**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| JOE HOLCOMBE, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 5:18-cv-555-XR |
| | ) *consolidated with* Nos. 5:18-cv-712-XR; |
| UNITED STATES OF AMERICA, | ) 5:18-cv-881-XR; 5:18-cv-944-XR; 5:18-cv- |
| | ) 949-XR; and 5:18-cv-951-XR |
| Defendant. | ) |
| | ) |
| _____ | ) |
| | ) |
| This document pertains to all cases | ) |
| _____ | ) |

<u>**DEFENDANT UNITED STATES OF AMERICA'S MOTION TO DISMISS**</u>

**JOSEPH H. HUNT**
Assistant Attorney General
Civil Division
**JOHN F. BASH**
United States Attorney
**THOMAS G. WARD**
Deputy Assistant Attorney General
Civil Division
**JOHN F. PANISZCZYN**
Assistant United States Attorney
State Bar No. 15443855
**JAMES G. TOUHEY, JR.**
Director, Torts Branch
Civil Division
**KIRSTEN L. WILKERSON**
Assistant Director, Torts Branch
Civil Division
**PAUL DAVID STERN**
Trial Attorney, Torts Branch
Civil Division
United States Department of Justice
**Attorneys for Defendant**
**UNITED STATES OF AMERICA**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... ii

STATEMENT ........................................................................................ 1

FACTUAL ALLEGATIONS ................................................................ 3

STATUTORY AND REGULATORY BACKGROUND ........................ 7

APPLICABLE LEGAL STANDARDS .................................................. 11

ARGUMENT ........................................................................................ 12

   Plaintiffs' Claims Must Be Dismissed for Lack of Subject Matter Jurisdiction Because They Are Not Actionable Under the FTCA ........................................................ 12

   I.   The FTCA Creates No Causes of Action for Violations of Federal Statutes or Regulation ........................................................................ 13

   II.  Under Texas Law A Private Person Would Not Be Liable To the Plaintiffs in Similar Circumstances ................................................................. 15

   III. The FTCA Misrepresentation Exception Independently Bars All The Plaintiffs' Claims ..................................................................... 26

   IV.  The Brady Act Itself Precludes Actions for Damages Based on The Failure of Federal Employees to Report Information to NICS ........................... 30

CONCLUSION ..................................................................................... 32

# **TABLE OF AUTHORITIES**

## **Cases**

*Abramski v. United States,*
    134 S. Ct. 2259 (2014) ................................................................................................ 7

*Acquisitions, LP v. United States,*
    224 F.3d 1260 (11th Cir. 2015) ................................................................................ 26

*Albuquerque v. Benson,*
    553 P.2d 1288 (N.M. Ct. App. 1976) ...................................................................... 15

*Alfonso v. United States,*
    752 F.3d 622 (5th Cir. 2014) .................................................................................... 30

*Art Metal—U.S.A., Inc. v. United States,*
    753 F.2d 1151 (D.C. Cir. 1985) ............................................................................... 14

*Baroni v. United States,*
    662 F.2d 287 (5th Cir. 1981) .................................................................................... 27

*Burnette v. Wahl,*
    588 P.2d 1105 (Or. 1978) ......................................................................................... 21

*Campos v. United States,*
    888 F.3d 724 (5th Cir. 2018) .................................................................................... 12

*Castro v. United States,*
    560 F.3d 381 (5th Cir. 2009) .................................................................................... 11

*Centeq Realty, Inc. v. Siegler,*
    899 S.W.2d 195 (Tex. 1995) .................................................................................... 16

*Commercial Union Ins. v. United States,*
    928 F.2d 176 (5th Cir. 1991) ........................................................................ 27, 28, 29

*Crider v. United States,*
    885 F.2d 294 (5th Cir. 1989) .............................................................................. 16, 18

*Dalehite v. United States,*
    346 U.S. 15 (1953) ............................................................................................. 2, 5, 6

*Dorking Genetics v. United States,*
    76 F.3d 1261 (2d Cir. 1996) ..................................................................................... 14

*FAA v. Cooper,*
    566 U.S. 284 (2012) ................................................................................................. 12

*FDIC v. Meyer,*
    510 U.S. 471 (1994) ............................................................................................ 12, 13

*George v. U.S. Dep't of Labor,*
    788 F.2d 1115 (5th Cir. 1986) ............................................................................ 11

*Graff v. Beard,*
    858 S.W.2d 918 (Tex. 1993) ................................................................................ 15

*Greater Hous. Transp. Co. v. Phillips,*
    801 S.W.2d 523 (Tex. 1990) ............................................................................... 16, 17

*Guidance Endodontics, LLC v. Dentsply Intern, Inc.,*
    749 F. Supp. 2d 1235 (D.N.M. 2010) .................................................................. 15

*Hornbeck Offshore Transp. LLC v. United States,*
    569 F.3d 506 (D.C. Cir. 2009) ............................................................................ 14

*In re FEMA Trailer Formaldehyde Prods. Liab. Litig.,*
    668 F.3d 281 (5th Cir. 2012) .............................................................................. 11, 13

*In re FEMA Trailer Formaldehyde Prods. Liab. Litig.,*
    713 F.3d 807 (5th Cir. 2013) .............................................................................. 26, 28

*Johnson v. Sawyer,*
    47 F.3d 716 (5th Cir. 1995) ................................................................................ 13, 14, 19

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
    511 U.S. 375 (1994) ............................................................................................ 11

*Lane v. Pena,*
    518 U.S. 187 (1996) ............................................................................................ 12

*Lawrence v. United States,*
    340 F.3d 952 (9th Cir. 2003) .............................................................................. 26, 27

*Life Partners Inc. v. United States,*
    650 F.3d 1026 (5th Cir. 2011) ............................................................................ 26, 28, 29

*Loram Maint. of Way, Inc. v. Ianni,*
    210 S.W.3d 593 (Tex. 2006) ............................................................................... 16, 17

*McNeily v. United States,*
    6 F.3d 343 (5th Cir. 1993) .................................................................................. 26

*Medina v. United States,*
    259 F.3d 220 (4th Cir. 2001) .............................................................................. 31

*Metro. Life Ins. Co. v. Atkins*,
    225 F.3d 510 (5th Cir. 2000) ................................................................ 28

*Nat'l Rifle Ass'n v. Reno*,
    216 F.3d 122 (D.C. Cir. 2000) ............................................................ 8, 9

*Nixon v. Mr. Prop. Mgmt. Co.*,
    690 S.W.2d 546 (Tex. 1985) ................................................................ 21

*Otis Eng'g v. Clark*,
    688 S.W.2d ............................................................................................ 21

*Otis Eng'g*,
    668 S.W.2d ............................................................................... 16, 17, 21

*Pack v. Crossroads, Inc.*,
    53 S.W.3d 492 (Tex. Ct. App. 2001) .................................................. 19

*Paul v. United States*,
    929 F.2d 1202 (7th Cir. 1991) ............................................................ 26

*Perry v. S.N.*,
    973 S.W.2d 301 (Tex. 1998) ....................................................... passim

*Rayonier, Inc. v. United States*,
    352 U.S. 315 (1957) ............................................................................. 14

*Richards v. United States*,
    369 U.S. 1 (1962) ........................................................................... 13, 15

*Ridgecrest Ret. & Healthcare v. Urban*,
    135 S.W.3d 757 (Tex. Ct. App. 2004) ................................................ 19

*Sanders v. United States*,
    324 F. Supp. 3d 636 (D.S.C. 2018) ..................................................... 31

*Sea Air Shuttle v. United States*,
    112 F.3d 532 (1st Cir. 1997) ............................................................... 14

*Sellfors v. United States*,
    697 F.2d 1362 (11th Cir. 1983) .......................................................... 13

*Smith v. Merritt*,
    940 S.W.2d 602 (Tex. 1997) ......................................................... 19, 20

*Smith v. United States*,
    507 U.S. 197 (1993) ............................................................................. 13

*St. Tammany Par. ex rel. Davis v. FEMA*,
    556 F.3d 307 (5th Cir. 2009) ................................................................... 12

*Terrazas v. Garland & Loman, Inc.*,
    142 P.3d 374 (N.M. Ct. App. 2006) ....................................................... 15

*Tindall v. United States*,
    901 F.2d 53 (5th Cir. 1990) ...................................................................... 14

*United States v. Argonics, Inc.*,
    164 F.3d 1343 (10th Cir. 1999) .............................................................. 14

*United States v. Giardina*,
    861 F.2d 1334 (5th Cir. 1988) ................................................................ 23

*United States v. McGowan*,
    469 F.3d 386 (5th Cir. 2006) ................................................................... 23

*United States v. Mitchell*,
    463 U.S. 206 (1983) ................................................................................. 12

*United States v. Neustadt*,
    366 U.S. 696 (1961) ................................................................................. 26

*United States v. Sherwood*,
    312 U.S. 584 (1941) ................................................................................. 12

*United States v. Smith*,
    324 F.2d 622 (5th Cir. 1963) ................................................................... 13

*Wentwood Woodside I, LP v. GMAC Commercial Mortg. Corp.*,
    419 F.3d 310 (5th Cir. 2005) ................................................................... 25

*Williams v. United States*,
    242 F.3d 169 (4th Cir. 2001) ................................................................... 14

*Williamson v. Tucker*,
    645 F.2d 404 (5th Cir. 1981) ................................................................... 12

*Willoughby v. United States ex rel. U.S. Dep't of the Army*,
    730 F.3d 476 (5th Cir. 2013) ................................................................... 13

*Zamora v. Smalley*,
    358 P.2d 362 (N.M. 1961) ...................................................................... 15

*Zelaya v. United States*,
    781 F.3d 1315 (11th Cir. 2015) .............................................................. 26

## Statutes

18 U.S.C. § 922 ...................................................................................... *passim*

28 U.S.C. § 2674 ...................................................................................... 14

28 U.S.C. § 2680(h) ............................................................................ 2, 26, 30

28 U.S.C. §§ 1346(b) .......................................................................... 1, 2, 15

34 U.S.C. § 40901 ........................................................................ 8, 9, 10, 23

42 U.S.C. § 4012a .................................................................................... 25

Pub. L. No. 103-159 ............................................................................ 7, 9, 11

Pub. L. No. 110-180 .................................................................................. 9

Pub. L. No. 115-141 .................................................................................. 9

## Rules and Regulations

28 C.F.R. § 25.2 ...................................................................................... 8

28 C.F.R. § 25.6 ...................................................................................... 8

Fed. R. Civ. P. 12(b)(2) ............................................................................ 11

## Other Authorities

UCMJ Article 128 .................................................................................... 5

*Public Wrong and Private Action,*
    27 HARV. L. REV. 317 (1914) ............................................................. 21

*The Application of Criminal Legislation to Negligence Cases:  A Reexamination,*
    23 SANTA CLARA L. REV. 427 (1983) .................................................. 21

**STATEMENT**

These consolidated wrongful death and personal injury actions were brought against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.* Each of the cases arises out of the horrific mass shooting perpetrated by former airman Devin Patrick Kelley at the First Baptist Church in Sutherland Springs, Texas, on Sunday, November 5, 2017. In all, Kelley killed 26 worshipers and injured at least 20 others. Kelley died of a self-inflicted gunshot wound after fleeing the scene of his crimes.

More than three years earlier, Kelley had been separated from the United States Air Force ("USAF") as part of a sentence imposed on him by a general court-martial after he pled guilty to assaulting his wife and young stepchild. Kelley was sentenced to confinement for 12 months, a reduction in rank, and a bad-conduct discharge from the USAF for these crimes.

The Plaintiffs in these actions include representatives of the estates and family members of several victims Kelley killed at the First Baptist Church, and several victims who were shot by Kelley but survived their wounds. The gist of the Plaintiffs' claims against the United States is that Kelley was able to carry out the attack at the church because employees of the USAF failed to report to the Attorney General that Kelley had been convicted of a crime punishable by a term of imprisonment in excess of one year and a misdemeanor crime of domestic violence (both of which disqualified Kelley under applicable Federal law from acquiring a firearm), that he had a history of domestic violence and stays in a mental health facility while in USAF, and that he had received a bad-conduct discharge from the USAF.

The Plaintiffs contend that the USAF's failure to report these items of information to the Attorney General violated various Federal statutes and regulations. They further contend that, as a result of the USAF's failure to communicate this information to the Attorney General, Kelley

was able to purchase several firearms following his separation from the USAF, and that he used one or more of these firearms to kill and wound his victims at the church on November 5, 2017.

The Plaintiffs understandably seek compensation for the unspeakably horrible losses they have suffered allegedly as a result of mistakes by the USAF.  In the FTCA, Congress "waived sovereign immunity from suit for certain specified torts of federal employees."  *Dalehite v. United States,* 346 U.S. 15, 17 (1953).  At the same time, however, Congress placed limits on the United States' waiver of its immunity, as well as on the scope of the United States' substantive liability.  The FTCA, therefore, does not "assure injured persons damages for all injuries caused by such employees."  *Id*.

The United States now moves to dismiss all the consolidated actions for lack of jurisdiction over the subject matter.  Insofar as the Plaintiffs seek recovery of damages from the United States for violations of Federal statutes or regulations that imposed reporting obligations on the USAF, their claims are not actionable under the FTCA.  Liability can be imposed on the United States under the FTCA only when "the law of the place" where the allegedly negligent or wrongful act or omission occurred (*i.e.* applicable State law), would impose liability on a private person in similar circumstances.  *See* 28 U.S.C. §§ 1346(b), 2674.

Texas generally imposes no actionable duty on a private person to protect another from a third party's criminal acts, and none of the narrowly circumscribed exceptions from this general no-duty rule are applicable in the circumstances presented in these cases.  Nor do the federal reporting statutes cited by the Plaintiffs furnish any basis for imposing liability upon the United States on a negligence *per se* theory under Texas law.

Furthermore, the FTCA's misrepresentation exception, 28 U.S.C. § 2680(h), which precludes the imposition of liability on the United States for any claim for harm arising out of the

failure to communicate information, independently bars all the Plaintiffs' claims in these actions, including but not limited to any claims the Plaintiffs might assert based on a negligent undertaking theory of liability.

Finally, the federal statute on which the Plaintiffs primarily base their claims (*i.e.,* the Brady Handgun Violence Prevention Act of 1993 ("the Brady Act")), expressly provides that no liability for damages may be imposed on employees of the Federal Government for failing to prevent the sale of a firearm to a person prohibited by law from receiving it.  *See* 18 U.S.C. § 922(t)(6)(A).  This statutory immunity also shields the United States from liability to the Plaintiffs in these cases.

## FACTUAL ALLEGATIONS[1]

In January 2010, Kelley entered active duty as an airman with the USAF.[2]  Kelley "had a long, troublesome history with the United States Air Force," which included letters of counseling and letters of reprimand being placed in his employment file.[3]  In 2011, Kelley married Tessa K.

---

[1] This recitation of factual allegations is taken primarily from the complaints in the six consolidated cases.  The parties were ordered to submit a list of agreed-upon facts at the status conference held in the cases on October 12, 2018.  *See* Order, ECF No. 18 (filed Sept. 30, 2018). In compliance with the Court's order, the Plaintiffs thereafter submitted to the Court a list of stipulated facts as to which the parties so far have been able to agree.  *See* Pls.' Status Conference Mem. at pp. 2-3, ECF No. 24 (filed Oct. 11, 2018).  Except for the stipulated facts listed therein, the United States accepts the truth of the Plaintiffs' factual allegations recited herein solely for purposes of the instant motion to dismiss.

[2] Pls.' Status Conference Mem., Stipulated Facts ¶ 1, ECF No. 24.

[3] McNulty Compl. ¶¶ 3.1-3.2; Vidal Compl. ¶¶ 3.1-3.2; Wall Compl. ¶¶ 3.1-3.2; *see generally* Uhl Compl. ¶ 17 (describing "long history of behavioral issues and generally poor performance during [Kelley's] tenure with the United States Air Force").

Lodge, who had an infant son from a previous marriage.[4]  They lived together in a home on

Holloman Air Force Base in Otero County, New Mexico.[5]  Reports surfaced that Kelley was

physically and mentally abusing his wife and stepson.[6]  An extensive investigation ensued.

Kelley eventually produced a video confessing to his wrongful conduct.[7]

          During the investigation, Kelley was admitted to Peak Behavioral Health Services, Inc.

(Peak), a mental health facility located in Santa Teresa, New Mexico.[8]  Plaintiffs allege that the

Air Force involuntarily committed Kelley to Peak "[a]s a result of Devin Kelley's work conduct,

threats made by Mr. Kelley and the domestic abuse of his wife and child."[9]  On June 7, 2012,

Devin Kelley escaped from Peak by jumping a fence.[10]  Kelley was found by Texas state law-

enforcement authorities later that same day.[11]  The following day, Kelley was placed into

---

[4] Pls.' Status Conference Mem., Stipulated Facts ¶ 2, ECF No. 24; *see also* Holcombe Compl. ¶ 33; Ramsey Compl. ¶ 33; McNulty Compl. ¶ 3.4; Vidal Compl. ¶ 3.4; Wall Compl. ¶ 3.4.

[5] McNulty Compl. ¶ 3.4; Vidal Compl. ¶ 3.4; Wall Compl. ¶ 3.4.

[6] McNulty Compl. ¶¶ 3.4-3.7; Vidal Compl. ¶¶ 3.4-3.7; Wall Compl. ¶¶ 3.4-3.7.

[7] McNulty Compl. ¶ 3.4; Vidal Compl. ¶ 3.4; Wall Compl. ¶ 3.4

[8] Holcombe Compl. ¶ 38; Ramsey Compl. ¶ 38.

[9] McNulty Compl. ¶ 3.8 (alleging the Government "ordered Kelley confined to Peak Behavioral Health Services"); Vidal Compl. ¶ 3.4 (same); Wall Compl. ¶ 3.4 (same); *see also* Holcombe Compl. ¶ 38; Ramsey Compl. ¶ 38; Uhl Compl. ¶ 20.

[10] Holcombe Compl. ¶ 39; Ramsey Compl. ¶ 39; McNulty Compl. ¶ 3.10; Vidal Compl. ¶ 3.10; Wall Compl. ¶ 3.10; Uhl Compl. ¶ 21.

[11] Ramsey Compl. ¶ 39; Holcombe Compl. ¶ 39; *see also* McNulty Compl. ¶ 3.10 (alleging the apprehension occurred the following day); Vidal Compl. ¶ 3.10 (same); Wall Compl. ¶ 3.10 (same); Uhl Compl. ¶ 21 (same).

confinement at the 49th Security Force Squadron confinement facility on the suspicion that he had violated Articles 86, 128, and 134 of the Uniform Code of Military Justice ("UCMJ").[12]

In July 2012, one charge and five specifications were preferred against Kelley.[13]  The charge consisted of one specification of assault consummated by a battery, two specifications of assault with a dangerous weapon, and two specifications of assault consummated by a battery against a child under the age of 16 years, all in violation of Article 128 of the UCMJ.[14]  In August 2012, the original charge, along with an additional charge of assault with a dangerous weapon, in violation of UCMJ Article 128, was referred to trial by general court-martial.[15]

In November 2012, as part of a plea agreement, Kelley pled guilty to two counts of assault in a general court-martial, in violation of UCMJ Article 128.[16]  Kelley was sentenced to confinement for twelve months, a bad-conduct discharge, and reduction in rank to E-1 (the lowest rank possible).[17]  Following his general court-martial, Kelly was transferred to confinement in a Navy brig in San Diego, California.[18]  Kelley and his wife divorced while he was confined in the Navy brig.[19]  In March 2013, after serving his sentence, Kelley was released

---

[12] Pls.' Status Conference Mem., Stipulated Facts ¶ 3, ECF No. 24.

[13] *Id.* ¶ 4.

[14] *Id.*

[15] *Id.* ¶ 5.

[16] *Id.* ¶ 6.

[17] *Id.* ¶ 7.

[18] Holcombe Compl. ¶ 19; Ramsey Compl. ¶ 18.

[19] Holcombe Compl. ¶ 36; Ramsey Compl. ¶ 36.

from confinement.[20]  In April 2014, a final action was taken on Kelley's bad-conduct

discharge.[21]  In May 2014, the Air Force discharged Kelley.[22]

    Between 2016 and 2017, Kelley purchased firearms in Colorado and Texas.[23]  In April

2016, Kelley entered Academy Sports & Outdoor in San Antonio, Texas, and purchased a Model

AR-556 rifle.[24]  On November 5, 2017, Devin Kelley entered the First Baptist Church of

Sutherland Springs in Sutherland Springs, Texas, and used the AR-556 rifle to kill 26 people and

wound at least 20 others.[25]  Kelley was "the perpetrator and sole shooter."[26]  As Kelley exited the

church, he was confronted by a bystander.[27]  They engaged in a gun battle before Kelley fled the

scene.[28]  As the bystander gave chase, Kelley's car veered off the road.[29]  With his vehicle in a

ditch, Kelley then used one of his firearms to commit suicide.[30]

---

[20] Pls.' Status Conference Mem., Stipulated Facts ¶ 8, ECF No. 24.

[21] *Id.*

[22] *Id.*

[23] *Id.* ¶ 10.

[24] Holcombe Compl. ¶ 20; Ramsey Compl. ¶ 19; McNulty Compl. ¶ 5.6; Vidal Compl. ¶ 5.6; Wall Compl. ¶ 5.6.

[25] Pls.' Status Conference Mem., Stipulated Facts ¶¶ 11-12, ECF No. 24; *see also* Holcombe Compl. ¶ 14; Ramsey Compl. ¶ 13; McNulty Compl. ¶ 6.1; Vidal Compl. ¶ 6.1; Wall Compl. ¶ 6.1; Uhl Compl. ¶ 15.

[26] Holcombe Compl. ¶ 15; Ramsey Compl. ¶ 14.

[27] Holcombe Compl. ¶ 16; Ramsey Compl. ¶ 15.

[28] Holcombe Compl. ¶ 16; Ramsey Compl. ¶ 15.

[29] Holcombe Compl. ¶ 17; Ramsey Compl. ¶ 16.

[30] Holcombe Compl. ¶ 17; Ramsey Compl. ¶ 16.

## STATUTORY AND REGULATORY BACKGROUND

The Gun Control Act of 1968, as amended, makes it unlawful for any person to knowingly transfer a firearm to certain classes of individuals, and also makes it unlawful for such individuals to receive a firearm. *See* 18 U.S.C. § 922(d), (g) & (n). Individuals prohibited by the statute from receiving a firearm include anyone who is under indictment for, or has been convicted in any court of, any crime punishable by a term of imprisonment exceeding one year (§ 922(g)(1) & (n)); has been adjudicated a mental defective or committed to any mental institution (§ 922(g)(4)); has been discharged from the Armed Forces under dishonorable conditions (§ 922(g)(6)); or has been convicted in any court of a misdemeanor crime of domestic violence (§ 922(g)(9)).

"The statute establishes a detailed scheme to enable [Federally licensed firearms] dealer[s] to verify, at the point of sale, whether a potential buyer may lawfully own a gun." *Abramski v. United States,* 134 S. Ct. 2259, 2263 (2014). Under 18 U.S.C. § 922(c), the would-be purchaser must, except in certain specified circumstances, appear in person on the dealer's business premises. *Id.* "Before completing any sale, the dealer must 'verif[y] the identity of the transferee by examining a valid identification document' bearing a photograph." *Id.* (quoting 18 U.S.C. § 922(t)(1)(C)) (alteration by Court). "In addition, the dealer must procure the buyer's 'name, age, and place of residence.'" *Id.* (quoting 18 U.S.C. § 922(b)(5)). "And finally, the dealer must . . . submit that background information to the National Instant Background Check System (NICS) to determine whether the potential purchaser is for any reason disqualified from owning a firearm." *Id.* (citing 18 U.S.C. § 922(t)(1)(A)-(B)).

NICS was established in 1998 pursuant to the provisions of the Brady Act. *See* Brady Handgun Violence Prevention Act of 1993, Pub. L. No. 103-159, § 103(b), 107 Stat. 1356, 1541

(1993) (codified at 34 U.S.C. § 40901(b)) (formerly 18 U.S.C. § 922 note) ("Not later than 60 months after November 30, 1993, the Attorney General shall establish a national instant criminal background investigation system that any licensee may contact, by telephone, for information, to be supplied immediately, on whether receipt of a firearm by a prospective transferee would violate section 922 of Title 18 or State law.").

"A computerized system operated by the FBI, the NICS searches for disqualifying information in three separate databases: (1) the 'NICS Index,' containing records on persons known to be disqualified from possessing firearms under federal law; (2) the 'National Crime Information Center,' containing records on protective orders, deported felons, and fugitives from justice; and (3) the 'Interstate Identification Index,' containing criminal history records." *Nat'l Rifle Ass'n v. Reno*, 216 F.3d 122, 125 (D.C. Cir. 2000).

Based on a search of the relevant databases, the Brady Act regulations authorize NICS to provide the dealer with one of three responses:

> (A) "Proceed" response, if no disqualifying information was found in the NICS Index, NCIC, or III.
> (B) "Delayed" response, if the NICS search finds a record that requires more research to determine whether the prospective transferee is disqualified from possessing a firearm by Federal or state law. A "Delayed" response to the [dealer] indicates that the firearm transfer should not proceed pending receipt of a follow up "Proceed" response from the NICS or the expiration of three business days (exclusive of the day on which the query is made), whichever occurs first . . . .
> (C) "Denied" response, when at least one matching record is found in either the NICS Index, NCIC, or III that provides information demonstrating that receipt of a firearm by the prospective transferee would violate 18 U.S.C. 922 or state law . . . .

*28 C.F.R. § 25.6(c)(1)(iv)(A)-(C); see also* 28 C.F.R. § 25.2 (defining "Proceed" to mean "a NICS response indicating that the information available to the system at the time of the response did not demonstrate that transfer of the firearm would violate federal or state law").

The Brady Act also authorized the Attorney General to "secure directly from any

department or agency of the United States such information on persons for whom receipt of a firearm would violate subsection (g) or (n) of section 922 of title 18, United States Code or State law, as is necessary to permit the system [(*i.e.,* NICS)] to operate in accordance with this section."  Brady Handgun Violence Prevention Act of 1993, Pub. L. No. 103-159 § 103(e)(1), 107 Stat. at 1542(1993) (codified as amended at 34 U.S.C. § 40901(e)(1)(A)) (formerly 18 U.S.C. § 922 note).  The statute further provided that "[o]n request of the Attorney General, the head of such department or agency shall furnish such information to the system."  *Id*. (codified as amended at 34 U.S.C. § 40901(e)(1)(B)) (formerly 18 U.S.C. § 922 note).

The NICS Improvement Amendments Act of 2007 ("NIAA") amended the Brady Act to enhance the requirement that Federal departments and agencies provide relevant information to NICS concerning persons whose receipt of a firearm would be unlawful.  *See* NICS Improvement Amendments Act of 2007, Pub. L. No. 110-180, § 101(a)(1)(A)(2) & (B)(3), 121 Stat. 2561 (2008) (codified at 34 U.S.C. § 40901(e)(1)(B)) (formerly 18 U.S.C. § 922 note) ("On request of the Attorney General, the head of such department or agency shall furnish electronic versions of the information described under subparagraph (A) to the system."); *id*. § 101(a)(1)(4)(C) (codified at 34 U.S.C. § 40901(e)(1)(C)) (formerly 18 U.S.C. § 922 note) ("If a Federal department or agency under subparagraph (A) has any record of a person demonstrating that the person falls within one of the categories described in subsection (g) or (n) of section 922 of Title 18, the head of such department or agency shall, not less frequently than quarterly, provide the relevant information contained in such record to the Attorney General.") (formerly 18 U.S.C. § 922 note).

In the wake of the tragic events that gave rise to the instant litigation, Congress enacted the Fix NICS Act of 2018 ("Fix NICS Act").  *See* Fix NICS Act of 2018, Pub. L. No. 115-141,

Div. S, Title VI (2018) (codified in part at 34 U.S.C. § 40901(e)(1)(F) through (K)).  The Fix

NICS Act requires each Federal department or agency to certify twice per year that it is in

compliance with the records submission requirements imposed by 34 U.S.C. § 40901(e)(1)(C),

and to establish and biennially update, if necessary, an implementation plan to ensure maximum

coordination and reporting of records, including annual benchmarks, qualitative goals and

quantitative measures, needs, and estimated compliance costs.  34 U.S.C. § 40901(e)(1)(F) &

(G).

 The Fix NICS Act further requires the Attorney General to make compliance

determinations based on each agency's implementation plan, and holds Federal agencies

accountable for failing to transmit records by requiring the Attorney General to publish on the

Department of Justice's website and report to Congress the status of any agency that has failed to

submit the required certification or failed to comply with its implementation plan.  *Id*. §

40901(e)(1)(G) & (H).

 The Fix NICS Act also prescribes penalties for a Federal department's or agency's

noncompliance with the statute's certification and record submission requirements:

> For each of fiscal years 2019 through 2022, each political appointee of a Federal
> department or agency that has failed to certify compliance with the record
> submission requirements under subparagraph (C), and is not in substantial
> compliance with an implementation plan established under subparagraph (G),
> shall not be eligible for the receipt of bonus pay, excluding overtime pay, until the
> department or agency—
> > (i) certifies compliance with the record submission requirements
> > under subparagraph (C); or
> > (ii) achieves substantial compliance with an implementation plan
> > established under subparagraph (G).

*Id*. § 40901(e)(1)(I).

 Finally, the Fix NICS Act leaves in place the provision of the Brady Act which precludes

the award of damages against Federal employees (and certain others) who are responsible for

providing information to NICS in the event that an action at law is brought against them for failing to prevent the sale or transfer of a firearm to a person whose receipt or possession of the firearm is unlawful under 18 U.S.C. § 922:

> Neither a local government nor an employee of the Federal Government or of any State or local government, responsible for providing information to the national instant criminal background check system shall be liable in an action at law for damages—
> (A) for failure to prevent the sale or transfer of a firearm to a person whose receipt or possession of a firearm is unlawful under the section; or
> (B) for preventing such a sale or transfer to a person who may lawfully receive or possess a firearm.

Brady Handgun Violence Prevention Act of 1993, Pub. L. No. 103-159, § 102(b), 107 Stat. 1541 (1993) (codified at 18 U.S.C. § 922(t)(6)).

## APPLICABLE LEGAL STANDARDS[31]

"A Rule 12(b)(1) motion to dismiss challenges the subject-matter jurisdiction of the federal court." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) ("*FEMA Trailer I*"). "Plaintiffs bear the burden of establishing subject-matter jurisdiction." *Id.* (citing *Castro v. United States,* 560 F.3d 381, 386 (5th Cir. 2009), *vacated on other grounds,* 608 F.3d 266 (5th Cir. 2010)). "Federal courts are courts of limited jurisdiction; without jurisdiction conferred by statute, they lack the power to adjudicate claims." *Id.* (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

---

[31] To date, in two of the six consolidated cases (*Ramsey v. United States*, Case No. 5:18-cv-00944; *Uhl v. United States*, Case No. 5:18-cv-00881), service of process has not been properly effected against the United States Attorney General or the United States Attorney's Office for the Western District of Texas. Absent proper service, this Court lacks personal jurisdiction over the United States. Dismissal for lack of personal jurisdiction over the United States due to insufficient service of process would be pursuant to Federal Rule of Civil Procedure 12(b)(2). *See George v. U.S. Dep't of Labor*, 788 F.2d 1115 (5th Cir. 1986) (The district court enjoys a broad discretion in determining whether to dismiss an action for ineffective service of process . . . .").

"In resolving a motion under Rule 12(b)(1), the district court 'has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Campos v. United States*, 888 F.3d 724, 729 (5th Cir. 2018) (quoting *St. Tammany Par. ex rel. Davis v. FEMA*, 556 F.3d 307, 315 (5th Cir. 2009) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

## ARGUMENT

### PLAINTIFFS' CLAIMS MUST BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION BECAUSE THEY ARE NOT ACTIONABLE UNDER THE FTCA

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). "Sovereign immunity is jurisdictional in nature." *Id*. "Indeed, the 'terms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *Id*. (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)); *see also United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite to jurisdiction").

"A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (citations omitted). "Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Id*. "Any ambiguities in the statutory language are to be construed in favor of immunity, so that the Government's consent to be sued is never enlarged beyond what a fair reading of the text requires." *FAA v. Cooper*, 566 U.S. 284, 290 (2012) (citations omitted).

**I.    THE FTCA CREATES NO CAUSES OF ACTION FOR VIOLATIONS OF FEDERAL STATUTES OR REGULATION**

"The Federal Tort Claims Act ("FTCA") is the exclusive remedy for suits against the United States or its agencies sounding in tort." *Willoughby v. United States ex rel. U.S. Dep't of the Army*, 730 F.3d 476, 479 (5th Cir. 2013).  In what has been referred to as its "principal provision," *Richards v. United States*, 369 U.S. 1, 6 (1962), the FTCA "waives the sovereign immunity of the United States for certain torts committed by federal employees 'under circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place where the act or omission occurred.*'"  *Smith v. United States*, 507 U.S. 197, 201 (1993) (quoting 28 U.S.C. § 1346(b)) (italics added by the Court). "[B]y its terms, this section is more than a choice-of-law provision:  It delineates the scope of the United States' waiver of sovereign immunity." *Id*.

"A claim comes within this jurisdictional grant—and thus is 'cognizable' under § 1346(b)—if it is actionable under § 1346(b)."  *FDIC v. Meyer*, 510 U.S. at 477.  "[T]o be actionable under § 1346(b), a claim must allege, *inter alia,* that the United States 'would be liable to the claimant' as 'a private person' 'in accordance with the law of the place where the act or omission occurred.'"  *Id*.  "[Section] 1346(b)'s reference to the 'law of the place' means law of the State—the source of substantive liability under the FTCA."  *Id*. at 478; *see also FEMA Trailer I*, 668 F.3d at 287 ("The 'law of the place where the act or omission occurred' refers exclusively to state law.").

"It follows, of course, and has consistently been held, that 'the FTCA was not intended to redress breaches of federal statutory duties.'"  *Johnson v. Sawyer*, 47 F.3d 716, 727 (5th Cir. 1995) (en banc) (quoting *Sellfors v. United States*, 697 F.2d 1362, 1365 (11th Cir. 1983)).  *See also United States v. Smith*, 324 F.2d 622, 624-25 (5th Cir. 1963) (the FTCA "simply cannot

-13-

apply where the claimed negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs", and is unavailable where "[t]he existence or nonexistence of the claim . . .depends entirely upon Federal statutes"), quoted with approval in *Johnson v. Sawyer*, 47 F.3d at 727; *Hornbeck Offshore Transp. LLC v. United States*, 569 F.3d 506, 509 (D.C. Cir. 2009) (citing *Johnson v. Sawyer*); *Williams v. United States,* 242 F.3d 169, 173 (4th Cir. 2001) (same); *United States v. Argonics, Inc.*, 164 F.3d 1343, 1345 (10th Cir. 1999) (same); *Sea Air Shuttle v. United States*, 112 F.3d 532, 536 (1st Cir. 1997) (same). Likewise, "a federal regulation cannot establish a duty owed to the plaintiff under state law." *Tindall v. United States*, 901 F.2d 53, 56 n.8 (5th Cir. 1990), *quoted with approval by Johnson v. Sawyer*, 47 F.3d at 727.

Thus, "it is a 'well-established principle that the violation of a federal statute or regulation by a government official does not itself create a cause of action under the FTCA.'" *Hornbeck Offshore Transp. LLC v. United States*, 569 F.3d at 509 (quoting *Art Metal—U.S.A., Inc. v. United States*, 753 F.2d 1151, 1157 (D.C. Cir. 1985)); *see also Dorking Genetics v. United States*, 76 F.3d 1261, 1266 (2d Cir. 1996) ("The FTCA does not create new causes of action, but only waives immunity under circumstances that would create liability 'in the same manner and to the same extent as a private individual under like circumstances.'" (quoting 28 U.S.C. § 2674)).  "[T]he test established by the Tort Claims Act for determining the United States' liability is whether a private person would be responsible for similar negligence under the law of the State where the acts occurred."  *Rayonier, Inc. v. United States*, 352 U.S. 315, 319 (1957).

Therefore, insofar as the Plaintiffs seek recovery of damages from the United States for violations of Federal statutes or regulations that imposed reporting obligations on the USAF,

-14-

their claims are not actionable under the FTCA.  The FTCA does not waive the Federal

Government's sovereign immunity for claims based on violations of the federal statutes or

regulations on which the Plaintiffs base their claims.  To the contrary, the FTCA expressly

provides that the United States can be held liable only in accordance with applicable local tort

law.  *See* 28 U.S.C. § 1346(b).  Accordingly, the Plaintiffs' claims against the United States are

actionable under the FTCA only to the extent that a private person would be liable under Texas

law in similar circumstances.[32]

## II.   UNDER TEXAS LAW A PRIVATE PERSON WOULD NOT BE LIABLE TO THE PLAINTIFFS IN SIMILAR CIRCUMSTANCES

### A.  Generally, There Is No Legal Duty Under Texas Law To Protect Another From The Criminal Acts Of A Third Party

Under Texas law, the threshold inquiry in any negligence case is whether the defendant

owes a legal duty to the plaintiff.  *See Graff v. Beard*, 858 S.W.2d 918, 919 (Tex. 1993) ("It is

fundamental that the existence of a legally cognizable duty is a prerequisite to all tort liability.");

---

[32] The FTCA "requires application of the whole law of the State where the act or omission occurred," *Richards v. United States*, 369 U.S. at 11, including that State's choice-of-law rules.  At the time of his arrest and court martial, Kelley was stationed at Holloman Air Force Base in Otero County, New Mexico.  Thus, the alleged acts or omissions at issue in these cases—namely, the USAF's failure to report information about Kelley's court-martial conviction to the FBI—occurred in New Mexico.  For tort actions, "New Mexico courts follow the doctrine of *lex loci delicti commissi*—that is, the substantive rights of the parties are governed by the law of the place where the wrong occurred."  *Guidance Endodontics, LLC v. Dentsply Intern, Inc.*, 749 F. Supp. 2d 1235, 1258 (D.N.M. 2010) (quoting *Terrazas v. Garland & Loman, Inc.*, 142 P.3d 374, 377 (N.M. Ct. App. 2006)).  "The *lex loci delicti* rule defines the state where the wrong occurred as 'the state where the last event necessary to make an actor liable for an alleged tort takes place.'"  *Guidance Endodontics*, 749 F. Supp. 2d at 1258 (quoting *Zamora v. Smalley*, 358 P.2d 362, 363 (N.M. 1961)).  The doctrine is also referred to as "the law of the State of injury." *Guidance Endodontics*, 749 F. Supp. 2d at 1258 (quoting *First Nat'l Bank in Albuquerque v. Benson*, 553 P.2d 1288, 1289 (N.M. Ct. App. 1976)).  Here, Texas was the place of the injury and where the last critical event occurred.  Accordingly, under New Mexico's choice-of-law rules Texas substantive law governs these actions.

-15-

*Perry v. S.N.*, 973 S.W.2d 301, 304 (Tex. 1998); *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195,

197 (Tex. 1995); *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).

Generally, there is no legal duty under Texas law to protect another from the criminal

acts of a third party.  *See Perry*, 973 S.W.2d at 306 ("At common law there is generally no duty

to protect another from the criminal acts of a third party or to come to the aid of another in

distress."); *Centeq Realty, Inc.*, 899 S.W.2d at 197 (same); *see also Greater Houston Transp.*

*Co.,* 801 S.W.2d at 525 ("Generally, there is no duty to control the conduct of third persons.");

*Crider v. United States,* 885 F.2d 294, 298 (5th Cir. 1989) ("The Texas Supreme Court [has]

recognized that as a general rule a person is under no duty to control the conduct of another, even

if he has the practical ability to exercise such control.").

### B.  None of the Established Exceptions from Texas's General No-Duty Rule Are Applicable in These Cases

"This general rule does not apply when a special relationship exists between the actor and

the third party which imposes a duty upon the actor to control the third person's conduct."

*Greater Houston Transp. Co.*, 801 S.W.2d at 525 (citing *Otis Eng'g Corp. v. Clark*, 668 S.W.2d

307, 309 (Tex. 1983); RESTATEMENT (SECOND) OF TORTS § 315(a) (1965)).  "For instance, the

master-servant relationship may give rise to a duty on the part of the master to control the

conduct of his servants outside the scope of employment."  *Otis Eng'g*, 668 S.W.2d 307, 309

(Tex. 1983).  "But it is a narrow duty; typically an 'employer is liable only for the off-duty torts

of his employees which are committed on the employer's premises or with the employer's

chattels."  *Loram Maint. of Way, Inc. v. Ianni*, 210 S.W.3d 593, 596 (Tex. 2006) (quoting *Otis*

*Eng'g*, 668 S.W.2d at 309.

In addition, "when, because of an employee's incapacity, an employer exercises control

over the employee, the employer has a duty to take such action as a reasonably prudent employer

-16-

under the same or similar circumstances would take to prevent the employee from causing an unreasonable risk of harm to others." *Id.* (quoting *Otis Eng'g*, 668 S.W.2d at 309, citing without adopting RESTATEMENT (SECOND) OF TORTS § 319 (1965) ("One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.")).

In order for such a duty to arise, however, "the employer must affirmatively exercise control over the incapacitated employee." *Ianni*, 210 S.W.3d at 597 (citing *Otis Eng'g*, 668 S.W.2d at 309, 311). "Once affirmative action has been taken for the benefit of another, the employer has a duty to act with reasonable care, even if the employer initially had no duty to act." *Id.* "Thus, while an employer owes no duty to act to control the conduct of an impaired off-duty employee, if the employer does decide to act, its duty is 'to avoid any affirmative act which might worsen the situation.'" *Id.* (quoting *Otis Eng'g*, 668 S.W.2d at 309).

Thus, in *Otis Engineering Corp. v. Clark*, the Texas Supreme Court held that liability could be imposed on an employer where, having become aware that an employee had drank himself into a state of extreme intoxication while at work, one of the employer's supervisors accompanied the inebriated employee to his vehicle and suggested he drive himself home. While driving home, the employee caused the fatal accident which resulted in the deaths of the plaintiffs' wives.

As the Texas Supreme Court has since recognized, critical to its decision in *Otis Engineering* was the fact that the employer "had made the situation worse" by "suggesting [the intoxicated employee] drive home." *Ianni*, 210 S.W.3d at 597; *see also Greater Houston Transp. Co.*, 801 S.W.2d at 526 (explaining that in *Otis Engineering* the employer had

-17-

"suggested the employee go home and escorted him to the parking lot," thereby "creat[ing] an unreasonable and foreseeable risk of harm to others"); *Crider v. United States*, 885 F.2d at 298 (noting that the employer-employee relationship and the employer's "affirmative act" in sending the employee home while intoxicated both were critical factors to the imposition of the duty in *Otis Engineering*).

Here, unlike the situation presented in *Otis Engineering,* no employment relationship existed between the USAF and Kelley at the time Kelley perpetrated the mass shooting at the First Baptist Church.  Instead, Kelley had been separated from the USAF more than three years earlier.  Thus, any duty United States arguably owed to exercise control over Kelley ended once Kelley was discharged from the USAF.  Moreover, Kelley did not perpetrate the mass shooting on premises that were controlled by the USAF, and did not use firearms belonging to the USAF to carry it out.  Finally, the USAF's failure to report Kelley's conviction, commitment, or bad-conduct discharge to the Attorney General constituted nothing more than inaction, rather than an "affirmative act" like the supervisor's suggestion that the inebriated employee drive himself home upon which the Texas Supreme Court predicated the imposition of a tort duty on the employer in *Otis Engineering*.  *See Perry*, 973 S.W.2d at 306 (characterizing defendants' failure to report child abuse they had witnessed being committed by third parties at a child care center as "inaction rather than action," and concluding "it did not fall within any of the established exceptions" to Texas's general no-duty rule).

### C.  Liability Cannot Be Imposed for Violations of Federal Reporting Statutes under Texas' Negligence *Per Se* Doctrine

The fact that the USAF may have been statutorily required to report information concerning Kelley's conviction, commitment, or bad-conduct discharge to the Attorney General furnishes no basis for imposing liability on the United States under the negligence *per se*

doctrine.  *See Johnson v. Sawyer*, 47 F.3d at 729 ("Where a claim is wholly grounded on a duty imposed on an allegedly violated federal statute or regulation merely on the basis of a general state doctrine of negligence *per se*, without requiring that there be some specific basis for concluding that similar conduct by private persons would be actionable under state law, is to in essence discriminate against the United States:  recovery against it is allowed, although for similar conduct the private person or entity would not be subject to liability under state law. Plainly, the FTCA waiver of sovereign immunity does not go so far.")

Under Texas law, only the violation of "a penal statute" can give rise to negligence *per se*.  *Smith v. Merritt*, 940 S.W.2d 602, 607 (Tex. 1997); *see also Perry*, 973 S.W.2d at 304-07; *Ridgecrest Ret. & Healthcare v. Urban*, 135 S.W.3d 757, 762 (Tex. Ct. App. 2004) ("A violation of a non-penal administrative code statute does not establish a negligence per se claim.").  "A 'penal statute' is one that defines a criminal offense and specifies a corresponding fine, penalty or punishment."  *Pack v. Crossroads, Inc.*, 53 S.W.3d 492, 509 (Tex. Ct. App. 2001).

None of the federal reporting statutes cited by the Plaintiffs makes a federal department or agency's failure to report information to the Attorney General a criminal offense and specifies a corresponding fine, penalty, or punishment.  Thus, violations of these statutes cannot serve as a basis for a negligence *per se* claim under Texas law.

Moreover, even if the non-penal nature of the federal reporting statutes cited by the Plaintiffs were to be ignored, in analogous circumstances the Texas Supreme Court has held that private persons who violate a penal statute requiring the reporting of a third party's criminal conduct cannot be held liable to the third party's victims under the negligence *per se* doctrine. *See Perry*, 973 S.W.2d at 306-09.

-19-

As noted already, the defendants in *Perry* allegedly had witnessed the abuse of children at a day-care center, but failed to report what they had seen to the authorities as required by a provision of Texas's Family Code, which made the knowing failure to report such abuse itself a criminal offense.  Noting that the plaintiffs—children who had been abused at the center—were within the class of persons whom the statute was meant to protect, the court held that this fact did not end its inquiry as to whether the negligence *per se* doctrine was applicable.  *See id.* at 305 ("The Court must still determine whether it is appropriate to impose tort liability for violations of the statute.") (citing *Smith v. Merritt*, 940 S.W.2d at 607).

The Court identified five factors to be considered in determining whether the negligence *per se* doctrine should be applied to private persons who violated the Family Code's reporting provisions would be inappropriate.  *See Perry*, 973 S.W.2d at 306-09.  As summarized by the Court, the following five factors were relevant to this determination:

> (1) [W]hether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common law duty; (2) whether the statute puts the public on notice by clearly defining the required conduct; (3) whether the statute would impose liability without fault; (4) whether negligence per se would result in ruinous damages disproportionate to the seriousness of the statutory violation, particularly if the liability would fall on a broad and wide range of collateral wrongdoers; and (5) whether the plaintiffs injury is a direct or indirect result of the violation of the statute.

*Id.* at 309.

As demonstrated below, all five of the relevant factors identified by *Perry* weigh against adopting negligence *per se* to violations of the Federal reporting statutes at issue in these cases. The Court in *Perry* "first consider[ed] the fact that, absent a change in the common law, a negligence per se cause of action against these defendants would derive the element of duty solely from the Family Code."  *Id.*  The Court explained that this was so because (as in the instant cases) at common law there generally is no duty to protect another from the criminal acts

-20-

of a third party or to come to the aid of another in distress, and that none of the established

exceptions to the general no-duty rule were applicable. *Id.* (citing, *inter alia*, *Otis Eng'g v.*

*Clark*, 688 S.W.2d at 309).

On this basis, the Court distinguished the case before it from those in which the actor

already owed a common-law duty of reasonable care to others, and the criminal statute at issue

was applied merely to determine whether the actor's conduct was unreasonable.  Where (as in

the case before it, and in the instant cases), however, the actor owes no common-law duty of

reasonable care to others, "recognizing a new, purely statutory duty 'can have an extreme effect

upon the common law of negligence' when it allows a cause of action where the common law

would not." *Id.* (quoting David P. Leonard, *The Application of Criminal Legislation to*

*Negligence Cases:  A Reexamination*, 23 S\ANTA C\LARA L. R\EV. 427, 449 n.92 (1983)).

"In such a situation, applying negligence per se 'bring[s] into existence a new type of tort

liability.'" *Perry,* 973 S.W.2d at 306 (quoting *Burnette v. Wahl*, 588 P.2d 1105, 1109 (Or.

1978)).  "The change tends to be especially great when, as here, the statute criminalizes inaction

rather than action." *Perry*, 973 S.W.2d at 306 (citing *Otis Eng'g*, 668 S.W.2d at 309; 3 Fowler v.

Harper, *et al.,* T\HE L\AW OF T\ORTS § 18.6 (2d ed. 1986); W. Page Keeton, et al., P\ROSSER &

K\EETON ON THE L\AW OF T\ORTS § 56, at 373-77 (5th ed. 1984); Ezra Ripley Thayer, *Public*

*Wrong and Private Action,* 27 H\ARV. L. R\EV. 317 (1914) (all discussing traditional tort law

distinction between misfeasance and nonfeasance)).

Noting that it had created a new tort-law duty by applying the negligence *per se* doctrine

just once before, *see Perry,* 973 S.W.2d at 306-07 (citing *Nixon v. Mr. Prop. Mgmt. Co.,* 690

S.W.2d 546, 549 (Tex. 1985)), the Court concluded that the absence of a relevant common-law

duty should be taken into consideration in determining whether to apply the negligence *per se*

doctrine to violations of the statute at issue.  *See Perry,* 973 S.W.2d at 307 ("Thus, based on both this Court's past practice and the observations of noted scholars, we conclude that the absence of a relevant common-law duty should be considered in deciding whether to apply negligence per se to the Family Code's reporting provision.").

Here, likewise, the United States owed no common-law duty to protect others from Kelley's criminal acts, and (as already noted) none of the established exceptions to this general no-duty rule are applicable in these cases.  Thus, applying the negligence *per se* doctrine here would establish a new type of tort liability, effecting a change that would be especially great because the new tort liability would be predicated on inaction or nonfeasance on the part of employees of the Federal Government (*i.e.,* the failure to report information to the Attorney General).  As in *Perry* itself, this factor clearly militates against applying the negligence *per se* doctrine in these cases.

With regard to the question of notice, which was the second factor the Court considered in *Perry,* the relevant inquiry is not whether, in the specific circumstances presented in these cases, the statute required the USAF to report information concerning Kelley to the Attorney General, but instead should focus on the full range of circumstances in which the statute imposes reporting requirements on Federal departments and agencies.  *See Perry,* 973 S.W.2d at 307-08 (noting that there was no question in the case before the Court that the defendants were required by the Family Code to report the child abuse they had observed occurring at the day-care center, but holding that other circumstances that might arise would present "difficult judgment calls" where "the statute does not clearly define what conduct is required in many conceivable situations").

The reporting requirement under the Brady Act is triggered whenever a Federal department or agency "has any record of any person demonstrating that the person falls within one of the categories described in subsection (g) or (n) of title 18, United States Code," in which event the statute provides that "the head of such department or agency shall, not less frequently than quarterly, provide the pertinent information contained in such record to the Attorney General."  34 U.S.C. § 40901(e)(1)(C).

Determining whether a record "demonstrat[es] that the person" to whom the record pertains falls within one of the categories of individuals described by 18 U.S.C. § 922(g) & (n) frequently can involve difficult judgment calls, at least with regard to certain of those categories. *See, e.g., United States v. McGowan,* 469 F.3d 386, 392 n.7 (5th Cir. 2006) (construing 18 U.S.C. § 922(g)(3) to require regularity of usage of a controlled substance over an extended period, contemporaneous with possession or receipt of a firearm); *United States v. Giardina,* 861 F.2d 1334, 1336-37 (5th Cir. 1988) (construing 18 U.S.C. § 922(g)(4) to exclude emergency involuntary hospitalization of individual for observation).  Thus, as in *Perry*, this factor also counsels against the adoption of negligence *per se* liability here because whether reporting is statutorily required sometimes is unclear.

The third *Perry* factor, "whether applying negligence per se to the reporting statute would create liability without fault," 973 S.W.2d at 308, likewise weighs heavily against adopting negligence *per se* in these cases.  In *Perry,* the Court concluded that this factor actually weighed in favor of imposing civil liability in the case before it because the Family Code criminalized only the "knowing[ ]" failure to report child abuse.  *Id.*  Here, unlike the Family Code reporting provision at issue in *Perry,* the Brady Act contains no language providing that the statute is violated only by a "knowing" failure to report information to the Attorney General.  Predicating

-23-

negligence *per se* on violations of such a statutory duty would result in the creation of liability without fault.

Similarly, the fourth *Perry* factor, "whether negligence per se would impose ruinous liability disproportionate to the seriousness of the defendant's conduct," *id*. at 308, also militates against adopting negligence *per se* based on violations of the reporting requirements imposed on federal departments and agencies by the Brady Act as amended by the NIAA. In *Perry*, the Court held that the failure to report child abuse should not be equated with child abuse itself, and noted that the latter offense always constituted a felony, while the failure to report it constituted no more than a misdemeanor. *Id*. at 308 ("Through its penal laws, the Legislature has expressed a judgment that abuse and nonreporting deserve very different legal consequences.").

The contrast is even starker in these cases than it was in *Perry*. Obviously, the conduct of an individual who uses a firearm which it is unlawful for him to possess to commit violent crimes (here, to kill 26 people and to wound at least 20 more) is far more culpable than the failure of a federal department or agency to report information to the Attorney General regarding whether it would be unlawful for the individual to receive a firearm, a failure which is not a criminal offense at all.

The fifth and last *Perry* factor, "whether the injury resulted directly or indirectly from the violation of the statute," 973 S.W.2d at 308, like all the others, also counsels against adopting negligence *per se* liability based on violations of the reporting statutes at issue in these cases. As the Court noted in *Perry*, while lack of direct causation is not itself dispositive, "a reporting statute by definition places a *fourth* party between the defendant and the plaintiff: the person or agency to whom the defendant is required to make the report." *Id*. As the Court noted, the imposition of liability for violation of such a reporting statute would be unprecedented. *See id.*

("We are not aware of any Texas case applying negligence per se to a statute that, like the child abuse reporting provision, interposes not one but two independent actors between the plaintiff and the defendant.").

Finally, one additional factor, not considered by the Court in *Perry* because the statute at issue there was one adopted by the Texas Legislature, rather than by Congress, also is relevant here since the Plaintiffs base their claims in these cases on alleged violations of *federal* reporting statutes.  Congress obviously would have been reluctant to establish the reporting requirements imposed by these statutes if it believed that by doing so it was exposing the United States to potentially enormous tort liability every time a prohibited person was able acquire as a result of a federal department or agency's failure to report disqualifying information to the Attorney General, and the person subsequently used the firearm to commit a crime.

Indeed, in passing the Brady Act, Congress expressly precluded damages actions against Federal employees for failing to prevent the sale or transfer of a firearm to a prohibited person. *See* 18 U.S.C. § 922(t)(6)(A).  This provision of the Brady Act represents a clear expression by Congress of its unwillingness to allow potentially enormous tort liability to be imposed any time an employee of the Federal Government fails to prevent the sale of firearms to a prohibited individual.  The Texas Supreme Court would respect this legislative judgment, and decline to create any new tort duty under the negligence *per se* doctrine for violations by Federal departments and agencies of their statutory reporting obligations under the Brady Act.  *See Wentwood Woodside I, LP v. GMAC Commercial Mortg. Corp.*, 419 F.3d 310, 323 (5th Cir. 2005) (because there is no federal private right of action under the federal Flood Disaster Protection Act of 1973, 42 U.S.C. § 4012a, the Texas Supreme Court would decline to create one under Texas law based on negligence *per se* doctrine).

### III.   THE FTCA MISREPRESENTATION EXCEPTION INDEPENDENTLY BARS ALL THE PLAINTIFFS' CLAIMS

In any event, the Plaintiffs' action must be dismissed pursuant to the FTCA's misrepresentation exception because the government's failure to communicate information was a vital link between the alleged negligence of Federal employees and the injury.  Any claim arising out of "misrepresentation" is expressly excluded from the FTCA's waiver of sovereign immunity by 28 U.S.C. § 2680(h).  This exception encompasses negligent as well as deliberate misrepresentations.  *United States v. Neustadt*, 366 U.S. 696, 702, 704 (1961); *Life Partners Inc. v. United States*, 650 F.3d 1026, 1031 (5th Cir. 2011); *McNeily v. United States*, 6 F.3d 343, 347 (5th Cir. 1993).  Both affirmative misstatements and omissions of material fact are equally protected.  *McNeily*, 6 F.3d at 347 (citing *Paul v. United States*, 929 F.2d 1202 (7th Cir. 1991)); *In re FEMA Trailer Formaldehyde Prods. Liab. Litig*., 713 F.3d 807, 812 (5th Cir. 2013) ("*FEMA Trailer II*").

The exception is broad and covers any claim arising out of the "communication of (or failure to communicate) information."  *Life Partners Inc*., 650 F.3d at 1032; *see also Lawrence v. United States*, 340 F.3d 952, 958 (9th Cir. 2003) ("The misrepresentation exception shields government employees from tort liability for failure to communicate information, whether negligent, or intentional."); *Zelaya v. United States*, 781 F.3d 1315, 1334 (11th Cir. 2015) ("[M]iscommunication and non-communication yield the same result for purposes of the misrepresentation exception, because the misrepresentation exception 'encompasses failure to communicate as well as miscommunication.'") (quoting *JPL Acquisitions, LP v. United States*, 224 F.3d 1260, 1265 n.3 (11th Cir. 2015)).

When applicable, moreover, the misrepresentation exception bars claims not only for financial injury, but also bodily harm.  *See, e.g., FEMA Trailer II*, 713 F.3d at 809-10

(misrepresentation exception barred plaintiffs' claims for exposure to formaldehyde based on FEMA's alleged material omissions of fact concerning exposure risk to evacuees temporarily housed in trailers after Hurricanes Katrina and Rita); *Commercial Union Ins. v. United States*, 928 F.2d 176, 179-80 (5th Cir. 1991) (misrepresentation exception barred insurers' contribution and indemnity claims based on United States Bureau of Mines' publication of report approving design of respirators furnished by employer to workers who allegedly contracted silicosis as result of exposure to silica dust while sandblasting at shipyard); *Lawrence v. United States*, 340 F.3d at 958 (misrepresentation exception barred plaintiff's claim that she was sexually assaulted by participant in witness protection program as result of Federal law enforcement officers' failure to provide Idaho Department of Health and Welfare full, complete, and accurate information concerning participant's criminal history during hearing).

Finally, the misrepresentation exception cannot be circumvented by asserting that the federal government assumed a duty under the applicable State's law by undertaking to provide the information at issue.  For example, in *Baroni v. United States*, 662 F.2d 287 (5th Cir. 1981), the plaintiff homeowners argued that the misrepresentation exception did not bar their claims for flood damage because the Federal Housing Administration had undertaken to determine whether their homes were located above the 50-year flood elevation.  The Fifth Circuit flatly rejected this attempt to evade the exception's protection.  *Id*. at 289 ("Assuming that the government's undertaking created a duty under state law to determine the flood level non-negligently, the damages complained of by the plaintiffs still result solely from the fact that the government communicated its miscalculation to the developer who relied on it, and that reliance eventually caused the plaintiffs' damage.").

-27-

In determining whether a claim is properly characterized as one for misrepresentation, courts assess "whether the chain of causation from the alleged negligence to the injury depends upon a misrepresentation by a government agent." *FEMA Trailer II*, 713 F.3d at 811 (quoting *Life Partners Inc.*, 650 F.3d at 1031 (quoting *Commercial Union Ins. v. United States*, 928 F.2d at 179)). Such a determination centers on whether "the claim is negligence in the communication of (or failure to communicate) information or negligence in the performance of an operational task, with misrepresentation being merely collateral to such performance." *Life Partners Inc.*, 650 F.3d at 1032 (quoting *Metro. Life Ins. Co. v. Atkins*, 225 F.3d 510, 512 (5th Cir. 2000)).

In *Life Partners Inc.*, a company purchased an existing life insurance policy owned by an employee of the Small Business Administration ("SBA"). Prior to purchasing the policy, the company contacted the SBA to confirm that the policy had not been assigned to any other party. Without reviewing its own records, the SBA assured the company that the policy had not been assigned. In fact, a simple review of the record would have revealed that the policy had been previously assigned. Based on the government's failure to communicate that critical information, the company agreed to buy the policy and suffered financial loss as a result and brought suit against the United States under the FTCA.

The Fifth Circuit held the action was barred by the misrepresentation exception. In an effort to avoid the exception, the company attempted to characterize its claims as one of mere negligence and clerical error—specifically, by asserting that "it stemmed from the SBA's negligence in failing to keep appropriate records of the prior assignment." *Life Partners, Inc.*, 650 F.3d at 1029. The Court of Appeals disagreed: "even assuming the SBA had performed a task negligently, Life Partners has not established that any such negligence caused its injury.

Simply put, Life Partners would have suffered no injury absent the misrepresentation, because it otherwise would not have purchased the policy." *Id.* at 1033. In other words, the communication was not merely collateral to the alleged negligence; instead, it was an essential link in the casual chain.

A similar analysis underpinned *Commercial Union Ins. v. United States*, 928 F.2d at 176. As already noted, in that case shipyard workers allegedly had contracted silicosis as a result of exposure to silica dust while sandblasting. Their employer provided the workers with supplied-air respirators. The model of respirator had previously been tested by the Bureau of Mines of the U.S. Department of Interior, pursuant to federal regulation. The Bureau published the results of its findings, which approved usage of the respirator. The company claimed that it purchased those respirators based on the published approval by the Bureau. The company's insurers eventually sued the United States under the FTCA, claiming that "the bureau's failure to discover the risk was negligent, and proximately caused the injuries of the silicosis claimants." *Id.* at 178.

The Fifth Circuit affirmed the dismissal of the action. In so doing, the court emphasized that the transmission of misinformation was "a necessary link in the causal chain from the negligence on the part of the bureau that the insurer allege to the injuries they claim to have suffered as a result of [the employer's] use of defective supplied-air respirators." *Id.* at 179. In finding that "[n]egligent misrepresentation . . . [was] an essential part of the insurer's claim," the court concluded that "only by claiming that [the employer] relied on the bureau's publicly disseminated approval when it decided to use the respirators in question can the insurers establish a proximate causal connection between the alleged negligence in the testing process and the alleged injury." *Id.*

Here, the transmission of misinformation (or the failure to communicate accurate information) to the licensed firearms dealer from whom Kelley purchased firearms is a necessary link in the causal chain that led to the Plaintiffs' injury.  In order to bring an action against the United States, the Plaintiffs necessarily must allege that NICS failed to inform the dealer that receipt of the firearm by Kelley would violate Federal law.  That communication between NICS and the dealer was the indispensable nexus between any alleged negligence and the injuries alleged.  Indeed, the entire NICS apparatus exists solely to communicate information to firearms dealers, which is then relied upon by the dealers when consummating firearm sales.

Accordingly, the Plaintiffs' claims are rooted in communications (or the failure to communicate) by government employees that are causally linked to the decedent's injuries.  Accordingly, the Plaintiffs' claims are barred by 28 U.S.C. § 2680(h).

## IV.   The Brady Act Itself Precludes Actions for Damages Based on The Failure of Federal Employees to Report Information to NICS

The Plaintiffs' actions arise from the alleged failure of employees of the Federal Government to furnish information to NICS which, had it been reported, allegedly would have prevented the sale of one or more firearms to Kelley.  When enacting the Brady Act, Congress anticipated such causes of action might be brought and expressly forbade them.  Consequently, this action must be dismissed.

Because no Federal employee can be held liable for failing to prevent a gun purchase, the United States likewise cannot be held liable in tort.  In *Alfonso v. United States*, 752 F.3d 622, 627 (5th Cir. 2014), the Fifth Circuit held that the United States was entitled to invoke a provision of the Louisiana Homeland Security and Emergency Assistance and Disaster Act ("LHSEADA") that shielded individual agents of the state from tort liability arising out of their homeland security and emergency preparedness activities in an FTCA suit based on the

-30-

negligence of members of the National Guard in Federal-pay status.  *See also Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001) ("[T]he United States is entitled to avail itself of any defenses its agents could raise in their individual capacities.").

Recently, the Brady Act's no-liability provision was applied to the United States to preclude recovery in a FTCA action arising out of the mass shooting in a church in Charleston, South Carolina.  *Sanders v. United States*, 324 F. Supp. 3d 636 (D.S.C. 2018), *appeal pending,* No. 18-1931 (4th Cir.).  There, plaintiffs alleged that the perpetrator was permitted to purchase the firearm he used to kill his victims at the church as the result of the negligence of federal employees performing NICS background checks.  In granting the United States' motion to dismiss, the court held that the plaintiffs' claims were statutorily barred by the Brady Act.  The court found that it was "Congress's clear intent in enacting § 922(t)(6) . . . to prevent any assumption of monetary liability for the operation of the background check system."  *Id.* at 640.

Here, likewise, the Plaintiffs' claims are that as a result of the failure of USAF employees to furnish information to NICS, a prohibited person was able to obtain a firearm.  Because the USAF employees would be shielded from liability pursuant to the Brady Act, the United States is entitled to assert the same defense.  All the Plaintiffs' claims in these cases therefore are barred by the Brady Act's no-liability provision.

## CONCLUSION

For the reasons stated and upon the authorities cited, these actions should be dismissed

for lack of jurisdiction over the subject matter.

Dated this 2nd day of November 2018.

Respectfully submitted,

**JOSEPH H. HUNT**
Assistant Attorney General
Civil Division
**JOHN F. BASH**
United States Attorney
**THOMAS G. WARD**
Deputy Assistant Attorney General
Civil Division
**JOHN F. PANISZCZYN**
Assistant United States Attorney
State Bar No. 15443855
**JAMES G. TOUHEY, JR.**
Director, Torts Branch
Civil Division
**KIRSTEN L. WILKERSON**
Assistant Director, Torts Branch
Civil Division

*/s/ Paul David Stern*
**PAUL DAVID STERN**
Trial Attorney, Torts Branch
Civil Division
United States Department of Justice
P.O. Box 888
Benjamin Franklin Station
Washington, D.C.  20004
Telephone:  (202) 616-2197
Email:  paul.david.stern@usdoj.gov

**Attorneys for Defendant**
**UNITED STATES OF AMERICA**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 2, 2018, I electronically filed the foregoing with the clerk of court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record and any other electronic filer as of the time of the filing.  I further certify that on the same date copies of the foregoing document and the notice of electronic filing will be mailed by first-class mail to the following counsel for Plaintiffs:

Robert E. Ammons
Texas State Bar # 01159820
Email: rob@ammonslaw.com
April A. Strahan
Texas State Bar # 24056387
Email: april@ammonslaw.com
3700 Montrose Boulevard
Houston, Texas 77006

Daniel D. Barks (*pro hac vice*)
Email: ddb@speiserkrause.com
SPEISER KRAUSE, P.C.
1750 Tysons Boulevard, Suite 1500
PMB #41
McLean, VA 22102

Mark W. Collmer
Texas State Bar # 04626420
Email: mark@collmerlaw.com
THE COLLMER LAW GROUP
3700 Montrose Blvd., First Floor
Houston, Texas 77006

Jamal K. Alsaffar
Email: jalsaffar@nationaltriallaw.com
Texas State Bar # 24027193
Laurie Higginbotham
Email: lhigginbotham@nationaltriallaw.com
Texas State Bar # 50511759
Tom Jacob
Email: tjacob@nationaltriallaw.com
Texas State Bar # 24069981
Koby Kirkland
Email: kkirkland@nationaltriallaw.com
Texas State Bar # 24086587
7500 Rialto Blvd, Bldg. Two, Ste 250
Austin, TX 78735

Dennis C. Peery
Texas State Bar # 15728750
Email: d.peery@tylerpeery.com
R. Craig Bettis
Texas State Bar # 24040518
Email: craig@tylerpeery.com
5822 IH 10 West
San Antonio, Texas 78201

*/s/ Paul David Stern*
PAUL DAVID STERN
Trial Attorney, Torts Branch
*Attorney for Defendant United States of America*