## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JON HOLCOMBE ET AL., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Civil Action No.  SA-18-CV-555-XR |
| | § | |
| UNITED STATES OF AMERICA, | § | *Consolidated with*: |
| | § | Nos. 5:18-CV-712-XR; |
| *Defendant.* | § | 5:18-CV-881-XR; 5:18-CV-944-XR; |
| | § | 5:18-CV-949-XR; 5:18-CV-951-XR; |
| | § | 5:18-CV-1151-XR; 5:19-CV-184-XR; |
| | § | 5:19-CV-289-XR; 5:19-CV-506-XR |
| | § | |

### ORDER ON MOTION TO DISMISS

On this date, the Court considered the Government's Motion to Dismiss for Lack of Jurisdiction (docket no. 28), Plaintiffs' response (docket no. 44), the Government's reply (docket no. 45), Plaintiffs' sur-reply (docket no. 51), and the Government's sur-sur-reply (docket no. 52). After careful consideration, the Court GRANTS IN PART AND DENIES IN PART the Government's motion.

### 1.  Background

These cases stem from the 2017 mass shooting in Sutherland Springs, Texas. On November 5, 2017, Devin Patrick Kelley killed 26 churchgoers and injured 20 more. Among the plaintiffs in these consolidated cases are surviving churchgoers and relatives of those killed. They seek recovery against the United States under the Federal Tort Claims Act. Kelley purchased the firearms he used to kill or injure Plaintiffs and Plaintiffs' family members at an Academy Sports & Outdoors on April 7, 2016. The thrust of this lawsuit is that Kelley should

1

not have been able to purchase these firearms, but failures by the United States Air Force and Department of Defense to collect, handle, and report required information allowed him to do so.

Federal law prohibits certain categories of people from buying firearms. *See* 18 U.S.C. § 922. Devin Kelley fit several of these categories: he was convicted of a crime punishable by imprisonment of more than one year, he was committed to a mental institution, he was dishonorably discharged from the Armed Forces, and he was convicted of a crime of domestic violence. Yet despite having the duty to process and report this information, the Air Force did not, so when the retailer ran his name through the background check system it learned no disqualifying information. Here, Plaintiffs seek to hold the Government accountable for this failure.

### a. Devin Kelly

Devin Kelley entered active duty as an airman with the United States Air Force ("USAF") in January 2010.[1] Kelley was initially assigned to an Intelligence Specialist program but was cut from the program due to poor grades. He was transferred to the 49th Logistics Readiness Program. Kelley was stationed at Holloman Air Force Base in Otero County, New Mexico.

Between July 2011 and March 2012, USAF placed in Kelley's file at least four letters of counseling and at least five letters of reprimand. Kelley was known to have made threats against his USAF superiors. Officers were advised that Kelley was attempting to carry out death threats made to his commanding officers.  Kelley was known to have attempted to

---

[1] The Court takes these facts, where possible, from the parties' joint stipulated facts or Plaintiffs' recitation of facts not stipulated, docket no. 24, and takes the remainder from the consolidated complaints.

smuggle guns onto a USAF base in violation of base operating procedures and USAF regulations.

On April 12, 2011, Kelley married Tessa K. Loge, who had an infant son from a previous marriage. Loge moved into USAF base housing. Kelley committed acts of domestic violence against Loge and her son. On June 8, 2011, Loge took her son to Gerald Champion Medical Center in Alamogordo, New Mexico because he was vomiting. The attending pediatrician also noticed febrile seizure and facial bruising. A CT scan revealed a fractured clavicle and subdural hemorrhage. Kelley produced a video confessing to USAF that he caused these injuries, and a Court Martial was convened. The NM Children, Youth, and Families Department took the child into their custody.

During Kelley's pre- and post-trial confinement, USAF placed him on lockdown for suicide risk. While these charges were pending, in spring 2012 USAF involuntarily committed Kelley to Peak Behavioral Health Services, located in Santa Teresa, New Mexico, which has a dedicated unit for U.S. military personnel. As a basis for committing Kelley, USAF noted:

> The Evidence shows a serious escalation of behavior involving firearms and threats after the physical abuse of a child. Particularly alarming is his decision to try to obtain another firearm while undergoing inpatient mental health care, conducting research on body armor, and then escaping from the facility late at night without authorization . . . .
> Lesser forms of restraint are inadequate to mitigate the flight risk he poses nor would they prevent him from carrying out the threats that he has made against others, especially given the forethought and planning that he showed by attempting to purchase another firearm and his escape from the mental health facility.

On June 7, 2012, Kelley jumped a fence and escaped from the facility. He was apprehended by local law enforcement personnel, who noted that Kelley was a "danger to himself and others." While a detainee at the facility, Kelley attempted to buy firearms and

tactical gear online and have these items shipped to San Antonio, Texas. USAF was aware that Kelley attempted to do so. Kelley threatened that if he were picked up by Security Forces, he would go for their guns. On July 10, 2012, USAF determined that Kelley should be confined while awaiting trial because it was foreseeable that he would not appear for trial or would engage in serious criminal misconduct.

A Court Martial considered charges against Kelley for: fleeing Peak Behavior Health Services Facility; causing physical injury to his stepson; holding a gun to Loge's temple and asking if she wanted to die; and threatening to kill Loge, members of her family, and members of his squadron. Kelley was charged with pointing a loaded gun at Loge and two counts of threatening his spouse with an unloaded firearm. On November 7, 2012, Kelley pled guilty to striking Loge, choking her, pulling her hair, and kicking her and to assaulting his stepson with "force likely to produce death or grievous bodily harm." He was sentenced to 12 months of imprisonment, a bad-conduct discharge, and reduction in rank to airman basic. USAF discharged Kelley with a "bad conduct discharge."

### b.  Statutory Context

Under federal law, people with certain characteristics cannot buy or own firearms (18 U.S.C. § 922(g)) and dealers cannot sell to those so disqualified (18 U.S.C. § 922(d)). These disqualifying characteristics include, as relevant here, those with a misdemeanor domestic violence conviction, those convicted of a crime punishable by more than a year, those dishonorably discharged from the military, and those involuntarily committed to a mental institution.

The Brady Handgun Violence Prevention Act, passed in 1993, tasked the Attorney General with the establishment of the national instant criminal background check system ("NICS"). *See* 34 U.S.C. § 40901. The Attorney General delegated this task to the FBI. The FBI, in administering NICS, performs background checks on those who try to buy a firearm from a federally licensed gun dealer. As provided in the Brady Act implementing regulations, when NICS receives a background check request, NICS must respond with "Proceed" (the go-ahead signal), "Denied" (stopping the sale), or "Delayed" (additional information required). 28 C.F.R. § 25.6(c)(iv)(A)-(C).

Federal agencies, including USAF and DOD, are obligated to report disqualifying information to NICS. Federal agencies that have "any record of any person demonstrating" that the person should not be able to purchase a gun "shall, not less frequently than quarterly, provide the pertinent information contained in such record to" NICS. 34 U.S.C. § 40901(e)(1)(C).

This Brady Act reporting requirement and the reporting requirements of various other federal statutes (including the Uniform Federal Crime Reporting Act of 1988 and the Victim's Rights and Restitution Act of 1990) are made DOD policy in Department of Defense Manual 7730.47. Further, Department of Defense Manual 7730.47-M Volume 1, Enclosure 3 implements the policy of Manual 7730-47 and prescribes reporting requirements pursuant to the various federal laws.

This manual sets out a central DOD repository, Defense Incident-Based Reporting System ("DIBRS"), which is to include incidents of domestic violence and criminal data. DOD uses this to transmit reportable crimes to the FBI's databases, which are used in

background searches. DIBRS was created because, "[i]n addition to meeting the mandatory statutory requirements, . . . . . [DOD has] been faced with increasing requests from Congress, the Department of Justice, and other agencies for statistical data on criminal offenses[.]" Manual 7730.47-M Volume 1, Enclosure 3 at 11. "These requests necessitate improvements in the ability of [DOD] to track a crime or incident through the law enforcement, criminal investigation, command action, judicial, and corrections phases." *Id.*

### c. DOD's and USAF's History of Reporting Failure

Despite these federal reporting obligations, as incorporated in and implemented by the DIBRS system, USAF and DOD have consistently mis- or under-reported required information.

In 2014, the DOD's Inspector General ("IG") evaluated compliance with DOD's reporting procedures. The investigation concluded that

> 10 years of DoD criminal incident data have not been provided to the FBI for inclusion in the annual uniform crime reports to the President, the Congress, State governments, and officials of localities and institutions participating in the UCR Program, as implemented in DoD Directive 7730.47 and DoD Manual 7730.47‑M, Volume 1.

In the time period sampled, Air Force Security Forces failed to submit fingerprint cards and final disposition reports in 60 percent of cases.

Then, in February 2015, the IG conducted a comprehensive review of the failures of the branches of the U.S. military to promptly and accurately input criminal conviction information into the appropriate computer databases. This study found that, between June 2010 and October 31, 2012,[2] from a sample of 358 convictions that required reporting, USAF submitted 248 fingerprint cards and 245 final dispositions. As part of this report, the IG made

---

[2] Kelley's conviction was in November 2012.

recommendations to USAF. The first recommendation was for USAF to submit and enter the missing fingerprint and final criminal disposition information for the sample period into the appropriate databases. Another recommendation was for USAF to "take prompt action" to ensure that all arrestee information is properly reported. USAF agreed to both recommendations.

Finally, a 2017 IG report found that USAF did not remedy its reporting problems. In the sample taken for this report, USAF was deficient in reporting fingerprints and final dispositions in 94 percent of cases. Referring to the Sutherland Springs shooting, this IG report stated "[a]ny missing fingerprint card and final disposition report can have serious, even tragic consequences, as may have occurred in the recent church shooting in Texas."

Specifically here, while USAF was required to enter Kelley's conviction and criminal history into federal databases, USAF did not do so. USAF allegedly did not report Devin Kelley's domestic violence conviction, his incarceration for a crime punishable by more than one year, his commitment to psychiatric inpatient care, or his bad conduct discharge post-court martial to NICS, the Interstate Identification Index, or the National Crime Information Center.

### d. Sutherland Springs Shooting

Between 2016 and 2017, Kelley purchased guns in Colorado and Texas. These dealers received "Proceed" signals from NICS due to USAF's and DOD's reporting failures. Then, on September 5, 2017, Kelley used at least one of these guns when he entered First Baptist Church and killed 26 people and injured 20 others.

Plaintiffs are the victims and the victims' relatives. Joe and Claryce Holcombe are the parents of decedent John Bryan Holcombe, who was killed in the Sutherland Springs shooting

(18-555). Margarette Vidal was shot four times during the shooting—Monica Shabbir, Robert Vidal, and Ramiro Vidal, Jr. are Vidal's children (18-712). Charlene Uhl is the parent of decedent Kaley Krueger (18-881). Gary Ramsey and Ronald Ramsey, Jr. are the sons of decedent Therese Rodriguez (18-944). Lisa McNulty is the mother and H.M. and J.M. are the children of decedent Tara McNulty (18-949). Kati Wall, Michael Johnson, Christopher Johnson, Dennis Johnson, Jr., Deanna Staton, and James Graham are the children of decedents Sara Johnson and Dennis Johnson (18-951). Regina Amador is the daughter and Jose Rodriguez and Guadalupe Rodriguez are the parents of decedent Richard Rodriguez (18-1151). Farida Brown was injured in the shooting (19-184). Christopher Ward brings his claims on behalf of the estate of the deceased JoAnn Ward and B.W., a minor, and on behalf of R.W., a minor injured in the shooting (19-289). Kris Workman (19-506) was shot eight times during the shooting. Plaintiffs' counsel has indicated that additional suits will follow pending exhaustion of administrative remedies.

### e.  Summary of Claims

Plaintiffs filed their complaints individually, which for efficiency were consolidated under the above-captioned case, as it was first filed. The way the complaints depict the Government's negligence varies slightly, but at bottom they allege USAF and DOD were negligent in failing to submit or submitting inaccurate or incomplete information related to Kelley. Along the way, Plaintiffs allege these entities were negligent in their training and supervision, processing and recording of information, and other acts. Thus, Plaintiffs bring claims for negligence *per se* based on violation of the Brady Act, negligent undertaking, and negligent training and supervision.

### 2. Discussion

#### a. Standard for Dismissal Under Rule 12(b)(1)

The Government moves the Court to dismiss this case for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure Rule 12(b)(1). Dismissal is proper under Rule 12(b)(1) "when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). The party asserting federal jurisdiction bears the burden of proving jurisdiction. *In re FEMA Trailer Formaldehyde Products Liab. Litig.*, 646 F.3d 185, 189 (5th Cir. 2011). When considering a motion to dismiss for lack of jurisdiction, courts may consider evidence outside of the complaint and dismiss on the bases of: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986). In determining whether subject-matter jurisdiction exists, "[c]ourts must strictly construe all waivers of the federal government's sovereign immunity, [resolving] all ambiguities in favor of the sovereign." *Linkous v. United States*, 142 F.3d 271, 275 (5th Cir. 1998).

#### b. Federal Tort Claims Act

"The Federal Tort Claims Act, subject to several exceptions, waives the sovereign immunity of the United States, making it liable in tort 'in the same manner and to the same extent as a private individual under like circumstances,' 28 U.S.C. § 2674, for certain damages 'caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the

9

United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.' 28 U.S.C. § 1346(b) (emphasis added)." *Johnson v. Sawyer*, 47 F.3d 716, 727 (5th Cir. 1995). "While as a matter of abstract linguistics the phrase 'law of the place where the act or omission occurred' might be thought to include generally applicable federal law, it has long been settled that it does not, and that 'the liability of the United States under the Act [FTCA] arises only when the law of the state would impose it.'" *Id.* (quoting *Brown v. United States*, 653 F.2d 196, 201 (5th Cir. 1981). Here, Texas provides the applicable state law.

### c.  The Government's Motion to Dismiss

The Government presents several bases for dismissal. First, the Government argues the United States cannot be held liable here because Texas law would not impose liability on a private person under analogous circumstances. Alternatively, the Government argues that the FTCA's misrepresentation exception strips jurisdiction here, and in any event the Brady Act itself immunizes the United States against claims related to the background check system's operation.

Here, the Court considers first whether the misrepresentation exception bars the claims and whether the Brady Act immunizes the United States against them. If any of Plaintiffs' legal theories clear these two hurdles, the Court will decide whether Texas law recognizes liability for private persons under analogous circumstances.

### i.  Misrepresentation Exception

There are several exceptions to the FTCA's waiver of sovereign immunity. The exception relevant here retains sovereign immunity as to "[a]ny claim arising out of  . . .

misrepresentation [or] deceit." 28 U.S.C. § 2680(h). This misrepresentation exception bars

claims for both negligent and intentional misrepresentation and applies to both affirmative acts

and omissions of material fact. *Metro. Life Ins. Co. v. Atkins*, 225 F.3d 510, 512 (5th Cir.

2000).

In *Life Partners*, the most recent case in which the Fifth Circuit discusses the

misrepresentation exception at length, the court summarized the two leading Supreme Court

precedents as follows:

> The Supreme Court has considered the scope of the misrepresentation
> exception in two leading cases, *United States v. Neustadt*, 366 U.S. 696, 81
> S.Ct. 1294, 6 L.Ed.2d 614 (1961), and [*Block v. Neal*, 460 U.S. 289, 103 S.Ct.
> 1089 (1983)]. In *Neustadt*, the Court held that a suit alleging that the plaintiffs
> bought a home for more than it was worth based on a negligent appraisal was
> barred. 366 U.S. at 711, 81 S.Ct. 1294. The plaintiffs alleged that the inaccurate
> appraisal resulted from a negligent inspection, not from a misrepresentation. *Id*.
> at 704–05, 81 S.Ct. 1294. The Court, however, held that the damage, the
> payment of a purchase price in excess of the home's fair market value, arose out
> of negligent misrepresentation, even if the government also negligently
> conducted the inspection. *Id.*; *see Ware v. United States*, 626 F.2d 1278, 1283
> (5th Cir. 1980). The plaintiffs would not have purchased the home, and
> therefore suffered the harm, without the misrepresentation.
>
> In *Block*, the Court distinguished *Neustadt*, holding that a similar claim
> was not barred. 460 U.S. at 296, 103 S.Ct. 1089. There, after the plaintiff
> contracted for the construction of a home, the Farmers Home Administration
> (FmHA) agreed to supervise construction. *Id*. The FmHA employee inspected
> the home three times, issuing a final report indicating that the construction
> accorded with the specifications approved by the FmHA. When the plaintiff
> bought the home and later discovered extensive defects, she sued the FmHA.
> Although the government argued that Neal's damages were caused by the
> inspection reports, and therefore her claim was barred as one for
> misrepresentation, the Court held that the injury Neal alleged, a defective
> house, arose from the FmHA's failure to oversee construction. Id. at 297–98,
> 103 S.Ct. 1089. The plaintiff alleged an injury she "would have suffered
> independently of [her] reliance on the erroneous [representation]." *Id*. at 296–
> 97, 103 S.Ct. 1089. The plaintiff's reliance on the FmHA's misrepresentation
> did not cause the defects in the home; rather, they were caused by the FmHA's
> negligence in failing to oversee construction.

*Life Partners, Inc. v. United States*, 650 F.3d 1026, 1031 (5th Cir. 2011).

From these cases, the Fifth Circuit derived a two-step process for deciding whether the misrepresentation exceptions bars a claim. *Commercial Union Ins. Co. v. United States*, 928 F.2d 176, 179 (5th Cir. 1991). Courts first ask "whether 'the chain of causation' from the alleged negligence to the injury depends upon a misrepresentation by a government agent." *Life Partners*, 650 F.3d at 1031. Relevant to this question is whether "the focal point of the claim is negligence in the communication of (or failure to communicate) information or negligence in the performance of an operational task, with misrepresentation being merely collateral to such performance." *Atkins*, 225 F.3d at 512. Because courts "focus on the conduct upon which the plaintiff's claim is based," Plaintiffs' choice of pleading does not control. *Life Partners*, 650 F.3d at 1032 (quoting *Truman v. United States*, 26 F.3d 592, 592 (5th Cir. 1994)).

Second, if the claim does depend on a misrepresentation, courts ask "whether Congress has nonetheless waived sovereign immunity independently of the FTCA." *Life Partners*, 650 F.3d at 1032 (quoting *Commercial Union*, 928 F.2d at 179). Here, the only waiver of immunity cited by Plaintiffs is the FTCA, so the Court's inquiry is limited to the first step. "The FTCA's misrepresentation exception is broad: it bars any claim arising out of a misrepresentation—even if the conduct underlying the claim may also constitute a tort not barred by section 2680(h)." *Life Partners*, 650 F.3d at 1032. "[T]he line between what constitutes a permissible negligence claim and a barred misrepresentation claim has not been clearly delineated." *Saraw Partnership v. United States*, 67 F.3d 567, 570 (5th Cir. 1995).

In *Life Partners*, the Fifth Circuit summarizes this Circuit's applicable precedents:

> In *Atkins*, a case also involving insurance beneficiaries, we reversed the dismissal of a claim alleging that the government had improperly failed to

12

include the beneficiary form signed by the decedent in his file. [*Metro. Life Ins. Co. v. Atkins*, 225 F.3d 510, 511-12 (5th Cir. 2000)]. The district court held, and the government argued, that the claim was one for misrepresentation because the federal employee had failed to communicate to the decedent that his personnel file did not include a signed copy of the beneficiary form. *Id.* at 512. We held that the injury was caused by the government's failure to keep the signed form, irrespective of any failure to communicate. *Id.* Because the injury arose from the negligent performance of an operational task, it was not barred.

We have also held that a claim was not barred when the Veterans' Administration failed to enter the plaintiff's loan payment properly, resulting in foreclosure of the plaintiff's property. *Saraw P'ship*, 67 F.3d at 571. The government argued that any injury was caused by the government's failure to communicate that it had not received the plaintiff's payment. Id. at 570–71. We rejected that argument, holding, "This case is not about reliance on faulty information or on the lack of proper information; rather, the gist of this case is the government's careless handling of Saraw's loan payments." *Id.*

Likewise, we have reversed the dismissal of a claim alleging that the Department of Agriculture mis-diagnosed and then itself killed a rancher's cattle. [*Ware v. United States*, 626 F.2d 1278, 1282-83 (5th Cir. 1980)]. The government argued that the claim was barred because a mis-diagnosis is a misrepresentation. We noted, however, that the plaintiff had not taken any action in reliance on that mis-diagnosis, which is required for a misrepresentation claim; rather, the government had killed the cattle, causing the damage itself. *Id.* at 1283. "The government's misrepresentation caused Ware to do nothing save remain in ignorance that he had suffered a compensable loss." *Id.* Importantly, the misrepresentations in the above cases were merely collateral to the focal point of the claims, "negligence in the performance of an operational task." *See Atkins*, 225 F.3d at 512.

In contrast, we have affirmed the dismissal of a claim based on the FHA's miscalculation of the predicted 50-year flood plane when approving a subdivision plan, holding that the damages sought resulted "solely from the fact that the government communicated its miscalculation to the developer who relied on it, and that reliance eventually caused the plaintiffs' damages." *Baroni v. United States*, 662 F.2d 287, 289 (5th Cir. 1981); see also [*McNeily v. United States*, 6 F.3d 343, 347 (5th Cir. 1993)]. We also affirmed the dismissal of a claim based on the FmHA's unfulfilled promise to give a farmer a loan if he sold some of his land, which in turn caused him to be ineligible for the loan. *Williamson v. U.S. Dep't of Agric.*, 815 F.2d 368, 378 (5th Cir. 1987). Because the plaintiff had relied on the FmHA's representation that he would receive a loan in selling his land, his claim was barred. *Id.*

650 F.3d at 1032–33.

After summarizing these cases, the *Life Partners* court stated that "[i]n sum, a claim for injury arising from a plaintiff's reliance on a misrepresentation is barred by the FTCA; a claim alleging injury independent of the misrepresentation, such as one in which government action directly caused the injury, is not barred." *Id.*

The *Life Partners* court then upheld a finding that the plaintiff's claims arose from a misrepresentation. That plaintiff contacted the Small Business Administration to confirm that an insurance policy had not been assigned to another party, and the SBA mistakenly told the plaintiff that it had not. The plaintiff purchased the policy and later sued for its damages. The *Life Partners* court found that this injury "arose from its actions in reliance on the SBA's misrepresentations" and the misrepresentation exception thus barred the claim. The court noted that the records correctly reflected the previous assignment, so the records were not kept negligently like in *Atkins*, nor did a government employee fail to check these records. Instead, the employee had actual knowledge of the previous assignment but misrepresented this information anyway. "Simply put, Life Partners would have suffered no injury absent the misrepresentation, because it otherwise would not have purchased the policy." *Id.*

Relying on *Life Partners* and *Commercial Union*, the Government argues this exception bars Plaintiffs' claims because

> [h]ere, the transmission of misinformation (or the failure to communicate accurate information) to the licensed firearms dealer from whom Kelley purchased firearms is a necessary link in the causal chain that led to the Plaintiffs' injury. In order to bring an action against the United States, the Plaintiffs necessarily must allege that NICS failed to inform the dealer that receipt of the firearm by Kelley would violate Federal law. That communication between NICS and the dealer was the indispensable nexus between any alleged negligence and the injuries alleged. Indeed, the entire NICS apparatus exists solely to communicate information to firearms dealers, which is then relied upon by the dealers when consummating firearm sales. Accordingly, the Plaintiffs' claims are rooted in communications (or the failure

14

to communicate) by government employees that are causally linked to the decedent's injuries.

Docket no. 28 at 37.

**1.  The exception does not apply because Plaintiffs did not rely, even indirectly, on a governmental representation**

In response, Plaintiffs point to limiting language in *Block*, arguing that the Supreme Court foreclosed in that case the broad application of this exception that the Government here advances. The *Block* court stated that the misrepresentation exception applies when "the essence of an action for misrepresentation, whether negligent or intentional, is the communication of information *on which the recipient relies*." *Block*, 460 U.S. at 296 (emphasis added). And in *Saraw Partnership v. U.S.*, the Fifth Circuit stated that "[w]here there is no detrimental reliance on an alleged miscommunication, no claim for misrepresentation is made." 67 F.3d 567, 571 (5th Cir. 1995). Without reliance on any governmental statement, then, Plaintiffs argue the exception cannot apply, and Plaintiffs argue there was no such reliance here.

The Government counters this reliance argument with *Baroni*, which found that even though the plaintiffs had not relied on the government's miscalculation of the flood plain, the developer did so rely, and that reliance was a link in the chain that led the plaintiffs to purchase their home and subsequently caused the plaintiffs' injuries. 662 F.2d at 289. The Government argues that, here, the gun retailers relied on a governmental communication to proceed with the purchases, and that this indirect reliance is sufficient for the misrepresentation exception to apply.

15

The Court is not persuaded. For one thing, there is not even indirect reliance on Plaintiffs' part anywhere in the chain of causation. In *Baroni*, the plaintiffs' purchase decision indirectly relied on the misrepresentation—they relied on the representations of one who relied on the government's misstatement. But here that is not the case. The cases make clear that *some* reliance on plaintiffs' part is necessary,[3] although cases like *Baroni* show that sometimes this hurdle is met even where the government's communication was not represented to the plaintiff directly.[4] But in this case, even a far-reaching application of the "vital link" argument the Government advances would fail. Plaintiffs simply did not rely on a governmental statement of any kind—not even indirectly. They did not rely on any representation that was buttressed by a governmental misstatement. It is true that the gun retailers relied on some government representation (the "Proceed" signal from NICS) in selling Kelley the firearms, but Plaintiffs did not rely on this representation to their detriment. For another thing, as discussed below, the Court views Plaintiffs' claims as alleging operational negligence, not negligent communication. Any miscommunication in the chain of causation is merely collateral.

Thus, the misrepresentation exception to the FTCA's immunity waiver does not bar Plaintiffs' claims for lack of any reliance to Plaintiffs' detriment. Even if the claims were

---

[3] For example, *Life Partners*, in summarizing *Ware*, stated that "the plaintiff [in *Ware*] had not taken any action in reliance on th[e] misdiagnosis, which is required for a misrepresentation claim[.]" 650 F.3d at 1033. *Life Partners* then stated that, "[i]n sum, a claim for injury arising from a plaintiff's reliance on a misrepresentation is barred by the FTCA . . . ." *Id.*; *see also Kim v. United States*, 2017 WL 5158709 (E.D. Cal. Nov. 7, 2017) ("Circuit courts have . . . held that a claim must contain the essential elements of misrepresentation to come within the exception . . . . One relatively non-controversial element is that the plaintiffs have relied on the representation to their detriment.").

[4] Also, *Baroni* was decided before *Block* and its progeny, which inclines the Court not to rely on *Baroni* as anything more than one factual example in the line of cases beginning with *Neustadt*.

centered on representations or failures to communicate, then, the exception would not apply. But the Court also finds that Plaintiffs' complaint centers on operational negligence, which is an additional basis on which Plaintiffs successfully avoid the misrepresentation exception.

### 2.   Additionally, the exception does not apply because Plaintiffs allege operational negligence, not communication failure

As mentioned above, Plaintiffs note that the case law distinguishes between the communication of information (barred by the misrepresentation exception) and the performance of operational tasks (not barred). They argue that their claims fall into the latter category: operational negligence—"*i.e.*, the Government's negligent failure to collect, submit, or process information into the national background-check system, as required by statute." Docket no. 44 at 37. They argue the "gist" of the case is operational negligence in failing to properly run the background-check system, and any governmental communications were merely collateral. *Id.* at 40.

The Fifth Circuit, in *Saraw Partnership*, stated that

[t]o determine whether a claim is one for misrepresentation or negligence the court examines the distinction between the performance of operational tasks and the communication of information. The government is liable for injuries resulting from negligence in performance of operational tasks even though misrepresentations are collaterally involved. It is not liable, however, for injuries resulting from commercial decisions made in reliance on government misrepresentations.

67 F.3d at 571 (citing *Mundy*, 983 F.2d at 952).

In *Mundy*, the government misfiled paperwork related to a contractor's application for security clearance. 983 F.2d at 952. This resulted in denial of the application. The government told the contractor's employer about the denial, and in turn the employer fired the contractor. Although the government communicated the denial to the employer, the Ninth Circuit held

that the communication was not a misrepresentation. The court reasoned that the real cause of

the injury was the negligent application procession, which was actionable under the FTCA:

> The Government was negligent, Mundy asserts, in misfiling a document
> and in subsequently overlooking that document during the processing of his
> security clearance request. Although the Government necessarily
> communicated the result of this operational task to [the employer], the
> communication was not a misrepresentation: the security clearance in fact had
> been denied. Viewed in this way, the communication was only "collaterally
> involved" in Mundy's injury. The Government's alleged operational error—
> overlooking a misfiling in processing Mundy's security clearance—remains the
> focal point of this suit.

*Id.*

In *Saraw Partnership*, the Fifth Circuit held that the claims were not barred by the

misrepresentation exception for lack of reliance, as discussed above, and because the gist of

the case was operational negligence. 67 F.3d at 570-71. The plaintiffs purchased property, a

transaction the Veterans' Administration financed. *Id.* at 568-69. Payment coupons from the

VA were meant to finance the loan payments, but a VA employee's erroneous data entry

caused a coupon book not to be issued. Plaintiffs thus could not make loan payments and the

house was foreclosed upon. Relying on *Mundy*, the Fifth Circuit found the "erroneous

keypunch" caused the injury, so the proper focal point was the "alleged negligently-performed

operational task of the government," not "reliance on faulty information or on the lack of

proper information[.]" *Id.* at 571.

In *Atkins*, another case discussed above, the alleged harm was caused by negligent

performance of an operational task because the claims "alleg[e] that the United States

employee failed to preserve and properly file the correct copy—that is, the signed copy—of

[plaintiff's] form." 225 F.3d at 513.

In a Western District of Texas case, the plaintiff complained of negligent FDA inspection, which the court found to be an operational task. *Lone Star Bakery, Inc. v. United States*, 2007 WL 321405, at *4 (W.D. Tex. Jan. 11, 2007). The improper reporting alleged by the plaintiff was collateral because "[a] breach of the FDA's regulatory duties to inspect does not depend on the transmission of erroneous information, regardless of what information was actually transmitted." *Id.*

Here, the gravamen of Plaintiffs' allegations is the Government's negligence in performing the operational task of collecting, handling, processing, and entering Kelley's background information into the national background check system.

Even if the Court were inclined to accept the Government's argument, the "misrepresentation" that the gun retailers received was not a misrepresentation at all. NICS did not have record of Kelley due to the Government's systemic operational negligence. *Life Partners* hints at this distinction: in *Atkins* there was operational negligence in failure to keep accurate records, but in *Life Partners* the records were correct and yet the government official misrepresented the information anyway. 650 F.3d at 1033. In *Mundy*, also, the Ninth Circuit stated "[a]lthough the Government necessarily communicated the result of [its] operational task to [the employer], the communication was not a misrepresentation: the security clearance in fact had been denied." 983 F.2d at 952. Here, also, the proceed signal from NICS was not a misrepresentation: the gun retailers' query regarding Kelley accurately came up empty.

In the Court's view, the Government is focused on the wrong "communication." If there were any transmission (or lack thereof) of information that would bring this case under the misrepresentation exception, it would be USAF's failure to communicate Kelley's history

that should have disqualified him from gun ownership, not the correct representation from

NICS that nothing in its databases indicated Kelley could not purchase a gun. And at this

stage, the former act skews closer to operational negligence—rooted in failure to collect and

process information that should have been in its possession—than to communicational failure.

Thus, the misrepresentation exception does not bar Plaintiffs' claims.[5]

### ii. Brady Act Immunity

The Court next turns to a provision of the Brady Act that immunizes from liability

certain participants in the background-check system.

This provision states:

> Neither a local government nor an employee of the Federal Government or of
> any State or local government, responsible for providing information to the
> national instant criminal background check system shall be liable in an action at
> law for damages . . . for failure to prevent the sale or transfer of a firearm to a
> person whose receipt or possession of the firearm is unlawful under this
> section.

18 U.S.C. § 922(t)(6).

---

[5] Plaintiffs also argue that *Block* and other cases signal that the misrepresentation exception applies to commercial injuries, not personal injuries like those complained of here. Docket no. 44 at 35. For example, *Block* states the exception applies only when the action fits a misrepresentation claim as commonly defined, which "has been confined very largely to the invasion of interests of a financial or commercial character, in the course of business dealines." 460 U.S. at 296 n.5; *see also Saraw Partnership*, 67 F.3d at 571 (citing *Mundy v. U.S.*, 983 F.2d 950 (9th Cir. 1993), for the proposition that the Government is not liable "for injuries resulting from commercial decisions made in reliance on government misrepresentations"). The Government, however, cites several cases that apply the exception outside the commercial context. Docket no. 45 at 32 (citing, e.g., *In re FEMA Trailer Formaldehyde Products Liab. Litig.*, 713 F.3d 807 (5th Cir. 2013)). The case law is somewhat inconclusive on whether the exception is limited to commercial injury, and since in this case the exception is inapplicable on the operational negligence and reliance grounds, the Court declines to weigh in on this point.

20

## 1. The Brady Act, by its plain text, does not immunize the United States

First, the Government argues that this provision precludes this action against the United States, while Plaintiffs argue that the United States is not among the listed immunized entities, rendering this provision inapplicable in suits against the United States.

The Government's argument was adopted under similar circumstances in *Sanders v. United States*. 324 F. Supp. 3d 636 (D.S.C. 2018), *appeal pending*, No. 18-1931 (4th Cir.). The *Sanders* plaintiffs are victims and their relatives of another mass shooting carried out in a church: the murder by Dylann Roof of nine people in Charleston, South Carolina. *Id.* In that case, the plaintiffs sued the United States for the negligent acts of NICS employees. *Id.* The *Sanders* court held that the discretionary function barred the plaintiffs' claims, and as an alternative ground stated "it is obvious to the Court that a claim of negligence in the operation of the NICS system resulting in a prohibited person obtaining a firearm falls plainly within the scope of the Government's immunity." *Id.* at 649.

It is not so clear to this Court. The proper analysis seems to be two-fold.[6] First, does the Brady Act independently pull back some of the FTCA's broad sovereign immunity waiver in a suit against the United States? If not, the standard FTCA analysis applies, which the Court

---

[6] It would collapse this inquiry—in the Court's view, improperly—to follow the Government's proposed logical progression, which the *Sanders* court appears to have followed. That progression is: 1) Section 922(t)(6) immunizes federal employees; 2) the federal employees Plaintiffs allege acted negligently with respect to Kelley's information would be immune from this suit, had Plaintiffs brought it against them rather than against the United States; 3) the United States can use the defenses available to its employees;  4) and, thus, the United States is immune under Section 922(t)(6).

21

conducts below—namely, if the United States were a private person, would that person be liable in Texas under analogous circumstances?[7]

Here, the first question depends on the statutory text. In other words, is the Government correct that the United States is immune even though the immunity provision omits it from the listed immune entities? The Government argues that sovereign immunity is the default, and any waiver of that immunity must be set out clearly. Since "[o]nly the explicit inclusion of the United States in statutory language waives the government's sovereign immunity," the Government argues the United States need not be "listed in a statutory immunity provision to shield the government from liability." Docket no. 45 at 35.

Plaintiffs have the better of this argument, though, as they point out that the FTCA *is* the necessary immunity waiver. Congress has pulled back some of that waiver in specific statutes and has explicitly listed the United States where it has done so.[8] Under the negative-implication canon, "where Congress has carefully employed a term in one place and excluded it in another, it should not be implied where excluded." *United States v. Bo*, 472 F.2d 720, 722 (5th Cir. 1972).

The plain language of the statute weighs against the Government's argument that the omission of the United States is meaningless. The Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a

---

[7] In conducting this second inquiry, the Court applies state law, and any defense available to that private person under state law is available to the United States.

[8] *See, e.g.*, 46 U.S.C. § 4704 ("The United States, and any officer or employee of the United States is not liable to an owner or operator for damages resulting from removal of an abandoned barge under this chapter."); 18 U.S.C. § 3771 ("Nothing in this chapter shall be construed to authorize a cause of action for damages or to create, to enlarge, or to imply any duty or obligation to any victim or other person for the breach of which the United States or any of its officers or employees could be held liable in damages."); 10 U.S.C. § 806b ("Nothing in this section (article) shall be construed . . . to imply any duty or obligation to any victim of an offense under this chapter or other person for the breach of which the United States or any of its officers or employees could be held liable in damages.").

statute what it says there[,]" and "[w]hen the words of a statute are unambiguous . . . this first canon is also the last: 'judicial inquiry is complete.'" *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Here, the Brady Act is unambiguous in specifying the people and entities immune from liability in providing information to NICS, and the United States is not listed.

This conclusion is reinforced by the people and entities the statute *does* list: local governments and employees of federal, local, and state governments. If, as the Government argues, it was unnecessary to list the United States because federal employees were listed, that would make redundant the listing of both local governments *and* employees of local governments. Under the construction doctrine *expression unius est exclusion alterius*, "to express or include one thing implies the exclusion of the other, or of the alternative." *Texas v. United States*, 809 F.3d 134, 182 n.182 (5th Cir. 2015). This applies "only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003). It does not apply "unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Id.* Here, it is fair to suppose Congress considered listing the United States among the immunized entities, and this inference lends support to the Court's conclusion.

Since Congress chose not to include the United States in the list of immunized entities, the Brady Act immunity provision can only operate to the Government's benefit here if the United States can avail itself of its employees' immunities under federal law.

23

### 2. The United States is not immune simply because its employees are immune

The Government cites *Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001), for the proposition that "the United States is entitled to avail itself of any defenses its agents could raise in their individual capacities." Docket no. 28 at 38. In *Alfonso v. United States*, the Government notes, the United States defeated an FTCA action by invoking a provision of Louisiana law that shielded state agents from liability arising out of emergency preparedness activities. 752 F.3d 622.

But "[a]s immunities and defenses are defined by the same body of law that creates the cause of action, the defenses available to the United States in FTCA suits are those that would be available to a private person under the relevant *state law*." *Vidro v. United States*, 720 F.3d 148, 151 (2d Cir. 2013) (emphasis added). Plaintiffs note that this "flows directly from the FTCA's text, which states that the Government stands in the shoes of a private state-law defendant and is liable—or not—'in accordance with the law of the place where the act of omission occurred.'" Docket no. 44 at 48. And since in *Alfonso* and *Medina* the United States claimed state-law defenses, these cases do not show that the United States can here claim an immunity granted to its employees by federal law.

What these cases show is that the United States, when standing in the position of a private person under the FTCA, can use any state-law defenses available to that person. Among these defenses are, where applicable, the argument that federal statute preempts certain types of state tort claims.[9] It is also made explicit in the FTCA that the United States

---

[9] This is shown by the cases the Government cites in reply. In *Avery v. United States*, a Fair Credit Reporting Act preclusion provision—which precluded negligence actions against "any person who furnished information to a consumer reporting agency" unless there is "malice of willful intent"—was "fatal to Plaintiffs' negligence claim,

can invoke "judicial or legislative immunity" available to its employees. 28 U.S.C. § 2674. This refers to "the traditional immunities that have long protected the key functions of the legislative and judicial branches of the Government," H.R. Rep. No. 100-700, at 5 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5945, 5948, not congressional grants of immunity directed at specific individuals or circumstances. It does not follow, then, that a statutory immunity provision shielding government employees from liability—and failing to immunize the federal government—can be invoked as a defense under state law. No case cited by the United States or revealed in the Court's research holds this.

The *Sanders* court stated—and the Government appears to argue here—that "Congress's clear intent in enacting § 922(t)(6) was to prevent any assumption of monetary liability for the operation of the background check system." 324 F. Supp. 3d at 640. If this were so, however, Congress could have stated as much. Instead, the Brady Act contains other precisely defined immunities beyond that discussed here. *See* 18 U.S.C. § 922(s)(7) (immunizing, in the waiting-period provision, "[a] chief law enforcement officer or other person responsible for providing criminal history background information"). This is not indicative of a blanket immunity against all liability related to the background check system.

The position that Congress intended to immunize the United States in roundabout fashion through a grant of immunity to federal employees rather than immunizing the United States directly lacks satisfactory support. The statute includes tailored grants of immunity—none of which fit the United States—and the doctrine cited by the Government focuses on

---

because such a claim against a private individual would be preempted by" the statute. Docket no. 45 at 36 (citing 534 F. Supp. 2d 40, 24 (D.D.C. 2008). In *Sobel v. United States*, a Health Care Quality Improvement Act preclusion provision—which limits damages for a VA internal professional review body and dictates a presumption of immunity—ended an FTCA claim because the plaintiff's allegations did not overcome the presumption of immunity. *Id.* (citing 571 F. Supp. 2d 1222, 1229).

state-law defenses. Thus, the Court holds that the unavailability of suit against federal

employees directly does not confer immunity on the United States in this FTCA action.

### 3. Even if the United States is immune, the Act cabins immunity to those 'responsible for providing information'

Even if the Government could avail itself of its employees' immunity, this provision

states that it applies to those federal employees "responsible for providing information" to

NICS. If applicable here, it would immunize the United States for some of its allegedly

negligent conduct, but not all. Had Congress intended to completely immunize those covered

by the provision, it would have omitted this "responsible for providing information" qualifier.

In arguing that § 922(t)(6) is a total bar to Plaintiffs' claims, the Government focuses

only on the alleged acts related to the transmission of fingerprint cards and criminal incident

data to the FBI's background check system. The Government does not grapple with the other

alleged negligence. For example, Plaintiffs allege the USAF failed to: collect fingerprints and

criminal incident data from and about Kelley; submit this information to DOD; train and

supervise employees in properly collecting and submitting this information; and correct these

problems despite a promise to do so following the Inspector General report. Further, in

addition to DOD's failure to transmit Kelley's information to the FBI, they allege DOD failed

to: follow policies and procedures regarding the collection and transmission of fingerprint

cards and criminal history data and correct wrong or incomplete database entries.

Not every federal employee responsible for these alleged acts—including collection,

supervision, training, and processing—is "responsible for providing information" to NICS.

Under no circumstances, then, does the Brady Act immunity provision end these cases, as the

Government claims. Further, at this stage the individual employees (whose defenses the

26

Government attempts to invoke on its own behalf) are not known by name. This is not a pleading deficiency—those in the position of Plaintiffs cannot be expected to know with specificity USAF's internal delegation of responsibilities and where in that chain the missteps occurred. Determining which employees' responsibilities fall under this immunity provision and which do not would require the benefit of discovery and would be better addressed at summary judgment or trial. Thus, even if the Government *could* invoke this provision—and the Court holds above that it cannot—disposition under 12(b)(1) would be inappropriate.

### iii.  Plaintiffs' Claims

Having ruled that neither the misrepresentation exception nor the Brady Act's immunity provision bars Plaintiffs' claims, the Court turns to Plaintiffs' legal theories. Under the FTCA, the United States is liable in tort for "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). That place is, in this case, Texas. Docket no. 28 at 22 n.32 (explaining that while Kelley was stationed in New Mexico during his court martial, New Mexico's choice of law rules indicate Texas law applies because it was the place of the last injury and where the last critical event occurred).

The test is whether a private person would be responsible for similar negligence under the law of the State where the acts occurred." *Rayonier, Inc. v. United States*, 352 U.S. 315, 319 (1957). But "like circumstances" does not mean "same circumstances," *Indian Towing Co. v. United States*, 350 U.S. 61, 68-69 (1955), and "a court's job in applying the standard is

to find the most reasonable analogy," *In re FEMA Trailer Formaldehyde Prods. Liab. Litig. ("FEMA Trailer I")*, 668 F.3d 281, 288 (5th Cir. 2012).

However, "the FTCA was not intended to redress breaches of federal statutory duties." *Johnson v. Sawyer,* 47 F.3d 716, 727 (5th Cir. 1995) (quoting *Sellfors v. United States*, 697 F.2d 1362, 1365 (11th Cir. 1983)). "[T]he FTCA's 'law of the place' requirement is not satisfied by direct violations . . . of federal statutes or regulations standing alone. . . . The alleged federal violations also must constitute violations of duties 'analogous to those imposed under local law.'" *Id.* (quoting *Chen v. United States*, 854 F.2d 622, 626 (2d Cir. 1988)). Put another way, the FTCA "simply cannot apply where the claimed negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs" or where the claim "depends entirely upon Federal statutes." *United States v. Smith*, 324 F.2d 622, 624-25 (5th Cir. 1963). "This is not to say that the required state law must be one directly applicable to the conduct of federal employees or to the precise activity from which the claim arose." *Johnson*, 47 F.3d at 728.

As to negligence *per se*, courts have "generally refused to find the necessary state law *duty* in an assertedly violated federal statute or regulation merely because the law of the relevant state included a general doctrine of negligence *per se*." *Id.* at 728-29 (emphasis in original). "Duties set forth in *federal* law do not, therefore, automatically create duties cognizable under *local tort law*. The pertinent question is whether the duties set forth in the federal law are analogous to those set forth in local tort law." *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1158 (D.C. Cir. 1985).

> Where a claim is wholly grounded on a duty imposed by an allegedly violated federal statute or regulation, to allow FTCA recovery merely on the basis of a general state doctrine of negligence *per se*, without requiring that

28

> there be some specific basis for concluding that similar conduct by private
> persons or entities would be actionable under state law, is to in essence
> discriminate against the United States: recovery against it is allowed, although
> for similar conduct the private person or entity would not be subject to liability
> under state law.

*Johnson*, 47 F.3d at 729. Further, the Fifth Circuit has "long followed the principle that we will not create 'innovative theories of recovery or defense' under local law, but will rather merely apply it 'as it currently exists.'" *Id.* (quoting *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1217 (5th Cir. 1985)).

Plaintiffs allege the United States breached its civil statutory duty to collect, process, and submit Kelley's background information into the national background-check system. The question here is whether Texas law provides any reasonable analogy to this duty. The Court will analyze in turn each of Plaintiffs' three claims—negligence *per se*, negligent undertaking, and negligent training and supervision.

### 1. Plaintiffs do not state a viable claim negligence *per se* based on violation of the Brady Act

First, Plaintiffs allege the United States violated the Brady Act and claim that this violation establishes negligence *per se* under Texas law. A negligence cause of action has three elements: (1) a legal duty, (2) breach of that duty, and (3) damages proximately caused by the breach. *See Praesel v. Johnson*, 967 S.W.2d 391, 394 (Tex. 1998). Negligence *per se* is a tort concept under which "a legislatively-imposed standard of conduct is adopted by the civil courts as defining the conduct of a reasonably prudent person." *Carter v. William Sommerville & Son, Inc.*, 584 S.W.2d 274, 278 (Tex. 1979); *Johnson v. Enriquez*, 460 S.W.3d 669, 673 (Tex.App.–El Paso 2015, no pet.).

29

The parties hotly dispute the applicable test for negligence *per se*. It is beyond dispute, however, that every negligence *per se* case begins with two threshold questions: whether the plaintiff belongs to the class that the statute was intended to protect and whether the plaintiff's injury is of a type that the statute was designed to prevent. *Praesel*, 967 S.W.2d at 395. Beyond that, the parties contest whether a penal statute is required, whether different inquiries govern civil and criminal statutes, and whether the Court must apply the factors set out in *Perry v. S.N.*, 973 S.W.2d 301, 305 (Tex. 1998).[10]

Here, however, the Court finds resolution of these issues unnecessary. For purposes of this motion, the Court assumes that *Praesel* provides the proper (and sole) test in this case, as Plaintiffs claim. The first two factors—the right type of injury and the right class of plaintiff—appear clearly met, as the Brady Act aims to protect the general public against gun violence. Further, despite the Government's argument that negligence *per se* requires a penal statute and that the Brady Act is non-penal as applied to the United States, the Court assumes the Texas negligence *per se* doctrine's scope could reach the Brady Act.

Crucially, however, the *Praesel* court imposes a third requirement: whether the alleged conduct would be considered substandard even in the absence of a statute. 967 S.W.2d at 395

---

[10] In *Perry*, the Court stated that if the threshold questions are satisfied, courts must still determine whether it is appropriate to impose tort liability for violations of the relevant regulations. *See Perry*, 973 S.W.2d at 306. The *Perry* court listed five factors to consider in doing so:

> (1) whether the regulations are the sole source of any tort duty from the defendant to the plaintiff or merely supply a standard of conduct for an existing common law duty; (2) whether the regulations put the public on notice by clearly defining the required conduct; (3) whether the regulations would impose liability without fault; (4) whether negligence per se would result in ruinous damages disproportionate to the seriousness of the regulatory violation, particularly if the liability would fall on a broad and wide range of collateral wrongdoers; and (5) whether the plaintiff's injury is a direct or indirect result of the violation of the regulation.

*Omega Contracting, Inc. v. Torres*, 191 S.W.3d 828, 840 (Tex. App.—Fort Worth 2006, no pet.) (citing *Perry*, 973 S.W.2d).

(citing *Parrott v. Garcia*, 436 S.W. 2d 897, 899 (Tex. 1969)). This element requires consideration of whether there is a corresponding common-law duty that is congruent with the statutory duty. Similarly, the *Perry* court, as one factor useful for deciding whether it is appropriate to impose tort liability for a given statutory violation, asked "whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common law duty." *Perry*, 973 S.W.2d at 309.

This is because "the defendant in most negligence per se cases already owes the plaintiff a pre-existing common law duty to act as a reasonably prudent person, so that the statute's role is merely to define more precisely what conduct breaches that duty." *Id.* at 306; *see also Allen v. Wal-Mart Stores, LLC*, No. CV H-16-1428, 2017 WL 978702, at *12 (S.D. Tex. Mar. 14, 2017), *aff'd sub nom., Allen v. Walmart Stores, L.L.C*., 907 F.3d 170 (5th Cir. 2018) ("Usually, . . . when [Texas courts] consider whether to use a statute for tort liability, a duty previously exists under common law, so the court turns to the statute to establish the specific standard of care.") (citing *Parrott*, 436 S.W. 2d at 899-900).

The Texas Supreme Court "has created a new duty by applying negligence per se on only one occasion." *Perry*, 973 S.W.2d at 307 (citing *Nixon v. Mr. Property Management Co*., 690 S.W.2d 546, 549 (Tex. 1985)). But the *Perry* court stated that in the Texas Supreme Court's "next major negligence per se case" after *Nixon*, which was *El Chico Corp. v. Poole*, 732 S.W.2d 306, 309 (Tex. 1993), "we returned to the norm of deriving duty from the common law and looking to the statute only for the standard of conduct." *Id.*

Here, there is no general Texas common-law duty that corresponds with the Brady Act's reporting requirements, as there is "generally no duty to protect another from the

31

criminal acts of a third party or to come to the aid of another in distress." *See Perry*, 973

S.W.2d at 306 (citing *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983)). This lack

of common-law duty is fatal to Plaintiffs' negligence *per se* claims under Texas law and in the

FTCA context. The Court must be mindful of its role in a case like this.

First, as the Fifth Circuit stated in *Wentwood*, federal courts must make an "*Erie*

guess" about how the Texas Supreme Court would answer a novel negligence *per se* question.

*Wentwood Woodside I, LP v. GMAC Commercial Mortg. Corp.*, 419 F.3d 310, 323 (5th Cir.

2005). Texas courts have already considered whether gun dealers can be negligent *per se* by

violating § 922,[11] but this Court must still ask whether the statute's reporting aspects—as

opposed to its point-of-sale aspects—can support Texas negligence *per se* liability. And given

the lack of congruent common-law duty and the Texas Supreme Court's reluctance to create

new ones, the Court's *Erie* guess is that the Texas Supreme Court would not establish a new

duty here. This is so even when working under the presumption that Plaintiffs' test is the

correct one. As stated above, the Court applies Texas law as it exists, but it will not import

innovative theories of recovery or otherwise expand Texas tort law.

Second, the lack of common-law duty puts Plaintiffs' claims at odds with the edicts in

*Johnson* and other FTCA cases. Without an analogous state-law duty, this claim is "wholly

grounded on a duty imposed by an allegedly violated federal statute" without a "specific basis

for concluding that similar conduct would be actionable under state law[.]" *Johnson*, 47 F.3d

---

[11] *See Reyna v. Academy Ltd.*, No. 01-15-00988-CV, 2017 WL 3483217, at *4–7 (Tex. App.—Houston [1st Dist.] Aug. 15, 2017, no pet. h.) (recognizing violation of § 922 may constitute negligence per se); *Wal-Mart v. Tamez*, 960 S.W.2d 125, 128 (Tex. App.—Corpus Christi 1998, pet. denied) (same); *Bryant v. Winn-Dixie Stores, Inc*., 786 S.W.2d 547, 548–550 (Tex. App.—Fort Worth 1990, writ denied) (same); *Peek v. Oshman's Sporting Goods, Inc*., 768 S.W.2d 841, 844 (Tex. App.—San Antonio 1989, writ denied) (same); *Ellsworth v. Bishop Jewelry and Loan Co*., 742 S.W.2d 533 (Tex. App.—Dallas 1987, writ denied) (same).

at 729. The most that can be said is that 1) the United States allegedly violated the Brady Act, 2) Texas has a negligence *per se* doctrine, and 3) Texas has applied this doctrine to the Brady Act in gun-dealer cases. This is not enough.

Thus, because Plaintiffs have pointed to no "analogous circumstances" under which Texas law imposes the necessary duty to support the negligence *per se* claims and because the FTCA is unavailable where "[t]he existence or nonexistence of the claim depends entirely upon Federal Statutes,"[12] the Government's motion is granted as to the negligence *per se* claims.

### 2. Plaintiffs state a valid negligent undertaking claim under Texas law

Still, "notwithstanding their inability to support an FTCA suit, federal statutes and regulations can still be important." *Zelaya v. United States*, 781 F.3d 1315, 1324–25 (11th Cir. 2015). For example, they "may provide evidence that the government has assumed duties analogous to those recognized by local tort law" or "may provide the standard of care against which the government's conduct should be assessed." *Id.* (quoting *Art Metal*, 753 F.2d at 1158-59)). "In short, while a federal employee's breach of a federally-imposed duty may bolster a FTCA claim, it cannot, on its own, create the duty that gives rise to that claim. That task falls to the applicable state jurisdiction." *Id.*

Here, Plaintiffs allege that the United States is liable for negligent undertaking. As *Zelaya* further explains, in FTCA cases,

> [w]hen the complaint involves one of the "garden variety common law torts," th[e] requirement of a state tort cause of action can be easily met. . . . Difficulties arise, however, when the activities at issue are "uniquely governmental functions" with unique duties that suggest no obvious analogue

---

[12] *Johnson*, 47 F.3d at 728 (quoting *United States v. Smith*, 324 F.2d 622, 624-25 (5th Cir. 1963)).

among private actors. *Indian Towing Co. v. United States*, 350 U.S. 61, 64, 76 S.Ct. 122, 100 L.Ed. 48 (1955). Without question, it can be difficult to imagine how a private person could be liable for breaches of such quintessentially governmental functions as the regulation of air travel, prisoners, drugs, and livestock because no private person has such duties under state law. *See, e.g., Smoke Shop, LLC v. United States*, 761 F.3d 779, 780 (7th Cir. 2014) (drug enforcement regulations); *Alfrey v. United States*, 276 F.3d 557, 559 (9th Cir. 2002) (regulation of prison inmates); *Dorking Genetics v. United States*, 76 F.3d 1261, 1262 (2d Cir. 1996) (cattle inspections); *Howell v. United States*, 932 F.2d 915, 916 (11th Cir. 1991) (airline safety regulations).

Notwithstanding these conceptual difficulties, the Supreme Court long ago made clear that there is no exception from FTCA liability solely because the particular tort arose from the performance of uniquely governmental functions. *Indian Towing*, 350 U.S. at 64, 76 S.Ct. 122. . . . We have recognized that "[n]ormally, the most analogous approach in determining whether the government is liable in the regulator-enforcer context under state law is the [G]ood [S]amaritan doctrine." . . . . Thus, in cases where the plaintiff points to the violation of a federal statutory or regulatory duty, we generally look to the applicable state's Good Samaritan doctrine to decide if the plaintiff has alleged a state tort claim that satisfies the § 1346(b)(1) requirement and thereby opens the door for a claim under the FTCA.

*Zelaya*, 781 F.3d at 1324–25.

As the Second Circuit stated in *Ingham v. Eastern Air Lines, Inc.*, "[i]t is now well established that when the government undertakes to perform services, which in the absence of specific legislation would not be required, it will, nevertheless, be liable if these activities are performed negligently." 373 F.2d 227, 236 (2d Cir. 1967).

The Government also cites this passage, apparently for the proposition that if the governmental service is prescribed by statute it is not a voluntary undertaking under the Good Samaritan doctrine. Docket no. 45 at 24. The Government misunderstands the sentence. *Ingham* is stating that even if the only reason the Government acts is because of legislation, it still cannot act negligently. *See also Alfrey v. United States*, 276 F.3d 557, 568–69 (9th Cir. 2002) ("Once a decision to investigate inmate threats has been made, however, and that

34

investigation initiated, there is a legitimate expectation that the investigation will be conducted with due care. Both the Supreme Court and this court have long distinguished between the government's decision to act or provide a service, and the (negligent) performance of that act or service."). The *Ingham* passage's meaning is made clear in the subsequent passage, as the court engages in a thought exercise:

> Assuming arguendo, that in the absence of FAA regulations approach controllers would not have to advise incoming aircraft of weather conditions, the decision to provide such information would lead carriers and their pilots normally to rely on the government's performance of that service. The carriers, relying on the FAA to keep their pilots informed of current weather conditions, would be likely to reduce both the quantity and quality of their own weather reporting. In light of this reliance, it is essential that the government properly perform those services it has undertaken to provide albeit voluntarily and gratuitously.

373 F.2d at 236.

The Good Samaritan doctrine, or negligent undertaking, is established in Texas law, which generally imposes no duty to act in preventing harm to others. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000). Even so, a duty to use reasonable care may arise "when a person undertakes to provide services to another, either gratuitously or for compensation." *Id*. Texas courts rely on the Restatement formulation, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

*Id.* (quoting Restatement (Second) of Torts § 323 (1965)).

In deciding the duty element of a negligent undertaking theory, courts must ask whether a defendant acted in a way that requires the imposition of a duty where one otherwise

would not exist, *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013) (per curiam), considering "several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the defendant's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant," *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).

Here, Plaintiffs allege the United States, in undertaking to establish a complex national background-check system, assumed the duty not to operate this system negligently. Further, Plaintiffs argue, even if negligently running the background check system is not an undertaking under Texas law, the USAF's volunteering to take corrective action and failing to do so does constitute such an undertaking. Although these allegations could not support a negligence *per se* claim, violation of these duties imposed by statute and regulation provide evidence that the United States have voluntarily assumed a duty, as recognized by Texas common law.

First, applying the *Phillips* factors, the Court must decide the duty element. The risk, foreseeability, and likelihood of injury are high. Gun violence generally and mass shootings specifically are tragically commonplace. To limit this violence, Congress has disqualified certain people from buying, owning, or possessing guns and established a national background check system to prevent these people from obtaining guns. With Kelley specifically, at every stage in his life—during and after his USAF tenure—the threat of violence loomed. People like Kelley cannot own guns and the negligent operation of the background check system foreseeably increased the risk and likelihood of injuries like those suffered by Plaintiffs.

The social utility of USAF's and DOD's conduct is high, but the magnitude of guarding against the injury and the consequences of placing this burden on the United States are low. The United States, of all possible entities, is best positioned to carry out the NICS system effectively and has the resources to absorb the blow when, as here, it allegedly acts negligently and faces the prospect of damages for that negligence. Taken together, these factors lead the Court to conclude that the United States owed a duty in this case. Had the Government elected to provide this service even without a statute requiring it, the United States would also, in that case, assume this duty.

Another court in the Western District of Texas recently denied summary judgment in an FTCA case stemming from another mass shooting the Government should allegedly have prevented—the 2015 Fort Hood shooting. *Kristensen v. United States*, No. 1:17-CV-126-DAE, 2019 WL 1567908 (W.D. Tex. Jan. 31, 2019). In that case, the court found that the plaintiffs had a negligent undertaking claim, locating the duty in "Army and Department of Defense regulations" that was "voluntarily assumed by affirmative conduct—enacting the regulations and acting under color of them." *Id.* The *Kristensen* decision supports this Court's conclusion. Similarly, here, in enacting the DOD regulations mandating that information be collected and reported to NICS, the Government assumed a duty to act non-negligently in doing so. And when USAF promised to adopt the IG report's recommendations and fix its systemic problems, it re-affirmed this assumption of duty.

With the duty element satisfied, Plaintiffs easily satisfy the remaining elements. Importantly, Plaintiffs' reliance is not required here. Many arguments like Plaintiffs' fail because, in casting an argument in terms of a state's Good Samaritan doctrine, plaintiffs often

run into the misrepresentation or discretionary-function exceptions. Not so here. As held above, Plaintiffs relied on no governmental representation or failure to communicate, which prevents application of the misrepresentation exception. This would pose a problem under a Good Samaritan doctrine that requires reliance on the voluntary undertaking, but Texas's does not. It requires either reliance or an increased risk of harm. And despite the Government's argument to the contrary, Plaintiffs allege the systemic negligence on the Government's part led to a background check that was botched many times over, and the result was that Devin Kelley bought guns he should have been disqualified from buying. He used those guns to kill Plaintiffs' family members. This is a sufficient allegation of increased risk of harm. Besides, this is a factual question, as is whether the Government should have known of a danger to Plaintiffs arising from its alleged negligence.

Further, referring to the above discussion of the Brady Act immunity provision, the alleged negligent undertaking—enacting and acting under color of regulations that require DOD and USAF to collect, handle, process, and report information to the background check system—implicates the conduct of employees well beyond those "responsible for providing information" to NICS. Even if the United States were immune to the extent its employees are immune, then, the negligent undertaking claim would still survive. The United States would still have assumed the duty to act non-negligently with respect to the background check system, and it would still have breached this duty by, for example, failing even to collect Kelley's fingerprints. This act and other alleged acts have nothing to do with "providing information" to NICS.

Thus, Plaintiffs' claim for negligent undertaking under Texas law should proceed.

### 3. Plaintiffs state a valid claim for negligent training and supervision

Finally, Plaintiffs bring claims for negligent training and supervision. "The elements of a claim for negligent supervision, like all negligence claims, are (1) the defendant owed a legal duty to the plaintiff, (2) the defendant breached that duty, (3) the plaintiff suffered damages, and (4) the damages were proximately caused by the defendant's breach." *Latimer v. Mem'l Hermann Hosp. Sys.*, No. 14–09–00925–CV, 2011 WL 175504, at *3 (Tex. App.—Houston [14th Dist.] Jan. 20, 2011, no pet.) (citation omitted). "To prevail on a claim for negligent hiring or supervision, the plaintiff is required to establish not only that the employer was negligent in hiring or supervising the employee, but also that the employee committed an actionable tort against the plaintiff." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 801 n. 2 (Tex. 2010) (quoting *Brown v. Swett & Crawford of Tex., Inc.*, 178 S.W.3d 373, 384 (Tex. App.—Dallas 2005, no pet.)).

Claims against an employer for negligently hiring, supervising, training, or retaining an employee are based on direct liability, not on vicarious liability. *Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 100-01 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). "Negligent hiring, retention, and supervision claims are all simple negligence causes of action based on an employer's direct negligence rather than on vicarious liability." *Dangerfield v. Ormsby*, 264 S.W.3d 904, 912 (Tex. App—Fort Worth 2008, no pet.) An employer has a duty to adequately hire, train, and supervise employees and "[t]he negligent performance of those duties may impose liability on an employer if the complainant's injuries are the result of the employer's failure to take reasonable precautions to protect the complainant from misconduct of its

39

employees." *Mackey v. U.P. Enterprises, Inc.*, 935 S.W.2d 446, 459 (Tex. App.—Tyler 1996, no pet.).

The Government argues only that because there is no actionable tort against a federal employee, these claims cannot survive. But, as held above, Plaintiffs have stated an actionable tort for negligent undertaking. Although not styled as a claim against an employee, it is based on the negligence of federal employees. Plaintiffs allege that federal employees negligently collected, processed, and reported background information—if they can prove that this negligence was proximately caused by negligent supervision or training, the Government would be liable under a negligent training or supervision theory.

This claim is better addressed at summary judgment or trial, as discovery will reveal whether Plaintiffs meet the necessary elements. For now, based on the information reasonably available to Plaintiffs, the complaint states a valid negligent training and supervision claim.

### 3. Conclusion

Accordingly, the Government's Motion to Dismiss is GRANTED IN PART and DENIED IN PART. Plaintiffs' negligence *per se* claims are DISMISSED. Plaintiffs' negligent undertaking claim and negligent training and supervision claims will proceed. To the extent any of the consolidated complaints do not include one or more of these claims, those complaints are DISMISSED WITH LEAVE TO AMEND. Should those plaintiffs wish to pursue their claims, they must file an amended complaint by June 6, 2019.

Discovery in this case was stayed pending resolution of this motion. This stay is LIFTED and the parties are now DIRECTED to confer and submit a proposed scheduling order and Rule 26(f) report by June 13, 2019.

It is so ORDERED.

SIGNED this 23rd day of May, 2019.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE