**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **KRIS WORKMAN**<br>**Plaintiff,**<br><br>**v.**<br><br><br>**THE UNITED STATES OF AMERICA**<br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br><br><br>**CIVIL ACTION NO:**<br><br>**5: 18-cv-00555-XR** |

**PLAINTIFF KRIS WORKMAN'S FIRST AMENDED COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

This case arises out of negligence and negligence *per se* by the United States of America and its agencies causing the massacre at the Sutherland Springs First Baptist Church on November 5, 2017. Kris Workman, Individually, (hereinafter referred to as "Plaintiff"), brings this Complaint under the Federal Tort Claims Act, 28 U.S.C. § 2674 against the United States of America and would respectfully show the following:

**Contents**

I.   PARTIES……………………………………………………………...…………..3

II.  BACKGROUND………………………………………………………..…….3

    A. Congress passed key legislation to prevent shootings like the Sutherland Springs shooting…….……………………………………………………………5

    B. Congress, the Department of Defense and the Air Force voluntarily undertook a non-delegable duty to report convictions for domestic violence, incarceration for a crime punishable by more than one year, and mental institution commitment…………………….…………………………………………..7

C. The Department of Defense and Air Force knew that it was not reliably collecting and reporting fingerprints and final disposition information to the FBI………………………………………………………..…..…..…10

..

III.   DEVIN KELLEY

A. The Air Force knew Devin Kelley's violent history……………………………..……11

B. The Air Force commits Devin Kelley to a mental health facility………………….17

C. The Air Force charges and convicts Devin Kelley of domestic violence, resulting in his incarceration for a crime punishable by more than one year……...…………....19

D. Kelley commits a mass shooting at the Sutherland Springs First Baptist Church on November 5, 2017…………………………………………………………………

IV.   AIR FORCE'S COMMISSIONS AND OMISSIONS…………………….............24

A. The Department of the Air Force missed multiple opportunities to provide Devin Kelley's fingerprint cards and final disposition reports to the FBI……………………………………………….………….……………..24

B. Systematic failures in operations, organization, hiring training, and supervision caused the Air Force's failure to collect, maintain, and submit Devin Kelley's fingerprint cards and final disposition reports to the FBI………………………………..……………………….……………………27

C. The United States is liable both directly and vicariously liable for these acts and omissions……………………………………………………. ……………..…..30

V.   CAUSES OF ACTION

A. Negligence………………………………..………………………….…….....40

B. Negligent Failure to Train & Supervision……………………………...…..…..42

C. Negligent Undertaking…………………………………………..………….43

VI.   CAUSATION…………………………………………………………….…45

A. Department of Defense and Department of the Air Force's negligence caused injuries to the Plaintiffs……………………………………………………45

B. Had the Air Force reported Kelley's history, the FBI's Instant Criminal Background Check System would have blocked Devin Kelley's firearm purchase…………………………………………………………………....47

VII.   DAMAGES…………………………………………………………………47

VIII.    JURISDICTION, VENUE, & SERVICE…………………..…………..……..…..……..49

IX.    LIABILITY OF THE UNITED STATES………………………..………..…..…49

X.    JURISDICTIONAL ALLEGATION……………………………..…………..…50

## I.    <u>PARTIES</u>

1.1    Defendant is the United States of America.

1.2    Plaintiff is a resident of Texas and Wilson County.

1.3    Plaintiff Kris Workman suffered devastating physical and emotional injuries from gunshot wounds to his spine and internal organs in the shooting at the First Baptist Church of Sutherland Springs on November 5, 2017.   He is therefore a proper party to bring suit under Texas law for personal injuries suffered as a result of the negligence of the United States of America, the United States Air Force and the Department of Defense that proximately caused his permanent injuries.

## II.    <u>BACKGROUND</u>

### A. Congress passed key legislation to prevent shootings like the Sutherland Springs shooting.

2.1    Through several pieces of legislation spanning almost thirty years, Congress acted to block individuals who present a known risk of violence from purchasing firearms. To that end, Congress mandated that certain individuals must be flagged in an instant criminal background check system used by firearms sellers nationwide in the interest of public safety. The Air Force and Department of Defense ignored three statutory mandates that required Devin Kelley's entry into the background check system: his domestic violence conviction, his conviction for a crime punishable by imprisonment for over a year, and his commitment to a mental institution. As a direct result of the Air Force and Department of Defense's failure to flag Kelley in the FBI (Federal Bureau of

Investigations) database, his documented threats of gun violence, his active efforts to acquire guns and body armor, and his acts of family violence while in the Air Force predictably resulted in a shooting rampage following discharge from the Air Force.

2.2     The Air Force provided no notice whatsoever to the civilian population of the danger when it illegally allowed the mentally ill shooter to retain the capacity to purchase firearms upon discharge from the Air Force. The failure to act by the Air Force to comply with the law in the use of ordinary care, despite the accumulated knowledge by mental health professionals employed by and/or under contract with the Air Force about the shooter's dangerous mental condition made the shooter's later acts of mass murder simply a question of time, location and the identities and number of his victims.  The shooter predictably attempted to enter into domestic relationships subsequent to his discharge.  His mental illness was known to the Air Force long before his discharge in early 2014 combined with his propensity for threats of gun violence and known prior attempts to acquire the means to perpetrate gun violence resulted in a predictable armed attack, targeting his ex-wife's family, congregation members, and visitors at the Sutherland Springs First Baptist Church on November 5, 2017.

2.3     Federal law makes it unlawful to sell a firearm to a person whom the seller knows or has reasonable cause to believe is someone who (a) has been convicted of a misdemeanor crime of domestic violence; (b) has been convicted of a crime punishable by imprisonment for longer than a year; or (c) has been committed to any mental institution.  18 U.S.C§922(d)(l),(4),(9). These categories of individuals are forbidden from possessing firearms. *Id.*§922(g).

2.4     Congress attempted to quell the dangers presented by mass shooters like Devin Kelley before he was even born. Initially passed as the Gun Control Act of 1968, the law banned the sale of firearms to those individuals with criminal histories and those individuals who have been committed to mental institutions.

2.5 In 1993, Section 103 of the Brady Handgun Violence Prevention Act required the Attorney

General of the United States to establish an instant criminal background check system that a firearm seller must use to determine whether the sale of the firearm violates 18 U.S.C. § 922. Under 18 U.S.C. § 922(t), a licensed dealer of firearms shall not sell or transfer to any person without first contacting the national instant criminal background check system.

2.6   Congress passed the Brady Bill to prevent shootings just like the Sutherland Springs shooting. When the Brady Bill was introduced in the House, one of the Bill's sponsors explained that express purpose:

> Mr. Speaker, I rise to strongly support today's introduction of the Brady Bill. Five years ago, a man named Larry Dale walked into Mercer's Discount Foods in Tulsa, OK, and opened fire on an unsuspecting crowd of shoppers. Dale's rampage killed one person and severely wounded another. Many Oklahomans were outraged to learn that Dale, a convicted felon with a history of mental illness, had walked into a gun store the day before his crime, filled out a single form, and walked out with his instrument of death. The tragedy is that 5 years after Larry Dale proved how flawed the system is, the Brady Bill is not the law of the land.[1]

2.7   When the Brady Bill went to committee, the Chairman's opening statement in the House Subcommittee hearings noted that the Brady Bill would effectively prevent barred individuals from purchasing firearms: We are meeting today to consider a bill whose time has come- the Brady Handgun Violence Prevention Act....

> There is nothing complicated about this bill. … It will save lives. The Brady Bill will save lives that are being wasted in an epidemic of handgun violence from Brooklyn to Florida and all across America. And that is not theory that is fact.
> After Brady passes, a convicted felon will no longer be able to walk into a gun store, as thousands have done this year, and walk out 10 minutes later with a murder weapon. State after State has shown that waiting periods and background checks work.[2]

---

[1] Congressional Record, House, at H731 (Feb. 22, 1993).
[2] Brady Handgun Violence Protection Act, hearing before the Subcommittee on Crime and Criminal Justice of the House Judiciary Committee (Sept. 30, 1993).

5

2.8     The committee issued the House Committee Report. Under the heading "Summary and

Purpose," the committee reported:

> The purpose of H.R. 1025 is to prevent convicted felons and
> other persons who are barred by law from purchasing guns from
> licensed gun dealers, manufacturers or importers.

The House report underscored that background checks are necessary to prevent violent

offenders from gaining access to firearms:

> The experiences of States which require background checks before
> firearm sales also indicate that many repeat offender criminals buy
> guns directly from firearms dealers. For example, in California, a
> background check intercepted 2,500 felons attempting to buy guns
> from dealers last year...Each year in Illinois some 3,000
> prohibited persons seek to purchase firearms and are
> denied.[3]

2.9     In 1996, the Domestic Violence Offender Gun Ban, also referred to as the "Lautenberg

Amendment," made it unlawful to sell firearms to anyone convicted of a misdemeanor crime of

domestic violence. Congress enacted the Domestic Violence Offender Gun Ban to "close [a]

dangerous loophole" in the gun control laws: while felons had long been barred from possessing

guns, many perpetrators of domestic violence are convicted only of misdemeanors.[4]

2.10    In abusive relationships, the severity of domestic violence often increases over time, and the

presence of a firearm increases the likelihood of homicide.[5] Congress recognized that "[f]irearms and

domestic strife are a potentially deadly combination."[6] As one Senator noted during the debate over §

922(g)(9), "[A]ll too often, the only difference between a battered woman and a dead woman is the

presence of a gun." 142 Cong. Rec. 22986 (1996) (statement of Sen. Wellstone).

---

[3] H. Rep. No. 103-344, Brady Handgun Violence Prevention Act (Nov. 10, 1993).
[4] United States v. Castleman, 134 S. Ct. 1405, 1408–09 (2014) (citing United States v. Hayes, 555 U.S. 415, 426 (2009)).
[5] See id., at 14–15; Campbell et al., Assessing Risk Factors for Intimate Partner Homicide, DOJ, Nat. Institute of Justice J., No. 250, p. 16 (Nov. 2003) ("When a gun was in the house, an abused woman was 6 times more likely than other abused women to be killed").
[6] See Voisine v. United States, 136 S. Ct. 2272 (2016) (citing Hayes, 555 U.S. at 427).

**B. Congress, the Department of Defense, and the Department of Air Force voluntarily undertook a non-delegable duty to report convictions for domestic violence, incarceration for a crime punishable by more than one year, and mental institution commitment.**

2.11    Federal law requires Government agencies to report ineligible firearm purchasers to a national database. Specifically, 34 U.S.C. § 4090l(e)(l)(C) states that federal agencies that have "any record of any person demonstrating" that the person should not be able to purchase a gun "shall, not less frequently than quarterly, provide the pertinent information contained in such record to" the Attorney General for the national instant criminal background check system. Section 4090l (e) (l) (D) creates an obligation on agencies to correct and update these records.

2.12    Title 10, U.S.C. section 1562 requires that the Department of Defense establish a central database of information on the incidents of domestic violence involving members of the armed forces. This section also requires that all military departments, including the Department of the Air Force, report domestic violence incidents.

2.13 It is Department of Defense policy that all Department agencies, including the Department of the Air Force, comply with the (a) crime reporting requirements of the Uniform Federal Crime Reporting Act of 1988; (b) reporting requirements for victim and witness assistance notifications of the Victim's Rights and Restitution Act of 1990, and (c) reporting requirements of the Brady Handgun Violence Prevention Act.

2.14    To implement these federal laws, the Department of Justice established the National Instant Criminal Background Check System (NICS). Congress, through the Brady Act, established the NICS Indices, which contains information provided by federal agencies of persons prohibited from receiving firearms under federal law. The NICS responds instantly to background check inquiries by querying the NICS Indices, the National Crime Information Center, and the Interstate Identification Index. The Interstate Identification Index contains biometric criminal history based on fingerprint submission.

2.15    The Department of Defense issued policies that required submission of fingerprint cards and

final disposition reports to the FBI for inclusion in the NICS database. The Department of Defense and the U.S. Air Force promulgated these policies through Department of Defense Instruction 5505.11, "Fingerprint Card and Final Disposition Report Submission Requirements." Instruction 5505.11 requires the collection of fingerprints and the submission of criminal history to the FBI. Under this instruction, U.S. Air Force law enforcement agents are to collect and submit fingerprint cards when they have probable cause to believe that a person committed a violation or a crime that would make the person ineligible to obtain a firearm. In addition, final disposition reports must be submitted to the FBI upon final disposition of the offense.

2.16.   Department of Defense Manual 7730.47-M Volume 1, Enclosure 3, prescribes the reporting data elements needed to comply with Federal criminal incident reporting pursuant to federal law. Enclosure 3 states the Defense Incident-Based Reporting System:

> Shall be used to centralize the collection of information that is reportable by the DoD Components pursuant to The Brady Handgun Violence Prevention Act of 1993, which requires the Department of Defense to report these eight categories to the FBI for purposes of prohibiting firearm purchases:
>
> (1)Persons who have been convicted in any court of a crime punishable by imprisonment for a term exceeding 1 year....
>
> (4) Persons who have been adjudicated as mental defectives or who have been committed to a mental institution…....
>
> (7)   Persons convicted in any court of a misdemeanor crime of domestic violence.

2.17   The Department of the Air Force issued instruction 31-206 and 31-118.   Air Force policies required that Air Force Security Forces units obtain complete sets of fingerprints on fingerprint cards. Air Force Instructions require the submission of these fingerprint cards and final disposition reports to the FBI.   Department of Air Force Instruction 31-205 requires fingerprinting of all post-trial inmates during the in-processing into a confinement facility. The Instruction also required that Air Force train it staff in in-processing matters, including

collecting and submitting fingerprint cards and final disposition reports to the FBI.

2.19    The Department of the Air Force also has instructions, handbooks, and manuals that provide policy, guidance, and procedures for collecting and reporting criminal history data to the FBI, consistent with Department of Defense policies.

2.20    Air Force Office of Special Investigations Handbook 71-105 ("An Agent's Guide to Conducting and Documenting Investigations," March 9, 2009) obliges Air Force agents or employees to collect a subject's fingerprints (or the electronic equivalent) after a subject interview. The Handbook requires Detachment leadership to review the fingerprint cards and final disposition reports for accuracy, verify the fingerprints were acceptable, and document their review.

2.21    Air Force Office of Special Investigations Manual 71-118, Volume 4, ("General Investigative Methods," April 5, 2012) requires the collection of fingerprints from all subjects of Special Investigations after the subject interview if investigating the subject for violation of certain offenses, including crimes of domestic violence.    It refers Air Force agents to Department of Defense Instruction 5505.11 for the criteria of collecting and submitting fingerprints to the FBI.

2.22    Air Force Office of Special Investigations Manual 71-121 ("Processing and Reporting Investigative Matters," October 12, 2012) requires Air Force agents to submit a subject's fingerprints to the FBI if they have probable cause to believe the subject of their investigation committed certain offenses, including offenses involving domestic violence.    This manual also requires agents to submit completed final disposition reports on military members to the FBI within fifteen (15) days of sentencing.    Duplicates of these reports must be maintained in the Air Force investigative case files. This manual further requires Detachment leadership to review—for sufficiency—investigative files monthly from the date of the allegation until the

case is closed.

### C. The  Department of Defense and Air Force knew that it was not reliably collecting fingerprints and reporting final disposition information to the FBI.

2.18    The Department of Defense Inspector General conducted several investigations that found failures in the submission of required fingerprints and final disposition reports to the FBI throughout the Department.

2.19    In 1997, the Inspector General found a high level of non-compliance by Department of Defense and its agencies. For example, the Air Force failed to submit fingerprint cards in 38% of its criminal cases and failed to submit final disposition reports in half its criminal cases. The Inspector General recommended that the military departments and defense agencies develop policies and implement procedures to correct these failures and prevent such failures from occurring in the future. The United States Air Force agreed with the recommendations.

2.20    In 2013, and Inspector General investigation revealed that defense departments failed to collect or failed to report 20 percent of fingerprints in sexual assault cases. (Report No. DoDIG Report No. 2013-091, "Evaluation of Military Criminal Investigative Organizations' Sexual Assault Investigations" July 9, 2013).  Similarly, in 2014, an Inspector General report revealed that Defense Departments failed to collect and submit fingerprints in child death investigations. In 2015 and 2017, the Inspector General found that Defense Departments failed to collect or submit fingerprints in investigations of sexual assault.

2.21 In 2015, the Inspector General issued another report (Report No. DoD IG-2015-081, "Evaluation of Defense Compliance with Criminal History Data Reporting Requirements") where it found that the military services failed to consistently submit fingerprint cards and 32% of final disposition reports.  The Inspector General recommended that the Air Force take prompt action to submit missing fingerprint and final disposition reports to the FBI. The Inspector

General also recommended that the Air Force take prompt action to ensure submission of fingerprint cards from future criminal investigations and future final dispositions reports. The Department of Air Force agreed with these recommendations.

2.21    A 2017 review conducted by the Inspector General (Report No. DoDIG-2018-035, "Evaluation of Fingerprint Card and Final Disposition Report Submissions by Miltary Service Law Enforcement Organizations" Dec. 5, 2017) again determined that the military services failed to submit fingerprint cards and final disposition reports as required.

### III.    DEVIN KELLEY

#### A.    The Air Force knew Devin Kelley's violent history.

3.1    Devin Kelley entered the Air force Delayed Enlistment Program on June 12, 2009. While enlisting, Kelley lied to the Air Force about using and possessing marijuana. On January 5, 2010, he re-certified his lies about marijuana use and possession when he entered active military service. On March 5, 2010, Kelley graduated from basic military training.

3.2    On April 14, 2010, the Air Force began training Kelley as a Network Intelligence Analyst, but Kelley had academic issues. Kelley's military training leaders recommended Kelley for elimination from the course because he did not meet academic standards. The report also indicated that Kelley has several minor disciplinary infractions.

3.3    On December 16, 2010, the Air Force re-assigned Kelley to a traffic management career field. On January 11, the Air Force permanently changed Kelley's station to Holloman Air Force Base ("Holloman"). Kelley arrived there at Holloman in late 2011. Between June 19, 2011 and March 2012, he accumulated four Memorandums for Record, four Letters for Counseling, and Five Letters of Reprimand. Kelley's conduct included failure to obey direct orders, creating a hostile work environment, making false statements, and insubordination of a superior officer. This included a letter of reprimand for lying to his supervisor, and for failing

to report to his duty station after being ordered to do so. In other letters, Kelley was warned that his conduct was a criminal act. In at least three of these letters, the Air Force told Kelley that he had proven that he could not be depended upon. In at least two of these letters, the Air Force noted that Kelley could not always be trusted and had demonstrated a disregard for the Air Force's core values. The Air Force warned Kelley that future misconduct would lead to more severe punishment.

3.4    In February 2011, Kelley began dating Tessa K. Kelley (nee Loge). Tessa Kelley had a child from a previous marriage. On April 12, 2011, Tessa Kelley and Devin Kelley married.

3.5 On June 2, 2011 Tessa Kelley took her child to William Beaumont Army Medical Center (a facility owned and operated by an agency of the United States). A nursing note indicated concern for child abuse or neglect. While questioning Tessa Kelley about her son's injuries, Tessa Kelley stated that Devin Kelley had kicked her.

3.5   On June 8, 2011, Devin and Tessa Kelley took the child to an ER complaining of vomiting and falling. The physicians noted that the child had bruising on the child's left cheek that appeared to be fresh and "a little purple." A CT scan revealed a fractured clavicle and a subdural hemorrhage (bleeding on the brain). After the fact, Devin Kelley admitted to the United States Air Force that he caused these injuries without excuse or justification. Devin Kelley produced a video confessing to his wrongful conduct. Physicians notified the Children, Youth and Families Department in New Mexico, who, in turn, notified the Air Force Office of Special Investigations Detachment 225 at Holloman of the possible child abuse.

3.6 On June 9, 2011, Air Force Special Investigations opened an investigation for assault on a child, listing Devin Kelley as the subject. They interviewed Kelley that day. Kelley denied striking his stepson, and denied having any knowledge of Tessa Kelley striking her son. Kelley stated that he and Tessa Kelley were the only ones with direct access to his stepson. Kelley

claimed he did not know how his stepson received the injury to his head. Kelley suggested that his stepson received the injury from falling on the floor while crawling or playing in his crib. At the end of the interview, the agents collected Kelley's fingerprints and released him to his unit representatives. Air Force agents collected Kelley's fingerprints because they believed that probably cause existed that Kelley committed the assault on his stepson. However, they did not send Kelley's fingerprint cards to the FBI as required by policy.

3.8   On June 28, 2011 Kelley's stepson was placed in foster care because of unexplained injuries and the suspicion of child abuse.  Also, on that day Tessa Kelley reported that Kelley has physically assaulted her by grabbing her around the throat, choking her and throwing her against a wall. This report was provided to Air Force Reserve leadership and to the 49th Security Forces Squadron at Holloman Air Force Base. The Air Force report of the incident stated that the investigation "determined that no crime had been committed and there was no evidence of any injury to either party"

3.9   On September 7, 2011, Devin Kelley voluntarily went to the Holloman Mental Health Clinic as a walk-in patient and stated that he was unable to cope with the stress he was under at work. He stated that the fact that Child Protective Services was removing his stepson from the house due to an allegation of abuse caused his stress. Kelley also stated that his supervisor was constantly "yelling at work."   A staff psychologist wrote in Kelley's mental health record that treatment would concentrate on his "anxiety/attention/occupational; continue to develop relational and mood management coping skills."   The psychologist also wrote that Kelley would be seen weekly. Between September 7, 2011 and February 22, 2012, Kelley was treated 17 times at the Holloman Mental Health Clinic. During that time, Kelley was prescribed Atomoxetine, Ibuprofen, Albuterol, Fluticasone, and Omeprazole.

3.10   In a report on Kelley's October 11, 2011 visit, a psychologist wrote that Kelley had trouble

13

interacting with authority figures and that he perceived that they were criticizing him.  On January 10, 2012, the psychologist examined Kelley again and reported that Kelley was "able to attend and focus on pertinent material at home and at work."  The psychologist wrote that Kelley was also able to control and direct his energy appropriately" and that there was no significant change in his symptoms."

3.11    On February 17, 2013, Tessa Kelley called the 49th Security Forces Squadron to report that Kelley had abused her after fleeing to El Paso, Texas. Tessa Kelley told Air Force 49th Logistics Readiness Squadron First Sergeant that Kelley's actions caused her to fear for her life. In response, the First Sergeant told her that the Squadron Commander would issue Kelley a no contact order. Terra Kelley told the Squadron investigators that the reason she left Kelley was to get away from him "and the abuse", that Kelley had been physically abusing her since July 2011 and that Kelley had choked her on multiple occasions. She stated that in one instance on December 24, 2011, Kelley pushed her against a wall and choked her because she had told him that she did not what to visit his family and stated, "you better pack your bags or I'll choke you to the ceiling and pass you out." Tessa Kelley also said that on another occasion, she and Kelley argued over her wanting to go for a walk at night. This argument resulted in Kelley choking her, kicking her in the stomach and then dragging her by her hair into the bathroom. She said that Kelley told her "I'm going to water-board you" and stuck her head directly under the showerhead. Tessa Kelley also told investigators that Kelley emotionally and physically abused her throughout their marriage. Tessa Kelley provided other examples of abuse, stating that Kelley would threaten to choke her if she did not do as he said, and would slap her, kick her, pull her hair, drag her through their house, and control her. She stated that Kelley told her if she "said anything to anyone he would bury her in the desert somewhere." Tessa Kelley stated that the reason she had not reported the abuse sooner was due to fear for bother

her life and the life of her son.

3.12    On February 12, 2012, Air Force investigators tried to interview Devin Kelley as a subject to their investigation into crimes of domestic violence. Kelley requested legal counsel and did not make a statement. The 49th Security Forces Squadron did not collect his fingerprints. Department of Defense and Air Force policies require the collection and submission of fingerprint cards to the FBI.

3.13    On February 23, 2012, Kelley voluntarily entered in-patient care at the Peake Behavioral Health Services ("Peak"), where he remained until March 8, 2012. Peak is a mental health institution. During Kelley's intake evaluation, staff diagnosed him as having "an adjustment disorder with depressed mood." The staff wrote, "the patient reported feeling suicidal with a plan to shoot himself with a gun after his wife informed him that she was filing assault charges for the altercation that occurred three weeks prior to admission." Kelley told Peak personnel that he had frequent mood swings. Kelley also reported that he had severe anxiety. Kelley told a clinical nurse specialist that he was diagnosed with Attention Deficit Hyperactivity Disorder while he was in fourth grade. He also told the staff that the Holloman Mental Health Clinic had counseled him to help him cope with his Child Protective Services case, his marital problems and his alleged emotional abuse from a female supervisor at work. During Kelley's in-patient treatment, he was prescribed Strattera for Attention Deficit Hyperactivity Disorder, Welbutirn for depression, Clonazepam for anxiety and Ambien for insomnia.

3.15    On March 8, 2012, the Peak discharged Kelley and told him to follow up with Holloman Mental Health Clinic. Between March 14, 2012 and April 26, 2012, Kelley was seen at the clinic seven times. The clinic had access to Kelley's records at Peak. The last visit to the clinic was April 26, 2012, during which Kelley told clinic personnel that he was experiencing more difficulty than ever before becase the final hearing for the adoption of his stepson was one hearing away from

resolution.

3.16    In approximately mid-March 2012, while at their residence, Tessa Kelley watched as Kelley put one bullet in a .38 Special revolver. Kelley then pointed the gun at his own head and pulled the trigger three times. Kelley then pointed the gun at Tessa Kelley and threatened her. On approximately April 23, 2012, Tessa Kelley and Kelley were driving to El Paso, Tessa Kelley asked Kelley to slow down. Devin Kelley cursed at her and told her "don't' tell me how to drive." He police later pulled Kelley over and cited him for speeding. After receiving the ticket and continuing to drive, Kelley blamed the ticket on Tessa Kelley and pulled the car over again. Kelley then pulled out a gun and placed the muzzle of the weapon against her temple, stating, "Do you want to die?" Tessa Kelley pushed the gun away and began to cry. Kelley then told her that he slapped her son on June 8, 2011, the day her son was taken to the hospital. Kelley additionally stated that he had struck his stepson on multiple occasions, the first time being in March 2011, in New Braunfels. The Air Force became aware of these facts through Tessa Kelley in an interview the Office of Special Investigations conducted on May 3, 2012.

3.17    On April 27, 2012, Tessa Kelley convinced Devin Kelley to make a full video confession. In the video, he admitted to hitting her son multiple times in frustration. Kelley stated that his frustration would lead him to push, strike, and slap his stepson. Kelley also acknowledged that he caused bruising on his stepson's face on June 8, 2011. Kelley further admitted that he caused his stepson's skull injury. He stated that he had pushed his stepson down multiple times and shook him on at least two occasions. After completing the video, he gave it to Tessa Kelley. On April 29, 2012, Tessa Kelley provided the recording of Kelley's confession to his First Sergeant. The First Sergeant provided the recording to Air Force Office of Special Investigations.

**B.    The Air Force commits Devin Kelley to a mental health facility.**

3.18    On April 29, 2012, Kelley's chain-of-command arranged to have him admitted back into

16

the Peak Behavioral Health Services. On April 30, 2012, Kelley entered Peak a second time. Kelley stated that he was going to shoot himself and Peak staff put a high-risk notification alert on his chart due to his homicidal and suicidal indicator.

3.19    On May 3, 2012, Air Force agents re-interviewed Tessa Kelley. She stated that she thought Kelley might have hurt her son, but she had not seen him do anything to hurt her son. She stated that she began suspecting him of injuring her son when Kelley started physically, verbally and mentally abusing her. Tessa Kelley stated that Kelley had struck, kicked, choked and puller her hair out on multiple occasions. She stated that Kelley threatened to kill her if she ever reported the abuse to police or any other party. Additionally, Kelley had stated to her, "if the cops show up at my door, I will shoot them." She also said he had told her, "my work is so lucky I do not have a shotgun because I would go in there and shoot everyone.: Tessa Kelley said that on one occasion while driving, Kelley struck her in the stomach in front of two friends, threatening to beat her if she continued speaking. Ina separate interview of other witnesses, Air Force investigators discovered that other individuals had witnessed Kelley verbally abuse Tessa Kelley on multiple occasions. In an interview of Tessa Kelley's childhood friend, he stated that Tessa Kelley told him about "all the times" Kelley had abused her. Tessa Kelley included the details of how Kelley would "hit her in the stomach and pull her hair out" and how he attempted to "water-board" her. Tessa Kelley told her childhood friend that water-boarding consisted of Kelley pushing her head under the shower faucet and turning on the water.

3.20    On June 6, 2012, a Peak staff member discovered Kelley's interest in guns. His medical records note that Kelley's insight and judgment are so impaired that Kelley does not understand "how that does not look good on him."

3.21    While receiving inpatient care at Peak, Mr. Kelley made several threats that if he were picked up by Security Forces, he would go for their guns. While at Peak, Devin Kelley was trying to

carry out threats he made against his chain-of-command. He made plans to purchase another firearm because his other weapons had been confiscated by the Air Force, its agents or contractors.

3.22    On June 7, 2012, Kelley left Peak facility without permission from the staff and without notifying anyone. On June 8, 2012, Peak director located Kelley at a Greyhound bus station in El Paso. A Greyhound security officer and an El Paso police officer handcuffed him, and police pofficers from Sunland Police Department transported him back to Peak. Kellet did not voluntarily return to Peak but was involuntarily re-commited to Peak. On the same day, Kelley's commander prepared a pretrial confinement package. That package included a memorandum stating that Kelley's commander was convinces that Kelley was dangerous and likely to hard someone if released. Kelley's commander also cited Kelley's internet search for body armor and firearms as further justification for the pretrial confinement. The commander concluded that Kelley was a flight risk and ordered him into pretrial confinement.

3.23    So, the 49th Security Forces Squadron detained Kelley at Peak and transported him to the 49th Security Forces Squadron Confinement Facility. Because Kelley was ordered into pretrial confinement, Air Force policy required the confinement facility personnel to fingerprint Kelley during the in-processing into the confinement facility and to submit those records to the FBI after sentencing. Air Force agents or employees did not take Kelley's fingerprints at this time. If fingerprints were taken, Air Force agents or employees did not retain those fingerprints as required by policy. Further, if any fingerprints were taken, Air Force agents or employees did not submit fingerprints to the FBI after his sentencing, as required.

### C. The Air Force charges and convicts Devin Kelley of domestic violence, resulting in his incarceration for a crime punishable by more than one year.

3.24    On June 8, 2012, Air Force investigators interviewed Kelley about Tessa Kelley's assault allegations and his absent without leave status when he left Peak. Kelley told them that

"something tragic had happened and he wanted to kill himself." Kelley also told the agents that he "escaped" from Peak because he was planning to go to New Braunfels, to plan his suicide. Kelley told agents that he made a confession video on his own free will. Because Air Force Detachment 225 Special Agents were in possession of Kelley's confession, conducted a subject interview, and Kelley was ordered into pretrial confinement on June 8, 2012, stating that he had reasonable grounds to believe Kelley assaulted Tessa and her son. In a memorandum dated June 12, 2012, the Pretrial Confinement Review Officer found that adequate probable cause existed to believe Kelley had assaulted Tessa and her son. Yet, Air Force failed to collect or submit Kelley's fingerprints.

3.25   A Pretrial Confinement Memorandum, dated June 8, 2012, concluded that Kelley had violated the Uniform Code of Military Justice: Article 86, date of Offense, June 7, 2012, Description of Offense, Absence without leave; Article 128, Date of Offense, April 23, 2012, Description of Offense, Communication of a threat and Article 134, Date of Offense, April 23, 2012, Date of Offense, Assault.

3.26   On July 10, 2012, the Air Force determined that Devin Kelley should be confined while awaiting trial because "it is foreseeable that [Mr. Kelley] will not appear for trial and/or will engage in serious criminal misconduct." As a basis for this conclusion, the Air Force noted:

> The Evidence shows a serious escalation of behavior involving firearms and threats after the physical abuse of a child. Particularly alarming is his decision to try to obtain another firearm while undergoing inpatient mental health care, conducting research on body armor, and then escaping from the facility late at night without authorization....
> Lesser forms of restraint are inadequate to mitigate the flight risk he poses nor would they prevent him from carrying out the threats that he has made against others, especially given the forethought and planning that he  showed by attempting to purchase another firearm and his escape from the mental health facility.

In addition, Commander Nathan McLeod Hughes found in that same order:

> "I am convinced that he is dangerous and likely to harm someone if

released. I further believe he is a flight risk. He fled to San Antonio, TX after turning over his confession to harming his stepchild, thus demonstrating that he is not likely to be present at any further hearings regarding his case.  Furthermore, when he was informed that he might be released from the mental health facility and placed into pretrial confinement, or other restrictions, he escaped from the mental health facility by jumping a fence late at night after making arrangements to purchase a handgun.

He also concluded:

"…….that his behavior in fleeing from authority and trying to purchase weapons leads me to conclude that he will not obey an order to be restricted to base and that such an order would be insufficient to prevent him from continuing to commit serious misconduct, such as harming someone in his squadron or his wife who lives on base."

3.27    On July 26, 2012, the Air Force charged Kelley with suspected violations of Article 128, against Tessa Kelley and her son. This is a charge of a crime of domestic violence. On August 2, 2012, an article 32 hearing was conducted. An article 32 hearing is a preliminary hearing that determines whether there is probable cause to believe an offense has been committed and the accused committed the offense; determines if the convening authority has court-martial jurisdiction; considers the form of charges; and recommends the disposition of the case. The hearing presented evidence that Kelley had abused Tessa Kelley from June 2011 through April 2012. The medical evidence presented during the hearing indicated her son suffered severe injuries inflicted by Kelley.

3.29    On August 27, 2012, charges were referred to court-martial. Kelley remained in confinement until the court-martial hearing on November 6, 2012.

3.30    On November 3, 2012, trial counsel offered, and the Staff Judge Advocate presented, Kelley and his defense counsel with an Offer for Pretrial Agreement. The agreement specified that, in return Kelley's plea of guilty to the charges of assault against his wife and stepson, the firearm charges would be dismissed, and his confinement would not exceed 3 years. On

November 4, 2012, Kelley and his defense counsel agreed to the terms of this agreement.

3.31   On November 6, 2012, in accordance with the pretrial agreement, Kelley pleaded guilty in the General Court-Martial proceedings to assault on his wife and stepson. On November 7, 2012, the Court-Martial panel sentenced Kelley to a reduction in rank to Airman Basic, confinement for 12 months and a bad conduct discharge. The plea of guilty to assault on his wife and stepson was a crime of domestic violence and a crime punishable by imprisonment for a term exceeding one year. In fact, Kelley's maximum sentence for the assaults on his wife and stepson included potential confinement for 5 years and 6 months.

3.32   The Air Force General Court Martial Order No. 10 specifically noted at the top of the order that this was a "Crime of Domestic Violence. 18 U.S.C § 922.(g)(9)." The citation to section 922(g)(9) references the federal law that prevents individuals convicted of even a misdemeanor crime of domestic violence from possessing a firearm.

3.33   On November 7, 2012, after his conviction, Kelley returned to the Confinement Facility at Holloman. Because his conviction changed his status from pretrial confinement detainee to post trial inmate, Air Force Corrections System policy required the confinement facility personnel to collect and submit Kelley's fingerprints during his in-processing into the confinement facility. Air Force employees did not collect, maintain, or submit Kelley's fingerprints to the FBI. Air Force agents or employees did not submit a final disposition report of Kelley's criminal history to the FBI. Air Force policy requires agents to submit the final disposition report within fifteen days (15) of Kelley's sentencing.

3.34   On December 14, 2012, the Air Force Office of Special Investigations received a Report and Result of Trial of Devin Kelley. Per policy, the Air Force should have reported the final disposition of Devin Kelley's convictions to the FBI. But it did not. Instead, the Air Force Special Agent in Charge certified that Kelley's fingerprints were submitted to the FBI. This

permitted the agent to close the investigation file when, in fact, the Air Force never collected, maintained, or submitted Devin Kelley's fingerprints or final disposition reports to the FBI.

3.35    On December 18, 2012, Kelley was transferred to and incarcerated at the Naval Consolidated Brig, Miramar, California, until his release on March 31, 2013. During his intake evaluation, Naval Consolidated Brig personnel placed Kelley in separate sleeping quarters from the general population while conducting medical and psychological assessments of him. Because of the evaluation, Kelley was classified as a "suicide risk in gown" as well as an "Assault risk – escape risk."

3.36    On March 31, 2013, Kelley was released from the Naval Consolidated Brig, upon completion of his sentence. Between March 31, 2013, and April 2, 2013, Kelley completed Air Force out-processing paperwork and was ordered "not to enter or reenter or be found within the limits of the United States military installation of Holloman Air Force Base, New Mexico, for an indefinite period."

3.37    On December 3, 2013, the Air Force Court of Criminal Appeals affirmed the findings and sentencing in Kelley's court-martial. On May 9, 2014, after the automatic appeals courts upheld Kelley's conviction and sentence, he was officially separated from the Air Force with a Bad Conduct Discharge. 3.38        On September 30, 2016, Kelley's former 49th Logistics Readiness Squadron supervisor received a threatening message from Kelley on Facebook. The message stated, "Hey you stupid b****. You should have been put in the ground a long time ago. Better hope I don't ever see you. You can't face facts, you fat piece of s***." Kelley's former supervisor said that she had not attempted to contact Kelley before receiving the message, and that it was unexpected. She stated that she saved Kelley's Facebook message as a screenshot and forwarded it to her former Air Force supervisor. Kelley's former supervisor also stated that she had considered reporting this incident to law enforcement and obtaining a

restraining order against Kelley but decided against it because she felt that he would find out where she lived.

**D. Kelley commits a mass shooting at the Sutherland Springs First Baptist Church on November 5, 2017.**

3.39    On December 22, 2014, Kelley purchased a Glock Model 19, a 9- millimeter, semi-automatic handgun, from Specialty Sports and Supply, in Colorado Springs, Colorado. He completed the ATF Forms 4473 and the store completed the required NICS check on the same day. The response provided was that the sale could proceed.

3.40    On June 26, 2015, Kelley purchased a Ruger GP100, a .357 Magnum, revolver handgun, again from Specialty Sports and Supply in Colorado Springs. He completed the ATF Form 4473 and the store completed the required NICS check on the same day. The response provided was that the sale could proceed.

3.41    On April 7, 2016, Kelley purchased a Ruger AR-556, a 5.56-millimeter, semi-automatic rifle, from Academy Sports and Outdoors (Store No. 41), in San Antonio, Texas. He completed the ATF Form 4473, and the store completed the required NICS check on the same day. The response provided was that Academy could proceed with the sale.

 3.42   On October 18, 2017, Kelley purchased a Ruger SR22, a .22 caliber, semiautomatic handgun, from Academy Sports and Outdoors (Store No. 46), in Selma, Texas. He completed the ATF Form 4473 and the store completed the required NICS check on the same day. The response provided was that Academy could proceed with the sale.

3.43    On four ATF Forms 4473 that Kelley filled out to purchase the firearms after his conviction, he certified that he had never been convicted of any crime for which the judge could sentence him for more than 1 year in confinement. One of the questions on ATF Form 4473 asks, "Have you ever been convicted in any court of a felony, or any other crime, for which the

judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation." Kelley should have answered "yes" to this question.

3.44    On November 5, 2017, Kelley entered the First Baptist Church of Sutherland Springs, Sutherland Springs, Texas, and opened fire with three of the four firearms he had purchased. He killed 26 people and wounded 22 others. After being shot by armed citizens who responded to the shooting, Kelley fled from the church in his automobile. Kelley later died from a self-inflicted gunshot wound.

## IV   AIR FORCE COMISSIONS AND OMISSIONS

**A. The Department of Air Force missed multiple opportunities to provide Devin Kelley's fingerprint cards and final disposition reports to the FBI**

4.1    On June 9, 2011, the Air Force first missed its opportunity to submit Kelley's fingerprint cards to the FBI, when the Office of Special Investigations opened an investigation into the assault of Kelley's stepson.

4.2    Also on June 9, 2011, an Air Force Special Agent wrote an affidavit to the military magistrate to obtain authority to search Kelley's on-base residence for evidence related to Kelley's alleged assault of his stepson. In the affidavit, the Special Agent wrote that he believed probable cause existed to search for evidence of child abuse. On June 17, 2011, a second Special Agent wrote a separate affidavit to a military magistrate requesting authority to seize certain property from Kelley. In that affidavit, the agent represented that he or she believed that probable cause existed to seize the property to determine the source of the victim's injuries. Even though Air Force agents believed that probable cause existed, they never submitted to the FBI the fingerprint cards collected on the June 9th interview. Additionally, their supervisors did not create a note in the investigative case file stating that the fingerprint card had been reviewed, as required by Air Force Office of

Special Investigation Handbook 71-105. Almost certainly, the supervisors failed to certify the review of the cards because they did not review them.

4.3      The Air Force Special agents who interviewed Kelley on June 9, 2011 knew of the Air Force policy requirements to collect and submit fingerprints to the FBI. The agents were unable to provide any reason why the Air Force failed to submit Kelley's fingerprints to the FBI. The Department of Defense Inspector General concluded that the Special Agents did not follow Department of Defense and Air Force policies regarding the submission of fingerprints, and that some agents did not understand the policies. The Inspector General also found confusion among the Special Agents as to when fingerprints should be submitted to the FBI. The former Special Agent-in-Charge and Superintendent believed that fingerprints were normally submitted within 2 days of the subject interview. The case agent stated that at the time of the Kelley assault investigation, he was not aware that of the requirement for submission of the fingerprints to the FBI upon a probable cause determination.

4.4      The second missed opportunity for the Air Force to submit Kelley's fingerprints to the FBI occurred on February 17, 2012. The 49th Security Forces Squadron opened an investigation on Kelley for assaulting Tessa Kelley, after she told the 49th Security Forces Squadron investigators that Kelley had been physically abusing her since July 2011. At that time, the investigators should have collected Kelley's fingerprints, in accordance with Department of Defense and Air Force policy. At the time, the Air Force had probable cause to believe that Kelley committed assault. The Inspector General concluded that Air Force investigators did not have a clear understanding of, and did not follow, DoD and USAF policy regarding the collection and submission of fingerprints.

4.5      The third missed opportunity for the Air Force to collect and submit Kelley's fingerprints to FBI occurred on June 8, 2012, when Air Force Office of Special Investigations interviewed Kelley

immediately after he was placed in pretrial confinement. Air Force investigators believed that probable cause existed that Kelley assaulted his stepson based on the evidence collected, including Kelley's confession on video. According to records of the interview with Kelley, investigators collected Kelley's fingerprints at the end of the subject interview. The Air Force negligently maintained Devin Kelley's fingerprints because a review of the case file found no fingerprint cards within it. Regardless, Air Force agents or employees did not submit the fingerprint cards to the FBI. So, while Special Agents initialed the block signifying that they collected Kelley's fingerprints, there is no evidence that they were collected and submitted to the FBI.

4.6     The Inspector General concluded Special Agents did not know or follow Department of Defense and Air Force policy, and they did not collect and submit Kelley's fingerprints to the FBI following his second subject interview on June 8, 2012. The failure to collect or submit the fingerprints occurred, in part, because of the Special Agent-in-Charge's practice not submit the fingerprints to the FBI until after the Detachment received the Report of Result of Trial from the Staff Judge Advocate or the Commander's record of discipline. However, none of the Special Agents could provide a sufficient or supportable reason why Kelley's fingerprints were not collected or submitted following his subject interview.

4.7     The fourth missed opportunity for the Air Force to submit Kelley's fingerprints and the first missed opportunity to submit Kelley's final disposition report to the FBI occurred on November 7, 2012, when the Air Force convicted Kelley by General Court-Martial for assault on Tessa Kelley and his stepson. As noted above, Air Force Corrections System policy required the confinement facility personnel to collect an inmate's fingerprints and submit the fingerprints with final disposition during in-processing into the confinement facility. As required by Air Force Instruction 31-205, the 49th Security Forces Squadron Confinement Facility staff should have included the final disposition on the fingerprint card they collected when they in-processed Kelley into the

confinement facility after his court-martial. That fingerprint card should have been sent to the FBI with the final disposition report.

4.8    When the Air Force processed Kelley for post-trial confinement, the Air Force confinement staff failed to collect Kelley's fingerprints. The Confinement Facility personnel did not follow Department of Defense and Air Force policy for collecting and submitting fingerprints and final disposition reports to the FBI. Personnel also did not know and were not trained that once fingerprints were collected, they should be submitted to the FBI. So, even if they had collected Devin Kelley's fingerprints and final disposition data, more likely than not, the personnel would not have submitted them to the FBI as a proximate result of the lack of training and supervision.

4.9    The second missed opportunity for the Air Force to submit Kelley's final disposition report to the FBI occurred on December 14, 2012, when the Office of Special Investigations Detachment 225 Special Agent-in-Charge received the results of Kelley's trial and closed the Kelley investigation. The Agent falsely certified in the Air Force's database system that the Air Force submitted to the FBI Kelley's fingerprints and final disposition reports. Moreover, the investigative case file cover sheet did not contain a supervisor's signature or a date to signify that the file was reviewed for closure, as required by Air Force Office of Special Investigations Manual 71-121.

**B.    Systematic failures in operations, organization, hiring, training, and supervision caused the Air Force's failure to collect, maintain, and submit Devin Kelley's fingerprint cards and final disposition reports to the FBI.**

4.10    The Air Force's failure to collect, maintain, and submit fingerprint cards and final disposition reports to the FBI was not an isolated error. Instead, this failure was caused by failures in operations, organization, training, and supervision.

4.11    For example, the Detachment leadership did not review the file or complete the Closed Investigative File checklist and the Investigative Information Management System checklist

properly. Instead, the Special Agent-in-Charge assumed that the case agent had completed the actions necessary and submitted Kelley's fingerprints and final disposition to the FBI. He therefore completed the two checklists without verifying that the fingerprints and final disposition report had been submitted to the FBI. If the Agent-in-Charge and Superintendent had included a review of Kelley's fingerprints in the leadership review, the fact that the fingerprints had not been submitted would have been identified.

4.12    Next, according to Air Force Office of Special Investigations Manual 71‑121, all criminal investigations require monthly supervisory reviews to ensure that investigators follow policy and that investigations are sufficient and timely. Air Force leadership conducted 15 supervisory reviews of the Kelley investigation from June 29, 2011, through October 5, 2012. However, none of the supervisory reviews that were documented discussed fingerprint card collection or submission. Although Air Force policy required supervisory reviews to include the investigatory case file, no such reviews of the case file occurred. Kelley's fingerprint cards were retained in the investigative case file. Had they reviewed the case file, more likely than not, they would have identified that the Air Force had not submitted Kelley's fingerprints to the FBI. The monthly supervisory reviews of Kelley's investigative case file were incomplete and ineffective in identifying that Kelley's fingerprint cards remained in the investigative case file and had not been submitted to the FBI.

4.13    The high turnover and disorganization in the Office of Special Investigations contributed to the Air Force's failure to collect, maintain, and submit Kelley's fingerprint cards and final disposition reports to the FBI. Between June 2011 and March 31, 2013, Air Force Office of Special Investigations Detachment 225 had two Special Agents-in-Charge and three interim Special Agents-in-Charge. The second interim Agent-in-Charge described the administrative process for closing cases was a "disaster" as a result of the large backlog of investigative case files stacked throughout the office. The third interim agent observed approximately 30 cases spread throughout the

Detachment office area in various stages of closure, in terrible condition, with many of the cases missing investigative documentation and corresponding activities with the agent notes. Air Force assigned a permanent Agent-in-Charge in December 2011. This agent noticed that staffing challenges and operations tempo caused the office to be "hell." The office was severely behind in closing out old cases and described the unit as a "bottomless pit" that was impossible to dig out from.

4.14    The Inspector General determined that the Air Force's failure to submit Kelley's fingerprints was part of a systemic problem with the Office of Special Investigations Detachment 225. After reviewing 70 closed investigations for fingerprint card and final disposition report submission to the FBI, the Inspector General found 8% of cases where investigators did not collect fingerprints; 20% of cases where investigators collected, but did not submit to the FBI, fingerprint cards; and 31% of cases where investigators failed to submit to the FBI final disposition reports.

4.15    In 2014, the Inspector General of the Department of Defense evaluated the reporting system's compliance with its own mandatory procedures and policies. The principal finding of this investigation condemned the performance of the Department of Defense. Specifically, it found that the military was:

> not reporting criminal incident data to the Federal Bureau of Investigation (FBI) for inclusion in the annual Uniform Crime Reports to the President, the Congress, State governments, and officials of localities and institutions participating in the Uniform Crime Report Program, as required by Federal law.

As a result of this failure:

> 10 years of DoD criminal incident data have not been provided to the FBI for inclusion in the annual uniform crime reports to the President, the Congress, State governments, and officials of localities and institutions participating in the UCR Program, as

29

implemented in DoD Directive 7730.47 and DoD Manual
7730.47‑M, Volume 1.

4.16    At the time of the Kelley investigation, the Air Force Security Forces Center was responsible for training, equipping, and organizing all Security Forces for the Air Force. At the time of the Kelley assault investigation, the Air Force Security Forces Academy did not train students on fingerprint card collection and submission or on final disposition report submission procedures. In 2015, the Air Force Security Forces created fingerprint training as part of the "Annual Home Station Training" requirements. The 1-hour long lesson plan was designed to be used by individual Security Forces Squadrons to train personnel on the physical collection of fingerprints and completion of the fingerprint card. However, the lesson plan does not contain any information relating to the submission of fingerprints. Additionally, the lesson plan did not reference Department of Defense or Air Force policy requirement and did not specify the conditions under which the fingerprint cards should be submitted nor did the lesson plan discuss the submission of the final disposition report.

4.17    The agents working on the Kelley investigation acknowledge the lack of training. One investigator explained that the only fingerprint training he received was "on-the-job" and that it related to the collection of fingerprints. Other investigators could not recall any training on fingerprinting subjects of investigation and under what circumstances. Neither did the Air Force provide training on an annual or reoccurring basis. The Inspector General interviewed one officer who explained that the majority of 49th Security Forces personnel were not familiar with collecting fingerprints at the time of the Kelley assault investigation.

## C.    Under Texas law, the United States is directly liable to the Plaintiffs through its Vice-Principals

4.18    Plaintiffs incorporate the preceding paragraphs and re-allege them as if fully set forth here. Texas law imputes direct liability for the acts and omissions of vice-principals that

proximately cause injury and damages. Persons with command authority over units and divisions of the Air Force, and/or over the entire Air Force and Department of Defense; and/or who had authority to employ, direct and discharge Air Force personnel and/or were responsible for engaging in non-delegable duties imposed on the Air Force by law and regulations committed the acts and omissions that directly and proximately caused the injuries and damages of each plaintiff. Their acts are deemed under Texas law as the acts of the Air Force and the Department of Defense itself.

4.19    Vice-principals of the United States Air Force breached their statutory duties to enforce their non-delegable mandatory obligations under 18 U.S.C. 922(d) (l) to train, manage, supervise, order and compel the relevant personnel within the Air Force to report persons who have been indicted or convicted in any court of a crime punishable by imprisonment for a term exceeding one year, specifically including airman Devin Kelley.

4.20    Vice-principals of the United States Air Force breached their statutory duties to enforce their non-delegable mandatory obligations under 18 U.S.C. 922(d)(4) to train, manage, supervise, order and compel the relevant personnel within the Air Force to report persons who have been committed to a mental institution, specifically including airman Devin Kelley.

4.21    Vice-principals of the United States Air Force breached their statutory duties to perform their non-delegable mandatory obligations under 18 U.S.C. 922(d)(l) to train, manage, supervise, order and compel the relevant personnel within the Air Force to report persons who have been indicted or convicted in any court of a crime of domestic violence. 18 U.S.C. 922(d)(8).

4.22    Vice-principals of the United States Air Force breached their legal obligation under Department of Defense Instruction 6400.06, which states in pertinent part: "[I]t is DOD policy that a 'qualifying conviction' also includes a conviction for a 'crime of domestic violence' tried

31

by general or special court-martial which otherwise meets the definition of domestic violence."
*Id.* at section 6.1.4.3. Further, a "conviction for an offense meeting the definition of a 'felony crime of domestic violence'.......shall also be considered a qualifying conviction." *Id.* at section 6.1.4.3.1.

4.23    Devin Kelley's conviction met the Requirements of DOD Instruction 6400.06 and other applicable sections of 18 U.S.C. 922(d) yet Command level Air Force and Department of Defense personnel (i.e., Vice-principals under Texas law) negligently failed to train, supervise, manage, order and compel the relevant information to be input into the relevant database by those acting under their control or direction in their squadron.

4.24    The pre-trial confinement order, entered on June 8, 2012, and signed by Commander of the 49th Logistics Readiness Squadron, Commander Nathan McCleod-Hughes, determined, "The course of conduct by AIC Kelley leads me to conclude that he will continue to engage in serious criminal conduct if not confined. He pointed a gun at his wife and then himself; carried a weapon openly on his person; confessed to injuring his stepchild, and then fled the area by driving to San Antonio, TX." The Order further concluded: "But for the intervention by his father, I'm convinced that he would have been AWOL and would not have returned on his own accord to Holloman AFB. After learning that he might be released from the mental health facility, he deliberately planned to obtain another gun (the other gun having been taken away from him) and body armor after making threats to kill his wife and threats to try to take away the guns of any security forces members." The Order summarized the findings as follows: "I am convinced that he is dangerous and likely to harm someone if released. I further believe that he is a flight risk. He fled to San Antonio, TX after turning over his confession to harming his stepchild, thus demonstrating that he is not likely to be present at any further hearings regarding his case.  Furthermore, when he was informed that he might be released from the mental health facility and placed into pretrial

confinement or other restrictions, he escaped from the mental health facility by jumping a fence late at night after making arrangements to purchase a handgun." Command Level Air Force Personnel concluded that Devin Kelley was dangerous and likely to harm someone if released.

4.25    Commander McCleod-Hughes unquestionably functioned as a squadron leader in charge of the command of an entire squadron of the Air Force, and his authority renders him a vice-principal under applicable Texas law.  McCleod-Hughes negligently failed to train, supervise, manage, command, order and compel his subordinates in the 49th Logistical Squadron and the investigative personnel assigned thereto to report the relevant disqualifying information to the FBI regarding the Devin Kelley. His negligence in failing under his command authority to do so is negligence of the United States itself.

4.26    Air Force and Department of Defense vice-principals violated DoD Directive 5106.1 (references (b) and (c)) that all DCIOs and all other DoD investigative and police organizations shall submit to the FBI as prescribed therein, the offender criminal history data for all Armed Forces members they investigate for the commission of an offense listed in enclosure 3.   Indeed, Commander McCleod Hughes, as the Squadron Commander failed as a vice-principal to ensure that persons under his command and control submitted the statutorily required information into the FBI's background check system.  His failure to do so and to train, supervise, command, order and compel those under his command to do violated not only Air Force and DoD regulations, but also the express requirement of Section 922 of the Brady Act.   At no time during the pre-trial confinement or the court-martial proceedings did Commander McLeod Hughes perform his statutory duties as a vice-principal of the Air Force and the squadron leader of this disturbed airman to ensure that the information necessary for civilian authorities to become aware of the danger posed by Airman Kelley was submitted as required by law to the FBI.

4.27    Further, DODI 5055.11 PS, Section 5.1 mandates that the Inspector General of the Department of Defense shall monitor and evaluate compliance with this instruction. Under section 5.2, the Secretaries of the Military Departments and the Heads of the other DoD Components shall: (5.2.1) issue procedures as may be necessary to implement and comply with this instruction; (5.2.2) ensure that Commanders (i.e. vice-principals) establish and follow procedures to promptly notify the appropriate DCIO or other DoD law enforcement organization when a military judicial proceeding is initiated or command action is taken in non-judicial proceedings against a military subject investigated by a law enforcement organization for   an offense listed in enclosure 2 and of the final disposition of such military judicial or non-judicial proceedings.

4.28    Vice-principals, including but not limited to Commander McLeod Hughes,   of the United States Air Force breached their mandatory   non- delegable duty to train, supervise, manage, command, order and compel personnel under their respective commands to report the required information into NICS upon the initiation of the articles of court-martial against Devin Kelley in September 2012,  and upon his conviction, and upon his sentencing.  On December 6, 2017, Secretary Dr. Heather Wilson of the United States Air Force admitted under oath before the Senate Judiciary Committee that the United States Air Force should have input the required information on the occurrence of each of those events.

4.29    Under 18 U.S.C. § 922(d) and Department of Defense Manual 7730.47-M, Vol. 1, Enclosure 3, the United States Air Force had a mandatory obligation to report Kelley's indictments, convictions at court-martial, commitment to a mental institution, and domestic violence to the FBI. However, vice-principals of the Air Force and Department of Defense failed to report Kelley's legally required and disqualifying data into the NICS as obligated by law. Vice-principals at the Department of Defense failed to ensure that its own mandatory directives

were properly enforced as its agency, the Air Force, had an unacceptably high failure rate of which the Department of Defense was aware. The Department of Defense's failure, by vice-principals in charge of the applicable units and divisions of the Department of Defense and the Air Force, to train, supervise, manage, supervise, command, order, monitor and compel the Air Force's compliance to avoid the repeated failures to comply with these mandatory directives also caused Devin Kelley's conduct and conviction to go unreported.

4.30    The vice-principals in the Air Force responsible for mandating compliance with the applicable mandatory, non-discretionary statutes and regulations set forth herein negligently failed to train, order, monitor, supervise, command and enforce the mandatory requirements of these laws and regulations by all relevant personnel in all relevant units and divisions of the Air Force.

4.31    Secretary Wilson testified before the Judiciary Committee in December 2017 that the Air Force Inspector General and the Air Force would monitor corrective action and complete periodic audits, prospectively, to insure compliance with the required regulations and statutes for reporting criminal history information to the FBI.  The Inspector General and the Auditor General of the Air Force occupy positions as vice-principals of the Air Force within the meaning of Texas law and failed to perform their required obligations to order, audit the completion of, supervise, command and compel the input of the statutorily required information in a timely manner. Their failures to comply with their duties under both federal and Texas law as vice principals of the Air Force prevented the FBI from receiving the statutorily necessary information from relevant personnel in the Air Force to prevent this disqualified, sick airman from ever passing a background check using the NICS database once the Air Force turned him loose on civilian society with no notice whatsoever of the danger following the completion of his sentence.

4.32    Secretary Heather Wilson and her predecessor, as Secretaries of the Air Force, had the obligation to monitor DoD IG audit reports and Air Force Auditor General reports, directly and through their direct subordinates, to ascertain compliance with the United States Code and DoD regulations and directives promulgated to comply with the United States Code, including but not limited to 18 U.S.C. § 922(d) and Department of Defense Manual 7730.47-M, Vol. 1, Enclosure 3.  The DOD IG's Report 2019-30 "Report of Investigation into the United States Air Force's Failure to Submit Devin Kelley's Criminal History Information to the Federal Bureau of Investigation" expressly sets forth the failures of the Air Force, the Air Force Security Service and the Air Force Office of Special Investigations (AFOISI) to comply with the statutory reporting requirements to the FBI for years prior to its first audit report in 1997.  It notes that Report PO 97-003 found a high level of non-compliance years preceding the release of that report. (P.55). The Air Force agreed with the DoD IG's recommendations to develop new interim procedures and issued a directive by AFOSI in December 1996 "which emphasized that reporting requirements are a mandatory inspection item for all AFOSI self-inspections and AFOSI Inspector General inspections."

4.33    Report 2019-30 goes on to document that in 2015 the DoD IG issued Report No. DoDIG-2015-081, which    "determined that the Military Services still did not consistently submit fingerprint cards and final disposition reports as required." (P 56).    The failures included failing to report twenty-eight percent of the required fingerprint cards and thirty percent of the final disposition reports to the FBI", yet neither the present nor former Secretary of the Air Force, using their authority as vice-principals of the Air Force, took the necessary and agreed steps to make the necessary corrections to eliminate the reporting deficiencies retroactive prior to the shooting at the First Baptist Church on November 5, 2017.

4.34    The DOD IG report 2019-30 further noted that in November of 2017 the same office was

conducting yet another review of compliance by the military service branches with the Brady and related DoD mandatory obligations (p. 56)  and issued on December 5, 2017, Report No. DODIG-2018-035, "Evaluation of Fingerprint Card and Final Disposition Report Submissions by Military Service Law Enforcement Organizations".   Report 2019-30 further notes that the 2017 report found that the Air Force continued to fail to report fourteen percent of the required fingerprint cards and an identical percentage of the final disposition reports to the FBI as required by law.

4.35   The Air Force Chief of Staff,    the Air Force Deputy Chief of Staff for Logistics, Engineering and Force Protection and their respective predecessors each negligently failed as vice-principals to issue timely and necessary orders and to train, supervise, command, monitor and compel personnel under their respective commands to comply with the obligations under federal law and Texas law to report the fingerprint cards and final disposition reports of all disqualified airman. they further failed to issue timely orders on receipt of the DOD IG audit report in February 2015 and at all time thereafter prior to the shooting in the First Baptist Church               to               correct               training               and compliance deficiencies by issuing the necessary and "more robust"  training requirements  to which Secretary Heather Wilson attested under oath on December 13, 2017 in response to Question for the Record 1 issued by  Senator Mazie Hirono following Secretary Wilson's live testimony before the  United States Senate Judiciary Committee on December 6, 2017.

4.36   The Secretary of the Air Force and her predecessor Secretary Deborah Lee James failed as vice-principals of the Air Force to comprehend  and address the size, scope and severity of the continued violations of the Brady Act and DoD mandatory policies outlined herein to supervise, monitor, command, order and compel the relevant subordinate offices within their respective commands to in turn train, supervise, monitor, command, order and compel the

responsible personnel at the AFOSA and Air Force Security Commands to timely report all disqualifying information under NICS to the FBI and to retroactively make the corrective changes to report the unreported disqualifying information, to which the Air Force agreed as Secretary Wilson admitted under oath following issuance of DoD IG report number DoD IG-2015-081, issued in February 2015.

4.37   Indeed, certain vice-principals and their predecessors in positions throughout the command structure of the Air Force held command authority, on information and belief from the Air Force's own published listing of commands in 2016, that empowered and authorized them to act by commanding many subordinates under their command, yet failed to act within the scope of their respective areas of command responsibility to train, supervise, manage, order, compel and otherwise ensure that fingerprint cards, disposition reports and other disqualifying information mandatorily required to be reported to the FBI were in fact timely reported in accordance with Sections 922 of the Brady Act and the other relevant statutes, directives and regulations set forth herein. (See attached as Exhibit A Air Force Magazine, September 2016 edition p. 72-79). Those vice-principals include, but are/were not limited to General David Goldfein, Air Force Chief of Staff; General Stephen W. Wilson, Air Force Vice Chief of Staff; Lt. General Gina M. Grosso, Deputy Chief of Staff in Manpower, Personnel and Services; Lt. General John W. Raymond, Deputy Chief of Staff in Operations; Deputy Chief of Staff in Operations Lt. General John B. Cooper; and other vice-principals whose identities are known to the United States and will become known to the Plaintiffs through the discovery process.

4.38   All of the aforementioned vice-principals were negligent in training, supervising, managing, undertaking, and directing and commanding the operational tasks mandated under the applicable statutes, directives and regulations to mandatorily report the disqualifying

information of the shooter to the FBI long before this shooter left the Air Force and sought to purchase firearms from licensed dealers that were used in the shooting, and which resulted in the permanent injuries to Plaintiff Kris Workman that would not have occurred had the vice principals ordered the performance of the specific, mandated statutory tasks set out above. The negligent performance of the operational tasks in an affirmative way increased the harm to the public at large, and the victims of the shooting, including specifically, Kris Workman.

4.39    Additionally, national background check systems designed specifically to be accessed to determine whether a particular purchaser's receipt of a firearm violated the Gun Control Act was not properly populated due to the failure to perform the operative tasks in a reasonable way. Information actually known by the Airforce and United States of America through its vice principals demonstrated Devin Kelley's purchase of firearms in the shooting would have, and should have, been denied.

4.40    Due to the failure to properly perform, supervise, train, command, monitor and compel the performance of operative tasks by vice principals and their subordinates, the shooting and killing with the weapons obtained wrongfully occurred. It was more likely true than not true that Kelley would not have shot Kris Workman and other victims at the time of Mr. Workman's severe injuries, without the acquisition and use of the type of firearms Kelley felt he needed to be armed with to perform the task he chose. The failure to adhere to, and operatively perform, the ministerial directives (including in house and external standard operating procedures set out above) resulted in NICS policies that govern investigation and reporting--that were required as ministerial acts and mandated to be complied with--not to be properly followed. The very acts that would have given rise to a "denied" response to any inquiry into the required data bases to be searched were not listed, as a direct result of the operational tasks not being performed in a reasonable way.

39

4.41     Individually and collectively, vice-principals and other as yet unknown vice- principals--pending discovery--of the Air Force and DOD negligently failed to comply with non-delegable mandatory duties, thereby subjecting the Air Force to direct liability for its negligent acts that proximately caused permanent injuries to Mr. Workman.

## V. CAUSES OF ACTION

### A.     Negligence[7]

5.1     The Department of Air Force failed to use ordinary care and failed to do that which a person of ordinary prudence would have done under same or similar circumstances by failing to collect, maintain, and transmit Devin Kelley's fingerprint's to the FBI, as described in this Complaint.

5.2     The Department of Air Force failed to use ordinary care and failed to do that which a person of ordinary prudence would have done under same or similar circumstances by failing to submit Devin Kelley's final disposition information to the FBI, as described in this Complaint.

5.3     The Department of the Air Force negligently failed to report criminal incident data to the Defense Incident-Based Reporting System of Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, and commitment to the mental institution.

5.4     The Department of the Air Force failed to submit criminal-history data to the FBI when probable cause existed in the Air Force Office of Special Investigations and Air Force Security Forces investigations on Kelley, after Kelley's court-martial conviction, and also upon his post-trial confinement at Holloman Air Force Base.

---

[7] Per the District Court's order, Plaintiffs have not included a cause of action sounding in negligence per se. ECF Doc. #59 (May 23, 2019). Plaintiffs reserve the right to appeal this decision and would have included the cause of action, but for the Court's order.

5.5     The United States, through Secretary of the Air Force Heather Wilson, admitted the allegations found in Paragraph 5.4 in response to a question by Senator Mazie K. Hirono in a submission dated December 13, 2017.

5.6     Alternatively, the Department of the Air Force negligently submitted inaccurate or incomplete criminal incident data to the Defense Incident-Based Reporting System of Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, or commitment to the mental institution.

5.7     The Department of the Air Force negligently failed to correct incomplete or incorrectly submitted criminal-incident data to the Defense Incident-based Reporting System of Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, or commitment to the mental institution.

5.8     The Department of the Air Force negligently failed to submit fingerprint cards and final disposition reports for Devin Kelley's criminal convictions, or alternatively submitted incomplete or incorrect data to the FBI as required by federal law. As a result, the FBI's Next Generation Identification database lacked critical information about Devin Kelley's history and failed to prevent the sale of firearms to Devin Kelley.

5.9     Findings by the Inspector General confirmed the Air Force Office of Special Investigations and Security Forces personnel then assigned at Holloman Air Force Base, New Mexico, did not report required information to civilian law enforcement in the Kelley case. The review also found the error in the Kelley case was not an isolated incident and similar reporting lapses occurred at other locations.

5.10     In fact, the problem was widespread across both the Office of Special Investigations and the Air Force Security Forces. A 2015 Defense Department audit revealed that the Air Force was not in

compliance with a mandatory statutory requirement to report all offender criminal history data and, despite the discovery of non-compliance, the Air Force made no retroactive corrections.

5.11     The Department of the Air Force admitted the allegations contained in Paragraph 5.9 in a press release published on November 28, 2017. The Department of the Air Force, through the Secretary of the Air Force Heather Wilson, admitted the allegations contained in Paragraph 5.10 on December 6, 2017 before the United States Senate Judiciary Committee.

5.12     The Department of Defense negligently failed to ensure that the Department of the Air Force submitted the required criminal incident, fingerprint cards, and final disposition data.

5.13     The Department of Defense negligently failed to ensure that identified criminal incident data errors are tracked to correction.

5.14     The Department of Defense negligently failed to populate data about Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, and commitment to the mental institution from the Defense Incident-Based Reporting System into the FBI's National Incident-Based System.

B.     **Negligent Failure to Train & Supervise**

5.15     The United States and its agencies have an obligation to adequately train and supervise employees. The Air Force's failure to collect, maintains, and submits fingerprint cards and final disposition reports to the FBI were not an isolated error. Instead, this failure was caused by failures in operations, organization, training, and supervision, as described in this Complaint.

5.16     The United States, through its agencies, failed to adequate supervise the individuals who were tasked with the collection, maintenance, and submission of Devin Kelley's fingerprints and final disposition reports to the FBI or the DOD's DIBRS database. Had they adequately supervised

the collection of fingerprints, they would have noticed that in some instances, their employees did not collect fingerprints. They would have noticed in other instances, their employees did not maintain fingerprint cards in the case file. And they would have noticed that at no point, did their employees submit Devin Kelley's fingerprint cards or final disposition reports to the FBI for inclusion in the National Instant Criminal Background Check System.

5.17    The United States Air Force at no point between 2009 and 2013 trained its employees to collect, maintain, and submit fingerprint cards and final disposition reports to the FBI for inclusion in the National Instant Criminal Background Check System. Nor did the Air Force put in place a system that verified if the required reporting had occurred, which it had not.

5.18    These failures by the Air Force and Department of Department of Defense to train and supervise its reporting personnel led to its employees failing to submit reports and data to both the DIBRS and FBI about Devin Kelley. Thus, the United States is liable for negligent training and negligent supervision.

## C.    Negligent Undertaking

5.19    The United States Congress voluntarily undertook the creation of a national instant background check system upon passage of the Brady Bill. To implement this system, the Department of Justice created the National Instant Criminal Background Check System. The Department of Defense and Department of Air Force implemented policies, procedures, manuals, and instructions—and acted under the color of these regulations—regarding the reporting of individuals who received convictions for domestic violence, incarceration for a crime punishable by more than one year, and mental institution commitment. These policies and procedures included the collection, maintenance, and reporting of fingerprint cards of those disqualified individuals.

5.20    The United States, through its agencies, voluntarily undertook the training and supervision of its employees responsible for the collection, maintenance, and submission of fingerprint cards and final disposition reports to the FBI.

5.21    The United States, through its agencies, voluntarily undertook the correction of inaccurate or incomplete submissions to FBI's National Instant Criminal Background Check System. On multiple occasions, the Department of Defense's Inspector General alerted the United States and its agencies to its negligent failure to collect, maintain, and submit fingerprint cards and final disposition data to the FBI. The Air Force agreed with the Inspector General's recommendations and agreed to take corrective action.

5.22    The United States, through Congress and its agencies, rendered these services because Congress and the agencies recognized that they were necessary for the protection of individuals like the Plaintiffs. To limit this violence, Congress disqualifies certain people from buying, owning, or possessing guns and established a national background check system to prevent these people from obtaining guns. In fact, when asked the question, "[W]ho do you believe is the beneficiary of the Brady Act? Who do you think Congress was trying to protect?" Thomas Ward, Deputy Assistant Attorney General for the United States responded, "All of us. Three hundred and sixty-five million Americans."[8] Mr. Ward told the truth when he stated the Brady Act was intended to protect all Americans.

5.23    The failure to use reasonable care increases the risk that individuals like Devin Kelley obtain firearms when they are prohibited by law from obtaining such firearms. In fact, the foreseeable and proximate result of the failure to use reasonable care is that individuals like Devin Kelley will pass the background check when obtaining firearms for the use of mass murders, like the one he

---

[8] Sanders v. United States, No. 18-1931 (4th Cir. May 7, 2019) (Oral Argument).

committed in Sutherland Springs. What's more, the United States, through its agencies, knew of the specific increase of risk posed by Devin Kelley if the United States failed to exercise reasonable care in its undertaking because the United States knew of Devin Kelley's conduct between 2009 and 2013, as detailed in this Complaint and in the Department of Defense Inspector General's investigation of the matter.

5.24    The United States, through its agencies, negligently failed to: (a) collect, maintain, and transmit Devin Kelley's fingerprint cards to the FBI and DOD DIBRS; (b) submit Devin Kelley's final disposition report to the FBI and DOD DIBRS; (c) train and supervise its employees and agents with regard to the collection, maintenance, and transmission of fingerprint cards to the FBI and DOD DIBRS; (d) train and supervise its employees and agents with regard to the submission of final disposition reports to the FBI and DOD DIBRS; and (c) take corrective action multiple times when alerted to this negligence.

## VII   CAUSATION

### A.    Department of Defense and Department of the Air Force's negligence caused injuries to the Plaintiffs.

6.1     One or more of the above negligent acts of the Department of the Air Force and the Department of the Defense directly and proximately caused injury to the Plaintiffs.

6.2     When Devin Kelley attempted to purchase firearms to use in the Sutherland Springs shooting, the FBI Incident-Based Reporting System should have included Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, and commitment to the mental institution. The FBI's database did not contain any of this required information, or alternatively, contained incorrect or incomplete information, as a

direct and proximate result of one or more of negligent acts of the Department of Defense and Department of the Air Force.

6.3     When Devin Kelley attempted to purchase firearms to use in the Sutherland Springs shooting, the FBI's National Instant Criminal Background Search System should have contained Devin Kelley's criminal history, populated from the FBI's Next Generation Identification (or the Interstate Identification Index) system. The FBI's National Instant Criminal Background Search System should have contained Devin Kelley's criminal history populated by submission of his final disposition report from the Air Force. However, because of the Government's negligence, Kelley's fingerprint identification and criminal disposition reports were not submitted to the FBI and the FBI's Background Check System did not disqualifying information on Devin Kelley.

6.4     As a result of one or more of the above acts of negligence, when Academy requested the FBI search its National Instant Criminal Background Search System to determine whether it could sell firearms to Devin Kelley, the FBI notified Academy to "proceed" with the sale. But for the United States' negligence, there would have been prohibiting information within the FBI's Background Search System. And but for the United States' negligence, the FBI would have notified Academy that the sale should be "denied."

6.5     When Devin Kelley attempted to purchase the firearms used in the Sutherland Springs shooting, the sale should have been blocked for one or more of the following reasons: (a) he had a conviction of a crime punishable by imprisonment for a term exceeding one year; (b) he had a conviction for domestic violence; and (c) he had previously been committed to a mental institution.

6.6     When Devin Kelley purchased the firearms used in the Sutherland Springs shooting, his omission from the FBI's background check system and ability to complete the purchase was a direct,

proximate, and foreseeable result of one or more acts of negligence of the Department of Defense and Department of the Air Force.

**B.     Had the Air Force reported Kelley's history, the FBI's Instant Criminal Background Check System would have blocked Devin Kelley's firearm purchase.**

6.7     Devin Kelley purchased the firearms used in the Sutherland Springs shooting from a federal firearms licensee, Academy Sports & Outdoor. At the time, the licensee must submit biographical information about Kelley to the FBI's Instant Criminal Background Check System. If the Air Force had properly reported Devin Kelley's fingerprint cards and history to the FBI, the Background Check System would have informed the firearms dealer to deny the purchase.

6.8      The purpose of the Uniform Federal Crime Reporting Act of 1988, the Brady Handgun Violence Prevention Act, and the Domestic Violence Offender Gun Ban are to ensure that violent offenders and high-risk individuals like Kelley do not get access to firearms. The Department of Defense in 1994 began designing the Defense Incident-Based Reporting System (DIBRS) to meet criminal justice related reporting requirements mandated by the Uniform Federal Crime Reporting Act and the Brady Handgun Violence Prevention Act. The DIBRS permits the DOD to forward offense and arrest information required by FBI.

6.9     The entry into the federal law-enforcement database would have blocked Mr. Kelley's purchase of the firearms used in the Sutherland Springs' shooting. The Government's acts or omissions directly and proximately resulted in Devin Kelley's purchase of the firearms used in the November 5, 2017 Sutherland Springs First Baptist Church shooting.

## VII.   DAMAGES

7.1     The preceding paragraphs are incorporated and re-alleged as if fully set forth herein.

7.2     Kris Workman was in the church that day as the praise team leader and had just returned

to a pew before the attack started from outside the church. Kris Workman, his brother Kyle and his mother Julie all fell to the floor in the church when the shooting started and attempted to play dead. Kris prayed as others around him were shot. The shooter eventually approached Kris from behind, placed the barrel of the rifle against his back and fired a paralyzing shot directly into his spine.  He then drew his sidearm before leaving the church and fired another round into Kris' intestines, rupturing them.  Kris required surgery to close the abdominal wounds and lay hospitalized for weeks while doctors attempt to assess, evaluate and treat his spinal injuries. He began a long rehabilitation program on an in-patient basis and eventually transitioned to an outpatient. He has required ongoing medication for severe nerve pain, repeated treatment for UTI infections related to catheterization and other treatments and procedures, including psychological evaluation. He has lost almost all sensation below the waist and now requires use of a wheelchair to move from place to place.   He continues to suffer from the permanent and ongoing physical and emotional effects of his injuries and their effects and will do so for the rest of his life because his paraplegia and associated complications are permanent.  His ability to father children is in doubt; his interaction with his one child is physically impaired, as is his interaction and relationship with his wife, Colbey Workman due to his permanent injuries and loss of sensation below the waist.

7.3     Plaintiff seeks recover for all elements of damages to which he is entitled under Texas law. Plaintiff has incurred substantial past medical expense which are ongoing and is expected to incur future medical expense in excess of one million five hundred thousand dollars during the duration of his lifetime.

7.4     Plaintiff further seeks damages for physical pain and mental anguish, including mental torment, pain and suffering, physical impairment, as well as significant disfigurement resulting from gunshot wounds throughout his body.

7.5     As a direct and proximate result of the negligent, careless, and reckless conduct and failures of Defendant United States of America,  Plaintiff Kris Workman was injured and seeks compensatory damages under applicable Texas law and statutory law of the United States.

## VIII . JURISDICTION, VENUE, & SERVICE

8.1    This Federal District Court has federal-question jurisdiction of this action because this action is brought pursuant to and in compliance with 28 U.S.C. §§ 1346(b), 2671-2680, commonly known as the Federal Tort Claims Act.

8.2    Venue is proper in this district pursuant to 28 U.S.C. § 3191(e)(l) because the United States is a Defendant, Plaintiffs reside in the Western District, and no real property is involved in the action.

8.3    The United States of America may be served with process in accordance with Rule 4(1) of the Federal Rules of Civil Procedure. Service is affected by serving a copy of the Summons and Complaint by certified mail, return receipt requested, to the following:

> John F. Bash, Esq.
> United States Attorney for the Western District of Texas United States
> Attorney's Office
> ATTN: Civil Process Clerk 601 NW Loop 410, Suite 600 San Antonio, Texas
> 78216
>
> William Barr
> Attorney General of the United States, The Attorney General's Office
> ATIN: Civil Process Clerk
> 950 Pennsylvania Avenue, NW Washington, DC 20530-0001

## IX. LIABILITY OF THE UNITED STATES

9.1    This case is commenced and prosecuted against the United States of America to and in compliance with Title 28 U.S.C. §§ 2671-80, the Federal Tort Claims Act. Liability of the United States is predicated specifically on 28 U.S.C. § 2674 because the personal injuries and resulting damages of which the complaint is made were proximately caused by the negligence,

wrongful acts or omissions of employees or agents of the United States of America working for the United States Department of the Air Force and/or Department of Defense, while acting within the scope of their office, employment, or agency under circumstances where the United States of America, if a private person, would be liable to the Plaintiffs in the same manner and to the same extent as a private individual.

9.2    The United States Department of Defense and Department of the Air Force are agencies of the United States. The Defendant, the United States of America, through its agencies, at all times material to this lawsuit, owned and operated Holloman Air Force Base and staffed its facilities and vehicles with its agents, servants and employees. The Defendant, the United States of America, through its agencies, at all times material to this lawsuit, owned and operated the Defense Manpower Data Center, which operates the Defense Incident-Based Reporting System.

8.3    This lawsuit is not a claim listed in 28 U.S.C. § 2680, exceptions to the Federal Tort Claims Act.

## X. JURISDICTIONAL ALLEGATION

10.1    Pursuant to 28 U.S.C. § 2675(a), Plaintiff timely presented his claim to the United States by submitting a Form SF-95 to Mr. Bradford Hunt, located at the U.S. Air Force Claims & Tort Litigation Division, 1500 West Perimeter Road #1700, Joint Base Andrews, Maryland 20762, on July 17, 2018. See attached SF-95. Exhibit B.

10.2    Receipt of the claim (Air Force Claim No. 18-017041) by the Department of the Air Force on June 20, 2018 was acknowledged by Jennifer Freda, paralegal to General Torts Branch, Air Force Claims and Tort Litigation Division. *(See* Ms Freda's correspondence acknowledging receipt of claim attached as Exhibit C.)

10.3    As of May 9, 2019, more than six months have elapsed since the claim was presented to the Defendant United States of America and Defendant United States of America has not made a final disposition of Plaintiffs' claims. Accordingly, the claims of the Plaintiff is deemed denied pursuant to 28 U.S.C. § 2675(a).

10.4    Plaintiff has exhausted his administrative remedies under the Federal Tort Claims Act and has fully complied with all jurisdictional and statutory prerequisites and conditions precedent to the commencement and prosecution of this lawsuit against the Defendant United States of America.

10.5    Plaintiffs claimed $31,000,000 in damages in his administrative claim and seeks damages in such amount here.

## CONCLUSION

Plaintiffs request that Defendant be cited to appear and answer this Complaint; that upon final trial, the Plaintiffs have judgment against Defendant, for the amount of actual damages and for other and different amounts as they shall show by proper amendment before trial; for post-judgment interest at the applicable legal rate; for all Court costs incurred in this litigation; and for such other relief, at law and in equity, both general and special, to which Plaintiffs may show themselves entitled to and to which the Court believes them deserving.

Respectfully submitted,

_____/s/ Brett Reynolds_____
BRETT T. REYNOLDS
Federal Bar No. 19994
State Bar No. 16795500
btreynolds@btrlaw.com
BRETT REYNOLDS & ASSOCIATES, P.C.
1250 NE Loop 410, Suite 310
San Antonio, Texas  78209
(210) 805-9799 – Telephone
(210) 455-2434 – Facsimile
**ATTORNEY FOR PLAINTIFF**