# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| | § | |
| **RUBEN D. RIOS, JR.**, | § | |
| Individually and as Heir at Law of | § | |
| the Estate of Tara McNulty | § | |
| | § | |
| *Plaintiff-Intervenor* | § | CIVIL ACTION NO. 5:18-CV-555-XR |
| | § | |
| **v.** | § | |
| | § | |
| **THE UNITED STATES,** | § | |
| | § | |
| *Defendant* | § | |

**PLAINTIFF RUBEN D. RIOS, JR.'S ORIGINAL COMPLAINT IN INTERVENTION**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff Ruben D. Rios, Jr., the surviving spouse of Tara McNulty, deceased, brings this Original Complaint in Intervention Individually and as Heir at Law of the Estate of Tara McNulty under the Federal Tort Claims Act, 28 U.S.C. § 2674, against the United States of America. This Complaint arises out of negligent acts and omissions committed by the United States of America and its agencies that proximately caused the November 5, 2017 mass shooting at Sutherland Springs First Baptist Church. These negligent acts and omissions allowed the shooter, Devin Kelley, to acquire a firearm and kill twenty-six innocent churchgoers at Sutherland Springs, including Tara McNulty.

Accordingly, Plaintiff would respectfully show this Honorable Court the following:

## TABLE OF CONTENTS

I.      **PARTIES** ........................................................................................ **4**

II.     **BACKGROUND** ............................................................................... **4**

    A.   *Congress passed key legislation to prevent mass shootings like the Sutherland Springs massacre* ................................................................................4

    B.   *Federal Law creates a mandatory, non-delegable duty for the Air Force to report a conviction for domestic violence, incarceration for a crime punishable by more than one year, and a mental institution commitment* ..............................................8

    C.   *The Department of Defense and Department of the Air Force have a history of failing to submit reportable criminal incidents to the FBI's National Instant Criminal Background Check System*..............................................................................11

III.    **DEVIN KELLEY**...............................................................................**13**

    A.   *The Air Force knew about Devin Kelley's violent history* ......................................13
    B.   *The Air Force commits Devin Kelley to a mental health facility* .........................16

    C.   *The Air Force convicts Devin Kelley of domestic violence, resulting in his incarceration for a crime punishable by more than one year*............................ 17

    D.   *The Air Force fails to report Devin Kelley's domestic violence conviction, his incarceration for a crime punishable by more than one year, or his commitment to psychiatric inpatient care to the FBI*................................................................................................18

    E.   *The Air Force fails to submit Devin Kelley's fingerprint data and conviction to the FBI's Next Generation Identification database* .......................20

IV.    **CAUSES OF ACTION** ......................................................................**21**

    A.   *The Department of the Air Force's Negligence*..................................................21
    B.   *The Department of Defense's Negligence*..........................................................23

V.    **CAUSATION**....................................................................................**24**

    A.   *Department of Defense and Department of the Air Force's negligence proximately caused Tara McNulty's death* ........................................24

    B.   *Had the Air Force reported Kelley's history, the FBI's Instant Criminal Background Check System would have blocked Devin Kelley's firearm purchase*...............................................................25

**VI.**      **DAMAGES** .............................................................................................**26**

      *A.*   *Wrongful Death* ...............................................................................*26*
      *B.*   *Survival*..........................................................................................*28*

**VII.**     **JURISDICTION, VENUE, & SERVICE**.............................................**29**

**VIII.**    **LIABILITY OF THE UNITED STATES**.............................................**30**

**IX.**      **JURISDICTION ALLEGATIONS**......................................................**31**

**X.**       **CONCLUSION** .............................................................................**31**

# I.
# PARTIES

**1.1**     Defendant is the United States of America.

**1.2**     Plaintiff-Intervenor Ruben D. Rios, Jr. resides in San Antonio, Texas within the jurisdiction of this Court. Rios is the surviving spouse of Lisa McNulty, deceased.

# II.
# BACKGROUND

**A.     Congress passed key legislation to prevent mass shootings like the Sutherland Springs massacre.**

**2.1**     Through several pieces of legislation spanning almost 30 years, Congress acted to block individuals who present a known risk of violence from purchasing firearms. To that end, Congress mandated that certain individuals must be flagged in an instant criminal background check system used by firearms sellers nationwide in the interest of public safety. This system, known as the National Instant Criminal Background Check System (NICS), is operated by the FBI.

**2.2**     Before the massacre at Sutherland Springs First Baptist Church, The Air Force and Department of Defense ignored three statutory mandates that required Devin Kelley's entry into the NICS: **(1)** his domestic violence conviction; **(2)** his conviction for a crime punishable by imprisonment for over a year; and **(3)** his commitment to a mental institution.

**2.3**     As a direct result of the Air Force and Department of Defense's failure to

report Kelley to the FBI, his domestic violence escalated into a murderous shooting rampage aimed at his ex-wife's family and neighbors worshiping at the Sutherland Springs First Baptist Church.

**2.4** During the shooting rampage, Ruben D. Rios, Jr.'s late wife, Tara McNulty, was in the church with her two minor children, H.M. and J.M. As Tara was reaching out to protect her daughter H.M. from the gunfire, she was fatally shot in the back of the head. Immediately thereafter, H.M. and J.M. were each shot three times. Lisa McNulty, Tara's mother and H.M. and J.M.'s grandmother, was one of the first responders at the massacre. After seeing her deceased daughter lying on the church floor, Lisa rescued her grandchildren and carried each of them out of the church toward nearby emergency care responders. Both H.M. and J.M survived the mass shooting.

**2.5** Federal law makes it unlawful to sell a firearm to a person whom the seller knows or has reasonable cause to believe: **(a)** has been convicted of a misdemeanor crime of domestic violence; **(b)** has been convicted of a crime punishable by imprisonment for longer than a year; or **(c)** has been committed to any mental institution. 18 U.S.C. §§§ 922(d)(1), (4), (9). These individuals are also forbidden from possessing any firearm or ammunition. *Id.* at (g).

**2.6** Before Devin Kelley was even born, Congress attempted to reduce the significant public danger presented by mass shooters. Initially passed as the Gun Control Act of 1968, the law banned the sale of firearms to individuals with criminal histories and individuals who have been committed to mental institutions.

**2.7**     In 1993, Congress amended the Gun Control Act of 1968 by enacting the Brady Handgun Violence Prevention Act (the "Brady Act"). Section 103 of the Brady Act required the Attorney General of the United States to establish an instant criminal background check system that firearm sellers must use to determine whether the sale of the firearm violates 18 U.S.C. § 922.[1] Under 18 U.S.C. § 922(t), a licensed dealer of firearms "shall not sell or transfer to any person" without first contacting the National Instant Criminal Background Check System.

**2.8**     Congress passed the Brady Act to prevent mass shootings just like the Sutherland Springs shooting. When the Act was introduced in the House of Representatives, one of the Bill's sponsors explained its express purpose:

> Mr. Speaker, I rise to strongly support today's introduction of the Brady bill. Five years ago, a man named Larry Dale walked into Mercer's Discount Foods in Tulsa, OK, and opened fire on an unsuspecting crowd of shoppers. Dale's rampage killed one person and severely wounded another. Many Oklahomans were outraged to learn that Dale, a convicted felon with a history of mental illness, had walked into a gun store the day before his crime, filled out a single form, and walked out with his instrument of death. The tragedy is that 5 years after Larry Dale proved how flawed the system is, the Brady Bill is not the law of the land.[2]

**2.9**     When the Brady Act went to committee, the Chairman's opening statement in the House Subcommittee hearings noted that the Act would effectively prevent barred individuals from purchasing firearms:

> We are meeting today to consider a bill whose time has come— the Brady Handgun Violence Prevention Act....

---

[1] *See Printz v. United States*, 521 U.S. 898, 902 (1997).
[2] Congressional Record, House, at H731 (Feb. 22, 1993).

There is nothing complicated about this bill. … It will save lives. The Brady bill will save lives that are being wasted in an epidemic of handgun violence from Brooklyn to Florida and all across America. And that is not theory, that is fact.

After Brady passes, a convicted felon will no longer be able to walk into a gun store, as thousands have done this year, and walk out 10 minutes later with a murder weapon. State after State has shown that waiting periods and background checks work.[3]

**2.10**   The committee then issued the House Committee Report. Under the heading "Summary and Purpose," the House Report stated the following:

The purpose of H.R. 1025 is to prevent convicted felons and other persons who are barred by law from purchasing guns from licensed gun dealers, manufacturers or importers.[4]

The House Report also emphasized that background checks are necessary to prevent violent offenders from gaining access to firearms:

The experiences of States which require background checks before firearm sales also indicate that many repeat offender criminals buy guns directly from firearms dealers. For example, in California, a background check intercepted 2,500 felons attempting to buy guns from dealers last year. … Each year in Illinois some 3,000 prohibited persons seek to purchase firearms and are denied.[5]

**2.11**   In 1996, the Domestic Violence Offender Gun Ban, also referred to as the "Lautenberg Amendment," made it unlawful to sell firearms to anyone convicted of a

---

[3]*Brady Handgun Violence Protection Act*: *Hearing on H.R. 1025 before the Subcomm. on Crime and Criminal Justice of the H. Comm. on the Judiciary*, 103rd Cong. (Sept. 30, 1993) (statement of Charles E. Schumer, Chairman of the Subcomm.).

[4]H.R. REP. No. 103-344, *Brady Handgun Violence Prevention Act* (Nov. 10, 1993), *reprinted in* 1993 U.S.C.C.A.N. 1984.

[5]*Id*. at 1986-87.

misdemeanor crime of domestic violence. Congress enacted the Domestic Violence Offender Gun Ban to "close [a] dangerous loophole" in the gun control laws: while felons had long been barred from possessing guns, many perpetrators of domestic violence are convicted only of misdemeanors.[6]

 **2.12** In abusive relationships, the severity of domestic violence often increases over time, and the presence of a firearm increases the likelihood of homicide.[7] Congress recognized that "[f]irearms and domestic strife are a potentially deadly combination."[8] As one Senator noted during the debate over the Ban, codified as 18 U.S.C. §922(g)(9), "[A]ll too often, the only difference between a battered woman and a dead woman is the presence of a gun."[9]

**B.** **Federal Law creates a mandatory, non-delegable duty for the Air Force to report a conviction for domestic violence, incarceration for a crime punishable by more than one year, and a mental institution commitment.**

 **2.13** Federal law requires Government agencies to report ineligible firearm purchasers to a national database. Specifically, 34 U.S.C. § 40901(e)(1)(C) states that federal agencies that have "any record of any person demonstrating" that he or she cannot lawfully purchase a gun under 18 U.S.C. § 922(g) or (n) "shall, not less frequently than quarterly, provide the pertinent information contained in such record

---

[6]*United States v. Castleman*, 572 U.S. 157, 159 (2014) (citing *United States v. Hayes*, 555 U.S. 415, 426 (2009)).

[7]*See id.,* at 160; Campbell et al., Assessing Risk Factors for Intimate Partner Homicide, DOJ, Nat. Institute of Justice J., No. 250, p. 16 (Nov. 2003) ("When a gun was in the house, an abused woman was 6 times more likely than other abused women to be killed").

[8]*See United States v. Hayes*, 555 U.S. 415, 427 (2009).

[9]142 Cong. Rec. 22986 (1996) (statement of Sen. Wellstone).

to the Attorney General." This information is then reported to the FBI and loaded into the FBI's National Instant Criminal Background Check System (NICS). Gun retailers use the NICS to determine if an individual is legally eligible to purchase a firearm. Additionally, 34 U.S.C. § 40901(e)(1)(D) mandates that Federal departments or agencies correct and update the records in the NICS.

**2.14** The Department of Defense is required by 10 U.S.C § 1562 to establish a "central database of information on the incidents of domestic violence involving members of the armed forces." This section also requires that all military departments, including the Department of the Air Force, report domestic violence incidents to the administrator of this database.

**2.15** Department of Defense policy mandates that all Department agencies, including the Department of the Air Force, comply with **(a)** the crime reporting requirements of the Uniform Federal Crime Reporting Act of 1988; **(b)** the reporting requirements for victim and witness assistance notifications of the Victim's Rights and Restitution Act of 1990, and **(c)** the reporting requirements of the Brady Act.

**2.16** As such, Department of Defense Directive 7730.47 and Department of Defense Manual 7730.47-M implemented federal criminal-incident reporting requirements. To comply with these requirements, the Department of Defense created the Defense Incident-Based Reporting System (DIBRS) as a central repository of incident-based data. The DIBRS is the tool the Department of Defense uses to collect and transmit reportable criminal incident data, including incidents of domestic violence, to the FBI's National Incident-Based Reporting System (NIBRS). Data from

the NIBRS is then included in the FBI's Uniform Crime Report (UCR) Program.

**2.17**   The Department of Defense has a non-delegable duty to monitor and ensure compliance with Directive 7730.47 and populate data from DIBRS to the FBI.  To accurately determine whether an individual is eligible to purchase a firearm, the FBI's National Instant Criminal Background Check System depends on complete records of criminal incident data from sources like the NIBRS and UCR Program.[10]

**2.18**   Department of Defense Instruction Manual 7730.47 implemented the reporting requirements of numerous federal laws, including the Uniform Federal Crime Reporting Act of 1988, The Victims' Rights and Restitution Act of 1990, The Brady Handgun Violence Prevention Act of 1993, The Lautenberg Amendment to the Gun Control Act, and The Jacob Wetterling, Megan Nicole Kanka, and Pam Lychner Sex Offender Registration and Notification Program. This instruction manual mandates that Department of Defense agencies, including the Air Force, report criminal incident data to the FBI, maintain a 4 percent or less data submission error rate, and correct errors within 30 days of notification of the error.

**2.19**   For example, Department of Defense Manual 7730.47-M Volume 1, Enclosure 3, prescribes the reporting data elements needed to comply with The Brady Act. Enclosure 3 states that the Defense Incident-Based Reporting System:

> shall be used to centralize the collection of information that is
> reportable by the DoD Components pursuant to The Brady

---

[10]*See* National Oil and Hazardous Substances Contingency Plan, National Priorities List Update, 63 Fed. Reg. 101, 29026, (May 27, 1998) (to be codified at 40 C.F.R. pt. 300) ("The effectiveness of the NCIS will depend on the extent to which the most accurate and complete records of Federal and State criminal offenses and records in other prohibiting category are instantly available in response to inquiries from firearms dealers.").

Handgun Violence Prevention Act of 1993, which requires the Department of Defense to report these eight categories to the FBI for purposes of prohibiting firearm purchases:

(1) Persons who have been convicted in any court of a crime punishable by imprisonment for a term exceeding 1 year. …

(4) Persons who have been adjudicated as mental defectives or who have been committed to a mental institution. …

(7) Persons convicted in any court of a misdemeanor crime of domestic violence.

**2.20** Accordingly, at the time of the Sutherland Springs massacre, The United States Air Force was required to report court-martial convictions of domestic violence and commitments of active-duty soldiers to inpatient psychiatric or mental healthcare facilities to the Department of Defense's Incident-Based Reporting System Database (DIBRS). In turn, the Department of Defense must report DIBRS data to the FBI.

**C.   The Department of Defense and Department of the Air Force have a history of failing to submit reportable criminal incidents to the FBI's National Instant Criminal Background Check System.**

**2.21** In 2014, The United States Inspector General evaluated the process of the Department of Defense and its agencies, including the Department of the Air Force, for reporting accurate criminal incident data to the Defense Incident-Based Reporting System. The Inspector General issued his findings in Report Number DOGIG-2015-011.[11]

**2.22** The Inspector General found that the Department of Defense "is not

---

[11]INSPECTOR GEN., U.S. DEPT. OF DEFENSE, EVALUATION OF THE DEFENSE CRIMINAL INVESTIGATIVE ORGANIZATIONS' DEFENSE INCIDENT-BASED REPORTING SYSTEM REPORTING AND REPORTING ACCURACY (2014), https://media.defense.gov/2014/Oct/29/2001713419/-1/-1/1/DODIG-2015-011.pdf

reporting criminal incident data to the Federal Bureau of Investigation (FBI) … as required by Federal law."[12] As a result, "10 years of DoD criminal incident data have not been provided to the FBI…."[13] As an example of a reporting failure, the Inspector General noted that between August 2012 and January 2013, the Air Force failed to report data to the Defense Incident-Based Reporting System because the employee responsible had left the job and the replacement employee was not trained.[14] Ultimately, the Inspector General concluded:

> Our evaluation determined DoD has not completed the FBI's requirements for the DIBRS database certification; therefore, DoD does not report criminal incident data to the Attorney General, through the FBI.[15]

**2.23** Between approximately 2005 and 2015, the Defense Incident-Based Reporting System database did not populate its data into the FBI's National Incident-Based Reporting System (NIBRS) for inclusion in the Uniform Crime Report. Because of this failure, a significant amount criminal incident data was not reported to the FBI's National Instant Criminal Background Check System.

**2.24** In April 2016, Devin Kelley purchased the firearms he used in the Sutherland Springs shooting. Before this time, the United States knew or should have known that the failure to report criminal incident data could foreseeably result in mass

---

[12]*Id.*
[13]*Id.*
[14]*Id.*
[15]*Id.*

shootings. For example, in June 2015, Dylann Roof shot and killed nine people at Emanuel African Methodist Episcopal Church in Charleston, South Carolina. Roof should have been blocked by the National Instant Criminal Background Check System from purchasing the gun that he used to kill those victims. In fact, former FBI Director James Comey concluded that "the bottom line is clear: Dylan Roof should not have been able to legally buy that gun that day."[16]

**2.1** In another high-profile mass shooting, Seung-Hui Cho shot and killed 32 people in April 2007 on the Virginia Tech campus. Two years earlier, Mr. Cho had been adjudicated by a court to be mentally ill and involuntarily committed to a mental health facility. However, because Virginia state authorities had not reported these records to the FBI, Mr. Cho was able to purchase the firearms used in the shooting.[17]

### III.
### DEVIN KELLEY

**A.    The Air Force knew about Devin Kelley's violent history.**

**3.1** Devin Kelley had a long, troublesome history with the United States Air Force. In January 2010, Mr. Kelley entered active duty. He was initially assigned to an Intelligence Specialist program but was cut from the program due to poor grades. The United States then transferred him to the 49th Logistics Readiness Squadron at

---

[16] FBI National Press Office, *Statement by FBI Director James Comey regarding Dylann Roof Gun Purchase*, FBI (July 10, 2015), https://www.fbi.gov/news/pressrel/press-releases/statement-by-fbi-director-james-comey-regarding-dylann-roof-gun-purchase.
[17] Michael Luo, *Cho's Mental Illness Should Have Blocked Gun Sale*, THE NEW YORK TIMES (April 20, 2007), https://www.nytimes.com/2007/04/20/us/20cnd-guns.html,

Holloman Air Force Base in New Mexico.

**3.2**     Between July 2011 and March 2012, the Air Force placed in Mr. Kelley's employment file at least four letters of counseling and at least five letters of reprimand. Mr. Kelley's conduct included failure to obey direct orders, creating a hostile work environment, making false statements, and insubordination of a superior officer. In at least 7 of these letters, Mr. Kelley was warned that his conduct was a criminal act. In at least 3 of these letters, the Air Force told Mr. Kelley that he had proven that he could not be depended upon. In at least 2 of these letters, the Air Force noted that Mr. Kelley could not always be trusted and had demonstrated a disregard for the Air Force's core values. In each of these letters, the Air Force warned Mr. Kelley that future misconduct would lead to more severe punishment.

**3.3**     During Mr. Kelley's service, he was caught trying to sneak firearms onto Holloman Air Force Base. Furthermore, Military officers were advised that Kelley was attempting to carry out death threats made to his commanding officers.

**3.4**     While serving in the Air Force, Mr. Kelley began dating Tessa K. Kelley and married her on April 12, 2011. Ms. Kelley had a child from a former relationship.

**3.5**     In late April 2011, Tessa Kelley and her child moved into base housing on Holloman Air Force Base. After moving in, Devin Kelley began to abuse both Ms. Kelley and her child on base. He would push and hit the child, often on the child's head. Additionally, on at least two occasions, Mr. Kelley hit the child hard enough to cause death or serious bodily injury.

**3.6**     For instance, on June 8, 2011, Tessa Kelley took her child to Gerald

Champion Medical Center in Alamogordo, New Mexico because he was vomiting. The attending pediatrician noticed not only vomiting, but febrile seizure and bruising to the left side of the child's face. A CT scan revealed a fractured clavicle and subdural hemorrhage (bleeding outside the brain). After this violent incident, Devin Kelley admitted to the United States Air Force that he caused these injuries without excuse or justification. Devin Kelley also produced a video confessing to his wrongful conduct.

**3.7**    The New Mexico Children, Youth, and Families Department ultimately took the abused child away from Devin Kelley and into their custody.

**3.8**    Between June 24, 2011 and April 27, 2012, Devin Kelley continued to physically abuse Tessa Kelley. He would punch her, choke her, pull her hair, and kick her. Foreshadowing the violence to come, Kelley threatened Tessa Kelley that if she ever told anyone about the abuse, he would "kill [her] and [her] entire family." He also told her, "I could just bury you some where here in the desert and nobody would ever find you."

**3.9**    On April 23, 2012, while driving to El Paso, Texas, Devin Kelley took out his gun, held it against Tessa Kelley's temple, and asked, "Do you want to die?" Tessa Kelley pushed the gun away but Mr. Kelley then placed the gun in Tessa Kelley's mouth. He told her he would kill her if she told anyone. Further, Tessa Kelley alleged that Devin Kelley sexually assaulted her during their marriage. In November 2012, Devin Kelley admitted these facts to the Air Force.

**3.10**     Throughout their relationship, Devin Kelley abused Tessa Kelley multiple times and admitted this violent conduct to the Air Force. In fact, Air Force security was called at least once to the Kelley residence when Devin Kelley choked Tessa Kelley for at least 15-20 seconds. Mr. Kelley admitted to the Air Force that there was no justification or excuse for his violent conduct.

**B.**     **The Air Force commits Devin Kelley to a mental health facility.**

**3.11**     As a result of Devin Kelley's poor work conduct, verbal threats, and the domestic abuse of his wife and stepson, the Government ordered Kelley confined to Peak Behavioral Health Services in June 2012. Peak is a private psychiatric hospital that has special programs for the care of active duty service members. Upon information and belief, the United States has a contractual relationship with Peak to offer inpatient commitment and therapy.

**3.12**     While receiving inpatient care at Peak, Mr. Kelley made several threats that if he were picked up by Security Forces, he would try to seize their guns. While at Peak, Devin Kelley also tried to obtain firearms and conducted research into body armor. At this time, Mr. Kelley was attempting to carry out the threats he made against his chain of command. Kelley was forced to strategize ways to purchase firearms because his other weapons had been confiscated by the Air Force, its agents, or contractors.

**3.13**     On June 7, 2012, Devin Kelley unlawfully escaped Peak by jumping a fence and planned to purchase a firearm. However, before he could try to purchase a weapon, Kelley was caught the next day by Texas authorities.

C.     **The Air Force convicts Devin Kelley of domestic violence, resulting in his incarceration for a crime punishable by more than one year.**

    **3.14**  As a result of this dangerous misconduct, the Air Force court-martial alleged several charges against Devin Kelley: **(a)** Mr. Kelley violated UCMJ Art. 86 by fleeing Peak Behavioral Health Services Facility; **(b)** Mr. Kelley violated UCMJ Art. 128 by causing physical injury to his stepson, including the broken clavicle and subdural hematoma; **(c)** Mr. Kelley violated UCMJ Art. 128 by holding a gun to Tessa Kelley's temple and asking if she wanted to die; and **(d)** Mr. Kelley violated UCMJ Art. 134 by threatening to kill Tessa Kelley, members of her family, and members of his squadron.

    **3.15**  The probable cause findings for Mr. Kelley's charges stated:

> The evidence presented during the hearing clearly indicates that the minor child…was subject to physical abuse. The evidence also indicates that Mrs. Tessa Kelley was assaulted by a weapon being placed against her head and that AIC Kelley had threatened her on other occasions. Finally, the evidence establishes that AIC Kelley left the Peak Behavioral Health Services facility, his place of duty, without authorization.

    **3.16**  On July 10, 2012, the Air Force determined that Devin Kelley should be confined while awaiting trial because "it is foreseeable that [Mr. Kelley] will not appear for trial and/or will engage in serious criminal misconduct." As a basis for this conclusion, the Air Force noted:

> The Evidence shows a serious escalation of behavior involving firearms and threats after the physical abuse of a child. Particularly alarming is his decision to try to obtain another firearm while undergoing inpatient mental health care, conducting research on body armor, and then

escaping from the facility late at night without authorization….

Lesser forms of restraint are inadequate to mitigate the flight risk he poses nor would they prevent him from carrying out the threats that he has made against others, especially given the forethought and planning that he showed by attempting to purchase another firearm and his escape from the mental health facility.

**3.17**    The Air Force General Court Martial Order No. 10 specifically noted at the top of the order that this was a "Crime of Domestic Violence. 18 U.S.C. § 922(g)(9)." The citation to section 922(g)(9) references the federal law that prevents individuals convicted of even a misdemeanor crime of domestic violence from possessing a firearm.

**3.18**    On November 7, 2012, Devin Kelley ultimately plead guilty to unlawfully striking Tessa Kelley, choking her, pulling her hair, and kicking her. He also plead guilty to assaulting his stepson with force likely to produce death or grievous bodily harm. His other charges were withdrawn and dismissed with prejudice as a part of his plea deal.

**3.19**    The Air Force sentenced Devin Kelley to 12 months of imprisonment, a bad-conduct discharge, and reduction in rank to airman basic (E-1). During Mr. Kelley's pre-and post-trial confinement, the Air Force placed him on lockdown for suicide risk. On April 10, 2014, the Air Force discharged Devin Kelley.

**D.**    **The Air Force failed to report Devin Kelley's domestic violence conviction, his incarceration for a crime punishable by more than one year, or his commitment to psychiatric inpatient care to the FBI.**

**3.20**    Under Federal law and Department of Defense Manual 7730.47-M, Vol. 1, Enclosure 3, the United States Air Force (and its agents and employees) had a mandatory,

non-delegable obligation to report Devin Kelley's indictments, his court martial convictions, his commitment to a mental institution, and his domestic violence convictions to the FBI.

**3.21**   However, the Department of Defense failed to ensure that its own directives were properly enforced. The Air Force had an unacceptably high criminal incident reporting failure rate of which the Department of Defense was aware. The Department of Defense's failure to manage, supervise, and monitor the Air Force's repeated failures to comply also proximately caused Mr. Kelley's conduct and conviction to go unreported.

**3.22**   In 2014, the Inspector General of the Department of Defense evaluated the reporting system's compliance with its own mandatory procedures and policies. The principal finding of this investigation condemned the performance of the Department of Defense. Specifically, it found that the military was:

> not reporting criminal incident data to the Federal Bureau of Investigation (FBI) for inclusion in the annual Uniform Crime Reports to the President, the Congress, State governments, and officials of localities and institutions participating in the Uniform Crime Report Program, as required by Federal law.[18]

**3.23**   As a result of this failure:

> 10 years of DoD criminal incident data have not been provided to the FBI for inclusion in the annual uniform crime reports to the President, the Congress, State governments, and officials of localities and institutions participating in the UCR Program, as implemented in DoD Directive 7730.47 and

---

[18] U.S. DEPARTMENT OF DEFENSE, EVALUATION OF THE DEFENSE CRIMINAL INVESTIGATIVE ORGANIZATIONS' DEFENSE INCIDENT-BASED REPORTING SYSTEM REPORT AND REPORT ACCURACY (2014), https://media.defense.gov/2014/Oct/29/2001713419/-1/-1/1/DODIG-2015-011.pdf.

DoD Manual 7730.47-M, Volume 1.[19]

**E.    The Air Force fails to submit Devin Kelley's fingerprint data and conviction to the FBI's Next Generation Identification database.**

**3.24**    The FBI's Next Generation Identification (NGI) database's primary function is to provide the FBI a fully automated fingerprint identification and criminal history reporting system. The failure to populate this database with all the required fingerprint records can allow an illegible customer to purchase a weapon, hinder criminal investigations, and potentially impact law enforcement and national security interests.

**3.25**    Specifically, among other uses, the Next Generation Identification information is checked by Federal Firearms Licensees to instantly determine, through the FBI's National Instant Criminal Background Search System, whether a prospective buyer is eligible to buy firearms. The failure to populate FBI databases with all the required fingerprint records can result in a customer unlawfully purchasing a firearm.[20]

**3.26**    The United States' Inspector General admitted the allegations in Paragraphs 3.24 and 3.25 in Report No. DOGIG-2018-035, dated December 4, 2017. The Inspector General found that the Military Services did not consistently submit fingerprint cards and final disposition reports to the FBI as required by Department of Defense Instruction 5505.11 and 28 U.S.C. § 534. The Inspector General stated:

> Any missing fingerprint card and final disposition report can have serious, even tragic consequences, as may have

---

[19]*Id.*

[20]*See supra* note 10.

occurred in the recent church shooting in Texas.[21]

**3.27**    The Air Force's criminal fingerprint data is submitted to the FBI either electronically or by mail. In the time period sampled by the United States Inspector General, he found that the Air Force Security Forces failed to submit fingerprint cards and final disposition reports the majority of the time—in sixty (60) percent of cases.

**3.28**    In 2015, The Inspector General made recommendations to the Department of the Air Force to correct errors in the submission of fingerprint cards and final disposition reports in Report No. DOGIG-2015-081. The Air Force agreed with this recommendation. However, the Air Force took no corrective action to ensure that Devin Kelley's finger prints or final criminal disposition reports were reported to the FBI, and the Department of Defense failed to follow its policy to monitor compliance with these reporting requirements.

## IV.
## CAUSES OF ACTION

**A.**    **The Department of the Air Force's Negligence.**

**4.1**    The Department of the Air Force negligently failed to report criminal incident data to the Defense Incident-Based Reporting System of Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, and commitment to the mental institution.

**4.2**    The Department of the Air Force failed to submit criminal-history data

---

[21]U.S. DEPARTMENT OF DEFENSE, EVALUATION OF FINGERPRINT CARD AND FINAL DISPOSITION REPORT SUBMISSIONS BY MILITARY SERVICE LAW ENFORCEMENT ORGANIZATIONS (2017), https://media.defense.gov/2017/Dec/05/2001852278/-1/-1/1/DODIG-2018-035.PDF

to the FBI when probable cause existed in the Air Force Office of Special Investigations and Air Force Security Forces investigations on Kelley, after Kelley's court-martial conviction, and also upon his post-trial confinement at Holloman Air Force Base.

4.3    The United States, through Secretary of the Air Force Heather Wilson, admitted the allegations found in Paragraph 4.2 in response to a question by Senator Mazie K. Hirono in a submission dated December 13, 2017.

4.4    Alternatively, the Department of the Air Force negligently submitted inaccurate or incomplete criminal incident data to the Defense Incident-Based Reporting System of Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, or commitment to the mental institution.

4.5    The Department of the Air Force negligently failed to correct incomplete or incorrectly submitted criminal-incident data to the Defense Incident-Based Reporting System of Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, or commitment to the mental institution.

4.6    The Department of the Air Force negligently failed to submit fingerprint cards and final disposition reports for Devin Kelley's criminal convictions, or alternatively submitted incomplete or incorrect data to the FBI as required by federal law. As a result, the FBI's Next Generation Identification Database lacked critical information about Devin Kelley's criminal history and the Instant Criminal Background Check failed to flag Kelley as an unlawful firearm purchaser.

**4.7**     Preliminary findings by the Air Force Inspector General confirmed that the Air Force Office of Special Investigations and Security Forces personnel; then assigned at Holloman Air Force Base, New Mexico, did not report required information to civilian law enforcement in the Kelley case. The review also found the reporting error in the Kelley case was not an isolated incident and similar reporting lapses occurred at other locations.

**4.8**     In fact, the reporting problem was widespread across both the Office of Special Investigations and the Air Force Security Forces. A 2015 Defense Department audit revealed that the Air Force was not in compliance with a mandatory statutory requirement to report all offender criminal history data and, despite the discovery of non-compliance, the Air Force made no retroactive corrections.

**4.9**     The Department of the Air Force admitted the allegations contained in Paragraph 4.7 in a press release published on November 28, 2017. The Department of the Air Force, through the Secretary of the Air Force Heather Wilson, admitted the allegations contained in Paragraph 4.8 on December 6, 2017 before the United States Senate Judiciary Committee.

**B.     The Department of Defense's Negligence.**

**4.10**     The Department of Defense negligently failed to populate data about Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, and commitment to the mental institution from the Defense Incident-Based Reporting System into the FBI's National Incident-Based Reporting System (NIBRS) and Uniform Crime Report (UCR)

23

Program.  Thus, this data was not included in the FBI's National Instant Criminal Background Check System.

**4.11**   The Department of Defense negligently failed to ensure that the Department of the Air Force submitted the required criminal incident, fingerprint cards, and final disposition data to the Defense Incident-Based Reporting System

**4.12**   The Department of Defense negligently failed to ensure that identified criminal incident data errors are tracked to correction.

**V.**

**CAUSATION**

**A.**   **The Department of Defense and the Department of the Air Force's negligence proximately caused Tara McNulty's death.**

**5.1**   One or more of the above negligent acts of the Department of the Air Force and the Department of the Defense directly and proximately caused Tara McNulty's death and Plaintiff-Intervenor's ensuing injuries and damages.

**5.2**   When Devin Kelley attempted to purchase the firearms he used in the Sutherland Springs shooting, the FBI's Incident-Based Reporting System should have included Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, and commitment to the mental institution. The FBI's database did not contain any of this required information, or alternatively, contained incorrect or incomplete information, as a direct and proximate result of one or more of negligent acts of the Department of Defense and Department of the Air Force. Therefore, Devin Kelley was not listed as ineligible to purchase a firearm in the FBI's National Instant Criminal Background Check System.

**5.3**     When Devin Kelley attempted to purchase the firearms he used in the Sutherland Springs shooting, the FBI's National Instant Criminal Background Search System (NICS) should have contained Devin Kelley's criminal history, populated from the FBI's Next Generation Identification system. However, because of the Government's negligence, Kelley's fingerprint identification and criminal disposition reports were not submitted to the FBI and the NICS did not contain Kelley's convictions.

**5.4**     When Devin Kelley attempted to purchase the firearms he used to kill Tara McNulty in the Sutherland Springs shooting, the sale should have been blocked for one or more of the following reasons: **(a)** he had a conviction of a crime punishable by imprisonment for a term exceeding one year; **(b)** he had a conviction for domestic violence; and **(c)** he had previously been committed to a mental institution.

**5.5**     When Devin Kelley purchased the firearms he used in the Sutherland Springs shooting, his omission from the FBI's background check system and the ensuing ability to complete the purchase was a direct, proximate, and foreseeable result of one or more acts of negligence of the Department of Defense and Department of the Air Force.

**B.     Had the Air Force reported Kelley's history, the FBI's Instant Criminal Background Check System would have blocked Devin Kelley's firearm purchase.**

**5.6**     In April 2016, Devin Kelley purchased the firearms used in the Sutherland Springs shooting from a Federal firearms licensee, Academy Sports + Outdoors. At this time, Academy was required to submit biographical information about Kelley to the FBI's Instant Criminal Background Check System (NICS). If the Air Force had properly

reported Devin Kelley's history to the FBI, the NICS would have informed Academy to deny Kelley's purchase.

**5.7**    The purpose of the Uniform Federal Crime Reporting Act of 1988, the Brady Handgun Violence Prevention Act, and the Domestic Violence Offender Gun Ban are to ensure that violent offenders and high-risk individuals like Mr. Kelley are prevented from gaining access to firearms. The Department of Defense in 1994 began designing the Defense Incident-Based Reporting System (DIBRS) to meet criminal justice related reporting requirements mandated by the Uniform Federal Crime Reporting Act and the Brady Handgun Violence Prevention Act. The DIBRS permits the DOD to forward offense and arrest information required by these laws to the FBI.

**5.8**    Mr. Kelley's entry into the DIBRS database would have ultimately blocked his purchase of the firearms he used in the Sutherland Springs' shooting.

**5.9**    For these reasons, the Government's negligent acts or omissions directly and proximately resulted in Devin Kelley's purchase and usage of firearms on November 5, 2017 in the Sutherland Springs First Baptist Church mass shooting.

## VI.
## <u>DAMAGES</u>

**A.**    **Wrongful Death**—Tex. Civ. Prac. & Rem. Code Ann. § 71.004

**6.1**    Plaintiff-Intervenor Ruben D. Rios, Jr. brings this action as the surviving wrongful death beneficiary of Tara McNulty pursuant to Texas Civil Practice & Remedies Code § 71.004(b).

**6.2**    On November 5, 2017, Devin Kelley used the guns he purchased to kill

twenty-six individuals, including Tara McNulty, and injure twenty others. On said date, Devin Kelley shot Tara McNulty in the back of the head and killed her using firearms he should have been banned from purchasing.

**6.3**      As a result of the negligence of the United States' employees, agents, or representatives, Plaintiff Ruben D. Rios, Jr., the surviving spouse of Tara McNulty, suffered damages for which recovery is sought, including:

a.   Pecuniary loss, including loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, sustained in the past;

b.   Pecuniary loss, including loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, that, in reasonable probability, will be sustained in the future;

c.   Loss of companionship and society sustained in the past;

d.   Loss of companionship and society that, in reasonable probability, will be sustained in the future;

e.   Mental anguish sustained in the past;

f.   Mental anguish that, in reasonable probability, will be sustained in the future;

g.   Loss of inheritance;  and

h.   All other wrongful death damages to which Intervenor is entitled to recover under applicable Texas or federal law.

**B.**     **Survival**—Tex. Civ. Prac. & Rem. Code Ann. § 71.021(b)

**6.4**     Furthermore, under Texas Civil Practice & Remedies Code § 71.021(b), Rios brings a survival cause of action on behalf of the Estate of Tara McNulty in his capacity as her legal heir. On or before June 8, 2019, the administration[22] of Tara McNulty's Estate was completed. Therefore, there is currently **no administration pending** of Tara McNulty's Estate and **none is necessary** in the future. *See Shepherd v. Ledford*, 962 S.W.2d 28, 31–32 (Tex. 1998) (holding that under Texas law "[h]eirs at law can maintain a survival suit during the four-year period the law allows for instituting administration proceedings if they allege and prove that there is no administration pending is none is necessary.").

**6.5**     Thus, Rios has the requisite standing to bring this survival action on behalf of the Estate of Tara McNulty and seek the following damages suffered by the Estate as a direct and proximate result of the United States' aforementioned negligent conduct:

a.   Physical pain and suffering;

b.   Mental anguish;

c.   Medical expenses;

d.   Funeral and burial expenses; and

e.   All other survival damages to which Intervenor is entitled to recover on behalf of the Estate of Tara McNulty under applicable Texas and federal law.

---

[22]Tara McNulty's mother, Lisa McNulty, was appointed Independent Administratrix of Tara McNulty's Estate on June 26, 2018.

## VII.
## JURISDICTION, VENUE, & SERVICE

**7.1**     This Federal District Court has federal-question jurisdiction of this action because this action is brought pursuant to and in compliance with 28 U.S.C. §§ 1346(b), 2671–2680, commonly known as the Federal Tort Claims Act.

**7.2**     Venue is proper in this district pursuant to 28 U.S.C. § 3191(e)(1) because the United States is a defendant, Plaintiff-Intervenor resides in this district, and no real property is involved in the action.

**7.3**     The United States of America may be served with process in accordance with Rule 4(1) of the Federal Rules of Civil Procedure. Service is affected by serving a copy of the Summons and Complaint on the United States Attorney John F. Bash, United States Attorney for the Western District of Texas by certified mail, return receipt requested at his office:

> United States Attorney's Office
> Attn: Civil Process Clerk
> 601 NW Loop 410, Suite 600
> San Antonio, Texas 78216

**7.4**     Service is also affected by serving a copy of the Summons and Complaint on William Barr, Attorney General of the United States, by certified mail, return receipt requested at:

> The Attorney General's Office
> Attn: Civil Process Clerk
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

## VIII.
## LIABILITY OF THE UNITED STATES

**8.1**     This case is commenced and prosecuted against the United States of America to and in compliance with Title 28 U.S.C. §§ 2671-80, the Federal Tort Claims Act. Liability of the United States is predicated specifically on 28 U.S.C. § 2674 because the personal injuries and resulting damages of which the complaint is made were proximately caused by the negligence, wrongful acts or omissions of employees or agents of the United States of America working for the United States Department of the Air Force or Department of Defense, while acting within the scope of their office, employment, or agency under circumstances where the United States of America, if a private person, would be liable to Plaintiff-Intervenor in the same manner and to the same extent as a private individual.

**8.2**     The United States Department of Defense and Department of the Air Force are agencies of the United States. The Defendant, the United States of America, through its agencies, at all times material to this lawsuit, owned and operated Holloman Air Force Base and staffed its facilities and vehicles with its agents, servants and employees. The Defendant, the United States of America, through its agencies, at all times material to this lawsuit, owned and operated the Defense Manpower Data Center, which operates the Defense Incident-Based Reporting System.

**8.3**     This lawsuit is not a claim listed in 28 U.S.C. § 2680, exceptions to the Federal Tort Claims Act.

## IX.
## JURISDICTIONAL ALLEGATIONS

**9.1**    Pursuant to 28 U.S.C. §§ 2672 and 2675(a), the claims set forth herein were filed with and presented administratively to the United States of America through the Standard Form 95, which is attached hereto as "**Exhibit B**" and incorporated herein by this reference. Plaintiff's claim for damages presented in the Standard Form 95 stated a "sum certain."

**9.2**    The United States Department of the Air Force acknowledged receipt of Plaintiff's claims by letter; dated February 14, 2019, stating that it had received Plaintiff-Intervenor's claims on February 13, 2019. This acknowledgement letter is attached hereto as "**Exhibit C**" and is incorporated herein by this reference.

**9.3**    The United States failed to make final disposition of this claim within six (6) months of presentation of Plaintiff's claims. This action was filed greater than six (6) months from the presentation of the claims underlying the lawsuit.

**9.4**    Accordingly, Plaintiff has complied with all jurisdictional prerequisites and conditions precedent to the commencement and prosecution of this lawsuit.

## X.
## CONCLUSION

Plaintiff-Intervenor requests that Defendant be cited to appear and answer this Complaint; that upon final trial, Plaintiff-Intervenor has judgment against Defendant, for the amount of actual damages and for other and different amounts as he shall show by proper amendment before trial; for post-judgment interest at the applicable legal rate;

for all Court costs incurred in this litigation; and for such other relief, at law and in equity, both general and special, to which Plaintiff-Intervenor may show himself to be entitled to and to which the Court believes him deserving.

Respectfully submitted,

**THE CARLSON LAW FIRM, P.C.**
100 East Central Expressway
Killeen, Texas 76541
(254) 526-5688
(254) 526-8204  FAX

BY:   **/s/ Craig W. Carlson**
Craig W. Carlson
Attorney in Charge
Texas Bar No. 00792039
ccarlson@carlsonattorneys.com
Philip J. Koelsch
Texas Bar No. 24110103
pkoelsch@carlsonattorneys.com