IN THE UNITED STATES WESTERN DISTRICT OF TEXAS
SAN ANTONIO  DIVISION

| | | |
|---|---|---|
| DONNA WHITE, INDIVIDUALLY AND AS | § | |
| REPRESENTATIVE OF THE ESTATE | § | |
| OF ROY WHITE, | § | |
| | § | |
| Plaintiff, | § | NO. __5:19-cv-01291__ |
| | § | (*consolidated with* 5:18-cv-555-XR) |
| v. | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

1

## PLAINTIFF'S SECOND AMENDED COMPLAINT

This case arises out of negligence by the United States of America and its agencies causing the massacre at Sutherland Springs First Baptist Church on November 5, 2017. Plaintiff bring this Second Amended Complaint under the Federal Tort Claims Act, 28 U.S.C. § 2674 against the United States of America and would respectfully show the following.

## TABLE OF CONTENTS

I.     PARTIES ......................................................................................................... 5

II.    BACKGROUND ............................................................................................... 5

       A.    Congress passed key legislation to prevent shootings like the
             Sutherland Springs shooting ......................................................... 5

       B.    Congress, the Department of Defense, and the Air Force
             voluntarily undertook a non-delegable duty to report
             convictions for domestic violence, incarceration for a crime
             punishable by more than one year, and mental institution
             commitment .................................................................................... 9

       C.    The Department of Defense and Air Force knew that it was not
             reliably collecting and reporting fingerprints and final
             disposition information to the FBI .............................................. 12

III.   DEVIN KELLEY ............................................................................................. 14

       A.    The Air Force knew Devin Kelley's violent history ................... 14

       B.    The Air Force commits Devin Kelley to a mental health facility ..... 22

       C.    The Air Force charges and convicts Devin Kelley of domestic
             violence, resulting in his incarceration for a crime punishable
             by more than one year .................................................................. 24

       D.    Kelley commits a mass shooting at the Sutherland Springs
             First Baptist Church on November 5, 2017 ................................ 29

IV.    AIR FORCE'S COMISSIONS & OMISSIONS ........................................... 31

       A.    The Air Force missed multiple opportunities to provide Devin
             Kelley's fingerprint cards and final disposition reports to the
             FBI ................................................................................................... 31

       B.    Systematic failures in operations, organization, hiring,
             training, and supervision caused the Air Force's failure to
             collect, maintain, and submit Devin Kelley's fingerprint cards
             and final disposition reports to the FBI ..................................... 35

V.     ROY WHITE WITNESSED THE EVENTS IN REAL TIME .................... 39

VI.    CAUSES OF ACTION .................................................................................. 40

       A.    Negligence ...................................................................................... 40

B.   Negligent Failure to Train & Supervise........................................................ 43

C.   Negligent Undertaking................................................................................. 44

D.   Negligence *Per Se* ..................................................................................... 46

E.   Bystander Claims ....................................................................................... 47

VII. CAUSATION ....................................................................................................... 49

A.   The Department of Defense and Air Force's negligence caused
     injuries to the Plaintiffs .................................................................... 49

B.   Had the Air Force reported Kelley's history, the FBI's Instant
     Criminal Background Check System would have blocked Devin
     Kelley's firearm purchase. ................................................................ 50

VIII.  DAMAGES .......................................................................................................... 51

IX.   JURISDICTION, VENUE, & SERVICE .......................................................... 52

X.    LIABILITY OF THE UNITED STATES........................................................... 53

XI.   JURISDICTIONAL ALLEGATIONS .............................................................. 54

XII.  CONCLUSION..................................................................................................... 55

## I. PARTIES

1.1     Defendant is the United States of America.

1.2     Plaintiff Donna White, is the surviving Spouse of Roy White and resides in Carrollton, Texas.

1.3     Plaintiff Donna White, is the representative of the estate of the late Roy White.

1.4     Plaintiff attests that no administration to Roy White's estate is pending, and that none is necessary pursuant to the Texas Survival Statute, Tex. Civ. Prac. & Rem. Code Ann. § 71.021.

## II. BACKGROUND

### A.   Congress passed key legislation to prevent shootings like the Sutherland Springs shooting.

2.1     Through several pieces of legislation spanning almost 30 years, Congress acted to block individuals who present a known risk of violence from purchasing firearms. To that end, Congress mandated that certain individuals must be flagged in an instant criminal background check system used by firearms sellers nationwide in the interest of public safety. The Air Force and Department of Defense ignored three statutory mandates that required Devin Kelley's entry into the background check system: his domestic violence conviction, his conviction for a crime punishable by imprisonment for over a year, and his commitment to a mental institution. As a direct result of the Air Force and Department of Defense's failure to flag Kelley in the FBI database, his domestic violence escalated into a murderous shooting rampage

5

targeting his ex-wife's family and neighbors at the Sutherland Springs First Baptist Church on November 5, 2017.

22      Federal law makes it unlawful to sell a firearm to a person whom the seller knows or has reasonable cause to believe is someone who (a) has been convicted of a misdemeanor crime of domestic violence; (b) has been convicted of a crime punishable by imprisonment for longer than a year; or (c) has been committed to any mental institution. 18 U.S.C. § 922(d)(1), (4), (9). These categories of individuals are forbidden from possessing firearms. *Id.* § 922(g).

23      Congress attempted to quell the dangers presented by mass shooters like Devin Kelley before he was even born. Initially passed as the Gun Control Act of 1968, the law banned the sale of firearms to those individuals with criminal histories and those individuals who have been committed to mental institutions.

24      In 1993, Section 103 of the Brady Handgun Violence Prevention Act required the Attorney General of the United States to establish an instant criminal background check system that a firearm seller must use to determine whether the sale of the firearm violates 18 U.S.C. § 922. Under 18 U.S.C. § 922(t), a licensed dealer of firearms shall not sell or transfer to any person without first contacting the national instant criminal background check system.

25      Congress passed the Brady Bill to prevent shootings just like the Sutherland Springs shooting. When the Brady Bill was introduced in the House, one of the Bill's sponsors explained that express purpose:

> Mr. Speaker, I rise to strongly support today's introduction of the Brady bill. Five years ago, a man named Larry Dale walked into Mercer's Discount Foods in Tulsa, OK, and

opened fire on an unsuspecting crowd of shoppers. Dale's rampage killed one person and severely wounded another. Many Oklahomans were outraged to learn that Dale, a convicted felon with a history of mental illness, had walked into a gun store the day before his crime, filled out a single form, and walked out with his instrument of death.  The tragedy is that 5 years after Larry Dale proved how flawed the system is, the Brady Bill is not the law of the land.[1]

2.6    When the Brady Bill went to committee, the Chairman's opening statement in the House Subcommittee hearings noted that the Brady Bill would effectively prevent barred individuals from purchasing firearms:

> We are meeting today to consider a bill whose time has come-the Brady Handgun Violence Prevention Act . . . .
>
> There is nothing complicated about this bill. . . . It will save lives. The Brady bill will save lives that are being wasted in an epidemic of handgun violence from Brooklyn to Florida and all across America. And that is not theory, that is fact.
>
> After Brady passes, a convicted felon will no longer be able to walk into a gun store, as thousands have done this year, and walk out 10 minutes later with a murder weapon. State after State has shown that waiting periods and background checks work.[2]

2.7    The committee issued the House Committee Report. Under the heading "Summary and Purpose," the committee reported:

> The purpose of H.R. 1025 is to prevent convicted felons and other persons who are barred by law from purchasing guns from licensed gun dealers, manufacturers or importers.

---

[1] Congressional Record, House, at H731 (Feb. 22, 1993).

[2] Brady Handgun Violence Protection Act, hearing before the Subcommittee on Crime and Criminal Justice of the House Judiciary Committee (Sept. 30, 1993).

> The experiences of States which require background checks before firearm sales also indicate that many repeat offender criminals buy guns directly from firearms dealers. For example, in California, a background check intercepted 2,500 felons attempting to buy guns from dealers last year. . . . . Each year in Illinois some 3,000 prohibited persons seek to purchase firearms and are denied. [3]

28    In 1996, the Domestic Violence Offender Gun Ban, also referred to as the "Lautenberg Amendment," made it unlawful to sell firearms to anyone convicted of a misdemeanor crime of domestic violence. Congress enacted the Domestic Violence Offender Gun Ban to "close [a] dangerous loophole" in the gun control laws: while felons had long been barred from possessing guns, many perpetrators of domestic violence are convicted only of misdemeanors.[4]

29    In abusive relationships, the severity of domestic violence often increases over time, and the presence of a firearm increases the likelihood of homicide. [5] Congress recognized that "[f]irearms and domestic strife are a potentially deadly combination."[6] As one Senator noted during the debate over § 922(g)(9), "[A]ll too often, the only difference between a battered woman and a dead woman is the presence of a gun." 142 Cong. Rec. 22986 (1996) (statement of Sen. Wellstone).

---

[3] H. Rep. No. 103-344, Brady Handgun Violence Prevention Act (Nov. 10, 1993).

[4] *United States v. Castleman*, 134 S. Ct. 1405, 1408–09 (2014) (citing *United States v. Hayes,* 555 U.S. 415, 426 (2009)).

[5] *See id.,* at 14–15; *see also* Campbell et al., Assessing Risk Factors for Intimate Partner Homicide, DOJ, Nat. Institute of Justice J., No. 250, p. 16 (Nov. 2003) ("When a gun was in the house, an abused woman was 6 times more likely than other abused women to be killed").

[6] *See Voisine v. United States*, 136 S. Ct. 2272 (2016) (citing *Hayes,* 555 U.S. at 427).

**B. Congress, the Department of Defense, and the Air Force voluntarily undertook a non-delegable duty to report convictions for domestic violence, incarceration for a crime punishable by more than one year, and mental institution commitment.**

2.10    Federal law requires Government agencies to report ineligible firearm purchasers to a national database. Specifically, 34 U.S.C. § 40901(e)(1)(C) states that federal agencies that have "any record of any person demonstrating" that the person should not be able to purchase a gun "shall, not less frequently than quarterly, provide the pertinent information contained in such record to" the Attorney General for the national instant criminal background check system. Section 40901(e)(1)(D) creates an obligation on agencies to correct and update these records.

2.11    Title 10, U.S.C. section 1562 requires that the Department of Defense establish a central database of information on the incidents of domestic violence involving members of the armed forces. This section also requires that all military departments, including the Air Force, report domestic violence incidents.

2.12    It is Department of Defense policy that all Department agencies, including the Air Force, comply with the (a) crime reporting requirements of the Uniform Federal Crime Reporting Act of 1988; (b) reporting requirements for victim and witness assistance notifications of the Victim's Rights and Restitution Act of 1990, and (c) reporting requirements of the Brady Handgun Violence Prevention Act.

2.13    To implement these federal laws, the Department of Justice established the National Instant Criminal Background Check System (NICS). Congress, through the Brady Act, established the NICS Indices, which contains information provided by federal agencies of persons prohibited from receiving firearms under federal law. The

9

NICS responds instantly to background check inquiries by querying the NICS Indices, the National Crime Information Center, and the Interstate Identification Index. The Interstate Identification Index contains biometric criminal history based on fingerprint submission.

2.14    The Department of Defense issued policies that required submission of fingerprint cards and final disposition reports to the FBI for inclusion in the NICS database. The Department of Defense and U.S. Air Force promulgated these policies through Department of Defense Instruction 5505.11, "Fingerprint Card and Final Disposition Report Submission Requirements." Instruction 5505.11 requires the collection fingerprints and the submission criminal history to the FBI. Under this instruction, U.S. Air Force law enforcement agents are to collect and submit fingerprint cards when they have probable cause to believe that a person committed a violation of a crime that would make them ineligible to obtain a firearm. In addition, final disposition reports must be submitted to the FBI upon final disposition of the offense.

2.15    Department of Defense Manual 7730.47-M Volume 1, Enclosure 3, prescribes the reporting data elements needed to comply with Federal criminal incident reporting pursuant to federal law. Enclosure 3 states the Defense Incident-Based Reporting System:

> shall be used to centralize the collection of information that is reportable by the DoD Components pursuant to The Brady Handgun Violence Prevention Act of 1993, which requires the Department of Defense to report these eight categories to the FBI for purposes of prohibiting firearm purchases:
>
> (1) Persons who have been convicted in any court of a crime punishable by imprisonment for a term exceeding 1   year. …

10

(4) Persons who have been adjudicated as mental defectives or who have been committed to a mental institution. …

(7) Persons convicted in any court of a misdemeanor crime of domestic violence.

2.16     The Air Force issued Instruction 31-206 and 31-118. Air Force policies required that Air Force Security Forces units obtain complete sets of fingerprints on fingerprint cards. Air Force Instructions require the submission of these fingerprint cards and final disposition reports to the FBI. Air Force Instruction 31-205 requires fingerprinting of all post-trial inmates during the in-processing into a confinement facility. The Instruction also required that Air Force train its staff in in-processing matters, including collecting and submitting fingerprint cards and final disposition reports to the FBI.

2.17     The Air Force also has instructions, handbooks, and manuals that provide policy, guidance, and procedures for collecting and reporting criminal history data to the FBI, consistent with Department of Defense policies.

2.18     Air Force Office of Special Investigations Handbook 71-105 ("An Agent's Guide to Conducting and Documenting Investigations," March 9, 2009) obliges Air Force agents or employees to collect a subject's fingerprints (or the electronic equivalent) after a subject interview. The Handbook requires Detachment leadership to review the fingerprint cards and final disposition reports for accuracy, verify the fingerprints were acceptable, and document their review.

2.19    Air Force Office of Special Investigations Manual 71-118, Volume 4, ("General Investigative Methods," April 5, 2012) requires the collection of fingerprints from all subjects of Special Investigations after the subject interview if investigating the subject for violation of certain offenses, including crimes of domestic violence. It refers Air Force agents to Department of Defense Instruction 5505.11 for the criteria of collecting and submitting fingerprints to the FBI.

2.20    Air Force Office of Special Investigations Manual 71-121 ("Processing and Reporting Investigative Matters," October 12, 2012) requires Air Force agents to submit a subject's fingerprints to the FBI if they have probable cause to believe the subject of their investigation committed certain offenses, including offenses involving domestic violence. This manual also requires agents to submit completed final disposition reports on military members to the FBI within fifteen (15) days of sentencing. Duplicates of these reports must be maintained in the Air Force investigative case files. This manual further requires Detachment leadership to review—for sufficiency—investigative files monthly from the date of the allegation until the case is closed.

C.    **The Department of Defense and Air Force knew that it was not reliably collecting and reporting fingerprints and final disposition information to the FBI.**

2.21    The Department of Defense Inspector General conducted several investigations that found failures in the submission of required fingerprints and final disposition reports to the FBI throughout the Department.

222    In 1997, the Inspector General found a high level of noncompliance by Department of Defense and its agencies. For example, the Air Force failed to submit fingerprint cards in 38% of its criminal cases and failed to submit final disposition reports in half of its criminal cases. The Inspector General recommended that the Military Departments and Defense agencies develop polices and implement procedures to correct these failures and prevent such failures from occurring in the future. The United States Air Force agreed with the recommendation.

223    In 2013, an Inspector General investigation revealed that Defense Departments failed to collect or failed to report 20% of fingerprints in sexual assault cases. (Report No. DoDIG-2013-091, "Evaluation of Military Criminal Investigative Organizations' Sexual Assault Investigations," July 9, 2013.) Similarly, in 2014, an Inspector General investigation revealed that Defense Departments failed to collect or submit fingerprints to the FBI in sexual assaults of children. Also in 2014, the Inspector General found Defense Departments failed to collect and submit fingerprints in child death investigations. In 2015 and 2017, the Inspector General found that Defense Departments failed to collect or submit fingerprints in investigations of sexual assault.

224    In 2015, the Inspector General issued another report (Report No. DoDIG-2015-081, "Evaluation of Department of Defense Compliance with Criminal History Data Reporting Requirements"). Plaintiffs incorporate this report into their complaint by reference. In this report, the Inspector General found that the Military Services failed to consistently submit fingerprint cards and final disposition reports

as required. For example, the Air Force failed to submit 31% of required fingerprint cards and 32% of final disposition reports. The Inspector General recommended that Air Force take prompt action to submit missing fingerprint and final disposition reports to the FBI. The Inspector General also recommended that Air Force take prompt action to ensure submission of fingerprint cards from future criminal investigations and future final dispositions reports. The Air Force agreed with these recommendations.

2.25    A 2017 review conducted by the Inspector General (Report No. DODIG-2018-035, "Evaluation of Fingerprint Card and Final Disposition Report Submissions by Military Service Law Enforcement Organizations," December 5, 2017). Plaintiffs incorporate this report into their complaint by reference.  In this report, the Inspector General again determined the Military Services failed to submit fingerprint cards and final disposition reports as required.

## III.    DEVIN KELLEY

### A.   The Air Force knew Devin Kelley's violent history.

3.1    Devin Kelley entered the Air Force Delayed Enlistment Program on June 12, 2009. While enlisting, Kelley lied to the Air Force about using and possessing marijuana. On January 5, 2010, he recertified his lies about marijuana use and possession when he entered active military service. On March 5, 2010, Kelley graduated from basic military training.

3.2    On April 14, 2010, the Air Force began training Kelley as a Network Intelligence Analyst, but Kelley had academic issues. Kelley's military training

leaders recommended Kelley for elimination from the course because he did not meet academic standards. The report also indicated that Kelley had several minor disciplinary infractions.

3.3     On December 16, 2010, the Air Force reassigned Kelley to a traffic management career field. On January 11, 2011, the Air Force permanently changed Kelley's station to Holloman Air Force Base ("Holloman"). Kelley arrived at Holloman in late April 2011. Between June 19, 2011, and March 20, 2012, he accumulated four Memorandums for Record, four Letters of Counseling, and five Letters of Reprimand. Kelley's conduct included failure to obey direct orders, creating a hostile work environment, making false statements, and insubordination of a superior officer. This included a letter of reprimand for lying to his supervisor and for failing to report to his duty station after being ordered to do so. In other letters, Kelley was warned that his conduct was a criminal act. In at least three of these letters, the Air Force told Kelley that he had proven that he could not be depended upon. In at least two of these letters, the Air Force noted that Kelley could not always be trusted and had demonstrated a disregard for the Air Force's core values. The Air Force warned Kelley that future misconduct would lead to more severe punishment.

3.4     In February 2011, Kelley began dating Tessa K. Kelley (neé Loge). Tessa Kelley had a child from a previous marriage. On April 12, 2011, Devin Kelley and Tessa Kelley married.

3.5     On June 2, 2011, Tessa Kelley took her child to William Beaumont Army Medical Center (a facility owned and operated by an agency of the United States). A

nursing note indicated concern for child abuse or neglect. While questioning Tessa Kelley about her son's injuries, Tessa Kelley stated that Devin Kelley had kicked her.

3.6     On June 8, 2011, Devin and Tessa Kelley took the child to an ER complaining of vomiting and falling. The physicians noticed the child had bruising on the child's left cheek that "appeared to be fresh and a little purple." A CT scan revealed a fractured clavicle and subdural hemorrhage (bleeding on the brain). After the fact, Devin Kelley admitted to the United States Air Force that he caused these injuries without excuse or justification. Devin Kelley produced a video confessing to his wrongful conduct. Physicians notified the Children, Youth and Families Department in New Mexico, who, in turn, notified the Air Force Office of Special Investigations Detachment 225 at Holloman of the possible child abuse.

3.7     On June 9, 2011, Air Force Special Investigations opened an investigation for assault on a child, listing Devin Kelley as the subject. They interviewed Kelley that day. Kelley denied striking his stepson and denied having any knowledge of Tessa Kelley striking the son. Kelley stated that he and Tessa Kelley were the only ones with direct access to his stepson. Kelley claimed he did not know how his stepson received the injury to his head. Kelley suggested that his stepson received the injury from falling on the floor while crawling or playing in his crib. At the end of the interview, agents collected Kelley's fingerprints and released him to his unit representatives. Air Force agents collected Kelley's fingerprints because they believed probable cause existed that Kelley committed the assault on his stepson.    However,

Air Force agents did not send Kelley's fingerprint cards to the FBI, as required by policy.

3.8     On June 24, 2011, Kelley's stepson was placed in foster care because of unexplained injuries and the suspicions of child abuse. Also on that day, Tessa Kelley reported that Kelley had physically assaulted her by grabbing her around the throat, choking her, and throwing her against a wall. This report was provided to Air Force Reserve leadership and to the 49th Security Forces Squadron at Holloman Air Force Base. The Air Force report of the incident stated that the investigation "determined no crime had been committed and there was no evidence of any injuries to either party."

3.9     On September 7, 2011, Kelley voluntarily went to the Holloman Mental Health Clinic as a walk-in patient and stated that he was unable to cope with the stress he was under at work. He stated that Child Protective Services was removing his stepson from the house due to an allegation of abuse caused his stress. Kelley also stated that his supervisor was constantly "yelling at work." A staff psychologist wrote in Kelley's mental health record that treatment would concentrate on his "anxiety/attention/occupational; continue to develop relational and mood management coping skills." The psychologist also wrote that Kelley would be seen weekly. Between September 7, 2011, and February 22, 2012, Kelley was treated 17 times at the Holloman Mental Health Clinic. During this time, Kelley was prescribed Atomoxetine, Ibuprofen, Albuterol, Fluticasone, and Omeprazole.

3.10    In a report on Kelley's October 11, 2011, visit, a psychologist wrote that Kelley had difficulty interacting with authority figures and that he perceived that they were criticizing him. On January 10, 2012, the psychologist examined Kelley again and reported that Kelley was "able to attend to and focus on pertinent material at home and work." The psychologist also wrote that Kelley was able to "control and direct his energy appropriately" and that there were "no significant changes in [his] symptoms."

3.11    On February 17, 2012, Tessa Kelley called the 49th Security Forces Squadron to report that Kelley had abused her after fleeing to El Paso, Texas. Tessa Kelley told Air Force 49th Logistics Readiness Squadron First Sergeant that Kelley's actions caused her to fear for her life. In response, the First Sergeant told her that the Squadron Commander would issue Kelley a no contact order. Tessa Kelley told the Squadron investigators that the reason she left Kelley was to get away from him "and the abuse," that Kelley had been physically abusing her since July 2011 and that Kelley had choked her on multiple occasions. She stated that in one instance on December 24, 2011, Kelley pushed her against a wall and choked her because she had told him that she did not want to visit his family and stated, "You better pack your bags or I'll choke you to the ceiling and pass you out." Tessa Kelley also said that on another occasion, she and Kelley argued over her wanting to go for a walk at night. This argument resulted in Kelley choking her, kicking her in the stomach, and then dragging her by her hair into the bathroom. She said that Kelley told her "I'm going to water-board you" and stuck her head directly under the showerhead. Tessa Kelley

also told the investigators that Kelley emotionally and physically abused her throughout their marriage. Tessa Kelley provided other examples of abuse, stating that Kelley would threaten to choke her if she did not do as he said, and would slap her, kick her, pull her hair, drag her through their house, and control her. She stated that Kelley told her if she "said anything to anybody he would bury her in the desert somewhere." Tessa Kelley stated that the reason she had not reported the abuse sooner was due to fear for both her life and the life of her son.

3.12     On February 12, 2012, Air Force investigators tried to interview Devin Kelley as a subject of their investigation into crimes of domestic violence. Kelley requested legal counsel and did not make a statement. The 49th Security Forces Squadron did not collect his fingerprints. Department of Defense and Air Force policies required the collection and submission of fingerprint cards to the FBI.

3.13     On February 21, 2012, Devin Kelley voluntarily went to the Holloman Mental Health Clinic as a walk-in patient. He told the staff psychologist that he was upset because his wife left him and because he believed that she told the 49th Security Forces Squadron that he assaulted her. On February 22, 2012, Kelley returned to the Clinic because he was still upset that his wife left him. A licensed clinical social worker stated that Kelley told her "he would like to go to the psychiatric hospital for help because he did not believe he could help himself on an outpatient status."

3.14     On February 23, 2012, Kelley voluntarily entered in-patient care at the Peak Behavioral Health Services ("Peak"), where he remained until March 8,  2012.

Peak is a mental health institution. During Kelley's intake evaluation, staff diagnosed him as having "an adjustment disorder with depressed mood." The staff wrote, "The patient reported feeling suicidal with a plan to shoot himself with a gun after his wife informed him that she was filing assault charges for an altercation that occurred three weeks prior to admission." Kelley told the Peak personnel that he had frequent mood swings. Kelley also reported that he had severe anxiety. Kelley told a clinical nurse specialist that he was diagnosed with Attention Deficit Hyperactivity Disorder while he was in the fourth grade. He also told the staff that the Holloman Mental Health Clinic had counseled him to help him cope with his Child Protective Services case, his marital problems, and his alleged emotional abuse from a female supervisor at work. During Kelley's in-patient treatment, he was prescribed Strattera for Attention Deficit Hyperactivity Disorder, Wellbutrin for depression, Clonazepam for anxiety, and Ambien for insomnia.

3.15    On March 8, 2012, the Peak discharged Kelley and told him to follow up with the Holloman Mental Health Clinic. Between March 14, 2012, and April 26, 2012, Kelley was seen at the Clinic seven times. The Clinic had access to Kelley's records at Peak. The last visit to the Clinic was April 26, 2012, during which Kelley told Clinic personnel that he was experiencing more difficulty than ever before because the final hearing for the adoption of his stepson was one hearing away from resolution.

3.16    In approximately mid-March 2012, while at their residence, Tessa Kelley watched as Kelley put one bullet in a .38 Special revolver. Kelley then pointed the

gun at his own head and pulled the trigger three times. Kelley then pointed the gun at Tessa Kelley and threatened her. On approximately April 23, 2012, while Tessa Kelley and Kelley were driving to El Paso, Tessa Kelley asked Kelley to slow down. Devin Kelley cursed at her and told her "don't tell me how to drive." The police later pulled Kelley over and cited him for speeding. After receiving the ticket and continuing to drive, Kelley blamed the ticket on Tessa Kelley and pulled the car over again. Devin Kelley then pulled out a gun and placed the muzzle of the weapon against her temple, stating, "Do you want to die?" Tessa Kelley pushed the gun away and began to cry. Kelley then put the gun in his mouth and asked her why she wanted to be with him. Kelley then told her that he had slapped her son on June 8, 2011, the day her son was taken to the hospital. Kelley additionally stated that he had struck his stepson on multiple occasions, the first time being in March 2011, in New Braunfels. The Air Force became aware of these facts through Tessa Kelley in an interview the Office of Special Investigations conducted on May 3, 2012.

3.17    On April 27, 2012, Tessa Kelley convinced Devin Kelley to make a full video confession. In the video, he admitted to hitting her son multiple times in frustration. Kelley stated that this frustration would lead him to push, strike, and slap his stepson. Kelley also acknowledged that he caused the bruising on his stepson's face on June 8, 2011. Kelley further admitted that he caused his stepson's skull injury. He stated that he had pushed his stepson down multiple times and shook him on at least two occasions. After completing the video, he gave it to Tessa Kelley. On April 29, 2012, Tessa Kelley provided the recording of Kelley's confession to his First Sergeant.

The First Sergeant provided the recording to Air Force Office of Special Investigations.

## B.   The Air Force commits Devin Kelley to a mental health facility.

3.18     On April 29, 2012, Kelley's chain-of-command arranged to have him admitted back into the Peak Behavioral Health Services. On April 30, 2012, Kelley entered Peak a second time. Kelley stated that he was going to shoot himself and Peak staff put a high-risk notification alert on his chart due to his homicidal and suicidal indicator.

3.19     On May 3, 2012, Air Force agents re-interviewed Tessa Kelley. She stated that she thought Kelley might have hurt her son, but she had not seen him do anything to hurt her son. She stated that she began suspecting him of "injuring" her son when Kelley started physically, verbally, and mentally abusing her. Tessa Kelley stated that Kelley had struck, kicked, choked, and pulled her hair out on multiple occasions. She stated that Kelley threatened to kill her if she ever reported the abuse to police, or any other party. Additionally, Kelley had stated to her, "If the cops show up at my door, I will shoot them." She also said that he had told her, "My work is so lucky I do not have a shotgun because I would go in there and shoot everyone." Tessa Kelley said that on one occasion while driving, Kelley struck her in the stomach in front of two friends, threatening to beat her if she continued speaking. In a separate interview of other witnesses, Air Force investigators discovered that other individuals had witnessed Kelley verbally abuse Tessa Kelley on multiple occasions. In an interview of Tessa Kelley's childhood friend, he stated that Tessa Kelley told him

about "all of the times" Kelley abused her. Tessa Kelley included the details of how Kelley would "hit her in the stomach and pull her hair out" and how he attempted to "water board" her. Tessa Kelley told her childhood friend that water boarding consisted of Kelley pushing her head under the shower faucet and turning on the water.

3.20    On June 6, 2012, a Peak staff member discovered Kelley's interest in guns. His medical records note that Kelley's insight and judgment are so impaired that Kelley does not understand "how that does not look good on him."

3.21    While receiving inpatient care at Peak, Mr. Kelley made several threats that if he were picked up by Security Forces, he would go for their guns. While at Peak, Devin Kelley tried to obtain firearms and conducted research into body armor. Mr. Kelley was trying to carry out threats he made against his chain of command. He made these plans to purchase another firearm because his other weapons had been confiscated by the Air Force, its agents, or contractors.

3.22    On June 7, 2012, Kelley left the Peak facility without permission from the staff and without notifying anyone. On June 8, 2012, a Peak Director located Kelley at a Greyhound bus station in El Paso. A Greyhound security officer and an El Paso police officer handcuffed him, and police officers from the Sunland Police Department transported him back to Peak. Kelley did not voluntarily return to Peak but was involuntarily re-committed to Peak. On the same day, Kelley's Commander prepared a pretrial confinement package. The package included a memorandum stating that Kelley's Commander was "convinced" that Kelley was "dangerous and likely to harm

someone if released." Kelley's Commander also cited Kelley's Internet search for body armor and firearms as further justification for the pretrial confinement. The Commander concluded that Kelley was a flight risk and ordered him into pretrial confinement.

3.23    So, the 49th Security Forces Squadron detained Kelley at Peak and transported him to the 49th Security Forces Squadron Confinement Facility. Because Kelley was ordered into pretrial confinement, Air Force policy required the confinement facility personnel to fingerprint Kelley during the booking processing into the confinement facility and to submit those records to the FBI after sentencing. Air Force agents or employees did not take Kelley's fingerprints at this time. If fingerprints were taken, Air Force agents or employees did not retain those fingerprints as required by policy. Further, if fingerprints were taken, Air Force agents or employees did not submit fingerprints to the FBI after his sentencing, as required.

## C.   The Air Force charges and convicts Devin Kelley of domestic violence, resulting in his incarceration for a crime punishable by more than one year.

3.24    On June 8, 2012, Air Force investigators interviewed Kelley about Tessa Kelley's assault allegations and his Absent without Leave status when he left Peak. Kelley told them that "something tragic had happened and he wanted to kill himself." Kelley also told the agents that he "escaped" from Peak because he was planning to go to New Braunfels, to plan his suicide. Kelley told agents that he made a confession video "on his own free will." Because Air Force Detachment 225 Special Agents were in possession of Kelley's confession, conducted a subject interview, and Kelley was

ordered into pretrial confinement, Department of Defense policy required the Special Agents to collect and submit Kelley's fingerprints to the FBI. Kelley's Commander ordered Kelley into pretrial confinement on June 8, 2012, stating that he had "reasonable grounds to believe" Kelley assaulted Tessa and her son. In a memorandum dated June 10, 2012, the Pretrial Confinement Review Officer found that "adequate probable cause" existed to believe Kelley had assaulted Tessa and her son. Yet, Air Force failed to collect or submit Kelley's fingerprints.

3.25    A Pretrial Confinement Memorandum, dated June 8, 2012, concluded that Kelley had violated the Uniform Code of Military Justice: Article 86, Date of Offense, June 7, 2012, Description of Offense, Absence without leave; Article 128, Date of Offense June 9, 2011, Description of Offense, Assault on a Child; Article 134, Date of Offense, April 23, 2012, Description of Offense, Communication of a Threat; and Article 134, Date of Offense, April 23, 2012, Description of Offense, Assault.

3.26    On July 10, 2012, the Air Force determined that Devin Kelley should be confined while awaiting trial because "it is foreseeable that [Kelley] will not appear for trial and/or will engage in serious criminal misconduct." As a basis for this conclusion, the Air Force noted:

> The Evidence shows a serious escalation of behavior involving firearms and threats after the physical abuse of a child. Particularly alarming is his decision to try to obtain another firearm while undergoing inpatient mental health care, conducting research on body armor, and then escaping from the facility late at night without authorization . . . .
>
> Lesser forms of restraint are inadequate to mitigate the flight risk he poses nor would they prevent him from

> carrying out the threats that he has made against others,
> especially given the forethought and planning that he
> showed by attempting to purchase another firearm and his
> escape from the mental health facility.

3.27    On July 26, 2012, the Air Force charged Kelley with suspected violations of Article 128 (Assault), against Tessa Kelley and her son. This is a charge of a crime of domestic violence. On August 2, 2012, an Article 32 hearing was conducted. An Article 32 hearing is a preliminary hearing that determines whether there is probable cause to believe an offense has been committed and the accused committed the offense; determines if the convening authority has court-martial jurisdiction; considers the form of charges; and recommends the disposition of the case. The hearing presented evidence that Kelley had abused Tessa Kelley from June 2011 through April 2012. The medical evidence presented during the hearing indicated her son suffered severe injuries inflicted by Kelley. The Article 32 Investigating Officer found reasonable grounds existed to believe that Kelley committed the offenses alleged.

3.28    On August 15, 2012, Kelley was also charged with a suspected violation of Article 128 (Assault) for threatening Tessa Kelley with a firearm. This a crime of domestic violence and a crime punishable by imprisonment for a term exceeding one year.

3.29    On August 27, 2012, charges were referred to court-martial. Kelley remained in confinement until the court-martial trial on November 6, 2012.

3.30    On November 3, 2012, trial counsel offered, and the Staff Judge Advocate presented, Kelley and his defense counsel with an Offer for Pretrial Agreement. The

agreement specified that, in return for Kelley's plea of guilty to the charges of assault against his wife and stepson, the firearm charge would be dismissed, and his confinement would not exceed 3 years. On November 4, 2012, Kelley and his defense counsel agreed to the terms of this agreement.

3.31    On November 6, 2012, in accordance with the pretrial agreement, Kelley pleaded guilty in the General Court-Martial proceedings to assault on his wife and stepson. On November 7, 2012, the Court-Martial panel sentenced Kelley to a reduction in rank to Airman Basic, confinement for 12 months, and a Bad Conduct Discharge. The plea of guilty to assault on his wife and stepson was a crime of domestic violence and a crime punishable by imprisonment for a term exceeding one year. In fact, Kelley's maximum sentence for the assaults on his wife and stepson included potential confinement for 5 years and 6 months.

3.32    The Air Force General Court Martial Order No. 10 specifically noted at the top of the order that this was a "Crime of Domestic Violence. 18 U.S.C. § 922(g)(9)." The citation to section 922(g)(9) references the federal law that prevents individuals convicted of even a misdemeanor crime of domestic violence from possessing a firearm.

3.33    On November 7, 2012, after his conviction, Kelley returned to the Confinement Facility at Holloman. Because his conviction changed his status from pretrial confinement detainee to post trial inmate, Air Force Corrections System policy required the confinement facility personnel to collect and submit Kelley's fingerprints during his in-processing into the confinement facility. Air     Force

employees did not collect, maintain, or submit Kelley's fingerprints to the FBI. Air Force agents or employees did not submit a final disposition report of Kelley's criminal history to the FBI. Air Force policy requires agents to submit the final disposition report within fifteen days (15) of Kelley's sentencing.

3.34    On December 14, 2012, the Air Force Office of Special Investigations received a Report and Result of Trial of Devin Kelley. Per policy, the Air Force should have reported the final disposition of Devin Kelley's convictions to the FBI. But it did not. Instead, the Air Force Special Agent in Charge certified that Kelley's fingerprints were submitted to the FBI. This permitted the agent to close the investigation file when, in fact, the Air Force never collected, maintained, or submitted Devin Kelley's fingerprints or final disposition reports to the FBI.

3.35    On December 18, 2012, Kelley was transferred to and incarcerated at the Naval Consolidated Brig, Miramar, California, until his release on March 31, 2013. During his intake evaluation, Naval Consolidated Brig personnel placed Kelley in separate sleeping quarters from the general population while conducting medical and psychological assessments of him. Because of the evaluation, Kelley was classified as a "suicide risk in gown" as well as an "Assault risk – escape risk."

3.36    On March 31, 2013, Kelley was released from the Naval Consolidated Brig, upon completion of his sentence. Between March 31, 2013, and April 2, 2013, Kelley completed Air Force out processing paperwork and was ordered "not to enter or reenter or be found within the limits of the United States military installation of Holloman Air Force Base, New Mexico, for an indefinite period."

3.37    On December 3, 2013, the Air Force Court of Criminal Appeals affirmed the findings and sentencing in Kelley's court-martial. On May 9, 2014, after the automatic appeals courts upheld Kelley's conviction and sentence, he was officially separated from the Air Force with a Bad Conduct Discharge.

3.38    On September 30, 2016, Kelley's former 49th Logistics Readiness Squadron supervisor received a threatening message from Kelley on Facebook. The message stated, "Hey you stupid b****. You should have been put in the ground a long time ago. Better hope I don't ever see you. You can't face facts, you fat piece of s***." Kelley's former supervisor said that she had not attempted to contact Kelley before receiving the message, and that it was unexpected. She stated that she saved Kelley's Facebook message as a screenshot and forwarded it to her former Air Force supervisor. Kelley's former supervisor also stated that she had considered reporting this incident to law enforcement and obtaining a restraining order against Kelley, but decided against it because she felt that he would find out where she lived.

### D.   Kelley commits a mass shooting at the Sutherland Springs First Baptist Church on November 5, 2017.

3.39    On December 22, 2014, Kelley purchased a Glock Model 19, a 9-millimeter, semi-automatic handgun, from Specialty Sports and Supply, in Colorado Springs, Colorado. He completed the ATF Forms 4473 and the store completed the required NICS check on the same day. The response provided was that the sale could proceed.

3.40    On June 26, 2015, Kelley purchased a Ruger GP100, a .357 Magnum, revolver handgun, again from Specialty Sports and Supply in Colorado Springs.   He

completed the ATF Form 4473 and the store completed the required NICS check on the same day. The response provided was that the sale could proceed.

3.41    On April 7, 2016, Kelley purchased a Ruger AR-556, a 5.56-millimeter, semi-automatic rifle, from Academy Sports and Outdoors (Store No. 41), in San Antonio, Texas. He completed the ATF Form 4473, and the store completed the required NICS check on the same day. The response provided was that Academy could proceed with the sale.

3.42    On October 18, 2017, Kelley purchased a Ruger SR22, a .22 caliber, semiautomatic handgun, from Academy Sports and Outdoors (Store No. 46), in Selma, Texas. He completed the ATF Form 4473 and the store completed the required NICS check on the same day. The response provided was that Academy could proceed with the sale.

3.43    On four ATF Forms 4473 that Kelley filled out to purchase the firearms after his conviction, he certified that he had never been convicted of any crime for which the judge could sentence him for more than 1 year in confinement. One of the questions on ATF Form 4473 asks, "Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation." Kelley should have answered "yes" to this question.

3.44    On November 5, 2017, Kelley entered the First Baptist Church of Sutherland Springs, Sutherland Springs, Texas, and opened fire with three of the four firearms he had purchased. He killed 26 people and wounded 22 others. After

being shot by armed citizens who responded to the shooting, Kelley fled from the church in his automobile. Kelley later died from a self-inflicted gunshot wound.

## IV.   AIR FORCE' S COMISSIONS & OMISSIONS

### A.   The Air Force missed multiple opportunities to provide Devin Kelley's fingerprint cards and final disposition reports to the FBI

4.1     On June 9, 2011, the Air Force first missed its opportunity to submit Kelley's fingerprint cards to the FBI, when the Office of Special Investigations opened an investigation into the assault of Kelley's stepson.

4.2     Also on June 9, 2011, an Air Force Special Agent wrote an affidavit to the military magistrate to obtain authority to search Kelley's on-base residence for evidence related to Kelley's alleged assault of his stepson. In the affidavit, the Special Agent wrote that he believed probable cause existed to search for evidence of child abuse. On June 17, 2011, a second Special Agent wrote a separate affidavit to a military magistrate requesting authority to seize certain property from Kelley. In that affidavit, the agent represented that he or she believed that probable cause existed to seize the property to determine the source of the victim's injuries. Even though Air Force agents believed that probable cause existed, they never submitted to the FBI the fingerprint cards collected on the June 9th interview. Additionally, their supervisors did not create a note in the investigative case file stating that the fingerprint card had been reviewed, as required by Air Force Office of Special Investigation Handbook 71-105. Almost certainly, the supervisors failed to certify the review of the cards because they did not review them.

4.3     The Air Force Special agents who interviewed Kelley on June 9, 2011 knew of the Air Force policy requirements to collect and submit fingerprints to the FBI. The agents were unable to provide any reason why the Air Force failed to submit Kelley's fingerprints to the FBI. The Department of Defense Inspector General concluded that the Special Agents did not follow Department of Defense and Air Force policies regarding the submission of fingerprints, and that some agents did not understand the policies. The Inspector General also found confusion among the Special Agents as to when fingerprints should be submitted to the FBI. The former Special Agent-in-Charge and Superintendent believed that fingerprints were normally submitted within 2 days of the subject interview. The case agent stated that at the time of the Kelley assault investigation, he was not aware that of the requirement for submission of the fingerprints to the FBI upon a probable cause determination.

4.4     The second missed opportunity for the Air Force to submit Kelley's fingerprints to the FBI occurred on February 17, 2012. The 49th Security Forces Squadron opened an investigation on Kelley for assaulting Tessa Kelley, after she told the 49th Security Forces Squadron investigators that Kelley had been physically abusing her since July 2011. At that time, the investigators should have collected Kelley's fingerprints, in accordance with Department of Defense and Air Force policy. At the time, the Air Force had probable cause to believe that Kelley committed assault. The Inspector General concluded that Air Force investigators did not have a clear understanding of, and did not follow, DoD and USAF policy regarding the collection and submission of fingerprints.

4.5     The third missed opportunity for the Air Force to collect and submit Kelley's fingerprints to FBI occurred on June 8, 2012, when Air Force Office of Special Investigations interviewed Kelley immediately after he was placed in pretrial confinement. Air Force investigators believed that probable cause existed that Kelley assaulted his stepson based on the evidence collected, including Kelley's confession on video. According to records of the interview with Kelley, investigators collected Kelley's fingerprints at the end of the subject interview. The Air Force negligently maintained Devin Kelley's fingerprints because a review of the case file found no fingerprint cards within it. Regardless, Air Force agents or employees did not submit the fingerprint cards to the FBI. So, while Special Agents initialed the block signifying that they collected Kelley's fingerprints, there is no evidence that they were collected and submitted to the FBI.

4.6     The Inspector General concluded Special Agents did not know or follow Department of Defense and Air Force policy, and they did not collect and submit Kelley's fingerprints to the FBI following his second subject interview on June 8, 2012. The failure to collect or submit the fingerprints occurred, in part, because of the Special Agent-in-Charge's practice not submit the fingerprints to the FBI until after the Detachment received the Report of Result of Trial from the Staff Judge Advocate or the Commander's record of discipline. However, none of the Special Agents could provide a sufficient or supportable reason why Kelley's fingerprints were not collected or submitted following his subject interview.

4.7    The fourth missed opportunity for the Air Force to submit Kelley's fingerprints and the first missed opportunity to submit Kelley's final disposition report to the FBI occurred on November 7, 2012, when the Air Force convicted Kelley by General Court-Martial for assault on Tessa Kelley and his stepson. As noted above, Air Force Corrections System policy required the confinement facility personnel to collect an inmate's fingerprints and submit the fingerprints with final disposition during in-processing into the confinement facility.  As required by Air Force Instruction 31-205, the 49th Security Forces Squadron Confinement Facility staff should have included the final disposition on the fingerprint card they collected when they in-processed Kelley into the confinement facility after his court-martial. That fingerprint card should have been sent to the FBI with the final disposition report.

4.8    When the Air Force processed Kelley for post-trial confinement, the Air Force confinement staff failed to collect Kelley's fingerprints. The Confinement Facility personnel did not follow Department of Defense and Air Force policy for collecting and submitting fingerprints and final disposition reports to the FBI. Personnel also did not know and were not trained that once fingerprints were collected, they should be submitted to the FBI. So, even if they had collected Devin Kelley's fingerprints and final disposition data, more likely than not, the personnel would not have submitted them to the FBI as a proximate result of the lack of training and supervision.

4.9    The second missed opportunity for the Air Force to submit Kelley's final disposition report to the FBI occurred on December 14, 2012, when the Office of

Special Investigations Detachment 225 Special Agent-in-Charge received the results of Kelley's trial and closed the Kelley investigation. The Agent falsely certified in the Air Force's database system that the Air Force submitted to the FBI Kelley's fingerprints and final disposition reports. Moreover, the investigative case file cover sheet did not contain a supervisor's signature or a date to signify that the file was reviewed for closure, as required by Air Force Office of Special Investigations Manual 71-121.

### B. Systematic failures in operations, organization, hiring, training, and supervision caused the Air Force's failure to collect, maintain, and submit Devin Kelley's fingerprint cards and final disposition reports to the FBI.

4.10    The Air Force's failure to collect, maintain, and submit fingerprint cards and final disposition reports to the FBI was not an isolated error. Instead, this failure was caused by failures in operations, organization, training, and supervision.

4.11    For example, the Detachment leadership did not review the file or complete the Closed Investigative File checklist and the Investigative Information Management System checklist properly. Instead, the Special Agent-in-Charge assumed that the case agent had completed the actions necessary and submitted Kelley's fingerprints and final disposition to the FBI. He therefore completed the two checklists without verifying that the fingerprints and final disposition report had been submitted to the FBI. If the Agent-in-Charge and Superintendent had included a review of Kelley's fingerprints in the leadership review, the fact that the fingerprints had not been submitted would have been identified.

35

4.12    Next, according to Air Force Office of Special Investigations Manual 71-121, all criminal investigations require monthly supervisory reviews to ensure that investigators follow policy and that investigations are sufficient and timely. Air Force leadership conducted 15 supervisory reviews of the Kelley investigation from June 29, 2011, through October 5, 2012. However, none of the supervisory reviews that were documented discussed fingerprint card collection or submission. Although Air Force policy required supervisory reviews to include the investigatory case file, no such reviews of the case file occurred. Kelley's fingerprint cards were retained in the investigative case file. Had they reviewed the case file, more likely than not, they would have identified that the Air Force had not submitted Kelley's fingerprints to the FBI. The monthly supervisory reviews of Kelley's investigative case file were incomplete and ineffective in identifying that Kelley's fingerprint cards remained in the investigative case file and had not been submitted to the FBI.

4.13    The high turnover and disorganization in the Office of Special Investigations contributed to the Air Force's failure to collect, maintain, and submit Kelley's fingerprint cards and final disposition reports to the FBI. Between June 2011 and March 31, 2013, Air Force Office of Special Investigations Detachment 225 had two Special Agents-in-Charge and three interim Special Agents-in-Charge. The second interim Agent-in-Charge described the administrative process for closing cases was a "disaster" as a result of the large backlog of investigative case files stacked throughout the office. The third interim agent observed approximately 30 cases spread throughout the Detachment office area in various stages of closure,   in

terrible condition, with many of the cases missing investigative documentation and corresponding activities with the agent notes. Air Force assigned a permanent Agent-in-Charge in December 2011. This agent noticed that staffing challenges and operations tempo caused the office to be "hell." The office was severely behind in closing out old cases and described the unit as a "bottomless pit" that was impossible to dig out from.

4.14    The Inspector General determined that the Air Force's failure to submit Kelley's fingerprints was part of a systemic problem with the Office of Special Investigations Detachment 225. After reviewing 70 closed investigations for fingerprint card and final disposition report submission to the FBI, the Inspector General found 8% of cases where investigators did not collect fingerprints; 20% of cases where investigators collected, but did not submit to the FBI, fingerprint cards; and 31% of cases where investigators failed to submit to the FBI final disposition reports.

4.15    In 2014, the Inspector General of the Department of Defense evaluated the reporting system's compliance with its own mandatory procedures and policies. The principal finding of this investigation condemned the performance of the Department of Defense. Specifically, it found that the military was:

> not reporting criminal incident data to the Federal Bureau of Investigation (FBI) for inclusion in the annual Uniform Crime Reports to the President, the Congress, State governments, and officials of localities and institutions participating in the Uniform Crime Report Program, as required by Federal law.

As a result of this failure:

10 years of DoD criminal incident data have not been provided to the FBI for inclusion in the annual uniform crime reports to the President, the Congress, State governments, and officials of localities and institutions participating in the UCR Program, as implemented in DoD Directive 7730.47 and DoD Manual 7730.47-M, Volume 1.

4.16    At the time of the Kelley investigation, the Air Force Security Forces Center was responsible for training, equipping, and organizing all Security Forces for the Air Force. At the time of the Kelley assault investigation, the Air Force Security Forces Academy did not train students on fingerprint card collection and submission or on final disposition report submission procedures. In 2015, the Air Force Security Forces created fingerprint training as part of the "Annual Home Station Training" requirements. The 1-hour long lesson plan was designed to be used by individual Security Forces Squadrons to train personnel on the physical collection of fingerprints and completion of the fingerprint card. However, the lesson plan does not contain any information relating to the submission of fingerprints. Additionally, the lesson plan did not reference Department of Defense or Air Force policy requirement and did not specify the conditions under which the fingerprint cards should be submitted nor did the lesson plan discuss the submission of the final disposition report.

4.17    The agents working on the Kelley investigation acknowledge the lack of training. One investigator explained that the only fingerprint training he received was "on-the-job" and that it related to the collection of fingerprints. Other investigators could not recall any training on fingerprinting subjects of investigation and under what circumstances. Neither did the Air Force provide training on an annual or reoccurring basis. The Inspector General interviewed one officer who

explained that the majority of 49th Security Forces personnel were not familiar with collecting fingerprints at the time of the Kelley assault investigation.

## V.  ROY WHITE WITNESSED THE EVENTS IN REAL TIME

5.1    On the morning of November 5, 2017, Donna White was with her husband in their living room when Roy White received a call from their son.  The son told Roy to "turn on the news."

5.2    Roy White turned on a live broadcast of Fox News with aerial and ground coverage of his mother's church surrounded by police vehicles and rescue vehicles along with active chyron graphics stating "Breaking News" and that a mass shooting was occurring at the First Baptist Church in Sutherland Springs, Texas.  Roy perceived, in active time, contemporaneous details surrounding his mother's shooting.

5.3    No official death toll or in depth details were offered by the news as the situation was still breaking, and happening live.

5.4    While watching the breaking news reports, Roy White attempted to call his sister, Michelle Shields, who lived in Sutherland Springs and his mother, Lula White, who had been in the church that morning.  Roy was able to reach his sister, who was at the scene, and confirmed to Roy that his mother was dead as Roy watched the details of the church shooting unfold on the screen before him.

5.5    Later, after his contemporaneous perceptions of the incident through live news coverage and conversations with those on scene, Roy was informed that

Lula White's body was found in the church shielding the body of the daughter of the First Baptist Church's pastor.  The Pastor's daughter was also deceased.

5.6     Roy White continued watching the live news coverage for about another half hour to an hour in stunned disbelief until he turned off his TV.  Roy White then broke down in anguish on his living room floor.

## VI. CAUSES OF ACTION

### A.   Negligence

6.1     The Air Force failed to use ordinary care and failed to do that which a person of ordinary prudence would have done under same or similar circumstances by failing to collect, maintain, and transmit Devin Kelley's fingerprint's to the FBI, as described in this Complaint.

6.2     The Air Force failed to use ordinary care and failed to do that which a person of ordinary prudence would have done under same or similar circumstances by failing to submit Devin Kelley's final disposition information to the FBI, as described in this Complaint.

6.3     The Air Force negligently failed to report criminal incident data to the Defense Incident-Based Reporting System of Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, and commitment to the mental institution.

6.4     The Air Force failed to submit criminal-history data to the FBI when probable cause existed in the Air Force Office of Special Investigations and Air Force Security Forces investigations on Kelley, after Kelley's court-martial conviction,

and also upon his post-trial confinement at Holloman Air Force Base.

6.5    The United States, through Secretary of the Air Force Heather Wilson, admitted the allegations found in Paragraph 5.4 in response to a question by Senator Mazie K. Hirono in a submission dated December 13, 2017.

6.6    Alternatively, the Air Force negligently submitted inaccurate or incomplete criminal incident data to the Defense Incident-Based Reporting System of Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, or commitment to the mental institution.

6.7    The Air Force negligently failed to correct incomplete or incorrectly submitted criminal-incident data to the Defense Incident-based Reporting System of Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, or commitment to the mental institution.

6.8    The Air Force negligently failed to submit fingerprint cards and final disposition reports for Devin Kelley's criminal convictions, or alternatively submitted incomplete or incorrect data to the FBI as required by federal law. As a result, the FBI's Next Generation Identification database lacked critical information about Devin Kelley's history and failed to prevent the sale of firearms to Devin Kelley.

6.9    Findings by the Inspector General confirmed the Air Force Office of Special Investigations and Security Forces personnel then assigned at Holloman

Air Force Base, New Mexico, did not report required information to civilian law enforcement in

the Kelley case. The review also found the error in the Kelley case was not an isolated incident and similar reporting lapses occurred at other locations.

6.10     In fact, the problem was widespread across both the Office of Special Investigations and the Air Force Security Forces. A 2015 Defense Department audit revealed that the Air Force was not in compliance with a mandatory statutory requirement to report all offender criminal history data and, despite the discovery of non-compliance, the Air Force made no retroactive corrections.

6.11     The Air Force admitted the allegations contained in Paragraph 5.9 in a press release published on November 28, 2017. The Air Force, through the Secretary of the Air Force Heather Wilson, admitted the allegations contained in Paragraph 5.10 on December 6, 2017 before the United States Senate Judiciary Committee.

6.12     The Department of Defense negligently failed to ensure the Air Force submitted the required criminal incident, fingerprint cards, and final disposition data.

6.13     The Department of Defense negligently failed to ensure that identified criminal incident data errors are tracked to correction.

6.14     The Department of Defense negligently failed to populate data about Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, and commitment to the

mental institution from the Defense Incident-Based Reporting System into the FBI's National Incident-Based System.

## B.   Negligent Failure to Train & Supervise

6.15     The United States and its agencies has an obligation to adequately train and supervise employees. The Air Force's failure to collect, maintain, and submit fingerprint cards and final disposition reports to the FBI was not an isolated error. Instead, this failure was caused by failures in operations, organization, training, and supervision, as described in this Complaint.

6.16     The United States, through its agencies, failed to adequate supervise the individuals who were tasked with the collection, maintenance, and submission of Devin Kelley's fingerprints and final disposition reports to the FBI or the DOD's DIBRS database. Had they adequately supervised the collection of fingerprints, they would have noticed that in some instances, their employees did not collect fingerprints. They would have noticed in other instances, their employees did not maintain fingerprint cards in the case file. And they would have noticed that at no point, did their employees submit Devin Kelley's fingerprint cards or final disposition reports to the FBI for inclusion in the National Instant Criminal Background Check System.

6.17     The United States Air Force at no point between 2009 and 2013 trained its employees to collect, maintain, and submit fingerprint cards and final disposition reports to the FBI for inclusion in the National Instant Criminal Background Check System. Nor did the Air Force put in place a system that verified

if the required reporting had occurred, which it had not.

6.18    These failures by the Air Force and Department of Department of Defense to train and supervise its reporting personnel led to its employees failing to   submit reports and data to both the DIBRS and FBI about Devin Kelley. Thus, the United States is liable for negligent training and negligent supervision.

## C.   Negligent Undertaking

6.19    The United States Congress voluntarily undertook the creation of a national instant background check system upon passage of the Brady Bill. To implement this system, the Department of Justice created the National Instant Criminal Background Check System. The Department of Defense and Air Force implemented policies, procedures, manuals, and instructions—and acted under the color of these regulations—regarding the reporting of individuals who received convictions for domestic violence, incarceration for a crime punishable by more than one year, and mental institution commitment. These policies and procedures included the collection, maintenance, and reporting of fingerprint cards of those disqualified individuals.

6.20    The United States, through its agencies, voluntarily undertook the training and supervision of its employees responsible for the collection, maintenance, and submission of fingerprint cards and final disposition reports to the FBI.

6.21    The United States, through its agencies, voluntarily undertook the correction of inaccurate or incomplete submissions to FBI's National Instant

Criminal Background Check System. On multiple occasions, the Department of Defense's Inspector General alerted the United States and its agencies to its negligent failure to collect, maintain, and submit fingerprint cards and final disposition data to the

FBI. The Air Force agreed with the Inspector General's recommendations and agreed to take corrective action.

622    The United States, through Congress and its agencies, rendered these services because Congress and the agencies recognized that they were necessary for the protection of individuals like the Plaintiffs. To limit this violence, Congress disqualifies certain people from buying, owning, or possessing guns and established a national background check system to prevent these people from obtaining guns. In fact, when asked the question, "[W]ho do you believe is the beneficiary of the Brady Act? Who do you think Congress was trying to protect?" Thomas Ward, Deputy Assistant Attorney General for the United States responded, "All of us. Three hundred and sixty-five million Americans."[7] Mr. Ward told the truth when he stated the Brady Act was intended to protect all Americans.

623    The failure to use reasonable care increases the risk that individuals like Devin Kelley obtain firearms when they are prohibited by law from obtaining such firearms. In fact, the foreseeable and proximate result of the failure to use reasonable care is that individuals like Devin Kelley will pass the background check when obtaining firearms for the use of mass murders, like the one he committed in

---

[7]    *Sanders v. United States*, No. 18-1931 (4th Cir. May 7, 2019) (Oral Argument).

exercise reasonable care in its undertaking because the United States knew of Devin Kelley's conduct between 2009 and 2013, as detailed in this Complaint and in the Department Sutherland Springs. What's more, the United States, through its agencies, knew of the specific increase of risk posed by Devin Kelley if the United States failed to of Defense Inspector General's investigation of the matter.

624    The United States, through its agencies, negligently failed to: (a) collect, maintain, and transmit Devin Kelley's fingerprint cards to the FBI and DOD DIBRS;  (b) submit Devin Kelley's final disposition report to the FBI and DOD DIBRS; (c) train and supervise its employees and agents with regard to the collection, maintenance, and transmission of fingerprint cards to the FBI and DOD DIBRS; (d) train and supervise its employees and agents with regard to the submission of final disposition reports to the FBI and DOD DIBRS; and (e) take corrective action multiple times when alerted to this negligence.

## D.   Negligence *Per Se*[8]

625    Under Texas law, a negligence *per se* cause of action has three elements:

---

[8]   Plaintiffs appreciate that on May 23, 2019, the Court dismissed the negligence *per se* claims in Case 5:18-cv-00555-XR and several other consolidated civil actions arising from the mass shooting in Sutherland Springs, Texas that gives rise to this civil action. In reviewing the briefing and the Court's order, Plaintiffs believe the issues surrounding this claim have been ably and comprehensively briefed for the Court and that the Court has thoroughly analyzed these issues and reached a reasoned conclusion. Nevertheless, Plaintiffs respectfully disagree with the Court's conclusion and include this claim in order to reserve the right to appeal the Court's decision to dismiss this claim. If the Court is amenable to reconsidering dismissal of this claim, Plaintiffs would be happy to submit  additional briefing to the Court. Otherwise, Plaintiffs incorporate by reference the briefs that have been submitted to the Court on the negligence *per se* claim and reserve the right to appeal the dismissal of this claim.

(1) a legal duty, (2) a breach of that duty, and (3) damages proximately caused by the breach. *Praesel v. Johnson*, 967 S.W.2d 391, 394 (Tex. 1998).

6.26    Defendant's violations of federal law breached their duty to collect, process, and submit Kelley's information to the national background-check system.[9]

6.27    Under Texas law, Defendant's failures to report Kelley's information violate a clearly-defined standard of conduct.

## E.   Bystander Claims

6.28    The current COVID-19 crisis has only highlighted the way that the world has changed with respect to information received via modern technology. With the advent of modern technology, individuals can experience events in real-time given the speed at which the information can be relayed and the various ways which that information can be perceived. Indeed, by way of example, counsel appeared virtually for a recent hearing before the Honorable Court—and while all counsel were not physically located in the same courthouse, the same building, or even the same city, they each had a real-time, contemporaneous, active and experiential perception of the hearing as it unfolded. In other words, counsel were "present" for the hearing.

---

[9]  *See Wal-Mart v. Tamez*, 960 S.W.2d 125, 127–28 (Tex. App.—Corpus Christi 1997, pet. denied) (recognizing that under Texas law, a violation of 18 U.S.C. § 922 is negligence per se.); *Bryant v. Winn-Dixie Stores*, 786 S.W.2d 547, 549 (Tex. App.—Fort Worth 1990, writ denied) (same); *Peek v. Oshman's Sporting Goods*, 768 S.W.2d 841 (Tex. App.—San Antonio 1989, writ denied) (same); *Ellsworth v. Bishop Jewelry and Loan Co.*, 742 S.W.2d 533, 535 (Tex. App.—Dallas 1987, no writ) (same).

6.29    Historically, information could not be relayed in real-time.  Now, with live news coverage of events as they occur, people can witness events happening that they could only previously hear about long after they occurred.  People could not communicate as effectively, rapidly, and efficiently as they can now with cellular telephones and text messages.

6.30    Even though Roy did have a visual perception of the scene contemporaneous with the incident, Texas courts have nevertheless permitted non-visual perceptions as a basis for bystander recovery. *See Bedgood v. Madalin*, 589 S.W.2s 797, 802-03 (Tex. Civ. App.—Corpus Christi 1979), *reversed on other grounds*, 600 S.W.2d 773. 775-76 (Tex. 1980). There, a father heard a car hit his son, heard his son scream, and a loud thud, and immediately ran to the scene to find his son gravely injured and unconscious.  The court stated, "we have no difficulty with the fact that Dr. Madalin did not visually witness the accident, but rather heard it and then witnesses the results soon thereafter" such that "his perception of the accident was still contemporaneous." *Id.; see also Landreth v. Reed*, 570 S.W.2d 486 (Tex. Civ. App,--Texarkana 1978, no writ) ("[A]ctual observance of the accident is not required if there is otherwise an experiential perception of it.").  Like in *Bedgood*, Roy White had his own, contemporaneous, experiential perception of the events as they unfolded.

6.31    For all intents and purposes, Roy White was present at the scene by telephone and by virtue of his direct, contemporaneous witnessing of the events as they occurred live before him on television, and he suffered shock from the sensory

and contemporaneous observance of the incident. The emotional distress that Roy suffered as a result of his real-time perceptions of his mother's shooting and subsequent death caused a physical manifestation or physical consequences, including but not limited to crying spells, nightmares, sleeplessness, increased anxiety, and loss of appetite.   As a result, Roy White's estate is entitled to recover all damages appropriate under Texas law, including but not limited to those in the past and future for the mental anguish, anxiety, suspense, and fright.

## VII.   CAUSATION

### A.   The Department of Defense and Air Force's negligence caused injuries to the Plaintiffs.

7.1     One or more of the above negligent acts of the Air Force and the Department of the Defense directly and proximately caused injury to the Plaintiffs.

7.2     When Devin Kelley attempted to purchase firearms to use in the Sutherland Springs shooting, the FBI Incident-Based Reporting System should have included Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, and commitment to the mental institution. The FBI's database did not contain any of this required information,  or alternatively,  contained incorrect  or incomplete information, as  a direct and proximate result of one or more of negligent acts of the Department of Defense and Air Force.

7.3     As a result of one or more of the above acts of negligence, when Academy requested the  FBI  search  its  National  Instant  Criminal  Background  Search  System  to determine whether it could sell firearms to Devin Kelley, the FBI notified Academy

to "proceed" with the sale. But for the United States' negligence, there would have been prohibiting information within the FBI's Background Search System. And but for the United States' negligence, the FBI would have notified Academy that the sale should be "denied."

7.4     When Devin Kelley attempted to purchase the firearms used in the Sutherland Springs shooting, the sale should have been blocked for one or more of the following reasons: (a) he had a conviction of a crime punishable by imprisonment for a term exceeding one year; (b) he had a conviction for domestic violence; and (c) he had previously been committed to a mental institution.

7.5     When Devin Kelley purchased the firearms used in the Sutherland Springs shooting, his omission from the FBI's background check system and ability to complete the purchase was a direct, proximate, and foreseeable result of one or more acts of negligence of the Department of Defense and Air Force.

## B.    Had the Air Force reported Kelley's history, the FBI's Instant Criminal Background Check System would have blocked Devin Kelley's firearm purchase.

7.6     Devin Kelley purchased the firearms used in the Sutherland Springs shooting from a federal firearms licensee, Academy Sports & Outdoor. At the time, the licensee must submit biographical information about Kelley to the FBI's Instant Criminal Background Check System. If the Air Force had properly reported Devin Kelley's fingerprint cards and history to the FBI, the Background Check System would have informed the firearms dealer to deny the purchase.

7.7     The purpose of the Uniform Federal Crime Reporting Act of 1988, the

Brady Handgun Violence Prevention Act, and the Domestic Violence Offender Gun Ban are to ensure that violent offenders and high-risk individuals like Kelley do not get access to firearms. The Department of Defense in 1994 began designing the Defense Incident-Based Reporting System (DIBRS) to meet criminal justice related reporting requirements mandated by the Uniform Federal Crime Reporting Act and the Brady Handgun Violence Prevention Act. The DIBRS permits the DOD to forward offense and arrest information required by FBI.

7.8    The entry into the federal law-enforcement database would have blocked Mr. Kelley's purchase of the firearms used in the Sutherland Springs' shooting. The Government's acts or omissions directly and proximately resulted in Devin Kelley's purchase of the firearms used in the November 5, 2017 Sutherland Springs First Baptist Church shooting.

## VIII.  DAMAGES

8.1    Devin Kelley used the guns he purchased at Academy Sports & Outdoor to kill twenty-six individuals and injure twenty others on November 5, 2017.  Plaintiffs seek damages based on the physical and mental trauma they have suffered because of this shooting.

8.2    Roy White's mother, Lula White, was killed in the shooting.

8.3    As the surviving child of Lula White, Roy White brough an administrative claim against the United States Air Force for all available damages for which he is entitled in law and in equity.

8.4    Roy White passed away after the incident made the basis of this suit.

8.5     Donna White, is the surviving spouse of Roy White.

8.6     Donna White, Individually, and as Representative of The Estate of Roy White, seeks all available damages for the claims possessed by The Estate of Roy White, for which the Estate is entitled in law and in equity.

8.7     Based on the trauma Plaintiffs have suffered, Plaintiffs seek recovery of all damages to they are entitled to recover pursuant to state and federal law including, but not limited to, the following:

    a)  Mental anguish;
    b)  Loss of companionship and society;
    c)  Loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of pecuniary value;
    d)  Loss of inheritance;
    e)  Out of pocket expenses;
    f)  Funeral and burial expenses; and
    g)  Other pecuniary damages.

## IX.   JURISDICTION, VENUE, & SERVICE

9.1     This Federal District Court has federal-question jurisdiction of this action because this action is brought pursuant to and in compliance with 28 U.S.C. §§ 1346(b), 2671–2680, commonly known as the Federal Tort Claims Act.

9.2     Venue is proper in this district pursuant to 28 U.S.C. § 3191(e)(1) because the United States is a defendant, the actions which give rise to the claim occurred in this district, and no real property is involved in the action.

9.3     The United States of America may be served with process in accordance with Rule 4(1) of the Federal Rules of Civil Procedure. Service is affected by serving

a copy of the Summons and Complaint on the United States Attorney John F. Bash, United States Attorney for the Western District of Texas by certified mail, return receipt requested at his office:

> United States Attorney's Office
> ATTN: Civil Process Clerk
> 601 NW Loop 410, Suite
> 600 San Antonio, Texas
> 78216

9.4    Service is also affected by serving a copy of the Summons and Complaint on William Barr, Attorney General of the United States, by certified mail, return receipt

requested at:

> United States Attorney General's Office
> ATTN: Civil Process Clerk
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

## X.    LIABILITY OF THE UNITED STATES

10.1    This case is commenced and prosecuted against the United States of America to and in compliance with Title 28 U.S.C. §§ 2671-80, the Federal Tort Claims Act. Liability of the United States is predicated specifically on 28 U.S.C. § 2674 because the personal injuries and resulting damages of which the Complaint is made were proximately caused by the negligence, wrongful acts or omissions of employees or agents of the United States of America working for the United States Air Force or Department of Defense, while acting within the scope of their office, employment, or agency under circumstances where the United States of America, if a private person, would be liable to the Plaintiffs in the same manner and to the same extent as a private individual.

10.2    The United States Departments of Defense and Air Force are agencies of the United States. The Defendant, the United States of America, through its agencies, at all times material to this lawsuit, owned and operated Holloman Air

Force Base and staffed its facilities and vehicles with its agents, servants and employees. The Defendant, the United States of America, through its agencies, at all times material to this lawsuit, owned and operated the Defense Manpower Data Center, which operates the Defense Incident-Based Reporting System.

10.3    The United States, through its agency, the Air Force, at all times material to this lawsuit and at all times described in this lawsuit, owned and operated the following and staffed it with its agents, employees, or representatives:

- Air Force Security Forces;
- Air Force Security Forces Center;
- Air Force Security Forces Academy;
- Air Force Office of Special Investigations Detachment 225;
- 49th Security Forces Squadron;
- Holloman Air Force Base Mental Health Clinic;
- 49th Logistics Readiness Squadron; and
- 49th Security Forces Squadron Confinement Facility.

10.4    This lawsuit is not a claim listed in 28 U.S.C. § 2680, exceptions to the Federal Tort Claims Act.

## XI. JURISDICTIONAL ALLEGATIONS

11.1    Pursuant to 28 U.S.C. §§ 2672 and 2675(a), the claims set forth here were filed with and presented administratively to the United States of America. The United States Air Force acknowledge receipt on February 9, 2018, stating that it had received Plaintiffs' claims on January 22, 2018.  The Claim stated a "sum certain."

11.2    The United States failed to make final disposition of this claim within  six (6) months of presentation of their claims. This action was filed greater than six (6) months from the presentation of the claims underlying the lawsuit.

11.3    Accordingly, Plaintiffs have complied with all jurisdictional prerequisites and conditions precedent to the commencement and prosecution of this lawsuit.

## XII.   CONCLUSION

Plaintiffs request that Defendant be cited to appear and answer this Complaint and that upon final trial, Plaintiffs have judgment against Defendant for the amount of actual damages and for other and different amounts as they shall show by proper amendment before trial, for post-judgment interest at the applicable legal rate, for all court costs incurred in this litigation, and for such other relief, at law and in equity, both general and special, to which Plaintiffs may show themselves entitled to and to which the Court believes them deserving.

Respectfully Submitted:

**THE LAW OFFICES OF THOMAS J. HENRY**
**& HILLARD MARTINEZ GONZALES LLP**


By:_____/s/ Marco A. Crawford_____

    Thomas J. Henry
    State Bar No. 09484210
    Marco A. Crawford
    State Bar No. 240679654
    Andrew K. Hicks
    State Bar No. 24087718
    521 Starr Street
    Corpus Christi, Texas 78401
    Phone: (361) 985-0600
    Fax: (361) 985-0601

    Robert C. Hilliard
    State Bar No. 09677700
    bobh@hmglawfirm.com
    Catherin D. Tobin
    State Bar No. 24013642
    catherine@hmglawfirm.com
    Marion Reilly
    State Bar No. 24079195
    719 S. Shoreline Blvd.
    Corpus Christi, Texas 78401
    Phone (800) 334-3298

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 5, 2020 I electronically filed the foregoing with the clerk of court by

using the CM/ECF system, which will send a notice of electronic filing to all counsel of record

and any other electronic filer as of the time of the filing.

John F. Bash
United States Attorney

John Paniszczyn
Civil Chief
United States Attorney's Office

**Western District of Texas**

Joseph H. Hunt
Assistant Attorney General

James G. Touhey, Jr.
Director, Torts Branch

Stephen E. Handler
Senior Trial Counsel, Torts Branch

Austin Furman
Trial Attorney, Torts Branch

Jocelyn Krieger
Trial Attorney, Torts Branch

Paul David Stern
Trial Attorney, Torts Branch

**United States Department of Justice**
**Civil Division**

***Counsel for the United States of America***


Robert C. Hilliard
Bar No. 0967700
bobh@hmglawfirm.com

Catherine D. Tobin
Bar No. 24013642
catherine@hmglawfirm.com

Marion Reilly
Bar No. 24079195
marion@hmglawfirm.com

Hilliard Martinez Gonzales LLP
719 S. Shoreline Blvd.
Corpus Christi, TX 78401
Telephone: 800-334-3298


 ___**/s/ Marco A. Crawford**_____
Marco A. Crawford