EXHIBIT C

NEWS DESK

# THE TRIAL OF NOOR SALMAN AND ITS SHOCKING DISREGARD FOR SURVIVORS OF DOMESTIC VIOLENCE

By Rachel Louise Snyder
April 1, 2018



*Charles Swift, the lead defense attorney for Noor Salman, the widow of the Pulse night-club shooter, following Salman's acquittal on March 30th.* Photograph by Joey Roulette / Reuters

Throughout the Orlando Pulse-massacre trial, Charles Swift, the lead attorney for the defendant, Noor Salman, liked to float the theory of Occam's razor. Occam's razor is a problem-solving doctrine that reasons that when there are multiple hypotheses to any one question, the simplest explanation is usually right. It was at once a metaphor for the trial itself and a parallel for the woman at the center of it.

Salman was being tried for obstruction of justice and aiding and abetting her husband, Omar Mateen, who murdered forty-nine people at Pulse night club before being shot dead by police. Last Friday, a jury acquitted her on all counts. Several hours later, she

walked out of the federal courthouse in Orlando in the same black blazer she'd worn throughout the trial. She climbed into the passenger seat of her attorney's car, fastened her seat belt, and sobbed. Apart from one interview with the New York *Times*, in 2016, Salman has not spoken publicly since the attack. She did not take the stand in court. Through her attorneys, she turned down repeated requests for interviews. For some, particularly the family members of Pulse victims, the verdict may not lead to much peace. But, after observing large parts of the trial, I believe that Salman's ordeal is, perhaps more than anything, a cautionary tale. From the start, it was a weak case from federal prosecutors, filled with missteps and contradictory testimony by the F.B.I. and also a deep and abiding misunderstanding of the nature of life for victims of domestic abuse.

On the night of the attack, Salman was awoken at her house, as was her son, and both were taken to the local F.B.I. office, in Fort Pierce, Florida, where she was questioned for nearly a dozen hours. She never asked for an attorney. She never asked to leave. For the first three and a half hours, she operated under the assumption that she could be returning home to her husband—the man who raped her, she said, who threatened to take her son, who threatened to take her life. The man who strangled her and controlled her daily activities. And more than anything, perhaps, the man who showed her, in 2013—when the F.B.I. questioned and then cleared him for suspicious comments that he had made in support of violent extremism—how he was capable of outsmarting the system, because the system had let him go. For those first three and a half hours, before she knew for certain that her husband was dead, her senses were geared toward her and her son's survival.

Salman did not know the extent of Mateen's carnage, nor how sprawling the investigation into the massacre would become. Police shot and killed Mateen at 5:17 A.M., and F.B.I. Special Agent T. J. Sypniewski finally informed Salman that he was dead sometime around 8:30 A.M. On the witness stand, Sypniewski described her as dry-eyed over this news. "She didn't cry; she expressed no emotion," he told the court. Sypniewski's colleague, Special Agent Christopher Mayo, was also interviewing Salman with Sypniewski. Mayo testified that Salman had actually sobbed when she heard the news. This was one of many inconsistencies in the F.B.I. agents' testimonies, a factor that the jury foreman said, after the trial, had figured into the jury's acquittal. The foreman's statement also pointed out that the F.B.I. did not record the interview—a practice that Swift, the defense attorney, said he believes should become standard for all future F.B.I. interviews.

Salman entered the F.B.I. office believing herself the wife of an abuser, and learned that she was a widow. Suddenly, she no longer lived under the authoritarian rule of a man who watched grisly beheading videos on his phone while at work. Salman's defense attorneys used very little of her history of abuse in their arguments, because the larger point for them was to convince jurors that she did not know of his plans before the attack unfolded. But from my viewpoint her victimhood was both entirely pertinent and shockingly disregarded by both the F.B.I. investigators and, later, by the federal prosecutors who chose to put her on trial.

Law-enforcement officials are not always familiar with the control that abusers have over their victims. They frequently encounter the following scenario: responders are called to a scene of domestic violence in a home. When they arrive, often to their dismay and annoyance, the victim begins to scream at them to go away, to tell them they aren't wanted, even to holler obscenities at them. This happens even when a victim's physical injuries—black eyes, bloody wounds—are obvious. Police often interpret this behavior as evidence that the victim is mentally or emotionally unstable. But this behavior is a message not to law enforcement, but to the abuser. It says, "I know you will be here when they are gone. I am loyal even in the face of your violence." It says, "Please don't kill me when they are gone."

I believe Salman was a passive prisoner in her own home, the ward of a guard she had vowed to spend her life with. He made sure that she had no means to escape him. He kept her from working, told her that he'd get full custody of their child if she left, and

gave her a pittance of twenty dollars a week to spend. She was his longest-enduring victim. Today, she is another survivor.

The prosecution's case was based primarily on a confession that was written by an F.B.I. agent and that Salman signed after nearly twelve hours of questioning. The average F.B.I. interrogation lasts ninety minutes, Charles Swift pointed out, in his closing argument. When she signed it, Salman was physically, mentally, and emotionally exhausted. Early on in the trial, forensic evidence revealed that multiple statements in the confession were false.

Salman's claim that she "cased" Pulse with her husband was not true. Before the night of the massacre, neither she nor Mateen had ever been in the vicinity of the night club. Upon entering Pulse, on June 12, 2016, Mateen asked a security guard where all the women were. Swift pointed out that if Mateen didn't know his target until the moment it became his target, how could his wife have known? During his closing argument, Swift also showed the jury, with the help of a red marker, all the parts of Salman's signed confession that were demonstrably false. By the end of his argument, only half of the confession remained unmarked.

More damning still for the F.B.I. was that, after the prosecution rested its case, information was revealed to the jury that Mateen's father, Seddique, had been an informant for the F.B.I. for eleven years, and had wire-transferred funds to Turkey and Afghanistan in the weeks before the attacks. Jurors learned that the F.B.I. had even once considered grooming Omar Mateen as an informant. Why the F.B.I. decided that he did not represent a threat to public safety, after investigating him for ten months, in 2013, was not clarified during the trial. Mateen's father, however, is now currently under investigation.

A day before closing arguments began, I sat down with the Salman family, in a restaurant catering to motorcycle enthusiasts—crotch rockets and cruisers with blistering shines on their fenders were on display, and heavy metal pounded through the speakers. We discussed how the past two years have been for them. During the trial, the defense presented details of Salman's special-education classes, her below-average I.Q., her lifelong cognitive challenges. For the family, it was an unnecessary public shaming. "All her life, we've tried to build her up. And all this year, we have destroyed her," Al Salman, her uncle, told me. "We are forever changed."

Susan Adieh, whom Noor refers to as "Auntie," was more outspoken. "Why is this happening? Because she is a Muslim woman." Indeed, earlier in the week, a statement of support was released by nearly a hundred domestic-violence groups, Muslim organizations, and human-rights institutions: "She is being prosecuted under the guise of guilt by association as a Muslim woman married to a Muslim man who committed mass violence."

When the verdict was finally read, and Salman was acquitted, the family broke into tears and hugs in the courtroom. I spoke with Al a little later by phone. He talked about Noor needing a good therapist, and how he'd watched the jury members taking notes throughout the trial; he knew they were taking it seriously, and it gave him faith in the outcome. Then I asked him if there was anything else he wanted to say that I hadn't asked. He thought for a moment. I could hear laughter in the background, the clatter of a room full of people. "We need to protect our justice system," he said.

Rachel Louise Snyder is the author of the books "No Visible Bruises," "What We've Lost Is Nothing" and "Fugitive Denim." She first contributed to the magazine in 2013.

More:   Pulse Shooting   Orlando Shooting   Omar Mateen   Trial