IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| HOLCOMBE, et. al,<br>        Plaintiffs<br><br>vs.<br><br>UNITED STATES OF<br>AMERICA,<br>        Defendant | NO. 5:18-CV-00555-XR<br>(consolidated cases) |

# PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Since 1987, mandatory policy has required the Air Force to collect and submit fingerprints and criminal history to the FBI.[1] And since 1987, commanders have had a supervisory responsibility to ensure that their agents follow this policy.[2] Yet the Air Force and Department of Defense (DoD) failed to meet their obligations to collect, maintain, and submit Devin Kelley's fingerprints and final disposition to the FBI.[3] In fact, due to the Government's negligence, at least 7,300 criminals were not indexed with the FBI.[4] Plaintiffs ask this Court to grant partial summary judgment because the evidence overwhelmingly shows that the United States:

1. undertook responsibilities that it failed to meet;
2. failed to supervise the agents with those responsibilities; and
3. failed to train those agents.

---

[1]   Exh. A, Dep. Col. Poorman, at 179:20–23 (AFOSI 30(b)(6) Rep.) (referencing AFOSI Regulation 124–102, Exh. U–3, at 28–37 (USA25369–78)).

[2]   *Id.* at 179:24–180:5.

[3]   Dkt. No. 149 (stipulations).

[4]   Exh. U–19, at 12–17 (USA24749–54).

# TABLE OF CONTENTS

Plaintiffs' Motion for Partial Summary Judgment .............................................1

Table of Contents.................................................................................................2

Standard ...............................................................................................................3

Statement of Undisputed Facts ...........................................................................3

Negligent Undertaking .........................................................................................4

    1.  The Air Force failed to exercise reasonable care in collecting and
        submitting Devin Kelley's criminal history...........................................5
        1.1.  Direct employee negligence ........................................................5
        1.2.  Negligent documentation & retention of evidence .........................9
        1.3.  Agreements to correct negligence ...............................................10
    2.  The Department of Defense and the Air Force both negligently
        undertook the centralization of criminal history. ................................12
        2.1.  Department of Defense Negligence...............................................13
        2.2.  Air Force Negligence...................................................................15
    3.  The Government's failure to exercise reasonable care foreseeably
        increased the risk of harm...................................................................17
        3.1.  Increased risk of harm to the public ...........................................17
        3.2.  Foreseeability of gun violence ....................................................19
    4.  Physical harm resulted from the Government's failure to exercise
        reasonable care ...................................................................................23

Failure to Supervise ...........................................................................................26

    1.  Unit Leadership...................................................................................27
    2.  Staff Judge Advocates Office .............................................................30
    3.  Second Field Investigations Region ....................................................31
    4.  Headquarters Air Force Office of Special Investigations.....................34

Failure To Train .................................................................................................35

    1.  Holloman Office of Special Investigations...........................................36
    2.  Holloman Security Forces ...................................................................39

Conclusion...........................................................................................................41

Appendix 1: Government Acronyms ....................................................................45

Appendix 2: Government Witnesses.....................................................................46

Appendix 3: Government Organizational Chart ...................................................49

Appendix 4: Det. 225 Organizational Chart........................................................50

Certificate of Service ..........................................................................................51

## STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where, as here, the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund*, 778 F.3d 593, 601 (7th Cir. 2015).

In Texas, it is well established that "the term 'negligence' means the doing of that which a person of ordinary prudence would not have done under the same or similar circumstances, or the failure to do that which a person of ordinary prudence would have done under the same or similar circumstances." *Great Atl. & Pac. Tea Co. v. Evans*, 175 S.W.2d 249, 250–41 (Tex. 1943).

## STATEMENT OF UNDISPUTED FACTS

The following facts are not in dispute:

1. On June 9, 2011, the Air Force collected, but did not submit Devin Kelley's fingerprints. Dkt. No. 149 ¶ 1 (stipulations).
2. Air Force agents told the Inspector General that they believed there was probable cause to believe Kelley committed the assault on his stepson on June 9, 2011. *E.g.*, Dkt. No. 113, at 29–30 ¶ 3.7 (U.S. Answer).
3. On Feb. 17, 2012, the Security Forces conducted a subject interview of Kelley, but did not collect or submit fingerprints. Dkt. No. 149 ¶ 2.
4. On June 8, 2012 and Nov. 7, 2012, the Air Force Special Investigators and/or Security Forces were required to collect and submit fingerprints but failed to do so. *Id.* ¶ 3–4.

5.  On Nov. 7, 2012, the Air Force and the DoD were required to submit Kelley's final disposition to the FBI but did not do so. *Id.* ¶ 5.

6.  On Dec. 14, 2012, the Air Force was required to submit fingerprints and final dispositions to the FBI but did not do so. *Id.* ¶ 6.

7.  Between June 29, 2011 and Oct. 5, 2012, the Unit leadership performed at least 15 monthly reviews. They did not note Kelley's fingerprints were unsubmitted nor took corrective action during this time. *Id.* ¶ 7.

8.  Between Kelley's conviction and the Sutherland Springs shooting, neither the Air Force Special Investigators nor the Security Forces submitted Kelley's criminal history to the FBI and, consequently, Kelley's criminal history was not in the FBI's NICS's background search system at any time before Nov. 5, 2017. *Id.* ¶ 8–9.

9.  Between Dec. 22, 2014 and Oct. 18, 2017, Kelley purchased four guns from federally licensed firearms dealers after a NICS background check response provided that the sale could proceed. *E.g.*, Dkt. No. 113, at 53–54, ¶¶ 3.39–3.42 (U.S. Answer).

10. Every firearm in Kelley's possession in the Sutherland Springs shooting was purchased through a federal firearms licensee and was approved for sale by the FBI. Dep. Ranger Snyder, at 223:20–24 (Texas Ranger's 30(b)(6) Rep.); Exh. U–7, at 4 (USA12797) (ATF Report of Investigation).

11. Admissions made by Government Rule 30(b)(6) Witnesses. *See* Appendix 2, List of Government Witnesses.

## NEGLIGENT UNDERTAKING

In its order denying the Government's motion to dismiss, this Court explained the elements of a negligent undertaking cause of action. First, the Government must undertake services necessary for the protection of the American public but fail to exercise reasonable care in that undertaking. Dkt. No. 59, at 35. Second, the Government's failure to exercise reasonable care must have increased the risk of harm to the public. *Id.* And third, physical harm must have resulted from the Government's failure to exercise reasonable care. *Id.*; *see also* Restatement (Second) of Torts § 323 (1965).

### 1. The Air Force failed to exercise reasonable care in collecting and submitting Devin Kelley's criminal history.

The Air Force's negligent undertaking looks like this: First, the Government issued regulations requiring the collection and submission of fingerprints and final dispositions of felons and domestic violence perpetrators to the FBI. Second, it issued supporting regulations—such as requiring documentation and retention of case files—to catch failures to submit criminal history. And third, after investigations by the Inspector General, it agreed to correct its failures to collect and submit criminal history. Each of these efforts should have ensured that Devin Kelley's fingerprints and criminal history were in the FBI's background check system.[5] But the Government failed to exercise reasonable care in performing its obligations, which prevented that result. This increased the risk of harm to the public and resulted in actual physical harm.

#### 1.1. Direct employee negligence

"Deniable offenses" are offenses that will result in the denial of an attempt to purchase a firearm. Government representatives almost universally agree that federal agencies should collect and submit deniable offenses to the FBI in a timely fashion.[6] In Devin Kelley's case, his convictions could be punishable

---

[5] The information sent to the FBI gets entered into one of three databases (the "triple-I," the NCIC, and the NICS Indices), which the FBI checks before every federally licensed firearms purchase. Exh. C, Dep. Del Greco, at 57:11–15 (FBI 30(b)(6) Rep.). A felony conviction results in an instant denial. *Id.* at 81:9–13.

[6] *Id.* at 38:17–20, 39:9–13; Exh. D, Dep. Col. Tullos, at 101:6–13; Exh. E, Dep. Verdego, at 51:8–17 (DoD 30(b)(6) Rep.); Exh. A, Dep. Col. Poorman, at 170:13–16, 175:18–21 (AFOSI 30(b)(6) Rep.). *See also* Exh. U–6, DoD Instruction 5505.11, at 16–28 (USA1806–18); Exh. U–2, AFOSI Manual 71-121, at 1 (USA418), 10– 12 (USA491–93).

by more than a year in prison and are crimes of domestic violence.[7] Consequently, they were reportable under Air Force and DoD regulations.[8]

The Air Force's obligation comes from DoD Regulations and Air Force regulations. In 1998, DoD issued Instruction 5505.11.[9] The Instruction applies to all "organizational entities within the [DoD]."[10] And it requires all DoD law enforcement organizations to submit fingerprints after they decide—in coordination with the Staff Judge Advocate—that probable cause exists for the commission of an offense.[11] But if Agents make a probable cause determination without a Judge Advocate, it's mandatory for them to report.[12] And the Instruction requires all DoD law enforcement organizations to submit convictions within 15 days of the final disposition.[13]

Mandatory Air Force regulations are the second source of these obligations to report. Like DoD, the Air Force required units to collect, maintain, and submit fingerprints and final dispositions to the FBI.[14] Specifically, agents must maintain two copies of the fingerprint cards and final dispositions in the case

---

[7]   Exh. D, Dep. Col. Tullos, at 121:8–16, 178:10–15, 191:18–192:2; Exh. U–17, at 3–4 (USA12947–48) (Kelly conviction report).

[8]   In fact, all of the crimes listed in Attachment 8—the list of crimes that must be reported to the FBI by the Air Force—are those crimes in which an individual may be punished for more than a year. Exh. A, Dep. Col. Poorman, at 173:1–5. Stated another way, the Air Force only submits deniable convictions under Attachment 8. *Id.* at 173:18–21.

[9]   *See* Exh. U–6, at 1–15 (USA1–15); 16–28 (USA1806–1818).

[10]  *Id.* at 17 ¶ 2(a) (USA1807).

[11]  *Id.* at 25 ¶ 1(b)(1), (4)(a) (USA1815); Exh. F, Dep. Col. Owen, at 81:7–10 (AF SJA 30(b)(6) Rep.).

[12]  Exh. D, Dep. Col. Tullos, at 120:13–22 (Holloman Staff Judge Advocate).

[13]  Exh. U–6, at 25 ¶ 1(b)(3) (USA1815).

[14]  Exh. U–2, AFOSI Manual 71-121, at 10 ¶ 5.14 (USA491).

file.[15] At the time of the Kelley investigation, Holloman used hardcopy finger-
print cards and disposition reports.[16] As a result, regulations required agents
to document the submission in the electronic file.[17] And like DoD, agents
should submit the final disposition to the FBI (and document the submission)
within 15 days after the SJA notifies them of the conviction.[18] Finally, confine-
ment facility agents also should collect and submit fingerprints.[19]

Based on these requirements, there's universal agreement—from the top
down—that the Air Force did not perform its obligations here. For example,
Air Force Sec. Wilson testified to Congress that the Air Force failed to submit
criminal history.[20] And the Government stipulated that on at least four sepa-
rate occasions, the Air Force was required to collect and submit Kelley's finger-
prints or final disposition to the FBI but failed to do so.[21]

As of at least June 2011, the Government believed it had probable cause
that Devin Kelley committed a felony crime of domestic violence.[22] That's
when they got the report that Devin Kelley was abusing his stepson.[23] As a re-

---

[15]   *Id.* at ¶ 5.14.1.2.

[16]   Exh. G, Dep. Agent Mills, at 25:5–10.

[17]   Exh. A, Dep. Col. Poorman, at 342:9–15, 343:20–25 (AFOSI 30(b)(6) Rep.); Exh. U–
2, AFOSI Manual 71-121, at 12 ¶ 5.13.2.2 (USA493) (requirement to document the
submission of the final disposition form).

[18]   Exh. U–2, AFOSI Manual 71-121, at 12 ¶ 5.13.2.2 (USA493).

[19]   Exh. U–3, AF Instruction 31-205, at 18–20 (USA5488–90); *see also* Exh. H, Dep.
Col. Ford, at 213:22–214:8 (Air Force 30(b)(6) representative establishing this as a
mandatory instruction).

[20]   Exh. U–9, at 1 (USA22319).

[21]   Dkt. No. 149 ¶ 3–6 (stipulations); Exh. A, Dep. Col. Poorman, at 47:18–21 (AF
30(b)(6) Rep.).

[22]   Exh. I, Dep. Officer Veltri, at 115:1–4.

[23]   Exh. U–17, at 15 (USA13411).

sult, on June 9, 2011, the Air Force Office of Special Investigations interro-gated Devin Kelley.[24] Then they collected two copies of his fingerprints.[25] One copy should have remained in the file, while the other copy should have been sent to the FBI.[26] But both copies remained in the file.

After June 2011, the Air Force also had a continuing obligation to correct its failure to report.[27] Put another way, if an agent does not follow the regula-tions, that does not let the Air Force off the hook.[28] Yet, as detailed in the In-spector General's report,[29] the Air Force Special Investigators, Security Forces, and Corrections facilities continued to have—and miss—multiple opportunities to collect and submit Kelley's criminal history to the FBI. For example, follow-ing the June 2011 subject interrogation, the Air Force special agents swore out a probable cause affidavit based on medical evidence that Kelley's child was physically abused.[30] Even after Kelley provided the Air Force Security Forces and Special Investigators a videotaped confession, the Air Force neglected to submit his criminal history data to the FBI.[31] Kelley's conviction and confine-ment came and went, without submission of his criminal history to the FBI.[32]

---

[24]  *Id.* at 16–19 (USA13418–21).

[25]  *Id.* at 5–8 (USA12953–56).

[26]  Exh. U–2, AFOSI Manual 71-121, at 10 ¶ 5.14.1.2 (USA491).

[27]  Exh. A, Dep. Col. Poorman, at 177:16–19 (AFOSI 30(b)(6) Rep.).

[28]  *Id.* at 177:6–10.

[29]  Exhs. U–11, U–12, U–13, U–14, U–15 (USA5250–387).

[30]  Exh. U–17, at 26–27 (USA13675–76).

[31]  Exh. U–5 (USA14813–23) (transcript of confession); Exh. U–17, at 20 (USA13431) (receipt of confession).

[32]  Dkt. No. 149, at ¶ 4–6 (stipulations).

### 1.2.  Negligent documentation & retention of evidence

Air Force regulations require agents to accurately input their investigative activities in their electronic case file specifically because the "information entered affects output and outcome … because of the link to other databases."[33] Those linked-to databases include the National Crime Information Center (NCIC) and the Defense Incident Based Reporting System (DIBRS).[34] The NCIC is one of the three databases searched by the FBI's NICS firearms check.[35] And DIBRS is supposed to be a central repository of Brady reportable information that the DoD had an obligation to forward to the FBI.[36]

This case presents multiple examples of the failure to document. For example, the Air Force (and DoD) required submission of fingerprints upon determination of probable cause in coordination with the Staff Judge Advocates' office.[37] Before submitting fingerprints, special agents must coordinate with the Staff Judge Advocate and document that coordination.[38] Yet, the "Internal Data Pages" contain no reference to coordination on probable cause.[39]

---

[33]  Exh. U–2, AFOSI Manual 71-121, at 13 (USA451).

[34]  *Id.*

[35]  Exh. C, Dep. Del Greco, at 57:11–15 (FBI 30(b)(6) Rep.).

[36]  See *infra*, Section 2, at pg. 12 (on the DoD and AF negligent operation of the centralized Brady database). In fact, Air Force headquarters also uses the case file to "collect and report [DIBRS] requirements." Exh. U–3, AFOSI Handbook 71-105, at 1 (USA1343), 3 (USA1349), 38–41 (USA12318, USA12322, USA12323, USA12334).

[37]  Exh. U–2, AFOSI Manual 71-121, at 11 ¶ 5.14.2.1 (USA492).

[38]  *Id.*; Exh. D, Dep. Col. Tullos, at 84:17–22 (Staff Judge Advocate at Holloman); Exh. F, Dep. Col. Owen, at 49:17–50:6, 53:14–54:8 (Air Force 30(b)(6) Rep. on probable cause).

[39]  Exh. U–16 (USA13569–79) (data pages for Kelley). *See also* Exh. I, Dep. Officer Veltri, at 36:12–18, 38:3–23 (noting that documentation needs to occur in internal data pages); Exh. U–2, AFOSI Manual 71-121, at 11 ¶ 5.14.1.2 (fingerprints), 12 ¶ 5.14.2.2 (final disposition) (USA492–93).

The Air Force requires their agents to consult with Judge Advocates on probable cause because Judge Advocates are lawyers and have more training on probable cause.[40] Judge Advocates can serve as a safety net, ensuring the identification of probable cause necessary for submission, where an agent might miss it.[41] This documentation allows supervisory reviews to verify, from viewing the electronic file, whether criminal history submission occurred.[42]

Next, on June 8, 2012—after Kelley confessed to the crimes on video—agents interviewed him. During that interrogation, Agent Clinton Mills certified that he fingerprinted Kelley.[43] Yet Kelley's file contains no fingerprints from that date.[44] Not only that, Agent Mills has no recollection of coordinating with the Staff Judge Advocate.[45] Agents are responsible for maintaining their case files and ensuring that fingerprint cards do not get lost or misfiled.[46] But notably, Holloman was Agent Mills' first duty station following training, meaning he was a probationary agent.[47]

### 1.3. Agreements to correct negligence

The Air Force then negligently failed to correct its mistakes. Regarding Kelley, the Air Force had a continuing obligation to correct its failure to report.[48] And more broadly, the Air Force knew of a systemic problem in failing

---

[40] Exh. F, Dep. Col. Owen, at 56:5–17 (AF 30(b)(6) Rep. on SJA probable cause).
[41] *Id.* at 57:19–58:4.
[42] Exh. A, Dep. Col. Poorman, at 123:4–124:2.
[43] Exh. U–17, at 22–23 (USA13452–53); *see also* Exh. G, Dep. Agent Mills, at 55:15–18.
[44] Exh. G, Dep. Agent Mills, at 56:6–10.
[45] *Id.* at 56:18–21.
[46] *Id.* at 58:2–9.
[47] *Id.* at 18:10–19:8; *see also infra*, Failure to Train, at 33.
[48] Exh. A, Dep. Col. Poorman, at 177:16–19 (AFOSI 30(b)(6) Rep.).

to report fingerprints and final dispositions, and had agreed to remedy the problem, but never did.

Starting in 1997, the Inspector General for the DoD had identified deficiencies in the Government's collection and submission of criminal history and fingerprints to the FBI.[49] In response to that report, the Air Force agreed to implement procedures to address the problems.[50]

In 2015, the IG conducted another investigation into the criminal history reporting requirements.[51] After reviewing the Air Force's problems, the IG recommended that the Air Force take prompt action to correct missing fingerprints and final disposition reports to the FBI—and the Air Force again agreed to do so.[52] The IG also recommended that the Air Force correct its reporting for all future arrestees and convicted offenders; and the Air Force agreed to do that too.[53] Notably, the time frame that the IG examined was June 1, 2010, to October 31, 2012—during the Kelley investigation and one week before his conviction.[54] As the Air Force Security Forces representative testified, the "bottom line of the report [was] telling the Air Force [it] still had a problem with reporting criminal data."[55] And the intent behind the report "was for the Air Force to fix this problem. That's it."[56]

The email trail following the IG Report confirms these agreements: "I need region [Commanders] involved on every case … **We will also have a lot of clean-up work to do in the NCIC** to document action in the system. More to

---

[49]   Exh. U–18, at 11–14 (USA11166, 68–70).
[50]   *Id.* at 15–16 (USA11183, USA11188).
[51]   *Id.* at 17 (USA11697); Exh. H, Dep. Col. Ford, at 272:11–20 (AF 30(b)(6) Rep.).
[52]   Exh. U–18, at 20 (USA11713).
[53]   *Id.* at 20–21 (USA11713–14); Exh. A, Dep. Col. Poorman, at 273:11–16.
[54]   Exh. U–18, at 19 (USA11699).
[55]   Exh. H, Dep. Col. Ford, at 312:6–19.
[56]   *Id.* at 312:20–313:7.

come … but **this issue is not going away**."[57] Brigadier General Givens told all Region commanders: "In case it is not clear, [the Commander] expects that you are engaged on this issue ... and you are overseeing the process to ensure people are being appropriately indexed. My sense is if you are presently doing anything less than 100% review in this particular area (NCIC indexing) you are falling short."[58] Air Force leadership predicted the issue: "I would anticipate **we need to be executing a plan/fixes sooner rather than later**."[59] This was two years before the Sutherland Springs shooting.

Not only did the Air Force fall short in indexing Kelley's missing submissions, but the Air Force did not even correct the specific cases identified by the DoD Inspector General.[60] Fast forward to 2017, when the Inspector General testified before Congress: "We made the recommendations to the services and it's quite clear that the services did not take appropriate action to follow up on those recommendations."[61] In sum, the Air Force had a specific obligation to correct the reporting failures in Kelley's case, and a broader mandate to fix its systemic problems—and it did neither.

## 2. The Department of Defense and the Air Force both negligently undertook the centralization of criminal history.

Separate from the regulations requiring direct submission, the DoD entered into a Memorandum of Understanding (*i.e.*, an agreement) requiring the

---

[57]   Exh. U–10, at 2–3 (USA26279–80) (emphasis added).

[58]   *Id.*

[59]   *Id.* at 1 (USA26278) (Dec. 16, 2015) (emphasis added).

[60]   Exh. A, Dep. Col. Poorman, at 274:19–275:11.

[61]   Testimony of Glenn Fine, Department of Defense Inspector General, at ~01:56 (Dec 6, 2017), *available at* https://tinyurl.com/congresstestimony; *see also* Exh. U–18, at 2–10 (USA5425–33) ("In conclusion, the DoD OIG has repeatedly found deficiencies with the Military Services submission of required fingerprints, final dispositions reports, and other criminal history to the FBI for inclusion in its databases.").

centralized collection of Brady Bill criminal history for submission to the FBI. It agreed to do so using the Defense Incident Based Reporting System (DIBRS) database. Essentially, the Air Force should submit Brady offenses to DIBRS, and the DoD, in turn, should submit them from DIBRS to the FBI. Negligently, the Air Force failed to submit to DIBRS and the DoD, in turn, failed to collect and submit to the FBI.

### 2.1.  Department of Defense Negligence

First, the DoD undertook centralized collection of criminal history data for reporting to the NICS background search system.[62] In 1998, the DoD entered into a Memorandum of Understanding with the FBI to submit Brady Bill offenses within its DIBRS to the NICS Index.[63] Both agencies then reaffirmed that Memorandum in 2007.[64] In the 2007 contract, the DoD agreed to "provide data from the Defense Incident Based Reporting System (DIBRS) [and] should the DoD determine it possesses relevant records from sources other than the DIBRS, the DoD also agrees to provide those records expeditiously."[65] The DoD also agreed to "correct any record determined to be invalid or incorrect."[66] Importantly, the Government's representative on DIBRS testified that the 2007 Memorandum between the DoD and the FBI was binding on the DoD and is

---

[62]  Exh. E, Dep. Verdego, at 116:20–117:2 (DoD 30(b)(6) Rep. on DIBRS).

[63]  Exh. U–6, at 38–44 (USA4091-97). Exh. E, Dep. Verdego, at 78:13–20, 90:14–19 (Government representative testifying that the agencies entered into this agreement so that DoD could supply FBI with criminal history for making determinations under the Brady Act.).

[64]  Exh. U–6, at 45–52 (USA4115–22).

[65]  *Id.* at 47 (USA4117).

[66]  *Id.* at 49 (USA4119).

still effective, even today.[67] Both the DoD's representative and the FBI's representative confirmed this undertaking.[68]

In furtherance of this agreement, the DoD issued regulations undertaking the responsibility to provide DIBRS criminal history to the FBI.[69] For example, the DoD issued Manual 7730.47, a mandatory policy that applies to all of DoD up to 2014, when it was re-issued.[70] The DoD issued this manual—specifically Volume 1 of the manual—to comply with the crime reporting requirements of the Brady Bill.[71] But even after all that, between 2011 and 2017 the DoD was not providing DIBRS criminal history data to the FBI's NICS system.[72]

Similarly, the DoD also undertook the responsibility to create a central registry of domestic violence incidents in the Military Branches.[73] But when asked about the ownership of this database, the DoD's representative testified that it did not exist.[74] The Government claimed that this was an "unfunded mandate by Congress"—but when pressed, it had to admit that Congress did

---

[67] Exh. E, Dep. Verdego, at 77:19–79:3, 17:15–22 (establishing that Ms. Verdego has full authority to speak as a Government representative).

[68] *Id.* at 78:13–20; 90:14–19 (DoD); Exh. C, Dep. Del Greco, at 127:7–130:19 (FBI).

[69] *E.g.*, Exh. E, Dep. Verdego, at 133:9–134:17.

[70] *Id.* at 100:4–19; 106:17–20 (the manuals are still required policy for DoD and its agencies to follow); Exh. U–6, at 29 (USA4082).

[71] Exh. U–6, DoD Directive 7730.47, at 30 (USA4083), DoD Manual Vol. 1, at 54 (USA4367); Exh. F, Dep. Col. Owen, at 86:14–22 (SJA 30(b)(6) Rep. testifying to the same). Indeed, reportable offenses under the Brady Bill need to be maintained in the DIBRS database for 99 years from the entry. Exh. U–6, DoD Manual 7730.47-M-V1, at 58 (USA4435).

[72] Exh. E, Dep. Verdego (DoD 30(b)(6) Rep.), at 88:15–17; 91:11–15 (DoD not providing data to FBI's Triple I database); 91:18–22 (DoD not providing data to FBI's NCIC database).

[73] *Id.* at 121:17–122:10.

[74] *Id.* at 122:11–12.

not issue those regulations.[75] Instead, the DoD undertook this mandatory obligation but, between 2010 and 2018, did not fulfill its responsibility.[76]

## 2.2. Air Force Negligence

The DoD was not the only weak link in this chain: The Air Force compounded the DoD's negligence by failing to submit criminal history information to the DoD for inclusion in the DIBRS database.

Here, the DoD spelled out the Air Force's responsibilities in mandatory regulations. Chiefly, the DoD Manual's general procedures establish that "DIBRS shall be used to centralize the collection of information reportable by the DoD Components" under the Brady Bill.[77] It requires that the secretaries of the Military Departments and the heads of other DoD components should ensure compliance with policies and procedures to implement DIBRS reporting and to train personnel to that end.[78] In the words of DoD regulations, "DIBRS is designed to meet the data repository needs involved in reporting on overall law enforcement activities … as mandated by Congress, including … [c]ase dispositions as mandated by the [Brady Bill]."[79] Specifically, military police, the Air Force Office of Special Investigations, the Staff Judge Advocates, and Air

---

[75] *Id.* at 123:2–8.

[76] *Id.* at 123:11–124:4.

[77] Exh. U–6, DoD Manual 7730.47 Vol. 1, at 55–56 (USA4368–69); *see also* Exh. E, Dep. Verdego, at 100:13–16 (establishing 7730.47 as mandatory policy applicable to all of DoD between 1996 and 2014).

[78] Exh. E, Dep. Verdego, at 108:6–20; Exh. U–6, DoD Directive 7730.47, at 32 (USA4085).

[79] Exh. U–6, DoD Directive 7730.47M-V1, at 59–60 (USA4931, USA4939); *see also* Exh. E, Dep. Verdego, at 95:22–96:4 (DoD 30(b)(6) Rep.).

Force corrections have reporting obligations.[80] Even Air Force confinement facilities were required to submit DIBRS data on a monthly basis.[81]

The Government's negligence implicates supervisory responsibilities because the secretaries of the military departments and heads of the components have an obligation to make sure the employees are complying with DoD 7730.47 and establish procedures to implement DIBRS reporting.[82] Because of the failure to follow this regulation, the DoD representative testified that these regulations are not accomplishing their stated purpose.[83]

The most egregious example of this failure is the Staff Judge Advocates office. They had a responsibility to submit final dispositions (i.e., Kelley's felony and domestic violence convictions) to DIBRS. Under DoD Manual 7730.47 Vol. 1, at USA4373, an area "involved in the DIBRS that falls in the judge advocate area of responsibility are … the results of trial reporting … Judicial function officials shall report the results of the trial and identifying information of offenders qualifying pursuant to the [Brady Bill]." The Judge Advocates' office "shall forward data … on a monthly basis."[84] The Government's representative for the Staff Judge Advocates testified that 7730.47 is a mandatory instruction that requires the SJA's office to report the results of trial to DIBRS.[85] Though they had this responsibility, no one from the Judge Advocate's office submitted information to DIBRS.[86] In fact, the Air Force never even gave the Holloman

---

[80]   Exh. U–6, DoD Directive 7730.47M-V1, 59–61 ¶¶ 1(a)(2)(a), (b), (d), and (e) (USA4931, USA4939–40).

[81]   *Id.* at 57 ¶ 5 (USA4373).

[82]   Exh. E, Dep. Verdego, at 108:13–20.

[83]   *Id.* at 97:15–19.

[84]   *Id.*; *see also* Exh. F, Dep. Col. Owen, at 86:14–22 (SJA 30(b)(6) Rep.)

[85]   Exh. F, Dep. Col. Owen, at 88:2–19; *see also* Exh. D, Dep. Col. Tullos, at 193:14–21 (Holloman SJA testifies to the same).

[86]   Exh. F, Dep. Col. Owen, at 99:16–100:1 (SJA 30(b)(6) Rep.).

SJA office access to submit to DIBRS.[87] As a result, Kelley's felony and domestic violence convictions—which would have prevented him from purchasing firearms—were never submitted to DIBRS.[88] This compounded on the DoD's failure to submit DIBRS data to the FBI.[89]

### 3. The Government's failure to exercise reasonable care foreseeably increased the risk of harm.

Under Texas law, "foreseeability does not necessarily equate to predictability." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 519 (Tex. 2019). Foreseeability does not require that a person anticipate the "precise manner in which injury will occur once he has created a dangerous situation through negligence. It requires only that the general danger, not the exact sequence of events that produce the harm, be foreseeable." *Id.* Here, the Government's failure to exercise reasonable care generally increased the risk of harm to the public. And the Government should have "reasonably anticipated the dangers" or risk of harm that the Government created by negligently failing to report Kelley's background into the system. *Id.*

#### 3.1. Increased risk of harm to the public

First, the Government's conduct generally increased the risk of harm to the public from gun violence. In 2008, Congressional amended findings noted

---

[87]  Exh. D, Dep. Col. Tullos, at 194:22–195:16.

[88]  Exh. E, Dep. Verdego, at 135:7–139:3, Exhibit 11 & 12 (showing that the only data in DIBRS concerning Kelley was the May 25, 2011 credible report of criminal incident). Someone from the Air Force reported to DIBRS that, on May 25, 2011, law enforcement officials responded to a credible report of a criminal incident by Devin Kelley. Exh. E, Dep. Verdego, at 145:22–146:15. While they made this report on October 21, 2013, eleven months after his conviction, they did not submit the conviction itself. *Id.* at 144:7–9; Exh. U–17, at 3 (USA12947) (Kelley conviction report).

[89]  Exh. E, Dep. Verdego, at 97:15–19.

that mass shootings like the Virginia Tech shooting necessitated improved information sharing between federal agencies.[90] Plaintiffs have detailed, in their Amended Complaints, multiple examples from the legislative history showing that Congress passed these laws to prevent gun violence generally, including mass shootings.[91]

This corresponds with Government representative and witness testimony, which almost universally agrees that the NCIS background search system decreases the risk of shooting deaths by keeping guns out of the hands of felons.[92]

But for the NCIS to work, federal agencies must accurately collect and submit criminal history data.[93] The more information the FBI has on dangerous felons, the better able they are to prevent individuals who shouldn't have firearms from getting those firearms.[94] Thus, when Government agencies fail to

---

[90] 34 U.S.C. § 40902.

[91] *E.g.*, Pl. Am. Complaint, Dkt. No. 64, at 5–8 ¶ 2.5–2.9 (discussing the legislative history behind the Brady Bill and similar laws, all acknowledging the increased risk of gun violence).

[92] *See* Exh. C, Dep. Del Greco, at 36:7–14 (FBI 30(b)(6) Rep.); Exh. D, Dep. Col. Tullos, 112:16–21, 114:1–19 (SJA, Holloman AFB); Exh. A, Dep. Col. Poorman, at 137:16–19 (AFOSI 30(b)(6) Rep.); Exh. H, Dep. Col. Ford, at 46:24–47:16 (Air Force 30(b)(6) Rep.); Exh. E, Dep. Verdego, at 67:7–11 (DoD 30(b)(6) Rep.); Exh. J, Dep. Col. Hudson, at 223:17–224:3 (Region 2 Commander); Exh. K, Dep. Col. Bearden, at 117:7–14 (Commander of the 49th Logistics Readiness Squadron); Exh. L, Dep. Maj. Nathan McLeod-Hughes, at 124:13–17 (Director of Operations for the 49th Logistics Readiness Squadron); Exh. M, Dep. Agent Holz, at 37:11–20, 165:6–22 (AF Special Agent); Exh. N, Dep. Agent Hoy, at 34:4–18 (Special Agent in Charge); Exh. O, Dep. Agent Bankhead, at 118:8–19 (Superintendent).

[93] Exh. C, Dep. Del Greco, at 37:7–10, 37:22–38:4 (FBI 30(b)(6) Rep.); Exh. F, Dep. Col. Owen, at 59:20–60:6 (SJA 30(b)(6) Rep.); Exh. E, Dep. Verdego, at 65:1–9 (DoD 30(b)(6) Rep.); Exh. A, Dep. Col. Poorman, at 131:11–16 (AFOSI 30(b)(6) Rep.); Exh. U–8, at 2–3 (USA16665, USA16677).

[94] Exh. C, Dep. Del Greco, at 37:11–21 (FBI 30(b)(6) Rep.); Exh. A, Dep. Col. Poorman, at 131:18–24 (AFOSI 30(b)(6) Rep.); Exh. E, Dep. Verdego, at 65:1–9, 121:3–8 (DoD 30(b)(6) Rep.).

share or report data on dangerous felons and child abusers, they expose the public to an increased risk of gun violence.[95]

### 3.2. Foreseeability of gun violence

Second, the evidence overwhelmingly establishes that the Government knew or should have known the risk that Kelley posed. As this Court noted early on, the "risk, foreseeability, and likelihood of injury are high." Dkt. No. 59 at 36 (May 23, 2019). "With Kelley specifically, at every stage in his life—during and after his USAF tenure—the threat of violence loomed. People like Kelley cannot own guns and the negligent operation of the background check system foreseeably increased the risk and likelihood of injuries like those suffered by Plaintiffs." *Id.* Discovery taken since the Court's Order only reinforces this conclusion.

The Air Force convicted Kelley for abusing his wife and beating his child (causing a broken clavicle and subdural hematoma).[96] His treatment of his wife and child were determined by the Air Force Central Registry Board to meet the criteria for child physical maltreatment and entry into the DoD central database.[97] But the DoD negligently failed to even create the database.[98]

In the course of its investigation, the Air Force learned **a lot** about Kelley. For example, Air Force agents interviewed former school classmates who recounted experiencing horrific sexual, physical, and verbal abuse from Kelley,

---

[95]   Exh. E, Dep. Verdejo, at 121:10–15 (DoD 30(b)(6) Rep.); Exh. M, Dep. Agent Holz, at 164:18–165:3; Exh. L, Dep. Maj. McLeod-Hughes, at 124:5–12; Exh. I, Dep. Officer Veltri, at 73:7–13.

[96]   Exh. U–17, at 3–4 (USA12947–48); Exh. U–4, at 5–7 (USA13374–76).

[97]   Exh. U–4, at 8–9 (USA14698, USA14752).

[98]   *See supra*, notes 73–76 & accompanying text (discussing the mandatory regulations requiring creation of this database and the fact that it **does not and has not** ever existed).

as minors.[99] And during his time with the Air Force, Kelley made threats against leaders and his wife, and gave his superiors the "gut feeling that if there was ever going to be someone who would shoot up the shop, it would be him."[100] Repeatedly, Kelley threatened: "If the cops show up at my door, I will shoot them," and "My work is so lucky I do not have a shotgun because I would go in there and shoot everyone."[101] Kelley's mental health providers had notified the Air Force that he presented the "**maximum risk** range" for violence and lack of control.[102]

The Air Force investigators testified about the threat Devin Kelley posed, not just for violence, but for **mass shooting violence** specifically. Commander Hoy testified that in 2012 "there is clearly evidence that suggests he could do a mass shooting, and that was reported."[103] Hoy went further, testifying that if Devin Kelley were permitted to have any kind of gun it would be **foreseeable** that he could commit a mass shooting.[104] Like Hoy, Commander Randall Taylor testified that Kelley threatened a mass shooting while in the Air Force.[105] Lyle Bankhead, the supervising investigator for Kelley's investi-

---

99    *E.g.*, Exh. U–17, at 24–25 (USA13455, USA13469) (names redacted to protect the identity of individuals abused as children).
100   Exh. U–19, at 11 (USA23929).
101   Exh. U–17, at 14, 21 (USA13404, USA13438).
102   *Id.* at 28–29 (USA13983–84) (emphasis added).
103   Exh. N, Dep. Agent Hoy, at 150:12–17
104   *Id.* at 152: 8–13 (emphasis added).
105   Exh. B, Dep. Agent Taylor, at 88:13–89:2.

gation, testified that Kelley specifically threatened to commit a mass shooting.[106] And he confirmed that the Air Force discovered that Kelley was laying the groundwork and planning for a mass shooting event.[107]

Given this history, the Holloman Air Force Base assembled a "**High Risk for Violence** Response Team" to investigate Kelley.[108] The Staff Judge Advocate testified that the reason they put the team together was because Kelley was a "major threat to commit an act of violence."[109] And in fact the team concluded exactly that.[110]

Understandably, during the investigation—but before the conviction—the Air Force confiscated the firearms that Kelley owned.[111] And they committed Kelley to Peak Mental Institution.[112] While there, he made several statements that, if the Air Force detained him, he would "go for their guns."[113] And while he was at Peak, a search of his computer revealed that he had researched the purchase of firearms and body armor.[114] But then he escaped Peak. These facts led the Commander of the 49th Logistics Readiness Squadron to conclude: "I am convinced that he is dangerous and likely to harm someone if released."[115] Commander Hughes then testified that by February 17, 2012, Kelley made

---

[106] Exh. O, Dep. Agent Bankhead, at 87:24–88:5.

[107] *Id.*, at 106:10–22 (discussing how Kelley's plan to obtain a gun after his hospital release, body armor searches, and threats to take away the guns of Security Forces members were all acts that somebody planning a mass shooting would do).

[108] Exh. D, Dep. Col. Tullos, at 223:20–224:17, 226:17–227:1 (explaining the purpose of the team).

[109] *Id.* at 227:7–14, 228:2–7.

[110] *Id.* at 228:8–11.

[111] Exh. U–4, at 4 (USA13372); *see also e.g.*, Dkt. No. 113, at 41–42 ¶ 3.21 (U.S. Original Answer)

[112] Exh. U–4, at 6 (USA13375).

[113] *Id.*

[114] *Id.*

[115] *Id.* at 7 (USA13376).

threats to "blow everybody's head off" and the Air Force knew "that the evidence of a threat was made for a very violent shooting."[116]

Other Air Forces Commanders knew about the growing menace of Kelley's capacity for mass violence. After Kelley's conviction and confinement, Commander Robert Bearden requested that the Air Force permanently ban Kelley from stepping foot on an Air Force base after he was discharged. Why? "Kelley has repeatedly threatened to kill his leadership. He was openly carrying a firearm on Holloman, AFB … I view this Airman as a threat to not only myself, but my staff and other Airmen in this Squadron."[117] In fact, Col. Bearden testified that by the end of March 2013, Air Force command knew "Devin Kelley was a very dangerous person who was threatening to kill multiple people with guns."[118] Summing up the extent to which the Air Force foresaw Kelley's coming violence, Col. Bearden testified that AFOSI Detachment 225, the 49th Security Forces at HAFB, the 49th Logistics Readiness Squadron, the Family Advocacy Program for the High Risk for Violence Team at HAFB, and the 49th Wing Judge Advocate all had knowledge of the "high risk for violence and the potential for mass violence" that Devin Kelley was capable of.[119]

---

[116] Exh. L, Dep. Maj. McLeod-Hughes, at 93:11–15; 94:9–15.

[117] Exh. U–4, at 3 (USA13324). *See also id.* at 1–2 (USA13318–19) ("Additional evidence of Kelley's high risk unpredictable and criminal behavior includes his history of mental health issues, his preoccupation with weapons, his verbal declaration that he has contemplated offensive attack strategies on both Air Force personnel and organizations [and] his online research of body armor and guerrilla warfare tactics…"); Exh. U–17, at 31–32 (USA17621–22) (Finding of probable cause to court martial Kelley: "it is **foreseeable** that [Kelley] … will engage in serious criminal misconduct."); Exh. U–4, at 10–12 (USA17614–16) ("it is **foreseeable** that [Kelley] will engage in serious criminal misconduct.").

[118] Exh. K, Dep. Col. Bearden, at 48:5–14.

[119] *Id.* at 197:5–17.

And his Commanders were right. After his discharge from the Air Force and permanent ban, Kelley contacted Air Force employees with troubling signs of impending violence. He tried to get on base multiple times.[120] Then, around 2015, Kelley contacted his Staff Sergeant and explained his obsession with church shootings and guns. "Regarding the church shooting in South Carolina, Kelley told [her], 'I wish I had the nerve to do it.'"[121] His Staff Sergeant described Kelley as "completely obsessed with mass shootings."[122]

All of this evidence overwhelmingly proves that Kelley posed a foreseeable risk of gun violence.

### 4. Physical harm resulted from the Government's failure to exercise reasonable care

Finally, the Government's negligence enabled Kelley to perpetrate one of the deadliest mass shootings in American history. And the organizations that have investigated the shooting agree. For example, the DoD's Inspector General issued a report stating that if Kelley's fingerprints had been submitted to the FBI, he could not have acquired the firearms that he used to kill 26 people and injure others.[123] The DoD IG further testified to Congress that the Air Force should have sent his fingerprints and final disposition to the FBI, which should have prevented him from purchasing a gun.[124] Similarly, the Texas Rangers' 30(b)(6) representative testified that Kelley was able to perpetrate the shooting because he was able to buy those firearms.[125] In short, the only

---

[120] Exh. U–19, at 3–4 (USA16520–21); Exh. U–4, at 13–15 (USA15641–43) (Kelley base access records).
[121] Exh. U–19, at 10 (USA22911).
[122] *Id.*
[123] Exh. U–11, at 6 (USA5255).
[124] Exh. U–18, at 3 (USA5426).
[125] Exh. V, Dep. Texas Ranger Snyder, at 228:23–229:1.

reason Kelley had the guns is because the Air Force did not tell the FBI that he was a convicted felon.[126]

The Government has stipulated that the Air Force's failure to submit Kelley's fingerprints and criminal history to the FBI resulted in his fingerprints and convictions being unavailable to the National Instant Criminal Background Check System before November 5, 2017.[127] The FBI's corporate representative concurred with this stipulation: the FBI did not have the information it needed for the NICS Background Search of Kelley, nor did the DoD or Air Force correct that missing information.[128] Because Kelley's convictions were not in the FBI's system due to the Government's negligence, the Government's negligence facilitated Kelley's purchase of the firearms that he used in the Sutherland Springs shooting.[129]

The Government's only defense is to speculate that Kelley might've acted similarly, somehow, even if he had been denied the opportunity to purchase those firearms. But the Government's conjecture about what Kelley might've done, had he been denied, does not save the Government from liability for what actually happened. *Leitch v. Hornsby*, 935 S.W.2d 114, 119 (Tex. 1995) ("Proof of causation cannot 'turn on speculation or conjecture'"). And there is no evidence suggesting that Kelley attempted to purchase guns from anyone other than an FFL.[130] In fact, Kelley was thwarted in his first attempt at buying an assault rifle (at Dicks Sporting Goods) by the store's policy on ID.[131]

---

[126] *Id.* at 229:24–230:7; 235:14–22; Exh. U–11, at 6 (USA5255).

[127] Dkt. No. 149 ¶ 8–9 (stipulations).

[128] Exh. C, Dep. Del Greco, at 130:21–131:11; Exh. A, Dep. Col. Poorman, at 46:12–18 (Air Force corporate representative testifies fingerprints were not submitted).

[129] Exh. V, Dep. Texas Ranger Snyder, at 236:3–9; *see also* Exh. U–7, at 4–15 (USA12797–12808) (ATF Report on the firearms used).

[130] Exh. A, Dep. Col. Poorman, at 138:24–139:3.

[131] Exh. S, Dep. Danielle Smith (formerly Kelley), at 145:6–150:3.

And after this licensed dealer denied Kelley a gun, he did not borrow a gun from friends or family, and he did not ask someone to execute a straw purchase for him. Nor did he go to a gun show. He simply went to another federal dealer, passed the FBI check (due to the Government's negligent failure to report Kelley's background into the system), and purchased the assault rifle.[132]

The Air Force had actually groomed Kelley to continue purchasing at FFLs. Notably, he had purchased two firearms **on base** while under criminal investigation for felony assault and crimes of domestic violence.[133] Had Air Force employees submitted Kelley's fingerprints before 2012—when witnesses testified there was probable cause—he would not have been allowed to purchase these firearms on base.[134] And more importantly, the FBI would have put him on a previously-denied database for all future gun sales.[135]

To speculate that Kelley would have gotten an assault rifle by some other illegal means ignores Kelley's history of purchasing guns from federally licensed firearms dealers. Just limiting the scope to after Kelley's conviction, Kelley purchased guns from licensed dealers on December 22, 2014 (USA12893), June 26, 2015 (USA15371), April 7, 2016 (USA12899), and—two weeks before the shooting—October 18, 2017 (USA12896).[136] Each of these successful purchases conditioned Kelley to continue buying firearms at federally licensed dealers.[137] On each of these purchases, Kelley lied on his firearms transaction form by denying his criminal history—and that's another felony conviction punishable by up to 10 years in prison. Had the Government taken

[132] *Id.*
[133] Exh. U–7, at 1–3 (USA12133–35).
[134] Exh. I, Dep. Officer Veltri, at 115:1–4 (noting probable cause existed in 2011).
[135] Exh. C, Dep. Del Greco, at 56:19–22, 57:1–5 (FBI 30(b)(6) Rep.).
[136] Kelley's gun purchases can be found at Exh. U–20.
[137] Exh. V, Dep. Snyder, at 276:14–278:10 (Texas Rangers 30(b)(6) Rep.).

reasonable care in its undertaking, Kelley not only would have been denied the ability to purchase firearms but also would have been prosecuted for false statements on federal forms.[138] And if not that, he would have been prosecuted as a felon with a firearm.[139]

The evidence overwhelmingly shows that the harm caused by Kelley's mass shooting was a foreseeable result of the Government's failure to exercise reasonable care in undertaking the obligation to report Kelley's background data into the background-check system. The Court should therefore rule as a matter of law that the Government was negligent on this ground.

## FAILURE TO SUPERVISE

Long established precedent imposes liability for supervisory negligence. *E.g.*, *Castillo v. Gared, Inc.*, 1 S.W.3d 781, 786 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) ("An employer has a duty to adequately hire, train, and supervise employees."). In *Underwood v. United States*, the Fifth Circuit ruled that the Government could be held responsible for issuing a weapon to an unstable soldier who then used it to kill his wife, reasoning that the soldier was a foreseeable tortfeasor. 356 F.2d 92, 98–99 (5th Cir. 1966).[140] In Texas, an employer can be liable for negligence if its failure to use due care in supervising

---

[138] Exh. V, Dep. Snyder, at 273:1–10 (Texas Ranger 30(b)(6) Rep.).

[139] The ATF Director testified before Congress that domestic violence cases like Kelley are a priority: "If we have information that someone has a firearm and they have a conviction for domestic violence, and that becomes a priority to us, because again, it shows that usually a close partner or loved one could be at danger and our whole job is to prevent that—to prevent gun violence from happening." Testimony of ATF Director Brandon before the Senate Judiciary Committee (Dec. 6, 2017) (at approximately 1h 52m 55s to 1h 53m 49s), *available at* https://ti-nyurl.com/congresstestimony

[140] Even though the court heard the appeal from Alabama, it stated: "We think that it was in recognition of some such duty that the precautionary measures were adopted by the Air Force. We need not decide to what extent, if any, the state law

an employee creates an unreasonable risk of harm. *Clark v. PFPP Ltd. P'ship*, 455 S.W.3d 283, 287 (Tex. App.—Dallas 2015, no pet.); *Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d 489, 495–96 (Tex. App.—Fort Worth 2002, no pet.) (collecting cases). The rule on adequate supervision of employees typically applies to situations that involve physical danger or where inadequate supervision caused harm to third persons. *Garcia v. Allen*, 28 S.W.3d 587, 592–93 (Tex. App.—Corpus Christi 2000, pet. denied). And of course, there are multiple cases from across the country that have held the Government responsible for negligent supervision and training. *E.g.*, *Zeranti v. United States*, 358 F. Supp. 3d 244, 259 (W.D.N.Y. 2019); *Charles v. United States*, 18 CV 883 (VB), 2019 WL 1409280, at *4 (S.D.N.Y. Mar. 28, 2019); *E.J. v. United States*, 13-CV-01923 NC, 2014 WL 988893, at *1 (N.D. Cal. Mar. 10, 2014).

In this case, at every level of the chain of command, mandatory regulations required review of the file for the failure to collect and submit fingerprints and final dispositions to the FBI, either directly or through the DoD. The failure to do so was a failure to supervise.

## 1.  Unit Leadership

The Government stipulated that on at least 15 separate occasions, regulations required supervisors to review the file and take supervisory action to correct the failure to collect and submit Kelley's fingerprints and criminal history

---

is applicable. The precautions to be exercised in permitting the withdrawal of firearms and ammunition are so fully prescribed by the Regulation and instructions that it is not necessary to resort to state law." 356 F.2d at 99.

to the FBI.[141] Air Force policy forms the basis of this stipulation—it required Detachment 225 unit leadership[142] to conduct monthly reviews of the case file.

Unit leadership must conduct monthly periodic reviews—a "fundamental aspect of the investigative process"—for "sufficiency of investigative effort and compliance with established policy."[143] They also must ensure that agents properly document their case activities and that the physical and electronic file are complete.[144] They have a monthly obligation to review the cases from the date of the allegation or complaint until the case is closed.[145] In this case, the Air Force received the complaint on Kelley by at least June 9, 2011.[146] Eighteen months later, on December 14, 2012, the Kelley file was submitted and approved for closure.[147] When reviewing these files, unit leadership should use the Investigative Sufficiency Checklist as a guide for reviews.[148] Items 22–23 on that checklist specifically ask unit leadership whether fingerprints and final dispositions were collected and submitted.[149] The regulations require unit leadership to ensure that subordinates "obtain and validate subject's fingerprints; … [and] submit subject's fingerprints [and] dispositions to the FBI…"[150] When reviewing submissions, unit leadership should also document that those

---

[141] Dkt. No. 149 ¶ 7 (stipulations).

[142] AF defined "unit leadership" to include the commander, special agent in charge, and director of a unit. Exh. U–2, AFOSI Manual 71-121, at 1 (USA418).

[143] Exh. U–2, AFOSI Manual 71-121, at 7 ¶ 4.24, 4.24.1.3 (USA467); *see also* Exh. A, Dep. Col. Poorman, at 164:19–165:8 (Air Force representative testifies that the reviews are a supervisory obligation of unit leadership).

[144] Exh. U–2, at 2 ¶ 1.3 (USA426).

[145] *Id.* at 9–10 ¶ 4.24.1.3 (USA467–68).

[146] Exh. U–17, at 14 (USA13404).

[147] *Id.* at 1–2 (USA12913–14) (electronic audit).

[148] Exh. U–2, AFOSI Manual 71-121, at 8 (USA468) (mandatory regulation); Exh. U–1, at 3–7 (USA575–79) (investigative checklist).

[149] Exh. U–1, at 4 (USA576).

[150] Exh. U–2, AFOSI Manual 71-121, at 10 ¶ 5.14.1 (USA491).

reviews were complete.[151] Notably, however, unit leadership receives no training on how to conduct case reviews.[152]

Worse, since at least 2010, the Air Force knew that Detachment 225 had consistently failed to conduct case file reviews. At that time, the Air Force Inspector General had conducted a review of Region 2 and had provided a report to the Region 2 commander and to the AFOSI Commander.[153] In this document, the IG notified the chain of command that monthly case file reviews were not being conducted and documented appropriately.[154] On this issue, the Air Force representative testified that the Region 2 Commander and the AFOSI Commander were both told that Detachment 225 was not performing a fundamental aspect of the investigative process.[155] But the Air Force representative could not identify what, if anything, had been done in response to this finding.[156]

Next, when closing the file, unit leadership needed to review the file using a checklist mandated by regulations.[157] But Kelley's closed-case checklist had many unchecked boxes, including those concerning the fingerprint cards and final dispositions.[158] To make matters worse, the Unit Commander, Randall Taylor, certified that fingerprints and final dispositions **were** sent to the FBI,

---

[151] *Id.* at 11 ¶ 5.14.1.2 (USA492).
[152] Exh. A, Dep. Col. Poorman, at 165:25–166:3, 168:20–25 (AFOSI 30(b)(6) Rep.).
[153] Exh. A, Dep. Col. Poorman, at 146:7–19 (confirming receipt).
[154] Exh. U–19, at 18, 20–21 (USA25145, USA25147–148); Exh. A, Dep. Col. Poorman, at 153:16–20, 158:10–24.
[155] Exh. A, Dep. Col. Poorman, at 158:10–17.
[156] *Id.* at 158:19–24.
[157] Exh. U–2, AFOSI Manual 71-121, at USA450 (instruction); Exh. U–1, at 1–2 (USA567–68) (regulation provided checklist).
[158] Exh. U–17, at 12–13 (USA13395–96).

when they were actually never sent.[159] Taylor testified that his practice was to ask the case agent whether they had submitted this information.[160] So either the case agent lied to Mr. Taylor, or Mr. Taylor didn't follow his usual practice; either way, Mr. Taylor falsely certified that the fingerprints and final dispositions had been sent.

The failure of unit supervision in this case leads directly back to the Air Force's failure in training. Mr. Taylor testified that he received more training on the applicable regulations **in preparation for his deposition** than he ever received on how to supervise case files.[161] Mr. Taylor's failure to conduct file reviews and his false certification of FBI submission flow directly from the Air Force's failure to train him on his job duties.[162] And he testified that, if he had received proper training, he would have submitted the fingerprints and final disposition forms.[163]

## 2.  Staff Judge Advocates Office

The Staff Judge Advocates' office had mandatory supervisory responsibilities over the agents investigating their cases. Not only was the Staff Judge Advocates' office supposed to submit criminal history,[164] but regulations required them to coordinate with the case agent in subject interviews.[165] In fact, case agents were required not only to consult the SJA but also to document that

---

[159]  *Id.* at 1–2 (USA12913–14) (electronic audit); Exh. B, Dep. Agent Taylor, at 115:4-14, 18–24.

[160]  Exh. B, Dep. Agent Taylor, at 116:21–117:5.

[161]  *Id.* at 29:21–30:3.

[162]  *Id.* at 25:17–20.

[163]  *Id.* at 49:2–7, 30:18–31:4.

[164]  *See supra* notes 84–89 & accompanying text (requiring DIBRS submission).

[165]  Exh. U–3, Air Force Instruction 51-201, at 21–22 ¶ 13.29 (USA11733, USA11989), 26 (USA18273), 27 ¶ 13.26–27 (USA18520) (same instruction, but from 2007).

consultation.[166] And when they coordinate, they must discuss the sufficiency of the investigation.[167] Col. Tullos, the Staff Judge Advocate at Holloman, testified that they did have weekly meetings where they discussed cases, but he did not recall any conversations about probable cause or the reporting of fingerprints.[168] In the Kelley investigation, there should have been approximately 70 meetings with the Judge Advocate's office.[169] Agent Mills testified that these were **70 missed opportunities** to identify whether fingerprints had been collected, maintained, and submitted to the FBI.[170]

### 3. Second Field Investigations Region

Moving up the chain of command, the Second Field Investigations Region has supervisory responsibility over Holloman Detachment 225.[171] Region 2 likewise failed to meet its mandatory supervisory obligations in many ways.

First, Air Force regulations required Region 2 to perform case reviews of the Kelley investigation for compliance with established policy.[172] When a Region 2 Desk Officer performs case reviews on a file, the regulations set checks

---

166  Exh. A, Dep. Col. Poorman, at 123:4–12; Exh. U–2, AFOSI Manual, at 2 ¶ 1.5.3 (USA426) (mandatory requirement to participate in case review meetings), 3 ¶ 1.5.5 (USA427) (requirement to document meetings).

167  Exh. G, Dep. Agent Mills, at 77:14–17; 79:5–15; *see also* Exh. U–2, AFOSI Man 71-121, at 7–8 ¶ 4.24.4 (USA467–68) ("Use the AFOSI Investigative Sufficiency Checklist (Attachment 7) … as a guide for reviews."); Exh. U–1, at 3–7 (USA575–USA579) (Attachment 7, sufficiency checklist requiring inquiry into the status of fingerprints & final dispositions).

168  Exh. D, Dep. Col. Tullos, at 72:7–20, 89:7–18, 90:2–4; Exh. G, Dep. Agent Mills, at 72:15–22 (Agent testified that he did not recall those discussions either).

169  Exh. G, Dep. Agent Mills, at 74:5–13, 75:9–19.

170  *Id.* at 75:20–76:2, 76:10–14.

171  Exh. P, Dep. Albright, at 35:16–36:21.

172  Exh. U–2, AFOSI Man 71-121, at 8 ¶ 4.25 (USA468) (requiring case reviews of "significant investigations," which "affect the AF's ability to preserve good order and discipline, deter and neutralize internal and external threats, and bring unfa-

that were not performed in the Kelley investigation. For example, they must use the "Region Case Review Checklist." The regulations state that the Region Case Review Checklist is "more comprehensive" than the checklist used by agents and unit leadership.[173] The checklist is mandatory.[174] It requires reviewers to ensure that the cases they review are in compliance with current Air Force policy.[175] And "compliance with policy," on the Region Case Review Checklist, includes compliance with collection and submission of fingerprints and final dispositions to the FBI.[176] This means ensuring that agents are following the regulations in AFOSI Manual 71-121.[177] When a reviewer discovers that fingerprint cards or final dispositions have not been submitted, he should notify the special agent's chain of command, who has the supervisory responsibility to correct those problems.[178]

In this case, the Region 2 case reviewer checked the Kelley file multiple times.[179] Every time he logged into the electronic file, he would see that Kelley was charged with an assault on a minor child—the same charge on Kelley's unsubmitted fingerprint cards.[180] But the reviewer failed to check whether

---

vorable attention to the command."); Exh. D, Dep. Col. Tullos, at 140:8–10 (Holloman SJA's testimony that the Kelley investigation was a "significant investigation"); Exh. I, Dep. Officer Veltri, at 56:4–8, 56:15–19, 58:8–13, 58:17–23 (Region 2 Case Reviewer's testimony that if the Kelley investigation were conducted poorly it could affect the AF's ability to preserve good order and discipline, deter internal threats, and bring unfavorable attention—as it did—to command).

[173] *See* Exh. U–2, AFOSI Manual 71-121, at 8 ¶ 4.24.4 (USA468); Exh. U–1, at 3–7 (USA575–USA579) (Attachment 7, the referenced checklist in ¶ 4.24.4).

[174] Exh. A, Dep. Col. Poorman, at 117:24–118:3 (AFOSI 30(b)(6) Rep.).

[175] *Id.* at 119:7–12; Exh. I, Dep. Officer Veltri, at 21:6–8 (Region 2 Desk Officer should review case files for investigative sufficiency).

[176] Exh. A, Dep. Col. Poorman, at 121:10–122:1.

[177] Exh. I, Dep. Officer Veltri, at 29:16–24, 46:16–22, 48:25–49:4, 97:22–25.

[178] *Id.* at 30:19–24, 34:11–19, 31:11–18.

[179] *E.g.,* Exh. I, Dep. Officer Veltri, at 102:4–15 (March 6, 2012); 102:24–103:6 (May 9, 2012); 103:8–19 (June 7, 2012); 103:20–104:6 (Aug. 9, 2012).

[180] *Id.* at 104:9–21.

Kelley's fingerprints and final disposition forms were ever submitted to the FBI.[181] The Region 2 reviewer also had physical access to the Kelley file.[182] By the time he visited Detachment 225, he would have seen two copies of the fingerprint cards.[183] Because one card should be sent to the FBI and a second kept in the file, he testified that, if he had seen two cards, he would have had the responsibility to report that failure.[184] But he never did.

   Tragically, the explanation for this breakdown lies with Veltri's supervisor—Region 2 Commander, Col. Hudson. How could so much inattention be paid to Kelley's fingerprint and conviction submission from the ground level investigators all the way up to the Region 2 Command level? Because Region Command didn't even know reporting was required, much less that it was a 20-plus year problem in the Air Force. Col. Hudson testified that the **first time** he learned that fingerprints and felony convictions must be reported to the FBI was **after** the Sutherland Springs shooting.[185] What's more, he testified that while he was Region 2 Commander (which was during the Kelley investigation and thereafter), he "never provided any specific supervisory oversight or training…to correct the errors in fingerprint collection, processing, submitting and conviction reporting to the FBI."[186]

---

[181]  *Id.* at 71:4–9 (using the electronic system, he would see if fingerprints or final dispositions had been submitted to the FBI).

[182]  *Id.* at 79:9–12 (performed visit to Detachment 225); 40:25–41:5 (had physical access to the file anytime if he wanted).

[183]  *See* Exh. U–17, at 5–10 (USA12953–58) (Kelley's fingerprint cards dated before the visit).

[184]  Exh. I, Dep. Officer Veltri, at 84:20–85:10.

[185]  Exh. J, Dep. Col. Hudson, at 240:21–241:4.

[186]  *Id.* at 241:6–242:3.

### 4. Headquarters Air Force Office of Special Investigations

Finally, Headquarters also needed to perform systematic reviews of archived case files to identify investigative deficiencies.[187] During inspections, Headquarters inspectors must examine files for compliance with policy.[188] They do this by using the closed-case checklist (which requires checking fingerprints and final disposition submissions).[189] The policies require this review for two reasons. First, Headquarters must also collect, compile, and report to the DIBRS, and index criminals into the NCIC.[190] Second, Headquarters must correct deficiencies by improving training, clarifying instructions or manuals, and changing procedural processes.[191]

After closure, the Air Force sent Kelley's file to Headquarters for archiving.[192] But there is no evidence that Headquarters performed these reviews—and if they did, they failed to identify the systemic deficiencies related to submitting fingerprint cards and final dispositions to the FBI.[193]

All of the above (parts 1–4) presents overwhelming evidence of the Government's failure to supervise. The Court should therefore rule as a matter of law that the Government was negligent on this ground.

---

[187]  Exh. U–2, AFOSI Manual 71-121, at USA469 ¶ 4.25.2; *see also* USA12913–14 (Holloman submitted the Kelley file to Archive on April 4, 2013 after confirming that fingerprints and final disposition had been sent to the FBI). HQ AFOSI is above the Region 2 in the Chain of Command and has supervisory responsibility over Region 2. Dep. Veltri, at 59:24–60:9, 60:25–61:4, 62:20–63:2.

[188]  Exh. U–2, AFOSI Manual 71-121, at 9 ¶ 4.25.3 (USA469).

[189]  *Id.* at ¶ 4.25.2; *see also* Exh. U–1, at 1–2 (USA567, USA568).

[190]  Exh. U–2, AFOSI Manual 71-121, at 6 ¶ 3.2.3.1.1 (USA436).

[191]  *Id.* at 9 ¶ 4.25.2 (USA469). The NCIC is searched by the FBI's NICS firearms check. Exh. C, Dep. Del Greco, at 57:11–15 (FBI 30(b)(6) Rep.).

[192]  Exh. A, Dep. Col. Poorman, at 76:9–20 (AFOSI 30(b)(6) Rep)

[193]  *See* Exh. I, Dep. Officer Veltri, at 63:22–64:10.

## FAILURE TO TRAIN

To establish a claim for negligent training, a plaintiff must prove that a reasonably prudent employer would have provided training beyond that which was given, and the failure to do so caused his injuries. *Mendoza v. PGT Trucking, Inc.*, No. 1:18-CV-432-LY-ML, 2020 WL 1902562, at *3 (W.D. Tex. Jan. 27, 2020). Where mandatory regulations require training, and the Air Force fails to train its agents to collect and submit fingerprints and final dispositions, the Air Force has breached its obligation to train its employees. Generally, the purpose of Air Force training is to ensure that each individual is prepared to meet mission requirements.[194] And one of the Air Force's mission requirements is the collection and submission of fingerprints and final disposition data.[195]

Starting with the Government's Rule 30(b)(6) representatives, multiple witnesses testified that, when the Air Force issues mandatory instructions, they have an obligation to train the individuals to whom those instructions apply on the substance of those instructions.[196] This is because the Air Force issued mandatory Instruction 36-2201, setting forth requirements for its training programs.[197] This instruction incorporates the Career Field Education and Training Plan, which sets forth the minimum training requirements for each

---

[194]   Exh. A, Dep. Col. Poorman, at 181:11–19 (AFOSI 30(b)(6) Rep.).

[195]   *Id.* at 20–23.

[196]   *E.g.*, Exh. A, Dep. Col. Poorman, at 90:6–10 (AFOSI 30(b)(6) Rep. on training); Exh. F, Dep. Col. Owen, at 97:16–22 (Air Force 30(b)(6) Rep.); Exh. E, Dep. Verdego, at 110:11–22 (DoD 30(b)(6) Rep.); Exh. D, Dep. Col. Tullos, at 143:2–11 (Holloman SJA); Exh. B, Dep. Agent Taylor, at 18:1–5 (Commander of Detachment 225); Exh. G, Dep. Agent Mills, at 32:12–16 (Special Agent at Detachment 225).

[197]   Exh. U–3, at 23–25 (USA12993–95); *see also* Exh. A, Dep. Col. Poorman, at 180:14–181:2 (AFOSI 30(b)(6) Rep. on training).

career field—such as Special Investigations or Security Forces.[198] This document includes a Specialty Training Standard, which specifies the training requirements mandated by the Air Force.[199]

### 1. Holloman Office of Special Investigations

Since 2000, submitting criminal history to the NCIC and FBI has been a core training task for the Air Force Special Investigations Specialty Training Standard.[200] Before a student can graduate formal training, he must be able to determine step-by-step procedures for submitting criminal histories to the NCIC/FBI.[201] If a student graduates the formal training without that knowledge, it's considered a failure in training.[202] After graduating, agents take on a probationary role within their units for a minimum of 15 months.[203] During this probationary period, the Air Force assigns a supervisor to provide additional training.[204] Not only must the supervisor train, but the supervisor serves as a safety net, to catch mistakes in the collection and submission of fingerprints to the FBI.[205] And only when the supervisor certifies the probationary agent as "competent" to collect and submit fingerprints and criminal history, should the supervisor certify the probationary agent.[206] In sum, if an agent finishes probation but is unable to competently submit fingerprints and criminal history to the FBI, it's either a problem with the student's retention

---

[198]   Exh. A, Dep. Col. Poorman, at 182:10–183:6.

[199]   *Id.* at 187:18–188:3.

[200]   *Id.* at 188:6–189:21.

[201]   *Id.* at 191:22–192:2.

[202]   *Id.* at 192:3–9.

[203]   *Id.* at 193:16–194:9.

[204]   *Id.* at 194:15–18, 231:25–232:3.

[205]   *Id.* at 232:4–9.

[206]   *Id.* at 207:3–8, 241:4–7 (required to keep a record of certification).

or a problem with the training.[207] But if the Air Force certifies a student as competent when they are not, that's considered a failure in training.[208]

The Holloman Office of Special Investigations had training problems. First, the Air Force representative on training agents could not provide or identify the certification records of any of the agents involved in Kelley's investigation.[209] In fact, he could not say what training, if any, those individuals involved in the Kelley investigation had received on collecting and submitting fingerprints and final dispositions, during their probationary period.[210] So the Court is left to piece together the training from the evidence, and there's no evidence that the agents investigating Kelley ever received the required training.

**Special Agent in Charge Randall Taylor.** By the time Randall Taylor becomes SAIC (a supervisory and training role), he should have received training to be competently able to submit criminal history and final dispositions to the FBI.[211] Yet Mr. Taylor testified that he remembers receiving no specific training on when to submit fingerprints of felons.[212] In fact, he learned that agents are supposed to submit fingerprints only **after** the Inspector General's investigation into the Sutherland Springs shooting.[213] And he testified that he received more training on the regulations from the lawyers who prepared him for deposition,  than he ever received while in the Air Force.[214] Importantly,

---

[207] *Id.* at 207:22–208:4.
[208] *Id.* at 208:9–13.
[209] *Id.* at 241:8–18, 247:13–16.
[210] *Id.* at 247:17–248:5.
[211] Exh. A, Dep. Col. Poorman, at 215:21–25. SAIC and Commander are used interchangeably. Exh. P, Dep. Albright, at 28:9–29:13. Special agents report to the superintendent and then to the Commander or SAIC. *Id.*; *see also* Exh. A, Dep. Col. Poorman, at 217:25–218:4.
[212] Exh. B, Dep. Agent Taylor, at 28:4–17.
[213] *Id.* at 28:13–17.
[214] *Id.* at 29:21–30:3.

the Air Force representative also testified that the Air Force had no testimony or evidence to contradict Mr. Taylor's account.[215] And Mr. Taylor testified that, had the Air Force given him the appropriate training, he would have ensured that Kelley's fingerprints and final disposition were submitted to the FBI.[216]

**Superintendent Lyle Bankhead**. Mr. Bankhead arrived at Detachment 225 in June of 2011, straight from training—meaning he was a probationary agent in need of supervision.[217] The earliest he could have graduated from probationary status was August 2012, even if he had not been away that summer for pre-deployment training.[218] But in August 2012, the Air Force promoted Mr. Bankhead to superintendent—with supervisory responsibility over other agents.[219] While he was a probationary agent, the Air Force should have trained him to competently submit fingerprints and final dispositions to the FBI.[220] But Mr. Bankhead told the Inspector General that he received no such training.[221] This lines up with Mr. Taylor's (his Commander's) testimony that Holloman did not provide its agents any probationary training related to fingerprints.[222] And again, the Air Force testified, through its representative on training, that it had no evidence to contradict Mr. Taylor's or Mr. Bankhead's testimony that they received no training on submitting fingerprints or final dispositions to the FBI.[223]

---

[215]  Exh. A, Dep. Col. Poorman, at 216:8–25; *see also id.* at 220:10–23 (the only two possibilities are a failure in training or a failure in retention).
[216]  Exh. B, Dep. Agent Taylor, at 30:18–25, 31:1–4, 49:2–7.
[217]  Exh. A, Dep. Col. Poorman, at 231:21–24, 233:10–13.
[218]  *Id.* at 233:18–22, 234:13–18.
[219]  *Id.* at 41:5–15.
[220]  *Id.* at 234:23–235:7.
[221]  Exh. U–19, at 2 (USA15919).
[222]  Exh. B, Dep. Agent Taylor, at 39:25–40:9.
[223]  Exh. A, Dep. Col. Poorman, at 239:4–12.

**Agent Yonatan Holz**. Mr. Holz was the "primary agent" on the Kelley investigation.[224] Like Mr. Bankhead, Mr. Holz joined Holloman as a probationary agent, fresh out of training.[225] By the time Mr. Holz finished his probationary status at Holloman—by August 2011—he should have been able to competently submit fingerprints and final dispositions to the FBI.[226] Yet Mr. Holz testified that the Air Force never trained him on how and when to submit fingerprints to the FBI before the Kelley investigation.[227] As a result, the Air Force, through its 30(b)(6) representative on training, admitted that this was a failure in training.[228] And the Air Force had no evidence to contradict Mr. Holz' testimony that he had received no training.[229]

## 2.  Holloman Security Forces

As with Special Investigations, the evidence shows that the Air Force failed to train its Security Forces employees to collect and submit criminal history. By design, Air Force Security Forces training **does not** include training on collecting and submitting fingerprints or final dispositions to the FBI.[230] Instead, as the Government's representative testified, the "buck stops" with the Commander of 49th Security Forces on training.[231]

That's a problem for Holloman because the Commander knew very little about criminal history submission. For example, he believed that fingerprint

---

[224] Exh. M, Dep. Agent Holz, at 22:14–19; Exh. G, Dep. Agent Mills, at 34:4–12.
[225] Exh. M, Dep. Agent Holz, at 14:19–15:10; Exh. A, Dep. Col. Poorman, at 242:18–22, 242:23–243:1.
[226] Exh. A, Dep. Col. Poorman, at 243:17–22.
[227] Exh. M, Dep. Agent Holz, at 31:13–21; Exh. A, Dep. Col. Poorman, at 244:10–21.
[228] Exh. A, Dep. Col. Poorman, at 245:25–246:10.
[229] *Id.* at 246:15–20.
[230] Exh. H, Dep. Col. Ford, at 246:25–247:7 (Air Force 30(b)(6) Rep. on training).
[231] *Id.* at 200:6–22.

data does not go through Security Forces.[232] It does.[233] He believed that Security Forces do not determine probable cause during the course of investigations.[234] They do.[235] And he believed that Security Forces did not have a responsibility to submit information to the FBI.[236] They definitely do.[237]

As a result, the agents working for Security Forces also lacked training when handling the Kelley case. For example, Security Forces Agent Ryan Sablan testified that the Air Force trained him to believe that he did **not** have to submit fingerprints to the FBI, even if he had probable cause.[238] The Air Force's representative testified that either this was a failure of training or an error on Mr. Sablan's part.[239] Agent Sablan also testified that his training did not teach him where to send fingerprints, either.[240] In contrast, the Air Force's Security Forces training representative testified that agents should have been trained on this point by the 49th Security Forces Commander.[241]

All of the above (parts 1−2) presents overwhelming evidence of the Government's failure to train. The Court should therefore rule as a matter of law that the Government was negligent on this ground.

---

[232] Exh. U–19, at 6 (USA21794).

[233] Exh. U–3, AF Instruction 31-206, at 6 ¶ 2.24 (USA3981), 7 (USA4010–19) (policy and instructions on how Security Forces should submit this information).

[234] Exh. U–19, at 8 (USA21796).

[235] Exh. U–6, DoD Instruction 5505.11, at 25 (USA1815).

[236] Exh. U–19, at 9 (USA21810).

[237] Exh. U–3, AF Instruction 31-206, at 5 ¶ 2.14 (USA3976) (reporting electronically to DIBRS at DoD), 6 ¶ 2.24 (USA3981) (requiring the submission fingerprint cards and final dispositions to the FBI by security forces); *see also* Exh. H, Dep. Col. Ford, at 245:5–11 (Air Force 30(b)(6) Training Rep. testifying that Boyd got these facts wrong).

[238] Exh. R, Dep. Agent Sablan, at 99:9–15 (30(b)(6) Rep. on Security Forces training).

[239] Exh. H, Dep. Col. Ford, at 190:3–16, 192:3–17.

[240] Exh. R, Dep. Agent Sablan, at 106:16–23.

[241] Exh. H, Dep. Col. Ford, at 190:18–25.

## CONCLUSION

The evidence overwhelmingly shows that the Air Force and the DoD negligently undertook obligations that they failed to perform. And the Government's failures are directly traceable to the Government's negligence in supervising and training its employees. Given the evidence presented, the Court should grant summary judgment and hold that the Government is liable in each of Plaintiffs' negligence-based causes of action.

Respectfully Submitted,

/s/ Jamal K. Alsaffar
**Jamal K. Alsaffar**
JAlsaffar@nationaltriallaw.com
Texas Bar No. 24027193
**Tom Jacob**
TJacob@nationaltriallaw.com
Texas Bar No. 24069981
**Whitehurst, Harkness, Brees, Cheng, Alsaffar & Higginbotham & Jacob PLLC**
7500 Rialto Blvd, Bldg. Two, Ste 250
Austin, TX 78735
Office 512-476-4346
Fax 512-476-4400
Counsel for Vidal, McKenzie, Solis, McNulty, and Wall

/s/ Jason P. Steed
**Jason P. Steed**
JSteed@kilpatricktownsend.com
Texas Bar No. 24070671
**Kilpatrick Townsend & Stockton LLP**
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
Office 214-922-7112
Fax 214-853-5731
Counsel for Vidal, McNulty, and Wall

/s/ April A. Strahan
**April A. Strahan**
april@ammonslaw.com
Texas Bar No. 24056387
**Robert E. Ammons**
rob@ammonslaw.com
Texas Bar No. 01159820
**The Ammons Law Firm**
3700 Montrose Blvd.
Houston, TX 77006
Office 866-523-1603
Fax 713-523-4159
Counsel for Holcombe, Ramsey, Curnow & Macias

/s/ Daniel J.T. Sciano
**Daniel J.T. Sciano**
DSciano@tsslawyers.com
Texas Bar No. 17881200
**Tinsman & Sciano**
10107 McAllister Freeway
San Antonio, TX 78216
Office 210-225-3121
Fax 210-225-6235
Counsel for Amador

/s/ Daniel Barks
**Daniel D. Barks, *pro hac vice***
ddb@speiserkrause.com
**Speiser Krause, P.C.**
5555 Glenridge Connector, Suite 550
Atlanta, GA 30342
Office 571-814-3344
Fax 866-936-6382
Counsel for Holcombe

/s/ Mark Collmer
**Mark W. Collmer**
drcollmer@aol.com
Texas Bar No. 04626420
**Collmer Law Firm**
3700 Montrose
Houston, TX 77006
Office 713-337-4040
Counsel for Holcombe

/s/ Dennis Peery
**Dennis Charles Peery**
d.peery@tylerpeery.com
Texas Bar No. 15728750
**R. Craig Bettis**
cbettis@tylerpeery.com
Texas Bar No. 24040518
**Tyler & Peery**
5822 West IH 10
San Antonio, TX 78201
Office 210-774-6445
Counsel for Uhl


/s/ George LeGrand
**George LeGrand**
tegrande@aol.com
Texas Bar No. 12171450
**Stanley Bernstein**
Texas Bar No. 02225400
**LeGrand & Bernstein**
2511 N. Saint Mary's St.
San Antonio, Texas 78212
Office 210-733-9439
Fax 510-735-3542
Counsel for Wall & Solis


/s/ Justin Demerath
**Justin Demerath**
jdemerath@808west.com
Texas Bar No. 24034415
**O'Hanlon, McCollom & Demerath**
808 West Ave.
Austin, TX 78701
Office 512-494-9949
    Counsel for Corrigan, Braden,
    Warden, Stevens, Pachal, McCain, &
    Poston

/s/ Tim Maloney
**Tim Maloney**
Texas Bar No. 12887380
timmaloney@yahoo.com
**Paul E. Campolo**
pcampolo@maloneyandcampolo.com
Texas Bar No. 03730150
**Maloney & Campolo, L.L.P.**
926 S. Alamo
San Antonio, TX 78205
Office (210) 465-1523
Counsel for Ramsey


/s/ Joe Schreiber
**Joseph M. Schreiber**
joe@lawdoneright.net
Texas Bar No. 240374497
**Erik A. Knockaert**
erik@lawdoneright.net
Texas Bar No. 24036921
**Schreiber | Knockaert, PLLC**
701 N. Post Oak Rd., Suite 325
Houston, TX 77024
Phone (281) 949-8904
Fax (281) 949-8914
Counsel for Brown


/s/ Jason Webster
**Jason Webster**
jwebster@thewebsterlawfirm.com
Texas Bar No. 24033318
**The Webster Law Firm**
6200 Savoy
Suite 640
Houston, TX 77036
    Counsel for Lookingbill

/s/ Brett Reynolds
**Brett T. Reynolds**
btreynolds@btrlaw.com
Texas Bar No. 16795500
**Brett Reynolds & Associates, P.C.**
1250 N.E. Loop 420, Suite 420
San Antonio, TX 78219
(210)805-9799
   Counsel for Workman, Colblath, and
   Harris

/s/ Marco Crawford
**Marco Crawford**
**Law Office of Thomas J. Henry**
4715 Fredricksburg
San Antonio, TX 78229
(210) 585-2151
(361) 985-0601 (fax)
mcrawford@tjhlaw.com
   Counsel for McMahan

/s/ Craig Carlson
**Craig Carlson**
ccarlson@carlsonattorneys.com
**Philip Koelsch**
pkoelsch@carlsonattorneys.com
**Joe Craven**
jcraven@carlsonattorneys.com
**The Carlson Law Firm**
100 E Central Texas Expy
Killeen, TX 76541
254-526-5688
   Counsel for Rios

/s/ Marion M. Reilly
Marion M. Reilly
**Hilliard Munoz Gonzales, L.L.P.**
719 S. Shoreline - Ste 500
Corpus Christi, TX 78401
(361) 882-1612
361/882-3015 (fax)
marion@hmglawfirm.com
   Counsel for McMahan

/s/ Kelley W. Kelley
**Kelley W. Kelley**
**Anderson & Associates Law Firm**
2600 SW Military Drive, Suite 118
San Antonio, TX 78224
(210) 928-9999
(210) 928-9118 (fax)
kk.aalaw@yahoo.com
   Counsel for Ward

## APPENDIX 1: GOVERNMENT ACRONYMS

| ACRONYM | MEANING |
|---------|---------|
| 2FIR | Second Field Investigations Region<br>*Also known as Region 2.* |
| AFOSI | Air Force Office of Special Investigations |
| DIBRS | Defense Incident Based Reporting System |
| FFL | Federal Firearms Licensee |
| I2MS | Investigative Information Management System<br>*The electronic criminal investigation case file.* |
| JA | Judge Advocate |
| NCIC | National Crime Information Center<br>*One of the three databases searched by the NICS before firearms transfer.* |
| NICS | National Instant Criminal Background Check System |
| SAIC | Special Agent in Charge<br>*Also referred to as the Commander of the Unit* |
| SJA | Staff Judge Advocate |

# APPENDIX 2: GOVERNMENT WITNESSES

### Government Rule 30(b)(6) Representatives

**Kimberly Del Greco** currently serves as Deputy Assistant Director overseeing the NICS Section, the Biometrics section, and the IT component of the FBI CJIS. Exh. C, Dep. Del Greco, at 14:13–15:5. She represents the FBI. *Id.* at 13:6–12; 24:21–25:11; Exhibit 1 (notice of deposition).

**Col. Robert M. Ford Jr.** represents the Air Force security forces on topics related to training and the Air Force response to Inspector General recommendations from 1997-2017. Exh. H, Dep. Col. Ford, at 48:19–50:13.

**Col. John Owen** is a JAG attorney and current chief of the Military Services Division of the Air Force. Exh. F, Dep. Col. Owen, at 6:10–15. He represented the Staff Judge Advocates' office. *Id.* at 10:2–11; 27:8–17; Exhibit 1 (notice of deposition).

**Col. Kevin Poorman** is a civilian employee of the Air Force and a representative of the Air Force Office of Special Investigations on topics related to training and the Air Force response to Inspector General recommendations from 1997-2017. Exh. A, Dep. Col. Poorman, at 14:5–15:11; 84:18–86:3; Exhibits 1–2 (notice of depositions).

**Special Agent Robert Spencer** is the representative for the Air Force in dealing with the FBI when it comes to criminal indexing. Exh. T, Dep. Spencer, at 7:6–19; 17:10–18:7; Exhibit 1 (notice of deposition).

**Shelley Ann Verdego** is a DoD Representative testifying on information related to the DoD reporting information into the NICS through the DIBRS database. Exh. E, Dep. Verdego, at 16:4–18:7; Exhibit 1 (notice of deposition).

### Second Field Investigations Region

Hudson, Col. James was the commander of the Second Field Investigations Region during the Kelley investigation. Exh. J, Dep. Col. Hudson, at 29:5–10.

Albright, Jacqueline was Deputy Director of Region 2 from June 2007 to June 2013. Exh. P, Dep. Albright, at 12:21–13:6.

Veltri, Mathew was a Region 2 desk officer from 2010 to approximately 2015. Exh. I, Dep. Officer Veltri, at 18:2–13.

### Holloman Air Force Base

Col. Owen Tullos served as the Staff Judge Advocate at Holloman through the investigation and conviction of Devin Kelley. Exh. D, Dep. Col. Tullos, at 33:13–22.

Randall Taylor was the Special Agent in Charge (aka Commander) of Detachment 225 (AFOSI) from December 2011 through the Kelley investigation. Exh. B, Dep. Agent Taylor, at 8:4-9, 16:13–16.

Vince Bustillo was the Special Agent in Charge of Detachment 225 (AFOSI), retiring in July 2011. Exh. Q, Dep. Agent Bustillo, at 48:15–20.

Lyle Bankhead was a probationary agent with Detachment 225 from May/June 2011 but promoted to superintendent in August of 2012. Exh. O, Dep. Agent Bankhead, at 28:1–7, 41:5–15.

Yonatan Holz was a special agent responsible for investigating the Kelley case at Detachment 225. Exh. M, Dep. Agent Holz, at 13:3–6, 22:14–19.

James Hoy was superintendent before Mr. Bankhead at Detachment 225 in 2011. *See* Defendant's Supplemental Disclosures, at 2 (July 28, 2020).

Clinton Mills served as an AFOSI special agent in 2011 during the Kelley investigation, first arriving at Holloman in 2010 straight from training to become a special agent. Exh. G, Dep. Agent Mills, at 19–20.

Col. Robert Bearden served as the Commander of the 49th Logistics Readiness Squadron from June 2012 to June 2014, including during Kelley's discharge from the Air Force following his criminal confinement. Exh. K, Dep. Col. Bearden, at 19:23–20:7.

Maj. Nathan McLeod-Hughes served as the Director of Operations for the 49th Logistics readiness Squadron. Exh. L, Dep. Maj. McLeod-Hughes, at 24:17–25:4.

Tech Sergeant Ryan Sablan was a field investigator in the Holloman Security Forces from 2009 to 2014. Exh. R, Dep. Agent Sablan, at 22:13–18, 31:12–19.

## APPENDIX 3: GOVERNMENT ORGANIZATIONAL CHART



## APPENDIX 4: DET. 225 ORGANIZATIONAL CHART



## CERTIFICATE OF SERVICE

By our signatures above, we certify that a copy of Plaintiffs' Motion for Partial Summary Judgment has been sent to the following on August 21, 2020 via the Court's CM/ECF notice system, and electronic service to their respective emails.

PAUL DAVID STERN

STEPHEN E. HANDLER

JOCELYN KRIEGER

AUSTIN FURMAN

Torts Branch

United States Dept. of Justice

Civil Division

Paul.David.Stern@usdoj.gov

Austin.L.Furman@usdoj.gov

Jocelyn.Krieger@usdoj.gov

Stephen.Handler@usdoj.gov