1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE WESTERN DISTRICT OF TEXAS

3                   SAN ANTONIO DIVISION

4  HOLCOMBE, et al.,            )
                                )
5        Plaintiffs,            )
                                )
6  vs.                          ) Civil Action No.
                                )
7  UNITED STATES OF AMERICA,    ) 5:18-CV-00555-XR
                                )
8        Defendant.             ) (Consolidated cases)

9

10

11          REMOTE ORAL VIDEOTAPED DEPOSITION

12              UNITED STATES OF AMERICA

13           BY ITS CORPORATE REPRESENTATIVE

14              JAMES KEVIN POORMAN

15              Thursday, July 9, 2020

16

17

18

19

20

21

22

23

24  Reported by:

25  Rebecca Callow, RMR, CRR, RPR

Poorman, Kevin                    07-09-2020

14

1    A.   I am now, yes.

2    Q.   And how long have you been a civilian

3  employee of the Air Force?

4    A.   20 years.

5    Q.   Is the testimony that you're giving today

6  within the course and scope of your employment with

7  the Air Force?

8    A.   Yes.

9    Q.   Do you understand that you have been

10 designated as a representative of the Air Force in

11 this lawsuit?

12   A.   Yes.

13   Q.   Do you have full authority to speak on

14 behalf of the Air Force today?

15   A.   Yes.

16            MR. STERN:   Objection.

17            Mr. Poorman -- to the extent that

18 you're asking about certain particular topics for

19 which he's been designated as a representative of

20 Air Force OSI.

21   BY MR. JACOB:

22   Q.   And, you know, that's a good point to raise

23 as well.

24            At times, Mr. Stern may object.  And

25 unless Mr. Stern tells you expressly not to answer my

Poorman, Kevin                          07-09-2020

1   question, do you understand that you are obligated to

2   answer my question?

3       A.   Yes.

4       Q.   Do you understand that you have an

5   obligation to testify on what is known or reasonably

6   known by the government on the topics you've been

7   designated for today?

8       A.   Yes.

9       Q.   Are you fully prepared to discuss those

10  topics?

11      A.   I believe I am, yes.

12      Q.   And in a second we'll go through the

13  notices to make sure we're on the same page about

14  the specific topics.

15              But before we get there, can you tell

16  me briefly how, if at all, you prepared for this

17  deposition?

18      A.   I read a variety of documents that were

19  listed in the deposition notices and I spoke with

20  DoJ and Air Force attorneys, and then I also spoke

21  with personnel in the Air Force Office of Special

22  Investigations that could help inform me to a

23  greater degree on the topics that I anticipated

24  being questioned about.

25      Q.   Did you prepare in any other ways?

Poorman, Kevin                    07-09-2020

41

1              So I talked with Lauren Ware about --

2    Lauren Ware followed John Pecko into the forensic

3    teaching position at the OSI academy in about the

4    2008 or '9 time frame.  So she followed John Pecko.

5              There was a break between the two.  I

6    don't recall that discussion, so I don't know how

7    much of a break.  So she took over the training of

8    those blocks of instruction -- or part of those

9    blocks of instruction and was there until like 2012.

10             So, much like John Pecko, I was trying

11   to get an understanding of whether -- to what extent

12   the training had continued on her watch as it did on

13   John Pecko's watch, and kind of compare it to the

14   extent that it was consistent with what I had been

15   training in 2001-2002 to see if there was continuity

16   of training from those who actually were in the

17   classroom doing the training.

18        Q.   And what did you learn from Ms. Ware?

19        A.   That it did continue, that she was teaching

20   essentially the same material that I had been

21   teaching.  In fact, many of her slides she offered

22   were -- she knew to be slides I had put together,

23   many of the photographs and many of the slides,

24   so ...

25        Q.   Did you discuss with Ms. Ware anything else

Poorman, Kevin                          07-09-2020

1  some reason I was curious the extent to which we --

2  did we ever submit Mr. Kelley's fingerprints?  Are

3  they still in the file or do they exist on those,

4  because I was curious of the extent to which -- so

5  that was a question I asked.

6           And then I asked a little about I2MS,

7  trying to understand a little about the upload and

8  then how information moved from our headquarters, or

9  from OSI to the DoJ to the FBI to the III systems

10  there.  That's -- that's the primary topics I was

11  talking to him about.

12      Q.   I think the first thing that you asked

13  Mr. Brown was whether the Air Force did submit

14  Kelley's fingerprints to the FBI.  Is that fair?

15      A.   Yes.

16      Q.   And what did you discover?

17      A.   That, no, the fingerprint cards were still

18  in the case file.

19      Q.   What about concerning his final

20  disposition?

21      A.   I don't know that I asked about final

22  disposition.

23           I think I assumed -- I don't remember

24  asking the question.  I assumed that, since the

25  prints were in the file, that -- well, I think I

```
1   did.  I think I did ask.

2              He said that there were two blank --

3   or there were blank R-84s, the green cards, were in

4   the file.

5      Q.   Okay.  So from that -- and this might be a

6   very basic question.

7              You said that the reason you know that

8   the fingerprints weren't submitted is when you

9   looked -- when he looked in the file he saw that

10  there were two fingerprint cards in the file.  Is

11  that fair?

12             MR. STERN:  Objection.  This is beyond

13  the scope of what Mr. Poorman has been asked to

14  testify on as a representative of OSI.

15     A.   That's what I recall.  That's what I

16  recall.

17     BY MR. JACOB:

18     Q.   And that's because, under the regulations,

19  one of the fingerprint cards are supposed to be

20  submitted to the FBI.  Right?

21     A.   Yes.

22     Q.   So if you see in the file that there are

23  two fingerprint cards, you know that one of them

24  were not submitted.  Right?

25             MR. STERN:  Objection.
```

Poorman, Kevin                    07-09-2020

76

1    archive, that goes -- the file goes to headquarters?

2       A.   Well, once the file is closed, all the

3    documents are in it and it's ready to go to archive,

4    yes.  It comes through headquarters and then

5    headquarters archives.

6                So some come to our file room, some

7    end up archived at a storage location over in

8    Maryland Federal Records Repository location.

9       Q.   With regard to the Devin Kelley

10   investigative file, when it was closed in the

11   2012-2013 time frame, did the closed file submission

12   to archive go through Air Force headquarters as

13   well?

14               MR. STERN:  Objection.  Beyond the

15   scope of Mr. Poorman's testimony.

16      A.   That would have been the process, yes.

17      BY MR. JACOB:

18      Q.   At any time, did the closed case archived

19   file not go through headquarters?

20      A.   No.

21               It would have gone to our file room

22   personnel in order to get archived.  They all come

23   to the file room, not agents.  They're

24   administrators, but they come into that shop.

25      Q.   So in terms of this three-tier process, one

Poorman, Kevin                    07-09-2020

84

1   going to just put my phone on mute but leave

2   everything else alone.

3                    Is that the protocol here?

4       Q.   Yeah.   That works for me.

5                    MR. STERN:  Mr. Poorman, why don't you

6   go ahead and hang up from the conference call and

7   then you call back in in five minutes after.

8                    THE WITNESS:  Do you mean actually

9   hang up?  Don't mute?  Okay.

10                   Okay.  I'll do that then.  Okay.  All

11  right.

12                   THE VIDEOGRAPHER:  Mr. Stern, are you

13  okay with going off record?

14                   (No audible response.)

15                   THE VIDEOGRAPHER:  Okay.  The time is

16  11:12 a.m. Central.  Going off record.

17                   (Recess taken.)

18                   THE VIDEOGRAPHER:  The time is

19  11:25 a.m. Central.  We're back on the record.

20      BY MR. JACOB:

21      Q.   All right.  Mr. Poorman, we're back on the

22  record.  And we had initially talked about some of

23  the individuals that you had conversations with.

24  Now I'd like to show you a document that you may

25  have seen already.

Poorman, Kevin                    07-09-2020

85

1           Okay.  Are you seeing a notice of

2    deposition on your screen, Mr. Poorman?

3        A.   Yes.

4        Q.   And have you seen this notice of

5    deposition?

6        A.   Yes.

7                MR. JACOB:  For the court reporter,

8    I'm going to attach this deposition as Exhibit 1 to

9    the deposition, and I'll email it to the court

10   reporter after the deposition is completed.

11                (Deposition Exhibit 1 was

12                marked for identification.)

13       BY MR. JACOB:

14       Q.   I'd like to show you Exhibit A to this

15   deposition.  Are you seeing page 8 of 12, Exhibit A,

16   to the notice of deposition?

17       A.   Yes.

18       Q.   And do you see topic number 5 on Exhibit 1?

19       A.   Yes.

20       Q.   Okay.  Now, are you prepared to discuss

21   topic number 5 as it concerns the Air Force OSI?

22       A.   As it concerns OSI, yes.  Yes.

23       Q.   And do you have authority to speak on

24   behalf of the Air Force on the training or education

25   Air Force OSI gave concerning the collection and

Poorman, Kevin                    07-09-2020

86

1  submission of fingerprints and final dispositions to

2  the FBI in DIBRS?

3      A.   Yes.

4      Q.   I also want to show you exhibit -- another

5  exhibit.  We're going to mark this exhibit.  You

6  should see a Plaintiffs' Notice of Deposition, page

7  1 of 10, on your screen now.  Correct?

8      A.   Yes.

9           MR. JACOB:  And this is our second

10  notice of deposition, which we will mark as

11  Exhibit 2.  And I'll email the court reporter

12  afterwards.

13           (Deposition Exhibit 2 was

14           marked for identification.)

15  BY MR. JACOB:

16      Q.   Have you seen this notice before,

17  Exhibit 2?

18      A.   Yes.

19      Q.   And I'm going to show you Exhibit A of

20  Exhibit 2.  You should see page 4 of 10 on your

21  screen.

22      A.   Yes.

23      Q.   And are you prepared to discuss topic 1 of

24  Exhibit 2 as it relates to Air Force OSI?

25      A.   Yes.

Poorman, Kevin                          07-09-2020

90

1          individuals who those instructions apply

2          to on the substance of those

3          instructions?"

4                    And he answers "Yes."

5      A.    That's --  that correctly.

6      Q.    Okay.  Do you agree with that proposition,

7   that when the Air Force issues mandatory

8   instructions, they have an obligation to train those

9   individuals on those instructions?

10     A.    For mandatory instructions, yes.

11     Q.    Okay.  And in this case there are several

12  mandatory instructions that you reviewed.  Right?

13     A.    Yes.

14     Q.    And we discussed a few of them, including

15  the mandatory instructions dating all the way back

16  to 1995 concerning the submission of fingerprints

17  and final dispositions to the FBI.  Right?

18     A.    Well, we discussed them going back to 1987.

19  Yes.

20     Q.    Right.  Okay.  So it's fair to say when the

21  Air Force issues mandatory instructions on the

22  collection and submission of fingerprints and final

23  dispositions to the FBI, the Air Force has an

24  obligation to train special agents on that process?

25                    MR. STERN:  Objection.

Poorman, Kevin                          07-09-2020

117

1   AFOSI Manual 90-101 as being mandatory.  Right?

2        A.   Yes.

3        Q.   Okay.  So let me show you page 7 of

4   AFOSI 90-101, Bates-stamped USA 22541.

5                  Do you see that?

6        A.   Yes.

7        Q.   I'm going to zoom in to Paragraph 2.2.2.

8                  Do you see that?

9        A.   Yes.

10       Q.   It gives -- region case reviewers, RCRs,

11  the -- may design their own processes for

12  identifying, reviewing, and tracking high-visibility

13  investigations.  Right?

14       A.   Yes.

15       Q.   And then it says, "Region reviewers will

16  use the region case review checklist for their case

17  reviews, but may expand on it as needed based on

18  unique local requirements or procedures."  Right?

19       A.   Yes.

20       Q.   Per 90-101, the region case reviewers are

21  required to use the region case review checklist but

22  may expand on that.  Fair?

23       A.   Fair.

24       Q.   So, going back to our spreadsheet, fair to

25  say, under 90-101, the region case review checklist

Poorman, Kevin                    07-09-2020

118

1   is a mandatory checklist?

2       A.   Yes.   I would agree that that's the read of

3   the paragraph, yes.

4       Q.   Okay.   So looking at the various tasks on

5   USA 25432, a region case reviewer would go through

6   and determine whether each of these checklist items

7   had been met.   Right?

8       A.   Yes.

9       Q.   So, for example, you have administrative,

10  investigative sufficiency, records checks,

11  et cetera?

12      A.   Yes.

13      Q.   I'm showing you Case Quality.   Please tell

14  me what the Case Quality tab is for.

15      A.   Give me just a moment to read through.

16      Q.   I'll try to make this as big as possible.

17              (Document review.)

18  BY MR. JACOB:

19      Q.   Mr. Poorman, let me reask that question so

20  our record is clear.

21              Can you tell me what Tab H, the Case

22  Quality tab in the region case review checklist, USA

23  25432, is intended for?

24      A.   To prompt a reviewer to look at, as

25  categories investigative sufficiency, whether it's

Poorman, Kevin                           07-09-2020

119

1   written professionally, whether the case appears to

2   be being run with some degree of timeliness

3   consideration; are they making progress, is it

4   compliant with policy, data integrity, information

5   entered into I2MS, for example, is it accurate.

6   That's what it means.

7      Q.   So here in Tab H, we're looking -- the

8   region case reviewers are to ensure that the cases

9   that they review are in compliance with current

10  Air Force policy, for example?

11               MR. STERN:  Objection.

12     A.   Yes.

13     BY MR. JACOB:

14     Q.   So that includes the collection and

15  submission of fingerprints and final disposition

16  reports.  Right?

17               MR. STERN:  Objection.  The document

18  speaks for itself.

19     A.   Well, to the extent that what you're asked

20  to surveil here, if you will, asked to review is

21  available to you, then you would want to look at it.

22               But this is 2007, and as I mentioned

23  before, the file that you're looking at is a digital

24  file because the file is sitting at a field unit.

25               And in '7 at least, and then up

121

1   were collected and submitted.

2              MR. STERN:  I'm sorry, Tom.  I don't

3   know if you broke up at the end of that sentence.

4              MR. JACOB:  Let me reask the question.

5              MR. STERN:  Thank you.

6      BY MR. JACOB:

7      Q.   The checklist says -- Mr. Poorman, can you

8   hear me?

9      A.   Yes, I can.

10     Q.   So when the checklist says "compliance with

11  current policy," that includes ensuring compliance

12  with the part of the policy that requires the

13  collection and submission of fingerprints to the

14  FBI.  True?

15             MR. STERN:  Objection.

16     A.   It includes checking compliance with

17  compliance items that you can see.  Yes.

18     BY MR. JACOB:

19     Q.   Well, I'll get to the "see" part, but I

20  want to take this baby steps.

21     A.   Okay.  I'm sorry.  Yes.

22     Q.   So fair to say that when the case review

23  checklist says compliance with current policy, that

24  includes compliance with Air Force policy to submit

25  final dispositions to the FBI?

Poorman, Kevin                          07-09-2020

122

1       A.   Yes.

2       Q.   Okay.  Now, you said that -- I think the

3    next part of your -- our discussion was that, you

4    know, Air Force region reviewers may not be able to

5    see whether fingerprints were submitted or not.

6    Right?

7       A.   At that time, yes.  That's correct.

8       Q.   Well, an Air Force reviewer or Air Force

9    region reviewer certainly would be able to see

10   electronically whether a suspect of a crime had been

11   interviewed.  Right?

12      A.   Yes.

13      Q.   And they would be able to see whether they

14   had -- let me back up a little bit.

15              Air Force policy required their special

16   agents to coordinate with the staff judge advocate on

17   issues of probable cause before submission of

18   fingerprints.  Right?

19              MR. STERN:  Objection.

20      A.   It depends on the time frame.

21              That probable cause standard didn't

22   come into play until IC4 121.  So in the 2007

23   instruction, at the time you pull this, at that

24   point PC was not part of the determination.

25   \\\

Poorman, Kevin                    07-09-2020

123

1      BY MR. JACOB:

2      Q.   Well, let's look at just the -- during the

3   Devin Kelley investigation.

4                During the Devin Kelley investigation,

5   Air Force special agents were required to consult

6   with the SJA on probable cause determinations.

7   Right?

8      A.   Yes.

9      Q.   And not only were they required to consult

10   with the SJA, they were supposed to document their

11   consultation in the electronic file?

12      A.   Yes.

13      Q.   So a region case reviewer reviewing a case

14   file with Detachment 225 would see if the agents are

15   doing their job, following policy, that a

16   consultation on probable cause following a subject

17   interview was done?

18      A.   Documented it, yes.

19      Q.   Right.   And they're supposed to document it

20   under that mandatory policy.   Right?

21      A.   Yes.

22                MR. STERN:   Objection.

23      BY MR. JACOB:

24      Q.   So based on that information alone, they

25   could see that fingerprints need to have been

Poorman, Kevin                    07-09-2020

124

1    collected and submitted to the FBI?

2         A.    They could conclude that, yes.

3         Q.    And if they're following this checklist,

4    they could simply call up the case agent and ask

5    them, hey, just want to make sure that you submitted

6    the fingerprints per policy?

7         A.    They could if it expanded to that.  This

8    checklist doesn't call out specifically that issue.

9    But -- and there are hundreds of compliance issues

10   for us to follow.

11              A region may or may not have drilled

12   into the hundreds of compliance issues that we have

13   in an investigation and drilled into it.

14              You have to accommodate some

15   discretion on the part of a region reviewer as to

16   what they drill into or a case review could take

17   weeks.

18        Q.    Well, Mr. Poorman, I thought we agreed that

19   this case review checklist was not discretionary.

20        A.    Okay.  Well, even if it's mandatory -- and

21   we agree it's mandatory -- when you get to

22   compliance with current policy, then that opens the

23   door to hundreds of compliance issues regarding an

24   investigation.

25              What I was saying is this doesn't

Poorman, Kevin                    07-09-2020

131

1    yes.

2        Q.    Well, let me ask you this:

3              Are you familiar with the FBI's NICS

4    background search system?

5        A.    Yes.  In general, yes.

6        Q.    Well, are you aware that the FBI uses that

7    background search system when individuals try to

8    purchase firearms from federally licensed firearm

9    dealers?

10       A.    Yes.

11       Q.    Would you agree with me that the FBI -- for

12   the FBI's NICS system to work, federal agencies must

13   accurately collect and submit criminal history of

14   violent felons?

15             MR. STERN:  Objection.

16       A.    Yes.

17   BY MR. JACOB:

18       Q.    Would you agree with me that the more

19   information that the FBI has on dangerous felons,

20   the better decisions they can make in preventing

21   individuals who shouldn't have firearms from getting

22   them?

23       A.    The more information that's in the systems

24   they look at, yes.

25       Q.    Right.  The more information the FBI has on

Poorman, Kevin                     07-09-2020

137

1   motivation for doing this or the opportunity to do

2   this with a church full of people.

3                So when I get to that, I just say,

4   yeah, that portion of the stool leg that had to do

5   with the ability to buy the weapon, if that's the

6   chosen weapon method -- and in this instance it was,

7   as opposed to many other weapons; semi-trucks and

8   other things that could be used to kill a

9   concentration of people.

10               We did not do what we needed to do to

11  prevent the ability to buy a firearm through a

12  firearms dealer.  That was our omission.  And that's

13  why I keep using that word as -- as the context.

14               I don't mean to quibble, but that is

15  very much the way that I think we look at this.

16  Q.   Would you agree with me that reducing the

17  capability of dangerous felons from getting firearms

18  is one way to reduce the risk of harm to the public?

19  A.   Yes.

20               MR. STERN:  Objection.  Asked and

21  answered.  This is the same line of questioning in

22  multiple different ways.  His answer remains the

23  same as it was before.

24  BY MR. JACOB:

25  Q.   Sir, let me ask you this:

Poorman, Kevin                    07-09-2020

138

1              You mentioned, in your terms the stool

2    of opportunities, that there are other ways to

3    acquire a firearm.  Do you remember that

4    conversation?

5         A.   Yes.

6         Q.   Do you have any evidence that Devin Kelley

7    acquired firearms from any individuals other than a

8    licensed firearms dealer?

9              MR. STERN:  Objection.  This is

10   outside the scope of Mr. Poorman's testimony.  He

11   wouldn't possibly have -- you can answer it in your

12   own personal capacity, if you have any knowledge --

13   personal knowledge of that question.

14              You may answer that question.

15        A.   No, I don't -- I don't.

16              I don't specifically recall exactly.

17   I know there were some weapons purchased.  I don't

18   know where -- I don't recall exactly where all the

19   weapons per purchased.  I'm sorry.

20        BY MR. JACOB:

21        Q.   In all fairness, sir, you're the one that

22   brought up the other avenues of purchasing a

23   firearm.

24              So what I want to know is, do you have

25   any evidence to suggest that Devin Kelley attempted

Poorman, Kevin                    07-09-2020

139

1    to purchase firearms from anyone other than a

2    federally licensed firearms dealer?

3         A.    Okay.  No, I don't.

4         Q.    Okay.  Let me show you another document.

5                   MR. STERN:  Tom, are we changing

6    subjects?

7                   MR. JACOB:  Yes.

8                   MR. STERN:  Can we take five minutes?

9                   MR. JACOB:  Yes.

10                  Does that work for you, sir?

11                  THE WITNESS:  If that's me, yes.

12                  MR. JACOB:  Yes.  Absolutely.

13                  MR. STERN:  Mr. Poorman, I assume

14   we're going to be going a few more hours, so I don't

15   know what you want to do about lunch or if you need

16   a longer break.  I can go however you guys see fit.

17   I just need five, ten minutes.

18                  MR. JACOB:  Let's go ahead and go off

19   the record and then we can ...

20                  MR. STERN:  Yeah.

21                  THE VIDEOGRAPHER:  The time is 12 --

22   I'm sorry.  The time is 12:44 p.m. Central.  We're

23   going off the record.

24                  (Recess taken.)

25                  THE VIDEOGRAPHER:  The time is

Poorman, Kevin                    07-09-2020

146

1      Q.   Well, let me ask you this:

2           Is this document, the IG unit

3    compliance inspection, available to Air Force OSI?

4      A.   Well, this is conducted by.

5           I don't know that I understood your

6    question correctly.

7      Q.   Sure.  Let me show you the first page of

8    USA 25055.  Do you see that?

9      A.   Yes.

10     Q.   And do you see under "Distribution"?

11     A.   Yes.

12     Q.   Can you tell me who this document is

13   distributed to?

14     A.   To the Region 2 commander and to the AFOSI

15   commander.

16     Q.   Okay.  So the Region 2 commander and the

17   AFOSI commander gets a copy of this document after

18   it's completed.  Fair?

19     A.   Yes.

20     Q.   So let's see what they would have seen.

21          So taking a look at the Section T,

22   that's the section that is titled "AFOSI Detachment

23   225 Holloman AFB."  Right?

24     A.   Yes.

25     Q.   And it seems like Holloman Air Force Base

Poorman, Kevin                          07-09-2020

153

1      Q.   Well, we know the document was -- and I can

2   show you the first page again if you want.

3      A.   I remember 2010.  Right.

4              It would have been before that,

5   because that's -- but I don't -- I don't -- I don't

6   see in this document it tells me what period.

7      Q.   Okay.  Well --

8      A.   But it would apply to whatever they were,

9   yes.

10             THE REPORTER:  They would apply to

11  what, sir?

12             THE WITNESS:  That comment would apply

13  to whatever the body of cases were that they looked

14  at, whatever period.

15     BY MR. JACOB:

16     Q.   Well, what we know is that the Region 2 --

17  Region 2 FIR commander knows in 2010 that the

18  monthly case reviews were not conducted and

19  documented appropriately.  True?

20     A.   Yes.

21     Q.   Would you agree with me if I were to say

22  periodic case reviews for sufficiency of

23  investigative effort and compliance with established

24  policy is a fundamental aspect of the investigative

25  process?

Poorman, Kevin                    07-09-2020

158

1   serious enough to rise to the level of a finding.

2                   And then there would be a requirement

3   to comment and come back on it, but this didn't rise

4   to a finding, so far as I can see in this paragraph.

5                   So I don't know that -- if there was

6   anyone that specifically had to take action and

7   report back on what action they took based on this.

8       Q.   Well, you know, we might be quibbling with

9   the words "finding," you know.

10                  At the end of the day, I guess, what

11  I'm concerned about is there -- AFOSI Region 2

12  commander and AFOSI commander is being told that one

13  of their detachments is not doing a fundamental

14  aspect of the investigative process, monthly case

15  reviews.  Right?

16                  MR. STERN:  Objection.

17      A.   Yes.

18      BY MR. JACOB:

19      Q.   Okay.  And I'll shortcut this because I

20  think your answer to this is you do not know what

21  was done in response to this monthly case reviews

22  not being conducted or documented appropriately.  Is

23  that fair?

24      A.   Yes.

25      Q.   Okay.  Let me show you -- on your screen

Poorman, Kevin                    07-09-2020

164

1      A.    Yes.  That's right up front.  Yes.

2      Q.    Let me ask you this:

3            When a manual like this is released, or

4   changes to a manual like this are released by

5   Air Force Office of Special Investigations, how do

6   they let the agents on the ground know about a change

7   or a new manual --

8      A.    They send out a worldwide email --

9      Q.    Did they do anything else --

10      A.    -- it goes to everybody.  I'm sorry.

11      Q.    Do they do anything else other than

12   emailing all agents?

13      A.    Not routinely, no.

14      Q.    Okay.  Let's look at some of the specifics

15   in this manual.  I'm going to show you page 75.

16            All right.  You should see page 75,

17   AFOSI Manual 71-121.  Right?

18      A.    Yes.

19      Q.    Okay.  So under this manual, do you see

20   Paragraph 5.14.1.2?

21      A.    Yes.

22      Q.    And it's the paragraph titled "Unit

23   Leadership Review."  Right?

24      A.    Yes.

25      Q.    It requires that unit leadership must

Poorman, Kevin                     07-09-2020

165

1   review all FD-249, both hard copy and electronic

2   when accomplished, and R-84 for accuracy and

3   completeness, before sending them to the FBI.

4   Right?

5       A.   Yes.

6       Q.   And this is a supervisory obligation of

7   unit leadership.  Right?

8       A.   Yes.

9       Q.   And unit -- unit leadership are not

10  personally responsible for sending fingerprints and

11  the final dispositions to the FBI.  Right?

12      A.   They're not personally responsible.

13  Normally, it's a case investigator or another in the

14  unit, if I'm understanding that question, yes.

15      Q.   Yes.  Their obligation is supervisory, and

16  that they are supervising individuals in their

17  command to ensure that they do their jobs

18  appropriately.  Right?

19      A.   Yes.

20      Q.   And part of that supervisory responsibility

21  is to review these fingerprint cards and the R-84s

22  before sending -- before the agent sends them on to

23  the FBI.  Right?

24      A.   Yes.

25      Q.   What training does Air Force OSI provide

Poorman, Kevin                    07-09-2020

166

1    unit leadership in conducting these types of

2    reviews?

3         A.   No special training on that aspect.

4         Q.   What training did AFOSI provide unit

5    leadership in conducting case file reviews?

6         A.   There's no special course or training for

7    that.

8         Q.   And this might be just a lawyer question,

9    but you say there's no special course.  Is there

10   some sort of un-special course?

11              Is there -- you know, I'm trying to

12   capture any possible training that AFOSI might give

13   to unit leadership on this type of review, either the

14   case file review or the review of the fingerprints

15   and the final disposition.

16        A.   Well, it takes me back to the definition of

17   "training."  So there's no special course that they

18   go to and sit down in a classroom and they get

19   instructed on how to do that.

20              So when I mean special training, I

21   mean that kind of training.  They get training.  The

22   training is on-the-job training.  They went through

23   the same training that the same people that are

24   supposed to supervise and do that.

25              The training consists -- plus

168

1  they, by virtue of the years of experience they

2  have, now have received training, practiced the

3  training, understand the requirement, and are in a

4  position to know, as a result of that training and

5  experience, what needs to be done.

6      Q.   Okay.  So is it fair to say that

7  detachment -- or unit leadership do not receive any

8  on-the-job training beyond what a normal special

9  agent would receive in the conducting of criminal

10  investigations?

11      A.   No.  They might.

12           They may get on criminal

13  investigations, not on fingerprint cards and R-84s.

14  They could get advanced training.  So I don't mean

15  to -- but I'm trying to understand what the scope of

16  the question is.

17      Q.   No, no.  I appreciate that.  It helps me

18  ask better questions.  So let me ask a better

19  question.

20           Would it be fair to say unit leadership

21  do not receive any training beyond on fingerprints

22  collection and submission or final disposition

23  collection and submission beyond what a special agent

24  would receive?

25      A.   Correct.

Poorman, Kevin                    07-09-2020

169

1      Q.    Even though a unit leader is supposed to

2  also do case file reviews on a monthly basis.  Fair?

3      A.    Yes.

4      Q.    And are supposed to specifically review the

5  fingerprints and R-84s, the final dispositions, for

6  accuracy and completeness.  Right?

7      A.    Yes.

8      Q.    And let me talk to you about why that

9  review is important.  Because if the fingerprint

10  card or the R-84 is not filled out accurately or

11  completely, the FBI might send it back.  Right?

12      A.    Yes.

13      Q.    So it's important that you have a second

14  set of eyes reviewing those cards to make sure that

15  those cards are filled out accurately and

16  completely.  Fair?

17      A.    Yes.

18      Q.    Okay.  Let me share my screen again, and

19  keep going on the same manual.

20             Do you see page 75 of AFOSI

21  Manual 71-121 still?

22      A.    I do.

23      Q.    And we're still on Bates stamp page

24  USA 492.  Right?

25      A.    Correct.

Poorman, Kevin                        07-09-2020

170

1      Q.    I'm going to blow up and you should see

2   Paragraph 5.14.2.  Do you see that?

3      A.    I do.

4      Q.    And it's "Military Subject Fingerprint

5   Submission" is the title of this heading.  Right?

6      A.    Yes.

7      Q.    And it's the paragraph that requires AFOSI,

8   Air Force OSI, to submit FD-249s through the

9   fingerprint criminal activity to the FBI upon

10  determination following coordination with the

11  servicing SJA of probable cause.  Right?

12     A.    Yes.

13     Q.    Fair to say that federal agencies should

14  collect and submit fingerprints to the FBI in a

15  timely manner?

16     A.    Yes.

17     Q.    Do you see the last part of that first

18  sentence that says, "Probable cause exists to

19  believe that the subject has committed an offense

20  listed in Attachment 8"?

21     A.    Yes.

22     Q.    Are you familiar with Attachment 8?

23     A.    Attachment 8, yes.  That's the -- that's

24  the 249.

25     Q.    And you're seeing page 163 of the

Poorman, Kevin                    07-09-2020

173

1              All of the crimes listed in

2    Attachment 8 are those crimes in which an individual

3    may not be actually punished but could be punished

4    for more than a year.  Right?

5         A.    Correct.   Correct.

6         Q.    So if the FBI gets criminal history data

7    from the Air Force Office of Special Investigations

8    knowing that only those felonies are the ones that

9    are being submitted under the Air Force and DoD

10   rules, the FBI knows that something -- the criminal

11   history they get from the Air Force is going to be a

12   felony.  Right?

13             MR. STERN:  Objection.

14        A.   I don't know what the FBI knows.  I don't

15   know what they know.  I -- this -- I don't know what

16   they know.

17        BY MR. JACOB:

18        Q.   Well, what I mean is, if the Air Force is

19   only submitting and DoD is only submitting felony

20   convictions under Attachment 8 -- right?

21        A.   Yes.

22        Q.   -- then the FBI knows that those that they

23   are receiving under -- in the CJIS system are felony

24   convictions.  Right?

25             MR. STERN:  Objection.

Poorman, Kevin                        07-09-2020

175

1  common nomenclature description of the violation,

2  yes.

3      BY MR. JACOB:

4      Q.   Okay.   Now let me show you page 76 of this

5  document.   Page 76, you have in front of you, of

6  AFOSI Manual 71-121.   Right?

7      A.   I do.

8      Q.   And this is the page that requires

9  submission of the hard copy R-84 to the FBI within

10  15 days of notification of final disposition.

11  Right?

12           Let me make that bigger for you.

13      A.   Yeah.   If you could make it a little

14  larger.   I can't see that.

15           Yeah.   There.   Thank you.

16      Q.   Okay.

17      A.   Yes.   Yeah.

18      Q.   Fair to say the Air Force has an obligation

19  to collect and submit criminal histories to the FBI

20  in a timely fashion?

21      A.   Yes.

22      Q.   For regulation, that's 15 days after

23  notification of final disposition?

24      A.   Yes.

25      Q.   Let me ask you this.   We've talked about

Poorman, Kevin                          07-09-2020

177

1   agent.  Right?

2      A.   The Air Force is responsible for complying

3   with the requirement.  So, yes.

4      Q.   Yeah.  And I'm sorry if this question is

5   very simple.

6             But if an agent doesn't follow this

7   regulation requiring the collection and submission of

8   final disposition data, that doesn't let the

9   Air Force off the hook.  Right?

10     A.   No.

11             MR. STERN:  Objection.  This line of

12  questioning has nothing to do with training or the

13  adoption of IG recommendations and, therefore, is

14  outside the scope of Mr. Poorman's testimony.

15     BY MR. JACOB:

16     Q.   The Air Force has an ongoing obligation to

17  correct any final dispositions or fingerprints that

18  were not submitted to the FBI.  Correct?

19     A.   Yes.

20     Q.   Okay.  Let me show you -- this is 71-121.

21             You said that you reviewed regulations

22  going back to 1987.  Right?

23     A.   Yes.

24     Q.   I'm showing you Air Force OSI Regulation

25  124-102.  Do you see that?

Poorman, Kevin                    07-09-2020

179

1      Q.    On your screen you should also now be able

2  to see page 2 of AFOSI Regulation 124-102.  Right?

3      A.    Yes.

4      Q.    And I want to show you -- I'll zoom in, so

5  you can read it better.  Do you see the paragraph

6  titled "Procedures"?

7      A.    Yes.

8      Q.    And, again, we see here all the way back to

9  1987 AFOSI units are supposed to contribute to the

10 III file for the offenses listed in Attachment 1.

11 Right?

12     A.    Yes.

13     Q.    And then detachment commanders and special

14 agents in charge will be responsible for ensuring

15 case agents obtain fingerprints and other necessary

16 data to complete the fingerprint form and the R-84

17 form.  Right?

18     A.    Yes.  There's a little breakup there.

19           Yes.

20     Q.    So, since 1987, it's been mandatory policy

21 that AFOSI agents collect and submit fingerprints

22 and criminal history to the FBI.  Right?

23     A.    Yes.

24     Q.    Since 1987, commanders of OSI SAICs have

25 had the supervisory responsibility of ensuring that

Poorman, Kevin                    07-09-2020

180

1   their agents actually do this requirement.   Right?

2       A.   Yes.

3       Q.   And that includes disciplinary abilities.

4   Right?

5       A.   If it's severe enough, yes.

6       Q.   Okay.  Well, let's continue to move down

7   the regulations and let me show you another.

8              You should see Air Force Instruction

9   36-2201 on your screen.   Right?

10      A.   Yes.

11      Q.   And this is Bates-stamped USA 12959.

12  Right?

13      A.   Yes.

14      Q.   And can you tell me -- first of all,

15  Air Force Instruction 36-2201 is a mandatory

16  instruction.   Right?

17      A.   Yes.

18      Q.   And it's titled "Air Force Training

19  Program."  Right?

20      A.   Yes.

21      Q.   Have you reviewed Air Force Instruction

22  36-2201 in preparation for your deposition today?

23      A.   I perused it, yes.

24      Q.   Can you tell me what the purpose of

25  Air Force Instruction 36-2201 is?

Poorman, Kevin                          07-09-2020

181

1      A.    To generally outline how Air Force training

2   is conducted.

3      Q.    Okay.  And let me show you Chapter 4, the

4   first paragraph.

5              You're seeing Chapter 4 of Air Force

6   Instruction 36-2201.  Right?

7      A.    Yes.

8      Q.    And this is the chapter on formal training.

9   Right?

10     A.    Yes.

11     Q.    And the first sentence on formal training

12  is, "The purpose of the Air Force training is to

13  ensure each individual is prepared to meet Air Force

14  mission requirements."  Right?

15     A.    Yes.

16     Q.    A true statement?

17     A.    I'm sorry?

18     Q.    Is that a true statement?

19     A.    Yes.

20     Q.    Fair to say that one of the Air Force

21  mission requirements is collecting, submitting

22  fingerprints and final disposition data?

23     A.    Yes.

24     Q.    Okay.  Let me show you page 35 of this

25  document.

Poorman, Kevin                           07-09-2020

182

1          Do you see page 35, USA 12993?

2     A.   Yes.

3     Q.   And paragraph -- can you tell me what a

4  career field education and training plan is?

5     A.   Yes.

6     Q.   What is a career field education and

7  training plan?

8     A.   Do you want me to answer separate from

9  what's on the screen that's been enlarged?

10     Q.   Well, first, I want to know your

11  understanding of a career field education and

12  training plan as described in AFI 36-2201.

13     A.   So it's a plan on how you train your people

14  that are assigned to a particular career field.

15     Q.   And CFETP, is that the acronym?  Do you say

16  it a special way?

17     A.   CFETP (pronouncing).

18          After a while it rolls off your

19  tongue, but CFETP is I understand what that is.

20     Q.   Okay.  So a career field education and

21  training plan identifies the training requirements

22  for a particular career field.  Right?

23     A.   Yes.

24     Q.   Serves as a roadmap for career progression

25  and outlines requirements that must be satisfied at

Poorman, Kevin                    07-09-2020

183

1   appropriate points through the career path.  Right?

2       A.   Yes.

3       Q.   So it's another way of saying these are the

4   minimum training requirements for various career

5   fields.  Right?

6       A.   Correct.

7       Q.   Does the career field of a special agent

8   have a CFETP?

9       A.   Yes.

10      Q.   Okay.  And I think you reviewed some of

11  those CFETPs.  Right?

12      A.   Yes.

13      Q.   Okay.  Let me show you one of them.

14           You should be seeing on your screen

15  USA 25379.  Right?

16      A.   Yes.

17      Q.   Can you tell me what USA 25379 is?

18      A.   Yes.  That's the CFETP specific to the OSI,

19  the special investigations career field.

20      Q.   So a special agent -- this would outline

21  the minimum training requirements for special

22  agents.  Fair?

23      A.   Yes.

24      Q.   And when would this document by applicable

25  or effective?

187

1    that change.

2                 There's no need to change the CFETP

3    because it already said collect and send, and after

4    the change it would still say collect and send.

5                 It's with the understanding that you

6    collect and send or you train on whatever the policy

7    is that gives you the particulars that you would put

8    in front of a student.

9        Q.    Okay.

10       A.    So does that help?

11       Q.    Sort of.  But it might be helpful to talk

12   in specifics.  So let me show you the specific page.

13       A.    Okay.

14       Q.    You should be seeing on your screen

15   page USA 25415 out of the document USA 25379.  The

16   CFETP.  Right?

17       A.    Yes.

18       Q.    And so just so that the Court is oriented

19   to what we're looking at, this is a table within the

20   CFETP called the STS.  Right?

21       A.    Yes.

22       Q.    That's the Specialty Training Standard.

23   Right?

24       A.    Yes.

25       Q.    And the Specialty Training Standard in

Poorman, Kevin                    07-09-2020

188

1    CFETP is the formal training requirements mandated

2    by the Air Force.   Right?

3         A.   Yes.

4         Q.   Here, for example -- I'll make that bigger

5    so you can see it better.

6                   We have the Air Force mandating that

7    students learn how to fingerprint and photograph

8    subjects.   Right?

9         A.   Yes.

10        Q.   And that is what is known as a core task.

11   Right?

12        A.   Yes.

13        Q.   And then we also have a "submit criminal

14   history data to the NCIC and FBI."   Right?

15        A.   Yes.

16        Q.   Again, a core task.

17        A.   Well, it's not asterisked here, so the

18   asterisks identify core tasks.

19        Q.   So let me ask you this:

20                   Are you aware if submitting criminal

21   history data to the FBI and NCIC became a core task

22   down the line?

23        A.   Well, I think it was a core task here.   I

24   don't know why the asterisk isn't there.   And it

25   seems that -- I'm sorry.   I'm a little confused in

Poorman, Kevin                     07-09-2020

189

1   looking at that.

2                   Is this the -- I know I'm -- you're

3   not here to answer my questions, but I'm confused

4   on -- does this appear elsewhere -- fingerprints and

5   submitting criminal elsewhere in this CFETP?

6        Q.   Not that I could find --

7        A.   Under what heading?  If we go one page,

8   maybe that would help.

9        Q.   All right.  You should be able to see

10  page 12 and 13 of the CFETP.  Right?

11       A.   Yes.

12       Q.   So 12 is the heading titled

13  "Interrogations."  Right?

14       A.   Yes.

15       Q.   And then it lists A through G.  Right?

16       A.   A through G, yes.  Okay.  I didn't have the

17  heading.

18       Q.   Now, you said that submitting criminal

19  history and data to the NCIC and FBI should be a

20  core task?

21       A.   Yes.

22       Q.   Okay.  And do you see the last -- let me

23  make it bigger for you.

24                   Do you see the last three columns?

25       A.   I do.

Poorman, Kevin                    07-09-2020

191

1  history data to the NCIC/FBI is listed as a 2B

2  requirement.  Right?

3      A.   Yes.

4      Q.   So a 2 requirement says that, before

5  students can graduate, they must be able to do most

6  parts of a task and need only help with the hardest

7  tasks, partially proficient.  Right?

8      A.   Yes.

9      Q.   And a B requirement is a task knowledge

10 level.  Right?

11     A.   Right.

12     Q.   And that means that before a student can

13 graduate a formal training, they must be able to

14 determine step-by-step procedures for doing a task.

15 Right?

16              MR. STERN:  Objection.

17     A.   That's 2B.  That's the "B" part, yes.

18 BY MR. JACOB:

19     Q.   Yeah.  So let's apply it to our situation

20 here, and specifically submitting criminal history

21 data to the NCIC/FBI.

22              The "B" part tells us that before a

23 student may graduate formal training, he must be --

24 or she must be able to determine step-by-step

25 procedures for submitting criminal histories to the

Poorman, Kevin                    07-09-2020

192

1   NCIC/FBI.  Right?

2        A.   Yes.

3        Q.   And if a student graduates the formal

4   training, the CITP or the BSIC that we discussed

5   previously, without being able to determine

6   step-by-step procedures, for example, to submit

7   criminal history to the FBI or NCIC, that's a

8   failure in training.  True?

9        A.   Yes.

10        Q.   Let me show you a second CITP.

11             This one.  All right.  You should have

12   on your screen a document that is Bates-stamped

13   USA 24755.  Right?

14        A.   Yes.

15        Q.   And that is the career field and education

16   and training plan for special investigations dated

17   2012.  Fair?

18        A.   Yes.

19        Q.   So this USA 24755 is the one that

20   supersedes the last document that we were looking

21   at, which was the 2000 career field and education

22   training plan.  Right?

23        A.   Yes.

24        Q.   So we're going to go through this as well.

25   And we talked a little bit about the formal

Poorman, Kevin                    07-09-2020

193

1  education that these students have.  I want to talk

2  about the on-the-job education with this document.

3  Let me show you page --

4              First of all, have you reviewed the

5  2012 career field education and training plan for

6  special investigations?

7      A.   Yes.  I've perused the first part and then

8  looked more closely at the STS portion, yes.

9      Q.   Okay.  So the page that you're looking at

10  is page 25, USA 24779.  Right?

11      A.   Yes.

12      Q.   Okay.  And this page, particularly the

13  paragraph on -- the last paragraph, 5.1.3.1,

14  discusses a probationary period.  Right?

15      A.   Yes.

16      Q.   So we talked about how students -- special

17  agents go through the CITP, C-I-T-P, then they go

18  through BSIC, and then they have on-the-job training

19  as a probationary agent.  Right?

20      A.   Yes.

21      Q.   So when -- and according to this

22  regulation, special agents are probationary for a

23  minimum period of 15 months.  Right?

24      A.   Yes.

25      Q.   Was that also true of the 2000 document,

194

 1   the 2000 career field education plan?

 2       A.   I don't know if it was true over the --

 3   you're talking about the 15 months?  Is that what

 4   you mean?

 5       Q.   Yes.  Yes.

 6       A.   Yeah.  During that period, at some point,

 7   12 -- I believe it was 12 months and we extended it

 8   to 15 months, but I don't know exactly what year

 9   that happened.

10       Q.   Okay.  Well, let's talk about what happens

11   in the probationary period.

12                   Agents are supposed to receive

13   additional on-the-job training.  Right?

14       A.   Yes.

15       Q.   And they're supposed to have someone

16   supervising their work during that probationary

17   period.  Right?

18       A.   Yes.

19       Q.   And the supervisor is responsible for

20   ensuring that the probationary agent timely and

21   accurately follows regulations?

22       A.   That they -- they're to ensure that the

23   agent is -- demonstrates the ability to perform

24   whatever the specific tasks to whatever level of

25   training they're required to do.

Poorman, Kevin                    07-09-2020

207

1   competently.  Right?

2       A.   Yes.

3       Q.   So by the time a -- the probationary

4   period -- an agent graduates his probationary

5   period, he should be able to competently submit

6   fingerprints and criminal history data to the FBI.

7   Right?

8       A.   Yes.

9       Q.   And would it be fair to say if he does not

10  know how to competently submit fingerprints and

11  criminal history data to the FBI after graduating

12  his probationary period, that is a failure in

13  training?

14                 MR. STERN:  Objection.

15      A.   No.  I don't think it -- it may be a

16  failure in retention of information in -- that he

17  received in training, and he forgot or didn't do it.

18                 It's hard to assess that question as

19  to what's at the root of the failure.  Is it the

20  training or not complying with the training that

21  they received, so ...

22      Q.   Okay.  So if I can rephrase my question.

23                 Would it be fair to say that if a

24  student finishes his probationary period and he is

25  unable to competently submit fingerprints or criminal

Poorman, Kevin                          07-09-2020

208

1    history to the FBI, it's either a problem with the

2    student's retention abilities or a problem with the

3    training, one of those two?

4         A.    Correct.

5               And at that time, if they can't do it

6    competently at the time that they're certified off,

7    then there is a -- they shouldn't be off the

8    training, yes.

9         Q.    Well, and that's what I mean is, if they're

10   certified as able to competently submit fingerprints

11   and criminal history to the FBI, but they actually

12   can't, that's a failure in training.  Fair?

13        A.    Yes.

14        Q.    Okay.  What about the ability to

15   competently submit criminal history data to DIBRS?

16   Are you familiar with that?

17        A.    Yes.

18        Q.    By the time --

19              MR. STERN:  Can we take five minutes

20   if we're switching subjects?

21              MR. JACOB:  This is still the -- I'm

22   literally done with this after this last line, so if

23   I can just finish this one point and then we can

24   take a break.

25              MR. STERN:  Okay.  I do apologize.  Of

Poorman, Kevin                    07-09-2020

215

1       A.    Let me read it if we could.   Just one

2    moment.

3       Q.    Sure.

4               (Document review.)

5       A.    I've read it now.

6               And so I don't know of any specific

7    training he received, so I don't disagree with his

8    answer.

9    BY MR. JACOB:

10      Q.    By the time he becomes SAIC, Mr. Taylor

11   should have completed the CITP training.   Right?

12      A.    The C-I-T-P, yes.

13      Q.    Yes.

14      A.    Yes.

15      Q.    He should have passed BSIC training.

16   Right?

17      A.    Yes.

18      Q.    And he should have gone through

19   probationary period of on-the-job training.   Right?

20      A.    Yes.

21      Q.    So by the time he is SAIC, he should have

22   received training on -- such that he's competently

23   able to submit criminal fingerprints and final

24   dispositions to the FBI.   Fair?

25      A.    Yes.

216

1      Q.    Okay.  Let me show page 28 of his

2   deposition.  And I'm going to show you lines 4

3   through 12 first.

4                Do you see lines 4 through 12 on

5   page 28 of Mr. Taylor's deposition?

6      A.    Yes.

7      Q.    He's asked:

8                QUESTION:  "But is it -- it's safe

9         to say, as you sit here today, that the

10        United States Air Force, when you went to

11        work as a detachment commander in 225 in

12        December of 2011, all the way up until

13        the time you retired in February of 2014,

14        you never had any specific training by

15        the United States Air Force as to

16        specifically when you should submit

17        fingerprints on behalf of those

18        committed -- convicted of a felony."

19             ANSWER:  "Not that I recall, sir."

20                Did I read that correctly?

21     A.    Yes.

22     Q.    Are you aware of any testimony to

23   contradict -- or are you aware of any evidence to

24   contradict his testimony?

25     A.    No.

Poorman, Kevin                     07-09-2020

217

1    Q.   If you look at lines 13 through 16, do you

2  see he actually learned that you're supposed to

3  submit fingerprints as soon as there's probable

4  cause from the IG report?

5    A.   Where are we on page 28?  I'm sorry.

6    Q.   Okay.  Let me show you lines 13 through 17.

7    A.   Okay.  I can read it from here.  Okay.

8  Thank you.

9            (Document review.)

10   A.   Yes.

11  BY MR. JACOB:

12   Q.   Okay.  So you see that Mr. Taylor, the

13  SAIC, the commander of Detachment 225 when the

14  Devin Kelley investigation was going on, is

15  testifying that he didn't learn that you're supposed

16  to submit fingerprints when probable cause is

17  determined until he learned that from the inspector

18  general?

19   A.   That's what it says.  Yes.

20   Q.   So that's a failure in training.  Isn't

21  that true?

22            MR. STERN:  Objection.

23   A.   No.

24  BY MR. JACOB:

25   Q.   Well, wouldn't it be fair to say he's

Poorman, Kevin                          07-09-2020

218

1   supposed to know when he -- when he should be

2   submitting fingerprints to the FBI before he

3   finishes his on-the-job training?

4        A.   Yes.

5        Q.   Here he's saying he didn't learn that until

6   after he retired.

7        A.   Okay.  Yes.

8        Q.   Okay.  So if he didn't learn that he was

9   supposed to submit fingerprints as soon as probable

10  cause is determined until after he retired, that

11  means he didn't learn that on the job, did he?

12                MR. STERN:   Objection.

13       A.   No.  That's just what he says.

14  BY MR. JACOB:

15       Q.   Do you believe he's lying?

16       A.   I'm not saying he's lying.  He may have not

17  recalled the training that he gets.  It's very

18  comprehensive, and the training for fingerprinting

19  is only a very small portion of the overall

20  17 weeks.

21                So I don't know what he recalls, but I

22  just don't agree with his -- with his statement.

23       Q.   Well, you know, he doesn't testify that he

24  doesn't recall that training.  Right?

25       A.   He testifies to the words I see in front of

Poorman, Kevin                    07-09-2020

220

```
 1        Q.   Okay.  Well, what I see -- okay.  So --
 2              MR. JACOB:  I'm sorry.  Is someone
 3   trying to say something?
 4        BY MR. JACOB:
 5        Q.   Well, what we do know is that he did not
 6   know, for whatever reason, that he -- that he was
 7   supposed to submit fingerprints as soon as there's
 8   probable cause.  Right?
 9        A.   That's what he says.
10        Q.   So, again, we're left with two
11   possibilities here.  Fair?
12        A.   Well, let me hear the possibilities.  Yeah.
13        Q.   One of the --
14        A.   I think I --
15        Q.   Well, one of the -- one of the
16   possibilities is that he was never trained on this.
17   He was never provided this information by the
18   Air Force.
19              Or the other possibility is that he was
20   provided it and he didn't retain it or he didn't read
21   it.  Right?
22        A.   Those seem to be the two possibilities,
23   yes.
24        Q.   Okay.  Let me show you -- I want to show
25   you pages 39 to page 40 of Mr. Taylor's deposition.
```

Poorman, Kevin                    07-09-2020

231

1  certainty, and that would include the ability to

2  look in a case file and see there's prints still in

3  it, then it would not have been a proper

4  certification.

5       BY MR. JACOB:

6       Q.   And unlike Region 2, Mr. Taylor was

7  actually at Detachment 225.  Right?

8       A.   Yes.  Correct.

9       Q.   He could have easily pulled the case file

10  and looked to see if there were fingerprints or

11  final dispositions completed and sent.  Right?

12      A.   Yes.

13                MR. STERN:  Objection.  Scope.

14      BY MR. JACOB:

15      Q.   Okay.  You mentioned that -- the training

16  of the superintendents, so let me show you his

17  testimony.

18                Are you familiar with Mr. Lyle

19  Bankhead?

20      A.   Only in name.

21      Q.   Okay.  Are you aware that Mr. Bankhead was

22  a probationary agent when he arrived at

23  Detachment 225?

24      A.   I seem to recall that being the case, yes.

25      Q.   So, again, with probationary agents, we

Poorman, Kevin                          07-09-2020

232

 1   know that there needs to be a supervisor supervising

 2   his activities.   Right?

 3       A.   Yes.

 4       Q.   And if he's supposed to submit fingerprints

 5   or criminal history as a probationary employee,

 6   there should be a supervisor responsible for

 7   catching any mistakes he makes on that front.

 8   Right?

 9       A.   Yes.

10       Q.   Do you know when Mr. Bankhead became

11   promoted to -- well, let me ask you this.

12                Actually, let's step back.

13                If he arrived at Detachment 225 in

14   2011, what is the minimum amount of time that he

15   would have been a probationary agent?

16       A.   2011, it would have been 15 months.

17       Q.   So when is the earliest time in which he

18   could have graduated from being a probationary agent

19   to a full-fledged agent?

20       A.   Tell me when he graduated from the academy.

21   I'm sorry.

22       Q.   Sure.  Here, let me show you.  That would

23   be better.

24                You should see Mr. Bankhead's

25   deposition testimony, page 28, on your screen.

Poorman, Kevin                    07-09-2020

233

1    Correct?

2       A.   Yes.

3       Q.   And you can see that he arrived at

4    Detachment 225 on approximately May or June of 2011.

5    Right?

6       A.   Yes.  Lines 3 and 5, I think, is what

7    you're referring to.  Right?  Yes.

8       Q.   Yeah.  And 8 through 11 as well.

9       A.   Okay.

10      Q.   So if he arrived at Detachment 225 at May

11   or June of 2011, 15 months would be around August of

12   2012.  Right?

13      A.   Okay.  Yes.

14      Q.   So I'm just trying to do the simple math

15   here.  May 1st, 2011, plus 15 months is August 1st,

16   2012.  Right?

17      A.   Yes.  That sounds right.

18      Q.   So August of 2012 is the earliest possible

19   point at which he could have graduated from being a

20   probationary employee to a full-fledged special

21   agent.  Fair?

22      A.   Yes.  Fair.

23      Q.   Okay.  Do you know when he became

24   superintendent?

25      A.   No, I don't, exactly.

Poorman, Kevin                    07-09-2020

234

1    Q.   Would it surprise you to learn that he

2  became superintendent in August of 2012?

3    A.   And when did he get off probation again?

4  August of ...

5    Q.   August of 2012.

6    A.   Yeah.  Would it be unusual?  Yes.  It would

7  be -- it would be unusual.  And it would be a bit

8  surprising to me, yes.

9    Q.   So let me make sure we have our timeline

10  here, because he comes to Detachment 225, at the

11  earliest, in May of 2011.  Right?

12    A.   Right.

13    Q.   And you see on lines 5 through 11 of his

14  deposition, page 41, that he actually left in

15  that -- the summer months for some pre-deployment

16  training.  Right?

17            (Document review.)

18    A.   Yes.  That's what I think it says, yes.

19  BY MR. JACOB:

20    Q.   Okay.  And, now, Mr. Bankhead was

21  superintendent under Randall Taylor.  Right?

22    A.   Yes.

23    Q.   Under -- now, while he was on the --

24  receiving on-the-job training, he should have

25  learned to competently submit fingerprints to the

Poorman, Kevin                    07-09-2020

235

1    FBI.  Right?

2         A.    He, Bankhead, yes.

3         Q.    While he was receiving on-the-job training

4    as a probationary employee, he should have learned

5    to competently submit final dispositions to the FBI.

6    Right?

7         A.    Yes.

8         Q.    And he should have received training on

9    completing the appropriate case closure checklists

10   as well.  Right?

11        A.    Yes.

12        Q.    Okay.  Let me show you some of his

13   testimony.

14              Here I'm showing you page 35 of

15   Mr. Bankhead's testimony.  Right?

16        A.    Yes.

17        Q.    Do you see in lines 6 through 17 he's

18   testifying he doesn't remember receiving training on

19   submitting fingerprints to the FBI?

20        A.    Could we scroll up to -- I can't -- I mean,

21   we start with November 12.  Is that the beginning of

22   that sentence?  I think it's the middle.

23        Q.    You should be able to see the entire page,

24   page 35.

25        A.    Yes.  I can see it.

Poorman, Kevin                          07-09-2020

239

1    training manager as to whether he provided it or

2    not.

3         Q.   Well, let me ask you this:

4              You, as the Air Force representative on

5    training of these Air Force OSI agents, do you have

6    any evidence to contradict Mr. Taylor --

7    Mr. Bankhead's statement to the IG that he did not

8    receive training on fingerprints or the R-84

9    submission?

10             MR. STERN:  Objection.

11   Mischaracterizes testimony.

12        A.   I don't have any evidence, no.

13   BY MR. JACOB:

14        Q.   Going back to the STS, do you remember on

15   the STS there were some middle columns?

16        A.   Yes.

17        Q.   And the middle -- and let me give you an

18   example of that so we're talking specifics and not

19   generalities.

20             On your screen should be page 58 of the

21   STS, USA 24812.

22        A.   Yes.

23        Q.   Do you see the third section, or column,

24   that's labeled "Certification For On-The-Job

25   Training"?

Poorman, Kevin                    07-09-2020

241

 1   in those tasks.

 2              That's what the "3" stands for.  Right?

 3       A.   Yes.

 4       Q.   And if that probationary agent is competent

 5   in the task, the certifier is supposed to initial on

 6   the 3E column.  Right?

 7       A.   Yes.

 8       Q.   For Mr. Taylor or Mr. Bankhead, did you see

 9   a certification by a trainer in your investigation

10   of this case?

11       A.   I haven't seen a completed STS for

12   Mr. Bankhead.

13       Q.   Have you seen a completed STS for

14   Mr. Taylor?

15       A.   No.

16       Q.   Okay.  Have you seen a completed STS for

17   Yonatan Holz?

18       A.   No.

19       Q.   Do you know who Mr. Holz is?

20       A.   He was one of the investigators.

21       Q.   Okay.  Would it surprise you to learn he

22   was the primary investigator on the Devin Kelley

23   case file?

24       A.   It would not surprise me.

25       Q.   Okay.  You should be seeing page 22 of

242

1    Mr. Holz's deposition.  Right?

2        A.    Yes.

3        Q.    And you see lines 14 through 19 is where he

4    testifies that he was specifically involved as a

5    special agent investigator in the Devin Kelley case.

6    Right?

7        A.    Yes.

8        Q.    Do you know when Mr. Holz joined Holloman?

9        A.    I don't recall the exact date.  No.

10       Q.    Okay.  Let me show you -- I want to show

11   you page 15 of Mr. Holz's testimony.  Right?

12       A.    Okay.

13       Q.    And you should see, from lines 2 through

14   about 15, that he joins New Mexico Detachment 225

15   right after training at the Federal Law Enforcement

16   Training Center in Georgia.  Right?

17       A.    Right.

18       Q.    So if he's going straight from the

19   Federal Law Enforcement Training Center to Holloman,

20   that means he should be on a probationary status at

21   the beginning of his time at Holloman.  Right?

22       A.    Yes.

23       Q.    That means that he should have someone

24   supervising him, as well, teaching him the ropes.

25   Right?

Poorman, Kevin                    07-09-2020

243

1         A.    Yes.

2         Q.    And by the time that he is finished in that

3    probationary status, he should be able to

4    competently submit fingerprints and criminal history

5    data to the FBI.  Right?

6         A.    Yes.  Let me read this one.

7               He went to Seymour Johnson.  And while

8    at Seymour Johnson, he should have been -- so he

9    gets to Holloman.  So he should have been on

10   probation, yeah, until -- I'm calculating -- late

11   summer of '11.  He could have been in training.

12              Am I tracking with what you're saying?

13        Q.    Yes.

14        A.    Okay.  Yeah.

15        Q.    And my question is more specific than that,

16   too.

17              By the time he finishes the on-the-job

18   probationary status at Holloman, he should be able to

19   competently submit fingerprints and final

20   dispositions to the FBI.  Right?

21        A.    Yes.  By the completion -- by August or so

22   of '11, yes.

23        Q.    Otherwise, a certifier should not certify

24   him as completing probationary status.  Right?

25        A.    Correct.

Poorman, Kevin                    07-09-2020

244

1     Q.    Okay.  So let me show you page 31 of his

2   deposition.

3               Do you see page 31 of Mr. Holz's

4   deposition in front of you?

5     A.    Yes.

6     Q.    Okay.  I just want to zoom in on lines 13

7   through 21.  Do you see that?

8     A.    Yes.

9     Q.    The question is:

10          QUESTION:   "So just to close the

11          loop.  Prior to your time at Holloman,

12          during your entire time, the entire time

13          at Holloman Air Force Base in 2011 and

14          2012, you did not receive any type of

15          training similar to the 2017 training you

16          received regarding how and when to submit

17          fingerprints at the FBI -- to the FBI

18          CJIS subdivision.  Is that correct?"

19          ANSWER:   "Correct."

20              Did I read that correctly?

21     A.    Yes.

22     Q.    Now, did you review Mr. Holz's deposition

23   before your testimony today?

24     A.    I believe so.  Yes.

25     Q.    So you're aware that -- I'm sorry?

245

1      A.   No.   I'm sorry.   I read -- I read a few,

2   and that was, I believe, one of them, yes.

3      Q.   So you're aware the first time he received

4   training, in his testimony, about fingerprint

5   submission to the FBI was the -- in 2017 in Turkey?

6                Do you remember that?

7      A.   I don't think I connected that.

8                I -- I thought that -- well, I had

9   not -- so to say that 2017 was the first training he

10  received when he was in Turkey, by that you mean

11  didn't -- you're saying that he did not receive

12  training in CITP or into BSIC either?  Is that what

13  you're saying.

14               The first time is 2017 is what he's --

15  is what you're saying he's saying.  At all.

16     BY MR. JACOB:

17     Q.   Yeah.   His testimony here on page 31 is

18  sort of a summation.  And it's asking him whether at

19  Holloman or before Holloman he's received any

20  training on how and when to submit fingerprints to

21  FBI CJIS.

22               MR. STERN:  Objection.

23     A.   I see what you're referring to.

24     BY MR. JACOB:

25     Q.   Okay.   So that would be a failure in the

Poorman, Kevin                    07-09-2020

246

1   on-the-job training at Holloman Air Force Base.

2   Fair?

3                  MR. STERN:   Objection.

4   Mischaracterizes the testimony on the screen.

5        A.   If he did not get OJT training on

6   submitting fingerprints and R-84s during his

7   probationary period, and he got off of probation

8   without getting that while he was on probation, then

9   that would be -- that would be a failure to complete

10  training properly for probationary training.   Yes.

11       BY MR. JACOB:

12       Q.   All right.   Have you seen Mr. Holz's

13  certification -- training certification in the STS?

14       A.   No.   I don't think I have.   No.

15       Q.   So as you sit here today, as the Air Force

16  representative on the training of AFOSI agents, you

17  have no evidence to contradict Mr. Holz's testimony

18  that he did not receive training at Holloman Air

19  Force Base on submitting fingerprints?

20       A.   That's correct.

21       Q.   Can you tell me -- and let me close this.

22                  Can you tell me, what training do

23  Air Force OSI airmen receive on correcting mistakes,

24  such as a failure to submit fingerprints or criminal

25  history to the FBI?

Poorman, Kevin                    07-09-2020

247

1        A.    Training on not doing something?  Is that

2   what you're asking?

3        Q.    No.   I'm asking what training do Air Force

4   OSI airmen, the folks that investigated the

5   Devin Kelley criminal charges in 2011 and 2012,

6   receive on correcting failures to submit final

7   dispositions or fingerprints to the FBI?

8        A.    I don't think we give training on what to

9   do if you fail to do something.

10       Q.    Okay.  Let me ask you -- we talked about

11  Mr. Holz, we talked about Mr. Bankhead, and

12  Mr. Taylor.

13              Have you seen or found the STS for any

14  Holloman Detachment 225 OSI agent that was involved

15  in or in the Devin Kelley criminal investigation?

16       A.    No, I have not.

17       Q.    Okay.  So as you sit here today, as a

18  representative of the Air Force on the training of

19  AFOSI agents, you cannot tell us what training, if

20  any, those individuals received on fingerprint card

21  collection and submission to the FBI or final

22  disposition submission to the FBI.  Fair?

23              MR. STERN:  Objection.

24       A.    Are we speaking to the probationary period

25  only?  Is that what you ...

Poorman, Kevin                    07-09-2020

248

1    BY MR. JACOB:

2        Q.   We're speaking to the individual agents

3    involved in the investigation of the Devin Kelley

4    felonies and crimes of domestic violence.

5        A.   I do not have their STSs.   Correct.

6        Q.   We've been going for a little while.   Do

7    you need a break?   I'm about to transition to

8    another section.

9                    MR. STERN:  Let's do so, please.

10                   THE VIDEOGRAPHER:  Time is 3:51 p.m.

11   Central.   Off the record.

12                   (Recess taken.)

13                   THE VIDEOGRAPHER:  The time is

14   4:11 p.m. Central.   Back on the record.

15   BY MR. JACOB:

16       Q.   All right.   Mr. Poorman, can you hear me?

17       A.   I can.

18       Q.   Okay.   I --

19                   MR. ALSAFFAR:  Wait a minute.   Did

20   they push the video button?

21                   That's just a joke.   Sorry.

22                   THE VIDEOGRAPHER:  We did.   My bad.

23   BY MR. JACOB:

24       Q.   Okay.   Mr. Poorman, are you ready to go?

25       A.   Yes.

Poorman, Kevin                    07-09-2020

273

1    arrestees and convicted offenders conform to the

2    reporting requirement.  Fair?

3        A.   Yes.

4             MR. STERN:  Objection.

5    Mischaracterizes the document.

6        BY MR. JACOB:

7        Q.   Did I mischaracterize the document, sir?

8        A.   Well, you read the recommendation

9    correctly, and then our response was the Air Force

10   agrees with our recommendation.

11       Q.   So the Air Force did agree to correct -- or

12   take prompt action to ensure that fingerprint and

13   final disposition for future arrestees and convicted

14   offenders are submitted appropriately.  Is that

15   fair?

16       A.   Yes.

17       Q.   So if we're dealing with the -- one week

18   after the time frame of this report Devin Kelley

19   gets convicted.  Right?

20       A.   Yes.

21       Q.   But the Air Force does not follow through

22   on its agreement, did it?

23             MR. STERN:  Objection.

24   Mischaracterizes testimony.  Mischaracterizes the

25   document.  Argumentative.

Poorman, Kevin                    07-09-2020

274

1    A.   Well, I don't -- that's quite a leap.  I

2  don't -- we implemented attempts to improve our

3  future arrestees.  Did we get to 100 percent and

4  perfect?  Then I think future assessments identify

5  precisely what was and wasn't done after this

6  report.

7       BY MR. JACOB:

8       Q.   Well, let me ask you this:

9            Isn't it true that, as of at least

10  2017, maybe 2018, both AFOSI -- the Air Force OSI and

11  Security Forces have not corrected all of the

12  deficiencies identified in the 2015 DoD/IG audit?

13      A.   The one specifically identified that needed

14  fixing, based on that sampling, is that -- or are

15  you talking generally?

16      Q.   Well, first of all, the Air Force OSI and

17  Security Force -- well, let's stick with Air Force

18  OSI.

19           Air Force OSI did not correct the cases

20  identified by the inspector general in this 2015-081

21  DoD/IG report.  True?

22           MR. STERN:  Objection.  Asked and

23  answered.

24      A.   We corrected those we could correct, as is

25  spoken to in the memorandum that attached to this

275

1   report.

2       BY MR. JACOB:

3       Q.    So the answer to my question is that the --

4   the mistakes identified by the DoD/IG were not

5   corrected even after the Devin Kelley incident?

6                MR. STERN:  Objection.

7   Mischaracterizes previous testimony.

8       A.    We corrected -- they identified like -- by

9   the time we sorted out which ones were ours and what

10  we were under an obligation to correct, we corrected

11  as many of the 15 that we could correct.

12                So we did correct some, and then

13  others we could not correct, so to the -- to those

14  that were identified in this report that pertained

15  to OSI.  I can't speak to the Security Forces cases.

16      BY MR. JACOB:

17      Q.    With regard to Air Force OSI, the Air Force

18  agreed to submit all -- to ensure that all future

19  convicted offenders are submitted to the FBI.

20  Correct?

21      A.    Yes.

22      Q.    And the Air Force did not submit all

23  future -- or convicted offenders to the FBI, did

24  they?

25                MR. STERN:  Objection.

Poorman, Kevin                    07-09-2020

342

 1          Mr. Poorman?

 2                  THE WITNESS:  Yes.  That's fine.

 3                  THE VIDEOGRAPHER:  The time is

 4   6:37 p.m.  We're going off the record.

 5                  (Recess taken.)

 6                  THE VIDEOGRAPHER:  The time is

 7   6:44 p.m. Central.  We are back on the record.

 8      BY MR. STERN:

 9      Q.   Mr. Poorman, was there an obligation by OSI

10   case agents to note that they had submitted --

11   whether they had submitted fingerprints in an -- in

12   the IDP notes in I2MS?

13      A.   Yes.  To the -- in the case file in the

14   notes is, generally, where it's -- where it's

15   recommended to put that.  Yes.

16      Q.   Well, in the hard copy or in the -- in the

17   hard copy, the fingerprints would be placed in the

18   folder.  Correct?

19      A.   Correct.  Right.  That's -- they'd be

20   filed -- one filed, then the other should be sent

21   off.  But, yes.

22      Q.   And was there an obligation to note the

23   submission in IDP?

24                  Well, what is IDP?  Let me start that

25   way.

Poorman, Kevin                    07-09-2020

343

1      A.   It's the internal data page.  It's the

2   internal data page.

3      Q.   So was it discretionary as to whether or

4   not that type of note would have been put in IDP?

5      A.   We varied on where we put it, but -- I'm

6   sorry.  I'd have to reflect on what's in IC4 of 121

7   at the time as to where it prescribes documenting

8   that.

9      Q.   Is it fair to say that there were no

10  mandatory obligations in IC4 of AFOSI Manual 71-121

11  and no much mandatory obligation would have existed?

12     A.   Correct.

13     Q.   Thank you.  Thank you for your time,

14  Mr. Poorman.

15          MR. STERN:  That's all I have.

16          MR. JACOB:  Mr. Poorman, I have a few

17  follow-up questions.

18              FURTHER EXAMINATION

19   BY MR. JACOB:

20     Q.   First of all, I want to make very clear, so

21  we can clear up this last point that Paul just

22  raised.  There is a mandatory obligation to document

23  the collection and submission of fingerprints in the

24  electronic file, is there not?

25     A.   Yes.

Poorman, Kevin                    07-09-2020

361

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

HOLCOMBE, et al.,            )
                             )
      Plaintiffs,            )
                             )
vs.                          ) Civil Action No.
                             )
UNITED STATES OF AMERICA     ) 5:18-CV-00555-XR
                             )
      Defendant.             ) (Consolidated cases)


REPORTER'S CERTIFICATE

REMOTE ORAL VIDEOTAPED DEPOSITION OF

UNITED STATES OF AMERICA

BY ITS CORPORATE REPRESENTATIVE

JAMES KEVIN POORMAN

July 9, 2020


        I, Rebecca J. Callow, Registered Merit

Reporter, Certified Realtime Reporter, Registered

Professional Reporter and Notary Public in and for

the State of Texas, hereby certify to the following.

        That the witness, JAMES KEVIN POORMAN, was

duly sworn by the officer and that the transcript of

the oral deposition is a true record of the

testimony given by the witness;

Poorman, Kevin                    07-09-2020

362

1          That the original deposition was delivered

2     to Jamal Alsaffar.

3

4          That a copy of this certificate was served

5     on all parties and/or the witness shown herein on

6     July 17, 2020.

7

8          I further certify that pursuant to FRCP

9     Rule 30(f)(1) that the signature of the deponent:

10          [ X ] was requested by the deponent or a

11     party before the completion of the deposition and is

12     to be returned within 30 days from date of receipt

13     of the transcript.  If returned, the attached

14     Changes and Signature Page contains any changes and

15     the reasons therefor;

16          [   ] was not requested by the deponent or

17     a party before the completion of the deposition.

18          I further certify that I am neither

19     counsel for, related to, nor employed by any of the

20     parties or attorneys to the action in which this

21     proceeding was taken.  Further, I am not a relative

22     or employee of any attorney of record in this cause,

23     nor am I financially or otherwise interested in the

24     outcome of the action.

25

Poorman, Kevin                    07-09-2020

363

1

2          SUBSCRIBED AND SWORN TO under my hand and

3    seal of office on this the 17 day of July, 2020.

4

5

6                          _____

7

8                    Rebecca J. Callow, RMR, CRR, RPR

9                    Notary Public, Travis County, Texas

10                   My Commission No. 12955701-3

11                   Expires:  09/12/2021

12                   RES IPSA

13                   501 Congress Avenue, STE 150

14                   Austin, Texas 78701

15                   512.334.6777

16                   FIRM # CRF-11371

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT FOR
THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JOE HOLCOMBE, et. al, | § | NO. 5:18-CV-00555-XR |
| | § | |
| Plaintiffs | § | Consolidated with: |
| | § | 5:18-cv-00712-XR (*Vidal*) |
| | § | 5:18-cv-00881-XR (*Uhl*) |
| vs. | § | 5:18-cv-00944-XR (*Ramsey*) |
| | § | 5:18-cv-00949-XR (*McNulty*) |
| UNITED STATES OF | § | 5:18-cv-00951-XR (*Wall*) |
| AMERICA, | § | 5:18-cv-01151-XR (*Amador*) |
| | § | 5:19-cv-00184-XR (*Brown*) |
| Defendant | § | 5:19-cv-00289-XR (*Ward*) |
| | § | 5:19-cv-00506-XR (*Workman*) |
| | § | 5:19-cv-00678-XR (*Colbath*) |
| | § | 5:19-cv-00691-XR (*Braden*) |
| | § | 5:19-cv-00706-XR (*Lookingbill*) |
| | § | 5:19-cv-00714-XR (*Solis*) |
| | § | 5:19-cv-00715-XR (*McKenzie*) |
| | § | 5:19-cv-00805-XR (*Curnow*) |
| | § | 5:19-cv-00806-XR (*Macias*) |

## NOTICE OF DEPOSITION

To:  Defendant, United States of America, by and through
its attorney, Paul Stern, United States Department of
Justice, Three Constitution Square, 175 N Street,
N.E., Washington, DC 20002.

From:  Plaintiffs, Vidal, et. al, 5:18-cv-712-XR, McNulty, et.
al, 5:18-cv-00949-XR; Wall, et. al, 5:18-cv-00951-XR;
Solis, et. al, 5:19-cv-00714-XR, and McKenzie, 5:19-cv-
00715-XR.

James Poorman
EXHIBIT
**01**

Please take notice that under Fed. R. Civ. P. 30(b)(6), the above Plaintiffs will take the deposition of the Defendant, United States of America. Pursuant to local, statewide, and national emergency orders related to the ongoing COVID-19 pandemic, the deposition will occur virtually with all parties attending via remote deposition technology provided by Res Ipsa. Secure links will be provided via email by Res Ipsa. The deposition will be recorded stenographically and may be digitally video recorded. The court reporter and videographer are being provided through Res Ipsa, 501 Congress Avenue, Suite 150, Austin, Texas 78701, email: depos@res-ipsa.com. The court reporter that swears in the witness remotely will do a statement on the record saying that all parties agree and stipulate to the remote deposition and the remote swearing of the witness. The deposition, when so taken and returned according to law, may be used in evidence at the trial of this case.

The deposition will be held on June 18, 2020 at 9:00am and will be conducted remotely by Res Ipsa, with the witness and all parties in their preferred respective locations.

You are invited to attend and participate as you deem appropriate. The deposition will take place from day to day until complete. Pursuant to Rule 30(b)(6), the United States of America shall designate one or more officers, directors, managing agents, or other persons who consent and are knowledgeable to testify on the United States' behalf with respect to the subject matters set forth in attached Exhibit A. A request to produce documents permitted under Rule 30(b)(2) is attached as Exhibit B.

# DEFINITIONS

Please see applicable definitions in W.D. Tex. Local Rule CV-26(b)(1)–(7). The singular form of any word shall include within its meaning the plural form of the word and vice versa. For your convenience, Plaintiffs have duplicated those definitions here:

**Communication**. The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

**Document**. The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a). A draft of a nonidentical copy is a separate document within the meaning of this term.

**Identify (With Respect to Persons)**. When referring to a person, to "identify" means to give, to the extent known, the person's full name, present or last known address, e-mail address, and telephone number, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

**Identify (With Respect to Documents)**. When referring to documents, "to identify" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s), and recipient(s).

**Parties**. The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent,

subsidiaries or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

**Person**. The term "person" is defined as any natural person or business, legal or governmental entity or association.

**Concerning**. The term "concerning" means relating to, referring to, describing, evidencing or constituting.

# ACRONYMS

The following acronyms apply to this notice:

| ACRONYM | MEANING |
| --- | --- |
| AFOSI | Air Force Office of Special Investigations |
| CJIS | Criminal Justice Information Services |
| DIBRS | Defense Incident-Based Reporting System |
| DMDC | Defense Manpower Data Center |
| DoD | Department of Defense |
| DODIG | Department of Defense Inspector General |
| I2MS | Investigative Information Management System |
| IAFIS | Integrated Automated Fingerprint Identification System |
| NCIC | National Crime Information Center |
| NGI | Next Generation Identification |
| NIBRS | National Incident-Based Reporting System |
| NICS | National Instant Criminal Background Check System |
| USAF | United States Department of Air Force |

Respectfully Submitted,


/s/ Jason P. Steed

**Jason P. Steed**
JSteed@kilpatricktownsend.com
Texas Bar No. 24070671
**Kilpatrick Townsend & Stockton LLP**
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
Office 214-922-7112
Fax 214-853-5731
Counsel for Vidal, McNulty, and Wall


/s/ Jamal K. Alsaffar

**Jamal K. Alsaffar**
JAlsaffar@nationaltriallaw.com
Texas Bar No. 24027193
**Tom Jacob**
TJacob@nationaltriallaw.com
Texas Bar No. 24069981
**Whitehurst, Harkness, Brees, Cheng, Alsaffar & Higginbotham & Jacob PLLC**
7500 Rialto Blvd, Bldg. Two, Ste 250
Austin, TX 78735
Office 512-476-4346
Fax 512-476-4400
Counsel for Vidal, McNulty, McKenzie, Solis, Ramirez and Wall

# CERTIFICATE OF SERVICE

By our signatures above, we certify that a copy of this pleading, Notice of

Deposition, has been sent to the following on June 5, 2020 via email.

JOSEPH H. HUNT
Assistant Attorney General
United States Dept. of Justice
Civil Division

JOHN PANISZCZYN
Civil Chief
United States Attorney's Office
Western District of Texas

JOHN F. BASH
United States Attorney
Western District of Texas

JAMES G. TOUHEY, JR.
Director, Torts Branch
United States Dept. of Justice
Civil Division

KIRSTEN WILKERSON
Assistant Director, Torts Branch
United States Dept. of Justice
Civil Division

STEPHEN E. HANDLER
Senior Trial Counsel, Torts Branch
United States Dept. of Justice
Civil Division

PAUL DAVID STERN
Trial Attorney, Torts Branch
United States Dept. of Justice
Civil Division
CLAYTON R. DIEDRICHS
Assistant United States Attorney

STEPHEN TERRELL
Trial Attorney, Torts Branch
United States Dept. of Justice
Civil Division
JAMES E. DINGIVAN
Assistant United States Attorney

JIM F. GILLIGAN
Assistant United States Attorney

# EXHIBIT A

Examination is requested on the following subject matter areas:

1.  The identity of persons, and identity and location of documents referenced in the DODIG-2015-011 Report.

2.  The identity of persons, and identity and location of documents referenced in the DODIG 2015-081 Report.

3.  The identify of persons, and identity of location of documents referenced in the DODIG 2018-035 Report.

4.  The identity of persons, and identity and location of documents referenced in the DODIG-2019-030 report.

5.  Training or education USAF personnel received concerning fingerprint collection and final disposition submission procedures, including submission to the FBI CJIS, NIBRS, or DIBRS. This topic concerns training or education given to personnel involved in the investigation, court-martial, or confinement of Devin Kelley between July 1, 2011 and December 14, 2012, whether they received the training at the time or some earlier time. This topic includes, but is not limited to: (a) the training or education provided by the Air Force Security Forces Academy at Joint Base San Antonio-Lackland, Texas; (b) the 65-day course at the security Forces Academy covering basic military police functions; (c) formal or informal training; (d) "on-the-job" training or education; (e)

recurring or annual training or education; and (f) training or education provided by the Naval Corrections Academy.
==

6.   Policies, procedures, practices, checklists, and protocols concerning Air Force Security Force's and AFOSI's execution of DoD Instruction 7730.47-M Volume 1. This topic includes, but is not limited to, the monthly submission of information to the DMDC and the DIBRS database for centralization of the collection of information reportable by the DoD Components pursuant to The Brady Handgun Violence Prevention Act of 1993. This topic includes but is not limited to, information concerning I2MS, as noted on pages 8–9 of DODIG-2015-011.

7.   Policies, procedures, practices, checklists, and protocols concerning the FBI CJIS NICS database and how other databases such as Next Gen (NGI) (formerly Integrated Automated Fingerprint Identification System (IAFIS)), NCIC, NIBRS, and Uniform Crime Report (UCR) are used to populate it. This topic includes, but is not limited to, the process by which the FBI receives and subsequently uses the information from DIBRS to prevent the purchase of firearms by any person prohibited by one of the eight listed categories.

8.   Policies, procedures, practices, checklists, and protocols concerning the Air Force Security Force's and AFOSI's execution of DoD Instruction 5505.11. This topic includes, but is not limited to, the submission of fingerprints and final disposition reports to FBI CJIS by both the Air Force Security Force and AFOSI. This topic includes, but is not limited to, the process by which Devin Kelley's

fingerprints and final disposition report should have been reported to FBI CJIS.

9. Policies, procedures, practices, checklists, and protocols concerning probable cause determinations by a Staff Judge Advocate, especially to include, when a determination should be made, and any training given to guide Judge Advocates on probable cause determinations.

10. Policies, procedures, practices, checklists, and protocols concerning the USAF Corrections System policy for post-trial inmates during in-processing concerning the submission of fingerprints and final disposition reports to the FBI. This topic includes, but is not limited to, the collection of Devin Kelley's fingerprints and submission of his final disposition report by the confinement facility personnel.

11. Policies, procedures, practices, checklists, and protocols put in to place following DODIG-2015-081 pertaining to the AFOSI's NCIC program director to ensure that fingerprints and final disposition reports are submitted to IAFIS (NGI) according to DoD Instruction 5505.11.

# EXHIBIT B

Under Fed. R. Civ. P. 34(b)(2), you are commanded to attend and testify at the above specified time and place; you are commanded to produce the below designated documents, electronically stored information, or tangible things in your possession, custody, or control. The following requests do not seek any communication to or from your legal counsel. Please produce a true and correct copy of the following within thirty (30) days of this notice or at the deposition, whichever is sooner. If produced before the deposition date, please produce these documents electronically. If produced at the deposition, please produce a physical copy of the document for examination and marking as a deposition exhibit, as well as an electronic version of the document in its native format.

1.  Your current curriculum vitae or resume.

2.  Documents you reviewed in preparation for this deposition.

3.  Policies, procedures, practices, checklists, or protocols concerning the topics covered in Exhibit A.

4.  Reports, notes, logs, letters, communication, or other documents you have authored or have been sent to you concerning this case or the topics covered in Exhibit A.

5.  Charts, diagrams, PowerPoints, illustrations, or other demonstrative aids that illustrate the relationships or communication between any of the following: the FBI

CJIS, NICS, NGI, DMDC, NIBRS, DIBRS, IAFIS, or NCIC.

6.   Handouts, manuals, course materials, or other documents concerning the training or education of any Air Force employee on fingerprint collection and final disposition submission procedures.

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| HOLCOMBE, et. al,<br>        Plaintiffs<br>vs.<br>UNITED STATES OF<br>AMERICA,<br>        Defendant | NO. 5:18-CV-00555-XR<br>(consolidated cases) |

## DECLARATION

I am _____, and I declare the following as true and correct:

1) I am of sound mind, over the age of 18, and have personal knowledge of the facts contained in this declaration. I was a deponent in the above-styled cause and was deposed by the parties by remote means.

2) From the beginning of the deposition until the end of the deposition, including breaks, I was under oath and received no coaching, assistance, or other help in answering questions, whether in person, by telephone, videoconference, or any electronic or other means of communication.

3) From the beginning of the deposition until the end of the deposition, including during breaks, I did not communicate—whether in person, by telephone, videoconference, or any electronic or other means of communication—with any person about the case other than what is reflected in the court reporter's transcript of the deposition.

Under 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED on this _____ day of _____, 2020.


_____
SIGNATURE

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| HOLCOMBE, et. al, | NO. 5:18-CV-00555-XR |
| | (consolidated cases) |
| Plaintiffs | |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Defendant | |

## REMOTE DEPOSITION PROTOCOL ORDER ORDER

The Court ORDERS that Parties should take remote depositions in this case while the COVID-19 Pandemic precludes in-person depositions. The Court ORDERS that the Parties should abide by the following protocol.

a. Parties shall serve notice of depositions that outline the remote means of taking the deposition, including the technologies used and how parties should connect to the deposition. An example notice of deposition is attached to this order as EXHIBIT A.

b. The court reporter shall swear the witness in remotely.

c. Parties shall use only documents in deposition that have been previously exchanged more than five (5) business days prior to the deposition and uniquely bates stamped. Parties may refer to those documents by bates stamp number and display those documents on the witness' screen, if such technology is used. Should the parties wish to attach documents, Parties will put on the record the bates stamp range of the document and produce the document to the court reporter following the deposition.

d. The court reporting or IT firm running the remote deposition technology will disable private chats between individuals involved in the deposition.

Exhibit C 000001

e. At the conclusion of the deposition, the witness shall sign the declaration attached as EXHIBIT B to this Order, affirming that no witness tampering occurred.

It is so ORDERED.

SIGNED on this ___28th___ day of ___April_____, 2020.

_____

HON. JUDGE XAVIER RODRIGUEZ

Exhibit C 000002

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| HOLCOMBE, et. al, | NO. 5:18-CV-00555-XR |
| | (consolidated cases) |
| Plaintiffs | |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Defendant | |

## PLAINTIFFS' NOTICE OF DEPOSITION PURSUANT TO FED. R. CIV. P. 30(B)(6)

To:  Defendant, United States of America, by and through its attorney, Paul Stern, United States Department of Justice, Three Constitution Square, 175 N Street, N.E., Washington, DC 20002.

Please take notice that under Fed. R. Civ. P. 30(b)(6), the Plaintiffs will take the deposition of the Defendant, United States of America, by oral examination using video, audio, and stenographic means, at the following location and date:

Date:      March 6, 2020, or other agreed date

Location:   U.S. Attorneys' Office
Three Constitution Square,
175 N Street, N.E.,
Washington, DC 20002.

Time:      9:00 AM CST

James Poorman
EXHIBIT
**02**

Court Reporter:     Res Ipsa or designee

Videographer:     Res Ipsa or designee

The deposition will continue from day to day until completed, with such breaks, as necessary. Pursuant to Rule 30(b)(6), the United States of America shall designate one or more officers, directors, managing agents, or other persons who consent and are knowledgeable to testify on the United States' behalf with respect to the subject matters set forth in attached **Exhibit A**. A request to produce documents permitted under Rule 30(b)(2) is attached as **Exhibit B**.

## DEFINITIONS

Please see applicable definitions in W.D. Tex. Local Rule CV-26(b)(1)–(7). The singular form of any word shall include within its meaning the plural form of the word and vice versa. For your convenience, Plaintiffs have duplicated those definitions here:

**Communication**. The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

**Document**. The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a). A draft of a nonidentical copy is a separate document within the meaning of this term.

**Identify (With Respect to Persons)**. When referring to a person, to "identify" means to give, to the extent known, the person's full name, present or last known address, e-mail address, and telephone number, and when referring to a natural person, additionally, the present or last known place of

employment. Once a person has been identified in accordance with this sub-paragraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

**Identify (With Respect to Documents)**. When referring to documents, "to identify" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s), and recipient(s).

**Parties**. The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

**Person**. The term "person" is defined as any natural person or business, legal or governmental entity or association.

**Concerning**. The term "concerning" means relating to, referring to, describing, evidencing or constituting.

# EXHIBIT A

Examination is requested on the following subject matter areas:

1.  Implementation of recommendations by Department of Defense (DoD) Inspector General, between 1997 and present, concerning the submission of criminal history data or fingerprints by Air Force units or command to DoD Defense Manpower Data Center or the FBI and Air Force agreements or undertakings to correct omissions or failures to submit such data or fingerprints. This topic includes corrective actions taken by the units or commands concerning such recommendations, agreements, or undertakings; instructions, regulations, guidelines, or other mandates provided to various Air Force units or command levels concerning such recommendations, agreements, or undertakings; and training or supervision provided to units or command concerning implementation of such recommendations, agreements, or undertakings.

# EXHIBIT B

Under Fed. R. Civ. P. 34(b)(2), you are commanded to attend and testify at the above specified time and place; you are commanded to produce the below designated documents, electronically stored information, or tangible things in your possession, custody, or control. The following requests do not seek any communication to or from your legal counsel. Please produce a true and correct copy of the following within thirty (30) days of this notice or at the deposition, whichever is sooner. If produced before the deposition date, please produce these documents electronically. If produced at the deposition, please produce a physical copy of the document for examination and marking as a deposition exhibit, as well as an electronic version of the document in its native format.

1.    Your current curriculum vitae or resume.

2.    Documents you reviewed in preparation for this deposition.

3.    Policies, procedures, practices, checklists, or protocols concerning the topics covered in **Exhibit A**.

4.    Reports, notes, logs, letters, communication, or other documents you have authored or have been sent to you concerning this case or the topics covered in **Exhibit A**.

5.    Handouts, manuals, course materials, or other documents concerning the training or education of any Air Force employee on fingerprint collection and final disposition

submission procedures reviewed by you that concern this case or the topics covered in **Exhibit A**.

Respectfully Submitted,

/s/ Jamal K. Alsaffar

**Jamal K. Alsaffar**
JAlsaffar@nationaltriallaw.com
Texas Bar No. 24027193
**Tom Jacob**
TJacob@nationaltriallaw.com
Texas Bar No. 24069981
**Whitehurst, Harkness, Brees, Cheng,
Alsaffar & Higginbotham & Jacob
PLLC**
7500 Rialto Blvd, Bldg. Two, Ste 250
Austin, TX 78735
Office 512-476-4346
Fax 512-476-4400
Counsel for Vidal, McKenzie, Solis,
McNulty, and Wall

/s/ Jason P. Steed

**Jason P. Steed**
JSteed@kilpatricktownsend.com
Texas Bar No. 24070671
**Kilpatrick Townsend & Stockton
LLP**
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
Office 214-922-7112
Fax 214-853-5731
Counsel for Vidal, McNulty, and Wall

/s/ April A. Strahan

**April A. Strahan**
april@ammonslaw.com
Texas Bar No. 24056387
**Robert E. Ammons**
rob@ammonslaw.com
Texas Bar No. 01159820
**The Ammons Law Firm**
3700 Montrose Blvd.
Houston, TX 77006
Office 866-523-1603
Fax 713-523-4159
Counsel for Holcombe, Ramsey, Curnow
& Macias

/s/ Daniel J.T. Sciano

**Daniel J.T. Sciano**
DSciano@tsslawyers.com
Texas Bar No. 17881200
**Tinsman & Sciano**
10107 McAllister Freeway
San Antonio, TX 78216
Office 210-225-3121
Fax 210-225-6235
Counsel for Amador

/s/ Daniel Barks

**Daniel D. Barks,** *pro hac vice*
ddb@speiserkrause.com
**Speiser Krause, P.C.**
5555 Glenridge Connector, Suite 550
Atlanta, GA 30342
Office 571-814-3344
Fax 866-936-6382
Counsel for Holcombe

/s/ Mark Collmer

**Mark W. Collmer**
drcollmer@aol.com
Texas Bar No. 04626420
**Collmer Law Firm**
3700 Montrose
Houston, TX 77006
Office 713-337-4040
Counsel for Holcombe

/s/ Dennis Peery

**Dennis Charles Peery**
d.peery@tylerpeery.com
Texas Bar No. 15728750
**R. Craig Bettis**
cbettis@tylerpeery.com
Texas Bar No. 24040518
**Tyler & Peery**
5822 West IH 10
San Antonio, TX 78201
Office 210-774-6445
Counsel for Uhl

/s/ George LeGrand

**George LeGrand**
tegrande@aol.com
Texas Bar No. 12171450
**Stanley Bernstein**
Texas Bar No. 02225400
**LeGrand & Bernstein**
2511 N. Saint Mary's St.
San Antonio, Texas 78212
Office 210-733-9439
Fax 510-735-3542
Counsel for Wall & Solis

/s/ Justin Demerath

**Justin Demerath**
jdemerath@808west.com
Texas Bar No. 24034415
**O'Hanlon, McCollom & Demerath**
808 West Ave.
Austin, TX 78701
Office 512-494-9949
    Counsel for Corrigan, Braden,
    Warden, Stevens, Pachal, McCain, &
    Poston

/s/ Tim Maloney

**Tim Maloney**
Texas Bar No. 12887380
timmaloney@yahoo.com
**Paul E. Campolo**
pcampolo@maloneyandcampolo.com
Texas Bar No. 03730150
**Maloney & Campolo, L.L.P.**
926 S. Alamo
San Antonio, TX 78205
Office (210) 465-1523
Counsel for Ramsey

/s/ Joe Schreiber

**Joseph M. Schreiber**
joe@lawdoneright.net
Texas Bar No. 240374497
**Erik A. Knockaert**
erik@lawdoneright.net
Texas Bar No. 24036921
**Schreiber | Knockaert, PLLC**
701 N. Post Oak Rd., Suite 325
Houston, TX 77024
Phone (281) 949-8904
Fax (281) 949-8914
Counsel for Brown

/s/ Jason Webster

**Jason Webster**
jwebster@thewebsterlawfirm.com
Texas Bar No. 24033318
**The Webster Law Firm**
6200 Savoy
Suite 640
Houston, TX 77036
    Counsel for Lookingbill

/s/ Brett Reynolds
**Brett T. Reynolds**
btreynolds@btrlaw.com
Texas Bar No. 16795500
**Brett Reynolds & Associates, P.C.**
1250 N.E. Loop 420, Suite 420
San Antonio, TX 78219
(210)805-9799
   Counsel for Workman, Colblath, and
   Harris

/s/ Marion M. Reilly
Marion M. Reilly
**Hilliard Munoz Gonzales, L.L.P.**
719 S. Shoreline - Ste 500
Corpus Christi, TX 78401
(361) 882-1612
361/882-3015 (fax)
marion@hmglawfirm.com
   Counsel for McMahan

/s/ Marco Crawford
**Marco Crawford**
**Law Office of Thomas J. Henry**
4715 Fredricksburg
San Antonio, TX 78229
(210) 585-2151
(361) 985-0601 (fax)
mcrawford@tjhlaw.com
   Counsel for McMahan

/s/ Kelley W. Kelley
**Kelley W. Kelley**
**Anderson & Associates Law Firm**
2600 SW Military Drive, Suite 118
San Antonio, TX 78224
(210) 928-9999
(210) 928-9118 (fax)
kk.aalaw@yahoo.com
   Counsel for Ward

# CERTIFICATE OF SERVICE

By our signatures above, we certify that a copy of Plaintiffs' Motion has been sent to the following on January 21, 2020 via email to the following counsel of record

JOSEPH H. HUNT
Assistant Attorney General
United States Dept. of Justice
Civil Division

JOHN F. BASH
United States Attorney
Western District of Texas

KIRSTEN WILKERSON
Assistant Director, Torts Branch
United States Dept. of Justice
Civil Division

PAUL DAVID STERN
Trial Attorney, Torts Branch
United States Dept. of Justice
Civil Division
CLAYTON R. DIEDRICHS
Assistant United States Attorney

JIM F. GILLIGAN
Assistant United States Attorney

JOHN PANISZCZYN
Civil Chief
United States Attorney's Office
Western District of Texas

JAMES G. TOUHEY, JR.
Director, Torts Branch
United States Dept. of Justice
Civil Division

STEPHEN E. HANDLER
Senior Trial Counsel, Torts Branch
United States Dept. of Justice
Civil Division

STEPHEN TERRELL
Trial Attorney, Torts Branch
United States Dept. of Justice
Civil Division
JAMES E. DINGIVAN
Assistant United States Attorney