**In the Matter Of:**

HOLCOMBE vs UNITED STATES

5:18-CV-00555-XR

**RANDALL TAYLOR**

*February 25, 2020*



1  investigating the crimes that he committed while in
2  the Air Force; is that true?
3       A.   Yes, sir.
4       Q.   And can you tell the jury -- I'm sorry.  Can
5  you tell the judge what was your actual job title at
6  the time you were in the Air Force and dealing with
7  the Devin Kelley matter?
8       A.   I was a special agent in charge of
9  AFOSI, Det 225.
10      Q.   Now, you don't do that today; correct?
11      A.   No, sir.
12      Q.   In fact, you've retired from the Air Force?
13      A.   Yes, sir.  Yes.
14      Q.   Well, on behalf of the families and the
15 plaintiffs, I would like to thank you for your
16 service in the Air Force.  And I hope you understand
17 that they -- that they appreciate that; okay?
18      A.   Thank you, sir.
19      Q.   Now, have you ever given a deposition
20 before?
21      A.   No, sir.
22      Q.   Well, I'm going to be able to ask you
23 questions today, and I may ask you for a verbal
24 response.  This nice lady is taking down everything
25 that we're saying.  And if sometimes folks nod their



1  you sit here today, Mr. -- Mr. Taylor, that -- that
2  you had to rely upon the Air Force to properly train
3  you in order to comply with those regulations?
4       A.  Yes, sir.
5       Q.  Meaning, it was not fair for them just to
6  turn you loose into a new job and expect you to know
7  every single regulation without the proper training,
8  is it?
9           MR. FURMAN:  Object to the form.
10          You can answer.
11          THE WITNESS:  Yes, sir.
12 BY MR. WEBSTER:
13      Q.  And, in fact, that's the way you felt when
14 you went to work for Detachment 225 around December
15 of 2011?
16      A.  Yes, sir.
17      Q.  In fact, you felt like you'd been kind of
18 dropped into the grease, would you agree with that?
19      A.  Yes, sir.
20      Q.  And you would agree with me, as you sit here
21 today, when you came -- when you showed up, you
22 actually complained to superiors that, hey, I don't
23 know what I'm doing?
24          MR. FURMAN:  Objection to form.
25          You can answer.



1     Q.  And part of that proper training would be to
2  make sure that you knew, as the detachment command
3  at 250, how to properly submit fingerprints to the
4  NCIC database; correct?
5     A.  Yes, sir.
6     Q.  Because one of your job responsibilities is
7  not only -- would not only be through law enforcement
8  at that time, protecting those folks on the base, the
9  other soldiers, but would also be protecting the
10 public of the United States; correct?
11    A.  Yes, sir.
12    Q.  And if the Air Force doesn't properly train
13 you to do that and follow those jobs, then you can --
14 you can create a risk for the public to be harmed;
15 correct?
16         MR. FURMAN:  Objection to the form;
17 speculation.
18         You can answer.
19         THE WITNESS:  Referring to the big Air
20 Force; sir?
21 BY MR. WEBSTER:
22    Q.  Yes, sir.
23    A.  Yes, sir.
24    Q.  And would you agree with me when Air Force
25 agents are not properly trained, that can lead to



```
 1      Q.  There was agents not wearing the proper
 2 attire; correct?
 3      A.  Yes, sir.
 4      Q.  The fingerprint machine did not work;
 5 correct?
 6      A.  Yes.
 7      Q.  Meaning the one that you scanned in that you
 8 can --
 9      A.  Electronic --
10      Q.  Electronic ones?
11      A.  Yes, sir.
12      Q.  So all the fingerprints, at least up to that
13 point as you were aware of until you fixed the
14 machine, were all being hand rolled and done by hard
15 copy; correct?
16      A.  Yes, sir.
17      Q.  When you came on as Detachment 225, did the
18 Air Force provide you any training at that point in
19 time with regards to your job duties?
20      A.  Not specifically, sir.
21      Q.  And during that -- so how did you learn how
22 to start doing criminal investigations there at
23 Detachment 25?
24      A.  Oh, thank you.
25          So in June of 2000 -- or January of 2005, I
```



1  like, on-the-job training or a misinterpretation or
2  an interpretation, rather, of the AFOSI handbook or
3  instruction.
4       Q.   But it's safe to say, as you sit here today,
5  that the United States Air Force when you went to
6  work as a detachment commander in 225 in December
7  of 2011, all the way up until the time you retired
8  in February 2014, you never had any specific training
9  by the United States Air Force as to specifically
10 when you should submit fingerprints on behalf of
11 those convicted of a felony?
12      A.   Not that I recall, sir.
13      Q.   In fact, as you sit here today, it was news
14 to you later on that you're supposed to submit those
15 fingerprints as soon as there is actual -- probable
16 cause is determined; right?
17      A.   Yes, sir.  I learned that from the IG.
18      Q.   And that was during the time that you done
19 those basic interviews that you did here in the
20 investigation of the criminal matter with the arrest
21 of Devin Kelley; correct?
22      A.   Yes, sir.
23      Q.   Now, can you tell me, what did you do to
24 prepare for your deposition today?
25      A.   Yesterday I sat with Austin and Christin,



```
 1  and that's -- that's my preparation.
 2        Q.   And did you review any documents?
 3        A.   There were some documents we reviewed, yes,
 4  sir.
 5        Q.   Can you tell me what you reviewed without
 6  getting into specific conversations with your
 7  lawyers?
 8        A.   I was provided a review of excerpts, you
 9  know, one being the Air Force Office of Special
10  Investigation Handbook, another policy too.  I don't
11  recall.  Another OSI policy, and I believe I was
12  provided an opportunity to see my review notes from
13  the case when I was active duty.
14        Q.   Okay.  How long did you meet with your
15  lawyers?
16        A.   It would have been three, four hours.
17        Q.   And y'all went over -- did you go over the
18  specific policies and procedures as it relates to
19  submitting fingerprints?
20        A.   We did review those.
21        Q.   So is it safe to say, as you sit here today,
22  the meeting with your lawyers yesterday, Mr. Taylor,
23  was more training on what those DOD regulations were
24  than at any other time you got when you were actually
25  in the Air Force?
```



```
 1         MR. FURMAN:  Objection to form.  You can
 2  answer.
 3         THE WITNESS:  I -- I did feel that way, sir.
 4  BY MR. WEBSTER:
 5     Q.  And they kind of enlightened you as to what
 6  process and procedure was supposed to be; correct?
 7         MR. FURMAN:  Same objection.  You can
 8  answer.
 9         THE WITNESS:  Yes, sir.
10  BY MR. WEBSTER:
11     Q.  And that's not your fault, Mr. Taylor.
12  That's the United States Air Force's, isn't it?
13         MR. FURMAN:  Same objection.
14         You can answer.
15         THE WITNESS:  It -- I -- I would agree that
16  it is -- it is the responsibility of the employer.
17  BY MR. WEBSTER:
18     Q.  And would you agree with me too,
19  Mr. Taylor, that had you been trained with those --
20  with what your lawyers went over with you yesterday,
21  those DOD regulations, and you would have known that
22  when you were in command at
23  Detachment 225; that would have been on your
24  priority, and you would have made sure it happened?
25     A.  I agree, sir.
```



```
 1      Q.  And you would have made sure that Devin
 2  Kelley's fingerprints were properly submitted along
 3  with every other felon that was there; correct?
 4      A.  Yes, sir.
 5      Q.  Because you've also stated in your documents
 6  and the rest that at certain times, Mr. Taylor, you
 7  don't even believe that this was being done on a
 8  regular basis; correct?
 9      A.  Yes, sir.
10      Q.  Meaning that those fingerprints were not
11  being submitted on behalf of a lot of different
12  people that would fall under the felon category were
13  not being submitted pursuant to DOD regulations in
14  Detachment 225; correct?
15      A.  Yes, sir.
16          MR. FURMAN:  Objection to form.
17          You can answer.
18          THE WITNESS:  Yes, sir.
19  BY MR. WEBSTER:
20      Q.  Did you do anything outside of -- did you go
21  back and do any of your own investigation?
22      A.  No, sir.
23      Q.  Okay.  You didn't go back and try to find
24  anything or read anything other than the text
25  messages you may have given me?
```



1  of six individuals.  Six, I believe, was what the
2  number was.
3       Q.  And can you explain to the judge what was,
4  kind of, the hierarchy within the Detachment 225?
5       A.  All right.  So the -- I was the special
6  agent in charge, and I had -- reported to me was at
7  the time a noncommissioned officer in charge.  When I
8  first arrived it was James Hoy, later became Lyle
9  Bankhead.  And James Hoy and/or Lyle Bankhead had
10 managed the day-to-day operations of the detachment
11 in terms of criminal investigations and operations.
12      Q.  So would they then -- would this person
13 underneath you -- then they would have five agents
14 underneath them?
15      A.  Yes, sir.
16      Q.  Is that correct?
17      A.  Yes, sir.
18      Q.  All right.  So -- and y'all were the special
19 investigative unit or specialty -- the -- what are
20 they called, SAIC?  S-A-I-C.
21      A.  I was --
22      Q.  Sorry.
23      A.  Yes, sir.  I was the special agent in charge
24 of the west side detachment.
25      Q.  Did you provide any type of training for



```
 1  those individuals when you got there?
 2       A.   We did a lot of training, and most of it, as
 3  I recall, was about case management because that was
 4  a void, appeared to be a fairly significant void
 5  about case management.
 6       Q.   And when you say case management, that did
 7  not entail submitting fingerprints to the FBI;
 8  correct?
 9       A.   No, sir.
10       Q.   That entailed basically trying to make sure
11  that you were complying with the regulations that you
12  work on the file every four days; right?
13       A.   Yes, sir.
14       Q.   Is that a safe way -- is that kind of a
15  civilian way to put it?  You were responsible for
16  making sure there was work done every four days on
17  that investigative file; is that true?
18       A.   That is a true statement, sir.
19       Q.   Okay.  And that is difficult to do, isn't
20  it?
21       A.   Very challenging.
22       Q.   And that's because you have open
23  investigations, you get called out on other
24  investigations, and it's hard to keep up at that
25  point; right?
```



```
 1  BY MR. WEBSTER:
 2      Q.  And if you had been properly trained on the
 3  form DOD regulations on when to submit fingerprints,
 4  at the time you swore out that affidavit, sir, you
 5  would have made sure those fingerprints went to the
 6  FBI, wouldn't you?
 7      A.  Yes, sir.
 8          MR. FURMAN:  Objection.
 9  BY MR. WEBSTER:
10      Q.  Now, if we go back to the text messages, it
11  says, "Believe after the appeal process.  The appeal
12  process expired March 2014.  You were on your way out
13  and I had already departed."
14          Do you see that?
15      A.  Yes, sir.
16      Q.  And it's safe to say that that was your --
17  your assumption based upon your training that you
18  had from the -- what little training you had from the
19  Air Force at that time; correct?
20      A.  That was my belief.
21      Q.  In November of 2017; is that correct?
22      A.  Yes, sir.
23      Q.  All right.  If we go to the next page.  And
24  then Jayson says, "Yeah.  Sucks just thinking about
25  it"; correct?
```



```
 1  Mr. Taylor?
 2       A.  Yes, sir.
 3       Q.  In fact, even the second part where he talks
 4  about "My work is so lucky I do not have a shotgun
 5  because I would go in there and shoot everyone."
 6  That's -- that's a guy threatening a member of the
 7  United States Air Force who is now threatening to
 8  kill everyone on the Air Force base; correct?
 9           MR. FURMAN:  Objection to form; misstates.
10           THE WITNESS:  Shoot everyone in the -- in
11  his shop, yes, sir.
12  BY MR. WEBSTER:
13       Q.  Well, let me ask you this.  Let's -- let's
14  fix the -- let's fix the objection.  What he was
15  saying was he works -- Devin Kelley at this point was
16  still a member of the United States Air Force;
17  correct?
18       A.  Yes, sir.
19       Q.  And his work would have been where he was
20  working there at Holloman Air Force Base; correct?
21       A.  Yes, sir.
22       Q.  And what he's threatening there, at least
23  according to your investigation and your affidavit
24  that you swore out on June 8th, 2012, is that he was
25  threatening to commit a mass shooting with a shotgun;
```



 1  correct?
 2       A.  Yes, sir.
 3       Q.  And that caused -- I would assume -- would
 4  this have been one of those things that would have
 5  triggered you opening the old investigation?
 6       A.  Yes, sir.
 7       Q.  Okay.  And then -- so if you're going to --
 8  as a -- as a good special -- as a good special agent
 9  in charge, you would want to go back and try to get
10  all the charges possible you can and try to put this
11  individual in jail; correct?
12       A.  Yes, sir.
13       Q.  So when you administratively closed it, did
14  that mean the JAG Corps, the people -- the
15  prosecutor, what is the term on Holloman Air Force
16  Base for the person -- the lawyer that's in charge
17  much of prosecuting?
18       A.  Military justice.
19       Q.  Okay.  Did military justice also close the
20  file?
21       A.  I -- under normal circumstances, they would
22  have been closed in -- in -- in agreement with one
23  another.
24       Q.  Okay.  So when you requested -- would this
25  type of report -- would have -- looking back on this,



```
 1  if you go -- one, two, three, four -- four places
 2  down to 12/14 of 2012 -- do you see that?
 3       A.   Yes, sir.
 4       Q.   It asks "Has the Fingerprint Card FD-249
 5  been sent to the FBI?"  Do you see that?
 6       A.   Yes, sir.
 7       Q.   At least according to your testimony and
 8  according to evidence that we've seen and you've
 9  reviewed, that was not -- that was not done; correct?
10       A.   Yes, sir.
11       Q.   Now, if you would have put "no" in that,
12  would the I2MS database allow the case to have been
13  closed?
14       A.   I don't believe so, sir.
15       Q.   Okay.  Meaning, it would still remain open;
16  right?
17       A.   Yes, sir.
18       Q.   Then it says -- if you drop down two more
19  spaces, it says, "12/14 of 2012."  "Has the
20  disposition R-84 been sent to the FBI?"  Do you see
21  that?
22       A.   Yes.
23       Q.   What is the Disposition R-84?
24       A.   I don't recall, sir.
25       Q.   That would have been more documentation that
```



```
 1  would have gone to the NCIC database; correct?
 2       A.  Possibly, sir.  I actually think it was
 3  going to the FBI, yes.
 4       Q.  Is it safe to say that a Disposition R-84
 5  would have been the crimes that he had been convicted
 6  of --
 7           MR. FURMAN:  Objection.
 8  BY MR. WEBSTER:
 9       Q.  -- if you know?
10       A.  It would have had his convictions on it, I
11  believe, sir.
12       Q.  Okay.
13       A.  If I -- if I saw the R-84, I can give a
14  better response, but I don't remember exactly what
15  was on there.
16       Q.  Fair enough.  I don't want to dig it out
17  right now.
18           But it's fair to say that the R-84 was not
19  sent to the FBI; correct?
20       A.  Yes, sir.
21       Q.  All right.  Do you know why -- why,
22  Mr. Taylor, you decided to close that case that day
23  without that information?
24           MR. FURMAN:  Objection.
25           THE WITNESS:  I can't specifically recall
```



1 what took place on that day; right?  But as the
2 standard of process and practice, a case agent would
3 have provided me with a confirmation that these items
4 were done through either a checklist or a verbal
5 confirmation.
6 BY MR. WEBSTER:
7     Q.  Okay.  So let's -- I want to talk about that
8 for a second.
9         Okay.  So paint the picture for us, is what
10 I like to say.  What did your office look like?  How
11 big was it?  Your office at the time on
12 December 12th -- or December 14th, 2012, what did
13 your office look like?
14    A.  It was probably half the size of this room
15 here, my office -- personal office.
16    Q.  Right.
17    A.  Less than half the size of this room.
18    Q.  Okay.  So it's just like a regular size,
19 what we call office; right?
20    A.  Yes, sir.
21    Q.  Did you have two chairs in front of you?
22    A.  Yes, sir.  Couches.
23    Q.  And would there be -- and a couch?
24    A.  Yes, sir.
25    Q.  All right.  What else was in the room?



```
 1  STATE OF CALIFORNIA )
                       ) ss.
 2  COUNTY OF KERN     )

 3

 4         I, Janie E. Wilkins, a Certified Shorthand

 5  Reporter in the State of California, holding Certificate

 6  No. 12497, do hereby certify that RANDALL DEAN TAYLOR,

 7  the witness named in the foregoing deposition, was by me

 8  duly sworn; that said deposition was taken

 9  February 25, 2020, at the time and place set forth on

10  the first page hereof.

11         That upon the taking of the deposition, the

12  words of the witness were written down by me in

13  stenotypy and thereafter transcribed by computer under

14  my supervision; that the foregoing is a true and correct

15  transcript of the testimony given by the witness.

16         Pursuant to Federal Rule 30(e), transcript

17  review was requested.  I further certify that I am

18  neither counsel for nor in any way related to any party

19  to said action, nor in any way interested in the result

20  or outcome thereof.

21         Dated this 6th day of March, 2020, at

22  Bakersfield, California.

23
                            _____
24                          Janie E. Wilkins, CSR No. 12497

25
```

