```
 1        IN THE UNITED STATES DISTRICT FOR
            THE WESTERN DISTRICT OF TEXAS
 2               SAN ANTONIO DIVISION

 3

   JOE HOLCOMBE, et al.,   :
 4                         :
         Plaintiffs,      :
 5                        :
   v.                     :No:
 6                        :5:18-CV-00555-XR
   UNITED STATES OF       :
 7   AMERICA,             :
                          :
 8        Defendant.      :

 9

10

11        VIDEOTAPED DEPOSITION OF
           COLONEL OWEN W. TULLOS
12

13

14        Wednesday, December 4, 2019
                 1:33 p.m.
15

16

17        United States Attorney's Office
        United States Department of Justice
            175 N Street, Northeast
18        Three Constitution Square
             Washington, D.C.
19

20        Noojan Ettehad, Videographer
        Terry L. Bradley, Court Reporter
21

22
```



800.211.DEPO (3376)
EsquireSolutions.com

1        A.    Very little.  I think we looked at a

2   couple of small disciplinary actions that did

3   not rise above a non-judicial punishment, with

4   the exception of one case.

5        Q.    I understand.

6        A.    But that wasn't my primary duty.

7   And just for clarification --

8        Q.    Yes.

9        A.    -- Cyber Command is a Combatant

10  Command.

11       Q.    That was going to be a question I

12  had.  Okay.  That makes sense then.

13            Let's jump, now we're at Holloman

14  Air Force Base.  And I believe this is the

15  relevant time period during part of Devin

16  Kelly's investigation and ultimate prosecution

17  and conviction.  Is that correct?

18       A.    Yes.

19       Q.    All right.  And when you were --

20            You were a Staff Judge Advocate at

21  Holloman Air Force Base?

22       A.    Yes.



COLONEL OWEN W. TULLOS                    December 04, 2019
JOE HOLCOMBE vs UNITED STATES                              72

```
 1   little bit.  Your --

 2            And when I say "your office", I'm

 3   talking about Staff Judge Advocate's office,

 4   which you were the boss of that office.  Fair

 5   to say?

 6       A.    Yes.

 7       Q.    Okay.  So your office Assistant

 8   Judge Advocates or Assistant Staff Judge

 9   Advocates would hold weekly meetings with OSI

10   separately and also 49th Security Forces

11   separately, correct?

12       A.    Yes.  And I don't recall whether it

13   was weekly with Security Forces.  Sometimes

14   they didn't have as many cases.

15       Q.    Okay.  And would those meetings

16   involve in part reviewing active case files

17   that the agents at OSI and Security --

18            -- 49th Security Forces were

19   actively investigating?

20       A.    Yes.

21       Q.    Okay.  And that would include Devin

22   Kelley's case, correct?
```



1        A.    Yes.

2        Q.    Okay.  And I want to talk a little

3    bit about that.

4        A.    Okay.

5        Q.    So first of all, you understand

6    that --

7              And you can look if you want, if you

8    flip to Page 1811 of the instruction, and go to

9    No. 33.  Article 128 - Assault, is one of the

10   listed reportable offences in Enclosure 2 of

11   this mandatory instruction.  Is that right?

12       A.    Yes.

13       Q.    Okay.  And that's the charge that

14   Devin Kelley was charged with and also

15   convicted on, correct?

16       A.    Yes.

17       Q.    Okay.  Now, in Section (d) this

18   mandatory section asks that the law enforcement

19   investigator determines probable cause in

20   consultation with the Staff Judge Advocate.

21             Is that right?

22       A.    Right.



```
 1   BY MR. ALSAFFAR:

 2        Q.    They could have happened, you just

 3   don't recall whether when they reported back to

 4   you, you addressed it.

 5             Let me ask a different question.

 6        A.    Okay.

 7        Q.    As the trainer/supervisor of these

 8   Judge Advocates did you ever specifically

 9   inquire -- and this is for all investigations

10   at Holloman, not just Devin Kelley -- did you

11   ever specifically inquire:  Hey Judge

12   Advocates, are you all making sure that these

13   agents understand the reporting requirements

14   under probable cause and that we're not holding

15   back fingerprints that should be reported to

16   the FBI?

17        A.    I do recall conversations about

18   probable cause.

19        Q.    Okay.

20        A.    I do not recall specifically the

21   application of that probable cause, whether it

22   was with regards to the fingerprints or search
```



1   and seizure issues or other aspects.

2       Q.    Including reporting of those

3   fingerprints?

4       A.    I don't recall.  I remember having

5   probable cause discussion and training, but not

6   specifically with regard to reporting.

7       Q.    And would you include in that when

8   we talk about the agents understanding of

9   collection, storage and reporting of

10   information, that that includes also what's

11   called final disposition reports after a

12   conviction?

13      A.    Right.

14      Q.    Are you familiar with that term,

15   final disposition report?

16      A.    Yes.

17      Q.    Are you familiar with the R-84 and

18   249 reports?

19      A.    Not the forms specifically.  I don't

20   know the numbers.

21      Q.    Okay.  So there is the fingerprint

22   report, card or electronic, that is sent to FBI



```
 1            First of all, that's a mandatory
 2    requirement under this instruction, correct?
 3            (Witness nodded.)
 4            That "shall".
 5       A.   Yes.
 6       Q.   What's your understanding when you
 7    were at Holloman Air Force Base when you were
 8    prosecuting and convicting Devin Kelley, whose
 9    responsibility it was to mail or send the
10    fingerprint card and final disposition report
11    to the FBI?
12       A.   It would either be the Office of
13    Special Investigations or Security Forces.
14       Q.   Okay.  And what did --
15            My understanding, if I'm -- I want
16    to make sure I'm not misstating this -- is that
17    your office after Devin Kelley -- let's talk
18    about Devin Kelley -- after Devin Kelley was
19    convicted in November 2012, you were the SJA,
20    correct?
21       A.   Yes.
22       Q.   After Devin Kelley was convicted you
```



COLONEL OWEN W. TULLOS                          December 04, 2019
JOE HOLCOMBE vs UNITED STATES                                 112

```
 1   qualifying offences to get guns, is one of the

 2   reasons they've demonstrated their willingness

 3   to break the law first, correct?  Is that fair?

 4        A.    As a society, yes, that's fair.

 5        Q.    Okay.  And as a society, as the

 6   general public -- we're talking about

 7   protecting the public -- do we want criminals

 8   who have been convicted of qualifying offences

 9   under this DODI instruction to not have access

10   to guns because we want to protect the public

11   from those people?  Is that fair?

12        A.    That's fair.  That's one of the

13   reasons --

14        Q.    Okay.

15        A.    -- to the extent that this stops it.

16        Q.    Okay.  Right.  It's one of the

17   things we can do to prevent dangerous people

18   from having guns that could increase the risk

19   of harm to the public generally, fair?

20        A.    That's a fair society interest, and

21   we're interested in that as well.

22        Q.    I'm sorry?
```



1              Would you agree that when these

2    dangerous criminals are convicted and reported

3    and denied access to firearms, that we are

4    increasing the safety to the general public?

5              MR. FURMAN:  Objection to form.

6              THE WITNESS:  Yes.

7    BY MR. ALSAFFAR:

8        Q.    Would you also agree that if a

9    dangerous criminal like Devin Kelley, who's

10   been convicted of a qualifying offence that

11   would deny him access to firearms, that if that

12   is not reported, those convictions are not

13   reported, and people like Devin Kelley do get

14   access to firearms, that increases the risk of

15   harm to the general public?

16             MR. FURMAN:  Objection to form.

17   BY MR. ALSAFFAR:

18       Q.    Do you agree with that?

19       A.    Yes, it could.  And I --

20             It could, yes.

21       Q.    Okay.

22       A.    And when you said "dangerous", the



1  your office at Holloman Air Force Base, the SJA

2  Office, while you were investigating Devin

3  Kelley and ultimately convicting him, did you

4  have an applicable checklist that ensured that

5  coordination with the OSI and 49th was

6  documenting in the investigative file?

7      A.    I'm pretty sure it was not in the

8  court martial checklist.  I don't know whether

9  there was a different one.  I will mention that

10  when they say they shall submit the form, the

11  consultation with the SJA was only as

12  necessary.

13      Q.    Right.  And that's going back to

14  what you said earlier that it was fine, it's

15  okay and for the individual agents and Security

16  Forces personnel at 49th to --

17          -- if they made a probable cause

18  determination, if they made it in their own

19  minds, at that point it's mandatory for them to

20  report, and they don't need to consult with

21  your office, correct?

22      A.    Correct.



COLONEL OWEN W. TULLOS                    December 04, 2019
JOE HOLCOMBE vs UNITED STATES                          121

1        Q.    Okay.

2        A.    And anything post conviction would

3   be the same thing.  That decision is pretty

4   much apparent --

5        Q.    Yeah.

6        A.    -- and so they wouldn't have to

7   consult with us.

8        Q.    Okay.  But they have no discretion

9   when they receive a report of conviction to not

10  send that to the FBI, correct?  If it's a

11  qualifying offence like Devin Kelley's.

12       A.    Qualifying offence.

13       Q.    Correct.  And Devin Kelley's was,

14  right?  Yeah?

15       A.    That's the way I would read that.

16  Yes.

17       Q.    No. 3 says, under (b) says:  Within

18  15 calendar days after final disposition of

19  military judicial or nonjudicial proceedings,

20  or the approval of a request for discharge,

21  retirement, or resignation in lieu of court

22  martial, disposition information shall be



1   argument that could be made for that.  Again, I

2   would be dependent on other mechanisms because

3   in that timeframe of those reviews I don't know

4   what the best way to run that meeting would

5   have been.  It's conceivable that would have

6   been part of it.  Yeah.

7   BY MR. ALSAFFAR:

8       Q.    Okay.  Would you have considered

9   Devin Kelley's investigation a significant

10  investigation?

11          MR. FURMAN:  Objection to form.

12          THE WITNESS:  Yes.

13  BY MR. ALSAFFAR:

14      Q.    If an investigation is poorly

15  conducted by the Air Force, would that affect

16  the Air Force's ability to preserve good order

17  and discipline within the Air Force itself?

18          MR. FURMAN:  Objection to form.

19          THE WITNESS:  Possible.  Depends.

20  Again, a number of factors could go into that.

21  BY MR. ALSAFFAR:

22      Q.    It could not affect it, but if a --



 1   BY MR. ALSAFFAR:

 2       Q.    Okay.  So you agree that if the Air

 3   Force or DOD issues policies like we've talked

 4   about, mandatory policies concerning criminal

 5   investigations, that they --  they, the Air

 6   Force or DOD -- does have an obligation to

 7   train Investigators and Special Agents on those

 8   mandatory regulations?

 9           MR. FURMAN:  Objection to form.

10           MR. ALSAFFAR:  Correct?

11           THE WITNESS:  Yes.

12   BY MR. ALSAFFAR:

13       Q.    Okay.  And let's look at --

14           Do you have exhibit, the 71-121 in

15   front of you?

16       A.    Yes.

17       Q.    Look at Section 1.8 under Lessons

18   Learned.

19       A.    Yes.

20       Q.    It states:  Within 30 days of the

21   conclusion of the trial, the local SJA and

22   available members of the trial team will



1        A.    It was confinement for 12 months, a

2    bad conduct discharge, and reduction to the

3    grade of E-1.

4        Q.    Okay.  What else?  Can you read

5    more?  What else is in the --

6        A.    The approved sentence to confinement

7    as a pretrial agreement would not --

8             The approved sentence of this

9    confinement would not exceed 3 years.

10       Q.    Okay.  And that means that this was

11   an offence that he was convicted of, Devin

12   Kelley was convicted of, that had a sentence

13   that could have been up to 3 years.

14       A.    I believe it could have been up to 5

15   years.

16       Q.    Okay.

17       A.    But the pretrial agreement lists --

18       Q.    Yeah.

19       A.    -- maximum punishment would have

20   been 3 years, depending on what the jury

21   returned.

22       Q.    Okay.  So the actual sentence that



1   many of them regarding the conviction.

2        Q.     What do you mean you consulted with

3   many of them regarding the conviction?

4        A.     12th Air Force JAA is my higher

5   Headquarters, and we worked with them

6   throughout this process.

7        Q.     Uh-huh.

8        A.     The defense counsel, we coordinated

9   with them on the clemency aspect of the

10  process.  Similarly, we reported later actions

11  to various agencies on here.

12       Q.     Okay.  When you met with those

13  agencies you just identified after Devin

14  Kelley's conviction, did you confirm whether or

15  not they reported the conviction to the FBI?

16       A.     No, not that I know of.  Somebody

17  else may have.

18       Q.     By the way, is Specification 1 a

19  crime of domestic violence?

20       A.     Yes.

21       Q.     And under the Lautenberg Gun Control

22  Act Amendment, that's in and of itself required



1    to be reported to the FBI, correct?

2         A.    That's correct.

3         Q.    Okay.  You can put that aside for

4    now.  I think forever, but I'm not going --

5              I just think --

6              Okay.  Let's see here.  I want to go

7    back to Exhibit 5.

8              Show you Exhibit 5.

9              And I think I owe you a copy.  Here

10   you go.

11             (Exhibit 5 presented for

12   identification.)

13             Exhibit 5 is Department of Defense

14   Manual 7730.47-M, Volume 1, dated December 7,

15   2010.  You see under Paragraph 1(b):  This

16   Volume:  Prescribes the reporting data elements

17   needed to comply with Federal criminal incident

18   reporting pursuant to the note to section 534

19   of Title 28, USC (also known and hereafter

20   referred to as The Uniform Federal Crime

21   Reporting Act of 1998 --

22             -- 1988 -- sorry -- as amended



1   (Reference (d)) and the note to section 922 of

2   Title 18 USC (also known and hereafter referred

3   to as The Brady Handgun Violence Protection Act

4   of 1993, as amended, Reference (e)).

5            Did I read that correctly?

6       A.    You did with one exception.  It

7   would be Violence Prevention Act.

8       Q.    Oh.  Thank you for correcting that.

9       A.    Sure.

10      Q.    Thank you.

11           Boy.  Whoever wrote this needs to go

12  back to legal writing school, right?  All of

13  these.

14           Okay.  I want you to go to Section 4

15  on the second page, which is 4945 under

16  Judicial Functions.  And it reads:  The two

17  areas involved in the DIBRS that fall in the

18  Judge Advocate area of responsibility are the

19  reporting requirements of Reference (m) and the

20  results of the trial reporting required by

21  Manual of Courts Martial (Reference (r)) Rule

22  of Court Martial 1101.  Judicial function



 1  officials shall report the results of the trial

 2  and the identifying information for offenders

 3  qualifying pursuant to The Brady Handgun

 4  Violence Prevention Act of 1993, as amended.

 5  Legal organizations with DIBRS reporting

 6  responsibilities shall forward data to the

 7  functional consolidating activity on a monthly

 8  basis.  The functional consolidating activity

 9  shall forward data to DMDC on a monthly basis.

10          Did I read that correctly?

11      A.   Yes.

12      Q.   What is your understanding of this

13  Rule No. 4?

14      A.   That we have an obligation to report

15  the results of trial and then the subsequent

16  actions that we have when the convening

17  authority takes final action, to the agencies

18  responsible for entering that in the database.

19      Q.   To entering that into what?

20      A.   The database.

21      Q.   I'm sorry.  Who's responsibi --

22          Who's responsibility is it to enter



1   it into the database according to this?

2        A.    Either Security Forces or Office of

3   Special Investigations.

4        Q.    Okay.

5        A.    We did not have access to DIBRS.

6        Q.    So the Staff Judge Advocate Office,

7   it doesn't have access to DIBRS, correct?

8        A.    That's correct.

9        Q.    Okay.   So what's your understanding

10  here of the two areas involved in the DIBRS

11  that fall in the Judge Advocate area of

12  responsibility?   Is it just reporting the

13  results of trial, as it relates to Devin

14  Kelley's case, to the AFOSI and Security

15  Forces?

16       A.    That's correct.

17       Q.    Okay.   Um, okay.   That's all I have

18  on that one.

19            I'll hand you Exhibit No. 4, and

20  then we'll be caught up on my reverse counting.

21  And let me give this to your attorneys.

22            Here you go.



COLONEL OWEN W. TULLOS                         December 04, 2019
JOE HOLCOMBE vs UNITED STATES                                  223

1  -- even it's numbering is interesting -- Page 2

2  of this document.

3            MR. FURMAN:  Jamal, is there a Bates

4  stamp?

5            MR. ALSAFFAR:  Yeah.  I don't see a

6  Bates stamp on this, but I know this is --

7            This was produced, but --

8            MR. STERN:  This is our production,

9  right?

10            MR. ALSAFFAR:  It should be, yeah.

11  It should be.  I don't know why there's not a

12  Bates stamp number on it, but we can certainly

13  go back and look over it.  Yeah.  Yeah.  But

14  there is not.  There is not.  I don't --

15            I don't necessarily know why

16  actually.  It's strange.

17  BY MR. ALSAFFAR:

18     Q.    Okay.  On the bottom of Page 2,

19  you --

20            Do you know what the Holloman Air

21  Force Base High Risk For Violence Response Team

22  is?



1        A.    Yes.

2        Q.    And it's HRVRT is the acronym,

3   correct?

4        A.    Yes.

5        Q.    Can you tell me what the Holloman

6   Air Force Base High Risk For Violence Response

7   Team is as it existed at the time of Devin

8   Kelley's investigation and conviction?

9        A.    It's a team that would be convened

10  when deemed appropriate based on a certain fact

11  and circumstances.  It would be composed of

12  investigators, Security Forces and/or Office of

13  Special Investigations, medical personnel,

14  usually mental health, possibly family advocacy

15  legal, so interdisciplinary team that would try

16  to assess when a situation would be a potential

17  for violence to occur.

18       Q.    Okay.  Um, and in this letter the

19  ATF counsel states that in May 14th-15th,

20  2012 -- so this is the same Page 2 I was

21  referring to you to -- said that:  An HRVRT was

22  convened to discuss Kelley's mental health



1   first -- I have two areas to ask you about --

2   first, do you remember this Holloman Air Force

3   Base High Risk For Violence Response Team that

4   was put together to discuss Devin Kelley

5   specifically?

6       A.    It occurred before I arrived.

7       Q.    Okay.  So this was 2 months --

8             --  2 months before you arrived?

9       A.    Right.  I was aware of it after the

10  fact.

11      Q.    Okay.  And how did you become aware

12  of this High Risk For Violence Response Team

13  that was put together at Holloman Air Force

14  Base for Devin Kelley?

15      A.    As part of my review and discussion

16  of the case I became aware of it.

17      Q.    Okay.  So as part of your duties as

18  an SJA at Holloman Air Force Base and a

19  supervisor of Judge Advocates at the base, you

20  were aware that a High Risk For Violence

21  Response Team was put together to specifically

22  assess Devin Kelley's risk factors, correct?



1       A.    Yes.

2       Q.    And specifically, the High Risk For

3  Violence Response Team was put together for

4  Devin Kelley in May 2012 by the Air Force,

5  correct?

6       A.    Yes.

7       Q.    And the reason why that the High

8  Risk For Violence Response Team was put

9  together by the Air Force in May 2012 was

10  because Devin Kelley was a major threat to

11  commit an act of violence.

12            MR. FURMAN:  Objection to form.

13            MR. ALSAFFAR:  Correct?

14            THE WITNESS:  Yes.

15  BY MR. ALSAFFAR:

16       Q.    And you agreed with that?

17       A.    It was a potential.  They were

18  assessing that.  And I think that's what their

19  conclusion was.  Yes.

20       Q.    Actually they said he is a major

21  threat to commit an act of violence, correct.

22       A.    It was convened to determine that,



1  and that was their determination.

2      Q.    Fair.  Fair.  So the High Risk

3  Violence Response Team at Holloman Air Force

4  Base in May 2012 was convened to decide whether

5  Devin Kelley was a major threat for violence,

6  correct?

7      A.    That's correct.

8      Q.    And they ended up determining that

9  in fact Devin Kelley was a high risk major

10  threat to commit an act of violence, correct?

11      A.    Yes.

12      Q.    And you didn't disagree with that

13  when you were part of the review of that

14  decision, were you?

15      A.    No, I don't disagree with it.

16      Q.    Okay.  And on Page No. 3, the

17  paragraph titled June 8th, 2012, this document

18  states:  Kelley's Commander orders him into

19  pre-trial confinement at 49 SFS Building, 35.

20  Confinement was deemed necessary because it was

21  foreseeable he would flee again and engage in

22  serious criminal misconduct.



1                   CERTIFICATE OF NOTARY PUBLIC

2              I, Terry L. Bradley, the officer before

3     whom the foregoing deposition was taken, do

4     hereby certify that the witness whose testimony

5     appears in the foregoing deposition was duly

6     sworn by me; that the testimony of said witness

7     was taken by me in shorthand and thereafter

8     reduced to computerized transcription under my

9     direction; that said deposition is a true

10    record of the testimony given by said witness;

11    that I am neither counsel for, related to, nor

12    employed by any of the parties to the action in

13    which this deposition was taken; and further,

14    that I am not a relative or employee of any

15    attorney or counsel employed by the parties

16    hereto, nor financially or otherwise interested

17    in the outcome of the action.

18                                _____

19                                Notary Public in and for
                                  the District of Columbia
20
      My Commission expires:  April 30, 2022
21

22

