```
 1           IN THE UNITED STATES DISTRICT COURT

 2          FOR THE WESTERN DISTRICT OF TEXAS

 3               SAN ANTONIO DIVISION

 4

 5

 6   JOE HOLCOMBE, et al.     )   NO. 5:18-CV-00555-XR

 7   Plaintiffs              )     (Consolidated cases)

 8   -vs-                    )

 9   UNITED STATES OF        )

10   AMERICA                 )

11   Defendant               )

12

13

14       Videotaped Deposition of Shelley Ann Verdego

15                  Arlington, VA

16           Tuesday, December 17, 2019

17                  10:00 a.m.

18

19   Job No: J4766138

20   Pages:  1-195

21   Reported by:  Kenneth Norris

22
```



1          Would you take a look at the second page of

2    Exhibit 2, please?

3          A.   Yes, sir.

4          Q.   Do you see on the second page of Exhibit 2

5    Paragraph 13?  Would you read that into the record

6    please, out loud?

7          A.   Paragraph 13?

8          Q.   Yes, please.

9          A.   "Shelley Verdego, chief law enforcement

10   United States Air Force information pertaining to the

11   Department of Defense reporting information into NICS

12   through the DIBRS database."

13         Q.   Okay.  And I'll represent to you that this

14   is a document, Exhibit 2 is a document that the United

15   States served on us that describes the subject areas

16   of knowledge that you as a witness may have in this

17   litigation.

18              Is Paragraph 13 of Exhibit 2 an accurate

19   statement of the areas of knowledge that you as a

20   witness have concerning this litigation?

21         A.   It is.  However, I have no experience with

22   the United States Air Force.



1        Q.   Okay.

2             Who is your immediate employer?

3        A.   The Defense Human Resource Activity, DHRA.

4        Q.   And is that a component of the Department of

5   Defense?

6        A.   It is.  Yes, sir.

7        Q.   So other than the fact that you are not an

8   employee of the United States Air Force, is it fair to

9   say that you have information pertaining to the

10  Department of Defense reporting information into NICS

11  through the DIBRS database?

12       A.   That's correct.  Yes, sir.

13       Q.   Okay.  And a couple more sort of

14  housekeeping things.

15             Is it fair to say that the United States has

16  designated you to testify on its behalf today?

17       A.   It is.

18       Q.   Do you have the full authority to speak on

19  behalf of the government concerning the information

20  pertaining to the Department of Defense reporting

21  information into NICS through the DIBRS database?

22       A.   I do.



SHELLEY ANN VERDEGO                                December 17, 2019
JOE HOLCOMBE vs UNITED STATES                                    18

1      Q.   Do you understand that you have -- you are

2  obligated to testify about all information that is

3  known or reasonably available to the Department of

4  Defense concerning the topics that you've been

5  designated for?

6           MR. STERN:  Objection.

7           THE WITNESS:  I do understand.

8  BY MR. JACOB:

9      Q.   Okay.  Can you briefly describe to me how

10 the United States of America prepared you for this

11 deposition?

12     A.   Sure.  I met with the attorneys from the

13 Department of Justice, the Department of Defense, as

14 well as the United States Air Force.  We went over

15 documents and discussed how the testimony would go.

16     Q.   Okay.

17          And when you say you met with attorneys for

18 the various agencies of the United States, are those

19 attorneys here in the room today?

20     A.   They are.

21     Q.   Okay.  And other than the attorneys in this

22 room today, have you met with any other attorneys



SHELLEY ANN VERDEGO                        December 17, 2019
JOE HOLCOMBE vs UNITED STATES                              51

1   for me.

2        A.   Yes, sir.

3        Q.   And if you wouldn't mind reading the

4   paragraph on USA 17745 to yourself for a second?

5        A.   Yes, sir.

6        Q.   Okay.  Let me ask you some questions about

7   this paragraph and DOD generally.

8             Under DOD manual 7730.47 Volume 1, is it

9   fair to say Agency should provide criminal incident

10  data within 15 days of the end of the month?

11       A.   Per the manual, it is 15 work days after the

12  end of each month.

13       Q.   Okay.  Is it fair to say Agencies have an

14  obligation under federal regulations to timely collect

15  and submit criminal history data including those of

16  violent felons?

17       A.   That's correct.

18       Q.   Once the Agency submits the data to DMDC --

19  the criminal history data to DMDC, is it true that

20  DMDC should return criminal history data containing

21  errors?

22       A.   That's correct.



SHELLEY ANN VERDEGO                          December 17, 2019
JOE HOLCOMBE vs UNITED STATES                              65

1       Q.   It's a true statement that the ability of

2   NICS to determine quickly and effectively whether an

3   individual is prohibited from possessing or receiving

4   a firearm depends on the completeness of the

5   information provided by Federal Agencies to NICS,

6   right?

7               MR. STERN:  Objection, it's beyond the

8   scope.

9               THE WITNESS:  Yes.

10  BY MR. JACOB:

11      Q.   It depends upon the accuracy of the

12  information provided by Agencies to the NICS?

13              MR. STERN:  Objection.

14              THE WITNESS:  Yes.

15  BY MR. JACOB:

16      Q.   Flip to the next page, Page 16666.  Do you

17  see that?

18      A.   Yes, sir.

19      Q.   I'm looking at the first full paragraph

20  starting with, as provided in the presidential

21  memorandum.

22      A.   Yes, sir.



1    BY MR. JACOB:

2        Q.   Do you agree with the document?

3             MR. STERN:  Objection, beyond the scope.

4             THE WITNESS:  I do if every other factor in

5    place works out.

6    BY MR. JACOB:

7        Q.   Well, I'm asking you whether you agree with

8    the statement:  The submission of records by Agencies

9    to NICS are critical in preventing gun violence?

10            MR. STERN:  Objection, beyond the scope.

11            THE WITNESS:  Yes.

12   BY MR. JACOB:

13       Q.   And then the next part of that page goes on

14   to identification of relevant records, right?

15       A.   Yes, sir.

16       Q.   And it lists 10 categories of relevant

17   records that might be submitted to NICS?

18       A.   Yes.

19       Q.   And this is what you were talking about as

20   well with regard to -- you're looking at this document

21   to determine whether a record might be relevant,

22   right?



1        A.   So DIBRS doesn't have any connection to this

2    system at all.

3        Q.   Okay.  And is that by design?

4        A.   I believe so.

5             (Verdego Exhibit No. 7 was marked for

6    identification.)

7    BY MR. JACOB:

8        Q.   I'm going to hand you a document that's been

9    marked Exhibit 7.  And tell me when you have Exhibit 7

10   in front of you and you've had an opportunity to

11   review it.

12       A.   I have it in front of me and I have reviewed

13   it.

14       Q.   What is Exhibit 7?

15       A.   It is the memorandum of understanding

16   between the Department of Defense and the Federal

17   Bureau of Investigation regarding the provision and

18   use of prohibited persons data.

19       Q.   Is Exhibit 7 a true and correct copy of that

20   memorandum of understanding?

21       A.   It is.

22       Q.   And when was Exhibit 7 effective?



```
 1        A.    2007.

 2        Q.    Was this memorandum of understanding ever

 3   revoked by either the Department of Defense or the

 4   FBI?

 5        A.    No.

 6        Q.    So is Exhibit 7, the memorandum of

 7   understanding, still effective as we sit here today?

 8        A.    Yes.

 9        Q.    And it's been effective ever since 2007?

10        A.    Yes.

11        Q.    What is the purpose of the memorandum of

12   understanding in Exhibit 7?

13        A.    It constitutes an agreement between the

14   Department of Defense and the FBI where the Department

15   will provide data to the FBI for inclusion into the

16   Department of Justice's or the FBI's National Incident

17   Criminal Background Check System.

18        Q.    And used for when making determinations

19   under the Brady Act?

20        A.    Yes.

21            MR. STERN:  Objection, form.

22   BY MR. JACOB:
```



SHELLEY ANN VERDEGO                              December 17, 2019
JOE HOLCOMBE vs UNITED STATES                                  79

1       Q.   Is this agreement binding on the Department

2  of Defense?

3       A.   It is.

4       Q.   Let me go through some of this.  Before we

5  do, let me ask you:  When was the first time you saw

6  Exhibit 7?

7       A.   December of 2017.

8       Q.   And is that a part of your review to get up

9  to speed with your current role?

10      A.   Yes, sir.

11      Q.   And when was the last time you reviewed

12  Exhibit 7?

13      A.   Last Monday.

14      Q.   Is -- was that part of your preparation for

15  this deposition?

16      A.   Yes, sir.

17      Q.   Do you review Exhibit 7 as a normal course

18  of your -- in the normal course of your business?

19      A.   Do I refer to it?  No. Have I looked at it?

20  Yes.

21           Just because the attachment, attachment one

22  again, covers all the 10 prohibitors and then kind of



 1   System?

 2          MR. STERN:  Objection, form.

 3          THE WITNESS:  Okay.  So if -- just so I

 4   understand your question, it's actually, I think you

 5   said search, but it's really National Instant Criminal

 6   Background Check System.

 7   BY MR. JACOB:

 8      Q.   Can we call it NICS for short?

 9      A.   We can.

10          You are correct.

11      Q.   Okay.  I guess, let me make sure I

12   understand what I'm correct about.  Was DOD providing

13   DIBRS data to NICS directly?

14      A.   I'm sorry.  Repeat that question.

15      Q.   Was DOD, between 2011 and 2017, providing

16   DIBRS data to FBI's NICS system?

17      A.   No.

18      Q.   And why not?

19      A.   Because DIBRS was set up just for

20   statistical data.

21      Q.   Any other reason why FBI was -- scratch

22   that.



1          Q.    Uh-huh.

2          A.    That's what that is.  So it doesn't identify

3   an individual --

4          Q.    Sure.

5          A.    -- in regards -- in a group.

6          Q.    But I'm talking about for individual records

7   that was submitted in DIBRS, does it identify the

8   Agency that --

9          A.    Yes, it does.

10         Q.    For individuals that are submitted into

11  DIBRS, does it identify the category of prohibited

12  person?

13         A.    It does not.

14         Q.    Okay.  Would you agree that under this

15  memorandum of agreement, the FBI is requesting from

16  DOD and the DOD is agreeing to provide this

17  information, the category of prohibited or restricted

18  person?

19         A.    Yes.

20         Q.    And I guess what I don't understand is why

21  was DOD -- and let me step back.

22              You said that DOD was providing it to Triple



1   I and the National Crime Information Center, right?

2       A.   That's right.

3       Q.   Was DOD providing DIBRS data concerning

4   individuals who are restricted from selling firearms

5   under the Brady Bill to Triple I?

6            MR. STERN:   Objection, form.

7            THE WITNESS:   No.   Because Triple I is only

8   biometric, so it's only fingerprints, retina, things

9   of that nature.   It's not --

10  BY MR. JACOB:

11      Q.   Okay.   So, DOD was not providing DIBRS data

12  concerning individuals who were prohibited from

13  selling a firearm under the Brady Bill to Triple I?

14      A.   That's correct, because it was not -- there

15  was no way to do it.

16      Q.   Okay.   So let's talk about the National

17  Crime Information Center.

18           Was DOD providing DIBRS data to the FBI

19  National Crime Information Center on individuals who

20  were prohibited from purchasing firearms under the

21  Brady Bill?

22      A.   No.



1  Exhibit 8?

2      A.   So it's to re-issue the DOD directive to a

3  DOD instruction to establish policy and assign

4  responsibility for criminal incident reporting,

5  implement reporting requirements of section 534 of

6  Title 28 United States Code otherwise known as the

7  Uniform Federal Crime Reporting Act of 1988.

8          Also reporting requirements for the victim

9  and witness assistant notification otherwise known as

10  the Victims Rights and Restitution Act of 1990.

11          And then section 922 Title 18 otherwise

12  known as the Brady Handgun Violence Prevention Act and

13  the Weinberg Amendment to the Gun Control Act.  And

14  then sections 16901 through 16928 of Title 42,

15  otherwise known as the Jacob Wetterline and the Megan

16  Nicole Canta and the Pam Winter Sex Offender

17  Registration and Notification Program, and finally for

18  reporting requirements for public law 107-188.

19      Q.   Would it be fair to say that 7730.47 is sort

20  of be a go-to instruction concerning DIBRS?

21      A.   Yes.

22      Q.   So under the purpose, one of the purposes of



1   Exhibit 8, this instruction, was to implement the

2   reporting requirements of section 922 of Title 18

3   known as the Brady Bill, right?

4        A.   Yes.

5        Q.   Can you tell me how either Directive 7730.47

6   before this or the Instruction 7730.47 and the

7   associated manuals implement the reporting

8   requirements of the Brady Bill?

9        A.   So this document basically covers -- this

10  document being the instruction -- talks to kind of

11  what the DOD policy is and then also what the --

12  there's a responsibility section that kind covers who

13  does what within the Department in regard to DIBRS.

14       Q.   Okay.  And my question's a little bit more

15  specific.  How do the set of instructions, the

16  directives and their associated manuals, how do they

17  implement the reporting requirements of the Brady

18  Bill?

19       A.   They don't.

20       Q.   Okay.  Would it be fair to say that the

21  Department of Defense issued these instructions and

22  manuals that don't meet the stated purpose of their --



```
 1   the instructions and manuals?

 2               MR. STERN:  Objection.

 3               THE WITNESS:  Can you re-ask that?

 4   BY MR. JACOB:

 5       Q.   Sure.  Fair to say one of the stated

 6   purposes of 7730.47 is to implement the reporting

 7   requirements of the Brady Bill, right?

 8       A.   Yes.

 9       Q.   And also fair to say that they're not; these

10   manuals and instruction are not implementing the

11   reporting requirements of the Brady Bill?

12               MR. STERN:  Objection.

13               THE WITNESS:  That's correct.

14   BY MR. JACOB:

15       Q.   So would it be fair to say that instructions

16   and manuals, 7730.47 are not meeting their stated

17   purpose?

18               MR. STERN:  Objection.

19               THE WITNESS:  Yes.

20   BY MR. JACOB:

21       Q.   Okay.  Let me flip and ask you some more

22   specific questions.
```



1          A.    Okay.  I've reviewed it.

2          Q.    So Exhibit 9 -- tell me what Exhibit 9 is

3     first.

4          A.    It is the Department of Defense Directive

5     Number 7730.47, the Defense Incident-Based Reporting

6     System.

7          Q.    Okay.  So this was the policy that was

8     re-issued by Exhibit 8 as an instruction, right?

9          A.    This directive was re-issued as an

10    instruction, yes.

11         Q.    And that instruction is Exhibit 8?

12         A.    Yes.

13         Q.    And Exhibit 9, directive 7730.47 is the

14    mandatory policy that's applicable to all of DOD

15    between 1996 and 2014.  Is that fair?

16         A.    It's correct, yes.

17         Q.    Okay.  And 2014 was when Exhibit 8 was

18    re-issued?

19         A.    Yes.

20         Q.    Let me ask you some questions about

21    Exhibit 8.  And from your understanding, were there

22    substantive changes between Exhibit 9 and Exhibit 8?



1  | and Air Force to follow the responsibilities and the

2  | procedures set out in the two manuals; Volumes 1 and

3  | two.  Is that fair?

4  |      A.   The directive, Exhibit 8, authorizes the

5  | publication of the manuals.

6  |      Q.   Exhibit 9 you mean?

7  |      A.   I'm sorry.  Nine, yes.

8  |      Q.   Okay.  So what Exhibit 9 is doing is

9  | establishing broad level DIBRS policy, right?

10 |      A.   Yes.

11 |      Q.   And saying, okay, we're going to publish

12 | these two manuals that DOD and the Agencies have to

13 | follow?

14 |      A.   Right.  Manuals within the Department of

15 | Defense are typically technical.  So it's conversion

16 | of codes, things of that nature.

17 |      Q.   Right.  But the manuals are still required

18 | policy for the DOD and Agency to follow per the

19 | directives?

20 |      A.   That's correct.

21 |      Q.   Okay.  Then let me ask you a couple more

22 | questions about this directive, Exhibit 9.

1          A.    Okay.  I'm there.

2          Q.    So 4085, Paragraph 5.2 imposes certain

3    obligations on the secretaries of the Military

4    Department and the heads of other DOD components?

5          A.    Yes, sir.

6          Q.    And one of those obligations that the

7    secretaries of the Military Department and heads of

8    other DOD components should do is, "Ensure compliance

9    with this directive and establish policies and

10   procedures to implement DIBRS within their

11   components."  Do you see that?

12         A.    I do.  Yes, sir.

13         Q.    So would it be fair to say what this policy,

14   this directive in Exhibit 9 is telling the secretaries

15   of the Military Departments and heads of the

16   components to do is make sure the employees within

17   your control are complying with this directive and

18   establish procedures to implement that compliance for

19   DIBRS reporting?

20         A.    Yes.

21              MR. STERN:  Objection, form.

22   BY MR. JACOB:



1  be able to report to DIBRS.

2  BY MR. JACOB:

3      Q.   Sure.  And, also, would it be fair to say

4  that this directive is instructing the secretaries of

5  the Military Departments, heads of DOD components to

6  train their personnel to comply with the associated

7  manuals, the two manuals?

8      A.   I mean, in this case, no.  Because they

9  weren't -- they hadn't been published.

10     Q.   Sure.

11          When they're published, of course.  The

12  directive expects the secretaries of the Military

13  Departments and heads of DOD components to train their

14  personnel to comply with those manuals?

15          MR. STERN:  Objection.

16          THE WITNESS:  Yes.

17  BY MR. JACOB:

18     Q.   Would it be fair to say that when the

19  government issues mandatory policies it should train

20  its employees to follow those policies?

21          MR. STERN:  Objection to form.

22          THE WITNESS:  Yes.



1    document.

2            THE WITNESS:  So, DIBRS was used as a data

3    repository for all law enforcement activities.

4    BY MR. JACOB:

5        Q.   Uh-huh.  So would it be fair to say DIBRS

6    was used to centralize the collection of information

7    reportable by DOD components pursuant to the Brady

8    Bill?

9            MR. STERN:  Objection.

10           THE WITNESS:  That's what it says.

11   BY MR. JACOB:

12       Q.   And is it true that between December 7th,

13   2010 and 2018 -- July of 2018, the DOD was using DIBRS

14   to centralize the collection of information that is

15   reportable by DOD components pursuant to the Brady

16   Handgun Violence Prevention Act?

17       A.   DOD was using DIBRS to report NIBRS

18   information for the Uniform crime report.

19       Q.   Sure.  But my question's a little different.

20           My question was whether between 2010 and

21   2018, DOD was using DIBRS to centralize the collection

22   of information reportable by the DOD components



1   pursuant to the Brady Bill?

2        A.   Yes.

3        Q.   Okay.  So between 2010 and 2018, DIBRS

4   contained a repository of information that is

5   reportable by DOD components pursuant to the Brady

6   Bill?

7             MR. STERN:  Objection.

8             THE WITNESS:  It was, with the exception of

9   the category.

10  BY MR. JACOB:

11       Q.   Okay.  Well, let's take this step by step.

12            I'm going to Page 4937.  Do you see that?

13       A.   Yes, sir.

14       Q.   Do you see the Paragraph C4 on 4937?

15       A.   Yes, sir.

16       Q.   This paragraph is requiring the USDPNR, and

17  I'm forgetting -- I'm blanking on that acronym.

18       A.   Undersecretary of defense for personnel and

19  readiness.

20       Q.   Okay.  I appreciate that.  So this paragraph

21  on Page 48937 is requiring the undersecretary of

22  defense for personnel and readiness to maintain the



1              THE WITNESS:  I would agree with that.

2    BY MR. JACOB:

3       Q.   Would you agree that the more information

4    the FBI has on dangerous felons the better decisions

5    they can make in preventing individuals who shouldn't

6    have guns from getting them?

7              MR. STERN:  Objection.

8              THE WITNESS:  I agree.

9    BY MR. JACOB:

10      Q.   Would you agree that when government

11   Agencies fail to share data on dangerous felons and

12   child abusers they unnecessarily expose the public to

13   a risk of gun violence?

14             MR. STERN:  Objection, form.

15             THE WITNESS:  I would agree.

16   BY MR. JACOB:

17      Q.   Okay.  Let's talk, then, about this next

18   page, the database on domestic violence.  Are you at

19   Page 4941?

20      A.   Yes, sir.

21      Q.   Do you see the paragraph Database on

22   Domestic Violence?



1       A.   I do.

2       Q.   Is this referring to the DOD Central Repos

3  --  Registry Database?

4       A.   I'm not sure of your question.

5       Q.   Sure.  I guess maybe a better question would

6  be, what is the database on domestic violence on Page

7  4941 of Exhibit 10 referring to?

8       A.   It's referring to central database of

9  information on incidents regarding domestic violence

10  involving members of the military.

11       Q.   Okay.  And who owns that database?

12       A.   The database does not exist.

13       Q.   Okay.  Why does the database not exist?

14       A.   Basically because DMDC did not have the

15  resources or the capabilities to create the database.

16       Q.   Okay.  So would it be fair to say that this

17  manual, Exhibit 9, requires the DMDC to create that

18  database?

19       A.   That's correct.

20       Q.   And who is in charge of allocating those

21  resources to the DMDC?

22       A.   The director of DHRA, Defense Human Resource



1   Activity.

2        Q.   Okay.  So I guess I'm confused as to why the

3   Department of Defense would issue a manual telling

4   DMDC to create this database but then not associate

5   the required resources to do that?

6        A.   It was an unfunded mandate by Congress.

7        Q.   Congress didn't write this manual though.

8        A.   No, they did not.

9        Q.   The DOD wrote this manual, right?

10        A.   That's correct.

11        Q.   And the DOD is taking the obligation on

12   itself to create this database of domestic violence,

13   right?

14        A.   Correct.

15        Q.   And it's an mandatory database that -- or a

16   mandatory obligation?

17             MR. STERN:  Objection.

18             THE WITNESS:  You're asking me if it's a

19   mandatory obligation?

20   BY MR. JACOB:

21        Q.   Yes?

22        A.   It is, by law.



1        Q.    Okay.   And not only by law, by the terms of

2    this manual, right?

3              MR. STERN:   Objection.

4              THE WITNESS:   Correct.

5    BY MR. JACOB:

6        Q.    So at no time between 2010 and 2018 did this

7    database on domestic violence exist?

8        A.    That's correct.

9        Q.    Let me flip you to Page 4943 of Exhibit 10.

10       A.    Yes, sir.

11       Q.    Do you see the functional areas with DIBRS

12   reporting responsibilities are?

13       A.    Paragraph D?

14       Q.    Yes.

15       A.    Yes.

16       Q.    And if I'm not mistaken, that paragraph goes

17   onto Page 4945 of Exhibit 10?

18       A.    Yes.

19       Q.    It basically divides up the DOD into various

20   functional areas including law enforcement and command

21   actions and corrections?

22       A.    That's correct.



 1        A.    Yes, sir.

 2        Q.    Do you see the definition of DIBRS?

 3        A.    I do.

 4        Q.    DIBRS is defined in this manual as, "An

 5   incident-based system used to report criminal and

 6   specifically identified incidents from initial law

 7   enforcement response offender to," -- scratch that.

 8   Let me restart that.

 9            DIBRS is defined as the, "Incident-based

10   system used to report criminal and specifically

11   identified incidents from initial law enforcement

12   response to offender released from confinement."  Did

13   I read that correctly?

14        A.    You did.

15        Q.    "It includes provisions to comply with the

16   Brady Handgun Prevention Act of 1993."  Did I read

17   that correctly?

18        A.    You did.

19        Q.    Okay.  So the very definition of DIBRS is to

20   track these criminal incidents from -- all the way

21   from the beginning to the point where these

22   individuals are released from prison, right?



1      A.    Correct.

2            MR. STERN:  Objection.

3   BY MR. JACOB:

4      Q.    At every step of the way?

5      A.    Yes.

6      Q.    And the very definition of DIBRS requires

7   compliance with the Brady Handgun Violence Prevention

8   Act, right?

9            MR. STERN:  Objection, misstates the

10  document.

11  BY MR. JACOB:

12     Q.    I'm on Page 5009.

13     A.    It includes provisions to comply with the

14  Brady Act.

15     Q.    So the definition of DIBRS includes

16  provisions to comply with the Brady Act, right?

17     A.    Yes.

18     Q.    Let me --

19     A.    Can we take a quick break?

20           MR. JACOB:  Yes.  Sure.

21           VIDEOGRAPHER:  The time is 12:29 p.m.

22           We're going off the record.



```
 1                (Whereupon, a recess ensued.)

 2                VIDEOGRAPHER:  The time is 12:39 p.m.

 3                We're back on the record.

 4                (Verdego Exhibit No. 11 was marked for

 5       identification.)

 6       BY MR. JACOB:

 7            Q.   I'll hand you what's been marked as

 8       Exhibit 11.  Tell me when you have that in front of

 9       you and a chance to review it?

10            A.   I have it.

11            Q.   Can you tell me what Exhibit 11 is?

12            A.   Yes.  It is the DIBRS entry from the United

13       States Air Force in regards to Devin Kelley.

14            Q.   And is it a true and correct copy of the

15       DIBRS entry from the United States Air Force regarding

16       Devin Kelley?

17            A.   Yes.

18            Q.   And can you just first, broad steps, walk me

19       through what I'm looking at?

20                MR. STERN:  Can I interject for a second,

21       Tom?

22                MR. JACOB:  Yes.
```



1              MR. STERN:  In preparation for Ms. Verdego's

2     deposition, she took notes on this very entry.  So I

3     will provide a copy to opposing counsel.

4              MR. JACOB:  Okay.  I'm just going to mark

5     these notes as Exhibit 12.

6              (Verdego Exhibit No. 12 was marked for

7     identification.)

8     BY MR. JACOB:

9         Q.   Can I trade you, please?

10        A.   Sure.

11        Q.   All right.  So you have Exhibit 11 and

12    Exhibit 10 in front of you, right?

13        A.   I have 11 and 12.

14        Q.   Sorry.  Exhibit 11 and Exhibit 12 in front

15    of you?

16        A.   Yes, sir.

17        Q.   Okay.  So tell me what Exhibit 12 is?

18        A.   So this is the DIBRS -- I'm sorry, number

19    12?

20        Q.   Yes.  Tell me what Exhibit 12 is.

21        A.   So it's the Air Force's -- Air Force

22    submission to DIBRS for Devin Kelley that I have taken



1   notes on basically using the DOD manual 7730-47 Volume

2   1.  And I just basically took all the codes in that

3   manual and put them here so that, you know, because

4   there was no way I was going to be able to memorize

5   all this.

6        Q.   You know, that's why I marked the manual, so

7   you'd have that in front of you.  But this makes it a

8   lot easier.

9            Let me make sure I have this.  Exhibit 12 is

10  a true and correct copy of the notes that you made to

11  the DIBRS entry for Devin Kelley, fair?

12            MR. STERN:  Objection, misstates testimony.

13            THE WITNESS:  Well, this is a copy of the

14  entry.  They're not -- they don't -- they're not

15  exactly similar because they're printed out

16  differently.  But it is, in fact -- it has the same

17  data.

18  BY MR. JACOB:

19       Q.   Sure.  Let me re-ask that question.

20            Exhibit 12 is a true and correct copy of the

21  DIBRS entry for Devin Kelley along with the notes that

22  you made on that copy?



1     A.   Yes.

2     Q.   Okay.

3          So let's -- using Exhibit -- and before we

4     get there, the notes interpreting the DIBRS entry for

5     Devin Kelley came from what we have marked as

6     Exhibit 10, the manual, Volume 1 of 7730.47, fair?

7     A.   Yes, sir.

8     Q.   And specifically we're looking at -- and it

9     starts approximately on Page 49, USA 4950 to 51 with

10    tape -- do you have Exhibit 10 in front of you?

11         You should stop letting him take your

12    papers.

13         Okay.  So you have Exhibit 10 in front of

14    you, right?

15    A.   Yes, sir.

16    Q.   So around Page 4951, we should start seeing

17    some tables that describe the various fields of DIBRS

18    entries.  Is that correct?

19    A.   That's correct, sir.

20    Q.   Okay.  And if I'm understanding you

21    correctly, what you did was you took Kelley's DIBRS

22    entry from the Air Force and compared it to



1   Exhibit 10, and you made annotations so you could

2   understand what the DIBRS entry was referring to?

3        A.   Yes, sir.

4        Q.   So let's go through the DIBRS entry for

5   Kelley and we can use either Exhibit 11 or Exhibit 12

6   or both if you prefer?

7        A.   Okay.

8        Q.   Do you have Exhibit 11 and 12 in front of

9   you?

10       A.   I do.

11       Q.   Okay.  So start by telling me what the

12   administrative segment is?

13       A.   So the administrative segment starts with

14   the FBI location number, that's how when it gets

15   transmitted to the uniform crime report it shows kind

16   of the geographic region so that they can better

17   report where the crime occurred.

18            Those are the first -- starts at the letter

19   N and then ends in the letter O.  As a point of

20   reference the DOs at end of that number actually

21   refers to the Air Force.

22       Q.   Okay.



1      Q.   So, M means administrative segment?

2      A.   Correct.

3      Q.   And then A, what does A in the

4   administrative segment mean?

5      A.   It is the report type, which is an add.  So

6   they added something to the report.

7      Q.   Okay.  So it would have been first added on

8   October 21st, 2013, Exhibit 11?

9      A.   Yes.

10     Q.   Do you know what happened on October 21st,

11  2013 that prompted this addition to DIBRS?

12     A.   I do not.

13     Q.   What is the Y in the administrative segment

14  mean?

15     A.   The Y means was it reported to NIBRS.

16     Q.   It means what?

17     A.   Is it reportable -- is it reportable to

18  NIBRS.

19     Q.   Okay.  So the Y doesn't mean, was it

20  actually reported to DIBRS.

21     A.   Correct.  It just means should it be a NIBRS

22  entry.



1    Q.   And what differentiates offenses that should

2  be a NIBRS entry versus should not be a NIBRS entry?

3    A.   In this case none, because the report

4  actually is for NIBRS.

5    Q.   What do you mean by that?

6    A.   Meaning that when you report something to

7  DIBRS, it is for inclusion into the National

8  Incident-Based Reporting System.

9    Q.   So are all DIBRS reports marked for

10 inclusion into NIBRS?

11   A.   It is my understanding they are, yes.

12   Q.   Then why even have that Y segment?

13   A.   I think it is -- this is speculation but I

14 believe this is a requirement through -- for the FBI.

15   Q.   Okay.  What about the I following the Y in

16 the administrative segment?

17   A.   The I is asking whether or not this was an

18 incident or -- incident/report occurred date category.

19        And so this was the incident.  This tells

20 you it was an incident.  And then the following

21 numbers tell you the date of the incident.

22   Q.   So what is the data of the incident?



1        A.    It is May 25th, 2011.

2        Q.    So if we go back to our manual --

3        A.    Uh-huh.

4        Q.    -- do you have that in front of you?

5        A.    I do.

6        Q.    And you go to Page USA 4943, where it says,

7    "Law enforcement should begin the DIBRS reporting

8    process when law enforcement officials respond to a

9    credible report of a criminal incident."

10       A.    Yes, sir.

11       Q.    Is it fair to say that what Air Force

12   through its law enforcement employees are telling DMDC

13   is that on 2011, 5-25 they received a credible report

14   of a criminal incident?

15       A.    Yes.

16       Q.    Okay.  And do you have 4943 in front of you?

17       A.    Yes.

18       Q.    Do you see Paragraph C?

19       A.    Yes.

20       Q.    It says, "No organization shall submit PII

21   to the DMDC that could jeopardize or compromise any

22   ongoing investigation."  Do you see that?  Did I read



```
 1              REPORTER'S CERTIFICATE:

 2              Commonwealth of Virginia

 3              County of Arlington, to wit:

 4                   I, KENNETH NORRIS, a Notary Public of

 5       the Commonwealth of Virginia, County of Arlington, do

 6       hereby certify that the within named witness

 7       personally appeared before me at the time and place

 8       herein set out, and after having been duly sworn by

 9       me, according to law, was examined.

10                   I further certify that the examination

11       was recorded stenographically by me and this

12       transcript is a true record of the proceedings.

13                   I further certify that I am not of

14       counsel to any of the parties, nor in any way

15       interested in the outcome of this action.

16                   As witness my hand and notarial seal

17       this 17th day of December, 2019.

18                             _____

19                             KENNETH NORRIS

20                             Notary Public

21       My Commission Expires:  2-28-21;Notary Reg#:7501816

22
```



IN THE UNITED STATES DISTRICT FOR
THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JOE HOLCOMBE, et. al, | § | NO. 5:18-CV-00555-XR |
| | § | |
| Plaintiffs | § | Consolidated with: |
| | § | 5:18-cv-00712-XR (*Vidal*) |
| | § | 5:18-cv-00881-XR (*Uhl*) |
| vs. | § | 5:18-cv-00944-XR (*Ramsey*) |
| | § | 5:18-cv-00949-XR (*McNulty*) |
| UNITED STATES OF | § | 5:18-cv-00951-XR (*Wall*) |
| AMERICA, | § | 5:18-cv-01151-XR (*Amador*) |
| | § | 5:19-cv-00184-XR (*Brown*) |
| Defendant | § | 5:19-cv-00289-XR (*Ward*) |
| | § | 5:19-cv-00506-XR (*Workman*) |
| | § | 5:19-cv-00678-XR (*Colbath*) |
| | § | 5:19-cv-00691-XR (*Braden*) |
| | § | 5:19-cv-00706-XR (*Lookingbill*) |
| | § | 5:19-cv-00714-XR (*Solis*) |
| | § | 5:19-cv-00715-XR (*McKenzie*) |
| | § | 5:19-cv-00805-XR (*Curnow*) |
| | § | 5:19-cv-00806-XR (*Macias*) |

## NOTICE OF DEPOSITION

To: Defendant, United States of America, by and through
its attorney, Paul Stern, United States Department of
Justice, Three Constitution Square, 175 N Street,
N.E., Washington, DC 20002.

From: Plaintiffs, Vidal, et. al, 5:18-cv-712-XR, McNulty, et.
al, 5:18-cv-00949-XR; Wall, et. al, 5:18-cv-00951-XR;
Solis, et. al, 5:19-cv-00714-XR, and McKenzie, 5:19-cv-
00715-XR.



Page 1 of 12

Please take notice that under Fed. R. Civ. P. 30(b)(6), the above Plaintiffs will take the deposition of the Defendant, United States of America, by oral examination using video, audio, and stenographic means, at the following location and date:

Date:             September 12, 2019

Location:         United States Attorney's Office
                  601 NW Loop 410, Ste. 600
                  San Antonio, Texas 78216

Time:             9:00 AM CST

Court Reporter:   Res Ipsa or designee

Videographer:     Res Ipsa or designee

The deposition will continue from day to day until completed, with such breaks, as necessary. Pursuant to Rule 30(b)(6), the United States of America shall designate one or more officers, directors, managing agents, or other persons who consent and are knowledgeable to testify on the United States' behalf with respect to the subject matters set forth in attached Exhibit A. A request to produce documents permitted under Rule 30(b)(2) is attached as Exhibit B.

## DEFINITIONS

Please see applicable definitions in W.D. Tex. Local Rule CV-26(b)(1)–(7). The singular form of any word shall include within its meaning the plural form of the word and vice versa. For your convenience, Plaintiffs have duplicated those definitions here:

**Communication**. The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

**Document**. The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a). A draft of a nonidentical copy is a separate document within the meaning of this term.

**Identify (With Respect to Persons)**. When referring to a person, to "identify" means to give, to the extent known, the person's full name, present or last known address, e-mail address, and telephone number, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

**Identify (With Respect to Documents)**. When referring to documents, "to identify" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s), and recipient(s).

**Parties**. The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

**Person**. The term "person" is defined as any natural person or business, legal or governmental entity or association.

**Concerning**. The term "concerning" means relating to, referring to, describing, evidencing or constituting.

## ACRONYMS

The following acronyms apply to this notice:

| Acronym | Meaning |
|---------|---------|
| AFOSI | Air Force Office of Special Investigations |
| CJIS | Criminal Justice Information Services |
| DIBRS | Defense Incident-Based Reporting System |
| DMDC | Defense Manpower Data Center |
| DoD | Department of Defense |
| DODIG | Department of Defense Inspector General |
| I2MS | Investigative Information Management System |
| IAFIS | Integrated Automated Fingerprint Identification System |
| NCIC | National Crime Information Center |
| NGI | Next Generation Identification |
| NIBRS | National Incident-Based Reporting System |
| NICS | National Instant Criminal Background Check System |
| USAF | United States Department of Air Force |

Respectfully Submitted,

/s/ Jason P. Steed

**Jason P. Steed**
JSteed@kilpatricktownsend.com
Texas Bar No. 24070671
**Kilpatrick Townsend & Stockton
LLP**
2001 Ross Avenue, Suite 4400
Dallas, TX75201
Office 214-922-7112
Fax 214-853-5731
Counsel for Vidal, McNulty, and
Wall

/s/ Jamal K. Alsaffar

**Jamal K. Alsaffar**
JAlsaffar@nationaltriallaw.com
Texas Bar No. 24027193
**Tom Jacob**
TJacob@nationaltriallaw.com
Texas Bar No. 24069981
**Whitehurst, Harkness, Brees,
Cheng, Alsaffar & Higginbotham
& Jacob PLLC**
7500 Rialto Blvd, Bldg. Two, Ste 250
Austin, TX 78735
Office 512-476-4346
Fax 512-476-4400
Counsel for Vidal, McNulty,
McKenzie, Solis, Ramirez
and Wall

## CERTIFICATE OF SERVICE

By our signatures above, we certify that a copy of this pleading, Notice of
Deposition, has been sent to the following on August 22, 2019 via email and
certified mail, return receipt requested.

JOSEPH H. HUNT
Assistant Attorney General
United States Dept. of Justice
Civil Division

JOHN F. BASH
United States Attorney
Western District of Texas

KIRSTEN WILKERSON
Assistant Director, Torts Branch
United States Dept. of Justice
Civil Division

PAUL DAVID STERN
Trial Attorney, Torts Branch
United States Dept. of Justice
Civil Division
CLAYTON R. DIEDRICHS
Assistant United States Attorney

JIM F. GILLIGAN
Assistant United States Attorney

JOHN PANISZCZYN
Civil Chief
United States Attorney's Office
Western District of Texas

JAMES G. TOUHEY, JR.
Director, Torts Branch
United States Dept. of Justice
Civil Division

STEPHEN E. HANDLER
Senior Trial Counsel, Torts Branch
United States Dept. of Justice
Civil Division

STEPHEN TERRELL
Trial Attorney, Torts Branch
United States Dept. of Justice
Civil Division
JAMES E. DINGIVAN
Assistant United States Attorney

# EXHIBIT A

Examination is requested on the following subject matter areas:

1.  The identity of persons, and identity and location of documents referenced in the DODIG-2015-011 Report.

2.  The identity of persons, and identity and location of documents referenced in the DODIG 2015-081 Report.

3.  The identify of persons, and identity of location of documents referenced in the DODIG 2018-035 Report.

4.  The identity of persons, and identity and location of documents referenced in the DODIG-2019-030 report.

5.  Training or education USAF personnel received concerning fingerprint collection and final disposition submission procedures, including submission to the FBI CJIS, NIBRS, or DIBRS. This topic concerns training or education given to personnel involved in the investigation, court-martial, or confinement of Devin Kelley between July 1, 2011 and December 14, 2012, whether they received the training at the time or some earlier time. This topic includes, but is not limited to: (a) the training or education provided by the Air Force Security Forces Academy at Joint Base San Antonio-Lackland, Texas; (b) the 65-day course at the security Forces Academy covering basic military police functions; (c) formal or informal training; (d) "on-the-job" training or education; (e) recurring or annual training or education; and (f)

training or education provided by the Naval Corrections Academy.

6.  Policies, procedures, practices, checklists, and protocols concerning Air Force Security Force's and AFOSI's execution of DoD Instruction 7730.47-M Volume 1. This topic includes, but is not limited to, the monthly submission of information to the DMDC and the DIBRS database for centralization of the collection of information reportable by the DoD Components pursuant to The Brady Handgun Violence Prevention Act of 1993. This topic includes but is not limited to, information concerning I2MS, as noted on pages 8–9 of DODIG-2015-011.

7.  Policies, procedures, practices, checklists, and protocols concerning the FBI CJIS NICS database and how other databases such as Next Gen (NGI) (formerly Integrated Automated Fingerprint Identification System (IAFIS)), NCIC, NIBRS, and Uniform Crime Report (UCR) are used to populate it. This topic includes, but is not limited to, the process by which the FBI receives and subsequently uses the information from DIBRS to prevent the purchase of firearms by any person prohibited by one of the eight listed categories.

8.  Policies, procedures, practices, checklists, and protocols concerning the Air Force Security Force's and AFOSI's execution of DoD Instruction 5505.11. This topic includes, but is not limited to, the submission of fingerprints and final disposition reports to FBI CJIS by both the Air Force Security Force and AFOSI. This topic includes, but is not limited to, the process by which Devin Kelley's

fingerprints and final disposition report should have been reported to FBI CJIS.

9.    Policies, procedures, practices, checklists, and protocols concerning probable cause determinations by a Staff Judge Advocate, especially to include, when a determination should be made, and any training given to guide Judge Advocates on probable cause determinations.

10.   Policies, procedures, practices, checklists, and protocols concerning the USAF Corrections System policy for post-trial inmates during in-processing concerning the submission of fingerprints and final disposition reports to the FBI. This topic includes, but is not limited to, the collection of Devin Kelley's fingerprints and submission of his final disposition report by the confinement facility personnel.

11.   Policies, procedures, practices, checklists, and protocols put in to place following DODIG-2015-081 pertaining to the AFOSI's NCIC program director to ensure that fingerprints and final disposition reports are submitted to IAFIS (NGI) according to DoD Instruction 5505.11.

## EXHIBIT B

Under Fed. R. Civ. P. 34(b)(2), you are commanded to attend and testify at the above specified time and place; you are commanded to produce the below designated documents, electronically stored information, or tangible things in your possession, custody, or control. The following requests do not seek any communication to or from your legal counsel. Please produce a true and correct copy of the following within thirty (30) days of this notice or at the deposition, whichever is sooner. If produced before the deposition date, please produce these documents electronically. If produced at the deposition, please produce a physical copy of the document for examination and marking as a deposition exhibit, as well as an electronic version of the document in its native format.

1.    Your current curriculum vitae or resume.

2.    Documents you reviewed in preparation for this deposition.

3.    Policies, procedures, practices, checklists, or protocols concerning the topics covered in Exhibit A.

4.    Reports, notes, logs, letters, communication, or other documents you have authored or have been sent to you concerning this case or the topics covered in Exhibit A.

5.    Charts, diagrams, PowerPoints, illustrations, or other demonstrative aids that illustrate the relationships or communication between any of the following: the FBI

CJIS, NICS, NGI, DMDC, NIBRS, DIBRS, IAFIS, or NCIC.

6.   Handouts, manuals, course materials, or other documents concerning the training or education of any Air Force employee on fingerprint collection and final disposition submission procedures.

Submitted on October 21, 2013:

Administrative Segment M:

NM01900DO000077711AYJMAYI201105250000201106090001          000000


Offense Segment F:

NM01900DO000077711AYJFAA128-G-CNNN20YNM      99        AXN


Arrestee/Offender Segment A:

NM01900DO000077711AYJAC01AKELLEY                DEVIN        PATRICK
EM03FRS63424548419910212                  TXUS 20
NM01900DO000077711AYJAC02AKELLEY                TESSA        KAYLYNN
S█████████                                0000


Victim Segment V:

NM01900DO000077711AYJVA001A128-G-CA
I            0100M    DN09 06 IBON 01AF02AB


No data for Property Segment P



USA00016836



DIBRS Entry for Kelley (003)

Submitted on October 21, 2013:

Administrative Segment M:

NM01900DQ000077711AYJMAYI20110525000020110609001          000000

Offense Segment F:

NM01900DQ000077711AYJFAA128-G-CNNN20YNM     99     AXN

Arrestee/Offender Segment A:

NM01900DQ000077711AYJAC01AKELLEY   AF   DEVIN     PATRICK        TXUS 20

EM03ERS63424548419910212

NM01900DQ000077711AYJAC02AKELLEY        TESSA     KAYLYNN        0000

Victim Segment V:

NM01900DQ000077711AYJVA001A128-G-CA          0100M   DN09 06 IBON 01AF02AB

No data for Property Segment P

Page 1



