IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

```
HOLCOMBE, et al.,            )
                             )
    Plaintiffs,              )
                             )
vs.                          ) Civil Action No.
                             )
UNITED STATES OF AMERICA,    ) 5:18-CV-00555-XR
                             )
    Defendant.               ) (Consolidated cases)
```

REMOTE ORAL VIDEOTAPED DEPOSITION

OF THE UNITED STATES AIR FORCE

BY ITS CORPORATE REPRESENTATIVE

COLONEL ROBERT M. FORD, JR.

Thursday, June 18, 2020

Reported by

Rebecca Callow, RMR, CRR, RPR

Job No. U061820

1      BY MR. ALSAFFAR:
2      Q.   Okay.  Do you agree with that, that that's
3  one of the purposes of NICS, is to prevent dangerous
4  criminals from getting access to handguns through
5  federal licensed firearms dealers?
6              MR. STERN:  Objection.
7      A.   I believe that that's one of the purposes.
8      BY MR. ALSAFFAR:
9      Q.   And when a dangerous criminal who's been
10 convicted of a felony and is reported to the FBI and
11 is denied access to firearms, do you agree that
12 we're increasing the safety to the general public,
13 that that's one of the consequences of the system
14 when it --
15             MR. STERN:  Objection.  Objection.
16     BY MR. ALSAFFAR:
17     Q.   You can answer.
18     A.   So this would be my personal opinion.
19             So my personal opinion would be that
20 if we're preventing someone from legally purchasing
21 a handgun who has demonstrated a history of criminal
22 offenses, I believe, in the aggregate, that would
23 reduce the risk to people and -- or the population.
24     Q.   ==And one of the reasons -- do you agree that==
25 ==one of the reasons to report criminals like==

1  Devin Kelley, who've been convicted, to the FBI is
2  that, if we don't do that -- we don't report
3  criminals like Devin Kelley, we could be increasing
4  the risk of harm, generally, to the public?
5               MR. STERN:  Objection.
6       BY MR. ALSAFFAR:
7       Q.   You can answer.
8       A.   So this is, again, my personal opinion.
9                I do think that you can make that
10 conclusion that we would be reducing the risk to
11 populations.
12               If you kept people who've shown a
13 capability of committing criminal offenses, like
14 Devin Kelley as you mentioned, I personally believe
15 that that is one way of reducing the risk to people.
16 And that's the intent.
17      Q.   Okay.  And, do you agree that, in order for
18 the NICS system to work, federal agencies, like
19 Security Forces and the Air Force, must accurately
20 collect and submit criminal history data?
21      A.   For it to work as intended -- as intended,
22 yes.  I would agree with that.
23      Q.   And a database like NICS, or any database,
24 is only as good as the data that's entered into it.
25 Do you agree with that?

1              MR. STERN:  Objection.
2      A.   I agree that information that relies on
3 people to input data into it is as good as the
4 information that's put into it.
5      BY MR. ALSAFFAR:
6      Q.   Okay.  And do you agree that when a
7 government agency like the Air Force fails to share
8 data on dangerous felons, that they unnecessarily
9 expose the public to increased risk of gun violence?
10             MR. STERN:  Objection.
11     BY MR. ALSAFFAR:
12     Q.   You can answer.
13     A.   So this would be my personal opinion.  And
14 I believe that if personnel in the Air Force do not
15 input information that makes itself into NICS
16 prevents someone from purchasing a handgun, that it
17 is a problem and could increase the risk to anyone
18 associated with those specific individuals.
19     Q.   Going back to the topics that you've been
20 designated for, 5 and 10 and item number 1 on the
21 second notice that I showed you, do you have full
22 authority to speak on behalf of the government on
23 those topics -- all those topics?
24     A.   Yes.
25     Q.   And you're aware that the answers you give

```
 1   to my questions regarding those topics will be
 2   binding on the government as a whole?
 3                MR. STERN:  Objection.
 4                Jamal, are you asking him insofar as
 5   Air Force Security Forces?
 6                MR. ALSAFFAR:  Yes.  Paul, I think
 7   that's a fair objection.  That's what I meant.  Let
 8   me -- is it okay if I rephrase?
 9                MR. STERN:  Please.
10        BY MR. ALSAFFAR:
11        Q.   Colonel Ford, you're aware that the answers
12   that you give to my questions regarding those topics
13   in the deposition notice that we've identified will
14   be binding upon the Air Force Security Forces.
15   Correct?
16        A.   Yes.  I understand that.
17                I'm having a little difficulty
18   understanding the word "binding" and what's your
19   intent by the word "binding."  If you could clarify
20   that, it might help me.
21        Q.   Yes.  That's fine.  That's a good example
22   of a clarification.
23                When you -- when a witness is being
24   designated as what's called a Federal Rule of Civil
25   Procedure 30(b)(6) witness on certain topics like
```

1  you've been designated, are you aware that that
2  means that you have been picked by the government to
3  answer on behalf of the entire Air Force Security
4  Forces relating to those topics, 5, 10, and topic 1
5  of the second notice?
6      A.   Yes.
7      Q.   And by answering -- what I mean by
8  "binding" upon the Air Force Security Forces, you
9  are being put into the shoes as the person most
10 knowledgeable about the topics that we've
11 identified.
12           MR. STERN:  Objection.
13     A.   I understand that.
14     BY MR. ALSAFFAR:
15     Q.   Okay.  Now I want to talk to you a little
16 bit about how you -- how you were prepared to
17 provide the information known or reasonably known to
18 the Air Force Security Forces regarding these
19 matters listed in the deposition notice; topics 5,
20 10, and topic 1 of the second notice.
21           What have you done to prepare for this
22 deposition on those topics?
23     A.   So I interviewed a few personnel, and I
24 provided those names to Mr. Stern via email, to get
25 some background information as to the policy and

1      Q.    Would you like me to rephrase it?

2      A.    Yes.

3      Q.    Okay.  Mr. Sablan testified under oath that

4  when he was investigating Devin Kelley, his training

5  told him that he did not have to submit

6  Devin Kelley's fingerprints to the FBI even if he

7  had probable cause to believe that he -- that

8  Devin Kelley committed the crime.

9            That's what he testified to.  Correct?

10     A.    Correct.

11     Q.    All right.  So Mr. Sablan's understanding

12 of what his training told him was not what the

13 instructions require.  Isn't that correct?

14           MR. STERN:  Objection.

15     A.    I think Mr. Sablan's understanding is not

16 accurate.  That's what I'm saying.

17     BY MR. ALSAFFAR:

18     Q.    In other words, the mandatory instructions,

19 both the DoDI 5505.11 and the 31-206 instructions

20 that was applicable at the time of this

21 investigation, required Security Forces

22 investigators like Mr. Sablan to send fingerprints

23 to the FBI if the investigator had probable cause to

24 believe that the crime was committed.  Correct?

25     A.    Correct.

1  Q.   Okay.  In other words -- let me put it to
2  you this way.
3           If Mr. Sablan, investigator of
4  Devin Kelley for the Security Forces, was trained
5  not to submit Devin Kelley's fingerprints even when
6  there was probable cause to believe he committed the
7  crime, then he was not trained properly.  Correct?
8           MR. STERN:  Objection.  Form.
9       A.   Right.
10          I just don't -- I just don't agree
11 that that equates to him not being trained properly.
12 That's what I'm saying to you.
13      BY MR. ALSAFFAR:
14      Q.   So you're saying that it's possible he was
15 trained properly but just didn't follow his
16 training?
17      A.   Yes.  That's exactly what I'm saying.
18      Q.   And according to Mr. Sablan -- and he's the
19 one who was there on the ground at the time -- he
20 was testifying under oath that he not trained to
21 properly submit fingerprints when probable cause
22 existed to believe that a crime was committed --
23 right? -- according to him?
24      A.   Yes.  According to him.
25      Q.   And, ultimately, Mr. Sablan was supposed to

1  and just leading into the next question, my question
2  was, for the record, that Harry Truman had a sign on
3  his desk at the Oval Office that said, "The Buck
4  Stops Here."  You know that.  Right?  That story?
5      A.   Yes, sir.  I've read that before.
6      Q.   Okay.  And in terms of where the buck stops
7  at the 49th Security Forces squadron, that buck
8  stops with the commander of Security Forces
9  squadron.  Correct?
10     A.   In a manner of speaking, yes.  The squadron
11 commander is responsible.
12     Q.   And whatever methodology the squadron
13 commander used, he was required to train his
14 Security Forces investigators properly so that they
15 all understood the mandatory instruction that
16 related to submission of fingerprint data and
17 conviction data and criminal history data to the
18 FBI.  Right?
19              MR. STERN:  Objection.
20     A.   I agree that it's his responsibility, the
21 squadron commander's, to ensure they are properly
22 trained to submit fingerprints to the FBI.
23     BY MR. ALSAFFAR:
24     Q.   Now, when -- do you agree that when
25 Air Force agents are not properly trained, that can

1  submission of the Devin Kelley fingerprints to the
2  FBI during his pretrial confinement period from
3  June 8th, 2012, to November 7th, 2012?
4      A.   So Air Force Instruction 31-205, there's
5  paragraphs that cover in-processing of inmates.  And
6  it talks about pretrial and posttrial, that
7  Air Force personnel can be placed into pretrial and
8  posttrial confinement.  So it covers that.
9           And then there's another set of
10 paragraphs that covers fingerprinting.  And in those
11 paragraphs, it doesn't really separate between
12 posttrial and pretrial as far as fingerprinting.
13 That's what I recollect.
14           And if we have it to put on the
15 screen, we can look at that just to be sure, but
16 that's what I recollect.
17     Q.   Yes.  Yes.  No problem.
18           In terms of -- let me share it with
19 you.  Just let me know when you see the instruction
20 on the screen.
21     A.   Okay.  I see it.
22     Q.   And I'm showing you what's Bates-stamped
23 USA 5457.  And this is the Air Force Instruction
24 31-205 that was applicable when Devin Kelley was in
25 pretrial confinement and posttrial confinement.

1  **Correct?**
2      A.   That's correct.
3      Q.   And this is the Air Force Security
4  Corrections System Instruction.  Is that right?
5      A.   Yes.
6      Q.   And this highlight here, this instruction,
7  31-205, is a mandatory instruction.  Correct?
8      A.   Correct.
9      Q.   Tell me what training was provided by the
10 Air Force to confinement personnel at the
11 Security Forces 49th confinement facility in terms
12 of fingerprinting military members who were placed
13 in pretrial confinement?
14     A.   So personnel that goes through -- excuse
15 me -- that work in confinement sections have two
16 different tracks that they can go down.
17              So the requirement for the
18 noncommissioned officer in charge of confinement,
19 which is normally like an E-5, E-6, who's in charge
20 of confinement, they are required to attend the
21 corrections course that is put on by the Navy and
22 hosted at Joint Base San Antonio-Lackland.
23              That's an approximate four-week course
24 where they teach them how to do corrections.  They
25 discuss fingerprinting as a means to in-processing

```
 1        BY MR. ALSAFFAR:
 2        Q.    Is that correct?
 3        A.    According to his testimony, that's correct.
 4   Yes.
 5        Q.    And according to his testimony,
 6   Colonel Boyd is wrong and misunderstanding in
 7   applying the mandatory instruction related to
 8   court-martial convictions from Security Forces
 9   investigations.   Correct?
10        A.    Yes.   According to his testimony, he would
11   be wrong.
12        Q.    And if the 49th squadron commander
13   responsible for ensuring that his Security Force
14   investigators understand the reporting requirements
15   as a mandatory Air Force instruction thinks that it
16   is never the Security Forces' responsibility to
17   submit fingerprint or conviction data to the FBI,
18   then there's a pretty small chance that those
19   Security Forces investigators have been properly
20   trained.   Correct?
21              MR. STERN:   Objection.   Calls for
22   speculation.
23        A.    I don't agree with that necessarily.   They
24   could be properly trained by the people in their
25   section.
```

```
 1     BY MR. ALSAFFAR:
 2     Q.   So, in other words, they're left to the
 3  devices of somebody else other than the commander to
 4  tell them how to properly understand the mandatory
 5  reporting instructions.  Correct?
 6     A.   That's one way of putting it.
 7     Q.   Would you agree that it's not a very good
 8  training program for Security Forces
 9  investigators -- it's not a good training program
10  when the commander of the squadron responsible for
11  certifying the investigator is not even aware of the
12  mandatory instruction requirements for reporting
13  fingerprint and conviction data?
14             MR. STERN:  Objection.
15     A.   I don't necessarily agree with that.
16     BY MR. ALSAFFAR:
17     Q.   Do you think it's a good training program
18  when the Security Forces commander of a squadron is
19  unfamiliar with the mandatory reporting requirement
20  for the FBI?
21     A.   I'm thinking here because, in my mind, what
22  I'm saying -- thinking is that the -- it's not a
23  good sign, but it does not mean it's a bad training
24  program.
25     Q.   Remember how we talked about that the
```

1   **formal training academies do not teach these**
2   **Special Forces investigators how to -- or how or**
3   **when to properly submit fingerprint and conviction**
4   **data to the FBI?**
5                  **They're not taught that at the**
6   **academy, remember?  Right?**
7        **A.   Yes.**   I remember that.
8        **Q.   Okay.  And you said that that's okay**
9   **because that's left to on-the-job training at the**
10  **various -- underneath the various training forces'**
11  **squadron commanders to teach them that element**
12  **before they become certified investigators.  Right?**
13       A.   Yes.  I remember that.
14       **Q.   So if the training program for on-the-job**
15  **training is run by a commander of the**
16  **Security Forces who does not understand what the**
17  **mandatory instructions for reporting fingerprints**
18  **and conviction data to the FBI required, that is not**
19  **a good training program, is it?**
20              MR. STERN:  Objection.
21       A.   I think it's not a good sign of their
22  training program.  I don't agree that it's a bad
23  training program.
24       BY MR. ALSAFFAR:
25       **Q.   All right.  Well, one of the things that**

1  **1997?**

2  A.  That's correct.

3  **Q.  So let me ask a little bit different**

4  **question, you know, just broadly, because one of the**

5  **issues -- and let's talk specifically about issue as**

6  **it relates to your topic, which is the Air Force's**

7  **correction of failing to submit fingerprint data and**

8  **conviction data.  Okay?  So that's what I'm talking**

9  **about.  All right?**

10  A.  Okay.

11  Q.  So is it a correct statement that from 1997

12  through the tragedy in this case, November 5th,

13  2017, the Devin Kelley mass shooting, that the

14  Air Force was having a problem in accurately

15  reporting fingerprint data and conviction data for

16  qualifying offenses with FBI?

17            MR. STERN:  Objection.

18  A.  So in my personal opinion I would say that

19  it was -- that those DoD/IG reports do reflect that

20  the Air Force was having an issue doing that, yes.

21  BY MR. ALSAFFAR:

22  **Q.  And if we want to -- let's start with the**

23  **1997 report.  So you reviewed that.  Correct?**

24  A.  Yes.

25  **Q.  And I'm going to share my screen again with**

1      BY MR. ALSAFFAR:
2      Q.   Correct?
3      A.   That's an interpretation of the DoD report.
4  It doesn't say those words exactly.
5      Q.   Well, of course.
6               Don't you agree that the purpose of
7  these reports was to inform the Air Force
8  Security Forces that there is a problem with
9  reporting criminals to the FBI, and it's not just
10 limited to the small sample size we were able to do.
11 You agree with that, don't you?
12              MR. STERN:  Objection.
13 Mischaracterizes the document.
14     BY MR. ALSAFFAR:
15     Q.   I'm asking you for your opinion as a
16 30(b)(6) witness, Colonel, just to be clear.
17     A.   I agree that the report -- the bottom line
18 of the report is telling the Air Force you still had
19 a problem with reporting criminal data.
20     Q.   Okay.  And the real objective here -- let's
21 just talk common sense.
22              The objective of the implementations
23 of these recommendations in the DoD/IG was to
24 correct the actual systemic problem in the Air Force
25 Security Forces of not reporting people who needed

1  to be reported.  That was the goal.  Correct?
2              MR. STERN:  Objection.
3       BY MR. ALSAFFAR:
4       Q.   Is that correct?
5       A.   So in my personal opinion, I believe that
6  that's the intent behind the DoD/IG report was for
7  the Air Force to fix this problem.  That's it.
8       Q.   In other words, let me just put it
9  straightforwardly.  And I'm sorry.  This is just
10 such an important issue.
11              But, I mean, if the Air Force came
12 back to you, Colonel, and said, Hey, we fixed the
13 small sample size, but we're not going to fix all
14 the others, and we don't have to, going forward, fix
15 the other stuff, going forward with the convicts and
16 the fingerprint reporting.  That's not acceptable.
17 Right?  Unacceptable.  Right?
18      A.   In my personal opinion --
19      Q.   Yes.
20      A.   -- I think that -- in my personal opinion,
21 I think that that would not be acceptable to me.
22      Q.   The goal here was -- for the DoD/IG was for
23 the third or -- fourth time, if you include 1987,
24 you include 1997, 2014, and now 2015, the IG is
25 sending up a red flag to the Air Force

```
 1                  REPORTER'S CERTIFICATION
 2          I, Rebecca J. Callow, Registered Merit Reporter
 3  and Notary Public of State of Texas, hereby certify to
 4  the following.
 5          That the witness, ROBERT M. FORD, JR., was duly
 6  sworn by the officer and that the transcript of the oral
 7  deposition is a true record of the testimony given by the
 8  witness;
 9          That the original deposition was delivered to
10  Jamal Alsaffar.
11          That a copy of this certificate was served on
12  all parties and/or the witness shown herein on
13  June, 26, 2020.
14          I further certify that pursuant to FRCP Rule
15  30(f)(1) that the signature of the deponent:
16          was requested by the deponent or a party
17  before the completion of the deposition and is to be
18  returned within 30 days from date of receipt of the
19  transcript.  If returned, the attached Changes and
20  Signature Page contains any changes and the reasons
21  therefor;
22  I further certify that I am neither counsel
23  for, related to, nor employed by any of the parties or
24  for, related to, nor employed by any of the parties or
25  attorneys to the action in which this proceeding was
```

1  taken.  Further, I am not a relative or employee of any
2  attorney or record in this cause, nor am I financially or
3  otherwise interested in the outcome of the action.
4
5
6          SUBSCRIBED AND SWORN TO under my hand and seal
7  of office on this the 26th day of June, 2020.
8
9          _____
10         Rebecca J. Callow, RMR, CRR, RPR
11         Notary Public, Travis County, Texas
12         My Commission No. 12955701-3
13         Expires:  09/12/2021