Report No. DODIG-2019-030

**FOR OFFICIAL USE ONLY**



# INSPECTOR GENERAL

*U.S. Department of Defense*

**DECEMBER 6, 2018**



## Report of Investigation into the United States Air Force's Failure to Submit Devin Kelley's Criminal History Information to the Federal Bureau of Investigation

INTEGRITY ★ INDEPENDENCE ★ EXCELLENCE

**The document contains information that may be exempt from mandatory disclosure under the Freedom of Information Act.**

# FOR OFFICIAL USE ONLY

USA00005250

FOR OFFICIAL USE ONLY



FOR OFFICIAL USE ONLY

USA00005251

FOR OFFICIAL USE ONLY

# Table of Contents

I.   Introduction ....................................................................................................... 1

    DoD OIG Investigation ...................................................................................... 2

II.  Factual Background .......................................................................................... 5

    A.  Kelley's Background ................................................................................... 5

    B.  USAF Delayed Enlistment .......................................................................... 5

    C.  USAF Initial Assignments .......................................................................... 6

    D.  Domestic Violence Incidents ...................................................................... 8

    E.  Initiation of the AFOSI Criminal Investigation ......................................... 9

    F.  Initiation of 49th Security Forces Squadron Criminal Investigation ........ 12

    G.  Kelley's Mental Health Treatment ........................................................... 13

    H.  Kelley Threatens Tessa Kelley .................................................................. 15

    I.   Kelley Confesses to Abusing his Stepson ................................................. 15

    J.   AFOSI Interviews Witnesses in the Kelley Investigation ......................... 19

    K.  Interviews of Kelley's Former Girlfriends ................................................ 21

    L.  Pretrial Confinement, Court-Martial, and Confinement .......................... 23

    M.  Kelley's Release from Confinement .......................................................... 27

    N.  Post-Confinement ..................................................................................... 28

    O.  Kelley's Firearms Purchases .................................................................... 30

    P.  Sutherland Springs Church Shooting ....................................................... 32

III. Chronology of Significant Events .................................................................... 33

IV.  Federal Law, DoD Fingerprint Policy, and Previous DoD OIG Reports ........... 46

    A.  Federal Law and Policy Requirements ...................................................... 46

    B.  Previous DoD OIG Reports ....................................................................... 55

    C.  Other DoD OIG Reports ........................................................................... 59

FOR OFFICIAL USE ONLY

USA00005252

FOR OFFICIAL USE ONLY

V.    Analysis of Missed Opportunities to Submit Kelley's Fingerprints and Final
      Disposition Report to the FBI ................................................................................ 61

      A.   The USAF's Missed Opportunities to Submit Kelley's Fingerprints and
           Disposition Report to the FBI, as Required by DoD and USAF Policy ........... 61

      B.   AFOSI Supervisory Reviews of Kelley's Investigative Case File ................... 87

      C.   Work Environment and USAF Fingerprint Training ................................... 90

      D.   Kelley's Mental Health and His Right to Legally Purchase Firearms ........... 101

      E.   Kelley's No Contact Order and Military Protective Order ........................ 104

      F.   Post-Trial Events ......................................................................... 106

VI.   Overall Conclusions ......................................................................... 107

VII.  Recommendations ............................................................................ 113

      A.   USAF Recruiting Process Background Checks ....................................... 113

      B.   USAF Security Forces File Retention ................................................ 114

      C.   USAF Training Program Revisions .................................................... 115

      D.   No Contact Orders ..................................................................... 116

      E.   Performance of USAF Personnel ...................................................... 116

      F.   Management Comments and Our Response ............................................. 117

VIII. Appendix A ................................................................................... 119

      A.   Prior OIG Reports ..................................................................... 119

      B.   Other DoD OIG Reports ................................................................ 124

IX.   Appendix B ................................................................................... 130

      Acronyms and Abbreviations ................................................................ 130

FOR OFFICIAL USE ONLY

USA00005253

# Report of Investigation into the United States Air Force's Failure to Submit Devin Kelley's Criminal History Information to the Federal Bureau of Investigation

## I.  Introduction

The DoD Office of Inspector General (OIG) investigated the circumstances surrounding the United States Air Force's (USAF) failure to submit Devin Patrick Kelley's criminal history information to the Federal Bureau of Investigation (FBI) for inclusion in its databases.[1]  In November 2017, Kelley shot and killed 26 people in the First Baptist Church of Sutherland Springs, Sutherland Springs, Texas, with weapons he purchased from licensed firearms dealers.

As described in detail in this report, in November 2012, while in the USAF, Kelley was the subject of two law enforcement investigations, one led by the 49th Security Forces at Holloman Air Force Base (HAFB), the other led by the Air Force Office of Special Investigations (AFOSI) Detachment 225.  As a result of the investigations, Kelley was convicted by General Court-Martial of an assault on both his wife and stepson, which is reportable to the FBI in accordance with DoD policy.  This conviction should have prevented Kelley from purchasing a firearm from a licensed firearms dealer.

USAF Law Enforcement organizations at HAFB are composed of the 49th Security Forces Squadron and the AFOSI Detachment 225.  The USAF Security Forces and AFOSI perform different missions within the USAF.  The USAF Security Forces perform a security and law enforcement function on USAF installations.  The AFOSI performs major criminal and counterintelligence investigations for the USAF.

DoD policy required the submission of Kelley's fingerprints to the FBI at several points.  The first time that the USAF should have submitted his fingerprint cards to the FBI Criminal Justice Information Services (CJIS) Division was after probable cause was determined in an investigation by the AFOSI Detachment 225 that Kelley assaulted his stepson and Tessa Kelley.[2]  Additionally, a final disposition report should have been submitted to the FBI at the conclusion of Kelley's court-martial.  The USAF was also required to submit to the FBI Kelley's fingerprints at other times, including when Kelley entered post-trial confinement following his court-martial.

---

[1]  Hereafter referred to as "Kelley."

[2]  Tessa Kelley is also known as Tessa Brennaman and Tessa Loge.  However, for the purposes of this report, Tessa Kelley will hereafter be referred to as "Tessa Kelley."

USA00005254

However, the USAF did not submit Kelley's fingerprints and final disposition report to the FBI at any time. If Kelley's fingerprints were submitted to the FBI, he would have been prohibited from purchasing a firearm from a licensed firearms dealer. Because his fingerprints were not submitted to the FBI CJIS Division, Kelley was able to purchase firearms, which he used to kill 26 people at the First Baptist Church of Sutherland Springs on November 5, 2017.

Our report describes in detail Kelley's actions while in the USAF and afterwards, including his criminal convictions by court-martial for assaulting his wife and stepson, his confinement and discharge from the USAF, his purchase of weapons from licensed firearms dealers, and his killing of 26 individuals at the First Baptist Church of Sutherland Springs on November 5, 2017.

## DoD OIG Investigation

In the hours following the shooting, law enforcement officials discovered that the USAF had not submitted Kelley's fingerprints and final disposition report to the FBI for entry into the appropriate FBI criminal history databases.

On November 6, 2017, the Secretary of Defense asked the DoD Inspector General to investigate "whether the appropriate information regarding Kelley should have been transmitted to the FBI CJIS Division for inclusion in its databases and whether or not the USAF transmitted the information." On November 9, 2017, the DoD OIG announced that it was opening this investigation.

To conduct this investigation, we assembled a multi-disciplinary team of special agents, investigative specialists, and attorneys and subpoenaed Kelley's criminal history and mental health records. The team conducted 41 witness interviews, including interviews of Kelley's ex-wife, his second wife, and his father.[3] We also constructed a detailed chronology of the events related to Kelley and the USAF law enforcement at HAFB, which is included in this report.

We reviewed the Gun Control Act of 1968, the Brady Act, and the Lautenberg Amendment. Furthermore, we reviewed DoD, USAF, and AFOSI policies concerning the collection and submission of fingerprints to the FBI.

---

[3] AFOSI IG investigators also interviewed many witnesses shortly after the shooting and provided us copies of the recordings and transcripts of these interviews. We reviewed those transcripts and incorporated the information in our investigation, where appropriate.

USA00005255

We also obtained, reviewed, and analyzed numerous documents relevant to this investigation, including investigative case files, court-martial records, and mental health and medical records. In addition, we consulted with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), the FBI CJIS Division, and the Texas Department of Public Safety (the Texas Rangers).

This 131-page report provides the results of our investigation and is divided into nine parts.

This section, Part I, contains the introduction to this report.

Part II describes Kelley's personal history before he enlisted in the USAF, as well as his performance and behavioral problems in the USAF. It also discusses the USAF law enforcement interactions with Kelley and its failure to submit Kelley's fingerprints and final disposition report to the FBI CJIS Division on several occasions.

Part III contains a chronology of the significant events related to this investigation, to place those events in context.

Part IV contains our analysis of the Federal law, DoD, USAF, and AFOSI policy that was applicable to the specific issues that we investigated. Additionally, we summarize previous DoD OIG reports that relate to the submission of fingerprints and final disposition report to the FBI CJIS Division.

Part V is the main part of this report. It describes the USAF's missed opportunities to collect and submit Kelley's fingerprints and his final disposition report to the FBI CJIS Division. First, we discuss each of the interactions with the USAF law enforcement and the missed opportunities it had to collect and submit Kelley's fingerprints and final disposition report to the FBI CJIS Division in detail. Second, we detail the AFOSI monthly supervisory reviews of the investigative case file and the policy that requires the reviews be documented in Investigative Information Management System (I2MS). Third, we examined AFOSI Detachment 225's personnel assignment history, its leadership gaps, and its investigative caseload to determine whether these factors may have contributed to the failure to submit Kelley's fingerprints to the FBI CJIS Division for inclusion in its database. Fourth, we describe Kelley's mental health history to determine if his mental health status should have been reported to the FBI CJIS Division for inclusion in its databases. Fifth, we analyzed whether the no contact order or the Military Protective Order, issued to Kelley in 2012, should have been entered into the National Crime Information Center (NCIC) database

USA00005256

and prohibited him from purchasing a firearm. Finally, we describe the events that occurred after Kelley's court-martial, and whether the USAF complied with the policy requirements for processing Kelley's fingerprints and forms.

Part VI contains our overall conclusions.

Part VII provides eight recommendations to the DoD and the USAF based on the findings of this investigation.[4]

Part VIII is Appendix A, which provides details of our prior evaluations on the collection and submission of fingerprints and final disposition reports to the FBI CJIS Division throughout the DoD.

Part IX is Appendix B, which contains the acronyms and abbreviations used within our report.

---

[4] We provided a draft of this report to the Office of the Under Secretary of Defense for Personnel and Readiness and to the USAF. We considered management comments when preparing the final report.

USA00005257

## II.   Factual Background

This section of the report provides detailed background on the facts and circumstances that led to the events on November 5, 2017, when former United States Air Force (USAF) member Devin P. Kelley shot and killed 26 people and wounded 22 others at the First Baptist Church of Sutherland Springs, Sutherland Springs, Texas. It discusses Kelley's personal history before he enlisted in the USAF, as well as his performance and behavioral problems in the USAF.  It also discusses the USAF law enforcement interactions with Kelley and its failure to submit Kelley's fingerprints and final disposition report to the FBI Criminal Justice Information Services (CJIS) Division on several occasions.

### A.   Kelley's Background

Kelley was born on February 12, 1991, in San Marcos, Texas.  He attended and graduated from New Braunfels High School in New Braunfels, Texas.

On November 29, 2006, the New Braunfels Police Department (NBPD) arrested Kelley for possession of marijuana, a class B misdemeanor.  The NBPD referred the incident to the New Braunfels Juvenile Probation Office.  Kelley received 6 months of probation and 60 hours of community service.  The New Braunfels Juvenile Probation Office dismissed the matter on April 10, 2007.

Kelley was expelled from New Braunfels High School from December 2006 until February 2007.  During this time, Kelley enrolled in an unnamed alternative school.  However, Kelley graduated from New Braunfels High School in May 2009.

### B.   USAF Delayed Enlistment

On June 12, 2009, Kelley entered the USAF Delayed Enlistment Program through the San Antonio Military Entrance Processing Station.[5]  As part of his enlistment paperwork package, he completed the "USAF Drug and Alcohol Abuse Certificate."  On this document, under Section II, "Certification at Time of Application," he answered "No" in response to the questions, "Have you ever used or experimented with Marijuana" and "Have you ever experimented with, used, or possessed any illegal drug or narcotic."  Kelley later recertified this information as accurate on January 5, 2010, the day he entered active military service.

---

[5]  The Delayed Entrance Program is a program for recruits who enlist in the Ready Reserve and agree to subsequent enlistment in an Active Component of the Military Services.

USA00005258

(FOUO) On January 3, 2010, the NBPD received a complaint from a 14-year-old girl who had told a youth pastor that Kelley had sexually assaulted her approximately one week earlier. The pastor in turn spoke to the girl's father, who then contacted NBPD. An NBPD patrol officer interviewed the girl at her residence. She said that she and her "friend," [Kelley], went for a walk around the neighborhood, after which she and Kelley returned to and entered his vehicle. The girl reported that after getting into the car, Kelley held her arms and assaulted her. Specifically, she stated that at some point after entering the vehicle Kelley "grabbed" her hand and forced her to touch his exposed penis. The girl stated she pulled her hand away, got out of the vehicle, and ran home. The girl provided Kelley's telephone number, work address, and vehicle description to the police.

On January 5, 2010, Kelley entered active military service in the USAF. He attended Basic Military Training at Joint Base San Antonio-Lackland, Texas.

(FOUO) On February 3, 2010, NBPD detectives interviewed the 14-year-old girl again. She stated that on January 3, she had been walking in her neighborhood and received a telephone call from Kelley. After some talk, they agreed to meet near her house. Upon his arrival, they both walked around the neighborhood and ended up back at his car. The girl stated that Kelley opened the door and pushed her inside the back seat, kissing her face and neck as he held her hands. The girl stated that her cellular telephone rang and she told Kelley that she had to go, got out of the car, and ran to her house.

(FOUO) On March 1, 2010, the Comal County Crisis Center notified the NBPD that the girl did not wish to participate further in the investigation. The NBPD detectives terminated the investigation without interviewing Kelley.

## C.    USAF Initial Assignments

On March 5, 2010, Kelley graduated from Basic Military Training. He received permanent change of station (PCS) orders to the 316th Training Squadron, Goodfellow Air Force Base (AFB), Texas, and on April 14, 2010, began training to be a Network Intelligence Analyst. This USAF training course consisted of two main blocks or periods of instruction: the "Network Intelligence Analysis Fundamentals" course, and the "Network Intelligence Analysis Apprentice" course. Kelley successfully completed the first block of instruction on May 6, 2010. A Military Training Assessment at this time stated that Kelley was an "Excellent Airman; he had no derogatory paperwork."

USA00005259

However, Kelley had academic issues with the second block of instruction. Kelley's Student Training Report for this course indicated that he had failed four tests, even after receiving one-on-one training sessions with course staff. In a report on Kelley, Military Training Leaders recommended Kelley for elimination from the course because he did not meet the academic standards. The report also noted that Kelley "had several minor disciplinary infractions," but did not specify the infractions.

On December 16, 2010, Kelley was reassigned to the Traffic Management career field.

On January 11, 2011, Kelley received PCS orders from Goodfellow AFB to the 49th Logistics Readiness Squadron, Holloman AFB (HAFB), New Mexico. Kelley's PCS orders included a stop in Fort Lee, Virginia, to complete his Traffic Management Apprentice technical training from January to March 2011.

Shortly after Kelley's arrival at HAFB in late April 2011, he began receiving disciplinary actions. Between June 19, 2011, and March 20, 2012, he accumulated four memorandums for record (MFRs), four Letters of Counseling (LOCs), and five Letters of Reprimand (LORs).[6] The details regarding these administrative punishments were:

- July 22, 2011 – LOC for using his personal cellular telephone while in the unit warehouse, against local regulations;[7]
- July 26, 2011 – LOC for using his personal cellular telephone to text others during the Hazardous Materials Course, and failing six course progress checks and subsequently failing the course;
- August 31, 2011 – MFR for not counting the quantity of received property during the course of his duties;
- September 1, 2011 – MFR for processing equipment through the logistics system that was unserviceable;
- September 6, 2011 – LOC for missing a scheduled medical appointment;[8]
- September 9, 2011 – MFR for wearing headphones while in uniform;

---

[6]  According to Air Force Instruction 36-2907, "Unfavorable Information File," November 26, 2014, MFRs, LOCs, and LORs are administrative disciplinary measures available to USAF commanders and supervisors under USAF Instructions. These administrative disciplinary measures can be written or verbal, with LORs being more severe than LOCs, and LOCs more severe than MFRs. These actions are intended to improve, correct, and instruct subordinates who depart from standards of performance, military bearing, or integrity, for conduct either on duty or off duty, and whose actions degrade the individual and unit mission.

[7]  In the USAF, a military organization above a squadron level (group, wing, air division, numbered Air Force, air component command, Major Command) is an establishment, while a squadron and lower (squadron, flight, or detachment) is a unit.

[8]  According to Kelley's Family Advocacy Records, on this date he missed an appointment with that office. The Family Advocacy Records stated that Kelley "did not keep an appointment with Family Advocacy nor called to cancel/reschedule." The records did not indicate what the appointment was for; however, there is a note that reads, "1800-1830: No one home for scheduled HV [Home Visit]."

USA00005260

- September 9, 2011 – MFR for not logging off his computer;

- September 12, 2011 – LOR for shutting down a computer another person had been using with the intent to log that person off;

- September 29, 2011 – LOC for not completing an assigned task;

- February 16, 2012 – LOR for lying to his supervisor. Kelley called his supervisor a disparaging word. When confronted by his supervisor as to what he called her, Kelley lied, telling her that he had not said anything negative about her;

- March 19, 2012 – LOR for failing to properly process supply items in the warehouse where he worked;

- March 19, 2012 – LOR for losing his military identification card for a second time, resulting in a coworker having to report to base and cover duties assigned to Kelley because he could not access the base without a military ID card; and

- March 20, 2012 – LOR for failing to report to his duty section after being ordered to do so.

## D. Domestic Violence Incidents

Kelley met his first wife, Tessa Kelley, sometime during 2007 or 2008, when both lived in New Braunfels. In February 2011, Kelley began dating Tessa Kelley, who had a son from a previous relationship. Kelley and Tessa Kelley were married on April 12, 2011.

(FOUO) On June 2, 2011, Tessa Kelley took her son, who was approximately 11 months old, to the William Beaumont Army Medical Center, Fort Bliss, El Paso, Texas, for treatment for a febrile seizure (involving body spasms for 4 to 5 seconds and his eyes rolling back) with vomiting and diarrhea. A nursing note for this period indicated concern for child abuse or neglect.[9] Due to the son's condition, he was transferred and admitted to Providence Hospital, El Paso, Texas, for treatment in the children's Intensive Care Unit. A bone survey and chest x-rays conducted at Providence Memorial Hospital revealed that the son had suffered a fractured right clavicle. The hospital released the son on June 4, 2011. On June 6, 2011, a pediatrician at the 49th Medical Operations Squadron, HAFB, conducted a post-hospitalization follow-up examination on the son. A medical record review noted that the son's febrile illness and diarrhea had resolved and he "was doing well."

---

[9] During the course of the AFOSI investigation, a USAF Child Abuse Pediatrician reviewed the injuries noted in Kelley's stepson's medical records. She noted that during patient triage, while questioning Tessa Kelley about her son's injuries, Tessa stated Kelley "kicked her" in the leg. Triage nurses noted that, "she [Tessa Kelley] did not explain [the circumstances] further."

USA00005261

On June 8, 2011, Kelley and Tessa Kelley took the son to the Gerald Champion Regional Medical Center Emergency Room, Alamogordo, New Mexico, because the son was vomiting and "falling over." Medical Center staff called the pediatrician at HAFB, who went to the hospital and conducted an examination on the son. During the examination, the pediatrician noted bruising on the son's left cheek that was not on his face during the June 6, 2011 examination. The bruising "appeared to be fresh and a little purple," and "appeared to be a hand print."

(FOUO) On June 9, 2011, the pediatrician from HAFB requested that the son be admitted to the Medical Center. The pediatrician was concerned that the injury was from a slap. The son was admitted to the hospital after a Computerized Tomography scan showed fluid collection consistent with a small left frontal subdural hemorrhage on his head. The pediatrician notified the Children, Youth and Families Department (CYFD), Alamogordo, New Mexico, who, in turn, notified the Air Force Office of Special Investigations (AFOSI) Detachment 225 at HAFB of the possible child abuse.[10]

## E.    Initiation of the AFOSI Criminal Investigation

On June 9, 2011, AFOSI Detachment 225 at HAFB, opened an investigation for assault on a child, listing Kelley as a subject, based upon information from a social worker at the CYFD.[11] The same day, the AFOSI conducted a subject interview of Kelley and collected his fingerprints.

After receiving Article 31 rights advisement for assault, Kelley waived his rights and agreed to speak to the Special Agents.[12] Kelley denied striking his stepson and denied having any knowledge of Tessa Kelley striking the son. Kelley stated that he did not spend very much time with his stepson, and that he and Tessa Kelley were the only ones with direct access to his stepson. Kelley claimed he did not know how his stepson received the injury to his head, saying that Tessa Kelley first observed the injuries to his stepson's face June 8, 2011, while driving with Kelley to the Gerald Champion Regional Medical Center. Kelley suggested that his stepson received the injury from falling on the floor while crawling or playing in his crib. At the end of

---

[10] An AFOSI Detachment is a geographically separated field office under the operational control of a regional headquarters. In the case of AFOSI Detachment 225, the regional headquarters was the 2nd Field Investigations Region, located at Langley AFB, Virginia.

[11] (FOUO) Due to the nature of Kelley's stepson's injuries and circumstances surrounding the matter, AFOSI listed both Kelley and Tessa Kelley as subjects for the assault investigation. For more information about the AFOSI Case No. 225-C-128-G-32329111651413, see Part V of this report.

[12] In accordance with 10 U.S.C., Section 831 and Article 31(b), any person subject to the Uniform Code of Military Justice must be advised of their rights prior to interrogation or any request for a statement. Article 31(b) states, "No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial."

USA00005262

his interview with the AFOSI Detachment 225 Special Agents, Kelley's fingerprints and a deoxyribonucleic acid (DNA) sample were collected, and he was released to his unit representatives.[13]

This was the first opportunity for the USAF to submit Kelley's fingerprints. Submission of Kelley's fingerprints should have occurred if the Detachment received a probable cause determination from the Staff Judge Advocate or other legal advisor that Kelley committed the crimes he was accused of, as required by DoD Instruction (DoDI) 5505.11, "Fingerprint Card and Final Disposition Report Submission Requirements." We reviewed AFOSI's investigative documentation and did not find any evidence indicating that a probable cause determination to submit Kelley's fingerprints to the FBI CJIS Division had occurred.

(FOUO) On June 12, 2011, a Registered Nurse at Providence Hospital told AFOSI Detachment 225 Special Agents that a bone survey conducted on June 10, 2011, showed a fracture of Kelley's stepson's right clavicle.

On June 24, 2011, Kelley's stepson was placed in foster care because of the unexplained injuries and the suspicions of child abuse.

(FOUO) On June 24, 2011, Tessa Kelley told her sister that Kelley had physically assaulted her by grabbing her around the throat, choking her, and throwing her against a wall. Tessa Kelley's sister, a USAF Reservist, reported the assault to her USAF Reserve leadership, who reported it to the 49th Security Forces Squadron, HAFB. The 49th Security Forces Squadron patrol went to the Kelley's residence. Its report of the incident stated that the investigation "determined no crime had been committed and there was no evidence of any injuries to either party."

However, due to the AFOSI's ongoing investigation involving Kelley and Tessa Kelley, the 49th Security Forces Squadron contacted AFOSI Detachment 225 Special Agents. The AFOSI Detachment 225 Special Agents and USAF representatives decided to take Tessa Kelley to an off-base restaurant to eat, then to a local park to talk. Tessa Kelley told them that the incident was the result of "stress due to [her] son being taken by CYFD." Tessa Kelley stated that she and her husband were "fighting," but that they were planning to participate in marital counseling. Tessa Kelley stated that her "main goal was to get the son back." Tessa Kelley did not answer most of the AFOSI Special Agent's questions and did not provide any further information about the alleged assault.

---

[13] The AFOSI Detachment 225 Special Agents mailed the DNA kit to U.S. Army Criminal Investigation Laboratory. The Chief of the Combined DNA Index System Branch verified that the U.S. Army Criminal Investigation Laboratory received Kelley's DNA from the AFOSI Detachment 225 on July 5, 2011. The AFOSI Detachment 225 Special Agents could not explain why the DNA kit was mailed but Kelley's fingerprint cards were not.

USA00005263

In July 2011, the AFOSI case agent took leave before deploying to Afghanistan.[14] The case agent deployed from August 2011 through February 2012.[15]  According to a Special Agent from AFOSI Detachment 225, due to staffing challenges, very little investigative activity occurred on the Kelley assault investigation while the case agent was deployed.

On September 7, 2011, Kelley voluntarily went to the HAFB Mental Health Clinic as a walk-in patient and stated that he was unable to cope with the stress he was under at work.  He stated that Child Protective Services was removing his stepson from the house due to an allegation of abuse caused his stress.  Kelley also stated that his supervisor was constantly "yelling at work."  A staff psychologist, wrote in Kelley's mental health record that treatment would concentrate on his "anxiety/attention/occupational; continue to develop relational and mood management coping skills."  The psychologist also wrote that Kelley would be seen weekly.  Between September 7, 2011, and February 22, 2012, Kelley was treated 17 times at the HAFB Mental Health Clinic.  During this time, Kelley was prescribed Atomoxetine, Ibuprofen, Albuterol, Fluticasone, and Omeprazole.[16]

In a report on Kelley's October 11, 2011, visit, a psychologist wrote that Kelley had difficulty interacting with authority figures and that he perceived that they were criticizing him.  The psychologist indicated that Kelley was not in "acute mental status" and that there was no safety concern noted at that time.

On January 10, 2012, the psychologist examined Kelley again and reported that Kelley was "able to attend to and focus on pertinent material at home and work." The psychologist also wrote that Kelley was able to "control and direct his energy appropriately" and that there were "no significant changes in [his] symptoms."

On February 17, 2012, Kelley told a 49th Logistics Readiness Squadron Senior Non-commissioned Officer (SNCO) in his chain-of-command that Tessa Kelley had left a note at their house and he could not find her. This SNCO informed the 49th Logistics Readiness Squadron First Sergeant, who in turn informed the 49th Security Forces Squadron Base Defense Operations Center (BDOC). According to the First Sergeant, the BDOC issued an alert to all 49th Security Forces Squadron patrols for them to "be

---

[14] A case agent is the AFOSI Special Agent that is primarily responsible for advising the AFOSI Detachment leadership on the status when requested. AFOSI Detachment leadership is ultimately responsible for the AFOSI investigations within their Detachments.

[15] The case agent later permanently left AFOSI Detachment 225 in October 2012.

[16] According to the WebMD website, Atomoxetine is prescribed to treat attention deficit hyperactivity disorder. Ibuprofen is prescribed to relieve pain. Albuterol is prescribed to treat wheezing and shortness of breath caused by breathing problems (such as asthma, chronic obstructive pulmonary disease). Fluticasone is prescribed reduce swelling in the nose. Omeprazole is prescribed to treat stomach and esophagus problems (such as acid reflux or ulcers). www.webmd.com.

USA00005264

on the lookout" for Tessa Kelley. Shortly thereafter, a guard at the HAFB front gate
notified the BDOC that a woman matching Tessa Kelley's description had walked out
through the gate with a suitcase in her hand.

(FOUO) Later that day, Tessa Kelley called the 49th Security Forces Squadron
to report that Kelley had abused her and that she was staying with her aunt in El Paso.
The BDOC contacted the First Sergeant, who called Tessa Kelley's aunt and asked her
to bring Tessa Kelley to the 49th Security Forces Squadron to make a statement about
the assault. Tessa Kelley got on the telephone and told the First Sergeant that Kelley's
actions caused her to fear for her life. In response, the First Sergeant told her that the
49th Logistics Readiness Squadron Commander would issue Kelley a no contact order.[17]

(FOUO) The SNCO brought Kelley to the 49th Security Forces Squadron office
so the First Sergeant could speak to him regarding the alleged assault. Before the
First Sergeant could read Kelley his rights, Kelley made a spontaneous statement that
he had heard Tessa Kelley abusing her son on "many" occasions. Specifically, Kelley
stated, "Every time the baby woke up she [Tessa Kelley] would get up out of bed and
go to the [baby's] room, I heard a thump and the baby would start crying."

## F.    Initiation of 49th Security Forces Squadron Criminal Investigation

AFOSI's investigative case file on Kelley reported that on February 17, 2012,
Tessa Kelley returned to HAFB and told 49th Security Forces Squadron personnel
about domestic abuse by Kelley. Tessa Kelley told the 49th Security Forces Squadron
investigators that the reason she left Kelley was to get away from him "and the abuse,"
that Kelley had been physically abusing her since July 2011 and that Kelley had choked
her on multiple occasions. She stated that in one instance on December 24, 2011,
Kelley pushed her against a wall and choked her because she had told him that she
did not want to visit his family and stated, "You better pack your bags or I'll choke
you to the ceiling and pass you out." Tessa Kelley also said that on another occasion,
she and Kelley argued over her wanting to go for a walk at night. This argument
resulted in Kelley choking her, kicking her in the stomach, and then dragging her by
her hair into the bathroom. She said that Kelley told her "I'm going to water-board
you" and stuck her head directly under the showerhead.

---

[17]  Tessa Kelley told 49th Security Forces Squadron investigators about how Kelley abused her, which is detailed in 49th Security Forces
Squadron SFMIS Case No. I20120200128.

USA00005265

Tessa Kelley also told the investigators that Kelley emotionally and physically abused her throughout their marriage. Tessa Kelley provided other examples of abuse, stating that Kelley would threaten to choke her if she did not do as he said, and would slap her, kick her, pull her hair, drag her through their house, and control her. She stated that Kelley told her if she "said anything to anybody he would bury her in the desert somewhere." Tessa Kelley stated that the reason she had not reported the abuse sooner was due to fear for both her life and the life of her son.

On February 17, 2012, the 49th Security Forces Squadron investigators tried to conduct a subject interview of Kelley in their office regarding the assault. However, Kelley requested legal counsel and did not make a statement.

At this time, the 49th Security Forces Squadron did not collect his fingerprints. DoD and USAF policies required the submission of a fingerprint card (Federal Document 249 [FD-249], "Arrest and Institution Fingerprint Card") to the FBI CJIS Division when a law enforcement official determined, after coordination with the servicing Staff Judge Advocate or legal advisor, that probable cause existed to believe that the person committed an offense listed in DoDI 5505.11, Enclosure 2. Although the 49th Security Forces Squadron incident report states that the Staff Judge Advocate was briefed on the investigation, there is no indication that there was a probable cause determination made by either the Staff Judge Advocate or anyone in the 49th Security Forces Squadron. This was the second opportunity for the USAF to submit Kelley's fingerprints to the FBI CJIS Division.

According to Kelley's personnel information file, on February 17, 2012, Kelley's Commander issued Kelley a "no contact order" because of Tessa Kelley's complaint. The no contact order directed Kelley to have no contact with Tessa Kelley, prohibiting him from initiating any contact or communication with Tessa Kelley.[18]

## G.  Kelley's Mental Health Treatment

Kelley's mental health records showed that on February 21, 2012, he voluntarily went to the HAFB Mental Health Clinic as a walk-in patient. He told the staff psychologist that he was upset because his wife left him and because he believed that she told the 49th Security Forces Squadron that he assaulted her.

---

[18] According to DoDI 6400.06, "Domestic Abuse Involving DoD Military and Certain Affiliated Personnel," August 21, 2007, Incorporating Change 4, May 26, 2017, a Military Protective Order can be issued by a commander when necessary to safeguard a victim, quell a disturbance, and maintain good order and discipline.  The Military Protective Order is similar to a no contact order.  However, only Military Protective orders may be entered into NCIC.

USA00005266

According to Kelley's mental health records, on February 22, 2012, Kelley returned to the HAFB Mental Health Clinic because he was still upset that his wife left him. A HAFB Mental Health Clinic licensed clinical social worker stated that Kelley told her "he would like to go to the psychiatric hospital for help because he did not believe he could help himself on an outpatient status."

On February 23, 2012, Kelley voluntarily entered in-patient care at the Peak Behavioral Health Services (PBHS), where he remained until March 8, 2012.[19] During Kelley's intake evaluation, PBHS staff diagnosed him as having "an adjustment disorder with depressed mood." The PBHS staff wrote, "The patient reported feeling suicidal with a plan to shoot himself with a gun after his wife informed him that she was filing assault charges for an altercation that occurred three weeks prior to admission." Kelley told the PBHS personnel that he had frequent mood swings. Kelley also reported that he had severe anxiety. Kelley told a PBHS Clinical Nurse Specialist that he was diagnosed with Attention Deficit Hyperactivity Disorder while he was in the fourth grade. He also told the PBHS staff that the HAFB Mental Health Clinic had counseled him to help him cope with his Child Protective Services case, his marital problems, and his alleged emotional abuse from a female supervisor at work. During Kelley's in-patient treatment, he was prescribed Strattera for Attention Deficit Hyperactivity Disorder, Wellbutrin for depression, Clonazepam for anxiety, and Ambien for insomnia.

The Licensed Mental Health Counselor wrote an undated memorandum in Kelley's PBHS mental health file, stating that Kelley had learned to manage his anger and reduce his stress. She also wrote that Kelley appeared to be motivated during his psychoeducational therapy groups and wanted to make changes so he could have a healthier lifestyle and work on improving his marriage.[20]

On March 8, 2012, the PBHS discharged Kelley and told him to follow up with the HAFB Mental Health Clinic. Between March 14, 2012, and April 26, 2012, Kelley was seen at the HAFB Mental Health Clinic seven times. The last visit was April 26, 2012, during which Kelley told HAFB Mental Health Clinic personnel that he was experiencing more difficulty than ever before because the final hearing for the adoption of his stepson was one hearing away from resolution.

---

[19]  According to its website, PBHS is an in-patient mental health facility located at 5060 McNutt Road, Santa Teresa, New Mexico. http://peakbehavioral.com/. Strategic Behavioral Health, LLC purchased the PBHS facility on May 20, 2013, from Universal Health Services, Inc. and became custodian of Kelley's medical record.

[20]  According to the medical dictionary website, psychoeducational therapy is a health program that addresses stress management and health education. https://medical-dictionary.thefreedictionary.com/psychoeducational.

USA00005267

## H.    Kelley Threatens Tessa Kelley

According to Kelley's pretrial confinement appeal package, in approximately mid-March 2012, while at their residence, Tessa Kelley watched as Kelley put one bullet in a .38 Special revolver.[21]  Tessa Kelley stated that, Kelley then pointed the gun at his own head and pulled the trigger three times.  Kelley then pointed the gun at Tessa Kelley and "threatened" her.[22]

(FOUO) In addition, according to Tessa Kelley, on approximately April 23, 2012, while Tessa Kelley and Kelley were driving to El Paso to pick up Tessa Kelley's mother (who was flying in to visit them) from the airport, Tessa Kelley asked Kelley to slow down.  She said Kelley replied, "Shut the F*** up, don't tell me how to drive."[23]  The police later pulled Kelley over and cited him for speeding.  After receiving the ticket and continuing to drive, Kelley blamed the ticket on Tessa Kelley and pulled the car over again.  She stated that Kelley then pulled out a gun and placed the muzzle of the weapon against her temple, stating, "Do you want to die?"  Tessa Kelley pushed the gun away and began to cry.  Kelley then put the gun in his mouth and asked her why she wanted to be with him.  Kelley stated she was stupid for being with him and that she should know the reason why.  Kelley then told her that he had slapped her son on June 8, 2011, the day her son was taken to the hospital.  Kelley additionally stated that he had struck his stepson on multiple occasions, the first time being in March 2011, in New Braunfels.

## I.    Kelley Confesses to Abusing his Stepson

According to Tessa Kelley's AFOSI testimony, in February 2012, Kelley had locked himself in an El Paso hotel room's bathroom.  Tessa Kelley said that while Kelley was locked in the bathroom she heard him crying and repeating the words, "I'm so sorry [stepson], I'm sorry I did this to you," approximately ten times.  Tessa Kelley also stated that she tried to confront Kelley about his statement, but he did not reply.

On April 23, 2012, Kelley again told Tessa Kelley that he was the one who injured her son the day they took him to the hospital in June of 2011.  Kelley also told Tessa Kelley that he had admitted to the base Chaplain that he had hurt her son. Tessa Kelley told Kelley that "God would want him to do the right thing and tell the truth about what he had done," to which he agreed.

---

[21]  (FOUO) As noted above, Kelley's Commander issued him a no contact order on February 17, 2012, that had an expiration date of May 17, 2012.  In her April 10, 2018, interview with DoD OIG Investigators, Tessa Kelley stated that she was never told about the no contact order.  After reporting the incident the 49th Security Forces Squadron, Tessa Kelley moved into her aunt's residence in El Paso and stayed there for approximately one to four months.  She did not specify to the 49th Security Forces Squadron investigators what the frequency of her contact with Kelley was during that time.

[22]  The description of this incident is taken from Tessa Kelley's summarized deposition presented at Kelley's Article 32 hearing.

[23]  The description of these events is based on the May 3, 2012, AFOSI interview of Tessa Kelley.

USA00005268

(FOUO) On April 27, 2012, based on guidance from her sister, Tessa Kelley asked Kelley to make a "confession recording." Tessa Kelley's sister had encouraged her to have Kelley record a confession documenting that he had injured his stepson. Tessa Kelley's sister told her to pretend that she would still love Kelley and would stay with him if he told the truth regarding his stepson's injuries.

(FOUO) Tessa Kelley stated she talked him "into making a full confession video" on April 27. In the video, he admitted to hitting her son multiple times in frustration. Kelley stated that this frustration would lead him to push, strike, and slap his stepson. Kelley also acknowledged that he caused the bruising on his stepson's face on June 8, 2011. Kelley further admitted that he caused his stepson's "brain and clavicle injuries." He stated that he had pushed his stepson down multiple times and shook him on at least two occasions. Kelley stated that, on one occasion, he shook his stepson so hard that his eyes rolled to the back of his head and he had a seizure. On April 27, 2012, after completing the recording, Kelley gave it to Tessa Kelley.

On April 28, 2012, Kelley visited his parents in San Antonio. According to a PBHS physician, he told the physician that he had thoughts about shooting himself with his gun. On April 29, 2012, after speaking with the chaplain, Kelley's father escorted Kelley back to HAFB.

On April 29, 2012, Tessa Kelley provided the recording of Kelley's confession to his First Sergeant. The First Sergeant provided the recording to AFOSI Detachment 225.

On April 29, 2012, Kelley's chain-of-command arranged to have him admitted back into the PBHS.

On April 30, 2012, Kelley voluntarily entered the PBHS for the second time. Kelley denied his wife's report that he was going to kill his sergeant. Kelley stated that he was going to shoot himself and PBHS staff put a high-risk notification alert on his chart due to his homicidal and suicidal indicators.

On May 3, 2012, AFOSI agents reinterviewed Tessa Kelley. She stated that she thought Kelley might have hurt her son, but she had not seen him do anything to hurt her son. She stated that she began suspecting him of "injuring" her son when Kelley started physically, verbally, and mentally abusing her. Tessa Kelley stated that Kelley had struck, kicked, choked, and pulled her hair out on multiple occasions. She stated that Kelley threatened to kill her if she ever reported the abuse to police, or any other party. Additionally, Kelley had stated to her, "If the cops show up at my door, I will shoot them." She also said that he had told her, "My work is so lucky I do not have a shotgun because I would go in there and shoot everyone."

USA00005269

Tessa Kelley said that on one occasion while driving, Kelley struck her in the stomach in front of two friends, threatening to beat her if she continued speaking. During the AFOSI investigation, the two "friends" in question were identified and one of them was interviewed. The other friend did not want to speak to law enforcement. However, the AFOSI summary of those interviews did not cover this incident; therefore, AFOSI could not corroborate Tessa Kelley's allegation that her husband, Kelley, struck her while they were driving with those friends.

(FOUO) In the AFOSI summary of a separate interview, the biological father of Tessa Kelley's son said that Tessa Kelley's sister had told him that Kelley choked her with his hands. Tessa Kelley's sister told AFOSI Special Agents that she had witnessed Kelley verbally abuse Tessa Kelley on multiple occasions. She also told the Special Agents that she was "aware" of Kelley physically abusing Tessa Kelley but did not see any bruising or missing hair. In an interview of Tessa Kelley's childhood friend, he stated that Tessa Kelley told him about "all of the times" Kelley abused her. Tessa Kelley included the details of how Kelley would "hit her in the stomach and pull her hair out" and how he attempted to "water board" her. Tessa Kelley told her childhood friend that water boarding consisted of Kelley pushing her head under the shower faucet and turning on the water.

On June 6, 2012, a PBHS staff member reported that he saw Kelley looking at an internet website "related to guns." According to the PBHS records, it was not clear what Kelley was looking for or whether he was trying to purchase or had already purchased a weapon at that time. A PBHS Clinical Nurse Specialist wrote in Kelley's mental health record:

> [T]he patient has been confronted about his behavior of looking at websites related to guns when he is under legal and occupational scrutiny related to his comments and his involvement, but again his insight and judgment are so impaired that he does not make the connection about how that does not look good on him.

On June 7, 2012, Kelley left the PBHS facility in Santa Teresa, New Mexico, without permission from the staff and without notifying anyone.

On June 8, 2012, a PBHS Director located Kelley at a Greyhound bus station in El Paso. A Greyhound security officer and an El Paso police officer handcuffed him, and police officers from the Sunland Police Department transported him back to PBHS.[24]

---

[24]  The Greyhound Bus station in El Paso is approximately 12 miles from the PBHS facility, Santa Teresa, New Mexico.

USA00005270

On the same day, Kelley's Commander prepared a pretrial confinement package. The package included a memorandum stating that Kelley's Commander was "convinced" that Kelley was "dangerous and likely to harm someone if released." Kelley's Commander also cited Kelley's Internet search for body armor and firearms as further justification for the pretrial confinement. The Commander concluded that Kelley was a flight risk and ordered him into pretrial confinement.

The 49th Security Forces Squadron picked up Kelley from the PBHS and transported him to the 49th Security Forces Squadron Confinement Facility.

Because Kelley was ordered into pretrial confinement, USAF Corrections System policy required the confinement facility personnel to fingerprint Kelley during the in-processing into the confinement facility and to submit those records to the FBI after sentencing.[25] We could not determine if his fingerprints were taken at this point. When we checked for the 49th Security Forces Squadron Confinement Facility records on July 2, 2018, the USAF informed us that it was unable to locate any of the 49th Security Forces Squadron Confinement Facility records. The USAF also informed us that the facility closed on May 25, 2016, and that the records were likely destroyed in accordance with USAF records disposition policy.[26]

We contacted an FBI CJIS Criminal History Information and Policy Unit program analyst who informed us in an e-mail that:

> We did a check of anything coming in to the NGI [Next Generation Identification] utilizing the subject's name. That would show us if anything was submitted (including fingerprint rejections). We do not show that a criminal submission ever came in with that name (from any agency).

Therefore, we could not determine if the 49th Security Forces Squadron collected Kelley's fingerprints on the fingerprint card. However, we do know that Kelley's fingerprints were not submitted after his sentencing, as required.

---

[25] AFI 31-205, "The Air Force Corrections System," April 7, 2004, Incorporating Change 1, July 6, 2007, Certified Current on April 28, 2011, required USAF confinement facility personnel to complete two FDs-249 on all inmates. It directed that confinement facility personnel were to collect the inmate's fingerprints during their in-processing into the facility. However, the fingerprints were not submitted to the FBI CJIS Division until the sentence was adjudged.

[26] Inmate confinement facility records for inmates that were released from local confinement could have been destroyed 4 years after the inmate's release from confinement, in accordance with Air Force Manual 37-139, Table 31-2, Rule 1. The USAF was unable to provide documentation showing when or where the records were destroyed, but the records would have been eligible for destruction in December 2016.

USA00005271

(FOUO) On June 8, 2012, AFOSI Detachment 225 Special Agents interviewed Kelley regarding Tessa Kelley's assault allegation and his Absent without Leave status when he left the PBHS facility. After the agents advised him of his rights, Kelley told the agents that he wanted to talk about things but could not due to his legal counsel request. However, according to the AFOSI report, Kelley told them that "something tragic had happened and he wanted to kill himself." Kelley also told the agents that he "escaped" from the PBHS facility because he was planning to go to New Braunfels, to plan his suicide. Kelley told agents that he made a confession video "on his own free will." He stated that Tessa Kelley had told him that she was pregnant, but she was upset and wanted to get a divorce. Kelley also stated that Tessa Kelley had told him that she went to El Paso, and had a miscarriage, but Kelley did not provide any more details.

Because AFOSI Detachment 225 Special Agents were in possession of Kelley's confession, conducted a subject interview, and Kelley was ordered into pretrial confinement, DoD policy required the Special Agents to collect and submit Kelley's fingerprints to the FBI CJIS Division.[27]  This was the third opportunity for the USAF to collect and submit Kelley's fingerprints to FBI CJIS Division.

On June 25, 2012, Kelley's Commander issued him a Military Protection Order to prevent Kelley from abusing Tessa Kelley and her son any further. The Military Protection Order required that any communication between Tessa Kelley and Kelley be through his First Sergeant, until further notice.[28]

## J.    AFOSI Interviews Witnesses in the Kelley Investigation

From May 1, 2012 through September 28, 2012, AFOSI Detachment 225 Special Agents conducted interviews of witnesses, such as friends and family of Kelley and Tessa Kelley, to identify the facts and circumstances surrounding their relationship and verify any instances of abuse. AFOSI interviewed three witnesses who said they had knowledge of verbal abuse, domestic assault, and sexual abuse by Kelley.

---

[27]  Kelley's Commander ordered Kelley into pretrial confinement on June 8, 2012, stating that he had "reasonable grounds to believe" Kelley assaulted Tessa and her son. In a memorandum dated June 10, 2012, the Pretrial Confinement Review Officer found that "adequate probable cause" existed to believe Kelley had assaulted Tessa and her son.

[28]  According to DoDI 6400.06, a commander can issue a Military Protective Order when necessary to safeguard a victim, quell a disturbance, and maintain good order and discipline while a victim has time to pursue a protection order through a civilian court, or to support an existing Civilian Protection Order.  A commander can use DD Form 2873, "Military Protective Order," to issue the Military Protective Order.

USA00005272

FOR OFFICIAL USE ONLY

### 1. Witness Interview 1

An acquaintance of Tessa Kelley stated that he believed that the Kelleys did not have "a good relationship." The acquaintance opined that Kelley "controlled" Tessa Kelley so she would not be able to tell people about the ongoing abuse she received from Kelley. The acquaintance stated that Tessa Kelley was scared of her husband but that she kept going back to him because she felt she would lose her child. Tessa Kelley told the acquaintance about one occasion when Kelley grabbed and yanked Tessa Kelley's hair, and repeatedly struck her in the stomach and kicked her. Additionally, Tessa Kelley told the acquaintance that Kelley attempted to "water board" her on at least one occasion. Tessa Kelley told the acquaintance that water boarding consisted of Kelley pushing her head under the shower faucet and turning on the water. The acquaintance believed the relationship became abusive in approximately January 2012, when he observed bruises on Tessa Kelley.

### 2. Witness Interview 2

(FOUO) The second witness, Tessa Kelley's sister, described Kelley as "possessive and controlling" of Tessa Kelley. The sister said Kelley followed Tessa Kelley "everywhere," including the bathroom. The sister stated he would not allow Tessa Kelley to see her friends. The sister also witnessed Kelley verbally abuse Tessa Kelley on multiple occasions. The sister stated that she was also aware through Tessa Kelley that Kelley pulled a gun on Tessa Kelley, and was aware that he physically abused Tessa Kelley. The sister stated that Kelley "played mind games" with Tessa Kelley and in one instance asked Tessa Kelley, "What if I was the one that hurt [your son]?"

### 3. Witness Interview 3

(FOUO) Tessa Kelley's brother stated that in January 2012, while Kelley and Tessa Kelley were home visiting family, Kelley spent the night at the home of Tessa Kelley's brother. Also present was the brother's girlfriend. The brother stated that the following day, his girlfriend told him that Kelley had sexually assaulted her. The girlfriend told Tessa Kelley's brother that at approximately 3:00 a.m., Kelley attempted to put his hands down her pants. The girlfriend told Tessa Kelley's brother that she asked Kelley to stop, pushing his hands away, but Kelley persisted and then ultimately pulled his penis out and masturbated in front of her. Later, after she went to sleep, she felt Kelley grabbing her inner thigh, and stopped him once again.

USA00005273

(FOUO) Tessa Kelley's brother confronted Kelley, but Kelley denied everything and called the girlfriend a "crazy b****." Tessa Kelley's brother stated that Kelley later admitted the events to Tessa Kelley but told her he would kill Tessa Kelley if she told anybody. The brother stated that Tessa Kelley told him she "was beat" by Kelley. Tessa Kelley's brother stated that Tessa Kelley confided this information after Kelley confessed that he tried to "hook up" with the girlfriend of Tessa Kelley's brother.[29]

## K.    Interviews of Kelley's Former Girlfriends

(FOUO) From June 18, 2012, to October 1, 2012, AFOSI Detachment 225 Special Agents also identified and interviewed four of Kelley's former girlfriends. They described instances of sexual assault and abuse by him. There is no evidence that the former girlfriends ever reported the alleged abuse to any law enforcement agency before their interview with the AFOSI Detachment 225 Special Agents. The following sections describe the interviews with the four former girlfriends.

### 1.    Former Girlfriend 1

(FOUO) One former girlfriend stated she met Kelley in 2005, while she was in the seventh grade in New Braunfels. Kelley was approximately 14 years old. She dated him for approximately 8 months, but ended the relationship due to his "constant verbal and sexual abuse." She stated that she tried to end the relationship numerous times, but Kelley would say he would kill himself if she did. Kelley told her he would kill himself approximately five to eight times throughout their relationship. She also stated that Kelley "made her do things no seventh grader should." She asserted that he would force her to give him oral sex, pushing her head down to his groin, and he forced her to masturbate him. He also touched her genital area. The interviewee stated that all of the contact was non-consensual and that she only engaged in it because Kelley threatened to kill himself if she did not.

### 2.    Former Girlfriend 2

(FOUO) Another former girlfriend stated that around 2007, when she was 14 years old and in the seventh grade, she met Kelley at church. She dated Kelley for 1 year and 2 months. Kelley was approximately 16 years old. She stated that he ultimately broke up with her because he wanted to pursue other relationships. She also stated that Kelley "made her do things no seventh grader should be doing at their

---

[29]    (FOUO) AFOSI did not interview the potential victim or Kelley, or conduct an investigation into this allegation. In response to our inquiry into the details of the incident, AFOSI referred the allegation to the Comal County Sheriff's Office, but was unable to explain why it did not report or refer the incident when Tessa Kelley's brother brought it to AFOSI's attention originally.

USA00005274

(FOUO) age." During their relationship, Kelley was jealous, overly protective, and that their relationship was sexually and emotionally abusive. She stated that Kelley sexually abused her approximately four to five times after they broke up. He would force her to masturbate him by using verbal abuse to control her. He would call her often to harass her and to try to rekindle their relationship after they separated.

### 3. Former Girlfriend 3

(FOUO) Another former girlfriend stated that, in 2008, when she was 16 years old, she dated Kelley. Kelley was approximately 17 years old at the time. She described Kelley as "extremely possessive and controlling." She stated that Kelley controlled their relationship with verbal and mental abuse. Kelley would tell her that she was ugly, no one would want her, and she was not good for anyone. She stated that Kelley sexually abused her when Kelley forcefully took her "sexual virginity." She told him that she was not ready to have sexual intercourse; but Kelley kept reassuring her, it would be "ok." She stated that she did not know what to do about having sex with him. She stated that she tried pushing him away, but that Kelley was stronger than she was. He subsequently "inserted his penis into her vagina and penetrated her hymen." She stated that she thought Kelley had "mental issues." He would often tell her that "girls got raped all the time," and that she needed his protection to keep from being raped. He told her that he needed to keep an eye on her.

### 4. Former Girlfriend 4

(FOUO) Another former girlfriend stated that she dated Kelley when she was 14 years old for approximately 10 months.[30] She did not elaborate as to how old he was at the time. She described him as "emotional and possessive," and thought he might have a "mental disorder." Kelley pressured her "into doing many things sexually that she was not ready for in her stage of life." She did not feel that Kelley sexually assaulted her, but thought he was extremely persistent regarding sexual activity. She thought her relationship with him was not healthy and tried to break it off multiple times, but Kelley threatened to kill himself if she did. Kelley verbally abused her, telling her that no one else would ever want her, and tried to distance her from her parents. She stated that she felt brainwashed by him. She said that after they stopped seeing each other, Kelley would periodically contact her through Facebook and "beg" her to talk to him. She ultimately agreed and provided him her telephone number. Kelley initially texted her and complained about his, then, current relationship with Tessa Kelley. However, his text messages eventually turned sexual in nature. She described the texts as inappropriate in nature, and she stopped replying to him.

---

[30] (FOUO) The AFOSI investigative case file does not specify the dates of the relationship.

USA00005275

We did not find any documentation that the AFOSI Detachment 225 Special Agents referred the alleged abuse to any law enforcement agency.

## L. Pretrial Confinement, Court-Martial, and Confinement

On June 8, 2012, after Kelley was discharged from the PBHS facility, 49th Security Forces Squadron personnel escorted him back to HAFB. Kelley was ordered into Pretrial Confinement (PTC), which consisted of him being placed in the Confinement Facility. A PTC hearing later the same day determined that probable cause existed for Kelley to remain in PTC.

The PTC Memorandum, dated June 8, 2012, stated that Kelley was suspected of committing four violations of the Uniform Code of Military Justice (UCMJ), specifically:

- Article 86, Date of Offense, June 7, 2012, Description of Offense, Absence without leave;
- Article 128, Date of Offense June 9, 2011, Description of Offense, Assault on a Child;
- Article 134, Date of Offense, April 23, 2012, Description of Offense, Communication of a Threat; and
- Article 134, Date of Offense, April 23, 2012, Description of Offense, Assault.[31]

On July 26, 2012, Kelley was charged with suspected violations of UCMJ Article 128 (Assault), against Tessa Kelley and her son.

On August 2, 2012, an Article 32 hearing was conducted.[32] The hearing presented evidence that Kelley had abused Tessa Kelley from June 2011 through April 2012. The medical evidence presented during the hearing indicated her son suffered severe injuries inflicted by Kelley. The Article 32 Investigating Officer found reasonable grounds existed to believe that Kelley committed the offenses alleged.

On August 15, 2012, Kelley was also charged with a suspected violation of UCMJ Article 128 (Assault) for threatening Tessa Kelley with a firearm.

On August 27, 2012, charges were referred to court-martial. Kelley remained in confinement until the court-martial trial on November 6, 2012.

---

[31] In the 7-day PTC Review memorandum, Kelley was listed as having violated UCMJ Articles 86 (Absence without leave), Article 128 (Assault on a child), Article 128 (Aggravated Assault), and Article 134 (Communicating threats). The 7-day PTC memo amended the incorrect documentation in the 48-hour PTC hearing, which was dated June 8, 2012, listing violation D, Article 134 as "assault."

[32] An Article 32 hearing is a preliminary hearing that determines whether there is probable cause to believe an offense has been committed and the accused committed the offense; determines if the convening authority has court-martial jurisdiction; considers the form of charges; and recommends the disposition of the case.

USA00005276

On October 5, 2012, the AFOSI Detachment 225 Special Agent-in-Charge (SAIC) closed the investigation because he determined that all of the logical investigative steps had been conducted. He subsequently forwarded the report of investigation to the 49th Logistics Readiness Commander for command action.[33] The 49th Wing Commander, the 49th Mission Support Group Commander, and the Staff Judge Advocate received a copy for informational purposes.

On November 3, 2012, trial counsel offered, and the Staff Judge Advocate presented, Kelley and his defense counsel with an Offer for Pretrial Agreement (PTA).[34] The PTA specified that, in return for Kelley's plea of guilty to the charges of assault against his wife and stepson, the firearm charge would be dismissed and his confinement would not exceed 3 years.

On November 4, 2012, Kelley and his defense counsel agreed to the terms of the PTA.

On November 6, 2012, in accordance with the pretrial agreement, Kelley pleaded guilty in the General Court-Martial proceedings to assault on his wife and stepson. On November 7, 2012, the Court-Martial panel sentenced Kelley to a reduction in rank to Airman Basic, confinement for 12 months, and a Bad Conduct Discharge.

On November 7, 2012, after his conviction, Kelley returned to the Confinement Facility at HAFB. Because his conviction changed his status from pretrial confinement detainee to post trial inmate, Air Force Corrections System policy required the confinement facility personnel to collect and submit Kelley's fingerprints during his in-processing into the confinement facility.[35] This was the fourth opportunity for the USAF to submit Kelley's fingerprints and the first missed opportunity to submit Kelley's final disposition report to the FBI CJIS Division.

---

[33] Command action is the final administrative, judicial, or nonjudicial punishment decision that a commander takes against a military member to resolve disciplinary problems. In this case, command action would be the result of the court-martial.

[34] Air Force Policy Directive 51-1, "The Judge Advocate General's Department," November 19, 1993, states that the Staff Judge Advocate is the senior judge advocate on the installation and is responsible for providing legal services to the commander, the commander's staff, and others as appropriate.

[35] AFI 31-205, "The Air Force Corrections System," April 7, 2004, Incorporating Change 1, July 6, 2007, Certified Current on April 28, 2011, required USAF confinement facility personnel to complete two FDs-249, on all post-trial inmates. It directed one to be mailed to the FBI, CJIS Division, and the second was maintained in the correctional treatment file.

USA00005277

When we contacted the FBI in our investigation, a CJIS Criminal History Information and Policy Unit program analyst searched the Next Generation Identification system for Kelley's fingerprints and informed us that the FBI CJIS Division did not receive Kelley's fingerprint card from the 49th Security Forces Squadron. Therefore, we could not determine whether the 49th Security Forces Squadron had collected Kelley's post-trial confinement inmate fingerprints.

According to AFOSI policy, AFOSI Detachment 225 also should have submitted the final disposition report following the court-martial on the fingerprint card or the FBI-Department of Justice Form R-84, "Final Disposition Report," to the FBI within 15 days of Kelley's sentencing.[36]

On December 14, 2012, the AFOSI Detachment 225 received the AF Form 1359, "Report of Result of Trial." This was the second opportunity for the USAF to submit the final disposition report for Kelley's criminal history to the FBI. We determined that this final disposition report was not submitted to the FBI.

On December 18, 2012, Kelley was transferred to and incarcerated at the Naval Consolidated Brig, Miramar, California, until his release on March 31, 2013. Secretary of the Navy Instruction 1640.9C, "Department of the Navy Corrections Manual" January 3, 2006, requires its confinement facilities to collect and maintain prisoner fingerprints for inclusion in the prisoner's confinement records, but prohibits the submission of the fingerprints to the FBI.[37] We determined that Kelley's fingerprint cards were in his confinement records at the Naval Consolidated Brig, as required.

During his intake evaluation, Naval Consolidated Brig personnel placed Kelley in separate sleeping quarters from the general population while conducting medical and psychological assessments of him. Because of the evaluation, Kelley was classified as a "suicide risk in gown" as well as an "Assault risk – escape risk." These classifications required Kelley to be observed for 48 hours, from December 18 through December 20, for any signs of injurious behavior. The Initial Custody Classification Worksheet also indicated Kelley was taking three medications at the time: "Klarnapin (sic) – anxiety; Celexa – depression; and Ambien – sleep."

---

[36] AFOSI Manual 71-121, "Processing and Reporting Investigative Matter Certified Current on October 12, 2012," requires AFOSI Special Agents to submit a completed hard-copy final disposition report on military members to the FBI within 15 days of sentencing.

[37] Secretary of the Navy Instruction 1640.9C, "Department of the Navy Corrections Manual," January 3, 2006, deleted the requirement for the confinement facilities to submit fingerprints to the FBI. It now requires that confinement facilities collect and maintain fingerprints on all prisoners upon arrival for inclusion into the prisoner's confinement record. It also states that the fingerprints "shall" not be submitted to the FBI.

USA00005278

Following the observation period, Kelley was reassessed and moved into general population until his release. While incarcerated at the Naval Consolidated Brig, Kelley received seven "Inmate Observation Reports," documenting multiple violations of the Naval Consolidated Brig, Miramar, "Rules and Regulations and Standard Operating Procedures." The following violations of rules 410.A, 404.C and Standard Operating Procedures 1000.3, paragraph 8a(c)z were documented in the reports:

- Inmate Observation Report     January 27, 2013     Failed to show for med call;
- Inmate Observation Report     January 28, 2013     Untidy/unsanitary cell;
- Inmate Observation Report     February 8, 2013     Failed to show for med call;
- Inmate Observation Report     February 11, 2013     Failed to show for med call;
- Inmate Observation Report     February 14, 2013     Failed to show for med call;
- Inmate Observation Report     February 19, 2013     Unsatisfactory cell;
- Inmate Disciplinary report     February 19, 2013     Failed to show for med call on three or more dates; and
- Prisoner Observation Report     March 23, 2013     Talking in med line.[38]

While in confinement, Kelley attended and completed various treatment classes, including Dialectical Behavioral Therapy, Victim Impact, Substance Abuse Education, Substance Abuse Training Program, Anger Management, and Crossroads. Because Kelley's confinement at the Naval Consolidated Brig was not long, he did not have enough time to enter into Violent Offender Treatment.[39]

The Naval Consolidated Brig documented several items relating to Kelley's mental health. Upon initial intake, Kelley completed an intake questionnaire assessing mental and psychological stability. Kelley indicated on the questionnaire that he had previously contemplated committing suicide. Kelley was listed as a suicide risk as well as a flight risk. Because Kelley indicated that he had suicidal tendencies while under initial observation, for the first few days of confinement he was placed in a special gown designed to inhibit the ability to commit suicide. After the initial observation period between December 18, 2012, and December 20, 2012, Kelley was reassessed and cleared for general population.

---

[38]   The Naval Consolidated Brig policies state that prisoners shall inspect the cell area for any obvious discrepancies, including damages or prohibited property, and document this on a cell inspection form. Upon moving out of a cell for any reason, staff will inspect the cell and the prisoner will be held responsible for discrepancies. Any prisoner not where the prisoner is supposed to be is a violation of movement regulation and subject to disciplinary action. When a prisoner is prescribed a medication, a corpsman will determine what appointment times the prisoner should attend in order to properly take the medication. Failure to report to take the medication as prescribed is a violation of the policy.

[39]   On November 20, 2017, the Naval Consolidated Brig, Miramar, Commanding Officer told us that an inmate who does not have enough time at the confinement center to complete a specific treatment class will not be admitted into the class, even for a portion of it, as attending only a part of it may be harmful to the inmate.

USA00005279

On December 14, 2012, the AFOSI Detachment 225 received the Report of Result of Trial, which documented the result of Kelley's trial.

On the same day, the AFOSI Detachment 225 SAIC certified in the Investigation and Information Management System (I2MS) case management system checklist that Kelley's fingerprints were submitted to the FBI CJIS Division.[40] This permitted the SAIC to close the investigation.[41]

In fact, the fingerprints and final disposition report were never submitted to the FBI.

We discuss below, in Part V, our investigation into why the USAF did not submit Kelley's fingerprints and final disposition report to the FBI CJIS Division.

## M.   Kelley's Release from Confinement

The Naval Consolidated Brig calculated Kelley's latest release date as April 8, 2013. The calculation incorporated Kelley's sentencing date (November 7, 2012), the sentence of 12 months, and credit for his time served in pretrial confinement (5 months and 2 days). Kelley received 5 days subtracted from his sentence release date for positive work he completed while incarcerated and good behavior.

On March 31, 2013, Kelley was released from the Naval Consolidated Brig, upon completion of his sentence.[42] Kelley returned to HAFB under escort of the Security Forces Squadron personnel.

Between March 31, 2013, and April 2, 2013, Kelley completed USAF out-processing paperwork and was ordered "not to enter or reenter or be found within the limits of the United States military installation of HAFB, New Mexico, for an indefinite period."

---

[40] This SAIC assumed command of the AFOSI Detachment 225 in December 2011 and he was not the SAIC that was in command when the AFOSI Detachment 225 opened the Kelley assault investigation. The military judicial, nonjudicial, or administrative results that are documented on the AF Form 1359 are used to populate the final disposition report. AFI 51-201, "Administration of Military Justice," June 6, 2013, states that the AF Form 1359, "Report of Result of Trial," will be automated and printed from the Automated Military Justice Analysis and Management System. After final adjournment of the court-martial in every case, the trial counsel will promptly sign and publish the result of the trial using the Report of Result of Trial memorandum. The Report of Result of Trial is distributed to the accused's immediate commander, the court-martial convening authorities and the Staff Judge Advocates, the commander of the local Security Forces Squadron, and AFOSI detachment, and, if the accused is in confinement, to the commanding officer responsible for the confinement facility and the confinement officer.

[41] I2MS is a web-based computer application that allows AFOSI Special Agents to document case information and allows AFOSI leaders to manage investigations. AFOSI Special Agents use I2MS "activities" to document actions taken during an investigation. Specifically, the fingerprint activity is used to document the collection of fingerprints and their submission to the FBI CJIS Division for criminal history checks and for inclusion in the FBI's databases. AFOSI Manual 71-121 requires that the legal coordination be documented in I2MS.

[42] Kelley received credit for time served during the 152 days that he was in PTC.

USA00005280

Upon completion of his out-processing, Kelley was placed on excess leave status and reassigned to the Headquarters Air Force Security Forces Center, Corrections Division, Joint Base San Antonio-Lackland, for administrative purposes while he awaited the review of his appeal of his conviction.[43]

During this time, Kelley resided in an apartment in a barn located on his parent's property in New Braunfels, which is approximately 50 miles from Joint Base San Antonio-Lackland.

## N.    Post-Confinement

On June 17, 2013, a 20-year-old woman reported to Comal County Sheriff's Office (CCSO) deputies, New Braunfels, that Kelley had sexually assaulted her. The woman stated that on June 15, 2013, she went to Kelley's residence to "hang out." She and Kelley went into Kelley's bedroom where he had her sit on the bed next to him and then he pushed her down onto her back. Once in this position, Kelley climbed on top of her chest, and pinned her arms underneath his legs. She stated Kelley then pulled out his penis and tried to have her perform oral sex on him. She said that Kelley told her that if she did not open her mouth, that he would choke her. Using his hands, Kelley then began to choke her until she opened her mouth, at which point he "shoved" his penis into her mouth. The victim stated she bit down on his penis to try to get him to stop, resulting in Kelley slapping her across the face and telling her that "he would hurt me if I didn't do what he said." Afterwards, he let the woman off the bed and she left Kelley's residence.

The CCSO report stated that the woman added that "a few weeks" before Kelley forced her to have oral sex, she had gone to Kelley's residence and Kelley tried to kiss her but she resisted. He also tried to penetrate her with his finger. She stated that when Kelley pinned her down, he "ripped my shorts off," and penetrated her with his penis.

---

[43] A convicted military member's rights of appeal hinge on the specific terms of his sentence. When the service member receives confinement in excess of 180 days or the member receives a punitive discharge (Bad Conduct Discharge or Dishonorable Discharge for enlisted / Dismissal for Officers), the service member is entitled to an automatic appeal through the military appellate courts. Kelley met this standard both in terms of length of his sentence and the punitive discharge he received. Excess leave status, also known as Appellate Review Leave, is when the service member does not have to actively report for duty, but is still considered covered by the USAF administratively until all judicial appeals have been reviewed and completed. The Air Force Security Forces Center is responsible for training, equipping, and organizing all Security Forces for the USAF. The Corrections Division Center is responsible for USAF members in an excess leave status.

USA00005281

The CCSO report stated the woman told her close friend Tessa Kelley about the alleged rape.[44]  The CCSO deputy interviewed Tessa Kelley, who stated that the woman had told her that Kelley had forced the woman to have oral sex with him. Tessa Kelley also told the CCSO deputy that during their marriage, Kelley had choked her, slapped her, kicked her, water-boarded her, and held a gun to her head. Tessa Kelley's recounting of Kelley's abuse was consistent with her statements to AFOSI and the USAF Security Forces investigators during the investigations of Kelley in 2012, which are described above.

On June 27, 2013, the woman's report of the sexual assault and Tessa Kelley's statements were referred to CCSO detectives for further investigation.  On July 18, July 25, and September 18, 2013, CCSO detectives tried to call the woman but were unsuccessful.  On October 7, 2013, the CCSO lead detective mailed the woman a letter asking that she contact the detective to discuss the case.  In this letter, the detective wrote, "Failure to contact me within a reasonable amount of time will result in this case being inactivated for lack of cooperation."[45]

On October 14, 2013, after receiving no response from the woman, the CCSO lead detective noted that the case would be "inactivated" pending contact from the victim.  The CCSO detectives subsequently "inactivated" the case without interviewing Kelley.

On December 3, 2013, the USAF Court of Criminal Appeals affirmed the findings and sentencing in Kelley's court-martial.

(FOUO) On February 1, 2014, the CCSO received a "911" call from an individual who reported that the caller had received a text message from a woman who was Kelley's girlfriend at the time.  The caller stated that in the text message, Kelley's girlfriend claimed Kelley was abusing her.  The caller reported that Kelley's girlfriend also indicated in the text message that her "arms were red," and she provided the location where Kelley was temporarily living.

A CCSO Deputy went to Kelley's residence.  According to the CCSO report, when the CCSO Deputy arrived at the residence, an unidentified witness characterized the incident as a "misunderstanding and teenage drama."  The CCSO Deputy left the residence with no additional action being taken.[46]

---

[44] Tessa Kelley was identified as Tessa Brennaman in the CCSO report 13-06-3030, as she was divorced from Kelley at the time.

[45] When an investigation becomes "inactive," the investigative efforts are suspended pending the identification of credible leads.  Placing an investigation in inactive status may occur when victims or witnesses become uncooperative, or other efforts have failed to progress the investigation.

[46] The report that CCSO provided to the DoD OIG did not identify who had reported the incident to CCSO, who the CCSO who spoke to, who the CCSO contacted on scene, or any injuries suffered.

USA00005282

On April 4, 2014, Kelley and his second wife were married in Comal County, Texas, and moved to Colorado Springs, Colorado, later that year. They lived in Colorado until their first child was born in 2015, and then decided to return to New Braunfels to have the support of Kelley's family while raising their son. In 2017, Kelley's second wife gave birth to their second child.

On May 9, 2014, after the automatic appeals courts upheld Kelley's conviction and sentence, he was officially separated from the USAF with a Bad Conduct Discharge.

On August 1, 2014, the El Paso County Sheriff's Office cited and released Kelley for animal Cruelty. A neighbor reported to the Sherriff's Office that Kelley threw his dog to the ground, punched it, and dragged it to his residence by the neck. Sheriff's officers contacted Kelley, who denied abusing the dog. The Sheriff's Office charged Kelley, and after a hearing, he received a deferred sentence for 18 months, pending completion of an animal cruelty course (which he completed), was fined $168, and was ordered to pay restitution of $368 for the kenneling and vaccinating the dog.

On September 30, 2016, Kelley's former 49th Logistics Readiness Squadron supervisor received a threatening message from Kelley on Facebook. The message stated, "Hey you stupid b****. You should have been put in the ground a long time ago. Better hope I don't ever see you. You can't face facts, you fat piece of s***." Kelley's former supervisor said that she had not attempted to contact Kelley before receiving the message, and that it was unexpected. She stated that she saved Kelley's Facebook message as a screenshot and forwarded it to her former USAF supervisor on October 1, 2017. Kelley's former supervisor also stated that she had considered reporting this incident to law enforcement and obtaining a restraining order against Kelley, but decided against it because she felt that he would find out where she lived.

## O. Kelley's Firearms Purchases

We determined when and where Kelley purchased firearms during his USAF service and after his discharge. On six occasions, he purchased firearms from stores that were Federal Firearms Licensed (FFL) dealers.[47] On each occasion, he completed the ATF Form 4473, Firearms Transaction Record, and the FFL submitted Kelley's information to the National Instant Criminal Background Check System (NICS) for a check of disqualifying information.

---

[47] An FFL is an individual or a company engaged in the manufacture or importation of firearms and ammunition, or the interstate and intrastate sale of firearms. The ATF issues the license.

USA00005283

On each occasion, because no prohibiting information was in any of the three systems searched by NICS, to include the submission of fingerprints to the FBI, the FFL was notified that the sale could proceed.[48]

First, on February 12, 2012, Kelley purchased a European American Armory Windicator .38 Special revolver from the HAFB Base Exchange. He completed the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Forms 4473, "Firearms Transaction Record."[49] The HAFB Base Exchange completed the required NICS check on the same day. The response provided was that the FFL could proceed with the sale.

Second, on April 12, 2012, Kelley purchased a Sig Sauer P250, a 9-millimeter, semi-automatic handgun, from the HAFB Base Exchange. Kelley completed the ATF Forms 4473. The HAFB Base Exchange completed the required NICS check on the same day. The response provided from NICS personnel was that the FFL could proceed with the sale.

Third, on December 22, 2014, Kelley purchased a Glock Model 19, a 9-millimeter, semi-automatic handgun, from Specialty Sports and Supply, in Colorado Springs, Colorado. He completed the ATF Forms 4473 and the store completed the required NICS check on the same day. The response provided was that the FFL could proceed with the sale.

Fourth, on June 26, 2015, Kelley purchased a Ruger GP100, a .357 Magnum, revolver handgun, again from Specialty Sports and Supply in Colorado Springs. He completed the ATF Form 4473 and the store completed the required NICS check on the same day. The response provided was that the FFL could proceed with the sale.

Fifth, on April 7, 2016, Kelley purchased a Ruger AR-556, a 5.56-millimeter, semi-automatic rifle, from Academy Sports and Outdoors (Store No. 41), in San Antonio, Texas. He completed the ATF Form 4473, and the store completed the required NICS check on the same day. The response provided was that the FFL could proceed with the sale.

Sixth, on October 18, 2017, Kelley purchased a Ruger SR22, a .22 caliber, semi-automatic handgun, from Academy Sports and Outdoors (Store No. 46), in Selma, Texas. He completed the ATF Form 4473 and the store completed the required NICS check on the same day. The response provided was that the FFL could proceed with the sale.

[48] According to the FBI, NICS Audit Log records relating to allowed transactions (other than the NICS Transaction Number and the date the NICS Transaction Number was assigned) are destroyed within 24 hours of informing the FFL the transaction may proceed.

[49] The purchaser or transferee is required to complete the ATF Form 4473 before receiving a firearm from an FFL. The FFL uses the information provided on the form to determine if the person is prohibited from receiving a firearm. The ATF Form 4473 is not provided to the NICS. Only the identifying information contained on the form is provided for purposes of conducting the NICS checks. The ATF Form 4473 is retained by the FFL.

USA00005284

On four ATF Forms 4473 that Kelley filled out to purchase the firearms after his conviction, he certified that he had never been convicted of any crime for which the judge could sentence him for more than 1 year in confinement.[50]  This was not true, because Kelley's maximum sentence for the assaults on his wife and stepson crime included potential confinement for 5 years and 6 months.  Kelley had signed a pretrial agreement that stated his sentence to confinement would not exceed 3 years.  His General Court-Martial resulted in an actual sentence of one year.

## P.   Sutherland Springs Church Shooting

On November 5, 2017, Kelley entered the First Baptist Church of Sutherland Springs, Sutherland Springs, Texas, and opened fire with three of the four firearms he had purchased.  He killed 26 people, and wounded 22 others.  After being shot by armed citizens who responded to the shooting, Kelley fled from the church in his automobile.  Kelley later died from a self-inflicted gunshot wound.

---

[50]  One of the questions on ATF Form 4473 asks, "Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation."  Kelley should have answered "yes" to this question.

USA00005285