**FOR OFFICIAL USE ONLY**
Work Paper – Bankhead Interview
Project 2018C004

## Facts:

On June 13, 2018, SA Rebecca Hyatt and SA Laura Aleman interviewed SA Lyle Bankhead (lyle.bankhead@us.af.mil,　　　　). This interview occurred at AFOSI Detachment 601, Joint Base Hickam-Pearl, Hawaii. Bankhead acknowledged the interview was recorded, had no questions about the Privacy Act, and was sworn in for his testimony. Bankhead provided the following information: He came on active-duty in September 2001 in the munitions career field. He graduated from the Federal Law Enforcement Training Center in May 2011 and transitioned to AFOSI, where he has conducted investigations and protective service operations.

## Background:

He arrived to Holloman Air Force Base (AFB), NM in 2009, cross-trained into AFOSI in May 2011, was assigned to AFOSI Detachment 225, and left in October 2013. He started as a probationary agent, promoted in rank, and became the superintendent in September 2012, where he remained in that position until he left Detachment 225. Bankhead was on temporary duty (TDY) for pre-deployment training from approximately May/June 2012 through August 2012; upon his return, he took over the superintendent duties. He remembered some of the Kelley investigation. His specific role in the investigation changed a lot, as the allegation was made before Bankhead graduated from FLETC. He was not at the Detachment during the first subject interview when the fingerprints would have been collected. As a probationary agent, he helped during the interview of Tessa Kelley and was the evidence custodian. He explained he shared the responsibility of evidence custodian with someone else when he finished training and then became the superintendent. He could not recall who made case assignments during the Kelley investigation, but believed that the Special Agent in Charge (SAIC) would have done that. Typically, the superintendent handled operations in the detachment, specifically as it related to the criminal investigations. During the Monday morning staff meeting, the agents discussed all of the cases and during this time, agents could be tasked as well.

## Summary:

The Detachment's process for collecting and submitting fingerprints was as follows: after the subject interview, the agents would collect the fingerprints and then hold on to them. This would typically be done by who was conducting the interview, which was usually the case agent; however, this could change depending on TDYs and deployments. Yonatan Holz was the case agent for the majority of the investigation; however, Bankhead did not know who collected Kelley's fingerprints. He was not at the Detachment during either of the subject interviews (June 9, 2011 and June 8, 2012) and could not speak to the fingerprinting process during the interviews.

Bankhead explained the current process for fingerprinting was very uniform both at his current assignment and also when he was assigned to Osan AB, Korea. I2MS is linked with IAFIS and fingerprints are now electronically submitted through the criminal booking inquiry, following a probable cause determination with base legal. He explained this could be done at the same time and was a simple process.

Bankhead could not recall the specific submission process at Detachment 225, describing a manual process where the case agent was responsible for mailing the FD-249s to the FBI;

USA00015915

**FOR OFFICIAL USE ONLY**
Work Paper – Bankhead Interview
Project 2018C004

correctly because of what he was shown by AFOSI IG in his interview. Bankhead acknowledged the blank Case Closure Checklist was "completely on me" and did not know why it was filled out incorrectly. Usually, if there was an outstanding task on the checklist, Bankhead would make sure it was done before sending the case file out.

Bankhead did not feel he was properly training to collect and submit fingerprints, stating he was not trained on a lot of items. FLETC taught agents how to roll fingerprints and complete the FD-249, however, there was no training on fingerprint submission. Bankhead did not receive any superintendent training or case file review training. He explained it was not normal to progress as fast as he did, and it was overwhelming. There was an informal superintendent training program at the time, where you would shadow another superintendent, who hopefully handled things correctly. If this superintendent trainer did things wrong, then the superintendent trainee would learn the wrong way. Bankhead added the Region nominated people to attend this training, and he was never nominated by the Region chief to attend. He said the Region Chief would likely be responsible for verifying who was coming into the Region as a superintendent and in need of this training. Bankhead believed he received fingerprint training at FLETC on both the electronic and ink fingerprints; however, FLETC's electronic machine was a different electronic system. There was no AFOSI-specific training in the follow-on academy, and there was no training on the R-84.

Bankhead recalled the Detachment was inspected by Region 2 but not on the collection and submission of fingerprinting. Currently, while Bankhead is assigned to Region staff, he says his Region verifies fingerprint submission along with the Detachment and HQ AFOSI; while at Detachment 225, nobody outside of the Detachment would have reviewed it. Right before Bankhead departed the Detachment, the Detachment was comprised of all probationary agents except the SAIC, Bankhead, and Greg Harper. Everybody who transferred into the Detachment was a probationary agent, and the training fell primarily on Bankhead, with some involvement from Taylor, as they did everything in the Detachment together.

Bankhead did not have any additional information to provide.

Prepared By: ALEMAN.LAURA.A.1268094411  <span style="font-size:smaller">Digitally signed by ALEMAN.LAURA.A.1268094411 Date: 2018.08.07 08:18:54 -04'00'</span>

SA Laura Aleman

Reviewed By: HYATT.REBECCA.S.USAN.1388016236  <span style="font-size:smaller">Digitally signed by HYATT.REBECCA.S.USAN.1388016236 Date: 2018.08.06 13:12:20 -04'00'</span>

SA Rebecca Hyatt

Supervisor: SIMONTON.SHAWN.C.1143504359  <span style="font-size:smaller">Digitally signed by SIMONTON.SHAWN.C.1143504359 Date: 2018.12.05 11:13:34 -05'00'</span>

SSA Shawn C. Simonton

USA00015919

*Devin Patrick Kelley, access, transaction, status, and credential history*

Timeline of Credential/Status Events
- August 11, 2011: DOD credential issuance (Active Duty). Card was set to expire August 10, 2014. Card was terminated September 4, 2012.
- February 10, 2012 Update of phone number
- April 25, 2012: DBIDS credential issuance (Visitor) at Holloman AFB. Sponsored by Tessa Kelley.
- June 8, 2012: Remarks added to the person's record from Hollomon AFB by Operator, Towanda Worthy.
  - Remarks: "**BOLO** HOLLOMAN AFB--CAUTION ARMED AND DANGEROUS--ESCAPED FROM MENTAL HOSPITAL--6/7/12."
- December 12 2012: Record was accessed at Holloman AFB (probable manual lookup by guard on duty)
- March 30, 2013: Remarks added to the person's record from Holloman AFB by Operator, Heather Ignacek.
  - Remarks: "**BARRED FROM HAFB** IDV WAS DISCHARGED FROM USAF--CONTACT SF ASAP IF ACCESS ATTEMPTED-- 3/30/13" (no alert status was added)
- March 31, 2013: DBIDS credential issuance (Visitor) at Holloman AFB.
  - Inadvertently initiated by Heather Ignacek; terminated 2 minutes later; Naithaan Williams was listed as sponsor
- March 31, 2013: Barred status issued at Holloman AFB. Thomas Smith
  - Remarks: "Indefinitely Barred from Holloman AFB. **CAUTION** KELLEY is known to have a FIREARM and has threatened the lives of leadership as well as Security Forces. Member formally of 49 LRS. Barment Authority Col Croft 49 WG/CC - Begin date 29 Mar 2013 - Indefinite 49SFS/Reports and Analysis DSN 572-7251" (this remark was added on 26 Apr 2013 to "Alert status")
- April 9, 2013: Attempted access following barment status in DBIDS and was denied.
- April 26, 2013: Remarks added from March 30, 2013 updated to: "BARRED INDEF- CAUTION POSS FIREARM, THREAT TO USAF MEMBERS & SFS"  (this remark was added to personnel status)
- June 12 2014: IOLS received termination of CAC credential and terminated credential in DBIDS reason code "lost or Stolen"
- August 26 2015: Record Accessed at San Antonio AFB
  - Probable reason and outcome:  manual lookup; "Deny" recommendation returned; no credential issued
- February 17 2016 Records accessed Holloman AFB
  - Probable reason and outcome:  manual lookup; "Deny" recommendation returned; no credential issued
- November 6, 2017
  - Armed and Dangerous: "Armed and Dangerous: Inadvertently added by AFSFC during lookup
- 

Access History

| Base ID | Base | Gate | Date UTC | Recommendation | Recommendation Reason |
|---|---|---|---|---|---|
| 176164 | HOLLOMAN AFB | West Gate | 11/8/2011 21:23 | Allow | |
| 176164 | HOLLOMAN AFB | West Gate | 11/9/2011 17:20 | Allow | |
| 176164 | HOLLOMAN AFB | West Gate | 11/9/2011 21:59 | Allow | |
| 176164 | HOLLOMAN AFB | Main Gate | 4/12/2012 2:46 | Allow | |
| 176164 | HOLLOMAN AFB | Main Gate | 4/12/2012 20:28 | Allow | |
| 176164 | HOLLOMAN AFB | Main Gate | 4/17/2012 1:31 | Allow | |
| 176164 | HOLLOMAN AFB | Main Gate | 4/28/2012 1:23 | Allow | |
| 176164 | HOLLOMAN AFB | Main Gate | 4/9/2013 23:18 | Deny | Barred |

Sponsors
- Tessa Kelley

USA00016520

<u>Statuses</u>
- March 29, 2013
  - Barred: "Indefinitely Barred from Holloman AFB. Member to Out-process HAFB 31 Mar to 5 Apr 2013. After which barment becomes permanent. CAUTION KELLEY is known to have threatened the lives of leadership as well as Security Forces. Barment approval Col Croft 49 WG/CC"
    - Updated on April 26, 2013 to "Indefinitely Barred from Holloman AFB. **CAUTION** KELLEY is known to have a FIREARM and has threatened the lives of leadership as well as Security Forces. Member formally of 49 LRS. Barment Authority Col Croft 49 WG/CC - Begin date 29 Mar 2013 - Indefinite 49SFS/Reports and Analysis DSN 572-7251"

1      **SWORN TESTIMONY OF**
2      **LIEUTENANT COLONEL (Retired) DAVID BOYD**
3

W:  Lt Col (R) David Boyd
IO: Colonel Tom Riney  IO2: Colonel Brian Bacarella
IO3: Ms. Lan Nguyen

4
5      **Case:  Devin Kelley IG Inquiry**
6
7
8      IO:  Okay, the time is now 1417, Eastern Standard Time on the 13th December 2017.  The
9      persons present are the witness, Lieutenant Colonel Retired David Boyd; the investigating
10     officers, Colonel Riney, Colonel Bacarella, and Ms. Nguyen. The investigating officers are
11     located in the Pentagon. Mr. Boyd, where are you located?
12
13     W:  Monument, Colorado.
14
15     IO:  Okay, and that's at your residence, correct?
16
17     W:  Correct.
18
19     IO:  Okay. All right. I will now administer the oath. Please stand and raise your right hand.
20
21     W:  Okay.
22
23     IO:  Do you solemnly swear that the testimony you're about to give shall be the truth, the
24     whole truth, and nothing but the truth, so help you God?
25
26     W:  I do.
27
28     IO:  Okay. Thank you. Please be seated. You are not allowed to record this interview. Please
29     confirm that you are not recording this interview?
30
31     W:  I am not.
32
33     IO:  Okay. Having been advised of the nature of this inquiry, the witness testifies as follows:
34     Please state your name and spell your last name.
35
36     W:  David J. Boyd, B-O-Y-D.
37
38     IO:  And what is your current military status?
39
40     W:  Retired.
41
42     IO:  Okay. And what rank did you retire in?
43

*This is a protected document.  It will not be released (in whole or part), reproduced, or given additional
dissemination (in whole or part) outside the Air Force without the approval of The Inspector General, SAF/IG*

**FOR OFFICIAL USE ONLY (FOUO)**

USA00021788

1
2    IO: Okay. Now were the case reviews after you reviewed them, was anything sent up to Air
3    Force Security Forces Center at that time?
4
5    W: You know, other than I think being entered into SFMIS, I don't think so.
6
7    IO: Okay.
8
9    W: Nothing formal. That I'm aware of.
10
11   IO: Do you know how fingerprint data was submitted? Did it go through the Security Forces
12   Center?
13
14   W: Well OSI was typically responsible for like it's just policy like if there was -- if
15   somebody needed to be entered into NCIC after a conviction it was OSI that was responsible
16   for doing that.
17
18   IO: Okay.
19
20   W: So we didn't touch that.
21
22   IO: But how about if there were reporting requirements, and I'll cover these when we start
23   talking reporting, but if there was reporting requirements before any kind of judicial?
24
25   W: SFMIS is the only thing I can think of.
26
27   IO: Okay. So that's --
28
29   W: Unless it was a more, you know, really because when we -- we talked about what we did,
30   we handled basically misdemeanors on the installation.
31
32   IO: Okay.
33
34   W: So for the most part anything we would deal with, if we had interviews then everything
35   would be turned over directly to a First Sergeant, Squadron commander.
36
37   IO: Okay. Now -- okay. Was that after the -- so if you did the investigation that included
38   interrogations or I guess witness questioning, that would all get turned over?
39
40   W: Just to be fair, we interviewed and so, you know, yeah we would interview somebody and
41   it would all be written, and then I'm not sure 100 percent what was put into SFMIS --
42
43   IO: Okay.
44
45   W: -- after that. And you know, typically, we would, you know, we just as the matter of, you
46   know, because the commander has the overall responsibility for judicial, nonjudicial actions

*This is a protected document. It will not be released (in whole or part), reproduced, or given additional dissemination (in whole or part) outside the Air Force without the approval of The Inspector General, SAF/IG*

**FOR OFFICIAL USE ONLY (FOUO)**

1  against members under their command, and so we would try to keep the commanders as
2  informed as we could --
3
4  IO: Okay.
5
6  W: -- on anything we had going on.
7
8  IO: Okay. I guess along those lines, where you mentioned that the report would get written,
9  and then part of it would get put into SFMIS, you know how long those reports were
10 maintained?
11
12 W: I have no idea. I don't know.
13
14 IO: Okay.
15
16 W: I don't know what the -- you know, how long it would go out for.
17
18 IO: Okay. You don't know how long they were -- they had to keep them?
19
20 W: No. No.
21
22 IO: Okay. Now, going back towards the fingerprinting. If you brought somebody in for
23 questioning, or you had a case that was going on, and this case we'll eventually be talking
24 about assault so, but a case like assault and you brought somebody in for questioning on that,
25 what they be fingerprinted? Would all the military members be fingerprinted?
26
27 W: You know, I want to -- I can't remember off the top of my head I want to say, well I don't
28 want to say because I really can't remember if that was our process. I mean I trusted my
29 investigations guys to handle the nuances to all of that.
30
31 IO: So it would be the guys who were in the SFOI would be the ones to ask what the process
32 was there?
33
34 W: Yes.
35
36 IO: Okay. And Mr. Schnell would be one of those guys?
37
38 W: Yes.
39
40 IO: Anybody else that you think I can ask from that SFOI Department, or branch?
41
42 W: That's still there?
43
44 IO: And they don't have to still be there, who do you think would be the best one to ask?
45
46 W: Schnell.
47

*This is a protected document. It will not be released (in whole or part), reproduced, or given additional
dissemination (in whole or part) outside the Air Force without the approval of The Inspector General, SAF/IG*

**FOR OFFICIAL USE ONLY (FOUO)**

1   IO:  Schnell, okay.
2
3   W:  Yeah, I mean he's probably, not probably, he is the best investigator -- the best
4   investigator I'd ever had --
5
6   IO:  Okay.
7
8   W:  -- at all my command tours.
9
10  IO:  Okay. Great. Do you know if there was a requirement to submit fingerprints, or if there
11  was the policy on --
12
13  W:  I can't remember. I -- you know.
14
15  IO:  One of the things --
16
17  W:  I don't want to make conjecture or guess, so I just don't remember.
18
19  IO:  Okay. One of the things that we see in the Department of Defense Instructions is there is
20  a probable cause determination that goes into determining when fingerprints should be
21  submitted or when they shouldn't be.
22
23  W:  Okay.
24
25  IO:  Do you remember any kind of process where you determine probable cause during
26  investigations?
27
28  W:  No. Uh, uh [negative response].
29
30  IO:  Okay. You never hear anything from the SJA or hear about talking with the SJA about?
31
32  W:  Well if -- well, I guess there was nothing formal.
33
34  IO:  Okay.
35
36  W:  But there was nothing ever done in a vacuum either without SJA's input. So for example,
37  if we truly had probable cause or wanted to do anything with it, it would be, you know, we
38  could -- we would be talking directly with the Staff Judge Advocate for the installation.
39
40  IO:  Okay. And they would -- they would be the ones kind of telling you if there's probable
41  cause to go forward or not?
42
43  W:  Yes. Yes.
44
45  IO:  Okay.
46

*This is a protected document.  It will not be released (in whole or part), reproduced, or given additional
dissemination (in whole or part) outside the Air Force without the approval of The Inspector General, SAF/IG*

**FOR OFFICIAL USE ONLY (FOUO)**

USA00021796

1  that's truly a misdemeanor offense, because now they're going to have a felony conviction on
2  their records.
3
4  IO:  Okay.
5
6  W:  You know, but OSI takes that. You know, they are responsible for inputting whatever it is
7  into NCIC on a felony conviction.
8
9  IO:  Is that written anywhere do you know, is there guidance out there?
10
11  W:  I don't know if it's written or not. I just know that -- I would -- I don't know. I would
12  assume so. I know that I've never seen a checklist for us ever inputting that anywhere into
13  NCIC.
14
15  IO:  Got it.
16
17  IO3:  Mr. Boyd, if --
18
19  W:  Yes, ma'am.
20
21  IO3:  If a court-martial conviction results from a Security Forces investigation, whose
22  responsibility is it at that point to input the information into was it N --
23
24  IO:  NCIC.
25
26  IO3:  NCIC?
27
28  W:  I believe it's still OSI.
29
30  IO3:  Do you recall --
31
32  W:  I've never -- I don't ever remember having that responsibility.
33
34  IO:  Okay.
35
36  IO3:  Okay.
37
38  W:  With any of my investigations.
39
40  IO3:  What about if one of the -- a Security Forces investigation results in a nonjudicial
41  punishment? Are fingerprints put into the system at that point?
42
43  W:  No, because if they aren't guilty, then there's no crime. If they're found not guilty.
44
45  IO3:  Well no, no. If a commander believes that the member violated something, and offers
46  NJP, and the NJP is accepted by the member, and the commander finds that member guilty of
47  a charge, that's not conviction, but there still is --

*This is a protected document. It will not be released (in whole or part), reproduced, or given additional dissemination (in whole or part) outside the Air Force without the approval of The Inspector General, SAF/IG*

**FOR OFFICIAL USE ONLY (FOUO)**

USA00021810

FD-302 (Rev. 5-8-10)

- 1 of 2 -

OFFICIAL RECORD

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    11/06/2017

Jessika Lee Edwards (Edwards), black female, date of birth (DOB)
███ social security account number (SSAN) **(P-1)** telephone number
███ home address of ██████████, Ft. Sill, Oklahoma
73503, was interviewed at the Ft. Sill Military Police Station in Ft.
Sill, Oklahoma. Also present for the interview was her husband, Jeremiah
Edwards, black male, DOB ████████ SSAN **(P-1)** telephone number
██████████ After being advised of the identity of the interviewing
Agents and the nature of the interview, Edwards provided the following
information:

Edwards was Devin Patrick Kelley's (Kelley) Staff Sergeant in the
United States Air Force around 2010-2011 at Holloman Air Force Base in New
Mexico. Kelley lived on base with his wife and step-son. Kelley told
Edwards that everyone was against him and always did the bare minimum at
work. Edwards volunteered to be Kelley's supervisor because no one else
wanted to supervise him. Kelley was incarcerated around early 2012 for
physical abuse to his wife and step-son.

A couple of years later, Kelley contacted Edwards via Facebook and
requested a reference for a job. The two began an on and off communication
that was strictly through Facebook messenger until about four months ago.
Edwards then gave Kelley her phone number because Kelley was acting
suicidal.

Kelley was upset that his wife or girlfriend wanted to take his son
away from him. Kelley told Edwards he would buy dogs off of Craigslist to
train. If the dogs did not listen, Kelley would use the dogs for target
practice and dismember them. Kelley also obsessed with church shootings
and guns. Regarding the church shooting in South Carolina, Kelley told
Edwards, "I wish I had the nerve to do it." Kelley also sent Edwards
pictures of multiple guns he was building, specifically an AR-15 style
rifle.

Edwards told Kelley to get help once she realized he was completely
obsessed with mass shootings. Edwards then deleted Kelley as a friend on
Facebook. Edwards said it was possible that Kelley made a new Facebook
account and attempted to add her back as a friend.

---

Investigation on    11/05/2017    at Ft. Sill, Oklahoma, United States (In Person)

File #   356E-SA-2228817                                    Date drafted    11/06/2017

by   Damon Morton , H. Cris Lang

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FBI000285

USA00022911

Interview of Troy Bizzack, ███████████, referenced by Valorie Rowe, they all worked together at Holloman AFB in NM

Approximately 11:17 am

In AF, Devin worked for me. Section chief for supervisor of warehouse. Under my leadership.

Met just before left for or right when came back from Afghanistan in 2012 or 2013

One of worst airman ever supervised

Caused a lot of problems

Defiant, tried to buck system as much as could

Caused rifts with coworkers

Progressive discipline

-Valorie would write up once or twice before went up to his level

.-this happened once or twice

He was out of air force in his opinion

He made some threats to leadership

- Through his wife, his wife told our command she and devin talked about how we wouldn't get away with it
- Had a gut feeling that if there was ever going to be someone who would shoot up the shop, it would be him

Made some written threats to his wife

Had to take weapons out of his car and home on air force base

- Wasn't allowed to have them on base
- No weapons on vehicle and if live on base housing, need to have weapons registered with security forces on base and needed to have them locked up with armory on base
- Had a loaded 9 mm in trunk of car and he confiscated

Was admitted into mental facility (civilian) – sent him to be evaluated - for awhile and escaped from it

- Sia valley in las cruces, mexico or in el paso was admitted
- At 2 am first sergeant calls to tell him devin escaped
- Called valorie to let them know because didn't know what capable of

Was something about him that was off, that could never put finger on

Work relationship ended when he was discharged between 2014 and 2015

Right around time he was convicted of assault charges and went away for a year

FBI001299

USA00023929

For Official Use Only

# HEADQUARTERS
# AIR FORCE
# OFFICE OF SPEICAL
# INVESTIGATIONS

## National Criminal Information Center

## Indexing Task Force

## December 2017 – January 2020

Prepared by:  Major John Hoffmann
NCIC TF Lead (May 19 to Jan 20)

15 January 2020

For Official Use Only

USA00024749

For Official Use Only

I.    OVERVIEW

On 5 Nov 17, Devin Kelley fatally shot 26 people and wounded 20 others during a mass shooting at First Baptist Church, Southerland Springs, Texas.  Kelley was prohibited by law from purchasing a firearm due to a domestic violence conviction by Courts Martial.  Kelley's conviction was not indexed in the National Criminal Information Center[1] database, the Interstate Identification Index (III)[2], which is one of the databases used by the National Instant Criminal Background Check System[3] to flag prohibited firearms purchases.  Following the tragic events that day, at the direction of the Secretary of the Air Force, AFOSI embarked on a comprehensive review of archived case files to ensure the integrity of criminal history data provided as a result of AFOSI investigations.

II.    NCIC INDEXING TASK FORCE OPERATIONS

Starting December 2017, AFOSI established the NCIC Indexing Task Force.  The Task Force (TF) was charted to review all archived AFOSI case files dating back to 1998 to verify subjects who were required to be indexed were properly indexed in accordance with Federal Law and DOD policy. Additionally, the TF conducted a CODIS[4] review to check compliance as the criteria for DNA indexing was very similar to those for criminal indexing.

The TF was located at AFOSI headquarters.  Agents were pulled from across the Command to serve as reviewers.  In total there were 14 six week iterations spanning 21 months.  299 individual agents participated in the TF.  238 agents traveled to headquarters for the effort.  Some agents served multiple tours on the TF.  Additionally some professional staff were used in the initial iterations to assist with manual prints and reviews.  The first 5 iterations of the TF were made up 27-37 agents for each six week cycle.  The remaining 9 iterations were made up of 9-10 agents for each cycle.  For a brief period, AFOSI directed the Reserve (IMA) force to conduct their annual training period at headquarters to serve on the TF.  This quickly proved inefficient due the spin up time required to conduct sufficient reviews.  By the time the IMA force knew the review process, their two week annual tour was over.  Two large conference rooms were transformed into work space for the reviewers, as the TF progressed and the number of reviewers was reduced the space was reduced to one conference room.

The archived case files within the sample period were contained in three different case management systems: Crime and Counterintelligence Terrorism Information System (CACTIS), Legacy Investigative Information Management Systems (I2MS) and Web I2MS.  In addition to the case file systems, the Command also embarked on an effort to digitize case files.  CaseLink was the program used to access the files that were digitized by this effort.  This put the archived cases into two categories, digitized files and physical files.  Phase I of the TF was the review of the digitized files. Phase II was the review of the physical files.  Phase II required the ordering of files from the National Archives and Records Administration (NARA)[5].

Initially, tracking of TF work was recorded on spreadsheets.  In January 2018, AFOSI fielded a database tool to track the reviews and produce the documents needed to update the criminal history through the Criminal Justice Information Services Division (CJIS)[6].  The database also served as the starting point for the data set.  The data set was created by pulling case information from SmartOSI

For Official Use Only

USA00024750

For Official Use Only

where basic case information for the three case management systems (CACTIS, I2MS, Web I2MS) was combined. "Shells" were auto-populated for each case number with subject information and data from the Air Force Automated Military Justice Analysis & Management System (AMJAMS). The reviewer would update the shells with the required charge and disposition information to support a criminal index. The database tool was also structured to manage workflow, provided a place for reviewer notes and recorded who modified the record as it moved through the review process. The database tool was critical to organizing and documenting the review effort.

Phase I (2003 to 2017) reviews were conducted in stages. The first step was to check III to see if the subject was indexed. If not, the file was moved to the next stage where a legal review of Probable Cause (2010 to 2017 cases) was conducted and established the disposition documents were present in the file. The final check would confirm all of these items were documented and the corrections were added to a spreadsheet to update the record through CJIS. During Phase I, the TF reviewed 47,129 files and identified 5,647 criminal indexes as deficient. Deficient files were corrected to the fullest extent possible.

Phase II (1998 to 2002) reviews were conducted by looking for the source documents in the physical case file. If the documents supported a criminal history index, the reviewers would check III to see if a correct index existed. If the record was deficient the corrections were added to the spreadsheet to update the record through CJIS. This phase of the TF required the physical files be retrieved from NARA. This part of the TF engaged the file room for the ordering, tracking and return of the archived files. This created a constant churn of physical files moving through limited space in the file room and the warehouse. During Phase II, the TF reviewed 26,683 files and identified 1,677 criminal indexes as deficient. Deficient files were corrected to the fullest extent possible.

During both phases, if an index was missing the TF would create the index by manually submitting the fingerprints. In cases were the fingerprint card (FD-249) was present in the file those prints would be used to create an index in III. For the case files that did not have prints, the TF was able to obtain 'Civil Prints' from CJIS. The 'Civil Prints' are the prints all DOD members submit when they enter the military. There are many reasons why the prints might not be in the file. Having this option available significantly reduced the total number of missing indexes.

Due to the volume of cases the TF was supported by the Command legal office and eventually had dedicated legal support. In addition, an important tool for the reviewers was the searchable spreadsheets for Non-Judicial Punishment (NJP) and Courts Martial (CM) actions pulled from AMJAMS. Another invaluable tool for the reviewers was the Automated Records Management System (ARMS). Often the supporting disposition documents (NJP, CM, or Discharge) were available in ARMS making obtaining copies of supporting documents much easier.

The TF effort was led by three leadership teams. In addition to leading the agents in the review process, the leadership teams were responsible for the efficient flow of files to review. An additional task was coordinating the care and feeding of the TDY agents as they cycled in and out every six weeks. The constant churn of manpower made the logistical piece just as taxing as the review process. Logistical issues included funding (approx. $1.6 Million in TDY funds), DTS, badging, system access, training, coordinating lodging and working with the Regions to fill the required manpower

For Official Use Only

USA00024751

For Official Use Only

slots took.  The TF leadership teams reported directly to the Vice Commander, who was ultimately responsible for the effort to the AFOSI Commander and HHQ.

## III.   CODIS INDEXING REVIEW

As the TF conducted reviews of the case files 2010 to 2017 for criminal indexing, a review for proper CODIS indexing was also conducted.  This was a logical step in the process as often the requirements for criminal indexing is the same as it is for DNA indexing.  The TF reviewed 18,212 files and found 6192 that required a DNA index and 3551 cases where DNA was not collected but should have.  Unfortunately, there is no way to compel subjects to give a DNA sample for the purposes of fixing the deficiency.

## IV.   MISSING PRINTS

Based on the sample set and the age of the cases it was inevitable there would be cases that did not contain a copy of the FD-249.  In these instances the first source for prints was the 'Civil Prints' process.  The second source for prints was for those subjects who had an FBI number from another agency, to contact that agency and request prints.  The final source was to request prints from the subject.  This final option was problematic because due to the age of the cases, many subjects were no longer a member of the military and therefore there was no way to compel them to provide prints.  In total there were 359 cases missing prints that required an index.  To help mitigate the risk of the missing index, all of those subjects with a qualifying offense/disposition/venue for NICS were indexed with a permanent firearms prohibition.  The list was also checked against DOD databases to determine if any of the subjects still worked for DOD.  22 subjects were still affiliated with DOD in some fashion (Active, Reserve, ANG, GS, Contractor, Retired, etc).  Leads were generated to attempt to obtain prints from four of the 22.  Two of the four were still subject to the UCMJ and can be ordered to provide prints.  For the remaining subjects there is no mechanism to compel them to give their prints.  In total, the number of missing prints files represents 0.005% of the total data sample.

## V.   OVER INDEXING

During Phase I of the TF and on the heels of the tragic incident in Southerland Springs the reviewers took the approach of indexing everyone who was arrested for a qualifying offense.  The DOD Instruction governing when someone should be indexed changed in 2010.  All cases prior to 2010 should have been indexed based on the disposition of the case not the arrest.  This led to a significant number of subjects who were indexed in error.  The TF reviewed all of the cases between 1998 and 2009 with a non-qualifying disposition and expunged those indexes that were made in error.  The TF identified over 1500 indexes that met this criteria.  Through this review and the validation process the over indexing of subjects was fixed by the conclusion of the TF.

## V.   VALIDATION PROCESS

From mid-September 2019 to mid-January 2020 all of the record corrections and expungements submitted to CJIS by the TF were validated for accuracy.  In total, almost 19,432 FBI numbers were reviewed revealing 2519 records did not update as requested.  The primary issue in the

For Official Use Only

USA00024752

For Official Use Only

validation process was indexes were created, however the dispositions did not update. These corrections were resubmitted and will be re-validated until there are no errors. Completing this task was passed to the Air Force Criminal Justice Information Cell at the conclusion of the TF in January 2020.

## VI.   LESSONS LEARNED

Due to the size and scope of the TF this was a massive undertaking and there are some important lessons to be learned from the experience.

Lesson #1, Project management is an important piece for a TF of this scope. Due to the enormous about of files and the multiple moving parts efficiencies could have been gained if early on in the process the leadership team took a pause and examined the criteria and refined processes. Often the initial days of the TF are described as "building the airplane as you were flying it". An operational pause early for process refinement would have potentially reduced the length of the TF and issues like the 'over indexing' of subjects.

Lesson #2, Validations were an important part of the process that was not executed until the end of the file reviews. The validations that were completed showed that the updating process with CJIS was not "fire and forget". Additionally, some spreadsheets from the earliest days of the TF did not appear to be sent. Validation should have been a part of the process from the start and ongoing. This would have allowed the TF leadership to identify errors in the correction process with CJIS and fixed them sooner.

Lesson #3, The Database tool was a critical component in the review process. The development and decision to use the tool to organize the effort saved a tremendous amount of time and resources.

Lesson #4, Management tasks needed to be bifurcated. Managing the review process was a full time job as was the management of resources. A consistent piece of feedback from the TF leaders is having one person do both quickly resulted in task saturation. One person needed to focus on the reviews and one person needed to focus on the logistics as their full time jobs.

## VII.   SUMMARY

The NCIC Indexing Task Force was a huge undertaking for the Command. Over 21 months, in 14 six week iterations, the TF reviewed over 73,000 files and identified over 7,300 files requiring correction. Every agent who participated in this effort embodied the renewed focus on 'attention to detail' and the importance of every step of the investigative process. The tragedy of Southerland Springs reminds us how every step counts and the Command made the extraordinary commitment to make sure it never happens again. This took a significant amount of time and resources, but was a necessary and important step toward returning integrity to the criminal history data AFOSI provides to CJIS. The efforts of the NCIC TF corrected the historical record, which allows the Air Force and AFOSI to proceed, with confidence, on the implementation of the Air Force Criminal Justice Information Cell and the handling of criminal indexing in the future.

USA00024753

For Official Use Only

1.  The National Crime Information Center is the United States' central database for tracking crime-related information. The NCIC has been an information sharing tool since 1967. It is maintained by the Criminal Justice Information Services Division of the Federal Bureau of Investigation and is interlinked with federal, tribal, state, and local agencies and offices.
2.  The III index points to the criminal history record. However, if the individual was arrested for the first time on or after July 1, 1974, he or she will be part of III regardless of year of birth. Furthermore, a number of older records have been added to the automated system based on various criteria established by the FBI.
3.  The National Instant Criminal Background Check System is a United States system for determining if prospective firearms or explosives buyers' name and birth year match those of a person who is not eligible to buy. It was mandated by the Brady Handgun Violence Prevention Act of 1993 and launched by the Federal Bureau of Investigation in 1998.
4.  The Combined DNA Index System, or CODIS, blends forensic science and computer technology into a tool for linking violent crimes. It enables federal, state, and local forensic laboratories to exchange and compare DNA profiles electronically, thereby linking serial violent crimes to each other and to known offenders. Using the National DNA Index System of CODIS, the National Missing Persons DNA Database also helps identify missing and unidentified individuals.
5.  The National Archives and Records Administration is an independent agency of the United States government charged with the preservation and documentation of government and historical records.
6.  The Criminal Justice Information Services Division is a division of the United States Federal Bureau of Investigation located in Clarksburg, Harrison County, West Virginia. The CJIS was established in February 1992 and is the largest division in the FBI.

USA00024754

**P.  AFOSI Detachment 225, Holloman AFB  – <u>SATISFACTORY</u>**

*Key Production Indicators*

| Crim Mission – Cases Opened | | | | |
|---|---|---|---|---|
| Cases Opened | 2006 | 2007 | 2008 | 2009 |
| | 25 | 20 | 20 | 28 |
| Source Utilization | | | | |
| *Sources Used* | 2006 | 2007 | 2008 | 2009 |
| **Source Initiated** | 7 | 5 | 5 | 10 |
| **Not Source Initiated** | 1 | 3 | 6 | 4 |
| Counterintelligence Mission | | | | |
| *Transmitted IIRs* | 2006 | 2007 | 2008 | 2009 |
| **IIR** | 0 | 0 | 0 | 4 |
| **BioIIR** | 0 | 0 | 0 | 0 |
| **IIR Type Subtotal** | 0 | 0 | 0 | 4 |
| CI Threat Assessments | | | | |
| | 2006 | 2007 | 2008 | 2009 |
| **TAs** | 0 | 0 | 0 | 0 |
| **Threats Exp./Neut.** | 0 | 0 | 0 | 0 |
| 110 (Agent Applicant) Cases Closed with 110 Report Produced | | | | |
| *Case Count* | 2006 | 2007 | 2008 | 2009 |
| **Open** | 0 | 0 | 4 | 0 |
| **Closed** | 0 | 0 | 4 | 0 |
| Crim Mission Timeliness | | | | |
| | 2006 | 2007 | 2008 | 2009 |
| **% on Metric Target** | 28.00% | 34.78% | 27.78% | 73.30% |
| **Case Count** | 25 | 23 | 18 | 15 |
| Lead Timeliness | | | | |
| | 2006 | 2007 | 2008 | 2009 |
| **Percent on Time** | 100% | 100% | 96.30% | 97.37% |
| **Lead Count** | 12 | 20 | 27 | 38 |
| Substantive Investigations Final Closed | | | | |
| *Case Count* | 2006 | 2007 | 2008 | 2009 |
| **Case Count** | 3 | 5 | 71 | 17 |
| **Significant (ECI)** | 0 | 0 | 38 | 10 |
| | | | | |
| *Cases Resolved* | 2006 | 2007 | 2008 | 2009 |
| **Resolution** | 3 | 2 | 63 | 16 |

**Mission Profile:**
To produce timely and thorough felony-level criminal and counterintelligence investigations, products and services promoting effective force protection and safeguarding the good order and discipline of the USAF.

**Available Manpower**                         **Deployments**

**FOR OFFICIAL USE ONLY.** This report may be protected from disclosure under the Freedom of Information Act.  Do not release or publish, whole or in part, outside official DoD channels without express approval of the Director, SAF/IGI.

USA00025145

Authorized: 9, Assigned: 9                    1,669 man-days

**Minor Finding**
-   The unit was missing equipment that was not properly accounted for prior to the previous EC's departure. The list and dollar amount for the items missing are as follows:  0005 Reproducer Soun SN#5835 01 205 6612SA valued at $4,500.00, 0015, Generator 7135 SN# SUB 6115PZ135 valued at $1,241.87, and 0017 Transmitter FAS SN#5815005572083 valued at $5,426.63, totaling $11,168.50 in missing equipment.   The old KIV-7 unit and the two STE telephones are accounted for on the equipment account.  The custodian stated they did not have any budget code 9 items.  This same information was documented in the 20-22 Jul 09 SAV, but the unit failed to take corrective action as instructed by the Region.  The detachment initiated a report of survey on the recommendation of the IG.

**Weaknesses**
Report Documentation/Timeliness/Sufficiency
-   A random review of source dossiers revealed the detachment failed to have adequate data for recruiting sources.  There were several dossiers that did not have background data; the motivation was weak and not focused.  The sources  that were terminated did not have termination reports for witting sources and several of the termination meets were conducted over the telephone.  The levies were weak and not specific.  The handling agents failed follow up on levies given to the sources.  Required photos of the source and vehicle were missing.  The dossier and form 14s consistently did not have the meet location documented.  There were no documented reviews and one source did not have entrapment  training.   A review  of  the  dossiers maintained at the detachments shows a significant improvement since the arrival of the new SAIC.
Counterintelligence
-   The unit has been without SIPRNET connectivity for majority of the 2009 year.  The   current   program manager who was on probation at the time did not receive proper guidance from the previous detachment leadership.  The desk audit revealed there was a learning curve over the inspection period.  The program manager did the best they could to meet minimum standards.
-   The unit CI plans for 2007 – 2009 were present and the 2008 and 2009 plans were uploaded into CI2MS.  The plans were not specific in regards to targets and milestones.  The  2007  and  2008  plans  were  essentially identical with no quarterly reviews and or adjustments.   All A&P files were created in CI2MS, but no TMFs were created.  The unit had HRU files for all their targets for the reporting period instead of the files being opened as TMFs.  For the years 2006 – 2008, there were minimum activities and those activities that were completed were not proactive.  There were no leadership reviews annotated on the plans or in CI2MS.
-   The unit has attempted to have briefing/debriefing program for foreign visitor escorts.  However, there was no previous program or procedures for briefing/debriefing base personnel who travel OCONUS; a process had been recently implemented.  The unit has adequate liaison with counterparts, both on and off base.  The unit's collection efforts are not aligned with the AF CI Strategy and CI Board approved Target list.
-   The CI program manager has a Portico account and has one CS in Portico.  The PM understood that all new CS's were to be entered into Portico.  The unit has established methods of reporting base threat information.  The normal channel of communication was through the TWG; the unit attends all TWG meetings and recalls.  For time-sensitive information the unit had reported the information directly to the Wing/CC.
-   Analysis was integrated into the current plan, but due to low-levels of activities, analytical products were not used or requested.  DTA's were accomplished and loaded into CI2MS for all report years.

**Meet Standards with Comments**
Weapons
-   All weapons were accounted for, either on-hand or a hand receipt was on hand.  The program manager appointment letters were present for the reporting period  with  the  exception  of  2006-2007.  All personnel were currently qualified on their primary, secondary and intermediate weapons or the proper revocation letters were issued.  Several   previous revocation letters were issued late and unsigned for the secondary weapon.

**FOR OFFICIAL USE ONLY.** This report may be protected from disclosure under the Freedom of Information Act.  Do not release or publish, whole or in part, outside official DoD channels without express approval of the Director, SAF/IGI.

USA00025146

Several agents did not complete pro-fire during multiple cycles throughout the inspection period. A majority of the ancillary training was documented. There were no quarterly inventories documented for 2006 1st quarter, 2008 1st, 3rd and 4th quarters, and 2009 1st, 2nd and 3rd quarters. AFOSI Form 8s were not maintained for all of 2006 and Jan-Jun and Oct-Dec 2007. AF Form 105s did not indicate the required four-month inspections were being conducted. No qualification or training documentation could be located for one assigned reserve member of the unit.

Contingency Funds/Commodities
- The primary and alternate C-Funds custodians were appointed in writing and received C-Funds Certification training prior to assuming duties with a few exceptions. In 2006, there were no C-Fund training certificates available; the detachment commander did not have a certificate on file for 2007. Delegation letters were not revalidated at the beginning of each fiscal year. In 2008 there were no delegation letters from Region 2/CC; only AFOSI/CC. The detachment commander delegated authority for advances on 17 Apr 09, 5 Jun 09, and 8 Jun 09. In 2010, all delegation letters were present and dated IAW AFOSII 71-111. The C-Funds documents were maintained in hard copy four years past the close of the fiscal year (2006).
- A C-Funds audit was conducted and all monies on-hand, plus all outstanding vouchers equaled the total amount of funds advanced to the unit. All C-Fund audits were conducted quarterly and documented using I2MS CFMS by two disinterested persons; however, all but four audits did not identify disinterested persons in writing. The C-Funds custodian properly safeguarded all cash.
- C-Funds expense forms were justified properly except for those relating to source meet expenses. Several expenses provided an excessive amount of information pertaining to source operations.
- The majority of C-Fund transfer documents only had detachment signatures; region custodian signatures were missing. A random review of 27 AFOSI Form 30s identified nine advances not settled within 90 days over the last three years. There were 13 expenses not paid within the 10 day time period. Source meal expenses were not broken down according to AFOSII 71-111.
- The primary and alternate commodities custodians were appointed in writing; however, not all letters from 2006 were available in the commodities continuity binder. Quarterly commodity inventories were conducted and documented by two disinterested personnel except January – March 2007 (2nd quarter 2007), October – December 2007 (1st quarter 2008), and January – March 2008 (2nd quarter 2008). Except on four occasions, auditors were not identified in writing.

Evidence
- The primary and alternate evidence custodians have been appointed in writing and all have received the Evidence Custodian Certification prior to assuming duties. Inventories were conducted semiannually, when there was a change in primary and alternate custodians as well as consistent inventories done on a quarterly basis. All documentation was maintained since last UCI.
- Evidence was historically not being sought after and tracked for disposal within 14 days, currently, the detachment's evidence custodian has established several checks to ensure proper disposition of evidence.
- A laptop computer power supplies were not identified and marked on the evidence tag. Drugs seized were not sent to the lab for testing, and film seized was not developed. There were two SIM cards found in two cellular phones. On a consistent basis the changes in condition were not documented. One notebook was identified without a page count and loose unidentified paper was found in the bottom of a bag.
- The detachment collected two Sexual Assault Forensic Examination kits under restricted reporting. The activities were not in compliance with activity titling IAW AFOSIMAN 71-122. Both kits were later unrestricted, sent to the lab, and processed as rape cases.

Training
- There was one primary and two alternate training managers appointed in writing; one of the alternates had not completed the AF Training Course. The unit had no probationary agents. Trainers and certifiers were assigned to all Junior NCOs. All agents were certified on all core tasks, and appropriate tasks were identified based on the MTL. The unit had a specific MTL for each work center.

Felony Criminal Investigations/Operations

**FOR OFFICIAL USE ONLY.** This report may be protected from disclosure under the Freedom of Information Act. Do not release or publish, whole or in part, outside official DoD channels without express approval of the Director, SAF/IGI.

USA00025147

- The detachment produced Criminal Plans in hardcopy that were specific,      measureable, attainable, time bound, relevant.  Criminal Program Management A&P files in I2MS were found for 2007-2010; however, required documentation was not always attached.   There were no quarterly reviews identified, no documentation of findings, changes, or updates to the plans to demonstrate active program management.  It was also noted there was no associated target management files (TMF) associated to the Criminal Program Management A&P file, nor were the activities and case files appropriately associated and identified in the TMF.  In 2006 there were two TMF files in I2MS that matched up to the 2005/2006 plan found on the detachment's server (no A&P file associated).  The detachment accomplished annual local Criminal Threat Assessments except for the FY 10 CTA; none were attached in I2MS except for 2009.
- Inspectors reviewed 13 currently open/investigatively closed cases and dossiers in I2MS and observed the following:  SUBJECT/VICTIM participant information was mostly inputted into I2MS properly; some basic character descriptors were not completed; and monthly case reviews were not conducted and documented appropriately.

Fraud Investigations/Operations
- The unit had Base-Level Fraud plans for 2006, 2008 and 2009. The plans identified targets, but were not very specific and did not provide detailed rationale or violations pursued.  Milestones were established and mostly timely.  For the years 2006 and 2007 the plans were not loaded into I2MS, no TMFs were opened, objectives were either not present or very weak, no activities were present to show pro-activity and productivity, and no leadership reviews were conducted.  For the years 2008 and 2009 the plans were loaded into I2MS, TMFs were opened, objectives were entered but very weak and general, some activities indicated some pro-activity and production, and however no leadership reviews were conducted.  The Joint Fraud Plans were present for all reporting years; no reviews conducted.  The unit had one fraud case in 2006 and two in 2009.  It was apparent the unit had improved throughout the years and seamed committed to continue to improve this program to increase their identification, neutralize and exploit fraud initiatives.

Source Program
- The detachment currently managed seven productive CSs.   Source meet activity documentation lacked specific details of levies, follow-up, and source background information.  Current CSs were consistently met, however, only one CS was tested (polygraph).  CSs were mostly trained and vetted to ensure access to each aligned target.  Dossiers were missing AF 686s, photos of CS and/or vehicle, back ground checks. Some dossiers were missing security pledges.  One closed dossier did not have a termination report.  The Source Manager and/or detachment leadership did not provide consistent documented monthly reviews.  Current dossier reviews were documented in I2MS.

Security Program
- The unit security manager was appointed in writing and the primary and alternate security manager was properly trained.  Self inspections were completed in Jun 09 and a SAV was completed in Jul 09.  However, there was no documented SAV or Self inspection for 2006, 2007, or 2008.  Classified information is being maintained in locked security containers and the unit has a locally produced version of the SF 701 they are using for the end-of-day checklist.  The detachment had emergency action plans and they are tested semi-annually.

Knowledge Operations Management (KOM)
- The unit had a current file plan dated 28 Jul 09.  The RC and the COR completed the required training.  The KOM established an ERK drive and is currently working on transitioning records from the public drive to the ERK.  The unit does not have any vital records identified.

Resource Planning
- The primary and alternate custodians were appointed in writing.  There were no  appointment letters for the equipment account for 07, 08.  The ECs were trained within the 30 day requirement. All equipment is processed through the AIM system.  Equipment is being labeled with the appropriate tracking labels and all new requirements for the unit are being processed through the PWRR system.

Transportation Program

**FOR OFFICIAL USE ONLY.**  This report may be protected from disclosure under the Freedom of Information Act.  Do not release or publish, whole or in part, outside official DoD channels without express approval of the Director, SAF/IGI.

USA00025148