IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JOE HOLCOMBE, et. al, | § | NO. 5:18-CV-00555-XR |
| | § | (Consolidated cases) |
| Plaintiffs | § | |
| | § | |
| | § | |
| vs. | § | |
| | § | |
| UNITED STATES OF | § | |
| AMERICA, | § | |
| | § | |
| Defendant | § | |

**<u>MEMORANDUM IN SUPPORT OF THE UNITED STATES OF AMERICA'S
MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS ...................................................................................................... 2

STANDARD OF REVIEW ..................................................................................................... 2

ARGUMENT .......................................................................................................................... 3

   I.    Texas Law Imposes No Duty That Would Provide a Basis For Liability Against the
United States. ...................................................................................................................... 3

      A.   The Enactment of Federal Statutes and Regulations is Not a Basis for Liability under
the FTCA. .......................................................................................................................... 4

      B.   Plaintiffs Cannot Prove the Necessary Elements of a Negligent Undertaking. ............... 6

   II.   The USAF's Failure to Submit Devin Kelley's Criminal History Data Was Not The Legal
Cause Of The Plaintiffs' Alleged Injuries.......................................................................... 19

      A.   The USAF's Failure to Submit Kelley's Criminal History Information to NICS Was
Not a Proximate Cause of the Shooting............................................................................ 20

      B.   Kelley's Conduct Demonstrates That He Was the Proximate Cause of the Mass
Shooting............................................................................................................................. 22

      C.   Kelly's Mass Shooting Was Not Foreseeable to Anyone in His Life and Certainly Not
to the Air Force. ................................................................................................................ 29

   III.   Plaintiffs' Negligent Training and Supervision Claims Should Be Dismissed.............. 31

   IV.   The Brady Act's Immunity Provision Precludes This Action........................................ 33

CONCLUSION....................................................................................................................... 35

# TABLE OF AUTHORITIES

**Federal Cases**

*Abreu v. United States,*
  468 F.3d 20 (1st Cir. 2006) ............................................................................... 8, 35

*Alfonso v. United States,*
  752 F.3d 622 (5th Cir. 2014) ................................................................................. 35

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................................................. 5

*Ayala v. United States,*
  49 F.3d 607 (10th Cir. 1995) .................................................................................. 19

*Castaldo v. Stone,*
  192 F. Supp. 2d 1124 (D. Colo. 2001) ................................................................... 25

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ................................................................................................. 5

*Clemente v. United States,*
  567 F.2d 1140 (1st Cir. 1977) ................................................................................ 10

*Coleman v. United States,*
  912 F.3d 824 (5th Cir. 2019) ................................................................................... 5

*Florida Auto Auction of Orlando v. United States,*
  74 F.3d 498 (4th Cir. 1996) ..................................................................................... 9

*Foglia v. Milby,*
  132 F.3d 1453 (5th Cir. 1997) ................................................................................. 6

*Holbrook v. United States,*
  673 F.3d 341 (4th Cir. 2012) ................................................................................... 7

*Ingham v. E. Air Lines, Inc.,*
  373 F.2d 227 (2d Cir. 1967) ............................................................................ 10, 28

*Ireland v. Jefferson Cty. Sheriff's Dept.,*
  193 F. Supp. 2d 1201 (D. Colo. 2002) ................................................................... 30

*Johnson v. Sawyer,*
  47 F.3d 716 (5th Cir. 1995) ................................................................. 5, 6, 10, 34

*Knight v. Cooper,*
  No. 5:17-CV-234-OLG, 2018 WL 7350947 (W.D. Tex. June 1, 2018) .................. 34

*Laird v. Nelms,*
  406 U.S. 797 (1972) ............................................................................................... 34

*McCarty v. Hillstone Rest. Grp., Inc.,*
  864 F.3d 354 (5th Cir. 2017) ................................................................................... 5

*Monell v. Dep't of Soc. Serv's of City of New York,*
  436 U.S. 658 (1978) ............................................................................................... 35

*Myers v. United States,*
  17 F.3d 890 (6th Cir. 1994) .................................................................................... 19

*Nat'l Rifle Ass'n v. Reno,*
  216 F.3d 122 (D.C. Cir. 2000) ................................................................ 16, 17, 29
*Nowlan v. Cinemark Holdings, Inc.,*
  2016 WL 4092468 (D. Colo. Jun. 24 2016) .................................................... 25
*Pate v. Oakwood Mobile Homes, Inc.,*
  374 F.3d 1081 (11th Cir. 2004) ...................................................................... 19
*Phillips v. Lucky Gunner, LLC,*
  84 F. Supp. 3d 1216 (D. Colo. 2015) .............................................................. 25
*Plascencia v. Hillman,*
  No. 19-CV-40-PRM, 2019 WL 4087439 (W.D. Tex. July 03, 2019) ............ 33
*Printz v. United States,*
  521 U.S. 898 (1997) ................................................................................... 19, 20
*Sanchez v. United States,*
  671 F.3d 86 (1st Cir. 2012) ............................................................................... 8
*Sanchez v. United States,*
  568 U.S. 1249 (2013) ......................................................................................... 8
*Sea Air Shuttle Corp. v. United States,*
  112 F.3d 532 (1st Cir. 1997) ........................................................................... 10
*Sheridan v. United States,*
  969 F.2d 72 (4th Cir. 1992) ............................................................................. 19
*Shumpert v. City of Tupelo,*
  905 F.3d 310 (5th Cir. 2018) ............................................................................. 5
*Skipper v. United States,*
  1 F.3d 349 (5th Cir. 1993) ............................................................................... 31
*Turbe v. Gov't of Virgin Islands,*
  938 F.2d 427 (3d Cir. 1991) ............................................................................ 19
*United States v. Smith,*
  324 F.2d 622 (5th Cir. 1963) ............................................................................. 6
*Wentwood Woodside I, LP v. GMAC Commercial Mortg. Corp.,*
  419 F.3d 310 (5th Cir. 2005) ............................................................................. 9
*Williams v. McCollister,*
  671 F. Supp. 2d 884 (S.D. Tex. 2009) ...................................................... 33, 34
*Zelaya v. United States,*
  781 F.3d 1315 (11th Cir. 2015) ......................................................................... 7

**State Cases**

*DeWitt v. Harris County,*
  904 S.W.2d 650 (Tex. 1995) ............................................................................ 36
*Allways Auto Group, Ltd. v. Walters,*
  530 S.W.3d 147 (Tex. 2017) ............................................................................ 21
*Bell v. Campbell,*
  434 S.W.2d 117 (Tex. 1968) ............................................................................ 24

*Brown v. Swett & Crawford of Texas, Inc.*,
    178 S.W.3d 373 (Tex. App. 2005) ................................................... 33
*Colonial Sav. Ass'n v. Taylor*,
    544 S.W.2d 116 (Tex. 1976) ................................................... 18, 19
*Doe v. Boys Club of Greater Dallas, Inc.*,
    907 S.W.2d 472 (Tex. 1995) ............................... 22, 24, 31, 32
*Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*,
    926 S.W.2d 287 (Tex. 1996) ................................................... 18
*Gonzales v. Willis*,
    995 S.W.2d 729 (Tex. App. 1999) ................................................... 33
*Lear Siegler, Inc. v. Perez*,
    819 S.W.2d 470 (Tex. 1991) ................................................... 24
*Lopez v. McDonald's Corp.*,
    193 Cal.App.3d 495 (1987) ................................................... passim
*Morrone v. Prestonwood Christian Academy*,
    215 S.W.3d 575 (Tex. App. 2007) ................................................... 36
*Prudential Ins. Co. v. Jefferson Assocs., Ltd.*,
    896 S.W.2d 156 (Tex. 1995) ................................................... 22, 33
*Roberts v. Healey*,
    991 S.W.2d 873 (Tex. App. 1999) ................................................... 22, 23
*Torrington Co. v. Stutzman*,
    46 S.W. 3d 829 (Tex. 2000) ................................................... 9
*Union Pump Co. v. Allbritton*,
    898 S.W.2d 773 (Tex. 1995) ................................................... 22, 23, 24

## Federal Statutes

18 U.S.C. § 921(a)(21)(D) ................................................... 28
18 U.S.C. § 922 ................................................... 8, 11
18 U.S.C. § 922(g) ................................................... 36
18 U.S.C. § 922(g)(1) ................................................... 11
18 U.S.C. § 922(t)(6) ................................................... 4, 35, 36
18 U.S.C. § 922(g)(4) ................................................... 11
28 U.S.C. § 534 ................................................... 13, 15
28 U.S.C. § 2671 ................................................... 7
28 U.S.C. § 1346(b) ................................................... 3, 34
34 U.S.C. § 40901(b) ................................................... 13
34 U.S.C. § 40901(e)(1)(A) ................................................... 11
34 U.S.C. § 40901(e)(1)(B) ................................................... 8, 36
42 U.S.C. § 1983 ................................................... 35
Pub. L. No. 110-180 ................................................... 11

## Federal Regulations

27 C.F.R. § 478.11 ........................................................................................................... 11

28 C.F.R. § 0.85(e)........................................................................................................... 16

28 C.F.R. § 0.85(f) ........................................................................................................... 16

28 C.F.R. § 20.30 ............................................................................................................. 13

## INTRODUCTION

These consolidated actions arose out of the horrific mass shooting that occurred on November 5, 2017, at the First Baptist Church in Sutherland Springs, Texas.  The shooter, Devin Patrick Kelley, killed twenty-six people and injured at least twenty others during the rampage. Plaintiffs have brought suit under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* ("FTCA"), alleging that the United States is liable for the tragedy because, but for failures by the United States Air Force ("USAF") to report disqualifying information about Kelley to the Federal Bureau of Investigation's ("FBI's") National Instant Criminal Background Check System ("NICS"), Kelley would not have been able to purchase the firearms he used to carry out the massacre at the church.

While Plaintiffs understandably seek compensation for the unspeakably horrible losses they have suffered, they have no viable claim against the United States, which is entitled to summary judgment as a matter of law for several reasons.

First, Plaintiffs cannot establish an applicable duty under Texas law.  Federal statutes and regulations, and the enactment of them, cannot form the basis of a duty under the FTCA.  Nor can Plaintiffs prove that the USAF rendered a service to another or that any failure to report Kelley's criminal history information increased the risk of harm to Plaintiffs under a negligent undertaking theory of liability.  Such novel theories of tort liability threaten to expose the United States to unprecedented liability that was never contemplated by Congress and would be at odds with settled law.

Second, Plaintiffs cannot establish that the USAF's alleged reporting failure was the legal cause of their injuries.  Given that Kelley had many alternative sources for obtaining a firearm, coupled with his premediation and determination to commit the mass shooting, Plaintiffs cannot

prove that the USAF's failure to report information about Kelley to the FBI was a legal cause of the shooting.  Moreover, it was simply unforeseeable to the USAF in 2012 that, five years later, Kelley would perpetrate the fifth most deadly mass shooting in U.S. history by systematically killing members of a church roughly 700 miles away.  Well-settled law bars such attenuated theories of causation, and indeed the United States is aware of no case under Texas law holding that plaintiffs can establish proximate causation under circumstances like these.

Third, Plaintiffs cannot recover damages for their claims of negligent training and supervision.  Under Texas law, a claim for negligent training and supervision requires an underlying actionable tort.  In addition, where there is a claim of *respondeat superior* liability, claims for negligent training and supervision are means to the same ends and therefore become irrelevant under Texas law.

Finally, under Texas *respondeat superior* law, Plaintiffs' claims are precluded by 18 U.S.C. § 922(t)(6), a provision of the Brady Handgun Violence Prevention Act of 1993 ("the Brady Act") that shields employees of the Federal government from liability in actions at law for damages for failing to prevent the sale or transfer of firearms to persons whose receipt or possession of them is unlawful.  In sum, the Defendant is entitled to summary judgment on four independent bases, and Plaintiffs' complaints should be dismissed with prejudice on all grounds.

## STATEMENT OF FACTS

Pursuant to Local Rule CV-7(d)(1), the United States hereby incorporates by reference the Statement of Facts and the Index of Exhibits.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a).  Rule 56 permits judgment even if the parties disagree about the facts; "the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  To prevail on summary judgment, the movant need only point out "that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Although a court generally must "review the facts in the light most favorable to [the non-moving party]," a court must do so "only when both parties have submitted evidence of contradictory facts."  *Shumpert v. City of Tupelo*, 905 F.3d 310, 323 (5th Cir. 2018).  Courts "will not assume 'in the absence of any proof that the nonmoving party could or would prove the necessary facts.'"  *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 358 (5th Cir. 2017).

## ARGUMENT

**I.**    **Texas Law Imposes No Duty That Would Provide a Basis For Liability Against the United States.**

In its prior ruling, the Court recognized that "there is no general Texas common-law duty that corresponds with the Brady Act's reporting requirements, as there is generally no duty to protect another from the criminal acts of a third party or to come to the aid of another in distress."  ECF No. 59 ("Order") at 31–32.  The Court also acknowledged that, absent an analogous state-law duty, the "existence or nonexistence of the claim depends entirely upon Federal Statutes."  *Id.* at 33; *see also Johnson v. Sawyer*, 47 F.3d 716, 727 (5th Cir. 1995) ("[T]he FTCA was not intended to redress breaches of federal statutory duties."); *Coleman v. United States*, 912 F.3d 824, 834-35 (5th Cir. 2019) (district court erred by analyzing plaintiff's privacy-related claims under framework that viewed federal Privacy Act claims as cognizable under FTCA; alleged violations of Federal statutes cannot be basis for FTCA claims).

Nonetheless, the Court afforded Plaintiffs an opportunity to take discovery to attempt to prove that "the United States, in undertaking to establish a complex national background-check system, assumed the duty not to operate this system negligently" and that "the USAF's volunteering to take corrective action and failing to do so" constituted a negligent undertaking under Texas law.  Order at 36.  Plaintiffs cannot do so.

To the contrary, the discovery that has taken place since the Court ruled on the motion to dismiss only further demonstrates how Plaintiffs' novel attempt to impose an ill-defined and potentially wide-ranging tort duty on the United States has no private analog and therefore no basis in state law.  Plaintiffs' attempt to pursue this novel theory and impose unprecedented liability against the government should be rejected as contrary to well-established law. Moreover, discovery in this case has demonstrated that the Air Force did not adopt any recommendation by the Department of Defense Office of Inspector General constituting a voluntary undertaking to submit Kelley's criminal history information into the NICS system.

## A.     The Enactment of Federal Statutes and Regulations is Not a Basis for Liability under the FTCA.

As the Court acknowledged, federal statutes and regulations cannot create a cause of action and impose tort liability on the government under the FTCA.  Order at 28.  Indeed, it is well established that "the FTCA was not intended to redress breaches of federal statutory duties." *See Johnson v. Sawyer*, 47 F.3d 716, 728 (5th Cir. 1995); *see also Foglia v. Milby*, 132 F.3d 1453 (5th Cir. 1997) ("[T]he FTCA was not intended to redress breaches of federal statutes or regulations standing alone."); *United States v. Smith*, 324 F.2d 622, 624-25 (5th Cir. 1963) (FTCA "simply cannot apply where the claimed negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs" or where the claim "depends entirely upon Federal statutes."); *Holbrook v. United States*, 673 F.3d 341, 347 (4th

4

Cir. 2012) ("The price of circulating internal guidance should not be an exponential increase in exposure to a tort suit.").

As the Court observed, while federal statutes and regulations "may provide evidence that the government has assumed duties analogous to those recognized by local tort law" or "may provide the standard of care against which the government's conduct should be assessed," they cannot create a cause of action under the FTCA. *Id*. at 33 (quoting *Zelaya v. United States*, 781 F.3d 1315, 1324–25 (11th Cir. 2015) (internal quotation marks omitted). That is because the FTCA provides a cause of action solely for *state law* tort violations. "In short, while a federal employee's breach of a federally-imposed duty may bolster a FTCA claim, it cannot, on its own, create the duty that gives rise to that claim. That task falls to the applicable state jurisdiction." *Id*. (citation omitted).

Plaintiffs attempt to circumvent this black-letter law by arguing that it is not the federal statutes and regulations themselves, but the enactment of them, which established a voluntary undertaking under Texas law.[1]  As a threshold matter, this is a legally-flawed theory that would impose unprecedented liability on the federal government and is inconsistent with established law.  Nonetheless, Plaintiffs' theory fails for an independent reason: Plaintiffs can point to nothing in the record indicating that in enacting the statutes establishing the federal background check system, Congress intended to impose any duty on the federal government, much less

---

[1]  In their Sur-Reply to the Government's Motion to Dismiss, Plaintiffs argued, "[The Government's] argument oddly presumes or proposes that the U.S. Congress was not a part of the U.S. Government when it voluntarily enacted these federal statutes.  But the text of the FTCA recognizes that, obviously, Congress is a part of the Government.  *See* 28 U.S.C. § 2671. And the Government, through Congress, has undertaken—by statute—many activities that serve as the basis for FTCA liability when negligently performed."  ECF No. 51 at 4.  If, as Plaintiffs argue, the United States could be held liable under the FTCA whenever Congress enacted a federal statute, this tenet would be turned on its head.

subject the federal government to tort liability.  Where Congress intends to create a cause of action against the government, it says so expressly, and there is nothing here indicating that Congress intended to create a new avenue of potentially wide-ranging liability against the federal government when it passed the statutes creating the federal background check system.  No award of damages against the United States is expressly authorized by the terms of the Brady Act, 18 U.S.C. § 922 et seq., or the NICS Improvement Amendments Act of 2007 ("NIAA"), 34 U.S.C. § 40901(e)(1)(B)).  Allowing Plaintiffs to recover damages under the FTCA would subvert that remedial scheme.  *See, e.g.*, *Abreu v. United States*, 468 F.3d 20, 30-31 (1st Cir. 2006) (FTCA could not be used to recover damages for Navy's alleged violations of Resource Conservation and Recovery Act (RCRA) because allowing such recovery would subvert RCRA's remedial scheme, under which no damages could be awarded against the United States); *Sanchez v. United States*, 671 F.3d 86, 94–95 (1st Cir. 2012) (applying same reasoning to preclude recovery under FTCA for Navy's alleged violations of Clean Water Act), cert. denied, 568 U.S. 1249 (2013). No private person analog exists in this case, and Plaintiffs cannot cite the enactment of federal statutes or regulations to circumvent that requirement.

      **B.**      **Plaintiffs Cannot Prove the Necessary Elements of a Negligent Undertaking.**

Plaintiffs have likewise failed to establish the necessary elements to demonstrate that the Department of Defense ("DoD") or the USAF engaged in a negligent undertaking under Texas law.  Again, this is a flawed legal theory that is contrary to Fifth Circuit law and would subject the federal government to tort claims contrary to the intent of Congress.  Nonetheless, Plaintiffs' theory also fails because they cannot establish the requisite elements under Texas law.

Texas relies on Restatement (Second) of Torts § 323 to determine whether a private person who undertakes to provide services to another can be held liable under its "good

Samaritan" doctrine. *Torrington Co. v. Stutzman*, 46 S.W. 3d 829, 837 (Tex. 2000). The Restatement provides,

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if:
> (a) his failure to exercise such care increases the risk of such harm, or
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965); *see also* Order at 35. Here, Plaintiffs' claim fails for two independent reasons: (1) they cannot prove that either the DoD or the USAF rendered services "to another," or (2) that the failure to submit Kelley's criminal history information to the FBI *increased* the risk of harm to Plaintiffs.

### 1. The DoD's Intra-Governmental Reporting Was Not an Undertaking to Provide Service to Another.

The negligent undertaking theory under Texas law only applies where a party provides services "to another". *See Wentwood Woodside I, LP v. GMAC Commercial Mortg. Corp.*, 419 F.3d 310, 319 (5th Cir. 2005) (citing Restatement (Second) of Torts § 323 and concluding that where one "undertakes . . . to render services *to another* which he should recognize as necessary for the protection of the other's . . . things, he may be subject to liability to the other"); *see also Florida Auto Auction of Orlando v. United States*, 74 F.3d 498 (4th Cir. 1996) (finding U.S. Customs regulations "do not represent an effort specifically to 'render services' to Appellees.").

However, as the First Circuit has observed, intra-governmental reporting regulations do not entail services to another and thus create no "legal duty to the citizenry":

> [P]laintiffs cannot use the implicit sovereignty of the government to argue that all its internal communications establish standards of care similar to those created by duly promulgated laws of general application. Not all acts and orders of the United States government are so sovereign that they must be treated as commands which create legal duties or standards, the violation of which involves breaking the law. A considerable part of the government's conduct is in the context of an employer-

7

employee relationship, a relationship which includes reciprocal duties between the government and its staff, but not necessarily a legal duty to the citizenry.

*Clemente v. United States*, 567 F.2d 1140, 1144 (1st Cir. 1977) (finding that FAA policy to inspect turbine powered aircraft, although mandatory, was a duty "owed by the employees to the government," not a "statutory duty to offer special protection to plaintiffs' decedents"), cited with approval by *Johnson*, 47 F.3d at 730; *see also Sea Air Shuttle Corp. v. United States*, 112 F.3d 532, 537 (1st Cir. 1997) (finding that the "regulatory remedy cannot be deemed to give rise to an enforceable duty to any individual victim of the unlawful conduct").[2]

The same is true here where Plaintiffs seek to rely on intra-governmental reporting regulations governing information exchanged between DoD and FBI.  The Brady Act authorized the Attorney General to "secure directly from any department or agency of the United States such information on persons for whom receipt of a firearm would violate subsection (g) or (n) of section 922 of title 18, United States Code or State law, as is necessary to enable the system [(i.e., NICS)] to operate in accordance with this section."  Pub. L. No. 103-159 § 103(e)(1), 107 Stat. at 1542(1993) (codified as amended at 34 U.S.C. § 40901(e)(1)(A)) (formerly 18 U.S.C. § 922 note).  The NIAA amended the Brady Act to enhance the exchange of information between

---

[2]  In its prior ruling allowing the case to proceed to discovery, the Court cited *Ingham v. E. Air Lines, Inc.*, 373 F.2d 227, 236 (2d Cir. 1967).  However, in *Ingham*, unlike here, a private person analog existed.  There, the plaintiffs alleged that a federal air traffic controller was negligent in the manner in which he conveyed weather information to the crew of an airliner.  It was not the mere enactment of the statutory obligation to report the weather that formed the basis for liability under the negligent undertaking doctrine.  Rather, the air traffic controllers in that case had analogous private duties apart from FAA requirements.  *See Clemente*, 567 F.2d at 1146-48 ("Tort liability is intrinsic in the function; once the government took control of the air towers it became subject to the duties that would devolve on any entity that took on such responsibility.") (emphasis added).  Thus, while the Court was correct that "even if the only reason the Government acts is because of legislation, it still cannot act negligently," Order at 34, *Ingham* illustrates that the duty to act that gives rise to liability cannot derive solely from an agency's obligations that are owed to the government.

Federal departments and agencies and NICS concerning persons whose receipt of a firearm would be unlawful. *See* NIAA, Pub. L. No. 110-180, § 101(a)(1)(A)(2) & (B)(3), 121 Stat. 2561 (2008) (codified at 34 U.S.C. § 40901(e)(1)(B)) (formerly 18 U.S.C. § 922 note) ("On request of the Attorney General, the head of such department or agency shall furnish electronic versions of the information described under subparagraph (A) to the system.").

Under 18 U.S.C. § 922(g)(1) and (g)(9),[3] DoD service personnel submit criminal history information to the FBI, as outlined in Department of Defense Instruction ("DoDI") 5505.11. Ex. AA at USA00001806. The Instruction established procedures for submitting Suspect Fingerprint Cards ("FD-249") and Final Disposition Forms ("FBI/DOJ Form R-84") to the FBI's Criminal Justice Information Services ("CJIS") Division. The Air Force Office of Special Investigations ("AFOSI") and Security Forces likewise issued Instructions and Manuals for submitting criminal history information to the FBI for indexable offenses. AFOSI Manual 71-121 (Ex. Z at USA00000418); AFI31-206 (Ex. BB at USA00003962); AFI 31-205 (Ex. CC at USA00020635).

---

[3] Devin Kelley was not prohibited from possessing firearms under 18 U.S.C. §§ 922(g)(4) or (g)(6). 18 U.S.C. § 922(g)(4) prohibits sales to an individual who has "been adjudicated as a mental defective or has been committed to any mental institution." *See* 27 C.F.R. § 478.11 (defining terms). As Kelley's medical records make clear, he voluntarily entered PEAK on two occasions: February 23, 2012, and April 30, 2012. Ex. C at PEAK000938; Ex. E at PEAK0000135. Moreover, even when Kelley "eloped" from PEAK on June 7, 2012, local law enforcement returned him to PEAK for one day without a formal court ordered decision. Kelley was never "adjudicated as a mental defective" or the subject of a "formal commitment" by a court ordered decision. (27 C.F.R. § 478.11; Del Greco Dep. at 164-65). Additionally, 27 § C.F.R. 478.11 makes clear that "discharged . . . under dishonorable conditions" "does not include any separation from the Armed Forces resulting from any other discharge, *e.g.*, a bad conduct discharge." As part of his general court-martial conviction, Kelley was given a bad-conduct discharge. Ex. D at USA00013356. Because Kelley was not dishonorably discharged, he was not a prohibited from possessing a firearm under 18 U.S.C. § 922 (g)(6). Therefore, the regulatory regime through which DoD would submit information to the FBI pursuant to §§ 922 (g)(4) or (g)(6) is not relevant to this litigation.

Such intra-governmental exchanges of information do not have a private person analog under Texas law, nor do they provide a "service" to specific victims of gun violence. Rather, the Brady Act and NIAA merely provided for the intra-governmental exchange of information, and DoD implemented procedures to facilitate the exchange of information within the government. Accordingly, Plaintiffs' negligent undertaking theory fails.

Indeed, if the mere enactment of federal statutes and regulations could serve as the basis for imposing an actionable duty, the United States would be exposed to unprecedented tort liability. Even when limited to regulations aimed at fostering information sharing with other agencies, such a holding would cripple key government functions. For example, under Plaintiffs' theory, a plaintiff might allege that the DoD could be held legally responsible for failing to properly disseminate Law Enforcement Criminal Intelligence (CRIMINT), *see* DoDI 5525.18 (establishing CRIMINT dissemination policy to "aid in crime prevention, threat disruption, offender pursuit and apprehension, and evidence capture necessary for conviction"); or failing to exchange information pertaining to Counterintelligence (CI) threats, *see* DoDI 5240.26 ("Conduct information exchanges with Federal, State, local, tribal and foreign agencies on CI insider threats"). If promulgating such directives could constitute an undertaking, the government would have an incentive to stop performing key functions rather than expose itself to such ill-defined and potentially far-reaching liability.

### 2. The USAF's Adoption of DoD Inspector General Recommendations Was Not an Undertaking to Perform Services to Another.

The record likewise refutes Plaintiffs' allegation that "the USAF's volunteering to take corrective action and failing to do so" constituted "an undertaking." Order at 36. The Court afforded Plaintiffs an opportunity to take discovery to attempt to establish that certain reports issued by the DoD Office of Inspector General ("IG") revealed systemic failures in the reporting

of criminal history information to the FBI and, as a result, the USAF agreed to "promptly ensure that such systemic failures were corrected."  *See* ECF No. 1 at ¶ 64.  However, the record demonstrates that the USAF did not adopt any IG recommendation that constituted an undertaking to submit Kelley's criminal history information into the NICS system.  In sum, not only is Plaintiffs' negligent undertaking theory legally flawed, it is not supported by the record.

   a.  *DODIG-1997-030: Evaluation of Department of Defense Compliance with Criminal History Data Reporting Requirements*

The first IG report Plaintiffs cite does not address the Brady Act or the submission of information to the NICS system at all; indeed, it predates it.  The report was issued on February 10, 1997, nearly two years before NICS became operational on November 30, 1998, (Ex. U at USA00016666; 34 U.S.C. § 40901(b)), and merely suggested improvements in the processes used by Defense Criminal Investigative Organizations ("DCIOs"), including the Air Force Office of Special Investigations ("AFOSI"), to submit suspect fingerprint cards and final disposition reports to the FBI pursuant to the Uniform Federal Crime Reporting Act.  1997 IG Report, Ex. Y at USA00011166; *see also* 28 U.S.C. § 534 et seq.; 28 C.F.R. § 20.30 (designating FBI's CJIS Division as the manager of the databases).  Accordingly, the report is simply irrelevant to the issues here.

Nonetheless, the evidence shows that the Air Force complied with the IG's 1997 recommendations, and indeed had already initiated efforts to improve its procedures.  In fact, the AFOSI had already adopted guidelines that were more restrictive than the procedures recommended by the IG, such as submitting fingerprints within a shorter time period than that recommended by the IG.  According to the 1997 IG Report, AFOSI was the most compliant of the DCIOs both in submitting suspect fingerprint cards and final disposition reports.  *Id*. at 4; (Ex. F, Poorman Dep. at 295–96) (noting the AFOSI's failure rate was "[l]ess than half of the

other two services").  In other words, the IG recommendation was to implement procedural

guidelines that were less restrictive than those already imposed by AFOSI while new DoD

Instructions were being developed.  AFOSI implemented the recommendation while maintaining

its more stringent policy.  The IG found the Air Force comments "fully responsive."  *Id*. at 13.

   b.  *DODIG-2015-081: Evaluation of Department of Defense Compliance with Criminal
       History Reporting Requirements*

   The second IG report Plaintiffs cite is likewise irrelevant to the allegations in Plaintiffs'

complaint.  *See, e.g.*, ECF No. 1 at ¶ 64.  That report, issued in 2015, was limited to "service

members *convicted of qualifying offenses* between June 1, 2010, and October 31, 2012."

(emphasis added).  Devin Kelley was not convicted of a qualifying offense during that time

period.  *See* ECF No. 149 (stipulating Kelley's general court-martial conviction was on

November 7, 2012).  Accordingly, while the IG recommended in this report—and USAF

agreed—to submit certain fingerprints and final dispositions from this period to the FBI's CJIS

Division, contrary to Plaintiffs' allegations, Devin Kelley's fingerprints and dispositions would

not have been among them, because he had not been convicted in a general court-martial during

the relevant period of time.[4]

---

[4] The Rule 30(b)(6) witnesses Plaintiffs deposed from the AFOSI and Security Forces
both confirmed that the IG made no recommendation to submit fingerprints or final dispositions
from a time period that would have included Mr. Kelley's conviction.  *See* Ford Dep. at 371 (Q:
"So, to be clear, when the Security Forces adopted the recommendation to submit the missing
fingerprints and final dispositions within the evaluated sample period, did it [agree] to submit
every outstanding fingerprint and final disposition form since 1997?"  A: "No.  It did not.  It
agreed to submit all the ones that were in the range of this DoD/IG report, which was already
explained as between June 2010 through October 2012.");  Ex. F, Poorman Dep. at 311 (Q:
"When OSI adopted the recommendation to submit the identified missing fingerprints and final
disposition forms, did it agree to submit every outstanding fingerprint and final disposition form
since 1987?"  A: "No.");  *see also* Ex. EE, Ford Dep. at 374 (Q: "So does the second
recommendation have any bearing on the reporting of Devin Kelley's information to the FBI
NICS?"  A: "No, it does not.");  Ex. F, Poorman Dep. at 316 (Q: "OSI interpreted the future

In any event, the record shows that, again, the Air Force complied with the IG's recommendations. The IG found the USAF's comments "addressed all specifics of the recommendations. No further comments are required." Ex. DD at USA00011714.

> c. *DODIG-2015-011: Evaluation of the Defense Criminal Investigative Organizations' Defense Incident-Based Reporting System Reporting and Reporting Accuracy*

The third report Plaintiffs cite (DODIG-2015-011) is irrelevant to this litigation because it concerns a DoD database that is not used to submit an *individual's* criminal history information to the FBI and because the USAF in fact had already submitted Kelley's information to that database before the report was published, thereby rendering its recommendation moot with regard to him. The October 29, 2014, IG report evaluated DCIOs' processes for reporting accurate criminal incident data to the Defense Incident-Based Reporting System ("DIBRS"). DIBRS IG Report, USA00017737. As outlined in DoD Directive 7730.47, DIBRS is a central repository maintained and operated within the DoD's Defense Manpower Data Center "to enhance DoD and Service capability to analyze trends and to respond to Executive, Legislative, and oversight requests for statistical data relating to criminal and other high-interest incidents" that was originally created pursuant to the Uniform Crime Reporting Act. Ex. X, Verdejo Dep. at 179-180. It provides aggregate statistical data to the FBI's National Incident-Based Reporting System ("NIBRS"), which is used to inform the Uniform Crime Reports.[5] *Id*. at 184. The

---

arrestees and convicted offenders as subsequent to the issuance of this report. Is that correct?" A. "Yes.").

[5] In addition to providing for the collection of criminal history information, the Uniform Federal Crime Reporting Act of 1988 (28 U.S.C. § 534 note), provides that federal law enforcement will contribute to the Uniform Crime Reporting Program and directs the Attorney General to collect crime statistics from all federal agencies, including the Department of Defense, "that routinely investigate complaints of criminal activity." The statute is implemented through 28 C.F.R. § 0.85(f), which provides that the Director of the FBI shall "operate a central

October 29, 2014 IG Report therefore makes no finding regarding any alleged failures to report under the Brady Act.

Rather, in providing information to NICS, USAF submits fingerprint cards and final disposition reports directly into databases *that inform the Interstate Identification Index* ("III"). The IG found in its 2020 report that, using this mechanism, AFOSI and Security Forces had achieved a 100 percent compliance rate under the Brady Act.  Ex. II at USA00024853.

This approach is consistent with DOJ guidance.  NICS searches for disqualifying information in three separate databases: (1) the NICS Index, containing records on persons known to be disqualified from possessing firearms under federal law; (2) the National Crime Information Center ("NCIC"), containing records on protective orders, deported felons, and fugitives from justice; and (3) the III, containing criminal history records.  *Nat'l Rifle Ass'n v. Reno*, 216 F.3d 122, 125 (D.C. Cir. 2000).  The Department of Justice issued Guidance to Agencies Regarding Submission of Relevant Federal Records to the NICS: "If records are relevant to the NCIC or III, you should submit them to those databases, rather than the NICS Index . . . .  An agency's effort to comply . . . will thus be simplified and facilitated by preferring the NCIC and III during submission."[6]  Ex. U at USA00016678–79.  The Guidance continues by

---

clearinghouse for police statistics under the Uniform Crime Reporting Program."  To satisfy this requirement, NIBRS—an incident-based reporting system used by law enforcement agencies in the United States for collecting and reporting statistical data on crimes—was developed.  NIBRS does not contain the required biographic identifiers to allow NICS to search the data.  28 C.F.R. § 0.85(e).

[6] DOJ Guidance gives two reasons for preferring III over the NICS Index: "First, records submitted to the NCIC and III are available to federal, state, and local authorities for a wide variety of law enforcement purposes.  Accordingly, populating the NCIC and III has benefits not only for the firearms background check, but also for law enforcement more broadly.  Second, a 'hit' in the NICS Index triggers an automatic denial of the firearm transfer.  Therefore, contributors must 'pre-validate' information before submitting it to the NICS Index . . . .  If an agency submits information to the NCIC or III, in contrast, it need not pre-validate the record;

noting that convictions under § 922(g)(1) and (g)(9) should be submitted to the III.  Ex. U at USA00016679.  "If, for any reason, the NCIC or III will not accept relevant records, please submit those records to the NICS Index."  *Id*.

In response to the DOJ Guidance, then-Undersecretary of Defense Wright wrote a letter to the Attorney General confirming that DoD had already "been submitting its 'prohibited persons' data to NICS since 1998" through this mechanism.  Ex. W at USA0005407.  As the letter observed, "DoD's ability to report to NICS is due in large part to the established system of reporting qualifying information to NCIC and III, for NICS to search and retrieve, as a part of normal criminal justice business.  This reporting takes place from the myriad of law enforcement agencies in DoD directly to those systems; not from a central DoD CJI RMS."  The letter continued by noting that for felony convictions (922(g)(1)) and misdemeanor convictions of domestic violence (922(g)(9)), the DoD submits criminal history information into NCIC/III.[7]  *Id*.

In any event, the USAF had already submitted Mr. Kelley's information to the DIBRS database before the IG report that Plaintiffs cite was even issued.  While the 2014 IG report recommended submitting additional information to DIBRS that had not been reported during a limited period of time (August 2012 to January 2013), Devin Kelley's information was submitted to DIBRS on October 21, 2013, well before the IG issued its report and several years before Kelley purchased the firearms he used to commit the mass shooting.  Ex. F, Poorman Dep.

---

the NCIC and III have broader law enforcement purposes, and whether a record in either database is in fact prohibiting is a determination that the NICS will make on a case-by-case basis when they get a hit in those databases."  Ex. U at USA00016664

[7] Ms. Verdejo, the government's 30(b)(6) witness, similarly confirmed that DoD has been "providing [criminal history data] through the Interstate Identification Index or Triple I or the National Crime Information Center or NCIC."  (Ex. X, Verdejo Dep. at 86).

at 267–68; Ex. G at USA00016836.[8]  Accordingly, the 2014 DIBRS IG Report is irrelevant to

the allegations here, and certainly provides no evidence of any voluntary undertaking because the

Air Force had already reported Kelley's information to DIBRS before the IG report was even

issued.

### 3.   The USAF Did Not Increase the Risk of Harm to Plaintiffs.

Plaintiffs' negligent undertaking theory further fails because the USAF did not increase

the risk of harm to Plaintiffs.  Plaintiffs acknowledge that "this case does not involve Plaintiffs'

reliance on any Government statement or disclosure."  ECF No. 44 at 36.  The Court similarly

concluded that "there is not even indirect reliance on Plaintiffs' part anywhere in the chain of

causation."  Order at 16.  Absent a finding of reliance, Plaintiffs must demonstrate that the

United States increased the risk of harm to Plaintiffs.  They cannot do so.

The Supreme Court of Texas has held that, in a negligent undertaking case, the defendant

is "under a duty to avoid such an affirmative act that may actually worsen a situation."  *Golden*

*Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*, 926 S.W.2d 287 (Tex. 1996) (basing

liability on the affirmative recommendation of a scoutmaster suspected of child molestation); *see*

*Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 120 (Tex. 1976) (plaintiff in "no worse condition

than if [the defendant] had never undertaken to provide [the service] in the first place").

Accordingly, under Texas law, the issue is not whether the risk of harm would have been

decreased if government agencies had operated the background check system in a non-negligent

fashion.  *See Colonial Sav. Ass'n*, 544 S.W.2d at 120.  Rather, the relevant inquiry is whether the

risk to Plaintiffs would have been lower if the government had not operated the background

---

[8]  Per USAF policy, the DIBRS submission did not include Kelley's final disposition, as it
was not required as part of the aggregate statistic data received by DIBRS to satisfy the Uniform
Crime Reporting Act.  (Ex. F, Poorman Dep. 210–211) (explaining that DIBRS submissions use
codes rather than individual narratives).

check system at all, whether negligently or not.  Under the appropriate inquiry, there is no basis for concluding that the government's conduct *increased* Plaintiffs' risk of injury compared to the risk they faced if there had been no Brady background check system at all.

Other courts applying Restatement Section 323, and a closely related provision, Section 324A, have acknowledged this rule of law, including in cases under the FTCA.  *See, e.g.*, *Pate v. Oakwood Mobile Homes, Inc.*, 374 F.3d 1081, 1087 n.4 (11th Cir. 2004) (finding in FTCA case no increased risk of harm where the government failed to "ensure the abatement of a pre-existing hazard" but "did not increase the hazard"); *Sheridan v. United States*, 969 F.2d 72, 74-75 (4th Cir. 1992) (finding in FTCA case the breach exposed plaintiff to no greater risk of harm than "if the United States had never promulgated such regulations in the first instance"); *Myers v. United States*, 17 F.3d 890, 903 (6th Cir. 1994) (concluding in FTCA case that "a duty is imposed only if the risk is increased over what it would have been had the defendant not engaged in the undertaking at all"); *Ayala v. United States*, 49 F.3d 607, 614 n.5 (10th Cir. 1995) (finding in FTCA case that no increased risk "over what it would have been had [the employee] done nothing at all"); *Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 432 (3d Cir. 1991) (concluding Section 323 requires comparison "to the risk that would have existed had the defendant never provided the services initially").

*Printz v. United States* is instructive.  521 U.S. 898 (1997).  There, the question before the United States Supreme Court was whether the interim provisions of the Brady Act that commanded state and local law enforcement officers to conduct background checks on prospective handgun purchasers violated the Constitution.  *Id*. at 902.  County sheriffs from Montana and Arizona brought suit, arguing that the interim provision "compelled enlistment of state executive officers for the administration of federal programs."  *Id*. at 905.  The Court

agreed, concluding that chief law enforcement officers ("CLEOs") may voluntarily choose to participate in the federal scheme, but the Brady Act's interim provision commanding state conduct was unconstitutional.  *Id*. at 934–35.

As a result of the *Printz* decision, CLEOs were not obligated to conduct background checks during the five-year period between the enactment of the Brady Act and the establishment of NICS.  As a result, some gun dealers were unable to contact government entities to conduct a background check prior to selling a firearm.  No one could reasonably suggest that CLEOs increased the risk of harm by not participating in the Federal background check system.  At best, those CLEOs that opted out of participating elected not to mitigate the known risks of gun violence.

The same can be said here, where Plaintiffs allege that the Air Force's negligence led to the failure of the background check system.  Whether the risk stems from a decision to opt out of the background check system or the failure to submit criminal history information to NICS, the result remains the same.  In both circumstances, law enforcement officers may have failed to mitigate a risk caused by third parties; however, they did not increase such risk.[9]  Concluding that plaintiffs have a viable claim here would risk widening the scope of liability under "good Samaritan" law beyond all reasonable (and established) bounds because the duty element would

---

[9]  Mr. Poorman, the AFOSI Rule 30(b)(6) witness on training and USAF's adoption of IG recommendations, testified as much: "Would you agree with me that when government agencies fail to share criminal history on dangerous felons, they unnecessarily expose the public to an increased risk of gun violence? A: I don't know that I – that we agree that it exposes the public to gun violence. . . . And the way that's phrased would come across to me as an act of commission, that there's some contribution, if you will, to the ability.  I think it's an act of omission. I think [AFOSI] perhaps didn't mitigate the ability to get a weapon, certainly didn't mitigate the ability to get a weapon from a federal firearms – licensed federal firearms dealer."  Ex. F, Poorman Depo. at 133.

cease to provide a meaningful limitation on liability: in almost every negligence case, it can be said that the defendant's conduct increased the risk of injury to the plaintiff as compared to a world in which the defendant exercised reasonable care.[10]  Consequently, because Plaintiffs cannot prove the necessary elements of a negligent undertaking under Texas law, the United States is entitled to summary judgment as a matter of law.

## II.     The USAF's Failure to Submit Devin Kelley's Criminal History Data Was Not The Legal Cause Of The Plaintiffs' Alleged Injuries.

Plaintiffs' claims fail for a second, fundamental reason: their failure to demonstrate proximate causation.  Plaintiffs' claims are based on a highly attenuated causal chain that seeks to link the USAF's failure submit Kelley's criminal history information to the FBI to his intentional and premeditated decision to gun down twenty-six individuals years after he left the Air Force, during which time he had obtained weapons from multiple sources completely independent of any action (or inaction) on the part of the Air Force.  As the Texas Supreme Court has repeatedly acknowledged, "the connection between the defendant and the plaintiff's injuries simply may be too attenuated to constitute legal cause."  *Allways Auto Group, Ltd. v. Walters*, 530 S.W.3d 147, 149 (Tex. 2017) (citations omitted).  That is the case here where Texas courts have held in similar circumstances that plaintiffs have failed to establish proximate causation.  *Roberts v. Healey*, 991 S.W.2d 873, 878-79 (Tex.App.—Houston [14th Dist.] 1999,

---

[10]  The United States submits that the above legal analysis is dispositive of the "increased risk of harm" inquiry.  Nonetheless, the Court viewed in its prior ruling that this analysis "is a factual question."  Order at 38.  To the extent the Court decides the "increased risk of harm" analysis based on whether the "Government should have known of the danger to Plaintiffs arising from its alleged negligence," the United States refers the Court to Section II.  As explained below, it simply was not foreseeable that Kelley would conduct such a heinous act, much less would conduct such an act using a gun he obtained as a result of alleged failures in the background check system.

pet. denied).  Indeed, the United States is unaware of any case in which a Texas court has

endorsed the sort of attenuated theory of causation that Plaintiffs seek to pursue here.

### A.     The USAF's Failure to Submit Kelley's Criminal History Information to NICS Was Not a Proximate Cause of the Shooting.

In order to prove proximate causation, plaintiffs must demonstrate both cause in fact and

foreseeability.  *Prudential Ins. Co. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995);

*Roberts v. Healey*, 991 S.W.2d 873, 878 (Tex. App. 1999), pet. denied.  If cause in fact does not

exist, foreseeability is immaterial.  *Roberts*, 991 S.W.2d 879–80.

Even if the plaintiff's injury would not have transpired "but for" the negligence of the

defendant, the connection between the defendant and the plaintiff's injuries may be too

attenuated to establish legal cause.  *See Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775

(Tex. 1995).  Rather, "[t]he evidence must go further, and show that such negligence was the

proximate, and not the remote, cause of resulting injuries . . . [and] justify the conclusion that

such injury was the natural and probable result thereof."  *Doe v. Boys Club of Greater Dallas,

Inc.*, 907 S.W.2d 472, 477 (Tex. 1995).

Texas courts applying these principles have found that plaintiffs failed to demonstrate

proximate causation under strikingly similar circumstances.  In *Roberts v. Healey*, for example,

the court held that an attorney's failure to obtain a protective order against an abusive and

threatening estranged husband was too attenuated from the husband's murderous rampage to be

the legal cause of the plaintiff's injuries.  *Roberts*, 991 S.W.2d at 878 (Tex. App. 1999).  Karin

Roberts brought an action against her attorney who neglected to secure a signed protective order

despite preparing an affidavit and filing an application.  *Id*. at 877.  The need for a protective

order stemmed from her husband's erratic and harassing behavior, which included domestic

violence and threats with a gun.  After Roberts moved into a new apartment with her daughters,

she was forced to call the police because her husband was following her.  Roberts' husband later attempted to commit suicide, which Roberts reported to her attorney, and was admitted to a psychiatric ward for several days.  One evening, Roberts' husband forced his way into her apartment, shot and killed their children, and wounded Roberts' mother.

Roberts' attorney argued that the killing would have occurred regardless of whether he obtained a protective order because evidence showed it would not have been a sufficient deterrent.  *Id*. at 879.  In support of this contention, the attorney attached to his summary judgment motion "a portion of Karin's deposition stating she lied to [her estranged husband] on the day of the attack telling him she already had a protective order in an attempt to prevent his violent acts."  *Id*.  In affirming the dismissal of the case due to a lack of causation, the appellate court held that the attorney's "failure to obtain a protective order is too attenuated from [the husband's] criminal conduct to constitute a legal cause of injury to [Roberts], her mother, and her children."  *Id*. at 879.  In support of its holding, the court stated that "legal cause is not established if the defendant's conduct does no more than furnish the condition that makes the plaintiff's injury possible."  *Id.*  Accordingly, the court held that plaintiff had failed to demonstrate proximate causation because the attorney's "failure to obtain a protective order did no more than create the condition (absence of a protective order) that enabled [the estranged husband] to kill [Robert's] children and wound her mother."  *Id*. (citing *Union Pump*, 898 S.W.2d at 775).  As the court observed, the lawyer's conduct was "too remotely connected with the plaintiff's injury to constitute legal causation."  *Id.* at 878-79.

*Roberts* stands for the proposition that the failure to submit information to an entity for the purpose of preventing a third party from engaging in criminal conduct is too attenuated to constitute a legal cause of a plaintiff's injury.  In comparing *Roberts* with the instant matter, the

21

failure to obtain a protective order from a court and the failure to submit the criminal history information to the FBI, at best, did no more than create the conditions that enabled both the estranged husband and Devin Kelley to commit heinous crimes.  But, demonstrating that the defendant merely provided a condition making the plaintiff's injury possible is not sufficient to meet the cause-in-fact requirement.  *Doe*, 907 S.W.2d at 477; *Union Pump Co*., 898 S.W.2d at 776; *Bell v. Campbell*, 434 S.W.2d 117, 120 (Tex. 1968).

Indeed, Plaintiffs' claims here depend on a highly attenuated causal chain of events involving numerous individual steps that span several years that is insufficient to demonstrate proximate causation.  *See Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 (Tex. 1991) ("there are certain situations in which the happenstance of place and time is too attenuated from the defendant's conduct for liability to be imposed.").  It is simply too remote to suggest that the USAF personnel at Holloman Air Force Base who failed to submit information to a FBI database in 2011–12 caused the mass shooting at the First Baptist Church of Sutherland Springs in 2017, nearly five years later.  As detailed below, the Air Force personnel had nothing to do with Kelley's independent, calculated, and well-planned decision to use a gun to kill 26 innocent people and injure 20 others.

Texas law refutes any claim that the United States proximately caused Mr. Kelley's actions, and indeed, the United States is unaware of any Texas case that has endorsed such an attenuated and remote theory of causation.  Indeed, the USAF's conduct is even more attenuated in time and place than the circumstances presented in *Roberts*.

### B.     Kelley's Conduct Demonstrates That He Was the Proximate Cause of the Mass Shooting.

In fact, courts have consistently held that mass shooters are the proximate cause of the catastrophic injuries they inflict because their criminal acts were deliberate, premediated, and

well planned—not parties whom plaintiffs allege acted negligently or failed to take actions that might have prevented the tragedies.  For example, in *Phillips v. Lucky Gunner, LLC,* 84 F. Supp. 3d 1216 (D. Colo. 2015), a case arising out of the Aurora theater shooting perpetrated by James Holmes, plaintiffs brought an action against the gun shops where Holmes had purchased the ammunition and other equipment he used in the mass shooting.  The court dismissed the negligence claim, concluding that even if the defendant owed a duty of care, the sales of ammunition and other items to Holmes did not proximately cause the plaintiffs' injuries:

> There can be no question that Holmes's deliberate, premeditated criminal acts were the predominant cause of plaintiffs' daughter's death.  Holmes meticulously prepared for his crime, arriving at the theater equipped with multiple firearms, ammunition, and other gear allegedly purchased from several distinct business entities operating both online and through brick and mortar locations.  Neither the web nor the face-to-face sales of ammunition and other products to Holmes can plausibly constitute a substantial factor causing the deaths and injuries in this theater shooting.

*Id*. at 1228.  The same reasoning led a court to subsequently dismiss an action against the theater for allegedly failing to provide certain safety measures:

> Even if such omissions contributed in some way to the injuries and deaths, the Court finds that Holmes' premeditated and intentional actions were the predominant cause of plaintiffs' losses. . . . [A] reasonable jury could not plausibly find that [the theater's] actions or inactions were a substantial factor in causing this tragedy.

*Nowlan v. Cinemark Holdings, Inc.*, 2016 WL 4092468, at *3 (D. Colo. Jun. 24 2016); *see also Castaldo v. Stone*, 192 F. Supp. 2d 1124, 1171 (D. Colo. 2001) (dismissing case arising out of the mass shooting at Columbine High School because the perpetrators' actions "were the predominant, if not sole, cause of Plaintiffs' injuries"); *Lopez v. McDonald's Corp*., 193 Cal.App.3d 495 (1987) (finding lack a causation due to heinousness of mass killing).

Here, Devin Kelley's deliberate, premeditated, and well-planned criminal acts were the sole legal cause of Plaintiffs' injuries.  Given the evidence demonstrating Kelley's planning and

desire to commit a mass shooting, along with the many alternative sources that Kelley had

available for purchasing a firearm, the Plaintiffs cannot prove that the government proximately

caused their injuries.





██████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████ The mass shooting was clearly a premeditated act that could not have been prevented by simply blocking Kelley's ability to acquire firearms through one avenue—a federal firearms licensee ("FFL").

Kelley's access to firearms through means other than purchasing them at FFLs is well documented. [12] ████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████

---

[12] *See* 18 U.S.C. § 921(a)(21)(D) (defining FFLs as persons "engaged in the business" of selling firearms)

████████████████████████████████████████████████

███████████████████████████    ██████████████████████

██████████████████████████████████████.  The evidence

proves that Kelley clearly knew how to purchase weapons in ways other than at FFLs, whether it

be at gun shows, through straw purchasers, or online.

Moreover, Kelley was not deterred when faced with hurdles to purchasing firearms.  Ms.

Smith provided an affidavit wherein she admitted that, in November or December 2015, she

went with her husband to DICK'S Sporting Goods, Inc., where the manager declined to sell

Kelley a firearm "because of an ID issue."  Ex. K at SSS-001035.  Then, in April 2016, she

accompanied him to an Academy Sports + Outdoors ("Academy") store in Selma, Texas.  *Id*.

There, Devin purchased a Ruger AR 556, the firearms Kelley used to commit the mass killings.

*Id*.  Ms. Smith further attested that they went back to Academy monthly so Devin could purchase

magazines and ammunition.  *Id*.  Ms. Smith's affidavit disproves the argument that Kelley would

have been deterred or otherwise prevented from committing the shooting if the Air Force

submitted his criminal history information to the FBI.  Kelley, in fact, was denied at an FFL but

nonetheless continued to obtain firearms.

The type of firearms Kelley used in the mass shooting are ubiquitously sold by non-FFLs.

Stephen J. Barborini, an expert in private guns sales resulting from his 25 years of experience as

a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), issued

a report that noted the firearms Kelley carried into the church—a Ruger AR-566 and the Glock

9—are two of the most popular and widely sold firearms in the United States  "In Texas, a

person could easily have purchased a Glock semi-automatic pistol and an AR-15 type semi-

automatic rifle, the same type of firearms that KELLEY had, from private sellers without any

paperwork or background check . . . .  At any major gun shop or gun show, this type of rifle outnumbers all the other types."  Ex. P, Barborini Report at USA00025729.  Additionally, online sales of firearms, through sites like Texas Gun Traders and ARMSLIST, provide a venue for individuals to purchase firearms without being subjected to NICS.  *Id.* at USA00025728.

Finally, while Kelley had access to—and had repeatedly utilized legal avenues of obtaining firearms through non-FFLs—research shows that criminals (and others) also regularly obtain firearms through illegal means.  Roughly 400,000 guns are stolen every year in the United States.[13]  Prohibited purchasers also have other people purchase firearms for them, a practice widely referred to as a "straw purchase."  *Id.*  "Straw purchases" were the method used to obtain firearms for many of the deadliest mass shootings in the country, including the Columbine massacre and the San Bernardino murders.  *Ireland v. Jefferson Cty. Sheriff's Dept.*, 193 F. Supp. 2d 1201 (D. Colo. 2002); *United States v. Marquez*, Case No. 5:15-MJ-498 (C.D. Cal. Dec. 17, 2015).

Indeed, in a strikingly analogous circumstance to the case at hand, Thomas Kinnunen attempted to commit a mass shooting at the West Freeway Church of Christ in White Settlement, Texas.  Similar to Kelley, Kinnunen was a prohibited person as a result of his criminal background.  Because his information was in NICS, he was twice denied a firearm purchase at an FFL.  Ex. R at USA00023966–87; Ex. T at USA00025624.  Nonetheless, Kinnunen was not deterred and obtained firearms through alternative means.  Although Kinnunen's attempt was foiled, it is evident that he planned to commit a mass murder at a church in Texas.  Given the

---

[13]  *See* James D. Wright & Peter Rossi, Armed & Considered Dangerous, 183-84 (2d ed. 2008) (surveying felons in eleven state prisons); Mayors Against Illegal Guns, Felons Seek Firearms, No Strings Attached: How Dangerous People Evade Background Checks and Buy Illegal Guns Online, Everytown for Gun Safety (Sept. 16, 2013).

ubiquity of firearms in Texas and the many alternatives to purchase them, Plaintiffs cannot

demonstrate that Kelley would not have obtained firearms through alternate means that implicate

any alleged action or inaction by the United States government.

To suggest that Kelley would not have committed the mass shooting that he had planned

for months using weapons to which he already had access or which he could have obtained

through non-FFLs is fanciful.  The evidence demonstrates that Kelley would have committed the

mass shooting regardless of whether he was denied the ability to purchase firearms at FFLs.

Plaintiffs cannot prove that the Air Force's failure to submit Kelley's information was a legal

cause of their harm.

C.      Kelly's Mass Shooting Was Not Foreseeable to Anyone in His Life and
        Certainly Not to the Air Force.

Finally, while the Court need not address foreseeability because USAF's conduct was not

the cause-in-fact of Plaintiffs' injuries, Plaintiffs' claims also fail because, given the time

between Kelley's conviction and the mass killing, and Kelley's ability to conceal his plans from

those nearest to him, the Plaintiffs' injuries were not foreseeable to the USAF as a matter of law.

As noted above, proximate cause requires that Plaintiffs demonstrate not only that the

defendant's act or omission was a "cause in fact" of their injury, but also that the injury was

foreseeable, *i.e.*, that a person of ordinary intelligence should have anticipated the danger created

by the act or omission.  *Doe*, 907 S.W.2d at 478.  "Foreseeability requires that the injury

complained of be of such a general character as might reasonably have been anticipated from the

defendant's conduct." *Skipper v. United States*, 1 F.3d 349, 352 (5th Cir. 1993).  The standard

necessitates more than viewing the facts in retrospect, theorizing an extraordinary sequence of

events whereby the defendant's conduct brings about the injury.  *Doe*, 907 S.W.2d at 478 (citing

Restatement (Second) of Torts § 435(2) (1965)).  Given the extraordinary circumstances of this case, Plaintiffs cannot make such a showing here.

Devin Kelley perpetrated the fifth most deadly mass shooting the history of the United States.  He did so five years after his court martial and over three years after he was separated from the USAF.  His victims were unidentifiable and unforeseeable to the USAF, as they were not the victims of his domestic abuse or the targets of his verbal threats while he was in the USAF.  *Cf. Kristensen v. United States*, No. 1:17-cv-126-DAE (W.D. Tex. 2020) ("SPC Giffa's actions on that tragic night was a superseding, unforeseeable event that could not have been anticipated by the Army based on the information they had during that 12-day period.").

Moreover, it cannot be said that the shooting was foreseeable to the USAF when those closest to Kelley at the time of the shooting did not foresee the tragedy, including his mental-health counselor, former roommate, and his wife – even as he was in the process of meticulously preparing and planning the attack.  Candace Marlowe, a counselor at the New Braunfels Counseling Center, saw Kelley from June through August 2016, and as late as September 1, 2017.  She testified that she was not aware of his plans or suspected that he would engage in conduct of that general nature.  Ex. M, Dep. of Candace Marlowe at 77.  Even two months before the shooting, Marlowe did not perceive Kelley to be a risk for homicidal violence and took no steps that would have been triggered by a risk assessment, such as a psychiatric referral or involuntary commitment for inpatient evaluation and treatment.  Ex. L at MARLOW00000001–48.  Emily Willis, a former roommate of Devin and Danielle Kelley, also testified that while she witnessed Kelley's abusive behavior, she did not foresee the events that transpired.  Devin Kelley's conduct was not foreseeable to those closest to him, let alone USAF employees five years earlier.  Ex. I, Willis Dep. at 67–68. ███████████████

███████████████████████████████████████

███████████████████████████████████████

███ Kelley's ability to conceal his murderous intentions rendered the shooting a superseding, unforeseeable event.

## III.    <u>Plaintiffs' Negligent Training and Supervision Claims Should Be Dismissed</u>.

A claim of negligent training or supervision requires not only a finding that the employer was negligent in its training and supervision of the employee, "but also that the employee committed an actionable tort against the plaintiff." *Brown v. Swett & Crawford of Texas, Inc.*, 178 S.W.3d 373, 384 (Tex. App. 2005). Plaintiffs must prove not only that the training and supervision was negligent, but that the underlying actions of the United States' employees constitute an actionable tort under Texas law. *See Gonzales v. Willis*, 995 S.W.2d 729, 739 (Tex. App. 1999). However, as discussed in detail *supra*, the United States is entitled to summary judgment on the elements of duty and causation. As there was no underlying actionable tort, Plaintiffs' claims of negligent training and supervision must be dismissed.

Moreover, to the extent that this Court finds that United States employees did commit an actionable tort, the negligent training and supervision claims nonetheless fail under Texas law. Texas law holds that "[u]nder the doctrine of *respondeat superior*, an employer will be held vicariously liable for the negligence of its employee." *Williams v. McCollister*, 671 F. Supp. 2d 884, 888 (S.D. Tex. 2009). However, "any direct liability claim for negligence [such as negligent training and supervision] and a claim for vicarious liability under a theory of respondeat superior are generally mutually exclusive modes of recovery." *Plascencia v. Hillman*, No. 19-CV-40-PRM, 2019 WL 4087439 (W.D. Tex. July 03, 2019); *see also Williams*, 671 F. Supp. 2d at 888; *Knight v. Cooper*, No. 5:17-CV-234-OLG, 2018 WL 7350947, at *1

31

(W.D. Tex. June 1, 2018).  Claims of negligent hiring and supervision and claims of ordinary negligence under a theory of vicarious liability are "means to the same end."  *Knight*, 2018 WL 7350947 at *1.  Accordingly, "regardless of any allegation of fault on the part of the employer . . . . if vicarious liability is not contested, the employee's competence and the employer's own negligence in hiring, failing to properly train, or negligently supervising become irrelevant, as long as a plaintiff pleads ordinary negligence."  *Williams*, 671 F. Supp. 2d at 888.

Under the FTCA, the United States is liable only "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."  28 U.S.C. § 1346(b).  "The legislative history [of the FTCA] indicates that Congress intended to permit liability essentially based on the intentionally wrongful or careless conduct of Government employees, for which the Government was to be made liable according to state law under the doctrine of *respondeat superior* . . . ."  *Laird v. Nelms*, 406 U.S. 797, 801 (1972).  In other words, "[a]ll FTCA liability is *respondeat superior* liability."  *Johnson v. Sawyer*, 47 F.3d 716, 730 (5th Cir. 1995).

Here, Plaintiffs' FTCA claims are based on the theory that one or more government employee acted negligently, and that the United States is vicariously liable under a theory of *respondeat superior*.  28 U.S.C. § 1346(b); *Johnson*, 47 F.3d at 730.  Plaintiffs' claims of negligent hiring and supervision are inherently "means to the same ends" as their claims of voluntary undertaking theory, and therefore any allegations of fault on behalf of the United States in training or supervising its employees "become irrelevant" under Texas law. Consequently, the United States is entitled to summary judgment on Plaintiffs' claims of negligent training and supervision.

IV.    **The Brady Act's Immunity Provision Precludes This Action**.

The Brady Act expressly provides that no liability for damages may be imposed on employees of the Federal Government for failing to prevent the sale of a firearm to a person prohibited by law from receiving it.  *See* 18 U.S.C. § 922(t)(6).  In its prior ruling, the Court held that the Brady Act immunity provision did not preempt Plaintiffs' claims for three reasons.  *See* ECF Nos. 59 & 133.  First, the Court observed that the plain text of § 922(t)(6) only immunizes local governments, not the United States.  *Id*. at 23.  However, because the liability of local governments under § 1983 is not vicarious, *see Monell v. Dep't of Soc. Serv's of City of New York*, 436 U.S. 658, 691 (1978), mentioning only the employees of local governments in § 922(t)(6), without also specifically mentioning local governments themselves, would not have been sufficient to protect them from damages liability under § 1983.  Contrarily, no specific mention of the United States in § 922(t)(6) was necessary because the liability of the United States under the FTCA (unlike the liability of local governments under 42 U.S.C. § 1983) is based entirely on *respondeat superior* principles.  Thus, while the United States and States could benefit from the immunity afforded to their employees, local governments needed to be specifically identified in the statute to benefit from its immunity.

Second, the Court concluded that *Alfonso v. United States*, 752 F.3d 622, 625 (5th Cir. 2014), was not controlling because the immunity at issue in that case was one conferred by a State statute.  Order at 24.  But Texas *respondeat superior* law allows an employer to assert any affirmative defense afforded to its employees.  In *DeWitt v. Harris County*, the Texas Supreme Court explained that when an employer is held liable for the negligence of its employee under the doctrine of *respondeat superior*, "the liability is derivative or indirect."  904 S.W.2d 650

(Tex. 1995).  Thus, under Texas's doctrine of *respondeat superior*, a private employer is "entitled to assert any affirmative defenses its employee has to liability."  *Id*. at 654.

The court in *Morrone v. Prestonwood Christian Academy*, 215 S.W.3d 575 (Tex. App. 2007), rev. denied, applied these principles to conclude that an employer was not liable for derivative claims based on *respondeat superior* under Texas law in circumstances where its employee was protected by an immunity provision under a Federal statute (namely, the Coverdell Teacher Protection Act).  *Id*. at 584.  *Morrone* demonstrates that a similarly situated private defendant (*i.e.*, one whose employee is protected by an immunity provision under a federal statute) is entitled to invoke its employee's Federal statutory immunity to defeat a claim seeking to impose *respondeat superior* liability under Texas law.

Third, the Court concluded that § 922(t)(6) protected only those Federal employees who themselves directly furnish data to the NICS system.  However, individuals can be "responsible for providing information" to NICS, 18 U.S.C. § 922(t)(6), when they play roles in gathering (rather than transmitting) the relevant information, or when they develop policies and procedures for providing information to NICS.  The relevant statutes impose on the head of each department and agency of the United States the responsibility to furnish NICS with any departmental or agency records demonstrating that a person falls within one of the categories described in 18 U.S.C. § 922(g) or (n). See 34 U.S.C. § 40901(e)(1)(B) & (C).  Heads of Federal departments and agencies do not personally discharge this responsibility, but delegate these responsibilities to subordinate departmental and agency officials.  The Court's narrow construction threatens to substantially hollow out the provision and would often leave unprotected individuals that Congress surely intended to protect.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant its motion for summary judgment and dismiss all Plaintiffs' claims with prejudice.

Dated: August 21, 2020

Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division

JOHN F. BASH
United States Attorney

STEPHEN E. HANDLER
Senior Trial Counsel, Torts Branch
Civil Division

*Paul David Stern*
PAUL DAVID STERN
AUSTIN L. FURMAN
JOCELYN KRIEGER
DANIEL P. CHUNG
Trial Attorneys, Torts Branch
Civil Division
United States Department of Justice

Attorneys for Defendant
UNITED STATES OF AMERICA

## CERTIFICATE OF SERVICE

I certify that on August 21, 2020, I electronically filed the foregoing with the clerk of court by using the CM/ECF system, and that all counsel of record have received notice and been served through that system.

*Paul David Stern*
PAUL DAVID STERN
Trial Attorney, Torts Branch
Civil Division
United States Department of Justice
Attorneys for Defendant
UNITED STATES OF AMERICA
