IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JOE HOLCOMBE, et. al, | § | NO. 5:18-CV-00555-XR |
| | § | (Consolidated cases) |
| Plaintiffs | § | |
| | § | |
| | § | |
| vs. | § | |
| | § | |
| UNITED STATES OF | § | |
| AMERICA, | § | |
| | § | |
| Defendant | § | |

## <u>DEFENDANT UNITED STATES OF AMERICA'S STATEMENT OF FACTS</u>

<u>Facts Pertaining to Devin Patrick Kelley's Time in the Air Force:</u>

1.   On January 5, 2010, Devin Patrick Kelley ("Kelley") entered active military service with the United States Air Force ("USAF").  Ex. A at USA00014492.

2.   Starting in April 2011, Kelley was stationed at Holloman Air Force Base ("AFB") in New Mexico.  *Id.* at USA00014505.

3.   Kelley and Tessa Brennaman were married on April 12, 2011.  Tessa and her son, J.L., moved into housing at Holloman AFB.  Ex. B at USA00005261.

4.   On February 23, 2012, Kelley voluntarily entered PEAK Behavioral Health Services a mental health facility located in Santa Teresa, New Mexico.  Ex. C at PEAK0000834, 938. Kelley was discharged from PEAK on March 8, 2012.  *Id.* at PEAK0000821.

5.  On April 17, 2012, Kelley received a letter of reprimand from his Acting Commander for the physical assault of Tessa Kelley on or about February 17, 2012.  Ex. D at USA00013387.

6.  On April 30, 2012, Devin Kelley again voluntarily entered PEAK Behavioral Health Services.  Ex. E at PEAK00000004, 135.

7.  On June 7, 2012, Kelley eloped from PEAK.  Ex. B at USA00005270.  He was returned by local law enforcement to PEAK before he was released into Air Force custody for pre-trial confinement on June 8, 2012.  *Id.* at USA00005271.

8.  On November 7, 2012, Devin Kelley was convicted in a general court-martial of violating two specifications of Article 128 of the Uniform Code of Military Justice.  *Id.* at USA000013356.  Kelley was sentenced to a reduction to the grade of E-1, confinement for 12 months, and a bad conduct discharge.  *Id.*

9.  On December 18, 2012, Kelley was transferred to the Naval Consolidated Brig at Miramar Naval Base, San Diego, California.  Ex. A at USA00014498.

10. Tessa Kelley and Devin Kelley were divorced on October 17, 2012.  (Ex. JJ at USA00014367.

11. Kelley was released from confinement on March 31, 2013.  Ex. A at USA00014496.

12. Kelley's information was submitted to the Defense Incident-Based Reporting System ("DIBRS") on October 21, 2013.  Ex. F, Poorman Dep. at 267-68; Ex. G at USA00016836.

Kelley gets Married and Moves to Colorado:

13. Devin Kelley married Danielle Smith (a.k.a. Danielle Kelley, Danielle Shields) on April 4, 2014.  Ex. B at USA00005283.

14. Kelley separated from the Air Force with a bad conduct discharge on May 8, 2014.  Ex. A at USA00014490.

15. On December 22, 2014, Kelley purchased a Glock Model 19, 9mm caliber pistol in Colorado Springs, Colorado.  Ex. H at USA00000029-30.

16. In the summer of 2015, the Kelleys lived in Colorado Springs, Colorado, with a roommate, Emily Willis.  Ex. I, Dep. of Emily Willis at 37-38.  Danielle confided in Ms. Willis that Kelley was physically abusive, and Ms. Willis observed that Kelley was very controlling of Danielle.  *Id.* at 37, 42-43. After observing a bruise on the leg of the Kelley's child, Ms. Willis filed a report with the Colorado police of suspected child abuse.  *Id.* at 76-80, 83.  Nonetheless, Ms. Willis testified that she never thought that Kelley would commit a mass shooting.  *Id.* at 67-68.

17. On June 26, 2015, Kelley purchased a Ruger GP100 in Colorado Springs, Colorado.  Ex. H at USA00000032-33.

18. In November or December 2015, Devin Kelley went with his wife, Danielle, to DICK's Sporting Goods, Inc., where he attempted to purchase a firearm.  The manager declined to sell Kelley a firearm due to "an ID issue."  Ex. J, Smith Dep. at 148, Ex. K. SSS-001035.

19.  On April 7, 2016, the Kelleys went to an Academy Sports and Outdoors in Selma Texas, where Devin Kelley purchased a Ruger AR-556, as well as a magazine and ammunition.  Ex. J, Smith Dep. at 149-50; Ex. H at USA00000019-27, Ex. K. SSS-001035. Kelley used his Colorado license to purchase the AR-556.  The Kelleys then went back to Academy every month to purchase magazines and ammunition.  Ex. J., Smith Dep. at 149-40.

<u>Kelley Becomes Obsessed with Mass Shootings:</u>

20. Kelley was treated by Candace Marlowe, a counselor at the New Braunfels Counseling Center, between June and August 2016, and as late as September 1, 2017.  Ex. L at MARLOW00000007-08.  Ms. Marlowe testified that Kelley was not someone she considered in

3

any regard a risk for violence during her treatment of him.  Ex. M, Dep. of Candace Marlowe at

77.  Ms. Marlowe did not refer Kelley to a psychiatrist or inpatient mental health care.  Ex. L at

MARLOW00000001-48.

21. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

22. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████

23. ████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████.

24. ████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████
██████████████████████

25. ████████████████████████████████████████████
███████████████████████████

26. ████████████████████████████████████████████
████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████

<u>Kelley Makes Preparations for the Mass Shooting:</u>

27. █████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████

28. ███████████████████████████████████████

█████████████████████████

29. ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████

30. ████████████████████████████████████████████

31. Kelley made at least nine modifications to his AR-556 to make it more accurate, faster-shooting, and more amenable to clearing any malfunction.  Ex. O at USA00012801-02; Ex. P at USA00025732-33.

32. On September 1, 2017, Kelley visited his therapist, Candace Marlowe, after not seeing her for about a year.  She thought that he looked like he was doing well.  She did not see Kelley for any sessions after that one.  Ex. M, Dep. of Candace Marlowe, at 77; Ex. L at MARLOW00000001-48.

<u>The Weeks Leading Up to the Shooting:</u>

33. On October 18, 2017, Kelley purchased a Ruger Model SR-22, .22 caliber pistol in Selma, Texas.  Ex. H at USA00000016-18.

34. ██████████████████████████████████████
████████████████████████████████████

35. ██████████████████████████████████████
██████████████████████████████████████

36. ███████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████████

37. ███████████████████████████████████████
████████████████████

38. ███████████████████████████████████████
████████████████████████████████
██████████████████

39. ██████████████████████████████████████████
████████████████████████████████████
██████████████████

40. ██████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

41. ██████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

42. ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████

43. ██████████████████████████████████████████████████

███████

44. On November 5, 2017, Devin Kelley committed the mass shooting at the First Baptist

Church in Sutherland Springs Texas.

45. ██████████████████████████████████████████████████

███████████████████████████

46. ██████████████████████████████████████████████████

███████████████████████████████████

7

<u>Kelley Could Have Acquired Firearms to Use in the Shooting Through Means Other Than an</u>

<u>FFL:</u>



47. ██████████████████████████████████████

██████

48. ██████████████████████████████████████

██████████████.

49. ██████████████████████████████████████

██████████████.

50. ██████████████████████████████████████

████████████████████████████.

51. ██████████████████████████████████████

████████████ ████████████████████████████

██████████████.

52. ██████████████████████████████████████

██████████████████████████████████████

████████████████████████████.

53. In December 2019, Thomas Kinnunen attempted to commit a mass shooting at the West

Freeway Church of Christ in White Settlement, Texas.  Ex. T, Fox Report at USA00025624.

Kinnunen attempted to purchase firearms at FFLs on two occasions, and was denied both times

through the NICS system.  Ex. R at USA00023966; Ex. S at USA00023977.  Kinnunen

nonetheless acquired a firearm, and was foiled in his shooting attempt only through the

intervention of armed security personnel.  Ex. T, Fox Report at USA00025624.

The Gun Control Act, the Brady Act, and the NIAA:

54. The Gun Control Act of 1968, as amended, makes it unlawful for any person to knowingly transfer a firearm to certain classes of individuals, and also makes it unlawful for certain individuals to receive a firearm.  (18 U.S.C. § 922(d), (g) & (n))  Individuals prohibited by the statute from receiving a firearm include anyone who is under indictment for, or has been convicted in any court of, any crime punishable by a term of imprisonment exceeding one year (§ 922(g)(1) & (n)); has been adjudicated a mental defective or committed to any mental institution (§ 922(g)(4)); has been discharged from the Armed Forces under dishonorable conditions (§ 922(g)(6)); or has been convicted in any court of a misdemeanor crime of domestic violence (§ 922(g)(9)).

55. The Brady Handgun Violence Prevention Act of 1993 ("the Brady Act"), Pub. L. No. 103-159 § 103(e)(1), 107 Stat. at 1542 (1993), required the Attorney General to establish a national instant criminal background check system that could be used by federal firearms dealers to determine whether a buyer is prohibited from receiving a firearm.  34 U.S.C. § 40901(b).

56. The National Instant Criminal Background Check System ("NICS"), became operational on November 30, 1998.  Ex. U at USA0001665.  It is operated by the Criminal Justice Information Services ("CJIS") Division of the Federal Bureau of Investigation ("FBI").

57. The Brady Act only requires background checks for transactions involving Federal Firearms Licensees ("FFLs").  *See* 18 U.S.C. § 921(a)(21)(D) (defining FFLs as persons "engaged in the business" of selling firearms).

58. The Brady Act authorized the Attorney General to "secure directly from any department or agency of the United States such information on persons for whom receipt of a firearm would violate subsection (g) or (n) of section 922 of title 18, United States Code or State law, as is

necessary to permit the system [(i.e., NICS)] to operate in accordance with this section." 34 U.S.C. § 40901(e)(1)(A) (formerly 18 U.S.C. § 922 note).

59. Under the Brady Act, "Neither a local government nor an employee of the Federal Government or of any State or local government, responsible for providing information to the national instant criminal background check system shall be liable in an action at law for damages— (A) for failure to prevent the sale or transfer of a firearm to a person whose receipt or possession of a firearm is unlawful under the section; or (B) for preventing such a sale or transfer to a person who may lawfully receive or possess a firearm. 18 U.S.C. § 922(t)(6).

60. NICS searches for disqualifying information in three databases: (1) the NICS Index, which contains records on persons known to be disqualified from possessing firearms under federal law; (2) the National Crime Information Center, which contains records on protective orders, deported felons, and fugitives from justice; and (3) the Interstate Identification Index, which contains criminal history records. 28 CFR § 25.6(c); Ex. V, Dep. of Kimberly Del Greco, Director of FBI CJIS Division at 55-57.

61. Based on a search of the relevant databases, the Brady Act regulations authorize NICS to provide the federal firearms licensee with one of three responses: (A) "Proceed" response, if no disqualifying information was found in the NICS Index, NCIC, or III; (B) "Delayed" response, if the NICS search finds a record that requires more research to determine whether the prospective transferee is disqualified from possessing a firearm by Federal or state law; or (C) "Denied" response, when at least one matching record is found in either the NICS Index, NCIC, or III that provides information demonstrating that receipt of a firearm by the prospective transferee would violate 18 U.S.C. 922 or state law. 28 C.F.R. § 25.6 (c)(1)(iv)(A)-(C).

62. The NICS Improvement Amendments Act of 2007 ("NIAA") amended the Brady Act to enhance the requirement that Federal departments and agencies provide relevant information to NICS concerning persons whose receipt of a firearm would be unlawful. (*See* NICS Improvement Amendments Act of 2007, Pub. L. No. 110-180, § 101(a)(1)(A)(2) & (B)(3), 121 Stat. 2561 (2008) (codified at 34 U.S.C. § 40901(e)(1)(B)) (formerly 18 U.S.C. § 922 note)) "On request of the Attorney General, the head of such department or agency shall furnish electronic versions of the information described under subparagraph (A) to the system." (*Id*. § 101(a)(1)(4)(C) (codified at 34 U.S.C. § 40901(e)(1)(C)) (formerly 18 U.S.C. § 922 note)) "If a Federal department or agency under subparagraph (A) has any record of a person demonstrating that the person falls within one of the categories described in subsection (g) or (n) of section 922 of Title 18, the head of such department or agency shall, not less frequently than quarterly, provide the relevant information contained in such record to the Attorney General." *Id.*

63. In March 2013, the Department of Justice issued Guidance to Agencies Regarding Submission of Relevant Federal Records to the NICS. Ex. U at USA00016664. This Guidance states that "If records are relevant to the NCIC or III, you should submit them to those databases, rather than the NICS Index." *Id.* at USA00016678. "An agency's efforts to comply . . . will thus be simplified and facilitated by preferring the NCIC and III during submission." *Id.* at USA00016678-79.

64. In response to the Guidance from the United States Department of Justice, the then-Undersecretary of Defense wrote a letter to the Attorney General, noting that the DoD "has been submitting its 'prohibited persons' data to NICS since 1998." Ex. W at USA00005407. The letter further stated "DoD's ability to report to NICS is due in large part to the established system of reporting qualifying information to NCIC and III, for NICS to search and retrieve, as a part of

normal criminal justice business.  This reporting takes place from the myriad of law enforcement

agencies in DoD directly to those systems; not from a central DoD CJI RMS."  *Id.* at

USA00005408.  The letter also noted that for felony convictions and misdemeanor convictions

of domestic violence, under 18 U.S.C. §§ 922(g)(1) and (g)(9), respectively, the DoD submits

criminal history into NCIC/III.  *Id.*; *see also* Ex. X, Dep. of Shelley Verdejo, Rule 30(b)(6)

Deponent Regarding DIBRS at 86.

Department of Defense's Reporting of Criminal History Data:

65. The Uniform Crime Reporting Act of 1988, 28 U.S.C. § 534, authorizes the Attorney

General to "acquire, collect, classify, and preserve identification, criminal identification, crime,

and other records . . . ."  This information is collected into the Uniform Crime Reports.  34

U.S.C. § 41303.

66. "The Criminal [Justice] Information Services Division, Federal Bureau of Investigation,

is designated for compiling and disseminating criminal history record information."

USA00011173; *see also* 28 C.F.R. § 20.30.

67. On February 10, 1997, the Inspector General, Department of Defense, issued a report,

which found that Defense Criminal Investigative Organizations (DCIOs) were not consistently

submitting criminal history data to the FBI pursuant to 28 U.S.C. § 534 ("1997 IG Report").  Ex.

Y at USA0001166.

68. The 1997 IG Report stated that CPM 10 "lacks adequate policy and implementing

instructions."  *Id.* at USA00011169.

69. The Air Force Office of Special Investigations ("AFOSI") is a DCIO.  *Id.* at

USA00011168.

70. The 1997 Report found that AFOSI was the most compliant of the DCIOs in submitting criminal history data. *Id.* at USA00011175; *see also* Ex. F, Dep. of Kevin James Poorman, Rule 30(b)(6) Deponent Regarding AFOSI's adoption of IG recommendations at 295-96.

71. AFOSI, in its response to the 1997 Report, stated that it had been working on this issue since it conducted an evaluation in March 1993. Ex. Y at USA00011218. AFOSI notes that, when comparing the results of the AFOSI 1993 evaluation and the 1997 IG Report, "you see a marked improvement." *Id.* AFOSI credited its own "clarifying guidance," issued in November 1995, which contained specific timelines for submission of fingerprint cards. *Id.* AFOSI also noted that its then-current policies were more restrictive than those suggested by the DoD's November 1996 memorandum. *Id.* at USA00011219. AFOSI issued a memorandum to its field units in December 1996, informing them of the new DoD IG policy, and stating that the current criminal history data reporting policies would not be relaxed. *Id.*

72. The Air Force also concurred that the Air Force Security Police (now known as Air Force Security Forces) should report offenses that met CPM criteria. *Id.* at USA00011220.

73. The IG found the Air Force's comments "fully responsive." *Id.* at USA00011184.

74. Following the 1997 Report, the DoD issued DoD Instruction 5505.11, the relevant version of which was reissued on July 9, 2010. Ex. AA at USA00001806. The Air Force promulgated Instructions and Manuals to AFOSI and Air Force Security Forces which implemented DODI 5505.11. AFOSI Manual 71-121, Ex. Z at USA00000492; AFI 31-206 Ex. BB at USA00003981-82; AFI 31-205, Ex. CC at USA00020668.

75. On February 12, 2015, the DoD IG issued report number DODIG-2015-081, titled "Evaluation of Department of Defense Compliance with Criminal History Data Reporting Requirements." Ex. DD at USA00011697 ("2015 Report"). The report determined whether

13

fingerprints and final disposition reports for service members convicted of qualifying offenses between June 1, 2020, and October 21, 2012, were submitted to FBI CJIS.  *Id.* at USA00011699

76. Devin Patrick Kelley was not convicted within the evaluated time period.  Ex. D at USA000013356.

77. The Air Force responded by identifying the convicted individuals based only on the evaluated time period within the 2015 IG Report and, if possible, submitting their missing fingerprints cards and final disposition reports.  Ex. F, Poorman Dep. at 311, 316;  Ex. EE, Ford Dep. at 371, 374.

78. The IG found the USAF's comments "addressed all specifics of the recommendations. No further comments are required."  Ex. DD at USA00011700.

<u>DIBRS Reporting</u>

79. In addition to requiring the collection of criminal history information, the Uniform Federal Crime Reporting Act of 1988 (28 U.S.C. § 534 note), provides that federal law enforcement will contribute to the Uniform Crime Reporting Program and directs the Attorney General to collect crime statistics from all federal agencies, including the Department of Defense, "that routinely investigate complaints of criminal activity."

80. The statute is implemented through 28 CFR 0.85(f), which provides that the Director of the FBI shall "operate a central clearinghouse for police statistics under the Uniform Crime Reporting Program."

81. To satisfy this requirement, the FBI established the National Incident-Based Reporting System ("NIBRS") – an incident-based reporting system used by law enforcement agencies in the United States for collecting and reporting statistical data on crimes—was developed.  Ex. V, Dep. of Del Greco at 26.

82. NIBRS does not receive criminal history information pertaining to individuals who are deniable under the Brady Act.  *Id.* at 27.

83. On October 29, 2014, the DoD IG issued a report, DODIG-2015-011, titled "Evaluation of the Defense Criminal Investigative Organizations' Defense Incident-Based Reporting System Reporting and Reporting Accuracy."  Ex. FF at USA00017735 ("DIBRS Report").

84. The DIBRS Report evaluated the DCIOs' process for reporting accurate criminal incident data to the Defense Incident-Based Reporting System (DIBRS) in Accordance with DoD Manual ("DoDM") 7730.47-M, Volume 1. *Id.* at USA00017737.  The DIBRS Report concluded that "DoD is not reporting criminal incident data to the Federal Bureau of Investigation (FBI) for inclusion in the annual Uniform Crime Reports to the President, the Congress, State governments, and officials of localities and institutions participating in the Uniform Crime Report Program, as required by Federal law."  *Id.* at USA00017737.

85. DIBRS was established under DoD Directive 7730.47 as "a central repository of incident-based statistical data . . . maintained at the Defense Manpower Data Center (DMDC) to enhance DoD and Service capability to analyze trends and to respond to Executive, Legislative, and oversight requests for statistical data relating to criminal and other high-interest incidents."  Ex. GG at USA00004082.

86. DIBRS was originally created to comply with the Uniform Crime Reporting Act, and provides aggregate statistical data to the FBI's NIBRS, which is used to inform the Uniform Crime Reports.  Ex. X, Verdejo Dep. at 179-80, 184.

87. Neither DOD Directive 7730.47, nor the DoD Manual 7730.47-M, include a reporting mechanism to submit an individual's criminal history information to the FBI's CJIS in order to

satisfy the Brady Act.  *See* Ex. GG, DoD Directive 7730.47; Ex. HH, DoDM 7730.47-M;

DODIG-2020-064, Ex. II at USA00024853.

88. The monthly statistical information submitted by DCIOs into DIBRS cannot, at present,

be disaggregated to determine whether individuals are prohibited under the Gun Control Act. Ex.

X, Verdejo Dep. at 187-88.

89. DIBRS does not receive the information required to pre-validate submission into the

NICS Index; and DIBRS was not funded to satisfy the reporting requirements of the Brady Act.

*Id.* at 187-88.

90. In concurring with the IG recommendation, AFOSI noted that it had "identified and

corrected the internal process flaw which allowed a lapse in reporting to occur, and as of 10 July

2014, the DIBRS program managers completed corrected action."  Ex. FF at USA00017755.

91. The IG found AFOSI's management comments responsive to its recommendation.  *Id.* at

USA00017755.

92. Devin Kelley's information was submitted to DIBRS on October 21, 2013, well before to

the IG issued its report and several years before Kelley purchased the firearms he used to commit

the mass shooting.  Ex. F, Poorman Dep. at 267-68; Ex. G at USA00016836.