# Ex. F

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE WESTERN DISTRICT OF TEXAS

 3                        SAN ANTONIO DIVISION

 4   HOLCOMBE, et al.,              )
                                    )
 5       Plaintiffs,                )
                                    )
 6   vs.                            ) Civil Action No.
                                    )
 7   UNITED STATES OF AMERICA,      ) 5:18-CV-00555-XR
                                    )
 8       Defendant.                 ) (Consolidated cases)

 9

10

11            REMOTE ORAL VIDEOTAPED DEPOSITION

12                   UNITED STATES OF AMERICA

13              BY ITS CORPORATE REPRESENTATIVE

14                     JAMES KEVIN POORMAN

15                    Thursday, July 9, 2020

16

17

18

19

20

21

22

23

24   Reported by:

25   Rebecca Callow, RMR, CRR, RPR
```

Poorman, Kevin                           07-09-2020

133

1  some contribution, if you will, to the ability.  I
2  think it's an act omission.
3             I think it perhaps didn't mitigate the
4  ability to get a weapon, certainly didn't mitigate
5  the ability to get a weapon from a federal
6  firearms -- licensed federal firearms dealer.
7             It didn't fully mitigate the inability
8  to get a weapon, but it didn't provide the FBI what
9  they needed, if a call is made, that would have
10 resulted in the weapon not being sold.  But, again,
11 I see -- that's an act of omission.
12            And so "exposed," I'm sorry, I take
13 exception with that word in there.  But, again, it
14 sounded like more of an action verb to me, and I
15 don't -- I don't think we contributed or failure
16 contributes in an active way to that.  Over.
17            (Pause in proceedings.)
18            THE WITNESS:  Is someone still there?
19 I'm sorry.
20            MS. SANDERS:  We're still here.
21    BY MR. JACOB:
22    Q.   Sir, can you hear me?
23    A.   Okay.  It just was a long -- long silence.
24 I thought it was a disconnect or something.
25    Q.   I think we're talking past each other on

                                                         210
1   that effectively for them.
2        Q.   Okay.  But upon graduation from BSIC,
3   agents must know that that's one of the tasks that
4   need to be done.  Right?
5        A.   No.
6        Q.   The task level A nomenclature can name
7   parts, tools, and simple facts about the task?
8        A.   Well, yes.  But I don't think this extends
9   to DIBRS.
10       Q.   DIBRS is a criminal information database,
11  no?
12       A.   DIBRS is the criminal incident reporting
13  system.  Yes.  And we submit to that, so ...
14       Q.   And so it is a criminal information
15  database?
16       A.   Well, yes.
17       Q.   Okay.  So would it be fair to say that,
18  upon graduation, agents must know -- name the parts,
19  tools, and simple facts about submitting criminal
20  history to DIBRS?
21       A.   No.
22       Q.   And why do you say no?
23       A.   Well, they -- they can name the parts, they
24  can name the tools, and they can name the simple
25  facts for how they submit information.

211

1           But with respect narrowly to DIBRS,
2    because there's CODIS and NCIC and all, they do not
3    need to know how to submit data -- how data
4    submission goes with regard to sending it to DIBRS.
5         Q.   Let me ask you this:
6              At any time between 2000 to 2012, were
7    agents trained in BSIC about DIBRS submission?
8         A.   They were -- submission, no.  They were
9    trained DIBRS.
10        Q.   Okay.  And what were they trained DIBRS?
11        A.   Well, that the codes that we -- so the
12   codes that we have for our cases -- let's use
13   128 code -- 128 file number.  This file that you're
14   creating, agent, when you go in and you pick a
15   violation that seems to apply to the case you're
16   working, you're going to have violation codes.
17             Those codes, at the front end there's
18   a nomenclature, there's the -- you know, the simple
19   description.  But the number you're seeing in
20   advance of that descriptor is a DIBRS code.
21             And you're going to pick a violation
22   and have a DIBRS code on it, and picking that to
23   load that and pull that up in the system and load
24   that against that, because it's part of the DIBRS
25   codes that correspond to DIBRS submissions.

1   A.   I don't know what you mean by -- I don't
2   know specifically what you mean by "corrective
3   action."
4        BY MR. JACOB:
5        Q.   Well, are you aware that Devin Kelley's
6   final disposition was never submitted to the DIBRS
7   database?
8             MR. STERN:   Objection.
9        A.   Well, no.  I'm not aware that it wasn't
10  submitted.  I believe it was submitted.
11       BY MR. JACOB:
12       Q.   It's your belief that Devin Kelley's final
13  disposition data was submitted to the DIBRS
14  database?
15       A.   Yes.
16       Q.   And what is your basis of that belief?
17       A.   Well, I talked -- and so here's another
18  name.  I'm sorry.  It's Wayne Combs.
19            So Wayne, and last name, C-o-m-b-s.
20  He's a contractor that works for us and is the
21  individual who, on a monthly basis, compiles and
22  submits the data to DIBRS.
23            And so I asked him if we had submitted
24  Devin Kelley's prints to DIBRS, and he confirmed
25  that they had.  In fact, he confirmed that -- it was

268

1   in October of '13, I think, that he has a
2   confirmation that -- that that file was accepted by
3   DMDC, the Defense Manpower Data Center.
4       Q.   Let me ask you this:
5            Are you aware that -- well, did you
6   actually look at that DIBRS data to determine whether
7   that was the final disposition data?
8       A.   No.  I took what he offered me and -- as
9   having been done and that's -- I didn't go into the
10  database and look myself, no.
11      Q.   Would it surprise you to learn that the
12  data that was submitted was actually data from 2011,
13  before the conviction occurred?
14      A.   I don't know -- I do not know what data got
15  submitted.  I only know that he said that it had
16  been accepted by DMDC.
17           So I don't know to what extent it
18  completed all of the requirements necessary for our
19  submission, because we don't submit disposition data
20  to DMDC.  We submit five of the eight, I believe,
21  segments to DMDC.
22           So whether it occurred before the
23  conviction, it could have occurred before the
24  conviction but still be complete is, I think, my
25  point I'm trying to make.

1       BY MR. STERN:
2       Q.   Let's take a look at the findings in this
3   report.  Go to Bates stamp 11175.  This is Finding A
4   I want to take a look at.
5            The second sentence of the first
6   paragraph reads:  "The Army failed to send FD-249s to
7   the FBI in 82.1 percent of its cases, the Navy
8   83.3 percent, and the Air Force in 28.3 percent."
9            Did I read that correctly?
10      A.   Yes.
11      Q.   So, according to this report, the Air Force
12  was the most compliant of the military branches in
13  submitting the FD-249 forms.  Is that correct?
14      A.   Yes.
15      Q.   In fact, it was considerably higher in its
16  accuracy or its compliance than the Navy and Army.
17  Isn't that accurate?
18      A.   Well, "considerably" is a subjective word.
19  It's higher by whatever that percentage is.  Yes.
20      Q.   Fair enough.
21           While Army and Navy were failing at a
22  near 82 or 83 percent rate, the Air Force compliance
23  was -- failure rate was only 39 or 38 percent.  Is
24  that correct?
25      A.   Yes.  Less than half of the other two

296

1  services, yes.
2      Q.   Better said.  Thank you, sir.
3           The report continues by saying:  The
4  failure to submit R-84 in the Army cases was
5  78.7 percent, in the Navy was -- in the Navy cases it
6  was 94 percent, in the Air Force it was 50 percent.
7  Is that correct?
8      A.   Yes.
9      Q.   So, again, according to this report, the
10 Air Force was the most compliant of any of the
11 military branches in submitting R-84 forms.  Isn't
12 that accurate?
13     A.   Yes.
14     Q.   Looking at the next page of this report,
15 what is the -- if you could scroll up a little bit,
16 I want to ask you what the purpose of the paragraph
17 regarding starting at "Air Force Office of Special
18 Investigations" was.
19     A.   Well, I think the purpose was the IG was
20 reporting for Air Force and then for the other
21 services what was and wasn't in the place in the
22 respective MCIOs to guide compliance with the
23 requirement to submit criminal history data.
24     Q.   And did the inspector general find that
25 OSI's policies were more or less stringent than the

311

1  93.48 percent success rate for final dispositions."
2      Q.   And in adopting the IG recommendation to
3  submit the missing fingerprints and file
4  dispositions, OSI was referring to those 16
5  fingerprints and 17 final disposition reports.  Is
6  that accurate?
7      A.   Yes.
8      Q.   And it's also accurate to say that that
9  effort would not have included Mr. Kelley's
10 information.  Is that true?
11     A.   Yes.
12     Q.   When OSI adopted the recommendation to
13 submit the identified missing fingerprints and final
14 disposition forms, did it agree to submit every
15 outstanding fingerprint and final disposition form
16 since 1987?
17     A.   No.
18     Q.   Did OSI feel the need to conduct a
19 comprehensive review of all criminal history data of
20 all convicted individuals from 1997, given that they
21 had a roughly 94 percent compliance rate?
22     A.   No.
23     Q.   Did OSI undertake to perform a
24 comprehensive review of all criminal convictions
25 prior to what had happened post Kelley's shooting?

316

1                 So this was February of '15.  Yes.
2       Q.   OSI interpreted the future arrestees and
3   convicted offenders as subsequent to the issuance of
4   this report.  Is that accurate?
5       A.   Yes.
6       Q.   Again, the adoption -- the adoption of that
7   report -- the adoption of this recommendation would
8   not have had any bearing on reporting Kelley's
9   fingerprints or final disposition to the FBI NICS.
10  Is that accurate?
11      A.   Correct.
12               MR. JACOB:  Objection.  Form.
13      A.   Correct.
14      BY MR. STERN:
15      Q.   Okay.  You can answer.
16               Is that accurate?
17      A.   Yes.
18      Q.   It talks about taking prompt action to
19  ensure fingerprints and final disposition reports
20  for future arrestees and convicted offenders conform
21  to DoD instruction 5505.11.
22               How did OSI go about stressing the
23  importance of obtaining fingerprints and submitting
24  fingerprints and final dispositions following the
25  2015-081 IG report?