# Ex. T

Declaration of James Alan Fox, Ph.D.

in

Holcombe v. United States

July 15, 2020

I, James Alan Fox, declare as follows:

1. I am the Lipman Family Professor of Criminology, Law and Public Policy at Northeastern University in Boston. I received a B.A. in Sociology in 1972, an M.A. in Criminology (with distinction) in 1974, an M.A. in Statistics (and honored with the top student award) in 1975, and a Ph.D. in Sociology (with distinction) in 1976, all from the University of Pennsylvania. I joined the faculty at Northeastern University as assistant professor in 1977, was promoted to associate professor in 1982, was tenured in 1983, was promoted to full professor in 1985, was appointed Dean of the College of Criminal Justice in 1991, was awarded the Lipman Family Chair in 1999, and received a joint appointment in the School of Public Policy and Urban Affairs in 2007. I have published eighteen books and dozens of articles, with a specialization in the quantitative analysis of criminal justice issues. I was also founding editor of the *Journal of Quantitative Criminology.* In addition, I served as a visiting fellow with the U.S. Department of Justice, Bureau of Justice Statistics. I have been selected by several universities and organizations for special awards and honors for scholarly achievements.

2. *My research and publications have focused primarily on homicide, and mass murder and serial killing, in particular, both defined as the killing of at least four victims, be it in a continuing assault (mass murder) or over an extended period of time (serial murder). My four decades of research on mass and serial homicide is highlighted by several books with multiple editions: *Mass Murder: America's Growing Menace* (1985), *Overkill: Mass Murder and Serial Killing Exposed* (1994*), Killer on Campus: The Gainesville Student Murders* (1996), *Violence and Security on Campus: From Pre-School through College* (2010), *The Will to Kill: Making Sense of Senseless Murder*, 5th Edition (2018), and *Extreme Killing: Understanding Serial and Mass Murder,* 4th Edition *(2018).* Given my extensive background in this area, I was selected by the Chief of Police of the city of Seattle to head a Blue-Ribbon Task Force investigating the 2006 Capitol Hill Mass Shooting perpetrated by Kyle Huff and was appointed by

1

CONFIDENTIAL

USA00025609

the Florida Department of Law Enforcement as a member of the Combined Task Force investigating the 1990 murders of five college students in Gainesville committed by Danny Rolling. In addition, I have served as an expert witness in civil suits connected to the 1990 Jacksonville GMAC mass shooting carried out by James Pough, the 1989 Standard Gravure mass shooting in Louisville perpetrated by Joseph Wesbecker, and Robert Berdella's 1984-1988 torture-murder spree in Kansas City. I also served as an NBC news analyst for the 2002 D.C. Sniper case and the 2012 Sandy Hook school shooting. I am currently the Principal Investigator of a 21-month project funded by the National Institute of Justice, titled "The Nature, Trends, Correlates, and Prevention of Mass Public Shootings in America, 1976-2018." Finally, I am one of the principals in curating and maintaining *the Associated Press, USA Today, Northeastern University Mass Killing Database.*

3. I have published a variety of books, most on multiple homicide or statistical methods. This list includes those published within the past ten years:

   a. Jack Levin and James Alan Fox, *Elementary Statistics in Social Research: The Essentials*. 3rd Edition. Pearson, 2010.
   b. James Alan Fox and Harvey Burstein, *Violence and Security on Campus: From Pre-School through College*. Praeger Publishing, 2010.
   c. James Alan Fox, Jack Levin, and David R. Forde, *Elementary Statistics in Criminal Justice Research*, 4th Edition. Pearson, 2014.
   d. James Alan Fox, R*andomized Response and Related Methods for Surveying Sensitive Data*, 2nd Edition, Sage Publications, 2016.
   e. Jack Levin, James Alan Fox and David R. Forde, *Elementary Statistics for Social Research*, 12th Edition. Pearson, 2017.
   f. James Alan Fox, Jack Levin and Kenna Quinet, *The Will to Kill: Making Sense of Senseless Murder*, 5th Edition. Sage Publications, 2018.
   g. James Alan Fox, Jack Levin, and Emma E. Fridel, *Extreme Killing: Understanding Serial and Mass Murder*, 4th Edition. Sage Publications, 2018.

4. I have published a number of scholarly journals articles, primarily in the areas of multiple homicide, intimate partner homicide, youth homicide, school violence, capital punishment, as well as statistical methods. This list includes these articles published over the past decade:

   a. James Alan Fox, "Remembering the Launch of JQC, 1985–1991," *Journal of Quantitative Criminology* 26 (December 2010).
   b. James Alan Fox, "The Challenges of Bullying Prevention: Remarks for the New England Law | Boston." *Journal on Criminal & Civil Confinement Symposium*, 37 (September 2011).

2

CONFIDENTIAL
USA00025610

c.  Jack Levin and James Alan Fox, "The Normalcy of Serial Murder," in Kevin Borgeson and Kristen Kuehnle, eds., *Serial Offenders in Theory and Practice*, Sudbury, MA: Jones and Bartlett Press, 2011.

d.  Marieke Liem, Jack Levin, Curtis Holland, and James Alan Fox, "The Nature and Prevalence of Familicide in the United States, 2000-2009." *The Journal of Family Violence* 28 (April 2013).

e.  James Alan Fox and Monica J. DeLateur, "Mass Shootings in America: Moving Beyond Newtown." *Homicide Studies* 18 (February 2014).

f.  Aviva Rich-Shea and James Alan Fox, "Zero-Tolerance Policies," in Glenn W. Muschert, Stuart Henry, Nicole L. Bracy, and Anthony A. Peguero (eds.), *Responding to School Violence: The Columbine Effect*. Boulder, CO: Lynne Rienner Publishers, 2014.

g.  James Alan Fox and Monica J. DeLateur, "Weapons of Mass (Murder) Destruction." *Journal of Criminal & Civil Confinement* 40 (Spring 2014).

h.  James Alan Fox and Jack Levin, "Mass confusion concerning mass murder." *The Criminologist* 40 (January/February 2015).

i.  James Alan Fox, "Rampage killings on campus." *Violence & Gender* 2(4), December 2015.

j.  James Alan Fox and Emma E. Fridel, "The tenuous connections involving mass shootings, mental illness and gun laws." *Violence & Gender* 3(1), March 2016.

k.  James Alan Fox and Emma E. Fridel, "Gender differences in patterns and trends in U.S. homicide, 1976–2015." *Violence & Gender* 4(2), June 2017.

l.  Emma E. Fridel and James Alan Fox, "Too few victims: Finding the optimal minimum victim threshold for defining serial murder." *Psychology of Violence* 7, August 2017.

m.  Jack Levin and James Alan Fox, "Multiple Homicide: Understanding Serial and Mass Murder," in F. Brookman, E. R. Maguire, and M. Maguire, eds., *The Wiley Handbook of Homicide*, New York: Wiley/Blackwell, 2017.

n.  James Alan Fox and Jack Levin, "Understanding Mass Shootings," in L. Wilson, ed., The *Wiley Handbook of the Psychology of Mass Shootings*, New York: Wiley/Blackwell, 2017.

o.  James Alan Fox and Emma E. Fridel, "The Menace of School Shootings in America: Panic and Overresponse," in H. Shapiro, ed., *The Handbook of Violence in Education: Forms, Factors, and Preventions*, New York: Wiley/Blackwell Publishers, 2018.

p.  James Alan Fox and Emma E. Fridel, "School-Day Perils: More than Just Mass Shootings." *The Criminologist*, Jan/Feb 2019.

q.  Emma E. Fridel and James Alan Fox, "The quantitative study of serial murder: Regression is not transgression." *Aggression and Violent Behavior*, 44(1) 2019.

r.  Emma E. Fridel and James Alan Fox, "Gender differences in patterns and trends in U.S. homicide, 1976–2017." *Violence & Gender* 6(1), March 2019.

3

USA00025611

s.  Richard Rosenfeld and James Alan Fox, "Anatomy of the homicide rise." *Homicide Studies* 23, May 2019.

t.  James Alan Fox and Emma E. Fridel, "Crime statistics and the media," in David R. Forde, ed., *The Encyclopedia of Research Methods and Statistical Techniques in Criminology and Criminal Justice*, New York: Wiley/Blackwell Publishers, in press.

u.  Daniel J. Flannery, James Alan Fox, Lacey Wallace, Edward Mulvey, and William Modzeleski, "Guns, school shooters and school safety: What we know and directions for change." Under review.

v.  Grant Duwe, Nathan Sanders, Michael Rocque and James Alan Fox, "Forecasting the severity of mass public shootings in the United States." Under review.

w.  Michael Siegel, Grant Duwe, Michael Rocque, James Alan Fox, and Emma Fridel, "The Effect of State Gun Laws on the Incidence and Severity of Mass Public Shootings: 1976-2018, Under review.

5.  I have served as an expert witness in a number of cases and trials, civil and criminal. Here is a list of cases in which I have been involved over the past four years:

a.  Expert witness for defense in civil suit, Lindsey Horne v. Carnival Cruise Lines, 2015-2016

b.  Expert witness for the defense in capital trial, State of Florida v. Harochio J. Varnadore, 2016-2018

c.  Expert witness for defense in civil suit related to sexual assault, Jane Doe v. Carnival Corporation, 2016-17

d.  Expert witness for the defense in capital trial, State of Florida v. Herman I. Pickens, 2016-2019

e.  Expert witness for the defense in capital trial, State of Florida v. Arsenio James, 2016-2017

f.  Expert witness for plaintiff in civil suit related to assault on fan, Matthew Fortese v. the Baltimore Orioles, 2016-2017

g.  Expert witness for the defense in capital trial, State of Florida v. Anthony Carter, 2017-2018

h.  Expert witness for the defense in capital trial, State of Florida v. Richard Franklin, 2017

i.  Expert witness for the defense in capital trial, State of Florida v. Frantzy Jean Marie, 2017-2018

j.  Expert witness for defense in resentencing hearing, State of Florida v. Paul Dixon, 2017

k.  Expert witness for the plaintiff in wrongful death suit, Jason Field for the estate of Richard Field, and Gloria Amanda Gibbs for the estate of Lina Bolanos v. Palladion Services, LLC et al., 2017—

4

l.   Expert witness for the defense in civil suit, David Carideo v. Whet Travel, Inc. and Carnival Corporation d/b/a Carnival Cruise Line, 2018

m.   Expert witness for the defense in civil suit, Jones, Broadus and Jones, Corliss v. Carnival Corporation, 2018-2019

n.   Expert witness for the defense in civil suit, Linda Heald v. Carnival Corporation, 2018-2019

o.   Expert witness for the defense in capital trial, State of Florida v. Aaron James Gregory, 2019—

p.   Expert witness for the defense in civil suit related to a fatal shooting, Ansara v. Caesars Palace, 2020—

q.   Expert witness for the defense in civil suit related to an assault at Morehouse College, 2020—

6.   To supplement these lists of publications and experience as an expert witness, a copy of my full curriculum vitae is attached. It identifies nearly 300 opinion columns published since 1984 in newspapers around the country (including columns published in my role as a member of the *USA Today* Board of Contributors since 2013 and columns published while a bi-weekly contributor to the *Boston Herald* in 2005-2006) and over 200 posts to my "Crime and Punishment" blog for the *Boston Globe's* website, Boston.Com, from 2010 through 2014. All of my columns and blog posts since 2000 are available on my website: www.jamesalanfox.com.

7.   In exchange for my services as an expert witness in this action, I am being compensated for my time at the rate of $550 per hour. In addition, travel and other expenses are reimbursable.

8.   I have reviewed a variety of reports, documents, and audio/video files related to the Sutherland Springs shooting and Devin Patrick Kelley's background in reaching the opinions expressed below. A list of these sources is provided in an appendix.

9.   In the paragraphs below, I offer expert opinion buttressed by research in several areas. I reserve the right to amend my positions in light of any new information received. In particular, I understand that the depositions of Michael Kelley, Rebecca Kelley, Danielle Smith, and Academy sporting goods are in the process of being scheduled or rescheduled.  I reserve the right to issue a supplemental report after receiving the transcripts from those depositions.  The focus areas and brief statements of my position for each are as follows:

a) Was it foreseeable that Devin Kelley would commit the mass shooting at the First Baptist Church in Sutherland Springs, Texas, based on the facts known to the Air Force investigators at the time when they should have submitted Kelley's fingerprints and final disposition to the FBI's National Criminal Background Check

CONFIDENTIAL                                                                                   USA00025613

System (NICS)? *No. Notwithstanding Kelley's past aggressive behavior, including his domestic violence conviction, mental health treatment, or other characteristics, it was not foreseeable to the Air Force that Kelley would engage in the type of conduct that caused Plaintiffs injuries—i.e., perpetrating a shooting rampage at a church over five years after his conviction.*

b) Would Kelley have been prevented from perpetrating the November 5, 2017 church shooting had the Air Force submitted Kelley's fingerprints and final disposition to the FBI's NICS? *No. Given the many alternative sources that Kelley would have had available for purchasing a firearm without being subjected to a Federal background check, his determination to commit the mass shooting, and empirical evidence showing that background checks at FFLs do not necessarily prevent mass shootings, a denial at an FFL would not have prevented Kelley from carrying out his plan of attack.*

c) Are the opinions contained in reports submitted by Plaintiffs' experts Daniel W. Webster, ScD, Larry D. Youngner, Colonel, USAF (Ret.), and The Honorable Jon T. Rymer persuasive? *No. The opinions offered by these Plaintiffs' experts are not persuasive concerning either the foreseeability of the church shooting based on Kelley's background or the causal connection between Kelley's ability to acquire firearms for use in the attack and the failure of the Air Force to submit information about Kelley's domestic violence conviction to the FBI. Most notably, Plaintiffs' experts fail even to entertain the obvious possibility that Kelley could have obtained a weapon from a source other than an FFL and fail to distinguish mass shooters, such as Kelley, from persons engaged in less severe criminal behavior, such as domestic violence.*

d) If the Court finds the Air Force is in part responsible for causing the church shooting, how much responsibility should be allocated to the Air Force, as compared to the other responsible parties, including the shooter? *Given the lack of foreseeability, and the likelihood that Kelley would have been able to purchase firearms without a background check, the extent that the Air Force can be blamed for the church shooting several years after Kelley left the Air Force is minimal compared to the responsibility of Kelley for his own depraved, deliberate, and premeditated act of mass murder, which is among the deadliest and most heinous mass shootings in recent history.*

*Foreseeability*

10. Devin Kelley's history of domestic violence did not make the Sutherland Springs mass shooting foreseeable. Most mass murderers do not have a prior history of domestic violence. Moreover, the overwhelming majority of individuals who abuse intimate

CONFIDENTIAL                                                                      USA00025614

partners or family members do not subsequently commit mass murder, especially one directed at innocent strangers.

11. Devin Kelley was clearly ill-tempered, and he tended to overreact to what he perceived as personal slights or criticism. However, there was little, if anything, to suggest, while in the Air Force, that he was capable of slaughtering dozens of innocent people in a public setting without provocation.  Whatever the reason, there was nothing in Kelley's background indicating that he would commit this degree of violence against innocent people he didn't know and who had not done anything to provoke him.

12. Regardless of whatever so-called "red flags" exist, the likelihood that someone with those characteristics would commit a mass public shooting is extremely low. In light of the facts here, this outcome cannot be foreseen or predicted with any degree of certainty with respect to Kelley. Although there are characteristics that are more common in the biographies of mass killers than in the general population, the extremely low prevalence of mass killing, and especially deadly mass shootings in a public venue, as compared to whatever indicators are considered, makes reliable prediction virtually impossible. As Bjelopera and his colleagues concluded based on a Congressional Research Service analysis of 78 public mass shootings, "because public mass shootings are rare, potential perpetrators cannot be identified accurately, and no systematic means of intervening are known to be effective."[1]

13. Because of the well-known low base rate problem, any attempt to predict is subject to a very high percentage of false positives: individuals who possess characteristics common among mass murderers or even make mass-shooting threats in the presence of others or online, but who never turn their anger into action.[2] As to the fact that threats typically do not amount to anything more than written or spoken words, O'Toole notes, "most threateners do not act on their threat."[3]

14. In his deposition, Terry Snyder of the Texas Rangers resisted the idea that the church massacre was a foreseeable event based of Devin Kelley's purchases of deadly weapons and various firearm accessories in the weeks leading up to the shooting, his repeated calls to a merchant in the days leading up to the shooting about a much desired acquisition of two 100-round drum magazines, several ominous notes-to-self

---

[1] Bagalman, E., Caldwell, S. W., Finklea, K. M., & McCallion, G. (2013). Public mass shootings in the United States: Selected implications for federal public health and safety policy. Congressional Research Service, Washington, DC.
[2] For a discussion of the methodological problems impacting prediction, see Chaiken, J., Chaiken, M., & Rhodes, W. (1994). "Predicting violent behavior and classifying violent offenders," in Albert J. Reiss and Jeffrey A. Roth, eds., *Understanding and Preventing Violence, Volume 4*. National Academy of Sciences, Washington, DC.
[3] O'Toole, M. E. (2000). The school shooter: A threat assessment perspective. Critical Incident Response Group, National Center for the Analysis of Violent Crime, Quantico, VA.

CONFIDENTIAL                                                                                          USA00025615

and photographs uploaded to his iCloud account in the months prior to the shooting, and a threatening text message sent to his mother-in-law. If these are not clear indicators, then certainly the conduct Kelley engaged in while with the Air Force several years earlier would not be.

15. In his cross-examination of Texas Ranger Terry Snyder in the course of his July 7, 2020 deposition, Plaintiffs' counsel pressed the deponent regarding a March 22, 2013 Air Force memo revealing that Devin Kelley had threatened to kill "leadership." Through his questions, Plaintiffs' counsel intimated that this would have been a harbinger of the church shooting years later. However, most deadly threats are not acted upon, especially when they are non-specific (e.g., leadership rather than a named target) and not accompanied by any deliberate steps taken toward execution.[4] This is hardly reflective of Kelley's later actions that included a specific threat against his mother-in-law and especially detailed preparations for killing (e.g., a to do list of items needed for the church shooting and steps taken to conceal his planned action from his wife).

16. Although Devin Kelley had some of the traits often seen in the biographies of mass killers (e.g., history of violence, gun ownership, and fascination with firearms), he also had certain characteristics (e.g., married and employed) that are associated with a lesser likelihood of his committing a mass public shooting. For example, Devin Kelley saw Candace Marlow, a licensed professional counselor with six years of experience, for one-hour talk therapy sessions twice-weekly between June 6, 2016 and August 25, 2016. He then returned for a single follow-up session on September 1, 2017, about two months prior to the Sutherland Springs church shooting.  During those therapy sessions, Kelley indicated how much he loved his son and that "his son was his hope and the reason he kept going."[5] Taken altogether, therefore, Kelley did not necessarily fit the mass shooter "profile."

17. Several elements that would be counter-indicative of an impending mass slaughter were identified by Kelley's therapist during a follow-up therapy session just two months prior to the church shooting. "His wife had just had the girl, so now he had his son and his baby girl," recalled Marlowe. "He had just got a new job as a security guard at a RV park, and he said that he had friends that had got him the job. So there was support there that hadn't been there before."[6] Marlowe denied observing

---

[4] In a 10-year follow-up of 614 individuals who had been *convicted* of making threats to kill, only 3% did in fact commit a homicide within that time frame; see Warren et al., Threats to kill: a follow-up study. *Psychological Medicine* (2008) 38(4):599-605. The rate of follow-through would likely be even lower for individuals whose threats were not sufficiently serious to have resulted in a conviction.
[5] Deposition of Candace McKenzie Marlowe, June 18, 2020, p. 59.
[6] Deposition of Candace McKenzie Marlowe, June 18, 2020, p. 129.

CONFIDENTIAL

USA00025616

anything about Kelley during the September 2017 session that would give her reason for concern.

18. In an interview with the FBI following the church shooting, Jessica Edwards recalled that Devin Kelley appeared to be fascinated with mass shootings. Of course, her observation occurred after Kelley had left the Air Force. Nevertheless, whatever the strength of his interest, there are countless individuals who are fascinated with, or take significant interest in, extreme acts of violence, and these persons may even empathize with the perpetrator. Fortunately, few ever do more than fantasize.

19. There is evidence that Devin Kelley engaged in acts of violence against animals, a characteristic long believed by many lay persons as being predictive of future homicide. No evidence of such behavior existed until after he was discharged from the Air Force. Regardless, while there are well-known examples of multiple murderers for whom torturing animals had been a training ground for later violence against humans, that in itself is not a reliable predictor.[7] Even the psychiatrist who first proposed animal cruelty as one of a three-component constellation indicating homicidal proneness (known as "MacDonald's Triad") subsequently retreated on the theory in the face of non-confirming empirical evidence.[8]

20. According to at least one friend (e.g., Joey Mizell), Devin Kelley became far more interested in firearms after leaving the military. And neither Mizell, nor anyone close to Kelley, has said that he or she thought or believed that Kelley would actually perpetrate a mass shooting. In fact, several people had positive things to say about Kelley, as observed in the letters written in support of him in connection with the sentencing phase of his Air Force criminal trial.

21. As noted above, Devin Kelley's history of domestic violence did not make the mass shooting at the First Baptist Church foreseeable. There is considerable misunderstanding about the extent to which domestic violence is a precursor to a mass shooting. The following are examples of the widespread misinterpretation of empirical evidence in the wake of the Sutherland Springs church shooting:[9]

> Appearing on the *PBS NewsHour* the day after Sutherland Springs church shooting, Deborah Epstein, co-director of the Domestic Violence Clinic at the Georgetown University Law Center, claimed there is a strong correlation between domestic violence and mass shootings. "If you look at all the mass shootings that have occurred on U.S. soil," said Epstein, "the vast majority of

---

[7] Ryan, K. (2009). The Macdonald triad: Predictor of violence or urban myth?. California State University, Fresno.
[8] MacDonald, J. M. (1968). *Homicidal threats*. Springfield, IL: Charles C. Thomas Publishers.
[9] Material drawn from James Alan Fox, "Domestic violence is a tragedy. It's not a predictor of mass murder." *USA TODAY*, November 15, 2017.

CONFIDENTIAL                                                                                   USA00025617

them have been committed by people who have perpetrated domestic violence against an intimate partner, a series of intimate partners, or are in the process of dealing with domestic violence."

In a one-week follow-up story about the church shooting, a headline in the *San Antonio Express-News* read, "Are mass killings and domestic violence linked? It depends who you ask." You'd think such a determination would be a matter of fact, not opinion. Unfortunately, in the media version of the children's game of telephone, the message is easily misinterpreted as it gets repeated from one news source to another.

"There is an obvious link between mass shootings and domestic violence," suggested Susan Higginbotham, executive director of the Pennsylvania Coalition Against Domestic Violence. She at least cited her evidence: "A study last year by Everytown for Gun Safety, which used FBI data and media reports to analyze mass shootings from January 2009 to December 2016, showed that 54% of the perpetrators of these horrific mass killings had a history of domestic or family violence."

22. Susan Higginbotham was only partially correct, misconstruing the most important point. The Everytown study did indeed find that 54% of mass shootings involved intimate partners or family members as victims. In this majority, however, the domestic violence *was* the mass shooting of family members, and not necessarily a history of previous domestic violence. Everytown's case summaries of 156 shootings from 2009 through 2016 (in which four or more victims were killed), reveal 85 incidents in which a gunman murdered at least some current or former intimate partners or family members. Of these, 41% were preceded by other acts of domestic violence. Among the entire pool of mass shootings, only 25% revealed any indication of prior domestic violence.[10]

23. As reflected in the Everytown data, the prevalence of prior domestic violence among mass killers varies by type and target. Fridel specifically compared the prevalence of prior domestic violence for the 390 U.S. mass killers from 2006 through 2016 (over 80% of whom perpetrated the attack with a firearm) based on the nature of the offense (i.e., family annihilation, felony-related murders, and public massacres).[11] Whereas 16.5% of mass murderers had a history of domestic violence (most of those

---

[10]The initial Everytown for Gun Safety report that was cited by many in the aftermath of the Sutherland Springs shooting was based on mass shootings with four or more fatalities from 2009 through 2016. Everytown more recently released an updated report based on 194 cases from 2009 through 2018. The share of the 194 mass shootings that had some indication or prior domestic violence remained at 25%.

[11] Fridel, E. E. (2017). "A multivariate comparison of family, felony, and public mass murders in the United States." *Journal of Interpersonal Violence*, 1-27.

CONFIDENTIAL

USA00025618

linked to family massacres), only 6.6% of those who killed at least four victims in a public setting (such as a church) were known to have had a prior history of violence against intimates or family members. Thus, while domestic violence is a serious offense in itself, it is not generally found in the backgrounds of mass public killers.

24. Even if a majority of mass shootings were preceded by violence against intimate partners or family members, that still would hardly serve as a reliable predictor of mass murder. There are, unfortunately, at least 10 million incidents of domestic violence every year in the United States, according to estimates reported by the National Coalition Against Domestic Violence. By contrast, there are, on average, about two dozen mass shootings annually with at least four fatalities. Any attempt to predict mass murder solely on the basis of prior domestic violence would be wrong well more than 99% of the time.

25. There are, of course, gradations of domestic violence, from shoves to shootings. Kelley's physical abuse of his stepson requiring medical and social service intervention is certainly disconcerting (although his stepson did recover from his injuries). Nevertheless, the use of brute force as a spontaneous reaction to a stressful situation (e.g., a crying child) or conflict (e.g., marital discord) is very different than, and not necessarily predictive of, the type of cold-hearted deliberation reflected in the November 5, 2017 church massacre.

26. Devin Kelley's pointing a gun at his first wife's head does, of course, involve a weapon that is far more lethal than brute force. However, pulling a gun on someone in a heated moment is very different than a premediated tactical attack on a church using firearms with special accessories, body armor, and a tactical vest.  Although firearms were involved in both, the nature of the criminal acts is quite different.  Accordingly, even general threats using a gun are not necessarily predictive of mass gun violence through a mass shooting.

27. Because neither domestic violence nor any of the other deviant characteristics discussed above creates the ability to ascertain with any certainty whether an individual is likely to commit a mass shooting, the fact that Kelley possessed certain of those characteristics does not make the Sutherland Springs church shooting foreseeable.

*The Inaccurate Background Check was not a Critical Factor*

28. The failure to pass a background check, and thus being denied an attempt to purchase a firearm from an FFL, does not prevent a highly determined individual,

11

such as Devin Kelley, from obtaining firearms. As explained below, there are ample avenues for acquiring a gun without a background check.

29. It is important to note that federal law requires background checks only for firearm purchases from FFLs. In a state like Texas that does not mandate universal background checks, there are many other ways to obtain a firearm, including a private sale or a straw purchase by someone without disqualifying characteristics.

30. Research shows that in fact people frequently obtain firearms without a background check. According to a 2015 nationally representative survey of more than 1,600 gun owners conducted by Miller and colleagues, 22% of those who had obtained their most recent firearm within the previous two years reported doing so without a background check. For guns purchased privately within that time frame (i.e., other than from a store or pawnshop, including sales between individuals in person, online, or at gun shows), half were obtained without a background check. Moreover, for those living in states, like Texas, that do not regulate the private transfer of firearms, 57% of the guns obtained privately were acquired without a background check.[12]

31. The options for acquiring a firearm in Texas without a background check are plentiful: there are countless gun owners in the state (Texas ranks 17th in terms of gun ownership, according to Siegel's estimate[13]) who could potentially sell a firearm privately, as well as frequent gun shows held in the state (hundreds in a given year[14]) in which sales can be transacted with a private seller without a background check. Although the Miller et al. survey data were not designed specifically to be representative at the state level, the findings for gun purchases by Texas gun owners showed a pattern similar to the national results with many of the firearms having been acquired online, at gun shows, as gifts or inheritances, or in private sales from friends or family members.[15]

32. The facts show that in all likelihood a denial at an FFL would not have deterred or otherwise prevented Devin Kelley. He did not stop when he was first denied from purchasing a semiautomatic rifle at one FFL (DICK's Sporting Goods), but instead proceeded to purchase an AR-556 at another FFL (Academy Sporting Goods). There is every reason to believe that he would have sought an alternative—such as through a straw purchase, an online purchase, or a gun show—had he been denied at Academy Sporting Goods or any other FFL.

---

[12] Miller, M., Hepburn, L., & Azrael, D. (2017). "Firearm acquisition without background checks: results of a national survey." *Annals of internal medicine*, 166(4), 233-239.

[13] M. Siegel, "State Firearm Law Database, 1976-2020," Boston University School of Public Health, 2020.

[14] See, for example, https://gunshowtrader.com/gunshows/texas-gun-shows

[15] Private communication with Matthew Miller, March 5, 2020.

CONFIDENTIAL

USA00025620

33. In the past, as stated by Danielle Kelley in her interview with the DODIG, Kelley had acquired a firearm privately from friend. He was therefore certainly aware of this option.  He also apparently sold an SCCY CPX-2 9mm Semiautomatic Pistol to a pawn shop.  It does not appear that he purchased this weapon through an FFL.  Kelley's iCloud account also had a picture of a shotgun, and appears to be one that he owned or at least to which he had access.

34. Devin Kelley had a very convenient option for obtaining firearms without undergoing a background check had he needed to do so. His father Michael Kelley, on whose property Devin and Danielle resided, possessed guns of his own and, according to the Texas Rangers Supplemental Report, Devin had access to them.

35. Devin Kelley purchased body armor and took anti-diarrheal medication in advance of the church shooting. This underscores his premeditation and attention to detail in carrying out the massacre. Whereas crimes of passion or other spontaneous acts of violence may be thwarted by limiting access to firearms, individuals who plan and strategize to the level of Kelley are extremely hard to stop.

36. In addition, while at the Peak behavioral-medicine facility, Kelley was observed looking for firearms on the Internet. He also found firearms accessories, like 100-round magazines, through Facebook.  He was therefore savvy in regard to means for purchasing firearms without a being subjected to a background check. It also demonstrates that Kelley had the willingness to purchase firearms despite obstacles standing in his way.

37. Kelley also acquired body armor through an online transaction.  Because he was a felon, owning body armor was illegal in Texas.  But this did not stop him from purchasing the body armor.  There is no reason to suspect that it would have been any harder for him to purchase a firearm online.

38. Kelley would have also been able to get others to purchase weapons for him. Given the extent to which Kelley was manipulative and controlling over his second wife Danielle, if necessary, he might have made her purchase a firearm on his behalf. According to his ex-wife Tessa, Devin was "smart": He would have known that he was not permitted to own a firearm but would have been able to figure out how to obtain one if he had been denied through legal means.[16] She obviously had firsthand knowledge of Kelley's use of force and use of coercion to get what he wants.

39. Emily Willis, with whom the Kelleys shared an apartment in Colorado Springs, described in her May 26, 2020 deposition how Danielle consistently acquiesced to

---

[16] Document USA00021840 Tessa Interview summary, p. 4, para. j.

CONFIDENTIAL

USA00025621

Devin's requests and demands in both trivial matters (e.g., what to eat for dinner, and what movie to watch) as well as more substantial ones (e.g., she was not allowed to go out on her own, and she complied with his sexual fetishes). Willis could not recall an instance when Danielle refused her husband (p. 108). When asked whether she believed that Danielle would have purchased a weapon for Devin if he asked her to do so, Willis responded, "[I]n my opinion, when Devin wanted something from Danielle, she would do whatever it took to make him happy. I don't particularly think that if she would have known what was going to happen with the firearm she would have done it. But if it was like an everyday type of question, I guess I could see her doing it. Buying the gun" (p. 68). As for the qualifier, there is no indication that Danielle was aware that her husband was planning on using a firearm to carry out a mass shooting.

40. In his cross-examination of Texas Ranger Terry Snyder, Plaintiff counsel pointed out that the Lautenberg Amendment "made it *impossible* for people that had been convicted of a crime involving spousal abuse to own firearms" [Emphasis added].[17] It may be illegal, but clearly not impossible.

41. History has shown that mass killers, like Devin Kelley, are very determined and will find the means for acquiring the weaponry they need despite whatever hurdles are in their path to destruction. From 2006 through 2019, there were 77 individuals in the U.S. who are alleged to have fatally shot at least four victims in a public setting.[18] As shown in Table 1, of the 63 perpetrators of a mass public shooting (MPS) for whom the relevant background information is available, nearly 40% obtained their firearms despite being prohibited from owning a weapon based on mental illness, a history of domestic violence, criminal record, or youth. These instances demonstrate that background check requirements do not necessarily deter or stop potential mass killers. Accordingly, if the Air Force had submitted Kelley's fingerprints and final disposition to the FBI's NICS, he, like other mass shooters, would likely have still acquired a deadly firearm needed to perpetrate the November 5, 2017 Sutherland Springs church shooting.

42. Table 2 displays the source of the firearms used in mass public shootings committed by prohibited purchasers. Aside from the few firearms that were obtained illegally from an FFL (including the AR-556 purchased by Devin Kelley at Academy Sporting Goods), there were numerous other avenues by which these assailants acquired their weapons.

---

[17] Deposition of Terry L. Snyder taken July 7, 2020, p. 240, lines 5-7.
[18] Based on the Associated Press, USA Today, Northeastern University Mass Killing Database.

CONFIDENTIAL

USA00025622

43. Table 3 displays the type of weapon according to whether they were obtained from an FFL or through some other private transaction. While Devin Kelley purchased his semiautomatic rifle (an AR-556) from an FFL, many other prohibited assailants successfully acquired a similar firearm without having to pass a background check. In any event, because Kelley was shooting indoors at unarmed, defenseless victims, the specific type of firearm would not have a major effect on the extent of injury and death. Clearly, had Kelley been unable to purchase a deadly weapon from an FFL because of a "denial" during his background check, there were other ways that he, like other mass shooters in recent years, could have secured firearms. Moreover, as evidenced by his possession of a firearm on the Air Force base contrary to regulations, as well as his many other transgressions and illegal behaviors (including illicit drug use), Kelley was not one who felt particularly constrained by the law. In all likelihood, he would not have let an inability to purchase a weapon from an FFL prevent him from carrying out his deadly plan.

44. Sadly, the facts suggest that this is the type of mass shooting that could not have been prevented. There are certain circumstances that can foil a would-be assailant's plan to commit mass murder. For example, in her study of thwarted mass shooting plots, Sarteschi found that the overwhelming majority were averted on account of "leakage"—when a friend, family member, or some other member of the public learned about the planned assault and alerted authorities.[19] Apparently, no one close to Kelley was aware of his murderous intentions and could therefore intervene. Indeed, that he was able to conceal his plans from his wife and family shows all the more the resolve that he had to carry out this mass killing.

45. Mass killings can also be thwarted, or at least limited in terms of death toll, by interventions at the point of attack. For example, the FBI's database on active shooter events includes several gunmen who set out to kill large numbers of victims in a public location, but were stopped from harming anyone when confronted at the scene by the police or an armed bystander or else by turning the gun on themselves.[20] Kelley was also confronted by armed citizens at the scene of the church shooting and eventually took his own life, however not before dozens of worshipers were killed or injured. In contrast to these two forms of intervention, there is no empirical evidence of serious mass murder plots having been thwarted because of a failed background check connected to an attempt to purchase a firearm from an FFL.

---

[19] Sarteschi, C. M. (2016). "An examination of thwarted mass homicide plots and threateners." *Aggression and violent behavior*, 30, 88-93.

[20] Active Shooter Incidents in the United States in 2019, the Advanced Law Enforcement Rapid Response Training (ALERRT) Center at Texas State University and the Federal Bureau of Investigation, U.S. Department of Justice, Washington, D.C. 2020.

CONFIDENTIAL

USA00025623

46. Evidence supporting this point is found by reference to another recent Texas shooting. Although it does not meet the victim threshold for mass murder, the December 2019 shooting at the West Freeway Church of Christ in White Settlement, Texas, committed by Keith Thomas Kinnunen, clearly demonstrates the limits of the federal system of background checks in preventing a prohibited purchaser from acquiring and ultimately using a deadly weapon to kill multiple victims. Because of his criminal history, Kinnunen was twice denied a firearm purchase at an FFL. Despite that, he apparently had little difficulty, particularly in a state like Texas, acquiring the shotgun that he used in the shooting spree.

47. Importantly, Kinnunen's attempt at mass murder was foiled due to intervention by armed church security personnel. In general, there may be a legitimate question as to whether individuals who have their plan for mass murder revealed to others would actually follow through with the act. However, there is no doubt that someone like Kinnunen, who was in the act of killing when gunned down by church security, was indeed intending to commit mass murder. Consequently, the level of resolve that led him to seek firearms from alternative sources even when denied at an FFL was most certainly the same level of resolve that Devin Kelley had in his intention to commit the Sutherland Springs church shooting.

*Response to Plaintiffs' Expert, Daniel Webster*

48. The report submitted by Plaintiff's expert Daniel Webster, ScD, focuses almost exclusively on domestic violence and intimate partner homicide. However, although it is true that Devin Kelley had a history of domestic violence while in the military (and apparently beyond), the relevant questions surround the foreseeability and causal linkage to mass shootings, especially incidents involving strangers in a public setting.

49. Webster cites a body of his research and work by others on prior violence as a predictor of future offending and on the effectiveness of background checks in preventing violence. But the only attention that Webster gives to existing research on mass shootings is in a single sentence on p. 7: "Furthermore, many of these factors— male violence against female intimate partners, sexual violence, threats to kill, and suicidality—are common among those who commit mass shootings," citing a recent paper by Zeoli and Parul (2020) and an August 2019 opinion piece by Peterson and Densely in the *Los Angeles Times*. Neither of these references support the notion that mass shootings are predictable based on a history of domestic violence.

50. The connection between mass shootings and prior acts of domestic violence primarily involve mass shootings that are perpetrated against immediate family members, especially in residential settings. For example, in an examination of over 300 mass

CONFIDENTIAL

USA00025624

killings in the U.S. between 2006 and 2016, each with at least four fatalities, Fridel identified a history of domestic violence among 28.8% of family annihilators, but only 6.6% of those who committed a public massacre. [21]

51. Zeoli and Paruk collected data on mass shootings (with at least four victims killed) from 2014 through 2017 based on several publicly available databases and compared 28 assailants with some evidence of prior domestic violence against 28 with no such indication. Not surprisingly, those who had a history of domestic violence were significantly more likely to have targeted intimate partners than those who did not have this in their background. Ultimately, Zeoli and Paruk shied away from advancing any notion that mass shootings were foreseeable based on a history of domestic violence: "Finally, we do not suggest that domestic violence perpetration be viewed as a predictor of mass shootings. Certainly, only a small fraction of individuals who commit domestic violence will conceive of, plan, or commit a mass shooting." Indeed, the very authority that Webster cites in support of the foreseeability of mass shootings explicitly rejects that theory.

52. Peterson and Densley's only reference to domestic violence in their *Los Angeles Times* op-ed is in the context of mass shooters having been the victim of or observer of domestic violence, but not as the perpetrator of domestic violence: "The vast majority of mass shooters in our study experienced early childhood trauma and exposure to violence at a young age. The nature of their exposure included parental suicide, physical or sexual abuse, neglect, domestic violence, and/or severe bullying." Thus, there is nothing in the Peterson and Densley argument that suggests the foreseeability of mass shooting based on a history of violence against intimates or other family members.

53. The only other statement in Webster's report that could at all conceivably apply to mass shootings comes on p. 9: "Although we did not examine the subset of cases that resulted in multiple-victim deaths in our 11-city study, a study of domestic homicide in North Carolina found that if an intimate partner homicide was committed with a firearm, the offender was twice as likely to kill multiple victims than if the offender used a different weapon," citing a 2018 study by Smucker, Kerber, and Cook. Of course, it makes perfect sense, in light of the greater lethality of firearms, that a gun assault would be more apt to claim multiple lives than an attack with, say, a knife or brute force. Moreover, since the Smucker et al. study concerned intimate partner homicide, although the article does not address this point, it is very likely that the additional victims were family members killed at home, not strangers in a public

---

[21] Fridel, op. cit., p. 13.

CONFIDENTIAL

USA00025625

setting such as a church. Thus, this evidence is hardly relevant to Sutherland Springs church shooting.

54. Webster asserts on p. 14 of his expert report, "In this case, it is more likely than not, based on the above research and my background, had the United States Air Force or Department of Defense reported the relevant disqualifying information concerning Devin Kelley to the FBI, that would have prevented Kelley's ability to purchase firearms and his ability to kill 26 people at the First Baptist Church of Sutherland Springs." In view of the evidence regarding the many avenues through which Kelley could have acquired firearms without a background check (which Webster does not at all address in his report), as well as the number of mass public shootings perpetrated by prohibited purchasers whose guns were obtained through means other an FFL, Webster's "more likely than not" conclusion concerning causation is unsupported by the research or any of the material in his report.

55. Webster cites research by Wintemute suggesting that denials of legal firearms purchases because of failed background checks help to keep dangerous weapons out of the hands of individuals with a history of violence. However, as indicated above, the availability of alternative sources for purchasing a firearm without a background check still allows determined mass shooters to carry out their deadly plan of attack. That raises the question as to whether universal background checks, cutting off all legal means of gun purchasing, would help prevent mass shootings. Seven states have required universal background checks since at least 2006, and 8 additional states adopted the requirement at some point since then. Table 4 shows the results of a Poisson regression of state-level annual counts of mass public shootings with 4 or more victims killed over the time frame 2006-2019 to assess the effect of state universal background check laws, while controlling for the overall incidence of homicide, state populations, and overall trend in mass shootings. As shown, such state laws significantly reduce the likelihood of a mass public shooting. The table indicates a clear difference between states that mandate universal background checks and those that do not in terms of limiting access to dangerous weapons for individuals planning to shoot large number of victims in a public setting.

56. Thus, had Devin Kelley resided in one of the states mandating background checks for all firearms transactions and had failed a background check based on his domestic violence conviction while in the Air Force, he would have found it far more difficult to acquire firearms. This is because these states require background checks for private sales, but also because these laws make it more difficult to purchase a weapon in a different state, as federal law generally prohibits private sales to out-of-state residents. Nevertheless, living in Texas allowed him many avenues for purchasing a firearm without a background check, regardless of whether his domestic violence

18

USA00025626

conviction while in the Air Force was reflected in the FBI's National Instant Criminal Background Check System.

57. Overall, whatever the strength of the research covered in Webster's report, it is not particularly relevant to assessing the foreseeability of the Sutherland Springs mass shooting or the causal link between the failure of the Air Force to provide the FBI with information about Devin Kelley's domestic violence conviction and his violent rampage five years later.

*Response to Plaintiffs' Expert, Larry D. Youngner*

58. On p. 40 at the bottom, Youngner claims that the failure of Air Force personnel to inform the FBI of disqualifying events allowed Kelley "to purchase a stockpile of weapons when he *otherwise would have been stopped* from doing so" [Emphasis added]. That, of course, does not consider his other options for acquiring his weapons without being subject to a background check. Thus, one cannot conclude, as Youngner does, that Kelley would have been stopped from purchasing firearms.

59. Moreover, on p. 40, first line, Youngner states "The former SAIC who investigated Kelley's also testified that it was foreseeable that Kelley would commit a mass shooting." Statements about Kelley's likely behavior made during the investigation prompted by the November 5, 2017 shooting are post-hoc assessments with knowledge of what happened at the First Baptist Church. Of course, hindsight is 20/20. As Amman and her colleagues note "Hindsight bias is the inclination, after an event, to see it as having been more predictable than it was."[22] Consequently, although the former SAIC was likely being earnest in making that statement, such comments must be viewed in light of the well-known nature of hindsight bias.

*Response to Plaintiffs' Expert, Jon T. Rymer*

60. On p. 21 of his report, Rymer states: "In short, it is my conclusion that the Air Force exposed the general public to an unnecessary and increased risk of harm for gun violence because they knew that Devin Kelley was a specific gun violence threat to the public and failed to report his criminal data history to the FBI, which would have more likely than not prevented this terrible tragedy from occurring on November 5, 2017." It is true that Kelley was able to purchase his weapons through an FFL when he should not have been to do so. However, I strongly disagree that had he not been able to do so, there was more than a 50/50 chance he would have been prevented

---

[22] Amman, M., Bowlin, M., Buckles, L., Burton, K. C., Brunell, K. F., Gibson, K. A., & Robins, C. J. (2017). Making prevention a reality: identifying, assessing, and managing the threat of targeted attacks. Federal Bureau of Investigation, U.S. Department of Justice, Washington, DC.

CONFIDENTIAL                                                                 USA00025627

from committing the mass shooting. Given his strong intent and methodical preparation, it is more likely than not that he would have found an alternative means of acquiring his weapons. As the empirical data cited above demonstrate, there are many other mass shooters who were prohibited purchasers yet were able to acquire their weapons from sources other than an FFL.

61. Rymer twice cites a former supervisor's observation that Kelley was "fascinated" with mass shootings, although that observation came after Kelley had left the Air Force. Moreover, his fascination apparently wasn't perceived to be sufficiently extreme and worrisome such that his former supervisor apparently did not feel the need to contact law enforcement. Actually, there are countless individuals who are fascinated with mass shootings, including some who identify with the assailant. Furthermore, Kelley was hardly the only person to remark about the Charleston church shooting in a way that suggests support for Dylann Roof's agenda. However, the overwhelming majority of people who might scare us, talk tough, and even make threatening comments never actually commit the atrocious act that they find so intriguing. These types of behaviors, so-called "red flags," rarely lead to acts of mass violence, although after the fact such "red flags" become the improper focus of what people think could have been done to prevent the violent act.

62. Rymer and Youngner both point out that Kelley would have been subject to arrest had he been denied a gun purchase because of his having lied about his criminal record history. While technically true, this was hardly the type of deterrent that would have stopped Kelley. In Fiscal 2017, according to the U.S. General Accounting Office, only 12 of the 112,000 who were subject to arrest for such violations in connection to Federal background checks were in fact prosecuted. That translates to a one-hundredth of one percent (0.01%) likelihood of prosecution.[23] And that doesn't even consider the probability of subsequent conviction and punishment. The likelihood that Kelley's concealment when completing ATF Form 4473 (Firearms Transaction Record) would have resulted in his arrest and conviction is exceptionally remote. In any event, Kelley had shown on numerous occasions that he took actions to meet his needs and desires without regard for legal consequences (e.g., sexual assaults and domestic violence). The remote risk of prosecution for lying on an ATF Form 4473 would not have deterred him.

*Apportionment of Responsibility*

63. Based on the available evidence and the opinions articulated above, it my conclusion that the Air Force has relatively little responsibility for the tragic events of November

---

[23] The U.S. Government Accountability Office, "Few Individuals Denied Firearms Purchases Are Prosecuted and ATF Should Assess Use of Warning Notices in Lieu of Prosecution." GAO-18-440, September 2018.

CONFIDENTIAL                                                                                    USA00025628

5, 2017. Granted, Devin Kelley's record of domestic violence should have been submitted to one of the FBI's databases that are used during NICS background checks. However, I understand that the criminal investigators responsible for doing so had myriad work and home stressors, including long hours and many active criminal investigations, that played into the conviction not being reported. Moreover, in all likelihood, Kelley would not have been prevented from carrying out the mass shooting if prohibited from purchasing firearms from an FFL. In addition, it was not foreseeable from the vantage point of the Air Force that Kelley would commit a deadly mass shooting in a public place years after he his discharge. Given the problems with foreseeability, and the low likelihood that denial at an FFL would have prevented the shooting, the Air Force's responsibility in this mass shooting is fairly limited.

64. In contrast, Devin Kelley bears the brunt of responsibility for his own actions: lying about his violent history in connection with a Federal background check and, most importantly, willfully perpetrating a dreadful act of carnage at the First Baptist Church in Sutherland Springs, one of the most heinous and despicable mass shootings in recent history. The use of body armor to prolong the rampage, carrying several weapons and multiple ammunition magazines, killing children and a pregnant woman among dozens of other innocents in a sacred house of worship, reflect a degree of depravity that overshadows any failures of Air Force personnel years before the crime.

65. With Devin Kelley's suicide, the full truth about his motivation for attacking the First Baptist Church in Sutherland Springs may never be known for certain. However, there are clear indications that his choice of target reflected a blend of anger toward his wife's family who attended the church and his disdain for organized religion and Christianity, in particular. In a May 2017 Facebook post, Kelley wrote "All I know is if any of my wife's family are going to heaven I deff (sic) don't want to spend eternity with them" and "I'm an atheist and they are ignorant self righteous (sic) Christians or so they claim in public. But behind closed doors it's drug addiction and domestic violence. My wife was the right person to marry but the rest of them could get shot in the face and I'd laugh." Neither of these contributors existed during the time of Kelley's military service.

66. This begs the question as to why he did target worshipers at the First Baptist Church, rather than directly attacking his mother-in-law at her home to avenge Danielle's repeated sexual abuse during childhood.  In what has been termed "murder by proxy," the location may have been chosen because of his mother-in-law's affiliation with the church. Under that rationale, the shooter's depraved thinking was that even if she were not present at the church on November 5, 2017, he could still cause her

21

USA00025629

significant pain and suffering by killing her relatives and friends who were present that day. It is also possible that Kelley, who considered himself to be an atheist, would have held some negative views regarding organized religion. Moreover, by staging his rampage in a sacred space, Kelley's payback for his own unhappiness and misfortune would be magnified.

67. Regardless of the motivation, which we may never know for sure, the heinousness of Kelley's crime cannot be understated.  A large body count, a house of worship as a location, the murder of children and women are all factors that increase the newsworthiness of a mass shooting, according to our recent research funded by the National Institute of Justice. To the extent that newsworthiness logically correlates with heinousness, the Sutherland Springs church shooting stands as one of the worst in modern U.S. history.  Moreover, having studied mass murders and serial killers, my assessment is that this is one of the worst shootings I have seen.  Given the depravity of Kelley's actions, the premeditation, and the intentional and wanton killing of 26 people, and the attempted killing of 20 others, Kelley should far and away bear the responsibility in this civil litigation.

James Alan Fox

CONFIDENTIAL

USA00025630

Table 1: Prohibiting conditions for mass public shooters

| Prohibit | f | % |
| --- | --- | --- |
| Not prohibited | 39 | 61.9% |
| Mental illness | 7 | 11.1% |
| Domestic violence | 4 | 6.3% |
| Criminal record | 10 | 15.9% |
| Age | 2 | 3.2% |
| Multiple prohibitors | 1 | 1.6% |
| Unknown | 14 | |
| Total | 77 | 100.0% |

Table 2: Source of gun acquisition by prohibited mass public shooters

| Source | f | % |
| --- | --- | --- |
| FFL | 7 | 21.2% |
| Legal unspecified | 2 | 6.1% |
| Private sale friend/family | 0 | 0.0% |
| Borrowed | 1 | 3.0% |
| Stolen | 14 | 42.4% |
| Internet | 3 | 9.1% |
| Ghost | 3 | 9.1% |
| Private sale--Gun show | 0 | 0.0% |
| Private sale - Unspecified | 2 | 6.1% |
| Illegally returned by family member | 1 | 3.0% |
| Borrowed or stolen - Unclear | 0 | 0.0% |
| Unknown | 3 | |
| Total | 36 | 100.0% |

Table 3: Type of firearm and source for prohibited mass public shooters

| Types | FFL | Other |
| --- | --- | --- |
| Handgun | 0 | 7 |
| Revolver | 0 | 4 |
| Pistol | 2 | 1 |
| SA Handgun | 4 | 3 |
| Shotgun | 0 | 1 |
| Rifle | 0 | 4 |
| SA rifle | 1 | 8 |
| Automatic rifle | 0 | 1 |
| Undetermined | 0 | 0 |
| Total | 7 | 29 |

23

USA00025631

Table 4: Poisson regression of public mass shooting counts

| Parameter | B | S.E | 95% Conf. Interval | | Hypothesis Test | | |
| | | | Lower | Upper | Wald $\chi^2$ | df | Sig. |
|---|---|---|---|---|---|---|---|
| (Intercept) | -3.535 | 0.4411 | -4.400 | -2.671 | 64.244 | 1 | 0.000 |
| Universal checks | -0.860 | 0.3445 | -1.535 | -0.185 | 6.233 | 1 | 0.013 |
| Homicide count | 0.000 | 0.0008 | -0.002 | 0.001 | 0.029 | 1 | 0.866 |
| Population (in mil) | 0.113 | 0.0425 | 0.029 | 0.196 | 7.040 | 1 | 0.008 |
| Year (since 2005) | 0.045 | 0.0358 | -0.025 | 0.116 | 1.596 | 1 | 0.206 |

Dependent Variable: Public mass shootings drawn from the Associated Press/USA Today/Northeastern University Mass Killing Database

24

CONFIDENTIAL
USA00025632

Appendix: List of Documents and Audio/Video Files Reviewed

| | |
|---|---|
| PEAK00000001 | |
| USA00005250 | 12.6.18 DoD OIG Report re Kelley (Unredacted).pdf |
| USA00012158 | El Paso Police Report (escape from MH Facility).pdf |
| USA00012797 | ATF Report of Investigation.pdf |
| USA00012857 | 2802-Devin Kelley Sexual Assault Report - Redacted.pdf |
| USA00012883 | EPCO_Court_10133.pdf |
| USA00013393 | US AFOSI CASE FILE 225-C-128-G-32329111651413.pdf |
| USA00014490 | FOUO-PII_Official_Personnel_File.pdf |
| USA00014681 | New Braunfels Police Dept documents for Devin Kelley.pdf |
| USA00014693 | (PA) Kelley PIF with Spreadsheet.pdf |
| USA00014962 | 9-12_FOUO-PII_Pretrial Allied Papers_USvKelley_unredacted.pdf |
| USA00015084 | [U-FOUO] 20180313 2 IGX to DoDIG Data Call 5 Atch 1.pdf |
| USA00015086 | 9-01_FOUO-PII_Charge Sheet_USvKelley_unredacted.pdf |
| USA00015094 | Kelley Confinement Release Record.pdf |
| USA00015241 | Danielle-Interview_Summary.pdf |
| USA00015247 | Comal County Sheriffs Criminal Offense Report.pdf |
| USA00015271 | Comal County Sheriff Notes.pdf |
| USA00015281 | 7_FOUO-PII_Official_Military_Personnel_File.pdf |
| USA00015363 | Case_14-10133.pdf |
| USA00015367 | WP Interview Rowe 29Jan18.pdf |
| USA00015374 | DoD CAF  Response to DoD IG (KELLEY) PORTFOLIO.pdf |
| USA00015523 | D Kelley Admission Form.pdf |
| USA00015525 | AFOSI CDI.pdf |
| USA00015641 | Kelley's DMDC Installation Access Record.pdf |
| USA00016126 | Kelley.Danielle.515 - Transcription Validated ML.pdf |
| USA00016281 | NAVCON MIRIMAR PRISONER EDUCATION SURVEY.pdf |
| USA00016362 | WP-Communication with DPS-20180208.pdf |
| USA00016393 |  (FOUO) AFSFC - Kelley Documents.pdf |
| USA00016902 | ROT (DO NOT DISSEMINATE WO JAJM PERMISSION).pdf |
| USA00021118 | Holloman Records - Devin Kelley.pdf |
| USA00021659 | FAP.pdf |
| USA00021723 | Kelley Video Redacted and Blurred.mp4 |
| USA00021724 | Devin Kelley Composition Notebook contents.pdf |
| USA00021823 | WP_Bizzack Interview scs.pdf |
| USA00021840 | Interview Thumbnail Brennaman.pdf |
| USA00021845 | Brennaman.MSV |
| USA00021846 | wolfe-d19.pdf |
| USA00021870 | Wolfe.MSV |
| USA00021871 | Kelley mental health records.pdf |

25

CONFIDENTIAL

| | |
|---|---|
| USA00022326 | Holloman Family Advocacy Records |
| USA00022625 | Bates FBI000001-000088-Part 1_Redacted.pdf |
| USA00022715 | Bates FBI000089-000280-Part 1_Redacted.pdf |
| USA00022907 | Bates FBI000281-000589-Part 2_Redacted.pdf |
| USA00023216 | Bates FBI000590-000600-Part 3_Redacted.pdf |
| USA00023227 | Bates FBI000601-000774-Part 4_Redacted.pdf |
| USA00023401 | Bates FBI000775-00849-1A Lead Summary_Redacted.pdf |
| USA00023478 | Bates FBI000850-001071-Serial Attachments_Redacted.pdf |
| USA00023702 | Bates FBI001072-001334-Serial Attachements-Redacted.pdf |
| USA00023966 | KINNUNEN Denial - 2009.pdf |
| USA00023977 | KINNUNEN Denial - 2004.pdf |
| USA00025482 | DDF-Protection Order.tif |
| USA00025485 | Kinnunen Criminal History Record Information 1-27-2020.pdf |
| USA00025499 | Kinnunen NTN 0LB08PY Case History.pdf |
| USA00025518 | Kinnunen NTN 1017G4JZT Case History State Submitted.pdf |
| USA00025527 | Kinnunen NTN 1D0HXLZ Case History.pdf |
| 18-1151-001035 | Danielle Kelley Affidavit (Dicks) |
| MARLOW00000001 | DKelley Chart.pdf |
| TXRANGERS00000048 | S-Springs Investigative Timeline and Overview.doc |
| TXRANGERS00000126 | 11-05-2017_11.17.46.4a_-_Verizon_E911_-_2_-_25_(Voice)_TS.WAV |
| TXRANGERS00000141 | 11-05-2017_11.35.30.2a_-_Verizon_E911_-_3_(Voice)_TS.WAV |
| TXRANGERS00006022 | Donald Brassfield.doc |
| TXRANGERS00006023 | FBI Timeline - DEVIN_KELLEY_SITREP_11-6-17_0400_v2 (3).pdf |
| TXRANGERS00006063 | SUTHERLAND SPRINGS - Timeline of Events (DRAFT) 12202017 - SB.xlsx |
| TXRANGERS00006158 | fox6now  11062017 - Texas church gunman threatened mother-in-law who attended church with text messages.pdf |
| TXRANGERS00006168 | fox6now  11062017 - What we know about Texas church shooter Devin Patrick Kelley.pdf |
| TXRANGERS00006175 | fox6now  11072017 - Sutherland Springs church shooting- What we know.pdf |
| TXRANGERS00006183 | fox6now  11112017 - Texas church shooting victims honored, funeral held.pdf |
| TXRANGERS00006192 | Map.jpg |
| TXRANGERS00006203 | Wikipedia - Sutherland_Springs_church_shooting.pdf |
| TXRANGERS00006232 | KELLEY-DEVIN SUMMARY REPORT CAROLYN.DEWITT.DPS.TEXAS.GOV.pdf |
| TXRANGERS00006400 | Leads Online - 20171207145725855.pdf |
| TXRANGERS00006403 | Post-It from HCT&F - 11-7-17.pdf |
| TXRANGERS00006404 | Receipt from 10-28-17 - HCT&F - 11-6-17.pdf |
| TXRANGERS00006415 | Girlfriends  (Lain).pdf |
| TXRANGERS00006484 | KELLEY - FB post (2).jpg |
| TXRANGERS00006541 | HEB Devin Kelley Store Hourly Interview Form.pdf |
| TXRANGERS00006580 | KELLEY (Summit Vacation and RV Resort Employment).pdf |

CONFIDENTIAL                                                                                          USA00025634

| | |
|---|---|
| TXRANGERS00006724 | TEW_2173 - New Braunfels Counseling Center 07202016.JPG |
| TXRANGERS00006725 | A1712001_ATTEND_COURSE_COMPLETE_output (TEA).rtf |
| TXRANGERS00006729 | Cibolo PD Case #16-00786 (supplements).pdf |
| TXRANGERS00006731 | Comal Co SO Report 13-06-3030.pdf |
| TXRANGERS00006748 | Comal Co SO Report 14-02-0169.pdf |
| TXRANGERS00006749 | Devin P Kelley.doc |
| TXRANGERS00006755 | DevinPKelley_NBISDrecords.pdf |
| TXRANGERS00006773 | KELLEY DEVIN P - 02121991 (NBISD).pdf |
| TXRANGERS00006777 | KELLEY TXCCH.pdf |
| TXRANGERS00006842 | KELLEY, Devin-11052017-Workup.pdf |
| TXRANGERS00006850 | KELLEY_CHL Applicant 06601054  (RSD).pdf |
| TXRANGERS00006866 | New Braunfels PD -1000000464 Juvenile Incident 01032010.pdf |
| TXRANGERS00006948 | Kelley-Levine investigation notes.pdf |
| TXRANGERS00007920 | MVI_0694_ENH.MP4 |
| TXRANGERS00010925 | Frank Palmeroy Interview 171219_0249.MP3 |
| TXRANGERS00010936 | 171106_004.MP3 |
| TXRANGERS00010939 | 1FCB09FC-FBA4-4C8D-9C72-E6AEC395319D |
| TXRANGERS00010940 | 4E044BAA-6A64-44A4-84CB-E5090D22E9CB.txt |
| TXRANGERS00010942 | 77F95BC5-6427-432A-A8D1-670E60C35357.txt |
| TXRANGERS00010943 | 044DA981-4425-473C-8F57-4C3E05D3AFE8.txt |
| TXRANGERS00010944 | 242DD7AD-5884-4CD0-A78A-870161720E95.txt |
| TXRANGERS00010945 | 7677A00D-9DAC-4CBF-A1E9-9C4427B30056.txt |
| TXRANGERS00010946 | 8990B552-FB16-45F0-AF92-DC2C80E88B0C.txt |
| TXRANGERS00010947 | 1108176C-E820-4130-9642-96EA554A0B7E.txt |
| TXRANGERS00010948 | BE191FA7-C776-4589-946C-A5347470CDA8.txt |
| TXRANGERS00010951 | CF38D6BB-FA4D-44BC-B98D-C29D18890C42.txt |
| TXRANGERS00010952 | F2D1ECAA-B580-4EEA-A06F-2769FC41D2DA.txt |
| TXRANGERS00010957 | IMG_5397.JPG |
| TXRANGERS00010958 | IMG_5398.JPG |
| TXRANGERS00010965 | IMG_5568.JPG |
| TXRANGERS00010967 | IMG_5594.JPG |
| TXRANGERS00010968 | IMG_5616.JPG |
| TXRANGERS00010969 | IMG_5726.JPG |
| TXRANGERS00010970 | IMG_5798.JPG |
| TXRANGERS00010971 | IMG_5801.JPG |
| TXRANGERS00010972 | IMG_5890.JPG |
| TXRANGERS00013174 | IMG_4365.JPG |
| TXRANGERS00013175 | IMG_4366.JPG |
| TXRANGERS00013183 | 2019_09_04_20_56_23.pdf |
| TXRANGERS00013230 | 2019_09_04_21_00_24.pdf |
| TXRANGERS00013241 | 2019_09_04_21_20_37.pdf |
| TXRANGERS00013443 | 2019_09_04_21_39_48.pdf |
| TXRANGERS00013497 | 2019_09_04_21_02_50.pdf |

CONFIDENTIAL

USA00025635

TXRANGERS00013807   2019_09_04_22_11_11.pdf
TXRANGERS00013814   2019_09_04_22_12_18.pdf
TXRANGERS00016636   tick46538205-tick46538484-video1.ts
TXRANGERS00016639   tick46538767-tick46539046-video1.ts
TXRANGERS00016640   tick46539047-tick46539326-video1.ts
TXRANGERS00016641   tick46539328-tick46539607-video1.ts
TXRANGERS00016642   tick46539608-tick46539887-video1.ts
TXRANGERS00016643   tick46539889-tick46540168-video1.ts
TXRANGERS00016644   tick46540169-tick46540449-video1.ts
TXRANGERS00016645   tick46540450-tick46540729-video1.ts
TXRANGERS00016646   tick46540731-tick46541010-video1.ts
TXRANGERS00016647   tick46541011-tick46541290-video1.ts
TXRANGERS00016648   tick46541293-tick46541571-video1.ts
TXRANGERS00016649   tick46541572-tick46541852-video1.ts
TXRANGERS00016650   tick46541853-tick46542132-video1.ts
TXRANGERS00016651   tick46542135-tick46542413-video1.ts
TXRANGERS00016652   tick46542414-tick46542694-video1.ts
TXRANGERS00016653   tick46542695-tick46542974-video1.ts
TXRANGERS00016654   tick46542975-tick46543255-video1.ts
TXRANGERS00016655   tick46543256-tick46543416-video1.ts
TXRANGERS00016656   KyleWorkman.MP3
TXRANGERS00016681   IMG_0044.JPG
TXRANGERS00016684   IMG_0047.JPG
TXRANGERS00016685   IMG_0048.JPG
TXRANGERS00016905   Stephen Willeford - By EVANS.WMA
TXRANGERS00046827   IMG_5451.JPG
TXRANGERS00046856   IMG_5493.JPG
TXRANGERS00046864   IMG_5519.JPG
TXRANGERS00046877   IMG_5533.JPG
TXRANGERS00046878   IMG_5534.JPG
TXRANGERS00046886   IMG_5549.JPG
TXRANGERS00046900   IMG_5572.JPG
TXRANGERS00046901   IMG_5573.JPG
TXRANGERS00046915   IMG_5592.JPG
TXRANGERS00047011   IMG_5837.JPG
TXRANGERS00047046   IMG_5895.JPG
TXRANGERS00048172   Danielle Kelley.doc
TXRANGERS00048173   Danielle Shieds 2018 Interview - SA Express News.docx
TXRANGERS00048210   Shooter Timing and Pauses Inside Church.doc
TXRANGERS00048211   Situation Report #2.docx
TXRANGERS00048213   Situation Report 1.docx
TXRANGERS00048216   Situation Report 3.docx
TXRANGERS00048655   IMG_1780.JPG

CONFIDENTIAL                                                                                    USA00025636

TXRANGERS00048827   OVERALL TIMELINE - SUTHERLAND SPRINGS - FINAL.pptx
TXRANGERS00049004   Rod Green and Michelle Shields interview.WMA
TXRANGERS00049089   Supplement 2.pdf
TXRANGERS00049224   Supplement #51.pdf
TXRANGERS00049323   Supplement #30.pdf
TXRANGERS00049338   Supplement #35.pdf
TXRANGERS00049353   Supplement #39.pdf
TXRANGERS00049355   Supplement #40.pdf
TXRANGERS00049380   Interview Kelley Family.pdf
TXRANGERS00049385   Ranger Mims consent to search.pdf
TXRANGERS00049417   Interview Charlotte Ann Hudson 11-8-2017.WMA
TXRANGERS00053246   0043@201711011327010.mpg
TXRANGERS00053247   0044@201711011326450.mpg
TXRANGERS00053248   2019_09_05_10_17_43.pdf
TXRANGERS00053377   2017I-TRF-50018811-S3-Kite.pdf
TXRANGERS00053379   2017I-TRF-50018811-S4-Kite.pdf
TXRANGERS00053381   2017I-TRF-50018811-S5-Kite.pdf
TXRANGERS00053577   2017I-TRF-50018797-S2-Hatfield.pdf
TXRANGERS00053580   2017I-TRF-50018787-Investigaion.pdf
TXRANGERS00053599   2017I-TRF-50018787-S3-Gideon.pdf
TXRANGERS00053601   2017I-TRF-50018787-S4-Pauska.pdf
TXRANGERS00053607   2017I-TRF-50018787-S5-Pauska.pdf
TXRANGERS00053617   2017I-TRF-50018852-S2_Mims.pdf
TXRANGERS00053631   2017I-TRF-50018852-S8_Mims.pdf
TXRANGERS00053635   2017I-TRF-50018852-S10_Mims.pdf
TXRANGERS00053638   2017I-TRF-50018852-S11_Mims.pdf
TXRANGERS00053641   2017I-TRF-50018852-S12_Mims.pdf
TXRANGERS00053649   2017I-TRF-50018624-S12-Russell.pdf
TXRANGERS00053652   2017I-TRF-50018624-S13-Russell.pdf
TXRANGERS00053663   2017I-TRF-50018624-S16-Barina.pdf
TXRANGERS00053667   2017I-TRF-50018624-S17-Evans.pdf
TXRANGERS00053669   2017I-TRF-50018624-S18-Evans.pdf
TXRANGERS00053671   2017I-TRF-50018624-S19-Evans.pdf
TXRANGERS00053675   2017I-TRF-50018624-S20-Mitchell.pdf
TXRANGERS00053678   2017I-TRF-50018624-S21-Kindell.pdf
TXRANGERS00053680   2017I-TRF-50018624-S22-Kindell.pdf
TXRANGERS00053688   2017I-TRF-50018624-S26-Rackley.pdf
TXRANGERS00053690   2017I-TRF-50018624-S27-Rackley.pdf
TXRANGERS00053694   2017I-TRF-50018624-S29-Rackley.pdf
TXRANGERS00053696   2017I-TRF-50018624-S2-Garcia.pdf
TXRANGERS00053710   2017I-TRF-50018624-S34-Duck.pdf
TXRANGERS00053732   2017I-TRF-50018624-S40-Snyder.pdf
TXRANGERS00053734   2017I-TRF-50018624-S41-Snyder.pdf

CONFIDENTIAL                                                                 USA00025637

TXRANGERS00053739   2017I-TRF-50018624-S43-Garcia.pdf
TXRANGERS00053741   2017I-TRF-50018624-S44-Garcia.pdf
TXRANGERS00053743   2017I-TRF-50018624-S45-Garcia.pdf
TXRANGERS00053746   2017I-TRF-50018624-S46-Wright-Pending Approval.pdf
TXRANGERS00053750   2017I-TRF-50018624-S5-Smith.pdf
TXRANGERS00053752   2017I-TRF-50018624-S6-Sanchez.pdf
TXRANGERS00053874   2017I-TRF-50018772-S51_Jeter.pdf
TXRANGERS00053902   171105_002.MP3
TXRANGERS00055323   2018_07_18_13_39_34.pdf
TXRANGERS00055325   2018_07_18_13_40_56.pdf
TXRANGERS00055329   2018_07_18_13_38_41.pdf
TXRANGERS00055330   2018_07_18_13_24_19.pdf
TXRANGERS00077465   tick46538485-tick46538765-video1.ts
TXRANGERS00077466   Retrieved Items from Kelley's Car.pdf
SS-002290           002290-002304 Webster Report.pdf
SS-002305           002305-002350 Webster CV.pdf
SS-002351           002351 Webster Fee Schedule & Testimony History.pdf
SS-002352           002352-002373 Youngner CV.pdf
SS-002374           002374 Youngner Fee Schedule.pdf
SS-002375           002375-002420 Rymer Report, CV & Attmts.pdf
SS-002421           002421-002525 Youngner Report w Attmts.pdf
                    Holcombe v. United States, 388 F.Supp.3d 777 (W.D. Tex. 2019)
                    Transcript: Deposition of Emily Willis
                    Transcript: Deposition of Candace Marlowe
                    Transcript: Deposition of Texas Rangers 30(b)(6), Terry Snyder
                    Amended Complaint in Holcombe v. United States, 5:18-cv-555, ECF
                    No.60
                    Findings of Fact and Conclusions of Law in Kristensen v. United States,
                    17-cv-126, ECF No. 105

CONFIDENTIAL                                                    USA00025638