IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JOE HOLCOMBE, et. al, | § | NO. 5:18-CV-00555-XR |
| | § | |
| Plaintiffs | § | Consolidated with: |
| | § | 5:18-cv-00712-XR (*Vidal*) |
| | § | 5:18-cv-00881-XR (*Uhl*) |
| vs. | § | 5:18-cv-00944-XR (*Ramsey*) |
| | § | 5:18-cv-00949-XR (*McNulty*) |
| UNITED STATES OF | § | 5:18-cv-00951-XR (*Wall*) |
| AMERICA, | § | 5:18-cv-01151-XR (*Amador*) |
| | § | 5:19-cv-00184-XR (*Brown*) |
| Defendant | § | 5:19-cv-00289-XR (*Ward*) |
| | § | 5:19-cv-00506-XR (*Workman*) |
| | § | 5:19-cv-00678-XR (*Colbath*) |
| | § | 5:19-cv-00691-XR (*Braden*) |
| | § | 5:19-cv-00706-XR (*Lookingbill*) |
| | § | 5:19-cv-00714-XR (*Solis*) |
| | § | 5:19-cv-00715-XR (*McKenzie*) |
| | § | 5:19-cv-00805-XR (*Curnow*) |
| | § | 5:19-cv-00705-XR (*Workman*) |
| | § | 5:19-cv-00806-XR (*Macias*) |

**DEFENDANT UNITED STATES' MOTION TO EXCLUDE
TESTIMONY OF PLAINTIFFS' EXPERT DANIEL WEBSTER**

Defendant United States of America, through undersigned counsel, moves this Court to

exclude the testimony of Plaintiffs' retained expert, Dr. Daniel Webster, an epidemiologist,

concerning issues of causation because his testimony in that regard fails to satisfy the standard

set forth under Fed. R. Evid. 702, and is not sufficiently reliable under *Daubert v. Merrell Dow

Pharm., Inc.*, 509 U.S. 579 (1993) and its progeny.  Dr. Webster's opinions should be excluded

because (1) the "analytical gap" between his opinions on cause-in-fact and foreseeability, and the

epidemiological research that he relies on for those opinions, is too great; (2) his deposition

testimony discussing Devin Kelley's state of mind and individual proclivities is not based in

epidemiological methods, and he is not qualified to provide an opinion outside of that area of

expertise; and (3) he failed to account for obvious alternative explanations and relied on insufficient data in developing his opinions.

## INTRODUCTION

On April 1, Plaintiffs designated Dr. Daniel Webster, Sc.D., M.P.H., as an expert in the areas of "Epidemiology of Firearm Violence, Public Health Policy, [and] Methodological Issues in Injury and Violence[.]"  (ECF No. 197.)  Dr. Webster is a researcher and academic based out of Johns Hopkins University in Baltimore, Maryland.  (ECF No. 206.)  According to Plaintiffs, "Dr. Webster will testify as to the epidemiological aspects of the Sutherland Springs shooting[,]" and the testimony is based on "epidemiological data and research[.]"  (*Id.*)

In his expert report, Dr. Webster purports to offer opinions on whether "gun violence" was "foreseeable" and whether the United States Air Force's acts or omissions "more likely than not" would have prevented Devin Patrick Kelley from purchasing firearms and killing 26 people at the First Baptist Church of Sutherland Springs.  (Ex. A, Expert Report at 14-15.)  Counsel for the United States took Dr. Webster's deposition on August 12.  (Ex. B, Webster Dep. Tr.)  The United States files this motion to exclude the testimony of Dr. Daniel Webster because his testimony does not meet the requirements of Fed. R. Evid. 702.

## STANDARD OF REVIEW

In order for expert testimony to be admissible, it must meet the requirements of Fed. R. Evid. 702.  The overarching purpose of Fed. R. Evid. 702 is to "ensure the expert uses reliable methods to reach his [or her] opinions, and those opinions [are] relevant to the facts of the case." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).  Rule 702 "requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case."  Fed. R. Evid. 702 advisory committee's notes, 192 F.R.D. 340, 421; *see Cano v. Everest*

*Minerals Corp.*, 362 F. Supp. 2d 814, 818 (W.D. Tex. 2005) (Rodriguez, J.) (citing Fed. R.

Evid. 702).  The party seeking to have expert testimony admitted has the burden to prove its

admissibility.  *See Cano*, 362 F. Supp. 2d at 818-19 (citing *Moore v. Ashland Chem. Inc.*,

151 F.3d 269, 276 (5th Cir. 1998)).

## ARGUMENT

### I.    Dr. Webster's Testimony Should Be Excluded Because There Is Too Great An Analytical Gap Between The Epidemiological Research That He Relies Upon and the Opinions That He Seeks To Offer in this Litigation.

Under Rule 702 and *Daubert*, expert testimony is admissible only if "there is an

adequate 'fit' between the data and the opinion proffered."  *Moore*, 151 F.3d at 276.

More generally, "[a]n expert's opinion must be supported to provide substantial

evidence."  *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005).  "A court may

conclude that there is simply too great an analytical gap between the data and the opinion

proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Under such

circumstances, the expert's opinions should be excluded.  *See id.* (affirming exclusion of

testimony where the four studies the expert cited did not provide adequate support for

the expert's conclusion); *see also Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355

(5th Cir. 2007) ("District courts must carefully analyze the studies on which experts rely

for their opinions before admitting their testimony.").

In order to prevail on liability on their negligent-undertaking theory, Plaintiffs must

establish proximate cause.  *See Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 405

(Tex. 1993) ("While [§ 323 of the Restatement (Second) of Torts] is the law in Texas . . . it does

not determine or suggest the appropriate standard of causation.").  Here, proximate cause

consists of two elements: foreseeability and cause-in-fact.  *Bustamante v. Ponte*, 529 S.W.3d

447, 456 (Tex. 2017).  The research that Daniel Webster cites concerning proximate cause does

not support – and in fact refutes – his opinions, and therefore his testimony on causation should be excluded.  *See Guile*, 422 F.3d at 227 ("[W]e look to the basis of the expert's opinion, and not the bare opinion alone.").

> ### A.   *The analytical gap between Dr. Webster's cause-in-fact opinion and the epidemiological research is too great.*

In proving cause-in-fact under Texas law, "a plaintiff cannot show that a defendant's negligence was more likely than not a cause of injury 'where the defendant's negligence deprived the tort victim of only a 50% or less chance of avoiding the ultimate harm.'" *Bustamante*, 529 S.W.3d at 456 (quoting *Kramer*, 858 S.W.2d at 400); *see Cano*, 362 F. Supp. 2d at 819 ("Plaintiffs must establish that it is more likely than not that Plaintiffs would not have suffered from their various cancers but for the Defendants' activities . . . .").  Accordingly, Plaintiffs must prove that there is a greater than 50% chance that Plaintiffs would not have been harmed if Devin Kelley's criminal history data would have come up in a background check when he attempted to purchase firearms at a federally-licensed firearms dealer ("FFL").

In his expert report, Dr. Webster cites two studies as support for his opinion that a background check at an FFL "more likely than not" would have prevented the mass shooting perpetrated by Devin Kelley.  (Ex. A, Report 10-12.)  The first study, a 2001 study by Dr. Garen Wintemute, *et al.*, used data for the three years following California's 1991 addition of a firearms prohibition for violent misdemeanants in order to compare violent misdemeanants between the ages of 21 and 34 who attempted to purchase a handgun and were denied to similarly-aged violent misdemeanants who had successfully purchased a handgun legally in 1989 or 1990, before the law was passed.  (Ex. C, Wintemute Study #1.)  The second study, on which Garen Wintemute was also an author, involved comparing subsequent criminal offenses between convicted felons who attempted to purchase handguns in 1977, but were denied, and persons who were permitted to purchase a handgun in 1977 because they had a criminal record that

contained at least one felony arrest, but no felony convictions.  (Ex. D, Wintemute Study #2.)  At his deposition, Dr. Webster acknowledged that no other study has examined the effectiveness of background checks using naturally-occurring control groups, as these two studies had done. (Ex., B, Dep. Tr. 235:14 – 236:15.)  However, these two studies are insufficient to support Dr. Webster's opinion on cause-in-fact here.

As a threshold matter, neither of these studies specifically address Kelly or his ability to obtain firearms from sources that did not require a background check.  Although there is significant scientific literature showing that prohibited persons routinely obtain firearms, Webster did not address that literature at all in his report.  (Ex. B, Dep. Tr. 220:8-16.)  As Defendant observed in its motion for summary judgment, Kelly had access (and previously had acquired) firearms from sources other than FFLs.  (ECF No. 256-1, U.S. memo. summ. J. 26-29.) These instances show Kelley's ability and willingness to obtain firearms outside of an FFL.  On the other hand, neither of the studies relied upon by Dr. Webster nor his report discuss that important factor.  In addition, these studies do not answer the question of which of the persons who are denied purchases at FFLs due to failed background checks are deterred from acquiring, or unable to acquire, firearms from other avenues.  There is simply too great an analytical gap between such generalized epidemiological studies and the individual circumstances here.

The limited relevance of these studies to the litigation here is evident in the studies themselves.  "It is inconsistent with the scientific method for an expert to rely selectively on portions of a study which support the conclusion he [or she] has been hired to provide, while ignoring significant portions of the study which contradict the desired conclusion."  *Camp v. Lockheed Martin Corp.*, No. CIV.A. H-97-1938, 1998 WL 966002, at *3 (S.D. Tex. Dec. 29, 1998) (citing *Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194, 195 n.4 (5th Cir. 1996)). Importantly, the authors to the second study found that with respect to at-risk persons with two

or more violent offense charges—a category into which Kelley fits—there was **no** statistically significant increased risk for future violence when at-risk persons purchased handguns at FFLs. (Ex. D, Study #2, p.89.)  Based on that result, the authors concluded that "Persons with 2 or more prior charges may have established a pattern of activity **unaffected by** denial of handgun purchase." (*Id.* (emphasis added).)  Kelley's acquisition of firearms through means other than FFLs and willingness to persist in attempting to purchase firearms even when denied (*see* Section IV, *infra*) show that he would not have been deterred if he had been denied due to a background check, consistent with the conclusion of the authors of this study.  Dr. Webster ignores the author's conclusion in his report, suggesting that his opinion is not an objective opinion based on the existing science, but rather an act of advocacy on behalf of Plaintiffs.

Further highlighting Dr. Webster's lack of disinterest, Dr. Webster neglects to discuss in his expert report perhaps the most pertinent study, his own research, which shows that background checks do not prevent mass shootings.  Indeed, Dr. Webster previously wrote in the published scientific literature that "comprehensive background checks . . . do not seem to be associated with the incidence of fatal mass shootings." (Ex. E, Webster Study, p.187.)  His article further states that "the conditions that facilitate or suppress lethal violence overall may not explain rare and especially lethal mass shooting events." (*Id.* at 188.)  The fact that he has offered opinions solely for purposes of litigation that are directly contrary to those he offered in the published scientific literature is an independent basis for exclusion of his opinions.  *See* Fed. R. Evid. 702 advisory committee's notes, 192 F.R.D. 340, 419 (observing that additional *Daubert* factors include "Whether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.") (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311.1317 (9th Cir. 1995)).

Moreover, even as to the abstract question of whether a background check system is capable of preventing individuals from obtaining firearms, the evidence Webster cites does not support his ultimate opinion.  Dr. Webster admits that the first study he cites found that denying the firearm purchase to violent misdemeanants reduced "future criminal offending involving firearms and/or violence" by 22%.  (Ex. B, Dep. Tr. 263:15 – 264:16).  According to Dr. Webster, the second study found a similar effect of a roughly 25% reduction when it compared the future criminality of those arrested or charged with felonies.  (*Id.* at 276:18 – 277:1.)  Consequently, according to Dr. Webster, these two studies, which involve denial for handgun purchases to individuals believed to be at high risk for gun violence, at best, demonstrate a roughly 25% reduction in future violent crime when comparing the future criminality of at-risk persons who were denied purchase of a firearm due to a background check to at-risk persons who were not denied purchase.  (*Id.; see also* Ex. B, Dep. Tr. 276:18 – 277:1) ("Q Would you agree that the studies show about a 25 percent reduction on violence based off denial of the purchase?  A Yes").  In order to meet the "more likely than not" standard for causation under Texas law, however, there must be a **greater than 50% probability** that a given cause led to a given effect.  By his own admission, the only scientific studies on the crime-prevention effects of background checks that Dr. Webster cites fail to meet this standard.  Accordingly, there is simply "too great an analytical gap" between the scientific evidence Dr. Webster cites and the opinion he offers.  *See Joiner*, 522 U.S. at 146.[1]

---

[1] As this Court has observed, even if expert testimony on causation were adequate to satisfy *Daubert*, there is no point in permitting such testimony if it cannot meet the causation standard under Texas law.  *See Cano*, 362 F. Supp. 2d at 821-22 ("If evidence is admissible under federal procedural law but fails to [satisfy] Texas substantive law, the Plaintiffs' victory on the admissibility question would be a hollow one, as the evidence would be deemed insufficient as a matter of law to survive summary judgment."); *see also Daubert*, 509 U.S. at 596 ("[If] the scintilla of evidence presented . . . is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free . . . to grant summary judgment[.]").

Even if the studies that Dr. Webster cites adequately dealt with the circumstances pertinent to Devin Kelley, and could meet the standard under Texas law of cause-in-fact, there are other reasons that they are not a reliable basis for his opinions here.  For example, Dr. Webster ignores that in the first study he relied upon, which involved misdemeanants, the authors "were unable to categorize crimes systematically as involving guns, violence, both, or neither[,]" and therefore conceded that they were "unable to study the specific effect of California's denial policy on risk of arrest for violent gun crimes."  (Ex. C, Study #1, p.1025.)  When asked about this during his deposition, Dr. Webster did not dispute that the study could not speak to the specific effect of the denial policy on future gun violence.  (Ex. B, Dep. Tr. 259:3 – 260:13.).  Because the authors could not tease out to what extent background checks deter non-violent gun crime, non-gun violence, and/or gun violence, the extent to which background checks deterred violent gun crime is not directly addressed in this study, and therefore it does not address the question presented in this litigation, even assuming research on misdemeanants was applicable in the case of a convicted felon who later commits a mass shooting like Kelley.

In addition, both studies involved handgun purchases, not assault rifles such as the weapon used by Kelley in the mass shooting here. (Ex. B, Dep. Tr. 151:8-12.) ("So I suspect not something particularly unusual among mass shooters is that they choose a semiautomatic assault rifle, it's built and designed to carry out acts of mass violence.").  Differences between those who attempt to purchase a handgun (which can be easily concealed) and those who attempt to purchase an assault rifle (which can potentially allow one to be more effective in a mass shooting) are yet another reason the studies do not support Dr. Webster's opinion concerning whether Kelley would have been deterred from committing the mass shooting.  For this reason, and the reasons stated above, the two studies are far too removed from Kelley's circumstances to

support any opinion that a background check "more likely than not" would have prevented him

from obtaining a firearm, and Dr. Webster's opinion in that regard is therefore unreliable.

### B. The analytical gap between Dr. Webster's foreseeability opinion and the epidemiological research is too great.

Finally, while it is dubious that Dr. Webster as an epidemiologist even has the requisite

qualifications to offer such opinions, his assertion that Mr. Kelley's violence was "foreseeable"

is likewise unreliable.  "Foreseeability requires that the injury complained of be of such a general

character as might reasonably have been anticipated from the defendant's conduct." *Skipper v.*

*United States*, 1 F.3d 349, 352 (5th Cir. 1993).  Relevant to whether harm was foreseeability is

whether the harm "was different in kind from that generally contemplated by the duty," and

whether there is "distance in time and location" from the breach of the duty. *Phan Son Van v.*

*Pena*, 990 S.W.2d 751, 755 (Tex. 1999).

Dr. Webster acknowledges that mass shootings like the one here are rare events that

cannot be accurately predicted.  (Ex. B, Dep. Tr. 52:8 – 53:15.).  Moreover, the research

Dr. Webster cites in his report with respect to foreseeability almost exclusively addresses matters

related to the foreseeability of intimate violence by domestic abusers.  (Ex. A, Report 6-8.)  As

he acknowledged during his deposition, the research concerns the risk of violence toward

intimate partners and their families (Ex. B, Dep. Tr. 99:10-14), and he was unaware of research

concerning domestic abusers' risk for other types of violence, such as violence against unknown

persons.  (*Id.* at 177:16 – 178:5.)  There is no connection between Kelley's domestic violence

convictions in the Air Force, and mass shootings generally or the mass shooting here, which was

not domestic violence.  Dr. Webster's opinions regarding the alleged foreseeability of Kelley's

crime are merely *ipse dixit* dressed up in the guise of expert opinion and therefore are

inadmissible.  *Joiner*, 522 U.S. at 146 ("Nothing in either *Daubert* or the Federal Rules of

Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Indeed, the studies themselves demonstrate that they are not a reliable basis for Dr. Webster's opinions.  For example, one of the studies characterizes domestic violence as a crime of impulsivity, rather than as a premeditated crime.  (Ex. F, Saltzman Study, p.3045.) ("[W]e find no evidence to suggest that a substantial proportion of fatal [acts of domestic violence] involve persons with such sustained, cold-blooded homicidal intent.  Indeed, studies of male batterers and anecdotal reports suggest that many [acts of domestic violence] (fatal and nonfatal) are a spontaneous response to conflict or anger and frequently occur without premeditation or planning.").  However, the mass shooting violence here was clearly premeditated.  (ECF No. 256-1, U.S. mem. summ. J. 24-26.)  The significant difference between the spontaneous, impulsive domestic violence that the Air Force was aware of and the calculated, deliberate violence perpetrated years later against unknown or little-known persons, demonstrates the huge analytical leap between the research Dr. Webster relies upon and his conclusion concerning the foreseeability of the violence here.  Because that "analytical gap" between Dr. Webster's opinions on foreseeability and cause-in-fact, and the research relied upon in reaching those opinions, is simply too large, Dr. Webster's opinions on causation are unreliable, and cannot meet the requirements of *Daubert* and Fed. R. Evid. 702.

II.     **Dr. Webster's Assertions Regarding Devin Kelley's Alleged Proclivities with Respect to Firearms Should Be Excluded Because They Are Speculative and Unsupported And Outside The Scope of His Expertise.**

In determining the connection between the expert's knowledge and her or his testimony, "the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'"  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *see* Fed. R. Evid. 702(c), (d).  "The district court's responsibility 'is to make certain that

an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Cano*, 362 F. Supp. 2d at 819 (citation omitted).  In other words, the court "must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Moore*, 151 F.3d at 278.  Even if an expert is qualified and a method is reliable, the method must still be properly applied to the facts consistent with that method.  *See Kumho Tire*, 526 U.S. at 156 ("The trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'") (citation omitted).

During his deposition, Dr. Webster made a variety of speculative assertions for why Kelley's denial at an FFL might have prevented the mass shooting.  These assertions all involved speculating as to why Kelley would not have utilized other means to acquire a firearm to commit the shooting, such as conjectures that Kelley was concerned about going to jail (Ex. B, Dep. Tr. 139:14-17; 147:1 – 148:4; 163:9-21; 167:5-12), wasn't comfortable purchasing firearms except through an FFL (*id.* at 142:11 – 143:4; 145:22 – 146:14; 149:8 – 150:3; 162:13 – 163:8), wanted reliable firearms (*id.* at 151:21 – 152:8), or that he preferred very specific firearms (*id. at* 142:11 – 143:4).  These conjectures are inconsistent with evidence that shows that Kelley did in fact acquire firearms through means other than an FFL and was not deterred when denied at an FFL. *See* Section IV, *infra*.  Regardless, these conjectures are not based on any specific statements that Kelley made to anyone or actions he took, and thus require Dr. Webster to opine as to Kelley's state of mind.  As an epidemiological researcher, Dr. Webster is in no position to do so, even if speculation regarding Kelley's state of mind were permissible expert testimony.  *See Hanan v. Crete Carrier Corp.*, No. 3:19-CV-0149-B, 2020 WL 584370, at *3 (N.D. Tex. Feb. 6, 2020)

("[A] trial court may strike expert testimony that evaluates a party's state of mind, as that evaluation is within the province of the [trier of fact].") (citation omitted).

Dr. Webster has been designated as an expert in the "Epidemiology of Firearm Violence[.]"  (ECF No. 206).  However, the speculative assertions he made during his deposition go well beyond "the epidemiological aspects of the Sutherland Springs Shooting," and are simply not based in "epidemiological data and research[.]"  (*Id.*)  Neither at his deposition nor in his report did Dr. Webster point to any research that demonstrates that any at-risk persons, let alone those at risk for committing mass violence, are deterred from seeking out firearms through avenues other than an FFL due to fear of prosecution, fear of gun deals gone wrong, a preference for new firearms, or any general unwillingness to acquire firearms through a means other than an FFL.[2]  Because Dr. Webster's assertions are not based on, or supported by, any epidemiological research, and indeed are not the proper subject of epidemiological testimony, his testimony on why Kelley would not have acquired a firearm elsewhere if denied at an FFL is unreliable and outside the scope of his expertise.

Instead of pointing to research, Dr. Webster resorts to general conjectures. (Ex. B, Dep. Tr. 162:10-12) ("How many people want to meet a stranger carrying an assault rifle when you're bringing hundreds of dollars of cash?")  He then claims that such conjecture would be true about Devin Kelley, testifying as if he had a window into Devin Kelley's mind.  These speculative

_____

[2] The one study that Webster did point to during his deposition is not relevant here. Dr. Webster cited a study he authored concerning acquisition of firearms through the underground market in Baltimore to support his argument about the importance of trust in a private sale of firearms.  (Ex. B, Dep. Tr. 145:11-21.)  This was a survey of men in Baltimore involved with the criminal-justice system about firearm acquisition.  (Ex. G, Crifasi Study.)  That study about criminals, who are likely connected to inner city Baltimore gangs, has little bearing on attitudes toward gun acquisition among those not involved in gangs, especially in the rural area outside San Antonio, Texas.

assertions regarding Kelley's state of mind have no basis in epidemiological research and tread into the territory of individual prediction, the domain of psychology and psychiatry.

Epidemiology is not field that specializes in the prediction of individual behavior (Ex. B, Dep. Tr. 57:10-12) ("A psychiatrist probably is more focused on can you predict accurately a particular outcome for a particular patient.").  Although epidemiologists such as Webster may study "individual risk factors" (*Id.* at 41:4 – 42:8), that is very different than predicting whether an individual will or will not engage in a particular behavior.  Through his 30 years as an epidemiological researcher, Webster has never had to predict individual behavior.  (*Id.* at 277:21 – 278:17; 59:4-7) ("I mean, before this case, have you had instances where you had to predict individual behavior? A That's not the nature of my job, no.").  Indeed, despite having conducted research regarding background checks at a policy level, Dr. Webster has never previously opined on whether a background check would be effective with respect to an individual.  (*Id.* at 63:4-8) ("Have you ever opined on -- previously on whether a background check -- whether a background check or entry of information to a background check system would have prevented violence before? A No.")  Although he has opined as an expert before, his opinions have almost exclusively addressed firearms policy matters.  (*Id.* at 60:20 – 61:13.)

As an epidemiologist, Dr. Webster lacks the qualifications to offer testimony on how Kelley's individual characteristics might have prevented him from seeking out firearms from other avenues if he had been denied at an FFL.  An expert may be well-qualified, but if an expert's qualifications "do not align with or support . . . [the expert's] causation testimony[,]" the expert is not qualified to testify in that regard.  *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016) (dicta); *see Edmonds v. Ill. Cent. Gulf R.R.*, 910 F.2d 1284, 1286-87 (5th Cir. 1990) (finding that expert in clinical psychology with expertise on the general

link between stress and illness could not offer the opinion that stress was the legal cause of plaintiff's coronary heart disease).

Dr. Webster indicated he is not an expert in psychology or social work (Ex B, Dep. Tr. 36:11-19), and he has had no training in clinical assessment (*id.* at 31:1-5). His experience and knowledge all concern epidemiological research. To the extent Dr. Webster's opinions go beyond that scientific discipline, and he seeks to predict the likelihood that an individual would commit violence by resorting to experience predicting based on individual characteristics (as a psychologist or psychiatrist might do), he is simply not qualified to provide that type of opinion, and thus that testimony is inadmissible under Fed. R. Evid. 702.

### III.   Dr. Webster's Failures to Account for Alternative Explanations and to Consider Key Evidence in Developing his Opinions Render His Testimony Unreliable.

Although Dr. Webster offered numerous explanations at his deposition about reasons about why Kelley would not have purchased a firearm to use in the mass shooting other than through an FFL, in his expert report, Dr. Webster fails to consider that Kelley had the ability to obtain firearms through alternative means and ignores relevant evidence indicating that he would not have been deterred. If an expert opines on causation, "a necessary ingredient [to the expert's testimony] is the exclusion of alternative causes." *Michaels v. Avitech, Inc.*, 202 F.3d 746, 753 (5th Cir. 2000); *see* Fed. R. Evid. 702 advisory committee's notes, 192 F.R.D. 340, 419 (observing that additional *Daubert* factors include "whether the expert has adequately accounted for obvious alternative explanations[.]").

Dr. Webster has failed to conduct such an analysis here. For example, when pressed at his deposition, Webster acknowledged that there are "a lot of avenues through which a prohibited person can get firearm[,]" (Ex. B, Dep. Tr. 142:5-10; 138:6-13), and that persons who are determined and have resources can obtain firearms regardless of whether they are prohibited (*id.* at 60:9-20). Dr. Webster also did not dispute research showing that persons are often willing

to sell firearms to persons even when they know or should know the person is prohibited from owning a firearm. (*Id.* at 143:18 - 144:10; 207:18 – 209:7; *see also* Ex. H, Wintemute Review, p.1706) ("In a study of private-party sales at gun shows, undercover investigators found that nearly two-thirds of sellers proceeded with a sale despite having reasonable cause to believe they were selling to a prohibited person . . . . [In another study,] [u]ndercover investigators found that 62 percent of online firearm sellers were willing to sell to buyers who had said they would probably fail a background check."). Indeed, an article upon which Dr. Webster relies in his report make clear that "an unregulated private-party market creates an open channel for the acquisition of firearms by prohibited persons and purchasers with criminal intent[.]" (Ex. H, Review, p.1708.) Nonetheless, Dr. Webster failed to consider these alternatives.

Indeed, Dr. Webster did not even consider key documents that would have been necessary to assess in order to conduct such an analysis, rendering an opinion that was therefore not "based on sufficient facts or data[.]" Fed. R. Evid. 702(b). "Where an expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009); *see 360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*, No. A-14-CA-00847-SS, 2016 WL 6075566, at *4 (W.D. Tex. Apr. 22, 2016) ("Experts cannot ignore relevant evidence by cherry-picking the facts which conform to a desired outcome.").

For example, although Dr. Webster reviewed ATF Forms 4473 showing that Kelley did purchase firearms from FFLs (ECF No. 206), he did not review documents, such as those provided by the Texas Rangers, showing that Kelley had access to guns through means other than an FFL.[3]  Likewise, he did not review Danielle Smith's interview with the DODIG in which

---

[3] Plaintiffs had access to the Texas Rangers files through their state-court litigation with Academy, Ltd., and Dr. Webster had access to at least one of the Rangers documents, as he cited at least one Rangers document in his report. (Ex. A, Report 15, n.28.)

she stated that Kelley bartered for a shotgun and bought a handgun from a friend.  (ECF No. 256-19.)  Nor did he review Danielle Smith's statement concerning attempt to purchase an AR 556 at DICK's sporting goods, indicating that while Kelley was not allowed to make that purchase because of his Colorado license, he persisted in obtaining the AR 556 rifle used to commit the shooting.  (ECF No. 256-13.)  Instead of reviewing key documents contrary to his opinion in this litigation, it appears that Dr. Webster was only provided selected documents consistent with Plaintiffs' theory of the case.  For this reason, Dr. Webster's opinions are unreliable and should be excluded.

## **<u>CONCLUSION</u>**

For the reasons stated and upon the authorities cited, the United States respectfully requests this Court exclude the testimony of Dr. Daniel Webster on the issue of causation.

Dated: August 31, 2020                              Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division

JOHN F. BASH
United States Attorney

STEPHEN E. HANDLER
Senior Trial Counsel, Torts Branch
Civil Division

 */s/ Austin L. Furman*
PAUL DAVID STERN
AUSTIN L. FURMAN
JOCELYN KRIEGER
DANIEL P. CHUNG
Trial Attorneys, Torts Branch
Civil Division
United States Department of Justice

Attorneys for Defendant
UNITED STATES OF AMERICA

## CERTIFICATE OF SERVICE

I certify that on August 31, 2020, I electronically filed the foregoing with the clerk of court by using the CM/ECF system, and that all counsel of record have received notice and been served through that system.

*/s/ Austin L. Furman*
AUSTIN L. FURMAN
Trial Attorney, Torts Branch
