# Ex. A

# JOHNS HOPKINS UNIVERSITY

Bloomberg School of Public Health
Johns Hopkins Center for Gun Policy and
Research
624 North Broadway, 5th Floor
Baltimore, Maryland 21205-1996
410-955-0440

Tom Jacob
Whitehurst, Harkness, Brees, Cheng, Alsaffar, Higginbotham & Jacob, PLLC
7500 Rialto Blvd.
Building 2, Suite 250
Austin, TX  78735

March 31, 2020

Dear Mr. Jacob:

I have been retained as an expert by your firm to analyze, from my perspective, the U.S. Air Force for its failure to submit records to the FBI concerning criminal convictions of Airman Devin P. Kelley for committing serious acts of domestic violence against his wife and child during a 10-month period between 23 June 2011 and 27 April 2012.

**Relevant Credentials**

I am a Bloomberg Professor of American Health in Violence Prevention and Director of the Johns Hopkins Center for Gun Policy and Research at the Johns Hopkins Bloomberg School of Public Health. I previously served as Deputy Director for Research and Co-Director search at the Center for the Prevention of Youth Violence and headed the Johns Hopkins-Baltimore Collaborative for Violence

1

Reduction, a technical assistance and applied research support to the Baltimore Police Department and the State's Attorney for Baltimore City.

I began my career in public safety research in 1985 as a Research Associate at the University of Michigan's School of Public Health directing ground-breaking research on the association between alcohol use patterns of parents and their offspring during adulthood as part of longitudinal community health cohort study. I have devoted most of my research since then on studies relevant to firearm-related violence, suicides, and injuries from unintentional shootings. I have a Master of Public Health degree from the University of Michigan (1985) and a doctorate in Health Policy and Management from the Johns Hopkins School of Public Health (1991). This graduate training included many advanced courses in epidemiology, research methods, statistical analysis, economics, and sociology.

Immediately prior to joining the faculty at Johns Hopkins, I directed a program on violence research at the Washington Hospital Center in Washington, DC. I joined the faculty of the Johns Hopkins School of Public Health in 1992, and since 2010 have been a tenured Professor of Health Policy and Management with a joint appointment in the School of Education's Division of Public Safety Leadership. I teach graduate courses on violence prevention. Previously, I taught courses in research and evaluation methods at Johns Hopkins. I serve on the steering committee of a pre- and post-doctoral training program in violence prevention research funded by the National Institutes of Health and as core faculty on a NIH funded pre- and post-doctoral research program in drug dependence epidemiology.

I have directed numerous studies related to gun violence and its prevention including many studies that examine firearms and youth. I have published 128 articles in scientific, peer-reviewed journals and an additional 8 invited commentaries in scientific journals. I've also authored 12 book

SSS-002291

chapters and 24 reports. The vast majority of these publications addressed some aspect of violence and/or firearm injuries and their prevention. I am the lead editor of a book entitled <u>Reducing Gun Violence in America: Informing Policy with Evidence and Analysis</u> by Johns Hopkins University Press (2013). In addition, I served as special editor or co-editor of three special issues on gun violence for top tier public health journals – Epidemiologic Reviews, Preventive Medicine, and Annual Reviews in Public Health. My curriculum vita, detailing these publications, is attached.

Relevant to this case, prior to my research career, I was a social worker for Kentucky's Department of Social Services in charge of the DSS office in Gallatin County office where I handled all cases of suspected child maltreatment and domestic violence.

The Johns Hopkins Center for Gun Policy and Research was established in 1995 to conduct rigorous research into gun policy questions, look objectively at all available data, and analyze and report the results. Where the data and research, considered objectively, support a policy, we say so. Where the data and research do not support the efficacy of a particular policy, we say that as well. Our goal is not to advance any specific policy or agenda, but to use data and research to inform public policy decisions.

For a full listing of my qualifications and background, please see my CV, which I have attached and incorporated into this report.

In the past four years, I have testified as an expert in the following cases:

1. Rocky Mountain Gun Owners v. Hickenlooper, Case No. 13CV33879, (City & Cty. of Denver Dist. Ct.)
2. Cook v. Hickenlooper, Civil Action No. 13-CV-1300-MSK-MJW (D. Colo.)
3. Kolbe v O'Malley, No.: 1:13-cv-02841-CCB (D. Md.)

3

In this report I will review data and research that demonstrates that access to firearms by individuals with a history of domestic violence and suicidality greatly increases the risk that those individuals will commit serious acts of violence including homicide, and fatal mass shootings.  I will also review research that demonstrates that denials of applications to purchase firearms due to the applicant's history of violence, other criminal acts, or threatening behaviors resulting from mental illness reduce the risk of the applicant's risk of committing acts of violence.

All of the opinions I have reached in this report are to a reasonable degree of certainty. I should I be given access to further documents or asked additional, I reserve the right to supplement these opinions.

**Devin P. Kelley's History Relevant to Risk of Serious Violent Behavior Including Homicide**

Airman First Class Devin P. Kelley was charged and plead guilty of serious acts of domestic violence including aggravated assault against his wife and an assault against his stepson that resulted in serious injuries resulting in hospitalization. In addition, Kelley was charged with threatening his wife with a firearm. This charge was dismissed as part of an agreement that he plead guilty to other charges of physical assault against his wife and stepson. These charges were both felony charges and domestic violence charges; either or both of which would have prevented him under the law from possessing a firearm.[1] The specifics of his physical and emotional abuse against his first wife, Tessa Kelley, included attempts to strangle her, "waterboard" her, kick her, sexual assault, and threaten her with a loaded firearm. Devin P. Kelley had a history of violence, including sexual violence, against girls and women dating back to adolescence that included a variety of methods of coercive control common in the most

---

[1] Devin Kelley Report of Trial (Nov. 7, 2012) (USA12947-48); (USA00012877-82)

4

dangerous perpetrators of domestic violence. He had a history of mental and personality disorders, including antisocial behavior disorder, and was suicidal.[2] There are multiple examples of this, including the following non-exhaustive list:

- His Air Force Supervisor was so uneasy with Devin Kelley, that she told her supervisor "We need to watch this guy cause he's the kind of person who will come in and shoot everybody."[3]

- Another supervisor stated that Kelley had a history of animal abuse and a "Perverse fascination with mass shootings." Before the shooting, Kelley told the Staff Sgt. That "After the S.C. church shooting, he wanted to do something like that."[4]

- Within the Air Force Office of Investigations File, an Affidavit for Search and Seizure recounts that Mr. Kelley not only threatened his wife, but stated "If the cops show up at my door, I will shoot them" and "my work is so lucky I do not have a shotgun because I would go in there and shoot everyone."[5]

- Devin Kelley's Psych Assessment described a "Severe Problem" with control, including anger and violence, and placed him in the Maximum Risk Range for potential violence.[6]

- During Kelley's time in the Air Force, his superiors were so concerned with Kelley, that they initiated a "High Risk for Violence Response Team." This is a "multi-disciplinary team that is initiated and chaired by the Family Advocacy Officer when members of a family unit may be imminent danger of being harmed by other family members or there is a concern of impending violence in the unit environment."[7]

- While confined to Peak Behavioral Health Services, but before Kelley escaped, Computer results showed that Kelley had been searching for weapons, body armor, and transport to San Antonio and lodging.[8]

---

[2] See generally Dep't of Defense Inspector General (2018) Report of the Investigation into the United State Air Force's Failure to Submit Devin Kelley's Criminal History Information to the Federal Bureau of Investigation, No. DODIG-2019-030
[3] Interview Thumbnail, Mrs. Valerie Lynn Rowe (Jan. 18, 2018) (USA00015367-70).
[4] Notes from FBI Interview on page USA00022632 (USA00022625-14), USA00022911 (USA00022907-23215)
[5] Air Force Criminal File, Devin Kelley on page USA00013998. (USA00013393-14181)
[6] Air Force Criminal File, Devin Kelley on page USA00013984. (USA00013393-14181)
[7] Interview Thumbnail, Col. Owen W. Tullos, on page USA00015868 (USA00015868-69).
[8] Air Force Kelley Investigative File, on page USA00013991 (USA00013393-14181).

5

**Predicting Future Violence – the Role of Prior Violence and Access to Firearms**

**Research on Risks Factors for Domestic Homicide**

Devin P. Kelley had many risk factors for committing fatal abuse against an intimate partner. I was the second author of a case-control study to identify risk and protective factors for lethal outcomes for women who suffered physical violence by a current or former intimate partner with data from 11 geographically diverse cities in the United States that was published in *American Journal of Public Health* in 2003.[9] The cases were 220 homicides of women who were murdered by a current or former intimate partner. The controls were 343 women ages 18 to 50 years old from these same 11 cities identified via a random-digit dial phone survey who were currently in or recently in an intimate relationship with someone who was physically abusive toward them. Data on potential risk or protective factors for the cases were obtained from proxy informants who were close to the deceased victim and had knowledge of the circumstances surrounding the victim's relationship with her abuser. Although we performed a series of regression analyses designed to ascertain the independent relationships between the variables of interest, the basic bi-variate relationships are particularly important when it comes to predicting those most at risk. Our bi-variate analyses showed that, compared with women who experienced nonfatal intimate partner violence, women who were murdered by their (ex)partners were more likely to have experienced at the hand of their abuser prior attempts to "choke" or strangle (56.4% vs. 9.9%), forced sex (57.1% vs. 14.9%), threats with a lethal weapon (55.3% vs. 4.7%), threat to kill her (73.6% vs. 14.6%) and her family (33.8% vs. 7.6%), threats to harm her child (18.5% vs. 1.2%), and highly controlling

---

[9] Campbell JC, Webster DW, Koziol-McLain J, et al. (2003) Risk factors for femicide within physically abusive intimate relationships: Results from a multi-site case control study. *American Journal of Public Health* 93:1089-97.

6

behavior (65.9% vs. 24.5%). Lethal cases were also distinguished from nonfatal cases of intimate partner violence by the abuser having previously been arrested for a violent crime (21.8% vs. 11.5%) and alcohol abuse (52.0% vs. 30.9%). A related study in which we looked at factors associated with intimate partner femicides that also resulted in the homicide perpetrator then committing suicide found similar risk factors in addition to prior threats of suicide by the abusive partner (100% vs. 10.4%).[10] Each of these relationships were highly statistically significant suggesting that the differences are very unlikely due to chance. Individuals receiving inpatient treatment for psychiatric/mental health are at substantially higher risk of committing acts of violence in comparison to others with no such disorders.[11] Furthermore, many of these factors – male violence against female intimate partners, sexual violence, threats to kill, and suicidality – are common among those who commit mass shootings.[12,13]

Each of these risk factors for violence, including lethal violence, existed in Devin P. Kelley's case prior to his purchasing a Sig Sauer P250, a 9-millimeter, semi-automatic handgun and a box of ammunition from the HAFB Base Exchange on April 12, 2012, prior to his purchasing a 9 mm semi-automatic handgun and a box of ammunition from HAFB Base Exchange on June 14, 2012. They also existed after his conviction for felony domestic violence against his wife, Tessa Kelley, and stepson on

---

[10] Koziol-McLain J, Webster DW, MacFarlane J, Block CR, Glass N, Campbell JC. (2006) Risk factors for femicide-suicide in abusive relationships: results from a multi-site case control study. *Violence & Victims* 21:3-21.

[11] Swanson, Jeffrey W. (1994) "Mental Disorder, Substance Abuse, and Community Violence: An epidemiological approach." In *Violence and Mental Disorder*, J. Monahan and H. Steadman, eds.  Chicago: University of Chicago Press.

[12] Zeoli AM, Paruk JK.  (2020) Potential to prevent mass shootings through domestic violence firearm restrictions. *Criminology & Public Policy* 19:129-145. **https://doi.org/10.1111/1745-9133.12475**

[13] Peterson J, Densley J. Op-Ed: "We have studied every mass shooting since 1966. Here's what we've learned about the shooters." *The Los Angeles Times*. 4 August 2019. https://www.latimes.com/opinion/story/2019-08-04/el-paso-dayton-gilroy-mass-shooters-data

7

SSS-002296

November 7, 2012 that are disqualifying conditions for legal purchase and possession of a firearm based on federal law.  These risk factors for lethal violence and conditions for legal prohibition from purchasing or possessing firearms existed prior to Kelley's subsequently purchased 9 mm semi-automatic handgun on December 22, 2014; the Ruger .357 revolver on June 26, 2015, both from Specialty Sports and Supplies in Colorado Springs, Colorado,; and a Ruger AR-566-millimeter semi-automatic rifle from Academy Sports and Outdoors in San Antonio, Texas on April 7, 2016.

**Access to Firearms and Risk of Violence among those with a History of Violence**

The previously mentioned 11-city case-control study of risk factors for intimate partner femicide among those who were in intimate relationships with histories of physical violence (Campbell, Webster, Koziol-McLain et al., 2003) included a series of regression analyses designed to derive the independent associations between a long list of hypothesized risk and protective factors for lethal domestic violence. The factor with the largest adjusted odds ratio for increased risk for intimate partner femicide was the abuser's access to a firearm.  After controlling for other risk and protective factors, the abuser's access to a firearm increased the odds of intimate partner homicide by a factor of 5.38 above what would be expected if the abuser did not have access to a firearm.[14] This translates to a 438 percent higher risk of intimate partner femicide due to the abuser's access to a firearm among couples with a male-on-female history of violence. In our study that looked at risk factors for intimate partner femicide followed by perpetrator suicide, we found that the abuser's access to a firearm was associated with a 13-fold increase in risk compared to abusers who did not have firearms after controlling for other risk and

---

[14] Campbell et al. 2003

8

protective factors.[15] Although we did not examine the subset of cases that resulted in multiple-victim deaths in our 11-city study, a study of domestic homicide in North Carolina found that if an intimate partner homicide was committed with a firearm, the offender was twice as likely to kill multiple victims than if the offender used a different weapon.[16] These strong independent associations between a domestic violence perpetrator's access to and use of firearms is consistent with other studies linking access to [17,18] and use of firearms [19] and lethal violence.

Beyond research specific to domestic violence, there is evidence that access to firearms by those with a history of violence is associated with increased risk for future violence by those who acquire firearms legally. Renown gun violence researcher and emergency medicine physician Garen Wintemute has led several studies of individuals who legally purchased handguns in California or attempted to purchase handguns in California but were denied due to legal prohibitions.  The first study included data on 5,923 authorized purchasers of handguns ages 21 to 49 years who purchased handguns in 1977. Analyzing 15 years of follow-up data after the purchases, those who had previously been convicted of a violent misdemeanor (which in 1977 did not disqualify someone from legal purchase of a firearm) were

---

[15] Koziol-McLain et al., 2006.

[16] Smucker, S., Kerber, R. E., & Cook, P. J. (2018). Suicide and additional homicides associated with intimate partner homicide: North Carolina 2004–2013. *Journal of Urban Health*, **95**, 337–343.

[17] Bailey JA, Kellerman A, Somes G, Banton J, Rivara F, Rushforth N.  (1997) Risk factors for violent death of women in the home. *Archives of Internal Medicine* 157:777-782.

[18] Kellerman A., Rivara F, Rushforth N, et al. (1993) Gun ownership as a risk factor for homicide in the home.  *New England Journal of Medicine* 329:1084-1091.

[19] Saltzman LE, Mercy JA, O'Carroll P, Rosenberg M, Rhodes P.  Weapon involvement and injury outcomes in family and intimate assaults. *JAMA* 267:3043-3047.

9

9 times more likely to subsequently be arrested and charged with felony violence than were handgun purchasers with no criminal history.[20]

**Effects of Denials for Firearm Purchasers to Prohibited Persons**

In 1991, California added violent misdemeanors to the list of conditions that prohibited an individual from legally purchasing a firearm for a period of 10 years. Wintemute and colleagues studied the criminal records of 927 persons ages 21 to 34 years who attempted to purchase a handgun in California who had prior convictions for violent misdemeanors and compared their subsequent criminal offending over a three-year period. The comparison group were 787 persons who had prior convictions for misdemeanor violence but legally purchased handguns in 1989 or 1990 and were of the same age range as the group denied in 1991.  After controlling for age, sex, and prior criminal history, being approved to purchase a handgun (despite a history of violence) was associated with a 29% higher rate of future criminal offending involving firearms and/or violence than being denied for handgun purchase. There was no association between being approved to purchase a handgun versus denied and future criminal offending that did not involve firearms or violence.[21] The specificity of the association to crimes of violence and/or crimes involving weapons and not other crimes bolsters the case for inferring that

---

[20] Wintemute GJ, Drake CM, Beaumont JJ, Wright MA, Parham CA.  (1998) Prior misdemeanor convictions as a risk factor for later violent and firearm-related criminal activity among authorized purchasers of handguns. *JAMA* 280: 2083-2087.

[21] Wintemute GJ, Wright MA, Drake CM, Beaumont JJ. (2001) Subsequent criminal activity among violent misdemeanants who seek to purchase handguns: risk factors and effectiveness of denying handgun purchase. *JAMA* 285:1019-1026.

SSS-002299

there is a causal connection between a person with a violent history being denied when they attempt to purchase a firearm and the probability of future violence.

Using some of the similar data and research design from California, Wright and colleagues examined subsequent criminal offending among 177 individuals who attempted to purchase handguns in 1977 but were denied due to prior felony convictions and 2,470 persons who legally purchased handguns in 1977 and had prior records that included felony arrests (but no felony convictions).[22] In analyses that adjusted for the nature and extent of prior criminal history and age group, those who were allowed to legally purchase handguns had rates of future arrests for crimes involving firearms and/or violence that were 10 percent to 30 percent higher than those who were denied due to a prior felony conviction.

I co-authored a study with Dr. April Zeoli and others that was published in *American Journal of Epidemiology* that was designed to understand the impact of firearm restrictions on population-level rates of intimate partner homicide using data for the years 1980-2013 for 45 states with complete data. We found that laws restricting violent misdemeanants from purchasing firearms were associated with a 23 percent lower rate of intimate partner homicide and the federal law that made domestic battery convictions a prohibiting condition for firearm purchase were associated with a 9 percent lower rate intimate partner homicide by firearms.[23] Both these associations were statistically significant after

---

[22] Wright MA, Wintemute GJ, Rivara FP. (1999) Effectiveness of denial of handgun purchase to persons believed to be at high risk for firearm violence. *American Journal of Public Health* 89:88-90.

[23] Zeoli AM, McCourt A, Buggs S, Lilley D, Frattaroli S, Webster DW. (2018) Analysis of the strength of legal firearms restrictions for perpetrators of domestic violence and their impact on intimate partner homicide. *American Journal of Epidemiology* 187(11):2365–2371. doi: 10.1093/aje/kwy174.

11

controlling for the effects of other firearms laws and other factors such as demographic differences, economic indicators, rates of homicides by non-intimate-partners, police per capita, federal funding for domestic violence prevention, and a proxy for the prevalence of gun ownership. This study also found that firearm restrictions for domestic violence restraining orders were associated with significant reductions in intimate partner homicide and the larger the group covered by the restriction, the larger the protective effect of the firearm restriction.

**Importance of Complete Records on Prohibiting Conditions for Background Checks of Firearm Purchasers**

Most of the studies above with evidence supporting the contention that denying prohibited persons with a history of violence from legal firearm purchase leads to reduced risk of violence, including lethal violence are premised on the records for prohibiting conditions being accessible to the FBI and/or state law enforcement agencies charged with vetting potential purchasers of firearms. But Garen Wintemute has made a strong case for the importance of complete records for background checks to identify individuals with prohibiting conditions and documented how records for prohibiting conditions have often not been available to the FBI for screening firearms purchasers.[24] One study examined the effects of Connecticut beginning in 2007 to report its mental health records on events that led to legal restrictions for firearms possession to the FBI's NICS.  By 2014, there were nearly 14,000 mental health records for prohibiting conditions submitted by Connecticut to the NICS.  Using records from the mental health system and the courts to determine the prohibited status of individuals who

---

[24] Wintemute GJ. (2019) Background Checks for Firearm Purchases: Problems and Recommendations to Improve Effectiveness.  *Health Affairs* doi: 10.1377/hlthaff.2019.00671

12

were charged with violent crimes in the state from January 2002 through December 2009, Swanson and colleagues tested the effect of reporting mental health records for disqualifying events in 2007 by contrasting the rate of offending by individuals whose mental health and criminal records indicated were disqualified from possessing a firearm solely due to mental health prohibitors before and after the state reported the records to the NICS.  Violent offending by the affected group declined from 6.7 percent prior to 2007 to 3.2 percent after 2007, a rate that is 52 percent lower than the period before Connecticut began submitting relevant mental health records to the NICS.[25]

**Conclusion**

Based on available research, I believe that there is strong evidence that prior history of serious intimate partner violence including sexual violence, suicidality, alcohol abuse, and serious mental health problems are risk factors future violence including lethal violence. The data also indicate that among individuals with a history of violence, access to firearms increases their risks of committing violence including acts of lethal violence.  Denying violent individuals from purchasing firearms from licensed gun dealers reduces the risk of criminal offending involving firearms and/or violence. Firearm prohibitions for individuals with a history of violence saves lives, but the ability of firearm laws to reduce violence including homicides is limited by failures to report records to the NICS that reveal prohibiting conditions for individuals with a history of serious violence.

---

[25] Swanson JW, Robertson AG, Friseman LK, Norko MA, Lin HJ, Swartz MS, Cook PJ.  (2013) Preventing gun violence involving people with serious mental illness.  Pages 33-51 in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis.* DW Webster and JS Vernick, eds. Baltimore: Johns Hopkins University Press.

13

In this case, it is more likely than not, based on the above research and my background, had the United States Air Force or Department of Defense reported the relevant disqualifying information concerning Devin Kelley to the FBI, that would have prevented Kelley's ability to purchase firearms and his ability to kill 26 people at the First Baptist Church of Sutherland Springs. As stated in the IG Report:

> If Kelley's fingerprints were submitted to the FBI, he would have been prohibited from purchasing a firearm from a licensed firearms dealer. Because his fingerprints were not submitted to the FBI CJIS Division, Kelley was able to purchase firearms, which he used to kill 26 people at the First Baptist Church of Sutherland Springs on November 5, 2017.[26]

Likewise, I reviewed testimony of various individuals to Congress, including the Inspector General and Secretary of the Air Force, who also testified under oath similarly.

I also reviewed the deposition of Ms. Kimberley Del Greco, a representative of the FBI. She testified under oath that if the FBI had a record of a felony conviction or crime of domestic violence, that is an instant denial. (pg. 81-82). The vast majority of denials in the NICS system are for felony convictions (pg. 85). And the NICS responds to call-based background checks within 20 seconds and electronic background checks—such as a check for the Ruger AR rifle—in less than a third of that time (pg. 49). In fact, when an FFL does a firearms background search, the NICS was able to give an immediate response ("deny" or "proceed") in approximately 90% of the millions of background searches (pg. 45-50). Further, once Kelley is denied a firearm, the NCIC places his information in the denied persons file, which is an automatic denial for future purchases. (pg. 56-57)

---

[26] USA00005255 (DODIG-2019-030)

14

Following Kelley's release, Kelley attempted to purchase a firearm on Dec. 22, 2014.[27] Had the United States agencies submitted Kelley's offenses to the FBI, the e-Check would have returned "Deny" instead of "Proceed." Kelley would have been denied that firearm and all future firearms, including the Ruger AR Rifle, and Kelley's false answers on the ATF Form 4473 would have subjected Kelley to fine or imprisonment.

Finally, given Kelley's history of domestic violence and his history of threats and conduct, and the fact that he targeted the church his wife's family attended[28], it was or should have been foreseeable to the United States that Kelley would commit gun violence. Based upon the set of facts in this case and the available research evidence, I believe that the U.S. Air Force's failure to follow protocols and ensure that Devin Kelley's records of convictions for felony domestic violence were sent to the FBI's NICS enabled him to acquire firearms and greatly increased the likelihood that he could carry out a horrific mass shooting that included 26 victims murdered.

*Daniel W. Webster* (signature)

Daniel W. Webster, Sc.D., M.P.H.

1.

---

[27] Kelley Firearms Transfer Record, ATF Form 4473 (Dec. 22, 2014)
[28] Texas Rangers, Texas Department of Public Safety, Supplemental Report, Interview of Kelley Family

15

SSS-002304