# Ex. B

**1**

```
 1        THE UNITED STATES DISTRICT COURT
 2      FOR THE WESTERN DISTRICT OF TEXAS
 3              SAN ANTONIO DIVISION
 4   -------------------------
     JOE HOLCOMBE, et al.,      :
 5                             :
          Plaintiffs,          :
 6       vs.          :No. 5:18-CV-00555-XR
 7   UNITED STATES OF AMERICA,  :
 8          Defendant.          :
     -------------------------
 9              Bethesda, Maryland
10         Wednesday, August 12, 2020
11   Video Conference/Videotaped Deposition of:
12              DANIEL WEBSTER
13   called for oral examination by counsel for
14   Defendant, pursuant to notice, at 5413 Harwood Road,
15   Bethesda, Maryland, before Sheri C. Stewart, RMR, of
16   Esquire Deposition Solutions, a Notary Public in and
17   for the State of Maryland, beginning at 10:06 a.m.,
18   when were present on behalf of the respective
19   parties:
20
21
22
```

**2**

```
 1   A P P E A R A N C E S :
 2   On behalf of Plaintiffs:
 3     TOM JACOB, ESQUIRE
       JAMAL ALSAFFAR, ESQUIRE
 4     STEPHEN SHANDLER, ESQUIRE
       JOSEPH SCHRIEBER, ESQUIRE
 5     APRIL STRAHAN, ESQUIRE
       JOCELYN KRIEGER, ESQUIRE
 6     DANIEL CHUNG, ESQUIRE
 7
 8   On behalf of Defendant:
 9     AUSTIN FURMAN, ESQUIRE
       U.S. Department of Justice
10     Federal Tort Claims Act Staff
       3CON
11     175 N Street, N.E., 11th Floor, Room 1109
       Washington, D.C.  20002
12     (202) 616-4272
       Austin.L.Furman@usdoj.gov
13
14   Also present:  Elisheva Galiley, Videographer
15
16
17
18
19
20
21
22
```

**3**

```
 1            C O N T E N T S
 2   EXAMINATION BY:              PAGE
 3     MR. FURMAN            6
 4     MR. JACOB           289
 5     MR. FURMAN          309
 6   WEBSTER DEPOSITION EXHIBITS:        PAGE
 7   1  Dr. Webster's CV        19
 8   2  Pages from Dkt. 206         37
 9   3  Dr. Webster's report        63
10   4  Sutherland Springs Dr. Webster depo    69
11   5  In Texas and Beyond, Mass Shootings Have
12      Roots in Domestic Violence       105
13   6  Weapon Involvement and Injury Outcomes in
14      Family and Inmate Assaults       123
15   7  Statement of Danielle Kelley      139
16   8  Point, Click, Fire:  An Investigation of
17      Illegal Online Gun Sales       143
18   9  Photo of rifle        150
19   10  Leads Online document      152
20   11  Using Research Evidence to Reframe the
21      Policy Debate Around Mental Illness and
22      Guns:  Process and Recommendations     171
```

**4**

```
 1   EXHIBITS (CONTINUED)
 2   WEBSTER DEPOSITION EXHIBITS:        PAGE
 3   12  Project Muse        180
 4   13  Background Checks for Firearm Purchases:
 5      Problem Areas and Recommendations to
 6      Improve Effectiveness       203
 7   14  Buying a handgun for someone else:  Firearm
 8      dealer willingness to sell       207
 9   15  Evidence concerning the regulations of
10      firearms design, sale, and carrying on
11      fatal mass shootings in the United States   238
12   16  Colorado case trial       250
13   17  Subsequent Criminal Activity Among Violent
14      Misdemeanants Who Seek to Purchase Handguns 257
15   18  Effectiveness of Denial of Handgun Purchase
16      to Persons Believed to be at High Risk for
17      Firearm Violence       268
18   19  Gun shows across a multistate American gun
19      market:  Observational evidence of the
20      effects of regulatory policies      282
21
22   (*Exhibits attached to transcript.)
```

THE VIDEOGRAPHER:   Good morning.  We are now on the record.  The time is now 10:06 a.m. on August 12, 2020.

This begins the videotaped deposition of Daniel Webster, taken in the matter of Joe Holcombe, et al., versus the United States of America, Case Number of which is 5:18-CV-00555-XR.

My name is Elisheva Galiley.  I am your remote videographer today.  The court reporter is Sheri Stewart.  We are representing Esquire Deposition Solutions.

As a courtesy, will everyone who is not speaking please mute your audio and please remember to unmute your audio when you are ready to speak.

Counsel, will you please state your name and whom you represent, after which the court reporter will swear in the witness.

MR. FURMAN:   This is Austin Furman defending the United States.

MR. JACOB:   Tom Jacob for the plaintiffs.

MR. ALSAFFAR:   Jamal Alsaffar for the plaintiffs.

MR. SHANDLER:   Stephen Shandler for the United States.

MR. SCHRIEBER:   Joseph Schrieber for the plaintiffs.

MS. STRAHAN:   April Strahan for the plaintiffs.

MS. KRIEGER:   Jocelyn Krieger for the United States.

MR. CHUNG:   Daniel Chung for the government, for the United States.

P R O C E E D I N G S

WHEREUPON,

DANIEL WEBSTER,

called as a witness, and having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR. FURMAN:

Q    Thank you.  And good morning, Dr. Webster.

A    Good morning.

Q    Can you hear me okay?

A    Yes.

Q    Good.  I'll try to speak up.  If at any point during the deposition you can't hear me, certainly let me know.  We're all adapting to the technology and the new age that we live in currently, so I appreciate you bearing with us.

Could you please state your full name for the record?

A    Daniel William Webster.

Q    Thank you, Dr. Webster.

And you indicated before we went on video that you're currently located at your home address; is that right?

A    That's correct.

Q    Dr. Webster, how are you feeling this morning?

A    I'm feeling fine.  Thank you.

Q    Glad to hear that.  Again, I appreciate your patience with the technology.  This morning we're going to be going through, obviously, your reports, some documents.  I have a screen share function with my technology that allows me to share

my screen.  We'll try doing that.  If it doesn't work, I've got a laptop here.  Your attorneys say you have a laptop.  We might have to switch to that. So I appreciate being flexible during the process.

A    Sure.

Q    Have you -- thank you.

Have you ever had your deposition taken before?

A    Yes.

Q    Have you ever testified in court?

A    Yes.

Q    And has any of that testimony been other than as an expert witness?

A    No.

Q    All right.  We'll get into that in a little bit.  I'm sure you're familiar -- I'm going to quickly go over the ground rules for the deposition.

During the deposition, please direct questions to me and not to your attorney, unless there's an issue of privilege.  Your attorney may make objections throughout the deposition, but

29

```
 1        A     Any what kind of experience?
 2        Q     Clinical?
 3        A     No.
 4        Q     All right.  And then just a few more
 5   professional questions.
 6              Do you have any professional
 7   licenses?
 8        A     No.
 9        Q     And, obviously, as you testify in this
10   case, I have to assume that your -- Johns Hopkins is
11   fine with you performing work outside of your
12   employment with them?
13        A     Yes.
14        Q     Do you -- other than testifying as an
15   expert witness in litigation, do you perform any
16   other outside consulting or -- that type of work?
17        A     Occasionally.
18        Q     Are you doing any right now, other than
19   this case?
20        A     I am a consultant on a project supported
21   by Arnold Ventures, some consultant to John Jay
22   School of Criminal Justice in New York to help
```

30

```
 1   develop a concept paper for community violence
 2   prevention.
 3        Q     Okay.  And does your employer place any
 4   restrictions on your outside employment, your
 5   employer being Johns Hopkins?
 6        A     Yeah.  I mean, I wouldn't be able to state
 7   them explicitly, but you can't, in essence, have
 8   another full-time job doing -- in the consulting
 9   while you're also drawing a full-time salary.  So --
10        Q     That makes sense.
11        A     So some of my independent consulting work
12   is limited by that, of course.  The demands of being
13   a full-time faculty at Johns Hopkins are pretty
14   substantial.
15        Q     I can imagine.
16              Turning just to your areas of
17   expertise.  In your report, you note, for your
18   graduate training, you had advanced classes in
19   epidemiology, research methods, statistical
20   analysis, economics and sociology.
21              Does that sound right?
22        A     Yes.
```

31

```
 1        Q     In your graduate studies, did you have any
 2   sort of clinical courses, like psychological
 3   assessment, anything like that?
 4        A     No graduate courses in clinical
 5   assessment.
 6        Q     Right.  And concerning your expertise as a
 7   researcher, so obviously these -- most of these, you
 8   know, papers and projects are multiperson projects.
 9   And typically, if you're involved in a project, what
10   role do you have with respect to the research
11   design?
12        A     I am commonly actually designing research,
13   developing the proposals of what we study and how we
14   study it.  I often involve junior -- junior faculty
15   and graduate students that I supervise in carrying
16   out that work.
17        Q     As part of the research design, would you
18   be the person to determine what statistical analyses
19   is used?
20        A     Yes.
21        Q     And would you also, as part of that,
22   determine what the, for example, the P values would
```

32

```
 1   be for significance testing?
 2        A     Yeah.  One thing I'll just clar- -- just
 3   to be clear.
 4        Q     Sure.
 5        A     You know, these are collaborative efforts,
 6   so, you know, I'm the senior researcher within --
 7   within our center, of course, but I don't want to
 8   portray this as I made every decision relevant to
 9   every publication.  That's not true.
10              But -- we do work as a team, but as a
11   senior leader I play an important role.
12        Q     That's understandable.
13              What about when it's time to run the
14   data, to run the statistical analyses, would you do
15   that?
16        A     I typically would not do the statistical
17   analyses.  I'd go over to output, with whoever was
18   doing those, to make sure that things look right.
19   But I was typically not doing that myself.
20        Q     And what about the writing of the article,
21   who usually takes the first draft of writing up an
22   article or paper?
```

1    A    That can vary quite a bit, actually.  So

2 either the lead or the senior author will have the

3 heaviest role in that, and sometimes different parts

4 are divvied up.

5         So, again, it's something that we

6 typically decide project by project, paper by paper.

7    Q    Sounds good.

8         As far as teaching, what subject

9 areas do you currently teach in?

10    A    I teach a course called Understanding and

11 Preventing Violence.  I also am doing a seminar

12 currently called Reimagining More Effective and Fair

13 Public Safety.  And I have a new course coming out

14 in the spring.

15    Q    And what's that called?

16    A    I know the course, I don't know the title

17 of that.  But it's problems -- it's problem-solving

18 and gun violence.

19    Q    Have you ever taught any research methods

20 courses?

21    A    Yes.

22    Q    Have you ever taught any statistics

1 courses?

2    A    No.  Within the research methods courses

3 we cover some statistical analysis, but they're not

4 listed as statistics courses.

5    Q    In the research methods course that you've

6 taught, is that the undergraduate or graduate level?

7    A    Graduate for master's and doctoral

8 students.

9    Q    That's a course on epidemiological

10 methods?

11    A    The course that I taught as a lead

12 instructor for many years and as a co-instructor for

13 also a number of years, was Research Methods and

14 Health Policy.

15    Q    And I'm assuming, I guess, the course

16 covers how to design different types of studies to

17 study different public health problems?

18    A    Exactly.

19    Q    Thank you.

20         Dr. Webster, in what fields do you

21 consider yourself to be an expert?

22         MR. JACOB:   Objection, form.

1    A    I consider myself an expert in gun

2 violence, in gun violence prevention.  Those are my

3 specialty areas.  I also have expertise relevant to

4 substance abuse and substance abuse policy.

5         Those are the areas that I focus most

6 of my work on, is violence, specifically gun

7 violence, and then substance abuse issues.

8    Q    And more generally, do you consider

9 yourself an expert in the field of epidemiology?

10         MR. JACOB:   Objection, form.

11    A    I use epidemiology in my work in the

12 content areas that I just described.

13 BY MR. FURMAN:

14    Q    In the cases that you've testified in --

15 either in deposition or trial, have you been

16 qualified as an expert in the field of epidemiology?

17         MR. JACOB:   Objection, form.

18    A    I'm not sure how to answer the question to

19 be honest with you.  Maybe you could restate.

20 BY MR. FURMAN:

21    Q    Sure.  As far as -- when you're giving

22 expert testimony in Federal Court and I think most

1 state courts, you have to apply a certain

2 methodology in order to arrive at opinions.  And I

3 would suspect that, in your case, your background

4 and research in, you know, epidemiological studies,

5 that the methodology that you would employ to

6 provide those types of opinions would be

7 epidemiology --

8    A    That's correct.

9    Q    -- right?

10    A    That's correct.

11    Q    Do you consider yourself an expert in

12 psychology?

13         MR. JACOB:   Objection, form.

14    A    No.

15 BY MR. FURMAN:

16    Q    Do you consider yourself an expert in

17 social work?

18         MR. JACOB:   Form.

19    A    No.

20 BY MR. FURMAN:

21    Q    Do you consider yourself an expert in mass

22 shootings?

41

1 factors and trying to explain community level risk.
2          So I think epidemiology works on both
3 of those levels, and my research would be the same.
4      Q     And does your research focus on individual
5 factors or just community-based factors?
6      A     Both.
7      Q     What aspects of your research focus on
8 individual factors?
9      A     Well, a study that I was lead
10 co-investigator on that I think is quite relevant to
11 this case was a case-controlled study to understand
12 what factors were predictive of lethal outcomes when
13 there was eminent partner violence, and we very
14 extensively examined the incredibly broad range of
15 potential risk and protective factors to discern
16 which were and were not associated with lethal
17 outcomes.
18      Q     And with respect to the research you just
19 referenced referring to individual risk factors,
20 identifying individual -- would you agree that
21 identifying individual risk factors is different
22 than predict whether a specific individual will

42

1 commit domestic violence?
2          MR. JACOB:   Objection, form.
3      A     A risk factor applies very directly to the
4 probability that an individual will commit an act or
5 have a particular outcome that you are studying.
6 It's not intended to be 100 percent certain, but
7 that's the whole idea, is based upon the actual
8 experience at the individual level.
9 BY MR. FURMAN:
10      Q     Will you agree that future violence is
11 hard to predict?
12      A     Is it hard to predict?  Yeah, it can be.
13      Q     Well --
14      A     We know -- we know -- we know a great deal
15 about prediction, but it's not a certain science.
16      Q     Right.  Would you agree that, in most
17 instances, even psychiatrists cannot accurately
18 predict who will be violent?
19          MR. JACOB:   Objection, form.
20      A     I would say psychiatrists are, in
21 particular, vantage point and mostly they are --
22 they have a limited set of information available to

43

1 them, and quite often they're focusing on what
2 psychiatrists or psychologists tend to focus on,
3 which are psychological conditions which is a
4 limited amount of information.
5          So it's challenging for them to make
6 predictions.
7 BY MR. FURMAN:
8      Q     Well, it's challenging for all of us,
9 isn't it?
10          MR. JACOB:   Objection, form.
11      A     I -- I stated before that -- that
12 predicting violence is -- is difficult.
13 BY MR. FURMAN:
14      Q     Right.  And there are many people who have
15 risk factors for violence who never commit violence,
16 would you agree with that?
17      A     Yes.
18      Q     And one of the studies you cited in your
19 report -- I'm going to -- do you recall a study by
20 Garen Wintemute, Prior misdemeanor convictions as a
21 risk factor for later violent in firearm-related
22 criminal activity among authorize purchasers of

44

1 handguns.  Do you recall that study?
2      A     Yes.
3      Q     And that study showed that, among the
4 purchasers, those with violent misdemeanor
5 convictions were more likely to be charged with a
6 new offense after the handgun purchase; is that
7 right?
8      A     That's correct.
9      Q     And even in that study, around 50 percent
10 of the persons who had one prior misdemeanor
11 conviction were never violent again; isn't that
12 right?
13      A     Well, to be accurate to the data from that
14 study, they were not arrested for a violent offense.
15 That does not mean that they were not violent.  Most
16 acts of violent do not result in people being
17 arrested for violence.
18      Q     But you can't measure that accurately, can
19 you?
20          MR. JACOB:   Objection, form.
21      A     Yes.  Most violent behavior is not
22 reported and therefore difficult to measure.

49

1    processes that we know grossly under -- undercount
2    violent crime.
3        Q.    Right.  But if you take less reliable
4    data, you also run the risk of overreporting crime,
5    correct?
6        MR. JACOB:    Form.
7        A.    What researchers do is -- or should do, is
8    they're clear about what their measures are and what
9    the limitations of them -- those measures are.
10        I'm not sure -- if you want to state
11    that question again, I'm not sure exactly where to
12    go with that question.
13    BY MR. FURMAN:
14        Q.    I think the issue is that, if you're
15    relying on less reliable measures of criminal
16    behavior than criminal charges, you run the risk of
17    identifying behavior that is, in fact, not criminal.
18        Would you agree?
19        A.    I think you have to be specific to the
20    methodology that you're going to use.  So it's very
21    dependent upon the study and your -- what you're
22    able to accurately record.

50

1        But, look, violence is a phenomenon
2    that is challenging to study because, A, our systems
3    aren't perfect and -- in identifying those through
4    official records, and self-report can sometimes, not
5    always, be fully accurate.
6        Q.    Right.  I mean, that's the problem --
7        A.    Domestic violence --
8        Q.    -- with researchers --
9        A.    Let me just complete that.
10        Domestic violence can be a little --
11        Q.    Of course.
12        A.    -- easier because you can talk to victims
13    about their experiences, whereas nondomestic
14    violence, there's not always relationships between
15    perpetrators and victims.
16        So different forms of violence have
17    their own challenges to study.
18        Q.    Right.  And that's one of the problems --
19    or, you know, challenges of being a researcher is
20    finding the best ways to measure what you're trying
21    to measure, right?
22        A.    Sure.

51

1        Q.    And you can't always accurately measure
2    you know, what you want to measure because it's not
3    always someone keeping tabs, like you mentioned,
4    with the violence.  You know, just because someone,
5    you know, isn't in the system for being violent
6    doesn't mean they weren't violent is what you're
7    saying, right?
8        A.    Well, what I'm saying is -- let's bring it
9    back to the matter at hand with the Wintemute study.
10        Wintemute, you know, used a measure
11    that I think is very solid with respect to not
12    having what we would refer to as the false positive
13    measures, meaning that you record someone as
14    committing a violent crime when they did not.
15        The measure that he uses with
16    convictions is one in which there's a whole process
17    of outcomes of investigations and scrutiny
18    throughout the process to determine whether --
19    whether a violent act occurred or not.
20        It is not a particularly good measure
21    to record all violent events for the reasons that I
22    just explained.

52

1        Q.    Right.  And that false positive problem,
2    that's been particularly a problem with respect to
3    predicting mass shootings, right?
4        MR. JACOB:    Objection, form.
5        A.    You'll have to be a little more explicit
6    with the question.
7    BY MR. FURMAN:
8        Q.    Well, in your report, you talk about
9    different characteristics of the shooter here that
10    you plan to be consistent with mass shooters in
11    general.
12        Is that fair?
13        A.    Yes.
14        Q.    And -- but if you're using those criteria,
15    things like domestic violence, suicidality, those
16    types of factors to predict domestic violence,
17    you're going to be -- or, sorry, mass shooting,
18    you're going to be wrong a lot, lot, lot more than
19    you're correct, would you agree?
20        MR. JACOB:    Form.
21        A.    Yes.  Any -- any time you are studying a
22    relatively rare outcome, like a mass shooting, any

1  effort for prediction is going to have a significant
2  number of false positives.
3      Q      And that's a problem in being able to
4  foresee events like mass shootings, correct?
5          MR. JACOB:    Objection, form.
6      A      I would not argue that.  I think what I
7  would argue and what I put forward in my expert
8  testimony is that, while it may be difficult to
9  predict the scale of violence, predicting that some
10  act of violence would occur based upon a set of
11  factors is far easier.  And in my expert opinion,
12  about the nature of this case, indicated to me a
13  fairly high probability that Mr. Kelley would carry
14  out violent acts in the future, including violent
15  acts with firearms.
16  BY MR. FURMAN:
17      Q      When you say a fairly high probability,
18  could you put a number on that?
19      A      No.
20          THE WITNESS:    Could I ask you -- just one
21  second.  I -- some -- my dog walker is here,
22  and I just got to get my dog out for him.

1      Can --
2          MR. FURMAN:    I'll let you go off the
3  record.
4          THE WITNESS:    -- I have --
5          MR. FURMAN:    That's fine.  Yeah, let's
6  take a five-minute break.  No problem.
7          Off the record, please.
8          THE VIDEOGRAPHER:    We are going off the
9  record at 11:09 a.m.
10          (Whereupon, there was a break from
11  11:09 a.m. until 11:23 a.m.)
12          THE VIDEOGRAPHER:    We are back on video
13  record at 11:23 a.m.
14  BY MR. FURMAN:
15      Q      Thank you.
16          And Dr. Webster, before the break --
17  and correct me if I'm wrong, but I think you were
18  saying that -- I had asked you about foreseeability
19  of a mass shooting, and you had said that, no, you
20  know, it was -- with respect to the shooter in this
21  case, it was foreseeable that there'd be some sort
22  of future violence, and I think you used the term

1  fairly high probability.  And I had asked about --
2  you about whether that was quantifiable.
3      A      I don't have a very specific probability
4  that I would put on it.
5      Q      Would you say more than 50 percent?
6          MR. JACOB:    Objection, form.
7      A      Again, uncertainty around any -- any such
8  estimate.  But I would say that there -- there would
9  be, you know, 50 percent or more chance that some
10  act of serious violence, including with a firearm,
11  would occur under the set of circumstances with his
12  history.
13      Q      And when you say "serious violence," what
14  do you mean by that?
15      A      Well, serious violence could mean anywhere
16  from threatening, putting a gun to someone's head in
17  a domestic violence scenario.  It could -- it could
18  mean shooting someone in an altercation, or it could
19  be as horrific as what happened in Sutherland
20  Springs.
21      Q      What about a physical altercation of some
22  sort, would that be serious violence?

1      A      It certainly could be, depending on the
2  nature of the physical altercation.
3      Q      What about a robbery using a firearm?
4  Would that be your definition?
5      A      That would certainly be included in that
6  definition.
7      Q      Earlier I asked you about psychiatrists
8  and you had indicated that, you know, they have
9  certain diagnoses they use, but are you -- I guess,
10  first, but wouldn't you agree that -- and we're
11  talking about predicting violence, we're not talking
12  about, you know, predicting any sort of, you know,
13  particular mental health symptom, we're talking
14  about just violent towards others.  And would you
15  agree that even psychiatrists who specialize in
16  individual behavior, they struggle to accurately
17  predict the future violence of their patients?
18          MR. JACOB:    Objection, form, asked and
19      answered.
20      A      Yes, I would agree that they struggle with
21  that.
22

BY MR. FURMAN:

Q   Um-hum.  Do you believe, as an epidemiologist, that you're better able to predict future violence than a psychiatrist?

MR. JACOB:   Form.

A   Our -- our type of prediction is different.  I'm not -- you know, I'm a policy researcher, and I'm thinking about general probabilities.

A psychiatrist probably is more focused on can you predict accurately a particular outcome for a particular patient.

So it's sort of an apples or oranges kind of comparison.

BY MR. FURMAN:

Q   Well, I'm not sure I agree, Dr. Webster. I mean, if you're trying to predict the outcome of a football game and either the outcome is Team A wins or Team B wins, whether you're coming at it from one perspective or the other, it's easy to quantify, you know, if I -- if I predict, you know, using my methods correct, you know, which team wins

75 percent of the time and you predict 50 percent of the time accurately, then it's clear one method is better.

Would you agree?

MR. JACOB:   Objection, form.

A   Well, look, you -- you presented a hypothetical scenario that I, quite honestly, don't see as relevant here.  Maybe you can spread it more connected to what -- what we're talking about.

BY MR. FURMAN:

Q   Sure.  And I think that the relevancy is you're predicting whether someone's going to be violent or not violent, and whether you come at that prediction from -- as a psychiatrist or epidemiologist, either -- it's a common variable, either it's true or not true, and you can, you know, measure and accurately tabulate whether you're correct or not.

So it's under that, you know, rationale I'm asking whether you think you can predict better than a psychiatrist.

MR. JACOB:   Objection, form, asked and

answered.

A   Yeah, I really don't know.

BY MR. FURMAN:

Q   I mean, before this case, have you had instances where you had to predict individual behavior?

A   That's not the nature of my job, no.

Q   So you haven't; is that correct?

A   Well, other than what we covered earlier in the --

Q   The social work?

A   -- the social work component, no.  The nature of my job is as a researcher.  And I'm not -- I don't have clinical encounters in which I am tasked with -- with predicting whether someone will be violent or not.

Q   Understood.

I'd like to back up for a minute to talk about, you know, epidemiology, studying the individual risk factors as well as, you know, kind of broader policy.

And with respect to the policy side,

you know, would you agree that some policies that might work with respect to some people might not work with respect to others?

A   Yes.

Q   And the goal typically as a epidemiologist is to have the -- the greatest net impact, would you agree with that?

A   Yes.

Q   To use it in its relevance to this case, so I know you advocate for permit-to-purchase-type regulations in states and obviously those add additional protections to those who can acquire firearms who otherwise are prohibited from having them.

But you would agree that -- I mean, there are always some people who, you know, if they have the resources, the money, the determination, the ability, they're going to get a firearm.

Would you agree with that?

A   Yes.

Q   Dr. Webster, in your prior expert testimony, prior to this case, would you agree that

1  those cases all involve subject -- subject matters
2  related to firearms policy and regulations?
3       A    Yeah, yeah, firearm policy and/or just --
4  you know, there -- there were other -- I was an
5  expert witness, for example, on -- pardon me, in
6  litigation against gun shots in West Milwaukee, and
7  the litigation pertained to the practices of the
8  licensed gun dealer that facilitated transactions
9  that led to the shootings of four police officers.
10           So that wasn't directly a gun policy
11  question on the table; it was -- had more to do with
12  practices relevant to risk for firearm injury and
13  violence.
14       Q    Have you ever testified in any tort
15  litigation before?
16       A    This is people being sued?  I mean, I
17  think I -- what I just described, did that.
18       Q    This civil case against the gun -- the
19  gun -- the firearms shop?
20       A    Yes.
21       Q    Other than that, any prior tort work?
22       A    Gosh, this dates back to, I don't remember

1  now, 2008 or so.  There was litigation that New
2  York -- the City of New York brought against about
3  two dozen gun shops for negligent practices, and I
4  was an expert in that case.
5       Q    Any other torte occasions?
6       A    No.
7       Q    Prior to this case, have you opined on the
8  issue of legal causation?
9       A    I'm not sure.
10       Q    You're not sure because you don't
11  remember?
12       A    Well, I'm not sure if -- if what I was, if
13  that's very specifically what I was tasked with
14  doing.  I mean, the litigation that I referred to
15  earlier with the two gunshot cases, my testimony
16  applied more generally to what we know about gun
17  dealer practices and oversight and measures to
18  restrict their practices.  And I don't really
19  remember if the question on the table to me was did
20  X cause Y.
21       Q    Okay.  I appreciate that.
22           Have you ever opined on the issue of

1  foreseeability of violence in any prior expert
2  testimony?
3       A    No.
4       Q    Have you ever opined on -- previously on
5  whether a background check -- whether a background
6  check or entry of information to a background check
7  system would have prevented violence before?
8       A    No.
9       Q    And, Dr. Webster, I believe you're being
10  paid $400 an hour for this litigation?
11       A    Yes.
12       Q    Is that your standard rate?
13       A    Yes.
14       Q    I'd like to turn to your expert report, if
15  you want to grab a copy.  I'll put it up on the
16  screen as well.
17       A    Sure.
18       Q    We'll mark this as Exhibit 3.
19           (Whereupon, Exhibit No. 3 was marked for
20           identification.)
21  BY MR. FURMAN:
22       Q    It's a 15-page document dated March 31st,

1  2020.
2           Dr. Webster, do you have a hard copy
3  in front of you?
4       A    I do.
5       Q    Okay.  And does it begin with, lower
6  right-hand corner, SSS-2290?
7       A    Yes.
8       Q    And last number should be SSS-2304?
9       A    Yes.
10       Q    And this is the expert report you authored
11  in this case?
12       A    Yes.
13       Q    Sitting here today -- I mean, I'm sure
14  there might be a typo or two, no one's perfect, but
15  is there anything that you need to amend or change
16  in this report?
17       A    No.
18       Q    Do you have any intention at this time
19  to -- to amend your report in the future?
20       A    No.
21       Q    Did anyone assist you in preparing this
22  report?

97

1  you can get from the FBI supplemental homicide
2  report finds a much larger share of -- of incidents
3  with connections to domestic relationships and
4  domestic violence.
5      Q.    Right.  With respect to the Everytown for
6  Gun Safety, if I instructed you that updated data
7  showed that of the 194 mass shootings in the
8  database, only about 25 percent had a domestic
9  violence connection, would that sound right to you?
10     MR. JACOB:   Form.
11     A.    I'm not sure.  I'd have to look at it.
12 BY MR. FURMAN:
13     Q.    I believe you cited 54 percent, that was
14 your interview with NPR a couple days after the
15 shooting; is that right?
16     A.    That was based upon our earlier Everytown
17 for Gun Safety report.
18     Q.    And if that were -- and if that number was
19 flawed, would that change your opinion?
20     A.    Change my opinion on the percent that have
21 domestic violence connections?  Of course.
22     Q.    What about in this case, with respect to

98

1  the foreseeability of violence with respect to the
2  shooter?
3      A.    It really doesn't -- it doesn't matter all
4  that much.  I mean, we know that domestic violence
5  is -- is a connection to a lot of incidents and it
6  was, from my opinion in this particular case, he
7  didn't pick Sutherland Springs Church there
8  completely at random.  He chose it because of its
9  connections to his wife and her family.
10         So, to me, it's connected to a
11 pattern of domestic violence that is very much about
12 domination and control of an individual.
13     Q.    Looking at that same sentence and the last
14 two words you use are gun violence.
15         Are you making any distinction there
16 between gun violence and other types of violence?
17     A.    Yeah.  Again, this is -- this is a guy who
18 has a history not just of violence but a history of
19 gun violence.  He did threaten his wife with a gun,
20 for example.
21         And what we know generally about the
22 gun playing an important role in domestic violence,

99

1  both in terms of intimidation, of control, and in
2  terms of the probability of fatal outcome.  There's
3  no single factor that has a greater impact on the
4  likelihood of whether a couple with intimate partner
5  violence, whether that turns to lethal outcomes than
6  if the person has a firearm.
7          And their prior threats with the
8  firearm were also highly predictive of -- of future
9  homicidal acts.
10     Q.    But, Dr. Webster, the research you cite in
11 your report, that's all related to future violence
12 against domestic partners and family members; am I
13 right?
14     A.    Yes.
15     Q.    So how does that relate to future acts of
16 violence against persons other than those persons,
17 other than family members?
18     A.    Well, we know two things.  One, is we
19 know, as I was saying before, that there are many
20 mass shooting events that start with a domestic
21 relationship and extend outward.
22         The Sandy Hook Elementary School

100

1  tragic shooting, for example, Adam Lanza shot and
2  murdered his mother before heading to the school.
3          There's a variety of other scenarios
4  as well in which the first act is carried out
5  against a family member and then other people are
6  targeted, often when they have family connections to
7  them.
8          So -- so domestic violence -- and
9  there's plenty of studies out there that show that
10 domestic violence is a predictor of violence
11 generally, not just specifically in the context of
12 those domestic relationships, particularly the more
13 severe forms of violence.
14         You know, as studied over time, and I
15 teach this in my course Understanding and Preventing
16 Violence, that there's something we refer to as
17 common couple violence that is -- tends to be less
18 severe and it's people who just -- you know, they
19 don't have good interpersonal skills and they scream
20 at people sometimes and they might push or shove or
21 something, but it's not particularly serious.
22         And there's another form or violence

**137**

1  that he did not do that.
2  BY MR. FURMAN:
3      Q    Right.  But he also -- because he didn't
4  have to, right?
5          MR. JACOB:    Objection.  Mischaracterizes
6      the evidence.
7      A    He -- he did not coerce anyone to get a
8  gun for him.  He was able to get a gun from a
9  licensed gun dealer because there was no records to
10  indicate he was a prohibited person.
11  BY MR. FURMAN:
12      Q    Right.  But he was coercive towards women,
13  correct?
14      A    Yeah.
15      Q    And he liked firearms?
16      A    Definitely.
17      Q    And he wanted to get firearms?
18      A    Yeah.
19      Q    And one way to get a firearm if you're a
20  prohibited person is through a straw purchase?
21      A    Yeah.
22      Q    And I understand that you -- actually, it

**138**

1  never happened -- but you're certainly an expert
2  entitled to give an opinion.  And do you have an
3  opinion as a policy and gun firearms researcher
4  about whether someone like Devin Kelley could have
5  obtained firearms through use of a straw purchaser?
6      A    Is it possible?  Yes, it's possible.
7      Q    Is it likely?
8      A    It's quite unknown, and here's why I say
9  that.  We almost exclusively know how individuals,
10  prohibited individuals, get guns.  We know that
11  principally through surveys, but what we don't know
12  is how many prohibited people did not get guns and
13  why.  That's really the question at hand here.
14          While we see that straw purchase is,
15  is a way that prohibited people sometimes acquire
16  firearms, what we don't know is how many times they
17  were unable to do that for any number of reasons.  I
18  just, I'm a co-author and I study, published, since
19  2017 or 2018, looking at, in essence, the
20  underground gun market in Baltimore City and
21  following some hand purchaser licensing and some
22  other measures to try to prevent, including

**139**

1  heightened gun dealer oversight.  And we ask people
2  following, following that law was it more difficult
3  to get people to purchase guns for you, and we had
4  about 30 percent who said yes.
5          So, but our study was unusual.
6  Really studies generally don't ask people, hey, did
7  you want to get a gun or try to get a gun but
8  couldn't, and that's sort of a hypothetical here of
9  if he hadn't been able to easily acquire the gun
10  from the licensed gun dealer as he did to carry out
11  this act, might he had done that otherwise.  We --
12  yes, as I said, it's possible, but certain, don't
13  know.
14      Q    Well, what is your reason for believing
15  that he would not have tried to get a gun otherwise?
16      A    Well, A, it's a crime.  B, he may not have
17  been successful.  I'm not sure.
18      Q    I'm going to mark another exhibit.  This
19  will be Exhibit 7.
20          (Whereupon, Exhibit No. 7 was marked for
21      identification.)
22

**140**

1  BY MR. FURMAN:
2      Q    Do you see that, Dr. Webster?  The
3  statement of Danielle Kelley?
4      A    Yes.
5      Q    In the lower right-hand corner is
6  SSS-1035.  Is this a document you've seen before?
7      A    It is.
8      Q    Okay.  This is on our list from
9  plaintiffs' counsel, but I'll take your word for it.
10  But have you ever seen it before?  So this document
11  talks about, or this is the sworn testimony of
12  Mr. Kelley's widow, correct?
13      A    Yeah.
14      Q    And it discusses him going to the Dick's
15  Sporting Goods attempting to purchase a Ruger
16  assault rifle?  That's about that paragraph four.
17  Do you see that?
18      A    I do.
19      Q    And the last sentence or second to last
20  says, Devin was prevented from purchasing a gun at
21  Dick's Sporting Goods that day.  Do you see that?
22      A    Yeah.

**Page 141**

1    Q    And then paragraph five talks about what
2    we all know, in April 2016, the Ruger AR-556 was
3    purchased in Texas at an Academy Sporting Goods. Do
4    you see that?
5    A    Yes.
6    Q    So according to sworn testimony of
7    Danielle Kelley, Devin Kelley was, in fact, denied
8    for purchase of a gun, correct?
9    A    Yes, he was.
10   Q    And he still went on to purchase the same
11   weapon he had tried to purchase otherwise, right?
12   A    That's correct.
13   Q    And if he had been denied as an FFL, he
14   would have gone and found another avenue to find the
15   same weapon, right?
16       MR. JACOB:    Objection, form.
17   A    The only thing we know is what he did with
18   FFLs. So we know initially he was denied and he did
19   not get a gun. We know that he tried it on a
20   different occasion, was able to purchase the gun in
21   question and committed a horrendous act of mass
22   violence. That's what we know.

**Page 142**

1    Q    Right. It would be your, certainly your
2    firearms policy, regulation, researcher and --
3    right?
4    A    Yeah, correct.
5    Q    You know about all the avenues that
6    prohibited persons can obtain firearms, right?
7    A    Sure.
8    Q    And there are a lot of avenues, would you
9    agree?
10   A    Yeah.
11   Q    And there's typically a lot of avenues for
12   people who do a lot of research on the Internet on
13   guns, right?
14   A    Sure. There's also a lot of reasons why
15   people don't get guns. Again, as I was saying,
16   that's less well studied but what, what I've learned
17   is that there's great uncertainties in, it's called
18   unregulated market, where you're buying used guns
19   from any, you know, various kind of characters, and
20   it requires a trusted supplier and a trusted
21   product.
22       It appears to me that Mr. Kelley had

**Page 143**

1    a strong preference for particular type of firearm,
2    particularly if he was going to carry out not any
3    act of gun violence, but an act in which he was
4    helping to kill a lot of people.
5    Q    All right. I'm going to mark an exhibit.
6    I guess we're up to 8.
7        (Whereupon, Exhibit No. 8 was marked for
8        identification.)
9    BY MR. FURMAN:
10   Q    Do you see that document, sir?
11   A    Yeah.
12   Q    It's called Point, Click, Fire. Is
13   that -- have you seen this pamphlet before?
14   A    Yes.
15   Q    It says, investigation, I believe, of
16   online gun sales. Do you see that?
17   A    Yes.
18   Q    And I'm here on page five of the PDF.
19   Says, 62 percent of private gun sellers agreed
20   they'd sell a firearm to a buyer who said he
21   probably couldn't pass a background check. Do you
22   see that?

**Page 144**

1    A    Yeah.
2    Q    And 40 percent of guns are sold through
3    private sellers. Do you see that?
4    A    Yes.
5    Q    Do you have any reason to doubt those
6    numbers?
7    A    Well, the, the one on right, the
8    40 percent, is based on survey data going back to
9    the 1990s. So the more updated research estimates
10   that at 22 percent.
11   Q    Right. And the 22 percent, that's the
12   Miller study you're referring to?
13   A    Yes.
14   Q    I'm looking here at the text. It says,
15   sells conducted over the Internet has been connected
16   to mass shootings at Virginia Tech and Northern
17   Illinois University, murder of police officers,
18   illegal sells to minors, et cetera. Do you see
19   that?
20   A    Yes.
21   Q    And then on page five, Web sites people
22   can purchase guns. Are you familiar with them?

1    A    Yes.

2    Q    And as long as it's a private sale, privy

3 to purchaser is obtained, weapons through these

4 Web sites, not infrequently. Would you agree?

5        MR. JACOB:   Objection, form.

6    A    Difficult thing to study, but I don't

7 doubt that many people, prohibited people have

8 acquired firearms, clearly connecting individuals

9 through these different Internet sites.

10 BY MR. FURMAN:

11    Q    And the Baltimore study you're referring

12 to about needing a trusted seller, that was a survey

13 of persons who were mostly gang members, correct?

14    A    No. This was people on parole and

15 probation in Baltimore City. Some may have been

16 gang members, we don't know, but it was an anonymous

17 survey of people on parole, parole and probation in

18 Baltimore City.

19    Q    So you didn't measure how many of them

20 were gang members?

21    A    No.

22    Q    And when you said people have concerns

1 about obtaining a weapon through a trusted source,

2 it seems from the data here private sellers are

3 often very willing to sell to prohibited persons

4 even knowing that they might be prohibited. Would

5 you agree?

6        MR. JACOB:   Objection, form.

7    A    The data from the study indicated a

8 willingness of many people to, to make that

9 transaction. What's relevant in the case that this

10 litigation's about is what Mr. Kelley's comfort and

11 preference were and I believe he had some experience

12 with Craigslist that didn't work out particularly

13 well. He seemed to be more confident that he could

14 get the gun he wanted from an FFL.

15 BY MR. FURMAN:

16    Q    You mentioned crime being a potential

17 reason that, or the fact that acquiring a gun or

18 acquiring a gun at an FFL might have been criminal

19 as a possible deterrent for Mr. Kelley. Mr. Kelley

20 certainly committed many criminal acts, would you

21 agree?

22    A    Yeah.

1    Q    And do you think that threat of

2 prosecution for lying on a Form 4473 would have

3 deterred him from purchasing a weapon or he would

4 have been deterred from purchasing a weapon through

5 a private sale because he might be prosecuted for

6 owning that weapon?

7        MR. JACOB:   Form.

8    A    I think it's certainly possible,

9 particularly given the time, the period in which he

10 acquired the firearms.

11        So generally speaking, I mean, this

12 sort of line of argument you share all the time,

13 criminals don't obey laws so why would they ever be

14 deterred from permitting a crime because they're

15 criminals.

16        It's kind a circular kind of argument

17 but there's also plenty of research evidence that

18 people who engage in criminal acts all the time do

19 things to avoid being arrested and prosecuted and

20 going to jail, they don't really like being

21 arrested, prosecuted and going to jail.

22        So, yeah, I think it's a very

1 reasonable thing to to, to assume that Mr. Kelley could

2 have been deterred from engaging in a straw purchase

3 because he did not want to be arrested, prosecuted

4 and go to federal prison.

5    Q    Well, he certainly wasn't deterred by

6 dying, was he?

7    A    Well, that was at the end of the game

8 here. Yeah, so he was, he was in a suicidal place

9 at that time. He appeared to be, anyway.

10    Q    Right. And certainly the mass murder

11 committed, that was certainly a criminal act, would

12 you agree?

13    A    Of course.

14    Q    But you think that prosecution for

15 possession of a gun would have deterred him from --

16 isn't lying on a Form 4473 a crime?

17    A    Yeah, it is.

18    Q    And he was never deterred from that, was

19 he?

20    A    Not in instances that we know about here.

21    Q    I skipped ahead to a document. It looks

22 like this is page nine of 24 of the PDF, and I have

1  it where it has AK-47.  Do you see that?

2      A    Yeah.

3      Q    And AK-47, that's an assault rifle?

4      A    Um-hum, yeah.

5      Q    And it appears the shooter here was able

6  to obtain one online?

7      A    Yeah.

8      Q    And do you have any reason to doubt that

9  Mr. Kelley would have been unable to obtain an AR-15

10 assault rifle through the seller through a means

11 other than an FFL?

12         MR. JACOB:   Form, asked and answered.

13      A    Yeah.  We sort of covered this ground.  So

14 is it possible?  Yeah, yeah.  As I said before, it

15 is possible.  But we simply know from the available

16 record that Mr. Kelley did not do that.  And again,

17 there's a whole host of reasons why people don't

18 want to do those exchanges.

19             If you think about it, you're meeting

20 a stranger, you're bringing hundreds of dollars to

21 meet a stranger with an assault rifle, okay?  That,

22 that could be a sort of intimidating interaction,

---

1  could be that Mr. Kelley, but it was far safer for

2  him to walk into a gun shop and pick out a gun

3  himself.

4         MR. FURMAN:   I'll mark an exhibit.  I

5      think we're up to 9.

6             (Whereupon, Exhibit No. 9 was marked for

7      identification.)

8  BY MR. FURMAN:

9      Q    You see the picture of the shotgun,

10 Dr. Webster?

11      A    Yeah.

12      Q    And have you seen this photo before?

13      A    Yes.

14      Q    And this was taken from the iCloud account

15 of Devin Kelley that was obtained by the Texas

16 rangers in their investigation of him.

17         Dr. Webster, are you aware of whether

18 this weapon was purchased as an FFL?

19      A    I think that may have been a private

20 transaction.  I don't honestly recall now how he got

21 that shotgun.

22      Q    You're certainly able to get it, correct?

---

1      A    Yes, sure.

2      Q    And certainly an evil person could

3  certainly use a shotgun to injure large amounts of

4  people, right?

5      A    Yeah.  If you look at the mass shooting

6  with the biggest casualties, you rarely see shotguns

7  involved.  Shotguns typically are things that are

8  used in incidents with fewer cases.  So I suspect

9  not something particularly unusual among mass

10 shooters is that they choose a semiautomatic assault

11 rifle, it's built and designed to carry out acts of

12 mass violence.

13      Q    But assuming you're right and that this,

14 in fact, was acquired by a private sell, then that

15 would show that Devin Kelley was willing to enter

16 into those type of transactions, right?

17         MR. JACOB:   Objection, form.

18      A    It shows that he was willing to do that

19 for this particular shotgun.

20 BY MR. FURMAN:

21      Q    And why would he do something different

22 with respect to an assault rifle?

---

1      A    Well, again, it could be that, that stakes

2  are higher for him at that particular time and, you

3  know, undertaking an act of mass violence is a

4  pretty serious thing to do if that's your intent.

5  You know, you don't want to get a gun that's

6  defective, so I suspect that he wanted a gun that he

7  could trust, wasn't going to not perform as he

8  wanted it to.

9      Q    And are there any studies you're aware of

10 on the quality of weapons obtained through private

11 sells versus the quality of weapons obtained at an

12 FFL?

13      A    No.

14      Q    We'll mark this as Exhibit 10.

15             (Whereupon, Exhibit No. 10 was marked for

16     identification.)

17 BY MR. FURMAN:

18      Q    Can you see the document, Dr. Webster?  It

19 says, Leads Online?

20      A    Yes.

21      Q    At the very top here you see there's a

22 sell of a 9-millimeter pistol from Mr. Kelley to a

1  online just as well as you can -- actually, easier
2  than you can search for private sellers.
3          So, so he could have been searching
4  for, you know, which license dealers had the best
5  deals on assault rifles.
6  BY MR. FURMAN:
7      Q    But it's not hard to find a Web site like
8  armslist.com, is it?
9      A    No.
10          MR. JACOB:    Objection, form.
11  BY MR. FURMAN:
12     Q    And if right now during the deposition you
13  or I wanted to go and, go online and search for
14  guns, we could probably arrange for a sell pretty
15  quickly, would you agree?
16          MR. JACOB:    Objection, form.
17     A    Yeah, I don't doubt that, we probably
18  could.  I haven't -- just to be clear -- I'm sorry.
19  Say again?
20  BY MR. FURMAN:
21     Q    I'm sorry.  Finish the last part.
22     A    I just said, just to be clear, I haven't

1  done that.  Not something I want to do.  And I
2  suspect -- but that's actually the point, it's not
3  that it's about Danielle (sic) Webster and what he
4  would do, but what I'm saying is that there's a
5  number of people who might, yeah, sure, they know
6  can you go online and buy a firearm from a stranger,
7  but how many people actually do it?
8          There's a huge gap between knowing
9  that that is possible and actually doing it for the
10  reasons I just said before.  How many people want to
11  meet a stranger carrying an assault rifle when
12  you're bringing hundreds of dollars of cash?
13     Q    Well, there are ways to limit the risk,
14  right?
15     A    I'm sure there are.  But again, my point
16  is that many people will very logically view that as
17  a risky kind of thing to do for any number of
18  reasons, including personal safety.  Including that
19  maybe that gun was previously used in a crime.
20  Including that maybe that gun doesn't work as well
21  as you might hope it does.
22          So there's a host of reasons why.

1  Even if you can -- and you can often get lower
2  prices from a private seller than you can a licensed
3  gun dealer, yet people routinely choose a licensed
4  gun dealer over a private seller and their reason is
5  they're more confident in the safety and quality of
6  the firearm when they're dealing with a licensed
7  dealer than they are with some stranger who they
8  connected with on armslist.com.
9      Q    And was Devin Kelley -- you referenced
10  about risk.  Is Devin Kelley the type of person who
11  was deterred by risk?
12     A    He didn't seem to really love to go to
13  jail.  He didn't really love to be confined in the
14  hospital for mental treatment.  So I'm going to go
15  out on a limb and say he, he wanted to avoid risk of
16  going to jail and he probably wanted to go to avoid
17  the risk of being shot.
18          It seems to me that he was -- his
19  behavior showed that those are things that he cared
20  about.  He didn't want to be confined and doubtful
21  that he wanted to be shot.
22     Q    Dr. Webster, you can go to jail for

1  sexually assaulting someone, correct?
2      A    Yes.
3      Q    And Devin Kelley did that multiple times,
4  correct?
5      A    He did.  A lot of people get away with
6  that, particularly with acquaintances when you're a
7  teenager.
8      Q    Carrying a concealed weapon without a
9  permit is illegal in many states, right?
10     A    Sure.
11     Q    And Devin Kelley carried a concealed
12  weapon in Texas without a permit, right?
13     A    Actually, I don't know if he carried,
14  concealed.  The information that I read in the
15  transcripts and such indicated that he would have
16  one on his hip.  It wasn't always clear to me
17  that -- I actually inferred that it was often open
18  carry as opposed to conceal carry.
19     Q    And his even owning firearms was illegal
20  under the Gun Control Act, correct?
21     A    Yes.
22     Q    But that didn't deter his purchases of

1 those firearms and FFLs, right?

2     A    No.

3     Q    Owning body armor is a felony in Texas

4 correct, if you're a felon?

5     A    I don't know that law specifically, but

6 I'll take your word for it.

7     Q    Texas Penal Code Section 46.041A is a code

8 I'm referring to. And Devin Kelley acquired body

9 armor online, correct?

10     A    Yeah.

11     Q    And he wasn't deterred in making that

12 transaction, was he?

13     A    Apparently not.

14     Q    Devin Kelley abused animals, correct?

15     A    That's what the evidence suggests, yeah.

16     Q    And he got caught in Colorado, right?

17     A    Yes.

18     Q    And abuse of animals is potentially,

19 depending on severity, a felony, right?

20         MR. JACOB:   Objection, form. Yeah,

21     depending on the severity.

22

---

BY MR. FURMAN:

2     Q    Devin Kelley used, used illegal drugs,

3 correct?

4     A    That's my understanding.

5     Q    And Devin Kelley offered money to women

6 for sexual favors; is that right?

7     A    I believe so.

8     Q    And he also had -- you point out in your

9 report, he had antisocial personality disorder; is

10 that right?

11     A    That's what he was diagnosed with, I

12 believe.

13     Q    People with antisocial personality

14 disorder aren't too concerned about risk, are they?

15     A    I don't think I would make that

16 conclusion. They do have a variety of antisocial

17 and that isn't a violent thing, but they also try to

18 avoid consequences for those practices or behaviors.

19 So don't just act in ways in which they have no care

20 about the potential of being caught and facing

21 consequences necessarily.

22     Q    We just talked about a number of

---

1 occurrences or law breaking behaviors, several of

2 which at least could have potentially put Devin

3 Kelley in jail, correct?

4     A    Yeah.

5     Q    And is it still your opinion that Devin

6 Kelley would have been deterred by denial at an FFL

7 by seeking money or seeking firearms elsewhere due

8 to risk of going to jail? Is that right?

9         MR. JACOB:   Form.

10     A    What I was stating is that there are a

11 variety of risks connected to, to these things, one

12 of which is incarceration.

13 BY MR. FURMAN:

14     Q    Right.

15         MR. JACOB:   Austin, I don't know if you're

16     near a stopping point, but we've been going

17     about an hour and a half. It might be, if you

18     are, maybe a ten minute break.

19         MR. FURMAN:   I'll give you that. I was

20     thinking the same thing. So let's go off the

21     record, please.

22         THE VIDEOGRAPHER:   We are going off video

---

1     record at 2:59 p.m.

2         (Whereupon, there was a break from

3     2:59 p.m. until 3:12 p.m.)

4         THE VIDEOGRAPHER:   We are back on video

5     record at 3:12 p.m.

6 BY MR. FURMAN:

7     Q    Thank you. Dr. Webster, we've been

8 talking about some of the behaviors and risk factors

9 that you recall that the Air Force may or should

10 have been aware of with respect to Devin Kelley for

11 future violence. And are you aware that there was

12 a, although there was a plea agreement with respect

13 to the charges, that there was a sentencing trial

14 with respect to Mr. Kelley?

15     A    Yes.

16     Q    And that was -- and a jury of his peers

17 were charged with determining the severity or the

18 length of his sentence; is that right?

19     A    Yes.

20     Q    And under the felony assault of his son

21 and the misdemeanor itself of his wife, he could

22 have been sentenced to five and a half years in

1    suicidal, suicidality.

2        Q    Well, I mean, it's documented now, almost

3    by definition, if you're going to commit a mass

4    shooting, don't you have to be prepared to die?

5    It's a pretty good likelihood, wouldn't you agree?

6        A    Yeah, I would.

7        Q    And the study you cited that's related to

8    intimate partner violence, and again, Devin Kelley

9    didn't kill his intimate partner and then kill

10   himself, he killed church members that were not his

11   wife, right?

12           MR. JACOB:   Objection, form.  Asked and

13       answered.

14       A    Right.

15   BY MR. FURMAN:

16       Q    Right.  So how is the research related to

17   someone who kills their spouse and then kill

18   themselves, how is that related to a mass shooting

19   of people other than his spouse?  That's where I'm,

20   I'm not seeing the connection.

21       A    Well, it's something I discussed earlier.

22   I believe his motivation was relevant to his history

---

1    of domestic violence and his set of motivations.

2        Q    All right.  Is there any empirical

3    research on motivation related to domestic violence

4    concerning future violence?

5        A    Not that I can think of.

6        Q    If you can turn back to your report, and

7    this is page nine.  This is beyond research specific

8    to domestic violence.  There is evidence that access

9    to firearms by those with a history of violence is

10   associated with increased risk for future violence

11   by those who acquire firearms legally.  Do you see

12   that?

13       A    Yeah.

14       Q    And we talked about the Wintemute study

15   earlier, so, but before we move on, when you say

16   acquire firearms legally, what do you mean by that?

17       A    Well, in this particular study these are

18   individuals who went to a licensed gun shop and

19   acquired guns, they were not prohibited, at the time

20   that they purchased their guns.

21       Q    Right.  Devin Kelley was prohibited,

22   right?

---

1        A    That's correct.

2        Q    So his purchasing a gun would have been

3    illegal, right?

4        A    Yeah.  Actually, I think that's precisely

5    the point, that he was not denied because the

6    records were not in there.  When, when you do a

7    study in which you look at people who go to licensed

8    gun shops in the manner quite similar to what

9    Mr. Kelley did and they were denied, their rate of

10   committing violent acts, including violent acts,

11   violent crimes with firearms was significantly

12   lower.

13       Q    And you're referring to the additional

14   Wintemute studies cited in your report; is that

15   right?

16       A    That's correct.  Also separate research

17   that, also that I cite, led by Dr. Jeffrey Swanson

18   and Duke University, looking very specifically at

19   individual cases of who was and was not prohibited

20   and the records in the background check system.

21               And Connecticut, for example, greatly

22   increased its submission of records for denying

---

1    firearm acquisition for cases relevant to mental

2    health denials, that the individuals who were

3    affected by that, in terms of they were illegal,

4    their rates for violent crime were basically cut in

5    half.

6        Q    Since you brought that up, I'm going to

7    mark exhibit -- I think we're up to 12.

8               (Whereupon, Exhibit No. 12 was marked for

9           identification.)

10   BY MR. FURMAN:

11       Q    Reducing Gun Violence in America.  Is that

12   your book?

13       A    It is.

14       Q    And this is the Mr. Swanson you were

15   talking about?

16       A    Yes.

17       Q    Does this book chapter refer to some of

18   the, the research you're talking about?

19       A    Yes.

20       Q    Is this who you're referring to, the

21   subgroup or the corresponding decline was greater,

22   from 6.7 before NICS to 3.2 percent after NICS?

1 licensed gun dealer, however, that does not mean
2 that, that background checks are not a deterrent for
3 some individuals being able to carry out acts of gun
4 violence.
5     Q    On the left-hand side are some of, what
6 you're referring to as far as comprehensive
7 background checks.  Reading here, a cluster of
8 population level studies have yielded findings of no
9 effect for comprehensive background check policies.
10 Do you see that?
11     A    Yes.
12     Q    And here it says, or private party sells
13 more frequently involve background checks in states
14 where checks are required, 74 percent that are in
15 states where they are not.  But note that in the
16 first group there is 26 percent noncompliance of the
17 requirement.  Do you see that?
18     A    Yeah.
19     Q    Does that sound right to you, the numbers?
20     A    It's what the study reflects, yeah.
21     Q    I'm looking over here where it says
22 noncompliance by sellers and buyers, it talks about

1 the 26 percent.  A noncompliance of this magnitude
2 preserves a sizeable pathway for anonymous,
3 undocumented transfers of firearms.  Do you agree
4 with that statement?
5     A    Yeah.
6     Q    And then in a study of private-party sells
7 at gun shows, undercover investigators found that
8 nearly two-thirds of sellers proceeded with a sale
9 despite having reasonable cause to believe they were
10 selling to a prohibited person.  Do you see that?
11     A    Yeah.
12     Q    Any reason to dispute that?
13     A    No.
14     Q    A study of would purchasers at online
15 firearms, brokerages found that, at a minimum, one
16 in thirty were prohibited persons.  Any reasons to
17 dispute that?
18     A    No.
19     Q    And last, the undercover investigators
20 found that 62 percent of online firearms sellers
21 were willing to sell to buyers who had said they
22 would probably fail background checks.  Do you agree

1 with that?
2     A    Yeah, I did.  That's what the study found.
3 I mean --
4     Q    And research also found that retailers are
5 often willing to sell to a straw, potential straw
6 purchaser, correct?
7     A    I would say a small subset.
8     Q    We'll mark this Exhibit 14.
9         (Whereupon, Exhibit No. 14 was marked for
10     identification.)
11 BY MR. FURMAN:
12     Q    Dr. Webster, do you see the document in
13 front of you?
14     A    I do.
15     Q    These authors, are these associates of
16 yours?
17     A    Vittes once worked for me.
18     Q    And this was a study of 120 handgun
19 dealers with a person calling, posing as a potential
20 straw purchaser; is that right?
21     A    Um-hum, yes.
22     Q    And the results in the summary here it

1 says most dealers, most dealers are willing to sell
2 a handgun regardless of the end user.  Do you see
3 that?
4     A    I do.  The fact that they indicated on the
5 phone in openness is a separate question of whether
6 someone shows up to do it, what they would do.
7     Q    Well, we just talked about some stated gun
8 shows where people were actually selling to people
9 who they thought were prohibited, right?
10     A    Yeah.
11     Q    So people do actually sell to, you know,
12 sell firearms in private sells even when they have
13 good reason to believe that the person is
14 prohibited.  Would you agree with that?
15     A    Yeah, but my, my comment just a minute ago
16 was simply in reference to the study that we're
17 looking at right now that I want to acknowledge some
18 limitation of how they aren't measuring a
19 willingness to sell.  They're measuring willingness
20 to sell based upon a conversation on the phone which
21 is very different from someone who's before them
22 where they have to go through the procedures with

1    4473s and so on, or whether they would make that
2    transaction or not.
3         Q     Well, so is it possible that some of the
4    dealers who were unwilling to sell on the phone in
5    person might have been also willing to sell to a
6    straw purchaser, right?
7         A     Yeah, we don't know.
8         Q     Okay.  Dr. Webster, we've been talking
9    about background checks and particularly why
10   comprehensive background checks might not work.
11   With respect to whether a background check works
12   with respect to a particular person, there are a
13   number of factors.  Would you agree?
14        MR. JACOB:   Objection, form.
15        A     Can you do a clearer -- I'm not sure, I'm
16   not sure how to answer question.
17   BY MR. FURMAN:
18        Q     Right.  So I'm looking at whether a
19   particular individual who is prohibited from
20   purchasing, whether that particular person will be
21   able to acquire a weapon for firearm not
22   withstanding a background check or how effective the

1    background check will be, that depends on a variety
2    of factors, would you agree?
3         A     Yeah.
4         Q     We talked about several, you know, the
5    availability of firearms, you know, the straining of
6    regulations in a particular state, and those are
7    both relevant, correct?
8         A     Yeah, they're relevant.  I think what's
9    most relevant is -- and it's what we learned in a
10   number of studies, pretty consistently learned, is
11   that people have a very strong preference for
12   purchasing firearms, acquiring firearms from people
13   they know and trust and that they pretty rarely
14   engage in those transactions with a stranger.
15           So if you live in Texas, for example,
16   and there's a lot of people with guns but you don't
17   know any who would actually, you trust them or they
18   trust you, doesn't mean that guns are widely
19   available.  So what's most relevant -- and Phil
20   Cook, a famous economist from Duke University who
21   studied gun violence and gun markets is, you know,
22   there are times and places where there are a lot of

211

1    guns but the limiting factor is a trusted supplier,
2    and I think that's relevant in this case with
3    Mr. Kelley.
4           Mr. Kelley seemed to not have friends
5    and family who were willing, who he trusted and who
6    trusted him, with a firearm transaction and that
7    exchanges with just strangers who might be in the
8    area or something were quite uncertain as well.
9           So in this particular case, I think,
10   you know, his ability to be able to get a gun
11   directly from an unlicensed gun seller was, was
12   really quite critical in what happened here.
13        Q     Dr. Webster, we talked about Devin
14   Kelley's purchaser of firearms, or not firearms,
15   body armor through online and we talked about that
16   was illegal under the Texas code and as an online
17   transaction.  Is there any evidence you're aware of
18   that Devin Kelley had any particular trust in this
19   person selling body armor online?
20        A     I don't actually know that he got it from
21   an individual he just met up with.  I don't know
22   exactly how he got that body armor.  I don't know

212

1    that it was, hey, meet me at the parking lot at the
2    Wal-Mart or whatever.  I don't know how he --
3    whether its something that showed up on his door
4    step in an Amazon box or how, how it got there.  I
5    don't really recall that.
6         Q     All right.  Certainly there are a large
7    number of transactions for firearms that involve the
8    Internet, correct?
9         A     Yeah, as a place to connect with potential
10   sellers.  So, yeah, that a mechanism by which people
11   do make connections.
12        Q     And you're indicating, Dr. Webster, is
13   that all those persons who purchase firearms through
14   the Internet built some sort of rapport or
15   relationship with the seller before they're willing
16   to engage in the transaction?
17        A     I honestly don't know, but it's important
18   to note that actually included in the study we were
19   just talking about a moment ago that Matthew Miller
20   led, that the vast majority of people acquire guns
21   in a manner that do involve a background check
22   commonly through an FFL.

1      A    That's not what I was saying. What I was
2  saying is not to get a friend to buy a gun for you
3  but a friend who had a gun that you want to buy, buy
4  from. So it's, it's very common that people buy
5  guns from people they know. Sometimes it's to what
6  we were discussing before, is a straw sell, in which
7  the prohibitive person says, hey, will you go to
8  Bob's Gun Shop and go in and buy me, you know, this
9  AR-15 or whatever, but -- or some a more common
10  scenario is, you know, we also search on networks
11  and what we, what we know is that people buy and
12  sell from through those social networks and that's
13  particularly true when it comes to prohibited people
14  acquiring firearms.
15              So the biggest category of, source of
16  guns for prohibited people from the national surveys
17  are people incarcerated in State prisons for
18  committing violent crime is through a friend or a
19  family member.
20              So it didn't appear from what, the
21  information available, that Mr., that Devin Kelley
22  had someone, a friend or family, that he trusted or

1  they trusted him, in which to get a firearm.
2              So I think there's a number of
3  factors that make me conclude that it's quite
4  probable that he would not have been able to carry
5  out the act of violence that he did had he not had
6  the door open for him through a licensed dealer.
7      Q    I'm not quite sure I understand your
8  logic, Dr. Webster. I mean, if I can go to the car
9  store and buy a new car at a car dealership, I can
10  buy any car I want and then get it, but if I have to
11  buy a car from a friend, then obviously I'm limited
12  to the cars that my friend has.
13              So if I need a car to drive around
14  and I can't buy one from a dealer, I got to buy one
15  from a friend, but if I can buy one from a dealer,
16  all else being equal, why wouldn't I? Doesn't the
17  same apply here?
18              I mean, Devin Kelley is going to go
19  to a, you know, FFL to buy a firearm and he gets the
20  selection he wants and, yeah, I could buy from a
21  friend but if he's not, you know, if the background
22  check isn't prohibiting him, why would he limit

1  himself to buy something else when he can buy
2  whatever he wants from an FFL?
3      MR. JACOB:   Objection, speculation.
4      A    Well, I'll just respond. Guns and cars
5  are two different products and you might find, if
6  you're a prohibited person, you find somebody will
7  sell you a lawn mower, you might find somebody who
8  will sell you a car, you might find somebody who
9  will sell you a piece of furniture.
10              But if you say, hey, can I buy your
11  gun to this friend, particularly if they know you,
12  they may know, hey, you shouldn't buy a gun, B,
13  you're prohibited, I'm not going to sell you my gun.
14              So, so, yeah, it's a marketplace that
15  is built upon trust. There are risks and laws in
16  place as it relates firearms that are unique among
17  products. And we know from studying this general
18  phenomenon of criminal access to firearms that it's,
19  it's highly dependent upon social networks who --
20  where there are trusted suppliers and sellers.
21              And again, it's one thing if you're,
22  if you're in a gang and there are individuals who,

1  who share guns within a gang, but this, Mr. Kelley,
2  is different -- individual. He did not think to
3  have a social network to speak of and certainly not
4  one that saw him as trustworthy, so yeah.
5      Q    All right. We were discussing the trusted
6  factors and those sorts of things. Is that anywhere
7  in your report?
8      A    To make it easy, I don't see anywhere in
9  your report where you discuss acquiring firearms at
10  a -- through a means other than through an FFL.
11      MR. JACOB:   Objection, form.
12      A    Yeah, it's not in here, but I'm telling
13  you that's my expert opinion. So this is what I
14  study. I'm happy to write something summarizing it
15  if you'd like, but that's, that's my opinion based
16  upon the data that I know.
17  BY MR. FURMAN:
18      Q    And given the prevalence of the firearms
19  and the limited regulations of firearms in Texas, do
20  you think it's a critical omission that you did not
21  discuss at all the ability of the shooter to get
22  firearms elsewhere in Texas, other than an FFL?

1  That's the whole point of this case, is that he had
2  a trigger to pull, and particularly a trigger to a
3  firearm that facilitated mass violence because of
4  the failure to put his records into the FBI's NICS
5  system where he should have been denied from being
6  able to acquire the firearm that he used to commit
7  mass murder.
8  BY MR. FURMAN:
9      Q    Earlier we also talked about how -- we
10 talked about the language used to increase the risk
11 of harm and I guess my question is increase a risk
12 of harm over what?
13     A    I don't know how to answer that question
14 other than, no, I've been asking -- answering more
15 or less the same question over and over.  So this is
16 a man who had a history of violence, including a
17 history of gun violence.  It's not as though there
18 would have been no risks that he would have done
19 anything to harm someone had the Air Force and the
20 Department of Defense done what they were supposed
21 to do.
22              But we only have the facts available

1  in this particular case, and in this particular case
2  we have a man who, who was able to acquire serious
3  weaponry to carry out this act who didn't have the
4  obvious means to, that were preferable to him, to be
5  able to, to carry out his intentions.
6      Q    And the Air Force's obligation to submit
7  the fingerprints, that was under the Brady Act,
8  right?
9          MR. JACOB:   Objection, form.
10     A    I don't know if it's under the Brady Act
11 or a different act, I don't know, but I know that
12 they're federally -- federal laws require that
13 they're supposed to submit these records.
14 BY MR. FURMAN:
15     Q    And if there were no federal law requiring
16 them to submit the records, then there would have
17 been no increased risk of harm if those records were
18 not submitted, right?
19         MR. JACOB:   Objection, form.
20     A    I don't care if the law required it or
21 not.  Their failure to do so enabled this man to
22 acquire the firearms to use to commit mass murder.

1  So that is what is relevant.  I mean, I think it's
2  also relevant that they didn't follow federal law.
3  But independent of what the law is, there's an
4  obligation for public safety to submit records for
5  individuals who are legally prohibited to have a
6  gun.
7  BY MR. FURMAN:
8      Q    Okay.  I'd like to move on.  Dr. Webster,
9  in your report you cite research that supports the
10 background checks to defer future violence.  I'm
11 talking about the Wintemute study.  Does that sound
12 familiar?
13     A    Yes, yes.
14     Q    Are there any other studies that you -- I
15 know there's the population based studies that look
16 at background checks.  Obviously those don't have
17 control groups, or if they do, they're synthetic
18 controls, but are there any other studies that
19 compare background checks, to do background checks
20 in the way Wintemute does using the naturally
21 occurring control groups?
22         MR. JACOB:   Objection, form.

1      A    No, certainly not in the same manner in
2  some of the studies that our teams have done with,
3  with studying comprehensive background check law
4  requirements.  There are studies that are cited in
5  Dr. Wintemute's 2019 study that shows that the more
6  records that states examined in their background
7  check system, that there's a correlation with fewer
8  firearm homicides.  So I think that is relevant to
9  this case as well.
10 BY MR. FURMAN:
11     Q    There's no study that you're aware of on
12 whether individuals who are denied purchase at an
13 FFL go on to acquire firearm from other means?
14     A    I'm thinking for a moment here.  Nothing I
15 can think of at the moment.
16     Q    All right.  Part of the problem with
17 having a study like that is you need a way for the
18 study to trace weapons or find weapons that people
19 who are acquiring weapons for a private sale,
20 there's no record, right?
21     A    That's correct.
22     Q    So I suppose you do a survey of people who

1    Q    All right. I'm getting a -- hopefully we
2    will stay connected. If we do we'll just --
3         MR. JACOB:    Did he disconnect?
4         THE VIDEOGRAPHER:    I believe so. We'll go
5    off the record while we wait for Mr. Furman.
6         MR. JACOB:    Okay.
7         THE VIDEOGRAPHER:    Okay. We are going off
8    video record at 5:44 p.m.
9         (Whereupon, Exhibit No. 17 was marked for
10   identification.)
11        (Whereupon, there was a break from
12   5:44 p.m. until 6:01 p.m.)
13        THE VIDEOGRAPHER:    We are back on video
14   record at 6:01 p.m.
15   BY MR. FURMAN:
16   Q    Thank you, Dr. Webster. Can you hear me
17   okay?
18   A    I can.
19   Q    Thank you. I marked an exhibit, so I'll
20   try to bring the same exhibit using share screen on
21   this computer. Let's see if that works. All right.
22   I hit share screen. Did that work?

1    A    Yes.
2    Q    Okay. Perfect. And this is Exhibit 17.
3    And we were discussing this before we got cut off.
4    This is one of the studies you relied upon in your
5    --
6    A    Yes.
7    Q    -- in your report?
8    A    Yes.
9    Q    Okay. And I think you explain some of the
10   details of this study in your report, so I don't
11   think we need to get into them this second, but I'm
12   looking here at the introduction, and Wintemute
13   makes the statement, denial of handgun purchases by
14   felons has associated reduction in their risk of
15   committing new gun or violent crimes that are
16   approximately 20 percent of the 25 percent. Do you
17   see that?
18   A    Yes.
19   Q    And you're referring to the other study
20   that you said in your report, correct?
21   A    Yes.
22   Q    Okay. We'll talk about that one in a

1    minute.
2    A    Okay.
3    Q    All right. I'm looking, this is page 1025
4    of the study, that says, it's referring to criminal
5    record data, and it says, because criminal records
6    data were not sufficiently specific, we are unable
7    to categorize crimes systematically involving guns,
8    violence, both or neither. We were therefore unable
9    to study the specific effects of California's denial
10   policy on risk of arrests for violent crimes.
11        So basically what Wintemute is saying
12   that whether or not this background check had a
13   section deterring violence, we can't specifically
14   say so with respect to violent gun crimes, correct?
15        MR. JACOB:    Objection. Mischaracterizes
16        the evidence.
17   A    It's what is clearly stated in the article
18   here. Not all the crimes that they were able to
19   record was it possible to discern whether a gun was
20   involved or not. So principally, as they report,
21   they report crimes that involve violence or guns.
22

1    BY MR. FURMAN:
2    Q    Right, but if your objection is to measure
3    gun violence and Wintemute is saying a limitation
4    that you can't do that precisely, correct?
5         MR. JACOB:    Objection. Mischaracterizes
6         the testimony. Asked and answered.
7    A    Correct.
8    BY MR. FURMAN:
9    Q    Sorry, Doctor. What was your answer?
10        MR. JACOB:    Same objection.
11   A    That's correct. That's correct. He notes
12   the limitation in the data and I acknowledge what,
13   what was noted, what the limitations of data.
14   BY MR. FURMAN:
15   Q    Let's go here on page, would be 2735, it's
16   referring, says purchasers were more likely than
17   denied persons to be arrested for a new gun and/or
18   violent crime. Do you see that?
19   A    I do.
20   Q    And it's referring at the end, it says P.
21   Is that a P significant testing value?
22   A    Yes.

1    Q    And if he says threshold at .05.048, just
2    meets in there, right?
3    A    Yes.
4    Q    And if it had been three, a thousands
5    higher, he would have concluded otherwise, right,
6    that there was no difference, if the no hypothesis
7    was true?
8    A    Well, with respect to the statistical
9    significance test, yes. I'll say the field is moved
10   from when this study was published so that
11   statisticians and epidemiologists are not fixated on
12   a magical threshold of .05, but the, but simply
13   acknowledging degrees of uncertainty around any
14   given estimate.
15   Q    Right. And Dr. Webster, there are certain
16   statistics such as affect sizes that can accurately
17   characterize or determine the size of affects,
18   correct?
19   A    Yeah.
20   Q    And did Dr. Wintemute do that here?
21   A    He did in terms of percent change, which
22   is a pretty clear and understandable way to reflect

1    size of affect.
2    Q    It is, but you have to know whether the,
3    the differences are real ones versus ones that's an
4    artifact or the data, correct?
5    A    I don't know what you mean by artifact or
6    the data.
7    Q    Or I guess a better term might be just
8    statistically, statistically significant, right?
9    Just to say it different doesn't mean anything
10   unless there's a statistically different impact,
11   right?
12        MR. JACOB:    Objection, form.
13   A    I'm going to say my interpretation of, of
14   the findings in this data is that the difference
15   that Dr. Wintemute and his colleagues report here
16   between those who are able to purchase versus those
17   denied are important in terms of the size of the
18   affect as well as the statistical significance.
19        So in both instances we have the
20   size, a size affect that is, in my mind, quite
21   meaningful, and a, a measure of the degree of
22   certainty of that difference that also indicates

1    something that is, to use your words, unlikely to be
2    an artifact but simply reflect the true difference
3    between purchasers, those who are able to purchase
4    versus those who are able -- those who were denied.
5    BY MR. FURMAN:
6    Q    Right. On the first page here under
7    results, you're referring to the 1.29 and supervised
8    confidence intervals?
9    A    Yes. So that 95 percent confidence
10   interval for that hazard rate reflects that it could
11   be anywhere from a 4 percent difference to a
12   60 percent difference. So the, the best estimate is
13   a 29 percent higher rate among those who are able to
14   purchase versus denied.
15   Q    Right. And I -- as one of our witnesses
16   call it, I hate to make you do public math, but if
17   it's a 29 percent increase, wouldn't that be the
18   same as being a 22 percent decrease or less likely
19   to take 129 over 29?
20        MR. JACOB:    Objection, form.
21   A    129 over what? I'm sorry, I didn't hear
22   the last part.

1    BY MR. FURMAN:
2    Q    Sorry, 29 over 129 in order to compete the
3    percentage reduction versus percentage increase.
4        MR. JACOB:    Objection, form.
5    A    I'm not sure how that's how I would do the
6    math.
7    BY MR. FURMAN:
8    Q    Do you have a different number?
9    A    Hold on a second. Yeah, a little more
10   than a 20, a little more than -- about 22 and a half
11   percent lower.
12   Q    Okay. Twenty-two, okay. We'll take that
13   number. So essentially denial in this case due to a
14   background check led to a 22 percent reduction in
15   future violence?
16   A    Yes.
17   Q    And this involves those convicted of only
18   a violent misdemeanor, correct?
19   A    Yes.
20   Q    And Devin Patrick Kelley was also
21   convicted of a violent felony as well, correct?
22   A    Correct.

1    And Dr. Webster, are these two
2  studies the most relevant for your opinions in this
3  case regarding whether Devin Patrick Kelley would
4  have not committed mass violence had he been denied
5  an FFL?
6    MR. JACOB:   Objection, form.
7    A    I think the most directly, relevant, I
8  think that the Swanson study, Jeffrey Swanson study
9  that we talked about earlier, while it pertained,
10  the prohibiting conditions pertained to those with
11  mental illness connected prohibitors, it was a
12  direct, very direct study about having more records
13  and more capacity to identify prohibiting conditions
14  and how that affects violent crime, which then
15  showed that it was a pretty large affect of a
16  50 percent reduction connected to the capacity to
17  deny firearms to prohibited people.  People, people
18  designated as prohibited based on a level of danger.
19  BY MR. FURMAN:
20    Q    But was that with respect to prohibited
21  based off mental health status, correct?
22    A    Yeah.

1    MR. JACOB:   Objection to the form.
2    A    As I was saying earlier, the vast majority
3  of -- look, mental illness by itself, not a good
4  predictor.  You're prohibited from purchasing
5  firearms connected to the mental illness connection,
6  that typically is violence connected.  The thing
7  that gets you involuntarily committed for mental
8  health treatment is because you have threatened or
9  committed acts of violence against someone else or
10  yourself.
11    So typically prohibitions connected
12  to mental health are very directly relevant to
13  capacity and risk for violence.
14  BY MR. FURMAN:
15    Q    And in the Swanson study didn't
16  82.5 percent as the individuals also have
17  comorbidity, a substance abuse problem?
18    MR. JACOB:   Objection.  Asked and
19    answered.
20  BY MR. FURMAN:
21    Q    And wouldn't the fact that almost all of
22  the study participants or people studied had such a

1  disorder, wouldn't that be a, a large, potentially
2  confounding variable?
3    A    No.  It's simply the reality of, of what
4  those individuals were, were living with.  I mean,
5  the reason that they have high risk for committing
6  violence is a combination of their mental illness
7  and that their substance abuse practices and
8  disorders.  And, again, it's a very small subset who
9  are prohibited for firearm purchases.  And almost
10  always the reason they are prohibited because
11  they've exhibited behavior they have done things
12  that show that they are dangerous and violent,
13  violent towards others or themselves.
14    So this is, this is a group that
15  typically has a history of violent and dangerous
16  behaviors that, in their particular case, have some
17  connection to a history of mental illness and
18  substance abuse.  But what is, is what is determining
19  their prohibited status, again, it's not like
20  someone came in and they got diagnosed with
21  schizophrenia and they said, okay, you can't have a
22  gun, that's not how it works.  You get prohibited

1  because you've done something incredibly dangerous
2  and threatening to someone else or yourself.
3  Someone else or yourself, yes.
4    So that is quite relevant to
5  understanding and coming to a conclusion about this
6  case.
7    Q    Is there any other research you're aware
8  of showing that filling in gaps in the background
9  check system lead to decreased violence?
10    A    Yeah.  Dr. Swanson has a very similar
11  study in Florida, or more recent.
12    Q    That is again regarding mental health?
13    A    Yeah.
14    Q    Any of those types of studies with respect
15  to any of the other prohibitors under the Gun
16  Control Act?
17    A    Not that I can think of right now.
18    Q    Returning for a minute to the Wintemute
19  studies we just talked about, the two studies.
20  Would you agree that the studies show about a
21  25 percent reduction on violence based off denial of
22  the purchase?

277

1    A    Yes.

2    Q    FFL?  And Doctor, given that these studies
3  only show a 25 percent reduction in risk, how can
4  you in this case conclude that there was a greater
5  than 50 percent likelihood that Devin Patrick Kelley
6  would have been prohibited or prevented, rather,
7  from committing violence?

8    A    Based upon the facts in Mr. Kelley's case.
9  And in the case in the Wintemute studies, you're
10 talking about a broad population.  Many of those
11 individuals are involved or connected with the
12 social networks involved in criminal activities,
13 gangs and such, that facilitates their capacity to
14 acquire firearms and more generally engage in
15 violent activities.  That was not case with Mr.
16 Kelley.  Mr. Kelley was not part of the gang.

17       So my conclusion about this case is,
18 is based upon facts presented about Mr. Kelley's
19 history and, and the case relevant to his ability
20 to, to get firearms.

21    Q    And Dr. Webster, before, before this case,
22 this litigation, had you ever offered an opinion on

278

1  whether an individual would have been prevented from
2  committing violence by a background check?

3       MR. JACOB:    Objection.  Asked and
4       answered.

5  BY MR. FURMAN:

6    Q    Sorry.  You can answer.

7    A    The answer is no.

8    Q    And is that something, determining whether
9  an individual would be prohibited by a background
10 check, is that something you do in the course of
11 your work as an epidemiologist?

12       MR. JACOB:    Objection, form.  Asked and
13       answered.

14    A    Yeah, as I stated before, I am, I'm not in
15 a clinical capacity evaluating individuals.  I look
16 at it in broad such data to understand violent
17 behavior, role of guns and gun policy.

18 BY MR. FURMAN:

19    Q    And that's, Doctor, is it not different
20 from what you are doing in this case?

21       MR. JACOB:    Objection, form.

22    A    What I'm doing in this case is I'm drawing

279

1  upon my understanding of gun violence, something
2  I've studied for 30 years, and the facts available
3  in this case.

4  BY MR. FURMAN:

5    Q    Dr. Webster, have you heard of ghost guns?

6    A    Sure.

7    Q    60 minutes did a special on that.  Did you
8  watch that?

9    A    I did not watch it.  I knew that there was
10 a segment but it's something I'm well aware of.

11    Q    Right.  And that's essentially where you
12 buy the partially assembled firearm through the mail
13 and then assemble it yourself?

14    A    Yep.

15    Q    Is that basically right?

16    A    Yep.

17    Q    And do you have any reason to believe that
18 Devin Kelley would not have been able to acquire one
19 of these ghost gun kits in 2016, 2017, in order to
20 obtain a weapon?

21       MR. JACOB:    Objection.  Calls for
22       speculation.

280

1    A    They were sold back then.  Whether he
2  would have wanted or been inclined to or had the
3  mechanical tools and capacity to but putting
4  together a ghost, a working, functioning firearm, I
5  don't know, really don't know.

6  BY MR. FURMAN:

7    Q    Are you personally aware of how much
8  effort it takes or what tools you need in order to
9  assemble one of these weapons?

10    A    You can't do it with, with, you know, a
11 couple screwdrivers and such.  You have to have --
12 you have to do some drill items and other things,
13 piece it together.

14    Q    Do you know about how long it takes to
15 assemble one of those firearms?

16    A    Not off the top of my head, no.

17    Q    Are instructions on how to assemble these
18 firearms readily available through the Internet or
19 otherwise?

20    A    Yeah.

21    Q    Can we go off the record?

22       MR. JACOB:    Yeah.