# Ex. H

**VIOLENCE**

DOI: 10.1377/hlthaff.2019.00671
HEALTH AFFAIRS 38,
NO. 10 (2019): 1702–1710
©2019 Project HOPE—
The People-to-People Health
Foundation, Inc.

By Garen J. Wintemute

ANALYSIS

# Background Checks For Firearm Purchases: Problem Areas And Recommendations To Improve Effectiveness

**Garen J. Wintemute**
(gjwintemute@ucdavis.edu) is
the Baker-Teret Chair in
Violence Prevention and a
professor of emergency
medicine at the University of
California Davis, in
Sacramento. He directs the
UC Davis Violence Prevention
Research Program and the
University of California
Firearm Violence Research
Center.

**ABSTRACT** Mandatory background checks on firearm purchasers receive widespread support from the general public and firearm owners. Background checks appear to reduce the risk of violence substantially among prohibited persons whose purchases are denied. However, population-level studies, including studies of comprehensive background check policies, have often shown no clear evidence of benefit. There is one notable exception: Permit-to-purchase policies have consistently been associated with beneficial population-level effects. The findings of no benefit may in part be an artifact of history, as the completeness of the data on which background checks are run has improved substantially since the periods examined by those studies. Nonetheless, significant problems with implementation and design still limit the population-level effectiveness of background check policies. In this article I review nine of these problem areas and suggest actions that could substantially improve the effectiveness of background check policies in preventing firearm-related violence.

Several widely known public mass shootings have occurred after people who were prohibited from purchasing firearms nonetheless purchased them from licensed firearm retailers after background checks failed to identify their prohibitions (see online appendix section A1 for case summaries).[1] False-negative background checks may be common, as it appears likely that hundreds of thousands of prohibiting events have never been reported.

Other problems in the implementation and design of background check policies also impair their effectiveness, and carefully conducted studies have often found them not to affect population-level measures of violence. The problem areas in implementation are incomplete data due to failed reporting, poor definitions of prohibiting events, insufficiently thorough background checks, release of firearms before checks are completed, noncompliance by sellers and buyers, and suboptimal enforcement. The problem areas in design are overly narrow prohibition criteria, failure to include private-party transfers, and failure to include a permitting process.

The purpose of this article is to help set the stage for improvements to background check policies that will maximize their effectiveness in preventing firearm violence. It is divided into three parts: background information; a review of the science on the effectiveness of background checks; and a consideration of the problem areas listed above, with recommendations for improvement.

Downloaded from HealthAffairs.org on October 12, 2019.
Copyright Project HOPE—The People-to-People Health Foundation, Inc.
For personal use only. All rights reserved. Reuse permissions at HealthAffairs.org.

SSS-002798

## Background

Over the ten years ending with 2017, US civilian fatalities from firearm violence (homicide and suicide) exceeded US combat fatalities in World War II. In 2017 there were 14,542 firearm homicides; 23,854 firearm suicides[2]; and an estimated 456,269 instances of aggravated assault, robbery, or rape involving firearms.[3] Firearm homicides have increased by 32 percent since a low in 2014, suicides by 41 percent since 2006, and nonfatal victimizations by 37 percent since 2013.[2]

As one approach to prevention, federal law prohibits the purchase or possession of firearms or ammunition by people who meet specified criteria (see appendix exhibit A1 and appendix section A2).[1] Some criteria, such as prior criminal convictions, are strongly associated with risk for future violence, including among firearm owners.[4–6] Others, such as undocumented alien status, are not.[7]

Some high-risk characteristics are not prohibiting under federal law. States have therefore expanded their prohibitions to include people convicted of violent misdemeanor crimes, those subject to temporary domestic violence restraining orders, or those who have experienced mental health emergencies associated with danger to themselves or others.

Since the passage of the Gun Control Act of 1968, people purchasing firearms from federally licensed retailers (such as gun stores and pawnshops) have been required to certify under penalty of perjury that they are not prohibited persons. Only with the Brady Handgun Violence Prevention Act of 1994, however, were background checks required to help determine whether purchasers were telling the truth. From then through 2015 nearly 2.6 million firearm purchases were denied, usually because prospective purchasers had prohibiting criminal convictions.[8]

Background check procedures and rigor vary from state to state (appendix section A3).[1] In all cases, queries are submitted to the National Instant Criminal Background Check System (NICS), which is operated by the Federal Bureau of Investigation (FBI). The completeness of the data accessed by NICS has increased substantially, particularly in recent years (appendix exhibit A2).[1] About 90 percent of NICS checks are completed in a few minutes.[9] If necessary, people purchasing from licensed retailers must wait as long as three business days for checks to be completed before acquiring firearms,[9] and retailers must keep permanent records.

However, most states allow direct sales between private parties,[10] if neither party is a prohibited person. A licensed retailer is not involved, no background check or waiting period is required, and no record need be kept. About 22 percent of all firearm transfers in the United States proceed without background checks.[11]

For a prohibited person or a purchaser with criminal intent, a private-party transaction is essential. Not surprisingly, the vast majority (about 90 percent) of firearms used in crime are obtained through transactions that do not involve background checks.[12,13]

Recognizing the problem, a number of states have enacted comprehensive background check policies (also known as universal background check policies), which require essentially all transfers of firearms to be routed through a licensed retailer (see appendix section A4 for a list of these states).[1]

The provisions of comprehensive background check policies differ. One important variant is permit to purchase,[14] in which permits or licenses to purchase firearms are issued only after people apply to a state or local law enforcement agency; pass a background check; and, in some states, show evidence of firearm safety training. In permit-to-purchase states, licensed retailers and private parties may sell only to purchasers with valid permits. Some permit-to-purchase laws require in-person applications and fingerprinting.

Comprehensive background check policies enjoy widespread public support. In 2017, 87.8 percent of the public endorsed them, with differences of less than 5 percent between firearm owners and nonowners (85.3 percent and 88.7 percent, respectively) and between Republicans and Democrats (approximately 91 percent and 88 percent, respectively).[15]

## Policy Evaluations

Background checks and denials of purchase appear to reduce the risk of subsequent violence among prohibited persons whose purchases are denied. In a controlled observational study of California's expansion of its prohibitions to include violent misdemeanor convictions, denial was associated with a decrease of about 25 percent in the risk for future firearm-related or violent crime among prospective purchasers.[16] Similar results were obtained in a comparison between prospective handgun purchasers with felony convictions, who were denied, and felony arrestees, who were approved.[5]

Two studies examined improved reporting of prohibiting mental health events, which increased the ability of background checks to identify prohibited persons. In Connecticut there was an immediate reduction of more than 50 percent in the risk of arrest for violent crime, which

Downloaded from HealthAffairs.org on October 12, 2019.
Copyright Project HOPE—The People-to-People Health Foundation, Inc.
For personal use only. All rights reserved. Reuse permissions at HealthAffairs.org.

SSS-002799

greatly exceeded the reduction in a comparison group.[17,18] In Florida improved reporting was associated with a 50 percent decrease in the odds of arrest for a violent crime, with essentially no change in a comparison group.[19]

At the general population level, however, results have been mixed. A study of the Brady Handgun Violence Prevention Act of 1993 in the period 1994–97 found no effect for homicide and an effect on suicide only for people ages fifty-five and older.[20]

A cluster of population-level studies have yielded findings of no effect for comprehensive background check policies. The policies were not associated with an expected decrease in within-state purchases of crime-involved firearms.[21] Repeal of comprehensive background check policies in Indiana and Tennessee in 1998 was not associated with an increase in firearm homicides or suicides.[22] The existence of a comprehensive background check policy had no discernible effect on intimate partner homicides.[23] A study of waiting periods for firearm purchases included comprehensive background check policies as a covariate and found no effect.[24] A study of California's comprehensive background check policy and violent misdemeanor prohibition, both of which took effect in 1991, found no attributable change in firearm homicide or suicide rates.[25] In one instance, comprehensive background check policies were associated with increased rates of firearm homicide.[26] A three-state study of recently enacted comprehensive background check policies that examined subsequent trends in background checks themselves—insufficient time had elapsed for a study of mortality or crime rates—found a post-enactment increase in only one state.[27]

Other studies of comprehensive background check policies have found benefits, however. Private-party sales more frequently involve background checks in states where checks are required (74 percent) than in states where they are not (43 percent)—but note that in the first group there is 26 percent noncompliance with the requirement.[11] The three-state study just mentioned observed increasing background checks for private-party sales in one state following comprehensive background check enactment, but no pre-enactment data were available for comparison.[27] A separate study found a post-enactment increase in private-party checks for sales not at gun shows in another one of the three states, while checks at gun shows (which had previously been required) declined.[28] Comprehensive background check policies appear to have a beneficial effect on in-state firearm trafficking.[29]

> Comprehensive background check policies enjoy widespread public support.

### Permit To Purchase

Increasing evidence, reviewed in detail elsewhere,[30] suggests that permit-to-purchase policies are beneficial. The enactment of permit to purchase in Connecticut in 1995 was associated with a 40 percent decrease in firearm homicides[31] and a 15.4 percent decrease in firearm suicides.[32] Conversely, Missouri's 2007 repeal of its permit-to-purchase policy was associated with a 25 percent increase in firearm homicides in one study[33] and a 17–27 percent increase in another,[34] as well as a 16.1 percent increase in firearm suicides.[32] Nationwide, permit-to-purchase statutes were associated with an 11 percent decrease in firearm homicides in large urban counties[35,36] and a decrease in shootings of law enforcement officers.[37]

Permit-to-purchase laws that required fingerprinting and gave law enforcement agencies discretion in issuing permits were associated with 76 percent lower rates of interstate firearm diversion, while fingerprinting absent discretion was associated with 45 percent lower rates.[38] Permit-to-purchase requirements, together with record-keeping requirements for firearm acquisitions, were associated with a decrease in the proportion of crime guns that were first sold by in-state retailers.[21] These results suggest that permit to purchase reduces (or at least complicates) the acquisition of firearms for criminal use. Additional studies are summarized in appendix section A5.[1]

### Implications And Opportunities

Why would a policy that appears to have substantial beneficial effects on people directly affected often not have measurable benefits at the population level? I believe that the research does not suggest that background checks are fundamentally ineffective. Rather, the implementation and design problems listed above need to be rectified for these policies to produce their intended benefits. I discuss the problems briefly here; more detailed discussions are available elsewhere.[39]

Downloaded from HealthAffairs.org on October 12, 2019.
Copyright Project HOPE—The People-to-People Health Foundation, Inc.
For personal use only. All rights reserved. Reuse permissions at HealthAffairs.org.

SSS-002800

> **Efforts to improve voluntary reporting have greatly increased the number of records available for review.**

**INCOMPLETE DATA DUE TO FAILED REPORTING**
The accuracy of background checks depends on the complete reporting of prohibiting events, but reporting failure is common and occurs at two levels. Local agencies, such as courts and licensed psychiatric facilities, frequently fail to report to state data repositories. In turn, states frequently fail to report to the FBI. There are no data on how many prohibited persons have acquired firearms because of false-negative background checks.

One very important contributor to reporting failure is not widely appreciated: Other than for federal agencies, reporting is voluntary. State sovereignty precludes a federal requirement for states to report.[40] However, nonreporting by the armed forces, which as federal agencies are required to report, is also widespread[41,42] (see appendix section A1 for example cases).[1]

The best example of failed reporting to states by local agencies concerns felony arrest dispositions. In the 2016 Survey of State Criminal History Information Systems, final dispositions were reported for only 71 percent of felony arrests.[43] Fewer than half of the final dispositions were available in seven states, and only twenty-one states had more than 80 percent. The survey also addressed reporting by states to federal agencies. In 2016 approximately 74 percent of the dispositions received were reported to the FBI (appendix section A6).[1]

Efforts to improve voluntary reporting have greatly increased the number of records available for review (appendix exhibit A2).[1] The National Criminal History Improvement Program and the NICS Act Record Improvement Program incentivize states to improve their record systems and report to the FBI and provide support for states that do so. In fiscal year 2018 the Bureau of Justice Statistics awarded $43 million to states under the former program and nearly $21 million under the latter.

Under the provisions of the Fix NICS Act of 2017, federal agencies are required to certify that all prohibiting events have been reported or to submit a plan for achieving full compliance, and accountability mechanisms have been established. Support for improved voluntary state reporting was increased by providing feedback on the completeness of reporting and identifying nonreporting jurisdictions.

▶ **REMEDIES AND RECOMMENDATIONS:** Federal support for state and local efforts should continue and—if necessary—increase, with a goal of 100 percent reporting. Timeliness should be emphasized, as the risk for violence is highest soon after a prohibiting event occurs. Some states provide data on request instead of filing reports; the adequacy, timeliness, and completeness of background checks involving this process should be assessed.

The new provisions related to reporting by federal agencies and accountability for noncompliance should be enforced, with a mandated objective of 100 percent reporting. Required reports and certifications, as well as actions taken to ensure compliance or sanction noncompliance, should be made public.

States should require timely reporting by local agencies to ensure the existence of adequate data at the state level, if they have not done so already, and should require timely state-level reporting to the FBI. The sovereignty questions preventing a federal requirement would not apply.

States should also require the indefinite retention of records associated with potentially prohibiting events. The FBI has reported that destruction of records has often led to the inability to determine whether a prohibiting event has occurred.[44]

**POOR DEFINITIONS OF PROHIBITING EVENTS**
Definitions of prohibiting events and conditions in federal statutes are very ambiguous, which makes applying definitions to a specific person quite difficult (see appendix section A2 for these definitions).[1] For example, the Code of Federal Regulations supplies a 264-word definition of "unlawful user of or addicted to any controlled substance" but gives no clear guidance on how this definition should be applied. The seemingly straightforward "misdemeanor crime of domestic violence" is particularly difficult.[45] Other definitions, such as "adjudicated mentally defective or committed to a mental institution," are both vague and reflective of a profound misunderstanding of the condition to which they apply.[46]

▶ **REMEDIES AND RECOMMENDATIONS:** Policy makers should review the existing prohibitions and answer the following questions: What is the rationale for the prohibition? What class of individuals is the prohibition intended to reach? What is the evidence that members of the class are at increased risk for violence? How should the class definition be altered to reflect a current

Downloaded from HealthAffairs.org on October 12, 2019.
Copyright Project HOPE—The People-to-People Health Foundation, Inc.
For personal use only. All rights reserved. Reuse permissions at HealthAffairs.org.

SSS-002801

understanding of the class and existing evidence of risk? What guidelines can assist in determining whether a potentially prohibiting event is, in fact, prohibiting? The product of this effort should constitute the basis for legislation that redefines prohibited classes in federal and state statutes and regulations.

**INSUFFICIENTLY THOROUGH BACKGROUND CHECKS** Thirty states rely entirely on NICS background checks, and twenty may make additional queries of state data (see appendix section A3 for further details).[1] The magnitude of nonreporting by states makes it plausible, at least, that state-level checks will return fewer false-negative results. Two ecological studies have found evidence suggesting that checks conducted by state agencies and including state-level databases were associated with reduced rates of firearm violence[47,48] (appendix section A7).[1]

The weapons used in a mass shooting in a Charleston, South Carolina, church in 2015 were acquired after a background check on the shooter returned a false-negative result (appendix section A1).[1] The FBI's follow-up investigation highlighted the fact that NICS checks do not extend to the National Data Exchange (N-DEx), which contained a "prohibiting incident report" for the Charleston shooter.[49] N-DEx contains more than 400 million records, and a pilot test conducted by the agency's Criminal Justice Information Services Advisory Policy Board found that adding NDEx to background checks identified additional prohibited persons.[50]

▶ **REMEDIES AND RECOMMENDATIONS:** NICS checks should be extended to include N-DEx. In July 2018 the FBI signaled its intent to do this, beginning as soon as 2020.[50] The impact of this reform on the accuracy of background checks could easily be assessed.

Given that problems with state reporting are likely to persist, states should consider adopting point-of-contact status (see appendix section A3 for further details)[1] and adding relevant state databases to background checks.

**RELEASE OF FIREARMS BEFORE CHECKS ARE COMPLETED** Under federal law, purchasers may acquire their firearms after three business days if they have not been found to be prohibited persons. When records are ambiguous or incomplete, three days might not be enough to complete the background check. In the period 1999–2017, according to NICS annual reports, at least 68,684 prohibited persons acquired firearms before their prohibitions were confirmed. In 2014–17 the number increased an average of 34 percent per year. The FBI refers these cases to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and most—but not all—of such firearms are recovered or transferred to a retailer or nonprohibited private party.[49]

> **Several state prohibitions that go beyond those in federal statutes are well supported by research evidence.**

▶ **REMEDIES AND RECOMMENDATIONS:** Firearm transfers should not be allowed to occur before background checks are completed. Walmart adopted this policy in 2002, in fulfillment of what it terms its "obligation to be a responsible seller of firearms."[51] Consideration should also be given to a longer fixed-duration waiting period—a policy associated in one study with substantial decreases in firearm homicides.[24]

**NONCOMPLIANCE BY SELLERS AND BUYERS** A 2016 survey found that 26 percent of private-party firearm transfers were completed without a background check in states where checks were required.[11] Noncompliance of this magnitude preserves a sizable pathway for anonymous, undocumented transfers of firearms.

In a study of private-party sales at gun shows, undercover investigators found that nearly two-thirds of sellers proceeded with a sale despite having reasonable cause to believe they were selling to a prohibited person.[52] A study of would-be purchasers at online firearm brokerages found that, at a minimum, one in thirty were prohibited persons.[53] Undercover investigators found that 62 percent of online firearm sellers were willing to sell to buyers who had said they would probably fail a background check.[54]

▶ **REMEDIES AND RECOMMENDATIONS:** Public education campaigns may be of value, as some buyers and sellers might not know that their states have comprehensive background check policies. Other noncompliance is deliberate. Thus, education should include information on the penalties associated with violations. Consideration should be given to making repeated violations a prohibiting event or classifying a second conviction as a felony. Sting enforcement operations should target sellers who furnish firearms to prohibited persons. Highly publicized prosecutions could eliminate those sellers from the market and deter others from replacing them.

Downloaded from HealthAffairs.org on October 12, 2019.
Copyright Project HOPE—The People-to-People Health Foundation, Inc.
For personal use only. All rights reserved. Reuse permissions at HealthAffairs.org.

SSS-002802

> Permit-to-purchase policies have repeatedly been associated with reduced rates of violence.

**SUBOPTIMAL ENFORCEMENT** To my knowledge, there are no systematic data on the nonenforcement of background check requirements. After Colorado enacted its comprehensive background check statute, some county law enforcement officials reportedly stated that they would not enforce it, and some retailers refused to conduct background checks for private-party sales.[27] Nonenforcement may spread with the growth of "Second Amendment sanctuaries"—cities, counties, and states where officials have in some manner declared opposition to or refuse to enforce comprehensive background check or other firearm policies.[55,56]

Adequate enforcement can have beneficial effects. Observational research has found that noncompliance is rare at California gun shows. The state's Bureau of Firearms regularly stations undercover special agents at the shows, and this practice is known and commented on by attendees.[57]

▶ **REMEDIES AND RECOMMENDATIONS:** Investigation into the prevalence and consequences of nonenforcement should be a high priority. Legal and policy scholars should give attention to these questions: What incentives for enforcement and disincentives for nonenforcement can be developed? What sanctions for nonenforcement are appropriate? If nonenforcement leads to an adverse outcome, is there any liability for that outcome?

**OVERLY NARROW PROHIBITION CRITERIA** Several state prohibitions that go beyond those in federal statutes are well supported by research evidence. One involves people convicted of violent misdemeanors such as assault and battery. In California, handgun purchasers with one prior violent misdemeanor conviction were five times as likely as those with no criminal history to be arrested subsequently for violent crimes.[4] The risk was fifteen times higher for purchasers with two or more such convictions. California's subsequent prohibition for violent misdemeanants was associated with a 25 percent reduction in the risk of subsequent arrest for violent crime.[16]

Population-level studies have associated a purchase prohibition for violent misdemeanants with an 18 percent reduction in firearm homicides[58] and a 23 percent reduction in intimate partner homicides.[23] A study of large urban counties found an increase in firearm homicides associated with a violent misdemeanor prohibition, and the authors speculated that conditions leading to the enactment of the prohibition might also lead to increases in homicides.[35,36]

Federal prohibitions for people convicted of misdemeanor domestic violence and those subject to domestic violence restraining orders (known as respondents) do not extend to dating partners with whom the victim has not had children, though dating partners account for nearly half of all intimate partner homicides.[59,60] The domestic violence restraining order prohibition applies only to permanent orders issued after hearings. State purchase prohibitions for respondents have repeatedly been found to be effective,[59] and these effects are specifically associated with coverage for ex parte orders and dating partners.[23]

There is no federal firearm prohibition for people who misuse alcohol.[61] Substantial evidence associates heavy alcohol use with an increase in risk for violence, including firearm violence.[61,62] In a large longitudinal study, handgun purchasers with prior convictions for driving under the influence or other alcohol-related crimes were at least four times as likely to be arrested subsequently for violent or firearm-related crimes, compared with purchasers who had no prior criminal history.[63]

Many states have adopted prohibitions related to acute, severe mental illness associated with danger to self or others, going beyond the federal requirement for an adjudication or formal commitment. The association between such times of acute, severe illness and near-term violence risk is well established.[64–66]

▶ **REMEDIES AND RECOMMENDATIONS:** Congress and states that have not done so already should consider adopting each of the prohibitions reviewed here: for people convicted of violent misdemeanors, those convicted of domestic violence misdemeanors or subject to domestic violence restraining orders who were the dating partners of the victim or protected person, those subject to temporary domestic violence restraining orders, those with criminal convictions associated with misuse of alcohol, and those who have recently undergone involuntary treatment for mental illness associated with an imminent danger to self or others.

Downloaded from HealthAffairs.org on October 12, 2019.
Copyright Project HOPE—The People-to-People Health Foundation, Inc.
For personal use only. All rights reserved. Reuse permissions at HealthAffairs.org.

SSS-002803

**FAILURE TO INCLUDE PRIVATE-PARTY TRANSFERS** It is very important to note that the most rigorous population-level studies finding no effect of comprehensive background check policies on population-level rates of violence[22,25] relied on data from before 2007, when criminal and particularly mental health prohibiting events were much less frequently reported to the FBI. It is very likely that the false-negative rate on background checks was much higher in the past than it is today, and that rate is likely to continue to decrease.

It remains the case that an unregulated private-party market creates an open channel for the acquisition of firearms by prohibited persons and purchasers with criminal intent, and it is important that this channel be closed to the extent possible.

▶ **REMEDIES AND RECOMMENDATIONS:** Congress and the states should require essentially all transfers of firearms to be subject to background checks. The requirement should extend to people holding so-called Brady alternative permits,[67] because the holders of such permits may retain them after becoming prohibited persons. As mentioned above, states should consider becoming points of contact for background checks, so that these can include reviews of state databases.

**FAILURE TO INCLUDE A PERMITTING PROCESS** Permit-to-purchase policies deserve special consideration. They have repeatedly been associated with reduced rates of violence, even in the presence of the other problems I have discussed. This reduction could occur by several mechanisms. A required interaction with law enforcement may create a significant disincentive for firearm acquisition by people at increased risk for violence. Potential surrogate or "straw" purchasers might also feel this disincentive strongly. Permit to purchase would likely also create a disincentive for private-party buyers and sellers not to comply with the underlying background check requirement.

▶ **REMEDIES AND RECOMMENDATIONS:** The first step is to understand better what makes permit-to-purchase policies different. There should be a detailed assessment of specific variations among states in the design and implementation of permit to purchase to determine which elements of policy and practice are most important. Implementation would be labor-intensive, and a cost-benefit analysis and a discussion of how to fund implementation would be necessary. The outcome of this work should be a model policy for consideration by states and Congress.

## Conclusion

Background checks for firearm purchasers reduce the risk of violence among those directly affected. Attention to the problem areas in design and implementation outlined here should substantially improve the checks' effectiveness at the population level. Any reforms to policy and practice will merit rigorous evaluation. ∎

The preparation of this article was supported by the Joyce Foundation (Grant No. 15-36377). The author gratefully acknowledges the assistance of Sydney Sohl in the production of the article.

**NOTES**

1. To access the appendix, click on the Details tab of the article online.
2. Centers for Disease Control and Prevention. Injury Prevention and Control. Welcome to WISQARS™ [Internet]. Atlanta (GA): CDC; [last reviewed 2019 Mar 21; cited 2019 Jul 24]. Available from: https://www.cdc.gov/injury/wisqars/index.html
3. Bureau of Justice Statistics. NCVS Victimization Analysis Tool (NVAT) [Internet]. Washington (DC): BJS; [cited 2019 Jul 25]. Available from: http://www.bjs.gov/index.cfm?ty=nvat
4. Wintemute GJ, Drake CM, Beaumont JJ, Wright MA, Parham CA. Prior misdemeanor convictions as a risk factor for later violent and firearm-related criminal activity among authorized purchasers of handguns. JAMA. 1998;280(24):2083–7.
5. Wright MA, Wintemute GJ, Rivara FP. Effectiveness of denial of handgun purchase to persons believed to be at high risk for firearm violence. Am J Public Health. 1999;89(1):88–90.
6. Wright MA, Wintemute GJ. Felonious or violent criminal activity that prohibits gun ownership among prior purchasers of handguns: incidence and risk factors. J Trauma. 2010;69(4):948–55.
7. Flagg A. Is there a connection between undocumented immigrants and crime? The Upshot, New York Times [serial on the Internet]. 2019 May 13 [cited 2019 Jul 24]. Available from: https://www.nytimes.com/2019/05/13/upshot/illegal-immigration-crime-rates-research.html
8. Karberg JC, Frandsen RJ, Durso JM, Buskirk TD, Lee AD. Background checks for firearm transfers, 2015—statistical tables [Internet]. Washington (DC): Bureau of Justice Statistics; 2017 Nov [cited 2019 Jul 25]. Available from: https://www.bjs.gov/content/pub/pdf/bcft15st.pdf
9. Federal Bureau of Investigation. National Instant Criminal Background Check System (NICS) operations [Internet]. Washington (DC): FBI; 2017 [cited 2019 Jul 25]. Available from: https://www.fbi.gov/file-repository/2017-nics-operations-report.pdf/view
10. Giffords Law Center to Prevent Gun

Downloaded from HealthAffairs.org on October 12, 2019.
Copyright Project HOPE—The People-to-People Health Foundation, Inc.
For personal use only. All rights reserved. Reuse permissions at HealthAffairs.org.

SSS-002804

Violence. Universal background checks [Internet]. San Francisco (CA): The Center; c 2018 [cited 2019 Jul 24]. Available from: https://lawcenter.giffords.org/gun-laws/policy-areas/background-checks/universal-background-checks/#state

11 Miller M, Hepburn L, Azrael D. Firearm acquisition without background checks: results of a national survey. Ann Intern Med. 2017; 166(4):233–9.

12 Alper M, Glaze L. Source and use of firearms involved in crimes: survey of prison inmates, 2016 [Internet]. Washington (DC): Bureau of Justice Statistics; 2019 Jan [cited 2019 Jul 25]. Available from: https://www.bjs.gov/content/pub/pdf/suficspi16.pdf

13 Vittes KA, Vernick JS, Webster DW. Legal status and source of offenders' firearms in states with the least stringent criteria for gun ownership. Inj Prev. 2013;19(1):26–31.

14 Center for Gun Policy and Research. Permit-to-purchase licensing for handguns [Internet]. Baltimore (MD): Johns Hopkins Bloomberg School of Public Health; 2016 Apr [cited 2019 Jul 25]. Available from: https://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/publications/PTP-policy-brief.pdf

15 Barry CL, Webster DW, Stone E, Crifasi CK, Vernick JS, McGinty EE. Public support for gun violence prevention policies among gun owners and non–gun owners in 2017. Am J Public Health. 2018; 108(7):878–81.

16 Wintemute GJ, Wright MA, Drake CM, Beaumont JJ. Subsequent criminal activity among violent misdemeanants who seek to purchase handguns: risk factors and effectiveness of denying handgun purchase. JAMA. 2001;285(8):1019–26.

17 Swanson JW, McGinty EE, Fazel S, Mays VM. Mental illness and reduction of gun violence and suicide: bringing epidemiologic research to policy. Ann Epidemiol. 2015;25(5):366–76.

18 Swanson JW, Robertson AG, Frisman LK, Norko MA, Lin H-J, Swartz MS, et al. Preventing gun violence involving people with serious mental illness. In: Webster DW, Vernick JS, editors. Reducing gun violence in America: informing policy with evidence and analysis. Baltimore (MD): Johns Hopkins University Press; 2013. p. 33–51.

19 Swanson JW, Easter MM, Robertson AG, Swartz MS, Alanis-Hirsch K, Moseley D, et al. Gun violence, mental illness, and laws that prohibit gun possession: evidence from two Florida counties. Health Aff (Millwood). 2016;35(6):1067–75.

20 Ludwig J, Cook PJ. Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. JAMA. 2000;284(5):585–91.

21 Webster DW, Vernick JS, Hepburn LM. Relationship between licensing, registration, and other gun sales laws and the source state of crime guns. Inj Prev. 2001;7(3):184–9.

22 Kagawa RMC, Castillo-Carniglia A, Vernick JS, Webster D, Crifasi C, Rudolph KE, et al. Repeal of comprehensive background check policies and firearm homicide and suicide. Epidemiology. 2018;29(4):494–502.

23 Zeoli AM, McCourt A, Buggs S, Frattaroli S, Lilley D, Webster DW. Analysis of the strength of legal firearms restrictions for perpetrators of domestic violence and their associations with intimate partner homicide. Am J Epidemiol. 2018; 187(7):1449–55.

24 Luca M, Malhotra D, Poliquin C. Handgun waiting periods reduce gun deaths. Proc Natl Acad Sci U S A. 2017;114(46):12162–5.

25 Castillo-Carniglia A, Kagawa RMC, Cerdá M, Crifasi CK, Vernick JS, Webster DW, et al. California's comprehensive background check and misdemeanor violence prohibition policies and firearm mortality. Ann Epidemiol. 2019;30:50–6.

26 Gius M. The effects of state and federal background checks on state-level gun-related murder rates. Appl Econ. 2015;47(38):4090–101.

27 Castillo-Carniglia A, Kagawa RMC, Webster DW, Vernick JS, Cerdá M, Wintemute GJ. Comprehensive background check policy and firearm background checks in three US states. Inj Prev. 2018;24(6):431–6.

28 Vernick JS, Alcorn T, Horwitz J. Background checks for all gun buyers and gun violence restraining orders: state efforts to keep guns from high-risk persons. J Law Med Ethics. 2017;45(1_suppl):98–102.

29 Webster DW, Vernick JS, Bulzacchelli MT. Effects of state-level firearm seller accountability policies on firearm trafficking. J Urban Health. 2009;86(4):525–37.

30 Crifasi CK, McCourt AD, Booty MD, Webster DW. Policies to prevent illegal acquisition of firearms: impacts on diversions of guns for criminal use, violence, and suicide. Curr Epidemiol Rep. 2019;6(2):238–47.

31 Rudolph KE, Stuart EA, Vernick JS, Webster DW. Association between Connecticut's permit-to-purchase handgun law and homicides. Am J Public Health. 2015;105(8):e49–54.

32 Crifasi CK, Meyers JS, Vernick JS, Webster DW. Effects of changes in permit-to-purchase handgun laws in Connecticut and Missouri on suicide rates. Prev Med. 2015;79:43–9.

33 Webster D, Crifasi CK, Vernick JS. Effects of the repeal of Missouri's handgun purchaser licensing law on homicides. J Urban Health. 2014; 91(2):293–302.

34 Hasegawa RB, Webster DW, Small DS. Evaluating Missouri's handgun purchaser law: a bracketing method for addressing concerns about history interacting with group. Epidemiology. 2019;30(3):371–9.

35 Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, Webster DW. Association between firearm laws and homicide in urban counties. J Urban Health. 2018;95(3):383–90.

36 Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, Webster DW. Correction to: Association between firearm laws and homicide in urban counties. J Urban Health. 2018;95(5):773–6.

37 Crifasi CK, Pollack KM, Webster DW. Effects of state-level policy changes on homicide and nonfatal shootings of law enforcement officers. Inj Prev. 2016;22(4):274–8.

38 Webster DW, Vernick JS, McGinty EE, Alcorn T. Preventing the diversion of guns to criminals through effective firearm sales laws. In: Webster DW, Vernick JS, editors. Reducing gun violence in America: informing policy with evidence and analysis. Baltimore (MD): Johns Hopkins University Press; 2013. p. 109–21.

39 Bureau of Justice Statistics. National Criminal History Improvement Program: grants-related publications and products [Internet]. Washington (DC): BJS; [cited 2019 Jul 25]. Available from: https://www.bjs.gov/index.cfm?ty=tp&tid=47

40 *Printz v. United States*, 521 U.S. 898 (1997).

41 Department of Defense, Office of Inspector General. Evaluation of fingerprint card and final disposition report submissions by military service law enforcement organizations [Internet]. Washington (DC): DoD; 2017 Dec 4 [cited 2019 Jul 25]. (Report No. DODIG-2018-035). Available from: https://media.defense.gov/2017/Dec/05/2001852278/-1/-1/1/DODIG-2018-035.PDF

42 Department of Defense, Office of Inspector General. Evaluation of the Defense Criminal Investigative Organizations' Defense Incident-Based Reporting System reporting and reporting accuracy [Internet]. Washington (DC): DoD; 2014 Oct 29 [cited 2019 Jul 25]. Available from: https://apps.dtic.mil/dtic/tr/fulltext/u2/a612495.pdf

43 Goggins BR, DeBacco DA. Survey of state criminal history information systems, 2016: a criminal justice information policy report [Internet]. Washington (DC): Bureau of Justice Statistics; 2018 Feb [cited 2019 Jul 25]. Available from: https://www.ncjrs.gov/pdffiles1/bjs/grants/251516.pdf

Downloaded from HealthAffairs.org on October 12, 2019.
Copyright Project HOPE—The People-to-People Health Foundation, Inc.
For personal use only. All rights reserved. Reuse permissions at HealthAffairs.org.

SSS-002805

## VIOLENCE

44 Department of Justice. Executive summary: the reporting of information to the National Instant Criminal Background Check System (NICS) and review of ATF Form 4473 [Internet]. Washington (DC): DoJ; [cited 2019 Jul 25]. Available from: https://www.justice.gov/opa/press-release/file/1042731/download

45 Gallegos A, Goggins B. State progress in record reporting for firearm-related background checks: misdemeanor crimes of domestic violence [Internet]. Washington (DC): Office of Justice Programs; 2016 Dec [cited 2019 Jul 25]. Available from: https://www.ncjrs.gov/pdffiles1/bjs/grants/250392.pdf

46 Goggins B, Gallegos A. State progress in record reporting for firearm-related background checks: mental health submissions [Internet]. Washington (DC): Bureau of Justice Statistics; 2016 Feb [cited 2019 Jul 25]. Available from: https://www.ncjrs.gov/pdffiles1/bjs/grants/249793.pdf

47 Sumner SA, Layde PM, Guse CE. Firearm death rates and association with level of firearm purchase background check. Am J Prev Med. 2008;35(1):1–6.

48 Sen B, Panjamapirom A. State background checks for gun purchase and firearm deaths: an exploratory study. Prev Med. 2012;55(4):346–50.

49 Department of Justice, Office of the Inspector General. Audit of the handling of firearms purchase denials through the National Instant Criminal Background Check System [Internet]. Washington (DC): DoJ; 2016 Sep [cited 2019 Jul 25]. Available from: https://oig.justice.gov/reports/2016/a1632.pdf

50 Givens A, Knapp A. FBI to add major law enforcement database to gun background check system. The Trace [serial on the Internet]. 2018 Jul 10 [cited 2019 Jul 25]. Available from: https://www.thetrace.org/2018/07/fbi-background-check-system-nics-ndex-charleston/

51 Walmart. Walmart statement on firearms policy [Internet]. Bentonville (AR): Walmart; [cited 2019 Jul 25]. Available from: https://news.walmart.com/2018/02/28/walmart-statement-on-firearms-policy

52 City of New York. Gun show undercover: report on illegal sales at gun shows [Internet]. New York (NY): The City; 2009 Oct [cited 2019 Jul 25]. Available from: http://www.nyc.gov/html/om/pdf/2009/pr442-09_report.pdf

53 Mayors Against Illegal Guns. Felon seeks firearm, no strings attached [Internet]. New York (NY): Everytown for Gun Safety; 2013 Sep [cited 2019 Jul 25]. Available from: http://www.nyc.gov/html/om/pdf/2013/felon_seeks_firearm.pdf

54 Mayors Against Illegal Guns. Point, click, fire: an investigation of illegal online gun sales [Internet]. New York (NY): City of New York; 2011 Dec 14 [cited 2019 Aug 2]. Available for download from: https://www.issuelab.org/resource/point-click-fire-an-investigation-of-illegal-online-gun-sales.html

55 Allen R. Few violations of Colorado's "unenforceable" gun laws. USA Today [serial on the Internet]. 2014 Jan 30 [cited 2019 Jul 25]. Available from: https://www.usatoday.com/story/news/nation/2014/01/30/colorado-gun-laws-enforcement/5055523/

56 Richardson V. Democrats' gun control push fuels rise of Second Amendment sanctuary movement. Washington Times [serial on the Internet]. 2019 Mar 19 [cited 2019 Jul 25]. Available from: https://www.washingtontimes.com/news/2019/mar/19/second-amendment-sanctuary-movement-counters-democ/

57 Wintemute GJ. Gun shows across a multistate American gun market: observational evidence of the effects of regulatory policies. Inj Prev. 2007;13(3):150–5.

58 Siegel M, Pahn M, Xuan Z, Fleegler E, Hemenway D. The impact of state firearm laws on homicide and suicide deaths in the USA, 1991–2016: a panel study. J Gen Intern Med. 2019 Mar 28. [Epub ahead of print].

59 Zeoli AM, Malinski R, Turchan B. Risks and targeted interventions: firearms in intimate partner violence. Epidemiol Rev. 2016;38(1):125–39.

60 Sorenson SB, Spear D. New data on intimate partner violence and intimate relationships: implications for gun laws and federal data collection. Prev Med. 2018;107:103–8.

61 Wintemute GJ. Alcohol misuse, firearm violence perpetration, and public policy in the United States. Prev Med. 2015;79:15–21.

62 Branas CC, Han S, Wiebe DJ. Alcohol use and firearm violence. Epidemiol Rev. 2016;38(1):32–45.

63 Wintemute GJ, Wright MA, Castillo-Carniglia A, Shev A, Cerdá M. Firearms, alcohol and crime: convictions for driving under the influence (DUI) and other alcohol-related crimes and risk for future criminal activity among authorised purchasers of handguns. Inj Prev. 2018;24(1):68–72.

64 Steadman HJ, Mulvey EP, Monahan J, Robbins PC, Appelbaum PS, Grisso T, et al. Violence by people discharged from acute psychiatric inpatient facilities and by others in the same neighborhoods. Arch Gen Psychiatry. 1998;55(5):393–401.

65 Qin P, Nordentoft M. Suicide risk in relation to psychiatric hospitalization: evidence based on longitudinal registers. Arch Gen Psychiatry. 2005;62(4):427–32.

66 Wolf A, Fanshawe TR, Sariaslan A, Cornish R, Larsson H, Fazel S. Prediction of violent crime on discharge from secure psychiatric hospitals: a clinical prediction rule (FoVOx). Eur Psychiatry. 2018;47:88–93.

67 Bureau of Alcohol, Tobacco, Firearms and Explosives. Permanent Brady permit chart [Internet]. Washington (DC): ATF; [last updated 2017 May 10; cited 2019 Jul 25]. Available from: https://www.atf.gov/rules-and-regulations/permanent-brady-permit-chart

Downloaded from HealthAffairs.org on October 12, 2019.
Copyright Project HOPE—The People-to-People Health Foundation, Inc.
For personal use only. All rights reserved. Reuse permissions at HealthAffairs.org.

SSS-002806