# Ex. KK

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

| | |
|---|---|
| HOLCOMBE, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Civil Action No. |
| | ) |
| UNITED STATES OF AMERICA, | ) 5:18-CV-00555-XR |
| | ) |
| Defendant. | ) (Consolidated cases) |

REMOTE ORAL VIDEOTAPED DEPOSITION

OF THE UNITED STATES AIR FORCE

BY ITS CORPORATE REPRESENTATIVE

COLONEL ROBERT M. FORD, JR.

Thursday, June 18, 2020

Reported by

Rebecca Callow, RMR, CRR, RPR

Job No. U061820

1  were never reported to the FBI by the
2  Security Forces.  Correct?
3     A.   Reported by the Security Forces?  That is
4  correct.  They were not.
5     Q.   And that was even after the -- you're aware
6  that the DoD/IG report in 2015 came out in
7  February 2015.  Right?
8     A.   Yes.  I'm aware of that.
9     Q.   And after the DoD/IG in 2015 reported that
10 there were still significant problems, failure rates
11 around 30 percent within the Air Force, generally,
12 and, actually, it was higher within the
13 Security Forces. Correct?
14    A.   That is correct.
15    Q.   That even after that report in February of
16 2015, the Security Forces -- the Air Force
17 Security Forces never went back and reported
18 Devin Kelley's fingerprints between 2015 and 2017,
19 the day of the shooting.  Correct?
20    A.   They weren't asked to, according to that
21 DoD/IG report.
22    Q.   Well, regardless of whether they were asked
23 to by the IG report, that's not really relevant, is
24 it?
25             MR. STERN:  Objection.

1    A.    It is if you're bringing up --

2    BY MR. ALSAFFAR:

3    **Q.    You can answer my question.  Go ahead.**

4    A.    All I was going to say is it's relevant

5    because you're referencing the DoD/IG report.

6              What the DoD/IG asked the Air Force to

7    do was to submit those qualifying convictions that

8    were not submitted during that time period.

9              Unfortunately, Devin Kelley's

10   conviction occurred after that time period.  His

11   conviction was November of 2012, when that range of

12   that DoD/IG report ended on 31 October.

13   Unfortunately it did not include that.  That's what

14   I was trying to say.

15   **Q.    Oh, no.  Right.  And I understand that.**

16   **Just so the Court understands really what you're**

17   **saying, let's really talk about what you're actually**

18   **saying here.**

19             **In order to follow up and see if the**

20   **Air Force was still complying with the reporting**

21   **requirement, the DoD/IG just took a sample size from**

22   **June 2010 to October 31st, 2012.  Right?  They just**

23   **took a sample size.  Correct?**

24   A.    Correct.  Correct.

25   **Q.    And just based on just that small sample**

expertise.

We also have your pre-deployment type of mission. So you have your mission that when you're deployed overseas, your, you know, forward operating area where you have to actually do installation defense inside the wire, so to speak, outside the wire, as well, a little bit.

My point in all that is it's so wide-ranging and far-encompassing, there's so many things that a Security Forces member has to learn and develop the skill set to do over the course of their career or enlistment.

**Q. What about Security Forces investigators, specifically? Can you talk about their wide-ranging skill set?**

A. Yes. So, for example, they have to be taught and become experienced for witness interviews, for example. That's a very necessary skill to have. Setting up crime scenes, protecting evidence, the processing of evidence, making sure chains of custody for evidence are airtight and ready to go.

They also serve a responsibility for -- for example, if we've got a high-risk individual on the installation and a hostage

```
 1  negotiation type of response, they're responsible
 2  for doing those kinds of things.
 3            Their role and responsibility is so
 4  wide-ranging, much, much more than the fingerprint
 5  process, which is central to this -- a lot of this
 6  discussion.  The point is they are required to know
 7  so many more things, and this is a small subset of
 8  that.
 9      Q.   Are they required to be trained on all of
10  those skill sets?
11      A.   Oh, yes.  Definitely.
12            So the same process.  The vast
13  majority of that's going to be training with the
14  military police investigation school.
15            That's why the vast majority of those
16  topics are taught there, because -- there are
17  criteria that we use to decide what's going to be
18  taught at certain schools.
19            For example, it would be the frequency
20  of the task, the operational relevance of the task,
21  the criticality of the task, and then finally the
22  difficulty of the task.  All those elements fall
23  into play to determine what topics are going to be
24  taught at those schools, whether it's a
25  Security Forces academy, military police
```

```
 1  this witness's expertise.  Calls for speculation.
 2       A.   So the submission of fingerprints after
 3  having probable cause, that would prevent them --
 4  prevent someone from purchasing a firearm, if that's
 5  what you're asking.
 6       BY MR. STERN:
 7       Q.   Well, is it a prohibited offense under the
 8  Gun Control Act, to the extent that you know?
 9               MR. ALSAFFAR:  Objection --
10       A.   Yes.
11               MR. ALSAFFAR:  -- outside the scope of
12  the witness's expertise.
13       BY MR. STERN:
14       Q.   Okay.  So as a result of this
15  investigation, you have already testified regarding
16  the final disposition.  Is that correct?
17       A.   Yes.
18       Q.   Okay.  So, in fact, you previously
19  testified that, as a result of the Security Forces
20  investigation, Kelley received a letter of
21  reprimand.  Is that correct?
22       A.   Yes.
23               MR. STERN:  And, Lieutenant Colonel
24  Phillips, if you can pull up what has previously
25  been marked as Exhibit 6, that letter of reprimand.
```

1      BY MR. STERN:
2      **Q.   Just to be clear, your previous testimony**
3  **was that, as a result of the Security Forces**
4  **investigation, Devin Kelley was given a letter of**
5  **reprimand on April 17th, 2012.  Is that correct?**
6      A.   Yes.
7      **Q.   And I believe you testified that a letter**
8  **of reprimand is, quote, a low bar?**
9      A.   Yes.  For an assault charge, that is a low
10 bar.
11     **Q.   What do you mean by "a low bar"?**
12     A.   My point being that commanders, for that
13 kind of offense, would normally be offering
14 nonjudicial punishment or be ready to go to
15 court-martial.
16              So if they felt that they had enough
17 evidence to support going to a court-martial, they
18 would either do that or offer nonjudicial punishment
19 in lieu of a court-martial, because that's how the
20 process works.
21              So if they felt comfortable enough to
22 go to a court-martial, they have to -- excuse me.
23              When you offer nonjudicial punishment,
24 you're stating that you have enough evidence to go
25 to a court-martial.

1      Because they did not offer nonjudicial
2  punishment anywhere documented in here, and they
3  went straight to a letter of reprimand, that leads
4  me to believe, from a commander's position, that
5  they questioned the evidence put before them to
6  bring it to a court-martial-martial, and the low
7  bar, being a letter of reprimand, speaks to that.
8              MR. ALSAFFAR:  Objection --
9       BY MR. STERN:
10     **Q.   And let me --**
11             MR. ALSAFFAR:  Sorry.  I've got to get
12  my objection on the record.
13             My objection is actually to the
14  answer.  That was speculation by the Colonel.
15      BY MR. STERN:
16     **Q.   Let me break this down in smaller bites, so**
17  **to speak, Colonel.**
18             **Is the letter -- is a letter of**
19  **reprimand the equivalent of a court-martial?**
20     A.   No.
21     **Q.   Is a letter of reprimand the equivalent of**
22  **a judicial decision?**
23     A.   It is not the equivalent of a judicial
24  decision.
25     **Q.   So is it accurate to state that Kelley was**