# Ex. PP

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JOE HOLCOMBE, et. al, | § | NO. 5:18-CV-00555-XR |
| | § | |
| Plaintiffs | § | Consolidated with: |
| | § | 5:18-cv-00712-XR (*Vidal*) |
| | § | 5:18-cv-00881-XR (*Uhl*) |
| vs. | § | 5:18-cv-00944-XR (*Ramsey*) |
| | § | 5:18-cv-00949-XR (*McNulty*) |
| UNITED STATES OF | § | 5:18-cv-00951-XR (*Wall*) |
| AMERICA, | § | 5:18-cv-01151-XR (*Amador*) |
| | § | 5:19-cv-00184-XR (*Brown*) |
| Defendant | § | 5:19-cv-00289-XR (*Ward*) |
| | § | 5:19-cv-00506-XR (*Workman*) |
| | § | 5:19-cv-00678-XR (*Colbath*) |
| | § | 5:19-cv-00691-XR (*Braden*) |
| | § | 5:19-cv-00706-XR (*Lookingbill*) |
| | § | 5:19-cv-00714-XR (*Solis*) |
| | § | 5:19-cv-00715-XR (*McKenzie*) |
| | § | 5:19-cv-00805-XR (*Curnow*) |
| | § | 5:19-cv-00705-XR (*Workman*) |
| | § | 5:19-cv-00806-XR (*Macias*) |

## DECLARATION OF HAROLD J. BURSZTAJN, MD

1.     I serve as an Associate Professor of Psychiatry (part-time), Founder of the

Program in Psychiatry and the Law, and Principal Mentor for students at Harvard Medical

School (HMS). I have more than 25 years of service as senior clinical faculty at HMS coupled

with more than 30 years of experience in clinical and forensic practice as a psychiatrist. I am

certified in the specialty of psychiatry by the American Board of Psychiatry and Neurology. I

am licensed to practice medicine in the state of Massachusetts.

2.     I was retained by the U.S. Department of Justice to perform a forensic

neuropsychiatric evaluation concerning Devin Patrick Kelley for purposes of this consolidated

litigation. Following my investigation, I drafted a report dated July 15, 2020, containing the

opinions that I intend to testify to at trial in this litigation. I also anticipate preparing a

supplemental report following the depositions of Michelle Shields, Michael Kelley, and Rebecca Kelley.

3.      I understand that my report is being submitted, along with this declaration, as an exhibit to Defendant's opposition to Plaintiffs' motion for partial summary judgment.

4.      I verify that the statements and opinions contained in all of my reports referenced in this declaration are true and accurate, and that all opinions are offered to a reasonable degree of forensic neuropsychiatric certainty.

I declare under penalty of perjury that the foregoing is true and accurate.  Executed on this 1st day of September 2020, Cambridge, MA.

Harold J. Bursztajn, MD

**Harold J. Bursztajn, MD**
96 Larchwood Drive
Cambridge, MA  02138
Telephone: 617-492-8366
Telefax:     617-441-3195
http://www.forensic-psych.com

Princeton University AB 1972
Harvard Medical School MD 1976

July 15, 2020

Paul David Stern, Esq.
U.S. Department of Justice

Re:   ***Holcombe, et al. v. United States*, No. 5:18-cv-0055 (W.D. Tex.)**

Dear Mr. Stern and team,

## I.   Identification:

What follows is a report of my ongoing forensic neuropsychiatric evaluation of the discovery data made available to date with respect to the following questions:

1.  Was it foreseeable, which from a forensic psychiatric perspective is distinct from "conceivable" or "imaginable," at the time the Air Force should have submitted Devin Kelley's criminal history data to the FBI database, that Kelley would commit a mass shooting after his discharge from the Air Force?

2.  Would Kelley have been deterred, or otherwise prevented, from committing the mass murder at the church if he had been denied the ability to purchase firearms at federally licensed firearms dealers?

3.  From a forensic psychiatric perspective, was Devin Kelley responsible for the mass murder he committed on November 5, 2017?

4.  Do Plaintiffs' experts' opinions withstand inquiry as to forensic methodology?

## II.  Qualifications of Evaluator:

I serve as an Associate Professor of Psychiatry (part-time), Founder of the Program in Psychiatry and the Law, and Principal Mentor for students at Harvard Medical School (HMS).  I have more than 25 years of service as senior clinical faculty at HMS coupled with more than 30 years of experience in clinical and forensic practice as a psychiatrist.  I am certified in the specialty of psychiatry by the American Board of Psychiatry and Neurology.  I am licensed to practice medicine in the state of Massachusetts.

Clinically, I treat patients suffering from neuropsychiatric disorders, including thought, mood, personality, post-traumatic, adjustment, and substance-related (illicit or prescribed) disorders.  For more than 35 years I have treated patients

*Thirty years of patient care, consultation and teaching*

USA00025540

suffering from complex medical and neuropsychiatric problems.  I have a related clinical and forensic interest in prospective and retrospective assessment of risk of harm to self or others, and in the evaluation and treatment (including medication management) of patients at foreseeable and preventable risk of injuring themselves or others.

My forensic practice and teaching have entailed numerous evaluations of dangerousness to self or others both in and out of institutions.  I have a longstanding special forensic interest in ensuring reasonable safety (including through voluntary or involuntary commitment) for persons who suffer from mental illness and for those with whom they come in contact in hospital, workplace, school, and other public settings.  I have written specifically about clinical application of the *Tarasoff* duty to warn (Wulsin et al., 1983), and for the past decade, I have contributed a chapter on suicide prevention to an annually updated textbook for practicing physicians (Coletsos & Bursztajn, 2011-2020).  I consult regularly for secondary schools, colleges and universities, hospitals, and other institutions on assessment, reduction, and prevention of suicide and homicide.

Starting with my first book, *Medical Choices, Medical Chances* (1981, 1990), clinical decision making under conditions of uncertainty and complex causation in clinical and forensic contexts, including evaluation of medical causation, have long been among my major clinical, teaching, and research interests.  I am a founding member of the Society for Medical Decision Making and have published extensively on medical and psychiatric decision making.  At Harvard Medical School, I served for many years as faculty for the Intensive Diagnostic Interviewing preparatory course for the board examinations in psychiatry and neurology.  I continue to teach diagnostic interviewing to medical students and residents and regularly participate in morbidity and mortality conferences that review how cases with tragic outcomes might have been foreseen or prevented.  I have written specifically about the distorting effects of hindsight bias on attribution of causality in cases of suicide (Bursztajn et al., 1988).  A regular part of my forensic practice is conducting forensic psychiatric autopsies (more than 200 since 1982)—e.g., in cases of homicide/suicide—in which I reconstruct the deceased's state of mind by reviewing medical records and corroborative legal records.

Honors received include being named a recipient of the Clifford A. Barger Excellence in Mentoring Award at Harvard Medical School, serving as Harvard Medical School Alumni Representative to the Harvard University Alumni Council, and being an invited speaker at the Flexner Dean's Lecture Series at Vanderbilt University School of Medicine.

## III. Basis of Current Forensic Neuropsychiatric Opinion

My current forensic neuropsychiatric opinion is based on review and analysis of the following data:

A.  Review and analysis of case materials [see Appendix]

2

B. Review and analysis of relevant literature:

1. American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders* (5th Ed.) (*DSM-5*). Washington, DC: American Psychiatric Publishing, 2013.

2. Bursztajn HJ, Brodsky S. Forensic mental health practice. In Butcher JN, Hooley JM, Kendall PC, eds. *The APA Handbook of Psychopathology*. Washington, DC: American Psychological Association Books, 2018:751-766.

3. Bursztajn HJ, Feinbloom RI, Hamm RM, Brodsky A. *Medical Choices, Medical Chances: How Patients, Families, and Physicians Can Cope With Uncertainty.* New York: Delacorte, 1981; Routledge, 1990.

4. Bursztajn HJ, Gutheil TG, Brodsky A, Swagerty E. Magical thinking, suicide, and malpractice litigation. *Bull Am Acad Psychiatry Law*, 1988; 16:369-376.

5. Bursztajn HJ, Gutheil TG, Hamm RM, Brodsky A. Subjective data and suicide assessment in the light of recent legal developments. Part II: Clinical uses of legal standards in the interpretation of subjective data. *Int J Law Psychiatry.* 1983; 6:331-350.

6. Coletsos IC, Bursztajn HJ. Suicide. In: Domino FJ, ed. *The 5-Minute Clinical Consult.* 19th-28[th] eds. Philadelphia: Lippincott Williams & Wilkins; 2011-2020.

7. Feinstein R, Plutchik R. Violence and suicide risk assessment in the psychiatric emergency room. *Comprehensive Psychiatry.* 1990; 31:337-343.

8. Felon Seeks Firearm, No Strings Attached: A Report by Mayors Against Illegal Guns, September 2013.

9. Fischhoff B. Hindsight [is not equal to] foresight: The effect of outcome knowledge on judgment under uncertainty. *J Exp Psychol: Human Perception and Performance* 1975; 1:288-299.

10. Gilligan J. *Violence: Reflections on a National Epidemic.* New York: Vintage, 1997.

11. Goldstein AM, Bursztajn HJ. Capital litigation: Special considerations. In Drogin EY, Drogin F, Dattilio M, Sadoff RL, Gutheil TG (Eds.), *Handbook of Forensic Assessment: Psychological and Psychiatric Perspectives.* Hoboken, NJ: John Wiley & Sons; 2011:145-170.

12. Gutheil TG, Bursztajn HJ. Avoiding ipse dixit mislabeling. *J Am Acad Psychiatry Law.* 2003; 31:205-210.

13. Gutheil TG, Bursztajn HJ, Brodsky A. The multidimensional assessment of dangerousness: competence assessment in patient care and liability prevention. *Bull Am Acad Psychiatry Law.* 1986; 14:123-129.

14. Gutheil TG, Bursztajn HJ, Hamm RM, Brodsky A. Subjective data and suicide assessment in the light of recent legal developments. Part I: Malpractice prevention and the use of subjective data. *Int J Law Psychiatry.* 1983; 6:317-329.

15. Heilbrun K. *Principles of Forensic Mental Health Assessment.* New York: Kluwer Academic, 2001.

3

USA00025542

16. Heilbrun K, Grisso T, Goldstein A.  Foundations of Forensic Mental Health Assessment (Best Practices in Forensic Mental Health Assessment). Oxford University Press, 2008.

17. Nickerson RS. Confirmation bias: A ubiquitous phenomenon in many guises. *Rev Gen Psychology* 1998; 2(2):175-220.

18. Webster DW, McCourt AD, Crifasi CK, Booty MD, Stuart EA. Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States. *Criminology & Public Policy.* 2020; 19:171–212.

19. Wulsin LR, Bursztajn HJ, Gutheil TG.  Unexpected clinical features of the Tarasoff decision: the therapeutic alliance and the "duty to warn." *Am J Psychiatry.* 1983; 140:601-603.

## IV. Current Forensic Neuropsychiatric Opinion:

Based on review and analysis of the data identified in section III above, my current forensic neuropsychiatric opinions, which I hold to a reasonable degree of forensic neuropsychiatric certainty, are as follows:

1. It was not foreseeable, from a forensic psychiatric perspective, at the time the Air Force should have submitted Devin Kelley's criminal history data to the FBI database, that Kelley would commit a mass shooting after his discharge from the Air Force.

2. Kelley would not have been deterred, or otherwise prevented, from committing the mass murder at the church if he had been denied the ability to purchase firearms at federally licensed firearms dealers.

3. From a forensic psychiatric perspective, Devin Kelley was and is responsible for the mass murder he committed on November 5, 2017.

4. Plaintiffs' experts' opinions do not withstand inquiry as to forensic methodology.

In summary, it is my opinion, which I hold to a reasonable degree of forensic neuropsychiatric certainty, that Devin Patrick Kelley's actions on November 5, 2017 – *i.e.*, those involved in a premeditated, massive, lethal mass shooting -- were not foreseeable to the Air Force during his enlistment from 2009 to 2014. Additionally, even if his criminal history data had been reported to the FBI database, Kelley would not have been deterred or otherwise prevented from committing the mass shooting at the church.

Forensically, based on my training and experience, I understand the question of foreseeability to be different from whether a particular future action is possible, conceivable, or imaginable.  Although past violence is a significant risk factor for future violence, both the past and potential future violence need to be analyzed in context in order to assess foreseeability.  In this case, the period of several years that elapsed between the violent acts known to the Air Force and the premeditated mass killing at the church (a violent act of a very different order from anything he

4

USA00025543

had done before) effectively breaks the chain of foreseeability, let alone preventability, for reasons discussed below. If the passage of time, bringing substantial changes in Kelley's situation and motivations, were not enough, his demonstrated capacity for concealment, and acts of concealment, further reduce the claim of foreseeability to unsupportable speculation. Finally, even if anyone could have foreseen that he was a risk to commit a mass shooting, the level of determination he showed in planning and executing the mass shooting made his murderous rampage tragically unpreventable.

Kelley's history of domestic and other violence, as well as threats of violence, as far as it was known to the Air Force, indicated that some future violence was possible. However, the type of future violence that was foreseeable was wholly different in nature and gravity from the violent actions perpetrated by Kelley on November 5, 2017. While in the Air Force, Kelley manifested impulsive behavior in the presence of some antisocial personality traits. By 2017, the risk he presented was compounded by an overlay of obsessive-compulsive and paranoid features, which channeled his rage into sustained planning of large-scale violence. Thus, the extensive data related to Kelley's impulsive behavior while serving in the Air Force are consistent with the unforeseeability of his carrying out a mass shooting at a church in 2017.

Adding to the unforeseeability, a number of unanticipated factors intervened in the three and a half years between Kelley's discharge on May 9, 2014 and the mass killing he perpetrated on November 5, 2017. Most notably, in 2016, Kelley's behavior transitioned from impulsive to compulsive, as he began heavily researching mass shootings, purchasing magazines and ammunition on a monthly basis, and taking disturbing photos of himself wearing the very mask and equipment that he utilized in the shooting.

Despite the escalating tensions within Kelley's life years after his discharge from the Air Force, the horrific act he carried out was not foreseeable by Candace Marlowe, the private counselor he saw from June through August 2016, and as late as September 1, 2017, or by those who prescribed his psychotropic medications. Assuming reasonably prudent prescribing behavior, those medications would not have been prescribed to someone perceived to be at heightened risk of dangerousness. Kelley's murderous actions were not foreseeable to the medical professionals who treated him mere weeks or months before the shooting, or by those closest to him, much less to Air Force personnel who investigated him years earlier.

With respect to preventability, Kelley acted with determination, careful planning, and concealment. Had he been unable to purchase weapons from federally licensed firearms dealers, he had the capability and motivation to find alternative means of procuring weapons or other means of achieving his murderous ends.

Specific considerations underlying this opinion are as follows:

**A. It was not foreseeable, from a forensic psychiatric perspective, at the time the Air Force should have submitted Devin Kelley's criminal history data**

5

CONFIDENTIAL

USA00025544

to the FBI database, that Kelley would commit a mass shooting after his discharge from the Air Force.

The knowledge of the Air Force in the case of Devin Kelley must be evaluated in light of the information actually available to the Air Force personnel who would have submitted his criminal history data to the FBI at the relevant time in order to avoid the distortions of hindsight bias. Hindsight bias is a well-known, well-documented form of cognitive bias (Fischhoff, 1975; Bursztajn et al., 1981/1990). The *Encyclopedia Britannica* defines the term as "the tendency, upon learning an outcome of an event—such as an experiment, a sporting event, a military decision, or a political election—to overestimate one's ability to have foreseen the outcome. It is colloquially known as the 'I knew it all along phenomenon.'" Knowing the horrific deeds done by Kelley on November 5, 2017, there is a human tendency to focus more on prior information that was consistent with the ultimate outcome while discounting information that made that outcome less foreseeable.

     1.    **Kelley's conduct while in the Air Force did not make a mass shooting foreseeable**.

Although it is understandable to want to believe that the Air Force could have foreseen the possibility of the mass shooting, the data belie that claim. The extensive data related to Kelley's behavior while serving in the Air Force from 2009 to 2014 are consistent with the unforeseeability of his carrying out mass murder three and a half years after his discharge (and remarriage), let alone perpetrated against strangers or barely known individuals at a church, based on information available at the time.

The picture of Devin Kelley's potential for violence while in the Air Force focuses on impulsive and reactive actions. His history of acts of domestic and other personal violence and threats of violence indicates a risk of impulsive, episodic, small-scale violence. In contrast to a mass shooting of those whom he did not know or barely knew, Kelley's history of actual aggression was aimed at people close to him. While reprehensible, his aggression was relational and/or sexual in nature.

His verbalizations of hostility towards groups of others, such as his threats toward his workplace, were also in the context of conflicts and perceived personal slights and unfairness. His threats were toward those who were known to him and by whom he felt personally aggrieved. For example, on May 3, 2012, Tessa Kelley reported to Air Force agents that he had said to her, "My work is so lucky I do not have a shotgun because I would go in there and shoot everyone." (Holcombe First Amended Complaint, p. 22). She also informed Air Force investigators that Kelley put a gun to her head and threatened her. But these were hotheaded threats against known individuals who Kelley believed had wronged him. He made threats, but did not choose to act on them.

Indeed, it was this type of impulsive behavior that led the HAFB High Risk for Violence Response Team to consider Kelley a high risk for suicidal and homicidal

6

USA00025545

ideation in May 2012, and that led Kelley's Commander to place Kelley in pretrial confinement while he awaited trial in June 2012. But, whereas Kelley's violent acts prior to his separation from the Air Force were impulsive and typically reactive, the church shooting involved sustained planning and preparation. To speculate that Kelley's threats against his wife or supervisors made it foreseeable that he would kill twenty-six strangers at a church more than four years later is classic hindsight bias.

Indeed, such hindsight bias is made clear by the one-year sentence Kelley received by his military peers. Following Kelley's plea agreement, he was subject to a maximum sentence of five and a half years. The jury was told to consider five principal reasons for the sentence, including "protection of society from the wrongdoer." The jury was informed: "you should consider the accused's background, his character, his service record, the duration and character of the accused's pretrial confinement, all matters in extenuation and mitigation, and any other evidence he presented. You should also consider any matters in aggravation." If the jury would have foreseen Kelley as being a significant threat, much less the perpetrator of a mass shooting, it is highly likely they would have sentenced him to more than one year of incarceration.

The shooting was also not foreseeable on the basis of any information available to the mental health professionals in the Air Force who treated Devin Kelley. Information available to the Air Force and its personnel was consistent with a person suffering from ADHD, situational anxiety and depression, and antisocial personality traits who had difficulty coping with a variety of situations, including marital conflicts and the organizational demands of military service. In a report (dated September 19, 2011) of a forensic psychological assessment conducted on July 28, 2011, Kenneth C. Kenney, Ph.D., MSW, summarized his findings as follows:

> Mr. Kelley presents with minimal levels of depression and anxiety. He has a history of ADHD, and he reports continued problems with concentration and inattention. He has problems with sleep, and he is subject to racing thoughts, although he does not report any other bipolar symptoms. Although he does not meet criteria for a personality disorder, he tends to blame others for his problems, overvaluing his own perceptions and misjudging the motivations of others. (p. 41)

Devin Kelley's situation in those years entailed difficulty coping with marital conflicts and the demands of military service. He was voluntarily hospitalized at Peak Psychiatric from April 30 to June 8, 2012. During that period, he was diagnosed with Major Depressive Disorder, recurrent, severe without psychotic features, Panic Disorder with Agoraphobia, and Attention Deficit Disorder, in addition to antisocial personality traits (Medical Records Peak Psychiatric Hospital PEAK00000001, pp. 4-7). The context of this episode of depression and anxiety was understood to be marital strife with pending divorce and legal, occupational, social, and economic problems, including his sense that he was being harassed and belittled by his superiors at work.

7

 USA00025546

The results of psychological testing in early April 2012, a little before that hospitalization, indicated the following: "Displaying quixotic emotionality, he may express his momentary thoughts and feelings impulsively and may be provoked into sudden, unpredictable hostility. A pattern of negativism, faultfinding, and stubbornness may be punctuated periodically by belligerent and querulous outbursts."

Later, while in pretrial confinement, Kelley was evaluated yet again to determine whether he was fit to stand trial. A multi-method psychological examination in August 2012 by Dr. Chanova, a clinical psychologist, reported that Devin Kelley had a Personality Disorder consisting of mixed Antisocial, Borderline, and Narcissistic Features, in addition to an Adjustment Disorder with Mixed Disturbance of Emotions and Conduct and Attention Deficit Disorder. Dr. Chanova found that Kelley "does not display any signs whatsoever of a disturbed thought process or psychotic disorder" (p. 189) and that he "was not suffering from a severe mental disease or defect on any of the occasions he engaged in the alleged criminal conduct" (p. 190). Dr. Chanova, like the staff at Peak Psychiatric, was clear that there was no psychosis and that he saw significant antisocial traits. Dr. Chanova's testing and analysis emphasized some of those antisocial traits, noting that Kelley appeared to be "untrustworthy and unreliable," "may be treacherous and scheming," and "uses people as a means to an end" (p. 189). These antisocial traits of deviousness and deception, combined with an apparent absence of psychosis—allowing for a capacity for concealment—are consistent with unforeseeability of his later actions.

Given his psychological profile as known to the Air Force and the crimes with which he was charged, there was little basis for suspecting that Devin Kelley presented a greater risk of violence than other abusive husbands. He had violent fantasies and impulses which were directed primarily towards individuals at his place of work, or towards those in his personal life, including his wife and son. Psychiatric treatment, criminal prosecution, and separation from the Air Force were strongly indicated and were carried out appropriately by the Air Force. Long-term risks and rare events such as mass shootings are extremely difficult to predict, even by professionals such as psychologists and psychiatrists, and the professionals who treated him during his time with the Air Force could not have foreseen the November 5, 2017 church shooting, particularly given that Kelley worsened after his discharge.

**2.    Kelley deteriorated and became increasingly troubled only after leaving the Air Force.**

During the three and a half years between Devin Kelley's official separation from military service on May 9, 2014 and the horrific events of November 5, 2017, he experienced a series of unforeseeable intervening events that brought significant challenges, with attendant behavioral escalation in the context of changes in his life situation. Kelley remarried on April 4, 2014 (a month before his official separation from the Air Force) and had two children. It was the mother of this

8

USA00025547

wife, rather than any connection to his first wife Tessa, whom he had abused, who provided a likely motive for the shooting.

A snapshot of Devin Kelley's mental state and behavior one year after his discharge from the Air Force in 2014 is provided by the deposition of Emily Willis, who briefly shared an apartment with Devin and Danielle in Colorado from June 26 to July 13-14, 2015. Willis describes Kelley's self-serving, manipulative, highly controlling behavior, his road rage and racial slurs, his abuse of Danielle, and his injuring their infant son Michael (which led Willis to file a police report that caused the Kelleys to move out). Nonetheless, in her account, he maintained at that time a capacity to control his behavior in pursuit of his purposes. Illustrating the difference between foresight and hindsight, she testified that it had never occurred to her while they were living together that he would commit a mass shooting, but that as she thought about it afterward, his having done so became plausible (pp. 67-68).

Strikingly, the version of Kelley that was apparent to the roommate over a few weeks was not apparent to his therapist, an expert in behavior and psychology. Indications of Devin Kelley's self-reported and observed mental state, two and three years after his separation from the Air Force, can be found in the records of his counseling sessions with Candace Marlowe, M.S., LPC (Licensed Professional Counselor), from June 6, 2016 to August 28, 2016, and on September 1, 2017, at New Braunfels counseling center. Although he presented on June 6, 2016 stating that he just needed to talk, he also reported poor sleep, nightmares, and paranoia, saying that he was "stressed, numb, depressed" and "didn't care." During the first months of treatment, he discussed anxiety and financial stress. In August he discussed concerns about finances related to Danielle's pregnancy. He also reported that his wife had been found cheating. The session summary for August 26, 2016 reports that he related that he did not trust his wife and was worried that she would cheat again. He remained concerned about money and was suspicious, tense, angry, anxious, fearful, and had somatic complaints.

Perhaps most striking is that, although Kelley revealed some issues to Marlowe, he was able to conceal his increasingly violent thoughts and plans. After August 2016, he was not seen again by Ms. Marlowe until he came for a final session on September 1, 2017. According to Ms. Marlowe, during that session Kelley's thought content was unusual and he was withdrawn, angry, and anxious (MARLOW00000034). Even then, two months before the mass killing, Ms. Marlowe gave no indication that she perceived Kelley to be at significant risk for homicidal violence. She did not take any actions that such a risk assessment would trigger, such as a psychiatric referral or involuntary commitment for inpatient evaluation and treatment. Moreover, on that day, Kelley reported to her that he was employed "as a security guard at RV Park"—and she thought he was doing well. Tragically, that was far from the case.

Following the end of counseling in August 2016, from the records made available to me, it appears that Kelley took a steep downturn in late 2016. Kelley's Facebook posts during that time reflect a dramatic change from his posts in 2010-

9

2014, when his anger and violent impulses were leavened by awareness of and some expressed regret for his destructive impulses and his pattern of lies and deceit. Unlike in those earlier years, in which his posts depicted a struggle with his worst impulses and a search for divine grace, his posts in 2016 expressed no such yearnings for moral or spiritual betterment. Indeed, on November 9, 2016 he wrote, "God doesn't exist. Just like santa." Whereas on January 4, 2011 he had posted, "For this reason I say, if one is whole, one will be filled with light, but if one is divided, one will be filled with darkness," on November 8, 2016 he commented, "The darkness is so much more fun." Now he manifested a much more indiscriminate impulse towards killing than had appeared previously. His violent threats became more explicit and unrestrained. For example, on November 9, 2016 he replied to another poster, "But if you do want too come find me be aware that I have enough firepower too end any threat," and "Come too my house and I'll be more than willing too pump you full of lead if you step 1 foot on my property. 600 rounds per minute from a high powered assault rifle with a hair trigger will end your pathetic existence" (spelling as in original).

At this same time, Devin Kelley began to exhibit an extreme and perverse interest in serial killers. On November 19, 2016 he apparently posted to a Facebook account, "Mass murderers don't do it because of video games. They do it because they are tired of the fucking bullshit in the rigged system and the hate that breeds in all 90% of humans. And it's time for payback. Most of them anyway. Serial killers do it because they are addicted too [sic] the rush of killing and get bored with killing animals." On March 21, 2017 he reportedly posted, "You learn to shoot by doing it ... a lot of the mass shooters are impossible to detect. I'm pretty sure they don't go around acting crazy screaming to the world but are very careful. Just like serial killers. So they pass psych evals anyway" (Records Texas Rangers TXRANGERS00000048-77567 pp. 16-17). With these words he foreshadowed the unforeseeability of the horrific act he was to commit months later and described the deliberate planning he would undertake to conceal it.

Coupled with his interest in mass murders was an increased interest in firearms. While he apparently had a lifelong interest in guns, it was following the December 22, 2014 gun purchase, according to Danielle and Michael Kelley (p. 80), that he became increasingly enamored of them. Danielle and Michael Kelley describe Devin's increasing interest in guns, knowledge about guns, and shooting. In addition to targets, he enjoyed shooting birds and bats (p. 84). He also shot a severely injured horse to put it out of its misery (p. 83).

His increased enjoyment in killing animals was reported by another person as well. Not long before the shooting, Devin Kelley had a conversation with his friend Mr. Mizell (Records, Texas Rangers p. 142). According to investigators, "Mizell stated Kelley told him that he enjoyed killing animals. Kelley would have a financial budget for buying dogs and cats to kill. Mizell stated Kelley was trying to get Mizell mad for telling him about the animals because Kelley knew Mizell is very religious. Mizell stated he became upset and disturbed by Kelley's behavior and tried to talk to him about it. Mizell stated Kelley was posting videos on YOUTUBE and one was of Kelley helping a deer who had gotten caught in a fence. Kelley told Mizell that the deer ended up dying and that Kelley enjoyed

10

CONFIDENTIAL
USA00025549

death and watching things die. Mizell stated Kelley knew he was going to go to hell." It is worth noting that such torturing others by proxy, as in trying to agitate Mr. Mizell by boasting of the pleasure he took in another's suffering, appears more than three years after his discharge from the Air Force and only a short time before the targeted mass murder in the church.

In 2017, his fascination with mass shootings turned to premeditation. On May 26, 2017 he texted to his mother-in-law, Michelle Shields, "I suggest you don't test my resolve. If for any reason to attempt to insert yourself between Danielle and I again I will personally make it my mission to destroy your entire life.... After everything Ben has done and now how you and nana acted" (p. 214). On this same day, in an iCloud note, Kelley made a reference to "violence of action." I understand that violence of action means the unrestricted use of speed, strength, surprise, and aggression to achieve total dominance against your enemy. Indeed, Kelley may have well been contemplating an attack on that date. This was a watershed in his transition from irregular outbursts of antisocial behavior to premeditated mass violence driven by obsessive-compulsive and paranoid tendencies.

There are numerous indicators that Kelley was planning the attack on the church for some time. Notes in iCloud obtained from the Texas Rangers show an individual planning for a tactical assault over the summer of 2017. Kelley writes notes about weapon weight, weights of his body armor, and equipment purchases he needed to make—equipment that appears later to have been used in the church shooting. Ominously, in July 2017, Kelley refers to himself as the "Angel of Death." A sign that he might have been preparing for combat, or to use his weapons in a situation in which others might return fire, is his purchase on August 6, 2017 of AR500 body armor with tactical plates (p. 307). Come fall of 2017, Kelley appeared to be gathering intelligence on the Sutherland Springs church at its fall festival, as well as intelligence from a First Baptist Church in LaVernia.

He also attempted to buy two 100-round magazines only a week before the shooting. On October 28, 2017 he ordered 100-round high-capacity .223 drum magazines (Report, Texas Rangers p. 383). After finding they did not fit his rifle, he returned them on the same day and ordered two other magazines. Mr. Beaty, who took the order, told investigators that Kelley called him every day, several times a day, checking to see whether his order had arrived. He also came to the store on November 4, 2017 asking about the order. This pattern of behavior is consistent with a sense of urgency, likely growing urgency at the time of the November 4 in-person visit.

On the day he ordered the magazines, he also apparently posted to Facebook, "Remember the fifth of November!!" (p. 16). This is an apparent reference to Guy Fawkes Day and the famous verse commemorating the event ("Remember, remember! The fifth of November, The Gunpowder treason and plot..."). This is consistent both with his contemplating a plan for November 5, the date of the mass killing, and with his awareness of other means (e.g., explosives) for carrying out lethal attacks on large groups. On November 4, Devin Kelley left work early, leaving his station unsecured (Records, p. 456). On that or the following day he

11

USA00025550

messaged his sister via Facebook that he must "hide among the sheeple" and was worried about being "hunted and chained down" (p. 16). This is consistent with a likelihood of emergent or increasing paranoia and concealed premeditation of the mass killing.

This singular focus on a mass shooting event, the premeditation shown by Kelley in planning at least months before the event, and the cold-blooded murders in the church are far and away different from the impulsive, hotheaded, and scattered violence he exhibited while in the Air Force. Consequently, to say that the Air Force could have anticipated conduct so different from the conduct he displayed while under their control cannot be supported, and the mass shooting was simply unforeseeable.

**B. Kelley would not have been deterred, or otherwise prevented, from committing the mass murder at the church if he had been denied the ability to purchase firearms at federally licensed firearms dealers.**

Devin Kelley was a motivated killer, capable of planning and concealment and unconcerned with legal constraints. It is highly likely that had he been unable to obtain guns through federal firearms licensees (FFLs), he would have utilized other means to purchase weapons, such as private purchases through certain on-line outlets, through friends or family, or at gun shows. Accordingly, it is unsupportable speculation to claim that had Kelley been denied a firearm at an FFL, such denial would have deterred him from obtaining a firearm through other means.

Kelley's strong antisocial traits, coupled with paranoia, narcissism, and ability to conceal from others, make deterring someone like him nearly impossible. Antisocial Personality Disorder is defined in *DSM-5* as "a pervasive pattern of disregard for and violation of the rights of others" (American Psychiatric Association, 2013, p. 659). Among its manifestations are "failure to conform to social norms with respect to lawful behaviors, as indicated by repeatedly performing acts that are grounds for arrest," "irritability and aggressiveness, as indicated by repeated physical fights or assaults," and "deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure." A person with these traits would readily steal, falsify, or use other unlawful means to obtain a firearm, would manipulate others by "conning," and would conceal through lying and deceit. At Peak Psychiatric Hospital in 2012, Kelley was found to exhibit antisocial personality traits. Dr. Chanova's psychological evaluation that same year found no indication of a psychotic disorder, but rather a Personality Disorder consisting of mixed Antisocial, Borderline, and Narcissistic Features. Dr. Chanova noted that Kelley appeared to be "untrustworthy and unreliable," "may be treacherous and scheming," and "uses people as a means to an end" (p. 189).

Such behaviors are reinforced by traits associated with Narcissistic Personality Disorder, "a pervasive pattern of grandiosity (in fantasy or behavior), need for admiration, and lack of empathy" (p. 669). These traits include "a sense of entitlement (i.e., unreasonable expectations of especially favorable treatment or

12

CONFIDENTIAL                                                                                    USA00025551

automatic compliance with his or her expectations)" and being "interpersonally exploitative (i.e., takes advantage of others to achieve his or her own ends)." Kelley's sense of entitlement is exemplified by his regularly exacting compliance from Danielle, as described by Emily Willis in her deposition. His treatment of Danielle, as well as of his therapist and prescribing physicians (among others), can reasonably be characterized as exploitative.

Like many people who have antisocial and narcissistic personality traits, Kelley exhibited paranoia that fueled his focus on concealment. Paranoid Personality Disorder is defined in *DSM-5* as "a pervasive distrust and suspiciousness of others such that their motives are interpreted as malevolent" (p. 649). (A diagnostic sign particularly applicable to Kelley is: "Has recurrent suspicions, without justification, regarding fidelity of spouse or sexual partner.") As a function of this pervasive distrust and suspicion, a person with this disorder "is reluctant to confide in others because of unwarranted fear that the information will be used maliciously against him or her."

Coupled with Kelley's antisocial personality traits is his knowledge and sophistication concerning gun purchases. Kelley's second wife, Danielle, reported that Kelley had owned a gun which he bought from a friend (pp. 81-82). She and Devin Kelley's father, Michael Kelley, reported in an investigative interview that it was likely a "knock off" of a Sig-Sauer. He was not happy with the quality of this gun and, after they moved to Colorado, on December 22, 2014, he bought a Glock Model 19. Records document that he sold a 9mm pistol at a pawn shop in Texas on October 20, 2015. The investigative interview with Danielle and Michael Kelley indicates that Devin thoroughly researched his weapons purchases (Interview, p. 94). There is no reason to believe, given his antisocial personality traits, apparent disregard for the law, and strong motivation to acquire weapons, that he would not have purchased the guns he had researched through gun shows or person-to-person sales, which would have been available had retail outlets refused to sell to him.

Even if retail outlets had refused to sell firearms to him, he still, of course, could have had another person buy one for him. Kelley had no problem being manipulative, conniving, or using force to obtain his wishes. In grade school and after, he coerced several young women into sexual situations they were not ready for in order to have his sexual needs met. He later sexually assaulted a woman in 2013, as well as his wife, as described by Emily Willis. In addition, he had no issue about physically abusing women to relieve his frustration. Indeed, he seemed to pick out women with abuse histories (such as his wife), likely knowing that he could exert influence over them. Sadly, victims of abuse often have views of their spouse that are not consistent with reality. An abused spouse typically believes that their spouse didn't mean to hurt them, or that it won't happen again, despite a persistent pattern of abuse.

Against this backdrop, it is highly likely that if Kelley had been unable to obtain a firearm through an FFL, or even a private sale, then he would have had his wife purchase one for him. Although it would have exposed his wife to potential criminal prosecution, Kelley showed no regard for his wife's well-being in that he

13

USA00025552

physically and sexually assaulted her.  According to Emily Willis, Kelley was controlling and Danielle would do what he wanted in all areas, from the mundane to the criminal.  Kelley would have had Danielle buy him a gun if he could not otherwise have obtained one.  Consistent with his intent to commit murder, he would not stop until he obtained the firearms he desired.

Devin Kelley's actions on November 5, 2017 are fully consistent with planning and deliberation.  As noted above, his final weeks were marked by increasing determination, likely focused and intensified by his paranoia.  At about 10:30 AM, he restrained his wife to the bed and dressed in tactical gear, carrying a black duffle bag (Records Texas Rangers, p.1).  He then said to Danielle, "I am sorry I have to do this. I am just trying to protect you. I have to tie you up," and began tying her up on the floor.  He "hog-tied" her by securing her hands and feet together, and then, while she was on her stomach, he handcuffed her.  Danielle reported that he tied her up to restrain her and that the restraints were not too tight or too uncomfortable (p. 70).  Kelley later texted his father and sister to untie her (p. 70).

Given his reported willingness to tie up a spouse he seems to have cared for and to buy firearms and drugs from private sources, outside of ordinary channels and legally sanctioned markets, the inconvenience of having to resort to such private sales of weapons—or gun shows, for that matter—would have been highly unlikely to present a substantial obstacle to him.  Moreover, given the determination he showed when he was in a violent frame of mind, in the unlikely event that he had been unable to obtain firearms at all, he would likely have found another means of violence, such as explosives or the use of an automobile to commit mass murder.  A person with what is known of Kelley's personality structure, when he meets barriers, is likely to become even more determined.  Lacking the usual restraints on his behavior (including those imposed by conscience or by self-preservation), and planning carefully to avoid error and exposure, Devin Kelley left very little room for his actions to be foreseen or prevented.

Concealment is intended to make a person's actions difficult to impossible to foresee, and when someone is as determined as Kelley showed himself to be, there is likely no way to prevent him from carrying out his plans.  Kelley kept his intentions secret and took care to prevent his wife from interfering by tying her up.  He was clearly able to plan and control his behavior, to form and carry out intentions, and to conceal his plan and preparations from others.  The murders were premeditated and carried out with clear intent by Devin Kelley.  Given Kelley's motivation, premeditation, ability to conceal, and ability to acquire weapons, putting his criminal history into the FBI database would not have prevented this tragedy.

C. **There are no forensically reliable data to support the speculation that Kelley was involuntarily committed for psychiatric hospitalization and would therefore be subject to prohibition of weapons ownership.**

14

CONFIDENTIAL

USA00025553

A formal inpatient commitment is an involuntary placement by a judge or adjudicative body based on evidence that the person is a threat to himself or others. Although a patient who is voluntarily admitted to a psychiatric hospital may likewise be there because of a risk or harm to himself or others, the patient is permitted to sign himself out. That said, a patient who signs himself out of the hospital against medical advice may need to be involuntarily committed if he is unwilling to sign himself back into the hospital.

It is well documented that Kelley's admission to PEAK was voluntary. There is no evidence that a judge ordered him to be there, as required by New Mexico law governing civil commitments to psychiatric facilities. A review and analysis of his psychiatric hospitalization reveals no involuntary hospitalization commitment forms in the entire record. Rather, Kelley's psychiatric admissions were all on a "voluntary" status. He was never committed to a psychiatric hospital and thus was not prohibited from owning a weapon on that basis.

Contrary to what some believe, the fact that Kelley is said to have "escaped" has no bearing on this question. Likewise, the fact his commanding officer may have ordered him to admit himself to the hospital does not mean he was involuntarily committed. It simply means that his leaving the hospital may have made him AWOL.

### D. From a forensic psychiatric perspective, Devin Kelley was and is responsible for the mass murder he committed.

As discussed above, Kelley's actions were the equivalent of the premeditated murders of 26 people and attempted murder of 20 or more others. His actions prior to the shooting—purchasing body armor, his impatience to buy new ammunition, his reference to the 5th of November (Guy Fawkes Day)—are consistent with premeditation, well before that morning when he tied up his wife before driving to the church. A forensic psychiatric analysis is consistent with Kelley being the responsible agent of the mass murder he committed. There are no forensic-psychiatrically reliable data to support the speculation that "but for" the acts or omissions of others, the mass murder he committed could have been foreseen or prevented.

Kelley did not have any mental defect or disease such that he could have legitimately asserted an insanity defense. There are no reliable and valid forensic psychiatric data indicating that he could not differentiate between right and wrong, nor that he could not appreciate the immorality and unlawfulness of the mass murder he committed. After the church shootings and after he himself had been shot, Devin Kelley is described as remorseful. According to one account, something changed in him when he was shot near the church. He left a voicemail telling Danielle that he had done something bad, that he was sorry, that he had been shot three times (twice in the leg and once in the side), and that he was losing blood and consciousness. Danielle recalled, "He was like 'I can't, I've killed so many people, so many people.' He kept saying how sorry he was" (Interview p. 67). Likewise, he told his father on the phone that he had made a horrible mistake. Michael Kelley reported that Devin told him, "I messed up

15

USA00025554

really bad" (Records p. 324).  These reports are consistent with his having known the difference between right and wrong.  As such, there are no reliable and valid forensic psychiatric data relative to any potential plea of not guilty by reason of insanity (NGRI).

Moreover, Kelley was not intoxicated at the time of the killing.  Autopsy findings confirm the presence of multiple psychoactive medications in Devin Kelley's bloodstream at the time of his death.  THC (the psychoactive component of marijuana) was detected, as was barbiturate.  His blood test was negative for alprazolam and clonazepam (generic for Xanax and Klonopin respectively), although he had been prescribed those medications.  Kelley's blood test was positive for cyclobenzaprine (generic for Flexaril), a muscle relaxant with a benzodiazepine-like structure that is sometimes used to treat common symptoms of benzodiazepine withdrawal.  With his history of a motorcycle accident, it is likely that Kelley was prescribed Flexaril for pain complaints.  Given the well-known side effects and withdrawal symptoms associated with both Klonopin and Flexaril, these medications generally are prescribed in the context of careful psychiatric monitoring.  Assuming reasonably prudent prescribing behavior, they would not have been prescribed to someone perceived to be at heightened risk of dangerousness.  Rather, Kelley's character structure is consistent with his having used his accident-related injury to complain of pain while concealing any other motives for obtaining medication, let alone his plans for mass murder.

In contrast to the depraved and heinous acts of Kelley, the Air Force's failure to submit his criminal history data is regrettable, but pales in comparison to the premeditated murder of 26 worshippers and the injury of 20 more.  Relative to a forensic psychiatric analysis of causation, there are no forensically reliable and valid data to indicate a causal nexus between the assumed failure of the Air Force to put Kelley's name into a database in 2013-2014 and his committing mass murder in 2017.  Moreover, whereas hindsight bias might lead us to draw a straight line from factors known to the Air Force and its agents during that time period, a closer examination of his history reveals that immediate and foreseeable risks were dealt with in an appropriate manner and that events that occurred in the years following Kelley's separation from the Air Force on 5/9/14 are of great importance in understanding and explaining the tragic violence he perpetrated on November 5, 2017.

During his enlistment from 2009 to 2014, the Air Force took a number of appropriate steps to evaluate and reduce the risk Kelley presented.  Overall, the Air Force took decisive steps to reduce the foreseeable risks to Kelley's co-workers, wife, and son.  Those steps included convening a CRB 'high risk for violence' board, facilitating mental health evaluation and treatment (including therapy, medication, and hospitalization), facilitating treatment and involvement of the Family Advocacy program, confiscating weapons, effecting restraining orders, effecting pre-trial confinement, and successfully prosecuting his criminal behavior.  As a result, the foreseeable risks—that is, the immediate and intermediate-term dangers of violence toward his wife, son, and Air Force staff— were appropriately addressed, assessed, and mitigated.  From clinical and forensic psychiatric and risk-reduction perspectives, these actions were all reasonable and

16

 USA00025555

prudent. Furthermore, based on a forensic psychiatric analysis of organizational process, the available data are consistent with a reasonable inference that although submitting Kelley's criminal history data would also have been prudent, the significant work demands and personal strife of the criminal investigators precipitated Kelley's case falling through the cracks. Although that is not an excuse, putting any significant amount of responsibility on the Air Force investigators in light of the prudent steps the Air Force did take, and the heinousness of Kelley's acts, would be grossly inappropriate.

### E. Plaintiff-Retained Experts' Failure to Validly Address Foreseeability, Causation, and Preventability.

Having reviewed and analyzed the plaintiff-retained experts' methods of data collection, data analysis, and opinion formulation with respect to foreseeability, causation, and preventability, I have serious concerns about the validity, reliability, and utility of their work for forensic purposes.

Generally accepted standards of methodological reliability for forensic mental-health data collection, data analysis and opinion formulation include *consideration of reasonable alternative hypotheses* (see Heilbrun, 2001; Heilbrun et al., 2008). The evaluator considers alternative hypotheses and tests those hypotheses by gathering all data relevant to proving or disproving them. Such testing of one's opinion is often necessary in order to avoid *confirmation bias*, which has been defined as "the seeking or interpreting of evidence in ways that are partial to existing beliefs, expectations, or a hypothesis in hand" (Nickerson, 1998). In addition, the use of multiple measures and multiple sources of information can provide *convergent validity* – i.e., substantiation of findings by finding consistencies in the data provided by different measures. Generally accepted methodological standards for forensic psychiatry also require a critical examination of the context and reliability of the data used to test the alternative hypotheses (Heilbrun, 2001; Heilbrun et al., 2008).

In the context of forensic assessment, confirmation bias can be mitigated by gathering data and entertaining arguments that disconfirm rather than confirm one's position or belief, and by looking for convergent validity. Having reviewed plaintiffs' experts' reports, I am of the position that they have not sufficiently considered alternatives to their conclusions and have not considered, or improperly disregarded, other data. My criticisms of plaintiffs' experts' methodology are set out below.

### 1. Daniel W. Webster

The methodology employed by Daniel W. Webster, Sc.D., M.P.H., as reflected in his report dated March 31, 2020, fails to meet generally accepted standards of reliability for forensic purposes in the following ways:

### a. Misapplication of statistical categories

Webster describes his methodology as follows: "I will review data and research

17

USA00025556

that demonstrates that access to firearms by individuals with a history of domestic violence and suicidality greatly increases the risk that those individuals will commit serious acts of violence including homicide, and fatal mass shootings." His reference to "access to firearms" fails to differentiate among different ways of obtaining firearms. Likewise, "acts of violence" fails to specify the particular form of violence Kelley perpetrated. Webster also proposes to "review research that demonstrates that denials of applications to purchase firearms…reduce the risk of the applicant's risk of committing acts of violence" (p. 4). Again, he refers to "acts of violence" in a generic sense.

This misapplication of broad statistical categories characterizes Webster's selection and analysis of research findings throughout his report. He states that "Kelley had many risk factors for committing fatal abuse against an intimate partner" (p. 6), not mass murder. He cites a study he coauthored (Zeoli et al., 2018) that "found that laws restricting violent misdemeanants from purchasing firearms were associated with a 23 percent lower rate of intimate partner homicide and the federal law that made domestic battery convictions a prohibiting condition for firearm purchase were [sic] associated with a 9 percent lower rate [of] intimate partner homicide by firearms" (p. 11). Kelley, however, did not commit intimate partner homicide. On the contrary, he very possibly saw himself as avenging harm done to his wife when he attacked her mother's congregation. Accordingly, Webster's analysis concerning prediction and preventability based on a history of domestic violence is fundamentally beside the point.

Webster does cite two sources to support the claim that "many of these [risk] factors [for intimate partner homicide] – male violence against female intimate partners, sexual violence, threats to kill, and suicidality – are common among those who commit mass shootings" (p. 7). Whatever Webster may think he is proving with this imprecisely stated generalization, many thousands of people show these same risk factors. How do we identify the very few who will commit mass shootings? What is the proportion of adult men who commit intimate partner violence, and how does that compare to the proportion of male mass shooters, for whom the intimate partner is not a target, who have committed intimate partner violence? Webster does not address these critical questions.

In his focus on research on domestic violence, Webster is asking the wrong question. Even granting the accuracy of Webster's statistics, and even if Kelley did not show the capacity for concealment and the determination that he did, the passage of time between his separation from the Air Force and the mass shooting weighs heavily against the foreseeability of the latter. With the added factors of concealment and determination, there is no reliable and valid basis for the claim of foreseeability.

Likewise, there are insufficient data to support Webster's opinion that, more likely than not, if the Air Force had reported the relevant information to the FBI, "that would have prevented Kelley's ability to purchase firearms and his ability to kill 26 people…" (p. 14). The claim that Kelley's ability to purchase firearms would have been prevented had his criminal history data been in NICS is demonstrably false, as private sales through gun shows or otherwise would not

18

CONFIDENTIAL

have been restricted.  Indeed, we know from Danielle Kelley's report that he had previously bought a gun from a friend.  We also know that he had access to his father's guns.  Thus, Devin Kelley could have gone ahead and killed 26 people with firearms purchased or otherwise obtained through means that did not require a background check.  Webster's failure to specify from what sources Kelley could or would have purchased firearms leaves his extravagant and sweeping concluding sentence, "I believe that the U.S. Air Force's failure to follow protocols… ***enabled him to acquire firearms and greatly increased the likelihood that he could carry out a horrific mass shooting*** that included 26 victims murdered" (p. 15; emphasis added), with no factual support.  While I have no doubt that easy access to a gun in the heat of the moment—for example, in the context of extreme rage during or in the immediate aftermath of domestic quarrel—would increase the likelihood of lethal violence, Webster provides no data or analysis to distinguish between such impulsive crimes and premeditated, well planned murders.

What makes Webster's failure to address the weakest link in his causal chain, the ability of a determined individual to purchase weapons without involving sellers who utilize the NICS background check, most stunning is the fact that a recent article of which he was lead author describes the limited effectiveness of current gun regulations.  He and his colleagues write, "[L]aws commonly advocated as solutions to mass shootings—comprehensive background checks, assault weapons bans, and de-regulation of civilian concealed carry of firearms—were unrelated to fatal mass shootings" (Webster et al., 2020, p. 171).  In their research on mass shootings, Webster et al. "found no evidence that concealed carry laws, assault weapons bans, prohibitions for domestic abusers and violent misdemeanants, or point-of-sale CBC laws were associated with the incidence of fatal mass shootings" (p. 181).

It is striking that an expert who asserts that having Kelley's information in NICS "would have prevented Kelley's ability to purchase firearms and his ability to kill 26 people" has made no mention of his very recent research indicating that current background-check regulations have no impact on the incidence of mass shootings.  As Webster and colleagues report, "In a study of fatal mass shootings in the United States during 2014–2017 with several online data sources, Zeoli and Paruk (2020, issue) determined that 46% of the shootings were committed by someone who was prohibited or likely prohibited from possessing a firearm" (p. 172).  Webster seems to have assembled arguments and evidence most favorable to the plaintiffs' case, while disregarding the data that recently led him to conclude, "The findings of this study suggest that the most common policy prescriptions offered by advocates on each side of the debate over gun control—comprehensive background checks and assault weapons bans on one side and so-called 'Right to Carry' laws reducing restrictions on civilian concealed carry of firearms on the other side—do not seem to be associated with the incidence of fatal mass shootings.  Twenty-eight percent of the shootings in this study had some connection to domestic violence, yet we found ***no evidence that laws designed to keep firearms from perpetrators of domestic violence have affected mass shootings connected to domestic violence***" (p. 187; emphasis added).  His own study results thus undermine the very opinions expressed in his report.

19

A likely explanation for Webster's results, which he and his colleagues call "surprising," is that the psychology of mass killing is different from that of many cases of femicide, the one involving more planning and deliberation and the other being more frequently impulsive.  A report by "Mayors Against Illegal Guns" in 2013 found that "Each year, millions of people connect through online ads to buy and sell firearms. And because many of the transactions are conducted by so-called 'private sellers' who are not required by federal law to conduct background checks, guns routinely change hands with no questions asked" (p. 3).  Private sales between individuals at gun-show sales or arranged online can also be conducted without background checks, as Kelley apparently did at least twice.

**b.  Failure to evaluate the perpetrator as an individual**

In a case such as this, determining the relevance of statistical generalizations to an individual perpetrator necessitates assessment by a professional who focuses on predicting individual behavior.  Webster, whose only reported clinical experience was as a social worker dealing with suspected child maltreatment and domestic violence, is unqualified for this task.  His doctorate is in health policy and management, and, by his account, his graduate training focused on "epidemiology, research methods, statistical analysis, economics, and sociology" (p. 2).  Webster is an academic who researches the effects and need for firearms regulation policy.  He does not counsel patients, assess individuals' psychological or psychiatric health, or have experience applying research findings to the treatment or assessment of individuals. A forensic psychiatric autopsy is concerned instead with a person's motivations and actions in the context of that person's life history and evolving circumstances.  It is based on an assessment of the individual in light of facts specific to that individual, the training and experience of the psychiatrist, and the body of relevant psychiatric literature.  Webster's failure to analyze data from those perspectives with respect to Devin Kelley makes his assessment and conclusions far too non-specific with respect to Kelley's behavior.  During his enlistment in the Air Force, Kelley committed impulsive, reactive acts of domestic violence—acts of a sort that are regrettably common.  Mass murder simply is not foreseeable based on this record.

As for preventability, or the power of deterrence, Webster's generic arguments are undercut by the specifics of Kelley's personality traits and behavior, which show an individual who would not be deterred in his desire to commit violence.  Webster cites data to the effect that some percentage of people are deterred from further violence by being denied access to legally purchased firearms.  Webster's inferences from statistics may well apply to individuals who represent the norm within those statistics—namely, domestic abusers who, in an impulsive fit of rage, turn to a firearm previously purchased legally as a weapon of convenience.  But Webster's statistics lump together large numbers of people with different personalities, motivations, and behavior patterns.  The determination, planning, and concealment Kelley showed in carrying out the mass killing indicate that he was virtually impossible to deter.

**2.  Larry D. Youngner and the Honorable Jon T. Rymer**

20

Larry D. Youngner, an attorney and military law consultant, and the Honorable Jon Rymer refer to reports that they assert indicated a foreseeable risk of violence on the part of Devin Kelley. They do so without performing their own analysis or distinguishing between the foreseeable short-term risk of impulsive violence and the unforeseeable risk of methodically planning and executing large-scale violence. Thus, they fail to address, let alone establish, a foreseeable risk of a mass killing in a church three and a half years after Kelley left the Air Force.

For example, Youngner writes as if the Air Force continued to be responsible for evaluating Kelley as late as 2017, as in his citing Kelley's later contact with Jessika Edwards (p. 40). Furthermore, both he and Rymer fail to consider the likelihood that unforeseeable changes in the intervening years in Kelley's life situation and outlook might have precipitated the mass killing he perpetrated. Understanding the causes of that murderous act and the nature of Devin Kelley's motivations requires an analysis of Kelley's actions, experiences, and psychological status in the years following his separation from the Air Force. Yet these two experts fail to consider any such data, e.g., Kelley's crescendoing obsession with mass murderers, characteristics of mass murder, and firearms, as well as the cumulative effects of chronic substance abuse.

Youngner argues that due to the alleged failures of the DoD and USAF, "for years after his conviction and confinement, firearms dealers, the FBI and the congregation in Sutherland Springs, Texas were unable to keep Kelley from purchasing firearms and tragically harming public safety." In this formulation, Youngner does not assess or even mention the possibility of Devin Kelley procuring weapons through private purchases at gun shows or online. Failure to consider the availability of alternative means for obtaining firearms and the likelihood that Kelley would have utilized those means renders Youngner's analysis useless for attributing causality.

Similarly, Rymer concludes, "Had the AF and DoD met its operational, supervisory, and training obligations, more likely than not, Kelley would not have acquired the firearms necessary to perpetrate the mass shooting on November 5, 2017, in Sutherland Springs…. Moreover, because Kelley lied on the ATF Form 4473, he would have been subject to felony prosecution and confinement. And [after] an initial deny, Kelley would be permanently in the NCIC previously denied file (DelGreco Deposition pages 56-57) further subjecting him to future denials of firearms, including the Ruger AR rifle, which he used to perpetrate the mass shooting at issue." This conclusion fails even to acknowledge, let alone assess, the probability of Kelley accessing weapons through readily available alternative avenues. Rymer, without supporting data or analysis, creates the impression that these alternatives were not available to Kelley or that he would not have utilized them.

Rymer's additional speculation regarding Kelley being subjected to felony prosecution and confinement for lying on ATF Form 4473 does not provide any reason to believe that this would have had a significant effect in preventing Kelley from carrying out the attacks of November 5, 2017. Rymer fails to assess the probability of prosecution and incarceration following Kelley's completion of the

21

USA00025560

form on December 22, 2014 or the probability that he would still be incarcerated nearly three years later.  Rymer's problematic failure to assess that fact is typical of the insufficiently rigorous methodologies utilized by Plaintiffs' experts.

## V.  Supplementation of Opinion:

I am prepared to supplement the above opinions with review and analysis of such additional discovery materials, including additional medical and mental-health records, witness statements, deposition testimony, and interviews of collateral informants, as may become available.  In particular, I understand that the depositions of Michael Kelley, Rebecca Kelley, Danielle Smith, and Academy, Ltd., are in the process of being scheduled or rescheduled.  The testimony from those depositions is expected to be relevant to my opinions in this matter, and I plan to author an appropriate supplemental report following the conclusion of those depositions.

Yours very truly,

Harold J. Bursztajn, MD

22

USA00025561

## Appendix:  Materials Reviewed and Analyzed

| | |
|---|---|
| PEAK00000001 | Medical Records from Peak |
| USA00005250 | 12.6.18 DoD OIG Report re Kelley (Unredacted).pdf |
| USA00005399 | ATF Response to DOD IG ico Devin Patrick Kelley (5-3-2018).pdf |
| USA00005406 | Federal Firearms Prohibition Under 922(g)(4) - Mental Defective.pdf |
| USA00012141 | MOU with Peak Behavioral Health (2009).pdf |
| USA00012149 | MOU with Peak Behavioral Health (2013).pdf |
| USA00012158 | El Paso Police Report (escape from MH Facility).pdf |
| USA00012797 | ATF Report of Investigation.pdf |
| USA00012857 | 2802-Devin Kelley Sexual Assault Report - Redacted.pdf |
| USA00012883 | EPCO_Court_10133.pdf |
| USA00013393 | US AFOSI CASE FILE 225-C-128-G-32329111651413.pdf |
| USA00014490 | FOUO-PII_Official_Personnel_File.pdf |
| USA00014681 | New Braunfels Police Dept documents for Devin Kelley.pdf |
| USA00014693 | (PA) Kelley PIF with Spreadsheet.pdf |
| USA00014962 | 9-12_FOUO-PII_Pretrial Allied Papers_USvKelley_unredacted.pdf |
| USA00015084 | [U-FOUO] 20180313 2 IGX to DoDIG Data Call 5 Atch 1.pdf |
| USA00015086 | 9-01_FOUO-PII_Charge Sheet_USvKelley_unredacted.pdf |
| USA00015094 | Kelley Confinement Release Record.pdf |
| USA00015241 | Danielle-Interview_Summary.pdf |
| USA00015247 | Comal County Sheriffs Criminal Offense Report.pdf |
| USA00015271 | Comal County Sheriff Notes.pdf |
| USA00015281 | 7_FOUO-PII_Official_Military_Personnel_File.pdf |
| USA00015363 | Case_14-10133.pdf |
| USA00015367 | WP Interview Rowe 29Jan18.pdf |
| USA00015374 | DoD CAF  Response to DoD IG (KELLEY) PORTFOLIO.pdf |
| USA00015523 | D Kelley Admission Form.pdf |
| USA00015525 | AFOSI CDI.pdf |
| USA00015641 | Kelley's DMDC Installation Access Record.pdf |
| USA00016126 | Kelley.Danielle.515 - Transcription Validated ML.pdf |
| USA00016281 | NAVCON MIRIMAR PRISONER EDUCATION SURVEY.pdf |
| USA00016362 | WP-Communication with DPS-20180208.pdf |
| USA00016393 | (18) (FOUO) AFSFC - Kelley Documents.pdf |
| USA00016902 | (5) ROT (DO NOT DISSEMINATE WO JAJM PERMISSION).pdf |
| USA00021118 | Holloman Records - Devin Kelley.pdf |
| USA00021659 | FAP.pdf |
| USA00021723 | Kelley Video Redacted and Blurred.mp4 |
| USA00021724 | Devin Kelley Composition Notebook contents.pdf |
| USA00021823 | WP_Bizzack Interview scs.pdf |
| USA00021840 | Interview Thumbnail Brennaman.pdf |
| USA00021845 | Brennaman.MSV |
| USA00021846 | wolfe-d19.pdf |
| USA00021870 | Wolfe.MSV |

23

USA00025562

| | |
|---|---|
| USA00021871 | Kelley mental health records.pdf |
| USA00022326 | Holloman Family Advocacy Records |
| USA00022625 | Bates FBI000001-000088-Part 1_Redacted.pdf |
| USA00022715 | Bates FBI000089-000280-Part 1_Redacted.pdf |
| USA00022907 | Bates FBI000281-000589-Part 2_Redacted.pdf |
| USA00023216 | Bates FBI000590-000600-Part 3_Redacted.pdf |
| USA00023227 | Bates FBI000601-000774-Part 4_Redacted.pdf |
| USA00023401 | Bates FBI000775-00849-1A Lead Summary_Redacted.pdf |
| USA00023478 | Bates FBI000850-001071-Serial Attachments_Redacted.pdf |
| USA00023702 | Bates FBI001072-001334-Serial Attachements-Redacted.pdf |
| 18-1151-001036 | Kelley Autopsy |
| 18-1151-001035 | Danielle Kelley Affidavit (Dicks) |
| TXRANGERS00000048 | S-Springs Investigative Timeline and Overview.doc |
| TXRANGERS00000126 | 11-05-2017_11.17.46.4a_-_Verizon_E911_-_2_-_25_(Voice)_TS.WAV |
| TXRANGERS00000141 | 11-05-2017_11.35.30.2a_-_Verizon_E911_-_3_(Voice)_TS.WAV |
| TXRANGERS00006022 | Donald Brassfield.doc |
| TXRANGERS00006023 | FBI Timeline - DEVIN_KELLEY_SITREP_11-6-17_0400_v2 (3).pdf |
| TXRANGERS00006063 | SUTHERLAND SPRINGS - Timeline of Events (DRAFT) 12202017 - SB.xlsx |
| TXRANGERS00006158 | fox6now_11062017 - Texas church gunman threatened mother-in-law who attended church with text messages.pdf |
| TXRANGERS00006168 | fox6now_11062017 - What we know about Texas church shooter Devin Patrick Kelley.pdf |
| TXRANGERS00006175 | fox6now_11072017 - Sutherland Springs church shooting- What we know.pdf |
| TXRANGERS00006183 | fox6now_11112017 - Texas church shooting victims honored, funeral held.pdf |
| TXRANGERS00006192 | Map.jpg |
| TXRANGERS00006203 | Wikipedia - Sutherland_Springs_church_shooting.pdf |
| TXRANGERS00006232 | KELLEY-DEVIN SUMMARY REPORT CAROLYN.DEWITT.DPS.TEXAS.GOV.pdf |
| TXRANGERS00006400 | Leads Online - 20171207145725855.pdf |
| TXRANGERS00006403 | Post-It from HCT&F - 11-7-17.pdf |
| TXRANGERS00006404 | Receipt from 10-28-17 - HCT&F - 11-6-17.pdf |
| TXRANGERS00006415 | Girlfriends (Lain).pdf |
| TXRANGERS00006484 | KELLEY - FB post (2).jpg |
| TXRANGERS00006541 | HEB Devin Kelley Store Hourly Interview Form.pdf |
| TXRANGERS00006580 | KELLEY (Summit Vacation and RV Resort Employment).pdf |
| TXRANGERS00006724 | TEW_2173 - New Braunfels Counseling Center 07202016.JPG |
| TXRANGERS00006725 | A1712001_ATTEND_COURSE_COMPLETE_output (TEA).rtf |
| TXRANGERS00006729 | Cibolo PD Case #16-00786 (supplements).pdf |
| TXRANGERS00006731 | Comal Co SO Report 13-06-3030.pdf |
| TXRANGERS00006748 | Comal Co SO Report 14-02-0169.pdf |
| TXRANGERS00006749 | Devin P Kelley.doc |
| TXRANGERS00006755 | DevinPKelley_NBISDrecords.pdf |

24

CONFIDENTIAL

USA00025563

| | |
|---|---|
| TXRANGERS00006773 | KELLEY DEVIN P - 02121991 (NBISD).pdf |
| TXRANGERS00006777 | KELLEY TXCCH.pdf |
| TXRANGERS00006842 | KELLEY, Devin-11052017-Workup.pdf |
| TXRANGERS00006850 | KELLEY_CHL Applicant 06601054  (RSD).pdf |
| TXRANGERS00006866 | New Braunfels PD -1000000464 Juvenile Incident 01032010.pdf |
| TXRANGERS00006948 | Kelley-Levine investigation notes.pdf |
| TXRANGERS00007920 | MVI_0694_ENH.MP4 |
| TXRANGERS00010925 | Frank Palmeroy Interview 171219_0249.MP3 |
| TXRANGERS00010936 | 171106_004.MP3 |
| TXRANGERS00010939 | 1FCB09FC-FBA4-4C8D-9C72-E6AEC395319D |
| TXRANGERS00010940 | 4E044BAA-6A64-44A4-84CB-E5090D22E9CB.txt |
| TXRANGERS00010942 | 77F95BC5-6427-432A-A8D1-670E60C35357.txt |
| TXRANGERS00010943 | 044DA981-4425-473C-8F57-4C3E05D3AFE8.txt |
| TXRANGERS00010944 | 242DD7AD-5884-4CD0-A78A-870161720E95.txt |
| TXRANGERS00010945 | 7677A00D-9DAC-4CBF-A1E9-9C4427B30056.txt |
| TXRANGERS00010946 | 8990B552-FB16-45F0-AF92-DC2C80E88B0C.txt |
| TXRANGERS00010947 | 1108176C-E820-4130-9642-96EA554A0B7E.txt |
| TXRANGERS00010948 | BE191FA7-C776-4589-946C-A5347470CDA8.txt |
| TXRANGERS00010951 | CF38D6BB-FA4D-44BC-B98D-C29D18890C42.txt |
| TXRANGERS00010952 | F2D1ECAA-B580-4EEA-A06F-2769FC41D2DA.txt |
| TXRANGERS00010957 | IMG_5397.JPG |
| TXRANGERS00010958 | IMG_5398.JPG |
| TXRANGERS00010965 | IMG_5568.JPG |
| TXRANGERS00010967 | IMG_5594.JPG |
| TXRANGERS00010968 | IMG_5616.JPG |
| TXRANGERS00010969 | IMG_5726.JPG |
| TXRANGERS00010970 | IMG_5798.JPG |
| TXRANGERS00010971 | IMG_5801.JPG |
| TXRANGERS00010972 | IMG_5890.JPG |
| TXRANGERS00013174 | IMG_4365.JPG |
| TXRANGERS00013175 | IMG_4366.JPG |
| TXRANGERS00013183 | 2019_09_04_20_56_23.pdf |
| TXRANGERS00013230 | 2019_09_04_21_00_24.pdf |
| TXRANGERS00013241 | 2019_09_04_21_20_37.pdf |
| TXRANGERS00013443 | 2019_09_04_21_39_48.pdf |
| TXRANGERS00013497 | 2019_09_04_21_02_50.pdf |
| TXRANGERS00013807 | 2019_09_04_22_11_11.pdf |
| TXRANGERS00013814 | 2019_09_04_22_12_18.pdf |
| TXRANGERS00016636 | tick46538205-tick46538484-video1.ts |
| TXRANGERS00016639 | tick46538767-tick46539046-video1.ts |
| TXRANGERS00016640 | tick46539047-tick46539326-video1.ts |
| TXRANGERS00016641 | tick46539328-tick46539607-video1.ts |
| TXRANGERS00016642 | tick46539608-tick46539887-video1.ts |
| TXRANGERS00016643 | tick46539889-tick46540168-video1.ts |

25

| | |
|---|---|
| TXRANGERS00016644 | tick46540169-tick46540449-video1.ts |
| TXRANGERS00016645 | tick46540450-tick46540729-video1.ts |
| TXRANGERS00016646 | tick46540731-tick46541010-video1.ts |
| TXRANGERS00016647 | tick46541011-tick46541290-video1.ts |
| TXRANGERS00016648 | tick46541293-tick46541571-video1.ts |
| TXRANGERS00016649 | tick46541572-tick46541852-video1.ts |
| TXRANGERS00016650 | tick46541853-tick46542132-video1.ts |
| TXRANGERS00016651 | tick46542135-tick46542413-video1.ts |
| TXRANGERS00016652 | tick46542414-tick46542694-video1.ts |
| TXRANGERS00016653 | tick46542695-tick46542974-video1.ts |
| TXRANGERS00016654 | tick46542975-tick46543255-video1.ts |
| TXRANGERS00016655 | tick46543256-tick46543416-video1.ts |
| TXRANGERS00016656 | KyleWorkman.MP3 |
| TXRANGERS00016681 | IMG_0044.JPG |
| TXRANGERS00016684 | IMG_0047.JPG |
| TXRANGERS00016685 | IMG_0048.JPG |
| TXRANGERS00016905 | Stephen Willeford - By EVANS.WMA |
| TXRANGERS00046827 | IMG_5451.JPG |
| TXRANGERS00046856 | IMG_5493.JPG |
| TXRANGERS00046864 | IMG_5519.JPG |
| TXRANGERS00046877 | IMG_5533.JPG |
| TXRANGERS00046878 | IMG_5534.JPG |
| TXRANGERS00046886 | IMG_5549.JPG |
| TXRANGERS00046900 | IMG_5572.JPG |
| TXRANGERS00046901 | IMG_5573.JPG |
| TXRANGERS00046915 | IMG_5592.JPG |
| TXRANGERS00047011 | IMG_5837.JPG |
| TXRANGERS00047046 | IMG_5895.JPG |
| TXRANGERS00048172 | Danielle Kelley.doc |
| TXRANGERS00048173 | Danielle Shieds 2018 Interview - SA Express News.docx |
| TXRANGERS00048210 | Shooter Timing and Pauses Inside Church.doc |
| TXRANGERS00048211 | Situation Report #2.docx |
| TXRANGERS00048213 | Situation Report 1.docx |
| TXRANGERS00048216 | Situation Report 3.docx |
| TXRANGERS00048655 | IMG_1780.JPG |
| TXRANGERS00048827 | OVERALL TIMELINE - SUTHERLAND SPRINGS - FINAL.pptx |
| TXRANGERS00049004 | Rod Green and Michelle Shields interview.WMA |
| TXRANGERS00049089 | Supplement 2.pdf |
| TXRANGERS00049224 | Supplement #51.pdf |
| TXRANGERS00049323 | Supplement #30.pdf |
| TXRANGERS00049338 | Supplement #35.pdf |
| TXRANGERS00049353 | Supplement #39.pdf |
| TXRANGERS00049355 | Supplement #40.pdf |
| TXRANGERS00049380 | Interview Kelley Family.pdf |

26

CONFIDENTIAL

USA00025565

| | |
|---|---|
| TXRANGERS00049385 | Ranger Mims consent to search.pdf |
| TXRANGERS00049417 | Interview Charlotte Ann Hudson 11-8-2017.WMA |
| TXRANGERS00053246 | 0043@201711011327010.mpg |
| TXRANGERS00053247 | 0044@201711011326450.mpg |
| TXRANGERS00053248 | 2019_09_05_10_17_43.pdf |
| TXRANGERS00053377 | 2017I-TRF-50018811-S3-Kite.pdf |
| TXRANGERS00053379 | 2017I-TRF-50018811-S4-Kite.pdf |
| TXRANGERS00053381 | 2017I-TRF-50018811-S5-Kite.pdf |
| TXRANGERS00053577 | 2017I-TRF-50018797-S2-Hatfield.pdf |
| TXRANGERS00053580 | 2017I-TRF-50018787-Investigaion.pdf |
| TXRANGERS00053599 | 2017I-TRF-50018787-S3-Gideon.pdf |
| TXRANGERS00053601 | 2017I-TRF-50018787-S4-Pauska.pdf |
| TXRANGERS00053607 | 2017I-TRF-50018787-S5-Pauska.pdf |
| TXRANGERS00053617 | 2017I-TRF-50018852-S2_Mims.pdf |
| TXRANGERS00053631 | 2017I-TRF-50018852-S8_Mims.pdf |
| TXRANGERS00053635 | 2017I-TRF-50018852-S10_Mims.pdf |
| TXRANGERS00053638 | 2017I-TRF-50018852-S11_Mims.pdf |
| TXRANGERS00053641 | 2017I-TRF-50018852-S12_Mims.pdf |
| TXRANGERS00053649 | 2017I-TRF-50018624-S12-Russell.pdf |
| TXRANGERS00053652 | 2017I-TRF-50018624-S13-Russell.pdf |
| TXRANGERS00053663 | 2017I-TRF-50018624-S16-Barina.pdf |
| TXRANGERS00053667 | 2017I-TRF-50018624-S17-Evans.pdf |
| TXRANGERS00053669 | 2017I-TRF-50018624-S18-Evans.pdf |
| TXRANGERS00053671 | 2017I-TRF-50018624-S19-Evans.pdf |
| TXRANGERS00053675 | 2017I-TRF-50018624-S20-Mitchell.pdf |
| TXRANGERS00053678 | 2017I-TRF-50018624-S21-Kindell.pdf |
| TXRANGERS00053680 | 2017I-TRF-50018624-S22-Kindell.pdf |
| TXRANGERS00053688 | 2017I-TRF-50018624-S26-Rackley.pdf |
| TXRANGERS00053690 | 2017I-TRF-50018624-S27-Rackley.pdf |
| TXRANGERS00053694 | 2017I-TRF-50018624-S29-Rackley.pdf |
| TXRANGERS00053696 | 2017I-TRF-50018624-S2-Garcia.pdf |
| TXRANGERS00053710 | 2017I-TRF-50018624-S34-Duck.pdf |
| TXRANGERS00053732 | 2017I-TRF-50018624-S40-Snyder.pdf |
| TXRANGERS00053734 | 2017I-TRF-50018624-S41-Snyder.pdf |
| TXRANGERS00053739 | 2017I-TRF-50018624-S43-Garcia.pdf |
| TXRANGERS00053741 | 2017I-TRF-50018624-S44-Garcia.pdf |
| TXRANGERS00053743 | 2017I-TRF-50018624-S45-Garcia.pdf |
| TXRANGERS00053746 | 2017I-TRF-50018624-S46-Wright-Pending Approval.pdf |
| TXRANGERS00053750 | 2017I-TRF-50018624-S5-Smith.pdf |
| TXRANGERS00053752 | 2017I-TRF-50018624-S6-Sanchez.pdf |
| TXRANGERS00053874 | 2017I-TRF-50018772-S51_Jeter.pdf |
| TXRANGERS00053902 | 171105_002.MP3 |
| TXRANGERS00055323 | 2018_07_18_13_39_34.pdf |
| TXRANGERS00055325 | 2018_07_18_13_40_56.pdf |

27

CONFIDENTIAL

USA00025566

| | |
|---|---|
| TXRANGERS00055329 | 2018_07_18_13_38_41.pdf |
| TXRANGERS00055330 | 2018_07_18_13_24_19.pdf |
| TXRANGERS00077465 | tick46538485-tick46538765-video1.ts |
| TXRANGERS00077466 | Retrieved Items from Kelley's Car.pdf |
| MARLOW00000001 | DKelley Chart.pdf |
| | Transcript: Deposition of Emily Willis |
| | Transcript: Deposition of Candace Marlowe |
| | Transcript: Deposition of Texas Rangers 30(b)(6), Terry Snyder |
| SS-002290 | 002290-002304 Webster Report.pdf |
| SS-002305 | 002305-002350 Webster CV.pdf |
| SS-002351 | 002351 Webster Fee Schedule & Testimony History.pdf |
| SS-002352 | 002352-002373 Youngner CV.pdf |
| SS-002374 | 002374 Youngner Fee Schedule.pdf |
| SS-002375 | 002375-002420 Rymer Report, CV & Attmts.pdf |
| SS-002421 | 002421-002525 Youngner Report w Attmts.pdf |
| | Amended Complaint in Holcombe v. United States, 5:18-cv-555, ECF No.60 |

28

CONFIDENTIAL

USA00025567