IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| HOLCOMBE, et. al,<br>Plaintiffs<br><br>vs.<br><br>UNITED STATES OF<br>AMERICA,<br>Defendant | NO. 5:18-CV-00555-XR<br>(consolidated cases) |

## PLAINTIFFS' RESPONSE TO THE GOVERNMENT'S DAUBERT MOTION

The Government moves to exclude the testimony of Johns Hopkins epidemiologist Dr. Daniel Webster.[1] However, the Government does not challenge his qualifications. That's because Dr. Webster has 30 years of experience in epidemiology, economics, sociology, gun violence, public health policy, and methodological issues related to injury and violence.[2] Even though he reaches the same conclusions the Inspector General found in two separate reports (as recently as February 2020), the Government challenges those opinions as unreliable.[3] The Court should deny the Government's motion because a full

---

[1]  Exh. 2 (CV); Exh. 3, Dep. Webster 19:3–20 (authenticating CV).

[2]  Exh. 3, Dep. Webster 30:16–22, 38:5–10.

[3]  *See* Dkt. No. 250-11, at 6 (2018 Report) ("If Kelley's fingerprints were submitted to the FBI, he would have been prohibited from purchasing a firearm from a [FFL]. Because his fingerprints were not submitted … Kelley was able to purchase firearms, which he used to kill 26 people at the First Baptist Church of Sutherland Springs on November 5, 2017."); Exh. 4, USA24845, USA24847 (2020 Subsequent Review Report) (finding that the Government's omission "allowed Kelley to pass a background check and purchase firearms from a FFL.").

review of the *Daubert* factors overwhelmingly demonstrates the reliability of his methodology and conclusions.

# TABLE OF CONTENTS

Daubert Factors ................................................................................................. 1

Argument ........................................................................................................... 2

   1.  Dr. Webster's conclusions arise out of his research, not litigation. .............................................................................................. 2

   2.  Epidemiology is known to reach reliable results using established standards and controls. ......................................................... 3

   3.  Dr. Webster based his conclusions on peer-reviewed research fit for the issue at hand. ............................................................................ 4

      3.1.  Dr. Webster cites multiple studies that support his conclusions. ............................................................................. 5

      3.2.  The Government's take on domestic violence studies at best raises a fact issue. ....................................................... 7

      3.3.  Dr. Webster thoroughly explained how and why he reached his conclusions. ............................................................... 9

   4.  Dr. Webster accounts for obvious alternative explanations. ............... 13

      4.1.  Dr. Webster relies on studies that find people prefer reliable firearms from trusted sellers. ....................................... 13

      4.2.  Dr. Webster applied his extensive experience in the field to  Devin Kelley's specific factual situation ............................... 15

   5.  Dr. Webster meets the other Rule 702 criteria as well. ....................... 17

Conclusion ........................................................................................................ 18

# DAUBERT FACTORS

Courts may consider various factors on the admissibility of expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149–50 (1999). These factors are "neither exclusive nor dispositive." Fed. R. Evid. 702 advisory committees note to 2000 amendments. The Advisory Committee outlines the various factors that may be applicable to this case:

- Whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation." *Id.* (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995)).

- Whether the field of expertise is known to reach reliable results and whether the field maintains standards and controls. *Id.*

- Whether the technique or theory has been subject to peer review and publication. *Id.*

- Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. *Id.* (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

- Whether the expert has adequately accounted for obvious alternative explanations. *Id.* (citing *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994)).

- Whether the technique or theory has been generally accepted in the scientific community. *Id.*

- That the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. at 146 (1999)).

# ARGUMENT

### 1. *Dr. Webster's conclusions arise out of his research, not litigation.*

Dr. Webster has been researching gun violence and gun policy for nearly 30 years.[4] In fact, he learned about the Sutherland Springs shooting—including the Government's negligence—through his work on gun violence independent of this litigation.[5] The issues in this case bear directly on his day-to-day work. Dr. Webster is the Professor of American Health and Violence Prevention at Johns Hopkins University and the Director of the Johns Hopkins Center for Gun Policy Research.[6] He's also core faculty of the Center for Mental Health and Substance Abuse Research and the Center for Injury Research and Policy.[7] And he currently teaches courses on Understanding and Preventing Violence, Public Safety, and Problem Solving & Gun Violence.[8]

Starting with his very first job as a social worker in child maltreatment cases, he has been investigating the potential for both short term and long term risk of violence for individuals like Devin Kelley.[9] As an epidemiologist, his work focuses on both individual circumstances and community factors to explain risk.[10] For example, he's led studies investigating factors that were predictive in the lethal outcomes of intimate partner violence.[11] Based on

---

[4]  Exh. 3, Dep. Webster 309:4–6.

[5]  *Id.* at 14:11–15:1, 16:10–17:16.

[6]  *Id.* at 21:5–20.

[7]  *Id.* at 22:16–21.

[8]  *Id.* at 33:8–18.

[9]  *Id.* at 25:7–26:7, 26:21–27:15.

[10]  *Id.* at 40:10–41:6.

[11]  *Id.* at 41:7–17.

over 30 years of experience, Dr. Webster began forming his opinions in the regular course of his work but finalized them after reviewing the relevant evidence in this case.

### 2. *Epidemiology is known to reach reliable results using established standards and controls.*

Courts—including this one—use epidemiology to determine causation in individual cases. *E.g.*, *Cano v. Everest Min. Corp.*, 362 F.Supp.2d 814, 824 (W.D. Tex. 2005). An epidemiologist may testify about the application of the increased risk to a particular person. *See Gideon v. Johns Manville Sales Corp.*, 761 F.2d 1129, 1136 (5th Cir. 1985) (epidemiologist competent to testify on increased risk of cancer and reduced life expectancy of the plaintiff).

In FTCA cases, courts use epidemiological experts—relying on population level data—to reach conclusions on causation in individual cases. *E.g.*, *Lee v. United States*, SA-08-CA-531-OG, 2013 WL 12094219, at *24 (W.D. Tex. July 22, 2013) (using epidemiology to determine whether a vaccine would have prevented disease in a medical malpractice case); *Clark v. Kellogg Brown & Root LLC*, No. 2:07-CV-191, 2008 WL 11357972, at *3 (E.D. Tex. Sept. 23, 2008) ("In reaching its finding of specific causation, the court has considered the testimony of … plaintiffs' expert epidemiologist.").

Moreover, epidemiology in general, and Dr. Webster's analysis in particular, contains both the existence of standards and controls that help it reach reliable conclusions. Dr. Webster actually teaches Johns Hopkins graduate students research methods and statistics in Health Policy.[12]

---

[12] *Id.* at 33:19–34:18.

3. *Dr. Webster based his conclusions on peer-reviewed research fit for the issue at hand.*

Dr. Webster prepared a report (Dkt. No. 261-1) and a Declaration explaining how he reached his conclusions.[13] Based on his background experience, the studies, and the specific facts of this case, he reached two conclusions. First, he has a general causation opinion that the Government's negligence increased the risk of harm. Second, a specific causation opinion that, more likely than not, had the Government used due care and submitted Devin Kelley's information to the NICS, that would have prevented the sale of firearms that he used in the Sutherland Springs shooting.[14]

Confusing specific and general causation, the Government sets aside Dr. Webster's experience and expertise and the specific facts of the Kelley case. Ignoring those, the Government argues that two of the 14 studies that Dr. Webster cited do not show a "greater than 50% chance that Plaintiffs would not have been harmed." Dkt. No. 261, at 4. In doing so, the Government relies on *Cano v. Everest Min. Corp.* and other toxic tort cases. 362 F. Supp. 2d 814 (W.D. Tex. 2005).

But the Government entirely sidesteps the fact that in toxic tort cases, the plaintiff usually cannot show specific causation. *E.g.*, *Merrel Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714–15 (Tex. 1997). Where there's an absence of "reliable evidence of specific causation," a plaintiff may prove causation through epidemiological general causation studies. *Id.* at 715. Reliance on only general causation "concedes that science cannot tell us what caused a particular Plaintiff's injury." *Id.* Unlike *Havner* and other toxic tort

---

[13] Exh. 1, Webster Declaration.

[14] Exh. 3, Dep. Webster 221:11–14; Dkt. No. 261-1, at 16.

cases, there is **no doubt** as to the specific cause of Plaintiffs' injuries: after approval from a federal background check, Devin Kelley used firearms he purchased to kill and maim.

The Government nevertheless argues that there is a fitness problem with Dr. Webster's testimony because he does not meet the general causation standard under this Court's decision in *Cano v. Everest Min. Corp.*, 362 F. Supp. 2d 814 (W.D. Tex. 2005). On this point, the Government focuses on only two of the fourteen studies that Dr. Webster referenced. But even here, the question for the Court is whether **all** of the studies that Dr. Webster relies on are "so dissimilar to the facts presented" that Dr. Webster's opinions cannot be "sufficiently supported" by any studies. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144–45 (1997). That's because "trained experts commonly extrapolate from existing data." *Id.* at 146. But where they do, they should "explain how and why" they have extrapolated the data. *Id.* at 144 (cleaned up).

In this case, Dr. Webster's conclusions are not "far removed" from the studies he relies on; he adequately explains how and why he extrapolated his conclusions from the data. *Id.*

### 3.1.   Dr. Webster cites multiple studies that support his conclusions.

Concerning general causation, epidemiological evidence may be indirect evidence. *Cano*, 362 F. Supp. 2d at 820; *see also Bostic v. Ga-Pac. Corp.*, 439 S.W.3d 332, 334 (Tex. 2014) ("While but-for causation is a core concept in tort law, it yields to the more general substantial factor causation in situations where proof of but for causation is not practically possible or such proof otherwise should not be required."). But even on the issue of general causation, the Government misinterprets causation as it is applied to epidemiology. Under

Texas law, epidemiological studies can meet the "50% likelihood standard" where Plaintiffs cannot show specific causation. *Id.* However, this rule is not dipositive even in general causation. Even without meeting that standard, Plaintiffs can martial other evidence to show more likely than not the defendant's conduct caused injury. *Cano,* 362 F. Supp. 2d at 824; *McManaway v. KBR, Inc.*, No. H-10-1044, 2012 WL 13059744, at *7 (S.D. Tex. Aug. 22, 2012) (reaching the same conclusion interpreting *Cano*).

The Government's version of the "50% likelihood standard" is simply incorrect. Whereas Dr. Webster looks at the totality of the evidence, the Government primarily focuses on two or three studies. In actuality, Dr. Webster's report cites 14 articles and 1 book, including the two that the Government references.[15] But even when limiting the review only to the Government's studies, Dr. Webster demonstrates that the **vast majority (60%–88%) of individuals denied firearms** are not later arrested for firearms violence.[16]

But unlike the Government, Dr. Webster did not limit his review to two studies. As outlined in his Report and his Declaration, he surveyed the literature and found that Devin Kelley's domestic violence history increased the risk of gun violence anywhere from **3 to 12-fold**.[17] Then, applying the more-likely-than-not standard, Dr. Webster synthesized the studies and explained that applying the studies, his experience and expertise, and examining the particular facts of the case, he could conclude to a reasonable degree of scientific certainty that the Air Force's negligence increased the risk of harm and

---

[15] Exh. 1, Webster Declaration, at ¶ 8.

[16] *Id.* at ¶ 5.

[17] *Id.* at ¶ 8, 11; *see also* Dkt. No. 261-1, at 8–9 (same data in Dr. Webster's report).

resulted in Mr. Kelley acquiring the firearms he used in the Sutherland Springs shooting.

### 3.2. The Government's take on domestic violence studies at best raises a fact issue.

Not wanting to substantively address the other studies, the Government tries to differentiate the ones on domestic abuse by arguing that domestic abuse is a crime of impulsivity, not premeditated, and that there are no studies linking domestic violence to "unknown persons." On both counts, the Government misses the mark.

First, the Government ignores the impulsive nature of Kelley's act. Danielle Smith testified that Devin Kelley attacked the Sutherland Springs church **the day after** she told him she wanted a divorce and **the day before** she planned to file for divorce.[18] Second, these are not "unknown persons." Danielle Smith testified that Devin Kelley attacked the church as a way to punish her—she grew up in that church, her family went there, and she taught the children that Kelley murdered.[19] Moreover, she told Devin Kelley that her mother, Michelle Shields, was helping her get the divorce.[20] And Ms. Shields was an active member (and on the board of directors) of the Church.[21]

---

[18] Exh. 5, Dep. Danielle Smith, 206:13–207:6, 212:19–24. Dr. Webster also testified that the studies do not differentiate violence the way the Government wishes. *E.g.*, Exh. 3, Webster Dep. 121:3–122:9. In fact, the best predictor of future violence is past violence and behavior. *Id.* at 175:7–10; *see also id.* at 171:2–13 (While a mental health diagnosis alone is not a predictor of violence, a diagnosis combined with behavior—such as that which would result in hospitalization—is a risk factor for violence).

[19] Exh. 5, Dep. Danielle Smith, 206:18–207:6; *see also id.* at 223:20–224:2 (Kelley knew these facts).

[20] *Id.* at 212:19–24.

[21] *Id.* at 42:10–17.

It's only happenstance that Ms. Shields was not at the Church the day of the shooting. If she had been, would the Government's position be that Ms. Shields' injuries were foreseeable, but not the other 46 people? But even if there were some factual dispute—which there is not—as to whether domestic violence motivated Kelley, the Court may admit Dr. Websters testimony under the conditional relevance rule. Fed. R. Evid. 104(b).

Third, the Government's position butchers Texas law on foreseeability. Dr. Webster's opinion is not that it's easy to predict mass violence. Instead, the nature of the facts of the particular case indicate "a fairly high probability that Mr. Kelley would carry out violent acts in the future, including violent acts with firearms."[22] Stated another way, it's more likely than not that Kelley would carry out an act of gun violence.[23] In contrast, the Government sets a fake goal post. No requirement under Texas law says Plaintiffs must show that the Air Force could foresee that Kelley would commit a mass murder. Neither is there a requirement under Texas law that the Air Force should foresee the specific people hurt by its negligence. Instead, the standard is that Kelley presented a risk of danger of committing gun violence. *See* Dkt. No. 264, at 20–27 (discussing Texas law on foreseeability, holding that Texas law does not require the prediction of "the particular accident or injury which in fact occurs."). The Court should reject the Government's attempt to turn the foreseeability standard into a predictability standard.

---

[22] Exh. 3, Dep. Webster 53:3–15.

[23] *Id.* at 84:2–13.

### 3.3. **Dr. Webster thoroughly explained how and why he reached his conclusions.**

The Government spends time on two studies that look at subsequent criminal activity among firearms purchasers with criminal history. And as Dr. Webster makes clear in his Declaration, he uses these population level studies as evidence supporting his conclusion that the Government increased the risk of harm.[24]  To be clear, the Government does not argue that these studies fail to show any increased risk of harm. Instead, the Government mischaracterizes the law and argues that the studies do not show a 50% or greater risk of harm.

Kelley was at even higher risk because he had **two domestic violence felony** convictions. The evidence throughout the case supports this conclusion. For example, the Government's FBI representative testified that by 2016—when Kelley purchased the assault rifle he used in the shooting—the FBI had processed 1.3 million denials.[25]  Of those, felony convictions account for the majority of NICS denials.[26] And of course, if a record of a felony conviction is in the FBI's database, it's an instant denial.[27]

(see figure on next page)

---

[24] If anything, these studies underreport the incidence of recidivism. Exh. 3, Dep. Webster, 43:18–44:8; 44:9–46:1, 47:4–18 ("Certainly it's far more than based upon what we know about reporting of violent events…").

[25] Exh. 6, Dep. Del Greco, 84:11–18, Dep. Exh. 3, at 19.

[26] *Id.* at 85:8–11; Dep. Exh. 3, at 18 (chart of denials).

[27] *Id.* at 82:9–14.



*Figure 1: Exhibit 3, pg. 19, to FBI Rule 30(b)(6) Representative's Deposition Testimony*

Moreover, not only does the felony nature of Kelley's crimes increase the risk, but so does the domestic violence connection. Underreporting is a serious problem with both violent crime in general and domestic violence specifically, and it's virtually impossible to design studies that would take into account unreported violence.[28] The Government fails to substantively address the domestic violence connection because they know the studies do not support them. Most studies support the link between gun violence and domestic violence history. In fact, the studies recognize that acts of mass violence are "a blend between acts against the family and intimate partners and others."[29]

Another key reason the studies show the minimum effect—not the maximum effect—from background search policies is the record gaps in those databases.[30] Multiple studies dating back to the 1990s show that "huge gaps with reporting records on dispositions that were relevant" cause these background checks to be less effective than they otherwise would be.[31] One reason records are incomplete in these studies is that they date back to the early 1990s, when the Brady Bill was first passed.[32] At that time, records systems were just beginning to be maintained and were incomplete.[33] Another reason is the Agencies' failure to contribute records. That's particularly relevant

---

[28] Exh. 3, Dep. Webster 45:2–46:1, 119:14–120:4.

[29] *Id.* at 103:9–104:21.

[30] *Id.* at 201:13–203:8, 236:4–9.

[31] *Id.*; Exh. 1, Webster Declaration ¶ 6.

[32] This is particularly true of the 2001 and 1999 studies (Dkt. No. 261-3 and 261-4) that the Government so heavily relies upon in its argument. The Inspector General's Report in 2020 finds that, starting from 1997, it was not until the Sutherland Springs shooting did the services finally take action to correct this widespread problem. *See* Exh. 4, USA24849 (DoD IG Report detailing the services compliance rate from 1997–2019).

[33] Exh. 3, Dep. Webster 242:8–243:21.

here, where just **one** office (AFOSI) of **one** branch of the US Military identi-fied over **7300 missing individual records**. Dkt. No. 249, at 1 & n.4. That number does not include the Security Forces' failure, nor does it include miss-ing records from the Navy or Army. In this way, the Government effectively takes advantage of its own negligence to defend its case. But these types of confounding variables are the reason that a trained epidemiologist would be helpful to the Court in understanding the literature.

Another example of the Government's failure to understand the epidemi-ological science is its take on some of the mass shootings studies. The Govern-ment misleads the Court by arguing that "the most pertinent study … shows that background checks do not prevent mass shootings." Dkt. No. 261, at 6. Here, they play fast and loose with the technical terminology because—as ad-dressed by Dr. Webster's Declaration and deposition—this study does not ac-tually examine the effectiveness of federal background checks at all.[34] The study notes that background checks in private sales are not associated with the incidence of mass shootings.[35] But, as Dr. Webster notes, the study does show one type of state background check that decreases the incidence of mass shootings: the background checks performed by states before a license is is-sued.[36] However, the Court need not wade into the effectiveness of state back-ground checks in private transfers to resolve any issue in this case because Kelley purchased the weapons used in the shooting from an FFL in a state with only federal background checks.

---

[34] Exh. 1, Webster Declaration ¶ 6; *see also* Exh. 3, Dep. Webster 238:7–240:1.

[35] *Id.*

[36] Exh. 1, Webster Declaration ¶ 7.

### 4. *Dr. Webster accounts for obvious alternative explanations.*

Here, the Government confuses alternate causes with alternate realities. The Government states the known tort concept that a plaintiff should have to rule out plausible alternate causes for the injury. For example, if a plaintiff has cancer, an alternative cause may be smoking. But in this case, we know the exact cause of the injury: gunshot wounds.

In reality, cause in fact asks the simple question: but for the Government's negligence, would Kelley have been able to purchase the guns he used in the shooting? He was able to purchase the gun because the sale was approved by the FBI. If his records from the Air Force had been in the FBI system, he would not have gotten the gun he used. *See generally* Dkt. No. 249 (Plaintiffs' MSJ). Like a dog bite case where the defendant negligently leaves a gate open, we know the cause: the dog went through the open gate and bit the plaintiff. In these cases, courts don't spend exhaustive inquiries into whether the dog could jump the fence. Jumping the fence is an alternative reality that plaintiffs do not need to disprove. Otherwise, the defendant could argue an infinite number of alternative realities: What if the dog dug a hole under the fence? What if the plaintiff had left home earlier? Or later? Because we know Plaintiffs' injuries were caused by Devin Kelley's use of guns he shouldn't have been able to purchase, the Court doesn't need to wade into imagined alternate realities.

### 4.1. **Dr. Webster relies on studies that find people prefer reliable firearms from trusted sellers.**

But when raised by the Government, Dr. Webster explained "how and why" he reached his conclusion. *Gen. Elec. Co.*, 522 U.S. at 145. First, it's highly improbable that Kelley could have committed mass murder at

Sutherland Springs through means other than firearms given what epidemi-ologists in the public health field know about the nature of mass violence.[37] And the Government's speculation can be rebutted by the actual facts of the case, which Dr. Webster discussed at length in deposition, and in his Declara-tion.[38]

Moreover, the relevant epidemiological studies show that people have a strong preference for purchasing firearms from trusted sources and that only rarely do they engage in those transactions with strangers.[39] Specifically, the research supports the conclusions that attempts to purchase firearms in the unregulated market require a trusted seller and a trusted buyer.[40] The "re-sults of this study highlight the role of gun laws in creating barriers such as limiting supply or sources of guns." Dkt. No. 261-7, at 6. Dr. Webster's experi-ence also supports this conclusion: from his 30 years of experience doing gun policy research, reliability of both the source and weapon can be a reason that an individual goes to an FFL for a gun.[41]

In response, the Government argues that Texans are less likely to use trusted sellers for firearms than Baltimore "inner city gang members." Dkt. No. 261, at 12 n.2. Given the State of Texas' relationship with firearms, why would this be true? If anything, Texans are more likely to want reliable, trusted firearms. But even the Government's premise is deeply flawed. For one, the study looks at adult men residing in the city limits of Baltimore on

---

[37] Exh. 3, Dep. Webster 79:17–80:22 (assault rifles make it easier given its capacity for ammunition and ease of access).

[38] Exh. 1, Webster Declaration.

[39] Exh. 3, Dep. Webster 210:4–211:12.

[40] *Id.* at 142:11–143:4, 145:11–18.

[41] *Id.* at 299:9–12.

probation. Dkt. No. 261-7, at 3. From there—without the study even mentioning the words "gang" or "inner city"—the Government concludes that they are "likely connected to inner city Baltimore gangs." Dkt. No. 261, at 12 n.2. In deposition, Dr. Webster explained that there was no evidence to link study participants to "inner city gang members" (or any other type of gang member).[42] What's more, the Government can point to no study that people in Texas—let alone Devin Kelley—prefer untrusted sellers over trusted sellers.

### 4.2.   Dr. Webster applied his extensive experience in the field to Devin Kelley's specific factual situation.

From his 30 years of experience conducting gun policy research, reliability can be a reason that an individual goes to an FFL for a gun.[43] And that opinion was based not only on his background, but also the actual facts and evidence in the case. Applying that background to Devin Kelley, Dr. Webster had plenty of evidence to conclude that Devin Kelley preferred a regulated seller over an unregulated seller. For example, in Colorado, Devin Kelley purchased a handgun in a private sale. Dkt. No. 264-6, at 4. He found the handgun "awfully designed, and [it] kept having problems with the springs." *Id.* at 4–5. He got rid of it and went to a regulated seller with more options, such as the choice of color. *Id.*[44] "You get what you pay for." *Id.* at 5.[45]

---

[42] Exh. 3, Dep. Webster, 145:11–18.

[43] *Id.* at Dep. Webster 299:9–12.

[44] Contrary to the Government's assertions, Dr. Webster reviewed these documents. Exh 3, Dep. Webster, 296:6–297:22 (discussing Danielle Kelley's testimony); 139:20–141:22 (noting that Dr. Webster previously reviewed Danielle Kelley's affidavit concerning DICKS Sporting Goods); *see also infra* Part 5 (addressing the Government's argument that Dr. Webster did not have sufficient facts or data).

[45] *See also* Exh. 5, Dep. Danielle Smith, 218:1–14 (Devin Kelley liked new guns that worked properly).

Second, Devin Kelley's interest in firearms likewise supports the conclusion he preferred the reliability and selection. Devin Kelley repeatedly purchased guns from regulated sellers. The first time was on base while under investigation for felony crimes of domestic violence. Dkt. No. 250-7, at 1–3 (purchase form at Holloman). And even after his conviction at Holloman, he continued to buy from regulated sellers. Dkt. No. 250-20.

Finally, as Dr. Webster notes in his Declaration, if the Government speculates about whether Kelley would get guns in underground markets, then we must consider all other relevant parts of this counterfactual. In the alternative world where the Government is not negligent, Devin Kelley lies on his ATF forms, subjecting him to 10 years in prison. Also, in this alternative reality, Devin Kelley would have interacted with the police multiple times, each time subjecting him to arrest as a felon in possession of a firearm. In some of these interactions, he openly told the police that he was armed. As Dr. Webster testified, the state and federal authorities frequently prosecute felons with firearms.[46]

In sum, Dr. Webster followed a consistent methodology, not relying on any one study, but surveying the literature and applying his 30 years of gun policy expertise to the specific facts of this case.

---

[46] Exh. 3, Dep. Webster, 294:13–19.

**5.** ***Dr. Webster meets the other Rule 702 criteria as well.***

First, the scientific community generally accepts Dr. Webster's methodology. Dr. Webster has 120 to 130 peer-reviewed publications on the very issues in this case.[47] And these studies have consistently found a connection between firearm violence—including mass shootings—and the availability and prevalence of firearms.[48]

Second, Dr. Webster "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 146). Dr. Webster does not testify before courts as a regular practice.[49] On this point, courts are free to reject the Government's argument where it presents "a conclusory statement"—as it does in this case—that an expert's methodology differs from his practice. *See Board of Regents Univ. Tex. Sys. v. Tower Car Wash*, No. A-11-ca-125-LY, 2012 WL 13028618, at *5 (W.D. Tex. Feb. 10, 2012).

Third, Dr. Webster had sufficient facts and data. Here, the Government falsely asserts that Dr. Webster did not review certain documents. *E.g.*, Dkt. No. 261, at 15–16. For example, they say that Dr. Webster didn't review any Texas Rangers documents. Yet, Dr. Webster not only cited some of these

---

[47] *Id.* 308:15–309:3.

[48] *Id.* 191:2–9, 18–20; Exh. 1, Webster Declaration.

[49] Exh. 3, Dep. Webster, at 23:7–21 (vast majority of his time—75%—spent on research, and the remaining amount of time on teaching and administration).

Texas Rangers documents in his report (*e.g.*, Dkt. No. 261-1, at 16 n.28), but the Government discussed the issue extensively with him at deposition.[50]

In Plaintiffs' designation and prior to Dr. Webster's deposition (per the agreement of the parties), Plaintiffs provided a comprehensive list of documents that Dr. Webster reviewed. Those lists include the documents the Government now complains Dr. Webster did not review.[51] To date, the Government has produced over 32,000 pages of documents. Plaintiffs have likely produced more. Experts cannot review every document in the case as that would be a fruitless and expensive endeavor not proportional to the needs of the case. Nevertheless, Dr. Webster reviewed the documents needed for him to reach a conclusion about the specific facts of this case.

## CONCLUSION

Dr. Webster based his conclusion on sufficient facts and data, specifically about the Devin Kelley case, but also on his 30 years of experience in firearm violence policy, and a survey of the literature. Fed. R. Evid. 702. His methods are reliable, generally accepted, and were reliably applied to the specific facts

---

[50] *E.g.*, *Id.* at 129:21–130:2, 150:9–151:12 (discussing iCloud photos from the Texas Rangers on Kelley's accusation of a shotgun); 140:2–7, 269:6–297:22 (discussing Danielle Kelley's testimony); 139:20–141:22 (noting that Dr. Webster previously reviewed Danielle Kelley's affidavit concerning DICKS Sporting Goods).

[51] Exh. 3, Dep. Webster, Exh. 2 & 4. Parties have also agreed that none of Plaintiffs' experts need to provide a rebuttal/supplemental report until after the Government provides its final supplemental reports. To date, the Government has not provided those reports.

of this case. *Id.* While he does not testify regularly, he has testified as an expert in prior cases on the effect of firearm policy and the risk of injury from particular individuals.[52] Plaintiffs respectfully ask the Court to reject the Government's contrived reading of the law and the literature.

---

[52] Exh. 3, Dep. Webster 60:21–61:13.

Respectfully Submitted,

| | |
|---|---|
| /s/ Jamal K. Alsaffar | /s/ Jason P. Steed |
| **Jamal K. Alsaffar** | **Jason P. Steed** |
| JAlsaffar@nationaltriallaw.com | JSteed@kilpatricktownsend.com |
| Texas Bar No. 24027193 | Texas Bar No. 24070671 |
| **Tom Jacob** | **Kilpatrick Townsend & Stockton** |
| TJacob@nationaltriallaw.com | **LLP** |
| Texas Bar No. 24069981 | 2001 Ross Avenue, Suite 4400 |
| **Whitehurst, Harkness, Brees, Cheng,** | Dallas, TX75201 |
| **Alsaffar & Higginbotham & Jacob** | Office 214-922-7112 |
| **PLLC** | Fax 214-853-5731 |
| 7500 Rialto Blvd, Bldg. Two, Ste 250 | Counsel for Vidal, McNulty, and Wall |
| Austin, TX 78735 | |
| Office 512-476-4346 | |
| Fax 512-476-4400 | |
| Counsel for Vidal, McKenzie, Solis, | |
| McNulty, and Wall | |

| | |
|---|---|
| /s/ April A. Strahan | /s/ Daniel J.T. Sciano |
| **April A. Strahan** | **Daniel J.T. Sciano** |
| april@ammonslaw.com | DSciano@tsslawyers.com |
| Texas Bar No. 24056387 | Texas Bar No. 17881200 |
| **Robert E. Ammons** | **Tinsman & Sciano** |
| rob@ammonslaw.com | 10107 McAllister Freeway |
| Texas Bar No. 01159820 | San Antonio, TX 78216 |
| **The Ammons Law Firm** | Office 210-225-3121 |
| 3700 Montrose Blvd. | Fax 210-225-6235 |
| Houston, TX 77006 | Counsel for Amador |
| Office 866-523-1603 | |
| Fax 713-523-4159 | |
| Counsel for Holcombe, Ramsey, Curnow | |
| & Macias | |

| | |
|---|---|
| /s/ Daniel Barks | /s/ Mark Collmer |
| **Daniel D. Barks,** *pro hac vice* | **Mark W. Collmer** |
| ddb@speiserkrause.com | drcollmer@aol.com |
| **Speiser Krause, P.C.** | Texas Bar No. 04626420 |
| 5555 Glenridge Connector, Suite 550 | **Collmer Law Firm** |
| Atlanta, GA 30342 | 3700 Montrose |
| Office 571-814-3344 | Houston, TX 77006 |
| Fax 866-936-6382 | Office 713-337-4040 |
| Counsel for Holcombe | Counsel for Holcombe |

/s/ Dennis Peery
**Dennis Charles Peery**
d.peery@tylerpeery.com
Texas Bar No. 15728750
**R. Craig Bettis**
cbettis@tylerpeery.com
Texas Bar No. 24040518
**Tyler & Peery**
5822 West IH 10
San Antonio, TX 78201
Office 210-774-6445
Counsel for Uhl

/s/ George LeGrand
**George LeGrand**
tegrande@aol.com
Texas Bar No. 12171450
**Stanley Bernstein**
Texas Bar No. 02225400
**LeGrand & Bernstein**
2511 N. Saint Mary's St.
San Antonio, Texas 78212
Office 210-733-9439
Fax 510-735-3542
Counsel for Wall & Solis

/s/ Justin Demerath
**Justin Demerath**
jdemerath@808west.com
Texas Bar No. 24034415
**O'Hanlon, McCollom & Demerath**
808 West Ave.
Austin, TX 78701
Office 512-494-9949
    Counsel for Corrigan, Braden,
    Warden, Stevens, Pachal, McCain, &
    Poston

/s/ Tim Maloney
**Tim Maloney**
Texas Bar No. 12887380
timmaloney@yahoo.com
**Paul E. Campolo**
pcampolo@maloneyandcampolo.com
Texas Bar No. 03730150
**Maloney & Campolo, L.L.P.**
926 S. Alamo
San Antonio, TX 78205
Office (210) 465-1523
Counsel for Ramsey

/s/ Joseph M. Schreiber
**Joseph M. Schreiber**
joe@lawdoneright.net
Texas Bar No. 24037449
**Erik A. Knockaert**
erik@lawdoneright.net
Texas Bar No. 24036921
**Schreiber | Knockaert, PLLC**
701 N. Post Oak Rd., Suite 325
Houston, TX 77024
Phone (281) 949-8904
Fax (281) 949-8914
Counsel for Brown

/s/ Jason Webster
**Jason Webster**
jwebster@thewebsterlawfirm.com
Texas Bar No. 24033318
**The Webster Law Firm**
6200 Savoy
Suite 640
Houston, TX 77036
    Counsel for Lookingbill

/s/ Brett Reynolds

**Brett T. Reynolds**
btreynolds@btrlaw.com
Texas Bar No. 16795500
**Brett Reynolds & Associates, P.C.**
1250 N.E. Loop 420, Suite 420
San Antonio, TX 78219
(210)805-9799
    Counsel for Workman, Colblath, and
    Harris

/s/ Marco Crawford

**Marco Crawford**
**Law Office of Thomas J. Henry**
4715 Fredricksburg
San Antonio, TX 78229
(210) 585-2151
(361) 985-0601 (fax)
mcrawford@tjhlaw.com
    Counsel for McMahan

/s/ Craig Carlson

**Craig Carlson**
ccarlson@carlsonattorneys.com
**Philip Koelsch**
pkoelsch@carlsonattorneys.com
**Joe Craven**
jcraven@carlsonattorneys.com
**The Carlson Law Firm**
100 E Central Texas Expy
Killeen, TX 76541
254-526-5688
    Counsel for Rios

/s/ Marion M. Reilly

Marion M. Reilly
**Hilliard Munoz Gonzales, L.L.P.**
719 S. Shoreline - Ste 500
Corpus Christi, TX 78401
(361) 882-1612
361/882-3015 (fax)
marion@hmglawfirm.com
    Counsel for McMahan

/s/ Kelley W. Kelley

**Kelley W. Kelley**
**Anderson & Associates Law Firm**
2600 SW Military Drive, Suite 118
San Antonio, TX 78224
(210) 928-9999
(210) 928-9118 (fax)
kk.aalaw@yahoo.com
    Counsel for Ward

# CERTIFICATE OF SERVICE

By our signatures above, we certify that a copy of Plaintiffs' Response to the Government's Daubert Motion has been sent to the following on September 18, 2020 via the Court's CM/ECF notice system.

JOSEPH H. HUNT
Assistant Attorney General
United States Dept. of Justice
Civil Division

JOHN F. BASH
United States Attorney
Western District of Texas

KIRSTEN WILKERSON
Assistant Director, Torts Branch
United States Dept. of Justice
Civil Division

PAUL DAVID STERN
Trial Attorney, Torts Branch
United States Dept. of Justice
Civil Division
CLAYTON R. DIEDRICHS
Assistant United States Attorney

JIM F. GILLIGAN
Assistant United States Attorney

JOHN PANISZCZYN
Civil Chief
United States Attorney's Office
Western District of Texas

JAMES G. TOUHEY, JR.
Director, Torts Branch
United States Dept. of Justice
Civil Division

STEPHEN E. HANDLER
Senior Trial Counsel, Torts Branch
United States Dept. of Justice
Civil Division

STEPHEN TERRELL
Trial Attorney, Torts Branch
United States Dept. of Justice
Civil Division
JAMES E. DINGIVAN
Assistant United States Attorney