IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| HOLCOMBE, et. al, | NO. 5:18-CV-00555-XR |
| | (consolidated cases) |
| Plaintiffs | |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Defendant | |

# DECLARATION

I am Daniel Webster, and I declare the following as true and correct:

1) I am of sound mind, over the age of 18, and have personal knowledge of the facts contained in this declaration.

2) I have reviewed the United States' motion and attachments in this case. The Government's motion misinterprets the studies, the epidemiological science, and conclusions in this case. Importantly, the Government misunderstands the methodology and misapplies the methodology and statistical analyses from studies I cited in my report to reach conclusions that these studies did not reach. To be clear, I relied on the studies and research cited in my report and implemented the same methodology and analyses used in those studies and research that were used to reach my conclusions in this case.

3) In addition, I had access to very specific and voluminous evidence on the shooter that was available to the Air Force prior to the shooting that is critically important information in forming my conclusions about the risk of harm and foreseeability of gun violence Devin Kelley posed prior to and leading up to the shooting. It is important to note that much of that specific and extensive evidence of Devin Kelley's violent conduct, use of guns as part of his violent conduct, along with his threats of mass gun violence while he was in the Air Force was not mentioned in the Government's motion. But any conclusion about the

specific risk and foreseeability f gun violence Devin Kelley posed, and about which the Air Force was aware, is important evidence in forming conclusions about risk and foreseeability of gun violence being committed by him. Failure to consider that information is unsound methodology for drawing conclusions relevant to my field of violence prevention.

4)  I was asked to answer to questions in this case and the Government confuses the evidence supporting those questions in its motion. First, my report and testimony answer the general causation question of whether the failure to operate the background search system with due care increases the risk of gun violence to the American public. (Absolutely, it does.) Second, my report and testimony answer the specific causation question in this case—if the United States had followed the law—whether that would have prevented Devin Kelley from acquiring the firearms he used in the Sutherland Springs shooting. (Absolutely, it would.)

5)  **Wright & Wintemute Studies.** (Exhibits C & D) The government states, regarding studies by Wintemute and Wright Exhibits C & D, "*As a threshold matter, neither of these studies specifically address Kelly or his ability to obtain firearms from sources that did not require a background check… In addition, these studies do not answer the question of which of the persons who are denied purchases at FFLs due to failed background checks are deterred from acquiring, or unable to acquire, firearms from other avenues. There is simply too great an analytical gap between such generalized epidemiological studies and the individual circumstances here.*"

This is simply not true. The Wintemute et al. study published in JAMA in 2001 uses administrative data to assess criminal offending in 927 individuals who applied through an FFL to purchase handguns in California but were denied. If those denials were ineffectual because those who were denied would have easily obtained firearms from non-FFLs sellers who had no legal obligation to make the transfer contingent upon the purchaser passing a background check, the rate of offending for violent and firearms crimes would have been the same as that of the 727 individuals who purchased handguns despite having prior convictions for violent crimes. This study tests the net effect of denial in the real world where some who are denied acquire firearms through other means and some do not. This study provides clear scientific evidence that the net effect of denial was to significantly reduce the incidence of violent and firearm offending. After controlling for other factors, violent offenders who were allowed to purchase handguns subsequently had a rate of offending for violent or gun crimes that was 29% higher than those with similar histories who were denied handgun

purchases as a result of a background check. The 95 percent confidence interval around that point estimate includes a **60% higher rate** of gun/violent offending among those with prior convictions for violent crimes who were allowed to purchase handguns compared with a similar group who were denied as a result of an FFL-initiated background check. There were no differences in subsequent criminal offending that did not involve firearms or violence, bolstering the evidence that handgun purchase denial led to lower rates of violent and gun offending rather than some difference in general risks of criminal offending. Similarly, in the study led by Mona Wright and published in 1999 examined the criminal records of 170 felons who attempted to purchase a handgun from an FFL in 1977 but were denied purchase following a background check. These 170 felons, of course, could have sought to obtain a firearm from a non-FFL seller who, at that time, was not required to make firearms transfers contingent upon the purchaser passing a criminal background check. While some of the 170 denied felons did nevertheless obtain a firearm (12% had a subsequent gun-related arrest), the data from this study indicates that 88% were not subsequently arrested for a gun crime. Stated another way, the vast majority of those denied firearms were not arrested for a firearms-related crime. Thus, the findings from both of these studies - that included hundreds of individuals denied firearm purchases from FFLs as a result of records submitted for law enforcement officials to identify prior convictions for committing violent crimes and who could have potentially obtained firearms from non-FFLs but apparently did not do so - support my conclusion that the failure to exercise due care in submitting records to the FBI's NICS system for convictions for violent crimes that prohibit legal firearm purchase and possession increases the risk of gun violence by prohibited individuals such as Devin Patrick Kelley. Importantly, as I noted in deposition and my report, this is not the only evidence as the Government suggests.

The Government further argues, "*Although there is significant scientific literature showing that prohibited persons routinely obtain firearms, Webster did not address that literature at all in his report. (Ex. B, Dep. Tr. 220:8-16.) As Defendant observed in its motion for summary judgment, Kelly had access (and previously had acquired) firearms from sources other than FFLs.*" As explained above, the two large studies of individuals denied firearm purchases from FFLs due to background checks that identified prohibiting conditions for individuals seeking firearms account for the fact that some who are denied can and do obtain firearms in other ways. **Yet both studies show that the large majority of those who are denied are not subsequently arrested for committing crimes with firearms.** In the Wintemute et al. (2001) study, among the denied group, there were only 8 charged

with gun or violent crimes for every 100 years of person follow up. In the Wright et al. study, 88% of those who were denied purchase as a result of a background check were <u>not</u> arrested for a gun crime during the three-year follow-up period.

The Government further argues that, "*Importantly, the authors to the second study found that with respect to at-risk persons with two or more violent offense charges—a category into which Kelley fits—there was no statistically significant increased risk for future violence when at-risk persons purchased handguns at FFLs. (Ex. D, Study #2, p.89.) … Kelley's acquisition of firearms through means other than FFLs and willingness to persist in attempting to purchase firearms even when denied (see Section IV, infra) show that he would not have been deterred if he had been denied due to a background check, consistent with the conclusion of the authors of this study.*" Yet the point estimate for the effect of denial for offenders with 2 prior convictions for violent crimes was <u>identical to that for the overall sample</u> of individuals with any prior conviction for a violent offense. Because there were fewer individuals who had 2 prior convictions for violent crimes versus the larger overall sample of individuals with prior violent offenses, the statistical precision of the estimate is reduced. Indeed, the 95 percent confidence interval for risk for subsequent offending with guns or violence for purchasers versus denied indicated the potential increase in offending 100 percent higher for purchasers. **Stated another way, for individuals with two or more violent offense charges, range of statistical uncertainty in the model indicates that there could be as much as a 2-fold increased risk of offending associated with being allowed to purchase a firearm versus being denied.** Furthermore, since this paper was published in 2001, top journals publishing epidemiological findings are moving away from rigid determinations of what is or is not statistically significant and simply requiring researchers to present estimates of the uncertainty surrounding any statistical finding.[1] Thus, I am on solid ground to conclude from the data from this study that a substantial number of individuals with a history similar to that of Devin Kelley were deterred from committing future acts of violent crimes as a result of being denied when they attempted to purchase a handgun as a result of a background check.

---

[1]  Harrington, David, Ralph B. D'Agostino, Constantine Gatsonis and others.  New Guidelines for Statistical Reporting in the *Journal*. (2019) *New England Journal of Medicine* 381:285-286.  DOI: 10.1056/NEJMe1906559
https://www.nejm.org/doi/full/10.1056/NEJMe1906559

Also relevant to this point is research that I cited and discussed in my report and deposition was the 2013 study by Jeffrey Swanson and colleagues, which showed that increasing the records for mental-health-related prohibiting conditions that were available in background check databases reduced the rates of violent crime for the group in question by approximately 50 percent. Again, the ability to block the sale of firearms to this group of prohibited individuals resulted from changes to this group of prohibited individuals resulted from changes in practices for sharing records for background checks. The prohibited group had the ability to access firearms through transactions that did not require a background check, yet apparently many did not do that and as a result their rate of violent offending was cut in half.

The Government argues that the scientific literature indicates that prohibited persons "routinely" obtain firearms. I did, indeed, consider the scientific literature relevant to firearm acquisition by prohibited persons. Most studies of this type only collect data from armed criminals, inmates in jails or prisons, or gang members. The studies do not survey or collect data on an entire group of prohibited persons or, more relevant to this case, survey individuals who were denied firearm purchase after a background check and inquire about their subsequent interests and efforts in obtaining firearms. My own research on this topic[2,3] and research by prominent economist and gun violence researcher Philip Cook[4] shows that high-risk individuals interested in obtaining firearms have a preference for new firearms and are extremely reluctant to purchase firearms from strangers, noting the dangers and uncertainty of such transactions involving firearms and large sums of money. Although Devin Kelley may have once purchased a handgun from a friend does not mean that, many years later and after a history of violence that included convictions that prohibited legal gun ownership, among other social problems, Devin Kelley could readily

---

[2]  Webster, Daniel W., Lorraine H. Freed, Shannon Frattaroli, Monena H. Wilson. (2002)  How delinquent youth acquire guns: Initial versus most recent gun acquisitions. *Journal of Urban Health* vol. 79, pages 60-69.

[3]  Crifasi, Cassandra K, Seema Choksey, Shani Buggs, and Daniel Webster. (2017) The initial impact of Maryland's Firearm Safety Act of 2013 on the supply of crime guns in Baltimore.  *The Russel Sage Foundation Journal for the Social Sciences* 3(5):128-140.  https://www.jstor.org/stable/10.7758/rsf.2017.3.5.06

[4]  Cook, Philip J., Jens Ludwig, S. Venkatesh, Anthony A. Braga. (2007). Underground gun markets. *Economics Journal.* Vol. 117, pages 588–618.

Cook, Philip J., Susan T. Parker, and Harold A. Pollack. (2015) Sources of guns to dangerous people: what we learn by asking them. *Preventive Medicine* vol. 79, pages 28–36.

find someone who he trusted and who trusted him in a firearms transaction. Indeed, the available evidence indicates that he decided to take his chances with firearms transactions from an FFL where he was assured a reliable product and exchanges that did not involve potential threats to his personal safety.

The Government also questions my conclusion that the available evidence meets the "more likely than not" standard for causation under Texas law – a greater than 50% probability that a given cause led to a given effect – because the point estimates of the effects of denials for firearm purchase applications in the Wintemute and Wright studies are closer to 25 percent reduction in risks. Of course, the estimates of effect are an <u>average</u> effect across all persons who were denied a firearm purchase and have a decree of uncertainty around the estimate of the average effect that can be wide. For example, the 95 percent confidence interval for the point estimate for <u>average</u> effect for denial in the Wintemute study include up to a 60 percent increase for subsequent offending involving guns and/or violence. For the Wright study, the 95 percent confidence interval for the average effect on violence included a 39 percent increase. My professional determination is that the government's failure to submit records to the NICS that would have led to a denial for Devin Kelley's application to purchase the firearm he used to commit mass murder is based on the evidence from these and other studies that I cite in my report, the knowledge I have attained leading research on gun violence for 30 years and reviewing other research in the field, and, importantly, the information available about Mr. Kelley's history of violence and dealings with firearms. Research shows that the ability to obtain firearms for prohibited persons is highly dependent upon having trusted suppliers, trusted products, and suppliers who trust the potential purchaser. The facts in this case suggest that he did not have a close friend or family member who could or would supply him with the type of firearm that he wanted. While it is possible that Kelley might have tried to purchase an assault-style rifle from a stranger advertising on an internet site the intention to sell such a firearm, such transactions are intimidating, potentially dangerous, and come with no warranty.

The Government also argues that it was inappropriate to draw conclusions about this case from the Wintemute study because the available data for that study could not always distinguish which cases were acts of gun violence and used a category of gun and/or violent crime category as an outcome. That is a limitation of the data in this study, however, in the article the authors note, "*Our records review established that in the period prior to actual or attempted handgun purchase, convictions for nonviolent gun crimes made up only 4.4% of convictions for*

*all crimes involving guns, violence, or both guns and violence.*" Thus, it is likely that most of the crimes associated with purchase versus denial by a prohibited violent offender were serious crimes. Indeed, I would argue that the less precise measure used in this study likely biased the estimated effect in the direction of a null hypothesis (no effect) because some who were denied firearm purchase may have substituted less lethal weapons – a desired effect of firearm restrictions – and the public safety benefits of that substitution would be missed by the less precise measure used in the study.

6) The Government also states: "*Dr. Webster neglects to discuss in his expert report perhaps the most pertinent study, his own research, which shows that background checks do not prevent mass shootings. Indeed, Dr. Webster previously wrote in the published scientific literature that "comprehensive background checks . . . do not seem to be associated with the incidence of fatal mass shootings." (Ex. E, Webster Study, p.187.) His article further states that "the conditions that facilitate or suppress lethal violence overall may not explain rare and especially lethal mass shooting events." (Id. at 188). The fact that he has offered opinions solely for purposes of litigation that are directly contrary to those he offered in the published scientific literature is an independent basis for exclusion of his opinions.*"

This claim demonstrates a lack of understanding of my research and the data used in it. As I explained in detail during my deposition for this case, the study in question uses state-level data to assess the associations or lack thereof between the presence of certain state firearm laws and the incidence of fatal mass shootings. One of the laws examined was comprehensive background check (CBC) requirements that extend background check requirements to private (i.e., non-FFL) transfers. The study was not designed to test whether prohibited persons are deterred from committing acts of fatal mass shootings because we simply did not have sufficient data in that study to answer this question. Background checks could, indeed, deter acts of fatal mass shootings by prohibited persons even if there is no statistical association between CBC laws for private transfers and fatal mass shootings. I cited the Wintemute article (Exhibit H) that explains some of the reasons that several studies, several of which I am an author, have not found that CBC laws have significantly reduced firearm homicides. Incomplete data due to failed reporting is the one reason. But I also co-authored two studies that examined more thoroughly this question. Both examined the key question: When passing laws to increase background checks in private sales, does that result in more pre-firearm-sale background checks being completed? The answer was that the laws often do not increase the number of background checks. Without increasing the

number of private sale background checks, it is not possible for private background checks to be *more* effective than only requiring background checks for sales from FFLs. Also, about two-thirds of individuals who commit fatal mass shootings were not prohibited from purchasing firearms when they committed their acts.[5] When CBC laws are enacted, there are often no significant increases in background checks performed.[6] Thus, if a large majority of mass shooters are not prohibited and there is very little increase in background checks as a result of CBC laws, it is not surprising that our study found no association between CBC laws in private transfers and fatal mass shootings. This finding is not inconsistent with the notion that denying firearm sales to violent prohibited individuals could not reduce the likelihood that those individuals will commit acts of fatal mass gun violence.

7) It is noteworthy, however, that my 2020 study of fatal mass shootings and firearms laws did find a rather large association between the presence of firearm purchase licensing laws and fewer fatal mass shootings. State licensing laws, of course, do require background checks for prospective firearm purchasers to be licensed. The question in this case is not the one I examined in my 2020 study, which examined the association between state laws that extend background check requirements to private transfers of firearms. That association is not was is relevant in this case. The question is this case is whether a functioning federal background check would have prevented Devin Kelley from purchasing the guns he actually purchased and used to commit mass murder. The answer to that question is a definitive yes. We know that each time Mr. Kelley tried to purchase these firearms, his information was accurately and correctly run through the NICS system. Had the NICS system had Mr. Kelley's history of prior prohibiting convictions, the FBI would have provided the various FFLs a "deny" instead of "proceed"

---

[5] Everytown for Gun Safety. Mass Shootings in America: 2009 to the present. https://maps.everytownresearch.org/massshootingsreports/mass-shootings-in-america-2009-2019/; The Violence Project, https://www.theviolenceproject.org

[6] Castillo-Carniglia, Alvaro, Rose M. Kagawa, Daniel W. Webster, Jon S. Vernick, Magdalena M. Cerda, Garen J. Wintemute. (2017) Comprehensive Background Check Policy and Firearm Background Checks in Three States. *Injury Prevention* doi:10.1136/injuryprev-2017-042475.

Castillo-Carniglia, Alvaro, Daniel Webster, Garen J. Wintemute. (2019) Effect on background checks of newly-enacted comprehensive background check policies in Oregon and Washington: a synthetic control approach. *Injury Epidemiology*. 6:45. Published 2019 Nov 27. doi:10.1186/s40621-019-0225-8

with sale. Such a denial could have potentially led to federal charges against Devin Kelley for falsely claiming that he had not been convicted of felony crimes or misdemeanor domestic battery.

8) The Government claims there is no connection between Devin Kelley's history of domestic violence and the mass shooting at the church in Sutherland Springs and, therefore, my report covering the issue of the role of firearm availability in determining lethal outcomes from domestic violence is irrelevant to the case. Yet many studies show that a history of domestic violence is common among perpetrators of fatal mass shootings and that many of the incidents are domestic homicides or connected directly to acts of domestic homicide. My report cites twelve (12) articles and a book that I edited on the topic. (Footnotes 9 to 13, 16 to 25.) As I discussed in my report, the overwhelming evidence shows that individuals with a history of domestic violence are likely to commit future acts of violence against their (ex)intimate partners, family members and others. For example, I cited one of the largest studies ever undertaken on the issue (Campbell 2003) in which I was a co-author. That study showed that, after controlling for relevant risk and protective factors, previous threats with a weapon were associated with an increased the risk of domestic murder by **3.38 times** above situations with no such threats; threats of murder increased the risk of domestic violence related murder by **3.22 times**; and the abuser's access to a firearm independent of the effects of severe forms of abuse, was associated with an increased risk of domestic homicide that was **5.38 higher** than that of abuser's without access to a firearm. Abuse triggered by the partner leaving the abuser for another partner or by the abuser's jealousy resulted in a **5-fold increased risk** of murder. All of these risk factors are directly relevant to Mr. Kelley.

9) This case has the hallmarks of domestic abuser violence, from threats of spousal violence with a weapon to the history of physical abuse of the spouse and child. It is also important to note that in its motion, the Government seems to employ its own limited (and incorrect) definition of "domestic violence related" crime. As my studies in my report point out and as I mentioned in my deposition, domestic related violence is not limited to violence against the spouse, child, or persons in the home. It is well reported and understood that domestic violence related crimes often include violence the abuser commits against family members of the spouse, friends of the spouse, or others the abuser perceives to be influencing the spouse. For example, one study found that 24 percent of the cases in which men killed multiple family members with a firearm occurred in a variety of constellations. "These included the killing of a spouse and in-laws, the killing of parents and other family members, or the killing of secondary relations, such as combinations of

grandparents, cousins, aunts, uncles, nephews. Perpetrators committed suicide following the event in more than one third of the cases. In cases in which the spouse and in-laws were killed, the spouse constituted the primary target; here, the perpetrator perceived the in-laws as equally guilty of betrayal. This was reflected in the relatively high prevalence of intimate partner problems, including prior restraining orders. In other cases in this cluster, the physical and geographic closeness of family members caused them to be present and thus become a victim of the familicide… Typically, the victims and perpetrator did not share a household."[7] Furthermore, it is well established that the most violent perpetrators of domestic and intimate partner violence are violent against others as well.[8]

10)   So, when defining the sphere of foreseeability of potential victims of domestic violence, one must include those members of the family close to the abused, as well as friends of the abused, or others the abuser believes play a role in the abused's life. And the facts of this case bear that out too. The testimony of Danielle Smith (formerly Kelley) shows that Devin Kelley went to the church on Sunday with murderous intent because the previous day, Ms. Kelley had told him she wanted a divorce. (pg. 195 to 207). She testified that Mr. Kelley was punishing her for asking for a divorce by shooting the people at the church, because she grew up in that church, went to the church, and he killed the children in that church that she helped raise. (pg. 207). She also testified that Mr. Kelley regularly threatened not only to kill her, but also kill her family if she left him. (pg. 223-224). Even more specifically, Danielle Kelley testified that she told Mr. Kelley that on that Monday—the day after the shooting—he was going to have to take her to meet her mother, Michelle Shields, who would take care of her and the kids and that on that Monday they would go file for the divorce. (pg. 212). Michelle Shields was an active member and on the board of directors of the Sutherland Springs church and the next day Mr. Kelley went there and committed the mass shooting where he also killed Ms. Shields' mother (Danielle's grandmother). So, the facts revealed by this

---

[7]  Liem, Markieke and Ashley Reichelmann. (2013) Patterns of Multiple Family Homicide. *Homicide Studies* Vol.18 (1), p. 44  doi: 10.1177/1088767913511460

[8]  Holtzworth-Munroe A, Stuart GL (1994) Typologies of male batterers: Three subtypes and the differences among them. Psychological Bulletin 116: 476–497.

Holtzworth-Munroe A, Meehan JC, Herron K, Rehman U, Stuart GL (2000) Testing the Holtzworth-Munroe and Stuart batterer typology. Journal of Consulting and Clinical Psychology 68: 1000–1019.

testimony further solidify that this was clearly a domestic violence related shooting.

11)   I further cited multiple studies showing that in these domestic violence situations, the risk of harm to other victims connected to the spouse also increase. For example, one study I cited shows the domestic violence offender who uses a firearm is twice as likely to kill multiple victims than an offender who does not use a firearm. The Saltzman study I cited in my report (Exhibit F) examined homicides of spouses and related individuals and found that firearms increased the risk of death **12-fold** for these groups of people. The point of these studies is that access to firearms are a significant factor in causing the death of domestic violence victims and associated individuals.

12)   Next, before my deposition, I provided the underlying data from the Violence Project. (This data was published in June 2020, so I did not have it available to me at the time I wrote my report.) The Violence Project is a nonprofit, nonpartisan research center, funded by the Department of Justice, which has created an incredibly detailed database on mass shootings since 1966. Using that data, shooters had a history of domestic violence in 35%+ of mass shootings,  and a history of physical violence in 62%+ of mass shootings. These numbers are generally consistent with other studies into mass shootings in the United States, which I discussed in my report and deposition (e.g., Zeoli 2020).

13)   Moreover, these studies are not the *only* evidence for my conclusion that had the United States followed the law and submitted Devin Kelley's information to the NICS, that would have, more likely than not, prevented Kelley from purchasing the firearms used in the Sutherland Springs shooting. As I noted in my report and deposition, multiple specific facts about Kelley make it highly likely that, had the Government submitted Mr. Kelley's information to the NICS, that would have prevented the sale of the firearms he used in the shooting at issue. These facts include the information the Government knew about Mr. Kelley: such as his history of committing sexual assaults as a minor, his history of drug abuse, his mental health issues, and his threats of mass violence while in the Air Force.

14)   My determination about the likelihood that the Government's failure to report Devin Kelley's prohibiting conditions into the FBI's NICS system was also informed by Mr. Kelley's research into firearms, testimony from witnesses—such as Danielle Kelley's deposition—and that the only times he purchased guns in private sales (non-FFLs), he found them unreliable. Ms. Kelley testified that Mr. Kelley enjoyed the selection, access, and ease of purchasing from an FFL as well. Given Devin

Kelley's history with private sales of firearms and his strong preference for high-quality firearms, his lack of friends or family members who would sell him a firearm, and the challenges and potential dangers of a black market sale, I find the Government's claim that Mr. Kelley would have readily obtained a firearm to use to commit mass murder completely speculative. Moreover, in the counterfactual world where the Air Force did submit Mr. Kelley's information to NICS, it is relevant that Devin Kelley had multiple run-ins with police after his firearm-prohibiting convictions. In some of those run-ins, there is video evidence of Kelley admitting to the possession of firearms. In those videos, the police did not have access to the background check information to identify Mr. Kelley as a felon. In this counterfactual world in which Mr. Kelley's records are submitted to the FBI, if Mr. Kelley acquires firearms through some other means, it is likely that he would have been arrested and convicted as a felon in possession of a firearm. He would have likely served years in prison and thus reduced the probability that he would commit mass murder or other acts of violence.

15) Finally, the counterfactual the Government proposes of a "strawman" purchase is equally speculative by the facts of this case. Danielle Kelley testified that Mr. Kelley never asked her to serve as a straw purchaser and that even if he did, she would never have done it. (pg. 227). And she was never asked to buy a gun for him even after he was denied a gun by another FFL.

Under 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED on this _____18th___ day of _____September___, 2020.

_____

SIGNATURE OF DANIEL WEBSTER