**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| JOE HOLCOMBE ET AL., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Civil Action No.  SA-18-CV-555-XR |
| | § | |
| UNITED STATES OF AMERICA, | § | *Consolidated Cases* |
| | § | |
| *Defendant.* | § | |
| | § | |

## <u>ORDER</u>

On this date, the Court considered (1) Plaintiffs' consolidated motion for partial summary judgment (docket no. 249), the Government's response (docket no. 265), and Plaintiffs' reply (docket no. 275); (2) a separate motion for partial summary judgment filed by certain Plaintiffs represented by Brett Reynolds (the "Reynolds Plaintiffs")[1] (docket no. 308), the Government's response (docket no. 314), and the Reynolds Plaintiffs' reply (docket no. 316); and (3) the Government's motion for summary judgment (docket no. 256), Plaintiffs' response (docket no. 264), and the Government's reply (docket no. 273). Although the parties filed separate motions for summary judgment, there is significant overlap among the arguments made in the motions and accompanying responses. Accordingly, the Court will address the motions together. After careful consideration, the Court issues the following order.

---

[1] Despite the consolidation of these cases, the Court permitted the Reynolds Plaintiffs to file a separate motion for summary judgment to address a potential conflict of interest with the remaining Plaintiffs, who are pursuing a related action in state court.  The Reynolds Plaintiffs include Kris Workman, Colbey Workman, Kyle Workman, Morgan Harris, David Colbath as next friend of Eevee Workman, Kris Workman and Colbey Workman as next friend of Eevee Workman, David Colbath, individually and as next friend of Olivia Colbath, and Kip Workman and Julie Workman.

## BACKGROUND

These consolidated cases stem from the mass shooting at the First Baptist Church in Sutherland Springs, Texas on November 5, 2017. The shooter, Devin Patrick Kelley ("Kelley"), entered the church and opened fire, killing 26 people and wounding 22 more. After fleeing the scene, Kelley later died from a self-inflicted gunshot wound. Plaintiffs are survivors of the shooting and relatives of those injured or killed. They seek recovery against Defendant United States ("the Government") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680.  The thrust of these lawsuits is that Kelley should not have been able to purchase the firearms he used in the shooting, but negligent failures by the Government to collect, handle, and report required information about Kelley allowed him to do so.

Kelly committed the shooting using firearms he purchased from federal firearms licensees ("FFLs") between December 2014 and October 2017. In four separate firearms purchases, Kelley completed the required purchasing form—ATF Form 4473—certifying that he was eligible to purchase the firearm under federal law, and the retailer ran the mandatory background check through the National Instant Criminal Background Check System ("NICS") administered by the FBI.  In each instance, the response from the NICS was that the retailer could proceed with the sale. Kelley should not have cleared the background check, however, because he had been convicted of a disqualifying offense in November 2012 while he was serving in the United States Air Force ("USAF") at Holloman Air Force Base ("HAFB") in New Mexico. Specifically, Kelley was convicted by General Court-Martial of assaulting his then-wife, Tessa Kelley, and his stepson. The USAF had an obligation—and multiple opportunities—to submit Kelley's fingerprints and criminal history to the FBI's Criminal Justice Information Services ("CJIS") Division for inclusion in its databases. Its failure to do so is the basis for this action.

## I.   Investigation and Conviction[2]

On June 8, 2011, Tessa Kelley took her infant son to the emergency room because he was vomiting. The pediatrician who examined him noticed facial bruising, and, after testing revealed a fractured clavicle and subdural hemorrhage, reported the injuries as suspected child abuse. The next day, the Air Force Office of Special Investigations ("AFOSI") Detachment 225[3] initiated an investigation of Devin Patrick Kelley for assault on a child. After interviewing Kelley, special agents took two sets of fingerprints and placed them in his investigative file.

On February 17, 2012, while the AFOSI investigation for child abuse was still ongoing, the 49th Security Forces Squadron[4] opened an investigation of Kelley for assault after Tessa Kelley reported that he had been physically and emotionally abusing her since July 2011. Security Forces attempted to interview Kelley, but he requested legal counsel and refused to make a statement. There is no evidence that Security Forces collected Kelley's fingerprints during the interview. Citing anger and depression because of his wife's accusations, Kelley was voluntarily admitted to Peak Behavioral Health Services (the "Peak"), where he remained from February 23, 2012 until March 8, 2012.

Later that spring, Kelley admitted to Tessa Kelley that he had abused her son and caused the injuries that led to his hospitalization in 2011. He eventually filmed a video confession, which Tessa Kelley provided to the USAF on April 29, 2012. The next day, Kelley voluntarily entered in-patient treatment at the Peak for the second time.

---

[2] These facts are undisputed, unless otherwise noted.

[3] An AFOSI Detachment is a geographically separated field office under the operational control of a regional headquarters. In the case of AFOSI Detachment 225, the regional headquarters was the 2nd Field Investigations Region, located at Langley AFB, Virginia.

[4] Security Forces and AFOSI perform different functions within the USAF. Security Forces primarily serve a security and law enforcement role on USAF installations, while AFOSI is responsible for conducting major criminal and counterintelligence investigations for the USAF.

On June 7, 2012, Kelley jumped a fence and escaped from the facility. He was apprehended by local law enforcement personnel, who returned him to the Peak. The next day, he was discharged from the Peak and entered pretrial confinement. In his order approving pretrial confinement, Kelley's Commander noted that, while he was at the Peak, Kelley had attempted to buy firearms and tactical gear online and have these items shipped to San Antonio, Texas. Kelley threatened that if he were picked up by Security Forces, he would "go for their guns." The Commander concluded that Kelley was "dangerous and likely to harm someone if released."

On November 7, 2012, after entering a guilty plea, Kelley was convicted in General Court-Martial proceedings of assault on his wife and stepson. He was sentenced to 12 months of imprisonment, a bad-conduct discharge, and reduction in rank to airman basic. He was confined at HAFB, and later transferred to Naval Consolidated Brig, Miramar, California.

On December 14, 2012, AFOSI Detachment 225 received the Report of Result of Trial, which documented the result of the General Court-Martial. On the same day, the AFOSI Detachment 225 special agent in charge ("SAIC") certified on the closing checklist in the Investigation and Information Management System ("I2MS") electronic file that Kelley's fingerprints and final disposition information had been submitted to the FBI's CJIS Division, though they had not. This permitted the SAIC to close the investigation.

After his release from confinement on March 31, 2013, Kelley was permanently barred from HAFB at the request of Commander Robert Bearden, who cited Kelley's threats to kill leadership, his escape from the Peak, and Internet searches for body armor and guerrilla tactics as evidence that he was a security threat. The appeals court upheld Kelley's conviction, and he was officially separated from the USAF with a bad conduct discharge on May 8, 2014.

## II. Statutory and Regulatory Context

The Government's FBI reporting obligations arise from the Brady Handgun Violence Prevention Act of 1993, 34 U.S.C. § 40901 (the "Brady Act"), its implementing regulations, and instructions promulgated by the Department of Defense ("DoD") and the USAF. The Brady Act requires federal agencies, including the DoD and USAF, to report disqualifying information to NICS "not less than quarterly." 34 U.S.C. § 40901(e)(1)(C). Disqualifying information includes "any record of any person demonstrating that the person falls within one of the categories" of persons prohibited from purchasing firearms described in Section 922(g) of the Gun Control Act of 1968. 18 U.S.C. § 922(g). Section 922(g), in turn, prohibits the possession or purchase of firearms by certain categories of people, including those who have been:

> (1) convicted in any court of a crime punishable by imprisonment for a term exceeding one year;
>
> (4) adjudicated as mental defectives or who have been committed to a mental institution;
>
> (6) discharged from the Armed Forces under dishonorable conditions; or
>
> (9) convicted in any court of a misdemeanor crime of domestic violence

18 U.S.C. § 922(g)(1), (4), (6), (9). The DoD and the USAF have issued a series of regulations and directives to carry out their reporting obligations under the Brady Act.

DoD Instruction ("DoDI") 5505.11, entitled "Fingerprint Card and Final Disposition Report Submission Requirements," outlines the procedures for submitting fingerprint cards and final disposition reports to the FBI's CJIS Division. Docket no. 250, Ex. U-6 at 16–28. The AFOSI and Security Forces have, in turn, issued their own instructions and policies for submitting fingerprints and criminal history information to the FBI based on the requirements set forth in DoDI 5505.11. *See, e.g.*, AFOSI Manual 71-121 (docket no. 250, Ex. U-2); Air Force Instruction

("AFI") 31-206 (*id.*, Ex. U-3 at 4–16); and AFI 31-205 (*id.*, Ex. U-3 at 17–20). Generally, DoDI 5505.11 requires law enforcement organizations ("LEOs"), including AFOSI and Security Forces, to submit fingerprints after they decide that probable cause exists for the commission of certain enumerated offenses, including assault. *Id.*, Ex. U-6 at 25. Then, after the conclusion of military criminal proceedings, LEOs must submit the final disposition report to the FBI within fifteen days. *See id.* Confinement facility personnel are also required to collect and submit fingerprints. *See id.*, Ex. U-3 at 18–20.

The information sent to the FBI gets entered into one of three databases: (1) the Interstate Identification Index (the "III" or "triple-I"), which accesses criminal history records through fingerprint data; (2) the National Crime Information Center ("NCIC"), which contains information on wanted persons, protection orders, and other persons identified as relevant to NICS searches; and (3) the NICS Indices, which were created for the purpose of performing a NICS background check and contain records provided by local, state, and federal agencies concerning prohibited persons under federal law that may not be appropriate for submission to the NCIC or the III. *See Nat'l Rifle Ass'n v. Reno*, 216 F.3d 122, 125 (D.C. Cir. 2000); 28 C.F.R. § 25.6(c)(1)(iii); docket no. 250, U-12 at 16 n.52.

When an FFL requests a background check, the NICS automatically queries the three FBI CJIS Division databases and, based on the search results, issues one of three responses: "Proceed" (the go-ahead signal), "Denied" (stopping the sale), or "Delayed" (additional information required). 28 C.F.R. § 25.6(c)(iv)(A)-(C). A delayed transaction indicates that additional research is required to determine whether the prospective buyer is eligible. *Id.* A felony conviction results in an instant denial. Docket no. 249, Ex. C, Dep. Del Greco, at 57:11–15.

### III.  Procedural History

Plaintiffs filed numerous separate complaints, which for efficiency were consolidated under the above-captioned case, as it was first filed. The Government moved to dismiss on multiple grounds, including that the United States was shielded from liability by Section 922(t)(6) of the Brady Act, and that Plaintiffs had not alleged viable state law causes of action. Docket no. 28. The Court agreed that Plaintiffs could not proceed on a negligence *per se* theory but rejected all other grounds for dismissal. Docket no. 59 at 29–33. Both parties now move for summary judgment on Plaintiffs' surviving claims of negligent undertaking, negligent supervision, and negligent training.

### DISCUSSION

### I.   Summary Judgment Standard

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the non-moving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the non-movant's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en banc*, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence"

meet the nonmovant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*). Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable [trier of fact] to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

## II.  Analysis

### A.  Negligent Undertaking

Plaintiffs assert that, in undertaking to establish a complex national background-check system, the Government assumed the duty not to operate this system negligently. To establish a claim of negligent undertaking in Texas, Plaintiffs must show that: (1) the Government undertook

to perform services that it should have known were necessary for the protection of others but failed to exercise reasonable care in that undertaking; (2) the Government's negligent performance of those services increased the risk of harm; and (3) the Government's failure to exercise reasonable care caused physical harm. *Torrington v. Stutzman*, 46 S.W.3d 829, 838–39 (Tex. 2000); *see also* Restatement (Second) of Torts § 323 (1965); docket no. 59 at 35.

### 1. Duty

The Government devotes a significant portion of its summary judgment briefing to the argument that Texas law does not impose a duty that could provide a basis for liability against the United States in this case. *See* docket no. 256 at 3–16; docket no. 277 at 3–8. This Court has already rejected this argument twice: first, in its order denying the Government's motion to dismiss, docket no. 59 at 37, and again, in its order denying the Government's motion to certify interlocutory appeal of that order, docket no. 133. The Government characterizes the Court's previous orders as "afford[ing] Plaintiffs an opportunity to take discovery to attempt to prove" the existence of a duty. Docket no. 256 at 4. "[T]he existence of duty," however, "is a question of law for the court to decide from the facts surrounding the occurrence in question." *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).

The Court has already determined, as a matter of law, that the Government owed a duty to Plaintiffs. The Government contends that this conclusion should be reversed, however, based on discovery conducted after the Court ruled on the motion to dismiss. Docket no. 256 at 10. Though the Court reaffirms its recognition of a duty, it will briefly address the Government's arguments— to the extent that they rely on evidence obtained through discovery rather than abstract legal arguments recycled from the motion to dismiss—in order to clarify the source and scope of the Government's duty.

At bottom, the Government objects to the Court's recognition of a duty because of the "unprecedented liability" the United States would face if it "could be held liable under the FTCA whenever Congress enacted a federal statute." Docket no. 256 at 5 n.1. Plaintiffs correctly point out that a federal statute can only implicate the FTCA where "Congress passes a law undertaking responsibilities for the Government." Docket no. 264 at 3. But the Government's objection also misstates the Court's characterization of the undertaking in this case: "enacting *and acting under color of* regulations that require DOD and USAF to collect, handle, process, and report information to the background check system." Docket no. 59 at 38 (emphasis added). Indeed, the Court explicitly recognized that federal statutes and regulations cannot, on their own, "create the duty that gives rise to [an FTCA] claim." *Id.* at 33 (quoting *Zelaya v. United States*, 781 F.3d 1315, 1324–25 (11th Cir. 2015)). They "may provide evidence that the government has assumed duties analogous to those recognized by local tort law" or "may provide the standard of care against which the government's conduct should be assessed." *Id.* But the existence of a duty depends on the law of the applicable jurisdiction. *Id.*

The Court did not recognize an undertaking based on the Government's enactment of the Brady Act alone, or even on the adoption of its implementing regulations. The evidence that the Government undertook to operate a national background check system is found in its own conduct—the Government does in fact operate a national background check system, and has done so since the NICS was established in 1998. *See* docket no. 256, Ex. W at USA0005407. Despite the Government's objections, this duty analysis is entirely consistent with how Texas courts treat private persons in the context of negligent undertaking cases. In Texas, a mere promise to render a service coupled with neither performance nor reliance generally imposes no tort obligation upon the promisor. *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W. 2d 392, 396 (Tex. 1991).

"Without some affirmative course of action beyond the making of a mere promise or without reliance on that promise, the [defendant] cannot be held liable for [the plaintiff's] injuries." *Id.* Thus, in assessing the scope of the Government's undertaking, the Court must look not only to the language of the statutes and regulations that "provide evidence that the government has assumed duties" but also to the Government's conduct in light of those statutes and regulations.

The Government argues that the Court should not recognize an undertaking to submit Kelley's fingerprints and criminal history to the FBI based on: (1) the USAF's adoption of certain recommendations by the Inspector General ("IG") of the DoD in 2015; (2) the Government's operation of the Defense-Incident Based Reporting Systems ("DIBRS"); or (3) Kelley's in-patient treatment at the Peak and subsequent bad conduct discharge. The Court will address each argument in turn.

### a. Adoption of 2015 Report of the Inspector General

In February 2015, the IG of the DoD conducted a comprehensive review of the failures of the branches of the U.S. military to promptly and accurately input criminal conviction information into the FBI databases. Docket no. 250, Ex. U-18 at 17–21. Specifically, the IG reviewed whether fingerprints and final disposition reports for service members convicted of qualifying offenses between June 1, 2010, and October 31, 2012, were submitted to the FBI's CJIS Division. *Id.*

In its review, the IG found that 304 sets of fingerprints and 334 final dispositions for military offenders convicted during the sample period were missing from the FBI databases. *Id.* The IG issued two recommendations to the Secretaries of the Navy and the Air Force: first, that they "take prompt action to submit the *missing* [fingerprints and disposition reports]," and, second, that they "take prompt action to ensure fingerprints and final disposition reports for *future* arrestees and convicted offenders conform to DoD Instruction 5505.11." *Id.* (emphasis added). It is

11

undisputed that the USAF agreed with the IG's recommendations. *See id.* However, the parties disagree about whether, in adopting these recommendations, the USAF agreed to submit Kelley's fingerprints and criminal history to the FBI.

The source of this disagreement is the date of Kelley's conviction: November 7, 2012. His conviction fell outside of the sample period the IG used in its evaluation. Thus, his fingerprints and final disposition cannot have been among the 304 sets of missing fingerprints and 334 missing final dispositions that the Government agreed to submit to the FBI. The relevant question is whether in agreeing to ensure that fingerprints and final disposition reports "for *future* arrestees and convicted offenders" would be submitted, the USAF undertook to submit information related to Kelley's conviction, which, by the date of the IG's report, was over two years old. *Id.* The Government contends that "the record demonstrates that the USAF did not adopt any IG recommendation that constituted an undertaking to submit Kelley's criminal history information into the NICS system." Docket no. 156 at 17. Indeed, the IG noted that the response from the USAF "addressed all specifics of the recommendation" and that "[n]o further comments [were] required." Docket no. 250, Ex. U-18 at 21.

Plaintiffs offer some evidence showing that the USAF interpreted the adoption of the IG's recommendations more broadly than the Government suggests. For example, emails following the 2015 IG report provide that AFOSI "had a lot of clean-up work to do in NCIC to document action in the system" and "anything less than 100% review in this particular area (NCIC indexing) [is] falling short." *Id.*, Ex. U-10 at 1–3. One Government representative characterized the "bottom line" of the IG report as "telling the Air Force [it] still had a problem with reporting criminal data" and that the thrust of the report "was for the Air Force to fix this problem. That's it." Docket no. 249, Ex. H, Dep. Col. Ford at 312:5–19.

However, even assuming such statements conveyed an intent to correct all of the USAF's errors in FBI reporting, Plaintiffs have failed to provide evidence showing that the Government ever actually submitted missing fingerprints or criminal history information for convictions that occurred outside of the sample period. That is, if after the IG report was published the USAF had submitted fingerprints and criminal history information for offenders convicted between November 1, 2012—the day after the sample period—and February 12, 2015—the date of the IG report—the Court might be able to conclude, from the USAF's conduct, that it had undertaken to perform a comprehensive self-audit of its compliance with its NICS obligations. In the absence of such affirmative conduct, the Court cannot conclude that the USAF intended to correct its failure to submit Kelley's criminal history information by adopting the 2015 IG report.

Still, the Government's adoption of the IG's recommendations does reaffirm its original undertaking to operate the NICS. That is, the USAF's correction of the errors identified by the IG constitutes an affirmative act that confirms the Government's original assumption of a duty to collect and report Kelley's fingerprints and criminal history to the FBI.

### b. Defense-Incident Based Reporting Systems

Plaintiffs allege that the DoD and USAF were negligent in failing to submit reportable Brady Act information to the NICS databases through the Defense-Incident Based Reporting Systems ("DIBRS"). Docket no. 249 at 12–17. The Government responds that it cannot have been negligent for failing to submit Brady information to the NICS through the DIBRS for the simple reason that the DIBRS is *incapable* of submitting such information to the NICS databases. Docket no. 265 at 7.

The FBI regularly collects crime data for purposes other than the administration of the background check system. Since 1930, the FBI has collected incident-based crime data reported

by county, state, and federal law enforcement agencies "to develop a reliable set of criminal statistics." Docket no. 250, Ex. U-6 at 55. Pursuant to the Uniform Federal Crime Reporting Act of 1988 and its implementing regulations, the FBI operates a clearinghouse for crime data called the National Incident-Based Reporting System ("NIBRS"). 34 U.S.C. § 41303. Through the NIBRS, the FBI "assembles, publishes, and distributes . . . data to contributing agencies," for "use in their administration, operation, and management." *Id.*

The DIBRS is an incident-based database operated by the DoD to satisfy the data collection and reporting requirements of, among other Congressional mandates, the Uniform Federal Crime Reporting Act of 1988 and the Brady Act. *Id.* at 30. The data is maintained at the DoD's Defense Manpower Data Center ("DMDC") and periodically submitted to the NIBRS. *Id.* In essence, the USAF has a duty to report DIBRS information to the DMDC, which then provides the data to the FBI for inclusion in a separate database, the NIBRS. *Id.*

In March 1998, several months before the NICS became operative, the DoD entered into a Memorandum of Understanding ("MOU") with the FBI to submit offenses reportable under the Brady Act within the DIBRS to the NICS Index. *Id.* at 38. The DoD then issued regulations establishing procedures for the collection and submission of DIBRS criminal history to the FBI. *See* DoDI 7703.47 (*id.* at 29) and DoD Manual 7730.47-M, Volume I ("DoDM 7730.47-M-VI") (*id.* at 53).

But the DoD failed to fulfill the 1998 MOU's promise in two fundamental ways. First, the regulations it issued—DoDI 7730.47 and DoDM 7730.47-M-VI—do not include a specific requirement to submit Brady information from the DIBRS to the FBI CJIS Division for entry into the NICS databases. Instead, they merely indicate that "[t]he DIBRS shall be used to centralize the collection of information that is reportable by the [DoD] pursuant to the [Brady Act]." *Id.* at

14

USA00004368. Thus, the DMDC had instructions to collect the Brady information in DIBRS, and to submit it to the FBI for inclusion in the NIBRS, but *not* for inclusion in the NICS databases.

This distinction—between the NIBRS and the NICS databases—is the key to understanding the second way in which the DoD and FBI failed to realize the objectives of the 1998 MOU. According to DoDI 7730.47 and DoDM 7730.47-M-VI, LEOs are required to collect and submit Brady Act information, which includes the prohibited person's personally identifiable information ("PII"), to the DMDC for entry into the DIBRS. Docket no. 256, Ex. HH at USA00004365. But the DIBRS does not actually have the ability to capture the PII for the Brady Act information that is required for submission to the FBI CJIS Division and entry into the NICS databases. *Id.*, Ex. II at USA00024967.

The DIBRS was an existing database when the Brady Act information submission requirement was established, and it was never updated to meet the requirements of the NICS databases. *Id.* The DIBRS was designed to collect data for submission to the FBI, which would then enter it into the NIBRS. Docket no. 250, Ex. U-6 at 30. The purpose of the NIBRS is to provide LEOs with aggregated crime statistics—"detailed, accurate, and meaningful statistical data about when and where crime takes place, what form it takes, and the characteristics of its victims and perpetrators." *Id.* at 55. The NIBRS does not contain the required PII to allow NICS to search the data. And, because the DIBRS was designed to feed the NIBRS, the DIBRS likewise does not identify the biographical indicators that would allow it to operate as an NICS database.

The 1998 MOU envisioned a level of data integration and flexibility that the DIBRS simply could not deliver. Other than the 1998 MOU,[5] Plaintiffs have failed to provide any evidence of an

---

[5] The DoD and the FBI appear to have reaffirmed the 1998 MOU in a 2007 MOU. *See* docket no. 250, Ex. U-6 at 45. Given the DoD's continued failure to take any affirmative steps to update the DIBRS, however, the 2007 MOU likewise fails to provide sufficient evidence of an undertaking.

affirmative act that would constitute an undertaking to harmonize the DIBRS and NICS reporting requirements. Rather than overhauling the DIBRS to comply with the data requirements of the NICS Index, the DoD elected to submit Brady information separately through the III, an entirely different system. As such, the Court finds that the 1998 MOU merely memorialized a misunderstanding about the functionality of the DIBRS—and the requirements of NICS data submission—that continued until the DoD IG identified the problem in a 2020 review of the DoD's submission of criminal history information to the FBI. *See* docket no. 256, Ex. II at USA00024967. Even if the 1998 MOU can be read as a promise by the DoD to submit criminal history information to the NICS databases through the DIBRS, "[w]ithout some affirmative course of action beyond the making of a mere promise," the Government cannot be held liable for its failure to keep its word. *Fort Bend Cnty. Drainage Dist*, 818 S.W. 2d at 396. The Court concludes that the Government did not undertake to provide Brady Act information to the NICS through the DIBRS.[6]

### c.  Kelley's Mental Health and Bad Conduct Discharge

The Government observes that Kelley was not disqualified from owning a firearm under Sections 922(g)(4) or (g)(6) of the Gun Control Act, which prohibit the sale of firearms to individuals who have been "adjudicated as a mental defective or . . . committed to any mental institution" or those who have been "discharged from the Armed Forces under dishonorable conditions," respectively. Docket no. 256 at 9 n.3; *see* 18 U.S.C. §§ 922(g)(4), (6).

The Government asserts that Kelley's in-patient treatment at the Peak did not disqualify him from purchasing a firearm because he was never involuntarily committed to the Peak. ATF

---

[6] Plaintiffs note that the DoD also agreed in DoDM 7730.47-M-VI to establish a central registry of domestic violence incidents in the Military Services, but never actually created the database. Docket no. 249 at 14 (citing Ex. E, Dep. Verdego at 121:17–122:10). Here, again, the DoD's mee promise to create the database, without an affirmative act, cannot constitute an undertaking under Texas law.

regulations clarify that "commitment to a mental institution" requires "formal commitment" by a "court, board, commission, or other lawful authority." 27 C.F.R. § 478.11 The DoD IG's 2018 report on the USAF's failure to submit Kelley's information to the FBI confirms this interpretation. *See* docket no. 250, Ex. U-14 at 17. Kelley voluntarily entered the Peak on two occasions: February 23, 2012, and April 30, 2012. *See id.*, Ex. C; Ex. E. And when he left the grounds without authorization on June 7, 2012, local law enforcement returned him to the facility for one day without a formal court order. *See* docket no. 250, Ex. U-14 at 17. Thus, Kelley's mental health history did not disqualify him from purchasing firearms under Section 922(g) of the Brady Act.

Nor did his bad conduct discharge. 27 C.F.R. § 478.11 further clarifies that the term "discharged under dishonorable conditions" "does not include any separation from the Armed Forces resulting from any other discharge, e.g., a bad conduct discharge." Because Kelley's bad conduct discharge did not constitute a "dishonorable discharge," he was not prohibited from possessing a firearm under 18 U.S.C. § 922 (g)(6).

The Government thus concludes that the "regulatory regime through which DoD would submit information to the FBI pursuant to §§ 922 (g)(4) or (g)(6) is not relevant to this litigation." Docket no. 256 at 9 n.3. While the Court agrees that the specific procedures for reporting dishonorable discharge and mental health information to the FBI are not implicated here, Sections 922(g)(4) and (g)(6) remain relevant to this litigation insofar as they bear on the question of foreseeability. That is, while Sections 922(g)(4) and (g)(6) did not trigger a duty to report Kelley's information to the FBI, they do shed light on the characteristics that make gun ownership more dangerous for some people than others.

## 2. *Breach*

Having clarified the source and the scope of the Government's undertaking, the Court finds that there is no genuine dispute of material fact as to whether the USAF breached its duty to exercise reasonable care in the collection and submission of Kelley's Brady information to the FBI. It is undisputed that, in total, the USAF missed *four* opportunities to collect and submit Kelley's fingerprints to the FBI, *two* opportunities to submit his final disposition, and—through mandatory supervisory reviews of Kelley's investigative file—at least *sixteen* opportunities to correct its earlier errors. *See* docket no. 149 at ¶¶1–7.

The first instance of the USAF's negligence in the Kelley investigation occurred on June 9, 2011, during AFOSI's very first interview with Kelley concerning his stepson's injuries. After the interrogation, AFOSI agents collected two copies of his fingerprints, pursuant to AFOSI and DoD policy. *See* Docket no. 149 ¶ 1; AFISO Manual (docket no. 250, Ex. U-2 at 10); DoDI 5505.11 (docket no. 250, Ex. U-6 at 25). At the end of the interview, agents collected two sets of Kelley's fingerprints. Because they had probable cause to believe that Kelley had committed an assault, [7] the agents should have submitted one set of Kelley's fingerprints to the FBI. *Id.* Both sets of fingerprints remained in the file. *Id.*

The USAF's second opportunity to collect Kelley's fingerprints occurred on February 17, 2012, when Security Forces investigators questioned Kelley about his wife's abuse allegations. Though the record does not indicate whether the investigators made a probable cause determination, Kelley's Commander did issue Kelley a no-contact order on the date of the interview and later issued a letter of reprimand finding that Kelley had physically assaulted his

---

[7] An AFOSI special agent submitted a probable cause affidavit to the military magistrate to obtain authority to search Kelley's residence for evidence of the abuse. Docket no. 350, Ex. U-17 at 26–27.

wife on multiple occasions. Docket no. 250, Ex. U-11 at 17; docket no. 265, Ex. UU at USA00013387–88. It is undisputed that the 49th Security Forces Squadron failed to collect Kelley's fingerprints after the interview. Docket no. 149 ¶ 2.

On June 8, 2012, following Kelley's videotaped confession and his escape from the Peak, ASOFI agents interviewed Kelley for a second time. The parties have stipulated that DoD and USAF instructions and policies required the agents to collect and submit Kelley's fingerprints to the FBI. Docket no. 149 ¶ 3. Agent Clinton Mills certified in the interview records that he fingerprinted Kelley, but the investigative file did not contain any fingerprints from that date. Docket no. 250, Ex. U-17 at 22; docket no. 149 ¶ 3. This represents the Government's third opportunity—and third failure—to collect Kelley's fingerprints and submit them to the FBI for inclusion in the NICS databases.

The parties agree that after Kelley's General Court-Martial conviction on November 7, 2012, DoD and Air Force instructions and policies required the 49th Security Forces Squadron Confinement Facility to collect Kelley's fingerprints and submit them to the FBI. Docket no. 149 ¶ 4; *see* AFI 31-205 (docket no. 250, Ex. U-3 at 17–20). It is undisputed that the 49th Security Forces Squadron Confinement Facility employees did not collect or submit Kelley's fingerprints for inclusion in the NICS. Docket no. 149 ¶ 4. This was the fourth opportunity for the USAF to submit Kelley's fingerprints and the first missed opportunity to submit Kelley's conviction to the FBI CJIS Division.[8]

---

[8] Fingerprint cards are collected on form FD-249, which includes a space to record the final disposition of the case. *See* DoDI 5505.11, docket no. 250, Ex. U-6 at 13. If the final disposition is not available when FD-249 is collected and submitted, then an FBI/DoJ Form R-84, "Final Disposition Report," is required. *Id.* at 3 ¶ 6.2.3. Because the disposition of Kelley's case was available when he entered the 49th Security Forces Squadron Confinement Facility on November 7, 2012, however, confinement officers should have recorded the conviction on FD-249, along with his fingerprints.

Between June 29, 2011 and October 5, 2012, DoD and Air Force instructions and policies required AFOSI Detachment 225 leadership to perform monthly reviews of the Kelley investigation, including both the electronic record and the physical copy of the investigative files. *Id.* ¶ 7. Though both sets of fingerprints collected on June 8, 2011 remained in Kelley's file during these fifteen monthly reviews, Detachment 225 leadership failed to note that one set of Kelley's fingerprints had not been submitted to the FBI and failed to take any corrective action. *Id.*

On December 14, 2012, AFOSI Detachment 225 received the results of Kelley's General Court-Martial conviction. *Id.* ¶ 5. DoD and Air Force instructions and policies required Detachment 225 to submit Kelley's final disposition report to the FBI within fifteen days after receiving notice of the final disposition. *Id.*; docket no. 250, Ex. U-2 at 12 ¶ 5.14.2.2. Detachment 225 leadership failed to submit Kelley's final disposition report to the FBI. *Id.* This was the second opportunity for the USAF to submit the final disposition to the FBI.

That same day, Detachment 225 closed the Kelley investigation. Docket no. 250, Ex. U-17. Before closing an investigative file, AFOSI unit leadership must conduct another review of the file, which also requires reviewing fingerprints and the final disposition report and confirming in 12MS that both were submitted to the FBI. The Detachment 225 SAIC falsely certified in 12MS that Kelley's fingerprints and final disposition information had been submitted to the FBI, which allowed him to close the Kelley investigation. Docket no. 250, Ex. U-17.

Given these repeated failures to collect and submit Kelley's information to the FBI, no reasonable trier of fact could find that the Government exercised reasonable care in performing its FBI reporting obligations. Accordingly, the Court holds that the Government breached its duty as a matter of law, and that Plaintiffs are entitled to summary judgment on that issue.

### 3. *Increased Risk of Harm*

Drawing on Section 323 of the Restatement (Second) of Torts, Texas law requires Plaintiffs to establish either that they relied on the Government's performance of its duties or that the Government's failure to exercise reasonable care in operating the background-check system increased the risk of harm. *Torrington*, 46 S.W.3d at 838 (citing Restatement (Second) of Torts § 323(a),(b) (1965)). Because there is no evidence that Plaintiffs affirmatively relied on the operation of the NICS,[9] the parties agree that Plaintiffs must demonstrate that the Government's negligence increased the risk of harm. *Id.*

The parties disagree about the proper benchmark for this assessment, however. The Government asserts that the "relevant inquiry is whether the risk to Plaintiffs would have been lower if the Government had not operated the background check system at all, whether negligently or not." Docket no. 256 at 16–17. Plaintiffs argue that the correct reference point is non-negligent performance. Docket no. 264 at 8–13. Thus, the Court should ask whether the risk of harm would have been lower if the Government had operated the background check system with reasonable care. Though the Court endorses Plaintiffs' framing of the inquiry for the reasons explained below, the evidence demonstrates that summary judgment would be inappropriate under either standard.

---

[9]The Reynolds Plaintiffs take the position that the Government's negligence in operating the NICS increased the risk of harm to Plaintiffs by depriving the State of Texas the opportunity to establish its own background check system that would have prevented the shooting. Docket no. 308 at 17–20.

Though framed as evidence that the USAF "increased the risk of harm," the Reynolds Plaintiffs' position is at bottom about reliance: "The Government knows that Texas and all states *have come to rely on the Government's operation of this system* as the sole source of information about the criminal histories of discharged military members who apply for firearm ownership." *Id.* at 18 (emphasis added).

The Court need not speculate about whether the State of Texas would have established its own background check system in the face of the Government's failure to operate the NICS with reasonable care. A negligent undertaking claim based on reliance requires a showing that the *plaintiff* relied on the undertaking. *Torrington*, 46 S.W.3d at 838. Even if the State legislature's failure to enact a complex regulatory regime could serve as evidence that the *State* relied on the Government's undertaking—itself a doubtful proposition—it would not demonstrate that *Plaintiffs* relied on the undertaking.

The absence of a clear baseline for the risk-of-harm analysis has led to inconsistent applications of Section 323, even within Texas. *See, e.g.*, *Texas Woman's Univ. v. The Methodist Hosp.*, 221 S.W.3d 267, 285 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (finding genuine issue of material fact as to whether hospital's negligent failure to timely install its flood protections increased the risk of flood damage to neighboring university compared to non-negligent performance); *City of Haltom City v. Aurell*, 380 S.W.3d 839, 859 (Tex. App.—Fort Worth 2012, no pet.) (finding that city's alleged failure to exercise reasonable care in undertaking to protect low-lying neighborhood from flooding "[did] not raise a fact issue that the danger of flooding . . . was worse . . . than if the [c]ity had never recognized the danger and had never expressed an intention to remedy it."). That many negligent undertaking cases implicate both reliance *and* increased risk of harm only adds to the confusion. *See, e.g.*, *Texas Woman's Univ.*, 221 S.W.3d at 285; *Kristensen v. United States*, No. 1:17-CV-126-DAE, 2019 WL 1567908, at *6 (W.D. Tex. Jan. 31, 2019). Indeed, the Government correctly points out that several of the cases that Plaintiffs cite in support of their risk-of-harm standard are governed by the plaintiff's reliance on the undertaking, and do not address whether the defendant's conduct increased the risk of harm. Docket no. 277 at 10 n.6 (citing *Osuna v. S. Pac. R.R.*, 641 S.W.2d 229, 230 (Tex. 1982) and *Indian Towing Co. v. United States*, 350 U.S. 61 (1955)).

The Government relies heavily on language from *Colonial Savings Association v. Taylor* for the proposition that Texas courts will not impose liability in negligent undertaking cases unless the risk of harm resulting from the negligence is greater than the risk of harm *before* the undertaking. 544 S.W.2d 116, 120 (Tex. 1976). There, the defendant bank, which held a lien on a property owned by Taylor, obtained an insurance policy that covered only one of the two homes on Taylor's property. A fire destroyed the home that the policy did not cover, and Taylor sued the

bank for negligent undertaking, arguing that the bank's failure to insure the home increased his risk of harm. The Texas Supreme Court disagreed, explaining that "Colonial's failure to obtain insurance on the house did not increase the risk of fire to the house." *Id.* at 120. The court observed that, unless Taylor had refrained from purchasing insurance in reliance on Colonial's undertaking to purchase it for him, "the loss would be as much a result of his own failure to obtain insurance as of Colonial's," and remanded the case for further proceedings on the reliance issue. *Id.* at 121. Of course, the harm in this case cannot be said to be as much a result of Plaintiffs' own failure to operate a national background-check system as the Government's. As the Court previously noted in its order denying the Government's motion to dismiss, "[t]he United States, of all possible entities, is best positioned to carry out the NICS system effectively." Docket no. 59 at 37.

The Court agrees with Plaintiffs that the relevant question is whether the risk of harm would have been lower if the Government had performed its duties with reasonable care. The Government argues that the Court's standard would dramatically expand the scope of liability in negligent undertaking cases because "in almost every negligence case, it can be said that the defendant's conduct increased the risk of injury to the plaintiff as compared to a world in which the defendant exercised reasonable care." Docket no. 256 at 19. But the very case on which the Government relies for its risk-of-harm standard—*Taylor*—contemplates imposing liability where the defendant's conduct did *not* increase the risk of harm compared to a world in which the defendant exercised reasonable care. It is true that Colonial's failure to obtain insurance "left Taylor in no worse condition than if Colonial had never undertaken to provide [the service] in the first place." *Taylor*, 544 S.W.2d at 120. It is equally true, however, that if Colonial *had* exercised reasonable care and insured the home, the insurance coverage would not have reduced the risk of fire. The issue at the center of *Taylor*'s risk-of-harm analysis, then, is how courts should *identify* the relevant

risk of harm, not how they should *measure* it.[10] *See Lifshen v. 20/20 Acct. Sols., LLC*, 458 F. Supp. 3d 534, 544 (N.D. Tex. 2020) ("The [*Taylor* court] did not find a lack of insurance to be the risk that negligent undertaking claims are concerned with. Rather, the risk is the harm itself.").

The identity of the harm—injury and death resulting from gun violence—is not in question here. The inquiry is whether the Government's negligence increased the risk of harm to Plaintiffs. As the Court previously observed in its order denying the Government's motion to dismiss, "[w]ith Kelley specifically, at every stage in his life—during and after his USAF tenure—the threat of violence loomed." Docket no. 59 at 36. The summary judgment record confirms this conclusion. In recommending that the USAF permanently bar Kelley from HAFB after his bad conduct discharge, Commander Robert Bearden summarized the evidence of the danger Kelley posed: "Kelley has repeatedly threatened to kill his leadership. He was openly carrying a firearm on Holloman, AFB . . . I view this Airman as a threat to not only myself, but my staff and other Airmen in this Squadron." Docket no. 250, Ex. U-4 at 3. A reasonable trier of fact could find that, under such circumstances, the Government's negligent failure to submit Kelley's fingerprints to the FBI—and to correct that failure after supervisory review of Kelley's file—increased the likelihood of injuries like those suffered by Plaintiffs.

Plaintiffs note that testimony from the Government's witnesses and Rule 30(b)(6) representatives "almost universally agrees that the NICS background search system decreases the risk of shooting deaths by keeping guns out of the hands of felons." Docket no. 249 at 18. Kimberly

---

[10] Though the Government objects to this formulation as an "attempt to supplant the required 'increase[d] risk of harm' element with a 'foreseeability' analysis," the conceptual overlap that the Government identifies between foreseeability and Plaintiffs' construction of the risk-of-harm requirement is not necessarily problematic. Nor is it particularly surprising, given that foreseeability pervades inquiries into both the existence of a duty and proximate cause. *See Coachmen Indus., Inc. v. Willis of Illinois, Inc.*, 565 F. Supp. 2d 755, 778 (S.D. Tex. 2008) (treating the "increased risk of harm" inquiry as "analogous to a question of proximate cause.").

Del Greco, the Director of FBI's CJIS Division, disagreed, however, observing that "guns are obtained in many different ways." Docket no. 277, Ex. XX at 36–37. The Government's risk-of-harm argument thus depends on the ubiquity of firearms in the United States and the existence of multiple avenues for obtaining firearms that do not implicate the background check system at all, regardless of how it is operated. This is not just a hypothetical possibility—there is evidence that Kelley purchased guns from non-FFLs and that he had access to his father's firearm collection. Docket no. 259 at 62–63, 122; s*ee infra* Section II(A)(4)(a).

Plaintiffs counter that Kelley was unlikely to utilize the alternatives, however, because each of his successful firearms purchases—including two purchases on base while he was under investigation for assault[11] and four purchases after his conviction—actually "conditioned Kelley to continue buying firearms at federally licensed dealers." Docket no. 249 at 24; docket no. 250, Ex. U-20. To the extent that evidence at trial shows that the Government's negligence *encouraged* Kelley's unlawful firearms purchases, this finding would likely satisfy the demanding risk-of-harm standard proposed by the Government. That is, in light of everything that the USAF learned about Kelley before his bad conduct discharge, a trier of fact could find that the risk of harm resulting from the Government's negligence was greater than the risk of harm *before* the existence of the NICS process. *See, e.g.*, *W. Hills Bowling Ctr., Inc. v. Hartford Ins. Co.*, 412 F.2d 563 (5th Cir. 1969) (holding that an insurance company's negligent failure to conduct a timely investigation

---

[11] Kelley purchased two firearms on base while he was under investigation for assaulting his wife and stepson—one on February 12, 2012 and another on April 12, 2012. Docket no. 265, Ex. OO at 3–4, 7. The Government correctly points out the Kelley would not have been prohibited from purchasing firearms under Section 922(g) of the Brady Act *before* his conviction in November 2012. However, if the ASOFI and Security Forces agents had submitted Kelley's fingerprints to the FBI after their interviews with him on June 9, 2011, and February 17, 2012, respectively, the NICS check would have returned a "delayed" response and triggered the three-day waiting period. *See* docket no. 250, Ex. U-12 at 35 n. 73. A reasonable factfinder could conclude that such a delay would have discouraged future gun purchases, even if it did not prohibit the transfers in question.

after a fire foreseeably increased the risk of a second fire where the insurer was on notice of the activity of vandals after the first fire); *Sabia v. State,* 164 Vt. 293, 669 A.2d 1187 (1995) ("[T]he continued abuse following [the defendant's] failure to act posed an increased risk of harm by sending the message to the perpetrator that he could act with impunity.").

Kelley's ability to obtain firearms from sources outside of FFLs is at the heart of this factual dispute and, in many ways, at the heart of this litigation. There is a genuine dispute of material fact as to whether the Government's failure to exercise reasonable care in performing its duties under the background check system increased the risk of harm. Because resolving this dispute will require the factfinder to weigh the evidence and make credibility determinations, granting summary judgment in favor of either party on the risk-of-harm issue is inappropriate and the parties' motions are denied.

### 4. *Proximate Cause*

Proximate cause comprises two elements: cause-in-fact and foreseeability. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). "Both elements must be present . . . and may be established by direct or circumstantial evidence." *McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 903 (Tex. 1980). Proximate cause may not be established "by a mere guess or conjecture, but rather must be proved by evidence of probative force." *Id.* at 904. Texas law recognizes that there may be more than one proximate cause of a single event. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010). Thus, the relevant inquiry here is whether the Government's negligent failure to report Kelley's criminal record to NICS was *a* proximate cause, not *the* proximate cause, of Plaintiffs' injuries. *See Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d

26

778, 784 (Tex. 2001). "All persons whose negligent conduct contributes to the injury, proximately causing the injury, are liable." *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992).

### a.  Cause-in-Fact

The test for cause-in-fact, or "but-for causation," is whether the act or omission was "a substantial factor in causing the injury and without which the harm would not have occurred." *Ryder Integrated Logistics, Inc. v. Fayette Cnty.*, 453 S.W.3d 922, 929 (Tex. 2015) (quoting *Nixon v. Mr. Prop. Mgmt. Corp.*, 690 S.W.2d 546, 549–50 (Tex. 1985)). In determining whether an act or omission is a "substantial" factor in causing an injury, the Supreme Court of Texas has relied on a comment to Section 431 of the Restatement (Second) of Torts:

> The word "substantial" is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called "philosophic sense," which includes every one of the great number of events without which any happening would not have occurred. Each of these events is a cause in the so-called "philosophic sense," yet the effect of many of them is so insignificant that no ordinary mind would think of them as causes.

*Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 (Tex. 1991) (quoting Restatement (Second) of Torts § 431 cmt. a (1965)). Thus, even if the plaintiff's injury would not have occurred "but for" the negligence of the defendant, the connection between the defendant and the plaintiff's injuries may be too attenuated to establish legal cause. *See Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995). If the defendant's negligence merely "furnished a condition that made the injuries possible," there can be no cause in fact. *See IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 799 (Tex. 2004). Rather, "[t]he evidence must go further, and show that such negligence was the proximate, and not the remote, cause of resulting injuries." *Doe v. Boys Club of Greater Dallas*, Inc., 907 S.W.2d 472, 477 (Tex. 1995).

The Government argues that Plaintiffs' injuries are "too attenuated" to have been proximately caused by its negligence and that it "did no more than create the conditions that enabled" the shooting. Docket no. 256 at 22. Specifically, the Government insists that "[i]t is simply too remote" to conclude that the USAF's failure to submit information to the NICS database "in 2011-2012 caused the mass shooting at the First Baptist Church of Sutherland Springs in 2017, nearly five years later." *Id.*

The Government's contention that its conduct was too remote in time from the shooting, however, overlooks the ongoing nature of the danger created by its negligence. The cases the Government cites in support of its timing argument are inapposite because their reasoning relies on identifying an endpoint to the danger created by a tortfeasor's negligence. *See Bell v. Campbell*, 434 S.W.2d 117, 120–22 (Tex. 1968) ("All forces involved in or generated by [the defendants'] negligence had come to rest, and no one was in any real or apparent danger therefrom."); *Union Pump Co.*, 898 S.W.2d at 776 ("[T]he forces generated by the fire had come to rest when [plaintiff] fell off the pipe rack. The fire had been extinguished, and [the defendant] was walking away from the scene."). In the five years between his conviction and the shooting, Kelley was able to acquire four firearms in four separate transactions because of the Government's negligence. Kelley's ability to purchase firearms—and the danger therefrom—did not come to rest after his conviction in 2012 or even his discharge from the USAF in 2013. Thus, the Government cannot demonstrate that the connection in time between the negligent conduct and Plaintiffs' injuries is too attenuated to establish legal cause. *Bell*, 434 S.W.2d at 122.

The Government's argument that its conduct was not a substantial factor in causing Plaintiffs' injuries in the "popular" sense relies primarily on *Roberts v. Healey*, 991 S.W.2d 873 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). In *Roberts*, the plaintiff sued her attorney

for his negligent failure to obtain a protective order against her estranged husband, who later killed the plaintiff's two small children and wounded her mother. *Id.* at 877. The Fourteenth Court of Appeals found that the attorney's "failure to obtain a protective order did no more than create the condition (absence of a protective order) that enabled" the estranged husband's criminal conduct. *Id.* The Government thus asserts that *Roberts* stands for the proposition that "the failure to submit information to an entity for the purpose of preventing a third party from engaging in criminal conduct is too attenuated to constitute a legal cause of a plaintiff's injury." Docket no. 256 at 21.

A closer examination of the reasoning in *Roberts*, however, indicates that although the opinion recites the "furnished a condition" language that the Texas Supreme Court has employed to describe attenuation problems, the court was merely assessing traditional "but for" causation. In holding that the defendant "conclusively disproved cause in fact," the court relied on deposition testimony from the plaintiff that, earlier on the day of the attack, she had lied to her husband and told him that she had already obtained a protective order. *Id.* at 879. Thus, the defendant argued, "even if he had obtained a protective order," the husband "would nevertheless have killed his daughters and shot [the plaintiff's mother]." *Id.* Because the absence of a protective order was not even a but-for cause of the injuries, the court should not have reached the question of whether the attorney's negligence "furnished a condition that made the injuries possible."

Plaintiffs attempt to further distinguish *Roberts* on the ground that "[a] protective order is not capable of physically preventing anything" while a proper background check has the effect of "physically preventing a would-be purchaser from purchasing guns at an FFL." Docket no. 264 at 15–16. Thus, Plaintiffs argue, "[a] proper background check does not merely discourage action, like a protective order; it is an actual, physical deterrent to improper gun sales." Docket no. 264

at 16. It is not clear, however, that "physically preventing" the improper gun sales to Kelley would have "physically prevented" the shooting in the same way—it may have merely discouraged it. This is not necessarily fatal to Plaintiffs' claims. *See Del Lago Partners*, 307 S.W.3d at 774–75 (holding that a reasonable jury could have found that a bar's failure to provide security was a cause-in-fact of injuries sustained during a brawl, based on testimony that a security presence can "deter problems," "chill dangerous or criminal activity," and "defuse hostile behavior"). However, the extent to which a proper background check would have "discouraged" Kelley from committing the shooting depends, at least in part, on his ability to obtain guns from sources other than FFLs.

The Government argues that Kelley's access to "alternative sources" of firearms is dispositive of the causation issue. Docket no. 256 at 22–29. Specifically, the Government argues that Kelley could have borrowed a firearm or purchased one from a non-FFL—at a gun show, through a straw purchaser, or online. Docket no. 256 at 27. In support of this argument, the Government points to evidence that Kelley lived on the same property as his father, Michael Kelley, and had access to his father's firearms. Docket no. 259 at 122. Danielle Smith, Kelley's widow, also testified that he frequently attended gun shows in Colorado and in Texas and that he had purchased two firearms from a friend in Colorado. Docket no. 259 at 62–63. Plaintiffs do not appear to dispute the evidence that Kelley could have procured firearms from non-FFLs. Rather, they dispute the conclusions that the Government draws from this evidence, arguing that even if it tends to show that he "knew how" to buy firearms from other sources, "[t]here is no evidence that Kelley would have actually purchased guns from a non-FFL, if he couldn't get them from an FFL." Docket no. 264 at 18. For example, relying on additional testimony from Ms. Smith, Plaintiffs note that Kelley found the two guns he purchased from a friend to be "so unreliable that he threw one

away and traded the other for a dog on Craigslist." Docket no. 264 at 17 (citing docket no. 264-6 at 6).

As evidence that Kelley would not have been deterred from obtaining firearms if he had failed the FBI background check, the Government cites Kelley's unsuccessful attempt to purchase a gun from Dick's Sporting Goods in New Braunfels, Texas in late-2015. Docket no. 256 at 27; *see id.*, Ex. K at 1. The manager declined to sell Kelley the gun because he had presented a Colorado driver's license, rather than a Texas driver's license. *Id.* But shortly thereafter, in April 2016, he purchased one of the firearms he used in the shooting at an Academy Sports + Outdoors ("Academy") store in Selma, Texas.[12] *Id.* In response, Plaintiffs point out that Academy is itself an FFL. Docket no. 249 at 25. "[A]fter this licensed dealer denied Kelley a gun, he did not borrow a gun from friends or family, and he did not ask someone to execute a straw purchase for him. Nor did he go to a gun show. He simply went to another federal dealer," where he passed the background check. *Id.* Thus, the 2016 purchase cannot serve as evidence that Kelley would have turned to non-FFLs if he had failed the FBI background check. Plaintiffs further submit that if the

---

[12] The Government has designated Academy as a responsible third party in this action, alleging that Academy violated the Federal Gun Control Act, 18 U.S.C. § 922(b)(3), by selling a firearm to Kelley in Texas after he presented a Colorado driver's license. *See* docket no. 150. This is also the basis for the pending state court action against Academy.

The Reynolds Plaintiffs note that the identification issue was a short-lived and artificial impediment to Kelley's access to firearms from FFLs. *See* docket no. 308. An abstract of Kelley's driving record indicates that he was eligible to obtain a Texas driver's license ("TDL") as early as 2007 and eventually did obtain a TDL in May 2017, approximately six months before the shooting. *Id.*, Ex. A at 1–2. The Reynolds Plaintiffs argue that, because Kelley could have purchased the same firearms used in the shooting with a valid TDL within this six-month period, Academy's illegal sale in 2016 cannot have proximately caused Plaintiffs' injuries.

The Court agrees with the Reynolds Plaintiffs that Kelley's acquisition of a TDL bears on the Government's designation of Academy as a responsible third party and on the appropriate apportionment of liability in this case. Given the evidence that Kelley obtained firearms from non-FFLs, however, the Court cannot conclude that the evidence of the TDL establishes that Plaintiffs are entitled to summary judgment on the issue of proximate cause.

Government had operated the background-check system with reasonable care, Kelley would likely have been arrested before he committed the shooting—either for lying on his gun purchasing form or, during any one of his several encounters with police after being discharged from the USAF, for possessing a firearm as a convicted felon. Docket no. 275 at 6–8.

Counterfactuals abound. Determining whether it is more likely than not that the Government's negligence was a substantial factor in causing Plaintiffs' injuries will require a factfinder to weigh the evidence and to make credibility determinations. The parties' disagreement over the likelihood that Kelley would have committed the shooting using firearms from non-FFLs thus represents a genuine issue of material fact that precludes summary judgment.

### b. Foreseeability

Foreseeability, the second element of proximate cause, requires that a person of ordinary intelligence should have anticipated the danger created to others by a negligent act or omission. *Nixon*, 690 S.W.2d at 549–50. Foreseeability does not require the defendant to predict "the particular accident or injury which in fact occurs." *Brown v. Edwards Transfer Co.*, 764 S.W.2d 220, 223 (Tex. 1988). Nor does it require that the actor foresee "the precise manner in which the injury will occur once he has created a dangerous situation through his negligence." *Travis*, 830 S.W.2d at 98. The danger of injury is foreseeable if its "general character . . . might reasonably have been anticipated" in light of the attendant circumstances. *Carey v. Pure Dist. Corp.*, 124 S.W.2d 847, 849 (Tex. 1939) (citations omitted).

"Foreseeability requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant's conduct brings about the injury." *Doe*, 907 S.W.2d at 478. It is "a practical test, a test of common experience applied to human conduct." *City of Gladewater v. Pike*, 727 S.W.2d 514, 518 (Tex. 1987) (quoting *Cook Consultants, Inc. v.*

*Larson*, 700 S.W.2d 231, 236 (Tex. App.—Dallas 1985, writ ref'd n.r.e.)); *see also Clark v. Waggoner*, 452 S.W.2d 437, 440 (Tex. 1970) (emphasizing "the teachings of common experience and practical sense in solving problems of foreseeability"). It asks whether the injury "might reasonably have been contemplated" as a result of the defendant's conduct. *McClure*, 608 S.W.2d at 903.

Where the plaintiff's injuries involve the criminal conduct of a third party, Texas courts have relied on Section 448 of the Restatement (Second) of Torts:

> The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, *unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created*, and that a third person might avail himself of the opportunity to commit such a tort or crime.

*Nixon*, 690 S.W.2d at 550 (quoting Restatement (Second) of Torts § 448 (1965)) (emphasis added). Thus, a tortfeasor's negligence will not be excused where a third-party's criminal conduct "is a foreseeable result of such negligence." *Id.*

The Government sets forth several arguments in support of its position that the shooting was not a reasonably foreseeable consequence of its failure to submit Kelley's fingerprints and final disposition to the FBI: (1) the shooting was too "heinous" to be foreseeable;[13] (2) the shooting was not similar to Kelley's previous criminal conduct; and (3) Kelley was able to conceal his intentions from those closest to him. Docket no. 256 at 29–31; docket no. 277 at 15–19. The Court will address each in turn.

---

[13] The Government argues that its failure to submit Kelley's fingerprints and criminal history to the FBI could not have been a "substantial factor" in causing Plaintiffs' injuries because Kelley's premeditated criminal conduct was a superseding cause of the shooting. Though the Government raises this argument to establish that it is not the cause-in-fact of the injuries Plaintiffs suffered, the question of whether Kelley's criminal conduct cuts off the Government's liability depends on the foreseeability of the conduct. *See Nixon*, 690 S.W.2d at 550. Thus, the Court addresses this argument in the context of its foreseeability analysis.

That a tragedy is, from a moral or psychological perspective, "senseless" or "incomprehensible" does not render it legally unforeseeable. In suggesting that the Sutherland Springs shooting was unforeseeable because it was "heinous," the Government asks the Court to substitute its subjective horror at the magnitude of harm in this case for the objective standard required under Texas law. "The test is not what the wrongdoer *believed* would occur; it is whether he ought reasonably to have foreseen that the event in question, or some similar event, would occur." *Clark v. Waggoner*, 452 S.W.2d 437, 440 (Tex. 1970).

As evidence that some crimes are simply too heinous to be reasonably anticipated, the Government cites other mass shooting cases where courts have found that the harm was unforeseeable. *See, e.g.*, *Lopez v. McDonald's Corp.*, 193 Cal. App. 3d 495 (1987); *Phillips v. Lucky Gunner, LLC*, 84 F. Supp. 3d 1216, 1226 (D. Colo. 2015). Importantly, however, the defendants in those cases knew nothing about the perpetrators that would lead them to anticipate a mass shooting. *See, e.g.*, *Lopez.*, 193 Cal. App. 3d 495 (finding that a mass shooting committed by an "*unknown* third party" was unforeseeable in premises liability case); *Phillips*, 84 F. Supp. 3d 1226 ("The only fact that plaintiffs offer to suggest that defendants should have questioned [the shooter] is the amount of ammunition and other potentially dangerous materials that he purchased, but there is nothing inherently suspicious about large internet orders."). Here, the Government cannot plausibly argue that it did not know anything about Kelley that would lead it to anticipate a "heinous" crime because the USAF explicitly recognized his threats of mass violence as evidence supporting its decision to extend his pre-trial confinement and, later, to permanently bar him from HAFB. *See, e.g.*, docket no. 250, Ex. U-4 at 6–7 (recommending continued pretrial confinement and citing Kelley's history of domestic violence, threats to take Security Forces' guns and to kill his wife, admission to and subsequent escape from a mental health facility, and plans to obtain

34

weapons and body armor as evidence that Kelly was "dangerous and likely to harm someone if released.").

The Government's argument that Kelley's history of domestic violence did not render the shooting foreseeable is equally unpersuasive. The Court agrees that, considered in isolation, Kelley's domestic violence conviction would not necessarily lead a person of ordinary intelligence to anticipate a mass shooting. Texas courts have generally held that "domestic disputes do not typically augur more serious crimes against strangers." *QuikTrip Corp. v. Goodwin*, 449 S.W.3d 665, 675 (Tex. App.—Fort Worth 2014, pet. denied). But the rationale for this principle is that the threat of violence is limited by the boundaries of the domestic relationship. *See id.* (finding that the previous acts of violence "against people with whom [the perpetrator] had deep connections" were not of the same character as the rape and murder of a "total stranger"); *see also Ramirez v. AHP Mut. Hous. Ass'n., Inc.*, No. 14–04–00159–CV, 2005 WL 425486, at *2 (Tex. App.— Houston [14th Dist.] Feb. 24, 2005, no pet.) (mem. op.) (explaining that domestic violence incidents are "not similar to a random attack from a stranger").

But the Government concedes that Kelley's threats of violence extended beyond his domestic relationships. Plaintiffs' injuries were not foreseeable, the Government argues, because they were not "the victims of his domestic abuse *or the targets of his verbal threats* while he was in the USAF." Docket no. 256 at 30 (emphasis added). The targets of his verbal threats, however, included not only Kelley's ex-wife and her family, but also Security Forces (threatening to "go for their guns"), police officers ("If the cops show up at my door, I will shoot them"), and other members of his squadron ("My work is so lucky I do not have a shotgun because I would go in there and shoot everyone."). Docket no. 250, Ex. U-4 at 6; Ex. U-17 at 14, 21. The sweeping and indiscriminate nature of these threats demonstrate that Kelley's domestic violence conviction

cannot be considered in isolation because the threat of violence was not limited to the context of his close, personal relationships.

Likewise, testimony from "those closest to Kelley"—his mental health counselor, his former roommate, and his wife—that they failed to anticipate the shooting does not establish that the shooting was unforeseeable. Indeed, this formulation entirely mischaracterizes the foreseeability standard. Foreseeability does not require anyone to predict "the precise manner in which the injury will occur" *Travis*, 830 S.W.2d at 98. And, as Plaintiffs correctly note, "[f]oreseeability is about looking forward, not backward—about what might have been reasonably anticipated at the time of the negligent act or omission; not about considering what happened, in hindsight." Docket no. 264 at 20. Thus, whether any of Kelley's confidants actually anticipated that he would commit a mass shooting in the weeks before it occurred has no bearing on whether the shooting was foreseeable. The relevant inquiry is whether, "at the time of [its] negligent conduct," the Government should have realized the likelihood that its failure to submit his conviction and fingerprints "afforded an opportunity to [Kelley] to commit such a . . . crime." *Nixon*, 690 S.W.2d at 550 (quoting Restatement (Second) of Torts § 431 (1965)).

Still, the Court cannot conclude that the shooting was foreseeable as a matter of law. The Government has presented sufficient evidence to create a genuine issue of material fact as to foreseeability. Kelley's widow testified that she noticed a significant deterioration in his mental health in the last year of his life. Docket no. 259, Ex. J, Smith Dep. at 161. And there is evidence that, in the summer of 2017, Kelley's interest in mass shootings escalated from "research to planning."[14] *See id.*, Ex. N.   The Government has also brought forth some evidence to suggest

---

[14] Plaintiffs assert that evidence of Kelley's growing obsession with firearms and with mass shootings "only reinforced the foreseeability of Kelley's actions." Docket no. 264 at 21. However, given that foreseeability

that at some unspecified date, while Kelley was visiting his mother-in-law, Michelle Shields, Kelley found some photos and/or videos of his wife, Danielle Smith, being sexually abused as a young child by her adoptive father, Donald Brassfield.  Brassfield was being prosecuted in the 25th District Court of Guadalupe County, Texas.[15] *Id.* Kelley's wife was apparently going to be called as a witness, and Kelley did not want her to testify and Kelley perhaps absconded with the photos/videos he found in an effort to protect his family. *Id.* The record also indicates that Kelley and Smith were having marital troubles, and that Kelley perceived Shields as interfering in their marriage. *Id.* The Government implies Kelley was very upset by these developments, blamed Shields for the sexual abuse Danielle suffered, and was aware that Shields was an active member of the First Baptist Church of Sutherland Springs. *Id.* To the extent that the Government can establish that Kelley's conduct was motivated by some unforeseeable, external event or that, in the years between Kelley's conviction and the Sutherland Springs shooting, Kelley's mental health deteriorated so significantly as to render his actions unforeseeable, a reasonable trier of fact could find that the shooting was unforeseeable.[16] Because resolving the foreseeability question will require the factfinder to weigh the evidence and make credibility determinations, the Court cannot grant summary judgment in favor of either party.

---

is judged at the time of the defendant's negligent conduct, Kelley's behavior after his discharge from the USAF cannot serve as evidence of foreseeability.

[15] Brassfield was convicted of aggravated sexual assault of a child on June 7, 2019, and sentenced to 50 years' imprisonment in the custody of the Texas Department of Criminal Justice.  Register of Actions, *State of Texas v. Brassfield*, No. 16-1733-CR-A, http://judicial.co.guadalupe.tx.us/CaseDetail.aspx?-CaseID=817192 (last visited Jan. 3, 2021).

[16] On the other hand, any evidence establishing that Kelley intended the Sutherland Springs shooting as an act of domestic violence—against Shields—would tend to further undermine the Government's position that no one could have anticipated the shooting based on Kelley's history of domestic violence.

### B.  Failure to Supervise and Failure to Train

Plaintiffs ask the Court to rule as a matter of law that the Government was negligent in its failure to properly supervise and train USAF employees charged with collecting and submitting fingerprints and criminal history to the FBI. To prevail on a claim for negligent supervision or negligent training, a plaintiff is required to establish not only that the employer was negligent in supervising or training the employee, "but also that the employee committed an actionable tort against the plaintiff." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 801 n.2 (Tex. 2010) (quoting *Brown v. Swett & Crawford of Tex., Inc*., 178 S.W.3d 373, 384 (Tex. App.—Dallas 2005, no pet.)). Indeed, Plaintiffs concede that "where an employee did not commit a wrongful act that caused injury (*i.e*., where an employee was not negligent), the employer cannot have negligently trained or supervised that employee." Docket no. 264 at 28. Because the Court has determined there is a genuine issue of material fact as to whether the Government's negligence in operating the background check-system caused Plaintiffs' injuries, it follows that there is also a genuine issue of fact as to whether the Government's alleged failure to train or supervise its employees caused those injuries, even if negligent training or supervision is established. Thus, the Court must deny Plaintiffs' motion for summary judgment on their claims for negligent supervision and training.

Neither the Government's motion for summary judgment nor its response to Plaintiffs' motion for partial summary judgment addresses the substance of Plaintiffs' claims for negligent supervision and training. Instead, the Government argues that the Court should dispose of these claims because they fall within the discretionary function exception to the FTCA and because they are a "means to the same end" as their negligent undertaking claim.

### 1. *Discretionary Function Exception*

The Government argues for the first time in its response to Plaintiffs' motion for partial summary judgment that the discretionary function exception bars Plaintiffs' claims for negligent training and negligent supervision. Docket no. 265 at 16–20. The discretionary function exception provides that the Government's waiver of sovereign immunity under the FTCA does not extend to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The Supreme Court discussed the discretionary function exception in *United States v. Gaubert*, 499 U.S. 315 (1991):

> The exception covers only acts that are discretionary in nature, acts that "involv[e] an element of judgment or choice," and "it is the nature of the conduct, rather than the status of the actor" that governs whether the exception applies. The requirement of judgment or choice is not satisfied if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," because "the employee has no rightful option but to adhere to the directive."
>
> Furthermore, even "assuming the challenged conduct involves an element of judgment," it remains to be decided "whether that judgment is of the kind that the discretionary function exception was designed to shield." Because the purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," when properly construed, the exception "protects only governmental actions and decisions based on considerations of public policy."

*Id.* at 322-23 (citations omitted). With regard to the violation of regulations, the *Gaubert* court stated:

> if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation. If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy.
>
> On the other hand, if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by

> the regulation involves consideration of the same policies which led to the
> promulgation of the regulations.

*Id.* at 324. "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* at 325.

Applying these principles, the Supreme Court has developed a two-step test to determine whether the discretionary-function exception applies. *St. Tammany Parish v. FEMA*, 556 F.3d 307, 323 (5th Cir. 2009) (citing *Berkovitz v. United States*, 486 U.S. 531 (1988)). First, the court asks whether the challenged actions were discretionary, or whether they were instead controlled by mandatory statutes or regulations—in other words, whether the conduct is a "matter of choice for the acting employee." *Id.* The mere existence of a statute, regulation, or policy governing the conduct of a federal employee does not render such conduct non-discretionary. *See Gaubert*, 499 U.S. at 324. Second, if the conduct involves such discretion, the court must determine whether it is the kind of judgment that the discretionary function exception was designed to shield. *Id.* The exception was designed to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy and thus protects only governmental actions and decisions based on considerations of public policy. *Id.*

### a.  Legal Standard

Because the Government's discretionary function argument is based on the applicability of exceptions to the FTCA's waiver of sovereign immunity, it implicates the Court's subject matter jurisdiction. *See Lopez v. U.S. Immigr. & Customs Enf't*, 455 F. App'x 427, 431 (5th Cir. 2011). A federal district court has a mandatory duty to dismiss claims over which it does not have subject matter jurisdiction. *Stanley v. Cent. Intel. Agency*, 639 F.2d 1146, 1157 (5th Cir. 1981). In evaluating whether it has subject matter jurisdiction, the court should not adjudicate the merits of

the claim. *Id.* A party generally may raise a court's lack of subject-matter jurisdiction at any stage of the litigation. *Fisher v. Univ. of Tex. at Austin*, 758 F.3d 633, 639 (5th Cir. 2014).

The Government raises this argument for the first time in response to Plaintiffs' motion for partial summary judgment. The summary judgment standard is typically inappropriate for evaluating questions of subject matter jurisdiction, however, because summary judgment involves an adjudication on the merits. *Stanley*, 639 F.2d at 1157. Thus, as a preliminary matter, the Court must identify the appropriate standard for assessing the Government's jurisdictional challenges.

The Fifth Circuit has indicated that, where issues of fact are central both to subject matter jurisdiction and the claim on the merits, the trial court should assume jurisdiction and proceed to the merits under a Rule 12(b)(6) or Rule 56 standard. *See Montez v. Dept. of the Navy*, 392 F.3d 147 (5th Cir. 2004); *Tindall v. United States*, 901 F.2d 53 (5th Cir. 1990). However, it has also held that the merits and the jurisdictional issue under § 2680(a), the discretionary function exception, are not so intertwined as to prevent separate consideration and decision of the jurisdictional issue. *Hix v. U.S. Army Corps of Eng'rs*, 155 Fed. App'x 121, 128 n.8 (5th Cir. 2005); *Ford v. Am. Motors Corp.*, 770 F.2d 465, 468 (5th Cir. 1985) ("The merits and the jurisdictional issue were not so intermeshed as to prevent the separate consideration and decision of the jurisdiction question, albeit that decision is based in large measure on facts relevant to the merits.").

The evaluation of the discretionary function exception, then, should be conducted under the 12(b)(1) standard as long as it does not require resolving disputed facts that overlap with the merits. *E.g.*, *Lopez*, 455 F. App'x at 431 (noting that district court converted United States' motion for summary judgment to a Rule 12(b)(1) motion); *Patel v. United States*, 398 F. App'x 22, at *5 (5th Cir. 2010) (in reviewing discretionary function exception dismissal, stating that "[the

plaintiff's] complaint, as supplemented by undisputed facts and resolved disputed facts, may be considered in a dismissal of a complaint for lack of subject matter jurisdiction."). Because the Court finds that the jurisdictional issue is not intertwined with the merits of Plaintiffs' claims for negligent training and supervision, the Government's attack on the Court's jurisdiction should be decided under the standard applicable to motions under Rule 12(b)(1) rather than motions for summary judgment.

Dismissal is proper under Rule 12(b)(1) "when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). Typically, in determining whether subject-matter jurisdiction exists, "[c]ourts must strictly construe all waivers of the federal government's sovereign immunity, [resolving] all ambiguities in favor of the sovereign." *Linkous v. United States*, 142 F.3d 271, 275 (5th Cir. 1998). However, the Supreme Court has cautioned that "this principle is 'unhelpful' in the FTCA context, where 'unduly generous interpretations of the exceptions run the risk of defeating the central purpose of the statute.'" *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 491–92 (2006) (quoting *Kosak v. United States*, 465 U.S. 848, 853 n.9 (1984)) (citations omitted). Thus, the proper objective of a court attempting to construe one of the exceptions to the FTCA's sweeping waiver of immunity is to identify 'those circumstances which are within the words and reason of the exception'—no less and no more." *Id.*

In ruling on a motion under Rule 12(b)(1), the Court "has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *United States v. Freeman*, 556 F.3d 326, 334 (5th Cir. 2009). "Because at issue in a factual 12(b)(1) motion is the

trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* at 412–13. In short, no presumptive truthfulness attaches to a plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. *Id.* at 413. Further, materials such as affidavits and regulations can be considered when relevant to the issue of jurisdiction. *Poindexter v. United States*, 777 F.2d 231 (5th Cir. 1985).

While the plaintiff bears the burden of showing an unequivocal waiver of sovereign immunity, it remains an open question which party retains the ultimate burden of proof on the applicability of the discretionary function exception. *St. Tammany Parish v. FEMA*, 556 F.3d 307, 315 n.3 (5th Cir. 2009). Regardless of which party bears the ultimate burden of proof, at the pleading stage, the plaintiff must allege a claim that is facially outside the exception. *Id.* At the summary judgment stage, the plaintiff must submit evidence that the claim is facially outside the exception. *Morales v. United States*, 371 F. App'x 528, 532 (5th Cir. 2010). In addition, the plaintiff must establish a plausible causal relationship between the breach of the non-discretionary duty and the plaintiff's injury. *Lopez*, 455 Fed. App'x at 433 n.1.

### b.  Analysis

Courts in the Fifth Circuit have consistently held that the Government's employment decisions are the kind of judgment that the discretionary function exception was designed to shield. *See, e.g.*, *Dorsey v. Relf*, No. 4:12-CV-021-A, 2013 WL 791604, at *5 (N.D. Tex. Mar. 4, 2013) ("Decisions regarding hiring, supervising, training, and retaining employees involve many public policy considerations and matters of judgment and choice"), *aff'd*, 559 F. App'x 401 (5th Cir. 2014);  *Walding v. United States*, 955 F. Supp. 2d 759, 802 (W.D. Tex. 2013) ("Courts have  . . .

generally held that decisions relating to hiring, training, and supervision of employees" are shielded by the discretionary function exception). Thus, while the discretionary function analysis involves a two-step test, in this case, the first step—assessing whether the challenged actions were discretionary—will be outcome-determinative.

Plaintiff's claims for negligent supervision and training generally do not suffer from the typical defect involved in jurisdictional challenges based on the discretionary function exception— the absence of a federal statute, regulation, or policy governing the Government's conduct. Indeed, the DoD and USAF have established comprehensive and detailed instructions for carrying out their responsibilities under the Brady Act. Virtually all of the instructions promulgated by the USAF include a bolded, capitalized heading indicating that compliance with the publication is "mandatory." *See, e.g.*, AFOSI Manual 71-121, docket no. 250, Ex. U-2 at 1. But the relevant question is not whether compliance with the USAF's directives is mandatory—it is whether the directives afford employees a choice about the manner in which they carry out their responsibilities. Thus, the Court must analyze each of the regulatory provisions Plaintiffs invoke in support of their claims for negligent supervision and training.

### i. *Negligent Supervision*

Plaintiffs allege that mandatory regulations required review of Kelley's file "at every level of the chain of command" in the AFOSI. Docket no. 249 at 27. The Government agrees that the ASOFI supervisory duties are governed by USAF directives, but argues that Plaintiffs' claim for negligent supervision is nonetheless barred because these instructions "afford the USAF personnel significant discretion in the precise manner in which they carry out supervisory tasks." Docket no. 265 at 17. The parties address several levels of supervision: unit leadership at Detachment 225,

the Staff Judge Advocates ("SJA") office, the Second Field Investigations Region ("Region 2"), and the Headquarters AFOSI ("HQ AFOSI").

First, pursuant to AFOSI Manual 71-121, AFOSI unit leadership[17] is required to review both the electronic records of investigative activities in the "12MS" system and the physical, record copy of the investigative files for sufficiency and data integrity "from the date the case is opened until it is forwarded to Headquarters AFOSI for retention." *See* docket no. 250, Ex. U-2 ¶ 4.24.1.3. Each investigative file must be reviewed on a monthly basis, and the manual requires AFOSI leadership to use a comprehensive checklist to perform the review. *Id.* ¶ 4.24.1.3. The checklist includes several items requiring leadership to review the fingerprints and final disposition report in the physical file and confirm the submission of fingerprints to the FBI. *See id.*, Ex. U-1 at 4, 7. The manual sets forth specific instructions about how unit leaders should document their review, directing them to include only the reviewer's name and the date of the file review, and prohibiting reviewers from actually filling out the checklist in the folder or adding "comments or recommendations that will be subject to legal discovery." *Id.*, Ex. U-2 ¶ 4.24.4.

The manual separately requires unit leadership to ensure that subordinates "obtain and validate subject's fingerprints; … [and] submit subject's fingerprints [and] dispositions to the FBI…" *Id.*, Ex. U-2 ¶ 5.14.1. Before closing a file for submission to HQ AFOSI, AFOSI unit leadership must conduct another review of the file, this time using a closed-investigation checklist, which also requires reviewing fingerprints and the final disposition. The Court finds that AFOSI Manual 71-121 does not afford AFOSI unit leaders discretion as to whether, when, or how they should conduct these supervisory reviews of investigative case files. Thus, their conduct falls outside of the discretionary function exception and within the Court's subject matter jurisdiction.

---

[17] The term "unit leadership" is used to describe commanders, SAICs, and directors.

Furthermore, given that Detachment 225 unit leaders were required to confirm that Kelley's information had been submitted to the FBI before closing the file, the Court finds that Plaintiffs have established a plausible causal relationship between the breach of this non-discretionary duty and their injuries.

Plaintiffs argue that Staff Judge Advocates have mandatory supervisory responsibilities over the AFOSI agents investigating their cases. But the regulations outlining the relationship between SJAs and AFOSI agents—AFOSI Manual 71-121 and Air Force Instruction 51-201 ("AFI 51-201")—grant SJAs broad discretion to determine how to support their investigative teams. Both instructions, for example, indicate that SJAs and AFOSI agents "must develop a collaborative relationship focused on integrating investigative efforts and the legal process." Docket no. 250, Ex. U-2 ¶ 1.5; *id.*, Ex. U-3 ¶ 13.26. AFI 51-201 further provides that SJAs shall "establish local procedures" and "work" and "coordinate" with AFOSI case agents. *Id.*, Ex. U-3 ¶¶ 13.26, 13.29. SJAs should attend AFOSI case review meetings "[a]s appropriate." *Id.* ¶ 13.30. That the instructions leave open the question of how to "collaborate" and "work" and "coordinate" with AFOSI is evidence of discretion. Given their role as legal advisors during the investigative process, this discretion clearly involves weighing the kind of policy considerations that the discretionary function exception was designed to shield.

Plaintiffs next assert that the Second Field Investigations Region ("Region 2"), which supervises AFOSI Detachment 225, was negligent in failing to review Kelley's case file to determine whether his fingerprints and criminal history had been submitted to the FBI. AFOSI Manual 71-121 directs Region reviewers to concentrate their file review efforts on "significant investigations" in their regions. *Id.*, Ex. U-2 ¶ 4.25. "Significant investigations" are defined as "those investigations that, if conducted poorly, affect the [USAF]'s ability to preserve good order

and discipline, deter and neutralize internal and external threats, and bring unfavorable attention to the command." *Id.* However, under AFISO Manual 90-101, Region 2 commanders are afforded significant discretion in determining which investigative files to review. *See* docket no. 265, Ex. SS ¶ 2.2.2 ("[Regions] may design their own processes for identifying, reviewing, and tracking high visibility investigations."). Plaintiffs' argument that the Kelley investigation should have been considered a significant investigation addresses the substance of their claim that Region 2 failed to exercise reasonable care in performing its supervisory duties. The Court cannot reach the merits of the claim, however, because the relevant AFISO directives fail to demonstrate that Region 2 had a non-discretionary duty to review Kelley's file.

After an investigative file is closed, the record copy is sent to HQ AFOSI for archiving. AFOSI Manual 71-121 explains that the goal of HQ AFOSI is "to identify investigative deficiencies and to confirm data integrity through the systematic review of archived Case File investigations." Docket no. 250, Ex. U-2 ¶ 4.25.2. The procedure for HQ AFOSI's systemic review of closed case files is outlined in AFISO Manual 90-101. Docket no. 265, Ex. SS. Once a week, a member of the HQ Case Review Team ("CRT") must randomly select a number of case files from the newly closed investigations and, using the Closed Case Review Checklist, review the record copy of the file and the 12MS entry for discrepancies. *Id.* ¶ 2.1. Unlike Region 2 case review, the HQ CRT review process is non-discretionary. AFISO Manual 90-101 prescribes a specific course of action that the HQ CRT must follow in reviewing case files.[18]

---

[18] That the files slated for weekly review must be "randomly" selected precludes the possibility that the selection of files can involve policy considerations. Indeed, the randomness requirement itself is the result of a policy consideration: "The goal of randomly selecting [case files] is to achieve a measure of confidence that identified issues and problems are a reliable indicator of broader problems throughout the command." Docket no. 265, Ex. SS ¶ 2.1.

Despite the Court's finding that the HQ CRT's review process is non-discretionary, however, Plaintiffs have failed to demonstrate a plausible causal relationship between the breach of the non-discretionary duty and their injuries. *See Lopez*, 455 Fed. App'x at 433 n.1. First, as the Government notes, because files are randomly selected for review, the HQ CRT had no obligation to review all case files, or any case file in particular. Thus, the HQ CRT's failure to review Kelley's file cannot constitute a breach of duty without a further showing that reviewers violated the procedures set forth in AFOSI Manual 90-101. Second, the regulations grant the HQ CRT discretion in determining the appropriate remedy for deficiencies they identify during their review:

> Identified deficiencies may be remedied through a variety of avenues to include working with the [AFOSI training program] to target specific training deficiencies, changes or clarification in instructions or manuals, and modifications and changes in procedural processes.

Docket no. 265, Ex. SS ¶ 2.1. Thus, even if the HQ CRT had reviewed Kelley's file and recognized that his fingerprints and final disposition had not been submitted to the FBI, it would not have been required to correct the problem, at least under the terms of AFOSI Manual 90-101. *Id.*

Plaintiffs argue that the Government's negligent operation of the DIBRS—its failure to consistently submit information to the DIBRS and its failure to integrate the DIBRS and NICS— implicates the supervisory responsibilities of the DoD and the USAF. Docket no. 249 at 16. The "Secretaries of the Military Departments and the Heads of the Other DoD Components" are required under DoD Directive 7730.47 to "[e]nsure compliance with this Directive and establish policies and procedures to implement the DIBRS." Docket no. 250, Ex. U-6 at 32 ¶¶ 5.2–5.2.1. But this mandate fails to offer any specific guidance as to *how* the Secretaries of the Military Departments and the Heads of the DoD components should go about "ensuring compliance" and "establish[ing] policies and procedures." In other words, it affords the DoD and the USAF the discretion to determine the precise manner in which they ensure compliance with their data

reporting obligations. The Government notes that because DIBRS was not capable of submitting the required data to the NICS, the DoD submitted such information through the III, which was specifically designed for this purpose. The choice to create a new database rather than overhaul an existing database clearly involves the kind of policy considerations the discretionary function exception is meant to protect.

Plaintiffs appropriately limit their claim for negligent supervision of the DIBRS to supervisory functions—ensuring compliance with directives and establishing policies and procedures. However, some USAF supervisors, including SJAs and HQ AFOSI, also have direct DIBRS reporting responsibilities. *See id.* at 60–61 ¶¶ 1(a)(2)(b), (d); *id.*, Ex. U-3 at 3. DoD Manual 7730.47-M indicates that the obligation to provide data to the DIBRS is non-discretionary: "[l]egal organizations with DIBRS reporting responsibilities *shall* forward data to the functional consolidating activity on a monthly basis." *Id.*, Ex. U-6 at 57 (emphasis added). Even if Plaintiffs could establish that the Government was negligent with respect to its DIBRS reporting obligations, however, they have failed to demonstrate a plausible causal relationship between the breach of the non-discretionary duty and their injuries. *See Lopez*, 455 Fed. App'x at 433 n.1. Because the DIBRS and the NICS are incompatible, the USAF's failure to submit data to the DIBRS (and the DoD's subsequent failure to forward the DIBRS data to the FBI) cannot have been the proximate cause of the failed background check. Thus, even if the Government undertook to provide Brady information to the NICS through the DIBRS—and the Court holds concludes that it did not—the Government's conduct in operating the DIBRS falls within the discretionary function exception to the FTCA.

In sum, the Court holds that Plaintiffs' claim for negligent supervision survives the Government's jurisdictional attack to the extent that it stems from the supervisory conduct of

AFOSI Detachment 225 unit leadership. Otherwise, it falls outside of the Court's subject matter jurisdiction.

### ii.  *Negligent Training*

Plaintiffs' argument that the Government failed to train ASOFI and Security Forces agents is fundamentally outcome oriented: because agents were able to complete their training without an understanding of their mandatory duty to submit Kelley's fingerprints and final disposition to the FBI, their training must have been inadequate. *See* docket no. 249 at 35. But this circumstantial evidence of negligent training is insufficient to overcome the Government's jurisdictional attack because the discretionary function exception is inherently process oriented. "The relevant inquiry is whether the policy specifically addresses *how* an official must confront a given situation." *See Walding*, 955 F. Supp. 2d at 780 (citing *Lopez*, 455 Fed. App'x at 433) (emphasis added). "A policy may direct general policy goals, such as determining compliance with certain guidelines, but when the policy fails to prescribe 'specific direction' as to what course of action an employee must follow, it generally fails to establish a non-discretionary duty." *Id.*

The collection and submission of fingerprints and criminal history to the FBI has been a "core task" within the AFOSI Specialty Training Standard ("STS") since 2000. Docket no. 249, Ex. A, Col. Poorman Dep. Tr. at 182:10–183:6; docket no. 265, Ex. VV at USA00025415. The STS describes the minimum qualifications set forth in Career Field Education and Training Plans ("CFETPs"),[19] which serve as "a road map for career progression" for each career field within the USAF. *Id.* Plaintiffs argue that because this core task is a minimum qualification, training students how to collect and submit Brady Act information is non-discretionary.

---

[19] Air Force Instruction 36-2201 ("AFI 36-2201") sets forth the minimum requirements for USAF training programs and includes detailed instructions for developing CFETPs. Docket no. 250, Ex. U-3 at 23–25. Because Plaintiffs do not allege that the Government violated AFI 36-2201 in developing the AFOSI training plan, however, the Court does not address its requirements.

The Fifth Circuit rejected a similar argument in *Lopez v. United States Immigration &*
*Customs Enforcement.* 455 Fed App'x 427 (5th Cir. 2011). There, the plaintiff argued that the
United States Marshals Service ("USMS") breached its own non-discretionary policies in failing
to inspect a contract facility housing those in federal custody and failing to oversee the facility's
medical care. *Id.* at 432. The USMS directives stated that an institution needed to be inspected
before the award of an intergovernmental agreement and annually thereafter. Another directive
required the agency to conduct an initial on-site inspection to determine the facility's level of
compliance with USMS inspection guidelines. The Court noted that the directives "provided no
guidance, or even mention, on a variety of topics relating to this inspection obligation." *Id.* at 433.
"Such issues include whether the grant of an IGA was to be contingent on a specific level of
compliance, what minimum 'level of compliance' . . . a facility had to meet, and what remedial
actions to take (if any) in the event of insufficient compliance with USMS guidelines." *Id.* The
Court concluded that the decisions about how to conduct an inspection "were imbued with policy
and discretionary factors" and the USMS inspection directive did not impose a non-discretionary
duty to inspect the facility. *Id.*

Here, the STS for the Office of Special Investigations requires the USAF to train students
in the collection and submission of fingerprints and criminal history to the FBI, but does not offer
any guidance on how to conduct the training. Nor does it indicate how the USAF should measure
students' proficiency with respect to this "core task," the level of proficiency required before a
student can graduate, or what remedial actions to take in the event a student cannot demonstrate
proficiency. *See id.* That the STS leaves open the question of *how* to conduct fingerprint training
is evidence of choice. The Court finds that the STS does not impose a non-discretionary duty to
train AFOSI students to collect and submit fingerprints and final dispositions to the FBI. As in

*Lopez*, the decisions about how to develop and implement a training program for members of the USAF are "imbued with policy and discretionary factors." *Id.*; *see also Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1217 (D.C. Cir. 1997) ("The extent of training with which to provide employees requires consideration of fiscal constraints, public safety, the complexity of the task involved, the degree of harm a wayward employee might cause, and the extent to which employees have deviated from accepted norms in the past. Such decisions are surely among those involving the exercise of political, social, or economic judgment.").

Plaintiffs also argue that Security Forces training was inadequate. The USAF Security Forces train at the USAF Security Forces Academy at Joint Base San Antonio-Lackland, Texas, and later receive on-the-job training from their squadron commanders. Plaintiffs acknowledge that "[b]y design, Air Force Security Forces [Academy] training *does not* include training on collecting and submitting fingerprints or final dispositions to the FBI." Docket no. 249 at 39. Thus, the agents of the 49th Security Forces Squadron responsible for sending Kelley's fingerprints to the FBI relied on their Commander for training on fingerprint procedures. Plaintiffs fail to identify any statute, regulation, or policy that governs how squadron commanders should go about training new agents on fingerprinting, or any other topic.[20] Instead, Plaintiffs cite the Commander's limited awareness of Security Forces' fingerprinting responsibilities and procedures as evidence that his training was insufficient.

There is some support for the position that the Commander's poor grasp of the USAF's reporting obligations removes his conduct from the ambit of the discretionary function exception. *See, e.g.*, *Dinger v. Hornbeck Offshore Servs., Inc.*, 968 F. Supp. 1185, 1188 (S.D. Tex. 1997) ("There can be no element of discretion or choice when there is nothing from which to choose.

---

[20] Notably, Plaintiffs do not address whether training in fingerprint collection and submission procedures appears on the Security Forces CFETP.

The Court finds that the inspector's failure to know about a potentially applicable regulation takes the inspector's conduct out of the discretionary function exception."). The Fifth Circuit recently rejected this argument, however, explaining that while an official's "lack of familiarity with the policies may be strong evidence of a breached duty, such evidence does not affect the inquiry at hand: whether the challenged actions contained an element of judgment." *Gonzalez v. United States*, 851 F.3d 538, 546–47 (5th Cir. 2017). Thus, such arguments "better inform the merits of her underlying claims, rather than whether the discretionary function exception applies." *Id.*

There is ample evidence that the Security Forces was negligent in failing to train agents on fingerprint submission procedures. The 2017 IG Report concluded that the Commander's on-the-job training was "insufficient and it was not based on any established curriculum or policy requirements." *See* docket no. 250, Ex. U-14 at 15. But the discretionary function exception applies "whether or not the discretion be abused." 28 U.S.C. § 2680(a). The Court cannot reach the merits of Plaintiffs' claim for negligent training because it is barred by the discretionary function exception. By design, the Commander of the 49th Security Forces Squadron exercises broad discretion in determining how to train his agents at HAFB. As an employment-related decision, this is precisely the type of choice the discretionary function exception was designed to shield. *See Walding*, 955 F. Supp. 2d at 802. Accordingly, Plaintiffs' claim for negligent training is dismissed for lack of subject matter jurisdiction.

## 2. *Respondeat Superior Admission*

The Government argues that Plaintiffs' negligent undertaking claim precludes recovery on their claims for negligent supervision and training. Because Plaintiffs' claim for negligent training must be dismissed for lack of subject matter jurisdiction, the Court will only address the Government's argument as it applies to the surviving claim for negligent supervision. The Court

finds that both the unique posture of claims brought under the FTCA and practical considerations counsel against dismissal of Plaintiffs' claim for negligent supervision.

Claims against an employer for negligently hiring, supervising, training, or retaining an employee are based on direct liability, not on vicarious liability. *Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 100–01 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). An employer has a duty to adequately hire, train, and supervise employees and "[t]he negligent performance of those duties may impose liability on an employer if the complainant's injuries are the result of the employer's failure to take reasonable precautions to protect the complainant from misconduct of its employees." *Mackey v. U.P. Enters., Inc.*, 935 S.W.2d 446, 459 (Tex. App.—Tyler 1996, no pet.). However, Texas courts have generally acknowledged that "a direct liability claim . . . and a claim resulting in vicarious liability under *respondeat superior* could be mutually exclusive modes of recovery" where an employer stipulates to vicarious liability. *Williams v. McCollister*, 671 F. Supp. 2d 884, 888 (S.D. Tex. 2009) (citing *Estate of Arrington v. Fields*, 578 S.W.2d 173, 178–79 (Tex. Civ. App.—Tyler 1979, writ ref'd n.r.e.) and *Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 654 (Tex. App.—Dallas 2002, pet. denied)). Claims of negligent supervision and claims of ordinary negligence under a theory of vicarious liability are mutually exclusive where they are "means to the same end." *Knight v. Cooper*, No. 5:17-CV-234-OLG, 2018 WL 7350947, at *1 (W.D. Tex. June 1, 2018). Accordingly, "regardless of any allegation of fault on the part of the employer . . . . if vicarious liability is not contested, the employee's competence and the employer's own negligence in hiring, failing to properly train, or negligently supervising become irrelevant, as long as a plaintiff pleads ordinary negligence." *Williams*, 671 F. Supp. 2d at 888.

This principle, known in some jurisdictions as the "*respondeat superior* admission" rule and in others as the "*McHaffie* rule," is "intensely pragmatic." *Grimes v. Combined Transp., Inc.*,

No. 3:05-CV-00461-ECR-RAM, 2007 WL 9780634, at *5 (D. Nev. Oct. 3, 2007) (applying rule derived from *McHaffie v. Bunch*, 891 S.W. 2d 822 (Mo. 1995)). Though no Texas court appears to have explicitly endorsed *McHaffie*, its reasoning is instructive. The Missouri Supreme Court held in *McHaffie* that the trial court had erred in admitting evidence of negligent hiring and negligent entrustment after the defendant-employer had already admitted that its truck driver was an employee working in the scope of his employment at the time of the accident. *McHaffie*, 891 S.W.2d at 827. The court's primary concern was judicial economy:

> If all of the theories for attaching liability to one person for the negligence of another were recognized and all pleaded in one case where the imputation of negligence is admitted, the evidence laboriously submitted to establish other theories serves no real purpose. The energy and time of courts and litigants is unnecessarily expended.

*Id.* at 826. The court also considered the prejudicial effect of admitting such evidence given that claims for negligent entrustment and negligent hiring required evidence that the employer "knew or should have known" of the employee's "incompetence" or "a particular dangerous proclivity . . . followed by employee misconduct." *Id.* at 825. In short, the direct liability causes of action added nothing to the plaintiff's case other than the possibility that the jury would consider character evidence for an improper purpose. *See Grimes*, 2007 WL 9780634, at *4.

   *McHaffie*'s reasoning does not map neatly onto claims brought under the FTCA because, as both parties note, "[a]ll FTCA liability is *respondeat superior* liability." *Johnson v. Sawyer*, 47 F.3d 716, 730 (5th Cir. 1995). Here, both the USAF agents responsible for NICS submissions *and* their supervisors are employees of the United States. The purpose of Plaintiffs' claim for negligent supervision is not to impute the liability of USAF special agents to their supervisors, which the Court agrees would be a waste of judicial resources. The purpose of the negligent supervision claim is just the opposite—to determine the amount of harm that can be independently attributed

to USAF leadership's failure to exercise reasonable care in supervising its agents. Thus, Plaintiffs' claim for negligent supervision is not a "means to the same end" as *respondeat superior* liability.

Unlike cases involving negligent entrustment, hiring, and retention, there is no risk that allowing Plaintiffs' claim for negligent supervision to proceed to trial will prejudice the Government by introducing improper character evidence. Negligent supervision claims do not rely on character evidence. Indeed, because the Court has already determined that the Government undertook to operate a national background check system—and adequate supervision is a component of that undertaking—both claims will likely rely on the very same evidence. Thus, permitting both claims to go to trial will not require the trier of fact to consider additional, "laboriously submitted evidence" in support of the negligent supervision claim or unnecessarily expend the Court's time and energy. *McHaffie*, 891 S.W.2d at 826.

In fact, preserving Plaintiffs' claim for negligent supervision will better serve the interest of judicial economy than dismissal in this case because it will allow the factfinder to separately consider the amount of harm, if any, that can be attributed to USAF leaders' failure to supervise the agents responsible for FBI submissions. This approach will assist the trier of fact in apportioning liability among the Government—including employees "responsible for providing information" to NICS and their supervisors—and the twelve responsible third parties designated by the Government—Devin Kelley, Academy, and John Does 1–10. Docket no. 160. *See Lorio v. Cartwright*, 768 F. Supp. 658, 660 (N.D. Ill. 1991) (*respondeat superior* admission rule loses its force when comparative negligence is at issue); *see also Liberty Ins. Corp. v. Caterpillar*, Inc., No. SA–13–CV–83–XR, 2013 WL 3166616, at *1–2 (W.D. Tex. June 20, 2013) (failure to train or supervise used as a basis for designating responsible third party).

Addressing the extent to which Plaintiffs' injuries were independently caused by the Government's negligent supervision at trial will also have advantages in the event of an appeal. The Government has already expressed its intent to appeal the Court's ruling that Section 922(t)(6) of the Brady Act does not confer immunity on the United States. *See* docket no. 107. But, as the Court recognized in its order denying the Government's motion to dismiss, even if the United States could avail itself of its employees' immunities, Section 922(t)(6) only applies to those federal employees "responsible for providing information" to the NICS. Docket no. 59 at 26. There are many federal employees, including USAF leadership, whose conduct is implicated in the Government's undertaking to operate the background check system who were not "responsible for providing information" to the NICS. In the event that Plaintiffs prevail at trial and the Fifth Circuit disagrees with the Court's ruling on Brady immunity, reapportioning liability will be much easier if the factfinder has already considered the extent to which Plaintiffs' injuries were independently caused by the Government's negligent supervision.

In light of these practical considerations and the single-party nature of claims brought under the FTCA, the Court declines to dismiss Plaintiffs' claim for negligent supervision under the *respondeat superior* admission rule.

### C. Brady Act Immunity

The Government reasserts its position that Plaintiffs' claims are barred by the immunity provision of the Brady Act. Docket no. 256 at 33-34; *see* 18 U.S.C. § 922(t)(6). The Court previously rejected this argument in its order on the Government's motion to dismiss. Docket no. 59 at 20–29. Because the Government fails to present any facts or law that were unavailable when the Court ruled on the motion to dismiss, the Court declines the invitation to reconsider its earlier conclusions concerning Brady Act immunity.

## **CONCLUSION**

As explained herein, the Court finds that Plaintiffs have provided legally sufficient evidence to overcome the Government's motion for summary judgment. The Court finds as a matter of law that, in undertaking to establish and operate a complex national background-check system, the Government assumed the duty to operate the system with due care and that the Government breached that duty. However, because there are genuine issues of fact as to whether the Government's negligence increased the risk of harm and proximately caused Plaintiffs' injuries, Plaintiffs are not entitled to judgment as a matter of law. Plaintiffs' claim of negligent training is dismissed because it is barred by the discretionary function exception. The surviving claims for negligent undertaking and negligent supervision remain to be tried. Plaintiff's negligent supervision claim is limited to Detachment 225 leadership's failure to supervise the individuals responsible for collecting and submitting Kelley's fingerprints and final disposition to the FBI.

Accordingly, it is **ORDERED** that:

The Government's Motion for Summary Judgment (docket no. 256) is **GRANTED IN PART** and **DENIED IN PART**; and

Plaintiff's Motion for Partial Summary Judgment (docket no. 249) is **GRANTED IN PART** and **DENIED IN PART**; and

The Reynolds Plaintiffs' Motion for Partial Summary Judgment (docket no. 308) is **DENIED**.

It is so **ORDERED**.

SIGNED this 6th day of January, 2021.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE