**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| JOE HOLCOMBE *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Civil Action No.  SA-18-CV-555-XR |
| | § | |
| UNITED STATES OF AMERICA, | § | *Consolidated Cases* |
| | § | |
| *Defendant.* | § | |
| | § | |

**<u>ORDER</u>**

On this date, the Court considered the Government's motion to exclude the testimony of Plaintiffs' retained expert, Dr. Daniel Webster (ECF No. 261), Plaintiffs' response (ECF No. 274), and the Government's reply (ECF No. 286). After careful consideration, the Court issues the following order.

**BACKGROUND**

These consolidated cases stem from the mass shooting at the First Baptist Church in Sutherland Springs, Texas on November 5, 2017. The shooter, Devin Patrick Kelley ("Kelley"), entered the church and opened fire, killing 26 people and wounding 22 more. After fleeing the scene, Kelley later died from a self-inflicted gunshot wound.

Kelley committed the shooting using firearms he purchased from federal firearms licensees ("FFLs") after clearing the required background check through the National Instant Criminal Background Check System ("NICS") administered by the FBI. Kelley should not have passed the NICS background check, however, because he had been convicted of a crime that disqualified him from purchasing firearms.

While serving in the U.S. Air Force ("USAF"), Kelley pleaded guilty to a crime of domestic violence for assaulting his then-wife, Tessa Kelley, and stepson during General Court-Martial proceedings in November 2012. Despite U.S. Department of Defense ("DoD") and USAF instructions and policies that required the USAF to collect and submit Kelley's fingerprints and final disposition report of conviction to the FBI, the USAF failed to do so. ECF No. 149. Consequently, Kelley's fingerprints and conviction were not in the FBI's NICS at any time before the shooting on November 5, 2017. *Id.*

Plaintiffs are survivors of the shooting and relatives of those injured or killed. They seek recovery against Defendant United States ("the Government") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680, for its negligent failure to collect, handle, and report required information about Kelley that would have prevented him from purchasing the firearms used in the shooting. Plaintiffs bring claims for negligent undertaking and negligent supervision.[1]

To establish a claim of negligent undertaking in Texas, a plaintiff must show that: (1) the defendant undertook to perform services that it should have known were necessary for the protection of others but failed to exercise reasonable care in that undertaking; (2) the defendant's negligent performance of those services increased the risk of harm; and (3) the defendant's failure to exercise reasonable care caused physical harm. *Torrington v. Stutzman*, 46 S.W.3d 829, 838–39 (Tex. 2000) (citing Restatement (Second) of Torts § 323 (1965)). The Court granted Plaintiffs' motion for summary judgment with respect to the first element, holding that the Government failed to exercise reasonable care in its undertaking to operate a national background check system and to collect and submit Kelley's fingerprints and conviction to the FBI. *See* ECF No. 318 at 8–20.

---

[1] The Court previously dismissed Plaintiffs' claims of negligence *per se* and negligent training. *See* ECF No. 59 at 29–33; ECF No. 318 at 50–53.

However, the Court concluded that there were genuine issues of material fact as to whether the Government's negligence increased the risk of harm and proximately caused Plaintiffs' injuries.[2] *See id.* at 21–37.

Plaintiffs have designated Daniel Webster as a testifying expert on these issues. ECF No. 206 at 9–13. Dr. Webster relies on epidemiological research and his professional experience to support his general conclusions that (1) access to firearms by individuals with a history of domestic violence and suicidality greatly increases the risk that those individuals will commit serious acts of violence, including homicide and fatal mass shootings, and (2) denying firearms purchases to applicants with a history of violence, other criminal acts, or threatening behaviors resulting from mental illness reduces the risk that those applicants will commit acts of violence. ECF No. 161-1 at 5. With respect to Kelley, Dr. Webster specifically concludes that a proper background check would likely have deterred him from committing the shooting and that it was or should have been foreseeable to the Government that Kelley would commit an act of gun violence. *Id.* at 15–16.

The Government seeks to exclude Dr. Webster's report and testimony as unreliable under Rule 702 of the Federal Rules of Evidence and to strike a declaration provided by Dr. Webster in support of Plaintiffs' response to the Government's *Daubert* motion. *See* ECF No. 261 at 1; ECF No. 286 at 18. Because the underlying *Daubert* motion depends on the extent and nature of Dr. Webster's opinions, the Court will first decide whether Dr. Webster's declaration can be considered and then proceed to the question of whether his analysis is admissible under Rule 702.

---

[2] Plaintiffs' claim for negligent supervision likewise requires Plaintiffs to show that the Government's failure to exercise reasonable care in supervising its employees proximately caused their injuries. *See Mackey v. U.P. Enters., Inc.*, 935 S.W.2d 446, 459 (Tex. App.—Tyler 1996, no pet.). The same factual disputes that precluded summary judgment on Plaintiffs' negligent undertaking claim also precluded summary judgment with respect to their claim for negligent supervision.

## DISCUSSION

### I.    Motion to Strike Dr. Webster's Declaration

#### A. Legal Standard

The Federal Rules of Civil Procedure state that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1) (emphasis added). Rule 26(a) requires testifying experts to provide an expert report that includes "a complete statement of all opinions the witness will express and the basis and reasons for them; the facts or data considered by the witness in forming them; [and] any exhibits that will be used to summarize or support them," among other things. FED. R. CIV. P. 26(a)(2)(B). The Federal Rules also contemplate that opposing experts will present rebuttal evidence, *see* FED. R. CIV. P. 26(a)(2)(D), and that the original expert may supplement his testimony, *see* FED. R. CIV. P. 26(a)(2)(E).

Federal Rule of Civil Procedure 26(e) requires parties to supplement previous disclosures if they learn that such disclosures are incorrect or incomplete. This duty extends to information included in expert reports and given during expert depositions. FED. R. CIV. P. 26(e)(2). Parties must make these supplemental expert disclosures by the time Rule 26(a)(3) pretrial disclosures are due. *Id.* However, supplemental "disclosures are not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert information." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 571 (5th Cir. 1996).

A district court has broad discretion in deciding whether to strike expert testimony as a sanction for a violation of Rule 37. *Sierra Club*, 73 F.3d at 572. In exercising this discretion, courts look to four factors: "(1) the importance of the witnesses' testimony; (2) the prejudice to the

opposing party of allowing the witnesses to testify; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation, if any, for the party's failure to comply with the discovery order." *Id.*

Courts routinely reject untimely "supplemental" expert testimony where the opinions are based upon information available prior to the deadline for expert disclosures and the disclosure "departs from [or] expands upon [the] original report in [any] material respects." *Sobrino-Barrera v. Anderson Shipping Co.*, No. H–09–3642, 2011 WL 5245396, at *3 (S.D. Tex. Oct. 24, 2011). Thus, Dr. Webster's declaration is subject to being stricken to the extent that it inserts new opinions that are not mere elaboration or supplementation. *See In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 371 (5th Cir. 2016); *Pratt v. Landings at Barksdale*, No. CIV.A. 09–1734, 2013 WL 5375951, at *2 (W.D. La. Sept. 24, 2013) (striking a declaration after finding that it "contains new opinions, not mere logical extensions, that go beyond those previously presented" and that "appear to be based upon information available prior to the deadline for service of initial expert reports."). Further, as indicated by the plain language of Rule 37, the testimony will only be stricken where it is not "substantially justified or harmless," and where a balance of the *Sierra Club* factors indicates that it should be stricken.

### B. Analysis

In support of their response in opposition to the Government's motion to strike Dr. Webster's testimony, Plaintiffs included a declaration from Dr. Webster addressing the Government's objections to the reliability of the opinions in his expert report and deposition testimony. *See* ECF No. 274-1. The Government moves to strike the declaration as an untimely attempt to supplement his expert report, arguing that the declaration "seeks to offer new opinions, or at a minimum new bases or reasons for his opinions." ECF No. 286 at 18. Specifically, the

Government notes that Dr. Webster's declaration includes ten studies not cited in his original report and includes new opinions on Kelley's preference for reliable firearms from a trusted dealer and whether Kelley would have tried to access a firearm through a straw purchaser. *Id.*

The Government correctly notes that Plaintiffs have offered no explanation for their untimely disclosure of the information in Dr. Webster's declaration. ECF No. 286 at 18. It appears, however, that the vast majority of the arguments in the Government's *Daubert* motion rely on testimony from Dr. Webster's deposition, which was held on August 12, 2020—nine days *after* the close of discovery on liability issues and the deadline for filing supplemental reports as designated in the most recent scheduling order for this case. ECF No. 221 at 2. Dr. Webster asserts in his declaration that the Government's *Daubert* motion misconstrues his testimony and conclusions, and "misunderstands . . . and misapplies the methodology and statistical analyses" of studies cited in his expert report "to reach conclusions that these studies did not reach." ECF No. 274-1, Webster Decl. at 1.

Rule 37 only warrants exclusion of expert testimony as a sanction where the failure to disclose that testimony is not "substantially justified." A comparison of Dr. Webster's declaration with his initial expert report reveals three main purposes for the declaration: (1) to contest the Government's characterizations of his testimony and the methodology and conclusions of the studies cited in his expert report; (2) to clarify the assumptions about underground gun markets in the data supporting his analysis; and (3) to supplement his report with data bolstering his deposition testimony.

Though the information in the declaration was available before the deadline for expert disclosures, the Court concludes that the portions included for the first two purposes are substantially justified because of the timing of Dr. Webster's deposition. That is, because his

deposition did not occur until after the deadline for supplemental expert reports had already expired, he could not have anticipated or addressed the Government's alleged misperceptions about his report, data, and testimony before the Rule 26(e) deadline. *See Allen v. Ford Motor Co.*, No. 9:09CV100, 2010 WL 3791037, at *4 (E.D. Tex. Sept. 23, 2010) ("An affidavit may be appropriate to clarify confusion stemming from a challenged expert witness'[s] deposition testimony" that was "taken out of context."); *Caramba, Inc. v. Nationwide Mut. Fire Ins. Co.*, No. H-19-1973, 2020 WL 7684136, at *4 (S.D. Tex. Dec. 24, 2020) (denying the defendant's motion to strike supplemental report filed over six months after the deadline for rebuttal reports, where expert argued that the defendant insurance company had cited his deposition out of context in its motion for summary judgment). Furthermore, it appears that Dr. Webster made many of the clarifications contained in his declaration during his deposition, which the Government simply ignores in its *Daubert* motion. To the extent that the information contained in the declaration is duplicative of Dr. Webster's deposition testimony, the supplemental testimony is also harmless.

Three of the new studies cited in Dr. Webster's declaration are offered in support of what the Government describes as "new opinions" about the likelihood that Kelley would have purchased a firearm from a non-FFL or through a straw purchase. The Court disagrees with the Government's characterization of Dr. Webster's declaration on these points, and instead finds that they are a logical extension and clarification of an underlying assumption in the studies cited in Dr. Webster's initial expert report. The thrust of the Government's cause-in-fact argument is that, even if Kelley had been denied from purchasing a firearm at an FFL, he could have committed the shooting with firearms obtained from alternative sources. The thrust of the Government's *Daubert* motion is that Dr. Webster's opinions and the data on which they rely fail to account for this possibility. *See* ECF No. 261.

The Government's position simply overlooks that the existence of alternative sources of firearms is a key operating assumption in Dr. Webster's analysis, and in the studies cited in his initial expert report. *See, e.g.*, ECF No. 261-8, Wintemute 2019, at 3 ("For a prohibited person . . . a private-party transaction is essential"); ECF No. 261-3, Wintemute et al. 2001, at 8 (addressing the argument that those "prevented from buying guns in the legal market will simply acquire them illegally"). This is because the studies cited in Dr. Webster's report were designed to measure the impact of firearm denials and other gun control policies on rates of violent crime, not on the underground market for illegal firearms. *See* ECF No. 261-4, Wright *et al.* 1999, at 3 ("We do not know whether those denied legal handgun purchase obtained a firearm by other means. But while this policy's immediate objective is to prevent acquisition of handguns by high-risk individuals, its overall goal is to reduce their rate of criminal activity. Our evidence indicates that this occurs.").

Because these studies suggest that denying firearms to certain individuals reduces violent crime *despite* the ubiquity of unregulated private-party markets for firearms, the Government cannot logically overcome their findings by simply pointing to the existence of alternative sources of obtaining guns—the studies already account for this reality. This misunderstanding was a central theme at Dr. Webster's deposition. Each time he was presented with an alternative gun source, Dr. Webster agreed that it was "possible" that Kelley could have obtained a gun in such a manner, but declined to speculate about the likelihood that he would have actually done so. *See, e.g.*, ECF No. 261-2, Webster Dep. 132:2–8 (straw purchases), 142:11–15 (internet purchases); 208:7–209:7 (gun shows). And he explained his reluctance to speculate in terms of scientific reliability: there are "a lot of reasons why people don't get guns," but "that's less well studied." *Id.* 142:14–16; *see also id.* 236:11–15 (noting that he was unaware of any study addressing whether individuals who are denied at FFLs go on to acquire guns from other sources).

Acknowledging the "great uncertainties" in unregulated markets, Dr. Webster explained in his deposition that the limited research on the question of why and how people *fail* to obtain guns illegally indicates that the answer is highly individualized, and depends on factors such as their preferences for a particular type of firearm and their relationships with "trusted suppliers" in a particular market. *Id.* 142:14–143:4. This research includes Dr. Webster's own study of the underground gun market in Baltimore (the "Baltimore study") and two studies by Philip Cook (the "Cook studies"), which were not cited in his initial expert report. *Id.* 220:5–20.

Looking to the *Sierra* factors, the Court concludes that testimony concerning the "trusted suppliers" studies is important because it will help Plaintiffs explain why certain gun control laws can reduce rates of gun violence, despite the ubiquity of unregulated firearms markets. Though the studies cited in the initial report account for this phenomenon, the Baltimore and Cook studies will clarify how the "great uncertainties" in underground transactions can affect market participation, and address speculation that Kelley would have committed the shooting with a gun obtained outside of the legal market. *Sierra Club*, 73 F.3d at 572.

The Court is not persuaded that permitting these portions of the supplemental report would prejudice the Government. The Government cannot claim surprise because Dr. Webster's expert opinion did not change. *See Jones v. Harley-Davidson*, No. 2:14-cv-694-RWS-RSP, 2016 WL 5395952, at *2 (E.D. Tex. Sep. 27, 2016). The declaration does not reach a new conclusion concerning the likelihood that Kelley would have obtained a firearm illegally—it simply states that such a conclusion would be "speculative." *See* ECF No. 274-1, Webster Decl. at 11–12. This seems to be a logical extension of Dr. Webster's initial report, which did not address whether Kelley would have obtained a firearm illegally or cite any studies that could speak to that question.

Given that Dr. Webster's declaration was disclosed nearly six months before the deadline for disclosures under Rule 26(a)(3), this is not "a case of one party ambushing the other with undisclosed expert opinions at trial." *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d at 374. Any potential prejudice could be cured through a request for a continuance to conduct a second deposition in the months before trial. The Government does not seek such relief in its motion, however, and the Court does not grant it here. Together, these factors weigh in favor of admitting the testimony concerning the "trusted sources" studies.

With respect to all remaining studies and facts cited in Dr. Webster's supplement but not specifically referenced in his expert report or deposition, the Court concludes that they should be stricken as untimely supplements to the initial expert report. These studies and facts were available to Dr. Webster at the time expert disclosures were due and there is no justification for the failure to include these in the initial report. *Villegas v. Cequent Performance Prods., Inc.*, No. SA–15–CV–473–XR, 2017 WL 816872, at *5 (W.D. Tex. 2017) (striking list of studies and articles supporting opinions of expert who was asked during his deposition to cite academic support for his theories, but could not recall any specific references and later offered "no justification whatsoever" for the failure to provide these citations, though had over two months to supplement his opinions within the scheduling order deadlines").

The Court concludes that Plaintiffs have demonstrated good cause to supplement Dr. Webster's initial report to clarify the Government's alleged misunderstanding of the studies he cites in support of his conclusions and to address his testimony related to the Baltimore study. Accordingly, the Government's motion to strike Dr. Webster's declaration is denied except to the limited extent described in this order.

II.     *Daubert* **Motion**

    **A.  Legal Standard**

Rule 702 of the Federal Rules of Evidence allows a witness "who is qualified as an expert" to testify if:

   a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

   b)    the testimony is based on sufficient facts or data;

   c)    the testimony is the product of reliable principles and methods; and

   d)    the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), provides the analytical framework for determining the admissibility of expert testimony. *Daubert* requires the district courts to act as "gatekeepers" to ensure expert testimony meets Rule 702's standards. *Id.* at 589. As a preliminary matter, a district court "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting FED. R. EVID. 702). If the expert is qualified, a court must follow *Daubert*'s analytical framework to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

The reliability inquiry entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can be properly applied to the facts in issue. *Id.* at 592–93. In *Daubert*, the Supreme Court enumerated five nonexclusive factors to consider when assessing reliability: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential

rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Id*. at 593–94; *see also Burleson v. Tex. Dep't of Crim. Just.*, 393 F. 3d 577, 584 (5th Cir. 2004). The test for determining reliability is flexible and can adapt to the particular circumstances underlying the testimony at issue. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). The point of this inquiry "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*

The relevance inquiry requires the Court to determine if expert testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591. "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401.

A trial court's role as gatekeeper under *Daubert* "is not intended to serve as a replacement for the adversary system." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) (citing Rule 702 advisory committee's note). Thus, in determining the admissibility of expert testimony, the court should approach its task "with proper deference to the [factfinder]'s role as the arbiter of disputes between conflicting opinions." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. The party proffering expert testimony has the burden of establishing by a preponderance of the evidence that the challenged expert testimony is admissible. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *see also* Fed. R. Evid. 104.

**B. Analysis**

The Government attacks the reliability of Dr. Webster's opinions on three bases, arguing:

(1) that the "analytical gap" between his opinions on causation and the epidemiological research that he relies on for those opinions is too great;

(2) that his testimony discussing whether an FFL-denial would have deterred Kelley from purchasing a firearm and committing the shooting is not based in epidemiological methods, and he is not qualified to provide an opinion outside of that area of expertise; and

(3) that he failed to account for obvious alternative explanations and relied on insufficient data in developing his opinions.

ECF No. 261 at 1–2.

To begin, the Court is satisfied that Dr. Webster is qualified as an expert to testify on the epidemiology of gun violence, public health policy, and methodological issues in epidemiology. *See Cooks*, 589 F.3d at 179. Over a thirty-year career, Dr. Webster has devoted most of his research to gun-related injuries and violence, has directed numerous studies related to gun violence and its prevention, and has published 128 articles in scientific, peer-reviewed journals, in addition to numerous commentaries, book chapters and other reports. *See* ECF No. 274-2 (*curriculum vitae*); ECF No. 274-3, Webster Dep. 19:3–20; ECF No. 261-1, Webster Rep. at 2. He holds a bachelor's degree in psychology, a master's degree in public health, and a doctorate in health policy and management. *Id.* He has taught graduate courses on violence prevention and research methods in public health, and currently serves as the Bloomberg Professor of American Health in Violence Prevention at Johns Hopkins University. ECF No. 274-3, Webster Dep. 33:10–34:14. He also directs the Johns Hopkins Center for Gun Policy Research, where his primary role is "designing research, developing the proposals of what we study and how we study it." *Id.* 21:5–20, 31:12–14.

Although Dr. Webster's testimony and expert report establish that he relied on a variety of peer-reviewed studies to arrive at his conclusions, Rule 702 requires courts to assess the reliability of the underlying data used to formulate the opinion. *See Allen v. Pa. Eng'g Corp.*, 102. F.3d 194, 199 (5th Cir. 1996) ("[I]f the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion from that data is likewise unreliable."). The Government does not directly challenge the methodology employed in any of these studies, instead asserting that the underlying data, however scientifically reliable, cannot logically support Dr. Webster's conclusions. Indeed, the Court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997). Dr. Webster's testimony may properly be excluded if there is "too great an analytical gap between the data and the opinion proffered." *Id.* That is, the Court may exclude Dr. Webster's analysis if the studies that he relies on are "so dissimilar to the facts presented" that Dr. Webster's opinions cannot be "sufficiently supported" by the studies. *Joiner*, 522 U.S. at 144–45.

Though the Government's arguments are addressed more fully below, the Court observes as a preliminary matter that each of the Government's attacks on Dr. Webster's testimony suffers from the same conceptual defects—confusing admissibility with sufficiency, and sufficiency with certainty. The Government urges the Court to establish an unattainable goalpost, essentially arguing that each item of expert testimony is unreliable insofar as it fails to conclusively prove Plaintiffs' theory of causation. But, of course, this is not the standard for admissibility—nor is it even the standard for success on the merits. It is not the Court's role, in the context of a *Daubert* motion, to judge the conclusions that an expert's analysis generates; the ultimate arbiter of disputes between conflicting opinions is the trier of fact. *See Daubert*, 509 U.S. at 595 ("The focus, of

course, must be solely on the principles and methodology, not on the conclusions that they generate."); *Viterbo*, 826 F.2d at 422 (discussing "proper deference to the [factfinder]'s role as the arbiter of disputes between conflicting opinions").

To the extent that the Government wishes to attack the "bases and sources" of Dr. Webster's opinion, such questions "affect the weight to be assigned to that opinion rather than its admissibility" and should also "be left for the [factfinder]'s consideration." *Viterbo*, 826 F.2d at 422 (citing *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 580 (5th Cir. 1985)). The Government's doubts about the bases for Dr. Webster's opinions do not render his opinions so "unsupported" as to create "too great an analytical gap" between the evidence he relies on and his opinions. *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 783 (N.D. Tex. 2013). Because its arguments rely on an overly narrow and rigid construction of both the admissibility framework under Rule 702 and the substantive requirements of proximate cause, the Government has failed to demonstrate that Dr. Webster's report and testimony should be excluded as scientifically unreliable.

### 1. Dr. Webster's proximate cause analysis is based on a reliable scientific foundation

Proximate cause comprises two elements: cause-in-fact and foreseeability. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). "Both elements must be present . . . and may be established by direct or circumstantial evidence." *McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 903 (Tex. 1980). Further, though claimants are generally free to prove causation through lay testimony or through expert testimony, *Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 884 (5th Cir. 2004), proximate cause may not be established "by a mere guess or conjecture, but rather must be proved by evidence of probative force." *McClure*, 608 S.W.2d at 904.

### a.  Cause in Fact

The test for cause-in-fact, or "but-for causation," is whether the act or omission was "a substantial factor in causing the injury and without which the harm would not have occurred." *Ryder Integrated Logistics, Inc. v. Fayette Cnty.*, 453 S.W.3d 922, 929 (Tex. 2015) (quoting *Nixon v. Mr. Prop. Mgmt. Corp.*, 690 S.W.2d 546, 549–50 (Tex. 1985)). Though Dr. Webster cites at least six peer-reviewed studies in support of his conclusion that Kelley would have been deterred by a proper background check, *see* ECF No. 261-1, Webster Rep. at 10–13, ECF No. 274-1, Webster Decl. at 5, the Government addresses only two of the articles in its motion to exclude Dr. Webster's testimony. The first, a 2001 study by Dr. Garen Wintemute, *et al.*, used data for the three years following California's 1991 addition of a firearms prohibition for violent misdemeanants in order to compare violent misdemeanants who attempted to purchase a handgun and were denied to similarly-aged violent misdemeanants who had successfully purchased a handgun legally in 1989 or 1990, before the law was passed. *See* ECF No. 261-3. The study found, *inter alia*, that misdemeanants who had been approved to purchase a handgun were 29% more likely to commit an offense involving firearms and/or violence. *Id.*

The second study, of which Dr. Wintemute was also an author, involved comparing subsequent criminal offenses between convicted felons who attempted to purchase handguns in 1977, but were denied, and persons who were permitted to purchase a handgun in 1977 because they had a criminal record that included felony arrests, but no convictions. ECF No. 261-1, Webster Rep. at 10–11. The study found that those who were allowed to legally purchase handguns had rates of future arrests for crimes involving firearms and/or violence that were 10% to 30% higher than those who were denied due to their prior felony conviction. *Id.*

From these figures (the "Wintemute studies"), the Government concludes that the two studies, "at best, demonstrate a roughly 25% reduction in future violent crime." ECF No. 261 at 7. The Government then argues that the Court should exclude Dr. Webster's testimony as unreliable because (1) such generalized epidemiological data fails to account for "the individual circumstances here"; (2) it fails to satisfy the "more likely than not" standard for causation; and (3) it contradicts conclusions in his own peer-reviewed publications. *Id.* at 5–7. These arguments betray multiple misconceptions about both scientific methodology and the nature of the *Daubert* inquiry.

First, the Government notes, "[a]s a threshold matter," that the "neither of the studies specifically address Kelly [sic] or his ability to obtain firearms from sources that did not require a background check." *Id.* at 5. At the outset, it is unclear what this observation is intended to achieve—an attack on the reliability of studies, perhaps, or on the relevance of the results. But the notion that expert testimony is only admissible to the extent that it is based on studies of identical individuals under identical circumstances would not only turn the "flexible" inquiry envisioned under Rule 702 on its head, *see Daubert*, 509 U.S. at 594, but such rigid constructions of reliability and relevance would defeat the very purpose of expert testimony: to help the trier of fact understand and evaluate the evidence, *id.* at 591.

"Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* at 592 (internal citations omitted). Experts may base their opinions on inferences properly drawn from scientific facts. *See id.* (applying the term "knowledge" to "any body of known facts

or to any body of ideas *inferred from* such facts or accepted as truths on good grounds.") (citing Webster's Third New International Dictionary 1252 (1986)) (emphasis added). Indeed, "trained experts commonly extrapolate from existing data," so long as they "explain how and why" they have extrapolated the data. *Joiner*, 522 U.S. at 144–46.

The Government contends that the Wintemute studies are unreliable because "they do not answer the question of which of the persons who are denied purchases at FFLs due to failed background checks are deterred from acquiring or unable to acquire, firearms from other avenues." ECF No. 261 at 5. First, that the Wintemute studies fail to answer a question addressing the Government's theory of causation is not evidence that they cannot reliably support Dr. Webster's analysis, and thus is not the proper subject of a *Daubert* motion. *See Viterbo*, 826 F.2d at 422 (*Daubert* does not require that an expert "disprov[e] or discredit[ ] *every* possible cause other than the one espoused by him.") (emphasis added). More importantly, this critique completely misstates the causal issue at hand.

The relevant inquiry is whether a proper background check would have deterred the shooting, not whether Kelley would have been deterred from obtaining a gun illegally. Though these questions are related, they are not coextensive—access to alternative sources of firearms is not a perfect proxy for future acts of gun violence. An individual who fails a background check and is denied at an FFL would, of course, need to find an alternative source of firearms to commit a shooting. But it is also possible that firearm denial discourages violence even among those who subsequently manage to obtain an illegal firearm. The Wintemute studies address whether firearm denial can deter violent crimes. The Court cannot conclude that they are "so dissimilar to the facts presented" that they cannot support Dr. Webster's opinion that firearm denial can deter people with a criminal history like Kelley's from future acts of violence. *Joiner*, 522 U.S. at 144–45.

The Government's argument that the Wintemute studies "do not support [Dr. Webster's] ultimate opinion" because they cannot independently satisfy the standard for cause in fact under Texas law mischaracterizes the purpose for which they are cited and simply ignores the other studies cited in Dr. Webster's report and testimony. ECF No. 261 at 7. The Government asserts that because the Wintemute studies suggest that firearm denial reduces violent crime by only 25%, they cannot be offered as evidence of cause-in-fact, which requires a "greater than 50% chance that Plaintiffs would not have been harmed" if the Government had submitted Kelley's fingerprints and criminal history information to the FBI. *Id.* at 4. But this view relies on a fundamental misunderstanding about the Plaintiffs' evidentiary burden and the function of expert testimony in this case. The question is not whether a firearm denial would deter over 50% of the *general population* from committing an act of gun violence, but whether it is more likely than not that such a denial would have deterred Kelley from committing the shooting.

The parties' arguments concerning the admissibility of Dr. Webster's testimony demonstrate a confusion—on both sides—about the proper role of expert testimony in this case. The confusion is likely the result of Dr. Webster's reliance on epidemiological data to support his opinions on causation. There is nothing inherently problematic with the use of such data in expert testimony. Epidemiological studies can be particularly helpful evidence of causation where, as here, "direct human experimentation cannot be done." *Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 820 (W.D. Tex. 2005). The problem is that, in their arguments about the reliability and relevance of Dr. Webster's testimony in this case, the parties rely far too heavily on cases evaluating the admissibility of epidemiological evidence in the context of toxic tort cases. But toxic tort litigation is a horse of a different color.

Though this case poses some of the same evidentiary challenges involved in toxic tort cases because of the practical and ethical implications of human experimentation, the analogy ends there. In a toxic tort case, the plaintiff's "burden is to prove *to a reasonable degree of medical certainty*, based on a reasonable medical probability and scientifically reliable evidence," that exposure to a substance caused the injuries or condition at issue in the case. *Cano*, 362 F. Supp. 2d at 820 (emphasis added). The causation analysis in a toxic torts case is complicated by a variety of considerations:

> Toxic tort cases present a unique challenge to the classical conception of causation. Other tort cases, such as slip-and-fall or car accident cases, feature scenarios where causation is fairly obvious-if one car collides with another, common sense dictates that a range of injuries from broken limbs to internal bleeding to death can result. . . . The causation inquiry in toxic tort cases is more complicated because the injuries themselves are usually not immediately obvious and the connection between exposure and injury is not a matter of common sense or everyday experience. Moreover, a variety of exposures frequently can associate with the condition. Using one example, both smoking and exposure to asbestos increase the risk of lung cancer. When smoking and exposure to asbestos combine, the risk of cancer increases precipitously.

*In re Meridia Prods. Liab. Litig.*, 328 F. Supp. 2d 791, 798 (N.D. Ohio 2004). Due to the nature of the claims and evidence involved, toxic tort cases *require* testimony from scientific and medical experts to establish causation. S*ee Seaman v. Seacor Marine L.L.C.*, 326 F. App'x 721, 723 (5th Cir. 2009) ("A plaintiff in such a case cannot expect lay fact-finders to understand medical causation; expert testimony is thus *required* to establish causation.") (emphasis added). As a result, the causation analysis in toxic tort cases generally amounts to a battle of the experts.

In light of the centrality of scientific evidence and numerous problems of proof involved in these cases, many courts, including those in Texas, have adopted a two-step framework for evaluating causation in toxic tort cases. *See Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997). A plaintiff must first provide sufficient scientific evidence of "general

causation," which addresses whether a substance is capable of causing a particular injury or condition in the general population, and "specific causation," which addresses whether a substance caused a particular individual's injury. *Id.* "Sequence matters: a plaintiff must establish general causation before moving to specific causation. Without the predicate proof of general causation, the tort claim fails." *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010). Courts have also developed highly specific and demanding statistical guidelines for establishing general causation. *See Havner*, 953 S.W.2d at 720–724 (describing relative risk requirements and minimum confidence intervals for demonstrating a "doubling of risk" through epidemiological evidence in toxic tort cases).

Whether expert testimony will assist the trier of fact is governed in part by whether the testimony is relevant to the plaintiff's burden of proof under the substantive law. *Cano*, 362 F. Supp. 2d at 822; *see Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1320 (9th Cir. 1995) ("In assessing whether the proffered expert testimony 'will assist the trier of fact' in resolving this issue, we must look to the governing substantive standard . . . ."); *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 n.2 (10th Cir.2005) ("Under the relevance prong of *Daubert*, the court must ensure that the proposed expert testimony logically advances a material aspect of the case."). Because proof of general causation *requires* statistical evidence within the parameters defined by substantive law, an epidemiological study that falls short of those requirements cannot logically advance a plaintiff's allegation that they have been met. *See Cano*, 362 F. Supp. 2d at 822 ("*Havner* controls the issue of what evidence is required to establish causation *in a toxic tort case* and therefore what evidence is relevant.") (emphasis added). Thus, evidence of general causation is relevant—and therefore admissible—only to the extent it is sufficient.

Here, Plaintiffs' theory of causation does not logically or legally *require* epidemiological evidence. Many of the social sciences are interested in and have studied the questions at the heart of this case. *See District of Columbia v. Heller*, 554 U.S. 570, 703 (2008) (Breyer, J., dissenting) (citing studies on the life-saving effect of handgun restrictions published in academic journals in the fields of medicine, law, economics, epidemiology, and criminology). Plaintiffs may very well have designated an economist, sociologist, or psychologist as a testifying expert on these matters instead of, or in addition to, an expert in epidemiology such as Dr. Webster. Indeed, to rebut Plaintiffs' theory of causation, the Government has designated a professor of criminology, a medical doctor specializing in forensic neuropsychiatry, and a legal scholar. ECF No. 237 at 1–4. The sheer diversity of disciplines with expertise bearing on the issues at hand suggests that, unlike in toxic tort cases, there are multiple points of entry for considering the question of causation in this case.

Indeed, this case further differs from toxic tort litigation in that the connection between the Government's negligence and Plaintiffs' injuries is in many ways a matter of "common sense or everyday experience" that will rely on testimony from witnesses with personal knowledge about Kelley. *In re Meridia Prods. Liab. Litig.*, 328 F. Supp. 2d at 798. The "distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008). (quoting FED. R. EVID. 701, advisory committee's note to 2000 amendments). In their filings thus far, the parties have identified a variety of evidence in support of their differing theories of causation that relies on "reasoning familiar in everyday life." *Id.* For example, Plaintiffs cite testimony from Kelley's widow, Danielle Smith, that she would have refused to participate in a

straw purchase as evidence that he would not have committed the shooting with a gun obtained in a straw purchase. *See* ECF No. 275-4, Smith Dep., 226:20–227:12. The Government, on the other hand, points to the fact that Kelley lived on the same property where his father kept unlocked guns as evidence that Kelley could have committed the shooting with a stolen gun. *See* ECF No. 259. Such inferences "result[ ] from a process of reasoning familiar in everyday life," and do not require any kind of specialized knowledge. FED. R. EVID. 701, advisory committee's note to 2000 amendments. Still, expert testimony may be helpful to the factfinder in determining how much weight to afford to a given item of lay testimony.

In short, this is not a toxic tort case, and Plaintiffs' use of epidemiological data does not make it one. Dr. Webster's reliance on epidemiological research rather than, say, sociological research, is only relevant insofar as it identifies the particular discipline against which reliability is measured. *Moore*, 126 F.3d at 686–87. Thus, the reliability of Dr. Webster's opinion depends on whether the studies he cites are "grounded in the principles, methods and procedures" of epidemiology, not whether his conclusions conform to an evidentiary framework that applies to an entirely unrelated (and particularly idiosyncratic) theory of liability. *Id.*; *see Bustamante v. Ponte*, 529 S.W.3d 447, 460 (Tex. 2017) (concluding that the guidelines that courts apply to the admissibility of epidemiological evidence in toxic tort cases does not govern the reliability of such evidence in other kinds of litigation). The parties' arguments over whether Dr. Webster's testimony constitutes evidence of "general causation" or "specific causation"—and whether that evidence satisfies the statistical guidelines for the admissibility of epidemiological studies in the context of toxic tort cases—are completely inapposite here, where proof of causation does not rise or fall with the sufficiency of the expert testimony.

Plaintiffs correctly observe that whereas Dr. Webster's opinion "looks to the totality of the evidence," the Government's attack on his opinion improperly "focuses on two or three studies."[3] ECF No. 274 at 8. Given the multitude of factors that bear on whether a proper NICS background check would have deterred the shooting, it is unsurprising that Dr. Webster's analysis approaches the question from multiple angles. Moreover, "the difficulties which inevitably arise when proof of causation hinges upon counterfactual reasoning emphasize the importance of inferences and common sense in the factfinding process." *Putnam Res. v. Pateman*, 958 F.2d 448, 461 (1st Cir. 1992). Cause in fact is "incapable of mathematical proof, since no one can say with absolute certainty what would have occurred if the defendant had acted otherwise." *Id.* (citing W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser & Keeton on the Law of Torts* 269–70 (5th ed. 1984)). Where, as here, the causation analysis requires the factfinder to consider a variety of counterfactual scenarios, "[c]ircumstantial evidence, expert testimony, or common knowledge may provide a basis from which the causal sequence may be inferred." *Id.*

Plaintiffs need not identify a single factor that would have independently deterred Kelley from committing the shooting to prove by a preponderance of the evidence that the Government's negligence caused Plaintiffs' injuries. Thus, Dr. Webster's reliance on studies that in isolation would be insufficient to conclusively prove causation does not render his analysis unreliable. *See Bustamante*, 529 S.W.3d at 460 (trial court's admission of an epidemiological study that could not

---

[3] The Government's assumption that the other studies on which Dr. Webster relies are irrelevant—presumably because of perceived distinctions between the parameters of a given study and the facts of this case—is unwarranted. For example, Dr. Webster cites to a 2019 study examining the effect of reporting mental health records of individuals charged with disqualifying crimes to NICS, which showed that violent offending by the affected group declined by 52%. *See* ECF No. 261-1, Webster Rep. at 12–13. The Government would likely object on the ground that Kelley was never barred from purchasing a firearm because of his mental health history. But the Court has already clarified that the trier of fact may consider Kelley's mental health history as a risk factor for committing future violence, or, as here, as a protective factor against committing future violence *after* being disqualified from purchasing a firearm. *See* ECF No. 318 at 17.

independently demonstrate causation was appropriate where the plaintiff's "evidence of causation [went] far beyond an isolated study."). The Government will have a chance to challenge the conclusions Dr. Webster draws from these studies through "[v]igorous cross-examination" and the "presentation of contrary evidence" at trial. *Daubert*, 509 U.S. at 596. Such attacks on the "bases" of an expert opinion "affect the weight to be assigned to that opinion rather than its admissibility" and should also "be left for the [factfinder]'s consideration." *Viterbo*, 826 F.2d at 422

Finally, the Government argues that the Court should exclude Dr. Webster's cause-in-fact testimony because he has "offered opinions solely for the purposes of litigation that are directly contrary to those he offered in the published scientific literature." ECF No. 261 at 6. A court may exclude expert opinion testimony because it contradicts conclusions in the expert's peer-reviewed publications if the contradiction suggests the expert's litigation testimony is not supported by the scientific principles and methods of his discipline. *See, e.g.*, *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 26 F. Supp. 3d 449, 460 (E.D. Pa. 2014); *Avendt v. Covidien Inc.*, 262 F. Supp. 3d 493, 524 (E.D. Mich. 2017).

Here, the Government refers to a study that Dr. Webster published in 2020 (the "Webster study") that used state-level data to evaluate the effects of various state gun laws on the incidence of mass shootings. *See* ECF 261-5. The Webster study concludes, among other things, that "comprehensive background checks . . . do not seem to be associated with the incidence of fatal mass shootings." *Id.* at 18. The Government speculates that "[t]his is likely because of the determination of individuals committing such murders and the availability of alternative avenues for obtaining firearms without going through a background check." ECF No. 286 at 6. But there are several reasons, founded in the principles and methods of epidemiology, to doubt this explanation.

First, if the Government's theory were correct—that the comprehensive background check ("CBC") laws were ineffective simply because would-be mass shooters are so determined to commit a mass shooting that they will always find an alternative source of firearms—the Webster study should not have identified *any* policies associated with a decrease in the incidence of mass shootings. But Dr. Webster found that banning large capacity magazines ("LCMs") and in-person licensing requirements were both associated with a reduction in the number of mass shootings. ECF 261-5 at 18. The Government's unsupported hypothesis cannot explain why a mass shooter would be deterred by a state-level ban on LCMs but not a state-level CBC.

Second, there are significant differences between the state CBC laws evaluated in Dr. Webster's study and the FFL background checks at issue in this case.[4] Specifically, Dr. Webster's study evaluated the impact of *state* laws extending CBC laws to *private* firearms sales. *See* ECF 261-5. Dr. Wintemute explained in an article published in 2019 that such state-level CBC requirements are much less likely to be effective than federally mandated background checks for a variety of reasons, including non-reporting of disqualifying crimes by state and local agencies, private parties' failure to comply with the CBC requirement, and failure by law enforcement officials to enforce the CBC laws. *See* ECF No. 261-8 at 5–8. Thus, Dr. Wintemute concluded that the "research does not suggest that background checks are fundamentally ineffective," but that government agencies need to cooperate to rectify widespread "implementation and design problems" for these policies to produce their intended benefits. *Id.* at 4.

---

[4] To the extent that the Government intends to highlight the scarcity of studies directly addressing whether federally-mandated background checks decrease the risk of injuries like those suffered by Plaintiffs, the Court observes that the Government itself bears some responsibility for the dearth of research in this sphere. From 1996 until 2019, a provision in the Government's annual spending bill known as the "Dickey Amendment" mandated that "none of the funds made available for injury prevention and control at the Centers for Disease Control and Prevention (CDC) may be used to advocate or promote gun control." *See, e.g.*, Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208 (1996).

Many of the difficulties involved in operating state-level background checks are simply not implicated here. For instance, Kelley's background check relied on reporting by the USAF, a federal agency. State sovereignty precludes the Government from mandating that states report criminal history data to the FBI. *Id.* at 5. Thus, while federal agencies such as the USAF are required to report criminal history information to the FBI, participation by state and local agencies is entirely voluntary. The distinction in reporting requirements is especially important in this case, where relevant activity occurred in three different states: Kelly was convicted of the disqualifying crime in New Mexico, and later passed background checks and purchased firearms from FFLs in both Colorado in Texas. *See* ECF Nos. 250-17, 250-20. It is reasonable to assume that a CBC relying on voluntary coordination by three separate states would be less effective than a background check relying on mandatory reporting by a single federal agency. Furthermore, to the extent that the ineffectiveness of CBC laws can be explained by noncompliance at the point of sale—*i.e.*, the parties' failure to actually conduct the required background checks—the findings in the Webster study are inapposite here: in each of Kelley's four firearms purchases following his conviction, the FFL ran the required background check. *Id.*

As described above, Dr. Webster cites a significant body of evidence in support of his conclusion that a proper background check would have deterred the shooting. This evidence, along with Dr. Wintemute's summary of the inadequacies of state-law CBCs in the context of private firearms deals, demonstrate that Dr. Webster's "contrary litigation opinion" is in fact the product of generally accepted and reliable scientific principles and methods and is thus admissible, despite the Government's objections. *See Daubert*, 509 U.S. at 592.

### b. Foreseeability

The Government contends that Dr. Webster's opinion on foreseeability "is divorced from the scientific research" because "there is no study specifically demonstrating any predictive link between domestic violence and a mass shooting." ECF No. 286 at 15. But this argument both mischaracterizes Dr. Webster's testimony and misstates the standard for foreseeability in Texas.

The Government repeatedly urges the Court to exclude Dr. Webster's foreseeability testimony because he "conceded during his deposition [that] mass shootings are rare events that cannot be accurately predicted." *See, e.g.*, *id.* (citing ECF No. 261-2, Webster Dep. 52:8−53:15); ECF No. 261 at 9 (same). First, though Dr. Webster did acknowledge that studying a "relatively rare outcome, like a mass shooting," will lead to "a significant number of false positives," ECF No. 261-2, Webster Dep. 52:21−53:2, the fact that an event is difficult to predict does not automatically render any evidence in support of foreseeability inadmissible. *See Giles v. Wyeth, Inc.*, 500 F. Supp. 2d 1048, 1058 (S.D. Ill. 2007) (admitting testimony of epidemiologists that antidepressants cause suicide even though (1) the "causal link . . . [was] generally not accepted" and (2) "[a]s a rare event" that presents "both ethical and practical difficulties," the cause of suicide had rarely if ever been studied in large clinical epidemiological trials, because the "proper method for attacking the evidence" was "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.") (citing *Daubert*, 509 U.S. at 596). More importantly, however, as Dr. Webster explains, "while it may be difficult to predict the scale of violence, predicting that some act of violence would occur based upon a set of factors is far easier." ECF No. 261-2, Webster Dep. 53:8−11.

That epidemiological studies can more reliably predict the probability of "some act of violence" than of a mass shooting is not fatal to Dr. Webster's foreseeability analysis because

foreseeability does not require the defendant to predict "the particular accident or injury which in fact occurs." *Brown v. Edwards Transfer Co.*, 764 S.W.2d 220, 223 (Tex. 1988). Nor does it require that the actor foresee "the precise manner in which the injury will occur once he has created a dangerous situation through his negligence." *Travis*, 830 S.W.2d at 98. The danger of injury is foreseeable if its "general character . . . might reasonably have been anticipated" in light of the attendant circumstances. *Carey v. Pure Dist. Corp.*, 124 S.W.2d 847, 849 (Tex. 1939) (citations omitted). The relevant inquiry is whether, "at the time of [its] negligent conduct," the Government should have realized the likelihood that its failure to submit his criminal history "afforded an opportunity to [Kelley] to commit such a . . .  crime." *Nixon*, 690 S.W.2d at 550 (quoting Restatement (Second) of Torts § 431 (1965)).

The Government's related argument that certain alleged gaps between the existing research and the facts of this case render Dr. Webster's opinion unreliable also fails because it overlooks the pragmatic nature of the foreseeability inquiry. Foreseeability is "a practical test, a test of common experience applied to human conduct." *City of Gladewater v. Pike*, 727 S.W.2d 514, 518 (Tex. 1987) (quoting *Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231, 236 (Tex. App.—Dallas 1985, writ ref'd n.r.e.)); *see also Clark v. Waggoner*, 452 S.W.2d 437, 440 (Tex. 1970) (emphasizing "the teachings of common experience and practical sense in solving problems of foreseeability"). Further, as one of the elements of proximate cause, a plaintiff may demonstrate foreseeability through any probative evidence, direct or circumstantial, *McClure*, 608 S.W.2d at 903, and testimony by both lay and expert witnesses. *Hamburger*, 361 F.3d at 884.

As an example of one such gap, the Government attacks Dr. Webster's reliance on studies involving domestic violence because they fail to account for violence outside of the context of the perpetrator's domestic relationships. It is true that Dr. Webster did not cite to a specific study in

his initial expert report indicating that a history of domestic violence increases the likelihood of violence against strangers.[5] However, as the Court has previously noted, the "sweeping and indiscriminate" nature of Kelley's threats against Security Forces, his fellow Airmen, and police officers, "demonstrate that Kelley's domestic violence conviction cannot be considered in isolation because the threat of violence was not limited to the context of his close, personal relationships." ECF No. 318 at 35–36. That Dr. Webster has likewise failed to proffer a study showing that people who threaten to go to work and "shoot everyone" are more likely to commit acts of gun violence does not render his testimony unreliable nor does it preclude the factfinder from considering Kelley's threats in its foreseeability analysis. The same is true of Kelley's multiple admissions to a mental health facility for in-patient treatment, his bad conduct discharge from the USAF, and his permanent bar from his workplace after being discharged.

Again, the purpose of admitting expert witnesses is not to impose on each item of expert testimony a duty to independently prove disputed facts with laser precision and absolute certainty. Indeed, "it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." *Daubert*, 509 U.S. at 591. The purpose of admitting expert testimony is instead to "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Even where no single item of expert testimony is persuasive on its own, "[i]t is not intrinsically 'unscientific,'" and may be particularly helpful, "for

---

[5] Dr. Webster's declaration *does* include citations to studies that support his conclusion that most perpetrators of domestic violence are violent against others as well. ECF No. 274-1, Webster Decl. at 10. However, to the extent that Dr. Webster did not identify these studies during his deposition, they are among the portions stricken from the declaration, as explained above. Still, the Government's attack on the reliability of the domestic violence studies as applied to this case misses the mark because, as the Court previously noted, Plaintiffs have provided evidence suggesting that Kelley may have intended the Sutherland Springs shooting as an act of domestic violence targeted at his mother-in-law, Michelle Shields, whom he blamed for his marital problems and the sexual abuse his wife had suffered as a child. *See* ECF No. 318 at 36–37; *see also* ECF No. 261-2, Webster Dep. 98:6–9 ("[H]e didn't pick Sutherland Springs Church there completely at random. He chose it because of its connections to his wife and her family.").

experienced professionals to arrive at a conclusion by weighing all available scientific evidence—this is not the sort of 'junk science' with which *Daubert* was concerned." *Joiner*, 522 U.S. at 153–54 (Stevens, J., concurring).

Indeed, evaluating the "weight of the evidence" would appear to the Court to be a critical component of scientific progress, from research design to peer review and publication. That is, in undertaking to design a study that will both attract adequate funding and survive the peer review process, a scientist must consider the state of the existing research to determine, based on the available evidence, which questions are worth asking and how best to answer them.[6] Given Dr. Webster's expertise in research design and methodology, the Court concludes that he is qualified to testify as to the weight of the foreseeability evidence in this case and to which factors most reliably predict future gun violence.

### 2. Dr. Webster's testimony concerning the likelihood that Kelley would have been deterred by a proper background check is admissible

The Government next argues that the Court should exclude deposition testimony in which Dr. Webster "made a variety of speculative assertions" about why a proper background check might have prevented the mass shooting because, as an expert in epidemiology rather than clinical psychology or social work, "Dr. Webster lacks the qualifications to offer testimony on how Kelley's individual characteristics might have prevented him from seeking out firearms from other

---

[6] *See* Michael J. Saks & Davis L. Faigman, *Failed Forensics: How Forensic Science Lost Its Way and How It Might Yet Find It*, 4 ANN. REV. L. & SOC. SCI. 149, 150 (2008) ("[I]n most scientific fields experience and observation are designated as the *first* steps of the scientific method") (emphasis added); Samuel J. McNaughton, *What is Good Science?*, 13 NAT. RESOURCES & ENV'T 513, 513 (1999) ("[T]he scientific method . . . . begins with a question. A scientist's observations (data) about a phenomenon or, perhaps, data published by another scientist prompt the scientist to pose a question about the phenomenon."); *id.* ("Once statistical significance has been established, the scientist must decide whether the results are of scientific significance." A result may be of "high statistical significance but may be of no practical importance whatever.").

avenues if he had been denied at an FFL." ECF No. 261 at 11, 13. The Court disagrees with the Government's assumption that such an analysis requires an opinion on Kelley's "state of mind" that could only be performed by a trained clinician, and concludes that the testimony is admissible.

To the extent that the Government seeks to have Dr. Webster excluded because his expertise is not solely focused on the psychology of mass shootings, but gun violence and prevention more generally, it is worth noting as an initial matter that courts routinely reject efforts to artificially narrow the scope of a witness's expertise in order to disqualify him or her. *See, e.g.*, *Johnson v. BAE Sys. Land & Armaments, L.P.*, No. 3:12-CV-1790-D, 2014 WL 1714487 (N.D. Tex. Apr. 30, 2014) (rejecting attempt to disqualify clinical psychologist who specialized in hate crimes from testifying on emotional impact in a Title VII case).

Even assuming that Dr. Webster's opinions in this case implicate some sort of psychological analysis, "[a] lack of specialization should generally go to the weight of the evidence rather than its admissibility" and "an expert witness is not strictly confined to his area of practice, but may testify concerning related applications." *United States v. Wen Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013). It is also worth noting that Dr. Webster has a degree in psychology and began his career as a social worker. *See* ECF No. 274-2; ECF No. 274-3, Webster Dep. 19:3–20; ECF No. 261-1, Webster Rep. at 3. As a social worker for Kentucky's Department of Social Services, Dr. Webster handled cases of suspected child abuse and domestic violence. ECF No. 261-1, Webster Rep. at 3. His role included both counseling and investigative duties. ECF No. 274-3, Webster Dep. 25:11–13. Specifically, he investigated reports of child abuse to assess the risk of future violence based on evidence of domestic violence, substance abuse, and mental health issues, and, ultimately, to determine whether it was safe for the child to remain in the home. *Id.* 26:10–27:14.

Given his education, training, and experience as a social worker, along with his academic research, the Court could conclude that Dr. Webster is qualified to testify as to Kelley's state of mind in this case. However, the Court is not persuaded that the testimony the Government seeks to exclude requires the expertise of a clinical psychologist or an evaluation of Kelley's state of mind. Indeed, given the tall order that the Government would have the Court impose on any expert purporting to testify as to the likelihood that Kelley would have been deterred by an FFL denial—"a window into Devin Kelley's mind," ECF No. 261—it is difficult to imagine how a psychologist or social worker would fare any better than an epidemiologist.

Thus, there may be some merit to the contention that opinions concerning an individual's state of mind are not the proper subject of expert testimony. *See Fisher v. Halliburton*, No. H–05–1731, 2009 WL 5216949, at *2 (S.D. Tex. Dec. 21, 2009) ("[A] trial court may strike expert testimony that evaluates a party's state of mind," because "[a]n expert's credentials do not place him in a better position than the [trier of fact] to draw conclusions about a defendant's state of mind.") (citing *Marlin v. Moody Nat'l Bank, N.A.*, 248 F. App'x 534, 541 (5th Cir. 2007) (per curiam)). But the precise delineations of what opinions Dr. Webster can offer are more appropriately the subject of a motion *in limine* and/or an objection at trial. The Court concludes that Dr. Webster is qualified to opine on the likelihood that a proper background check would have deterred Kelley from committing the shooting, based on his individual characteristics and history. *See also Daubert*, 509 U.S. at 592 ("Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.") (internal citations omitted).

The Government also suggests that the Court should disregard the research supporting Dr. Webster's opinion that Kelley's specific firearms preferences and lack of a trusted network for

illegally obtained firearms made him less likely to seek firearms from non-FFLs. ECF No. 261-1, Webster Rep. at 12 n.2. The Government writes off Dr. Webster's application of his research on underground gun markets in Baltimore to the facts of this case as unreliable based on perceived differences between Kelley and the participants in Dr. Webster's study. Specifically, the Government asserts that Dr. Webster's "study about criminals, who are likely connected to inner city Baltimore gangs, has little bearing on attitudes toward gun acquisition . . . in the rural area outside of San Antonio, Texas." *Id.* Setting aside Dr. Webster's explicit testimony that the study did not measure how many of the study participants were affiliated with gangs, *see* ECF No. 261-2, Webster Dep. 145:11–21, the Court declines to endorse the Government's apparent view that gang members in Baltimore are as analytically distinct from Devin Kelley as lab animals are from human subjects. *See Joiner*, 522 U.S. at 144 (excluding causation opinion for failing to explain how and why experts could have extrapolated from "seemingly far-removed animal studies"). Yet again, the Government's challenge bears on the weight to be assigned to Dr. Webster's opinion, not its admissibility.

### 3. Dr. Webster's report accounts for alternative explanations

The Government's argument that Dr. Webster's opinion is unreliable because he failed to consider evidence of Kelley's access to sources of firearms other than FFLs fails for two reasons. First, as explained above, the studies Dr. Webster offers in support of his opinion on causation *already* account for the existence of illegal firearms transfers. Second, the Government's argument is based on a false premise—that Dr. Webster failed to consider the relevant evidence. The Government simply misunderstands Dr. Webster's failure to endorse their interpretation of this evidence as a failure to consider it.

Here, Dr. Webster's opinion is hardly so unsupported as to warrant exclusion. His initial export report explains, for example, how the results of the first Wintemute study "bolster[ ] the case for inferring that there is a causal connection" between firearm denial and a decrease in violent crime. ECF No. 261-1, Webster Rep. at 10–11. Thus, Dr. Webster accounts for important alternative explanations for the statistical support in his causation opinion (*i.e.*, that it is merely evidence of a correlation or chance). And as his deposition testimony and supplement report—not to mention the studies themselves—make clear, the existence of an unregulated private-party market for firearms is simply an operating assumption in measuring the impact of a gun control policy. The data on which Dr. Webster relies inherently accounts for the universal reality of illegal firearms transfers in America.

Next, the Government argues that Dr. Webster's analysis is unreliable because it fails to consider evidence, including "key documents" provided by the Texas Rangers from their own investigation of the shooting, showing that Kelley had the ability to obtain firearms from non-FFLs and that a firearm denial would not have deterred him from committing the shooting. ECF No. 261 at 14–16 (citing *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) ("Where an expert's opinion is based on insufficient information, the analysis is unreliable.")). While it is true that an expert who opines on causation must adequately account for alternative explanations, *Daubert* does not require that an expert "disprov[e] or discredit[ ] *every* possible cause other than the one espoused by him" as long as his opinion does not "simply pick[ ] the cause that is most advantageous to [a party's] claim" while ignoring other relevant evidence. *Viterbo*, 826 F.2d at 422 (emphasis added). In other words, "[w]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.'" *Id.*

Dr. Webster's analysis does not "ignore" relevant evidence. He acknowledged in his deposition, for example, that Kelley had the ability to obtain firearms from non-FFLs. *See* ECF No. 261-2, Webster Dep. 146:11−14 (referencing Kelley's sale of an illegally obtained firearm on Craigslist). As explained above, Dr. Webster concludes that it would be speculative to assume that Kelley actually would have accessed guns through any of those sources. This testimony is not based on mere "credentials and a subjective opinion," but on Dr. Webster's own research showing that "people have a very strong preference for . . . acquiring firearms from people they know and trust and that they pretty rarely engage in those transactions with a stranger" and evidence that Kelley lacked an adequate network of trusted family and friends who would be willing to help him obtain a firearm illegally. *Id.* 210:11−11:8. Similarly, Dr. Webster's expert report specifically cites to the very interviews in the Texas Rangers documents that the Government suggests he ignored. *See* ECF 261-1, Webster Rep. at 16 n.28.

That Dr. Webster reaches a different conclusion than the Government would reach based on the same evidence is not the product of improper cherry-picking; it is the product of competing, research-based theories of how to evaluate that evidence. *See Moore*, 151 F.3d at 276 (proponent of expert testimony need not prove that opinions are correct). The result is not an *unreliable* opinion but merely a *different* one, which, highlights the existence of questions of fact that should be left to trial.

## CONCLUSION

The Court concludes that Plaintiffs have established by a preponderance of the evidence that, except to the extent that portions of his declaration must be stricken as untimely supplements to his expert report, Dr. Webster's expert testimony is admissible. *Moore*, 151 F.3d 269 at 276; *see also* FED. R. EVID. 104.

Accordingly, the Court hereby **ORDERS** that the Government's motion to exclude the testimony of Plaintiffs' expert, Daniel Webster (ECF No. 261) is **GRANTED IN PART** with respect to certain portions of Dr. Webster's declaration described in this order, and **DENIED IN PART** with respect to all other testimony.

It is so **ORDERED**.

SIGNED this 2nd day of February, 2021.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE