Ex. C

1                   IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
2                        SAN ANTONIO DIVISION

3

4    JOE HOLCOMBE, et al.,

5         Plaintiffs,          CIVIL ACTION NO. 5:18-cv-555-XR
                                    (Consolidated cases)
6    v.

7    UNITED STATES OF AMERICA,

8         Defendant.

9

10

11

12
     REMOTE VIDEOTAPED DEPOSITION OF COLONEL LARRY YOUNGNER
13              Taken By Counsel for Defendant
                       (Pages 1-233)
14
                  Wednesday, February 17, 2021
15                 10:05 a.m. - 6:12 p.m.

16                 By Zoom Videoconference
                  Cape Coral, Florida 33909
17

18       ---------------------------------------------

19

20

21

22   Remotely Reported By:
     Megan M. Soria
23   Notary Public
     State of Florida at Large
24   Esquire Deposition Solutions - Tampa Office
     Phone - 813.221.2535, 800.838.2814
25   Esquire Job No.  6568565



COLONEL LARRY YOUNGNER                          February 17, 2021
JOE HOLCOMBE vs UNITED STATES                                    42

```
 1   it was my experiences.  And that's still there.          11:16:28
 2   Absolutely.                                              11:16:30
 3      Q.  In your experiences that helped you form your     11:16:31
 4   opinion, you never had any responsibility directly for   11:16:38
 5   submitting fingerprints; correct?                        11:16:43
 6      A.  Yes, ma'am.  That is correct.  We had             11:16:47
 7   responsibility for submitting data like the report of    11:16:50
 8   result of trial, that then triggered another agency like 11:16:53
 9   OSI or the confinement facility or security forces, if   11:16:57
10   you will, to submit the required criminal history data.  11:17:01
11      Q.  And did you -- you never supervised OSI or SFS    11:17:04
12   personnel in their duty to submit fingerprints; is that  11:17:12
13   right?                                                   11:17:17
14      A.  That's correct.  I did not supervise them on      11:17:17
15   their duty to submit fingerprints.  We would only answer 11:17:21
16   questions if asked.                                      11:17:25
17      Q.  Let's go to the second duty that you stated in    11:17:27
18   your report.  I'm looking at -- I'll pull it up, Page 34 11:17:35
19   of the report.  Sorry.  I've got to scroll here.         11:17:44
20      A.  The second duty was the final disposition report  11:17:56
21   piece?                                                   11:17:59
22      Q.  Yes.  That's what I'm going to ask you about.     11:17:59
23   I'm looking at Subparagraph B here, "duty two, final     11:18:02
24   disposition report preparation and submission."  And you 11:18:06
25   see where I'm looking at that?                           11:18:09
```



```
 1  regulations and instructions that were done for this      11:20:22
 2  case, with your prior knowledge and experience providing  11:20:25
 3  context for those; is that correct?                       11:20:29
 4      A.  Yes.  I think that's fair.                        11:20:32
 5      Q.  In your previous experiences in the Air Force,    11:20:37
 6  were you ever -- did you ever have a responsibility for   11:20:40
 7  preparing or submitting the final disposition reports to  11:20:43
 8  the FBI?                                                  11:20:47
 9      A.  I did not.  No, ma'am.                            11:20:48
10      Q.  And did you ever supervise OSI or SFS personnel   11:20:49
11  in their preparing or submitting final disposition        11:20:55
12  reports?                                                  11:21:00
13      A.  No, ma'am.  I did not.                            11:21:01
14      Q.  And then just going to throw this back up,        11:21:02
15  Exhibit 2 back up.  Looking at Subparagraph B1, and at    11:21:09
16  the bottom of that paragraph, you state, "Unfortunately,  11:21:16
17  had the Detachment 225 and the 49th SFS personnel         11:21:20
18  submitted Kelley's criminal history data, even under the  11:21:27
19  erroneous timeframe, Kelley would not have been able to   11:21:32
20  purchase the weapons he used in the Southern Springs      11:21:37
21  shooting"; did I read that correctly?                     11:21:40
22      A.  You did read that correctly.                      11:21:42
23      Q.  The erroneous appellate timeframe, as you         11:21:44
24  discussed in the previous paragraph, that's based on      11:21:48
25  your knowledge from the depositions that some of the      11:21:51
```



| | | |
|---|---|---|
| 1 | report is that the purchases had the unfortunate effect | 12:56:47 |
| 2 | of conditioning Kelley to know and understand that he | 12:56:53 |
| 3 | was able to utilize federally licensed firearms dealers. | 12:56:56 |
| 4 | Can you define "conditioning"? | 12:57:01 |
| 5 | A.  When someone engages in a practice and it gets | 12:57:05 |
| 6 | reinforced over time.  So one or two times might be the | 12:57:09 |
| 7 | luck of the draw; three, four, five, six times.  So when | 12:57:17 |
| 8 | on December 2014, April 2016, June 2016, October 2017, | 12:57:20 |
| 9 | Devin Kelley is able to go into an FFL dealer and obtain | 12:57:27 |
| 10 | a weapon, he is getting reinforced, you know, positive | 12:57:31 |
| 11 | reinforcement to him that this is something I can get | 12:57:36 |
| 12 | away with by lying on these applications on the 4473s. | 12:57:39 |
| 13 | He certainly falsified the 4473s after his release from | 12:57:44 |
| 14 | confinement. | 12:57:51 |
| 15 | Q.  Do you have any particular expertise in | 12:57:52 |
| 16 | conditioning? | 12:57:59 |
| 17 | A.  I have expertise in foreseeability, in assessing | 12:58:04 |
| 18 | government practices and looking at the facts of this | 12:58:10 |
| 19 | case.  I am not a behavioral psychologist or a | 12:58:12 |
| 20 | behavioral scientist, but my common sense and knowledge | 12:58:16 |
| 21 | of the ways of the world that overlap from my area of | 12:58:21 |
| 22 | expertise into others, I think can add value to the fact | 12:58:24 |
| 23 | finder and to the parties. | 12:58:28 |
| 24 | Q.  And we have established that Kelley may not | 12:58:29 |
| 25 | have -- if he was not under indictment or the equivalent | 12:58:34 |



COLONEL LARRY YOUNGNER                    February 17, 2021
JOE HOLCOMBE vs UNITED STATES                           99

```
 1  relates to the Air Force's duties to submit CHD to FBI.    13:03:30
 2        MS. KRIEGER:  I think we've got -- I think we are    13:03:37
 3     about time to -- about time to take a lunch break.       13:03:39
 4        THE WITNESS:  Yes, ma'am.                             13:03:43
 5        MS. KRIEGER:  So let's go off the record.             13:03:44
 6        THE VIDEOGRAPHER:  We are going off the record.       13:03:47
 7     The time is 1:03.                                        13:03:49
 8        (Recess from 1:03 p.m. to 1:41 p.m.)                  13:03:58
 9        THE VIDEOGRAPHER:  We are now back on the record.     13:41:44
10     The time is 1:41.                                        13:41:46
11  BY MS. KRIEGER:                                             13:41:49
12     Q.  Afternoon.  Welcome back, Colonel Youngner.  What   13:41:49
13  do you consider -- you started to say this earlier, but    13:41:56
14  what do you consider to be the subject matter of your      13:42:00
15  expertise in this case?                                    13:42:03
16     A.  Good question.  I was asked initially to review     13:42:05
17  the -- well, I was asked to review the DoD IG report       13:42:10
18  based -- and I think the reason -- I can't speak for       13:42:16
19  others.  I can tell you what I understood my expertise,    13:42:20
20  then and now, to be.  And that is to be an Air Force       13:42:24
21  officer and judge advocate who is experienced with DoD     13:42:30
22  and Air Force investigations, to include inspector        13:42:38
23  general investigations at DoD IG, and the SAC IG level,    13:42:46
24  down to installation level IGs.                            13:42:53
25        Next is the familiar and an expert in the duties    13:42:57
```



| | | |
|---|---|---|
| 1 | of the Air Force to comply with direction from higher | 13:43:04 |
| 2 | headquarters', direction within the Air Force for | 13:43:12 |
| 3 | compliance with congressional mandates, frankly statute. | 13:43:15 |
| 4 | And then how DoD and the Air Force implement those | 13:43:21 |
| 5 | higher headquarters' responsibilities.  So what is the | 13:43:26 |
| 6 | duty, is established.  What is the promulgating | 13:43:29 |
| 7 | instruction at DoD and subordinate to DoD by US Air | 13:43:36 |
| 8 | Force and within US Air Force, in this case OSI and SF | 13:43:42 |
| 9 | communities, as well as the judge advocates, and to | 13:43:46 |
| 10 | provide expert opinion, if any opinion exists, on the | 13:43:51 |
| 11 | DoD IG report and what consequence, if any, that had for | 13:43:54 |
| 12 | ahead quarters Air Force, down to the Det level for OSI, | 13:44:00 |
| 13 | headquarters Air Force down to the squadron level for | 13:44:06 |
| 14 | security forces.  And I think wrapped up -- I assess | 13:44:10 |
| 15 | wrapped in that experience as a military attorney to | 13:44:20 |
| 16 | look at the reasonableness of actions based on -- based | 13:44:24 |
| 17 | on the facts of the case and the legal standards | 13:44:32 |
| 18 | involved in a case, if you will.  Foreseeability would | 13:44:35 |
| 19 | be one of those issue s, and which is a legal issue. | 13:44:39 |
| 20 | And then the facts, I think, speak for themselves as | 13:44:44 |
| 21 | they relate back to these duties and whether or not | 13:44:48 |
| 22 | there is increased risk of harm, whether or not the | 13:44:52 |
| 23 | conduct is foreseeable or not. | 13:44:55 |
| 24 | And we have already explored, as an example, one | 13:44:56 |
| 25 | of the duties I thought did not exist was the duty of | 13:45:02 |



1    the staff judge advocate to report criminal history          13:45:07
2    data.  In fact, that is an opinion of mine.  I do think       13:45:12
3    it's responsibility the staff judge advocate to point        13:45:16
4    out concerns that they identify to other Air Force           13:45:18
5    personnel, kind of an agency, if you will,                   13:45:23
6    responsibility.  But you can only report what you get        13:45:26
7    seen or what you get exposed to.                             13:45:29
8        Q.  So --                                                13:45:32
9        A.  I hope that answers it.                              13:45:34
10       Q.  It does, very thoroughly.  You stated that as you    13:45:35
11   were -- one of the things you were asked to do as a          13:45:41
12   military attorney was to assess, among other things,         13:45:44
13   based on the facts of the case and the legal standards       13:45:48
14   known to you, increased risk of harm, and                    13:45:52
15   foreseeability, and maybe some other legal issues; is        13:45:56
16   that correct?                                                13:46:00
17       A.  Well, I guess actually I wasn't asked to do.  I      13:46:00
18   was asked, what was the report?  What were the duties        13:46:04
19   and what were the consequences?  And it was actually --      13:46:06
20   so I'm not parroting back.  It was actually my opinion       13:46:10
21   that there were consequences -- not that you were            13:46:15
22   suggesting that, just to let you know.  When I read          13:46:17
23   through this the first time, my gut reaction was a bit       13:46:20
24   of shock.  Then I went back and said, okay.  What is         13:46:24
25   your role?  What is your lane?  You are an expert            13:46:26



1  consultant.  Assess this, good, bad or ugly, however        13:46:30
2  this falls out.  What do you think of this report?  What    13:46:34
3  are the consequences?  What was implied as far as           13:46:36
4  duties?  If I apply a Texas tort law analysis and my        13:46:39
5  analysis is what I read from Judge Rodriguez.  I didn't     13:46:44
6  know back and pull out the restatement and read tort        13:46:48
7  law.  I just looked at his definitions and applied those    13:46:52
8  to the facts of the case.                                   13:46:55
9       So I don't know if I wandered off on a tangent         13:46:57
10  here and lose something, I want to make sure I'm           13:47:02
11  answering your question.                                   13:47:04
12     Q.  I think that was helpful.  So when you were         13:47:05
13  assessing the consequences, you were -- of the Air         13:47:09
14  Force's actions, you were applying Texas tort law based    13:47:15
15  on Judge Rodriguez's opinions that he wrote in this        13:47:18
16  case?  Is that correct?                                    13:47:24
17     A.  Whatever I had in his opinions at the time; so      13:47:25
18  some of these have become more refined because in March    13:47:31
19  of last year, I didn't have, I think the motion for        13:47:34
20  summary judgment.  And I didn't have, I guess the          13:47:39
21  Daubert motion on Webster.  But I did have his opinion.    13:47:43
22  I think it was an initial motion to dismiss when the       13:47:50
23  cases were consolidated.  And it laid out the              13:47:54
24  foundations for negligent undertaking as a duty.  I        13:47:57
25  think it was the Phillips factors.  I don't have the       13:48:06



1    case in front of me.  But laid out the factors to    13:48:09

2    consider, and that there was a duty -- and it also    13:48:11

3    eliminated certain duties.  There were certain things    13:48:14

4    that the Air Force could not be held responsible for.    13:48:17

5        So I did read the law, applying my legal    13:48:21

6    experience to it.  But in the context really of looking    13:48:26

7    at it as what -- because part of understanding Air Force    13:48:30

8    duties, we have -- unlike the civilian world, there    13:48:36

9    isn't a Title 18 equivalent for dereliction of duty.  It    13:48:40

10   is -- someone that IBM can't be convicted of not doing    13:48:44

11   their job well.  And someone, even if you can be    13:48:48

12   censured or reprimanded under labor law and federal    13:48:52

13   employment law, but you can't be criminally convicted    13:48:56

14   for dereliction of duty.  And dereliction of duty, to    13:49:00

15   include a duty to submit required reports, is a triable    13:49:04

16   criminal offense in a military code of justice.  So I    13:49:08

17   think that partially what -- I'm speculating as to why    13:49:11

18   Plaintiff's Counsel wanted to hire me on this, but my    13:49:15

19   assessment, what I brought to the table was an    13:49:18

20   understanding of how the military, in particular the Air    13:49:22

21   Force and IGs, look at duty, and then help them form    13:49:28

22   their judgment after I write an opinion that either    13:49:36

23   party can use.    13:49:39

24     Q.  So when you were writing the consequences section    13:49:40

25   of your initial report, and also then when you were    13:49:45



1  writing portions your supplemental report, you were          13:49:49

2  applying the law as it's set out by Judge Rodriguez in       13:49:55

3  his opinions, to the facts of the case as you know, as       13:50:02

4  you set out the facts that you laid out in other parts       13:50:07

5  of your report?                                              13:50:10

6      A.  Well, to the best of my ability, I don't want to     13:50:11

7  step on the province of the finder of fact once they say     13:50:15

8  this is.  I think he wrote proximate cause has two           13:50:18

9  elements, cause and fact and foreseeability, kind of         13:50:25

10 flashbacks of law school.  So I -- it was easy to kind       13:50:30

11 of track that nightmare.  But anyway, track back to          13:50:33

12 those legal standards, if you will.  And the -- so what      13:50:41

13 I did was I guess straightforward somewhat, what did I       13:50:48

14 see were consequences of a duty that I assess the six        13:50:53

15 duties.  It's clear to me from reading his last opinion      13:50:58

16 that he's not really interested in training, though I        13:51:02

17 think that's supervisory responsibility.  So I applied       13:51:05

18 the facts of the case to the laws I understood it.  But      13:51:10

19 the DoD IG report that I started with, I actually            13:51:15

20 started with the '18 report and then realized there's a      13:51:20

21 lot more here.  So then I went back and went from '97        13:51:23

22 and read the reports moving forward and then read the        13:51:26

23 DoD IG report of '18 again.  And that helped me look at      13:51:30

24 okay, as a framework, conceptually, let's look at the        13:51:36

25 DoD IG analysis of this, and do I agree or disagree?         13:51:40



| | | |
|---|---|---|
| 1 | me ask it a different way. | 14:21:25 |
| 2 | A.  Sure. | 14:21:26 |
| 3 | Q.  Do you recall at any of your SJA positions, | 14:21:27 |
| 4 | advising OSI or security forces on fingerprints or the | 14:21:36 |
| 5 | submission of criminal history data? | 14:21:40 |
| 6 | A.  I do not.  I never had that duty.  And it gets | 14:21:43 |
| 7 | back to the roles and missions that are in the AFIs that | 14:21:46 |
| 8 | we talked about earlier.  And the SJA has the role to -- | 14:21:52 |
| 9 | and I will tell you, so first of all, no; I did not.  I | 14:21:56 |
| 10 | had aware of change -- as I was about to retire, we | 14:22:00 |
| 11 | focused very aggressively on combatting sexual assault | 14:22:04 |
| 12 | in the military.  And the Air Force led the services on | 14:22:09 |
| 13 | special victim counsel and on victim's advocacy rights. | 14:22:13 |
| 14 | I've actually been a victim's advocate in my private | 14:22:18 |
| 15 | practice now on a couple occasions.  And there are much | 14:22:22 |
| 16 | better checklists and systems in place to make sure | 14:22:26 |
| 17 | victims are advised, not just sexual assault victims. | 14:22:30 |
| 18 | So I'm aware, since I retired, that the Air Force -- so | 14:22:35 |
| 19 | from 2014 to date, that there are more requirements in | 14:22:37 |
| 20 | 51-201 and in matters that are submitted in AFI 41-201, | 14:22:42 |
| 21 | administration of military justice, as well as post | 14:22:52 |
| 22 | conviction notifications as a result of increased | 14:22:54 |
| 23 | awareness of victims's rights, both in general and in | 14:22:58 |
| 24 | sexual assault cases in particular. | 14:23:03 |
| 25 | Q.  In your SJA positions, were you ever aware of | 14:23:05 |



1  that OSI used to talk about, that's interesting, but it    14:39:33

2  gets in the way of prosecuting the cases that you know     14:39:37

3  have got to go to trial or the cases you've got to        14:39:41

4  develop.                                                   14:39:44

5       So I think a light caseload is four.  I think a      14:39:45

6  heavy caseload is, with all aspects, north of eight for   14:39:49

7  any particular agent.  And realizing they will buddy up,  14:39:57

8  one will be taking notes while the other one is doing     14:40:01

9  the interview.  The other one types up the 1168.  But to  14:40:04

10 be a lead agent, to be the -- if you will, investigative  14:40:09

11 lead.                                                      14:40:13

12     Q.  In your active duty positions, did you regularly  14:40:14

13 use the AFOSI Manual 71-121?                               14:40:24

14     A.  No.  I did not.  In fact, it is pulling teeth     14:40:29

15 sometimes to get OSI to release their investigative       14:40:37

16 manuals.  My Bible was the manual for court-martial,      14:40:41

17 first and foremost, then 51-201 as a judge advocate.  So  14:40:45

18 I apologize for the religious references.  My guide was   14:40:51

19 the 51-201 and the assorted checklists that we had.       14:40:55

20     But even as a defense counsel, I would want to        14:40:59

21 argue, I would get discovery of an OSI agent's prior      14:41:04

22 disciplinary history.  And if I found they had committed  14:41:10

23 a mendacity offense, I could try to impeach their         14:41:14

24 testimony because they lied about something and received  14:41:19

25 Article 15 on it.  I was lucky to do that.  Usually when  14:41:23



COLONEL LARRY YOUNGNER                    February 17, 2021
JOE HOLCOMBE vs UNITED STATES                          134

| | | |
|---|---|---|
| 1 | I went to the judge and filed a motion to compel | 14:41:26 |
| 2 | discovery.  Getting OSI to give you their checklist or | 14:41:29 |
| 3 | to give you the case file, usually on the defense side | 14:41:33 |
| 4 | at the bar, required me to file a motion to compel | 14:41:36 |
| 5 | discovery.  The as a prosecutor, it was -- well, you | 14:41:39 |
| 6 | really want to see the case file?  Sure.  I remember | 14:41:46 |
| 7 | this plain as day on my first couple cases.  JAGs don't | 14:41:50 |
| 8 | usually ask us for that.  So getting the case file, much | 14:41:55 |
| 9 | less the instructions or the checklists that are | 14:41:59 |
| 10 | supposed to follow, OSI was, in my assessment, based on | 14:42:01 |
| 11 | my experience in the Air Force for 25 years, loathed to | 14:42:07 |
| 12 | provide those documents to anybody other than OSI | 14:42:10 |
| 13 | agents. | 14:42:14 |
| 14 | Q.  So based on what you just said, fair to say that | 14:42:14 |
| 15 | when you were on active duty, you did not regularly | 14:42:17 |
| 16 | access any of the OSI instructions or guidelines or | 14:42:22 |
| 17 | checklists or anything like that? | 14:42:28 |
| 18 | A.  That is fair. | 14:42:30 |
| 19 | Q.  Is it also true of the security forces | 14:42:31 |
| 20 | instructions when you were on active duty?  Were you | 14:42:38 |
| 21 | able to regularly access the security forces | 14:42:40 |
| 22 | instructions? | 14:42:45 |
| 23 | A.  Actually, yes, I was able to regularly access the | 14:42:45 |
| 24 | security forces instructions.  I could go to the e-pub's | 14:42:50 |
| 25 | website and get to those.  They weren't restricted | 14:42:55 |



COLONEL LARRY YOUNGNER                          February 17, 2021
JOE HOLCOMBE vs UNITED STATES                                 135

```
 1   access items.  And often an SFOI NCO would include the        14:43:00
 2   checklist with the materials that we would receive from       14:43:05
 3   them on a case file.  My experience, the SF regulations       14:43:08
 4   and/or checklists were much more accessible to the judge      14:43:13
 5   advocates on the case.  And I looked at them.                 14:43:16
 6        I recall early on in my career as a supervisor, I        14:43:19
 7   didn't have need, typically, to do that as an SJA.  It        14:43:23
 8   was more as a trial counsel and defense counsel.              14:43:28
 9     Q.  So it sounds like when you water trial counsel          14:43:30
10   and defense counsel, at that point in time you would          14:43:33
11   have been familiar with the -- more familiar with the         14:43:36
12   security forces instructions than your were later?            14:43:39
13     A.  I would say I was still generally familiar.  I          14:43:45
14   just didn't have a need to go -- in my role advising the      14:43:49
15   commander on disposition of a case, or of how to conduct      14:43:53
16   the case, there just wasn't a need for me to, in most         14:43:58
17   instances, unless there was an issue on -- I would get        14:44:03
18   into it on issues of, say a probable cause search and         14:44:07
19   seizure.  And that point, I would be able to access even      14:44:13
20   the OSI records when it was specifically relevant to the      14:44:17
21   issue at trial.  Then I recall one of those arguments         14:44:22
22   was we had to see the wing commander and OSI involved         14:44:25
23   having access to records that we need to make sure this       14:44:30
24   is done properly.  But it did not involve fingerprints.       14:44:32
25     Q.  While you were on active duty, you mentioned that       14:44:37
```



| | | |
|---|---|---|
| 1 | look over my case list real quick? | 14:48:42 |
| 2 | Q.  Sure. | 14:48:44 |
| 3 | A.  Do you mind repeating the question?  Because I | 14:48:55 |
| 4 | may have a case out of Keisler involving an alleged | 14:48:57 |
| 5 | rape.  But his did not -- the use of weapons in that | 14:49:02 |
| 6 | case, I don't believe -- so what was the question one | 14:49:06 |
| 7 | more time? | 14:49:09 |
| 8 | Q.  Sure.  My question was, have you ever worked on a | 14:49:09 |
| 9 | case that involved a person who was prohibited from | 14:49:13 |
| 10 | purchasing firearms, who nonetheless had been able to | 14:49:18 |
| 11 | purchase firearms? | 14:49:22 |
| 12 | A.  My first answer is no.  I have not.  Let me just | 14:49:27 |
| 13 | quickly look through and see if there are any others in | 14:49:33 |
| 14 | here.  No.  I have not, to the best of my recollection. | 14:49:37 |
| 15 | Q.  In developing the opinions that you made in your | 14:49:47 |
| 16 | -- in both of your reports, did you speak with anyone | 14:49:52 |
| 17 | other than Counsel in this case? | 14:49:55 |
| 18 | A.  No.  I did not.  And if I may, let me know when | 14:49:58 |
| 19 | it's an appropriate time to take a break. | 14:50:03 |
| 20 | Q.  I'm just -- absolutely.  I'm just finishing this | 14:50:05 |
| 21 | up. | 14:50:10 |
| 22 | A.  Okay. | 14:50:10 |
| 23 | Q.  Once I finish up this, in the next five minutes. | 14:50:11 |
| 24 | So you did not -- the only person that you spoke with as | 14:50:16 |
| 25 | part of development of your opinions in this case was | 14:50:20 |



```
 1   Counsel; correct?                                    14:50:24

 2      A.  Counsel for Plaintiffs; that is correct.      14:50:24

 3      Q.  Okay.  You didn't speak with anyone from the  14:50:26

 4   Department of Defense or Air Force?                   14:50:30

 5      A.  I don't recall speaking to anybody else about 14:50:32

 6   this case.                                           14:50:35

 7         MS. KRIEGER:  Okay.  Let's take a five-minute   14:50:36

 8      break then.                                        14:50:38

 9         THE WITNESS:  Thank you.                        14:50:39

10         THE VIDEOGRAPHER:  We're going off the record.  14:50:40

11      The time is 2:50.                                  14:50:41

12         (Recess from 2:50 p.m. to 3:00 p.m.)           14:50:42

13         THE VIDEOGRAPHER:  We are now back on the record. 15:00:45

14      The time is 3:00 p.m.                              15:00:46

15   BY MS. KRIEGER:                                      15:00:50

16      Q.  One more thing that I had about the previous -- 15:00:50

17   the previous topics about your experiences.          15:00:54

18      A.  Yes, ma'am.                                    15:00:58

19      Q.  When you were on active duty, how familiar were 15:00:59

20   you with the DoD Instruction 5505.11?                15:01:02

21      A.  The -- I was generally aware that it existed.  I 15:01:08

22   would not call myself extremely familiar with it when I 15:01:15

23   was on active duty.  I've obviously had an opportunity 15:01:20

24   to become much more familiar with it as expert on this 15:01:23

25   case.                                                15:01:27
```



1    Q.  I think that is true for all of us.                    15:01:29

2    A.  I was aware of DIBRS and the reporting                 15:01:32

3  requirements there, and the Volume 1 and Volume 2.  And      15:01:36

4  I generally -- I would say probably became more aware of     15:01:42

5  it in the timeframe of my assignment at Seymour Johnson.     15:01:47

6  I'm just -- that was 2003 to 2005.  I'm wondering why I      15:02:01

7  think that as opposed to when I was at Rhein-Main, but       15:02:14

8  anyway, that was the best of my recollection.                15:02:18

9    Q.  Prior to being retained in this case, how             15:02:20

10  familiar were you with the Brady Handgun Violence           15:02:25

11  Prevention Act?                                             15:02:30

12    A.  Fairly familiar -- actually, you said Brady.         15:02:30

13  Lautenberg, I knew a lot more about.  I generally knew      15:02:37

14  about categories, I don't think I knew 10 specific          15:02:40

15  categories of disqualified persons or such.  But so I       15:02:44

16  had some familiarity with the Brady Gun Control Act and     15:02:50

17  with it predecessor or with the Gun Control Act of '68,     15:02:59

18  if I have that right.  So I hope that answers your          15:03:05

19  question.                                                   15:03:09

20    Q.  How -- why -- you say you were somewhat familiar      15:03:09

21  with it.  Why were you somewhat familiar with it?           15:03:14

22    A.  Well, so I mean, I just generally remember the        15:03:17

23  Brady Gun Control Act being passed, and I remember          15:03:29

24  President Reagan's shooting and there was legislative       15:03:34

25  response for gun control and series of gun control          15:03:38



```
 1   legislation.  At one point I was an NRA member.  I am        15:03:41
 2   not currently.  I possess and believe in safely using       15:03:46
 3   weapons that I shoot for sport or hunting.  With            15:03:51
 4   military, my very first assignment at the 101st Airborne     15:03:56
 5   Division as an ambulance platoon leader, one of my          15:04:01
 6   troops, literally the weekend I got there, engaged in a     15:04:05
 7   serious criminal offense and was locked up in the           15:04:09
 8   Clarksville, Tennessee jail, later escaped from it and      15:04:13
 9   got shot.  And that was -- that goes back a ways.  That     15:04:17
10   was 1986, '87 timeframe.  So I have been aware of it.  I    15:04:24
11   would imagine it came up during the course of -- I'm        15:04:30
12   trying to think of particular cases I did that might        15:04:33
13   have involved weapons, or the types of threats that        15:04:36
14   people posed.  I guess I can just say I have a general      15:04:40
15   knowledge of it, somewhat incident to my duties, but I     15:04:45
16   can't recall.  I did not prosecute any case involving      15:04:49
17   someone who I can recall who obtained a weapon who was     15:04:55
18   disqualified from having one.                              15:04:58
19       Q.  You said you were more familiar with the           15:05:00
20   Lautenberg Amendment.  Why were you more familiar with     15:05:04
21   that?                                                      15:05:06
22       A.  Maybe this relates back to the Brady Gun Control   15:05:06
23   Act.  So when you become a judge advocate, you go          15:05:10
24   through a judge advocate staff officer course.  Then we    15:05:13
25   get annual updates on the law.  So there's a military      15:05:17
```



1    continuing legal education program in addition to your        15:05:23

2    state bar's continuing education program.  We also, in        15:05:28

3    the Air Force, have a mid-career course and I would go        15:05:32

4    do criminal law development at JAG school, a program in       15:05:37

5    Charlottesville.  There was an entire year block of           15:05:41

6    instruction on military justice and military law as part      15:05:44

7    of that.  So undoubtedly, I was taught about these            15:05:47

8    factors, particularly Lautenberg Amendment, because -- I      15:05:56

9    had two specialty areas also in my career.  And that was      15:06:05

10   military criminal matters, which involved into               15:06:08

11   leadership, and operations law.  And international and        15:06:13

12   operations law, part of that is being able to deploy,         15:06:16

13   deploy down range, and that includes having to have a         15:06:19

14   firearm.  And domestic violence and the impact of            15:06:23

15   domestic violence on readiness is something that was an       15:06:27

16   issue throughout my career, particularly the last half        15:06:32

17   of my career.                                                 15:06:35

18          Even on the point where we would discuss from the      15:06:37

19   recruiting level, and this actually relates to a non-JAG      15:06:40

20   role with the developing airspace leaders program.  Are       15:06:43

21   we attracting and retaining the right kind of talent?         15:06:48

22   No offense to our sister services, but the academic          15:06:53

23   scores in the Air Force are higher.  As a matter of          15:06:57

24   fact, of the other service records, the data backs that      15:06:59

25   up.  So their military aptitude batteries come back at a     15:07:02



1   higher level.  And the question is, do we -- there was a    15:07:07

2   question during a manpower downfall, do we lower            15:07:10

3   standards to attract people, yet have to deal with          15:07:14

4   waivers for moral concerns or firearm possession.  So it    15:07:19

5   has come up in the course of my career in several           15:07:23

6   different ways.  That's why I would have a familiarity      15:07:27

7   with a the Lautenberg Amendment, as well as the Brady       15:07:30

8   Gun Control Act.                                            15:07:36

9       Q.  Is it fair to say that you are now quite familiar   15:07:36

10  with the Brady Act and Lautenberg Amendment?                15:07:42

11      A.  Much more familiar than I was before I was          15:07:46

12  retained to advise on this case.                            15:07:49

13      Q.  How did you become -- how did you improve your      15:07:51

14  familiarity with these laws?                                15:07:55

15      A.  I read -- I read through the reports.  I mean,       15:07:59

16  there's -- so every one of the DoD IG reports, I'm          15:08:02

17  almost positive, give you the legislative history.  So      15:08:06

18  it is just another layer, as you go through them, as to     15:08:10

19  what's happening.  And my radar is now attuned to the       15:08:15

20  issues.  So I haven't researched it on purpose, but I       15:08:18

21  think there was like a NICS Improvement Act or something    15:08:21

22  like that, either '18, '19 or '20.  So now I've kind of     15:08:25

23  got my radar.  The spidey sense tingles when I hear         15:08:29

24  things like "NICS" or "background checks," so -- but to     15:08:34

25  answer your question, again, reading the depositions and    15:08:38



COLONEL LARRY YOUNGNER                    February 17, 2021
JOE HOLCOMBE vs UNITED STATES                             144

1  the discovery, you read through Ms. Del Greco's                15:08:43

2  deposition and you read the she had a PowerPoint exhibit        15:08:47

3  of 40-something slides that breaks down everything that        15:08:50

4  happens.  Then there is the ATF agents who talk about          15:08:54

5  what they do.  Anyway, so I would say just in doing my         15:08:57

6  due diligence to read all this material and provide an         15:09:06

7  opinion, is how I most become informed.                        15:09:09

8      Q.  And you just mentioned Kim Del Greco and her NICS       15:09:12

9  PowerPoint.  Prior to being retained in this case, how         15:09:17

10  familiar were you with the National Instant Criminal          15:09:20

11  Background Check System, which for some reason is             15:09:26

12  abbreviated as NICS?                                          15:09:29

13     A.  I have purchased weapons and filled out a 4473         15:09:32

14  from an FFL.  And so as a result, I'm completely              15:09:36

15  familiar, having done it on those forms.  So that's my        15:09:42

16  familiarity.  I own an AR.  I own a 0.45 caliber pistol.      15:09:49

17  I own a shotgun.  My wife has a 0.50 caliber Beowulf.         15:09:56

18  We are responsible gun owners.  We lock them and trigger      15:10:04

19  lock them.  And anyway, that's enough about that.            15:10:10

20     Q.  So other than your experience with NICS when           15:10:12

21  buying firearms yourself, is all of your familiarity         15:10:18

22  with the NICS system based on the documents and              15:10:21

23  testimony that were provided to you in this case?            15:10:24

24     A.  That and my experience, that's correct, just my        15:10:27

25  personal weapon purchasing experience.                       15:10:31



| | | |
|---|---|---|
| 1 | was another state, and we coordinated it with their | 15:14:30 |
| 2 | local law enforcement to then forward that to the FBI, | 15:14:33 |
| 3 | to make sure they corrected his data so that he would no | 15:14:36 |
| 4 | longer be listed as a disqualified person.  And that | 15:14:40 |
| 5 | case is Williams, Shelby Williams, if you want to know | 15:14:45 |
| 6 | who it was.  It is one of the listed cases.  It's been | 15:14:50 |
| 7 | since I retired. | 15:14:54 |
| 8 | Q.  How familiar are you with gun control laws in | 15:14:55 |
| 9 | Texas? | 15:15:00 |
| 10 | A.  Only with what I've read about in this case; so I | 15:15:00 |
| 11 | would not -- I would not say I am -- I'm not Barred in | 15:15:07 |
| 12 | Texas and I would not offer opinions on Texas law, | 15:15:15 |
| 13 | though if we wanted to talk about on Texas firearm law, | 15:15:17 |
| 14 | let me put it that way, I am very comfortable assessing | 15:15:23 |
| 15 | constructs such as tort law foreseeability and so forth | 15:15:27 |
| 16 | as defined by a judge, but not substituting a legal | 15:15:30 |
| 17 | opinion for a judge's opinion; I would not dare to do | 15:15:35 |
| 18 | that. | 15:15:39 |
| 19 | That was a long way of saying I am not a Texas | 15:15:39 |
| 20 | lawyer and I only have familiarity with Texas gun law | 15:15:47 |
| 21 | that has been presented to me on this case. | 15:15:57 |
| 22 | Q.  Do you know if Texas has any gun control laws | 15:15:59 |
| 23 | that goes beyond what the federal law requires? | 15:16:02 |
| 24 | A.  My -- in answering your question, I'm not sure | 15:16:11 |
| 25 | what "go beyond" -- let me tell you what I am aware of, | 15:16:22 |



| | | |
|---|---|---|
| 1 | A.  Let me get my notes.  Page 78.  Okay. | 16:24:30 |
| 2 | Q.  Here you say, "As a result of the multiple Air | 16:24:38 |
| 3 | Force failures to report CHD, the Air Force conditioned | 16:24:42 |
| 4 | Kelley to expect to be able to purchase the high | 16:24:45 |
| 5 | quality, new reliable firearms directly from an FFL | 16:24:48 |
| 6 | dealer."  Did I read that directly? | 16:24:52 |
| 7 | A.  You did. | 16:24:55 |
| 8 | Q.  We spent a lot of time on this subject before. | 16:24:55 |
| 9 | So is your definition of conditioning here the same as | 16:24:59 |
| 10 | it was in your previous report? | 16:24:59 |
| 11 | A.  It is.  And I also, as previously discussed in | 16:25:09 |
| 12 | the other report, defer to a definition of the 4473, I | 16:25:11 |
| 13 | think Line 11 Bravo on the form as to whether the | 16:25:16 |
| 14 | information indictment, did he lie on those first two | 16:25:22 |
| 15 | forms or not?  I know that Texas Ranger testified, I got | 16:25:26 |
| 16 | that snippet in there.  But the qualification I gave | 16:25:29 |
| 17 | prior to this about the distinction between a deferral | 16:25:41 |
| 18 | versus a denial comes into play.  But my definition | 16:25:45 |
| 19 | still remains the same as far as conditioning. | 16:25:49 |
| 20 | Q.  And your understanding of what conditioning | 16:25:51 |
| 21 | means, in your basis for determining that he was | 16:25:56 |
| 22 | conditioned, that's the same as we discussed previously; | 16:26:00 |
| 23 | correct? | 16:26:03 |
| 24 | A.  To be clear, it is the same and I included my | 16:26:06 |
| 25 | assessment of the opinions provided by Dr. Bursztajn and | 16:26:09 |



1   Dr. Webster to help build my knowledge in expressing          16:26:16

2   that opinion.                                                 16:26:20

3       Q.  But in essence, it's -- the basis for your            16:26:21

4   opinion is your common sense experience, your common          16:26:25

5   sense knowledge of conditioning, combined with your           16:26:32

6   knowledge of the facts and laws and regulations of this       16:26:35

7   case?                                                         16:26:41

8       A.  I think that's fair, yes.                             16:26:42

9       Q.  So let's turn to Page 27.  We are on Page 27.         16:26:43

10  I'm sorry.  Let's turn to Page 27 of the report.  We are      16:26:58

11  Bates 27.  Paragraph 81, and here you state, "With the        16:27:03

12  evidence also pointing to Devin Kelley's strong               16:27:11

13  preference for only his guns and new guns, more likely        16:27:15

14  and common sense outcomes are indicated."                     16:27:18

15      A.  Yes.                                                  16:27:21

16      Q.  What do you mean by "common sense outcomes"?          16:27:22

17      A.  To be clear, the fact finder on a case is going       16:27:22

18  to look at -- I'm not trying to be cute here.  I want to      16:27:44

19  explain this answer in fairness to all the parties.  I        16:27:46

20  read Judge Rodriguez's opinion about the boundaries of        16:27:49

21  expert testimony as it related to Dr. Webster.  And I         16:27:54

22  came back to this and thought, okay.  Let's think about       16:27:59

23  what your basis of opinions are.  And to me, it is both       16:28:02

24  based on my professional experience as a military             16:28:10

25  officer and as a judge advocate.  But also, if he agrees      16:28:14



```
 1   with my -- my interpretation of these facts and what the    16:28:21
 2   consequences are, then I think it's a common sense          16:28:26
 3   outcome.  In other words, just common sense would           16:28:29
 4   dictate that somebody who is continually -- so it's a --    16:28:33
 5   you said before, counterfactuals abound.  And you can       16:28:37
 6   look at this, whether it's a counterfactual or a fact,      16:28:41
 7   what are the facts of this case?  We have, I assess, an     16:28:48
 8   expressed opinion, strong opinion by Devin Kelley, by       16:28:52
 9   those who knew him, for new guns and guns he could          16:28:57
10   procure from an FFL dealer.  So therefore it's more         16:29:01
11   likely than not, and common sense interpretation of         16:29:05
12   those facts and the laws that operate, that he would        16:29:09
13   have been denied a point of sale inquiry on his last        16:29:13
14   four weapons.  He would have been delayed on the first      16:29:19
15   two, because of his history.  It would make sense for       16:29:22
16   him to be investigated by ATF.  ATF, I think in previous    16:29:22
17   testimony, reports a heightened awareness for weaponry      16:29:39
18   possession on domestic violence cases.  If this was just    16:29:42
19   a bad check by that went to get a gun like your             16:29:44
20   hypothetical before, all that ATF could investigate --      16:29:49
21   when I read that GAO report, it was investigated at         16:29:53
22   state level and ATF level.  I am highly confident that      16:29:57
23   they would have gone to knock on his door because of his    16:30:01
24   domestic violence history.  Common sense would dictate      16:30:04
25   that.  And the facts of what ATF has already testified      16:30:08
```



1    to and others have testified to in the studies that          16:30:12

2    we're relying on.  I mean, I don't know if you want me        16:30:14

3    to go through each of these, but...                           16:30:18

4       Q.  I'll -- I'm sorry.  I didn't mean to interrupt         16:30:20

5    you.  Let me ask you question about each of them.  That       16:30:24

6    will just make the record mere clear.                         16:30:27

7           So I think you just stated your basis for             16:30:37

8    believing that he would be investigated by ATF.  I took       16:30:37

9    this down but you have the report in front of you.            16:30:39

10      A.  Yes, ma'am.                                            16:30:41

11      Q.  So the next question, the next opinion is he           16:30:41

12   would have been prosecuted for federal and/or state           16:30:48

13   firearms related violations after attempting to purchase      16:30:51

14   firearms, including falsifying the 4473.  What is the         16:30:55

15   basis for your belief that Kelley would have been             16:31:05

16   prosecuted?                                                   16:31:07

17      A.  The fact that Texas -- well, there are several         16:31:08

18   bases.  One, had he been entered -- had his criminal          16:31:14

19   history data been entered into NICS, not just once, but       16:31:19

20   each time, you would have two final disposition reports       16:31:23

21   and four sets of fingerprint cards, or at least one from      16:31:25

22   OSI and one from security forces on the fingerprint           16:31:30

23   cards.  And you would have two FDRs.  So you definitely       16:31:34

24   have data at NICS that if FBI would have, showing the         16:31:37

25   final disposition of his case for domestic violence and       16:31:41



1    Q.  But assuming that he had been denied and somehow        16:38:45

2  had a firearm anyway, perhaps from a friend or                16:38:51

3  something, do you -- do you have any reason think that        16:38:55

4  Kelley would have told law enforcement that he had a gun      16:38:58

5  on him?                                                       16:39:03

6    A.  I don't have any reason to think that he would or       16:39:04

7  wouldn't.  I -- in looking at his conduct, he seems a         16:39:06

8  little cocky.  He seems a little bold, the way he talks.      16:39:10

9  I wouldn't put it past Devin Kelley to be dumb enough to      16:39:15

10  know he's been denied and still tell a cop, hey, I'm         16:39:20

11  packing a gun.  I think it is consistent for him to brag     16:39:24

12  about it.  And because he is, pardon my expression, a        16:39:30

13  bad ass.                                                     16:39:33

14    Q.  Have you ever worked --                               16:39:33

15    A.  With this gang, anyway.                               16:39:35

16    Q.  Have you ever worked with ATF?                        16:39:39

17    A.  No.  I have not worked -- I'm trying to think of      16:39:47

18  when I have attended training and education with ATF         16:39:49

19  agents, but I have not worked with ATF.  No.  I have         16:39:53

20  not.                                                        16:39:57

21    Q.  So now I'm looking at subparagraph -- let's -- we     16:39:57

22  can kind of take them, I think in chunks here.  The --      16:40:05

23  so let's start with Subparagraphs E, F and I, and that      16:40:12

24  he would not have bought at a gun show, would not have      16:40:19

25  bought online, would not have manufactured a firearm or     16:40:23



1    ghost gun.  I want to clarify something.  When you are        16:40:31

2    coming to these conclusions, do these build on each           16:40:34

3    other?  Are you saying here that if he had been denied        16:40:37

4    and investigated and prosecuted, he would not have            16:40:42

5    bought at a gun show?                                         16:40:45

6        A.  That's a good question.  Actually, I think these     16:40:46

7    are serial, not building, if you will.  I hate to say         16:40:50

8    like a spiral development, but any one of these -- if         16:40:55

9    you had just reported him once with the fingerprints,         16:40:59

10   that could have been enough to get him entered.  If you       16:41:02

11   had just denied him once, it could have been enough.  It      16:41:06

12   certainly aggravates it that it happened all these other      16:41:11

13   times to condition him even more.  So since we have           16:41:16

14   entertained counterfactuals about the case, I would just      16:41:20

15   tell you, it is my opinion that he wouldn't have done         16:41:23

16   one then the other.  I think he's demonstrated a very         16:41:29

17   strong preference for weapons from an FFL dealer.  So I       16:41:32

18   don't think if -- and I guess the best example for this       16:41:36

19   for me is, he tried to get one from Dick's.  When that        16:41:40

20   didn't work, he went to Academy.  So he didn't turn to a      16:41:43

21   gun show.  He didn't turn to -- he went to them, but he       16:41:49

22   never bought one.  So the facts are he didn't buy a gun       16:41:53

23   ever at a gun show.  The facts are he never bought a          16:41:57

24   firearm online.  And he, I guess we have to explore this      16:42:00

25   shotgun and how he arranged to get that.  But I don't         16:42:06



```
 1   know anybody has really narrowed that down.  He didn't    16:42:10

 2   ask anybody to loan him -- I'm sorry.  You want to talk    16:42:14

 3   to the ones you have.                                      16:42:16

 4       He didn't research how to build a ghost gun nor        16:42:18

 5   talk about a ghost gun, but he did talk about how great    16:42:22

 6   this AR is, and Dad, you need to get one, too.  So he      16:42:26

 7   was very expressive about high quality weapons.            16:42:30

 8   According to Danielle Smith, he studied the weights of     16:42:37

 9   the weapons, the rounds, the loads, the specs or           16:42:40

10   specifications.  And so he seemed to be a bit of a high    16:42:44

11   quality firearm aficionado.  That was his thing.           16:42:48

12       Why he didn't turn to these others, it doesn't --      16:42:56

13   what he did in fact did or didn't research.  He didn't     16:43:00

14   research ghost guns.  He didn't try to followup to try     16:43:04

15   to get these things.                                       16:43:07

16       Q.  So your basis for those three statements, E, F     16:43:08

17   and I, are that that's consistent with the behavior that   16:43:13

18   he, in fact, showed.  He never did buy at a gun show, he   16:43:19

19   never did buy -- well, unclear about online.  And he       16:43:23

20   never manufactured a ghost gun.  Is that fair?             16:43:26

21       A.  Not completely.  It is consistent with his         16:43:30

22   behavior.  That's fair.  But it is also consistent with    16:43:33

23   the testimony of other deponents.  And it's consistent     16:43:36

24   with the facts of what he actually did do in purchasing    16:43:43

25   FFL dealer weapons.                                        16:43:47
```



| | | |
|---|---|---|
| 1 | Q.  Okay.  And now the Subparagraphs G and H, and I | 16:43:48 |
| 2 | separated those out because they both require the | 16:43:56 |
| 3 | actions of someone else to have been involved.  He would | 16:44:01 |
| 4 | not have successfully borrowed a firearm.  He would not | 16:44:04 |
| 5 | have obtained a firearm by proxy.  What is your basis | 16:44:07 |
| 6 | for saying those? | 16:44:09 |
| 7 | A.  The basis for saying those are that his desire | 16:44:11 |
| 8 | for, as evidenced by his conduct, the FFL dealer | 16:44:17 |
| 9 | procured weapon; the fact that he liked having his own | 16:44:23 |
| 10 | weapon.  As your expert Mr. Barborini talked about, he | 16:44:27 |
| 11 | liked to modify it.  He added on a lot of things to the | 16:44:32 |
| 12 | AR, in particular, to custom kit it out, if you will, to | 16:44:36 |
| 13 | his particular aficionado specifications.  He never, in | 16:44:40 |
| 14 | fact, did borrow from his father.  He -- others had | 16:44:46 |
| 15 | testified they wouldn't have loaned him one.  He may | 16:44:51 |
| 16 | have tried, but there is no evidence in the record that | 16:44:55 |
| 17 | I reviewed of him ever trying to borrow a weapon.  And | 16:44:57 |
| 18 | in fact, he didn't have to because he was able to | 16:45:02 |
| 19 | purchase high quality firearms from FFLs, even though he | 16:45:04 |
| 20 | should have been disqual ified.  Those altogether form | 16:45:09 |
| 21 | the basis of -- other deponents' testimony, it's his | 16:45:12 |
| 22 | actual conduct in fact. | 16:45:16 |
| 23 | And again, I build in the counterfactual.  It's a | 16:45:18 |
| 24 | more likely outcome that had the criminal history data | 16:45:26 |
| 25 | been submitted, this wouldn't -- he wouldn't have | 16:45:31 |



1   pursued these.  He didn't like anything but FFL procured          16:45:35
2   weapons.                                                          16:45:39
3       Q.   To be clear, all of your conclusions here are            16:45:40
4   based on your review of the depositions and documents             16:45:44
5   that have been produced in this case?                             16:45:49
6       A.   And to include the experts' opinions as well on          16:45:51
7   both sides.                                                       16:45:55
8       Q.   Are you aware of any research or literature              16:45:56
9   regarding where mass shooters obtain their weapons?               16:46:31
10      A.   Immediately, I'm trying to remember if Barborini         16:46:38
11  talked about that.  All I know is that on the facts of            16:46:45
12  this research, the experts may have had something to say          16:46:49
13  about that.  I just know the facts of this case is Devin          16:46:53
14  Kelley, as a mass shooter, obtained his from FFL dealers          16:46:58
15  after the Air Force failed to submit his criminal                 16:47:02
16  history data.                                                     16:47:06
17      Q.   Are you aware of any research that examines where        16:47:07
18  people in Texas, in general, obtain their weapons?                16:47:10
19      A.   I remember reading somewhere in a deposition             16:47:15
20  that, words to the effect of, "this is Texas and                  16:47:18
21  everybody has guns."  I think that the -- so research, I          16:47:21
22  it may have been Barborini again who talked about the             16:47:30
23  common availability of firearms.  But the relevance is            16:47:35
24  back to, it's an interesting question for both parties,           16:47:38
25  what do we know about this particular shooter and Devin           16:47:42



| | | |
|---|---|---|
| 1 | own?  I know you mentioned this before. | 17:02:17 |
| 2 | A.  I qualified -- so when I was in the Army, I fired | 17:02:20 |
| 3 | all the basic weapon systems at Fort Bragg over a | 17:02:24 |
| 4 | six-week period from the M1 A1, Abrams tank, down to the | 17:02:30 |
| 5 | 45 caliber pistol, the law, the 105 millimeter Alistair, | 17:02:33 |
| 6 | so forth.  I qualified with grenades.  I qualified | 17:02:39 |
| 7 | expert M16 at that time before I deployed to Iraq.  I | 17:02:43 |
| 8 | qualified expert on the M4, the updated version with the | 17:02:46 |
| 9 | collapsable stock.  So I'm actually recognized -- should | 17:02:51 |
| 10 | be on DD form 214, my expert weapon qualification on the | 17:02:55 |
| 11 | M4, the M16, and then I also qualified expert with the | 17:03:01 |
| 12 | 38 pistol at one point in my career.  I have | 17:03:05 |
| 13 | familiarization fired the M60, several other weapons. | 17:03:09 |
| 14 | So I am not going to call myself a weapons expert, but I | 17:03:16 |
| 15 | have qualified as an expert soldier and airman using | 17:03:21 |
| 16 | some of the basic weapons, including one variant of what | 17:03:26 |
| 17 | was used in this case. | 17:03:29 |
| 18 | Q.  Do you have any expertise in firearm sales or | 17:03:31 |
| 19 | trafficking? | 17:03:36 |
| 20 | A.  No.  I do not.  I just have experience from | 17:03:36 |
| 21 | having purchased a weapon and filled out the ATF forms. | 17:03:42 |
| 22 | Q.  Do you have expertise in firearm safety? | 17:03:47 |
| 23 | A.  Yes, I do.  I was a range safety officer for | 17:03:50 |
| 24 | several years at Fort Detrick, Maryland.  I was a range | 17:03:55 |
| 25 | safety officer at Andrews Air Force Base.  I would run | 17:03:59 |



```
 1   is he appears to be a very well qualified expert, as      17:30:21
 2   does Dr. Webster.                                         17:30:25
 3      Q.  Do you have any expertise in forensic psychiatry?  17:30:27
 4      A.  I have -- my only expertise in forensic            17:30:32
 5   psychiatry has been in the course of my duties as trial   17:30:37
 6   counsel or defense counsel.  I do have extensive          17:30:41
 7   experience working with forensic psychiatrists and        17:30:44
 8   psychologists.  I have attended some forensic training    17:30:47
 9   in that regard, but as a military counsel, defense or     17:30:50
10   trial.  So I am not a -- I have no specialized training   17:30:54
11   or experience in forensic psychology.  All that relates   17:30:59
12   to the criminal, basically to the litigation process in   17:31:03
13   direct examining, cross-examining scientific experts and  17:31:10
14   so forth.                                                 17:31:14
15      Q.  And you dispute in these -- in Paragraph 91, Dr.   17:31:15
16   Bursztajn's conclusion that it was not foreseeable to     17:31:23
17   the Air Force that Kelley would commit a crime of mass    17:31:25
18   violence such as the shooting on November 5th; is that    17:31:29
19   correct?                                                  17:31:29
20      A.  That's -- I do because it's in my wheelhouse to    17:31:32
21   discuss the legal terms of foreseeability.  And as I      17:31:35
22   understand the Texas law and frankly, I form that         17:31:41
23   opinion based on my knowledge, experience and             17:31:45
24   understanding of Texas tort law and the Federal Tort      17:31:47
25   Claims Act, but particularly in this case you have to     17:31:54
```



1  apply Texas law to the case at bar.                17:31:56

2     Q.  Do you -- setting aside the foreseeability   17:31:59

3  conclusion, do you dispute any of Dr. Bursztajn's   17:32:04

4  opinions about Kelley's mental health?              17:32:08

5     A.  I assess that Dr. Webster has a better reasoned  17:32:12

6  assessment of the facts in this case, compared to Dr.  17:32:20

7  Bursztajn.  But I would have to have you point to me a  17:32:25

8  specific opinion and we can talk about it.  I'm not   17:32:28

9  ready to make an assertion one way or the other.    17:32:33

10    Q.  But in your rebuttal report, you did not     17:32:36

11  specifically point out any disputes that you had with  17:32:40

12  Dr. Bursztajn's conclusions about Kelley's mental    17:32:48

13  health?                                             17:32:50

14        MR. ALSAFFAR:  Objection, form.               17:32:53

15    A.  The -- I guess to the extent that I stand by my  17:32:53

16  report, it was on the issues that I was writing about.  17:33:14

17  So the knowledge of Devin Kelley's previous violent  17:33:17

18  conduct, asking the appropriate questions, which is   17:33:22

19  whether it's paragraph, subparagraph 91C, so I do take  17:33:29

20  issue with -- I guess what I'm saying, these feed into  17:33:34

21  each other.  And his mental -- Devin Kelley's mental   17:33:38

22  health is -- evidence of his mental health is a fact for  17:33:42

23  the finder of fact to assess.  And I would -- there was  17:33:49

24  nothing raised in Bursztajn's report -- how can I put   17:34:00

25  this?  I guess my rebuttal report identified the areas  17:34:08



| | | |
|---|---|---|
| 1 | where I disagree with it.  And silence is not | 17:34:14 |
| 2 | acceptance.  So the fact that I may have not commented | 17:34:18 |
| 3 | on an aspect of his report, doesn't mean I agree or | 17:34:21 |
| 4 | disagree.  It just means I didn't form an opinion on it | 17:34:24 |
| 5 | and I have no opinion to form on that, if I was silent | 17:34:28 |
| 6 | on it. | 17:34:32 |
| 7 | Q.  Okay.  So in Paragraph C here, I'll put this up. | 17:34:32 |
| 8 | Subparagraph C of Paragraph 91, which was on Page 30. | 17:34:53 |
| 9 | A.  Yes, ma'am. | 17:34:57 |
| 10 | Q.  In Subparagraph 1 here, you again are stating -- | 17:34:57 |
| 11 | we have spent a lot of time on this.  I don't intent to | 17:35:04 |
| 12 | go into a lot of detail.  You state, "The pattern over | 17:35:07 |
| 13 | time of becoming aware of the ability to acquire | 17:35:13 |
| 14 | firearms from FFL certainty conditioned Devin Kelley | 17:35:15 |
| 15 | that the acquisition of firearms at FFLs was a path that | 17:35:20 |
| 16 | was available to him."  Did I read that correctly? | 17:35:24 |
| 17 | A.  Yes, ma'am, you did. | 17:35:26 |
| 18 | Q.  And this is based on the same -- your basis for | 17:35:27 |
| 19 | saying this is the same as your basis for stating your | 17:35:33 |
| 20 | opinion regarding Kelley's conditioning in other | 17:35:37 |
| 21 | sections of the report? | 17:35:41 |
| 22 | A.  It is, as previously stated, and as previously | 17:35:42 |
| 23 | clarified on that distinction on the deferral versus | 17:35:45 |
| 24 | denial on the first two purchases.  I still think that a | 17:35:51 |
| 25 | deferral would have had a deterrent impact, but I am | 17:35:57 |



1    hoping to being corrected with the definition of          17:36:00

2    information or an indictment on the form.                 17:36:03

3        Q.  You state that, the next sentence here,           17:36:08

4    "cumulative awareness increased each additional purchase  17:36:14

5    and fostered a chain of events that created a sense of    17:36:20

6    confidence in his ability to acquire any gun he           17:36:24

7    desired."  It continues.  That's not the end of the       17:36:29

8    sentence.  I want to ask you, is there evidence to show   17:36:33

9    that Kelley had an increased sense of confidence in his   17:36:36

10   ability to acquire firearms at FFLs?                      17:36:40

11       A.  That's a conclusion I drew based on Danielle      17:36:43

12   Smith's discussing his use of weapons and how his, lack   17:36:50

13   of a better word, hobby of weapon use was, the primary    17:36:55

14   source of that is Danielle Smith's deposition.  To some   17:37:02

15   extent, there was some additional supporting deposition   17:37:09

16   testimony from his parents, but it's a conclusion that I  17:37:14

17   drew from her testimony and the facts of his continued    17:37:20

18   purchasing, and the fact that -- it's also based on Mr.   17:37:26

19   Barborini's assessment of the modifications he was        17:37:30

20   making and his desire for high quality firearms, I think  17:37:33

21   that was expressed by Mr. Barborini as well.  I guess     17:37:41

22   the fact if you looked at the type of the guns he is      17:37:48

23   progressively purchasing, but those were my thoughts.     17:37:51

24       Q.  Then in Subparagraph 2 at the bottom of the page  17:37:54

25   and going onto the next page, you state, "Following the   17:37:59



COLONEL LARRY YOUNGNER                    February 17, 2021
JOE HOLCOMBE vs UNITED STATES                           213

| | | |
|---|---|---|
| 1 | and the effect of those laws? | 17:45:13 |
| 2 | MR. ALSAFFAR:  Same objection, calls for | 17:45:16 |
| 3 | speculation on another individual. | 17:45:18 |
| 4 | A.  Again, it's not my place to assess that, though | 17:45:20 |
| 5 | he does seem to be highly qualified with both his juris | 17:45:23 |
| 6 | doctorate and his PhD.  I just took issue with how he | 17:45:30 |
| 7 | framed the issues as stated in my report. | 17:45:34 |
| 8 | BY MS. KRIEGER: | 17:45:34 |
| 9 | Q.  Do you have any particular expertise in the laws | 17:45:37 |
| 10 | related to firearm sales or the effects of those laws? | 17:45:39 |
| 11 | A.  I would say I do now.  So I would say that I have | 17:45:43 |
| 12 | learned quite a bit in preparing for this case, about | 17:45:56 |
| 13 | the National Instant Criminal Background Check System, | 17:46:01 |
| 14 | the Gun Control Act, the Brady Gun Control Act, the | 17:46:09 |
| 15 | Lautenberg Amendment.  And so certainly this experience | 17:46:14 |
| 16 | has enhanced my knowledge. | 17:46:20 |
| 17 | Q.  That's fair.  Outside of your -- outside of the | 17:46:24 |
| 18 | research and documents that you have reviewed for this | 17:46:30 |
| 19 | case, do you have any other expertise in laws related to | 17:46:34 |
| 20 | firearm sales and the effect of those laws? | 17:46:39 |
| 21 | A.  Firearm sales and the effect of those laws, I | 17:46:42 |
| 22 | would say only the research that I have conducted since | 17:46:47 |
| 23 | being retained in September of 2019, so however many | 17:46:53 |
| 24 | months that is, a year and several months worth of | 17:46:59 |
| 25 | experience. | 17:47:03 |



| | | |
|---|---|---|
| 1 | (Recess from 5:50 p.m. to 5:51 p.m.) | 17:50:45 |
| 2 | THE VIDEOGRAPHER:  We are back on the record. | 17:52:06 |
| 3 | The time is 5:51. | 17:52:07 |
| 4 | BY MS. KRIEGER: | 17:52:12 |
| 5 | Q.  Colonel Youngner, do you have any reason to | 17:52:12 |
| 6 | dispute that Dr. Fox is an expert in criminology and | 17:52:16 |
| 7 | specifically in mass shootings? | 17:52:19 |
| 8 | MR. ALSAFFAR:  Same objection, calls for | 17:52:22 |
| 9 | speculation. | 17:52:23 |
| 10 | A.  Again, I'm speculating what his qualifications | 17:52:28 |
| 11 | are.  I read his record.  He seems to be a very educated | 17:52:31 |
| 12 | man on those subjects, and I would not be surprised if | 17:52:35 |
| 13 | the judge did determine he was qualified as an expert. | 17:52:39 |
| 14 | BY MS. KRIEGER: | 17:52:41 |
| 15 | Q.  Do you have any expertise in criminology, other | 17:52:41 |
| 16 | than your experience as a prosecutor? | 17:52:55 |
| 17 | A.  Three years of law school, and LLM and 35 years | 17:52:56 |
| 18 | of legal experience; I mean, so other than those | 17:53:00 |
| 19 | experiences stated in my CV, no.  But what's the | 17:53:08 |
| 20 | distinction between being a criminal prosecutor and | 17:53:12 |
| 21 | criminal defense counsel, and criminology?  I have taken | 17:53:16 |
| 22 | courses in juris prudence and the philosophy of law and | 17:53:20 |
| 23 | reasons why we prosecute and punish.  So I -- | 17:53:24 |
| 24 | Q.  Well, let me -- sorry.  Go ahead. | 17:53:28 |
| 25 | A.  So I mean, I don't have a PhD in Criminology, but | 17:53:30 |



1    I have a juris doctorate and LLM in aspects -- actually,    17:53:34

2    my LLM is in military law which includes military    17:53:38

3    justice.  So I let that record speak for itself.  So I    17:53:43

4    do have those qualifications.  And I would leave it to    17:53:46

5    the court to determine whether those are appropriate in    17:53:49

6    the field of criminology as well as criminal law.  I    17:53:52

7    would say I am an expert in criminal law.    17:53:55

8       Q.  Do you have any -- have you done any research    17:54:01

9    regarding the statistics of crimes?    17:54:03

10      A.  I have not conducted research.  I have read the    17:54:10

11   reports of obviously the experts in this case.  And so I    17:54:14

12   would say I'm not a research scientist, if you will, or    17:54:19

13   -- I guess would you even call this a science?  I'm not    17:54:26

14   a research statistician.    17:54:40

15      Q.  Do you have any -- other than the work that you    17:54:42

16   have done for this case, do you have any expertise in    17:54:48

17   mass shootings?    17:54:48

18         MR. ALSAFFAR:  Objection, form.  Sorry.  What is    17:54:55

19      that?  I'm not sure that is an expertise that exists.    17:55:01

20      A.  I've represented someone --    17:55:04

21         MR. ALSAFFAR:  You might need to define that a    17:55:07

22      little more.    17:55:09

23      A.  I mean, sure.  I will tell you, I have the    17:55:09

24   experience representing someone accused of negligent    17:55:13

25   homicide, the deal of 16 people.  Two Black Hawk    17:55:18



| | | |
|---|---|---|
| 1 | helicopters were shot down.  It was a different kind of | 17:55:23 |
| 2 | mass shooting.  It was a mistake by two fighter pilots | 17:55:24 |
| 3 | who shot down the wrong aircraft.  But it was a mass | 17:55:28 |
| 4 | murder and they were charged with negligent homicide. | 17:55:32 |
| 5 | And that case was about two years worth of my life.  So | 17:55:35 |
| 6 | -- but I would not hold myself out to be the same type | 17:55:43 |
| 7 | of expert as Dr. Fox, if that's what you're getting at. | 17:55:46 |
| 8 | I do think I have a criminal law background, criminal | 17:55:51 |
| 9 | law experience, particularly military criminal law | 17:55:55 |
| 10 | experience, and experience advising -- it's already on | 17:55:59 |
| 11 | the record in my CV, but IGs, OSIs, and security forces. | 17:56:02 |
| 12 | And when it comes to looking at the data reported by | 17:56:05 |
| 13 | GAO, by Dr. Fox and others, I can then, based on my | 17:56:16 |
| 14 | experience, form an opinion which I provided in these | 17:56:22 |
| 15 | reports.  It may be contrary to his, but I like to point | 17:56:25 |
| 16 | out that what was missing the gaps, and I think it's | 17:56:28 |
| 17 | appropriate.  I didn't have to be a criminologist to | 17:56:31 |
| 18 | identify the gaps.  I just had to be a good criminal | 17:56:34 |
| 19 | lawyer. | 17:56:37 |
| 20 | Q.  Have you done any research into mass shootings? | 17:56:44 |
| 21 | A.  Only what I read for this case.  I've not done | 17:56:47 |
| 22 | any independent research prior to this case. | 17:56:50 |
| 23 | Q.  And you disagree with Dr. Fox's opinion that it | 17:56:53 |
| 24 | was not foreseeable to the Air Force that Kelley would | 17:56:57 |
| 25 | engage in the type of conduct that caused Plaintiffs' | 17:57:00 |



| | | |
|---|---|---|
| 1 | injuries.  And that's Paragraph NICS; correct? | 17:57:04 |
| 2 | A.  I assess that it was, in fact, foreseeable that | 17:57:07 |
| 3 | Kelley would engage in this act.  And the Air Force | 17:57:20 |
| 4 | should have anticipated the dangers that their failure | 17:57:22 |
| 5 | to submit criminal history data to the FBI had.  And by | 17:57:23 |
| 6 | failing to do so, they increase the risk of harm every | 17:57:28 |
| 7 | time they fail to comply with that requirement. | 17:57:32 |
| 8 | Q.  So in summary, you disagree with Dr. Fox's | 17:57:35 |
| 9 | assessment regarding foreseeability; is that fair? | 17:57:45 |
| 10 | A.  That's fair.  I think he uses the wrong legal | 17:57:47 |
| 11 | standard for it.  I think he should apply the same | 17:57:50 |
| 12 | standards that Judge Rodriguez has. | 17:57:53 |
| 13 | Q.  I think in Paragraphs 102 and 103, you also | 17:57:57 |
| 14 | express your disagreement with Dr. Fox's assessment of | 17:58:02 |
| 15 | the GAO report of September 2018; is that fair? | 17:58:07 |
| 16 | A.  Well, yes, because what it does is he points out | 17:58:14 |
| 17 | there's only a 0.01 percent likelihood of prosecution | 17:58:18 |
| 18 | and it ignores the facts -- so it cherry picks data and | 17:58:21 |
| 19 | says there's only 12 cases.  What a low number.  And it | 17:58:26 |
| 20 | ignores the impact states have.  And just looking at it | 17:58:30 |
| 21 | alone, we see two states out of 50 that had 600 -- doing | 17:58:33 |
| 22 | math in public here, 613 successful prosecutions.  So it | 17:58:39 |
| 23 | discounts the state interest.  And Oregon and | 17:58:45 |
| 24 | Pennsylvania were cited.  It didn't have a number for | 17:58:49 |
| 25 | the convictions other than it was a high number. | 17:58:52 |



| | | |
|---|---|---|
| 1 | priority.  If they have a domestic violence case, they | 18:00:39 |
| 2 | are going to look at it.  So I would, for those reasons, | 18:00:41 |
| 3 | disagree with Dr. Fox.  That's the basis for my | 18:00:44 |
| 4 | disagreement. | 18:00:47 |
| 5 | Q.  So you mentioned the -- Dr. Fox doesn't address | 18:00:48 |
| 6 | the deterrent effect of the approximately 100,000 | 18:00:55 |
| 7 | denials, the deterrent effect of those weapons not being | 18:01:01 |
| 8 | on the street.  Does the GAO report address the | 18:01:06 |
| 9 | deterrent effects of denials? | 18:01:10 |
| 10 | A.  Well, the -- the -- so in context, I don't recall | 18:01:13 |
| 11 | right now that it does, but the point was Dr. Fox | 18:01:18 |
| 12 | dropped a footnote in his report and references GAO | 18:01:23 |
| 13 | report to basically say look, you can have 100,000 | 18:01:27 |
| 14 | weapons taken, only 12 get prosecuted; without saying | 18:01:30 |
| 15 | anything, being silent on the role of states which had a | 18:01:34 |
| 16 | dramatically -- the difference between 12 and 472 in | 18:01:42 |
| 17 | Pennsylvania, 12 nationwide and 141 in Oregon.  And | 18:01:46 |
| 18 | won't speculate as to how many the other 47 or 48 states | 18:01:51 |
| 19 | had.  But that is a substantial -- if I take that | 18:01:55 |
| 20 | average, let's say it's 200 times 50 states, we are now | 18:01:57 |
| 21 | getting into numbers that again, might be low, but if | 18:02:02 |
| 22 | that's -- if any one of those 1,000 are Devin Kelley, | 18:02:06 |
| 23 | then you just prevented a mass murder potentially. | 18:02:11 |
| 24 | So the GAO report, to answer your question, I | 18:02:14 |
| 25 | don't recall whether it got into that analysis.  But | 18:02:17 |



COLONEL LARRY YOUNGNER                    February 17, 2021
JOE HOLCOMBE vs UNITED STATES                        222

1   again, Dr. Fox cherry picked the data to try to bolster          18:02:20

2   his opinion without being honest about the rest of the           18:02:25

3   report.  I shouldn't say honest.  Without being                  18:02:28

4   forthright about the rest of the data that would hurt            18:02:31

5   his opinion; it would certainly make his opinion more            18:02:34

6   questionable and less strong for the Defense.                    18:02:38

7       Q.  Is it your opinion that being denied at an FFL           18:02:40

8   has a deterring effect?                                          18:02:44

9       A.  Yes, it is.                                              18:02:45

10      Q.  What is the basis for that opinion?                      18:02:46

11      A.  First of all, the -- let me just answer.                 18:02:48

12          Go ahead, please.                                        18:02:58

13      Q.  I was just going to restate the question.  Does          18:02:59

14  being denied at an FFL, in and of itself, separate from          18:03:03

15  any investigation or prosecution, have a deterrent               18:03:07

16  effect?  And what is the basis for that opinion?                 18:03:11

17      A.  I assess that it does, based -- I believe Dr.            18:03:14

18  Webster wrote about this in his report.  And secondly,           18:03:16

19  my common sense and knowledge of the ways of the world.          18:03:20

20  You have folks -- third, my basis is that Devin Kelley's         18:03:23

21  comments about not wanting to go back to jail, to avoid          18:03:29

22  police, Devin Kelley appears to be the kind of person            18:03:33

23  who does not want to have ATF knocking on his door, does         18:03:36

24  not want to have a deferral investigated or a denial             18:03:40

25  investigated.  So taking together all of those sources           18:03:45



COLONEL LARRY YOUNGNER                        February 17, 2021
JOE HOLCOMBE vs UNITED STATES                             223

| | | |
|---|---|---|
| 1 | of that information, that forms the basis of my opinion. | 18:03:53 |
| 2 | It is not just speculation or a guess on my part. | 18:03:56 |
| 3 | Q.  And you also refer to -- you say in Paragraph | 18:03:59 |
| 4 | 102, I assess that these investigations had a chilling | 18:04:05 |
| 5 | effect on those who submitted those 12,710 applications | 18:04:10 |
| 6 | to FFL dealers.  That's referring to the 12,710 | 18:04:14 |
| 7 | investigation that were, in fact, done.  What is the | 18:04:19 |
| 8 | basis for your assessment that investigations had a | 18:04:24 |
| 9 | chilling effect on those investigated? | 18:04:28 |
| 10 | A.  Again, the -- I'd have to go back to what I read | 18:04:30 |
| 11 | from Dr. Webster's declaration and report.  And that | 18:04:40 |
| 12 | would be a basis as well as again, my knowledge and | 18:04:47 |
| 13 | experience in dealing with criminals.  It is not -- and | 18:04:51 |
| 14 | with what Devin Kelley said again.  I didn't talk about | 18:04:58 |
| 15 | Devin Kelley in that sentence.  I just talked about | 18:05:05 |
| 16 | those particular applicants.  And I'd have to go back | 18:05:09 |
| 17 | into the GAO report itself, because I believe there was | 18:05:11 |
| 18 | comment. | 18:05:15 |
| 19 | Actually, in addition to that, I want to say that | 18:05:15 |
| 20 | Ms. Del Greco addressed in her -- so this would also be | 18:05:17 |
| 21 | a basis for this.  I don't have hers in front of me, but | 18:05:22 |
| 22 | her deposition talked about the purpose of NICS and how | 18:05:25 |
| 23 | those denials, so there were a couple of -- I keep | 18:05:31 |
| 24 | thinking of Del Greco in particular.  I don't know why | 18:05:38 |
| 25 | closing my eyes helps me think, embarrass myself. | 18:05:42 |



1       I believe Ms. Del Greco commented that the -- she      18:05:46
2   talked about the mission statement of NICS.  And as I      18:05:51
3   take away, the fact that there were denials has -- the     18:05:54
4   implication I had is that denials and even deferrals can   18:05:58
5   have a deterrent impact.  And then there was some other    18:06:02
6   study that talked about domestic violence and future      18:06:13
7   offenses.  So I extrapolated that many GAO reports         18:06:17
8   talked about how many were for domestic violence and how   18:06:20
9   many were for falsified statements.  They broke out        18:06:23
10  categories.  And I think the PowerPoint chart that Del     18:06:26
11  Greco had in one of her PowerPoint charts, a breakout of   18:06:30
12  the categories of basis for either denial or deferral.     18:06:34
13      So all taken together, and on top of that, my          18:06:39
14  common sense and knowledge and experience, would lead me   18:06:44
15  to reach that opinion.  Those are the bases.               18:06:51
16  Q.  Do you cite in your report here that Webster's --      18:06:53
17  Webster's research or his report is the basis for          18:06:59
18  concluding that there is a chilling effect?                18:07:03
19  A.  I cited it as a basis for all of my opinions.  I       18:07:05
20  cited that I had read his report and his declaration.      18:07:09
21  So there's a point in my report where I noted all the      18:07:14
22  documents I read and relied on to form these opinions.     18:07:20
23  It was noted in there as one of the opinions.  I'd have    18:07:23
24  to go open up and look, but I'm highly confident that I    18:07:27
25  cited both his report and his declaration.  And it's in    18:07:31

