# CANDACE MARLOW
# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

JOE HOLCOMBE, ET AL.,          §
      Plaintiffs          §
              §
v.                             §   Civil No. 5:18-cv-555-XR
              §
UNITED STATES OF AMERICA,      §
      Defendant            §

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPED ORAL DEPOSITION OF

CANDACE McKENZIE MARLOWE

JUNE 18, 2020

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    VIDEOTAPED ORAL DEPOSITION OF CANDACE McKENZIE
MARLOWE, produced as a witness at the instance of the
Defendant, and duly sworn, was taken in the above-styled
and numbered cause on the 18th of June, 2020, from
10:05 a.m. to 2:52 p.m., before Glenda I. Green,
Certified Shorthand Reporter in and for the State of
Texas, reported by Computerized Stenotype Machine,
Computer-Assisted Transcription, with myself, the
witness, the videographer, and the witness's attorney
located at the offices of Ken Owen & Associates,
801 West Avenue, Suite 100, Austin, Texas, and all other
counsel present via Zoom, pursuant to Notice; Subpoena;
the Federal Rules of Civil Procedure; the First
Emergency Order regarding the COVID-19 State of
Disaster; and any further stated provisions on the
record.  Counsel also agreed off the record that the
Federal Rule 30(b)(5) statement being read into the
record by the court reporter could be waived.



```
 1              A P P E A R A N C E S

 2

 3  FOR THE PLAINTIFFS:

 4       MR. JOSEPH SCHREIBER (Present Via Zoom)
         SCHREIBER KNOCKAERT, PLLC
 5       701 North Post Oak Road, Suite 325
         Houston, Texas  77024
 6       Office: 281.949.8904
         Fax: 281.949.8914
 7       Email: joe@lawdoneright.net

 8       MS. CHELSIE KING GARZA (Present Via Zoom)
         THE WEBSTER LAW FIRM
 9       6200 Savoy Drive, Suite 150
         Houston, Texas  77036
10       Office: 713.581.3900
         Fax: 713.581.3907
11       Email: cgarza@thewebsterlawfirm.com

12       MR. JUSTIN B. DEMERATH (Present Via Zoom)
         O'HANLON, McCOLLUM & DEMERATH
13       808 West Avenue
         Austin, Texas  78701
14       Office: 512.494.9949
         Fax: 512.494.9919
15       Email: jdemerath@808west.com

16

17  FOR THE DEFENDANT:

18       MR. AUSTIN L. FURMAN (Present Via Zoom)
         MR. DANIEL P. CHUNG (Present Via Zoom)
19       UNITED STATES DEPARTMENT OF JUSTICE
         Torts Branch (FTCA)
20       P.O. Box 888, Ben Franklin Station
         Washington, D.C.  20044
21       Office: 202.616.4272
         Fax: 202.616.5200
22       Email: austin.l.furman@usdoj.gov
                 daniel.p.chung@usdoj.gov
23

24

25
```



```
 1              A P P E A R A N C E S   (Continued)

 2

 3  FOR THE WITNESS:

 4        MR. J. GREGORY MYERS
          MYERS DOYLE
 5        7676 Woodway, Suite 350
          Houston, Texas  77063
 6        Office: 713.278.9215
          Fax: 713.278.9163
 7        Email: gmyers@myersdoyle.com

 8

 9  ALSO PRESENT:

10        MS. LORI STEVENSON, Zoom Moderator

11        MS. TAYLOR WILLIS, Videographer

12

13  REPORTED BY:

14        MS. GLENDA I. GREEN, CSR 2194
          ESQUIRE DEPOSITION SOLUTIONS, Firm No. 003
15        1235 North Loop West, Suite 510
          Houston, TX 77008
16        Office: 832.214.4221
          Email: houstonscheduling@esquiresolutions.com
17

18                    * * * * *

19

20

21

22

23

24

25
```



1                        I N D E X

2                                                        PAGE

3       Appearances............................... 2&3

4  WITNESS:

5       CANDACE McKENZIE MARLOWE

6           Examination by Mr. Furman................   6

7           Examination by Mr. Schreiber............ 147

8       (SIGNATURE WAIVED)

9       REPORTER'S CERTIFICATE..................... 161

10                       * * * * *

11                 E X H I B I T   I N D E X

12    NUMBER            DESCRIPTION          PAGE DESIGNATED

13  Exhibit 1  Subpoena to Produce Documents,       19
                Information, or Objects or to
14              Permit Inspection of Premises in a
                Civil Action; Witness's file
15
    Exhibit 2  12/6/18 Inspector General, U.S.      150
16              Dept. of Defense, Report of
                Investigation into the United States
17              Air Force's Failure to Submit Devin
                Kelley's Criminal History Information
18              to the Federal Bureau of
                Investigation
19
    Exhibit 3  11/7/12 Report of Result of Trial    152
20
    Exhibit 4  3/22/13 Dept. of the Air Force Memo  154
21
                        * * * * *
22

23                    REPORTER'S NOTE:

24    Quotation marks are used for clarity and do not

25        necessarily indicate a direct quote.



| | |
|---|---|
| 1 | MS. WILLIS:  This is the videotaped | 10:05 |
| 2 | deposition of Candace Marlowe, in the matter of | 10:05 |
| 3 | Joe Holcombe, et al., versus the United States of | 10:05 |
| 4 | America, being heard before the United States District | 10:05 |
| 5 | Court for the Western District of Texas, Civil Action | 10:05 |
| 6 | No. 518-cv-555-XR. | 10:05 |
| 7 | This deposition is being held at | 10:05 |
| 8 | Ken Owen & Associates, in Austin, Texas.  Today's date | 10:05 |
| 9 | is June 18th, 2020; and the time on the record is | 10:05 |
| 10 | 10:04 a.m. | 10:05 |
| 11 | My name is Taylor Willis, and I am the | 10:05 |
| 12 | videographer.  The court reporter is Glenda Green. | 10:05 |
| 13 | Counsel, will you please introduce | 10:05 |
| 14 | yourselves and affiliations; and the witness will be | 10:05 |
| 15 | sworn. | 10:05 |
| 16 | MR. FURMAN:  Austin Furman, for the | 10:05 |
| 17 | defendant, United States. | 10:05 |
| 18 | MR. SCHREIBER:  Joseph Schreiber, for the | 10:05 |
| 19 | plaintiffs. | 10:05 |
| 20 | MS. GREEN:  Next? | 10:06 |
| 21 | MR. DEMERATH:  Justin Demerath, for the | 10:06 |
| 22 | plaintiffs. | 10:06 |
| 23 | MS. KING GARZA:  And Garza, for the | 10:06 |
| 24 | plaintiffs. | 10:06 |
| 25 | MR. MYERS:  And I'm Greg Myers.  I'm | 10:06 |



1 presenting the deponent.                                    10:06

2            MS. GREEN:  This deposition is being             10:07

3 conducted remotely in accordance with the First            10:07

4 Emergency Order regarding the COVID-19 State of             10:07

5 Disaster.                                                   10:07

6            My name is Glenda Green, Texas CSR               10:07

7 No. 2194.  I am administering the oath and reporting the    10:07

8 deposition.                                                 10:07

9            Ma'am, I need to swear you in.  Please           10:07

10 raise your right hand.                                     10:07

11            CANDACE McKENZIE MARLOWE,                       10:07

12 having first been duly sworn, testified as follows,        10:07

13 to-wit:                                                    10:07

14            MS. GREEN:  Okay, Counsel.                      10:07

15            MR. FURMAN:  Thank you, ma'am.                  10:07

16                 EXAMINATION                                10:07

17 BY MR. FURMAN:                                             10:07

18     Q.   Good morning, Ms. Marlowe.  Could you state       10:07

19 your full name for the record?                             10:07

20     A.   Candace McKenzie Marlowe.                         10:07

21     Q.   Thank you.                                        10:07

22            And you -- Can you provide me with an           10:07

23 address?  If you don't want to give your home address, a   10:07

24 business address is fine.                                  10:07

25     A.   709 Generations Drive, Suite 410,                10:07



1  as well, but if -- if you need me to zoom in or, umm, if          10:24

2  there's problems with seeing something, please let me             10:24

3  know.                                                             10:24

4          Okay.  And just so you know, there --                    10:24

5  there's a number in the lower right-hand corner, which            10:24

6  is almost all of your last name.  We forgot the "e" at            10:24

7  the end.  I apologize for that.  Umm.  But these are the          10:24

8  documents we received from you, umm, what I believe you           10:24

9  referred to as the "Kelley file," and we've now marked            10:24

10 those with a number, so we can refer to them by that              10:24

11 number, umm, during the deposition today.  So if I say            10:24

12 "Marlowe 1," then I'd be referring to -- to this page.            10:24

13          Umm.  In looking at this first page of                   10:24

14 the document, is this a document you've seen before?              10:24

15    A.   Yes.                                                      10:25

16    Q.   Okay.  Now, I'm just going to scroll to the               10:25

17 remainder of -- of this document.                                 10:25

18          MR. FURMAN:  And for the record, this                    10:25

19 will be Exhibit 1.  We'll be marking the -- the file              10:25

20 provided to us by Ms. Marlowe as Exhibit 1.  So that's            10:25

21 the 47-page document received in response to the                  10:25

22 subpoena.                                                         10:25

23          (Exhibit 1 designated.                                   10:25

24    Q.   (BY MR. FURMAN) There we go.  Is this the                 10:25

25 second page in front of you?                                      10:25



| | | | |
|---|---|---|---|
| 1 | A. | Yes. | 10:25 |
| 2 | Q. | Page 3? | 10:25 |
| 3 | A. | Yes. | 10:25 |
| 4 | Q. | Page 4, the instructions? | 10:25 |
| 5 | A. | Yes. | 10:25 |
| 6 | Q. | And Page 5? | 10:25 |
| 7 | A. | Yes. | 10:26 |
| 8 | Q. | Does all that look familiar to you? | 10:26 |
| 9 | A. | Yes. | 10:26 |
| 10 | Q. | Thank you. | 10:26 |
| 11 | | (Document taken off screen. | 10:26 |
| 12 | Q. | (BY MR. FURMAN) Thanks. | 10:26 |
| 13 | | And what did you do when you received | 10:26 |
| 14 | that document? | | 10:26 |
| 15 | | (Witness made distinctive sound. | 10:26 |
| 16 | A. | Contacted my lawyer [laughed]. | 10:26 |
| 17 | Q. | (BY MR. FURMAN) [Laughed].  And that lawyer, | 10:26 |
| 18 | that's Mr. Myers? | | 10:26 |
| 19 | A. | Yes. | 10:26 |
| 20 | Q. | Thank you. | 10:26 |
| 21 | | And, umm, did you ultimately search for | 10:26 |
| 22 | documents? | | 10:26 |
| 23 | A. | Yes. | 10:26 |
| 24 | Q. | And where did you search for documents? | 10:26 |
| 25 | A. | In my office. | 10:26 |



1      Q.    Okay.  And when you say your office, what do          10:26

2  you mean by that?                                              10:27

3      A.    Umm.  I have an office that I rent in                10:27

4  New Braunfels Counseling Center.                               10:27

5      Q.    Okay.  And that's the office that you searched       10:27

6  for records in response to the subpoena?                       10:27

7      A.    Yes.                                                 10:27

8      Q.    So you keep -- you keep your client files in         10:27

9  that particular office?                                        10:27

10      A.    Yes.                                                10:27

11      Q.    And did you keep any client files for -- for        10:27

12  New Braunfels Counseling clients, do you keep them            10:27

13  elsewhere, any files?                                         10:27

14      A.    No.                                                 10:27

15      Q.    Do you keep any electronic files for your           10:27

16  clients?                                                      10:27

17      A.    No.                                                 10:27

18      Q.    And the document you provided to us, that was       10:27

19  the complete file for -- for Mr. Kelley?                      10:28

20      A.    Yes.                                                10:28

21      Q.    And did you -- or -- Well, did you take any         10:28

22  notes regarding your sessions with Mr. Kelley that were       10:28

23  not in the client file?                                       10:28

24      A.    No.                                                 10:28

25      Q.    And were there any documents for Mr. Kelley         10:28



CANDACE M. MARLOWE                                    June 18, 2020
JOE HOLCOMBE vs UNITED STATES OF AMERICA                        22

```
 1  that, umm, might have been lost or destroyed for -- you    10:28
 2  know, due to lapse of time or otherwise removed from the   10:28
 3  file?                                                       10:28
 4       A.   No.                                               10:28
 5       Q.   All right.  And I appreciate your time in        10:29
 6  assembling those documents as well.                         10:29
 7            At this time I'd like to get a little bit        10:29
 8  into your background.  Umm.                                 10:29
 9            If you could say your, umm -- What's your        10:29
10  highest level of education?                                 10:29
11       A.   I have a master's degree.                         10:29
12       Q.   In what area of study?                            10:29
13       A.   Psychology.                                       10:29
14       Q.   I have a master's in psychology as well.         10:29
15            Umm.  Any other training?                         10:29
16       A.   No.  Just psychology [laughed].                   10:29
17       Q.   [Laughed].  Well, that's a good field of         10:29
18  study, so I can understand that.  Umm.                      10:29
19            And your professional title, that's a           10:29
20  Licensed Professional Counselor?                            10:29
21       A.   Yes.                                              10:29
22       Q.   And what does that mean?                          10:29
23       A.   It means that I'm licensed by the state to      10:29
24  counsel.                                                    10:30
25       Q.   And what did you have to do to obtain that      10:30
```



CANDACE M. MARLOWE                                    June 18, 2020
JOE HOLCOMBE vs UNITED STATES OF AMERICA                        23

1  license?                                                    10:30

2      A.    Umm.   I got my master's degree; and then I did   10:30

3  a certain number of hours supervised by an LPC              10:30

4  supervisor; and then I took a licenser exam.                10:30

5      Q.    And was that a written exam?                      10:30

6      A.    Yes.  No.  It was electronic.  I'm sorry.         10:30

7      Q.    Oh.  I'm behind the times.  I apologize.          10:30

8           Okay.  And do you have any sort of --              10:30

9  I -- I don't know how this works for, umm, Licensed         10:30

10 Professional Counselors, but do you have any, like,         10:30

11 equivalent of like a board certification or                 10:31

12 specialization within counseling?                           10:31

13     A.    No.                                               10:31

14     Q.    And -- And are you required to, umm, meet any     10:31

15 requirements to keep that license?                          10:31

16     A.    Yes.  Every two years you renew your license.     10:31

17 You have to do 24 CEUs, continuing edu -- education         10:31

18 credits.                                                    10:31

19     Q.    Okay.  Anything else?                             10:31

20     A.    No.                                               10:31

21     Q.    Okay.                                             10:31

22     A.    Well, you pay money [laughed].                    10:31

23     Q.    I -- I'm sorry.  I didn't catch that.             10:31

24     A.    I said you -- you pay money for it.  Other        10:31

25 than that --                                                10:31



1      Q.   I -- Of course [laughed].  Of course.  It goes                    10:31

2  for lawyers as well.                                                       10:31

3           Umm.  Are you a member of any                                     10:31

4  professional organizations?                                               10:31

5      A.   No.                                                              10:31

6      Q.   And how long have you been a Licensed                            10:32

7  Professional Counselor?                                                   10:32

8      A.   For six years.                                                   10:32

9      Q.   Six years.  So roughly 2014?                                     10:32

10     A.   Yeah.                                                            10:32

11     Q.   I'm sorry.  What year did you get your                           10:32

12  master's degree?                                                         10:32

13     A.   I graduated December 2011.                                       10:32

14     Q.   And the time period between your master's and,                   10:32

15  umm, getting your license, was that time spent in                        10:32

16  accumulating hours to obtain that license?                               10:32

17     A.   Yeah, as a licensed professional intern,                         10:32

18  you -- yeah, I was supervised, and it takes that long to                 10:32

19  accumulate the hours for it.                                             10:32

20     Q.   Understood.                                                      10:32

21           And, Ms. Marlowe, are you currently                             10:32

22  employed?                                                                10:33

23     A.   Yes.                                                             10:33

24     Q.   Where do you work currently?                                     10:33

25     A.   I have a contract with New Braunfels                             10:33



1  Counseling Center.  It's a private practice.                10:33

2      Q.   Anywhere else?                                     10:33

3      A.   No.                                                10:33

4      Q.   And when you say you have a contract, could        10:33

5  you explain that a little more?                             10:33

6      A.   Umm.  The owner of the business has slots for      10:33

7  contracts, people to come in; and basically you're just    10:33

8  renting a room and you pay her a certain amount of --       10:33

9  amount of money to be there for X amount of years.          10:33

10     Q.   Okay.  And other than renting you the room,        10:33

11 does New Braunfels Counseling provide any other services    10:33

12 for you?                                                    10:33

13     A.   They run the billing and make appointments and     10:33

14 keyed up -- keep up with our insurances.                    10:34

15     Q.   So some of the administrative-type functions?      10:34

16     A.   Yes.                                               10:34

17     Q.   Okay.  Anything else they do?                      10:34

18     A.   No [laughed].                                      10:34

19     Q.   And other than sharing the same office space,      10:34

20 do you have any sort of affiliation or relationship with    10:34

21 the other professionals who work out of that office?        10:34

22     A.   No.                                                10:34

23     Q.   And -- And do you know what kind of services       10:34

24 are provided, New -- New Braunfels Counseling?  Is it       10:34

25 just counseling or do --                                    10:34



```
 1      Q.   That makes sense.                              11:03
 2           Do you know why Mr. Kelley was assigned        11:03
 3 to you in particular?                                    11:03
 4      A.   No.                                            11:03
 5      Q.   I'm scrolling again, and this is Marlowe 21.   11:03
 6 It looks to be a copy of Mr. Kelley's driver's license.  11:03
 7 Umm.  Looking at the photo, is this what Mr. Kelley      11:03
 8 looked like around the time that you saw him?            11:03
 9      A.   No.                                            11:03
10      Q.   How did he look different?                     11:03
11      A.   Umm.  His hair was shorter and he didn't have  11:03
12 facial hair.                                             11:04
13      Q.   And do you know why he had a Colorado driver's 11:04
14 license?                                                 11:04
15      A.   He lived in Colorado.                          11:04
16      Q.   And do you know when he came back to Texas     11:04
17 from Colorado?                                           11:04
18      A.   I don't recall.                                11:04
19      Q.   Understood.                                    11:04
20           I'm going to jump to the last page here.       11:04
21      A.   Oh.  Whoops.                                   11:04
22      Q.   I'm on Marlowe 47.  It says "New Braunfels     11:04
23 Counseling Center, Initial Assessment."  Do you see      11:04
24 that?                                                    11:04
25      A.   Yes.                                           11:04
```



CANDACE M. MARLOWE                                June 18, 2020
JOE HOLCOMBE vs UNITED STATES OF AMERICA                      43

| | | |
|---|---|---|
| 1 | Q.   Okay.  And what is this form? | 11:04 |
| 2 | A.   This is the form we utilize with every new | 11:04 |
| 3 | patient to just do the diagnosis.  It's just getting a | 11:05 |
| 4 | gist of what the whole picture looks like of the person. | 11:05 |
| 5 | Q.   And that's the first time you meet with a | 11:05 |
| 6 | client? | 11:05 |
| 7 | A.   Yes.  It's the initial assessment. | 11:05 |
| 8 | Q.   Umm.  Okay.  And -- And what are your goals | 11:05 |
| 9 | during that first meeting? | 11:05 |
| 10 | A.   To assess how treatment will be and if it's a | 11:05 |
| 11 | fit for them to stay with me. | 11:05 |
| 12 | Q.   And how long is the initial appointment | 11:05 |
| 13 | typically? | 11:05 |
| 14 | A.   Just an hour. | 11:05 |
| 15 | Q.   Do you recall if it was any longer or shorter | 11:05 |
| 16 | for Mr. Kelley's first appointment? | 11:05 |
| 17 | A.   Umm.  I don't recall. | 11:05 |
| 18 | Q.   And on this form, is that your handwriting? | 11:06 |
| 19 | A.   Yes [laughed]. | 11:06 |
| 20 | Q.   And is that your signature at the bottom? | 11:06 |
| 21 | A.   Yes. | 11:06 |
| 22 | Q.   And the date in the upper right-hand corner of | 11:06 |
| 23 | June 6th, 2016, does that sound right? | 11:06 |
| 24 | A.   Yes. | 11:06 |
| 25 | Q.   And on this form there are various categories. | 11:06 |



1  It says "Presenting Problem," "Symptoms," "Diagnosis."      11:06
2  And are these the categories of questions you would ask     11:06
3  a client during the first meeting?                          11:06
4      A.   Yes.                                               11:06
5      Q.   You did you have any -- any sort of standard       11:06
6  structure or format for asking these questions?             11:07
7      A.   No.                                                11:07
8      Q.   All right.  Now looking at the form, it says       11:07
9  ref -- "Referred From:  Google."  So it sounds like he      11:07
10 just -- he found New Braunfels Counseling online.  Is       11:07
11 that your understanding?                                     11:07
12     A.   Yes.                                               11:07
13     Q.   And under "Presenting Problem," umm, it says,      11:07
14 "just need to talk."  Umm.  Is that something clients        11:07
15 commonly put in the area?                                    11:07
16     A.   Sometimes.                                         11:07
17          MS. GREEN:   Commonly what?                        11:07
18          MR. MYERS:   "Put."                               11:07
19          MS. GREEN:   "Put."                               11:07
20     Q.   (BY MR. FURMAN) And during that first meeting,     11:08
21 did he provide any detail about what he wanted to talk       11:08
22 about?                                                       11:08
23     A.   I don't recall.                                    11:08
24     Q.   At a later time did you come to realize or         11:08
25 understand why you thought Mr. Kelley was in treatment       11:08



1  with you?                                                    11:08

2      A.   The more we talked, it was predominantly            11:08

3  stress management about finances.                            11:08

4      Q.   So stress management of finances was the            11:08

5  primary issue?                                               11:08

6      A.   Yeah.                                               11:08

7      Q.   And any other significant issues that he           11:08

8  brought up during the sessions?                              11:08

9      A.   Those were mainly it.                               11:09

10      Q.   All right.  And do you find in your practice       11:09

11  that sometimes clients are not candid or forthcoming        11:09

12  about the reason they're seeking treatment?                 11:09

13      A.   Sometimes.                                         11:09

14      Q.   And did you find that to be the case with         11:09

15  Mr. Kelley?                                                 11:09

16      A.   No.                                               11:09

17      Q.   Okay.  Umm.  So just very generally, when you     11:09

18  first met Mr. Kelley, what was your impression of him?      11:09

19      A.   He was very quiet and a little bit guarded,        11:09

20  nervous.                                                   11:09

21      Q.   Anything that -- else that sticks out to you      11:10

22  from that first appointment as we stand here today?         11:10

23      A.   No, that's mainly it.  He was just very           11:10

24  guarded, very hesitant.                                    11:10

25      Q.   Did that change during the course of therapy?     11:10



1      A.    Slowly he became less guarded.                    11:10

2      Q.    Did he become less quiet, I guess, more           11:10

3  talkative?                                                  11:10

4      A.    A little bit at times.                            11:10

5      Q.    What about nervous?  Did he seem less nervous     11:10

6  later on?                                                   11:10

7      A.    That was pretty consistent [laughed].             11:10

8      Q.    Did you have an understanding of why he was so    11:11

9  nervous?                                                    11:11

10     A.    No.                                               11:11

11     Q.    And at this point in time was there any --        11:11

12 ever any reason to believe that mister -- Did Mr. Kelley    11:11

13 in any way seem any -- any different than a typical         11:11

14 client that might walk into your office?                    11:11

15     A.    No.                                               11:11

16     Q.    And during any -- any of the time -- During       11:11

17 any of the times that you treated Mr. Kelley, did he        11:11

18 ever seem like anyone other than a typical client that      11:11

19 you would treat in your office?                             11:12

20     A.    No.                                               11:12

21     Q.    I'm looking at -- I'm going to jump down right    11:12

22 now and go to "Medical History," and it says there, it     11:12

23 looks like, "Acid Reflux."  And during this first          11:12

24 meeting, did he bring any other medical problems to your   11:12

25 attention?                                                  11:12



 1      A.    No.                                              11:12
 2      Q.    And did he bring any medical problems to your   11:12
 3  attention at any time during the course of -- of          11:12
 4  therapy?                                                  11:12
 5      A.    Not that I can recall.                          11:12
 6      Q.    Did he ever mention anything about having       11:12
 7  chronic pain in his neck?                                 11:13
 8      A.    No.                                             11:13
 9      Q.    Did he ever mention a motorcycle accident       11:13
10  where he had gotten injured?                              11:13
11      A.    No.                                             11:13
12      Q.    And at this first meeting do you recall if      11:13
13  Mr. Kelley told you that he was taking any medications?   11:13
14      A.    At that time he said he had antipsychotics      11:13
15  from the Air Force at one point.                          11:13
16      Q.    And -- But that was -- that was in the past --  11:13
17      A.    Right.                                          11:13
18      Q.    -- when --                                      11:13
19      A.    That was in the past, and he currently wasn't   11:13
20  on anything.                                              11:13
21      Q.    And other than the history of antipsychotics    11:14
22  with the Air Force, did he mention any other medications  11:14
23  he had been prescribed at any time?                       11:14
24      A.    Not at that time.                               11:14
25      Q.    And did he at a later time?                     11:14



1      A.   Later times he shared that he had tried, umm,      11:14

2  Xanax and Klonopin for anxiety.                             11:14

3      Q.   And other than the Xanax, Klonopin, and the        11:14

4  antipsychotics, did he mention any other medicines he       11:14

5  had taken --                                                11:14

6      A.   No.                                                11:14

7      Q.   -- umm, to you at any time?                        11:14

8      A.   No.                                                11:14

9      Q.   With regard to the history of antipsychotics,      11:14

10  did he tell you which medications he had been prescribed    11:14

11  specifically?                                               11:15

12     A.   No, he did not specify.                            11:15

13     Q.   And did he say who prescribed them to him?         11:15

14     A.   No, not specifically; just that it was during      11:15

15  the time in the Air Force.                                  11:15

16     Q.   Okay.  With respect to the Xanax and Klonopin,     11:15

17  did he ever tell you who had prescribed those               11:15

18  medications for him?                                        11:15

19     A.   No.                                                11:15

20     Q.   At the time you were treating him, did             11:15

21  Mr. Kelley have a primary doctor?                           11:15

22     A.   I don't recall.  I want to say no, but I don't     11:15

23  recall.                                                     11:15

24     Q.   Understood.                                        11:15

25          Do you recall at any time during the               11:16



1  treatment of Mr. Kelley him providing you with any names  11:16

2  of medical providers he had seen over the years?  11:16

3      A.   No.  11:16

4      Q.   And did he ever...  Sorry.  11:16

5           Re -- Returning to the history of  11:16

6  antipsychotics, did he tell you why he had been  11:16

7  prescribed that type of medi -- medicine?  11:16

8      A.   No.  11:16

9      Q.   At that first meeting did he describe any  11:16

10  behavior that he believed to be consistent with  11:16

11  psychosis?  11:16

12      A.   No.  11:16

13      Q.   Given the lack of history of psychosis but the  11:17

14  prescription of antipsychotic medicine, is that  11:17

15  something that concerned you?  11:17

16      A.   No.  11:17

17      Q.   And why is that?  11:17

18      A.   Well, I mean, he was under somebody else's  11:17

19  treatment, and he wasn't very forthcoming with that  11:17

20  whole time period, so -- and then it was in the past, so  11:17

21  it didn't pertain to the now.  11:17

22      Q.   Understandable.  11:17

23           So you felt -- and correct me if I'm  11:17

24  wrong, but you felt that he might have not been  11:17

25  providing all of the details of his medication history?  11:17



1  Would that be fair?                                             11:18

2      A.   Yes.  He was pretty guarded.                          11:18

3      Q.   And just generally did you have reason to             11:18

4  question whether he was providing you accurate                 11:18

5  information with respect to other areas of questioning          11:18

6  as well?                                                        11:18

7      A.   Well, I mean, honestly, you never really know         11:18

8  if people are being honest with what they're saying.           11:18

9  You've just got to kind of roll with it.                       11:18

10     Q.   So you weren't attempting to, I guess, verify         11:18

11 at that first meeting whether his history was a hundred         11:18

12 percent complete; is that right?                                11:18

13     A.   That's what we did later on as you develop the        11:18

14 relationship.                                                   11:18

15     Q.   Understood.                                            11:18

16          So you felt building a rapport with                    11:19

17 Mr. Kelley was -- was paramount during that first              11:19

18 meeting as well as getting important data and that            11:19

19 details could be filled in later?  Is that fair?              11:19

20     A.   Yes.                                                   11:19

21     Q.   And just so the record is clear, you -- you           11:19

22 have never prescribed medicine to anyone; correct?            11:19

23     A.   Correct.                                               11:19

24     Q.   Looking under "Substance Abuse History" --           11:19

25     A.   Yeah.                                                  11:19



| | | |
|---|---|---|
| 1 | Q.    -- if I'm reading it correctly, it says, | 11:19 |
| 2 | "smokes weed every day; alcohol," and -- and did I read | 11:19 |
| 3 | that right? | 11:20 |
| 4 | A.    Yes [laughed]. | 11:20 |
| 5 | Q.    Okay.  Umm.  So it sounds like he was saying | 11:20 |
| 6 | he was using marijuana every day; is that right? | 11:20 |
| 7 | A.    Yes. | 11:20 |
| 8 | Q.    Was that concerning to you at the time? | 11:20 |
| 9 | A.    No. | 11:20 |
| 10 | Q.    And why is that? | 11:20 |
| 11 | A.    Sometimes people will utilize marijuana to | 11:20 |
| 12 | self-medicate for anxiety, and it just didn't seem like | 11:20 |
| 13 | an extreme thing at the time. | 11:20 |
| 14 | Q.    Understood. | 11:20 |
| 15 | Did Mr. Kelley tell you why he used | 11:20 |
| 16 | marijuana every day? | 11:20 |
| 17 | A.    I don't recall. | 11:20 |
| 18 | Q.    Did you have a belief at the time as to why he | 11:21 |
| 19 | was regularly using marijuana? | 11:21 |
| 20 | A.    Not at the time, not at the initial session. | 11:21 |
| 21 | Q.    Did you later just develop a belief as to why | 11:21 |
| 22 | he was using it? | 11:21 |
| 23 | A.    Yes.  I developed the belief that he was | 11:21 |
| 24 | self-medicating for -- to sleep and to manage the | 11:21 |
| 25 | anxiety, to calm down. | 11:21 |



CANDACE M. MARLOWE                                          June 18, 2020
JOE HOLCOMBE vs UNITED STATES OF AMERICA                              52

1       Q.   So in his context you -- you saw the use of          11:21

2   marijuana as primarily therapeutic?  Is that fair?            11:21

3       A.   Yes.                                                 11:21

4       Q.   Was the use of marijuana causing any problems        11:21

5   in his life?                                                  11:21

6       A.   Not that I can recall.                               11:21

7       Q.   In reference to alcohol, do you remember what        11:22

8   he said about -- about that?                                  11:22

9       A.   Just that he would drink at times.                   11:22

10      Q.   Do you recall how much he would say he would         11:22

11  typically drink?                                              11:22

12      A.   No, I don't.                                         11:22

13      Q.   Sitting here today do you recall if his              11:22

14  recounting of alcohol use was more consistent with            11:22

15  social drinking rather than binge drinking?                   11:22

16      A.   It definitely wasn't social.  I -- Well, he          11:22

17  drank by himself.                                             11:22

18      Q.   And do you know if he drank to -- to get drunk       11:23

19  or to get a high?                                             11:23

20      A.   To get drunk.                                        11:23

21      Q.   And at the time did you see it as particularly       11:23

22  problematic?                                                  11:23

23      A.   No, because it wasn't excessive every day from       11:23

24  what I was informed.                                          11:23

25      Q.   Understood.                                          11:23



1         And during the time that you saw                    11:23

2    Mr. Kelley, did his alcohol -- his self-reported alcohol    11:23

3    use ever change?                                            11:23

4        A.   No.                                               11:23

5        Q.   And during your treatment of Mr. Kelley, did      11:23

6    you ever come to suspect he had a problem with alcohol      11:23

7    abuse?                                                      11:23

8        A.   No.                                               11:23

9        Q.   At the time of the first intake session, would    11:24

10   you have also asked about the use of other substances?      11:24

11       A.   Yes.                                              11:24

12       Q.   And -- And if Mr. Kelley had reported using       11:24

13   other illegal drugs or substances, would you have          11:24

14   written that down?                                          11:24

15       A.   Yes.                                              11:24

16       Q.   And did you feel at the time he was being         11:24

17   honest about his use of alcohol and -- and substances?      11:24

18       A.   Yes, as far as I knew.                            11:24

19       Q.   Did you ever at any time have reason to doubt     11:24

20   that he was being honest to you about his use of            11:24

21   substances?                                                 11:24

22       A.   No.                                               11:24

23       Q.   Were you concerned about any of his               11:24

24   personality traits or characteristics predisposing him      11:25

25   to substance abuse?                                         11:25



| | | |
|---|---|---|
| 1 | Q.   Other than the -- what we talked about, the | 11:53 |
| 2 | unfairness he felt in the financial treatment of his | 11:53 |
| 3 | sisters versus him, did he ever talk about any other | 11:53 |
| 4 | issues or grievances with his sisters? | 11:53 |
| 5 | A.   No. | 11:53 |
| 6 | Q.   The very last statement under "Social | 11:53 |
| 7 | History," it says, "History of Air Force."  And I think | 11:53 |
| 8 | you said he -- he talked very little about the | 11:53 |
| 9 | Air Force? | 11:53 |
| 10 | A.   Right. | 11:53 |
| 11 | Q.   Well, what little did he tell you? | 11:53 |
| 12 | A.   Just that he was in it and he wa -- wasn't in | 11:53 |
| 13 | it anymore. | 11:53 |
| 14 | Q.   Did he ever talk about his discharge or the -- | 11:54 |
| 15 | the nature of his discharge from the Air Force? | 11:54 |
| 16 | A.   No. | 11:54 |
| 17 | Q.   Did he ever talk about spending time in prison | 11:54 |
| 18 | while with the Air Force? | 11:54 |
| 19 | A.   No. | 11:54 |
| 20 | Q.   And during that first meeting did he talk | 11:54 |
| 21 | about, umm, having any -- any friends? | 11:54 |
| 22 | A.   No. | 11:54 |
| 23 | Q.   And did he at a later time? | 11:54 |
| 24 | A.   When he came back the one time in '17, he had | 11:54 |
| 25 | more friends. | 11:54 |



| | | |
|---|---|---|
| 1 | Q.   So you said "he had more friends"? | 11:54 |
| 2 | A.   Uh-huh. | 11:54 |
| 3 | MR. MYERS:  Is that a "yes"? | 11:55 |
| 4 | THE WITNESS:  I guess. | 11:55 |
| 5 | MR. MYERS:  No.  You have to say "yes." | 11:55 |
| 6 | You said -- | 11:55 |
| 7 | THE WITNESS:  Yes. | 11:55 |
| 8 | MR. FURMAN:  -- "Uh-huh." | 11:55 |
| 9 | THE WITNESS:  I'm sorry [laughed]. | 11:55 |
| 10 | MR. FURMAN:  [Laughed].  Thank you. | 11:55 |
| 11 | Q.   (BY MR. FURMAN) Do you know if he had any | 11:55 |
| 12 | friends during this time of the first meeting? | 11:55 |
| 13 | A.   Not that I was informed of, no. | 11:55 |
| 14 | Q.   And -- And up until that last meeting in 2017, | 11:55 |
| 15 | and any -- any time before then, did he inform you of | 11:55 |
| 16 | having any -- any friends? | 11:55 |
| 17 | A.   No. | 11:55 |
| 18 | Q.   Was that concerning to you at all? | 11:55 |
| 19 | A.   Yes, but it made sense because he was guarded. | 11:55 |
| 20 | Q.   I -- Other than him being guarded, do you have | 11:55 |
| 21 | any -- any other reason to believe that he might have | 11:55 |
| 22 | had issues making friends? | 11:56 |
| 23 | A.   Because he was bullied and he had anxiety. | 11:56 |
| 24 | Those people are less likely to trust other people to be | 11:56 |
| 25 | friends with because they don't want to get hurt again. | 11:56 |



| 1 | Q.   That's understandable. | 11:56 |
| 2 | Any other reason with Mr. Kelley you | 11:56 |
| 3 | thought he might have had issues making friends? | 11:56 |
| 4 | A.   No. | 11:56 |
| 5 | Q.   And just generally with respect to this form | 11:56 |
| 6 | here, umm, all the information on here is provided by | 11:56 |
| 7 | the -- I guess -- well, except for a diagnosis, but this | 11:56 |
| 8 | is based off just the interview with the client? | 11:57 |
| 9 | A.   Yes. | 11:57 |
| 10 | Q.   In Mr. Kelley's case did you review any | 11:57 |
| 11 | medical records or consult with anyone, umm, in | 11:57 |
| 12 | formulating his diagnosis or treatment? | 11:57 |
| 13 | A.   No. | 11:57 |
| 14 | Q.   Is that something you would typically do? | 11:57 |
| 15 | A.   No. | 11:57 |
| 16 | Q.   Okay.  I'd like to look at, on the same form, | 11:57 |
| 17 | under "Symptoms," and -- and just -- just so I'm clear, | 11:57 |
| 18 | are these symptoms that the patient's reporting or | 11:57 |
| 19 | things you're observing or both or what is this | 11:57 |
| 20 | referring to? | 11:57 |
| 21 | A.   Kind of those key words that he would say.  So | 11:57 |
| 22 | it's -- it's not -- It's things he said. | 11:57 |
| 23 | Q.   Okay.  And -- And it says, "sleeps poorly." | 11:58 |
| 24 | Do you recall what he said about his sleep? | 11:58 |
| 25 | A.   No, I don't recall. | 11:58 |



1      Q.    Do you recall from later sessions some of the    11:58

2  sleeping difficulties he might have described to you?      11:58

3      A.    No.                                              11:58

4      Q.    What about nightmares?  Do you recall anything   11:58

5  about that?                                                11:58

6      A.    No, I believe that was not mentioned again.      11:58

7      Q.    And during that first meeting did he provide     11:58

8  any details on the nightmares?                             11:58

9      A.    No.                                              11:58

10     Q.    Next you have, "paranoid."  Is -- And so this    11:58

11 is something he's reporting to you?                        11:58

12     A.    Yes.                                             11:59

13     Q.    He -- He's saying he's paranoid?                 11:59

14     A.    Yes.                                             11:59

15     Q.    So, yes?                                         11:59

16     A.    Yes.                                             11:59

17     Q.    Okay.  Is that something a person who's          11:59

18 paranoid would typically say?                              11:59

19     A.    Sometimes.                                       11:59

20     Q.    What about in your experience?                   11:59

21     A.    Sometimes.                                       11:59

22     Q.    And was his -- His being paranoid or reporting   11:59

23 himself to be paranoid, was that consistent with your      11:59

24 impression of him?                                         11:59

25     A.    It correlated to the anxiety, yes.               11:59



1    Q.   Did he provide any examples of being paranoid    11:59
2  in that first session?                                  11:59
3    A.   No.                                              11:59
4    Q.   What about at a later time?                      11:59
5    A.   I don't recall.                                  12:00
6    Q.   Did he exhibit any characteristics consistent   12:00
7  with someone who was paranoid when you saw him in       12:00
8  session?                                                12:00
9    A.   Yes.                                             12:00
10   Q.   What were some of those?                         12:00
11   A.   The being guarded and kind of passive with his   12:00
12 words, hesitant.                                        12:00
13   Q.   When you say "passive with his words," what do   12:00
14 you mean by that?                                       12:00
15   A.   Kind of gauging who I was and getting a feel     12:00
16 for if he could talk to me, so kind of saying a little  12:00
17 bit of something and seeing how I would react to it.    12:01
18   Q.   Did it sound like he was reticent to speak his   12:01
19 mind?                                                   12:01
20   A.   Yeah.  Yes.                                      12:01
21   Q.   And is paranoia something in a client you'd be   12:01
22 concerned about?                                        12:01
23   A.   It depends on how severe it is.                  12:01
24   Q.   How severe do you think Mr. Kelley's was at      12:01
25 this time?                                              12:01



```
 1        A.   Not something alarming.                      12:01

 2        Q.   So his level of paranoia wasn't something that 12:01

 3 was alarming to you?                                      12:01

 4        A.   Not at the time, no.                          12:01

 5             MR. SCHREIBER:  Objection.  Asked and         12:01

 6 answered.                                                 12:01

 7        Q.   (BY MR. FURMAN) At any time did his paranoia  12:01

 8 become alarming to you?                                   12:02

 9        A.   When he found out his wife cheated on him.    12:02

10        Q.   And that's during a later session?            12:02

11        A.   Yes.                                          12:02

12        Q.   Okay.  I -- I have a -- treatment notes here. 12:02

13 We can talk about that a little bit more, umm, when we    12:02

14 get there, if that's okay.                                12:02

15             When he presented to you this first time,     12:02

16 did he want to work with you on being less paranoid?      12:02

17        A.   No.                                           12:02

18        Q.   Was it something you were trying to treat?    12:02

19        A.   No.                                           12:02

20        Q.   Can paranoia be consistent with a more -- or  12:02

21 with a severe psychiatric diagnosis?                      12:02

22        A.   Potentially.                                  12:02

23        Q.   And did you have any concerns here that his   12:03

24 level of paranoia was consistent with a more severe       12:03

25 psychiatric diagnosis?                                    12:03
```



1      A.    No.                                          12:03

2      Q.    And just to make sure I'm clear, when I --   12:03

3  when I said "severe psychiatric diagnosis," what does  12:03

4  that mean to you?                                      12:03

5      A.    Like schizophrenia or something along those  12:03

6  lines.                                                 12:03

7      Q.    But you were more -- You were -- were not    12:03

8  worried about his paranoia being, like I said, a       12:03

9  psychotic level at this time?                          12:03

10     A.    Correct.                                     12:03

11     Q.    Did you ever have concerns that his paranoia 12:03

12 reached a psychotic level?                             12:03

13     A.    No.                                          12:03

14     Q.    Next under "Symptoms" you -- you wrote,      12:04

15 "stressed."  Do you recall what he was stressed about? 12:04

16     A.    Finances.                                    12:04

17     Q.    Isn't everyone [laughed]?                    12:04

18     A.    [Laughed].                                   12:04

19           MR. SCHREIBER:  Objection.                   12:04

20     Q.    (BY MR. FURMAN) A --                         12:04

21           MR. SCHREIBER:  Sidebar.                     12:04

22     Q.    (BY MR. FURMAN) And do you recall or do you  12:04

23 recount any other stressors at this time?              12:04

24     A.    That was predominantly his stressor; so, no. 12:04

25     Q.    And what particularly was his financial      12:04



CANDACE M. MARLOWE                                June 18, 2020
JOE HOLCOMBE vs UNITED STATES OF AMERICA                      72

| | | |
|---|---|---|
| 1 | A.   No [laughed]. | 12:08 |
| 2 | Q.   Did you tell him that? | 12:08 |
| 3 | A.   Yes. | 12:08 |
| 4 | Q.   Was he receptive of that? | 12:08 |
| 5 | A.   No. | 12:08 |
| 6 | Q.   [Laughed]. | 12:08 |
| 7 | A.   [Laughed]. | 12:08 |
| 8 | Q.   I understand. | 12:08 |
| 9 |       Next on the "Symptoms" list, you have, | 12:08 |
| 10 | "numb."  Umm.  What is that referring to? | 12:08 |
| 11 | A.   He said sometimes he felt numb. | 12:08 |
| 12 | Q.   And what kind of, I guess, mental health | 12:08 |
| 13 | issues or psychotic diagnoses can that be consistent | 12:08 |
| 14 | with? | 12:08 |
| 15 | A.   Depression.  Depression can make somebody feel | 12:08 |
| 16 | empty. | 12:08 |
| 17 | Q.   Anything else? | 12:09 |
| 18 | A.   No, that's predominantly where we went with | 12:09 |
| 19 | that, was it was just a very sad, empty place, numb. | 12:09 |
| 20 | Q.   So in Mr. Kelley's circumstances, you felt the | 12:09 |
| 21 | numbness was related to his being depressed?  Is that | 12:09 |
| 22 | fair? | 12:09 |
| 23 | A.   Yes. | 12:09 |
| 24 | Q.   Were you ever concerned that the numbness was | 12:09 |
| 25 | a sign of a more significant mental health issue like | 12:09 |



CANDACE M. MARLOWE
JOE HOLCOMBE vs UNITED STATES OF AMERICA

June 18, 2020
73

1   psychosis or disassociation?                          12:09

2        A.   No.                                          12:09

3        Q.   And then the next sentence, "depressed," so  12:09

4   we've -- we kind of got into that.  Other than being  12:09

5   numb, what else made you -- or what else he said was  12:09

6   consistent with depression?                           12:10

7        A.   He said he was depressed.                    12:10

8        Q.   Was that consistent with your observation?  12:10

9        A.   Yes.                                         12:10

10       Q.   What did you observe with him that was       12:10

11  indicative of depression?                              12:10

12       A.   Just the -- the thing -- the culmination of 12:10

13  the things he was saying sounded like a depressed person 12:10

14  based off of the diagnostic manual.                    12:10

15       Q.   When we refer to "diagnostic manual," is that 12:10

16  the -- the DSM?                                        12:10

17       A.   Yes.                                         12:10

18       Q.   Did he talk about ever being on any medication 12:10

19  to treat depression?                                   12:10

20       A.   No.  He had only talked about the            12:10

21  antipsychotics and then later the anxiety medicines.   12:10

22       Q.   Did you feel that antidepressant medication  12:11

23  might have been helpful in his case?                   12:11

24       A.   You know, we never talked about it.          12:11

25       Q.   That -- That's fair.                          12:11



1      And earlier we talked about the -- the    12:11

2  use of marijuana.  Umm.  At this time was he doing    12:11

3  anything else to treat his depression?    12:11

4      A.   No.    12:11

5      Q.   And did you have any sense at this time as to    12:11

6  what was causing his [indiscernible]?    12:11

7           MS. GREEN:  His what?  Causing his what?    12:12

8           MR. FURMAN:  Sorry.    12:12

9      Q.   (BY MR. FURMAN) Causing his depression?    12:12

10      A.   Umm.  No.  I mean, probably -- No, not at the    12:12

11  time.  It was -- It was very much an initial session.    12:12

12      Q.   Understood.    12:12

13           But what about later?  Did you later have    12:12

14  a sense of what had been -- might have been causing his    12:12

15  depression?    12:12

16      A.   His stress; the pressure he put on himself.    12:12

17      Q.   Anything else?    12:12

18      A.   That's what I gathered.  No, not anything    12:12

19  else.    12:12

20      Q.   Thank you.    12:12

21           And -- And, lastly, you have, "don't    12:12

22  care," in quotes.  Does quotes mean this is a statement    12:13

23  he made?    12:13

24      A.   Yes.    12:13

25      Q.   And to you what was that statement indicative    12:13



```
 1  of?                                                    12:13
 2      A.   It correlates to the depressed state and the   12:13
 3  numbness.  Sometimes people just say they don't care.   12:13
 4      Q.   So it sounds like he was, I guess, apathetic   12:13
 5  during that meeting?                                     12:13
 6      A.   Yes.                                            12:13
 7      Q.   And other than the symptoms here, do you       12:13
 8  recall if he brought to your attention any other        12:13
 9  symptoms during that first meeting?                      12:13
10      A.   No, I don't recall.                            12:13
11      Q.   And if other symptoms were important, would    12:14
12  you have written them down?                              12:14
13      A.   Absolutely.                                     12:14
14      Q.   And during the course of Mr. Kelley's          12:14
15  treatment were there other -- were there significant    12:14
16  symptoms -- new significant symptoms that came about?    12:14
17      A.   No; just more -- more of what was already       12:14
18  there, more of the anxiety, the stress.                  12:14
19      Q.   So the latest symptoms were just consistent    12:14
20  with a different level of the symptoms described here?   12:14
21  Is that fair?                                            12:14
22      A.   Yes.                                            12:14
23      Q.   I'm going down to -- more towards the bottom    12:14
24  of the page, where it says "Danger to Self/Others."  Do  12:14
25  you see that?                                            12:15
```



1    A.   Yeah.                                        12:15

2    Q.   And it says, "Passive.  SI."  What does that  12:15

3 mean?                                                12:15

4    A.   Suicidal ideations.                          12:15

5    Q.   And could you just ec -- Could you explain   12:15

6 what "passive" sudis -- "suicidal ideation" is?      12:15

7    A.   That is sometimes the person thinks of wanting  12:15

8 to die or kill themself or just not be here, but they  12:15

9 don't have a plan or intent.                         12:15

10    Q.   Thank you.                                   12:15

11         Do you recall any examples that he gave      12:15

12 during that first session of passive suicidal ideation?  12:15

13    A.   No.                                          12:15

14    Q.   Was that something that was concerning to you?  12:15

15    A.   Not at the time because it correlates with   12:15

16 depression and there was no intent or plan.          12:15

17    Q.   So to determine whether someone is suicidal in  12:16

18 addition to ideation, you looked at -- you -- you     12:16

19 typically look at intent and plan as well; is that    12:16

20 right?                                               12:16

21    A.   Intent, plan, or history, yes, that's right.  12:16

22    Q.   Did he disclose any history of suicidal       12:16

23 attempts or suicidal ideation in the past?           12:16

24    A.   No.  I would have written it down.           12:16

25    Q.   In other times did -- during your treatment of  12:16



1  him, did he ever express passive suicidal ideation?        12:16

2      A.   I don't recall.                                    12:16

3      Q.   And do you recall if his suicidality behaviors     12:16

4  ever increased to include intent and/or plan?              12:16

5      A.   No.                                                12:17

6      Q.   So, no -- no, they did not?                        12:17

7      A.   No, they did not.  They did not increase that      12:17

8  I was aware of.                                             12:17

9      Q.   Thank you.                                         12:17

10          So is it fair that at the time of this             12:17

11  appointment, you had no reason to believe he was going     12:17

12  to hurt himself?                                           12:17

13     A.   Correct.                                           12:17

14     Q.   And at this appointment did you have any           12:17

15  reason to believe that he would hurt anyone else?          12:17

16     A.   No.                                                12:17

17     Q.   At any time during the course of your              12:17

18  treatment with Mr. Kelley, did you have reason to          12:17

19  believe that he would hurt someone else?                   12:17

20     A.   No.                                                12:17

21     Q.   Was Mr. Kelley someone you considered in any       12:17

22  regard a risk for violence during your treatment of him?   12:17

23     A.   No.                                                12:17

24     Q.   Given the potential of certain persons with        12:18

25  mental health issues to harm themselves or others, umm,    12:18



1 do you routinely ask clients if they have weapons or | 12:18
2 firearms in the home? | 12:18
3      A.   No. | 12:18
4      Q.   Is that something you ever ask of clients? | 12:18
5      A.   If they have expressed that they have intent | 12:18
6 or a plan, then that's the next question, but not | 12:18
7 otherwise. | 12:18
8      Q.   And with Mr. Kelley, did you ever ask him if | 12:18
9 he had firearms in the home? | 12:18
10     A.   No. | 12:18
11     Q.   Did you ever ask him if he had access to | 12:18
12 firearms? | 12:18
13     A.   I didn't have to because in the first session, | 12:18
14 he mentioned he liked hunting hogs and deer, so I | 12:18
15 assumed he had hunting stuff for that. | 12:18
16     Q.   [Laughed].  That's a fair point.  I guess... | 12:19
17          So when he was referring to hunting hogs | 12:19
18 and deer, umm, I guess he wasn't hunting with a bow and | 12:19
19 arrow; is that right? | 12:19
20     A.   Correct.  I guess I just assumed it was a gun. | 12:19
21 I don't know anything about hunting. | 12:19
22     Q.   When he described the hunting, did he describe | 12:19
23 any specifics of -- of the firearms, what type or whose | 12:19
24 they were, any of those details? | 12:19
25     A.   No. | 12:19



| | | |
|---|---|---|
| 1 | MR. SCHREIBER:  Objection.  Assumes facts | 12:19 |
| 2 | not in evidence. | 12:19 |
| 3 | A.   No. | 12:19 |
| 4 | Q.   (BY MR. FURMAN) And before we get to that | 12:19 |
| 5 | first treatment, I just want to, umm, focus on the -- | 12:20 |
| 6 | the diagnosis you gave Mr. Kelley, umm, in this form. | 12:20 |
| 7 | And -- And just for background information is this five | 12:20 |
| 8 | axes here.  So what are those five axes related to? | 12:20 |
| 9 | A.   Umm.  It's a different part of the diagnosis | 12:20 |
| 10 | to kind of break down where is the person at.  Like | 12:20 |
| 11 | Axis I is the main diagnosis.  Axen -- Axis II is for | 12:20 |
| 12 | personality diagnoses.  Axis III is for medical issues | 12:20 |
| 13 | or -- how do you say -- diagnoses.  Axis IV are the | 12:20 |
| 14 | stressors or the -- kind of the heavy hitters of why | 12:20 |
| 15 | they would be in therapy, like the things that are | 12:20 |
| 16 | wrong.  And Axis V is the severity of the issue or the | 12:20 |
| 17 | diagnosis. | 12:21 |
| 18 | Q.   That's helpful.  Thank you. | 12:21 |
| 19 | Under Axis V, it says "Current" and "GAF | 12:21 |
| 20 | 50."  I guess, first, what is "GAF"? | 12:21 |
| 21 | A.   Oh, my goodness [laughed]. | 12:21 |
| 22 | Q.   [Laughed]. | 12:21 |
| 23 | A.   I don't remember what it -- It's something | 12:21 |
| 24 | functioning. | 12:21 |
| 25 | Q.   Oh, if you don't remember what it -- what | 12:21 |



1  it -- What does it generally mean?  What does it entail?  12:21

2  What -- What does the number "50" mean?  12:21

3      A.    It's the severity of how it's affecting them.  12:21

4  Like, "50" means it's pretty moderate.  But it's -- The  12:21

5  higher you go, the healthier the individual.  The lower  12:21

6  you go, the more the severe the issue.  12:21

7      Q.    That's what I needed.  Thank you.  12:21

8          So when you're saying "50," you said that  12:21

9  was moderate severity of his symptoms?  12:21

10     A.    Right.  Yes.  12:21

11     Q.    Thanks.  12:21

12         Looking at Axis II, you say "defer," so  12:22

13 what does "defer" mean?  12:22

14     A.    Defer for the -- Well, for Axis III -- I'm not  12:22

15 a medical doctor, so I don't really choose to write  12:22

16 anything there.  So I defer to their medical doctor.  12:22

17 And Axis II, I didn't see at the time any kind of  12:22

18 personality disorders, so I deferred to nothing was  12:22

19 there [laughed].  12:22

20     Q.    Understood.  12:22

21         Umm.  At a later time, umm, did you see  12:22

22 any indications that Mr. Kelley might have behavior  12:22

23 consistent -- or symptoms consistent with a personality  12:22

24 disorder?  12:22

25     A.    No.  12:22



```
 1      Q.   Can paranoia be consistent with a personality      12:22
 2 disorder?                                                     12:22
 3      A.   I think it can be a trait of several               12:22
 4 personality disorders, but, you know, they've got            12:22
 5 several traits.                                              12:23
 6      Q.   So you felt like the paranoia alone wasn't         12:23
 7 sufficient to diagnose a personality disorder?  Is that      12:23
 8 fair?                                                        12:23
 9      A.   That's fair.                                       12:23
10      Q.   And at -- at other times with -- with other       12:23
11 clients, have you had the opportunity to diagnose a          12:23
12 personality disorder?                                        12:23
13      A.   Yes.                                               12:23
14      Q.   Thank you.                                         12:23
15           Looking at Axis I, umm, it looks like it           12:23
16 says "F31.9"; is that right?                                 12:23
17      A.   Yes.                                               12:23
18      Q.   And then it says, it looks like, "Bipolar I."      12:23
19 And then could you read the rest to me?  I think it's an     12:24
20 abbreviation.  I can't quite make it out.                    12:24
21      A.   Sure.  "Bipolar 1 disorder, current episode        12:24
22 unspecified."                                                12:24
23      Q.   And what's that mean in laymen's terms?            12:24
24      A.   Umm.  That he was definitely in Bipolar I          12:24
25 disorder, but the current experience he was having, the      12:24
```



1   current episode, if you will, was -- I couldn't decipher          12:24

2   if it was mixed or if he was manic or if he was                   12:24

3   predominantly depressed.  Figure that out as a -- at a            12:24

4   later date when you get to know them better.                      12:24

5        Q.   Understood.                                             12:24

6             But after that first meeting, you were                  12:24

7   convinced he had Bipolar I disorder of some type?                 12:24

8        A.   Yes.                                                    12:24

9        Q.   And what led you to that conclusion?                    12:24

10       A.   Just the -- the combination between the very            12:24

11  heightened mood and then the very depressive moments              12:25

12  that he would have just fit with the diagno -- the                12:25

13  symptoms [laughed].                                               12:25

14       Q.   Understood.                                             12:25

15            When you say "heightened mood," could you               12:25

16  explain a little more what you mean by that?                      12:25

17       A.   Like the anxiety and the paranoia and, umm,            12:25

18  other symptoms I'm guessing I saw at the time.                    12:25

19       Q.   Sure.                                                   12:25

20            Do you recall seeing any other symptoms                 12:25

21  of Mr. Kelley that were indicative of mania?                      12:25

22       A.   I don't recall at this time.                            12:25

23       Q.   Okay.  And we talked about the depression              12:25

24  already.  At any of the time during your treatment of            12:25

25  Mr. Kelley did you revisit that diagnosis or see a               12:26



1  need -- see a need to revisit it?                    12:26

2      A.   I don't recall.                             12:26

3      Q.   Do you recall if you needed to make a       12:26

4  differential diagnosis during this first meeting,    12:26

5  differentiating bipolar from another type of disorder? 12:26

6      A.   No.                                         12:26

7      Q.   Is bipolar disorder frequently treated with 12:26

8  medication?                                          12:27

9      A.   Yes, it can be.                             12:27

10     Q.   And I'm guessing from what we said earlier,  12:27

11 umm, it sounded like he wasn't on any medication for  12:27

12 bipolar at this time; is that right?                 12:27

13     A.   Correct.                                    12:27

14     Q.   Was that concerning to you at all?          12:27

15     A.   Not at the time.                            12:27

16     Q.   Was it at a later time?                     12:27

17     A.   No.                                         12:27

18     Q.   And during the visit or any time did        12:27

19 Mr. Kelley relay to you that he had been diagnosed with 12:27

20 bipolar disorder at any time in the past?            12:27

21     A.   No.                                         12:27

22     Q.   As part of your caseload overall do you     12:28

23 regularly treat patients with bipolar disorder?      12:28

24     A.   Yes.                                        12:28

25     Q.   And can bipolar disorder clients have       12:28



| | | |
|---|---|---|
| 1 | instances where they lose touch with reality or | 12:28 |
| 2 | psychotic breaks? | 12:28 |
| 3 | A.   Yes. | 12:28 |
| 4 | Q.   I think we covered this.  But you never saw | 12:28 |
| 5 | anything like that with Mr. Kelley? | 12:28 |
| 6 | A.   No, I did not. | 12:28 |
| 7 | Q.   And can bi -- clients with bipolar disorder | 12:29 |
| 8 | sometimes engage in -- in risky behavior? | 12:29 |
| 9 | A.   Yes. | 12:29 |
| 10 | Q.   At this time did you have any concerns about | 12:29 |
| 11 | Mr. Kelley engaging in risky behavior? | 12:29 |
| 12 | A.   No. | 12:29 |
| 13 | Q.   Did you at a later time? | 12:29 |
| 14 | A.   No. | 12:29 |
| 15 | Q.   Now, at any point in time did you have | 12:30 |
| 16 | questions about whether Mr. Kelley needed to be referred | 12:30 |
| 17 | to a medical doctor to treat his bipolar? | 12:30 |
| 18 | A.   Umm.  If you see later in the notes, I wrote a | 12:30 |
| 19 | letter for him to go to a doctor for anxiety medicines | 12:30 |
| 20 | but not bipolar. | 12:30 |
| 21 | Q.   Okay.  Thank you for pointing that out.  And | 12:30 |
| 22 | we'll get to that in one minute. | 12:30 |
| 23 | THE WITNESS:  Oh, my -- my -- Sorry. | 12:30 |
| 24 | (Witness indicating cell phone. | 12:30 |
| 25 | Q.   (BY MR. FURMAN) At any time during -- during | 12:30 |



1  anything else you saw as an obstacle to potentially        12:32

2  working with and treating Mr. Kelley at this time?         12:32

3       A.   No.                                              12:32

4       Q.   Umm.   At this appointment or sometime after     12:32

5  did you develop any sort of treatment plan for             12:32

6  Mr. Kelley?                                                12:32

7       A.   Not specifically.                                12:32

8       Q.   Did you work with him to develop treatment       12:32

9  goals?                                                     12:32

10      A.   Yes.                                             12:32

11      Q.   Do you recall what those goals were?             12:32

12      A.   To learn coping mechanisms for the stress,       12:32

13 basically.                                                 12:32

14      Q.   Anything else?                                   12:33

15      A.   Not that I can recall.                           12:33

16      Q.   Thank you.                                       12:33

17           I think that's all the questions I have          12:33

18 on -- on that form.  Umm.                                  12:33

19           Before we review the treatment notes,            12:33

20 just -- And if you need to look back on the calendar we    12:33

21 looked at earlier, it's the seventh page of the            12:33

22 documents, umm, what we've marked as Marlowe 7, and --     12:33

23 But looking at it generally, it looks like, for the most   12:33

24 part, your treatment of Mr. Kelley, so during at least     12:33

25 the summer of 2016, was twice a week?  Does that sound     12:33



1  right?                                                      12:33

2       A.   Yes.                                              12:33

3       Q.   Is that typical for your clients?                12:33

4       A.   Some.                                             12:33

5       Q.   Is that a number that you decided on with        12:34

6  Mr. Kelley?                                                 12:34

7       A.   Yes.                                              12:34

8       Q.   And is that a, umm -- Was the amount of          12:34

9  treatment sessions per week any way indicative of the     12:34

10 level of his problems?                                     12:34

11      A.   No.                                               12:34

12      Q.   But, obviously, you felt that coming in twice    12:34

13 a week could be beneficial to him?                         12:34

14      A.   Yes.                                              12:34

15      Q.   And for setting appointments did you have a      12:34

16 preset schedule with him or did he just schedule at the   12:35

17 end of every session?                                      12:35

18      A.   I honestly don't recall [laughed].              12:35

19      Q.   It's not a problem.  I don't -- I don't think    12:35

20 it's the most critical question, so...                    12:35

21           And during that first treat -- visit or         12:35

22 at any other time you met with Mr. Kelley, did he         12:35

23 mention having any sort of prior mental health            12:35

24 treatment?                                                 12:35

25      A.   No.                                               12:35



 1  back?                                                    12:39

 2     A.   Not as far as I knew, no.                        12:39

 3     Q.   Understood.                                      12:39

 4          Now, you might have said this, but I             12:39

 5  think you felt like he was making good progress in       12:39

 6  therapy during your treatment?                           12:39

 7     A.   Yes.                                             12:40

 8     Q.   As a therapist did you ever assign Mr. Kelley    12:40

 9  what they call "homework" or assign him work outside of  12:40

10  the session for his treatment?                           12:40

11     A.   Yes.                                             12:40

12     Q.   Do you recall some examples of that?             12:40

13     A.   Oh, golly.  No [laughed].  I'm sorry.  I don't   12:40

14  recall.                                                  12:40

15     Q.   Understood.                                      12:40

16          Do you recall if Mr. Kelley was dutiful          12:40

17  about doing his homework?                                12:40

18     A.   Yes.                                             12:40

19     Q.   He was good about doing it?                      12:40

20     A.   Yes.                                             12:40

21     Q.   Okay.  I'd like to go through some of the        12:41

22  treatment notes.  Umm.  You know, I understand, again,   12:41

23  you might not remember everything, you know, about every 12:41

24  specific question, so I certainly understand that, but,  12:41

25  umm, I'd like to cover a few of them.  So I'm going to    12:41



1  turn first to -- We're going to go chronologically, so          12:41

2  that starts at the end of the documents you gave to us.          12:41

3  So I'm looking at here Marlowe 46, which is the note for          12:41

4  June 6th as well as June 9th.  Are you there?          12:41

5      A.   Yes.          12:41

6      Q.   Thanks.          12:41

7           Again, is this a form that's provided to          12:41

8  you by the counseling center for use in your practice?          12:41

9      A.   Yes.          12:41

10     Q.   Are you required to use this form?          12:41

11     A.   No.          12:41

12     Q.   And I'd like to just quickly generally talk          12:42

13 about the form before we get into some of the specifics          12:42

14 about what you notated for Mr. Kelley.  So, umm, where          12:42

15 it says "MENTAL STATUS," what is that referring to          12:42

16 generally?          12:42

17     A.   Like if they're orientated to time, place,          12:42

18 themselves, like if they know where they're at and          12:42

19 they're present, if you will.          12:42

20     Q.   And then it looks like below that there's some          12:42

21 symptoms that a client might present with?          12:42

22     A.   Yes.          12:42

23     Q.   And then "THOUGHT CONTENT," what's that          12:42

24 referring to?          12:42

25     A.   How they process their thoughts, if it's          12:42



1  organized or unorganized, if they're jumping everywhere,    12:42

2  or if it's kind of like this dialogue where it's pretty     12:43

3  clear.  And appro -- That's what "Appropriate" is.          12:43

4      Q.    Okay.  And then "SPEECH," what is that            12:43

5  referring to?                                               12:43

6      A.    Like if they're -- How they're responding to     12:43

7  you, if they can enunciate clearly or if they're holding    12:43

8  back or if they're giving you one-word answers, how         12:43

9  they're talking to you.                                     12:43

10     Q.    Okay.  And -- And then "AFFECT," what is          12:43

11 "AFFECT"?                                                   12:43

12     A.    Their expressions, like if they're -- how --     12:43

13 how their face is moving, I guess.  [Laughed].  If          12:43

14 they're happy, sad, flat; what they're presenting           12:43

15 mood-wise.                                                  12:43

16     Q.    Okay.  And looking at the notes here, these      12:43

17 are all your handwriting?                                   12:44

18     A.    Yeah.                                             12:44

19     Q.    Are those your signatures --                     12:44

20     A.    Correct.                                          12:44

21     Q.    -- on those notes?                               12:44

22     A.    Yes.                                              12:44

23     Q.    And then just as a general practice, how long    12:44

24 after treatment sessions do you complete these notes?       12:44

25     A.    Same day.                                         12:44



1        Q.    So you do it while it's still fresh in your --          12:44

2  in your mind?                                                        12:44

3        A.    Yes.                                                     12:44

4        Q.    And the level of detail in the notes here,              12:44

5  particularly the "SUMMARY" sec -- section, is that                  12:44

6  consistent with the detail you use in other notes --               12:44

7        A.    Yes.                                                     12:44

8        Q.    -- with other -- with other clients?                    12:44

9        A.    Yes, absolutely.                                        12:44

10       Q.    And does anyone, insurance or anyone, review            12:45

11 these treatment notes?                                              12:45

12       A.    No.                                                     12:45

13       Q.    So these notes are for just your benefit and           12:45

14 potentially for the benefit of any future treater?                 12:45

15       A.    Yes.                                                     12:45

16       Q.    All right.  I'm looking at the -- the                   12:45

17 June 6th, 2016, note, and I noticed you -- for -- under            12:45

18 "MENTAL STATUS," and -- and you marked certain symptoms,           12:45

19 like "Depressed," it looks like, "Withdrawn," "Fearful,"           12:45

20 "Tense," "Anxious," "Suspicious."  Do you see that?                12:45

21       A.    Yeah.  Yes.                                             12:46

22       Q.    So that means you observed those behaviors             12:46

23 during the session?                                                 12:46

24       A.    Yes.                                                     12:46

25       Q.    And that's consistent with what we were                12:46



1  talking about earlier because this was the intake          12:46

2  session; correct?                                          12:46

3      A.   Yes.                                              12:46

4      Q.   It looks like here that the box next to           12:46

5  "Paranoid" was not marked.  Do you know why?               12:46

6      A.   Because I marked "Suspicious."                    12:46

7      Q.   So in your mind, putting down two versus one      12:46

8  was redundant?                                             12:46

9      A.   Yes.                                              12:46

10     Q.   Next to "SPEECH," it looks like you marked        12:46

11 "Impaired."  Umm.  What did you mean by that?              12:46

12     A.   The difficulty of him talking and getting it      12:47

13 out.                                                       12:47

14     Q.   And did you feel that his impaired speech was     12:47

15 due to his guardedness or was there some other reason?     12:47

16     A.   Being guarded and hesitant.                       12:47

17     Q.   Under "AFFECT," it looks like you marked          12:47

18 Flat/Blunted."  What does that mean?                       12:47

19     A.   Like if you look at someone's face and there's    12:47

20 just no expression, they're just --                        12:47

21          (Witness made distinct sound.                     12:47

22     A.   No expression.                                    12:47

23     Q.   (BY MR. FURMAN) And that -- that's how he         12:47

24 presented to you?                                          12:47

25     A.   Yes.                                              12:47



1    Q.   Did he ever smile in session?                    12:47

2    A.   I don't recall.                                  12:48

3    Q.   Do you know if he ever -- Do you recall if he    12:48

4  ever cried in session or got emotional?                 12:48

5    A.   No, I don't recall.                              12:48

6    Q.   And we talked about several of these topics      12:48

7  already.  Umm.  I just -- I just want to touch briefly  12:48

8  on the hunting issue.  It says -- looks like it says,   12:49

9  "Lives on family ranch," and then, "likes hunting hogs  12:49

10  and deer."  Umm.  What did -- What did he tell you about 12:49

11  that?                                                   12:49

12    A.   Just simply that is all I can recall him        12:49

13  saying.                                                 12:49

14    Q.   And did he do the hunting on his parents'       12:49

15  ranch?                                                  12:49

16    A.   Yes.                                            12:49

17    Q.   Did he say the reason he was hunting, just      12:49

18  because he enjoyed it or some other reason?            12:49

19    A.   I don't think he specified.  I guess I assumed  12:49

20  because he enjoyed it.                                 12:49

21    Q.   Did he ever express to you any enjoyment or     12:50

22  satisfaction in hurting or killing animals?           12:50

23    A.   No.                                            12:50

24    Q.   And other than this session, do you recall if  12:50

25  he talked about hunting and -- or using firearms at any 12:50



CANDACE M. MARLOWE                                    June 18, 2020
JOE HOLCOMBE vs UNITED STATES OF AMERICA                        96

1  other point during your treatment of him?          12:50

2       A.   No.                                        12:50

3       Q.   Looking at the treatment note at the bottom of    12:50

4  that page, the June 9th treatment note, it looks like    12:50

5  under "MENTAL STATUS," several of the same boxes are    12:51

6  still checked.  Do you see that?                     12:51

7       A.   Yes.                                        12:51

8       Q.   And do you have any specific rec --          12:51

9  recollection of that second appointment?             12:51

10      A.   No.                                         12:51

11      Q.   And we've already talked about some of this.   12:51

12 I won't repeat myself too much.  But it looks like it   12:51

13 says, "Discussed financial concerns," and then it says,   12:51

14 "stress about working around people."  With regards to   12:51

15 "stress about working around people," do you recall    12:52

16 anything he might have said?                          12:52

17      A.   No, I don't.                                12:52

18      Q.   And then below that, it looks like it says,   12:52

19 "Shared was in military '09 through '13."  Did I read   12:52

20 that right?                                           12:52

21      A.   Yes.                                        12:52

22      Q.   And you said that's to say he -- he told you   12:52

23 about his service in the military and that was between   12:52

24 2009 and 2013?  Does that sound right?               12:52

25      A.   I hope that's what that means.  It either   12:52



1  means that or September 2013.  He got out -- I'm pretty    12:52

2  sure '09 to '13 is what it means, that he served.          12:52

3      Q.   And it says, "Discussed family relationship."     12:53

4  Do you recall specifically what was discussed during       12:53

5  that appointment?                                          12:53

6      A.   No, I don't.                                      12:53

7      Q.   In regards to the stress about working around     12:53

8  people, do you ever have a sense of whether Mr. Kelley     12:53

9  had problems or issues dealing with people?                12:53

10     A.   Well, yeah, like the history of being bullied     12:53

11 and beat up and mistreated.  That's probably why he was    12:53

12 guarded, and that doesn't fare well when you're around     12:53

13 other people.                                              12:53

14     Q.   So you felt that bullying and guardedness were    12:53

15 making it hard for him to interact with others?            12:53

16     A.   Yes.                                              12:53

17     Q.   All right.  We can turn to the next note          12:54

18 chronologically.  So this is Marlowe 45 in notations.      12:54

19 And the -- the two notes, again, the one at the top is     12:54

20 June 14, 2016.  Are you there?                             12:54

21     A.   Yes.                                              12:54

22     Q.   And, again, the "MENTAL STATUS," it looks like    12:54

23 several of the same boxes are still checked from the       12:54

24 prior session.  Do you see that?                           12:54

25     A.   Yes.                                              12:54



 1  know what that's referring to?                          01:05

 2      A.   No, I don't recall.                            01:05

 3      Q.   Do you recall at any point during your         01:06

 4  treatment with him him discussing having memory or      01:06

 5  recall issues?                                          01:06

 6      A.   I don't remember.  [Laughed].  I don't         01:06

 7  remember memory issues.                                 01:06

 8      Q.   All right.  We can go to the next page.  So    01:06

 9  this is Marlowe 43 on your --                           01:06

10            MR. SCHREIBER:  Hold on a second.  Do you     01:06

11  mind taking a five-minute break for me?                 01:06

12            MR. FURMAN:  Yeah, that's fine with me.       01:06

13            MR. SCHREIBER:  Thank you.  I need to         01:06

14  go --                                                   01:06

15            MR. FURMAN:  Yeah.  Off the record.           01:06

16            MS. WILLIS:  Off the record at 1:05 p.m.      01:06

17            (Recess.                                      01:06

18            MS. WILLIS:  We're on the record at           01:15

19  1:14 p.m.                                               01:15

20            MR. FURMAN:  Thank you.                       01:15

21      Q.   (BY MR. FURMAN) Mr. Marl -- Ms. Marlowe, we    01:15

22  went on a break.  We had in front of you Marlowe 43,    01:15

23  which at the top says "July 1, 2016," a treatment note. 01:15

24  Are you there?                                          01:15

25      A.   Yes.                                           01:15



1     Q.   All right.  And looking under the summary for     01:15

2  that treatment note, you have, "Hard to focus," in        01:15

3  quotes.  Umm.  And do you recall why Mr. Kelley might      01:16

4  have said that?                                            01:16

5     A.   No.                                                01:16

6     Q.   Over the course of your treatment of him, did     01:16

7  he describe difficulties in focusing?                      01:16

8     A.   I don't recall.                                    01:16

9     Q.   Well, was any ability -- or inability of him      01:16

10 to focus, was that ever something that was a concern for   01:16

11 you?                                                        01:16

12    A.   Umm.  No.                                          01:16

13    Q.   Okay.  I'm going to turn to the note at the       01:16

14 bottom of the page, the July 5th, 2016, note.  It looks    01:16

15 like several of these topics we've talked about before,    01:17

16 the history of bullying, and on the third or fourth line   01:17

17 there, umm, financial stressors.  Umm.  On the second to   01:17

18 the bottom line, it says, "History of wife cheating."      01:17

19 Do you see that?                                            01:17

20    A.   Yes.                                                01:17

21    Q.   Do you recall specifically what was talked        01:17

22 about at that time?                                         01:17

23    A.   No, I do not.                                       01:17

24    Q.   Was -- The cheating of his prior wife, is that    01:17

25 something that came up multiple times during his           01:17



1 treatment with you?                                            01:17

2     A.   Yes.  It -- I mean, it appears so based off of       01:17

3 my notes.  [Laughed].                                          01:17

4     Q.   Well, was it something that was particularly         01:17

5 bothersome to him?                                             01:17

6     A.   Yes.                                                  01:18

7     Q.   Do you know why it was bothersome to him?            01:18

8     A.   Because he had suspicions of his current wife        01:18

9 cheating.                                                      01:18

10    Q.   And when did he make those suspicions first          01:18

11 known to you?                                                 01:18

12    A.   I don't recall the details.                          01:18

13    Q.   Do you recall what made him -- what behaviors        01:18

14 made him suspicious his current wife was cheating?           01:18

15    A.   No, not at this time.  I just know that our          01:18

16 last session in '16 was because of that.                     01:18

17    Q.   Okay.  Umm.  I'll get that -- to that in a           01:18

18 minute.  Umm.  That's helpful.                               01:18

19              And at this time was there anything             01:19

20 unusual or concerning about his suspicions of his            01:19

21 current wife cheating?                                        01:19

22    A.   No.                                                  01:19

23    Q.   So it sounds like you thought he had a -- some       01:19

24 reason to be suspicious versus -- I'm sure some of your      01:19

25 clients have paranoia or suspicions for no good reason.      01:19



1  But it sounds like your understanding was that          01:19

2  Mr. Kelley had reason to potentially believe that, in   01:19

3  fact, his wife was cheating?                            01:19

4       A.   I don't recall.                               01:19

5       Q.   You could turn to the next page.  This is     01:19

6  Marlowe 42 in my copy, the July 7th, 2016, treatment    01:19

7  note at top.  And the -- the very first thing under     01:20

8  "SUMMARY," "Racing thoughts - can't sleep," do you      01:20

9  recall anything in more detail about that?              01:20

10      A.   No.                                           01:20

11      Q.   Do you recall during any time during the      01:20

12 course of your treatment of Mr. Kelley any specific     01:20

13 sleeping issues that he notified you of?                01:20

14      A.   No, I think it was correlated to his stress.  01:20

15 Like if you perpetually think about something, it's --  01:20

16 it's going to keep you -- it can keep you from sleeping. 01:20

17      Q.   So your understanding was he had a number of  01:20

18 worries, and because of those worries, he'd think about 01:20

19 them and therefore not be able to sleep?  Is that fair? 01:21

20      A.   Yes.                                          01:21

21      Q.   And the third line, it looks like it says,    01:21

22 "Has," maybe, countered "a lot of bad people"; --       01:21

23      A.   "Endured."                                    01:21

24      Q.   -- is that -- that right?                     01:21

25      A.   "Endured."                                    01:21



1         Turning to the July 19th treatment note,    01:25

2   it looks like the, I guess, third line from the bottom,    01:26

3   second filled in line, it says, "Medicine options."  Is    01:26

4   that what that says?    01:26

5        A.   Yes.    01:26

6        Q.   And then is that like an arrow being drawn    01:26

7   from "Processed anxiety"?    01:26

8        A.   Yes.    01:26

9        Q.   Okay.  And -- And what is the significance of    01:26

10   the arrow?    01:26

11        A.   It correlated.  The medicine options were for    01:26

12   the anxiety.    01:26

13        Q.   So it seemed like during the session, you    01:26

14   discussed different medication options for anxiety with    01:26

15   him?    01:26

16        A.   Just the possibility of utilizing medicine.    01:26

17        Q.   And at -- at this time did you feel that    01:27

18   medicine would be an appropriate option for him?    01:27

19        A.   Yes.  Usually I start out by not saying    01:27

20   anything about medicine to see if coping is sufficient    01:27

21   on its own, but then if it's not and we need a little    01:27

22   extra, I refer them out to someone that can add medicine    01:27

23   plus treatment.    01:27

24        Q.   And is that what you did here?    01:27

25        A.   Yes.    01:27



1     Q.   All right.  And then the next page in the          01:27

2   file, Marlowe 40, I think this is the letter that you     01:27

3   wrote, if you'd turn to there.                            01:27

4     A.   Yes.  Sorry.                                        01:27

5     Q.   And is that your letter?                           01:27

6     A.   Yes.                                                01:27

7     Q.   And that's your -- your signature?                 01:27

8     A.   Yes.                                                01:27

9     Q.   All right.  Umm.  Looking at the second line       01:28

10   of the lever -- letter, umm, you refer to                01:28

11   "psychoanalysis therapy."  Do you know why you used that 01:28

12   term there?                                              01:28

13     A.   Not at the time [laughed] because we were         01:28

14   just -- No.                                              01:28

15     Q.   Now, do you -- do you have any idea why you       01:28

16   would have put that there?                               01:28

17     A.   No.                                               01:28

18     Q.   Okay.  And then the next sentence, it says,       01:28

19   "Devin has consistently expressed severe anxiety."  Do   01:28

20   you see that?                                            01:28

21     A.   Yes.                                              01:28

22     Q.   And that -- that's based off your observation     01:28

23   of him?                                                  01:28

24     A.   Yes.                                              01:28

25          Can -- Can I say something?  I know why I         01:29



1  put "psychoanalysis."  It just came to me.                      01:29

2       Q.   Oh, okay.                                             01:29

3       A.   Because sometimes if you just write "therapy,"       01:29

4  people think physical therapy or other forms of therapy.       01:29

5  So --                                                           01:29

6       Q.   Oh [laughed].                                         01:29

7       A.   -- I put that for like mental health therapy.        01:29

8       Q.   That's smart.  Okay.  That makes sense.  Thank       01:29

9  you.  Yeah, if you need to correct a statement or amend        01:29

10  something like that, that's perfectly fine, so feel free       01:29

11  to do so.                                                      01:29

12            And then the next sentence, "Devin has              01:29

13  expressed symptoms of the following," and you list out         01:29

14  some symptoms.  So these are symptoms he's expressed to        01:29

15  you during the course of treatment?                            01:29

16       A.   Yes.                                                 01:29

17       Q.   And then going to the very end of the letter,       01:29

18  it says, "Devin reports that the medications that have         01:30

19  worked in the past included Klonopin and Xanax."  Do you       01:30

20  see that?                                                      01:30

21       A.   Yes.                                                 01:30

22       Q.   And do you know when during the course of           01:30

23  treatment he informed you that he had, in fact, been on        01:30

24  those medications?                                             01:30

25       A.   I don't recall specifically.                        01:30



1      Q.    And did you -- At this time did you feel that      01:30

2  it would be appropriate for Mr. Kelley to be on those      01:30

3  medications?                                                01:30

4      A.    Yes.                                              01:30

5      Q.    And do those medications have potential for       01:30

6  abuse by some people?                                       01:30

7      A.    I suppose for some.                               01:30

8      Q.    And did you have any concerns about Mr. Kelley    01:30

9  abusing those medications if he were to be prescribed       01:30

10 them?                                                       01:30

11     A.    No.                                               01:30

12     Q.    Is this type of letter something that you        01:30

13 typically do when clients request medication?              01:30

14     A.    Umm.   Sometimes, if they feel like it would     01:31

15 help.                                                       01:31

16     Q.    Do you recall why you wrote the letter here?     01:31

17     A.    He wasn't very good at expressing what was       01:31

18 wrong specifically symptom-wise, and so it was an aid      01:31

19 for when he went to the doctor to take it with him.        01:31

20     Q.    And do you know if he ever went to the doctor    01:31

21 to -- to get help with anxiety?                            01:31

22     A.    I think in one of the next notes it talks        01:31

23 about him going to an MHMR facility.                       01:31

24     Q.    And do you recall whether they did, in fact,     01:31

25 prescribe him medication?                                  01:31



1      A.    I don't recall.                              01:31

2      Q.    Due to Mr. Kelley's reported use of marijuana  01:32

3 daily, did that present any concerns regarding, umm, at  01:32

4 least those medications like Klonopin and Xanax?         01:32

5      A.    No.                                           01:32

6      Q.    Did you ever believe that Mr. Kelley was     01:32

7 exaggerating his anxiety symptoms?                       01:32

8      A.    No.                                           01:32

9      Q.    Okay.  We can turn to the -- the next page.  01:32

10 This is back in treatment notes, and this is Marlowe 39  01:32

11 in my copy, the July 21, 20 -- 2016, note on top.        01:33

12     A.    Okay.  I'm there.                             01:33

13     Q.    Thank you.                                    01:33

14           And it looks like the first line, it         01:33

15 looks like, "Wife's, maybe, "grandfather died"?         01:33

16     A.    Yes.                                          01:33

17     Q.    Does it -- Okay.  And then along -- the line  01:33

18 below that says, "Danielle," and then it says, "sad      01:33

19 and" -- I can't read what's after that.  Would you mind  01:33

20 reading that to me?                                      01:33

21     A.    "Sad and crying."                             01:33

22     Q.    "Sad and crying."  And then it says,          01:33

23 "Danielle's family conflict."  Umm.  Do you know what    01:33

24 that's referring to?                                     01:33

25     A.    No.                                           01:33



1    Q.    So the respect in this instance would have          01:35

2 been concerning his wife?                                     01:35

3    A.    Yes.                                                 01:35

4    Q.    And then it looks like it said -- like it           01:35

5 says, "Wife mood," and then there's -- there's an arrow,      01:36

6 "real mad to real nice."  Did I read that right?             01:36

7    A.    Yes.                                                 01:36

8    Q.    Do you know what that's referring to?               01:36

9    A.    Just the -- how tumultuous their relationship       01:36

10 would get with the fighting, that it could be really         01:36

11 good one minute, then really bad another.                    01:36

12    Q.    Was that concerning to you?                         01:36

13    A.    It was consistent with how things had been; so     01:36

14 not overly.                                                  01:36

15    Q.    During the time that you treated Mr. Kelley,       01:36

16 did you ever develop a sense through treatment about --      01:36

17 about his wife, about who she is --                          01:36

18    A.    Not mu --                                           01:36

19    Q.    -- about her personality?                          01:36

20    A.    Not much, I mean, other than his suspicions of     01:36

21 her cheating.  I think he really wanted to work it out       01:37

22 with her and that's why he was in therapy.  That was a       01:37

23 part of it.                                                  01:37

24    Q.    We can go ahead and turn to the next page.         01:37

25 This is Marlowe 38, a treatment note, July 28th, 2016,       01:37



1  on top.  Are you there?                                    01:37

2      A.   Yes, sir.  I'm sorry.                             01:37

3      Q.   No problem.                                       01:37

4           And here I'm looking at the "SUMMARY."            01:38

5  Umm.  And this is what -- what you were referring to       01:38

6  previously.  It says, "Discussed wife's sexual abuse       01:38

7  past."  And do you recall anything specifically about      01:38

8  what Mr. Kelley said about her past?                       01:38

9      A.   Not specifically; just that he was very upset     01:38

10 that she had been hurt by her family in that way.          01:38

11     Q.   Do you know why it was bothering him at this      01:38

12 particular time?                                           01:38

13     A.   Because he endured abuse and bullying             01:38

14 throughout his life.  You mean why specifically at that    01:38

15 time?                                                      01:38

16     Q.   Right.  I guess -- Or what I'm looking at, at     01:38

17 this July 28th -- So I would suspect his wife would have   01:38

18 told him about any abuse sometime prior to that.  So I     01:39

19 didn't know if it was a triggering event or event         01:39

20 particular to this time that made him want to talk about   01:39

21 his wife's past abuse.                                     01:39

22     A.   No, I'm not sure specifically.  Sometimes         01:39

23 stuff just comes up.                                       01:39

24     Q.   Did he ever express violence or wanting to        01:39

25 commit violence that -- to people who had done this        01:39



 1 | to -- to his wife? | 01:39
 2 | A. No. | 01:39
 3 | Q. And below that, it says, "Hard to | 01:39
 4 | concentrate." Do you recall any -- anything | 01:40
 5 | specifically about that? | 01:40
 6 | A. No. | 01:40
 7 | Q. Below that, it says, "Depression worse." Do | 01:40
 8 | you recall specifically why it was worse? | 01:40
 9 | A. No. | 01:40
10 | Q. Now, at the bottom there, you said that M -- | 01:40
11 | "MHMR for medication." So that's the local clinic, I | 01:40
12 | think you were saying? | 01:40
13 | A. Right. If somebody has low to no income, | 01:40
14 | it's -- it's a resource for them in the community run by | 01:40
15 | the state. | 01:40
16 | Q. Thank you. | 01:40
17 | Okay. Let's look at the obvious second | 01:40
18 | treatment note. At the top, he says, "No more" -- or | 01:40
19 | you say, "No more anxiety or" -- "or racing thoughts." | 01:41
20 | Umm. Do you know why that was? | 01:41
21 | A. No. | 01:41
22 | Q. And it looks like it talks about some of the | 01:41
23 | issues that we've already talked about. | 01:41
24 | Do you recall if the reduction in anxiety | 01:41
25 | or racing thoughts was correlated with starting any | 01:41



| | | |
|---|---|---|
| 1 | medicine? | 01:41 |
| 2 | A.   No, I don't recall specifically. | 01:41 |
| 3 | Q.   You can go ahead and turn to the next page. | 01:42 |
| 4 | So this is my copy, Marlowe 37, the August 9th session | 01:42 |
| 5 | on top.  Are you with me? | 01:42 |
| 6 | A.   Yeah. | 01:42 |
| 7 | Q.   Great. | 01:42 |
| 8 | Umm.  Looking again at the, umm, | 01:42 |
| 9 | "SUMMARY," it looks like, umm, it says, "Danielle | 01:42 |
| 10 | pregnant," exclamation point? | 01:42 |
| 11 | A.   Yes [laughed]. | 01:42 |
| 12 | Q.   [Laughed].  Umm.  How did he react to his | 01:42 |
| 13 | wife's pregnancy? | 01:42 |
| 14 | A.   He was -- That kind of revamped and fueled the | 01:42 |
| 15 | worry about the finances because babies are expensive. | 01:42 |
| 16 | Q.   Was he otherwise happy about her pregnancy? | 01:42 |
| 17 | A.   Yes. | 01:43 |
| 18 | Q.   And then the treatment note at the bottom for | 01:43 |
| 19 | August 11, umm, again, it's talking about things I think | 01:43 |
| 20 | we've talked about.  At the very bottom, it says, "Has | 01:43 |
| 21 | money right now."  Do you know why he had money at that | 01:43 |
| 22 | time? | 01:43 |
| 23 | A.   No, not specifically.  Like I said, he -- his | 01:43 |
| 24 | money would ebb and flow; he would have it and then not | 01:43 |
| 25 | have it. | 01:43 |



1  your treatment with him?                                    01:56

2      A.   Yes.                                               01:56

3      Q.   And in looking back on your treatment today,      01:56

4  is there anything you felt like you could have done any    01:56

5  differently or would have done differently with his        01:56

6  treatment?                                                 01:56

7      A.   No.                                               01:56

8      Q.   All right.  Well, let's turn to the -- the        01:56

9  9/1/17 note.  So this is Marlowe 34 in my copy.            01:56

10     A.   Okay.                                             01:56

11     Q.   So this looks to be about a year after the        01:56

12 last time you saw him.  Umm.  Do you recall the            01:56

13 circumstances and him reinitiating -- reinitiating         01:57

14 treatment?                                                 01:57

15     A.   No, I don't recall.                               01:57

16     Q.   Is something like this, where a client doesn't    01:57

17 come in for a year and then comes back, is something       01:57

18 like that unusual?                                         01:57

19     A.   No.                                               01:57

20     Q.   In the period between 2016 and when he came       01:57

21 back in 2017, had -- prior to him rescheduling, had you    01:57

22 had any contact with him?                                  01:57

23     A.   No.                                               01:57

24     Q.   And during that period of time, after he last    01:57

25 saw you in 2016 and then in 2017, do you know if he        01:57



1  sought, you know, psychotherapy elsewhere?                  01:57

2       A.   No, I don't know.                                 01:57

3       Q.   And when you saw him in September 2017, did he    01:58

4  seem different to you than he had been about a year         01:58

5  prior?                                                      01:58

6       A.   No.  He seemed about the same.                    01:58

7       Q.   Was his physical appearance the same?             01:58

8       A.   No.  I think his hair was falling out.  He had    01:58

9  a condition or something with his skin on his head.         01:58

10      Q.   Okay.  Umm.  What about from a mental health       01:58

11 perspective?  Was his mental health status the same or      01:58

12 similar to when you last saw him?                           01:58

13      A.   No.  It seemed like it was getting better.        01:58

14      Q.   Getting better how?  What specifically?           01:59

15      A.   Well, he -- They had -- He -- His wife had the    01:59

16 girl, so now he had his son and his baby girl.  He had      01:59

17 just got a new job as a security guard at a RV park, and    01:59

18 he said that he had friends that had got him the job.       01:59

19 So there was support there that hadn't been there           01:59

20 before.                                                     01:59

21      Q.   On the first part of the "SUMMARY," it            01:59

22 sound -- it says, "Thinks he has Asperger's diagnosis."     01:59

23 Umm.  I guess, first, what is Asperger's?                   01:59

24      A.   It's a form of autism.                            01:59

25      Q.   And do you know why he was saying that to you?    01:59



1      A.    I think he was just updating me on where he      01:59

2  was at, and he -- It was a self-diagnosis.  He had been   01:59

3  doing some research on Google and said that some of the   01:59

4  traits on there seemed like they fit him, and he was      02:00

5  just sharing that with me.                                02:00

6      Q.    Did you have any clinical opinion as to         02:00

7  whether or not he had Asperger's?                         02:00

8      A.    No, but I notated it thinking that he was       02:00

9  going to maybe come back and we could look into it        02:00

10  further.                                                  02:00

11      Q.    Understood.                                     02:00

12            And at the time he came in for this            02:00

13  September 2017 appointment, umm, was it his intention to  02:00

14  come back into treatment?                                 02:00

15      A.    I think he was just touching base to see if --  02:00

16  I think he was really just probing the Asperger's thing,  02:00

17  but since I didn't bite for it, he -- that might have     02:00

18  been part of why he didn't come back.  I was hoping he    02:00

19  was initiating services.                                  02:00

20      Q.    Sure.                                           02:00

21            Now, at the bottom of that note, it looks      02:01

22  like it says, "Client was just catching up - refused      02:01

23  further services."  Is that what you were referring to?   02:01

24      A.    Yes.                                            02:01

25      Q.    So is it fair to say that you felt like he      02:01



1  could still benefit from treatment at this time but          02:01

2  he -- he'd like to not continue?                             02:01

3      A.   Yes.                                                 02:01

4      Q.   Do you know whether when he stopped treatment        02:01

5  in 2016, did -- was part or any of the reason he stopped     02:01

6  coming because of any loss of Medicaid benefits?             02:01

7      A.   I don't know.  I don't know at that time.  I        02:01

8  know that when he --                                         02:01

9      Q.   Okay.                                               02:01

10      A.   -- came in September seven -- 2017, he said he     02:01

11  had Medicaid, but he didn't, and so I didn't even get       02:02

12  paid for that session [laughed].                            02:02

13      Q.   I -- I -- Sorry.  I missed that.  What session     02:02

14  was that?                                                   02:02

15      A.   The September 1st, 2017.                           02:02

16      Q.   Oh, okay.  Was there anything concerning to        02:02

17  you at all in Mr. Kelley's presentation to you during       02:02

18  that September 2017 visit?                                  02:02

19      A.   No.                                                02:02

20      Q.   And during the course of this visit did he        02:02

21  discuss anything about being on medication or -- or         02:03

22  medicine?                                                   02:03

23      A.   No.                                                02:03

24      Q.   Okay.  And when -- It says he refused further      02:03

25  services.  Do you recall specifically the reason he gave    02:03



1  for not wanting to come back?                                  02:03

2       A.   No, I don't recall.                                  02:03

3       Q.   Umm.  Did you -- After this visit did you --         02:03

4  did you communicate with him at all in any way?                02:03

5       A.   No, I don't think so.                                02:03

6       Q.   All right.  We've gone through the treatment         02:04

7  notes, and I'm just going to, umm, go through a few of         02:04

8  the things -- or -- Mr. Kelley might have talked to you        02:04

9  about just to see if it was mentioned at all.  Umm.            02:04

10           Before I get there, just -- I know you               02:04

11  said that he was guarded and had anxiety, umm, you know,      02:04

12  related to the history of bullying.  Umm.  Other than         02:04

13  some guardedness, did you have any other concerns or          02:04

14  worries about his reporting of the facts and events to        02:04

15  you?                                                          02:04

16      A.   No.                                                  02:04

17      Q.   Did you feel like he was a truthful person?          02:05

18      A.   Yes, as far as I knew.                               02:05

19      Q.   Do you recall any instances where you might          02:05

20  have thought he might have been lying or not being            02:05

21  truthful with you?                                            02:05

22      A.   No.                                                  02:05

23      Q.   And during the course of treatment did he ever       02:05

24  try to embellish or exaggerate problems?                      02:05

25      A.   No.                                                  02:05



1  style rifle he had purchased, an assault-type rifle?          02:15

2  Did he ever discuss that?                                     02:15

3       A.   No.                                                 02:15

4       Q.   Did he ever talk about, other than hunting,         02:15

5  using firearms, for target shooting or for anything?          02:15

6       A.   No.                                                 02:15

7       Q.   Did he ever talk about, umm, going to gun           02:15

8  shows?                                                         02:15

9       A.   No.                                                 02:15

10       Q.   Did he ever talk about purchasing or using         02:15

11  body armor of any kind?                                       02:16

12       A.   No.                                                 02:16

13       Q.   Did he -- Other than firearms, did he talk         02:16

14  about owning or using any other types of weapons, knives     02:16

15  or anything else?                                             02:16

16       A.   No.                                                 02:16

17       Q.   So he never discussed purchasing or wanting to     02:16

18  purchase any firearms with you; is that right?               02:16

19       A.   That's right.                                      02:16

20       Q.   Umm.  Turn -- Turning back to, you know, the       02:16

21  events of November 25th -- or - sorry - November 5th,        02:16

22  2017, the Sutherland Springs church shooting, umm, when      02:16

23  you realized that Mr. Kelley was the shooter, how did        02:17

24  you -- well, what did you feel about that?                   02:17

25       A.   Devastated.                                        02:17



1      Q.    Were you surprised?                              02:17

2      A.    Extremely.                                       02:17

3      Q.    Why is that?                                     02:17

4      A.    You -- You never think somebody you're trying   02:17

5 to help is going to do such a horrific thing.              02:17

6      Q.    And when you found that out, did you reflect    02:17

7 at all on your course of treatment with him?               02:17

8      A.    Of course.  Yes.                                 02:17

9      Q.    And in looking back, is there anything you      02:17

10 think you should -- could have done differently?          02:17

11     A.    No.                                              02:17

12     Q.    As a trained clinician do you have any sense    02:17

13 on why Mr. Kelley -- Kelley might have done what he did?  02:17

14           MR. SCHREIBER:  Objection.  Calls for           02:18

15 speculation.                                               02:18

16     A.    I have no idea.  I have no idea.  It was a       02:18

17 complete surprise.                                         02:18

18     Q.    (BY MR. FURMAN) Understood.                      02:18

19           And just to be clear, so the -- the --          02:18

20 the church shooting on the -- November 5th, 2017, that    02:18

21 was nothing you could have foreseen during your           02:18

22 treatment of him as a therapist --                        02:18

23           MR. SCHREIBER:  Objection.                       02:18

24     Q.    (BY MR. FURMAN) -- is that right?                02:18

25           MR. SCHREIBER:  Calls for a legal                02:18



```
 1 conclusion.  Calls for speculation.                      02:18
 2           MR. MYERS:  You can answer.                     02:18
 3      A.   Oh, I'm sorry.  Was that a --                   02:18
 4      Q.   (BY MR. FURMAN) You can --                      02:18
 5      A.   -- question?                                    02:18
 6      Q.   -- answer.                                      02:18
 7      A.   What was -- Oh, can you repeat the question?    02:18
 8 I'm sorry.                                                02:18
 9      Q.   [Laughed].  I -- I can.  He might object        02:18
10 again.  So --                                             02:18
11           MR. SCHREIBER:  I will.                         02:18
12      A.   [Laughed].  I'm sorry.                          02:18
13      Q.   (BY MR. FURMAN) [Laughed].  So the -- the       02:18
14 November 5th, 2017, church shooting, umm, there was no    02:18
15 way you could have possibly foresaw that event based off  02:19
16 your treatment of Mr. Kelley, was there?                  02:19
17      A.   Correct.                                        02:19
18           MR. SCHREIBER:  Objection.  Calls for           02:19
19 legal conclusion.  Calls for speculation.                 02:19
20      A.   No, it was not foreseeable with my treatment.   02:19
21      Q.   (BY MR. FURMAN) At any point in time did        02:19
22 you -- do you recall learning on the news or otherwise    02:19
23 about Mr. Kelley's criminal background and whether or     02:19
24 not that had been, umm, put in the FBI background check   02:19
25 system?                                                   02:19
```



```
 1                 UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2
   JOE HOLCOMBE, ET AL.,       §
 3          Plaintiffs         §
                               §
 4 v.                          §    Civil No. 5:18-cv-555-XR
                               §
 5 UNITED STATES OF AMERICA,   §
            Defendant          §
 6
                     REPORTER'S CERTIFICATION
 7        DEPOSITION OF CANDACE McKENZIE MARLOWE
                        JUNE 18, 2020
 8
 9       I, GLENDA I. GREEN, Certified Shorthand Reporter in

10 and for the State of Texas, hereby certify to the

11 following:

12       That the witness, CANDACE McKENZIE MARLOWE, was

13 duly sworn by the officer and that the transcript of the

14 oral deposition is a true record of the testimony given

15 by the witness;

16       That examination and signature of the witness to

17 the deposition transcript was waived by the witness and

18 agreement of the parties at the time of the deposition;

19       That the amount of time used by each party at the

20 deposition is as follows:

21       Mr. Furman - 3 hours, 57 minutes

22       Mr. Schreiber - 15 minutes

23       That $_____ is the deposition officer's charges

24 to the Defendant for preparing the original deposition

25 transcript and any copies of exhibits;
```



1    That pursuant to information given to the

2 deposition officer at the time said testimony was taken,

3 the following includes counsel for all parties of

4 record:

5    MR. JOSEPH SCHREIBER, MS. CHELSIE KING GARZA &

6 MR. JUSTIN B. DEMERATH, Attorneys for Plaintiffs

7    MR. AUSTIN L. FURMAN & MR. DANIEL P. CHUNG,

8 Attorneys for Defendant

9    MR. J. GREGORY MYERS, Attorney for Witness

10    I further certify that I am neither counsel for,

11 related to, nor employed by any of the parties or

12 attorneys in the action in which this proceeding was

13 taken, and further that I am not financially or

14 otherwise interested in the outcome of the action.

15    Certified to by me this 19th day of June, 2020.

16

17    _____

18 GLENDA I. GREEN, Texas CSR 2194
   Expiration Date:  12/31/2016
   ESQUIRE DEPOSITION SOLUTIONS, No. 003
19 1235 North Loop West, Suite 510
   Houston, TX 77008
20 Office: 832.214.4221
   Email: houstonscheduling@esquiresolutions.com

21

22

23

24

25

