IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| JOE HOLCOMBE, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) CIVIL ACTION NO. 5:18-cv-555-XR |
| v. | ) (consolidated cases) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT UNITED STATES OF AMERICA'S DEPOSITION DESIGNATIONS, OBJECTIONS, AND COUNTER DESIGNATIONS TO THE TESTIMONY OF MAJOR NATHAN MCLEOD-HUGHES**

Defendant submits the following designations of the testimony given by Major Nathan McLeod-Hughes by deposition on January 9, 2020. An excerpted transcript reflecting the designations, and the United States' counter designations to Plaintiffs' designations, is attached as Exhibit A. This document is Government Trial Exhibit GEX-12.

| Designated testimony | Transcript |
|---|---|
| 24:17-25:22 | 17 Q. Okay. The -- at the time that you were at -- let me<br>18 get this on the record too. Tell me what your -- tell me about<br>19 your time at Holloman Air Force Base, when you started, when<br>20 you ended, what rank you were, etcetera.<br>21 A. I arrived at Holloman about the summertime June/July<br>22 of 2011. I left Holloman approximately November of 2014. My<br>23 job was the director of operations for the 49th Logistics<br>24 Readiness Squadron. I served in that job the entire time<br>25 period. I was deployed for six months off site to Afghanistan<br>1 in a similar capacity at the -- at a similar organization<br>2 there.<br>3 Q. When were you deployed in Afghanistan, sir?<br>4 A. February till approximately September of 2013. |

| | |
|---|---|
| | 5  Q. Okay. And what was your position at Holloman Air<br>6  Force Base? Your specific position and role from 2011 through<br>7  2000 -- the end of 2012 when the Devin Kelley investigation was<br>8  happening --<br>9  A. I was --<br>10  Q. -- and his -- and his -- his eventual conviction? Go<br>11  ahead.<br>12  A. I was the director of operations for the Logistics<br>13  Readiness Squadron there.<br>14  Q. And you were a major?<br>15  A. Yes, I was.<br>16  Q. All right. So when you say you were the director of<br>17  operations for the 49th Logistic Readiness Squadron what was<br>18  your job? What were your responsibilities?<br>19  A. The director of operations is the second in command<br>20  for the squadron when it come -- my day-to-day duties involved<br>21  operational issues ensuring that our support to our customers<br>22  is provided. |
| 26:3-14 | 3  Q. Okay. And is this -- I'm sorry. Is the Security<br>4  Forces Squadron within the Logistic Readiness Squadron?<br>5  A. No.<br>6  Q. Okay. How is -- what is the relationship between the<br>7  -- I'm going to say LRS for Logistic Readiness Squadron. Is<br>8  that okay?<br>9  A. Yes.<br>10  Q. Am I saying that right?<br>11  What is the relationship between the 49th LRS and the<br>12  49th Security Forces?<br>13  A. They are separate organizations with their own<br>14  leadership. |
| 27:20-28:1 | 20  Q. Okay. Now, Devin Kelley was in the Logistics<br>21  Readiness Squadron, correct?<br>22  A. Correct.<br>23  Q. Okay. So you were one of Devin Kelley's commanders<br>24  when he was at the Holloman Air Force Base LRS; is that right?<br>25  A. No. I was not the commander. Occasionally I was the<br>1  acting commander. |
| 157:3-14 | 3  Mr. McLeod-Hughes, under what circumstances were you<br>4  acting director at Holloman?<br>5  A. Acting commander?<br>6  Q. Acting commander, I apologize, yes.<br>7  A. When my commander had to leave the area for any<br>8  extended period of time such as vacation time or if he was<br>9  attending a class or seminar in another location where he would<br>10  have to go TDY or temporary duty.<br>11  Q. So at any given time how -- how long would you have |

| | |
|---|---|
| | 12· been in the position of acting commander?<br>13 ·A.· It could be anywhere from a few days to less than two<br>14· weeks. |
| 31:17-32:14 | 17· Q.· Okay.· And how -- what kind of communication or<br>18· involvement or connection did you have when you were acting<br>19· commander of the 49th LRS that Devin Kelley was a part of?<br>20· What kind of communication did you have with the 49th Security<br>21· Forces Wing when they were investigating folks under your<br>22· command like Devin Kelley?<br>23· A.· They were a security forces squadron and I had zero<br>24· contact.<br>25· Q.· So when one of your airmen or airwoman, women were<br>·1· under investigation for potential criminal conduct by the 49th<br>·2· Security Wing -- Security Forces Wing they would have no<br>·3· communication with the supervisors or commanders that were over<br>·4· those airmen or airwomen to let you know that one of them was<br>·5· under investigation?<br>·6· A.· I do not know if the squadron would have contacted my<br>·7· squadron commander directly.· They would more than likely not<br>·8· have contacted the supervisors below the commander.<br>·9 · Q.· All right.· How did -- then how did you get involved?<br>10· How did you know to issue a letter of reprimand regarding Devin<br>11· Kelley assaulting his wife and child?<br>12 ·A.· Our first sergeant for our squadron would have<br>13· brought the information to me at the time to explain what was<br>14· going on. |
| 32:25-33:13 | 25 ·Q.· Okay.· So what -- what training, if any, did you get<br>·1· on the Department of Defense instructions and Air Force<br>·2· instructions regarding fingerprint submission and fingerprint<br>·3· collection?<br>·4 · A.· I had zero training.<br>·5 · Q.· And to be clear, you had zero training on the<br>·6· Department of Defense instructions and Air Force Instructions<br>·7· related to fingerprint collection and fingerprint submission<br>·8· while you -- the entire time you were at Holloman Air Force<br>·9· Base?<br>10 ·A.· Correct.<br>11 ·Q.· And do you know why that is, you received no training<br>12· on that?<br>13 ·A.· It was not part of my duties. |
| 34:9-15 | ·9 · Q.· Okay.· Did you have any communications when you were<br>10· at Holloman Air Force Base?· Any kind of communications with<br>11· anyone at Holloman Air Force Base, 49th Security Forces Wing<br>12· relating to their collection and submission of fingerprints of<br>13· airmen under your command who were either charged with crimes<br>14· or convicted of crimes or under investigation for crimes? |

| | |
|---|---|
| | 15 ·A.· I had zero contact with the security forces squadron. |
| 35:7-25 | ·7· Q.· No, I understand.· And that's -- that's helpful to me<br>·8· to understand sort of what your sort of purview and role<br>·9· because it's not very clear on security forces side at least of<br>10· Holloman Air Force Base how everybody interacted and worked<br>11· together.· So my understanding is when you were acting<br>12· commander at Holloman Air Force Base in the 2011-2012 timeframe<br>13· you as acting commander of the 49th LRS that Devin Kelly was a<br>14· part of have had no connection, involvement or working<br>15· relationship with the 49th Security Forces Wing?<br>16 ·A.· I did not, correct.<br>17 ·Q.· You did not.· Okay.<br>18 ·Now, whenever you issued a letter of reprimand or<br>19· issued, like in this case a pretrial confinement order on Devin<br>20· Kelley did you have any kind of -- well, how did you<br>21· communicate that or work with, if at all, the 49th Security<br>22· Forces Wing when that occurred?<br>23 ·A.· I did not communicate at all with the -- with the<br>24· security forces squadron.· I would have communicated the<br>25· information to my first sergeant. |
| 39:12-40:3 | 12 ·Q.· Okay.· Did you -- when you were at Holloman Air Force<br>13· Base while Devin Kelley was there did your command, so the 49th<br>14· LRS, have access to any kinds of files, security forces files<br>15· relating to people in your command that were being<br>16· investigated?<br>17 ·A.· I don't know.<br>18 ·Q.· What do you mean by "you don't know"?<br>19 ·A.· I don't know if they would or would not have had<br>20· access to any files.<br>21 ·Q.· No.· What I'm asking is, when you were at Holloman<br>22· Air Force Base and when you were in second command at 49th LRS<br>23· and when you were acting commander at 49th LRS would you -- was<br>24· there any time which you would have had access to any computer<br>25· files, security forces files relating to investigations,<br>·1  criminal investigations that were being done on people under<br>·2· your command like Devin Kelley?<br>·3 ·A.· No. |
| 40:24-41:7 | 24 ·Q.· Did you ever have any communication with special<br>25· agents who were investigating your airmen while you were at<br>·1· Holloman Air Force Base?<br>·2 ·A.· Not that I can recall.<br>·3 ·Q.· Okay.· So if -- if agents send -- sent records, OSI<br>·4· records from the AFOSI to the 49th Logistics Readiness Squadron<br>·5· where would you those be stored?<br>·6 ·A.· I don't know if the OSI organization would have sent<br>·7· any sort of investigatory documents to the squadron. |

| 51:5-52:17 | ·5· Q.· Okay.· What about your -- well, let's actually talk<br>·6· about that more specifically.· Did you ever have any<br>·7· conversation -- did you ever have any conversations when you<br>·8· were second in command and acting commander at Holloman Air<br>·9· Force Base with Lieutenant Colonel Marconi or Lieutenant<br>10· Colonel Bearden about how to deal with and how to document and<br>11· how to sort of supervise and monitor an airman like Devin<br>12· Kelley who was under your command and was under an ongoing<br>13· criminal investigation like we see in this document?<br>14 · A.· No.<br>15 · Q.· Okay.<br>16 · A.· Not that I can recall.<br>17 · Q.· Okay.· So you don't recall any time in 2011-2012<br>18· timeframe where you would -- you would have any communication<br>19· with Lieutenant Colonel Marconi or Lieutenant Colonel Bearden<br>20· about how to manage and how to supervise and how to keep an eye<br>21· on this ongoing criminal investigation involving one of your<br>22· airmen in your command?<br>23 · A.· In my capacity I am not brought in on the full<br>24· details of any investigation that may be going on.· So, no, I<br>25· would not have been told anything about the investigation other<br>·1· than there is an investigation going on about Member X.· But I<br>·2· would not have been provided any specific training or knowledge<br>·3· beyond that.<br>·4 ·Q.· Okay.· And so -- so what I understand is that first<br>·5· specifically as it relates to Devin Kelley you never had any<br>·6· communication, conversation, plan, discussions with your<br>·7·  commanders, Lieutenant Colonel Bearden and Lieutenant Colonel<br>·8·  Marconi about Devin Kelley when he -- about his criminal<br>·9·  investigation, correct?<br>10 ·A.· That particular statement, no, I had communications<br>11· with them, but not for how to manage an investigation.<br>12 ·Q.· Okay.<br>13 ·A.· I never touched any sort of investigation.· There<br>14· were -- there were instances where the commander if he or she<br>15· was stepping out for a time period and something was going on I<br>16· may have been informed some superficiary information about what<br>17· was going on or what might happen during their time away. |
|---|---|
| 65:17-66:1<br>[JEX 21] | 17 ·Q.· Okay.· I'm handing you Exhibit No. 5.· Could you<br>18· please review that just silently to yourself and tell me when<br>19· you've had a chance to review it.<br>20 ·A.· I've reviewed it.<br>21 ·Q.· Okay.· Exhibit 5 is marked USA13387 and I've also got<br>22· it up on the screen if it's a little easier for you to see.<br>23· This is a -- this is a true and correct copy of actually a<br>24· letter, a memorandum that you personally authored, correct? |

| | |
|---|---|
| | 25 A. No. I did not author it.<br>1 Q. Okay. It says Nathan McLeod-Hughes, who's that?<br>2 A. I signed it, but did not author it.<br>3 Q. Okay. All right. And I appreciate the specificity.<br>4 Okay. Who authored this for you?<br>5 A. I'm not entirely sure, but I would believe the first<br>6 sergeant did. |
| 68:13-69:2<br>[JEX 21] | 13 Q. All right. Number 1, it states, "Investigation has<br>14 revealed that you physically assaulted Mrs. Tessa K. Kelley on<br>15 or about February 17, 2012 at 2629B McKinley Loop, Holloman Air<br>16 Force Base, New Mexico." Did I read that correctly?<br>17 A. Correct.<br>18 Q. And that -- that -- so that's stating that Devin<br>19 Kelley assaulted Tessa Kelley on Holloman Air Force Base itself<br>20 on February 17, 2012, correct?<br>21 A. Correct.<br>22 Q. The next sentence says, "That on multiple occasions<br>23 you physically assaulted your spouse. On this occasion you<br>24 punched her in the arm and slapped her with an open hand while<br>25 you were involved in a verbal/physical altercation." Is that<br>1 correct?<br>2 A. Correct. |
| 70:3-10 | 3 Q. And how would the first sergeant come about this<br>4 information to provide to you such that you would be willing to<br>5 sign it and actually issue a reprimand for it?<br>6 A. Logically would have gotten from security forces.<br>7 Q. Okay. So would the first sergeant under your command<br>8 have been communicating with the 49th Security Forces to get<br>9 this information?<br>10 A. I would infer yes. |
| 72:13-73:2 | 13 Q. Okay. And I think from our earlier conversation at<br>14 this point April 17, 2012, when you're specifically<br>15 reprimanding Devin Kelley for assault, you would not have<br>16 inquired or asked about collection of fingerprints or<br>17 submission of fingerprints to the FBI; is that fair to say?<br>18 A. At the time the letter of reprimand is provided there<br>19 is no two way conversation, but there's nothing involving<br>20 fingerprints in issuing the document.<br>21 Q. So because there's no kind of conversation is my<br>22 statement correct, that when you were issuing this reprimand<br>23 stating that Devin Kelley's actions violated Article 128 of US<br>24 -- UCMJ-Assault you would not have then followed up or inquired<br>25 about fingerprint collection or fingerprint submission to the<br>1 FBI? That's not something you would have done?<br>2 A. No, that is not something I would have done. |
| 119:9-16 | 9 Q. Okay. Now, I know -- we talked about this earlier, |

| | |
|---|---|
| | 10 but since we're specifically on this, at this point in time<br>11 when you had a reason to believe these assaults had been<br>12 committed by Devin Kelley and you signed this letter on June 8,<br>13 2012, you didn't specifically check or make sure that Devin<br>14 Kelley's fingerprints were collected or submitted to the FBI,<br>15 fair?<br>16 A. I'm not involved in the process on that, but no. |
| 135:20-25 | 20 Q. Okay. So based on what we talked about I think it's<br>21 -- my understanding is that neither you or anyone that you<br>22 supervised at Holloman Air Force Base were individuals who<br>23 would have been responsible, employees responsible for<br>24 reporting to the NICS FBI system; is that correct?<br>25 A. Correct. |
| 136:25-137:19 | 25 Okay. Did you -- did your -- when you were acting<br>1 commander or second in command at Holloman Air Force Base did<br>2 you ever had any kind of monthly or weekly or intermittent<br>3 meetings where you sat down and reviewed any investigated case<br>4 files that were being done on people like Devin Kelley who were<br>5 in your command?<br>6 A. No.<br>7 Q. All right. So that would -- then just to close that<br>8 out, you never had any oversight review meetings with the 49th<br>9 Security Forces regarding Devin Kelley's case --<br>10 A. No.<br>11 Q. -- correct?<br>12 Never had any oversight or joint meetings with the<br>13 staff judge advocate's office regarding Devin Kelley's case,<br>14 right?<br>15 A. Right.<br>16 Q. And you never had any kind of joint meetings to<br>17 review Devin Kelley's case periodically with the AFOSI<br>18 Detachment 225; is that right?<br>19 A. That's right. |
| 159:9-160:10 | 9 Q. Did your day-to-day -- did anyone in the Logistics<br>10 and Readiness Squadron have any responsibilities requiring the<br>11 taking of fingerprints?<br>12 A. No.<br>13 MR. ALSAFFAR: Objection to form.<br>14 BY MS. KRIEGER:<br>15 Q. Did anyone in the Logistics and Readiness Squadron<br>16 have as part of their duties the responsibility to submit<br>17 fingerprints to the FBI?<br>18 MR. ALSAFFAR: Objection. Form.<br>19 A. No.<br>20 BY MS. KRIEGER:<br>21 Q. Did your position involve any duties or |

|  | |
|---|---|
|  | 22· responsibilities related to law enforcement?<br>23 ·A.· No.<br>24 ·Q.· Did you supervise any law enforcement personnel?<br>25 ·A.· No.<br>·1 · Q.· Did you personally ever take fingerprints?<br>·2 · A.· No.<br>·3 · Q.· Did you personally ever submit fingerprints to the<br>·4· FBI?<br>·5 ·A.· No.<br>·6 ·Q.· Why not?<br>·7 ·A.· That's not my position to do that.<br>·8 ·Q.· Do you know whose position it would be to do that?<br>·9 ·A.· I know the security forces personnel take<br>10· fingerprints, but I don't know who would submit it to the FBI. |
| 162:11-15 | 11  Q.· Okay.· Just let me quickly look at my notes.<br>12 ·Just going back to the fingerprints very briefly.<br>13· Did you have any responsibilities or duties to check to see if<br>14· fingerprints had been collected or submitted?<br>15 ·A.· No. |

In addition, Defendant makes the following objections and counter-designations to Plaintiffs' designated testimony of Major Nathan McLeod-Hughes.

| Plaintiffs' Designated Testimony | Objection | Counter-designation | Transcript |
|---|---|---|---|
| 5:2-10 | | | |
| 9:13-25 | | | |
| 24:17-25:2 | | | |
| 25:5-13 | | | |
| 25:16-26:2 | | | |
| 27:20-22 | | | |
| 28:5-16 | | | |
| 28:20-25 | | | |
| 30:19-25 | | 30:6-13 | ·6· ·Q.· ·We'll -- we'll look at.· We'll -- I'll put those in<br>·7· ·front of you because I just want to know your general knowledge<br>·8· ·and memory of it.<br>·9· ·A.· ·In my position I am not normally involved in<br>10· ·administrative side of the house.<br>11· ·Q.· ·Okay.· What's -- what do you mean by "administrative<br>12· ·side?"<br>13· ·A.· ·The paperwork.· If LOC or letters of counseling or |
| 32:9-20 | | | |
| 41:17-42:15 | | | |
| 43:6-22 | | | |
| 44:5-23 | | | |
| 53:5-16 | | | |
| 58:4-18 | FRE 602, Lacks Personal Knowledge | 58:19-59:1 | 19· ·Q.· ·Do you know what a CRB is?<br>20· ·A.· ·Other than the spelling of it, no, I do not.<br>21· ·Q.· ·Okay.· And what you're saying other than the fact<br>22· ·that it tells you in this letter that was sent to your squadron<br>23· ·that CRB means Central Registry Board and you have no<br>24· ·understanding of what that is outside of how it's described in<br>25· ·this letter.<br>·1· ·A.· ·That is correct. |

| | | | |
|---|---|---|---|
| 59:2-20 | FRE 602, Lacks Personal Knowledge | | |
| 60:1-8 | FRE 602, Lacks Personal Knowledge | | |
| 65:16-25 | | 66:1-6 | ·1· ·Q.· ·Okay.· It says Nathan McLeod-Hughes, who's that?<br>·2· ·A.· ·I signed it, but did not author it.<br>·3· ·Q.· ·Okay.· All right.· And I appreciate the specificity.<br>·4· ·Okay.· Who authored this for you?<br>·5· ·A.· ·I'm not entirely sure, but I would believe the first<br>·6· ·sergeant did. |
| 66:16-19 | | | |
| 66:23-25 | | | |
| 67:9-19 | | | |
| 67:22-25 | | | |
| 68:3-9 | | | |
| 68:13-69:2 | | | |
| 70:7-10 | | | |
| 73:3-15 | | | |
| 74:17-21 | FRE 602 Lacks Personal Knowledge; 702, Improper Opinion | | |
| 74:23-75:4 | FRE 602 Lacks Personal Knowledge; 702, Improper Opinion | | |
| 76:19-77:1 | | | |
| 80:13-21 | FRE 602 Lacks Personal Knowledge; 702, Improper Opinion | | |
| 84:13-85:12 | | | |
| 86:8-89:19 | FRE 602, Lacks Personal Knowledge; FRE 702, Improper Opinion | | |

| | | | |
|---|---|---|---|
| 90:4-19 | FRE 602, Lacks Personal Knowledge; FRE 702, Improper Opinion | | |
| 91:10-19 | FRE 602, Lacks Personal Knowledge | | |
| 92:5-8 | FRE 602, Lacks Personal Knowledge | | |
| 92:20-25 | | | |
| 93:11-20 | | | |
| 94:9-15 | FRE 602, Lacks Personal Knowledge | | |
| 95:10-23 | FRE 602, Lacks Personal Knowledge; FRE 702, Improper Opinion | | |
| 104:6-13 | FRE 602, Lacks Personal Knowledge | 104:14-17 | 14· ·Q.· ·And the commander at the time again on May 17, 2012,<br>15· ·was Frank Marconi, Lieutenant Colonel and he signed it on May<br>16· ·17, 2012, as well, correct?<br>17· ·A.· ·Correct. |
| 105:2-11 | FRE 602, Lacks Personal Knowledge | | |
| 105:14-106:14 | FRE 602, Lacks Personal Knowledge | | |
| 107:2-19 | FRE 602, Lacks Personal Knowledge | 107:22-25 | 22· ·Q.· ·Okay.· And were you ever informed as one of Devin<br>23· ·Kelley's supervisors at the 49th LRS that he was looking for<br>24· ·weapons and body armor while he was in a mental institution?<br>25· ·A.· No. |
| 108:4-9 | | | |
| 108:17-20 | FRE 402, Relevance | | |
| 110:23-111:8 | FRE 602, Lacks Personal Knowledge | 110:13-22 | 13· ·Q.· ·Okay.· And in those instances when all these mass<br>14· ·shootings were happening in the past back then and currently, a<br>15· ·lot of those times the person committing the mass shootings had<br>16· ·body armor on?· Do you have a memory of that?<br>17· ·A.· ·No, I don't have a memory of that. |

| | | | 18· ·Q.· ·Okay.· You just don't -- didn't -- don't know either<br>19· ·way?· It's okay if you don't.· I'm just saying body armor is<br>20· ·something that's commonly used in mass shootings by the<br>21· ·perpetrators, fair?<br>22· ·A.· ·I don't know. |
|---|---|---|---|
| 111:12 (beginning with "if")-112:5 | | | |
| 113:1-11 | | | |
| 113:18-114:2 | Misstates evidence, prior testimony | | |
| 114:8-22 | Misstates prior testimony | | |
| 115:5-8 | | | |
| 116:3-11 | | 116:12-14 | 12· ·Q.· ·Now, do you know where this information came from<br>13· ·that you put into this letter?<br>14· ·A.· ·No. |
| 116:15-18 | | | |
| 117:5-16 | FRE 702, Improper Opinion | | |
| 120:7-121:18 | | | |
| 121:22-122:11 | FRE 602, Lacks Personal Knowledge; 702 Improper Opinion | | |
| 122:16-123:5 | | | |
| 123:11-16 | FRE 702, Improper Opinion | | |
| 124:5-25 | FRE 402, Relevance; 602, Personal Knowledge; 702 Improper Opinion | | |
| 126:1-127:3 | | | |
| 128:1-8 | | | |
| 130:18-25 | | | |

| | | | |
|---|---|---|---|
| 149:12 (beginning with "So")-150:5 | FRE 602, Lacks Personal Knowledge; 702 Improper Opinion | | |
| 165:25-166:17 | FRE 402, Relevance | | |

Dated: March 12, 2021

Respectfully submitted,

BRIAN BOYNTON
Acting Assistant Attorney General
Civil Division

ASHLEY C. HOFF
United States Attorney
Western District of Texas

By: */s/ Paul David Stern*
PAUL DAVID STERN
JOCELYN KRIEGER
Trial Attorneys, Torts Branch
United States Department of Justice
Civil Division

*Counsel for the United States of America*

## CERTIFICATE OF SERVICE

I certify that on March 12, 2021, I electronically filed the foregoing with the clerk of court by using the CM/ECF system, and that all counsel of record have received notice and been served through that system.

*/s/ Paul David Stern*
PAUL DAVID STERN
JOCELYN KRIEGER
Trial Attorneys, Torts Branch
*Attorneys for Defendant*
