```
 1              IN THE UNITED STATES DISTRICT FOR
                THE WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3   JOE HOLCOMBE, et al.,    )   NO. 5:18-CV-00555-XR
                              )
 4                            )   Consolidated with:
     Plaintiffs,             )   5:18-cv-00712-XR (Vidal)
 5                            )   5:18-cv-00881-XR (Uhl)
                              )   5:18-cv-00944-XR (Ramsey)
 6       vs.                  )   5:18-cv-00949-XR (McNulty)
                              )
 7                            )   5:18-cv-00951-XR (Wall)
     UNITED STATES OF         )   5:18-cv-01151-XR (Amador)
 8   AMERICA,                 )   5:19-cv-00184-XR (Brown)
                              )   5:19-cv-00289-XR (Ward)
 9                            )   5:19-cv-00506-XR (Workman)
     Defendant.               )   5:19-cv-00678-XR (Colbath)
10                            )   5:19-cv-00691-XR (Braden)
                              )   5:19-cv-00706-XR (Lookingbill)
11                            )   5:19-cv-00714-XR (Solis)
                              )   5:19-cv-00715-XR (McKenzie)
12                            )   5:19-cv-00805-XR (Curnow)
                              )   5:19-cv-00806-XR (Macias)
13   _____

14              VIDEOTAPED DEPOSITION OF

15        LIEUTENANT COLONEL ROBERT C. BEARDEN
     _____

16

17           PURSUANT TO NOTICE, the above-entitled

18   deposition was taken on behalf of the Plaintiffs at

19   Peterson Air Force Base, 135 Dover Street, Building

20   350, Suite 2068, Colorado Springs, Colorado, on

21   January 16, 2020, at 3:15 p.m., before Dawn Gage, a

22   Professional Court Reporter and Notary Public within

23   and for the State of Colorado.

24

25
```

**PEX 0087-0001**



```
13            LIEUTENANT COLONEL ROBERT C. BEARDEN,

14    having been first duly sworn according to law, was

15    examined and testified under oath as follows:

16                         EXAMINATION

17    BY MR. ALSAFFAR:                                        03:16

18         Q.   Good afternoon, Colonel.  How are you        03:16

19    doing?                                                  03:16

20         A.   Good, thanks.                                 03:16

21         Q.   My name is Jamal Alsaffar.  And we just      03:16

22    met today, didn't we?                                   03:16

23         A.   Yes.                                          03:16
```

**PEX 0087-0002**



21        First of all, you just took an oath.  And I          03:17

22   know we're sitting in a conference room, but I want        03:17

23   to make sure you understand the importance and

24   weight of that oath.                                       03:17

25        A.   Yes.                                             03:17

**PEX 0087-0003**



| | | |
|---|---|---|
| 1 | Q.   You understand that the oath that you | 03:17 |
| 2 | just took is the same oath that you would have taken | 03:17 |
| 3 | if we were in a court of law before a judge and jury | 03:17 |
| 4 | with the same penalties of perjury if you don't tell | 03:17 |
| 5 | the truth; do you understand that? | |
| 6 | A.   Correct, yes. | 03:17 |
| 7 | Q.   Okay.  And you're prepared to tell the | 03:17 |
| 8 | whole truth as you know it, under oath today, | 03:17 |
| 9 | correct? | 03:17 |
| 10 | A.   Yes. | 03:17 |

**PEX 0087-0004**



```
15          Q.    Okay.  Colonel, can you tell us what      03:26
16    your current employment situation is with the Air     03:26
17    Force?                                                03:26
18          A.    So, I'm the Vice Commander in the 10th    03:26
19    Air Base Wing at the United States Air Force          03:26
20    Academy.                                              03:26
21          Q.    How long have you been there?             03:26
22          A.    About 18 months.                          03:26
23          Q.    All right.  And can you tell us what      03:26
24    time period you were stationed at Holloman Air Force  03:26
25    Base in New Mexico?                                   03:27
```

**PEX 0087-0005**



```
 1          A.    Sure.   I was there from June of 2012 to     03:27

 2    June of 2014.                                            03:27

 3          Q.    And what was your position while you         03:27

 4    were at Holloman Air Force Base from June of 2012 to     03:27

 5    June of 2014?                                            03:27

 6          A.    Correct.   I was the commander of the        03:27

 7    49th logistics readiness squadron.                       03:27

 8          Q.    All right.   And how would you describe      03:27

 9    your job duties and responsibility as commander of       03:27

10    the Logistics Readiness Squadron at the 49th?            03:27

11          A.    All right.   So, I was responsible for       03:27

12    the morale, health, welfare of that unit.   And that     03:27

13    unit -- that unit's mission, which was to provide        03:27

14    logistics support to the 49th Wing and it's units.       03:27
```

**PEX 0087-0006**



```
15          First of all, while you were squadron --        03:32
16    excuse me, while you were the commander of the LRS     03:32
17    49th division at Holloman Air Force Base, you          03:32
18    were -- you were at all times, a federal employee of   03:32
19    the federal government, correct?                       03:32
20          A.   Correct.                                    03:32
21          Q.   And while you were a commander at           03:32
22    Holloman Air Force Base, you were working within the   03:32
23    course and scope of your employment for the federal    03:32
24    government, correct?                                   03:32
25          MR. FURMAN:  Objection; legal concept. You       03:32
```

PEX 0087-0007



```
 1   You can answer.
 2          MR. ALSAFFAR:  You can answer.                    03:32
 3          A.   Yes.                                         03:32
```

```
22          Now, can you tell -- can you give me your        03:33
23   understanding of why you're testifying today?           03:33
24          A.   So, Airman Devin Kelley was assigned to     03:33
25   my unit subsequent to his service in the                03:33
```

**PEX-0087-0008**



1   He committed some heinous crimes.                           03:33

2           And now, you know, the various survivors and        03:33

3   families of those that were killed and injured are         03:33

4   suing in a civil proceeding for damages.                   03:33

5           And being that I was his commander at the           03:33

6   time you-all are interested in, I'm sure, how I            03:33

7   handled that, what I did and why I did it.                 03:34

**PEX 0087-0009**



22        Q.    Okay.  Did you have any -- did you have          03:35

23   a memory of Devin Kelley when you heard about this          03:35

24   shooting?                                                    03:35

25        A.    I did.  So, I -- I remembered saying nothing...  03:35



PEX 0087-0010

| | | |
|---|---|---|
| 1 | in our holding cell there at Holloman.  And I | 03:35 |
| 2 | remembered seeing him when he came back from prison | 03:36 |
| 3 | at Mira Mar and did, I guess, what you would call, | 03:36 |
| 4 | you know, the final exit interview with me.  It was | 03:36 |
| 5 | my final chance to talk to him before he was | 03:36 |
| 6 | released from the Air Force. | 03:36 |
| 7 |      Q.   And I just want to make sure that the | 03:36 |
| 8 | record is clear is that, you remembered specifically | 03:36 |
| 9 | meeting in person with Devin Kelley at the holding | 03:36 |
| 10 | cell in Holloman Air Force Base in 2012? | 03:36 |
| 11 |      A.   That's correct. | 03:36 |
| 12 |      Q.   And you also remember meeting personally | 03:36 |
| 13 | with Devin Kelley when he was -- when he served -- | 03:36 |
| 14 | finished out his prison sentence at Mira Mar and was | 03:36 |
| 15 | returned back to Holloman Air Force Base for | 03:36 |
| 16 | out-processing; is that -- | 03:36 |
| 17 |      A.   That's correct. | 03:36 |

**PEX 0087-0011**



13        Q.   And when you say, Read these charges to       03:40

14    him, you're talking about the point at which he was     03:40

15    indicted with charges, but yet to be tried of those     03:40

16    charges?                                                03:40

17        A.   That's correct, yes.  So I had to --          03:40

18    they gave me -- it's, essentially, a script that I      03:40

19    had to read to him saying, Hey, you're being charged    03:40

20    with the following.  We had to sign it.  And then,      03:40

21    you know, his court-martial followed those charges.     03:40

**PEX 0087-0012**



21        Q.   And I thank you for that.                        03:44

22        So when -- so at that point when you were          03:44

23   meeting with Devin Kelley the first time, shortly      03:44

24   after June 30, 2012, you, as the commander of the       03:44

25   49th LRS at that point had reasonable grounds to        03:44

**PEX 0087-0013**



LT. COLONEL ROBERT C. ROBERT BEARDEN            January 16, 2020
JOE HOLCOMBE vs UNITED STATES                              35

1  believe that he had committed those offenses charged

2  against him and you were -- you-all were getting          03:44

3  ready for the trial?                                      03:44

4          A.    That's correct.                             03:44

**PEX 0087-0014**



```
 8          So, I think, generally, what you're telling       03:49
 9     me is Tracy Wolfe communicated to you in some           03:49
10     fashion that, Hey, Colonel, you need to know, this      03:49
11     person, Devin Kelley.  Was -- I believe you said        03:49
12     someone who made threats against the unit, and we       03:49
13     need to take precautions to protect the people in       03:49
14     our unit from Devin Kelley?                             03:49
15          A.   For clarity, he did do that when Airman       03:49
16     Kelley was coming back from Mira Mar.                   03:49
17          Q.   Okay.
18          A.   And so you-all have a memo that I signed      03:49
19     asking for some specific debarment things and that      03:49
20     kind of thing.
21          So that's when he -- he told me, Hey -- I          03:50
22     remember for sure then, that he told me, Hey,           03:50
23     this -- this guy has threatened the unit before,        03:50
24     that kind of thing.  I don't remember him telling me    03:50
25     anything like that shortly after my change of           03:50
```

**PEX 0087-0015**



1    command.                                              03:50

**PEX 0087-0016**



```
 6                                   Okay.  And,          03:58

 7    Colonel Bearden -- is Exhibit No. 3, correct?       03:58

 8         A.    That's correct.                          03:58

 9         Q.    Is Exhibit No. 3 a -- a fair and         03:58

10    accurate representation of the statement that you   03:58

11    gave to the DoD IG investigators?                   03:59

12         A.    It is.                                    03:59
```

**PEX 0087-0017**



8        Q.   Okay.  Thank you for that.  I notice on          03:59

9    Page 2 of your statement, Exhibit No. 3, you clarify

10   for the DoD IG that the threats that you had, been         04:00

11   informed about Kelley were of an                           04:00

12   active-shooter-type-threat --                              04:00

13        A.   Yes, sir.

14        Q.   -- do you see that?  That is an accurate         04:00

15   representation of what you told them?                      04:00

16        A.   Yes, sir.  So, the -- you know, as I was         04:00

17   mentioning a minute ago, you know, the First              04:00

18   Sergeant prior to Kelley's return said he had made        04:00

19   threats about shooting up the unit and leadership.        04:00

20        So it wouldn't surprise me that when I was           04:00

21   talking to them, I'd used that language, an               04:00

22   active-shooter-type incident.                             04:00

23        Q.   And so, when we're talking about him,          04:00

24   this time frame in 2012 when you were at the command     04:00

25   LRS 49th when you were describing the thre**PEX 0087-0018**00



1   Devin Kelley had made were of an active-shooter          04:00

2   type, we're talking about a mass-shooting-type           04:00

3   threat that he was making to the unit?                   04:00

4        A.   Right.  So the First Sergeant had              04:00

5   advised me that he had made threats of shooting, you     04:00

6   know, leadership and the implication was, you know,      04:01

7   not against one person, multiple individuals, which      04:01

8   I think is to your point.                                04:01

**PEX 0087-0019**



```
 5        Q.   Okay.  So when -- from the time that        04:02
 6   you -- whatever the time frame you were made aware    04:02
 7   of these specific threats of Devin Kelley, that       04:02
 8   Devin Kelley was making against the unit, these       04:02
 9   active-shooter, mass-shooting-type threats,           04:02
10   certainly, by the end of March 2013, you were aware   04:02
11   that Devin Kelley was a very dangerous person who     04:02
12   was threatening to kill multiple people with guns,    04:02
13   correct?                                              04:02
14        A.   That's correct.                             04:02
```

**PEX 0087-0020**



```
18        So, at that time, March 2013, as the              04:03

19   commander of the 49th LRS at Holloman, you -- you      04:04

20   knew specifically that Devin Kelley proposed an        04:04

21   increased risk of harm to people in your unit at the   04:04

22   base?                                                  04:04

23        A.   That's --                                    04:04
```

**PEX 0087-0021**



1           A.    That's correct.                    04:04



24          Q.   Okay.  So you had an escort, which is          04:13

25   typical.  And then you had a -- specifically had an         04:13

**PEX 0087-0023**



| | | |
|---|---|---|
| 1 | armed guard from the 49th Security Forces also | 04:13 |
| 2 | present, which is atypical for Devin Kelley?  You | 04:13 |
| 3 | had that for Devin Kelley? | 04:13 |
| 4 |     A.   Yes, sir. | 04:13 |

**PEX 0087-0024**



```
 5        Q.   Okay.  I'm going to hand you            04:16

 6   Exhibit No. 7.                                    04:16

 7        (Deposition Exhibit 7 was marked for

 8   identification.)

 9        A.   Thank you.

10        Q.   (By Mr. Alsaffar)  Exhibit -- you're    04:16

11   welcome.  Exhibit No. 7, Colonel, is marked USA   04:16

12   14794; do you see that at the bottom right?       04:16

13        A.   Yes.                                    04:16
```

**PEX 0087-0025**



    4          Q.   Okay?  All right.  So if you look at        04:17

    5     this June 15, 2011, memorandum, do you see at the     04:17

    6     top, it says it's "For 49 Logistics Readiness         04:17

    7     Squadron," do you see that?                           04:17

    8          A.   Yes, sir.                                   04:17

    9          Q.   And do you see at the top, there's a --     04:17

   10     it looks like an initial-type signature?  And I      04:17

   11     think it says August 2011 --                         04:17

   12          A.   Correct.

**PEX 0087-0026**



3        Q.   All right.  So whoever the First              04:17

4   Sergeant was at the time of August 2011, when we see   04:17

5   a diamond like that with a signature, that means       04:18

6   some First Sergeant has received the document,         04:18

7   signed it, seen the document?                          04:18

8        A.   I think that's a reasonable conclusion.      04:18

9        Q.   Okay.  So going back to the actual           04:18

10  document, it's for the 49th Logistics Readiness        04:18

11  Squadron, which was the squadron that you were         04:18

12  commander of in the time period June 2012 through      04:18

13  2014, correct?                                         04:18

14       A.   That's correct.                              04:18

15       Q.   That's your squadron.  And this is from      04:18

16  AFOSI, Detachment 225, right?                          04:18

17       A.   Correct.                                     04:18

18       Q.   Now, tell me, just -- just for the           04:18

19  record, what's AFOSI Detachment 225?                   04:18

20       A.   That's the Air Force Office of Special       04:18

21  Investigations at Holloman Air Force Base.             04:18

22       Q.   All right.  And the -- the AFOSI, those      04:18

23  are the -- the agents on base who investigate airmen   04:18

24  and air women who are involved in possible criminal    04:18

25  acts, correct?                                         04:18

**PEX 0087-0027**



| | | |
|---|---|---|
| 1 | A.   Correct. | 04:18 |
| 2 | Q.   Okay.  And so this notification is from | 04:18 |
| 3 | James Hoy, Special Agent, Superintendent of | 04:18 |
| 4 | Detachment 20 -- 225, correct? | 04:18 |
| 5 | A.   Correct. | 04:18 |
| 6 | Q.   And, essentially, what this document | 04:19 |
| 7 | is -- is telling you, is as of June 15, 2011, it's | 04:19 |
| 8 | telling the 49th LRS at Holloman -- Holloman Air | 04:19 |
| 9 | Force Base that one of your airmen in your command | 04:19 |
| 10 | in -- in the LRS Squadron, Devin Kelley, is being | 04:19 |
| 11 | investigated for criminal -- potential criminal | 04:19 |
| 12 | conduct, correct? | 04:19 |
| 13 | A.   That's correct, but I'd like to offer | 04:19 |
| 14 | some clarity. | 04:19 |
| 15 | Q.   Please. | 04:19 |
| 16 | A.   So, it's -- it's notifying the squadron | 04:19 |
| 17 | commander at the time that one of the airmen in his | 04:19 |
| 18 | command -- | |
| 19 | Q.   Right. | |
| 20 | A.   -- is being investigated; I wasn't | 04:19 |
| 21 | there. | 04:19 |
| 22 | Q.   And, at this time, June 15th, 2011, | 04:19 |
| 23 | would this be Lieutenant Colonel Marconi was the | |
| 24 | commander of the LRS 49th at that time? | 04:19 |
| 25 | A.   That's correct. | 04:19 |

**PEX 0087-0028**



LT. COLONEL ROBERT C. ROBERT BEARDEN                    January 16, 2020
JOE HOLCOMBE vs UNITED STATES                                          64

1          Q.   All right.   And then you were in his          04:19

2    position, June 2012 to June 2014?                          04:19

3          A.   That's correct.                                 04:19

**PEX 0087-0029**



1          Q.    -- unless you do or others do, so that's          04:20

2     helpful.                                                     04:20

3          I guess my -- just the bottom line here is              04:20

4     the 49th Logistics Readiness Squadron was being             04:20

5     informed and it's been received, that as of June 15,        04:20

6     2011, Devin Kelley is being investigated by the             04:20

7     AFOSI Detachment 20 -- 225 for potential criminal           04:21

8     conduct?                                                    04:21

9          A.    That is correct.                                 04:21

**PEX 0087-0030**



4      Q.   (By Mr. Alsaffar)  Now, Exhibit No. 8 is      04:22

5   a memorandum for 49 LRS/CC, and does that stand for      04:22

6   49th Logistics Readiness Squadron command?      04:22

7      A.   Commander, yes, sir.      04:22

8      Q.   Okay.  And it's dated October 21st,      04:22

9   2011, correct?      04:22

10     A.   Correct.      04:22

25         So this is an elect- -- this is a  **PEX 0087-0031** 04:23



| | | |
|---|---|---|
| 1 | October 21st, 2011, letter is signed by Commander | 04:23 |
| 2 | Marconi -- signed on -- on the same day, | 04:23 |
| 3 | October 21st, 2011, correct? | 04:23 |
| 4 | A.   Correct. | 04:23 |
| 5 | Q.   Okay.  And this is a letter that was | 04:23 |
| 6 | sent from the 49th WG/CV, correct? | 04:23 |
| 7 | A.   That's correct. | 04:23 |
| 8 | Q.   And tell me what that is. | 04:23 |
| 9 | A.   That is the 49th Wing Vice Commander. | 04:23 |
| 10 | Q.   And I believe you told me early in the | 04:23 |
| 11 | deposition that that's a level above your command in | 04:23 |
| 12 | terms of supervisory review, correct? | 04:23 |
| 13 | A.   That's correct.  So, this would have | 04:23 |
| 14 | been the vice commander of the wing, then you have | 04:23 |
| 15 | the group, then you have the squadron.  So two | 04:23 |
| 16 | levels up from the squadron. | 04:23 |
| 17 | Q.   And the -- the subject of this relates | 04:23 |
| 18 | to -- it says, "Central Registry Board Incident | 04:24 |
| 19 | Determination," CRB for -- for -- for short. | 04:24 |
| 20 | Now, do you -- do you know what the CRB is? | 04:24 |
| 21 | A.   Yes, sir. | 04:24 |
| 22 | Q.   Tell me what your understanding of it | |
| 23 | is. | 04:24 |
| 24 | A.   So, the Central Registry Board is a | 04:24 |
| 25 | board that meets to consider primarily domestic | 04:24 |

PEX-0087-0032



| | | |
|---|---|---|
| 1 | abuse cases.  And it is a nondisciplinary and it's | 04:24 |
| 2 | not judicial, it's administrative in nature. | 04:24 |
| 3 |       And we use it in the Air Force to determine | 04:24 |
| 4 | whether acts meet certain criteria.  And if they | 04:24 |
| 5 | meet those criteria for, say, domestic abuse, then | 04:24 |
| 6 | there's a central registry database that those names | 04:24 |
| 7 | can be put in. | 04:25 |
| 8 |       And then that -- what that allows for is, for | 04:25 |
| 9 | example, if I was an airman on active duty and I had | 04:25 |
| 10 | a case that meet, and then I'm separated, and I come | 04:25 |
| 11 | back and apply for a civilian position, for example, | 04:25 |
| 12 | at a child development center -- | 04:25 |
| 13 |      Q.   Right. | |
| 14 |      A.   -- then if it -- if they -- when they | 04:25 |
| 15 | run the check, if it pops up in the central -- | 04:25 |
| 16 | the -- if I've got a central registry in a case that | 04:25 |
| 17 | met, then there's an alert that, for example, in the | 04:25 |
| 18 | case of domestic abuse, that might not be the person | 04:25 |
| 19 | you want working with children -- | 04:25 |
| 20 |      Q.   Right. | |
| 21 |      A.   -- because they had a case that | 04:25 |
| 22 | previously met criteria for a central registry | 04:25 |
| 23 | board. | |

**PEX 0087-0033**



24          Q.   And my understanding in reading through          04:26

25    this sort of mandatory various instructions for the         04:26

**PEX 0087-0034**



| | | |
|---|---|---|
| 1 | Air Force on this kind of board is that the -- | 04:26 |
| 2 | the -- one of the commanders, whether it's from the | 04:27 |
| 3 | wing or from -- or from right below them, they put | 04:27 |
| 4 | together sort of a collection of individuals, | 04:27 |
| 5 | including this judge advocate's office, the -- the | 04:27 |
| 6 | squadron Security Forces and OSI to be on this board | 04:27 |
| 7 | and serve? | 04:27 |
| 8 |     A.   That's correct.  The Air Force | 04:27 |
| 9 | instruction spells out specific members.  And there | 04:27 |
| 10 | are voting and nonvoting members on the board.  And | 04:27 |
| 11 | they hear cases like domestic abuse. | 04:27 |

**PEX 0087-0035**



2        Q.   Okay.  And -- and what -- what you're                    04:28

3    talking about is is that the CRB, part of their job               04:28

4    is to participate in maintaining a central registry              04:28

5    of all reported domestic abuse and child                         04:28

6    maltreatment incidents that might -- that meet                   04:28

7    criteria for maltreatment at the installation CRB?               04:28

8        A.   That's correct.                                         04:28

9        Q.   Okay.  And the -- let's go back to                      04:28

10   Exhibit No. 8, so -- just to put a bow on it.                    04:28

11        On October 21st, 2011, the 49th Wing Vice                   04:28

12   Commander is sending a memo to the 49th LRS at                   04:29

13   Holloman Air Force Base that -- that the CRB met, in             04:29

14   relation to Devin Kelley on October 21st, 2011, to              04:29

15   review incident involving Devin Kelley, correct?                 04:29

16        A.   Correct.

17        Q.   And the allegation was child physical                  04:29

18   maltreatment by Devin Kelley, correct?                           04:29

19        A.   Correct.                                               04:29

20        Q.   And the board, the CRB board, determined               04:29

21   the incident "met criteria for child physical                   04:29

22   maltreatment and entry into the DoD Central Registry

23   database," correct?

24        A.   Yes, sir.

**PEX 0087-0036**



LT. COLONEL ROBERT C. ROBERT BEARDEN          January 16, 2020
JOE HOLCOMBE vs UNITED STATES                              74

```
24          Q.   Got it.  So, to put a pin on that, on        04:32

25    October 21st, 2011, the CRB made a determination         04:32
```

**PEX 0087-0037**



```
1   that there was probable cause that Devin Kelley was     04:32

2   involved in child maltreatment, so the criteria for     04:32

3   the CRB reporting was met?                              04:32

4        A.   Yes, sir.                                     04:33
```

**PEX 0087-0038**



25        All right.  I'm handing you Exhibit No. 35



1    It's a letter, memorandum, dated February 16th,          04:35

2    2012.  And this one is actually a memorandum for         04:35

3    Devin Kelley, specifically, correct?                     04:35

4          A.   That's correct.                               04:35

5          Q.   And it's on the front and back.  I'm          04:35

6    trying to save some trees.  And it's from -- do you      04:35

7    see on the back that it says this letter, this           04:35

8    memorandum, is from John De Laura, 2d Lieutenant,        04:35

9    U.S. Air Force; do you know who that is?                 04:35

10          A.   Yes.                                          04:35

11          Q.   Okay.  Can you tell me who that is?           04:35

12          A.   Yes.  So we call him Art.  So Art was --      04:35

13    by the time I got there, I think he was a First          04:35

14    Lieutenant.  And so he was one of the officers in        04:35

15    the squadron at the time.

**PEX 0087-0040**



23          It states that, On February 3rd, 2012, you          04:37

24    were briefed by Ms. Valorie Rowe; do you see that?        04:37

25          A.   Yes, sir.                                       04:37

**PEX 0087-0041**



```
 1        Q.   And I want you to go a little bit down          04:37
 2   towards the bottom of Paragraph 1 where it says,          04:37
 3   "You left the office"; do you see that?                   04:37
 4        A.   I do.                                           04:37
 5        Q.   It states, You left the office and              04:37
 6   disrespectfully stated, quote, I know, you told me        04:37
 7   three times already!, end quote.  After leaving the       04:37
 8   office you stated, quote, She's a fucking bitch, end      04:37
 9   quote; do you see that?                                   04:38
10        A.   I do.                                           04:38
11        Q.   Okay.  And I apologize for the language,        04:38
12   I'm just reading, just for the record, directly          04:38
13   what's reported in this letter.  Okay?                    04:38
14        A.   I understand.                                   04:38
15        Q.   Okay.  And so this is a reprimand letter        04:38
16   for Devin Kelley's conduct, February 16th, 2012,          04:38
17   towards one of his female supervisors, correct?           04:38
18        A.   Correct.                                        04:38
```

**PEX 0087-0042**



| | |
|---|---|
| 1 | Q.   It says, Interview of Tessa Kelley, | 04:58 |
| 2 | February 17th, 2012, by Ryan Sablan or Sablan, 49 | 04:58 |
| 3 | SFS; do you see that? | 04:59 |
| 4 | A.   I do. | |
| 5 | Q.   So that's again, the 49th Security | |
| 6 | Forces, correct? | 04:59 |
| 7 | A.   Correct. | 04:59 |
| 8 | Q.   All right.  And I just want to go | 04:59 |
| 9 | through this investigation, or this letter, in light | 04:59 |
| 10 | of the letter of reprimand where I just showed you | 04:59 |
| 11 | where Devin Kelley had some pretty harsh words for | 04:59 |
| 12 | his supervisor, Valorie Rowe.  Okay? | 04:59 |
| 13 |    And do you agree, that characterization is | 04:59 |
| 14 | harsh words and inappropriate words to his | |
| 15 | supervisor, female supervisor? | |
| 16 | A.   I agree. | 04:59 |
| 17 | Q.   Okay.  February 17th, 2012, Tessa Kelley | 04:59 |
| 18 | is report -- well, reporting a fairly serious | 04:59 |
| 19 | instance of physical abuse by Devin Kelley on her; | 04:59 |
| 20 | is that a -- fair to say? | 04:59 |
| 21 | A.   Yes.  It says that she stated he choked | 04:59 |
| 22 | her, in the first line. | 04:59 |
| 23 | Q.   And I'll read that into the record. | 04:59 |
| 24 |    Kelley -- Tessa Kelley -- states he -- Devin | 04:59 |
| 25 | Kelley -- choked her in the restroom and squeezed... | 04:59 |

PEX 0087-0043



1    occasions has choked her because she didn't want to

2    spend Christmas with his family.                          04:59

3        On December 24th, Kelley stated he pushed her         05:00

4    against the wall, choked her and told her, You            05:00

5    better pack your bags or I'll choke you to the            05:00

6    ceiling and pass you out; do you see that?                05:00

7        A.   I do.                                            05:00

8        Q.   Okay.  So February 17th, 2012, the 49th          05:00

9    Security Forces at Holloman Air Force Base is             05:00

10   getting an allegation that Kelley's threat -- is          05:00

11   choking his wife on more than one occasion, correct?      05:00

12       A.   Correct.                                         05:00

13       Q.   A couple of lines down, Tessa Kelley             05:00

14   stated Devin Kelley dragged her by her hair into the      05:00

15   bathroom and said, I'm going to water board you, and      05:00

16   stuck her head in the showerhead; do you see that?        05:00

17       A.   I do.                                            05:00

**PEX 0087-0044**



 2        Q.   (By Mr. Alsaffar)  The couple lines          05:01
 3   down, she says that Devin Kelley stated, You're 90     05:01
 4   percent of our problem and you -- if you repeat what   05:01
 5   I say, I'll kill you and drag your dead body and       05:01
 6   desert it.                                             05:01
 7        So Tessa Kelley is reporting on                   05:01
 8   February 17th, 2012, that Devin Kelley now has also    05:01
 9   threatened to kill her and drag her body to desert     05:01
10   it, correct?                                           05:01
11        A.   Correct.                                     05:01
12        Q.   And next line, Tessa Kelley stated, On       05:01
13   multiple occasions, he has called her a bitch,         05:01
14   whore, slut, piece of shit, worthless and your         05:01
15   family doesn't love you.                               05:01
16        And that -- that language right there -- and      05:01
17   I apologize again for using it, but that's what's      05:01
18   stated in her report, correct?                         05:01
19        A.   That's correct.                              05:01
20        Q.   The -- that language is similar to what      05:01
21   Devin Kelley's supervisor was reporting about a week   05:02
22   before, the type of language Devin Kelley was using    05:02
23   against his female supervisor, correct?                05:02
24        A.   Correct.                                     05:02
25        Q.   Okay.  If you look about four **PEX 0087-0045**  05:02

| | | |
|---|---|---|
| 1 | lines down from where we were just reading -- | 05:02 |
| 2 | actually, one, two, three, four -- you know, the | 05:02 |
| 3 | easiest thing for me to do is just highlight it for | 05:02 |
| 4 | you.  Okay. | 05:02 |
| 5 | I highlighted the line for you where Tessa | 05:02 |
| 6 | Kelley is reporting that Devin Kelley said, quote, | 05:02 |
| 7 | My work is lucky.  I'd take a shotgun and blow | 05:02 |
| 8 | everyone's head off; do you see that? | 05:02 |
| 9 | A.   I do. | 05:03 |
| 10 | Q.   Okay.  So this is a report directed to | 05:03 |
| 11 | the 49th Security Forces at Holloman Air Force Base | 05:03 |
| 12 | on February 17th, 2012, where Devin Kelley is | 05:03 |
| 13 | threatening to engage in a mass shooting, right? | 05:03 |
| 14 | A.   Right.  Yeah, Tessa Kelley is saying | 05:03 |
| 15 | that that's what he said. | 05:03 |
| 16 | Q.   Okay. | |
| 17 | A.   Yep, I agree. | 05:03 |
| 21 | This is a report that -- by his wife to the | 05:03 |
| 22 | 49th Security Forces that on February 17th, 2012, | 05:03 |
| 23 | that Devin Kelley is threatening to use a gun to | 05:03 |
| 24 | commit mass murder, correct? | 05:03 |
| 25 | A.   Correct. | 05:03 |

**PEX 0087-0046**



24          So, first of all, the -- the letter of          05:04

25    reprimand where he called his female supervisor you        05:04



PEX 0087-0047

1   week before a bitch, sorry for using that language,   05:04

2   but that's -- that's what he used.   05:05

3        And then about a week and a half later, the   05:05

4   49th is getting another report that he's using that   05:05

5   kind of language on top of choking his wife and   05:05

6   threatening to commit mass murder against his people   05:05

7   at work, correct?   05:05

8        A.   Correct.   05:05

23        Q.   And -- and we'll go -- we'll keep going   05:05

24   through these so that we can identify them, but you

25   kind of made a reference.   05:05

**PEX 0087-0048**



1      So, actually, June 25th, 2011, is when the          05:05
2   AFOSI informed your squadron -- you weren't there       05:06
3   yet --                                                  05:06
4      A.   Right.                                          05:06
5      Q.   -- so -- but your squadron that, Hey,           05:06
6   we're already criminally investigating him.  You get    05:06
7   the February letter of reprimand where he's -- he's     05:06
8   using very intemperate and inappropriate language       05:06
9   towards his female supervisor in your -- in -- in       05:06
10  LRS' command at 49th --                                 05:06
11     A.   Correct.                                        05:06
12     Q.   -- correct?  And then, a couple of weeks        05:06
13  after that, February 17th, 2012, his wife is            05:06
14  reporting yet another instance of abuse with very       05:06
15  specific -- would you agree, very specific, very        05:06
16  detailed, granular, disturbing details about both       05:06
17  his physical abuse of her and his threat to commit      05:06
18  mass murder against people at Holloman?                 05:06
19     A.   Yes, sir.                                       05:06

**PEX 0087-0049**



20      Q.   So, it would be a -- what you would          05:08

21  expect, at least, would be a phone call from           05:08

22  Security Forces to the First Sergeant at LRS, who      05:08

23  you would then hope would inform the commander of      05:08

24  the LRS about somebody like Devin Kelley?              05:08

25      A.   That's exactly the way I would expect it.    05:08

**PEX 0087-0050**



1   to go.                                                                05:08

**PEX 0087-0051**



```
18        Q.   (By Mr. Alsaffar)  And I'm going to hand
19   you, sir, Exhibit No. 10.  Exhibit No. 10 is dated       05:17
20   April 17th, 2012, correct?                               05:17
21        A.   Yes, sir.                                      05:17
22        Q.   Now, this is -- this is a memorandum           05:17
23   again for Devin Kelley specifically, right?              05:17
24        A.   Correct.                                       05:17
```

**PEX 0087-0052**



13        Q.    Okay.  At this time, April 17th, 2012,        05:18

14   the acting commander was Nathan McLeod-Hughes, Major     05:18

15   Nathan McLeod-Hughes, right?                             05:18

16        A.    Correct.                                      05:18

17        Q.    And that's who this April 17th, 2012,         05:18

18   memo is from?                                            05:18

19        A.    Yes, sir.                                     05:18

20        Q.    And this is yet another letter of            05:18

21   reprimand, right?                                        05:18

22        A.    Correct.                                      05:18

23        Q.    And it states under the first paragraph       05:18

24   that "Investigation has revealed that you physically    05:18

25   assaulted Mrs. Tessa Kelley on or about February 17,    05:18

PEX 0087-0053



| | | |
|---|---|---|
| 1 | 2012"; do you see that? | 05:18 |
| 2 |     A.   I do. | 05:18 |
| 3 |     Q.   "That on multiple occasions you | 05:18 |
| 4 | physically assaulted your spouse, on this occasion | 05:18 |
| 5 | you punched her in the arm and slapped her with an | 05:18 |
| 6 | open hand while you were involved in a | 05:19 |
| 7 | verbal/physical altercation"; do you see that? | 05:19 |
| 8 |     A.   I do. | 05:19 |

| | | |
|---|---|---|
| 15 |     Q.   All right.  So now, we've got 49th | 05:19 |
| 16 | Security Forces, February 2012.  And now we have | 05:19 |
| 17 | Major Nathan McLeod-Hughes, as well, reporting and | 05:19 |
| 18 | being made aware of Devin Kelley's assault on his | 05:19 |
| 19 | wife, correct? | 05:19 |
| 20 |     A.   Right. | 05:19 |
| 21 |     Q.   Okay.  And this is -- he states, "You | 05:19 |
| 22 | are hereby reprimanded! Your actions violated | 05:19 |
| 23 | Article 128 of the UCMJ-Assault," right? | 05:19 |
| 24 |     A.   Yes. | 05:19 |
| 25 |     Q.   Okay.  So, this would have been your **PEX 0087-0054** | 05:19 |



| 1 | instance where the Air Force, and specifically the | 05:19 |
| 2 | 49th LRS, was aware of Devin's -- Devin Kelley's | 05:19 |
| 3 | reported violence, correct? | 05:20 |
| 4 |       A.   Correct. | 05:20 |

**PEX 0087-0055**



LT. COLONEL ROBERT C. ROBERT BEARDEN                   January 16, 2020
JOE HOLCOMBE vs UNITED STATES                                      112

19        Q.   Can anyone carry a firearm on base?          05:22

20        A.   No.  So, typically, you're limited to        05:22

21   law enforcement personnel.  Some bases allow retired   05:22

22   law enforcement personnel to carry on base, that       05:23

23   kind of thing.                                          05:23

24        What's typical would be that, like, to have        05:23

25   it stored in your home, you have to register it         05:23

**PEX 0087-0056**

1   Security Forces so that they know you have firearms          05:23
2   in your home.                                                05:23
3        That -- that's typical, but carrying, no.  So           05:23
4   you -- typically, you transport, you know, in your           05:23
5   car, in the trunk, on -- on or off of base, but              05:23
6   otherwise, it's locked up at home.                           05:23


9        Q.   (By Mr. Alsaffar)  All right.  I'm                 05:23
10  going -- I'm going to hand you Exhibits No. 11 and           05:23
11  No. 12, okay?                                                05:23
12       A.   Okay.                                              05:23
13       Q.   And I don't know if you're familiar with          05:23
14  these forms, but what I've handed you, Exhibit               05:23
15  No. 11 is a Firearms Transaction form, commonly              05:23
16  known as an ATF Form 4473.  It's a form you fill out         05:23
17  when you want to buy a gun.                                  05:23
18       A.   Okay.                                              05:23

**PEX 0087-0057**



```
 1         Q.   Now, the first exhibit, No. 11, that I      05:24
 2   handed you, if you look on -- I've highlighted it       05:24
 3   for you on the back -- remember when we were talking    05:24
 4   about his two reports in February 2012, one from his    05:24
 5   female supervisor where he had used that -- that        05:24
 6   inappropriate language and then we'd seen one a week    05:24
 7   and a half later, his wife reported him in 2012         05:24
 8   threatening chocking her, water boarding her,           05:24
 9   threatening mass murder; do you remember that?          05:24
10         A.   I do.                                        05:24
11         Q.   That was about February 17th, 2012.  Now     05:24
12   this, on that second page that you're looking at is     05:25
13   Devin Kelley is purchasing a weapon at -- around        05:25
14   February 11, 2012, correct?                             05:25
15         A.   12th.                                        05:25
16         Q.   Oh, February 12th, 2012, correct?            05:25
17         A.   Correct.                                     05:25
18         Q.   So this is right in between the time         05:25
19   frame right after -- after he made those remarks to     05:25
20   his female supervisor and just before his wife comes    05:25
21   in and says, This guy is choking me, water boarding     05:25
22   me and threatening to kill his leadership?              05:25
23         A.   Correct.                                     05:25
24         Q.   Okay.  And if you noted that this was        05:25
25   purchased at Holloman Air Force Base Exchange?          05:25
```

PEX 0087-0058



1        A.   I see that.                                    05:25

2        Q.   Do you see that?  Okay.  All right.  And       05:25

3   then, the second exhibit, Exhibit No. 12, remember       05:25

4   commander -- acting commander Nathan McLeod-Hughes'      05:25

5   letter was April 17th, 2012; is that correct?           05:25

6        A.   Yes.                                           05:26

7        Q.   All right.  And what is -- this -- this        05:26

8   form is Devin Kelley purchasing another firearm at      05:26

9   Holloman Air Force Base Exchange.  And what's the        05:26

10  date on the purchase there?                              05:26

11       A.   April 12th, 2012.                              05:26

12       Q.   Okay.  So the -- just a few days before        05:26

13  this letter of reprimand from Commander Nathan           05:26

14  McLeod-Hughes --

15       A.   Um-hum.

16       Q.   -- Devin Kelley has purchased another          05:26

17  separate firearm at Holloman Air Force Base              05:26

18  Exchange, correct?                                       05:26

19       A.   Correct.                                       05:26

**PEX 0087-0059**



20        Q.    Okay.  And one of the laws that we have        05:28

21   in place in this country is that if you have either       05:28

22   been credibly accused, via probable cause of a            05:28

23   crime, domestic violence or a felony assault, that        05:28

24   your fingerprints should be collected and they            05:28

25   should be reported to the FBI, which would PEX 0087-0060  05:28



```
 1  prevent you from purchasing a firearm, right?          05:28

 2       A.   Right.                                        05:28




 7       Q.   (By Mr. Alsaffar)  And that -- and when       05:28

 8  we -- people like that who are supposed to be           05:28

 9  reported to the FBI in order to prevent them from       05:28

10  getting firearms are allowed to purchase firearms,      05:28

11  that increases the risk of harm to the public;          05:29

12  doesn't it?                                             05:29

13       MR. FURMAN:  Objection to the form.                05:29

14       A.   I would agree with that.                      05:29








22       Q.   I want to show you Exhibit No. 13.            05:29

23       (Deposition Exhibit 13 was marked for

24  identification.)

25       Q.   (By Mr. Alsaffar)  Exhibit 13 is             05:29
```

PEX 0087-0061



| | |
|---|---|
| 1 | of a letter -- or a memorandum from Tracy Wolfe and | 05:29 |
| 2 | sergeant -- First Sergeant 49th LRS; do you see | 05:29 |
| 3 | that? | 05:29 |
| 4 |        A.   I do. | 05:29 |

11        Q.   And I'm sorry, this is dated April 26th,     05:29
12   2012?                                                 05:29
13        A.   Correct.                                    05:29
14        Q.   And this is a memorandum for -- this is      05:29
15   the 49th Security Forces, correct?                    05:30
16        A.   Correct.                                    05:30
17        Q.   All right.  So this is the place that        05:30
18   had -- it was conducting the investigation, the       05:30
19   Security Forces of the -- of Devin Kelley on          05:30
20   February 17th, 2012, right?                           05:30
21        A.   That's correct.                             05:30
22        Q.   So two months later, your -- this was        05:30
23   your First Sergeant at Holloman, correct --           05:30
24        A.   Correct.                                    05:30
25        Q.   -- when you came in command.  **PEX 0087-0062**  05:30



1    months after that February event, 2012, Tracy Wolfe          05:30
2    is sending this memo to the 49th Security Forces             05:30
3    telling them that, I've taken -- I'm in possession           05:30
4    of one of the firearms of Devin Kelley and storing           05:30
5    it at the base armory, correct?                              05:30
6        A.   It's asking -- it's asking the Security             05:30
7    Forces Squadron to store a firearm belonging to              05:30
8    Devin Kelley at the armory, base armory.                     05:30
9        Q.   All right.  And -- and so what has                  05:30
10   happened is First Sergeant Wolfe is in possession            05:30
11   and has taken the gun -- Devin Kelley's gun -- a gun         05:30
12   of Devin Kelley's?                                           05:30
13       A.   I think that's a reasonable assumption.             05:30
14       Q.   Okay.  And so your -- First Sergeant                05:31
15   Wolfe, who was Marconi's First Sergeant at this              05:31
16   time --                                                      
17       A.   Right.                                              
18       Q.   -- Commander Marconi's First Sergeant at            
19   this time is asking the Security Forces of the 49th          05:31
20   at Holloman to store it and not let Devin Kelley get         05:31
21   this gun?                                                    05:31
22       A.   Correct.  Yeah.  He goes on to say, the             05:31
23   only people who are authorized to check it out are           05:31
24   him and the commander -- "him" being First Sergeant          05:31
25   Wolfe.                                                       05:31

**PEX 0087-0063**



6        Q.   Now, I just showed you two documents         05:32

7    where in the span of a couple of months, Devin        05:32

8    Kelley had purchased two guns at Holloman Air Force    05:32

9    Base, a .38 Special and a 9 millimeter

10   semiautomatic, correct?

11       A.   Correct.

12       Q.   All right.  So this is only talking

13   about securing the .38 Special?                        05:32

14       A.   That's correct.                               05:32

15       Q.   So, at this point, we don't know what's       05:32

16   going on with the other gun?                           05:32

17       A.   I think that's a reasonable assumption.       05:32

18       Q.   All right.  Are you familiar with what        05:32

19   an HRVRT is?                                           05:32

20       A.   A high risk -- I forget the V, but it's       05:32

21   a -- it's a team you called together if you think      05:33

22   that you've got an airman that isn't -- presents a     05:33

23   high risk.                                             05:33

24       So it's -- brings together several different       05:33

25   agencies on the base to consider, Okay, in this        05:33

PEX-0087-0064



1   person a risk to themself or others?                  05:33

2         Q.    Is it, HRVRT stands for High Risk for     05:33

3   Violence Response Team?                               05:33

4         A.    That sounds correct.                      05:33

5         Q.    Okay.  So there's a team that's put       05:33

6   together on the base when you have identified an      05:33

7   individual that is a high risk for violent conduct?   05:33

8         A.    Right.                                     05:33

**PEX 0087-0065**



800.211.DEPO (3376)
EsquireSolutions.com

```
13                                        So Exhibit          05:35
14   No. 14, the front page says, Memorandum For -- and       
15   then there's handwriting, 49 LRS-CC-CC -- looks like     05:36
16   F?                                                        05:36
17        A.    F.                                             05:36
18        Q.    What is -- what does that mean?                05:36
19        A.    So to the commander and the First             05:36
20   Sergeant.                                                 05:36
21        Q.    Okay.  So this is a memo to 49th               05:36
22   Logistics Readiness Squadron Commander and -- and         05:36
23   CCF is what again?                                        05:36
24        A.    First Sergeant.                                05:36
25        Q.    First Sergeant.  So that would have been       05:36
```

**PEX 0087-0066**



| | | |
|---|---|---|
| 1 | Tracy Wolfe, probably? | 05:36 |
| 2 | A.   Correct. | 05:36 |
| 3 | Q.   All right.  And this is from the 49th | 05:36 |
| 4 | Security Forces, correct? | 05:36 |
| 5 | A.   From the commander. | 05:36 |
| 6 | Q.   And the commander of the 49th Security | 05:36 |
| 7 | Forces signed here is David Boyd again? | 05:36 |
| 8 | A.   Correct. | 05:36 |
| 9 | Q.   And he's got -- in there, he's X'd a box | 05:36 |
| 10 | that says, "COMMANDER'S REPORT OF DISCIPLINARY | 05:36 |
| 11 | ADMINISTRATIVE ACTION IS REQUIRED...Upon completion, | 05:36 |
| 12 | please return the original form...with the action | 05:36 |
| 13 | annotated no later than" May 2nd, 2012; do you see | 05:36 |
| 14 | that? | 05:36 |
| 15 | A.   I do. | 05:36 |
| 16 | Q.   And then under No. 2, it states, "The | 05:36 |
| 17 | unit commander or designee must endorse all forms." | 05:36 |
| 18 | A.   Correct. | 05:36 |
| 19 | Q.   And then at the bottom there, it says, | 05:36 |
| 20 | "AF Form 3545/SFMIS," and it's got that case number, | 05:37 |
| 21 | and "ROI"; do you see that? | 05:37 |
| 22 | A.   I do. | 05:37 |
| 23 | Q.   Which, that stands for Report of | 05:37 |
| 24 | Investigation? | 05:37 |
| 25 | A.   It does. | 05:37 |

**PEX 0087-0067**



1        Q.   And then attached to it is that document        05:37
2    I showed you earlier where -- from the file where        05:37
3    it's got the narrative of the interview with Tessa       05:37
4    Kelley with all the description of what Devin Kelley     05:37
5    was doing, including his threats for mass murder,        05:37
6    with the legal consultation with the SJA, and then      05:37
7    the Commander Boyd instruction?                          05:37
8        A.   Yes, sir.                                        05:37
9        Q.   So it appears -- does it appear from            05:37
10   this document that around this time frame, so around    05:37
11   the end of April, May 2012, the Security Forces is       05:37
12   sending to the 49th LRS notification of the Security     05:37
13   Forces investigation of Devin Kelley?                    05:37
14       A.   Correct, and requiring from them some           05:37
15   kind of action.                                          05:37

**PEX 0087-0068**



```
12          Q.   Okay.  All right.  And now, we're --        05:38
13   we're getting to what we were just discussing a few      05:38
14   seconds ago, which is the HRVRT --                       05:38
15          A.   Okay.                                        05:39
16          Q.   -- meeting.  So now, we're talking about     05:39
17   mid-May 2012.  The 49th LRS now has received the         05:39
18   notification of investigation from the Security          05:39
19   Forces into Devin Kelley with the various threats he     05:39
20   made.                                                    05:39
21          And I want to talk now about the High Risk        05:39
22   for Violence Response Team that was formed for Devin     05:39
23   Kelley.                                                  
24          Now, you had mentioned the regulation             05:39
25   earlier.  Now, there's a -- let me find it. I            05:39
```

PEX-0087-0069



| | | |
|---|---|---|
| 1 | got it right here.  There is an Air Force | 05:39 |
| 2 | Instruction, a mandatory instruction, actually, | 05:39 |
| 3 | relating to how the Air Force has to handle HRVRT | 05:39 |
| 4 | situations, correct? | 05:39 |
| 5 | A.   I believe so. | 05:39 |
| 11 | (Deposition Exhibit 15 was marked for | |
| 12 | identification.) | 05:39 |
| 13 | Q.   (By Mr. Alsaffar)  All right.  I'm | 05:39 |
| 14 | handing you Exhibit No. 15.  This was produced to us | 05:39 |
| 15 | by the government. | |
| 16 | A.   Okay. | |
| 17 | Q.   It's Bates stamp 7575.  And it's Air | 05:40 |
| 18 | Force Instruction 40-301.  And from the Family | 05:40 |
| 19 | Advocacy Program.  And you see that it states that | 05:40 |
| 20 | "COMPLIANCE OF THIS PUBLICATION IS MANDATORY," | 05:40 |
| 21 | correct? | 05:40 |
| 22 | A.   I do. | 05:40 |
| 23 | Q.   Okay.  So no discretion involved, you | 05:40 |
| 24 | have to follow this instruction, right? | 05:40 |
| 25 | A.   Correct. | 05:40 |

**PEX 0087-0070**



| | | |
|---|---|---|
| 1 | Q.   It's one of those.  So let's talk | 05:40 |
| 2 | about -- let me flip you to Page 2, Section 2.2.8; | 05:40 |
| 3 | do you see that? | 05:40 |
| 4 | A.   I do. | 05:40 |
| 5 | Q.   Okay.  And it's titled, "High Risk for | 05:40 |
| 6 | Violence Response Team, (HRVRT)," right? | 05:40 |
| 7 | A.   It is. | 05:40 |
| 8 | Q.   Correct?  Okay.  So, it states that, | 05:40 |
| 9 | "The HRVRT will be activated when there is a threat | 05:40 |
| 10 | of immediate and serious harm to family members, | 05:40 |
| 11 | unmarried intimate partners, or the FAP staff," | 05:40 |
| 12 | which is the Family Advocacy Program, correct? | 05:41 |
| 13 | A.   Correct. | 05:41 |
| 14 | Q.   Okay.  So we know that the HRVRT, the | 05:41 |
| 15 | high risk for violence team is not even put together | 05:41 |
| 16 | unless there is a threat from someone of immediate | 05:41 |
| 17 | and serious harm to family members? | 05:41 |
| 18 | A.   Correct. | 05:41 |
| 23 | Q.   All right.  "Members are appointed in | 05:41 |
| 24 | writing by their CC," which stands for commander? | 05:41 |
| 25 | A.   It does. | 05:41 |

**PEX 0087-0071**

1   Q.   All right.   "And approved by the FAC.            05:41
2   Membership includes the FAO, the FAP clinician         05:41
3   working with the family, member's SQ/CC," and that     05:41
4   stands for?                                            05:41
5        A.   Squadron commander.                          05:41
6        Q.   All right.  So that would be the 49th        05:41
7   LRS in Devin Kelley's situation?                       05:41
8        A.   Correct.                                     05:41
9        Q.   "JA," which stands for judge advocate?       05:41
10       A.   Correct.                                     05:41
11       Q.   "SFS," which stands for Security Forces,     05:41
12  correct?                                               05:41
13       A.   Correct.                                     05:41
14       Q.   "MH provider, AFOSI"?                        05:41
15       A.   Correct.                                     05:42
16       Q.   "DAVA," do you know what that is?            05:42
17       A.   DAVA, the -- I would need to look it up,     05:42
18  but it's -- they handle abuse cases.                   05:42
19       Q.   Domestic abuse --                            05:42
20       A.   Domestic abuse, yes.                         05:42
21       Q.   Okay.  And so, this is -- you had            05:42
22  mentioned this, they're kind of similar to the         05:42
23  CRB where it's a collection of -- HRVRT is a           05:42
24  collection of various members of squadron              05:42
25  commanders, judge advocates, Security Forces, cont'l   05:42

PEX 0087-0072



1    advocacy folks, family advocacy clinicians, AFOSI          05:42

2    members in a group team to help assess the threat          05:42

3    risk of this person, right?                                05:42

4          A.    Right.                                         05:42

25         Q.   (By Mr. Alsaffar)   Okay.   The **PEX 0087-0073**43



| 1 | being that Devin Kelley would have posed a threat of | 05:43 |
| 2 | immediate and serious harm to family members? | 05:43 |
| 3 | A.    Right. | 05:43 |

| 19 | Q.   (By Mr. Alsaffar)  This Exhibit 16 is | 05:44 |
| 20 | a -- at the top, it's titled "U.S. Department of | 05:44 |
| 21 | Justice, Bureau of Alcohol, Tobacco, Firearms and | |
| 22 | Explosives from Chief Counsel"; do you see that? | 05:44 |
| 23 | A.   I do. | 05:44 |
| 24 | Q.   Okay.  Now, this was produced to us by | 05:44 |
| 25 | the government, as well.  And you -- can you read the | 05:44 |

PEX 0087-0074



| | | |
|---|---|---|
| 1 | the Bates stamp number on the bottom right for | 05:44 |
| 2 | everybody? | |
| 3 | A.   5399. | 05:44 |
| 4 | Q.   Okay.  And it's got a USA Bates stamp | 05:44 |
| 5 | number, correct? | 05:44 |
| 6 | A.   It does. | 05:44 |

18      Q.   Do you remember when I told you a couple      05:45

19  of minutes ago that at Holloman Air Force Base, a      05:45

20  High Risk for Violence Team was put together for      05:45

21  Devin Kelley on May 14th, 2012, time frame?      05:45

22      A.   I do.      05:45

23      Q.   Okay.  So this -- this establishes --      05:45

24  this is where we get this information.      05:45

25      A.   Okay.      05:45

**PEX 0087-0075**



1          Q.   The Department of Justice is telling us          05:45

2    that on May 14th to 15th, 2012, at Holloman Air          05:45

3    Force Base, a High Risk for Violence Response Team          05:45

4    convened to discuss Devin Kelley's mental health          05:45

5    concerns; do you see that?

6          A.   I do.

**PEX 0087-0076**



```
 7          So in this letter from the Department of
 8    Justice, it states, May 14th to 15th, a high risk     05:46
 9    for violence team has been put together for Devin     05:46
10    Kelley, correct?                                      05:46
11          A.   I see that.                                05:46
12          Q.   At Holloman Air Force Base, right?         05:46
13          A.   Yes, sir.                                  05:46




17          Q.   And it states further, "Kelley's
18    Squadron leadership and his mental health providers   05:46
19    feel that he is a major threat to commit an act of    05:46
20    violence, and is currently institutionalized for     05:46
21    mental and emotional instability."                    05:46
22          A.   It does.                                   05:46
```

**PEX 0087-0077**



8        Q.    Okay.  And so, at least we know through          05:47

9    the HRVR team that in May 14th-15th, the 49th LRS          05:47

10   Squadron has determined that he is, Devin Kelley, is       05:47

11   a major threat to commit an act of violence,              05:47

12   correct?                                                  05:47

13        A.    Correct.                                        05:47

**PEX 0087-0078**



```
20        Q.   So, I'm showing you -- this is the USA    05:54

21   Bates stamp, I'll show you the Bates stamp on the    05:54

22   bottom, 13431; do you see that?                       05:54

23        (Deponent perused computer screen.)             05:54

24        A.   Not yet.                                    05:54
```

**PEX 0087-0079**



3       Q.   You see it, okay.  And this is -- let me      05:55

4   pull it up again.  I'll highlight it for you.  This     05:55

5   is a report from AFOSI dated April 29th, 2012,          05:55

6   correct?                                                05:55

7       A.   Correct.                                       05:55

8       Q.   And I want to show you the AFOSI.  And         05:55

9   it's an interview of your First Sergeant by Special

10  Agent Holtz, correct?                                   05:55

11      A.   Interview of Wolfe, Tracy A.  I don't          05:55

12  see who did it.  Sorry.

13      Q.   The first page; do you see that?               05:55

14  Interview of Wolfe, April 29th --                       05:55

15      A.   I do.

16      Q.   -- 2012?

17      A.   Yep.

18      Q.   And then -- oh, I'm sorry.  It's by

19  Clinton Mills --

20      A.   Mills, Clinton.  I see at the bottom.

21      Q.   Clinton Mills is a Special Agent, AFOSI.       05:55

22      A.   Okay.                                          05:55

23      Q.   And it states that Tracy Wolfe, Holloman       05:55

24  Air Force Base, 49 LRS provided AFOSI Detachment 225    05:55

25  with a black external hard drive allegedl**PEX 0087-0080**55



| | | |
|---|---|---|
| 1 | containing a confession by subject, D.  Kelley to | 05:55 |
| 2 | all of victim's injuries.  Wolfe received the hard | 05:55 |
| 3 | drive from subject T. Kelley on the same day. | 05:56 |
| 4 |     A.   Correct. | 05:56 |
| 13 |     Q.   -- where I was getting it from.  So | 05:56 |
| 14 | let's go back to the -- the HRVRT, high risk for | 05:56 |
| 15 | violence meeting and then the action subsequent to | 05:56 |
| 16 | that. | |
| 17 |     A.   Okay. | 05:56 |
| 18 |     Q.   So, if you look on -- what exhibit | 05:56 |
| 19 | number was that again? | |
| 20 |     A.   Exhibit 16. | 05:56 |
| 21 |     Q.   Exhibit 16.  And it's Page No. 4, it's | 05:56 |
| 22 | No. 3 on the bottom. | 05:56 |
| 23 |     A.   Okay. | 05:56 |
| 24 |     Q.   June 8, 2012; do you see that? | 05:56 |
| 25 |     A.   I do. | 05:56 |

**PEX 0087-0081**



1    Q.   And actually, above it, June 7th, 2012,    05:56
2  the Department of Justice states that Kelley
3  "'escapes' from Peak Behavioral Health Services
4  where he is undergoing treatment"; do you see that?    05:56
5    A.   I do.                                      05:56
6    Q.   And are -- were you aware that he had      05:56
7  tried -- he had -- well, he had escaped the Peak
8  Mental Institution, right?
9    A.   I was made aware; I don't remember when.   05:57
10    Q.   Okay.  And then the next day, June 8th,    05:57
11  Kelley's commander orders him into pretrial         05:57
12  confinement at the 49th Security Forces,            05:57
13  Building 35, right?                                 05:57
14    A.   Correct.                                   05:57
15    Q.   Now, where is that confinement facility    05:57
16  located, vis-à-vis, your 49 LRS?                    05:57
17    A.   Again, within probably a mile, short       05:57
18  drive on the base.                                  05:57
19    Q.   Okay.  And June 8, 2012, "Confinement      05:57
20  was deemed necessary because it was foreseeable he  05:57
21  would flee again and engage in serious criminal     05:57
22  misconduct"; do you see that?                       05:57
23    A.   I see that.                                05:57
24    Q.   And you have no reason to disagree with
25  that statement, correct?

**PEX 0087-0082**



```
 1          A.   I do not.                              05:57

 2          Q.   Okay.  And there's "evidence in the   05:57

 3    record that Kelley attempted to purchase a handgun  05:57

 4    before being placed into pretrial confinement     05:57

 5    (June 7, 2012 entry)"; do you see that?           05:57

 6          A.   I do.                                   05:57




16          Q.   (By Mr. Alsaffar)  Exhibit No. 17 is  05:58

17    Bates stamped USA 13378, and it's from Xavier     05:58

18    Alvarez, Director of Military Affairs.

19          A.   Okay.                                   05:58
```

**PEX 0087-0083**



```
 2        Q.    "At approximately 2235 Nurse on unit         05:58
 3   informed staff that a code three (elopement) had        05:58
 4   been called onto Military Unit reference Devin          05:58
 5   Kelley."  All right?
 6         So, this is a notification that he was            05:58
 7   escaping from the mental institution, right?           05:58
 8        A.    Right.                                       05:58
 9        Q.    Now, you were -- your understanding was      05:58
10   he had escaped from that mental institution; he was    05:58
11   not allowed to; it was AWOL on his part, right?        05:58
12        A.    Correct.                                     05:58
13        Q.    And if you go a couple of lines down,        05:58
14   commander -- or sorry, Director Alvarez states,
15   "Computer results showed that DK had been searching    05:59
16   weapons, body armor, transport to San Antonio and      05:59
17   lodging.                                                05:59
18         "SM's (sic) reported to staff, that DK had        05:59
19   been working diligently in PT, to accomplish a         05:59
20   twelve mile run"; do you see that?                     05:59
21        A.    I do.                                        05:59
```

**PEX 0087-0084**



```
 6        Q.   And so, what we know is that he was          05:59

 7   searching for weapons and body armor while he was in   05:59

 8   a mental institution on the day or around the time

 9   he was trying escape from the mental institution,      05:59

10   right?

11        A.   Right.                                        05:59

12        Q.   Okay.  Now, if you go a little bit            05:59

13   farther down, do you see where it says "Greyhound       05:59

14   security and Police"?

15        A.   I do.                                         05:59

16        Q.   "Greyhound security and Police were           05:59

17   notified of the possible suspect heading downtown       05:59

18   and advised that he may be a danger as per his          05:59

19   recent 'death by cop' statements"; do you see that?    06:00

20        A.   I do.                                         06:00
```

**PEX 0087-0085**



```
 6        Q.   Exactly.  So, in other words, this is      06:00
 7   another kind of -- another different kind of threat  06:00
 8   with weapons that Devin Kelley is making?            06:00
 9        A.   Right.                                      06:00
10        Q.   All right.  And the next sentence,         06:00
11   "Throughout" -- it says, "Throughout this process    06:00
12   Master Sergeant Wolfe," so that's Tracy Wolfe,       06:00
13   correct?                                             06:00
14        A.   Correct.                                    06:00
15        Q.   -- "and Major Nordin were in constant      06:00
16   communication with Director Alvarez."
17        So again -- first of all, do you know who
18   Major Nordin is?                                      06:00
19        A.   I don't.                                    06:00
20        Q.   Okay.  So, in this situation, Director     06:00
21   Alvarez is stating that your First Sergeant Wolfe    06:01
22   is -- is communicating with them and is being made   06:01
23   aware of all this stuff, was actually working        06:01
24   closely and being made aware of what Devin Kelley    06:01
25   was doing?                                            06:01
```

**PEX 0087-0086**



```
1          A.   Right, right.                        06:01

2          Q.   So -- so, your First Sergeant Wolfe  06:01

3   would have known about the -- these searching for 06:01

4   weapons, searching for body armor, his escape from 06:01

5   the mental institution and his threat -- his weapons 06:01

6   threat of death by cop?                          06:01

7          A.   Right.                               06:01
```

**PEX 0087-0087**



8        Q.   Someone from the Security Forces,        06:13

9    someone now from family advocacy, as well.  So     06:14

10   that -- that right there is four different units    06:14

11   within the Holloman Air Force Base that were put    06:14

12   together specifically aware that Devin Kelley posed  06:14

13   a high risk of violence by May 2012, fair?          06:14

14       A.   Fair.                                      06:14

23       Q.   I want to show you another thing related   06:14

24   to that, Exhibit No. 19.                            06:14

25            (Deposition Exhibit 19 was marked for

PEX 0087-0088

1    identification.)                                          06:14

2          Q.    (By Mr. Alsaffar)   And this is dated May     06:14

3    17, 2012.   Let me switch you on that -- actually,        06:14

4    you can have mine.   That's okay.   It makes it easier    06:14

5    for you.   It makes it easier for you -- dated May        06:14

6    17, 2012.   It's a memorandum for the 49th LRS            06:15

7    commander --                                              06:15

8          A.    Correct.                                      06:15

**PEX 0087-0089**



3        Q.    So May 17th, 2012, the CRB, Central                    06:16

4   Registry Board, made that probable-cause                        06:16

5   determination that Devin Kelley met the criteria for           06:16

6   adult physical maltreatment?                                   06:16

7        A.    Right.                                               06:16

**PEX 0087-0090**



         8          Q.   I'm going to show you Exhibit 18.          06:17

         9          A.   Okay.

        10          Q.   I'm sorry, it's a little bit out of

        11    order.  And this is -- this is the letter I gave you   06:17

        12    before the break, so you have it.                      06:17

        13          Exhibit 18 is a memorandum from the acting       06:18

        14    commander for 49th LRS, that's Nathan McLeod-Hughes,   06:18

        15    Major Hughes, correct?                                 06:18

        16          A.   Correct.                                    06:18

        17          Q.   And on -- so on June 8th, 2012, Major       06:18

        18    Hughes has put this memorandum together for the 49th   06:18

        19    Wing, Judge Advocate, the 49th Wing Commander,         06:18

        20    right?                                                 06:18

        21          A.   Correct.                                    06:18

**PEX 0087-0091**



```
12        Q.   Now, this is a -- this is a memorandum      06:18
13   that the 49th LRS commanders put together approving   06:19
14   a pretrial confinement of Devin Kelley, June 8,       06:19
15   2012, correct?                                        06:19
16        A.   Correct.                                    06:19
```

**PEX 0087-0092**



```
21        Q.   So, first, Commander Hughes believes          06:20

22   that -- or he's stating here he has reasonable          06:20

23   grounds to believe these offenses were committed,       06:20

24   which means he has probable cause to believe they       06:20

25   were committed, right?
```

**PEX 0087-0093**



```
 1        A.    Right.                                        06:20

 2        Q.    So, that's June 8, 2012, the 49th LRS         06:20

 3   commander has probable cause to believe that -- that

 4   these offenses were committed, right?                    06:20

 5        A.    Correct.                                      06:20

 6        Q.    Now, underneath that, he states,             06:20

 7   "Second, I have reasonable grounds to believe           06:20

 8   continued pretrial confinement is necessary because    06:20

 9   it's foreseeable that the confinee will not appear      06:20

10   at trial, and/or will engage in serious criminal       06:21

11   misconduct if confinement is not continued,"            06:21

12   correct?                                                 06:21

13        A.    Correct.                                      06:21

14        Q.    Commander Hughes here is stating that as      06:21

15   of June 8th, 2012, the 49th LRS has reasonable          06:21

16   grounds to believe that Devin Kelley will engage in     06:21

17   serious criminal misconduct, and that that is why he    06:21

18   has to be confined in a jail?                            06:21

19        A.    Correct.                                      06:21
```

**PEX 0087-0094**



17      Q.   Okay.  And do you -- and, you know,          06:22

18   we've looked through a lot of the evidence so far    06:22

19   that was available.  And do you have any reason to   06:22

20   disagree with that assessment of "foreseeable"?      06:22

21      A.   I don't.                                     06:22

**PEX 0087-0095**



```
 7          Q.   Okay.  And he notes on April 23rd, 2012,    06:23

 8   Commander Hughes notes that "while driving to El        06:24

 9   Paso," Kelley, Devin Kelley "took his gun out of his    06:24

10   holster and held it against her" -- Tessa               06:24

11   Kelley's -- "temple, stating 'do you want to die'";     06:24

12   do you see that?                                        06:24

13          A.   I do.                                       06:24
```

**PEX 0087-0096**



```
19          Let's go down to No. 5.  Commander Hughes        06:25

20    states that, "Furthermore, investigation revealed       06:25

21    that while receiving inpatient mental health care,

22    the member made several threatening statements that     06:25

23    if he were picked up by Security Forces that he         06:25

24    would go for their guns"; do you see that?              06:25

25          A.   I do.                                        06:25
```

**PEX 0087-0097**



```
 1        Q.   So, there, he's stating that -- all          06:25

 2   right, we also know that Devin Kelley is now            06:25

 3   threatening Security Forces if they come for him,       06:25

 4   and specifically going for the Security Forces'         06:25

 5   guns, too --                                            06:25

 6        A.   Correct.                                      06:25

 7        Q.   -- right?  Additionally, on June 7,           06:25

 8   2012, Kelley contacted Holloman Air Force Base          06:25

 9   Exchange and entered into an agreement to purchase a    06:25

10   9 millimeter handgun; do you see that?                  06:25

11        A.   I do.                                         06:25

12        Q.   So this is when he's in a men- -- the         06:25

13   day he's in a mental facility, the day he escapes

14   the mental facility, he's trying to arrange for the     06:26

15   actual purchase of a gun from the Holloman Air Force    06:26

16   Base Exchange, right?                                   06:26

17        A.   I see that.                                   06:26

18        Q.   And do you remember when I showed you         06:26

19   earlier the two forms where he actually purchased       06:26

20   two guns in 2012 from that very same Holloman Air       06:26

21   Force Base Exchange, right?                             06:26

22        A.   Correct.                                      06:26

23        Q.   All right.  So, he knew how to get guns       06:26

24   from that Holloman Exchange, right?                     06:26

25        A.   Right.                                        06:26
```

**PEX 0087-0098**



8        Q.   Okay.   An examination of the computer he          06:26

9    had been using at the facility revealed that Kelley          06:26

10   searched for a map to the bus station, as well as           06:26

11   conducted research on the purchases of -- of weapons        06:26

12   and body armor.                                             06:26

13        And I showed you that documentation earlier,           06:26

14   as well; do you remember that?                              06:26

15        A.   You did.                                          06:26

16        Q.   Okay.

17        A.   I remember.                                       06:26

18        Q.   Yeah.   And so this is getting                    06:26

19   communicated.   So now we know Commander Hughes at          06:26

20   the LRS, the 49th LRS is also aware of all this             06:26

21   information.

22        And he's putting in here his support, his             06:27

23   statement that it's foreseeable, this is a very            06:27

24   dangerous person?                                          06:27

25        A.   Right.                                           06:27

**PEX 0087-0099**



```
 1         Q.   Right?  Okay.  Paragraph 6, he says --      06:27
 2    Commander Hughes says, The course of conduct by       06:27
 3    Kelley leads me to conclude that he will continue to  06:27
 4    engage in serious criminal conduct if not confined.   06:27
 5         So -- so here, Commander Hughes is saying        06:27
 6    unless he's in jail, he's going to commit continued   06:27
 7    serious conduct -- criminal conduct, right?           06:27
 8         A.   Right.                                       06:27
 9         Q.   And -- and so, the 49th LRS at Holloman     06:27
10    Air Force Base on June 2012 was certainly aware       06:27
11    that -- that Devin Kelley is -- has probable cause    06:27
12    to believe that he's a threat for serious violence    06:27
13    with weapons, right --                                06:27
14         A.   Right.                                       06:27
15         Q.   Okay.  Is that -- do you agree with         06:27
16    that?                                                  06:27
17         A.   I agree.                                     06:27
```

**PEX 0087-0100**



```
23        Q.   (By Mr. Alsaffar)  I'm handing you          06:32

24   Exhibit No. 21.  And I -- and Exhibit No. 21 is also   06:32

25   a charge sheet; is that correct?                       06:32
```

**PEX 0087-0101**



| | |
|---|---|
| 1 | A. That is correct. | 06:32 |
| 2 | Q. And this is dated, actually, August 15, | 06:32 |
| 3 | 2012? | 06:32 |
| 4 | A. That is correct. | 06:32 |
| 5 | Q. Related to Devin Kelley, correct? | 06:32 |
| 6 | A. Yes, sir. | 06:32 |
| 15 | Q. Okay. And -- and that's okay. I know | 06:32 |
| 16 | it was years ago. But this charge sheet is | 06:32 |
| 17 | indicating an additional Article 128 charge of | 06:32 |
| 18 | assault, against Devin Kelley; correct? | 06:32 |
| 19 | A. That's correct. | 06:32 |
| 20 | Q. So this is a separate charge of assault | 06:32 |
| 21 | on Tessa Kelley his wife with a dangerous weapon, to | 06:32 |
| 22 | wit, a loaded firearm, right? | 06:33 |
| 23 | A. That's correct. | 06:33 |

**PEX 0087-0102**



4        Q.   All right.  And so this would have          06:33

5    been -- by this time, as well, August 15, 2012,        06:33

6    probable cause, Air Force knew they had probable       06:33

7    cause to believe that Devin Kelley had committed       06:33

8    this additional assault charge because they had        06:33

9    indicted him for it?                                   06:33

10       A.   Right.                                        06:33

**PEX 0087-0103**



2      Q.   So the -- so when a government agency         06:39

3   actually fails to report this criminal-conviction    06:39

4   data on felons, dangerous felons, like Devin Kelley, 06:39

5   that's unnecessarily exposing the public to a -- an   06:39

6   increased risk of harm, isn't it?                     06:39

7        MR. FURMAN:  Objection to form; you can          06:39

8   answer.                                               06:39

9        A.   I would agree, yes.                         06:39

16       Q.   -- right?  Okay.  And, in -- in             06:39

17   particular with Devin Kelley, not only was he a      06:39

18   convicted felon who -- who had a felony that should  06:39

19   prevent him from legally obtaining firearms, but the 06:39

20   Air Force also knew by the time of his conviction    06:39

21   that he was also a convicted felon, he had a         06:39

22   particular -- a particular habit of threatening gun  06:39

23   violence and mass-shooting violence, right?          06:39

24       MR. FURMAN:   Objection to form; you can         06:39

25   answer.                                              06:40

**PEX 0087-0104**



1        A.    So, yes, there's -- there's clearly                    06:40

2    evidence that he had made those kind of                          06:40

3    mass-shooting threats.                                           06:40

4        Q.    (By Mr. Alsaffar)   Right.   And so, by                06:40

5    November 11 -- November 2012, the Air Force -- and               06:40

6    all the commands that are listed here were aware                 06:40

7    that, not only is he a convicted felon and the type              06:40

8    of charges which should prevent him from legally                 06:40

9    buying a firearm, but this particular person, Devin              06:40

10   Kelley, has also made several forms of threats of                06:40

11   gun violence and mass-shooting gun violence prior to             06:40

12   the conviction, right?                                           06:40

13       A.    Correct.                                               06:40

**PEX 0087-0105**



15          (Deposition Exhibit 23 was marked for

16   identification.)                                          06:43

17          Q.   Okay.  During -- about this time frame,       06:43

18   and I think this is one of the documents you              06:43

19   specifically reviewed prior to your deposition, but       06:43

20   I want to show you Exhibit No. 23 --                      06:43

21          A.   Okay.                                         06:43

22          Q.   -- which is Bates 13324.                      06:43

23          A.   Yes, sir.                                     06:43

24          Q.   So, this is about a week before -- a          06:43

25   week or so before you meet with Devin Kelley, you         06:43

**PEX 0087-0106**



```
 1  his release from jail, correct?                    06:43

 2       A.   Yes, sir.                                06:43

 3       Q.   And it's March 22, 2013.  You sent this  06:43

 4  memo to the Security Forces Division, correct?     06:43

 5       A.   Right.                                   06:43








17       Q.   Okay.  So this is -- and just so the    06:44

18  record's clear, you're sending this memorandum to  06:44

19  the 49th Security Forces Squadron at Holloman Air  06:44

20  Force Base?                                         06:44

21       A.   Right, yeah, to a -- to a specific unit  06:44

22  within that squadron.                              06:44

23       Q.   And the subject is "Conditional Barment  06:44

24  Request for Devin Kelley," right?                  06:44

25       A.   Yes, sir.                                06:44
```

**PEX 0087-0107**



```
 1        Q.   And I didn't -- I didn't even point this        06:44
 2   out.  This is a memo you wrote and that's your            06:44
 3   signature at the bottom, Robert Bearden, Commander,       06:44
 4   49th LRS, right?                                          06:44
 5        A.   So, I -- I signed it.  I'm pretty sure          06:44
 6   my First Sergeant wrote it for me --
 7        Q.   Okay.
 8        A.   -- but yes, that is my signature; it's          06:44
 9   my memo.                                                  06:44
10        Q.   Okay.  And -- and you were -- you were          06:44
11   agreeing with the content of this by signing it?          06:44
12        A.   Correct.                                        06:44
13        Q.   Okay.  Can you tell me first what a             06:44
14   "conditional barment request" means?                     06:44
15        A.   So, you know, we have the authority to          06:44
16   bar individuals from the base.                            06:44
17        Q.   Um-hum.                                         06:44
18        A.   And so, what I'm asking for here is that        06:44
19   essentially that he be barred from the base with a        06:45
20   very unique, discrete exception to be on the base to      06:45
21   be out-processed.                                         06:45
```

**PEX 0087-0108**



```
 9         Q.   Is it fair to say that, at this point,       06:46

10    what you're trying to do is protect the people         06:46

11    inside the base from Devin Kelley?                     06:46

12         A.   Yes.  Specifically, because he had           06:46

13    threatened to shoot squadron leadership, I felt like   06:47

14    we needed some extra protection.                       06:47
```

**PEX 0087-0109**



```
 2        Q.   Now -- and you mentioned in this memo        06:49

 3   that, specifically, that he not only threatened to    06:49

 4   kill his leadership, he had threatened repeatedly to  06:49

 5   kill his leadership?                                   06:49

 6        A.   Correct.                                     06:49

 7        Q.   And go -- also you state a little            06:49

 8   farther down that -- I -- you state that, "What they  06:49

 9   found was alarming," and you're referring to what he  06:49

10   was doing while he was in a mental institution?

11        A.   Right.                                       06:49

12        Q.   "He was searching the Internet for body     06:49

13   armor and guerilla tactics"; do you see that?         06:49

14        A.   Yes, sir.                                    06:49

15        Q.   Okay.  And now, when we're talking about    06:49

16   searching for weapons, threatening to kill            06:49

17   leadership, searching for body armor, and now

18   guerilla tactics, body armor and guerilla tactics,    06:49

19   weapons, we're all -- this is putting a very          06:49

20   specific picture of mass-shooting-type conduct; fair  06:50

21   to say?                                                06:50

22        MR. FURMAN:  Objection to form.                  06:50

23        A.   I think that's a fair characterization      06:50

24   of it.                                                 06:50
```

**PEX 0087-0110**



18       Q.   So my statement is correct, you       06:50

19  specifically -- you specifically, according to this

20  memo, communicated those concerns directly to the

21  Security Forces commander that you had concerns that  06:50

22  Devin Kelley still posed a threat --         06:51

23       A.   Right.                06:51

24       Q.   -- correct?

25       A.   Right.                06:51

**PEX 0087-0111**



```
24        Q.   (By Mr. Alsaffar)  Okay.  I'm going to      06:55

25   hand you Exhibit 24.
```

**PEX 0087-0112**



```
 5        Q.   -- of March 22nd, 2013.  Exhibit 24 is       06:55
 6   March 27, 2013, "Request for Expulsion and Order Not
 7   to Reenter Holloman Air Force Base for Devin           06:55
 8   Kelley."                                               06:55
 9        A.   Okay.                                        06:55
10        Q.   And this is for the 49th Wing Commander,     06:55
11   which is, I believe two levels above your command?     06:55
12        A.   Correct.                                     06:55
22        Q.   All right.  I want to take you through       06:56
23   this a little bit.                                     06:56
24        This seems consistent with what you were          06:56
25   saying in your letter a few days earlier, right        06:56
```

PEX 0087-0113



1   essentially, we don't want this guy, Devin Kelley on      06:56

2   this base for an indefinite amount of time?              06:56

3         A.   Right.                                        06:56

25        Q.   That's right.  And if you look down       06:57

PEX 0087-0114



| | | |
|---|---|---|
| 1 | further down on Paragraph 3, towards the bottom, so | 06:57 |
| 2 | under 3 b, Captain McQuillan is stating that | 06:57 |
| 3 | "Additional evidence of Kelley's high risk | 06:57 |
| 4 | unpredictable and criminal behavior includes his | 06:57 |
| 5 | history of mental health issues, his preoccupation | |
| 6 | with weapons, his verbal declaration that he has | 06:57 |
| 7 | contemplated offensive attack strategies on both Air | 06:57 |
| 8 | Force personnel and organizations (including his | |
| 9 | leadership and Security Forces), his online research | 06:57 |
| 10 | of body armor and guerilla warfare tactics while a | 06:57 |
| 11 | patient in a military mental health facility, his" | 06:57 |
| 12 | purchase of and purchase -- possession of weapons | 06:57 |
| 13 | "and his successful escaped from a military mental | 06:57 |
| 14 | health facility"; do you see that? | 06:58 |
| 15 | A.   I do. | 06:58 |
| 16 | Q.   I mean, fair enough.  March 27, 2013, | 06:58 |
| 17 | the -- the 49th wing judge JAG -- judge advocate | 06:58 |
| 18 | command is painting a very, very specific picture of | 06:58 |
| 19 | Devin Kelley as a person who could commit mass -- a | 06:58 |
| 20 | mass shooting, violent act -- | 06:58 |
| 21 | MR. FURMAN:  Objection to form. | 06:58 |
| 22 | Q.   (By Mr. Alsaffar)  -- do you agree with | 06:58 |
| 23 | that? | 06:58 |
| 24 | MR. FURMAN:  Same objection. | 06:58 |
| 25 | Q.   (By Mr. Alsaffar)  Go ahead. | 06:58 |

**PEX 0087-0115**



```
 1          A.   Can -- ah, yes, I agree.                       06:58




 5          Do you remember how we were talking about the       06:58
 6   various sort of Air Force departments who had              06:58
 7   specific knowledge of the variety of violent acts          06:58
 8   and threats that Devin Kelley had made?                    06:59
 9          We talked about AFOSI Detachment 225; we            06:59
10   talked about the -- your squadron, 49 LRS, 49th            06:59
11   Security Forces, the Family Advocacy Program for the       06:59
12   high risk violence team, and now we know also the          06:59
13   49th Wing judge advocate also has evidence and             06:59
14   knowledge of the high risk for violence and the            06:59
15   potential for mass violence that Devin Kelley's            06:59
16   capable of, right?                                         06:59
17          A.   Correct.                                        06:59




23          (Deposition Exhibit 25 was marked for
24   identification.)                                           06:59
25          Q.   (By Mr. Alsaffar)  So a couple of -- 06:59
```

PEX 0087-0116



| | | |
|---|---|---|
| 1 | later, so now we're a week after your letter or | 06:59 |
| 2 | request for -- for a barment is March 29th, 2013; do | 06:59 |
| 3 | you see that? | 07:00 |
| 4 |     A.   I do. | 07:00 |
| 5 |     Q.   Sorry.  And it's -- it's actually | 07:00 |
| 6 | directed to Devin Kelley from the 49th Wing | 07:00 |
| 7 | Commander, correct? | 07:00 |
| 8 |     A.   Yes, sir. | 07:00 |
| 9 |     Q.   And it's -- states that it's signed by | 07:00 |
| 10 | Andrew Croft, Colonel Croft? | 07:00 |
| 11 |     A.   Correct. | 07:00 |
| 12 |     Q.   I believe you told me about him earlier? | 07:00 |
| 13 |     A.   Right, Wing Commander. | 07:00 |
| 14 |     Q.   Wing Commander.  That's a command above | 07:00 |
| 15 | you, correct, when you were at Holloman -- | 07:00 |
| 16 |     A.   Yeah, two above me. | 07:00 |
| 20 |     Q.   Okay.  And he states that effect -- in | 07:00 |
| 21 | Paragraph 2, "Effective immediately upon receipt of | 07:00 |
| 22 | this notice, you are ordered not to enter or reenter | 07:00 |
| 23 | or be found within the limits of the United States | 07:00 |
| 24 | military installation of Holloman Air Force Base, | 07:00 |
| 25 | New Mexico, for an indefinite period of time, | 07:00 |

**PEX 0087-0117**



```
 1          A.   Yes, sir.                              07:00




10          Q.   There you go.  Okay.  Thank you for that   07:01
11   clarification.  So, at least as of March 29th, 2013,   07:01
12   several commanders now at Holloman Air Force Base
13   were saying, Devin Kelley, you're not allowed into     07:01
14   this space because you're a threat to -- to people     07:01
15   in this space, and we're -- we're not allowing you     07:01
16   here indefinitely?                                     07:01
17          A.   Right.                                      07:01
```

**PEX 0087-0118**



```
12        Q.   (By Mr. Alsaffar)  Handing you Exhibit      07:02

13   No. 26.  And this is a "Defense Manpower Data Center

14   Installation Access Record" relating to Devin         07:02

15   Kelley.  It's Bates numbered 15641.                    07:02

16        And I want you to go to 15642, the second        07:02

17   page.  So you don't have to read all this.  Now,      07:02

18   this is relating to Devin Kelley and his ID card and  07:02

19   attempts to access the base -- the various bases,

20   Air Force Bases.

21        A.   Okay.
```

**PEX 0087-0119**



```
 7        Q.   And -- and even if the ID was           07:03
 8   accidentally not taken from him, would it -- would 07:03
 9   it be the process for the base, if they enter a    07:03
10   barment order and an order not to enter, that they 07:03
11   would put an alert saying, this person, even if they 07:03
12   have an ID, is not allowed in?                     07:03
13        A.   Right.  They would scan it and then get  07:03
14   a warning up that they weren't allowed.            07:03
21        Q.   Okay?  So, the first paragraph says,     07:03
22   January 24th, 2018 (sic), Scott Ulrich, Director,  07:03
23   Physical Security/Law Enforcement Defense Human
24   Resources Activity, Defense Manpower Data Center   07:04
25   provided the Department of Defense OIG a           07:04
```

PEX 0087-0120



| | | |
|---|---|---|
| 1 | Installation Access Log Entries -- | 07:04 |
| 2 | A.    Okay. | 07:04 |
| 3 | Q.    -- associated to Devin Kelley. | 07:04 |
| 4 | A.    Okay. | 07:04 |
| 5 | Q.    So that's what this document is.  If you | 07:04 |
| 6 | look on the second page, under April 9th, 2013, | 07:04 |
| 7 | "AGENT NOTE - Mr. Ulrich opined that Devin Kelley, | 07:04 |
| 8 | or someone using his assigned ID credential, | 07:04 |
| 9 | attempted to gain access to Holloman Air Force Base | 07:04 |
| 10 | and was subsequently denied due to the existing | 07:04 |
| 11 | barment"; do you see that? | 07:04 |
| 12 | A.    I do. | 07:04 |
| 13 | Q.    So, on April 9th, 2013, either Devin | 07:04 |
| 14 | Kelley or someone who somehow got access to his ID | 07:04 |
| 15 | card was trying to get back on the base -- | 07:04 |
| 16 | A.    Right. | 07:04 |
| 17 | Q.    -- right?  Okay.  Next -- No. 12, | 07:04 |
| 18 | August 26th, 2015, so we're two years later; do you | 07:04 |
| 19 | see that?  No. 12? | 07:04 |
| 20 | A.    Oh, yeah, I'm sorry.  Yes, now I see it. | 07:04 |
| 21 | Q.    This is San Antonio Air Force Base. | 07:04 |
| 22 | This is actually just about an hour outside of | 07:04 |
| 23 | Sutherland Springs, Texas, okay?  Just so you know. | 07:05 |
| 24 | "AGENT NOTE -- Mr. Ulrich opined that Devin | 07:05 |
| 25 | Kelley, or someone using his assigned ID credential | 07:05 |

**PEX 0087-0121**



| | | |
|---|---|---|
| 1 | attempted to gain access to San Antonio Air Force | 07:05 |
| 2 | Base at the Visitor Center and was subsequently | |
| 3 | denied due to the existing barment"; do you see | 07:05 |
| 4 | that? | 07:05 |
| 5 |     A.   I do. | 07:05 |
| 6 |     Q.   So we have an August 26th, 2015, either | 07:05 |
| 7 | Devin Kelley or someone who's -- again, somehow gets | 07:05 |
| 8 | ahold of the ID was trying to access the Air Force | 07:05 |
| 9 | base when they shouldn't have, right? | 07:05 |
| 10 |     A.   Right. | 07:05 |
| 11 |     Q.   Okay.  And then if you look down, the | 07:05 |
| 12 | next entry, February 17, 2016, Records accessed | 07:05 |
| 13 | Holloman Air Force Base.  AGENT NOTE - Mr. Ulrich | 07:05 |
| 14 | opined that Devin Kelley, or someone using his | 07:05 |
| 15 | assigned ID credential, attempted to gain access to | 07:05 |
| 16 | Holloman Air Force Base and was denied due to | 07:06 |
| 17 | debarment; do you see that? | 07:06 |
| 18 |     A.   I do. | 07:06 |
| 19 |     Q.   Okay.  So we have three different | 07:06 |
| 20 | attempts with Devin Kelley, or somebody who got | 07:06 |
| 21 | ahold of his ID was trying to get -- get on base, | 07:06 |
| 22 | get on to a place he was barred from entering, | 07:06 |
| 23 | right? | 07:06 |
| 24 |     A.   Correct. | 07:06 |

**PEX 0087-0122**



17        Q.    -- that these things, making sure the          07:18

18    FBI was aware of this dangerous person --                 07:18

19        A.    Right.                                          07:18

20        Q.    -- both through fingerprint access and          07:18

21    also his convictions, that's designed to make sure        07:18

22    that when you guys released him to the public, which      07:18

23    you did, right?  That's what you-all did, you had to      07:18

24    release him to the public?                                07:18

25        A.    Correct.                                        07:18

**PEX 0087-0123**



1      Q.   This was the safety net for the rest of          07:18

2    us.  Those of us out there in Texas, and Sutherland     07:18

3    Springs, as well, to protect those folks from Devin     07:18

4    Kelley, right?                                           07:18

5      A.   I would -- I would agree with that               07:18

6    characterization.                                        07:18

**PEX 0087-0124**



1                         CERTIFICATION

2

  STATE OF COLORADO)
3                  )  ss.
  COUNTY OF DENVER )
4

5

6          I, Dawn Gage, Professional Court Reporter
  and Notary Public for the State of Colorado, do
  hereby certify that previous to the commencement of
7  the examination, the said LIEUTENANT COLONEL ROBERT
  C. BEARDEN, was duly sworn by me to testify the
8  truth in relation to the matters in controversy
  between said parties.

9
           I further certify that said videotaped
10 deposition was taken in shorthand by me and was
  reduced to typewritten form by computer-aided
11 transcription, that the foregoing is a true
  transcript of the questions asked, testimony given,
12 and proceedings had.

13         I further certify that I am not an
  attorney nor counsel nor in any way connected with
14 any attorney or counsel for any of the parties to
  said action or otherwise interested in its events.

15
           I further certify that, pursuant to Rule
16 30(f)(1), review was requested.

17         IN WITNESS WHEREOF, I hereunto affix my
  hand and notarial seal this 31st day of January,
18 2020.

19
           My commission expires March 17, 2023
20

21         [signature: Dawn Gage]

22 _____
                 DAWN GAGE
         Professional Court Reporter
23
      DAWN GAGE
24    NOTARY PUBLIC
    STATE OF COLORADO
    NOTARY ID 19994024770
25 MY COMMISSION EXPIRES MARCH 17, 2023

**PEX 0087-0125**

