IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| HOLCOMBE, et. al, Plaintiffs | NO. 5:18-CV-00555-XR (consolidated cases) |
| vs. | |
| UNITED STATES OF AMERICA, Defendant | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW

In November 2012, the Air Force convicted Devin Kelley ("Kelley") by General Court-Martial of assaulting his then-wife, Tessa Kelley, and his stepson. Both were felonies and both were crimes of domestic violence. The Government had an obligation—and multiple opportunities—to collect and submit Kelley's fingerprints and criminal history to the FBI's Criminal Justice Information Services ("CJIS") Division for inclusion in its databases. Its failure to do so is the basis for this action.

The thrust of these lawsuits is that Kelley should not have been able to purchase the firearms he used in the shooting at the First Baptist Church of Sutherland Springs ("the Church") on November 5, 2017, but negligent failures by the Government to collect, handle, retain, and report required information about Kelley allowed him to do so. *See* Dkt. No. 318 (previous order on Motion for Summary Judgment detailing a summary and background of the case).

From April 7, 2021, to April 20, 2021, the Court held a bench trial to re-solve disputed issues of fact. This Court relies on the testimony of the wit-nesses, both live and appearing remotely, as well as the written submissions provided to the Court by agreement of the parties. In so doing, the Court makes credibility determinations as appropriate. This memorandum and or-der will more fully set forth the Court's findings of fact and rulings of law on issues relating to liability and causation. *See* Fed. R. Civ. P. 52(a). The Court will hold a separate bench trial on damages.

# TABLE OF CONTENTS

**Widespread Operational Failures** ..............................................**5**

    1.  The Government's failure to exercise reasonable care ..........................6

        1.1.  Air Force Office of Special Investigations Negligence ...................7

        1.2.  Security Forces Negligence ...........................................................10

        1.3.  Negligent Supervision at Holloman ..............................................12

    2.  The Government's failures were systemic. ............................................16

    3.  The Government's failures increased the risk of physical harm. .........17

        3.1.  Primary increased risk of harm ....................................................18

        3.2.  Secondary increased risk of physical harm ...................................21

**Kelley's Post-Air Force Conduct** .............................................**23**

**Kelley's Motive** .........................................................................**24**

    1.  Kelley's conflict with Danielle's family. ................................................24

    2.  Kelley's marriage problems exacerbated the conflict with the
Shields family. ......................................................................................26

    3.  Kelley's attack on the Church allowed him to fulfill his threats
and isolate his wife from her family. .....................................................28

    4.  Kelley was not trying to protect his wife by killing and maiming
over 40 people. ......................................................................................30

    5.  Kelley's attack was not random. ..........................................................31

**Crime of Domestic Violence** ....................................................**32**

    1.  Expert Definitions ................................................................................33

    2.  Legal Definitions ..................................................................................34

**Foreseeability** ...........................................................................**37**

    1.  Domestic violence was foreseeable to the Air Force..............................38

        1.1.  Kelley's acts "were the same crimes and same behavior"
that he exhibited in the Air Force. ...............................................38

1.2.  Devin Kelley's abuse of Danielle mirrors his abuse of Tessa Kelley. ...................................................................... 39

2.  Mass violence was foreseeable to the Air Force. .................................. 41

2.1.  Kelley threatened and attempted to commit a mass shooting in the Air Force. .................................................... 41

2.2.  The Air Force knew of and ignored multiple red-flags. ............... 43

3.  Kelley did not substantially deteriorate after separation from the Air Force. ...................................................................... 45

3.1.  Mental Health .................................................................... 47

3.2.  Religious Views ................................................................. 49

3.3.  Drugs .................................................................................. 50

**Substantial Factor** ...................................................................... **52**

1.  The Government's stipulations provide much of the evidence needed. ........................................................................................ 53

2.  Denial of the tools of mass murder would deter Kelley specifically. .................................................................................. 56

2.1.  Expert testimony on the effect of denials. .................................... 56

2.2.  Direct evidence of the deterrent effect on Kelley. ....................... 58

2.3.  Kelley denied access to base. .......................................................... 59

3.  Alternative sources of guns lack factual support. ............................... 60

4.  The Government's counterfactuals require multiple levels of speculation. ............................................................................. 65

5.  Texas law undermines the Government's counterfactuals. .................. 67

**Apportionment** ...................................................................... **69**

1.  Academy Sports + Outdoors ....................................................... 69

2.  United States & Devin Kelley ..................................................... 70

**Conclusions of Law** ...................................................................... **77**

## WIDESPREAD OPERATIONAL FAILURES

Since 1987, it's been Air Force policy to submit fingerprints and final dispositions to the FBI. JEX-49. In 1993, Congress passed the Brady Bill, which required the agencies to report criminal history to the FBI. JEX-236. The entire purpose of the Brady Bill was to stop shootings like the Sutherland Springs Church shooting. *E.g.*, JEX-645, at 2 (Presidential signing statement, noting a mass murder without a background check of a mental institution patient); JEX-646, at 1 (floor argument noting another mass murder in Tulsa). In 1997—after a decade of law and policy on the books—the Department of Defense made the Air Force aware of significant and systemic gaps in its criminal history reporting. JEX-14.

Then, in 2015, the DoD Inspector General evaluated the Department of Defense criminal history reporting to the FBI and found it still lacking. JEX-1. In 2015, the Inspector General of the DoD was Jon Rymer, who also served as an expert witness for the Plaintiffs in this trial. Trial Tr. 879:12–14; JEX-615 (Rymer CV). He testified that the 2015 IG report on criminal history reporting made the Air Force aware of its ongoing obligation to report and correct criminal history reporting to the FBI. Trial Tr. 880:14–22. Further, he testified that if the Air Force took a different position in litigation, that would contradict their agreement at the time of the report. *Id.* at 881:17–883:6. The Air Force's awareness of this problem is further shown, when following the 2015 IG Report, Air Force Office of Special Investigations ("AFOSI") headquarters sent an email to all region commands stating: "if you are presently doing anything less than 100% review in this particular area

(NCIC indexing) you are falling short." JEX-198 at 1. Unfortunately, the Air Force kept falling short even in 2015.[1]

Notably, these reports are sent to the Inspector General of the agency. This is particularly important because the Inspector General of the Air Force also serves as the Commander of the Office of Special Investigations. Trial Tr. 883:9–884:2 (Rymer). So, when the DoD IG informs the AF IG of systemic problems, that report directly implicates the Air Force Office of Special Investigations chain of command. *Id.*

### 1. *The Government's failure to exercise reasonable care.*

Given this history, the Court is not surprised that the overwhelming and uncontested evidence proves widespread operational negligence in the collection, maintenance, and submission of criminal history to the FBI. These were mandatory, non-delegable obligations of the United States. The Government's stipulations and public statements by the Air Force alone prove multiple missed opportunities across the AFOSI, Security Forces, and the Department of Defense. Dkt. No. 149; JEX-45 (Sec. Wilson's Congressional Testimony). At trial, there was universal agreement that the Government should have reported—but failed to report—Kelley's criminal history to the FBI. Trial Tr. 1214:11–1215:9 (Barborini); Trial Tr. 633:2–11 (Del Greco); Trial Tr. 1080:4–1081:16; 1082:18–22; (Ryan); Trial Tr. 1274:7–14 (Donohue). And years after the negligence (and after the lawsuit) the Government censured agents for their failure to report Devin Kelley, noting that their failure "contributed to

---

[1] In response to this report, the Government claimed that the Air Force was "fixing" the problem and highlighted smaller percentages of the Government's failure to report. The agents on the ground, however, believed the failure to report was much greater than the IG reported. JEX-637, at 4 ("I think the number is higher than 30%" … "You're probably right.").

Devin Kelley not being identified" in NICS, and that such conduct "fell below the minimum standards." *E.g.*, JEX-509 (Holz); JEX-42 (Lyle Bankhead, supervisor). In one such censure, the Air Force noted that the leadership failure "resulted in required information not being entered into" the NICS. JEX-166.

Beyond the stipulations and statements, the evidence at trial shows both the Air Force Office of Special Investigations and Security Forces at Holloman Air Force Base failed at basic operations in the collection, maintenance, and submission of criminal history to the FBI.

## 1.1.   **Air Force Office of Special Investigations Negligence**

Under AFOSI Manual 71-121, special agents had a mandatory obligation to report Kelley's fingerprints and final dispositions.[2] JEX-4 at 79–81. Crucially, the Air Force was also obligated to collect and submit this information

---

[2] The requirement to submit fingerprints is triggered when the agent has probable cause. The Court finds that the Air Force had probable cause to submit Kelley's fingerprints to the FBI from June 2011 onward. The Court bases this finding on the trial evidence as well as the Inspector General's report on the matter. *See* JEX-3. For example, from the very first visit to the Kelley home, Air Force Security Forces "concluded that Kelley's wife was likely abused by Kelley." JEX-528, at 1. The record overwhelmingly supports the conclusion that by June 2011, AFOSI agents had probable cause to believe Kelley committed assault on his wife and stepson. PEX-87, at 30 (Col. Bearden); PEX-93, at 26 (Agent Holz); PEX-94, at 28 (Supervisor Hoy); PEX-107, at 34 (Verdego). Plaintiffs also offered the testimony of IG Rymer, who testified that this IG report—which found the agents had probable cause in June 2011—had sufficient information to reach reliable conclusions, and those conclusions were the product of reliable methods and principles. Trial Tr. 895:13–896:8. The DoD IG, when they reach conclusions on probable cause, has access to an interdisciplinary team of subject-matter experts that help them reach reliable conclusions. *Id.* at 886:16–897:15. The Air Force IG (the Commander of AFOSI) had input on the probable cause question. *Id.* at 889:4–19. And the Air Force concurred with all findings of the DoD IG. *Id.* at 893:6–11.

in a timely fashion. *Id.* ¶¶ 5.14.2.1–5.14.2.1.1, 5.14.2.2. Not only did the regulations require the Air Force to report Kelley, but also imposed the continuing obligation to submit missing criminal history. Trial Tr. 913:2–5 (Rymer); *id.* at 702–03 (Youngner).

Yet the Government stipulated that at no time before the Sutherland Springs Church shooting did the Government submit Kelley's fingerprints or final dispositions. Dkt. No. 149 at 2–3 ¶¶ 8–9 (stipulations). At one point in the investigation, an agent certified that Kelley's fingerprints were taken. JEX-22, at 60. However, either the agent falsely certified or the Air Force failed to maintain the file and keep the fingerprint cards. The DoD forensically searched the Air Force files and computers but could not find any evidence of these fingerprints. JEX-40, at 7m46s–8m48s.

Moreover, unit leadership[3] had an obligation to check the fingerprints and final dispositions for accuracy and completion and document their review.[4] JEX-4 at ¶¶ 5.14.1, 5.14.1.3. Unit leadership also had an obligation to review the case file monthly from the date of the allegation until the case is

---

Moreover, the Government represented to the Court that it intended to provide expert testimony on probable cause findings, but the Government voluntarily withdrew this testimony. See Dkt. No. 342, at 4. Thus, the finding that the Air Force had probable cause from June 2011 onward is uncontested and unchallenged by the Government.

[3]   Unit leadership as used in 71-121 includes the commander, special agent in charge, and director of the unit. JEX-4, at 1. Per the stipulations of the parties, AFOSI Unit Leadership includes Vince Bustillo, Alex Meusburger, Randall Taylor, Lyle Bankhead, and James Hoy. Dkt. No. 425, at 1–2 ¶¶ 5(a)–(c), (g), (j).

[4]   At the time, Holloman used hard-copy fingerprint and final disposition cards. PEX-98, at 17. The Air Force required agents to make two copies of both—one for the file and one for the FBI. JEX-4, at 79 ¶ 5.14.1.2; PEX-101, at 11 (AFOSI Representative). So, if an agent looks in the file and sees two copies, they know that one has not been submitted. PEX-98, at 21.

sent to headquarters for archival. *Id.* at 51 ¶ 4.24.1.3 (rule); *id.* at 35 (the life-cycle of a case); *see also* Trial Tr. 731:3–18 (Youngner). Here, the FBI's final disposition report is specifically noted as an item for review. *Id.* at 51. These regulations point leadership to the investigative sufficiency checklist (or a more comprehensive checklist) as a guide for these reviews. *Id.* The sufficiency checklist has boxes to ensure that unit leadership and special agents meet each of the above outlined requirements. *See id.* at 169 (unit leadership review), 170 (file documentation), 172 (fingerprint/final dispositions). Although this checklist does not create yet *another* mandatory obligation on the Air Force, it does highlight the important action items allowing for easy compliance with existing mandatory obligations. And this checklist did not abrogate the mandatory instructions to submit Kelley's criminal history information to the FBI. JEX-4, at 79-81; JEX-8, at 10, 13; Trial Tr. 831–832 (Youngner). Indeed, the checklist included simple reminder items to ensure that information was forwarded to the FBI. To that end, this checklist bears on the questions of foreseeability and apportionment.

Further, the Air Force stipulated that there were at least 15 supervisory reviews, where the Air Force unit leadership did not review the case file to take corrective action. Dkt. No. 149 at 2 ¶ 7. However, the regulations require supervisory reviews from the date of the allegation to the date of submission to archive. JEX-4, at 51 ¶ 4.24.1.3. The investigation was initiated on June 9, 2011. JEX-22, at 6. Agent Bankhead submitted the case to archive on April 10, 2013. JEX-19. Based upon these additional supervisory reviews, AFOSI in fact missed 21 monthly supervisory opportunities to correct the agent's failure to submit fingerprints and final disposition. Plaintiffs' expert Col.

Youngner confirmed these monthly supervisory misses, and the Government did not contest them at trial. Trial Tr. 730:12–734:8.

At the end of the investigation, the Air Force requires unit leadership to use the AFOSI Closed Investigation File Checklist after a complete investigation. JEX-4, at 119 ¶ 9.2.1.2; Trial Tr. 719–720 (Youngner). "After screening, unit leadership must authenticate" the file by signing and dating it. *Id.*; *see also* JEX-4, at 160 (checklist requiring screening of fingerprints and final dispositions). Here, unit leadership left unchecked the Closed Investigation File Checklist in the physical file. JEX-22, at 4. Had they checked, the unit leadership would have noticed the missing fingerprint and final disposition submissions—resulting in supervisory action to correct the mistake. And unit leadership electronically certified—falsely—two times that Kelley's criminal history had been submitted to the FBI. JEX-19, at 1–2.

### 1.2.    **Security Forces Negligence**

Devin Kelley was also investigated for domestic abuse by the Air Force Security Forces at Holloman Air Force Base. The Security Forces had similar obligations to collect and submit Kelley's fingerprints and final disposition under their own regulations and Department of Defense regulations. JEX-212, at 1; *see also* JEX-3; Trial Tr. 702:14–703:9 (Youngner). Beyond that, the Security Forces had a mandatory obligation to submit Kelley's final disposition when they took Kelley into the corrections system. Dkt. No. 149, at 2 ¶ 4.

The Government argues that while the Security Forces failed to collect or submit Kelley's fingerprints, they were not required to submit the final disposition *prior to confinement* because their investigation only resulted in a let-

ter of reprimand. Dkt. No. 149 ¶ 2 (stipulation); Trial Tr. 1832 (closing argument). To be clear, the Government presented this argument at trial despite stipulating to the opposite. Specifically, the Government agreed that following Kelley's conviction *and through the date of the shooting*, the DoD and Air Force instructions required the 49th Security Forces Squadron to collect Kelley's fingerprints and submit them along with the convictions to the FBI. *See* Dkt. No. 149 ¶ 9. The Court accepts the Government's stipulation regarding the Security Forces' negligence.

Likewise, after Kelley's conviction, the Staff Judge Advocate sent the results of conviction to the Security Forces Squadron. JEX-20 ("SFS/CC/SFOI"); PEX-106, at 57–58 (identifying the individuals on the distribution list); JEX-20; PEX-91, at 171–172 (Col. Ford). Under Instruction 5505.11, the law enforcement organizations—such as the Security Forces—had a mandatory obligation to submit the final disposition within 15 days of the final disposition of a military judicial proceeding. JEX-8, at 10 ¶ 1(b)(3).[5] The DoD Inspector General, Col. Youngner, the Government's Security Forces corporate representative, and its FBI NICS representative agreed that the 49th Security Forces Squadron not only had this mandatory obligation to submit within this time, but also that it failed to meet it. JEX-3, at 57, 81 (DoDIG Report on Devin Kelley); Trial Tr. 747:1–20 (Col. Youngner); PEX-91, at 171:21–172:19 (Security Forces representative Col. Ford); Trial Tr. 672:17–673:13 (FBI representative Del Greco). And at trial, its own Security Forces representative

---

[5]   This mandatory instruction requires law enforcement organizations to submit the final disposition within 15 calendar days of "final disposition of military judicial or nonjudicial proceedings." That term—"final disposition of military judicial proceedings"—is defined to include the report of trial. JEX-8, at 13. Accordingly, when a DoD law enforcement organization receives the report of trial, it has 15 days to report criminal history to the FBI.

testified that the mandatory instruction had no such qualification that excused the 49th Security Forces from submitting Kelley's criminal history data once they received the SJA notice of conviction. PEX-91, at 171–172 (Col. Ford). Ultimately, the Security Forces' negligent supervision was best explained by Lt. Col. Boyd's false understanding that "we don't touch that" when referring to fingerprint and criminal history submission. JEX-44, at 7 (Lt. Col. Boyd's testimony). This of course directly contradicts the mandatory DoD and Security Forces instructions. PEX-91, at 96 (Col. Ford confirming Lt. Col. Boyd's flawed understanding of the mandatory instructions).

The Court likewise finds that the Security Forces did not exercise reasonable care by failing to collect and submit Kelley's fingerprints, even though Holloman Security Forces agents had that mandatory obligation. Further, the Security Forces failed to submit Kelley's final disposition within 15 days of his final disposition. And the Security Forces failed to submit his criminal history—the fingerprints and final disposition—when imprisoning him. Finally, at no point before the Church shooting did the Security Forces take corrective action. Dkt. No. 149, at 3 ¶ 9 (stipulations).

## 1.3.   **Negligent Supervision at Holloman**

The Court also finds that both the AFOSI at Detachment 225 and the Security Forces at Holloman Air Force Base negligently supervised their agents in the collection, maintenance, and submission of Devin Kelley's fingerprints

and criminal convictions to the FBI.[6] The Government stipulated that supervisors at AFOSI Detachment 225 had at least 15 mandatory reviews of Devin Kelley's file in which to correct the submission errors but failed each time. Dkt. No. 149 ¶ 7. But at trial, it went uncontested that the mandatory regulations require monthly supervisory reviews from the date the investigation is initiated (June 9, 2011) to the date the file is submitted to headquarters for archival (April 10, 2013). JEX-4, at 51 ¶ 4.24.1.3; *see also* JEX-19 (confirming archival date by supervisory agent Bankhead). That puts the number of mandatory supervisory monthly reviews of the Kelley file at 21. And because it is uncontested that the Government failed to submit Kelley's fingerprints and convictions to the FBI despite these 21 mandatory supervisory reviews, Plaintiffs proved their claims for negligent supervision. *See also* PEX-104, at 14–16 (Gov't 30(b)(6) representative Spencer testified that Detachment 225 supervisors were responsible for ensuring agents send fingerprints and conviction data); *id.* at 33–36 (Spencer testified the SAIC and Superintendent failed to follow mandatory instructions DoDI 5505.11 and AFI 71-121).

---

[6]   Under Texas law, claims against an employer for negligent supervision are based on direct liability, not vicarious liability. *Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 100-01 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). An employer has a duty to adequately supervise employees and "[t]he negligent performance of those duties may impose liability on any employer if the complainant's injuries are the result of the employer's failure to take reasonable precautions to protect the complainant from misconduct of its employees." *Mackey v. U.P. Enters., Inc.*, 935 S.W.2d 446, 459 (Tex. App.—Tyler 1996, no pet.). An employer can be liable for negligence if its failure to use due care in supervising an employee creates an unreasonable risk of harm. *Clark v. PFPP Ltd. P'ship*, 455 S.W.3d 283, 287 (Tex. App.—Dallas 2015, no pet.). And of course, the Government has been regularly held liable for negligent supervision. *E.g.*, *Zeranti v United States*, 358 F.Supp.3d 244, 259 (W.D.N.Y. 2019); *Charles v. United States*, 18 CV 883 (VB), 2019 WL 1409289, at *4 (S.D.N.Y. Mar. 28, 2019); *E.J. v United States*, 13-CV-01923 NC, 2014 WL 988893, at *1 (N.D. Cal. Mar. 10, 2014).

As this Court previously stated, Plaintiffs' claims for negligent supervision do not allow any discretion in implementing them. Dkt. No. 318, at 44. And the trial evidence conclusively established that the supervisory reviews conducted during the Kelley file's lifespan, and the final supervisory closed case review, involved no discretion. Also, the extent and breadth of supervisory negligence was much greater than just the 21 missed monthly reviews. Based on the trial evidence, the Detachment 225 supervisors examined Kelley's file anywhere from 75 to 96 times, all the way through 2016. JEX-349, at 30; Trial Tr. 741—742 (Youngner); *see supra* ¶ 1.1 at 8–10. And 70–75% of the total Kelley file reviews were conducted by supervisory agents. Trial Tr. 742 (Youngner); JEX-348; JEX-349. Again, the Government did not dispute these figures at trial. To be sure, the DoD Inspector General concluded that the Detachment 225 supervisory reviews were incomplete and ineffective and had "drastic consequences." JEX-3, at 94, 116. Notably, these conclusions were supported by the highest levels of AFOSI supervisory command—the Air Force Inspector General. As Plaintiffs' expert—and former DoD Inspector General Rymer—testified, the Air Force IG also wears the hat of the AFOSI Commander. And the Air Force IG/AFOSI Commander submitted its own report on the Kelley investigation which agreed with and supported the conclusions of the DoDIG report on Kelley. Trial Tr. at 883—884, 892—893 (Rymer); see also, JEX-27 (AF IG investigation). And as Inspector General Rymer confirmed, Detachment 225's mandatory obligations did not end with Kelley's release, but were an ongoing obligation up to and until the errors were fixed. Trial Tr. at 913 (Rymer).

The Government also stipulated that the 49th Security Forces Squadron failed to collect Kelley's fingerprints upon his post-conviction confinement as

required by the DoD and Security Forces instructions. Dkt. No. 149, ¶¶ 4, 9. Then at trial, Plaintiffs proved that Security Forces supervisors at the confinement facility had a mandatory, non-discretionary obligation to submit Kelley's fingerprints to the FBI during his pre-trial confinement as well. JEX-8, at 10; PEX-91, at 82, 231 (Col. Ford). Ultimately, that duty to ensure compliance with regulations on both occasions fell on multiple supervisory commanders. Namely, the NCOIC (non-commissioned officer-in-charge) at the 49th confinement facility and the 49th Security Forces commander, Lt. Col. Boyd. PEX-104, at 66-69 (Spencer); Trial Tr. at 749—750 (Youngner); PEX-91, at 58, 67 (Col. Ford); JEX-3, at 82 (DoDIG Report detailing confinement facility failures). As with Detachment 225, Plaintiffs proved their claim for negligent supervision by the Air Force Security Forces at Holloman.

The Court notes that the negligent supervision finding relates to the Brady immunity issue too. Section 922(t)(6) of the Brady Act (Brady immunity) only applies to federal employees "responsible for providing information" to NICS. Dkt. No. 59, at 26. The Government raised no new facts that change the Court's original Order on immunity. However, as discussed in this section above, the trial evidence established that 70–75% of contact with Kelley's case file was by supervisory agents at Detachment 225. And various witnesses confirmed that the supervisors themselves were not responsible for the actual submission or reporting of the criminal history data. Rather, that fell to the case agents. *See e.g.*, PEX-88, at 41–43 (SAIC Bustillo testifying that any errors noted by supervisors would be told to the case agent who, in turn, would be responsible for correcting); *see also* PEX-93, at 101–103 (Case agent Holz explaining that had a supervisor told him to submit Kelley's information he would have done so within days); PEX-104, at 14–16, (AF Corp.

Rep. Spencer confirming SAIC gives "green light" to case agent who then submits); PEX-105, at 64–65 (SAIC Taylor testifying that a case agent would be responsible for confirmation of criminal history data submission). Because most of the Government's negligence was supervisory negligence committed by employees not "responsible for providing information" to NCIS, it follows that most of the negligence falls outside the ambit of the narrow immunity provision found in 922(t)(6).

The Government did not contest that supervisors at Detachment 225 and Holloman Security Forces had a mandatory obligation to catch and direct correction of the investigating agents' failures to collect and submit Devin Kelley's fingerprints and his qualifying convictions to the FBI. And the preponderance of the evidence and credible witness testimony proved that the Air Force negligently supervised its agents and that negligence resulted in Kelley's criminal history data never being submitted to the FBI.

### 2. *The Government's failures were systemic.*

The failures in the Kelley case were not isolated. Instead, they were widespread, as found by the DoD Inspector General and confirmed at trial. JEX-3, at 98; *see also* JEX-330 (AF press release announcing the same). The Air Force IG agreed with the DoD IG's conclusion that the failure to report Devin Kelley's criminal history was not an isolated problem, but widespread throughout the Air Force. Trial Tr. 893:18–22.

In AFOSI Detachment 225 alone—limited only to the time of the Kelley investigation—an Air Force investigation revealed dozens of failures to collect and report criminal history. JEX-27, at 53; JEX-354 (spreadsheet of failures to report at Det. 225). Detachment 225 fared even worse than the average Air

Force failure rate when it came to collecting and submitting criminal history to the FBI. JEX-432, at 18. In 2010, even before the Kelley investigation, the Air Force IG conducted a review of Detachment 225's Felony Criminal Investigation Operations and found that "monthly case reviews were not conducted and documented appropriately." JEX-139, at 93–94; JEX-27, at 51 ("the leadership team's process for monthly case reviews was deemed insufficient").

Altogether, in the AFOSI, there were 7300 missing criminal history submissions. JEX-433, at 5. This does not include the missing submissions from the Air Force Security Forces or any other branch of the military. *Id.*

### 3. *The Government's failures increased the risk of physical harm.*

The Court ruled as a matter of law that the Government established and operated a complex national background-check system, thereby assuming the duty to operate the system with due care, which the Government breached. Dkt. No. 318. Left for trial was the question of whether the Government's negligence increased the risk of harm to Plaintiffs. The Court finds that it did. The Government's operational failures increased the risk of physical harm to the public, including the Plaintiffs.[7]

---

[7]   The Government argues that the appropriate risk-of-harm question is what would happen if the Government had never operated NICS at all. Using the correct test, the Government did not offer evidence to contradict the Plaintiffs' evidence of increased risk of harm. Rather, the Government attempted to relitigate its prior motion to dismiss and motion for summary judgment. The Court addressed this question in prior orders. *See* Dkt. No. 133, at 7–8 & n.2; Dkt. No. 318, at 21–24. Moreover, over-reporting—reporting individuals who do **not** have qualifying convictions—may be a failure to exercise reasonable care that does not increase the risk of physical harm. In either that scenario or the one presented in this case, it makes no sense to compare the risk of harm to a counterfactual reality without NICS.

3.1.   **Primary increased risk of harm.**

There's ample evidence that the Government's negligence increased the risk of physical harm. First, DOJ policy states that the "ability of NICS to determine quickly and effectively whether an individual is prohibited from possessing or receiving a firearm depends on the completeness and accuracy of the information made available to it." JEX-35, at 2. And DOJ policy recognizes that its policy will add some burden, but "some additional burden does not by itself provide reason for an agency not to submit otherwise relevant information to the NICS." JEX-35, at 12–13. Likewise, a 2013 Presidential memorandum concluded: "Greater participation by agencies" in NICS "will strengthen the accuracy and efficiency of the NICS, increasing public safety by keeping guns out of the hands of persons who cannot lawfully possess them." JEX-224, at 1; JEX-628, at 57m3s–57m36s (FBI Director testifying that reporting to NICS is necessary for public safety). That's consistent with the NICS mission, which is "all about saving lives and protecting people from harm—by not letting guns fall into the wrong hands." JEX-322 (NICS Webpage); JEX-628, at 1h39m41s–1h40m7s (FBI Director Lindquist testifying that not reporting puts the public and law enforcement in danger).

Second, the witnesses agreed that the more information the FBI has on dangerous felons, the better they can prevent them from getting firearms. Trial Tr. 633:17–25 (FBI Representative Del Greco); *id.* at 1137:10–15 (ATF Representative Ryan); *id.* at 1216: 8–19 (Gov't expert Barborini: law enforcement job depends on felony conviction reporting). For example, Kimberley Del Greco, the Government's FBI representative, testified that preventing felons from acquiring firearms protects public safety. *Id.* at 623:18–20. Then, the Government's ATF representative testified that when Government agencies

don't report criminal convictions, they unnecessarily expose the public to a risk of gun violence. *Id.* at 1137:17–24; *see also* PEX-87, at 104 (same, from Col. Bearden); PEX-91, at 14 (Col. Ford); PEX-107, at 28 (AF 30(b)6) Rep., Verdego); PEX-93, at 61–62 (Agent Holz); PEX-97, at 63 (Major McLeod-Hughes); PEX-98, at 45–47 (Agent Mills).

Third, multiple Air Force employees testified that if prohibited persons like Kelley are able to buy guns from federal firearms licensees (FFLs), that increases the risk of harm to the public. PEX-87, at 61 (Col. Bearden); PEX-91, at 14 (AF Security Forces 30(b)(6) Rep. Col. Ford); PEX-93, at 61-62 (Agent Holz); PEX-94, at 15 (Supervisory Agent Hoy); PEX-97, at 63 (Major McLeod-Hughes); PEX-98, at 47 (Agent Mills); PEX-100, at 26 (JAG 30(b)(6) Rep., Col. Owen); PEX-106, at 29 (SJA Col. Tullos); PEX-107, at 28 (AF 30(b)(6) Rep., Verdego); PEX-109, at 77 ( Supervisory Agent Bankhead); PEX-101, at 23 (Col. Poorman).

Fourth, the Government's ATF representative agreed that dangerous felons become more dangerous to the public when they can accumulate more weapons illegally. Trial Tr. 1138:5–9 (Ryan). Likewise, the Government's gun violence expert conceded that the Air Force's failure to submit criminal history information to the FBI likely lead to more violent outcomes to the public. Trial Tr. 1345: 20–1346:23 (Donohue).

Finally, the Government cannot credibly argue their negligence didn't result in an increased risk of harm when the Government assessed that Kelley presented an increased threat to the public after he was released. Following his conviction, the Air Force barred him from re-entering Holloman Air Force Base. JEX-21 (Barment File). Then, the Air Force upgraded his threat level after determining he posed a threat of danger not only to the community

within Holloman Air Force Base but to the communities at all U.S. bases. JEX-422, at 1; *see also* Trial Tr. 1640–1642 (Fox). The Air Force's assessment of Kelley's increased risk of harm proved correct as he attempted to access Holloman Air Force Base and San Antonio Air Force Base in 2015 and 2016 but was stopped because the Air Force reported Kelley's dangerousness internally, and it worked. *Id.*

Beyond the Government's own conduct, testimony and policies, Plaintiffs presented credible testimony from Dr. Daniel Webster—an expert in gun violence prevention and public health—which showed how the Government's operational negligence increased the risk of harm to the public. Dr. Webster is an epidemiologist and a tenured professor of American Health and Violence Prevention. Trial Tr. 921:8–20; *see also* JEX-613 (CV). He's employed by Johns Hopkins School of Public Health, which is the number-one ranked school of public health in America. Trial Tr. 921:14–21. He has thirty years of teaching, training, education, and experience in social work, family violence, gun violence, and the prevention of gun violence. *Id.* at 923:9–925:19. He has also published on these areas, and on domestic violence and domestic homicide (including the most commonly cited study on these issues). *Id.* at 929:2–10. In fact, he's an author on the foundational study which created the danger assessment tool to identify high-risk individuals for violence. Trial Tr. 932:3–935:19; *see also* JEX-628, at 2h59m36–3h1m20s (officer discussing the lethality assessment tool to Congress). When he was offered as an expert in these areas—epidemiology, gun violence policy and prevention, and public health policy—the Government had no objections. *Id.* at 935:21–24. Dr. Webster testified that the literature, the science, and his experience indicate that this type of systemic missing criminal history increases the risk of harm to

the public. Trial Tr. 972:18–974:4. His testimony was supported by a great body of literature that shows missing information from the NICS system increases the risk of harm to the public. *Id.* at 970:10–972:1. The Court finds Dr. Webster's testimony on this matter credible and reliable.

### 3.2. **Secondary increased risk of physical harm.**

The trial evidence established three other ways the Government's operational negligence increased the risk of harm. First, Dr. Webster discussed that the Government's negligence increased the risk of harm to the public by making the NICS system less effective at preventing firearm acquisition. Trial Tr. 1037:18–1038:14. This is reflected in the studies researching what happens when firearms are denied at an FFL. Specifically, the studies show that in order to prevent mass shootings, "domestic violence cases need to become known to and move through the justice system … and the firearms restrictions need to be effectively implemented." Trial Tr. 1039:3–21, 1049:3–23 ("the information needs to get into the NICS system for them to work.").

The Government's expert on this issue previously published opinions that one of the issues plaguing the background check system is the failure of the agencies to submit criminal records. Trial Tr. 1330:20–1331:1 (Donohue). Specifically, he conceded that the failure of the Air Force to submit to NICS increases the risk of harm to the public. *Id.* at 1346:2–23.

Second, the criminal history provided also helps protect public safety because it is routinely used by law enforcement in their investigations. Trial Tr. 624:4–14; 610:1–14. The FBI Director testified to Congress that these NICS databases form the "backbone" of law enforcement. JEX-628, at 55m31s–56m.

At trial, the FBI's representative testified that one of the ways that the information in the NICS databases helps protect public safety is by helping law enforcement make accurate credibility assessments about eyewitnesses. Trial Tr. 628:14–18 (Del Greco). In this very case, an eyewitness, Emily Willis, reported Kelley for child abuse in 2015. JEX-522. In doing so, she told the police that Kelley had a prior child abuse charge in the military. JEX-522, at 3. But when the officer ran a background check on Kelley, nothing returned. JEX-522, at 5. Willis testified that the Air Force's failure to report Kelley hurt her credibility and put the child in danger. PEX-108, at 26–27.

Third, even under the Government's view on increased risk of harm, the Government's negligence created a greater risk of harm than before the existence of the NICS process because the "continued abuse following [the defendant's] failure to act posed an increased risk of harm by sending the message to the perpetrator that he could act with impunity." *Sabia v. State*, 669 A.2d 1187, 1192 (1995). Here, Kelley repeatedly obtained multiple firearms from FFLs without repercussion or denial. *See infra* Substantial Factor § 1. Similarly, Kelley had no problem submitting his fingerprints for background checks. *E.g.*, JEX-563, at 19, 27 (Schlitterbahn); JEX-569 (Private Security).

In summary, the preponderance of the evidence and credible witness testimony shows that the Government's failure to exercise reasonable care in the operating National Instant Criminal Background Check System increased the risk of physical harm to the Plaintiffs.

### KELLEY'S POST-AIR FORCE CONDUCT

The Air Force's investigation of Kelley for felony assault and domestic abuse resulted in a conviction on November 7, 2012. Dkt. No. 425 at 4 ¶ 13. Even though Kelley was released from prison on March 31, 2013, the Air Force did not discharge him until April 10, 2014. *Id.* at 4 ¶ 17–18.

Soon after Kelley's release from prison, he married Danielle Kelley (now Danielle Smith). Danielle Smith's life story is important and provides useful context to her testimony. It begins with her birth parents, who physically abused her and caused burns on 80% of her body. Trial Tr. 18. She was taken into the foster care system and placed with Kurt Brassfield and Michelle Shields. *Id.* Kurt Brassfield sexually abused Danielle without the knowledge of Michelle. *Id.* at 19–20, 429. And when Danielle told someone about it, two different police departments did not believe her. *Id.* at 429:17–430:22 (Michelle Shields). Mr. Brassfield was prosecuted for his conduct only after other children came forward. It's with these experiences that Danielle Smith met and married Devin Kelley, who continued the cycle of physical and emotional abuse. *E.g.*, *id.* at 31:3–10.

Between his time in prison and 2017, Kelley purchased several guns from FFLs. In four separate firearms purchases, Kelley completed the required purchasing form—ATF Form 4473—certifying that he was eligible to purchase the firearm under federal law, and the retailer ran the mandatory background check through the National Instant Criminal Background Check System ("NICS") administered by the FBI. In each instance, the response from the NICS was that the retailer could proceed with the sale. Kelley should not have cleared the background check, however, because of his convictions in the Air Force.

On November 5, 2017, Kelley woke up, ate breakfast, and hog-tied his wife at gun point. They had two children, one under the age of two and the other less than six months old. As his wife and kids watched from their one-room efficiency apartment, Kelley took out the guns he purchased at FFLs, and put on black tactical gear and a black mask. Before leaving, Kelley told Danielle that he would be back for her. Trial Tr. 1408:2–4. After locking his wife and two kids in the apartment, Kelley went to and entered the First Baptist Church in Sutherland Springs, Texas, and opened fire, killing 26 people and wounding 22 more. He died of a self-inflicted gunshot wound after fleeing the Church, headed towards his home.

After the shooting, Kelley's parents, Michael and Rebecca Kelley, broke into Kelley's apartment to find Danielle Smith hog-tied and her children crying. Danielle's "eyes were swollen like she had been crying for a long time. … she had snot running all over her face." Trial Tr. 570:7–571:9 (Rebecca Kelley); *id.* at 507:1–15 (Michael Kelley).

## KELLEY'S MOTIVE

The parties disputed Kelley's motive for attacking the Sutherland Springs Church. However, the Court finds that the preponderance of the credible evidence shows Kelley's motive was to attack a member of the church, Michelle Shields, and "eliminate her entire family" as Kelley threatened not long before the shooting.

1.  ***Kelley's conflict with Danielle's family.***

The preponderance of the evidence proves Kelley had a long-standing conflict with his wife's family, motivating his conduct on November 5, 2017.

For background, Michelle Shields is the adopted mother of Danielle Smith.[8] Trial Tr. 407:9–12. Her husband is Ben Shields and her son is David Shields. *Id.* at 407:3–6. 407:25–408:6. Lula White, who died at the Church, was Ms. Shields' mother. *Id.* at 408:3–5, 410:14–24, 450:5–6 (referred to as Nana).

Kelley's conflict with his wife's family began when Kelley became "stand-offish" with Ben Shields and would pick on their autistic son. Trial Tr. 433:24–433:11. Ben Shields confronted Kelley about picking on their son. *Id.* at 434:12–18. In March 2017, during their son's birthday party, Kelley instigated a fight with Lula White, and Ben and Michelle Shields. *Id.* at 439:16–440:17. This conflict resulted in Kelley pushing Ms. Shields' mother-in-law and Ben Shields confronting Kelley. *Id.* at 440:21–441:21.

The birth of Kelley's second child exacerbated this conflict. For the birth of her second child, Danielle wanted Michelle and Lula White at the hospital, but Kelley didn't.[9] *Id.* at 427:21–429:6, 438:20–439:6. So, Kelley instigated a fight with both Michelle Shields and Lula White. *Id.* at 446:4–24; *id.* at 445:3–9 (birth occurred on May 26, 2017).

The text messages between Devin Kelley's and Michelle Shields' phones show Kelley's escalation of the conflict. JEX-442. Following the altercation between Kelley and the Shields family at Ben Shields' birthday, Kelley sent a series of aggressive texts to Michelle. JEX-442, at 34; *see also* Trial Tr. 439–441 (Shields describing the conflict). Then, on May 23, 2017, Kelley told

---

[8]  Michelle Shields provided testimony in the trial, and at trial and during litigation, independent counsel represented Ms. Shields. Trial Tr. 407:20–22.

[9]  Similarly, when Danielle had her first child in Colorado, she wanted her mom and grandmother there for the birth. Trial Tr. 427–28. They drove across multiple states to see their first grandchild, but Kelley instigated a fight with them there, too. *Id.* at 446:8–24.

Michelle that only she and Lula White could visit for the birth of the second child. JEX-442 at 36–37. When Michelle Shields texted him, "we are on our way," Kelley told her not to come. JEX-442, at 39–40. Then Lula White took over texting, while Michelle was driving. Trial Tr. 445:10–446:3. In response to Lula, Kelley became extremely aggressive and threatened to eliminate the entire family. JEX-442, at 40–44, JEX-446, at 1–3 (text messages continued); *see also* JEX-584 (photos of the text messages); JEX-598, at 11m24s–12m16s (Michelle reading the texts and providing context).

2.  ***Kelley's marriage problems exacerbated the conflict with the Shields family.***

The Kelleys' marriage had long-standing problems as well. The witnesses uniformly agreed that Devin Kelley was controlling and abusive. Trial Tr. 385:24–386:1 (Ranger Snyder); *id.* at 432:14–433:8 (Michelle Shields); *id.* at 1380:17–21 (Erin Higgins); JEX-22, at 65 (Kelley was "jealous and overprotective"), 67 ("extremely possessive and controlling"). Michelle Shields testified that Kelley would not let Danielle talk to her family without his monitoring the chat. Trial Tr. 418:1–13; *id.* at 432:20–433:8 (wouldn't let her go to the grocery store alone). And Danielle had to earn basic human privileges from Kelley, sometimes through sexual acts. *Id.* at 1395:18–22, 62:18–25.

As a result of the abuse, Danielle previously tried to get a divorce. *E.g.*, *id.* at 1380:14–16; *id.* at 56:15–20. In 2015, Erin Higgins' texts with Danielle provide contemporaneous evidence that Kelley was abusive towards her and that she wanted to leave. JEX-478-B (text message evidence). Michelle Shields also corroborated Danielle's testimony on this point and confirmed

Kelley's abusive and controlling history. JEX-598, at 3m15s–4m34s. And Kelley's own statements confirm the historic abuse: in 2015, Kelley said he was upset that Tessa wanted to take his son away from him. JEX-510.

Shortly before the shooting, Danielle found photos of Devin Kelley cheating on her when he left his computer unattended. Trial Tr. 1381:17–23. As a result, Danielle asked Kelley for a divorce. *Id.* at 94:21–95:2. While the Government disputes that Kelley had marriage problems, multiple pieces of evidence corroborate Danielle's testimony. For example, Michelle Shields confirmed that Danielle had told Kelley that she wanted a divorce right before the shooting.[10] *Id.* at 450:18–451:9. And the night before the shooting, Devin Kelley told his sister that he was worried that "people were catching on" to him. Trial Tr. 377:2–21. In the context of his marriage problems, Kelley was likely referring to being caught cheating.

Finally, the next day—the day of the Shooting—the contemporaneous texts that Kelley sent to his parents further corroborate Danielle's testimony about their marriage troubles. JEX-799, at 3 (To Michael Kelley: "We just need alone time to talk."); JEX-799, at 4 (To Rebecca Kelley: "maybe we will just go to counseling. Idk. Me and her need time to talk."). If they were not having marriage problems, why would Devin tell his parents that they needed counseling and time to talk?

In response to these marriage troubles and Kelley's conflict with Danielle's family, Kelley did what domestic abusers do: he tried to isolate Dan-

---

[10]   Michelle Shields confirmed to the Government that she did not watch or gain information about Danielle's testimony. Trial Tr. 452:11–15. So, this testimony independently corroborates Danielle's testimony.

ielle from her family. As one witness said, "I think he wanted to control everything about Danielle's life. He wanted to isolate her." Trial Tr. 1649:19–24 (Fox); *see also id.* at 385:20–23 (Ranger Snyder) (Domestic abusers want to keep witnesses to their abuse under their control).

### 3.  *Kelley's attack on the Church allowed him to fulfill his threats and isolate his wife from her family.*

Kelley chose the Church as a way to permanently end his conflict with Danielle's family—thereby fulfilling his promise to eliminate her entire family—and to isolate Danielle from anyone who would support or help her escape an abusive marriage. JEX-598, at 11m24s–12m16s (Michelle Shields discussing the threat). Kelley knew that the Shields family regularly went to the Church. Trial Tr. 409:6–11 (Michelle Shields); *id.* at 410:4–13, 411:7–9 (husband and son); *id.* at 1658:3–5 (Kelley's knowledge); *id.* at 426:22–427:20 (Kelley knew that Danielle and Lula White had a close and loving relationship.). All three were members of the Sutherland Springs First Baptist Church. *Id.* at 391:7–14; 400:21–401:7. Indeed, Michelle Shields and her mom, Lula White, held leadership roles in the Church. *Id.* at 409:12–410:3. And Michelle had been going to that church since 1993. *Id.* at 408:11–12; *id.* at 444:1–22 (Michelle hosted Church members at her house).

Danielle also regularly attended the Church before she married Kelley. *Id.* at 400:21–24, 411:10–16; 415:18–20. Danielle cared for and taught the children at the Church. *Id.* at 411:17–23; 413:12–19; 414:3–20. But after she married Kelley, she started going to church less because Kelley kept her away. *Id.* at 416:2–4, 417:22–419:13.

Kelley's attack on the Church as a way to isolate Danielle also explains why Kelley asked Erin Higgins to meet him alone on the morning of the shooting. Trial Tr. 1404:1–14, 1404:15–1405:7; JEX-739, at 2 (Higgins Texas Rangers interview). Danielle views Erin Higgins as one of her two mothers, and they were particularly close. *Id.* at 20:15–23, 1378:10–17.

The fact witnesses' first reactions as to why Kelley attacked the Church confirm these reasons. For example, when asked by the Rangers if there was any significance of the Church, Danielle's first response is, "That's where I grew up." JEX-694, at 54m11s–55m22s; Trial Tr. 509:8–13 (same from Michael Kelley). Then, she begins listing: "my mother, my grandmother, my side of the family … Michelle Shields … Lula White … Ben Shields … David Shields … everybody at that Church was like family."[11] *Id.*; *see also* Trial Tr. 138:20–24 (Devin Kelley had an issue with Michelle Shields because, in his eyes, Ms. Shields was attempting to break apart Danielle and Devin's marriage).

Similarly, Michelle Shields told the Rangers that Kelley targeted her family because of her relationship with her daughter. Trial Tr. 450:13–451:2, 464:10–19; JEX-598, at 12m36s–13m7s (same); *id.* at 464:10–19 (same testimony at trial). And while the Shields, by happenstance, were not at the Church that day, Danielle's grandmother Lula White was there and Kelley killed her. *Id.* at 407:25–408:10; *id.* at 389:24–390:1, 391:15–22.

---

[11] Importantly, this was Danielle's first response when asked about Kelley's motive. Only after more questioning from the Rangers did the topic of Kurt Brassfield come up, after being told about Brassfield earlier in a separate interview by Michael Kelley.

4.   ***Kelley was not trying to protect his wife by killing and maiming over 40 people.***

The Government argues that Kelley's true motive for the mass murder was to protect Danielle Kelley from the Church and Michelle Shields. In the Government's view, the Church members were also abusive towards Danielle and Kelley was getting revenge. And Kelley believed Michelle Shields had photos of the abuse Danielle suffered as a child. On all accounts, the Government is wrong. Fundamentally, the Government's theory that Kelley was "protecting" his wife doesn't explain why he hog-tied her to the bed at gun point while their children looked on, crying. *E.g.*, Trial Tr. 1661:24–25 (Fox). Neither does it explain why Kelley wanted to meet Erin Higgins right before going to the Church to murder 26 people and injure 22 others. In fact, the Government's own expert responded, "I don't see the connection … No, it wasn't a protective move." Trial Tr. 1681:10–1682:1 (Fox).

The Government's theory is also factually inaccurate. First, Danielle Smith testified that she had problems with only one family at the Church. Trial Tr. 132:12–21 (Danielle Smith). Michelle Shields corroborated her testimony. *Id.* at 412:11–24, 460:6–8. Beyond that, the Government's entire basis for its "avenger" theory is taken from one statement in a summary of a Danielle Smith interview. Trial Tr. 1526:14–19. However, this statement was an unsigned draft and Dr. Bursztajn conceded that the quote does not appear in the actual audio transcription of the interview, either specifically or generally. *Id.* at 1535:12–18. In other words, the statement upon which the Government's theory is based was not actually made.

Third, Kelley told Erin Higgins that he found the photos and videos of Danielle's abuse on October 31 (the Fall Festival), four days before the shooting. *Id.* at 366:18–21, 1387:10–20. Kelley claimed he found these photos after leaving Danielle alone at the Fall Festival. JEX-478 ¶ 4 (Higgins Declaration). But when Kelley left Danielle alone at the Fall Festival, Michelle Shields testified it was for only five minutes. Trial Tr. 458:17–24. So, Kelley would have had to get to Michelle Shields' house, search the entire house, and return to the Church in five minutes. And supposedly he did that while also "casing" the Church. *Id.* at 459. This is not a credible theory.

The Government's theory also leaves too many unanswered questions. For example, Kelley knew of Danielle's abuse since age 17. JEX-658, at 43. Why did he wait until age 27 to act out this avenger theory? And Kelley knew of the photos since 2013. Why did he wait until 2017 to act? To adopt the Government's version of events, the Court would need to find that Devin Kelley— not the multiple other witnesses offering contrary testimony—was telling the truth about the Church, the photos, and Danielle Smith. The Court declines that invitation.

### 5. *Kelley's attack was not random.*

When the Government was not arguing its avenger theory, the Government argued that the attack was random. For example, the Government's expert testified that the people in the Church were strangers, but then on cross examination, conceded that Kelley knew them through attending the church and from living with Michelle Shields. Trial Tr. 1647:3–1648:6 (Fox). This also explains how people in the Church knew Devin Kelley. *E.g.*, JEX-582 (Pastor Pomeroy, confronting Kelley about his abuse); JEX-598 (Rod Green).

No investigative agency, including the Rangers, the FBI, or the ATF, believed that Kelley randomly picked the church. Trial Tr. 401:8–12. To put it differently, Kelley could have attacked a lot of places, but he chose the Church. There were many churches and movie theaters between Kelley's house and the Sutherland Springs Church. Trial Tr. 399:11–14, 1517:9–20, 1661:16–17 (Fox). And Kelley also posted about Guy Fawkes Day—which was an attack on British Parliament. Yet, Kelley did not attack the Texas Capital, just north of New Braunfels. *Id.* at 1516:25–1517:11. To the extent the Government argues this shooting was religiously motivated, Kelley made Islamophobic posts on Facebook, but did not target mosques closer to him. *Id.* at 1518:9–19. Similarly, he made anti-Semitic comments, but did not target synagogues. *Id.* at 1518:20–1519:7.

The Court finds that the credible evidence does not support that Kelley attacked the Church randomly. Nor does the credible evidence support the theory that Kelley's attack was motivated by political or religious leanings, or by seeking vengeance on the Church or any particular people in the Church for prior treatment of Danielle Kelley. Instead, the preponderance of the evidence and credible witness testimony shows that Kelley intended to kill Danielle's family *and* isolate her as a part of a pattern of physical, emotional, and verbal domestic abuse.

## CRIME OF DOMESTIC VIOLENCE

Both the witness testimony and Texas law confirm that Kelley's conduct on November 5, 2017, was a crime of domestic violence.

### 1. *Expert Definitions*

The evidence and the witness testimony support the conclusion that Kelley's attack and conduct on the Church was a crime of domestic violence. First, the investigating authorities considered the Kelley's home, where he hand-cuffed and hog-tied his wife and abandoned his children, a crime scene. Trial Tr. 213:20–214:3; JEX-544 (map of crime scenes). Indeed, his conduct towards his wife and children before leaving for the Church are *res gestae* of the shooting itself. *See Albrecht v. State*, 486 S.W.2d 97, 101 (Tex. Crim. App. 1972) (conduct before and after a crime may be the *res gestae* of the crime, important to issues, such as scienter).

Second, there is ample witness testimony supporting the conclusion that Kelley committed a crime of domestic violence. For example, the fields of public health, firearms violence, and epidemiology do not artificially limit the definition of domestic violence to injury to the intimate partner. Trial Tr. 990:24–991:4. Instead, domestic violence is about relationships. For hyper-controlling abusers, this includes the connections to their partners that they can use to control their partner. *Id.* at 991:19–992:16. The scientific evidence presented at trial also showed that mass murder and domestic violence are connected. *Id.* at 977:6–978:20. Some evidence presented at trial showed that as many as **54% of mass shootings** were related to domestic or family violence. *Id.* at 1334:14–1335:7 (Donohue). An FBI report concluded that the most frequently occurring concerning behaviors of mass shooters were related to their mental health, problematic interpersonal interactions, and leakage of violent intent. *Id.* at 1342:7–11; *id.* at 1623:9–15 (Fox). A Government expert, Mr. Donohue, testified that Kelley exhibited each of these red-flag signs to the Air Force. *Id.* at 1342:18–1343:12, 1345:2–8.

The Plaintiffs' expert, Dr. Metzner, also testified that "the shooting on November 5, 2017, was a crime of domestic violence." *Id.* at 1735:5–8. Psychiatry defines domestic violence as a pattern of abusive behavior used by a partner to control another. *Id.* at 1735:9–24. Dr. Metzner testified that this definition is not only well accepted in the psychiatric community but also adopted by the Department of Justice. *Id.* at 1735:25–1736:4.

2. ***Legal Definitions***

Additionally, under Texas law, Kelley committed a crime of domestic violence. On this point, the Government argues that Kelley's subjective motivations for avenging his wife's abuse from the Shields family and the Church in general are not domestic abuse. As previously discussed, the Court does not find the underlying premise of the Government's argument credible. Beyond that, the Government essentially asks this Court to allow an abuser to define what is and what is not domestic abuse. Domestic abusers look at the world through violence—they use violence to control their partners. That's exactly why there's a link between domestic violence and mass shootings.

That aside, the law does not focus on the "secret subjective intent, but rather on the **objective intent** manifested by the words or conduct of the actor." *Hudson v. State*, 629 S.W.2d 227, 230 (Tex. App.—Fort Worth 1982, no writ) (emphasis added); *see also Oregon v. Kennedy*, 456 U.S. 667, 675 (1982) ("Inferring the existence or nonexistence of intent from objective facts and circumstances is a familiar process in our criminal justice system."). And under the law, Kelley's attack on the Church was a crime of domestic violence.

Specifically, Texas would call the shooting "Family Violence." Texas law defines "family" as individuals related by consanguinity or affinity, "without

regard to whether those individuals reside together." Tex. Fam. Code § 71.003; *see also* Tex. Gov't Code §§ 573.022 & 573.024 (including mothers-in-law and grandmothers-in-law as family). And "family violence" means an act by one person in the family—e.g., Devin Kelley—against another member of the family—e.g., Danielle Smith, Michelle Shields, Ben Shields, or Lula White—that is intended to result in physical harm to that person.[12] Tex. Fam. Code § 71.004(1). Under Texas law, Devin Kelley's attack was not only an act of family violence but also an attempted murder of Michelle and Ben Shields. Tex. Penal Code § 15.01(a).

If Texas tried Devin Kelley for homicide under Texas Penal Code § 19.01—or for any offense against the person—the trial court would be required to make an affirmative finding that Kelley's crime was an act of family violence. Tex. Crim. Prac. & Pro. § 42.013. In fact, any misdemeanor involving family violence under Texas law requires the court to notify the person that they can no longer possess firearms. Tex. Crim. Prac. & Pro. § 42.0131. The Government argues that the Church shooting would not be reportable as a misdemeanor crime of domestic violence under the Lautenberg Amendment to the Brady Bill. But it certainly would be reportable as a felony crime. And Kelley's acts leading to the shooting—the abuse of his wife and children— would also be reportable. In addition, the Court finds that the Government's

---

[12]  Texas law cares about whether the Defendant intended to cause a particular result—e.g., physical harm—not about the Defendant's motive. *See* Tex. Penal Code § 6.03(a). Therefore, if Devin Kelley intended physical harm to Danielle Smith, the Shields, or Lula White, it matters not whether he subjectively believed that murdering 26 people was in Danielle's best interest, as the Government argues. And for an attempted crime, it doesn't matter that he actually accomplished his goal. Tex. Penal Code § 15.01(a), (c).

argument limiting domestic violence to only reportable offenses artificially narrows the foreseeability question.

Moreover, under the Texas Penal Code, Devin Kelley violated the law against Continuous Family Violence on November 5, 2017. Tex. Penal Code § 25.11(a). That section requires proof of two or more assaults against another "person or persons" defined as family under the Texas Family Code. Kelley's hog-tying of Danielle Smith constitutes one discrete act of physical assault and family violence. As does his placing a gun to her head. Kelley's murder of Lula White constitutes a second discrete act of assault and family violence. And beyond that day, the regular physical abuse of Danielle Smith in the preceding 12 months constitutes continuous family violence, which peaked with Kelley's conduct on November 5, 2017.

Finally, the Uniform Code of Military Justice would classify Kelley's mass shooting as a crime of domestic violence. 18 U.S.C. § 928b. Under section 928b(1), Kelley committed a "violent offense against … an immediate family member of [the spouse]" *Id.* Alternatively, Kelley "with the intent to threaten or intimidate a spouse," committed an offense against any person. *Id.* § 928b(2)(A). While this law was not in effect at the time of Kelley's shooting, the evidence is relevant to the increased risk of harm and foreseeability of this conduct.

In sum, the witness testimony, the fields of public health and psychiatry, Texas law, and military law define Kelley's attack on the Church as a crime of domestic violence.

# FORESEEABILITY

Under Texas law, proximate cause has two elements: foreseeability and cause in fact. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). Because Texas recognizes that multiple proximate causes may cause the same harm, multiple actors may: (a) be a substantial factor or but-for cause of the harm and (b) foresee the harm. *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001) ("More than one act may be the proximate cause of the same injury.").

Foreseeability requires that a person of ordinary intelligence may have anticipated the danger created to others by a negligent act or omission. *Nixon v. Mr. Property Mgmt. Co., Inc.*, 690 S.W.2d 546, 549–50 (Tex. 1985). It does not require that the actor foresee "the precise manner in which the injury will occur once he has created a dangerous situation through his negligence." *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). Importantly, foreseeability does not require the Government to predict the exact nature of the injury. *Brown v. Edwards Transfer Co.*, 764 S.W.2d 220, 223 (Tex. 1988). For example, in *Nixon*, evidence of past violent crimes was enough to show foreseeability in a case involving rape, even though there was no evidence of the same crime—i.e., the heinous rape of a 10-year-old child (or any rape of any kind)—being previously committed. 690 S.W.2d at 547, 550.

The Court finds, based on the evidence at trial, that Kelley's conduct on November 5, 2017, including the Church shooting—only three years after his discharge from the Air Force—was foreseeable to the United States. Dkt. No. 425, at 4 ¶ 18 (stipulating Kelley was separated from the Air Force on April 10, 2014). Not only were the domestic origins of this shooting foreseeable, but the Air Force could and should have foreseen mass violence based on its

knowledge of Kelley. And the Court finds that Kelley's mental health did not substantially deteriorate or change after he left the Air Force, in such a way as to make his conduct unforeseeable to the United States.

1.   ***Domestic violence was foreseeable to the Air Force.***

As discussed previously, the Court finds that Kelley's attack of the Sutherland Springs Church was a part of a pattern of domestic abuse. That domestic abuse was foreseeable to the Air Force.

1.1.   **Kelley's acts "were the same crimes and same behavior" that he exhibited in the Air Force.**

In Kelley's own words from his confession to the Air Force, if "they're a wife beater, they're probably going to beat their next wife. If they're a child beater, they'll probably going to beat their own child." JEX-366, at 24 (transcript); JEX-43 (video). Maybe that's why the Government's expert, Dr. Bursztajn, conceded that Kelley's last act before heading to the Sutherland Springs Church "were the same crimes and same behavior" that the Air Force convicted Kelley for. Trial Tr. 1523:14–18; *see also id.* at 1653:19–23 (Mr. Fox: the act was "technically" domestic violence). Right before heading to the Sutherland Springs Church, Kelley hog-tied his wife in front of their two children. Trial Tr. at 104:23–105:6. Like Tessa before, Kelley put a gun to Danielle's head, then made her and his two children watch as he got his guns and gear ready for the shooting. *Id.* The children—both under the age of 2—were crying. *Id.* at 106–107. And Kelley locked his wife and kids in that room. *Id.* at 110:16–19; *see also* Tex. Fam. Code § 261.001(1) & (4) (showing these acts constitute child abuse and child neglect under Texas law).

Kelley's relationship troubles foreshadowed more serious problems. In the Air Force, he was hospitalized in a mental institution twice—both times due to marriage troubles. *See* JEX-361, at 6 (first admission history of present illness); JEX-360 at 6 (second admission history of present illness). When he escaped the mental institution the second time, with the purpose of committing mass murder, he did so "after hearing of a potential military confinement in prison and also of his pending divorce." JEX-360, at 6; *see also* Trial Tr. 1497:11–1498:4 (Gov't expert concession that Kelley escaped with the plan to carry out a mass murder). And the Air Force knew in detail Kelley's "extensive record of violence and threats towards his leadership and spouse." JEX-21 at 4–9 (seeking to bar Kelley from base); Trial Tr. 1511:14–16 (Bursztajn testifying to the same).

### 1.2. Devin Kelley's abuse of Danielle mirrors his abuse of Tessa Kelley.

The record shows that Devin Kelley's abuse of Danielle "mirrors" his abuse of Tessa Kelley. Trial Tr. 1511:10–13, 1515:15–17 (Dr. Bursztajn). For example, Kelley picked similar victims: both Tessa and Danielle were raped as children by family. *Id.* at 1515:18–1516:12; *see also* JEX-22, at 164, 186 (Tessa's sexual assault history). He choked, kicked, slapped, and shoved both women. Trial Tr. 1512:21–25; *see also* JEX-21, at 31–32 (handwritten statement from Tessa describing abuse and threats of mass violence). And the Air Force knew that Kelley had sexually assaulted multiple women, two of which he had raped. Trial Tr. 1506:19–1507:1; *id.* at 62:1–23 (sexual assault of Danielle). In fact, not two months after Kelley was freed from prison by the Air

Force—while he was still on active duty—he raped another woman.[13] Trial Tr. 1509:16–1511:1; Dkt. No. 425, at 4 ¶ 18 (noting separation from the Air Force).

Perhaps as an excuse to justify his abuse, Kelley accused both Danielle and Tessa of cheating on him, without any evidence. Trial Tr. 1478:8–14. But it was actually Devin Kelley who cheated on his wives. JEX-159, at 42m39s (audio interview of Tessa); *id.* at 1h26m37s–1h27m42s (receiving nude photos when married).

As he did with Danielle, Kelley used signs to communicate with and control Tessa. Trial Tr. 1512:4–16 (Dr. Bursztajn); JEX-366, at 30 ("he placed his hand on my shoulder (meaning to tell me to shut up)…"); JEX-159 (Tessa Kelley interview, at approximately 17m 55s). He also isolated his wives by limiting their access to technology. JEX-528 (withholding driver's license and phone from Tessa); JEX-22 at 41 (Kelley would isolate Tessa), 164 (would not allow Tessa to remain behind with family). And—significantly—Kelley threatened to kill both women's families. Trial Tr. 1513:1–1514:24; JEX-22, at 547 (threatening Tessa's aunt and cousin).

To summarize, based on the credible evidence presented at trial, the Court finds that the Air Force's extensive knowledge of Kelley's abusive and violent conduct made his acts of violence in 2017 foreseeable.

---

[13] The Air Force knew that Kelley sexually assaulted multiple women, at least two of which he raped. Trial Tr. 1506:19–1507:1; JEX-22, at 63 (A.L. in 2005); 69, 170 (K.B. in 2007); 65 (K.L. in 2008); 67 (A.D. in 2008); 127–29 (J. in 2010); 176 (B.M. in 2012); *see also* JEX-410 (New Braunfels records for J.). One woman was assaulted two days before he entered the Air Force and another, Kelley raped while in the Air Force. JEX-22, at 176; Trial Tr. 1632:18–1633:7; JEX-158 at 3.

2.   ***Mass violence was foreseeable to the Air Force.***

Not only were the domestic origins of the Church shooting foreseeable, but the Government could and should have foreseen mass violence from its knowledge of Kelley.

### 2.1.   **Kelley threatened and attempted to commit a mass shooting in the Air Force.**

Initially, the Air Force knew of multiple documented threats of mass violence from Kelley. *E.g.*, Trial Tr. 1486:6–12 (Rowe) (citing JEX-511); *id.* at 387:17–19 (Rowe believed co-workers felt the same); *id.* at 1494:8–22 (mental health records); JEX-161, at 21m25s–22:21s (threatened Troy Bizzack and multiple co-workers and leadership); JEX-22, at 606 (threats of mass violence against police and co-workers); JEX-21, at 10 (repeatedly threatened to kill his leadership). For example, Sgt. Rowe knew in 2010 that "we need to keep an eye on this guy; he's the type of guy who's gonna come shoot up the place." JEX-515, at 2 (hand-written note); JEX-511 (typed statement). And she added, "pretty much everyone at work had the same impression of him." JEX-515, at 3. Similarly, Sgt. Bizzack believed that "if there was ever going to be someone who would shoot up the shop, it would be [Kelley]." JEX-517.

Kelley's threats were so serious that an outgoing commander briefed an incoming commander about them. Trial Tr. 1487:23–1489:15. The incoming commander, Col. Bearden, described Kelley as an "active-shooter" threat. Dkt. 365, at 9–10. That's why he asked for extra security when Kelley returned from prison: "because he had threatened to shoot squadron leadership, I felt like we needed some extra protection." PEX-87, at 109 (Col. Bearden).

By May 2012, the 49th LRS squadron had determined that Devin Kelley was a "major threat to commit an act of violence." PEX-87, at 78 (Col.

Bearden). Detachment 225 agreed. PEX-93, at 112 (Agent Holz). Leadership also agreed. PEX-97, at 32 (Commander McLeod Hughes); PEX-109, at 64–65 (Sgt. Bankhead); *see also* JEX-22, at 46, JEX-367, at 79 ("I'd take a shotgun and blow everyone's head off.").

By June 2012, those threats materialized in an attempted mass shooting. Trial Tr. 1497:11–1498:4 (Bursztajn); *id.* at 1737:1–3 (Metzner agrees); *see also id.* at 1615:2–9 (Gov't expert Fox opines that one of the "key factors" in determining whether someone is planning a mass shooting is researching body armor.); PEX-87, at 115–16 (Col. Bearden); PEX-93, at 90–91 (Agent Holz); PEX-109, at 66 (Sgt. Bankhead). The only reason a mass murder was prevented in the Air Force was because someone reported Kelley and Kelley was apprehended. Trial Tr. at 1498:5–16. When Kelley escaped the military mental institution with the intent to commit mass murder, the Air Force locked down the base, asked for Border Patrol's help in searching for him, printed out flyers noting that Kelley was a danger to himself and others, and even asked his wife to move into a safe house out of fear that Kelley would attack her and others. JEX-159, at 51m10s–52m20s (Tessa Kelley interview). And they locked down the base. *Id.*

In response to this evidence, the Government argued that Kelley was simply going home, not attempting to commit mass murder. The Government relied on a note that states Kelley sought transport "to San Antonio and lodging." JEX-22, at 599. But New Braunfels was Kelley's home—not San Antonio. Trial Tr. 469:16–19. And if Kelley was going home, why did he need lodging, toilet paper, a knife, and a gun? JEX-22, at 599. And why did he need body armor, guerrilla tactics, or cardiovascular training to take the Grey-

hound? JEX-21, at 4–5, 10. The Government's revisionist history does not explain these things and contradicts the Air Force's own statements to civilian police, after Kelley escaped, saying Kelley "was attempting to carry out death threats [made] on his military chain of command." JEX-527 at 5.

Kelley's past threats and conduct led to multiple Air Force employees testifying that Kelley's mass shooting at the Church was foreseeable to them at the time. *E.g.*, PEX-94, at 152 (Supervisor Hoy); PEX-106, at 74 (SJA Tullos); PEX-87, at 82–83 (Bearden); PEX-97, at 53–54 (McLeod Hughes); PEX-103, at 257 (Sablan). And multiple employees also testified that it was foreseeable that Kelley would engage in serious violent crime. PEX-87, at 94 (Col. Bearden); PEX-97, at 53 (Commander McLeod Hughes); PEX-94, at 63 (Supervisor Hoy); PEX-97, at 66 (Commander McLeod Hughes); PEX-106, at 74 (Agent Tullos). One of the Air Force supervisors who believed that it was foreseeable that Kelley could commit a mass shooting was himself an active-shooter expert and a "key member" of the Air Force Active Shooter threat working group. JEX-321, at 2 (Taylor CV); PEX-105, at 40–41 (foreseeable based on information he knew of Kelley in the military). Moreover, Col. Bearden had concluded that there was no "chance for rehabilitation." JEX-366, at 62. And Plaintiffs' experts further opined that Kelley's mass murder was foreseeable to the Air Force. Trial Tr. 947:3–948:10, 974:5–974:7, 992:17–993:14 (Webster); 1737:11–1739:9 (Metzner).

## 2.2. **The Air Force knew of and ignored multiple red-flags.**

In addition to Kelley's specific threats and conduct while in the Air Force, the Air Force knew of significant red-flags that made Kelley's conduct foreseeable. Dr. Webster opined that Kelley checked the boxes that showed the "greatest elevated level for future lethal violence." Trial Tr. 974:5–975:7. The

Court finds that this testimony has great weight because Dr. Webster was a foundational member of the study used by police departments and states across the country to identify high-risk individuals. *Id.* at 932:3–935:19; *see also* JEX-628, at 2h59m36s–3h1m20s (officer testifying on this tool).

The evidence also showed that access to guns is associated with a 41-fold increase in the risk of intimate partner homicide. Trial Tr. 981:10–19. And studies show that domestic violence increases the risk of homicide to people beyond the intimate partner. *Id.* at 983:14–23. Dr. Webster cited two such studies that show how domestic violence often extends beyond the family. *Id.* at 984:4–986:1 (Saltzman); *id.* at 987:8–990:20 (Liem). And the Government's expert, Mr. Donohue, presented similar evidence of mass shootings where a domestic dispute "spills into the public arena." *Id.* at 1334:14–1335:12. In fact, the Government's expert conceded that "the evidence suggests that [Kelley] went to the church because the family connection was there." *Id.* at 1337:25–1338:3.

The Government knew of these red-flags in Kelley's conduct. Trial Tr. 1485:15–1486:2; JEX-173 (Air Force employee claiming that Kelley exhibited red-flags). For example, First Sgt. Wolfe stated that the reason the Air Force sent Kelley to inpatient treatment at Peak was for "the safety of the unit." JEX-161, at 20h31s–21m24s. One of the mental health tests found in the Air Force file showed that Kelley was in the "maximum risk range" for lack of control, violence, and stress coping. JEX-22, at 592–93. And the Air Force's High Risk for Violence Response Team concluded that Kelley should be considered high risks for suicidal and homicidal ideation. Trial Tr. 1146:18–25; *id.* at 1146:18–25; JEX-365, at 150, 156 (high risk records); *see also* JEX-363, at 318 (placing Kelley on the high risk/high interest list due to suicidality,

homicidality, and unpredictable behaviors); Trial Tr. 1500:18–1501:15 (multiple mental health records documenting homicidal intent); *id.* at 1505:18–1506:12 (reckless and dangerous activities involving firearms).

Tessa's family even tried to warn the Air Force: her aunt emailed Kelley's chain of command, regarding her concern about Kelley's possession of a firearm, stating she believed that Kelley could create a hostage situation or worse. JEX-408, at 2; *see also* JEX-512 (Security Forces confiscated Kelley's weapons from a concern that he could hurt himself or his family).

### 3. *Kelley did not substantially deteriorate after separation from the Air Force.*

Kelley entered the Air Force on January 5, 2010. He was separated from the Air Force on April 10, 2014. JEX-421, at 1 (certificate of discharge); Dkt. No. 425, at 4 ¶ 18 (stipulation). The Government argues that between his separation from the Air Force in 2014 and the Church shooting in 2017, Kelley substantially deteriorated such that his 2017 conduct could not be foreseeable to the Air Force. But, as discussed above, the Air Force already knew that Kelley posed a threat of mass shooting or mass murder while he was still in the Air Force. And Kelley's mental health was compromised well before leaving the Air Force. While he was still in the Air Force, Kelley was hospitalized in a mental institution twice and went AWOL twice. Trial Tr. 1490:1–11; *id.* at 1617:11–24 (showing severe mental health problems in the military). The Air Force conducted extensive mental health testing on Kelley,

which revealed a significantly compromised individual.[14] These records can be found in JEX-363, but some examples include:

| TEST | DATE | CITATION |
|------|------|----------|
| MMPI-2 | 4/6/2012 | JEX-363, at 80–96. |
| MCMI-III | 4/6/2012 | JEX-363, at 68–79. |
| MCMI-III | 8/8/2012 | JEX-363, at 28–39. |
| Personality Assessment Inventory | 8/8/2012 | JEX-363, at 16–27. |
| Sanity Board Testing | 8/7–8/10/2012 | JEX-363, at 177–191. |

In short, contrary to the Government's position, the trial evidence showed that neither Kelley's mental health nor his religious views, nor his

---

[14]   The Air Force had access to and knowledge of Mr. Kelley's mental health records. When he was institutionalized at Peak twice, Peak had an agreement to allow the Air Force to access the records of in-patient Airmen. JEX-392 at ¶ 6.1.1 (2009); JEX-393, at 2 ¶ 5.1.1 (2013). Also, the Air Force had a Family Advocacy Program that reviewed Kelley's medical records. JEX-364, JEX-365. The Program's High Risk for Violence Response Team included the Commander, the First Sergeant, Security Forces, Office of Special Investigations, and the JAG. JEX-365 at 150; *see also* Trial Tr. 1501:16–1502:5 (noting membership). "JAG stated [that] they stand ready for immediate confinement however will need justification from mental health, OSI and SF." *Id.* The Response Team concluded that Mr. Kelley was to be considered high-risk for suicidal and homicidal ideations. *Id.* at 156. Moreover, Holloman Air Force Base had extensive mental health records on Devin Kelley. JEX-363. And as a part of his court martial, the Air Force had Devin Kelley undergo a competency determination, which included a complete review of Mr. Kelley's mental health records. JEX-363 at 177–251.

drug abuse, substantially changed after he left the Air Force. Even his work-place conduct—or misconduct—stayed constant.[15]

### 3.1. **Mental Health**

The Government claims that Kelley's post-Air Force mental health sub-stantially deteriorated because this is critical to their proximate cause argument. But the symptoms that the Government's expert, Dr. Bursztajn, claims were new were already well documented in the Air Force's records. *E.g.*, Trial Tr. 1477:23–1480:19 (paranoid delusions), 1484:12–14 (abuse of animals), 1493:20–1494:7 (insomnia); JEX-358, at 356, 443 ("patient also complains of headache for past 2 days"); JEX-157, at 14–15, 50 (long history of migraines).

The Government claims that Kelley had a new Bipolar Type I disease, even though Kelley had no family history of such psychiatric disease. JEX-363 at 185. Dr. Bursztajn based this claim on 20 pages of records from Kelley's counselor, Candace Marlowe, in 2016. Trial Tr. 1450–51, 1713:24–1714:9. But Candace Marlowe is a licensed counselor, not a psychologist or psychiatrist. *Id.* at 1713:3–20. And she made this provisional diagnosis on an initial intake assessment. JEX-63, at 47.

In contrast, Plaintiffs' expert, Dr. Metzner, demonstrated that Kelley did not meet the diagnostic criteria for Bipolar Type I disease, as set out in the

---

[15]  The Air Force documented a long history of Kelley's work-place misconduct. JEX-21 at 39–41; *see also* JEX-24 (Kelley's Personal Information File). For example, in both the Air Force and private employment, Kelley routinely abandoned his post. *Compare* JEX-24 at 67, 83, 92 (Air Force) *with* JEX-556 at 1, JEX-563 at 9, JEX-561 at 1 (Harley Davidson, Schlitterbahn, Summer Vacation & RV Resort). And of course, Kelley was written up multiple times for insubordination and creating a hostile work environment. *Compare* JEX-24 at 28, 74, 24 (Air Force) *with* JEX-563 at 7 (Schlitterbahn), JEX-561 (Wal-Mart: Kelley is not "re-hirable.").

DSM-5. Trial Tr. 1714–1724. For example, the DSM-5 describes the diagnostic features of Bipolar I as "euphoric, excessively cheerful, high, or feeling on top of the world." Trial Tr. 1721:10–23. Individuals who are Bipolar I will have a mood that is characterized by "unlimited and haphazard enthusiasm." *Id.* There is no evidence of witnesses describing Kelley this way. *Id.* Moreover, the Air Force considered Bipolar disease when treating Kelley, but ruled it out. *Id.* at 1725:22–1725:24; *compare* JEX-363, at 25 (noting the need to rule out Bipolar) *with* JEX-363, at 177 (Bipolar no longer a consideration). Therefore, Dr. Metzner concluded that Kelley did not have Bipolar disease. *Id.* at 1727:5–12. Instead, Dr. Metzner concluded that Kelley's testing revealed a person with a long standing personality disorder that is very difficult to change. *Id.* at 1733:11–1734:24.

Additionally, witness testimony corroborates the lack of change in Kelley's mental health. Kelley's own parents both testified that they noticed no mental health changes in Kelley leading up to the shooting. Trial Tr. 502:17–21, 503:10–12 (Michael Kelley); *id.* at 559:16–24, 560:8–16, 594:7–19 (Rebecca Kelley). While the Government offered Erin Higgins' testimony that Kelley had deteriorated, Ms. Higgins' testimony actually undermined the Government's argument. She testified that from the very beginning (2013), she knew that Devin Kelley was bad news. *Id.* at 1394:4–8; *id.* at 1395:4–9 (first met when Danielle was 18). The first time they met, Kelley threatened Ms. Higgins and her husband. *Id.* at 1394:9–14; 1397:16–19 ("I've done it before and I'll do it again."). As a result, Erin Higgins performed a background search on Kelley—but nothing came up. *Id.* at 1397:20–1398:20. If she had known about Kelley's convictions, his behavior would not have surprised her.

*Id.* at 1399:17–1400:8, 1401:12–14. And most likely, the reason that Ms. Higgins thought Kelley appeared to change was that she simply got to know Kelley better. *Id.* at 1403:9–14.

The Court finds Dr. Metzner's testimony on Kelley's mental health credible and finds that the Government's witnesses on this point lack credibility. Based on the credible evidence and witness testimony, the Court finds that Kelley's mental health was already compromised while he was in the Air Force, that the Government knew of Kelley's compromised mental health and of the threat Kelley posed for mass shooting or mass murder, and that Kelley's mental health did not substantially deteriorate after he left the Air Force—at least not enough to alter the foreseeability of his actions.

### 3.2.   **Religious Views**

Next, the Government claims that a consequence of Kelley's mental health deterioration was his "deep anti-religious sentiment." Trial Tr. 1839. Fatal to the Government's claim, however, is the Texas Rangers investigation, which found that Kelley's **shift in religious views occurred in 2012**—two years before the Air Force discharged him. *Id.* at 375:6–13; Dkt. No. 425, at 4 ¶ 18 (discharge in 2014).

And the evidence that the Government claims shows Kelley's "devoutly religious" views—his diary—actually paints a picture of a depraved individual who threatens suicide and homicide when confronted with the possibility of his spouse leaving him. JEX-357; Trial Tr. 1702:21–1704:16. This painted picture was fully visible to the Air Force in 2012. The Government also cites specific Facebook posts from 2017. Trial Tr. 380:4–20. But Dr. Metzner pointed out that those posts were not generically anti-religious, but instead were

specifically directed at Danielle's family. *Id.* at 1706:8–1707:17. When Kelley's religious comment was not directed at his family, he said, "No offense if you believe in heyzeus." JEX-503, at 641.

Not only were Kelley's posts specifically targeting Danielle's family, the only substantive difference between the types of threats and violence that Kelley exhibited on Facebook in 2017 and his earlier conduct while in the Air Force was the medium. That is, instead of posting to Facebook while he was in the Air Force, Kelley simply harassed people directly. *E.g.*, JEX-24, at 74 ("She's a f***king b****"). Moreover, the Air Force had evidence of similar statements that Kelley had made on Facebook at the time. *E.g.*, JEX-21 at 38; JEX-512, at 1 (Facebook posts concerning suicide).

Further still, none of the dozens of people that the Air Force interviewed characterized Kelley as devoutly religious. Trial Tr. 1704:17–1705:7. Neither did any of the witnesses at trial. *Id.* at 1705:8–11. Based on all of the credible evidence and witness testimony, the Court finds that Kelley's religious views did not substantially change or deteriorate after he left the Air Force, nor were his religious views a motivation for the Church shooting.

### 3.3.  **Drugs**

Additionally, at trial the Government offered evidence that had not been disclosed in discovery, to argue for the first time that Kelley was under the influence of a drug cocktail at the time of the shooting, and that this altered the foreseeability of Kelley's actions. This testimony contradicts the Government's own expert report, however, which opined that "Kelley was not intoxicated at the time of the killing … his blood test was negative for alprazolam and clonazepam." Trial Tr. 1476:9–24.

In re-direct examination, Government expert Dr. Bursztajn pivoted his testimony to argue that, while Kelley was not intoxicated, Kelley experienced withdrawal symptoms. *Id.* at 1525:17–21. If true, why didn't Kelley just take more of those drugs? He had access. JEX-799, at 119–133, JEX-608, at 2 (photos and investigation reports showing remaining pills available to Kelley on the day of the shooting). But "his withdrawing from Xanax and Klonopin is as likely as he was withdrawing from heroin … there's no evidence." Trial Tr. 1711:20–1712:6. Dr. Metzner testified that the levels of drugs found in Kelley's autopsy were trace amounts and that given the long half-life of the drug, had Kelley taken a larger dose, the toxicology would have reflected that. Trial Tr. 1710:2–12. Moreover, Kelley's use and abuse of drugs was well known to the Air Force. *E.g.*, JEX-158, at 1 (Kelley abused Ambien); JEX-363, at 225–228, JEX-358, at 485 (Kelley's AF Medication history showing use of clonazepam, Flexeril, etc.). The Court finds the contradictory testimony by Dr. Bursztajn lacks credibility and finds the preponderance of the evidence shows that Kelley's drug use (or abuse) did not significantly change or play a significant role in his conduct.

To conclude, the overwhelming evidence and the credible witness testimony proves that Kelley's attack on the Sutherland Springs Church on November 5, 2017, was or should have been foreseeable to the United States based on Kelley's history of domestic abuse, his history of threating mass violence, and his attempt of a mass attack while in the Air Force.

## SUBSTANTIAL FACTOR

The Government's negligence must be "a substantial factor in causing the injury and without which the harm would not have occurred." *Ryder Integrated Logistics, Inc. v. Fayette Cnty.*, 453 S.W.3d 922, 929 (Tex. 2015). Causation does not need to be proven with "direct and positive proof, as the [fact finder] may infer proximate cause from the circumstances surrounding the event." *Mosley v. Excel Corp.*, 109 F.3d 1006, 1009 (5th Cir. 1997). And because Texas recognizes the possibility of multiple proximate causes, there may be multiple substantial factors. *Lee Lewis Const., Inc.*, 70 S.W.3d at 784.

The Government argues that Kelley's knowledge of alternative means of acquiring firearms shows that the Government's negligence was not a substantial factor in causing harm. *E.g.*, Trial Tr. 1820. But Kelley's mere knowledge of alternative avenues of acquiring weapons "is no evidence of intent." *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 821 (Tex. 2009). Neither foreseeability nor cause-in-fact can be founded on "mere guess or conjecture." *McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 903 (Tex. 1980); *Int'l & Great N. R. Co. v. White*, 131 S.W. 811, 812 (Tex. 1910).[16] Moreover, if mere knowledge of alternative avenues of acquiring guns sufficed to undercut the deterrent effect of the background check system, then every individual who failed a background check would "find another way" to obtain a

---

[16]   The United States Supreme Court, in *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, similarly rejected a defendant's appeal to speculation to defeat but-for causation. 438 U.S. 59, 77–78 (1978). Although the issue arose in the context of standing, causation is an element of standing and the analysis is similar, though not determinative. *See* Wright & Miller, 13A Fed. Prac. & Proc. Juris. § 3531.5 (3d ed. 2020); *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154–60 (9th Cir. 2005) ("Causation and redressability overlap as two sides of the causation coin.").

firearm and requiring background checks would be futile. At trial, the Government argued that it has a "policy" position when it passes and administers laws (that background checks work as a deterrent), and a "tort" position when defending lawsuits (that background checks do not work as a deterrent and Kelley would've just "found another way"). Trial Tr. 1135. But the Government's conflicting positions undermine the credibility of its argument.

1.   ***The Government's stipulations provide much of the evidence needed.***

At the outset, the Court notes that the Government stipulated to the consequences of its negligence: as a result of the Government's negligence, NICS did not have Kelley's criminal history. Dkt. No. 149 at 2–3 ¶¶ 8–9. The Government's own experts further admitted that the Air Force's failure to report Kelley's criminal history was a substantial factor in Kelley's acquisition of the firearms used in the Sutherland Springs Church shooting. Trial Tr. 1237:11–1238:2 (Barborini). Similarly, Mr. Donohue testified that the Government's negligence made it "more likely than not" that Kelley would acquire the specific gun he used in the shooting. *Id.* at 1331:2–13.

That's because, if the Government had sent the information to the FBI, the FBI would have denied Devin Kelley's firearm purchases at FFLs. Trial Tr. 620:20–621:1; *id.* 649:9–23 (more detailed response to Court's questioning); 635:2–6 (same); 1116:6–23 (ATF: would have been an automatic denial); *see also id.* 619:11–620:9 (Had the Air Force sent in Devin Kelley's criminal

history data, it would have matched exactly the biographical data he pro-
vided to the FFLs.).[17] If not for the Government's negligence, from his first
purchase on Dec. 12, 2014, onward, every one of Kelley's firearm purchases
would have been a denial.[18] *Id.* at 623:4–17.

Because of the Government's negligence, Kelley acquired multiple guns:

| DATE | GUN | ATF FORM | DISPOSITION |
|------|-----|----------|-------------|
| Dec. 22, 2014 | 9mm Pistol, Glock 19 | JEX-342 | Recovered by ATF. JEX-423. |
| June 26, 2015 | 357 Mag Ruger GP100 | JEX-343 | Sold by Kelley. JEX-157, at 87. |
| Apr. 7, 2016 | Ruger AR-557 | JEX-345, at 4 | Recovered by ATF. JEX-423. |
| Oct. 18, 2017 | Ruger SR22 Pistol | JEX-346 | Recovered by ATF. JEX-423. |

---

[17] When an FFL does a background search, the FBI's NICS system automatically
searches three databases: the Interstate Identification Index, the NCIC, and the
NICS Indices. Trial Tr. 610:1–14. And the FBI provides one of three responses:
delay, deny, or proceed. *Id.* at 612:17–613:2.

[18] The Government provided evidence that, had it sent only the fingerprints but not
the final disposition, the FBI would have delayed rather than denied the sale.
*E.g.*, Trial Tr. 654–58. This is irrelevant. For the Air Force to meet its obliga-
tions, it must submit both the fingerprints and final disposition. However, to the
extent that his initial purchases at Holloman would have been delayed, the
Court finds it more likely than not that Kelley would have been discouraged from
pursuing future gun purchases. *See infra* Substantial Factor §§ 2–5.

Every gun that Kelley possessed at the time of the shooting was purchased through an FFL.[19] Trial Tr. 1347:4–12 (Donohue).

Here, the Government did more than just "furnish a condition" that made Plaintiffs' injuries possible. Dkt. No. 318, at 27. The Director of Compliance for Academy expressly confirmed, "[w]e sold him a firearm **because** he passed the background check and he completed the 4473 . . . ." PEX-90, at 12 (179:10-15) (emphasis added). Likewise, N.M., the Academy Sports + Outdoors' clerk who sold Kelley the firearm, stated: "We did a NICS background check, which goes to the FBI. After the FBI received their document, they sent us a document with a proceed to transfer the firearm to Mr. Devin Kelley." PEX-99, at 4 (46:20-24); *id.* at 6 (87:7-10) ("Kelley did come in . . . filling out the proper documents, filling out the background check. The background check came back with the proceed."); *id.* at 8 (165:16-17) ("We did the NICS background check that we stated earlier. Came back with the "proceed."). As a result, the Government's expert conceded that the "only reason" Kelley was able to acquire the firearms used in the shooting was the Air Force's failure to submit his criminal history. Trial Tr. 1347:21–1348:1 (Donohue).

---

[19]  Kelley also purchased or possessed other guns prior to 2014. First, in the Air Force, he purchased a handgun on Feb 12, 2012. JEX-18, at 1–2. This gun was confiscated by the Air Force. JEX-21 at 58. Second, he purchased a 9mm Pistol (Sig Sauer P250), also from the Holloman Base Exchange, an FFL. JEX-16, at 1–3. Kelley's father confiscated that gun, against his son's wishes, and sold it. JEX-157 at 95, 101–102. Kelley also attempted to purchase a firearm at an FFL, but the FFL reported him to the Air Force and prevented that sale. JEX-341; JEX-22 at 606. Next, after leaving the Air Force, Kelley acquired a handgun, but found it to be unreliable and sold it to a pawn shop. JEX-157 at 82; JEX-550. He also acquired a shotgun but bartered that gun for a dog. JEX-157 at 86. So, the only guns that Kelley owned, that he could use to commit violence—including the Church shooting—were purchased at an FFL, and only because Kelley passed the FBI background check, because of the Government's negligence.

And Kelley used the AR-556 assault rifle to harm the Plaintiffs in the Church. Trial Tr. 224:15–18; *id.* at 1215:10–23 (Barborini: If the Air Force submitted Kelley's criminal history, he would not have been allowed to buy the AR that he used in the Church shooting.).

## 2. *Denial of the tools of mass murder would deter Kelley specifically.*

If Kelley had been denied access to these firearms, the question remaining is whether this denied access would "deter," "chill dangerous or criminal activity," and "defuse hostile behavior." *Del Lago Ptrs. Inc. v. Smith*, 307 S.W.3d 762, 775 (Tex. 2010). And there is ample evidence that denial of access through a proper background check would have prevented Kelley from accessing the reliable firearms he needed to commit the Church shooting. According to the Government's own ATF representative, the NICS system does an "amazing job" at keeping firearms out of the hands of felons. Trial Tr. 1133:3–8. And the NICS background search system has caught over a million people who lied on their ATF form, just like Devin Kelley, and prevented them from acquiring firearms. *Id.* at 664:1–22.

More specifically, there is ample evidence that being denied access to reliable weapons from FFLs would have deterred or chilled Kelley's attack on November 5, 2017. That evidence comes in the form of: (1) expert testimony; (2) direct evidence of Kelley's response to being denied guns; and (3) indirect evidence of Kelley's response, when denied access to base.

### 2.1. **Expert testimony on the effect of denials.**

To start with, Plaintiffs' expert, Dr. Webster, testified that, after reviewing the literature in the field, and after reviewing the specific evidence in this

case, and relying on his experience, he believed Kelley would have been "deterred from serious acts of violence with a gun," had he been denied access at an FFL. Trial Tr. 947:3–948:10; *see also id.* at 969:14–25 (same). There are multiple studies that compare individuals denied guns with those allowed to purchase guns, and they support the conclusion that when individuals are denied at FFLs, they are discouraged and deterred from acquiring firearms altogether. *Id.* at 944:8–946:16. The studies show "a statistically significant elevated risk for gun offenses and violent offenses if [felons] were allowed to purchase as opposed to being denied firearms." *Id.* at 957:11–25. And "among those with only one prior weapon or violent arrest charge, purchases were two to four times as likely to be charged with new offenses as those who were denied." *Id.* at 958:13–17.

Dr. Webster also addressed the Government's claim that Kelley would acquire firearms through other means, opining that the literature and his experience could not endorse the Government's speculation. Trial Tr. 948:12–949:13; 969:14–25. That is, Kelley's social network, the risk involved, and his preference for reliable guns made it unlikely that he would venture into an alternative market for firearms. *Id.* at 962:6–964:5. Dr. Webster based his conclusion on the literature, including a study he personally conducted that showed the difficulty of getting these firearms when you lack a wide social network. *Id.* at 965:2–966:20. Kelley in particular had a very small social network. *Id.* at 1403:18–20 (Kelley tells Higgins he doesn't have any friends). In the Air Force, Kelley was a loner: "Nobody liked Kelley and Kelley did not have friends." JEX-517, at 2 (Sgt. Bizzack). And Dr. Webster's testimony is corroborated by reports issued by the FBI, which concluded that a "majority

of active shooters obtained their firearms legally, with only a small percentage obtaining a firearm illegally." *Id.* at 1339:22–25.

In sum, the Court finds Dr. Webster's testimony and literature credible. To the extent that the Government offered contradictory testimony, the Court does not find that testimony or evidence credible.

### 2.2.    Direct evidence of the deterrent effect on Kelley.

Next, the trial evidence showed two specific examples of Kelley's conduct when he was denied access to firearms from FFLs. First, in the Air Force, the Security Forces confiscated Kelley's firearm. JEX-21, at 58–59. In response, Kelley sought out a firearm from another FFL. JEX-341. The only thing that prevented this firearm acquisition was the FFL reporting Kelley to the Air Force. JEX-22, at 606. Importantly, there is no evidence that Kelley used a straw purchase, built a firearm, or borrowed a firearm. As a matter of fact, this early test case presented the perfect opportunity to see whether Kelley would force his abused and battered spouse—over whom he was extremely controlling—into purchasing a firearm for him. *See* JEX-22 (AF investigative file documenting extensive abuse). When the Texas Rangers investigated whether Kelley used his abused spouse for straw purchase or otherwise to acquire guns, they found no evidence. *E.g.*, JEX-548, at 2.

Second, Danielle Smith testified that in late 2015, Kelley tried to buy a gun at DICK'S. Due to a store policy on Kelley's Colorado ID, DICK'S denied him a gun. Yet Kelley's next attempt to purchase a firearm was at Academy, another FFL. JEX-345, at 4. The FBI Representative, Ms. Del Greco, testified that the FBI had no evidence that, between the DICK'S denial and Kelley's AR Purchase in 2016, Kelley acquired firearms from any non-FFL source.

Trial Tr. 670:20–24. The Texas Rangers investigation also revealed that all of the guns that Kelley possessed at the time of the shooting were acquired through FFLs. Again, if Kelley had been likely to find another source for weapons—as the Government suggests—this would have been another opportunity for him to do that. That Kelley did not take this opportunity to do so shows that he was not likely to do so.

The Court finds at least two reasons why Kelley sought out guns from FFLs and did not want guns from other sources. First, Kelley demonstrated fear of police and prison. Trial Tr. 1493:8–10 (Dr. Bursztajn). Second, and more importantly, the evidence conclusively established that Kelley preferred reliable guns. And this preference was demonstrated multiple times at trial. For example, Kelley would research guns heavily before purchasing them. JEX-157, at 92. This and his Facebook posts indicate that he preferred reliable guns. Trial Tr. 968:20–969:13 (citing JEX-502, at 127); JEX-503, at 86. The Government cited Kelley's acquisition of a handgun and a shotgun as evidence that Kelley knew how to get guns from other sources. But Kelley got rid of both of those guns because they were unreliable. JEX-157, at 82; JEX-550; Trial Tr. 43:9–23, 47:2–15 (Danielle Smith). Moreover, those purchases happened earlier, before the four FFL purchases that are at issue in this case. The fact that Kelley already knew that he could acquire guns from other means but got rid of those guns and chose to go to an FFL for his subsequent purchases, shows that Kelley preferred to go to FFLs for reliable guns and did not want guns from other sources.

### 2.3.  Kelley denied access to base.

Last but not least, Kelley's response to being denied access to Air Force bases provides circumstantial evidence of what Kelley would do in response

to being denied access through proper channels. For context, the Government believed Kelley to be so dangerous that they internally barred him from entering the base. JEX-21 (Barment File). Afterwards, he tried to enter Holloman in 2013, but the system returned a denial. Trial Tr. 1638:14–17 (Fox). Kelley used his ID, which had his picture on both sides. JEX-361, at 256–257. As a result of the Air Force's internal reporting, Kelley was denied entry. Trial Tr. 1638:22–24 (Fox). After his first attempt, the Air Force increased the threat level indicator for Kelley. *Id.* at 1640:15–1641:8. After his failed attempt, Kelley tried again in San Antonio in 2015, and in Holloman in 2016. *Id.* at 1641:2–1642:1. Each time, he was denied access. *Id.* at 1642:13–16.

After these denials, there is no evidence that Kelley used a friend to sneak on to base or tried to jump the fence. The Government argues that bases are well guarded. But Kelley was able to escape a military mental health institution by jumping a fence. JEX-21, at 3. So, Kelley knew how to evade base security, and how to get on or off base without permission. But—as the Government's expert conceded—the Air Force's internal reporting system stopped Kelley from accessing the base. Trial Tr. 1640:9–11 (Fox). And there is no evidence that Kelley made any attempt to get on base by other means, even though he knew how.

3. ***Alternative sources of guns lack factual support.***

The evidence contradicts the Government's alternative-sources argument. The Government argued that other avenues of acquiring firearms existed, such as ghost guns or gun shows—and then jumped to the conclusion that Kelley would have used those routes if the background check had denied access. But the Government presented no evidence of the type of guns that Kelley could have gotten through these other means—and thus presented no

evidence that Kelley could have harmed the Plaintiffs in the way that he did, with guns obtained through these other means. For example, an AR can shoot through walls. Trial Tr. 370:6–11. And an AR can fire 500 shots in under ten minutes. *Id.* at 396:10–17. This is how Kelley did so much harm. And there is no evidence that ghost guns or self-built guns could do the type of damage that Kelley did with his new-in-the-box AR-556 assault rifle.

On this issue, the Government had an uphill trek given the findings of the Texas Rangers. The Ranger's investigation revealed that Kelley possessed no weapons that were acquired through a straw purchase, gun show, or other unregulated means. Trial Tr. 226:9–13, 220:12–21, 237:10–14, 241:21–23, 383:13–18, 384:2–7 (Ranger Snyder). All of the weapons that he possessed were purchased through FFLs. Trial Tr. 221:20–22. And the Court finds that the post-shooting investigations were thorough. *See id.* at 194:20–196:10 (Texas Rangers, the FBI, the ATF, Homeland Security, and numerous law enforcement agencies involved); *id.* at 200:18-21 (15–30 Texas Rangers investigated). For example, the Texas Rangers searched the Kelley property. Trial Tr. 394:17–395:2 (Ranger Snyder). They found no weapons procured outside the FFL system. *Id.* at 395:7–11. Meaning they found no weapons that were stolen (*id.* at 395:12–14); no straw-sale weapons (*id.* at 395:15–16); and no firearms that were built (*id.* at 398:24–399:2). Additionally, the financial investigation into Kelley's bank accounts and online activity shows that he did not purchase weapons outside FFLs. Trial Tr. 394:5–12. Given the thoroughness of the post-shooting investigations, the Court may reliably say that, if there was any evidence that Kelley accessed one of these alternative avenues of firearms ownership, the investigators would have discovered it.

Next, the Government argues that Kelley could have gotten guns from various other sources, such as a gun show. But, while there was evidence that Kelley went to gun shows, there was no evidence that Kelley ever purchased a gun at a gun show. Trial Tr. 1220:7–9 (Barborini). Nor was there evidence of Kelley having access to "alternative markets." *Id.* at 1219:8–21, 1238:25–1239:2 (Barborini). Moreover, there was no evidence that Kelley was ever involved in a straw purchase. *Id.* at 1352:22–24 (Ranger Snyder); id. at 1221:12–14 (Barborini); *id.* at 1352:15–24 (Donohue). His parents testified that, had they known it was illegal for Kelley to possess a gun, they would not have bought him a gun. *E.g.*, *id.* at 491:25–492:1, 493:1–16 (Michael Kelley); *id.* at 547:10–11, 564:2–8 (Rebecca Kelley).[20] And the Government presented ample evidence that gun stores are trained to identify and stop straw purchases. GEX-173, 174, 175 (DICK'S Training Materials); GEX-227, 233, 236 (Academy). So, the Government's argument that Kelley would have gotten guns from other sources is entirely speculative.

The Government also argues that Kelley would have used his parents' guns, either by borrowing them or stealing them. But there was no evidence that Kelley ever borrowed his father's weapons. *Id.* at 396:4–6; *id.* at 562:7–9, 23–24 (Rebecca Kelley). Michael Kelley testified that Devin never asked to use his parent's guns. *Id.* at 490:2–6, 512:8–20; *id.* at 563:4–5 (Rebecca Kelley); *id.* at 1235:5–10 (Barborini). And the Government presented no evidence of Kelley ever stealing any guns. Michael Kelley kept his gun cabinet in the

---

[20]  Even if the Kelley family never knew that their son couldn't possess a gun, if they bought a gun, they'd have to fill an ATF form and commit a felony in order to do that. The ATF form 4473 says it's illegal to buy the gun if you're not the actual purchaser. *E.g.*, JEX-345 (pg. 4-5) (Question 11(a)). In this case, there's no evidence that his social network would commit a felony for him.

far back of the house, in the master closet, locked in a heavy-wood (walnut) cabinet. Trial Tr. 488:17–489:5, 487:8–22. The door to this cabinet is so heavy that the family needed to anchor it to the wall to prevent the cabinet from toppling. *Id.* at 561:16–23. To get in, Kelley would have needed time and tools, like a hammer and crowbar. *Id.* at 488:3–11, 498:13–18. Even if someone were able to break into the cabinet, Michael Kelley also had the habit of keeping a trigger lock on his guns. *Id.* at 499:13–17. And again, the Rangers found no evidence of stolen weapons in any of their post-shooting investigations. *Id.* at 1351:25–1352:3.

The Government further speculates that Kelley could build his own guns. Yet the Government's speculations again run headlong into the Texas Rangers' investigation, which revealed no evidence that Kelley had ever built a gun, or even had the capability of building a weapon. Trial Tr. 399:4–6 (Snyder); 485:1–24 (Michael Kelley). And witness testimony confirms that Kelley never purchased, possessed, or built any of the weapons that the Government speculates he could have built. *Id.* at 1223:9–14 (Barborini) (80-percent gun); 1223:23–25 (Barborini), 1354:9–25, 1356:19–21 (Donohue) (ghost guns). This evidence is consistent with Kelley's general lack of intelligence and skill. *E.g.*, JEX-679 (high school transcript). In the Air Force, Kelley flunked out of Network Intelligence School and was placed in traffic management. JEX-396, at 4 ("Airman did not meet minimum academic standards …"). And Kelley had a history of fumbling simple things, such as ordering parts for his weapons. Trial Tr. 392:11–15.

The Government claimed that, in 2015, Kelley sent pictures to an Air Force employee of "multiple guns he was building." JEX-510. But we do not

know if the pictures Kelley sent were merely pictures he pulled from the internet. We do know that there was no evidence from the post-shooting investigations that Kelley had ever actually built a gun.[21] Trial Tr. 398:19–399:6. And if Kelley tried to build a gun in 2015, as the Government claims, we can infer that he must have failed, because a few months later he bought a gun at an FFL. *See* JEX-343 (June 26, 2015); JEX-345, at 4 (Apr 7, 2016). And there was no evidence that he possessed a self-built gun at the time of the shooting.

Finally, the Government argued that Kelley could have gotten guns online, using a website like Armslist or Texas Gun Traders. But there was no evidence that Kelley used or had a login for those websites, or even knew of them. Trial Tr. 1220:20–25 (Barborini), 1645:9–24 (Fox). The FBI investigated Kelley's banking activity and online account activity and found no purchases on these websites. *See* JEX-429, JEX-544. The Government argued that Kelley's online research, while he was institutionalized in the military, demonstrated that he knew how to get guns online. But Kelley merely researched buying guns from Wal-Mart, another FFL. JEX-159, at 51m10s–52m20s. There is no evidence to support the Government's claim that Kelley was researching ghost guns—or to support any other speculation by the Government that Kelley would have obtained guns from other sources.

---

[21] The Government presented evidence that Kelley had modified his guns. But this took no particular skill: every "modification" that Kelley made to his firearms can be purchased off-the-shelf and easily added to an existing firearm. Trial Tr. 1356:6–18 (Donohue).

4. ***The Government's counterfactuals require multiple levels of speculation.***

At closing argument, the United States argued that, if Kelley had been denied at FFLs, he wouldn't just "take his ball and go home" because "he had been planning it for too long." Trial Tr. 1850:1–25. But all of the conduct that the Government points to, concerning Kelley's planning, occurred after repeated purchases at FFLs. Stated another way, Kelley did not start planning this shooting until years after he had obtained multiple firearms at FFLs. Essentially, the Government asks this Court to dive into an alternative reality where Kelley was denied firearms years before he started planning this mass shooting in his head. In that intervening time, without repeated and easy access to reliable weapons at FFLs, the record contains no evidence that Kelley would have developed a similar interest in and plan for this shooting. To the contrary, the evidence shows that, had Kelley been denied access to reliable weapons at FFLs, he likely would have been deterred.

Fundamentally, the Government's argument asks the Court to entertain hypothetical counterfactuals without any basis in the evidence. And the problem with wading into these "metaphysical and philosophical" aspects of causation is that proximate cause is a practical test of common experience applied to human conduct. *City of Gladiator v. Pike*, 727 S.W.2d 514, 518 (Tex. 1987); Restatement (Second) of Torts § 431 comment a (same).

In addition, if the Court entertains the Government's alternative realities, the Court will also need to entertain the Plaintiffs' counterfactuals. Would Kelley have been arrested in the years leading up to the shooting? Would Kelley have been prosecuted for lying on his ATF Form? Would Kelley

even have married Danielle Smith? And in the Plaintiffs' case, these counter-factuals are based on actual evidence. For example, after being released from prison, Kelley had multiple police interactions. JEX-572 (2013: sexual assault report); JEX-400, at 4 (cruelty to animals); JEX-519 (speeding ticket); JEX-522 (child abuse reporting); JEX-603 (Comal County); Trial Tr. 260:20–261:12 (Ranger Snyder).

The evidence also shows several facts that would be the basis for an arrest. First, it is illegal for felons to possess body armor in Texas. Trial Tr. 271:21–23. More importantly, Kelley's possession of firearms violated both federal and state law. *Id.* at 229:21–230:10. What's more, Kelley regularly carried a firearm and regularly talked about carrying a gun. *Id.* at 435:7–20 (Michelle Shields); *id.* at 435:21–436:12 (Shields), 1411:2–15 (Higgins). In fact, he had no problem telling law enforcement that he possessed a firearm. JEX-367, at 91 (declaring a gun at border patrol check point); JEX-603, at 3m6s–3m19s (telling Cibolo PD that he has a gun). Moreover, there are at least seven occasions where Kelley submits his fingerprints to the FBI but passed a background check. Trial Tr. 252:11–14. However, because of the Government's negligence, a police officer wouldn't have the necessary information to arrest Devin Kelley. *Id.* at 231:24–232:6, 249:7–10 (Snyder).

Had he been caught, lying on his ATF forms, alone, would have subjected Kelley to ten years in prison. Trial Tr. 661:17–22, 1139:14–19, 1141:1–3 And if he had been able to acquire a firearm, the Director of the ATF testified to Congress that they prioritize firearms retrievals when it concerns domestic violence. JEX-628, at 1h52m55s–1h53m49s; *see also* JEX-657, at 27 (In 2016, the FBI referred 4,170 firearm retrieval actions to the ATF); Trial Tr. 630:3–

22 (same). If the Court entertains the Government's unsupported counterfac-
tuals, about how Kelley might have still carried out the Church shooting,
even if he had been denied access to guns at FFLs, then the Court has to also
consider the more likely possibility that Kelley might've ended up in prison
and the Church shooting might never have happened.

Moreover, if the Court entertains the Government's speculative counter-
factuals, then the Court should also entertain Erin Higgins' testimony that, if
the Government had reported Kelley, the information would have turned up
in her background check and Danielle would never have married Devin Kel-
ley. Trial Tr. 1398:2–1400:18. And if they had never married, then Kelley
would not have had any reason to target the Sutherland Springs Church.

The Court finds that the Government's counterfactuals are speculative
and unsupported by the evidence. The credible, reliable evidence in the rec-
ord shows that the Government's failure to exercise reasonable care was a
substantial factor in causing the injuries to the Plaintiffs in this case.

5.   *Texas law undermines the Government's counterfactuals.*

While the Government's arguments on substantial factor causation are
contrary to the factual evidence, they are also contrary to the law. For exam-
ple, *Dickensen Arms-REO, L.P. v. Campbell* involved a lawsuit against an
apartment complex arising out of a car-jacking and murder. 4 S.W.3d 333,
335 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). Like this case, the de-
fendant argued that the shooter "was an unstoppable and undeterrable indi-
vidual" and the shooting "would have taken place even if defendants had
used reasonable care." *Id.* at 349. Like this case, the defendant relied on its
experts. *Id.* The court rejected the argument, relying on specific facts about

the criminal's prior conduct indicating he would be deterred. *Id.* at 349–50. Ultimately, it deferred to the jury to resolve conflicting evidence. *Id.*

Next, the Dallas Court of Appeals recently affirmed a $12 million dram-shop judgment where over-serving alcohol was a substantial factor in a car wreck. *Beamers Private Club v. Jackson*, No. 05-19-00698-CV, 2021 WL 1558738 (Tex. App.—Dallas Apr. 22, 2021, no pet. h.). Notably, the defendant did not argue, nor did the court entertain the possibility that the drunk would have made his own moonshine, grown his own barley, or stomped his own grapes if he had been denied alcohol at the defendant's bar. Neither did the court examine whether the drunk could have gotten drunk at the liquor store next door. The Court takes judicial notice that there is, in fact, a liquor store within walking distance of Beamers club in Dallas.[22]

Then, in *Nixon*, the Texas Supreme Court held that an unlocked apartment could be a substantial factor in the rape of a 10-year-old child. *Nixon*, 690 S.W.2d at 548. Here, the court did not wade into whether there were other apartment complexes available, or whether the rapist could have used his own home to commit this crime. Similarly, the Texas Supreme Court affirmed a verdict arising out of an assault at a bar where the late arrival of security was a substantial factor in a fight that broke out. *Del Lago Ptrs. Inc. v. Smith*, 307 S.W.3d 762, 767 (Tex. 2010). Like the other cases, the court did not consider whether the fight could have occurred at another bar or even in the parking lot.

---

[22]   https://goo.gl/maps/7rin2jwBDwWaDqVCA

In summary, the Court finds that the Government's failure to exercise reasonable care was a substantial factor in causing the injuries to the Plaintiffs in this case.

## APPORTIONMENT

Having found that the Government's failure to exercise reasonable care proximately caused the harm to the Plaintiffs, the Court, in its role as the trier of fact, apportions responsibility between the relevant parties.[23]

### 1.  *Academy Sports + Outdoors*

To start, the Court does not apportion responsibility to Academy here because the Government did not meet its evidentiary burden to show that Academy proximately caused Plaintiffs' injuries.[24] The Government's argument here rested on its position that Academy violated federal law when it sold the AR to Kelley, because federal law required Academy to comply with the laws of the state of residency of the purchaser.

However, the evidence showed that Kelley obtained a Texas driver's license in May 2017. JEX-380; Trial Tr. 1121:9–12 (ATF); JEX-564, at 1 (copy of Kelley's Texas license); JEX-567 (temporary DL permit). The Government's

---

[23]  The United States designated ten John Does, whom the Government claimed were working in conspiracy with Devin Kelley to commit the Sutherland Springs shooting. Dkt. No. 150. At trial, however, the Government voluntarily abandoned these entities, so the Court granted a Rule 52(c) motion striking all John Does. Trial Tr. 1682:14–25.

[24]  The Government presented only one party witness and offered no experts on this issue. The Court need not and does not decide any issue related to the Protection of Legal Commerce in Arms Act to resolve any issue in this FTCA lawsuit. Also, the Texas Supreme Court has stayed state-court litigation against Academy. Similarly, the Court does not decide any issue related to that litigation.

key witness on this point—a representative of the ATF—did not know that Kelley had obtained a Texas driver's license. *Id.* at 1120:11–18. And Kelley actually purchased one of his firearms, from Academy, using a Texas Drivers' License. JEX-554 (ATF Trace); Trial Tr. 1123:7–15 (ATF). According to the Government's ATF Representative, Kelley could have used this driver's license to purchase weapons. Trial Tr. 1124:9–1125:3. And most fatally, the ATF representative conceded that, regardless of whether Kelley had a proper license, if the Air Force had done its job, the NICS check would have stopped all of Kelley's FFL purchases. *Id.* at 1125:5–11.

In sum, the Government failed to present any evidence that would tend to show that Academy's actions in this matter proximately caused the Plaintiffs' damages. Simply put, the evidence the Government presented to the Court was lacking. The Court finds that the Government's evidence did not satisfy its burden of proof to show that Academy's failure to exercise reasonable care legally caused the Plaintiffs' injuries.

## 2.   *United States & Devin Kelley*

Setting Academy aside, the Court must apportion responsibility between Devin Kelley and the United States. The trier of fact is given great latitude in apportioning responsibility. *Damian v. Bell Helicopter Textron, Inc.*, 352 S.W.3d 124, 159 (Tex. App.—Fort Worth 2011, pet. denied). Under Texas law,

even if the evidence could support a different percentage allocation, the appellate court does not substitute its judgment for that of the trier of fact.[25] *Rosell v. Central W. Motor Stages, Inc.*, 89 S.W.3d 643, 659 (Tex. App.—Dallas 2002, pet. denied).

The Government provided no guidance as to its position in apportioning responsibility between Devin Kelley and the United States. Trial Tr. 1850–51. Plaintiffs suggested that the United States bear 70% of the responsibility and Kelley bear 30% responsibility. *Id.* at 1859–60.

The Court agrees with the Plaintiffs and finds the United States 70% responsible with the remainder to Devin Kelley. In apportioning the liability, the Court further subdivides the liability of the individuals involved as follows:

- 53% to supervisory negligence at the Air Force;
- 17% to Air Force special agents and investigators; and
- 30% to Devin Kelley.

---

[25] Longstanding Texas law holds that "where the tortious acts of two or more wrongdoers join to produce an indivisible injury" all the wrongdoers will be held jointly and severally responsible. *Landers v. East Tex. Salt Water Disposal Co.*, 248 S.W.2d 731, 734 (Tex. 1952); *Bistrain v. Levi*, 2020 WL 6951048, at *32–34 (E.D. Penn. 2020) (Same rule applied in an FTCA case); *Lakes of Rosehill Homeowners Assoc., Inc. v. Jones*, 552 S.W.3d 414, 420 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (holding that Tex. Civ. Prac. & Rem. Code Ch. 33 does not abrogate the indivisible injury rule) (Busby, J.). An indivisible injury is "an injury which from its nature cannot be apportioned with reasonable certainty to the individual wrongdoers." *Duffey v. Sleep Ctr. of Longview*, 598 S.W.3d 711, 715 (Tex. App.—Texarkana 2020, no pet. h.). Based upon the review of the record the Court finds that Plaintiffs' injuries are indivisible injuries. The Court cannot with reasonable certainty apportion gunshot injuries to the individual wrongdoers in this instance. The Court nonetheless shall determine the percentage of responsibility in its role as trier of fact.

The Court apportions the majority of responsibility to the supervisory agents for multiple reasons. First, over the lifetime of the Kelley file, the undisputed evidence at trial showed that supervisors at the Air Force were responsible for 70–75% of the contact with the Kelley file. Trial Tr. 742:7–20. And—setting aside the Government's daily ongoing obligation to correct—the only evidence at trial showed that the supervisors had 79 opportunities to review the file and correct the agents' mistakes. *Id.* at 729:6–13; 735:11–737:1 (Youngner). The supervisory staff instigated the investigation and knew the key evidence of foreseeability of Kelley's violent conduct. *See supra* Foreseeability; JEX-22, at 5 ("Report by: SA James F. Hoy"), 6 (noting that Bustillo and Hoy began the investigation); Dkt. No. 425 at 1–2 ¶¶ 5(a), 5(j) (stipulating that Hoy & Bustillo were leadership).

In analyzing responsibility apportionments, Courts have considered a number of different factors. Some courts consider the Defendant's indifference to the risk of harm in determining the appropriateness of an allocation. *See e.g.*, *Rosell*, 89 S.W.3d at 660 (warned of danger but moved into it). Here, the Government had been warned of its failure to submit since 1998 and was repeatedly indifferent to the risk of harm that this failure posed to the general public. On multiple occasions, both agents and leadership falsely certified that critical steps had been taken when they had not. *E.g.,* JEX-22, at 60 (false certification of taking fingerprints); JEX-40, at 7m46s–8m48s (forensic failed to find documentation); JEX-19, at 1–2 (unit leadership falsely certifies twice that fingerprints and final dispositions were sent to FBI). Detachment 225, in particular, had significant problems that the Air Force knew about but did not address. JEX-47, at 93–94 (audit revealed significant problems in evidence keeping and record keeping); JEX-121, at 1 (supervisory staff failed

in completing "crucial investigative documentation processes."). And in the case of Devin Kelley, individuals in supervisory leadership roles tried to justify their failures by complaining that the agents under their command "knew how to read" and that they "shouldn't have to lead." PEX-88, at 31–32 (Bustillo). This factor therefore favors apportioning significant responsibility to the Government.

Some courts also consider the knowledge of, and the nature and seriousness of, the danger—in this case, Devin Kelley and the threat he posed. *See Parker v. Highland Park, Inc.*, 65 S.W.2d 512, 520 (Tex. 1978) (in the contributory negligence context). As the Court has previously noted, "[w]ith Kelley specifically, at every state in his life—during and after his USAF tenure—the threat of violence loomed." Dkt. No. 318, at 24. The trial has conclusively demonstrated that Kelley presented an extreme risk of violence. And the Air Force knew that Kelley was in the maximum risk range (98 percentile) for lack of control, the maximum risk range for violence (93 percentile) and the maximum risk range for his inability to cope with stress (92 percentile). JEX-22, at 593. The Air Force also knew about his specific history of using guns to abuse his wife; of using firearms and body armor to plan and attempt a mass shooting; and of his actual threats to do the same—making the Air Force particularly aware of the nature and seriousness of the danger. This factor therefore favors apportioning significant responsibility to the Government.

Perhaps most importantly in this situation, courts consider the availability of alternatives or the availability of aid from others. *See Parker*, 565 S.W.2d at 520. In this case, given that neither the Plaintiffs nor any other party could create and run a National Instant Background Check System to

prevent Kelley from purchasing the guns that he used to harm the Plaintiffs—and given the Government's knowledge and reasons for undertaking this task[26]—there was no available alternative or available aid from others: only the Government could do what it ultimately failed to do. This factor therefore favors apportioning significant responsibility to the Government.

The Government argues it should receive a smaller share or no share of responsibility because the Air Force investigators conducted a thorough investigation. Trial Tr. 1832–33. Because the Government raises this issue, the Court notes that the only reason the Air Force had evidence of Kelley's depraved history is because multiple sexual assault victims came forward. *E.g.*, Trial Tr. 1509:11–14. And though the Air Force had evidence of (a) prolific spouse and child abuse; (b) multiple sexual assaults, including one during his time in the Air Force; and (c) a conclusion by Air Force leadership that Kelley has no "chance for rehabilitation," the Air Force punished Kelley with only a year in prison and a bad-conduct discharge. JEX-20 (conviction); JEX-366, at 62 (Col. Bearden). And even then, the Air Force kept Kelley in the military for over a year after his release from prison. Dkt. No. 425 at 4 ¶¶ 17–18 (stipulations); JEX-421, at 1 (certificate of discharge). At times during the Kelley investigation, the Air Force had corroborating evidence of sexual assaults, but never bothered to reach out to the victims or to refer out prosecution to the appropriate jurisdiction. *E.g.*, JEX-178. In fact, a 2010 Air Force IG investigation revealed to Air Force leadership that Detachment 225 had failed to maintain and document its collection of evidence. JEX-47, at 93 (seized drugs

---

[26] When the Brady act was passed, the Government was keenly aware that dangerous felons exist within its citizenry, and as a result of that specifically decided felons should not acquire firearms from FFLs as matter of law. JEX-754–JEX-755.

not tested, evidence unaccounted for). Specifically, Detachment 225 had failed to maintain its case file and had failed to conduct the required monthly reviews. *Id.* at 93–94; see also JEX-27, at 36–37 (Region 2 noting that Detachment 225 had systemic problems in handling criminal investigations).

The Government also argues that, given the heinous nature of Kelley's conduct, Kelley should bear all of the responsibility. While this Court does apportion significant responsibility to Kelley, the Court finds that the risk of harm and extreme danger that Kelley posed was well known to the Air Force. Indeed, the Air Force took extensive steps to protect itself from that danger, by removing Kelley's weapons (JEX-340), by barring Kelley from the base (JEX-21), and even by ordering armed guards on Kelley when he slept (JEX-21, at 10). Kelley escaped from a military installation twice—one of those times when he was in a mental institution. And the Air Force was so concerned that they printed flyers to post around town, stating Kelley should be considered a danger to himself and others. The Air Force even contemplated moving Kelley's spouse into a safe house and put the entire base on lockdown. JEX-159, at 51m10s–52m20s (Tessa Kelley interview). A year after the Air Force released Kelley from prison and barred him from HAFB, they upgraded his threat status and extended the barment to all Air Force bases. JEX-422, at 1; Trial Tr. 1640:15–1642:16 (Fox). To the Air Force, Kelley was not an unknown quantity. The trial conclusively established that no other individual— not even Kelley's own parents or spouse(s)—knew as much as the United States about the violence that Devin Kelley had threatened to commit and was capable of committing. Moreover, the evidence shows that—had the Government done its job and properly reported Kelley's information into the background check system—it is more likely than not that Kelley would have

been deterred from carrying out the Church shooting. For these reasons, the Government bears significant responsibility for the Plaintiffs' harm.

The Court's apportionment in this case is supported by other cases involving third-party criminal conduct. The Texas Supreme Court, in *Del Lago*, affirmed a 51-49 apportionment, with the defendant corporation receiving 51%. *Del Lago Ptrs., Inc.*, 307 S.W.3d at 767; *see also* 206 S.W.3d 146, 148 (Tex. App.—Waco 2006, pet. granted). And in *Hyde Park*, a Texas court affirmed an 80% apportionment of responsibility to the defendant, rejecting the argument that a "negligent wrongdoer can never bear more responsibility … than an intentional tortfeasor." *Hyde Park Baptist Church v. Turner*, No. 03-07-00437-CV, 2009 WL 211586, at *6–7 (Tex. App.—Austin 2009, pet. granted, but review denied as improvidently granted). Notably, the court's decision rested on the defendant's extensive knowledge of the attacker's prior bad conduct. *Id.* at *7. And the Hyde Park defendant knew much less about the attacker's prior bad conduct than the Air Force knew about Kelley. *See id.*; *see also Primoris Energy Servs. Corp. v. Myers*, 569 S.W.3d 745, 755–56 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (affirming 64% responsibility in favor of a general contractor over subcontractor).

The Court's apportionment of 70% responsibility to the Government is also consistent with cases across the United States:

- **75% responsibility** to the defendant over the criminal. *Hutcherson v. City of Phoenix*, 961 P.2d 449, 451 (Ariz. 1998) (abrogated on other grounds).

- **60% responsibility** to defendant over violent rapist. *Ortiz v. N.Y. City Hous. Auth.*, 22 F. Supp. 2d 15, 32 (E.D.N.Y. 1998).

- **80% responsibility** to defendant over attackers. *Paragon Fam. Rest. v. Bartolini*, 799 N.E.2d 1048, 1056 (Ind. 2003).

- **75% responsibility** to the Catholic Church over sexual assaulting priest. *Roman Catholic Diocese of Covington v. Secter*, 966 S.W.2d 286, 288 (Ky. Ct. App. 1998).

- **55% responsibility** to defendant over both attacker and plaintiff. *Patrick v. Employers Mut. Cas. Co.*, 745 So. 2d 641, 648 (La. Ct. App. 1999).

- **75% responsibility** to defendant over attacker. *Riley v. Maison Orleans II, Inc.*, 829 So. 2d 479, 487 (La. Ct. App. 2002).

- **75% responsibility** to defendant over shooter. *Rosh v. Cave Imaging Sys., Inc.*, 26 Cal. App. 4th 1225, 1232–33 (1994) ("Defendant first contends no reasonable person could conclude a negligent tortfeasor was more responsible for an injury than an intentional tortfeasor. We disagree.").

Notably, some states do not even allow the tortfeasor to benefit from a decreased share of responsibility when its liability is premised on failing to prevent the intentional tortfeasor's act. *Whitehead v. Food Max of Miss.*, 163 F.3d 265, 281 (5th Cir. 1998) (surveying states). In sum, the Court's 70/30 apportionment falls well within the range that a reasonable jury could find.

## CONCLUSIONS OF LAW

The substantive Texas law applies to this lawsuit. 28 U.S.C. § 1346(b)(1); Dkt. No. 59, at 27. The United States District Court for the Western District of Texas has jurisdiction over this case under 28 U.S.C. §§ 1346(b), 2401, and 2671–80. The Court finds that each of the Plaintiffs in this consolidated action timely presented their claims and administratively exhausted their remedies. *See* PEX-796 (Plaintiffs' administrative presentation documents). The

Court further finds, as to each of the Plaintiffs, greater than six months elapsed following the administrative presentation before filing suit. *Id.*

The remedy against the United States under the Federal Tort Claims Act is exclusive with regard to claims based upon torts of federal employees within the scope of their employment. 28 U.S.C. § 2679. The United States Air Force and Department of Defense are agencies of the United States of America. Dkt. No. 425, at 1 ¶ 3–4. At all times material to this action, the Air Force owned and controlled Holloman Air Force Base. *E.g.*, Dkt. No. 113, at 90–91 ¶¶ 9.2 & 9.3. At all times material to this lawsuit, the Air Force staffed Holloman and its facilities with agents, servants, and employees. *Id.* The Air Force has also stipulated to the employment status of specific employees. JEX-648 (declaration); Dkt. No. 425, at 1–3 ¶ 5 (stipulations).

The Court concludes that the Government failed to exercise reasonable care in its undertaking to submit criminal history to the FBI. The Government's failure to exercise reasonable care increased the risk of physical harm to the general public, including the Plaintiffs. And its failure proximately caused the deaths and injuries of the Plaintiffs at the Sutherland Springs First Baptist Church on November 5, 2017. The Court finds the United States 70% responsible for this harm and jointly and severally liable for the damages that may be awarded.

Any finding of fact that may also be deemed a conclusion of law is so deemed. Any conclusion of law that may also be deemed a finding of fact is so deemed.

Within 15 days of this Order, the Parties are ORDERED to confer and file with the Court a proposed plan to bring the individual damages cases to trial.

It is so ORDERED.

SIGNED on this _____ day of _____, 2021.

_____

HON. JUDGE XAVIER RODRIGUEZ

Respectfully Submitted,

/s/ Jamal K. Alsaffar
**Jamal K. Alsaffar**
JAlsaffar@nationaltriallaw.com
Texas Bar No. 24027193
**Tom Jacob**
TJacob@nationaltriallaw.com
Texas Bar No. 24069981
**Whitehurst, Harkness, Brees,
Cheng, Alsaffar & Higginbotham
& Jacob PLLC**
7500 Rialto Blvd, Bldg. Two, Ste 250
Austin, TX 78735
Office 512-476-4346
Fax 512-476-4400
Counsel for Vidal, McKenzie, Solis,
McNulty, and Wall

/s/ Jason P. Steed
**Jason P. Steed**
JSteed@kilpatricktownsend.com
Texas Bar No. 24070671
**Kilpatrick Townsend & Stockton
LLP**
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
Office 214-922-7112
Fax 214-853-5731
Counsel for Vidal, McNulty, and
Wall

/s/ April A. Strahan
**April A. Strahan**
april@ammonslaw.com
Texas Bar No. 24056387
**Robert E. Ammons**
rob@ammonslaw.com
Texas Bar No. 01159820
**The Ammons Law Firm**
3700 Montrose Blvd.
Houston, TX 77006
Office 866-523-1603
Fax 713-523-4159
Counsel for Holcombe, Ramsey,
Curnow & Macias

/s/ Daniel J.T. Sciano
**Daniel J.T. Sciano**
DSciano@tsslawyers.com
Texas Bar No. 17881200
**Tinsman & Sciano**
10107 McAllister Freeway
San Antonio, TX 78216
Office 210-225-3121
Fax 210-225-6235
Counsel for Amador

/s/ Daniel Barks
**Daniel D. Barks,** *pro hac vice*
ddb@speiserkrause.com
**Speiser Krause, P.C.**
5555 Glenridge Connector, Suite 550
Atlanta, GA 30342
Office 571-814-3344
Fax 866-936-6382
Counsel for Holcombe

/s/ Mark Collmer
**Mark W. Collmer**
drcollmer@aol.com
Texas Bar No. 04626420
**Collmer Law Firm**
3700 Montrose
Houston, TX 77006
Office 713-337-4040
Counsel for Holcombe

/s/ Dennis Peery

**Dennis Charles Peery**
d.peery@tylerpeery.com
Texas Bar No. 15728750
**R. Craig Bettis**
cbettis@tylerpeery.com
Texas Bar No. 24040518
**Tyler & Peery**
5822 West IH 10
San Antonio, TX 78201
Office 210-774-6445
Counsel for Uhl

/s/ George LeGrand

**George LeGrand**
tegrande@aol.com
Texas Bar No. 12171450
**Stanley Bernstein**
Texas Bar No. 02225400
**LeGrand & Bernstein**
2511 N. Saint Mary's St.
San Antonio, Texas 78212
Office 210-733-9439
Fax 510-735-3542
Counsel for Wall & Solis

/s/ Justin Demerath

**Justin Demerath**
jdemerath@808west.com
Texas Bar No. 24034415
**O'Hanlon, Demerath & Castillo**
808 West Ave.
Austin, TX 78701
Office 512-494-9949
    Counsel for Corrigan, Braden,
    Warden, Stevens, Pachal
    & Poston

/s/ Tim Maloney

**Tim Maloney**
Texas Bar No. 12887380
timmaloney@yahoo.com
**Paul E. Campolo**
pcampolo@maloneyandcampolo.com
Texas Bar No. 03730150
**Maloney & Campolo, L.L.P.**
926 S. Alamo
San Antonio, TX 78205
Office (210) 465-1523
Counsel for Ramsey

/s/ Joseph M. Schreiber

**Joseph M. Schreiber**
joe@lawdoneright.net
Texas Bar No. 24037449
**Erik A. Knockaert**
erik@lawdoneright.net
Texas Bar No. 24036921
**Schreiber | Knockaert, PLLC**
701 N. Post Oak Rd., Suite 325
Houston, TX 77024
Phone (281) 949-8904
Fax (281) 949-8914
Counsel for Brown

/s/ Jason Webster

**Jason Webster**
jwebster@thewebsterlawfirm.com
Texas Bar No. 24033318
**The Webster Law Firm**
6200 Savoy, Suite 640
Houston, TX 77036
(713) 396-5197
    Counsel for Lookingbill

/s/ Brett Reynolds
_____

**Brett T. Reynolds**
btreynolds@btrlaw.com
Texas Bar No. 16795500
**Brett Reynolds & Associates,
P.C.**
1250 N.E. Loop 420, Suite 420
San Antonio, TX 78219
(210) 805-9799
 Counsel for Workman, Colbath,
 Harris, and Moulton


/s/ Hugh Plummer
_____

**Hugh Plummer**
**Law Office of Thomas J. Henry**
4715 Fredricksburg
San Antonio, TX 78229
(210) 585-2151
(361) 985-0601 (fax)
hplummer@tjhlaw.com
 Counsel for McMahan


/s/ Craig Carlson
_____

**Craig Carlson**
ccarlson@carlsonattorneys.com
**Philip Koelsch**
pkoelsch@carlsonattorneys.com
**Joe Craven**
jcraven@carlsonattorneys.com
**The Carlson Law Firm**
100 E Central Texas Expy
Killeen, TX 76541
254-526-5688
 Counsel for Rios


/s/ Marion M. Reilly
_____

Marion M. Reilly
**Hilliard Munoz Gonzales, L.L.P.**
719 S. Shoreline - Ste 500
Corpus Christi, TX 78401
(361) 882-1612
(361) 882-3015 (fax)
marion@hmglawfirm.com
 Counsel for McMahan


/s/ Kelly W. Kelly
_____

**Kelly W. Kelly**
**Anderson & Associates Law
Firm**
2600 SW Military Drive, Suite 118
San Antonio, TX 78224
(210) 928-9999
(210) 928-9118 (fax)
kk.aalaw@yahoo.com
 Counsel for Ward

## CERTIFICATE OF SERVICE

By our signatures above, we certify that a copy of Plaintiffs' Proposed Findings of Fact & Conclusions of Law has been sent to the following on May 21, 2021 via the Court's CM/ECF notice system.

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
United States Dept. of Justice
Civil Division

MARY KRUGER
Civil Chief
United States Attorney's Office
Western District of Texas

GREGG N. SOFER
United States Attorney
Western District of Texas

JAMES G. TOUHEY, JR.
Director, Torts Branch
United States Dept. of Justice
Civil Division

KIRSTEN WILKERSON
Assistant Director, Torts Branch
United States Dept. of Justice
Civil Division

STEPHEN E. HANDLER
Senior Trial Counsel, Torts Branch
United States Dept. of Justice
Civil Division

PAUL DAVID STERN
Trial Attorney, Torts Branch
United States Dept. of Justice
Civil Division

STEPHEN TERRELL
Trial Attorney, Torts Branch
United States Dept. of Justice
Civil Division

CLAYTON R. DIEDRICHS
Assistant United States Attorney

JAMES E. DINGIVAN
Assistant United States Attorney

JIM F. GILLIGAN
Assistant United States Attorney

JOCELYN KRIEGER
Trial Attorney, Torts Branch
United States Dept. of Justice
Civil Division