**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| JOE HOLCOMBE *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Civil Action No. SA-18-CV-555-XR |
| | § | |
| UNITED STATES OF AMERICA, | § | *Consolidated Cases* |
| | § | |
| *Defendant.* | § | |
| | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

These consolidated cases stem from the mass shooting at the First Baptist Church in Sutherland Springs, Texas on November 5, 2017. The shooter, Devin Patrick Kelley ("Kelley"), entered the church and opened fire, killing 26 people and wounding 22 more. After fleeing the scene, Kelley later died from a self-inflicted gunshot wound. Plaintiffs are survivors of the shooting and relatives of those injured or killed. They seek recovery against Defendant United States ("the Government") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680. The thrust of these lawsuits is that Kelley should not have been able to purchase the firearms he used in the shooting, but negligent failures by the Government to collect, handle, and report required information about Kelley allowed him to do so.

From April 7, 2021 to April 20, 2021, the Court held a bench trial to resolve disputed issues of fact. This Court relies on the testimony of the witnesses, both live and appearing remotely, as well as the written submissions provided to the Court by agreement of the parties. This Order sets forth the Court's findings of fact and rulings of law on issues relating to liability and causation. *See* Fed. R. Civ. P. 52(a). The Court will hold a separate bench trial on damages.

## FINDINGS OF FACT

**Background**

1.      Devin Kelley committed the Sutherland Springs shooting on November 5, 2017, using firearms he purchased from federal firearms licensees ("FFLs") between December 2014 and October 2017.

2.      In four separate firearms purchases, Kelley completed the required purchasing form—ATF Form 4473—certifying that he was eligible to purchase the firearm under federal law, and the retailer ran the mandatory background check through the National Instant Criminal Background Check System ("NICS") administered by the FBI. In each instance, the response from the NICS was that the retailer could proceed with the sale.[1]

3.      Kelley should not have cleared the background check, however, because he had been convicted of a disqualifying offense in November 2012 while he was serving in the United States Air Force ("USAF") at Holloman Air Force Base ("HAFB") in New Mexico.

4.      Specifically, after investigations by two separate law enforcement units at HAFB— Air Force Office of Special Investigations ("AFOSI") Detachment 225 and the 49th Security Forces Squadron ("SFS")[2]—Kelley was convicted by General Court-Marial of assaulting his then-wife, Tessa Brennaman, and his stepson, J.L. JEX 20.

5.      USAF agents and leadership had an obligation—and multiple opportunities—to ensure that Kelley's fingerprints and criminal history were submitted to the FBI's Criminal Justice Information Services ("CJIS") Division for inclusion in its databases. Its failure to do so is the basis for this action.

---

[1]      *See* JEX 342; JEX 343; JEX 345; JEX 346.

[2]      Security Forces and AFOSI perform different functions within the USAF. Security Forces primarily serve a security and law enforcement role on USAF installations, while AFOSI is responsible for conducting major criminal and counterintelligence investigations for the USAF. JEX 3 at 1.

**Procedural History**

6. Plaintiffs filed numerous separate complaints, which for efficiency were consolidated under the above-captioned case, as it was first filed. *See* ECF No. 9.

7. Plaintiffs asserted negligence claims against the Government pursuant to the FTCA. The FTCA waives sovereign immunity and allows private individuals to sue the federal government for the torts of its employees by granting federal courts exclusive subject-matter jurisdiction over:

> civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). The manner in which the complaints depicted the Government's negligence varied slightly, but, collectively, Plaintiffs asserted claims for (1) negligence *per se* based on violation of the Brady Handgun Violence Prevention Act of 1993, 34 U.S.C. § 40901 (the "Brady Act"), (2) negligent undertaking, (3) negligent training, and (4) negligent supervision. *See* ECF No. 59 at 8.

8. In November 2018, the Government moved to dismiss on multiple grounds, including that the United States was shielded from liability by Section 922(t)(6) of the Brady Act, and that Plaintiffs had not alleged viable state law causes of action. ECF No. 28.

9. The Court agreed that Plaintiffs could not proceed on a negligence *per se* theory but rejected all other grounds for dismissal. ECF No. 59. Specifically, the Court held that Plaintiffs could not establish a claim for negligence *per se* because Texas law did not impose a common-law duty analogous to the Brady Act's reporting requirements. *Id.* at 29–33. Because the Court concluded that the United States was not entitled to the protections of the immunity provision set

forth in Section 922(t)(6) of the Brady Act, the parties proceeded to discovery on Plaintiffs' remaining claims for negligent undertaking, negligent supervision, and negligent training.

10.　　In August 2020, the parties filed cross-motions for summary judgment on liability. *See* ECF Nos. 249, 256. The Court issued an order on the parties' cross-motions for summary judgment on January 6, 2021 ("Summary Judgment Order"). ECF No. 318. After clarifying the source of the Government's reporting obligations, the Court held that the Government failed to exercise reasonable care in its undertaking to operate the NICS and to collect and submit Kelley's fingerprints and conviction to the FBI. *Id.* at 8–20. The Court could not grant summary judgment in favor of either party, however, because it concluded that there were genuine issues of material fact as to whether the Government's negligence increased the risk of harm and proximately caused Plaintiffs' injuries. The Court then dismissed Plaintiffs' claim for negligent training as barred by the discretionary function exception to the FTCA, but held that their claim for negligent supervision survived with respect to the supervisory conduct of AFOSI leadership. *Id.* at 53.

**Statutory and Regulatory Framework**

11.　　The Government's FBI reporting obligations arise from the Brady Act, its implementing regulations, and instructions promulgated by the Department of Defense ("DoD") and the USAF.

12.　　The Brady Act requires federal agencies, including the DoD and USAF, to report disqualifying information "not less frequently than quarterly." 34 U.S.C. § 40901(e)(1)(C).

13.　　Disqualifying information includes "any record of any person demonstrating that the person falls within one of the categories" of persons prohibited from purchasing firearms described in Section 922(g) of the Gun Control Act of 1968. 18 U.S.C. § 922(g).

4

14.     Section 922(g), in turn, prohibits the possession or purchase of firearms by certain categories of people, including those who have been:

(1)     convicted in any court of a crime punishable by imprisonment for a term exceeding one year;
(4)     adjudicated as mental defectives or who have been committed to a mental institution;
(6)     discharged from the Armed Forces under dishonorable conditions; or
(9)     convicted in any court of a misdemeanor crime of domestic violence

18 U.S.C. § 922(g)(1), (4), (6), (9).[3] The DoD and the USAF have issued a series of regulations and directives to carry out their reporting obligations under the Brady Act.

15.     DoD Instruction ("DoDI") 5505.11, entitled "Fingerprint Card and Final Disposition Report Submission Requirements," outlines the procedures for submitting fingerprint cards and final disposition reports to the FBI's CJIS Division. JEX 263.

16.     The AFOSI and Security Forces have, in turn, issued their own instructions and policies for submitting fingerprints and criminal history information to the FBI based on the requirements set forth in DoDI 5505.11. *See, e.g.*, JEX 4 (AFOSI Manual 71-121); JEX 11 (Air Force Instruction ("AFI") 31-206); JEX 10 (AFI 31-205).

17.     Fingerprints are collected on Form FD-249, which includes a space to record the final disposition of the case. *See* DoDI 5505.11, JEX 263 at 10–11. If the final disposition is not available when FD-249 is collected and submitted, then an FBI/DoJ Form R-84 ("R-84"), "Final Disposition Report," is required. *Id.*

18.     Generally, DoDI 5505.11 requires law enforcement organizations ("LEOs"), including AFOSI and Security Forces, to submit fingerprints after determining that probable cause

---

[3]     The parties have stipulated that Kelley was not disqualified from purchasing firearms based on his mental health history or his bad conduct discharge under subsections (g)(4) or (g)(6) of Section 922. ECF No. 425 ¶¶ 1, 2.

exists to believe that a military subject has committed one of certain enumerated offenses, including assault under Article 128 of the Uniform Code of Military Justice ("UCMJ"). *Id.* at 9.

19.     The version of DoDI 5505.11 in effect during the USAF's investigation of Kelley and his subsequent conviction "advance[d] the requirement to submit offender criminal history data to the CJIS Division from the point when charges are referred to an earlier point when an agent or other law enforcement investigator determines, following coordination with the servicing Staff Judge Advocate (SJA) or legal advisor if necessary, that probable cause exist . . . but in no case earlier than apprehension (military), arrest (civilian), or the subject interview."[4] *Id.* at 1.

20.     "Probable cause" is defined as "facts and circumstances, more than mere suspicion but less than proof beyond a reasonable doubt, that would lead a reasonable and prudent person to believe a crime has been, is being, or is about to be committed." *Id.* at 13.

21.     After the conclusion of military criminal proceedings, LEOs must submit the final disposition report on Form R-84 to the FBI within fifteen days. *See id.*

22.     Confinement facility personnel are also required to collect and submit fingerprints and final disposition reports to the FBI CJIS Division when they process inmates into a facility. *See* AFI 31-205, JEX 10 ¶ 5.3.4.

23.     USAF instructions impose additional supervisory responsibilities on AFOSI unit leadership, including commanders, special agents in charge ("SAICs"), and directors.[5] Specifically, pursuant to AFOSI Manual 71-121, unit leadership is required to review both the electronic records of investigative activities in the Investigation and Information Management System ("I2MS") electronic file and the physical, record copy of the investigative files for

---

[4]     A Staff Judge Advocate ("SJA") is a senior judge advocate on a USAF installation and is responsible for providing legal services to the commander, the commander's staff, and others as appropriate. JEX 3 at 28 n.34.
[5]     Per the stipulations of the parties, AFOSI Unit Leadership includes Vince Bustillo, Alex Meusburger, Randall Taylor, Lyle Bankhead, and James Hoy. ECF No. 425 at 1–2 ¶¶ 5(a)–(c), (g), (j).

sufficiency and data integrity "from the date the case is opened until it is forwarded to Headquarters

AFOSI for retention." JEX 4 at 51 ¶¶ 4.24, 4.24.1.3. Each investigative file must be reviewed on

a monthly basis, and the manual requires AFOSI leadership to use a comprehensive checklist to

perform the review. *Id.* The checklist provided in the manual—the "Investigative Sufficiency

Checklist"—includes several items requiring leadership to review the fingerprints and final

disposition report in the physical file and confirm the submission of fingerprints to the FBI. *See

id.* at 169–70, 172.[6] The manual separately requires unit leadership to ensure that subordinates

"obtain and validate subject's fingerprints; . . . [and] submit subject's fingerprints [and]

dispositions to the FBI." *Id.* at 79–80, ¶ 5.14.1.

24.     Before closing a file for submission to HQ AFOSI, AFOSI unit leadership must

conduct another review of the file, this time using the AFOSI Closed Investigation File Checklist,

which also requires reviewing fingerprints and the final disposition. *Id.* at 159–60. "After

screening, unit leadership must authenticate" the file by signing and dating it. *Id.*

25.     The information submitted to the FBI gets entered into one of three databases: (1)

the Interstate Identification Index (the "III" or "triple-I"), which accesses criminal history records

through fingerprint data; (2) the National Crime Information Center ("NCIC"), which contains

information on wanted persons, protection orders, and other persons identified as relevant to NICS

searches; and (3) the NICS Indices, which were created for the purpose of performing a NICS

background check and contain records provided by local, state, and federal agencies concerning

prohibited persons under federal law that may not be appropriate for submission to the NCIC or

---

[6]     Plaintiffs concede that "this checklist does not create yet another mandatory obligation on the Air Force," but note that it "highlight[s] the important action items allowing for easy compliance with existing mandatory obligations." ECF No. 448 at 9. However, the Government acknowledged at trial that Detachment 225 leaders had a nondiscretionary duty to ensure that the fingerprints had been submitted before case closure. Trial Tr. 1830:18–24.

the III. *See Nat'l Rifle Ass'n v. Reno*, 216 F.3d 122, 125 (D.C. Cir. 2000); 28 C.F.R. § 25.6(c)(1)(iii).

26.     When an FFL requests a background check, the NICS automatically queries the three FBI CJIS Division databases for the prospective transferee's biographical data. Based on the search results, the NICS issues one of three responses: "Proceed" (the go-ahead signal), "Denied" (stopping the sale), or "Delayed" (additional information required). 28 C.F.R. § 25.6(c)(iv)(A)–(C); JEX 496 at 9.

27.     The submission of a Brady prohibitor, including a felony assault conviction, to the NICS results in an automatic denial. Trial Tr. 612:6–8.

28.     If the search identifies a record that requires research to determine whether the prospective transferee is disqualified, a "Delayed" response is provided to the FFL and the information is forwarded for evaluation by a NICS Examiner. JEX 496 at 8; 28 C.F.R. § 25.6. A "Delayed" response also triggers a waiting period of three business days (exclusive of the day on which the query is made), during which time the firearm transfer should *not* proceed unless the FFL receives a follow-up "Proceed" response from the NICS. 28 C.F.R. § 25.6(iv)(B).

29.     Many transactions are delayed because of incomplete criminal history records, such as a missing disposition report, which is needed to determine if a transaction can proceed or must be denied. *See* JEX 797 at 2.

30.     In its 2016 report on NICS Operations, the CJIS Division of the FBI explained how the NICS Examiner proceeds if the background check returns a "delayed" response:

> When a validly matched record is potentially prohibiting but is incomplete, the NICS Section must search for the information needed to complete the record. This process often requires outreach to local, state, tribal, and/or federal agencies (e.g., arresting agencies, court systems). The Brady Act allows the FFL to legally transfer the firearm if the NICS transaction is not resolved within three business days. In some instances, the potentially prohibiting records are completed, and the

> transaction is denied. The NICS Section notifies the FFL of the denial and determines if the firearm was transferred to the buyer. If it was transferred, the NICS Section transmits this information to the ATF for further handling as a firearm retrieval referral.

*Id.* at 2. Thus, when a LEO submits an individual's fingerprints to the FBI during an investigation but fails to report the final disposition of the case, the sale of a firearm must be delayed to allow the FBI to conduct an investigation into whether the prospective transferee is prohibited from purchasing a firearm. This procedure illustrates why, even though the submission of fingerprints to the FBI does not by itself operate as a Brady prohibitor, fingerprints submissions are critical in identifying disqualified individuals and ensuring that they are unable to purchase (or retain) firearms unlawfully.

**Enlistment and Marriage to Tessa Brennaman**

31.    Devin Kelley enlisted in the USAF on January 5, 2010. ECF No. 149 ¶ 6.

32.    After completing basic training, Kelley was initially assigned as a Network Intelligence Analyst but was cut from the training program due to poor academic performance. JEX 396. He was reassigned to the Traffic Management career field in November 2010. *Id.*

33.    On or about January 11, 2011, Kelley was transferred to the 49th Logistics Readiness Squadron ("LRS") at HAFB. *Id.* ¶ 7.

34.    In February or March 2011, Kelley began dating Tessa Brennaman. JEX 158 at 1. Kelley and Brennaman had met while working at the same restaurant in 2008, when they were approximately 17 and 15 years-old, respectively. *Id.*

35.    Kelley and Brennaman were married on April 12, 2011, while Kelley was at home on leave from the USAF in New Braunfels, Texas. *Id.* at 1.

36.    Shortly thereafter, Kelley, Brennaman, and her infant son from a previous relationship, moved into base housing at HAFB. *Id.*

**Commencement of AFOSI Investigation**

37.     On June 8, 2011, Brennaman took her ten-month-old son, J.L., to the emergency room because he had been vomiting intermittently for two weeks. JEX 22 at 19.

38.     Brennaman reported that J.L. had recently been hospitalized for several days for dehydration caused by the persistent vomiting and diarrhea. JEX 367 at 106–09; JEX 22 at 19.

39.     The pediatrician who examined J.L. noticed facial bruising, and, after testing revealed a fractured clavicle and subdural hemorrhage, reported the injuries as suspected child abuse. JEX 367 at 109.

40.     The next day, AFOSI Detachment 225[7] initiated an investigation of a possible assault on a child in connection with J.L.'s injuries. JEX 22 at 6.

41.     AFOSI Special Agents Vince Bustillo and James Hoy conducted a subject interview of Devin Patrick Kelley on June 9, 2011. *Id.* at 26. Kelley denied striking his stepson and claimed that he did not know how the injuries occurred. *Id.* At the end of the interview, the agents collected two sets of Kelley's fingerprints on fingerprints cards (FD-249), but did not mail them to the FBI. ECF No. 149 ¶ 1.

42.     On the same day, AFOSI agents also interviewed Brennaman, who likewise denied striking the child and could not provide any explanation for the child's injuries. JEX 22 at 21. The agents also collected Brennaman's fingerprints. *See id.* at 378–79.

43.     On June 24, 2011, Kelley physically assaulted Brennaman for the first time, grabbing her around the throat, choking her, and throwing her against a wall. JEX 366 at 45.

---

[7]     An AFOSI Detachment is a geographically separated field office under the operational control of a regional headquarters. In the case of AFOSI Detachment 225, the regional headquarters was the 2nd Field Investigations Region, located at Langley AFB, Virginia. JEX 3 at 13.

44.     Brennaman told her sister, as USAF Reservist, about the incident later that day. JEX 158 at 2. Brennaman's sister reported to her leadership that Kelley had physically assaulted Brennaman. Reserve leadership informed the 49th SFS about the allegation. *Id.* Two SFS agents and AFOSI Agent Holz took Brennaman off base and spoke with her for over two hours. JEX 366 at 45, 48. Brennaman appeared distraught and was hesitant to answer questions. *Id.* at 48; JEX 22 at 700. Ultimately, she did not disclose any information about the assault, however, because Kelley had "threatened to kill both [Brennaman] and Air Force Security Forces" if she reported the abuse. JEX 366 at 45; *see also* JEX 158 at 2 (interview with the DoD IG).

45.     On June 24, 2011, J.L. was removed from the Kelleys' home and placed in the custody of the New Mexico Children, Youth and Families Department. *See* JEX 366 at 28; JEX 367 at 2.

46.     AFOSI records indicate that little to no investigative activity took place between July 2011 and March 2012, likely because the case agent assigned to the Kelley investigation, Yonatan Holz, was deployed to Afghanistan during that period. *See* JEX 22 at 178; PEX 98, Holz Dep. Tr. at 12:19–13:6, 13:11–15.

47.     During the same period, Detachment 225 was undergoing a change in leadership. In December 2011, Randall Taylor was assigned to Detachment 225. ECF No. 425 ¶ 5(c). When he arrived, Taylor found "an administrative nightmare." PEX 105, Taylor Dep. Tr. 24:20. The Detachment "had a pile of work," but "could not accomplish what needed to be accomplished" because most of the agents had very little experience conducting investigations. *Id.* at 161:22–162:1. Although agents worked "at least 12 hours a day," Taylor testified that they did not have enough time to accomplish all of their assigned duties and complained that they were overworked. *Id.* at 153:17–154:9.

**Security Forces Investigation and First Mental Health Hospitalization**

48.    On February 17, 2012, Kelley informed one of the supervisors in his chain-of-command, MSgt. Troy Bizzack, that Brennaman had left a disturbing note on the kitchen table and was nowhere to be found. JEX 22 at 168. Kelley then called the 49th SFS to report Brennaman missing. *Id.* at 51.

49.    Security Forces issued a base-wide "Be On the Lookout" ("BOLO") for her. *Id.* at 168. About an hour later, Brennaman was located in El Paso, Texas, with her aunt, Tracy Picazzo. *Id.* Speaking with MSgt. Jason Williams, another of Kelley's supervisors in the LRS, Picazzo asked Williams not to disclose Brennaman's location to Kelley due to possible abuse in the relationship. *Id.* at 166.

50.    Bizzack and Williams called Kelley in for questioning. Before Williams could read Kelley his Article 31 rights, Kelley accused Brennaman of abusing J.L., stating that he had often heard "a loud thump" followed by crying when Brennaman went to check on J.L. at night. *Id.* Williams stopped the conversation, and read Kelley his rights. Kelley requested an attorney, and the interview was terminated. *Id.* Lt. Col. Frank Marconi, Kelley's commander in the LRS, issued an order barring Kelley from contacting Brennaman. JEX 347 at 2. Kelley signed the no-contact order on February 17, 2012, acknowledging his receipt and understanding of the order. *Id.*

51.    Later that day, Brennaman returned to HAFB and gave a statement to Sgt. Ryan Sablan, an investigator in the 49th Security Forces Office of Investigations. JEX 22 at 52; PEX 103, Sablan Dep. Tr. 32:23–33:22. Brennaman explained that she had left town to get away from Kelley, who had been physically and emotionally abusing her since July 2011. *Id.*

52.    In the interview with Sablan, Brennaman described being choked, pushed against a wall, kicked in the stomach, punched in the arm, slapped across the face, and dragged by her hair.

12

*Id.* She brought photographs of bruising on her face and arm caused by the abuse. *Id.* at 52–53.

53.     Brennaman described Kelley to Sablan as "controlling" and recounted several instances in which Kelley used violence in an attempt to control her. *Id.* In December 2011, he had choked her because she did not want to spend Christmas with his family. *Id.* He pulled her by her hair to the bathroom, where he said he would "waterboard" her, and shoved her under the showerhead. *Id.* Once, Brennaman was speaking with a cashier in a store, Kelley put his hand on her shoulder (indicating that she should stop talking), and she moved her shoulder away. *Id.* Outside the store, Kelley said, "Don't ever fucking move away from me and when I'm talking my bitch will keep her mouth shut." *Id.* When Brennaman protested that she should not be spoken to in that manner, he punched her in the stomach. *Id.* On another occasion, when Brennaman said she wanted to go for a walk, Kelley told her she was not allowed, and, in the argument that ensued, choked her and kicked her in the stomach. *Id.*

54.     Kelley also frequently threatened violence against Brennaman in order to control her. When he heard a knock at their door, Kelley warned Brennaman, "If that's the cops, I will beat the shit out of you." *Id.* In a conversation about their marital troubles, Kelley said, "You're 90% of our problems and if you repeat what I say I'll kill you and drag your dead body and desert it." *See id.*; JEX 367 at 79.

55.     Brennaman also told Sablan that Kelley had threatened a mass shooting at HAFB, saying, "My work is lucky. I'd take a shotgun and blow everyone's head off." JEX 22 at 52.

56.     Brennaman reported that on February 12, 2012, while she and Kelley were driving from El Paso, Texas, back to HAFB, Brennaman told Kelley that she wanted a divorce. *Id.* He slapped her stomach and pulled her hair. *Id.* As he was attacking her, Kelley hit the side rail on the passenger side of the vehicle, which he blamed on Brennaman. *Id.* Brennaman said that her fear

level was "past ten because of the death threats, physical and verbal abuse" but that she had not come forward about the abuse because she wanted to stay until she could get her son back. JEX 22 at 52.

57.     On the same day that Brennaman asked for a divorce, Kelley purchased an EAA Windicator .38 Special Revolver (the "Windicator")—the first firearm he purchased while the AFOSI investigation for child abuse was still ongoing—at the Holloman Base Exchange ("BX"). JEX 18.

58.     Sablan attempted to interview Kelley, but he requested legal counsel and refused to make a statement. SFS advised Kelley to release his handgun to his acting First Sergeant. *Id.* at 51. There is no evidence that Security Forces collected Kelley's fingerprints during the interview. ECF No. 149 ¶ 2.

59.     A search of the Security Forces Management Information System ("SFMIS") revealed that Kelley had been involved in a domestic violence incident on June 24, 2011, but the entry indicated that it was non-violent. JEX 22 at 53.

60.     The SFS investigation was evidently closed on February 21, 2012, when Sablan issued his report of investigation. *See id.* at 51. The report was forwarded to Detachment 225, the 49th LRS, and the 49th SFS. *Id.*

61.     Citing anger and depression because of his wife's accusations, Kelley was voluntarily admitted to Peak Behavioral Health Services (the "Peak") on February 23, 2012.[8] JEX 361 at 15. He reported that he "couldn't control [his] emotions" and planned to shoot himself with

---

[8]     Because it was voluntary, Kelley's admission to the Peak did not disqualify him from purchasing a firearm under Section 922(g)(4) of the Gun Control Act, which prohibits the sale of firearms to individuals who have been "adjudicated as a mental defective or . . . committed to any mental institution" *See* 18 U.S.C. §§ 922(g)(4); ECF No. 425 ¶ 1. ATF regulations clarify that "commitment to a mental institution" requires "formal commitment" by a "court, board, commission, or other lawful authority." 27 C.F.R. § 478.11 17.

his gun after his wife informed him that she was filing assault charges. *Id.*

62.    Shortly after his admission, Kelley noted in his journal that Brennaman was going to a bar with her cousin, Brandon Picazzo, and that it "pissed [him] off" that she would not tell him where she was. JEX 357 at 6. [9] Kelley wrote that she was "stupid" for going to a bar because he was "not there to protect her." *Id.* Kelley then committed to stop using "violence . . . as a solution." *Id.* at 8. On the very next page, he wrote:

> I just found out Tessa is hanging out at some guy named Chris's house. It enrages me. . . . If I was there, I would kill him. She told me to stop harassing her. I don't feel that I was. I don't know if this now changes my plan. I think I should end it all. Maybe I have a mental disorder. But I think I'm going to change everything. I was planning on how to be back with my love again. But now that I'm pretty sure she has been seeing people behind my back, I'm going to take a different approach. Unless she proves to me that she loves me, I'm going to do whatever it takes to destroy all of this. I'll play along and wait out my time here. . . .

> But if things don't go as planned, I will kill myself because there is no way I can go back to a place like this or to jail. I would rather die. I don't want to hurt anyone. I just want to be reunified with my wife. And nobody better get in the way of that . . . . I'm seriously going over it in my mind, what it would be like if I actually did suicide/homicide. I don't want to but if this doesn't work out, I have no other alternative for myself. Until death do us part.

*Id.* at 9–15.

63.    Kelley remained at the Peak until March 8, 2012. JEX 361 at 3.

64.    In mid-March 2012, Kelley put a bullet in the Windicator—which had evidently been returned to him after he was discharged from the Peak—and pointed the gun at his head. JEX 366 at 45. He told Brennaman that he would shoot himself if they could not work out their marital problems. JEX 363 at 188. He pulled the trigger three times before turning the gun on Brennaman, who finally agreed. *Id.*

---

[9]    AFOSI marked this notebook as evidence on June 8, 2012, the day after Kelley escaped from the Peak. JEX 22 at 725.

65.     On April 12, 2012, Kelley purchased a Sig Sauer P250, a 9-millimeter, semi-automatic handgun (the "Sig Sauer")—the second firearm he purchased while the AFOSI investigation for child abuse was still ongoing—from the BX. Kelley completed the ATF Forms 4473. JEX 16.[10] The BX completed the required NICS check on the same day. *Id.* The response provided from NICS personnel was that the FFL could proceed with the sale. *Id.*

66.     Five days later, Maj. Nathan McLeod Hughes, who was then the Acting Commander of the LRS, issued a letter of reprimand ("LOR") to Kelley in connection with the SFS investigation. JEX 21 at 73. The LOR stated that the investigation had revealed that Kelley had physically assaulted Brennaman on multiple occasions, and that he had punched and slapped her during an altercation. *Id.* The LOR continued: "You are hereby reprimanded! Your actions violated Article 128 of the UCMJ-Assault." *Id.*

67.     A letter of reprimand is a non-judicial administrative action that does not itself form the basis of a prohibitor under the Gun Control Act.[11] *See* Trial Tr. 656:12–18; GEX 4 at 173. Given that the Security Forces investigation led to the conclusion that Kelley had in fact committed an assault in violation of Article 128 of the UCMJ, however, it is unquestionable that, on February 17, 2012,[12] SFS agents had probable cause to believe that Kelley had committed a reportable offense under DoDI 5505.11 and were obligated to collect and submit Kelley's fingerprints to the FBI. JEX 263 at 9. They never did. ECF No. 149 ¶ 2.

---

[10]     AFOSI was aware of this purchase on or before June 12, 2012, when Agent Holz marked a receipt for the Sig Sauer into evidence. JEX 22 at 769, 778.

[11]     Though the Government notes that this investigation "resulted in a letter of reprimand," Kelley's assault conviction was based in part on evidence collected during this investigation, including Brennaman's testimony that Kelley pulled her hair. *See* JEX 20 at 1; JEX 22 at 52.

[12]     All of the investigative activity appears to have occurred on February 17, 2012. *See* JEX 22 at 51–52.

**Confession Video**

68.     On April 23, 2012, Kelley and Brennaman were driving to the airport to pick up Brennaman's mother, Sandra Durling. Brennaman asked Kelley to slow down, but he refused. JEX 22 at 547–48. Shortly thereafter, Kelley was pulled over and issued a speeding ticket, which he blamed on Brennaman. *Id.* at 548. He then took his gun from his holster and placed it against Brennaman's left temple, asking, "Do you want to die?" *Id.* Brennaman pushed the gun away, and Kelley placed it in his mouth. *Id.* When Brennaman began to cry, Kelley threatened to kill her if she told anyone. *Id.* Kelley told Brennaman that she was "stupid" for being with him, and proceeded to confess to slapping and striking J.L. on multiple occasions when Brennaman was out of the room. *Id.*

69.     During her visit, Durling was alarmed to see that Kelley had a gun attached to his right hip and kept it with him wherever he went—including into K-Mart, where Brennaman worked, and onto the Base. JEX 408 at 1. She noted that the gun had been previously removed from Kelley, but had evidently been returned to him after he was no longer deemed suicidal. *Id.* On April 27, 2012, Durling sent an email to the 49th LRS stating that she was very concerned that the gun posed an additional threat to Brennaman's safety, given the mental and physical abuse she had already suffered from Kelley: "I fear he may either hold her in a hostage situation or worse yet use it on her." *Id.* at 2. The email was eventually passed onto Kelley's First Sergeant, Tracy Wolfe, who submitted a request to SFS asking to store Kelley's Windicator in the Base Armory and shared the email with AFOSI. JEX 340; JEX 408.

70.     Brennaman asked Kelley to confess to the abuse, and, on April 27, 2012, he recorded a video confession. *See* JEX 43. In the video, Kelley admitted to slapping J.L. across the face on multiple occasions, shaking him, and pushing him hard enough that he fell and landed on

his shoulder, presumably causing the fractured clavicle. JEX 22 at 152–53. Kelley explained that

that he acted out of frustration and described himself as "a 20-year-old man with no experience

with babies, an anger issue, and a lack of self-control." JEX 22 at 153. He described an enduring

difficulty controlling his emotions and conduct in the face of stressful situations:

> It can happen in a split second, you know, it only takes a few seconds to lose control. . . . I have a problem controlling my . . . emotions. . . . It seems to cause a lot of problems in my life and it caused a lot of problems in my marriage. I am very controlling. This is not my first mistake, and this it not the last mistake, and there's probably plenty to come unfortunately. . . . [E]ver since I was a kid I had problems controlling [myself] when I felt things weren't fair, I hit people, and yell[ed]. . . I think when you're under a lot of stress sometimes, you know, you can't handle it anymore and you do outrageous things that you'd never do . . . like hit a baby."

*Id.* at 154–56. Kelley acknowledged his pattern of dishonesty, saying, "I'm sorry I lied . . . one of

my biggest things is that I lie, and I lie, and I lie because I am ashamed. . . . I lied to my family. I

lied to everybody and it's something that I am good at. I'm good at lying. I denied everything." *Id.*

at 155. He also suggested, however, that people had overlooked his conduct because of his military

status: "Everybody I think knew deep down inside that I did it, but I think because I am military

people want to cover my ass because I represent the government." *Id.* at 154–55.

71.     On Sunday, April 29, 2012, Kelley left HAFB on his motorcycle without

permission from his supervisors and drove to his parents' home in New Braunfels, approximately

600 miles away. JEX 21 at 61; JEX 374 at 512; Trial Tr. 550:12–551:9. Not only was Kelley

scheduled for duty the next day, but he was also expected at a custody hearing at 9:00 a.m. JEX

21 at 61. Kelley's father, Michael Kelley, called one of the Base chaplains, who said he would

arrange to have Kelley readmitted to the Peak if he returned to HAFB. Trial Tr. 551:22–552:9.

Another chaplain notified Kelley's first sergeant, Tracy Wolfe, that Kelley was suicidal and

reaching out for help. JEX 22 at 553. That night, Kelley's father drove him back to New Mexico.

JEX 21 at 61; JEX 374 at 512; *see also* Trial Tr. 472:17–473:14.

72.     Wolfe was concerned about Brennaman and met her at K-Mart, where Brennaman worked. Brennaman informed Wolfe that she and Kelley had separated and that her mother had helped her move into a motel near her work. *Id.* Brennaman then gave Wolfe an external hard drive containing a video of Kelley confessing to assaulting J.L, which Wolfe turned over to AFOSI later that day. *Id.* at 39, 151.

73.     On May 3, 2012, AFOSI agents interviewed Brennaman for a second time, this time in connection with her abuse allegations against Kelley and his confession video. *Id.* at 46. Brennaman said that she began to suspect Kelley was responsible for J.L's injuries in June 2011, when he physically assaulted her for the first time, barely two months after their wedding. *Id.*; *see* JEX 22 at 53. Thereafter, Kelley became increasingly violent toward her. Brennaman reported being choked, slapped, kicked, shoved, and punched. *Id.* He also threatened to kill her if she ever told anyone. *Id.*

74.     She recounted that in February 2012, she left Kelley and filed a police report in El Paso, where she stayed with her aunt, Tracy Picazzo, for approximately three weeks, but had returned to HAFB in hopes of regaining custody of J.L. *Id.* She then described the events on April 23, 2012 that led Kelley to record the confession video, including Kelley's threatening behavior with his gun. *Id.*

75.     When Kelley confessed to her that he had abused J.L., Brennaman said that she felt "lost, confused, terrified for my family and myself." *Id.* at 57. She reported that Kelley had also made threats to kill her aunt, Tracy Picazzo, and her cousin, Brandon Picazzo. *Id.* Kelley had also threatened the lives of law enforcement ("If the cops show up at my door, I will shoot them"), and other members of his squadron ("My work is so lucky I do not have a shotgun because I would go in there and shoot everyone."). *Id.*

**Second Mental Health Hospitalization and Escape**

76.     On April 30, 2012, the day after the USAF received Kelley's confession video, he voluntarily entered in-patient treatment at the Peak for the second time. JEX 359 at 4.

77.     On June 7, 2012, Kelley called the Holloman BX from the Peak and placed an order for a Diamondback DB9, semi-automatic 9-millimeter handgun, which he said he would pick up on June 14, 2012. JEX 22 at 600–02. The BX notified AFOSI agents that Kelley had attempted to purchase a firearm, which never actually occurred. *See id.*

78.     Late that evening, Kelley jumped a fence and escaped from the Peak. *Id.* at 599. In the early hours of June 8, 2012, the Director of Military Affairs at the Peak located Kelley at a Greyhound bus station in El Paso, Texas. *Id.* A Greyhound security officer and an El Paso police officer handcuffed him, and police officers from the Sunland Police Department transported him back to the Peak. *Id.*

79.     On June 8, 2012, the 49th LRS and Detachment 225 took several key administrative and investigative steps to advance the case against Devin Kelley.

80.     Kelley's Commander in the LRS, Maj. Nathan McLeod-Hughes, issued an order recommending that Kelley be transferred from the Peak to pretrial confinement at HAFB. PEX 800 at 89. As evidence that Kelley was "dangerous and likely to harm someone if released," Maj. McLeod-Hughes specifically emphasized the threat of gun violence: "After learning that he might be released from the mental health facility, he deliberately planned to obtain another gun (the other gun having been taken away from him) and body armor after making threats [at the Peak] to try to take away the guns of any security forces members." *Id.* at 90–91.

81.     On the same day, Randall Taylor, the SAIC of Detachment 225, filed an affidavit establishing that probable cause existed to search Kelley's belongings at the Peak. JEX 22 at 66.

In his belongings, Kelley left a list of items he either intended to purchase or bring with him: "hat, sunglasses, knife, backpack, toilet paper, go phone sim card, micro USB charger, headphones, ATM $400, new hoodie" JEX 367 at 94. A review of Kelley's computer search history at the Peak revealed that he had been researching weapons, body armor, transport to San Antonio, and lodging. *Id.*

82.     AFOSI agent Gregory Harper issued a request dated June 8, 2012 for the release of Kelley's medical and mental health records relating to "anger management problems, acts of violence, suicidal gestures, prior history of domestic violence, emotional instability, and any other information deemed pertinent to this investigation." JEX 22 at 575.

83.     Finally, AFOSI agents Gregory Harper and Clinton Mills interviewed Kelley regarding Brennaman's assault allegation and his escape from the Peak. JEX 22 at 59. After the agents advised him of his rights, Kelley told them that he wanted to talk about things but could not because he had requested legal counsel. *Id.* Still, Kelley told the agents that "something tragic had happened and he wanted to kill himself." *Id.* He explained that Brennaman had informed him that she was pregnant, but was upset about the pregnancy and wanted to get a divorce. When she left Kelley to stay with her aunt in El Paso, Brennaman had a miscarriage. *Id.* at 581. He told agents that he "escaped" from the Peak because he was planning to go home to New Braunfels to plan his suicide. *Id.* Kelley told agents that he made the confession video "on his own free will." *Id.*

84.     The parties have stipulated that DoD and USAF instructions and policies required the agents to collect and submit Kelley's fingerprints to the FBI on June 8, 2012. ECF No. 149 ¶ 3. Agent Clinton Mills certified in the interview records that he fingerprinted Kelley, but the investigative file did not contain any fingerprints from that date. *See* JEX 22 at 60; ECF No. 149 ¶ 3.

85.     Kelley was placed in pretrial confinement on June 9, 2012. ECF No. 425 ¶ 9.

86.     On June 26, 2012, Commander Marconi issued a protective order, requiring Kelley to direct all communication to Brennaman through his first sergeant. JEX 21 at 57.

87.     On July 26, 2012, Lt. Col. Robert Bearden, the new Commander of the 49th LRS, recommended that charges be referred for trial by general court-martial, and that Kelley be discharged in the event of his conviction. JEX 367 at 2. Kelley's "attitude and actions," Lt. Col. Bearden wrote, "have had a negative impact on the unit since Nov 2011. I do not believe there is a chance for rehabilitation." *Id.*

88.     Between April 30, 2012—the date AFOSI received Kelley's confession video— and his conviction on November 12, 2012, AFOSI continued its investigation of Kelley. AFOSI discovered that he had a long pattern of violent and abusive conduct, especially against his domestic partners, starting in his early teenage years. Specifically, by the date the charges were referred, the AFOSI investigative file contained the following information:

a.     In 2005, when Kelley was approximately 14 years old, he began dating A.L., who was then in the seventh grade in New Braunfels. During the course of their eight-month relationship, A.L. suffered "constant verbal and sexual abuse." JEX 22 at 63. Kelley was controlling, would not allow A.L. to spend time with her friends, and called her "repeatedly" and "obsessively." *Id.* at 74. He forced A.L. to engage in non-consensual sexual acts through physical force. *Id.* When A.L. attempted to break up with him, Kelley threatened to kill himself. *Id.*

b.     In 2007, Kelley began a ten-month relationship with 14-year-old K.B. *Id.* at 170. She described Kelley as "emotional and possessive." *Id.* K.B. thought that Kelley "had a mental disorder" and noted that he fought with other kids during high school. *Id.* Kelley pressured her into sexual activity that she was not ready for at the time. K.B. attempted to break up with Kelley several times, but he threatened to kill himself if she did. *Id.*

c.     In the summer of 2008, Kelley began dating A.D., then in her freshman year of high school. A.D. described their relationship as "violent and aggressive" and Kelley as "extremely possessive and controlling" and "beyond jealous." *Id.* at 67. He would not allow A.D. to spend time with her friends or talk with people on the phone. *Id.* at 97. When A.D. was sixteen years old, Kelley took her sexual virginity by force.

*Id.* at 67. Despite this, he told A.D. that "girls got raped all the time and that she needed his protection from getting raped." *Id.* A.D. stated that Kelley had "mental issues" and "anger issues because he was scared of people leaving him." *Id.*

d.  In 2009, Kelley began dating K.L. *Id.* at 77. During the 14 months that they dated, Kelley was sexually and verbally abusive, forcing her "to do things no seventh grader should be doing at their age." *Id.* at 65. He tried to distance K.L. from her parents and made her feel "brainwashed." *Id.* Kelley ended things because he wanted to date other people, but later made harassing calls, attempting to engage K.L. in phone sex. *Id.* K.L. told AFOSI agents that she was sexually abused by Kelley four to five times after they broke up. *Id.* In one instance, he held her shirt up and used his phone to take photos of her breast, which he still possessed in June 2012. *Id.* at 77. On another occasion, Kelley pulled K.L. to him in the backseat of his car and refused to let go of her. *Id.* She had to bite Kelley to get him off of her. *Id.*

e.  A law enforcement records check revealed that, on January 3, 2010, two days before he entered the Air Force, Kelley was accused of indecency with a child. *Id.* at 127. The report from the New Braunfels Police Department indicated only that an unnamed juvenile female was forced to touch Kelley. *Id.* at 129.

f.  In January 2012, while he was in the Air Force, Kelley sexually assaulted his brother-in-law's girlfriend, B.M., during a visit to New Braunfels. *Id.* at 176. He attempted to put his hands down B.M.'s pants. *Id.* She pushed his hands away, and he exposed himself to her, began to masturbate, and attempted to touch her breast. *Id.* She pushed him away again, and eventually fell asleep. *Id.* She woke up to Kelley grabbing her inner thigh and stopped him for a third time. *Id.* The next day she told her boyfriend—Smith's brother—about what happened. *Id.* He confronted Kelley, who further aggravated the situation by starting a fight. *Id.* Kelley acknowledged what he had done, but told B.M. that he would kill her if she told anyone. *Id.*

89.  The Air Force also had access to and knowledge of Kelley's extensive mental health records because of an agreement with the Peak that allowed the USAF to access the records of in-patient Airmen. JEX 392 at ¶ 6.1.1 (2009); JEX 393 at 2 ¶ 5.1.1 (2013).

90.  HAFB had extensive mental health records on Devin Kelley. JEX 363. And as a part of his court martial, the Air Force had Devin Kelley undergo a competency determination, which included a complete review of Kelley's mental health records. JEX 363 at 177–251.

23

91.     The Air Force conducted extensive mental health testing on Kelley, which revealed a significantly compromised individual. One of the mental health tests found in the Air Force file showed that Kelley was in "maximum risk range" for lack of control, violence, and stress coping. JEX 22 at 592–93. And the Air Force's High Risk for Violence Response Team concluded that Kelley should be considered high risks for suicidal and homicidal ideation. Trial Tr. 1146:18–25; *id.* at 1146:18–25; JEX 365 at 150, 156 (high risk records); *see also* JEX 363 at 318 (placing Kelley on the high risk/high interest list due to suicidality, homicidality, and unpredictable behaviors); Trial Tr. 1500:18–1501:15 (multiple mental health records documenting homicidal intent); *id.* at 1505:18– 1506:12 (reckless and dangerous activities involving firearms).

92.     Although Kelley insisted that he suffered from bipolar disorder or had family history of bipolar disorder,[13] the Mental Health Clinic ruled out bipolar disorder after extensive psychological testing. JEX 358 at 150; JEX 363 at 25. Instead, personality assessments indicated that Kelley had "a personality disorder that is a mixture of antisocial, narcissistic, and borderline personality features." JEX 363 at 189.

93.     The Air Force had a Family Advocacy Program that reviewed Kelley's medical records. JEX 364, JEX 365. The Program's High Risk for Violence Response Team included the Commander, the First Sergeant, Security Forces, AFOSI, and the JAG. JEX 365 at 150; *see also* Trial Tr. 1501:16–1502:5 (noting membership). "JAG stated [that] they stand ready for immediate confinement however will need justification from mental health, OSI and SF." *Id.* The Response Team concluded that Kelley was to be considered high-risk for suicidal and homicidal ideations. *Id.* at 156.

---

[13]     *See, e.g.*, JEX 361 at 15 ("[P]atient reports that he thinks his sister is bipolar" though he admitted he had never been told by his parents or his sister that she was bipolar.); JEX 359 at 52 ("[Patient] is asking if he might have bipolar disorder, similar to his sister. He has been researching it on the computer and he identifies with some of the symptoms."

**Conviction, Confinement, and Discharge**

91.    On August 27, 2012, charges against Kelley were referred to a general court-martial. ECF No. 425 ¶ 11. He was charged with violations of Article 128 (assault) of the UCMJ for physically attacking Brennaman and J.L. on multiple occasions and for pointing a loaded gun at Brennaman on April 23, 2012. *See* PEX 100.

92.    Kelley and Brennaman's divorce was finalized on October 17, 2012. JEX 158 at 1.

93.    On November 2, 2012, Kelley entered a guilty plea to two specifications of violating the UCMJ Article 128, assault. ECF No. 425 ¶ 12; JEX 368.

> Specification 1: Did, within the continental United States, on divers occasions between on or about 24 June 2011 and or about 27 April 2012, unlawfully strike Tessa K. Kelley on her body with his hands, unlawfully choke the said Tessa K. Kelley on the neck with his hands, unlawfully pull the hair of the said Tessa K. Kelley with his hands, and unlawfully kick the said Tessa K. Kelley on her body with his foot.

> Specification 2: Did, within the continental United States, on divers occasions between on or about 27 April 2011 and on or about 16 June 2011, commit an assault upon J.M.L., a child under the age of 16 years, by striking him on the head and body with a force likely to produce death or grievous bodily harm, with his hands.

PEX 800 at 100. The plea agreement stated that in consideration for his plea, all other specifications, including the charge for threatening Brennaman with a gun, would be withdrawn and that the approved sentence to confinement would not exceed three years. JEX 368 at 4.

94.    On November 7, 2012, Kelley was sentenced to a bad conduct discharge,[14] confinement for 12 months, and reduction in rank to the grade of E-1. ECF No. 425 ¶ 13; JEX 20

---

[14]    Kelley's bad conduct discharge did not disqualify him from purchasing firearms under Section 922(g) of the Brady Act. 27 C.F.R. § 478.11 clarifies that the term "discharged under dishonorable conditions" "does not include any separation from the Armed Forces resulting from any other discharge, e.g., a bad conduct discharge." Because Kelley's bad conduct discharge did not constitute a "dishonorable discharge," he was not prohibited from possessing a firearm under 18 U.S.C. § 922 (g)(6).

at 1. The Report of Result of Trial specifically indicates that the conviction was for a "crime of domestic violence." *Id.*

95.     He was confined at HAFB, and later transferred to Naval Consolidated Brig (the "Brig"), Miramar, California on December 18, 2012. The parties agree that after Kelley's conviction, DoD and Air Force instructions and policies required the 49th SFS Confinement Facility to collect Kelley's fingerprints and submit them to the FBI. ECF No. 149 ¶ 4; *see* AFI 31-205, JEX 10 ¶ 5.3.4. Facility personnel failed to collect or submit Kelley's fingerprints for inclusion in the NICS. [15] *Id*

96.     On December 14, 2012, Detachment 225 received the results of Kelley's conviction, but failed to submit Kelley's final disposition report to the FBI CJIS Division as required under DoDI 5505.11. ECF No. 149 ¶ 5; JEX 263 at 10.

97.     Kelley's report of conviction included a mandatory distribution list of at least ten different DoD units, including the 49th SFS Commander and SFOI (the SFS investigative section) and AFOSI Detachment 225. JEX 20; Trial Tr. 187:16–188:18, 189:20–190:2.

98.     On the same day, the AFOSI Detachment 225 special agent in charge, Randall Taylor, certified on the closing checklist in the electronic file on I2MS that Kelley's fingerprints and final disposition information had been submitted to the FBI's CJIS Division, though they had not. JEX 19. This permitted Taylor to close the investigation.

99.     On January 14, 2013, the convening authority approved the findings and sentence. ECF No. 425 ¶ 15. At the top of the first page, the memorandum approving Kelley's sentence

---

[15]     Because the disposition of Kelley's case was available when he entered the 49th SFS Confinement Facility on November 7, 2012, confinement officers should have recorded the conviction on FD-249, along with his fingerprints. *See* DoDI 5505.11, JEX 263 at 10–11.

states in large, bold letters that the sentence involved a "Crime of Domestic Violence. 18 U.S.C. § 922(g)(9)." JEX 23 at 34. The memorandum was distributed to both the 49th SFS and Detachment 225. *Id.* at 35–36.

100.    In anticipation of Kelley's release from confinement, Lt. Col. Bearden recommended that he be barred from HAFB, citing his threats to kill leadership and his wife, his escape from the Peak, and his Internet searches for body armor and guerrilla tactics as evidence that he was a security threat. PEX 800 at 105. He summarized the evidence of the danger Kelley posed: "Kelley has repeatedly threatened to kill his leadership. He was openly carrying a firearm on Holloman, AFB . . . I view this Airman as a threat to not only myself, but my staff and other Airmen in this Squadron." *Id.*

101.    Kelley was released from confinement on March 31, 2013. ECF No. 425 ¶ 17. The next day, he received notice that he was indefinitely barred from HAFB. JEX 21 at 9. On April 9, 2013, Kelley, or someone using his credentials, attempted to access Holloman and was denied access. JEX 28 at 2.

102.    On April 10, 2014, Kelley was separated from the Air Force. ECF No. 425 ¶ 18. On the same date, AFOSI Detachment 225 and the 49th Security Forces Squadron were notified that Kelley's appeal from his November 7, 2012 conviction was final. ECF No. 425 ¶ 19. The appeals court upheld Kelley's conviction, and he was officially separated from the USAF with a bad conduct discharge on May 8, 2014.

**Marriage to Danielle Smith and Post-Air Force Conduct**

103.    Kelley married Danielle Shields (now Danielle Smith) on April 4, 2014. JEX 391.

104.    As a young child, Smith was severely abused by her birth parents, causing burns on 80% of her body. Trial Tr. 18:1–7. She entered the foster care system and was placed in the

care of Donald "Curt" Brassfield and Michelle Brassfield (now Michelle Shields).[16] *Id.* at 19:6–8. Brassfield sexually abused Smith for several years without Shields's knowledge. *Id.* at 19:23–2, 429. Smith eventually disclosed the abuse to a school counselor around the time of Shields's divorce from Brassfield. *Id.* at 429:19–20.

105.     When she learned about the abuse from the school, Shields took Smith to two different police departments to report the abuse, but neither one would pursue the case. *Id.* at 429:23–430:20. According to Smith, the police did not pursue the case because they thought she was lying and said she was "just promiscuous." Trial Tr. 21:7–19; *see also* JEX 441 at 8. At the time of the allegations, Brassfield's second wife, Erin Higgins, thought that Smith was "acting out due to her parents' divorce," Trial Tr. 1375:10–12, and told the police that Smith "had a problem with lying." JEX 441 at 7. Brassfield was prosecuted for his conduct only after other children came forward years later.[17] Despite this history, Smith remains close with both Shields and Higgins and considers both to be her mothers. *Id.* at 20:15–23.

106.     Smith began attending the First Baptist Church of Sutherland Springs as a child, with Michelle Shields and her mother, Lula White ("Nana"), who were both members of the Church. Trial Tr. 82:14-23; 410:10–21. Shields later remarried and her husband, Ben Shields, and their son, David, also attended services. *Id.* at 407:3–6. 407:25–408:6; 410:4–6; 411:7–9.

107.     Smith testified that, when she was young, she was bullied by another child at the Church and mistreated by the child's parents after they learned of the abuse allegations against Brassfield. *Id.* at 132:12–21. Michelle Shields corroborated her testimony. *Id.* at 412:11–24,

---

[16]     Michelle Shields provided testimony in the trial, and was represented by independent counsel during litigation and at trial. Trial Tr. 407:20–22.

[17]     Brassfield was convicted of aggravated sexual assault of a child on June 7, 2019, and sentenced to 50 years' imprisonment in the custody of the Texas Department of Criminal Justice. Register of Actions, *State of Texas v. Brassfield*, No. 16-1733-CR-A.

460:6–8. Still, before she married Kelley, Smith too also regularly attended the Church. *Id.* at 400:21–24, 411:10–16; 415:18–20. She cared for and taught the children at the Church. *Id.* at 411:17–23; 413:12–19; 414:3–20. Smith considered the Church "like another home," because she "grew up at the Church." Trial Tr. 83:3.

108.    Smith met Kelley through mutual friends when she was 13 years old, and he was 17. *Id.* at 22:13–21. She saw him frequently while visiting Higgins at her home in New Braunfels, Texas, where Kelley was born and raised. *Id.* at 22:15–23. Kelley pursued Smith by calling and texting her "constantly." *Id.* at 22:25. They became very close, and Smith confided in Kelley about some of Brassfield's inappropriate behavior. *Id.* at 24:6–24. Eventually, Smith and Kelley began a romantic relationship, which continued until Kelley left to join the Air Force. *Id.* at 23:19–24:5.

109.    After Kelley's marriage to Brennaman, Smith told Kelley that she no longer wanted to speak with him. *Id.* at 24:25–25:9. Kelley continued to contact her, however, and told her he suspected that Brennaman was cheating on him. *Id.* at 24:25–25:9. He called her regularly during his confinement, but never explained why he was in the Brig. *Id.* at 25:24–27:2.

110.    In 2013, after Kelley was released from the Brig, he moved back to New Braunfels, where he lived in a barn on his parents' property that had been converted into an apartment. *See id.* at 28:10–12, 32:19–22; JEX 793. Soon after his return, Kelley asked Smith out on a date. Trial Tr. 28:19–21. She initially declined, but Kelley "wouldn't leave [her] alone," so she finally agreed to see him so he would "stop calling [her] all the time." *Id.* at 29:15–30:6. The two began dating and, in approximately December 2013, Smith moved into the barn apartment where Kelley lived on his parents' property. *Id.* at 31:22–32:8.

111.    Kelley began to physically abuse Smith shortly after they moved in together. *Id.* at 38:1–9, 34:23–35:12. Sometime between the time Kelley and Smith began dating in 2013 and their

marriage in April 2014, Smith became pregnant. *Id.* at 30:23–31. She suffered a miscarriage, however, after Kelley kicked her in the stomach. *Id.*

112.     Kelley and Smith moved between Texas and Colorado three or four times during their marriage. *Id.* at 40:3–6; 63:22–25.

113.     On December 22, 2014, Kelley purchased a Glock Model 19, a 9-millimeter, semi-automatic handgun, from Specialty Sports and Supply, in Colorado Springs, Colorado. JEX 342. He completed the ATF Forms 4473 and the store completed the required NICS check on the same day. *Id.* The response provided was that the FFL could proceed with the sale. *Id.*

114.     Kelley and Smith had their first child, a son, in March 2015, while living in Colorado. *Id.* at 51:18–52:7. Smith wanted her mother, Michelle Shields, and Shields's mother, Lula White, to be present for the birth. *Id*. at 427–28. They drove across multiple states to be there. *Id.* at 446:8–24. After they arrived, Smith came down with a fever. *Id.* at 446:14–15. Kelley disagreed with Shields and White about how to treat the fever and told them to leave because he did not want them interfering. *Id.* at 446:15–447:2. Smith's friend Emily Willis, whom she had met while they were both working at the same restaurant in Colorado Springs, was able to visit Smith in the hospital after the baby was born. PEX 108 at 31:20–32:14

115.     The couple moved back to Texas around May 2015, and moved back onto the property owned by Kelley's parents so that they could help out with the baby. *Id.* at 52:18–25. At around the same time, Smith sent an email to Shields containing pictures of bruises she had suffered after being physically abused by Kelley. *Id.* at 437:13–18.

116.     Kelley prevented Smith from speaking privately with her mother, Michelle Shields. Trial Tr. 418:1–13. He would insist that they talk on speakerphone so he could listen. If Kelley did not like what they were talking about, he would hang up the phone. *Id.* at 453:7–23. And Smith

had to earn basic human privileges from Kelley, including the use of technology, sometimes through sexual acts. *Id.* at 1395:18–22, 62:18–25.

117.   As a result of the abuse, Smith tried to get a divorce. *E.g.*, *id.* at 1380:14–16; *id.* at 56:15–20. In 2015, Erin Higgins' texts with Smith provide contemporaneous evidence that Kelley was abusive towards her and that she wanted to leave. JEX 478-B (text message evidence). Michelle Shields also corroborated Smith's testimony on this point and confirmed Kelley's abusive and controlling history. JEX 598 at 3m15s–4m34s.

118.   On June 26, 2015, the Kelleys returned to Colorado Springs and moved into an apartment with Emily Willis.[18] *Id.* at 64:1-2, 65:18-19; GEX 1 at 39:19–21. While they were all living together, Smith confided in Willis about Kelley's history of abusive behavior toward his former wife and stepson, and toward Smith herself. PEX 108, Willis Dep. Tr. 37:6–22. Willis noticed that Kelley was very controlling—he controlled everything from the movies they watched and the food they ate to Smith's clothing and make-up. Smith and Kelley shared a phone and a Facebook page. He did not allow her to work. They never went anywhere separately. *Id.* at 42:11–18, 42:22–43:5, 43:16–17, 47:3–12.

119.   While living with Willis, Smith noticed a handprint on her baby's leg. Trial Tr. 65:2–4. Smith took a photograph of the bruise and showed it to Willis, who went into the bedroom to examine the bruise for herself. Trial Tr. 65:20–23; GEX 1 at 45, 67. Willis told Smith that she should leave Kelley, and that Willis would help. Trial Tr. 65:20–66:15; GEX 1 at 67. Smith asked Willis not to report Kelley out of fear that she would lose custody of the baby. PEX 108 at 77:3–

---

[18]   On the same date, Kelley purchased a 357 Mag Ruger GP100 revolver, from Specialty Sports and Supply, in Colorado Springs, Colorado. JEX 343. He completed the ATF Forms 4473 and the store completed the required NICS check on the same day. *Id.* The response provided was that the FFL could proceed with the sale. *Id.* This gun was not recovered by the Texas Rangers as Kelley ultimately sold it to a pawn shop. JEX 157 at 87.

5. The next morning, on July 14, 2015, Willis woke up to find that Kelley, Smith, and the baby had moved out of the apartment in the middle of the night. Trial Tr. 68:1–9; PEX 108 at 76:11–77:12.

120.     When she realized that the Kelleys were gone, Willis tried calling Smith several times, but nobody answered. JEX 522 at 5. She later sent several text messages to Smith, hoping to determine their whereabouts. *Id.* Smith eventually responded, "Hey, this is best. We are just going our separate ways." GEX 1 at 83:2–3.

121.     Concerned about the baby, Willis drove to the nearest police station to file a report. *See* JEX 522. She told the police that there was a child in danger and reported that Kelley had previously been arrested and imprisoned for child abuse and kicked out of the military. JEX 522 at 84. Willis provided Kelley's license plate numbers and his parents' address in New Braunfels. *Id.* When the officer ran a background check on Kelley, however, nothing returned. JEX 522 at 6.

122.     On August 26, 2015, Kelley, or someone using his credentials, attempted to access an Air Force base in San Antonio, Texas, but was denied access. JEX 28 at 2.

123.     In November 2015, Smith sent text messages to her stepmother, Higgins, indicating that she was considering divorcing Kelley. Trial Tr. 56:22–58:8, 61:13–14; JEX 478-B.

124.     In November or December 2015, Kelley attempted to purchase a gun at a Dick's Sporting Goods store in Texas, but was denied after he presented a Colorado driver's license. *Id.* at 73:19–74:16. He did not ask Smith to purchase the gun on his behalf. *Id.* at 74:19–23.

125.     On February 17, 2016, Kelley, or someone using his credentials, attempted to access Holloman, and was denied access. JEX 28 at 2–3.

126.     On April 7, 2016, Kelley presented his Colorado driver's license and purchased the AR-557 semi-automatic rifle that he later used in the shooting from an Academy Sports + Outdoors ("Academy") store in San Antonio, Texas.[19] JEX 345 at 4.

127.     In June 2016, Erin Higgins's daughter—Smith's stepsister—reported that she too had been sexually abused by Brassfield. Trial Tr. 127:17–25. In 2014, Brassfield had assaulted another girl. *Id.* at 128:16–20. Later that summer, he was indicted on charges of aggravated sexual assault of a child in the 25th District Court of Guadalupe County, Texas. *See* Register of Actions, *State of Texas v. Brassfield*, No. 16-1733-CR-A. Smith was also named as a victim in the Guadalupe County prosecution. *Id.* at 129:6–7.

128.     Kelley began attending therapy sessions with Candace Marlowe, a licensed counselor in June 2016. Trial Tr. 1713:3–20. Over the course of Kelley's treatment during the summer of 2016, Marlowe produced approximately twelve pages of notes on their sessions. *See* JEX 63 at 35–39, 41–47. According to Marlowe's notes, Kelley was experiencing anxiety about his financial instability and job prospects and about his marriage to Smith. *Id.*; *see* PEX 96, Marlowe Dep. Tr. 44:24–45:9. On multiple occasions, Kelley told Marlowe that he could not trust his wife and feared that Smith was cheating on him. JEX 63 at 35. He also discussed her history of being sexually abused and her "family conflict." *Id.* at 38–39.

129.     After her first meeting with Kelley on June 6, 2016, Marlowe noted in her initial assessment a diagnosis of "Bipolar I" disorder. *Id.* at 47. Marlowe's initial diagnosis was based on entirely on Kelley's self-reporting, however. Marlowe acknowledged that she never reviewed

---

[19]     The Government has designated Academy as a responsible third party in this action, alleging that Academy violated the Federal Gun Control Act, 18 U.S.C. § 922(b)(3), by selling a firearm to Kelley that would violate the laws of Colorado, the state in which Kelley then resided. *See* ECF Nos. 150, 160. This sale was also the basis for several state court actions against Academy in connection with the shooting. *See In re Academy, Ltd.*, --- S.W.3d ---,2021 WL 2635954, at *1 (Tex. 2021).

Kelley's medical records or consulted with anyone else concerning the diagnosis. GEX 2, Marlowe Dep. Tr. 65:5–15.

130.    Kelley's conflict with his Smith's family began when, sometime after returning to Texas from one of their stays in Colorado, the Kelleys lived with the Shields for several weeks. Trial Tr. 433:9–16. While they lived together, Michelle Shields noticed that Kelley was very controlling, not only of Smith but toward the rest of the family as well. He would not allow Michelle Shields to go to the grocery store alone with his wife. *Id.* at 432:20–433:8. He also constantly bullied Michelle and Ben Shields's son, David Shields, who is severely disabled, forcing Ben Shields to confront Kelley about his behavior. *Id.* at 433:24–433:11; 434:12–18. Eventually, Kelley and Smith moved out because the Shields insisted that Kelley look for a job, and he refused. *Id.* at 435:2–6.

131.    In March 2017, during a birthday party for David, Kelley instigated a fight with Lula White, and Ben, and Michelle Shields, after Lula White jokingly accused Kelley of "showing off" on the hoverboard David had received for his birthday. *Id.* at 439:16–440:17. This conflict resulted in Kelley pushing Ms. Shields' mother-in-law and Ben Shields confronting Kelley. *Id.* at 440:21–441:21. Following this altercation, Kelley sent a series of aggressive texts to Michelle. JEX 442 at 34; *see also* Trial Tr. 439–41.

132.    On May 2, 2017, in a series of comments posted on Facebook, Kelley indicated that he welcomed the death of his wife's family members:

> All I know is if any of my wife's family are going to heaven I deff don't want to spend eternity with them. . . . I'm an atheist and they are ignorant self righteous Christians or so they claim in public. But behind closed doors it's drug addiction and domestic violence. My wife was the right person to marry but the rest of them could get shot in the face and I'd laugh

JEX 503 at 641.

133.    The conflict further escalated when Kelley and Smith's second child was born on May 24, 2017. Smith had asked Shields and White to be at the hospital for the birth. *Id.* at 427:21–429:6, 438:20–439:6. When Shields texted, "we are on our way," Kelley told her not to come because "it's not time." JEX 442 at 39–40. Lula White took over texting while Shields was driving, and asked if they could bring him lunch. Trial Tr. 445:10–446:3. Kelley became extremely aggressive and told her that she and Shields were no longer welcome: "If for any reason you attempt to insert yourself between Danielle and I again I will personally make it my mission to destroy your entire life. I suggest you don't test my resolve." JEX 442 at 40–44, JEX 446 at 1–3; *see also* JEX 584; JEX 598, at 11m24s–12m16s.

**The Days Preceding the Shooting**

134.    On October 18, 2017, Kelley purchased a Ruger SR-22 pistol from Academy Sports + Outdoors. JEX 346. Again, Kelley lied on his ATF Form 4473, stating that he had not been convicted of a felony or a misdemeanor of domestic violence. *Id.* Again, the NICS check indicated that Academy could proceed with the sale. *Id.*

135.    Ten days before the shooting, Devin Kelley wrote a note on his iCloud account that included a list of various tasks, including "trash trailer," "get a pack pack for more ammo," "get more PMAGs," and "try on and reorganize gear." JEX 583.

136.    Eight days before the shooting, Kelley wrote additional reminders, including, "Delete Instagram and FB," "Clear YouTube and Safari," and "Destroy old iPhone." JEX 583 at 18. That same day, another note reminded Kelley to "Put together .22 kit," "Remove all weed stuff from house," "Put mag funnel back on," and "change out all batteries." JEX 583 at 19.

137.    Six days before the shooting, Kelley wrote another note, reminding him to "check the tire pressure," "charge her GoPhone," "Find location for push knife," "Put gun stuff in car

when Danielle doesn't notice," "Rifle into guitar case," and "Put dog tags for Michael in buried location." *Id.* at 20.

138.    On October 28, 2017, Kelley purchased two 100-round drum magazines from Hill Country Truck and Gun Store, an FFL. He contacted the manager of the store after seeing an advertisement for the magazines on Facebook. JEX 744. When they did not fit his rifle, he returned them, ordered two new magazines, and gave the manager his cell phone number. Trial Tr. 157:22–158:16; JEX 744. From the time of the return on October 28 until Saturday, November 3, Kelley called the store every day, multiple times a day, to see if the new magazines had arrived. JEX 744. The day before the shooting, November 4, 2017, Kelley went into the store to see if the magazines had arrived. *Id.*

139.    On October 31, 2017, Kelley, Smith, and their five-month-old daughter attended the Fall Festival at the Church with Michelle Shields. Trial Tr. 161 at 8–11. Because Kelley had refused to allow Shields to visit Smith in the hospital after the baby was born, this was Shields's first opportunity to meet her granddaughter. Indeed, Shields had not spoken with either Kelley or Smith since Kelley had threatened to "destroy [her] entire life" on May 24, 2017. *Id.* at 459:24–460:2. Shields testified that everyone was excited to see Smith and the baby, and welcomed them with open arms. *Id.* at 466:3–6. At some point, Kelley left Shields and Smith alone inside of the Church together for approximately five minutes. *Id.* at 458:10–24.

140.    That same day, Kelley texted Erin Higgins and asked him to call her as soon as she could. When Higgins called him shortly thereafter, he told her that he had discovered photographs and videos of Brennaman's abuse. *Id.* at 366:18–21, 1387:10–20. Kelley claimed he found these photos and videos at Michelle Shields's house after leaving Smith alone at the Fall Festival. JEX 478 ¶ 4. This is unlikely, however, given Shields's testimony that Kelley left Smith and Shields

alone for only five minutes. Trial Tr. 458:23–24. It is even more unlikely in light of Higgins's

testimony that Smith and Kelley had discovered the evidence at Shields's house years earlier, and

had burned it. *Id.* at 1390:21–1391:18; 1413:12–16.

141.    In 2017, Curt Brassfield was being prosecuted by the Guadalupe County District

Attorney's Office for the sexual assault of Smith's stepsister. *Id.* at 129:3–4. Smith was

subpoenaed to testify in Brassfield's criminal trial for sexual abuse, which was set for November

27, 2017. *Id.* at 129:8–131:5. According to Smith, Kelley was unhappy about Smith testifying and

forbid her from doing so. *Id.* at 131:6–9. According to Higgins, Kelley went "back and forth" on

whether he wanted Smith to testify, because he thought it would be too hard on her. *Id.* at 1389:5–

14.

142.    Kelley told Higgins that he was "going to do something about the videos and make

sure it would never happen again." *Id.* at 1390:10–17. He said that the images and videos were at

his residence. *Id.* at 1404:1–1405:7; JEX 739 at 2. He asked her to meet him—by herself—between

9:00 and 9:30 on the morning of the shooting so he could give her the videos. *Id.* He also asked

her if she was recording the conversation. JEX 599 at 22.

143.    Higgins contacted the Guadalupe County District Attorney and informed them

about the videos. *Id.* at 1388:19–23. When Higgins told Kelley to turn the videos over to the DA,

he stopped talking to her. *Id.* at 1387:23–1388:5.

144.    The next day, detectives from the Cibolo police department went to the gate at the

entrance to the Kelley family property to retrieve the photographs and videos that Kelley had told

Higgins he had found. *Id.* at 348:21–349:6; JEX 603.

145.    When the Cibolo detectives were at the property, Kelley told the detectives that he

was "pissed off" and that Smith potentially would take a fine rather than testify. Trial Tr. 350:10–

20; JEX 603. Kelley repeatedly stated that there were no photographs or videos on the property and that he did not appreciate being harassed about the matter. JEX 603. He told the detectives to "go digging around Michelle Shields' home" if they wanted to find photographs and videos of the abuse. Trial Tr. 351:3–8. Kelley was very upset that the police had come to his property and specifically mentioned that he had a gun. JEX 603.

146.     Shortly before the shooting, Smith testified that she found photos of Kelley cheating on her when he left his computer unattended. *Id.* at 1381:17–23. As a result, in the days leading up to shooting, Smith asked Kelley for a divorce. *Id.* at 94:21–95:2.

**The Shooting**

147.     On the morning of November 5, 2017, Kelley walked to his parents' house and asked them if they could watch his children because "he and Danielle needed to go someplace." Trial Tr. 501:22–502:9; 568:21–569:6. Texts that Kelley sent to his parents that morning suggest that his request that they babysit the children was related to his ongoing marital troubles with Smith. JEX 799 at 3 (To Michael Kelley: "We just need alone time to talk."); JEX 799 at 4 (To Rebecca Kelley: "maybe we will just go to counseling. Idk. Me and her need time to talk."). Kelley's parents were unable to watch the children, however, because one of Kelley's sisters was in town visiting. Trial Tr. 502:10–13; 569:4–6.

148.     Kelley returned to the apartment and told Smith to fix him breakfast. *Id.* at 103:1–4. Kelley ate breakfast, and immediately threw up. *Id.* at 103:16–21. When he came out of the bathroom, he walked to Smith, held a gun to her head, and handcuffed her hands and taped her hands together. *Id.* at 104:25–105:2. Kelley then dragged Smith to the bed by her hair and threw her onto the bed on her stomach, where he hog-tied her. *Id.* at 105:3–4.

149.    Kelley and Smith had two children, one under the age of two and the other less than six months old. As his wife and kids watched from their one-room efficiency apartment, Kelley took the guns he purchased at FFLs, and put on black tactical gear and a black mask. Before leaving, Kelley told Smith that he would be back for her. *Id.* at 1408:2–4.

150.    Before the shooting, Kelley texted his parents, "I'm sorry. I love you guys. Please go untie Danielle in the barn." *Id.* at 505:24–506:17; 179:9–11. When Kelley's parents, Michael and Rebecca, arrived at the barn, the door was locked. They eventually opened it to find the babies in the playpen and Smith tied up on the bed. They were able to get the rope untied, but Michael Kelley had to leave to get wire cutters for the handcuffs. *Id.* at 507:1–508:1; 110:16–19.

151.    At approximately 11:14 a.m., Kelley parked his Ford Expedition directly in front of the front door of the First Baptist Church in Sutherland Springs and exited his vehicle. *Id.* at 209:9–16; JEX 597 at 2. He opened fire, killing 26 people and wounding 22 more. Trial Tr. 275:23–276:7.

152.    While inside the church, Kelley only used the AR-556 rifle he purchased from Academy on April 7, 2016. Trial Tr. 224:11–18; JEX 434 at 1–2; JEX 552; JEX 75 at 3.

153.    At 11:22 a.m., Kelley exited the Church and was shot by Stephen Willeford, who had overheard gunfire from his home near the Church and brought his gun to the scene. JEX 597 at 2. Kelley fled the scene in his Ford Expedition. *Id.*

154.    After fleeing the scene, Kelley left Smith a voicemail. He said that he was sorry, that he loved her, and that he "was a fucking wreck and didn't know what had gone on in his head." Trial Tr. 179:12–21; JEX 585 at 3.

155.    Kelley also called his father, who put Kelley on speakerphone so that Rebecca Kelley and Smith could hear. Kelley stated that he had shot a lot of people at a church and that he

had been shot. He said it was Smith's mother's church. Trial Tr. 111:9–23; 508:2–509:1. Kelley kept saying "I didn't know what I was thinking. I wasn't thinking straight." *Id.* at 574:1.

156.    Kelley asked to speak with Smith, and told her that he loved her and that he was sorry. *Id.* 180:2–7. Then, Michael Kelley took the phone, and they called 911 to report the incident. *Id.* at 509:21. Smith called her mother, Michelle Shields, to determine whether Shields had attended church that morning and to make sure she was okay. JEX 694. By happenstance, Shields had not gone to services that day because her grandson was visiting. *Id.*

157.    At 11:32 a.m. on November 5, 2017, Kelley was found deceased inside his vehicle with gunshot wounds, including a self-inflicted gunshot wound to the head. JEX 597 at 2.

**Subsequent Investigations**

158.    Later that day, the Texas Rangers interviewed Smith, in the presence of her father-in-law, Michael Kelley. After Smith described the events of the morning prior to the shooting—being hog-tied at gun point and discovered by Kelley's parents and learning that Kelley had committed a shooting at the First Baptist Church—the Rangers asked her whether she was aware of "any significance to that place." Smith replied, "It's where I grew up. . . . That's the church I went to as a kid." JEX 694 at 54m11s–55m22s.

159.    Asked whether there would have been anyone in the congregation of any significance to either Kelley or to Smith, she said, "My mother, my grandmother, my second family." *Id.* at 55m22s. She gave the Rangers the names of her family members who regularly attended the Church—Michelle Shields (her mother), Lula White (her grandmother), Ben Shields (her stepfather), and David Shields (her stepbrother)—but added, "Everybody in that church is like family though." *Id.* at 55m45s. Smith was not aware at the time of the interview that Kelley had shot and killed Lula White. *Id.*

160.     The Rangers also interviewed Michelle Shields on the day of the shooting. JEX 598. Shields said that she normally attended church every Sunday, but happened to stay home that morning to spend time with her grandson. *Id.* at 13m10s–13m28s. After showing the Rangers the text messages she had received from Kelley in May 2017 threatening to "destroy [her] entire life," Shields said, "I really think he was coming after my family." *Id.* at 13m01s–13m03s.

161.     The Rangers' investigation revealed that Kelley possessed no weapons that were acquired through a straw purchase, gun show, or other unregulated means when the shooting occurred. Trial Tr. 226:9–13, 220:12–21, 237:10–14, 241:21–23, 383:13–18, 384:2–7.

162.     The Texas Rangers searched the Kelley property. Trial Tr. 394:17–395:2 (Ranger Snyder). They found no weapons procured outside the FFL system. *Id.* at 395:7–11. Meaning they found no weapons that were stolen (*id.* at 395:12–14); no straw-sale weapons (*id.* at 395:15–16); and no firearms that were built (*id.* at 398:24–399:2). Additionally, the financial investigation into Kelley's bank accounts and online activity shows that he did not purchase weapons outside FFLs. Trial Tr. 394:5–12. All of the firearms available to Kelley at the time of the shooting were guns he purchased through FFLs. *Id.* at 221:20–22.

163.     Though the Texas Rangers retained primary jurisdiction over the investigation of the Sutherland Springs shooting, multiple governmental agencies, including ATF, the FBI and DoD, opened investigations into the shooting. *See id.* at 194:20–196:10 (Texas Rangers, the FBI, the ATF, Homeland Security, and numerous law enforcement agencies involved).

164.     The day after the shooting, the Secretary of Defense asked the Inspector General of the DoD to investigate whether Kelley's information should have been transmitted to the FBI, whether the information was transmitted, and, if it was not, why it was not. JEX 3 at 49.

165.     On November 9, 2017, the Inspector General opened its investigation. *Id.* at 6. Over a year later—after interviewing over 40 witnesses and reviewing the applicable statutes and regulations and numerous documents related to the investigation and conviction, in consultation with ATF, the FBI and the Texas Rangers—the Inspector General issued a report summarizing its conclusions on December 6, 2018:

> The investigators and confinement personnel had a duty to know, and should have known, the DoD and USAF fingerprint policies, and should have followed them. The failures had drastic consequences and should not have occurred.
>
> In sum, we concluded that there was no valid reason for the USAF's failures to submit Kelley's fingerprints and final disposition report to the FBI CJIS Division.

*Id.* at 6–7, 116.

166.     In early 2019, the Air Force issued letters of admonishment to three USAF employees involved in the investigations of Devin Kelley between June 2011 and October 2012. *See* JEX 42; JEX 166; JEX 509. The letters concluded that the failure to ensure the reporting of criminal history data to the FBI's CJIS Division constituted a dereliction of duty that "fell below the minimum standards" and "contributed to Devin P. Kelley not being properly identified as an individual prohibited by law from purchasing a firearm." JEX 42; JEX 509.

## CONCLUSIONS OF LAW

The substantive Texas law applies to this lawsuit. 28 U.S.C. § 1346(b)(1). ECF No. 59 at 27. The United States District Court for the Western District of Texas has jurisdiction over this case under 28 U.S.C. §§ 1346(b), 2401, and 2671–80.

The Court finds that each of the Plaintiffs in this consolidated action timely presented their claims and administratively exhausted their remedies. *See* PEX 796 (Plaintiffs' administrative presentation documents). The Court further finds, as to each of the Plaintiffs, greater than six months elapsed following the administrative presentation before filing suit. *Id.*

The remedy against the United States under the Federal Tort Claims Act is exclusive with regard to claims based upon torts of federal employees within the scope of their employment. 28 U.S.C. § 2679. The United States Air Force and Department of Defense are agencies of the United States of America. ECF No. 425 ¶¶ 3–4. At all times material to this action, the Air Force owned and controlled Holloman Air Force Base. *E.g.*, ECF No. 113 ¶¶ 9.2 & 9.3. At all times material to this lawsuit, the Air Force staffed Holloman and its facilities with agents, servants, and employees. *Id.* The Air Force has also stipulated to the employment status of specific employees. JEX 648 (declaration); ECF No. 425 ¶ 5 (stipulations).

Any finding of fact that may also be deemed a conclusion of law is so deemed. Any conclusion of law that may also be deemed a finding of fact is so deemed.

I.      **Immunity Under Section 922(t)(6) of the Brady Act**

The Court sees no reason to disturb its previous conclusion that the Government is not entitled to immunity under Section 922(t)(6) of the Brady Act. *See* ECF No. 59 at 20–26. The provision states:

> Neither a local government nor an employee of the Federal Government or of any State or local government, responsible for providing information to the national instant criminal background check system shall be liable in an action at law for damages . . . for failure to prevent the sale or transfer of a firearm to a person whose receipt or possession of the firearm is unlawful under this section.

18 U.S.C. § 922(t)(6). The Brady Act is unambiguous in specifying the people and entities immune from liability in providing information to NICS: local governments and employees of federal, local, and state governments. *Id.* Notably absent from this list is the United States itself. In its order addressing the Motion to Dismiss, the Court rejected the Government's argument that the omission of the United States was meaningless. Instead, the Court concluded from the plain language of the statute that Congress *chose* not to extend immunity to the United States, based on the negative

43

implication canon of construction, *expressio unius est exclusio alterius*, which provides that the specification of one thing implies the exclusion of the other. ECF No. 59 at 23 (citing *Texas v. United States*, 809 F.3d 134, 182 n.182 (5th Cir. 2015)).

The Court further concluded that United States could not avail itself of its employees' immunity under Section 922(t)(6) because there was no evidence that the federal immunity provision constituted a defense under Texas law.[20] *Id.* at 24–25. "As immunities and defenses are defined by the same body of law that creates the cause of action, the defenses available to the United States in FTCA suits are those that would be available to a private person under the relevant *state law*." *Vidro v. United States*, 720 F.3d 148, 151 (2d Cir. 2013) (emphasis added). Thus, the United States, when standing in the position of a private person under the FTCA, can use any state-law defenses available to that person. In addition to these state-law defenses, the FTCA explicitly provides that the United States can invoke "judicial or legislative immunity" available to its employees traditionally available under common law. 28 U.S.C. § 2674; H.R. Rep. No. 100-700, at 5 (1988), reprinted in 1988 U.S.C.C.A.N. 5945, 5948. As the Court previously noted, however, "It does not follow . . . that a statutory immunity provision shielding government employees from liability—and failing to immunize the Federal Government—can be invoked as a defense under state law. No case cited by the United States or revealed in the Court's research holds this." ECF No. 59 at 25.

Still, the Government maintains that it is entitled to the protections of Section 922(t)(6). In its post-trial briefing, the Government cites *Morrone v. Prestonwood Christian Academy* for the proposition that "Texas courts have invoked federal immunity provisions afforded to employees

---

[20]     In negligence suits brought pursuant to the FTCA, the Court applies the substantive law of the state in which the alleged negligence took place. 28 U.S.C. § 2671 *et seq.*; *Hayes v. United States*, 899 F.2d 438, 443 (5th Cir. 1990). The Court applies Texas substantive law in this case. *Id.* at 443 n.4; *see also* ECF No. 59 at 27 (explaining that under New Mexico's choice- of-law rules, Texas substantive law governs these actions).

to dismiss derivative claims against their employers." ECF No. 449 at 62 (citing 215 S.W.3d 575 (Tex. App.—Eastland 2007, pet. denied)). In *Morrone*, a Texas school successfully invoked its employee's immunity under the Paul D. Coverdell Teacher Protection Act (the "Coverdell Act"), 20 U.S.C. §§ 6731–6738. 215 S.W.3d at 584. *Morrone*, the Government argues, "demonstrates a private employer is entitled to invoke its employee's immunity under a federal statute to defeat a *respondeat superior* claim under Texas law." ECF No. 449 at 62.

In reading *Morrone*, the Government evidently overlooked footnote 2, which clarifies that the teacher in fact enjoyed immunity pursuant to a *Texas statute* that explicitly incorporated the Coverdell Act by reference. 215 S.W.3d at 584 n.2. Describing the immunity available under Section 22.0511 of the Texas Education Code, the *Morrone* court noted that "[e]ffective September 1, 2003, the immunity provided under Section 22.0511(a) was extended to include that afforded under the Paul D. Coverdell Act. *Id.* (citing TEX. EDUC. CODE ANN. § 22.0511(c)).[21] The *Morrone* court did not, as the Government urges, invoke a federal immunity provision without any basis in state law. When the Texas legislature adopted the protections of the Coverdell Act, it converted a federal immunity provision into an affirmative defense available under state law. Thus, in holding that the employee and the school were entitled to immunity under the Coverdell Act, the court was applying *Texas* law, not federal law.

A federal statute may create a state-law defense by explicitly preempting certain actions under state law. For example, the Texas Supreme Court recently interpreted the immunity provision of the Protection of Lawful Commerce in Arms Act (the "PLCAA"), 15 U.S.C. §§ 7901–03—barring "qualified civil liability action[s] . . . in any Federal *or State* court—to preclude certain

---

[21] Section 22.0511(c) provides: "In addition to the immunity provided under this section and under other provisions of state law, an individual is entitled to any immunity and any other protections afforded under the Paul D. Coverdell Teacher Protection Act of 2001 (20 U.S.C. Section 6731 et seq.), as amended."

state-law claims against Academy.[22] *In re Academy, Ltd.*, --- S.W.3d ---,2021 WL 2635954, at *7

(Tex. 2021). Absent evidence of preemption, however, Texas law confirms the Court's

understanding that federal immunities and defenses do not automatically create parallel immunities

and defenses under state law. For example, "federal law does not determine whether an officer's

actions are discretionary for purposes of state law." *City of Lancaster v. Chambers*, 883 S.W.2d

650, 654 (Tex. 1994) (citing *Horta v. Sullivan*, 4 F.3d 2, 15 (1st Cir. 1993) ("[T]he district court

erred in reasoning that because the police officers' actions were 'discretionary' for the purposes of

qualified immunity under federal law, they were also performing 'discretionary functions' for the

purposes of [immunity under state law]") and *Greiner v. City of Champlin*, 816 F. Supp. 528, 545

(D. Minn. 1993) ("The federal doctrine of qualified immunity does not apply to claims brought

under [state] law.")).

Finally, even if the Government could avail itself of its employees' immunity, the provision

applies only to those federal employees "responsible for providing information" to NICS. 18

U.S.C. § 922(t)(6). But Plaintiffs have argued—and the Court has agreed—that their negligence

claims extend to conduct beyond merely "providing information" to the NICS, including *collecting*

fingerprints and criminal history data and *supervising* employees tasked with the collection and

---

[22]     "Congress enacted the PLCAA upon finding that manufacturers and sellers of firearms 'are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products . . . that function as designed and intended.'" *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1135 (9th Cir. 2009) (quoting 15 U.S.C. § 7901(a)(5)). To this end, the PLCAA provides that federal courts must 'immediately dismiss[ ]' a 'qualified civil liability action.' 15 U.S.C. § 7902(b).

    Whether Academy is entitled to immunity under the PLCAA has no bearing on this case, however, because Academy has been designated as a responsible third party, ECF No. 160, and thus will not face any liability in this action, regardless of the Court's apportionment of fault. *See* 1 McDonald & Carlson Tex. Civ. Prac. § 5:78 (2d. ed.) (citations omitted). "A qualified civil liability action encompasses, *inter alia*, civil actions 'brought by any person against a manufacturer or seller of a qualified product . . . for damages . . . or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party, but shall not include [specified enumerated exceptions.]' *Id.* § 7903(5)(A)." *Prescott v. Slide Fire Sols., LP*, 341 F. Supp. 3d 1175, 1187 (D. Nev. 2018). Because Plaintiffs cannot enforce or collect any judgment against Academy in this case, the designation as a responsible third party does not meet the definition of a "qualified civil liability action" under 15 U.S.C. § 7903(5).

submission of fingerprints and criminal history data. ECF No. 59 at 26; ECF No. 318 at 57 ("There are many federal employees, including USAF leadership, whose conduct is implicated in the Government's undertaking to operate the background check system" but who are not "'responsible for providing information' to the NICS.").[23] Had Congress intended to completely immunize those covered by the provision, it would have omitted this "responsible for providing information" qualifier. Thus, even if the Court were to conclude that Section 922(t)(6) extends to the Federal Government—and it does not—the provision would immunize the United States for some of its failure to send criminal history data to the FBI, but not for its negligent collection of such data or its negligent supervision of employees responsible for FBI submissions.

## II.    Plaintiffs' Claim for Negligent Undertaking

To establish a claim of negligent undertaking in Texas, Plaintiffs must show that: (1) the Government undertook to perform services that it should have known were necessary for the protection of others but failed to exercise reasonable care in that undertaking; (2) the Government's negligent performance of those services increased the risk of harm; and (3) the Government's failure to exercise reasonable care caused physical harm. *Torrington v. Stutzman*, 46 S.W.3d 829, 838–39 (Tex. 2000); *see also* Restatement (Second) of Torts § 323 (1965).

---

[23]    The Government contends that "individuals can be 'responsible for providing information' to NICS" even "when they play roles in gathering (rather than transmitting) the relevant information, supervising those who submit the relevant information, or developing policies and procedures for providing information to NICS." ECF No. 449 at 64. This argument evidently stems from the NICS Improvement Amendments Act of 2007, which requires that, on request of the Attorney General, the "head" of any department or agency of the United States furnish to the NICS electronic versions of the information on individuals disqualified under subsection (g) or (n) of 18 U.S.C. § 922. *See* 34 U.S.C. § 40901(e)(1)(B)). Setting aside that the conduct of the "heads" of the DoD and USAF is not implicated in this litigation, the Government has not offered any evidence that the Attorney General made such a request. Absent evidence that an employee actually was responsible for providing information to the NICS, the mere possibility of being asked to furnish such information does not fall within the ambit of Section 922(t)(6).

## A.    Negligent Undertaking and Negligence *Per Se*, Distinguished

Throughout the course of this litigation, the Government has maintained that it did not owe a duty to Plaintiffs under Texas common law. Each iteration of this argument, however, relies on the same fundamental error—conflating Plaintiffs' claim for negligent undertaking with a claim of negligence *per se*. Because its failure to appreciate the distinction between these two causes of action informs so many of the legal and factual arguments that the Government presented at trial and in its post-trial briefing, the Court will clarify the conceptual differences between the claims in the context of an action brought under the FTCA.

It is important to observe as a preliminary matter that, despite the Government's assertions to the contrary, this lawsuit is not premised on violations of the Brady Act or any of its implementing regulations alone. Indeed, "it is a 'well-established principle that the violation of a federal statute or regulation by a government official does not itself create a cause of action under the FTCA.'" *Hornbeck Offshore Transp. LLC v. United States*, 569 F.3d 506, 509 (D.C. Cir. 2009) (quoting *Art Metal—U.S.A., Inc. v. United States*, 753 F.2d 1151, 1157 (D.C. Cir. 1985)). This is because, by its very terms, the FTCA "*does not create new causes of action*; rather, it makes the United States liable in accordance with applicable local tort law." *Art Metal.*, 753 F.2d at 1157 (citing *Birnbaum v. United States*, 588 F.2d 319, 327–28 (2d Cir. 1978)) (emphasis added).

Still, this principle "does not create a bright-line rule that violation of a federal statute can never form the basis of an FTCA claim." *Talley v. United States*, No. 11–01180 (RBK/KMW), 2013 WL 1314414, at *4 (D.N.J. Mar. 28, 2013). "Instead, the 'negligent performance of (or failure to perform) duties embodied in federal statutes and regulations may give rise to a claim under the FTCA, but *only* if there are analogous duties under local tort law.'" *Id.* (quoting *Art Metal*, 753 F.2d at 1157 (emphasis in original)). Thus, federal statutes and regulations "may

provide evidence that the government has assumed duties analogous to those recognized by local tort law" or "may provide the standard of care against which the government's conduct should be assessed." *Zelaya v. United States*, 781 F.3d 1315, 1324–25 (11th Cir. 2015).

While the existence of a duty depends on the law of the applicable jurisdiction, *id.*, the United States Supreme Court has also rejected the argument that the government cannot be liable for the performance of "uniquely governmental functions." *Indian Towing Co. v. United States,* 350 U.S. 61, 64–65 (1955). Absent a statutory exception, such as the "discretionary function" exception in section 2680(a), the Court held that the government can be held liable for negligence at the "operational level" of governmental activity regardless of whether private persons perform a similar activity. *Id.* In FTCA cases involving such operational negligence:

> [N]ormally, the most analogous approach in determining whether the government is liable in the regulator-enforcer context under state law is the Good Samaritan doctrine. . . . Thus, in cases where the plaintiff points to the violation of a federal statutory or regulatory duty, we generally look to the applicable state's Good Samaritan doctrine to decide if the plaintiff has alleged a state tort claim that satisfies the § 1346(b)(1) requirement and thereby opens the door for a claim under the FTCA.

*Zelaya*, 781 F.3d at 1324–1325 (citations and alterations omitted). Though the common law generally imposes no duty to prevent harm to others, Texas law recognizes that a duty to use reasonable care may arise "when a person undertakes to provide services to another, either gratuitously or for compensation." *Torrington*, 46 S.W.3d at 837.

The Government asserts that Plaintiffs cannot "circumvent" the black letter law that federal statutes cannot serve as the basis for duties under state law by "noting that Texas recognizes the doctrine of negligent undertaking." ECF No. 449 at 76. "This logic fails," the Government insists, for the same reason that "negligence *per se* cannot be used to circumvent the private-person-analog requirement," *id.*:

> Where a claim is wholly grounded by a duty imposed on an allegedly violated federal statute or regulation, to allow FTCA recovery merely on the basis of a general state doctrine of negligence *per se*, without requiring that there be some specific basis for concluding that similar conduct by private persons or entities would be actionable under state law, is to in essence discriminate against the United States: recovery against it is allowed, although for similar conduct the private person or entity would not be subject to liability under state law.

*Johnson v. Sawyer*, 47 F.3d 716, 727 (5th Cir. 1995) (en banc). The Government's analogy to negligence *per se* is inapposite, however, because every claim for negligent undertaking contemplates the recognition of a new duty that would not otherwise be cognizable under the common law.[24] *See Osuna v. S. Pac. R.R.,* 641 S.W.2d 229, 230 (Tex. 1982) ("Having undertaken to place a flashing light at the crossing for the purpose of warning travelers, the railroad was under a duty to keep the signal in good repair, even though the signal was not legally required."). This is the distinction between a claim for negligent undertaking and a claim for ordinary negligence.

The Government's assertion that federal laws and policies cannot form the basis of liability under the FTCA stands directly at odds with the FTCA's discretionary function exception, which generally *requires* such federal directives in order to impose liability. The discretionary function exception provides that the Government's waiver of sovereign immunity under the FTCA does not extend to claims "based upon the exercise or performance or the failure to exercise or perform a

---

[24]     The Government's confusion is evident in its assertion that *Perry v. S.N.*, 973 S.W.2d 301, 306 (Tex. 1998) is the most analogous case involving a private party. ECF No. 449 at 80. There, the defendants had allegedly witnessed the abuse of children at a day-care center, but failed to report what they had seen to the authorities as required by a provision of Texas's Family Code, which made the knowing failure to report such abuse itself a criminal offense. Nonetheless, the Texas Supreme Court ruled that Texas law did not recognize a duty to report based on the criminal statute that imposed civil liability. *Id*. at 306–08. The distinction between *Perry* and this case is clear. The defendants in Perry did not gratuitously undertake to report the abuse—the Texas legislature imposed a duty on them. Rather than *Perry*, the better analogy is found in *Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*, 926 S.W.2d 287, 292–93 (Tex. 1996) ("Having undertaken to recommend a potential scoutmaster for the church, [the defendant] had a duty to use reasonable care in doing so to prevent an unreasonable risk of harm to . . . others who would be affected. [The defendant] breached that duty if it knew or should have known that [the potential scoutmaster] was peculiarly likely to molest boys.")

discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

The Supreme Court discussed the discretionary function exception in *United States v. Gaubert*, 499 U.S. 315 (1991):

> The exception covers only acts that are discretionary in nature, acts that "involv[e] an element of judgment or choice," and "it is the nature of the conduct, rather than the status of the actor" that governs whether the exception applies. The requirement of judgment or choice is not satisfied if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," because "the employee has no rightful option but to adhere to the directive."

*Id.* at 322–23 (citations omitted). With regard to the violation of regulations, the *Gaubert* court stated:

> if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation. *If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy.*

*Id.* at 324 (emphasis added). The mere existence of a statute, regulation, or policy governing the conduct of a federal employee does not render such conduct non-discretionary. *See Gaubert*, 499 U.S. at 324. The issue is whether those directives allow the employee to exercise judgment and choice, or whether they "specifically prescribe[ ] a course of action for an employee to follow." *Gaubert*, 499 U.S. at 322.

It follows that assessing whether a government employee's conduct was discretionary in nature requires a detailed examination of the statutes, regulations, and policies in question. Such an inquiry would hardly be worthwhile, however, if an employee's failure to comply with the directives in question could never create liability for the Government under state law. The Supreme Court's decision in *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 542 (1988) illustrates this point. In *Berkovitz*, the plaintiff suffered a severe case of polio after ingesting a dose of an oral

polio vaccine and sued the United States for the alleged negligence of the National Institutes of Health's Division of Biologic Standards ("BDS") in licensing the vaccine. After reviewing the applicable regulations, the Court determined that the BDS had no discretion to license a product without first (1) receiving certain test data from the manufacturer, and (2) determining that the product complied with the regulatory standards. *Id.* at 542–544. Accordingly, to the extent that the plaintiff's state-law claims arose out of the agency's failure to perform those duties, they were not barred by the discretionary function exception to the FTCA. *Id.* Further, "[i]n restating and clarifying the scope of the discretionary function exception," the Court "intend[ed] specifically to reject the Government's argument . . . that the exception precludes liability for any and all acts arising out of the regulatory programs of federal agencies. . . . To the extent we have not already put the Government's argument to rest, we do so now. The discretionary function exception applies only to conduct that involves the permissible exercise of policy judgment." *Id.* at 538–39.

In essence, the Government wants to have it both ways: when federal regulations do *not* set forth specific, mandatory instructions for federal employees to follow, it is shielded from liability under the discretionary function exception; when federal regulations *do* prescribe nondiscretionary functions, the Government asserts that it is shielded from liability because the obligations arise out of federal law. But, in advancing this proposition, the Government relies exclusively on cases addressing whether the enactment of a federal statute can support a cause of action for negligence *per se* under state law. Plaintiffs have asserted a claim for negligent undertaking. The discretionary function exception does not transform a negligent undertaking claim into a claim of negligence *per se*. The Government's argument has no more merit today than it did when the Supreme Court rejected it in *Berkovitz*. As the Second Circuit stated in *Ingham v. Eastern Air Lines, Inc.*, "[i]t is now well established that when the government undertakes to

52

perform services, which in the absence of specific legislation would not be required, it will, nevertheless, be liable if these activities are performed negligently." 373 F.2d 227, 236 (2d Cir. 1967).

**B.      The Government negligently performed its undertaking to operate the NICS**

The existence of a duty "is a question of law for the court to decide from the facts surrounding the occurrence in question." *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). In deciding the duty element of a negligent undertaking theory, courts ask whether a defendant acted in a way that requires the imposition of a duty where one otherwise would not exist, *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013) (per curiam), considering "several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the defendant's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant," *Phillips*, 801 S.W.2d at 525.

Weighing these factors, the Court has already determined, as a matter of law, that the Government owed a duty to Plaintiffs. *See* ECF No. 59 at 36–37. In undertaking to create and manage a national background check system, the Government assumed a duty under the common law to operate the NICS with reasonable care. *Id.* at 38.

At bottom, the Government objects to the Court's recognition of a duty because of the "unprecedented liability" the United States would face if it "could be held liable under the FTCA whenever Congress enacted a federal statute." ECF No. 449 at 67. Plaintiffs have correctly pointed out that a federal statute can only implicate the FTCA where "Congress passes a law undertaking responsibilities for the Government." ECF No. 264 at 3. But the Government's objection also misstates the Court's characterization of the undertaking in this case: "enacting *and acting under*

*color of* regulations that require DOD and USAF to collect, handle, process, and report information to the background check system." ECF No. 59 at 38 (emphasis added).

The Court did not recognize an undertaking based on the Government's enactment of the Brady Act alone, or even on the adoption of its implementing regulations. The evidence that the Government undertook to operate a national background check system is found in its own conduct—the Government does in fact operate a national background check system, and has done so since the NICS was established in 1998. *See* JEX 35 at 1. Despite the Government's objections, this duty analysis is entirely consistent with how Texas courts treat private persons in the context of negligent undertaking cases. In Texas, a mere promise to render a service coupled with neither performance nor reliance generally imposes no tort obligation upon the promisor. *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W. 2d 392, 396 (Tex. 1991). "Without some affirmative course of action beyond the making of a mere promise or without reliance on that promise, the [defendant] cannot be held liable for [the plaintiff's] injuries." *Id.* Thus, in assessing the scope of the Government's undertaking, the Court must look not only to the language of the statutes and regulations that "provide evidence that the government has assumed duties" but also to the Government's conduct in light of those statutes and regulations.

Plaintiffs highlight the USAF's "widespread operational failures" in operating the NICS as evidence of the Government's negligence. In February 2015, the Inspector General ("IG") of the DoD issued a report evaluating the DoD's compliance with its criminal history data reporting requirements. *See* JEX 1. To measure compliance, the IG had conducted a comprehensive review of qualifying convictions that occurred within a preselected sample period—June 1, 2010 to October 31, 2012—and determined whether fingerprints and final disposition reports for the offending service members were submitted to the FBI's CJIS Division. *Id.* at 9. The IG found that,

during the relevant period, the USAF had a 69% compliance rate for fingerprint submissions, and a 68% compliance rate for final disposition submissions. *Id.* at 13, 16. While the Court could determine from these figures that there is generally room for improvement in the USAF's operation of the NICS, they do not demonstrate that the Government was negligent with respect to Kelley's criminal history in particular. [25] *Am. Airlines, Inc. v. United States*, 418 F.2d 180, 197 (5th Cir.1969) ("[E]vidence of a similar act of negligence is not admissible to prove negligence in the performance of the same act later.").

Still, the 2015 IG Report is evidence that the Government has acted under the color of the Brady Act and its implementing regulations by actually operating a national background check system. Moreover, the fact that the USAF was able to properly submit criminal history data in approximately 70% of cases suggests that a USAF agent exercising reasonable care in the performance of his duties should be able to properly collect and submit fingerprints and final disposition reports in accordance with USAF and DoD regulations.

There is no question that the AFOSI and Security Forces agents at HAFB who were responsible for collecting and submitting Kelley's information to the FBI failed to meet this standard of care. DoD and USAF instructions imposed mandatory obligations on investigative agents and corrections officers to submit Kelley's fingerprints and final dispositions. *See* JEX 263; JEX 4 (AFOSI Manual 71-121); JEX 11 (AFI 31-206); JEX 10 (AFI 31-205). Yet the Government

---

[25]     Jon Rymer was the Inspector General of the DoD at the time the report was issued and also served as an expert witness for the Plaintiffs in this trial. Trial Tr. 879:12–14; JEX 615. He testified that the 2015 IG report on criminal history reporting made the Air Force aware of its ongoing obligation to report and correct criminal history reporting to the FBI. Trial Tr. 880:14–22. Following the 2015 IG Report, HQ AFOSI sent an email to all region commands stating: "if you are presently doing anything less than 100% review in this particular area (NCIC indexing) you are falling short." JEX 198 at 1. Although the Court concluded in its Summary Judgment Order that, in agreeing to correct the records identified in the 2015 report, the Government did *not* undertake to correct Devin Kelley's record (because his conviction fell outside of the sample period in the report), ECF No. 318 at 11–13, both the DoD IG and the Air Force IG confirmed that improper indexing was a widespread problem in AFOSI at the time of the Devin Kelley investigation. *See* Trial Tr. 893:6–22.

stipulated that at no time before the Sutherland Springs Church shooting did the Government submit Kelley's fingerprints or final dispositions. ECF No. 149 ¶¶ 8–9.

The 49th SFS agent who interviewed Kelley about Brennaman's allegations of domestic violence had an obligation to collect and submit Kelley's fingerprints to the FBI, but failed to do so. JEX 263 at 9, 13. When the 49th SFS received notice of Kelley's conviction for a reportable offense on November 7, 2012—based in part on conduct discovered during its own investigation— it had an obligation to submit the final disposition report to the FBI within 15 days. *See* JEX 20; JEX 263 at 13. It failed to do so. ECF No. 149 ¶¶ 8–9. Beyond that, the Security Forces personnel had a mandatory obligation to submit Kelley's final disposition when they took Kelley into the corrections system after his conviction. JEX 10 ¶ 5.3.4. They failed to do so. ECF No. 149 ¶ 4.

Though the parties dispute when Detachment 225 agents had probable cause to believe that Kelley had committed a reportable offense, there is no doubt that its receipt of Kelley's confession video on April 30, 2012 was sufficient to establish probable cause. Accordingly, AFOSI agents were obligated to submit Kelley's FD-249 to the FBI within 15 days. JEX 263 at 9, 13. Although an agent certified that Kelley's fingerprints were taken on that date, a forensic search of Air Force files and computers could not find any evidence of these fingerprints, indicating that either the agent's certification was false or the Air Force failed to maintain the file and keep the fingerprint cards. JEX 22 at 60; JEX 40 at 7m46s–8m48s. The mandatory supervisory duties described in AFOSI Manual 71-121 confirm that the Government's obligation to submit Kelley's fingerprints was ongoing—it did not terminate after the expiration of the 15-day submission window. JEX 4 at 51, 79–80. AFOSI agents likewise had a duty to submit Kelley's final disposition information on Form R-84 after receiving notice of Kelley's conviction, but failed to do so. *See* JEX 20; JEX 263 at 13; ECF No. 149 ¶¶ 8–9.

The Government could not offer any explanations for its agents' failure to perform these nondiscretionary functions. The Court concludes that the Government failed to exercise reasonable care in performing its undertaking to collect and submit Kelley's fingerprints and conviction information to the FBI.

### C. The Government's negligence increased the risk of harm

Drawing on Section 323 of the Restatement (Second) of Torts, Texas law requires Plaintiffs to establish either that they relied on the Government's performance of its duties or that the Government's failure to exercise reasonable care in operating the background check system increased the risk of harm. *Torrington*, 46 S.W.3d at 838 (citing Restatement (Second) of Torts § 323(a), (b) (1965)). Because there is no evidence that Plaintiffs affirmatively relied on the operation of the NICS, the parties agree that Plaintiffs must demonstrate that the Government's negligence increased the risk of harm. *Id.*

The parties disagree about the proper benchmark for this assessment, however. The Government maintains that the relevant inquiry is whether the risk to Plaintiffs would have been lower if the Government had not operated the NICS at all, whether negligently or not. *See* ECF No. 449 at 83–85. Plaintiffs argue that the correct reference point is non-negligent performance. ECF No. 448 at 17 n.7. Thus, the Court should ask whether the risk of harm would have been lower if the Government had operated the NICS with reasonable care. Though the Court previously endorsed Plaintiffs' framing of the inquiry, the evidence at trial demonstrated, by a preponderance of the evidence that Plaintiffs have met their burden, even under the Government's standard. That is, by confirming Kelley's perception that he was above the law, the Government's negligent operation of the NICS with respect to Kelley created a greater risk of harm than if it had never undertaken to establish a background check system at all.

To determine whether the Government's negligence increased the risk of harm, it is first necessary to identify the harm in question. As the Court made clear in its Summary Judgment Order, the identity of the harm in this case—injury and death resulting from gun violence—is not at issue here. ECF No. 318 at 24. The Government proposed metric in this case mischaracterizes the harm by suggesting that "the comparison points [sic] is whether Kelley would have been able to obtain firearms at FFLs if NICS had never been in operation." ECF No. 449 at 85. The harm to Plaintiffs in this case did not occur when Kelley purchased the Ruger in April 2016; it occurred when Kelley committed the shooting in November 2017. *See Colonial Savings Ass'n v. Taylor*, 544 S.W.2d 116, 120 (Tex. 1976) (concluding that an insurer's "failure to obtain insurance on the house did not increase the risk of fire to the house."); *Lifshen v. 20/20 Acct. Sols., LLC*, 458 F. Supp. 3d 534, 544 (N.D. Tex. 2020) ("The [*Taylor* court] did not find a lack of insurance to be the risk that negligent undertaking claims are concerned with. Rather, the risk is the harm itself."). Accordingly, the question at hand is whether the Government's negligence in failing to collect and submit Devin Kelley's fingerprints and criminal history data to the FBI increased the risk of injuries and death as a result of gun violence. By any measure, it did.

With respect to Plaintiffs' standard, nearly every witness—including many Air Force witnesses—agreed that multiple Air Force employees testified that if prohibited persons like Kelley are able to buy guns from federal firearms licensees (FFLs), that increases the risk of harm to the public. *See* PEX 87 at 61 (Col. Bearden); PEX 91, at 14 (AF Security Forces 30(b)(6) Rep. Col. Ford); PEX 93 at 61–62 (Holz); PEX 94 at 15 (Hoy); PEX 97 at 63 (Major McLeod-Hughes); PEX 98 at 47 (Mills); PEX 100 at 26 (JAG 30(b)(6) Rep., Col. Owen); PEX 106 at 29 (SJA Col. Tullos); PEX 107 at 28 (AF 30(b)(6) Rep., Verdejo); PEX 109 at 77 (Bankhead); PEX 101 at 23 (Col. Poorman). Testimony from the Government's own witnesses confirms this conclusion. For

example, Kimberley Del Greco, the Government's FBI representative, testified that preventing felons from acquiring firearms protects public safety. Trial Tr. at 623:18–20. Then, the Government's ATF representative testified that when Government agencies fail to report criminal convictions, they unnecessarily expose the public to a risk of gun violence, in part by making dangerous felons even more dangerous by allowing them to accumulate weapons illegally. *Id.* at 1137:17–24; 1138:5–9. Likewise, the Government's gun violence expert conceded that the Air Force's failure to submit criminal history information to the FBI likely leads to more violent outcomes to the public. Trial Tr. 1345: 20–1346:23

Aside from the widespread, common-sense agreement that the negligent operation of the NICS increases the risk of harm to the general public compared to non-negligent performance, with respect to Kelley specifically, the evidence also satisfies the Government's more demanding standard. That is, the preponderance of the credible evidence establishes that the Government's negligent failure to collect and submit Kelley's criminal history data to the FBI increased the risk of harm over what it would have been if the Government had never undertaken to operate the NICS in the first place.

After receiving two allegations that Kelley had committed domestic violence against his wife, the USAF failed to so much as collect his fingerprints. *See* JEX 158 at 2; JEX 22 at 51–53; ECF No. 149 ¶ 2. The USAF evidently concluded—following a single-day investigation of the second allegation on February 17, 2012—that Kelley had in fact assaulted Brennaman in violation of Article 128 of the UCMJ, a reportable offense under DoDI Instruction 5505.11. *See* JEX 21 at 73; JEX 263 at 9. Although the Government evidently had probable cause to believe that Kelley had committed a reportable offense, Kelley's fingerprints were not submitted to the FBI. ECF No. 149 ¶ 2. Again, they had not even been collected. *Id.*

Nearly two months later, on April 12, 2012—five days before the "final disposition" of the investigation arrived in the form of a letter of reprimand—Kelley purchased a semi-automatic handgun from an FFL after immediately passing the NICS background check. JEX 16. It was the second firearm he purchased on base during the course of the investigation for child abuse. *See* JEX 16; JEX 18. While it is true that, had Kelley's fingerprints been submitted to the FBI on February 17, 2012, he would not have been disqualified from purchasing the Sig Sauer in April 2012, it is likely that the transaction would have been delayed pending investigation by the NICS Examiner. A delay would have put Kelley on notice that the Air Force was aware of his criminal conduct and took it seriously. Instead, although the SFS agent who took Brennaman's statement on February 17, 2012 found her report credible, he failed to even collect fingerprints during his interview with Kelley later that day. GEX 9, Sablan Dep. Tr. at 264:12–16. The agent later testified that the "domestic violence situation" that Brennaman had described was "typical of the types of domestic violence that [he] saw as an investigator." *Id.* at 264:12–16, 322:16–20.

In the time between the interview with SFS on February 17th, 2012 and his confession on April 27, 2012, Kelley's conduct became increasingly dangerous. Though he was asked to hand over his firearm, it was evidently returned to him after he was discharged from the Peak on March 8, 2012. JEX 408. Brennaman's mother reported that Kelley was openly carrying a firearm on base. *Id.* Brennaman later told investigators (and Kelley admitted) that, in mid-March, shortly after his release from the Peak, Kelley put a bullet in his .38 Special Revolver, and pointed the gun at his head. JEX 366 at 45. He told Brennaman that, if they did not work out their problems, he would pull the trigger. JEX 363 at 188. He pulled the trigger three times and then turned the gun on Brennaman before she agreed to his demands. *Id.* Less than two weeks after Kelley was able to

purchase the Sig Sauer, he held a gun to his wife's temple and asked if she wanted to die, apparently because he blamed her for a speeding ticket. JEX 22 at 548.

The Sanity Board Report specifically noted that Kelley "denied having problems with the law, mostly because he never got caught." JEX 363 at 186. It also noted that, based on personality assessments conducted during his out-patient treatment at the HAFB Mental Health Clinic, that Kelley had "a personality disorder that is a mixture of antisocial, narcissistic, and borderline personality features." *Id.* at 189. The Government's expert in forensic psychiatry, Dr. Harold Bursztajn, characterized this "cluster of personality traits [as] most consistent with antisocial [personality disorder]," indicating that Kelley was someone who "felt that the rules didn't apply to him." Trial Tr. at 1434:8–10.

As evidenced by Kelley's increasingly violent conduct and statements in his confession video, the USAF's negligence in collecting and reporting his fingerprints only confirmed this belief: "Everybody I think knew deep down inside that I did it, but I think because I am military people want to cover my ass because I represent the government." *Id.* at 154–55. AFOSI agents did not collect or submit Kelley's fingerprints to the FBI during their interview with him on April 30, 2012, following their receipt of the confession video. Weeks later, during his second admission to the Peak, Kelley researched body armor and guerilla tactics, attempted to purchase a handgun over the phone, and threatened that if were discharged to the Military Police, he would try to disarm them and either be killed or kill someone. JEX 22 at 600–02; JEX 359 at 5. After his discharge from the Air Force, Kelley repeatedly obtained firearms from FFLs without repercussion or denial. Each time Kelley passed a background check further confirmed his belief that he was above the law. He had no problem submitting his fingerprints for employment-related background checks,

and no problem warning officers of the Cibolo police department that he was armed with a gun. *E.g.*, JEX 563 at 19, 27 (Schlitterbahn); JEX 569 (Private Security); JEX 603.

The preponderance of the evidence at trial establishes that the Government's negligence emboldened Kelley, both in purchasing firearms from FFLs and in engaging in and threatening acts of violence. *See, e.g.*, *W. Hills Bowling Ctr., Inc. v. Hartford Ins. Co.*, 412 F.2d 563 (5th Cir. 1969) (holding that an insurance company's negligent failure to conduct a timely investigation after a fire foreseeably increased the risk of a second fire where the insurer was on notice of the activity of vandals after the first fire); *Sabia v. State,* 164 Vt. 293, 669 A.2d 1187 (1995) ("[T]he continued abuse following [the defendant's] failure to act posed an increased risk of harm by sending the message to the perpetrator that he could act with impunity."). Although the Government credited Brennaman's serious allegations of domestic violence and threats of a mass shooting, it allowed Kelley to continue on this course of escalating conduct for several months without even so much as collecting his fingerprints. In this way, the Government's negligent failure to operate the NICS increased the risk of harm to a greater level than would exist if it had never undertaken to operate the NICS at all.

## D.     The Government's negligence proximately caused Plaintiffs' injuries

Proximate cause comprises two elements: cause-in-fact and foreseeability. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). "Both elements must be present." *McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 903 (Tex. 1980). Whether something constitutes a proximate cause of an event is a question "of fact particularly within the province of a [factfinder]." *Tex. Dept. of Transp. v. Olson*, 980 S.W.2d 890, 893 (Tex. App.—Fort Worth 1998). Proximate cause may not be established "by a mere guess or conjecture, but rather must be proved by evidence of probative force." *Id.* at 904. Like any other ultimate fact, however,

proximate cause need not be supported by direct evidence, as circumstantial evidence and inferences therefrom are a sufficient basis for a finding of causation." *City of Gladewater v. Pike*, 727 S.W.2d 514, 518 (Tex. 1987).

Texas law recognizes that there may be more than one proximate cause of a single event. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010). Thus, the relevant inquiry here is whether the Government's negligent failure to report Kelley's criminal history data to NICS was *a* proximate cause, not *the* proximate cause, of Plaintiffs' injuries. *See Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001). "All persons whose negligent conduct contributes to the injury, proximately causing the injury, are liable." *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992).

Where the plaintiff's injuries involve the criminal conduct of a third party, Texas courts have relied on Section 448 of the Restatement (Second) of Torts:

> The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, *unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created*, and that a third person might avail himself of the opportunity to commit such a tort or crime.

*Nixon*, 690 S.W.2d at 550 (quoting Restatement (Second) of Torts § 448 (1965)) (emphasis added). Thus, a tortfeasor's negligence will not be excused where a third-party's criminal conduct "is a foreseeable result of such negligence." *Id.*

### 1.    *Cause-in-Fact*

The test for cause-in-fact, or "but-for causation," is whether the act or omission was "a substantial factor in causing the injury and without which the harm would not have occurred." *Ryder Integrated Logistics, Inc. v. Fayette Cnty.*, 453 S.W.3d 922, 929 (Tex. 2015) (quoting *Nixon v. Mr. Prop. Mgmt. Corp.*, 690 S.W.2d 546, 549–50 (Tex. 1985)). "Establishing causation requires

facts sufficient for the fact-finder reasonably to infer that the defendants' acts were a substantial factor in bringing about the injury." *Tompkins v. Cyr*, 202 F.3d 770, 782 (5th Cir. 2000) (citing *Purina Mills, Inc. v. Odell*, 948 S.W.2d 927, 936 (Tex. App.—Texarkana 1997)).

To be a substantial factor, the act or omission must have such an effect in producing the harm as to lead reasonable people to regard it as a cause. *McLaurin v. Waffle House, Inc.*, 178 F. Supp. 3d 536, 563 (S.D. Tex. 2016) (citing *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 (Tex. 1991). Even if the plaintiff's injury would not have occurred "but for" the negligence of the defendant, the connection between the defendant and the plaintiff's injuries may be too attenuated to establish legal cause. *See Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995). If the defendant's negligence merely "furnished a condition that made the injuries possible," there can be no cause in fact. *See IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 799 (Tex. 2004). Rather, "[t]he evidence must go further, and show that such negligence was the proximate, and not the remote, cause of resulting injuries." *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995).

Still, Plaintiffs are not required to establish cause-in-fact to an absolute degree of certainty. *Havner v. E-Z Mart Stores, Inc.*, 825 S.W.2d 456, 460 (Tex. 1992). As one commentator concludes:

> The plaintiff is not, however, required to prove the case beyond a reasonable doubt. The plaintiff need not negative entirely the possibility that the defendant's conduct was not a cause, and it is enough to introduce evidence from which reasonable persons may conclude that it is more probable that the event was caused by the defendant than it was not.

W. Keeton, Prosser and Keeton on Torts § 41, at 269 (5th ed. 1984) (footnotes omitted). Texas law has never imposed a reasonable doubt standard in proving negligence. *See, e.g.*, *Bock v. Fellman Dry Goods Co.*, 212 S.W. 635, 636 (Tex. Comm'n App. 1919, holding approved)

(requiring plaintiff to exclude other probabilities would impermissibly impose "burden of establishing her case beyond a reasonable doubt"). And, again, Plaintiffs need not prove that the Government's negligence was the *sole* cause of their injuries. *See Harrison*, 70 S.W.3d at 784.

It is undisputed that every firearm in Kelley's possession on November 5, 2012 was purchased from an FFL after he passed a NICS background check. Kelley did not own a single firearm acquired through a straw purchase, gun show, or other unregulated means when the shooting occurred. Trial Tr. 226:9–13, 220:12–21, 237:10–14, 241:21–23, 383:13–18, 384:2–7. Still, the Government argues that its negligence in operating the NICS was not a substantial factor in causing Plaintiffs' injuries because "Kelley was *aware of* many avenues for obtaining firearms without going through a background check." ECF No. 449 at 99 (emphasis added). This knowledge, the Government contends, "coupled with his premeditation and determination to commit the mass shooting," is dispositive of the causation issue. *Id.* at 98. The Court disagrees.

In applying the rules of causation, the Court is "dependent upon the facts of the case." *Pike*, 727 S.W.2d at 517. The facts here establish that every gun Kelley owned on the day of the shooting was purchased through an FFL. Trial Tr. 221:20–22. The mere possibility that he could have obtained firearms by other means does not make it probable. The Government offered no evidence that Kelley ever purchased a gun at a gun show (Trial Tr. 1220:7–9), or engaged in a straw purchase (*id.* at 1352:22–24, 1221:12–14, 1352:15–24), or stole or borrowed anyone else's guns (*id.* at 395:12–14), or built his own (*id.* at 398:24–399:2). The financial investigation into Kelley's bank accounts and online activity shows that he did not purchase weapons outside FFLs. Trial Tr. 394:5–12. But Kelley's mere knowledge of alternative avenues of acquiring weapons "is no evidence of intent." *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 821 (Tex. 2009). Although Plaintiffs need not exclude every possible source of firearms other than FFLs to establish causation, there is

ample evidence that Kelley would not have used a firearm acquired from a non-FFL to commit the shooting.

First, Kelley's history of firearms purchases indicates that he had a strong preference for FFLs. On two occasions during his tenure with the USAF, Kelley's firearms were confiscated— first in February 2012 (*see* JEX 22 at 51), and then again in April 2012 (*see* JEX 340). In both instances, he simply sought another firearm from another FFL. *See* JEX 16 (purchase of the Sig Sauer from the BX on April 12, 2012); JEX 22 at 600–602 (attempt to order a 9-millimeter handgun from the BX before escaping the Peak on June 7, 2012). Likewise, after Dick's Sporting Goods declined to sell Kelley a gun in Texas after he presented his Colorado driver's license, Trial Tr. at 73:19–74:16, Kelley simply went to another FFL, to purchase a firearm at Academy, another FFL. JEX 345 at 4. Even while he was at the Peak, the guns Kelley researched buying online were from Wal-Mart, another FFL. JEX 159 at 51m10s–52m20s.

Kelley's preference for FFLs was likely related to his preference for reliable firearms. For example, Kelley conducted extensive research on his guns before purchasing them. JEX 157 at 92. Kelley added several, off-the-shelf "modifications" to his firearms that were designed to increase speed and accuracy. Trial Tr. 1356:6–18; *id.* at 968:20–969:13 (citing JEX 502 at 127); JEX 503 at 86. Likewise, although the Government cited Kelley's acquisition of a handgun and a shotgun outside of the regulated market as evidence that Kelley knew how to get guns from other sources, Kelley got rid of both of those guns because they were unreliable. JEX 157 at 82; JEX 550; Trial Tr. 43:9–23, 47:2–15. Those purchases happened before the FFL transactions at issue in this case, and there is no evidence that he purchased another firearm from the unregulated market after he disposed of the second gun. Smith testified that Kelley preferred to purchase firearms from "big stores," where he knew the guns would be brand new. Trial Tr. 47:4–15.

The Government insists that even if Kelley had been denied from purchasing firearms at FFLs, he would have found a way to commit the shooting because he "was not someone who would just take no for an answer":

> For example, he did not take no for an answer from girlfriends when they said no to sex, as AFOSI discovered in its investigation. He did not take no for an answer when his guns were confiscated in the Air Force. He was persistent in his pursuit of Smith, to the point of stalking. He was persistent in calling the store where he purchased the 100 round magazines just before the shooting. He persistently purchased guns in the military, even after they were confiscated.

ECF No. 449 at 99. First, even assuming that Kelley was "determined" to commit the shooting, his determination would not preclude a finding that the Government's negligence was one of proximate causes of Plaintiffs' injuries. *See Del Lago Partners*, 307 S.W.3d at 774. Moreover, what these examples reveal from the Court's perspective is that while Kelley may not have accepted "no," there is no reason to believe he was capable of adjusting his strategy in order to get a "yes."

It is not clear to the Court that Kelley was so determined to commit the shooting that he would have found a way to acquire firearms after being denied at an FFL. Kelley's entire life was characterized by his inability to solve problems effectively. When Smith initially declined to date him after his release from confinement, he called her again and again, until she relented. Trial Tr. 29:15–30:6. There is no evidence that he tried, say, sending her flowers. When the 100 round magazines he ordered were taking longer than he expected to arrive, he did not simply locate them at another store or order them online. He called the store every single day to see if they had arrived. When his guns were confiscated in the Air Force, he did not ask Brennaman to engage in a straw purchase or try to buy one at a gun show—he simply went to another FFL. JEX 22 at 51; JEX 16; JEX 22 at 600–602. The same is true of his denial at Dick's Sporting Goods. Trial Tr. at 73:19–74:16; JEX 345 at 4. After being barred from HAFB, Kelley tried to enter HAFB in 2013, but the

system returned a denial. Trial Tr. 1638:14–17. After his failed attempt, Kelley tried again in San Antonio in 2015, and in Holloman in 2016. *Id.* at 1641:2–1642:1. Each time, he was denied access. *Id.* at 1642:13–16. Kelley did not try to scale a wall or bribe a security official to get onto base. The evidence suggests that, if Kelley had been prevented from purchasing a firearm at an FFL after failing a NICS background check, he would have simply returned to yet another FFL to try again.

Even if Kelley had tried to obtain firearms from non-FFL sources, it is likely that he would have been unsuccessful, for several reasons. First, Kelley was unlikely to acquire firearms through private, unregulated purchases because he lacked an adequate network of trusted family and friends who would be willing to help him obtain a firearm illegally. Dr. Daniel Webster, an expert in gun violence prevention and public health, testified that studies show that people are very reluctant to purchase firearms in private transactions from someone they do not know or trust. Trial Tr. 963:11–14. In the Air Force, Kelley was a loner: "Nobody liked Kelley and Kelley did not have friends." JEX 517 at 2 (Sgt. Bizzack). And after his discharge, his social network remained small. Indeed, the evidence suggests that Kelley had very few friends and could not hold down a job. Trial Tr. at 1403:18–20; 40:18–23. The Court credits Dr. Webster's testimony that Kelley would have been unlikely to purchase a gun in a private transaction with a stranger, which would have forced him "to venture out into the rather risky and unpredictable marketplace," in which he could have been robbed, given an unreliable firearm, or given a gun used in connection with another crime. *Id.* at 963:15–22.

Second, it is unlikely that Kelley would have used his father's firearms to commit the shooting. Although Kelley's father, Michael Kelley, owned guns—including the same AR-556 that Kelley used to commit the Sutherland Spring shooting—he kept them in a locked gun cabinet,

to which he and his wife shared a single key, in the master bedroom closet in the back of the house. *Id.* at 488:17–489:5, 487:8–22, 562:26. The door to this cabinet is so heavy that the family needed to anchor it to the wall to prevent the cabinet from toppling. *Id.* at 561:16–23. Michael and Rebecca Kelley share a single key to the cabinet, that they kept hidden. *Id.* at 562:26. To have stolen his father's assault rifle on the morning of the shooting—while his parents were in the house visiting with his sister—Kelley would have needed time and tools, like a hammer and crowbar. *Id.* at 488:3–11, 498:13–18. And again, the Rangers found no evidence of stolen weapons in any of their post-shooting investigations. *Id.* at 1351:25–1352:3. Furthermore, given Kelley's universally recognized need for control, the Court finds it unlikely that he would have been willing to ask for his father's permission to use his firearms.

Finally, the Government sought to discredit Smith's testimony at trial that she would not have purchased a firearm for Kelley if he had asked because, as a victim of his domestic violence, "she did all sorts of things by coercion." Trial Tr. 74:19–75:4, 1605:15-1606:7. But under the Government's counterfactual—one in which Kelley turned to Smith because he could not otherwise get a gun—Smith, as the target of Kelley's constant death threats and physical violence, would have a stronger motive than perhaps anyone else to keep a deadly weapon out of his hands. *Id.* at 38:1–16. Indeed, expert testimony at trial established that firearms can significantly increase the lethality of intimate partner and family violence. *Id.* at 984:20–986:1 (discussing study that found family and intimate assaults involving firearms were 12 times more likely to result in death than family and intimate assaults that did not involve firearms).

In its post-trial briefing, the Government makes much of the Court's discussion of "deterrence" in the Summary Judgment Order. ECF No. 449 at 88. This emphasis is misplaced. The Court could determine from the summary judgment record whether Kelley had access to other

firearms at the time of the shooting. Still, the Court left open the possibility that, even if Kelley had acquired a firearm from the unregulated market, being denied by an FFL after failing a background check might have some deterrent effect. *See* ECF No. 318 at 30 ("It is not clear . . . that 'physically preventing' the improper gun sales to Kelley would have 'physically prevented' the shooting in the same way—it may have merely discouraged it."). But given the Court's conclusion that, based on the evidence presented at trial, Kelley likely would not have acquired a firearm outside of an FFL, the question of whether a firearm denial would have discouraged Kelley from committing the shooting is irrelevant—it is impossible to commit a shooting without a gun.[26]

If Kelley had, at the time of the shooting, possessed multiple assault rifles, some of which were acquired from FFLs after a passing a background check and some of which were acquired through any of the alternative means proposed by the Government, and did not exhibit a clear preference for one over another, a factfinder might reasonably conclude that the source of the firearm was not a substantial factor in causing Plaintiffs' injuries. Under those circumstances, Kelley might have taken multiple assault rifles to the scene and chosen one at random to use in the shooting.

However, where, as here, every single firearm Kelley owned at the time of the shooting was purchased from an FFL, and the circumstantial evidence indicates that he was unlikely to acquire a gun from an alternative source, it is impossible to conclude that the Government's negligence in operating the NICS merely "furnished a condition" for Plaintiffs' injuries. On these

---

[26]       Nonetheless, Plaintiffs presented credible evidence at trial the Kelley would have been deterred from committing the shooting had he been denied from purchasing a firearm at an FFL after failing a NICS background check. Specifically, Dr. Webster, testified that, after reviewing the literature in the field, and after reviewing the specific evidence in this case, and relying on his experience, he believed Kelley would have been "deterred from serious acts of violence with a gun," had he been denied access at an FFL. Trial Tr. 947:3–948:10; *see also id.* at 969:14–25 (same). Dr. Webster cited multiple studies comparing individuals denied guns with those allowed to purchase guns that support the conclusion that when individuals are denied at FFLs, they are discouraged and deterred from acquiring firearms altogether. *Id.* at 944:8–946:16.

facts, reasonable people would regard the Government's negligence as a cause. *Lear Siegler*, 819 S.W.2d at 472. Indeed, the Director of Compliance for Academy expressly confirmed, "[w]e sold him a firearm *because* he passed the background check and he completed the 4473 . . . ." PEX 90 at 12 (179:10-15) (emphasis added). Likewise, N.M., the Academy clerk who sold Kelley the firearm, stated: "We did a NICS background check, which goes to the FBI. After the FBI received their document, they sent us a document with a proceed to transfer the firearm to Mr. Devin Kelley." PEX 99 at 4 (46:20–24); *id.* at 6 (87:7–10) ("Kelley did come in . . . filling out the proper documents, filling out the background check. The background check came back with the proceed."); *id.* at 8 (165:16–17) ("We did the NICS background check that we stated earlier. Came back with the "proceed."). As a result, the Government's expert conceded that the "only reason" Kelley was able to acquire the firearms used in the shooting was the Air Force's failure to submit his criminal history. Trial Tr. 1347:21–1348:1 (Donohue).

## 2.   *Foreseeability*

Foreseeability, the second element of proximate cause, requires that a person of ordinary intelligence should have anticipated the danger created to others by a negligent act or omission. *Nixon*, 690 S.W.2d at 549–50. Foreseeability does not require the defendant to predict "the particular accident or injury which in fact occurs." *Brown v. Edwards Transfer Co.*, 764 S.W.2d 220, 223 (Tex. 1988). Nor does it require that the actor foresee "the precise manner in which the injury will occur once he has created a dangerous situation through his negligence." *Travis*, 830 S.W.2d at 98. The danger of injury is foreseeable if its "general character . . . might reasonably have been anticipated" in light of the attendant circumstances. *Carey v. Pure Dist. Corp.*, 124 S.W.2d 847, 849 (Tex. 1939) (citations omitted).

"Foreseeability requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant's conduct brings about the injury." *Doe*, 907 S.W.2d at 478. It is "a practical test, a test of common experience applied to human conduct." *City of Gladewater v. Pike*, 727 S.W.2d 514, 518 (Tex. 1987) (quoting *Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231, 236 (Tex. App.—Dallas 1985, writ ref'd n.r.e.)); *see also Clark v. Waggoner*, 452 S.W.2d 437, 440 (Tex. 1970) (emphasizing "the teachings of common experience and practical sense in solving problems of foreseeability"). It asks whether the injury "might reasonably have been contemplated" as a result of the defendant's conduct. *McClure*, 608 S.W.2d at 903.

(a)    <u>Scope of Evidence Bearing on Foreseeability</u>

The Government argues that the Court should limit its foreseeability analysis to the "conduct that gave rise to the duty," which the United States asserts was the conduct set forth in the two specifications to which Kelley pled guilty—the physical assaults of wife and stepson. ECF No. 449 at 89. This argument is unpersuasive for a variety of reasons. First, locating the Government's duty in this case in Kelley's conviction alone misstates the USAF's undertaking by ignoring fingerprint submissions altogether. Second, the argument appears to rely on the Government's persistent failure to recognize the distinction between a claim of negligence *per se* and a claim for negligent undertaking. Third, it conflates the disparate burdens of proof involved in imposing civil and criminal liability. Finally, the Government's artificially narrow conception of foreseeability is incompatible with the pragmatic nature of the foreseeability inquiry.

In asserting that the Court must limit its foreseeability analysis to the four corners of the report of conviction, the Government insists that "[a]ll information extraneous to an indictment and conviction is irrelevant to the reporting obligations of the Air Force under the Brady Act." *Id.*

¶ 57. This assertion is patently false in light of the USAF's clear obligation to submit fingerprints to the FBI *before* the referral of charges or conviction. *See* DoDI 5505.11, JEX 263 at 1. Thus, even assuming that the Court should only consider evidence of "the conduct that gave rise to the duty," that evidence includes any facts and circumstances bearing on the Government's duty to collect and submit Kelley's fingerprints.

The Government would have the Court believe that the submission of fingerprints to the NICS databases is irrelevant in assessing liability because an individual is not actually disqualified from purchasing a firearm under 18 U.S.C. 922(g)(4) or (g)(6) until *after* a conviction for a qualifying offense. Thus, the argument goes, the negligent failure to send fingerprints to the FBI cannot have proximately caused Plaintiffs' injuries because, even if the FD-249 had been submitted, it would not have prohibited Kelley from purchasing the firearms he acquired. But this position overlooks the function that fingerprints perform in ensuring that the information in the NICS databases is accurate and complete. As explained *supra*, when a NICS search returns a match to a potentially prohibiting record, the transaction is delayed and the NICS Section must reach out to judicial officials or LEOs for the information needed to render a final decision.[27] *See* JEX 271 at 1; JEX 797 at 2. Even if it had failed to submit a single final disposition report, had the Government submitted just one of the three FD-249 cards that should have been sent to the FBI while Kelley was in the USAF, a NICS Examiner would have easily determined that Kelley was disqualified from purchasing any of the firearms he owned at the time of the shooting.[28] Given

---

[27] An individual who is under *indictment* for a crime punishable by more than a year is also prohibited from purchasing a firearm. 18 U.S.C. 922(d)(1). Given that the final disposition report is not available while an individual is under indictment, it is not clear how the FBI could possibly enforce this provision without relying on fingerprint submissions to trigger a "delay" response to a background check and a follow-up investigation by a NICS Examiner.

[28] Though the Government contends that February 17, 2012 investigation conducted by the SFS could not have prohibited Kelley from purchasing a firearm because it resulted in a letter of reprimand—an administrative action—the evidence shows that Kelley was in fact convicted of assault under Article 128 of the UCMJ based on evidence uncovered in that investigation. The Article 32 Report recommending assault charges against Kelley specifically cites and attaches Brennaman's statement to the SFS on February 17, 2012 and the pictures she provided to Sgt. Sablan as

critical role of fingerprints in the operation of the NICS, a person of ordinary intelligence would anticipate the danger created to others by the USAF's negligent failure to submit fingerprints to the FBI. *Nixon*, 690 S.W.2d at 549–50.

Here, the Government's proposed foreseeability framework relies on the same faulty understanding of the cause of action in this case that plagues its arguments concerning duty. The Government asserts that the Court should disregard Kelley's "general propensity for violence [and] threats to his Air Force leadership," in assessing foreseeability since "no common-law duty existed" based on that conduct. ECF No. 449 at 88. "[C]ommon-law principles of foreseeability," it argues, "are simply irrelevant in this case," because the "the parameters of the alleged duty were strictly delineated by federal statute." *Id.* As explained *supra*, the USAF's duty in this case arises out of Texas common law, which imposes a duty of reasonable care on those who voluntarily undertake to perform services necessary for the protection of others. *Torrington*, 46 S.W.3d at 838–39. The operation of the discretionary function does not convert Plaintiffs' negligent undertaking claim into a claim of negligence *per se*, and does not change the nature of the foreseeability analysis under state law.

Even on its own terms, the Government's argument fails under Texas law. In evaluating claims of negligence *per se*, in which, as the Government describes it, "the parameters of the alleged duty [are] strictly delineated by [a] statute," Texas courts do not limit their foreseeability analysis to assessing the "conduct that gave rise to the duty." *See Mo. Pac. R. Co. v. Am. Statesman*,

---

supporting evidence. *See* JEX 366 at 7. Further, certain conduct listed on Kelley's report of conviction—hair pulling—is not mentioned in any of Brennaman's statements to AFOSI agents, and thus appears to arise solely out of the SFS investigation. *See id.* at 30, 33–35. Security Forces received a copy of Kelley's report of conviction, which indicated that he had been convicted of a crime of domestic violence. *See* JEX 374 at 8. In other words, Security Forces had all of the necessary information to accurately report Kelley's conviction to a NICS Examiner.

552 S.W.2d 99, 103 (Tex. 1977) ("Whether we label the act or omission as negligence *per se* or common negligence, the rules for determining proximate cause are the same.").

In *Durham v. Zarcades*, for example, the plaintiffs sued the prior owners of an apartment complex after being held hostage at gun point and sexually assaulted by an intruder who had kicked in the door to one of the units. 270 S.W.3d 708, 710 (Tex. App.—Fort Worth 2008). The plaintiffs alleged a claim for negligence *per se*, asserting that the owners of the complex had violated Section 92.153(a)(5) of the Texas Property Code, requiring all front doors of apartment units to be equipped with a keyless bolting device. *Id.* at 711. The owners' duty to install a lock arose by operation of the state statute, independent of local criminal activity. Nevertheless, the Fort Worth Court of Appeals evaluated the foreseeability of the plaintiffs' injuries by examining the *Timberwalk* factors—the same factors used to assess the foreseeability of criminal conduct in garden-variety premises liability cases. *Id.* at 719 (citing *Timberwalk Apartments Partners, Inc. v. Cain*, 972 S.W.2d 749, 759 (Tex. 1998)) ("These factors—proximity, recency, frequency, similarity, and publicity—must be considered together in determining whether criminal conduct was foreseeable.").

The *Timberwalk* factors illustrate another flaw in the Government's suggestion that information extraneous to the conviction is "irrelevant"—it disregards the fundamental difference between civil and criminal liability. The Supreme Court has "emphasized that proof beyond a reasonable doubt has traditionally been regarded as the decisive difference between criminal culpability and civil liability." *Jackson v. Virginia*, 443 U.S. 307, 315 (1979). Here, the Government asks the Court to assess whether Plaintiffs have established foreseeability by a preponderance of the evidence—their burden of proof in this civil action—based only on the conduct that the SJAs who prosecuted Kelley believed they could prove beyond a reasonable

doubt. In essence, the Government seeks to hold Plaintiffs' claims hostage to the product of prosecutorial discretion.[29] Given the competing burdens of proof and interests at stake, this arrangement hardly seems just.[30] Nor does it have any basis in the law. Texas courts do not require evidence of previous *convictions* to assess the foreseeability of future criminal conduct. *See Timberwalk*, 972 S.W.2d 749 (considering local crime rates and reported crimes as evidence of criminal activity); *Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*, 926 S.W.2d 287, 292 (Tex. 1996) (concluding that child molestation was foreseeable based on second-hand reports that assistant scoutmaster was "messing with" some boy scouts).

Finally, the Government's request that the Court close its eyes to Kelley's misconduct outside of his domestic violence convictions is simply divorced from the "teachings of common experience and practical sense" that are meant to govern the foreseeability inquiry. *Pike*, 727 S.W.2d at 518. There is perhaps no better evidence of this than the March 27, 2013 memorandum approving a request by Lt. Col. Bearden, Kelley's former Commander in the LRS, to permanently bar Kelley from HAFB. JEX 21 at 4–5. After a brief description of Kelley's conviction and confinement history, the memorandum presents a litany of facts in support of the barment, none of which served as the basis for Kelley's conviction:

> AB Kelley has a history of severe mental health problems. He openly carried a firearm on Holloman AFB, and placed a weapon to his wife's head. He has repeatedly threatened to kill his leadership. . . . Additional evidence of Kelley's

---

[29]     *See Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."); *United States v. Meadows*, 867 F.3d 1305, 1313 n.2 (D.C. Cir. 2017) ("In 1931, the government famously prosecuted Al Capone for income tax evasion rather than far more serious crimes that it might have had difficulty proving.").

[30]     The "primary interest of law enforcement agents is the apprehension, incapacitation, punishment, and . . . rehabilitation of criminals, as well as the possible deterrence of future criminals through the imposition of criminal sanctions. It may matter little to the investigating agents that the offense that is actually charged corresponds to their personal areas of expertise and authority. An agent of the Bureau of Alcohol, Tobacco, and Firearms, for example, may be sufficiently interested in the conviction of an Al Capone for criminal tax evasion as in the conviction of an Al Capone for alcohol or firearms violations. By contrast, such an agent may have little interest in subsequent civil proceedings." *Wolf v. C.I.R.*, 13 F.3d 189, 194 (6th Cir. 1993).

> high risk unpredictable and criminal behavior includes . . . his preoccupation with weapons, his verbal declaration that he has contemplated offensive attack strategies on both Air Force personnel and organizations (including his leadership and SFS), his online research of body armor and guerilla warfare tactics while a patient in a military mental health facility, his possession and purchase of weapons, and his successful escape from a military mental health facility.

*Id.* at 4–5. Applying "common experience" to Kelley's conduct outside of his conviction, the memorandum further concluded that he should be escorted by an armed member of the 49th SFS for the entirety of his outprocessing at HAFB. *Id.* at 4. Based on its investigation in 2012, the Government anticipated that Kelley would commit an act of gun violence in 2013, and took proactive steps to protect itself.

(b)     Evidence of Foreseeability

At the outset of this action, in determining whether to impose a duty on the Government, the Court was required to assess the foreseeability of harm in this case based on the allegations in the complaints. *Phillips*, 801 S.W.2d at 525. "With Kelley specifically," the Court observed, "at every stage in his life—during and after his USAF tenure—the threat of violence loomed." ECF No. 59 at 36. The credible evidence presented at trial confirms, by a preponderance of the evidence, that the only thing that made Devin Kelley more dangerous between his time in the Air Force and the day of the mass shooting was his acquisition of firearms. The USAF's extensive knowledge of Kelley's abusive and violent conduct made his acts of violence in 2017 foreseeable.

In disputing the evidence of foreseeability in this case, the Government seeks to avail itself of many of the same excuses Kelley employed to justify his conduct before his conviction. The Government cites the possibility that Kelley suffered from bipolar disorder, for example, and suggests that Kelley "was protecting Smith" in committing the shooting—perhaps to spare her the pain of testifying, or to avenge the bullying she suffered from certain Church members when she was growing up. ECF No. 449 at 93, 95. By deploying the very same explanations Kelley used to

avoid accountability in 2012, the Government only underscores that there was *not* a break in the causal chain that would render Kelley's conduct in 2017 unforeseeable.[31]

    (i)     *Kelley's mental state did not materially change between 2012 and 2017*

While he was still in the Air Force, Kelley was hospitalized in a mental institution twice and was AWOL twice. Trial Tr. 1490:1–11; *id.* at 1617:11–24. Although Kelley insisted that he suffered from bipolar disorder or had family history of bipolar disorder (*see* JEX 361 at 15; JEX 359 at 52), the Mental Health Clinic at HAFB ruled out bipolar disorder after extensive psychological testing. JEX 358 at 150; JEX 363 at 25. Still, the testing revealed that Kelley's mental health was significantly compromised while he was in the Air Force. Specifically, personality assessments indicated that Kelley had "a personality disorder that is a mixture of antisocial, narcissistic, and borderline personality features." JEX 363 at 189.

In suggesting that Kelley's mental health deteriorated so significantly after his discharge from the Air Force that his conduct was unforeseeable, the Government's expert, Dr. Bursztajn, relied exclusively on the "diagnosis" of Candace Marlowe, the licensed counselor who worked with Kelley during the summer of 2016, after her provisional intake assessment: Bipolar Disorder Type I. JEX 63 at 47. Marlowe admitted that she had not reviewed Kelley's medical records in making her initial diagnosis. Despite the fact that Marlowe took a total of twelve pages of notes during the course of her sessions with Kelley, the vast majority of which related to his financial

---

[31]    Any contention that the Government's conduct was too remote in time to have proximately caused the shooting overlooks the ongoing nature of the danger created by its negligence. *See Bell v. Campbell*, 434 S.W.2d 117, 120–22 (Tex. 1968) ("All forces involved in or generated by [the defendants'] negligence had come to rest, and no one was in any real or apparent danger therefrom."); *Union Pump Co.*, 898 S.W.2d at 776 ("[T]he forces generated by the fire had come to rest when [plaintiff] fell off the pipe rack. The fire had been extinguished, and [the defendant] was walking away from the scene."). In the five years between his conviction and the shooting, Kelley was able to acquire four firearms in four separate transactions because of the Government's negligence. Kelley's ability to purchase firearms—and the danger therefrom—did not come to rest after his conviction in 2012 or even his discharge from the USAF in 2013. Thus, the Government cannot demonstrate that the connection in time between the negligent conduct and Plaintiffs' injuries is too attenuated to establish proximate cause. *Bell*, 434 S.W.2d at 122.

stress, Dr. Burzstain accepted her diagnosis uncritically and used it to form the basis of his thesis—essentially that Kelley had committed a shooting as a result of a manic episode, evidenced by his delusional thinking. JEX 63 at 35–39, 41–47; PEX 96, Marlowe Dep. Tr. 44:24–45:9.

However, Plaintiffs' expert in forensic psychiatry, Dr. Jeffrey Metzner, noted that Kelley displayed some evidence of delusional thinking while he was in the Air Force, most likely related to his disordered personality. Trial Tr. 1729:13–23; 1730:11–1731:11. The Sanity Board's evaluation indicated that Kelley had been diagnosed "Personality Disorder – Mixed Antisocial, Narcissistic and Borderline Features." JEX 367 at 120. The personality assessments administered while Kelley was in the Air Force indicate that "[h]e endorsed a number of extreme and bizarre thoughts, suggesting the presence of delusions and/or hallucinations. He apparently believes that he has special mystical powers or a special 'mission' in life that others do not understand or accept." JEX 363 at 84. This is consistent with Smith's remark, in her interview with the Texas Rangers shortly after the shooting that Kelley felt "like nobody really understood him." *See* JEX 694. In short, the credible evidence establishes that, to the extent that Kelley suffered from delusional thinking in the days and months leading up to the shooting, his bizarre thoughts were not evidence of some unforeseeable manic episode, but of Kelley's personality disorder, which was known to the Air Force in 2012.

At the Government's invitation, Dr. Burzstain likewise suggested at trial that the shooting was unforeseeably "fueled" by a drug cocktail that Kelley had begun abusing sometime after his discharge from the USAF. Trial Tr. 1464:5–6 ("Tell us what drugs was he using, and what effect did they have in the year prior to the shooting."); *id.* at 1464:7–1465:20 (describing drugs and side effects). This testimony contradicts the Government's own expert report, however, which stated that "Kelley was not intoxicated at the time of the killing . . . his blood test was negative for

alprazolam and clonazepam." *Id.* at 1476:9–24. Accordingly, Dr. Bursztajn opined that, while Kelley was not intoxicated at the time of the shooting, he may have been experiencing withdrawal symptoms.[32] *Id.* at 1525:17–21.

But, as Plaintiffs' expert noted, "[Kelley's] withdrawing from Xanax and Klonopin is as likely as he was withdrawing from heroin . . . there's no evidence." *Id.* at 1711:20–1712:6. Dr. Metzner testified that the levels of drugs found in Kelley's autopsy were trace amounts and that given the long half-life of the drug, had Kelley taken a larger dose, the toxicology would have reflected that. *Id.* at 1710:2–12. Moreover, Kelley's use and abuse of drugs was well known to the Air Force. *E.g.*, JEX 158 at 1 (Kelley abused Ambien); JEX 363 at 225–228, JEX 358 at 485 (Kelley's AF Medication history showing use of clonazepam, Flexeril, etc.). The Court finds the contradictory testimony by Dr. Bursztajn lacks credibility and finds the preponderance of the evidence shows that Kelley's drug use (or abuse) did not significantly alter Kelley's mental state such that his conduct on November 5, 2017 was unforeseeable.

Based on the credible evidence and witness testimony, the Court finds that Kelley's mental health was already compromised while he was in the Air Force, that the Government knew of Kelley's compromised mental health and of the threat Kelley posed for mass shooting or mass murder, and that Kelley's mental state did not substantially deteriorate after he left the Air Force—at least not enough to alter the foreseeability of his actions.

### (ii)   *Domestic violence was foreseeable to the Air Force*

Kelley's attack on the First Baptist Church of Sutherland Springs was part of a pattern of domestic violence that was foreseeable to the Air Force in 2012. The preponderance of the credible

---

[32]    As Plaintiffs note, withdrawal is a particularly unlikely explanation for Kelley's conduct because he could have simply taken more drugs. He had access. JEX 799 at 119–133, JEX 608, at 2 (photos and investigation reports showing remaining pills available to Kelley on the day of the shooting).

evidence shows Kelley's motive was to attack a member of the church, Michelle Shields, and "destroy [her] entire life," as Kelley threatened not long before the shooting. JEX 446 at 1. Kelley was aware that Smith grew up in the Church, and that her family—Michelle, Ben, and David Shields and Lula White—regularly attended services there. Trial Tr. 409:6–11 (Michelle Shields); *id.* at 410:4–13, 411:7–9 (husband and son); *id.* at 1658:3–5 (Kelley's knowledge).

The Government's contention that the shooting was motivated by Kelley's "hatred of religion," the shooting was not a random attack on place of worship. Indeed, as evidence of animosity toward religion, the Government cited Facebook posts from 2017 in which Kelley criticized "ignorant self righteous Christians." JEX 503 at 641. But the posts were not generically anti-religious; they were specifically directed at Smith's family. After describing them as "ignorant self righteous Christians," Kelley said that his wife's family "could get shot in the face and [he]'d laugh." *Id.* He quickly followed up, clarifying that his animosity was not directed toward Christianity generally: "No offense if you believe in heyzeus." *Id.* Kelley also made Islamophobic posts on Facebook, but did not target any of the mosques closer to his home in New Braunfels. Trial Tr. 1518:9–19. Similarly, he made anti-Semitic comments, but did not target a synagogue. *Id.* at 1518:20–1519:7. Instead, on the day of the shooting, Kelley drove 60 miles to his wife's family's church. *Id.*

Dr. Metzner proposed four possible reasons for the shooting: first, that Kelley wanted to punish Smith after she asked for a divorce; second, that Kelley wanted to kill Smith's family specifically; third (and least likely), that Kelley wanted to avenge Smith's honor based on the bullying she experienced at the Church as a child, and fourth (and most likely), some combination of the first three. *Id.* at 1738:12–1739:3. The common theme, Dr. Metzner noted, was Smith herself—"this was another form of control and abuse" of Danielle Smith. *Id.* at 1739:4–7.

The Government's theory of the case relies on an artificially narrow—and troubling—understanding of domestic violence. Without ever defining the term "domestic violence," the Government asserts that "[t]he shooting was not motivated by domestic violence; in his twisted mind, Kelley was protecting Smith." ECF No. 49 at 93. For the practical purpose of assessing foreseeability, the Court endorses the definition of domestic violence set forth by Dr. Metzner: "a pattern of abusive behavior in a relationship that is used by one of the partners to either gain or maintain control of an intimate partner." Trial Tr. 1735:9–13. Abuse can take many different forms: it can include physical abuse, sexual abuse, emotional abuse, psychological abuse, economic abuse, threats, and stalking. *Id.* at 1735:14–18.

The Government's suggestion that Kelley's primary concern about the prospect of Smith's testimony against Brassfield was that it would be too painful for her is simply not plausible in light of Kelley's well-documented need for control over his intimate partners. Air Force records show that, in response to any assertion of independence by his partners, Kelley committed or threatened violence—against himself, his partners, their families, and anyone who would otherwise interfere with his control. He choked Brennaman when she said she did not want to spend Christmas with his family; he punched her in the stomach for speaking to a cashier after he indicated that she should stop talking; he choked her and kicked her in the stomach because she wanted to go for a walk. JEX 22 at 52–53. Likewise, Kelley would not allow Smith to use a cell phone without his permission and supervision, to work, or to drive. Trial Tr. 41:17–19; 418:1–13; 453:7–23; PEX 108, Willis Dep. Tr. 42:11–18, 42:22–43:5, 43:16–17, 47:3–12. It is unlikely that Kelley would have permitted Smith to demonstrate the strength and independence required to testify against Brassfield. It is especially unlikely that Kelley would have permitted Smith to testify in order to hold a sexual predator accountable, given Kelley's own sexual misconduct—including against

Smith herself. JEX 22 at 63–67, 74, 127–129, 170, 176; Trial Tr. 62:18–22. Indeed, Smith testified

at trial the Kelley had forbidden her from testifying at Brassfield's trial. Trial Tr. 131:6–9.

Dr. Metzner testified that it is a "common dynamic in domestic abuse" that the abusive

partner tells his victim that he is committing the abuse for her benefit. *Id.* at 1740:21–1741:2.

Indeed, Air Force records demonstrate that Kelley frequently abused and controlled his romantic

partners under the guise of protecting them. In 2008, for example, Kelley had justified his

"extremely possessive and controlling" behavior toward A.D.—including isolating her from her

friends and not allowing her to talk on the phone—by telling A.D. that "she needed his protection

from getting raped," despite the fact that he had sexually assaulted her himself. JEX 22 at 67, 97.

Similarly, Kelley asserted that it "pisse[d] [him] off" when he learned that his wife went to a bar

because he was "not there to protect her." JEX 357 at 6.

That aside, the law does not focus on the "secret subjective intent, but rather on the

*objective intent* manifested by the words or conduct of the actor." *Hudson v. State*, 629 S.W.2d

227, 230 (Tex. App.—Fort Worth 1982, no writ) (emphasis added); *see also Oregon v. Kennedy*,

456 U.S. 667, 675 (1982) ("Inferring the existence or nonexistence of intent from objective facts

and circumstances is a familiar process in our criminal justice system."). The Government's theory

that Kelley was "protecting" his wife doesn't explain why he hog-tied her to the bed at gun point

while their children looked on, crying. *E.g.*, Trial Tr. 1661:24–25 (Fox). The Government's expert,

Dr. Bursztajn, conceded that Kelley's last acts before heading to the Sutherland Springs Church

"were the same crimes and same behavior" for which Kelley was prosecuted while he was in the

Air Force. Trial Tr. 1523:14–18. Nor does the Government's "protection" theory explain why

Kelley wanted to meet Erin Higgins right before going to the Church to murder 26 people and

injure 22 others. The Government's own expert responded, "I don't see the connection . . .  No, it wasn't a protective move." Trial Tr. 1681:10–1682:1 (Fox).

Despite the Government's best efforts, there is simply no way to plausibly explain the attack on the First Baptist Church without reference to Smith and her family. The Court finds that the credible evidence does not support that Kelley attacked the Church randomly. Nor does the credible evidence support the theory that Kelley's attack was motivated by political or religious leanings, or by seeking vengeance on the Church or any particular people in the Church for prior treatment of Danielle Smith. Instead, the preponderance of the evidence and credible witness testimony shows that Kelley intended to kill Smith's family *and* isolate her as a part of a pattern of physical, emotional, and verbal domestic abuse.

> (iii)     *Mass violence was foreseeable to the Air Force*

Not only were the domestic origins of the shooting foreseeable, but the Government should have anticipated mass violence while Kelley was in the Air Force. The Government's argument that the danger Kelley posed to others was unforeseeable strains credulity in light of the fact that the USAF actually anticipated the risk of harm and took proactive steps to protect itself. Several months after the USAF permanently barred Kelley from HAFB in 2013, the Air Force upgraded his threat level after determining he posed a threat of danger not only to the community within HAFB but to the communities at all U.S. bases. JEX 422 at 1; *see also* Trial Tr. 1640–42.

Without ever indicating how they defined "foreseeability," the Government's experts opined exclusively as to their ability to predict whether any one individual will commit a mass shooting. *See* Trial Tr. 1434:13–15 (Dr. Burztajn opining that while Kelley was an "unpredictable and dangerous person," he was "not someone who was . . . more likely than not[] to commit mass murder"). They seemed to suggest that the only reliable predictor of future shootings is previous

shootings. See *id.* (noting that while Kelley had "previously . . . used [a gun] as a threat," the shooting was different from Kelley's prior conduct because he actually fired the weapon.") While there may be some statistical validity to this position, however circular, it is entirely divorced from the foreseeability standard: prior conduct need not be *identical* to render a specific act foreseeable, but must be "sufficiently similar to allow a reasonable person to anticipate and therefore protect against it." *Bos v. Smith*, 556 S.W.3d 293, 304 (Tex. 2018). Foreseeability requires only that Plaintiffs establish, by a preponderance of the evidence, that a person of ordinary intelligence would have anticipated the "general character" of the danger created by the Government's negligence. *Carey*, 124 S.W.2d at 849.

The Government's argument that Kelley's history of domestic violence did not render a mass shooting foreseeable is unpersuasive. The Court agrees that, considered in isolation, a domestic violence conviction would not necessarily lead a person of ordinary intelligence to anticipate a mass shooting. Texas courts have generally held that "domestic disputes do not typically augur more serious crimes against strangers." *QuikTrip Corp. v. Goodwin*, 449 S.W.3d 665, 675 (Tex. App.—Fort Worth 2014, pet. denied). But the rationale for this principle is that the threat of violence is limited by the boundaries of the domestic relationship. *See id.* (finding that the previous acts of violence "against people with whom [the perpetrator] had deep connections" were not of the same character as the rape and murder of a "total stranger"); *see also Ramirez v. AHP Mut. Hous. Ass'n., Inc.*, No. 14–04–00159–CV, 2005 WL 425486, at *2 (Tex. App.—Houston [14th Dist.] Feb. 24, 2005, no pet.) (mem. op.) (explaining that domestic violence incidents are "not similar to a random attack from a stranger").

But the Government concedes that Kelley's threats of violence extended beyond his domestic relationships. Kelley threatened to kill not only Brennaman and her family, but also

Security Forces (threatening to "go for their guns"), police officers ("If the cops show up at my door, I will shoot them"), other members of his squadron ("My work is so lucky I do not have a shotgun because I would go in there and shoot everyone."), and anyone who "[got] in the way" of his plan to reunite with Brennaman after his discharge from the Peak. JEX 22 at 52, 57; JEX 357 at 15. The sweeping and indiscriminate nature of these threats refutes the Government's assertion that threats known to the Air Force "were antisocial acts based on frustration and anger toward *specific individuals* who he had a direct relationship with and blamed for his workplace circumstances." ECF No. 449 at 91. In threatening Security Forces, police officers, his "work," and anyone who "[got] in the way" of his reunion with Brennaman, Kelley did not name "specific individuals" as the target of his threats.

Moreover, several Air Force witnesses agreed that when Kelley escaped from the Peak on June 7, 2012—after attempting to order a firearm over the phone, researching tactical gear and guerilla tactics online, and threatening to shoot Security Forces—he was planning to commit a mass shooting. Trial Tr. 1497:11–1498:4 (Bursztajn); *see also id.* at 1615:2–9 (expert opining that one of the "key factors" in determining whether someone is planning a mass shooting is researching body armor.); PEX 87 at 115–16 (Col. Bearden); PEX 93 at 90–91 (Agent Holz); PEX 109 at 66 (Sgt. Bankhead); PEX 105 at 88:22–89:2 (SAIC Taylor).

Still, the Government maintains that "Kelley was not planning to commit a mass shooting," because, when he was eventually detained and brought in for questioning, "he told the AFOSI agents that he had been planning to return home to commit suicide." JEX 22 at 59, 599. This explanation is not worthy of any credence. First, at least in his interactions with law enforcement and medical personnel, Kelley was an inherently untrustworthy source of information about his conduct and intentions. *See, e.g.*, JEX 22 at 155 ("I lied to everybody and it's something that I am

good at. I'm good at lying."); JEX 357 (writing out a list of things "to say to doctors" to convince them to release him from the Peak). But even if Kelley was not subjectively planning a mass shooting when he absconded from the facility, his transfer to pretrial confinement the very next day clearly demonstrates that the Air Force considered Kelley's behavior a threat not only to himself but to those around him. As evidence that Kelley was "dangerous and likely to harm someone if released," Kelley's Commander specifically emphasized the threat of gun violence: "After learning that he might be released from the mental health facility, he deliberately planned to obtain another gun (the other gun having been taken away from him) and body armor after making threats [at the Peak] to try to take away the guns of any security forces members." PEX 800 at 90–91. And, given that the USAF also barred Kelley from an Air Force base in San Antonio—where he was never stationed—circumstantial evidence demonstrates that the Government thought that Kelley posed a risk to people he did not know personally. JEX 422 at 1; *see also* Trial Tr. 1640–42.

As evidence that some crimes are simply too heinous to be reasonably anticipated, the Government cites other mass shooting cases where courts have found that the harm was unforeseeable. *See, e.g., Lopez v. McDonald's Corp.*, 193 Cal. App. 3d 495 (1987); *Phillips v. Lucky Gunner, LLC*, 84 F. Supp. 3d 1216, 1226 (D. Colo. 2015).[33] Importantly, however, the defendants in those cases knew nothing about the perpetrators that would lead them to anticipate

---

[33]    The Government also cites two additional Colorado cases applying Colorado state law. *See* ECF No. 449 at 102 (citing *Nowlan v. Cinemark Holdings, Inc.*, No. 12-cv-02517-RBJ-MEH, 2016 WL 4092468, at *3 (D. Colo. June 24, 2016) and *Castaldo v. Stone*, 192 F. Supp. 2d 1124, 1171 (D. Colo. 2001)). But the Government's reliance on Colorado law is unavailing—and its contention that Kelley's "criminal acts" were the "sole legal cause of Plaintiffs' injuries," *id.*, is a misrepresentation of the law that actually governs this case. Under Colorado law, a defendant's negligence cannot be a "substantial factor" in causing the plaintiff's injury if some other event or act was the "predominant cause." See *Phillips*, 84 F. Supp. 3d at 1228 (citing *North Colo. Med. Ctr. v. Comm. on Anticompetitive Conduct*, 914 P.2d 902, 908 (Colo. 1996)). No such concept of "predominant cause" exists under Texas law. Indeed, Texas courts have consistently held that an injury may have multiple proximate causes. *See, e.g., Del Lago*, 307 S.W.3d at 774 ("There may be more than one proximate cause of an event.").

a mass shooting. *See, e.g.*, *Lopez.*, 193 Cal. App. 3d 495 (finding that a mass shooting committed by an "*unknown* third party" was unforeseeable in premises liability case); *Phillips*, 84 F. Supp. 3d 1226 ("The only fact that plaintiffs offer to suggest that defendants should have questioned [the shooter] is the amount of ammunition and other potentially dangerous materials that he purchased, but there is nothing inherently suspicious about large internet orders.").

Here, the Government cannot plausibly argue that it did not know anything about Kelley that would lead it to anticipate such a crime because the USAF explicitly recognized his threats of mass violence as evidence supporting its decision to extend his pre-trial confinement and, later, to permanently bar him from HAFB. *See, e.g.*, PEX 800 at 90–91 (recommending continued pretrial confinement and citing Kelley's history of domestic violence, threats to take Security Forces' guns and to kill his wife, admission to and subsequent escape from a mental health facility, and plans to obtain weapons and body armor as evidence that Kelley was "dangerous and likely to harm someone if released.").

Indeed, it is difficult to imagine stronger evidence of foreseeability than Kelley's threats to commit a mass shooting and his attempt to actually carry one out while he was being hospitalized at a mental health facility. To adopt the Government's view of foreseeability in this case would amount to endorsing a rule that mass shootings are unforeseeable *per se*. The Court declines to adopt such a rule, as contrary to Texas law. That a tragedy is, from a moral or psychological perspective, "senseless" or "incomprehensible" does not render it legally unforeseeable. In suggesting that the Sutherland Springs shooting was unforeseeable because it was "horrific," the Government asks the Court to substitute its subjective horror at the magnitude of harm in this case for the objective standard required under Texas law. "The test is not what the wrongdoer *believed* would occur; it is whether he ought reasonably to have foreseen that the event in question, or some

similar event, would occur." *Clark v. Waggoner*, 452 S.W.2d 437, 440 (Tex. 1970). Here, the overwhelming evidence and the credible witness testimony establishes that Kelley's attack on the Sutherland Springs Church on November 5, 2017, was or should have been foreseeable to the United States based on Kelley's history of domestic abuse, his history of threating mass violence, and his attempt to commit a mass attack while in the Air Force.

## III.   Plaintiffs' Claim for Negligent Supervision

Claims against an employer for negligently hiring, supervising, training, or retaining an employee are based on direct liability, not on vicarious liability. *Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 100-01 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). "Negligent hiring, retention, and supervision claims are all simple negligence causes of action based on an employer's direct negligence rather than on vicarious liability." *Dangerfield v. Ormsby*, 264 S.W.3d 904, 912 (Tex. App—Fort Worth 2008, no pet.). An employer can be liable for negligence if its failure to use due care in supervising an employee creates an unreasonable risk of harm. *Clark v. PFPP Ltd. P'ship*, 455 S.W.3d 283, 287 (Tex. App.—Dallas 2015, no pet.).[34]

"The elements of a claim for negligent supervision, like all negligence claims, are (1) the defendant owed a legal duty to the plaintiff, (2) the defendant breached that duty, (3) the plaintiff suffered damages, and (4) the damages were proximately caused by the defendant's breach." *Latimer v. Mem'l Hermann Hosp. Sys.*, No. 14–09–00925–CV, 2011 WL 175504, at *3 (Tex. App.—Houston [14th Dist.] Jan. 20, 2011, no pet.) (citation omitted). An employer has a duty to adequately hire, train, and supervise employees and "[t]he negligent performance of those duties

---

[34] "To prevail on a claim for negligent hiring or supervision, the plaintiff is required to establish not only that the employer was negligent in hiring or supervising the employee, but also that the employee committed an actionable tort against the plaintiff." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 801 n.2 (Tex. 2010) (quoting *Brown v. Swett & Crawford of Tex., Inc.*, 178 S.W.3d 373, 384 (Tex. App.—Dallas 2005, no pet.)). Plaintiffs have established that the AFOSI agents assigned to Devin Kelley's case committed an actionable tort. Specifically, the agents were negligent in failing to submit his fingerprints and final disposition report to the FBI, and that the agents' negligence proximately caused Plaintiffs' injuries.

may impose liability on an employer if the complainant's injuries are the result of the employer's failure to take reasonable precautions to protect the complainant from misconduct of its employees." *Mackey v. U.P. Enters., Inc.*, 935 S.W.2d 446, 459 (Tex. App.—Tyler 1996, no pet.). Texas courts have declined to impose liability on supervisors where adequate supervision would not have changed their employees' conduct and where the torts of their employees were not foreseeable. *See Moore Freight Servs., Inc. v. Munoz*, 545 S.W.3d 85, 99 (Tex. App.—El Paso 2017, pet. denied) ("It is undisputed that [the truck] drifted off the road due to driver inattention. Better supervision . . . would have had no effect on the driver's conduct."); *Castillo v. Gared*, 1 S.W.3d 781, 783 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (A security company's policy permitting a security guard to enter a guest's room to investigate a disturbance without being accompanied by another person did not render the sexual assault of the guest foreseeable. The company did not know and had no reason to anticipate that the security guard in question would rape a guest.).

Here, the evidence demonstrates that Detachment 225 leadership should have anticipated the negligence of the agents acting under their direction during the Kelley investigation, given their heavy workload and lack of experience. For example, when Randall Taylor arrived at Detachment 225 in December 2011,[35] Taylor found "an administrative nightmare." PEX 105, Taylor Dep. Tr. 24:20. Files were strewn all over conference rooms. *Id.* at 24:21–25. The electronic fingerprint machine did not work. *Id. at* 24:4–24:16. Cases were stagnating. *Id. at* 24:23–24:2. The agents in Detachment 225 were generally inexperienced, "probationary" agents. *Id.* at 161:13–16. Indeed, Taylor testified that there was not a single individual in the entire department who had

---

[35]     Randall Taylor was assigned to Detachment 225 as the SAIC from December 2011 until May 31, 2014. ECF No. 425 ¶ 5(c). At that time, James Hoy was the superintendent, or non-commissioned officer in charge designated to report to Taylor. *Id.* ¶ 5(j). In approximately July 2012, Lyle Bankhead took over as the superintendent of Detachment 225. *Id.* ¶ 5(g); PEX 105, Taylor Dep. Tr. 39:3–9.

more than approximately a year and a half of experience. *Id.* at 199:14–18. Taylor requested additional manpower from his own supervisors, but, after they continued to send inexperienced agents to HAFB for two-week periods, he eventually declined any further "surge support" as more trouble than it was worth. *Id.* at 162:2–163:19. In sum, the Detachment "had a pile of work," but "could not accomplish what needed to be accomplished" because of the agents were so inexperienced. *Id.* at 161:22–162:1. Agents worked "at least 12 hours a day" and conducted 24-hour surveillance on "numerous, numerous occasions." *Id.* at 153:17–154:9. Taylor testified that agents brought sleeping bags into work because they did not know when they would be able to go home to sleep. *Id.* They did not have enough time to accomplish all of their assigned duties— "there was a general complaint that they were overtasked." *Id.* at 154:3–9.

Moreover, Taylor was aware that Kelley was dangerous. In fact, on June 8, 2012, he authored a probable cause memorandum seeking authorization to search Kelley's belongings after his escape from the Peak. JEX 22 at 66. In the memorandum, Taylor specifically highlighted Kelley's threatening behavior involving guns. He noted that Kelley had threatened to kill Brennaman and her aunt and had held a gun to Brennaman's head. *Id.* He reiterated Kelley's earlier threats against law enforcement ("If the cops show up at my door, I will shoot them") and his co-workers ("[M]y work is so lucky I do not have a shotgun because I would go in there and shoot everyone").[36] *Id.* After describing Kelley's attempt to purchase a firearm from the Peak and his subsequent escape, Taylor wrote that "[w]hile in inpatient status at the Peak, [Kelley] was categorized in the 'Maximum Risk Range' for violence, control issues and coping." *Id.* at 66–67.

Despite his awareness that Kelley posed a risk of violence generally and gun violence specifically, Taylor closed Kelley's investigative file without confirming that Kelley's fingerprints

---

[36]     At his deposition, Taylor agreed that this statement constituted a threat to commit a mass shooting with a shotgun. PEX 105, Taylor Dep. Tr. at 88:22–89:2.

and final disposition report had been submitted to the FBI. *See* JEX 19 at 1. Before closing a file

for submission to HQ AFOSI, AFOSI Manual 71-121 requires unit leadership to conduct a review

of the file using the AFOSI Closed Investigation File Checklist, which requires reviewing

fingerprints and the final disposition. JEX 4 at 159–60. On December 14, 2012, after receiving

Kelley's report of conviction, which indicated that Kelley had been convicted of a crime of

domestic violence, JEX 20, Taylor submitted the investigative file for closure in I2MS. JEX 19 at

1. The I2MS record indicates that Taylor certified answers to two questions in connection with

AFOSI's FBI reporting obligations before closing the case: (1) "Has the Fingerprint Card FD2-49

been sent to the FBI?" and (2) "Has the Disposition R-84 been sent to the FBI?" JEX 19 at 2. If

Taylor had correctly answered "no" to either of those questions, he would not have been able to

submit the file for closure. PEX 105, Taylor Dep. Tr. 115:11–14; JEX 3 at 31, 85 n.88.

Taylor testified that he could not recall why he submitted the case for closure without

confirming that Kelley's criminal history data had been submitted, but stated "a case agent would

have provided [him] with a confirmation that these items were done through either a checklist or

a verbal confirmation." PEX 105, Taylor Dep. Tr. at 116:21–117:5; 121:5–10. The copy of the

"Closed Investigation File Checklist" included in Kelley's physical investigative file indicated that

several investigative tasks had been accomplished. For example, someone marked that the "final,

signed, published [report of investigation] and [summary complaint report] [were] attached to the

file." JEX 22 at 3. However, Items 17 ("FD-249") and 18 ("R-84") on the checklist were left

entirely blank. *Id.* at 4. Given that the physical checklist indicated that the FD-249 and R-84 had

not been submitted, it would not have been reasonable for Taylor to have relied on the checklist to

close Kelley's investigative file. Likewise, in light of the dearth of experience among the agents

he supervised and his own testimony that the agents were not accomplishing all of the tasks

assigned to them, it would not have been reasonable for Taylor to have relied on a case agent's verbal or written confirmation that the items on the Closed Investigation File Checklist had been completed.

AFOSI Manual 71-121 requires Detachment leadership to review the physical investigative file for themselves before submitting a file for closure; it does not authorize SAICs or superintendents to rely on the agents they are supervising to conduct their supervisory reviews for them. *See* JEX 4 at 159–60. After screening a file for closure, AFOSI Manual 71-121 mandates that leadership authenticate the physical file by signing and dating it. JEX 4 at 119 ¶ 9.2.1.2. The case file cover sheet for Kelley's investigation did not contain a supervisor's signature or a date to signify that the file was reviewed for closure. JEX 22 at 1–2.

The Court concludes that Taylor's negligent supervision was a substantial factor in causing Plaintiffs' injuries, without which the harm would not have occurred. *Nixon*, 690 S.W.2d at 549–50 (Tex. 1985)). Had he ever checked the physical file, Taylor would have noticed the missing fingerprint and final disposition submissions—resulting in supervisory action to correct the mistake. *See, e.g.*, PEX 93 at 101–03 (Agent Holz explaining that had a supervisor told him to submit Kelley's information he would have done so within days). Instead, Taylor falsely certified that Kelley's criminal history had been submitted to the FBI. JEX 19 at 1–2.

Further, given everything that Taylor knew about Kelley's history of violent and threatening conduct—including threats to commit a mass shooting—he should have anticipated the danger that his negligent supervision created for others. *Nixon*, 690 S.W.2d at 549–50. It was equally foreseeable that the agents under Taylor's supervision would act negligently based on their workload and lack of experience. Because the electronic fingerprint machine was broken during the Kelley investigation, Taylor should have known that the only way to confirm that the

fingerprints and final disposition had been submitted was to check the physical copy of the Kelley's file.

For the foregoing reasons, the Court also concludes that Detachment 225 leadership negligently supervised their agents in the collection, maintenance, and submission of Devin Kelley's fingerprints and criminal convictions to the FBI, and that their negligent supervision was a proximate cause of Plaintiffs' injuries.

## IV.    Apportionment

### A.    *Academy Sports + Outdoors*

To start, the Court does not apportion any responsibility to Academy because the Government has failed to establish that Academy's negligence proximately caused Plaintiffs' injuries. The Government has designated Academy as a responsible third party in this action, alleging that Academy illegally and negligently sold the firearm used in the shooting to Kelley on April 7, 2016, in violation of federal law. ECF Nos. 150, 160.[37] Specifically, the Government asserts that the sale violated 18 U.S.C. § 922(b)(3), which provides that a seller of a firearm must comply with the law of the state of which the purchaser is a resident.

When he purchased the Ruger, Kelley presented his Colorado driver's license and listed his residence as Colorado Springs, Colorado on the required ATF Form 4473. Trial Tr. 1095: 4–5, 8–10; JEX 345 at 4. Academy was thus required to comply with Colorado law in conducting the sale. *See* 18 U.S.C. § 922(b)(3). Academy employees signed the ATF Form 4473, certifying that the sale to Kelley complied with all applicable laws. *See* Trial Tr. 1096:12–18, JEX 75 at 3; JEX 345 at 6. It is undisputed for the purposes of this action that the sale of the Ruger violated

---

[37]     The Government also designated ten John Doe parties as alleged co-conspirators. ECF No. 150. The Government voluntarily abandoned these designations at trial, however, and the Court granted a Rule 52(c) motion striking all John Does. Trial Tr. 1682:14–25.

Colorado's ban on large-capacity magazines ("LCMs"). Colorado prohibits the sale of magazines that hold over fifteen rounds. Trial Tr. 1099:16–22; COLO. REV. STAT. § 18-12-301(2)(a)(I). The Ruger was packaged with a 30-round magazine at the time of sale. Trial Tr. 1098:19–22. Assuming that the sale of the Ruger violated the law of Colorado, the state in which Kelley then resided, it also violated 18 U.S.C. § 922(b)(3).[38]

As evidence that Academy was negligent in selling the Ruger to Kelley, the Government observes that one of the employees involved in the sale, W.F., "did not know about Colorado's magazine restriction" and failed to ask Kelley "whether he was buying a firearm to circumvent the laws of his home state." ECF No. 449 at 54. The Government further notes that "[t]he Firearm Transaction Checklist used during the April 7, 2016 transaction has the answer 'Y' circled next to Question #5 under Step 3, '[d]id the customer provide a valid, un-expired, govt. issued photo ID containing their name, current home address, and a date of birth?'" *Id.*; JEX 67. The Government thus asserts that "Academy was negligent in failing to comply with federal law aimed at preventing individuals from crossing state lines to purchase firearms they are not lawfully permitted to possess." ECF No. 449 at 54.

Plaintiffs note that the identification issue was a short-lived and artificial impediment to Kelley's access to firearms from FFLs. An abstract of Kelley's driving record indicates that he was eligible to obtain a Texas driver's license ("TDL") as early as 2007 and eventually did obtain a TDL in May 2017, approximately six months before the shooting. JEX 380; Trial Tr. 1121:9–12 (ATF); JEX 564 at 1 (copy of Kelley's Texas license); JEX 567 (temporary permit). Thus, Plaintiffs argue that, because Kelley could have purchased the same firearms used in the shooting

---

[38]     The Supreme Court of Texas recently reached the opposite conclusion: "In sum, the sale of the Ruger AR-556 rifle to Kelley complied with the legal conditions of sale in both Texas and Colorado." *In re Academy, Ltd.*, ---S.W.3d ---,2021 WL 2635954, at *7 (Tex. 2021).

with a valid TDL within this six-month period, Academy's illegal sale in 2016 cannot have proximately caused Plaintiffs' injuries.

The Government suggests that the Court should disregard these arguments because "[t]he vast majority of Plaintiffs are judicially estopped from arguing that Academy was not negligent" based on their involvement in the state-court action against Academy. ECF No. 449 at 112 (citing *Hall v. GE Plastic Pacific PTE, Ltd.*, 327 F.3d 391 (5th Cir. 2003) ("Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding.") (internal quotation marks omitted)). Even so, the designation of a responsible third party is a defensive issue on which the *defendant*, not the plaintiff, bears the burden of proof. *Nichols v. Goodger*, No. 03–16–00044–CV, 2017 WL 3122793, at *4 (Tex. App.—Austin July 20, 2017, no pet.). The Government has not met this burden, however, because it failed to present a shred of evidence at trial or in its post-trial briefing in support of foreseeability.

There is no evidence that the Academy employees who sold the Ruger to Kelley should have anticipated the danger that the sale created to others. [39] *See Cowart v. Kmart Corp.*, 20 S.W.3d 779, 786 (Tex. App.—Dallas, 2000) ("The [plaintiffs] provided no summary judgment evidence of any fact that should have alerted any Kmart employee that [the customers who purchased

---

[39]     The Government does note that Academy's negligence "was particularly egregious in this instance due to the fact that the Colorado law was enacted specifically to prevent the exact type of event that took place through the use of the AR-556—a mass shootings [sic]." ECF No. 449 at 112. There is some support in Texas law for the proposition that a statute's purpose can serve as evidence of the foreseeable consequences of its violation. *See Pike*, 727 S.W.2d at 517–18. ("[I]t is clear under the facts that the injury here was foreseeable. The major reason [for the statute requiring cities] to keep a record of burials is to ensure that it is known where bodies are interred. By failing to keep the records, it is obvious that the exact occurrence sought to be avoided herein has occurred, namely, that a body cannot be found. The City Manager and City Secretary, as reasonable people, should have anticipated the dangers that their lack of diligence threatened."). However, given that one of the purposes of the Brady Act was to prevent mass shootings like the one committed by Devin Kelley, the Court presumes that the Government does not intend to endorse this approach to the foreseeability analysis. *See* JEX 645 at 2 (Presidential signing statement, noting a mass murder without a background check of a mental institution patient); JEX 646 at 1 (floor argument noting another mass murder in Tulsa).

ammunition later used in a shooting] would put the bullets in the hand of someone who would engage in criminal conduct. Thus, there was no controverting evidence Kmart could foresee that [the customers or the shooter] would use the purchased ammunition for a criminal purpose. Without this controverting evidence, there was no fact issue on foreseeability for the trial court. Therefore, because Kmart negated the foreseeability element of the [plaintiffs'] claim, the trial court properly rendered summary judgment.").

Without addressing foreseeability, the Government insists that Academy should bear a larger portion of the liability in this case because "[h]ad Academy adhered to its own Firearms Checklist and complied with applicable law, it would have refused to sell the firearms to an individual with a Colorado driver's license before a NICS background check was even performed." ECF No. 449 at 121. Here, the Government relies on the fact that the residency question appears *before* the NICS background check on Academy's internal firearm transaction checklist. *See* JEX 67 at 1. Under Texas law, a company's internal policies alone generally do not determine the governing standard of care. *Transp. Services, Inc. v. Fulgham*, 154 S.W.3d 84, 92 (Tex. 2004). And here, again, the Government's argument fails on the question of foreseeability. It is not foreseeable that performing these two steps in reverse order would create a danger to others.

Given the Government's own failure to adhere to its own mandatory procedures and checklists in this case, its attempt to impute greater liability to Academy on the same basis is somewhat surprising. "If the government finds filling out forms a chore, it has good company. The world is awash in forms, and rarely do agencies afford individuals the same latitude in completing them that the government seeks for itself today.*" Niz-Chavez v. Garland*, 141 S.Ct. 1474, 1485 (2021). Indeed, the Brady Act imposes harsh penalties on both FFLs and prospective transferees alike for violating its form-related provisions. An FFL, for example, may have its license revoked

for failing to maintain accurate and detailed records of the acquisition and disposition of the firearms its sells. *See* 18 U.S.C. §§ 923(g)(1)(A), 923(e). Likewise, a prospective transferee may face up to ten years in prison for misstating information on ATF Form 4473. *See* 18 U.S.C. § 924(a)(2); Trial Tr. 661:17–22, 1139:14–19, 1141:1–3. "If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez*, 141 S.Ct. at 1486.

### B.   *Remaining Parties*

The Court apportions liability to the remaining parties as follows:

> Devin Patrick Kelley: 40%
>
> AFOSI agents and Security Forces personnel: 20%
>
> Detachment 225 Leadership: 40%

Texas law does not prohibit a negligent wrongdoer from bearing more responsibility for an injury than an intentional tortfeasor. *Hyde Park Baptist Church v. Turner*, No. 03-07-00437-CV, 2009 WL 211586, at *6 (Tex. App.—Austin Jan. 30, 2009, pet denied). In *Turner*, the Austin Court of Appeals upheld a jury verdict apportioning 80% of responsibility to a daycare center for its negligent failure to prevent the abuse of a child and 20% to the abusive caregiver. *Id.* Chapter 33 of the civil practice and remedies code provides that the trier of fact shall determine the proportionate responsibility of each defendant in a tort claim. *See* TEX. CIV. PRAC. & REM. CODE § 33.003. As the *Hyde Park* court observed, "[t]he statute makes no distinction between those defendants who have acted negligently and those found to have committed intentional torts." *Turner*, 2009 WL 211586, at *6 (citing TEX. CIV. PRAC. & REM. CODE § 33.003). "Similarly, Hyde Park has not provided, nor have we found, any precedent in Texas case law that would support a

bright-line prohibition on allocating greater responsibility to a negligent defendant than to a defendant who acted intentionally." *Id.*

The trial conclusively established that no other individual—not even Kelley's own parents or partners—knew as much as the United States about the violence that Devin Kelley had threatened to commit and was capable of committing. Moreover, the evidence shows that—had the Government done its job and properly reported Kelley's information into the background check system—it is more likely than not that Kelley would have been deterred from carrying out the Church shooting. For these reasons, the Government bears significant responsibility for the Plaintiffs' harm.

## CONCLUSION

The Court concludes that the Government failed to exercise reasonable care in its undertaking to submit criminal history to the FBI. The Government's failure to exercise reasonable care increased the risk of physical harm to the general public, including Plaintiffs. And its failure proximately caused the deaths and injuries of Plaintiffs at the Sutherland Springs First Baptist Church on November 5, 2017.

The Court finds the United States 60% responsible for this harm and jointly and severally liable for the damages that may be awarded.

Within 15 days of this Order, the Parties are ORDERED to confer and file with the Court a proposed plan to bring the individual damages cases to trial.

It is so ORDERED.

SIGNED this 6th day of July, 2021.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE