# Morgan Harris

## Page 1

```
  1              UNITED STATES DISTRICT COURT
  2               WESTERN DISTRICT OF TEXAS
  3                  SAN ANTONIO DIVISION
  4
  5   Kyle Workman and Morgan
      Harris,
  6
               Plaintiffs          Civil Action No.
  7                                SA-19-cv-0705
                                   Consolidated in Civil Action
  8                                No. SA-18-cv-00555-XR
  9   v.
 10   United States of America,
 11           Defendant.
 12
 13        The Remotely Reported Videotape Deposition of
 14   MORGAN HARRIS, produced at the instance of the
 15   Defendant, and duly sworn, was taken in the
 16   above-styled and numbered cause on May 21, 2020, from
 17   10:11 a.m. to 12:19 p.m., before Truenea Teasley, CSR
 18   in the State of Texas reported by shorthand method at
 19   1250 NE Loop 410, Suite 310, San Antonio, Texas 78209
 20   in the City of San Antonio, County of Bexar, State of
 21   Texas, pursuant to the Federal Rules of Civil
 22   Procedure, the First Emergency Order regarding the
 23   COVID-19 State of Disaster, and the provisions stated
 24   on the record.
 25
```

## Page 2

```
  1                    A P P E A R A N C E S
  2   For the Deponent:
  3        Brett T. Reynolds
           Brett Reynolds & Associates
  4        1250 NE Loop, 410, Suite 310
           San Antonio, Texas 78201
  5        btreynolds@btrlaw.com
  6   For the Plaintiffs:
  7        Jamal K. Alsaffar
           Whitehurst, Harkness, Brees, Cheng, Alsaffar,
  8        Higginbotham, and Jacob, PLLC
           7500 Rialto Boulevard, Building 2, Suite 250
  9        Austin, Texas 78735
           jalsaffar@nationaltriallaw.com
 10
      For the Defendant:
 11
           Faith Lowry
 12        Christopher Bates
           Assistant United States Attorney
 13        950 Pennsylvania Avenue, NW
           Washington, DC 20530-0001
 14        faith.lowry@usdoj.gov
 15   ALSO PRESENT:
 16        Robie Rowley, Videographer
 17
 18   WITNESS:                                           PAGE
 19   MORGAN HARRIS
 20        Examination by MS. LOWRY                         4
 21   Certificate of Completion of Deposition              65
 22   Witness Signature/Correction Page                    68
 23
 24
 25
```

## Page 3

```
  1                 (All parties present have hereby
  2   waived the necessity of the reading of the
  3   statements by the deposition officer as
      required by Rule(30) (b)(5).)
  4           VIDEOGRAPHER:  Okay.  We are on the
  5   record at 10:21 a.m. Central Time.
  6           REPORTER:  Okay.  Today's date is May 21,
  7   2020.  The time is 10:11 a.m.  This is the videotape
  8   deposition of Morgan Harris and it is being conducted
  9   remotely in accordance with the First Emergency Order
 10   Regarding COVID-19 State of Disaster, paragraphs 2b
 11   and c.  The witness is located at 1250 Northeast Loop
 12   410, Suite 310, San Antonio, Texas 78209.
 13           My name is Truenea Teasley, Court
 14   Reporter number 8719.  I am administering the oath and
 15   reporting the deposition remotely by stenographic means
 16   from my home in El Paso, Texas.  My business address if
 17   210 East Main, Suite 1616, El Paso, Texas 79901.  The
 18   witness has been identified to me through
 19   representation of counsel.
 20           Would counsel please state their
 21   appearance and locations for the record.
 22           MR. REYNOLDS:  This is Brett Reynolds
 23   appearing as counsel for Morgan Harris.  I'm located at
 24   1250 Northeast Loop 410, Suite 310, San Antonio, Texas,
 25   in my law office.
```

## Page 4

```
  1           MR. ALSAFFAR:  Jamal Alsaffar for the
  2   plaintiffs, and I'm located in Austin, Texas.
  3           MS. LOWRY:  This is United States
  4   Attorney Faith Lowry for the defendant United States of
  5   America, and I'm in San Antonio, Texas.
  6           MR. BATES:  Christopher Bates for the
  7   United States, Arlington, Virginia.  And I said that
  8   I'll be listening in.  I'll need to step out for a
  9   moment, but I will listen in.
 10           MORGAN HARRIS,
 11   sworn by the Certified Court Reporter, testified as
 12   follows:
 13                         EXAMINATION
 14   BY MS. LOWRY:
 15      Q.   Are you ready to proceed?
 16      A.   Yes.
 17      Q.   Thank you.  Good afternoon -- or good morning,
 18   Ms. Harris.  My name is Faith Lowry.  I'm an attorney
 19   at the United States Attorney's office here in San
 20   Antonio, Texas.  And I'm here today on behalf of the
 21   United States, the defendant in action 518-CV-705 and
 22   the consolidated cases.
 23           Can you please state your name for the
 24   record.
 25      A.   Morgan Harris.
```

Morgan Harris

Page 37

1  how long was it before you were taken to the hospital?
2      A.  I -- I don't recall a specific. Do you want
3  an estimate?
4      Q.  I guess -- I guess the amount of time isn't
5  specifically important, but was it later into the
6  evening or did you go to the hospital from the church?
7      A.  I went to the hospital directly from the
8  church.
9      Q.  And was that by ambulance or was someone able
10  to drive you?
11      A.  It was by an ambulance, yes.
12      Q.  Were you receiving care in the ambulance while
13  you were being transported?
14      A.  There were multiple people in the ambulance
15  with me. I was specifically not being worked on. They
16  were tending to someone else.
17      Q.  Which hospital did they take you to?
18      A.  They took me to Connally Memorial in
19  Floresville and then to University.
20      Q.  In San Antonio?
21      A.  Correct.
22      Q.  How long were you at Connally?
23      A.  Maybe a couple of hours and they -- they made
24  sure I was stable and then they were overrun and
25  transferred me.

Page 38

1      Q.  Okay. Were you released the same day?
2      A.  Yes, that evening from University.
3      Q.  Prior to the shooting, had you been involved
4  in any life-threatening events?
5      A.  No.
6      Q.  And have you since that time?
7      A.  No.
8      Q.  After you were released from University, when
9  is the next time that you received medical care?
10      A.  They had me come back to the trauma ward in
11  University at two weeks out. I did my own packing and
12  dressing of wounds twice daily.
13      Q.  And is that upon the instructions that they
14  gave you at University when you were discharged?
15      A.  Yes.
16      Q.  I know that you've seen many, many, many
17  doctors and had many appointments since that time. We
18  are not going to walk through each of those
19  appointments.
20          I'll ask are you currently regularly
21  seeing a doctor?
22      A.  Currently the doctor that I've been seeing
23  office is closed because of the pandemic.
24      Q.  And which doctor is that?
25      A.  Dr. Sandra Shriner.

Page 39

1      Q.  Can you spell that to the best that you can
2  spell it.
3      A.  S-H-R-I-N-E-R.
4      Q.  Prior to the pandemic, how often were you
5  seeing Dr. Shriner?
6      A.  Between every two to four weeks.
7      Q.  And would that have been as recently as like
8  December 2019 or was it prior to that?
9      A.  I started seeing Dr. Shriner in December 2018
10  and the last I saw her was March 2020.
11      Q.  What kind of treatment are you receiving from
12  Dr. Shriner?
13      A.  She intermittently has had me on a chelator.
14      Q.  Can you explain what that is?
15      A.  Chelation therapy has to do with the lead
16  toxicity that's in my body and that's causing a
17  neuropathy. The chelator goes in and it -- to the --
18  it tries to bind the lead compound that's in the soft
19  tissue to pull it to the bloodstream to be -- to be --
20      Q.  Discharged from the body?
21      A.  Yes.
22      Q.  Are you currently on -- is it chelation? I'm
23  sorry. I'm not -- I may be not pronouncing it
24  correctly.
25      A.  I'm currently not on a chelator.

Page 40

1      Q.  When did you stop taking the chelator?
2      A.  I believe in July of 2019. And it's a very
3  strong medication so it's kind of one that you go on
4  and off of as needed.
5      Q.  What changed or happened in July of 2019 that
6  lead you to come off of the chelator?
7      A.  It was no longer being effective or as
8  effective. It wasn't pulling down the lead level from
9  the -- the blood to lead level. It was just remaining
10  at a steady number and with it being a strong
11  medication, if you're not seeing active results,
12  Dr. Shriner didn't want it to cause extra strain on my
13  body.
14      Q.  Is there a plan for you to get back onto the
15  chelator?
16      A.  She has been monitoring the blood to lead
17  level and she would like to -- the way it was explained
18  to me is that she wanted to -- she was hopefully, with
19  the -- the break, some more compounds of lead would
20  come back out of bone and they would be able to be
21  grabbed by the chelator, but we've been monitoring the
22  level and haven't -- haven't really seen it come back
23  out of the bone so it's --
24      Q.  What is your understanding of the current
25  level?

Morgan Harris

Page 41

1   A.  The current blood to lead level or --
2   Q.  Correct.
3   A.  Okay. My understanding is that it's been at
4  a -- between a 2 and a 4 the last few times that she's
5  had labs drawn.
6   Q.  And what is the scale? I assume it goes from
7  zero or 1. Do you know what -- where the scale ends?
8          MR. REYNOLDS: Objection, form.
9   A.  Not -- I -- I am not -- I don't know -- versed
10  isn't the right word -- knowledgeable on the subject to
11  comment on it.
12   Q.  (BY MS. LOWRY) No problem. I was just -- I'm
13  not either. And if you knew that it was a 1 to 10 or a
14  1 to 4 or to 5, I was just curious.
15          What is your understanding of the
16  severity of a level 2?
17   A.  Depending on age and health, it -- it affects
18  people differently. A level 2 in my body has affected
19  me to have bilateral drop foot and is causing cognitive
20  issues. But a level 2 in somebody else may not affect
21  them the same way. It -- it -- it varies by person.
22   Q.  Can you feel and appreciate the difference
23  between when you're at a 2 and when you're at a 4?
24   A.  I guess I'm not really -- I guess I don't
25  know.

Page 42

1   Q.  So I'm just curious if there are times when
2  you think the -- the effects that I'm experiencing,
3  drop foot or cognition issues -- we'll talk about
4  whatever those effects are -- but where you're thinking
5  they're worse today and then you find out that you're
6  at a different number, you're between -- you know,
7  you're at a 4 as opposed to a 2?
8   A.  Yes, they do occasionally feel like they're
9  much stronger from day to day so I would imagine, but
10  I -- it's just --
11   Q.  You don't know if it's tied to a specific.
12   A.  I don't know if it's tied to that because it
13  takes several weeks for the actual lab work to come
14  back so I -- I couldn't tell you for sure whether
15  it's -- my bad days are because it's increased or
16  decreased.
17   Q.  Okay. That makes sense.
18          Let's talk about your current health
19  condition. I believe you stated you're not currently
20  taking any medication. Correct?
21   A.  Just nutrition supplements.
22   Q.  And are the nutrition supplements intended to
23  aid in processing the lead toxicity?
24   A.  Yes.
25   Q.  What are those supplements?

Page 43

1   A.  I take -- I can't recall all of the specific
2  names, but I think I take six different supplements
3  designed to help process toxins out of the body.
4   Q.  Okay. And at this time those supplements are
5  the only medications or pills that you are taking.
6   A.  Correct.
7   Q.  Are you currently receiving physical therapy?
8   A.  Not currently. I'm doing in-home physical
9  therapy.
10   Q.  And is that with an in-home health provider or
11  do you -- you engage in physical therapy exercises
12  yourself?
13   A.  Myself, with different recommendations that
14  different doctors have given me to do exercises
15  specifically to help.
16   Q.  Have you noticed any improvement in your
17  physical condition? Maybe I'll say at what point since
18  the shooting was your physical condition at its worst?
19   A.  In 2018, approximately June.
20   Q.  And what was it -- what was your condition at
21  that time?
22   A.  It was undiagnosed at the time, but it was a
23  lipid neuropathy causing bilateral drop foot.
24   Q.  And "bilateral" means in both feet?
25   A.  Correct.

Page 44

1   Q.  And at that point did -- after it was
2  diagnosed, did you begin physical therapy?
3   A.  Yes.
4   Q.  About when was that?
5   A.  In the fall of 2018.
6   Q.  And how has the physical therapy affected the
7  severity of the drop foot?
8   A.  It hasn't really. It helped support the
9  muscles around it, but the muscles that -- muscles that
10  don't function haven't really -- you know, they -- it
11  hasn't affected the severity of the drop foot, I would
12  say.
13   Q.  And so at this -- are there other -- I guess
14  if the condition was worse in June of 2018, is that
15  condition better today?
16   A.  Mildly.
17   Q.  And in what ways?
18   A.  After the chelator, I was able to -- had a
19  little bit more functionality and a small amount more
20  of feeling.
21   Q.  In your feet?
22   A.  Correct. And through my legs. The -- the
23  nerve pain and symptoms has stayed the same though.
24   Q.  Besides the nerve pain and the bilateral foot
25  drop, what are the other symptoms that you experience

Morgan Harris

Page 45

1  that you tie to the shooting?
2      A. Because of the way that I walk, I experience a
3  lot of lower back to mid-back pain and a lot of pain in
4  my hips.
5      Q. Are there any other physical conditions that
6  you have on account of the shooting?
7      A. I have cognitive issues.
8      Q. Can you describe those, please.
9      A. Poor memory. A lot of times I have trouble
10 staying -- like staying on task. I've lost kind of the
11 ability to multitask, whereas before, I could like sit
12 at a table and have three different conversations with
13 family members, whereas now, it's -- it's really
14 overwhelming when multiple people are trying to talk at
15 me at the same time and I kind of -- like I just have
16 to kind of retreat because I'm not able to handle it as
17 well.
18         I have just not very clear thoughts. A
19 lot of times, I have to -- to get -- a lot of times, I
20 would just lose words and not be able to recall words
21 that I've used 100 times.
22     Q. Okay. And have your medical providers tied
23 these cognition issues to the lead toxicity?
24     A. Yes.
25     Q. Are you receiving any therapies or are there

Page 46

1  no therapies to offer to address these cognitive
2  issues?
3      A. I'm unsure if there are any offered and I'm
4  not --
5      Q. I'm getting just a little feedback and I'm
6  hoping it's not my computer again.
7      A. And currently --
8         VIDEOGRAPHER: Ms. Harris, could you
9  start this answer over, it seemed to freeze up a bit
10 for us.
11     A. Can you ask it again.
12     Q. (BY MS. LOWRY) Therapies that you are
13 receiving to address the cognition issues that you are
14 having.
15     A. I'm currently not seeking therapies to address
16 the specific cognition issues and I am unsure if there
17 are any that could be offered.
18     Q. What are your current hobbies?
19     A. I spend a lot of time -- or I enjoy spending a
20 lot of time with my siblings and my family, playing
21 board games, playing with my dog. Well, throwing the
22 ball for my dog.
23     Q. What kind of dog do you have?
24     A. I have a French Bulldog and we have two
25 Great Danes. I'm not able to play with them because

Page 47

1  they will run me over. I'm a little unsteady and
2  they've got big feet and big bodies.
3      Q. Prior to the shooting, what kind of things did
4  you do with your family?
5      A. My brother and I would go hiking a lot.
6  Growing up we did martial arts. Well, growing up up
7  until the time my brother kind of stepped away from
8  that, but I continued with it. I would spend a lot of
9  time with my nieces and nephews and playing outside,
10 playing hide and seek.
11     Q. And are those activities that have been
12 impacted by the shooting, your ability to engage in
13 those activities?
14     A. Yes.
15     Q. Are there activities that you did with your
16 family prior to the shooting that you are still able to
17 do?
18     A. Yes.
19     Q. What are those types of activities?
20     A. Mostly indoor ones like board games.
21     Q. Do you -- how often are you in touch with your
22 parents?
23     A. Frequently I would say.
24     Q. On a daily or weekly basis?
25     A. Yes.

Page 48

1      Q. And is that the same or more or less than
2  prior to the shooting?
3      A. I would say probably the same. Maybe a little
4  bit more frequently.
5      Q. And do you feel you're able to -- I guess I'll
6  back up.
7          Has your relationship with your parents
8  suffered, stayed the same or improved --
9      A. I have a lot of worry --
10     Q. -- since before the shooting?
11     A. I have a lot of worries because the whole
12 situation is a lot of stress. I mean it has not
13 negatively impacted. It's just created a lot of -- a
14 lot of worry.
15     Q. When you need someone to talk to, who do you
16 typically reach out to?
17     A. Family.
18     Q. And are they available to you when you need
19 someone?
20     A. Most of the time, yes.
21     Q. How do you feel your mental health has changed
22 as a result of the shooting?
23     A. Negatively, I think. I have a lot of
24 anxieties that I'm not able to deal with now like I was
25 before. I had minor anxieties before, but it was

12 (Pages 45 to 48)

Morgan Harris

Page 57

1  would relate to the damages in this case, I still have
2  to ask these very private questions.
3      A. I understand.
4      Q. Are you still able to have sex?
5      A. Yes.
6      Q. And do you feel like that relationship, your
7  sexual relationship, has been negatively affected or
8  not affected by the shooting?
9      A. Not affected.
10     Q. Besides Dr. Lincoln, are there any other
11 counselors that you're currently seeking at this time?
12     A. Currently, no.
13     Q. Prior to the shooting taking place, were you
14 aware of any threats of violence against the First
15 Baptist Church of Sutherland Springs?
16     A. No.
17     Q. Did you know Devin Kelley prior to the
18 shooting?
19     A. I knew of him, but I did not know him.
20     Q. Did you know of any conflicts that he had with
21 other members of the church?
22     A. No.
23     Q. That you recall had you ever previously
24 interacted with Devin Kelley?
25     A. Not him and I personally, no. I think he was

Page 58

1  there when I had a conversation with someone else.
2      Q. And that would be at the church or at a church
3  function?
4      A. Correct.
5      Q. Did you know Danielle Shields Kelley prior to
6  the shooting?
7      A. I did.
8      Q. How did you know her?
9      A. Through church.
10     Q. Do you know when you met her for first time?
11     A. No. Her and I were not super close. We were
12 a couple years apart.
13     Q. Is she older than you are?
14     A. I -- I believe so, yes.
15     Q. Prior to the shooting, did you know
16 Michael Kelley, Devin Kelley's father?
17     A. No.
18     Q. Did you know Michelle Fields prior to the
19 shooting?
20     A. I'm sorry. Can you repeat that name.
21     Q. I believe I might -- I might be off on this
22 first name. I thought it was Michelle Fields.
23     A. I don't know anybody of the last name Fields.
24     Q. Okay. Is there a different --
25     A. I know a Michelle Shields.

Page 59

1      Q. Michelle Shields. That's probably what my
2  problem is.
3         Do you know Michelle Shields?
4      A. Yes.
5      Q. And who is she?
6      A. She's a lady that attends church.
7      Q. Is that Danielle's mother?
8      A. I believe so. I'm not actually positive if
9  it's her birth mother or her adopted mother. I don't
10 know. Like I said I wasn't super close.
11     Q. Did you have any immediate family members who
12 were killed during the shooting?
13     A. Not immediate.
14     Q. Were there extended family members?
15     A. By marriage.
16     Q. And who was that?
17     A. My sister's sister-in-law.
18     Q. Do you or your husband own any weapons?
19     A. I do not. My husband does.
20     Q. Do you know what kind of weapons he owns?
21     A. A rifle, I believe, like a hunting rifle.
22     Q. Did he purchase that weapon while you have
23 been married?
24     A. No. It was a gift previous to our marriage
25 and to our relationship.

Page 60

1      Q. Do you know who he received it from?
2      A. His father, I believe.
3      Q. Have you ever purchased a weapon?
4      A. I have not.
5      Q. One minute.
6      A. Would now be an appropriate time to take a
7  restroom break?
8      Q. Now would be a great time.
9         MS. LOWRY: Can we please go off the
10 record for a quick restroom break.
11        VIDEOGRAPHER: Going off the record at
12 12:05 p.m. Central Time.
13        (A recess was taken.)
14        VIDEOGRAPHER: We are back on the record
15 at 12:13 p.m. Central Time.
16     Q. (BY MS. LOWRY) Ms. Harris, I just have a
17 handful of questions and then we'll be able to wrap up.
18     Do you currently wear any types of leg
19 braces or assistive equipment?
20     A. Yes, I do.
21     Q. What are those?
22     A. I currently wear a unit called a Bioness L300,
23 it's an electric stimulant device that helps. It's
24 a -- as I walk it sends an electronic pulse into the
25 muscles to lift the foot because the drop foot can't on

15 (Pages 57 to 60)

Morgan Harris

Page 61

1  its own. And when I am not able to wear those, I have
2  a set of AFOs that are just static braces that go into
3  my shoe and hold my foot at a 90-degree angle.
4    Q. What does AFO stand for?
5    A. I couldn't tell you.
6    Q. Me either. We'll look it up later.
7    A. It's what the type of brace is.
8    Q. Okay. The -- I might have gotten it down
9  incorrectly, but is it Bioness?
10   A. Yes.
11   Q. Okay. Can you describe what that looks like?
12 I'm unfamiliar.
13   A. It's a cuff with a -- like a battery pack that
14 hooks to the side, it's got electro pads on the inside
15 that I put water on to make a connection to the skin
16 and then as the tendon in the back of my knee bends or
17 moves, it triggers the stimulant to lift the foot.
18   Q. When you are using the Bioness system, do you
19 require a cane to walk?
20   A. No, I don't.
21   Q. Do you typically carry a cane at this time?
22   A. I have one that I keep in my car at all times
23 just in case if I don't have the AFO and the Bioness
24 breaks, it's there as a backup.
25   Q. How often let's say over the last week did you

Page 62

1  use your cane?
2    A. I haven't needed to.
3    Q. So it's a backup, but you're not regularly
4  using it at this time.
5    A. Correct.
6    Q. Are you able to drive?
7    A. Yes, modified.
8    Q. And what are those modifications?
9    A. Because of the drop foot, I am not able to
10 extend my foot to accelerate so I have to place kind of
11 like the bottom of my foot towards the heel on the
12 accelerator or the brake and I have to use my entire
13 leg to -- to apply pressure.
14   Q. Do you drive yourself to work?
15   A. I do.
16   Q. What is your current understanding about
17 whether you will be able to have children?
18   A. It's my current understanding that I am not
19 able to and that -- that the toxicity in my body, the
20 leg has an affect on a -- the embryo in the third
21 trimester and that it would leak out and affect the
22 child. So I've been told not to.
23   Q. Prior to the shooting, were you intending to
24 have children?
25   A. Eventually, yes.

Page 63

1    Q. And are -- have you and your husband
2  considered alternatives to having children of your own?
3    A. We've been told about them and they're --
4  they're options that we've not really looked into a
5  whole lot, but we know of them, yes.
6    Q. Do -- I'm -- I'd like to get a sense of how it
7  affects you to be told that you will not be able to
8  have children.
9    A. It's a really difficult thing to be told in
10 your 20s.
11   Q. All right. Well, I'm very sorry to end on a
12 negative note. You have been incredibly patient
13 throughout this deposition. I hope that you feel I've
14 been equally respectful of you.
15        Were there any questions that I asked you
16 that confused you and that you were not able to get
17 clarification on?
18   A. Not that I recall.
19   Q. You will have the opportunity to review your
20 deposition transcript and clarify or correct any
21 answers that were not given correctly at this
22 deposition.
23        MS. LOWRY: But at this time that will
24 conclude my questions for this deposition.
25   A. Understood.

Page 64

1        MR. REYNOLDS: We reserve our questions
2  on behalf of Ms. Harris until trial.
3        VIDEOGRAPHER: Okay. This concludes the
4  deposition at 12:19 p.m. Central Time. We are off the
5  record.
6        (Deposition concluded.)
16 (Pages 61 to 64)

Free State Reporting, Inc. 410-974-0947

Morgan Harris

Page 65

```
 1          UNITED STATES DISTRICT COURT
 2           WESTERN DISTRICT OF TEXAS
 3              SAN ANTONIO DIVISION
 4
 5    Kyle Workman and Morgan
      Harris,
 6              Civil Action No.
                 SA-19-cv-0705
 7           Consolidated in Civil Action
      v.       No. SA-18-cv-00555-XR
 8
 9    United States of America,
10
11           REPORTER'S CERTIFICATION
          VIDEOTAPE DEPOSITION OF MORGAN HARRIS
12                (Remotely Reported)
13                 MAY 21, 2020
14       I, Truenea Teasley, Certified Shorthand Reporter
15    in and for the State of Texas, hereby certify to the
16    following:
17        That the witness, MORGAN HARRIS, was duly sworn by
18    the officer and that the transcript of the oral
19    deposition is a true record of the testimony given by
20    the witness;
21        That the original deposition transcript was
22    delivered to Ms. Faith Lowry.
23        That a copy of this certificate was served on all
24    parties and/or the witness shown here on _____.
25        That the amount of time used by each party at the
```

Page 66

```
 1    deposition is as follows:
 2        Mr. Reynolds - 0 hours, 0 minutes;
 3        Ms. Lowry - 1 hours, 50 minutes.
 4        That pursuant to information given to the
 5    deposition officer at the time said testimony was
 6    taken, the following includes counsel for all parties
 7    of record:
 8    For the Plaintiff:
 9
        Brett T. Reynolds
10      Brett Reynolds & Associates
        1250 NE Loop, 410, Suite 310
11      San Antonio, Texas 78201
        btreynolds@btrlaw.com
12
        Jamal K. Alsaffar
13      Whitehurst, Harkness, Brees, Cheng, Alsaffar,
        Higginbotham, and Jacob, PLLC
14      7500 Rialto Boulevard, Building 2, Suite 250
        Austin, Texas 78735
15      jalsaffar@nationaltriallaw.com
16    For the Defendant:
17      Faith Lowry
        Christopher Bates
18      Assistant United States Attorney
        950 Pennsylvania Avenue, NW
19      Washington, DC 20530-0001
        faith.lowry@usdoj.gov
20
21        I further certify that pursuant to FRCP Rule
22    30(f)(1) that the signature of the deponent:
23        was requested by the deponent or a party before
24    the completion of the deposition and that the signature
25    is to be before any notary public and returned within
```

Page 67

```
 1    20 days from date of receipt of the transcript. If
 2    returned, the attached Changes and Signature Page
 3    contains any changes and the reasons therefore:
 4        I further certify that I am neither counsel for,
 5    related to, nor employed by any of the parties or
 6    attorneys in the action in which this proceeding was
 7    taken and further that I am not financially or
 8    otherwise interested in the outcome of the action.
 9        Certified by me this 29th day of May, 2020.
10
11
12                     Truenea Teasley
13
                  _____
14                TRUENEA TEASLEY, CSR/RPR/CCR
                  CSR No. 8719
15                Rasberry & Associates
                  Firm Registration No. 734
16                201 East Main, Suite 1616
                  El Paso, Texas 79901
17                Commission Expires: 09/30/2022
```

Page 68

```
 1              CORRECTION SHEET
 2    PAGE   LINE   CORRECTION      REASON
 3    _____
 4    _____
 5    _____
...
25    _____
```

**Morgan Harris**

Page 69

```
 1          I, MORGAN HARRIS, have read the foregoing
 2  deposition and hereby affix my signature that same is
 3  true and correct, except as noted above.
 4
 5
 6
 7          _____
                     MORGAN HARRIS
 8  The State of Texas   )
 9  County of El Paso    )
10
11          Before me, _____, on this
12  day personally appeared MORGAN HARRIS, known to be the
13  person whose name is subscribed to the foregoing
14  instrument and acknowledged to me that they executed
15  the instrument and acknowledged to me that they
16  executed the same for purposes and consideration
17  therein expressed.
18          Given under my hand and seal of office this
19  _____ day of _____, 2020.
20
21
22          _____
                     Notary Public in and for
                     El Paso County, Texas
23                   My commission expires:
24
25
```