# David Colbath

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2               WESTERN DISTRICT OF TEXAS
 3                  SAN ANTONIO DIVISION
 4
 5   David Colbath,
 6        Plaintiffs           Civil Action No.
                               SA-20-CV-00678
 7                             Consolidated in Civil Action
                               No. SA-18-cv-00555-XR
 8
     v.
 9
     United States of America,
10
          Defendant.
11
12
13       The Remotely Reported Videotape Deposition of
14   DAVID EUGENE COLBATH, produced at the instance of the
15   Defendant, and duly sworn, was taken in the
16   above-styled and numbered cause on May 27, 2020, from
17   10:06 a.m. to 1:12 p.m., before Truenea Teasley, CSR in
18   the State of Texas reported by shorthand method at
19   1250 Northeast Loop 410, Suite 310, San Antonio, Texas
20   78209 in the City of San Antonio, County of Bexar,
21   State of Texas, pursuant to the Federal Rules of Civil
22   Procedure, the First Emergency Order regarding the
23   COVID-19 State of Disaster, and the provisions stated
24   on the record.
25
```

## Page 2

```
 1                A P P E A R A N C E S
 2   For the Deponent:
 3       Brett T. Reynolds
         Brett Reynolds & Associates, P.C.
 4       1250 Northeast Loop 410, Suite 310
         San Antonio, Texas 78209
 5       btreynolds@btrlaw.com
 6
     For the Defendant:
 7
         Jim Gilligan
 8       Assistant United States Attorney
         601 N.W. Loop 410, Suite 600
 9       San Antonio, Texas 78216
         jim.gilligan.@usdoj.gov
10
11   ALSO PRESENT:
12       Joe Bazan, Videographer
13
14   WITNESS:                                        PAGE
15   DAVID EUGENE COLBATH
16       Examination by MR. GILLIGAN                    4
17       Further Examination by MR. REYNOLDS          130
18       Further Examination by MR. GILLIGAN          144
19   Certificate of Completion of Deposition          147
20   Witness Signature/Correction Page                150
21
22
23
24
25
```

## Page 3

```
 1                 (All parties present have hereby
 2   waived the necessity of the reading of the
 3   statements by the deposition officer as
     required by Rule(30) (b)(5).))
 4        VIDEOGRAPHER: We are on the record.
 5   Today's date is Wednesday, May 27th, 2020, and the time
 6   is 10:06 a.m.
 7        REPORTER: This is the video deposition
 8   of David Colbath and it is being conducted remotely in
 9   accordance with the First Emergency Order Regarding
10   COVID-19 State of Disaster, paragraphs 2b and c.  The
11   witness is located at 1250 Northeast Loop, Suite 410,
12   San Antonio, Texas 78209.
13        My name is Truenea Teasley, Court
14   Reporter number 8719.  I am administering the oath and
15   reporting the deposition remotely by stenographic means
16   from my home in El Paso, Texas.  My business address is
17   201 East Main, Suite 1616, El Paso, Texas 79901.  The
18   witness has been identified to me through
19   representation of counsel.
20        Would counsel please state their
21   appearance and locations for the record.
22        MR. REYNOLDS: Brett Reynolds, attorney
23   for plaintiff David Colbath, and I'm currently at my
24   office in San Antonio, 1250 Northeast Loop 410, Suite
25   310, 78209.
```

## Page 4

```
 1        MR. GILLIGAN: I'm Jim Gilligan and I
 2   represent the United States.  I'm present at my home
 3   because of restrictions now, but my office address is
 4   601 Northwest Loop 410, Suite 600, San Antonio, Texas
 5   78216.
 6        (Transcript Orders)
 7        MR. REYNOLDS: Brett Reynolds.  I would
 8   like an electronic pdf with condensed.
 9        MR. GILLIGAN: Jim Gilligan.  I'd like an
10   electronic pdf, and if I could get a condensed hard
11   copy and just a regular copy.
12        DAVID EUGENE COLBATH,
13   sworn by the Certified Court Reporter, testified as
14   follows:
15                    EXAMINATION
16   BY MR. GILLIGAN:
17        Q.  Hi, Mr. Colbath, can you hear me okay?
18        A.  Yes.
19        Q.  Okay.  And if I garble my words, it's not
20   intentional, but if you can't hear me for whatever
21   reasons or we get cut off visually, will you just
22   somehow indicate that so I -- so I know you can see me
23   and I can see you.  Fair?
24        A.  Yes, sir.
25        Q.  Okay.  You've been sworn in so your testimony
```

**David Colbath**

Page 69

1  A. Yes, you do.
2  Q. They're voluminous. But what I want to ask
3  you about right now -- when I say "now," I mean this
4  year, if you will, or the specialists that you've seen.
5  Could you educate me on that and could you talk about
6  them so I understand.
7  A. Well, in the last six months, Dr. Willingham
8  gave me this last test to find out what nerves are dead
9  and what might come back, et cetera, et cetera.
10  Q. Okay.
11  A. So that was done. I've had -- I go to a
12  counselor at the -- at The Ecumenical Center -- now,
13  since the coronavirus, I have not been -- but his name
14  is Terry and he's a counselor named Terry and I go
15  there.
16  Q. Does Terry have a last name?
17  A. Oh, man.
18       Do you know Terry's last name?
19       MR. REYNOLDS: Counsel, I think you've
20  probably got the records. I know you-all subpoenaed
21  them. It's Terry Davis.
22  A. Oh, that's right Terry Davis. Sorry about not
23  knowing that.
24  Q. (BY MR. GILLIGAN) Sure. And do you see him
25  like once a month, once a week or --

Page 70

1  A. We were seeing each other every week.
2  Q. Every week?
3  A. Yes. We were before the coronavirus.
4  Q. No. I understand.
5       And does he help or not?
6  A. No, I believe he'd been helping me, we were
7  doing a -- a therapy -- initially it was a light
8  therapy where you watch these lights and you go back
9  and I've -- I've remembered some things about the
10  shooting that I didn't remember and -- and we've been
11  over a number of different issues like that. You know,
12  the question is does it help? Well, I believe it's
13  helped me get through things --
14  Q. Yes.
15  A. -- that I'd have let stir up and bother me
16  without getting to talk to him. I -- I -- I've -- I
17  have no problem with visiting a counselor. When I was
18  in the Center for the Intrepid, I visited one every
19  day.
20  Q. Sure.
21  A. And in the hospital, a couple different ones
22  came to visit me a couple times a week. And I found
23  that it's good to talk and get that stuff on the table
24  and let's see what's going on or why I'm thinking it,
25  things like that.

Page 71

1  Now, your question again was what -- what
2  other specialists have I seen. I'm trying to think.
3  Q. Can we just go back to what you were just
4  discussing.
5  A. Sure.
6  Q. I'd just like to make sure I've flushed that
7  out.
8       So if you -- you -- before the
9  coronavirus hit, you -- you were seeing your counselor
10  about once a month? Once a week?
11  A. Once a week.
12  Q. I understand.
13       And then prior to that, when you were at
14  the Center for Intrepid, you were seeing somebody --
15  somebody would come in and you could sit and -- and
16  kind of like talk therapy, if you will, but help --
17  help you with the analysis of what you were feeling?
18  A. And actually at the Center for the Intrepid, I
19  didn't get to go there until late February or early
20  March of 2018, and so I did my physical rehab, I had
21  psychological help, I had therapeutic help. Many
22  different things. It's a -- it's a tremendous place.
23  But in the hospital, they came to me.
24  Q. Okay.
25  A. In the rehab hospital in New Braunfels where

Page 72

1  here I spent five and a half weeks, they came to me
2  and -- and -- and visited with me then daily or at
3  least a couple times a week.
4  Q. Okay. And we were -- we were talking about,
5  you know, you were talking about the counseling, but we
6  were also talking about specialists, some other
7  specialists that you've seen, that they're kind of
8  following you up and doing work with you now?
9  A. Yeah. In the -- in the last six months, I --
10  I -- I really have not had an opportunity to see
11  anybody besides Dr. Wilham -- Willingham, but for a
12  couple of reasons. The insurance that I have won't pay
13  for anything so everything I do is out of my pocket.
14  And just like the last specialist that I got to see, we
15  had to do a Skype because of the coronavirus with
16  the -- it was real hard to find a lead blood
17  specialist. And we found a --
18       You know the doctor's name?
19       MR. REYNOLDS: Counsel, he's referring to
20  Dr. Todd, which is a retained expert. And I'm not
21  really clear whether your question about specialists is
22  intending for the witness to include the retained
23  expert he's -- he's seen. I'm assuming that you're
24  okay with him talking about them in response to the
25  question because they are specialists.

18 (Pages 69 to 72)

David Colbath

Page 73

1  But Dr. Todd is who you're referring to.
2  A. Okay. So we -- we're trying to -- trying to
3  find out -- I have a little short-term memory problem
4  and -- and I've got -- as it turns out, after I took
5  some more x-rays, I still have a bullet in my chest
6  that I didn't know was there -- actually in my side,
7  stuck between the two and the three rib, a full-size
8  bullet. July of last year, I had one taken out of my
9  chest and I thought it was the last one, but in any
10 case it turned out to be not quite the last one.
11      But so I've got this high lead blood
12 content. So that specialist is one that we found,
13 we're trying -- I didn't know we retained him just for
14 this. I thought we retained him to try to help me out,
15 also, because what kind of treatments do I take? Is
16 there anything for me? How do I get some of this lead
17 out of me?
18      Of course, his first answer was we can't
19 do nothing until you get that bullet out of you, draw
20 blood again. Let's wait a couple of months, draw blood
21 again and let's see what the lead -- lead levels in
22 your blood go down to.
23 Q. (BY MR. GILLIGAN) I understand.
24     And what's your understanding of -- of
25 what his plan down the road for you is, if any? Your

Page 74

1  understanding.
2  A. Well, my understanding is I hope we can find
3  some type of help. Will the short-term memory problem
4  turn into something more? How do I get the lead out of
5  my blood? You know. Do I get it -- I don't know the
6  answers to that, that's above my scope. But I do know
7  that I have a problem and if there's any way to fix it,
8  I want it fixed. I don't need any help being dumb,
9  that's for sure.
10 Q. Was it your understanding that his intent is
11 once he gets blood levels -- your understanding -- is
12 that he may do surgery or recommend surgery to remove
13 that bullet or not?
14 A. He's already recommended that.
15     Oh.
16     He's already recommended that I -- I get
17 the bullet out, but they call it an elective surgery so
18 I got wait and I've got to be able to pay for myself,
19 also, but I'm getting it out because I -- I -- I
20 want -- you know. I'll tell you something. These
21 bullets are full metal jackets, if you've ever heard of
22 that.
23 Q. I have.
24 A. But that's not a true statement. These
25 bullets have lead on the back side. So it's a full

Page 75

1  metal except for the back side, the lead shows. That's
2  where the lead's leaking from. That's where I believe
3  the lead -- we believe the lead would be leaking from.
4      So anyway, I want to get it out of me --
5  Q. Okay.
6  A. -- if it's at all possible.
7  Q. I understand. In regards to any other
8  specialist that you're seeing right now, whether
9  they're, you know, treating or people that have
10 interviewed you?
11 A. No. I -- I don't -- I don't guess I've seen
12 one in the last few months.
13     Have I?
14 Q. Let me ask you this, then. One of -- one of
15 the experts that's been identified in this case is a
16 Dr. Corey Ticknor.
17 A. No, Chris. Chris Ticknor. Dr. Chris Ticknor.
18 Q. I'm sorry. Chris Ticknor. Correct?
19 A. Yes. Yes, sir.
20 Q. Okay. And he's talked to you on at least
21 three occasions?
22 A. At least, maybe more. Probably more. Yes,
23 sir.
24 Q. All right. And the -- one of these occasions
25 was in person or multiple occasions were in person?

Page 76

1  A. I've seen him more than once in person, yes,
2  sir.
3  Q. Okay. Is he giving you adjunct therapy in
4  addition to the counseling center or not?
5  A. Let me ask something. Give me a definition
6  for adjunct.
7  Q. Sure. Is he supplementing therapy other than
8  what you're also getting at the counseling center?
9  A. No, sir.
10 Q. Okay. I understand. So in -- in his capacity
11 he did like an evaluation, if you will. Right?
12 A. Yes.
13 Q. Okay.
14 A. The first one was probably a year and a half
15 ago.
16 Q. I understand.
17 A. Yes.
18 Q. And -- and was that in person?
19 A. Yes.
20 Q. And how long was that? Did that run about
21 three hours?
22 A. Probably, yes.
23 Q. Or -- or more or you just don't know.
24 A. I don't remember. Yeah. And I don't remember
25 how long it took, but we -- I was there quite some time

David Colbath

Page 137

1  Q. Do you have an understanding as to whether or
2  not that was or was not the maximum benefit that was
3  available to you under the Crime Victims fund?
4  A. The original -- the original maximum is 50,000
5  and then they put me in a category of catastrophic so
6  they gave me another 75,000 when it was all said and
7  done.
8  Q. So between the 75 plus the original 50, are
9  you at the cap of the Crime Victims fund as you
10 understand it?
11 A. I am.
12 Q. Do you have an understanding then of -- that
13 there is no more money available from the Crime Victims
14 fund to pay for or provide for any medical care for
15 you?
16 A. Correct.
17 Q. So since you don't have the Crime Victims fund
18 available and your insurance won't cover things, in
19 order for you to get medical care from providers, where
20 does it come from, Mr. Colbath?
21 A. Right now I'm going to pay for it myself.
22 Q. So whatever you can scrape up to set aside out
23 of your fencing business, after you pay the child
24 support, is that what would have to be used to provide
25 for -- for medical care for you?

Page 138

1  A. Absolutely.
2  Q. Are you concerned about the lead toxicity
3  issue that's be discovered from the lead testing that
4  was done, the blood lead testing that was done followed
5  by the evaluation by Dr. Todd?
6  A. Well, actually I'm very -- that's something I
7  said I'm very concerned about. I'm concerned what are
8  some of the things that's going to happen with a high
9  lead content in my blood. And they've attributed part
10 of it to it being a short-term memory problem, which I
11 seem to have at times and -- but I don't know where it
12 goes to from there. I want to get them out.
13 Q. Okay. You -- you don't want to have any lead
14 in your bloodstream if you can avoid it.
15 A. Right.
16 Q. Do you know how much of that lead has made its
17 way into your bone?
18 A. I don't.
19 Q. Does that concern you?
20 A. Very much.
21 Q. You mentioned that you're not presently taking
22 the gabapentin. Do you have an understanding as to
23 whether or not gabapentin is an -- has an opioid
24 derivative component in it?
25 A. I don't know if it does or not.

Page 139

1  Q. Okay. Have you noticed it making you at all
2  sleeping or groggy or having any similar side effects
3  when you were taking it?
4  A. One of the side effects I would have would be
5  grogginess.
6  Q. Okay. Is that a desirable side effect if
7  you're going to operate equipment or machinery at a job
8  site?
9  A. That's why I quit tooken it -- quit taking it.
10 Q. Okay. And that's where I was going.
11    Did you quit taking the gabapentin
12 because even though you're having pain, you don't want
13 to be groggy when you're at work.
14 A. That's right.
15 Q. So are you at work simply putting up with the
16 pain?
17 A. Yes.
18 Q. Is that what you have to do in order to avoid
19 the side effects associated with taking medication that
20 better controls the pain?
21 A. That's what I've got to do to make a living
22 and if there's a little pain involved, I've got to put
23 up with it.
24 Q. And had you say "a little pain." Mr. Colbath,
25 on an average day when you're out on the job site and

Page 140

1  you're ankle swells up, can you just tell us what --
2  how would you describe it to a zero to 10 scale --
3  which I'm sure some of the doctors have asked you at
4  various points in time since the shooting -- what would
5  you describe your pain level as on a typical day if
6  you're at work and your ankle is swelling up?
7     MR. GILLIGAN: Objection, form.
8  A. Sir?
9  Q. (BY MR. REYNOLDS) You can answer.
10    MR. GILLIGAN: I just made an objection
11 for the record. That's all.
12    Form.
13 A. When I was in the hospital, they'd come and
14 say "What's your pain level?" And they'd give me a
15 1 to 10. So, you know, carry it to a 4, 5, 6, 7, 8, 9,
16 10, whatever it is, what's going on.
17    Well, I carry a 3 to a 5 daily and that
18 hurts. That hurts.
19 Q. Is that ongoing?
20 A. Yes.
21    MR. REYNOLDS: I'll reserve the rest of
22 my questions. Well, wait, I have one more question.
23 Q. (BY MR. REYNOLDS) This -- this author in the
24 book, did he come to the Bible studies?
25 A. Yes.

35 (Pages 137 to 140)

Free State Reporting, Inc. 410-974-0947

Page 145

1  A. Yes, sir.
2  Q. Okay. Yes, sir. And you know I heard that
3  you -- you sold land that you possessed.
4      Was some of that cash that you got from
5  that sale used to pay those medical bills or not?
6  A. I did pay some. I paid some other bills I
7  had, some outstanding bills, yes.
8  Q. Can you give us an idea of how much of that
9  land money you used to pay those medical bills so we
10 know?
11 A. If -- if -- if this has to be a truthful
12 answer, I don't remember. I'm sure I could find some
13 numbers for you.
14 Q. All right. Other than that -- that author
15 that's been discussed, there's no other authors, right,
16 or are there that you know of?
17 A. Steven Wiliford has an author that they're
18 putting a book together. I don't know where they stand
19 with it. But that's all I know of.
20 Q. But anybody else that you know?
21     No?
22 A. No.
23 Q. I understand. Have you understood my
24 questions today?
25 A. I have.

Page 146

1  Q. Thank you, sir, for your time.
2  A. Thank you.
3      MR. REYNOLDS: We'll reserve the
4  remainder of our questions for trial.
5      VIDEOGRAPHER: This concludes today's
6  proceedings. We are going off the record. The time is
7  1:12 p.m.
8      (Deposition concluded.)

Page 147

1  UNITED STATES DISTRICT COURT
2  WESTERN DISTRICT OF TEXAS
3  SAN ANTONIO DIVISION
4
5  David Colbath,
       Civil Action No.
6      SA-20-CV-00678
       Consolidated in Civil Action
7      No. SA-18-cv-00555-XR
8  v.
9  United States of America,
10
11     REPORTER'S CERTIFICATION
   VIDEOTAPE DEPOSITION OF DAVID EUGENE COLBATH
12     (Remotely Reported)
13     MAY 27, 2020
14 I, Truenea Teasley, Certified Shorthand Reporter
15 in and for the State of Texas, hereby certify to the
16 following:
17 That the witness, DAVID EUGENE COLBATH, was duly
18 sworn by the officer and that the transcript of the
19 oral deposition is a true record of the testimony given
20 by the witness;
21 That the original deposition transcript was
22 delivered to Mr. James Gilligan.
23 That a copy of this certificate was served on all
24 parties and/or the witness shown here on _____.
25 That the amount of time used by each party at the

Page 148

1  deposition is as follows:
2      Mr. Reynolds - 0 hours, 17 minutes;
3      Mr. Gilligan - 2 hours, 24 minutes.
4      That pursuant to information given to the
5  deposition officer at the time said testimony was
6  taken, the following includes counsel for all parties
7  of record:
8
9  For the Deponent:

10     Brett T. Reynolds
       Brett Reynolds & Associates, P.C.
       1250 Northeast Loop 410, Suite 310
11     San Antonio, Texas 78209
       btreynolds@btrlaw.com
12
13 For the Defendant:

14     Jim Gilligan
       Assistant United States Attorney
       601 N.W. Loop 410, Suite 600
15     San Antonio, Texas 78216
       jim.gilligan.@usdoj.gov
16
17 I further certify that pursuant to FRCP Rule
18 30(f)(1) that the signature of the deponent:
19     was requested by the deponent or a party before
20 the completion of the deposition and that the signature
21 is to be before any notary public and returned within
22 20 days from date of receipt of the transcript. If
23 returned, the attached Changes and Signature Page
24 contains any changes and the reasons therefore;
25     I further certify that I am neither counsel for,

## David Colbath

Page 149

```
 1   related to, nor employed by any of the parties or
 2   attorneys in the action in which this proceeding was
 3   taken and further that I am not financially or
 4   otherwise interested in the outcome of the action.
 5       Certified by me this 8th day of June, 2020.
 6
 7
 8           Truenea Teasley
 9           _____
             TRUENEA TEASLEY, CSR/RPR/CCR
10           CSR No. 8719
             Rasberry & Associates
11           Firm Registration No. 734
             201 East Main, Suite 1616
12           El Paso, Texas 79901
             Commission Expires: 09/30/2022
```

Page 151

```
 1           I, DAVID EUGENE COLBATH, have read the
 2   foregoing deposition and hereby affix my signature that
 3   same is true and correct, except as noted above.
 4
 5
 6
 7                              _____
                                DAVID EUGENE COLBATH
 8   The State of Texas   )
 9   County of El Paso    )
10
11       Before me, _____, on this
12   day personally appeared DAVID EUGENE COLBATH, known to
13   be the person whose name is subscribed to the foregoing
14   instrument and acknowledged to me that they executed
15   the instrument and acknowledged to me that they
16   executed the same for purposes and consideration
17   therein expressed.
18       Given under my hand and seal of office this
19   _____ day of _____, 2020.
20
21
22                              _____
                                Notary Public in and for
                                El Paso County, Texas
23                              My commission expires:
```

Page 150

```
           CORRECTION SHEET
 1
 2   PAGE  LINE  CORRECTION    REASON
 3   _____
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25
```