```
 1                United States District Court
                    Western District of Texas
 2                    San Antonio Division

 3   Kati Wall, Michael Johnson,
     Individually and as Personal
 4   Representatives of
     The Estate of Dennis Johnson
 5   and The Estate of Sara Johnson,
     and Dennis Johnson Jr.,
 6   Christopher Johnson, Deanna
     Staton, and James Graham,        C.A. No. SA-18-cv-951
 7      Plaintiffs,                         Consolidated in
                                     C.A. No. SA-18-cv-00555-XR
 8    v.

 9   United States of America,
          Defendant.
10
     **********************************************************
11
             ORAL VIDEOCONFERENCED DEPOSITION OF KATI WALL
12                        VOLUME 1 OF 1
                        SEPTEMBER 28, 2020
13
     **********************************************************
14

15           ORAL VIDEOCONFERENCED DEPOSITION OF KATI WALL,

16   produced as a witness, duly sworn by me, at the instance

17   of the Defendant, taken in the above-styled and numbered

18   cause on the 28th day of September, 2020, from 1:37 p.m.

19   to 4:20 p.m., before Audrey L. Waldrop, Certified

20   Shorthand Reporter No. 6218 in and for the State of

21   Texas, via Zoom/Remote Counsel, with the witness located

22   at 6395 South Summers Circle, Douglasville, Georgia

23   30135, pursuant to the Federal Rules of Civil Procedure,

24   the Remote Deposition Protocol Order (and the provisions

25   stated on the record or attached therein).
```



GOVERNMENT
EXHIBIT
**286**

2

```
 1              R E M O T E   A P P E A R A N C E S

 2
    FOR THE PLAINTIFFS:
 3       Mr. Jamal K. Alsaffar
         WHITEHURST, HARKNESS, BREES, CHENG,
 4       ALSAFFAR, HIGGINBOTHAM & JACOB, P.L.L.C.
         7500 Rialto Boulevard
 5       Building Two
         Suite 250
 6       Austin, Texas 78735
         Phone:  (866) 566-4346
 7       Fax:  (512) 476-4400
         jalsaffar@nationaltriallaw.com
 8

 9  FOR THE DEFENDANT:
         Ms. Jacquelyn Christilles
10       ASSISTANT UNITED STATES ATTORNEY
         Ms. Kristin Bloodworth
11       ASSISTANT UNITED STATES ATTORNEY
         601 N.W. Loop 410
12       Suite 600
         San Antonio, Texas 78216
13       Phone:  (210) 384-7310
         Fax:  (210) 384-7312
14       jacquelyn.christilles@usdoj.gov
         kristin.bloodworth@usdoj.gov
15

16  ALSO PRESENT:
         Ms. Jennifer White-Canales, Zoom/Remote Counsel
17  Host

18

19

20

21

22

23

24

25
```

3

```
 1                        INDEX

 2                                          PAGE

 3   Appearances.....................................   2

 4   KATI WALL
         Examination by Ms. Christilles..............   5
 5
     Changes and Signature...........................  98
 6   Reporter's Certificate..........................  100

 7
                          EXHIBITS
 8
     WALL                                       PAGE
 9   NUMBER        DESCRIPTION                  MARKED

10   A         Notice of Oral Deposition of
               Witness Kati Wall with Duces Tecum,
11             unsigned Declaration, and Remote
               Deposition Protocol Order,
12             eight pages.                        12

13   B         Declaration signed by Kati Wall
               on 9/28/20 at the conclusion of the
14             deposition, one page.               97
```

15

16

17

18

19

20

21

22

23

24

25

4

1              P R O C E E D I N G S

2              THE REPORTER:  I see that y'all have a

3   protocol order as to how we conduct the deposition.  I

4   assume all counsel are familiar with that and so we're

5   going forward in that way.

6              And y'all are pursuant to the Federal

7   Rules; is that correct?

8              MR. ALSAFFAR:  Yes.

9              MS. CHRISTILLES:  Correct.

10              THE REPORTER:  We do have a Declaration

11   that will need to be signed afterwards.  We'll take care

12   of that.

13              And the protocol allows me to swear the

14   witness in remotely.

15              So with that having been said, is there

16   anything stipulation-wise I need to know about before I

17   swear the witness in?

18              MR. ALSAFFAR:  No.

19              MS. CHRISTILLES:  Nothing from us, no.

20              (Witness sworn.)

21              MS. CHRISTILLES:  All right.  Everybody

22   ready to proceed?

23              THE REPORTER:  Yes, ma'am.

24                      KATI WALL,

25   having been first duly sworn, testified as follows:

```
 1                         EXAMINATION
 2   BY MS. CHRISTILLES:
 3       Q.  Good afternoon, Ms. Wall.  My name is Jacquelyn
 4   Christilles.  I'm an attorney at the United States
 5   Attorney's Office for the Western District of Texas.
 6   That's in San Antonio, Texas.
 7               This other lady on the screen with us is
 8   Kristin Bloodworth.  She's a new attorney with our
 9   office, although, not a new attorney, so she's joining
10   us today for your deposition.
11               But just so you know who Kristin and I are,
12   we represent the United States in this case.  Okay?
13       A.  (Nods head.)
14       Q.  I'm going to go through some preliminary
15   matters just so we all understand how a deposition is
16   going to work.  I'm sure that your attorney has gone
17   through this a little bit with you, but I just like to
18   do it to make sure that we are all on the same page.
19               But the first thing we need to do is if you
20   could just state your name for the court reporter for
21   the record.
22       A.  Okay.  It's Kati Wall, K-A-T-I W-A-L-L.
23       Q.  Thank you.  Perfect.  It's always appreciated
24   for the court reporter when you spell your name.
25               Have you ever been deposed before?
```

1       A.  No.

2       Q.  Have you ever testified in a trial or anything

3   of that nature?

4       A.  No.

5       Q.  All right.  So this is brand new for you.

6   Really, the number-one rule is just to answer all of my

7   questions honestly and to the best of your ability.  Can

8   you promise to do that here today?

9       A.  I can.

10      Q.  Great.  And you're doing a really fantastic job

11  with rule number two, which is waiting until I finish my

12  question before you give an answer.  And can you promise

13  to do that throughout the deposition?

14      A.  Okay.

15      Q.  Okay.  And great job on that third rule, which

16  is to answer all of my questions audibly so that the

17  court reporter can write down your answer.  We always

18  want her to be able to write down a "yes" or a "no" if

19  it's a "yes" or a "no" question.  It's really difficult

20  when we're reading through a deposition transcript and

21  there's an "uh-huh" or an "huh-uh" because we really

22  don't know what that means.

23            So the third thing I'll ask is if it's a

24  "yes" or a "no" question, if you could answer with a

25  "yes" or a "no" instead of just a head nod or a "uh-huh"

1  or an "huh-uh" or something of that nature.  Can you

2  promise to do that?

3       A.  Yes.

4       Q.  Great.  Now, some of my questions may be

5  confusing because as lawyers, we don't speak like normal

6  people a lot of the time.  So if something I ask you is

7  confusing or it's a really bad question, you can ask me

8  to repeat it, you can ask me to rephrase it, but just I

9  want to make sure that you understand all of the

10  questions that I'm asking so that you can answer those

11  questions honestly.  Can you promise to ask me for

12  clarification if anything I ask you is confusing or you

13  just don't understand the question?

14       A.  Yes.

15       Q.  Great.  Now, sometimes your attorney may say,

16  "Objection."  And he's just preserving the record.  He

17  doesn't like how I asked one of my questions or

18  something lawyerly, so he may say, "Objection."  Now,

19  generally, you're going to be able to answer my question

20  after he says that objection but sometimes it'll ruin

21  your train of thought and so, please, if you don't

22  remember the question I asked before your attorney made

23  the objection, just ask me to repeat it.

24            Now, your attorney may object sometimes if

25  I ask a question that you shouldn't answer, but he'll

1    let you know if you shouldn't answer that question.

2    Okay?

3                Just to let you know what's kind of going

4    on.

5        A.  Okay.

6        Q.  Make sense?

7        A.  Yep.

8        Q.  All right.  Now, the subject that we're going

9    to be talking about today can be emotional.  I

10   completely understand that, and I appreciate you being

11   here.  If at any time you need a break, I want you to

12   tell me you need a break.  Can you promise to ask me for

13   a break if you need a break?

14       A.  I do.

15       Q.  Great.  Now, sometimes I might ask you to

16   estimate or guess on something, and I'll try to be clear

17   on that.  Otherwise, I don't want you guessing.

18               So, for instance, I might ask you when the

19   last time you ate ice cream was and you may not remember

20   the last time you ate ice cream and so I'll say, "Well,

21   can you guess the last time you ate ice cream?"  But if

22   you don't remember the last time you ate ice cream, you

23   can simply say, "I don't remember," or "I don't know."

24   "I don't remember" and "I don't know" are perfectly

25   acceptable answers, unless I ask you to guess, you might

1    say, "Well, it might have been sometime last week that I

2    ate ice cream."  Okay?

3              Can you promise to not guess unless I ask

4    you for an estimate?

5        A.  Yes.

6        Q.  Okay.  Great.  So I'm going to be asking you a

7    lot of questions today; and I'm trying to get to know

8    you, I'm trying to (transmission interruption) your

9    family.  And some of the questions may be difficult.

10   None of the questions are meant to embarrass you.

11   They're just questions that we have to ask as part of

12   this lawsuit.  Okay?  So I want you to know that none of

13   these questions aren't meant to embarrass you.

14              THE REPORTER:  Okay.  I'm sorry.  Is she

15   breaking up for you, Ms. Wall?

16              THE WITNESS:  Yes, she is.  She is.

17              THE REPORTER:  Okay.  So what I need you to

18   do, Ms. Christilles, is let's start that over again with

19   you started with, "So I'm going to be asking you a lot

20   of questions today.  I'm trying to"?  Sorry.  You broke

21   up, so that's --

22       Q.  Okay.  Can you hear me okay now?

23       A.  Yes.

24              MS. CHRISTILLES:  Okay.  I tried to do this

25   on my cell so you'd hear me okay, but it does look like

1   my cell phone is being crabby about service, so let me

2   move it a little bit, see if it just likes a different

3   position in my room.  So hold on just a minute.

4              (Discussion off the record.)

5       Q.  (By Ms. Christilles)  All right.  So what I was

6   talking about before my signal cut out is some of the

7   questions that I ask you are going to be difficult.  I'm

8   trying to learn about you, trying to learn about your

9   family.  None of my questions are meant to embarrass

10  you.  They're just part of the questions that I need to

11  ask you for this lawsuit.  Okay?

12      A.  Okay.

13      Q.  So the first one of those odd questions that I

14  have to ask is:  Are you under the influence of any

15  drugs or alcohol that might affect your ability to

16  answer my questions honestly?

17              So, for instance, if you were in the

18  emergency room this morning because you'd broken your

19  leg and you're on a very high dose of hydrocodone, that

20  might affect your ability to answer my questions.

21              So are you on any kind of medication or

22  have you consumed alcohol that might affect your ability

23  to answer my questions?

24      A.  No.

25      Q.  Okay.  Great.  All right.  Now, we know today

1  that I'm going to talk a lot about the shooting that

2  occurred at the First Baptist Church on November 5th,

3  2017.  Can we refer to that shooting that occurred at

4  the church as "the shooting"?  Can we agree that when I

5  refer to "the shooting," that that's what we're talking

6  about?

7      A.  Yes.

8      Q.  Okay.  All right.  Now, have you reviewed

9  anything prior to your deposition?

10          And when I ask have you reviewed anything,

11  I don't want it to be anything that your attorney has

12  given you.  So he may have given you some pointers on

13  how to do a deposition.

14          What I'm asking about is have you reviewed

15  anybody else's deposition to prepare for today, have you

16  looked at any police reports to prepare for today, or

17  anything of that nature.

18          Anything about the shooting, have you

19  reviewed anything to prepare for this deposition today?

20      A.  No.

21      Q.  Okay.  All right.  Now, did you receive a

22  deposition notice for this deposition today?  It would

23  have been a couple-page document telling you about when

24  we were going to do this deposition.

25      A.  No, I did not get a notice.

1     Q.   Okay.  Do you happen to have that deposition

2   notice, and did you get it in an e-mail?  So I'm

3   assuming you do not have it in front of you.

4     A.   I don't have it.  Like, I don't -- didn't get

5   one.

6     Q.   Okay.  All right.  I'm going to go through a

7   couple of things in that deposition notice.

8              MS. CHRISTILLES:  Could we go off the

9   record really quickly?

10             THE REPORTER:  Yes, ma'am.

11             (Discussion off the record.)

12             MS. CHRISTILLES:  Okay.  We can go back on

13   the record.

14             THE REPORTER:  Yes, ma'am.

15     Q.   (By Ms. Christilles)  All right.  Ms. Wall,

16   what we have in front of you, I'm going to have the

17   court reporter mark it as Exhibit A for this deposition.

18             (Wall Exhibit A marked.)

19     Q.   (By Ms. Christilles)  This is the Notice of

20   Oral Deposition of Witness Kati Wall with Duces Tecum;

21   and although you said you haven't reviewed this

22   document, I assume your attorney told you about this

23   deposition because you're here with us today.

24     A.   (Nods head.)

25     Q.   And so this is just the notice that we were

```
 1    going to take your deposition; and you, of course, are

 2    Kati Wall.

 3              We're going to scroll down to page 4 of

 4    this document.  Do you see page 4 of this document?  At

 5    the top it says, "Duces Tecum, Exhibit 'A' to Notice of

 6    Oral Deposition."  Do you see that in front of you,

 7    Ms. Wall?

 8        A.  Yes.

 9        Q.  Okay.  And so what this asks is for you to

10    bring some items with you to the deposition.  Now, I

11    know that's a little difficult since we are remote, but

12    I just want to go through a couple of these documents

13    and see if you possess these documents or if you have

14    provided these documents to your attorney.  Okay?

15        A.  Okay.

16        Q.  All right.  So the first thing asks about any

17    non-privileged records, such as personal notes,

18    calendars, diaries, phone logs, social media posts; and

19    we're really asking for anything related to this

20    lawsuit.

21              Have you provided any of those items to

22    your attorney; and if you haven't provided them, do you

23    have any of those items in your possession?

24        A.  I have not provided them to Jamal.

25              In relation to specifically the lawsuit or
```

1   in relation to the shooting?

2        Q.  Well, since the shooting's part of the lawsuit,

3   it would be relating to the shooting, too, Ms. Wall.

4        A.  Okay.  So I do have journals and things like

5   that; but I have not provided them to my attorney, no.

6        Q.  Okay.  All right.  Well, that's good for us to

7   know.  So you do have journals related to the shooting.

8        A.  (Nods head.)

9        Q.  Is that a "yes," Ms. Wall?

10       A.  Yes.  Sorry.

11       Q.  Okay.  No worries.  I'm just making sure the

12  court reporter doesn't get mad at us.

13            Now, the next thing asks for any medical

14  records that are in your actual or constructive

15  possession.  Now, many times we don't have our own

16  medical records, so what we're asking is:  Do you know

17  if there's any medical records -- medical or mental

18  health records for any medical or mental health

19  appointments that you've attended that relate to this

20  lawsuit, which would include the shooting?  Have you

21  provided any such records to your attorneys?

22       A.  Yes.  I have not provided them, but I do have

23  medical records related to the shooting.

24       Q.  Okay.  You do have medical records related to

25  the shooting.  And are those medical or mental health?

1    Who are those from?

2         A.  So I have psychiatry, so that's medical.  And

3    then mental health as far as like counseling and such.

4         Q.  Okay.  So you do have some psychiatry records

5    and some mental health records.

6         A.  Right, that I could produce.

7         Q.  Okay.  All right.  Well, that's good for us to

8    know, Ms. Wall.

9              All right.  Okay.  How about any medical

10   expenses?  Have you paid any medical expenses?  You

11   talked about some of those mental health appointments.

12   Have you had to pay for any of those out of pocket?

13        A.  Yes, absolutely.

14        Q.  Okay.  And have you provided those records to

15   your attorney?

16        A.  Not as of yet, no.

17        Q.  Okay.  All right.  Now, I have seen one

18   document, looks like from the independent school

19   district, concerning No. 4, alleged loss of earnings.

20        A.  Yes.

21        Q.  Okay.  I have seen that document.  It looks

22   like some leave that you took.  Is that the only

23   document related to a claim of loss of earnings that you

24   have?

25        A.  It's the only, like, immediately following the

1   shooting, yes; but I have been unable to hold a

2   full-time job since the shooting in general.

3        Q.   Okay.

4        A.   So I left my job at the school district after

5   going back.  I couldn't -- I couldn't handle it, and I

6   haven't been able to work full time since.

7        Q.   Okay.  I definitely want to talk about that a

8   little more.  Okay?

9        A.   (Nods head.)

10       Q.   So we'll go through that in just a moment.  I

11   just want to finish up going through some of these

12   documents that you may have provided to your attorney or

13   maybe that we need to get from you in the future.  Okay?

14             All right.  How about any photographs,

15   recordings, videotapes, or anything else that might show

16   any kind of damages?  And when we talk about damages,

17   anything related to this case or this shooting, do you

18   have any photographs or anything that you've provided to

19   your attorney?

20       A.   No.

21       Q.   Okay.  All right.  A lot of the rest of this

22   stuff talks about medical care and medical expenses.

23   It's kind of the same questions.  So we've talked a

24   little bit about that, so we're going to just kind of

25   scroll through and we are going to the Declaration on

1   this, which is page No. 6.  Oh, no -- yep, it is page

2   No. 6.  Excellent.

3            Okay.  So because we're doing this

4   deposition a little differently, we're doing it via

5   Zoom, we just want to make sure that we follow some

6   agreed-upon rules.  So I'm going to have --

7            MS. CHRISTILLES:  If you could scroll down

8   a little more so Ms. Wall could see the contents of this

9   Declaration.

10    Q.  (By Ms. Christilles)  Now, your attorney's

11   going to send this to you after the deposition, but it

12   talks about things that are occurring during the

13   deposition, so we want to make sure that you see this

14   before the deposition is actually finished.

15            So the first thing it says is you are of

16   sound mind, over the age of 18, you have personal

17   knowledge of the facts contained in this declaration,

18   and you are the deponent in the above-styled cause and

19   you were deposed by the parties by remote means.  So

20   when we're finished here, that will apply to you.

21            Now, here's what we want to discuss that's

22   going to happen during the deposition.  From the

23   beginning of the deposition until the end, including

24   breaks, you're under oath and you receive no coaching,

25   assistance, or other help in answering questions,

1   whether in person, by telephone, videoconference, or any

2   other electronic or other means of communication.

3            Do you understand that, Ms. Wall?

4       A.  Yes, ma'am.

5       Q.  Okay.  Do you have a cell phone near you,

6   Ms. Wall?

7       A.  I do.

8       Q.  Okay.  And so I'd just ask that you not receive

9   any type of coaching or anything of that nature via your

10  cell phone.

11           Now, of course, your attorney is available

12  to speak with you during breaks and things of that

13  nature.  Okay?  But we ask that you're just answering

14  all of these questions to the best of your ability.  Can

15  you agree to do that?

16      A.  I do.

17      Q.  Okay.  Great.  And then the final thing is from

18  the beginning of the deposition until the end, including

19  during breaks, you're declaring you did not communicate,

20  whether in person, by telephone, video-teleconference,

21  or any electronic or other means of communication with

22  any person about the case other than what is reflected

23  in the court reporter's transcript of the deposition.

24  Okay?

25      A.  Okay.

19

```
 1        Q.  Can you agree to do that?

 2        A.  Yes.

 3        Q.  All right.  So that's why we go through that,

 4   because you're declaring afterwards that you did all

 5   those things, but it's really not fair if you don't know

 6   that during the deposition.

 7             MS. CHRISTILLES:  Okay.  So I think we're

 8   done with Exhibit A for the deposition.

 9        Q.  (By Ms. Christilles)  All right.  Still hear me

10   okay?

11        A.  Yes.

12        Q.  Great.  Okay.  All right.  Now we've kind of

13   gone through all the formalities, and what I want to do

14   is I want to get to know you a little bit.  All right?

15             So the first thing is:  What is your date

16   of birth?

17        A.  ████88.

18        Q.  ████88.  Okay.

19             And are you currently married?

20        A.  Legally.

21        Q.  Okay.  Does that mean you're going through a

22   separation?

23        A.  I am, yes.

24        Q.  Okay.  And how long were you married for?

25        A.  Ten years.
```

1      Q.  Ten years.

2            What is your current husband's name?

3      A.  Jason Wall.

4      Q.  Jason Wall.  Okay.

5            Were you married previously?

6      A.  I was.

7      Q.  And how long did that marriage last?

8      A.  Six years.

9      Q.  Okay.  And who were you married to?

10     A.  Nicholas Deaton.

11     Q.  Okay.  Nicholas Deaton?

12     A.  Deaton, D-E-A-T-O-N, yeah.

13           MS. CHRISTILLES:  Okay.  I'm having a

14  little bit of feedback from somewhere.  If anybody --

15           THE WITNESS:  It might be my birds.  I

16  think --

17           MS. CHRISTILLES:  That is --

18           THE WITNESS:  My birds are chirping, and I

19  think that's what you're hearing.

20           MS. CHRISTILLES:  I am definitely hearing

21  your bird chirping.  That would be what it is exactly.

22     Q.  (By Ms. Christilles)  All right.  Could you

23  spell his last name again for me?  Was that a "Z," like

24  "zebra" or "D" like "dog"?

25     A.  "D" like "dog," D-E-A-T-O-N.

1        Q.  Okay.  Great.  All right.  I'm glad the bird is

2    participating as well.  What's the bird's name?

3        A.  What was that?

4        Q.  What is your bird's name?

5        A.  I have three parakeets; and they're Sky,

6    Sunshine, and then Berry.

7        Q.  Oh, I love it.  Okay.  Well, all right.

8                So two marriages.  Any marriages before

9    Mr. Deaton?

10       A.  No.

11       Q.  Okay.  All right.  And you're currently going

12   through a separation.

13               Do you have any children?

14       A.  I do.

15       Q.  How many children do you have?

16       A.  I have two sons.

17       Q.  What are their names?

18       A.  R███, and he is 15.  And then I have an

19   11-year-old named C███.

20       Q.  Okay.  So R███'s 15, and C███ is 11?  Did I

21   hear that right?

22       A.  Yes, ma'am.

23       Q.  Okay.  And are those your sons with your prior

24   husband or your current husband?

25       A.  My first husband.

```
 1       Q.  Okay.  So those are Mr. Deaton's biological

 2  sons?

 3       A.  Right.

 4       Q.  And do they live with you?

 5       A.  They do.

 6       Q.  Great.  Okay.  Now, talk to me about -- besides

 7  your kind of nuclear family unit, talk to me about any

 8  brothers and sisters that you have.

 9       A.  You broke up.  You said talk to me about

10  besides my nuclear family.  What was the second part?

11       Q.  I was going to -- I asked you if you have any

12  brothers or sisters.

13       A.  Yes.  There are six of us in total.

14       Q.  Okay.  Now, I understand that your

15  grandparents, the Johnsons, adopted you and so they were

16  your parents.  Are your brothers and sisters also their

17  children, or are they their grandchildren?

18       A.  Five of them -- or, sorry, four of them are

19  their biological children; and then Christopher, the

20  youngest, was adopted at the same time as me.

21       Q.  Okay.  Great.

22       A.  And for the record, they are my parents.  I

23  don't call them my grandparents.

24       Q.  Absolutely.  I completely understand that.

25  When did they legally adopt you?
```

```
 1        A.  I believe I was about 3, to the best of my
 2  memory.
 3        Q.  Okay.  And your parents, besides you, had four
 4  other biological children?
 5        A.  Yes, ma'am.
 6        Q.  How old are they, and what are their names?
 7        A.  Okay.  So Dennis Neil, Jr., is, I believe, 53
 8  or about to be 53.
 9             And then Jimmy, or James, he is, I think,
10  52, 53, something like -- somewhere in there.
11             And then there's Deanna, who is 49, and
12  Michael, who I believe is 47, 46, somewhere in there.
13        Q.  Okay.
14        A.  And then Christopher --
15        Q.  And how old's --
16        A.  -- is a year --
17        Q.  -- Christopher?
18        A.  A year younger than me.
19        Q.  Okay.  All right.  Now, besides your parents,
20  biologically who gave birth to you?
21        A.  Deanna.
22        Q.  Okay.  So Deanna is your biological mother?
23        A.  Yes.
24        Q.  And who is your biological father?
25        A.  His name is Chris Gray.
```

1      Q.  Okay.  All right.  Now, I know that your

2   parents raised you.  Did you have any interaction with

3   Deanna or your biological father growing up?

4      A.  Christopher, I only saw him one time through my

5   whole childhood.

6              Deanna was kind of in and out of the

7   picture.  I did live with her briefly two times after

8   the adoption was final.  It was very brief and very bad.

9   And then we would move back in with Nanny and Pa, and we

10  stayed -- we stayed with them.  From the time I was 11

11  on, I didn't live with her anymore; but she was kind of

12  around sometimes, like she would come and visit and

13  things like that.

14     Q.  Okay.  All right.  Do you have any kind of

15  relationship with Deanna now?

16     A.  Cordial.  We're civil.  I would not say that

17  we're close.

18     Q.  Okay.  All right.  Now, when you were living

19  with your parents, it sounds like your other siblings

20  are a little older.  Besides Deanna being there in and

21  out, did your older siblings ever live with you, or was

22  it just you and Christopher most of the time?

23     A.  There were a couple of periods where Michael

24  lived at home.  He was -- I remember him being in high

25  school still like when I was really little.  And then

1   after he got married, there was a couple of short

2   periods where he lived at home, but, otherwise, no.

3              But they were kind of around, you know.

4   I -- I knew them all.  Except for Jimmy.  Jimmy lived in

5   Florida.  But I did -- you know, Neil and Michael and

6   Deanna were all kind of around, and we had family

7   functions together and things like that.  So --

8       Q.  Okay.

9       A.  -- we knew them.

10      Q.  Did you guys -- sure.  Did you guys get

11  together for like holidays, do the Christmas thing

12  together?

13      A.  Yeah, we had Christmas and Thanksgiving, and we

14  always did a big barbecue and an egg hunt for Easter.

15  And birthdays and anniversaries and stuff, we'd have

16  get-togethers for that stuff, too.

17      Q.  And who are Christopher's biological parents?

18      A.  The same as mine, Deanna and Chris Gray.

19      Q.  Okay.  So Christopher is your full biological

20  brother?

21      A.  Yes.

22      Q.  Okay.  And so you got to grow up with him?

23      A.  I did.

24      Q.  Okay.  How close are you and Christopher?

25      A.  Not very.  He's -- we're very different people.

```
 1    So...
 2        Q.  Okay.  Where does Christopher live now?
 3        A.  As far as I know, he's around Floresville or
 4   San Antonio somewhere.  I haven't spoken to him in
 5   probably six months.
 6        Q.  Okay.  Now, where did you live growing up?  I
 7   know you lived with your parents, but what city did you
 8   live in with your parents?
 9        A.  Floresville.
10        Q.  Okay.  And you lived there the whole time
11   growing up?
12        A.  Yeah.
13        Q.  Okay.  Did your parents own a home there in
14   Floresville and that's where you grew up?
15        A.  First, we lived in the company house that was
16   owned by his job, my dad's job.  And then he retired
17   from that job, and they had rental property.  I think I
18   was 7.  They renovated the rental property and like
19   built an addition, and we moved to that house.  And
20   that's where my parents lived until they died.  So I
21   finished growing up in that house.
22        Q.  What was the address of that house?
23        A.  ████████████████, Floresville, Texas ████.
24        Q.  Okay.  And did it have a lot of acreage?  Did
25   you have a lot of area to run around on?
```

```
 1        A.  Yes, it's on 7 -- I think 7 and a quarter

 2   acres.

 3        Q.  Okay.  And you indicated your parents lived

 4   there until they passed away.  What has happened with

 5   the property since?

 6        A.  Michael lives there.  I own a mobile home that

 7   is on the property as well that's next to my parents'

 8   house, and I have a tenant who is living in that house

 9   right now.

10        Q.  Okay.  Did you ever live in that mobile home?

11        A.  I did.

12        Q.  When did you live in the mobile home?

13        A.  I lived there from June of 2016 until November

14   of 2018.

15        Q.  Okay.  And where do you live now?

16        A.  I live in Douglasville, Georgia.

17        Q.  Oh, okay.  That's right.  You do live in

18   Georgia.

19        A.  Uh-huh.

20        Q.  Now, before living in the mobile home -- you

21   lived there from 2016 to 2018, now you live in

22   Georgia -- where did you live before 2016?

23        A.  I lived in Georgia.

24        Q.  Okay.  And how long had you lived in Georgia

25   before you moved back to your parents' property?
```

```
 1        A.  Approximately 12 years.

 2        Q.  Okay.  So before moving to Georgia for that

 3   12-year span, did you live with your parents, or did you

 4   live somewhere else?

 5        A.  I lived with my parents until I moved out and

 6   moved to Georgia.

 7        Q.  Okay.  So just -- I just want to make sure I

 8   have the timeline clear.  Lived with your parents in

 9   Floresville your whole life, and then you moved to

10   Georgia.  Then you moved back for a couple of years, and

11   then now you're back in Georgia?

12        A.  Right.  I moved back to be with my parents.

13   And then they died, so I stayed for a year and then I

14   came back here.  This is where all my friends are.  I've

15   spent my whole adult life here.  So...

16        Q.  Talk to me about moving back to be close to

17   your parents.  Were they ill, or you just really wanted

18   to be near them?  Talk to me about the decision to move

19   back near your parents.

20        A.  It's kind of interesting because there wasn't

21   really like a reason.  I just -- I was about to graduate

22   college, and I just had this like really strong need to

23   go be with them.  And I hadn't wanted to move back the

24   whole time I'd been here.  I mean, I was still very

25   close with them, we talked on the phone every single
```

1   day, we were very close still, but I didn't -- other

2   than visiting and stuff, I'd never felt a need to move

3   back to Texas but all the sudden, I just felt like I had

4   to go home and so I did.  As soon as I graduated

5   college, a month later I moved my family to Texas.

6       Q.  Okay.  Was it just you and the boys, or did

7   your -- did Mr. Deaton go with you?

8       A.  This was -- this was after I was married to

9   Jason already.

10      Q.  Okay.

11      A.  Me and the boys came first.  We came in June

12  and got the house squared away and everything settled

13  and set up, and I got a job.  And then my husband came

14  in September.

15      Q.  That's right.  You told me you and Jason were

16  married for -- you've had been married ten years.

17      A.  Right, yes.

18      Q.  Okay.  Now, you said you were graduating from

19  college.  What did you go to college for?

20      A.  I was working towards being a teacher.  My --

21  my official degree is general studies, and it's an

22  associate's degree.  And then I enrolled in another

23  program to get my bachelor's in biology education, but

24  I've since dropped out.  So...

25      Q.  So you had graduated with your associate's, and

```
 1   then where did you enroll in the program for the

 2   bachelor's degree?

 3        A.  Western Governors University.

 4        Q.  Where is that at?

 5        A.  They're based in Utah, but it's -- it's an

 6   online school.

 7        Q.  Okay.  When did you enroll in that program?

 8        A.  Oh.  I want to say it was the summer of '17.

 9        Q.  Okay.  So you wanted to be a biology teacher.

10        A.  Uh-huh.

11        Q.  Have you ever realized that dream?

12        A.  No.

13        Q.  Okay.  What are you doing now?

14        A.  Mostly just like gig work, like driving Uber

15   Eats and things like that because if I have a bad day

16   where I can't really function, then I don't have to

17   leave the house.  So...

18        Q.  Okay.  So at the -- at the time of the

19   shooting, you were working for an independent school

20   district, though; is that correct?

21        A.  Yes, I was an instructional paraprofessional.

22   I worked in the federal at-risk program, so I helped

23   students who were drop-out risks to complete their work

24   and be able to graduate on time or accelerate

25   graduation.
```

1      Q.   Okay.  How long did you do that for?

2      A.   Two and a half years.

3      Q.   And was that when you got back to Texas in 2016

4   you immediately got that job?

5      A.   I worked at Grainger, the industrial supply

6   company.  I worked there for a few months before I got

7   the job with the school district.

8              But for the majority of the time that I was

9   there in Texas, I was working for them.  So...

10      Q.   And what school district was that again?

11      A.   East Central Independent School District.

12      Q.   Where is that at?

13      A.   Southeast of San Antonio.

14      Q.   Okay.

15      A.   Really close to Floresville.  Like it was about

16   a 25-minute drive.

17      Q.   Okay.  That's good.

18              So let's -- we've talked a little bit about

19   your work history, but I just want to -- I want to talk

20   about from high school kind of on until that 2016 time

21   period just kind of the jobs that you've done.

22              Did you graduate from high school?

23      A.   I did not.  I actually got a GED in 2008, and

24   then I was a stay-at-home mom until my youngest started

25   preschool in I think it was 2014.  I started college as

1   soon as he started preschool.  And I worked for my

2   college.  I worked as a student orientation leader and

3   also an English tutor.

4        Q.  Okay.

5        A.  But before then --

6        Q.  English --

7        A.  -- I was a stay-at-home --

8        Q.  -- and biology.

9        A.  Yes, I -- I thought about doing English first;

10  but then I was reading about the need for STEM teachers,

11  so -- science, technology, engineering, and math.  So

12  I -- I decided to go into science instead.

13       Q.  Okay.  All right.  So you got your GED in 2008.

14  When did you leave high school?

15       A.  2004.

16       Q.  Okay.  And what year were you in high school

17  when you left?

18       A.  I finished my freshman year, and I didn't go

19  back.

20       Q.  Okay.  So you finished up your freshman year,

21  and then did you have your son shortly thereafter?

22            I'm terrible with math.  So I tried to do

23  the math on the years, but --

24       A.  So --

25       Q.  -- I need a STEM teacher.  So...

33

```
 1        A.  (Laughter.)  I was -- I was dating a guy who

 2   was in the military, and I had already dropped out.  He

 3   thought he was getting deployed.  So in November of '04,

 4   we got married.  And I was -- I was 16.  I had just

 5   turned 16.

 6        Q.  Wow.

 7        A.  So my dad had to sign for it and everything

 8   because I was too young, you know, under 18.

 9             But he -- he deployed; and on our

10   honeymoon, I got pregnant with my oldest son, so nine

11   months later almost to the day we had R████.

12        Q.  So you had R████ and you're a military spouse

13   and so you're a stay-at-home mom; and then in 2008, you

14   go ahead and you get your GED.  And if I'm doing my math

15   right, you were still married to Mr. Eaton at that

16   time -- Deaton in 2008; is that right?

17        A.  Right.  We separated in May of 2010.

18        Q.  2010.  Okay.  So you'd already gotten your GED;

19   and then you were still a stay-at-home mom, though,

20   until R████ starts preschool.  When was that?

21        A.  Until C████ started preschool.

22        Q.  Oh, C████ started preschool.  That's right.

23   Okay.

24             And then you went back to school for your

25   associate's.
```

1      A.  Right.

2      Q.  Okay.  All right.  I think I got it all down.

3  All right.  Thank you for that.

4           And since you left the independent school

5  district sometime after your parents passed away, did

6  you have any other jobs besides kind of Uber Eats and

7  stuff following leaving your school district position?

8      A.  I did attempt to substitute teach a year and

9  had a really hard time with it.

10          And then I also took a position at a

11 daycare center, but I actually ended up getting fired

12 because I took off the anniversary of the shooting.  So

13 they -- they fired me for missing work even though they

14 had warnings and everything.

15          So it's pretty much been really difficult

16 to find something that I can handle doing and that will

17 put up with me not being able to handle it every day.

18 So...

19     Q.  Okay.  And I do want to talk about that a

20 little more, right, but I just -- I still want to get to

21 know you and get to know your family a little bit more

22 first.  Okay?

23     A.  Okay.

24     Q.  All right.  So what does your -- you're

25 separating from your husband.  What did he do for a

1    living, what does he do for a living?

2         A.  He's a general manager for Visionworks.

3         Q.  Okay.  All right.  And then after your divorce

4    was finalized, are you staying there in Georgia with all

5    your friends?

6         A.  Yes.

7         Q.  Okay.

8         A.  I stayed here.

9         Q.  All right.  Okay.  All right.  Let's see.  Oh,

10   here's one of those questions that's on my list that I

11   have to ask you.

12              Have you ever been arrested?

13        A.  Yes.

14        Q.  Okay.  Talk to me about that.

15        A.  Do I have to?

16        Q.  I -- I know -- it's one of those things -- I

17   know it's embarrassing, but you don't have to give me

18   all the details.  Just you can tell me what the charge

19   was, when it occurred, and kind of the final result.

20        A.  Okay.  So in June of this year, I was arrested

21   for prostitution.

22        Q.  Okay.

23        A.  I spent one day in jail and was bonded out, and

24   there's no end result yet because I'm not even getting

25   arraigned until November 11th.

1        Q.  Okay.  All right.  Any other ones?

2        A.  Nope, that's it.

3        Q.  Okay.

4        A.  I've never been in trouble in my life until

5    then.

6        Q.  Okay.  And so that's still pending?

7        A.  Right.

8        Q.  Okay.  All right.  Now, I know we've talked

9    about some difficulty you have had with your parents'

10   passing.  Have you ever been -- and we'll talk a little

11   bit more about going to see a counselor and getting some

12   assistance.

13            One of these questions I have to ask:  Have

14   you ever been adjudicated, like a court has said you're

15   mentally defective, or have you been committed to a

16   mental institution?

17       A.  No.

18       Q.  Okay.  Have you ever been in the armed forces?

19       A.  No.

20       Q.  Okay.  All right.  That was it for my standard

21   embarrassing questions.  Thank you very much for

22   answering them.

23       A.  Uh-huh.

24       Q.  All right.  Now, let's talk about things that

25   are a little more fun.  What kind of hobbies do you

1   have?

2       A.  I have a lot of hobbies.  I craft, which is

3   probably a bug I got from my mother.  That's one of her

4   hobbies.

5               I like to re-do furniture but like in a

6   funky way, make it really different, colorful.

7               I read and I journal.

8               And, you know, that's all I can think of

9   right now.

10      Q.  Oh, that's -- that's impressive.  What kind of

11  things do you craft?

12      A.  I do stuff with epoxy resin.

13      Q.  Okay.

14      A.  So I do stuff with, like, silicone molds.  I

15  make things, jewelry.

16              I crochet.

17              I do scrapbooking, water color painting.

18              There's a lot.  I have a -- a lot of craft

19  things.  So...

20      Q.  Yeah, I -- I was thinking, you know, I make

21  jewelry.  But you do the whole gamut of crafting, then?

22      A.  I do a lot of different things, yes.

23      Q.  Okay.  Great.  All right.  Talk to me about --

24  you said you got the crafting from your mom.  I want to

25  talk about living with your parents.  Talk to me about

1   growing up.  What kind of things did you do with your

2   parents?  Did they -- were they super involved taking

3   you, you know, to sports?  I want you to tell me about

4   what it was like growing up in your household as a young

5   child.

6        A.  Well, they both worked.

7        Q.  Okay.

8        A.  So, you know, we were latchkey kids, and --

9   when we were older.  When we were little, she was always

10  there.

11           But we did do things together.  Like we had

12  movie nights all the time.  We'd have ice cream and

13  popcorn and watch different movies together.  We'd go to

14  the video store and, like, pick them out and have like a

15  family -- like an organized family thing that we did

16  almost every weekend.

17           And then on the weekends, a lot of times my

18  mother and I would go shopping.  Like we'd either go to,

19  like, J.C. Penney and, like, max out her credit card or

20  we'd go to thrift -- like, thrift stores or yard sales.

21  She loved to go to yard sales and stuff.

22           And we would have to like sneak the stuff

23  in the house because my dad would kill her if he knew

24  how much money she was spending, so she would like go in

25  the living room to him with like a little bag, and she

```
 1   would send me into the bedroom with the rest of it.
 2              (Group laughter.)
 3      A.  So I would have to, like, sneak it in there for
 4   her.
 5              And he -- he was really like kind of quiet
 6   and like -- well, he didn't talk a lot.  He was very
 7   loud when he did talk, but he didn't talk a lot.  But as
 8   I got older and we would spend time together in the car,
 9   things like that, he would tell me a lot of stories
10   about when he was younger and when he was in the
11   military, and it was really awesome to -- to get to know
12   him like behind just the normal day-to-day dad thing.
13              It was -- it was good growing up with them.
14   Like, you knew that they loved you.  And they -- they
15   really tried to do stuff with us even though they were
16   old.  They weren't going to go outside and throw a
17   ball -- you know, not often, anyway.  They did some --
18   but it was, you know, let's -- let's make things
19   together or let's watch a movie.  It was, you know,
20   stuff that they could handle doing.
21      Q.  Okay.  And then you got that year time period
22   with them in 2016 until -- until they passed away.  Talk
23   to me about your relationship with them when you moved
24   back.
25      A.  Okay.  So it was about 18 -- almost 18
```

 1    months that I was there, 17 months that I had them

 2    before they passed.  And my daily routine was the moment

 3    I got home from work, I didn't even go inside my house,

 4    I just walked next door to their house.  And they would

 5    have my kids.  They would get my kids off the bus.  And

 6    we had a, like, organized weekly schedule of who cooked

 7    dinner.  We -- we all cooked over there at their house,

 8    and we made dinner for each other every night; and then

 9    on Friday nights, we would all go out together.

10              So we would -- we would end -- we'd all end

11    up in the kitchen anyway, like, cooking together; and

12    then -- especially me and my mom, or sometimes my

13    husband and my -- and my mom would cook together, too.

14    And then we would have our dinner, then we'd sit around

15    and maybe watch TV or talk or whatever, and then I would

16    take my kids home and put them to bed.

17              And then a lot of nights I would go back

18    over there and sit on the front porch and talk with her

19    or go sit on the foot of her bed and talk while she sat

20    up in her bed, mess around with pictures and craft stuff

21    and whatever she was -- whatever she was doing.  And I'd

22    stay over there sometimes till 10:00 or 11:00 o'clock at

23    night and then have to go to work the next day.

24              We were really, really close.  There was

25    not a day that went by in that whole 18 months that I

 1    did not see them.  It was every day.

 2        Q.  Okay.  And when you -- you mentioned that when

 3    you didn't live near them when you were in Georgia, that

 4    you often talked on the phone.  How often did you talk

 5    to your parents on the phone?

 6        A.  It was almost every single day.  Like, if we

 7    missed -- you missed a day here and there; but if we

 8    did, it was like something was going on.  And a lot of

 9    times we talked multiple times a day.  I would call her,

10    like, if I was getting frustrated with the kids or, you

11    know, if something happened or whatever, and then we'd

12    talk again later that night or whatever.  We talked a

13    lot.

14        Q.  Okay.  Now, you mentioned that they would help

15    you by getting the boys off the school bus.  When you

16    were living there that 18-month period, were they still

17    working?

18        A.  She was working I think three days a week, two

19    or three days a week, but he was not.  He was home,

20    retired to his lawnmower.

21        Q.  Okay.  And where was your mom working?

22        A.  She was working for Pfeil's Home & Garden, just

23    a little family-owned little garden store.  It was right

24    down the street from the house.

25        Q.  Okay.  Had she always worked there, or was that

1    kind of a new thing?

2        A.  She'd been there for I want to say like four

3    years, three or four, somewhere in there.

4                Prior to that, she had a period of

5    unemployment, but she did work for the Wilson County Tax

6    Office for ten years before that.

7        Q.  Okay.  Do you know if she got a retirement from

8    the Tax Office or?

9        A.  She did.  She did, uh-huh.

10       Q.  Okay.  So she had a retirement from the Wilson

11   County Tax Office, and then unemployed for a little bit,

12   and then she went to work for that local home and garden

13   shop; is that right?

14       A.  That's right.

15       Q.  Okay.  And was that always -- the home and

16   garden shop, was that always kind of a three-day-a-week

17   thing, or did she ever work there full time?

18       A.  I don't believe she ever did full time, no.  I

19   think it was always a few days a week.

20       Q.  Okay.  How about before Wilson County?  Did she

21   work anywhere else?

22       A.  I remember her working at a daycare center when

23   I was little; and then I think I was probably like 10,

24   she sat with an elderly lady at a nursing home.

25                But I think -- I think that's it.  She --

1    she didn't have like consistent -- now, she was -- she

2    was always employed by the church that we went to, not

3    Sutherland Springs but the Floresville Baptist church.

4    She worked in the nursery -- and they actually paid her

5    for that -- for probably like 20 years.  She had been

6    doing it since before I was born, and she did it for a

7    long time after.

8         Q.  Okay.  So at the time that she passed away, her

9    income would have been that retirement check from the

10   Wilson County Tax Office, the home and garden income.

11   Anything else?

12        A.  She also had Social Security.

13        Q.  Okay.  All right.  How about your dad?  Talk to

14   me about -- sounds like he was in the military.  Did he

15   retire from the military?

16        A.  He did.  He -- he put in 26 years.  Yeah, he --

17   he did part of it in the Navy and part of it in the

18   Army, and then he did -- he was in the National Guard as

19   well briefly.  I think the last little bit of it was

20   National Guard.

21            He had started out owning his own business

22   in Florida before I was born building -- they're like

23   greenhouses for ferns.  They call them "ferneries."  And

24   there's a company that used to be based in Floresville

25   that grew ferns and Christmas trees.  So the house that

1    we lived in when I was born and where I remember being

2    little was in the middle of this Christmas tree farm and

3    fernery, and he -- he managed the company for them.

4              And then when he retired from them and we

5    moved, he worked for a steel manufacturing company, and

6    he was a security guard for quite a long time.  I

7    believe the security guard position was his last job

8    that he had before he was, like, finally retired.

9        Q.  When did he finally retire?

10       A.  I'm not sure exactly.  I know when I moved out,

11   he was still doing a couple of nights a week as a

12   security guard.  So he -- it probably wasn't much longer

13   after that.  I would say probably that he was retired by

14   probably 2006 or 2007.

15       Q.  Okay.  And so his income would have been the

16   retirement from the military?

17       A.  Uh-huh.

18       Q.  And then did he get any other retirement checks

19   from any of those other companies that he worked for?

20       A.  He had military retirement, Social Security;

21   and there was one other retirement thing he had, but I

22   don't remember what it was from.  I did their taxes

23   every year.

24       Q.  Oh.

25       A.  So I was privy to some information my -- my

1   siblings weren't.  But I can't remember which job it was

2   that he had a little bit of retirement from.  It was a

3   very small, little account.

4       Q.  Okay.  So you did their taxes every year for

5   them?

6       A.  Yeah.

7       Q.  Okay.  All right.  Now, let's see.  I'm just

8   running down my list here.

9           How long were your parents married for?

10      A.  44 years.

11      Q.  Okay.  Now, you mentioned that growing up, you

12  went to and your mom worked at the Floresville Baptist

13  church.  Did I get that right?

14      A.  Yeah.

15      Q.  Okay.  Is that somewhere you went the whole

16  time growing up or?

17      A.  Yes, I -- I always went to the Floresville

18  church.  Right around the time that I got married, they

19  started going to Sutherland Springs.

20      Q.  Okay.  Do you know why they -- why they

21  switched churches?

22      A.  Yes, the pastor at the Floresville church did

23  not want my brother to go there anymore, Christopher.

24  He had been getting into some trouble, and he was

25  worried about my brother possibly bringing drugs to

1   church or being a bad influence on the other kids, so he

2   didn't want him there.

3            And my parents were like, "Well, if he's

4   not welcome here, then we're not either."

5            And they were very close friends with the

6   Holcombes, who had already moved over to the Sutherland

7   Springs church, so they followed them there.

8      Q.  Did you know the Holcombes?  Did you grow up

9   with the Holcombes?

10     A.  I did, yes.  Karla Holcombe actually threw the

11  baby shower when I was born, I mean.  And I remember

12  having sleep-overs at their house and playing with their

13  kids and chasing their -- they had a giant bird.  What

14  do they call it?  I totally lost it.  They had peacocks,

15  and we would chase them around their acreage and make

16  them squawk at us and stuff just being kids.

17     Q.  Did your parents have any kind of farm animals

18  on their acreage or any peacocks?

19     A.  Huh-uh.  No, we didn't have any animals.

20     Q.  Okay.  All right.  Now, I understand that you

21  and Michael are handling the estate for your parents.

22  Is that right?

23     A.  It is.

24     Q.  Okay.  Have you gone to court to have the

25  estate probated yet?

1        A.   No.

2        Q.   Okay.  And do you know if you're going to do

3    that?  Talk to me about how you're going to -- how

4    managing the estate is going.

5        A.   I'm sorry.  You broke up.

6        Q.   Shoot.  I said talk to me about how managing

7    the estate is going.  Kind of what's your division of

8    labor with Michael?  Where are you at in the process?

9             MR. ALSAFFAR:  Objection, form.

10       Q.   (By Ms. Christilles)  Go ahead and answer.  I

11   asked you two questions.

12            So just start with talk to me about where

13   you are in the process with managing the estate.  Let's

14   start there.

15            MR. ALSAFFAR:  Objection, form.

16            THE WITNESS:  Am I...

17       Q.   (By Ms. Christilles)  Go ahead and answer.

18            THE WITNESS:  Am I supposed to answer the

19   question?  I don't see him now.

20            MR. ALSAFFAR:  You can answer, if you

21   understand it.  If you understand it, you can answer.

22            THE WITNESS:  Okay.

23       A.   As far as I understand, in the process of

24   managing the estate, we're kind of in just a holding

25   pattern right now.  The estate is opened.  It's set up.

1  There's -- you know, everything's been established, and

2  we're just kind of waiting to do anything with it or

3  close it out.

4       Q.  (By Ms. Christilles)  Okay.  And what assets

5  are part of the estate?  And let's --

6       A.  Their house --

7       Q.  -- with --

8       A.  -- and their land.

9       Q.  Oh -- okay.  You knew -- I thought that maybe

10  my question was one of those dumb, you know, confusing

11  lawyer questions, but you knew exactly what I was

12  asking.

13            So if you would repeat that, because I

14  think I talked over you.

15            So what assets are part of the estate?

16       A.  Their house and their land.

17       Q.  Okay.  All right.  And did they have a will?

18       A.  They did; but it was written when Michael was

19  still a child, so it was really out of date and didn't

20  reflect accurately the assets that they have now and it

21  just -- it basically just said split everything between

22  their kids.  Like, it didn't -- it didn't really go into

23  anything besides that that really applies today.

24       Q.  And so how were you and Michael chosen as the

25  administrators of the estate?

1          A.  It was just a family agreement.  We -- we all

2     talked about it as a family, and they decided that it

3     would be best for me and Michael to take care of it.

4          Q.  Okay.  Do you know why they chose you?

5          A.  I don't.  I don't know.

6          Q.  You're the most responsible, right?

7          A.  Yeah, that's me.

8               (Group laughter.)

9          Q.  (By Ms. Christilles)  Talk to me about your

10    parents' hobbies.  I think you talked to me about the

11    fact that your mom liked to craft.  What did your dad

12    like to do?

13         A.  He did, like, woodworking.  He liked to build

14    things.  He loved his plants, I mean, taking care of his

15    yard and making it look nice and making garden beds and

16    things like that.  Mowing, he loved mowing.  I don't

17    know -- I don't know, but he loved it.

18         Q.  And did he do any of those activities with your

19    kids when y'all were living there for the 18 months?

20         A.  He did, yeah.

21         Q.  Okay.  Talk to me about his interaction with

22    your sons.

23         A.  Well, he would try to put the older one to

24    work, because that's what he was about.

25                    And my younger son, I would come home from

50

1  work sometimes and find him sprawled out in my dad's lap

2  watching TV with him and stuff.

3              He tried to teach them how to do yard work

4  and everything, but they weren't terribly interested in

5  that.  So...

6      Q.  Okay.  Did they have any other grandchildren?

7      A.  Yes, they do.

8      Q.  Who are their other grandchildren?

9      A.  Okay.  So Neil, which is Dennis Junior, he has

10  two daughters; and that's Leah and Taylor.  Leah is a

11  few years younger than me, and Taylor is I think 19.

12              And then let's see.  Jimmy doesn't have any

13  kids.

14              My mother, obviously -- she has one that

15  wasn't adopted.  So my brother Jared is their

16  grandchild.

17              And then Michael, he had two children,

18  Haley and Devon, who are both in their early 20s.

19              And then obviously my two children.

20              And then my brother Christopher had a

21  daughter, I███████, who was about a year old when they

22  passed away.  And he has since had another child, but

23  they weren't even pregnant or whatever whenever -- with

24  him, anyway, when my parents passed.  So...

25      Q.  Okay.  And while your parents were alive, did

```
 1    they have any great grandchildren?

 2         A.  I mean, not unless you count my -- my kids as

 3    great grandchildren.

 4              Actually, Leah, Leah has a son.

 5              So, yeah, they did.  They had...

 6         Q.  And that's kind of what I was thinking.

 7              THE REPORTER:  Okay.  This is the court

 8    reporter.  I'm sorry.  There's someone that wants to be

 9    admitted to the -- admitted.  Is that a person that we

10    should be admitting?

11              MS. BLOODWORTH:  That's me.  I'm

12    dropping -- every now and then, I'm missing.  So if I

13    could be let in via audio.

14              THE REPORTER:  Okay.  Yeah, so that

15    Ms. Bloodworth can hear the proceedings the best that

16    she can, we need to admit her.  Jenn, are you there, or

17    you need me to do it?

18              MS. WHITE-CANALES:  Yes, I'm letting her

19    in.  Hang on one second.

20              MS. BLOODWORTH:  Thank you.

21              (Discussion off the record.)

22              (Recess from 2:45 p.m. to 2:56 p.m.)

23              MS. CHRISTILLES:  All right.  I think we

24    can get started.

25         Q.  (By Ms. Christilles)  All right.  Ms. Wall, I
```

1    think that before we took a break, we were talking a

2    little bit about your parents' estate; and you indicated

3    that you and Michael were handling the estate and that

4    your parents had their house and their property as part

5    of their assets.

6            How about any bank accounts or savings

7    accounts?  What did your parents' financial situation

8    look like?

9    A.  I mean, when they died, they had like 600 bucks

10   in their checking account and a few hundred dollars in

11   savings.  I don't remember exactly how much, but not

12   much.  I mean, we're talking under $1500 in cash.

13   Q.  Okay.  So it --

14   A.  Oh, sorry.  Go ahead.

15   Q.  No, you go ahead.  I don't mean to cut you off

16   at all.

17   A.  Oh, I was just going to say that they -- they

18   didn't really have much of anything.

19   Q.  Okay.  When your parents -- I know that you

20   indicated that your parents were helping you pick the

21   boys up from the bus.  Were they providing you any kind

22   of financial support prior to their passing?

23   A.  I mean, nothing regular.  Like every now and

24   then if I was having a rough time, they would give me a

25   little cash for groceries or put some gas in my car,

1   something like that.

2        Q.  Okay.  How about your siblings, did they

3   provide financial support for your siblings?

4        A.  Well, I mean, Michael and Deanna lived with

5   them, so they kept a roof over their head and fed them.

6        Q.  Okay.  And I think I may have missed that part.

7   I know that Deanna kind of came in and out.

8             So how long had Michael and Deanna lived

9   with them?

10       A.  So Michael had been there for, I don't know,

11  probably about ten years solid.  So my parents got

12  custody of Michael's children through the foster system,

13  and Michael came to live there.  He had a little travel

14  trailer that he slept in most of the time, but, I mean,

15  he lived there basically.

16            Deanna had lost her house in April of 2017;

17  and they just told her, like, you know, "Put all your

18  stuff in storage and come home, and we'll -- we'll help

19  you out until you guys get on your feet."  So she had

20  been living there I guess that's what, about six months?

21       Q.  Okay.  And so they were -- your parents were

22  also caring for Michael's children at the time they

23  passed away?

24       A.  No, when they passed away, Michael's children

25  were adults already.

1      Q.  Okay.  But at some point they had also taken

2  care of Michael's children?

3      A.  Right, they raised Michael's children from the

4  time they were I think 4 and 5 until they were adults.

5      Q.  Okay.  All right.  And remind me, wasn't one of

6  Michael's -- no, that was the older brother had children

7  about your age; is that right?

8      A.  Yeah, his oldest daughter is I want to say four

9  years younger than me.

10     Q.  Okay.  All right.  So were you in the house

11 when they were helping raise Michael's children?

12     A.  Part of the time, yeah.

13     Q.  Okay.  All right.  So Michael had been living

14 with them for about ten years before they passed away.

15     A.  Right.

16     Q.  Did he have any kind of employment or anything?

17     A.  Yeah.  He's a welder, and he had a -- he had a

18 job doing that.

19     Q.  Okay.  So they were -- he was living there and

20 they were probably providing food, but he also had some

21 source of income?

22     A.  Right.  And he would do stuff for them, like

23 help them fix things and stuff; and if -- like, for

24 example, their air-conditioner went out in the house.

25 Michael helped pay to get it fixed.

```
 1              So he would do things to help them out.  It
 2    wasn't just like a one-way relationship.  He helped
 3    them, too.
 4        Q.  Okay.  How about Deanna, does she have a --
 5        A.  She was not employed, but her husband was.  And
 6    as far as I know -- I don't know about like what
 7    arrangements they had, if she pitched in or anything
 8    like that; but, you know, she could pay for her own
 9    things.
10        Q.  Okay.  All right.  And so it was Deanna and her
11    husband that lived in the house for that period of time?
12        A.  Her husband worked out of town, so he was
13    almost never there.  He might come home like once a
14    month and visit, but he -- he's an out-of-town welder.
15        Q.  Okay.  Now, you indicated that they'd lost
16    their house.  Is -- is -- did I hear you right on that?
17        A.  Yeah, it went into foreclosure.  They ended up
18    doing a short sale.
19        Q.  Okay.  All right.  How about any of your other
20    siblings, did they provide any financial support for any
21    of your other siblings?
22        A.  I mean, over the years, yeah, every -- they
23    helped everybody at one point or another.  I mean, like
24    I don't know about, like, actively at the time that they
25    died, but over the years they had -- they had co-signed
```

1   on cars and houses and they had loaned money and gave

2   money and all kinds of things to all of us at one point

3   or another.

4        Q.  Okay.  All right.  Now, I kind of looked at

5   some of the information from the family tree, and I know

6   we've talked about your siblings.  Were all of your

7   siblings from your parents, or were -- some of your

8   siblings, did they have different parents?

9        A.  Okay.  So Neil -- Dennis Junior, excuse me, he

10  is -- he is Dennis's son from his first marriage.

11           And Jimmy and Deanna were Sara's children

12  from her first marriage; but Dennis did adopt Deanna

13  when she was about 11 years old, so he is legally her

14  father.

15           But Jimmy and Neil are both stepchildren.

16       Q.  And then Michael is their biological child?

17       A.  He's their biological son.  That's right.

18       Q.  Okay.  All right.  Now, we've talked a little

19  about your parents' finances at the time they passed.

20  Talk to me about their health.  Did they have any major

21  health problems or anything of that nature?

22       A.  So not really.  He had had an issue with his

23  heart valve but he lost a bunch of weight and the valve

24  was working properly and he was doing a lot better.

25           As for her, she was Type 2 diabetic, and

1  she had been pretty bad, like on insulin and pills and

2  everything.  And probably about a year before she

3  passed, me and my husband got her on the keto diet with

4  us; and she had lost 75 pounds, she had gotten off her

5  insulin.

6            Like, they were -- they were both doing

7  better than they were, you know, a couple of years prior

8  at the time that they passed away.

9       Q.  Okay.  Talk to me about your physical health,

10  Ms. Wall.  Has anything about your physical health

11  changed following the shooting?

12       A.  My physical health?  Not that I can think of,

13  no.

14       Q.  Okay.  All right.  And we talked a little bit

15  about some mental health changes.  Talk to me about --

16  talk to me about those mental health changes following

17  the shooting.

18       A.  So I have been diagnosed with post-traumatic

19  stress disorder.

20            It causes me to have anxiety, and

21  depression as well, and as well as like off-the-chart

22  attention deficit/hyperactivity disorder symptoms.

23            I have trouble sleeping.

24            I'm on five different mental health

25  medications trying to control the symptoms.

58

1                    It's -- it's pretty bad.

2                    Nightmares.

3                    I have agoraphobia, so I leave my house

4    maybe once a week, and that's very stressful to do.  I

5    feel very anxious if I'm in like a store or a

6    restaurant.  I have a hard time -- sometimes I have to

7    just leave my things and just go to my car, like I

8    can't -- I can't stay in there anymore.  Anywhere where

9    there's a lot of people, it just feels really unsafe.

10       Q.  Okay.  Talk to me about your PTSD diagnosis.

11   Who diagnosed you with PTSD?

12       A.  Well, initially, my therapist in Floresville

13   right after the shooting happened.

14                    But I actually went to a psychologist and

15   had a full mental health evaluation done, like a big

16   four-hour like ordeal kind of evaluation; and she -- she

17   diagnosed me with it as well.

18       Q.  Okay.  Tell me the names of your Floresville

19   therapist and then the psychologist that did that

20   testing.

21       A.  So the name of the agency in Floresville was

22   Camino Real.  My therapist's name was Susan -- oh, what

23   is her last name?  I can't remember her last name.  It

24   starts with an "M."

25       Q.  Okay.

```
 1        A.  And I also saw Jacinto there, like

 2   J-A-C-I-N-T-O, "Jacinto."

 3             And then I also saw their psychiatrist.

 4             So they should have a lot of information.

 5             Then the psychologist that I saw here that

 6   did my evaluation, her name is Tina Caudill.

 7        Q.  Okay.

 8        A.  And that's C-A-U-D-I-L-L.

 9        Q.  Okay.  Is she with a certain agency, or she's

10   just a private psychologist?

11        A.  She's a private psychologist, I believe.  I

12   think it might be like --

13        Q.  And she's there --

14        A.  -- Georgia Behavioral Health or something

15   generic like that, but her -- like, if you were to

16   Google her, you could get her information of where her

17   practice is and all that.

18        Q.  And she's there in Georgia.  What city in

19   Georgia is she in?

20        A.  Douglasville.

21        Q.  Say that for me one more time.

22        A.  Douglasville.

23        Q.  Okay.

24        A.  And then I also have two therapists here as

25   well.
```

1       Q.   Okay.   There in Georgia?

2       A.   Yes.

3       Q.   And what were their names?

4       A.   Lisa King.  And then my current therapist's

5   name is Clint Payne, P-A-Y-N-E.

6       Q.   And what was Mr. Payne's first name?

7       A.   "Clint," C-L-I-N-T.

8       Q.   Okay.   Lisa King and Clint Payne; is that

9   right?

10      A.   Yes.

11      Q.   Okay.  All right.  Had you ever suffered from

12  ADHD before?

13      A.   No.

14      Q.   Okay.  You indicated that you are on five

15  different medications.  Who prescribed those

16  medications?

17      A.   A doctor at like Northwest Georgia Behavioral.

18  It's associated with Peachford Hospital.  The doctor's

19  name, Brooke Boccaccio.

20      Q.   Can you try to spell that last name for me?

21      A.   I know it's like -- B-O-C-C-I-A-O, I think.

22      Q.   Okay.  And what was the organization that

23  Dr. Boccaccio was with?

24      A.   I think it was Northwest Georgia Behavioral

25  Health or something -- something along that line.  I

1   have the phone number and stuff, like, if -- if I needed

2   to find the records.

3       Q.  Yeah, we might ask your attorney to provide us

4   that information, but I appreciate you telling me that.

5               And when did she prescribe that medication

6   for you?

7       A.  I started with her, let's see -- I think it was

8   around August of Twenty Eight -- no, 2019.

9       Q.  Okay.  And before that, so the first -- kind of

10  the first mental health providers that you went to were

11  the providers at Camino Real; is that correct?

12      A.  Yes.

13      Q.  And when did you start seeing them?

14      A.  About a month after the shooting.

15      Q.  Okay.  And talk to me about what things you

16  were experiencing that made you decide to go there.

17      A.  I couldn't sleep.  I was having horrible,

18  horrible nightmares about like -- it was like a movie

19  playing in my head about what happened to my parents,

20  like I could see the things that I knew about what

21  happened to them.

22              I -- I was really, really depressed, like

23  really, really, really bad, very anxious, couldn't leave

24  my house, had a hard time being around anybody.

25      Q.  Now, you indicated that you were having

1  nightmares about what you knew had happened to your

2  parents.  Had you read some kind of reports or watched

3  some news?  How did you learn the information about what

4  had happened to your parents?

5      A.  Well, my -- the first indication that I got

6  about any -- anything detailed like that was when we

7  were setting up their cremation a few days after.  There

8  was a conversation that took place where we asked if we

9  could see them, you know, even though they weren't going

10  to be prepared or anything because they were being

11  cremated, would we be able to see them to say good-bye;

12  and they told us no because there was facial trauma.

13          So that led to Deanna calling the coroner's

14  office and asking for kind of a rundown of what was on

15  their body.  So I knew those details.

16          And then my second cousin supposedly talked

17  to a Texas Ranger who gave her what they thought

18  happened to my parents specifically based on the scene,

19  which I have some doubts about now, but it was enough to

20  paint a picture in my head in those first days.

21          That was within a week of -- of the

22  shooting.  So...

23      Q.  Had -- well, who was the second cousin that

24  talked to the Texas Rangers?

25      A.  Anita Dormer.

1      Q.  Okay.  So had you ever had any kind of

2   conversations with any Texas Ranger?

3      A.  No.

4      Q.  Okay.  Did you talk to any law enforcement

5   about what had happened?

6      A.  You broke up.  What was that?

7      Q.  Sure.  Did you talk to any law enforcement,

8   Texas Ranger, or anybody else involved with the

9   investigation about what had happened?

10     A.  No.  The only conversation that was had between

11  me and a law enforcement officer was when the Texas

12  Rangers told us they were dead.  That's it.  I didn't

13  get any, you know, details or have any conversation with

14  any officers.

15     Q.  Okay.  So Deanna got some details from the

16  coroner, and then a second cousin got some information

17  and kind of pieced together what had happened; is that

18  accurate?

19     A.  Yes.

20     Q.  Okay.  And so your nightmares were about what

21  you had pieced together about what had happened?

22     A.  Right, and different kind of possibilities

23  about what that might have been exactly.  You know,

24  there are still questions that you don't know the

25  answers to, like what were they thinking and what --

1   what were they saying and, you know, were they crying

2   and things like that that you think about all the time

3   and you don't -- you don't know and you can't know.

4        Q.   Right.  So after the shooting, how many days a

5   week were you having issues sleeping?

6        A.   (Pausing.)  I'm okay.

7        Q.   Okay.  Following the shooting, how many days a

8   week would you say you were having trouble sleeping?

9        A.   Every night.

10       Q.   Okay.  Did that ever get better?

11       A.   It -- it got better in the sense that the --

12   the lack of sleep wasn't quite as extreme, but I still

13   to this day do not sleep well every night.  It's just

14   not quite as extreme as it was initially.

15       Q.   Okay.  So you went from how many -- at your

16   worst possible, at the worst possible period when you

17   were experiencing the worst possible symptoms, how many

18   hours of sleep a night would you say you were getting

19   when it was the worst?

20       A.   Maybe one or two.

21       Q.   Okay.  And let's fast-forward to today.  How

22   many hours of sleep do you get a night today?

23       A.   Usually around six.

24       Q.   Okay.  And the nightmares, how many nights when

25   it was at its worst would you have nightmares?

1    A.  Can you repeat the question?

2    Q.  Sure.  When you were experiencing your worst

3  symptoms, how many nights a week would you get

4  nightmares?

5    A.  Oh, every night.  That's why I couldn't sleep.

6  I mean, every time I closed my eyes, I was seeing -- it

7  was like I was watching them die.

8    Q.  Okay.  And now we've fast-forwarded to present

9  day.  How many nights a week do you get nightmares?

10    A.  Probably three, four, somewhere in there.

11    Q.  Okay.  So about a month after the shooting,

12  you're having nightmares, trouble sleeping, anxiety, so

13  you go to Camino Real; is that right?

14    A.  Yes.

15    Q.  Okay.  And what kind of things or kind of

16  therapy did they recommend to help you?

17    A.  So they started off with just regular cognitive

18  behavorial therapy, grief counseling; and they also put

19  me on medication for depression and anxiety and one that

20  was supposed to stop nightmares or help with nightmares.

21  And that's what we did for a year, the whole year that I

22  was going there.

23    Q.  Okay.  Do you remember the name of those three

24  medications?

25    A.  Yes.  It was Wellbutrin, clonazepam, and -- oh,

1   what was the nightmare medicine -- prazosin.

2       Q.  Okay.  And you did that for a year.  Did that

3   seem to help?

4       A.  Not really.  I think the clonazepam helped more

5   than anything because it allowed me to get a little bit

6   more sleep and being exhausted was making everything

7   else worse.  But not really.

8       Q.  Okay.

9       A.  I don't think --

10      Q.  So how --

11      A.  -- it was enough.

12      Q.  Sorry I interrupted you there.  You didn't

13  think it was enough.

14      A.  Right.

15      Q.  Okay.  So after that year, what did you do for

16  therapy?

17      A.  Well, I moved here to Georgia, and I went

18  without insurance for a little while, so I couldn't

19  afford to do anything.

20          When I finally got my insurance back, I

21  decided to start off very strategically and get -- get

22  that evaluation done and from there go see a

23  psychiatrist and then from there start therapy.

24          My therapist, Lisa, I started with her; and

25  she's a very nice lady and she's probably very good at

1    what she does, but she wasn't -- there wasn't enough

2    feedback and there wasn't enough, you know, "You should

3    try this," or, "You should think about this this way,"

4    or, "Let's do this exercise."  There wasn't enough of

5    that going on.  It was just like I was just talking, and

6    that wasn't really helpful.

7              So then I found Clint and started going to

8    him, and he's been more -- he's more solution oriented,

9    I guess.  He's doing dialectical behavorial therapy, and

10   we're discussing trying EMDR as well.

11       Q.  Okay.  So you say that you wanted to do it

12   "strategically."  When you wanted to approach your

13   mental health strategically when you got to Georgia,

14   what do you mean by that?

15       A.  I mean that I wanted to -- I wanted to approach

16   it in a way that would -- that would help me the best.

17              Like by getting an evaluation, okay, I know

18   exactly what's wrong with me now, and then taking that

19   to a psychiatrist, okay, they know exactly what

20   medications might work and what, you know, my diagnoses

21   are and then having that -- all that paperwork between

22   the psychiatrist and the diagnosis to hand to a

23   therapist for them to look over that and know, okay,

24   this is how this person's mind is working, this is the

25   trauma that they're dealing with, and come up with some

1  kind of plan of attack to start really actually helping

2  me because I didn't want to just sit in therapy for no

3  reason like I had in Texas for a year.  It wasn't

4  helpful.

5       Q.  Okay.  How long have you been in therapy?

6       A.  I mean, off and on for almost three years.

7       Q.  How often do you go?

8       A.  Every week right now.

9       Q.  Okay.  Once a week, twice a week?

10       A.  No, once a week.

11       Q.  Once a week.  Okay.  Sorry, I may have talked

12  over you there.

13            Okay.  And you have the five different

14  medications; is that correct?

15       A.  Yes.

16       Q.  How often do you take those?

17       A.  That's daily.

18       Q.  Okay.  And how long have you been taking those

19  medications?

20       A.  A year and two months.

21       Q.  Okay.  And do you think that has improved your

22  mental health?

23       A.  Absolutely.

24       Q.  Okay.  All right.  So the medications have

25  helped improve your mental health?

1      A.  Yes.  It's not perfect and it's not where I'd

2  love to be, but it's definitely a lot better than I am

3  without medication.

4      Q.  Okay.  And how about the therapy, do you think

5  that that has helped?

6      A.  Yes, I do.

7      Q.  Okay.  All right.  Now, you indicated that you

8  had some journals from the time of the shooting and that

9  journaling is kind of one of those things that is a

10  hobby.  Do you still journal?

11      A.  Yeah, I do.

12      Q.  Okay.  How about posting on social media?  Do

13  you do -- do you have any kind of social media accounts?

14      A.  I do have Facebook, and I have TikTok.  I'm not

15  going to say that I've never ever talked about the

16  shooting of my parents on Facebook, but it's something

17  that I really try to not do.  I don't find that's

18  helpful, and I don't like to be -- I don't want people

19  commenting and being like, "Oh, I'm so sorry."  You

20  know, I don't -- I just don't want all that.  So not

21  really.

22      Q.  Okay.  Now, besides, you know, putting your

23  thoughts in journals and maybe -- maybe something on

24  social media, have you ever talked to the actual media,

25  like news media, about your parents or the shooting?

1      A.  Yes.  I have done, I believe, three or four

2   interviews with Lauren McGaughy from the Dallas Morning

3   News.  And there's been a couple of other small things

4   that I've spoken to someone briefly or something like

5   that.  I don't remember exactly.

6      Q.  And after you spoke to Lauren and maybe those

7   couple other things, did you see a written article about

8   it or a news production about it?

9      A.  Yes, I've seen a couple of written articles

10  that had mentioned myself.

11     Q.  Okay.  Anything on camera?  Have you ever done

12  any kind of on-camera interviews?

13     A.  Yes.  There was a couple of film students from

14  Texas University that did a documentary about how

15  invasive the news media was when this happened, and I

16  did speak with them on camera about my experience with

17  the media.

18     Q.  Okay.  So a couple written articles, but the

19  only time you would have been on camera was with the

20  students; is that accurate?

21     A.  That's accurate.

22     Q.  Okay.  All right.  And we talked a little bit

23  about talking with law enforcement.  Have you ever given

24  any kind of like written statement to law enforcement or

25  anything?

1      A.  No.

2      Q.  All right.  Have you read -- besides those news

3   articles where you're mentioned, which I'm assuming you

4   read because you knew you were mentioned, have you read

5   a lot of other articles about the shooting which may

6   have been written or interviews from other people?  Have

7   you read a lot of media about the shooting?

8      A.  I mean, I've read a few things.  I don't sit

9   around and, you know, obsessively read things about it,

10  but I've read a few little things here and there.

11     Q.  Okay.  Have you commented on any, like online

12  news articles?

13     A.  Not to my recollection, no.

14     Q.  Okay.  All right.  How about your family?  Have

15  you talked to your family about the shooting besides

16  talking to Deanna right after the shooting about what

17  she learned from the coroner and the second cousin?

18     A.  I mean, some, yeah.

19     Q.  Okay.  All right.  Who would you usually talk

20  to in your family?

21     A.  I probably talk to Deanna more than anybody

22  else.

23     Q.  Okay.  All right.  How about Michael?  Do you

24  talk to him about the shooting, or you just kind of

25  handle the estate with him?

1      A.  No, we don't really talk about it.  Michael

2  doesn't like to talk about it.

3      Q.  Okay.  All right.  Now, I'm going to back up a

4  little bit, and I want to talk about the day of the

5  shooting.  Okay?

6          And I know this is going to be difficult.

7  All right?  So if you need a break, I want you to tell

8  me you need a break.  But we're going to go into this,

9  and so I just want to give you a heads-up, give you a

10  chance to take a deep breath.  But if you need a break,

11  let me know.  Okay?

12      A.  Okay.

13      Q.  Okay.  So at the time of the shooting, you were

14  living on your parents' property.  Had you been

15  attending the church with them?

16      A.  I had gone to the Fall Festival a few days

17  before, but I'm not really a churchgoer, so other than

18  that, not really, no.

19      Q.  Okay.  So you weren't a member of Sutherland

20  Springs, of the church at Sutherland --

21      A.  No, I wasn't.

22      Q.  Okay.  Were they members of the First Baptist

23  Church at Sutherland Springs?

24      A.  Oh, yes.  He was a deacon and everything.

25  Yeah.

1        Q.   Right.  And so they went every single Sunday?

2        A.   Not every single Sunday, but most Sundays, yeah.

3        Q.   Okay.  Do you remember seeing them before they

4    left for church that day?

5        A.   Not that morning.  They forgot to set their

6    clocks back and it was Daylight Savings and they left an

7    hour early, so I didn't get to see them that morning.

8        Q.   Okay.  Would you generally get to see them on a

9    Sunday before church?

10       A.   Yeah, normally when they would be leaving for

11   church, I would be outside with my dogs, having coffee

12   and stuff, and I would walk up to their car and say bye

13   and talk to them for a second before they left.

14       Q.   Okay.  Tell me about finding out.  How did you

15   find out about the shooting?

16       A.   So I was outside doing some work at my house

17   and I heard Deanna scream my name and I knew from like

18   the way that she said my name that something was really

19   wrong and I just like took off running and I got kind of

20   between the yards.  And she met me there, and she showed

21   me a live feed on her phone from Facebook where it was

22   stating that there was -- there had been a shooting at

23   the church and there was like helicopters flying over

24   reporting.

25                So I just immediately like ran and got

1    Michael from his little trailer, and we got in the car

2    and we drove straight out there.

3        Q.  Okay.  How far --

4        A.  I drove.

5        Q.  How far away from the church were you?

6        A.  About 15 minutes.

7        Q.  Okay.  When you arrived at the church, was it

8    blockaded?  Were you able to get close to the church?

9    Talk to me about the scene that you saw when you

10   arrived.

11       A.  We had to park pretty far away.  There was cops

12   and EMTs and helicopters and firemen and everything just

13   everywhere, ambulances kind of surrounding the church.

14              I kind of frantically like ran up and was

15   just looking and looking.  Because I just -- the whole

16   way there, like all I could think about was just putting

17   my arms around my mom and just knowing she was okay.

18              And -- sorry.

19       Q.  It's okay.

20       A.  I was just looking for her.

21              But the first person that I saw that I

22   recognized was John Holcombe, and I ran up to him and I

23   said, "John, my parents."

24              And he said, "I don't know.  My mom's

25   dead."

1          So we kind of looked around and we talked

2   to a couple of people and they didn't know anything; and

3   the cops asked us to walk down to the community center,

4   which is like a block away from the church, and to wait

5   there and that someone would come and tell us what was

6   going on.

7     Q.  Okay.  Now, you said you were friends with the

8   Holcombes.  So did you know the Holcombes that also

9   passed away in the shooting?

10     A.  I did -- I found that out pretty -- I mean,

11   John told me his mom died; and then someone grabbed me

12   from behind while I was talking to John and pulled me

13   away from him and said that all the Holcombes were gone

14   and that he was hurt and that he lost his parents and

15   his wife and everything.

16     Q.  Okay.  Did you get near the church?  Did you

17   see anybody injured outside the church when you arrived?

18     A.  I did, yes.  I saw John, obviously.  He got

19   shot in one of his legs.

20          And I saw Julie Workman.  She had blood all

21   over her shirt.

22     Q.  Okay.  So you didn't see your parents injured?

23     A.  No.

24     Q.  Okay.  So you go to the community center, and

25   at what point do you find out about your parents?

1        A.  It was 14 hours later.  The -- the Red Cross

2   came.  They had us wearing armbands.  Like, we're

3   waiting around all day, they're still not telling us

4   anything.  It was like the attorney -- the -- what is it

5   called -- district attorney would come in and say, "Oh,

6   the FBI is going to come tell you guys a list of names,"

7   and then the FBI would come and say, "The Texas Rangers

8   are going to come and tell y'all a list of names," and

9   then the Texas Rangers would come, and they would say

10   the sheriff's department.  And they kept kind of like

11   bouncing back who has jurisdiction, I guess.

12              And finally they moved us over to a church

13   that was about a mile or two away down the road because

14   it had rooms that they could take us in and talk to us.

15   And we waited there for another probably three or four

16   hours, and then finally they called my family.  We were

17   the last ones to get called.

18              And we sat in there till the Texas Rangers

19   told us that they had died in the church.

20        Q.  Okay.  All right.  You need a break?

21        A.  I need a second.  Can I have a second?

22        Q.  Okay.  Why don't -- why don't we take a

23   ten-minute break.  Okay?

24        A.  Okay.

25              MS. CHRISTILLES:  You want to take a

```
 1   ten-minute break?  All right.  Let's come back at 3:43
 2   or whenever you're ready to come back.  Okay, Ms. Wall?
 3                THE WITNESS:  Okay.  Thank you.
 4                MS. CHRISTILLES:  Of course.
 5                (Recess from 3:33 p.m. to 3:44 p.m.)
 6       Q.  (By Ms. Christilles)  All right.  Ms. Wall,
 7   before the break, we were talking about being in the
 8   room and them telling you about your parents.  Who else
 9   was in that room with you?
10       A.  My best friend since 2nd grade.  Deanna,
11   Michael, Neil, my mom's sister Gail and her son Tony and
12   my mom -- I mean -- yeah, my mom's best friend, Brenda,
13   and her husband Danny and then Deanna's best friend,
14   Dawn.
15       Q.  Okay.  You said your best friend.  Who is your
16   best friend?
17       A.  Her name is Sierra Guerra.
18       Q.  Okay.  All right.  And recognize I think
19   everybody else, except your mom's sister was also there;
20   is that right?
21       A.  Yes.
22       Q.  Okay.  How many siblings did your mom have?
23       A.  She was one of six.
24       Q.  Oh, okay.  And all of her siblings still
25   survive?  Are they still alive --
```

1      A.  Yeah.  Yeah, they all are.

2              MS. CHRISTILLES:  Hold on one moment.

3              (Discussion off the record.)

4      Q.  (By Ms. Christilles)  All right.  Okay.  Now,

5  following the shooting, you indicated that you chose

6  cremation for your parents.  Did you have to -- did

7  anybody have to pay for those funeral expenses?

8      A.  Actually, my parents chose cremation, and they

9  had prepaid for it.

10     Q.  Okay.

11     A.  My mom owed a hundred and thirty dollars on

12  hers still, and Deanna and her husband paid that.

13  That's the only expense that we had.

14     Q.  And that was my next question.  Were there any

15  other expenses related to the shooting and your parents

16  that you had to pay?

17     A.  I'm sorry.  You broke up at the end of that

18  question.

19     Q.  Sorry about that.  I said besides the hundred

20  and thirty dollars that Deanna and her husband paid,

21  were there any other expenses related to the shooting

22  that you or your family had to pay?

23     A.  I don't really remember for sure.

24     Q.  Okay.  All right.  Did your parents have life

25  insurance?

1        A.  My dad did.

2        Q.  And who were the beneficiaries of his life

3   insurance?

4        A.  My children.

5        Q.  Okay.  So your two boys?

6        A.  Yeah, my two boys.

7        Q.  Okay.  And how much of a life insurance policy

8   was that?

9        A.  It was $5,000.  There were two policies, one

10   for each child, and they were $5,000 apiece.

11        Q.  Okay.  All right.  Now, I want to back up to a

12   couple of questions from when we were on the break.

13             You indicated that you had to stop therapy

14   when you moved to Georgia because you lost your health

15   insurance; is that right?

16        A.  That's right.

17        Q.  Okay.  But you've restarted therapy.  Is that

18   because you have a new health insurance, or how are you

19   paying for therapy right now?

20        A.  I'm still on my husband's health insurance, and

21   he is helping me pay for it right now.

22        Q.  Okay.  And you're separating from your husband.

23   Do you intend to continue with your therapy?

24        A.  I do.

25        Q.  Okay.  And are you going to be able to get

1   health insurance for that therapy?

2       A.  I'm not sure what I'm going to do yet as far as

3   that goes.

4       Q.  Okay.  All right.  Are you -- I know that

5   you're separating from your husband.  Are you in any

6   other kind of relationship at the moment?

7       A.  I am.

8       Q.  Okay.  And who are you in a relationship with?

9       A.  His name is John Lawrence.

10      Q.  All right.  You're going to have to help me

11  spell John's last name.

12      A.  Lawrence, L-A-W-R-E-N-C-E.

13      Q.  Okay.  Common name.  I just heard it

14  improperly.

15          And how did you --

16      A.  That's all right.

17      Q.  Okay.  How did you meet him?

18      A.  Online.

19      Q.  Okay.  And how long have you two been together?

20      A.  Like a dating app.  Oh, how long have we been

21  together?  A year.

22      Q.  Okay.  So you've been with him for a year?

23      A.  Yeah.

24      Q.  And does he live there in Georgia?

25      A.  He does.  He actually lives here with me.  So

1    my husband lives here, and then me and John live here,

2    and my kids, in one house?

3        Q.  Okay.  Okay.  Do you own the home or does your

4    husband own the home or do you own it together?

5        A.  We're renting it.

6        Q.  Oh, okay.  All right.  You have the mobile home

7    back in Floresville.  Do you own any other properties?

8        A.  No.

9        Q.  Okay.  So you're renting the property that

10   you're currently living in?

11       A.  Yes.

12       Q.  Okay.  And besides John and your husband and

13   your two boys, does anybody else live in the home?

14       A.  No.

15       Q.  Okay.  All right.  And you indicated that

16   you're doing some things like Uber Eats.  Is that your

17   only means of financial support, or is your husband

18   currently supporting you?  What other kinds of financial

19   support do you have right now?

20       A.  I mean, my husband pays for part of the bills

21   in the house, but I have to come up with ways to make

22   money to cover my portion.

23       Q.  Right.

24       A.  So Uber Eats and whatever way I can scrape up

25   the money.

1      Q.  Does Mr. Lawrence help out with some of the

2   bills?

3      A.  He does.

4      Q.  Okay.  And what does Mr. Lawrence do for a

5   living?

6      A.  Well, right now, he's currently on

7   Unemployment.  He lost his job because of COVID.  But he

8   has previously been in like retail management.  He's

9   also in a master's program to be a Licensed Clinical

10  Social Worker.

11     Q.  Okay.  Have you talked to him about any of your

12  therapy that you're going through?

13     A.  Oh, yeah.  Definitely.

14     Q.  Okay.  All right.  And how long have you been

15  in the house that you're renting?

16     A.  Since last December.

17     Q.  Okay.  And where is that house located?

18     A.  You want the address?

19     Q.  That'll help.  I just -- Georgia's kind of a

20  big state.  So...

21     A.  Okay.  So Douglasville is about 30 minutes west

22  of Atlanta.

23     Q.  Okay.

24     A.  We're considered part of the Metro Atlanta

25  area, actually.

1     Q.  Okay.  So you're in Douglasville.  That's where

2  you're renting the house?

3     A.  Right.

4     Q.  Okay.  All right.  And that's where you're at

5  taking this deposition today?

6     A.  Yes.

7     Q.  Okay.  Did you provide that address to the

8  court reporter?  I know she usually asks.

9     A.  No.

10     Q.  Okay.  Why don't you just go ahead and provide

11  the address and stuff where you're taking this

12  deposition at.

13     A.  Okay.  So it's ███████████, ███████████ --

14  sorry, ███████████████, Douglasville, Georgia

15  █████.

16     Q.  All right.  Now, we've talked a little bit

17  about how the shooting affected your ability to sleep,

18  how it --

19            THE WITNESS:  One second.

20     Q.  (By Ms. Christilles)  -- gave you some

21  nightmares.

22            (Discussion off the record.)

23            THE WITNESS:  Okay.  Sorry about that.

24            MS. CHRISTILLES:  No worries.  I think I

25  just did the same thing to you, so no apologies needed.

 1      Q.  (By Ms. Christilles)  All right.  So we talked

 2  earlier about how the shooting affected your ability to

 3  sleep and it gave you nightmares and you mentioned that

 4  it made you anxious and depressed and you talked to me

 5  about agoraphobia and -- and you gave me a lot of

 6  information and I just want to kind of break that down a

 7  little bit.

 8              So in the month after the shooting, we

 9  talked about you having difficulty sleeping every day,

10  having nightmares every day.  Talk to me about the

11  anxiety and depression.  What did that mean?  Instead of

12  just a title on it, what did that mean to you?

13      A.  Well, I couldn't hold food down.  I was

14  throwing up all the time.

15              I was crying all the time or just being --

16  like feeling just very empty and sad.

17              Not able to sleep.  Like, I would -- I

18  would try to sleep and I would wake up or I would be

19  laying there and my heart would be racing and -- and my

20  chest would feel tight and I wouldn't be able to fall

21  asleep because I would be afraid that I was going to

22  have a nightmare again.

23              I -- when I would go somewhere, like,

24  outside of my house, I would have that -- that panic

25  feeling and like my chest feeling tight and just, like,

1   my thoughts would be, you know, like I -- I have to get

2   out of here, I can't be here, I don't feel safe, that

3   kind of stuff.

4               Probably for the first year, like nothing

5   felt real, like I felt like this is just some terrible

6   dream and I'm just going to wake up and this could not

7   have possibly happened because it was just too -- too

8   much.  I just felt very overwhelmed and very sad all the

9   time.

10       Q.  You indicated that you were throwing up.  Did

11   you have any significant weight loss or weight gain

12   following the shooting?

13       A.  It has fluctuated greatly.  The first month I

14   lost like 15 pounds.  And then I gained like 30 pounds.

15   And it -- it goes back and forth depending on, like,

16   when I get -- if my anxiety is worse than my depression,

17   I'll lose weight because I'll be getting sick like that.

18   Still now, I can get upset, and I'll just start throwing

19   up.  And that never happened to me before the shooting.

20   That started the morning after.  And then if my

21   depression is worse than my anxiety, I tend to gain more

22   weight.  So it's just kind of up and down ever since.  I

23   am currently 50 pounds heavier than I was when my

24   parents died.

25       Q.  Okay.  How about your grooming habits following

1    the shooting?

2              And let's actually back up and talk about

3    before the shooting.  Tell me what kind of person you

4    are.  Were you somebody that went and got your hair done

5    all the time and got your nails done and really cared

6    about your appearance prior to the shooting?

7        A.  Yes.

8        Q.  Okay.  After the shooting, talk to me -- were

9    there any changes in your grooming habits?

10       A.  Yeah.  I've gone like long periods of time not

11   caring about getting my hair done or anything; and when

12   my depression is really bad, sometimes it's hard to get

13   myself to shower, like that feels like just too much

14   to -- to even worry about, and it can be several days

15   sometimes.

16       Q.  Okay.  And thinking back to your worst period

17   of time, what were your grooming habits like?  Did you

18   go days without showering?  Did you not brush your hair?

19   What did that look like at your worst possible time?

20       A.  Oh, yeah, totally.  Like days to a week without

21   showering, not doing anything, maybe just throw my hair

22   in a ponytail and leave it for days in the same ponytail

23   and wear the same clothes and just not brushing my

24   teeth, not washing my face, nothing, just existing.

25       Q.  Okay.  And now present day, what does that look

1   like?

2       A.  It's better, but it's still something that can

3   be a struggle when my depression starts to swing up

4   again.  But it's never that bad because I have more

5   support now.  Like, John will not let me get that bad.

6   Like, he will -- he's like, "Look, I will bathe you if I

7   have to," like, "Let's take a shower," and he'll help

8   me.

9       Q.  Okay.  Now, you were with your first -- no, you

10  were with your second husband at the time of the

11  shooting; is that correct?

12      A.  Right.

13      Q.  Okay.  Was he a good support system during that

14  time?

15      A.  He was not the support system that I needed,

16  but he was the best support system that he could handle

17  being.  This was very traumatic for him, too.

18      Q.  Okay.  Talk to me about that.  Why was it

19  traumatic for him?  Was he really close to your parents?

20      A.  Yeah, he -- I mean, he spent all that time that

21  I talked about that we spent at their house every day.

22  He was there, too, and he really cared about them and --

23  you know.

24              And it -- it also is -- it's not just

25  death, it's also like every idea you had about what your

1    future was going to be is now shifted and, you know, he

2    thought that things were going to be a certain way and

3    then they weren't.  And he lost his sense of normalcy.

4    He lost all his expectations for what we were going to

5    be doing with our lives.  He lost a lot of things

6    besides just my parents, just like I did.

7         Q.  Okay.

8         A.  So it was really hard for him, too.

9         Q.  Okay.  Now, you indicated that you went to the

10   Fall Festival at the church in Sutherland Springs prior

11   to the shooting.  Do you remember that?

12        A.  What was the last part you said?  It broke up.

13        Q.  Sure.  You mentioned that you went to the Fall

14   Festival prior to the shooting.  Do you remember telling

15   me that?

16        A.  Yes, I do.

17        Q.  Okay.  When you were at that Fall Festival, did

18   you see Devin Kelley there?

19        A.  I don't recall seeing him at all.

20        Q.  Okay.  Did you know anything about him or his

21   family prior to this?

22        A.  No.

23        Q.  Okay.  All right.  Did you know -- so you

24   didn't know anything about any conflicts he was having

25   with his wife or his in-laws?

         1        A.   No.   I mean, I didn't know his wife, I didn't

         2   know his mother-in-law.   I didn't know any of them.

         3        Q.   Okay.   All right.   Now, following the shooting

         4   we have talked about you seeking out therapy.   Did you

         5   participate in any kind of group therapy sessions with

         6   any of the other family members?

         7        A.   Not therapy, per se.   We had one group meeting

         8   where they just had kind of an open floor for people to

         9   share what their experiences were that day to kind of

        10   help each other fill in holes of things that we might

        11   have missed.   So there was just that one meeting, but it

        12   wasn't really therapy.

        13        Q.   And what kind of things were you filling in

        14   about the day during that group session?

        15        A.   Like details about what -- you know, kind of

        16   how things happened.   And we were hoping for someone to

        17   be able to tell us, like, anything about our parents,

        18   like if -- if they went fast or if they were, you know,

        19   suffering for the whole time or what happened.   Nobody

        20   knew anything about them specifically, but that's why we

        21   went, hoping to hear something.

        22        Q.   Okay.   Have you since found out any information

        23   about that?

        24        A.   I can't hear you.   You broke up.

        25        Q.   Sure.   Have you since found out any information

1    about whether or not they passed quickly or anything

2    like that?

3        A.  No.

4        Q.  Okay.

5        A.  I don't think anyone saw them specifically

6    enough to be able to tell me, you know, where they fell

7    in the sequence of events.

8            MS. CHRISTILLES:  All right.  I'm going

9    to -- if I could ask for five minutes, I'm just going to

10   run through my list of questions, make sure I got

11   everything, and then we should be done here very

12   quickly, Ms. Wall.  But if you would give me five

13   minutes, I'm just going to look through these questions

14   real quick.  Okay?

15           THE WITNESS:  Okay.

16           (Recess from 4:03 p.m. to 4:10 p.m.)

17       Q.  (By Ms. Christilles)  All right.  Ms. Wall,

18   just a few more things to go through.

19           We were talking about kind of that group

20   therapy session and your individual therapy.  Do

21   you know if any of your other family members attended

22   therapy?

23       A.  I think Christopher might have, and I think

24   Deanna did a little bit.

25       Q.  Okay.  Do you know if they saw that same

1    initial therapist at Camino Real as you did?

2        A.  I have no idea.

3        Q.  Okay.  So as a family unit, did you-all ever go

4    to any kind of therapy sessions?

5        A.  No.

6        Q.  Okay.  So the only thing that you did kind of

7    group-wise was that group come-together session, and it

8    wasn't therapy; is that accurate?

9        A.  Right.

10       Q.  Okay.  All right.  Now, I know that there were

11   some funds created for some of the victims of the

12   Sutherland Springs shooting.  Have you ever received any

13   kind of funds from an agency or the government in

14   relation to the passing of your parents?

15       A.  I'm not sure I understand the question.

16   Like --

17       Q.  Okay.

18       A.  -- "an agency" as in?  Like, I haven't directly

19   received money.  I've had -- the Attorney General for

20   the State of Texas has paid -- paid for Camino Real, but

21   other than that, no.

22       Q.  Okay.  And that's exactly what I'm asking, and

23   I appreciate that you took my terrible question and

24   answered it anyway.

25                   (Group laughter.)

1      Q.  (By Ms. Christilles)  So the Attorney General's

2   Office did pay for your therapy at Camino Real; is that

3   correct?

4      A.  That's correct.

5      Q.  Okay.  Any other types of payments like that

6   that you received from the government?

7      A.  No.

8      Q.  Okay.  And, currently, your health insurance,

9   what's paying for your therapy now, is your husband's

10  insurance?

11     A.  Right.

12     Q.  Okay.  All right.  Have you explored any kind

13  of government help for that kind of -- for paying for

14  that therapy at all?

15     A.  No, not really.

16         MR. ALSAFFAR:  Objection, form.

17     Q.  (By Ms. Christilles)  Okay.  And that was, "No,

18  not really," you haven't explored any other kind of

19  government help to pay for that therapy; is that

20  correct?

21     A.  No.

22         MR. ALSAFFAR:  Objection, form.

23     Q.  (By Ms. Christilles)  All right.  Now, just

24  kind of another topic related to this but something we

25  really haven't explored a lot was we talked a little bit

```
 1    about your dad's hobbies.  He really liked to mow the

 2    lawn.  Was he a hunter?

 3        A.  No.

 4        Q.  Okay.  Was he a gun owner?

 5        A.  No, he wasn't.

 6        Q.  Okay.

 7        A.  My mom was.

 8        Q.  Now, was your mom --

 9        A.  Yeah.

10        Q.  I was going to ask.  Was your mom a gun owner?

11        A.  Uh-huh, she was.

12        Q.  Okay.  Was she a hunter?

13        A.  What was that?

14        Q.  Was your mom a hunter?

15        A.  No.  When she was a kid, she hunted and stuff;

16    but I never knew her to hunt in my lifetime or anything

17    like that.

18        Q.  Okay.  Did she own a gun for personal

19    protection, or was she a collector?  What kind of gun

20    owner was she?

21        A.  She had a .38 special that my dad had got for

22    her when they lived in Florida.  There was a serial

23    rapist in their area that they lived in and he had got

24    her the gun for protection and she just still had it.

25    She wasn't like an enthusiast or anything like that.
```

1        Q.   So she just really had the one gun?

2        A.   Yeah.

3        Q.   Okay.  How about you, are you a gun owner?

4        A.   I am not.

5        Q.   Okay.  Is your husband a gun owner?

6        A.   No.

7        Q.   Okay.  How about your siblings, are they gun

8    owners?

9        A.   I think Michael is.

10       Q.   Okay.  Do you have any strong opinions about

11   gun ownership?

12            MR. ALSAFFAR:  Objection, form.

13       A.   Strong op -- I -- I feel that it should be

14   approached very carefully.

15       Q.   (By Ms. Christilles)  Okay.  And what do you

16   mean by that, "approached very carefully"?

17       A.   I think that it should be treated like how we

18   treat cars, like we should make sure that the person

19   operating a gun and owning a gun should understand how

20   to operate it properly and safely, that they should have

21   been taught and tested on that and passing background

22   checks that are full and accurate and that kind of

23   thing.

24       Q.   Okay.  You indicated you're not a gun owner.

25   Have you ever owned a gun?

```
1        A.  I did have an uncle give me a shotgun one time,
2   and I promptly sold it.  So not really.
3        Q.  Okay.  Who did you sell it to?
4        A.  It was a pawnshop, actually.
5        Q.  Okay.  Not -- not a gift you wanted to keep,
6   huh?
7        A.  Not really.  Not --
8        Q.  Okay.
9        A.  Just not for me.
10       Q.  Okay.  Well, Ms. Wall, I think that is all of
11  the questions that I had for you today; and I know when
12  we started this, I said my one main thing was that I
13  just ask you -- asked you to answer all the questions
14  honestly.  Have you answered all of the questions I've
15  asked you today truthfully?
16       A.  Yes.
17       Q.  Have there been any questions that you didn't
18  understand?
19       A.  Not that I can recall.
20       Q.  Okay.  All right.  Now, you will have the
21  opportunity, if you elect, to review your deposition
22  transcript.  Okay?  The court reporter has been typing
23  it up.  And so I -- I just ask you to review that
24  carefully and see if there's any discrepancies in that.
25  Okay?  Make sure that's accurate.
```

1      A.   Okay.

2                MS. CHRISTILLES:  Okay.  That's all I have.

3   I'll pass the witness.

4                MR. ALSAFFAR:  We'll reserve our questions

5   for trial.

6                MS. CHRISTILLES:  Okay.  Ms. Wall, I

7   believe that's all we have for you.

8                We have a couple of matters to wrap up with

9   the court reporter, but, Jamal, I think your client's

10  released.  Is that fine with you?

11               MR. ALSAFFAR:  Yeah.

12               (Discussion off the record.)

13               THE REPORTER:  Ms. Christilles, you'll be

14  responsible for payment for the original and one copy of

15  the transcript.  Will you take that electronically-only,

16  or do you need paper?

17               MS. CHRISTILLES:  I think we prefer

18  electronic.

19               THE REPORTER:  And then we'll have the

20  exhibits, and that will be electronic also.  Very good.

21               Do you need a rough or rush on it?

22               MS. CHRISTILLES:  No.

23               THE REPORTER:  Mr. Alsaffar, do you need a

24  copy of the transcript?  Do you wish to purchase one?

25               MR. ALSAFFAR:  No, we just need an e-mailed

1  pdf of the deposition and the exhibits, so just an

2  e-mailed pdf on both.

3            THE REPORTER:  Okay.  And so you're wanting

4  that with the read and sign; is that right?

5            MR. ALSAFFAR:  You can send me the e-mailed

6  pdf for read and sign, yes.

7            (Deposition concluded at 4:20 p.m.)
8               (Wall Exhibit B marked.)
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          CHANGES AND SIGNATURE

2   WITNESS NAME:  KATI WALL              DATE:  09/28/20

3      PAGE   LINE   CHANGE          REASON

4      _____

5      _____

6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20     _____

21     _____

22     _____

23     _____

24     _____

25     _____
```

```
 1            I, KATI WALL, have read the foregoing

 2   deposition and hereby affix my signature that

 3   same is true and correct, except as noted above.

 4

 5                     _____

                       KATI WALL

 6

 7   THE STATE OF _____:

 8   COUNTY OF _____:

 9            Before me, _____, on this

10   day personally appeared KATI WALL, known to me (or

11   proved to me under oath or through _____)

12   (description of identity card or other document) to be

13   the person whose name is subscribed to the foregoing

14   instrument and acknowledged to me that they executed the

15   same for the purposes and consideration therein

16   expressed.

17            Given under my hand and seal of office this

18   _____ day of _____, _____.

19

20

                       _____

21                     Notary Public in and for
                       The State of _____

22

     My Commission Expires: _____

23

24

25
```

```
 1                  United States District Court
                      Western District of Texas
 2                      San Antonio Division

 3    Kati Wall, Michael Johnson,
      Individually and as Personal
 4    Representatives of
      The Estate of Dennis Johnson
 5    and The Estate of Sara Johnson,
      and Dennis Johnson Jr.,
 6    Christopher Johnson, Deanna
      Staton, and James Graham,             C.A. No. SA-18-cv-951
 7         Plaintiffs,                         Consolidated in
                                            C.A. No. SA-18-cv-00555-XR
 8     v.

 9    United States of America,
           Defendant.
10

11                        VOLUME 1 OF 1
                       REPORTER'S CERTIFICATION
12         ORAL VIDEOCONFERENCED DEPOSITION OF KATI WALL
                      TAKEN ON SEPTEMBER 28, 2020
13

14         I, AUDREY L. WALDROP, Certified Shorthand Reporter
      in and for the State of Texas, hereby certify to the
15    following:
           That the witness, KATI WALL, was duly sworn by the
16    officer and that the transcript of the oral deposition
      is a true record of the testimony given by the witness;
17         That the deposition transcript was submitted
      _____ to the witness or to the attorney
18    for the witness for examination, signature and return to
      Free State Reporting by _____;
19         That the amount of time used by each party at the
      deposition is as follows:
20
           Ms. Jacquelyn Christilles:  2 hours, 11 minutes
21         Mr. Jamal K. Alsaffar:  0 hours, 0 minutes

22         That pursuant to information given to the
      deposition officer at the time said testimony was taken,
23    the following includes counsel for all parties of
      record:
24
           Mr. Jamal K. Alsaffar, Attorney for Plaintiffs
25         Ms. Jacquelyn Christilles, Attorney for Defendant
```

1    I further certify that I am neither counsel for,
related to, nor employed by any of the parties in the
2  action in which this proceeding was taken, and, further,
that I am not financially or otherwise interested in the
3  outcome of the action.
   Further certification requirements will be
4  certified to after they have occurred.
   Certified to by me this _____ day of October, 2020.

5

6

7
                   Audrey L. Waldrop, CSR
8                  Texas CSR No. 6218
                   Expiration Date:  October 31, 2021
9                  Free State Reporting
                   1378 Cape St. Claire Road
10                 Annapolis, Maryland 21409
                   800-231-8973

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONTINENTAL COURT REPORTERS, INC.
(713) 522-5080

FURTHER CERTIFICATION

1

2

3     The original deposition was/was not returned to the

deposition officer on _____;

4

5     If returned, the attached Changes and Signature

Page contains any changes and the reasons therefor;

6

7     If returned, the original deposition was delivered

to Ms. Jacquelyn Christilles, Custodial Attorney;

8

9     That $ _____ is the deposition officer's

charges to the Defendant for preparing the original

10

deposition transcript and any copies of exhibits;

11

12    That the deposition was delivered in accordance

with the Federal Rules of Civil Procedure and that a

13

copy of this certificate was served on all parties shown

14

herein.

15

16    Certified to by me this _____ day of

_____, 2020.

17

18

19    _____

Audrey L. Waldrop, CSR

20    Texas CSR No. 6218

Expiration Date:  October 31, 2021

21    Free State Reporting

1378 Cape St. Claire Road

22    Annapolis, Maryland 21409

800-231-8973

23

24

25

CONTINENTAL COURT REPORTERS, INC.
(713) 522-5080

United States District Court
Western District of Texas
San Antonio Division

Kati Wall, Michael Johnson, Individually and
as Personal Representatives of The Estate of
Dennis Johnson and the Estate of Sara
Johnson, and Dennis Johnson Jr., Christopher
Johnson, Deanna Staton, and James Graham,
    Plaintiffs,

    v.

United States of America,
    Defendant.

Civil Action No. SA-18-CV-951
Consolidated in Civil Action
No. SA-18-cv-00555-XR

**Notice of Oral Deposition of Witness Kati Wall with Duces Tecum**

TO:    Plaintiffs Kati Wall, Michael Johnson, Individually and as Personal Representatives of
The Estate of Dennis Johnson and the Estate of Sara Johnson, and Dennis Johnson Jr.,
Christopher Johnson, Deanna Staton, and James Graham, by and through their attorneys of
record: Jamal K. Alsaffar, Laurie Higginbotham, Tom Jacob, Koby Kirkland, Whitehurst,
Harkness, Brees, Cheng, Alsaffar, Higginbotham & Jacob, P.L.L.C., 7500 Rialto Blvd, Bldg.
Two, Ste. 250, Austin, TX 78735.

    **PLEASE TAKE NOTICE** that the United States of America, Defendant herein, will

take the deposition upon oral examination of Plaintiff **Kati Wall** on **September 28, 2020**, at

**1:30 p.m.** and will be conducted remotely by Zoom, by agreement of counsel, with the witness

attending via remote video, and all parties in their preferred respective locations.

    Pursuant to local, statewide, and national emergency orders related to the ongoing

COVID-19 pandemic, the deposition will occur virtually with all parties attending via remote

deposition technology provided by Res Ipsa.

    This deposition will be taken by stenographic means by Free State Reporting, Inc. 1378

Cape St. Claire Road, Annapolis, MD 21409, Telephone number (800) 231-8973.

    You will also take notice that the Plaintiff is requested to produce at the time and place of

this deposition, and to permit the inspection and copying, of any and all documents described in

the attached Exhibit "A".

**EXHIBIT**
**Wall**
**A**
09/28/20        aw        1

**Notice of Oral Deposition of Plaintiff**                                                        1

In compliance with a Court Order issued on April 28, 2020, attached are Exhibits "B"

and "C".  Exhibit "B" Declaration requires signature of the deponent at the conclusion of the

deposition, affirming that no witness tampering has occurred. Exhibit "C" is the Remote

Deposition Protocol Order issued by Judge Rodriguez.


Respectfully submitted,

John F. Bash
United States Attorney

By:  */s/ James E. Dingivan*
James E. Dingivan
Assistant United States Attorney
Texas Bar No. 24094139
Clayton R. Diedrichs
Assistant United States Attorney
Colorado Bar No. 16833
James F. Gilligan
Assistant United States Attorney
Texas Bar No. 07941200
601 N.W. Loop 410, Suite 600
San Antonio, Texas  78216
clayton.diedrichs@usdoj.gov
jim.gilligan@usdoj.gov
james.dingivan@usdoj.gov
(210) 384-7310 (phone)
(210) 384-7312 (fax)

**Notice of Oral Deposition of Plaintiff**                                                    **2**

**Certificate of Service**

I do hereby certify that a true and correct copy of the above and foregoing was served by e-mail transmission on September 22, 2020, addressed to:

Jamal K. Alsaffar (jalsaffar@nationaltriallaw.com)
Tom Jacob (tjacob@nationaltriallaw.com)
Laurie Higginbotham (lhigginbotham@nationaltriallaw.com)

*/s/ James E. Dingivan*
James E. Dingivan
Assistant United States Attorney

**Notice of Oral Deposition of Plaintiff**                                                                   **3**

**Duces Tecum**
**Exhibit "A" to Notice of Oral Deposition**

The witness is directed to bring to the deposition the following materials:

1. Any and all of your non-privileged records, personal notes, calendars, diaries, phone logs or other type of documents, including social media posts, concerning any fact or opinion in relation to this lawsuit.

2. Any and all medical records in your actual or constructive possession that have not been produced to date. This would include treatment for physical conditions and any mental anguish claims forming the basis of this lawsuit.

3. Any and all medical expenses relating to injuries alleged by you in this action that remain outstanding and/or that you have paid for and were not reimbursed.

4. Any documents to support any alleged loss of earnings or earning capacity, to include, but not limited to your federal and state income tax returns covering the years of 2010 up to and including 2019.

5. Any and all photographs, recordings, videotapes, computer disks or any other formats, recording visual images or sound that have been gathered by you or on your behalf to show liability or damages in your case.

6. Any claimed admissions made by any employees working for the government.

7. Any documents in your possession assessing your, or the person or estate you represent in this action, physical or mental impairment of any type, in your actual or constructive possession.

8. Any and all governmental medical records or private healthcare records in your actual or constructive possession to include any outpatient records, imaging studies, lab studies, physicians' or nurses' notes, or any other type of medical records which were created on or after January1, 2010.

9. Any and all medical records, reports, findings, diagnostic testing, imaging studies, or similar records relating to any issues in this lawsuit created on or after January 1, 2010.

10. Any item representing or evidencing payments made by any insurance company to you or to some other entity on your behalf with relate to the issues forming the basis of this lawsuit.

11. Any demand letters sent by you or on your behalf, to any potential defendants wherein you are making a claim for damages or benefits.

12. Any outstanding bills of any type related to medical expenses or any other expenses related to this lawsuit that remain outstanding and have not been paid to date.

Exhibit A 00001

13.     Any and all contracts or agreements or referrals between you and any other party or organization concerning your legal representation relating to this lawsuit.

14.     Any summary of medical records or chronology you have reviewed in preparation for your deposition.

15.     A list of all lawsuits in which you have been a defendant, including cause number, style of case and plaintiff's attorney's name.

16.     A list of all lawsuits in which you have been a plaintiff, including cause number, style of case and plaintiff's attorney's name.

Exhibit A 00002

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

HOLCOMBE, et. al,

      Plaintiffs

vs.

UNITED STATES OF
AMERICA,

      Defendant

NO. 5:18-CV-00555-XR

(consolidated cases)

# DECLARATION

I am _____, and I declare the following as true and correct:

1) I am of sound mind, over the age of 18, and have personal knowledge of the facts contained in this declaration. I was a deponent in the above-styled cause and was deposed by the parties by remote means.

2) From the beginning of the deposition until the end of the deposition, including breaks, I was under oath and received no coaching, assistance, or other help in answering questions, whether in person, by telephone, videoconference, or any electronic or other means of communication.

3) From the beginning of the deposition until the end of the deposition, including during breaks, I did not communicate—whether in person, by telephone, videoconference, or any electronic or other means of communication—with any person about the case other than what is reflected in the court reporter's transcript of the deposition.

Under 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED on this _____ day of _____, 2020.

_____

SIGNATURE

Page 1 of 1

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| HOLCOMBE, et. al, | NO. 5:18-CV-00555-XR |
| | (consolidated cases) |
| Plaintiffs | |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Defendant | |

## REMOTE DEPOSITION PROTOCOL ORDER ORDER

The Court ORDERS that Parties should take remote depositions in this case while the COVID-19 Pandemic precludes in-person depositions. The Court ORDERS that the Parties should abide by the following protocol.

a. Parties shall serve notice of depositions that outline the remote means of taking the deposition, including the technologies used and how parties should connect to the deposition. An example notice of deposition is attached to this order as EXHIBIT A.

b. The court reporter shall swear the witness in remotely.

c. Parties shall use only documents in deposition that have been previously exchanged more than five (5) business days prior to the deposition and uniquely bates stamped. Parties may refer to those documents by bates stamp number and display those documents on the witness' screen, if such technology is used. Should the parties wish to attach documents, Parties will put on the record the bates stamp range of the document and produce the document to the court reporter following the deposition.

d. The court reporting or IT firm running the remote deposition technology will disable private chats between individuals involved in the deposition.

Exhibit C 000001
October 4, 2021

e.  At the conclusion of the deposition, the witness shall sign the declaration attached as EXHIBIT B to this Order, affirming that no witness tampering occurred.

It is so ORDERED.

SIGNED on this ___28th___ day of ___April_____, 2020.

_____
HON. JUDGE XAVIER RODRIGUEZ

Exhibit C 000002
October 4, 2021

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

HOLCOMBE, et. al,
    Plaintiffs

vs.

UNITED STATES OF
AMERICA,
    Defendant

NO. 5:18-CV-00555-XR
(consolidated cases)

## DECLARATION

I am ___Kati Wall___, and I declare the following as true and correct:

1) I am of sound mind, over the age of 18, and have personal knowledge of the facts contained in this declaration. I was a deponent in the above-styled cause and was deposed by the parties by remote means.

2) From the beginning of the deposition until the end of the deposition, including breaks, I was under oath and received no coaching, assistance, or other help in answering questions, whether in person, by telephone, videoconference, or any electronic or other means of communication.

3) From the beginning of the deposition until the end of the deposition, including during breaks, I did not communicate—whether in person, by telephone, videoconference, or any electronic or other means of communication—with any person about the case other than what is reflected in the court reporter's transcript of the deposition.

Under 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED on this ___28th___ day of ___September___, 2020.

SIGNATURE

Page 1 of 1

Exhibit B 000001

**EXHIBIT**
Wall
**B**
09/28/20        aw