United States District Court
Western District of Texas
San Antonio Division

Joe Holcombe, et al.
    Plaintiffs,

v.

United States of America,
    Defendant.

No. SA-18-cv-00555-XR
(consolidated cases)

## Defendant's Amended Deposition Counter Designation to the Testimony of Lisa King Smith, Ed.S., LPC

Defendant submits the following amended counter designations of the testimony given by Lisa King Smith, Ed.S., LPC by deposition on February 25, 2021. The excerpted transcript reflecting these counter designations attached as Government Trial Exhibit GEX-272.

Defendant did not include in the designation the exhibit to the transcript.

| Plaintiffs' Designated testimony | Counter-Designation | Transcript |
|---|---|---|
| 4:7-17 | | |
| 4:22-5:2 | | |
| 5:6-9 | | |
| 8:13-9:12 | | |
| 10:8-20 | | |
| 11:17-20 | | |
| 13:12-15 | | |
| 19:1-20:6 | | |
| 20:13-16 | | |
| 26:2-15 | | |
| 26:19-27:14 | | |
| | 31:10-33:10 | 10. Q. There's a reference to her childhood with<br>11. regard to healthy boundaries. And this is in her<br>12. discussion on page AW000406 under the title of, "What<br>13. are your goals for counseling?" And actually, let's<br>14. just go through that paragraph.<br>15. The first statement or first sentence is,<br>16. "Get out of survival mode."<br>17. A. Mm-hmm.<br>18. Q. What did she mean by that?<br>19. A. Survival mode for her was more or less looking<br>20. toward the future and not making decisions just based on<br>21. the immediate crises. To try to plan better. To try to<br>22. have more goals. To feel more settled. |

|  |  |  |
|---|---|---|
|  |  | 23. Q. Okay. And the second sentence says, "Process
24. my long trauma list." What-all was included on that
25. trauma list?
1. A. It had to do with her family of origin issues,
2. primarily. She had also mentioned that she had been in
3. an abusive relationship in the past, I believe, you
4. know. And then after that it was the trauma of her
5. grandparents. So it was just a lifelong trauma, it
6. seems, one after the other, for her.
7. Q. The fourth sentence references, "Learn what
8. healthy boundaries and thought processes look like since
9. I never had an example of this as a child."
10. A. Mm-hmm.
11. Q. What healthy boundaries did she discuss with
12. you that she wanted to learn about?
13. A. She had, you know, a habit of being a people
14. pleaser. She, you know, would -- had a hard time saying
15. "no" to people. She would allow people to mistreat her
16. and take advantage of her. And she just had a really
17. difficult time setting those types of personal
18. boundaries.
19. Q. Okay. There is a reference, or you referenced
20. earlier, her mother. Did she describe her relationship
21. that she had with her mother at the time that she was
22. counseling with you?
23. A. She had only -- she had not talked to her in
24. quite some time. She had mentioned that when she -- the
25. few times that she had talked to her it was very
1. distressing and brought up some anger.
2. Q. Did she discuss any mental health issues that
3. her mother has or had?
4. A. We talked about it. You know, I am not her
5. mother's therapist, but -- I don't know what her
6. diagnoses are. But it certainly sounded like she had a
7. number of mental health issues.
8. Q. Did she discuss any past traumas with regard to
9. her biological brother?
10. A. Yes. We talked a little bit about that. |
| 33:11-17 |  |  |
| 36:7-20 |  |  |
|  | 36:21-23 | 21. Q. Okay. And then you met with her -- it looks
22. like the next appointment might have been August 21st,
23. 2019. Is that correct? |
|  | 39:13-40:7 | 13. Q. Then the next sentence references "Patient
14. reported her mother was very abusive and self-centered."
15. A. Mm-hmm. |

| | | |
|---|---|---|
| | | 16. Q. What type of abuse did Kati suffer at her
17. mother's hands?
18. A. Her mother was physically abusive. She was
19. verbally abusive. She was in and out of her life. She
20. wasn't a very consistent presence in her life. And when
21. she was present she was very adversarial.
22. Q. Did she continue to have an adversarial
23. relationship with the mom –
24. A. Yes.
25. Q. -- at the time that she was counseling with
1. you?
2. A. Yes.
3. Q. And she describes an uncle. And the uncle you
4. referenced was also abusive to her as well?
5. A. Yes.
6. Q. Do you know which uncle this was?
7. A. I don't remember. |
| 46:12-47:8 | | |
| 52:22-53:10 | | |
| | 55:21-57:23 | 21. Q. Okay. So we will turn to the notes from
22. October 2nd, 2019. This is Bates stamped KW000415. And
23. at this point she appears calm and open. And you
24. indicated that she reported, "I feel like things are
25. being settled. I have been substitute teaching. And I
1. think I want to finish my degree in education so I can
2. teach elementary school."
3. Tell me about that conversation about her
4. being settled and how things had been working for her at
5. that point.
6. A. Um, I think she [inaudible]. We had been
7. [inaudible] with our therapy. [Inaudible].
8. (Discussion off the record.)
9. A. She had indicated that she was feeling a little
10. better. We had been, you know, working in therapy
11. pretty consistently at that point. She had gotten on
12. the medication for anxiety and depression. And by this
13. point it would hopefully have started to kind of maybe
14. work. You know, to do its work.
15. And she -- you know, she had mentioned
16. before that she really wanted to go back to teaching,
17. and she wasn't sure if she was gonna be able to. She
18. wasn't sure if she was gonna be able to go back and do
19. that what she had done before. But, you know,
20. substitute teaching had given her kind of a little bit
21. of confidence. Felt like it was a good fit.
22. Q. And at this point you've seen her now since |

**Defendant's Deposition Designation to the Testimony of Lisa King Smith, Ed.S., LPC**     3

| | | |
|---|---|---|
| | | 23. early August. So it's about two months of weekly<br>24. sessions. How did you feel like she had progressed?<br>25. Um, if I recall, she – it seemed like if she<br>1. would continue therapy for the long haul, I mean, I felt<br>2. like she was making very good progress at that point.<br>3. Q. Was she putting in the work to make progress?<br>4. A. It appeared that she was.<br>5. Q. And what was that work that she was putting in?<br>6. What were those techniques?<br>7. A. Managing her thoughts. Turning -- because one<br>8. thing that we work on in CBT is taking negative thinking<br>9. patterns and turning them into neutral thinking<br>10. patterns. And that initially takes a lot of work.<br>11. And so she was starting to kind of see how<br>12. that was working for her, that what -- you know, the<br>13. negative thinking, how that had really led to a lot of<br>14. self-sabotage and how the neutral thinking was actually<br>15. helping her feel a little more at peace, able to make<br>16. better decisions.<br>17. Q. How was she self-sabotaging?<br>18. A. Just making small choices like not exercising.<br>19. Not -- you know, maybe going and grabbing fast food and<br>20. not eating healthy. Maybe overreacting to a situation<br>21. that didn't need it. Maybe shutting down. I mean,<br>22. just, those are some of the things that I recall being<br>23. issues that she struggled with from time to time. |
| 59:2-13 | | |
| | 61:15-17 | 15. Q. So you did not see her, to confirm, between<br>16. October 9th, 2019 and July 15th, 2020.<br>17. A. No. |
| 61:18-63:13 | | |
| | 63:14-64:15 | 14. Q. Did she discuss the trauma of prostitution and<br>15. the rape with you?<br>16. A. Yes.<br>17. Q. What did she say?<br>18. A. She said that -- let me see if I can remember<br>19. everything. That she had kind of established a little<br>20. bit of a rule for herself about how she would go about<br>21. meeting with clients. And in this particular<br>22. instance -- and I wish I could remember exactly why, but<br>23. she accepted a phone call from someone in the middle of<br>24. the night. And she said, "I knew I shouldn't have, you<br>25. know, done that, but I did anyway."<br>1. And she met this person. And they were at<br>2. an apartment complex. And he took her into an<br>3. abandoned -- it was some kind of an abandoned apartment. |

| | | |
|---|---|---|
| | | 4. And she asked him some questions about, "Why isn't there
5. any furniture in here?" And things like that. And he
6. wouldn't let her go.
7. And then he pulled a gun on her and raped
8. her. And he made a comment -- and I don't recall
9. what -- exactly what it was, but something to the effect
10. of, he was trying to decide if she was gonna let her
11. leave or not. And she said, you know, he did let her
12. leave ultimately. And she went home. She took a
13. shower. She told her husband. And he just laid with
14. her in the bed and held her. And that's all I remember
15. her telling me, that -- that's all I know. |
| | 65:8-19 | 8. Q. Okay. You said that the therapist and patient
9. worked on safety issues. What does that mean?
10. A. Well, feeling safe. I mean, she -- after this
11. event happened she -- it compounded the trauma. She's
12. got layers and layers of trauma. And so this was the
13. most immediate traumatic event. And she ultimately
14. just -- that's what happens with that type of trauma is,
15. there is this feeling of being unsafe.
16. And so we talked about that. And also
17. processed, if she was gonna continue to act as a
18. prostitute, how would she remain safe about it? You
19. know? |
| | 66:1-16 | 1. Q. Okay. At this time, did Ms. Wall indicate that
2. she was still on medications –
3. A. She did not --
4. Q. -- from the psychiatrist?
5. A. She did not indicate.
6. Q. Okay. And do you remember asking?
7. A. I don't remember if I asked or not.
8. Q. Did you have any suspicions that she had
9. stopped taking her medications?
10. A. Yes.
11. Q. Okay. Did you suspect any other type of drug
12. use?
13. A. Possibly.
14. Q. And why would those suspicions come from?
15. A. Just really -- it was really more of a -- more
16. of an assumption. I -- you know. |
| | 67:11-25 | 11. Q. Did the rape have any effect on how you decided
12. to proceed forward with her counseling?
13. A. Yeah. I mean, it would have had she continued
14. to see me. We -- it would have to be included, for
15. sure.
16. Q. And what did you do to address that issue? |

| | | |
|---|---|---|
| | | 17. What plans did you make to address that issue as you
18. continued forward with her?
19. A. Well, I had hoped if we had continued, that we
20. could work on decision-making. It appears that the
21. stress tolerance wasn't really working for her. The
22. choices -- you know, the decisions and choices that she
23. had made at that point needed to be addressed. And I
24. wanted to maybe explore how those decisions might be
25. related to her trauma. |
| | 70:2-16 | 2. Q. Okay. What concerns do you have for someone
3. who suffers a new sexual trauma?
4. A. I have concerns about self-harm. I have
5. concerns about declining, you know, mental status.
6. Declining, you know, functioning, basically. It can
7. really -- well, it complicates the trauma.
8. Q. And –
9. A. It can be re-triggering.
10. Q. Re-triggering with regards to her past sexual
11. trauma?
12. A. Yes.
13. Q. Okay. Was that a concern for you with Kati,
14. was that the more recent trauma would aggravate or, you
15. know, re-trigger those past traumas?
16. A. Yes. Yes. |
| | 71:5-7 | 5. Q. Okay. And so we'll go to your progress note
6. from August 3rd, 2020, which is a couple of weeks later.
7. This is Bates stamped KW000418. |
| | 73:5-24 | 5. Q. Was this your last appointment with Kati?
6. A. I believe so. I'm pretty sure that was the
7. last one.
8. Q. Did she seem open to coming back to you at that
9. session?
10. A. She did, but she did not show to the next
11. appointment. And I haven't seen her.
12. Q. Was there –
13. A. I haven't seen her since.
14. Q. So there was a subsequent appointment
15. scheduled. Correct?
16. A. I believe so. I believe there may have been
17. one scheduled for a week or two later. I wouldn't have
18. ended it that way.
19. Q. Okay. If I take you to -- looks like your
20. billing records, KW000420, there is a reference to an
21. August 18 -- sorry, August 19, 2020 session.
22. A. Yeah.
23. Q. It's a scheduled session. |

|  | 77:6-10 | 24. A. That was that no-show. Yeah.<br>6. Q. Okay. And you -- other than her employment and<br>7. timing issues, you don't know of any other explanation<br>8. for her gap in treatment between October 9th, 2019 and<br>9. July 15th, 2020. Correct?<br>10. A. No. I – |
|  | 77:16-17 | 16. A. I just said I don't know. You know, I don't<br>17. know at all what happened in between. |
| 79:18-80:4 |  |  |
| 80:11-22 |  |  |
| 81:4-10 |  |  |
| 81:14-16 |  |  |
| 83:3-10 |  |  |
| 83:18-25 |  |  |
| 84:9-85:7 |  |  |
| 86:6-17 |  |  |
| 86:25-87:18 |  |  |
| 87:23-88:17 |  |  |
|  | 88:18-23 | 18. Q. Okay. And absolutely, I know, we saw the<br>19. records that she also had other trauma happen to her.<br>20. A. Mm-hmm.<br>21. Q. While – during the treatment period you were<br>22. with her. Correct?<br>23. A. Yes. |
| 88:24-92:17 |  |  |
| 92:22-93:10 |  |  |
| 93:14-95:2 |  |  |

**Defendant's Deposition Designation to the Testimony of Lisa King Smith, Ed.S., LPC     7**

                Respectfully submitted,

                Ashley C. Hoff
                United States Attorney

By:  */s/ James E. Dingivan*
      James E. Dingivan
      Assistant United States Attorney
      Texas Bar No. 24094139
      james.dingivan@usdoj.gov
      Clayton R. Diedrichs
      Assistant United States Attorney
      Colorado Bar No. 16833
      clayton.diedrichs@usdoj.gov
      James F. Gilligan
      Assistant United States Attorney
      Texas Bar No. 07941200
      jim.gilligan@usdoj.gov
      Jacquelyn M. Christilles
      Assistant United States Attorney
      Texas Bar No. 24075431
      jacquelyn.christilles@usdoj.gov
      601 N.W. Loop 410, Suite 600
      San Antonio, Texas  78216
      Jocelyn Krieger
      Trial Attorney
      New Jersey Bar No. 065962013
      jocelyn.krieger@usdoj.gov
      175 N St. NE
      Washington DC 20002
      (210) 384-7372 (phone)
      (210) 384-7312 (fax)