**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **JON HOLCOMBE, et al.,** | § | |
| | § | |
| *Plaintiffs* | § | |
| | § | |
| **RUBEN D. RIOS, JR.,** | § | |
| | § | |
| *Plaintiff-Intervenor* | § | CIVIL ACTION NO. 5:18-CV-555-XR |
| | § | |
| **v.** | § | |
| | § | |
| **THE UNITED STATES,** | § | |
| | § | |
| *Defendant* | § | |

**PLAINTIFF RUBEN D. RIOS, JR.'S DAMAGES CHARGE AND TRIAL BRIEF IN
SUPPORT THEREOF**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff Ruben D. Rios, Jr. ("Rios") presents this Damages Charge to the Court and

Supporting Trial Brief on the nature and specific amount of damages he seeks to recover from the

United States as a result of Tara McNulty's wrongful death.[1]

**I.
DAMAGES CHARGE**

**1.1**      In accordance with the Court's November 12, 2021 Order, Rios seeks the

following wrongful death damages under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2674,

and Texas Civil Practice & Remedies Code § 71.004(a): [2]

---

[1]Rios fully supports the damages charge filed by other Plaintiffs; however, his wrongful death
claim is too unique to seek the same award as other derivative claimants who also lost their wife
in the mass shooting. *See infra* p. 18 (addressing the distinct facts impacting Rios' case). Thus,
Plaintiff Rios files this Charge and Supporting Trial Brief individually.
[2]*See* Trial Tr. of Damages Trial Proceedings Before the Hon. Judge Xavier Rodriguez, United

a.   Mental anguish sustained in the past: **$750,000**[3];

b.   Mental anguish that, in reasonable probability, will be sustained in the future: **$500,000**[4];

c.   Loss of companionship and society sustained in the past: **$150,000**;[5] and

d.   Loss of companionship and society that, in reasonable probability, will be sustained in the future: **$100,000**.[6]

Rios no longer seeks recovery of any other wrongful death damages or any survival damages in this action on behalf of Tara McNulty's Estate.[7] In support of the damage awards listed above, Rios respectfully shows the Court as follows:

## II.
## FACTUAL BACKGROUND
### Ruben Rios and Tara McNulty's Relationship

**2.1**    Rios is the surviving spouse of Tara McNulty ("Tara"), one of the victims murdered by Devin Kelley in the tragic November 5, 2017 mass shooting at the Sutherland Springs First Baptist Church. Rios first met Tara in the 5th Grade shortly after he moved to Floresville, Texas.[8] Tara and Rios attended church functions together with the Holcombe family.[9] At a young age, Rios was attracted to Tara's intelligence, cheerful personality, and appearance.[10] In fact, as adolescents, Rios and Tara began dating in the 7th grade.[11] Their youthful romantic relationship

---

States District Judge, at 3706:7–3710:10; Dkt. No. 452, at 99 (liability holding).

[3]*See infra* pp. 10–12 (past mental anguish evidence); 17–21 (caselaw supporting award).

[4]*See infra* pp. 13–14 (future mental anguish evidence); 17–21 (caselaw supporting award).

[5]*See infra* pp. 14–17 (loss of companionship evidence); 17–21 (caselaw supporting award).

[6]*See id.*

[7]*See* Dkt. No. 528, at 90 (damage elements for Rios listed in Plaintiffs' Trial Brief on Damages); Dkt. No. 168, at 42–44 (damages plead in Rios' Complaint in Intervention).

[8]Trial Tr. at 341:10–341:25.

[9]*Id.*

[10]*Id.* at 344:19–345:1.

[11]*Id.* at 344:7–344:22; *see also* PEX 12079-0002 (photograph of Rios and Tara in middle school).

ended several years later when Rios and Tara transitioned to high school.[12] Tara and Rios remained friends throughout high school but parted ways when Rios joined the Army after graduation.[13]

2.2      In 2006, Rios re-connected with Tara through social media while serving overseas during Operation Iraqi Freedom.[14] Tara reached out to Rios after his first marriage ended and the two began to communicate regularly on MySpace.[15] When Rios returned home to San Antonio for vacation, he and Tara rekindled their relationship. For instance, during Rios' thirty (30) day trip back to Texas, Rios and Tara spent nearly every day together.[16] By the fall of 2006, Tara moved from Texas to New York without her biological children to live with Rios while he was stationed at Fort Drum.[17] At this time, Tara and Rios began dating again as adults.[18]

2.3      In 2007, Rios deployed to the Middle East for the third (3) time in his Army career.[19] During this deployment, Tara wrote Rios letters expressing her admiration for him and her desire to continue their romantic relationship when Rios returned home. *See, e.g.,* PEX 12067-00009 ("I am so very proud of what and who you are my soldier, my hero, my heart and soul today, tomorrow, ten years from now…."); PEX 12067-00062 ("I just want you to know how much I love you. And that I will always love you with my entire heart, soul and body. I miss you so much. Forever yours, Tara Elyse").[20] After Rios returned to the United States, he lived together with Tara and their respective biological children as a family for around two (2) years in South Carolina

---

[12]*Id.* at 345:2–345:8.
[13]*Id.* at. 345:9–345:20.
[14]*Id.* at 345:18–346:3.
[15]*Id.* at 345:24–346:2.
[16]*Id.* at 347:18–348:8.
[17]*Id.* at 348:13–349:22; *see also* PEX 12073_00001 (Rios Army Records).
[18]*Id*. at 349:10–350:8.
[19]PEX 12073_00007 (Rios was deployed to Iraq for fifteen (15) months from 2007 to 2009).
[20]*See also* PEX 12067-0002 ("I dont want you to leave. I dont want to loose [sic] you. I dont want to be without you EVER!"); Trial Tr. at 394:1–394:12 (Rios testifying that PEX 12067-0002 was written before his third and final overseas deployment).

while stationed at Fort Jackson.[21] In 2011, Rios was transferred to Fort Polk in Louisiana.[22] Thus, Rios and Tara moved their family to DeRidder, Louisiana.

2.4      In December 2011, Tara spontaneously asked Rios to marry him.[23] Rios said yes and the couple eloped.[24] Specifically, on December 20, 2011, Rios and Tara were married before the 36th Judicial District Court of Louisiana – Parish of Beauregard.[25] On November 2, 2012, Rios and Tara celebrated their marriage before family and close friends at a formal ceremony in San Antonio.[26] From December 2011 to March 2015, Rios and Tara lived together as a happily married couple while Rios was stationed at Fort Polk. Rios and Tara enjoyed activities like hiking, bike rides, and were especially fond of trips to the beach.[27]

2.5      Rios and Tara planned to move their family to San Antonio permanently where Rios would transition to a civilian-like role in the Army and Tara would pursue a marketing career.[28] However, on or around March 17, 2015, Rios was arrested by the Beauregard Parish Sheriff's Department and sent to the Parish jail to await trial.[29] Rios' step-daughter, Plaintiff Hailey McNulty, and daughter, Kaitlyn Rios, accused him of committing sexual assault and ultimately

---

[21]Plaintiff Hailey McNulty, Plaintiff J.M., Damion Rios, and Kaitlyn Rios lived with Tara and Rios. Trial Tr. at 354:11–356:2; PEX 12073_00001 (Rios Army Records).
[22]PEX 12073_00001.
[23]Trial Tr. at 358:21–360:10.
[24]*Id.*
[25]PEX 12060-00002 (Marriage Certificate).
[26]Trial Tr. at 362:1–362:9; PEX 12067-00018 (Wedding Invitation).
[27]Trial Tr. at 365:6–365:20 (Rios testifying that the beach "was our solitude"); *see also* PEX 12069-00020 (Tara writing that she wants to go on a vacation to South Padre or Galveston with Rios after his release from pre-trial confinement).
[28]Trial Tr. at 365:21–366:20 (Rios was applying to be in charge of funeral services in San Antonio for the Army).
[29]PEX 12062-00001; Trial Tr. at 367:6–369:20.

testified at his trial.[30] On March 8, 2018, Rios was acquitted by a Louisiana jury.[31]

    **2.6**      Within a week of his detainment, Rios signed a Power of Attorney granting Tara

the authority to manage all his financial affairs and personal property. PEX 12081. Shortly

thereafter, the State of Louisiana issued a no contact order preventing Tara from communicating

with Rios.[32] Tara was also placed under court-ordered subversion. *See* PEX 12069-00039. To

combat these legal restrictions, Tara retained her own counsel. *See id.*[33]

    **2.7**      After approximately seven (7) months of no communication, Tara was able to

write, call, and visit Rios beginning on October 20, 2015. *See id.* (Tara writing that "I have waited

---

[30]Trial Tr. at 405:10–405:14. These false, retaliatory accusations were lodged against Rios shortly after he punished the four (4) children for watching internet pornography by canceling a planned family trip to Disney World. *See* PEX 12074-00002 (Dr. Howard's psychological report).

[31]*See* PEX 12062-00003, 00004 (The "Not guilty" Verdict). For this reason, Plaintiff Rios urges the Court to honor his constitutional presumption of innocence **and completely disregard any trial testimony or other evidence indicating and/or suggesting that Rios is in fact guilty of sexual assault.** *See* Trial Tr. at 284:23–286:1; *Houchins v. KQED, Inc.*, 438 U.S. 1, 37–38, (1978) (concluding that "[s]ociety has a special interest in ensuring that unconvicted citizens are treated in accord with their status."); *McGarry v. Pallito,* 687 F.3d 505, 511 (2d Cir. 2012) (noting that, upon entering state custody, "pretrial detainees surrender '[m]any of the liberties and privileges enjoyed by other citizens' even though they are still clothed in the presumption of innocence.").

As other courts have observed in FTCA cases, considering the merits of criminal charges in a civil trial disturbs the constitutional presumption of innocence. *See Ford-Sholebo v. United States,* 980 F. Supp. 2d 917, 1003 (N.D. Ill. 2013) (the court refused to consider whether the decedent would have been convicted in an FTCA wrongful death case where he died before standing trial). Here, the importance of this presumption is especially significant as the Court was not present at Rios' criminal trial and did not hear any evidence presented – including Hailey McNulty's trial testimony. *See id.* (by coincidence, the Northern District of Illinois presided over the civil wrongful death trial and the related criminal trial). Furthermore, Hailey's inflammatory allegations that Rios was physically abusive to Tara, without any corroborating evidence or specific supporting detail concerning the alleged act of domestic violence, lacks credibility and should be disregarded. *See, e.g., id.* at 1009 (finding that a criminal complaint describing a specific domestic violence incident was more credible than witness testimony about the event); Trial Tr. at 284:11–284:16.

[32]Trial Tr. at 371:11–371:16.
[33]*See also* Trial Tr. at 409:19–410:12 (Rios explaining to the Court that Tara retained a Louisiana attorney, David Wallace, during his criminal trial).

for this day for what seems like forever. Today we had court – and the judge released me from further supervision. **My lawyer, Mr. Wallace**, says that this means I am allowed to talk to you. So naturally my first thought was how to get this information to you – and letters seems to be the fastest way. **Obviously we can not talk about the case at all and we need to be extremely careful about everything we say**.") (emphasis added).

**2.8**      Rios remained in pre-trial confinement for nearly three (3) years due to a combination of factors like consistent defense counsel shuffling, multiple trial date extensions, and his refusal to accept a plea bargain.[34] While in confinement, Tara and Rios communicated most often over the phone. For instance, from March 2015 to June 2017, Rios called Tara's primary cell phone number (337-202-9203) from the number 855-313-5636.[35] According to Tara's extensive call records, she held approximately four hundred and ninety-three (**493**) distinct conversations with Rios lasting longer than ten (10) minutes during Rios' pre-trial confinement.[36] *See* **Ex. 1** (listing each conversation in PEX 12082 between 337-202-9203 and 855-313-5636 in the mobility records section). Sometime after June 10, 2017, the Beauregard Parish Jail changed the inmate call phone system.[37] Rios estimates that he last spoke to Tara around early October in 2017; however, he does not know for certain the number he called Tara from after the phone system change.[38]

---

[34]*Id*. at 369:18–369:25 (Rios was assigned six different court-appointed attorneys and each attorney requested a trial extension); *id*. at 379:15–379:20 (The State of Louisiana repeatedly enticed Rios to accept a plea bargain).

[35]*Id*. at 374:14–374:25; PEX 12082 (AT&T Phone Call Records: 337-202-9203).

[36]Upon further review of PEX 12082, Rios concedes that 1,983 is not the total number of phone calls he had with Tara during his pre-trial confinement due to numerous duplicate call entries. *See* Trial Tr. at 399:2–399:20. Stated differently, the Government is correct that 1,983 represents the total number of times 855-313-5636 appears in PEX 12082. *Id*.

[37]*See* Trial Tr. at 401:4–402:6; 411:12–411:19; 415:10–415:20 (Rios explaining that, after the phone system change, he was required to enter an inmate pin number for outgoing calls); *see also* PEX 12080-00004 (note from Brittany Smart, Custodian of Records for the Beauregard Parish Sheriff's Department, that the jail changed phone companies from Infinity to Homewave).

[38]Trial Tr. at 396:17–396:19; 411:12–411:19.

**2.9**     Tara also sent Rios approximately sixty-three (**63**) handwritten letters and photographs during his pre-trial confinement.[39] *See* **Ex. 2** (Pre-Confinement Love Letters in Chronological Order). As seen in the examples below, the letters contain strong words of endearment and encouragement.[40] The letters also express Tara's clear intent to remain married to Rios, her longing for physical intimacy with him, her steadfast belief that Rios will be acquitted, and her belief that the trying, involuntarily separation will ultimately strengthen their marriage. *See, e.g.,* PEX 12069-00031 ("You should know by now that I am not going anywhere. I love you. Always have – always will.") (emphasis added); *id.* at 0037 ("Your my lobster after all.")[41]; *id.* at 00017 ("I fall asleep at night imagining your arms around me – and I take comfort in the fact that in a few months my imagination will be a reality.") (emphasis added); *id.* at 00026 ("We will get through this – and we will be even stronger than we were before.") (underline as written).

**2.10**     After moving back to Sutherland Springs, Texas in the summer of 2015, Tara began to visit Rios in pre-trial confinement.[42] Specifically, Tara spent around thirteen (13) total hours driving to and from DeRidder, Louisiana to visit Rios at the Beauregard Parish Jail.[43] Tara visited the jail approximately thirteen (**13**) times during Rios' pre-trial confinement.[44]

---

[39]PEX 12069-00039 (10/20/2015 letter); *id.* at 00013 (10/21/2015 letter); *id.* at 00017 (10/24/2015 letter); *id.* at 00015 (10/25/2015 letter); *id.* at 00010 (10/26/2015 letter); *id.* at 00011 (10/28/2015 letter); *id.* at 00004 (10/29/2015 letter); *id.* at 00030 (10/30/2015 letter); *id.* at 00019 (11/2/2015 letter); *id.* at 00020 (11/4/2015 letter); *id.* at 00022 (11/7/2015 letter); *id.* at 00040(11/10/2015 letter); *id.* at 00034 (11/17/2015 letter); *id.* at 00025 (11/26/2015 letter); *id.* at 00029 (12/5/2015 letter); *id.* at 000007 (12/19/2015 letter); *id.* at 00024 (12/27/2015 letter); *id.* at 00027 (12/29/2015 letter); *id.* at 00038 (1/15/2016 letter); *id.* at 00037 (1/29/2016 letter); *id.* at 00036 (08/03/2016 letter); PEX 12070 (forty-two (42) total photos sent to Rios).

[40]*See infra* p. 8 (excerpts from 11/07/2015 letter and 11/26/2015 letter).

[41]*See* Trial Tr. at 389:17–389:20 (Rios testifying that he and Tara referred to each other as "lobsters" because "lobsters mate for life.").

[42]*Id.* at 284:8–284:10 (Plaintiff Hailey McNulty testifying that Tara moved the family back to Texas in the summer of 2015 after the spring semester); *id.* at 372:10–372:18 (Rios testifying that Tara moved in with her mother, Plaintiff Lisa McNulty, in Sutherland Springs).

[43]*Id.* at 372:18–372:23.

[44]*See* PEX 12069-000017) (Tara writing on 10/24/2015 that seeing Rios in person today "has been



*Excerpt from PEX 12069-00023 (11/07/2015 letter)*



*Excerpt from PEX 12069-00025 (11/26/2015 letter)*

**2.11**     During his pre-trial confinement, the polarizing nature of the criminal allegations

and the unknown future of their family strained Rios and Tara's marriage. For example, Rios and

Tara planned to relocate to Colorado Springs after his release but were uncertain if all four (4)

children would join them.[45] He and Tara also discussed the need for extensive therapy to mend

---

amazing for me."); PEX 12069-00029 (Tara writing on 12/5/2015 that she is leaving to visit Rios
tomorrow and will drive to Louisiana with Rios' father); PEX 12080-0004 (Beauregard Parish jail
records show eleven  (11) distinct visitation dates from Tara Rios on 05/15/2016, 05/29/2016,
07/17/2016,  08/07/2016,  09/11/2016,  10/30/2016,  11/06/2016,  11/20/2016,  12/11/2016,
03/26/2017, and 04/16/2017.
[45]*See* Trial Tr. at 376:14–377:23.

broken family relations following his certain acquittal.[46] Rios and Tara even discussed different contingency plans based on how their children would react post-acquittal. These options included buying two (2) homes in Colorado and Hailey McNulty possibly living with Lisa McNulty in Sutherland Springs.[47]

    **2.12**    Sometime around the spring or summer of 2017, Tara began some type of relationship with a man named Michael Wright.[48] The status of Tara and Wright's relationship at the time of her death is unclear. *See, e.g.*, Trial Tr. at 286:3–286:11 (Hailey McNulty testifying that Wright gave Tara a ring but considered himself to be her boyfriend – not fiancé); *id*. at 334:6–334:11 (Lisa McNulty testifying that Tara was not wearing Wright's ring when she died and does not know the reason for this).[49] Significantly, when Tara died, <u>she was wearing a silver cross given to her by Rios around her neck.</u>[50] Moreover, Lisa McNulty listed Wright as Tara's "close personal friend" in Tara's obituary – not her boyfriend, partner, or fiancé.[51] Wright, of course, has also not testified in this case. As such, it remains uncertain whether Tara and Wright were having intimate relations at the time of the shooting; were close, plutonic friends; or if the relationship had ended altogether. For instance, according to Tara's 2017 call records, she ended phone communications

---

[46]*Id*. at 375:21–376:13 (Rios testifying that "We're going to have to figure out if – just how things are going to work with the outcome because we know that I'm going to be found not guilty.").

[47]*Id*. at 376:21–377:23.

[48]*Compare* Trial Tr. at 286:3–286:11 (Hailey McNulty testifying that Tara introduced her to Michael Wright, her boyfriend, in August 2017) *with id*. at 333:11–333:19 (Lisa McNulty testifying that Tara began dating Wright around April or May of 2017).

[49]For this reason, it is reasonable to infer that Tara rejected Wright's attempt to advance the status of their extramarital relationship. *See Interest of Z.N.,* 602 S.W.3d 541, 545 (Tex. 2020) (the trier of fact may draw reasonable and logical inferences from the presented evidence under Texas law).

[50]*See* Trial Tr. at 350:13–351:14 (Rios testifying that he purchased the cross Tara wore in PEX 12066 – Christmas photographs taken in December 2006). *Compare* PEX 12066-0009 *with* PEX 01149-00240 (filed under seal – photograph of Tara's blood-soaked cross); *and* PEX 01105-00013 (filed under seal – autopsy photograph of Tara's jewelry at the time of her death).

[51]GEX 524 ("Tara is survived by her…close personal friend, Michael Wright…"); Trial Tr. at 333:22–333:23 (Lisa McNulty testifying that she wrote Tara's obituary).

with Wright on **September 15, 2021** – nearly two (2) months before her death. *See* **Ex. 3.**[52]

    **2.13**    Prior to this litigation, Plaintiff Rios never heard the name Michael Wright and was unaware that Tara had any sort of relationship with Wright. *See* Trial Tr. at 408:23–409:12.

**III.**
**ARGUMENTS AND AUTHORITY**

**A.**    **Evidence Supporting Mental Anguish Sustained in the Past.**

    **3.1**    Under Texas law, a plaintiff who does not suffer any physical injuries must show "direct evidence of the nature, duration, or severity of the plaintiff's anguish, thus establishing a substantial disruption in the plaintiff's daily routine" or "other evidence of a high degree of mental pain and distress that is more than mere worry anxiety, vexation, embarrassment, or anger" to recover damages for past mental anguish. *Anderson v. Duran*, 550 S.W.3d 605, 618–19. The Texas Supreme Court has observed that in "most death cases" the "emotional impact of the loss of a beloved person is the most significant damage suffered by a surviving relative." *Moore v. Lillebo,* 722 S.W.2d 683, 685 (Tex.1986). More specifically, the "emotional pain, torment, and suffering that the named plaintiff would, in reasonable probability, experience from the death of the family member" is the most significant damage suffered. *Id*. at 688. In turn, most surviving relatives easily exceed the mental anguish evidentiary hurdle.

    **3.2**    Here, Plaintiff Rios is no exception. The Government's retained psychological expert, Dr. Brian Marx, details in his report the high degree of mental pain and distress Rios suffers from as a direct result of Tara's murder. *See* GEX 750.[53] For example, Rios frequently avoids

---

[52]As seen in Exhibit 3 herein, the (partially) un-redacted version of PEX 12082 (Tara's Call Records) show that she last called a number associated with Wright on September 15, 2017. *Compare* GEX-800, p. 13 (Tara listing 622 as the last 3 digits of Wright's phone number in July 2017) *with* Rios 18-949-001751, Item 23431 and Rios 18-949-001948, Item 7149.

[53]The Court recognized Dr. Marx as an expert in the "assessment, diagnosis, and treatment of post-traumatic stress disorder." *Id*. at 3451:2–3451:7.

painful reminders of his tragic loss such as "listening to country music, spending time with mutual friends, especially married couples, and certain movies." *Id.* at 7. These traumatic cues can cause physiological symptoms like an elevated heart rate, tension, and perspiration. *Id.* If these symptoms occur while Rios is driving, he has to pull over to compose himself.[54] Rios' hyper-vigilant nature also significantly increased post-shooting as the tragedy validated his belief that bad things can happen "any place and anywhere." *Id.* at 8.[55] Thus, in public, Rios is now on alert for danger "100% of the time." *Id.* Rios also struggles with sleep deprivation, connecting emotionally with others, and strong feelings of survivor's guilt. *Id.* at 8–9. For instance, because of his Army training and combat experience, Rios truly believes he would have prevented Tara's death if he was at the Church when Devin Kelley opened fire on parishioners. See *id*; PEX 20027 at 38:10.[56]

      **3.3**    Dr. Marx and Dr. Kelly Harper, a post-doctoral fellow working under Marx's supervision, opined that Rios "provided sufficient and consistent information (both within the interview and across the interview and self-report measures) to judge that the interview yielded an accurate accounting of his current symptoms." *Id.* at 9.[57] After reviewing these symptoms, Dr. Marx and Dr. Harper diagnosed Rios with severe Post Traumatic Stress Disorder (PTSD) and mild Major Depressive Disorder suffered as a result of Tara McNulty's death. *Id.* at 11.

      **3.4**    Similarly, Dr. Kasi Howard, Rios' retained psychological expert, opined in her

---

[54]*See* Trial Tr. at 385:11–385:19 (Rios testifying "How stupid is that you have a hard time turning on the radio because you know songs that she liked? You hear them, and they just remind you of her and they make you sad. And you cry so hysterically that you have to pull over. And then the rest of the day is just ruined. You can't think about anything else.").

[55]*See Star Houston, Inc. v. Shevack*, 886 S.W.2d 414, 418 (Tex. App.—Houston [1st Dist.] 1994), writ denied, 907 S.W.2d 452 (Tex. 1995) (under Texas law, a party is "entitled to recover for the mental distress he proves the incident caused him" regardless of any "special susceptibility [to mental anguish] on the injured party's part[.]").

[56]Rios, in his defense psychological examination, explaining that due to his Army training and military specialization he "**guarantees that he could have stopped [the shooting].**"

[57]*See* Trial Tr. at 3461:20–3462:11; 3507:3–3507:17 (Dr. Marx testifying that he closely monitored the unlicensed psychologists on his evaluation team and "reviewed everything.").

report that Rios suffers from moderate Major Depressive Disorder and PTSD as a result of Tara's death. *See* PEX 12074-00006; PEX 12076. Dr. Oladapo Folarin, the Army psychiatrist who evaluated Rios before his military retirement, also diagnosed him with "Major Depressive Disorder." PEX 12073_0004. In his report, Dr. Folarin noted that Rios was "tearful in session as he talked about the murder of his wife and his own incarceration for false sexual abuse." *Id.* a 00009. Rios also admitted to Dr. Folarin that he feels depressed, hopeless, worthless, and anhedonic. *Id.* a 00008.

---

Diagnostic Summary

Based on the results of this assessment, Mr. Rios meets diagnostic criteria for PTSD, resulting from learning about the sudden, unexpected death of his wife during the Sutherland Springs Baptist Church shooting occurring on November 5th, 2017. These symptoms are severe and cause clinically significant distress and impairment. Based on the results of the SCID-5 modules administered, Mr. Rios met criteria for Major Depressive Disorder. These symptoms are consistent with mild severity and cause clinically significant distress and impairment. These symptoms are secondary to the Sutherland Springs church shooting on 11/5/2017.

---

*GEX 750–Page 11 of 12*

**3.5** Lastly, as the 5th Circuit has observed, the Texas Supreme Court "has indicated a willingness to infer past mental anguish in cases involving disturbing events, such as intentional torts." *Wackman v. Rubsamen,* 602 F.3d 391, 407 (5th Cir. 2010) (citing *Packway Co. v. Wudruff,* 901 S.W.2d 434, 442 (Tex.1995)). In this case, Devin Kelley, of course, intentionally killed Tara McNulty – an innocent, unarmed parishioner.[58] Accordingly, Rios contends that the Sutherland Springs mass shooting certainly qualifies as a "disturbing event" under Texas law where damages for past mental anguish should be inferred by the Court.

---

[58]*See* PEX 1104 (Tara McNulty's autopsy report).

**B.      Evidence Supporting Mental Anguish Sustained in the Future.**

**3.6**      To recover damages for future mental anguish, a plaintiff must present evidence demonstrating a reasonable probability that they will suffer compensable mental anguish in the future. *Id.* at 408 (citing *Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 917 (Tex. 2008)). Typically, this requires a showing that the plaintiff will suffer future mental pain and distress that is "more than mere worry, anxiety, vexation, embarrassment, or anger." *Id. (*quoting *Parkway,* 901 S.W.2d at 444).

**3.7**      At trial, Rios testified that when Tara died he lost his "lobster" or partner for life.[59] Although Rios has attempted to date other women, the frequent memories of his marriage to Tara disrupts the harmony of other romantic relationships.[60] In one particular relationship, Rios learned after a break up that he unknowingly talked about Tara all the time.[61] The relationship ended as Rios put Tara "on a pedestal" that was impossible for his ex-girlfriend to compete with.[62]

**3.8**      Rios is reminded of Tara's death everyday – as he habitually wears the cross Tara gave him and kisses it each morning.[63] When Rios thinks of his tremendous loss, he sometimes weeps hysterically and experiences physiological trauma that ruins his day.[64] More specifically, when Rios hears songs on the radio that Tara was particularly fond of, he feels as if his heart stops, his head begins to hurt, and he feels physical pain in his throat and shoulders.[65] The significant mental anguish associated with Tara's death has remained consistent since Rios' Army retirement in 2018.[66] Despite the negative emotional response to her death, Rios is "scared" that his memories

---

[59]Trial Tr. at 389:17–387:20.
[60]*See id.* at 387:9–387:21.
[61]*Id.*
[62]*Id.*
[63]*Id.* at 386:4–386:8.
[64]*Id.* at 385:3–385:20; 386:9–386:14.
[65]*Id.*
[66]*Id.* at 384:16–385:6.

of Tara will fade over time due to his relatively young age.[67]

    **3.9**     For the foregoing reasons, Rios has presented substantial evidence that he will continue to experience significant mental pain and distress in the future because of Tara's death.[68]

**C.**    **Evidence Supporting Past and Future Loss of Companionship & Society.**

    **3.10**    Past and future damages for loss of companionship and society are intended to compensate a wrongful death beneficiary for the "positive benefits flowing from the love, comfort, companionship, and society" the beneficiary would, in reasonable probability, have experienced if the decedent lived. *See Moore*, 722 S.W.2d at 688. Because of the unique factual circumstances straining Rios and Tara's marriage at the time of Tara's death, determining whether Rios is entitled to such damages requires careful consideration of a specific hypothetical question. Namely, after Rios' March 2018 acquittal, would he and Tara have restored their (once harmonious) marriage?[69]

    **3.11**    For the following reasons, the greater weight of credible evidence presented in this case leans strongly in favor of marital reconciliation.[70] First and foremost, the love letters Tara sent Rios are the only <u>direct evidence from the decedent</u> addressing her romantic relationships. *See* PEX 12067 (love letters sent to Rios before pre-trial confinement); PEX 12069 (love letters sent to Rios during pre-trial confinement).

    **3.12**    From approximately <u>April 2007 to August 2016</u>, the letters consistently and unambiguously express Tara's profound love for Rios and her desire to remain in an intimate

---

[67]*Id.* at 338:16–338:17 (Rios was 38 years old at the time of his testimony); 387:22–388:6.

[68]*See infra* pp. 17–21 *(*discussing the mental anguish awards upheld in *Wackenhut Corrections Corp. v. De La Rosa*, 305 S.W.3d, 594 (Tex. App.—Corpus Christi 2009, no pet.).

[69]*See* Trial Tr. at 385:6-385:10 *(*Rios discussing the activities he and Tara used to enjoy together*);* *id.* at 392:11-392:22 (Rios describing intimate relations with Tara); *supra* at p. 8 (describing Rios and Tara's post-acquittal plan to relocate to Colorado Springs).

[70]*See Horton v. Denny's Inc.,* 128 S.W.3d 256, 260 (Tex. App.—Tyler 2003, pet. denied) (when reviewing damages, Texas courts consider whether the award is "against the great weight and preponderance of the evidence"); *Murff v. Pass*, 249 S.W.3d 407, 409 n. 1 (Tex.2008) (preponderance of the evidence means the "greater weight of credible evidence").

relationship with him. *See, e.g.,* PEX 12067-0007 (04/19/2007 letter where Tara writes "I will be home with you and I can finally be in your arms again – which is right where I belong."); *id.* at 00070, 00071 (01/24/2010 letter where Tara writes "I am realizing that what I feel for you is 100% the real thing, and that I will continue to do anything to make it work. I love you ruber [sic], with all my heart and soul."); *id.* at 00076 (undated letter where Tara writes "I love you now, tomorrow, and forever. Your my everything."); PEX 12069-00027,00028 (12/29/2015 letter where Tara writes "Baby, I really don't know if I express enough how much I love you…Each morning I wake up and thank God that we are one day closer to each other again. I am trying to be patiently [sic] hoping for our blessing to come…."); *id.* at 00036 (08/3/2016 letter where Tara writes "I have no idea what the future holds – but I do know we will figure it out together.").

**3.13** Second, it is undisputed that Tara was married to Rios at the time of her death in spite of the allegations lodged against him by Tara's own daughter – Plaintiff Hailey McNulty.[71] Because of the heinous nature of the criminal charges, Tara likely faced enormous pressure from Hailey, and possibly other family members, to file for divorce and never see Rios again. *See Interest of Z.N.,* 602 S.W.3d 541, 545 (Tex. 2020) (the trier of fact may draw reasonable and logical inferences from the evidence under Texas law). Nevertheless, from Rios' March 2015 arrest to Tara's November 2017 death, she remained married to Rios for approximately <u>two (2) years, seven (7) months, and nineteen (19) days</u>.[72] The extensive length of the post-arrest marriage strongly suggests that Tara believed in Rios' innocence and was unwilling to give up on her marriage.[73]

---

[71] *See* PEX 12062-00007 (specific charges filed against Rios involving Hailey McNulty).

[72] *See* PEX 12062-00001 (listing Rios' arrest date as 03/17/2015); Trial Tr. at 413:25–414:2 (the Government "does not deny" that Tara was married to Rios). Similar to Devin Kelley's actual purchase of firearms from FFL's, Rios urges the Court to apply great weight to the undisputed fact that Tara McNulty remained married to Rios at the time of the shooting. In turn, like Kelley's ability to acquire firearms from a non-FFL source, the possibility that Tara could have filed for divorce does not make it probable. *See* Dkt. No. 452, at 65.

[73] The relatively short gap in time (four months) between Tara's death and Rios' criminal trial,

3.14    Third, there is no evidence in this case that Tara made any actual plans whatsoever to file for divorce around the time of her death. In contrast, there is evidence from Tara herself that she retained a Louisiana attorney, David Wallace, to lift her court-ordered restrictions and end a seven (7) month communication hiatus with Rios. *See* PEX 12069-00039.

3.15    Fourth, the fact that Tara wore a silver cross given to her by Rios on November 5, 2017 suggests that she maintained intimate feelings for him at the time of her death. *See supra* p. 9. Fifth, for the reasons discussed previously, the status of Tara and Michael Wright's extramarital relations in November 2017 is unclear and may have ended altogether. *See id*; Ex. 3.

3.16    Lastly, based on the (then) pending criminal case against Rios and Tara's prior court-ordered restrictions, a more than reasonable inference exists that Tara did not candidly discuss her marriage with Hailey McNulty, a constitutionally-mandated witness for the State of Louisiana,[74] upon advice of counsel. *See* PEX 12069-00039[75]; *Interest of Z.N.,* 602 S.W.3d at 545. Similarly, Tara discussing or acknowledging any intent to stay married to Rios with Hailey would certainly add significant hostility to their uneven relationship.[76] These more than reasonable inferences raise serious questions about the accuracy of Hailey McNulty's trial testimony concerning Tara's marriage. *See* Trial Tr. at 285:6–285:10.[77]

3.17    In sum, the greater weight of credible evidence presented to the Court, particularly

---

when compared to the multi-year length between Rios' initial arrest and Tara's death, also suggests that the State of Louisiana viewed Tara as an unfavorable trial witness. *See* Trial Tr. at 409:23–410:2 (Rios explaining to the Court that Tara intended to testify on his behalf).

[74]*See Crawford v. Washington*, 541 U.S. 36, 42 (2004) (discussing the confrontation clause).

[75]Tara writing to Rios that "the judge released me from further supervision" but "we can not talk about the case at all and we need to be extremely careful about everything we say."

[76]The relationship was, at least at times, contentious. *See, e.g*., *See* Trial Tr. at 285:3–285:5 (Hailey informed Tara that she will never live with Rios again); *id*. at 240:19–242:24 (Hailey testifying about the arguments she had with Tara prior to the shooting).

[77]Rios in no way questions the shocking physical harm and severe emotional trauma Hailey McNulty tragically endured, and continues to endure today, because of the mass shooting.

Tara McNulty's love letters to Rios, favor the finding that Plaintiff Rios and Tara McNulty, but for her wrongful death, would have reconciled their marriage after his March 2018 acquittal.[78]



*PEX 12061 (Facebook Messenger Exchange Between Rios and Lisa McNulty)[79]*

**D.      *Wackenhut v. De La Rosa* is the "Most Comparable" Case under the Maximum Recovery Rule and Supports the Amount of Damages Sought by Rios.**

**3.18**      Because of the 5th Circuit's "maximum recovery rule," the Court must carefully consider damage awards in factually similar state and federal reported decisions applying Texas law. *See Lebron v. United States*, 279 F.3d 321, 328 (5th Cir. 2002) ("The purpose of the maximum recovery rule is to bring rough consistently into comparable damages awards."); *Douglass v. Delta*

---

[78]*See supra* p. 8 (discussing Rios and Tara's plan to move to Colorado Springs post-acquittal).
[79]Although the Court has not ruled on PEX 12061's admissibility, assuming arguendo that PEX 12061 is admitted into evidence, the Facebook Messenger exchange at issue of course strongly supports marital reconciliation. *See* Dkt. No. 539, 543 (Rios' Trial Brief and Reply Brief).

*Air Lines, Inc.,* 897 F.2d 1336, 1339 (5th Cir. 1990) ("we compare damages awarded in factually similar cases, and arising within the controlling jurisdiction…."). [80] When no case in the controlling jurisdiction is factually similar to the case at issue, the 5th Circuit will apply a flexible comparative standard and consider the "most comparable case." *In re Parker Drilling Offshore USA LLC*, 323 Fed. Appx. 330, 334 (5th Cir. 2009); *see also Wackman*, 602 F.3d at 406–07.

3.19     After a thorough review of state and federal decisions applying Texas law, Plaintiff Rios cannot find a single reported case that stands "on all fours." *See Wackman,* 602 F.3d at 406. In other words, there is no comparable wrongful death case decided under Texas law involving the combination of unique facts like **(a)** the decedent was intentionally killed in a horrific manner; **(b)** prior to the wrongful death, the surviving spouse was confined due to false criminal accusations and involuntarily separated from the decedent; **(c)** the surviving spouse and decedent were involuntarily separated for over two (2) years prior to the wrongful death; **(d)** the surviving spouse and decedent maintained communication for most of the involuntary separation; [81] **(e)** the decedent had an extramarital relationship during the involuntary separation; and **(f)** the inflammatory nature of the criminal allegations caused significant marital strain.

3.20     Applying the 5th Circuit's flexible comparative analysis, the "most comparative" reported opinion decided under Texas law to the facts at hand is *Wackenhut Corrections Corp. v. De La Rosa*, 305 S.W.3d, 594 (Tex. App.—Corpus Christi 2009, no pet.). [82] In *Wackenhut,*

---

[80]*See also Lebron,* 279 F.3d at 326 (declining to use unreported decisions as benchmarks when applying the maximum recovery rule).

[81]*See* Ex. No. 1 (Rios and Tara consistently called each other from October 2015 to June 2017).

[82]The "second" most comparable reported opinion to this action is *Wackman v. Rubsamen*, 602 F.3d 391 (5th Cir. 2010). In *Wackman,* an elderly mother in hospice care was intentionally killed by her caretaker. *Id.* at 397–99. The adult children, who maintained a hostile relationship with their mother and had not seen her in nearly <u>ten (10) years</u> at the time of her death, brought a wrongful death action. *Id.* at 397, 405. Relying on Texas' inference of mental anguish following a disturbing death, the 5th Circuit upheld a jury award of $250,000 for past mental anguish to each of the adult children. *Id.* at 407. Similar to Rios, the *Wackman* plaintiffs were physically separated for years

Gregorio de la Rosa, Jr. ("Gregorio") was serving a six (6) month prison sentence for felony drug possession. *Id*. at 600. A few days before Gregario's release, he was beaten to death by other inmates while correctional officers stood by and laughed. *Id*. Thereafter, the decedent's family brought a wrongful death action against the correctional facility. *Id*.

3.21    The trial testimony releveled that Gregario and his wife separated about one (1) year before his death. *Id.* at 638.[83] After the separation, Gregario lived in Laredo with his parents and his wife moved Gregaio's three (3) children to Corpus Christi. *Id*. Because of his incarceration, Gregario was forced to leave his parent's home. Gregario also did not have any contact with his children both after the separation and during his conferment. *Id*.[84]

3.22    Therefore, Gregario's mother and children (like Rios) were involuntarily separated from the decedent at the time of the wrongful death, Gregario's children (like Rios) experienced involuntary communication gaps with the decedent because of his confinement, and Gregario (like Tara McNulty) was killed during an appalling act of violence.

3.23    Regarding the emotional impact of Gregario's wrongful death on his mother, the trial testimony showed that she clung to Gregario's picture and cried every night. *Id.* at 642. Gregario's wife testified that the children, after Gregario's death, cried a lot and did not understand why their father was gone. *Id.* at 638. Gregario's sister testified the oldest daughter tattooed Gregario's name on herself because she did not want to let him go. *Id.* The oldest daughter testified about how sad she was that Gregario was not at her high school graduation and will miss him

---

from the decedent before her wrongful death. However, unlike the facts at hand, the *Wackman* plaintiffs separated <u>voluntarily</u> from the decedent and the separation was far more extensive.

[83]The wife was not awarded any damages at trial. *Wackenhut,* 305 S.W.3d. at 600 n.1. Though like the *Wackman* plaintiffs, the wife's separation from Gregario was <u>entirely voluntarily</u>. *See id*. at 638 (the wife testified that she "needed a chance to be alone, to evaluate my life, my marriage…").

[84]Gregario's wife testified that Gregario rejected her attempt to schedule a prison visit with the children as Gregario did not want his daughters to see him in jail. *Id.*

dearly at important events like her wedding. *Id.* at 639. Gregario's other daughters testified about how much they loved and missed their father. *Id*. Although Gregario and his wife separated before his incarceration, the wife testified that she had "no doubt" that Gregario would have been involved in his children's' lives after his release from prison. *Id*.

3.24    The Corpus Christi Court of Appeals affirmed damage awards of $2 million for future mental anguish and $2 million for future loss of companionship to each of Gregario's children. *Id*. at 608, 639–640. The *Wackenhut* Court also affirmed $2.5 million for past mental anguish, $2.5 million for future mental anguish, $2.5 million for past loss of companionship, and $2.5 million for future loss of companionship awarded to Gregario's mother. *Id*. at 608, 642.[85]

3.25    Similar to the *Wackenhut* plaintiffs, Rios cried for days when he learned about Tara's murder,[86] slept by pictures of Tara,[87] faced tremendous difficulty accepting Tara's death,[88] keeps a special memento of Tara,[89] misses Tara dearly during emotionally-triggering events,[90] and planned to reconcile his relationship with Tara following his release from confinement.[91] Nevertheless, due to noteworthy factual differences from *Wackenhut*; like the lengthier physical separation between Rios and Tara, the strain the false criminal accusations caused on their marriage, and Tara's relationship with Michael Wright; Rios concedes that a significant downward damage reduction from *Wackenhut* is appropriate.

3.26    Therefore, Rios seeks the following damage awards from the Court as a result of

---

[85]Gregario's father died before trial, barring recovery of the (substantially similar) wrongful death damages awarded to his estate. *Id*. at 608, 634.
[86]Trial Tr. at 380:18–381:2.
[87]*Id*.
[88]*Id.* at 382:2–382:25 (Rios testifying that he did not believe that Tara was truly gone until he visited her gravesite).
[89]*Id*. at 386:1-386:8 (Rios wears the cross Tara gave him daily).
[90]*Id.* at 385:11–385:17.
[91]*Id*. at 376:14–377:13.

Tara McNulty's wrongful death:

    a.    $750,000 for past mental anguish – a **70**% reduction from the comparable award to Gregario's mother in *Wackenhut*;

    b.    $500,000 for future mental anguish – a **75**% reduction from the comparable award to Gregario's children in *Wackenhut*;

    c.    $150,000 for past loss of companionship and society – a **94**% reduction from the comparable award to Gregario's mother in *Wackenhut*; and

    d.    $100,000 for future loss of companionship and society – a **95**% reduction from the comparable award to Gregario's children in *Wackenhut*.

Respectfully Submitted,

**Craig W. Carlson**
Texas Bar No. 00792039
ccarlson@carlsonattorneys.com
**Philip J. Koelsch**
Texas Bar No. 24110103
pkoelsch@carlsonattorneys.com

**THE CARLSON LAW FIRM, P.C.**
100 East Central Expressway
Killeen, Texas 76541
Telephone: 254-526-5688
Facsimile: 254-526-8204
**Attorneys for Plaintiff Ruben D. Rios, Jr.**

## CERTIFICATE OF SERVICE

I certify that under Federal Rule of Civil Procedure 5, the foregoing Trial Brief was sent to counsel of record for all Plaintiffs' and Defendant, the United States of America, in this matter on *November 24, 2021* via the Court's electronic filing (CM/ECF) system.

**Craig W. Carlson**