IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| HOLCOMBE, et. al, | NO. 5:18-CV-00555-XR |
| | (consolidated cases) |
| Plaintiffs | |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Defendant | |

## PLAINTIFFS' DAMAGES CHARGE

Plaintiffs provide the following claimed damages and support:

Personal-Injury Claims ........................................................8

Personal-Injury Derivative Claims ................................................12

Survival Action Claims – Estate Claims ........................................15

Wrongful-Death Claims....................................................18

Property Damage Claims ...............................................25

Evidentiary Support ......................................................26

Plaintiffs would further provide the Court with the following explanation of Plaintiffs' methodology for requesting these damages.

### 1.   *Life Care Plans*

Plaintiffs have adjusted the various life care plans per the Court's instruction. Specifically, Plaintiffs have made the following downward adjustments to the life care plans:

- All life care plans are not present valued, thus not accounting for inflation or *Culver II* "best-and-safest" discounting.

- All medications have been averaged using generic medications.

- All attendant care has been calculated using the $22.00/hr agency rate except where specifically noted.

- All provisions for nursing care supervision have been deleted from the applicable life care plans per the Court's instruction.

### 2. *Non-Economic Damages Methodology*

Plaintiffs reached non-economic numbers based on the evidence presented at trial, the available similar verdicts reported under Texas law, and the Government's recent settlement of the Mother Emanuel Charleston Church mass-shooting case in South Carolina.

First, for the relevant damages' elements, Plaintiffs have provided evidentiary support in this brief. These damages include recoveries for individuals who experienced the shooting and watched their loved ones injured or killed in the shooting.

Second, the non-economic damages requested by Plaintiffs fall under or in-line with the Fifth Circuit's maximum-recovery rule. *See* Pls. Trial Br., ECF No. 529 (Sep. 29, 2021); *see also* 28 U.S.C. § 2674 (Under the FTCA, the Government must be treated "in the same manner and *to the same extent*" as a private party under similar circumstances) (emphasis supplied). Plaintiffs' briefing is consistent with FTCA verdicts. The following table provides some examples of FTCA verdicts using the same methodology endorsed by the Fifth Circuit concerning inflation and the maximum-recovery rule. *E.g.*, *Puga v. RCX Sous., Inc.*, 922 F.3d 285, 298 & n.12 (5th Cir. 2019) (must account for

inflation); *Salinas v. O'Neill*, 286 F.3d 827, 831 & n.6 (5th Cir. 2002) (150% maximum-recovery rule).

| REPORTED DAMAGES | INFLATION ADJUSTED | 150% RECOVERY | CITATION |
|---|---|---|---|
| **Pain and suffering of decedent**: $3,000,000 | $7,591,646.84 | **$11,387,470.26** | *Wheat v. United States*, 630 F. Supp. 699, 700, 722 (W.D. Tex. 1986) ($6,700,000 wrongful death medical malpractice bench verdict against the United States, represented by the San Antonio U.S. Attorney's office). |
| **Spousal recovery:** $1,800,000 | $4,554,988.11 | **$6,832,482.17** | |
| **Adult child:** $500,000 | $1,265,274.47 | **$1,897,911.71** | |
| **Minor child**: $1,000,000 | $2,530,548.95 | **$3,795,823.43** | |
| **Parents:** $400,000 | $1,012,219.58 | **$1,518,329.37** | |
| **Decedent's conscious pain & suffering:** $3,000,000 | $4,089,536.72 | **$6,134,305.08** | *McIntyre v. United States*, 447 F. Supp. 2d 54, 117–119 (D. Mass. 2006) (conscious pain and suffering in strangulation murder). |
| **Decedent's non-economic damages:** $3,000,000 | $3,379,644.75 | **$5,069,467.13** | *Curtis v. United States*, 274 F. Supp. 3d 1366, 1381–82 (N.D. Ga. 2017) ($11,797,609 verdict for wrongful death in plane crash). |
| **Spousal consortium:** $3,000,000 | $4,640,755.03 | **$6,961,132.55** | *McAsey v. United States*, 201 F. Supp. 2d 1081, 1106 (N.D. Cal. 2002) (Navy caused the electrocution death of 55-year-old). |
| **Two children's consortium:** $2,000,000 | $3,093,836.69 | **$4,640,755.04** | |

| REPORTED DAMAGES | INFLATION ADJUSTED | 150% RECOVERY | CITATION |
|---|---|---|---|
| **Mother's consortium:** $1,000,000 | $1,220,254.56 | **$1,830,381.84** | *Davis v. United States*, 670 F.3d 48, 51 (1st Cir. 2012) (strangulation wrongful death suit against the FBI) |

These results are in line with reported and unreported verdicts around the country for wrongful death[1] and personal injury.[2]

---

[1] *E.g.*, *Georgia CVS Pharmacy, LLC v. Carmichael*, — S.E.2d —, 2021 WL 5049438, at *1 (Ga. Ct. App. Nov. 1, 2021) (**$45,750,00 shooting verdict** resulting in multiple surgeries and permanent injuries); *Madden v. United States*, No. 10 C 8053, 2016 WL 10677590, at *10 (N.D. Ill. 2016) (**FTCA verdict** for wrongful death of 58-year-old resulting in $9,000,000 in loss of consortium to wife, $7,250,000 in pain and suffering to estate, and $6,500,000 in loss of consortium to five adult children); *Stearney v. United States*, No. 16-8060, 2019 WL 2161548, at * 1, *15 (D. Ariz. 2019) (**FTCA wrongful death** from MVA of father, mother, and son resulting in **$10,000,000 in pain and suffering** and loss of consortium to surviving child); *Barr v. United States*, No. 3:15-cv-01329, 2018 WL 4815413, at *11–13 (S.D. Ill. 2018) (suicide FTCA case, awarding $1,500,000 in conscious pain and suffering, $1,500,000 for loss of consortium for wife, and $1,000,000 for loss of consortium to daughter); *Jackson v. United States*, No. 4:16-cv-03219, 2018 WL 1755503, at *14 (D.S.C. 2018) (award of $4,000,000 in loss of consortium for husband died as a result of a postal truck wreck); *Gardella v. United States*, No. 1:15-cv-00242-LO-IDD  (E.D. Va. Feb. 11, 2016) (ECF No. 64) (wrongful death resulting in $2,332,752 in non-economic damages to wife of decedent and $1,500,000 to three children); *Champommier v. United States*, No. 11–10538, 2013 WL 4502069, at *28 (C.D. Cal. Aug. 21, 2013) (**FTCA shooting verdict**: $3,000,000 non-economic award to parents of shooting victim);

[2] *See* Pls. Trial Br., ECF No. 529 (Sep. 29, 2021); *e.g.*, *Dolenz v. United States*, 443 F.3d 1320, 1320–21 (10th Cir. 2006) (in motor vehicle wreck resulting injury to 47-year-old, affirming $4,000,000 for "non-economic damages, to include past and present pain and suffering, loss of enjoyment of life and disfigurement, and $2,000,000 to spouse for loss of consortium); *Viera v. United States*, No. 18-cv-9270, 2020 WL 5879035, at *17 (S.D.N.Y. 2020) ($2,000,000 in mental anguish

Third, Plaintiffs considered the Government's recent settlement of the Mother Emanuel Church mass-shooting case. There, the Government settled nine (9) wrongful-death cases ranging from $6,000,000 to $7,500,000.[3] The Government also settled five (5) personal-injury lawsuits for $5,000,000 each.[4] Notably, the Government resolved for $5,000,000 the personal-injury claims for those individuals who experienced the shooting but were not shot.[5] From there, Plaintiffs adjusted these values recognizing that they are

---

and loss of consortium with child of medical malpractice victim); *Phillips v. United States*, 801 F. Supp. 337, 349 (D. Idaho 1992) ($3,000,000 for pain and suffering, mental anguish, and loss of enjoyment of life for personal injuries arising out of truck wreck); *Kane v. United States*, 189 F. Supp. 2d 40, 54–55 (S.D.N.Y. 2002) ($1,200,000 verdict for PTSD in 41-year-old plaintiff resulting from postal truck wreck); *Laskowski v. United States*, 918 F.Supp.2d 301, 333 (M.D. Penn. 2013) ($1,200,000 award of pain and suffering damages arising out of failure to treat PTSD resulting in permanent disability).

[3] *Jackson v. United States*, No. 2:16-cv-2359 (D.S.C. Oct. 28, 2021) (ECF No. 75) ($6,000,000 settlement); *Moore v. United States*, No. 2:16-cv-2360 (D.S.C. Oct. 28, 2021) (ECF No. 75) ($6,000,000 settlement); *Coleman v. United States*, No. 2:16-cv-2405 (D.S.C. Oct. 28, 2021) (ECF No. 76) ($7,500,000 settlement); *Hurd v. United States*, No. 2:16-cv-2407 (D.S.C. Oct. 28, 2021) (ECF No. 75) ($7,500,000 settlement); *Simmons v. United States*, No. 2:16-cv-2351 (D.S.C. Oct. 28, 2021) (ECF No. 74) ($6,500,000 settlement); *Pickney v. United States*, No. 2:16-cv-2350 (D.S.C. Oct. 28, 2021) (ECF No. 73) ($7,500,000 settlement); *Sanders v. United States*, No. 2:16-cv-2354 (D.S.C. Oct. 28, 2021) (ECF No. 75) ($7,500,000 settlement); *Michel v. United States*, No. 2:16-cv-2746 (D.S.C. Oct. 28, 2021) (ECF No. 75) ($7,500,000 settlement); *Thompson v. United States*, No. 2:16-cv-2357 (D.S.C. Oct. 28, 2021) (ECF No. 74) ($7,500,000 settlement).

[4] *Sanders v. United States*, No. 2:16-cv-2356 (D.S.C. Oct. 28, 2021) (ECF No. 130); *Pickney v. United States*, No. 2:16-cv-2351 (D.S.C. Oct. 28, 2021) (ECF No. 73); *Pickney v. United States*, No. 2:16-cv-2352 (D.S.C. Oct. 28, 2021) (ECF No. 73); *Sanders v. United States*, No. 2:16-cv-2355 (D.S.C. Oct. 28, 2021) (ECF No. 75); *Sheppard v. United States*, No. 2:16-cv-2358 (D.S.C. Oct. 28, 2021) (ECF No. 78).

[5] *E.g.*, *United States v. Roof*, No. 2:15-cv-472, at 83–86 (D.S.C. Jan. 24, 2017) (ECF No. 893) (Sanders, Sheppard, and K.M. not shot); *United States v. Roof*, No. 2:15-cv-472, at 117–123, 124–25 (D.S.C. Mar. 29, 2017) (ECF No. 944) (Pinckney & M.P. not shot); *United States v. Roof*, No. 2:15-cv-472, at 58 (D.S.C. Jan. 24, 2017) (ECF No. 899) (Sheppard testimony to the same).

settlement values and to account for the specific factual circumstances that differ in this shooting, including the egregious underlying facts that led to a 60% joint and several liability finding at trial.[6] Then, Plaintiffs added compensation for the additional damages suffered by 17 individuals who were shot and survived and are now living with the consequences of the shooting. Here, Plaintiffs accounted for the resulting economic damages, and the severity of the impairment, disfigurement, and lifelong mental anguish for each individual, as well as the remaining life expectancy for each individual Plaintiff.

Finally, this case presents more egregious acts committed—with more knowledge—by the same Defendant. So, this Court should not find that the suffering caused in the Sutherland Springs shooting has less monetary value than what the Government was willing to *settle* for in the Charleston shooting. Should the Court disagree with Plaintiffs suggested allocation of the specific elements of damages, Plaintiffs ask the Court to use its judgment to allocate the total aggregate amount requested by each plaintiff as the Court believes appropriate. But in any event, the Court should not issue a judgment

---

[6] Specifically, Plaintiffs increased the noneconomic damages for those personal injury claimants who experienced the shooting and its lifelong effects but were not shot to from the $5,000,000 to 6,000,000 and increased the non-economic damages for those individuals who perished in the church from $6,000,000 to $7,000,000. It's clear by the number of wrongful death claimants in each cause of action that the Charleston Shooting Case stipulations valued wrongful death claimants at amounts ranging from $250,000 to $1,500,000. In this case, Plaintiffs assigned values to wrongful death claimants that range generally from $500,000 to $3,000,000 for these claimants' individual claims for the losses of their loved ones in the Wrongful Death Claimant section. While the average value of a singular wrongful death in the Charleston Shooting Case is $7,000,000 the average of the value of a singular wrongful death in plaintiffs' calculations is approximately $8,763,512.89 (including estate and beneficiaries).

that awards less than or equal to a settlement value as equal treatment under the law is a constitutional principle vitally important to this Judgment.

## PERSONAL-INJURY CLAIMS

| PLAINTIFF | PAST & FUTURE PAIN & MENTAL ANGUISH | PAST & FUTURE LOSS OF EARNING CAPACITY | PAST & FUTURE DISFIGUREMENT | PAST & FUTURE PHYSICAL IMPAIRMENT | PAST MEDICAL EXPENSES | FUTURE MEDICAL EXPENSES |
|---|---|---|---|---|---|---|
| Deborah Braden *19-cv-691* | $6,333,450.00[1] | $0.00 | $74,100.00[2] | $333,450.00[3] | $46,770.58[4] | $318,744.13[5] |
| Robert Braden *20-cv-109* | $6,000,000.00[6] | $0.00 | $0.00[7] | $0.00 | $2,619.90[8] | $0.00 |
| Elizabeth Braden obo Z.Z. *19-cv-691* | $9,759,000.00[9] | $2,729,053.00[10] | $1,611,000.00[11] | $5,370,000.00[12] | $166,270.63[13] | $3,502,336.05[14] |
| Farida Brown *19-cv-184* | $6,806,262.00[15,16] | $0.00 | $73,297.00[17] | $586,373.00[18] | $46,253.13[19] | $408,069.00[20] |
| David Colbath *19-cv-678* | $6,224,000.00[21] | $218,796.00[22] | $64,000.00[23] | $352,000.00[24] | $44,625.74[25] | $1,577,892.29[26] |
| John Porter Holcombe *19-cv-1318* | $6,000,000.00[27] | $0.00 | $0.00 | $0.00 | $8,940.61[28] | $0.00 |

Personal-Injury Claims

| PLAINTIFF | PAST & FUTURE PAIN & MENTAL ANGUISH | PAST & FUTURE LOSS OF EARNING CAPACITY | PAST & FUTURE DISFIGUREMENT | PAST & FUTURE PHYSICAL IMPAIRMENT | PAST MEDICAL EXPENSES | FUTURE MEDICAL EXPENSES |
|---|---|---|---|---|---|---|
| John Porter Holcombe obo E.J.H. *20-cv-368* | $6,000,000.00[29] | $0.00 | $0.00 | $0.00 | $8,487.90[30] | $0.00 |
| Dalia Lookingbill obo R.T. *19-cv-706* | $6,000,000.00[31] | $0.00 | $250,000.00[32] | $0.00 | $0.00 | $19,176.00[33] |
| Chancie McMahan obo R.W. *19-cv-972* | $12,902,450.00[34] | $3,054,182.00[35] | $2,101,050.00[36] | $7,003,500.00[37] | $274,249.76[38] | $2,374,756.13[39] |
| Juan Macias *19-cv-806* | $7,792,000.00[40] | $0.00 | $512,000.00[41] | $2,816,000.00[42] | $90,862.28[43] | $3,508,555.61[44] |
| Lisa McNulty obo J.M. *18-cv-949* | $6,540,750.00[45] | $0.00 | $154,500.00[46] | $849,750.00[47] | $70,982.32[48] | $184,184.43[49] |
| Hailey McNulty *18-cv-949* | $6,540,750.00[50] | $0.00 | $154,500.00[51] | $849,750.00[52] | $85,423.58[53] | $145,169.73[54] |

Personal-Injury Claims

| Plaintiff | Past & Future Pain & Mental Anguish | Past & Future Loss of Earning Capacity | Past & Future Disfigurement | Past & Future Physical Impairment | Past Medical Expenses | Future Medical Expenses |
|---|---|---|---|---|---|---|
| Margaret McKenzie *19-cv-715* | $6,070,805.00[55] | $0.00 | $20,230.00[56] | $111,265.00[57] | $25,587.72[58] | $583,077.17[59] |
| Brenda Moulton *20-cv-109* | $6,303,450.00[60] | $0.00 | $130,050.00[61] | $433,500.00[62] | $87,717.61[63] | $1,380,356.11[64] |
| Rosanne Solis *19-cv-714* | $6,086,450.00[65] | $0.00 | $24,700.00[66] | $135,850.00[67] | $16,905.82[68] | $952,491.12[69] |
| Joaquin Ramirez *19-cv-714* | $6,044,800.00[70] | $0.00 | $12,800.00[71] | $70,400.00[72] | $2,893.04[73] | $85,403.20[74] |
| Margarette Vidal *18-cv-712* | $6,044,625.00[75] | $0.00 | $12,750.00[76] | $70,125.00[77] | $221,680.65[78] | $641,784.19[79] |
| Zachary Poston *19-cv-691* | $9,078,000.00[80] | $2,212,639.00[81] | $684,000.00[82] | $3,078,000.00[83] | $101,186.19[84] | $3,802,287.69[85] |
| Julie Workman *19-cv-953* | $6,000,000.00[86] | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Personal-Injury Claims

| PLAINTIFF | PAST & FUTURE PAIN & MENTAL ANGUISH | PAST & FUTURE LOSS OF EARNING CAPACITY | PAST & FUTURE DISFIGUREMENT | PAST & FUTURE PHYSICAL IMPAIRMENT | PAST MEDICAL EXPENSES | FUTURE MEDICAL EXPENSES |
|---|---|---|---|---|---|---|
| Kyle Workman *19-cv-705* | $6,000,000.00[87] | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Morgan Harris-Workman *19-cv-705* | $6,099,575.00[88] | $458,798.00[89] | $28,450.00[90] | $156,475.00[91] | $15,394.10[92] | $619,587.61[93] |
| Kris Workman *19-cv-506* | $6,000,000.00[94] | $1,116,534.00[95] | $1,179,000.00[96] | $10,615,500.00[97] | $49,027.00[98] | $5,989,861.87[99] |

## PERSONAL-INJURY DERIVATIVE CLAIMS

| | PLAINTIFF | RELATIONSHIP | PAST & FUTURE LOSS OF CONSORTIUM / SERVICES |
|---|---|---|---|
| Deborah Braden | Elizabeth Braden<br>*19-cv-691* | *Daughter* | $100,000.00[100] |
| Deborah Braden | Robert Braden<br>*20-cv-109* | *Son* | $100,000.00[101] |
| Deborah Braden | Rebecca Metcalf<br>*20-cv-109* | *Daughter* | $100,000.00[102] |
| David Colbath | O.C.<br>*19-cv-1300* | *Daughter* | $250,000.00[103] |
| Juan Macias | Jennifer Macias<br>*19-cv-806* | *Wife (deceased)* | $480,000.00[104] |
| Brenda Moulton | Jessica Moulton<br>*18-cv-991* | *Daughter* | $200,000.00[105] |
| Brenda Moulton | William Lane<br>*18-cv-991* | *Son* | $100,000.00[106] |

Personal-Injury Derivative Claims

| | **Plaintiff** | **Relationship** | **Past & Future Loss of Consortium / Services** |
|---|---|---|---|
| Solis-Ramirez | Rosanne Solis *19-cv-714* | *Wife* | $250,000.00[107] |
| | Joaquin Ramirez *19-cv-714* | *Husband* | $250,000.00[108] |
| Margarette Vidal | Ramiro Vidal *18-cv-712* | *Son* | $100,000.00[109] |
| | Monica Shabbir *18-cv-712* | *Daughter* | $100,000.00[110] |
| | Robert Vidal *18-cv-712* | *Son* | $100,000.00[111] |
| Julie Workman | Kip Workman *19-cv-953* | *Husband* | $250,000.00[112] |
| | Kyle Workman *19-cv-705* | *Son* | $0.00 |
| | Kris Workman *19-cv-506* | *Son* | $0.00 |

Personal-Injury Derivative Claims

| | **PLAINTIFF** | **RELATIONSHIP** | **PAST & FUTURE LOSS OF CONSORTIUM / SERVICES** |
|---|---|---|---|
| Kris Workman | Kris & Colbey obo E.W. *19-cv-1304* | *Daughter* | $300,000.00[113] |
| | Colbey Workman *19-cv-1481* | *Wife* | $3,500,000.00[114] |
| Minor R.W. | Chancie McMahan *19-cv-972* | *Mother* | $250,000.00[115] |
| Minor Z.Z. | Elizabeth Braden *19-cv-691* | *Mother* | $250,000.00[116] |

## SURVIVAL ACTION CLAIMS – ESTATE CLAIMS

| ESTATE | ESTATE REPRESENTATIVE(S) | PHYSICAL PAIN & MENTAL ANGUISH | MEDICAL EXPENSES | BURIAL EXPENSES |
|---|---|---|---|---|
| Keith Braden *19-cv-691* | Deborah Braden | $7,000,000.00[117] | $0.00 | $0.00 |
| Robert Corrigan *19-cv-591* | Benjamin Corrigan | $7,000,000.00[118] | $0.00 | $0.00 |
| Shani Corrigan *19-cv-591* | Benjamin Corrigan | $7,000,000.00[119] | $0.00 | $0.00 |
| Crystal Holcombe *19-cv-1318* | John Porter Holcombe | $7,000,000.00[120] | $0.00 | $0.00 |
| G.H. *20-cv-368* | John Porter Holcombe | $7,000,000.00[121] | $0.00 | $0.00 |
| M.H. *20-cv-368* | John Porter Holcombe | $7,000,000.00[122] | $0.00 | $0.00 |
| E.H. *20-cv-368* | John Porter Holcombe | $7,000,000.00[123] | $0.00 | $0.00 |
| Dennis Johnson Sr. *18-cv-951* | Kati Wall & Michael Johnson | $7,000,000.00[124] | $0.00 | $0.00 |

Survival Action Claims – Estate Claims

| ESTATE | ESTATE REPRESENTATIVE(S) | PHYSICAL PAIN & MENTAL ANGUISH | MEDICAL EXPENSES | BURIAL EXPENSES |
|---|---|---|---|---|
| Sara Johnson *18-cv-951* | Kati Wall & Michael Johnson | $7,000,000.00[125] | $0.00 | $0.00 |
| JoAnn Ward *19-cv-289* | Chris Ward | $7,000,000.00[126] | $0.00 | $0.00 |
| E.G. *19-cv-706* | Dalia Lookingbill | $7,000,000.00[127] | $557.02[128] | $0.00 |
| B.W. *19-cv-289* | Chris Ward | $7,000,000.00[129] | $0.00 | $0.00 |
| Robert Marshall *19-cv-691* | Martina Pachal | $7,000,000.00[130] | $0.00 | $0.00 |
| Karen Marshall *19-cv-691* | Martina Pachal | $7,000,000.00[131] | $0.00 | $0.00 |
| Tara McNulty *18-cv-949* | Lisa McNulty | $7,000,000.00[132] | $0.00 | $0.00 |

Survival Action Claims – Estate Claims

| ESTATE | ESTATE REPRESENTATIVE(S) | PHYSICAL PAIN & MENTAL ANGUISH | MEDICAL EXPENSES | BURIAL EXPENSES |
|---|---|---|---|---|
| Ricardo C. Rodriguez *18-cv-1151* | Regina Amador | $7,000,000.00[133] | $0.00 | $6,682.00[133] |
| Therese Rodriguez *18-cv-944* | Ronald & Gary Ramsey | $7,000,000.00[134] | $0.00 | $0.00 |
| H.K. *18-cv-881* | Charlene Uhl | $7,000,000.00[135] | $0.00 | $0.00 |
| Peggy Warden *19-cv-691* | Jimmy Stevens | $7,000,000.00[136] | $0.00 | $0.00 |

## WRONGFUL-DEATH CLAIMS

| | PLAINTIFF | RELATIONSHIP | PAST & FUTURE PECUNIARY LOSS | PAST & FUTURE LOSS OF COMPANIONSHIP AND SOCIETY | PAST & FUTURE MENTAL ANGUISH | LOSS OF INHERITANCE |
|---|---|---|---|---|---|---|
| Keith Braden | Deborah Braden *19-cv-691* | *Wife* | $215,025.00[137] | $1,500,000.00[138] | $1,500,000.00[139] | $0.00 |
| | Rebecca Metcalf *20-cv-109* | *Daughter* | $0.00 | $375,000.00[140] | $375,000.00[141] | $0.00 |
| | Robert Braden *20-cv-109* | *Son* | $0.00 | $375,000.00[142] | $375,000.00[143] | $0.00 |
| | Elizabeth Braden *19-cv-691* | *Daughter* | $4,256.50[144] | $375,000.00[145] | $375,000.00[146] | $0.00 |
| Robert Corrigan | Benjamin Corrigan *19-cv-591* | *Son* | $206,744.75[147] | $375,000.00[148] | $375,000.00[149] | $0.00 |
| | Preston Corrigan *19-cv-591* | *Son* | $206,849.75[150] | $375,000.00[151] | $375,000.00[152] | $0.00 |
| Shani Corrigan | Benjamin Corrigan 19-cv-591 | *Son* | $206,744.75[153] | $375,000.00[154] | $375,000.00[155] | $0.00 |
| | Preston Corrigan 19-cv-591 | *Son* | $206,849.75[156] | $375,000.00[157] | $375,000.00[158] | $0.00 |

Wrongful-Death Claims

| | Plaintiff | Relationship | Past & Future Pecuniary Loss | Past & Future Loss of Companionship and Society | Past & Future Mental Anguish | Loss of Inheritance |
|---|---|---|---|---|---|---|
| **John Bryan Holcombe** | John Porter Holcombe *19-cv-1318* | *Son* | $0.00 | $1,250,000.00[159] | $1,250,000.00[160] | $0.00 |
| | Scott Holcombe *19-cv-972* | *Son* | $1,000,000.00[161] | $1,250,000.00[162] | $1,250,000.00[163] | $0.00 |
| | Joe Holcombe *18-cv-555* | *Father* | $0.00 | $750,000.00[164] | $750,000.00[165] | $0.00 |
| | Claryce Holcombe *18-cv-555* | *Mother* | $0.00 | $750,000.00[166] | $750,000.00[167] | $0.00 |
| **Karla Holcombe** | John Porter Holcombe *19-cv-1318* | *Son* | $0.00 | $1,250,000.00[168] | $1,250,000.00[169] | $0.00 |
| | Scott Holcombe *19-cv-972* | *Son* | $0.00 | $1,250,000.00[170] | $1,250,000.00[171] | $0.00 |

Wrongful-Death Claims

| | Plaintiff | Relationship | Past & Future Pecuniary Loss | Past & Future Loss of Companionship and Society | Past & Future Mental Anguish | Loss of Inheritance |
|---|---|---|---|---|---|---|
| Crystal Holcombe | John Porter Holcombe<br>*19-cv-1318* | *Husband* | $0.00 | $1,500,000.00[172] | $1,500,000.00[173] | $0.00 |
| | John Porter Holcombe obo E.H.<br>*20-cv-368* | *Daughter* | $0.00 | $500,000.00[174] | $500,000.00[175] | $0.00 |
| | Philip Hill<br>*20-cv-368* | *Son* | $0.00 | $500,000.00[176] | $500,000.00[177] | $0.00 |
| Dennis Johnson Sr. | Dennis Johnson Jr.<br>*18-cv-951* | *Son* | $0.00 | $375,000.00[178] | $375,000.00[179] | $0.00 |
| | Deanna Staton<br>*18-cv-951* | *Daughter* | $0.00 | $375,000.00[180] | $375,000.00[181] | $0.00 |
| | Michael Johnson<br>*18-cv-951* | *Son* | $0.00 | $375,000.00[182] | $375,000.00[183] | $0.00 |
| | Kati Wall<br>*18-cv-951* | *Daughter* | $434.03[184] | $375,000.00[185] | $375,000.00[186] | $0.00 |
| | Chris Johnson<br>*18-cv-951* | *Son* | $0.00 | $375,000.00[187] | $375,000.00[188] | $0.00 |

Wrongful-Death Claims

| | Plaintiff | Relationship | Past & Future Pecuniary Loss | Past & Future Loss of Companionship and Society | Past & Future Mental Anguish | Loss of Inheritance |
|---|---|---|---|---|---|---|
| Sara Johnson | James Graham<br>*18-cv-951* | *Son* | $0.00 | $375,000.00[189] | $375,000.00[190] | $0.00 |
| | Deanna Staton<br>*18-cv-951* | *Daughter* | $0.00 | $375,000.00[191] | $375,000.00[192] | $0.00 |
| | Michael Johnson<br>*18-cv-951* | *Son* | $0.00 | $375,000.00[193] | $375,000.00[194] | $0.00 |
| | Kati Wall<br>*18-cv-951* | *Daughter* | $0.00 | $375,000.00[195] | $375,000.00[196] | $0.00 |
| | Chris Johnson<br>*18-cv-951* | *Son* | $0.00 | $375,000.00[197] | $375,000.00[198] | $0.00 |
| JoAnn Ward | Chris Ward<br>*19-cv-289* | *Husband* | $0.00 | $1,500,000.00[199] | $1,500,000.00[200] | $0.00 |
| | Dalia Lookingbill<br>*19-cv-706* | *Mother* | $39,610.79[201] | $500,000.00[202] | $500,000.00[203] | $0.00 |
| | Dalia Lookingbill obo R.T.<br>*19-cv-706* | *Daughter* | $0.00 | $500,000.00[204] | $500,000.00[205] | $0.00 |

Wrongful-Death Claims

| | PLAINTIFF | RELATIONSHIP | PAST & FUTURE PECUNIARY LOSS | PAST & FUTURE LOSS OF COMPANIONSHIP AND SOCIETY | PAST & FUTURE MENTAL ANGUISH | LOSS OF INHERITANCE |
|---|---|---|---|---|---|---|
| Robert Marshall | Martina Pachal<br>*19-cv-691* | *Daughter* | $88,871.00[206] | $375,000.00[207] | $375,000.00[208] | $0.00 |
| | Kara Boyd<br>*19-cv-691* | *Daughter* | $88,871.00[209] | $375,000.00[210] | $375,000.00[211] | $0.00 |
| Karen Marshall | Martina Pachal<br>*19-cv-691* | *Daughter* | $88,871.00[212] | $375,000.00[213] | $375,000.00[214] | $0.00 |
| | Kara Boyd<br>*19-cv-691* | *Daughter* | $88,871.00[215] | $375,000.00[216] | $375,000.00[217] | $0.00 |
| Tara McNulty | Lisa McNulty<br>*18-cv-949* | *Mother* | $0.00 | $250,000.00[218] | $250,000.00[219] | $0.00 |
| | Lisa McNulty, obo J.M.<br>*18-cv-949* | *Son* | $64,429.50[220] | $500,000.00[221] | $500,000.00[222] | $0.00 |
| | Hailey McNulty<br>*18-cv-949* | *Daughter* | $64,429.50[223] | $500,000.00[224] | $500,000.00[225] | $0.00 |

Wrongful-Death Claims

| | **Plaintiff** | **Relationship** | **Past & Future Pecuniary Loss** | **Past & Future Loss of Companionship and Society** | **Past & Future Mental Anguish** | **Loss of Inheritance** |
|---|---|---|---|---|---|---|
| Ricardo C. Rodriguez | Regina Amador<br>*18-cv-1151* | *Daughter* | $250,000.00[226] | $750,000.00[225] | $750,000.00[225] | $0.00 |
| | Jose Rodriguez<br>*18-cv-1151* | *Father* | Deceased | | | |
| | Guadalupe Rodriguez<br>*18-cv-1151* | *Mother* | Deceased | | | |
| Therese Rodriguez | Gary Ramsey<br>*18-cv-944* | *Son* | $0.00 | $375,000.00[227] | $375,000.00[228] | $0.00 |
| | Ronald Ramsey Jr.<br>*18-cv-944* | *Son* | $0.00 | $375,000.00[229] | $375,000.00[230] | $0.00 |
| Haley Kruger | Charlene Uhl<br>*18-cv-881* | *Mother* | $0.00 | $375,000.00[231] | $375,000.00[232] | $0.00 |
| Peggy Warden | Jennifer Racey<br>*19-cv-691* | *Daughter* | $0.00 | $375,000.00[233] | $375,000.00[234] | $0.00 |

Wrongful-Death Claims

| | Plaintiff | Relationship | Past & Future Pecuniary Loss | Past & Future Loss of Companionship and Society | Past & Future Mental Anguish | Loss of Inheritance |
|---|---|---|---|---|---|---|
| Minor B.W. | Christopher Ward *19-cv-289* | *Father* | $0.00 | $375,000.00[235] | $375,000.00[236] | $0.00 |

## PROPERTY DAMAGE CLAIMS

| PLAINTIFF | PROPERTY DAMAGE |
|---|---|
| Fred Curnow<br>*19-cv-805* | $1,500.00[237] |
| Kathleen Curnow<br>*19-cv-805* | $1,500.00[238] |

# EVIDENTIARY SUPPORT

[1] **Deborah Braden's pain, suffering, and mental anguish damages.**
In addition to the $6,000,000 value represented by the Charleston case
precedent for individuals who experienced the church shooting and not shot,
Plaintiff requests $13,500 per year be awarded for gunshot wound (GSW)
related pain and suffering for the remainder of her 24.7 years or $333,450 for
a total of $6,333,450.

Plaintiff Deborah Braden was present in the Church during the shooting,
on November 5, 2017.  Plaintiff Braden saw her husband, Keith Braden killed
and her granddaughter, Z. Z. gravely injured.  She testified, "when the rest of
the bullets started coming, one came over our head and hit [sic] through the
wall right above our heads. And Keith hollered, 'Get down. Take cover.'"
Dmg. Trial Tr. 1458:9-12 (D. Braden). "I grabbed Zoe. I grabbed her, because
she was sitting between us, and pushed her to the floor". *Id*.  "[T]he bullets
were flying around the bottom of the church across, like, the outside. He was
going low, I guess, to hit us and kill us all on the floor. I saw bullets coming
through the side wall where we were. We were in the back corner." *Id*. "I was
shot on my right arm, which is on that side. It took a chunk out of there on
that arm." *Id., at* 1465. At trial, Plaintiff Braden described these injuries as,
"I was shot on my right arm, which is on that side. It took a chunk out of
there on that arm." *Id*. "I got shot twice in the right leg". Dmg. Trial Tr.
1465:17. "And then the other one was up in the hip area across my
butt…which has damaged the sciatic nerve". *Id*.

Plaintiff Deborah Braden was shot three times and was immediately
transferred to Connally Memorial hospital then to University Medical Center
where she was an inpatient for seven days. PEX-3023, PEX-3056. A graphical
depiction of Plaintiff's injuries is in the record at PEX-3085-2. Plaintiff
Deborah Braden suffers from the following medical conditions: (1) multiple
gunshot wounds; (2) gunshot wounds to the right forearm, left gluteal area,
left thigh and right thigh; (3) retained metallic ballistic fragments with risk
of lead toxicity; (4) lumbar sprain with multilevel intervertebral disc injury
(L1-L2 bulge, L2-L3 bulge, L3-L4 bulge, L4-L5 and L5-S1 protrusions) with
radiculopathy; (5) episode of Takotsubo's cardiomyopathy; (6) post-traumatic
stress disorder. PEX-3084-38.

As plaintiff expert, Dr. Sharmila Dissanaike noted, "[M]s. Braden was brought to the ER of Connally Memorial Medical Center by EMS from the scene of the shooting; she was awake and alert at this time. In addition to her physical injuries, Ms. Braden also tragically lost her husband in this incident, with her son and granddaughter also sustaining serious injuries. The most prominent injury was a large gunshot blast injury to Ms. Braden's left hip and buttock, with additional injuries to her right thigh and forearm. Based on her injuries, primarily the size and destruction associated with the left buttock wound, it was determined that she would benefit from transfer to a higher-level trauma center. She was sent to University Health System, where most of her subsequent care occurred. Ms. Braden sustained a large destructive soft tissue injury at the confluence of her left hip/thigh/buttock region, with large number of metallic shrapnel fragments embedded within the tissues, and active bleeding as suggested by the report of contrast extravasation on the CT scan obtained at University HS. She had two much smaller shrapnel fragments noted in her right forearm." PEX-03086, at 1.

"A subsequent ultrasound of her heart (ECHO) confirmed a significant reduction in her heart function from a stress cardiomyopathy (Takotsubo's cardiomyopathy, also known as Broken Heart syndrome, since it is triggered by sudden severe emotional or physical distress, such as occurred in this instance. It is most common in post-menopausal women, as in this case. Ms. Braden's heart pump function dropped below 30%, indicating a severe dysfunction of her heart. A catheterization was performed to rule out the possibility of a blockage in the arteries of her heart, which was negative. Since there were no reversible causes of her heart failure, she was cleared to proceed to surgery. Her wounds were irrigated in the operating room, and shrapnel and debris removed." PEX-3086, at 1.

Plaintiff was diagnosed with Major Depressive Disorder and Posttraumatic Stress Disorder by her expert, PEX-3083, at 6, and was also diagnosed with Major Depressive Disorder and Generalized Anxiety Disorder by experts for the Defendant, GEX-409, at 13. Deborah Braden's pain and mental anguish are extensively documented in the record in her videotaped psychological exam PEX-20001.

Plaintiff Braden experiences panic attacks to this day triggered by the shooting event including heart racing, sweating, crying, shortness of breath, a feeling as if she is choking/throat closing, and chest pressure. PEX-20001.

She has less interest in activities that she enjoyed before the shooting, like gardening, because she physically cannot do it and her husband is no longer there to help her. She feels like her energy level is at 20%. PEX-20001.

[2] **Deborah Braden's disfigurement damages.** Plaintiff requests $3,000 per year be awarded for disfigurement for the remainder of her 24.7 years or $74,100. Plaintiff has multiple scars from her wounds. The right arm demonstrates a 7 cm healed scar along the inner arm, along the ulnar aspect; she has a scar on her left buttock, which measures approximately 15 cm; right leg demonstrates two scars, most likely an entry and exit wound; the scars are puckered and contracted; lumbar examination reveals reduction of lordosis. PEX-3084-37. Plaintiff testified at trial, "The one on my arm especially is -- it's kind of ugly". Dmg. Trial Tr. 1475:14-15. "[T]he ones on my legs, they pucker some and they look ugly." Dmg. Trial Tr. 1475: 17-18. "The one on the backside is a mess". Dmg. Trial Tr. 1475:19. Depictions of the disfigurement are found in PEX-3084-77-78.

[3] **Deborah Braden's impairment damages.** Plaintiff requests $13,500 per year be awarded for impairment for the remainder of her 24.7 years or $333,450.

These injuries cause Plaintiff to have the following impairments: (1) Decreased physical function affecting a loss of vocational capacities or opportunities; (2) Decreased ability to participate in social avocational activities, i.e. participation in activities with others e.g. participation in sports, participation in community activities, etc.; (3) Decreased external mobility e.g. community ambulation, etc.; (4) Decreased ability to perform household services e.g. inside housework, etc.; (5) Decreased ability to participate in personal avocational activities e.g. personal hobbies, pastimes, interests, etc. PEX-3084-39. Plaintiff has 24.7 number of years left in her life and will suffer from these impairments for the remainder of her life.  Plaintiff is no longer able to complete household tasks, sleep, hold children, or go to the gym, along with other limitations. Dmg. Trial Tr. 1479 (D. Braden).

As plaintiff expert, Dr. Sharmila Dissanaike described, "Ms. Braden has had chronic pain in her lower back and sciatica-type pain radiating down her hip into her leg, requiring multiple outpatient visits to pain specialists and neurosurgeons, and advanced imaging including MRI and CT myelogram. This showed a prolapse of a disc in her lower spine, radiculopathy, as well as spinal stenosis; treatment with multiple injections of anesthetic agents and

steroids, as well as lumbar facet radiofrequency ablations provided significant pain relief, in addition to acupuncture, massage and manual myofascial releases. Despite these treatments she has required long term oral pain medication as well. She has had left leg swelling and is hypersensitive to pain in this leg, suggesting that at least some of her pain is due to a chronic post-injury pain syndrome that is not uncommon in patients after injury." PEX-03086, at 2.

Ms. Braden testified, "I have pain in my legs, down my legs, and nerve damage in my feet. My left leg is the worst. But it has numbing, and it has where I can't hardly feel it sometimes. But that and the back issues, it's hard to -- I can't sit for long periods of time. I can't stand for long periods of time. And there's a lot of the other issues with balloons popping and fireworks". Dmg. Trial Tr. 1478:15-22. "I'm always in pain. Dmg. Trial Tr. 1478:25.

[4] 2d Amd Stipulation, ECF No. 576, at 2 ¶ 8(a).

[5] Defendant stipulates to $214,995.01 of Ms. Braden's future medical expenses. 2d Amd Stipulation, ECF No. 576, at 3 ¶ 8(b). The remainder can be found in Plaintiff's life care plan. PEX-3084 (Gonzales LCP – D. Braden). Plaintiff Braden notes that the amount for future medical care demanded in this pleading *already reflects* the following adjustments made to her Life Care Plan: 2 years passed between original LCP date and trial removed/adjusted for all applicable line items; used $22/hour for home health; average generic drug pricing substituted for all medications available as generic.

Plaintiff's LCP expert projected her future medical damages in the amount of $370,147.35, but considering the court's instructions for the following: use $22/hour for attendant care; Neurontin $45.42; Celexa $14.10; Xanax $13.15, Plaintiff has adjusted the calculations of Plaintiff's future medical damages to the amount of $331,779.67.  This amount is *not* the present value of these damages.

[6] **Robert Braden's pain & mental anguish damages**. Plaintiff Robert Braden was present in the church during the shooting, on November 5, 2017. From Mr. Braden's perspective, "[i]t took a few minutes for people to realize what was going on. Shortly after, I'm not sure how many rounds in it was, but somebody had shouted that it was a shooter and everyone get down, so everybody began taking cover under their pews at that point, and in the sound booth, we ended up trying to take whatever cover we could. I had laid

down behind that door into the sound booth, kind of on my hands and knees there and was peeking out of the door. As I said, I was in the military. I was a security instructor as well in my time there, so my training had kicked in at that point. I was looking for an opportunity to stop the shooter at that point. I had no opportunity, but I stayed tucked behind that door, kind of peeking out with it cracked just a little bit." PEX-906, at 15:4-18 (R. Braden Dep.). Mr. Braden saw the following loved ones injured or harmed, "My mother, father and my niece Z were there." *Id.*, at 23:17-18.

Following the shooting, Robert found his father and provided comfort to him in his final moments, "I had climbed back over him again and grabbed his hand, let him know that, you know, Mom and -- Mom was okay, Z was okay, and he squeezed my hand a little bit just reassuring me that he was aware enough to know what I was saying to him." PEX-906-24:7-11.

Following his father's death, Mr. Braden began helping others who had been injured in the shooting, "from that point, I continued helping, or trying to help, first responders the best I could. Mostly I was going down the right side of the church checking to see who, if anyone, could still be helped on that side, who was -- who I could still find a pulse in, just doing what I could to help first responders get people out and get them loaded into ambulances, and mainly -- my main portion was inside of the church, though, just checking people to see who -- who could be helped." PEX-906-25:15-24.

Robert Braden was shot once and immediately went to Connally Memorial Medical Center where he was treated and discharged the same day. PEX-03121, at 13. A graphical depiction of his injuries is in the record at PEX-3128, at 1. As Mr. Braden testified at his trial deposition describing being shot as, "I would equate it to a hot knife, but duller than a knife going across your head and rather rapidly. And that was the immediate impact. After that, it turned more into more of like a sharp -- it was kind of a mix of a sharp and dull pain. Sometimes it would throb, and usually it was a deeper throbbing pain." PEX-906, at 30:3-9.

Robert Braden was diagnosed with Major Depressive Disorder, in denial and Posttraumatic Stress Disorder, in denial by his expert. PEX-3127, at 6.

[7] Plaintiff testified that he has some disfigurement, "under the hairline" where the bullet impacted his skull. PEX-906, at 31:2.

[8] 2d Amd Stipulation, ECF No. 576, at 2 ¶ 7.

[9] **Z.Z.'s pain, suffering, and mental anguish damages.** In addition to the $6,000,000 value represented by the Charleston case precedent for individuals who experienced the church shooting and were not shot, Plaintiff requests $52,500 per year be awarded for GSW related pain and suffering for the remainder of her 71.6 years or $3,759,000 for a total of $9,759,000.

Plaintiff Z.Z., was six years old and present in the Church during the shooting, on November 5, 2017. Z.Z.'s grandmother, Deborah Braden, testified, "I saw bullets coming through the side wall where we were. We were in the back corner. Dmg. Trial Tr. 1458:24-25 (D. Braden). "[Z.Z.] kept saying, 'Grandma, I want to scream. It hurts.'" *Id.*, at 1459:11-12. "I saw [Z.Z.]'s stomach blown open. I'm sorry. It was just a mess. I took off my shirt because I had nothing else to cover her with to try to keep her from bleeding. So I took off my shirt, and I covered it and held her stomach until help got there." *Id.*, at 1461:11-18. "And I didn't want [Z.Z.] to know how bad she was because I didn't want her to give up. She kept saying, 'Grandma, my leg hurts. Grandma, I want to close my eyes and go to sleep.'" *Id.*, at 1463:4-6. "[Z.Z.] was shot -- I'm not sure how many times. I really don't know if I heard. Her whole stomach area was shot. And she was shot in her leg, and it almost severed the leg. It was barely hanging on. And she almost bled to death laying there." Dmg. Trial Tr. 1464:24-1465:1.

Z.Z. sustained, "three gunshot wounds" (Dmg. Trial Tr. 1524:22 (E. Braden)) and was immediately transported to Connally Memorial Medical Center, then quickly transferred to University Hospital where she was an inpatient for 25 days. PEX-3144, at 823. A graphical depiction of Z.Z.'s injuries is in the record. PEX-3232, at 2. Z.Z. suffered from the following medical conditions: (1) Multiple gunshot wounds during mass shooting on November 5, 2017; (2) Left gluteal gunshot wound and penetration to periumbilical abdomen with rectosigmoid injury, perirenal and ischiorectal hematoma; status post exploratory laparotomy on November 5, 2017 followed by re-opening laparotomy and loop colostomy on November 6, 2017 with eventual colostomy closure on March 3, 2018; (3) Left hip/pelvic gunshot wound with comminuted and displaced femoral and sacral fractures; status post closed treatment of comminuted sacral fracture and left femur external fixation followed by open treatment of femoral fracture with flexible IM nails on November 9, 2017; (4) Left lower extremity profunda artery(PFA)/vein

injury and blast injury of superficial artery; status post PFA interposition bypass with reverse saphenous vein graft from right lower extremity, left superficial artery primary repair and 4 compartment fasciotomy; (5) Extensive soft tissue loss to left lateral and medial thigh and buttocks; s/p split-thickness skin grafting; (6) Left sciatic nerve injury with residual peroneal and tibial neuropathy; (7) Left lower extremity neuropathic pain, sensory and motor loss with gait and activities of daily living skills deficits; (8) Post-traumatic stress disorder, acute with exacerbation of pre-existing condition; (9) Retained lead bullet fragments with lead toxicity risk. PEX-3231, at 51-52.

At trial, Z.Z.'s mother, Elizabeth Braden described her injuries as, "[Z.Z.] had multiple shots. She had one in her pelvis, one in her stomach, and one that went in on the inside of her femur and blew out her whole back side of her leg at the femur area below her butt". Dmg. Trial Tr. 1524:16-19 (E. Braden). Her mother also testified, "[t]here's one to her pelvis. And that's the top where all the white little squigglies are and all the extra white spots, that's all the stuff that's still inside of her. It's the shrapnel that's still there. And then the second one is to the femur and how her femur is broken. And the big chunk where all the white stuff is there and on the outside is also stuff that's still there, bone pieces, shrapnel, and how her bone broke. So it would have been in and then out through there. And the one on top is in through the pelvis and out right above her bottom, her butt cheek." *Id.,* at 1526:5-15.

As plaintiff's expert, Dr. Sharmila Dissanaike noted, "she was initially evaluated at Connally Memorial Medical Center ER, by which time her left leg was already mottled and pulseless. She had received blood transfusion en route by EMS, and was immediately transferred by air ambulance to University Health System. Here she underwent emergency surgery to restore the blood supply to her left leg, requiring separate procedures on 11/5/17 and 11/6/17. The operations involved taking healthy vein from her uninjured right leg, and using it to replace the portion of her arteries on the left leg that were destroyed by the blast. This was successful at restoring blood supply to her left leg, preventing need for amputation. The skin and fascia of her left lower leg was opened (fasciotomy), which is standard practice in cases such as this, in order to prevent swelling and pressure from causing compartment syndrome." PEX-3235, at 1.

"[Z.Z.] underwent exploration of her abdomen and pelvis on 11/5/17 and 11/6/17, where a portion of her colon was brought to the skin level as a temporary diverting loop ostomy, to allow the rectal injury and her perineum/thigh wounds to heal without contamination from feces. This was subsequently reversed uneventfully in March 2018, precipitated by two ER visits for bleeding and prolapse of the ostomy." PEX-3235, at 1.

"[Z.Z.] underwent external stabilization of her femur fracture on 11/6/17, followed by placement of an internal rod later in her hospital stay. Hardware was subsequently removed uneventfully as an outpatient several months later." PEX-3235, at 1.

"[Z.Z.] was treated with negative pressure wound therapy to her multiple open wounds on the abdomen and left leg. All incisions were closed over a period of time with multiple skin graft operations, where healthy skin was taken from other parts of her body and used to cover the open areas. A prolonged period of wound care with home health nursing and outpatient clinic visits was required." PEX-3235, at 1.

"During the initial days of hospitalization [Z.Z.] required multiple blood transfusions, a breathing tube (intubation) and mechanical ventilation, and other forms of ICU support to maintain life. After stabilization, she was able to be transitioned to regular hospital ward care, and was eventually discharged on 11/29/17." PEX-3235, at 1.

"It is clear from the medical records that [Z.Z.] continues to suffer from post-traumatic stress disorder and anxiety disorder, in addition to sleep disturbance, insomnia and difficulty with normal social interactions. She remains on an antidepressant medication for these indications." PEX-3235, at 2.

Plaintiff's mother testified the nerve pain in her injury and her rear area, "is very painful." Dmg. Trial Tr. 1551:1 (E. Braden). "So it makes it hard for her to sit for long periods of time. It also makes it hard for her to stand long periods of time. A lot of exercises and stuff, it hurts extra for her." *Id.*, at 1551:4-6.

Before her current age of 10, Z.Z. had more than 25 surgeries that required sedations. Dmg. Trial Tr. 1539 (E. Braden). She falls a few times per week. *Id.*, at 1547. She requires monitoring in the bathroom to prevent

injury *Id.*  She uses a wheelchair to go long distances. *Id.*, at 1549.  She uses an electric cart at the grocery store. *Id.*, at 1550.  She has not been able to engage in extracurricular sports at school.  *Id.*, at 1551.  She is not able to do all normal household chores and requires an additional 3 hours of care per day. *Id.*, at 1552.  These types of problems will develop into further issues and continue to cause mental anguish and pain and suffering in dealing with them for the remainder of Z.Z.'s days.

Z.Z. was also diagnosed with Posttraumatic Stress Disorder by her expert.  He opines the essence of youth has been taken away from her, and she is now extremely insecure. This type of traumatic experience will have a negative impact on Z.Z. in terms of her feelings of basic security; at this point in her life, she clings to her mother and refuses to sleep alone, and she clings to a stuffed animal. Her formative and developmental years will be problematic. Z.Z.'s insecurity can translate into significant social problems as she gets older.  The resulting mental anguish will tend to be life altering. The mental anguish and emotional pain that Z.Z. suffers in dealing with her injury likely will continue to some degree and to some extent for the rest of her life PEX-3230.

   [10] **Z.Z.'s lost earnings damages.** Defendant has stipulated to $82,036.00 of lost future earning capacity. 2d Amd Stipulation, ECF No. 576, at 9 ¶ 24(c).

Plaintiff's vocational expert opined that Z.Z.'s earnings capacity would be significantly decreased by the post-injury lifetime power to earn money reasonably represented by the average earnings that accrue to persons with some college but no degree with a mobility disability.  Further, individuals with a mobility disability like Z.Z. will earn less money over the course of their life because they have a diminished work life expectancy. Specifically, Z.Z's work life expectancy will be reduced by 43%.  PEX-3228, at 3, at 4. In addition, Z.Z.'s impairments discussed above will further reduce her wages during her working life.  Based on a totality of the evidence, Z.Z.'s total reduction of earnings capacity should be 65%.

Plaintiff's mother testified at trial that Z.Z., "has always really said that she wants to be a veterinarian when she gets older," Dmg. Trial Tr. 1566:20-21 (E. Braden), but that her injuries will affect her for her entire life and impact her vocational prospects and educational prospects. *Id.*, at 1568:12-17.

Plaintiffs' experts have calculated Z.Z.'s lost with professional status at $5,135,450.00.  PEX-2324, at 5.

The Court has stated it rejects the idea of Z.Z. attaining professional status but will consider her lost earnings based upon the foundation of having a professional degree.

Government Expert Scarbrough has opined that the Expected Earnings and Benefits of Z.Z. with a bachelor's degree would total $4,198,544.  The value is calculated as Z.Z.'s earnings, minus taxes, plus Retirement Savings Benefits.  GEX-425 Page 45 of 55, Table 5, Sum of Earnings and Benefits section of the table.  Please note this amount is not reduced to present value.

Plaintiffs request that 65% of $4,198,544, or $2,729,053 be awarded to Z.Z. in loss of earning capacity.  This number is not reduced to present value.

[11] **Z.Z.'s disfigurement damages.** Z.Z.'s injuries and scars from her gunshot wounds are horrific and are in parts of her body that are normally exposed.  Even at her young age, she is conscious of her disfigurement.

Z.Z. has a mid-line scar at the abdomen, which extends from the mid-gastric to the pubic region. It is somewhat wide; she also has a scar at the left lower quadrant from her previous colostomy; a scar of the left upper gluteal region was noted with a moderate soft tissue defect consistent with muscle loss; the mid-calf of her right is 23.5 cm while the left is atrophied and measures 18 cm.; the left lower extremity also revealed multiple well-healed scars; there is a lateral scar, which measures 11 cm, a medial scar, which is 16 cm, and there is a very large and extensive area of scarring and defect at the lateral thigh, hip, as well as the medial thigh; a smaller scar is present at the lateral knee and there are longitudinal scars at the medial and lateral aspects of the legs from previous fasciotomies.  Also, she ambulates using a left AFO and her gait is antalgic with a slight hip hike for advancement of her leg; when the AFO is removed, she has a left foot drop with no dorsiflexion, which is also embarrassing.  PEX-3231, at 50.

Z.Z.'s mother testified that these disfigurements are experienced in this way: "right below her chest all the way down to the top of her pelvis, they cut her open around the belly button to repair her intestines and make sure that all that stuff was taken care of." Dmg. Trial Tr. 1554:24-1555:2 (E. Braden). "She has two of those scars on -- one on each side of her leg where they cut

her open. And those are -- those are still there." Dmg. Trial Tr. 1555:15-17. "She is constantly covering [the scars] up." *Id.*, at 1555:24. "She's constantly wearing leggings or -- even if it's 100 degrees outside, she'll put her leggings on. And when we're out in public, like if we go to the water park or the splash pad or something like that, she's very cautious about what she wears. She likes to wear the ones that cover all of the -- from the knee up and the full-blown shirt." *Id.*, at 1556:1-7.

As plaintiff's medical provider described in his deposition testimony, "examination of the foot without the AFO showed her ankle is inverted and her first toe, that's her big toe, is --  is flexed at 30 degrees at rest. So at rest it would be straight, right. She's -- she would be flat on the ground, but when her -- her foot is just relaxed, her big toe is bent down. So there's a mild contraction forming and if I tried to extend it out, it was painful and -- and it wasn't really that mobile. So her other toes were starting to bend in towards her big toe and -- and she was really sensitive for her entire foot and ankle to -- to light touch." PEX-0928, at 27:18-00028:3 (Dr. Jaramillo Dep.).

Further, "her left leg is considerably smaller and her foot is actually smaller. So there's going to be some appearance – appearance issues going forward, and it might be the blood flow and the nervous -- the nervous system injury as well." PEX-928, at 33:19-23.

Plaintiff requests $22,500 per year be awarded for disfigurement for the remainder of her 71.6 years or $1,611,000.00.

[12] **Z.Z.'s impairment damages.** Plaintiff requests $75,000 per year be awarded for impairment for the remainder of her 71.6 years or $5,370,000.00.

Plaintiff has 71.6 years left in her life PEX-2027, at 3, and will suffer from these impairments for the remainder of her life.   These injuries cause Plaintiff to have the following impairments: (1) Decreased ability to perform activities of daily living (ADLs) e.g. bathing, dressing, etc.; (2) Decreased locomotion e.g. walking, etc.; (3) Decreased physical function affecting a loss of vocational capacities/opportunities; (4) Decreased ability to participate in social avocational activities, i.e. participation in activities with others e.g. participation in sports, participation in community activities, etc.; (5) Decreased external mobility e.g. travel, community ambulation, etc.; (6) Decreased ability to perform household services e.g. inside housework, food cooking & clean-up, shopping for household, etc.; (7) Decreased ability to

participate in personal avocational activities e.g. personal hobbies, pastimes, interests, etc. PEX-3231, at 52.

At trial, Z.Z.'s mother described these impairments as, "currently, [Z.Z.] doesn't have a whole lot of feeling or any feeling in her foot still. It goes up her leg. If she can feel the parts of that, it's come-and-go. And it's not the same as her other side of her body. So lifting her foot up -- she has to wear a brace to help keep her foot at an angle so that she can walk or run. She can't do -- oh, impairment. So she's constantly hurting her -- like, her spine is constantly hurting. She can't sit long periods of time. She can't stand long periods of time." Dmg. Trial Tr. 1546:13-22 (E. Braden). Further, "she not only can't feel her foot, but she can't move it very well. So if she's relaxed, her foot just kind of hangs down. And she can't do the push-off like most of us can with our feet. And so it makes it difficult. So that's why she wears the brace at a 90-degree angle, to help hold her foot up so she doesn't trip over her foot, which she still trips because she can't feel her foot". *Id.*, at 1546:24-1547:5. "I worry about her slipping and falling, because she has. When she's not wearing that brace, it's more likely for her to fall because she's not paying attention, or she can't feel it. So, showering, dressing, uneven surfaces. Uneven surfaces are a big one, because she's fallen multiple times there." *Id.*, at 1547:19-24.

As plaintiff expert, Dr. Sharmila Dissanaike described, "muscle damage from the injury has led to significant loss of function, impeding her ability to perform normal activities of daily living. The cause of nerve and muscle damage is two-fold: first, there is potential injury caused directly by the blast and bullet trajectory, followed by secondary injury from the lack of blood flow (ischemia) to nerves and muscles in the hours until the vascular surgeons were able to completely restore flow." PEX-3235, at 2.

"Nerves are especially sensitive to the lack of oxygen when blood supply is disrupted; permanent nerve death can result even without direct injury. [Z.Z.] has wasting of the muscles of the lower leg (atrophy), and inability to move her left foot normally, requiring the use of a brace. She also has hypersensitivity, with heightened pain to touch and paresthesia – the sensation of pins and needles. An electric conduction test of her nerves and muscles performed at Children's Hospital of San Antonio was unable to be fully completed due to [Z.Z.]'s inability to tolerate this painful procedure,

however the initial results confirmed several areas of nerve injury, with corresponding muscle dysfunction." PEX-3235, at 2.

"She has chronic fatigue and has been unable to participate fully in age-appropriate physical activity. [Z.Z.] was tested and found to have slightly elevated blood lead levels, which is of concern especially in a young child." PEX-3235, at 2.

Z.Z. is further impaired because she is not able to give birth naturally due to gunshot wound injury to her pelvic bones, or comminuted sacral fracture. As her medical provider described in his deposition testimony, "I don't think she would be able to have a natural delivery. I think she's going to require probably a cesarean section," and, "with the arthritic issues that are going to come up, I -- I find it highly improbable that she would be able to deliver naturally". PEX-0928, at 23:24, at 24:2.

He noted further that Z.Z.'s family has been counseled that lead can cross the placenta and blood lead levels can have toxic effects on the nervous system of a developing child.  Further lead exposure can cause severe cognitive delays and non-viable births in some situations.   PEX-0928, at 48-50.  Her doctor discussed, "spontaneous abortions are going to be more likely and we discussed that. Her being able to actually -- to -- to carry a baby to full term would be difficult, and then the -- the baby would be exposed in utero to lead and then afterwards to additional lead if she was to breastfeed." PEX-0928, at 49:2-7.

Z.Z.'s mother said "Z.Z. and I have talked about the possibility that it's not a good idea for her to have kids because of the lead as well as because of the breaking of the pelvis and the bones and we don't know how they'll widen. . . So we've been talking about adoption, and we've been talking about other ways to start a family for when she's older."  Dmg. Trial Tr. 1558:11-16 (E. Braden).

[13] 2d Amd Stipulation, ECF No. 576, at 9 ¶ 24(a).

[14] Defendant stipulates to $2,983,794.00 of Z.Z.'s future medical expenses. 2d Amd Stipulation, ECF No. 576, at 9 ¶ 24(b). The remainder can be found in Plaintiff's life care plan. PEX-3231 (Gonzales LCP – Z.Z.). Minor Plaintiff Z.Z. notes that the amount for future medical care demanded in this pleading *already reflects* the following adjustments made to her Life Care

Plan: 2 years passed between original LCP date and trial removed/adjusted for all applicable line items; removed tuition and antidepressant/anxiety medications; applied $22/hour rate for home health; used average generic drug pricing for all medications available as generic.

According to Defendant's expert, Amy MacKenzie, "[s]omeone needs home health care when they cannot safely and independently perform activities of daily living or instrumental activities of daily living." Dmg. Trial Tr. 3664:6-8. Z.Z. needs assistance with her activities of daily living. Plaintiff's mother testified that Z.Z. needs assistance, "getting in and out of the shower is -- she's fallen a couple of times getting in and out of the shower." Dmg. Trial Tr. 1547:15-17. Z.Z. needs help navigating, "showering, dressing, uneven surfaces. Uneven surfaces are a big one, because she's fallen multiple times there." Dmg. Trial Tr. 1547:23-24. Further, "when we go grocery shopping, she uses one of the electric carts because walking in the store and being up on her foot that long will totally wipe her out." Dmg. Trial Tr. 1549:23-25. "[H]er leg that doesn't work quite right is really small. The muscles in that leg have atrophied. They don't get -- they don't work. So it makes that harder for her to balance on. It makes it harder for her to -- balance is the key thing, which also throws her into the falling or -- yeah, mostly falling or being able to do uneven or stamina." Dmg. Trial Tr. 1551:14-20.

According to Plaintiff's expert, Dr. Joe G. Gonzales, "when you violate a major joint, such as hip or knee, that destroys cartilage. And that sets the stage for premature generation, i.e., post-traumatic arthritis over time." Dmg. Trial Tr. 2678:21-24 (Dr. Gonzales). Further, "when you violate joints, which are the moving parts, it damages cartilage. It is almost certainly going to progress to a degenerative condition, which is painful. It restricts motion, and it limits function." *Id.*, at 2687:21-24).

Plaintiff's mother currently spends 3 hours per day managing her additional injury related needs.  Dmg. Trial Tr. 1552 (E. Braden).  Z.Z. needs attendant care to assist in her day-to-day life for the following reasons: (1) Diminish or eliminate her physical and psychological pain and suffering; (2) Reach and maintain the highest level of function given her unique circumstances; (3) Prevent complications to which her unique physical and mental conditions predispose her; (4) Afford her the best possible quality of

life in light of her condition. PEX-3231, at 56. The court has opined the hourly rate for Home Health Care in this case is $22 per hour.

Plaintiff's LCP expert projected her future medical damages in the amount of $3,449,611.31, but considering the court's instructions not to include the values for the following: tuition; anti-depressants; RN supervision; HHA @ $22/hr, Plaintiff has adjusted the calculations of Plaintiff's future medical damages to the amount of $3,507,312.35. This has risen because the Home Health Aid cost has increased per the Court's instruction.  This amount is *not* the present value of these damages.

[15] **Farida Brown's non-economic damages generally.** Ms. Brown respectfully submit that Farida Brown's injuries and damages are not strictly comparable to other plaintiffs in this consolidated lawsuit or in prior case law, although there are similarities as a shooting victim.  Accordingly, we provide two alternate analyses of non-economic damages.  Evidence supports both methods, which can yield similar results from different points of view.

The first method is like that undertaken by other Plaintiffs in this consolidated action, however, noting where Ms. Brown diverges and why. This analysis relies heavily on the government's settlement in the Charleston, South Carolina church shooting primarily for mental anguish damages for victims.  Method one yields a total claim of $7,920,254.

| PAIN & MENTAL ANGUISH | DISFIGUREMENT | PHYSICAL IMPAIRMENT | PAST MEDICAL EXPENSES | FUTURE MEDICAL EXPENSES |
| --- | --- | --- | --- | --- |
| $6,806,262 | $73,297 | $586,373 | $46,253.13 | $408,069 |

Because the first method ties the valuations of disfigurement and physical impairment to an assumed number for mental anguish, we provide a second valuation.  Should the Court depart from the mental anguish numbers suggested by Plaintiffs or evaluate disfigurement and physical impairment separately, this second method should apply.  In the second method, we base our damages on comparable elements of jury verdicts in conservative jurisdictions for lawsuits involving sustained attacks (citing two rapes and a dog bite) for elements of mental anguish and related non-economic damages, that did not involve chronic pain.  To address chronic pain, we cite one FTCA case (leg injury from slip-and-fall).

The second method supports the same mental anguish evaluation as method one.  However, if the Court were to use a lesser number for mental anguish, for example $5,700,000, then disfigurement and physical impairment can be evaluated independently and still yield a total claim of $7,956,007.

| PAIN & MENTAL ANGUISH (IF DISCOUNTED) | DISFIGUREMENT | PHYSICAL IMPAIRMENT | PAST MEDICAL EXPENSES | FUTURE MEDICAL EXPENSES |
|---|---|---|---|---|
| $5,700,000 | $281,513 | $1,520,172 | $46,253.13 | $408,069 |

[16] **Farida Brown's Physical Pain and Mental Anguish, past and future**. Farida Brown was a 73 years-old widow on November 5, 2017.  Dmg. Trial Tr. 1085:10-1086:11.  She was shot six times, with a full bullet in the right leg that was removed by surgery, a fragment near her right hip that cannot be surgically removed, and four times with bullet fragments in her left leg that cannot be surgically removed.  *See, e.g.,* PEX-4001 (hospital photos), PEX-4002 (X-ray), Dmg. Trial Tr. 1099:14-1103:3.  Correspondingly, her past medical bills are low for her injuries.  This does not diminish but increases her physical pain and impairment.  Farida still has bullet shrapnel in both her right and left thighs to this day, which will remain there until she dies.  PEX-4025, at 13, 14, 17, 21, 49 (Lifecare Plan notes).  It took months for her skin to grow back over the holes in her legs to close the open wounds, which left very bad scarring.  Dmg. Trial Tr. 1103:4-16; PEX-04025, at 62 (photos).  Lumps and scars remain over the shrapnel fragments.  Dmg. Trial Tr. 1099:24.

Farida's story of the shooting is at Dmg. Trial Tr. 1124-1134 (F. Brown).  She tried to take cover as her friends were being shot and screaming.  Dmg. Trial Tr. 1130.  In the second round of shooting, Farida saw her right leg shot and bleeding, and she began praying, knowing she was going to die.  *Id.*, at 1131.  She held hands with and prayed over Haley Krueger, who looked at her with sad eyes, while Farida held her.  *Id.*, at 1132.  Devin Kelley started shooting again, and her left leg filled with holes.  *Id.* at 1133.  She saw Devin Kelley's boots walking towards her, and she looked up and saw his assault rifle pointing at her.  *Id.*.  Farida knew she was going to die, and she prayed.  *Id.* At that moment Devin Kelley dropped his assault rifle gun and walked

out to reload, but he did not return.  Dmg. Trial Tr. 1133.  Haley Krueger died in Farida's arms with horrific injuries.  PEX-4005 (photos of visit to church); PEX-1153, at 276-281 (Haley Krueger death photos).  Farida lives with this image and survivor's guilt every day.  Dmg. Trial Tr. 1134.

**Chronic Pain**.  Pursuant to doctors' instructions, Farida exercises daily, Dmg. Trial Tr. 1134, through significant pain to do physical therapy both at clinics and at home.  After three years she can walk some, but her walking is already deteriorating as she is aging, exemplified by an altered gait that she calls a "wobble."  Dmg. Trial Tr. 1103:17-1106:15; PEX-4010, 4013, 4014 (records).  An altered gait causes deterioration of the spine.  Her condition will decline through her life expectancy.  PEX-4025-29, 45, 60 (requiring attendant care); GEX-432-17 (requiring higher hours attendant care); *see* discussion of life expectancy in the last paragraph of the last note below.  At her current age of 77 (turning 78 in January), Farida's life expectancy is another 13 years to age 90.  PEX-2027-00003.  At the time she was seen by Dr. Gonzales, that life expectancy was 88.  PEX-4025.  She will need a walker and eventually a motorized chair.  However, any immobilization makes it more difficult to move and find relief from the pain.  Farida testified to going through a painful cycle lasting all day.  Her legs hurt when she sits too long, but then they hurt again as she tries to stand and walk around.  She also has "sharp pain that it feels like electric -- like electric shocks. And then sometimes it feels like just the flesh falling apart. Or sometimes I feel like a dog grab onto my leg and just biting me all over."  Dmg. Trial Tr. 1103:17-1106:15.  Pain triggers her PTSD, so that she cannot sleep more than three hours a night. *Id.*, at 1114:12. She walks with a wobble and is unbalanced, which combined with sitting too long, causes pain in her hip and back. Dmg. Trial Tr. 1110:16-18; 1104:22-1106:15. Although government cross exam alleged preexisting degenerative changes in spinal disks, Dmg. Trial Tr. 1136-38, the report cited is for the "cervical spine," which means her neck not the lower lumbar spine that was affected by her altered gait. GEX-432, at 6. Accordingly, the government has the wrong body part.  Farida testified her neck and back were fine before the shooting, and it is her wobbly walk that causes back pain. Dmg. Trial Tr. 1138:21-25.

**Loss of enjoyment and friends**.  Farida can no longer do her favorite things like dance, hike, fish, boat, walk on the beach, go on family outings such as the Zoo, cook for her family, or hold grandchildren in her lap.  Dmg. Trial Tr. 1106-1110; PEX-4025-22 (listing disabilities).  Further, Farida's

injuries prevent her from using staircases.  Dmg. Trial Tr. 1110:19-20.
Members of the church were lifelong friends, and in the months before the
shooting Farida spent multiple days a week at church cooking, cleaning, and
serving.  Dmg. Trial Tr. 1088-1090; 1096-1099.  These relationships are lost,
Farida is scared everywhere she goes, and her PTSD causes her fear
attending church now and interferes with her worship. Dmg. Trial Tr. 1116-
17.

   **Ongoing PTSD linked to Chronic Pain**.  Plaintiff and Defense
experts agree Farida has PTSD.  PEX-4021 (Kennington Report); PEX-4022
(Kennington Records); PEX-925 (Kennington Depo); GEX-433 (Wolf Report);
PEX-20005 (Farida interview).  The government's expert states Farida's
"chronic pain from the shooting [is] intricately woven with her symptoms of
PTSD as her pain is triggered for intensive trauma-related injury. The pain
also prevents her from engaging as fully in life as she would like, causing her
to feel handicapped and, thereby, contributing to symptoms of depression."
Miss Brown is severely impaired both by her psychological symptoms and her
chronic pain, which are difficult to separate from each other."  GEX-433, at
12; Dmg. Trial Tr. 1121-1122.  Farida testified she is terrified to sleep. Dmg.
Trial Tr. 1114.  She has nightmares and wakes herself screaming, begging
Devin Kelley not to shoot her. Dmg. Trial Tr. 1114-15.  A firework show sent
her to her closet where she locked herself in for hours. Dmg. Trial Tr. 1116.
She is scared everywhere she goes. *Id*.  This causes her problems going to
church now and interferes with her worship.  *Id.*, at 1117.

   Farida has been consistently receiving psychological treatment from Dr.
Mary Kennington for the last four years and testified she will continue to do
so.  Farida testified this has been helpful.  Dmg. Trial Tr. 1119-1120, 1135.
However, despite these treatments from Dr. Kennington, her PTSD
continues.  *Id.*, at 1117-1121.

   **Calculating non-economic damages method one:** To compare this
case to Charleston with mental anguish of shooting victims having a baseline
of $6 million, Plaintiff estimates what multiplier may apply for the years
after the shooting.  The Charleston shooting victims died that day and had no
future pain, disfigurement, or physical impairment.  Accordingly, we apply
this multiplier across Farida's life expectancy from the day of the shooting.

   Farida testified she can only sleep 3 hours per night. Dmg. Trial Tr.
1114:12. She is therefore awake consistently 21 hour per day.  To evaluate

Farida's ongoing pain, suffering, and impairment, we used a baseline of 21 hours per day that she suffers, multiplied it by $15 per hour to represent the common starting wage in the current economy, multiplied for 365 days per year.  However, to take into account any good moments, we conservatively reduced the total by 25%.

The calculation: (21 hours * $15/hour * 365 days/year ) * 0.75 [reducing the total by 25%] = $86,231.25 per year.  We then multiply by 17 years, measured as 4 years from the day of the shooting in November 2017 through today plus Farida's life expectancy of 13 years from today.  *See* life tables at PEX-2027-3.  This equals $1,465,931.

We apportion this amount over the categories of non-economic damages as 5% to disfigurement, 55% to pain and mental anguish, and 40% to physical impairment.  This provides the following numbers:

| CHARLESTON PAIN AND MENTAL ANGUISH | ADDITIONAL GSW - P&S AND MENTAL ANGUISH | DISFIGUREMENT | PHYSICAL IMPAIRMENT |
|---|---|---|---|
| $6,000,000 | $806,262 | $73,297 | $586,372 |

By this method, total pain and mental anguish equals **$6,806,262**.

In the alternative, if method one applied 13 years instead of 17 years, the numbers would change as follows:  Pain and mental anguish would be $6,616,553; disfigurement would be $56,050, and impairment would be $448,402, which combined with the same medical expenses (past and future) would equal a total claim of $7,575,328.

**Method two:  Verdicts for Attacks and Chronic Pain.** FTCA verdicts were previously briefed.  There are no perfect analogies to the chronic pain and PTSD from a mass shooting at a church.  In the Charleston church shooting by Dylan Roof, the government recently agreed to pay survivors $5 million each, who were not shot, and without any findings of foreseeability or percent liability.  Those who were shot all died at the time, and settlements ranged from $6-7.5 million.  We do not diminish the Charleston victims' suffering.  However, settlement is a compromise and

should represent a floor on mental anguish.  Deceased parties do not feel chronic pain day-after-day and year-after-year.

Similar mental anguish numbers may be estimated from combining jury verdicts for mental anguish from an attack and chronic pain from an FTCA case in a slip-and-fall.  Inflation adjustments are made using the U.S. Bureau of Labor Statistics CPI Inflation Calculator: https://www.bls.gov/data/inflation_calculator.htm

For mental anguish from a sustained violent attack, there are Texas jury verdicts for two rape cases and a dog attack.  These cases do not involve the same chronic pain from a mass slaughter.  (Lexis citations to jury verdicts are provided.  If the Court or Defendant needs a pdf, they will be provided.)

a. In *Doe v. Pastazios Pizza, Inc*., No. CD-13-4564, in the 193rd District Court of Dallas County, 2015, 2015 Jury Verdicts LEXIS 5119 a restaurant owner and another man raped a restaurant server for two to three minutes at a hotel.  The total verdict (less punitive damages) was **$16,432,337**. The jury awarded $2 million for past mental anguish and $5 million for future physical pain and mental anguish.  The relationship of trust is analogous to the trust Ms. Brown had in going to church and the severe violation of her emotional state.

b. In *Fletcher v. IG, et al*, No 14-10284016, in the 462nd District Court of Denton County, Texas (April 15, 2019), 2019 Jury Verdicts LEXIS 8418, a girl was raped by two boys.  The plaintiff was awarded **$7 million** in non-economic damages, excluding punitive damages ($2 million for past loss of enjoyment of life, $1 million for future loss of enjoyment of life, $1 million for past mental anguish, $1 million for future mental anguish, $1 million for past pain and suffering, and $1 million for future pain and suffering).

c. *Mooring v. Gonzalez*, 16-000061-CV-85, February 20, 2017, in the 85th District Court of Brazos County (Bryan) Texas, 2017 Jury Verdicts LEXIS 201.  Mr. Mooring was attacked by two pit bulls known to be dangerous.  He suffered multiple bites and puncture wounds and had nerve and tendon damage to his arm and legs.  Total award was $5,137,657, which adjusts with inflation to **$5,851.693.56**, with lower medial costs than the present case.

For chronic pain, research revealed one FTCA case with a severe leg injury, but without any traumatic attack.  *Rosenthal v. US*, 2005 US Dist. LEXIS 6746, No. 3:03-CV-922, in the Northern District of Texas, Dallas Division.  Rosenthal was a doctor who broke his ankle in a slip and fall at the VA.  The ankle break required surgery and implanted hardware.  The hardware led to

deep vein thrombosis (DVT) which caused permanent injury to his leg, in which swelling and pain were aggravated by walking or standing for extended periods of time.  The portion of the verdict for physical pain and suffering was $1 million for past physical pain and suffering and $500,000 for pain and suffering in the future.  With inflation, these are adjusted to $1,438,437.34 (past pain and suffering) and $719,217.67 (future pain and suffering). His age was comparable to Farida's age.

Texas Pattern Jury Charge 28.3 "Caveat" permits separate submission of physical pain and mental anguish if the sufficiency of evidence is questioned, *citing Katy Springs & Manufacturing, Inc. v. Favalora*, 476 S.W.3d 579, 597–99, 610–11 (Tex. App.—Houston [14th Dist.] 2015, pet. denied).  Combining even modest elements of the cases above yields a similar total to Charleston settlement:

| | | |
|---|---|---|
| Mental Anguish in the past | Doe v. Pastazios Pizza, Inc, rape of employee, $2,000,000, adjusted for inflation | $2,298,809.15 |
| Mental Anguish in the future | Fletcher v. IG, et al, rape, $2,000,000, adjusted for inflation | $2,270,817.68 |
| Physical Pain in the past | Rosenthal v. US, FTCA slip-and-fall | $1,438,437.34 |
| Physical pain in the future | Rosenthal v. US, FTCA slip-and-fall | $719,217.67 |

Total:  $6,727,281.00

Pursuant to method one, Farida Brown requests **$6,806,262** in Pain and Mental Anguish, past and future.

[17] **Ms. Brown's disfigurement damages.** Farida's legs are disfigured from being shot six times, as detailed in the mental anguish note.  She has a long, wormlike scar on her right leg above the knee.  (The shrapnel scar near her right hip is less visible.)  She has scars over the four shrapnel holes in her left leg.  PEX-4025-62; PEX-4001, Dmg. Trial Tr. 1099:14-1103:16. She has lumps in her legs where the bullet shrapnel remains in both her right and left legs.  Dmg. Trial Tr. 1099:24; PEX-4025-13, 14, 17, 21, 49.  Her injuries

and pain cause her to walk with a wobble and be unbalanced.  Dmg. Trial Tr. 1110:16-18; 1104:22-1106:15.

**Method One**.  Allocating a percentage of 5% to disfigurement from the calculations above yields disfigurement of **$73,297**.

**Method Two**.  Because method one is dependent on assuming a mental anguish number, should the Court discount that method, Plaintiff respectfully requests the following analysis should apply to disfigurement.

To estimate damages for Plaintiff's injuries, Plaintiff cites *Mooring v. Gonzalez,* the dog attack case, where a jury found disfigurement in the past of $750,000 and in the future of $500,000.  Because the Plaintiff in that case also had facial scars, plaintiff has reduced those awards by 80% after adjusting for inflation, to generate the amounts below:

| | |
|---|---|
| Disfigurement sustained in the past. | $168.908.00 |
| Disfigurement that, in reasonable probability, Plaintiff will sustain in the future. | $112,605.00 |
| | Total:  $281,513.00 |

Assuming the Court uses method one, Plaintiff requests **$73,297** in disfigurement.  Should the court use a different pain and mental anguish evaluation, Farida Brown requests that method two be applied for $281,513 for her disfigurement, past and future.

[18] **Farida Brown's Physical Impairment, past and future**. Farida Brown is worse off than Plaintiffs in prior suits who were paralyzed because her ability to sit or lay down has been impaired.  She goes through a cycle every day of having pain from sitting, but then hurting again when she stands and moves around, punctuated by sharp pain that feels like "a dog grab onto my leg and just biting me all over."  Dmg. Trial Tr. 1103:17-1106:15.   Similarly, her ability to lay down and rest is impaired by the combination of chronic pain triggering PTSD and nightmares makes it so she

cannot sleep for more than three hours.  *Id.*, at. 1114:12. Depriving her of the ability to sit or lay down and rest is a form of torture, which for Farida, is her daily life.

Her walking is impaired because it is painful to do, she cannot walk on stairs, and she walks with a wobble and is unbalanced.  *Id.*, at 1110:16-18; 1104:22-1106:15. Her condition has also caused impairment to her hip and back, which is getting worse.  *Id.*, at 1110:16-18; 1104:22-1106:15.

This impairment prevents Farida from doing the things she most enjoyed.  Farida can no longer do her favorite things like dance, hike, fish, boat, walk on the beach, use staircases, go on family outings such as the Zoo, or hold grandchildren in her lap.  Dmg. Trial Tr. 1106-1110.  Her PTSD even obstructs her ability to go to church and worship, and she is scared everywhere she goes.  *Id.*, at 1116-17.

**Method One**.  Allocating a percentage of 40% to physical impairment from the calculations above yields disfigurement of **$586,373**.

**Method Two**.  Because method one is dependent on assuming a mental anguish number, should the Court discount that method, Plaintiff respectfully requests the following analysis should apply to disfigurement.

Because there is no direct analogy from prior FTCA cases, Plaintiff cites the jury verdict in *Mooring v. Gonzalez,* dog attack case, which was $750,000 for past impairment, and $1,500,000 for future impairment, which are then adjusted for inflation.  Because Farida's life expectancy is 13 years from today, per PEX-2027-3, we reduce the future damages by 60%.  However, Plaintiff notes that her condition is worse for the reasons stated above, and a higher number would easily be justified.

| | |
|---|---|
| Physical impairment sustained in the past | $844,540 |
| Physical impairment that, in reasonable probability, Plaintiff will sustain in the future. | $675,632 |
| | Total: $1,520,172 |

Assuming the Court uses method one, Plaintiff requests **$586,373** in physical impairment.  Should the court use a different pain and mental anguish evaluation, Farida Brown requests $1,520,172 for Physical Impairment, past and future.

[19] 2d Amd Stipulation, ECF No. 576, at 3 ¶ 9(a).

[20] Defendant stipulates to $325,188.86 of Ms. Brown's future medical expenses. 2d Amd Stipulation, ECF No. 576, at 3 ¶ 9(b). The remainder can be found in Plaintiff's life care plan. Plaintiff has lowered her present value request of $444,363.00 to **$408,069**, after subtracting brand name prices for Zoloft. (Applying a similar reduction for Zoloft to Dr. Gonzales' lifecare plan, before present value was applied, would reduce the total from $402,637.88 to $370,951 before present value is applied.)  The government agrees with most of Plaintiff's lifecare plan and stipulated to $325,188.86. *See* PEX-4025, GEX-432, ECF 530 at, at 3.  Differences are cited below.

**Brand name drug price deleted**.  The government's stipulation for a minimum lifecare plan included its agreement on all medical pricing except for Zoloft.  GEX-432.  For Zoloft, the present value of an average between brand names and generic was $40,327.  PEX-4027-15, 17.  Costs of the generic would be ~10% of the average, or $4,033.  PEX-4025-37-38.  The difference is $36,294, and Plaintiff has subtracted that from her damages model.

**Acute Hospitalization**.  Second, the government disagreed that acute hospitalization would be needed in the future for being injured in a fall. However, Farida Brown testified that she walks with a wobble and is unbalanced, and her condition is deteriorating.  Dmg. Trial Tr. 1110:16-18; 1104:22-1106:15. These facts were not disputed.  Dr. Gonzales opined that Farida would, within a reasonable degree of medical certainty, need $16,143.30 for acute hospitalization from a fall.  This category of damages should remain.

**Attendant Care**.  The government advised higher numbers for attendant care than Dr. Gonzales.  Plaintiff keeps the same numbers from Dr. Gonzales' plan.  Dr. Gonzales recommended four hours of attendant care starting at age 80.  PEX-4025-60.  Dr. Gonzales used a wage of $18.67, which is lower than the rate he used in Sutherland Springs, because Farida is living in Baytown, Texas.  PEX-4025-45; GEX-432-17, 19 (using same price).  In

contrast, the government states Farida should start receiving attendant care now at four hours per day and increase to six hours per day at age 80, for 365 services per year.  GEX-432-17, 19.  This would add ~ $204,000 to the lifecare plan through age 88.

**Life Expectancy**.  Where the government attempts to depart from attendant care is with an incorrect assumption about Farida's life expectancy.  Dr. Canter attempts to "truncate" life expectancy by five years, which is the same amount that she truncated Plaintiff Margarette Vidal who had a bad heart and diabetes.  Farida Brown does not have a bad heart, nor does she take insulin.  Rather, Farida's statements about diabetes were in reference to her low-sugar diet and monitoring her blood sugar so that it does not go into a diabetic range.  Dr. Canter mistakenly believed CDC lifecare tables were only for the perfectly healthy.  Dr. Canter cited to studies, but those studies concluded that that a person taking care of her health even with diabetes can expect to live a long life.  *See* GEX-432-18, n. 5, Laditka 2015 ("Conclusions: Much of the disability and mortality with diabetes was due to heart disease, obesity, and inactivity, risks that can be modified by health behaviors and medical care.") available at https://pubmed.ncbi.nlm.nih.gov/25476207/, n. 6 Leal 2018 ("Conclusion: Life expectancy tables provide a potentially useful tool of conveying prognostic information to people with type 2 diabetes and suggest substantial scope for increasing longevity by improving modifiable risk factors.") at https://pubmed.ncbi.nlm.nih.gov/19109355/.  The Court stated during trial that Margarette Vidal's life expectancy would be age 86.5 instead of 88.  Farida is exercising daily, dieting, and taking a pill every morning to keep her blood sugar in check.  Dmg. Trial Tr. 1134, 1095:18-25; PEX-4025-11, 12; GEX-432-9, 10.  Further, as Farida remains in health and alive, the life tables project her to live another 13 years to an even older age of 90, which will be age 91 in January.  PEX-2027-3.  For these reasons, Farida's life should not be truncated from age 88 that Dr. Gonzales concluded.

[21] **David Colbath's pain, suffering, and mental anguish damages.** Plaintiff David Colbath was present in the Church during the shooting, on November 5, 2017. He received over a dozen gunshot and shrapnel wounds. He testified, "But, all of a sudden, holes started coming through the door. And I turned around and screamed, "Get on the floor. Get on the floor. And when I did that, as I turned around -- I know 26 people died. So when I say this, I don't make light of any of that. But I was so fortunate that when I turned

around, I caught one in my forearm. But if I wouldn't have, in that split of a second, turned, I would have caught it dead in the chest. And I turned. And when I did that -- I'm 260 pounds at the time. And it actually just flung my arm and helped knock me down. And when I fell, I looked down at my arm. And the two bones were visible, and there was just nothing really hanging it together." Dmg. Trial Tr. 816.   David Colbath testified about experiencing additional gunshot wounds: "I'm flat on the ground. I'm laying there just momentarily, and I catch another one in my side. And I catch another one in my left ankle, and I caught another one in my right calf while I'm just laying there a couple minutes, maybe not even a couple of minutes, just a short amount of time." Dmg. Trial Tr. 818 (D. Colbath).

"But he shot me in the back of the neck. Though it was centered, missed my vertebrae, went over the top of my heart by less than a millimeter, hit the front breastbone, bounced around like those little bullets do, and came to rest in my side over here, in the left side of my breast." Dmg. Trial Tr. 824; PEX-6002, at 10.  David received three gunshot wounds in his buttocks, a shattered left ankle, a bullet wound down the side of his right leg, gunshot wound to his neck and two wounds in the right calf as well as shrapnel wounds and the wound that tore off much of the tissue and flesh in his right forearm. Dmg. Trial Tr. 827-828.   Additional bullets and/or fragments were found in his side and chest by Dr. Bestee and removed surgically in 2019 and 2020, respectively. Dmg. Trial Tr. 829; PEX-940, at 49.

David remained at SAMMC until late December 2017, before transfer to the New Braunfels Regional Rehabilitation Hospital. Records confirm: (1) Right upper extremity gunshot wounds requiring vascular repair and head injury to the radial and ulnar arteries as well as the median nerve, (2) Left lower extremity medial malleolus fracture with open reduction and internal fixation (3) Right proximal fibular fracture and wound (4) Right flank and sacral wounds (5) DVT prophylaxis.  PEX-6063, at 1.  He required intubation and ICU treatment. PEX-6063, at 7.  He also sustained gunshot wounds to the left chest and right flank. PEX-6063, at 7. PEX-6007, at 4-8.

The New Braunfels Regional Rehab. Hospital assessment on Dec. 6, 2017 included pain management with use of Oxycontin 10 mg every 12 hours with additional Oxycodone for breakthrough pain, along with gabapentin 600 mg three times daily and Tylenol for milder pain. He also received Flexeril for muscle spasms. PEX-6063, at 8.

Dr. Willingham, a physiatrist, most recently assessed David. His impression of October 4, 2021 includes (1) status post multiple gunshot wounds, right radial artery repair, right median nerve repair (2) status post ORIF left medial malleolus (3) Multiple wounds (4) Residual peripheral nerve motor and sensory right median palsies; (5) chronic neuropathic pain (6) depression with post-traumatic stress disorder symptoms. PEX-6081 at 1. His plan included discussion of potential TAR (total ankle replacement) vs ankle fusion to David's painful and swollen left ankle that previously underwent reconstruction. Dr. Willingham noted "marked increase in swelling on an already normally swollen left ankle, with pain in the medial aspect." PEX-6081 at 1.

Mr. Colbath received a diagnosis of PTSD from Dr. Chris Ticknor in 2018. PEX-6009, at 7: "David Colbath suffers from severe Post Traumatic Stress Disorder (PTSD). Based on history gathered on March 17, 2018 and March 24, 2018, which was approximately five months following the mass shooting, and subsequently in December 2019, it is evident Mr. Colbath has severe symptoms of PTSD that have not responded to recent or current efforts at counseling therapy to address symptoms of insomnia, nightmares, flashbacks, and extreme emotional hypersensitivity and reactivity." Dr. Ticknor opined that future medical care, including various therapies at a potential lifetime cost of 450,000 to 600,000 may be required, which is dependent on David's future emotional condition.

The Government's examiner also diagnosed David Colbath with PTSD. "Based on the results of this assessment, Mr. Colbath meets diagnostic criteria for chronic PTSD, resulting from the shooting occurring on November 5, 2017 at Sutherland Spring First Baptist Church. These symptoms are severe and cause clinically significant distress and impairment in functioning. Mr. Colbath copes with his symptoms primarily through avoidance, distraction, working, prayer, attending and leading Bible study classes, and sharing his story publicly. There is no evidence that Mr. Colbath met criteria for PTSD prior to the incident." GEX-461, at 13.

[22] Defendant stipulates to $144,159.00 of Mr. Colbath's future lost income. 2d Amd Stipulation, ECF No. 576, at 3 ¶ 10(c). David Colbath requests an award of $219,796. for loss of future earning capacity, based on the report and opinions of Dr. Carl Hubbard. PEX-6017, at 4. This amount also is not a present value.

[23] **David Colbath's disfigurement damages.** Mr. Colbath has a scar that extends vertically and laterally across his left ankle from the ORIF procedure performed to reconstruct his ankle. PEX-6002, at 15.  He has significant scarring that continues down his right forearm. Dmg. Trial Tr. P 844-845; PEX-6013. He has a scar along his right left inner thigh where tissue and blood vessels were removed to reconstruct his right forearm.

[24] **David Colbath's impairment damages.** These injuries cause David Colbath to have the following impairments: (1) Catastrophic loss of function of his right forearm and right hand, which he can move but cannot use for purposes of work Dmg. Trial Tr. 845-846; (2) Decrease ability to walk, including on uneven surfaces or for extended time or distance due to swelling and pain in his left ankle, which likely will require further surgery Dmg. Trial Tr. 866-868; (3) Decreased ability to drive because his right arm and hand become numb when used for gripping and holding a steering wheel Dmg. Trial Tr. 847-848); (3) Decreased ability to participate in personal avocational activities e.g. personal hobbies, pastimes, interests, etc. Mr. Colbath has 25.6 years left in his life and will suffer from these impairments for the remainder of his life.

Plaintiff requests $13,750 per year be awarded for impairment for the remainder of his 25.6 years or $352,000.

[25] 2d Amd Stipulation, ECF No. 576, at 3 ¶ 10(a).

[26] Defendant stipulates to $238,060.00 of Mr. Colbath's future medical expenses. 2d Amd Stipulation, ECF No. 576, at 3 ¶ 10(b). The remainder can be found in Plaintiff's life care plan. PEX-6019, 6020 (Altman-Bagwell LCP – D. Colbath). Plaintiff believes the total of $1,577,892.29 is appropriate ($1,508,837.16 plus $69,055.13 in potential care needs). Plaintiff Colbath notes that the amount for future medical care demanded in this pleading *already reflects* the following adjustments made to Mr. Colbath's Life Care Plan: confirmed no years passed between original LCP date and trial; removed RN supervision; used $22/hour rate for all home health; used average generic drug pricing for all medications available as generic.

[27] **Mr. Holcombe's personal injury damages for past and future pain and mental anguish**. In the shooting, John Holcombe lost his primary support network and now faces a future with a significantly decreased level of social and emotional support. PEX-8056, at 9 (Dr. Sutton Rpt. – J.P.

Holcombe). But on an even more basic scale, John *experienced* his tremendous loss in real time and in the most graphic way imaginable. Dmg. Trial Tr. 73–101 (J.P. Holcombe); JEX-647, at 29–32 (J.P. Holcombe Declaration). Mr. Holcombe never got to say goodbye to his wife on the day of the shooting, but he "couldn't see her face anyway. It was all blown off. It was just a crater where her face was. And she had the most beautiful face in the world." Dmg. Trial Tr. 100 (J.P. Holcombe). In fact, he "only knew that it was [Crystal] because she was wearing the purple maternity sweater that I had recently bought for her. He had shot her face off and the kids were laying all around her. I kept hearing that death moan coming from all directions. I went and saw what was left of my mom, slumped over. I saw Jenny with [N.H.] shot in her arms. I didn't think any of the kids survived." PEX-8056, at 4 (Dr. Sutton Rpt. – J.P. Holcombe). "I just wanted to go over to Crystal and hold her hand. That's all I wanted. And the kids were just laying there piled up with their faces blown off. I couldn't even see her beautiful face anymore. It was just a crater. So I just ran through the front door and out the side. And, eventually, I just kind of walked away. And I walked around to the front, and I saw people kind of being carried out. I saw [N.H.], and I saw Jenny. And [N.H.] was still alive, but she died right there in Jenny's arms. She died right there in Jenny's arms." Dmg. Trial Tr. 86 (J.P. Holcombe).

John not only experienced his biological family's suffering, but he experienced the deaths of many members of his church family. When the shooter paused, "I could hear this moan coming from people. I guess they were dying, but it was like (descriptive sound). And you could hear that sound coming from the people all throughout -- just coming from all kinds of different directions. And I guess there were people dying from the gunshots." Dmg. Trial Tr. 83 (J.P. Holcombe). The event shook his profound faith even as it had just drawn to a close: "it was quiet for a while, and everyone else— you know, eventually people started yelling, you know, 'Praise the Lord.' You know, 'Praise the Lord.' There were people celebrating that they were alive. And I wasn't really thinking that. To be honest, I was upset with God at that point that he had allowed it to happen." *Id.* at 85.

The day only got worse when he was taken to the hospital and immediately separated from his stepdaughter, 7-year-old EJH, who had also survived the shooting and had witnessed her mother beg for the lives of her

children before watching the shooter kill her children and then shoot her mother in the face. Dmg. Trial Tr. 87–88, 99 (J.P. Holcombe).

Mr. Holcombe described the "chink, chink" sound he heard as a hospital technician reached into the various bullet holes in his body and pulled out chunks of bullet, then dropping them into a glass container. Dmg. Trial Tr. 158–159 (J.P. Holcombe); *see also* PEX-8047 (J.P. Holcombe injury illustration). Adding insult to his incredible injuries, the hospital—evidently concerned about the potential for suicide in light of John's enormous losses—sent someone "to sit with me. He just sat there. Later I got a bill from him. He did nothing but sit there and look at me." JEX-647, at 32, ¶ 36 (J.P. Holcombe Declaration). Later that same night, the pipes and walls would make loud banging sounds and wake him up like was we was getting shot at again. Dmg. Trial Tr. 88–89 (J.P. Holcombe). All throughout the night he was also constantly awakened by people asking him to fill out forms and answer questions and draw diagrams. Dmg. Trial Tr. 90 (J.P. Holcombe).

To this day, John struggles daily to manage the unspeakable losses in his family, particularly trying to live up to the hopes that Crystal had for her children. Dmg. Trial Tr. 150–153 (J.P. Holcombe).

Because John was present and perceived his wife being shot and experiencing terror and suffering in a supposed place of sanctuary, under Texas law, he should be compensated with additional mental anguish damages flowing from his tremendous bystander injuries. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988); *see also* PEX-8056, at 8 (Dr. Sutton Rpt. – J.P. Holcombe, diagnosing Adjustment Disorder with mixed anxiety and depressed mood and other Specified Trauma and Stressor Related Disorder (Persistent Complex Bereavement Disorder)); PEX-8046 (Ecumenical Center therapy records for J.P. Holcombe); PEX-8025 (Holcombe Family Photos); PEX-8031 (Crystal Holcombe Eulogy).

[28] 2d Amd Stipulation, ECF No. 576, at 1 ¶ 2.

[29] **Minor EJH's personal injury damages for past and future pain and mental anguish**. Minor EJH has memories of the shooting, including making eye contact with the shooter and how her mother, Crystal, was begging Kelley not to kill her children and trying to get them to the Sunday school room. Dmg. Trial Tr. 99 (J.P. Holcombe). EJH remembers Kelley

shooting her siblings in front of her mother. *Id.* She also remembers her brother grabbing a seat cushion and attracting the shooter and causing him to start shooting at them. *Id.* EJH also remembers someone falling on her and suffering trample injuries. *Id.*; *see also* PEX-8063 (Minor EJH injury illustration). After the shooting, EJH was pulled from underneath the bloody and disfigured bodies of her pregnant mother and siblings, who had all been shot to death (her mother's face was "shot off"). PEX-8065, at 2 (Dr. Sutton Rpt – Minor EJH); Dmg. Trial Tr. 87 (J.P. Holcombe). After the shooting, John Holcombe discovered his stepdaughter "soaked in the blood of her mom and her siblings" with a neighbor across the street who was attempting to wash blood and body matter out of her hair with a garden hose. PEX-8065, at 2 (Dr. Sutton Rpt – Minor EJH); Dmg. Trial Tr. 87 (J.P. Holcombe).

When they arrived at the hospital after the shooting, medical staff separated John and EJH, and they weren't reunited until sometime around midnight. *Id.* at 88 (J.P. Holcombe). Something that really bothered Minor EJH was when the staff "took a pair of scissors and just cut up her clothes." *Id.* As EJH gets older, her treating therapist explains that she is becoming better able to grasp the concept of the permanent losses, and as a result, she is experiencing a resurgence of trauma responses. PEX-8065, at 2 (Dr. Sutton Rpt – Minor EJH). EJH is also experiencing anguish over the loss of her siblings, particularly her sister, MGH, as they "were kind of a team," "inseparable" and "best buddies." Dmg. Trial Tr. 140 (J.P. Holcombe).

Because EJH watched her mother, three siblings (plus her soon-to-be sibling), step-grandparents, step-uncle, and step-cousin suffer injuries, she is also entitled to additional mental anguish damages flowing for this bystander injury. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988); *see also* PEX-8065, at 7 (Dr. Sutton Rpt – Minor EJH, diagnosing Adjustment Disorder with mixed disturbance of mood and conduct and Other Specified Trauma and Stressor Related Disorder (Persistent Complex Bereavement Disorder)); PEX-8062 (Ecumenical Center therapy records for Minor EJH); PEX-8025 (Holcombe Family Photos).

[30] 2d Amd Stipulation, ECF No. 576, at 2 ¶ 3.

[31] **R.T.'s pain, suffering, and mental anguish damages**. Plaintiff R.T. was present in the Church during the shooting, on November 5, 2017. R.T. attended church that day with her mother, JoAnn Ward, her sisters E.G.

and B.W., and her stepbrother R.W. During the shooting, R.T. saw people lying down, trying to hide. PEX-941, at 16:11–17:18 (R.T. Dep.). Gunny Macias was lying near her helping her through; he was telling her everything was going to be all right. *Id.* Gunny sang Jesus Loves Me with her. R.T. watched as a woman reached for her hand, only to have her arm shot off. *Id.*

R.T. saw her stepbrother R.W.'s arm shot up and bloody. She witnessed her mother, JoAnn Ward, "trying to call somebody. Yeah, she was trying to call somebody before she fully - yeah passed away." PEX-941, at 18:5-13. R.T. heard "gun shots, like a lot of them. It was like nonstop. I heard people yelling, screaming, asking for help." *Id.*, at 18:19-23. R.T. heard her stepbrother R.W., "he kept just – yelling, mom, seeing if she was awake." *Id.*, at 19:6-11.

R.T. saw her sister B.W.'s fatal injuries. R.T. took off her glasses "Cause I kind of had saw my sister – her face was blown up and I didn't want that to happen, so I took off mine." PEX-941, at 20:8-21. R.T. watched her mother, JoAnn, try to shield her siblings. JoAnn covered B.W., R.W., and E.G. with her body. *Id.*, at 22:13-19.

R.T. has suffered a high degree of mental distress from what she experienced in the Church and the loss of her family. After the shooting, R.T. is standoffish. PEX-910, at 23:22–24:12 (M. Lookingbill Dep.). She has acquaintances where she used to have friends. *Id.* R.T. is not as trusting of people; she builds up walls. *Id.*, at 55:6–56:8. R.T. no longer attends birthday parties or sleepovers. *Id.* R.T. has times where she physically shuts down, goes into her room, and needs to be left alone. *Id.*, at 28:24–29:24. She cries at night; she cries for her mom and sisters. *Id.*

R.T. has nightmares and flashbacks of what happened; it's like it's happening all over again. PEX-941, at 29:17–30:6 (R.T. Dep.). She also has nightmares of her house disappearing. *Id.* She gets chills and doesn't want to talk about what happened. PEX-910, at 48:19–49:8 (M. Lookingbill Dep.). R.T. gets so worked up and so scared that she wants to throw up. PEX-910, at 56:9–57:1. When R.T. entered junior high, early in the school year, R.T. panicked during a drill at school. PEX-910, at 25:14–27:1. She panicked and went into the restroom and started crying. *Id.* R.T. gets scared and nervous at school, because of school shootings and she's afraid of it happening again. PEX-17123 at 7. R.T. has panic attacks, flashbacks of the event, where she

relives the panic. PEX-17123 at 5. She gets angry and throws things; she is easily frustrated. PEX-17123 at 3.

R.T. was diagnosed with complicated grief disorder and post-traumatic stress disorder. PEX-17125 at 13. R.T. has decreased ability to perform or maintain traditional roles within family, relationships, or other social units. PEX-17125 at 13. She also has decreased ability to participate in personal avocational activities, e.g., pastimes. PEX-17125 at 13. Dr. Gonzales opined that R.T. has psychological impairments and disabilities, which require lifelong medical care. PEX-17125 at 13.

32 **R.T.'s disfigurement damages**. When the shooting stopped, R.T. had blood on her that was not her own. PEX-941, at 21:4-23 (R.T Dep.). R.T. had scars on her arm, thigh, and ankle. R.T. believes the burns were caused by gun powder. Id. Plaintiff is requesting $250,000 in disfigurement damages which represents $3,748.13 annually over the course of her estimated 66.7 years of remaining life.

33 Defendant stipulates to $17,849.00 in future medical expenses, at minimum, for R.T. 2d Amd Stipulation, ECF No. 576, at 4 ¶ 12(a). The remainder can be found in Plaintiff's life care plan. PEX-17125 (Gonzales LCP – R.T.). Minor Plaintiff R.T. notes that the amount for future medical care demanded in this pleading *already reflects* the following adjustments made to her Life Care Plan: 2 years passed between original LCP date and trial removed/adjusted for all applicable line items; removed psychotropic medications.

34 **R.W.'s pain, suffering, and mental anguish damages.** At the time of the shooting, R.W. was five years old and shot five times PEX-17054; 17083. On November 5, 2017, R.W. attended with his stepmother, JoAnn Ward, his half-sister, Brooke Ward, and his stepsisters, Emily Garcia and Rihanna Tristan. As the gunman entered and started to fire at the congregation, R.W. screamed, "Mama," and tried to hide from the bullets. Dmg. Trial Tr. 1234; 1231 (R. Solis). R.W.'s stepmother, JoAnn, tried to shield R.W. and his half-sister and stepsisters by covering them with her body. Dmg. Trial Tr. 1924 (C. McMahan).

R.W. was found by first responder, Rusty Duncan, after the shooting. PEX-923, at 22, (C. Ward Dep.). R.W. extended his hand out from underneath his stepmother and grabbed Rusty's pant-leg as he passed by. PEX-923, at 22,

(C. Ward Dep.). JoAnn lay dead on top of R.W., and the bodies of one of his stepsisters and half-sister were right next to R.W.. Dmg. Trial Tr. 468 (J. Workman).  After R.W. grabbed Rusty, R.W. was picked up, completely undressed due to the extent of his injuries, and life-saving efforts began. PEX-923, at 22; Dmg. Trial Tr. 303 (L. McNulty).

R.W. heard and saw his father, Chris Ward, screaming for help as medical intervention efforts on R.W. continued, and R.W.'s stepsister, Rihanna, sat next to R.W., shaking. Dmg. Trial Tr., 467-468 (J. Workman). R.W.'s father held compression on his chest, and multiple tourniquets were placed on R.W.'s body to prevent massive blood loss. PEX-923, at 17, (C. Ward Dep.). R.W. had "holes" in his thigh and arm, and a large portion of his arm was missing.  PEX-923, at 17, (C. Ward Dep.). R.W. was also shot in his hip, buttock, stomach, and testicle. Dmg. Trial Tr. 1925-1926 (C. McMahan); PEX-17054; 17083. His mother reported that R.W. lost 80% of his blood, stopped breathing, and had to be revived by hospital personnel. PEX-17602, at 4. R.W. was in an induced coma for three weeks, hospitalized for three months, wore a colostomy bag for nine months, suffers hearing loss, and has endured over twenty-five surgeries, with more expected in the future. PEX-17602, at 4; PEX-17017, at 62; PEX-17017, at 110.

R.W.'s most recent surgery was a femoral bone transplant completed in August 2021 (one of three surgeries in 2021 alone). This surgery replaced dead bone in his leg and re-positioned it in preparation for future leg-lengthening surgeries that will aid R.W.'s walking ability.  R.W. was placed on an epidural for three days to manage the pain for this surgery.  Dmg. Trial Tr., 2126 (Dr. Roman).

R.W. continues to suffer a high degree of mental distress from the shooting. R.W. is fearful of loud noises, and even benign sounds—like cellophane present wrappers—put R.W. on high alert and remind him of the shooting.  Dmg. Trial Tr., 56 (Ranger Snyder). R.W. cannot handle the sound of sirens or loud booms and exhibits behavioral problems when he is exposed to unexpected loud noises. Dmg. Trial Tr. 1945-1946 (C. McMahan). When visiting a fake pirate ship at a local festival after the shooting, R.W. went into a "panic," "[h]is anxiety went through the roof," and his mother had to take him away from the festivities. *Id*. At a local school event featuring fire trucks and ambulances, R.W.'s teacher "ended up having to get him out of there and

take him to the counselor's office . . . [because R.W.] got into a panic and he didn't want to be there." *Id.*

The physical manifestations of R.W.'s grief also come in the form of R.W. sleepwalking, talking, and crying in his sleep. Dmg. Trial Tr. 1948 (C. McMahan). He has regular emotional outbursts at school and home, as well as difficulty concentrating and keeping up in class. *Id.*, at 1949. As R.W. ages, the emotional toll—and his outburst behavior—increases. *Id.*; PEX-17062. R.W. "feels no one loves him; and thinks he does things badly." PEX-17062, at 4 (Dr. Feltoon report). R.W. "thinks that his life is bad; thinks bad things happen to him; feels lonely; feels his stomach hurting," and that he sometimes "has trouble doing things; feels that he is a bad person; feels that he is stupid; and wants to be alone." PEX-17062, at 5. R.W. suffers an unusually elevated degree of anxiety, and always "feels that someone might hurt him at school; has scary dreams; thinks about scary things; worries that people might tease him; gets nervous; is afraid that he might get hurt; worries about the future; feels his hands shaking; worries that he might go crazy; worries that he might lose control; has problems sleeping; feels his heart pounding; gets shaky; is afraid that something bad might happen to him; and is afraid that he might get sick." PEX-17602, at 5. Dr. Feltoon reported that "[t]he essence of youth has been taken away from R.W." PEX-17602, at 5.

Chancie McMahan, on behalf of R.W., seeks a total of **$10,902,450.00** in past and future pain and mental anguish. This number is derived as follows: in addition to the $6,000,000 represented by the Charleston case precedent for individuals who experienced the church shooting and were not shot, Plaintiff requests $73,500 per year be awarded for gunshot wound-related pain and suffering annually for the remaining 66.7 years of R.W.'s anticipated life, totaling $4,902,450.00.

R.W. watched his stepmother JoAnn Ward, his half-sister, B.W., and his stepsister E.G., get shot and killed. Under Texas law, this entitles R.W. to additional mental anguish damages flowing from this bystander injury. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988).

Prior to her death, R.W. had a good relationship with R.W.'s stepmother, JoAnn Ward. Dmg. Trial Tr. 1919 (C. McMahan). Chancie and JoAnn communicated often and worked cooperatively together to make sure their

children shared family functions, such as birthdays, with one another. *Id*. Chancie testified that "[i]t was me and JoAnn all the time w[hen] it came to R.W. She did all the drop-off and pickups with me. I communicated with her about R.W. all the time. He had two moms." *Id*. JoAnn was R.W.'s "Mama Jo-Jo," and he lived with JoAnn for many years. *Id*. Indeed, as the gunman entered the Church and started to fire at the congregation, R.W. screamed "Mama," as he tried to hide from the bullets. Dmg. Trial Tr. 1234 (R. Solis). Chancie believed that Mama Jo-Jo would keep R.W. safe, and testified that to R.W., "[s]he was a really good mom." Dmg. Trial Tr. 1920:4-6 (C. McMahan).

E.G. was R.W.'s stepsister, and B.W. was R.W.'s half-sister. Dmg. Trial Tr. 1920. Both Brooke and Emily died during the shooting—both were shot multiple times in front of and next to R.W. *Id*.

During the shooting, R.W.'s stepmother, JoAnn, tried to shield R.W. and his half-sister and stepsisters by covering them with her body. *Id.*, at 1924. R.W. would repeat after the shooting that "the bad man shot Jo-Jo and shot my sisters." R.W. considered Brooke and Emily siblings and he treated them like siblings. *Id.* at 1951.

To this day, R.W. celebrates JoAnn, B.W.'s, and E.G.'s birthdays. Dmg. Trial Tr. 1929. Chancie takes R.W. to the store and R.W. picks them out cakes and they celebrate because it is something that R.W. feels compelled to do. *Id*. During these celebrations, R.W.'s grief often overcomes him, and he gets upset and cries. *Id*. R.W. often talks about how he misses his stepmother, half-sister, and stepsister and wishes that they were still here. *Id*. R.W. and Brooke were especially close. *Id*.

R.W. was sitting with his half-sister Brooke when the entire back of Brooke's head was "blown off." Dmg. Trial Tr. 459 (J. Workman). Brooke, R.W., and Emily were all together underneath JoAnn. Dmg. Trial Tr. 1924 (C. McMahan).

Chancie McMahan, on behalf of R.W., seeks $750,000 for additional mental anguish damages flowing from the bystander injury of witnessing the death of his stepmother, JoAnn Ward. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988).

Chancie McMahan, on behalf of R.W., seeks $750,000 for additional mental anguish damages flowing from the bystander injury of witnessing the

death of his half-sister, B.W. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988).

Chancie McMahan, on behalf of R.W., seeks $500,000 for additional mental anguish damages flowing from the bystander injury of witnessing the death of his stepsister, Emily Garcia. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988).

[35] **R.W.'s future lost earning capacity**. Chancie McMahan, on behalf of R.W., seeks $3,054,182.00 for R.W.'s lost future earnings. PEX-17086, at 2 (Dr. Fairchild Economic Report). As a result of the shooting, R.W. is "at risk educationally and vocationally." Id., at 2; PEX-17064, at 2. This amount represents what R.W. could reasonably have anticipated generating had he not been injured on November 5, 2017.  PEX-17086, at 4. Dr. Roman testified that R.W. will have difficulty securing gainful employment with his physical limitations and must get a job that is not dependent on R.W. using his body, but using his mind—jobs that are light duty or sedentary. Dmg. Trial Tr. 2165 (Dr. Roman).

[36] **R.W.'s disfigurement damages**. When R.W.'s mother, Chancie, first saw R.W. in the hospital after the shooting, she had "never seen anything like that before in [her] life. And it was something that nobody should really ever have to see." Dmg. Trial Tr. 1940 (C. McMahan). R.W. had so much damage to his chest and stomach area, that he was "split open from the middle of his pecs all the way down to his privates, just cut. And they didn't close it. So—they had clear tape on it, so it was just open. So it was very gruesome." *Id.* at 1941. R.W. had machines all over his body, and a metal rod protruding from the outside of his leg. *Id.*

 One of the gunshots hit R.W.'s left leg, leaving it "horribly damaged" and riddled with bullet fragments. Dmg. Trial Tr. 2119 (Dr. Roman); PEX-17083, 17021. He has an allograft—or bone from another person—and a plate and four screws drilled into his hip to keep the plate in place. Dmg. Trial Tr. 2126. A future leg-lengthening surgery will require installation of a metal rod into his leg that will need to be mechanically stretched weekly at home by R.W.'s mother. Dmg. Trial Tr. 1934 (C. McMahan).

One bullet entered R.W.'s body through his scrotum—causing scrotal injury with bladder and right ureter involvement. *Id.*, at 1926; *Id.*, at 2128 (Dr. Roman). "He has scrotum injury. He has ureter injury, which connects

the kidney to the bladder. He has bladder injury. He has kidney injury, all on that right side. He has small intestine injury on the right side. And then on the midline, he's got a large intestine injury." *Id.*, at 2129. "[T]hese are anatomical injuries. This anatomy is no longer normal." *Id.*

From the shooting and surgeries that R.W. has had to date, R.W. "has a disfigured left arm . . . scars on his stomach . . . [and] scars on his leg that he has to live with." Dmg. Trial Tr. 2088 (Dr. Feltoon); PEX-17052; 17053; PEX-17017, at 105-107; PEX-17027, at 159, PEX-17017, at 162; PEX-17020.

Chancie McMahan, on behalf of R.W., seeks a sum total of **$2,101,050.00** in past and future disfigurement. This number is consistent with case precedent on disfigurement awards and represents $31,500 per year be awarded for gunshot wound-related disfigurement annually for the remaining 66.7 years of R.W.'s anticipated life.

[37] **R.W.'s impairment damages**. R.W. has suffered and will continue to suffer significant physical impairment because of the shooting. One bullet entered R.W.'s left leg at the top of the femur, causing it to shatter in multiple pieces and rendering it unable to bear weight. Dmg. Trial Tr. 2119 (Dr. Roman). In addition, the bullet "totally destroyed" the ball of the femur, and shattered the growth plate. *Id.*, at 2119:20-2120:1. Because of his young age, the destruction of the growth plate means that R.W.'s left femur will not continue to grow at all, and his left leg is—and will remain—"tremendously shorter than the other leg." *Id.*, at 2120:2-17; 2132:8-16; PEX-17083. The shorter leg affects R.W. more with age. Dmg. Trial Tr. 1934 (C. McMahan). R.W. required daily pain medication and "[i]f he walked on it or ran, you know, X amount of time, he would start complaining about it, you know, being sore and hurting." *Id.*

In addition to the shattered growth plate, the top of R.W.'s bone was dead—"there wasn't enough blood supply there to keep the ball that fits into the socket alive." Dmg. Trial Tr. 2126 (Dr. Roman). In August 2021, R.W. had surgery to remove the dead bone in his leg and put a graft in. *Id*. That surgery, where doctors inserted a plate, drills, and bone from another person, also required cutting R.W.'s femur in order to reorient his leg "because he is not in the right orientation either for bearing weight properly." *Id.*, at 2126. The "purpose of that surgery was to give him a hip that hopefully he can walk on till he's an adult. That's the goal. That's the hope." *Id*. The significant difference in R.W.'s leg length has not yet been addressed. Dmg. Trial Tr.

1951 (C. McMahan) ("I just hope that they're able to correct that to where he's standing normal, walking normal. That's a major flaw for R.W.. It really does bother him a lot, and it bugs me that it bugs him.").

Dr. Roman testified that R.W. suffers from contracture—or joints that do not have full range of motion—in his elbow and hip that will worsen with age. Dmg. Trial Tr. 2149. He suffers from asymmetrical weakness—his left arm is weaker than his right and his left leg and gluteals are weaker than his right. *Id*. R.W. has severe nerve damage in both the gluteals and the radial nerve in his left arm. *Id*. R.W. "doesn't have full function of his hand." Dmg. Trial Tr. 1930 (C. McMahan)

As a result of the shooting, R.W. has a damaged ureter, and a damaged bladder which still contains scar tissue, preventing it from operating normally. Dmg. Trial Tr. 2133 (Dr. Roman). As such, R.W.'s bladder cannot distend and extend with normal elasticity to hold urine, resulting in incontinence. *Id*. R.W. has impaired bowel movement and impaired urinary tract movement, which will cause recurrent urinary tract infections and fecal and urinary incontinence. *Id.*, at 2150.  As a result, R.W. "spill[s]" urine on his body, groin, and upper thigh. *Id*.

Also, R.W. developed adhesions because of the significant bowel and intra-abdominal surgeries, eight open surgeries, and six pelvic surgeries. Dmg. Trial Tr. 2186 (Dr. Roman). These adhesions caused R.W.'s testicle to retract upward into his stomach and doctors had to perform an orchiopexy to remove the testicle from the incorrect position in R.W.'s stomach and place it correctly into the scrotum. *Id.*, at 2186. As a result, R.W. is at an increased risk of testicular cancer and potential future decreased fertility. *Id.*, at 2188.

Chancie McMahan, on behalf of R.W., seeks a total of **$7,003,500.00** in past and future physical impairment. This number is consistent with case precedent on disfigurement awards and represents $105,000 per year be awarded for gunshot wound-related disfigurement annually for the remaining 66.7 years of R.W.'s anticipated life.

[38] 2d Amd Stipulation, ECF No. 576, at 5 ¶ 15(a); PEX-17025, 17029, 17038, 17038, 17039, 17045, 17050.

[39] Defendant stipulates to $756,414.00 of R.W.'s future medical expenses. 2d Amd Stipulation, ECF No. 576, at 5 ¶ 15(b). The remainder can be found

in Plaintiff's life care plan. PEX-17075 (Roman LCP – R.W.). Dr. Angel
Roman, Plaintiff's Physician Life Care Planner, projected that R.W.'s future
medical expenses will total $2,733,863.01. Considering the Court's
instruction not to include psychotropic medications for R.W., the adjusted
calculations are as follows: **$275,752.67** in medical care expenses that, in
reasonable probability, will be incurred on behalf of R.W. in the future from
the time of trial until R.W. reaches the age of eighteen years; and
**$2,099,003.46** in medical care expenses that, in reasonable probability, R.W.
will incur after he reaches the age of eighteen years, for a total of
**$2,374,756,13.** This amount is *not* present-valued, and will be higher once
the appropriate values are placed on future medical expenses. Given R.W.'s
young age, Plaintiff respectfully requests that the Court adjust this rate to
reflect the historical real, or inflation-adjusted, rate of increase in these costs,
and the present value of these amounts. For instance, as of June 30, 2020,
Plaintiff's economist, Keith Fairchild, opined that R.W.'s total future medical
care costs equate to **$9,631,745** "in today's dollar terms." PEX-17078, at 5.

40 **Mr. Macias' personal injury damages for past and future pain
and mental anguish**. During the announcements on November 5, 2017,
Juan "Gunny" Macias heard a couple gunshots to his right, but he assumed it
was probably just someone harmlessly shooting off a gun, but when he heard
more and the sound of one of the windows breaking, he started to dial 911.
Dmg. Trial Tr. 1026–1027 (J. Macias). The urgency of the situation that was
unfolding in their little church could not be clearer than during Gunny's 911
call describing "lots of fire going on!" while dozens of gunshots can be heard in
the background. GEX-115 (Macias 911 call excerpt :42–1:26). While on that
911 call, Gunny was shot in the left arm and then began low-crawling to get
to a position to assess the situation and was shot in the hip. Dmg. Trial Tr.
1027–1028 (J. Macias). He looked to his side and watched his friend, Bob
Corrigan, as he lay dying and twitching like Gunny had seen before in battle.
*Id.* at 1028. Gunny was then shot in his buttocks and lower back as the
shooter was walking up and down the aisle, shooting in different directions.
*Id.* at 1027–1028. Gunny then heard a little girl whispering to him, R.T., who
told him she was scared, so Gunny told her not to be scared, and they sang
"Jesus Loves Me" together. *Id.* at 1029. When he thought it was clear to
move, he tried to stand up and couldn't. *Id.* at 1029–1030. But his movement
drew the shooter's attention, and the shooter reloaded and shot Gunny three
more times in the hip and chest. *Id.* at 1030. Gunny closed his eyes to keep
wood and shrapnel out, and when he opened them, "staring right in front of

me in the pew right between my eyes was a bullet hole." *Id.* The shooting stopped soon after, and Gunny was taken outside to wait for transport while his daughter's friend held his finger in his bullet wound. *Id.* at 1032–1033. Gunny was lying there thinking: "statistically, that type of bullet and that type of wound in that location of the hip was pretty much fatal" and "deep down, I thought for sure I was going to die that day." *Id.* at 1033. Gunny was evacuated via helicopter, and he specifically remembers the flight nurse commenting that it didn't matter which hospital they went to because "he wasn't going to make it." Dmg. Trial Tr. 1034 (J. Macias).

Gunny takes great pride in being a Marine, but what does a Marine's mental anguish look like? Like this: "I didn't save anybody's life." Dmg. Trial Tr. 1069 (J. Macias). He often remembers watching his friend, Bob Corrigan, dying before his eyes, and he focuses on the fact that he didn't go hold Bob's hand and how he wished he would have gone and hugged R.T., the crying little girl he sang with while the shooter killed their friends around them. Dmg. Trial Tr. 1068–1069 (J. Macias); *see also* JEX-647, at 8–10 (J. Macias Declaration).

Gunny also anguishes over his personal losses and ongoing mental health struggles. Before her untimely death during this trial, Gunny spent the past four years afraid of losing his wife, who had been his best friend for 31 years, because of the physical, emotional and mental drain of his injuries from the shooting on their marriage and friendship. Dmg. Trial Tr. 1071–1072 (J. Macias). He fears the potential effects of lead poisoning, particularly in light of the letter he received from the Texas Department of State Health Services warning him about his elevated blood lead levels. PEX-10018 (TX HHS letter to Macias). And despite having military training and serving overseas, the trauma that Gunny suffered as a civilian in his place of worship has caused him to experience ongoing PTSD symptoms that crop up in even the most innocent situations: "My wife has a water bottle that she closes. It makes a popping noise. And she's learned to inform me that she's about to pop it so I don't freak out, because I will freak out." Dmg. Trial Tr. 1067 (J. Macias). Gunny has also suffered far more serious, dangerous effects: "I've had night terrors. I have woken up hitting my wife, choking my wife because I'd have a night terror and there's a body next to me, and I think it's the shooter." *Id.*; *see also* PEX-10017, at 9 (Dr. Sutton Rpt – Juan Macias, diagnosing PTSD and major depressive disorder); GEX-505, at 13 (Dr.

Annunziata Report – Juan Macias, diagnosing PTSD and major depressive disorder); PEX-20014 & 20015 (Juan Macias defense psychological exam).

[41] **Mr. Macias' disfigurement damages**. Gunny's disfigurement damages are graphically documented in his injury illustration (PEX-10014) and various photographs (PEX-10001–10003, 10006), and the diagnostic conditions from gunshot rounds are detailed in his Life Care Plan (PEX-10016, at 76). Gunny had his entire colon and urethra removed and reconstructed. Dmg. Trial Tr. 1038 (J. Macias). The first gunshot removed a chunk of flesh from his left arm. Dmg. Trial Tr. 1039 (J. Macias); PEX-10003, at 23 (scar photo). The second gunshot tore through his hip. Dmg. Trial Tr. 1053 (J. Macias); PEX-10003, at 31 (scar photo). Additional gunshots entered and exited in the areas of his buttocks, abdomen, and low back, and he also has multiple scars from his various life-saving surgeries, feeding tube, and drains. PEX-10003, at 12–33 (scar photos). His scrotum and testicles are deformed. Dmg. Trial Tr. 1048 (J. Macias). He has to wear a bag to urinate. When he urinates, he moans as if he's having sex. Dmg. Trial Tr. 1048 (J. Macias describing the embarrassment that ensues). Mr. Macias' most prominent disfigurement to the public is his ostomy, which protrudes because of a hernia that will not resolve. PEX-10002, at 3 (blistered and infected ostomy photo); PEX-10003, at 6 (raw ostomy photo); PEX-10016, at 136 (photo of ostomy bag in place).

[42] **Mr. Macias' physical impairment damages.** Gunny's physical injuries and medical journey are documented in detail in his Life Care Plan (PEX-10016) and depicted graphically in his injury illustration (PEX-10014) and various photographs (PEX-10001–10003, 10006). Mr. Macias suffered multiple gunshot wounds to his left arm, chest, abdomen, hips, lower left leg, buttocks, arms and shoulder. PEX-10014 (J. Macias injury illustration); Dmg. Trial Tr. 1235 (J. Macias). He is "in constant pain 24/7, so that messes with the mind, and it itches, it burns, so that reminds me of something and brings back flashbacks of something.  It's like you're being tortured, and you can't stop it, and so your mind starts screaming inside, and what can you do?" PEX-20015, at 22:35 (Juan Macias defense psychological exam – part 2).

Before the shooting, Mr. Macias enjoyed camping and traveling, scuba diving, going to amusement parks, and having people over to their home for pool parties and cookouts. Dmg. Trial Tr. 1019–1021 (J. Macias). He is no longer able to do most of those things. He and his daughter were in the

process of rebuilding and restoring a 1973 Dodge Charger 454. *Id.* at 1021–1022. Today, the Charger still sits in the driveway; he can't work on it because of his physical limitations. *Id.*

Gunny's life is impaired in huge part because of the never-ending struggles with his ostomy: "This thing stinks. Who wants to cuddle up next to poop? Who wants to sit next to a guy, eat, and smell his poop? Normal people—they sit at a table to eat, and if they have gas, they can hold it or they can get up and go to the restroom. They don't do it at the table. . . . I do it right there where the plate is." PEX-20014, at 1:26:37 (Juan Macias defense psychological exam – part 1); *see also* PEX-10002, at 15 (photo of soiled ostomy). Gunny's ostomy is "basically my intestines—that little red thing sticking out is my intestines. It's sewn to the skin, and that's where my bowel movements happen." Dmg. Trial Tr. 1050–1051 (J. Macias) (describing ostomy photos at PEX-10016, at 136 and PEX-10002, at 3). Gunny has been given no hope that his ostomy will ever get better. Dmg. Trial Tr. 1051–1052 (J. Macias). He has, however, been told by the VA that he can't get any different supplies that will address his skin condition and the resulting problems he continually has with keeping his ostomy bag secured, clean and sterile: "poop will slide in through there, and then it will slide down. And then it moves around. And this whole thing becomes covered in poop. Poop leaks out. I've had poop on my shirt. I've had many issues with it. I've gone to the VA several times to talk to them about it. I've asked them if I could get a different type -- this is called a wafer -- a different type of wafer. They told me, 'No, we have a contract for this wafer and this wafer only, and that's the only thing you can get.' And I told them -- I said I've looked online that they have different shapes of wafers, and there's one that's a little bigger than this. But these corners come way out like this (indicating). And I said, to me, that looks like it would fit the circle -- the round ball of my hernia. And they are like, 'Well, we can't get that for you. If you want it, you have to pay for it yourself.'" *Id.* at 1052–1054.

⁴³ 2d Amd Stipulation, ECF No. 576, at 4 ¶ 13(a).

⁴⁴ Defendant stipulates to $1,140,619.00 of Mr. Macias' future medical expenses. 2d Amd Stipulation, ECF No. 576, at 5 ¶ 13(b). The remainder can be found in Plaintiff's life care plan. PEX-10016 (Gonzales LCP – J. Macias). Plaintiff Macias notes that the amount for future medical care demanded in this pleading *already reflects* the following adjustments made to Mr. Macias'

Life Care Plan: three years passed between original LCP date and trial removed/adjusted for all applicable line items; removed RN supervision; used $22/hour for home health; removed family counseling, flu and pneumonia vaccines; used average generic drug pricing for all medications available as generic.

[45] **J.M.'s past & future pain and mental anguish damages**. PEX-12030 (BAMC medical records, see generally); PEX-12038 (Dr. Feltoon psychological report).

J.M. was twelve years old at the time of the shooting. PEX-900, at 14 (M. McKenzie Dep.). During the shooting, his Aunt–Margaret McKenzie–put her hands over J.M.'s ears b/c it was so loud and put her whole body over him so bullets wouldn't hit him. PEX-900, at 21 (M. McKenzie Dep.); Dmg. Trial Tr. 246 (H. McNulty). The shooter got close to J.M. that he could see him head to toe and wearing full tactical-like body armor. Dmg. Trial Tr. 249 (H. McNulty). J.M. was screaming and crying during the shooting. He was yelling "ow" over and over, yelling and screaming. Dmg. Trial Tr. 251 (H. McNulty).

J.M. was shot in the left shin, which was completely torn apart, and his bone was shattered. Dmg. Trial Tr. 254 (H. McNulty) When his grandmother–Lisa McNulty– found him, J.M. was yelling and he couldn't move because his leg was shot.  J.M. was yelling in pain when the EMS tried to move him. Dmg. Trial Tr. 300 (L. McNulty). J.M.'s arm was shot, and his flesh was dripping, torn, and you could see pieces of skin hanging from his arm. *Id.* at 299. His recovery was prolonged, and he spent a very prolonged time in a wheelchair. Dmg. Trial Tr. 306 (L. McNulty).

J.M. loses control in situations where there are loud noises or sounds that he's not controlling. Dmg Trial Tr. 275 (H. McNulty). For example, J.M. heard a loud bang from the neighbor's house and it caused him to run scared into the garage and hide. "He went off the walls." That's happened a few times whenever he's not in control of the situation. Dmg. Trial Tr. 275 (H. McNulty). As another example, an explosion occurred on their neighbor's property, and it caused J.M. to fall apart. He ran to the shed and was crying and shaking. If he's outside feeding animals and hears a shot in the distance he'll stay in the barn and won't come out. Dmg. Trial Tr. 321-322 (L. McNulty)

Whenever J.M. is alone at home, he will not answer the door, and will pretend he's not there. Dmg. Trial Tr. 275 (H. McNulty). If somebody comes to the house when he's alone, he won't answer and will text his grandmother Lisa McNulty something like: "white truck is here." Lisa will always try to tell him in advance if a neighbor is coming over to get something or if someone else is scheduled to drop by so that he's not surprised. Dmg. Trial Tr. 321 (L. McNulty).

Before the shooting, J.M. was outgoing but now is "sunken into a shell." Dmg. Trial Tr. 319 (L. McNulty). J.M. will have a friend over just now and then but he's no longer in sports because of his injuries. He used to be a football and baseball player. Dmg. Trial Tr. 319 (L. McNulty). J.M. lost his best friend in the shooting—Greg Hill, Crystal and John Holcombe's son. Dmg. Trial Tr. 320 (L. McNulty).

Because J.M. watched his mother, sister, and aunt get shot, he is also entitled to additional mental anguish damages flowing for this bystander injury. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988).

[46] **J.M.'s past and future disfigurement damages**. J.M. was shot in the left shin and his shin was completely torn apart, and his bone was shattered. Dmg. Trial Tr. 254 (H. McNulty). J.M.'s arm was shot, and his flesh was dripping, torn, and you could see pieces of skin hanging from his arm. *Id.* at 299; J.M. has scarring from these gunshot wounds. *See* PEX-12040, at 60 (photos of J.M.'s legs as of 2019).

[47] **J.M.'s past & future physical impairment damages**. When Lisa McNulty found him, J.M. was yelling and he couldn't move because his leg was shot, and he was yelling in pain when the EMS tried to move him. Dmg. Trial Tr. 300 (L. McNulty). J.M. has always wanted to be an Air Force pilot but he won't be able to because he can't control the sounds and environment around him which causes him to be afraid. *Id.* at 276 (H. McNulty). Plus, he's not physically capable of qualifying as a pilot anymore. *Id.* He tries hard but his injuries won't let him do what he needs to physically do to reach that goal. *Id.* J.M. will have a friend over just now and then but he's no longer in sports because of his injuries. He used to be a football and baseball player. *Id.* at 319 (L. McNulty).

[48] 2d Amd Stipulation, ECF No. 576, at 6 ¶ 17(a).

[49] Defendant stipulates to $65,603.59 of J.M.'s future medical expenses. 2d Amd Stipulation, ECF No. 576, at 6 ¶ 17(b). The remainder can be found in Plaintiff's life care plan. PEX-12040 (Dr. Gonzales Life Care Plan for J.M.); PEX-12037 (Dr. Fairchild Economic report). Minor Plaintiff J.M. notes that the amount for future medical care demanded in this pleading *already reflects* the following adjustments made to his Life Care Plan: 2 years passed between original LCP date and trial removed/adjusted for all applicable line items; used average generic drug pricing for all medications available as generic.

[50] **Hailey McNulty's personal injury damages for past and future pain and mental anguish**. Hailey feels great sorrow and anguish because her last encounter with her mother, Tara McNulty, was a teenage fight. Dmg. Trial Tr. 243 (H. McNulty). When she got to the Church after that fight, she sat in the row in front of her mom who was sitting with Hailey's Aunt–Margaret McKenzie—and brother J.M. Dmg. Trial Tr. 243 (H. McNulty); PEX-1200, at 1 (video still at church); PEX-1213, at 1 (video still at church). The shooting started and sounded like fireworks, and her mom realized first it was something bad and pushed Hailey down underneath the pew. Her mom kept telling her "It's going to be okay, baby. It's going to be okay." She told Hailey she loved her. Dmg. Trial Tr. 246-247 (H. McNulty).

Hailey called her boyfriend and told him "I loved him because I thought I was going to die, and I was saying goodbye to him." Dmg. Trial Tr. 247 (H. McNulty).

Tara McNulty was calling 911 when Hailey got shot in the leg and saw a puddle of blood. She turned to her mom, and her mom said "it's okay. you have to keep pressure on it." Dmg. Trial Tr. 248 (H. McNulty). Around this time, Hailey saw Bryan Holcombe dead, laying on his back. Dmg. Trial Tr. 248 (H. McNulty). Hailey called her grandmother Lisa McNulty. Lisa McNulty testified that Hailey was crying and said "Nana, I've been shot. Nana, I'm shot." And she told Hailey that she was on her way and drove as fast as she could. Dmg. Trial Tr. 292 (L. McNulty).

The shooter was close enough for Hailey to see his feet and shoes. He was so close that she could reach out and touch him. Dmg. Trial Tr. 248 (H. McNulty). Hailey heard the shooter say "man, guys, it's stuffy in here" or "it's

smoky in here." It was very cloudy in the Church. Dmg. Trial Tr. 249 (H. McNulty). The shots sounded like loud banging or popping. "It's like going to a gun range and not wearing your ear protection. It was so loud and all you're hearing is ringing because it just hurt your ears." *Id.*

Hailey rolled back to her mom, Tara, and tried to talk to her. She didn't get any response when she touched her mom. Hailey realized her mom wasn't with her anymore. "Once I saw she was gone I gave up. I didn't want to try anymore. I didn't want to keep fighting anymore." Dmg. Trial Tr. 250 (H. McNulty) Her mom's last words were yelling "stop" over and over. *Id.*

Hailey was shot in her left leg on the outside of her calf and then the left lower part of her back. The bullet exited underneath her left armpit. She has shrapnel in her left leg, and in her chest. Dmg. Trial Tr. 252 (H. McNulty)

When she was put in the ambulance, she Hailey still feared the shooter was there and coming back. She experienced great anxiety as a result. Dmg. Trial Tr. 253 (H. McNulty). She remembers waking up in the ICU trying to rip out her wires; she was scared and didn't want to believe her mom was gone and kept saying "I want to see my mom." *Id.* at 256.

To this day, Hailey can't go back to church. "At restaurants I have my back to a wall and my face to the door so I can see who's coming in and out. I don't like being home alone and am freaked out when it rains, or a tree hits our tin roof and makes that banging sound." Dmg. Trial Tr. 261 (H. McNulty). If she's home alone, she refuses to answer the door—she'll hide and pretend no one is home. Hailey keeps all the doors and gate locked and closed, which she never did before. *Id.* at 262.

[51] **Hailey McNulty's disfigurement damages.** Hailey was shot in her left leg on the outside of her calf and the left lower part of her back. And the bullet exited underneath her left armpit. Hailey has shrapnel in her left and right legs. There are also bullet pieces in her chest. Dmg. Trial Tr. 252 (H. McNulty); PEX-12027 (Medical Illustration of GSW for HM). She has scars on left outside of her calf on the left leg; the lower right part of her back; underneath her left armpit; and especially throughout her legs; she has shrapnel under the skin you can see. Dmg. Trial Tr. 262-263 (H. McNulty). She believes people look at her like she is Frankenstein's monster. For example, when she went to get her nails done, she saw people staring at her legs—it made her uncomfortable because people would look at her "like it's

weird-looking and it was embarrassing." Dmg. Trial Tr. 264 (H. McNulty). As another example, she took senior pictures and when she got them back, she cried because her scars were very visible: "I cried that it was so ugly and I didn't want him to post the pictures anywhere." Dmg. Trial Tr. 264-265 (H. McNulty). She's tried to get back to running but the pain and numbness makes it too hard. And the calf muscle where she got shot in her left leg never grew back, so there remains a large indentation in her leg to this day. Dmg. Trial Tr. 267 (H. McNulty).

52 **Hailey McNulty's physical impairment damages**. Hailey's injuries and scars make it more difficult to sleep. "I can't sleep on my left side of my body because it hurts too much. I have to be careful how I sit because of the leg scars when I touch them against anything it hurts. I had to quit cross-country running which I was very passionate about. It was my thing." Dmg. Trial Tr. 265-266 (H. McNulty). Bras are uncomfortable to wear and cause pain because the bra sits right on a scar. *Id.* at 263. Whenever she tried to run her foot would hit the ground and she'd get a shock up her leg and numbness in her heel. "I tried hard to get back to running but I couldn't do it half as well as before." *Id.* at 266.

53 2d Amd Stipulation, ECF No. 576, at 6 ¶ 16(a); PEX-12014 & 12015 (See generally, BAMC medical records).

54 Defendant stipulates to $52,570.13 of Hailey McNulty's future medical expenses. 2d Amd Stipulation, ECF No. 576, at 6 ¶ 16(b). The remainder can be found in Plaintiff's life care plan. PEX-12026 (Dr. Gonzales LCP); PEX-12024 (Felton economist report). *See also supra* (regarding Hailey's physical impairment and scarring). Plaintiff McNulty notes that the amount for future medical care demanded in this pleading *already reflects* the following adjustments made to her Life Care Plan: 2 years passed between original LCP date and trial removed/adjusted for all applicable line items; used average generic drug pricing for all medications available as generic.

55 **Ms. McKenzie's damages for pain, suffering, and mental anguish**. Margaret McKenzie was seated on the left side of the Church four rows back from the pulpit sitting next to Tara McNulty on one side of her and her nephew J.M. on the other side of her. PEX-900, at 17 (M. McKenzie Dep.); PEX-1143, at 2 (Picture of church aisle seating). She first heard a loud noise from the outside of the church and then the shooter burst through the door, and all dropped to the floor. PEX-900, at 18 (M. McKenzie Dep.). The

shooting from the outside sounded like big heavy metal doors slamming repeatedly. PEX-900, at 19 (M. McKenzie Dep.). She crawled under the pew to protect J.M. (twelve years old at the time) and the noise was so loud she covered J.M.'s ears. She placed her whole body on top of him so that the bullets wouldn't hit him. *Id.* at 21 (M. McKenzie Dep.); PEX-1177, at 3 (church photo showing the small space they were hiding). Gun powder smell filled the air and smoke was filling the church. It was very strong in the small space. PEX-900, at 25 (M. McKenzie Dep.) To this day, Ms. McKenzie can still hear the whizzing sounds of the bullets flying past her head. *Id.* at 26.

During the second wave of shooting, Ms. McKenzie tried to get J.M. to a safer place against the wall away from the pews. PEX-900, at 29 (M. McKenzie Dep.). She saw Tara McNulty get killed during the third wave of shooting when she yelled "Stop, Stop" and the shooter heard her and shot her in the head. *Id.* at 31. Margaret was holding Tara's hand when Tara got shot in the head. She felt Tara's hand losing the grip and not long after that Margaret was shot in the leg. *Id.* at 33.

When the police arrived, Margaret went to Tara and tried shaking her. But she didn't respond, so she felt around her body. When she went to her head and felt the blood, she knew Tara was dead. PEX-900, at 34 (M. McKenzie Dep.). Margaret kissed Tara's cheek and told Tara she loved her. *Id.* at 34.

Margaret has cerebral palsy and never had children. So, she was close to Tara, Hailey, and J.M.—especially Tara. She never missed birthdays or special occasions for them. She treated them all like her own kids and was close with Tara. Dmg. Trial Tr. 291 (L. McNulty). For these reasons, the Court should award Ms. McKenzie additional mental anguish awards arising out of her bystander witnessing of Tara McNulty's death and Hailey McNulty and J.M.'s injuries. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988).

Additionally, her treating psychiatrist, Dr. Nagel, diagnosed her with PTSD. PEX-900, at 44 (M. McKenzie Dep.). She feels no place is safe because not even a church is safe anymore. So, she rarely leaves her apartment. She's always looking for an exit door, looks around for places to hide when in public spaces, she moves quickly to get from Point A to Point B to avoid strangers, and this happens all the time whenever she's out. *Id.* at 45-46. Loud noises

startle her and bring back shooting memories. PEX-900, at 46-47 (M. McKenzie Dep.). She has flashbacks still and regularly, that last minutes and it takes a minute to realize where she is and that she's safe. *Id.* She's haunted by shooting memories once a week. *Id.* at 48. She has daily problems with sleep. *Id.* at 48-49. She still experiences regular panic attacks. *Id.* at 51. And Ms. McKenzie has survivor's guilt and wishes she was killed instead of Tara. Margaret blames herself for not keeping Tara quiet and wished she had covered Tara too to protect her from the bullets. *Id.* at 51-52.

Plaintiffs' expert and her treating psychologist diagnosed Ms. McKenzie with PTSD as a result of the shooting. *See* PEX-12056 (Dr. Feltoon Report); PEX-12051 (Dr. Nagel counseling records). The Government's expert agreed and added a diagnosis of Major Depressive Disorder because of the shooting. *See* GEX-543 (Dr. Marx Government psychology report).

[56] **Ms. McKenzie's disfigurement damages**. Ms. McKenzie was shot in the left upper portion of her leg and the bullet went through. She also has shrapnel injuries to her wrist and scarring and disfigurement in both places. PEX-900, at 37 (M. McKenzie Dep.); *see also* PEX-12043, at 47 (medical record sketch of injury locations); PEX-12057, at 57–58 (photos of healed scars in 2019); PEX-12058 (Medical illustration of injuries).

[57] **Ms. McKenzie's impairment damages**. Ms. McKenzie's gunshot wounds made her pre-existing cerebral palsy significantly worse. Before, she could get by with a cane. Now she frequently must use a walker and electric scooter. She was very energetic before the shooting but gets a lot more tired now and her legs feel tired all the time now. PEX-900, at 38 (M. McKenzie Dep.). Before the shooting, she never used a walker or scooter and could climb stairs without difficulty. *Id.* at 40. Before the shooting, she learned handicap snow skiing, kayaking, was adventurous, and traveled a lot. *Id.* at 40; *see also id.* at 41 (Ms. McKenzie played sled hockey before the shooting). Now, she can't do any of the above activities because walking with the walker is very tiring. And she's afraid of leaving the house and stays home inside most of the time. *Id.* at 41.

[58] 2d Amd Stipulation, ECF No. 576, at 5 ¶ 14(a) (past medical expenses).

[59] Defendant stipulates to $557,890.08 of Ms. McKenzie's future medical expenses. 2d Amd Stipulation, ECF No. 576, at 5 ¶ 14(b). The remainder can be found in Plaintiff's life care plan. PEX-12057 (Dr. Gonzales life care plan);

PEX-12055 (Dr. Fairchild Economic report); *see also* PEX-12042, at 1-3 (Pics of Margaret's home and tight living quarters). Plaintiff McKenzie notes that the amount for future medical care demanded in this pleading *already reflects* the following adjustments made to her Life Care Plan: 2 years passed between original LCP date and trial removed/adjusted for all applicable line items; confirmed no home modification costs included; removed RN supervision; used $22/hour for home health; average generic drug pricing substituted for all medications available as generic.

[60] **Ms. Moulton's pain, suffering, and mental anguish damages**. In addition to the $6,000,000 value represented by the Charleston case precedent for individuals who experienced the church shooting and not shot, Plaintiff requests $10,500 per year be awarded for gunshot wound related pain and suffering for the remainder of her 28.9 years or $303,450 for a total of $6,303,450.

Plaintiff Brenda Moulton was present in the Church during the shooting, on November 5, 2017. She testified, "He was trying to hit me in the head. The bullets were going through -- hitting the wood, and as the -- it hit the wood, the wood hit me in the head. So, I had bruises on my scalp. My daughter told me, I came to -- when I was at the hospital, I had wood all in my hair. And I know he was at least five shots. I know he was aiming at my head." PEX-904, at 20:5-12. "[O]nce he got past that pillar, and in between the sound booth and the pillar, he could see me. And he was already trying to get me before. And so, he shot me here and in the leg above the knee (indicating) And that -- that was very, very, painful. And I was in shock." *Id.* at 23:1-7.  Plaintiff feared for her life the entire time of the shooting. *Id.* at 23:10.

Plaintiff Brenda Moulton was shot in the right flank and was immediately transferred to University Hospital where she was inpatient for 25 days. A bullet remains lodged in her spine to this day PEX-13032, at 5. A graphical depiction of Plaintiff's injuries is in the record. PEX-13048. Plaintiff Moulton suffered from the following medical conditions: (1) Multiple gunshot wounds to abdomen, chest and right leg in mass shooting; (2) S/p exploratory laparotomy with Grade 3 liver laceration and diaphragm repair; residual abdominal pain and GI dysfunction; (3) Right postero-lateral chest wall ballistic injury with rib fracture, bilateral lung contusions and post injury pulmonary embolism; (4) Right distal thigh gunshot wound with residual neuropathic pain and gait disturbance; (5) Post Traumatic Stress Disorder

with anxiety and depression; (6) Retained bullet fragment along T7-T8 intervertebral disc; risk for lead toxicity; (7) Chronic Pain Syndrome. PEX-13045, at 53. At her trial deposition, Plaintiff described these conditions as, "I've been told that it went into my liver and through -- crack -- broke a couple of ribs going up and went in through my diaphragm and lodged in my spine, in the upper part, because I know exactly where it is because it hurts there all the time. And the -- the pain will radiate down my ribs to my diaphragm. And I was cut from below, way below, my belly button like, in the -- where you have your ovaries, and all the way up to just the sternum, the cartilage bone." PEX-904, at 32:12-24.

As plaintiff expert, Dr. Sharmila Dissanaike noted, "[th]e primary source of injury was a bullet that entered her right chest around the 10th rib. After breaking the rib and entering the chest, it injured the right lung causing major bleeding into the right chest cavity (hemothorax. It then continued through the diaphragm (the thin muscle separating the chest from the abdomen cavity), as it moved through her body toward the back. It penetrated and tore her liver, which lies just under the diaphragm on the right side, causing life-threatening bleeding, before lodging in front of her spine between the 7th and 8th thoracic vertebra. The bullet narrowly missed injuring her spinal cord, which would likely have caused paralysis below the waist. Ms. Moulton's injury would have been life-ending had she not received excellent, prompt trauma surgical care. She was also found to have a superficial bullet injury to the right leg that caused soft tissue damage only, with shrapnel embedded within the wound. Ms. Moulton was taken immediately by ambulance to University Hospital in San Antonio for emergency trauma care. She was evaluated in the emergency room and found to be unstable, with bleeding into the chest and abdomen. She was taken immediately to the operating room by Dr. Dan Dent, who drained the blood out of the right chest with a tube thoracostomy, allowing the lung to re-expand. Dr. Dent and his team next repaired the injuries to the diaphragm and liver; since the bullet had created a blast cavity in the liver, he used the omentum (a fatty "apron" that normally hangs in the front of the abdomen) to fill the defect, prior to suturing the edges of the liver together. He also ensured there was no injury to the heart by direct exploration (pericardiotomy. Since it was anticipated that blood and bile would continue to exude from the injury for a while, multiple drains were left in the abdomen. Ms. Moulton received multiple blood transfusions and required

ICU care during her initial treatment, prior to being transferred to the regular hospital inpatient ward." PEX-13047, at 1.

Plaintiff was diagnosed with PTSD by Plaintiff's expert, PEX-13044, at 6, and was also diagnosed with PTSD by experts for the Defendant. GEX-554, at 13. Brenda Moulton's pain and mental anguish are extensively documented in the record in her videotaped psychological exam. PEX-20020.

Plaintiff Moulton has short term memory loss since the shooting. She gets emotionally upset and also has physical reactions: finger numbness, panic attacks, physical loss of body functions, heart racing, breathing changes, tense muscles and shaky balance. She has experienced a loss of interest in activities like taking care of her home, depression, anger, and irritability have become constant parts of her life, and she feels 100% cut off from other people. PEX-13047, at 1.

Defendant's expert, Jennifer Canter, testified at trial that, "[Moulton] hadn't showered for days. She didn't want to get up and do anything." Dmg. Trial Tr. 3355:20-21. "Her self-care was very poor. Her outlook on life was very sad." Dmg. Trial Tr. 3356:3-4.

Plaintiff testified, "And just everyday things that people take for granted that their body can do, I have to struggle with. Cramping. So much cramping in my body. Cramping underneath my ribs in the front up into my diaphragm, which scares me because it makes me feel like I can't breathe. There are also times that I move the wrong way, or something -- or bend over the wrong way and I guess it's messing with where the bullet is in my spine. And for just a moment I'll feel like (gasps) I can't breathe, and I get really bad anxiety because I feel like (gasps) I can't breathe. And it doesn't last too long. It stops, those -- those moments when that happens, it only lasts for a moment. But the pain is always -- I'm always having pain with my back especially." PEX-904, at 37:18-38:8.

[61] **Ms. Moulton's disfigurement damages**. Plaintiff has a mid-line abdominal scar that extends from her sternum to the pubis; a right lateral chest/abdominal wound, which is consistent with the gunshot entry wound; thoracic kyphosis. PEX-13045, at 52. Plaintiff testified that these disfigurements are experienced in this way, "I got a big hole in my side right here," PEX-904, at 44:4, and "it's a terrible scar." PEX-904, at 44:24-25. Depiction of the disfigurement is at PEX-13052, at 5. Plaintiff further

testified, "It's embarrassing. It's just really embarrassing." PEX-904, at 44:10-11. "I definitely don't have any chance at really having a -- what would be the right word, a relationship. Like even, you know, where they could see me -- me nude. I don't even like to see myself nude any, you know, more." PEX-904, at 44:17-21.

Plaintiff requests $4,500 per year be awarded for disfigurement for the remainder of his 28.9 years or $130,050.

[62] **Ms. Moulton's physical impairment damages**. These injuries cause Plaintiff to have the following impairments: (1) Decreased ability to interact and/or socialize with family, and/or friends and acquaintances; (2) Decreased locomotion e.g. walking, etc.; (3) Decreased ability to participate in social avocational activities, i.e. participation in activities with others e.g. participation in community activities, etc.; (4) Decreased external mobility e.g. community ambulation, etc.; (5) Decreased ability to perform household services e.g. inside housework, shopping for household, etc.; (6) Decreased ability to participate in personal avocational activities e.g. personal hobbies, pastimes, interests, etc. PEX-13045, at 54. Plaintiff has 28.9 years left in her life, PEX-2027, at 3, and will suffer from these impairments for the remainder of her life.  At her trial deposition, Plaintiff described these impairments as, "[p]ain all the time in my back. And it will go from my back and radiate down my ribs, down to my low -- to my diaphragm. And it just, all the time, this pain." PEX-904, at 37:31-6.

As plaintiff expert, Dr. Sharmila Dissanaike described, "[s]ince discharge Ms. Moulton has had visits to the ER for blood in the urine (hematuria) as well as falls, both of which may be related to injuries suffered in the shooting. She has reported diarrhea, muscle spasms, depression, and anxiety since the incident. She continues to have chronic pain requiring narcotic medication, tremors and weakness of her legs, and difficulty with balance, leading to instability and falls. All of the above have significantly impacted her ability to perform the activities of daily living." PEX-13047, at 2.

Plaintiff requests $15,000 per year be awarded for impairment for the remainder of her 28.9 years or $433,500.

[63] 2d Amd Stipulation, ECF No. 576, at 6 ¶ 18(a).

[64] **Ms. Moulton's future medical damages.** Defendant stipulates to $221,639.34 of Ms. Moulton's future medical expenses. 2d Amd Stipulation, ECF No. 576, at 7 ¶ 18(b). The remainder can be found in Plaintiff's life care plan and in the explanation below regarding attendant care based on testimony at trial. PEX-13045 (Gonzales LCP – B. Moulton). Plaintiff Moulton notes that the original life care plan has been reduced to $296,306.11 to reflect the following adjustments: 2 years passed between original LCP date and trial removed/adjusted for all applicable line items; removed physiatrist, knee radiography, antacids, opioid medications, flu and pneumonia vaccines; removed RN supervision; used $22/hour for home health; average generic drug pricing substituted for all medications available as generic.

According to Defendant's expert, Amy MacKenzie, "[s]omeone needs home health care when they cannot safely and independently perform activities of daily living or instrumental activities of daily living." Dmg. Trial Tr. 3664:6-8. Plaintiff Moulton needs assistance with her activities of daily living. Plaintiff is no longer able to, "do simple things like, bending over repeatedly. Had a lot of problems with my balance and walking. I'm terribly afraid of falling, because I am afraid that it's going to jar my back and I could hurt it worse, or end up in a wheelchair too because of it. I can't lift my granddaughter. I can't reach up over my head to the shelves in -- in the kitchen. I have to get my daughter to do all that. So now, of course, you know, I used to be the one cooking for her and now she's the one cooking for me." PEX-904, at 37:6-16. Plaintiff testified "[A]ll of the times [my daughter] spends just directly with taking care of my needs, I would say compacted four or five hours a day, four hours." PEX-904, at 46:19-21.

According to Plaintiff's expert, Dr. Joe G. Gonzales, "when you violate a major joint, such as hip or knee, that destroys cartilage. And that sets the stage for premature generation, i.e., post-traumatic arthritis over time." Dmg. Trial Tr. 2678:21-24. Brenda Moulton's sustained a bullet lodged between T7 and T8, PEX-13045, at 23, and a July 2018 study still showed there was an old bullet fragment in the anterior aspect of the lower thoracic spine. PEX-13045, at 41-42.

Plaintiff needs attendant care to assist in her day-to-day life for the following reasons: (1) Diminish or eliminate Ms. Moulton's physical and psychological pain and suffering; (2) Reach and maintain the highest level of

function given Ms. Moulton's unique circumstances; (3) Prevent complications
to which Ms. Moulton's unique physical and mental conditions predispose
her; (4) Afford Ms. Moulton the best possible quality of life in light of her
condition. PEX-13045, at 58. Plaintiff is currently receiving 4 hours per day
of home health care. Dmg. Trial Tr. at 938.  Jessica Moulton elaborated that
while she gets paid for only 28 hours of care per week, she provides "round-
the-clock care. I'm there wherever she needs me, no matter what she needs."
Dmg. Trial Tr. 985:13-14. The Court has opined the hourly rate for Home
Health Care in this case is $22 per hour. Plaintiff requests home health care
in the amount of 5 hours per day, every day, calculated to be $40,150.00 per
year for 27 years in the amount of $1,084,050.00.

Accordingly, and in total, Plaintiffs request $1,380,356.11 in future
medical expenses: $296,306.11 (the original life care plan amount reduced by
the Court's comments) + $1,084,050.00 (home health care added based on
trial testimony).

### [65] **Ms. Solis' past and future physical pain and mental anguish**.

Ms. Solis was inside the church sitting next to her husband when the
shooting started. Dmg. Trial Tr. 1232 (R. Solis). When the shooter came into
the church, Ms. Solis told her husband "go hide," because I didn't want both
of us to die. Dmg. Trial Tr. 1232 (R. Solis). She felt like if she moved even an
inch, he was going to hit her right on her head. *Id.* at 1232 (R. Solis). She
witnessed R.W. get shot multiple times. *Id.* at 1233. She heard the shooter
yell, "everybody die mother**kers." *Id.* at 1236. Then, she heard everyone's
screams. *Id.* at 1236. After the shooting was over, she was worried that the
shooter would follow her back to the hospital. *Id.* at 1238. Both Plaintiffs' and
Defendant's experts diagnosed Ms. Solis with PTSD and Major Depressive
Disorder as a result of the shooting. PEX-14047 (Dr. Feltoon's psychological
report); GEX-592 (Government expert Dr. Marx' psychological report); PEX-
14053 (Medical illustration of injury); PEX-20028 (recording of defense
psychologist medical examination)

The bullet wounds and subsequent recovery were very painful. *Id.* at
1238. The pain kept her from sleeping almost every night. *Id.* at 1246. Today,
she feels like she's living in a prison. *Id.* at 1248. She covers her windows
with blankets out of fear. *Id.* at 1251–52. Everyday things, like grocery
shopping, is a triggering environment; her hands get sweaty, her heart starts
beating rapidly, and she feels like she may vomit. *Id.* at 1248. She has

recurring night terrors three to four nights per week. Dmg. Trial Tr. 1249–50. She is depressed, angry, irritable, and perpetually scared. *Id.* at 1252.

[66] **Ms. Solis' disfigurement damages**. Ms. Solis was shot in her left shoulder. Dmg. Trial Tr. 1235 (R. Solis). She still has bullet fragments inside of her chest and stomach. *Id.* at 1238; *see also* PEX14002 (photograph of gunshot wound to left shoulder); PEX14045 (more recent photograph of left shoulder wound). She still experiences throbbing pain at night from her scar and shoulder wound. Dmg. Trial Tr. 1240. She cannot wear short-sleeved blouses out of embarrassment. *Id.* at 1240.

[67] **Ms. Solis' physical impairment damages.** Ms. Solis cannot use her left arm. Dmg. Trial Tr. 1241 (R. Solis). "I cannot do anything with my left arm anymore." *Id.* at 1241. She can't cut a single vegetable or open a can to prepare a meal. *Id.* at 1242. Ms. Solis was able to use her left arm for a variety of things before the shooting, like cooking and cleaning. *Id.* at 1241. Her preexisting disability did not cause the pain she experiences daily in her shoulder and arm. *Id.* at 1241 (R. Solis testifying that any preexisting pain confined to hand). She experiences chronic pain and decreased mobility because of the shooting. *Id.* at 1244 (Government expert concluding same).

[68] 2d Amd Stipulation, ECF No. 576, at 8 ¶ 21(a)(past medical expenses).

[69] Defendant stipulates to $462,044.10 of Ms. Solis' future medical expenses. 2d Amd Stipulation, ECF No. 576, at 8 ¶ 21(b). The remainder can be found in Plaintiff's life care plan.PEX-14045 (Dr. Gonzales life care plan); PEX-14046 (Dr. Feltoon psychological report); GEX-592 (Government expert Dr. Marx psychological report); PEX-14042 (See generally, University Hospital Medical Records); PEX-14030 (See generally, Connally Memorial Hospital Medical Records). Plaintiff Solis notes that the amount for future medical care demanded in this pleading *already reflects* the following adjustments made to her Life Care Plan: 2 years passed between original LCP date and trial removed/adjusted for all applicable line items; removed spine x-rays and MRIs; removed wheelchair costs; removed RN supervision; used $22/hour for home health; average generic drug pricing substituted for all medications available as generic.

[70] **Mr. Ramirez's pain and mental anguish**. Mr. Ramirez' wife–Roseanne Solis–heard a man say, "Everybody get down. They're shooting at us from the roof." So, they got down. Mr. Ramirez jumped on top of his wife to

protect her. Dmg. Trial Tr. 1231 (R. Solis). His wife said to him, "You need to go hide because I know this is the day we're going to die. We're going to die today." Dmg. Trial Tr. 1232 (R. Solis). And he thought he was going to die. PEX-918, at 18 (J. Ramirez Dep.).

He was shot on his left side and leg. Dmg. Trial Tr. 1249 (R. Solis). He felt the sensation of hot blood running down his leg where he was shot. PEX-918, at 14 (J. Ramirez Dep.). With a gunshot wound to the leg, Mr. Ramirez carried his wife to safety. PEX-918, at 17 (J. Ramirez Dep.). Mr. Ramirez testified that his injury remains painful and does not appear to be improving. PEX-918, at 23 (J. Ramirez Dep.).

Everyone Mr. Ramirez knew at the church died that day. PEX-918, at 6 (J. Ramirez Dep.). He watched as the shooter killed more and more people and watched them fall to the ground. PEX-918, at 11 (J. Ramirez Dep.). He witnessed bodies "jumping and bouncing" as they were hit with bullets. PEX-918, at 11 (J. Ramirez Dep.).

Mr. Ramirez suffered no mental health problems prior to the shooting. PEX-918, at 4 (J. Ramirez Dep.). Following the shooting, Mr. Ramirez fell into depression. *Id.* at 4. Mr. Ramirez is similarly terrified of grocery shopping, like his wife. *Id.* at 30. He cannot sleep for more than four hours because he fears someone is watching him from the windows. *Id.* at 32. He experiences depression and anxiety. *Id.* at 36. And it's worsened since the shooting. *Id.* at 36–37. His flashbacks are getting worse too. *Id.* at 38. When the trauma resurfaces, Mr. Ramirez gets down on his knees, sobbing, and begs God to erase it. *Id.* at 39. Both Plaintiffs' and Defendant's experts diagnosed Mr. Ramirez with PTSD because of the shooting. PEX-14047 (Dr. Feltoon's psychological report); GEX-592 (Government expert Dr. Marx' psychological report); The Government's expert, Dr. Marx, added a diagnosis of Major Depressive Disorder because of the shooting. GEX-592. *See also,* PEX-14053 (Medical illustration of injury); PEX-20028 (recording of defense psychologist medical examination).

[71] **Mr. Ramirez's disfigurement damages**. He was shot on his left side and leg. Dmg. Trial Tr. 1249 (R. Solis). He was shot in the leg and still has fragments inside his left leg. PEX-918, at 22 (J. Ramirez Dep.). Mr. Ramirez testified that his injury remains painful and does not appear to be improving. PEX-918, at 23 (J. Ramirez Dep.).

[72] **Mr. Ramirez' physical impairment damages**. He was shot on his left side and leg. Dmg. Trial Tr. 1249 (R. Solis). He was shot in the leg and still has fragments inside his left leg. PEX-918, at 22 (J. Ramirez Dep.). Mr. Ramirez testified that his injury remains painful and does not appear to be improving. *Id.* at 23. His leg bothers him more as time progresses. *Id.* at 23. He has trouble sleeping and is forced to elevate his leg every night. *Id.* at 24. He still experiences numbness. *Id.* at 25. He cannot bend over. *Id.* at 28. He cannot walk the distances he used to. *Id.* He cannot stand for lengths of time. *Id.* at 35. He used to work eight-to-twelve-hour days before the shooting. *Id.* at 33. Now, he can work two or three. *Id.* at 33. He used to work in construction and perform yardwork; but he cannot do any of that now. *Id.* at 45. He cannot walk the distances he used to. *Id.* at 28. He cannot stand for lengths of time. *Id.* at 35. He attended physical therapy twice a week for over two years. *Id.* at 22. He stopped because he couldn't find a way to pay for it. *Id.* at 23. He needs surgeries and specialist care because he cannot bear the continued pain. *Id.* at 27. But he does not have the money to do so. *Id.* at 27.

[73] 2d Amd Stipulation, ECF No. 576, at 7 ¶ 20(a).

[74] Defendant stipulates to $70,284.96 of Mr. Ramirez's future medical expenses. 2d Amd Stipulation, ECF No. 576, at 8 ¶ 20(b). The remainder can be found in Plaintiff's life care plan. PEX-14020 (Dr. Gonzales life care plan); PEX-14019 (Dr. Fairchild Economic Report). Plaintiff Ramirez notes that the amount for future medical care demanded in this pleading *already reflects* the following adjustments made to his Life Care Plan: 2 years passed between original LCP date and trial removed/adjusted for all applicable line items; average generic drug pricing substituted for all medications available as generic.

[75] **Ms. Vidal's pain, suffering, and mental anguish damages**. Ms. Vidal was shot and severely and permanently injured in the shooting. She cried and just waited for the shooter to kill her. Dmg. Trial Tr. 1630 (M. Vidal). Because that's what he was doing—"killing and killing and killing people." *Id.* at 1630 (M. Vidal).

Ms. Vidal remembers hugging N.H. moments before she was killed. *Id.* at 1629. She lost her closest friends, the Johnsons, that day too. *Id.* at 1629–30 (M. Vidal). During the shooting, she turned to the Johnsons to talk to them, and saw her closest friends dead on the floor next to her. *Id.* at 1631 (M.

Vidal). The shooting was so traumatic that Ms. Vidal suffered a heart attack shortly after. *Id.* at 1632 (M. Vidal).

After being shot, she woke up in the hospital two weeks later. Dmg. Trial Tr. 1632 (M. Vidal). Ms. Vidal did not return home for almost a year after the shooting. *Id.* at 1637 (M. Vidal). The physical therapy she endured daily was painful and hard. *Id.* at 1637 (M. Vidal).

Currently, she experiences daily pain and discomfort in her back. Dmg. Trial Tr. 1639 (M. Vidal). Her sleep is disrupted by the pain she feels from her scars. *Id.* at 1642 (M. Vidal). She feels worthless now. *Id.* at 1663 (M. Vidal). She suffers from panic attacks and severe depression because of the shooting. *Id.* at 1658. She suffers from regular nightmares about the shooting, panic attacks, and flashbacks. *Id.* at 1659-1661. Both Plaintiffs' and Defendant's experts diagnosed Ms. Vidal with PTSD because of the shooting. PEX-16016 (Dr. Feltoon's psychological report); GEX-619 (Government expert Dr. Marx' psychological report); The Government's expert, Dr. Marx, added a diagnosis of Major Depressive Disorder because of the shooting. GEX-619.

76 **Ms. Vidal's disfigurement damages**. Ms. Vidal suffered two gunshot wounds, one on her right leg and another in her back. Dmg. Trial Tr. 1631 (M. Vidal). She still has shrapnel inside of her. *Id.* at 1634 (M. Vidal). Ms. Vidal has permanent scarring too. *Id.* at 1638 (displaying PEX-16020, at 2). And the scars cause constant pain and discomfort. *Id.* at 1641 (M. Vidal). Her sleep is disrupted by the pain she feels from her scars. *Id.* at 1642 (M. Vidal); *see also* PEX-16019 (illustration of injuries); PEX-16020 (multiple photographs of scars).

77 **Ms. Vidal's impairment damages**. Before the shooting, Ms. Vidal was a completely independent and active woman. Dmg. Trial Tr. 1662 (M. Vidal). Prior to the shooting, Ms. Vidal loved dancing and would regularly dance at the local community dance hall near Sutherland Springs. Dmg. Trial Tr. 1652 (M. Vidal). Today, she cannot do anything with her leg now. It hurts all the time. She describes it as an "ugly" and "sick leg." *Id.* at 1640 (M. Vidal). She cannot walk like she used to. *Id.* at 1643 (M. Vidal). The numbness in her foot and leg can get so severe that she trips. *Id.* at 1644 (M. Vidal). She can only stand for five to ten minutes. *Id.* at 1645 (M. Vidal). And she cannot cook like she used to. *Id.* at 1655 (M. Vidal).

She endured multiple surgeries on her leg and back after the shooting. Dmg. Trial Tr. 1632 (M. Vidal). And heart surgery to treat the heart attack caused by the stress of the shooting. *Id.* at 1632–33. Her home is unsafe given her condition. Once, she fell on her stomach and had to scream until her neighbor heard her and came over. *Id.* at 1646. She broke two ribs from this fall. *Id.* at 1647.

[78] 2d Amd Stipulation, ECF No. 576, at 8 ¶ 22(a) (past medical expenses).

[79] Defendant stipulates to $342,099.59 of Ms. Vidal's future medical expenses. 2d Amd Stipulation, ECF No. 576, at 8 ¶ 22(b). The remainder can be found in Plaintiff's life care plan. PEX-16018 (Life Care Plan); PEX-16015 (Dr. Fairchild Economic report). Plaintiff Vidal notes that the amount for future medical care demanded in this pleading *already reflects* the following adjustments made to Ms. Vidal's Life Care Plan: 2 years passed between original LCP date and trial removed/adjusted for all applicable line items; removed RN supervision; used $22/hour for home health; used average generic drug pricing for all medications available as generic; adjusted for 86.5 life expectancy; removed MRIs.

[80] **Mr. Poston's pain, suffering, and mental anguish damages.** In addition to the $6,000,000 value represented by the Charleston case precedent for individuals who experienced the church shooting and were not shot, Plaintiff requests $54,000 per year be awarded for gunshot wound related pain and suffering annually for the remainder of his 57 years, or $3,078,000 for a total of $9,078,000.

Plaintiff Zachary Poston was present in the Church during the shooting, on November 5, 2017 with his grandmother. He suffered extreme physical pain, testifying, "[w]hen a few rounds started going through the back wall, I had a few rounds go right through me and my grandmother. One caught me through the abdomen. One went through my right arm…" Dmg. Trial Tr. 1849:17-19. "After the gunman shot up the right side of the church, he then proceeded to come in. I kicked a little girl just in time after -- Marc Holcombe was making a phone call, and the gunman had shot him in the back of the head, and then he proceeded to shoot me in the leg and wrist. And then when I played dead, he passed by me and continued to shoot the rest of the church. *Id.* at 1851:24-1852:5. Plaintiff Poston suffered extreme physical pain and suffering, testifying, "[i]n my upper thigh, it felt like someone took a sledgehammer to it and made it go extremely numb." *Id.* at 1858:6-7. As

Plaintiff testified about his wrist injury, "[t]he rounds entered in this small hole and exited with pretty much the rest of my bone in that case. That is – when I had been shot through my left wrist, there was nothing there holding it together other than just tendons and blood vessels." Dmg. Trial Tr. 1860:8-11. As Plaintiff testified about being shot in the calf, "the best way to describe it is someone set and -- put gasoline on it and lit me on fire because it burned a whole lot. And it didn't feel like it went deep; it just burned a whole lot, like fire." *Id.* at 1861:11-14. After the shooting, as he left the church, the fingers of his left arm were folded down, due to the destruction of the bone, and touching his left elbow, "my hand completely flopped all the way down to my elbow. My fingers were touching my elbow because there was nothing holding from here to -- about a hand's width around my -- where my wrist is."

Plaintiff Zachary Poston was shot, "[s]even times," Dmg. Trial Tr. 1858:17, and was immediately life-flighted to Brooke Army Medical Center where he was inpatient for 25 days. PEX-18016, at 930. A graphical depiction of Plaintiff's injuries is in the record. PEX-18052, at 2. Plaintiff Poston suffered from the following medical conditions: (1) Multiple high velocity gunshot wounds to torso, bilateral upper and lower extremities in mass shooting; (2) Severely comminuted, intra-articular left radial and ulnar fracture with injury of ulnar, dorsal veins and ulnar artery; status post ligation, excisional debridement, external fixation, and eventual ORIF on November 14, 2017; (3) Severe right comminuted, intra-articular fracture of base of 2nd metacarpal and trapezoid fractures; status post ORIF and percutaneous pinning with allograft bone grafting on November 28, 2017; (4) Comminuted left femoral diametaphysis fracture; status post excisional debridement, external fixation and eventual retrograde IM nailing and skin grafting on November 7, 2017; (5) Left common peroneal and tibial nerve injury; status post exploration and reconstruction with bilateral sural nerve autograft on February 2, 2018; (6) Left ulna/radial post traumatic arthritis and bone loss; (7) Left floppy foot with gait disorder; (8) Mobility and activities of daily living skills deficits; (9) Chronic neuropathic pain; (10) Retained metallic lead with elevated lead levels. PEX-18051, at 56–57. At trial, Plaintiff described these conditions as, "The rounds entered in this small hole and exited with pretty much the rest of my bone in that case. That is – when I had been shot through my left wrist, there was nothing there holding it together other than just tendons and blood vessels." Dmg. Trial Tr. 1860:8-11. "The first wound would be for my right arm. The back would be -- the bottom part would be where it entered, and the top would be where it

exited." Dmg. Trial Tr. 1860:22-24. "Number 2 would be across my abdomen. *Id.* at 1861:3. "Number 5 would be across the lower part of my left calf. That one, I don't think actually went in. It brushed across the entirety of my calf. And that one, the best way to describe it is someone set and -- put gasoline on it and lit me on fire because it burned a whole lot. And it didn't feel like it went deep; it just burned a whole lot, like fire. Number 6 a picture of my left leg. That one was as if someone took a sledgehammer and numbed from there all the way down to my toes. Number 7 was my left wrist. That was the one that -- that's a picture that's healed over a little bit. And Number 7 is also healed over a little bit as well. That is what they could piece together with what was left of me." *Id.* at 1861:8-22.

As plaintiff expert, Dr. Sharmila Dissanaike noted, "[u]pon evaluation by emergency medical services personnel at scene he was found to have significant blood loss from these injuries, primarily his left leg, resulting in low blood pressure (hypotension) and the need for blood transfusion." PEX-18055, at 1. "On the left, he suffered comminuted fractures of the forearm (radius and ulnar) at the wrist. This initially required external fixation for stabilization, carpal tunnel decompression and ligation of bleeding veins. This was followed by complex definitive repair on the comminuted fracture with multiple plates and screws by specialist hand surgeons. He required surgical irrigation and debridement, followed by application of a vacuum assisted wound dressing. He also received application of synthetic dermal matrix, and split thickness skin graft of the open wound. The bullet that entered the left thigh fractured the femur and caused significant bleeding. Initially this was treated with a tourniquet by emergency medical personnel from the scene. His femur fracture required temporary stabilization with an external fixation device, followed by definitive repair with an internal nail two days later. There was initial concern for major arterial injury, based on the CT images obtained; however, this was found to be vascular spasm, reflective of tourniquet application, rather than direct injury. Mr. Poston was evaluated in the operating room by a vascular surgeon, who confirmed the presence of good blood flow and that no treatment was required. Mr. Poston required surgical debridement, removal of debris and irrigation of the multiple open wounds of the left leg, followed by application of a vacuum-assisted wound dressing." PEX-18055, at 1.

"Mr. Poston suffered a fracture to the bones of his right hand (2nd metacarpal, possibly trapezius), that was repaired using percutaneous

pinning, K wires and bone graft." PEX-18055, at 1. "Mr. Poston was fortunate that trajectory of bullet/s over his chest and upper abdomen was tangential – i.e. travelled parallel to the ribcage across the front of his chest and abdomen, rather than penetrating into these cavities. While this resulted in a minor fracture of the left clavicle and significant damage to skin, soft tissue, and muscle, with scattered deposition of shrapnel throughout this region, it did not injure internal organs such as the heart, which would likely have been life-ending. Similarly, the gunshot to his right thigh caused extensive damage to soft tissue (skin, fat, and muscle) only. He also had a superficial injury to his right medial upper arm." PEX-18055, at 2.

Dr. Sharmila Dissanaike described Mr. Poston's retained lead as, "Multiple small metallic bullet fragments remain in Mr. Poston's chest, right hand, left arm and leg. Over time he has noticed the shrapnel in his right thigh and left leg migrating toward the skin and becoming palpable and symptomatic". PEX-18055, at 2.

Plaintiff's treating physician Dr. Kapoor is monitoring him for lead toxicity and feels that the retained lead fragments in his body put him at risk of developing a number of serious medical conditions over the course of his life. PEX-927, at 49. These include neurologic, renal, cardiovascular, hematologic, immunological, cancer and reproductive issues. PEX-927, at 55. It is not possible to ever remove the lead from Plaintiff's body. PEX-927, at 47. Plaintiff's lead level is monitored approximately every 3 months. Dmg. Trial Tr. 1892. His lead levels fluctuate between 8 and 14. Dmg. Trial Tr. 1893. Lead shrapnel migrates around his body and sometimes out his skin; occasionally when the lead fragments get close to the surface of his skin they are removed by a doctor. Dmg. Trial Tr. 1890. This creates worry and concern for Zach Poston, because he has a consistent reminder of what may be waiting for him down the road and reminding him that his body may prematurely fail. Dmg. Trial Tr. 1894.

Plaintiff Zachary Poston lives with mental anguish after witnessing the death of so many friends and family, including his grandmother, with whom he shared an extremely close relationship. He testified, "I think the bullets that she took would have killed me if she was not there, and I wouldn't be alive today if it weren't for her." Dmg. Trial Tr. 1861:8-22.

Plaintiff testified his injuries create further mental anguish for him, "Sometimes if I'm doing something or -- and get a cramp, such as taking a few

steps upstairs, my leg will cramp so bad that I have to stop what I'm doing in order to keep myself from falling." Dmg. Trial Tr. 1872:20-23. "Sometimes my wrist will do the same thing. It will cramp, and I have to wait for it to unlock itself, so to speak." Dmg. Trial Tr. 1873:2-3).

Plaintiff Poston was diagnosed with: (1) PTSD; (2) Major Depressive Disorder; (3) Somatic Symptom Disorder by his expert PEX-18050, at 6) and was also diagnosed with Posttraumatic Stress Disorder by experts for the Defendant. GEX-651, at 10. Plaintiff's pain and mental anguish are extensively documented in the record in his videotaped psychological exam PEX-20022.

Plaintiff Poston is in pain at least 75% of the time due to the injuries he sustained in the shooting. He feels like a completely different person now and considers every part of his life as being affected. PEX-20022 (Government Psychological Examination Video).

Plaintiff Poston has lost enjoyment of life and sleeps most of the time. He can no longer run and has minimal interest in flying his drone, technology, filming, hunting, and fishing, all interests he pursued before the shooting. Plaintiff has difficulty experiencing positive feelings like love or happy and is more likely to feel depressed or anxious. PEX-20022.

[81] **Mr. Poston's lost earnings damages.** This figure represents loss of earning capacity without military benefits. Should the Court find that Mr. Poston would have attained a military career, the appropriate amount of damages for loss of earning capacity is $3,929,862.00. PEX-18062 (Fairchild Earnings Report – Z. Poston). Defendant stipulated to $851,015.00 of Mr. Poston's future lost earnings. 2d Amd Stipulation, ECF No. 576, at 7 ¶ 19(c).

Plaintiff's vocational expert opined that Plaintiff Poston's earnings capacity would be significantly decreased as a result of his injury and inability to join the military, earn a BA, and retired with full military benefits before joining the civilian workforce in the field of technology. Also, Plaintiff's work life expectancy would be shorter due to his injuries.  PEX-18047, at 3-4. The Court has since opined that it will not consider damages related to Plaintiff's loss of a military career but would consider Plaintiff having a career wherein he would have attained a college degree. Defendant's expert, Samuel M. Lundstrom, Ph.D. opined in his report that the present value of the expected lifetime earnings of a male with a bachelor's degree

totaled $3,404,060. Plaintiff requests he be awarded lost earnings in the amount of $2,212,639.

Plaintiff testified at trial that he did not complete college, "[b]ecause of my disabilities, it was hard to do anything. And with the pressure on just having to learn, I couldn't get enough sleep to continue the recovery that I needed." Dmg. Trial Tr. 1895:13-15. "Between having to study and go to class, I couldn't sleep enough to catch up with my body to be able to recover. It was extremely hard to keep it mentally, because I couldn't hardly study and remember it or -- without having to think about what I was going to have to deal with the next day for classes or how people viewed me, from time to time. It was just hard overall." *Id.* at 1897:5-11. Finally, he testified that his injuries were, "the main reason I withdrew." *Id.* at 1897:14.

Plaintiff testified at trial that he has attempted to do four jobs and has not been able to keep any of them due to the at-issue injuries he sustained making it difficult to perform the physical rigors of each of these jobs. At the time of trial, Plaintiff was on medical leave from his current job. Dmg. Trial Tr. 1880:7-1884:25. Plaintiff testified at trial, "I keep a job for a few months. And at some point, I become fatigued and not be able to keep up with it. So, I have to quit or find something else to do." *Id.* at 1873:2-3.

Plaintiff testified at trial that the percentage of a work shift he feels like he could work in his 20's without becoming fatigued, if he had the appropriate accommodations, would be, "maybe half a shift." Dmg. Trial Tr. 1885:17-20.

While not currently available in his chosen occupations, even if plaintiff attempted to perform more sedentary work, the evidence reflects Plaintiff's injuries will still impair his earnings. While Plaintiff's impairments are more fully described in the related section above, he generally lacks fine motor skills to type or write, he has severe fatigue in his legs and ambulation is an issue. He testified, "My legs start giving out, and then my knee will give out after a few hours from doing anything or even really just walking around the house. Even just driving makes me tired to do anything." Dmg. Trial Tr. 1872:7-10.

Despite his deep desire to be useful and productive, Plaintiff does not feel like he will be able to work at a sustained 50% capacity over the course of his

useful working life.  Although his fatigue allows this now, degenerative changes will reduce this capacity over time.  Dmg. Trial Tr. 1885-1886; 2689.

Based on this evidence, the evidence supports that plaintiff has lost 65% of his earnings. Using Defendant expert Lundstrom's calculations above at $3,404,060, Zach Poston has sustained at least $2,212,639 in lost earning capacity.

[82] **Mr. Poston's disfigurement damages**. Plaintiff requests $12,000 per year be awarded for disfigurement for the remainder of his 57 years or $684,000.

Plaintiff's scars from his gunshot wounds are horrific and exist in parts of his body that are normally exposed.  He has scarring at the region of the elbow; extensive scarring of the wrists at the volar surface, more along the left volar wrist and distal forearm; right wrist hypertrophy is noted along with mild thenar muscle atrophy; left lower extremity examination reveals that he has a large 21 cm irregular scar along the thigh with muscle loss and there is evidence of anterior/medial thigh donor scars; At the left knee, there is a 6 cm scar; The right lower extremity examination reveals multiple scars; There is a 15 cm scar at the anterior thigh and an 11 cm scar, which is irregular, located at the lateral thigh; The left calf demonstrates significant muscular atrophy and, when measured at mid-calf level it is 31.5 cm compared to the right mid-calf measurement of 41.5 cm and there is a large soft tissue defect with scarring, discoloration, and an eschar at the distal end; The left foot is actively floppy and demonstrates absence of active dorsiflexion and plantar flexion and pes planus bilaterally. PEX-18051, at 55. Plaintiff testified that these disfigurements are experienced in this way, "It's hard to socialize with anybody my age because they think very negatively of [the arm scarring], especially if I go in for a job interview. They think I have tattoos that are inappropriate for jobs or think I've done something really wrong or against the law." Dmg. Trial Tr. 1888:10-14. "I don't really like drawing attention from crowds from the [left leg] scarring itself, especially anything above my knee, like on my left calf or left thigh. And a lot of people will stare at them." Dmg. Trial Tr. 1889:6-9. "A lot of people avoided me because of scarring". Dmg. Trial Tr. 1896:10.

[83] **Mr. Poston's impairment damages**. Plaintiff requests $54,000 per year be awarded for impairment for the remainder of his 57 years or $3,078,000.

These injuries cause Plaintiff to have the following impairments: (1) Decreased ability to perform activities of daily living (ADLs) e.g. bathing, dressing, etc.; (2) Decreased ability to perform or maintain traditional roles within family, relationships or other social units; (3) Decreased locomotion e.g. walking, etc.; (4) Decreased physical function affecting a loss of vocational capacities/opportunities; (5) Decreased ability to participate in social avocational activities, i.e. participation in activities with others e.g. participation in sports, participation in community organizations, participation in community activities, etc.; (6) Decreased external mobility e.g. community ambulation, etc.; (7) Decreased ability to perform household services e.g. inside housework, home and vehicles, travel for household activities, etc.; (8) Decreased ability to participate in personal avocational activities e.g. personal hobbies, pastimes, interests, etc. PEX-18051, at 57. Plaintiff has 57 years left in his life, PEX-2027, at 3, and will suffer from these impairments for the remainder of his life.  At trial, Plaintiff described these impairments as, "Small tasks, like, such as rotating bolts, my wrist, it locks up. If I'm driving, I don't trust my left wrist because it will lock up, or sometimes the nerves aren't right. I fatigue very easily with my legs. So, it's hard to walk any kind of distance without assistance. And even just day-to-day tasks around the house are hard to do." Dmg. Trial Tr. 1870:23-1871:5. "There's a nerve that's not connected. So, my foot hangs, and I can't control it. So, if I walk without any kind of braces or anything to hold it in one place or another, it will flop underneath my foot or roll sideways and sometimes even cause me to fall." Dmg. Trial Tr. 1873:8-12. "I really can't walk up flights of stairs. If I do, most of the time, I will fall within the first few steps." *Id.* at 1875:21-23.

As plaintiff expert, Dr. Sharmila Dissanaike described, "Poston suffered injury to the tibial and peroneal nerves from the gunshot wound to his left lower leg, resulting in chronic pain and loss of function leading to a foot drop." PEX-18055, at 2. Further, "he continues to need braces, splints and prosthetics replaced on a regular basis." PEX-18055, at 2.

Plaintiff's impairments cause him to use braces and a cane to walk, and even with these accommodations, he still falls at least once or twice a month. Dmg. Trial Tr. 1875:7-12.

As plaintiff's medical provider, Dr. Carlos Jaramillo opined in his deposition Zach is, "going to always have problems with his left leg and walking. It's going to be an issue. He's going to have problems running. It's going to be painful. It's – it's not going to work properly. He's going to require equipment to help him walk the best he can. He's going to have pain issues. His left wrist is missing a large piece of bone, so it's – it's unstable." PEX-928, at 53:6-14. Further, "fine motor will definitely be affected. And repetitive use, anything that he's going to do on a frequent basis, turning wrenches, using tools will cause -- will cause a lot of pain." *Id.* at 55:18-22.

[84] 2d Amd Stipulation, ECF No. 576, at 7 ¶ 19(a).

[85] **Mr. Poston's future medical damages.** Defendant stipulates to $284,915.22 of Mr. Poston's future medical expenses. 2d Amd Stipulation, ECF No. 576, at 7 ¶ 19(b). The remainder can be found in Plaintiff's life care plan. PEX-18051 (Gonzales LCP – Z. Poston). Plaintiff Poston notes that the amount for future medical care demanded in this pleading *already reflects* the following adjustments made to Mr. Poston's Life Care Plan: 2 years passed between original LCP date and trial removed/adjusted for all applicable line items; removed RN supervision; used $22/hour for home health; used average generic drug pricing for all medications available as generic.

According to Defendant's expert, Amy MacKenzie, "[s]omeone needs home health care when they cannot safely and independently perform activities of daily living or instrumental activities of daily living." Dmg. Trial Tr. 3664:6-8. Plaintiff Poston needs assistance with his activities of daily living. Plaintiff testified, "I fatigue very easily with my legs. So, it's hard to walk any kind of distance without assistance. And even just day-to-day tasks around the house are hard to do." Dmg. Trial Tr. 1871:2-5. "I have limited range of motion turning my wrist, and the fine motor skills are not what they used to be." *Id.* at 1871:13-14. "[L]ifting heavy things or anything weight-wise, it's as if someone is trying to bend my arm and snap it." *Id.* at 1871:19-21. "Heat makes me fatigue very easily, especially being out in the sun. My legs start giving out, and then my knee will give out after a few hours from doing anything or even really just walking around the house."

Even just driving makes me tired to do anything." Dmg. Trial Tr. 1872:5-10. Plaintiff reports that to shop for groceries, "I use a scooter." *Id.* at 1876:19.

According to Defendant's expert, Dr. James A. Scott, whose opinions were incorporated into the Life Care Plan report of Ms. MacKenzie, even at this early stage of his life in his 20's plaintiff has difficulty fully performing his activities of daily living.  Specifically, Dr. Scott acknowledges that Mr. Poston cannot perform basic tasks that require fine motor skills, such as buttoning his shirt, and he can't perform all basic household tasks as before the shooting, such as cooking.  He and acknowledges that even in his 20's he is less active than he once was.  Further, he acknowledges difficulty with more physically demanding activities such as mowing/shoveling. GEX-650, at 60.

At his young age, Plaintiff feels like he can't trust his left arm in safety-sensitive situations, his wrist will occasionally lock up where he can't let go of the steering wheel or it won't do what it's told, Dmg. Trial Tr. 1876-77, and his injuries have caused him to have two car accidents.  Dmg. Trial Tr. 1882. He utilizes a wheelchair to go long distances.  *Id.* at 1876.

Zach Poston's conditions created by his gunshot wounds will deteriorate as he ages.  According to Plaintiff's expert, Dr. Joe G. Gonzales, "when you violate a major joint, such as hip or knee, that destroys cartilage. And that sets the stage for premature generation, i.e., post-traumatic arthritis over time." Dmg. Trial Tr. 2678:21-24. Further, Dr. Gonzales testifying specifically about Plaintiff Poston, "this is a young man who was injured very young. So that's significant in that he's got a lot of time to live, and he has a lot of time for these post-traumatic changes to occur. But specifically, he had injuries to his left wrist, what are described as intra-articular. And that's very important because, when you violate joints, which are the moving parts, it damages cartilage. It is almost certainly going to progress to a degenerative condition, which is painful. It restricts motion, and it limits function. So that's his left hand." Dmg. Trial Tr. 2687:15-25. Further testifying about Plaintiff Poston, Dr. Gonzales stated, "On the right side, he has similar fractures to part of his hand, specifically to the index finger. But his wrist is also symptomatic, as per his most recent testimony. So, he is affected with both wrist and hands. He also sustained a significant comminuted fracture to the left hip. The injury was such that he required surgical stabilization. He

also has injuries to significant nerves of the leg, the peroneal and tibial. Those are the nerves that allow our foot to clear the floor and also to push off from the floor. So, you would have a floppy foot, basically. Not just drop foot, but also a floppy foot." Dmg. Trial Tr. 2688:1-12.

Dr. Gonzales concludes about Plaintiff Poston, testifying, "in the 20 years that will follow, those post-traumatic degenerative changes, the muscular atrophy, the neurological impact of his mobility, as well is the decline and function of his upper extremities will be rather progressive. So that by the age of 40, I believe he will require assistance to do all the things he needs to do on his own behalf and around the house. So, I've provided eight hours a day at the age of 40. I recommended continuing with that amount for 20 years. And from 40 to 60, there will be another acceleration of those degenerative changes, but I kept it at eight. But then at age 60, I bumped it up to the 12, and that would go on the balance of his life." Dmg. Trial Tr. 2689:11-23.

Plaintiff needs attendant care to assist in his day-to-day life for the following reasons: (1) Diminish or eliminate Mr. Poston's physical and psychological pain and suffering; (2) Reach and maintain the highest level of function given Mr. Poston's unique circumstances; (3) Prevent complications to which Mr. Poston's unique physical and mental conditions predispose him; (4) Afford Mr. Poston the best possible quality of life in light of his condition. PEX-18051, at 61. The court has opined the hourly rate for Home Health Care in this case is $22 per hour.

Plaintiff's LCP expert projected his future medical damages in the amount of $3,490,719.79, but in light of the court's instructions not to include the values for the following: RN supervision; Home Health Care Aid Cost @ $22/hr; Generic pricing only: Naproxen $20.13; Neurontin $53.51; Cymbalta $145.97; Ultram $37.40, Plaintiff has adjusted the calculations of Plaintiff's future medical damages. This amount increased due to the Court's instruction related to the cost of Home Health Care; this amount was previously calculated by Plaintiff's experts at a lower rate.   This value is NOT the present value of these damages.

### 86 Julie Workman's pain, suffering, and mental anguish damages.

Plaintiff Julie Workman, a member of the praise team, was present and singing in the Church on November 5, 2017 with her two sons, Kris and Kyle shortly before the shooting began.  She testified that, during the massacre,

Dmg. Trial Tr. 452:19-25: "And as I looked Kris in the eyes, I looked over and I watch the barrel of this gun go 3 or 4 inches from my son's back. I watch the flume from the gunfire. I hear the sound in my ear of the gunfire. And then my son screams out. I reach out and grabbed his hand. And of all things. I told him to shut up." She testified to what happened when the gunman heard her yell at Kris. Dmg. Trial Tr. 452:4-13: "He put a bullet to my chest. The bullet hit me right here (indicating). And I immediately went, 'Oh, my God.' It was like a Mack truck hitting me in the chest. I had, just two weeks prior, had reconstruction surgery from bilateral mastectomies from breast cancer. And I was praying. This was my last surgery, two weeks prior. And I was still wrapped in bandages." She also sustained embedded glass in her right knee from crawling beneath a broken glass fixture on a fan shot by the shooter. Dmg. Trial Tr. 462.

Plaintiff Julie Workman had no knowledge whether her other son Kyle was dead or alive, when she heard the shooter empty an entire clip in the direction of Kyle's path out of the church, just after he shot and paralyzed her son Kris. Dmg. Trial Tr. 452-453. "So, I stayed with pressure on my chest, and I looked back at Kris. And the next thing I notice is that the gunman had taken more steps over to the wall. And the next thing I hear is he unloaded the rest of the magazine down the wall of the aisle. And I'm like, what is he doing? Why is he—and I look at my feet, or towards my feet, and my younger son, Kyle, is no longer there." She had no idea thereafter while triaging victims whether her son Kyle was dead or bleeding out in a field outside. Dmg. Trial Tr. 466.

Plaintiff Julie Workman triaged many, finding horrific fatal injuries on adults and children that she had known for many years. The carnage caused her to feel overwhelmed immediately and sad. Dmg. Trial Tr. 470. When she realized within days that her son was paralyzed permanently, as she testified at trial: "My world went reeling. I had no idea what we were going to do, how we were going to handle this." Dmg. Trial Tr. 478.

Dr. Christopher Ticknor diagnosed Julie Workman with moderate to severe post-traumatic stress disorder in July of 2018. PEX-19010, at 7-8. He noted in his report: "In addition to anger and irritability, Julie Workman has been experiencing sadness, breakthrough crying spells, nausea, emotional loss of control and fear. She noted that fearfulness may be the hardest emotion for her to cope with given that the Bible tells her '365 times' that she

is not to be fearful and instead, to "trust in the Lord." PEX-19010, at 5.  He concluded that she was struggling with "nightmares, flashbacks, enhanced startle response, emotional triggers, sleep disturbance, and difficulty concentrating." PEX-19010 at 7. Julie testified at trial regarding the nightmares, dreams, and flashback, as follows: Dmg. Trial Tr. 483: "Yes. Many times, many days, many nights, my husband would wake me because I was screaming."  When asked how long those symptoms continued, Julie testified: "Oh, it still continues. My last one was last weekend at a Women of Joy Conference after unexpected fireworks were being fired." *Id.* at 483.

As Dr. Ticknor opined, Julie likely will continue to experience significant limitations from PTSD and depression affecting personal and family relationships, as well as her self-confidence and ability to connect with people. PEX-19010, at 8. Dr. Ticknor again evaluated Julie Workman in December of 2019.  He opined in that report, PEX-19011, at 9–10: "Julie Workman's need for current psychological counseling and future psychiatric treatment are necessary for her to continue the process of managing grief and PTSD. There is a strong need for comprehensive counseling therapy. She has recently begun working in counseling therapy with Terry Davis, a licensed professional counselor, and is just now beginning to get comfortable with the concept of discussing not only the tragedy, but her internal emotional trauma as a result of the shooting. She will need intensive counseling therapy and likely, psychiatric assessment and medication management for years to come."

Dr. Ticknor opined at trial that Julie Workman's PTSD will be chronic, Dmg. Trial Tr. 2479, and that she will need long-term counseling and psychiatric care to manage her symptoms. Dmg. Trial Tr. 2480; PEX-19011 at 10.

The Government's psychological examiner Daniel Lee, opined: "Mrs. Workman meets DSM-5 diagnostic criteria for PTSD related to being shot during the Sutherland Springs church shooting on 11/5/2017 … Although there is simply no way to estimate how much treatment is needed to significantly reduce Mrs. Workman's PTSD and other symptoms, Mrs. Workman is a good candidate for a full course of evidence-based, trauma-focused psychotherapy with a highly skilled and trained mental health care provider … Additionally, given that her PTSD symptoms have adversely impacted her marriage, Mrs. Workman and her husband may benefit from

couples counseling or Cognitive–behavioral conjoint therapy for PTSD, an evidence-based intervention for PTSD that includes a family member in treatment." GEX-661 at 10.

[87] **Kyle Workman's Mental Anguish and Bystander Mental Anguish damages**. Plaintiff Kyle Workman was present in the Church on November 5, 2017, with his brother, Kris, his mother Julie and his fiancée Morgan Harris.  Kyle testified that he jumped over "a pile" of people and then "army-crawled to a pew and got to a middle aisle as he [the shooter] was circling the front where [Kyle] was and my brother and mother were."  Dmg. Trial Tr. 595.

He ran out of the church in terror: "As I'm running out the doors, I remember hitting the door on my way out the frame of the door.  And then as I was leaving, I also heard—I heard Kris scream. And I knew he was shot." Dmg. Trial Tr. 596. He bounced off the shooter's car as he exited the building and "didn't want to take any chance to look or—I just was running as fast as I could." Dmg. Trial Tr. 596. He had no knowledge whether his brother, fiancée, or mother remained alive after he reached the Valero store, which had no back exit and they locked the front door. Dmg. Trial Tr. 597.

After the shooting, Plaintiff Kyle Workman experienced fear and depression. "I couldn't be alone … There were times when I would be alone, and my thoughts would spiral. And I just felt—I felt sad and depressed that everything had gone on, that we lost 26 friends, family."  Dmg. Trial Tr. 602. He left his employer because he no longer felt safe in a public grocery store open to the public. His efforts to obtain a door watcher and/or permission to conceal carry a firearm were rebuffed so he felt he had to leave. *Id.* at 603-604. Kyle Workman continues to experience mood swings and flashbacks, which can be triggered by loud noises.  *Id.* at 608. The issues continue, with only slight improvement since the shooting and he desires continued counseling. *Id.* at 609.

The Government examiner noted that symptoms must persist for one month and last at least three months. He confirmed by exam that Kyle Workman's symptoms persisted at the time of the exam, three years later. GEX-688, at 11. The examiner noted that Mr. Workman's symptoms "are moderate to severe and cause clinically significant distress and occupational impairment."  GEX-688, at 13.

Dr. Chris Ticknor performed a psychiatric evaluation of Kyle Workman. He opined that Kyle Workman's responses on the PTSD worksheet, GEX-785, at 16, were consistent with the diagnosis of PTSD, which he confirmed on his interview. Dmg. Trial Tr. 2472. Kyle Workman likely will require ongoing assessment and treatment of his symptoms through counseling, perhaps EMDR therapy and medication for his "panic-attack like symptoms." Dmg. Trial Tr. 2473.

[88] **Ms. Harris-Workman's pain, suffering, and mental anguish damages.** Plaintiff Morgan Harris was in the sound booth in the church during the shooting on November 5, 2017. She suffered gunshot and shrapnel wounds to the left leg, torso and face. She was treated at University Hospital for the gunshot wounds. Dr. Ticknor diagnosed Ms. Harris with moderate to severe adjustment disorder with depressed mood. PEX-19090 (Ticknor Report – M. Harris). She had no history of psychiatric or psychological disorders or treatment before this shooting. She has undergone counseling by Pat Lincoln and received psychiatric evaluation by Dr. Annette Scott for depression, along with prescription antidepressant medication. She requires indefinite cognitive behavioral therapy to treat the symptoms. PEX-19090, at 4. She also requires antidepressant medication. GEX-697, at 14 (Dr. Scott medical records – M. Harris). Ms. Harris testified:

> Q. Okay. Did you hear people screaming, yelling, or any sounds going on during the shooting from outside of the sound booth?
>
> A. Yes, I did.
>
> Q. Could you discern any words?
>
> A. I heard -- I heard one of the young ladies that I had seen grow up, I heard her scream. And then I heard her say, "Oh, God, Annabelle." And that's the last I heard of voices until later, I believe, I heard the shooter speak…. I stayed in the church. And I remember trying to help point first responders in the right direction where I knew people were and where they needed help. I know that I -- a first responder, one of the officers, tried to put a tourniquet on my leg.

> And I told him that I didn't need it and he needed to
> put it on someone who needed it more. And he, without
> a second thought, shook his head and moved forward.

> Q.  Was your leg bleeding?

> A.  Yes.

Dmg. Trial Tr. at 649–654. The Government's psychologist diagnosed Morgan Harris with ongoing post-traumatic stress disorder in November of 2020, over three years after the shooting, caused by the shooting. GEX-724, at 7–13. Their own examiner concluded: "All of the evidence suggests that it is clear Mrs. Harris is in a worse place psychologically now than she was in the months after the attack." *Id.* at 12. "There is no evidence that symptoms of PTSD pre-dated the Sutherland Springs church shooting or that they are related to another traumatic event." *Id.* at 11.

[89] **Ms. Harris-Workman's lost earnings damages**. Morgan Harris requests an award of $458,798.00 for loss of future earning capacity, based on the report and opinions of Dr. Carl Hubbard. PEX-19093 (Hubbard Report – M. Harris), at 2, and based on the vocational evaluation and testimony of Dr. Irmo Marini. *See* PEX-19091 (Marini report – M. Harris); PEX-948 (Marini deposition designation). This amount also is not a present value.

[90] **Ms. Harris-Workman's disfigurement damages**. Plaintiff Morgan Harris requests the Court award $8,787.35 per year for disfigurement in the past and future for the remainder of her 56.9 years, totaling $500,000.00. Plaintiff Morgan Harris must walk with braces that visibly disfigure her in order to balance. No evidence indicates that Morgan Harris will cease having to walk with the braces that she has used only after the shooting, and for which she had no symptoms requiring their use prior to the shooting.

[91] **Ms. Harris-Workman's impairment damages**. Plaintiff Morgan Harris requests the Court award $17,574.69 per year for impairment for the remainder of her 56.9 years, totaling $1,000,000.00. Morgan was unable to have the shrapnel removed from her leg:

> Q.  Were you ever made aware of surgery not being an
> option?

> A.  I was told that the pieces were not -- they were all too
>     small. And it would -- it would not be feasible, that it
>     would basically tear apart my leg to be able to get to
>     them all.
>
> Q.  And which leg is this?
>
> A.  My left leg.
>
> Q.  So as far as you know, are those pieces of shrapnel still
>     there?
>
> A.  Yes, they are.
>
> Q.  And do you have any idea -- were you given any idea
>     how many pieces of this fine shrapnel were in your
>     leg?
>
> A.  No.

Dmg. Trial Tr. at 600-661.

She testified regarding the inception of her difficulty walking:

> Q.  Okay. After the shooting, did you experience any
>     difficulty ambulating or walking?
>
> A.  Yes.
>
> Q.  When did you first notice that?
>
> A.  Well, immediately following, I was not able to walk. I
>     was on crutches.

Dmg. Trial Tr. at 661-662.

> Q.  And you continued using crutches until you found
>     them less painful than using a cane [sic]?

A. Yes. I stopped using the crutches probably the first
week of December.

Q. Did the symptoms really improve, or did you just
switch to the cane?

A. I swapped to the cane because the crutches were, like I
said, they were painful to walk on, and I was -- with
the lack of balance, they were hard to use.

Q. And so when you noticed that you were having trouble
with foot drop and your feet not moving properly, what
did you do then? Did you seek out medical attention?

A. Not right away. I didn't realize that it wasn't just
muscle atrophy until -- Julie mentioned that it
sounded like symptoms of something -- of foot drop.
And I had never heard of that before. I didn't know
what it was. And she said that I needed to go see
someone -- to get in to see a doctor because foot drop is
very serious and very permanent."

Dmg. Trial Tr. at 664.

The Government introduced no evidence that Morgan exhibited any foot
drop prior to the shooting. If in fact the hydrocephalus that the Government's
experts opined about is responsible in part for her bilateral severe peripheral
neuropathy that indisputably developed after the shooting, then the
Government is responsible as a matter of law for an injury-producing event
that activated a latent condition and produced the injurious symptoms:
"However, a tortfeasor takes a plaintiff as he finds her. *Coates v. Whittington*,
758 S.W.2d 749, 752 (Tex. 1988). "If a latent condition does not cause pain or
suffering, but that condition plus an injury caused such pain, then the injury,
and not the latent condition, is the proximate cause." *Katy Springs & Mfg.,
Inc. v. Favalora*, 476 S.W.3d 579, 591 (Tex. 2015) (worker's compensation).
Similarly, if supported by sufficient expert evidence, a plaintiff may recover
medical damages proximately caused by a tortious event that aggravated a
pre-existing medical condition. *See Wal-Mart Stores Tex., LP v. Crosby*, 295
S.W.3d 346, 352–53 (Tex. App.—Dallas 2009, pet. denied); *Cavitt v. Jetton's*

*Greenway Plaza Cafeteria*, 563 S.W.2d 319 (Tex. App.—Houston [1st Dist.] 1978, no writ) (injury means physical damage or harm, including aggravation of pre-existing disease or condition by reason of such physical harm)." *Walmart Stores Texas, LLC v. Autrey*, 2021 WL 1216890 at 12-13, citing *Favalora*, 476 S.W.3d at 581. The evidence of prior right-sided numbness in the record shows that it resolved prior to Morgan Harris' injury in the shooting in November of 2017. PEX-937 at 32-34. The record is devoid of any evidence of prior foot drop or bilateral peripheral neuropathy. Indeed, the evidence is all to the contrary: Morgan Harris was as physically active as one can imagine prior to the shooting, teaching martial arts full-time and engaging in all activities of daily living she desired—with no impairment. Plaintiff Harris does not dispute that the opening pressure on the lumbar puncture ordered by Dr. Gazda, her own medical provider in 2018, was above the normal range for opening pressure. Assuming that opening pressure is diagnostic of a hydrocephalus, as the Government urges, the Government produced no evidence indicating or proving that her opening pressure would have been any different had a lumbar puncture been performed prior to November 5, 2017. Absent such evidence, no evidentiary basis exists in the record to conclude that the intracranial pressure that Morgan lived with prior to the shooting was different (i.e., lower) than the pressure measured on the date of the one lumbar puncture test in July of 2018.

As such, the evidence introduced by the Government leads logically to the conclusion that Morgan had a latent condition in the form of a hydrocephalus that did not produce symptoms of bilateral peripheral neuropathy until the injurious event—the serious injuries to her body from multiple shrapnel wounds in the shooting—superimposed on the pre-existing latent hydrocephalus. Only after that serious injury on November 5, 2017 did the hydrocephalus produce the peripheral neuropathy. The Government's own experts and a provider, Dr. Bogaev, testified that the hydrocephalus and/or a Chiari 1 malformation and/or a syrinx are producing the symptoms. Plaintiff does not dispute that all three are congenital abnormalities of the physical structure of her body. But the undisputed fact is that Morgan suddenly developed the bilateral peripheral neuropathy and foot drop after the shooting. The fact that she was able to engage in all her activities prior to the shooting and testified—with no dispute--that she had no symptoms of foot drop militate in favor of the conclusion that the congenital abnormalities were not producing symptoms of foot drop or neuropathy or any impairment

at the time of or prior to the shooting. GEX-714, at 65–66. Dr. Bogaev
testified:

> Q.   Okay. And if you assume with me that she was, in fact,
>      a martial arts instructor in five martial arts 06:18 up
>      to and immediately preceding the shooting and
>      teaching it as her regular job, that would imply that
>      any symptoms she's having from either a
>      syringomyelia or a hydrocephalus or a Chiari
>      malformation are not interfering with her central
>      nervous system such that they interfere [inaudible]
>      her being very physically active. Fair?
>
> A.   That's correct.

GEX-716, at 64–65.

As such, the Government temporally and proximately caused the
previously latent hydrocephalus to produce the peripheral neuropathy after
the shooting from which Morgan has suffered unremitting symptoms and
impairment since the shooting. The evidence in the record shows that
Morgan had to begin walking with assistance after this shooting and never
was able to walk normally thereafter. She required first crutches, then a
cane, and then orthotic braces that she continues to wear to allow her to walk
and maintain her balance because of the foot drop.

[92] 2d Amd Stipulation, ECF No. 576, at 4 ¶ 11(a).

[93] **Ms. Harris-Workman's future medical damages**. Defendant
stipulates to $619,587.61 as Ms. Morgan Harris-Workman's future medical
expenses. 2d Amd Stipulation, ECF No. 576, at 4 ¶ 11(b). Plaintiff's life care
plan is PEX-19127 (Gonzales LCP – M. Harris). Plaintiff Harris notes that
$491,453.77 represents the amount for future medical care with the following
adjustments made to Dr. Gonzales' Life Care Plan prior to the stipulation: 1
year passed between original LCP date and trial removed/adjusted for all
applicable line items; removed psychotherapy; used average generic drug
pricing for all medications available as generic.

[94] **Mr. Workman's pain, suffering, and mental anguish damages.**
Plaintiff Kris Workman was in the church during the shooting on November 5,

2017. He suffered a catastrophic life-altering spinal gunshot wound and a separate intestinal gunshot wound. The spinal wound nearly severed his cord and resulted in permanent paralysis and loss of sensation below the waist. PEX-929, at 167-168 (Willingham Dep.). He testified: "And I could tell he was right next to me. And he shot me in my back point-blank. So, I kind of did my best to resist reacting to that, as I was trying to play dead. But I kind of pushed up on my arms a little bit and screamed because that's…It was extremely painful, yeah…I could tell that I could not feel sensation in the bottom half of my body. I felt pain, but I couldn't move anything in the bottom half of my body…So, he made his way -- I could tell -- he walked a little bit away from me. So, I kind of opened my eyes a little bit, and I could tell he grabbed his sidearm and pulled out his sidearm and shot me one more time in the flank with his sidearm." Dmg. Trial Tr. at 747 (K. Workman). And regarding the nature and character of the pain suffered for four years:

"I had to learn how to hold my guitar differently in a wheelchair. I had to learn how to position myself to be able to sing. Any sort of touch that happens on my legs produces neuropathic pain in my legs. So, I have to find ways to manage that while I rest the guitar on my legs and try to play…Currently, I'm taking pregabalin, or Lyrica. Recently, our doctor has added amitriptyline to that mixture. It seems to help a little bit. It doesn't quell the pain very much, but it helps…It's always there, but certain events, as I mentioned, like touching my legs or movement to my legs or vibration of any kind, even when just rolling in the wheelchair, can spur greater neuropathic pain……From my hips down, I've lost all sort of sensation and control. Q. But even though you've lost sensation and control, you still, nonetheless, have neuropathic pain in your legs? A. That's correct. Q. And the amitriptyline was added recently, if I understand correctly, to attempt to quell it? A. That's correct. Q. Is that because the -- well, what level of pain were you having with the Lyrica or the generic equivalent? A. At a minimum, at all times, I would say that the pain level and was around a 3. And it could get a lot higher at various times if there were things spurring more pain to happen. It also happens intermittently even if nothing is happening. Sometimes the pain levels can rise to a pretty high amount to where I can't function. When that happens, I have to just kind of grit my teeth and bear it and hold on until it goes away." Dmg. Trial Tr. at 722–723 (K. Workman).

Kris spent two and a half weeks at SAMMC recovering from intestinal surgery and stabilizing his wounds, with attendant pain. PEX-19060 (Ticknor

Rpt – K. Workman), at 5. X-rays of the lumbar spine revealed multiple retained metallic fragments from prior penetrating ballistic injury. PEX-19055 (BAMC records – K. Workman), at 97. Spinal exam on January 18, 2018 at SAMMC revealed no reflexes and complete paraplegia. PEX-19055 (BAMC records – K. Workman), at 106. Medical illustration of injuries is located at PEX-19032. He was transferred as inpatient to University Hospital, where he remained as an inpatient until Dec. 17, 2017. He then attended outpatient therapy at Reeves at least biweekly throughout 2018 and 2019. None of the therapy succeeded in recovering functional use of Kris Workman's legs or his body below the waist.

During his hospital stay at SAMMC, Kris described receiving "a lot of drugs" for surgery and no return of sensation while hospitalized. PEX-19060 (Ticknor Rpt – K. Workman), at 5. Kris Workman underwent psychological evaluation by the Government's examiner as well as by Dr. Chris Ticknor on behalf of the Plaintiffs. He completed a PTSD checklist at the request of Dr. Ticknor, who then diagnosed moderate to severe PTSD, which remained after re-evaluation on December 14, 2019. *Id.* at 7. He told Dr. Ticknor: "The spiritual high of the events [the shooting] has worn off. Now reality has set in. Walking again is not going to happen. It is disheartening." He continued suffering "often unrelenting neuropathic pain." *Id.* at 8. He described continuing flashbacks about the shooting. Seeing reminders of the shooting in the form of the church location, which he regularly attends as praise team leader, triggers traumatic memories. Dr. Ticknor opined: "It is my opinion that given his personality dynamics and his linear thinking, which is typical of computer science engineers, it is very difficult for Kris Workman to access emotional feelings and process them in a necessary, health fashion." *Id.*

Dr. Ticknor: "He consistently and with great effort controlled significant internal emotional turmoil. That's what I just described. There's a lot going on inside of Kris Workman, a tremendous amount of emotional turmoil. You can see it. And you can see this tremendous -- what I consider to be an exhausting effort to control it…As you can see, I did ask him about PTSD. Whereas he initially described having sadness rarely, as I mentioned, over the time that we spent in the interview, he eventually admitted that thoughts of the shooting and the consequences of his health run through his mind every day, frequently throughout the day. He recalled what are essentially flashbacks. And I used his words in the quotations, "pictures in my mind of actual events and memories from the shooting." Mr. Workman can still see Bryan Holcombe's face, who was deceased on the floor near Kris at the time of the shooting. Kris also had

frightening memories of his mother desperately dialing 9-1-1 during the shooting and seeing his mother physically wincing as she was shot. He has a painful memory of a boy with an incredible amount of blood on the child's shirt. Dmg. Trial Tr. at 2455-2456 (C. Ticknor).

The Government's examiner diagnosed Kris Workman with moderate PTSD causing "clinically significant distress and impairment" as of December 11, 2020, three years after the shooting. GEX-681 (Marx Rpt – K. Workman), at 9.

95 **Mr. Workman's lost earnings damages.** Defendant stipulates to $115,620.00 of Mr. Kris Workman's future lost earnings. 2d Amd Stipulation, ECF No. 576, at 9 ¶ 23(c). The remainder can be found in PEX-19036 (Hubbard Earnings Report – K. Workman) and PEX-19035 (Marini Vocational Report – K. Workman). This amount also is not a present value. Dr. Marini, a vocational rehabilitation expert who evaluated Kris Workman's vocational potential and earning capacity testified to the vocational improbability of Kris maintaining employment at his present level at his current employer. *See, e.g.*, PEX-948 (Marini Dep.), at 101, 115-116.

96 **Mr. Workman's disfigurement damages.** Plaintiff requests the Court award $35,000 per year for disfigurement in the past and future caused by Mr. Workman's injuries and their effects for the remainder of his 33.7 years, totaling $1,179,000.00. Kris Workman will continue to experience atrophy of his lower limbs, which will weaken over time, according to the Government's expert. Dmg. Trial Tr. at 3685-3686 (A. MacKenzie). "He has a severe disability." Dmg. Trial Tr. at 3687. In medical probability he will develop decubitus ulcers over time, also known as pressure sores, which are themselves disfiguring and will require treatment. Dr. Willingham testified: "In addition, he likely will develop decubitus ulcers later in life and it's another condition which shortens his lifespan…There will be some that spiral out of control and require, usually, surgical intervention for closure." PEX-929 (Willingham Dep.), at 167-168.

Defense expert, Mackenzie, testified: "Okay. And so what we know is that -- with certainty is that Mr. Workman is going to get weaker, not stronger, over time. He is going to have overuse injuries because of his overreliance on his upper body, and his legs are also going to wither and get

weaker over time, correct? A. That's probably true, yes." Dmg. Trial Tr. at 3686 (A. MacKenzie).

[97] **Mr. Workman's impairment damages.** Plaintiff requests the Court award $315,000 per year for impairment for the remainder of his 33.7 years, totaling $10,615,500.00. Kris Workman was discharged home on December 11, 2017, after which he began intensive long-term outpatient therapy interspersed with copious medical appointments with various providers.

Dr. Willingham, a board-certified physiatrist/provider, evaluated Kris Workman twice. Kris Workman will suffer permanently from paraplegia. PEX-929 (Willingham Dep.), at 161. He is at risk permanently of contracting urinary tract infections that can cause pain and burning for a person with normal sensation, but Workman won't feel the symptoms. That fact places him at elevated risk for systemic infection from sepsis, which is life-threatening. He is at risk for conditions, including sepsis, which may shorten his life expectancy. *Id.* at 163-166. "In addition, he likely will develop decubitus ulcers later in life "and it's another condition which shortens his lifespan…There will be some that spiral out of control and require, usually, surgical intervention for closure." *Id.* at 167-168.

These injuries cause Plaintiff to have impairments in all aspects of his daily life, including the following: (1) Catastrophic loss of function of sensation below the waist with permanent paraplegia and inability to ambulate with L2 AIS A neurologic dysfunction. (PEX-19028 (Bagwell-Altman LCP – K. Workman), at 24; Dmg. Trial Tr. at 2541 (D. Altman)); (2) Permanent neurogenic bladder, requiring daily manual self-catheterization four to five times per day (PEX-19033 (Best Report – K. Workman), at 1; Dmg. Trial Tr. at 2541 (D. Altman)); (3) Neurogenic bowel, requiring digital evacuation of his bowels each day for the remainder of his life (PEX-19033, at 2); (4) Catastrophic loss of all sexual function including inability to attain or maintain an erection to engage in sexual intercourse, and inability to ejaculate (*Id.*); (5) catastrophic and likely permanent loss of reproductive function due to loss of sensation combined with uncertain and likely substantial diminished sperm quantity and sperm mobility (*Id.*); (6) Inability to drive without specially altered vehicle equipped with hand controls and hydraulic lift platform allowing access to the vehicle by Kris in his wheelchair with equipment to transfer from wheelchair to driver's seat; (7) inability to shower and toilet without restroom facilities specially designed for paraplegia. (8) decreased ability to participate in personal avocational

activities, e.g., personal hobbies, pastimes, interests, including stock car racing; (9) increased and ongoing risk of urinary tract infections and sepsis due to permanently required catheterizations (*Id.* at 1); (10) increased risk of decubitus ulcers and pressure sores due to paraplegia. Plaintiff has 33.7 years left in his life (PEX-19042 (Bagwell-Altman Suppl LCP – K. Workman), at 3) and will suffer from these impairments for the remainder of his life. His level of neurological function will remain the same, but superimposition of the aging process on his injury will increase the likelihood of medical complications and also increase his need for personal care assistance. (PEX-19028 (Bagwell-Altman LCP – K. Workman), at 24).

Further, Dr. Altman testified to a diminished life expectancy for Kris Workman due to his injuries: "The projected residual life expectancy for Mr. Workman, which is only 34 years because of consequences of morbidity and mortality of his injuries and associated spinal cord injury. Q. He will live less -- he will not live as long as he would ordinarily live on the tables because of the spinal cord injury? A. Statistically speaking, that's correct." Dmg. Trial Tr. at 2545 (Dr. Altman).

[98] 2d Amd Stipulation, ECF No. 576, at 8 ¶ 23(a).

[99] **Mr. Workman's future medical expenses.** Defendant stipulates to $2,754,778.00 of Mr. Workman's future medical expenses. 2d Amd Stipulation, ECF No. 576, at 8–9 ¶ 23(b). The remainder can be found in Plaintiff's life care plan. PEX-19042 (Altman-Bagwell LCP – K. Workman). Plaintiff believes the total of $5,989,861.87 is appropriate ($5,117,039.98 plus $872,821.89 in potential care needs). Plaintiff Workman notes that the amount for future medical care demanded in this pleading *already reflects* the following adjustments made to Mr. Workman's Life Care Plan: confirmed no years passed between original LCP date and trial; removed RN supervision; removed psychotherapy; used $22/hour rate for all home health; removed exoskeleton and accompanying costs; used average generic drug pricing for all medications available as generic.

[100] **Elizabeth Braden's damages for loss of consortium from injury to her mother, Deborah Braden**. Plaintiff Elizabeth Braden's mother, Deborah Braden was seriously injured in the church shooting and she has suffered loss of consortium of her mother over the course of her life. As she testified, "my mom and I are pretty close. And ever since [Z.Z.] was born and little, she would help me with [Z.Z.] on the weekends or when I needed extra

help with them. We also vacationed together. And Mom was always my second helper". Dmg. Trial Tr. 1569:8-12. "[S]he was like my other parent." *Id.* at 1569:17-18. Plaintiff Braden confirmed that post shooting her mother helps her significantly less. *Id.* at 1570:23-24. Before the shooting, "Mom would be the one to 'Let's get together,' you know, 'Everybody come over and barbecue or just hang out.' And now she is constantly busy and not feeling well. A lot of times, it's the hurting -- she hurts, her body hurts or she's just emotionally exhausted." *Id.* at 1571:7-11.

Further, Deborah Braden testified, "since the shooting and all, I, again, have a hard time holding the children and lifting them. I was very scared for a long time to have the kids at the house because I wasn't sure if we'd be safe because of the shooting. For a long time, I had to stay inside. And I was afraid to have anybody there because I didn't know. The children and I -- Beth and I would take the children and go to the beach together. We would go spend two or three days or whatever at the beach. Or we'd go, you know, take the kids to the zoo, go fishing. All the little fun things that we liked to do, I can't do that with them anymore." *Id.* at 1482:15-25. She confirmed that she is not able to provide as much childcare for her own three children or help around her children's homes since the shooting. *Id.* at 1483:17-20. She testified that she cannot provide the same kind of advice to her children, "I do not, because, mentally, I don't even know whether I'm coming or going a lot of the time. So it's hard for me to give them advice -- motherly advice that I think would be helpful for them. I don't know anymore. I mean, I'm kind of split, you know." *Id.* at 1484:1-6. "I haven't been there for them as much as I would like to have been. I miss out on a lot of the get-togethers and the events just because, physically, I can't do it." *Id.* at 1484:16-19.

[101] **Robert Braden's loss of consortium damages for injury to his mother, Deborah Braden**. Plaintiff Robert Braden's mother, Deborah Braden was seriously injured in the church shooting and he has suffered loss of consortium of his mother over the course of his life. Deborah Braden testified, "since the shooting and all, I, again, have a hard time holding the children and lifting them. I was very scared for a long time to have the kids at the house because I wasn't sure if we'd be safe because of the shooting. For a long time, I had to stay inside. And I was afraid to have anybody there because I didn't know." Dmg. Trial Tr. 1482:15-20. She confirmed that she is not able to provide as much childcare for her own three children or help around her children's homes since the shooting. Dmg. Trial Tr. 1483:17-20.

She testified that she cannot provide the same kind of advice to her children, "I do not, because, mentally, I don't even know whether I'm coming or going a lot of the time. So it's hard for me to give them advice -- motherly advice that I think would be helpful for them. I don't know anymore. I mean, I'm kind of split, you know." Dmg. Trial Tr. 1484:1-6. "I haven't been there for them as much as I would like to have been. I miss out on a lot of the get-togethers and the events just because, physically, I can't do it." Dmg. Trial Tr. 1484:16-19.

[102] **Rebecca Metcalf's loss of consortium damages for injury to her mother, Deborah Braden**. Plaintiff Rebecca Metcalf's mother, Deborah Braden was seriously injured in the church shooting and she has suffered loss of consortium of her mother over the course of her life. Deborah Braden testified, "since the shooting and all, I, again, have a hard time holding the children and lifting them. I was very scared for a long time to have the kids at the house because I wasn't sure if we'd be safe because of the shooting. For a long time, I had to stay inside. And I was afraid to have anybody there because I didn't know." Dmg. Trial Tr. 1482:15-20. She confirmed that she is not able to provide as much childcare for her own three children or help around her children's homes since the shooting. Dmg. Trial Tr. 1483:17-20. She testified that she cannot provide the same kind of advice to her children, "I do not, because, mentally, I don't even know whether I'm coming or going a lot of the time. So it's hard for me to give them advice -- motherly advice that I think would be helpful for them. I don't know anymore. I mean, I'm kind of split, you know." Dmg. Trial Tr. 1484:1-6. "I haven't been there for them as much as I would like to have been. I miss out on a lot of the get-togethers and the events just because, physically, I can't do it." Dmg. Trial Tr. 1484:16-19.

[103] **O.C.'s damages for the loss of consortium of her injured father, David Colbath**. Plaintiff O.C. is the minor daughter of Plaintiff David Colbath and Diana Colbath, who is not a Plaintiff. She was seven years old and was not present in the church. Diana and David were divorced at the time of the shooting. Under the custody arrangement, O.C. spent about 40% of her time with David and the remainder with Diana. PEX-6088, at 2. In February 2020, Dr. Joanne Murphey evaluated O.C. and documented that O.C. was at SAMMC with her mother when David and relatives of the dead and injured arrived to check on relatives. "O.C." heard a lot of people talking about the carnage…Diana called her mom and told her to come get O.C. to get her out of that environment." PEX-6088, at 4. When a news story about

the shooting came on the TV in David's hospital room, O.C. would start screaming. PEX-6088, at 5.

O.C. reported having bad dreams and fear of the incident recurring. She told Dr. Murphey: "Dad cannot do physical things as he used to like run and play, but she's glad he's alive." PEX-6088 at 4. In December of 2017, O.C. reported abdominal pain, nausea and reflux to her pediatrician Dr. Peck. PEX-6088, at 7. Dr. Murphey testified that O.C. was first able to see her Dad four days after the shooting. PEX-946, at 169. The shooting remained a stressor for O.C. if others brought up the subject. PEX-946, at 172. The stress was responsible for O C's digestive issues. PEX-946 at 177. Dr. Murphey opined that O.C. is likely to continue to experience symptoms of adjustment disorder as a result of her experience with her father's injury. PEX-946 at 182.

104 **Ms. Macias' damages for the loss of consortium of her husband, Juan Macias**. Before her premature death, Jennifer Macias spent what would be the final four years of her life living like an "estranged roommate" to her husband, Juan "Gunny" Macias. Dmg. Trial Tr. 1070 (J. Macias). Juan Macias' catastrophic injuries put him in the ICU for 60 days and then in acute rehabilitation care for another 33 days, totaling 99 days of inpatient care. PEX-944, at 33:14–36:5 (Jennifer Macias Dep.). During those 99 days, Jennifer struggled with managing an extraordinary load, including her husband's care, her job, their daughter, preparations for Gunny's return home, and learning how to provide medical care for her husband when he finally made it home. *Id.* at 33–37.

Before the shooting, Gunny and Jennifer Macias had re-committed themselves to a healthier lifestyle: "getting in shape, dieting and eating right and swimming and having fun." Dmg. Trial Tr. 1070 (J. Macias). They owned an RV, had just earned scuba diving certifications, and were planning several vacations. PEX-10051, at 3 (Dr. Sutton Rpt – Jennifer Macias). Before the shooting, they were a couple who was very physically affectionate and who were "two teenage kids in love." *Id.* at 1022. They were always holding hands, sitting close to each other, and leaning on each other. *Id.*

After the shooting, Gunny felt that Jennifer had "given up" and wasn't happy because "she sees me always hurting and in pain, and that hurts her." Dmg. Trial Tr. 1070 (J. Macias). Simply put: "No matter what, Jennifer was

always happy. She's not anymore." *Id.* After the shooting, they no longer went camping or swimming or scuba diving and no longer cuddled up to eat popcorn together. *Id.* In addition to their daytime struggles, Mr. Macias also testified that he periodically woke up from night terrors to discover he was hitting and choking Jennifer in her sleep, having mistaken her for the shooter. Dmg. Trial Tr. 1067 (J. Macias).

From November 5, 2017 until her death on October 22, 2021, Jennifer Macias was her husband's caregiver rather than his spouse, spending each day worrying and depressed about what happened to her husband and how it ended the future they'd thought they would have when "Gunny" left for church that morning. Dmg. Trial Tr. 1069–1071 (J. Macias); *see also* PEX-10046 (Ecumenical Center records for Jennifer Macias diagnosing Adjustment Disorder); PEX-10051, at 8 (Dr. Sutton Rpt – Jennifer Macias, diagnosing Adjustment Disorder with mixed anxiety and depressed mood); GEX-511, at 13 (Dr. Marx Report – Jennifer Macias, diagnosing PTSD); PEX-20013 (Jennifer Macias defense psychological exam).

[105] **Jessica Moulton's loss of consortium damages for injuries to her mother, Brenda Moulton**. Plaintiff Jessica Moulton is the daughter of Plaintiff Brenda Moulton and was not present in the church at the time of the shooting. Jessica Moulton grew up with her mother and continued relying on her mother's advice and counsel after she moved away from home and after she graduated from high school. Dmg. Trial Tr. 945. In fact, she consulted her mother for advice about ending important relationships. She also consulted her mother for advice about parenting when Ms. Moulton gave birth to her own daughter V., in an unstable relationship with the father, which ended. Dmg. Trial Tr. 947-948. She testified that Brenda Moulton "was there -- she stayed the night in the hospital with me for two or three days after I had her [V.]. She was up with me all night. She's an amazing grandmother, and she really helped me a lot."

Jessica testified that her mother regularly saw her and her daughter prior to the shooting, even though Jessica lived in San Antonio:

> A. "How often would she see her?
>
> Q. Yes, ma'am.

A. All the time. As much as she could, whether it was
video chatting, coming up to San Antonio in person.
She'd even stay for up to a week at a time. She was
very involved. Q. Did your mother have any physical
impairment or any physical infirmities prior to this
shooting? A. Not physical, no." Dmg. Trial Tr. p. 949.

On the date of the shooting, Jessica knew her mother would be attending
church because she planned to pray for the recovery of her brother William
Lane from a serious illness, after which Jessica expected her to come babysit
and visit her brother with Jessica in the hospital where her brother was a
patient. Dmg. Trial Tr. 955.

In the shooting, Brenda Moulton suffered serious injuries requiring
hospitalization for a month, and also was diagnosed with PTSD. Since the
shooting, Brenda Moulton has not been physically or emotionally providing
advice, counsel or support of any type to Jessica Moulton. She testified:

A. "No, sir. Now I'm the one advising and helping her
through her emotions and anything that she comes
across.

Q. Do you feel like you're getting any assistance with her
like you did prior to the shooting if you, as a parent,
needed any advice or, as her daughter, needed any
advice about parenting or about anything?

A. She cannot provide any kind of assistance.

Q. Do you look to her for advice any longer?

A. No.

Q. Do you wish things were like this, or do you wish she
was back to the condition she was in prior to the
shooting? Of course, I wish –

[Objection removed]

Q. You can answer.

A. I -- yes, I wish it was the way it was before the shooting.

Q. Do you have any hope or expectation, based on what you have seen over the last four years, that your mother's conditions that you've observed are going to change from what they are now?

A. No, sir.

Q. Is your mother in psychiatric -- under psychiatric care?

A. Yes.

Dmg. Trial Tr. 986-987.

Jessica Moulton's life is on indefinite "hold" as a result of the loss of parental consortium combined with the physical limitations of her mother caused by her injuries. She testified that she is unable to engage in a social life, unable to date or get together with friends or invite others to the small trailer in Stockdale where she lives with her mother due to her mother's PTSD. Dmg. Trial Tr. 988-989.

Ms. Moulton experiences depression as a result of her life and her education being on hold, although she has chosen thus far not to seek treatment for the depression caused by the role reversal she has experienced as a result of her mother's injuries, her PTSD and the combined effects. Dmg. Trial Tr. 995-996. She feels "very small and sad."

[106] **William Lane's loss of consortium damages for injuries to his mother, Brenda Moulton**. Plaintiff William Lane is the son of Plaintiff Brenda Moulton. He was not present in the church at the time of the shooting. He lived with his mother at home through age nineteen. PEX-915, at 15 (W. Lane Dep. Designation). He remained in contact with his mother. On October 12, 2017, he was hospitalized for endocarditis. *Id.* at 25. His mother regularly visited him at the hospital. *Id.* at 31-32. He was discharged the day before the shooting. William saw his intubated mother when they found her in the hospital ICU and was distraught by her critical condition

and inability to breathe on her own. *Id.* at 42. His sister had to stay with his mother when she went home from the hospital, and he observed it was hard on Jessica. *Id.* at 48. They can no longer hunt and can't take his son hunting with his mother because of her physical condition since the shooting. *Id.* Her "whole life" was about the outdoors before the shooting, but he can't interact with her as a mother outdoors now because of her injuries. *Id.* She "breaks down all the time" when William and his son are around Brenda, who has PTSD. *Id.* at 55-56. He testified: "When I do need help, I can't come to her for it" since the shooting because of her condition and the effects of her injuries. *Id.* at 52. He can't bother her with his problems because she can't handle them.

107 **Ms. Solis' damages for the loss of consortium of her husband, Joaquin Ramirez**. Though they do not have a marriage license, Ms. Solis and Mr. Ramirez hold themselves out as husband and wife. Dmg. Trial Tr. 1226 (R. Solis); *see also* Tex. Fam. Code § 2.401(a)(2) (Under Texas law, an informal marriage may be proved by evidence that (1) the man and women agreed to be married; (2) after the agreement they lived together in this state as husband as wife; and (3) they represented to others they were married.). They live together. Dmg. Trial Tr. 1226 (R. Solis). They present themselves to their community, church, family and friends as husband and wife. Dmg. Trial Tr. 1226 (R. Solis). While the Government seemed to try to rebut this fact, if the Court examines the medical records, the Court will see multiple places in the record as early as the days after the shooting where they referred to each other as husband and wife. PEX-14035, at 88 (2018), 122 (2019); PEX-14026, at 13 (Nov. 11, 2017). Before the shooting, the couple was always on the go and doing activities together. Dmg. Trial Tr. 1248 (R. Solis); PEX-918, at 46 (J. Ramirez Dep.). Now, they feel like they're in a prison. Dmg. Trial Tr. 1248 (R. Solis). They cannot converse anymore because of the problems with their own minds. PEX-918, at 48 (J. Ramirez Dep.). They simply cannot get "into the spirit" of talking to one another. PEX-918, at 48 (J. Ramirez Dep.).

108 **Mr. Ramirez' damages for loss of consortium of his wife, Roseanne Solis**. Though they do not have a marriage license, Ms. Solis and Mr. Ramirez hold themselves out as husband and wife. Dmg. Trial Tr. 1226 (R. Solis); see also Tex. Fam. Code § 2.401(a)(2) (Under Texas law, an informal marriage may be proved by evidence that (1) the man and women agreed to be married; (2) after the agreement they lived together in this state as husband as wife; and (3) they represented to others they were married.).

They live together. Dmg. Trial Tr. 1226 (R. Solis). They present themselves to their community, church, family and friends as husband and wife. Dmg. Trial Tr. 1226 (R. Solis). While the Government seemed to try to rebut this fact, if the Court examines the medical records, the Court will see multiple places in the record as early as the days after the shooting where they referred to each other as husband and wife. PEX-14035, at 88 (2018), 122 (2019); PEX-14026, at 13 (Nov. 11, 2017). Before the shooting, the couple was always on the go and doing activities together. Dmg. Trial Tr. 1248 (R. Solis); PEX-918, at 46 (J. Ramirez Dep.). Now, they feel like they're in a prison. Dmg. Trial Tr. 1248 (R. Solis). They cannot converse anymore because of the problems with their own minds. PEX-918, at 48 (J. Ramirez Dep.). They simply cannot get "into the spirit" of talking to one another. PEX-918, at 48 (J. Ramirez Dep.).

109 **Ramiro Vidal's damages for loss of consortium of his mother, Margarette Vidal.** Ms. Vidal's injury is permanent and disabling. PEX-16018, at 50–51 (Dr. Gonzalez report). To a reasonable degree of medical certainty, the evidence at trial showed that she has a permanent "Decreased ability to interact and/or socialize with family, and/or friends and acquaintances," "Decreased ability to participate in social avocational activities, i.e. participation in activities with others e.g. participation in community activities, etc.", and "Decreased ability to participate in personal avocational activities e.g. personal hobbies, pastimes, interests, etc." *Id.* at 51. According to the expert evidence, "Ms. Vidal will have lifelong disfigurement, progressive symptoms, as well as, physical and psychological impairments and disabilities, which require lifelong medical care." *Id.* at 54.

These permanent and lifelong disabilities interfere in her ability to have the relationship she once had with her child. Before the shooting, Ms. Vidal would get in the car to visit her grandchildren. Dmg. Trial Tr. 1652 (M. Vidal). She used to do everything independently. PEX-934, at 37 (Ramiro Vidal Dep.). Her mobility and independence have been significantly diminished. PEX-934, at 38 (Ramiro Vidal Dep.). Ramiro gets depressed thinking about his mom. PEX-934, at 45 (Ramiro Vidal Dep.). He constantly worries that she's fallen, and no one is there to help her. PEX-934, at 45 (Ramiro Vidal Dep.). He can't sleep more than four hours a night. PEX-934, at 45 (Ramiro Vidal Dep.). The shooting changed their world. PEX-934, at 46 (Ramiro Vidal Dep.).

110 **Monica Shabbir's damages for loss of consortium of her
mother, Margarette Vidal.** Ms. Vidal's injury is permanent and disabling.
PEX-16018, at 50–51 (Dr. Gonzalez report). To a reasonable degree of medical
certainty, the evidence at trial showed that she has a permanent "Decreased
ability to interact and/or socialize with family, and/or friends and
acquaintances," "Decreased ability to participate in social avocational
activities, i.e., participation in activities with others e.g., participation in
community activities, etc.", and "Decreased ability to participate in personal
avocational activities e.g., personal hobbies, pastimes, interests, etc." *Id.* at
51. According to the expert evidence, "Ms. Vidal will have lifelong
disfigurement, progressive symptoms, as well as, physical and psychological
impairments and disabilities, which require lifelong medical care." *Id.* at 54.

These permanent and lifelong disabilities interfere in her ability to have
the relationship she once had with her child. In short, the shooting has
changed their relationship. Dmg. Trial Tr. 1698 (M. Shabbir). Before the
shooting, Ms. Vidal would get in the car to visit her grandchildren. Dmg.
Trial Tr. 1652 (M. Vidal). Sometimes, she'd stay for extended periods of time.
*Id.* at 1652 (M. Vidal). It was a fun relationship. *Id.* at 1678 (M. Shabbir).
Their bond strengthened when Ms. Shabbir became a mom too. *Id.* at 1678
(M. Shabbir). She was Ms. Shabbir's "right hand" and "always helping." *Id.* at
1680 (M. Shabbir).

Today, her mom is terrified to drive to Sequin to visit her. Dmg. Trial Tr.
1653 (M. Vidal). Making the drive is painful on her back. *Id.* She used to help
with caring for the grandchildren if her daughter needed it. *Id.* at 1655 (M.
Vidal). But now, she's stopped coming to any of her grandchildren's
ceremonies. *Id.* at 1689 (M. Shabbir). Ms. Shabbir now knows that her mom
stays away because she feels worthless. *Id.* at 1691–92 (M. Shabbir). She
constantly worries about her mom. *Id.* at 1695 (M. Shabbir).

111 **Robert Vidal's damages for loss of consortium of his mother,
Margarette Vidal.** Ms. Vidal's injury is permanent and disabling. PEX-
16018, at 50–51 (Dr. Gonzalez report). To a reasonable degree of medical
certainty, the evidence at trial showed that she has a permanent "Decreased
ability to interact and/or socialize with family, and/or friends and
acquaintances," "Decreased ability to participate in social avocational
activities, i.e., participation in activities with others e.g., participation in
community activities, etc.", and "Decreased ability to participate in personal

avocational activities e.g. personal hobbies, pastimes, interests, etc." *Id.* at 51. According to the expert evidence, "Ms. Vidal will have lifelong disfigurement, progressive symptoms, as well as, physical and psychological impairments and disabilities, which require lifelong medical care." *Id.* at 54. These permanent and lifelong disabilities interfere in her ability to have the relationship she once had with her child. Following the shooting, Robert Vidal had to tend to his mother's care nearly every day. PEX-913, at 19-20 (R. Vidal Dep.). After the shooting, Ms. Vidal's caretaking and loving nature completely changed. PEX-913, at 24 (R. Vidal Dep.) Before the shooting, his mother would host family gatherings, but since the shooting family gatherings have stopped altogether. PEX-913, at 24 (R. Vidal Dep.).

112 **Kip Workman's loss of consortium damages for injury to his wife, Julie Workman**. Plaintiff Kip Workman is married to Plaintiff Julie Workman. Julie was in the church on November 5, 2017, while Kip was at home. Julie and Kip have been married for over thirty years. Dmg. Trial Tr. 508. They had a happy, successful marriage prior to the shooting. They never needed or sought counseling Dmg. Trial Tr. 513-515. After the shooting, Julie Workman became "short-tempered", causing Kip Workman to be "on pins and needles" around her Dmg. Trial Tr. 527. Kip testified "And she just a lot more irritable and –I don't know. I just have to be on pins and needles when I'm around her...We don't do near the stuff that we used to do. Dmg. Trial Tr. 528. He tries to manage on his own without "having to—I don't want to get in a position where we're going to end up fighting or going at it, you know. I don't know. I guess I don't know the right words to say. But it's definitely a— it's ever-present now that I have to kind of—I don't know. Just, I try not to burden her with it, as little as possible." Dmg. Trial Tr. 530.

The shooting caused damage to the marital intimacy between Kip Workman and Julie Workman. Dmg. Trial Tr. p. 531. He testified that their marital intimacy remains "a bunch different", because, as he testified, "I think it's her irritability and her—from the shooting or whatever. I don't know what you call it. She's just not—I guess she's—her mind is on other things, maybe. I don't know." Dmg. Trial Tr. 532-533. The change in their relationship affected their ability to enjoy attending events and traveling. Dmg. Trial Tr. 535-536. "Yeah, we talk about it, but it just seems like we can't, you know, between Kris and—it's not enjoyable…It's hard for us to be confined together too much like that." Dmg. Trial Tr. 536-537. Plaintiff Kip

Workman uses the opportunities in therapy to discuss relationship issues with Terri Davis. Dmg. Trial Tr. 538.

Julie Workman testified that the effects of what she has gone through have damaged the marital intimacy that existed between her and Plaintiff Kip Workman prior to the shooting. Dmg. Trial Tr. 495. "I believe it's changed how we look at each other. I mean, I do love him. I'm committed to our marriage. I don't believe in divorce. That word is not in our vocabulary." Julie Workman testified that the PTSD she continues to experience adversely affects their marriage and marital intimacy: "We can chew each other's heads off. I can—something will just irritate me, and we will fuss at one another. And off to the bedroom he goes, and in the living room I stay." Dmg. Trial Tr. 499. She testified that she and Kip Workman face an uncertain future together: "I pray, as times goes on, that things will improve. But I want to say, I don't know if things will improve, we may have to seek other options." Dmg. Trial Tr. 499.

Plaintiff Kip Workman reported the effects on their marriage to the Government's examiner: "He stated that the shooting has changed them as individuals (e.g., they are more irritable with each other), and has stressed their relationship. Their focus as a couple and their plans for travel have also been impacted." GEX-665, at 12.

[113] **E.W.'s loss of consortium damages for injury to her father, Kris Workman**. Plaintiff E.W. is the minor daughter of Plaintiffs Kris Workman and Colbey Workman. Kris Workman suffered catastrophic injuries in the shooting. E.W. was not present in the church at the time of the shooting. She was born in 2014 and was three years old at the time. PEX-908, at 10. E.W. is aware that her father is different and appears anxious to her mother about the fact that he is different. PEX-908, at 54. Colbey Workman testified: "Yeah, she doesn't like to tell him things about her life because she feels like he won't want to hear them. A lot of times when she does or has tried in the past to share things with him, he is asleep, or he is in pain, or he is on the toilet, or he actually has a moment of time to get some work done so he is busy and she knows that—or we have talked about that, reasons why he feels that way." PEX-908, at 54.

Dr. Joanne Murphey conducted a psychological interview and evaluation of E.W. with her parents on February 19, 2020, including administration of the TSCYC. She also reviewed her research on the impact of a disabled

parent at length in her report of that date. PEX-19069, at 6-9. She documented that E.W. dealt with separation anxiety following the shooting due to her father's extend stay in hospitals and frequent hospital visits for therapy, evaluation and treatment thereafter. PEX-19069, at 5. She concluded based on her interview, her training and experience and the peer-reviewed literature that E.W. has and will continue to experience adjustment disorder with anxious features and may or may not develop anxiety disorder. PEX-19069, at 9). It is undisputed that Kris Workman, E W's father, has irreversible permanent paraplegia with loss of sensation below the waist. E.W. has lost the consortium of her father, Kris Workman, to the extent that he can no longer engage in some of the activities of a non-disabled father, and the psychological effects on E.W. of interacting with Kris Workman, who has been diagnosed with PTSD and her mother, Colbey Workman, who has been diagnosed with both major depressive disorder and anxiety as a result of the shooting.

Dr. Murphey confirmed at trial that E.W. experienced separation anxiety and that she was aware her Dad could no longer play outside with her after the shooting PEX-946, at 216. She further confirmed that E.W. will have to adjust to life with her father and her incipient awareness of her father's bowel and bladder program and that she may well have no brothers and sisters in that her father may not be able to be a Daddy to give her any brothers or sisters as a result of his injury. PEX-946 at 217-218. Those factors, she testified, are some that support her diagnosis of continued adjustment disorder for E. W., PEX-946 at 219, notwithstanding that E.W. is presently doing well in school at the young age of seven years old.

114 **Colbey Workman's damages for the loss of consortium of her husband, Kris Workman**. Plaintiff Colbey Workman is married to Plaintiff Kris Workman. Kris Workman suffered catastrophic injuries in the shooting. Colbey was not present in the church at the time of the shooting. She married Kris in August of 2012 and they have one child from the marriage, E W. PEX-908, at 10. She characterized their marriage prior to the shooting: "Good. We communicated really well, we spent a lot of alone time together, and I would say we had a very good relationship." PEX-908, at 18. As an example, she testified that they enjoyed attending a wedding event only a month before the shooting, as part of the wedding party. PEX-908, at 21.

As a result of the paraplegia suffered by Plaintiff Kris Workman, he has no sensation that will allow him to attain an erection or to ejaculate. PEX-908, at 39. Attempts to treat his catastrophic sexual dysfunction have not succeeded: "It's—it was something that we tried to be optimistic about at first and thought that maybe with time or medications that that might help, but nothing really seems to have helped to the point where we were able to satisfactorily have sex, and so actually, it's—for a while now, we just haven't even really tried." PEX-908, at 40. Colbey Workman described the toll on their marriage: "Hopeless and a little bit like we may never really be as close as we were before because it's taken an extreme emotional toll on both of us, and so we don't even really talk about it." PEX-908, at 40.

The likelihood that Kris can father children is low: "He has so far been unable to get a full erection, that makes it pretty difficult. He has so far been unable to ejaculate at all, so having a child naturally would not be possibility at all. So, we probably would have to consider IVF……Yeah. But I'm not even sure if that would work, because we don't really know the status of his sperm count or what he has available. PEX-908, at 41.

Plaintiff's retained urological expert opined as follows: "There are techniques to aspirate sperm from the testes and use for artificial insemination. This often requires multiple attempts and is often very costly. The general cost currently is in the $20,000 range at an in vitro fertilization center or if done at the University Hospital in the $8,000-$12,000 range. In addition, significant issues exist with diminished sperm motility in patients with paraplegia and loss of sensation below the waist as a group. Therefore, the likelihood that Mr. Workman can donate viable sperm for use in artificial insemination is questionable." PEX-19033, at 1. In addition: "His fertility status is also compromised by the nerve injury with the inability to ejaculate and pregnancy cannot occur and no sexual fluid can be obtained from artificial insemination. There are treatments for this with aspiration of sperm from the testes and then using artificial insemination techniques a pregnancy could occur, but with the recurring infections, the sperm motility and sperm health could be impaired and have a decreased chance of fertility." PEX-19033, at 2.

Plaintiff Colbey Workman has sought and received counseling for depression followed by medication (Effexor) prescribed by Dr. Hendley. PEX-908, at 42. She testified: "I started taking the first medication because I guess

I finally gave up that I could do any of this on my own, and I was too anxious and depressed all the time to enjoy any part of my life." PEX-908, at 45.

The status of Plaintiff Colbey Workman's marriage to Kris Workman is uncertain: "I'm just not really sure how well he will handle getting older because he's already in a lot of pain all the time, and he is—he still does some of the same things, but he doesn't really engage himself as much in things that he enjoys, so I just—we don't really communicate as well as we used to because he is very impatient right now because of pain and he's just tired, and I am anxious that that will not improve." PEX-908, at 46.

When directly asked about processing the uncertainty, she testified: "Yeah, just Kris is working right now, but I know that he struggles, and he and I are both anxious that that's not something he'll be able to do forever. …His levels of pain are intense enough that sometimes he just has to go to sleep because that's the only way that he can get through it, so he takes frequent breaks, and then he can't eat anything during the day when he's working because he has to immediately evacuate his bowels, and he can't—he doesn't have time in his workday to do that and work successfully." PEX-908, at 51-52.

Colbey Workman attempted to supplement Kris Workman's income as the sole breadwinner and contribute to the marriage but failed because she was overwhelmed with responsibilities. PEX-908, at 48-50. "Yeah. That was part of the reason I decided to go to school to begin with, because I wanted to have the option that if Kris couldn't work because of various reasons, because of pain or whatever he was going through that I could work." PEX-908 at 50.

The Government's examiner concluded that Colbey Workman suffers from major depressive disorder and panic disorder. GEX-249, at 11-12. That examiner documented that physical intimacy was always a critical component of Plaintiff Colbey Workman's relationship with Kris Workman, and the anxiety produced by the fact that her husband no longer has sensation below the waist GEX-249, at 4.

Dr. Chris Ticknor conducted two evaluations of Colbey Workman. He concluded in pertinent part in his report of December 19, 2019:

- "Colbey related with thoughtfulness and concern that it is likely she and her husband will not be able to have additional children in the

future because of Kris Workman's spinal cord injuries and subsequent paralysis. Colbey volunteered that she and Kris have talked about hopefully having another child which may or may not be possible. If so, it is likely to involve expensive invitro fertilization or other obstetrical means for Colbey to conceive. Colbey acknowledged that adoption might be a possibility for her and Kris, but they would do so only after failing to have a child of their own. PEX-19065, at 4.

- "Colbey Workman affirms similar information gathered from Kris Workman that the impact of the physical disabilities Kris has sustained from the shooting in Sutherland Springs has led to a tragic loss of consortium for this married couple. Both Kris and Colbey Workman are private people. They respectfully talked about their loss of physical intimacy, but also conveyed that given their strong spiritual faith and devotion to each other, that they have worked hard at finding aspects of the tragedy that have led them to feel closer to each other, more trusting of each other, and finding the confidence to survive whatever the future may bring." PEX-19065, at 4-5.

[115] **Chancie McMahan's loss of services due to the injury of her child, R.W.** Chancie McMahan, Individually, seeks $250,000.00 for the loss of household services R.W. would have provided to her household until the age of eighteen years. R.W. has impaired functioning of his hand and difficulty walking and bearing weight. Dmg. Trial Tr. 1930:15; 2126:10-18. Given his physical limitations, R.W. cannot use his body as a normal boy and can only perform light tasks or more sedentary activities. *Id.* at 2159:23-2160:10. R.W. is thus unable to assist his mother in basic everyday tasks that he would be expected to perform, such as mowing the lawn, helping with dishes, helping pull weeds, take out the trash, and general clean up around the home. *Id.* at 2159:23-2160:10.

[116] **Elizabeth Braden's damages for loss of services due to injury to her child, Z.Z.** *See* Tex. Pattern Jury Charge § 28.6 (2020). Elizabeth Braden's 7-year-old child, Z.Z. was gravely injured in the church shooting and she has suffered loss of services of her minor child over the course of her life. Z's injuries, both psychological and physical prohibit her from performing the services a normal child would perform. Medical testimony clearly establishes that Z's injuries have inhibited her ability to perform her Activities of Daily Living and decreased her physical function. Doctors have opined that she has

a decreased ability to perform household services e.g., inside housework, food cooking, and cleanup. PEX-3231, at 52.

117 **Keith Braden's physical pain & mental anguish damages**. Keith Braden was present in the church on November 5, 2017 and shot and killed. In the church with Mr. Braden that day were his wife, granddaughter, and son. Plaintiff Keith Braden was shot seven times at his right calf, right thigh, right hip, right lower back, and right flank. A graphical depiction of these injures is at PEX-3102, at 8. Keith Braden suffered significant conscious pain and suffering in the process of dying due to torn soft tissues, nerves and organs, right rib and femur fractures caused by numerous projectiles, distress of seeing and hearing the shooting, anxiety from physiological changes of the body due to significant blood loss and worry for his family members who were also harmed.

Plaintiff Robert Braden testified that he checked on his father, Keith Braden, after the shooting and found he was still alive, "[s]o when I jumped down, I immediately saw my dad laying on the ground…I went over to check on him. He wasn't moving very much at all, but I went to check on him. I did feel a faint pulse in his neck. I told him that I was going to check on Mom and Dad -- or Mom and Z". PEX-906, 23:21-24:1. "So at that point I went back over to my dad. I had climbed back over him again and grabbed his hand, let him know that, you know, Mom and -- Mom was okay, Z was okay, and he squeezed my hand a little bit just reassuring me that he was aware enough to know what I was saying to him." PEX-906, 24:6-11. "[T]he next time I checked on him, he -- I couldn't find a pulse again." PEX-906, page 24:12-13. At trial Plaintiff Deborah Braden described her experiencing her husband, Keith Braden's, last moments, "And at that point, Keith was alive. And he said, "Okay." And, I mean, I felt the kick when Keith died. I felt his foot kick. And I knew he was dead, but I didn't want to accept it. It was just too heart-wrenching." Dmg. Trial Tr. 1462:11-14.

118 **Robert Corrigan's physical pain & mental anguish damages**. Robert Corrigan was present in the church on November 5, 2017 and shot and killed. A graphical depiction of these injures is at PEX-7038-9. Plaintiff was shot seven times in the chest, left upper arm, lower left flank, left buttock, and anal region. Plaintiff suffered in the process of dying from torn soft tissues, nerves and organs, and bone fractures caused by numerous projectiles, the distress of seeing and hearing the events during the shooting,

and anxiety from physiologic changes of the body due to significant blood loss. Mr. Corrigan suffered enough blood loss to result in hemorrhagic shock, causing anxiety before death PEX-7038, at 7. Physical evidence reveals that Mr. Corrigan sustained bullet wounds as he was crawling on the floor between pews after the shooting began. Additionally, his chest entrance wounds make clear that he made purposeful movements to become lying on his back after he was shot. PEX-7038, at 6. As Plaintiff Julie Workman testified at trial, "Bob [Corrigan] was laying face up with this horrible look on his face, his eyes wide open. And I knew that Bob was dead." Dmg. Trial Tr. 456:16-18. As Plaintiff John Porter Holcombe testified, "Bob Corrigan did not survive." *Id.* at 77:18.

[119] **Shani Corrigan's physical pain & mental anguish damages**. Shani Corrigan was present in the church on November 5, 2017 and shot and killed. A graphical depiction of these injures is at PEX-7044-8. Plaintiff was shot nine times in the neck, back left shoulder, left mid back, the left buttock, right hip, medial right thigh, left chest, back of her head, left abdomen, and dorsum of the left arm. Plaintiff suffered in the process of dying from facial and abdomen injuries and distress from seeing and hearing the events during the shooting PEX-7044, at 7. Based on the locations of her wounds, and the location in which her body was found, it is clear that Ms. Corrigan was alive when the shooting began, and then took cover under a pew; the lethal wounds she sustained were inflicted after she was laying face down on the church floor. She was alive for several minutes before the shooting began before meeting her demise PEX-7044, at 6. As Plaintiff Julie Workman testified at trial, "I go to the right where my friend Shani is laying sprawled out, urine everywhere. I knew she wasn't alive." Dmg. Trial Tr. 456:9-11.

[120] **Crystal Holcombe Physical Pain & Mental Anguish Damages.** Crystal Holcombe died of multiple gunshot wounds. PEX-8010 (death certificate); PEX-8012 (injury illustration). Mrs. Holcombe was shot at least eleven (11) times. PEX-8011, at 3–8 (Gwin report describing in detail the gunshot wounds). There is no question that Mrs. Holcombe was still alive and perceiving the danger to herself and her children (including her unborn child), as when Kelley first began shooting, Mrs. Holcombe got up and was walking her children to the left wall. JEX-647, at 29 (J.P. Holcombe Declaration). Based upon medical and physical evidence, Mrs. Holcombe suffered at least one gunshot wound before her fatal head wounds and then exhibited purposeful movement by taking cover on the floor of the church and

positioning herself in a protective embrace of her daughter, Minor M.H. PEX-8011, at 6–8. While trying to protect her minor daughter from the gunman, she was shot several more times. *Id.* Mrs. Holcombe was "alive and conscious after the shooting began and for a period of time after the shooting began." *Id.*, at 8. Mrs. Holcombe experienced significant pain and suffering from the multiple gunshot wounds causing "torn soft tissues and nerves, and bone fractures caused by numerous projectiles damaging her body." *Id.* She also experienced significant mental anguish from the distress of seeing and hearing the events around the shooting and "[a]nxiety from physiologic changes of the body due to significant blood loss." *Id.*

In scene photographs, deceased Crystal Holcombe is protectively embracing her deceased daughter, Minor M.H. *See, e.g.*, PEX-1153, at 56; PEX-1147, at 15. Part of Crystal's mental anguish claim is the fact that she died in church surrounded by her husband, four children, father-in-law, mother-in-law, brother-in-law, sister-in-law, and niece-in-law. Crystal was present and perceived her family members being shot and experiencing terror and suffering in a supposed place of sanctuary. PEX-8023, at 7. Minor EJH was with her mother during the shooting and remembers her mother begging Kelley not to kill her children and that Kelley shot her siblings in front of her mother. Dmg. Trial Tr. 99 (J.P. Holcombe). Under Texas law, Crystal should be compensated for bystander damages. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988).

[121] **Minor G.H. Physical Pain & Mental Anguish Damages.** Minor G.H. died of multiple gunshot wounds. PEX-8018 (death certificate); PEX-8020 (injury illustration). Minor G.H. was shot at least twenty-five (25) times. PEX-8019, at 3–8 (Gwin report describing in detail the gunshot wounds). Based upon medical and physical evidence, Minor G.H. suffered numerous gunshot wounds to his head, chest, back, spine, flank, buttock, ribs, both thighs, right lower leg, and left arm. *Id.* at 4.

Based on the medical and scene evidence, Minor G.H. made purposeful movements after being shot and suffered additional and ultimately fatal wounds while taking cover. *Id.* Therefore, Minor G.H. "was alive and conscious after the shooting began and for a period of time after being initially shot" and "suffered significant conscious pain and suffering as she lay dying." *Id.*, at 8. Specifically, Minor G.H. sustained several wounds on the anterior aspect of his body at an earlier point in time than the rapidly fatal

wounds of the posterior aspect of the body. *Id.* Minor G.H. ultimately experienced significant physical pain and suffering from the multiple gunshot wounds causing "torn soft tissues and nerves caused by numerous projectiles damaging his body." *Id.*

Part of Minor G.H.'s mental anguish claim is the fact that he died in church surrounded by his mother, three sisters, stepfather, step-grandfather, step-grandmother, step-uncle, step-aunt, and step-cousin. Minor G.H. was present and perceived his family members being shot and experiencing terror and suffering in a supposed place of sanctuary. PEX-8015, at 6–7. Under Texas law, he should be compensated for bystander damages. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988).

[122] **Minor M.H. Physical Pain & Mental Anguish Damages.** Minor M.H. died of multiple gunshot wounds. PEX-8022 (death certificate); PEX-8024 (injury illustration). Minor M.H. was shot at least six (6) times. PEX-8023, at 4–7 (Gwin report describing in detail the gunshot wounds). Based upon medical and physical evidence, Minor M.H. suffered gunshot wounds to various organs, most of which would not have been immediately fatal, and even after sustaining a gunshot wound to her head, the medical evidence confirms it was not immediately fatal. *Id.* at 6. Therefore, Minor M.H. "was alive and conscious after the shooting began and for a period of time during the shooting" and "suffered significant conscious pain and suffering as she lay dying." *Id.*, at 7. Minor M.H. experienced significant physical pain and suffering from the multiple gunshot wounds causing "torn soft tissues and nerves, and bone fractures" caused by numerous projectiles damaging her body. *Id.* She also experienced significant mental anguish from the distress of seeing and hearing the events around the shooting. *Id.*

In scene photographs, deceased Crystal Holcombe is protectively embracing her deceased daughter, Minor M.H. *See, e.g.*, PEX-1153, at 56; PEX-1147, at 15. Part of Minor M.H.'s mental anguish claim is the fact that she died in church surrounded by her mother, two sisters, brother, stepfather, step-grandfather, step-grandmother, step-uncle, step-aunt, and step-cousin. Minor M.H. was present and perceived her family members being shot and experiencing terror and suffering in a supposed place of sanctuary. PEX-8023, at 7. Under Texas law, she should be compensated for

bystander damages. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988).

123 **Minor E.H. Physical Pain & Mental Anguish Damages.** Minor E.H. died of multiple gunshot wounds. PEX-8014 (death certificate); PEX-8016 (injury illustration). Minor E.H. was shot at least six (6) times. PEX-8023, at 3–7 (Gwin report describing in detail the gunshot wounds). It is clear from the evidence that Minor E.H. survived the shooting for several minutes but was in significant pain and struggling for breath while being attended to by parishioners and first responders. Dmg. Trial Tr. 463-466 (J. Workman describing her efforts to revive Minor E.H. and the sounds of her "gasping for air" during the final stages of agonal breathing); PEX-8023, at 6.

Based upon medical and physical evidence, Minor E.H. suffered six gunshot wounds to her right eye and face, neck, chest, abdomen, right elbow, and right thigh. PEX-8023, at 3–4. She was clearly "alive and conscious after the shooting began and for a period of time after being shot" and "suffered significant conscious pain and suffering as she lay dying." *Id.*, at 7. Minor E.H. experienced significant physical pain and suffering from the multiple gunshot wounds causing "torn soft tissues, nerves and organs, and fractures caused by numerous projectiles damaging her body" caused by numerous projectiles damaging her body. *Id.* She also experienced significant mental anguish from the distress of seeing and hearing the events around the shooting and "[a]nxiety from physiologic changes of the body due to significant blood loss." *Id.*

Part of Minor E.H.'s mental anguish claim is the fact that she died in church surrounded by her mother, two sisters, brother, stepfather, step-grandfather, step-grandmother, step-uncle, step-aunt, and step-cousin. Minor E.H. was present and perceived her family members being shot and experiencing terror and suffering in a supposed place of sanctuary. PEX-8015, at 6–7. Under Texas law, she should be compensated for bystander damages. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988).

124 **Dennis Johnson Sr. Physical Pain & Mental Anguish Damages.** Dennis Johnson died of multiple gunshot wounds. PEX-9000 (death certificate). Mr. Johnson suffered at least ten (10) gunshot wounds. PEX-9009, at 5 –6 (Gwin report describing in detail the wounds). Based on the medical evidence, "Mr. Johnson Sr. underwent aforementioned psychologic

responses to increasing blood loss and likely suffered some degree of anxiety." *Id.* at 6–7.

The evidence shows that Mr. Johnson "had purposeful movement to take a position of cover" after being shot, "where he sustained numerous additional gunshot wounds." *Id.* at 7. In conclusion, Mr. Johnson was "alive and conscious after the shooting began and for a period of time after being shot." *Id.* In sum, Mr. Johnson experienced significant pain and suffering from the multiple gunshot wounds and also experienced significant mental anguish from seeing and hearing the events around the shooting and the anxiety from the psychologic changes to the body.

Before the shooting, Mr. and Mrs. Johnson lived together and independently at their house in Sutherland Springs, TX. PEX-916, at 15 (C. Johnson Dep.). Mr. and Mrs. Johnson were married for approximately 44 years. Dmg. Trial Tr. 1403:21–22; PEX-919, at 27 (K. Wall Dep.). They lived a loving life with their family. PEX-9004 (photos); PEX-9005 (video); PEX-9006 (Photos). Part of their mental anguish claim is the fact that they died in the church. This was a place they loved and rarely skipped attending. PEX-902, at 34–35 (J. Graham Dep.). Mr. Graham explains the unimaginable horror that they must have felt because of the location of their murder. *Id.* at 34–35. One of Mr. Johnson's last acts—even though he was unarmed and 77 years old—was to try and charge the shooter to prevent him from killing more people. Dmg. Trial Tr. 822:14–23:9 (Colbath). After Kelley shot Mr. Johnson, he started to try and hide Ms. Johnson. PEX-916, at 38 (C. Johnson Dep.). There was another lady who was screaming, but Sara Johnson tried to calm her down and tried to get her to be quiet. Id. But the shooter saw him, walked over and killed Sara. *Id.* Dennis got up and tried to attack Kelley, but he got "sprayed across the chest." PEX-916, at 39. But even that wasn't enough to kill Mr. Johnson. Id. Mr. Johnson crawled back to Sara Johnson and tried "to hold her brains in. And that's how he died, looking in her eyes." *Id.* Mr. Johnson also watched Ms. Johnson get shot and die; and under Texas law, each should be compensated for bystander damages. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988).

[125] **Sara Johnson Physical Pain & Mental Anguish Damages**. Sara Johnson died of multiple gunshot wounds. PEX-9001 (death certificate). Specifically, Ms. Johnson suffered two gunshot wounds to her body. PEX-

9010, at 4 (Gwin report). The first gunshot wound was to her left arm. The first gunshot wound is to her right eye. *Id.* at 4–5. She sustained this gunshot wound after she had taken cover. *Id.* at 5. Dr. Gwin reports that this gunshot wound did not "immediately" kill her. *Id.* at 5–6. She suffered significant conscious pain and suffering in the form of physical injuries from the bullet wounds, and significant mental anguish from the distress of seeing and hearing the events of the shooting.

Part of the Johnsons' mental anguish claim is the fact that they died in the church. This was a place they loved and rarely skipped attending. PEX-902, at 34–35 (J. Graham Dep.). Mr. Graham explains the unimaginable horror that they must have felt because of the location of their murder. *Id.* at 34–35.

One of Mr. Johnson's last acts—even though he was unarmed and 77 years old—was to charge the shooter to prevent him from killing more people. Dmg. Trial Tr. 822:14–23:9 (Colbath). After Kelley shot Mr. Johnson, he tried to hide and protect Ms. Johnson. PEX-916, at 38 (C. Johnson Dep.). There was another lady who was screaming, but Sara Johnson tried to calm her down and tried to get her to be quiet. *Id.* But the shooter saw him, walked over and killed Sara. *Id.* Dennis got up and tried to attack Kelley, but he got "sprayed across the chest." PEX-916, at 39. But even that wasn't enough to kill Mr. Johnson. *Id.* Mr. Johnson crawled back to Sara Johnson and tried "to hold her brains in. And that's how he died, looking in her eyes." *Id.* Because Ms. Johnson watched as Mr. Johnson got shot multiple times before being shot herself, she should be compensated for bystander damages as well. B*oyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988).

[126] **JoAnn Ward's physical pain and mental anguish damages.** JoAnn Ward was present in the Church during the shooting on November 5, 2017. JoAnn Ward was just 30 years old at the time of her death. PEX-1056. JoAnn suffered seven gunshot wounds during the shooting. PEX-1056. She suffered a gunshot wound to the head, gunshot wound of the left edge of the chest, gunshot wound of the left side of her chest, gunshot wound of her central chest, gunshot wound of her right side of the check and abdomen superior, gunshot wound of her right side of her chest and abdomen inferior, and a gunshot wound of her abdomen. PEX-1056. JoAnn also had additional

abrasions, lacerations, and contusions of her face, chin, trunk, and right arm. PEX-1056.

Joann always put her kids first, her family first. PEX-910, at 10:12–12:5. She was passionate about making sure her children and her husband had everything they needed, that they were cared for before taking care of herself. *Id.* She was optimistic, always looking on the bright side of things. *Id.* She would do charity walks for autism and child abuse fundraisers with her children. *Id.* She fostered dogs. *Id.* These things were important for her to show her children. *Id.*

JoAnn was protective; she only allowed her sister Mandi or her parents to watch her children. *Id.* JoAnn was the protector of the household. PEX-941, at 6:24–9:1. She would make sure that her children always had what they needed and that they were always okay. *Id.* R.W., JoAnn's stepson, had two moms. Dmg. Trial Tr. 1919:18–1920:6. R.W. called JoAnn, Mama Jo-Jo. *Id.* Chancie McMahan, R.W.'s biological mother, trusted JoAnn to keep R.W. safe; she was a good mom. *Id.* When R.W. woke up in the hospital after the shooting, he said he saw Mama Jo-Jo in heaven. *Id.* at 1927:4-22.

[127] **E.G.'s physical pain and mental anguish damages**. E.G. was present in the Church during the shooting on November 5, 2017. E.G. was just seven years old at the time of her death. E.G. suffered five gunshot wounds in the shooting. E.G. sustained a graze wound of her left upper arm, gunshot wound of her pelvis, gunshot wound of her left thigh, gunshot wound of her posterior left lower leg, and a gunshot wound of her left foot. E.G. also had abrasions of her face with minor contusions and abrasions of her trunk and extremities. PEX-17119; PEX-1040.

After the shooting, E.G. was taken to University Health System Hospital via AirLife at 11:42 am. PEX-17116 at 58; PEX-17116 at 66. E.G. was reported to be opening her eyes on scene. PEX-17116, at 50. She arrived at the hospital intubated. She was immediately taken to the operating room for exploration of the pelvis. She suffered extensive intra-operative blood loss secondary to iliac versus vena cava vein injury. She deteriorated, requiring CPR and emergent thoracotomy, and intra-cardiac massage. PEX-17116, at 53; PEX-17116, at 68-69. E.G. was given 20 units of blood, ten units of thawed plasma, and three doses of platelets. PEX-17116, at 57. After 3 hours of resuscitative efforts, E.G.'s status did not improve. Discussion was made the available family about futility of care, and the decision was made to stop

resuscitative efforts. E.G. was pronounced dead at 2:45 pm. PEX-17116, at 53.

E.G. was referred to as "Emy" by her family. PEX-910, at 8:8-16. She was very hands-on with wanting to help the men in the family fix or repair something. Id. She loved to work outside. She loved Johnny Cash, Selena, Whitney Houston, and a mix of all music. Id. If she was singing, she was happy. She was always happy, smiling, and laughing. She was just "the perfect child." Id. E.G. was a very shy, caring, loving person. PEX-941, at 6:24–7:13. E.G. was R.T.'s best friend. PEX-910, at 9:2-7.

[128] 2d Amd Stipulation, ECF No. 576, at 2 ¶ 5(a).

[129] **B.W.'s physical pain and mental anguish damages**. B.W. was present in the Church during the shooting on November 5, 2017. B.W. died with her sister and mother. B.W. was just five years old at the time of her death. PEX-1028. B.W. suffered four gunshot wounds during the shooting. Id. B.W. suffered a gunshot wound of the head, perforating gunshot wound of her face, perforating gunshot wound of her left hip, penetrating gunshot wound of her right lower back. Id. B.W. also had lacerations, abrasions, and contusions of the trunk and extremities. Id.

B.W. was known as "Boogie" by her family. PEX-910, at 9:10-22. She was a girly girl who loved anything that sparkled and glittered. Id. B.W. was obsessed with Peppa Pig, so much so that she started talking with a British accent. Id. She had a contagious laugh. If you were upset, she could make you laugh. Id. B.W. was sassy; she would say whatever was on the top of her head, she was very lovable and caring. PEX-941, at 6:24 to page7:13. She was Daddy's little girl. B.W. liked Chris to carry her or to sit in his lap. PEX-923, at 25:5–27:10.

During the walk-around portion of church that morning, B.W. had danced and hugged Julie Workman. Dmg. Trial Tr. 458:22–460:1. She was dancing, showing off her ballet moves, in her blue Cinderella dress. Id.

After the shooting stopped, Julie found B.W. lying face down. Id. The entire back of her head was blown off. Id. Julie Workman began screaming. Id. Gunny Macias yelled at her like she was on the battlefield:

"Julie, get it together. This day didn't take God by surprise. You were trained for this day. Use all of your skills and all of your training to get people out of here. Anybody who's alive, get them out of here." *Id.*

Julie responded, "You give me one minute to yell for this baby. This is all uncalled for. She didn't deserve this." *Id.*

130 **Robert Marshall's physical pain and mental anguish damages**. Robert Marshall was present in the church on November 5, 2017 and shot and killed. A graphical depiction of these injures is at PEX-11035-10. Plaintiff was shot three times in his right lateral thigh and left lateral hip. Plaintiff suffered in the process of dying from torn soft tissues, nerves and organs, and bone fractures caused by projectiles, distress of seeing and hearing the events of the shooting, and anxiety from physiologic changes of the body due to significant blood loss. PEX-11035-8.

Mr. Marshall was injured but alive at the conclusion of the shooting. As Julie Workman testified at trial, "[a]nd then behind them was the new couple, the Marshalls. And Mr. Marshall was screaming, 'My beautiful wife. My wife. Help my wife.' And I looked at his wife, and she also was laying in her body excrements. And I told Mr. Marshall -- he was trying to get up to get to his wife, and I realized that he was having difficulty breathing. And I told Mr. Marshall I needed him to stay down, to sit, to concentrate on his breathing, that the ambulance and help was on its way. I realized -- he was leaning over this way, so -- and I told him he needed to put his hand and put pressure there. I didn't have anything that I could stop a flailing chest wound -- that wasn't the words I used at that time, but that's what I know it was. But I needed him to hold pressure and to stay down and stay calm until he could get help, that he needed to work on his breathing." Dmg. Trial Tr. 457:4-21.

Mr. Marshall received medical intervention after the shooting; he was transported from inside the church to the front yard of the church on a body board; clothing was cut by first responders in order to assess him and attempts were made to staunch bleeding by placing bandages on him. Unfortunately, that intervention was not successful, and he perished on the front lawn of the church PEX-11032, at 7.

[131] **Karen Marshall's physical pain & mental anguish damages**. Karen Marshall was present in the church on November 5, 2017 and shot and killed. A graphical depiction of these injures is at PEX-11041, at 8. Plaintiff was shot three times in her left chest, hips, and lower back. All of Ms. Marshall's wounds have trajectories of left to right, indicating she was initially shot in a manner that was not immediately fatal when the initial round of shooting from outside of the church began. Further, scene photographs show blood around airways that is indicative of coughing up blood and other agonal respirations. PEX-11041, at 5. Blood patterns exhibit evidence of purposeful movements after death. PEX11041, at 6. Plaintiff suffered in the process of dying from torn soft tissues, nerves and organs, and pelvic fractures caused by projectiles, and distress of seeing and hearing the events of the shooting. PEX-11041, at 6.

As Julie Workman testified at trial, "And then behind them was the new couple, the Marshalls. And Mr. Marshall was screaming, 'My beautiful wife. My wife. Help my wife.' And I looked at his wife, and she also was laying in her body excrements. And I told Mr. Marshall -- he was trying to get up to get to his wife, and I realized that he was having difficulty breathing. And I told Mr. Marshall I needed him to stay down, to sit, to concentrate on his breathing, that the ambulance and help was on its way. I realized -- he was leaning over this way, so -- and I told him he needed to put his hand and put pressure there. I didn't have anything that I could stop a flailing chest wound -- that wasn't the words I used at that time, but that's what I know it was. But I needed him to hold pressure and to stay down and stay calm until he could get help, that he needed to work on his breathing." Dmg. Trial Tr. 457:4-21.

[132] **Tara McNulty's conscious pain and mental anguish.** PEX-12001 (Tara McNulty Death Certificate); PEX-12006 (Dr. Gwin Report and medical illustration—pain and suffering).

Tara McNulty was aware of her impending death and, as one of the last people to get shot and killed in the church, suffered for an extended period of time before being killed. PEX-900, at 31 (M. McKenzie Dep.) (Tara was killed during the third wave of shooting). And even after Tara was shot and killed she did not die immediately—Margaret McKenzie was holding Tara's hand when Tara got shot in the head. She felt Tara's hand losing the grip and not

long after that Margaret was shot in the leg. PEX-900, at 33 (M. McKenzie Dep.).

When the shooting started and sounded like fireworks, she realized first and she pushed her daughter Hailey down underneath the pew. Tara kept telling Hailey "it's going to be okay, baby. It's going to be okay." She told Hailey she loved her. Dmg. Trial Tr. 246-247 (H. McNulty). Tara called 911. Then, Hailey was shot in the leg and they saw the puddle of blood. Hailey turned to her mom. Tara said "it's okay. you have to keep pressure on it." Dmg. Trial Tr. 248 (H. McNulty). Tara saw Hailey was shot and bleeding. She saw and heard Hailey calling out for "mamma." PEX-900, at 22 (M. McKenzie Dep.). Tara called out to Bryan Holcombe sitting on the floor next to Hailey and told him to protect Hailey, saying "Get over there. Get my baby. Cover her, protect my baby." PEX-900, at 22 (M. McKenzie Dep.). After the first wave of shooting, the shooter went outside and Tara got up. Then the shooter came back and Tara got back down under the pew. PEX-900, at 27-28 (M. McKenzie Dep.). Tara was still alive throughout the second wave of the shooting, and was trying to get a man to protect Hailey during this wave. PEX-900, at 30 (M. McKenzie Dep.). During the second wave of shooting, Tara was trying to reach for her daughter Hailey and Tara was crying because she knew Hailey was shot. PEX-900, at 31 (M. McKenzie Dep.). The shooter went back out and came back for a third wave of shooting. That's when Tara starting yelling at the shooter "Stop, Stop, Stop!" The shooter heard Tara and that's when he shot Tara in the head. PEX-900, at 31 (M. McKenzie Dep.); Dmg. Trial Tr. 250 (H. McNulty).

Because Tara McNulty saw her children get shot and her aunt, Margaret McKenzie, get shot, Tara's estate should also be compensated for the conscious mental anguish flowing from this bystander claim. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988).

[133] **Ricardo C. Rodriguez's Survival Damages – Compensatory Damages for "Pain and Mental Anguish" -** Conscious Physical Pain and Emotional Pain, Torment, And Suffering Experienced by Ricardo C. Rodriguez before his death & Funeral and Burial Expenses. On November 5, 2017, Richard C. Rodriguez a/k/a Ricardo Rodriguez, 64 years old at the time, was attending church services at the Sutherland Springs First Baptist Church with his spouse, Therese Rodriguez, Deceased, and was initially

seated in the fourth pew from the front of the Church, on the closest available seat to the middle aisle on the right-hand side of the Church (*see* PEX-1223 looking from the rear of the Church to the front) when the mass shooting began. Richard was seated to the left of his wife Therese closest to the aisle. After the mass shooting, Richard was found face down in a position almost two rows forward from where he was initially seated when the mass shooting first started. He was found on the complete right-hand side of the Church where he had crawled to in an attempt to shield himself and escape from the shooter. *See* PEX-1227, at 1 and PEX-1153, at 20, PEX-1153, at 21, PEX-1153, at 23, PEX-1153, at 24, PEX-1153, at 25, and PEX-1153, at 26. Dr. Chester Gwinn, medical examiner, confirmed factually that Richard Rodriguez had been shot a total of eight times and had made purposeful movements in an attempt to escape, confirming that he was alive and conscious during the massacre. *See* Report of Dr. Chester Gwinn, Medical Examiner at PEX-15005, Autopsy Report of Richard C. Rodriguez at PEX-1086, and Death Certificate of Richard C. Rodriguez at PEX-15007. Regina Amador, as Independent Administratrix of the Estate of Richard C. Rodriguez, Deceased, seeks damages, for the "pain and mental anguish", meaning the conscious physical pain and emotional pain, torment, and suffering experienced by Richard C. Rodriguez, Deceased, from the moment the mass shooting began until his untimely death in the Church where he worshipped, after having crawled a significant distance in an attempt to save his life. She also seeks the reasonable amount of expenses for funeral and burial of Richard C. Rodriguez reasonably suitable to his station in life (*see* the funeral bill for Richard C. Rodriguez, Deceased at PEX-15008). The total bill was $9,057.00 (discounted by $2,375.00) and the Crime Victims Fund paid $6,500 which has a potential subrogation claim on any amount they paid for funeral and burial expenses.

The eight shots that struck Richard C. Rodriguez were located in different parts of his body: left and right thighs, back, right side of face and jaw. (PEX-15005-9) Richard C. Rodriguez suffered severe conscious physical pain and emotional pain, torment, and suffering prior to his and his loving wife's tragic and untimely deaths. The physical evidence showed he sustained torn soft tissues, damage to his nerves and blood vessels, and sustained multiple bone fractures caused by numerous projectiles. The Plaintiffs have presented through expert testimony, irrefutable evidence of conscious physical pain and emotional pain, torment, and suffering based on the wound pattern and physical location of Richard Rodriguez before and after his death.

The Government has offered no contradictory evidence. The abject terror of the events surrounding the shooting (over 450 rounds fired) are virtually undisputed, and are captured as the Court knows, on a graphic video of the events which further corroborates evidence of conscious suffering. These include the sights, smells, and sounds that preceded his death, and were accentuated by the death of his loving spouse, and further compounded by his desperate, but futile, attempt to crawl to safety on the far-right hand side of the Church and rows forward from where he began. The Court has graphic visual evidence of the manner in which the Shooter was clothed and masked, and the sounds of the semi-automatic weapon being discharged and ultimately filling the sanctuary with smoke from the Ruger AR-556 Rifle. The direct and circumstantial evidence of the probable conscious physical pain and emotional torment likely experienced by Richard prior to his untimely death is irrefutable. *See* PEX-15005-9 The shooting lasted approximately 7 minutes and 24 seconds based on the undisputed evidence. *See* PEX-1187.

The Autopsy Report, Dr. Gwinn's Report, and the forensic evidence confirms Richard sustained bullet wounds initially while standing, and additional bullet wounds after he took cover between the second and third pews, where he had crawled to after initially having sat next to his loving spouse and pew 4. PEX-15005. Three of the projectiles entered the posterior aspect of Mr. Rodriguez' body and two projectiles entered the anterior aspect of Mr. Rodriguez' left thigh. PEX-15005. In the position Mr. Rodriguez was found after the shooting, he could not have sustained the anterior wounds, therefore, it is clear that he made purposeful movements to become lying on his stomach after he was shot, and before the posterior wounds were inflicted. PEX-15005, at 6. The projectile that entered the right side of the face caused fatal injuries and was sustained after he took cover under the final pew where he was ultimately found. PEX-15005.

### [134] **Therese Rodriguez's physical pain & mental anguish damages.**

Therese Rodriguez died of multiple gunshot wounds. PEX-15034 (death certificate); PEX-15041 (injury illustration). Mrs. Rodriguez was shot at least six (6) times. PEX-15040, at 3–6 (Gwin report describing in detail the gunshot wounds). Based upon medical and physical evidence, "Mrs. Rodriguez sustained two rifle wound injuries of the anterior aspect of the body prior to exhibiting intentional movement in order to take cover face down on the church floor." *Id.* at 6. While hiding from the gunman, she was shot four more times, with three bullets striking vital organs in her abdomen

and chest. *Id.* In other words, Mrs. Rodriguez first sustained two gunshot wounds from projectiles that passed through the church wall and/or pews or other object after exhibiting purposeful movement to take cover on the church floor where she ultimately sustained fatal injuries. *Id.* Therefore, Mrs. Rodriguez was "alive and conscious after the shooting began and for a period of time after being shot." *Id.* Mrs. Rodriguez experienced significant pain and suffering from the multiple gunshot wounds causing "torn soft tissues and nerves" caused by numerous projectiles damaging her body. *Id.* She also experienced significant mental anguish from seeing and hearing the events around the shooting. *Id.*

Before the shooting, Therese and Richard Rodriguez lived happily together, working on projects in their yard, spending time with their children and grandchildren, and enjoying life. Dmg. Trial Tr. 1216:5–22 (G. Ramsey); PEX-15037 (photos). Part of their mental anguish claim is the fact that they died in the church. This was a place she loved and where she wanted to be. PEX-20026 (R. Ramsey defense psychological exam at 27:40-27:48). Mrs. Rodriguez watched her husband die in a supposed place of sanctuary; and under Texas law, each should be compensated for bystander damages. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988).

[135] **H.K's physical pain and mental anguish damages**. Farida Brown testified that H.K. was sitting in the row directly in front of her in the church before the shooting happened Dmg. Trial Tr. at 1126:21-1127:2. And H.K. was alive after the initial shots were fired from the exterior of the church because H.K. crawled under the pew with and hid next to her. *Id.* at 1128:19-21, 1131:20-21. While hidden under the pew as the shooting transpired, Farida Brown "held [H.K.'s] hand. And she looked at me. And those sad eyes wasn't moving, wasn't saying nothing" as they prayed together. H.K. watched silently as Farida Brown was shot and maimed directly in front of her. *Id.* at 1131:22-1133:25.

Brenda Moulton testified that H.K. was under the pew with her during the shooting and H.K. was alive and conscious as she showed Moulton her arm which was wounded by a gunshot and bleeding. PEX-9004, at 14:24-15:9.

Chester S. Gwin, MD's report notes that H.K. alive and conscious after the shooting began. PEX-5007, at 7. H.K. was shot fifteen (15) times. PEX-5003 at 5. He states that wounds "E" and "I" located "on the anterior aspect of

the body" "could not have been sustained when she was in" the position she was found in at death and must have been "sustained at an earlier point in the shooting." PEX-5003, at 6, 9 (diagram of H.K.'s wounds). "H.K. suffered significant conscious pain and suffering as she lay dying in the form of" "physical pain and suffering from torn soft tissues and musculature caused by numerous projectiles damaging her body" and "mental pain and suffering from" the "distress of seeing and hearing the events during the shooting incident from the initial shot to at least when Kelley began firing from inside the church." PEX-5003, at 7.

136 **Peggy Warden's physical pain and mental anguish damages**. Peggy Warden was present in the church on November 5, 2017, and shot and killed. A graphical depiction of these injures is at PEX-18063-8. Plaintiff was shot five times in her neck, right lower abdomen, right arm, left thigh, and left calf. Plaintiff suffered in the process of dying from torn soft tissues and nerves, bone fractures caused by numerous projectiles, distress from seeing and hearing the events during the shooting, and anxiety from physiologic changes of the body due to significant blood loss. PEX-18063, at 7. As Plaintiff Zachary Poston testified at trial, "[w]hen a few rounds started going through the back wall, I had a few rounds go right through me and my grandmother." Dmg. Trial Tr. 1849:17-18. "She was shot with probably a few rounds that hit me as well, because there was a few rounds that passed through between us that hit me on my right side on my abdomen and next to my elbow. And a few hit her on probably her left side. And that's how she got shot then." *Id.* at 1850:7-11. "I told her, 'Get down.' I grabbed her. We went to the floor, laying on our sides. And she kind of spooned – she was the bigger spoon for me." *Id.* at 1850:21-23. "She was kind of holding onto me, so she was wrapped around me." *Id.* at 1851:11-12. "I felt something hit her and do a zigzag pattern across my back but not hit me. I don't think it was a bullet that went through her into me. I think one hit her and severely wounded her. I'm not sure if it killed her or not." *Id.* at 1852:20-23.

137 Defendant stipulated that the Estate of Keith Braden suffered at minimum $60,046.00 in lost future earning capacity. 2d Amd Stipulation, ECF No. 576, at 10 ¶ 27. The remainder of this amount can be found at PEX-3101 (Fairchild Earnings Report – K. Braden).

138 **Deborah Braden's loss of companionship damages for the death of her husband**. Plaintiff Deborah Braden lost Keith Braden, her

husband. They had been married for 33.5 years. Plaintiff Deborah Braden testified that before the shooting they had a great and loving marriage. Deborah Braden described Keith Braden as "My husband was a sweet, loving man. He was very caring. He was a family man. He enjoyed having the kids around and teaching them new things" Dmg. Trial Tr. 1485: 8-10. Deborah Braden was directly next to her husband when he was killed. She testified, "my husband was laying next to me. We had our feet together. He was on the outside closest to the door, and Zoe and I were crawled up underneath together." Dmg. Trial Tr. 1459:8-10.

Plaintiff Deborah Braden suffers from loss of advice and counsel from her husband's tragic death on November 5, 2017. At trial, Plaintiff Braden testified to the advice and counsel that Keith Braden would give to her and their family, "He didn't like to fish, but he did know the kids liked to, and he knew I liked to. So he would bait the hook for the kids and we'd fish. Up there at Kerrville, we would fish on the river. They had little perch that the kids could catch." Dmg. Trial Tr. 1488:14-18.

Plaintiff Deborah Braden suffers from loss of companionship and society from her husband's tragic death on November 5, 2017. At trial, Plaintiff Braden testified about how Keith Braden would show his love for her and granddaughter, ZZ, "Keith was a very sensitive man as well…he'd leave me a note on the kitchen counter, you know, "Love you. Have a great day. I'll see you this evening or this afternoon." And Z, when she'd wake up and she'd see I got a letter, she finally told Grandpa, she goes, "Papa, how come you don't leave me love notes too?" And so he had to start writing love notes for her. He'd leave one for me and one for her. Or he'd bring in flowers if I was down. If he knew I was having a rough time, he'd bring home a bunch of flowers for me" Dmg. Trial Tr. 1487:4-15.

[139] **Deborah Braden's mental anguish damages for the loss of her husband**. Plaintiff Deborah Braden suffers from mental anguish from the loss of her husband. On September 4, 2019, Plaintiff Braden met with plaintiff's psychiatrist who diagnosed her with Major Depressive Disorder and Posttraumatic Stress Disorder PEX-3083-6. On October 29, 2020, Plaintiff Braden met with defense psychiatrist who diagnosed her with other specified trauma and stressor related disorder, major depressive disorder, and generalized anxiety disorder. At trial, Plaintiff Braden testified to having to adjust to life without her husband, "It was very difficult because he's the

one that -- he did so much for me, and we did so much together. It was a big hole in my heart not having him around. He used to do the checkbook and keep up with all of that. He knew where all the paperwork and everything was for everything. I had no clue. So I had to jump in and figure out where everything was and how to make it work. I didn't know. He did keep really good records. And he told me several times, he said, 'Honey, you need to sit down and look at this stuff. You know to know where -- you know, what bills we pay, what's what.' I had no clue. And that was very difficult. Physically, my heart aches with him not around. I miss just his -- he'll come in and just give me a little squeeze. And it's lonely. It hurts." Dmg. Trial Tr. 1492:17-1493:7.

As Plaintiff's expert, Dr. David Feltoon, concluded in his report about Plaintiff, "Mrs. Braden experiences several other changes since her husband's death. She has concentration problems. She is unable to focus on tasks. She has less energy, and she is more fatigued. She has difficulty making decisions. She is more withdrawn, and she avoids people. She feels abandoned and alone. There is less fun and less pleasure in her life; she suffers from anhedonia. She acknowledges being more easily agitated, angered and irritated. Mrs. Braden is unable to relax. She always is afraid that something bad is going to happen. She feels nervous, and anxious. She feels like she will never be happy again until she gets to heaven and reunites with her husband." PEX-3083, at 5.

Similarly, Mrs. Braden testified that she will not be complete until she is able to be reunited with her husband in Heaven. (Trial Testimony, 1511:11-13).

[140] **Rebecca Metcalf's loss of companionship and society damages for the death of her father, Keith Braden**. Plaintiff Rebecca Metcalf lost her father, Keith Braden, who was shot and killed in the church on November 5, 2017. Plaintiff Rebecca Metcalf was 36 years old at the time of her father's tragic death. Plaintiff Metcalf testified during her deposition in this matter that before the shooting, her father, Keith Braden, was a "great man". PEX-00931, at 37:10.

Plaintiff Metcalf suffers from loss of advice and counsel from her father's tragic death on November 5, 2017. In her deposition, Plaintiff Metcalf testified that she would regularly ask her father for advice regarding childcare, "I would talk to him when my oldest boy would give me a hard time

and he would always come back and tell me something stupid that I did as a teenager and some of the things he had to deal with me." PEX-931, at 41:16-19. Further, Plaintiff testified that her father helped her around her house and repaired things, testifying, "he told me how to fix my car." PEX-931, at 39:24-40:3.

Plaintiff Metcalf suffers from loss of companionship and society from the loss of her father. In her deposition, she described how a hole has been formed in their family, "We've always been fairly close. We would do family get-togethers and all of us would just kind of hang out and tease each other and give each other a hard time about just stupid little things. And now we don't -- it's kind of like there's a rift between us now. We still spend time together, we still do the family events, it's just not the same without Dad around. He was kind of the one that brought us all together and -- I guess that's the best way to describe it. He was the one that brought us all together and now that he's not there, it's just no matter how much you try, there's something missing. It's just not the same." PEX-931, at 34:4-15.

[141] **Rebecca Metcalf's mental anguish damages for the death of her father, Keith Braden**. Plaintiff Metcalf suffers from mental anguish from the loss of her father. On September 4, 2019, Plaintiff Metcalf met with plaintiff's psychiatrist who diagnosed her with Major Depressive Disorder. PEX-3240-5. On October 8, 2020, Plaintiff Metcalf met with defense psychiatrist who diagnosed her with Posttraumatic Stress Disorder with panic attacks. In her deposition, Plaintiff Metcalf testified that she is unable to return to working in emergency healthcare, explaining that she mentally cannot go back to working EMS. PEX-931, at 15:6-17.

[142] **Robert Braden's loss of consortium claim for the death of his father, Keith Braden**. Plaintiff Robert Braden lost his father, Keith Braden, who was shot and killed in the church on November 5, 2017. Plaintiff was 29 at the time of his father's tragic death. Plaintiff Braden suffers from loss of advice and counsel from his father's tragic death on November 5, 2017. In his deposition, Plaintiff Braden testified that six weeks before the shooting, Keith Braden was best man at his wedding, "[s]o it -- it just seemed like a fitting choice to pick him for my best man. I mean, like I said, I -- I didn't have the highest view of him as a kid, but as I grew up, I realized what he was doing in life and how he was just preparing us for anything that came our way, just constantly teaching us, guiding us, always there for advice. I

mean, he was – our relationship into adulthood had kind of grown more to a friendship than it was, you know, a father and a child so it -- it just seemed like the fitting choice to pick him, since he was always there for us." PEX-906, at 39:17-40:2.

Plaintiff Braden suffers from loss of companionship and society. In his deposition, Plaintiff testified that his father, "[h]e would -- he would always come up with stories that he had read, and he was -- he was always reading in his time off, just reading fun books and stuff, and he would always be excited to share what he had – one of the funny stories he ran across or, you know, he also worked at H-E-B, so occasionally he would throw in a story about some customer that he had to deal with, and usually it was just a really fun joking time." PEX-906-40:9-16.

[143] **Robert Braden's mental anguish damages for the death of his father, Keith Braden**. Plaintiff Braden suffers from mental anguish from the loss of his father. On September 3, 2019, Plaintiff Braden met with plaintiff's psychiatrist who diagnosed him with Major Depressive Disorder, in denial and Posttraumatic Stress Disorder, in denial. PEX-3127, at 6. In his deposition, Plaintiff Braden testified that, "Well, I think the biggest thing I miss is just being able to talk to him and get advice on things that are coming up in life, you know, just kind of I miss -- I miss having him as that guy. He was – he was the type of guy that was usually prepared for anything that life threw at him, and my mom kind of jokes that he just -- seems like he had a foresight about things and was always prepared, but I miss him as a guide and just kind of having him there to prepare me for whatever was coming next in life, you know." PEX-906-41:16-25.

[144] 2d Amd Stipulation, ECF No. 576, at 2 ¶ 6.

[145] **Elizabeth Braden's damages for loss of consortium of her father, Keith Braden**. Plaintiff Elizabeth Braden lost her father, Keith Braden, who was shot and killed in the church on November 5, 2017. Plaintiff Elizabeth Braden was 32 years old at the time of her father's tragic death. Plaintiff Braden testified that before the shooting, her relationship with Keith Braden was strong and supportive. Plaintiff Braden testified that she would see her father, Keith Braden, "multiple times a week, helping him out with housework and fixing the house and hanging out with him at church on Sundays and when we could." Dmg. Trial Tr. 1573:18-20.

Plaintiff Braden suffers from loss of advice and counsel from her father's tragic death on November 5, 2017. At trial, she testified to consulting her dad about life, describing, "the boys were boys, and I needed dad advice about medical with the boys or growing up or -- with the boys, he would be able to help me with that or even just the medical advice." *Id.* at 1576:14-17. She testified that, "[her father] "did" help with her children. *Id.* at 1576:25-1577:1.

Plaintiff Braden suffers from loss of companionship and society from her father's tragic death on November 5, 2017. Plaintiff Braden testified to her and her daughter's, ZZ, relationship with her father, "Yeah. So he really bonded with [Z]. They got – because the boys would go to their other grandparents' every other weekend, so [Z] would go to my parents' every other weekend. And they would write little notes back and forth to each other. And he was a great role model for all of my kids, but especially [Z]. And so, like, the pictures of him playing with her, that was just their normal day. And the one on the bottom where he's playing in the dirt with her is -- they were building sand castles, but she was making him mud pies and putting them in a little cup and letting him pretend to drink it and -- just goofing off with her." *Id.* at 1574:9-20.

[146] **Elizabeth Braden's mental anguish damages for the death of her dad, Keith Braden**. Plaintiff Braden suffers from mental anguish from the loss of her father. On September 3, 2019, Plaintiff Braden met with plaintiff's psychiatrist who diagnosed her with posttraumatic stress disorder and Major Depressive Disorder. PEX-3118, at 7. On October 22, 2020, Plaintiff Braden met with defense psychiatrist who diagnosed her with posttraumatic stress disorder and Major Depressive Disorder. GEX-416, at 10. At trial, Plaintiff Braden also testified to the difficulty of coping with the loss of her father, "[w]ith my dad, it's been very difficult to even be at, like, church. That's the last place I got to hug him and the last place I got to spend any time with him, and it's hard to be up there. And I have -- it's hard to be at H-E-B because he was always there. Or even being at my mom's house where I'm waiting for him to come home still, and he's not coming home. Because that's where we grew up, and he's not coming home." Id. at 1575:13-20.

[147] Defendant stipulated that the Estates of Robert and Shani Corrigan, combined, suffered at minimum $381,659.00 in lost future earning capacity.

2d Amd Stipulation, ECF No. 576, at 11 ¶ 28. The remainder of this amount can be found at PEX-7037 (Fairchild Earnings Report – R. & S. Corrigan) and PEX-7036 (Casenave Vocational Report – R. Corrigan).

148 **Benjamin Corrigan damages for the loss of consortium of his father, Robert Corrigan**. Plaintiff Benjamin Corrigan lost his father, Robert Corrigan, who was shot and killed in the church on November 5, 2017. Plaintiff Benjamin Corrigan was 31 years old at the time of his father's tragic death. Plaintiff Benjamin Corrigan testified that before the shooting, Robert Corrigan was a supportive father and a teacher to him.

Plaintiff Corrigan suffers from loss of advice and counsel from his father's tragic death on November 5, 2017. Plaintiff Corrigan testified that his father achieved chief master sergeant in the Air Force and was often a source of career advice for him, "[h]e made it to chief master sergeant, which is the highest rank you can achieve as an enlisted person. He had a 30-year career. And he -- throughout that career, he had to deal with a lot of different issues, a lot of pretty stressful and tough issues, as you can imagine. So, if I ever came up against any issues like that, I knew I could always lean on him for advice. So, he was an example of integrity and really mentored me throughout my career thus far." Dmg. Trial Tr. 1758:1-9.

Plaintiff Corrigan suffers from loss of companionship and society from his father's tragic death on November 5, 2017. Plaintiff Corrigan testified that when he was stationed in Japan, "I had to lean on my parents pretty heavily because I had just bought two cars before we moved. And then I got the orders, and I had to go to Japan and buy two more cars. And then I also had a pretty tenuous situation trying to get my house rented out. The tenant that I had wasn't paying rent. So in order to help me from going under, my dad bought the truck from me. And then he would help us. Whatever we needed to get, like, diapers and groceries, from paycheck to paycheck, I could lean on him for. So my parents were always very supportive. And even when we couldn't be together, he was still helping us out the best that he could." *Id.* at 1756:1-12.

149 **Benjamin Corrigan's mental anguish damages for the death of his father, Robert Corrigan**. Plaintiff Corrigan suffers from mental anguish from the loss of his father. On September 14, 2019, Plaintiff Corrigan met with plaintiff's psychiatrist who diagnosed him with Major Depressive Disorder. PEX-7022 at 6. On October 20, 2020, Plaintiff Corrigan

met with defense psychiatrist who diagnosed him with posttraumatic stress disorder. GEX-468, at 10. Plaintiff Corrigan further testified at trial that he has suffered in his career due to his mental anguish, "I had a specific instance when I was at training cross-training to become a signals analyst. I had to review some autopsy paperwork. And it was some pretty explicit, gruesome detail. And after reviewing the paperwork, I couldn't sleep. I was supposed to be in class the next day for some academic training. And I kept trying and trying, and I just couldn't go to sleep until about 4:30 or 5 in the morning. I finally fell asleep. And then I almost immediately woke up with a nightmare, and I contacted my trainer and told him what happened. And he said, you know, I could just take that day. So I wasn't able to perform training the next day because I went essentially the entire night without any sleep. And that kind of thing has continued ever since. On a daily basis, I probably get somewhere between three to five hours of sleep. The nightmares are infrequent, but I'd rather not have any at all." Dmg. Trial Tr. s 1770:25-1771:17.

After being raised by a career Air Force veteran and himself serving over 10 years in the Air Force, Benjamin Corrigan suffers a unique and severe form of mental anguish due to making the difficult choice not to abandon his military career after the tragic loss of his parents due to the failures in this case. He testified the situation creates a concentric conflict. "On one hand, my dad dedicated his career and 30 years of his life to demonstrating to his kids the importance of service, dedication, commitment, integrity, all of those things. I followed in his footsteps and I've been in for 16 years." Dmg. Trial Tr. 1774:17-22. "Knowing that the Air Force knew that there was an issue that needed to be addressed and chose that it was not important enough to address, that ultimately led to my parents murder, it makes it very difficult to say that I'm proud of an organization and proud to be a part of an organization that would do that." *Id.* at 1775:5-10. "[I]t is exceedingly difficult to put on the uniform, take all the responsibility that goes with that, be a representative and ambassador for the organization and then go back home every day and take it off." *Id.* at 1776:2-5. "[I]ts with a heavy heart and no small amount of sheer determination and willpower that I get through day to day, every day putting on the uniform, going to work, being a part of this origination." *Id.* at 1776:11-14.

[150] Defendant stipulated that the Estates of Robert and Shani Corrigan, combined, suffered at minimum $381,659.00 in lost future earning capacity

and that Preston Corrigan's related past medical expenses total $210.00. 2d Amd Stipulation, ECF No. 576, at 10 ¶ 25, 28. The remainder of this amount can be found at PEX-7037 (Fairchild Earnings Report – R. & S. Corrigan) and PEX-7036 (Casenave Vocational Report – R. Corrigan).

[151] **Preston Corrigan's damages for the loss of consortium of his father, Robert Corrigan**. Plaintiff Preston Corrigan lost his father, Robert Corrigan, who was shot and killed in the church on November 5, 2017. Plaintiff Preston Corrigan was 28 years old at the time of his father's tragic death.

Plaintiff Preston Corrigan suffers from loss of advice and counsel from his father's tragic death on November 5, 2017. At trial, Plaintiff Corrigan testified that he would talk to his father, Robert Corrigan, about once a week and would often rely on him for career advice, "So my dad, being a chief, he's in the very highest echelon of enlisted ranks that he could be. So he saw a lot of the kinds of things that I would see that, say, my older brother wouldn't have seen being a staff sergeant or a senior airman." Dmg. Trial Tr. 1723:4-7.

Plaintiff Corrigan suffers from loss of companionship and society. At trial, Plaintiff Corrigan testified that he would rely on his father for medical advice, "He was a medical professional. So anytime something happened with me or my kids, he'd be the first person I would call to get his advice first. And then -- or if I got a diagnosis of something, or my kids got a diagnosis of something, I would run it by my dad to see if he thought that made sense. That was huge. But mostly the career advice was huge too." Dmg. Trial Tr. 1724:10-16). Plaintiff Corrigan testified further, "anytime something was going on with my car, he would come out and help me fix it." Dmg. Trial Tr. 1726:4-5.

[152] **Preston Corrigan's mental anguish damages for the death of his father, Robert Corrigan**. Plaintiff Corrigan suffers from mental anguish from the loss of his father. On September 14, 2019, Plaintiff Corrigan met with plaintiff's psychiatrist who diagnosed him with Major Depressive Disorder PEX-7049, at 5. On October 15, 2020, Plaintiff Corrigan met with defense psychiatrist who diagnosed him with Posttraumatic Stress Disorder and Major Depressive Disorder GEX-474, at 10. At trial, Plaintiff Corrigan testified that he has been negatively impacted by the loss of his father, "There was -- there have been several instances at work where, if a senior officer or a senior leader says something that is -- I perceive to be

grossly self-interested at the detriment of those underneath them or if there's just a lack of accountability amongst leadership for something that they messed up, I start shaking. It happened in California. I couldn't even finish writing an email. All I had to do for the rest of the day was write an email, and I couldn't even finish typing out sentences." Dmg. Trial Tr. 1739:8-17.

After being raised by a career Air Force veteran and himself serving over 10 years in the Air Force, Preston Corrigan suffers a unique and severe form of mental anguish due to making the difficult choice not to abandon his military career after the tragic loss of his parents due to the failures in this case. He testified, "every day is a struggle. Putting on the uniform every day, looking at myself, I kind of feel like I'm betraying my parents by working for the people that essentially had them killed. . . It's super frustrating. And its something I go back and forth with every single day about whether or not I'm making the right decision by staying in and whether or not I'm being true to them." Dmg. Trial Tr. 1745:19-1746:2.

[153] Defendant stipulated that the Estates of Robert and Shani Corrigan, combined, suffered at minimum $381,659.00 in lost future earning capacity. 2d Amd Stipulation, ECF No. 576, at 10 ¶ 28. The remainder of this amount can be found at PEX-7037 (Fairchild Earnings Report – R. & S. Corrigan) and PEX-7036 (Casenave Vocational Report – R. Corrigan).

[154] **Benjamin Corrigan's damages for the loss of consortium of his mother, Shani Corrigan**. Plaintiff Benjamin Corrigan lost his mother, Shani Corrigan, who was shot and killed in the church on November 5, 2017. Plaintiff Benjamin Corrigan was 31 years old at the time of his mother's tragic death. Plaintiff Corrigan testified that before the shooting, Shani Corrigan was the "[G]lue that held our family together." Dmg. Trial Tr. 1760:25-1761:1. At trial, Benjamin Corrigan described Shani Corrigan as, "[S]he was so fun-loving and so relentlessly upbeat and optimistic...She was very, very big on family, very nurturing. She was also a jokester like my dad. They were kindred spirits, for sure." *Id.* at 1761:4-9.

Plaintiff Corrigan suffers from loss of advice and counsel from his mother's tragic death on November 5, 2017. Plaintiff Corrigan testified to the great lengths his mother would go to bring support to him and his family, even on the other side of the world, "she came out to Japan to help us with the newborn. We were really blessed to be able to have her come out and do that. That was a pretty big undertaking for her, but she made it happen. She

got her passport done in time. They got the money together. She got time away and made it out to Japan to be with us for the month after [B]'s birth." *Id.* at 1762:11-17. He will no longer have this type of advice and counsel in his future years.

Plaintiff Corrigan suffers from loss of companionship and society from his mother's tragic death on November 5, 2017. At trial, Plaintiff Corrigan testified to his mother's playful nature, "That's a picture of us all together at our friend Nate's house. It reminds me of a time when our friend Nate was over at our house, and he got dressed up in full battle rattle with body armor and a helmet and low-crawled through the hallway with a big battery-powered Nerf gun. And he snuck around the corner and started shooting Nerf gun darts at my mom when she was at the kitchen sink. And she ran over to him and grabbed him and started pouring water on him. And the whole time -- we were at my house, so she started telling my wife, 'Lindsey, Nate's getting water all over the floor.' It was a fun time." *Id.* at 1761:13-24. Plaintiff has been deprived of this companionship and society of his mother.

155 **Benjamin Corrigan's damages for mental anguish for the death of his mother, Shani Corrigan**. Plaintiff Corrigan suffers from mental anguish from the loss of his mother. On September 14, 2019, Plaintiff Corrigan met with plaintiff's psychiatrist who diagnosed him with Major Depressive Disorder. PEX-7022, at 6. On October 20, 2020, Plaintiff Corrigan met with defense psychiatrist who diagnosed him with posttraumatic stress disorder. GEX-468, at 10. Plaintiff Corrigan further testified at trial that he has suffered in his career due to his mental anguish, "I had a specific instance when I was at training cross-training to become a signals analyst. I had to review some autopsy paperwork. And it was some pretty explicit, gruesome detail. And after reviewing the paperwork, I couldn't sleep. I was supposed to be in class the next day for some academic training. And I kept trying and trying, and I just couldn't go to sleep until about 4:30 or 5 in the morning. I finally fell asleep. And then I almost immediately woke up with a nightmare, and I contacted my trainer and told him what happened. And he said, you know, I could just take that day. So I wasn't able to perform training the next day because I went essentially the entire night without any sleep. And that kind of thing has continued ever since. On a daily basis, I probably get somewhere between three to five hours of sleep. The nightmares

are infrequent, but I'd rather not have any at all." Dmg. Trial Tr. 1770:25-1771:17.

156 Defendant stipulated that the Estates of Robert and Shani Corrigan, combined, suffered at minimum $381,659.00 in lost future earning capacity and that Preston Corrigan's related past medical expenses total $210.00. 2d Amd Stipulation, ECF No. 576, at 10 ¶ 25, 28. The remainder of this amount can be found at PEX-7037 (Fairchild Earnings Report – R. & S. Corrigan) and PEX-7036 (Casenave Vocational Report – R. Corrigan).

157 **Preston Corrigan's damages for the loss of consortium of his mother, Shani Corrigan**. Plaintiff Preston Corrigan lost his mother, Shani Corrigan, who was shot and killed in the church on November 5, 2017. Plaintiff Preston Corrigan was 28 years old at the time of his mother's tragic death. Plaintiff Corrigan testified that before the shooting Shani Corrigan was joyful and playful, "I think the biggest descriptor for my mom would probably be joy. She was an incredibly joyful person. Nothing really phased her." Dmg. Trial Tr. 1726:25-1727:1. Preston Corrigan also testified, "She was super playful." Dmg. Trial Tr. 1727:6.

Plaintiff Corrigan suffers loss of advice and counsel from his mother's tragic death on November 5, 2017. At trial, Plaintiff Corrigan testified that his mother, "was always available no matter what. She would stop whatever she was doing at any moment that we asked her for something or needed something. She came out with our first son when I went to squadron officer school in Alabama. She came out and stayed a month and a half with my wife to provide extra help with our baby. And when we first had our son, he was -- he had acid reflux disease, and he cried he screamed for four and a half days straight. So she would tag us out and watch him while Beverly and I just slept." Dmg. Trial Tr. 1727:12-22.

Plaintiff Corrigan suffers from loss of companionship and society. At trial, Plaintiff Corrigan testified, "She -- having three boys as a mom, at first, you know, she resisted some of the shenanigans that we engaged in, but then she just dove headlong into it." Dmg. Trial Tr. 1727:6-8.

158 **Preston Corrigan's mental anguish damages from the death of his mother, Shani Corrigan**. Plaintiff Corrigan suffers from mental anguish from the loss of his mother. On September 14, 2019, Plaintiff Corrigan met with plaintiff's psychiatrist who diagnosed him with Major

Depressive Disorder. PEX-7049, at 5. On October 15, 2020, Plaintiff Corrigan met with a defense psychiatrist who diagnosed him with Posttraumatic Stress Disorder and Major Depressive Disorder. GEX-474, at 10. At trial, Plaintiff Corrigan testified that he has been negatively impacted by the loss of his mother, "There was -- there have been several instances at work where, if a senior officer or a senior leader says something that is -- I perceive to be grossly self-interested at the detriment of those underneath them or if there's just a lack of accountability amongst leadership for something that they messed up, I start shaking. It happened in California. I couldn't even finish writing an email. All I had to do for the rest of the day was write an email, and I couldn't even finish typing out sentences." Dmg. Trial Tr. 1739:8-17.

159 **John Porter Holcombe's Loss of Consortium damages for the death of his father.** John Holcombe described his father, Bryan (aka "Grumpy"), as "a wonderful father to me growing up" who taught him things like how to change oil in a car and who worked a lot to support their family. Dmg. Trial Tr. 111–113 (J.P. Holcombe). Bryan was very supportive and encouraging of John marrying Crystal and was "so excited that he was going to get more grandkids." *Id.* Bryan was a church elder, did volunteer work for the church, and would sometimes substitute for the Pastor and bring the message when needed. *Id.* Bryan also supported church members, such as if someone needed a prayer or help or advice with anything, he was there, or he would just pray with them. *Id.* On Thursday nights, John and Bryan sometimes would do a prayer meeting and a Bible study together. *Id.*

John saw his parents often, even after they moved out to the family farm in Floresville. Dmg. Trial Tr. 106 (J.P. Holcombe). Sometimes he would get requests from his dad for "comida" (their code for getting lunch somewhere) or they would go places like Harbor Freight, Northern Hydraulics and "Si Island" together. *Id.* at 106–107. John recalls once being summoned for jury service in the Western District and Bryan joining him to calm John's panic over the traffic and unfamiliar situation. *Id.* at 107. The Holcombe family enjoyed many traditions, including "Planksgiving"—their version of Thanksgiving celebrated on a different day so they could include more extended family (and dress up as pirates). *Id.* at 109; PEX-8025 at 153, 154, 156-158 (Holcombe "Planksgiving" photos).

John sought advice and counsel from his father on many occasions, including about his marriage to Crystal and the addition of her five children

to their family—about which Bryan gave him some guidance and even helped raising the kids at times. *Id.* at 114–115. John "absolutely" looked forward to family support from his parents with their five children and when their unborn child, Carlin, arrived. *Id.* at 120–121. Crystal and John definitely relied on the ability to leave the kids with his parents when they needed a break, and Bryan's shop made it easy because he modified it to allow Crystal to homeschool the kids from there where Crystal was working on her upholstery. *Id.* Bryan would fix problems (like a broken pipe) or help John and give him advice on how to fix it. *Id.* Bryan and Karla also gave John good advice on how to be a parent. *Id.*

160 **John Porter Holcombe's mental anguish claim for the death of his father.** John struggled with the loss of his father, especially when tasked with the unexpected, premature need to plan the funerals of so many of his family members. Dmg. Trial Tr. 93–97 (J.P. Holcombe). John described how his father had two wishes upon his death: (1) to have Amazing Grace played on bagpipes and (2) to be thrown out of an airplane at an airshow. *Id.* at 95–96. John was able to honor one of his father's wishes, but it is little comfort in light of the knowledge that they are forever gone: "[T]hey're gone. I've asked God to let me see them in a dream. And, occasionally, he has let me see Dad—or talk to Dad, at least. Not see him, but talk to him. But, occasionally, he's let me." Dmg. Trial Tr. 90 (J.P. Holcombe).

Because John was present and perceived his father being shot and experiencing terror and suffering in a supposed place of sanctuary. Under Texas law, he should be compensated for bystander damages, he is also entitled to additional mental anguish damages flowing from his tremendous bystander injuries. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988); *see also* PEX-8056, at 8 (Dr. Sutton Rpt – J.P. Holcombe, diagnosing Adjustment Disorder with mixed anxiety and depressed mood and Other Specified Trauma and Stressor Related Disorder (Persistent Complex Bereavement Disorder)); PEX-8046 (Ecumenical Center therapy records for J.P. Holcombe); PEX-8025 (Holcombe Family Photos).

161 **Scott Holcombe's pecuniary damages for the death of his father.** While Plaintiff Scott Holcombe was not present in the church during the shooting on November 5, 2017, he lost both parents (John Bryan Holcombe and Karla Holcombe) as well as five (5) other family members,

including brothers, sisters, and nieces and nephews. Dmg. Trial Tr. 188:1–25.
When describing his pecuniary loss sustained in the past, Scott described the
care, maintenance, support, services, advice and counsel and the other
reasonable contributions they made in the past. He states at trial, "They were
my rock. Like, they were always ready to help me. And, you know, they just
had my back no matter what. I had that because I tried to -- you know, when
I was 18, I tried to show them that I could, you know, do it on my own. And I
struggled, and I would always end up -- I always ended up having to go back,
back home. And, yeah, they were my support system. They were everything,
really. Like, I never imagined losing them like that. Dmg. Trial Tr. 162:7-14.
His father was special to Scott, insofar as he was teaching him a trade, in
addition to the support, maintenance and service he provided. Scott's father
also taught him how to repair vehicles such as the 1976 K5 Blazer they were
working on before the shooting. Scott testified, "We put a new cam and a '76
K5 Blazer that's been in the family since 1978. And I learned how to figure
out that it was a worn cam shaft. And he helped me figure all this stuff out
and helped me to replace a bunch of parts on it that I had no idea how to do."
*Id.* at 183.

Scott was being trained by his father to work at his business American
Canvas Works and was going to take over the business that earned between
$90,000 to $100,000 a year. Dmg. Trial Tr. 170–172; PEX-8070, at 1-8
(Photos of Shop). Scott testified that it would be near impossible to learn the
craft now that his father is gone. Dmg. Trial Tr. 176. Scott reasonably could
have continued this business for 10 years or more, he is a young man, and
obtained a reasonable income running American Canvas Works.

[162] **Scott Holcombe's loss of consortium damages for the death of
his father**. Scott had battled issues related to addiction. His father was a
pivotal figure in helping Scott turn his life around. In addition to the work
and mentorship his father provided him with American Canvas works, he
also provided Scott positive benefits flowing from the love, comfort,
companionship, and society that Scott, in reasonable probability, would have
received from his father had he or she lived. Scott's mother told him how
much those positive benefits had grown, and he testified, "And Mom told me,
'You know how special that is that he's letting you use his paint sprayer?'
And he was starting to trust me and be proud of me, and I was doing my best
to do the best I could. I wanted to impress him, you know. And I was on my
way to learning it." Dmg. Trial Tr. 180:18–22. Scott further talked about the

companionship, society, and routine he and his father shared, watching the Simpsons and being together as father and son. *Id.* at 181:1–16. He went on to state that his father was a positive influence in his life. He learned that his father was proud of him, and the path he was on. *Id.* at 184:10–21. It is foreseeable that but for the incident, Scott and his father would have continued their relationship, companionship, and society that has been lost. Thus, plaintiff will likely sustain the same losses in the future.

163 **Scott Holcombe's mental anguish damages for the death of his father**. Throughout his testimony, it was clear that Scott Holcombe was experiencing emotional pain, torment, and suffering experienced by the plaintiff because of the death of his loved one, his father. Plaintiff was crying through parts of his testimony, exhibiting a physical manifestation of the grief and loss associated with his claims. Dmg. Trial Tr. 187:2. He described the pain, torment, and suffering he sustained when learning of the news that his Mom, Dad, Danny, NH, Crystal, ERH, GLH, and MGH (his family) had all been killed. *Id.* at 188–190 He specifically testified, "And it hurt so bad I thought I was going to die. I didn't think I could handle that much pain, you know. And, actually, I've heard of people dying from grief, you know, and heartbreak. And I didn't think I could handle it." *Id.* at 189.

Scott testified that even four years after the shooting, he struggles with the emotional pain, torment, and suffering he experiences even now. He states "Well, I mean, like them not being here, you know. Their love, you support, its just gone now, and its just – and me trying to – I'm doing the best I can, but I'm having a really hard time, you know. And I'm trying to be happy, but I'm not the same as I was before." Dmg. Trial Tr. 191:14–21.

164 **Joe Holcombe's Loss of Consortium damages for the death of his son.** Bryan Holcombe had a "beautiful" relationship with his parents, Joe and Claryce. Dmg. Trial Tr. 212:18–20 (J. Holcombe). At the time of the shooting, Bryan and his wife, Karla, lived and ran their business on the family farm, which belongs to Joe and Claryce. Dmg. Trial Tr. 212:2–20 (J. Holcombe). Joe Holcombe is now 90 years old, and Claryce is now 86. Dmg. Trial Tr. 209:20 (J. Holcombe); PEX-914, at 12 (C. Holcombe Dep.). Mr. Holcombe described his son as a "marvelous help" to them and as someone who was "strong as an ox." Dmg. Trial Tr. 214:20–21 (J. Holcombe). According to Mr. Holcombe, his son "got me out of trouble lots of times when I was in trouble with the tractor." *Id.* 214:21–22. Mr. Holcombe saw his son

"often" and testified that "we got along like champs." *Id.* 215:6–12. They were a "very close" family who enjoyed time together and their unique traditions on their property and at their extended family's homes during holidays and special occasions. *Id.* 216:14–219:17. Mr. Holcombe misses many things about his son: when he needs help with something that Bryan would have helped him with, when he used to go talk to Bryan in his shop on their property and talk about Sunday school lessons and what they were doing and the weather—"just shooting the bull" while Bryan was working on his machines. *Id.* 222:25–223:18. Mr. Holcombe faces each day with reminders of the family members who are no longer alive; for example, he related that he "lost my two working buddies out here. My son and my grandson were my helpers. They'd help me fix my tractors and get work done on the land. I don't have that anymore." PEX-8068, at 5 (Dr. Sutton Rpt – Joe Holcombe). Mr. Holcombe reported that Bryan and his grandchildren were instrumental in his daily life before the shooting, and he described feeling sad and worried about the potential inevitability of him not being able to provide for his wife with care at home now that he is missing the support of his family, including other times of need such as when his truck breaks down or his computer needs fixing. GEX-485, at 9 (Dr. Marx Report – Joe Holcombe); *see also* PEX-20011 (J. Holcombe defense psychological exam).

[165] **Joe Holcombe's mental anguish claim for the death of his son.** Mr. Holcombe described learning of the shooting when he and his wife were at home after attending their own church service. Dmg. Trial Tr. 220:24–221:4 (J. Holcombe). Mr. Holcombe described the conversation during which he and his wife were told one at a time about the loss of nine members of their family who were killed that morning, including their son Bryan. *Id.* 221:5–222:11. Mr. Holcombe found it difficult to absorb the massive loss of loved ones all at once, noting "We were numb for a little while. We went to lots of funerals and said goodbye to lots of friends and family that we love." PEX-8068, at 5 (Dr. Sutton Rpt – Joe Holcombe). Mr. Holcombe feels sadness and a longing for his now deceased family members, but he finds great hope and comfort in the fact that his faith helps him to believe that he will see his son and the rest of their family soon. *Id.* In connection with a psychological evaluation, Mr. Holcombe reported experiencing symptoms such as fatigue or loss of energy, decreased ability to think or concentrate, recurrent thoughts of death, worry that is difficult to control or feels out of control (primarily with regard to how he will continue to care for his aging wife in the absence of a significant amount of family support), repeated, disturbing, and unwanted

memories of the shooting, and avoidance of memories, thoughts, or feelings related to the shooting. *Id.*, at 7–8; *see also* GEX-485, at 9 (Dr. Marx Report – Joe Holcombe); *see also* PEX-20011 (J. Holcombe defense psychological exam).

166 **Claryce Holcombe's Loss of Consortium damages for the death of her son.** Mrs. Holcombe testified that Bryan Holcombe was a wonderful son who would do anything she and her husband asked and did not put himself first—he put others first and wanted to tend to their needs. PEX-914, at 17:14–20 (C. Holcombe Dep.). She testified that she "always felt loved" by her son and family. *Id.* at 19:23–24. Her son, Bryan, lived very close, and Mrs. Holcombe enjoyed remaining uniquely close and in almost constant contact with Bryan and their extended family. PEX-8069, at 3 (Dr. Sutton Rpt – Claryce Holcombe). She described the loss of her son as "life changing" and "life destroying." PEX-914, at 26:14–18. Mrs. Holcombe explained that the loss changed her life because—before the shooting—they had family in and out of their home and who would bring them food, but after the shooting, "It was like night and day." *Id.* at 26:24–27:3; *see also* PEX-20010 (C. Holcombe defense psychological exam).

167 **Claryce Holcombe's mental anguish claim for the death of her son.** Mrs. Holcombe described learning of the shooting when she was sitting at their little round table and got a phone call from someone at their church saying there was a shooting, and just as she hung up, they saw the deacons and pastor from their church approaching their home: "And that's when we knew." PEX-914, at 23:15–24 (C. Holcombe Dep.); *see also* PEX-8069, at 4 (Dr. Sutton Rpt – Claryce Holcombe). Mrs. Holcombe described then following conversation during which they were told one-by-one about the total of nine members of their family who were killed that morning. *Id.* Mrs. Holcombe experienced feelings of disbelief as she tried to comprehend the simultaneous killing of nine members of her family. *Id.* Although Mrs. Holcombe expressed a strong Christian faith that underpins her ability to manage her family's enormous loss, she has cried on some occasions as she grieves. *Id.* at 5. Both Mr. and Mrs. Holcombe reported that Mrs. Holcombe's physical condition has deteriorated significantly since the day of the shooting, even beyond her pre-existing difficulties. *Id.* However, in recent months, her husband reported that Mrs. Holcombe "seems to have 'just given up and won't leave the house at all with me anymore.'" *Id.* In connection with a psychological evaluation, Mrs. Holcombe reported experiencing symptoms such as depressed mood most of the day, almost every day, feelings of sadness/emptiness or

hopelessness, inability to sleep or sleeping too much nearly every day, and excessive anxiety and worry about a variety of topics occurring more often than not, repeated disturbing dreams and thoughts of the shooting, avoiding memories, thoughts, or feelings related to the shooting, loss of interest in activities that she used to enjoy, feeling distant or cut off from other people, trouble experiencing positive feelings, and profound sadness and grief. *Id.* at 7–8; *see also* GEX-489, at 9 (Marx Report – Claryce Holcombe); *see also* PEX-20010 (C. Holcombe defense psychological exam).

168 **John Porter Holcombe's Loss of Consortium damages for the death of his mother.** John Holcombe describes his mother, Karla (aka "Mor Mor"), as a "peacemaker" and "great encourager" who spent a lot of time at the church and loved to serve the Lord. *Id.* at 116–119. "If there were youth in the church that were struggling[,] Mom would counsel with them. And she tried to bring peace into situations, you know, that were difficult or hard. She tried to fix broken relationships and help with those things." *Id.* John saw his parents often, even after they moved out to the family farm in Floresville. *Id.* at 106. Karla still helped John and Crystal by watching their children and cooking for everyone (the best chicken and dumplings): "She loved all of us, and she took care of us. She fed us. We never went hungry, you know, growing up with her." *Id.*

John "absolutely" looked forward to family support from his parents with their five children and when their unborn child, Carlin, arrived. *Id.* at 120–121. Crystal and John definitely relied on the ability to leave the kids with Karla and Bryan when they needed a break. *Id.* Karla also gave John good advice on how to be a parent. *Id.*; *see also* PEX-8056, at 8 (Dr. Sutton Rpt – J.P. Holcombe, diagnosing Adjustment Disorder with mixed anxiety and depressed mood and Other Specified Trauma and Stressor Related Disorder (Persistent Complex Bereavement Disorder)); PEX-8046 (Ecumenical Center therapy records for J.P. Holcombe); PEX-8025 (Holcombe Family Photos).

169 **John Porter Holcombe's mental anguish claim for the death of his mother.** John described three very specific memories of his mother in connection with the shooting event. First, John recalls his mother coming up to him before the service began and asking him to take her announcement off the recording because she wanted to announce plans for Pastor Appreciation Sunday and didn't want Pastor Frank to know about those plans. Dmg. Trial Tr. 73–74 (J.P. Holcombe). Second, John remembers that "when [Kelley]

started shooting, I made eye contact with my mom. And she screamed. I remember that. And then she kind of fell down. And I fell down." *Id.* at 82. Third, after the shooting was finally over, John recalls the haunting image that he "saw what [the shooter] did to Mom." *Id.* at 86.

Because John was present and perceived his mother being shot and experiencing terror and suffering in a supposed place of sanctuary. Under Texas law, he should be compensated for bystander damages, he is also entitled to additional mental anguish damages flowing from his tremendous bystander injuries. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988); *see also* PEX-8056, at 8 (Dr. Sutton Rpt – J.P. Holcombe, diagnosing Adjustment Disorder with mixed anxiety and depressed mood and Other Specified Trauma and Stressor Related Disorder (Persistent Complex Bereavement Disorder)); PEX-8046 (Ecumenical Center therapy records for J.P. Holcombe); PEX-8025 (Holcombe Family Photos).

[170] **Scott Holcombe's loss of consortium damages for the death of his mother**. While Plaintiff Scott Holcombe was not present in the church during the shooting on November 5, 2017, he lost both parents (John Bryan Holcombe and Karla Holcombe) as well as five (5) other family members, including brothers, sisters, and nieces and nephews. Dmg. Trial Tr. 188:1–25. When describing his pecuniary loss sustained in the past, Scott described the care, maintenance, support, services, advice and counsel and the other reasonable contributions they made in the past. He states at trial, "They were my rock. Like, they were always ready to help me. And, you know, they just had my back no matter what. I had that because I tried to -- you know, when I was 18, I tried to show them that I could, you know, do it on my own. And I struggled, and I would always end up -- I always ended up having to go back, back home. And, yeah, they were my support system. They were everything, really. Like, I never imagined losing them like that. *Id.* at 162:7-14. His mother was special to Scott as well. He testified about her cooking, "She always had food cooking, man. And I guess I was spoiled, or whatnot, because I never was hungry or nothing. I mean, she always had good food cooking. And, yeah, she kept us fed really good. She made the best chicken and dumplings." *Id.* at 181–82. When describing the loss of his mom to the court, Scott broke down and stated, "Just -- it's hard for me to say it. I mean, she was my mom, man. And they were very -- she was a hard-core Christian, but she believed it with all her heart and – but like I say, now that they're gone, I

haven't seen anyone like them. When they were here, I believed it more because they really did live it. And, you know, she loved me so much." *Id.* at 185:7–12.

Scott described his mother as someone who never gave up on him, who was supportive, and who provided him the care, maintenance, support, advice and counsel that helped guide him. Dmg. Trial Tr. 185–186.

Scott's mother, like his father, also provided Scott positive benefits flowing from the love, comfort, companionship, and society that Scott, in reasonable probability, would have received from his mother had she lived. Scott's mother told him he was working on his testimony. Scott testified, "I might have been making mistakes and being stupid but that she had hope that, you know, I would snap out of it and maybe one day be able to help people. Dmg. Trial Tr. 185:13–22. It is foreseeable that but for the incident, Scott and his mother would have continued their relationship, companionship, and society that has been lost. Thus, plaintiff will likely sustain the same losses in the future.

[171] **Scott Holcombe's mental anguish damages for the death of his mother**. Throughout his testimony, it was clear that Scott Holcombe was experiencing emotional pain, torment, and suffering experienced by the plaintiff because of the death of his loved one, his mother. Plaintiff was crying through parts of his testimony, exhibiting a physical manifestation of the grief and loss associated with his claims. Dmg. Trial Tr. 187:2. He described the pain, torment, and suffering he sustained when learning of the news that his Mom, Dad, Danny, NH, Crystal, ERH, GLH, and MGH (his family) had all been killed. *Id.* at 188–90. He specifically testified, "And it hurt so bad I thought I was going to die. I didn't think I could handle that much pain, you know. And, actually, I've heard of people dying from grief, you know, and heartbreak. And I didn't think I could handle it." *Id.* at 189.

Scott testified that even four years after the shooting, he struggles with the emotional pain, torment, and suffering he experiences even now. He states "Well, I mean, like them not being here, you know. Their love, you support, its just gone now, and its just – and me trying to – I'm doing the best I can, but I'm having a really hard time, you know. And I'm trying to be happy, but I'm not the same as I was before." Dmg. Trial Tr. 191:14–21.

[172] **John Porter Holcombe's Loss of Consortium damages for the death of his wife.** Crystal "was full of grace, beauty, love, mercy, compassion, and forgiveness." PEX-8031, at 1 (Crystal Holcombe Eulogy). John Holcombe was a bachelor who didn't know what he was missing with a family of his own until he befriended Crystal and her five children after her first husband's death. Dmg. Trial Tr. 118–119 (J.P. Holcombe); PEX-8031, at 2. But Crystal and the kids "kind of chipped on" him a little bit, and John ultimately found a home with this family, who all loved him and whom he loved: "we developed a friendship that became so much more. I was used to living by myself and I wasn't really looking for a relationship, but Crystal and the children are the best thing that ever happened to me in my whole life." *Id.* at 2–3.

Crystal had a gift with living things; she could take a plant that was nearly dead and bring it back to life and take an animal that was near death and nurture it back to health: "She could take a broken man (me) and make him whole again." PEX-8031, at 2; *see also* Dmg. Trial Tr. 130 (J.P. Holcombe). Crystal taught John that his father was right—God will provide; with Crystal in his life, financial concerns were overshadowed when he realized that the expenses of eating out and entertainment and such things diminished when Crystal cooked good meals for their family and the family entertained themselves at home. *Id.* at 114–115.

The life that John he never knew he wanted but had on November 4, 2017 ended the next day. The loss of the woman he loved and the family she had given him truly hit John the day he returned home and didn't get his usual greetings: "I came in and it was silence. When I entered the house, there was silence. There wasn't a 'Hey, my love. How was your day?' or any of that." Dmg. Trial Tr. 103–105 (J.P. Holcombe). Adding further to his grief— when he entered the room he had shared with his wife, he found it had been effectively destroyed by their animals during the time he'd been gone with foul odors ruining Crystal's unique scent. *Id.* John also desperately misses the hug he got from his wife upon his return home every day: "we fit so good together. I mean, I could hold her like this and her head would go like that, you know, when I hugged her (indicating). And I could go home, and I could tell her about my day. You know, I could have had a tough day at work or whatever, and I could go home and I could talk to her about it. And all she

had to do was give me a hug. And it was just a hug. That's all. And she'd hug and kiss, and I could feel the stress of the day drain."

Following the loss of nine of his family members, including his only biological child, John Holcombe has tried to honor his wife's wishes for her children, but he finds it very difficult to fill her shoes. Dmg. Trial Tr. 132 (J.P. Holcombe). "I've tried to fill the gaps, but I can't fill the gaps. I don't -- I'm absolutely not Crystal. She could be on the phone while she was cooking, while she was somehow keeping an eye on the kids. And that all -- you know, I'm more of a uni-tasker. I can do one thing at a time, but -- you know, she could multitask." Dmg. Trial Tr. 152–153 (J.P. Holcombe).

[173] **John Porter Holcombe's mental anguish claim for the death of his wife.** On the morning of November 5, 2017, John Holcombe was in the church with most of his immediate family and looking forward to surprising them with a chicken fried steak meal at Bill Miller after services. PEX-8056, at 4 (Dr. Sutton Rpt – J.P. Holcombe). When the shooting began, he saw his wife, Crystal, trying to get their children out of harm's way, and he "was just kind of hoping that Crystal and them got out." Dmg. Trial Tr. 86 (J.P. Holcombe). He had spent more than seven terrifying minutes in the sound booth desperately calling the sheriff's office and begging dispatch to send help. *Id.* at 82–86. And when he came out, John will never forget the sight of his murdered wife surrounded by their dead children: "I looked and I saw her. I saw what he did to her. Her face. And the kids, he shot them in the face. And their face was just a crater. It was just a crater where their face was." *Id.*; *see also* Dmg. Trial Tr. 469 (J. Workman describing John Holcombe "standing away from Crystal and crying out, 'My beautiful wife. My beautiful wife. They shot her head off. Why did they have to shoot her head off?'").

Now, John clings to memories and makes requests to God: "they're gone. I've asked God to let me see them in a dream. . . . One time, he let me see Crystal. He let me see Crystal, . . . he let me see Crystal and the kids. I don't know if Carlin was there, but I do -- you know, they were out in a meadow just like in a picnic. I believe that he let me see them, but I couldn't talk to them." Dmg. Trial Tr. 90 (J.P. Holcombe).

John finds solace in the place where he lost so much—the memorial created in the old sanctuary. Dmg. Trial Tr. 153–154 (J.P. Holcombe); PEX-2031, at 3 (photo of the old sanctuary memorial). He goes there every morning and opens it up at 8:00 a.m. to sit and pray and then returns in the evening

around 8:00 p.m. to close it back up. *Id.* "I just need a time machine. I wish I could have stopped it. I wish I could have done something to stop it." *Id.*

Because John was present and perceived his wife being shot and experiencing terror and suffering in a supposed place of sanctuary, he should be compensated for bystander damages, he is also entitled to additional mental anguish damages flowing from his tremendous bystander injuries. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988); *see also* PEX-8056, at 8 (Dr. Sutton Rpt – J.P. Holcombe, diagnosing Adjustment Disorder with mixed anxiety and depressed mood and Other Specified Trauma and Stressor Related Disorder (Persistent Complex Bereavement Disorder)); PEX-8046 (Ecumenical Center therapy records for J.P. Holcombe); PEX-8025 (Holcombe Family Photos); PEX-8031 (Crystal Holcombe Eulogy).

[174] **Minor EJH's Loss of Consortium damages for the death of her mother.** After losing her father as an infant, Minor EJH was just seven years old on November 5, 2017 when she lost her mother, three siblings (plus her soon-to-be sibling), step-grandparents, step-uncle, and step-cousin in the space of a few minutes. PEX-8065, at 2 (Dr. Sutton Rpt – Minor EJH). EJH expresses her losses in an age-appropriate way, stating "I did have a mom. She was the most best mom ever. But she got shot so she's dead now." *Id.* at 5. EJH has reported recurrent dreams about her mother and her siblings and expressed sadness and frustration that—when she does dream about her deceased mother and siblings, she has been unable to experience dreams where they are all present. *Id.* EJH appears deeply saddened by the fact that she is unable to experience a united family, even within the context of her dreams. *Id.* EJH's therapist explains that—because she is getting older— EJH is becoming better able to grasp the concept of the permanent losses; as a result, she is experiencing a resurgence of some of her trauma responses and significant grief over those losses. *Id.*; *see also* PEX-8065, at 7 (Dr. Sutton Rpt – Minor EJH, diagnosing Adjustment Disorder with mixed disturbance of mood and conduct and Other Specified Trauma and Stressor Related Disorder (Persistent Complex Bereavement Disorder)); PEX-8062 (Ecumenical Center therapy records for Minor EJH); PEX-8025 (Holcombe Family Photos).

[175] **Minor EJH's mental anguish claim for the death of her mother.** Minor EJH has specific, vivid, terrifying memories of her mother's

death. Specifically, she remembers her mother begging the shooter not to hurt her children, but the shooter then shot three of her children in front of her before fatally shooting her in the face. PEX-8065, at 4 (Dr. Sutton Rpt – Minor EJH). EJH remembers hiding beneath the bodies of her dead family members until she was discovered by an adult who picked her up and carried her from the sanctuary to safety across the street. *Id.* at 2 (Dr. Sutton Rpt – EJH); Dmg. Trial Tr. 87 (J.P. Holcombe); *see also* PEX-8065, at 7 (Dr. Sutton Rpt – Minor EJH, diagnosing Adjustment Disorder with mixed disturbance of mood and conduct and Other Specified Trauma and Stressor Related Disorder (Persistent Complex Bereavement Disorder)); PEX-8062 (Ecumenical Center therapy records for Minor EJH); PEX-8025 (Holcombe Family Photos).

[176] **Philip Hill's Loss of Consortium damages for the death of his mother.** Years before the shooting, Philip Hill had lost his biological father to a heart condition. PEX-8066, at 2 (Dr. Sutton Rpt – Philip Hill). On November 5, 2017, Philip lost his mother, unborn sibling, three younger siblings, step-uncle, step-cousin, step-grandmother, and step-grandfather. *Id.* at 7. The loss of his mother was particularly catastrophic for Philip because she was the one person who "had this amazing way with [Philip] no one else seemed to have figured out. . . . Crystal just knew how to work with him." *Id.* at 3. With the loss of his mother, Philip lost the person who could most effectively help him learn socialization and improve his interactions with others: "Crystal was always able to get his best out of him, whatever his best might have been." *Id.* Crystal worked hard to balance Philip's need for alone time with his need to grow socially by interacting with others. *Id.* Although Philip was not always able to demonstrate his feelings of love and connectedness to others in obvious ways, in spite of his unique characteristics, it was still obvious that his now-deceased mother, Crystal, provided a sense of calmness and safety for him that he was unable to find elsewhere, and Philip relied strongly on his mother to help him navigate the social and academic hurdles that he faced on a regular basis. *Id.* Philip's stepfather, John Holcombe, described how Crystal and Philip would tell jokes back and forth, which is now missing from Philip's life. Dmg. Trial Tr. 149–150 (J.P. Holcombe).

[177] **Philip Hill's mental anguish claim for the death of his mother.** Although Philip's unique personality prevents him from expressing his tremendous losses in more traditionally obvious ways, he has certainly

suffered and acknowledges that "Nothing feels normal anymore." PEX-8066, at 7 (Dr. Sutton Rpt – Philip Hill, diagnosing Adjustment Disorder with mixed disturbance of mood and conduct and Provisional Autism Spectrum Disorder – by history). After the shooting, Philip became more irritable, more defiant at times, and became more withdrawn, preferring not to leave his bedroom except when absolutely necessary. *Id.* at 3–4.

178 **Dennis Johnson, Jr.'s Consortium Damages for the loss of his father, Dennis Johnson Sr.** Dennis Johnson Jr. saw his dad at a minimum once every two weeks, but sometimes as often as every day. PEX-917, at 38. Dennis Johnson Jr. testified that he did not realize how much he loved his dad until he was gone nor did he "realize how much [he] was going to miss him and miss all of his wisdom and all of his advice." *Id.* at 40–41. On his visits, he described his dad as "nothing but advice." *Id.* at 38. The Johnson boys would spend time watching TV, woodworking, and doing yard work. *Id.* at 37–38 (Johnson Jr.) Mr. Johnson also provided Dennis Johnson Jr. financial help. *Id.* at 39–40.

The testimony also revealed how much Dennis and Sara Johnson provided and cared for their children. Mr. and Mrs. Johnson provided support to all their children "no matter what." Dmg. Trial Tr. 1422:19–23 (M. Johnson). And Mr. Johnson's family was the reason he gave up drinking 40 years before his death. *Id.* at 1387–88 (D. Staton). Mr. and Mrs. Johnson were the like "the Rock of Gibraltar" when it came to the love and support they gave their children. *Id.* at 1386:25–1387:2. Their parents provided lots of advice, usually from their family porch. *Id.* at 1394:11–23. Sara and Dennis taught their children "everything." *Id.* at 1371:20–1372. They taught their children about hard work, responsibility, and character. *Id.* Ms. Staton testified that they "prepared us for life.*" Id.* They modeled for their children the importance of being helpful and important in the community. *Id.* at 1385:20–23. Dennis and Sara Johnson provided support to all the children in the form of money, housing, co-signing on car or house loans, and providing direct loans. PEX-919, at 33–34. After the shooting, a testament to the love, comfort, and companionship their parents provided, the funeral service was packed: "The sanctuary, the bottom was full. The balcony was full, the foyer, the hallways, the auditorium [was full]… people were standing outside. There was no room for anybody." Dmg. Trial Tr. 1385:5–13 (D. Staton).

[179] **Dennis Johnson, Jr.'s Mental Anguish Damages for the death of his father, Dennis Johnson, Sr.** When his parents died, Mr. Johnson was in denial that it actually happened. PEX-917, at 14 (D. Johnson, Jr.). He received a phone call that there was an active shooter at the church. PEX-917, at 30. When he got to the Church, he found chaos. *Id.* at 30–31. Like the other children, he described the waiting process to find out whether their parents were dead and how it caused him mental anguish. PEX-917, at 32. He describes the scene as "nothing but grief and misery." *Id.* at 33.

After the shooting he suffered depression and couldn't get out of bed for about two months. PEX-917, at 47. As a result of the shooting, Dennis Johnson Jr. needed therapy. *Id.* at 10–13. He also began attending a support group at the Sutherland Springs Church. *Id.* at 24. Mr. Johnson Jr. also started isolating himself from others, self-medicating, and contemplating suicide. *Id.* at 15–16. Mr. Johnson Jr. also had trouble returning to church because it brought back too many painful memories. *Id.* at 17. He described the small size of the church and the terror that his parents must have felt. *Id.* at 25–26. Today, when he goes into a room, he always checks the exits and is very picky about where he sits in public places with crowds. *Id.* at 46–47. And today, he deals with his grief with religion, and by talking to his remaining family. *Id.* at 44. As for the future, he doesn't know what it holds for him: "I don't know. It's still more to come. Grief continues." *Id.* at 48.

[180] **Deanna Staton's Loss of Consortium damages for the death of her father.** Ms. Staton testified that she was very close to her father. Dmg. Trial Tr. 1371:17–19 (D. Staton). Her parents supported her when she gave birth to Kati Wall and Chris Johnson by adopting her two children when she couldn't care for them, without judgment or guilt. *Id.* at 1390:6–20. Ms. Staton described one time where her father purchased a mobile home, renovated it and provided her a place to live. *Id.* at 1391:2–25. In the years before the shooting, she would spend every day with her parents. *Id.* at 1392:3–15. While her husband and others provide her love and support, that does not replace the love and support that her parents provided her. *Id.* at 1405:8–22. She described at trial that one of the things she missed most about her father was the advice he gave and the support he gave her. *Id.* at 1409–10.

The testimony also revealed how much Dennis and Sara Johnson provided and cared for their children. Mr. and Mrs. Johnson provided support

to all their children "no matter what." Dmg. Trial Tr. 1422:19–23 (M. Johnson). And Mr. Johnson's family was the reason he gave up drinking 40 years before his death. *Id.* at 1387–88 (D. Staton). Mr. and Mrs. Johnson were the like "the Rock of Gibraltar" when it came to the love and support they gave their children. *Id.* at 1386:25–1387:2. Their parents provided lots of advice, usually from their family porch. *Id.* at 1394:11–23. Sara and Dennis taught their children "everything." *Id.* at 1371:20–1372. They taught their children about hard work, responsibility, and character. *Id.* Ms. Staton testified that they "prepared us for life." *Id.* They modeled for their children the importance of being helpful and important in the community. *Id.* at 1385:20–23. Dennis and Sara Johnson provided support to all the children in the form of money, housing, co-signing on car or house loans, and providing direct loans. PEX-919, at 33–34. After the shooting, a testament to the love, comfort, and companionship their parents provided, the funeral service was packed: "The sanctuary, the bottom was full. The balcony was full, the foyer, the hallways, the auditorium [was full]… people were standing outside. There was no room for anybody." Dmg. Trial Tr. 1385:5–13.

[181] **Deanna Staton's mental anguish claim for the death of her father, Dennis Johnson, Sr.** When Ms. Staton heard of the shooting, they started calling hospitals. Dmg. Trial Tr. 1376:11–21. They waited for hours with no one knowing what happened to their parents: "we were terrified." *Id.* at 1376:10–25. She called her mother over and over again on the phone and every hospital within 200 miles. *Id.* at 1378:9–1379:9. In fact, it wasn't until 12:33 am on Nov. 6 that they were finally told that they had lost their mother and father. *Id.* at 1381:9–21 (citing PEX-1187, at 3).

The fact that her parents died in a violent way has significantly affected Ms. Staton. *Id.* at 1403:22–1404:3. Every member of the Johnson family has had a difficult time dealing with the way their parents were taken and struggling with the grief. *Id.* at 1404:8–16. And as time marches forward, the grief has not abated—it has permanently changed this family. *Id.* at 1404:17–10405:7. What's more, Ms. Staton was married at the First Baptist Church of Sutherland Springs, which was the happiest day of her life. *Id.* at 1407:14–21. The fact that her parents were killed at this Church has destroyed her. *Id.* at 1407:22–1408:13. To this day, she still has nightmares about her parent's death. *Id.* at 1408:14–1409:5.

[182] **Michael Johnson's Loss of Consortium damages for the death of his father, Dennis Johnson, Sr**. Michael Johnson was very close to his parents. Dmg. Trial Tr. 1419:11–12 (M. Johnson). To this day, Mr. Johnson lives at his parent's house. *Id.* at 1418–19. They helped him through the rough times in his life and supported him in every way, including financially. *Id.* at 1419:13–20, 1433:13–15. His father was his best friend, teacher, and mentor. *Id.* at 1423:14–21. He guided him on day-to-day decisions, practical problems, and responsibility. *Id.* 1423:22–1424:7. Mr. Johnson shared with his son his love of the outdoors and gardening. *Id.* at 1423:8–25. Up until the shooting, they shared their love of yard work together. *Id.* at 1425.

The testimony also revealed how much Dennis and Sara Johnson provided and cared for their children. Mr. and Mrs. Johnson provided support to all their children "no matter what." *Id.* at 1422:19–23 (M. Johnson). And Mr. Johnson's family was the reason he gave up drinking 40 years before his death. *Id.* at 1387–88 (D. Staton). Mr. and Mrs. Johnson were the like "the Rock of Gibraltar" when it came to the love and support they gave their children. *Id.* at 1386:25–1387:2. Their parents provided lots of advice, usually from their family porch. *Id.* at 1394:11–23. Sara and Dennis taught their children "everything." *Id.* at 1371:20–1372. They taught their children about hard work, responsibility, and character. *Id.* They "prepared us for life." *Id.* They modeled for their children the importance of being helpful and important in the community. *Id.* at 1385:20–23. Dennis and Sara Johnson provided support to all the children in the form of money, housing, co-signing on car or house loans, and providing direct loans. PEX-919, at 33–34. After the shooting, a testament to the love, comfort, and companionship their parents provided, the funeral service was packed: "The sanctuary, the bottom was full. The balcony was full, the foyer, the hallways, the auditorium [was full]… people were standing outside. There was no room for anybody." Dmg. Trial Tr. 1385:5–13.

[183] **Michael Johnson's Mental Anguish damages for the death of his father, Dennis Johnson, Sr**. When Mr. Johnson found out about the shooting, he tried to call his parents several times. Dmg. Trial Tr. 1420:6–24 (M. Johnson). He described himself as being "out of it" that entire day and the experience being a "living hell." *Id.* at 1421:2–17. He was significantly affected by his father's death because Mr. Johnson was the family's spiritual advisor. *Id.* at 1389:14–90:4, 1405:21–22. The loss of Mr. Johnson was also significant to him because of the closeness of the relationship they shared.

Michael Johnson was very close to his parents. *Id.* at 1419:11–12. To this day, Mr. Johnson lives at his parent's house. *Id.* at 1418–19. They helped him through the rough times in his life and supported him in every way, including financially. *Id.* at 1419:13–20, 1433:13–15. His father was his best friend, teacher, and mentor. *Id.* at 1423:14–21. He guided him on day-to-day decisions, practical problems, and responsibility. *Id.* at 1423:22–1424:7. Mr. Johnson shared with his son his love of the outdoors and gardening. *Id.* at 1423:8–25. Up until the shooting, they shared their love of yard work together. *Id.* at 1425.

What's more, they helped Michael raise his kids from about age 4–5 until the kids were adults. PEX-919, at 31–32 (K. Wall Dep.). They would spend every day on the family porch with Mr. and Mrs. Johnson. Dmg. Trial Tr. 1428:18–1429:20. Mr. and Mrs. Johnson provided support to all their children "no matter what." *Id.* at 1422:19–23 (Johnson, M.).

[184] 2d Amd Stipulation, ECF No. 576, at 2 ¶ 4.

[185] **Kati Wall's Loss of Consortium damages for the death of her father, Dennis Johnson, Sr**. Ms. Wall is the adopted child of Dennis and Sara Johnson. PEX-919, at 8–9 (K. Wall Dep.). Dennis and Sara Johnson provided support to all the children in the form of money, housing, co-signing on car or house loans, and providing direct loans. *Id.* at 33–34. She lived in Floresville with Sara and Dennis growing up, then moved to Georgia, but then moved back a year before the shooting. *Id.* at 13. Growing up, they would have movie nights as a way of spending time together, every weekend. *Id.* at 38. As she got older, she would spend more time with Mr. Johnson and hear stories about when he was younger and in the military. *Id.* at 21. While she lived in Georgia, she would talk to her parents almost every day, if not multiple times a day. *Id.* at 23. And since 2016, she lived in a mobile home on her parent's property. *Id.* at 12 (moved out in 2018). She moved back to be closer to her parents. *Id.* at 13–14. After moving back, Dennis and Sara would care for Ms. Wall's children while Ms. Wall worked. *Id.* at 21–22. On weeknights, they would cook dinner together, but on Friday nights, they would go out together for dinner. *Id.* at 22. After dinner, they would watch TV and talk, and then put the kids to bed. *Id.* After putting the kids to bed, Ms. Wall would return to the Johnson's porch and sit and talk to them until about 10 or 11pm at night. *Id.*

The testimony also revealed how much Dennis and Sara Johnson provided and cared for their children. Mr. and Mrs. Johnson provided support to all their children "no matter what." Dmg. Trial Tr. 1422:19–23 (M. Johnson). And Mr. Johnson's family was the reason he gave up drinking 40 years before his death. *Id.* at 1387–88 (D. Staton). Mr. and Mrs. Johnson were the like "the Rock of Gibraltar" when it came to the love and support they gave their children. *Id.* at 1386:25–1387:2. Their parents provided lots of advice, usually from their family porch. *Id.* at 1394:11–23. Sara and Dennis taught their children "everything." *Id.* at 1371:20–1372. They taught their children about hard work, responsibility, and character. *Id.* They "prepared us for life." Id. They modeled for their children the importance of being helpful and important in the community. *Id.* at 1385:20–23. Dennis and Sara Johnson provided support to all the children in the form of money, housing, co-signing on car or house loans, and providing direct loans. PEX-919, at 33–34. After the shooting, a testament to the love, comfort, and companionship their parents provided, the funeral service was packed: "The sanctuary, the bottom was full. The balcony was full, the foyer, the hallways, the auditorium [was full]… people were standing outside. There was no room for anybody." Dmg. Trial Tr. 1385:5–13.

[186] **Kati Wall's Mental Anguish damages for the death of her father, Dennis Johnson, Sr**. When the children asked the coroner to see their parents, so they could say goodbye to them, the kids were not allowed to see them because of the facial trauma. PEX-919, at 39 (K. Wall Dep.). Ms. Wall has attended therapy as a result of the shooting. *Id.* at 3–4. She has been going to therapy for about three years now each week. *Id.* at 44–45. As a result of the shooting, Ms. Wall was diagnosed with PTSD, suffered anxiety and depression, and is having trouble sleeping. PEX-919, at 35–37, 42–43. She testified that she must use five different mental health medications to control her symptoms. *Id.* She testified that she would cry and feel "very empty and sad." PEX-919, at 54.

Ms. Wall also had trouble holding food down. *Id.* As a result of the shooting, the first month she lost 15 pounds, then gained 30 pounds — fluctuating with her depression. *Id.* at 55. She also began to throw up, which did not happen before the shooting. *Id.* Currently, she is 50 pounds heavier than she was at the time of the shooting. *Id.* And the death of her parents also impacted her grooming habits for the worse. *Id.* at 56–57. Moreover, when she does sleep, she has nightmares. *Id.* at 36. These nightmares usually

focus on the shooting and involve "playing in my head what happened to my parents…" *Id.* at 38. At times, she was "really, really depressed, [and] couldn't leave my house, [and] had a hard time being around anybody." *Id.* She testified that she has these nightmares almost every night. *Id.* at 41. Currently, she has nightmares three to four times a week. *Id.* at 41–42.

[187] **Chris Johnson's Loss of Consortium damages for the death of his father, Dennis Johnson, Sr.** Dennis and Sara Johnson were Chris Johnson's adoptive parents. PEX-916, at 7 (C. Johnson Dep.). Chris Johnson provided the court with several photos and videos and a Bible that exemplified his relationship with his parents. *Id.* at 4. Chris Johnson described his parents as his rock. *Id.* at 5; *see also* Dmg. Trial Tr. 1386:25–1387:2 (Staton describing them as the Rock of Gibraltar). As he was growing up, he would leave his biological parents' house—Sara and Denis Johnson would always provide him a place to stay. PEX-916, at 9–10. Mr. and Mrs. Johnson would help Chris with things like babysitting or small loans. *Id.* at 15–16. Mr. and Mrs. Johnson would help Chris celebrate his birthday. *E.g.*, *Id.* at 18. Before the shooting, in the fall of 2017, he would see Mr. and Mrs. Johnson fairly often. *Id.* at 25–26. He was there at the Sutherland Springs Church when Dennis Johnson gave his testimonial. *Id.* at 27. Another example of how much they cared for Chris Johnson is the story of why they moved from the Floresville church to the First Baptist Church of Sutherland Springs. The pastor at the Floresville church did not want Chris Johnson to attend any more, so his parents told him that if he was not welcome at that church, "we're not either." PEX-919, at 27–28 (K. Wall Dep.). As a result, they moved churches to the First Baptist Church of Sutherland Springs. *Id.*

The testimony also revealed how much Dennis and Sara Johnson provided and cared for their children. Mr. and Mrs. Johnson provided support to all their children "no matter what." Dmg. Trial Tr. 1422:19–23 (M. Johnson). And Mr. Johnson's family was the reason he gave up drinking 40 years before his death. *Id.* at 1387–88 (D. Staton). Their parents provided lots of advice, usually from their family porch. *Id.* at 1394:11–23. Sara and Dennis taught their children "everything." *Id.* at 1371:20–1372. They taught their children about hard work, responsibility, and character. *Id.* They "prepared us for life." *Id.* They modeled for their children the importance of being helpful and important in the community. *Id.* at 1385:20–23. Dennis and Sara Johnson provided support to all the children in the form of money, housing, co-signing on car or house loans, and providing direct loans. PEX-

919, at 33–34. After the shooting, a testament to the love, comfort, and companionship their parents provided, the funeral service was packed: "The sanctuary, the bottom was full. The balcony was full, the foyer, the hallways, the auditorium [was full]… people were standing outside. There was no room for anybody." Dmg. Trial Tr. 1385:5–13.

188 **Chris Johnson's Mental Anguish damages for the death of his father, Dennis Johnson, Sr**. As a result of the shooting, Mr. Johnson has gone to counseling. PEX-916, at 19–20 (C. Johnson Dep.). He saw them starting about three months after the shooting through at least 2019. *Id.* at 21. He learned of the shooting on the phone. *Id.* at 29–30. He didn't know whether his parents were involved in the shooting so he tried calling them, but they wouldn't pick up. *Id.* Like the rest of his family, he didn't figure out until nearly 1am that his parents had been killed. *Id.* at 30–31. Chris testified to the chaos of trying to find out whether his parents were still alive. *Id.* at 32.

Hearing about his parents shooting "tears him up" and "it's horrible." PEX-916, at 33–34. Chris Johnson describes in his testimony how the shooting contributed to his wife losing their unborn child and his job. *Id.* at 33–35. He described how the psychological impact of the shooting led to the troubles in his life and marriage. *Id.* at 35–36. Sometimes he's able to sleep at night, but other times it's hard for him to sleep as a result of losing Mr. and Mrs. Johnson. *Id.* at 36–37. Medical professionals told him that his wife lost their unborn child due to stress. *Id.* at 37. Chris Johnson's mental anguish has only increased as time moves forward. *Id.* at 40. He has started feeling angry at this situation. *Id.* at 41.

189 **James Graham's Loss of Consortium damages for the death of his mother, Sara Johnson**. Mr. Graham is the biological son of Sara Johnson and stepson of Dennis Johnson. PEX-902, at 4:23–5:9 (J. Graham Dep.). But they both raised him. *Id.* Mr. Graham was very close to his parents. *Id.* at 6 (Graham). He grew up with Sara and Dennis until he was 16 years old. *Id.* at 39–40. Sara Johnson and Mr. Graham talked on the phone often. *Id.* at 26–27. He would call her with any problems of his faith, life, or for general advice. *Id.* at 26–28. He described her as his "go-to girl" for advice, support, and guidance. *Id.* at 32. Since they lived so far apart, they would talk on the phone at least two times a month for about two or three hours. *Id.* at 27. On Mother's Day, he would try to be the first of her children to call her.

*Id.* at 28–29. Mr. Graham has a voicemail of his mother, which he listens to regularly to this day because he misses her. *Id.* at 30–31. He testified that he plays those messages at least four or five times a week. *Id.* at 45.

190   **James Graham's Mental Anguish damages for the death of his mother, Sara Johnson**. Mr. Graham first heard of the shooting the day of on the TV. PEX-902, at 7 (J. Graham Dep.). He was first informed that his parents could be involved by his uncle. *Id.* at 8. Like the other children, there was a long period of worry and anxiety when they didn't know what happened to their parents. *Id.* James Graham had been kept abreast of the situation the day of the shooting by his sister Deanna Staton. Dmg. Trial Tr. 1382:8–11 (D. Staton). Near midnight, when Ms. Staton called Mr. Graham to tell him that their parents passed, he responded, "No, no, no." *Id.* at 1382:14–19. He was in a state of disbelief and told Ms. Staton, "Surely they're off helping somebody." *Id.* at 1382:17–25.

Mr. Graham described the calls as frantic. PEX-902, at 9. He described the time between finding out about the shooting and finding out that his parents had been killed as 14 hours of "hell." *Id.* at 12–13. The last time he talked to his mom was six days before the shooting on his birthday. *Id.* at 10. He describes the terror that his parents felt as they were murdered as eating at him: it "eats me alive." *Id.* at 34. The last thing that his mother told him was on his birthday—that she loved him and would talk to him soon. *Id.* at 35. As a result of the shooting, Mr. Graham has had trouble sleeping. *Id.* at 43. He says that he would sleep much better if he weren't worried about the shooting. *Id.*

191   **Deanna Staton's Loss of Consortium damages for the death of her mother, Sara Johnson**. Ms. Staton testified that she was very close to her mother. Dmg. Trial Tr. 1371:17–19 (D. Staton). Her parents supported her when she had Kati Wall and Chris Johnson by adopting her two children when she couldn't care for them, without judgment or guilt. *Id.* at 1390:6–20. In the years before the shooting, she would spend every day with her parents. *Id.* at 1392:3–15. While her husband and others provide her love and support, that does not replace the love and support that her parents provided her. *Id.* at 1405:8–22. Ms. Staton testified that she misses her mom and specifically misses the small details about her mom, including her smell, and the advice that her mom would give her. *Id.* at 1409:9–21.

The testimony also revealed how much Dennis and Sara Johnson provided and cared for their children. Mr. and Mrs. Johnson provided support to all their children "no matter what." Dmg. Trial Tr. 1422:19–23 (M. Johnson). And Mr. Johnson's family was the reason he gave up drinking 40 years before his death. *Id.* at 1387–88 (D. Staton). Mr. and Mrs. Johnson were the like "the Rock of Gibraltar" when it came to the love and support they gave their children. *Id.* at 1386:25–1387:2. Their parents provided lots of advice, usually from their family porch. *Id.* at 1394:11–23. Sara and Dennis taught their children "everything." *Id.* at 1371:20–1372. They taught their children about hard work, responsibility, and character. *Id.* They "prepared us for life." *Id.* They modeled for their children the importance of being helpful and important in the community. *Id.* at 1385:20–23. Dennis and Sara Johnson provided support to all the children in the form of money, housing, co-signing on car or house loans, and providing direct loans. PEX-919, at 33–34. After the shooting, a testament to the love, comfort, and companionship their parents provided, the funeral service was packed: "The sanctuary, the bottom was full. The balcony was full, the foyer, the hallways, the auditorium [was full]… people were standing outside. There was no room for anybody." Dmg. Trial Tr. 1385:5–13.

[192] **Deanna Staton's Mental Anguish damages for the death of her mother, Sara Johnson**. Sara Johnson was the "glue" that kept the family together. Dmg. Trial Tr. 1388:21–89:13 (D. Staton). When Ms. Staton heard of the shooting, they started calling hospitals. *Id.* at 1376:11–21. They waited for hours with no one knowing what happened to their parents: "we were terrified." *Id.* at 1376:10–25. She called her mother repeatedly on the phone and every hospital within 200 miles. *Id.* at 1378:9–1379:9. In fact, it wasn't until 12:33 am on Nov. 6 that they were finally told that they had lost their mother and father. *Id.* at 1381:9–21 (citing PEX-1187, at 3).

The fact that her parents died in a violent way has significantly affected Ms. Staton. *Id.* at 1403:22–1404:3. Every member of the Johnson family has had a difficult time dealing with the way their parents were taken and struggling with the grief. *Id.* at 1404:8–16. And as time marches forward, the grief has not abated—it has permanently changed this family. *Id.* at 1404:17–10405:7. Ms. Staton was married at the First Baptist Church of Sutherland Springs, which was the happiest day of her life. *Id.* at 1407:14–21. The fact that her parents were killed at this Church has destroyed her. *Id.* at

1407:22–1408:13. To this day, she still has nightmares about her parents' death. *Id.* at 1408:14–1409:5.

[193] **Michael Johnson's Loss of Consortium damages for the death of his mother, Sara Johnson**. Michael Johnson was very close to his parents. Dmg. Trial Tr. 1419:11–12 (M. Johnson). To this day, Mr. Johnson lives at his parents' house. Dmg. Trial Tr. 1418–19. They helped him through the rough times in his life and supported him in every way, including financially. *Id.* at 1419:13–20, 1433:13–15. The testimony also revealed how much Dennis and Sara Johnson provided and cared for their children. Mr. and Mrs. Johnson provided support to all their children "no matter what." *Id.* at 1422:19–23 (M. Johnson). And Mr. Johnson's family was the reason he gave up drinking 40 years before his death. *Id.* at 1387–88 (D. Staton). Mr. and Mrs. Johnson were the like "the Rock of Gibraltar" when it came to the love and support they gave their children. *Id.* at 1386:25–1387:2. Their parents provided lots of advice, usually from their family porch. *Id.* at 1394:11–23. Sara and Dennis taught their children "everything." *Id.* at 1371:20–1372. They taught their children about hard work, responsibility, and character. *Id.* They "prepared us for life." *Id.* They modeled for their children the importance of being helpful and important in the community. *Id.* at 1385:20–23. Dennis and Sara Johnson provided support to all the children in the form of money, housing, co-signing on car or house loans, and providing direct loans. PEX-919, at 33–34. After the shooting, a testament to the love, comfort, and companionship their parents provided, the funeral service was packed: "The sanctuary, the bottom was full. The balcony was full, the foyer, the hallways, the auditorium [was full]… people were standing outside. There was no room for anybody." Dmg. Trial Tr. 1385:5–13.

[194] **Michael Johnson's Mental Anguish damages for the death of his mother, Sara Johnson**. When Michael Johnson found out about the shooting, he tried to call his parents several times. Dmg. Trial Tr. 1420:6–24 (M. Johnson). He described himself as being "out of it" that entire day and the experience being a "living hell." *Id.* at 1421:2–17. The loss of Mrs. Johnson was also significant to him because of the closeness of the relationship they shared. Michael Johnson was very close to his parents. *Id.* at 1419:11–12. To this day, Mr. Johnson lives at his parents' house. *Id.* at 1418–19. They helped him through the rough times in his life and supported him in every way, including financially. *Id.* at 1419:13–20, 1433:13–15. Mr. and Mrs. Johnson helped Michael raise his kids from about age 4-5 until the

kids were adults. PEX-919, at 31–32 (K. Wall Dep.). They would spend every day on the family porch with Mr. and Mrs. Johnson. Dmg. Trial Tr. 1428:18–1429:20. Mr. and Mrs. Johnson provided support to all their children "no matter what." *Id.* at 1422:19–23 (M. Johnson).

195   **Kati Wall's Loss of Consortium damages for the death of her mother, Sara Johnson**. One of Ms. Wall's hobbies—crafting—she took up because of her mother. PEX-919, at 18–19 (K. Wall Dep.). On weekends, Sara Johnson and Ms. Wall would go shopping together. *Id.* at 20. The testimony also revealed how much Dennis and Sara Johnson provided and cared for their children. Mr. and Mrs. Johnson provided support to all their children "no matter what." Dmg. Trial Tr. 1422:19–23 (Johnson, M.). And Mr. Johnson's family was the reason he gave up drinking 40 years before his death. *Id.* at 1387–88 (Staton). Mr. and Mrs. Johnson were the like "the Rock of Gibraltar" when it came to the love and support they gave their children. *Id.* at 1386:25–1387:2. Their parents provided lots of advice, usually from their family porch. *Id.* at 1394:11–23. Sara and Dennis taught their children "everything." *Id.* at 1371:20–1372. They taught their children about hard work, responsibility, and character. *Id.* They "prepared us for life." *Id.* They modeled for their children the importance of being helpful and important in the community. *Id.* at 1385:20–23. Dennis and Sara Johnson provided support to all the children in the form of money, housing, co-signing on car or house loans, and providing direct loans. PEX-919, at 33–34. After the shooting, a testament to the love, comfort, and companionship their parents provided, the funeral service was packed: "The sanctuary, the bottom was full. The balcony was full, the foyer, the hallways, the auditorium [was full]… people were standing outside. There was no room for anybody." Dmg. Trial Tr. 1385:5–13.

196   **Kati Wall's Mental Anguish damages for the death of her mother, Sara Johnson**. When the children asked the coroner to see their parents, so they could say goodbye to them, the kids were not allowed to see them because of the facial trauma. PEX-919, at 39 (K. Wall Dep.). Ms. Wall has attended therapy because of the shooting. *Id.* at 3–4. She has been going to therapy for about three years now each week. *Id.* at 44–45. As a result of the shooting, Ms. Wall was diagnosed with PTSD, suffered anxiety and depression, and is having trouble sleeping. *Id.* at 35–37, 42–43. She testified that she must use five different mental health medications to control her symptoms. *Id.* She testified that she would cry and feel "very empty and sad."

*Id.* at 54. Ms. Wall also had trouble holding food down. *Id.* As a result of the shooting, the first month she lost 15 pounds, then gained 30 points — fluctuating with her depression. *Id.* at 55. She also began to throw up, which did not happen before the shooting. *Id.* Currently, she is 50 pounds heavier than she was at the time of the shooting. *Id.* The death of her parents also impacted her grooming habits for the worse. *Id.* at 56–57. And when she does sleep, she has nightmares. *Id.* at 36. These nightmares usually focus on the shooting and involve "playing in my head what happened to my parents…" *Id.* at 38. At times, she was "really, really depressed, [and] couldn't leave my house, [and] had a hard time being around anybody." *Id.* She testified that she has these nightmares almost every night. *Id.* at 41. Currently, she has nightmares three to four times a week. *Id.* at 41–42.

[197] **Chris Johnson's Loss of Consortium damages for the death of his mother, Sara Johnson**. Chris Johnson described Sara as his "special lady." PEX-916, at 42–43 (C. Johnson Dep.). Dennis & Sara Johnson were Chris Johnson's adoptive parents. *Id.* at 7. Chris Johnson provided the court with several photos and videos and a Bible that exemplified his relationship with his parents. *Id.* at 4. When he was younger, Chris Johnson would do crafts with his mother. *Id.* at 25. Chris Johnson described his parents as his rock. *Id.* at 5; *see also* Dmg. Trial Tr. 1386:25–1387:2 (D. Staton describing them as the Rock of Gibraltar). As he was growing up, he would leave his biological parents house—Sara and Denis Johnson would always provide him a place to stay. PEX-916, at 9–10. Mr. and Mrs. Johnson would help Chris with things like babysitting or small loans. *Id.* at 15–16. Mr. and Mrs. Johnson would help Chris celebrate his birthday. *E.g.*, *id.* at 18. Before the shooting, in the fall of 2017, he would see Mr. and Mrs. Johnson often. *Id.* at 25–26. He was there at the Sutherland Springs Church when Dennis Johnson gave his testimonial. *Id.* at 27. Another example of how much they cared for Chris Johnson is the story of why they moved from the Floresville church to the First Baptist Church of Sutherland Springs. The pastor at the Floresville church did not want Chris Johnson to attend any more, so his parents told him that if he was not welcome at that church, "we're not either." PEX-919, at 27–28 (K. Wall Dep.). As a result, they moved churches to the First Baptist Church of Sutherland Springs. *Id.*

The testimony also revealed how much Dennis and Sara Johnson provided and cared for their children. Mr. and Mrs. Johnson provided support to all their children "no matter what." Dmg. Trial Tr. 1422:19–23 (M.

Johnson). And Mr. Johnson's family was the reason he gave up drinking 40 years before his death. *Id.* at 1387–88 (D. Staton). Their parents provided lots of advice, usually from their family porch. *Id.* at 1394:11–23. Sara & Dennis taught their children "everything." *Id.* at 1371:20–1372. They taught their children about hard work, responsibility, and character. *Id.* They "prepared us for life." *Id.* They modeled for their children the importance of being helpful and important in the community. *Id.* at 1385:20–23. Dennis and Sara Johnson provided support to all the children in the form of money, housing, co-signing on car or house loans, and providing direct loans. PEX-919, at 33–34. After the shooting, a testament to the love, comfort, and companionship their parents provided, the funeral service was packed: "The sanctuary, the bottom was full. The balcony was full, the foyer, the hallways, the auditorium [was full]… people were standing outside. There was no room for anybody." Dmg. Trial Tr. 1385:5–13.

198 **Chris Johnson's Mental Anguish damages for the death of his mother, Sara Johnson**. As a result of the shooting, he's gone to counseling. PEX-916, at 19–20 (C. Johnson Dep.). He saw them starting about three months after the shooting through at least 2019. *Id.* at 21. He learned of the shooting on the phone. PEX-916, at 29–30. He didn't know whether his parents were involved in the shooting so he tried calling them but they wouldn't pick up. *Id.* Like the rest of his family, he didn't figure out until nearly 1am that his parents had been killed. *Id.* at 30–31. Chris testified to the chaos of trying to find out whether his parents were still alive. *Id.* at 32.

Hearing about his parents shooting "tears him up" and "it's horrible." PEX-916, at 33–34. He describes in his testimony how the shooting contributed to him losing his unborn child and his job. *Id.* at 33–35. He described how the psychological impact of the shooting led to the troubles in his life and marriage. PEX-916, at 35–36. Sometimes he's able to sleep at night, but other times it's hard for him to sleep as a result of losing Mr. and Mrs. Johnson. *Id.* at 36–37. Medical professionals told him that his wife lost their unborn child due to stress. PEX-916, at 37. Chris Johnson's mental anguish has only increased as time moves forward. PEX-916, at 40. He has started feeling angry at this situation. *Id.* at 41.

199 **Chris Ward's damages for loss of consortium of his wife, JoAnn Ward.** Chris and JoAnn Ward were married on November 5, 2011. PEX-17006. Together, they had four children. PEX-923, at 5:9–10:7. R.T., JoAnn's

daughter from a previous relationship, was the oldest and was nine years old at the time of the shooting. *Id.* E.G., JoAnn's daughter from a previous relationship, was seven years old at the time of the shooting. *Id.* R.W., Chris' son from a previous relationship, was five years old at the time of the shooting. *Id.* B.W., JoAnn and Chris' child together, was also five years old at the time of the shooting. *Id.* All the children called him Dad. *Id.* They blended to make a loving, stable home for their kids.

Chris suffers from loss of companionship and society from the loss of his wife, JoAnn Ward. Chris and JoAnn met when they were in middle school. PEX-923 8:12-25. They kept in touch through high school. *Id.* After high school, they reconnected over Facebook, went to dinner one day, and then married a year and a half later. *Id.* Chris was the provider in the marriage. PEX-923, at 10:13–11:14, at 12:12–13:9. He drove a vacuum truck, hauling water before the shooting. *Id.* JoAnn took care of the children and the home.

Chris treated R.T. and E.G. as his own. PEX-923, at 9:20–10:1. Just as JoAnn treated R.W. as her own. *Id.* The family had fun together. PEX-923, at 10:8-12. The family had good times and good memories. *Id.* It was never just Chris and JoAnn; the kids were always with them. *Id.* The family enjoyed going to Corpus Christi together, doing projects together, and spending holidays together. PEX-941, at 9:22–10:6).

Chris and JoAnn had plans for more kids. PEX-923, at 10:13–11:3. They wanted to try to have another little boy. PEX-923, at 10:15–12:5. Their marriage had bumps, but they always got through it; they were committed to each other. *Id.* They loved each other. *Id.* They had an affectionate, caring, fun marriage. *Id.*

[200] **Chris Ward's mental anguish damages for the death of his wife, JoAnn Ward**. On November 5, 2017, Chris Ward got home from work around 8:30 – 9:00 am. PEX-923, at 13:10–14:13. His wife, JoAnn was awake when he got home; she was happy to see him. *Id.* It was their wedding anniversary. *Id.* Chris laid down to sleep. PEX-923, at 14:10–15:18. When he woke up, the house was empty. *Id.* JoAnn and the kids, E.G., R.T., B.W. and R.W., had gone to church. *Id.* Not long after that, Chris' brother was beating on the door, telling him that someone had shot up the church. *Id.* Chris jumped in his truck and drove to the church. *Id.*

When Chris arrived at the church, there were no ambulances or fire trucks. PEX-923, at 16:1-25. Chris Ward was screaming and hysterical for someone to help his son because he realized how badly R.W. was injured. Dmg. Trial Tr. 467:21–469:7. Chris saw R.W. on the ground being worked on. PEX-923, at 16:1–17:25. R.W. had been shot; he was bleeding. *Id.* Chris held pressure on his arm and leg. *Id.* Chris was trying to keep R.W. awake. *Id.* R.W. had a chunk out of his arm. *Id.* Chris helped carry R.W. into an ambulance. PEX-923, at 18:20-23.

Chris saw blood on the ground. PEX-923, at 18:12-19. He smelled gun powder and blood. *Id.* Chris heard people crying and asking for help. *Id.* Chris went into the church looking for his wife and daughters. *Id.* at 18:24–21:19. Chris found R.T. by the door crying. *Id.* R.T. said nothing when he hugged her. Chris saw bodies everywhere in the church. *Id.* He saw pews knocked over. *Id.* Chris heard people hollering and crying in pain. *Id.* Chris later learned that JoAnn and B.W. were still in the church, although Chris didn't recognize them. PEX-923, at 27:18–28:3. JoAnn died trying to save the kids by protecting them with her own body. *Id.*

While at University Hospital after the shooting, a Chaplain met with Chris and the family after E.G.'s death. PEX-17116-00049. The Chaplain observed that Chris seemed to be struggling the most. *Id.* He was not expressing his emotions and kept going outside to cope. *Id.* The Chaplain encouraged the family not to leave Chris alone. *Id.*

Since the shooting, Chris has seen several mental health professionals. As a result of losing his wife and daughters in the shooting, Mr. Ward has suffered extreme mental anguish. Chris Ward meets the diagnostic criteria for PTSD with panic attacks, major depression, generalized anxiety disorder, and alcohol-use disorder. *Id.*; PEX-17096; PEX-17103.

[201] This figure represents both past and future medical expenses. Defendant stipulates that Dalia Lookingbill incurred $1,024.61 in past medical expenses. 2d Amd Stipulation, ECF No. 576, at 10 ¶ 26(a). Plaintiff Lookingbill believes that $38,586.18 in future medical expenses is reasonable. Defendant stipulates to $11,561.76 of Ms. Lookingbill's future medical expenses. 2d Amd Stipulation, ECF No. 576, at 10 ¶ 26(b). The remainder can be found in Plaintiff's life care plan. PEX-17139 (Gonzales LCP – D. Lookingbill). Plaintiff Lookingbill notes that the amount for future medical care demanded in this pleading *already reflects* the following adjustments

made to her Life Care Plan: 2 years passed between original LCP date and trial removed/adjusted for all applicable line items; average generic drug pricing substituted for all medications available as generic.

202  **Dalia Lookingbill's loss of companionship damages for the death of her daughter, JoAnn Ward**. Dalia suffers from loss of companionship and society from her daughter and granddaughters' tragic deaths. Dalia began taking depression medication after JoAnn passed. The depression medication prescribed by Dr. Van Winkle helps her mood. PEX-943, at 15:2–16:6. Dalia has found some comfort in talking with her pastor about the tragedy. PEX-943, at 25:8-15. However, Dalia still cries when she's alone and avoids being alone. PEX-943, at 51:19-24. Dalia tends to go into her room and cry since there is nothing she can do to bring her baby back. PEX-943, at 29:6-13.

Dalia had a strong bond with JoAnn. JoAnn was the youngest of her nine children. PEX-910, at 6:5-13. JoAnn used to call her mom daily, if not several times a day. PEX-17137-00004. Dalia misses that. *Id.* Dalia feels like a part of her is missing. *Id.* The death of JoAnn, E.G., and B.W. is always on her mind and made things pretty bad for her. GEX-641, at 3. Dalia visits their gravesite to decorate for every holiday. PEX-943, at 29:14-20. Dalia continues to have difficulty sleeping through the night. PEX-943, at 49:18–50:25. Her sleep is erratic, and she often only gets 3 hours a night of sleep. *Id.* Dalia feels that there is less fun and less pleasure in her life now. PEX-17137-00004.

Dalia also had a close relationship with her granddaughter E.G. PEX-910, at 21:9–22:2. Dalia and Robert helped raise E.G. when she was young. *Id.* JoAnn and the girls lived with Dalia and Robert before JoAnn married Chris Ward. *Id.* E.G. stayed with Dalia and Robert while Chris and JoAnn built a stable home after they first were married. *Id.* E.G. was so close to Dalia and Robert that it was hard for her to leave them. *Id.*

203  **Dalia Lookingbill's mental anguish damages for the death of her daughter, JoAnn Ward**. Dalia was not in the Church the morning of the shooting. Her daughter, JoAnn Ward, attended service with Dalia's grandchildren, E.G., R.T., B.W., and R.W. After receiving word from family about the shooting, Dalia and Robert, her late husband, went to University Hospital as she believed E.G. was there. PEX-943, at 20:3–23:23. The doctors

told her after she arrived that E.G. was not going to make it. *Id.* They waited at the hospital to learn about JoAnn. *Id.*

The Chaplain at University Health System Hospital met with Chris Ward, Dalia, E.G.'s Aunt, and Uncles before and after E.G.'s death. PEX-17116-00049. The Chaplain noted that the family was upset about E.G.'s death and about her brother, R.W., who was in surgery. *Id.* The family repeatedly asked for help locating E.G.'s mother, JoAnn, and sister, B.W. *Id.* Dalia was struggling, wanting to know what happened to her daughter JoAnn and her granddaughter B.W. *Id.* The Chaplain encouraged the family not to leave Dalia alone. *Id.*

Dalia suffered as she waited at the hospital because they believed JoAnn and B.W. were also there. PEX-910, at 14:10–16:7. They eventually learned that JoAnn and B.W. were not at the hospital. They were later told that JoAnn had to be identified by her tattoos and that B.W. never left the church. *Id.* During this time, the family hoped JoAnn was alive; however, Mandi Lookingbill, her sister, knew that JoAnn wasn't alive because she would have called Mandi or her father looking for her children. *Id.*

Robert Lookingbill, Dalia's husband, passed on January 9, 2018. PEX-943, at 11:19–12:2. Two months after JoAnn. PEX-910, at 18:19–20:21. Dalia had to leave the funeral procession for JoAnn and the girls because they found Robert unresponsive. *Id.* It was almost like Robert gave up on life after the shooting. *Id.* He kept saying JoAnn and the girls were waiting for him. *Id.*

Dalia has suffered a high dree of mental pain and distress from losing her daughter and granddaughters. Since the shooting, Dalia has been here physically, but not mentally. PEX-910, at 35:1–36:5. Her daughter, Mandi Lookingbill, describes her as spacing out and forgetful. *Id.* JoAnn's death has ripped their family apart, sending everyone off into their little bubble. *Id.*

According to the Government's expert, Dalia Lookingbill "meets full diagnostic criteria for Major Depressive Disorder resulting from the murder of her daughter and grandchildren during the Sutherland Springs First Baptist Church on 11/5/2017. These symptoms are moderate in severity and cause clinically significant distress. Mrs. Lookingbill copes by keeping herself focused on valuing her relationship with her surviving children. Additionally, although she does not meet full diagnostic criteria for PTSD, she is

experiencing moderate symptoms which evoke clinically significant distress. Often described as sub-threshold, many individuals experience clinically significant PTSD symptoms that do not meet full diagnostic criteria. As with individuals who meet diagnostic criteria, individuals with sub-threshold symptoms often experience similar levels of distress and psychosocial impairment." GEX-641, at 8.

Dalia is "naively attempting to present herself in an overly positive fashion. She feels depressed, despondent, and hopeless. She is experiencing a great deal of emotional pain. She is tense, nervous, and fearful. She is withdrawn and introverted. She keeps her emotions bottled up inside. She is trying to be strong and go on with her life as best she can. She overuses the defense mechanisms of denial and repression." PEX-17137-00003.

Dalia has been diagnosed with major depressive disorder and complicated grief disorder. PEX-17193, at 11. Dalia has a decreased ability to interact and/or socialize with family and/or friends and acquaintances. PEX-17193, at 12.

[204] **R.T.'s loss of consortium damages for the death of his mother, JoAnn Ward**. R.T. suffers from loss of companionship and society from her mother's death. JoAnn Ward was just 30 years old at the time of her death. PEX-1056. JoAnn suffered seven gunshot wounds during the shooting. PEX-1056. She suffered a gunshot wound to the head, gunshot wound of the left edge of the chest, gunshot wound of the left side of her chest, gunshot wound of her central chest, gunshot wound of her right side of the check and abdomen superior, gunshot wound of her right side of her chest and abdomen inferior, and a gunshot wound of her abdomen. PEX-1056. JoAnn also had additional abrasions, lacerations, and contusions of her face, chin, trunk, and right arm. PEX-1056.

JoAnn was a momma bear who put her children's pictures on the wall and saved their artwork. PEX-941, at 7:14–9:1. JoAnn made her daughter R.T. feel like she was JoAnn's whole world. *Id.* JoAnn made R.T. feel special. *Id.* JoAnn made holidays and birthdays special for her family. *Id.* at 10:3–11:12. JoAnn put little notes in the kids' lunches to let them know they were loved. PEX-923, at 11:4-8.

R.T. suffers from loss of advice and counsel from her mother's tragic death. R.T. could share her problems with her mom. PEX-941, at 26:3–27:6.

JoAnn would help her solve her problems. *Id.* JoAnn would give her good guidance. *Id.* JoAnn encouraged her to be outspoken and bold. *Id.* R.T. is no longer the same after the shooting.

205 **R.T.'s mental anguish damages for the death of his mother, JoAnn Ward**. R.T. suffers from mental anguish from the loss of her mother. "Several factors place R.T. at risk for a complicated and prolonged grief process. These would include her close, dependent, and enduring relationship wither mother and the sudden, traumatic, untimely, unexpected and preventable nature of her death. When a loved one is lost in a sudden, unexpected, and preventable fashion this frequently results in a complicated bereavement process that is not easily resolved. The resulting mental anguish will tend to be enduring. The mental anguish and emotional pain that R.T. suffers likely will continue to some degree and to some extent for the rest of her life." PEX-17123, at 6. R.T.'s grieving would be intensified when JoAnn was not there for her developmental milestones such as school events, sporting events, dating, graduation, marriage, and parenthood. PEX-17123, at 6.

R.T. wishes she would have gone to the door of the church and looked, believing had she, she could have saved her family. PEX-910, at 17:8–18:6. Now, when R.T. hears a car door slam or garage door shut, she gets up to look out the front door to see where the noise is coming from. PEX-910, at 33:6-17. Her aunt Mandi attributes this behavior to R.T.'s belief that she could have saved her family if she had gone to the church's door. *Id.*

R.T. needs to take care of her mother and sister's graves. PEX-910, at 22:3–23:2. She wants everybody to know that they have people here who love them and still care for them. *Id.* R.T. writes notes and poems that she leaves at their headstones. *Id.* R.T. brought shells and sand from Corpus Christi to their graves because that was a happy place where the family vacationed. PEX-941, at 24:11–26:2.

R.T. wears a bracelet that has pictures of JoAnn, E.G., and B.W. PEX-941, at 30:5–31:25. She keeps some of their clothing and wears her mother's boots, even though they are a little big. *Id.* Gunny Macias gave her his Marine coin that she carries with her. PEX-941, at 32:1–33:1. R.T. recently made the volleyball team at school. Next year she can pick her volleyball

jersey number. PEX-941, at 33:6-24. She will pick number 4, because that is the last full day that she had with her family. *Id.*

206 In addition to the damages discussed above, Plaintiff Martina Pachal suffered loss of inheritance in the amount of $88,871 due to the untimely death of her father. This is calculated as one quarter of the assessment of the total pecuniary losses of Robert and Karen Marshall in the amount of $355,484.00 found at PEX-11034 (Fairchild Earnings Report – R. & K. Marshall) and PEX-7036 (Casenave Vocational Report – R. Marshall). The amount has been split in quarters and allocated between the two heirs to the two estates. Defendant stipulated that the Estates of Robert and Karen Marshall, combined, suffered at minimum $257,691.00 in lost future earning capacity. 2d Amd Stipulation, ECF No. 576, at 11 ¶ 30.

207 **Martina Pachal's damages for loss of consortium of her father, Robert Marshall**. Plaintiff Martina Pachal lost her father, Robert Marshall, who was shot and killed in the church on November 5, 2017. Plaintiff was 33 years old at the time of her father's tragic death. Plaintiff Pachal testified about her father, "He was an amazing person. He was the glue that held our family together and his side of the family." Dmg. Trial Tr. 1599:14-16. Further, "[my father and I] both went into the Air Force and became jet engine mechanics. I followed in my father's footsteps with that, and we ended up actually working on the same aircraft." *Id.* at 1600: 11-14.

Plaintiff Pachal testified speaking to her parents, "we would speak weekly…We would text all the time." *Id.* at 1604:24-25. Further, "[m]y parents loved FaceTiming the grandkids too. That was the way that they could be connected." *Id.* at 1605:3-4.

Plaintiff Pachal suffers from loss of advice and counsel from her father's tragic death on November 5, 2017. Plaintiff Pachal testified to her loss of parental support at trial, "Oh, gosh. Lots of parenting. And I miss them more than ever now because I have two teenagers. And I would have loved to have known, you know, how they handled me growing up and what advice they could give for being a parent." Dmg. Trial Tr. 1610:13-16.

Plaintiff Pachal suffers from loss of companionship and society from her father's tragic death on November 5, 2017. At trial, Plaintiff Pachal testified to their shared work in the Air Force, "[w]ell, the big one, being we both went into the Air Force and became jet engine mechanics. I followed in my father's

footsteps with that, and we ended up actually working on the same aircraft. He worked on the 135s down in Castle. And when Castle closed down, they moved a lot of those aircraft up to Fairchild, which is where I was. So we actually touched the same aircraft and worked on the same planes." Dmg. Trial Tr. 1600:11-18. She further testified to their shared interests, "My dad and myself, we loved good beer, good food. So that was a big -- that was a big thing in common." Dmg. Trial Tr. 1600:19-20.

208 **Martina Pachal's mental anguish damages for the death of her father, Robert Marshall**. Plaintiff Pachal suffers from mental anguish from the loss of her father. On September 15, 2019, Plaintiff Pachal met with plaintiff's psychiatrist who diagnosed her with Major Depressive Disorder. PEX-11022-5. On October 13, 2020, Plaintiff Pachal met with defense psychiatrist who diagnosed her with Posttraumatic stress disorder and generalized anxiety disorder GEX-516-8. Plaintiff Pachal further testified at trial that she had experienced two panic attacks at work, one involving a person with a weapon, "[b]ut I did have an instance at work where I had two panic attacks at work. I work in a larger hospital in Spokane, and we had a code silver, which is a person with a weapon in the hospital. And so just for safety measures, they made everybody, you know, go into a room. And I had ducked into a nursing break room, and I just felt my heart rate shoot up immediately and began getting really shaky. And some other nurses funneled in as well, and I was so thankful for wearing masks. I just remember biting my lip so hard to try not to break down during this. And everyone was just sitting in the room chatting like it was break time. And I'm in there fighting, trying to keep it together." Dmg. Trial Tr. 1612:24-1613:12.

209 In addition to the damages discussed above, Plaintiff Kara Boyd suffered loss of inheritance in the amount of $88,871 due to the untimely death of her father. This is calculated as one quarter of the assessment of the total pecuniary losses of Robert and Karen Marshall in the amount of $355,484.00 found at PEX-11034 (Fairchild Earnings Report – R. & K. Marshall) and PEX-7036 (Casenave Vocational Report – R. Marshall). The amount has been split in quarters and allocated between the two heirs to the two estates. Defendant stipulated that the Estates of Robert and Karen Marshall, combined, suffered at minimum $257,691.00 in lost future earning capacity. 2d Amd Stipulation, ECF No. 576, at 11 ¶ 30.

[210] **Kara Boyd's damages for loss of consortium of her father, Robert Marshall**. Plaintiff Kara Boyd lost her father, Robert Marshall, who was shot and killed in the church on November 5, 2017. Plaintiff was 30 years old at the time of her father's tragic death.

Plaintiff Kara Boyd suffers from loss of advice and counsel from her father's tragic death on November 5, 2017. In her deposition, she testified that she and her father regularly, "talked maybe, like, once a month, but I wish I would have called and checked in more." PEX-00921, at 7:20-21.

Plaintiff Boyd suffers from loss of companionship and society from her father's tragic death on November 5, 2017. In her deposition, Plaintiff Boyd testified that they would talk about their day to day lives and support each other when needed, "I know he was upset because he lost a -- one of his dogs. So I called to check in on him, you know, make sure he was doing okay because I know he was upset about that. So we talked about that. You know, just him working so much or what he was doing, which is mostly yard work. So those are kind of the majority of things we talked about." PEX-00921, at 8:7-14. Plaintiff Boyd described her father as "Oh, he was funny. He was a prankster. He was also a hard worker, too. I remember him working a lot, but any chance he got when he came home, he'd spend with us." PEX-00921, at 11:10-13.

[211] **Kara Boyd's mental anguish damages for the death of her father, Robert Marshall**. Plaintiff Boyd suffers from mental anguish from the loss of her father. On September 15, 2019, Plaintiff Boyd met with plaintiff's psychiatrist who diagnosed her with Major Depressive Disorder. PEX-11043 at 5. On October 17, 2020, Plaintiff Boyd met with defense psychiatrist who diagnosed her with Posttraumatic Stress Disorder and Generalized Anxiety Disorder. GEX-520, at 12. In her deposition, Plaintiff Boyd testified to losing her job due to her inability to focus throughout the grieving process, "[w]ith the loss of the job as well because the focus -- yeah. It's just -- it was really hard for me to focus, which is one main thing." PEX-921, at 28:1-3.

[212] In addition to the damages discussed above, Plaintiff Martina Pachal suffered loss of inheritance in the amount of $88,871 due to the untimely death of her father. This is calculated as one quarter of the assessment of the total pecuniary losses of Robert and Karen Marshall in the amount of $355,484.00 found at PEX-11034 (Fairchild Earnings Report – R. & K.

Marshall) and PEX-7036 (Casenave Vocational Report – R. Marshall). The amount has been split in quarters and allocated between the two heirs to the two estates. Defendant stipulated that the Estates of Robert and Karen Marshall, combined, suffered at minimum $257,691.00 in lost future earning capacity. 2d Amd Stipulation, ECF No. 576, at 11 ¶ 30.

[213] **Martina Pachal's damages for the loss of consortium of her mother, Karen Marshall**. Plaintiff Martina Pachal lost her mother, Karen Marshall, who was shot and killed in the church on November 5, 2017. Plaintiff was 33 years old at the time of her mother's tragic death. At trial, Plaintiff Pachal testified, "[m]y mom was very dedicated to her career. She had a long Air Force career, active duty and Air National Guard. She was one that gave me kind of the motivation to pursue my career, a very strong individual." Dmg. Trial Tr. 1602:12-15. Further, "[b]oth of my parents worked very hard to provide for us, all three of us kids". Dmg. Trial Tr. 1597:25-1598:1.

Plaintiff Pachal suffers from loss of advice and counsel from her mother's tragic death on November 5, 2017. At trial, Plaintiff Pachal testified to her loss of parenting advice, "[l]ots of parenting. And I miss them more than ever now because I have two teenagers. And I would have loved to have known, you know, how they handled me growing up and what advice they could give for being a parent." Dmg. Trial Tr. 1610:13-16.

Plaintiff Pachal suffers from loss of companionship and society from her mother's tragic death on November 5, 2017. At trial, Plaintiff Pachal testified to her mother's acts of service, "[y]eah. So, again, very dedicated to her career. She very proud of her kids going in the military. My brother as well, as you can see this picture on the bottom right, he -- that was his basic training graduation. And myself. My sister didn't go in, but she was very proud of all." Dmg. Trial Tr. 1602:25-1603:4. Plaintiff Pachal further testified to the distance her parents would travel to visit with her and her family, "[a]bsolutely. So we always had a lot of space between us. I've always lived in Washington ever since I left home. My parents moved to Texas shortly after I left. So there was always quite a bit of space, but they always made an effort. First birthdays were a big deal to be there for every kids' first birthday. They would try to travel as much as they could for Christmas, for other random little occasions as they could." Dmg. Trial Tr. 1603:13-20.

214 **Martina Pachal's mental anguish damages for the death of her mother, Karen Marshall**. Plaintiff Pachal suffers from mental anguish from the loss of her mother. On September 15, 2019, Plaintiff Pachal met with plaintiff's psychiatrist who diagnosed her with Major Depressive Disorder. PEX-11022, at 5. On October 13, 2020, Plaintiff Pachal met with defense psychiatrist who diagnosed her with Posttraumatic stress disorder and generalized anxiety disorder. GEX-516, at 8. Plaintiff Pachal further testified at trial that she had experienced two panic attacks at work, one involving a person with a weapon, "[b]ut I did have an instance at work where I had two panic attacks at work. I work in a larger hospital in Spokane, and we had a code silver, which is a person with a weapon in the hospital. And so just for safety measures, they made everybody, you know, go into a room. And I had ducked into a nursing break room, and I just felt my heart rate shoot up immediately and began getting really shaky. And some other nurses funneled in as well, and I was so thankful for wearing masks. I just remember biting my lip so hard to try not to break down during this. And everyone was just sitting in the room chatting like it was break time. And I'm in there fighting, trying to keep it together." Dmg. Trial Tr. 1612:24-1613:12.

215 In addition to the damages discussed above, Plaintiff Kara Boyd suffered loss of inheritance in the amount of $88,871 due to the untimely death of her father. This is calculated as one quarter of the assessment of the total pecuniary losses of Robert and Karen Marshall in the amount of $355,484.00 found at PEX-11034 (Fairchild Earnings Report – R. & K. Marshall) and PEX-7036 (Casenave Vocational Report – R. Marshall). The amount has been split in quarters and allocated between the two heirs to the two estates. Defendant stipulated that the Estates of Robert and Karen Marshall, combined, suffered at minimum $257,691.00 in lost future earning capacity. 2d Amd Stipulation, ECF No. 576, at 11 ¶ 30.

216 **Kara Boyd's damages for loss of consortium of her mother, Karen Marshall**. Plaintiff Kara Boyd lost her mother, Karen Marshall, who was shot and killed in the church on November 5, 2017. Plaintiff was 30 years old at the time of her mother's tragic death. Plaintiff Kara Boyd suffers from loss of advice and counsel from her mother's tragic death on November 5, 2017. In her deposition, she testified that she and her mother would regularly talk on the phone on a weekly basis about, "[j]ust day-to-day stuff like I would with my dad, the kids, work, whatever was going on, birthdays

coming up, you know, just the normal things I'd catch them up on." PEX-00921, at 9:12-15.

Plaintiff Boyd suffers from loss of companionship and society from her mother's tragic death on November 5, 2017. In her deposition, she described her mother as "[s]he was, I want to say, a bit feisty. She wasn't afraid to tell people what she thought or stand up for someone. So she was always someone who had your back, and she was a hard worker, too." PEX-00921, at 10:6-9.

[217] **Kara Boyd's mental anguish damages for the death of her mother, Karen Marshall**. Plaintiff Boyd suffers from mental anguish from the loss of her mother. On September 15, 2019, Plaintiff Boyd met with plaintiff's psychiatrist who diagnosed her with Major Depressive Disorder. PEX-11043 at 5. On October 17, 2020, Plaintiff Boyd met with defense psychiatrist who diagnosed her with posttraumatic stress disorder and Generalized Anxiety Disorder. GEX-520, at 12. In her deposition, Plaintiff Boyd testified to losing her job due to her inability to focus throughout the grieving process, "With the loss of the job as well because the focus -- yeah. It's just -- it was really hard for me to focus, which is one main thing." PEX-921, at 28:1-3.

[218] **Lisa McNulty's loss of consortium damages for the death of her daughter, Tara McNulty**. Tara was always thoughtful and caring. She was always there to help Lisa with the farm and animals. Whenever Lisa needed a break, Tara would stay at Lisa's house and take over. Or whenever Lisa needed a few days to see her family in New York, she'd come to Lisa's house and watch the farm and animals even when she lived in Louisiana. Dmg. Trial Tr. 318 (L. McNulty). "One thing to know about Tara was that she glowed. Tara glowed all the time and she was just a light." *Id.* at 326 (L. McNulty)

Tara McNulty had lots of friends and smiled all the time. She never met a stranger. People always told Lisa that they met Tara and really liked her. Tara always helped people and it didn't matter if she didn't have much, she was always willing to help. Dmg. Trial Tr. 312 (L. McNulty). Lisa loved hearing from others around town how friendly and kind Tara was and it always made her feel good to hear what a nice person her child was. *Id.* at 312 (L. McNulty).

Lisa provided the shower story as an example of how caring Tara was towards her: Tara lived on Lisa's property for several years before the shooting when Tara moved back from Louisiana. And when the water well broke down Lisa had to use Tara's shower. When Lisa went over, there was some iced tea in the fridge that Lisa tried and loved. Lisa told Tara about how good the tea was and the next morning when the well was still out and Lisa had to use Tara's shower again, there was a note Tara left on the fridge "Mom, I made you some more tea" with a fresh pitcher of tea in the fridge for Lisa. Tara did these small acts of kindness for Lisa regularly. *Id.* at 317 (L. McNulty)

"Tara was always there for me when I needed to help other family members." For example, when Lisa McNulty's dad was sick and she had to go out of state to see him, Tara would drop everything and come to her farm and take care of everything so Lisa could visit him. Tara would be there on less than a day's notice even when she had to travel long distances. *Id.* at 318 (L. McNulty) As another example, Lisa is not tech savvy but Tara was good with technology. Tara was always patient and helped with any technological issues Lisa had at home. Dmg. Trial Tr. 318-319 (L. McNulty).

Tara McNulty was a good mom and always holding her kids and hugging them. Tara was active and always wanted to do things with her kids, go for walks, picnics, family things together. *Id.* at 312-313 (L. McNulty). Tara was very close to her kids and they were always doing things together. *Id.* at 313 (L. McNulty). Tara would've been over the moon to be a grandmother to Hailey's child Sawyer. When Lisa was at the hospital when Sawyer was born she was thinking "I shouldn't be the one here. Tara should be the one here." *Id.* at 314 (L. McNulty). Tara loved being outdoors with her kids, bike-riding, hiking, camping and swimming. She loved to go to the lake with the family. And she was great with crafts. She could sew anything, make costumes by hand, arrange flowers so well. *Id.* at 315 (L. McNulty).

[219] **Lisa McNulty's mental anguish damages for the death of her daughter, Tara**. *See* GEX-141 (Video still pic of Lisa in church with Hailey being picked up); PEX-12012 (Dr. Feltoon psychological report); GEX-526 (Dr. Marx' psychological report); GEX-524 (Tara McNulty Obituary); PEX-1200, at 4 (Pic of gravesite with Blanket "I love you more" on grave).

Lisa came into the church just around the same time as the first responders and saw "the whole mess" inside the church. PEX-900, at 35 (M.

McKenzie Dep.). Lisa received a text from her sister in the church telling her "someone is shooting outside the church" and got in her car speeding to the church. On the way, she received a call from her granddaughter Hailey who was crying and said "Nana, I've been shot. Nana, I'm shot." And she told Hailey that she was on her way and drove as fast as she could. Dmg. Trial Tr. 292 (L. McNulty).

Lisa went to the church knowing she could be walking into an active shooter situation but didn't think twice to protect her family. *Id.* at 293 (L. McNulty). When Lisa arrived at the church and opened the church door smoke came billowing out and inside it smelled burnt. *Id.* at 295 (L. McNulty). Lisa first saw Tara after taking care of her grandson J.M. and touched her hand but it didn't move. Then she touched Tara's wrist and couldn't feel anything. She then saw the bullet hole in the back of her daughter's head and put her hand on Tara's shoulder. She told her "I love you but I have get these kids out of here, then I'll be back." After Lisa made sure the kids were away in the ambulance, Lisa returned to the church and told Tara "I'll take care of them for you. I'll take care of them." Dmg. Trial Tr. 301-302 (L. McNulty). The church was full of bodies flung everywhere and flesh. On the right-hand side there were bodies of children piled up and Lisa saw baby N.H. in the pile of children. Dmg. Trial Tr. 306 (L. McNulty).

Lisa put a blanket on Tara's grave because she didn't want her daughter to be down there by herself in the cold. Dmg. Trial Tr. 311 (L. McNulty). She provided the story behind the "I love you more" blanket—Tara was Lisa's only child and you get one heart and it's gone now. Dmg. Trial Tr. 311 (L. McNulty); PEX-1200, at 4 (Pic of gravesite with Blanket "I love you more" on grave). Time hasn't healed Lisa's wounds over losing Tara. Dmg. Trial Tr. 322 (L. McNulty). Tragically, Lisa has now developed suicidal thoughts. And it didn't happen right away because she focused on getting the grandkids better. It took a while to develop, and it got worse. This past year she had to give herself pep talks to get out of bed in the morning and get through the day. *Id.* at 323–324 (L. McNulty). In July of this year, Lisa actually made a plan to kill herself. She wanted to disappear but did not want to do it at her home. So, she booked a hotel near the beach on the Texas coast and she started driving to the coast. She got halfway to the coast and stopped herself from doing it. Dmg. Trial Tr. 324 (L. McNulty).

Lisa McNulty also has troubles with relationships and friendships. She can't listen to people and has rage inside that she can't stop. And she stays home now a lot. Dmg. Trial Tr. 325 (L. McNulty).

[220] Lisa McNulty, as executor of Tara McNulty's Estate, should be awarded $128,859.00, as stipulated by the United States. 2d Amd Stipulation, ECF No. 576, at 11 ¶ 29; *see also* PEX-12005 (Dr. Fairchild Economic Report); PEX-12001 (Tara McNulty Death Certificate); PEX-12004 (Tara McNulty Tax Returns).

[221] **J.M.'s past and future damages for loss of consortium of his mother, Tara McNulty**. Tara was an amazing mom. She worked two jobs to provide for the children and she always gave J.M. and Hailey what they needed. Dmg. Trial Tr. 268 (H. McNulty). She always made sure the kids had what they needed even if it meant she didn't get what she needed. J.M. never knew what it was like to go without because Tara worked so hard for him. *Id.* at 268 (H. McNulty). All of Tara's support and advice was the same for J.M. She would always be there cheering for him at his football games and taking him to his practices. J.M. liked martial arts and Tara always made sure he was there for karate practice and had all the things he needed for it. Dmg. Trial Tr. 274 (H. McNulty). J.M. "was Tara's baby and she couldn't tell him no about anything and [J.M.] couldn't do wrong in Tara's eyes." Dmg. Trial Tr. 274-275 (H. McNulty).

[222] **J.M.'s past and future damages for mental anguish for the death of his mom, Tara McNulty**. J.M. was 12 years old at the time of the shooting. PEX-900, at 14 (M. McKenzie Dep.). J.M. never knew what it was like to go without because Tara worked so hard for him. Id. at 268 (H. McNulty). All of Tara's support and advice was the same for J.M. She would always be there cheering for him at his football games and taking him to his practices. J.M. liked martial arts and Tara always made sure he was there for karate practice and had all the things he needed for it. Dmg. Trial Tr. 274 (H. McNulty). J.M. "was Tara's baby and she couldn't tell him no about anything and [J.M.] couldn't do wrong in Tara's eyes." Dmg. Trial Tr. 274-275 (H. McNulty).

[223] Lisa McNulty, as executor of Tara McNulty's Estate, should be awarded $128,859.00, as stipulated to by the United States. 2d Amd Stipulation, ECF No. 576, at 11 ¶ 29; *see also* PEX-12005 (Dr. Fairchild

Economic Report); PEX-12001 (Tara McNulty Death Certificate); PEX-12004 (Tara McNulty Tax Returns).

[224] **Hailey's damages for loss of consortium of her mother, Tara McNulty.** "She was an amazing mom." Tara worked two jobs to provide for her kids and she always gave J.M. and Hailey what they needed. Dmg. Trial Tr. 268 (H. McNulty). Tara was Hailey's biggest supporter and would get up at 5:30am to take her to cross-country practice and be up on Saturdays at 5:30am to take her to meets. Dmg. Trial Tr. 268 (H. McNulty). Tara always made sure Hailey had what she needed even if it meant Tara didn't get what she needed. And Tara did same for J.M. J.M. and Hailey never knew what it was like to go without because Tara worked so hard for them. Dmg. Trial Tr. 268 (H. McNulty). Hailey described her mom as her best friend. Dmg. Trial Tr. 268 (H. McNulty). And no matter how much they fought Tara was the most forgiving person. And there was nothing that Hailey or J.M. could do wrong, according to Hailey. Dmg. Trial Tr. 268 (H. McNulty).

"Mom would work until 2am and get up with only three to four hours sleep to make sure I got to practice because she knew how passionate I was about it and how much it meant to me. She always wanted to make sure that I had everything I needed to excel in every way possible." Dmg. Trial Tr. (H. McNulty) For Hailey, it's hard not to have Tara's guidance and support now. Especially now that Hailey is a mom, she wants to ask her questions about being a mother. When Hailey went into labor, and whenever she was having problems, all she wanted to do was ask Tara advice and for Tara to be there. Tara doesn't get to be a grandma to Hailey's son and her son will never know her. It's "not fair that he doesn't get to know her because she was the most wonderful person that I have ever met. But the things I'm missing meant so much." Dmg. Trial Tr. 270 (H. McNulty). Hailey wants to be a mom just like Tara was to her. Dmg. Trial Tr. 271 (H. McNulty).

Hailey and her mom had a Texas Bucket list they never got to complete. They got through some of it: Blue Bell ice cream factory, Frio River, the Comal River, an alpaca farm in Brenham. But they never got to finish the list which included Big Bend, Enchanted Rock, the Larry Joe Taylor country music festival, and Abilene, where Hailey told her mom there was a special sunset there. When she said that, Tara said "okay, we'll go." Dmg. Trial Tr. 272-273 (H. McNulty). "In a world full of ugliness, mom was a ray of light.

She always had a smile on her face and was always positive." Dmg. Trial Tr. 278 (H. McNulty)

225 **Hailey McNulty's mental anguish for the death of her mom, Tara McNulty**. Hailey feels great sorrow and anguish because her last encounter with her mom was a teenage fight. Dmg. Trial Tr. 243 (H. McNulty). When she got to the Church after that fight, she sat in the row in front of her mom. Tara was sitting with Hailey's Aunt–Margaret McKenzie– and Hailey's brother, J.M. Dmg. Trial Tr. 243 (H. McNulty); PEX-1200, at 1 (video still at church); PEX-1213, at 1 (video still at church). The shooting started and sounded like fireworks. Her mom realized first there was danger, and she pushed Hailey down underneath the pew. Tara kept telling her "It's going to be okay, baby. It's going to be okay." She told Hailey she loved her. Dmg. Trial Tr. 246-247 (H. McNulty).

Tara McNulty was calling 911. And Hailey got shot in the leg and saw a puddle of blood. She turned to her mom, and Tara told her "it's okay. you have to keep pressure on it." Dmg. Trial Tr. 248 (H. McNulty).

She rolled back to her mom, Tara, and tried to talk to her. She didn't get any response when she touched her. Hailey realized her mom wasn't with her anymore. "Once I saw she was gone I gave up. I didn't want to try anymore. I didn't want to keep fighting anymore." Dmg. Trial Tr. 250 (H. McNulty) Her mom's last words were yelling "stop" over and over. Dmg. Trial Tr. 250 (H. McNulty).

When she was put in the ambulance, Hailey still feared the shooter was there and coming back and had great anxiety as a result. Dmg. Trial Tr. 253 (H. McNulty). She remembers waking up in the ICU trying to rip out her wires; she was scared and didn't want to believe her mom was gone and kept saying "I want to see my mom." Dmg. Trial Tr. 256 (H. McNulty).

226 **Regina Amador's summary to support compensatory damages awards for "Mental Anguish", "Loss of Companionship and Society" and "Pecuniary Loss" for the wrongful death of her father**. Richard C. Rodriguez was Regina Amador's only remaining parent having lost her mother, due to illness, more than fifteen years earlier when she was still a young woman. Her father was her sole source of support, comfort, solace, and the evidence is undisputed that he performed the loving role of a single parent who cared deeply for his only child and daughter.  Regina Amador

sustained damages both in the past and the future which the Court should separately consider in assessing what would fairly and reasonably compensate her for each of the different elements of damages she sustained and is entitled to be compensated for as a result of the Government's neglect. The anxiety and emotional torment still experienced by Regina almost four years after her father's untimely death was clear and irrefutable as she described with heartfelt detail from the witness stand (and is further documented in the three-hour Defense Medical Exam). Regina's losses are particularly unique because, not only did she lose her only remaining parent, but she lost the support, comfort, and love that would have been provided her had he still been alive when her grandparents (who were also wrongful death beneficiaries) passed due to COVID-19 while awaiting justice in this Court. The uniqueness of her losses as it related to the circumstances of this case are profound and compelling.

Regina Marie Amador, n/k/a Regina Marie Reyes, lost her father and last living parent, Richard C. Rodriguez, in the shooting November 5, 2017. Dmg. Trial Tr. 1294:13-22. Regina Amador was Mr. Rodriguez' only biological child. Dmg. Trial Tr. 1295:8-9. Plaintiff Regina Amador was 33 years old at the time of her father's tragic death. Dmg. Trial Tr. 1296:16-21. Growing up, Regina Amador testified she was blessed to have an amazing father and that "everywhere he went, I went." Dmg. Trial Tr. 1295:20–1296:11. Regina Amador also testified that her father always took care of her and that she was first before his needs. Id. Plaintiff Regina Amador testified that she was his first daughter, his first child, and only child. Dmg. Trial Tr. 1298:18. Regina Amador testified her father was proud of her for working at Toyota because he raised her to be independent. Dmg. Trial Tr. 1297:13-23. Regina testified that growing up her father would always carry her and that her father provided love and comfort to her. Dmg. Trial Tr. 1298:11 through Page 1299:5. Regina Amador also testified that when her tonsils were removed, her father was there before she went under, and after she woke up, and having him there made her feel safe. Dmg. Trial Tr. 1299:8–23; see also PEX-1516, at 12. Regina Amador testified that her father loved to watch the San Antonio Spurs and that her and her father would watch the games together. Dmg. Trial Tr. 1302:17-24. Regina Amador also testified her and her father liked to watch 80's movies together. Dmg. Trial Tr. 1303:6-19. Regina Amador also testified that her father loved music and that she got into music because of her father. Dmg. Trial Tr. 1303:20–1304:3. Regina Amador testified her mother passed away in 2001, Dmg. Trial Tr. 1300:15–1301:4,

and that her father and her became even closer. Dmg. Trial Tr. 1301:13-15. Regina's father was proud that she graduated high school and he attended her high school graduation. Dmg. Trial Tr. 1304:10-19; PEX-1516, at 4.

When Regina moved out of the house, she testified that she moved into an apartment complex, the same apartment complex her father lived in, so they could be close to each other and so she could make sure he ate good food every day. Dmg. Trial Tr. 1305:13-16. She testified that her father, Richard Rodriguez, loved her and provided her comfort. Dmg. Trial Tr. 1299:2-5. Regina testified that she was blessed and so lucky to have her dad walk her down the aisle at her wedding. Dmg. Trial Tr. 1307:15–1308:5; PEX-15016, at 28. Regina testified that her father was there whenever she needed him, including at the time when her first child was born. Dmg. Trial Tr. 1306:2-24. Regina gave her father's name to her second child, Justin Richard. Dmg. Trial Tr. 1307:4-9. She testified that her father would help her whenever she needed him. He would let her use his vehicle when she did not have one to get to doctor's appointments. Dmg. Trial Tr. 1305:23-7. Regina testified that her father would help her financially when she needed it including a down payment for the mortgage to purchase her first home. Dmg. Trial Tr. 1309:17–1310:21. Regina stated that her father bought her a stove when they moved into their house, and he was always there when she needed him. Dmg. Trial Tr. 1310:22–1311:5. She testified her father was "her everything" and that he was the person that "made her feel safe". Dmg. Trial Tr. 1319:22-Page 1320:6. Regina also testified that her father helped with maintenance around the house including fixing her lawnmower and garbage disposal Dmg. Trial Tr. 1312:21-Page 1313:3 and Page 1311:14-16. Her father also helped her with maintenance on her vehicle. Dmg. Trial Tr. 1312:7-10. Regina testified that it is bittersweet that her son Julian looks similar to her father. Dmg. Trial Tr. 1313:14-Page 1314:2. Regina testified that her father was close to his grandchildren including picking them up every other weekend. Dmg. Trial Tr. 1308:24–1309:16. All of the above support claims for loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value – pecuniary loss. Regina testified that she attended her father's wedding to Therese. Page 1314:12-25. Regina testified that she was close with her father and they always spent holidays together. Page 1317:11-13.

Regina testified that her and her father had a habit and routine of getting together and enjoying one another's lives. When they didn't see each

other directly, they would talk every Friday to catch up on what they did that week, how the kids were doing in school, and how Richard and Therese were doing. Dmg. Trial Tr. 1317:21–1318:8. Regina testified that she knew the food and music she liked her father would also enjoy because they were so much alike. Dmg. Trial Tr. 1321:6-14. Regina also testified that there were a lot of times she would call her father about a relationship problem or a problem with one of her children and she felt comfortable talking to him. Dmg. Trial Tr. 1319:11-21. Regina stated that her father was her "best friend". Dmg. Trial Tr. 1319:19-21. A clearer case of a loving and caring relationship between a father and his daughter could not have been presented.  Regina testified that her father was the person that she "turned to" and the person that "would catch her" when she was "falling". Dmg. Trial Tr. 1320:4-6. Regina Amador testified that her and her father would always say "I love you" to each other when they hung up the telephone. Dmg. Trial Tr. 1301:20-21. She will never hear those words ever again, due mostly to the Government's abject neglect.

Regina learned that there was a shooting at her father's church while she was at Fiesta Texas with her family for a company picnic. Dmg. Trial Tr. 1325:17-25. She testified she remembers pausing in disbelief when she received the call and tried to digest what she heard, because she did not want to believe it. Id. Regina and her family immediately left Fiesta Texas and she testified she was not able to say what she heard because she did not want to believe it. Dmg. Trial Tr. 1326:12-13. Regina's family could tell something was wrong and had to hold her shoulders up. Dmg. Trial Tr. 1326:10-11. Regina and her family rushed to the church but the walk out of Fiesta Texas and the drive felt forever. Regina was calling her dad every 20 minutes and he was not answering. Dmg. Trial Tr. 1328:1-2. Regina testified that when her father was not answering (the phone on the day of the shooting) she would just start crying because she knew something was wrong because he would always answer. Dmg. Trial Tr. 132:10-11. Regina described the drive to the church as horrible; it took over an hour; her boyfriend was driving 100 miles an hour but Regina wanted him to go faster. Dmg. Trial Tr. 1328:20-23. Regina testified she was in shock when she arrived, she was confused and asked herself was this really happening because it felt like it was a dream. Dmg. Trial Tr. 1328:24-1329:7. Regina testified that she was marked with a piece of tape and told to go into a waiting area so they could get information from her. Dmg. Trial Tr. 1330:7-11. Regina testified she spoke with her step-brother and she felt in her heart that her father was gone since no one could

tell her what was happening. Dmg. Trial Tr. 1331:22-23. Regina testified her family was calling hospitals to see if someone was there with his name but there was no one with his name at any of the hospitals they called. Dmg. Trial Tr. 1331:24–1332:2. Regina testified that she wanted to be around her family when she got the news, so she went to her aunt Kelly's house (Evangelina Santos. Dmg. Trial Tr. 1332:3-24. Around 2 or 3 in the morning, Regina received a call from Gary, her stepbrother, who informed her that her father and step-mother were killed. Dmg. Trial Tr. 1333:7-9. Regina testified that "it got real bad", they (the family) were all crying…it was horrible…she kept saying out loud "he was my last parent".  Dmg. Trial Tr. 1333:7-18.

Regina testified that she started emotional counseling due to the horrific nature of her loss, after the shooting, at the Bereavement Center. Dmg. Trial Tr. 1334:9-10. Regina testified that, after her father's death, she was not the strong mother she needed to be. Dmg. Trial Tr. 1334:14-18. She testified that she along with her family were grieving. Dmg. Trial Tr. 1334:21–1335:1. Regina testified that her primary care physician started her on Zoloft and Xanax. Dmg. Trial Tr. 1335:4-7. She testified that she started having panic attacks and anxiety. Dmg. Trial Tr. 1335:4-7. She stated that she was having ugly nightmares. Dmg. Trial Tr. 1335:8-12. She was having nightmares frequently wherein she witnessed that was happening inside the church. Dmg. Trial Tr. 1335:13-15. Regina testified during these nightmares that she sees her father lying on the ground and he is choking on his blood. Dmg. Trial Tr. 1336:18. Regina testified she is having these dreams over and over again and she wants them to stop. Dmg. Trial Tr. 1336:19-22. Regina Amador testified that sometimes she just starts to panic and she feels lost, she feels scared and it's just an ugly feeling when the panic attack starts. Dmg. Trial Tr. 1337:1-6. Regina testified that her father's death impacted her work at Toyota and she was forced to take six months off of work given the anxiety and depression associated with her father's death. Dmg. Trial Tr. 1337:13-15. She testified when she returned to work, she would mess up because she would find herself thinking about her father. Dmg. Trial Tr. 1337:18-25. Regina testified that she believes her father is an angel around her all the time, watching over her and watching over what she is doing, so she speaks to her father. Dmg. Trial Tr. 1338:8-11. Regina testified she now has trouble interacting with other people because she finds herself thinking of her father and drifting away from the conversation. Dmg. Trial Tr. 1338:18-23. Regina's continued emotional torment and descriptive words of loss of companionship

evince compelling evidence of significant past and future mental anguish and loss of companionship.

On January 6, 2020, Regina met with plaintiff's retained psychologist, Dr. Feltoon, who diagnosed her with Major Depressive Disorder (PEX15045-6 and Trial Testimony, Page 1339:9-15. On November 11, 2020, Plaintiff Regina Amador met with defense retained expert, Stephanie Larew, who, in connection with Dr. Marx, diagnosed her with posttraumatic stress disorder (GEX-599-14 and Trial Testimony, Page 1339:16-25. See also the report of Stephanie Larew GEX-599 and the video examination at PEX-20000. Page 1338:8-11. Regina Amador was diagnosed with Major Depressive Disorder by Dr. Feltoon. Dmg. Trial Tr. 1339:11-15. She was diagnosed with Post Traumatic Stress Disorder by Dr. Marx. Dmg. Trial Tr. 1339:21-25. Dr. Feltoon corroborated after listening to her live testimony and in combination with the reports authored by Dr. Marx was unequivocal that Regina sustained PAST and FUTURE mental anguish and loss of companionship regardless of how it was defined under the DSM-5(V. Regina testified that she still has panic attacks and nightmares to this day. Dmg. Trial Tr. 1340:5-8. She testified that she was recently put back on Xanax and a different depression medication. Dmg. Trial Tr. 1340:13-15. Regina testified that she still visits her father's grave because that is her time to "talk to" her father; she testified that she still misses him, and she still thinks of him every single day. Dmg. Trial Tr. 1341:23–1342:5. Regina testified that her father's death was the hardest loss out of her mother, father, and brother's deaths given that he was her last parent and given the horrific manner in which he was taken from her. Dmg. Trial Tr. 1342:19-25. Regina Amador testified that when her mother died she thanked God that her dad was still alive because he was able to be there and support her. Dmg. Trial Tr. 1301:7-13); Regina Amador did not have the benefit of her father being there when her grandparents passed away, both of whom were parties to this lawsuit and unfortunately did not live to the trial of this case. Dmg. Trial Tr. 1300:5-13. Regina cherishes the last time she saw her father before the shooting at Pollos Asados because she will always remember the last hug she received from him. She felt his love and misses those hugs. Dmg. Trial Tr. 1322:13-23.

Evangelina Santos, the sister of Richard C. Rodriguez and Regina's aunt, also testified at trial. Dmg. Trial Tr. 1350:9-12. Mrs. Santos testified that her brother Richard Rodriguez was loveable, kind, would light up the room, and always made everyone laugh. Dmg. Trial Tr. 1354:2-5. Mrs. Santos testified it

is different after her brother's death. Dmg. Trial Tr. 1354:5. Mrs. Santos testified that her brother Richard Rodriguez loved his daughter Regina and that Regina "loved him so much". Dmg. Trial Tr. 1355:1-3. Mrs. Santos testified that the love between Richard and Regina showed because "he would do anything for her, buy her whatever she wanted." Dmg. Trial Tr. 1355:4-7. Mrs. Santos testified the love between them showed physically because they were just "loveable". Dmg. Trial Tr. 1355:8-12. Mrs. Santos testified that she personally observed Regina suffering emotional pain, torment, and suffering as a result of her father's death. Dmg. Trial Tr. 1355:19-Page 1356:1. Mrs. Santos testified that when Regina first got the news of her father's death, she "screamed" and she was "crying and crying" because it was the worst news we could hear. Dmg. Trial Tr. 1356:11-18. Mrs. Santos testified that the family has not gotten over the death of her brother. Dmg. Trial Tr. 1357:19-20. Mrs. Santos testified that based on her personally observations, it was clear Richard cared about his daughter Regina. Dmg. Trial Tr. 1358:3-7. Mrs. Santos described the relationship between Richard and Regina as "close, very close". Dmg. Trial Tr. 1358:22-24. Mrs. Santos testified that she has witnessed and observed Regina in emotional distress and pain as a result of her father's death and that the emotional pain and stress has not gone away. Dmg. Trial Tr. 1359:12-17.

Jose Rodriguez, Jr., brother of Richard Rodriguez and Regina's uncle also testified at trial. Dmg. Trial Tr. 1362,:18-22. He testified about the moral principles and strengths of the Rodriguez family. Jose Rodriguez, Jr. testified that "Regina was the love of his life...that's what he lived for". Dmg. Trial Tr. 1365:11-12. Jose Rodriguez, Jr. testified that Richard Rodriguez provided to Regina, was generous to Regina, and that Regina was so important to Richard. Dmg. Trial Tr. 1365:20-24. Jose Rodriguez, Jr. testified that Richard and Regina had a loving relationship. Dmg. Trial Tr. 1366:7-12. Richard Rodriguez, Jr. testified that he observed emotional pain and torment in Regina as a result of her father's death and testified "we were devastated", "it's still with us", and "it's going to endure for the rest of our lives". Dmg. Trial Tr. 1366:13-19.

The testimony of Mrs. Santos and Jose Rodriguez, Jr. provide additional corroboration regarding the compensatory damages.

**227 Gary Ramsey's loss of consortium damages for the death of his mother.** Gary Ramsey described his mother, Therese Rodriguez, as "just a

great person" who "[n]ever had anything bad to say really about anybody," who "[n]ever hurt anybody," and who was "[a]lways trying to help somebody, whether they needed it or not." Dmg. Trial Tr. 1215 (G. Ramsey). She loved working in her yard with her husband, "always planting something, growing something." *Id.* at 1216. Mr. Ramsey testified that he was "very close" with his mother, and he visited often—two to four times a week on average— because Mr. Ramsey lived about a quarter of a mile down the road from his mother. *Id.* at 1215. Mr. Ramsey and his sons would ride a four-wheeler or a golf cart down to see her. *Id.* During visits, they would "hang out, talk" or they would watch a movie with his mother and stepfather, or they would play with the kids, among other things. *Id.* Bringing his kids to visit his mother would sometimes also give Gary and his wife a break, with Gary sometimes dozing off on the couch while his mom would play with his kids. *Id.* at 1216. He relied on advice and counsel from his mother, such as help with parenting; he looked forward to continuing to rely on her for that sort of advice in the future; and he regrets that his mother will not have the opportunity to see what he has been able to accomplish in his life. *Id.* at 1218–1220.

228 **Gary Ramsey's mental anguish claim for the death of his mother.** On the day of the shooting, Gary Ramsey was busy working at his deer-processing facility for opening weekend for deer season when he noticed "a lot of cops . . . flying by" and then learned from a long-time customer that there was something going on at the church, which was about seven miles away. Dmg. Trial Tr. 1206–1207 (G. Ramsey). Somehow Mr. Ramsey "knew right then that it was bad." *Id.* at 1207. And he knew his mother was there that day because she was collecting money that day for a gift that Mr. Ramsey's business was creating for Pastor Appreciation Day. *Id.* at 1208. Mr. Ramsey got in his truck and sped to the church, calling the local dispatch for word on what happened on the way but getting "no comment." *Id.* Mr. Ramsey arrived at the church before it was roped off and witnessed "chaos," people who had been shot coming out of the church, "AR clips, laying everywhere," and "the carnage." *Id.* at 1209–1210. Mr. Ramsey spent the next several hours hoping for good news but feeling that it was unlikely his mother and stepfather survived. *Id.* at 1210–1213.

Mr. Ramsey copes with his loss by trying to keep busy, but he continues to grieve the loss of his mother. *Id.* at 1213–1214. But the shooting has left him with "pretty big trust issues with people in this world." *Id.* at 1214. Thus,

he and his family avoid going out to places with crowds, such as the movies, which they used to enjoy. *Id.*; *see also* PEX-15047, at 8 (Dr. Sutton Rpt – Gary Ramsey, diagnosing Adjustment Disorder with mixed anxiety and depressed mood and Other Specified Trauma and Stressor Related Disorder (Persistent Complex Bereavement Disorder)); GEX-612, at 12 (Dr. Marx Report – Gary Ramsey, diagnosing PTSD, major depressive disorder, and generalized anxiety disorder); PEX-20025 (Gary Ramsey defense psychological exam).

[229] **Ronald Ramsey, Jr.'s Loss of Consortium damages for the death of his mother.** Ronald Ramsey, Jr. described his mother as the family's "rock"—a strong woman and hard worker who immigrated with her family as a child, ironing clothes to make ends meet, and who had worked her entire life and just recently retired. Dmg. Trial Tr. 1191–1192, 1196 (R. Ramsey). His mom and her husband enjoyed working in their yard and around their home, and Therese loved planting flowers. *Id.* at 1192. Their family was "tight," and Mr. Ramsey would see his mother three to five times per month, sometimes more often. *Id.* at 1199. Among other reasons for visits, he would often help his mother and stepfather by fixing things for them and helping with "projects that were past their ability." *Id.* at 1198–1199. Sometimes Ronald and Gary would take their mother to the coast in Gary's boat; they liked to go out to eat, stay in and eat ice cream and cake, swim in Therese's "raggedy little swimming pool" and enjoy "a simple life." *Id.* at 1192–1193.

Mr. Ramsey relied on his mother for advice and counsel, particularly about parenting, but often just to pick up the phone and talk to her. *Id.* at 1195–1196. Mr. Ramsey doesn't think it's fair that his mother is no longer there. *Id.* at 1196. He feels angry that his mother didn't get to enjoy the retirement she had worked so hard for or spend time with her grandchildren. *Id.*

[230] **Ronald Ramsey, Jr.'s mental anguish claim for the death of his mother.** On the day of the shooting, Ronald Ramsey, Jr. was at a family baptism when his cousin (a deacon in that church) announced that Gary Ramsey had called and notified them of the shooting. Dmg. Trial Tr. 1187–1188 (R. Ramsey). Mr. Ramsey left immediately and drove 45–60 minutes to Sutherland Springs where he met his brother and their extended family and began the many-hour wait for news. *Id.* When he reached the church, "They hoarded you like cattle over to a building to sit there and wait for your agony

of what's gonna be told." PEX-20026, at 24:44-24:51 (Ronald Ramsey, Jr. defense psychological exam). Their family finally got confirmation of the deaths of Therese and Richard sometime around midnight to 1:00 a.m. Dmg. Trial Tr. 1190 (R. Ramsey). In the weeks following the shooting, Mr. Ramsey felt "a lot of emotions"—"angry, mad, disappointed"—and he questioned how the shooting could have happened, noting that he really had to trust his faith and believe in Jesus. *Id.* Eventually, he got his thoughts together and started planning the funeral.

The shooting has changed Mr. Ramsey's routine; he now avoids church because "If you're not safe in God's house, where are you safe?" PEX-20026, at 27:32-27:36. He also recalls upsetting reminders of the shooting, such as when they decided to have an estate sale of his mother's things where many survivors approached him to show him their gunshot wounds: "'It was just way too much for me. I don't know how to describe how I was feeling, but it was just bad.'" PEX-15046, at 4 (Dr. Sutton Rpt – Ronald Ramsey, Jr.). Mr. Ramsey feels angry and that his mother was cheated out of the rest of her life: "My mom was the picture of a law-abiding citizen. I mean, she got killed at church for God's sake. She was so tough and wonderful and didn't deserve this. . . . She beat cancer just to die like this? This isn't how it was supposed to go for her." *Id.* Mr. Ramsey describes being angry over what happened to his mother: "My mother was doing what she loved to do, and that was participate in church. And that's what she got." PEX-20026, at 27:40-27:48; *see also* PEX-15046, at 8 (Dr. Sutton Rpt – Ronald Ramsey, Jr., diagnosing Adjustment Disorder with mixed anxiety and depressed mood and Other Specified Trauma and Stressor Related Disorder (Persistent Complex Bereavement Disorder)); GEX-606, at 10 (Dr. Wolf Report – Ronald Ramsey, Jr., diagnosing PTSD); PEX-20026 (Ronald Ramsey, Jr. defense psychological exam).

[231] **Charlene Uhl's loss of consortium damages**. Ms. Uhl has lost the opportunity to simply share life her daughter, H.K. Ms. Uhl stated that H.K. "was like my best friend. We did everything together. We'd you know, go to movies, nail salons, shopping. Just normal things. We were – we'd go to the park almost every day," Dmg. Trial Tr. at 1143:18-23, for marathon training together and had been doing so for months before the shooting. *Id.* at 1146:5-1148:1). Following her daughter's death Ms. Uhl said her "best friend is gone. She's no longer here. I can't do things with her." "[T]he person that I was died the day that [H.K.] died. *Id.* at 1175:13-18. Ms. Uhl has lost H.K.'s assistance

with caring for and raising her autistic son. *Id.* at 1165:17-1166:1. Ms. Uhl has been further deprived of the joy inherent in watching H.K. grow up and achieve her life dreams, including becoming a neonatal intensive care unit (NICU) nurse. *Id.* at 1148:12-16, 1179:3-18; PEX-5013; PEX-5017.

[232] **Charlene Uhl's mental anguish damages**. Evidence shows that Ms. Uhl learned of the shooting through Facebook that morning Dmg. Trial Tr. at 1155:19-24. But she had to wait until after midnight to be notified of H.K.'s death. *Id.* at 1165:4-6. Ms. Uhl was "upset", "crying" and "frantic" at the scene of the shooting while searching for H.K. "because [she] could not find [her] child." *Id.* at 1159:1-5.

Ms. Uhl met with the Texas Rangers a few weeks after the shooting to obtain details regarding H.K.'s death because she "wanted to know if [H.K.] suffered" as Uhl "wasn't there with her" and she "needed to know", but this experience provided her no closure. *Id.* at 1168:11-25, 1172:11-16. Ms. Uhl stated that she has "never felt so alone and sad" and as if she had "just lost [H.K] all over again" on the day the FBI brought her the shoes and bow H.K. was wearing the day of the shooting. PEX-5007.

Ms. Uhl began attending counseling a few weeks after the shooting and continued counseling up to the time of trial almost four years later. *Id.* at 1172:17-22. Even at the time of trial she still had "more bad days than good." *Id.* at 1178:21-24. Ms. Uhl received counseling from one provider bi-monthly, weekly equine therapy from another, and became involved in a support group for people who lost children to help her cope after H.K.'s death. *Id.* at 1173:2-1175:3. Ms. Uhl anticipates that she will have counseling for the rest of her life. *Id.* at 1175:4-8.

Ms. Uhl has had severe sleep disturbances which continue to the present, *id.* at 1175, 19-20, a substantial weight gain that has resulted in liver fibrosis, *id.* at 1175:21-23, a dramatic increase in her migraines, *id.* at 1176:5-15, and been prescribed Xanax to help her cope. *Id.* at 1176:5-6.

Evidence from both Plaintiffs and Defendants shows that Plaintiff Uhl suffered from a Major Depressive Disorder, PEX-5005, at 5; GEX-438, at 10, and PTSD, GEX-438, at 9, 10. following the shooting. She suffers from a pervasive mood of sadness" "and she crie[d] everyday, frequently and uncontrollably" along with overwhelming feelings of irrational guilt. PEX-5005, at 4. Uhl "is devastated by the loss of her daughter" and "quite

distressed by the symptoms she experiences." PEX-5005, at 5; GEX-438, at 9. Her PTSD and depression impose "moderate difficulty in social and occupation/other import areas of functioning." GEX-438, at 9. Uhl's "PTSD symptoms negatively impact her relationships because she frequently isolates from others" and stays home more and is withdrawn. GEX-438, at 9; PEX-5005, at 5. She sometimes "does not attend work out of her desire to avoid stores and crowds" or when she gets "emotionally upset due to reminders or intrusive memories of her daughter's death." GEX-438, at 9. "The resulting mental anguish being experienced by Ms. Uhl will tend to be enduring" and will "likely continue to a significant degree for the rest of her life." PEX-5005, at 5.

Ms. Uhl's relationships with her remaining children and boyfriend have been affected and her boyfriend has told her that she's "not the same person [she] was when he started dating [her]." *Id.* at 1177:20-1178:9. "Ms. Uhl requires "four to six years of weekly psychological counseling sessions" and following that "will still need periodic counseling on a less frequent basis." PEX-5005, at 5.

[233] **Jennifer Racey's damages for loss of consortium for the death of her mom, Peggy Warden**. Plaintiff Jennifer Racey lost her mother, Peggy Warden, who was shot and killed in the church on November 5, 2017. Plaintiff was 36 years old at the time of her mother's tragic death. At trial, Plaintiff Racey testified that her mother was present for the birth, "[e]very single one [of her grandchildren] except for Jacob, because she had passed right before his birth." Dmg. Trial Tr. 1796:11-12.

Plaintiff Racey suffers from loss of advice and counsel from her mother's tragic death on November 5, 2017. At trial, Plaintiff Racey testified that her mother, "quite literally, molded me into the person that I am. She taught me how to appreciate things, showed me the value through her own actions, what mattered in this life and what didn't. She taught me that, no matter what, as long as you have family, you have everything. You never turn your back on someone that needs you. She taught me to garden. She taught me to do my taxes by hand before there was TurboTax or anything available to me. She taught me every recipe that I knew when I moved out of my home to be a functional adult that didn't require help. She gave me all of the tools that I needed to be who I needed to be for my children." Dmg. Trial Tr. 1796:19-1797:6.

Plaintiff Jennifer Racey suffers from loss of companionship and society from her mother's tragic death on November 5, 2017. At trial, Plaintiff Racey testified about her mother, "[s]he's the only person I truly ever trusted with my children. If I had somewhere I had to be, she was the one to watch them. If I had questions, if I needed guidance, if I needed help, she was the one I would call because she was my person. You make friends in this life, but nobody loves you or cares for you like your mother." Dmg. Trial Tr. 1797:9-15. "She was fundamental in my children's upbringing. She was my mentor. She was my teacher. She was my mom." *Id.* at 1798:5-6. In discussing how her mother provided services, Plaintiff Racey testified, "[t]he most insignificant, miniscule activity meant more just because we were together. We gardened together. We cooked together." *Id.* at 1798:14-16.

[234] **Jennifer Racey's mental anguish damages for the death of her mom, Peggy Warden**. Plaintiff Racey suffers from mental anguish from the loss of her mother. On September 3, 2019, Plaintiff Racey met with plaintiff's psychiatrist who diagnosed her with Major Depressive Disorder and Posttraumatic Stress Disorder. PEX-18071, at 6. On September 19, 2020, Plaintiff Racey met with defense psychiatrist who diagnosed her with Posttraumatic Stress Disorder. GEX-656, at 12. At trial, Plaintiff Racey testified that, ""[my mother and I] shared a driveway. We may as well have lived with each other. We got groceries for one another when we left the house because we literally shared a driveway on the same property that we passed one another on an almost every-single-day basis, if not more sometimes." Dmg. Trial Tr. 1788:23-1789:2. Further testifying that her mother, "took care of the house. She took care of the kids. She took care of the neighbors' kids, the community's kids, the church's kids. If you needed something, if someone was sick, if anyone said 'Hey, could you help me,' she would be the first person to say, 'What can I do and when?' And she was like that with everyone. There were no strangers. She had a love for humans, animals, you know, her God." Dmg. Trial Tr. 1790:8-16.

[235] B.W. was known as "Boogie" by her family and was Daddy's little girl. She loved when her dad, Chris, would carry her or let her sit in his lap. PEX-923 (C. Ward Dep.), at 25:5–27:10; PEX-910 (Mandi Lookingbill Dep.), at 9:10-22. On November 5, 2017, Chris Ward got home from work around 8:30–9:00 am. PEX-923 (C. Ward Dep.), at 13:10–14:13. After spending a few minutes with his wife, Chris laid down to sleep. *Id.* at 14:10–15:18. When he woke up, the house was empty. *Id.* JoAnn and the kids, including B.W., had gone to

church. *Id.* Not long after that, Chris' brother was beating on the door, telling him that someone had shot up the church. *Id.* Chris jumped in his truck and drove there. *Id.* When Chris arrived, there were no ambulances or fire trucks. *Id.* at 16:1-25. He was screaming and hysterical. Dmg. Trial Tr. 467:21–469:7 (Julie Workman). Chris saw blood on the ground. PEX-923 (C. Ward Dep.), at 18:12-19. He smelled gun powder and blood. *Id.* Chris heard people crying and asking for help. *Id.* Chris went into the church looking for his wife and daughters. *Id. at* 18:24–21:19. He saw bodies everywhere. *Id.* He saw pews knocked over. *Id.* He heard people hollering and crying in pain. *Id.* He later learned that his little girl, B.W., was still in the church, although her little body was unrecognizable. *Id.* at 27:18–28:3.

While at University Hospital after the shooting, a Chaplain met with Chris and the family after E.G.'s death and observed that Chris seemed to be struggling the most. *Id.* He was not expressing his emotions and kept going outside to cope. *Id.* The Chaplain encouraged the family not to leave Chris alone. *Id.*

Since the shooting, Chris has seen several mental health professionals. As a result of losing his wife and daughters, Chris meets the diagnostic criteria for PTSD with panic attacks, major depression, generalized anxiety disorder, and alcohol-use disorder. *Id.*; PEX-17096 (Feltoon Rpt – C. Ward); PEX-17103 (Davenport medical records – C. Ward). One of the hardest things for Chris to accept is the death of his little girl, whose love and spirit is obvious in family photos of her with her dad. PEX-17008 (Ward Family Photos).

[236] B.W. was known as "Boogie" by her family and was Daddy's little girl. She loved when her dad, Chris, would carry her or let her sit in his lap. PEX-923 (C. Ward Dep.), at 25:5–27:10; PEX-910 (Mandi Lookingbill Dep.), at 9:10-22. On November 5, 2017, Chris Ward got home from work around 8:30–9:00 am. PEX-923 (C. Ward Dep.), at 13:10–14:13. After spending a few minutes with his wife, Chris laid down to sleep. *Id.* at 14:10–15:18. When he woke up, the house was empty. *Id.* JoAnn and the kids, including B.W., had gone to church. *Id.* Not long after that, Chris' brother was beating on the door, telling him that someone had shot up the church. *Id.* Chris jumped in his truck and drove there. *Id.* When Chris arrived, there were no ambulances or fire trucks. *Id.* at 16:1-25. He was screaming and hysterical. Dmg. Trial Tr. 467:21–469:7 (Julie Workman). Chris saw blood on the ground. PEX-923 (C. Ward Dep.), at 18:12-19. He smelled gun powder and blood. *Id.* Chris heard people crying and asking for help. *Id.* Chris went into the church looking for his wife and

daughters. *Id. at* 18:24–21:19. He saw bodies everywhere. *Id.* He saw pews knocked over. *Id.* He heard people hollering and crying in pain. *Id.* He later learned that his little girl, B.W., was still in the church, although her little body was unrecognizable. *Id.* at 27:18–28:3.

While at University Hospital after the shooting, a Chaplain met with Chris and the family after E.G.'s death and observed that Chris seemed to be struggling the most. *Id.* He was not expressing his emotions and kept going outside to cope. *Id.* The Chaplain encouraged the family not to leave Chris alone. *Id.*

Since the shooting, Chris has seen several mental health professionals. As a result of losing his wife and daughters, Chris meets the diagnostic criteria for PTSD with panic attacks, major depression, generalized anxiety disorder, and alcohol-use disorder. *Id.*; PEX-17096 (Feltoon Rpt – C. Ward); PEX-17103 (Davenport medical records – C. Ward). One of the hardest things for Chris to accept is the death of his little girl, whose love and spirit is obvious in family photos of her with her dad. PEX-17008 (Ward Family Photos).

[237] 2d Amd Stipulation, ECF No. 576, at 11 ¶ 31(a).

[238] 2d Amd Stipulation, ECF No. 576, at 11 ¶ 31(b).

Respectfully Submitted,

/s/ Jamal K. Alsaffar

**Jamal K. Alsaffar**
JAlsaffar@nationaltriallaw.com
Texas Bar No. 24027193
**Tom Jacob**
TJacob@nationaltriallaw.com
Texas Bar No. 24069981
**Whitehurst, Harkness, Brees, Cheng, Alsaffar & Higginbotham & Jacob PLLC**
7500 Rialto Blvd, Bldg. Two, Ste 250
Austin, TX 78735
Office 512-476-4346
Fax 512-476-4400
    Counsel for Vidal, McKenzie, Solis, McNulty, and Wall

/s/ Jason P. Steed

**Jason P. Steed**
JSteed@kilpatricktownsend.com
Texas Bar No. 24070671
**Kilpatrick Townsend & Stockton LLP**
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
Office 214-922-7112
Fax 214-853-5731
    Counsel for Vidal, McNulty, and Wall

/s/ April A. Strahan

**April A. Strahan**
april@ammonslaw.com
Texas Bar No. 24056387
**Robert E. Ammons**
rob@ammonslaw.com
Texas Bar No. 01159820
**The Ammons Law Firm**
3700 Montrose Blvd.
Houston, TX 77006
Office 866-523-1603
Fax 713-523-4159
    Counsel for Holcombe, Ramsey, Curnow & Macias

/s/ Daniel J.T. Sciano

**Daniel J.T. Sciano**
DSciano@tsslawyers.com
Texas Bar No. 17881200
**Tinsman & Sciano**
10107 McAllister Freeway
San Antonio, TX 78216
Office 210-225-3121
Fax 210-225-6235
    Counsel for Amador

/s/ Daniel Barks

**Daniel D. Barks,** *pro hac vice*
ddb@speiserkrause.com
**Speiser Krause, P.C.**
5555 Glenridge Connector, Suite 550
Atlanta, GA 30342
Office 571-814-3344
Fax 866-936-6382
    Counsel for Holcombe

/s/ Dennis Peery

**Dennis Charles Peery**
d.peery@tylerpeery.com
Texas Bar No. 15728750
**R. Craig Bettis**
cbettis@tylerpeery.com
Texas Bar No. 24040518
**Tyler & Peery**
5822 West IH 10
San Antonio, TX 78201
Office 210-774-6445
    Counsel for Uhl

/s/ George LeGrand

**George LeGrand**
tegrande@aol.com
Texas Bar No. 12171450
**Stanley Bernstein**
Texas Bar No. 02225400
**LeGrand & Bernstein**
2511 N. Saint Mary's St.
San Antonio, Texas 78212
Office 210-733-9439
Fax 510-735-3542
    Counsel for Wall & Solis

/s/ Mark Collmer

**Mark W. Collmer**
mark@collmerlaw.com
Texas Bar No. 04626420
**Collmer Law Firm**
3700 Montrose
Houston, TX 77006
Office 713-337-4040
    Counsel for Holcombe

/s/ Tim Maloney

**Tim Maloney**
Texas Bar No. 12887380
timmaloney@yahoo.com
**Paul E. Campolo**
pcampolo@maloneyandcampolo.com
Texas Bar No. 03730150
**Maloney & Campolo, L.L.P.**
926 S. Alamo
San Antonio, TX 78205
Office (210) 465-1523
    Counsel for Ramsey

/s/ Joseph M. Schreiber

**Joseph M. Schreiber**
joe@lawdoneright.net
Texas Bar No. 24037449
**Erik A. Knockaert**
erik@lawdoneright.net
Texas Bar No. 24036921
**Schreiber | Knockaert, PLLC**
701 N. Post Oak Rd., Suite 325
Houston, TX 77024
Phone (281) 949-8904
Fax (281) 949-8914
    Counsel for Brown

/s/ Justin Demerath
**Justin Demerath**
jdemerath@808west.com
Texas Bar No. 24034415
**O'Hanlon, Demerath & Castillo**
808 West Ave.
Austin, TX 78701
Office 512-494-9949
   Counsel for Corrigan, Braden,
   Warden, Stevens, Pachal, McCain, &
   Poston

/s/ Brett Reynolds
**Brett T. Reynolds**
btreynolds@btrlaw.com
Texas Bar No. 16795500
**Brett Reynolds & Associates, P.C.**
1250 N.E. Loop 420, Suite 420
San Antonio, TX 78219
(210)805-9799
   Counsel for Workman, Colbath, and
   Harris

/s/ Hugh J. Plummer
**Hugh J. Plummer**
hplummer@thomasjhenrylaw.com
**Law Office of Thomas J. Henry**
4715 Fredricksburg
San Antonio, TX 78229
(210) 585-2151
(361) 985-0601 (fax)
   Counsel for McMahan

/s/ Jason Webster
**Jason Webster**
jwebster@thewebsterlawfirm.com
Texas Bar No. 24033318
**The Webster Law Firm**
6200 Savoy
Suite 640
Houston, TX 77036
   Counsel for Lookingbill

/s/ Marion M. Reilly
Marion M. Reilly
**Hilliard Munoz Gonzales, L.L.P.**
719 S. Shoreline - Ste 500
Corpus Christi, TX 78401
(361) 882-1612
361/882-3015 (fax)
marion@hmglawfirm.com
   Counsel for McMahan

/s/ Diego Lopez
**Diego Lopez**
**Anderson & Associates Law Firm**
2600 SW Military Drive, Suite 118
San Antonio, TX 78224
(210) 928-9999
(210) 928-9118 (fax)
diego@diegolaw.com
   Counsel for Ward

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed through the Court's CM/ECF system on November 24, 2021, and the following counsel for the United States have received notice and been served through that system.

/s/ Jamal K. Alsaffar

**Jamal K. Alsaffar**

BRIAN BOYNTON
Acting Assistant Attorney General
Civil Division

ASHLEY C. HOFF
United States Attorney
Western District of Texas

KIRSTEN WILKERSON
Assistant Director, Torts Branch
United States Dept. of Justice
Civil Division

PAUL DAVID STERN
Trial Attorney, Torts Branch
United States Dept. of Justice
Civil Division

CLAYTON R. DIEDRICHS
Assistant United States Attorney

JIM F. GILLIGAN
Assistant United States Attorney

JOHN PANISZCZYN, Civil Chief
United States Attorney's Office
Western District of Texas

JAMES G. TOUHEY, JR.
Director, Torts Branch
United States Dept. of Justice
Civil Division

STEPHEN E. HANDLER
Senior Trial Counsel, Torts Branch
United States Dept. of Justice
Civil Division

STEPHEN TERRELL
Trial Attorney, Torts Branch
United States Dept. of Justice
Civil Division

JAMES E. DINGIVAN
Assistant United States Attorney

JACQUELYN M. CHRISTILLES
Assistant United States Attorney