**Holcombe Family**

1. **Joe Holcombe**

   1.1. **Joe Holcombe's individual damages for the death of John Bryan Holcombe[1]**

| Element | Amount |
|---|---|
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, will be sustained in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $10,000[2] |
| Loss of companionship and society that, in reasonable probability, will be sustained in the future | $25,000[3] |
| Mental anguish sustained in the past | $10,000[4] |

[1] For the reasons articulated herein, the United States recommends a total non-economic damages award of $50,000.00 to Joe Holcombe arising out of the death of his adult son John Bryan Holcombe. *See* Memorandum.

[2] Mr. Holcombe testified his son Bryan Holcombe suffered from a heart condition that was symptomatic, though he was not sure if Bryn Holcombe was seeing a physician for it. Trial Tr. 226:4-17. Further, the autopsy report of Bryan Holcombe showed that he had severe stynosis or blockage of the large cardiac vessels. PEX 1062 at 7. According to Defendant's expert Cardiologist, Dr. Evan Appelbaum, from Harvard Medical School's teaching hospital, the autopsy revealed "one of the hearts largest and most important arteries" was nearly completed blocked and "there was severe cholesterol plaque" in the largest artery in the body. GEX 493 at 2-3. Dr. Appelbaum further opined that Bryan Holcombe was at a high risk of having a major heart attack or stroke within five years at the time of his death. GEX 493 at 3. Although such heart attack could prove fatal, even with treatment, the severity of Bryan Holcombe's heart disease alone would reduce his life expectancy by 5-7 years. GEX 493 at 3.

[3] Mr. Holcombe is 90 years old (Trial Tr. 209:18-20) and based on the autopsy findings and the unrebutted expert opinion of Dr. Appelbaum, Bryan Holcombe had a greatly reduced life expectancy. *See* Note 2.

[4] Mr. Holcombe has a degree in clinical psychology from Baylor University, was a counselor for

| | |
|---|---|
| Mental anguish that, in reasonable probability, will be sustained in the future | $5,000 |
| Loss of inheritance | Not Claimed |

students, and can recognize depression. Trial Tr. 224:12-14. Mr. Holcombe testified, "And I don't consider myself depressed. Of course, I miss them, but it doesn't get me down. I keep going." Trial Tr. 224:18-19.  Plaintiffs'expert psychiatrist, Dr. Sutton found that 6 months after the shooting Mr. Holcombe and again in February 2020, GEX 762 at 87:13-14, exhibited no symptoms of PTSD or anxiety disorder. GEX 762 at 89:2-15.

2.   **Claryce Holcombe**

2.1.  **Claryce Holcombe's individual damages for the death of John Bryan Holcombe[5]**

| Element | Amount |
|---|---|
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, will be sustained in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $10,000[6] |
| Loss of companionship and society that, in reasonable probability, will be sustained in the future | $25,000[7] |
| Mental anguish sustained in the past | $10,000.[8] |
| Mental anguish that, in reasonable probability, will be sustained in the future | $5,000.[9] |
| Loss of inheritance | |

---

[5] For the reasons articulated herein, the United States recommends a total non-economic damages award of $50,000.00 to Claryce Holcombe arising out of the death of his adult son John Bryan Holcombe. *See* Memorandum.

[6] *See* Note 2.

[7] Mrs. Claryce Holcombe is 89 years old and in failing health.  She was born in 1932, GEX 277 at 12:13-16. Her son Bryan Holcombe suffered from a cardiac condition and had a greatly reduced life expectancy.  *See* Note 2.

[8] Dr. Sutton, Platintiffs' expert psychiatrist, Dr. Katy Fowler Sutton, Psy.D, LSSP testified that her testing of Mrs. Holcombe "didn't support a diagnosis of PTSD.  No, she was – she was subthreshold by a decent amount."  GEX 761 at 115:7-11; 163:16-22).  Dr. Sutton also testified that Mrs. Holcombe exhibits "good coping skills." GEX 761 at 122:15-25 through p. 123:1

[9] *See* Note 8.

3. **Bryan Scott Holcombe**

   3.1. **Bryan Scott Holcombe, individually for the death of John Bryan Holcombe**[10]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $5,000.00 |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $5,000.00[11] |
| Mental anguish sustained in the past. | $7,500.00 |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $7,500.00 |
| Loss of inheritance. | Not Claimed |

---

[10] For the reasons articulated herein, the United States recommends a total non-economic damages award of $50,000.00 to Bryan Scott Holcombe. This recommended award consists of $25,000.00 for the death his father John Bryan Holcombe and $25,000.00 for the death of his mother Karla Holcombe. See Memorandum.

[11] John Bryan Holcombe suffered from an undiagnosed cardiac condition—severe atherosclerosis throught the main cardiac vessels.  According to the unrebutted opinion of Defense Expert, Dr. Appelbaum, Mr. John Bryan Holcombe had a significantly reduced life expectancy as a result of his cardiac disease.  *See* Note 2.

### 3.2. **Bryan Scott Holcombe, individually for the death of Karla Holcombe**[12]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $5,000.00 |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $5000.00 |
| Mental anguish sustained in the past. | $7,500.00 |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $7,500.00 |
| Loss of inheritance. | $0.00 |

---

[12] For the reasons articulated herein, the United States recommends a total non-economic damages award of $50,000.00 to Bryan Scott Holcombe. This recommended award consists of $25,000.00 for the death his father John Bryan Holcombe and $25,000.00 for the death of his mother Karla Holcombe. See Memorandum.

4.  **John Porter Holcombe**[13]

4.1.  **John Porter Holcombe, individually for the death of Karla Holcombe**[14]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $10,000 |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $15,000 |
| Mental anguish sustained in the past. | $10,000[15] |

---

[13] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff John Porter Holcombe in the amount of $1,008,940.61. That award recommendation is broken down into $8,940.61 for economic damages, $100,000 in individual damages for non-economic damages arising out of the loss of his parents, $100,000 arising out of the loss of his wife, and $800,000 in individual non-economic damages. Mr. Holcombe lost multiple family members. As such it is appropriate to adjust the baseline damages for extraordinary circumstances. *See* Memorandum and Dkt. 579 ¶ 2(a).

[14] For the reasons articulated herein, the United States recommends a total award of $50,000.00 to John Porter Holcombe for the death of his mother Karla Holcombe.  This recommended award consists of  $50,000.00 in non-economic damages as the result of the death of his mother. *See* Memorandum.

[15] On page 160 of Plaintiffs Damages Brief, Dkt. 578, Plaintiffs assert psychiatric injuries by John Porter Holcombe citing to a report by their expert Dr. Sutton.  Plaintiffs' have expressly stated that they did not intend to  present any evidence of a psychiatric nature regarding John Port Holcombe.

> Ms. Strahan:  Clayton, just while you're doing that just because I wanted to make sure that this message got to you, . . . but our agreement is that we do not intend at trial to elicit any testimony from Dr. Sutton about her diagnoses of Mr. --- of John Porter Holcombe because he wasn't – he did not want to do an interview with the psychologist." GEX 761 p.5:18-25 to p. 6:1-2.

| | |
|---|---|
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $15,000 |
| Loss of inheritance. | Not Claimed |

4.2. **John Porter Holcombe, individually for the death of John Bryan Holcombe[16]**

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $10,000 |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $15,000[17] |
| Mental anguish sustained in the past. | $10,000 |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $15,000[18] |
| Loss of inheritance. | Not Claimed |

[16] For the reasons articulated herein, the United States recommends a total award of $50,000.00 to John Porter Holcombe for the death of his father John Bryan Holcombe.  This recommended award consists of  $50,000.00 in non-economic damages as the result of the death of his father. See Memorandum.

[17] Mr. Holcombe testified that while he and his father Bryan Holcombe used to see each other often for lunch, after his parents moved to the Farm, that is Joe Holcombe's property in Floresville, it was harder, and they would only "occasionally" go places on the weekends. (Trial Tr. 106:9-18).  Mr. Holcombe also testified that he used to go to Harbor Freight, and other places with his father, but that after Plaintiff and his wife Crystal were married, they only did so occasionally.  (Trial Tr. 107:12-23). Mr. Holcombe also testified that, because Floresville was so far from Sutherland Springs, getting together was harder. (Trial Tr. 106:12-18). Further, John Bryan Holcombe suffered from an undiagnosed cardiac condition—severe atherosclerosis throught the main cardiac vessels.  According to the unrebutted opinion of Defense Expert, Dr. Appelbaum, Mr. John Bryan Holcombe had a significantly reduced life expectancy as a result of his cardiac disease.  See Note 2, above.

[18] See note 17, above.

### 4.3. **John Porter Holcombe's individual damages for his own injuries**[19]

| Element | Amount |
|---|---|
| Physical pain and mental anguish sustained in the past. | $500,000.00 |
| Physical pain and mental anguish that, in reasonable probability, Plaintiff will sustain in the future. | $300,000.00 |
| Loss of earning capacity sustained in the past. | Not Claimed |
| Loss of earning capacity that, in reasonable probability, Plaintiff will sustain in the future. | Not Claimed |
| Disfigurement sustained in the past. | Not Claimed |
| Disfigurement that, in reasonable probability, Plaintiff will sustain in the future. | Not Claimed |
| Physical impairment sustained in the past | Not Claimed |
| Physical impairment that, in reasonable probability, Plaintiff will sustain in the future. | Not Claimed |
| Medical care expenses incurred in the past. | $8940.61[20] |
| Medical care expenses that, in reasonable probability, Plaintiff will incur in the future. | Not Claimed |

[19] For the reasons articulated herein, the United States recommends a total award of $808,940.61 to John Porter Holcombe for his own individual injuries.  This recommended award consists of $800,000.00 in non-economic damages in the form of past and future physical pain and mental anguish for the loss of a large number of family members, his own injuries, and his presence in the church during the shooting to include seeing the fatal injuries to his wife and step children, and $8,940.61 in past medical care expenses.  *See* Memorandum.

[20] *See* Dkt. 576 ¶ 2

### 4.4. **John Porter Holcombe, individually for the death of Crystal Holcombe**[21]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, will be sustained in the future. | Not Claimed |
| Loss of companionship and society sustained in the past. | $10,000 |
| Loss of companionship and society that, in reasonable probability, will be sustained in the future. | $40,000 |
| Mental anguish sustained in the past | $10,000 |
| Mental anguish that, in reasonable probability, will be sustained in the future. | $40,000 |
| Loss of inheritance. | Not Claimed |

---

[21] For the reasons articulated herein, the United States recommends a total award of $100,000.00 to John Porter Holcombe individually for the loss of is wife Crystal Holcombe.  This recommended award consists of  $100,000.00 in non-economic damages.  *See* Memorandum.

### 4.5. **John Porter Holcombe on behalf of the Estate of Crystal Holcombe**

| Element | Amount |
| --- | --- |
| Pain and mental anguish "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by the decedent before his or her death. Tex. Civ. Jury Instr. Gen. Neg. § 30.3 ¶1. | $250,000.00[22] |
| Medical Expenses | Not Claimed |
| Funeral & burial expenses | Not Claimed |

---

[22] The United States recommends that the Court make a total award to the Estate of Crystal Holcombe in the amount of $250,000, for her pain and mental anguish prior to her death. *See* Memorandum.

4.6. **John Porter Holcombe, on behalf of the Estate of E.H.**

| Element | Amount |
| --- | --- |
| Pain and mental anguish "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by the decedent before his or her death. Tex. Civ. Jury Instr. Gen. Neg. § 30.3 ¶1. | $250,000.00[23] |
| Medical Expenses | Not Claimed |
| Funeral & burial expenses | Not Claimed |

[23] The United States recommends that the Court make a total award to the Estate of E.H. in the amount of $250,000, for her pain and mental anguish prior to her death. *See* Memorandum. Further, regarding Plaintiffs' bystander claim that E.H. "was present and perceived her family members being shot . . .", there is no testimony that E.H. perceived the others being shot, who was shot first, or whether she was cognizant after being shot.

### 4.7. John Porter Holcombe, on behalf of the Estate of M.H.

| Element | Amount |
| --- | --- |
| Pain and mental anguish "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by the decedent before his or her death. Tex. Civ. Jury Instr. Gen. Neg. § 30.3 ¶1. | $250,000.00[24] |
| Medical Expenses | Not claimed |
| Funeral & burial expenses | Not claimed |

[24] The United States recommends that the Court make a total award to the Estate of M.H. in the amount of $250,000, for her pain and mental anguish prior to her death. *See* Memorandum. *See also*, note 23 (regarding bystander claim).

### 4.8. **John Porter Holcombe, on behalf of the Estate of G.H.**

| Element | Amount |
| --- | --- |
| Pain and mental anguish "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by the decedent before his or her death. Tex. Civ. Jury Instr. Gen. Neg. § 30.3 ¶1. | $250,000.00[25] |
| Medical Expenses | Not Claimed |
| Funeral & burial expenses | Not Claimed |

[25] The United States recommends that the Court make a total award to the Estate of G.H. in the amount of $250,000, for her pain and mental anguish prior to her death. *See* Memorandum. *See also* note 23 (regarding bystander claims).

4.9. **John Porter Holcombe, on behalf of minor child EJH**

4.9.1. **EJH's Personal Injury Claim**[26]

| Element | Amount |
| --- | --- |
| Physical pain and mental anguish sustained in the past. | $25,000 |
| Physical pain and mental anguish that, in reasonable probability, the child will sustain in the future. | $25,000[27] |
| Loss of earning capacity sustained in the past | Not Claimed |
| Loss of earning capacity that, in reasonable probability, will be sustained in the future from the time of trial until the child reaches the age of eighteen years. | Not Claimed |
| Loss of earning capacity that, in reasonable probability, will be sustained in the future after the child reaches the age of eighteen years. | Not Claimed |
| Disfigurement sustained in the past | Not Claimed |
| Disfigurement that, in reasonable probability, the child will sustain in the future. | Not Claimed |
| Physical impairment sustained in the past | Not Claimed |
| Physical impairment that in reasonable probability, the child will sustain in the future. | Not Claimed |

---

[26] For the reasons articulated herein, the United States recommends a total award of $58,487.90 to EJH's personal injury claims. The award consists of $50,000.00 in non-economic damages and $8,987.90 in past medical expenses incurred. *See* Memorandum.

[27] John Porter Holcombe testified that the psychiatrist at University Hospital and the counselor at the Ecumenical Center for Health and Healing concluded that EJH was doing well and did not require further psychiatric care or counseling. Trial Tr. 157:7-25.

| | |
|---|---|
| Medical care expenses incurred in the past on behalf of the child | $8487.90[28] |
| Medical care expenses that, in reasonable probability, will be incurred on behalf of the child in the future from the time of trial until the child reaches the age of eighteen years. | Not Claimed |
| Medical care expenses that, in reasonable probability, the child will incur after she reaches the age of eighteen years. | Not Claimed |

---

[28] *See* Dkt. 576 ¶ 3

### 4.9.2.__EJH's damages for the death of Crystal Holcombe__[29]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, the child will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $25,000.00 |
| Loss of companionship and society that, in reasonable probability, the child will sustain in the future | $50,000.00 |
| Mental anguish sustained in the past. | $25,000.00[30] |
| Mental anguish that, in reasonable probability, the child will sustain in the future | $50,000.00[31] |
| Loss of inheritance. | Not Claimed |

[29] For the reasons articulated herein, the United States recommends a total award of $150,000.00 to EJH for the death of her mother Crystal Holcombe.  This recommended award consists of $150,000.00 in non-economic damages as the result of the death of her mother. EJH lost multiple family members. As such it is appropriate to adjust the baseline damages for extraordinary circumstances. *See* Memorandum.

[30] John Porter Holcombe testified that the psychiatrist at University Hospital and the counselor at the Ecumenical Center for Health and Healing both told him that EJH was doing well and did not require further psychiatric care or counseling.  Trial Tr. 157:7-25

[31] *See* Note 30.

4.10.   **John Porter Holcombe, on behalf of Philip Hill, formerly a minor child (presently 18)**

4.10.1.   **Philip's damages for the death of Crystal Holcombe[32]**

| Element | Amount |
|---|---|
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, the child will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $10,000 |
| Loss of companionship and society that, in reasonable probability, the child will sustain in the future | $50,000 |
| Mental anguish sustained in the past. | $10,000 |
| Mental anguish that, in reasonable probability, the child will sustain in the future | $30,000 |
| Loss of inheritance. | Not Claimed |

---

[32] For the reasons articulated herein, the United States recommends a total award of $100,000.00 to Phillip Hill for the death of his mother Crystal Holcombe.  This recommended award consists of  $100,000.00 in non-economic damages as the result of the death of his mother.  *See* Memorandum.

## Lookingbill-Ward Family

1. **Dalia Lookingbill[1]**

    1.1. **Dalia Lookingbill, for the death of JoAnn Ward**

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed[2] |
| Pecuniary loss that, in reasonable probability, will be sustained in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $20,000.00[3] |
| Loss of companionship and society that, in reasonable probability, will be sustained in the future | $15,000.00[4] |

---

[1] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Dalia Lookingbill in the amount of $62,604.37. That award recommendation is broken down into $50,000 in individual damages for non-economic damages arising out of the death of her daughter, $1,042.61 in past medical expenses and $11,561.76 in future medical expenses. The United States is entitled to a settlement offset resulting from a settlement between Ms. Lookingbill and another settling party in the amount of $100,000 in accordance with Tex. Civ. Prac. & Rem. Code § 33.012(b) and *Utts v. Short*, 81 S.W.3d 822 (Tex. 2002). *See* Memorandum and Dkt 576¶ 26.

[2] Although Plaintiffs' table reflects $39,610.79 for Ms. Lookingbill's past & future pecuniary loss, this amount is actually a claim for past and future medical expenses. *See* Dkt 578 at 21, 181.

[3] Ms. Lookingbill's baseline total non-economic damage is reasonably calculated at $50,000. *See* Memorandum. Plaintiffs did not produce any evidence regarding Ms. Lookingbill to meaningfully deviate from this baseline. As a parent of an adult child living a separate life, Ms. Lookingbill suffers limited loss of companionship and society as a result of her adult daughter's death.

[4] Ms. Lookingbill is 64 years old. She has a supportive family including two living daughters and a son. *See* GEX 639 at 53:5-18. Ms. Lookingbill alternates residences between her two daughters, Mandi and Maria. *See* PEX 910 at 37:25-38:3 and GEX 640 at 11. Ms. Lookingbill is reasonably likely to suffer less from the limited loss of companionship and society as a result of her daughter's death as time progresses

| | |
|---|---|
| Mental anguish sustained in the past | $10,000.00[5] |
| Mental anguish that, in reasonable probability, will be sustained in the future | $5,000.00[6] |
| Medical care expenses incurred in the past | $1,042.61[7] |
| Medical care expenses that, in reasonable probability, Plaintiff will incur in the future. | $11,561.76[8] |

[5] Ms. Lookingbill was diagnosed with Major Depressive Disorder. GEX 641 at 9. Ms. Lookingbill also suffered the loss of her husband due to cancer in January 2018. GEX 639 at 11:19-12:1. She began taking medication for depression following the shooting, but appears to no longer be taking that medication. GEX 639 at 15:7-9 and PEX 17139-00011. She has not attended any counseling. GEX 639 at 16:7-17 and PEX 17139-00011. Ms. Lookingbill did return to work two weeks after the shooting.  GEX 639 at 25:2-4. She no longer works due to Parkinson's disease. *See* GEX 641 at 9.

[6] According to Dr. Marx, "Ms. Lookingbill's supportive family is a strength that may positively influence treatment outcome." GEX 614 at 9.  She is a good candidate for several evidence-based interventions for depression. *Id*.

[7] *See* Dkt 576¶ 21(a).

[8] *See* Dkt 576¶ 21(b), Dr. Canter disagreed with some of the recommendations set forth in Plaintiff's life care plan. *See* GEX 640. Specifically, costs associate with a primary care physician. *Id*. at 12. Although Ms. Lookingbill attended primary care appointments more frequently directly after the shooting, at some point she was told she was doing fine and her doctor released her. *See* GEX 639 at 28:5-29:5. Ms. Lookingbill's past and future medical expenses are reflected on Plaintiffs' table as "past and future pecuniary losses." *See* Dkt 578 at 21, 181.

1.2.  **Dalia Lookingbill, on behalf of the Estate of E.G., for survival damages**

| Element | Amount |
| --- | --- |
| Pain and mental anguish "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by the decedent before his or her death. Tex. Civ. Jury Instr. Gen. Neg. § 30.3 ¶1. | $350,000[9] |
| Medical Expenses | $557.02[10] |
| Funeral & burial expenses | Not Claimed |

---

[9] For the reasons articulated herein, the United States recommends that the Court make a total award to the Estate of E.G. in the amount of $350,557.02, for her pain and mental anguish prior to her death. E.G. was the only decedent that received life saving measures at a trauma center prior to passing from her injuries. As such it is appropriate to adjust the baseline damages awarded to the estate based on the probability that E.G. sustained additional pain and suffering following the shooting. *See* PEX 17116 and Memorandum.

[10] *See* Dkt. 576¶ 5 and PEX 17117-00001.

### 1.3. **Dalia Lookingbill, on behalf of R.T.**[11]

| Element | Amount |
| --- | --- |
| Physical pain and mental anguish sustained in the past. | $40,000[12] |
| Physical pain and mental anguish that, in reasonable probability, the child will sustain in the future. | $10,000[13] |
| Loss of earning capacity sustained in the past | Not Claimed |
| Loss of earning capacity that, in reasonable probability, will be sustained in the future from the time of trial until the child reaches the age of eighteen years. | Not Claimed |
| Loss of earning capacity that, in reasonable probability, will be sustained in the future after the child reaches the age of eighteen years. | Not Claimed |

---

[11] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Dalia Lookingbill on behalf of R.T., a minor child, in the amount of $217,849.00. That award recommendation is broken down into $50,000 in individual damages for non-economic damages arising out of her bystander claims, $150,000 in individual non-economic damages for the death of her mother and $17,849.00 in future medical expenses. The United States is entitled to a settlement offset resulting from a settlement between Ms. Lookingbill and another settling party in the amount of $100,000 in accordance with Tex. Civ. Prac. & Rem. Code § 33.012(b) and *Utts v. Short*, 81 S.W.3d 822 (Tex. 2002). *See* Memorandum and Dkt 576¶ 26.

[12] R.T. testified that she saw her mother die and saw her sister B.W.'s face "shot up." PEX 942. R.T. attended some mental health therapy at the Ecumenical Center but was ultimately more comfortable with the school counselor. PEX 910 at 47:4-16. She felt that the school counselor helped her. *Id*. at 47:17-19. She has maintained a relationship with the counselor. *Id*. at 44:14-23. She has not taken any medications for mental health. *Id*. at 47:20-22

[13] According to the objective tests administered by Dr. Feltoon, R.T.'s scores did not indicate that she was suffering from any mental health issues. *See* Trial Tr. 2095:8-20. R.T. has continued to be successful in school. *See* PEX 910 at43:10-44:13. Even though there is an indication that R.T.'s mental health is stable, she may still have some difficulty with mental anguish going forward, but there is no evidence to suggest that she will not benefit substantially from appropriate, evidence based, trauma-focused psychotherapy.

| | |
|---|---|
| Disfigurement sustained in the past | $0[14] |
| Disfigurement that, in reasonable probability, the child will sustain in the future. | $0[15] |
| Physical impairment sustained in the past | Not Claimed |
| Physical impairment that in reasonable probability, the child will sustain in the future. | Not Claimed |
| Medical care expenses incurred in the past on behalf of the child | Not Claimed |
| Medical care expenses that, in reasonable probability, will be incurred on behalf of the child in the future. | $17,849.00[16] |

---

[14] Although R.T. testified at her trial deposition that she has scars on her arm, thigh and ankle from gun powder, there is no medical evidence the shooting was the cause of these purported scars. *See* PEX 942 at 21:9-20. By agreement of counsel, R.T. was not subject to cross-examination during her trial deposition. Most notably, there are no notes in Plaintiff's life care plan from Dr. Gonzales concerning these purported injuries ("Her physical examination did not reveal any significant physical abnormalities). *See* PEX 17125 at 3.2, 3.3, 3.12. Plaintiffs base their submission of disfigurement damages solely on the testimony of R.T. at her trial deposition. Dkt 578 at 58. The medical evidence, however, contradicts her testimony.

[15] *See* Note 14.

[16] Dr. Canter determined that certain future costs provided in Plaintiff's life care plan were not appropriate. *See* GEX 258 at 10. Specifically, Dr. Canter disagreed with recommendations for primary care physician visits, a psychiatrist, antidepressants and sleep aids. Mandi Lookingbill stated that R.T. isn't seeking any kind of physical medical care for any injuries she had in the shooting and is on the same routine medical care schedule as Mandi Lookingbill's other children. PEX 910 at 48:5-16. R.T. also is only comfortable with the school counselor for her counseling needs. *See* PEX 910 at 28:10-20, 47:4-19.

### 1.4.  **Dalia Lookingbill, on behalf of R.T., for the death of JoAnn Ward[17]**

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $40,000.00[18] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $75,000.00[19] |
| Mental anguish sustained in the past. | $25,000.00[20] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $10,000.00[21] |

---

[17] As the dependent of a parent killed in the shooting, R.T.'s baseline non-economic damages total $100,000. However, given that R.T. lost multiple family members in the shooting it is appropriate to adjust the baseline damages for extraordinary circumstances. *See* Note 15.

[18] As a minor, it may be reasonably expected that R.T. has suffered significant loss of companionship and society from her mother in the years since her death.

[19] R.T. has been raised by Mandi Lookingbill since the day of the shooting. PEX 910 at 23:7-21. Mandi Lookingbill is married and is raising four other children in her home. *Id*. at 23:14-18. R.T.'s grandmother, Dalia Lookingbill, also lives in the home part time. *Id*. R.T.'s entire family provides her a great deal of support. *Id*. at 46:19-47:3. Given her excellent support system, it is reasonably likely R.T. will suffer less from the loss of companionship and society as time progresses.

[20] R.T. testified that she has cried, misses her mom and has nightmares. *See* PEX 942. According to the objective tests administered by Dr. Feltoon, R.T.'s scores did not indicate that she was suffering from any mental health issues. *See* Trial Tr. 2095:8-20. She has obtained mental health counseling from a school counselor and feels that has helped her. PEX 910 at 47:4-19

[21] R.T. has continued to do well in school, has participated in extra-curricular activities and has a loving supportive family. Though there is an indication that R.T.'s mental health is stable, she may still have some difficulty with mental anguish going forward, but there is no evidence to suggest

| Loss of inheritance. | Not Claimed |
| --- | --- |

---

that she will not benefit substantially from appropriate, evidence based, trauma-focused psychotherapy as provided for in Dr. Canter's life care plan. *See* GEX 258 at 11.

2. **Chris Ward**

2.1. **Chris Ward on behalf of the Estate of JoAnn Ward**

| Element | Amount |
|---|---|
| Pain and mental anguish "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by the decedent before his or her death. Tex. Civ. Jury Instr. Gen. Neg. § 30.3 ¶1. | $250,000[22] |
| Medical Expenses | Not Claimed |
| Funeral & burial expenses | Not Claimed |

---

[22] The United States recommends that the Court make a total award to the Estate of JoAnn Ward in the amount of $250,000, for her pain and mental anguish prior to her death. *See* Memorandum.

2.2. **Chris Ward on behalf of the Estate of B.W.**

| Element | Amount |
| --- | --- |
| Pain and mental anguish "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by the decedent before his or her death. Tex. Civ. Jury Instr. Gen. Neg. § 30.3 ¶1. | $250,000[23] |
| Medical Expenses | Not Claimed |
| Funeral & burial expenses | Not Claimed |

---

[23] The United States recommends that the Court make a total award to the Estate of B.W. in the amount of $250,000, for her pain and mental anguish prior to her death. *See* Memorandum.

### 2.3.  Chris Ward's individual damages for the death of JoAnn Ward[24]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, will be sustained in the future. | Not Claimed |
| Loss of companionship and society sustained in the past. | $60,000[25] |
| Loss of companionship and society that, in reasonable probability, will be sustained in the future. | $25,000[26] |
| Mental anguish sustained in the past | $50,000[27] |

[24] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Chris Ward, in the amount of $650,000. That award recommendation is broken down into $150,000 in individual damages for non-economic damages arising out of the death of his wife and $500,000 in for non-economic damages arising out of the death of his minor daughter. Mr. Ward lost multiple family members. As such it is appropriate to adjust the baseline damages for extraordinary circumstances. *See* Memorandum.

[25] Mr. Ward and Mrs. Ward had been married six years at the time of her death. PEX 923 at 7:3. She was killed on their sixth wedding anniversary. *Id*. at 7:7-9. Prior to the shooting, Mr. Ward and Mrs. Ward were raising her two children from prior relationships, R.T. and E.G., Mr. Ward's son, R.W., and their daughter, B.W. *Id*. at 6:22-25. All of the children called Mr. Ward "Dad." *Id*. at 9:9-10. Mrs. Ward, E.G. and B.W. were killed in the shooting and R.W. was seriously injured. Mr. Ward did begin dating at some point after the shooting. PEX 923 at 51:21-25. His girlfriend moved into his home. *Id*.

[26] Mr. Ward began dating after the shooting. PEX 923 at 51:21-25. It is reasonably likely that he will suffer less from the loss of companionship and society as time progresses.

[27] Although Mr. Ward witnessed the immediate aftermath of the shooting, he was not physically present when the injury to his wife and children occurred and is therefore not entitled to recover mental anguish damages as a bystander. *United Servs. Auto. Ass'n v. Keith*, 970 S.W.2d 540, 542 (Tex. 1998); *see also Hitchcock v. Steak N Shake, Inc.*, 2017 WL 5077901, at *10 (W.D. Tex. Nov. 2, 2017) (permitting recovery where "the relative was in close proximity to the accident . . . ."). Mr. Ward is therefore only entitled to recover mental anguish damages for the wrongful death claim, and not as a bystander. The evidence does demonstrate that Mr. Ward has

| Mental anguish that, in reasonable probability, will be sustained in the future. | $15,000[28] |
|---|---|
| Loss of inheritance. | Not Claimed |

experienced mental anguish as a result of the shooting. Following the shooting, Mr. Ward had several alcohol related incidents and was admitted to inpatient care at Laurel Ridge in October 2020 for issues with alcohol and suicidal ideations. *See* PEX 17104.

[28] Dr. Marx diagnosed Mr. Ward with PTSD, Major Depressive Disorder, Generalized Anxiety Disorder, and alcohol-use disorder. GEX 635 at 12. "These disorders, and their symptoms, are related to each other and successful treatment for PTSD and major depression may have downstream beneficial effects on alcohol-use and anxiety. *Id*. at 13. Given the severity of Mr. Ward's symptoms, Dr. Marx believes his treatment may be lengthier but that he can still benefit from evidence-based, trauma-focused psychotherapy. *Id*. at 13.

### 2.4.  **Chris Ward's damages for the death of B.W., a minor child**

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, will be sustained in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $100,000[29] |
| Loss of companionship and society that, in reasonable probability, will be sustained in the future | $200,000[30] |
| Mental anguish sustained in the past | $100,000[31] |
| Mental anguish that, in reasonable probability, will be sustained in the future | $100,000[32] |

---

[29] B.W. was five years old at the time of the shooting. PEX 923 at 6:16-18. Mr. Ward testified that she was "Daddy's little girl." *Id*. at 26:15-20. Mr. Ward was a truck driver and provided for his family. *Id*. at 11:11-14. He testified that he would spend time with his kids on his days off. *Id*.

[30] B.W. would have likely lived in the family home with Mr. Ward until attaining the age of eighteen at which time she would have likely left the family home and spent less time with her father.

[31] *See* Note 27.

[32] *See* Note 28.

3. __Chancie McMahan__

3.1. __Chancie McMahan on behalf of R.W.[33]__

| Element | Amount |
| --- | --- |
| Physical pain and mental anguish sustained in the past. | $500,000[34] |
| Physical pain and mental anguish that, in reasonable probability, the child will sustain in the future. | $150,000[35] |

---

[33] For the reasons articulated herein, the United States recommends the Court make a total award on behalf of R.W. in the amount of $2,082,139.84. That award recommendation is broken down into $1,250,000.00 in individual damages for non-economic damages, $274,249.76 in past medical care, $557,890.08 in future medical care. R.W. was seriously injured in the shooting, as such his case qualifies as extraordinary circumstances.

[34] R.W. sustained four gunshot wound injuries. *See* PEX 17054. R.W. was in inpatient care from the time of the shooting until January 2018. *See* PEX 17037-01810. By the time of his discharge, Mr. Ward reported that R.W. was coping very well and acting like 'a normal kid.' PEX 17037-01818. He was not having any sleeping issues. *Id*. at 02219. He did attend mental health treatment at University Health System and then the Ecumenical Center. *See* GEX 256, 17027, and 17033. R.W. was never prescribed mental health medication. PEX 923 at 76:1-3. According to Ms. McMahan, in the past year R.W. has started sleepwalking and crying in his sleep. Trial Tr. 1948:11-13. R.W. is also having outbursts at school. *Id*. at 1949:4-6. Ms. McMahan indicated R.W. is easily agitated at home. *Id*. at 1949:18-20. R.W. has experienced a lot of changes in the past year. *Id*. at 1954:10-12. Prior to January 2020, Mr. Ward had full custody of R.W. *Id*. at 1954:15-17. In January 2020, Ms. McMahan obtained full custody and moved R.W. to San Saba. *Id*. at 1955:11-13. R.W. moved into an apartment with Ms. McMahan's three other children. *Id* at 1955:21-1956:3. When he was living with his father, R.W. lived on some land and was able to enjoy activities such as riding a go-kart. *Id*. at 1956:4-9. Mr. Ward stated that R.W. was not having nightmares, insomnia or aggression when he lived with Mr. Ward. PEX 923 at 73:25-75:4. In the past year, Ms. McMahan moved again to Lampasas. *Id*. at 1955:16-20. As such, it is difficult to separate any mental anguish from the shooting with R.W.'s emotional reactions to his change in living arrangements.

[35] R.W. will require additional surgeries related to the injuries he sustained in the shooting, including a hip replacement. *See* GEX 732. R.W. Although Dr. Feltoon determined that R.W. had PTSD and would need psychotropic medications and counseling, the results of his objective testing are suspect. *See* PEX 17062 and Trial Tr. 2085-2089. There is no indication that R.W. would not benefit from appropriate evidence-based treatment. *See* Trial Tr. 3363:15-3364:20.

| | |
|---|---|
| Loss of earning capacity sustained in the past | Not Claimed |
| Loss of earning capacity that, in reasonable probability, will be sustained in the future. | $0[36] |
| Disfigurement sustained in the past | $100,000[37] |
| Disfigurement that, in reasonable probability, the child will sustain in the future. | $100,000[38] |
| Physical impairment sustained in the past | $250,000[39] |

---

[36] Plaintiffs' vocational expert, Ms. Mendez, asserted that R.W. was "at risk educationally and vocationally," PEX 17064 at 2, and notes that his high school graduation date has likely been delayed by one year. *Id*. at 3. She does not opine that he will be unable to graduate high school; nor does she indicate whether R.W. would have graduated high school or attended some college absent the shooting. Plaintiffs' economist did not consider the reductions that R.W. may face in the labor market due to his disabilities; rather, Dr. Fairchild bases his calculations on the assumption, without particular evidence, that R.W. will not progress as far in his education as he otherwise would have. This assumption is not supported by the evidence. While R.W. may be "at risk" educationally, Ms. Mendez did not explain how that translates to his likelihood of graduating high school or attending college. Nor did she explain how his current chances of reaching these educational milestones compares to his previous chances. Accordingly, Dr. Fairchild's assumptions are unwarranted and the Court cannot rely on his calculations for R.W.'s lost earning capacity and benefits. As Plaintiffs' note, R.W. may likely need to obtain employment that is dependent on using his mind. Dkt 578 at 62. This does not translate into an articulable amount of loss in future earnings capacity.

[37] R.W. sustained disfiguring gunshot wound injuries. *See* PEX 17071 at 102-104.

[38] *See* Note 37.

[39] After his release from the hospital, R.W. was in a wheelchair for some period of time and then used at walker. PEX 623 at 66:2-6. At some point, he was able to walk without the assistance of a walker. PEX 623 at 66:5-7. After his interview with Dr. MacKenzie, R.W. ran and jumped off the steps at her office. Trial Tr. 3675:25-3676:1. R.W. was able to return to many of his prior activities including driving his go-kart, jumping on a trampoline and throwing a ball. *See* GEX 626 and PEX 923 at 66:15-68:13. At the time of trial, R.W. was in a wheelchair following a procedure to lengthen his leg, but that was a temporary situation. Trial Tr. 17-22.

| | |
|---|---|
| Physical impairment that in reasonable probability, the child will sustain in the future. | $150,000[40] |
| Medical care expenses incurred in the past on behalf of the child | $274,249.76[41] |
| Medical care expenses that, in reasonable probability, will be incurred on behalf of the child in the future. | $756,414.00[42] |

---

[40] R.W. does walk with a limp. PEX 923 at 36:23-24. R.W. also may not obtain full functioning in his arm. GEX 628. Although Ms. McMahan attributes R.W.'s recent incontinence to the shooting, the evidence does not support this conclusion. Trial Tr. 1939:10-13. R.W. had a period of continence after the shooting. Trial Tr. 3639:3-14. During his interview with Plaintiff's life care planner Dr. Roman, he could control his bowels and his bladder. Trial Tr. 2168:13-16. According to Dr. Scott, incontinence may not be due to physical damage by may be due to emotional and/or behavioral aspects. Trial Tr. 3655:10-17. As noted in Note 55 above, R.W. has gone through some significant changes in the past year.

[41] *See* Dkt 576¶ 15(a).

[42] *See* Dkt 576¶ 15(b) and GEX 732. The two main areas of disagreement concerning R.W.'s life care plan are medications and nursing and attendant care. With regard to medications, Dr. Scott noted that Dr. Roman proposed Celebrex until R.W. reaches the age of 27, however over-the-counter-strength analgesics have been working well for R.W. Trial Tr. 3623:3-11, GEX 732 at19. Dr. Roman also proposed Cymbalta, an antidepressant starting at age 27 and continuing for decades. *Id*. at 3624:2-6. R.W. has not taken any mental health medication to this point and there is no indication he will need it in the future if he receives appropriate evidence-based treatment. *See* Note 37. Dr. Scott and Dr. MacKenzie also disagreed that R.W. would require four hours of home health care beginning at age 55. *See* GEX 732 at 23. Dr. Scott defined R.W.'s problems and discussed the optimized care that R.W. will receive under the life care plan. *See* Trial Tr. 3627:1-3628:16 According to both Dr. Scott and Dr. MacKenzie, the care under the life care plan will allow him to be independent related to activities of daily living or instrumental activities of daily living. *See* Trial Tr. 3676:8-20.

### 3.2. **Chancie McMahan's damages for injury to R.W., a minor**[43]

| Element | Amount |
| --- | --- |
| Loss of services that were sustained in the past | $0[44] |
| Loss of services that in reasonable probability will be sustained in the future until age eighteen. | $0[45] |

---

[43] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Chancie McMahan in the amount of $0 for non-economic damages related to the injury of her child, R.W.

[44] At the time of the shooting, R.W. was five years old. Trial Tr. 1927:23-24. At that time, Ms. McMahan did not have custody of R.W. In fact, she did not obtain custody of him until January 2020. Trial Tr. 1954:15-20. As such, R.W. was not providing any services to Ms. McMahan prior to the shooting. Additionally, she failed to present any evidence of the performance and value of purported lost services.

[45] Plaintiffs did not provide sufficient evidence that R.W. would be unable to assist his mother with everyday tasks. Plaintiffs point to Ms. McMahan's testimony that R.W. does not have full function of his hand (Trial Tr. 1930:156), Dr. Roman's testimony concerning R.W.'s leg lengthening surgery (Trial Tr. 2126:10-18) and Dr. Roman's testimony that R.W. will need to get a job that is not dependent on his body (Trial Tr. 2159:23-2160:10) to support Ms. McMahan's loss of services claim. Plaintiffs' fail to point out that Mr. Chris Ward detailed R.W.'s ability to throw a ball, operate a skid-steer, drive a go-kart and jump on a trampoline following the shooting. PEX 923 at 66:12-68:9.

## Macias Family

1. **Juan Macias**[1]

    1.1. **Juan Macias' damages for his own personal injuries.**

| Element | Amount |
| --- | --- |
| Physical pain and mental anguish sustained in the past. | $100,000.00[2] |
| Physical pain and mental anguish that, in reasonable probability, Plaintiff will sustain in the future. | $250,000.00[3] |
| Loss of earning capacity sustained in the past. | $0.00[4] |
| Loss of earning capacity that, in reasonable probability, Plaintiff will sustain in the future. | $0.00[5] |
| Disfigurement sustained in the past. | $100,000.00 |

---

[1] For the reasons articulated herein, the United States recommends the Court make a total award to the Plaintiff Juan Macias in the amount $2,231,481.28. The award recommendation is broken down into $1,231,481.28 for economic damages and $1,000,000.00 for non-economic damages. A separate additional $100,000 would go to Plaintiff Juan Macias as personal representative of the Estate of Jennifer Macias.

[2] Mr. Macias was shot six times. *See* Trial Tr. 1038:20-1040:7. He spent approximately 70 days in the Intensive Care Unit. *See* Trial Tr. 1037:23-24 and then an additional 30 days at Post Acute Medical, a rehabilitation facility. *See* Trial Tr. 1043:10-12.

[3] As a result of his wounds, Mr. Macias suffered numerous injuries to include pelvic fractures, rectal injury resulting in resection of portions of colon requiring a colostomy and urethral disruption resulting in erectile dysfunction, among other injuries. *See* Trial Tr. 1041:19-1043:4.

[4] Mr. Macias retired from the US Military in 2008. *See* Trial Tr. 1017:3-4. Mr. Macias did not present any evidence at trial of lost earning capacity in the past.

[5] Mr. Macias did not present any evidence at trial regarding of lost future earning capacity.

| | |
|---|---|
| Disfigurement that, in reasonable probability, Plaintiff will sustain in the future. | $200,000.00[6] |
| Physical impairment sustained in the past | $100,000.00[7] |
| Physical impairment that, in reasonable probability, Plaintiff will sustain in the future. | $250,000.00[8] |
| Medical care expenses incurred in the past. | $90,862.28[9] |
| Medical care expenses that, in reasonable probability, Plaintiff will incur in the future. | $1,140,619.00[10] |

[6] As a result of his wounds from both bullet wounds and the surgical care, Mr. Macias has permanent scarring on his left arm; left hip; left and right buttocks; right hip; a large vertical abdominal scar; and a permanent ostomy. *See* Trial Tr. 1048:21-1051:9.

[7] Mr. Macias was in the hospital for 70 days followed by 30 days in a rehabilitation facility. *See* Trial Tr. 1037:23-24 and 1043:10-12. While in the rehabilitation facility, Mr. Macias had to work on walking again which included using a wheelchair and walker. *See* Trial Tr. 1046:8-20.

[8] As a result of his injuries, Mr. Macias has ongoing physical injuries to include a colostomy, which causes ongoing difficulties *See* Trial Tr.1055:16-25 and taking substantial time to clean and maintain. *See* Trial Tr. 1053:5 to 1054:12. It also negatively impacts his daily life. *See* Trial Tr. 1056:1-1057:10).

[9] *See* Dkt 576¶ 13(a).

[10] *See* Dkt 576¶ 13(b).

### 1.2. **Juan Macias as personal representative of the Estate of Jennifer Macias**

| Element | Amount |
|---|---|
| Loss of household services sustained in the past | $20,000.00 |
| Loss of household services that, in reasonable probability, Mrs. Macias will sustain in the future. | $0.00[11] |
| Loss of consortium sustained in the past | $80,000.00 |
| Loss of consortium that, in reasonable probability, Mrs. Macias will sustain in the future | $0.00 |

---

[11] Unfortunately, Mrs. Macias passed away on October 22, 2021. Dkt #563. Her death was unrelated to the events before the Court.

**Moulton Family**

1. **Brenda Moulton's individual personal injury damages**[1]

| Element | Amount |
| --- | --- |
| Physical pain and mental anguish sustained in the past. | $57,500[2] |
| Physical pain and mental anguish that, in reasonable probability, Plaintiff will sustain in the future. | $57,500[3] |

---

[1] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Brenda Moulton in the amount of $459,356.95. That award recommendation is broken down into $150,000 for total non-economic damages and $309,356.95 in economic damages. *See* Memorandum and Dkt 576 ¶15.

[2] Mrs. Moulton sustained two gunshot wounds, one in the right chest and abdomen and another "superficial bullet injury" to the right leg that caused soft tissue damage only. PEX 13047-0001. Her "primary source of injury" was the bullet which entered her chest. *Id*. After entering the chest, it injured the right lung and continued through her body toward the back, eventually lodging in front of her spine. *Id*. She describes having daily pain from where the bullet is lodged near her spine. PEX 904-0040, 40:2-10. However, she only takes Tylenol with Codeine to deal with the pain on an as needed basis to deal with "excessive" pain, like "after going to PT." GEX 553 p. 23. Her mental anguish is more difficult to distinguish since she has an extensive history of past mental health problems. *See, e.g.*, GEX 554. She was, however, diagnosed with PTSD and Major Depressive Disorder. *Id*. Plaintiffs' submission is based on their flawed determination that the Charleston settlement provides "precedential" value in this case and then adds an additional steady award of damages for the rest of Mrs. Moulton's life expectancy. Dkt 578 p. 76. This highlights the problem with their use of the Charleston settlement for any purpose. Plaintiffs have no knowledge of any kind regarding what injuries, damages, or categories which this Charleston settlement was intended to address under South Carolina law. They do not compare any of the Charleston plaintiffs with Mrs. Moulton. There is no evidence before this Court which would compare and contrast a given Charleston plaintiff to Mrs. Moulton with regard to her injuries, her experience during the shooting, her recovery post-shooting, her potential for long term psychological and physical recovery, the impact on her family, and/or any other factors which should be considered by this Court when arriving at an appropriate compensatory award. Furthermore, this framework disregards specific testimony in the record regarding Mrs. Moulton's ongoing recovery and potential for additional recovery as time progresses. *See, e.g,* notes 3 and 5.

[3] Mrs. Moulton still suffers from daily pain as a result of her injuries. PEX 904-0040, 40:2-10. There is no evidence that she can obtain a surgical procedure to correct this problem. That said, Dr. Canter testified that if her mental health conditions were addressed, her physical pain would improve. Trial Tr. 3356:9-3357:3. She has not received adequate, evidence based, trauma-focused

| | |
|---|---|
| Loss of earning capacity sustained in the past. | $0 |
| Loss of earning capacity that, in reasonable probability, Plaintiff will sustain in the future. | $0 |
| Disfigurement sustained in the past. | $5,000[4] |
| Disfigurement that, in reasonable probability, Plaintiff will sustain in the future. | $10,000[5] |
| Physical impairment sustained in the past | $10,000[6] |

psychotherapy to date. It would be reasonable to assume that this treatment would improve both her physical and mental health going forward.

[4] Mrs. Moulton has sustained a permanent scar on her abdomen. PEX 13052-0005. Plaintiffs' submission states that Mrs. Moulton's scar is the reason she does not have a relationship. Dkt 578 p. 78. It goes on to suggest the Court award $4,500 annually for the rest of Mrs. Moulton's life. *Id*. The United States acknowledges that Mrs. Moulton has a scar but disputes the idea that it has caused her to not have an intimate relationship. First, Mrs. Moulton was not in a relationship at the time of the shooting. PEX 904 58:7-17. Second, Mrs. Moulton's family testified that due to her bipolar disorder she can be "difficult" and "tough". GEX 280 26:2-21. It is too speculative to connect her scar to her lack of an intimate relationship.

[5] There is no evidence to suggest Mrs. Moulton will not live with this scar for the rest of her life. PEX 904-00044.

[6] Mrs. Moulton occasionally uses a cane, especially when walking outside. GEX 553 p. 23. She does not have a wheelchair, scooter, or walker. *Id*. Plaintiffs' submission states that Mrs. Moulton suffers from the following physical impairments: "(1) Decreased ability to interact and/or socialize with family, and/or friends and acquaintances; (2) Decreased locomotion e.g. walking, etc.; (3) Decreased ability to participate in social avocational activities, i.e. participation in activities with others e.g. participation in community activities, etc.; (4) Decreased external mobility e.g. community ambulation, etc.; (5) Decreased ability to perform household services e.g. inside housework, shopping for household, etc.; (6) Decreased ability to participate in personal avocational activities e.g. personal hobbies, pastimes, interests, etc." Dkt 578 p. 79. However, Mrs. Moulton's family testified that their interactions are substantially similar as they were pre-shooting, and she still gardens and hunts with her daughter. The rest of her activities are limited, but are accomplished with the help of her daughter, who serves as her paid home health aid.

| | |
|---|---|
| Physical impairment that, in reasonable probability, Plaintiff will sustain in the future. | $10,000[7] |
| Medical care expenses incurred in the past. | $87,717.61[8] |
| Medical care expenses that, in reasonable probability, Plaintiff will incur in the future. | $221,639.34[9] |

---

[7] *See* note 8.

[8] Dkt 576 ¶ 15.

[9] *Id*. Plaintiffs' submission attempts to add-in more than $1 million in home health care requirements based on the statements of Jessica Moulton. Dkt 578 p. 81. Ms. Jessica Moulton is not qualified to assert such opinion. The United States objects to consideration of this additional care based on the statements of Jessica Moulton. Additionally, while the Court said it would generally consider $22/hour as the going rate for home health care, Mrs. Moulton *already* receives home health care through Girling. It should be awarded at the same rate she is currently receiving.

2. **Jessica Moulton's individual damages for injury to Brenda Moulton**[10]

| Element | Amount |
| --- | --- |
| Loss of Parental Consortium that was sustained in the past. | $5,000[11] |
| Loss of Parental Consortium in reasonable probability will be sustained in the future | $0[12] |

---

[10] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Jessica Moulton in the amount of $5,000 for non-economic damages.

[11] Moreover, given that the relationship between Ms. Jessica Moulton and Mrs. Brenda Moulton _improved_ post-shooting, the United States believes the proper award to Ms. Jessica Moulton for her loss of consortium is $5,000. The quality of their interaction is the same, Mrs. Brenda Moulton still teaches Ms. Jessica Moulton everything she needs to know, and the two of them have grown closer. Testimony of Mrs. Brenda Moulton: PEX 00904, p. 00071, lines 11-15; PEX 00904, p. 00074, lines 16-20; Courtroom Testimony of Ms. Jessica Moulton, p. 998, line 4 and p. 999, lines 18-20. A minor loss of consortium award for the time period during which Mrs. Brenda Moulton was hospitalized and recovering from her injuries is appropriate.

[12] _See_ note 13. Ms. Moulton's relationship with her mother has improved in both quality and quantity since the shooting. She has not provided sufficient evidence for this Court to conclude that she is likely to suffer additional loss of consortium damages. That Ms. Moulton's life is "on hold", to the extent that is even true, falls outside the consortium relationship with her mother.

### 3.  <u>William Lane's individual damages for injury to Brenda Moulton</u>[13]

| Element | Amount |
| --- | --- |
| Loss of Parental Consortium that was sustained in the past. | $5,000[14] |
| Loss of Parental Consortium in reasonable probability will be sustained in the future | $0[15] |

---

[13] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff William Lane in the amount of $5,000 for non-economic damages.

[14] Given that the relationship between Mr. Lane and Mrs. Brenda Moulton remained substantially similar to what it was before the shooting, the United States believes the proper award to Mr. Lane for his loss of consortium is only $5,000. The relationship between Mr. Lane and Mrs. Moulton has always been turbulent and "tough". GEX 280, Transcript of Depo for William Lane, 16:3-13, 17:8-24, 21:12-22:4. Mr. Lane moved out of the house at 19 and their relationship became "distant" before it slowly normalized over time. *Id*. at 24:4-12. Mrs. Moulton was "hard to visit", "hard to get a long with". *Id*. at 24:18-22, 26:2-21. They would see each other once a month or so. *Id*. at 27:23. Right before the shooting, due to Mr. Lane's endocarditis, it had increased slightly. *Id*. at 30:1-12. After Ms. Jessica Moulton and Mrs. Moulton moved into their new trailer, Mr. Lane went out to visit them about once every other month. *Id*. at 48:16-23. He would see Mrs. Moulton once or twice a month when she came into town for medical appointments. *Id*. at 48:24-49:12. A minor loss of consortium award for the time period during which Mrs. Moulton was hospitalized and recovering from her injuries is appropriate.

[15] *See* note 16. Mr. Lane's relationship with his mother has remained steady in both quality and quantity since the shooting. He has not provided sufficient evidence for this Court to conclude that he is likely to suffer additional loss of consortium damages.

**Warden Family**

1. **James Stevens on behalf of the Estate of Peggy Warden**

| Element | Amount |
| --- | --- |
| Pain and mental anguish "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by the decedent before his or her death. Tex. Civ. Jury Instr. Gen. Neg. § 30.3 ¶1. | $250,000[1] |
| Medical Expenses | Not Claimed |
| Funeral & burial expenses | Not Claimed |

---

[1] For the reasons articulated herein, the United States recommends that the Court make a total award to the Estate of Peggy Warden in the amount of $250,000, for her pain and mental anguish prior to her death. *See* Memorandum.

2. **Jennifer Racey for the death of Peggy Warden**[2]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $20,000[3] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $15,000[4] |
| Mental anguish sustained in the past. | $10,000[5] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $5,000[6] |

[2] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Jennifer Racey in the amount of $50,000 for non-economic damages related to the death of her mother. Plaintiffs did not produce any evidence regarding Ms. Racey to meaningfully deviate from this baseline.

[3] As an adult child living a separate life, Ms. Racey suffers limited loss of companionship and society as a result of her mother's death.

[4] Ms. Racey currently lives with her boyfriend and two of her children. Trial Tr. 1838:14-18. Her son, Zachary Poston lives nearby on the same piece of property. *Id*. at 17-18. She is also surrounded by other family members that live on the same property. *Id*. at 2-12. Ms. Racey is reasonably likely to suffer less from the limited loss of companionship and society as a result of her mother's death as time progresses.

[5] Ms. Racey attended approximately six counseling sessions following the shooting. Trial Tr. 1840:10-12. She did not attend any mental health treatment following those sessions. She has not taken any mental health medications. *Id*. at 4-9. Ms. Racey indicated to Dr. Marx that her psychological issues have made it difficult for her to work since the shooting. GEX 656 at 12. However, it appears Ms. Racey has always been a homemaker. *See* GEX 283 at 20:23-21:3 and Trial Tr. 1786:25-1787:7.

[6] Ms. Racey has been diagnosed with PTSD. GEX 656 at 12. Dr. Marx noted that her

| | |
|---|---|
| Loss of inheritance. | Not Claimed |

---

"willingness to speak openly with this interviewer about her traumatic experience of the shooting and the impact this experience has had on her bodes well for her ability to engage in and benefit from PTSD treatment." *Id*. Evidence based, trauma-focused psychotherapy can assist Ms. Racey in dealing with her psychological symptoms. *Id*.

### 3. __Zachary Poston's Individual Personal Injury Damages__[7]

| Element | Amount |
| --- | --- |
| Physical pain and mental anguish sustained in the past. | $250,000.00[8] |
| Physical pain and mental anguish that, in reasonable probability, Plaintiff will sustain in the future. | $150,000.00[9] |

---

[7] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Zachary Poston in the amount of $2,237,116.41. That award recommendation is broken down into $1,000,000 in non-economic damages, $851,015 in loss of earning capacity, $101,186.19 in past medical care and $284,915.22 in future medical care. *See* Memorandum and Dkt 576¶ 19.

[8] Mr. Poston sustained seven gunshot wounds, including wounds to his upper right arm, upper right abdomen, right wrist, right thigh, lower left leg, left thigh, and left wrist. PEX 18052. He described the pain of being hit with at least one of the bullets like being hit with a sledgehammer. Trial Tr. 1858:6-7. Mr. Poston underwent multiple surgeries at Brooke Army Medical Center for his injuries. He has retained shrapnel in his body and his lead levels are being monitored by Dr. Rohit Kapoor, although he has no symptoms of lead toxicity. GEX 270 at 9. Plaintiffs overstate Dr. Kapoor's concerns that Mr. Poston may develop lead toxicity at some point. *See* Dkt 578 at 89. In fact, when asked "based on the – your treatment of Mr. Poston where you reviewed one lead level at 14 and then a second level also at 14, is there any reason at this point to believe that he will develop these future medical conditions or complications," Dr. Kapoor answered "No." GEX 270 at 40:4-13. Mr. Poston was also seen several times by an orthopedic hand surgeon, Dr. Bagg. *See* GEX 264. Mr. Poston was with his grandmother, Peggy Warden, during the shooting and testified that he witnessed her death. Trial Tr. 1850:7-11. He also witnessed the death of other churchgoers. Trial Tr. 1855:12-17. Mr. Poston only met with a mental health counselor for approximately two to three months. Trial Tr. 1909:16-1910:2. He has not sought any additional mental health counseling or taken any mental health medications. Trial Tr. 1909:13-1910:4. Plaintiffs inappropriately cite to the Charleston settlement as precedent for Mr. Poston's injuries and for an award of $6,000,000. *See* Memorandum. Plaintiffs provide no basis for awarding Mr. Poston an additional $54,000 per year for the remainder of his life *in addition* to the $6,000,000.

[9] Mr. Poston recently received medical care for a small hole in his foot due to overuse of his foot and his inability to feel any pain. Trial Tr. 1885:3-7. Mr. Poston has not seen his orthopedic hand surgeon since February 2020. Trial Tr. 1904:15-18. Mr. Poston only takes naproxen and Tylenol for pain. Trial Tr. 1908:8-11. Although Mr. Poston is not currently seeking any other medical treatment, it is likely he will suffer from physical pain in the future. Mr. Poston has been diagnosed with PTSD and Major Depressive Disorder. GEX 651 at 10. Although Mr. Poston did not find mental health treatment helpful in the past, it is likely that evidence based, trauma-focused psychotherapy can assist Mr. Poston in dealing with any lingering psychological symptoms. *See* GEX 651 at 10-11.

| | |
|---|---|
| Loss of earning capacity sustained in the past. | $0[10] |
| Loss of earning capacity that, in reasonable probability, Plaintiff will sustain in the future. | $851,015.00[11] |
| Disfigurement sustained in the past. | $100,000.00[12] |
| Disfigurement that, in reasonable probability, Plaintiff will sustain in the future. | $100,000.00[13] |
| Physical impairment sustained in the past | $150,000.00[14] |

---

[10] Mr. Poston was a high school student at the time of the shooting. He successfully graduated high school following the shooting. Trial Tr. 1835:18-22. There is no indication that he was employed prior to the shooting. Mr. Poston was able to attend some college following the shooting, even though he had not intended to attend college prior to the shooting. Trial Tr. 1833:10-23. Mr. Poston has attempted to perform several jobs since the shooting including jobs at Bill Miller, a car lot, a hardwood flooring company, and a job at Caterpillar. *Id.* at 1880:14-1883:20. Although Mr. Poston has had difficulty holding a manual labor job, Plaintiffs did not produce any evidence of the amount of lost earning capacity as Mr. Poston has successfully been able to obtain a new job after leaving his prior employment.

[11] Mr. Poston testified that it was his hope to join the military, however, it is speculative at best that that Mr. Poston would have successfully enlisted in the military and continued that career until retirement. *See* GEX 648. Likewise, it is speculative that Mr. Poston will have a reduction in earnings while working or a reduction in work-life. *See Id.* Even though it is speculative that Mr. Poston will have lost earning capacity, the United States has stipulated to a 25% reduction in earning capacity. *See* Dkt 576 ¶ 19(c) and GEX 648 at 30. Additionally, the United States agreed with the recommendation for vocational evaluation and counseling in Plaintiff's life care plan. *See* GEX 731 at 16.

[12] Mr. Poston was left with scarring on multiple areas of his body due to the shooting. *See* PEX 18051-00101.

[13] *See* Note 12.

[14] Mr. Poston was in a wheelchair and needed a great deal of assistance when he was initially discharged from the hospital. Trial Tr. 1865:22-1886:18. Based on his motivation and determination, he was able to walk the stage for his high school graduation. Trial Tr. 1867:12-24.

| | |
|---|---|
| Physical impairment that, in reasonable probability, Plaintiff will sustain in the future. | $250,000.00[15] |
| Medical care expenses incurred in the past. | $101,186.19[16] |
| Medical care expenses that, in reasonable probability, Plaintiff will incur in the future. | $284,915.22[17] |

[15] Mr. Poston currently lives independently with a roommate on his family's property. Trial Tr. 1911:22-25. Mr. Poston will continue to have physical impairments in the future. He has physical limitations when attempting to perform tasks with his wrist, including fine motor skills and driving. *Id*. at 1870:23-1871:24. His legs fatigue easily and he has troubles walking long distances without assistance. *Id*. at 1871:2-3. He has an issue with left foot drop due to a disconnected nerve and is required to walk with a brace. *Id*. 1873 at 8-9. He does not have any feeling in his left foot. *Id*. at 1873:13-14. He utilizes assistive devices such as a cane, wheelchair or power scooter when traveling longer distances. *Id*. at 1875:7-1876:9.

[16] *See* Dkt 576¶ 19(a).

[17] *See* Dkt 576¶ 19(b). The main areas of disagreement with Plaintiff's life care plan for Mr. Poston are medications, rehabilitation services, nursing and attendant care and acute care services. *See* GEX 731. With regard to nursing and attendant care, Dr. Scott testified that mobility devices and environmental changes would provide Mr. Poston the necessary tools to live independently without the need for nursing and attendant care, as he is doing now. Trial Tr. 3614:11-25. Dr. Scott opined that Mr. Poston does not need occupational therapy, which relates to the arms, because there are no newly identified problems with Mr. Poston's wrists. *Id*. at 3617:11-13. As noted above, Mr. Poston has not attended any appointments with his orthopedic hand surgeon since February 2020. *See* Note 9. Dr. Scott based his opinions regarding acute care on the testimony of Dr. Bagg, Mr. Poston's treating orthopedic hand surgeon. Based on Dr. Bagg's testimony, Dr. Scott determined that a darrach procedure and an arthrodesis were not medically probable. Trial Tr. 3567:22:3568:17 and GEX 731. Dr. Bagg testified that he could not say for sure that Mr. Poston would develop arthritis and that the arthritis would be symptomatic necessitating these procedures. *See* GEX 264 at 13-14.

**Solis and Ramirez Families**

1. **Rosanne Solis[1]**

   1.1. **Individual Personal Injury**

| Element | Amount |
| --- | --- |
| Physical pain and mental anguish sustained in the past. | $30,000[2] |
| Physical pain and mental anguish that, in reasonable probability, Ms. Solis will sustain in the future. | $30,000[3] |

---

[1] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Rosanne Solis in the amount of $578,949.92. That award recommendation is broken down into $100,000 for total non-economic damages and $478,949.92 in economic damages. *See* Memorandum and Dkt 576¶ 21.

[2] Ms. Solis is a 61-year-old single woman. Ms. Solis was shot once in the posterior aspect of her left shoulder. *See* PEX 14042-00002, PEX 14037-00009. Ms. Solis reported that she did not feel when the bullet hit because she was taking hydrocodone pills the day of the shooting. Trial Tr. 1275:4-7. Ms. Solis had been taking pain medication for approximately eight years prior to the shooting. *Id*. at 1266:8-17. Ms. Solis had exploratory surgery on her shoulder following the incident. PEX 14042-00113. The surgery did not result in any repairs, rather the wound was irrigated and packed. *Id*. Ms. Solis was in the hospital overnight and then went home. *Id.* at 00086. Ms. Solis followed up with the Gonzaba Medical Group and attended four appointments at the medical group. *See* PEX 14037. By her November 17, 2017 appointment at the Gonzaba Medical Group, Ms. Solis reported that her wound was looking better. *Id*. at 00015. On December 1, 2017, Ms. Solis reported that she no longer had pain in her left shoulder. *Id*. at 00019. At her last appointment at Gonzaba, the wound appeared to be healed. *Id*. at 00025. Ms. Solis did not receive any physical therapy following the shooting. *See* GEX 591 at 7. Prior to the shooting, Ms. Solis had significant pre-existing medical conditions that affected her physical and mental health. Ms. Solis has a rare bone disease known as melorheostosis. Trial Tr. 1261:17-23. This condition affected the way her limbs developed. This condition also causes chronic pain in her left arm and back. It affects her ability to use her extremities and affects her ability to walk, among other things. *See* Trial Tr. 1262:1-3, 1261:24-1263:13, 1263:14-20. Ms. Solis had a long history of mental health disorders including anxiety and depression prior to the shooting. *See* Trial Tr. 1272:8-1273:3. Ms. Solis met criteria for PTSD related to the shooting. *See* GEX 592 at11. Ms. Solis did report to Dr. Eleanora Duke at WellMed after the shooting that her lifelong depression had gotten better because she realized how important life was. PEX 14043-00001. Her mood continued to improve over the next six months. *See* PEX 14043-00013.

[3] Although Ms. Solis testified that she continues to have pain in her left shoulder related to the

| | |
|---|---|
| Loss of earning capacity sustained in the past. | Not Claimed |
| Loss of earning capacity that, in reasonable probability, Ms. Solis will sustain in the future. | Not Claimed |
| Disfigurement sustained in the past. | $10,000[4] |
| Disfigurement that, in reasonable probability, Ms. Solis will sustain in the future. | $5,000[5] |
| Physical impairment sustained in the past | $15,000[6] |
| Physical impairment that, in reasonable probability, Ms. Solis will sustain in the future. | $10,000[7] |

shooting the medical records do not support this testimony as detailed above and it is quite likely the pain is from her pre-existing condition. Dr. Marx noted that there is great concern for a chronic course of PTSD. GEX 592 at 12. However, in reaching the prognosis for Ms. Solis' mental health, Dr. Marx relied, in part, on Ms. Solis self-report that she experienced "chronic pain and decreased mobility stemming from the shooting-related injuries." GEX 592 at 11. Ms. Solis has received counseling and medications for PTSD symptoms but has not received appropriate, evidence based, trauma-focused psychotherapy. GEX 592 at 12.  Ms. Solis has had a long history of receiving mental health treatment, but as Dr. Marx stated, it may not have been the right treatment. *See* Trial Tr. 3487:13-3488:25.

[4] In the short term, Ms. Solis' shoulder injury was an unsightly open wound, but medical records indicate it had healed by January 2018. *See* PEX 14000-0003 and PEX 14037-00025.

[5] Ms. Solis has a permanent scar on her shoulder from the bullet injury. PEX 14045-00059.

[6] During an initial appointment at the Gonzaba Medical Group, Dr. Smith noted decreased motor strength to the left biceps and triceps and decreased active range of motion of the left shoulder in all planes due to pain and wound. PEX 14037-00011.

[7] Ms. Solis is able to cook, clean and do yard work without assistance. *See* Trial Tr. 1268:16-17 and GEX 591 at 7. Her hobbies and activities have not changed since the shooting. Trial Tr. 1270:21-1271:2. Dr. Canter did note that she has some shoulder weakness. GEX 591 at 30.

| | |
|---|---|
| Medical care expenses incurred in the past. | $16,905.82[8] |
| Medical care expenses that, in reasonable probability, Ms. Solis will incur in the future. | $462,044.10[9] |

---

[8] *See* Dkt 576¶ 21(a).

[9] *See* Dkt 576¶ 21(b). Ms. Solis admitted that a wheelchair recommended by Dr. Gonzales would not be related to the shoulder injury she sustained in the shooting. *See* PEX 14045 at 42 and Trial Tr. 1264:10-16. Likewise, the MRI scan of her cervical spine and lumbar spine would not be related to the injuries sustained in the shooting. *See* PEX 14045 at 35 and Trial Tr. 1264:22-1266:4.

1.2. **Rosanne's damages arising from Mr. Ramirez**

| Element | Amount |
| --- | --- |
| Loss of household services sustained in the past | $0[10] |
| Loss of household services that, in reasonable probability, Ms. Solis will sustain in the future. | $0[11] |
| Loss of consortium sustained in the past | $0[12] |
| Loss of consortium that, in reasonable probability, Ms. Solis will sustain in the future | $0[13] |

---

[10] Ms. Solis and Mr. Ramirez were not married at the time of the shooting. During trial Ms. Solis admitted that prior to testifying in court she referred to Mr. Ramirez as her boyfriend.  Trial Tr. 1256:17-18, 1258:2-16. She now considers him her husband because "she's been with him for such a long time." *Id*. Although Ms. Solis and Mr. Ramirez are "going to get married" they were not married at the time of the shooting. *See* Trial Tr. 1259:4-6. Mr. Ramirez is also listed as Ms. Solis' "boyfriend" in medical records. *See* PEX 14030-00063 and PEX 14044-00006.

[11] *See* Note 10.

[12] *See* Note 10.

[13] *See* Note 10.

2. **Joaquin Ramirez**[14]

2.1. **Individual Injury**

| Element | Amount |
|---|---|
| Physical pain and mental anguish sustained in the past. | $30,000[15] |
| Physical pain and mental anguish that, in reasonable probability, Mr. Ramirez will sustain in the future. | $20,000 |
| Loss of earning capacity sustained in the past. | Not Claimed |
| Loss of earning capacity that, in reasonable probability, Mr. Ramirez will sustain in the future. | Not Claimed |
| Disfigurement sustained in the past. | $2,500[16] |

---

[14] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Joaquin Ramirez in the amount of $133,178.00. That award recommendation is broken down into $60,000 for total non-economic damages and $73,178.00 in economic damages. *See* Memorandum and Dkt 576¶ 20.

[15] Mr. Ramirez sustained shrapnel wounds to his left tibia, fibula and ankle. PEX 14009-00007-00008. There was no fracture, but rather "small superficially located shrapnel fragments." *Id*. He was treated at the Connally Memorial Medical Center and left the hospital for home two hours later. *Id*. at 00014. By November 13, 2017, his wounds were healing although he did have "mild swelling" in his left ankle. PEX 14013-00008. He was prescribed a topical ointment, an antibiotic and ibuprofen. *See Id*. at 00008-00009. He was also given crutches to assist with ambulation. *Id*. at 00014. On December 28, 2017, Mr. Ramirez was prescribed three units of therapeutic exercises, electric stimulation therapy and hot and cold pack therapy. PEX 14010-00006-00007. Mr. Ramirez's last appointment concerning his shrapnel wound was August 20, 2018 and there are no indication Mr. Ramirez sought treatment following this visit. PEX 14010-00028. Mr. Ramirez was able to escape the church at some point after Devin Kelley entered the church. *See* GEX 282 37:17-18. Mr. Ramirez did report mental health symptoms following the shooting and was diagnosed with PTSD. *See* PEX 14013-00005 and GEX 561 at 10.

[16] Photographs of Mr. Ramirez's injury, taken at an unspecified time, indicate that any disfigurement following the shooting was minor. *See* PEX 14000-00001.
.

| | |
|---|---|
| Disfigurement that, in reasonable probability, Mr. Ramirez will sustain in the future. | $2,500[17] |
| Physical impairment sustained in the past | $2,500[18] |
| Physical impairment that, in reasonable probability, Mr. Ramirez will sustain in the future. | $2,500[19] |
| Medical care expenses incurred in the past. | $2,893.04 |
| Medical care expenses that, in reasonable probability, Mr. Ramirez will incur in the future. | $70,284.96 |

---

[17] Photographs of Mr. Ramirez's ankle taken by Dr. Gonzales on October 10, 2019 indicate any disfigurement in mild. *See* PEX 14022-00047. Dr. Canter has agreed that with Dr. Gonzales' recommendation that Mr. Ramirez may need to consult with a plastic surgeon. *See* GEX 560 at 13.

[18] Mr. Ramirez was on crutches for some period of time but any treatment for his leg ended in August 2018. *See* Note 15.

[19] It is difficult to assess Mr. Ramirez's level of impairment because his counsel objected to any questions concerning Mr. Ramirez's ability to work following the shooting. See GEX 282 16:13-17, 19:10-20:21. However, Dr. Canter does afford Mr. Ramirez future services that indicate future impairment. *See* GEX 560.

## 2.2. **Joaquin's damages arising from Ms. Solis**

| Element | Amount |
| --- | --- |
| Loss of household services sustained in the past | $0[20] |
| Loss of household services that, in reasonable probability, Mr. Ramirez will sustain in the future. | $0[21] |
| Loss of consortium sustained in the past | $0[22] |
| Loss of consortium that, in reasonable probability, Mr. Ramirez will sustain in the future | $0[23] |

---

[20] Ms. Solis and Mr. Ramirez were not married at the time of the shooting. When asked at his deposition if he was married, Mr. Ramirez answered "No." GEX 282:21:3-5. Mr. Ramirez's counsel objected to further questions concerning Mr. Ramirez's relationship. *See Id*. at 6-22. Mr. Ramirez at some point referred to Ms. Solis as his wife but when asked why he referred to her as his wife, Mr. Ramirez stated "because I've known her for a long time, I have trusted her a lot and she's a sincere person." GEX 282 at 22:6-15.

[21] *See* Note 22 and 10.

[22] *See* Note 22 and 10.

[23] *See* Note 22 and 10.

**Vidal Family**

1. **Margarette Vidal, individually**[1]

| Element | Amount |
|---|---|
| Physical pain and mental anguish sustained in the past. | $30,000.00[2] |
| Physical pain and mental anguish that, in reasonable probability, Ms. Vidal will sustain in the future. | $20,000.00[3] |
| Loss of earning capacity sustained in the past. | Not Claimed |
| Loss of earning capacity that, in reasonable probability, Ms. Vidal will sustain in the future. | Not Claimed |
| Disfigurement sustained in the past. | $10,000.00[4] |

---

[1] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Margarette Vidal in the amount of $663,780.24. That award recommendation is broken down into $100,000 for total non-economic damages, $221.680.65 for past medical expenses and $342,099.59 in future medical expenses as a result of the shooting. *See* Memorandum and Dkt 576 ¶ 21.

[2] Ms. Vidal sustained gunshot wounds; one to her lower right leg and one to her back near her kidneys. Trial Tr. 1631:11-17. Ms. Vidal testified she passed out after the first shot. Trial Tr. 1633:5-17. At some point her leg was infected and she required surgery for the infection. Ms. Vidal attended two counseling sessions following the shooting but has not attended any counseling since that time. GEX 618 at 6.

[3] Ms. Vidal was diagnosed with PTSD. GEX-519 at 11. With regard to future mental anguish, there is no evidence that Ms. Vidal has received evidence-based, trauma-focused psychotherapy or any other cognitive behavioral therapy likely to reduce her moderate PTSD; therefore, it reasonably likely that if she were to undergo appropriate psychotherapy, her future mental anguish would be greatly diminished. *See generally* Testimony of Dr. Brian Marx.

[4] Ms. Vidal sustained gunshot wounds as a result of the shooting; one to her lower right leg and one to her back near her kidneys. Trial Tr. 1631:11-17. As of September 2019, the only pain she complained of was pain to her neck and right arm. *See* PEX 16009-00008. This pain was from a preexisting condition. Prior to the shooting, Ms. Vidal was diagnosed with osteopenia in her

| | |
|---|---|
| Disfigurement that, in reasonable probability, Ms. Vidal will sustain in the future. | $10,000.00[5] |
| Physical impairment sustained in the past | $20,000.00[6] |
| Physical impairment that, in reasonable probability, Ms. Vidal will sustain in the future. | $10,000.00[7] |
| Medical care expenses incurred in the past. | $221,680.65[8] |
| Medical care expenses that, in reasonable probability, Ms. Vidal will incur in the future. | $342,099.59[9] |

lumbar spine and left hip, an anterior wedge compression at T12, lumbar spondylosis, and tendonitis, chronic back pain which limited walking, atherosclerosis of the carotid arteries with 50-70% diameter stenosis of the right internal carotid artery, chest pain, and nonrheumatic mitral (valve) insufficiency, among other conditions. *See* GEX 618 p. 5-9. She was in physical therapy for degenerative joint disease and radiculopathy for 18 sessions between August 13, 2017 and November 3, 2017. *Id.*

[5] Ms. Vidal has scarring on her back and leg. Trial Tr. 1641:10-1642:14. The scarring is permanent. *See* PEX 16018-00088.

[6] Prior to the shooting Ms. Vidal required the use of a wheelchair outside of the home. GEX 618. Ms. Vidal also had cardiovascular disease prior to the shooting.

[7] Ms. Vidal can navigate her home with the use of a walker. GEX 618 at 38. As a result of the shooting, Ms. Vidal developed gait and balance deficits GEX 618 at 44, however she can be seen making tortillas in the kitchen at the new Sutherland Springs First Baptist Church, standing for over 20 minutes without assistance. GEX 615. Ms. Vidal sometimes walks to the church, which is 2 blocks away, with the assistance of her walker. GEX 617 p. 39:1-21.

[8] *See* Dkt 576¶ 22(a).

[9] *See* Dkt 576¶ 22(b).

2. **Ramiro Vidal Jr. individually as an adult child of Margarette Vidal**[10]

| Element | Amount |
|---|---|
| Loss of Parental Consortium that was sustained in the past. | $5,000.00[11] |
| Loss of Parental Consortium in reasonable probability will be sustained in the future | $0.00[12] |

---

[10] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Ramiro Vidal Jr. in the amount of $5,000.00 for non-economic damages.

[11] Plaintiff Ramiro Vidal testified that he still sees his mother on a regular basis to include family barbeques and dinners. GEX 284, ppgs.46:15-16; 63:6-25; 64:1-3. Ms. Vidal stated that he visits when he is not working. Trial Tr. 1667:13-15. She did not indicate that this has changed as a result of the shooting. A minor loss of consortium award for the time period during which Ms. Vidal was hospitalized and recovering from her injuries is appropriate.

[12] *See* Note 11.

3. **Robert Vidal individually as an adult child of Margarette Vidal**[13]

| Element | Amount |
| --- | --- |
| Loss of Parental Consortium that was sustained in the past. | $5,000.00[14] |
| Loss of Parental Consortium in reasonable probability will be sustained in the future | $0.00[15] |

---

[13] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Robert Vidal in the amount of $5,000.00 for non-economic damages.

[14] Plaintiff Robert Vidal testified that he is now closer to his mother than he was prior to the shooting. (GEX 285, p.37:7-13). Ms. Vidal stated that he visits when he is not working, she did indicate that this has changed as a result of the shooting. Trial Tr. 1667:12-14. A minor loss of consortium award for the time period during which Ms. Vidal was hospitalized and recovering from her injuries is appropriate.

[15] *See* Note 15.

4. **Monica Shabbir individually as an adult child of Margarette Vidal**[16]

| Element | Amount |
|---|---|
| Loss of Parental Consortium that was sustained in the past. | $5,000.00[17] |
| Loss of Parental Consortium in reasonable probability will be sustained in the future | $0.00[18] |

---

[16] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Monica Shabbir. in the amount of $5,000.00 for non-economic damages.

[17] Plaintiff Monica Shabbir testified that she lives in Seguin, TX—a 35 minute drive from her mother's home. Trial Tr. 1677:2-6. But she testified that she talks to her mother every night—they say good night to each other. Trial Tr. 1695:10-16. Ms. Vidal testified that her daughter comes and visits. Trial Tr. 1667:10-11. Mrs. Shabbir testified that prior to the shooting her mother Ms. Vidal was her best friend and that her mother is still her best friend today.  Trial Tr. 1678:14-15; 1692:2. A minor loss of consortium award for the time period during which Ms. Vidal was hospitalized and recovering from her injuries is appropriate.

[18] *See* Note 17.

### Workman Family

1. **Julie Workman**

   1.1. **Julie Workman's personal injury damages[1]**

| Element | Amount |
| --- | --- |
| Physical pain and mental anguish sustained in the past. | $54,000[2] |
| Physical pain and mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $46,000[3] |
| Loss of earning capacity sustained in the past. | Not Claimed[4] |

---

[1] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Julie Workman in the amount of $100,000.00. That award recommendation is broken down into $100,000 for total non-economic damages and $0 in economic damages. *See* Memorandum.

[2] Mrs. Workman sustained shrapnel injury to her breast tissue resulting in bruising. Mrs. Workman removed some of the shrapnel and the rest worked its way out over time. Mrs. Workman also removed glass shards from her knees with hemostats and alcohol she kept in her purse. Trial Tr. 474:12-475:24. Mrs. Workman saw a muzzle flash and heard the gunshots crippling her healthy son while feet away. Trial Tr. 451:6-25. She suffered a panic attack immediately after the gunman left believing at first Kyle, her other son, had also been seriously injured then realized his immediate location and fate was unknown. Trial Tr. 453:3-12. While rendering nursing care to multiple shot individuals, Mrs. Workman repeatedly witnessed and handled gruesome fatalities and applied tourniquets to catastrophic bleeding. Trial Tr. 455:2-466:10. Mrs. Workman has been diagnosed with PTSD. Her supportive family, husband and church, all suggest that evidence-based, trauma focused psychotherapy is likely to alleviate her symptoms. *See* GEX 661 at 10. Workman testified that one of the ways she dealt with stress is working. It's a distraction for her. In addition, being at work and being in the operating room and doing that job for 35 years that she has been doing it actually helped her. Mrs. Workman was in an environment where she knew that she was in control, able to do what she was called on to do and was able to care for other people. Trial Tr. 486:6-12.

[3] Mrs. Workman sustained superficial injuries because of the shooting and remaining shrapnel worked its way out over time. Trial Tr. 474:12-475:24.

| | |
|---|---|
| Loss of earning capacity that, in reasonable probability, Plaintiff will sustain in the future. | Not Claimed[5] |
| Disfigurement sustained in the past. | Not Claimed |
| Disfigurement that, in reasonable probability, Plaintiff will sustain in the future. | Not Claimed |
| Physical impairment sustained in the past | Not Claimed[6] |
| Physical impairment that, in reasonable probability, Plaintiff will sustain in the future. | Not Claimed[7] |
| Medical care expenses incurred in the past. | Not Claimed[8] |
| Medical care expenses that, in reasonable probability, Plaintiff will incur in the future. | Not Claimed[9] |

---

[6] Plaintiffs presented no evidence concerning physical impairment for Mrs. Workman.  Mrs. Workman took only one week off before going back to work. Trial Tr. 486:13-14.

[7] *See* Note 6.

[8] Plaintiffs presented no evidence concerning medical care for Mrs. Workman.

[9] *See* Note 8.

2. **Kip Workman**

2.1. **Kip Workman's damages for injury to Julie Workman[10]**

| Element | Amount |
| --- | --- |
| Loss of household services sustained in the past | $0[11] |
| Loss of household services that, in reasonable probability, Mr. Workman will sustain in the future. | $0[12] |
| Loss of consortium sustained in the past | $10,000[13] |
| Loss of consortium that, in reasonable probability, Mr. Workman will sustain in the future | $15,000[14] |

---

[10] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Kip Workman in the amount of $25,000. That award recommendation is broken down into $25,000 for total non-economic damages and $0 in economic damages. *See* Memorandum.

[11] Mrs. Workman's cared for her injuries to her breast and knees shortly after the shooting. Trial Tr. 474:12-475:24.

[12] *See* Note 11.

[13] *See* Note 2. There was a diminished interest in marital intimacy after the shooting. Trial Tr. 531:25-532:7 (4 month gap in intimate relations).  Mr. Workman testified he loves his wife tremendously Trial Tr. 549:14-16. In their 30-year relationship, they have been through births, death, good months, bad months and all sorts of things during their decades of relationship. Trial Tr. 549:17-25. He agreed that he probably said 'yes' that he would be married to Mrs. Workman the remainder of his life when he was deposed. Trial Tr. 550:1015. Mr. Workman has a strong family. Trial Tr. 540:24-25.

[14] *See* Note 3. In trial testimony, Mr. Workman testified to engaging in less intimacy than prior to the shooting. Trial Tr. 533:2-10

3. **Kyle Workman & Morgan Harris**

3.1. **Kyle Workman's personal injury damages**[15]

| Element | Amount |
| --- | --- |
| Physical pain and mental anguish sustained in the past. | $15,000[16] |
| Physical pain and mental anguish that, in reasonable probability, Plaintiff will sustain in the future. | $35,000[17] |
| Loss of earning capacity sustained in the past. | Not Claimed[18] |

---

[15] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Kyle Workman in the amount of $50,000.00. That award recommendation is broken down into $50,000 for total non-economic damages and $0 in economic damages. *See* Memorandum.

[16] Mr. Workman was present during part of the shooting but escaped by running out the back doors. Trial Tr. 596:3. Kyle Workman was not married to Morgan Harris before the shooting. Trial Tr.586:15-21. However, despite the shooting's occurrence, he married her roughly two months later on January 11, 2018. Trial Tr. 582:11-15:609:16-18. Shortly after the shooting, Mr. Workman saw Joe Ward, an HEB counselor, two to three times. Some time later, he saw Terry Davis at the Ecumenical Center, but testified he had stopped going to that counseling about 4 to 5 month prior to trial because of a job promotion. Trial Tr. 603:7-12. Mr. Workman thinks he received therapy with Terry Davis probably six to seven months continuously. Trial Tr. 603:7-12. When Mr. Workman left HEB's bakery job, he got a better job that was during the normal weekdays, Monday through Friday and he felt safer; he has been employed in that job for close to a year at the time of trial. Trial Tr.604:17-605:1. Since starting his new job at Gibson's Plumbing, he has received a promotion with more job responsibilities where he marks up builder's specification sheets to indicate where plumbing will be installed. Trial Tr. 611:9-612:10. Kyle routinely, therefore, socializes with his brother, has sought out and obtained a new job with normal work week hours and increased his salary by a promotion. He routinely gets together with family and goes out to eat after attending church on Sundays. Trial Tr. 614:20-615:3, 616:16-20. His testimony presents an active young man who is engaged in life.

[17] Mr. Workman was diagnosed with PTSD. GEX 688 at 8. Mr. Workman avoids processing the trauma but would benefit from evidence based, trauma-focused psychotherapy. *Id*.

[18] Plaintiffs presented no evidence concerning loss of past earning capacity for Mr. Workman.

| | |
|---|---|
| Loss of earning capacity that, in reasonable probability, Plaintiff will sustain in the future. | Not Claimed[19] |
| Disfigurement sustained in the past. | Not Claimed[20] |
| Disfigurement that, in reasonable probability, Plaintiff will sustain in the future. | Not Claimed[21] |
| Physical impairment sustained in the past | Not Claimed[22] |
| Physical impairment that, in reasonable probability, Plaintiff will sustain in the future. | Not Claimed[23] |
| Medical care expenses incurred in the past. | Not Claimed[24] |
| Medical care expenses that, in reasonable probability, Plaintiff will incur in the future. | Not Claimed[25] |

---

[19] Plaintiffs presented no evidence concerning loss of past earning capacity for Mr. Workman.

[20] Plaintiffs presented no evidence concerning disfigurement for Mr. Workman.

[21] *See* Note 20.

[22] Plaintiffs presented no evidence concerning physical impairment for Mr. Workman.

[23] *See* Note 22.

[24] Plaintiffs presented no evidence of medical expenses for Mr. Workman.

[25] *See* Note 24.

### 3.2. **Kyle Workman's damages for injury to Julie Workman**[26]

| Element | Amount |
| --- | --- |
| Loss of Parental Consortium that was sustained in the past. | Not Claimed[27] |
| Loss of Parental Consortium in reasonable probability will be sustained in the future | Not Claimed[28] |

---

[26] Mrs. Workman sustained superficial injuries because of the shooting and remaining shrapnel worked its way out over time. Trial Tr. 474:12-475:24.

[27] Plaintiffs presented no evidence of loss of consortium.

[28] *See* Note 27.

### 3.3. **Morgan Harris' personal injury damages**[29]

| Element | Amount |
| --- | --- |
| Physical pain and mental anguish sustained in the past. | $65,000[30] |
| Physical pain and mental anguish that, in reasonable probability, Plaintiff will sustain in the future. | $25,000[31] |
| Loss of earning capacity sustained in the past. | $0[32] |
| Loss of earning capacity that, in reasonable probability, Plaintiff will sustain in the future. | $0[33] |
| Disfigurement sustained in the past. | $5,000 |
| Disfigurement that, in reasonable probability, Plaintiff will sustain in the future. | $20,000 |

---

[29] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Morgan Harris in the amount of $760,268.19. That award recommendation is broken down into $125,000 for total non-economic damages and $635,268.19 in economic damages. *See* Memorandum and Dkt. 576 ¶ 11.

[30] Ms. Harris sustained mild injuries as a result of the shooting. However, Ms. Harris was told on multiple occasions by her treating doctors that she had experienced lead toxicity and that she should not become pregnant. Trial Tr. 677:15-19. Ms. Harris was diagnosed with pre-existing hydrocephalus, Arnold Chiari Malformation Type I, and syringomyelia. Trial Tr. 3121:8-11. Ms. Harris does not have lead toxicity but lives with the concern of possible harm to a fetus.

[31]. Ms. Harris has received counseling and talk therapy sessions but has not received appropriate, evidence-based, trauma-focused psychotherapy. GEX 724

[32] Ms. Harris remains unable to return to full time employment because she becomes fatigued and requires flexibility to attend medical appointments. Trial Tr. 687:14-25.

[33] Ms. Harris took a job as a part time paid intern with Mailgun Technologies in August of 2018 at $15/hr. Trial Tr. 684:7-685:12.

| | |
|---|---|
| Physical impairment sustained in the past | $5,000[34] |
| Physical impairment that, in reasonable probability, Plaintiff will sustain in the future. | $5,000 |
| Medical care expenses incurred in the past. | $15,394.10 |
| Medical care expenses that, in reasonable probability, Plaintiff will incur in the future. | $619,587.61[35] |

---

[34] Ms. Harris has abrasions on her chest and retained shrapnel near her eyebrow, cheekbone and on her lower legs while some of the shrapnel has made its way out over time. Trial Tr. 659:21-660:13.  Plaintiffs provided no credible proof the from a toxicologist that physical or neurological conditions complained of by Ms. Harris were causally linked to lead levels.  However, the United States presented Dr. Michael Kosnett, a well-published toxicologist, to explain the dose-response relationship; how the blood lead levels complained of that were actually measured would not cause any overt clinical symptoms from either Ms. Harris or David Colbath; and, alternative plausible medical explanation to explain their complaints. Trial Tr. 2919:25-3105:13. Dr. Bogaev, a Board-Certified Neurosurgeon, explained how the enlarged ventricles on imaging studies showed hydrocephalus and Arnold Chiari malformation, which would help monitor and further clarify her neurological sequalae.  Elevated intracranial pressure were also shown at the time of the spinal tap ordered to withdraw a sample of  spinal fluid for testing, which when tapped showed an elevated and abnormal spinal tap pressure. Dr. Bogaev believed Ms. Harris needed neurosurgical intervention by the introduction of a ventriculoperitoneal shunt or, alternatively to be carefully monitored with serial imaging studies of her head and neck region because of the overall enlarged ventricles and symptomatic Arnold Chiari malformation.  GEX 716, Transcript of Dr. Christopher Bogaev, consulting neurosurgeon on Morgan Harris. Dr. Becker explained alternative reasonable medical explanations for the conditions complained of by Ms. Harris. GEX 717, Dr. Becker's – Feb.3, 2021 Expert Report; GEX 718, Dr. Becker's Expert Report May 4, 2021 and Dr. Becker's Trial Tr. 3106:17-3171:8.

[35] *See* Dkt. 576 ¶ 11(b).

4. **Kris & Colbey Workman**

4.1. **Kris Workman's personal injury damages[36]**

| Element | Amount |
|---|---|
| Physical pain and mental anguish sustained in the past. | $150,000[37] |
| Physical pain and mental anguish that, in reasonable probability, Plaintiff will sustain in the future. | $150,000[38] |

---

[36] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Kris Workman in the amount of $4,419,425.00. That award recommendation is broken down into $1,500,000.000 for total non-economic damages and $2,919,425.00 in economic damages. *See* Memorandum and Dkt 576¶ 23.

[37] Mr. Workman experiences neuropathic pain, which is treated with pregabalin or Lyrica and amitriptyline. Trial Tr. 722:15-21. Mr. Workman reported that certain physical movements aggravate the neuropathic pain: "touching my leg, movement of my legs or vibration of any kind, even when rolling my wheelchair, can greater neuropathic pain." Trial Tr. 722:22-723:2. At a minimum, neuropathic pain, on a scale of 1 to 10, remains a 3 and can become higher at various times. Trial Tr. 723:13-23.

    According to Dr. Scott, Mr. Workman suffers atypical pain below the waist; his constant discomfort feels like a "sunburn" with episodic intense stabbing sensations. The pain intensity can be 7/10 on a pain intensity scale and can last a few seconds, up to two minutes. At times the pain is incapacitating. Mr. Workman's right side is more painful when it occurs. It occurs a few times a day. GEX 680 at 51.

    As to mental anguish, Mr. Workman tried to hide under a front pew but remained exposed to view because of his large frame and height. Trial Tr. 745:1-5. He heard repeated gunfire and heard screaming of people being shot. Trial Tr.745:22-746:7, 746:19-747:8. He was shot at point-blank range with a long barrel gun. Mr. Workman was shot a second time with a sidearm in his flank. Trial Tr. 747:9-748:10. He remained conscious the entire time and remained so until taken by ambulance to the hospital.

    At the hospital he was sedated and surgical intervention ensued. Trial Tr. 748:12-751:24. Mr. Workman underwent two separate surgeries: exploratory surgeries of his abdominal cavity and an intestinal surgical repair. Trial Tr. 752:2-22. Initially, he received acute hospital care at Brooke Army Medical Center (BAMC) from November 5, 2017 to November 22, 2017. GEX 680 at 4-5. Mr. Workman was transferred to University Health System Reeves Rehabilitation Center from November 22, 2017 to December 11, 2017. GEX 680 at 5.

[38] *See* Note 37.

| | |
|---|---|
| Loss of earning capacity sustained in the past. | $0[39] |
| Loss of earning capacity that, in reasonable probability, Plaintiff will sustain in the future. | $115,620[40] |
| Disfigurement sustained in the past. | $50,000[41] |
| Disfigurement that, in reasonable probability, Plaintiff will sustain in the future. | $50,000[42] |
| Physical impairment sustained in the past | $100,000[43] |

[39]  Plaintiffs presented no evidence concerning loss of past earning capacity for Mr. Workman.

[40]  After the shooting, Mr. Workman returned to his pre-shooting employer, Rackspace. At some point, he left Rackspace and acquired a new management information technology job at Mailgun. He currently supervises approximately 15 employees. Trial Tr. 738:17-22. The company has ADA-compliant space that Mr. Workman accesses when he needs to report physically to work. Trial Tr. 739:19-740:3. Mr. Workman believes that the new position "was an opportunity that I think fit me well and my skills." Trial Tr. 740:4-10. His new salary at Mailgun is around $70,000 per year. It is more than what he made at Rackspace. It is level with his peers in the industry. Trial Tr. 740:11-19. The United States stipulated to future loss of earning/loss of earning capacity in the amount of $115,620.00. Dkt 576 ¶ 23(c).

[41]  *See* Note 37, *infra* Note 43.

[42]  *See* Note 37, *infra* Note 43.

[43]  *See* Note 37. Additionally, Mr. Workman testified he has largely lost sensation and control from his hips down. Trial Tr. 723:3-6. He must self-catheterize to empty his bladder four to five times day. It takes 10 to 15 minutes each time. Trial Tr. 726:17-727:24. *See also* GEX 680 at 51. He must manually evacuate his bowels with sterile gloves two times a day on a schedule, depending on diet. Trial Tr. 727:25-728:10. Mr. Workman performs these tasks independently. He remains at risk for urinary tract infection because of daily self-catheterization. Trial Tr. 730:10-23. These incapacities requiring self-catheterization and bowel evacuation are permanent in nature. Trial Tr.732:10-13. Mr. Workman has a spinal cord injury formally rated L2 ASIA-B level. He has retained limited hip movement capability; functionally insensate skin below dermatome-including perirectal region as explained in the November 2, 2020 expert report after evaluation. GEX 680 at 51. Mr. Workman has suffered paralysis requiring wheelchair use-he retains some ability to flex both hips. He can stand with lower extremity bracing and support. GEX 680 at 51. Because of paralysis, Mr. Workman suffers infrequent spasticity, but none that is functionally disabling. GEX 680 at 51. Mr. Workman at time of his examination with Dr. Scott

| | |
|---|---|
| Physical impairment that, in reasonable probability, Plaintiff will sustain in the future. | $1,000,000[44] |
| Medical care expenses incurred in the past. | $49,027[45] |
| Medical care expenses that, in reasonable probability, Plaintiff will incur in the future. | $2,754,778[46] |

participated in therapy twice/week for general strengthening/mobility work. Mr. Workman drives adapted vehicles with hand controls including a modified van, a utility vehicle on his property and a go-kart. GEX 680 at 51. Mr. Workman explained the intimate relationship with his wife has suffered as a result of the shooting. He can still be intimate with his spouse with assistive means. Trial Tr .765:15-22. However, his genitalia provide no sensation and no longer provide the sexual satisfaction previously enjoyed. Trial Tr. 765:23-766:8.

[44] *See* Notes 37, 42.

[45] See Dkt. 576 ¶ 23

[46] Mr. Workman now has been diagnosed with L2 Paraplegia, ASIA B with lower neurogenic bowel and bladder. The United States stipulated to future healthcare expenses for outpatient physician services, therapeutic services, home health and household services, medications, diagnostic studies, supplies and equipment replacement in the amount of $2,754,778.00. Dkt. 576 ¶ 23.

### 4.2. **Kris Workman's individual damages for injury Julie Workman**

| Element | Amount |
| --- | --- |
| Loss of Parental Consortium that was sustained in the past. | Not Claimed[47] |
| Loss of Parental Consortium in reasonable probability will be sustained in the future | Not Claimed[48] |

---

[47] Mrs. Julie Workman testified that she has adjusted her work schedule to make sure that her son Kris is okay, that he has what he needs, and that his daughter is taken care of. Trial Tr. 480:9-15. She helps him by caring for the yard, the house, and most daily activities of living to make sure that he has the best in their "new normal." *Id*. at 480:16-18. Mrs. Workman traded in her Expedition for a car that Mr. Workman could get into and that would carry a wheelchair so that she could take him to doctors' appointments and physical therapy. *Id.* at 481:10-17. They tried to do a family vacation at the coast, but it was very difficult. *Id*. at 495:25-496:1. At the coast, there is hardly anything for anybody in a wheelchair. *Id*. at 496:2-3. Mrs. Workman and Mr. Workman were mad at each other, because when they went down to the beach, Mr. Workman stayed in the truck to avoid getting sand in his wheelchair. *Id.* at 496:4-7. They also cannot go skiing anymore, so they just do not even try to plan things anymore. *Id*. at 496:15-22.

Mrs. Colbey Workman testified that her husband is very close to his parents and that they spend a lot of time together. PEX 908 at 62. They all live close to each other in La Vernia, Texas. *Id*. Ms. Julie Workman sometimes helps take care of Mr. Workman's daughter, and their daughter sometimes spends the night at Ms. Julie Workman's house on the weekends. *Id*. Before the shooting, Kris and Colbey Workman went on a winter vacation to Colorado together with Julie and Kip Workman. *Id*. at 27.

[48] *See* Note 29.

### 4.3. **Colbey Workman's damages for injury to Kris Workman**[49]

| Element | Amount |
|---|---|
| Loss of household services sustained in the past | $25,000.00[50] |
| Loss of household services that, in reasonable probability, Mrs. Workman will sustain in the future. | $50,000.00[51] |
| Loss of consortium sustained in the past | $25,000.00[52] |
| Loss of consortium that, in reasonable probability, Mrs. Workman will sustain in the future | $150,000.00[53] |

[49] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Colbey Workman in the amount of $250,000.00. That award recommendation is broken down into $250,000 for total non-economic damages and $0 in economic damages. *See* Memorandum.

[50] Mr. Workman used to feed and take care of 20 head of cattle, which he can no longer do. PEX 908 at 30-32. He would mend broken fences, which he can no longer do because of his injuries. *Id*. If their home had improvements to make it more accessible, he could likely be more independent around the house, like with cooking, for example. *Id*. at 70-71.

[51] *See* Note 50.

[52] Before the shooting, Mr. and Mrs. Workman would go skiing together, which he can no longer do because of his injuries. PEX 908 at 27-28. The couple lives in a single-wide manufactured home that is too small for Mr. Workman to maneuver himself into certain spaces, including his daughter's room. *Id*. at 29-30. Mr. Workman has lost control of his bladder and bowels, which he may never regain. *Id*. at 37. Mrs. Workman had to assist him with catheters and bowel evacuations until he was able to do it himself. *Id*. at 38-9.

[53] Mr. Workman can no longer achieve an erection or ejaculate, which prevents them from being able to have sex. PEX 908 at 39-40. This makes Mrs. Workman feel hopeless, like they will never be as close as they were before the shooting. *Id*. The couple wants more children, but they will likely have to do invitro fertilization or adoption due to Mr. Workman's impairments. *Id*., at 40-41. Mrs. Workman is anxious because Mr. Workman no longer engages himself as much in things that he enjoys. *Id*. at 46. The couple does not communicate as well as they used to because the pain makes Mr. Workman impatient and tired. *Id*. Mrs. Workman is anxious that he will not improve. *Id*. Mrs. Workman did feel that the shooting brought the family closer together at first while they worked together to deal with the aftermath, but now that has changed. *Id*. at 60.

### 4.4. __Kris Workman and Colbey Workman on behalf of E.W., a minor, for her damages arising out of injuries to Kris Workman__[54]

| Element | Amount |
| --- | --- |
| Loss of Parental Consortium that was sustained in the past. | $45,000[55] |
| Loss of Parental Consortium in reasonable probability will be sustained in the future | $130,000[56] |

---

[54] For the reasons articulated herein, the United States recommends the Court make a total award to on behalf of E.W. in the amount of $175,000.00. That award recommendation is broken down into $175,000 for total non-economic damages and $0 in economic damages. *See* Memorandum.

[55] *See* Note 38, 43. E.W. does not like to tell her father things about her life, because she feels like he will not want to hear them. PEX 00908 at54. A lot of times when she has tried to share things with him, he is either asleep, in pain, on the toilet, or busy with work, which makes her feel that way. *Id*. His bowel evacuation, for example, once per day can take close to six hours, plus twenty minutes to do a catheter. *Id*. at 55.

[56] *See* Note 55.

## Braden Family

1. **Deborah Braden**[1]

   1.1. **Deborah Braden's individual damages for personal injury**

   | Element | Amount |
   | --- | --- |
   | Physical pain and mental anguish sustained in the past. | $75,000[2] |

---

[1] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Deborah Braden in the amount of $796,811.59. That award recommendation is broken down into $100,000 in individual non-economic damages for the loss of consortium arising out of the death of her spouse, $125,000 in individual non-economic damages for her personal injuries, $250,000 in non-economic damages as the representative of her husband's estate, $60,046.00 in economic damages arising out of her lost inheritance from her husband's estate, and $261,765.59 in individual economic damages for her own past and future medical expenses. *See* Memorandum and Dkt 576 ¶ 8.

[2] Mrs. Braden testified that she was in daily pain from the shooting. *See generally* Trial Tr. 1478-1482. However, Dr. Sridhar Vasireddy's deposition transcript contradicts the severity of her pain discussing the success she has had with regular pain treatment. GEX 273. She consistently reported her pain to Dr. Vasireddy as a "5 out of 10" over the course of months of treatment. *Id*. at 55:6-10. Dr. Vasireddy testified at his deposition that "with the help of my treatments, I think she is definitely getting back to a point when pain is not an overbearing thing for her." *Id*. at 44:13-15. He also testified that Mrs. Braden has made "significant improvement." *Id*. at 51:1-3. And that she was "thanking [him] very profusely for making her feel better." *Id*. at 51:10-13. He continued, "[the treatment] basically alleviated the pain so that she could get back to her normal day-to-day activities…so to that extent we have succeeded quite a bit. She is pretty happy." *Id*. at 57:13-18. She also has traveled to Alaska on a mission trip since the shooting. PEX 3052-0007, 00011, 00018, 00023; PEX 3079-00047. With regard to her mental anguish, Mrs. Braden scored a 26 on her CAPS assessment which falls in the "moderate" range. Trial Tr. 3474:6-12. Plaintiffs' submission is based on their flawed determination that the Charleston settlement provides "precedential" value in this case *and* then adds an additional steady award of damages for the rest of Mrs. Braden's life expectancy. Dkt 578 at 26. This particular citation highlights the problem with Plaintiffs' use of the Charleston settlement for any purpose. Plaintiffs have no knowledge of any kind regarding what injuries, damages, or categories which this Charleston settlement was intended to address under South Carolina law. They do not compare any of the Charleston plaintiffs with Mrs. Braden. There is no evidence before this Court which would compare and contrast a given Charleston plaintiff to Mrs. Braden with regard to her injuries, her experience during the shooting, her recovery post-shooting, her potential for long term psychological and physical recovery, the impact on her family, and/or any other factors which should be considered by this Court when arriving at an appropriate compensatory award. Furthermore, this framework disregards specific testimony in the record regarding Mrs. Braden's ongoing recovery and potential for additional recovery as time progresses. *See, e.g,* Notes 3 and 5.

| | |
|---|---|
| Physical pain and mental anguish that, in reasonable probability, Plaintiff will sustain in the future. | $25,000[3] |
| Loss of earning capacity sustained in the past. | Not Claimed |
| Loss of earning capacity that, in reasonable probability, Plaintiff will sustain in the future. | Not Claimed |
| Disfigurement sustained in the past. | $5,000[4] |
| Disfigurement that, in reasonable probability, Plaintiff will sustain in the future. | $10,000[5] |
| Physical impairment sustained in the past | $10,000[6] |

---

[3] Mrs. Braden has not seen Dr. Vasireddy since July 2020. GEX 273 at 29:11-23. As noted above, when asked what her long-term pain prognosis is, Dr. Vasireddy testified, "[S]he is definitely getting back to a point when pain is not an overbearing thing for her." *Id*. at 32:21-24. With regard to future mental anguish, there is no evidence that Mrs. Braden has received evidence-based, trauma-focused psychotherapy or any other cognitive behavioral therapy likely to reduce her moderate PTSD; therefore, it reasonably likely that if she were to undergo appropriate psychotherapy, her future mental anguish would be greatly diminished. *See generally* Testimony of Dr. Brian Marx. She also testified that she tries to maintain a positive outlook and find things that make her happy. Trial Tr. 1511:2-9.

[4] Ms. Braden sustained several scars that are "ugly", but she is having injections to treat them. Trial Tr. 1475:12-25. Plaintiffs' submission requests $3,000 annually for her scarring. Dkt 578 at 28. It does not provide any basis for why she will need this large an award for scarring, nor does it address her injections to treat them. Her trial testimony indicated that the only scar that "people see" is her arm scar for which she is receiving the injections. Trial Tr. 1475:14-23.

[5] In spite of her treatment injections, there is no evidence before the Court that her scars will dissipate entirely. Mrs. Braden has 24 residual years of life expectancy. GEX 408 at 30.

[6] Mrs. Braden testified that her primary sources of physical impairment arise out of her sciatic pain and numbness in her feet and legs. Trial Tr. 1478:10-20. However, as noted above, her pain doctor, Dr. Vasireddy, testified that her "[treatment] basically alleviated the pain so that she could get back to her normal day-to-day activities…so to that extent we have succeeded quite a bit. She is pretty happy." GEX 273 at 57:13-18. Plaintiffs' submission is based on a steady $13,500 annually. Dkt 578 at 28. Specifically, they argue that Mrs. Braden has a "[d]ecreased physical function affecting a loss of vocational capacities or opportunities; (2) Decreased ability to participate in social

| | |
|---|---|
| Physical impairment that, in reasonable probability, Plaintiff will sustain in the future. | $0[7] |
| Medical care expenses incurred in the past. | $46,770.58[8] |
| Medical care expenses that, in reasonable probability, Plaintiff will incur in the future. | $214,995.01[9] |

avocational activities, i.e. participation in activities with others e.g. participation in sports, participation in community activities, etc.; (3) Decreased external mobility e.g. community ambulation, etc.; (4) Decreased ability to perform household services e.g. inside housework, etc.; (5) Decreased ability to participate in personal avocational activities e.g. personal hobbies, pastimes, interests, etc. PEX-3084-39. Plaintiff has 24.7 number of years left in her life and will suffer from these impairments for the remainder of her life. Plaintiff is no longer able to complete household tasks, sleep, hold children, or go to the gym, along with other limitations. Dmg. Trial Tr. 1479 (D. Braden)." *Id*. This submission ignores (1) she retired years ago due to cancer (Trial Tr. 1501:5-8); (2) she has since traveled to Alaska as part of a mission trip (*see* note 7 below); (3) same; (4) Dr. Vasireddy's testimony that he had "basically alleviated the pain so that she could get back to her normal day-to-day activities" (*see* Note 2 above); (6) her testimony that she is still able to play with her family and her grandchildren, albeit with difficult standing up afterwards (Trial Tr. 1479:15-21).

[7] She testified that she is able to do all of the things she needs to do around the home. Trial Tr. 1504:17-22. She has also traveled outside the continental United States. PEX 3052-0007, 00011, 00018, 00023; PEX 3079-00047

[8] Dkt 576 ¶ 8(a).

[9] Dkt 576 ¶ 8(b); GEX 408, Life Care Plan of Dr. Jennifer Canter.

### 1.2. **Deborah Braden's individual damages for the death of Keith Braden**[10]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | $0[11] |
| Pecuniary loss that, in reasonable probability, will be sustained in the future. | $0[12] |
| Loss of companionship and society sustained in the past. | $25,000[13] |
| Loss of companionship and society that, in reasonable probability, will be sustained in the future. | $25,000[14] |
| Mental anguish sustained in the past | $25,000[15] |
| Mental anguish that, in reasonable probability, will be sustained in the future. | $25,000[16] |

---

[10] Mrs. Braden's baseline total non-economic damages for the loss of a spouse are reasonably calculated at $100,000. *See* Memorandum. Plaintiffs did not produce any evidence regarding Mrs. Braden to meaningfully deviate from this baseline.

[11] Plaintiffs produced no evidence that Mrs. Braden suffered pecuniary damages as a result of her husband's death except for the loss of inheritance noted herein. The law requires that pecuniary losses cannot be merely emotional damages, they must reflect an identifiable monetary value. *See* Memorandum. The discrepancy between the parties' numbers can be found in the expert reports. *Compare* GEX 413 *with* PEX 3101. The government categorized the lost income to the estate as lost inheritance to Mrs. Braden. *See* Note 17.

[12] *See* Note 11.

[13] *See* Note 10.

[14] *See* Note 10.

[15] *See* Note 10.

[16] *See* Note 10.

| | |
|---|---|
| Loss of inheritance | $60,046.00[17] |

---

[17] Dkt 576 ¶ 27; GEX 413, Report of Dr. Samuel Lundstrom

### 1.3. **Deborah Braden's damages on behalf of the Estate of Keith Braden**

| Element | Amount |
| --- | --- |
| Pain and Mental anguish | $250,000.00[18] |
| Medical Expenses | Not Claimed |
| Funeral & burial expenses | Not Claimed |

---

[18] The United States recommends that the Court make a total award to the Estate of Keith Braden in the amount of $250,000, for his pain and mental anguish prior to his death. *See* Memorandum. Plaintiffs' submission is predicated on the Charleston settlement. For the reasons described elsewhere in this filing, the Charleston settlement numbers are immaterial for the purpose of awarding compensatory damages to these Plaintiffs. *See, e.g.* Memorandum and Note 2.

2. **Rebecca Metcalf**[19]

2.1. **Rebecca Metcalf's individual damages for injury to Deborah Braden**

| Element | Amount |
|---|---|
| Loss of Parental Consortium that was sustained in the past. | $10,000.00[20] |
| Loss of Parental Consortium in reasonable probability will be sustained in the future | $0[21] |

---

[19] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Rebecca Metcalf in the amount of $60,000. That award recommendation is broken down into $50,000 in non-economic damages for the loss of consortium arising out of the death of her adoptive father and $10,000 in non-economic damages for the loss of consortium with her mother who survived.

[20] Mrs. Metcalf's mother survived and remains available to provide the same level of consortium that she did before the shooting. *See* GEX 273 at 57:13-18 ("[Her treatment] basically alleviated the pain so that [Mrs. Braden] could get back to her normal day-to-day activities…so to that extent we have succeeded quite a bit. She is pretty happy."); Trial Tr. 1479:15-21 ("I like to sit on the floor with the kids and be with them. It's really hard to get up. They laugh at me because I have to roll to get up -- roll over to get up. And so they laugh about that. They think it's funny. So we play humor where we can get it, you know."). A minimal award for the past loss of consortium while Mrs. Braden was recovering from her injuries is appropriate. Plaintiffs argue that Mrs. Metcalf is entitled to this award based on Mrs. Braden's inability to provide childcare and to provide parental guidance. Dkt 578 at 12, 112. This claim ignores Mrs. Braden statements that she *does* provide childcare to her grandchildren. Trial Tr. 1479:15-21. Further, Mrs. Metcalf is in her 30s with a family of her own. Plaintiffs' requested loss of consortium award for an adult child based on *injuries* and not the death of a parent is far out of line with relevant precedent. S*ee* Memorandum.

[21] *See* Note 20. Plaintiffs did not produce any evidence that Mrs. Metcalf is reasonably likely to suffer a loss of consortium in the future with regard to her relationship with Mrs. Braden.

## 2.2.  **Rebecca Metcalf's individual damages for the death of Keith Braden**[22]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $20,000.00[23] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $15,000.00[24] |
| Mental anguish sustained in the past. | $10,000.00[25] |

---

[22] Mrs. Metcalf's baseline total non-economic damages as an adult child for the loss of a parent is reasonably calculated at $50,000. *See* Memorandum. Plaintiffs did not produce any evidence regarding Mrs. Metcalf to meaningfully deviate from this baseline.

[23] As an adult, Mrs. Metcalf suffers limited loss of companionship and society as a result of her father's death. The evidence produced at trial shows that Mrs. Metcalf had an ordinary relationship with her father for an adult of her age and development. GEX 281 at 68:1-72:7. Mrs. Metcalf, who was 36 years old at the time of her father's death, claims this amount, based in part, on her statement that his death strained the family's relationships. Dkt 578 at 18, 143-4. However, there is credible evidence that Mrs. Metcalf's relationship with her family was under significant strain before the shooting. GEX 218 at 62:23-63:7. Specifically, she did not even attend her brother's wedding because the two were not speaking and she could not recall when the last time she spoke to her sister before the shooting occurred. *Id*. at 61:16-24.

[24] Mrs. Metcalf is an adult with her own family. Mrs. Metcalf is reasonably likely to suffer less from her limited loss of companionship and society as a result of her father's death as time progresses.

[25] Mrs. Metcalf was diagnosed by Dr. Marx with PTSD. GEX 427 at 15. Plaintiffs' amount is predicated on Mrs. Metcalf's PTSD diagnosis. Dkt 578 at 144. It does not, however, discuss any failure on her part to mitigate her damages in not seeking counseling. Further, it fails to address Dr. Marx's unopposed contention that many of these Plaintiffs, including Mrs. Metcalf, would succeed with an evidence-based, trauma-focused psychotherapy treatment.

| | |
|---|---|
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $5,000.00[26] |
| Loss of inheritance. | Not Claimed |

---

[26] Mrs. Metcalf has not received any evidence-based, trauma-focused psychotherapy treatment designed to treat her PTSD. GEX 427 at 5. With regard to future mental anguish, it is reasonably likely that if she were to undergo appropriate psychotherapy, her future mental anguish would be greatly diminished. *See generally* Testimony of Dr. Brian Marx. She continues to work as a Paramedic/EMT (GEX 427 at 5) and there is no evidence to support any theory that she is not reasonably likely to succeed in therapy.

3.  **Robert Braden**[27]

3.1.  **Robert Braden's individual personal injury damages**

| Element | Amount |
|---|---|
| Physical pain and mental anguish sustained in the past. | $2,500[28] |
| Physical pain and mental anguish that, in reasonable probability, Plaintiff will sustain in the future. | $0[29] |
| Loss of earning capacity sustained in the past. | Not Claimed |
| Loss of earning capacity that, in reasonable probability, Plaintiff will sustain in the future. | Not Claimed |
| Disfigurement sustained in the past. | Not Claimed |

[27] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Robert Braden in the amount of $47,619.90. That award recommendation is broken down into $35,000 in non-economic damages for the loss of consortium arising out of the death of his father, $10,000 in non-economic damages for the loss of consortium with his mother, and $2,619.90 in economic damages for past medical expenses. Memorandum and Dkt 576 ¶ 7(a). Mr. Braden, despite being in the church, was only grazed by a single object (presumed to be a bullet) causing a small cut to his forehead. PEX 3121. He has also not exhibited any symptoms of mental anguish. GEX 419.

[28] Mr. Braden sustained an abrasion or laceration to his forehead, presumably from a bullet. PEX 3121. It was his only injury. Note, PEX 3128, a medical illustration, grossly exaggerates Mr. Braden's laceration. In his videotaped trial deposition (PEX 907), there is no scar visible and certainly nothing which would have resulted from an injury like the one illustrated in PEX 3128. The Plaintiffs cannot and do not make any connection between Mr. Braden's case and a plaintiff in Charleston. *See* Note 2. Mr. Braden has no valid mental health diagnosis from the DSM-V. *See* Note 46. His physical injuries are limited to a single graze wound. There is no evidence before this Court which would compare and contrast a given Charleston plaintiff to Mr. Braden with regard to his injury, his experience during the shooting, the impact on his family, and/or any other factors which should be considered by this Court when arriving at an appropriate compensatory award.

[29] Mr. Braden does not suffer from any mental health problems. GEX 419; GEX 420; PEX 3127 (Report of Dr. Feltoon); Trial Tr. 3479:7-23.

| | |
|---|---|
| Disfigurement that, in reasonable probability, Plaintiff will sustain in the future. | Not Claimed |
| Physical impairment sustained in the past | Not Claimed |
| Physical impairment that, in reasonable probability, Plaintiff will sustain in the future. | Not Claimed |
| Medical care expenses incurred in the past. | $2,619.90[30] |
| Medical care expenses that, in reasonable probability, Plaintiff will incur in the future. | Not Claimed |

---

[30] Dkt 576 ¶ 7(a).

### 3.2.  **Robert Braden's damages for injury to his mom, Deborah Braden**

| Element | Amount |
|---------|--------|
| Loss of Parental Consortium that was sustained in the past. | $10,000.00[31] |
| Loss of Parental Consortium in reasonable probability will be sustained in the future | $0[32] |

---

[31] Mr. Braden's mother survived and remains available to provide the consortium that she did before the shooting. *See* GEX 273 at 57:13-18 ("[Her treatment] basically alleviated the pain so that [Mrs. Braden] could get back to her normal day-to-day activities…so to that extent we have succeeded quite a bit. She is pretty happy."); Trial Tr. 1479:15-21 ("I like to sit on the floor with the kids and be with them. It's really hard to get up. They laugh at me because I have to roll to get up -- roll over to get up. And so they laugh about that. They think it's funny. So we play humor where we can get it, you know."). A minimal award for the past loss of consortium while Deborah Braden was recovering from her injuries is appropriate. Plaintiffs argue that Mr. Braden is entitled to this award based on Mrs. Braden's inability to provide childcare and to provide parental guidance. Dkt 578 at 12, 111. This claim ignores Mrs. Braden statements that she *does* provide childcare to her grandchildren. Trial Tr. 1479:15-21. Further, Mr. Braden is in his 30s with a family of his own. Plaintiffs' requested loss of consortium award for an adult child based on *injuries* and not the death of a parent is far out of line with relevant precedent. *See* Memorandum.

[32] *See* Note 34. There is no evidence that Mr. Braden is reasonably likely to suffer a loss of consortium in the future with regard to his relationship with Mrs. Braden.

### 3.3. **Robert Braden's damages for the death of his dad, Keith Braden**[33]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $20,000.00[34] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $15,000.00[35] |
| Mental anguish sustained in the past. | $0[36] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $0[37] |

---

[33] Mr. Braden's baseline total non-economic damages as an adult child for the loss of a parent is reasonably calculated at $50,000. *See* Memorandum. In spite of the closeness of their relationship, because Mr. Braden has produced no evidence of mental anguish, he should be awarded damages for loss of consortium past and future in line with his sisters, but he should not be awarded any similar damages for mental anguish past or future. Therefore, the United States recommends a non-economic damage award for Mr. Braden as a result of his father's death in the amount of $35,000.

[34] As an adult, Mr. Braden suffers a relatively minor loss of companionship and society as a result of his father's death as compared with a minor child. The evidence produced at trial shows that Mr. Braden had an ordinary relationship with his father for an adult of his age and development. PEX 906 32:8-25.

[35] Mr. Braden is an adult with his own growing family. Mr. Braden is reasonably likely to suffer less from his loss of companionship and society as a result of his father's death as time progresses.

[36] Mr. Braden does not suffer from any mental health problems. GEX 419; GEX 420; PEX 3127 (Report of Dr. Feltoon); Trial Tr. 3479:7-23.

[37] *See* Note 39.

Loss of inheritance.                                    Not Claimed

4. __Elizabeth Braden__[38]

   4.1. __Elizabeth Braden's individual damages for the injury to her mom, Deborah Braden__

| Element | Amount |
| --- | --- |
| Loss of Parental Consortium that was sustained in the past. | $10,000.00[39] |
| Loss of Parental Consortium in reasonable probability will be sustained in the future | $0[40] |

---

[38] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Elizabeth Braden in the amount of $4,292,100.63. That award recommendation is broken down into $50,000 in non-economic damages for the loss of consortium arising out of the death of her father, $10,000 in non-economic damages for the loss of consortium with her mother, and $4,232,100.63 in combined damages on behalf of her minor daughter, Z.Z.

[39] Deborah Braden survived and continues to provide consortium to her daughter. *See* GEX 273 at 57:13-18 ("[Her treatment] basically alleviated the pain so that [Mrs. Braden] could get back to her normal day-to-day activities…so to that extent we have succeeded quite a bit. She is pretty happy."); Trial Tr. 1479:15-21 ("I like to sit on the floor with the kids and be with them. It's really hard to get up. They laugh at me because I have to roll to get up -- roll over to get up. And so they laugh about that. They think it's funny. So we play humor where we can get it, you know.") A minimal award for the past loss of consortium while Deborah Braden was recovering from her injuries is appropriate. Plaintiffs submit that the Court should award Elizabeth Braden $100,000 for her loss of consortium with her mother on the grounds that she cannot help as much with childcare and parental advice. Dkt 579 at 111. This claim ignores Mrs. Braden statements that she *does* provide childcare to her grandchildren. Trial Tr. 1479:15-21. Further, Elizabeth Braden is in her 30s with a family of her own. Plaintiffs' requested loss of consortium award for an adult child based on *injuries* and not the death of a parent is far out of line with relevant precedent. *See* Memorandum.

[40] *See* Note 42. There is no evidence that Ms. Braden is reasonably likely to suffer a loss of consortium in the future with regard to her relationship with Deborah Braden.

## 4.2. **Elizabeth Braden's damages for the death of her dad, Keith Braden**[41]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | $4,256.50[42] |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | $0[43] |
| Loss of companionship and society sustained in the past | $20,000.00[44] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $15,000.00[45] |

---

[41] Ms. Braden's baseline total non-economic damages as an adult child for the loss of a parent is reasonably calculated at $50,000. *See* Memorandum. Plaintiffs did not produce any evidence regarding Ms. Braden to meaningfully deviate from this baseline. Mrs. Braden is also entitled to $4,256.50 in past medical expenses.

[42] Plaintiffs place Mrs. Braden's stipulated past medical expenses under the pecuniary loss category. Dkt 578 at 145. Pursuant to the stipulation of the parties, Mrs. Braden is entitled to $4,256.50 in past medical expenses. Dkt 576 ¶ 6. Plaintiffs have produced no evidence to show that Ms. Braden suffered a pecuniary loss as a result of the death of Keith Braden. The law requires that pecuniary losses cannot be merely emotional damages, they must reflect an identifiable monetary value. *See* Memorandum.

[43] *See* Note 45.

[44] As an adult, Ms. Braden suffered limited loss of companionship and society as a result of her father's death. The evidence produced at trial shows that Ms. Braden had an ordinary relationship with her father for an adult of her age and development. GEX 281 at 68:1-72:7. Plaintiffs' submissions regarding Elizabeth Braden's loss of consortium are wrongly predicated primarily on her father's relationship with her children. *See* Dkt 579 at 146. Otherwise, Ms. Braden's testimony largely describes an ordinary parent child relationship for an adult child.

[45] Ms. Braden is an adult with her own family. She is reasonably likely to suffer less from her limited loss of companionship and society as a result of her father's death as time progresses.

| | |
|---|---|
| Mental anguish sustained in the past. | $10,000.00[46] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $5,000.00[47] |
| Loss of inheritance. | $0 |

---

[46] Ms. Braden was diagnosed with PTSD and depressive disorder (in remission). GEX 416 at 10. Plaintiffs' submission is predicated on Ms. Braden's PTSD diagnosis. Dkt 578 at 146. It does not, however, discuss any failure on her part to mitigate her damages in not seeking counseling. Further, it fails to address Dr. Marx's unopposed contention that many of these Plaintiffs, including Ms. Braden, would succeed with an evidence-based, trauma-focused psychotherapy treatment.

[47] Ms. Braden has not received any evidence-based, trauma-focused psychotherapy treatment designed to treat her PTSD. Trial Tr. 1578:5-9. With regard to future mental anguish, it is reasonably likely that if she were to undergo appropriate psychotherapy, her future mental anguish would be greatly diminished. *See generally* Testimony of Dr. Brian Marx.

### 4.3.  Elizabeth Braden's individual damages for the injury to her minor child, Z.Z.[48]

| Element | Amount |
| --- | --- |
| Loss of services that were sustained in the past | $0 |
| Loss of services that in reasonable probability will be sustained in the future until age eighteen. | $0[49] |

---

[48] Ms. Braden did not present any evidence of "lost services" from Z.Z.. Given Z.Z.'s age and development, any awards for these claims would be speculative at best.

[49] Plaintiffs' submission merely states that because Z.Z. was shot and suffered injuries, *ipso facto*, Ms. Braden suffers a loss of services. Dkt 578 at 125-6. Plaintiffs' evidence fails to establish that Z.Z.'s injuries will more likely than not cause her to be unable to provide the incidental household services that a minor child would be expected to perform, nor does it establish that those incidental household services would damage Ms. Braden in the amount of $250,000. This entire category of damages is speculative.

### 4.4. **Elizabeth Braden's damages on behalf of her minor child, Z.Z.**

| Element | Amount |
| --- | --- |
| Physical pain and mental anguish sustained in the past. | $300,000.00[50] |
| Physical pain and mental anguish that, in reasonable probability, the child will sustain in the future. | $100,000.00[51] |
| Loss of earning capacity sustained in the past | $0[52] |
| Loss of earning capacity that, in reasonable probability, will be sustained in the future from the time of trial until the child reaches the age of eighteen years. | $0[53] |

[50] Z.Z., a nine-year-old child, "sustained gunshot wounds to her left lower abdomen and left lower back, her posterior left thigh, and her left hip. Her left thigh tissue had a three-inch wide opening extending from the buttocks to the knee, the left side hip tissue was folded over towards her mid-line, and her left leg was internally rotated." GEX 423 at 10. Afterwards, she underwent an extensive list of medical procedures captured by Dr. Canter in her report. GEX 423 at 10-22. Plaintiffs' submission is based on their flawed determination that the Charleston settlement provides "precedential" value in this case *and* then adds an additional steady award of damages for the rest of Z.Z.'s life expectancy. Dkt 578 at 31. This highlights the problem with their use of the Charleston settlement for any purpose. Plaintiffs have no knowledge of any kind regarding what injuries, damages, or categories which this Charleston settlement was intended to address under South Carolina law. They do not compare any of the Charleston plaintiffs with Z.Z. There is no evidence before this Court which would compare and contrast a given Charleston plaintiff to Z.Z. with regard to her injuries, her experience during the shooting, her recovery post-shooting, her potential for long term psychological and physical recovery, the impact on her family, and/or any other factors which should be considered by this Court when arriving at an appropriate compensatory award. Furthermore, this framework disregards the testimony in the record regarding Z.Z.'s ongoing recovery and potential for additional recovery as time progresses. *See, e.g,* notes 54 and 57.

[51] Dr. Canter testified that Z.Z. is a candidate for cognitive behavioral therapy, which has some success with children. Trial Tr. 3363:15-3364:20. She is still likely to have pain and mental anguish over the course of her long residual lifetime, resulting in a larger award.

[52] Z.Z. was five years old at the time of the shooting. Plaintiffs produced no evidence of loss of earning capacity sustained in the past.

[53] *See* Note 57. Assuming a loss of income before she turns 18 is speculative.

| | |
|---|---|
| Loss of earning capacity that, in reasonable probability, will be sustained in the future after the child reaches the age of eighteen years. | $82,036.00[54] |
| Disfigurement sustained in the past | $25,000.00[55] |
| Disfigurement that, in reasonable probability, the child will sustain in the future. | $275,000.00[56] |
| Physical impairment sustained in the past | $25,000.00[57] |
| Physical impairment that in reasonable probability, the child will sustain in the future. | $275,000.00[58] |

---

[54] GEX 425 at 32. Further, Z.Z. is an *outstanding* student. PEX 3227 at 14; Trial Tr. 1583:3-1585:25. Her mother applied to have her entered into the school district's gifted and talented program. *Id*. There is no evidence that Z.Z. will suffer from a meaningful loss of future earning capacity over the remainder of her lifetime. Plaintiffs' submission cites to a general principle that people with disabilities make less over their lifetime than able-bodied members of the general public. Dkt 578 at 34-5. They believe that Z.Z.'s lifetime earnings can be reasonably expected to decrease by 65%. *Id*. This submission wholly ignores the evidence regarding Z.Z. the individual. There is no evidence in the record that Z.Z. would be unable to attain any degree she may choose to seek. She is, again, an outstanding student. Ms. Braden attempted to downplay her daughter's success in the classroom, but the records clearly demonstrate that Z.Z. has at least as good a long-term employment prospects as an average 2d grader.

[55] Z.Z. has several graft wounds, leg atrophy and other disfiguring injuries. GEX 423 at 27-31.

[56] *See* Note 58. Z.Z. has approximately 72 years of residual life expectancy. GEX 423 at 38. Plaintiff requests $22,500 per year be awarded for disfigurement, but fails to cite a basis for that amount. Dkt 578 at 35. Further, Plaintiffs simply state, without citation to the record that, "Z.Z. is conscious of her disfigurement." *Id*. The only evidence they cite in support of $22,500 annual award is that Z.Z. likes to wear leggings. *Id*. That, on its own, is insufficient to establish the need for ongoing disfigurement awards in this amount over the course of Z.Z.'s life.

[57] Dr. Canter's interview with Z.Z. discusses her physical impairments at length. GEX 423 at 23-26.

[58] *See* Note 70. Z.Z. has approximately 72 years of residual life expectancy. GEX 423 at 38. Plaintiffs submit that Z.Z. suffers from the following physical impairments: "(1) Decreased ability to perform activities of daily living (ADLs) e.g. bathing, dressing, etc.; (2) Decreased locomotion e.g. walking, etc.; (3) Decreased physical function affecting a loss of vocational capacities/opportunities; (4) Decreased ability to participate in social avocational activities, i.e.

| | |
|---|---|
| Medical care expenses incurred in the past on behalf of the child | $166,270.63[59] |
| Medical care expenses that, in reasonable probability, will be incurred on behalf of the child in the future from the time of trial until each child reaches the age of eighteen years | $73.677.04[60] |
| Medical care expenses that, in reasonable probability, the child will incur after he reaches the age of eighteen years. | $2,910,116.96[61] |

participation in activities with others e.g. participation in sports, participation in community activities, etc.; (5) Decreased external mobility e.g. travel, community ambulation, etc.; (6) Decreased ability to perform household services e.g. inside housework, food cooking & clean-up, shopping for household, etc.; (7) Decreased ability to participate in personal avocational activities e.g. personal hobbies, pastimes, interests, etc." However, these statements are belied and/or minimized by the objective evidence in the record. *See, e.g.,* GEX 423, 424 (Dr. Canter's reports discussing Z.Z.'s statements that she showers, etc.). Ms. Braden's self-reporting to La Vernia ISD about Z.Z.'s abilities also belie many of these submissions. PEX 3226. While there is certainly reason to believe Z.Z. will suffer from some physical impairment, Plaintiffs' submission artificially inflates her situation. Lastly, Plaintiffs continue to submit statements regarding pregnancy and blood lead levels. Dkt 578 at 38. These statements are supported only by a Physical Medicine and Rehabilitation physician without any training in the area. Trial Tr. 1582:3-1583-1; GEX 269. There has not been a single specialist in hematology, OB-GYN, or neonatology who has provided any opinion in this area. *Id*. The only credible evidence regarding lead levels and their impact on the human body presented by either party was the testimony of Dr. Kosnett. There is no reason, based on the testimony of Dr. Kosnett, to award Z.Z. any "physical impairment" damages based on PM&R physician and her mother's speculative assumptions regarding possible pregnancy problems for Z.Z. later in life.

[59] Dkt 576 ¶ 24(a).

[60] GEX 423 at 43-49.

[61] *Id*. at 42, 50-77.

## McNulty Family

1. **Lisa McNulty**

   1.1. **Lisa McNulty, as personal representative of the Estate of Tara McNulty, deceased[1]**

| Element | Amount |
|---|---|
| Pain and mental anguish "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by the decedent before his or her death. Tex. Civ. Jury Instr. Gen. Neg. § 30.3 ¶1. | $250,000[2] |
| Medical Expenses | Not Claimed |
| Funeral & burial expenses | Not Claimed |

---

[1] For the reasons articulated herein, the United States recommends that the Court award damages to the Estate of Tara McNulty in the total amount of $250,000 for her pain and mental anguish prior to her death. *See* Memorandum. The parties have stipulated that the lost future earning capacity for Tara McNulty is $128,859. Dkt. 576 ¶ 29. Plaintiffs' counsel includes this as past and future pecuniary loss for her children, Dkt. 578 at 22, but it is more properly considered loss of future earnings or loss of inheritance. Plaintiffs do not claim either of these categories. Accordingly, this figure is not included in these calculations.

[2] *See* Note 1, Memorandum. Ms. McNulty's head wound would have been rapidly fatal. PEX 12006 at 5. The wounds to her torso would also have been rapidly fatal; however, her chest cavity showed only 100 mL of blood, suggesting that her heart was no longer beating when those wounds were made. PEX 12006 at 5. All of Tara's wounds are consistent with her being in the same position at the time they were sustained, suggesting that they occurred at roughly the same point in time. PEX 12006 at 6.

### 1.2. **Lisa McNulty, on behalf of J.M., a minor child[3]**

#### 1.2.1. **J.M.'s Personal Injury Claim**

| Element | Amount |
|---|---|
| Physical pain and mental anguish sustained in the past. | $100,000[4] |
| Physical pain and mental anguish that, in reasonable probability, the child will sustain in the future. | $25,000[5] |
| Loss of earning capacity sustained in the past | Not Claimed |
| Loss of earning capacity that, in reasonable probability, will be sustained in the future from the time of trial until the child reaches the age of eighteen years. | Not Claimed |
| Loss of earning capacity that, in reasonable probability, will be sustained in the future after the child reaches the age of eighteen years. | Not Claimed |
| Disfigurement sustained in the past | $15,000[6] |

[3] For the reasons articulated herein, the United States recommends that the Court award damages to J.M. in the amount of $536,585.91. That award recommendation is broken down into $336,585.91 for his personal injury claim, including $136,585.91 for economic damages and $200,000 in non-economic damages, and $200,000 as a beneficiary for the wrongful death of his mother, Tara McNulty.

[4] J.M. was twelve years old and was present in the church at the time of the shooting. Trial Tr. 239:16-17. He was shot in the legs, and had a flesh wound on his arm. Trial Tr. 254:21-23; 299:17-300:4. He was taken to BAMC, Trial Tr. 303:11-12, and was discharged on November 14, 2017. PEX 12029 at 172. J.M. went to physical therapy every two weeks for a year. Trial Tr. 330:11-17. He had only a few counseling appointments, which ended about a year after the shooting. Trial Tr. 330:25-331:6, PEX 12029 at 4 (showing encounters with Dr. Jones).

[5] At his interview with Dr. Canter, J.M indicated that he has some pain when he does physical activities. GEX 537 at 19. J.M. is not currently taking any prescription medications. Trial Tr. 331:15-16. He is not currently seeing a psychiatrist or taking any medications for his mental health. Trial Tr. 331:9-16.

[6] J.M. has a small scar on his elbow, a tissue defect on his left lower leg, as well as various other scarring. PEX 12040 at 28. His injuries have undoubtedly improved over time.

| | |
|---|---|
| Disfigurement that, in reasonable probability, the child will sustain in the future. | $10,000[7] |
| Physical impairment sustained in the past | $35,000[8] |
| Physical impairment that in reasonable probability, the child will sustain in the future. | $15,000[9] |
| Medical care expenses incurred in the past on behalf of the child | $70,982.32[10] |
| Medical care expenses that, in reasonable probability, will be incurred on behalf of the child in the future from the time of trial until each child reaches the age of eighteen years | $0[11] |
| Medical care expenses that, in reasonable probability, the child will incur after he reaches the age of eighteen years. | $65,603.59[12] |

---

[7] *See* Note 6.

[8] By March 14, 2019, J.M. was able to stand, walk, and run on his left leg, unsupported and without complaint of pain.  PEX 12029 at 67. His arm is "fine." Trial Tr.329:24-25.

[9] J.M. is now able to walk "pretty much" normally. Trial Tr. at 330:18-19. Shortly before the start of trial, J.M. was able to run a full mile without stopping or having to walk. Trial Tr. at 276:16-19.

[10] *See* Dkt 576 ¶ 17(a).

[11] *See* Dkt 576 ¶ 17(b), GEX 537.  The United States stipulated to future lifetime medical costs of $65,603.59. However, there was no breakdown for medical costs up to age 18 versus after age 18 in the stipulation.

[12] *See* Dkt 576 ¶ 17(b).

### 1.2.2. __J.M.'s damages for the death of Tara McNulty__[13]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | $0[14] |
| Pecuniary loss that, in reasonable probability, the child will sustain in the future | $0[15] |
| Loss of companionship and society sustained in the past | $60,000[16] |
| Loss of companionship and society that, in reasonable probability, the child will sustain in the future | $45,000[17] |
| Mental anguish sustained in the past. | $70,000[18] |

[13] J.M. was a minor at the time of his mother's death, and so the baseline damages award is $100,000. *See* Memorandum. J.M. is entitled to an upwards adjustment for non-economic damages, as he was in the church with his mother at the time of her death.

[14] While Tara McNulty would undoubtedly have provided for her children, Plaintiffs did not produced any evidence substantiating a claim for J.M.'s pecuniary losses. The Stipulated amount of $128,859 is more properly considered loss of inheritance.

[15] *See* Note 14.

[16] As a minor, it may be reasonably expected that J.M. has suffered significant loss of companionship and society from his mother in the years since her death.

[17] As a minor, and J.M. likely still suffers significantly from the loss of companionship. It is likely that the loss of companionship of his mother will decrease as he becomes an adult. Moreover, J.M. lives with his grandmother, and has the support of his sister. Trial Tr. 277:10-14.

[18] As a minor, and because he was in the church with his mother at the time of her death, J.M. likely suffered mental anguish greater than what would ordinarily be associated with the death of a parent. However, there was no evidence as to whether he witnessed (i.e. saw or heard) her death.

| | |
|---|---|
| Mental anguish that, in reasonable probability, the child will sustain in the future | $25,000[19] |
| Loss of inheritance. | Not Claimed |

---

[19] There was minimal testimony as far as J.M.'s current anguish specifically related to his mother's death (as opposed to his own injuries). He is not in counseling, nor is he taking medications for his mental health. Trial Tr. 331:5-16. Nonetheless, it is reasonable that, as a minor, J.M. will continue to experience some mental anguish related to his mother's death.

### 1.3. **Hailey McNulty**[20]

#### 1.3.1. **Hailey's Personal Injury Claim**

| Element | Amount |
| --- | --- |
| Physical pain and mental anguish sustained in the past. | $75,000[21] |
| Physical pain and mental anguish that, in reasonable probability, Plaintiff will sustain in the future. | $25,000[22] |
| Loss of earning capacity sustained in the past. | Not Claimed[23] |

---

[20] For the reasons articulated herein, the United States recommends that the Court make a total award to Hailey McNulty in the amount of $462,993.71. That award recommendation is broken down to $262,993.71 for her personal injury, including $137,993.71 for economic damages and $125,000 in non-economic damages, and $200,000 as a beneficiary for the wrongful death of her mother, Tara McNulty.

[21] Ms. McNulty was 15 years old at the time of the shooting and was in the church. Trial Tr. 239:13-15, 243:6-13. Ms. McNulty was shot in the left leg and the left lower part of her back. Trial Tr. 252:7-11. She was admitted to Brooke Army Medical Center ("BAMC"), Trial Tr. 303:11-12, where she remained until November 14, 2021. Trial Tr. 256:20-21. After her release from the hospital, she retained bullet pieces; in particular, she has a bullet fragment in her torso, and shrapnel in her legs. Trial Tr. 252:12-14, 263:2-3. She has had three bullet fragments removed. Trial Tr. 263:2-3. Ms. McNulty saw a counselor at BAMC irregularly; she was prescribed an anti-depressant but did not have it refilled when the pills ran out. PEX 12014 at 2, 4 medical records from Nov. 5, 2017 to March 16, 2018; (showing encounters with Dr. Jones); Trial Tr. 280:16-22, PEX 12014 at 9; Trial Tr. 280:22-281:2.

[22] Ms. McNulty testified that she is unable to sleep on her left side, and she cannot have the back of her knee touching a chair. Trial Tr. 265:10-11. There is no evidence that Ms. McNulty currently uses any pain medication. She began taking an anti-depressant during her pregnancy. Trial Tr. 280:22-281:2.

[23] Plaintiffs did not produce any evidence to substantiate any claim of loss of earning capacity. At the time of the shooting, Ms. McNulty was 15 years old, and there is no evidence regarding her prior earning capacity. Trial Tr. 239:13-15. After the shooting, Ms. McNulty worked as a waitress for a time, then as a patient care associate; she is presently not working while attending college. Trial Tr. 281:6-282:2.

| | |
|---|---|
| Loss of earning capacity that, in reasonable probability, Plaintiff will sustain in the future. | Not Claimed[24] |
| Disfigurement sustained in the past. | $10,000[25] |
| Disfigurement that, in reasonable probability, Plaintiff will sustain in the future. | $5,000[26] |
| Physical impairment sustained in the past | $10,000[27] |
| Physical impairment that, in reasonable probability, Plaintiff will sustain in the future. | $0[28] |
| Medical care expenses incurred in the past. | $85,423.58[29] |
| Medical care expenses that, in reasonable probability, Plaintiff will incur in the future. | $52,570.13[30] |

---

[24] *See* Note 23.

[25] Ms. McNulty testified that she had noticeable scarring on her leg in the immediate aftermath of the shooting. Trial Tr. 264:1-265:7.

[26] Ms. McNulty has an indentation on her leg where she was shot. Trial Tr. 267:12-18. She has stated that her scarring "doesn't get to me as bad because I can't get rid of it. It's a part of me." Trial. Tr. 264:10-11.

[27] When Ms. McNulty left the hospital, she was able to walk with a boot. Trial Tr. 278:21-23. Ms. McNulty stopped using the boot in January of 2018. Trial Tr. 278:24-25. Ms. McNulty had to quit cross-country track due to her inability to run without pain. Trial Tr. 265:18-19.

[28] Ms. McNulty does not have difficulty with day-to-day tasks. Trial Tr. 279:13-21. To recover for physical impairment, the effect of the impairment must go beyond pain and suffering to produce a separate and distinct loss; it must also impact physical activities. *Golden Eagle Archery, Inc.*, 116 S.W.3d 757, 765 (Tex. 2003).

[29] *See* Dkt. 576 ¶ 16(a).

[30] *Id.* at ¶ 16(b), GEX 532.

2. **Hailey's damages for the death of Tara McNulty[31]**

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | $0[32] |
| Pecuniary loss that, in reasonable probability, the child will sustain in the future | $0[33] |
| Loss of companionship and society sustained in the past | $50,000[34] |
| Loss of companionship and society that, in reasonable probability, the child will sustain in the future | $30,000[35] |
| Mental anguish sustained in the past. | $85,000[36] |

[31] As a minor at the time of her death, the baseline for Ms. McNulty's wrongful death damages is $100,000. Hailey is entitled to an upwards adjustment for non-economic damages, as she was in the church with her mother at the time of her death. *See* Memorandum.

[32] *See* Note 14.

[33] *See* Note 14.

[34] As a minor at the time of her mother's death, Ms. McNulty suffered from the loss of companionship and society of her mother; she has also testified that she missed her mother's support when she had her child. Trial Tr. 270:5-12.

[35] Now, as an adult with her own family, Ms. McNulty is reasonably likely to suffer less in the future from the loss of companionship and society of her mother. She currently lives with her child and her boyfriend, who is supportive of her. She is also able to rely on her grandmother. Trial Tr. 282:6-17.

[36] In addition to the mental anguish that she suffered as a minor, Ms. McNulty testified about realizing her mother had died during the shooting. Trial Tr. 250:4-15. She also testified that she became upset because her last interactions with her mother involved an argument. Trial Tr. 243:1-5.

| | |
|---|---|
| Mental anguish that, in reasonable probability, the child will sustain in the future | $35,000[37] |
| Loss of inheritance. | Not Claimed |

---

[37] As an adult with her own family, and with the passage of time, it is reasonably likely that Ms. McNulty's mental anguish will decrease.

### 3. **Lisa McNulty, individually for the death of Tara McNulty**[38]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, will be sustained in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $11,000[39] |
| Loss of companionship and society that, in reasonable probability, will be sustained in the future | $13,000[40] |
| Mental anguish sustained in the past | $15,000[41] |

---

[38] Lisa McNulty was not present in the church during the shooting. She received a phone call from her granddaughter, Hailey, but did not hear any gunshots over the phone. Trial Tr. 292:13-16, 332:7-11. When she arrived at the church, the police were there; Mrs. McNulty walked into the church with the first responders. Trial Tr. 293:25-294:15. Although she witnessed the immediate aftermath of the shooting, she was not physically present when the injury to her daughter occurred, and is therefore not entitled to recover mental anguish damages as a bystander. *United Servs. Auto. Ass'n v. Keith*, 970 S.W.2d 540, 542 (Tex. 1998); *see also Hitchcock v. Steak N Shake, Inc.*, 2017 WL 5077901, at *10 (W.D. Tex. Nov. 2, 2017) (permitting recovery where "the relative was in close proximity to the accident . . . ."). Mrs. McNulty is therefore only entitled to recover mental anguish damages for the wrongful death claim, and not as a bystander. Accordingly, Mrs. McNulty is entitled to a total of $50,000 in non-economic damages. *See* Memorandum.

[39] Tara McNulty was an adult, who had lived most of her adult life apart from her mother. Trial Tr. 349:6-22; 352:23-353:10; 355:9-23; 360:6-10 (Testimony of Ruben Rios re: Tara living with him). While she had recently lived with her mother, at the time of her death, she and her children were living independently. Trial Tr. at 327:24-25.

[40] *See* Note 39. However, it is likely that as Mrs. McNulty ages, she would have needed her daughter's help more.

[41] Mrs. McNulty testified that since the shooting, she has suffered from severe grief. Trial Tr. 323 at 19-21. She has not sought counseling, and does not intend to. Trial Tr. 323:19-25. Dr. Marx has indicated that Mrs. McNulty would likely benefit from evidence-based, trauma-focused psychotherapy. GEX 526 at 13.

| | |
|---|---|
| Mental anguish that, in reasonable probability, will be sustained in the future | $11,000[42] |

---

[42] While Mrs. McNulty continues to experience grief, *see* Note 41, that grief is likely to diminish with time.

4. **Margaret McKenzie individual damages for her own injuries**[43]

| Element | Amount |
| --- | --- |
| Physical pain and mental anguish sustained in the past. | $50,000[44] |
| Physical pain and mental anguish that, in reasonable probability, Ms. McKenzie will sustain in the future. | $15,000[45] |
| Loss of earning capacity sustained in the past. | Not Claimed |
| Loss of earning capacity that, in reasonable probability, Ms. McKenzie will sustain in the future. | Not Claimed |

---

[43] For the reasons articulated herein, the United States recommends the Court make a total award to Margaret McKenzie in the amount of $667,477.80. That award recommendation is broken down into $84,000 for total non-economic damages and $583,477.80 in economic damages. *See* Memorandum and Dkt 576 ¶ 14.

[44] Ms. McKenzie sustained three gunshot injuries: a graze wound to her wrist, another graze on her ankle and wound to the back of her leg. PEX 900 at 60:18-61:9. She was hospitalized overnight for her injuries, and was able to fly back to her home in New York two days after the shooting. *Id.* at 61:17-22. By November 20, 2017, Ms. McKenzie did not require pain medication. PEX 12049 at 38. While she has been diagnosed with PTSD, she was able to overcome her fears to go to a New York Rangers game at Madison Square Garden in New York, which required her to take a train to the city, and to attend her A.A. meetings in person. PEX 900 at 67:14-22, 65:22-66:13. She suffered from anxiety prior to the shooting. PEX 900 at 60:8-14.

Ms. McKenzie described her relationship with her niece, Tara, as one where she "stay[ed] in touch with her and talk[ed] to her . . . mostly by email but once in a while by phone." PEX 900 at 13:4-14. This is not sufficient under Texas law to recover bystander damages. *See Garcia v. San Antonio Hous. Auth.*, 859 S.W.2d 78, 81 (Tex. App. 1993) ("Parents, siblings, children, and grandparents can recover as bystanders even if they did not reside with the injured person; other relatives must prove residence.").

[45] Ms. McKenzie continues to suffer some minor physical pain, as well as her PTSD symptoms. PEX 900 at 41:16-24.

| | |
|---|---|
| Disfigurement sustained in the past. | $1000[46] |
| Disfigurement that, in reasonable probability, Ms. McKenzie will sustain in the future. | $1000[47] |
| Physical impairment sustained in the past | $12,000[48] |
| Physical impairment that, in reasonable probability, Ms. McKenzie will sustain in the future. | $5,000[49] |
| Medical care expenses incurred in the past. | $25,587.72[50] |
| Medical care expenses that, in reasonable probability, Ms. McKenzie will incur in the future. | $557,890.08.[51] |

---

[46] Ms. McKenzie testified that she has some minor scarring from her injuries. PEX 900 at 37:16-38:2. However, the location of her most serious injury is an area that would be covered by clothing.

[47] *See* Note 46.

[48] Ms. McKenzie suffers from cerebral palsy, and began requiring the use of a cane in her forties. PEX 9000 at 7:22-24; 57:8-14. After the shooting, she required the use of a wheelchair for a short time before transitioning to a walker. PEX 900 at 62:9-25.

[49] Ms. McKenzie currently uses a walker, rather than a cane. PEX 900 at 39:2-9. Otherwise, she is able to live independently, including driving. PEX 900 at 63:18-25, 66:6-7.

[50] *See* Dkt. 576 at ¶ 14(a).

[51] *Id.* at ¶ 14(b), GEX 541.

5. **Ruben Rios, individually for the death of Tara McNulty**[52]

The United States objects to Exhibit 1 to Docket 577, as submitted after the close of evidence. While this document purports to be a summary of Exhibit PEX 12082, the United States has not been given an opportunity to review or determine the accuracy of this summary.

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |

[52] The United States submits that Mr. Rios has not substantiated his claims for damages for the death of Tara McNulty. Although Mr. Rios was legally married to Tara McNulty at the time of the shooting, evidence at trial has demonstrated that their relationship was effectively over well before the shooting. They had stopped living together as of March 17, 2015. Trial Tr. 404:21-405:1. Over time Tara McNulty's visits and phone calls became less frequent. *Id.* Her last letter to him is dated August 3, 2016. Trial Tr. 395:24-396:7, PEX 12069 at 36. The last phone call between them that can be substantiated is June 10, 2017. Trial Tr. 399:21-401:9, PEX 12082 at 1235. Once in Texas, Tara McNulty stopped using the name "Tara Rios." Trial Tr. 285:11-14, 333:8-10. For about seven months before the shooting, Tara McNulty was dating a man named Michael Wright. Trial Tr. 333:11-15. In July or August of 2017, Tara McNulty introduced her children to Michael Wright. Trial Tr. 286:3-7, 12-16. Prior to the shooting, Michael had given Tara McNulty a ring. Trial Tr. 286:8-9, 334:7-15. In the children's medical records, Michael Wright is referred to as Tara McNulty's fiancé. PEX 12014 at 60, 69. Michael was mentioned in Tara McNulty's obituary, while Mr. Rios was not included.  GEX 554. Tara McNulty's obituary and headstone both use the name Tara McNulty. GEX 554, PEX 12000 at 5, Trial Tr. 382:13.

Mr. Rios asserts that the Court should disregard testimony indicating or suggesting that Mr. Rios is in fact guilty of sexual assault. Dkt. 577 at 5 n. 31. In contrast to the *Ford-Solebo v. United States*, in which the United States asserted that the decedent would have remained incarcerated and eventually been deported, 980 F. Supp. 2d 917, 1003 (N.D. Ill. 2013), the United States makes no assertion regarding Mr. Rios' guilt or innocence. Nonetheless, the severity of the accusations against Mr. Rios, made by Tara McNulty's daughter, more likely than not had an effect of the future of the relationship. *See Dowling v. United States*, 493 U.S. 342, 348-49 (1990) (permitting evidence of prior criminal acts despite acquittal if relevance can be shown). Hailey McNulty testified that her mother was her "best friend," Trial Tr. at 268:23, and that her mother would have done anything she could to make Hailey happy. *Id.* at 283:21-22. Hailey also testified that she told her mother she would no longer live with Mr. Rios. *Id.* at 285:3-5. Hailey McNulty's testimony regarding Mr. Rios' abuse of her mother similarly goes to the likelihood that the relationship would not resume. On this point, counsel for Mr. Rios grossly misunderstands the holding of *Ford-Sholebo*, 980 F. Supp. 2d  at 1009, which found that the testimony of a wife in court, stating that her deceased husband had not abused her, was less credible than her signed criminal complaint. Here, Ms. McNulty's criminal complaint did not contradict her testimony in court, and there is no reason to doubt her credibility.

| | |
|---|---|
| Pecuniary loss that, in reasonable probability, will be sustained in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $0 |
| Loss of companionship and society that, in reasonable probability, will be sustained in the future. | $0 |
| Mental anguish sustained in the past | $0[53] |
| Mental anguish that, in reasonable probability, will be sustained in the future | $0[54] |
| Loss of inheritance. | Not Claimed |

---

[53] While Mr. Rios claims to be suffering from PTSD and depression due solely to Ms. McNulty's death, he has suffered from many other traumatic events in his lifetime. Trial Tr. 402:18-403:8. Mr. Rios refuses to seek counseling. Trial Tr. 403:9-11. He has only seen mental health professionals as part of this case, and when required to upon leaving the Army. Trial Tr. 403:12-404:9. When he goes for health appointments at Veterans Affairs facilities, his PTSD screenings are negative. GEX 547 at 16, 74.

[54] *See* Note 53.

**Brown Family**

1. **Farida Brown's personal injury damages**[1]

| Element | Amount |
| --- | --- |
| Physical pain and mental anguish sustained in the past. | $50,000[2] |

---

[1] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Farida Brown in the amount of $471,441.99. That award recommendation is broken down into $100,000 for total non-economic damages and $371,441.99 in economic damages. *See* Memorandum and Dkt 576 ¶9(a).

[2] Ms. Brown was in the church and was shot once in her right leg above her kneecap. Trial Tr. 1099:19-20. She also has shrapnel injuries in her legs. *Id*. at 1099:21-24. Plaintiffs' submission inflates her injuries to say that she was "shot" 6 times. Dkt 578, p. 41. But five of these injuries are shrapnel injuries, not gunshot wounds. She was in the hospital for two nights. *Id*. at 1102:21-24. She testified that although she is in daily pain, she takes a single gabapentin for pain relief. *Id*. at 1105:1-13. However, her medical records reflect a significantly lesser degree of pain. On December 15, 2017, only 5 weeks after the shooting, Ms. Brown reported "mild soreness in her right knee with increased activity, reporting that her pain was not functionally limiting." PEX 4008-00004; GEX 432 at 10. Ms. Brown has been diagnosed with PTSD. GEX 433. Plaintiffs' submission is based on their flawed determination that the Charleston settlement provides "precedential" value in this case, *and* then adds an additional steady award of damages for the rest of Ms. Brown's life expectancy. Dkt 578, p. 26. This particular citation highlights the problem with their use of the Charleston settlement for any purpose. Plaintiffs have no knowledge of any kind regarding what injuries, damages, or categories that the Charleston settlement was intended to address under South Carolina law. They do not validly compare any of the Charleston plaintiffs with Ms. Brown. There is no evidence before this Court which would compare and contrast a given Charleston plaintiff to Ms. Brown with regard to her injuries, her experience during the shooting, her recovery post-shooting, her potential for long term psychological and physical recovery, the impact on her family, and/or any other factors which should be considered by this Court when arriving at an appropriate compensatory award. In fact, Plaintiffs "estimates what multiplier may apply for the years after the shooting. The Charleston shooting victims died that day and had no future pain, disfigurement, or physical impairment." Dkt 578, p. 43. This is the same concern the United States continues to address with regard to Charleston references. Ms. Brown's counsel has no idea what settlement amounts were negotiated in the settlement case and for what injuries, so they resort to blanket and citation-less statements about what they think or what they may have read in a newspaper. They then "estimate" an additional award for their clients based on minimum wage (for unclear reasons) and/or a series of inapplicable and easily distinguishable Texas jury verdicts (based on rapes and dog bites). Dkt 578, pp. 44-45.

| | |
|---|---|
| Physical pain and mental anguish that, in reasonable probability, Plaintiff will sustain in the future. | $30,000[3] |
| Loss of earning capacity sustained in the past. | NOT CLAIMED |
| Loss of earning capacity that, in reasonable probability, Plaintiff will sustain in the future. | NOT CLAIMED |
| Disfigurement sustained in the past. | $5,000[4] |
| Disfigurement that, in reasonable probability, Plaintiff will sustain in the future. | $0[5] |
| Physical impairment sustained in the past | $10,000[6] |

[3] With regard to future physical pain, Ms. Brown last attended physical therapy in May 2020. PEX 04014-0004; GEX 432 at 11. With regard to future mental anguish, Ms. Brown informed her psychologist that she only felt depressed when she saw violence on TV and that she was really "enjoying life." PEX 04022-00099. She has a variable presentation of PTSD symptoms with a history of success in psychotherapy. GEX 433 at 13. It is reasonable to assume some limited mental anguish following a course of appropriate, evidence-based, trauma focused psychotherapy.

[4] Ms. Brown's primary care provider noted in January 2018 that "her surgical wound is well healed without signs of infection." PEX 4008-00004. Plaintiffs' submission again misleadingly cites Ms. Brown has having received 6 gunshot wounds. Dkt 578, p. 46. They then go on to rely on the same dog bite Texas jury verdict to further grossly inflate their non-economic damages award. *Id*. at 47.

[5] *See* Note 4. Ms. Brown's wounds were healed shortly after the shooting.

[6] Ms. Brown's primary care provider noted in December 2017 that she had "no hip, knee, or ankle range of motion deficits or pain with range of motion. No neuro deficits." PEX 4008-00004. When questioned by the United States' expert life care planner, Dr. Canter, Ms. Brown denied using "a cane, walker, or wheelchair." GEX 432 at 13. Plaintiffs' submission actually states, "Farida Brown is worse off than Plaintiffs in prior suits who were paralyzed because her ability to sit or lay down has been impaired." Dkt 578, p. 47. Plaintiffs then go on to discuss the dog bite jury verdict again for their physical impairment damages. *Id*. This submission (1) grossly misleads the court about the nature of her injuries (multiplying one gunshot wound into six), (2) wrongly posits that Ms. Brown would have been better off had she been paralyzed, (3) relies on increasingly inapt Texas jury verdicts on rape and dog bite cases to support their proposed awards, (4) ignores the objective medical records showing that Ms. Brown reported to her treating providers that she was improving almost immediately after the shooting and has no long term impairment.

| | |
|---|---|
| Physical impairment that, in reasonable probability, Plaintiff will sustain in the future. | $5,000[7] |
| Medical care expenses incurred in the past. | $46,253.13[8] |
| Medical care expenses that, in reasonable probability, Plaintiff will incur in the future. | $325,188.86[9] |

---

[7] As noted by Dr. Canter, Ms. Brown may have minor impairment necessitating the future use of an electric scooter and/or manual wheelchair in limited situations. *See* GEX 432 at 16.

[8] *See* Dkt 576 ¶ 9(a).

[9] *See id.* at 9(b).

## Uhl- Krueger Family

### 1.  Charlene Uhl on behalf of the Estate of H.K., a minor[1]

| Element | Amount |
| --- | --- |
| Pain and mental anguish "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by the decedent before his or her death. Tex. Civ. Jury Instr. Gen. Neg. § 30.3 ¶1. | $250,000 |
| Medical Expenses | Not Claimed |
| Funeral & burial expenses | Not Claimed |

---

[1] For the reasons articulated herein, the United States recommends that the Court make a total award to the Estate of H.K. in the amount of $250,000, for her pain and mental anguish prior to her death. *See* Memorandum.

### 2.   Charlene Uhl's individual damages for the death of H.K.[2]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, will be sustained in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $100,000[3] |
| Loss of companionship and society that, in reasonable probability, will be sustained in the future | $250,000[4] |
| Mental anguish sustained in the past | $100,000[5] |
| Mental anguish that, in reasonable probability, will be sustained in the future | $50,000[6] |

[2] For the reasons articulated herein, the United States recommends the Court award a total of $500,000 to Plaintiff Charlene Uhl for the wrongful death of her minor daughter, H.K. As the parent of a minor killed in the shooting, Ms. Uhl's baseline non-economic damages total $500,000. The evidence submitted does not show any reason to deviate from this baseline.

[3] Ms. Uhl testified that she and her daughter were close. She also testified that she was unaware of aspects of her daughter's life, including why H.K. was excited to attend church (Trial Tr. 1152:1-5) and many of the people that H.K. knew from the church. Trial Tr. 1167:14-18. In addition, H.K. was 16 at the time of her death; it is likely that she would have moved out of her family's home in the years after the shooting.

[4] *See* Note 3. As H.K. became an adult, it is likely that she would have left the family home and spent less time with her mother.

[5] Ms. Uhl has been diagnosed with moderately severe PTSD. GEX 438 at 9. She has sought counseling, which she finds helpful. Trial Tr. 1175:7-8. It is also difficult to separate her mental anguish from her pre-existing mental health issues; Ms. Uhl was diagnosed with anxiety prior to the shooting, as well as adjustment disorder with anxious mood. PEX 5011 at 67, 109.

[6] Ms. Uhl continues to be in therapy, and with evidence-based, trauma-focused psychotherapy, her prognosis is fair. GEX 438 at 10. With time, it is likely that her grief and anguish will decrease.

**Corrigan Family**

1. **Benjamin Corrigan**[1]

   1.1. **Benjamin Corrigan on behalf of the Estate of Robert Corrigan**

| Element | Amount |
|---|---|
| Pain and mental anguish "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by the decedent before his or her death. Tex. Civ. Jury Instr. Gen. Neg. § 30.3 ¶1. | $125,000.00[2] |
| Medical Expenses | Not Claimed |
| Funeral & burial expenses | Not Claimed |

---

[1] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Benjamin Corrigan (TSgt Corrigan herein to distinguish him from his brother, Capt Corrigan, and/or father CMSgt (Ret.) Corrigan) in the amount of $540,829.50. That award recommendation is broken down into $100,000 in individual damages for loss of consortium arising out of the death of his two parents, $250,000 for his portion of his parents' estates' survivorship claims, and $190,829.50 in economic damages for loss of inheritance. *See* Memorandum and Dkt 576 ¶ 28(a).

[2] The baseline damages awarded to the estate of each decedent is reasonably calculated at $250,000.00. *See* Memorandum. There are two representatives for each Corrigan estate. Each representative should be awarded 50% of the damages awarded to that estate. There has been no evidence produced which would support an award other than equal distribution to the two surviving children. *See* GEX 374, Family Trees. Plaintiffs' submission in this category improperly relies on the Charleston settlement. *See* Memorandum and Dkt 578 at 26. Plaintiffs have no knowledge of any kind regarding what injuries, damages, or categories which this Charleston settlement was intended to address under South Carolina law. They do not validly compare any of the Charleston plaintiffs with CMSgt (Ret.) or Mrs. Corrigan. There is no evidence before this Court which would compare and contrast a given Charleston plaintiff to CMSgt (Ret.) or Mrs. Corrigan with regard to their injuries, their experience during the shooting, the impact on their family, and/or any other factors which should be considered by this Court when arriving at an appropriate compensatory award.

### 1.2. **Benjamin Corrigan on behalf of the Estate of Shani Corrigan**

| Element | Amount |
| --- | --- |
| Pain and mental anguish "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by the decedent before his or her death. Tex. Civ. Jury Instr. Gen. Neg. § 30.3 ¶1. | $125,000.00[3] |
| Medical Expenses | Not Claimed |
| Funeral & burial expenses | Not Claimed |

---

[3] There are two representatives for each Corrigan estate. Each representative should be awarded 50% of the damages awarded to that estate. Plaintiffs presented no evidence which would support an award other than equal distribution to their two surviving children. *See* GEX 374, Family Trees. *See also* Note 2 with regard to issues with Plaintiffs' submission relying on the Charleston settlement.

### 1.3.  **Benjamin Corrigan's individual damages for the death of Robert Corrigan**

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | $0[4] |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | $0[5] |
| Loss of companionship and society sustained in the past | $20,000.00[6] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future. | $15,000.00[7] |

---

[4] Plaintiffs presented no evidence that TSgt Corrigan sustained damages in the form of pecuniary losses. Although implied during testimony that TSgt Corrigan suffered some sort of loss associated with his Air Force career as a result of this shooting, Plaintiffs failed to establish any substantive evidence that this is the case. *See generally* Trial Tr. 1774:15-23. Moreover, TSgt Corrigan testified that he has, since the shooting, extended his service in the United States Air Force and intends to retire from the Air Force. Trial Tr. 1778:11-22; GEX 466 at 28. Items cannot be merely emotional damages, they must reflect an identifiable monetary value. *See* Memorandum. Plaintiffs submitted their economic damages for the deceased Corrigans as pecuniary losses to their children instead of lost inheritance. Dkt 578 at 146-7. The difference in amounts is available for the Court's review by comparing the relevant reports (PEX 7036, PEX 7037, and GEX 470) but are properly characterized as lost inheritance vice pecuniary losses.

[5] *See* Note 4.

[6] TSgt Corrigan's baseline non-economic damage for the loss of each parent is reasonably calculated at $50,000. *See* Memorandum. Plaintiffs presented no evidence regarding TSgt Corrigan to meaningfully deviate from this baseline. As an adult child living a separate life well removed from the decedent(s), TSgt Corrigan suffers limited loss of companionship and society as a result of his parents' death.

[7] TSgt Corrigan is an adult with his own family and his own life. At the time of his parents' death, TSgt Corrigan was stationed at Kadena AB, Okinawa, Japan. He had not seen his family since they had gathered for the funeral of his younger brother who committed suicide in November 2016. TSgt Corrigan is reasonably likely to suffer less from the limited loss of companionship and society as a result of his parents' death as time progresses.

| | |
|---|---|
| Mental anguish sustained in the past. | $10,000.00[8] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $5,000.00[9] |
| Loss of inheritance. | $95,414.75[10] |

---

[8] TSgt Corrigan, despite having been diagnosed with PTSD, has never sought counseling from any source as a result of this shooting despite having free and confidential access to mental health resources. Trial Tr. 1780:10-23. Plaintiffs' damages amount is predicated on TSgt Corrigan's PTSD diagnosis. Dkt 578 at 147-8. It does not, however, discuss the failure on his part to mitigate his damages by not seeking counseling. Further, it fails to address Dr. Marx's unopposed contention that many of these Plaintiffs, including TSgt Corrigan, would succeed with an evidence-based, trauma-focused psychotherapy treatment.

[9] TSgt Corrigan has been diagnosed with PTSD. GEX 468 at 9. However, as noted by Dr. Marx, "[TSgt] Corrigan's intellect, ability to communicate, and familial support are protective factors that may positively influence his treatment outcome." *Id*. at 10. TSgt Corrigan is likely to have some difficulty with mental anguish going forward, but there is no evidence to suggest that he will not benefit substantially from appropriate, evidence based, trauma-focused psychotherapy. TSgt Corrigan's arguments that he sustains particularly acute mental anguish because he remains in the Air Force rings hollow in light of his independent, affirmative, ongoing decision to remain a part of Air Force and not mitigate his supposed "acute" damages.

[10] *See* Dkt 576 ¶ 28. There are two representatives for the combined Corrigan estate. Each representative should be awarded 50% of the damages sustained by that combined estate, and the estate itself is divided evenly in two between the decedents. The total combined award for loss of inheritance is reflected in Dkt 576 ¶ 28.

### 1.4.  **Benjamin Corrigan's individual damages for the death of Shani Corrigan**[11]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | $0[12] |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | $0[13] |
| Loss of companionship and society sustained in the past | $20,000.00[14] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future. | $15,000.00[15] |
| Mental anguish sustained in the past. | $10,000.00[16] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $5,000.00[17] |

---

[11] Although Mr. Corrigan testified that his relationship with his father involved more frequent communication due to their shared profession (Trial Tr. 1760:1-2), there is no evidence that the loss of his mother was meaningfully different than the loss of his father. Consequently, the United States recommends that the individual damages awards for the loss of Shani Corrigan match those for CMSgt (Ret.) Corrigan.

[12] *See* Note 2. Plaintiffs submitted their economic damages for the deceased Corrigans as pecuniary losses to their children instead of lost inheritance. Dkt 578 at 146-7. The difference in amounts is available for the Court's review by comparing the relevant reports. PEX 7036, PEX 7037, and GEX 470.

[13] *See* Note 12.

[14] *See* Notes 6 and 11.

[15] *See* Notes 7 and 11.

[16] *See* Notes 8 and 11.

[17] *See* Notes 9 and 11.

| | |
|---|---|
| Loss of inheritance. | $95,414.75[18] |

[18] *See* note 12.

2. **Preston Corrigan[19]**

2.1. **Preston Corrigan's individual damages for the death of Robert Corrigan**

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | $0[20] |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | $0[21] |
| Loss of companionship and society sustained in the past | $20,000.00[22] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $15,000.00[23] |

---

[19] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Preston Corrigan (Capt Corrigan) in the amount of $540,829.50. That award recommendation is broken down into $100,000 in individual damages for loss of consortium arising out of the death of his two parents, $250,000 for his portion of his parents' estates' survivorship claims, and $190,829.50 in economic damages for loss of inheritance. *See* Memorandum and Dkt 576¶ 28(a).

[20] Plaintiffs presented no evidence that Capt Corrigan sustained damages in the form of pecuniary losses. Although implied during testimony that Capt Corrigan suffered some sort of loss associated with his Air Force career as a result of this shooting, Plaintiffs failed to establish any substantive evidence that this is the case. *See generally* Trial Tr. 1744:18-1745:22. Moreover, Capt Corrigan testified that he has, since the shooting, extended his service in the United States Air Force and intends to retire from the Air Force. Trial Tr. 1746:3-5 and 1747:18-20; and GEX 472. Items cannot be merely emotional damages, they must reflect an identifiable monetary value. *See* Memorandum.

[21] *See* Note 20.

[22] Capt Corrigan's baseline non-economic damage for the loss of each parent is reasonably calculated at $50,000. *See* Memorandum. Plaintiffs presented no evidence regarding Capt Corrigan to meaningfully deviate from this baseline. As an adult child living a separate life well removed from the decedent(s), Capt Corrigan suffers limited loss of companionship and society as a result of his parents' death.

[23] As an adult child living a separate life well removed from the decedent(s), Capt Corrigan is reasonably likely to suffer less from the limited loss of companionship and society as a result of

| | |
|---|---|
| Mental anguish sustained in the past. | $10,000.00[24] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $5,000.00[25] |
| Loss of inheritance. | $95,414.75[26] |

---

his parents' death as time progresses.

[24] Capt Corrigan has been diagnosed with PTSD arising out of this shooting. GEX 474. However, Capt Corrigan is "close to his wife and son, and they have a third child on the way." GEX 474 at 10. It is reasonable to assume someone with his profile is likely to have successful treatment outcomes, should he avail himself of those options. Trial Tr. 3498:2-5. He has only recently begun seeking mental counseling. *Id*. at 1748:24-1749:4. He blames this an unfounded (and incorrect) assumption about what the USAF would do in response to a member of his career field seeking mental health treatment. *Id*. at 1748:12-1749:22. Plaintiffs' submission is predicated on Capt Corrigan's PTSD diagnosis. Dkt 578 at 149. It does not, however, discuss the failure on his part to mitigate his damages by not seeking meaningful counseling. Further, it fails to address Dr. Marx's unopposed contention that many of these Plaintiffs, including Capt Corrigan, would succeed with an evidence-based, trauma-focused psychotherapy treatment.

[25] *See* Note 24 (discussing likelihood of success for psychotherapy treatment for someone like Capt Corrigan). There is no evidence to suggest that he will not benefit substantially from appropriate, evidence based, trauma-focused psychotherapy. Capt Corrigan's arguments that he sustains particularly acute mental anguish because he remains in the Air Force rings hollow in light of his independent, affirmative, ongoing decision to remain a part of Air Force and not mitigate his supposed "acute" damages.

[26] *See* Dkt 576 ¶ 28. There are two representatives for the combined Corrigan estate. Each representative should be awarded 50% of the damages sustained by that combined estate, and the estate itself is divided evenly in two between the decedents. The total combined awards for loss of inheritance is reflected in Dkt 576 ¶ 28.

## 2.2.  **Preston Corrigan's individual damages for the death Shani Corrigan**[27]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | $0[28] |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | $0[29] |
| Loss of companionship and society sustained in the past | $20,000.00[30] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $15,000.00[31] |
| Mental anguish sustained in the past. | $10,000.00[32] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $5,000.00[33] |
| Loss of inheritance. | $95,414.75[34] |

---

[27] There is no evidence that the loss of Mr. Corrigan's mother was meaningfully different than the loss of his father. Consequently, the United States recommends that the individual damages awards for the loss of Shani Corrigan match those for Robert Corrigan. *See also* Note 25, discussing baseline recommendations for adult children's claims for loss of consortium.

[28] *See* Notes 12 and 27.

[29] *See* Notes 12 and 27.

[30] *See* Notes 22 and 27.

[31] *See* Notes 23 and 27.

[32] *See* Notes 24 and 27.

[33] *See* Notes 25 and 27.

[34] *See* Dkt 576 ¶ 28.

## Rodriguez- Amador Family

### 1.  Ronald & Gary Ramsey on behalf of the Estate of Therese Rodriguez

| Element | Amount |
| --- | --- |
| Pain and mental anguish "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by the decedent before his or her death. Tex. Civ. Jury Instr. Gen. Neg. § 30.3 ¶1. | $250,000[1] |
| Medical Expenses | Not Claimed |
| Funeral & burial expenses | Not Claimed |

---

[1] The United States recommends that the Court make a total award to the Estate of Therese Rodriguez in the amount of $250,000, for her pain and mental anguish prior to her death. *See* Memorandum.

## 2. **Regina Amador (n/k/a Reyes) on behalf of the Estate of Richard Rodriguez**[2]

| Element | Amount |
|---|---|
| Pain and mental anguish "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by the decedent before his or her death. Tex. Civ. Jury Instr. Gen. Neg. § 30.3 ¶1. | $250,000[3] |
| Medical Expenses | Not Claimed |
| Funeral & burial expenses | $182[4] |

---

[2] The United States recommends that the Court make a total award to the Estate of Richard Rodriguez in the amount of $250,182. That award recommendation is broken down into non-economic for his pain and mental anguish prior to his death and $182 in economic damages in funeral and burial expenses. *See* Memorandum.

[4] *See* PEX 15008. Plaintiffs correctly note that the total bill for Mr. Rodriguez's funeral was $9.057.00 (discounted by $2,375.00), and the Crime Victims Fund paid $6,500. Dkt 578 at 138. The Crime Victims Fund paid for nearly all of the funeral expenses for all of the decedents, yet Ms. Reyes is the only one seeking compensation for funeral expenses paid by the fund. Plaintiffs have presented no evidence that, four years after the shooting, the Crime Victims Fund has notified Plaintiffs of a subrogation claim. *See* Dkt 578 at 138.

### 3. **Ronald Ramsey Jr.'s damages for the death of Therese Rodriguez**[5]

| Element | Amount |
|---|---|
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $20,000[6] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $15,000[7] |
| Mental anguish sustained in the past. | $10,000[8] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $5,000[9] |

---

[5] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Ronald Ramsey Jr. in the amount of $50,000 for non-economic damages related to the death of his mother. Plaintiffs did not produce any evidence regarding Mr. Ramsey to meaningfully deviate from this baseline.

[6] As an adult child living a separate life well removed from the decedent, Mr. Ramsey suffers limited loss of companionship and society as a result of his mother's death.

[7] Mr. Ramsey is an adult who lives with his girlfriend. Trial Tr. 1187:2. He has five children and a busy, successful career as a Union President. *See* Trial Tr. 1187:5-6, 1201:8-16. Mr. Ramsey is reasonably likely to suffer less from the limited loss of companionship and society as a result of his mother's death as time progresses.

[8] Mr. Ramsey, despite having been diagnosed with PTSD, never sought counseling from any source as a result of this shooting nor has he taken any mental health medications. Trial Tr. 1201:19-21 and 1201:22-1202:7. Mr. Ramsey's hobbies such as hunting and fishing have not changed since his mother passed away. Trial Tr. 1202:12-15. Although he took approximately one month off from work following the shooting, he has maintained his pre-shooting employment. Trial Tr. 1201:8-16.

[9] Mr. Ramsey has been diagnosed with PTSD. GEX 605 at 10. Since his PTSD is of moderate

| | |
|---|---|
| Loss of inheritance. | Not Claimed |

severity and he was not directly exposed to the shooting, his symptoms are amenable to treatment. *Id*. Evidence based, trauma-focused psychotherapy can assist Mr. Ramsey in dealing with any lingering psychological symptoms. *Id*.

4. **Gary Ramsey's damages for the death of Therese Rodriguez**[10]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $20,000[11] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $15,000[12] |
| Mental anguish sustained in the past. | $10,000[13] |

---

[10] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Gary Ramsey in the amount of $50,000 for non-economic damages related to the death of his mother.

[11] Mr. Ramsey's baseline total non-economic damage is reasonably calculated at $50,000. *See* Memorandum. Plaintiffs did not produce any evidence regarding Mr. Ramsey to meaningfully deviate from this baseline. As an adult child living a separate life, well removed from the decedent, Mr. Ramsey suffers limited loss of companionship and society as a result of his mother's death.

[12] Mr. Ramsey lives on a small ranch in McCoy, Texas with his wife and two children. Trial Tr. 1205:10-17. His wife is supportive, and he would describe his marriage as generally wonderful. Trial Tr. 1222:12-13. Mr. Ramsey is reasonably likely to suffer less from the limited loss of companionship and society as a result of his mother's death as time progresses.

[13] Mr. Ramsey, despite having been diagnosed with PTSD, Major Depressive Disorder and Generalized Anxiety Disorder, never sought counseling from any source as a result of this shooting nor has he taken any mental health medications. Trial Tr. 1222:21-1223:4. Mr. Ramsey still enjoys hunting, fishing, boating and doing things with his family on his ranch. Trial Tr. 1222:7-11. He took very little time off from running his businesses following the shooting and has continued to be very successful in his businesses. *See* Trial Tr. 1213: 7-16.

| | |
|---|---|
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $5,000[14] |
| Loss of inheritance. | Not Claimed |

---

[14] Although Mr. Ramsey has been diagnosed with three mental health disorders, they share trans-diagnostic features. GEX 611 at 12. This means that successful treatment for one condition can often generalize to other conditions. *Id*. Mr. Ramsey's "intellect and his clear ability to be successful in business are protective factors that may positively influence treatment outcome." *Id*.

**5. Regina Amador's (n/k/a Reyes) damages for the death of Richard Rodriguez[15]**

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | $0[16] |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | $0[17] |
| Loss of companionship and society sustained in the past | $20,000[18] |

---

[15] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Regina Reyes (fna Amador) in the amount of $50,000 for non-economic damages related to the death of her father.

[16] Although Ms. Reyes indicates that her father provided her some monetary support, the timeframe appears to be well before her employment with Toyota, where she has been for six years. *See* Trial Tr. 1309:18-1311:3 ("when me and Joel first started our family, we would hit a lot of – we would – little financial issues since Joel was the only one working.") In fact, Plaintiffs point out that Ms. Reyes testified that Mr. Rodriguez "raised her to be independent." Dkt 578 at 197. The law requires that pecuniary losses cannot be merely emotional damages, they must reflect an identifiable monetary value. *See* Memorandum.

[17] *See* Note 16.

[18] Ms. Reyes' baseline total non-economic damage is reasonably calculated at $50,000. *See* Memorandum. Plaintiffs did not produce any evidence regarding Ms. Reyes to meaningfully deviate from this baseline. As an adult child living a separate life Ms. Reyes suffers limited loss of companionship and society as a result of her father's death. Plaintiffs appear to support Ms. Reyes' higher award by referencing the loss of her mother and grandparents. *See* Dkt 578 at 196-197. As Plaintiffs note, Ms. Reyes' mother passed more than fifteen years earlier. *Id*. Unfortunately, Ms. Reyes is not uniquely situated in having lost her only parent in the shooting. As such, this does not support a higher award. Plaintiffs also assert that Ms. Reyes should receive a higher award because Ms. Reyes' grandparents passed due to COVID-19 "while awaiting justice in this court." *Id*. There is nothing in the record that indicates the cause of her grandparents' passing and Plaintiffs fail to mention that Ms. Reyes' grandparents were both over 90 years old at the time of their passing. Plaintiffs also failed to present any testimony regarding Ms. Reyes' relationship with her grandparents or why their loss should affect her award.

| | |
|---|---|
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $15,000[19] |
| Mental anguish sustained in the past. | $10,000[20] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $5,000[21] |
| Loss of inheritance. | Not Claimed |

---

[19] Ms. Reyes is married with three sons. Trial Tr. 1343:13-20. She also maintains a close relationship with a prior spouse's children. *See* Trial Tr. 1343:23-1344:3. She is active in all of her children's lives. Trial Tr. 1344:1-6. She has a strong support system in her father's family. Trial Tr. 1327:1-3. Ms. Reyes is reasonably likely to suffer less from the limited loss of companionship and society as a result of her father's death as time progresses.

[20] Following the shooting, Ms. Reyes attended counseling for six months. It helped her with different coping mechanisms, she developed a closer relationship to God and she made several changes toward wellness. *See* PEX 15042-00005. She also took medications for mental health for approximately six months. It was not until the day before her testimony that she sought mental health medications and she had not attended any mental health counseling except for the six months of treatment following the shooting. *See* Trial Tr. 1345:17-1346:12.

[21] Ms. Reyes has been diagnosed with PTSD. GEX 599 at 14. Her treatment-seeking behavior and social support are protective factors and she will likely benefit from evidence based, trauma-focused psychotherapy. *Id*.

### Johnson Family

1. ### Kati Wall & Michael Johnson as representatives of the Estates of Dennis and Sara Johnson

   1.1. ### Kati Wall & Michael Johnson as personal representatives of the Estate of Dennis Johnson

| Element | Amount |
| --- | --- |
| Pain and mental anguish "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by the decedent before his or her death. Tex. Civ. Jury Instr. Gen. Neg. § 30.3 ¶ 1. | $250,000[1] |
| Medical Expenses | Not Claimed |
| Funeral & burial expenses | Not Claimed |

---

[1] For the reasons articulated herein, the United States recommends that the Court make a total award to the Estate of Dennis Johnson in the amount of $250,000, for his pain and mental anguish prior to her death. *See* Memorandum. According to two witnesses, in the immediate aftermath of the shooting, Mr. Johnson's body was in the pew that was his normal seat. Trial Tr. 460:12-14, 651:18-19. This suggests that he was shot and killed before he had time to take cover, likely in the first few minutes of the shooting. Plaintiffs cite to testimony by Christopher Johnson to argue that the Johnsons were alive for some portion of the shooting, Dkt. 578 at 131, but Christopher was not present in the church, and did not witness any of the shooting. Christopher could not provide the name of the person who told him about his parents' deaths. GEX 278 at 61:8-10

1.2. **Kati Wall & Michael Johnson as personal representatives of the Estate of Sara Johnson**

| Element | Amount |
| --- | --- |
| Pain and mental anguish "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by the decedent before his or her death. Tex. Civ. Jury Instr. Gen. Neg. § 30.3 ¶ 1. | $250,000[2] |
| Medical Expenses | Not Claimed |
| Funeral & burial expenses | Not Claimed |

---

[2] For the reasons articulated herein, the United States recommends that the Court make a total award to the Estate of Sara Johnson in the amount of $250,000, for her pain and mental anguish prior to her death. *See* Memorandum. According to two witnesses, in the immediate aftermath of the shooting, Mrs. Johnson's body was still in the pew that was her normal seat, with her husband. Trial Tr. 460:12-14, 651:18-19. This suggests that she was shot and killed before she had time to take cover, likely in the first few minutes of the shooting. Plaintiffs cite to testimony by Christopher Johnson to argue that the Johnsons were alive for some portion of the shooting, Dkt. 578 at 132, but Christopher was not present in the church, and did not witness any of the shooting. Christopher could not provide the name of the person who told him about his parents' deaths. GEX 278 at 61:8-10. Further, according to Christopher's second-hand account, Mrs. Johnson was "executed" prior to her husband being shot. *Id.* at 60:24-61:7. Because her head wound was "rapidly fatal," PEX 9010, she would not be eligible for bystander damages.

2. **Kati Wall**

2.1. **Kati Wall's individual damages for death of Dennis Johnson[3]**

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | $217.03[4] |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $15,000[5] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $10,000[6] |

---

[3] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Kati Wall in the amount of $100,434. That recommendation is broken down into $100,000 in non-economic damages arising out of the deaths of her parents ($50,000 for each parent) and $434 for lost pecuniary damages in the past ($217 for each parent). *See* Memorandum and Dkt. 576 ¶ 4(a).

[4] *See* Dkt. 576 ¶ 4(a). Plaintiffs did not produce any evidence to substantiate any claims for pecuniary losses other than medical expenses. Ms. Wall testified that her parents did not provide her with regular financial support.  GEX 286 at 52:21-53. The law requires that pecuniary losses cannot be merely emotional damages, they must reflect an identifiable monetary value. *See* Memorandum.

[5] Ms. Wall is an adult with her own family and life. She lived most of her adult life in Georgia. GEX 286 at 27:20-28:15. At the time of the shooting she lived in a mobile home on her parents' property, GEX 286 at 27:12-14. Nonetheless, Plaintiffs did not produce evidence to prove that Ms. Wall's damages should deviate meaningfully from the baseline non-economic damages for adult children. *See* Memorandum.

[6] Ms. Wall has now returned to Georgia, where "all of [her] friends" live. GEX 286 at 27:13-18, 28:14-15. Ms. Wall is reasonably likely to suffer less from the loss of companionship and society as a result of her parents' deaths as time progresses.

| | |
|---|---|
| Mental anguish sustained in the past. | $15,000[7] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $10,000[8] |
| Loss of inheritance. | Not Claimed |

---

[7] Ms. Wall has been diagnosed with PTSD. PEX 9026 at 10. However, she has a history of mental health issues and trauma. GEX 272 at 32:5-6. She told her psychologist that her childhood was "traumatic and difficult," and that her first husband was abusive. PEX 9026 at 1. As a child, Ms. Wall witnessed substance abuse, physical abuse, and domestic violence; she also experienced sexual abuse as a child and teenager. PEX 9026 at 2, PEX 9023 at 149. While she was taking college courses, Ms. Wall took Xanax for anxiety. PEX 9022 at 10. Prior to the shooting, she was diagnosed with bipolar disorder, Generalized Anxiety Disorder, and Obsessive Compulsive Disorder. PEX 9022 at 4. Most recently, she was arrested for prostitution and raped at gunpoint by a client. PEX 9025 at 14. While some portion of her mental anguish can be attributed to the loss of her parents, it is difficult to attribute much of it solely to that event.

[8] *See* Note 7. Ms. Wall is likely to have mental anguish going forward, but it will likely decrease over time. Ms. Wall gets support from her family. GEX 286 at 86:25-87:8.

2.2. **Kati Wall's damages for the death of Sara Johnson**

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | $217[9] |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $15,000[10] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $10,000[11] |
| Mental anguish sustained in the past. | $15,000[12] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $10,000[13] |
| Loss of inheritance. | Not Claimed |

---

[9] *See* Note 4, and Dkt. 576 ¶ 4(a).

[10] *See* Note 5.

[11] *See* Note 6.

[12] *See* Note 7.

[13] *See* Note 8.

3. **Michael Johnson**[14]

3.1. **Michael Johnson's individual damages for death of Dennis Johnson**

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $25,000[15] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $10,000[16] |
| Mental anguish sustained in the past. | $10,000[17] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $5,000[18] |

---

[14] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Michael Johnson in the amount of $100,000. That recommendation is based on $100,000 for non-economic damages arising out of the deaths of his parents ($50,000 for each parent). *See* Memorandum.

[15] Michael Johnson is an adult with his own family; however, he lived on his parents' property for over ten years. Trial Tr.  1432:19-22. It is likely, therefore, that he has experienced some, though limited, loss of companionship and society since his parents' deaths.

[16] *See* Note 15. It is reasonable to expect that Michael Johnson's experience of loss of companionship and society will dissipate over time, particularly considering the age of his parents (77 and 68). PEX 9000, 9001.

[17] Michael suffered from anxiety before the shooting, for which he took medication. Trial Tr. 1434:6-10. Since the shooting, he has not sought out any counseling or spoken to doctors about his feelings of grief. Trial Tr. 1434:16-22. Plaintiffs did not produce any evidence to suggest that his grief is unusually severe.

[18] *See* Note 17.

| Loss of inheritance. | Not Claimed |

### 3.2. **Michael Johnson's individual damages for the death of Sara Johnson**

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $25,000[19] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $10,000[20] |
| Mental anguish sustained in the past. | $10,000[21] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $5,000[22] |
| Loss of inheritance. | Not Claimed |

---

[19] *See* Note 15

[20] *See* Note 16.

[21] *See* Note 17.

[22] *See* Note 18.

4.  **Deanna Staton**[23]

4.1. **Deanna Staton's individual damages for the death of Dennis Johnson**

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $20,000[24] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $12,500[25] |
| Mental anguish sustained in the past. | $12,500[26] |

---

[23] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Deanna Staton in the amount of $100,000. That recommendation is based on $100,000 for non-economic damages arising out of the deaths of her parents ($50,000 for each parent). *See* Memorandum.

[24] Ms. Staton's baseline non-economic damages are reasonably calculated at $50,000 for each parent. *See* Memorandum. Plaintiffs did not produce any evidence regarding Ms. Staton to meaningfully deviate from this baseline. As an adult child with a family of her own, Ms. Staton suffers limited loss of companionship and society as a result of her parents' deaths.

[25] As an adult child, who is now living with her husband in Florida, Ms. Staton is reasonably likely to suffer less from the limited loss of companionship and society as a result of her parents' death as time progresses.

[26] Ms. Staton testified to her grief. However, before the shooting, she was diagnosed with PTSD from sexual abuse as a child, as well as bipolar disorder, anxiety, and depression. Trial Tr. 1414:1-13. After the shooting, she did a short amount of counseling, but stopped and has not returned. Trial Tr. 1415:22-1416:5.

| | |
|---|---|
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $5,000[27] |
| Loss of inheritance. | Not Claimed |

---

[27] It is reasonable to find that over time, Ms. Staton's grief will diminish, particularly as she is living with her husband who is a strong source of support. Trial Tr. 1416:16-23.

### 4.2. **Deanna Staton's individual damages for the death of Sara Johnson**

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $20,000[28] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $12,500[29] |
| Mental anguish sustained in the past. | $12,500[30] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $5,000[31] |
| Loss of inheritance. | Not Claimed |

---

[28] *See* Note 24.

[29] *See* Note 25.

[30] *See* Note 26.

[31] *See* Note 27.

5.  **Chris Johnson**[32]

5.1. **Chris Johnson's individual damages for the death of Dennis Johnson**

| Element | Amount |
|---|---|
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $15,000[33] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $10,000[34] |
| Mental anguish sustained in the past. | $15,000[35] |

---

[32] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Christopher Johnson in the amount of $100,000. That recommendation is based on $100,000 for non-economic damages arising out of the deaths of his parents. *See* Memorandum.

[33] Mr. Johnson's baseline total non-economic damage is reasonably calculated at $50,000 for each parent. *See* Memorandum. Plaintiffs did not produce any evidence regarding Mr. Johnson to meaningfully deviate from this baseline. Mr. Johnson has his own family and saw his parents a few times a week. GEX 278 at 44:21-45:12. As an adult child living a separate life, Mr. Johnson suffers limited loss of companionship and society as a result of his parents' death.

[34] As an adult with his own family, it is reasonably likely to expect that Mr. Johnson is likely to suffer less from the loss of companionship and society of his parents as time progresses.

[35] Plaintiffs did not produced any evidence suggesting that Mr. Johnson suffered unusually severe grief. Mr. Johnson saw a counselor approximately three times about the shooting, and has not been prescribed medication. GEX 287 at 39:6-8, 40:2-4, 42:5-8. While Mr. Johnson's wife may have miscarried due to stress, the doctor did not say that the shooting was the cause of the miscarriage. GEX 278 at 59:5-7. Furthermore, mental anguish due to his wife's miscarriage should not be considered part of Mr. Johnson's anguish for his parents' deaths.

| | |
|---|---|
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $10,000[36] |
| Loss of inheritance. | Not Claimed |

---

[36] It is reasonably likely that Mr. Johnson will suffer decreased mental anguish related to his parents' deaths over time.

### 5.2. **Chris Johnson's individual damages for the death of of Sara Johnson**

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $15,000[37] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $10,000[38] |
| Mental anguish sustained in the past. | $15,000[39] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $10,000[40] |
| Loss of inheritance. | Not Claimed |

[37] *See* Note 33.

[38] *See* Note 34

[39] *See* Note 35.

[40] *See* Note 36.

6.  **Dennis Johnson Jr.[41]**

6.1. **Dennis Johnson Jr. as child of Dennis Johnson Sr.**

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $15,000[42] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $10,000[43] |
| Mental anguish sustained in the past. | $17,000[44] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $8,000[45] |

[41] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Dennis Neal Johnson, Jr., in the amount of $50,000. That recommendation is based on $50,000 for non-economic damages arising out of the death of his father. *See* Memorandum. Neal was not adopted by his step-mother, Sara Johnson. GEX 279 at 22:5, 70:15.

[42] Mr. Johnson's baseline total non-economic damage is reasonably calculated at $50,000. *See* Memorandum. Plaintiffs did not produce any evidence regarding Mr. Johnson to meaningfully deviate from this baseline. As an adult child living a separate life, Mr. Johnson suffers limited loss of companionship and society as a result of his parents' death.

[43] As an adult with his own family, it is reasonably likely to expect that Mr. Johnson is likely to suffer less from the loss of companionship and society of his parents as time progresses.

[44] Mr. Johnson testified that after the shooting, he "self-medicated" with alcohol and drugs. GEX 279 at 40:4-8, 86:13-18. He went to counseling for about eight months. GEX 279 at 35:20-25.

[45] Mr. Johnson is now alcohol and drug-free. GEX 279 at 77:1-6. He stopped going to counseling because he "used the church" to handle his grief. GEX 279 at 75:2-18. In addition, it is reasonably likely that his grief for his father will decrease with the progression of time.

| Loss of inheritance. | Not Claimed |

7. **James Graham**[46]

7.1. **James Graham's individual damages for the death of  Sara Johnson**

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | Not Claimed |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | Not Claimed |
| Loss of companionship and society sustained in the past | $15,000[47] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $10,000[48] |
| Mental anguish sustained in the past. | $15,000[49] |

---

[46] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff James Graham in the amount of $50,000. That recommendation is based on $50,000 for non-economic damages arising out of the death of his mother. *See* Memorandum. Mr. Graham was not adopted by his step-father, Dennis Johnson. PEX 901 at 37:23-24.

[47] Mr. Graham's baseline total non-economic damage is reasonably calculated at $50,000. *See* Memorandum. Plaintiffs did not produce any evidence regarding Mr. Graham to meaningfully deviate from this baseline. Mr. Graham stopped living with his mother at the age of 16. PEX 902 at 39:23-40:5. He visited Sara and Dennis Johnson in Texas once, in 1998, and last saw them in person in 2009 or 2010. *Id.* at 40:9-18. As an adult child living a separate life well-removed from his mother, Mr. Graham suffers limited loss of companionship and society as a result of his mother's death.

[48] As an adult child living a separate life well removed from his mother, Mr. Graham is reasonably likely to suffer less from the limited loss of companionship and society as a result of his mother's death as time progresses.

[49] Plaintiffs did not produced any evidence showing unusually severe grief. Mr. Graham has not participated in any counseling or therapy since the shooting; his faith helps him cope with his grief. PEX 902 at 43:23-25, 44:7-13. His girlfriend, Barbara, has been present to help him with his grief as well.  *Id.* at 14:21-15:2.

| | |
|---|---|
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $10,000[50] |
| Loss of inheritance. | Not Claimed |

---

[50] *See* Note 49.  It is reasonably likely that his grief will decrease with the passage of time.

## Marshall Family

1. **Martina Pachal**[1]

   1.1. **Martina Pachal on behalf of the Estate of Robert Marshall**

| Element | Amount |
|---|---|
| Pain and mental anguish "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by the decedent before his or her death. Tex. Civ. Jury Instr. Gen. Neg. § 30.3 ¶1. | $250,000.00[2] |
| Medical Expenses | $0 |
| Funeral & burial expenses | $0 |

---

[1] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Martina Pachal in the amount of $660,907.00. That award recommendation is broken down into $75,000 in individual damages for the loss of consortium arising out of the death of her two parents, $500,000 combined as the sole representative of her parents' estates, and $85,907.00 in individual economic damages for her loss of inheritance. *See* Memorandum and Dkt 576 ¶ 28(a).

[2] The baseline damages awarded to the estate of each decedent is reasonably calculated at $250,000.00. *See* Memorandum. In this case, only Martina Pachal has been designated as the representative for the estates of Robert and Karen Marshall. Plaintiffs' submission relies on their flawed determination that the Charleston settlement provides "precedential" value in this case. Dkt 578 p. 26. Plaintiffs have no knowledge of any kind regarding what injuries, damages, or categories which this Charleston settlement was intended to address under South Carolina law. They do not validly compare any of the Charleston plaintiffs with Mr. or Mrs. Marshall. There is no evidence before this Court which would compare and contrast a given Charleston plaintiff to Mr. or Mrs. Marshall with regard to their injuries, their experience during the shooting, the impact on their family, and/or any other factors which should be considered by this Court when arriving at an appropriate compensatory award.

1.2. **Martina Pachal on behalf of the Estate of Karen Marshall**

| Element | Amount |
| --- | --- |
| Pain and mental anguish "Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by the decedent before his or her death. Tex. Civ. Jury Instr. Gen. Neg. § 30.3 ¶1. | $250,000.00[3] |
| Medical Expenses | $0 |
| Funeral & burial expenses | $0 |

---

[3] *See* note 2.

### 1.3. **Martina Pachal's individual damages for the death of Robert Marshall**[4]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | $0[5] |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | $0[6] |
| Loss of companionship and society sustained in the past | $20,000.00[7] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $15,000.00[8] |

---

[4] Mrs. Pachal's baseline total non-economic damages as an adult child for the loss of a parent is reasonably calculated at $50,000. *See* Memorandum. Plaintiffs produced no evidence regarding Mrs. Pachal to meaningfully deviate from this baseline.

[5] Plaintiffs produced no evidence that Mrs. Pachal sustained damages in the form of pecuniary losses. Trial Tr. 1620:4-6. The law requires that pecuniary losses cannot be merely emotional damages, they must reflect an identifiable monetary value. *See* Memorandum. Plaintiffs submitted their economic damages for the deceased Marshalls as pecuniary losses to their children instead of lost inheritance. Dkt 568 pp. 186-7. The difference in amounts is available for the Court's review by comparing the relevant reports. However, please note that the Plaintiffs forgot to account for the brother who is not a claimant. GEX 374 p. 12. There is no evidence in the record that Brandon Marshall would not have been treated as a co-equal when it comes to his parents' estate.

[6] *See* note 5.

[7] As an adult child living a separate life well removed from the decedent(s), Mrs. Pachal suffers limited loss of companionship and society as a result of her parents' death. The evidence produced at trial shows that Mrs. Pachal had an ordinary relationship with her father for an adult of her age and development, while residing thousands of miles away. She and her father spoke regularly and texted often. Trial Tr. 1620:17-22. She had not seen her father in several years. *Id.* at 1620:10-16.

[8] Mrs. Pachal is an adult with a family. At the time of her parents' death, Mrs. Pachal had not seen her father since they had gathered for a family reunion in 2015. Trial Tr. 1620:10-16. Mrs. Pachal is reasonably likely to suffer less from her limited loss of companionship and society as a result of her father's death as time progresses.

| | |
|---|---|
| Mental anguish sustained in the past. | $10,000.00[9] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $5,000.00[10] |
| Loss of inheritance. | $42,953.50[11] |

[9] Mrs. Pachal was diagnosed with PTSD and Generalized Anxiety Disorder which share trans-diagnostic features. This means that successful treatment for one condition can often generalize to the other condition. GEX 516 at 8. She attended a total of 13 mental health and wellness meetings between November 28, 2017 and May 4, 2018. PEX 11017-00011. There is no evidence she has sought counseling since that time. Plaintiffs' submission is predicated on Mrs. Pachal's PTSD and anxiety disorder diagnoses. Dkt 578 p. 187. It does not, however, discuss the failure on her part to mitigate her damages by not seeking meaningful counseling. Further, it fails to address Dr. Marx's unopposed contention that many of these Plaintiffs, including Mrs. Pachal, would succeed with an evidence-based, trauma-focused psychotherapy treatment.

[10] Mrs. Pachal maintains a "healthy family life and a healthy [] network of friends." *Id*. Further, "Mrs. Pachal's intellect, education and work history in nursing, and supportive family are strengths that may positively influence treatment outcome. Mrs. Pachal is a good candidate for several evidence-based interventions for PTSD." *Id*. at 9. Accordingly, if she complies with an evidence based, trauma-focused psychotherapy, she is likely to suffer from decreased mental anguish as time progresses.

[11] *See* Dkt 576 ¶ 30 and GEX 518 for total combined value of the Marshall estates. The Marshalls had three children: Martina Pachal, Kara Boyd, and Brandon Marshall. GEX 374 p. 12. The only evidence introduced at trial shows that the Marshalls intended to leave their estate to their three children in substantially equal shares. GEX 276 at 41:8-20. However, Brandon Marshall is not a claimant in this case. Accordingly, the combined Marshall estate has been reduced by one-third (representative of Brandon Marshall's anticipated share in the estate) and then distributed equally to the two claimants. This amount reflects Mrs. Pachal's claim to her father's half of the combined estate.

1.4. **Martina Pachal's individual damages for the death of Karen Marshall**[12]

| Element | Amount |
| --- | --- |
| Pecuniary loss sustained in the past | $0[13] |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | $0[14] |
| Loss of companionship and society sustained in the past | $7,500.00[15] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $2,500.00[16] |

---

[12] Mrs. Pachal's baseline total non-economic damages as an adult child for the loss of a parent is reasonably calculated at $50,000. *See* Memorandum. However, Mrs. Pachal's recovery for the loss of consortium with her mother should be adjusted downward from baseline due to the "strained" nature of their relationship. *See* Trial Tr. 1620:23-1621:10

[13] Plaintiffs did not produce any evidence that Mrs. Pachal sustained damages in the form of pecuniary losses. Trial Tr. 1620:4-6. The law requires that pecuniary losses cannot be merely emotional damages, they must reflect an identifiable monetary value. *See* Memorandum. Plaintiffs submitted their economic damages for the deceased Marshalls as pecuniary losses to their children instead of lost inheritance. Dkt 568 pp. 186-7. The difference in amounts is available for the Court's review by comparing the relevant reports. However, please note that the Plaintiffs forgot to account for the brother who is not a claimant. GEX 374 p. 12. There is no evidence in the record that Brandon Marshall would not have been treated as a co-equal when it comes to his parents' estate.

[14] *See* note 13.

[15]. Mrs. Pachal had a "strained" relationship with her mother.  *See* Trial Tr. 1620:23-1621:10. Plaintiffs' submission fails to acknowledge the fundamental distinction between Mrs. Pachal's relationship with her mother and with her father. Dkt 578 p. 189.

[16] Mrs. Pachal is an adult with a family. At the time of her parents' death, Mrs. Pachal had not seen her mother since they had gathered for a family reunion in 2015. Trial Tr. 1620:10-16. Mrs. Pachal is reasonably likely to suffer less from her limited loss of companionship and society as a result of her mother's death as time progresses.

| | |
|---|---|
| Mental anguish sustained in the past. | $10,000.00[17] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $5,000.00[18] |
| Loss of inheritance. | $42,953.50[19] |

---

[17] *See* note 9.

[18] *See* note 10.

[19] *See* note 11.

2. **Kara Boyd**[20]

2.1. **Kara Boyd's individual damages for the death of Robert Marshall**[21]

| Element | Amount |
|---|---|
| Pecuniary loss sustained in the past | $0[22] |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | $0[23] |
| Loss of companionship and society sustained in the past | $20,000[24] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $15,000[25] |

---

[20] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff Kara Boyd in the amount of $185,907.00. That award recommendation is broken down into $100,000 in individual damages for the loss of consortium arising out of the death of her two parents and $85,907.00 in individual economic damages for her loss of inheritance. *See* Memorandum and Dkt 576 ¶ 28(a).

[21] Mrs. Boyd's baseline total non-economic damages as an adult child for the loss of a parent is reasonably calculated at $50,000. *See* Memorandum. Plaintiffs did not produce any evidence regarding Mrs. Boyd to meaningfully deviate from this baseline.

[22] See note 5.

[23] *See* note 5.

[24] As an adult child living a separate life well removed from the decedent(s), Mrs. Boyd suffers limited loss of companionship and society as a result of her parents' death. The evidence produced at trial shows that Mrs. Boyd had an ordinary relationship with her father for an adult of her age and development. She and her father spoke monthly. GEX 276 at 26:20-27:21.

[25] Mrs. Boyd is an adult with a family. Mrs. Boyd is reasonably likely to suffer less from her loss of companionship and society as a result of her father's death as time progresses.

| | |
|---|---|
| Mental anguish sustained in the past. | $10,000.00[26] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $5,000.00[27] |
| Loss of inheritance. | $42,953.50[28] |

[26] Mrs. Boyd was diagnosed with PTSD and Generalized Anxiety Disorder. GEX 520 at 12-13. While she claims that she attended regular counseling sessions following the death of her parents, no records were produced which would support this statement or provide any additional information on the nature and/or duration of these sessions. They should be accorded minimal weight, if any. Plaintiffs' submission is predicated on Mrs. Boyd's PTSD and anxiety disorder diagnoses. Dkt 578 p. 18. It does not, however, discuss the failure on her part to mitigate her damages by not seeking meaningful counseling. Further, it fails to address Dr. Marx's unopposed contention that many of these Plaintiffs, including Mrs. Boyd, would succeed with an evidence-based, trauma-focused psychotherapy treatment.

[27] Mrs. Boyd "has been able to maintain some relationships with close friends and family." GEX 520 at 13. However, she "reports that her work continues to be affected by her PTSD symptoms [] describes herself as 'unmotivated' and 'mopey' and [] her work feels more 'difficult.'" *Id.* Mrs. Boyd has yet to receive a full course of evidence-based, trauma-focused psychotherapy with a highly skilled and trained mental health care provider. "Mrs. Boyd's willingness to speak openly with this examiner about her traumatic experience learning that her parents had been killed in the Sutherland Springs church shooting and the impact this experience has had on her bodes well for her ability to engage in and benefit from treatment." *Id.*

[28] *See* note 11.

## 2.2.  **Kara Boyd's individual damages for the death of Karen Marshall**[29]

| Element | Amount |
|---|---|
| Pecuniary loss sustained in the past | $0[30] |
| Pecuniary loss that, in reasonable probability, Plaintiff will sustain in the future | $0[31] |
| Loss of companionship and society sustained in the past | $20,000.00[32] |
| Loss of companionship and society that, in reasonable probability, Plaintiff will sustain in the future | $15,000.00[33] |
| Mental anguish sustained in the past. | $10,000.00[34] |
| Mental anguish that, in reasonable probability, Plaintiff will sustain in the future | $5,000.00[35] |

---

[29] Mrs. Boyd's baseline total non-economic damages as an adult child for the loss of a parent is reasonably calculated at $50,000. *See* Memorandum. Plaintiffs did not produce any evidence regarding Mrs. Boyd to meaningfully deviate from this baseline.

[30] Plaintiffs did not produce any evidence that Mrs. Boyd sustained damages in the form of pecuniary losses. GEX 276 at 33:2-3. *See also* note 5.

[31] *See* note 5.

[32] As an adult child living a separate life well removed from the decedent(s), Mrs. Boyd suffers limited loss of companionship and society as a result of her parents' death. The evidence produced at trial shows that Mrs. Boyd had an ordinary relationship with her mother for an adult of her age and development. She and her mother spoke weekly. GEX 276 at 26:20-27:21. They had not seen each other in person since 2015. *Id*. at 28:16-23.

[33] Mrs. Boyd is an adult with a family. Mrs. Boyd is reasonably likely to suffer less from her loss of companionship and society as a result of her mother's death as time progresses.

[34] *See* note 26.

[35] *See* note 27.

| Loss of inheritance. | $42,953.50[36] |

---

[36] *See* note 11.

## Colbath Family

1. ### David Colbath[1]

   1.1. ### Individual Personal Injury

| Element | Amount |
| --- | --- |
| Physical pain and mental anguish sustained in the past. | $250,000[2] |
| Physical pain and mental anguish that, in reasonable probability, Plaintiff will sustain in the future. | $150,000[3] |
| Loss of earning capacity sustained in the past. | $20,972[4] |

---

[1] For the reasons articulated herein, the United States recommends the Court make a total award to Plaintiff David Colbath in the amount of $1,044,816.74. That award recommendation is broken down into $600,000 for total non-economic damages and $447,816.74 in economic damages. *See* Memorandum and Dkt 576 ¶ 10 (Stipulation was only to $426,844.74, which did not include past earning loss).

[2] Mr. Colbath suffered multiple gunshot wounds to the left chest, right upper extremity, right flank/lateral low back, and bilateral lower extremities. GEX 729 at 28. Mr. Colbath received acute hospital care at Brooke Army Medical Center from November 5, 2017 until November 27, 2017. GEX 460 at 2, 5. He received in-patient rehabilitation at New Braunfels Regional Rehab Hospital from November 27, 2017 to December 22, 2017. GEX 460 at 5,7. Mr. Colbath saw mental health counselors at the Center for the Intrepid, who provided support and helped change his perspective as part of the healing process. Trial Tr. 916:22-918:5.

[3] On February 23, 2020, Colbath married Sheri Kay, a long-time personal friend. It was a joyous occasion in his life. Trial Tr. 923:11-17; 929:18-20. He now has a loving and supportive long-term relationship. Trial Tr. 924:4-7. Mr. Colbath has been diagnosed with PTSD. GEX 461 at 13-14. However, Mr. Colbath has done significant work to heal from his PTSD, including traveling throughout the nation to public speaking engagements about the Sutherland Springs mass shooting and church safety. Trial Tr. 919:19-925:5, 926:8-11. Mr. Colbath finds speaking about these topics to be healing. Trial Tr. 926:3-6. Mr. Colbath also returns to the Sutherland Springs (new) church facility multiple times a week. Trial Tr. 926:10-15. Mr. Colbath believes that based upon his own survival through this ordeal he has given him a calling to spread the word of God. Trial Tr. 926:16-927:23. The work that Mr. Colbath has put into his healing, along with his relationships with his children, wife, business, and church community, all suggest that evidence-based, trauma focused psychotherapy is likely to alleviate his symptoms. *See* GEX 461 at 14.

[4] Colbath's past average profitability of $20,972 is 65.9% of Dr. Hubbard's estimate of the cost to

| | |
|---|---|
| Loss of earning capacity that, in reasonable probability, Plaintiff will sustain in the future. | $144,159[5] |
| Disfigurement sustained in the past. | $65,000[6] |
| Disfigurement that, in reasonable probability, Plaintiff will sustain in the future. | $45,000[7] |
| Physical impairment sustained in the past | $45,000[8] |
| Physical impairment that, in reasonable probability, Plaintiff will sustain in the future. | $45,000[9] |

hire a full-time year-round contract laborer or $31,830. The $20,972, therefore, represents a full year of lost profits or, alternatively, Hubbard's cost of hiring a laborer for 65.9% of total cost for a year. GEX 458 at p. 12, note 37.

[5] *See* Dkt. 576 ¶ 10

[6] Mr. Colbath suffered eight gunshot wounds which caused physical injuries including a right arm injury to his distal radial/ulnar arteries, an injury to his median nerve, an injury to his torso, another in his left chest, one in his right flank/mid back, one in his right calf resulting in a fibula fracture; and another leg wound resulting in an ankle/medial malleolus fracture. GEX 459 at 58.

[7] Mr. Colbath continues to have scarring on his arm, his left thigh, his buttocks, and other parts of his body. Trial Tr. 845:4-10, 872:17-18, 874:1-13.

[8] Mr. Colbath engaged in eight months of vigorous physical therapy to improve his musculature and ability to use different muscle systems in his body, which "very much" benefitted him. Trial Tr. 863:8-11, 20-21, 864:8-19. Mr. Colbath has been independently driving himself since August 2018, though he felt comfortable doing so before that date. Trial Tr. 864:2-10.

[9] Dr. Scott notes Mr. Colbath's future physical bodily impairment issues will likely include:
- Right hand: Reduced hand sensation in median distribution and thumb/grip weakness;
- Left hand: Residual "ulnar nerve" distribution hypersensitivity/burning sensation with activity;
- Right leg: Reduced sensation of dorsal foot with some reported dysthesia sensations; and
- Left leg: He reports the left ankle as his dominant residual problem. Pain in inner ankle; popping sensation in foot: perceives his ankle is "fragile".

GEX 459 at 58. Vigorous physical therapy has enabled him to bear weight on his repaired ankle/foot. Trial Tr.864:12-14. When he finished with physical therapy he could walk well, but experienced swelling if he walked for more than 10 to 15 minutes. If swelling occurred, then after a 10-to-15-minute rest, he could walk or doing whatever he was doing. Trial Tr. 865:12-17-21.

| | |
|---|---|
| Medical care expenses incurred in the past. | $44,625.74[10] |

| | |
|---|---|
| Medical care expenses that, in reasonable probability, Plaintiff will incur in the future. | $238,060[11] |

### 1.2. <u>David Colbath, on behalf of O.C., a minor, for her individual damages for injury to David Colbath[12]</u>

| Element | Amount |
|---|---|
| Loss of Parental Consortium that was sustained in the past. | $15,000 |
| Loss of Parental Consortium in reasonable probability will be sustained in the future | $35,000[13] |

---

For walking, Mr. Colbath now understands what will hurt and what will keep his ankle from swelling. Trial Tr. 865:22-866:3. Mr. Colbath has been medically advised to wear compression stockings while working to reduce swelling, but he chooses not to use them. Trial Tr. 910:24-911:4. Regarding current prescription drug usage for nerve pain, Mr. Colbath stated: "(i)t's not gabapentin. It's a relation to it. I don't remember the name." In the last three months, he had not taken a single one. Trial Tr. 903:14-21. There were no prescribed pain medications that he currently took routinely. Trial Tr. 914:24-915:1.

[10] *See* Dkt 576 ¶ 10.

[11] *See* Dkt 576 ¶ 10; GEX 729. There is no credible proof the shooting led to morbid obesity requiring bariatric surgery using gastric sleeve procedure to reduce weight gain. Dr. Benzel MacMaster, the Government's retained orthopedic surgeon opined in his expert report: "…(t)here is no reasonable basis to conclude that the gastric sleeve procedure, recommended for Mr. Colbath, was in any way related to the incident on November 5, 2017. Contrary to testimony contained in these records, Mr. Colbath's actual weight upon admission to Emergency Department, at Brooke Army Medical Center (on November 2017) was 292.6 pounds." GEX 460 at 29. He was, therefore, morbidly obese before the shooting. Dr. MacMaster, the only orthopedic surgeon expert to opine on future lower limb surgery, stated: "(t)here was no reasonable evidence, in these records, that a recommendation for either an ankle arthrodesis or a total ankle replacement had been made by anyone qualified to opine on the necessity of such surgery." GEX 460 at 29. Dr. Scott also indicated bilateral surgical procedure on the ankles were not indicated presently. GEX 459 at 60.

[12] For the reasons articulated herein, the United States recommends that the Court award damages on behalf of O.C. in the total amount of $50,000 for loss of parental consortium. *See* Memorandum.

[13] Mr. Colbath testified that he is presently able to see O.C. "just about anytime I want." Trial Tr.

---

at 808:23-809:1. Nonetheless, as a young minor child, it is reasonable that O.C. will continue to suffer some damages due to the injuries to her father.