**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

JOE HOLCOMBE, *et al.*;
    *Plaintiffs*

-vs-

UNITED STATES OF AMERICA,
    *Defendant*

§
§
§
§
§
§
§
§
§
§
§

SA-18-CV-00555-XR

*Consolidated Cases*

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

These consolidated cases stem from the mass shooting at the First Baptist Church in Sutherland Springs, Texas on November 5, 2017. The shooter, Devin Patrick Kelley ("Kelley"), entered the church and opened fire, killing twenty-six people and wounding twenty-two more. After fleeing the scene, Kelley later died from a self-inflicted gunshot wound. Plaintiffs are survivors of the shooting and relatives of those injured or killed. They seek recovery against Defendant United States ("the Government") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680.

From April 7 to April 20, 2021, the Court held a bench trial to resolve disputed issues of fact as to the Government's liability for the shooting. After the trial, the Court concluded that the Government failed to exercise reasonable care in its undertaking to submit Kelley's criminal history to the FBI and that the Government was 60% responsible for the Plaintiffs' injuries. *Holcombe v. United States*, No. SA-18-CV-555-XR, 2021 WL 2821125, at *51 (W.D. Tex. July 6, 2021). From October 4 to November 29, 2021, the Court held a bench trial to resolve disputed issues of fact as to Plaintiffs' damages. Having considered the evidence and applicable law, the Court now issues its findings of fact and conclusions of law as to Plaintiffs' damages.

**CONCLUSIONS OF LAW**

Texas law controls the award of damages in this case. *See Lebron v. United States*, 279 F.3d 321, 326 n.4 (5th Cir. 2002). In personal injury and wrongful death cases, there are two broad categories of compensatory damages—economic and noneconomic damages. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 763 (Tex. 2003).

### I.      Economic Damages

In Texas, economic damages consist of "compensatory damages intended to compensate a claimant for actual economic or pecuniary loss; the term does not include exemplary damages or noneconomic damages." Tex. Civ. Prac. & Rem. Code § 41.001(4). Such damages at issue here are past and future medical expenses, past and future loss of earning capacity, and pecuniary losses for wrongful death including loss of services and support. *See generally* ECF No. 578.

At the start of the damages trial, the Government provided the Court with stipulations as to the Plaintiffs' economic losses. ECF Nos. 530, 559, 576. These stipulations reflect conclusions from the Government's experts concerning such losses. ECF No. 579 at 4. They further reflect the agreed value of Plaintiffs' past medical expenses. ECF No. 576 at 1.

### 1.  Pecuniary Loss

Pecuniary losses in the wrongful-death context are defined as the loss of the earning capacity of the decedent as well as the value of advice, counsel, services, care, maintenance, and support provided by the deceased. *Badall v. Durgapersad*, 454 S.W.3d 626, 637 (Tex. App.— Houston [1st Dist.] 2014, pet. denied); Texas Pattern Jury Charges—General Negligence, Intentional Personal Torts & Workers' Compensation (2020), PJC 29.3 to 29.6. Pecuniary loss may also include certain expenses incurred by the claimant, such as funeral expenses. *See*

*Landers v. B.F. Goodrich Co.*, 369 S.W.2d 33, 34–35 (Tex. 1963). Though valuing pecuniary loss is an economic assessment, "measuring a beneficiary's pecuniary loss is inherently speculative and imprecise and is therefore best left to the [fact finder's] common sense and sound discretion." *Samco Props., Inc. v. Cheatham*, 977 S.W.2d 469, 480 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). The fact finder may apply their own knowledge and expertise to estimate the value of the services provided by the decedent without proof of their value. *Badall*, 454 S.W.3d at 638 (citing *Excel Corp. v. McDonald*, 223 S.W.3d 506, 510 (Tex. App.— Amarillo 2006, pet. denied)). Spouses, parents, and children of the deceased may recover pecuniary loss for wrongful death. *See id.* (loss of parent's services); *Dougherty v. Gifford*, 826 S.W.2d 668, 681 (Tex. App.—Texarkana 1992, no writ) (loss of spouse's services); *Fibreboard Corp. v. Pool*, 813 S.W.2d 658, 683 (Tex. App.—Texarkana 1991, writ denied) (loss of child's services). Importantly, pecuniary losses are treated "as distinct from intangible or emotional damages recoverable in a loss of consortium claim." *Ellis v. United States*, 673 F.3d 367, 379 (5th Cir. 2012) (applying Texas law).

## 2. *Loss of Inheritance*

Additionally, a plaintiff may recover damages for loss of inheritance in a wrongful death action. *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 254 (Tex. 2008). In Texas, loss of inheritance is defined as "the present value that the deceased, in reasonable probability, would have added to the estate and left at natural death to the statutory wrongful death beneficiaries but for the wrongful act causing the premature death." *Yowell v. Piper Aircraft Corp.*, 703 S.W.2d 630, 633 (Tex. 1986). Thus, the plaintiff must offer proof as to the "decedents' salaries, expected raises, expected promotions and salary increases, earning

capacities, enforced savings through pension plans, spending habits, age, health, and relationship with the wrongful death beneficiaries." *Id.* at 634.

### 3. Loss of Earning Capacity

In a personal injury case, a plaintiff may recover damages for past and future loss of earning capacity. Texas PJC – General Negligence, Intentional Personal Torts and Workers' Compensation (2020), PJC 28.3 & comment. "Lost earning capacity is an assessment of what the plaintiff's capacity to earn a livelihood actually was and the extent to which that capacity was impaired by the injury." *Big Bird Tree Svcs. v. Gallegos*, 365 S.W.3d 173, 178 (Tex. App.—Dallas 2012, pet. denied). "Loss of past earning capacity is a plaintiff's diminished ability to work during the period between the injury and the date of trial." *Hospadales v. McCoy*, 513 S.W.3d 724, 742 (Tex. App.—Houston [1st Dist.] 2017, no pet.). The key focus in analyzing a plaintiff's past loss of earning capacity is "(1) what the plaintiff's capacity to earn was, and (2) how that capacity was impaired by the injury." *Perez v. Arredondo*, 452 S.W.3d 847, 862 (Tex. App.—San Antonio 2014, no pet.).

An award of damages for loss of future earning capacity can be based on a number of factors: "(1) past earnings; (2) the plaintiff's stamina, efficiency, and ability to work with pain; (3) the weakness and degenerative changes that will naturally result from the plaintiff's injury; and (4) the plaintiff's work-life expectancy." *Virlar v. Puente*, 613 S.W.3d 652, 682 (Tex. App.—San Antonio 2020, pet. filed); *Perez*, 452 S.W.3d at 862. Evidence of actual earnings at the time of trial is evidence of future earning capacity, "but it is not the only evidence in an inquiry that looks many years or decades into a person's future." *W&T Offshore, Inc. v. Fredieu*, 610 S.W. 884, 889 (Tex. 2020). The fact that the plaintiff's post-injury wage is higher than her pre-injury wage does not preclude an award of damages for loss of future earning capacity. *See*

4

*id.* (plaintiff could recover damages for loss of future earning capacity in spite of a higher hourly wage post-injury because he worked fewer hours, his new job did not cover living expenses whereas his prior job did, and he would face difficulty finding new employment if he lost his job at the time of trial). If the plaintiff is a child who has never earned money, "the jury must determine the value of [plaintiff's] lost earning capacity altogether from their common knowledge and sense of justice." *McIver v. Gloria*, 169 S.W.2d 710, 712 (Tex. 1943); *see also Durham Transp. Co., Inc. v. Beettner*, 201 S.W.3d 859, 865 (Tex. App.—Waco 2006, pet. denied).

### 4.  Loss of Services

A parent may recover for loss of services of an injured child. *Morrell v. Finke*, 184 S.W.3d 257, 290–91 (Tex. App.—Fort Worth 2005, pet. denied). "Services" includes the performance of household and domestic duties. *Whittlesey v. Miller*, 572 S.W.2d 665, 666 n.2 (Tex. 1978).  The parent must prove their child is incapable of performing household services. *Gonzalez v. Hansen*, 505 S.W.2d 613, 614–15 (Tex. App.—San Antonio 1974, no writ).

### II.    Noneconomic Damages

Noneconomic damages include "physical pain and suffering, mental or emotional pain or anguish, loss of consortium, disfigurement, physical impairment, loss of companionship and society, inconvenience, loss of enjoyment of life, injury to reputation, and all other nonpecuniary losses of any kind other than exemplary damages." TEX. CIV. PRAC. & REM. CODE § 41.001(12). Plaintiffs have asserted various claims for pain and suffering, mental anguish, disfigurement, impairment, and loss of companionship or consortium. The process of awarding noneconomic damages "is inherently difficult because the alleged injury is a subjective, unliquidated,

nonpecuniary loss." *Dawson v. Briggs*, 107 S.W.3d 739, 750 (Tex. App.—Fort Worth 2003, no pet.); *Dollison v. Hayes*, 79 S.W.3d 246, 249 (Tex. App.—Texarkana 2002, no pet.).

The fact finder is granted significant discretion in determining noneconomic damages because, as discussed, there is no objective measure to determine the adequacy of such compensation. *See Dawson*, 107 S.W.3d at 751; *Dollison*, 79 S.W.3d at 249. However, its discretion is not unlimited. In FTCA cases, courts will often look to previous reported damage awards in the state to determine the claimant's recovery for noneconomic damages. *See, e.g.*, *Lebron*, 279 F.3d at 325–29. Even so, "[b]ecause the facts of each case are different, prior damages awards are not always controlling . . . ." *Id.* at 326. Where unique facts are presented that are not reflected by controlling caselaw, a court may depart from prior damage awards. *Id.*

### 1. Mental Anguish

In both personal injury and wrongful death cases, a plaintiff may seek recovery for past and future mental anguish. Texas PJC – General Negligence, Intentional Personal Torts & Workers' Compensation (2020), PJC 28.3, 29.3–29.6 & comments. Recovery for mental anguish is permitted in personal injury cases in which the defendant's conduct caused serious bodily injury. *City of Tyler v. Likes*, 962 S.W.2d 489, 496 (Tex. 1997). Mental anguish is also recoverable for injuries of such a "shocking and disturbing nature that mental anguish is a highly foreseeable result," including suits for wrongful death and actions by bystanders for a close family member's serious injury. *Id.*

Where the plaintiff herself has been seriously injured, mental anguish may be inferred by the fact finder. *Popkowsi v. Gramza*, 671 S.W.2d 915, 919 (Tex, App.—Houston [1st Dist.] 1984, no writ); *see also City of Tyler*, 962 S.W.2d at 495. However, the fact finder "cannot automatically

infer mental anguish once *any* physical injury is sustained." *Katy Springs & Mfg., Inc. v. Favalora*, 476 S.W.3d 579, 595 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (emphasis in original). The fact finder, instead, should "consider the traumatic nature of the injury as a factor" in determining its award. *Id.*

In cases where the plaintiff is seeking recovery for mental anguish as a bystander, a plaintiff is required to establish that:

> (1) The plaintiff was located near the scene of the accident, as contrasted with one who was a distance away from it; (2) The plaintiff suffered shock as a result of a direct emotional impact upon the plaintiff from a sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence; and (3) The plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

*United Svcs. Auto. Ass'n v. Keith*, 970 S.W.2d 540, 542 (Tex. 1998).

Lastly, "[i]n wrongful death cases, mental anguish is the emotional pain, torment, and mental suffering that the plaintiff experienced as a result of the death of a family member." *Lane v. Martinez*, 494 S.W.3d 339, 345 (Tex. App.—Eastland 2015, no pet.). Compensation for mental anguish can be awarded only for such anguish that causes "substantial disruption in daily routine" or a "high degree of mental pain and distress." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995) (quoting *Trevenio v. Sw. Bell Tel. Co.*, 582 S.W.2d 582, 584 (Tex. Civ. App.—Corpus Christi 1979, no writ)). "Thus, proof of mental anguish can include painful emotions such as grief, severe disappointment, indignation, wounded pride, shame, despair, public humiliation, or a combination of any or all of those feelings." *Thomas v. Uzoka*, 290 S.W.3d 437, 455 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

"Mental anguish can be established through testimony from the injured party explaining how she felt and how her life was disrupted." *Tagle v. Galvan*, 155 S.W.3d 510, 519 (Tex. App.—San

Antonio 2004, no pet.). Evidence of mental anguish may also be introduced through the testimony of third parties or experts. *Parkway Co.*, 901 S.W.2d at 444.

### 2. Pain and Suffering

In a survival action, "only pain consciously suffered and experienced is compensable." *Ruiz v. Guerra*, 293 S.W.3d 706, 722 (Tex. App.—San Antonio 2009, no pet.). Conscious pain and suffering may be inferred from proof that the deceased had severe injuries or may be established by circumstantial evidence. *Id.* When the existence of pain and suffering is established, "there is no objective way to measure the adequacy of the amount awarded as compensation, which is generally left to the discretion of the fact-finder." *Dawson*, 107 S.W.3d at 751. The amount of damages awarded for pain and suffering are "necessarily speculative and each case must be judged on its own facts." *Pentes Design Inc. v. Perez*, 840 S.W.2d 75, 80–81 (Tex. App.—Corpus Christi 1992, writ denied).

### 3. Physical Impairment

"Physical impairment, sometimes called loss of enjoyment of life, encompasses the loss of the injured party's former lifestyle." *PNS Stores, Inc. v. Munguia*, 484 S.W.3d 503, 513 (Tex. App.—Houston [14th Dist.] 2016, no pet.). While other types of losses may factor into a claim for physical impairment, where other elements of noneconomic damages such as pain, suffering, mental anguish, and disfigurement are submitted, "there is little left for which to compensate under the category of physical impairment other than loss of enjoyment of life." *Golden Eagle Archery*, 116 S.W.3d at 772. "To receive physical impairment damages, the plaintiff must prove that (1) he incurred injuries that are distinct from, or extend beyond, injuries compensable through other damage elements, and (2) these distinct injuries have had a 'substantial' effect."

*Id.*; *see also Enright v. Goodman Distrib., Inc.*, 330 S.W.3d 392, 402 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

### 4. Disfigurement

"Disfigurement has been defined as that which impairs the appearance of a person, or that which renders unsightly, misshapen or imperfect, or deforms in some manner." *Figuerora v. Davis*, 318 S.W.3d 53, 64 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (quoting *Doctor v. Pardue*, 186 S.W.3d 4, 18 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)). Disfigurement damages are available when a plaintiff suffers scarring, "even when the scar is located on a part of the body that is usually covered by clothing." *Tellez v. GEO Grp. Inc.*, No. 5:15-cv-465-RCL, 2017 WL 3276177, at *8 (W.D. Tex. Aug. 1, 2017) (applying Texas law). Damages are additionally available for future disfigurement, which relates to recovery for "future embarrassment caused by the disfigurement." *Hopkins Cnty. Hosp. Dist. v. Allen*, 760 S.W.2d 341, 344 (Tex. App.—Texarkana 1988, no writ). Thus, a plaintiff does not have to prove additional scarring or deformation to recover for future damages related to their disfigurement. *Id.*

### 5. Loss of Consortium or Companionship

Recovery for loss of consortium is derivative of an injured person's claim. *Motor Express, Inc. v. Rodriguez*, 925 S.W.2d 638, 640 (Tex. 1996). Loss of consortium refers to the plaintiff's loss of "love, affection, protection, emotional support, companionship, care, and society" as a result of the injury their loved one suffered. *Reagan v. Vaughn*, 804 S.W.2d 463, 466 (Tex. 1990). Generally, spouses and children may seek such recovery. *See id.* (injury to parent); *Whittlesey v. Miller*, 572 S.W.2d 665, 666 (Tex. 1978) (loss of spousal consortium).

Loss of spousal consortium "consists of the emotional or intangible elements of a marital relationship." *Reeder v. Allport*, 218 S.W.3d 817, 819 (Tex. App.—Beaumont 2007, no pet.) (quoting *Whittlesey*, 572 S.W.2d at 666). Thus, "[a] spouse may recover for the loss of the injured spouse's affection, solace, comfort, companionship, society, assistance, and sexual relations necessary to a successful marriage." *Id.* (citing *Whittlesey*, 572 S.W.2d at 666).

Children may recover loss of consortium for the loss of "the parent's love, affection, protection, emotional support, services, companionship, care, and society" resulting from the injury to their parent. *Reagan*, 804 S.W.2d at 467. "Factors that the jury may consider in determining the amount of damages include, but are not limited to, the severity of the injury to the parent and its actual effect upon the parent-child relationship, the child's age, the nature of the child's relationship with the parent, the child's emotional and physical characteristics, and whether other consortium giving relationships are available to the child." *Id.*

In the wrongful-death context, loss of companionship and society "refers to the positive benefits flowing from the love, comfort, companionship, and society that the beneficiary would have experienced had the decedent lived." *Thomas*, 290 S.W.3d at 455. Some factors a fact finder may consider in determining damages for loss of companionship include: "(1) the relationship between the [deceased and the plaintiff]; (2) the living arrangements of the parties; (3) any extended absence of the deceased from the beneficiary; (4) the harmony of family relations; and (5) the couple's common interests and activities." *Id.* at 456.

The losses and pain these families have experienced is immeasurable. Our civil justice system only allows us to rectify these kinds of losses through money damages. Valuing human life, pain, and suffering is a task that our justice system has imposed on judges and juries, and the methodology used by both has been varied. In FTCA cases, the burden of determining liability

10

and awarding damages is placed exclusively on the trial judge without the benefit of a jury's input. To quantify damages, the Government proposed a damage model similar to that used by the Special Master for the September 11 victims' fund. This model, though, was never intended to be used in our tort system. KENNETH R. FEINBERG, ET AL., FINAL REPORT OF THE SPECIAL MASTER FOR THE SEPTEMBER 11TH VICTIM COMPENSATION FUND OF 2001 83–84 (2004). The Special Master's report on this fund expressly states so. *Id.* at 83–84. The September 11 victims' fund was a no-fault system used by Congress to compensate the families of victims who lost their lives in the unprecedented September 11 terrorist attacks where there otherwise may have been no recovery. By contrast, the Court has found liability in this case.   Further, the Government's suggestion that a September 11 type system be used wholly ignores the mandate that Texas law on damages is applied here. The Government is partially at fault for the deaths and injuries of these Plaintiffs. Its effort to obfuscate its responsibility by attempting to import a no-fault damages model into a case in which the Court has already found liability is wholly unavailing.

Ultimately, there is no satisfying way to determine the worth of these families' pain. However, the Court has looked to other damage awards for wrongful death and personal injury for guidance, particularly other FTCA cases.[1] While this case is unprecedented in kind and scope, these awards have been instructive. Given the number of injured and deceased persons in this tragic shooting, the Court will discuss the amount of these damages awards by each family, per each claimant.

---

[1]      *E.g.*, *Wheat v. United States*, 630 F. Supp. 699, 700, 722 (W.D. Tex. 1986) (reported damages of $3,000,000.00 for pain and suffering of decedent in FTCA case, adjusted for inflation: $7,631,441.61); *Champommier v. United States*, Nos. CV11-10538-MWF (PJWx), CV11-3913, 2013 WL 4502069, at *28 (C.D. Cal. Aug. 21, 2013) (reported noneconomic damages of $2,000,000.00 to shooting victim's mother in FTCA case); *Pressey v. Patterson*, 898 F.2d 1018, 1024–26 (5th Cir. 1990) (affirming reported jury award of $6,700,000.00 in compensatory damages to shooting victim, adjusted for inflation: $14,662,271.51.).

## FINDINGS OF FACT

### Timeline of Events

On the morning of November 5, 2017, the congregation at the First Baptist Church of Sutherland Springs began their Sunday services. After a worship song, Karla Holcombe began to deliver the morning announcements. Dmg. Trial Tr. 81:12–15. At approximately 11:15 a.m., Kelley arrived at the church and began firing at the congregation from the outside of the church. PEX 1187 at 1. When the congregation realized that they were under fire, they attempted to take cover where they could, mostly underneath the pews. Dmg. Trial Tr. 45:16–46:13. Several church members desperately called 911 to send help. *E.g.*, PEX 1019.

Then, Kelley moved inside the church. PEX 1187 at 2. Kelley walked up and down the aisles of the church, firing at those taking cover. *Id.* Adding to the panic, as Kelley fired inside the church, the sanctuary began to fill with smoke, making it difficult to see and breathe. Dmg. Trial Tr. 82:12–16. At 11:23 a.m., Kelley was drawn outside the church by Stephen Willeford. PEX 1187 at 2. Willeford and Kelley exchanged fire, and Kelley fled the scene. *Id.*

In the span of seven minutes and twenty-four seconds, Kelley fired 450 rounds using an AR-556 rifle, killing twenty-six people, and injuring twenty-two more. *Id.*; *see also* GEX 141 (videotape of the shooting captured by the church's video recording system, filed under seal due to the gruesome nature of the evidence).

### The Holcombe Family[2]

Almost the entirety of the Holcombe family was in the First Baptist Church on the day of the shooting. John Bryan Holcombe, Karla Holcombe, John Porter Holcombe, Crystal

---

[2]     For the sake of clarity, the Court refers to the adult parties and deceased minors by their first names and to surviving minors by their initials.

Holcombe, Emily Hill, Gregory Hill, Megan Hill, E.J.H., Marc Holcombe, Jennifer Holcombe, and Noah Holcombe were all in attendance that day. PEX 2032. Of those present, only three survived: John Porter, E.J.H., and Jennifer. *Id.* In total, nine members of the Holcombe family were killed, including the fetus Crystal carried at the time of her death whom John Porter posthumously named Carlin Brite.

Several members of the Holcombe family who were not present at the church on November 5, 2017, have asserted wrongful death claims for the loss of their loved ones in the shooting. Joe and Claryce Holcombe have each asserted wrongful death claims for the loss of their son, John Bryan Holcombe. Scott Holcombe, the son of John Bryan and Karla Holcombe, has asserted wrongful death claims for the deaths of his parents. Finally, Philip Hill, the eldest son of Crystal Holcombe, has asserted a wrongful death claim for the death of his mother.

John Porter Holcombe brings claims individually for his own personal injuries and on behalf of his stepdaughter E.J.H. He also represents the estates of his wife Crystal Holcombe, and stepchildren Emily Hill, Megan Hill, and Gregory Hill. Individually, John Porter has brought wrongful death claims for the deaths of his parents, John Bryan and Karla, and his wife, Crystal. He has asserted survival actions on behalf of the estates of Crystal, Emily, Megan, and Gregory for the pain and suffering his deceased family members experienced before their deaths. He has additionally asserted claims on behalf of E.J.H. for her own personal injuries and wrongful death for the death of her mother, Crystal.

1. *Joe Holcombe – 86 years old[3]*

Joe Holcombe brings a claim for the wrongful death of his son John Bryan. Joe was not present at the church when the shooting took place. Joe often misses his son, but he does not consider himself depressed: "I don't consider myself depressed. Of course, I miss them, but it doesn't get me down. I keep going." Dmg. Trial Tr. 224:18–19. Joe credits his strong Christian faith as a successful coping mechanism for the losses he has suffered. PEX 8068 at 8. Even though he is not depressed, Plaintiffs' and the Government's experts opine that Joe experiences "profound sadness, painful memories of the trauma, and avoidance of reminders of this loss." GEX 485 at 9; *see also* PEX 8068 at 8 (describing a delayed or complicated grief response).

Joe had a close relationship with John Bryan. He described their relationship as "beautiful." Dmg. Trial Tr. 212:17–18. John Bryan lived on the family farm with both Claryce and Joe, where he built his business, American Canvas Works. *Id.* at 212:18–23. Because of their close proximity, Joe would often walk to John Bryan's shop, and they visited frequently. *Id.* at 223:3–18. John Bryan regularly helped Joe and Claryce on the farm, especially with Joe's tractor. Id. at 214:19–22. When things broke at Joe's farm or home, John Bryan would help fix it. *Id.* at 214:20–215:5. Ultimately, Joe feels that John Bryan's assistance cannot be replaced. *Id.* at 214:19–22.

For these reasons, the Court awards Joe Holcombe:

$100,000 for Joe Holcombe's mental anguish sustained in the past for the death of his son, John Bryan Holcombe.

---

[3] The ages of the parties at the time of the shooting are reflected.

$100,000 for Joe Holcombe's mental anguish that, in reasonable probability, he will sustain in the future for the death of his son, John Bryan Holcombe.

$300,000 for Joe Holcombe's loss of companionship and society sustained in the past for the death of his son, John Bryan Holcombe.

$100,000 for Joe Holcombe's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his son, John Bryan Holcombe.

### 2. Claryce Holcombe – 84 years old

Claryce Holcombe brings a claim for wrongful death for her son, John Bryan. Since the shooting, Claryce has been depressed and frequently stays in bed. *Id.* at 223:22–25. Claryce feels that the shooting and simultaneous loss of nine family members has destroyed her life. Holcombe Depo. 26:20–24. Her life before and after the shooting, she testified, is "like night and day." *Id.* at 27:1–3. John Bryan always made Claryce feel loved. *Id.* at 19:20–24. Additionally, as discussed, John Bryan would frequently help around hers and Joe's home and farm.

For these reasons, the Court awards Claryce Holcombe:

$200,000 for Claryce Holcombe's mental anguish sustained in the past for the death of her son, John Bryan Holcombe.

$100,000 for Claryce Holcombe's mental anguish that, in reasonable probability, she will sustain in the future for the death of her son, John Bryan Holcombe.

$200,000 for Claryce Holcombe's loss of companionship and society sustained in the past for the death of her son, John Bryan Holcombe.

$100,000 for Claryce Holcombe's loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her son, John Bryan Holcombe.

### 3.  *Scott Holcombe – 30 years old*

Scott Holcombe has asserted a wrongful death claim for the deaths of his parents, John Bryan and Karla Holcombe. Scott seeks noneconomic damages, as well as past and future pecuniary loss as the result of his father's death.

Scott was not in the church on the day of the shooting. When he learned of the shooting and his parents' deaths, Scott testified that "it hurt so bad I thought I was going to die. I didn't think I could handle that much pain[.]" Dmg. Trial Tr. vol. 11, 189:20–22. "[D]evastated" did not begin to describe how he felt. *Id.* at 191:10. Since the shooting, Scott has not felt like the same person he was before. *Id.* at 191:20–21. "I'm trying to be happy, but I'm not the same as I was before like. I was actually happy when they were here, you know. And since they've been gone, I don't think I've been happy . . . ."  *Id.* at 191:20–23. His grief makes it difficult to be around others. *Id.* at 192:5–12. While Scott feels he is "getting better," he still finds it difficult to be in others' presence and to be happy. *See id.* at 192:1–13.

At the time of his parents' death, Scott was largely dependent on them, financially and emotionally. *Id.* at 163:18–21. Scott was recovering from addiction, and after completing several rehabilitation programs, came to live with his parents and was "on the right track." *Id.* at 166:4–21. Scott testified that his parents "were my rock. Like, they were always ready to help me. And, you know, they just had my back no matter what. . . . And I struggled, and I would always end up—I always end up having to go back home. And, yeah, they were my support system." *Id.* at 162:7–13. Scott saw his parents every day, and would spend quality time with his father in the

American Canvas Works shop learning his father's trade and watching television together. *Id.* at 618:20–23, 171:19–20, 180:24–8. Even throughout Scott's struggles with addiction, Scott never felt that his parents gave up on him. *Id.* at 185:24.

Scott additionally suffered pecuniary losses as a result of his father's death. At the time of the shooting, Scott was learning how to craft upholstery and trailer tarps from his father to take over the family business, American Canvas Works. *Id.* at 171:15–24. However, when John Bryan passed, Scott had not yet been fully trained on how to use the machinery to craft these products efficiently. *See id.* at 178:12–179:5 (describing how it would take him "weeks" to craft a cattle trailer tarp, whereas his father could finish one in two hours).

For these reasons, the Court awards Scott Holcombe:

$100,000 for Scott Holcombe's mental anguish sustained in the past for the death of his father, John Bryan Holcombe.

$100,000 for Scott Holcombe's mental anguish that, in reasonable probability, he will sustain in the future for the death of his father, John Bryan Holcombe.

$100,000 for Scott Holcombe's loss of companionship and society sustained in the past for the death of his father, John Bryan Holcombe.

$100,000 for Scott Holcombe's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his father, John Bryan Holcombe.

$50,000 for Scott Holcombe's pecuniary loss sustained in the past for the death of his father, John Bryan Holcombe.

$100,000 for Scott Holcombe's pecuniary loss that, in reasonable probability, he will sustain in the future for the death of his father, John Bryan Holcombe.

$100,000 for Scott Holcombe's mental anguish sustained in the past for the death of his mother, Karla Holcombe.

$100,000 for Scott Holcombe's mental anguish that, in reasonable probability, he will sustain in the future for the death of his mother, Karla Holcombe.

$100,000 for Scott Holcombe's loss of companionship and society sustained in the past for the death of his mother, Karla Holcombe.

$100,000 for Scott Holcombe's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his mother, Karla Holcombe.

### 4.  Philip Hill – 15 years old

Philip has asserted a wrongful death claim for the death of his mother, Crystal Holcombe. Philip did not attend church the day of the shooting but told Dr. Sutton in his clinical interview that the morning of the shooting he heard gunshots and emergency vehicles from his family's home. PEX 8066 at 4. When one of his uncles arrived at his home to deliver the news that nine of his family members were dead, he felt frightened and alarmed. *Id.* When discussing the loss of his mother and siblings to Dr. Sutton, Dr. Sutton observed that Philip was "unable" to describe his emotional state when he learned of the death of his mother and siblings, which is common for individuals with Autism Spectrum Disorder ("ASD"). *Id.* at 5. He stated, "Well, it just happened. And now it is weird." *Id.* Philip longs for the simplicity of his life before the shooting and stated that "nothing feels normal anymore." *Id.*

Because of Philip's ASD, he relied heavily on Crystal to help navigate the social and academic hurdles he faced. Crystal homeschooled Philip, and she was able to work with him consistently to help him academically and balance his need for socialization with his need for alone time. *Id.* at 3. John Porter described to Dr. Sutton:[4] "Crystal had this amazing way with Philip that no one else seemed to have figured out. He could be pretty stubborn at times, but Crystal just knew how to work with him. He still had a difficult time with extended periods of socialization and struggled to interact in a typical way with other kids this age. But Crystal was always able to get the best out of him, whatever his best might have been." *Id.* Dr. Sutton reported that "it was obvious that his now deceased mother provided a sense of calmness and safety for him that he was unable to find elsewhere." *Id.* After the shooting, John Porter was unable to homeschool him or E.J.H., and he enrolled Philip in an online program to get his GED. *Id.* at 4.

For these reasons, the Court awards Philip Hill:

$200,000 for Philip Hill's mental anguish sustained in the past for the death of his mother, Crystal Holcombe.

$200,000 for Philip Hill's mental anguish that, in reasonable probability, he will sustain in the future for the death of his mother, Crystal Holcombe.

$300,000 for Philip Hill's loss of companionship and society sustained in the past for the death of his mother, Crystal Holcombe.

$300,000 for Philip Hill's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his mother, Crystal Holcombe.

---

[4]     At the time of Dr. Sutton's clinical interview with Philip, Philip was a minor.

5.   *John Porter Holcombe – 39 years old*

John Porter Holcombe has asserted a claim for his own personal injuries arising from the shooting, as well as wrongful death claims for the death of his wife Crystal and his parents, John Bryan and Karla Holcombe.

When the shooting began, John Porter was in the sound booth recording the church service and remained there for the duration of the shooting. *Id.* at 82:16–85:22. The first bullet he noticed was while his mother Karla was giving the morning announcements, but he "figured maybe someone was just horsing around or something." *Id.* at 81:12–22. When it became clear what was happening, though, he took cover and began calling 911. *Id.* at 82:19–24. Before taking cover in the sound booth, he described seeing his mother, who was at the pulpit, scream and take cover. *Id.* at 82:16–18. Once the shooting stopped, he exited the sound booth and went to Crystal and the children. "I looked and saw [Crystal]. I saw what [Kelley] did to her. Her face. And the kids, he shot them in the face. And their face was just a crater . . . I saw what he did to [Karla]." *Id.* at 85:22–86:1. After being reunited with E.J.H., his only surviving stepchild that was in the church, they went to the hospital to receive treatment for their injuries. *Id.* at 87:17–88:19.

As to John Porter's physical injuries, he sustained shrapnel wounds in his left flank and buttocks. PEX 8047. The bullet fragments were removed at the hospital, and he has not required medical treatment for his physical injuries since. Dmg. Trial Tr. 88:1–12, 157:1–6.

Crystal and John Porter had a loving marriage. John Porter relied on Crystal for companionship, comfort, and support. During his testimony, he described how she would make meals, nurture him when he was sick, and greet him everyday when he came home from work and help ease the stress of the day. *See id.* at 103:22–105:3, 115:6–9, 131:7–22; *see also* PEX

8031. John Porter described Crystal as a healing presence who "loved to nurture things that needed nourishment," and that she would do that with him and their children. Dmg. Trial Tr. 130:8–14. Crystal additionally supported John Porter's church activities and would assist with supplies and "whatever [he] needed." PEX 8031 at 3. Since Crystal's untimely death, John Porter has struggled to fill her shoes in the life that they shared. He worries that he will not be able to parent E.J.H. and Philip as well as Crystal. *See* PEX 8056 at 5. He clings to memories of her, longs for the comfort she provided him, and finds it difficult to sleep without her. Dmg. Trial Tr. 103:22–105:7.

John Porter was only feet away from Crystal and the children when they were killed, and he has not forgotten the sight of his murdered wife surrounded by their dead children. *Id.* at 85:21–18. After the shooting, it was difficult for him to return home because of the memories his home held of his family. *Id.* at 101:21–103:10. Once he did return, he described entering a silent home when he had been accustomed to Crystal greeting him and the children playing. *Id.* He continues to experience recurrent dreams of Crystal and their children. *Id.* at 90:15–23. Every morning, he returns to the church to sit and pray to feel close to his deceased family, and then returns in the evening to close the church. *Id.* at 153:20–24. In the four years since the shooting, John Porter has and continues to grieve his tremendous losses. *Id.* at 154:2–4.

John Porter also lost his parents, John Bryan and Karla Holcombe, in the shooting. John Porter testified that he saw his parents frequently, and that he sometimes met them for lunch during the week or visited on the weekends. *Id.* at 105:22–106:18. He and his parents also held a prayer meeting and Bible study together Thursday nights at the church. *Id.* at 113:22–114:3. As a family, they celebrated special traditions together, like "Planksgiving," where they celebrated Thanksgiving on a different day with close family dressed as pirates. *See id.* at 109:10–110:10.

Both John Bryan and Karla provided guidance to John Porter on parenting. *Id.* at 121:21–122:6. John Porter testified that Karla "loved all of us, and she took care of us." *Id.* at 116:15–16. John Porter often relied on his father for help or advice on fixing things around the home. *Id.* at 121:14–20. Now that both are gone and he is a single father, he feels it is more difficult to parent without his parents' guidance and assistance. *Id.* at 122:12–21.

Just as with the loss of his wife and stepchildren, John Porter has struggled to accept the loss of both his parents and continues to grieve them: "And I just—I just—they're gone. I've asked God to let me see them in a dream. And, occasionally, he has let me see Dad—or talk to Dad, at least. Not see him, but talk to him." *See id.* at 90:14–23, 154:2–4. Plaintiff's expert Dr. Sutton has opined that John Porter is experiencing complicated and prolonged grief due to the sudden and violent loss of his wife, stepchildren, and parents. PEX 8056 at 8–9.

For these reasons, the Court awards John Porter Holcombe:

$2,000,000.00 for John Porter Holcombe's physical pain and mental anguish sustained in the past.

$1,000,000.00 for John Porter Holcombe's physical pain and mental anguish that, in reasonable probability, he will sustain in the future.

$8,940.61 for John Porter Holcombe's medical care expenses incurred in the past.[5]

$0 for John Porter Holcombe's medical care expenses that, in reasonable probability, he will incur in the future.

---

[5] Plaintiffs and the Government stipulate that this amount reflects John Porter Holcombe's past medical expenses. ECF No. 576 at 1.

$200,000.00 for John Porter Holcombe's mental anguish sustained in the past for the death of his wife, Crystal Holcombe.

$200,000.00 for John Porter Holcombe's mental anguish that, in reasonable probability, he will sustain in the future for the death of his wife, Crystal Holcombe.

$200,000.00 for John Porter Holcombe's loss of companionship and society sustained in the past for the death of his wife, Crystal Holcombe.

$200,000.00 for John Porter Holcombe's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his wife, Crystal Holcombe.

$100,000.00 for John Porter Holcombe's mental anguish sustained in the past for the death of his mother, Karla Holcombe.

$100,000.00 for John Porter Holcombe's mental anguish that, in reasonable probability, he will sustain in the future for the death of his mother, Karla Holcombe.

$100,000.00 for John Porter Holcombe's loss of companionship and society sustained in the past for the death of his mother, Karla Holcombe.

$100,000.00 for John Porter Holcombe's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his mother, Karla Holcombe.

$100,000.00 for John Porter Holcombe's mental anguish sustained in the past for the death of his father, John Bryan Holcombe.

$100,000.00 for John Porter Holcombe's mental anguish that, in reasonable probability, he will sustain in the future for the death of his father, John Bryan Holcombe.

$100,000.00 for John Porter Holcombe's loss of companionship and society sustained in the past for the death of his father, John Bryan Holcombe.

$100,000.00 for John Porter Holcombe's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his father, John Bryan Holcombe.

6. *E.J.H. – 7 years old*

E.J.H. was sitting with her mother, Crystal, and siblings at church the day of the shooting. While E.J.H. did not initially share the details of what she experienced in the shooting with John Porter, she eventually told him what happened. E.J.H. told her stepfather that "Crystal begged Kelley not to kill the kids. And so he shot them . . . in front of her. He shot them first." Dmg. Trial Tr. 99:6–10. After Kelley killed her family, someone, most likely Crystal, fell on her. *Id.* at 99:21–25. John Porter could not find E.J.H. in the immediate aftermath, but an unknown person found her underneath her family's bodies. *Id.* at 87:5–10. She was covered in blood and body matter, so she was taken to a home nearby and hosed off. *Id.* at 87:11–15. After her stepfather located her, she went to the hospital where her injuries were treated. *Id.* at 87:22–88:9. E.J.H. did not suffer any gunshot wounds but did suffer trample injuries. PEX 8063. She is no longer being treated for these injuries. *See* PEX 8060 at 13.

E.J.H. experienced a significant disruption in her life after the shooting. E.J.H. was just seven years old when the shooting occurred. John Porter informed Dr. Sutton that E.J.H. was in "a state of shock for a significant period of time" after the shooting. PEX 8065 at 4. Given her age, John Porter felt it was difficult for E.J.H. to understand the magnitude of what she had survived and the permanence of the losses she will continue to suffer. *Id.* E.J.H. would frequently

ask for her mother in the year following the shooting. *Id.* Out of concern, John Porter sought out psychotherapy for E.J.H. so she could process the trauma she experienced. *Id.* As E.J.H. has matured and begun to grasp the concept of permanent loss, she has begun to experience recurrent dreams about her mother and siblings. *Id.* at 5. John Porter explained to Dr. Sutton that E.J.H. "appears deeply saddened by the fact that she is unable to experience a united family, even within the context of her dreams." *Id.* Dr. Sutton ultimately diagnosed E.J.H. with Adjustment Disorder and a complex bereavement disorder. *Id.* at 7.

Additionally, E.J.H. struggled in school after the shooting and had trouble paying attention. *Id.* at 4. Crystal had homeschooled E.J.H. with her four siblings, but John Porter was unable to continue homeschooling E.J.H. after the shooting. She moved to several different schools, *id.*, but has now found a school that John Porter feels E.J.H. is enjoying and is receiving support. Dmg. Trial Tr. vol. 11, 133:19–20, 157:7–12. She has also since been released from treatment by her psychiatrist and therapist. *Id.* at 157:16–158:9.

It is apparent that E.J.H. had a close relationship with her mother. In her clinical interview with Dr. Sutton, E.J.H. stated that Crystal "was the most best mom ever . . . ." PEX 8065 at 5. E.J.H.'s biological father passed away in 2011, when E.J.H. was only one year old, leaving Crystal as her sole biological parent. *Id.* at 2. As a result of this shooting, E.J.H. has been orphaned and deprived of a maternal parental figure.

For these reasons, the Court awards E.J.H.:

$1,500,000.00 for E.J.H.'s physical pain and mental anguish sustained in the past.

$500,000.00 for E.J.H.'s physical pain and mental anguish that, in reasonable probability, she will sustain in the future.

$8,487.90 for E.J.H.'s medical care expenses incurred in the past.[6]

$0 for E.J.H.'s medical care expenses that, in reasonable probability, she will incur in the future.

$250,000 for E.J.H.'s mental anguish sustained in the past for the death of her mother, Crystal Holcombe.

$250,000 for E.J.H.'s mental anguish that, in reasonable probability, she will sustain in the future for the death of her mother, Crystal Holcombe.

$250,000 for E.J.H.'s loss of companionship and society sustained in the past for the death of her mother, Crystal Holcombe.

$250,000 for E.J.H.'s loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her mother, Crystal Holcombe.

### 7. The Estate of Crystal Holcombe – 36 years old

Crystal sustained eleven gunshot wounds. PEX 8012. While she sustained headshot wounds that would be considered rapidly fatal, PEX 8011 at 4, these wounds were sustained at a later point in the shooting. PEX 8011 at 4, 8. Plaintiff's expert Dr. Gwinn opined that she sustained at least one gunshot wound early in the shooting and "then exhibited purposeful movement in order to take cover on the floor of the church." *Id.* at 8. When the shooting began, she was sitting in the pews with her children but then moved them near one of the walls of the church. According to E.J.H., Crystal was trying to move herself and her children to the Sunday school room. Dmg. Trial Tr. 98:24–99:5. However, Kelley noticed them before Crystal could

---

[6]   Plaintiffs and the Government stipulate that this amount reflects E.J.H.'s past medical expenses. ECF No. 576 at 2.

escape with the children. *Id.* at 99:13–17. Crystal begged for her children's lives, and so Kelley shot her children in front of her before killing her. *Id.* at 99:8–11. Crystal died attempting to protect her children and was found protectively embracing her daughter Megan. Crystal was alive and conscious for much of the shooting, experienced physical pain from the gunshot wounds she sustained prior to her death, and experienced mental pain and suffering from witnessing the horrific death of her own children before her own murder.

For these reasons, the Court awards the Estate of Crystal Holcombe:

$7,000,000.00 for Crystal Holcombe's pain and mental anguish.

### 8.  *The Estate of Emily Hill – 11 years old*

Emily sustained six gunshot wounds. PEX 8015 at 3. She experienced the entirety of the shooting and did not die until after being carried out of the church by Julie Workman and first responders. In the immediate aftermath, Julie found Emily gasping for air and drenched in blood. Dmg. Trial Tr. 464:3–13. Julie tried to carry Emily out of the church on her own, but she slipped from Julie's grasp because she was so slick with blood. *Id.* at 464:18–465:8. An EMT had to assist Julie in carrying Emily to an ambulance. *Id.* at 465:14–24. Shortly after, she was declared dead, likely from blood loss due to damage to one of her main arteries. *Id.* at 466:5–8; PEX 8015 at 6. Dr. Gwin explains in his report that as blood loss increases, persons experience increased anxiety levels followed by confusion and lastly coma. PEX 8015 at 6. Although her actual blood loss cannot be quantified, Dr. Gwin concludes that Emily underwent these physiologic responses to her blood loss. *Id.* Emily was alive and conscious for the entirety of the shooting, experienced physical pain from the gunshot wounds she sustained prior to her death, and experienced mental pain and suffering from witnessing the shooting.

27

For these reasons, the Court awards the Estate of Emily Hill:

$6,000,000.00 for Emily Hill's pain and mental anguish.

### 9.   The Estate of Megan Hill – 9 years old

Megan sustained six gunshot wounds. PEX 8023 at 5. She moved with Crystal to try and get to the Sunday school room after the shooting began. *See id.* at 3; Dmg. Trial Tr. 99:3–5. Megan sustained some injuries that were not immediately life threatening, as well as a fatal gunshot wound to the head. PEX 8023 at 6. Based on her movement, she did not sustain the fatal head wound until she had moved with Crystal to cover and until after Kelley entered the church. *Id.* at 6–7. Given the dense bleeding over the surfaces of her brain, which show circulation and a beating heart, Megan was alive for a short period after being shot in the head. *Id.* at 7. Megan was alive and conscious for much of the shooting, experienced physical pain from the gunshot wounds she sustained prior to her death, and experienced mental pain and suffering from witnessing the shooting.

For these reasons, the Court awards the Estate of Megan Hill:

$6,000,000.00 for Megan Hill's pain and mental anguish.

### 10. The Estate of Gregory Hill – 13 years old

Gregory sustained twenty-five gunshot wounds. PEX 8019 at 3. He moved with Crystal to try and escape to the Sunday school room after the shooting began. Dmg. Trial Tr. vol. 11. 99:3–5. Given the trajectories of many of his wounds, Gregory sustained several wounds and exhibited purposeful movement after being injured to change his position of cover. PEX 8019 at 7. These wounds were sustained prior to the rapidly fatal wounds that Dr. Gwinn opined were

inflicted when Kelley had moved inside the church. *Id.* at 8. Gregory was alive and conscious for much of the shooting, experienced physical pain from the gunshot wounds he sustained prior to his death, and experienced mental pain and suffering from witnessing the shooting.

For these reasons, the Court awards the Estate of Gregory Hill:

$5,000,000 for Gregory Hill's pain and mental anguish.

### The McNulty/McKenzie Family

Many members of the McNulty family were present at the First Baptist Church of Sutherland Springs the day of the shooting. Tara McNulty was killed in the shooting. Her children, Hailey and J.M., were both injured but survived the shooting. Additionally, Tara's aunt, Margaret McKenzie, was present and was injured.

Hailey McNulty is bringing claims for her own personal injuries as well as a wrongful death claim for the death of her mother, Tara.

Lisa McNulty, Tara's mother, is bringing claims on behalf of J.M. for his own personal injuries as well as a wrongful death for the death of his mother, Tara. Lisa is also asserting a wrongful death claim for the death of her daughter. Lastly, Lisa brings a survivorship action for the pain and mental anguish that Tara experienced before her death.

Margaret McKenzie asserts claims for her own personal injuries.

Ruben Rios, Tara's legal spouse at the time of her death, brings a claim for wrongful death.

1.  *Hailey McNulty – 15 years old*

Hailey was attending church with her mother, brother, and aunt when the shooting occurred. At first, Hailey believed the sound of gunfire was fireworks, but when Tara pushed her to the ground, she realized the danger she and her family were in. Dmg. Trial Tr. 246:9–14. She feared for hers and her family's lives, and called her boyfriend to say goodbye to him. *Id.* at 247:22–25. While underneath the pews, Hailey was shot multiple times. *Id.* at 248:5–6; *see also* PEX 12027. Hailey turned to her mother, who comforted Hailey and instructed her to keep pressure on her leg wound. Dmg. Trial Tr. 248:7–11. Hailey rolled over to keep pressure on her wound and lost so much blood she began experiencing vision and hearing loss. *Id.* at 249:22–24. When she rolled back over and reached out for her mother, Tara did not respond to her touch or voice. *Id.* at 250:4–10. Hailey knew then that Tara was dead. *Id.* at 250:10. Once she saw her mother's body, Hailey "didn't want to try anymore. [She] didn't want to keep fighting anymore." *Id.* at 250:13–15. As she lay taking cover, she heard her brother J.M. and other church members screaming and crying. *Id.* at 251:2–17. When the shooting stopped, she continued to lay on the church floor until she was carried out by first responders and taken to Brooke Army Medical Center ("BAMC") for medical treatment. *Id.* at 252:19–253:2; PEX 12021.

Hailey survived five gunshot wounds. PEX 12027. She sustained a gunshot wound to her left chest that fractured three ribs and caused internal bleeding, and bruising and tearing of her lung tissue. PEX 12021 at 1. She also sustained gunshot wounds to her left leg with significant bleeding, though it avoided her major nerves and arteries. *Id.* Lastly, she had shrapnel injuries in her right leg. Shrapnel additionally was found in her chest. *Id.* On November 8, 2017, she underwent irrigation and debridement of her leg wounds and laceration closure. *Id.* Following her surgery, she required occupational and physical therapy. *Id.*

Hailey continues to experience pain from her physical injuries. *Id.* at 265:8–17; *see also* PEX 12026 at 23–24. Prior to the shooting, Hailey was very active and passionate about long-distance running. Dmg. Trial Tr. 265:18–19. However, she can no longer run because she experiences "a shock" up her leg and numbness in her left heel due to the impact. *Id.* at 266:17–20. She worked with her school's athletic trainer to participate in the Spring 2018 track season, but the pain meant she was "just unable to do what [she] used to do or be as good as [she] used to be." *Id.* at 266:8–21. "It's very hard whenever you were so good at something, and now it's like you can't even do half of what you used to be able to do. So it was very—it was a mental and physical thing." *Id.* at 266:22–25. Even more than just physical activity, Hailey's injuries and scars make sleeping and sitting difficult: "I still can't sleep on my left side, the left side of my body, because putting that pressure on that side with my scars . . . hurts. Whenever I sit, I can't have my legs—like, the bend of my knee touching the chair because it makes me uncomfortable." *Id.* at 265:12–17.

Hailey has scars on the outside of her calf on the left leg; the lower right part of her back; underneath her left armpit; and especially throughout her legs, she has visible shrapnel under the skin. *Id.* at 262:20–263:3. Her scarring caused her embarrassment in the months following the shooting. *Id.* at 264:1–9. When she would wear shorts or dresses, she could feel others staring at her scars. *Id.* at 264:11–14. At the nail salon, she could see when her nail tech would stare at her left leg, and it made her uncomfortable knowing the questions they wanted to ask about her scarring. *Id.* at 264:4–9. Soon after the shooting, she took senior photos with her boyfriend and was so embarrassed by her scars' appearance that she cried and told him not to share any photos that she was in. *Id.* at 264:18–265:7. Over time, though, she has become more comfortable with her scars and their appearance. *Id.* at 264:10–11.

31

Hailey was fifteen when her mom was killed in the shooting. Losing her only parent at a young age deeply affected Hailey's life. Hailey resents that she was never able to tell her mother goodbye. PEX 12024 at 5. She frequently longs for her mother, especially now that she is a mother herself. Dmg. Trial Tr. 270:5–22. Throughout Hailey's life, Tara was extremely supportive and encouraged Hailey in her athletic pursuits and made sacrifices to help with Hailey's success. *Id.* at 268:9–22. Tara was Hailey's best friend, and never let Hailey struggle alone. *Id.* at 268:23, 271:4–11. After Tara died, Hailey felt as though she had to grow up quickly in order to provide her brother J.M. with the support he needed. *Id.* at 276:25–277:14. The unexpected loss of her mother has left a void in Hailey's life. *Id.* at 277:17–278:7.

Since the shooting, Hailey has not been able to attend church. *Id.* at 261:9–14. When she has tried, she finds herself "just sitting there shaking, constantly looking at doors." *Id.* at 261:12–13. In any public space, Hailey is hypervigilant and cannot sit with her back to the door. *Id.* at 261:15–17, 261:22–24. Being alone is also difficult for Hailey. *Id.* at 261:18. If someone comes to her home while she is home alone, she becomes frightened and will not answer the door. *Id.* at 261:25–262:6. Furthermore, she is extremely cautious at home and takes care to ensure her doors and gate remain locked. *Id.* at 262:4–8. Plaintiff's expert Dr. Feltoon diagnosed Hailey with Posttraumatic Stress Disorder ("PTSD") and major depressive disorder. PEX 12024 at 6. Hailey sought counseling after the shooting, though she is no longer under the care of a mental health professional. Dmg. Trial Tr. 280:4–15. She is currently taking anti-depressants. *Id.* at 280:20–25.

For these reasons, the Court awards Hailey McNulty:

$2,000,000.00 for Hailey McNulty's physical pain and mental anguish sustained in the past.

$400,000.00 for Hailey McNulty's physical pain and mental anguish that, in reasonable probability, she will sustain in the future.

$100,000.00 for Hailey McNulty's disfigurement sustained in the past.

$0 for Hailey McNulty's disfigurement that, in reasonable probability, she will sustain in the future.

$150,000.00 for Hailey McNulty's physical impairment sustained in the past.

$100,000.00 for Hailey McNulty's physical impairment that, in reasonable probability, she will sustain in the future.

$85,423.58 for Hailey McNulty's medical care expenses incurred in the past.[7]

$145,169.73 for Hailey McNulty's medical care expenses that, in reasonable probability, she will incur in the future.[8]

$200,000.00 for Hailey McNulty's loss of companionship and society sustained in the past for the death of her mother, Tara McNulty.

$200,000.00 for Hailey McNulty's loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her mother, Tara McNulty.

$250,000 for Hailey McNulty's mental anguish sustained in the past for the death of her mother, Tara McNulty.

---

[7]     The Government and Plaintiffs stipulate that this amount reflects Hailey McNulty's past medical expenses. ECF No. 576 at 6.
[8]     This amount was calculated based on Plaintiffs' proposed life care plan for Hailey McNulty. *See* PEX 12026. The following adjustments were made to the proposed life care plan: two years passed between the original plan date and trial and use of average generic drug pricing for medications available as generics. *See id.* at 42–44. The Court utilizes generic drug pricing for every Plaintiffs' future medical expenses where available because "[o]ver 90 percent of people taking drugs are on generic drugs, in fact." Dmg. Trial Tr. 3325:2–21.

$250,000 for Hailey McNulty's mental anguish that, in reasonable probability, she will sustain in the future for the death of her mother, Tara McNulty.

$27,394.00 for Hailey McNulty's pecuniary loss incurred in the for the death of her mother, Tara McNulty.

$37,035.50 for Hailey McNulty's pecuniary loss that, in reasonable probability, she will sustain in the future for the death of her mother, Tara McNulty.[9]

2.   *J.M. – 12 years old*

J.M. was attending church with his mother Tara, sister Hailey, and aunt Margaret when the shooting occurred. When J.M. heard the first gunshot, he was confused and thought it was just a balloon. PEX 12038 at 2. However, once congregants began to yell "get down," J.M. realized that he and his family were under fire. *Id.* While taking cover, J.M. saw Kelley firing at other church-goers. *Id.* Margaret protected J.M. during the shooting, covering his body with her own and placing her hands over his ears. *Id.*; Mackenzie Dep. 21:13–19. J.M. was screaming and crying during the shooting, yelling "ow" over and over again. Dmg. Trial Tr. 250:25–251:5. J.M. saw his sister's back become "red with blood" during the shooting, and he feared for her life. PEX 12038 at 2.

When J.M.'s grandmother Lisa arrived at the scene with first responders, he was yelling and could not move because his left shin had been shot and his tibia shattered. Dmg. Trial Tr. 300:1–8; PEX 12041. J.M.'s arm had also been shot, and his flesh was torn with pieces of skin

---

[9]      The Government stipulated that Tara McNulty's lost earning capacity is $128,859.00. ECF No. 576 at 11. This amount is being split evenly between Tara's children Hailey and J.M. *See* ECF No. 578 at 194–95. Thus, the Court's award reflects this calculation. *See also* PEX 12005 (breaking down Tara McNulty's past and future loss of earning capacity).

hanging off his bone. Dmg. Trial Tr. 299:21–23. When EMS began to move him, he screamed from the pain. *Id.* at 300:7–8.

J.M. was taken to BAMC for medical treatment. PEX 12035. J.M. underwent irrigation and debridement of his multiple wounds, and laceration closure for the gunshot wound he sustained to his right calf. *Id.* He underwent external fixation on his left tibial fracture, followed by surgery to place an internal fixation with a plate and screws. *Id.* The large open wound in his left leg was irrigated and treated with a wound VAC. *Id.* Because of the wound VAC and tibial surgery, J.M.'s recovery was prolonged. *See id.*; Dmg. Trial Tr. 306:1–6.

In total, J.M. survived three gunshot wounds. PEX 12041. He continues to experience pain and discomfort from his injuries. PEX 12040 at 25. While he does not report constant pain, he cannot run without experiencing aching in his left leg. *Id.* The same leg is also hypersensitive, with frequent feelings of numbness and tingling. *Id.* His left leg also has a diminished range of motion and is easily fatigued. *Id.* at 26. Both his arm and leg are scarred from these gunshot wounds. *Id.* at 60. J.M. still has a slight limp in his left leg. Dmg. Trial Tr. 330:18–20.

Prior to the shooting, J.M. was involved with athletics and participated in swimming, karate, baseball, football, bike riding, and running. *Id.* at 319:24–320:4; PEX 12040 at 27. He has not been able to participate in most of these activities since the shooting because of his injuries. Dmg. Trial Tr. 319:22–23; PEX 12040 at 27. Specifically, his physicians have asked that he not participate in any activities "with sudden jolts or contact sports." PEX 12040 at 27. J.M. has made a return to running, though, and he recently was able to run a full mile without a break. Dmg. Trial Tr. 276:16–19.

As with his sister Hailey, J.M.'s mother Tara provided J.M. with care and support throughout his life. Tara worked two jobs to support her family, and encouraged J.M. in his athletic endeavors. J.M. and Tara had a special relationship; Hailey described: "But [J.M.] and my mom, that was her baby. At the end of the day, she could tell me 'no' about anything. But if [J.M.] were to ask the same exact question, it would be a 'yes' because that was—that was her baby. She loved me. But she loved that boy, and there was nothing that he could do wrong. Nothing." *Id.* at 274:21–275:1.

J.M. greatly misses his relationship with Tara. In his clinical interview with Dr. Feltoon, he stated that his greatest wish was to be able to see his mother again. PEX 12038 at 3. J.M. describes his mother as kind and loving, and that he thinks about her frequently. *Id.* Specifically, he lingers on thoughts of how his mother died, that he was not able to say goodbye to her, and the loneliness he feels now that she is gone. *Id.* at 5.

Before the shooting, J.M. was an outgoing boy with many friends. Dmg. Trial Tr. 319:16–17. Now, Lisa finds that he has "sunken into a shell." *Id.* at 319:16–22. In his clinical interview with Dr. Feltoon, J.M. admitted that he cries frequently and has a startle reaction to loud noises. PEX 12038 at 2. In one instance, J.M. was outside at a neighbor's house and there was a loud banging noise, and J.M. "freaked out and ran inside the garage and just went off the walls." Dmg. Trial Tr. 275:11–15. In another instance, J.M. was at a family friend's property when he heard an explosion in the distance. *Id.* at 321:12–14. J.M. "just fell apart. He went into the shed. He was crying, shaking." *Id.* at 321:5–16. J.M. also finds it difficult to concentrate on school, and at the time of trial was failing several of his classes. PEX 12038 at 3; Dmg. Trial Tr. 331:7–8. Dr. Feltoon diagnosed J.M. with PTSD and major depressive disorder. PEX 12038 at 6.

For these reasons, the Court awards J.M.:

$2,000,000.00 for J.M.'s physical pain and mental anguish sustained in the past.

$400,000.00 for J.M.'s physical pain and mental anguish that, in reasonable probability, he will sustain in the future.

$100,000.00 for J.M.'s disfigurement sustained in the past.

$0 for J.M.'s disfigurement that, in reasonable probability, he will sustain in the future.

$150,000.00 for J.M.'s physical impairment sustained in the past.

$100,000.00 for J.M.'s physical impairment that, in reasonable probability, he will sustain in the future.

$70,982.32 for medical care expenses incurred in the past on behalf of J.M.[10]

$16,158.54 for medical care expenses that, in reasonable probability, will be incurred on behalf of J.M. in the future from the time of trial until J.M. reaches the age of eighteen years.[11]

$168,025.89 for J.M.'s medical care expenses that, in reasonable probability, that, in reasonable probability, he will incur after he reaches the age of eighteen years.[12]

$250,000.00 for J.M.'s mental anguish sustained in the past for the death of his mother, Tara McNulty.

---

[10]    The Government and Plaintiffs stipulate that this amount reflects J.M.'s past medical expenses. ECF No. 576 at 6.

[11]    This amount was calculated based on Plaintiffs' proposed life care plan for J.M. *See* PEX 12037. The following adjustments were made to the proposed life care plan: two years passed between the original plan date and trial and use of average generic drug pricing for medications available as generics. *See id.* at 43–44 (discussing generic pricing).

[12]    This amount was calculated based on Plaintiffs' proposed life care plan for J.M. *See* PEX 12037. The following adjustments were made to the proposed life care plan: use of average generic drug pricing for medications available as generics. *See id.* at 43–44 (discussing generic pricing).

$250,000.00 for J.M.'s mental anguish that, in reasonable probability, he will sustain in the future for the death of his mother, Tara McNulty.

$200,000.00 for J.M.'s loss of companionship and society sustained in the past for the death of his mother, Tara McNulty.

$200,000.00 for J.M.'s loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his mother, Tara McNulty.

$27,394.00 for J.M.'s pecuniary loss incurred in the past for the death of his mother, Tara McNulty.

$37,035.50 for J.M.'s pecuniary loss that, in reasonable probability, he will sustain in the future for the death of his mother, Tara McNulty.[13]

3.  *Lisa McNulty – 56 years old*

Lisa McNulty was not at the church the day of the shooting, but was at work and planning to meet up with her daughter, Tara, sister, Margaret, and grandchildren, Hailey and J.M., later that Sunday, after she finished work. Dmg. Trial Tr. 290:4–20. While she was working, Lisa received a text message from Margaret that someone was shooting outside the church and to call the police. *Id.* at 291:21–23. After she called the sheriff's department, Lisa got in her car and began driving to the church. *Id.* at 292:2–13. As she sped towards the church, Lisa received a phone call from Hailey and heard Hailey crying. *Id.* at 292:13–14. Hailey screamed, "Nana, I've been shot. Nana, I'm shot." *Id.* at 292:15–16. Lisa attempted to console Hailey and told Hailey that she and the police were on the way. *Id.* at 292:17–18. When Lisa arrived, she

---

[13]     The Government stipulated that Tara McNulty's lost earning capacity is $128,859.00. ECF No. 576 at 11. This amount is being split evenly between Tara's children Hailey and J.M. *See* ECF No. 578 at 194–95. Thus, the Court's award reflects this calculation. *See also* PEX 12005 (breaking down Tara McNulty's past and future loss of earning capacity).

entered the church with the paramedics and went directly to her family. *Id.* at 294:13–24. She watched Hailey get carried out of the church by paramedics and noticed Tara lying face down underneath the pews. *Id.* at 301:11–16. Lisa touched her hand, but Tara did not respond. *Id.* at 301:16–17. Lisa then checked for a pulse when she noticed the bullet hole in the back of Tara's head. *Id.* at 301:18–21. Lisa then focused on getting J.M. and Margaret out of the church before she returned to Tara's body to say goodbye. *Id.* at 301:22–302:3.

After the shooting, Lisa did not have time to grieve her daughter. Instead, she focused on helping Hailey and J.M. recover from their injuries. PEX 12012 at 2; Dmg. Trial Tr. 304:23–305:8. However, now that Hailey is independent and J.M. does not require as much supervision, Lisa is experiencing significant grief for the loss of her daughter. *Id.* at 323:23–324:3. She is more withdrawn than she was before the shooting, and now has few friends. *Id.* at 322:22–323:16. Tara was her only child: "You get one child, and you get one heart. And they're both gone now." *Id.* at 311:22–23. Throughout this last year, getting out of bed every day was difficult for Lisa. *Id.* at 324:5–8. Lisa has developed suicidal thoughts. *Id.* at 322:19–21. *Id.* at 324:4–8. Lisa planned to commit suicide in July 2021, but did not follow through. *Id.* at 324:9–17.

Lisa described Tara as a thoughtful and caring daughter. *Id.* at 318:1–4. Tara often performed small acts of kindness for Lisa. For example, when Tara was living on Lisa's property, Lisa's water well went out. *Id.* at 317:6. Lisa came to Tara's home to shower. *Id.* at 317:9–11. Lisa tried the iced tea Tara had in her refrigerator and told Tara how much she loved the tea. *Id.* at 317:12–16. The next morning when Lisa came to shower again, Tara had left a note on the refrigerator, "Mom, I made you some more tea," and there was a fresh pitcher of tea in the refrigerator for Lisa. *Id.* at 317:14–23. When Lisa would travel to visit family in New York, Tara would take care of Lisa's animals and property while she was away. *Id.* at 318:1–19. Lisa could

always rely on her daughter to help with anything, whether it was to take care of Lisa's property or even to help her use her cell phone. *Id.* at 318:20–24.

For these reasons, the Court will award Lisa McNulty:

$100,000.00 for Lisa McNulty's mental anguish sustained in the past for the death of her daughter, Tara McNulty.

$100,000.00 for Lisa McNulty mental anguish that, in reasonable probability, she will sustain in the future for the death of her daughter, Tara McNulty.

$100,000.00 for Lisa McNulty's loss of companionship and society sustained in the past for the death of her daughter, Tara McNulty.

$100,000.00 for Lisa McNulty loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her daughter, Tara McNulty.

### 4.   *The Estate of Tara McNulty – 33 years old*

There is substantial evidence that Tara experienced a significant portion of the shooting before she died. Tara was the one who pushed Hailey to the floor when the shooting began, and she continually reached out to Hailey and attempted to keep Hailey calm by telling her that they would be all right. Dmg. Trial Tr. 246:9–247:2. Tara saw Hailey's injuries and instructed Hailey to keep pressure on her wounds. *Id.* at 248:7–8. Tara was crying because Hailey had been shot. McKenzie Dep. 31:13–14. After Hailey had been shot and J.M. managed to take cover by the wall, Tara began screaming, "stop, stop," repeatedly. *Id.* at 31:15–22. Kelley then shot Tara in the back of the head. *Id.* at 31:15–22; Dmg. Trial Tr. 250:16–23; PEX 12006.

Total, Tara suffered five gunshot wounds. PEX 12006. At least two of her wounds were likely sustained prior to the fatal shot to her head. *Id.* at 5–6. Tara was alive and conscious for much of the shooting, experienced physical pain from the gunshot wounds she sustained prior to her death, and experienced mental pain and suffering from witnessing her children being shot in front of her before her own murder.

For these reasons, the Court awards the Estate of Tara McNulty:

$7,000,000 for Tara McNulty's pain and mental anguish.

### 5. *Margaret McKenzie – 50 years old*

Margaret was attending church with her niece Tara, and Tara's children Hailey and J.M. on the day of the shooting. When Margaret first heard gunfire, like many of the church members, she did not realize what was happening immediately. McKenzie Dep. 18:20–22. Once other members shouted to get down, she dropped to the floor. *Id.* at 18:23–25. As she took cover, she looked for Tara and Hailey, and saw that Hailey was already shot and bleeding. *Id.* at 21:3–12. Margaret then crawled towards J.M. and put her hands over his ears because the sound of gunfire was so loud. *Id.* at 21:13–17. She then pulled herself over him, placing her whole body on top of J.M. to protect him from the bullets. *Id.* at 21:18–19. Margaret then tried to get J.M. against the wall of the church because she felt it was safer than underneath the pews. *Id.* at 29:5–16. However, Margaret could not reach the wall with J.M. and stayed near Tara and Hailey and held Tara's hand. *See id.* at 33:6–7. Tara began screaming "stop," repeatedly, which attracted Kelley to Tara and Margaret. *Id.* at 31:19–22. Kelley shot Tara in the back of the head and shot Margaret in her leg. *Id.* at 31:21–33:11. Margaret felt Tara's hand go limp, but did not realize

Tara was dead until after the shooting when she went to Tara to tell her that it was okay because the police had arrived. *Id.* at 33:6–34:13.

Once Lisa had arrived and escorted Margaret out of the church, Margaret realized that she had been shot. *Id.* at 36:12–20. In total, Margaret suffered three gunshot wounds: one in her left leg, one in her left ankle, and one in her right wrist. PEX 12058. She spent one night at BAMC for her injuries and did not have to undergo surgery to remove any bullets or fragments. PEX 12054. However, some of Margaret's wounds remained open, and she required home healthcare services to assist with caring for herself and wounds after the shooting because she has cerebral palsy with spasticity. *Id.* Margaret required a wheelchair for two months after the shooting, and subsequently graduated to use of a walker, and then a cane. PEX 12057 at 21. However, she now relies on the walker because she cannot move safely with the cane. *Id.*

Margaret was able to use a cane to walk safely prior to the shooting. McKenzie Dep. 39:2. Before the shooting, Margaret was "adventurous," and "wanted to be out and about a lot of the time." *Id.* at 40:18–22. Margaret skied, kayaked, and had tried sled hockey. *Id.* at 40:10–25. Now, Margaret is not physically able to lead the active lifestyle she once did. *Id.* at 41:13–24. She relies on a rolling walker or electric scooter for safe movement, and she is more easily fatigued. *Id.* at 39:5–9. She has also experienced increased spasticity since the shooting, and additionally has lost grip strength in her right hand. PEX 12057 at 21. Margaret's hearing has worsened since the shooting, and she has had to get a new hearing aid. McKenzie Dep. 52:21–53:20. Margaret also has visible scarring from her gunshot wounds. PEX 12057 at 57–58.

In addition to physical pain, Margaret suffers from significant mental distress because of the shooting. While Margaret struggled with anxiety before the shooting, it has significantly increased since. *Id.* at 21. Margaret avoids public spaces, and when she is in public, she is always

looking for exits or places to hide "in case there's a shooter." McKenzie Dep. 45:2–23. Because she does not feel safe in public, she stays home. *Id.* at 46:9–19. Loud noises trigger flashbacks to the shooting, and Margaret has nightmares about the shooting frequently. *Id.* at 47:7–49:11. Margaret's treating psychologist, Dr. Nagel, has diagnosed Margaret with PTSD, as has Dr. Feltoon and the Government's expert Dr. Marx. PEX 12056; GEX 543; GEX 246. Dr. Marx additionally included a diagnosis of major depressive disorder. GEX 543.

Margaret and Tara had a particularly close aunt–niece relationship. Margaret does not have children of her own, so Tara, Hailey, and J.M. are "like [Margaret's] own kids." Dmg. Trial Tr. 290:23–291:5. Tara's murder, inches away from Margaret, has caused her survivor's guilt:

> Q. Ms. McKenzie, do—are you still dealing with survivor's guilt?
> A. Yes.
> Q. Can you tell the Court what you mean by that?
> A. I wished I was the one that was shot and not Tara.
> Q. Why?
> A. Tara is a mom. She had kids, you know. I'm—I'm the single person with no kids. I figured she—she deserved to have a life. She was younger than me. She needed to live her life, you know. And I've already spent a lot of living before—before this happened. And she needed to live on.
> Q. Do you blame yourself at all for not saving her?
> A. I blame myself for not telling her to be quiet when she was yelling, "Stop. Stop." I didn't say anything to her. I should have covered her like I did with her—her boy. And I didn't think to cover her. I thought—I thought she was going to hide under the pew like I did. But she was sort of out in the opening on that floor between the pews.
> Q. Are you still grappling with that guilt as we sit here right now?
> A. Yes.

McKenzie Dep. 51:21–52:20.

For these reasons, the Court awards:

$1,000,000.00 for Margaret McKenzie's physical pain and mental anguish sustained in the past.

$300,000.00 for Margaret McKenzie's physical pain and mental anguish that, in reasonable probability, she will sustain in the future.

$20,000.00 for Margaret McKenzie's disfigurement sustained in the past.

$0 for Margaret McKenzie's disfigurement that, in reasonable probability, she will sustain in the future.

$100,000.00 for Margaret McKenzie's physical impairment sustained in the past.

$100,000.00 for Margaret McKenzie's physical impairment that, in reasonable probability, she will sustain in the future.

$25,587.72 for Margaret McKenzie's medical care expenses incurred in the past.[14]

$583,077.17 for Margaret McKenzie's medical care expenses that, in reasonable probability, she will incur in the future.[15]

### 6.  *Ruben Rios – 34 years old*

Ruben Rios and Tara were legally married at the time of her death. Tara and Rios were married in 2011. PEX 12060. On March 17, 2015, Rios was arrested after his daughter, K.R., and stepdaughter, Hailey, accused him of sexual assault. PEX 12062. Rios spent three years in pretrial confinement until his acquittal in 2018. *Id.*

Rios testified that, despite the separation he and Tara experienced because of his pretrial confinement, they maintained a marital relationship up until her death. The Court does not find

---

[14]     The Government and Plaintiffs stipulate that this amount reflects Margaret McKenzie's past medical expenses. ECF No. 576 at 6.

[15]     This amount was calculated based on Plaintiffs' proposed lifecare plan for Margaret McKenzie. *See* PEX 12057. This amount is adjusted to reflect the two years past between the life care plan date and trial, average generic drug pricing, RN supervision for attendant care, and a $22 per hour rate for attendant care. *See id.* at 39–41; 55.

Rios's testimony credible. Although the two were still legally married and there is conflicting testimony as to why Tara did not divorce Rios, the evidence shows that Tara had clearly abandoned the relationship prior to her death. Hailey testified that her mother stopped using the last name "Rios" and used her maiden name, McNulty, whenever she could. Dmg. Trial Tr. 285:11–14. There was also testimony from both Hailey and Lisa that Tara had begun a romantic relationship with Michael Wright in the Spring of 2017. *Id.* at 333:8–19. Though it is unclear if Tara considered Wright a boyfriend or fiancé, both Hailey and Lisa recall that Wright had given Tara a ring. *Id.* at 286:8–11, 334:6–15. Tara's obituary referred to Wright as a "close personal friend," and omitted Rios. GEX 524. Additionally, Wright was a pallbearer at Tara's funeral. *Id.* While there were love letters and phone calls exchanged between Rios and Tara early in Rios's confinement, the last of these letters was received in 2016, over a year before Tara's death. *See* PEX 12069. The last time Tara went to visit Rios in pretrial confinement was in April 2017, around the time she began her relationship with Wright. PEX 12080 at 4. The last phone conversation Tara had with Rios, per Tara's phone records, was in June 2017. *See* PEX 12082; Dmg. Trial Tr. 397:13–402:7. Rios's unsupported testimony cannot overcome the overwhelming amount of evidence that, at the time of Tara's death, no marital relationship existed between himself and Tara. Therefore, the Court will award no damages for past or future loss of companionship. Further, the preponderance of the evidence leads to the conclusion that Rios had been informed by Tara that their relationship had ended and accordingly the Court will award no damages for past or future mental anguish.

**The Workman Family**

Julie, Kris, Morgan (Harris), and Kyle Workman were all in attendance at church on the day of the shooting. Kip Workman, Julie's husband and Kris and Kyle's father, was not present at church that Sunday, nor were Colbey Workman and E.W., Kris's wife and daughter.

Julie has brought a claim for her own personal injuries arising out of the shooting, and Kip seeks derivative recovery for her injuries as her husband.

Morgan Harris Workman seeks recovery for her own personal injuries arising from the shooting.

Kyle Workman seeks recovery for his own personal injuries arising from the shooting.

Kris Workman seeks recovery for his own personal injuries arising from the shooting, and Colbey Workman seeks derivative recovery for Kris's injuries as his wife. On behalf of their daughter, E.W., Colbey and Kris seek derivative recovery for Kris's injuries.

1. *Julie Workman – 54 years old*

Julie Workman was attending church with her sons, Kris and Kyle, and future daughter-in-law Morgan on the day of the shooting. When the shooting began, Julie thought the children at the church were playing a prank and popping firecrackers outside. Dmg. Trial Tr. 445:23–446:15. The glass from the light fixture above her then shattered, and Julie heard Hailey McNulty scream, "I'm hit." *Id.* at 446:22–447:3. At that moment, Julie crawled underneath a pew to take cover. *Id.* at 447:4–8. Julie then called 911. *Id.* at 447:14–24. Once she was able to get through, she told the 911 operator that there was an active shooter at the church. *Id.* at 447:20–448:1. As the shots became more rapid, Julie was disconnected from the call. *Id.* at

448:7–10. Julie tried to get a view of Kelley's appearance to describe to law enforcement. *Id.* at 449:10–14. Julie recalls "staring into [Kelley's] face and seeing nothing in his face." *Id.* at 449:24–25.

Julie watched Kelley exit the church, reload, re-enter, and begin firing at others in the church. *Id.* at 450:10–22. Kelley then walked up the aisle towards the front of the church where she and her son Kris had taken cover. *Id.* at 450:23–451:2. Julie watched Kelley shoot Kris in the back, and then Kelley turned and shot Julie in the chest. *Id.* at 451:19–452:7. The impact "felt like a Mack truck" had hit her. *Id.* at 452:8–9. Julie did not suffer any bleeding from her wound because she had recently undergone reconstruction surgery from bilateral mastectomies just two weeks prior and had implants in her chest. *See id.* at 452:10–20. Julie then heard Kelley spray bullets at the wall, and then noticed her son Kyle was no longer taking cover under the pew. *Id.* at 452:24–453:2. She knew then that Kyle had run out of the church, and that Kelley must have been firing at Kyle. *Id.* at 453:4–7. Kelley exited the church, Julie believes, to kill Kyle. *Id.* at 454:5–9.

Once the shooting ended, Julie, an operating room nurse, "immediately went into triage mode." *Id.* at 455:14. While triaging, she saw many of her close friends had already been killed, and her friends who had survived were seriously wounded. *Id.* at 455:21–463:3. She made make-shift tourniquets from towels in the church to help those who were bleeding from their injuries and assisted in carrying survivors out of the church. *Id.* at 460:18–466:10. As she helped others, Julie had glass lodged in her knees and did not know if Kyle had escaped the church alive. *Id.* at 464:12–467:2, 474:5–10. After Kip located Kyle, Julie and Kip went to BAMC to be with Kris as his injuries were treated. *Id.* at 472:20–473:2, 474:5–8. Julie removed the glass from her knees

in the car ride on the way to BAMC, and the shrapnel in her chest naturally worked its way out over several weeks. *Id.* at 474:18–475:24.

In addition to the changes in her life and schedule to accommodate the long-term injuries Kris has suffered, Julie has struggled with her own mental health following the shooting. Julie felt helpless and angry after the shooting. *Id.* at 482:20–22. While she initially tried to handle her emotions alone, Julie eventually sought out counseling when it became clear her anger was causing issues with her ability to work. *Id.* at 484:8–486:17. Julie's counselor, Terry Davis, recognized that Julie was experiencing "fear, anxiety and symptoms of PTSD." PEX 19009. Both Plaintiffs' and the Government's experts, Dr. Ticknor and Dr. Marx, diagnosed Julie with PTSD. PEX 19010 at 7; GEX 661 at 9. Julie continues to attend counseling to treat her PTSD. Dmg. Trial Tr. 487:3–4. Even with such treatment, Julie still experiences many symptoms of PTSD, including nightmares and flashbacks. *Id.* at 483:11–19. For example, while at a church conference, Julie heard fireworks unexpectedly and immediately dropped to the floor and tried to find a place to hide. *Id.* at 483:16–21. When she saw that the people around her were not getting down and realized what she was hearing were fireworks, she had to calm herself and remind herself that she was in fact safe. *Id.* at 483:16–24.

For these reasons, the Court awards Julie Workman:

$2,000,000.00 for Julie Workman's physical pain and mental anguish sustained in the past.

$1,000,000.00 for Julie Workman's physical pain and mental anguish that, in reasonable probability, she will sustain in the future.

2. *Kip Workman – 56 years old*

Kip Workman was at home while his wife, Julie, and two sons, Kris and Kyle, were at church on the day of the shooting.

Kip and Julie have been married for over thirty years. Dmg. Trial Tr. 508:10–11. Prior to the shooting, Kip and Julie had a happy marriage. They would often take trips as a family, go out to dinner, have movie nights, and were a very social couple. *Id.* at 528:17–20. They were intimate regularly, and never felt the need to seek out couples therapy in their years together. *Id.* at 515:16–18, 531:19–24.

Since the shooting, Kip and Julie's marriage has not been the same. Their son Kris's injuries resulted in his permanent paralysis from the waist down. PEX 19028 at 13. As a result, Julie's daily schedule now "revolve[s] around making sure that [Kris is] okay; he has what he needs; making sure that my granddaughter, [E.W.] his daughter, is taken care of." Dmg. Trial Tr. 480:13–15. Both Julie and Kip's decisions are based on "is Kris going to be okay, does Kris need us, what do we have to do at Kris's house . . . now everything is about Kris, Morgan, Kyle, in that priority." *Id.* at 480:24–481:6. Kip and Julie do not travel or socialize the same way they did prior to the shooting because they do not want to be far from Kris and his family should they need help. Kip stated that "the focus being on [Kris] has taken away from our—our—what would have been our normal routine." *Id.* at 529:10–12. In addition to their focus on Kris and his family, Kip described Julie as a "work-aholic." *Id.* at 530:22–23. Julie is always trying to stay busy because she feels if she relaxes or let her mind wander, it will take her back to the shooting. *Id.* at 492:1–24. Together, this shift in priorities has taken away from Kip and Julie's time together as a couple.

In addition to the shift in priorities, Julie has, in Kip's perspective, changed since the shooting. Kip watched Julie age "ten years in six months just from . . . the stress." *Id.* at 531:2–5. Julie has become irritable and short-tempered since the shooting. *Id.* at 528:12–14. Kip feels that he must "be on pins and needles" when around Julie to avoid fighting with her. *Id.* at 527:20–25. Kip "wears[s] [his] kid gloves" around Julie, and they "don't have the same back-and-forth that [they] used to have." *Id.* at 529:16–18. Julie and Kip "can chew each other's heads off . . . something will just irritate [Julie], and [Kip and Julie] will fuss at one another. And off to the bedroom [Kip] goes, and in the living room [Julie] stay[s]." *Id.* at 499:6–14. Julie's change in demeanor has affected the couple's intimacy, and while they feel committed to one another, "if things don't improve, [they] may have to seek other options." *Id.* at 499:4–22, 532:14–24.

For these reasons, the Court awards Kip Workman:

$50,000.00 for loss of consortium sustained the past.

$50,000.00 for loss of consortium that, in reasonable probability, Kip Workman will sustain in the future.

### 3. *Kyle Workman – 25 years old*

Kyle was present in the church on the day of the shooting with his mother Julie, brother Kris, and then-fiancée Morgan Harris. When the shooting began, Kyle, like his mother, thought the gunshots were firecrackers. Dmg. Trial Tr. 593:18–21. Kyle heard the sound of glass shattering and church members yelling to get on the floor, and he realized that the church was under fire. *Id.* at 593:22–594:6. Kyle called 911 twice before he was able to reach an operator. *Id.* at 594:21–24. The operator asked if Kyle was at the First Baptist Church of Sutherland Springs, which he confirmed, and the operator said that first responders were on the way. *Id.* at

594:21–595:2. After Kyle saw John Bryan Holcombe die from his wounds, he ran out of the church. *Id.* at 595:6–20. Kyle "jumped over a pile of people" to get behind Kelley, and he got back down and crawled towards the aisle. *Id.* at 595:19–25. When Kelley fired his next shot, Kyle got back up and ran out of the back door. *Id.* at 596:1–3. As he ran out the door, he heard Kris scream and knew that his brother had been shot. *Id.* at 596:7–10. Kyle ran to the Valero convenience store across the street. *Id.* at 596:24–25. Once he made it to the Valero, he told the staff to call 911 and to lock the door because there was a shooter at the church. *Id.* at 596:25–597:2.

As Kyle took shelter at the Valero, he had no sense of whether his family inside the church had survived. *Id.* at 597:6–15. He watched Kelley's car drive down Highway 539 from the Valero, and "it felt like forever" until he began seeing first responders arrive at the church. *Id.* at 597:16–598:1. The store manager then came and told Kyle that his father, Kip, was looking for him in the field by the church. *Id.* at 598:21–25. At that point, he was reunited with his family and went to the hospital to be with Morgan. *Id.* at 598:21–599:25.

Kyle did not suffer any physical wounds from the shooting but has struggled mentally since. Kyle returned to his job at HEB two weeks after the shooting and sought counseling from HEB's on site counselor, Joe Ward, and eventually another counselor, Terry Davis, at the Ecumenical Center in La Vernia.[16] Davis diagnosed Kyle with PTSD, as has Dr. Ticknor and Dr. Marx. GEX 688; PEX 19074; PEX 19076. Being in public was difficult for Kyle immediately following the shooting. Dmg. Trial Tr. 601:12–15. He no longer felt safe in his workspace because "anybody could walk in at any time." *Id.* at 603:16–23. Kyle feared being "shot out of nowhere" at work. PEX 19074 at 10. Eventually, Kyle left his job at HEB over his safety

---

[16] While Kyle no longer is under Davis's care, it is not due to lack of desire, rather it is due to his new job being further away from La Vernia and his new work hours. Dmg. Trial Tr. 606:14–608:12.

concerns and found new employment. Dmg. Trial Tr. 604:17–25. To this day, Kyle suffers mood swings and flashbacks. *Id.* at 608:13–14. When something such as a loud noise triggers a flashback, Kyle "freeze[s] up" and his "thinking spirals." *Id.* at 608:21–23. While these symptoms have improved over time, he continues to experience them. *Id.* at 609:5–8.

For these reasons, the Court awards Kyle Workman:

$400,000.00 for Kyle Workman's physical pain and mental anguish sustained in the past.

$200,000.00 for Kyle Workman's physical pain and mental anguish that, in reasonable probability, he will sustain in the future.

### 4. *Morgan Harris Workman – 19 years old*

On the day of the shooting, Morgan arrived at the church to set up the audio-visual equipment for the services. Dmg. Trial Tr. 643:10–25. Morgan remained in the sound booth during services as she did every Sunday to monitor the audio-visual equipment. *Id.* at 644:14–20. When Morgan began hearing loud noises that she could not make out and church members shouting at one another to get down, Morgan got down behind the sound booth walls and sound equipment. *Id.* at 645:10–23. Within the first minute of the shooting, Morgan sustained shrapnel injuries to her legs. *Id.* at 646:5–11. As Kelley fired, Morgan heard other church members screaming and Kelley scoffing that it was difficult to breathe inside the church. *Id.* at 649:7–21. Once she heard Kelley drive away, she emerged from the sound booth and tried to find survivors. *Id.* at 649:22–650:11. When first responders arrived, she directed them to those who needed help. *Id.* at 653:25–654:9. She then exited the church where she was placed in an ambulance and taken to University Hospital for treatment. *Id.* at 655:25–656:25.

While at University Hospital, Morgan received wound care for the injuries to her legs. *Id.* at 658:2–15. Morgan also had shrapnel injuries in her right arm, chest, and face. *Id.* at 659:18–22. Some of the shrapnel embedded in her face worked its way out of her body on its own, but much of it is still embedded in her body. *Id.* at 659:25–4. Morgan can feel these small fragments underneath her skin and one piece is visible. *Id.* at 660:2–9. There is still shrapnel embedded in her left leg that cannot be removed surgically. *Id.* at 660:17–661:8.

Morgan could not walk independently immediately after the shooting and used crutches to do so. *Id.* at 661:20–25. When she visited her family and others in the hospital, she used a wheelchair because she was fatigued from walking. *Id.* at 662:1–4. Prior to the shooting, Morgan was a martial arts instructor and lived a very active lifestyle, so at first, she believed that the weakness she was experiencing was the result of muscle atrophy. *Id.* at 662:5–13, 706:22–24. However, Morgan's strength did not return, and she began experiencing problems with her gait and tripping and falling. *Id.* at 663:10–18. Julie told Morgan that she may be experiencing foot drop, and Morgan sought treatment. *Id.* at 664:12–665:21.

Morgan's treating neurologist, Dr. Gazda, believed Morgan's foot drop was a neuropathy due to lead toxicity from retained shrapnel. *Id.* at 668:8–14. When Morgan was first tested for lead in June 2018, her blood lead level was eight micrograms per deciliter. PEX 19088 at 8. Her most recent test in October 2019 showed a blood lead level of three micrograms per deciliter. *Id.* However, Dr. Kosnett, the Government's expert toxicologist, explains in his report: First, foot drop is not a common symptom of lead toxicity, rather it is more likely that the patient develops a wrist drop. GEX 721 at 14. Second, "overt symptoms of lead intoxication in adults do not emerge until blood lead concentration reaches or exceeds 30 to 40 [micrograms per deciliter] for a duration of days to years." *Id.* at 15. While Morgan was not tested for lead until months after

the shooting, Dr. Kosnett explains that in patients with retained shrapnel, the patient's blood lead level is initially close to zero and peaks within the first year. Dmg. Trial Tr. 2983:13–19; GEX 721 at 20. Thus, it is very unlikely that Morgan ever had such high blood lead levels immediately after the shooting. Lastly, "isolated lead neuropathy is very uncommon . . . Lead neuropathy usually occurs as the result of high levels of exposure, and at such levels other effects are almost always invariably observed, including bone marrow suppression (anemia and leukopenia), gastrointestinal tract effects (GI hemorrhage, diarrhea), renal effects (proteinuria, renal failure), hypertension, and gout." GEX 717 at 16. Notably, Morgan is not exhibiting these other symptoms commonly associated with lead toxicity. *Id.*

Additionally, there are other conditions that could explain Morgan's foot drop. When seeking treatment for her foot drop, it was discovered that Morgan has an Arnold Chiari malformation,[17] hydrocephalus,[18] and syringomyelia.[19] Dmg. Trial Tr. 3110:24–3111:7. While foot drop is not a common symptom of these conditions, Arnold Chiari and hydrocephalus are both associated with lower extremity weakness and foot drop in some cases. *Id.* at 3124:24–3125:12; Vardiman Dep. 30:5–31:1; GEX 721 at 19; GEX 717 at 17–18, 20.

Ultimately, the evidence presented regarding lead from retained shrapnel and Morgan's pre-existing conditions lead the Court to conclude that Morgan's foot drop is not due to lead toxicity. And while Plaintiffs contend in the alternative that the shooting aggravated her latent hydrocephalus, and turned Morgan's conditions symptomatic, there is no evidence in the record, other than the timing of the foot drop *after* the shooting, to establish that a shooting or retained

---

[17]     An Arnold Chiari malformation is a condition in which the brain tissue extends into the spinal canal. Dmg. Trial Tr. 3121:10–3122:6.
[18]     Hydrocephalus is a build up of cerebral-spinal fluid in the ventricles of the brain which creates pressure on the nervous system. Dmg. Trial Tr. 3111:3–11.
[19]     Syringomyelia is a cyst or cavity in the spine. Dmg. Trial Tr. 3111:1–2.

shrapnel could have such effects. Additionally, while Morgan had not developed a foot drop prior to the shooting, she was exhibiting other symptoms of hydrocephalus and Chiari malformation. Before the shooting, Morgan had a history of low back, hip, and neck pain, severe and abrupt headaches, as well as numbness of the right side of her body, all symptoms of either hydrocephalus or Chiari malformation. Dmg. Trial Tr. 3113:15–3114:13; GEX 717 at 16–17. Thus, Morgan's impairment and loss of earning capacity, all related to her foot drop, cannot be attributed to the shooting.

Even so, Morgan has suffered a great deal of mental anguish as a result of the shooting. Morgan has mood swings "from being seemingly fine to just dropping really low at the drop of a hat." Dmg. Trial Tr. 681:6–9. Flashbacks to the shooting are triggered by songs that might remind her of a church member or seeing a photograph on social media. *Id.* at 681:10–14. "It's hard to go day to day never knowing when you might just start spiraling." *Id.* at 681:14–15. Since the shooting, Morgan has avoided crowds and is more cautious. PEX 19090 at 3. Morgan also has a difficult time connecting with her husband, Kyle: "Sometimes, we just sit silently and have trouble connecting. That never happened before 2017." *Id.* Morgan has also experienced several cognitive deficiencies related to PTSD, depression, and anxiety such as short-term memory loss.[20] *See* GEX 713 at 49; GEX 721 at 19; GEX 717 at 18; GEX 724 at 12; PEX 19088 at 25. Dr. Ticknor diagnosed Morgan with an adjustment disorder with depressed mood, and Dr. Marx diagnosed Morgan with PTSD, major depressive disorder, and generalized anxiety

---

[20]     While Plaintiff's expert neurologist Dr. Todd opines that these deficiencies are likely related to overt lead toxicity, the Court finds it far more likely that they are related to Morgan's PTSD. Cognitive deficits in adults with lead exposure are observed in patients with blood lead level concentrations of twenty to fifty micrograms per deciliter, GEX 721 at 16, and there is no evidence to suggest that Morgan's blood lead levels were ever that high. Given the experts' agreement and vast medical literature concluding PTSD and other mental health conditions can cause such cognitive impairment, the Court finds this explanation more persuasive. *See* GEX 713 at 49; GEX 721 at 19; GEX 717 at 18; GEX 724 at 12; PEX 19088 at 25.

disorder. *Id.* at 4; GEX 724 at 12. Morgan is currently in counseling for these conditions, and is under the psychiatric care of Dr. Annette Scott. Dmg. Trial Tr. 680:1–13, 681:25–6.

For these reasons, the Court awards Morgan Harris:

$500,000.00 for Morgan Harris's physical pain and mental anguish sustained in the past.

$200,000.00 for Morgan Harris's physical pain and mental anguish that, in reasonable probability, she will sustain in the future.

$25,000.00 for Morgan Harris's disfigurement sustained in the past.

$25,000.00 for Morgan Harris's disfigurement that, in reasonable probability, she will sustain in the future.

$0 for Morgan Harris's physical impairment sustained in the past.

$0 for Morgan Harris's physical impairment that, in reasonable probability, she will sustain in the future.

$0 for Morgan Harris's loss of earning capacity sustained in the past.

$0 for Morgan Harris's loss of earning capacity that, in reasonable probability, she will sustain in the future.

$15,394.10 for Morgan Harris's medical care expenses incurred in the past.[21]

$619,587.61 for Morgan Harris's medical care expenses that, in reasonable probability, she will incur in the future.[22]

---

[21]     Plaintiffs and the Government stipulate that this amount reflects Morgan Harris Workman's past medical expenses. ECF No. 576 at 4.

*5. Kris Workman – 34 years old*

Kris Workman arrived at the church early on the day of the shooting to practice worship songs with the church's praise team. Dmg. Trial Tr. 742:22–743:4. Kris was the worship team leader at the church and played the guitar every Sunday for church services. *Id.* at 720:24–722:4. Once services began and the band finished with the first hymn, Kris began hearing a popping sound. *Id.* at 744:5–9. Kris initially believed the noise was coming from the amplifier or speaker. *Id.* at 744:10–13. When glass shattered in the church and he heard others yelling to get down, it became clear that the church was under fire, but Kris could not tell where the gunfire was coming from. *Id.* at 744:19–25. Kris tried to hide beneath the front pew, but the pew was short and his body was not fully covered. *Id.* at 745:5, 746:5–7. Kris laid on the floor to "play dead" while using his hearing to figure out where Kelley was or if anybody was speaking. *Id.* at 746:21–24. He heard "just gunfire and screams." *Id.* at 746:25. As Kelley walked up the center aisle, Kris felt Kelley approach and eventually stopped next to him. *Id.* at 747:3–8. Kelley then shot Kris in the back "point-blank." *Id.* at 747:9. Even though Kris was trying to stay quiet, he screamed from the pain. *Id.* 747:9–14. Kelley shot him again and then exited the church. *Id.* at 747:19–748:4.

Julie went to Kris and asked how he was, and he told her that he could not feel his legs. *Id.* at 749:3–12. When the paramedics arrived, they rolled Kris over, "which was extremely painful," carried him out of the church, and he waited to be loaded in an ambulance. *Id.* at 750:5–16. As he laid in the grass waiting to be carried off, Kris had "assumed everybody [in the church] had been killed," a feeling he could not describe in his testimony. *Id.* at 750:17–21. Kris was then placed in an ambulance and taken to the hospital. *Id.* at 750:9–14. The ambulance ride "was

---

[22]     The Government stipulates that this amount reflects Morgan Harris Workman's future medical expenses. ECF No. 576 at 4.

extremely painful because any movement at all was painful." *Id.* at 750:22–751:3. Almost immediately after arriving at the hospital, Kris was taken to surgery. *Id.* at 751:18–24.

Kris underwent two surgeries: First, an exploratory surgery to determine the extent of his injuries, followed by a second surgery to repair his intestinal system. *Id.* at 752:4–22; PEX 19028 at 5. Kris spent two and a half weeks recovering from his injuries at BAMC. Dmg. Trial Tr. 752:23–753:1. He was on pain medication, but it did not provide him with full relief. *Id.* at 753:8–12. Doctors informed Kris that his spine had been 90% lacerated, and Kris knew that he would be permanently paralyzed from the waist down. *Id.* at 752:14–19.

Kris was then discharged to Reeves Rehabilitation as an inpatient. *Id.* at 728:22–24; PEX 19028 at 6. While at Reeves, he began occupational therapy to adjust to life in a wheelchair. PEX 19028 at 6–7. He also had to learn how to maintain many of his bodily functions, as he suffers from neurogenic bladder and bowel. Dmg. Trial Tr. 728:25–729:4; PEX 19028 at 6. After two and a half weeks, Kris was discharged and continued outpatient therapy twice weekly at Reeves from 2017 to 2019. PEX 19028 at 6–15.[23] No therapy has succeeded in returning any function or sensation of Kris's body below his waist. Dmg. Trial Tr. 722:12–13, 765:23–5. The only feeling that Kris has below his waist is consistent neuropathic pain. *Id.* at 722:22–723:3.

Kris's spinal cord injury has impacted every aspect of his life. When Kris was first discharged from Reeves, he could not return to his home right away because it was not wheelchair accessible. *Id.* at 755:2–11. Several modifications to his home had to be made so that he could maneuver safely. *Id.* at 755:7–11. Colbey had to drive Kris everywhere until they could purchase a vehicle with hand controls and a hydraulic lift platform. *Id.* at 734:19–735:6.

---

[23]    Kris ceased his physical therapy treatment after a change in employment made maintaining the appointments difficult. *See* Dmg. Trial Tr. 735:9–736:4.

Additionally, much of Kris's day is occupied by maintaining his bodily functions. Due to his neurogenic bladder, Kris must catheterize four to five times per day. *Id.* at 726:24–727:1. Kris must also manually evacuate his bowels twice per day. *Id.* at 728:2–10. Lastly, Kris must stand upright in a standing frame for approximately an hour a day. *Id.* at 756:19–757:7. Total, Kris estimates it takes two and a half to three hours per day to maintain his health. *Id.* at 757:8–18.

While Kris has been successful in caring for himself in many respects thus far, he is at risk for many health complications later in life because of his spinal cord injury. Urinary tract infections ("UTI") are common in patients with a neurogenic bladder, PEX 19028 at 25, and Kris has experienced several UTIs since his injury, PEX 19033 at 1. These will recur throughout his life, and as Kris has no sensation, can become serious before they are detected. *Id.* at 1–2; *see* Dmg. Trial Tr. 731:13–732:9. As Kris ages, he will lose strength due to overuse of his upper body and become less independent. PEX 19028 at 24–25; Dmg. Trial Tr. 3686:7–12; Willingham Dep. 169:6–14. While spinal cord patients enjoy a period of wellness, "with the aging process that occurs over time, with that physical disability, they will have a decline in their health care condition because of the spinal cord injury." Willingham Dep. 169:10–14. Many such risks of the aging process in spinal cord patients include not only UTIs, but also increased risk of cardiovascular disease, pressure sores and decubitus ulcers, and bone density loss. PEX 19028 at 29–33. Furthermore, as Kris ages, his lower limbs will wither and atrophy. Dmg. Trial Tr. 3685:7–3685:12.

Kris also cannot engage in many of the hobbies he used to prior to the shooting. Kris led an active lifestyle prior to the shooting: He played tennis and volleyball, enjoyed bowling, dirt track racing, and helped on his family's cattle farm. PEX 19028 at 17; PEX 19025 at 7. He has been able to do none of these activities since he was shot. PEX 19028 at 17; Dmg. Trial Tr.

763:4–22. Of course, Kris has still been able to continue some of his hobbies or adapt them. Kris continues to play the guitar and sing in the church's worship team, though he had to learn how to hold his guitar so as not to trigger his neuropathic pain. Dmg. Trial Tr. 721:19–722:14. Kris has also raced go-karts with hand controls, and although enjoyable in the moment, Kris would "rather be in a car." *Id.* at 761:7–762:14. The Workman family hopes to one day be able to fit a stock car for Kris to race. *Id.* at 580:13–581:10.

Kris's family life has also been impacted. Kris has a difficult time engaging with his daughter E.W. and wife Colbey in the way he did prior to the shooting. *See id.* at 764:23–765:11; Colbey Workman Dep. 29:24–30:15; PEX 19069 at 5. When discussing his injuries with Dr. Ticknor, Kris stated: "The saddest thought I have is that my wounds and my paralysis will decrease my physical activity stuff with my daughter, [E.W.]." PEX 19025 at 6–7. While they used to take trips together as a family, travel has become difficult for Kris and they no longer do so as frequently. Colbey Workman Dep. 19:4–13, 28:9–29:4.

Additionally, prior to the shooting, Kris and Colbey had a "healthy sexual relationship, and now that's pretty much gone." Dmg. Trial Tr. 765:9–11. Because Kris has no sensation below his waist, he cannot maintain a voluntary erection or ejaculate. *Id.* at 765:15–766:8; PEX 19033 at 1. The likelihood that Kris would be able to donate viable sperm for artificial insemination is also questionable due to diminished sperm motility in patients with loss of sensation below the waist. PEX 19033 at 1. Both Kris and Colbey wanted to have more children, and the fact that they may not be able to do so naturally is "not a pleasant thought to think about." Dmg. Trial Tr. 767:10–24.

In addition to his personal life, Kris's professional life has also been affected by his injuries. From 2013 to 2020, Kris was employed as a supervisor at Rackspace. PEX 19065 at 2.

From 2013 to 2016, Kris's average annual gross income was $69,547.50. *See id.* at 6. While Kris was recovering from his injuries in 2017 and 2018, Kris made $73,761 and $62,741 per year respectively. *Id.* In November 2020, Kris quit his employment at Rackspace because of several changes to his position, and he felt he was having difficulty keeping up with his new responsibilities and was enjoying his job less. *Id.* at 2; Dmg. Trial Tr. 736:5–738:4. Kris began his employment with Mailgun in February 2021 as a technical support manager, salaried at $79,000 per year. PEX 19035 at 3. While Kris has succeeded professionally and has shown he is able to obtain supervisor-level employment positions, Kris is not likely to be able to work full time until retirement age. *See* PEX 19028 at 45–48. Spinal cord injury patients have a shortened life expectancy, and often experience a functional decline typically within fifteen years post injury. PEX 19028 at 45–48.

Kris is constantly reminded of the shooting because of the nature of his injury: "[I]t bears with me all day, every day. I mean, I have the constant reminder of the neuropathic pain, you know, the constant reminder of being in a wheelchair and I'm severely limited in what I'm capable of doing on my own. I have the constant reminders of the thoughts and memories that— you know, that come into my head of what happened that day. You know, those don't go away." Dmg. Trial Tr. 764:3–12. Both Dr. Ticknor and Dr. Marx diagnosed Kris with PTSD. GEX 681 at 9; PEX 19060 at 9. Kris, however, has not sought out treatment for his PTSD. Dmg. Trial Tr. 782:4–8.

For these reasons, the Court awards Kris Workman:

$5,000,000.00 for Kris Workman's physical pain and mental anguish sustained in the past.

$1,000,000.00 for Kris Workman's physical pain and mental anguish that, in reasonable probability, he will sustain in the future.

$0 for Kris Workman's disfigurement sustained in the past.

$100,000.00 for Kris Workman's disfigurement that, in reasonable probability, he will sustain in the future.

$3,000,000.00 for Kris Workman's physical impairment sustained in the past.

$3,000,000.00 for Kris Workman's physical impairment that, in reasonable probability, he will sustain in the future.

$0 for Kris Workman's loss of earning capacity sustained in the past.

$711,000 for Kris Workman's loss of earning capacity that, in reasonable probability, he will sustain in the future.

$49,027 for Kris Workman's medical care expenses incurred in the past.[24]

$5,117,039.98 for Kris Workman's medical care expenses that, in reasonable probability, he will incur in the future.[25]

---

[24] Plaintiffs and the Government stipulate that this amount reflects Kris Workman's past medical expenses. ECF No. 576 at 9.

[25] This amount was calculated based on Plaintiffs' proposed life care plan for Kris Workman. *See* PEX 19031, 19042. This amount is adjusted to reflect average generic drug pricing, to remove exoskeleton and associated costs as Kris cannot fit in an exoskeleton, see GEX 680 at 53, to remove psychotherapy as Kris has not sought out mental health treatment, Dmg. Trial Tr. 764:14–22; PEX 19025 at 8, to remove RN supervision for attendant care, and to reflect a $22 per hour rate for attendant care. *See* PEX 19031.

6. *Colbey Workman – 24 years old*

Colbey, Kris's wife, was not in the church on the day of the shooting. However, her marriage to Kris has been heavily impacted by the shooting because of Kris's catastrophic injuries.

Colbey and Kris have been married for nine years. Colbey Workman Dep. 10:5–12. Colbey characterized their marital relationship prior to the shooting as "good," and felt that she and Kris "communicated really well," and spent quality time together. *Id.* 17:21–18:3. Colbey and Kris often went on trips with their families and attended social events together. *Id.* at 21:10–17, 27:6–29:2. They also had a healthy intimate life together. Dmg. Trial Tr. 795:9–10.

Since the shooting, Kris and Colbey's marriage has become "a lot more difficult." *Id.* at 764:23–765:2. Much of Colbey and Kris's time together "involves accommodations for Kris." PEX 19065 at 4. Colbey feels "overwhelmed" and "burnt out" with performing the majority of household tasks and caring for E.W. now that Kris cannot assist as easily and is dependent on Colbey in many ways. *Id.* at 3; GEX 249 at 4. Their communication is strained because Kris is less patient with Colbey due to his neuropathic pain, Dmg. Trial Tr. at 765:3–5, and Colbey fears that this will not improve, Colbey Workman Dep. 46:5–20. Colbey also feels a great deal of anxiety about Kris's ability to work long term, as he is the family's sole breadwinner.[26] *Id.* at 46:7–23.

Kris and Colbey's intimate life is also "gone." Dmg. Trial Tr. 765:9–11. Because Kris is unable to have a voluntary erection or feel any sensation below his waist, they rarely engage in physical intimacy. *Id.* at 765:12–766:8; PEX 19033 at 1. Physical intimacy "was always a critical

---

[26]    While Colbey has her cosmetology license and worked as a hair stylist for a period after the shooting, Colbey had a difficult time working due to her anxiety and because E.W. and Kris rely on her for care.

component of their relationship," but it has now become "another anxiety-filled task." GEX 249 at 4. It is also unlikely that the couple will be able to have more children. Conceiving naturally is now impossible, and there is uncertainty whether Kris would be able to provide viable sperm for artificial insemination. Workman Dep. 40:20–41:8; PEX 19033 at 1. Both Kris and Colbey wanted to have more children, and the fact that they may not be able to "affects Colbey to a great degree." Dmg. Trial Tr. 767:21–24.

For these reasons, the Court awards Colbey Workman:

$200,000.00 for loss of consortium sustained the past.

$200,000.00 for loss of consortium that, in reasonable probability, Colbey Workman will sustain in the future.

### 7. E.W. – 2 years old

E.W., Kris and Colbey's daughter, was not in the church on the day of the shooting. While Kris was in the hospital and rehabilitation center for treatment, E.W. developed separation anxiety. PEX 19069 at 5. E.W. has further been diagnosed with an adjustment disorder due to the impact Kris's injuries have had on her life. *Id.* at 9. Dr. Murphey opined that E.W. will continue to experience an adjustment disorder and may develop an anxiety disorder as she becomes more aware of the permanent nature and extent of Kris's disability. *Id.*

Prior to the shooting, Kris was "very active" in E.W.'s life, and Kris, Colbey, and E.W. would frequently go on family trips together. Workman Dep. 19:4–13, 28:9–29:4. Because of Kris's paralysis, though, the family can no longer travel like they used to. Dmg. Trial Tr. 495:23–496:18. E.W. is also hesitant to share with Kris about her life because "she feels like he won't want to hear" about it. Colbey Workman Dep. 54:12–14. When E.W. tries to talk to Kris,

Kris is asleep, in pain, maintaining his bodily functions, or working. *Id.* at 54:15–19. Kris can still provide some care for E.W., but it is difficult for him to enter her room due to its size relative to his wheelchair, and he can no longer play outside with her. *Id.* at 29:24–30:15; PEX 19069 at 5.

For these reasons, the Court awards E.W.:

$150,000.00 for loss of consortium sustained the past.

$100,000.00 for loss of consortium that, in reasonable probability, E.W. will sustain in the future.

### The Colbath Family

David Colbath was present at church on the day of the shooting. His daughter, O.C., was not present. David Colbath seeks recovery for his own personal injuries. He has also asserted a claim for derivative recovery on behalf of his daughter, O.C.

### 1. *David Colbath – 55 years old*

David Colbath was attending church alone on the day of the shooting. That morning, David arrived at the church's fellowship hall to prepare to teach his Sunday school class. Dmg. Trial Tr. 814:5–10. After Sunday school, David sat in his usual spot in the back row. *Id.* at 815:7–16. When David heard what he believed were firecrackers, he turned to face the door. *Id.* at 816:1–3. David then noticed bullet holes in the door, turned back around, and screamed "Get on the floor. Get on the floor." *Id.* at 816:4–9. As David was turning, he was shot in the right forearm. *Id.* at 816:10–15. The force from the bullet was so great that it knocked David to the floor, and when he looked at his arm, "there was just nothing really hanging it together. . . . [Y]ou could see the two bones easy, as it—they were just there." *Id.* at 816:10–817:16. David

crawled away from the door and towards the wall of the church. *Id.* at 817:22–25. He laid flat on the floor "momentarily," and was shot in his side, left ankle, and right calf. *Id.* at 818:20–24. David listened to the "constant" sound of the bullets "whizzing" around, other church members calling 911, and asked himself "Where is the help?" *Id.* at 819:11–820:5.

Then, Gregory Hill, John Porter and Crystal's son, fell on top of David, "[a]nd the moment he fell, he was dead." *Id.* at 821:3–7. David was stuck underneath Gregory as he heard Kelley walk up the aisle firing at other congregants. *Id.* at 821:11–823:9. David described how he felt as he was trapped under Gregory: "And, you know, I'm a grown man. And when I say I was scared, I can't say how scared. It was just something that you had no control over. It—just absolutely terrified. You know, you're kind of helpless. There's nothing to do but just lay there and get shot." *Id.* at 823:14–18. Kelley then shot David in the back of the neck. *Id.* at 824:18–22. The bullet "felt like a foot of an elephant pushing me down into the concrete. It was just like this enormous, enormous pressure." *Id.* at 824:18–825:13. David then heard Kelley shoot Kris Workman and exit the church. *Id.* at 831:21–833:8.

When first responders arrived, they placed a tourniquet on David's arm, and he screamed from the pain: "And I screamed because I found out what pain is because that's when the pain started." *Id.* at 834:12–15. First responders then helped David crawl out from underneath Gregory, placed him on a gurney, and carried him outside. *Id.* at 835:16–836:15. David was then driven to BAMC in an ambulance. *Id.* at 837:12–17. He was immediately taken to the operating room. *Id.* at 839:10–14.

In total, David suffered eight gunshot wounds. PEX 6015. Tissue and blood vessels from David's left leg were grafted onto his right forearm and a wound VAC was applied. *Id.* at 844:6–14; PEX 6007 at 2. The bullet in his left ankle was removed, the gunshot wound in his right calf

treated, and he was given multiple blood transfusions due to massive blood loss. PEX 6007 at 2. His buttock wounds were also treated with a wound VAC. *Id.* David underwent reconstructive surgery for his left ankle. *Id.* at 3. He also had surgery on his right leg to remove the bullet lodged in his ankle and shrapnel in his calf.[27] Dmg. Trial Tr. 891:8–25.

David's recovery was prolonged. He was in BAMC until late November 2017 and then was admitted to the New Braunfels Regional Rehabilitation Hospital ("NBRRH") for further care. PEX 6007 at 2. While in treatment at NBRRH, David was in constant pain. Dmg. Trial Tr. 852:10–11. Physical therapy itself was painful, as doctors were trying to restore function to his right hand and left ankle. *Id.* at 853:8–854:3. Once a week, David was taken back to BAMC for further wound care to his buttocks and arm. *Id.* at 854:20–855:2. David was not discharged from NBRRH until late December 2017. Then, from January to August 2018, David was an outpatient at the Intrepid Center to continue physical and occupational therapy. *Id.* at 848:11–17, 862:4–863:19.

David made remarkable progress to restore function to his right arm. However, he has now reached a plateau in his recovery and has limited use of his right arm. David has "no strength" in his right forearm: "[P]ut a piece of pipe in my hand, and it will just fall out. I can hold it, but I can't grip it." *Id.* at 845:18–846:1. David's index and middle fingers are numb due to nerve damage. *Id.* at 846:6–20. "Any kind of vibration" will agitate David's right arm: "I can just be driving and, all of a sudden, my hand is asleep. And it's the sleep feeling that goes all the way up. . . . Is that painful? No. It's just aggravating and agitating. That kind of pain." *Id.* at 847:2–18. Additionally, David has "significant" scarring on his right forearm: "It's almost the

---

[27]     David has had two other bullets removed since his initial treatment at BAMC. One bullet was removed in July 2019 and the other in April 2021. Beste Dep. 10:19–11:17.

entire volar aspect of the [right] forearm. Multiple—multiple inches of width loss in that section of the forearm."[28] Willingham Dep. 88:13–25.

The gunshot wound to the back of David's neck did not sever his spine, but it did sever his ulnar nerve. Dmg. Trial Tr. 868:16–870:3. As a result, David's left forearm and middle and ring fingers are hypersensitive, "which just means anything that you touch, it's an aggravation." *Id.* at 870:10–20. The gunshot wound also causes him neck pain, and he must position himself in particular ways while laying down to avoid irritating it further. *Id.* at 871:23–872:13.

There is significant scar tissue on David's left leg that frequently causes him pain. Where doctors pulled the vein out of David's left thigh to graft onto his right arm, there is approximately a fifteen-inch scar that cramps "sometimes nightly." *Id.* at 872:14–873:2. These cramps are "solid, it-doesn't-want-to-release cramp[s]." *Id.* at 872:20–23. While David has sought treatment for the cramping, "nothing takes it away," and he has only found one treatment that provides slight relief. *Id.* at 873:9–16.

David's injury to his left ankle has decreased his ability to walk. Currently, David can walk "for an hour or two" to do daily activities but cannot "go on a brisk walk for an hour or anything like that." *Id.* at 866:6–10. If he is on his feet for too long, his ankle will swell, and he will have to sit and rest until the pain lessens. *Id.* at 865:15–866:3. David regularly takes ibuprofen to treat the swelling and pain, and though he has been prescribed hydrocodone for the pain, he refrains from taking such medication. *Id.* at 867:11–21. One of David's treating physicians, Dr. Willingham, has recommended that David undergo ankle fusion or a total ankle replacement. PEX 6081 at 1; PEX 6083 at 1.

---

[28]     In Dr. Willingham's deposition, he states "the left forearm," however, his report refers to scarring on David's right forearm. *Compare* Willingham Dep. 88:13–25, *with* PEX 6039 at 2, PEX 6015 (depicting David's right forearm injury).

David also has elevated blood lead levels due to retained bullets and shrapnel. PEX 6008 at 4–5. Plaintiff's expert neurologist Dr. Todd opines that lead exposure is causing (1) David's short-term memory loss and cognitive deficits and (2) peripheral neuropathy in his legs that cause an itching sensation in his toes. *Id.* at 13. However, David was experiencing short-term memory loss prior to the shooting. PEX 6077 at 482. Additionally, David's documented blood lead levels are ten micrograms per deciliter as of June 2019, and eleven micrograms per deciliter as of October 2019. PEX 6008 at 12. As discussed, Dr. Kosnett has opined that lead-induced peripheral neuropathy in adults does not emerge until blood lead concentration reaches or exceeds thirty to forty micrograms per deciliter for a period of days to years. GEX 457 at 2. Any worsening of David's cognitive deficiencies may be explained by other conditions that David is suffering from, such as insomnia and PTSD. GEX 455 at 14–15; PEX 6009 at 6. Similarly, there are also other explanations for the itching sensation in David's feet, such as restless leg syndrome. GEX 455 at 14; GEX 457 at 2; *see also* Dmg. Trial Tr. 3031:13–20.

Nonetheless, David's physical injuries have made it difficult if not impossible to engage in many of his hobbies. Prior to the shooting, David was "an avid hunter [his] entire adult life." Dmg. Trial Tr. 880:2–4. David has only been able to go on one hunting trip since the shooting, "and it was exhausting." *Id.* at 880:9–12. While he can hunt, David has "not had a real interest in doing it." *Id.* at 880:13–19. David also lived "a country life," and roped cattle and bred and rode horses. *Id.* at 880:23–881:4. He has not been on a horse or roped cattle since the shooting because of his injuries. *Id.* at 881:5–12.

David has suffered mentally as well as physically because of the shooting. In the first weeks after the shooting, David would not sleep alone because he was fearful and had frequent nightmares. *Id.* at 886:10–22. For approximately the first year after the shooting, David took

sleep aids. *Id.* at 885:7–14, 888:10–11. He still has difficulty sleeping but discontinued with sleep aids because he was worried about certain side effects of his medication. *Id.* at 888:12–16. David continues to experience flashbacks and unwanted memories of the shooting: "[I]t's kind of hard to get out of your mind. Disturbing to say the least. Hurtful. . . . I don't know that any of that stuff ever goes away." *Id.* at 887:23–11. Both Dr. Ticknor and Dr. Marx diagnosed David with PTSD. PEX 6009 at 8; GEX 461 at 13. To treat his PTSD, David saw a counselor at the Intrepid Center, and then began seeing counselor Terry Davis. Dmg. Trial Tr. 862:23–863:7, 902:8–15. While David is not currently in counseling, he believes that he will "have some type of counseling at times" throughout his life. *Id.* at 902:8–903:5.

Lastly, David's work and business have been impacted by his injuries. David currently owns and runs a fencing business. *Id.* at 804:1–805:3. Before the shooting, David went to his job sites and would supervise workers as well as erect fences himself. *Id.* at 805:20–806:2. Immediately after the shooting, David could not continue the business and took time off work to recover, and then began working again in November 2018. *Id.* at 806:18–807:12. Whereas David used to work ten-hour days constructing fences, David can now only work a few hours before needing to rest. *Id.* at 877:8–18. He must pay extra labor costs to make up for the physical labor he used to put into the business. *Id.* at 877:19–22.

For these reasons, the Court awards David Colbath:

$2,000,000.00 for David Colbath's physical pain and mental anguish sustained in the past.

$750,000.00 for David Colbath's physical pain and mental anguish that, in reasonable probability, he will sustain in the future.

$32,000.00 for David Colbath's disfigurement sustained in the past.

$32,000.00 for David Colbath's disfigurement that, in reasonable probability, he will sustain in the future.

$200,000.00 for David Colbath's physical impairment sustained in the past.

$100,000.00 for David Colbath's physical impairment that, in reasonable probability, he will sustain in the future.

$20,972.00 for David Colbath's loss of earning capacity sustained in the past.[29]

$144,159.00 for David Colbath's loss of earning capacity that, in reasonable probability, he will sustain in the future.[30]

$44,625.74 for David Colbath's medical care expenses incurred in the past.[31]

$768,137.45 for David Colbath's medical care expenses that, in reasonable probability, he will incur in the future.[32]

2. *O.C. – 7 years old*

O.C. was not attending church with her father, David, on the day of the shooting. When her mother learned of the shooting, O.C. went to BAMC with her mother. PEX 6088 at 4. O.C.

---

[29]     As David took a full year off to recovery, the Court's award reflects David's past average profitability. *See* GEX 458 at 12, n.37.

[30]     The Government stipulates that this amount reflects David Colbath's loss of future earning capacity. ECF No. 576 at 3. Plaintiffs' expert economist Dr. Hubbard's projection of extra labor costs exceeding the business's profitability is not credible. *See* PEX 6017 at 2; PEX 6013 at 9. The Court finds that such labor costs are equivalent to the business's average profitability prior to the shooting for the reasons discussed in Dr. Lundstrom's report. *See* GEX 458 at 12–13.

[31]     Plaintiffs and the Government stipulate this amount reflects David Colbath's past medical expenses. ECF No. 576 at 3.

[32]     This amount was calculated based on Plaintiffs' proposed life care plan for David Colbath. *See* PEX 6019; 6020. This amount is adjusted to reflect average generic drug pricing, removed costs associated with bariatric surgery, reconstructive surgery, home health care, compression stockings, and the following medications: analgesics, GI prophylaxis, anti-depressants, Lidoderm, sleep aids, and diuretics. *See id.*; *see also* GEX 459 at 58–60; GEX 729; Dmg. Trial Tr. 3574:17–3579:7, 3581:22–3585:1.

heard many people talking about the carnage at the church, and O.C.'s grandmother came to get O.C. "out of that environment." *Id.* O.C. did not see her father until three days after the shooting. David testified that once O.C. saw him in the hospital, "you could see the hurt in her eyes[.]" Dmg. Trial Tr. 858:1–7.

David's injuries have impacted his and O.C.'s parent–child relationship. For example, David "cannot do physical things as he used to like run and play." PEX 6088 at 6. O.C. still spends time regularly with David, but her stays at David's home are shorter. *Id.* In 2018, O.C. was hesitant to visit her father and had nightmares while sleeping at his home. *Id.* at 7–8. However, it is unclear if these feelings persist. While O.C. has had difficulty adjusting to David's injuries, Dr. Murphey testified that "overall [O.C.] is doing well," and that David continues to be an attentive parent to O.C. Murphey Dep. 125:16–19, 143:10–13.

For these reasons, the Court awards O.C.:

$25,000.00 for loss of consortium sustained the past.

$25,000.00 for loss of consortium that, in reasonable probability, O.C. will sustain in the future.

**The Moulton Family**

Brenda Moulton was attending church the day of the shooting and seeks recovery for her own personal injuries. Jessica Moulton and William Lane, Brenda's children, seek derivative recovery for their mother's injuries.

*1. Brenda Moulton – 53 years old*

Brenda arrived at church an hour early on the morning of the shooting because she did not realize the time change at the end of Daylight Savings. Moulton Dep. 11:19–24, 12:16–17.

Brenda went to go get coffee and socialized with her friend, Farida Brown, before services. *Id.* at 11:24–12:4. Instead of sitting in her usual spot at the front of the church, Brenda sat with Farida in the back row. *Id.* at 12:3–15. As the services began, Brenda "heard the bullets outside, because I'm very experienced with firearms all my life, and I—I knew what it was." *Id.* at 14:10–15. Brenda immediately took cover underneath the pew. *Id.* at 14:24–25. "And the next thing I know, this girl is right there next to the—where my face was under the pew showing me her arm, and there was a bullet that had gone under this vein and hit that vein." *Id.* at 15:1–7. Brenda saw Kelley's feet as he moved up and down the aisle, shooting at other church members. *Id.* at 18:16–19:4. Kelley fired at Brenda: "He was trying to hit me in the head. The bullets were going through—hitting the wood, and as the—it hit the wood, the wood hit me in the head." *Id.* at 20:2–8. Brenda watched as Kelley shot Annabelle Pomeroy: "I could see the bullets flying this way, and several of them just, you know, rippling to the shots, you know, when the bullets entered her body." *Id.* at 18:22–19:4. As Kelley exited the church, he fired at Brenda again, this time shooting her in the right flank. *Id.* at 22:22–23:7; PEX 13046. Getting shot "felt like a—a punch." Moulton Dep. 23:8–10. Brenda could feel "the blood dripping out" of her, and "started tasting blood and feeling it" in her breathing. *Id.* at 23:14–24:4.

First responders carried Brenda out of the church and set her on the ground as they waited for ambulances to arrive. *Id.* at 24:4–24. "[T]he skies were beautiful and blue, and there was a buzzard flying in circles around the church. And I—I just couldn't forget that. It's like, how did they smell that something's gone wrong that quickly." *Id.* at 24:24–25:3. As Brenda laid waiting for an ambulance, in pain and in shock, she feared she was bleeding to death. *Id.* at 26:1–12. Brenda was loaded into an ambulance and taken to University Hospital. *Id.* at 26:13–27:2. When

she arrived, doctors began cutting her clothes away from her and she was taken to the operating room. *Id.* at 28:12–29:5.

Brenda's gunshot wound was life-threatening. The bullet entered her body on her right flank—breaking several ribs, injuring her right lung and causing major bleeding into her chest cavity—and then penetrated and tore her liver, and eventually lodged in her spine where it remains to this day. PEX 13042 at 1. Doctors drained the blood from Brenda's chest cavity, repaired the injuries to her diaphragm and liver, and ensured there was no heart injury by direct exploration. *Id.* Multiple drains were left in Brenda's abdomen to drain blood and bile from her injury. *Id.*

Brenda' recovery was prolonged and complicated by several factors. *Id.* Her right lung dropped, requiring intubation. *Id.* She also had a blood clot in her lung, which was treated with blood-thinning agents. *Id.* She also developed an ileus, or slowing intestinal function or partial bowel obstruction, which caused severe nausea and vomiting, and had to be treated with a nasogastric tube. *Id.* Total, Brenda spent twenty-two days in the hospital. Moulton Dep. 32:1–5. After being discharged from University Hospital, Brenda was sent to Reeves Rehabilitation Center for physical and occupational therapy. PEX 13042 at 2. She was then discharged in March 2018, and continued outpatient therapy. *Id.*

Because of the retained bullet in Brenda's spine, she has constant pain in her back. Moulton Dep. 36:23–37:4. The pain radiates down her ribs through her diaphragm. *Id.* at 37:3–5. Brenda cannot do "simple things," like bend over, reach over her head, or lift her granddaughter: "And just everyday things that people take for granted that their body can do, I have to struggle with." *Id.* at 37:5–16. Brenda also has frequent cramping underneath her ribs which makes it feel as though she cannot breathe. *Id.* at 37:20–23. Similarly, if she moves in a way that aggravates

the bullet in her spine, it feels like she cannot breathe. *Id.* at 37:24–38:8. Brenda struggles with her balance and gait and has fallen four times since the shooting. *Id.* at 37:7–11, 38:9–11. Brenda's daughter, Jessica, moved in with her after the shooting to assist Brenda in her day-to-day activities. *Id.* at 8:21–22, 45:17–46:21.

As a result of Brenda's gunshot wound and subsequent treatment, Brenda has "a mid-line abdominal scar that extends from her sternum to the pubis," as well as scarring from the gunshot entry wound. PEX 13045 at 52, 92. Brenda finds her scarring "just really embarrassing." Moulton Dep. 43:22–44:15. Her embarrassment has prevented her from romantically engaging with men: "I definitely don't have any chance at really having a . . . relationship." *Id.* at 44:16–21.

Prior to the shooting, Brenda enjoyed living a "country life." *Id.* at 39:9–12. Now, though, Brenda lacks physical stamina and cannot be outside like she used to. *Id.* at 39:2–8. Her injuries have "ruined [her] ability to be outdoors." *Id.* at 40:8–12. "It's not fair. . . . I've always lived in the country. I've always enjoyed the animals. . . . And I—I love the country life. I hunt and harvest meat, eggs, dairy, vegetables when we can get our garden rain. We tried this year, not that I could really do that much. My daughter had to do it all. . . . Now, I'm indoors all the time. The TV is my best friend now." *Id.* at 39:9–40:13.

In describing her emotional state, Brenda testified: "Well, I feel sad. Sad that I can't do the things that I loved to do anymore. I feel sad and guilty that my daughter is doing all these things for us. I feel sad and depressed that I can't do more closeness [sic] with my granddaughter than I am able to now." *Id.* at 40:14–25. Brenda feels worthless, and she feels guilty that Jessica has had to take on caring for her since the shooting. *Id.* at 43:5–18. Since the shooting, Brenda has had difficulty concentrating and with her memory. *Id.* at 41:5–18. Dr. Canter, one of the

Government's expert life care planners, noted that in her interview with Brenda,  that Brenda "was sad. . . . She hadn't showered for days. She didn't want to get up and do anything."  Dmg. Trial Tr. 3355:15–21. In her responses to the Incomplete Sentence Blank, Brenda stated "Sometimes: I wish I was dead." PEX 13044 at 5. While Brenda has preexisting bipolar disorder, "her function [has] definitely declined." Dmg. Trial Tr. 3355:22–24. Both Dr. Feltoon and Dr. Marx diagnosed Brenda with PTSD. PEX 13044 at 6; GEX 554 at 13.

For these reasons, the Court awards Brenda Moulton:

$2,000,000.00 for Brenda Moulton's physical pain and mental anguish sustained in the past.

$1,000,000.00 for Brenda Moulton's physical pain and mental anguish that, in reasonable probability, she will sustain in the future.

$60,000.00 for Brenda Moulton's disfigurement sustained in the past.

$60,000.00 for Brenda Moulton's disfigurement that, in reasonable probability, she will sustain in the future.

$200,000.00 for Brenda Moulton's physical impairment sustained in the past.

$150,000.00 for Brenda Moulton's physical impairment that, in reasonable probability, she will sustain in the future.

$87,717.61 for Brenda Moulton's medical care expenses incurred in the past.[33]

$1,380,356.11 for Brenda Moulton's medical care expenses that, in reasonable probability, she will incur in the future.[34]

---

[33]     Plaintiffs and the Government stipulate this amount reflects Brenda Moulton's past medical expenses. ECF No. 576 at 6.

2.  *Jessica Moulton – 22 years old*

Jessica is Brenda's daughter and was not in the church the day of the shooting. Although she was not present, Jessica's life has been altered by her mother's injuries.

Brenda is Jessica's only parental figure, and Jessica relied on her throughout her life for advice and support. Dmg. Trial Tr. 939:2–10. Even when Jessica was "rebellious" in her high school years and briefly moved away from home, Brenda and Jessica remained in close contact through phone conversations and visits. Moulton Dep. 69:17–71:2; Dmg. Trial Tr. 940:22–942:18. When Jessica had her own daughter, V.M., Brenda supported Jessica and stayed in the hospital with Jessica: "[Brenda] was up with me all night. She's an amazing grandmother, and she really helped me a lot." Dmg. Trial Tr. 948:1–9. Brenda visited Jessica in San Antonio to help care for V.M., and "was very involved" in V.M.'s care. *Id.* at 949:5–12.

After the shooting, Jessica moved in with Brenda to provide her with round-the-clock care because Brenda has had difficulty walking and performing the activities of daily living. *Id.* at 978:3–20. Jessica drives her mother to any appointments she may have, runs errands for their household, ensures her mother takes her proper medications, cleans, cooks, and does many other household chores.[35] *Id.* at 981:11–15, 985:17–986:2, 987:24–988:12. Jessica feels that their roles have reversed, and she is now the one providing Brenda with the majority of the care. *Id.* at 985:25–986:8. Jessica can no longer go to Brenda for help with childcare or advice as she did

---

[34]    This amount was calculated based on the Plaintiffs' proposed life care plan for Brenda Moulton. *See* PEX 13045. The amount is adjusted to reflect the two years passed between the life care plan date and trial, average generic drug pricing, and removed costs for podiatry, opioid medication (Ultram), antacid medication, knee x-rays, and flu and pneumonia vaccines. *See id.* at 68–72, 84, 86. The Court finds that the podiatry, knee x-ray, vaccine, and antacid expenses are not related to her injuries, and that the opioid medication would be unsafe for Brenda to take while on her bipolar medication. Dmg. Trial Tr. 3359:7–24; GEX 553 at 30–31. The Court has, though, included the cost of attendant care at a $22 per hour rate for five hours per day for the remainder of Brenda's life because Brenda is unable to perform the tasks of daily living herself. *See* Dmg. Trial Tr. 3664:6–8.

[35]    Jessica is paid for her services through a home healthcare agency. Dmg. Trial Tr. 984:21–985:14.

before the shooting. *Id.* at 986:17–23. While Jessica "wouldn't want to be anywhere else," *id.* at 978:19–20, her own life has been "put on hold." *Id.* at 988:13–15. Jessica's social life has dwindled because Brenda cannot be left alone, nor can she bring anyone to her home because her mother is fearful of strangers. *Id.* at 988:16–989:5.

For these reasons, the Court awards Jessica Moulton:

$50,000.00 for Jessica Moulton's loss of parental consortium sustained in the past.

$50,000.00 for Jessica Moulton's loss of parental consortium that, in reasonable probability, she will sustain in the future.

3. *William Lane – 34 years old*

William is Brenda's son, and he was not present at the church the day of the shooting.

Growing up, William's father was not around, and Brenda was William's sole, constant parental figure. Lane Dep. 18:9–22. While it was not an easy childhood, it was "almost like a bunker mentality where it was like kind of us against the world . . . [Brenda's] a tough person to deal with a lot of times but, you know, there was also a bond because of that, you know, because of all the things we've been through." *Id.* at 21:11–22:4. After William moved out of the family home at nineteen, his relationship with his mother became more distant. *Id.* at 23:25–25:4. In 2006, when William started his own family, it was also difficult to be with his mother because she and his wife did not get along initially. *Id.* at 25:21–26:21. However, as the relationship between William's wife and Brenda warmed up, he spent more time with Brenda. *Id.* at 25:21–26:21. They took hunting trips, visited, and William would help around her home. *Id.* at 32:19–33:24. A month before the shooting, William was hospitalized for endocarditis, and Brenda came to visit him in the hospital "all the time." *Id.* at 30:12–32:13.

Since the shooting, William has visited his mom about once a month. *Id.* at 49:20–50:4. While he still makes the time and effort to see Brenda, their relationship has changed: "I don't think she's ever going to be the same, you know. I just don't see it happening." *Id.* at 51:25–52:2. When William does see his mother: "I have to be there for her, you know, both physically and mentally . . . she can't do a whole lot." *Id.* at 51:13–18. William does not believe that they will be able to hunt together again. *Id.* at 51:20–22. Brenda's injuries have also made it difficult for her to have a relationship with William's son, Brenda's grandson. *Id.* at 55:2–56:3. Since she cannot spend time outdoors with her grandson, it is difficult for her to bond with him. *Id.* at 52:3–20. William feels that his son is missing out on a relationship with his grandmother and that "bothers" him. *Id.* at 56:4–17.

For these reasons, the Court awards William Lane:

$25,000.00 for William Lane's loss of parental consortium sustained in the past.

$25,000.00 for William Lane's loss of parental consortium that, in reasonable probability, he will sustain in the future.

### The Macias Family

Juan "Gunny" Macias was attending church the day of the shooting and seeks recovery for his own personal injuries. His wife, Jennifer Macias, was not present. Jennifer passed away in the midst of the damages trial, and Gunny represents her estate in seeking derivative recovery for his injuries. ECF No. 563.

1. *Juan "Gunny" Macias – 53 years old*

Gunny Macias was attending church alone the day of the shooting, as his wife, Jennifer, and daughter, Amanda, had both decided to sleep in that morning. Dmg. Trial Tr. 1025:10–16.

Gunny heard gunshots, and because the church was "out in the country . . . [he] assumed it was probably just somebody shooting their gun off." *Id.* at 1026:18–25. But he heard more gunshots and then glass breaking, and he shouted "get down. Take cover." *Id.* at 1027:1–3. Gunny immediately began calling 911. *Id.* at 1027:4. As he was on the phone with the operator, Gunny was shot in the left arm. *Id.* at 1027:12–20. He turned, saw Kelley, and "realized what exactly was going on." *Id.* at 1027:21–23. Gunny began low crawling towards the wall and took another bullet in his left hip. *Id.* at 1027:24–1028:8. He looked towards the front of the church, and saw that two of his friends, Shani and Bob Corrigan, were dead. *Id.* at 1028:17–1029:4. Gunny was then shot in the buttocks and low back. *Id.* at 1029:5–7. As Gunny lay taking cover, he heard R.T. whisper his name and tell him she was scared. *Id.* at 1029:5–17. He comforted her, and they sang "Jesus Loves Me" together. *Id.* at 1029:18–22.

When Gunny heard a magazine drop from Kelley's AR-556, he "thought that was [his] opportunity to see if [he] could jump him." *Id.* at 1029:23–25. As he began pushing himself up, he realized that his left leg would not move. *Id.* at 1030:1–5. Kelley saw Gunny's movements, and Gunny slid back under the pew. *Id.* at 1030:5–6. Kelley then began firing at Gunny. *Id.* at 1030:7–8. As Kelley fired, moving towards Gunny, Gunny was shot in each side of his hip and chest. *Id.* at 1030:7–13. Gunny closed his eyes as the shrapnel, wood, and smoke clouded around him. *Id.* at 1030:14–15. Moments later, Gunny heard tires squealing and knew Kelley had left. *Id.* at 1030:23–25.

First responders carried Gunny out of the church and laid him on the grass. *Id.* at 1031:17–1032:8. While he waited to be taken to the hospital, Gunny "thought for sure [he] was going to die that day." *Id.* at 1033:15–22. He was then taken by helicopter to BAMC. *Id.* at 1033:23–1035:1. As doctors were preparing him for surgery, Jennifer and Amanda arrived at the

hospital. *Id.* at 1035:9–12. Gunny tried to take their minds off his injuries by joking with them to take photos. *Id.* at 1035:5–1036:11. His next memory was waking up in the ICU, intubated, and connected to other wires and tubes. *Id.* at 1036:21–1037:10.

Gunny sustained five to seven gunshot wounds. PEX 10014. He had hip and femur fractures, Dmg. Trial Tr. 2678:15–24; GEX 504 at 19; PEX 10016 at 11, as well as severe injuries to his abdominal cavity, urethra, scrotum, and rectum. Dmg. Trial Tr. 1042:9–19, 2679:2–6; GEX 504 at 19–20. On November 5, 2017, Gunny underwent surgery to repair his urethra as well as an exploratory laparotomy, proctoscope, and colostomy. GEX 504 at 19; PEX 10007 at 1318. Gunny's recovery was complicated by: "wound infections, mental status changes, respiratory distress, labile blood pressure, need for 'massive' blood transfusions, multiple procedures, and periods of hemorrhagic vs. septic shock." GEX 504 at 19. He spent almost seventy days in the ICU. Dmg. Trial Tr. 1037:23–1038:3.

After Gunny was discharged from BAMC, he was transferred to Post Acute Medical for rehabilitation. *Id.* at 1043:6–12. At Post Acute Medical, Gunny underwent both physical and occupational therapy. *Id.* at 1043:6–18. He had to learn how to walk again. *See id.* at 1044:11–19; PEX 10026 at 168, 178, 266. Relearning to walk was "extremely hard and extremely scary. . . . I was scared I was going to hurt myself. You can see my legs are just twigs." Dmg. Trial Tr. 1044:11–25; *see also* PEX 10003 at 34 (photo referenced in testimony). Thirty days later, Gunny was able to use a wheelchair and a walker, and was sent home. *Id.* at 1046:11–20. Though he was sent home, Gunny's treatment was ongoing. From February to May 2018, Gunny had home healthcare to assist in physical and occupational therapy, as well as wound care. *Id.* at 1047:22–1048:4; *see also* PEX 10016 at 41; PEX 10021.

Gunny continues to experience significant pain because of his injuries. He has nerve pain in his right foot due to nerve damage "that is icy cold and numb and stinging." Dmg. Trial Tr. 1048:5–10. To help with his foot pain, he must always wear a boot. *Id.* at 1048:5–10. Gunny also experiences testicular pain to the point where he cannot sit on concrete or metal surfaces. *Id.* at 1058:18–1059:9. Sitting or standing for long periods is painful for Gunny because of his hip injury. *Id.* at 1048:18–22.

Since the shooting, Gunny has also experienced incontinence. When Gunny has to urinate, he has to do so immediately because he does not "get very much warning[.]" *Id.* at 1060:2–8. He has bladder leaks, and he must wear a diaper. *Id.* at 1060:2–5. He also experiences an "extreme sensation," that's painful and "very intense" when he urinates. *Id.* at 1048:14, 1060:2–23. The intensity is so extreme that it causes him to groan, which he finds "very embarrassing." *Id.* at 1048:15–17, 1060:13–17.

Because of Gunny's rectal injury, the ostomy performed immediately after the shooting is permanent. *Id.* at 1051:24–1052:2; PEX 10016 at 69–70. The ostomy is a source of constant worry and embarrassment for Gunny. The ostomy protrudes because of a hernia that will not resolve. PEX 10016 at 136; Dmg. Trial Tr. 1051:25–1051:9; *see also* PEX 10003 at 29 (photograph referenced in testimony). The ostomy bag does not fit evenly around the stoma due to the hernia, which causes leakage and skin infections. Dmg. Trial Tr. 1052:11–1054:25. Gunny has leakage "several times a week." *Id.* at 1055:10–18. Since he does not have control over his bowel movements, he does not know until "either the smell is just outrageous" or he sees that stool has leaked onto his shirt. *Id.* at 1055:10–22, 1058:12–17. Because of the complications with his ostomy, Gunny avoids eating around others, traveling, and being in public. *Id.* at 1056:1–1058:17; PEX 10016 at 71; PEX 10017 at 8; GEX 505 at 12.

Gunny has multiple scars due to his injuries and subsequent treatment. Bullet wounds are visible on Gunny's arms, legs, back, chest, hip, abdomen, and buttocks. PEX 10003 at 12–33. There are also multiple scars from various tubes, drains, and surgeries. *Id.* at 12–33. Gunny's scrotum and testicles are also deformed and cause him significant pain. Dmg. Trial Tr. 1048:5–13. Additionally, Gunny has retained shrapnel in his hips, arms, abdomen, and chest. PEX 10014. His blood lead levels are currently at eleven micrograms per deciliter, which causes him significant worry. Dmg. Trial Tr. 1072:3–17.

Prior to the shooting, Gunny lived an active and social lifestyle. He and his wife Jennifer had an RV and enjoyed camping, scuba diving, going to amusement parks, and having friends over to their home for pool parties and cookouts. *Id.* at 1019:3–1021:15. However, Gunny is no longer able to do these things comfortably because of the constant struggle he has with his ostomy and incontinence: "I don't go anywhere. I don't do anything." *Id.* at 1055:16–18; *see also* PEX 10016 at 71; PEX 10017 at 8; GEX 505 at 12.

While Gunny had a twenty-four-year career in the Marines and had a prior PTSD diagnosis relating to his deployments, "it appears that [he] had worked through those symptoms before the shooting and that they had resolved almost entirely." PEX 10017 at 9; *see also* Jennifer Macias Dep. 39:23–43:6. Now, though, Gunny suffers from severe PTSD and depression. PEX 10017 at 9; GEX 505 at 11–12. Gunny thinks about the shooting "all the time[.]" Dmg. Trial Tr. 1067:5–7. His permanent injuries and pain are constant reminders of the shooting. *Id.* at 1067:8–11. For months after the shooting, Gunny needed somebody to be at home with him because of the anxiety he would feel when alone. Jennifer Macias Dep. 36:11–37:20. Gunny has a heightened startle reaction to loud noises. Dmg. Trial Tr. 1067:8–11. For example, when Jennifer would close her water bottle, it would pop. *Id.* at 1067:8–13. Jennifer

would have to warn Gunny when she was closing the bottle so he would not "freak out." *Id.* at 1067:8–15. Gunny has also had night terrors where he would be "screaming in [his] dreams but Jennifer couldn't wake [him] up," PEX 10017 at 4, or he would wake up hitting and choking Jennifer because he would mistake her for Kelley, Dmg. Trial Tr. 1067:16–19.

Gunny also suffers from survivor's guilt. When he thinks of the shooting, he returns to certain moments, such as seeing his friend Bob Corrigan die: "I know there's nothing I could do for him. But, you know, I think about, you know, what if I went over there and just like held his hand or talked to him as he was going." *Id.* at 1068:9–17. Gunny also remembers R.T. crying out for him: "I wish I could have gone and hugged her." *Id.* at 1068:17–19. Gunny testified: "I didn't save anybody's life. That's a big thing for me. At one time, someone got on the news and said about Sutherland Springs, that we did everything wrong, that we should have ran. And I felt so guilty because I was the first one to yell 'get down.' Although, I know—I know if anybody would have gotten up and tried running, the church so small, I think more people would have died. But the guilt is still there." *Id.* at 1069:1–10.

For these reasons, the Court awards Juan "Gunny" Macias:

$3,000,000.00 for Juan Macias's physical pain and mental anguish sustained in the past.

$2,000,000.00 for Juan Macias's physical pain and mental anguish that, in reasonable probability, he will sustain in the future.

$500,000.00 for Juan Macias's disfigurement sustained in the past.

$500,000.00 for Juan Macias's disfigurement that, in reasonable probability, he will sustain in the future.

$1,000,000.00 for Juan Macias's physical impairment sustained in the past.

$1,000,000.00 for Juan Macias's physical impairment that, in reasonable probability, he will sustain in the future.

$90,862.28 for Juan Macias's medical care expenses incurred in the past.[36]

$3,142,351.92 for Juan Macias's medical care expenses that, in reasonable probability, he will incur in the future.[37]

*2. The Estate of Jennifer Macias – 46 years old*

Jennifer was not present at church one the day of the shooting. Nonetheless, Jennifer's life was transformed by Gunny's injuries.

Before the shooting, Gunny and Jennifer were "two teenage kids in love." Dmg. Trial Tr. 1022:9–11. The two were "always holding hands. . . . always sitting real close to each other. . . . always leaning on each other." *Id.* at 1022:12–15. They had regular physical intimacy and "were best friends." *Id.* at 1071:9–13. After Gunny retired from the Marines, Jennifer and Gunny maintained active lifestyles and enjoyed camping, swimming, and scuba diving. *Id.* 1018:20–1019:19. Jennifer and Gunny had made a commitment to their health, and were eating well and

---

[36]     Plaintiffs and the Government stipulate this amount reflects Juan Macias's past medical expenses. ECF No. 576 at 4.
[37]     This amount was calculated based on the Plaintiffs' proposed life care plan for Juan Macias. *See* PEX 10016. This amount is adjusted to reflect the three years passed between the life care plan date and trial, average generic drug pricing, and removed costs for family counseling, flu and pneumonia vaccines, Viagra, analgesics, Ambien, Celexa, occupational and physical therapy, total knee arthroplasty, shoulder cortisone injections and shoulder manipulation under anesthesia. *See id.* at 96–103, 126–25, 129, 134. Given Jennifer Macias's death, the family counseling and Viagra costs are no longer justified. Additionally, the Court finds that the costs related to the knee arthroplasty, Celexa, Ambien, and analgesics are the result of preexisting conditions and injuries. *See* Dmg. Trial Tr. 3613:5–16; PEX 10043 at 772–73. The costs associated with periodic occupational and physical therapy are not justified because Gunny has no active issues with the use of his upper extremities, and the hip replacement will treat his hip pain rather than continued physical therapy. Dmg. Trial Tr. 3610:5–3611:7. Lastly, the costs associated with shoulder manipulation are not justified because Gunny's shoulder injury did not penetrate his joint, and typically such procedures are required where the patient has a shoulder girdle injury. *Id.* at 3612:1–17.

exercising regularly. *Id.* at 1070:9–10. "No matter what, Jennifer was always happy." *Id.* at 1070:2–3.

After the shooting, Jennifer had to shift into "survival mode." PEX 10051 at 4. While Jennifer was able to stay with Gunny in the hospital for all of November 2017, she had to return to work full-time that December. *Id.*; Jennifer Macias Dep. 33:21–24. In addition to managing a full-time job, Jennifer had to care for Gunny and perform all household chores. Jennifer Macias Dep. at 35:15–36:10.

Though Gunny has realized some recovery, he still suffers from his catastrophic injuries. In the four final years of their marriage, Jennifer and Gunny lived "like estranged roommates." Dmg. Trial Tr. 1070:19. They were no longer physically affectionate, nor did they camp, swim, or scuba dive. *Id.* at 1070:19–21. Because of Gunny's injuries, the two stopped engaging in sexual intimacy, and when they tried to be intimate in other ways, Jennifer felt it was "awkward, not the same." PEX 10051 at 4. Jennifer saw Gunny "always hurting and in pain," which in turn hurt her. Dmg. Trial Tr. 1070:24–25. Gunny's PTSD also affected their relationship. He testified that he woke up hitting and choking Jennifer because he would have night terrors and mistake her for Kelley. *Id.* at 1067:16–19. Jennifer had to become Gunny's caregiver rather than a spouse, and struggled with anxiety, guilt, and depression because of the lifestyle changes she had to make to care for her husband. *See* GEX 511 at 4–5, 13–14; PEX 10051 at 4, 8.

For these reasons, the Court awards the Estate of Jennifer Macias:

$300,000 for Jennifer Macias's loss of consortium sustained in the past.

**Farida Brown – 73 years old**

Farida Brown attended church alone on the day of the shooting. Dmg. Trial Tr. 1124:8–15. She arrived at the church early, as she did each Sunday, to make coffee and tea and help serve at the breakfast buffet before Sunday school. *Id.* at 1124:3–7. After Sunday school, she went into the church sanctuary for services and sat with her friends, Brenda Moulton and David Colbath. *Id.* at 1127:3–5. When she heard popping sounds, she and David looked at one another, confused. *Id.* at 1127:17–1128:2. Then, David began yelling to get down, and she hid under a pew. *Id.* at 1127:14–21. Farida watched as Kelley's boots passed by, walking up and down the aisle of the church and firing. *Id.* at 1130:7–14. Kelley shot Farida's right leg: "I saw holes in my leg, my right leg, a big hole in my right leg. And it started bleeding . . . And then I felt, like, very weak, like I was passing out or something." *Id.* at 1131:6–19. Farida believed she was going to die and began praying. As she prayed, she held Haley Krueger's hand and "kept, like, passing out, coming back." *Id.* at 1132:15–1133:9. Farida was then shot in her left leg. *Id.* at 1133:10–12. "And the last time when [Kelley] was coming back to the front door again, I saw his boots standing there next to me. . . . I was so scared of him. . . . I saw his gun, and it looked like it was pointed at me." *Id.* at 1133:13–19. Kelley did not fire at Farida, and he exited the church. *Id.* at 1133:20–25.

Farida was taken by ambulance to Connally Memorial Hospital. PEX 4009. She passed out in the ambulance from her injuries. Dmg. Trial Tr. 1134:3–8. In total, Farida suffered five gunshot wounds. PEX 4020 at 1. One gunshot wound was just above her right knee, and doctors removed the bullet in surgery. *Id.*; PEX 4012 at 255. Her other four wounds on her left leg were cleaned and left open to heal. PEX 4020 at 1; PEX 4012 at 255. She was discharged from the hospital two days after the shooting. PEX 4020 at 1; PEX 4012 at 250. Though she was

discharged shortly after the shooting, Farida still required at-home nursing and physical therapy for approximately two months. PEX 4025 at 16. It took over a month for her skin to heal from her open wounds. Dmg. Trial Tr. 1103:7–10. Farida still has scarring on her legs from her injuries. *Id.* at 1103:4–6; PEX 4025 at 62.

For three years after the shooting, Farida could not walk properly. Dmg. Trial Tr. 1105:16–20. However, she states that: "I still can't walk very good because now that I'm getting older, I feel weak. My legs feel very, very weak." *Id.* at 1105:16–20. When she walks, Farida consistently feels as though she is losing her balance and is going to fall. *Id.* at 1105:21–25. Farida has chronic pain; her legs hurt every day, as do her hips and back from sitting so frequently: "Because my legs hurt so bad, I have to sit. And then when I sit for a period of time, then my hip and my back start hurting. And then I have to get up and move around, and then my legs start hurting. And then I got to sit again or lie down." *Id.* at 1104:17–1105:5.

Prior to the shooting, Farida "was very lively, very active." *Id.* at 1093:25–1094:6. She did not like to stay home, instead she preferred to travel, go to the beach, swim, camp, hike, or dance. *Id.* at 1094:6–17. She also enjoyed going to the zoo with her children and grandchildren. *Id.* at 1094:6–17. Now, though, Farida cannot engage in these hobbies without pain: "Last time I danced, I hurt for two weeks." *Id.* at 1106:16–1107:11. When she last tried to go to the zoo with her family, she had to sit "every five minutes." *Id.* at 1107:12–18. They had to cut the trip short because of Farida's difficulty walking, and they went home. *Id.* at 1107:19–24. Farida cannot hold her great-grandchildren in her lap because of her pain. *Id.* at 1109:15–25. If Farida has to travel further than five minutes from her home, one of her children will drive her. *Id.* at 1107:25–1108:3. Farida testified: "I feel like my life is gone. I don't have the energy or the urge or the feelings to do anything when I'm in pain all the time." *Id.* at 1107:6–8.

In addition to her physical pain, Farida has struggled emotionally since the shooting. Though they have lessened, Farida experiences nightmares about the shooting, and sometimes wakes up screaming and thinking someone is going to shoot her. *Id.* at 1114:1–1115:23. Now, Farida gets only three hours of sleep per night. *Id.* at 1114:10–17. Farida's chronic pain often triggers flashbacks to the shooting: "I can't forget what happened. It's built in. It's there all the time now." *Id.* at 1115:24–1116:6. Simply going to the grocery store causes Farida fear and anxiety: "I don't go to the grocery store ever by myself. . . . The slightest little noise, I jump." *Id.* at 1116:24–1117:5. When Farida goes to church, she sits next to the front door "just in case [she has] to pick an exit real quick," and she is hypervigilant. *Id.* at 1117:9–20. Farida's treating psychologist, Dr. Kennington, has diagnosed her with PTSD, as has Dr. Marx. PEX 4021 at 1; GEX 433 at 12. Farida continues to go to Dr. Kennington for therapy sessions. Dmg. Trial Tr. 1119:10–1120:13.

For these reasons, the Court awards Farida Brown:

$1,250,000.00 for Farida Brown's physical pain and mental anguish sustained in the past.

$1,000,000.00 for Farida Brown's physical pain and mental anguish that, in reasonable probability, she will sustain in the future.

$25,000.00 for Farida Brown's disfigurement sustained in the past.

$25,000.00 for Farida Brown's disfigurement that, in reasonable probability, she will sustain in the future.

$250,000.00 for Farida Brown's physical impairment sustained in the past.

$250,000.00 for Farida Brown's physical impairment that, in reasonable probability, she will sustain in the future.

$46,253.13 for Farida Brown's medical care expenses incurred in the past.[38]

$370,951.00 for Farida Brown's medical care expenses that, in reasonable probability, she will incur in the future.[39]

### The Uhl/Krueger Family

Haley Krueger was attending church alone the day of the shooting and died from her gunshot wounds at the scene. Charlene Uhl, Haley's mother, brings a wrongful death claim and a survival action on behalf of Haley's estate.

### 1. Charlene Uhl – 39 years old

On the morning of the shooting, Charlene dropped Haley off at church early because Haley wanted to help Karla Holcombe with breakfast. Dmg. Trial Tr. 1152:16–25. She gave Charlene a hug and a kiss before walking into the church, and Charlene drove back to her home to do chores for the rest of the morning. *Id.* at 1154:6–23. After cleaning her home for a while, Charlene took a break and got on Facebook. *Id.* at 1155:19–24. She saw a post that stated there was an active shooter at the church. *Id.* at 1156:24–2. As soon as she saw the post, she went to the church. *Id.* at 1157:3–13. Charlene arrived at the church, but law enforcement would not let her in the building, and she was told to go to the community center. *Id.* at 1157:15– 1158:25. Family members of the church attendees were instructed to wait at the community center for updates on their loved ones. *Id.* at 1161:16–17. After several hours, family members were moved

---

[38]     Plaintiffs and the Government stipulate this amount reflects Farida Brown's past medical expenses. ECF No. 576 at 3.

[39]     This amount was calculated based on Plaintiffs' life care plan for Farida Brown; however, brand-name drug pricing for Zoloft was subtracted. *See* PEX 4025; *see also* GEX 432 at 24 (agreeing on all drug pricing and recommendations, except for Zoloft).

to the River Oaks Church. *Id.* at 1161:21–25. At approximately 12:30 a.m., after twelve hours of waiting, law enforcement informed Charlene that Haley had died inside the church. *Id.* at 1164:6–11, 1165:2–6.

Charlene then had to plan Haley's funeral: "It's very hard to go in there and plan your child's funeral, like that's something no parent should ever have to do. And it was very hard." *Id.* at 1166:7–20. In the weeks after the funeral, Charlene avoided being in public because people recognized her, and strangers would frequently approach her. *Id.* at 1167:19–1168:1. She eventually gave her phone to her friend because "every few minutes, it would ring and it would [be] somebody [she] didn't know or it would be somebody wanting a news story." *Id.* at 1168:2–10. Charlene also met with the Texas Rangers to obtain the details of Haley's death. *Id.* at 1168:11–23. However, the meeting did not provide any closure to Charlene. *Id.* at 1172:5–16.

Charlene and Haley had a very close relationship: "Haley was like my best friend. We did everything together. We'd, you know, go to movies, nail salons, shopping. Just normal things." Dmg. Trial Tr. 1143:18–23. The two were training to walk a half marathon together by December 2017, and went to the park six days a week to train. *Id.* at 1146:5–1147:14. Haley was a giving person, and she and Charlene would often help others together. *Id.* at 1148:12–20. For example, Charlene and Haley would give hot chocolate to the homeless on cold days. *Id.* at 1148:12–1149:19. Haley's death has left a void in Charlene's life that cannot be filled: "[M]y best friend is gone. She's no longer here. I can't do things with her. Just, I mean, she's gone. Like, the person that I was died the day she did." *Id.* at 1175:13–18.

Since the shooting, Charlene has struggled with both PTSD and depression. GEX 438 at 9; PEX 5005 at 6. She regularly attends counseling, takes psychotropic medications, and is involved in a grief support group, but still has "a lot of bad days." Dmg. Trial Tr. 1172:17–

1175:8, 1176:5–6; GEX 438 at 4. Charlene gained substantial weight since the shooting, and she also has more frequent migraines. Dmg. Trial Tr. 1175:21–1176:19. Though Charlene was not in the church, her daughter's sudden and violent death has impacted how she feels in public: "I'm always scared. . . . [N]ow I go into a restaurant, I try to sit where I can see the door. I tried going to a movie theater . . . a gentleman would sit next to me and he had a long coat on. And the whole movie—I couldn't focus on the movie. All I could focus on is what does he have under that jacket." *Id.* at 1176:20–1177:4. Her relationships with her three other children, Haley's siblings, have also been impacted by her grief: "They feel that mom is only worried about what happened to Haley. And they've even said, 'Well, what about us? We're still here.'" *Id.* at 1177:20–24. Charlene is reminded of her loss "every single day, every moment of every day." *Id.* at 1178:15–17.

For these reasons, the Court awards Charlene Uhl:

$250,000.00 for mental anguish sustained in the past by Charlene Uhl for the death of her daughter, Haley Krueger.

$250,000.00 for mental anguish that, in reasonable probability, Charlene Uhl will sustain in the future for the death of her daughter, Haley Krueger.

$100,000.00 for loss of companionship and society sustained in the past by Charlene Uhl for the death of her daughter, Haley Krueger.

$100,000.00 for loss of companionship and society that, in reasonable probability, Charlene Uhl will sustain in the future for the death of her daughter, Haley Krueger.

2. *The Estate of Haley Krueger – 16 years old*

Haley sustained fifteen gunshot wounds. PEX 5003 at 9. There is substantial evidence that she experienced a portion of the shooting before she died. Haley sat near Farida Brown and Brenda Moulton that morning. Dmg. Trial Tr. 1126:21–1127:5. When the shooting began, Haley showed Brenda her arm that had been injured. Moulton Dep. 15:1–7. While taking cover, Farida held Haley's hand, and Haley's "sad eyes wasn't moving, wasn't saying nothing." Dmg. Trial Tr. 1132:15–22. Dr. Gwinn additionally opined that Haley sustained two gunshot wounds, one to her hip and one to her chest, before lying face down underneath the pew and that these wounds were not life threatening. PEX 5003 at 6, 9. Haley was alive and conscious for much of the shooting, experienced physical pain from the gunshot wounds she sustained prior to her death, and experienced mental pain and suffering from witnessing the shooting.

For these reasons, the Court awards the Estate of Haley Krueger:

$5,000,000.00 for Haley Krueger's pain and mental anguish.

### The Rodriguez Family

Therese and Ricardo "Richard" Rodriguez were attending church the day of the shooting. Both died of their wounds at the scene. Ronald and Gary Ramsey, Therese's sons, bring wrongful death claims and a survival action as co-executors of Therese's estate. Regina Amador, Richard's daughter, brings a wrongful death claim and survival action on behalf of Richard's estate.

1. *Ronald Ramsey, Jr. – 46 years old*

On the morning of the shooting, Ronald had gone to church in Tilden, Texas for a baptism. Dmg. Trial Tr. 1187:17–25. At the end of services, Ronald's cousin, a deacon of the church, announced that Gary Ramsey had called and notified him of the shooting. *Id.* at 1188:5–10. Ronald left immediately and drove to the church. *Id.* at 1188:16–18. Upon arriving, he found a chaotic scene and was directed to the community center. *Id.* at 1188:24–1189:4. After sitting at the community center for what "seemed like forever," repeatedly calling Therese and Richard to no avail, he and the other families were eventually moved to another location. *Id.* at 1189:5–15. At approximately midnight, he received confirmation that both Therese and Richard died at the scene. *Id.* at 1189:16–1190:6.

The weeks after the shooting felt like a "blur," and Ronald felt as though he was in shock. *Id.* at 1190:13–25; PEX 15046 at 3. After Therese's funeral, he and Gary held an estate sale of their mother's belongings they did not wish to keep. PEX 15046 at 4. At the sale, some survivors of the shooting came and showed Ronald their gunshot wounds. *Id.* Seeing their wounds overwhelmed Ronald: "It was just way too much for me. I don't know how to describe how I was feeling, but it was just bad." *Id.*

Before her death, Ronald had a strong relationship with his mother. After his father moved to Costa Rica when he was a teenager, Therese raised him and his brother Gary as a single mother. *Id.* at 2. As an adult, when Ronald was close to Therese's house for work, he would stop to visit with his mother and stepfather Richard. Dmg. Trial Tr. 1198:16–24. Oftentimes, he fixed things and helped with home-improvement projects at Therese and Richard's home. *Id.* at 1198:16–24. Ronald and Gary took Therese to the coast to go boating, and they also enjoyed spending time at home eating cake and ice cream, swimming in Therese's

"raggedy swimming pool," and living "a simple life." *Id.* at 1192:11–1193:12. If Ronald needed "anything at all, no matter what it was," his mother was there for him. *Id.* at 1196:16–21.

Ronald still feels angry about how his mother died: "I just feel so cheated. My mom was the picture of a law-abiding citizen. I mean, she got killed at church for God's sake. She was so tough and wonderful and didn't deserve this. . . . She beat cancer just to die like this? This isn't how it was supposed to go for her." PEX 15046 at 4. Ronald has grieved for his mother every day since she was killed and maintains the flowers at her grave site. Dmg. Trial Tr. 1191:5–9, 1198:1–2. Dr. Marx diagnosed Ronald with PTSD, and Dr. Sutton diagnosed him with Adjustment Disorder and a complex bereavement disorder, though Ronald has not sought treatment for these conditions. *Id.* at 1201:17–21; GEX 606 at 9; PEX 15046 at 8.

For these reasons, the Court awards Ronald Ramsey Jr.:

$50,000.00 for Ronald Ramsey Jr.'s mental anguish sustained in the past for the death of his mother, Therese Rodriguez.

$50,000.00 for Ronald Ramsey Jr.'s mental anguish that, in reasonable probability, he will sustain in the future for the death of his mother, Therese Rodriguez.

$25,000 for Ronald Ramsey Jr.'s loss of companionship and society sustained in the past for the death of his mother, Therese Rodriguez.

$25,000 for Ronald Ramsey Jr.'s loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his mother, Therese Rodriguez.

1. *Gary Ramsey – 42 years old*

Gary was working at his deer-processing facility in La Vernia, Texas the morning of the shooting. Dmg. Trial Tr. 1206:15–24. He watched as police cars and ambulances "flew" past his facility, but he did not think anything of it until a customer mentioned that something had happened at the church. *Id.* at 1206:25–1207:25. Gary "knew right then that it was bad," and that his mother was at the church. *Id.* at 1207:25–1208:14. He immediately drove to the church, which was only a few miles away from his facility. *Id.* at 1207:9–14, 1208:3–1209:2. When Gary arrived, law enforcement had not yet blocked off the area, and he was able to enter the church. *Id.* at 1209:3–17. Gary saw injured church members walk outside, and as he walked up the aisle, he saw a young girl with bullet holes in her legs and AR clips scattered on the floor. *Id.* at 1209:18–1210:1. A first responder at the scene recognized Gary and told him that he did not need to see what had just happened. *Id.* at 1210:2–9. Gary "saw the carnage," but did not see his mother, and left the church. *Id.* at 1210:2–12. He then contacted family members to inform them about the shooting. *Id.* at 1210:13–1211:11. As he waited for news of his mother and stepfather, he tried to hold onto hope that they were alive, but felt that they were dead: "I knew what I saw. . . . [Y]ou hold onto that hope for an hour, two. And then you start realizing . . . . The phone would have rang. Somebody would have called us. . . . And as family members pulled up, I just told them that it ain't going to be good." *Id.* at 1211:5–25. Gary and Ronald learned at approximately midnight that Therese and Richard had died at the scene. *Id.* at 1212:9–1213:3.

Processing the shooting "was hard" for Gary, and he focused on his business to cope with his loss. *Id.* at 1213:4–16. Gary moved away from his "dream" home that was less than a mile from Therese and Richard's home because of reminders of the shooting and his mother. *Id.* at 1220:17–1221:11; PEX 15047 at 4. He also wanted to "get [further] away from people," because

he has "pretty big trust issues with people in this world." Dmg. Trial Tr. 1214:2–5, 1220:21–1221:8. Gary now avoids the movies, restaurants, and large crowds. *Id.* at 1214:2–22; PEX 15047 at 4. He thinks about the shooting every day and continues to grieve the loss of his mother. GEX 612 at 6; Dmg. Trial Tr. 1213:22–1214:1. Dr. Sutton diagnosed Gary with Adjustment Disorder with mixed anxiety and depressed mood and a complex bereavement disorder, and Dr. Marx diagnosed Gary with PTSD, major depressive disorder, and generalized anxiety disorder. PEX 15047 at 8; GEX 612 at 11. However, Gary has not sought counseling or other treatment for his grief or symptoms. Dmg. Trial Tr. 1222:21–1223:7.

As with his brother Ronald, Gary had a close relationship with Therese. After his father left, Therese raised Gary and Ronald as a single mother. PEX 15047 at 2. Gary always stayed close to home and spoke with his mother every day. *Id.* Since Gary's home was less than a mile from his mother's, he visited frequently with his own children, often several times a week. Dmg. Trial Tr. 1215:5–14. During visits, they would "hang out, talk," or watch a movie. *Id.* at 1215:15–18. Therese enjoyed being a grandmother and would play with Gary's children, giving him and his wife a break. *Id.* at 1215:24–1216:4. When Gary needed parenting advice, his mother was there to help him. *Id.* at 1218:16–1219:16. Not being able to share his children with Therese or share other parts of his life pains Gary: "I think every parent want[s] to be proud of their kids, and every child would want to see their parents be proud of them. And we're not going to have that. We're not going to have that possibility here anymore." *Id.* at 1219:9–1220:12.

For these reasons, the Court awards Gary Ramsey:

$50,000.00 for Gary Ramsey's mental anguish sustained in the past for the death of his mother, Therese Rodriguez.

$50,000.00 for Gary Ramsey's mental anguish that, in reasonable probability, he will sustain in the future for the death of his mother, Therese Rodriguez.

$25,000.00 for Gary Ramsey's loss of companionship and society sustained in the past for the death of his mother, Therese Rodriguez.

$25,000.00 for Gary Ramsey's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his mother, Therese Rodriguez.

2. *The Estate of Therese Rodriguez – 66 years old*

Therese was shot six times. PEX 15041. Therese first sustained two gunshot wounds as Kelley fired from the outside of the church, and then moved to take cover by lying face down underneath the pews. PEX 15040 at 5–6. As she took cover, Therese was shot four more times, with three bullets striking vital organs in her abdomen and chest. *Id.* at 6. She ultimately sustained her fatal injuries at that time. *Id.* Therese was alive and conscious for much of the shooting, experienced physical pain from the gunshot wounds he sustained prior to her death, and experienced mental pain and suffering from witnessing the shooting. *Id.*

For these reasons, the Court awards the Estate of Therese Rodriguez:

$5,000,000.00 for Therese Rodriguez's pain and mental anguish.

3. *Regina Amador – 33 years old*

On the day of the shooting, Regina was attending a company picnic at Fiesta Texas with her family. Dmg. Trial Tr. 1323:3–19. While at the bumper cars, Regina received a text message from Gary's wife, Cheryl, to call her. *Id.* at 1325:4–10. Regina called, and Cheryl informed Regina of the shooting and that they did not know if Therese and Richard were alive. *Id.* at

1325:14–1326:3. Regina and her family left Fiesta Texas and drove to the church. *Id.* at 1326:10–1327:25. As they drove, Regina called her father every few minutes to no avail: "But he always picked up. So when he wasn't picking up, I would just start crying because I knew something was wrong." *Id.* at 1327:25–1328:13. After an hour drive, they arrived and saw "miles and miles of news reporters and police. . . . And I was in shock because I was like, 'This is really happening.' And I just wanted to wake up and feel like it was a dream." *Id.* at 1328:20–1329:7. Once she was taken to the community center, Regina found her stepbrothers, Gary and Ronald. *Id.* at 1330:4–1331:1. Gary took Regina aside and told her that he went inside the church, and that "it doesn't look good," and that it was a "bloodbath in there." *Id.* at 1331:11–16. "So when he told me that, in my heart, I felt like he was gone and that's why we haven't got any answers." *Id.* at 1331:22–23. Regina decided to leave, wanting to be close to her family at her aunt's home. *Id.* at 1332:3–19. She waited for hours until Gary called and confirmed that Richard and Therese died in the shooting. *Id.* at 1333:17–1333:15.

After the shooting, Regina did not work for six months. *Id.* at 1337:13–17. She felt that her family "needed help," and they began bereavement counseling. *Id.* at 1334:9–1335:3; PEX 15042 at 1. Regina was also prescribed Zoloft and Xanax because she was experiencing panic attacks and anxiety. Dmg. Trial Tr. at 1335:4–7; PEX 15043 at 14–15. Though she stopped taking these medications for a period, she recently started a new psychiatric medication. Dmg. Trial Tr. 1340:1–15. She also had frequent nightmares after the shooting, in which she would imagine what her father experienced before his death. *Id.* at 1135:13–1336:22. Though she had already experienced the death of one parent and a sibling, Regina feels that losing her father has been the most difficult loss: "He was taken away from me, and he was my last parent." *Id.* at

1342:7–21. Dr. Marx diagnosed Regina with PTSD, and Dr. Feltoon diagnosed her with major depressive disorder. GEX 599 at 13; PEX 15045 at 6.

Regina and her father had a strong relationship. Regina is Richard's only biological child, and growing up, he was a very hands-on father to Regina. *Id.* at 1295:22–1296:10. When Regina was eighteen years old, her mother died, which brought her closer to her father. *Id.* at 1300:14–1301:15. Even though Regina leased her own apartment when she turned eighteen, she moved to the same complex as her father to be close with him: "Every day, he would come knocking on the door and just come and visit . . . . And then he would help me out too." *Id.* at 1305:5–1306:7. When Regina first started her family, she had financial difficulties, and her father helped support her and her family by paying bills, even going so far as to place a down payment on a home. *Id.* at 1309:17–1310:21. Richard was always there when Regina needed him, whether she needed help around her house or someone to vent to: "[H]e always took care of me. And I miss that. And I'm going to miss that." *Id.* at 1311:4–1313:10.

For these reasons, the Court awards Regina Amador:

$50,000.00 for Regina Amador's mental anguish sustained in the past for the death of her father, Richard Rodriguez.

$50,000.00 for Regina Amador's mental anguish that, in reasonable probability, she will sustain in the future for the death of her father, Richard Rodriguez.

$25,000.00 for Regina Amador's loss of companionship and society sustained in the past for the death of her father, Richard Rodriguez.

$25,000.00 for Regina Amador's loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her father, Richard Rodriguez.

$0 for Regina Amador's pecuniary loss sustained in the past for the death of her father, Richard Rodriguez.[40]

$0 for Regina Amador's pecuniary loss that, in reasonable probability, she will sustain in the future for the death of her father, Richard Rodriguez.[41]

### 4. The Estate of Ricardo "Richard" Rodriguez – 64 years old

Richard sustained eight gunshot wounds. PEX 15005. He was shot in his back, hip, left leg, and his head, and suffered shrapnel injuries to the right side of his face, right chest, right arm, and right leg. *Id.* at 4–5. He sustained at least two gunshot wounds to his left thigh and the shrapnel injuries on his right side before lying face down on the floor to take cover. *Id.* at 6. While the gunshot wound to his head would be immediately fatal, the evidence shows that Richard purposefully moved to lie on his stomach after he had been shot and injured. *Id.* Richard was alive and conscious for much of the shooting, experienced physical pain from the gunshot wounds he sustained prior to his death, and experienced mental pain and suffering from witnessing the shooting. *Id.*

For these reasons, the Court awards the Estate of Ricardo Rodriguez:

$5,000,000.00 for Richard Rodriguez's pain and mental anguish.

$6,682.00 for Richard Rodriguez's funeral and burial expenses.[42]

---

[40]   No evidence was presented to support any past pecuniary loss.
[41]   No evidence was presented to support any future pecuniary loss.
[42]   *See* PEX 15008 (Richard Rodriguez's funeral bill).

### The Ramirez/Solis Family

Roseanne Solis and Joaquin Ramirez were attending church together the day of the shooting. Both sustained gunshot wounds and seek recovery for their own personal injuries.[43]

*1. Roseanne Solis – 57 years old*

Roseanne was attending church with her partner, Joaquin, on the morning of the shooting. Dmg. Trial Tr. 1227:10–1228:8. As the congregation sang a hymn, Roseanne watched one of the children, R.W., playing in the pew near her. *Id.* at 1229:21–13. The service began, and Roseanne heard what sounded like firecrackers. *Id.* at 1231:16–21. When she heard a man shout "everybody get down," she and Joaquin got on the ground. *Id.* at 1231:22–25. Joaquin placed himself on top of Roseanne, but she told him to go hide because she did not want them both to die. *Id.* at 1232:2–12. Joaquin moved out of Kelley's path, but Roseanne was "in terror," and was frozen on the floor: "I knew if I moved . . . he was going to hit me right on the head. I could feel all the shots going right by my—on the side of my head." *Id.* at 1232:13–22. Roseanne heard R.W. scream, looked up for a moment, and saw that R.W. had been shot. *Id.* at 1232:23–25, 1234:2–7. She then crawled towards the back of the church to get out of Kelley's line of fire. *Id.*

---

[43]     Both also seek derivative recovery for loss of spousal consortium as a result of one another's injuries. However, the Court finds that the two were not married at the time of the shooting. "An informal or common-law marriage exists in Texas if the parties (1) agree to be married (2) lived together in Texas as husband and wife after the agreement, and (3) there presented to others that they were married." *Small v. McMaster*, 352 S.W.3d 280, 282 (Tex. App.—Houston [14th Dist.] 2011, pet. denied).

As to the first element, the parties must have a "present, immediate, and permanent marital relationship," and common-law marriage cannot be founded on an agreement to be married in the future. *Continental Cas. Ins. Co. v. Lavender*, No. 02-10-00399-CV, 2011 WL 2306832, at *1 (Tex. App.—Fort Worth June 9, 2011, pet. denied) (mem. op.). Roseanne provided conflicting testimony on this point, first stating that "I plan to marry [Joaquin]," then stating, "He is my husband." Dmg. Trial Tr. 1281:5–7.

The third element requires that the couple establish that they held themselves out as husband and wife such that they had a reputation in the community for being married. *Small*, 352 S.W.3d at 285. While Joaquin and Roseanne would inconsistently refer to each other as spouses in their testimony and to medical professionals, no evidence in the record shows that they had a reputation within the larger community for being married at the time of the shooting. In other words, there is no proof that they "consistently conducted themselves as husband and wife in the public eye or that the community viewed them as married." *Id.* (quoting *Danna v. Danna*, No. 05-05-00472-CV, 2006 WL 785621, at *2 (Tex. App.—Dallas March 29, 2006, no pet.) (mem. op.). Thus, while committed partners, Roseanne and Joaquin may not recover for loss of consortium for each other's injuries.

at 1234:10–21. When Kelley had re-entered the church, she heard him shout that everyone was going to die as he continued firing. *Id.* at 1236:2–9. Roseanne looked up again and saw that a woman near her was preparing to call 911. *Id.* at 1236:14–1237:7. Roseanne signaled for her to stop, knowing the noise would attract Kelley. *Id.* at 1236:14–1237:7. She then heard Kelley exit the church. *Id.* at 1237:7–10.

After the shooting, Roseanne's sister arrived and took Roseanne to Connally Memorial Hospital. *Id.* at 1237:17–21. She sustained one gunshot wound to the back of her left shoulder, though she did not feel anything when the bullet hit her. *Id.* at 1275:4–7; PEX 14050 at 1. While at the hospital, she was still fearful that Kelley was after her. Dmg. Trial Tr. 1237:22–5. Doctors administered pressure to the deep wound on her shoulder as well as antibiotics to prevent infection before she was taken by ambulance to University Hospital for further evaluation. PEX 14050 at 1; *see also* PEX 14042. After further treatment, she was released home that evening. PEX 14050 at 1. However, Roseanne's recovery was prolonged, as she required twice-daily wound care. *Id.* She also developed an infection as well as persistent discomfort. *Id.* The wound closed in March 2018. *Id.*

Prior to the shooting, Roseanne had preexisting chronic pain in her left hand due to melorheostosis, a rare bone condition which caused a deformity to her left hand. PEX 14045 at 17. Her pain has increased since the shooting. *Id.*; GEX 591 at 22. Her physical examinations revealed a complex regional pain syndrome and diminished strength in her left arm. PEX 14045 at 21; GEX 591 at 24–25. Roseanne stated that her "pain is more severe" and affects her sleep almost every night. Dmg. Trial Tr. 1245:20–1246:8. While she had limited use of her left hand before the shooting, it is now less functional and she needs more assistance than before to, for example, cook and clean. *Id.* at 1242:8–1244:7. Her need for assistance makes Roseanne feel

"useless." *Id.* at 1244:17–25. Additionally, her shoulder wound has left significant scarring. PEX 14045 at 59. The scars cause her significant embarrassment: "They embarrass me to the point where I can't wear short-sleeved blouses like I used to because I'm embarrassed because of that scar. It's so ugly." Dmg. Trial Tr. 1240:16–21. There is also retained shrapnel in Roseanne's shoulder and chest. *Id.* at 1245:13–19; PEX 14041.

In addition to Roseanne's chronic pain, she suffers from PTSD and major depressive disorder. PEX 14047 at 6; GEX 592 at 11. A few days after the shooting, Roseanne contacted Camino Real Community Services for therapy. PEX 14028 at 1–4. Though she has a long history of psychological problems that preceded the shooting, the shooting has made Roseanne fearful of public spaces: "Where I used to enjoy, like, going out to the zoo, going bike riding, you know, that we would go to the movies, to the point now where I'm even scared to go to the store now." Dmg. Trial Tr. 1247:17–1248:7. At home, Roseanne keeps her windows covered and a bat next to her bed. *Id.* at 1251:19–1252:8. When she sleeps, she has nightmares of the shooting: "[M]y insomnia has gotten so bad to the point where I wake up at night and I'm still thinking about that day, all the same things going through my mind, seeing the little boy screaming, seeing that lady that was in the—that was laying in that pool of blood, all the screaming that was going on." *Id.* at 1249:13–1250:6, 1251:7–18.

For these reasons, the Court awards Roseanne Solis:

$1,000,000.00 for Roseanne Solis's physical pain and mental anguish sustained in the past.

$1,000,000.00 for Roseanne Solis's physical pain and mental anguish that, in reasonable probability, she will sustain in the future.

$50,000.00 for Roseanne Solis's disfigurement sustained in the past.

$25,000.00 for Roseanne Solis's disfigurement that, in reasonable probability, she will sustain in the future.

$50,000.00 for Roseanne Solis's physical impairment sustained in the past.

$50,000.00 for Roseanne Solis's physical impairment that, in reasonable probability, she will sustain in the future.

$16,905.82 for Roseanne Solis's medical care expenses incurred in the past.[44]

$952,491.12 for Roseanne Solis's medical care expenses that, in reasonable probability, she will incur in the future.[45]

2. *Joaquin Ramirez – 50 years old*

Joaquin attended church with his partner, Roseanne, on the day of the shooting. Ramirez Dep. 30:9–15. After speaking with Karla Holcombe before services, he and Roseanne sat in a pew near the left wall of the church. *Id.* at 31:18–25, 32:5–17. Like Roseanne, when he heard the first sounds of gunfire, he believed it was fireworks. *Id.* at 33:3–4. But he then saw holes in the building, smelled gunpowder, and heard another church member yelling to get down. *Id.* at 33:7– 16. Joaquin and Roseanne got on the floor, and he covered Roseanne's body with his own. *Id.* at 33:9–14. Roseanne told him to save himself because she believed they were all going to die in the church. *Id.* at 34:10–16. Joaquin moved under a pew and watched as Kelley shot at other

---

[44]    Plaintiffs and the Government stipulate this amount reflects Roseanne Solis's past medical expenses. ECF No. 576 at 8.
[45]    This amount was calculated based on Plaintiffs' life care plan for Roseanne Solis. *See* PEX 14045. However, this amount reflects the two years passed between the original life care plan date and trial, removed spinal x-rays, MRIs and wheelchair costs as the Court finds these costs relate to Roseanne's preexisting melorheostosis. *See* GEX 591 at 29–30. Additionally, average generic drug pricing was substituted for all medications when available, and the cost of attendant care was averaged to $22 per hour with removed RN supervision. *See* PEX 14045 at 36–39, 52–53, 56, 58.

church members. *Id.* at 35:9–20. As Joaquin watched Kelley's shoes move up the aisle, Joaquin crawled underneath the pews towards the back of the church and escaped. *Id.* at 37:8–18. Once Joaquin made it out of the church, he realized he had been shot in his left ankle. *Id.* at 37:3–7.

When Joaquin was reunited with Roseanne outside of the church, her sister drove them both to Connally Memorial Hospital. *Id.* at 40:4–16. After an x-ray, doctors confirmed there was no fracture to the bones of his leg. PEX 14018 at 1; PEX 14009 at 8. However, there was shrapnel embedded over his left ankle, causing pain and an abrasion. PEX 14018 at 1; PEX 14009 at 8. Doctors discharged Joaquin that day. PEX 14018 at 1; Ramirez Dep. 44:9–11. He was sent home with crutches and could not bear weight on his foot for months. Ramirez Dep. 50:18–51:2. In December 2017, Dr. Smith evaluated Joaquin for pain in his left leg. PEX 14022 at 11; Ramirez Dep. 45:4–17. Joaquin underwent physical therapy with Dr. Smith until August 2018. PEX 14010 at 29.

Despite the physical therapy, Joaquin's left leg still causes him pain, and he experiences frequent stiffness and numbness. Ramirez Dep. 46:17–22, 48:2–7. He cannot walk for long distances like he used to, nor can he climb stairs as easily. *Id.* at 51:15–23, 52:6–9. Prior to the shooting, Joaquin constructed homes, but he has a difficult time doing so now because he cannot lift heavy objects or stay on his feet for very long. *Id.* at 58:15–18, 67:18–22, 70:13–19.

Joaquin continues to experience unwanted memories of the shooting, both through flashbacks during the day and nightmares when he sleeps. GEX 561 at 6. He has difficulty sleeping: "I just stay awake. I keep an eye open to see if there is anything around. I'm always scared and checking on windows and doors to go outside and look around with a flashlight." PEX 14020 at 2–3; *see also* GEX 561 at 6, 8. While he used to have friends that he would socialize with, Joaquin avoids leaving the house now because he is "afraid to go out." PEX

14020 at 3; GEX 561 at 8. Both Dr. Feltoon and Dr. Marx diagnosed Joaquin with PTSD, and Dr. Marx included further diagnoses of major depressive disorder and generalized anxiety disorder. PEX 14020 at 6; GEX 561 at 10.

For these reasons, the Court awards Joaquin Ramirez:

$1,000,000.00 for Joaquin Ramirez's physical pain and mental anguish sustained in the past.

$500,000.00 for Joaquin Ramirez's physical pain and mental anguish that, in reasonable probability, he will sustain in the future.

$5,000.00 for Joaquin Ramirez's disfigurement sustained in the past.

$5,000.00 for Joaquin Ramirez's disfigurement that, in reasonable probability, he will sustain in the future.

$25,000.00 for Joaquin Ramirez's physical impairment sustained in the past.

$25,000.00 for Joaquin Ramirez's physical impairment that, in reasonable probability, he will sustain in the future.

$2,893.04 for Joaquin Ramirez's medical care expenses incurred in the past.[46]

$85,403.20 for Joaquin Ramirez's medical care expenses that, in reasonable probability, he will incur in the future.[47]

---

[46]   Plaintiffs and the Government stipulate this amount reflects Joaquin Ramirez's past medical expenses. ECF No. 576 at 7.

[47]   This amount was calculated based on Plaintiffs' life care plan for Joaquin Ramirez. *See* PEX 14022. However, this amount reflects the two years passed between the original life care plan date and trial and average generic drug pricing for all medications where available. *See id.* at 30–32.

**The Johnson Family**

Sara and Dennis Johnson were attending church the day of the shooting. Both died at the scene. Their children, Deanna Staton, Michael Johnson, Kati Wall, and Christopher Johnson bring wrongful death claims for the deaths of their parents. James Graham, Sara's son, brings a wrongful death claim for the death of his mother. Dennis Johnson Jr., Dennis's son, brings a wrongful death claim for the death of his father.

*1. Deanna Staton – 46 years old*

Deanna was supposed to attend church with her parents the morning of the shooting, but had a migraine the night before and decided to sleep in. Dmg. Trial Tr. 1374:7–23. When she woke up, she checked her Facebook and saw a reporter broadcasting live about the shooting. *Id.* at 1374:21–1375:2. Deanna saw her mother's car in the background of the broadcast, and "just started screaming" for Kati. *Id.* at 1375:3–8. She gathered Kati and Michael, and they all drove to the church. *Id.* at 1375:10–17. When they arrived, Deanna ran to the church and saw Julie Workman outside and asked Julie where her parents were. *Id.* at 1375:19–1376:6. Julie told her, "Everyone left in there is dead, and your parents aren't there." *Id.* at 1376:6–8. Deanna "had hope" that her parents were alive, and she began calling hospitals to try and find them. *Id.* at 1376:9–17. They were then directed to the community center. *Id.* at 1376:17–21. However, it was still locked when Deanna and her family had arrived, and as they waited to be let inside, news media had arrived at the scene and "were putting cameras in [their] faces." *Id.* at 1377:12–1378:8. Eventually, they were let inside, where they continued to call hospitals and their parents for "hours." *Id.* at 1378:9–1379:1. Families of those in the church were then moved to the River Oaks Church, and Deanna continued to wait for news. *Id.* at 1379:7–1380:19. After thirteen-and-

a-half hours of waiting, law enforcement informed Deanna and her family that her parents were dead. *Id.* at 1381:7–11.

Deanna believes she is no longer the same person since the shooting. As time has passed, she believes her grief has gotten worse: "I'm not outgoing anymore. I'm not a happy person anymore." *Id.* at 1404:13–1405:7. The violent way in which her parents died continues to affect her: "It's horrible to think about because you are constantly thinking were they afraid? What was it like for them? That's your mama and your daddy. I don't care how old you are. That's your mama and your daddy. How could this have happened to them? I would have given anything to take their place." *Id.* at 1403:22–1404:5. Deanna continues to have nightmares about what her parents experienced in the church. *Id.* at 1408:14–1409:5. Deanna also avoids thoughts and reminders of her own wedding day because she was married in the church, which leads to thoughts about her parents "being dead on the floor." *Id.* at 1407:14–1408:13.

Deanna had close relationships with both her mother and father. When Deanna was a young mother, Sara and Dennis adopted Deanna's biological children, Kati and Christopher, during a difficult time in Deanna's life. *Id.* at 1390:8–13. Deanna "couldn't step up and do what needed to be done at the time. And they, without question, adopted the two of them." *Id.* at 1390:8–13. After losing her home, her parents invited her and her husband to come live with them. *Id.* at 1392:19–1393:2. Sara and Dennis "were like the Rock of Gibraltar," to the Johnson family and "were always there." *Id.* at 1386:25–1387:4. "They didn't give up on anyone. . . . Good, bad, or indifferent, what you did, they were there, open arms, all the time." *Id.* at 1387:3–9. Sara was "that constant glue" that made sure everyone in the family was together for the holidays, and that birthdays and anniversaries were acknowledged. *Id.* at 1388:24–1389:13. Dennis was the family's spiritual advisor, and he and Sara gave advice to their children

frequently. *Id.* at 1389:14–18, 1394:1–10. Many nights, Deanna, her parents, and the rest of her family, would enjoy family time on her parents' porch. *Id.* at 1392:12–18. Their love and emotional support cannot be replaced for Deanna: "They hugged me. They guided me in life. They guided me in my spiritual walk. They guided me in so many things." *Id.* at 1405:8–22.

For these reasons, the Court awards Deanna Staton:

$50,000.00 for Deanna Staton's mental anguish sustained in the past for the death of her mother, Sara Johnson.

$50,000.00 for Deanna Staton's mental anguish that, in reasonable probability, she will sustain in the future for the death of her mother, Sara Johnson.

$25,000.00 for Deanna Staton's loss of companionship and society sustained in the past for the death of her mother, Sara Johnson.

$25,000.00 for Deanna Staton's loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her mother, Sara Johnson.

$50,000.00 for Deanna Staton's mental anguish sustained in the past for the death of her father, Dennis Johnson.

$50,000.00 for Deanna Staton's mental anguish that, in reasonable probability, she will sustain in the future for the death of her father, Dennis Johnson.

$25,000.00 for Deanna Staton's loss of companionship and society sustained in the past for the death of her father, Dennis Johnson.

$25,000.00 for Deanna Staton's loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her father, Dennis Johnson.

2.  *Michael Johnson – 43 years old*

On the morning of the shooting, Michael was at home on his parents' property. Dmg. Trial Tr. 1420:1–5. His niece (and adoptive sister), Kati, told him about the shooting: "I just jumped out of bed. And it seemed like we got there in ten minutes." *Id.* at 1420:6–11. The scene was "pretty rough. . . . [T]here was just like people going everywhere and the ambulances coming in. And it was just very chaotic." *Id.* at 1420:12–20. Along with Deanna and Kati, Michael continually called his parents' cell phones with no answer. *Id.* at 1420:21–24. After waiting for what "felt like eternity," first at the community center and then at River Oaks Church, he and his family received confirmation that his parents had died inside the church: "It was like a living hell. . . . It was about the worst day of my life." *Id.* at 1421:4–19.

The loss of his parents was difficult for Michael as, like with his sister Deanna, he lived in their home and was very close to both Sara and Dennis. *Id.* at 1432:21–22. Michael described his relationship with his parents as "a team." *Id.* at 1419:13–17. Sara and Dennis helped Michael "through all the rough times," and even helped raise Michael's two children. *Id.* at 1419:13–20; Wall Dep. 54:1–4. Dennis was Michael's best friend, teacher, and mentor. Dmg. Trial Tr. 1423:14–16. He and his father shared a love of gardening, and they would work for days at a time, tilling, planting, and raking the yard. *Id.* at 1424:13–1425:19. Michael described his mother as "one of [his] best friends too," who would give him advice "whether [he] needed it or not." *Id.* at 1426:13–17. In the mornings, his mother would cook breakfast for him, and in the evenings, Michael would cook supper for her. *Id.* at 1426:18–1427:7. Every day, Michael spent time on his parents' porch and "[t]alked about everything." *Id.* at 1428:18–1429:20. Michael still lives in his parents' home and returning to an empty porch is difficult: "It's hard coming home to the house,

you know, and not seeing my dad on the porch to greet me or give me something to do." *Id.* at 1429:21–25.

For these reasons, the Court awards Michael Johnson:

$50,000.00 for Michael Johnson's mental anguish sustained in the past for the death of his mother, Sara Johnson.

$50,000.00 for Michael Johnson's mental anguish that, in reasonable probability, he will sustain in the future for the death of his mother, Sara Johnson.

$25,000.00 for Michael Johnson's loss of companionship and society sustained in the past for the death of his mother, Sara Johnson.

$25,000.00 for Michael Johnson's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his mother, Sara Johnson.

$50,000.00 for Michael Johnson's mental anguish sustained in the past for the death of his father, Dennis Johnson.

$50,000.00 for Michael Johnson's mental anguish that, in reasonable probability, he will sustain in the future for the death of his father, Dennis Johnson.

$25,000.00 for Michael Johnson's loss of companionship and society sustained in the past for the death of his father, Dennis Johnson.

$25,000.00 for Michael Johnson's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of her father, Dennis Johnson.

3. *Kati Wall – 29 years old*

Most Sundays, Kati would see her adoptive parents as they left for church. Wall Dep. 73:3–13. But the morning of the shooting, they had left early, and Kati did not get to see them. *Id.* at 73:3–13. As she was doing work outside her home, Kati heard Deanna scream her name: "I knew from like the way that she said my name that something was really wrong and I just like took off running . . . ." *Id.* at 73:14–20. Deanna showed Kati a live feed on her phone that was reporting on the shooting. *Id.* at 73:20–24. Deanna and Kati gathered Michael, and they all drove to the church. *Id.* at 73:25–74:4. Once they arrived, Kati ran to the church: "[T]he whole way there, like all I could think about was just putting my arms around my mom and just knowing she was okay. . . . I was just looking for her." *Id.* at 74:14–20. Kati spoke to several church members, but none knew if her parents had survived. *Id.* at 74:21–2. Kati, Deanna, and Michael all waited for news of their parents until 12:33 a.m., when they were finally notified that Sara and Dennis had died in the church. *Id.* at 76:15–19. Dmg. Trial Tr. 1381:9–21; PEX 1187 at 3.

Kati learned further details of her parents' deaths while planning their funeral. Wall Dep. 62:3–22. She and her family had contacted the coroner's office to ask if they could see their parents to say goodbye. *Id.* at 62:3–11. However, they were told they could not see their bodies because there was facial trauma. *Id.* at 62:12. Her family gleaned enough information from the Texas Rangers "to paint a picture" for Kati, and she had nightmares every night after the shooting about how her parents were killed. *Id.* at 62:13–22, 63:20–64:3. In the month after the shooting, Kati had severe anxiety and depression, such that she could not keep food down, had frequent crying spells, and felt "very empty and sad." *Id.* at 84:8–85:3. When Kati's depression was at its worst, she would go days to weeks without bathing or changing her clothes and was "just existing." *Id.* at 86:16–24.

A month after the shooting, Kati sought mental health treatment. *Id.* at 61:9–14. She was diagnosed with PTSD, and began cognitive behavioral therapy, grief counseling, and medication to treat her symptoms. *Id.* at 58:10–17; 65:11–22. Initially, she felt that therapy was unhelpful, but worked over the last several years to improve her mental health with new therapists and medications. *Id.* at 66:2–69:6. Currently, Kati attends therapy weekly and takes five different psychiatric medications. *Id.* at 68:5–69:6. Even with her treatment, she continues to have nightmares and feels anxious in public spaces and crowds. *Id.* at 58:14–58:9.

As with Deanna and Michael, Kati was "very close" with her parents. *Id.* at 28:16–29:1. After graduating high school, Kati moved to Georgia, and spoke with her parents every day, sometimes multiple times a day, over the phone. *Id.* at 28:2–29:15, 41:2–13. In 2016, Kati moved back to Texas and onto her parents' property and "not a day went by in that whole eighteen months that [she] did not see them." *Id.* at 27:3–14, 40:24–41:1. Her parents would pick up her sons from their school bus stop, and when Kati got home from work, she went to her parents' home for dinner. *Id.* at 40:2–9. Kati enjoyed cooking with her mom, and on Friday nights, they would go out as a family. *Id.* at 40:7–13. After dinner, she would watch television with her parents until it was time to put her children to bed. *Id.* at 40:14–16. Then, Kati would go back to her parents' home to sit on the porch and talk or help her mom craft, sometimes until late at night. *Id.* at 40:17–23.

For these reasons, the Court awards Kati Wall:

$50,000.00 for Kati Wall's mental anguish sustained in the past for the death of her mother, Sara Johnson.

$50,000.00 for Kati Wall's mental anguish that, in reasonable probability, she will sustain in the future for the death of her mother, Sara Johnson.

$25,000.00 for Kati Wall's loss of companionship and society sustained in the past for the death of her mother, Sara Johnson.

$25,000.00 for Kati Wall's loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her mother, Sara Johnson.

$50,000.00 for Kati Wall's mental anguish sustained in the past for the death of her father, Dennis Johnson.

$50,000.00 for Kati Wall's mental anguish that, in reasonable probability, she will sustain in the future for the death of her father, Dennis Johnson.

$25,000.00 for Kati Wall's loss of companionship and society sustained in the past for the death of her father, Dennis Johnson.

$25,000.00 for Kati Wall's loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her father, Dennis Johnson.

$434.03 for Kati Wall's pecuniary loss sustained in the past for the death of her father, Dennis Johnson.[48]

$0 for Kati Wall's pecuniary loss that, in reasonable probability, she will sustain in the future for the death of her father, Dennis Johnson.[49]

---

[48]     Plaintiffs and the Government stipulate this amount reflects Kati Wall's past medical expenses. ECF No. 576 at 2.

[49]     No evidence was presented to support any future pecuniary loss.

4. *Christopher "Chris" Johnson – 28 years old*

Chris was at work on the morning of the shooting. While working, he received a call from his wife's uncle asking what church his parents attend. Christopher Johnson Dep. 51:22–52:2. Christopher told him that his parents attended the First Baptist Church of Sutherland Springs, and he said that Christopher should call them to find out if they were all right. *Id.* at 52:2–5. Chris began calling his mother, but she did not answer. *Id.* at 52:6–12. He began calling his siblings when finally, Deanna answered and told him that there had been a shooting at the church. *Id.* at 52:13–17. At that time, Deanna believed that their parents were alive, so they were calling hospitals to try and find them. *Id.* at 52:18–22. Chris drove from his job site in Pflugerville to the church and waited for news with his family. *Id.* at 35:18–25, 52:23–53:6.

After the shooting, Chris tried to keep his family's spirits afloat: "I was the one trying to keep everybody—hey, man, it's all right, you know, let's just follow their legacy. Just do what they wanted us to do, and . . . they're looking on us right now . . . ." *Id.* at 55:6–19. He also attended counseling until 2019 for his grief. *Id.* at 39:11–40:1. As time has passed, though, Chris has found that his attitude has changed: "I don't want to get up. I don't want to go to work. I don't want to do nothing . . . ." *Id.* at 58:21–59:8. Knowing how his parents died continues to affect Chris: "[J]ust knowing how they died and knowing what good people they were . . . that tears me up . . . ." *Id.* at 55:20–56:3.

Sara and Dennis were Chris's "rock." *Id.* at 12:21–24. Throughout Chris's life, his parents would help him with small loans and even helped him buy a truck. *Id.* at 33:21–34:1. His parents also would provide childcare for Chris's children every week, and they enjoyed spending time with his children. *Id.* at 34:2–9, 35:2–7. Chris saw his parents a couple times a week, despite frequently working jobs outside of the Sutherland Springs area. *Id.* at 44:24–45:12. Only

116

four days before the shooting, Chris spent his birthday with his parents and reminisced about his childhood with them. *Id.* at 35:18–36:15.

For these reasons, the Court awards Christopher Johnson:

$50,000.00 for Christopher Johnson's mental anguish sustained in the past for the death of his mother, Sara Johnson.

$50,000.00 for Christopher Johnson's mental anguish that, in reasonable probability, he will sustain in the future for the death of his mother, Sara Johnson.

$25,000.00 for Christopher Johnson's loss of companionship and society sustained in the past for the death of his mother, Sara Johnson.

$25,000.00 for Christopher Johnson's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his mother, Sara Johnson.

$50,000.00 for Christopher Johnson's mental anguish sustained in the past for the death of his father, Dennis Johnson.

$50,000.00 for Christopher Johnson's mental anguish that, in reasonable probability, he will sustain in the future for the death of his father, Dennis Johnson.

$25,000.00 for Christopher Johnson's loss of companionship and society sustained in the past for the death of his father, Dennis Johnson.

$25,000.00 for Christopher Johnson's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his father, Dennis Johnson.

5. *James Graham – 51 years old*

On the day of the shooting, James was having his morning coffee at his home in Florida when he saw on the news that there had been a church shooting in Texas. Graham Dep. 7:17–22. At that time, he did not realize his parents were involved, and after saying a prayer, went about his day. *Id.* at 7:17–8:3. While out running errands, James received a call from his uncle that the shooting was at his parents' church, and nobody knew if his parents had survived. *Id.* at 8:4–22. James called Deanna, and she did not know if their parents were alive or dead, but she was hopeful. *Id.* at 9:2–19, 10:21–11:14. James then called hospitals near the church and his mother, and as the day dragged on with no news of his parents, he began to lose hope that they were alive. *Id.* at 11:15–12:11. When Deanna called to tell James that Sara and Dennis were dead, he "lost it." *Id.* at 14:8–20.

The manner in which his mother and stepfather died within the church continues to affect James. "The terror they felt, I just can't, I can't imagine that, how they must have felt knowing. The things they were experiencing in that church, I mean Dennis being shot ten times, the terror he felt, I just—it's unfathomable. . . . And that eats me, that eats me alive. They shouldn't have had to go through that." *Id.* at 34:5–18. He still cries about losing his mother when he is reminded that he will never be able to speak to her again. *Id.* at 33:20–34:4.

James is Sara's biological son and Dennis's stepson, but they both raised him. *Id.* at 5:1–9. Because James lived in Florida, he did not visit his parents often, but he did speak with them on the phone several times a month. *Id.* at 5:17–20, 27:5–15. Oftentimes, his phone calls with his mother would last two to three hours, and he "could call her any time" for any problem. *Id.* at 26:22–27:23. James always felt he received good advice from his mother and that she listened. *Id.* at 27:3–28:11. On Mother's Day and Sara's birthday, James always called early to make sure

he was the first child to wish her a happy Mother's Day or birthday. *Id.* at 28:22–29:8. James still has a voice message his mother left him that he listens to almost every day. *Id.* at 31:4–11.

For these reasons, the Court awards James Graham:

$50,000.00 for James Graham's mental anguish sustained in the past for the death of his mother, Sara Johnson.

$50,000.00 for James Graham's mental anguish that, in reasonable probability, he will sustain in the future for the death of his mother, Sara Johnson.

$25,000.00 for James Graham's loss of companionship and society sustained in the past for the death of his mother, Sara Johnson.

$25,000.00 for James Graham's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his mother, Sara Johnson.

### 6. Dennis "Neil" Johnson, Jr. – 49 years old

Neil was in bed on the morning of the shooting when he received a call from his co-worker that there had been an active shooter at the church. Dennis Johnson, Jr. Dep. 55:3–10. He quickly got dressed and went to the church but was redirected to the community center. *Id.* at 56:11–15. When he arrived, the area around the church was chaotic. *Id.* at 56:16–18. Law enforcement and news reporters surrounded the area while helicopters circled above. *Id.* at 56:16–25. Neil waited with his family for news of their parents. *Id.* at 57:10–17. As they waited, they watched other families walk into a room with law enforcement to receive news of their loved ones, "and then they get the information and then all the people can barely walk coming back. And you're waiting your turn to—you're waiting your turn for your name. It was pretty tough." *Id.* at 58:8–

15. Once they received news of their parents' death, Neil and his siblings cried and hugged one another before going home. *Id.* at 60:15–23.

Neil did not work for two months following the shooting. *Id.* at 77:7–12. At first, he was in denial that the shooting had happened and that his parents were two of the victims. *Id.* at 38:17–22. Neil self-medicated with alcohol and "just kept working" to avoid facing his grief. *Id.* at 40:4–10. He isolated himself and contemplated suicide until he realized "that [he] had to quit trying to be tough." *Id.* at 40:14–41:2. So Neil began counseling and then eventually returned to church. *Id.* at 35:11–25. He participated in counseling for eight months until he began to primarily rely on the church community for support. *Id.* at 35:11–16. While he feels supported by his family and community, Neil still feels hypervigilant in public spaces and his "[g]rief continues." *Id.* at 77:21–78:6, 79:4–7.

Neil saw Sara and Dennis sometimes every day, but at least once every two weeks. *Id.* at 65:7–12. He and his father would spend time relaxing watching television together, working in the yard, or woodworking together: "Our bonding time was working together." *Id.* at 62:7–12, 64:8–18. When he visited, Dennis was "nothing but advice." *Id.* at 65:13–20. Neil testified: "I respected that man and I did not realize how much I loved him. I didn't realize how much I was going to miss him and miss all of his wisdom and all of his advice. And I just miss my dad." *Id.* at 68:22–69:3.

For these reasons, the Court awards Dennis Johnson Jr.:

$50,000.00 for Dennis Johnson Jr.'s mental anguish sustained in the past for the death of his father, Dennis Johnson.

$50,000.00 for Dennis Johnson Jr.'s mental anguish that, in reasonable probability, he will sustain in the future for the death of his father, Dennis Johnson.

$25,000.00 for Dennis Johnson Jr.'s loss of companionship and society sustained in the past for the death of his father, Dennis Johnson.

$25,000.00 for Dennis Johnson Jr.'s loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his father, Dennis Johnson.

7.  *The Estate of Dennis Johnson – 77 years old*

Dennis sustained ten gunshot wounds. PEX 9009 at 5. He was shot at least twice while seated upright in the pew as Kelley fired from the outside of the church. *Id.* at 6. Then, he took cover in the pew aisle where he was shot several more times. *Id.* When Kelley entered the church, Dennis tried to hide Sara under a pew. Christopher Johnson Dep. 60:7–20. Another church member nearby was screaming, which attracted Kelley to Sara and Dennis. *Id.* at 60:20–25. Kelley shot Sara in the head. *Id.* at 60:24–25; PEX 9010 at 5. Dennis then charged Kelley, but Kelley shot him in the chest. He fell down, crawled back to Sara, and died cradling her head wound. Christopher Johnson Dep. 61:1–7; Dmg. Trial Tr. 822:19–823:9; *see also* PEX 9009 at 3. As he lay dying, he experienced significant blood loss, which increases anxiety levels followed by confusion and lastly coma. PEX 9009 at 6–7. Dennis Johnson experienced physical pain from the gunshot wounds he sustained prior to his death, and experienced mental pain and suffering from witnessing the shooting and his wife's murder.

For these reasons, the Court awards the Estate of Dennis Johnson:

$6,000,000.00 for Dennis Johnson's pain and mental anguish.

8. *The Estate of Sara Johnson – 68 years old*

Sara sustained two gunshot wounds. PEX 9010 at 3. The gunshot wound to her head was rapidly fatal, and she sustained this wound after Kelley had moved inside the church. *See id.* at 5; Christopher Johnson Dep. 60:7–25. Once Kelley had moved inside the church, she tried to hide under a pew, but Kelley heard screaming nearby and shot Sara in the head. Christopher Johnson Dep. 60:7–25. Sara experienced physical pain from the gunshot wound she sustained prior to her death, and experienced mental pain and suffering from witnessing the shooting.

For these reasons, the Court awards the Estate of Sara Johnson:

$6,000,000.00 for Sara Johnson's pain and mental anguish.

## The Braden Family

Deborah and Keith Braden were attending church with their son, Robert Braden, and granddaughter Z.Z. on the day of the shooting. Keith died in the shooting, and Deborah, Robert, and Z.Z. were injured.

Deborah has brought a claim for her own personal injuries, as well as wrongful death and survival actions for the death of her husband, Keith.

Robert has brought a claim for his own personal injuries and a wrongful death claim for the death of his father, Keith. He also seeks derivative recovery for his mother, Deborah's, injuries.

Elizabeth Braden brings a claim on behalf of her daughter, Z.Z., for Z.Z.'s injuries. Elizabeth also brings a wrongful death claim for the death of her father, Keith, and seeks derivative recovery for Z.Z. and Deborah's injuries.

Rebecca Metcalf brings a wrongful death claim for the death of her father Keith and seeks derivative recovery for Deborah's injuries.

### 1. Deborah Braden – 57 years old

On the morning of the shooting, Deborah met her husband, Keith, at the church for Sunday services. Dmg. Trial Tr. 1455:9–12. Their daughter, Elizabeth, was already at the church with Z.Z. *Id.* at 1455:6–8. Elizabeth left Z.Z. with Keith and Deborah so that she could go to work. *Id.* at 1455:6–8. Keith, Deborah, and Z.Z. sat in the back of the church. *Id.* at 1455:13–16. When Deborah heard the first gunshot, she was confused, "but then . . . the rest of the bullets started coming . . . ." *Id.* at 1458:2–11. Keith shouted: "Get down. Take cover." *Id.* at 1458:12–14. Deborah shoved Z.Z. onto the floor and covered Z.Z.'s body with her own. *Id.* at 1458:15–20. "People were screaming and crying. There was smoke." *Id.* at 1459:5–6. Deborah tried to comfort Z.Z. and keep her quiet as Kelley fired. *Id.* at 1459:8–1460:4. Deborah and Keith's feet were together, and they communicated that they were alive throughout the shooting by kicking each other's feet so as to keep as still and quiet as possible: "[I]f you moved, you got shot; if you screamed you got shot. . . . I wasn't going to let go of [Z.Z.]. I couldn't be with both of them, so I had to protect the baby." *Id.* at 1460:12–23.

Once the shooting stopped, Deborah saw Z.Z.'s "stomach blown open." *Id.* at 1461:8–14. Deborah took off her shirt and used it to cover Z.Z.'s wounds and stop the bleeding. *Id.* at 1461:15–18. She also saw that her close friend, Peggy Warden, was dead a few rows in front of her. *Id.* at 1461:24–1462:2. At that time, her son, Robert, walked out of sound booth and spoke with Keith. Robert said to Deborah: "Daddy wants to know if you're okay." *Id.* at 1462:6–9. Deborah said, "Yes. It's okay. We're good." *Id.* at 1462:3–10. Keith then passed. *Id.* at 1462:11–13. Deborah "knew he was dead, but [she] didn't want to accept it." *Id.* at 1462:13–14.

123

When first responders arrived, Deborah's son-in-law was among them. *Id.* at 1462:24–4163:2. She shouted at him for help with Z.Z.'s injuries: "I didn't want [Z.Z.] to know how bad she was because I didn't want her to give up. She kept saying, 'Grandma, my leg hurts. Grandma, I want to close my eyes and go to sleep.'" *Id.* at 1463:2–8. The paramedics carried Z.Z. and Deborah out of the church, and Deborah waited with Z.Z. until Z.Z. was placed in an ambulance. *Id.* at 1463:10–1464:12. Both were taken to Connally Memorial Hospital to be stabilized, and then transferred to University Hospital. *Id.* at 1466:6–1467:7; PEX 3086 at 1; PEX 3235 at 1.

Deborah suffered multiple gunshot wounds. *See* PEX 3086 at 1. Her most prominent injury was to her left hip and buttock, as well as wounds to her right arm and right leg. *Id.*; Dmg. Trial Tr. 1465:12–1466:1. While doctors wanted to operate on her wounds, this was initially delayed because she had a significant reduction in heart function. PEX 3086 at 1. Doctors performed a catheterization to rule out an artery blockage, which was negative, and they determined that Deborah had Broken Heart Syndrome. *Id.* Once she was safe to operate on, doctors irrigated Deborah's wounds and removed shrapnel and debris. *Id.* Doctors applied a wound VAC to Deborah's buttock injury, and her smaller injuries were treated with packing and gauze. *Id.* Deborah was discharged home on November 11, 2017, with home health wound care and a rolling walker. *Id.*

Deborah's wounds have left significant scars on her body. There is a scar on her right forearm, right thigh, and "the one on the backside is a mess . . . ." Dmg. Trial Tr. 1475:12–20; *see also* PEX 3084 at 77–78. Additionally, she has retained shrapnel throughout her hip, backside, and thigh. Dmg. Trial Tr. 1476:4–16; PEX 3085. Deborah's doctors are monitoring her

blood lead levels, with her most recent blood lead level measuring seven micrograms per deciliter. PEX 3079 at 8.

Furthermore, Deborah now has chronic pain. The wound to her backside causes sciatic pain, and she has nerve pain in her left leg. Dmg. Trial Tr. 1478:8–17. Her left leg will frequently go numb. *Id.* at 1478:15–17. Sitting or standing for long periods of time is also painful. *Id.* at 1478:18–20. Deborah's pain is constant, and it interferes with her sleep and ability to lift objects and to do household chores. *Id.* at 1478:23–1479:7. Playing with or holding her grandchildren has also become more difficult. *Id.* at 1479:8–21. Deborah now sees a pain management specialist to treat her back pain, though her treatments have not provided full relief. *Id.* at 1480:3–1481:25.

The loss of her husband has greatly affected Deborah. Keith and Deborah were married for thirty-three years. *Id.* at 1446:4–7. Keith "was just very sensitive, very caring. He worked hard to try and provide for the family, but he enjoyed his time off too with the family. He wanted to be with us and do things with us as a family." *Id.* at 1487:16–19. He would often write love notes to Deborah or bring her flowers if she was sad. *Id.* at 1487:3–15. Even though Keith did not enjoy fishing, he knew that Deborah and their children and grandchildren did, and he would bait hooks and help the grandchildren pull fish off the hook. *Id.* at 1488:13–24.

Keith's death has left a void that Deborah has been unable to fill. Deborah stated: "[H]e did so much for me, and we did so much together. It was a big hole in my heart not having him around." *Id.* at 1492:14–19. She still finds it difficult to accept the loss of her husband: "[I]t's very difficult to hear a sound and think it's my husband coming home, but it's not." *Id.* at 1494:4–7. As time has passed, Deborah still feels "that hole is still there. The ache, the

companionship, being able to have someone there to talk to, just him being there was—that was our world. That was my world." *Id.* at 1493:14–20.

In addition to the grief from losing her husband, Deborah has suffered other psychological effects from the shooting. She now has a startle reaction to loud noises. *Id.* at 1494:8–17. While shopping one day, a balloon nearby popped, and Deborah screamed. *Id.* at 1494:12–17. When these noises happen, it "takes [her] breath away, and [her] chest gets tight." *Id.* at 1494:22–1495:2. Deborah has unwanted memories of the shooting every day, as well as frequent nightmares. *Id.* at 1495:11–20. She has been diagnosed with major depressive disorder, PTSD, and generalized anxiety disorder. PEX 3083 at 6; GEX 409 at 11. Deborah has sought counseling in the past to treat her symptoms and has continued some outpatient care related to stress and pain management, as well as sleep disturbance. Dmg. Trial Tr. 1475:7–9; PEX 3083 at 5; GEX 409 at 4; *see generally* PEX 3079.

For these reasons, the Court awards Deborah Braden:

$2,000,000.00 for Deborah Braden's physical pain and mental anguish sustained in the past.

$1,000,000.00 for Deborah Braden's physical pain and mental anguish that, in reasonable probability, she will sustain in the future.

$30,000.00 for Deborah Braden's disfigurement sustained in the past.

$30,000.00 for Deborah Braden's disfigurement that, in reasonable probability, she will sustain in the future.

$150,000.00 for Deborah Braden's physical impairment sustained in the past.

$150,000.00 for Deborah Braden's physical impairment that, in reasonable probability, she will sustain in the future.

$46,770.58 for Deborah Braden's medical care expenses incurred in the past.[50]

$331,779.67 for Deborah Braden's medical care expenses that, in reasonable probability, she will incur in the future.[51]

$250,000.00 for Deborah Braden's mental anguish sustained in the past for the death of her husband, Keith Braden.

$250,000.00 for Deborah Braden's mental anguish that, in reasonable probability, she will sustain in the future for the death of her husband, Keith Braden.

$500,000.00 for Deborah Braden's loss of companionship and society sustained in the past for the death of her husband, Keith Braden.

$500,000.00 for Deborah Braden's loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her husband, Keith Braden.

$51,756.00 for Deborah Braden's pecuniary loss incurred in the past for the death of her husband, Keith Braden.[52]

$46,967.00 for Deborah Braden's pecuniary loss that, in reasonable probability, she will sustain in the future for the death of her husband, Keith Braden.[53]

---

[50]    Plaintiffs and the Government stipulate this amount reflects Deborah Braden's past medical expenses. ECF No. 576 at 2.

[51]    This amount was calculated based on Plaintiffs' life care plan for Deborah Braden. *See* PEX 3084. This amount has been adjusted to reflect the two years passed between the original life care plan date and trial, a $22 per hour rate for attendant care, removed RN supervision for attendant care, and average generic drug pricing for all medications where available. *See id.* at 53–55, 66.

[52]    *See* PEX 3101 at 6.

[53]    *See* PEX 3101 at 6.

## 2. *Z.Z. – 6 years old*

Z.Z. went to Sunday school with her mother, Elizabeth, the morning of the shooting. Dmg. Trial Tr. 1518:3–10. Elizabeth then left for work, and Z.Z. stayed with her grandparents, Keith and Deborah, for services. *Id.* at 1518:13–17. When the shooting began, Deborah covered Z.Z. *Id.* at 1458:15–20. She said to Deborah, "Grandma, I want to scream. It hurts." *Id.* at 1459:11–12. Deborah comforted Z.Z. and told her to stay quiet so as not to attract Kelley. *Id.* at 1459:13–19. Once the shooting stopped, to keep Z.Z. calm, Deborah sang "Jesus Loves Me" with Z.Z. until first responders arrived. *Id.* at 1462:17–1463:3. Paramedics placed Z.Z. on a gurney, and Deborah saw how severe Z.Z.'s leg injury was: "[I]t almost severed the leg. It was barely hanging on. And she almost bled to death laying there." *Id.* at 1464:24–1465:1. Z.Z. was then taken to Connally Memorial Hospital in an ambulance, where she was stabilized before being transferred by helicopter to University Hospital. PEX 3229 at 1.

Z.Z. suffered three gunshot wounds: one to her abdomen, one to her left leg, and one to her left buttock. PEX 3232. At University Hospital, Z.Z. underwent emergency surgery to restore the blood supply to her left leg. PEX 3229 at 1. Healthy veins from her uninjured right leg were taken and grafted to the portion of her arteries on the left leg that were destroyed by the gunshot. *Id.* Z.Z. also underwent exploratory surgery in her abdomen and pelvis, and a temporary ostomy was performed to allow better healing of her thigh wound. *Id.* An external fixator was initially placed to treat her left femur fracture, but "[t]here wasn't enough leg left for them to keep the external fixator on," so doctors had to place an internal rod to treat the fracture. *Id.*; Dmg. Trial Tr. 1524:24–1525:11. Wound VACs were applied to treat Z.Z.'s abdominal and leg wounds. PEX 3229 at 1. Z.Z. spent twenty-five days in the hospital before she was discharged home. *Id.*

Z.Z.'s recovery was prolonged. Z.Z. was not able to walk or stand on her own when she was sent home, and she was confined to a wheelchair. Dmg. Trial Tr. 1533:14–19. Her mother had to assist her in using the bathroom and showering. *Id.* at 1533:20–1534:1. Z.Z. went to doctors twice a week for wound care, three times a week for physical therapy, as well as vascular specialists for her leg. *Id.* at 1534:14–20; *see also* PEX 3231 at 46. Z.Z. continues to go to physical therapy. Dmg. Trial Tr. 1540:8–13.

Z.Z. also had complications with her ostomy. Z.Z. was six years old at the time of the shooting, so the ostomy's maintenance was difficult for her mother to manage. Dmg. Trial Tr. 1535:23–1536:4. When she slept, Z.Z. would toss and turn and sometimes her ostomy would open or leak. *Id.* at 1536:5–10. The ostomy smelled, and Z.Z. "hated it." *Id.* at 1535:19–20. In March 2018, Z.Z. had prolapse and bleeding of her ostomy. *Id.* at 1536:23–1537:10; PEX 3231 at 27. At that time, doctors reversed Z.Z.'s ostomy. Dmg. Trial Tr. 1537:7–10.

After years of physical therapy, Z.Z. remains significantly impaired by her injuries. Z.Z. has very little feeling in her left foot and has developed a foot drop. Dmg. Trial Tr. 1546:11–1547:2. In order to walk or run, she must wear a brace around her foot. *Id.* at 1546:17–18. Even with the braces, Z.Z. falls frequently: "shower, dressing, uneven surfaces. . . . all that is affected because of the lack of being able to feel [her left foot]." *Id.* at 1547:6–1548:1. Z.Z. must be monitored for sores from using her braces. *Id.* at 1548:7–19. Additionally, her mother massages the muscles in her left foot as they have atrophied. *Id.* at 1548:9–17. The muscles in her left leg are also atrophied, which makes it even more difficult for Z.Z. to balance. *Id.* at 1551:12–20. Z.Z. cannot walk for long distances, and she still relies on her wheelchair if she must stand or walk for long periods. *Id.* at 1549:18–1550:1. Z.Z. also has nerve pain from her buttock injury that makes sitting or standing for long periods painful. *Id.* at 1550:24–1551:6.

Z.Z.'s injuries have also scarred her. There is retained shrapnel in Z.Z.'s left leg and hips. PEX 3236 at 133. The muscle atrophy in Z.Z.'s left leg has made the leg "really small." Dmg. Trial Tr. 1551:12–16. There are significant indentations in her left leg and backside. PEX 3231 at 103. Z.Z. also has a midline abdominal scar from the exploratory surgery she underwent on the day of the shooting, as well as a scar from her ostomy. *Id.* at 102.  Z.Z. is "constantly covering" her scars. Dmg. Trial Tr. 1555:22–25. Even in the heat of the summer, Z.Z. wears long pants. *Id.* at 1556:1–2.

Furthermore, Z.Z.'s doctors have advised that Z.Z. will likely experience complications with pregnancy. *Id.* at 1557:22–1558:1. Because of the injuries to her leg and pelvis, doctors are unsure how Z.Z.'s hips would widen if she were to become pregnant. *Id.* at 1558:8–19. Any pregnancy would likely be extremely painful, and she would be unable to deliver naturally. Jaramillo Dep. 127:21–129:2.

Though Z.Z. had PTSD prior to the shooting from a car accident, it has worsened significantly since. Dmg. Trial Tr. 1560:21–23. Z.Z. sleeps in her mother's room every night to feel safe; she still experiences nightmares. *Id.* at 1560:17–18; PEX 3230 at 5. If neighbors are shooting fireworks, Z.Z. has to go inside and turn up the television volume. Dmg. Trial Tr. 1561:21–1562:1. Her mother then has to talk her through the noise and remind her that it is only fireworks. *Id.* at 1561:21–1562:1. When her school had a "soft" lockdown drill, Elizabeth had to pick Z.Z. up because Z.Z.'s "stomach was hurting. She was upset the rest of the day." *Id*. at 1562:12–15. Z.Z. cries frequently and misses school often because she has panic attacks. *Id.* at 1552:22–1553:13, 1563:22–23. Currently, Z.Z. attends counseling once a week to treat her symptoms. *Id.* at 1541:20–1542:10.

For these reasons, the Court awards Z.Z.:

$2,000,000.00 for Z.Z.'s physical pain and mental anguish sustained in the past.

$2,000,000.00 for Z.Z.'s physical pain and mental anguish that, in reasonable probability, she will sustain in the future.

$500,000.00 for Z.Z.'s disfigurement sustained in the past.

$500,000.00 for Z.Z.'s disfigurement that, in reasonable probability, she will sustain in the future.

$2,000,000.00 for Z.Z.'s physical impairment sustained in the past.

$1,000,000.00 for Z.Z.'s physical impairment that, in reasonable probability, she will sustain in the future.

$0 for Z.Z.'s loss of earning capacity sustained in the past.

$0 for Z.Z.'s loss of earning capacity that, in reasonable probability, will be sustained in the future from the time of trial until Z.Z. reaches the age of eighteen years.

$2,729,503.00 for Z.Z.'s loss of earning capacity that, in reasonable probability, she will sustain after she reaches the age of eighteen years.[54]

$166,270.63 for Z.Z.'s medical care expenses incurred in the past.[55]

$49,940.32 for Z.Z.'s medical care expenses that, in reasonable will be incurred on behalf of Z.Z. in the future from the time of trial until Z.Z. reaches the age of eighteen years.[56]

---

[54]    Dr. Scarbrough opined that Z.Z.'s expected earnings and benefits with a college degree would total $4,198,544.00. *See* GEX 425 at 45, Table 5 (sum of earnings and benefits section of the table). This award reflects a 65% loss of such earning capacity.

[55]    Plaintiffs and the Government stipulate this amount reflects Z.Z.'s past medical expenses. ECF No. 576 at 9.

$2,970,595.73 for Z.Z.'s medical care expenses that, in reasonable probability, she will incur after she reaches the age of eighteen years.[57]

### 3. Elizabeth Braden – 32 years old

Elizabeth went to Sunday school with Z.Z. the morning of the shooting. Dmg. Trial Tr. 1518:6–12. After Sunday school, Elizabeth and Z.Z. sat in the back row of the church with Deborah and Keith. *Id.* at 1518:11–13. Elizabeth then decided to leave for work, and left Z.Z. with Keith and Deborah. *Id.* at 1518:13–18. A few miles down the road from the church, a police officer passed Elizabeth with his lights and sirens on. *Id.* at 1518:18–1519:2. When Elizabeth arrived at work, she received a phone call from a friend telling her that there was an active shooter at the church and asking if she was all right. *Id.* at 1519:4–7. Elizabeth turned around and drove back to the church, all the way calling her parents to no answer. *Id.* at 1519:8–15. Finally, Elizabeth received a call from her mother: "And my mom said '[Z.Z.].' And at that point, I couldn't keep the tears and the just overwhelming urge to scream. So I pulled my car over. I jumped out of the car. I ran to the church." *Id.* at 1519:14–19. She found her mother, shirtless and injured, in front of the church. *Id.* at 1520:6–13. Deborah told Elizabeth that Z.Z. was in an ambulance and on the way to the hospital, and Elizabeth began driving to BAMC. *Id.* at 1520:23–25. She then received a call from an emergency room nurse at Connally Memorial, and the nurse told her that Z.Z. was being life-flighted to University Hospital. *Id.* at 1520:25–1521:6.

---

[56]     This amount was calculated based on Plaintiffs' life care plan for Z.Z. *See* PEX 3231. This amount has been adjusted to reflect the two years passed between the life care plan and the trial date and average generic drug pricing for all medications where available. *See id.* at 71–75.

[57]     This amount was calculated based on Plaintiffs' life care plan for Z.Z. *See* PEX 3231. This amount has been adjusted to reflect a $22 per hour rate for attendant care, removed RN supervision for attendant care, removed costs for anti-depressants and tuition as they are not justified, and average generic drug pricing for all medications where available. *See id.* at 71–75, 94, 96; Dmg. Trial Tr. 3362:2–3364:20 (discussing anti-depressant medication and tuition). This also reflects an adjustment to the number of attendant care hours to the following: four hours per day starting at age 55 until age 65, eight hours per day starting at age 65 until age 75, and sixteen hours per day beginning at age 75 until life expectancy. *See* PEX 3231 at 97.

Elizabeth changed course to University Hospital, and as she drove, received a phone call from her sister-in-law confirming that her father died in the shooting. *Id.* at 1522:20–1523:1. Elizabeth arrived at University Hospital and waited for several hours for news of her daughter. *Id.* at 1521:9–1522:16. Doctors continually asked to see pictures of Z.Z., and Elizabeth did not know Z.Z.'s condition until Z.Z.'s identity was confirmed at nine o'clock that evening. *Id.* at 1522:14–16.

Elizabeth's life has drastically changed since the shooting. Z.Z.'s injuries, both psychological and physical, prevent Z.Z. from performing household chores, and have made Z.Z. more dependent on Elizabeth. *Id.* at 1563:14–21. For example, Z.Z., now ten years old, continues to sleep in Elizabeth's room. *Id.* at 1563:14–21. The shooting has also altered Elizabeth's relationship with her mother. Before the shooting, Elizabeth and Deborah vacationed together, and Elizabeth often confided in her mother "without worrying." *Id.* at 1569:5–11, 1571:17–23. Deborah was also the person who would organize family gatherings. *Id.* at 1570:25–1571:8. As a single mother, Elizabeth relied heavily on her mother for childcare. *Id.* at 1569:19–1570:2. Deborah provided childcare "multiple times a week" and was the "other parent." *Id.* at 1570:6–8.

Since the shooting, though, Elizabeth is no longer able to rely on her mother in the same way. Deborah "is constantly busy and not feeling well. A lot of times, it's the hurting—she hurts, her body hurts or she's just emotionally exhausted." *Id.* at 1570:25–1571:11. Deborah stated that, "[a]ll the little fun things that we liked to do, I can't do that with them anymore." *Id.* at 1482:15–25. While Deborah is still able to provide some childcare, she is not able to care for her grandchildren as much as she did before the shooting. *Id.* at 1570:18–24. Elizabeth also feels that it is more difficult to confide in her mother and seek advice: "I feel like it's a burden to her for

me to have to talk to her about any of it because she's still living it herself." *Id.* at 1571:24–1572:3.

Prior to his death, Elizabeth and her father Keith had a close relationship. Keith helped Elizabeth escape an abusive relationship by housing her and her children: "He was there when I called." *Id.* at 1572:24–1573:12. Elizabeth saw him multiple times a week when she would either help around her parents' home or see him at church. *Id.* at 1573:13–24. Keith, like Deborah, also provided childcare, and was especially close with Z.Z. *Id.* at 1574:8–20. When Elizabeth needed parenting advice, particularly with respect to her two sons, Keith was there for her. *Id.* at 1576:12–24.

Elizabeth experiences significant grief for the loss of her father. She finds going to church difficult because "[t]hat's the last place [she] got to hug him and the last place [she] got to spend any time with him, and it's hard to be up there." *Id.* at 1575:9–16. Going to her mother's house is similarly difficult "[b]ecause that's where [she] grew up, and he's not coming home." *Id.* at 1575:17–20. Elizabeth lost significant weight after the shooting as she was experiencing severe panic attacks that induced vomiting. *Id.* at 1578:15–20. Her panic attacks are triggered by loud noises, sirens, and being around the church. *Id.* at 1579:1–5. Though she has learned several coping mechanisms, she still experiences panic attacks. *Id.* at 1578:15–25. Elizabeth also experiences survivor's guilt because, prior to leaving the church, she was sitting in the chair where her father was killed: "So if I hadn't have left, it would have been me or maybe I could have done something differently to help him or—you never know." *Id.* at 1579:6–12. Both Dr. Feltoon and Dr. Marx diagnosed Elizabeth with PTSD and major depressive disorder. PEX 3118 at 7; GEX 416 at 10. Elizabeth currently takes Zoloft for both depression and anxiety. PEX 3118 at 2.

For these reasons, the Court awards Elizabeth Braden:

$75,000.00 for Elizabeth Braden's mental anguish sustained in the past for the death of her father, Keith Braden.

$75,000.00 for Elizabeth Braden's mental anguish that, in reasonable probability, she will sustain in the future for the death of her father, Keith Braden.

$50,000.00 for Elizabeth Braden's loss of companionship and society sustained in the past for the death of her father, Keith Braden.

$50,000.00 for Elizabeth Braden's loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her father, Keith Braden.

$4,256.50 for Elizabeth Braden's pecuniary loss sustained in the past for the death of her father, Keith Braden.[58]

$0 for Elizabeth Braden's pecuniary loss that, in reasonable probability, she will sustain in the future for the death of her father, Keith Braden.[59]

$25,000.00 for Elizabeth Braden's loss of parental consortium sustained in the past.

$25,000.00 for Elizabeth Braden's loss of parental consortium that, in reasonable probability, she will sustain in the future.

$10,000.00 for Elizabeth Braden's loss of services sustained in the past.

---

[58]    Plaintiffs and the Government stipulate this amount reflects Elizabeth Braden's past medical expenses. ECF No. 576 at 2.

[59]    No evidence was presented to support any future pecuniary loss.

$10,000.00 for Elizabeth Braden's loss of services that, in reasonable probability, she will sustain in the future until Z.Z. reaches age eighteen.

### 4. Robert Braden – 29 years old

Robert arrived at the church early on the morning of the shooting as he did every Sunday to operate the sound booth. Braden Dep. 12:18–13:9. Robert remained in the sound booth once services began. *Id.* at 13:24–14:3. When the shooting started, he was confused and did not realize what was happening until someone shouted that it was a shooter and for everybody to get down. *Id.* at 15:4–10. Robert positioned himself behind the door to the sound booth for cover. *Id.* at 15:8–10. He opened the door and peeked out, "looking for an opportunity to stop the shooter . . . ." *Id.* at 15:13–18. As Kelley fired inside the church, Robert sustained a graze wound to his forehead. *Id.* at 15:19–22. Robert continued to look out from behind the door to find an opportunity to stop Kelley, but none presented itself. *Id.* at 15:22–16:3. After several more minutes, Robert heard tires squealing. *Id.* at 16:3–5. Still in the sound booth, Robert heard "people crying, screaming, calling out people's names." *Id.* at 22:8–17. When law enforcement arrived, Robert knew that the shooting had ended. *Id.* at 21:4–8.

Robert then climbed out of the sound booth and went to check on his family. *Id.* at 22:25–23:6. He saw his father Keith laying on the ground and checked for a pulse. *Id.* at 23:19–25. At the time, Keith still had a faint pulse. *Id.* at 23:24–25. Robert checked on Deborah and Z.Z. and told his father that they were all right. *Id.* at 24:2–9. Keith squeezed Robert's hand, and Keith subsequently passed. *Id.* at 24:9–13. Afterwards, Robert assisted first responders by trying to find those who could still be helped, applying pressure to gunshot wounds, and carrying others out of the church. *Id.* at 25:12–26:12.

At the scene, a first responder then gave Robert a gauze pad to keep pressure on his graze wound, and his wife then took him to Connally Memorial Hospital for treatment. *Id.* at 28:24–29:16. At Connally Memorial, doctors cleaned Robert's head wound and performed a CT scan. PEX 3129. The CT scan confirmed that Robert did not suffer an intra-cranial injury, and he was discharged from the hospital that evening. *Id.*; Braden Dep. 29:17–22. His injury left a scar under his hairline, but has required no further treatment. PEX 3129; Braden Dep. 30:24–31:2.

As a child, Robert felt that Keith was "a very strict father," but as he "matured and grew up . . . I kind of realized that . . . it wasn't the worst thing. He was just kind of preparing us for life, you know." Braden Dep. at 32:4–21. When Robert decided to join the Navy, his father, who had previously served in the Army, guided him through the process. *Id.* at 33:20–21, 38:3–12. As Robert grew into adulthood, Keith became his best friend and was the best man at his wedding. *Id.* at 39:1–40:5. Robert enjoyed being able to share "everyday life" with his father. *Id.* at 40:6–9.

Since his father's death, Robert feels that he is missing a guide. *Id.* at 41:14–25. Though he still has his mother, Deborah feels that she is not there for her children as much as she would like to be. Dmg. Trial Tr. 1484:16–19. Robert experiences significant grief when contemplating the fact that Keith never had an opportunity to meet his children. Braden Dep. 42:1–9. Keith enjoyed being a grandfather and "loved playing with [his grandchildren], loved goofing off and just having a good time with them." *Id.* at 41:2–10. Robert testified, "One of the hardest aspects of all of it is knowing how good he was with the other kids, with the other grandkids, and just knowing that he's not going to have that opportunity with my kids and they're not going to have that opportunity with him." *Id.* at 42:1–9.

Robert continues to endure additional emotional difficulties since the shooting. When Robert goes to church, for example, he feels anxious: "Just a higher pulse, higher respiratory rate, some kind of—kind of nervousness to check for exits and kind of plan where we're seated." *Id.* at 57:18–58:3. Despite working as a Department of Public Safety firearms examiner at the time of the shooting, he now has a heightened startle response to gunshots. PEX 3127 at 2.

For these reasons, the Court awards Robert Braden:

$750,000.00 for Robert Braden's physical pain and mental anguish sustained in the past.

$100,000.00 for Robert Braden's physical pain and mental anguish that, in reasonable probability, he will sustain in the future.

$75,000.00 for Robert Braden's mental anguish sustained in the past for the death of his father, Keith Braden.

$2,619.90 for Robert Braden's medical care expenses incurred in the past.[60]

$0 for Robert Braden's medical care expenses that, in reasonable probability, he will incur in the future.

$75,000.00 for Robert Braden's mental anguish that, in reasonable probability, he will sustain in the future for the death of his father, Keith Braden.

$50,000.00 for Robert Braden's loss of companionship and society sustained in the past for the death of his father, Keith Braden.

$50,000.00 for Robert Braden's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his father, Keith Braden.

---

[60] Plaintiffs and the Government stipulate this amount reflects Robert Braden's past medical expenses. ECF No. 576 at 2.

$25,000.00 for Robert Braden's loss of parental consortium sustained in the past.

$25,000.00 for Robert Braden's loss of parental consortium that, in reasonable probability, he will sustain in the future.

5. *Rebecca Metcalf – 36 years old*

On the morning of the shooting, Rebecca received a call from a friend, who told her that there was an active shooter at the church. Metcalf Dep. 40:17–22, 41:1–3. After the call, Rebecca went to the church and arrived before law enforcement cordoned off the scene. *Id.* at 41:25–1, 44:9–14. She walked to the front of the church, but Julie Workman stopped her from entering. *Id.* at 45:3–11. Julie told Rebecca that Deborah and Z.Z. were already on their way to the hospital and that her father did not survive. *Id.* at 45:20–23. Rebecca found Robert, who confirmed to her that their father had died inside the church. *Id.* at 46:2–6. Rebecca's husband, a paramedic, was at the scene and told Rebecca that he would find out where Deborah and Z.Z. had been taken. *Id.* at 47:1–6. Her grandmother came and brought her home. *Id.* at 50:21–51:12.

Before his death, Keith was an important source of guidance and support in Rebecca's life. If Rebecca was having trouble with her son, she would turn to her father for support. *Id.* at 69:14–22.  Rebecca relied on Keith for advice, and he "would just tell it like it is" and give her the "proverbial shaking" she needed. *Id.* at 68:19–69:9. Rebecca misses this guidance: "I've been dealing with a lot of anxiety and depression since the shooting happened and it's really hard because he would help me get through it . . . and I don't have him here to help me." *Id.* at 69:9–15.

The shooting also affected Rebecca's relationship with her other family members. Rebecca sees her mother less frequently, and they do not shop together like they did before the

shooting. *Id.* at 58:16–22, 59:15–18, 60:7–12. The family used to have get-togethers, but now "there's a rift." *Id.* at 58:7–9. "We still spend time together, we still do the family events, it's just not the same without Dad around. He was kind of the one that brought us all together . . . and now that he's not there, it's just no matter how much you try, there's something missing. It's just not the same." *Id.* at 58:9–15.

In addition to the grief from losing her father, Rebecca suffers from PTSD and major depressive disorder as a result of the shooting. GEX 427 at 13; PEX 3240 at 6. Two days after the shooting, Rebecca quit her job as an emergency medical technician because she felt  that she would be unable to competently respond to emergency scenes. Metcalf Dep. 33:6–17; GEX 427 at 14. Rebecca also has trouble concentrating, even on daily tasks or hobbies. GEX 427 at 14. She experiences panic attacks frequently. GEX 427 at 13; PEX 3240 at 4.

For these reasons, the Court awards Rebecca Metcalf:

$75,000.00 for Rebecca Metcalf's mental anguish sustained in the past for the death of her father, Keith Braden.

$75,000.00 for Rebecca Metcalf's mental anguish that, in reasonable probability, she will sustain in the future for the death of her father, Keith Braden.

$50,000.00 for Rebecca Metcalf's loss of companionship and society sustained in the past for the death of her father, Keith Braden.

$50,000.00 for Rebecca Metcalf's loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her father, Keith Braden.

$25,000.00 for Rebecca Metcalf's loss of parental consortium sustained in the past.

$25,000.00 for Rebecca Metcalf's loss of parental consortium that, in reasonable probability, she will sustain in the future.

6. *The Estate of Keith Braden – 62 years old*

Keith sustained seven gunshot wounds. PEX 3102. None of the gunshot wounds were immediately fatal, and both Deborah and Robert confirmed that Keith was alive for a short period after the shooting. *See id.* at 5. Keith was shot in his right calf, thigh, hip, lower back, and shoulder. *Id.* The gunshot wounds to his thigh caused femur fractures, and the gunshot wound to his shoulder severed a segment of his spinal cord. *Id.* at 5. Dr. Gwinn opined that Keith suffered sufficient blood loss to result in hemorrhagic shock, meaning that he underwent the physiologic responses to increasing blood loss: increased anxiety levels followed by confusion and lastly coma. *Id.* at 5–6. Keith experienced physical pain from the gunshot wounds he sustained prior to his death, and experienced mental pain and suffering from witnessing the shooting.

For these reasons, the Court awards the Estate of Keith Braden:

$5,000,000.00 for Keith Braden's pain and mental anguish.

**The Marshall Family**

Robert and Karen Marshall attended services at the church the day of the shooting. Both died of their wounds at the scene. Their daughters, Martina Pachal and Karen Boyd, bring wrongful death claims. Martina also brings survival actions on behalf of her parents' estates.

1. *Martina Pachal – 33 years old*

The morning of the shooting was a "[t]ypical Sunday morning" for Martina at her home in Washington until she received a text message from her brother asking if she had heard from their parents. Dmg. Trial Tr. 1605:20–1606:2. Martina said no, and her brother responded that

there had been a shooting at the church. *Id.* at 1606:3–4. Confused, Martina asked what it had to do with their parents. *Id.* at 1606:5–6. Her brother then told her it was possible that her parents were inside the church. *Id.* at 1606:7–10. Since Robert and Karen were new to the area, they had been considering attending different churches, including the First Baptist Church of Sutherland Springs. *Id.* at 1596:13–15, 1606:7–10. Martina and her brother called and texted their parents, but they could not reach them: "And I think our gut knew because my dad doesn't ever not answer his phone." *Id.* at 1606:11–14. Martina's brother lived in the area and drove by their parents' home to see if their car was there or which vehicle they had taken to church. *Id.* at 1607:1–7. The vehicle that her parents drove that day was parked in front of the church. *Id.* at 1607:9–11. Her brother waited at the River Oaks Church, where they received confirmation that their parents had died in the shooting. *Id.* at 1607:17–23.

Martina described their family growing up as follows: "busy family of three. Both my parents worked very hard to provide for us, all three kids." *Id.* at 1597:22–1598:1. When her father retired from the Air Force and began a career as a pilot for United Airlines, the family traveled together frequently to visit their extended family in Pennsylvania, and Robert and Karen "were always trying to find some place to land permanently . . . ." *Id.* at 1598:12–23. Martina was particularly close to her father. Robert "was the glue that held [their] family together. . . . He is a family man to his core." *Id.* at 1599:12–21. She and her father were both jet engine mechanics in the Air Force, and they shared a love of "good beer [and] good food." *Id.* at 1600:9–20. While Martina did not speak as frequently with her mother, Karen's dedication to her career inspired Martina to pursue her career in the Air Force. *Id.* at 1602:10–15, 1621:1–10. Her parents traveled as often as they could to visit her and her children in Washington. *Id.* at 1603:11–20.

Martina continues to grieve the loss of her parents. Birthdays and holidays are difficult because those "are guaranteed times I would have talked with them and FaceTimed them," and Martina realizes that no one is calling. *Id.* at 1609:24–1610:7. Now that her children are teenagers, Martina "miss[es] them more than ever . . . I would have loved to have known, you know, how they handled me growing up and what advice they could give for being a parent." *Id.* at 1610:10–16.

Martina often experiences unwanted memories about the shooting. She remembers what she experienced in the week after while planning her parents' funerals. *Id.* at 1611:11–18. In particular, the visual memory of her deceased parents haunts her. *Id.* at 1611:11–18. She also thinks about what her parents went through in their final moments. *Id.* at 1611:11–16. Martina is unable to concentrate at work because of these memories and thoughts. *Id.* at 1611:19–1612:4. Over time, Martina has started to experience panic attacks. *Id.* at 1612:10–20. On one occasion, while she was at work, a person entered her workplace with a weapon. *Id.* at 1612:24–1613:2. Martina went into a break room and felt her "heart rate shoot up," and she began "getting really shaky." *Id.* at 1613:4– 6. "I just remember biting my lip so hard to try not to break down during this. And everyone was just sitting in the room chatting like it was break time. And I'm in there fighting, trying to keep it together." *Id.* at 1613:7–12. Martina has felt less safe since the death of her parents, and when she sees news stories of other shootings, "it just feels like sometimes it creeps closer and closer." *Id.* at 1613:16–21. Dr. Feltoon diagnosed Martina with major depressive disorder, and Dr. Marx diagnosed her with PTSD and generalized anxiety disorder. PEX 11022 at 5; GEX 516 at 8.

For these reasons, the Court awards Martina Pachal:

$50,000.00 for Martina Pachal's mental anguish sustained in the past for the death of her mother, Karen Marshall.

$50,000.00 for Martina Pachal's mental anguish that, in reasonable probability, she will sustain in the future for the death of her mother, Karen Marshall.

$25,000.00 for Martina Pachal's loss of companionship and society sustained in the past for the death of her mother, Karen Marshall.

$25,000.00 for Martina Pachal's loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her mother, Karen Marshall.

$42,948.50 for Martina Pachal's loss of inheritance for the death of her mother, Karen Marshall.[61]

$50,000.00 for Martina Pachal's mental anguish sustained in the past for the death of her father, Robert Marshall.

$50,000.00 for Martina Pachal's mental anguish that, in reasonable probability, she will sustain in the future for the death of her father, Robert Marshall.

$25,000.00 for Martina Pachal's loss of companionship and society sustained in the past for the death of her father, Robert Marshall.

$25,000.00 for Martina Pachal's loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her father, Robert Marshall.

---

[61] The Government stipulates that the estates of Robert and Karen Marshall lost $257,691.00 in future earning capacity. ECF No. 576 at 11. The Court divided this amount between the two estates and then between Robert and Karen's three children, as the Marshalls intended to leave their estate to their three children in equal shares. PEX 11021 at 17–21, 65–67.

$42,948.50 for Martina Pachal's loss of inheritance for the death of her father, Robert Marshall.[62]

### 2. Kara Boyd – 30 years old

The day of the shooting, Kara received a text message from her brother that a shooting had occurred at the church their parents had considered joining. GEX 520 at 3. Kara and her siblings called and texted their parents to no avail. *Id.* Kara stayed in contact with her brother once she and her siblings knew that their parents were involved in the shooting. *Id.* That evening, her brother called and informed her that Robert and Karen had died in the shooting. *Id.*

Before the shooting, Kara spoke with her parents frequently over the phone, mostly about her children. Boyd Dep. 26:5–10. She also called regularly to simply see how her parents were doing and talk about "just day-to-day stuff." *Id.* at 26:7–14, 28:7–15. Both of her parents provided emotional support, and she relied on them for advice on how to raise her own children. *Id.* at 32:23–33:1, 33:6–14.

Following the shooting, Kara was "numb" and "in shock." GEX 520 at 3. She had difficulty concentrating and focusing, which led to her making mistakes at work and eventually cost her job. Boyd Dep. 60:20–24. Though she still has problems concentrating, her ability to complete everyday tasks has improved, and she is employed again. GEX at 3; Boyd Dep. 60:25–61:9. Kara feels "sad a lot" of the time, and cries "every day." Boyd Dep. 61:1–3. Sleeping, both going and staying asleep, is "a daily struggle." *Id.* at 59:22–24. She continues to grieve the loss of her parents, and she attends counseling manage her grief. *Id.* at 56:4–8. Dr. Feltoon diagnosed

---

[62]     *See supra* note 61.

145

Kara with major depressive disorder, and Dr. Marx diagnosed her with PTSD and generalized anxiety disorder. PEX 11043 at 5; GEX 520 at 11.

For these reasons, the Court awards Kara Boyd:

$50,000.00 for Kara Boyd's mental anguish sustained in the past for the death of her mother, Karen Marshall.

$50,000.00 for Kara Boyd's mental anguish that, in reasonable probability, she will sustain in the future for the death of her mother, Karen Marshall.

$25,000.00 for Kara Boyd's loss of companionship and society sustained in the past for the death of her mother, Karen Marshall.

$25,000.00 for Kara Boyd's loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her mother, Karen Marshall.

$42,948.50 for Kara Boyd's loss of inheritance for the death of her mother, Karen Marshall.[63]

$50,000.00 for Kara Boyd's mental anguish sustained in the past for the death of her father, Robert Marshall.

$50,000.00 for Kara Boyd's mental anguish that, in reasonable probability, she will sustain in the future for the death of her father, Robert Marshall.

$25,000.00 for Kara Boyd's loss of companionship and society sustained in the past for the death of her father, Robert Marshall.

---

[63]     *See supra* note 61.

$25,000.00 for Kara Boyd's loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her father, Robert Marshall.

$42,948.50 for Kara Boyd's loss of inheritance for the death of her father, Robert Marshall.[64]

### 3. The Estate of Robert Marshall – 56 years old

Robert sustained three gunshot wounds. PEX 11035. He was shot twice in his left hip and once on his right thigh. *Id.* at 4. All three wounds were sustained as Kelley fired from the inside the church. *Id.* at 5. None of the wounds were immediately fatal. *Id.* Robert was injured but alive at the conclusion of the shooting. *Id.* at 8. Julie Workman found Robert as he was screaming, "My beautiful wife. My wife. Help my wife." Dmg. Trial Tr. 457:4–6. She assisted him in putting pressure on his wounds and tried to calm him until first responders arrived. *Id.* at 457:7–21. When first responders arrived, they carried him out of the church and tried unsuccessfully to staunch his bleeding. PEX 11035 at 7. Robert died outside of the church. *Id.* at 3. Dr. Gwinn opined that Robert suffered significant enough blood loss to result in hemorrhagic shock, meaning that he underwent the physiologic responses to increasing blood loss: increased anxiety levels followed by confusion and lastly coma. *Id.* at 7. Robert experienced physical pain from the gunshot wounds he sustained prior to his death, and experienced mental pain and suffering from witnessing the shooting.

For these reasons, the Court awards the Estate of Robert Marshall:

$5,000,000.00 for Robert Marshall's pain and mental anguish.

---

[64] *See supra* note 61.

4. *The Estate of Karen Marshall – 56 years old*

Karen sustained three gunshot wounds. PEX 11041. She was shot in her hips, chest, and lower back. *Id.* All three wounds were sustained as Kelley fired from the inside of the church. *Id.* at 6. The gunshot wounds to her hips resulted in hip fractures and were incapacitating, but not fatal. *Id.* at 5. The gunshot wound to her chest was rapidly fatal. *Id.* at 6. However, Dr. Gwinn opined that it was likely she sustained her hip fractures prior to the chest wound: "Because the injuries related to the chest shot are rapidly fatal, significant purposeful movements after sustaining this wound would not be expected. Conversely, the left hip and left buttock wounds would not be as rapidly fatal, and conscious purposeful movements would be expected. Blood smudges of the upper extremities, left flank and right thigh from blood transfer during purposeful movements of her upper extremities. Therefore, Mrs. Marshall sustained one or both of these wounds at earlier point in time during the shooting incident and had a survival interval prior to sustaining the chest wound." *Id.* Karen experienced physical pain from the gunshot wounds she sustained prior to her death, and experienced mental pain and suffering from witnessing the shooting.

For these reasons, the Court awards the Estate of Karen Marshall:

$5,000,000.00 for Karen Marshall's pain and mental anguish.

## The Vidal Family

Margarette Vidal attended church alone on the day of the shooting. She seeks recovery for her own personal injuries. Margarette's children, Monica Shabbir, Ramiro Vidal, and Robert Vidal, were not in the church, and seek derivative recovery for their mother's injuries.

1. *Margarette Vidal – 74 years old*

On the morning of the shooting, Margarette went to church alone as she did every Sunday. Dmg. Trial Tr. 1628:10–21. Before services started, Margarette played with Noah Holcombe, and then went to sit in her usual seat next to her friends, Sara and Dennis Johnson. *Id.* at 1628:17–1629:2. When Margarette heard the first shots, she "didn't know what to do," and heard people shouting to get down. *Id.* at 1630:11–17. "I was crying. I was afraid. And I didn't know what was going to happen. . . . I started crying and just waiting for him to kill me because that's what he was doing, you know, just killing and killing and killing people." *Id.* at 1630:16–25. Margarette tried to speak to the Johnsons, but they were already dead beside her. *Id.* at 1631:1–7. She was then shot, once in her right leg just below her knee, and then lost consciousness. *Id.* at 1633:3–17. After Margarette lost consciousness, she was shot again in her right flank and suffered a heart attack. *Id.* at 1631:10–1632:10, 1633:3–17.

Margarette remembers waking up at BAMC two weeks later. *Id.* at 1631:24–1632:3. While Margarette was unconscious, doctors treated her heart attack. PEX 16014 at 1. She underwent a cardiac catheterization, and her right coronary artery was opened with a balloon angioplasty. *Id.* A drug eluting stent was also placed. *Id.* Margarette received blood transfusions, and she required ICU admission. *Id.* The gunshot wound to her right leg shattered the tibia and required multiple operations. *Id.* The wound was initially irrigated and debrided on November 6, 2017, and antibiotic beads were placed in the wound since it was "clearly contaminated" and posed a high risk of infection. *Id.* Two days later, Margarette underwent surgery to place an internal fixator. *Id.* A wound VAC was applied. *Id.* On November 10, 2017, the wound was covered with a skin graft. *Id.* Several weeks later, doctors placed a bone graft. *Id.* Margarette developed osteomyelitis, which required another operation to remove the infected bone graft and

place another antibiotic spacer. *Id.* The gunshot wound to Margarette's right flank scattered shrapnel throughout her back. *Id.* This wound was also irrigated and debrided and then subsequently closed. *Id.* The wound also fractured her ribs and spine. *Id.* Margarette had to wear a "turtle shell style" brace to stabilize these fractures. *Id.*

Margarette suffered a prolonged and complicated recovery. For eight months, Margarette was transferred back and forth between BAMC and a rehabilitation center. *See* PEX 16018 at 11–37. Margarette did physical therapy every day while she was at the rehabilitation center, which was painful and difficult. Dmg. Trial Tr. 1636:7–1638:15. When she was sent home, she was wheelchair bound, and has since progressed to the use of a walker or cane. *Id.* at 1643:21–1644:1; GEX 618 at 37.

Margarette experiences pain and discomfort every day because of her injuries. *Id.* at 1639:6–1640:3. Her right leg often goes numb and tingles, which makes it difficult to walk. *Id.* at 1644:12–23. Her back injury has also affected her ability to walk, and she now has to bend over: "I can't be straight walking. . . . It hurts." *Id.* at 1644:24–1645:10. In one incident, Margarette fell in her home and could not pick herself up. *Id.* at 1646:15–24. Since she lives alone, Margarette had to scream until a neighbor heard her to get help. *Id.* at 1647:15–1648:15. Standing for long periods of time is also painful for Margarette.[65] *Id.* at 1645:11–17.

Margarette's injuries have also left significant scarring. Her right leg is scarred from the knee to the ankle. PEX 16018 at 88; PEX 16020 at 3. Her backside is scarred and herniated where she was shot. PEX 16018 at 88. Any contact with these scars causes her discomfort, including when she is laying down to sleep. Dmg. Trial Tr. 1641:10–1643:7. Margarette feels that her leg is "ugly." *Id.* at 1640:9–15.

---

[65]     There is some dispute about how long Margarette can stand, though. *See* Dmg. Trial Tr. 1671:1–1673:11.

Before the shooting, Margarette had a busy social calendar. *Id.* at 1652:2–20. She enjoyed visiting her aunt's home or her daughter and grandchildren in Seguin, and she drove herself to go visit. *Id.* at 1652:6–11. She also went to the bingo hall regularly and helped at the church. *Id.* at 1652:18–19. Now, though, Margarette does not drive further than a block from her home because of her pain. *Id.* at 1653:3–1654:12. If Margarette has an appointment or needs to run errands, her daughter-in-law will drive her. *Id.* at 1667:1–6.

Since the shooting, Margarette has been diagnosed with PTSD and major depressive disorder. PEX 16016 at 6; GEX 619 at 10–11. She has frequent nightmares about the shooting or being shot while she is in her home. Dmg. Trial Tr. 1659:5–19. Loud noises scare Margarette. *Id.* at 1659:20–1660:5. She also has flashbacks to the shooting, and she suffers from panic attacks. *Id.* at 1660:23–1662:6. When she leaves her home, she is fearful and suspicious of others. *Id.* at 1662:22–1663:3. Margarette's physical limitations cause her to feel worthless: "I feel that way because I am worthless. I don't do the same things I used to do. . . . And well, I say it's not my fault. I think to myself it's not my fault. I try and I try." *Id.* at 1664:2–8.

For these reasons, the Court awards Margarette Vidal:

$1,250,000.00 for Margarette Vidal's physical pain and mental anguish sustained in the past.

$250,000.00 for Margarette Vidal's physical pain and mental anguish that, in reasonable probability, she will sustain in the future.

$50,000.00 for Margarette Vidal's disfigurement sustained in the past.

$50,000.00 for Margarette Vidal's disfigurement that, in reasonable probability, she will sustain in the future.

$50,000.00 for Margarette Vidal's physical impairment sustained in the past.

$25,000.00 for Margarette Vidal's physical impairment that, in reasonable probability, she will sustain in the future.

$221,680.65 for Margarette Vidal's medical care expenses incurred in the past.[66]

$641,784.19 for Margarette Vidal's medical care expenses that, in reasonable probability, she will incur in the future.[67]

## 2. Monica Shabbir – 35 years old

Monica is Margarette's daughter and seeks derivative recovery for her mother's injuries.

Before the shooting, Monica and Margarette had a "fun" relationship. Dmg. Trial Tr. 1678:5–6. "[M]y mom, she was ready—ready to do whatever. . . . We would go out on the weekends. Most of the time, she would come and visit us. . . . We would go out eating or shopping there at the outlet in San Marcos or—we would just, you know, just go to eat or just have fun." Id. at 1678:8–13. When Monica had her own children, she felt as though her bond with her mother strengthened. Id. at 1678:16–21. "[A]nything I needed, like if I needed for her to babysit or something, she was more than willing to do it." Id. at 1679:2–4.

Now, though, Margarette is "lonely, and . . . depressed there just stuck at the house." Id. at 1689:5–6. Margarette is not as involved in her grandchildren's lives "because she just physically can't because she'll be hurting too long . . . ." Id. at 1689:10–16. Monica feels that her

---

[66]     Plaintiffs and the Government stipulate this amount reflects Margarette Vidal's past medical expenses. ECF No. 576 at 8.

[67]     This amount was calculated based on Plaintiffs' life care plan for Margarette Vidal. See PEX 16018. This amount has been adjusted to reflect the two years passed between the original life care plan date and trial and an average life expectancy of 86.5 years. See id. at 53; GEX 618 at 49 (discussing Margarette's residual years). The amount also reflects a $22 per hour rate for attendant care, removed RN supervision for attendant care, removed costs associated with MRIs as Margarette has retained bullet fragments in her body, and average generic drug pricing for all medications where available. See PEX 16018 at 65–67, 81, 87; GEX 618 46–47.

mother avoids family gatherings because "[s]he thinks she's in the way . . . ." *Id.* at 1689:17–20. Even though Margarette is Monica's best friend, Monica feels that she cannot share certain things with Margarette because she does not want to hurt Margarette's feelings. *Id.* at 1691:24–1692:15. Monica worries about Margarette because of her falls, and if Margarette does not answer the phone when Monica calls, Monica panics. *Id.* at 1695:5–13. Though the two still speak every day, their conversations are now focused on Margarette's condition rather than making plans or "happy things." *Id.* at 1698:11–1699:3.

For these reasons, the Court awards Monica Shabbir:

$25,000.00 for Monica Shabbir's loss of parental consortium sustained in the past.

$25,000.00 for Monica Shabbir's loss of parental consortium that, in reasonable probability, she will sustain in the future.

### 3. Ramiro Vidal – 51 years old

Ramiro is Margarette's son and seeks derivative recovery for her injuries.

As Margarette recovered in the hospital, Ramiro and his family visited her daily. Ramiro Vidal Dep. 28:20–29:7. Once she was able to return home, Ramiro's wife, Teresa, began caring for Margarette. *Id.* at 42:14–15, 44:7–16. Now, Ramiro sees Margarette every day. *Id.* at 52:3–5. Margarette has lost her independence, and Ramiro is "depress[ed] thinking about that, thinking about my mom." *Id.* at 46:4–14, 54:2–6. He frequently worries that she is going to fall, so much so that it affects his ability to sleep. *Id.* at 54:2–6. For Ramiro, the shooting and his mother's injuries "changed the world." *Id.* at 55:13.

For these reasons, the Court awards:

$25,000.00 for Ramiro Vidal's loss of parental consortium sustained in the past.

$25,000.00 for Ramiro Vidal's loss of parental consortium that, in reasonable probability, he will sustain in the future.

### 4. Robert Vidal – 49 years old

Robert is Margarette's son and seeks derivative recovery for her injuries.

While Margarette was recovering in the hospital, Robert visited her every day. Robert Vidal Dep. 30:5–9, 31:10–19. Before Margarette was able to come home, Robert modified her home so that it was more accessible for her wheelchair and walker. *Id.* at 33:21–34:12.

Prior to the shooting, Margarette "loved cooking and baking. And not just for me. She would do it for the whole family." *Id.* at 39:6–9. Margarette's home was where family gatherings took place. *Id.* at 39:6–9. Now, because Margarette cannot stand for as long or cook as much, she no longer hosts such gatherings. *Id.* at 39:10–15.

For these reasons, the Court awards Robert Vidal:

$25,000.00 for Robert Vidal's loss of parental consortium sustained in the past.

$25,000.00 for Robert Vidal's loss of parental consortium that, in reasonable probability, he will sustain in the future.

### The Corrigan Family

Robert and Shani Corrigan were attending church together on the day of the shooting. Both died from their wounds at the scene. Their children, Preston and Benjamin Corrigan, each bring wrongful death claims. Benjamin also brings survival actions on behalf of both Robert's and Shani's estates.

1. *Preston Corrigan – 28 years old*

On the morning of the shooting, Preston was at the grocery store when he received a phone call from his wife. Dmg. Trial Tr. 1732:24–1733:2. She asked what church his parents attended, and he responded the First Baptist Church of Sutherland Springs. *Id.* at 1733:1–6. His wife told him to call his parents because there was a shooting at the church. *Id.* at 1733:7–13. Preston told himself that he would not "panic or freak out" until he received confirmation that they were injured or dead. *Id.* at 1733:14–17. He called his parents, but they did not answer. *Id.* at 1733:20–25. He called hospitals and law enforcement to try and get information, but was unsuccessful. *Id.* at 1734:1–8. That afternoon, he received a phone call from his cousin who lived in the area, and his cousin told Preston that his parents had died. *Id.* at 1734:9–14. Later that night, Preston received confirmation from law enforcement that his parents had died in the church. *Id.* at 1735:21–25.

Preston was very close with both of his parents, particularly his father. He stated that his father was his "whole inspiration." *Id.* at 1720:10–12. Preston followed in his father's footsteps and has dedicated his career to serving in the Air Force. *Id.* at 1721:3–5. He spoke with his father weekly, usually to get career advice. *Id.* at 1723:4–23. Robert was Preston's mentor and "provided basically an answer to anything," and he was the first person Preston would call for guidance. *Id.* at 1724:7–12. The two also shared a love for music. *Id.* at 1724:25–1725:2.

Shani was "an incredibly joyful person," who "was always available no matter what" if Preston or his brothers needed anything. *Id.* at 1726:25–1727:14. When Preston had his first child, Shani came to Alabama, where Preston was living at the time, and helped him and his wife care for their son for a month. *Id.* at 1727:15–1728:3. Shani "taught [Preston] how to love." *Id.* at 1728:10–12.

After the shooting, Preston noticed a shift in his personality. He had "angry outbursts," and was "starting to snap at the smallest things at the drop of a hat." *Id.* at 1737:22–1738:5. He was a "put-together, organized person" prior to the shooting, but now he struggles with forgetfulness and must write "literally everything down because [he] can't keep it all straight. *Id.* at 1741:1–14. Preston feels "overwhelmingly sad" that his son "will never know what it's like to have his, you know, grandfather ride him around on the tractor . . . and that's what he loves more than anything right now." *Id.* at 1744:4–10. Sleeplessness is now a "common theme" in Preston's life, and he finds it difficult to both fall asleep and stay asleep. *Id.* at 1744:18–20. He frequently has nightmares about his parents being shot. *Id.* at 1744:11–17. Preston also struggles with his decision to serve in the Air Force: "[I]t's something I go back and forth with every single day about whether or not I'm making the right decision by staying in and whether or not I'm being true to them." *Id.* at 1745:4–1746:5. Dr. Feltoon diagnosed Preston with major depressive disorder, and Dr. Marx diagnosed him with PTSD and major depressive disorder. PEX 7049 at 5; GEX 474 at 10. Preston is currently in counseling for psychological treatment. Dmg. Trial Tr. 1738:22–1739:1.

For these reasons, the Court awards Preston Corrigan:

$50,000.00 for Preston Corrigan's mental anguish sustained in the past for the death of his mother, Shani Corrigan.

$50,000.00 for Preston Corrigan's mental anguish that, in reasonable probability, he will sustain in the future for the death of his mother, Shani Corrigan.

$25,000.00 for Preston Corrigan's loss of companionship and society sustained in the past for the death of his mother, Shani Corrigan.

$25,000.00 for Preston Corrigan's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his mother, Shani Corrigan.

$210.00 for Preston Corrigan's pecuniary loss sustained in the past for the death of his mother, Shani Corrigan.[68]

$0 for Preston Corrigan's pecuniary loss that, in reasonable probability, he will sustain in the future for the death of his mother, Shani Corrigan.[69]

$95,414.75 for Preston Corrigan's loss of inheritance for the death of his mother, Shani Corrigan.[70]

$50,000.00 for Preston Corrigan's mental anguish sustained in the past for the death of his father, Robert Corrigan.

$50,000.00 for Preston Corrigan's mental anguish that, in reasonable probability, he will sustain in the future for the death of his father, Robert Corrigan.

$25,000.00 for Preston Corrigan's loss of companionship and society sustained in the past for the death of his father, Robert Corrigan.

$25,000.00 for Preston Corrigan's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his father, Robert Corrigan.

$95,414.75 for Preston Corrigan's loss of inheritance for the death of his father, Robert Corrigan.[71]

---

[68] Plaintiffs and the Government stipulate that this amount reflects Preston Corrigan's past medical expenses. ECF No. 576 at 10.
[69] No evidence was presented to support any future pecuniary loss.
[70] The Government stipulates that the combined estates of Robert and Shani Corrigan lost $381,659.00 in future earning capacity. ECF No. 576 at 11. The Court divided this amount between the two estates and then between Robert and Shani's two children, Preston and Benjamin.

2. *Benjamin Corrigan – 30 years old*

Benjamin was stationed in Japan on the day the shooting occurred. Dmg. Trial Tr. 1753:18–20. When he received a call from Preston at 5 a.m., he ignored it, assuming that Preston forgot about the time difference. *Id.* at 1765:15–21. However, the call also woke his wife, and she checked Facebook. *Id.* at 1765:22–23. She told Benjamin that he needed to return Preston's call. *Id.* at 1765:23–25. He did, and Preston told Benjamin that there was a shooting at the church and that they could not find their parents. *Id.* at 1766:1–9. Benjamin continued to stay in touch with Preston, other family members, and friends throughout the day trying to locate his parents. *Id.* at 1766:5–23. Hours later, Benjamin received a Red Cross notification that his parents had died. *Id.* at 1766:22–1767:1.

The Corrigan family was very close. Growing up, they were "very big on spending time together," and all shared a love of music and especially enjoyed listening to Robert play the guitar. *Id.* at 1754:7–22. A few years prior to the shooting, both Robert and Benjamin were stationed at Offutt Air Force Base, and Benjamin saw his parents almost every day. *Id.* at 1755:11–23. Benjamin felt that he could "lean on" his father for support as his father had helped him financially when he was struggling. *Id.* at 1756:1–12. If he was facing a difficult situation at work, Benjamin knew that he could call his father for advice. *Id.* at 1759:18–25. He also often relied on his mother. *Id.* at 1760:25–1761:1. After Benjamin had a child while stationed in Japan, Shani traveled to help care for her newborn grandchild. *Id.* at 1762:11–14. Benjamin described Shani as "the glue that held [their] family together." *Id.* at 1760:25–1761:1.

Losing his parents is "the most difficult thing" that Benjamin has experienced. *Id.* at 1769:1–2. He misses being able to call his parents with questions, playing board games with

---

71    *See supra* note 70.

them, and "lean[ing] on them for difficult things." *Id.* at 1768:20–25. "[K]nowing the brutality of what they had to endure" disturbs Benjamin. *Id.* at 1770:22–23. While he had insomnia prior to the shooting, he feels that it has since intensified. *Id.* at 1771:18–23. Benjamin will sometimes experience "overwhelming wave[s] of sadness" for the loss of his parents. *Id.* at 1773:12–14. Like his brother Preston, Benjamin finds his continued service in the Air Force difficult: "[I]t's with a heavy heart and no small amount of sheer determination and willpower that I get through day to day, every day putting on the uniform, going into work, being a part of this organization until I can reach the finish line, and, as we say, punch out." *Id.* at 1774:11–1776:15. Benjamin has been diagnosed with both major depressive disorder and PTSD. PEX 7022 at 6; GEX 468 at 10.

 For these reasons, the Court awards Benjamin Corrigan:

$50,000.00 for Benjamin Corrigan's mental anguish sustained in the past for the death of his mother, Shani Corrigan.

$50,000.00 for Benjamin Corrigan's mental anguish that, in reasonable probability, he will sustain in the future for the death of his mother, Shani Corrigan.

$25,000.00 for Benjamin Corrigan's loss of companionship and society sustained in the past for the death of his mother, Shani Corrigan.

$25,000.00 for Benjamin Corrigan's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his mother, Shani Corrigan.

$95,414.75 for Benjamin Corrigan's loss of inheritance for the death of his mother, Shani Corrigan.[72]

$50,000.00 for Benjamin Corrigan's mental anguish sustained in the past for the death of his father, Robert Corrigan.

$50,000.00 for Benjamin Corrigan's mental anguish that, in reasonable probability, he will sustain in the future for the death of his father, Robert Corrigan.

$25,000.00 for Benjamin Corrigan's loss of companionship and society sustained in the past for the death of his father, Robert Corrigan.

$25,000.00 for Benjamin Corrigan's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his father, Robert Corrigan.

$95,414.75 for Benjamin Corrigan's loss of inheritance for the death of his father, Robert Corrigan.[73]

3.  *The Estate of Robert Corrigan – 51 years old*

Robert sustained seven gunshot wounds. PEX 7038. He was shot in the chest, left arm, left flank, left buttock, and perianal region. *Id.* at 5. Robert was shot twice as Kelley fired from the outside of the church, while Robert was crawling on the floor between pews. *Id.* at 6. These two gunshot wounds caused significant bleeding. *Id.* Dr. Gwinn opined that Robert suffered significant enough blood loss to result in hemorrhagic shock, meaning that he underwent the physiologic responses to increasing blood loss: increased anxiety levels followed by confusion and lastly coma. *Id.* at 6–7. Robert experienced physical pain from the gunshot wounds he

---

[72]     *See supra* note 70.
[73]     *See supra* note 70.

sustained prior to his death, and experienced mental pain and suffering from witnessing the shooting.

For these reasons, the Court awards the Estate of Robert Corrigan:

$5,000,000.00 for Robert Corrigan's pain and mental anguish.

4. *The Estate of Shani Corrigan – 51 years old*

Shani sustained nine gunshot wounds. PEX 7044. She was shot in the chest, head, abdomen, left shoulder, back, left buttock, right hip, right thigh, and left arm. *Id.* Eight of her wounds were sustained as Kelley was shooting from inside the church. *Id.* at 6. The lethal wounds were inflicted after she was laying face down on the church floor. *Id.* at 7. Based on the locations of her wounds, and the position in which her body was found, it is clear that Shani was alive when the shooting began and then took cover under a pew. *Id.* at 7. Shani experienced physical pain from the gunshot wounds she sustained prior to her death, and experienced mental pain and suffering from witnessing the shooting.

For these reasons, the Court awards the Estate of Shani Corrigan:

$5,000,000.00 for Shani Corrigan's pain and mental anguish.

**The Warden Family**

Peggy Warden was attending church with her grandson, Zachary Poston, on the day of the shooting. Peggy died at the scene, and Zachary was severely injured. Zachary seeks recovery for his own personal injuries. Peggy's daughter, Jennifer Racey, brings a wrongful death claim. Jimmy Stevens brings a survival action on behalf of Peggy's estate.

### 1. Zachary Poston – 18 years old

On the morning of the shooting, Zachary had breakfast with his grandmother, Peggy, and went to church for Sunday school. Dmg. Trial Tr. 1847:1–24. After Sunday school, Zachary sat next to his grandmother for services. *Id.* at 1848:6–10, 1849:10–22. Zachary heard gunshots, turned towards the door, and saw holes in the door and walls of the church. *Id.* at 1848:23–1849:1. He was shot in the abdomen and right arm, and then shouted at others to get down. *Id.* at 1849:15–23. Zachary grabbed his grandmother, and they dropped to the floor. *Id.* at 1850:21–23. Peggy wrapped herself around Zachary, placing herself between him and the gunfire entering from the right side of the church. *Id.* at 1850:22–1851:22. When Kelley entered the church, Zachary saw him shoot Marc Holcombe in the back of the head. *Id.* at 1851:24–1852:2. Kelly then shot Zachary in his left leg and wrist. *Id.* at 1852:2–3. The gunshot wound to Zachry's leg "felt like someone took a sledgehammer to it and made it go extremely numb." *Id.* at 1858:5–7. Zachary "played dead," and Kelley walked away and continued firing at other church members. *Id.* at 1852:4–5. He saw as Kelley fired at the Johnsons and heard Sara Johnson make "a really awful wheezing noise" before she died. *Id.* at 1856:12–20. Zachary then watched Kelley run out of the church. *Id.* at 1856:8–11.

Before first responders arrived, Julie Workman placed make-shift tourniquets on Zachary's leg and arm. *Id.* at 1857:1–6. Zachary tried to communicate with his grandmother, but she did not respond. *Id.* at 1857:19–23. When Zachary was pulled from underneath the pew by first responders, Peggy did not move, and he knew that she was dead. *Id.* at 1857:19–25. Zachary was then life-flighted to BAMC. *Id.* at 1857:11–15.

Zachary survived seven gunshot wounds. PEX 18052. The most serious injuries were to his left arm, right hand, and left leg. PEX 18055 at 1. Zachary's left arm was almost severed;

when Zachary held up his left arm up while leaving the church, his hand "completely flopped all the way down to [his] elbow" because nothing was holding the joints together. Dmg. Trial Tr. 1862:4–14. Both radius and ulnar bones suffered multiple fractures. PEX 18055 at 1. At BAMC, an external fixator was placed to stabilize the arm, and then he underwent carpal tunnel decompression and ligation of bleeding veins. *Id.* This was followed by a complex repair to the factures, requiring multiple plates and screws. *Id.* He also underwent surgical irrigation and debridement, and a wound VAC was applied. *Id.* In late November, he underwent a split thickness skin graft. *Id.* The bullet that entered his left leg fractured his femur and caused significant bleeding. *Id.* This wound was similarly stabilized with an external fixator followed by repair with an internal nail two days later. *Id.* The wound also required surgical irrigation and debridement. *Id.* A wound VAC was applied. *Id.* Lastly, Zachary's right hand was repaired using percutaneous pinning, wires, and a bone graft. *Id.*  He was discharged on November 29, 2017. *Id.*

When Zachary was discharged, he was in a wheelchair and "needed assistance for everything." Dmg. Trial Tr. 1865:22–1866:5. Rehabilitation was both physically and emotionally difficult. *Id.* at 1868:2–9, 1868:19–1869:9. Zachary "went from being really athletic and doing all kinds of things to . . . being stuck in a bed, pretty much." *Id.* at 1868:25–1869:2. He struggled to find motivation to complete his physical therapy exercises: "[I]f you made any kind of progress but didn't do your exercises, you could go backwards to where you couldn't move as much. . . . you try to get motivation to do them. If you don't, you go backwards. If you do them, it's incredibly frustrating." *Id.* at 1868:2–9, 1868:19–23.

Even after a year of physical therapy at the Intrepid Center, Zachary experiences chronic pain and has difficulty performing daily tasks. *Id.* at 1870:7–20; PEX 18055 at 2. His left wrist will lock, limiting his ability to turn his wrist. Dmg. Trial Tr. 1870:25–1871:14. Lifting heavy

objects is painful for Zachary: "[I]t's as if someone is trying to bend my arm and snap it." *Id.* at 1871:19–21. The nerves in his left leg are severely damaged, and as a result, he has developed a foot drop. Id. 1873:7–14. Without braces, Zachary's left foot "will flop . . . or roll sideways and sometimes even cause [him] to fall." *Id.* at 1873:10–12. Additionally, his left knee is "significantly weaker" and will oftentimes give out on him. *Id.* at 1873:24–1874:2. Due to the damage in his left leg, he must use braces and a cane to walk. *Id.* at 1874:6–25. Zachary cannot walk up flights of stairs, and if he must stand or walk for long periods, he will use a wheelchair. *Id.* at 1875:16–1876:9. Though the braces and cane make it easier for Zachary to walk, they do not take away his fatigue from walking or exerting himself. *Id.* at 1874:12–18. He also suffers from diminished grip strength in his right hand. *Id.* at 1877:11–13.

Zachary's injuries have also caused extensive scarring. His left leg has a large scar on the front of his thigh and another on the side of his thigh, near his knee. PEX 18051 at 101. The left calf is atrophied, and there is a scar extending from below the knee almost to the ankle. *Id.* Both wrists, particularly the left, have prominent, visible scars. *Id.* The right thigh is also scarred, with significant indentation and discoloration. *Id.* Zachary covers his scars by wearing a compression sleeve over his left wrist, and he avoids wearing shorts in public. Dmg. Trial Tr. 1888:15–1889:4. People will stare at Zachary's scars, which makes him fell "[a]nxious about them or self-conscious." *Id.* at 1889:6–11.

Since the shooting, Zachary has had difficulty maintaining employment. Zachary testified: "I keep a job for a few months. And at some point, I become fatigued and not be able to keep up with it. So I have to quit or find something else to do." *Id.* at 1880:9–13. Currently, he is only able to work half a shift without becoming fatigued. *Id.* at 1885:17–20. After the shooting, Zachary completed a semester at college, but ultimately withdrew: "Between having to study and

go to class, I couldn't sleep enough to catch up with my body to be able to recover." *Id.* at 1897:5–11. As Zachary ages, he will undergo arthritic changes that will further limit his ability to work. *Id.* at 1885:21–1886:18, 2687:15–2689:4.

Prior to the shooting, Zachary enjoyed flying his drone, film work, and toying with electronics. *Id.* at 1898:15–21; GEX 651 at 7. However, he no longer feels motivated to do these activities. Dmg. Trial Tr. 1888:15–24; GEX 651 at 7; PEX 18050 at 5. Since the shooting, Zachary has felt as though he is in a fog and "forget[s] what [he's] doing from one thing to the next." Dmg. Trial Tr. 1899:1–11. "I don't really have the mental capacity to study or do what I need to for what I want as far as like the photography or any kind of extra hobbies. So I've kind of gotten a schedule mentally to sleep as much as possible, leave for work at the latest time as I can, and just repeat because I don't know what else to do." *Id.* at 1899:5–14. Zachary has a heightened startle response to loud noises, experiences panic attacks, and feels "paranoid" in public spaces. *Id.* at 1899:20–1900:20. During the day, Zachary experiences flashbacks to the shooting, and at night he has nightmares. *Id.* at 1901:13–1902:3. Both Dr. Feltoon and Dr. Marx diagnosed Zachary with PTSD and major depressive disorder. PEX 18050 at 6; GEX 651 at 10.

For these reasons, the Court awards Zachary Poston:

$2,000,000.00 for Zachary Poston's physical pain and mental anguish sustained in the past.

$500,000.00 for Zachary Poston's physical pain and mental anguish that, in reasonable probability, he will sustain in the future.

$250,000.00 for Zachary Poston's disfigurement sustained in the past.

$250,000.00 for Zachary Poston's disfigurement that, in reasonable probability, he will sustain in the future.

$500,000.00 for Zachary Poston's physical impairment sustained in the past.

$500,000.00 for Zachary Poston's physical impairment that, in reasonable probability, he will sustain in the future.

$0 for Zachary Poston's loss of earning capacity sustained in the past.

$2,212,639.00 for Zachary Poston's loss of earning capacity that, in reasonable probability, he will sustain in the future.[74]

$101,186.19 for Zachary Poston's medical care expenses incurred in the past.[75]

$2,607,937.04 for Zachary Poston's medical care expenses that, in reasonable probability, he will incur in the future.[76]

### 2. Jennifer Racey – 36 years old

Jennifer was at home relaxing the morning of the shooting, but when she began hearing police and helicopters move past her home, she knew that "something was wrong." Dmg. Trial Tr. 1802:12–14, 1803:9–16. Jennifer's aunt called to ask if Peggy had gone to church and told

---

[74]    Dr. Lundstrom opines that the average net lifetime earnings of a male with a bachelor's degree is $3,404,060.00. GEX 648 at 30. This award reflects that Zachary has sustained at least a 65% loss of such earning capacity.

[75]    Plaintiffs and the Government stipulate this amount reflects Zachary Poston's past medical expenses. ECF No. 576 at 7.

[76]    This amount was calculated based on Plaintiffs' life care plan for Zachary Poston. See PEX 18051. This amount has been adjusted to reflect the two years passed between the original life care plan date and trial, a $22 per hour rate for attendant care, removed RN supervision for attendant care, and generic drug pricing for all available medicines. See id. at 72–76, 99. The number of attendant care hours was adjusted as follows: four hours per day beginning at age 40 until age 60, and eight hours per day beginning at age 60 until life expectancy. See id. at 99. The Court also subtracted the costs associated with a manual wheelchair, as manual usage would aggravate Zachary's wrist injuries. Dmg. Trial Tr. 3619:19–3620:2. The Court does, however, include costs associated with a power scooter beginning now rather than at age 40. See id. at 3615:15–16.

Jennifer there had been a shooting. *Id.* at 1803:19–24. Jennifer then called Zachary and Peggy, but neither answered their phones. *Id.* at 1804:1–5. Jennifer drove to the church. *Id.* at 1804:6–9. By the time she arrived, first responders were setting up a perimeter around the church. *Id.* at 1804:10–12. Jennifer walked to the front of the church, but law enforcement stopped her from entering. *Id.* at 1804:16–18. She went around the side of the church to try and enter through the Sunday school door, where she found Julie Workman. *Id.* at 1804:19–6. Jennifer asked Julie if she knew where Peggy was, and Julie told Jennifer that Peggy had died. *Id.* at 1805:7–9. She then asked if Julie knew where Zachary was, and Julie told her that Zachary was alive when she saw him and that he had been taken to the hospital. *Id.* at 1805:10–16. Law enforcement would not allow Jennifer to see Peggy, so she left to find Zachary. *Id.* at 1805:15–1806:2.

Jennifer had a strong relationship with her mother. Jennifer lived on the family farm with Peggy, and though the two had separate houses, they "may as well have lived with each other." *Id.* at 1788:19–24. Peggy was "the only person [Jennifer] truly ever trusted with [her] children." *Id.* at 1796:9–15, 1797:7–10. Peggy and Jennifer shared a love of gardening, cooking, and animals. *Id.* at 1799:16, 1799:25–1801:17. When Jennifer wanted to share her children's achievements or had a question or needed help, her mother was the first person she would call: "She was my best friend, my confidante, my mentor, my teacher . . . Who do you call instead? Who would replace that? And I don't have an answer yet." *Id.* at 1798:21–1799:4.

Jennifer now finds it difficult to do the things she shared with her mother, such as gardening. *Id.* at 1820:7–21. She also no longer feels safe: "[The church] was safe and sacred, and my mother was murdered. So how do I feel safe anywhere else moving forward?" *Id.* at 1821:1–11. Jennifer always keeps first-aid kits and tourniquets in her purse or car "just in case." *Id.* at 1821:12–1822:3. Flashing lights, sirens, and guns trigger panic attacks for Jennifer. *Id.* at

1824:6–1825:4. Both Dr. Feltoon and Dr. Marx diagnosed Jennifer with PTSD, and Dr. Feltoon included an additional diagnosis of major depressive disorder. GEX 656 at 12; PEX 18071 at 6.

For these reasons, the Court awards Jennifer Racey:

$50,000.00 for Jennifer Racey's mental anguish sustained in the past for the death of her mother, Peggy Warden.

$50,000.00 for Jennifer Racey's mental anguish that, in reasonable probability, she will sustain in the future for the death of her mother, Peggy Warden.

$25,000.00 for Jennifer Racey's loss of companionship and society sustained in the past for the death of her mother, Peggy Warden.

$25,000.00 for Jennifer Racey's loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her mother, Peggy Warden.

### 3. The Estate of Peggy Warden – 56 years old

Peggy sustained five gunshot wounds. PEX 18063. She suffered wounds in her neck, abdomen, right arm, left thigh, and left calf. *Id.* When the shooting began, as Kelley fired from the outside of the church, Peggy was shot in the abdomen, thigh, and leg. *Id.* at 5; *see also* Dmg. Trial Tr. 1849:17–18. The gunshot wound to her abdomen severed her femoral artery and fractured her right hip. PEX 18063 at 4. Peggy took cover with Zachary and wrapped herself around him to protect him from the gunfire. Dmg. Trial Tr. 1850:21–1851:12. Peggy was shot two more times as Kelly fired from the inside of the church. PEX 18063 at 6. Dr. Gwin opined that Peggy experienced substantial blood loss, meaning that she underwent the physiologic responses to increasing blood loss: increased anxiety levels followed by confusion and lastly

coma. *Id.* Peggy experienced physical pain from the gunshot wounds she sustained prior to her death, and experienced mental pain and suffering from witnessing the shooting.

For these reasons, the Court awards the Estate of Peggy Warden:

$5,000,000.00 for Peggy Warden's pain and mental anguish.

### The Ward Family

JoAnn Ward attended church with her children, Brooke Ward, Emily Garcia, R.T., and stepson R.W., on the day of the shooting. JoAnn, Brooke, and Emily died of their wounds. R.W. was severely injured, and R.T. escaped physically unscathed.

Chancie McMahan, R.W.'s biological mother, seeks recovery on behalf of R.W. for his injuries and derivative recovery for R.W.'s injuries.[77]

Dalia Lookingbill, JoAnn's mother, brings a wrongful death claim for the death of her daughter. Dalia also seeks recovery on behalf of R.T. for the death of her mother, JoAnn, and brings a survival action on behalf of the estate of Emily Garcia.

Christopher Ward, JoAnn's husband and Brooke's father, brings wrongful death actions for the deaths of his wife and daughter. He also brings survival actions on behalf of JoAnn and Brooke's estates.

1. *R.W. – 5 years old*

R.W. was spending the weekend with his stepmother, JoAnn, and attended church with her, his half-sister Brooke, and stepsisters Emily and R.T. Dmg. Trial Tr. 1919:8–12; PEX 2032 at 9. During the shooting, JoAnn laid on top of Brooke, Emily, and R.W. to protect them from

---

[77]     Both Chancie McMahan and Christopher Ward dispute who is the legal guardian of their minor child, R.W. The matter is currently the subject of litigation in Wilson County, Texas. The Court expresses no opinion on this issue.

the gunfire. Dmg. Trial Tr. 1924:15–21. After the shooting, Rusty Duncan, a volunteer firefighter, arrived at the scene and began triaging the victims. *Id.* at 1924:24–1925:3. He saw JoAnn, "and he stepped over her because there wasn't [sic] nothing to assess. . . . And he said, as he was stepping over her, that a little arm grabbed ahold of his pant leg. And that was [R.W.]. He had to move Joann to get [R.W.]." *Id.* at 1925:4–9. He placed tourniquets on R.W.'s arm and leg and carried him out of the church. Christopher Ward, R.W.'s father, arrived at that time, and he applied pressure to R.W.'s wounds. Ward Dep. 16:22–18:4. R.W. was then life-flighted to University Hospital. Dmg. Trial Tr. 1925:10–12.

R.W. survived four gunshot wounds. PEX 17054. He was shot in the left arm, scrotum, left buttock, and left leg. *Id.* The gunshot to his arm injured his brachial artery and caused massive blood loss. *Id.*; *see also* Ward Dep. 16:22–18:4. The injury later required a split-thickness skin graft. Dmg. Trial Tr. 2134:20–22. R.W.'s femur was fractured in multiple places, and the bullet destroyed the ball of his left femur and shattered the growth plate. *Id.* 2119:5–2120:1. Doctors placed an external fixator because the left femur was "unreconstructible." *Id.* at 2121:9–18. The wound on his left leg also resulted in significant tissue loss and later required skin grafting. *Id.* at 2123:12–14. In addition to the femur fractures, R.W.'s buttock injury resulted in pelvic fractures that similarly destroyed growth plate. *Id.* at 2123:19–2124:6. Lastly, the bullet that entered R.W.'s scrotum also caused urinary damage, injuring the bladder, ureter, right kidney, small intestine, and large intestine. *Id.* at 2128:4–2129:14. Doctors performed a colostomy, but it was later reversed. PEX 17071 at 17, 33. In total, R.W. underwent thirty-four different medical procedures. Dmg. Trial Tr. 2137:16–17. R.W. was hospitalized for three months. PEX 17071 at 29.

After R.W. was discharged, he attended physical therapy three times a week for a year and a half. Ward Dep. 34:6–24. Even after extensive physical therapy, R.W. cannot make full use of his left arm or leg. *Id.* at 35:11–36:24. R.W. cannot fully extend his left arm, and his fingers and wrist are weak. Dmg. Trial Tr. 2134:23–2135:18. Because the injuries to his hip and femur destroyed his growth plate, R.W.'s leg will not grow from the hip. *Id.* at 1932:21–1933:4. As he has grown, his legs have become uneven, which makes it difficult for him to walk and causes significant pain. PEX 17071 at 92. R.W. underwent surgery in August 2021 to address his hip pain. Dmg. Trial Tr. 1933:12–1934:25. During the surgery, doctors removed dead bone and placed a graft as well as a plate and screws. *Id.* at 2126:10–14. R.W.'s leg-length discrepancy is currently at five centimeters, and he will have to undergo a leg-lengthening procedure soon. *Id.* at 2141:1–16. Once he is an adult, he will have to have a total hip replacement. *Id.* at 2145:11–2147:3. R.W.'s genital injury has also affected his chances of having children naturally. Ward Dep. 38:5–14.

R.W.'s injuries have also impacted his social interaction and development. Because his left leg causes significant pain, he cannot run, jump, and play at full speed or force. *See* PEX 17071 at 57–58. Prior to the shooting, R.W. enjoyed playing sports such as football and baseball. Ward Dep. 37:2–10. However, it is unlikely that he will be able to participate in athletics again. *Id.* at 37:2–16.

R.W.'s injuries have also left significant scarring. He has two large, circular scars on both sides of his left arm near his elbow. PEX 17071 at 105. There is also indentation near his elbow from these scars. *Id.* There is a large scar on his abdomen from an exploratory surgery he underwent while at University Hospital. *Id.* at 106. Additionally, there is a scar where his ostomy bag was placed. *Id.* There are multiple scars on his left leg and buttocks. *Id.* As discussed, R.W.'s

171

legs are noticeably different lengths. Dmg. Trial Tr. 1935:11–20. R.W. also has retained bullet fragments in his body. *Id.* at 1943:17–1944:13; *see also* PEX 17021 at 4 (photograph referenced in testimony).

In addition to R.W.'s physical injuries, the emotional effects of the shooting have also been difficult for R.W. to manage. For a year after the shooting, he slept in the same room as his father because he would have frequent nightmares. Ward Dep. 44:13–21. R.W. still has trouble sleeping, as he sleepwalks, talks, and cries when he sleeps. Dmg. Trial Tr. 1948:8–13. R.W. was also fearful that he was going to lose his father, as he had lost his stepmother and sisters. *Id.* at 45:7–11. R.W. has a startle response to sirens. Dmg. Trial Tr. 1946:5–14. In one instance at school, first responders came to teach children about safety and had brought emergency vehicles with lights and sirens on. *Id.* at 1946:5–9. R.W. went to the counselor's office in a panic and was sent home. *Id.* at 1946:5–17. R.W. has also had emotional outbursts in school and is easily agitated, and "the older he's getting, the worse off it's getting." *Id.* at 1949:4–23. While in the hospital, R.W. received some psychological care and once he was discharged continued such care. *Id.* at 1957:20–22, 1959:18–1960:3. However, he has not spoken to a counselor recently. *Id.* at 1950:2–4.

For these reasons, the Court awards R.W.:

$2,000,000.00 for R.W.'s physical pain and mental anguish sustained in the past.

$2,000,000.00 for R.W.'s physical pain and mental anguish that, in reasonable probability, he will sustain in the future.

$500,000.00 for R.W.'s disfigurement sustained in the past.

$500,000.00 for R.W.'s disfigurement that, in reasonable probability, he will sustain in the future.

$750,000.00 for R.W.'s physical impairment sustained in the past.

$500,000.00 for R.W.'s physical impairment that, in reasonable probability, he will sustain in the future.

$0 for R.W.'s loss of earning capacity sustained in the past.

$0 for R.W.'s loss of earning capacity that, in reasonable probability, will be sustained in the future from the time of trial until R.W. reaches the age of eighteen years.

$2,212,639.00 for R.W.'s loss of earning capacity that, in reasonably probability, will be sustained in the future after R.W. reaches the age of eighteen years.[78]

$274,249.76 for R.W.'s medical care expenses incurred in the past.[79]

$275,752.67 for R.W.'s medical care expenses that, in reasonable probability, will be incurred on behalf of R.W. in the future from the time of trial until R.W. reaches the age of eighteen years.[80]

$2,046,577.64 for R.W.'s medical care expenses that, in reasonable probability, he will incur after he reaches the age of eighteen years.[81]

---

[78]    Dr. Lundstrom opines that the average net lifetime earnings of a male with a bachelor's degree is $3,404,060.00. GEX 648 at 30. This award reflects that R.W. has sustained at least a 65% loss of such earning capacity.

[79]    Plaintiffs and the Government stipulate this amount reflects R.W.'s past medical expenses. ECF No. 576 at 9.

[80]    This amount was calculated based on Plaintiffs' life care plan for R.W. *See* PEX 17075. This award has been adjusted to reflect average generic drug pricing for all medications where available. *See id.* at 32–35.

[81]    This amount was calculated based on Plaintiffs' life care plan for R.W. *See* PEX 17075. This award has been adjusted to reflect a $22 per hour rate for attendant care, removed RN supervision for attendant care, removed

## 2. *Chancie McMahan – 26 years old*

Chancie seeks derivative recovery for loss of services due to R.W.'s injuries. R.W.'s physical limitations, described above, have limited his capability to assist his mother in everyday tasks he would ordinarily be expected to perform, such as cleaning around the home or yardwork. *See* Dmg. Trial Tr. 2159:23–2160:10. R.W. can only perform light tasks or sedentary activities. *Id.* at 2159:23–2160:10.

For these reasons, the Court awards Chancie McMahan:

$10,000.00 for Chancie McMahan's loss of services sustained in the past.

$10,000.00 for Chancie McMahan's loss of serves that, in reasonably probability, she will sustain in the future until R.W. is age eighteen.

## 3. *R.T. – 9 years old*

R.T. was attending church with her mother JoAnn, stepbrother R.W., and sisters Emily and Brooke on the day of the shooting. They all sat together, with JoAnn seated between R.T. and her siblings. R.T. Dep. 14:13–23. When the shooting began, R.T. and her family got down on the ground. *Id.* at 15:5–11. R.T. was hiding underneath a pew, while her mother and siblings were between the rows of pews. *Id.* at 15:16–16:8. A woman nearby reached out to hold R.T.'s hand, but the woman's arm was "shot off" before she could reach R.T. *Id.* at 17:4–13. Gunny Macias was to R.T.'s right, and the two sang "Jesus Loves Me" together. *Id.* at 16:18–17:3. When R.T. looked back at her family, she watched her mother try to make a phone call before she died. *Id.* at 18:2–13. Brooke's face was "blown up." *Id.* at 20:13–15. R.T. heard R.W.

---

costs for psychotropic medication, and average generic drug pricing for all medications where available. *See id.* at 32–35, 57, 62; Dmg. Trial Tr. 3624:2–6.

continually cry out for JoAnn, but she did not respond. *Id.* at 19:6–15. Smoke and blood were "everywhere," and R.T. was covered in others' blood. *Id.* at 20:24–25:7. Though she escaped mostly unscathed, R.T. still has scars on her arm and leg from being burned by gunpowder in the church. *Id.* at 21:8–23.

R.T. had close relationships with her mother and siblings. JoAnn always made R.T. feel special. *Id.* at 8:14–22. R.T. described her mom as "the protector of the household." *Id.* at 7:7–8. JoAnn was a mother "who always made sure [her children] were okay, safe, made sure [her children] were always doing what [they] loved and just made sure [her children] were okay." *Id.* at 7:21–23. As a family, they enjoyed taking trips to Corpus Christi during the summer. *Id.* at 9:22–10:2. JoAnn passed on her love of animals to her children, including R.T. They fostered dogs, and they raised chickens, ducks, and geese. *Id.* at 8:3–10. JoAnn and R.T. also shared a love of legal dramas, and when R.T. decided that she wanted to become a lawyer, JoAnn encouraged her to follow her passion. *Id.* at 34:2–16. Birthdays were "a big deal," and JoAnn would always plan outings for the family to celebrate. *Id.* at 11:7–12. One of their favorite things to do together was attend church. *Id.* at 11:18–12:1.

R.T. now lives with her aunt, Mandi Lookingbill, and though she feels loved and supported, "[i]t's not the same." *Id.* at 27:25–28:14. R.T. visits her mother and sisters' gravesites because "[s]he wants everybody to know that they have people here that love them and take care of them." Mandi Lookingbill Dep. 22:3–9. She writes notes and poems for her mother and sisters. *Id.* at 22:10–14. During a trip to Corpus Christi, R.T. brought back jars full of sand and seashells to place in front of their headstones. *Id.* at 22:17–23. She feels as though she is forgetting her family, and she memorializes them by wearing a bracelet with their pictures and keeping their clothing. R.T. Dep. 30:7–31:19.

Prior to shooting, R.T. was outgoing and had many friends. Mandi Lookingbill Dep. 23:25–24:3. Now, "[s]he doesn't feel like she has friends." *Id.* at 24:4–7. R.T. "keeps her distance" from others and is "scared to get close to people." *Id.* at 55:17–56:8. R.T. often cries through the night and has nightmares about the shooting. *Id.* at 29:15–22, 48:22–49:8. When she has nightmares, "she gets so worked up and so scared, she literally wants to throw up." *Id.* at 56:14–20. Sometimes, R.T. "shuts down," and "wants to be left alone." *Id.* at 29:2–14. R.T. attends church less because she feels anxious in church. PEX 17123 at 2.  She also suffers panic attacks while she is at school, sometimes multiple times a week. *Id.* at 5. Mandi is concerned about R.T.'s future: "I feel like she is going to have trust issues, anger issues, anxiety." Mandi Lookingbill Dep. 34:10–25.

For these reasons, the Court awards R.T.:

$1,000,000.00 for R.T.'s mental anguish sustained in the past.

$500,000.00 for R.T.'s mental anguish that, in reasonable probability, she will sustain in the future.

$10,000.00 for R.T.'s disfigurement sustained in the past.

$10,000.00 for R.T.'s disfigurement that, in reasonable probability, she will sustain in the future.

$0 for R.T.'s medical care expenses incurred in the past.

$3,891.96 for R.T.'s medical care expenses that, in reasonable probability, will be incurred on behalf of R.T. in the future from the time of trial until R.T. reaches the age of eighteen years.[82]

$15,284.04 for R.T.'s medical care expenses that, in reasonable probability, she will incur after she reaches the age of eighteen years.[83]

$250,000.00 for R.T.'s mental anguish sustained in the past for the death of her mother, JoAnn Ward.

$250,000.00 for R.T.'s mental anguish that, in reasonable probability, she will sustain in the future for the death of her mother, JoAnn Ward.

$250,000.00 for R.T.'s loss of companionship and society sustained in the past for the death of her mother, JoAnn Ward.

$250,000.00 for R.T.'s loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her mother, JoAnn Ward.

### 4. *Dalia Lookingbill – 60 years old*

The morning of the shooting, Dalia received a phone call from her one of her daughters, who told her that JoAnn had been shot. Dalia Lookingbill Dep. 20:6–13. She and her husband went to University Hospital to try and find her daughter and grandchildren. *Id.* at 20:16–21. When she arrived, doctors informed Dalia that her granddaughter, Emily, was not going to survive. *Id.* at 20:25–21:6. Dalia was crying and "in shock." Mandi Lookingbill Dep. 14:25–

---

[82]     This amount was calculated based on Plaintiffs' proposed life care plan for R.T. *See* PEX 17125. The amount was adjusted to reflect the two years passed between the original life care plan and trial date.

[83]     This amount was calculated based on Plaintiffs' proposed life care plan for R.T. *See* PEX 17125. The amount was adjusted to remove costs associated with psychotropic medications. *See id.* at 33; Dmg. Trial Tr. 3392:3–3393:5.

15:3. After Emily's passing, Dalia continued to wait at the hospital for news of JoAnn and Brooke. *Id.* at 15:22–25. Once they learned that they were not at the hospital, Dalia's son, Paul, drove back to Sutherland Springs. *Id.* at 15:25–16:2. Paul identified JoAnn's tattoos, and the family received confirmation that JoAnn and Brooke had died in the church. *Id.* at 16:1–10.

Dalia had a strong bond with JoAnn. JoAnn was the youngest of Dalia's nine children. Mandi Lookingbill Dep. 6:5–13. Before JoAnn married Christopher, JoAnn and her daughters lived with Dalia. *Id.* at 21:16–22:2. JoAnn called Dalia every day, often multiple times per day. PEX 17137 at 2. Since JoAnn's death, Dalia feels as though a part of her is missing. *Id.* Every holiday, Dalia decorates JoAnn's gravesite. Dalia Lookingbill Dep. 29:14–20.

For months after the shooting, Dalia would isolate herself in her room and cry because there is "nothing [she] can do to get [JoAnn] back." *Id.* at 29:6–9. She struggled to sleep in the months following the shooting. *Id.* at 49:18–51:5. Dalia's daughter, Mandi, stated that Dalia "is here physically, but mentally she is not here anymore." Mandi Lookingbill Dep. 35:5–14. Both Dr. Feltoon and Dr. Marx diagnosed Dalia with major depressive disorder as a result of JoAnn's death. PEX 17137 at 5; GEX 641 at 8. Dalia continues to grieve the loss of her daughter: "Our babies are supposed to bury us, not us them." PEX 17137 at 2.

For these reasons, the Court awards Dalia Lookingbill:

$250,000.00 for Dalia Lookingbill's mental anguish sustained in the past for the death of her daughter, JoAnn Ward.

$250,000.00 for Dalia Lookingbill's mental anguish that, in reasonable probability, she will sustain in the future for the death of her daughter, JoAnn Ward.

$100,000.00 for Dalia Lookingbill's loss of companionship and society sustained in the past for the death of her daughter, JoAnn Ward.

$100,000.00 for Dalia Lookingbill's loss of companionship and society that, in reasonable probability, she will sustain in the future for the death of her daughter, JoAnn Ward.

$1,024.61 for Dalia Lookingbill's pecuniary loss sustained in the past for the death of her daughter, JoAnn Ward.[84]

$11,561.76 for Dalia Lookingbill's pecuniary loss that, in reasonable probability, she will sustain in the future for the death of her daughter, JoAnn Ward.[85]

5. *Christopher "Chris" Ward – 33 years old*

Chris did not attend church with JoAnn and his children on the day of the shooting because he had worked a graveyard shift the night before. Ward Dep. 13:13–14:13. While Chris was eating breakfast at home, his brother arrived and told Chris that someone was shooting at the church. *Id.* at 15:8–15. Chris drove to the church and arrived before most first responders. *Id.* at 16:3–21. He saw his son, R.W., outside the church with Rusty Duncan. *Id.* at 16:22–25. Rusty was attempting to stop R.W.'s bleeding, and instructed Chris to put pressure on R.W.'s wounds. *Id.* at 17:1–15. As he waited for an ambulance, Chris heard those inside the church crying for help. *Id.* at 17:17–19. When the first ambulance arrived, Chris loaded R.W. inside and then ran towards the church. *Id.* at 17:20–25. Chris saw his stepdaughter, R.T., standing outside crying. *Id.* at 19:2–15. He comforted her, and then went inside to try and find JoAnn, Brooke, and

---

[84]     Plaintiffs and the Government stipulate that this amount reflects Dalia Lookingbill's past medical expenses. ECF No. 576 at 10.
[85]      The Government stipulates that this amount reflects Dalia Lookingbill's future medical expenses. ECF No. 576 at 10.

Emily. *Id.* at 19:1–17. Chris walked halfway through the church and saw "bodies everywhere. Kids. Pews knocked over, and—all this blood." *Id.* at 19:18–23. He searched for his family and was eventually told that they had already been taken out of the church. *Id.* at 20:9–19. Chris later learned that JoAnn and Brooke never left the church. *Id.* at 21:5–6. Because of their injuries, their bodies were unrecognizable to Chris. *Id.* at 21:7–11.

Chris and JoAnn had a caring and loving marriage. *Id.* at 11:1. Prior to their marriage, JoAnn had given birth to Emily and R.T. from previous relationships, and Chris had R.W. Together, they formed a blended family and soon after had a child together, Brooke. *Id.* at 9:1–8. Chris testified: "It was never just me and her. It was always the kids. We had fun. Just a lot of good times." *Id.* at 10:8–12. On Chris's days off, he, JoAnn, and the children often enjoyed fishing together and would "spend all kinds of time together." *Id.* at 11:10–14. Chris and JoAnn planned to have another child together. *Id.* at 10:15–18. The two were committed to one another and loved each other; JoAnn was Chris's "other half." *Id.* at 10:19–23, 11:15–18.

Brooke was "daddy's little girl," and was "happy and outgoing . . . always wanted to make people smile." GEX 635 at 2–3. Chris called Brooke "Boogie," and he enjoyed watching TV with her when he got home from work. Ward Dep. 26:13–20. Chris loved to carry Brooke and hold her in his lap. *Id.* at 26:21–27:7.

Chris has suffered a great deal since the shooting. The loss of JoAnn, Brooke, and Emily has left him depressed and anxious. *Id.* at 48:15–25. After the shooting, Chris began self-medicating with alcohol. *Id.* at 43:12–15. He struggled to maintain employment and relationships with his friends. *Id.* at 41:12–42:6; PEX 17096 at 5; GEX 635 at 12. In 2020, Chris was hospitalized for severe depression, active suicidal ideation with a plan to shoot himself, and alcohol-use disorder. GEX 635 at 4. After his hospitalization, he was placed on a treatment plan

that included psychotherapy and medication. *Id.* Though his treatment is ongoing, Chris still has severe sleep disturbance and experiences intrusive memories about the shooting. *Id.* at 7–9. Chris continues to experience survivor's guilt: "I should have been there with them. . . . I could have helped them maybe." Ward Dep. 48:8–11.

For these reasons, the Court awards Christopher Ward:

$500,000.00 for Christopher Ward's mental anguish sustained in the past for the death of his wife, JoAnn Ward.

$250,000.00 for Christopher Ward's mental anguish that, in reasonable probability, he will sustain in the future for the death of his wife, JoAnn Ward.

$250,000.00 for Christopher Ward's loss of companionship and society sustained in the past for the death of his wife, JoAnn Ward.

$250,000.00 for Christopher Ward's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his wife, JoAnn Ward.

$500,000.00 for Christopher Ward's mental anguish sustained in the past for the death of his daughter, Brooke Ward.

$250,000.00 for Christopher Ward's mental anguish that, in reasonable probability, he will sustain in the future for the death of his daughter, Brooke Ward.

$50,000.00 for Christopher Ward's loss of companionship and society sustained in the past for the death of his daughter, Brooke Ward.

$50,000.00 for Christopher Ward's loss of companionship and society that, in reasonable probability, he will sustain in the future for the death of his daughter, Brooke Ward.

6.  *The Estate of JoAnn Ward – 30 years old*

JoAnn sustained seven gunshot wounds. PEX 1056. She was shot in the head, chest, and abdomen. *Id.* JoAnn also suffered additional lacerations and bruising on her face, chin, trunk, and right arm. *Id.* During the shooting, JoAnn tried to shield Brooke, Emily, and R.W. by laying on top of them. R.T. Dep. 22:13–19. All of her gunshot wounds were sustained as she laid face down on the floor of the church, as every entrance wound was to her backside. *See* PEX 1058 at 10. Before she died, JoAnn was attempting to make a phone call, likely for help. R.T. Dep. 18:5– 13. When her husband, Chris, entered the church to try and locate her, her body was mangled beyond recognition. Ward Dep. 21:7–11. Her body was ultimately identified through tattoo comparisons. Mandi Lookingbill Dep. 16:2–4. JoAnn experienced physical pain from the gunshot wounds she likely sustained prior to her death, and experienced mental pain and suffering from witnessing the shooting.

For these reasons, the Court awards the Estate of JoAnn Ward:

$5,000,000.00 for JoAnn Ward's pain and mental anguish.

7.  *The Estate of Brooke Ward – 5 years old*

Brooke sustained four gunshot wounds. PEX 1028. Brooke was shot in the head, face, hip and back. *Id.* After the shooting began, Brooke's mother, JoAnn, tried to shield her from the gunfire. R.T. Dep. 22:13–19. When the shooting stopped, Julie Workman found Brooke "laying face down. And the entire back of her head was blown off." Dmg. Trial Tr. 459:8–11. The gunshot wound to her left hip entered on the frontside of her body, which could not have been inflicted as Brooke laid face down. *See* PEX 1030 at 8. This indicates that she exhibited purposeful movement after being shot at least once. Therefore, Brooke experienced physical pain

182

from the gunshot wounds she sustained prior to her death, and experienced mental pain and suffering from witnessing the shooting.

For these reasons, the Court awards the Estate of Brooke Ward:

$5,000,000.00 for Brooke Ward's pain and mental anguish.

8. *The Estate of Emily Garcia – 7 years old*

Emily sustained five gunshot wounds. PEX 17119. Emily was shot in her left arm, left leg, left foot, and hip. *Id.* She sustained four gunshot wounds as Kelley fired from the outside of the church, and a gunshot wound to her hip after Kelley entered the church. *Id.* at 5–6. The gunshot wound to her hip caused "extensive hemorrhaging" in her pelvic tissues. *Id.* at 6. When first responders arrived, Emily was opening her eyes, and she was taken to University Hospital. *Id.* at 3. She underwent emergency surgery, but Emily died on the operating table. *Id.* Emily experienced physical pain from the gunshot wounds she sustained prior to her death, and experienced mental pain and suffering from witnessing the shooting and anxiety from physiologic changes of her body due to significant blood loss.

For these reasons, the Court awards the Estate of Emily Garcia:

$5,000,000.00 for Emily Garcia's pain and mental anguish.

$557.02 for Emily Garcia's medical expenses.[86]

**The Curnow Family**

Kathleen and Fred Curnow, at the time of the shooting, lived directly across the street from the church. *See* Fred Curnow Dep. 43:18–22. Three bullets struck their property: one near

---

[86]     Plaintiffs and the Government stipulate this amount reflects Emily Garcia's past medical expenses. ECF No. 576 at 2.

the front door of their house, one in the windshield of Kathleen's car, and the last in the quarter panel of Fred's truck. *Id.* at 55:23–58:22. At the time of Fred's deposition, the bullet hole remained in their home, and the windshield and truck had been repaired. *Id.* at 55:14–21.

For these reasons, the Court awards Fred and Kathleen Curnow:

$1,500.00 to restore Fred Curnow's property to the condition it was in immediately before the occurrence in question.[87]

$1,500.00 to restore Kathleen Curnow's property to the condition it was in immediately before the occurrence in question.[88]

## CONCLUSION

The Court **ORDERS** Plaintiffs to submit proposed final judgments in each individual case within 10 days of this order. The judgments should reflect the damage awards made in this order. With respect to economic damages, the Court has determined the appropriate present-value discount rate to be equivalent to a thirty-year Daily Treasury Yield curve rate of 2.23%.

The Government may file any objections to the proposed judgments within 10 days of their filing.

---

[87] Plaintiffs and the Government stipulate this amount reflects the property damage Fred Curnow sustained. ECF No. 576 at 11.

[88] Plaintiffs and the Government stipulate this amount reflects the property damage Kathleen Curnow sustained. ECF No. 576 at 11.

It is so **ORDERED**.

**SIGNED** this 7th day of February, 2022.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE