```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3
    JOE HOLCOMBE, ET AL,              .
 4                                    .
                    PLAINTIFFS,       .
 5          vs.                       . DOCKET NO. 5:18-CV-555-XR
                                      .
 6   UNITED STATES OF AMERICA,        .
                                      .
 7                  DEFENDANT.        .
                                      .
 8

 9
            TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
10           BEFORE THE HONORABLE XAVIER RODRIGUEZ
                UNITED STATES DISTRICT JUDGE
11                     JULY 30, 2021

12

13

14

15  APPEARANCES:
    FOR THE PLAINTIFFS:      JAMAL K. ALSAFFAR, ESQUIRE
16                           WHITEHURST HARKNESS BREES CHENG
                              ALSAFFAR HIGGINBOTHAM AND JACOB
17                           7500 RIALTO BOULEVARD, BUILDING TWO
                             SUITE 250
18                           AUSTIN TX 78735

19

20  FOR THE DEFENDANT:       JAMES EDWARD DINGIVAN, ESQUIRE
                             UNITED STATES ATTORNEY'S OFFICE
21                           601 NW LOOP 410, SUITE 600
                             SAN ANTONIO TX 78216
22

23
    REPORTED BY:             GIGI SIMCOX, RMR, CRR
24                           OFFICIAL COURT REPORTER
                             UNITED STATES DISTRICT COURT
25                           SAN ANTONIO, TEXAS
```

1       (San Antonio, Texas; July 30, 2021, via Zoom
2   videoconference.)
3           THE COURT:  Good morning.
4           Miss Fernandez, as you probably well know, the
5   building is experiencing connectivity issues again so I can't
6   get email messages from you.
7           Do we have everybody online?
8           THE DEPUTY CLERK:  Yes, Judge.
9           THE COURT:  And so I don't see Gigi.  Is she there?
10          THE DEPUTY CLERK:  She's online.
11          THE COURT:  Okay.  Thank you.
12          Let's go ahead and call 18 civil 555, the
13  consolidated matters as well, Holcombe versus United States.
14          Who do we have speaking primarily for the plaintiffs'
15  group?
16          MR. ALSAFFAR:  Morning, Your Honor, Jamal Alsaffar
17  for the plaintiffs?
18          THE COURT:  Thank you.
19          And for the government?
20          MR. DINGIVAN:  Good morning, Your Honor, James
21  Dingivan here on behalf of defendant.
22          THE COURT:  Thank you.  So I had asked for an
23  advisory from you-all about how we should proceed.  Thank you
24  for the advisory.  It wasn't as helpful as I was hoping.
25          From what I got from the plaintiffs' group is you-all

1  just want trial and let's set aside 30 days and just go at it

2  with no indication of just what the order should be.

3        The government was a little more helpful saying,

4  well, we ought to do this by family groups or something a

5  little more organized, but didn't suggest family groups to me.

6        So I'm not sure where we should begin.  I guess, let

7  me get an understanding of how you-all intend to try the

8  damage phases.

9        So from the government's — well, let me start with

10 the plaintiffs.  Is there going to be, again, a lead

11 plaintiffs' group for the damages phase, or are you going to

12 revert back to all the attorneys of record for the individual

13 cases, Mr. Alsaffar?

14        MR. ALSAFFAR:  Yeah.  Thank you, Your Honor.

15        You know, the plan is, because, I mean, we're

16 still — my firm is still going to be lead counsel and

17 obviously represent our clients in the damage phase and help

18 organize everything on the plaintiffs' side and perhaps help

19 on some others, but, yes, we, you know, we think it's best for

20 the individual attorneys who represent certain families and

21 have those relationships to present those witnesses that we

22 ultimately decide on presenting live.

23        So that's the intention, Your Honor.

24        THE COURT:  Okay.  And then the government's defense

25 team, is it going to be the DOJ lawyers, or is it going to be

1   the U.S. Attorney's Office here in San Antonio?

2           MR. DINGIVAN:  Your Honor, it's going to be a little

3   bit of a mix of both.  It would be — the U.S. Attorney's

4   Office has been primarily responsible for the damages phase,

5   although the intent at this point is to have Ms. Krieger come

6   down and join us once again.

7           THE COURT:  Okay.  So that helps a little bit.

8           The other thing we need to figure out here is as we

9   go forward, well, how many people may be in a room, because

10  regrettably as of yesterday we've gone back into masking

11  requirements.

12          The Court has decided to — our hope was by

13  September 1 we thought we would get back to some measure of

14  normalcy.  That's not going to be happening.  We are going to

15  continue our use of three courtrooms for a single trial in

16  both — for both criminal and civil matters.

17          And so when we do have time to try your cases, it

18  will have to be in one courtroom and we're going to have to

19  worry about the number of people who might be in there, which

20  is another reason I was curious about how the plaintiffs'

21  groups were going to try this matter.

22          So let's figure out the order in light of all of

23  that.  I took, and my office took, a stab at doing a chart of

24  family groups and I'm going to do this slow because I'm going

25  to read out numbers.

1          But it seemed to me that for the first several trials

2    we ought to be looking at either 18 civil 555, 19 civil 972,

3    20-368, and 20-1318.  That's 18-555, 19-972, 20-368, and

4    20-1318.  That's Joe Holcombe, Claryce Holcombe, Scott, John

5    Porter, and then EGH and PJH.  There was other family members

6    in there but I believe their claims have been dismissed, but I

7    might be wrong about that.  But that seemed to be one family

8    grouping that made sense.

9          The other family grouping that perhaps made sense was

10   19-953, 19-705, 19-506, 19-1481, and 19-1301.  These are all

11   19, 2019 cases.  953, 705, 506, 1481, and 1301.  That's Kip

12   and Julie Workman, Colbey, Kris, Kyle, Morgan Harris and Eevee

13   Workman.  That seemed to be the next logical grouping.

14         Let me stop there.  With that, let me hear from the

15   plaintiffs' group.  Does that kind of ordering make sense or

16   not, or are you proposing something different?  And I know

17   there was an issue about regrettably elderly plaintiffs

18   passing away before we could complete this.

19         In light of that concern, does this suggestion make

20   sense, Mr. Alsaffar?

21         MR. ALSAFFAR:  Thank you, Your Honor.

22         And the reason why we have concerns about breaking up

23   the trial into, I guess minitrials with different collective

24   families, is I actually think that will increase the time it

25   takes to do it and increase all the costs as well

1  unnecessarily.

2          And here's why, Your Honor, is we worked very hard on

3  the plaintiffs' side and I believe on the defendant's side as

4  well months ago or more than months ago when we designated our

5  trial experts and our damage experts.

6          And what I mean by that, Your Honor, is we tried very

7  hard to group as many of the plaintiffs, regardless of the

8  relationships with each other, through the same experts.

9          So for example, in your two carved-out families that

10  you just listed for us, that would require us to call the same

11  experts multiple times every time the different one is set up.

12  And that's true for a collection of three or four experts.

13          And that's also true for the defendant.  That would

14  increase their costs as well because they have tried to follow

15  the same model we did in making it more economical through the

16  damages side of the case.

17          So that's what will be happening, and that's why, you

18  know, while we appreciated the suggestion of the government we

19  saw that as a real issue, that we actually think is going to

20  increase the time to do this, as well as the costs.

21          You know, and to answer your original question, what

22  is our plan initially, unlike in the liability phase we —

23  both sides have come to an agreement, subject to the Court's

24  approval of course, that, you know, we ought to put time

25  aggregate, not individual witness time, sort of aggregate time

1   elements on each side, and that would help us really focus on

2   how to get through the trial.

3          And based on some agreements that actually we have

4   gotten into in the last week, we're really narrowing down both

5   the plaintiffs, the live plaintiffs and the expert witnesses

6   that we need to call.  And I think that if we have those

7   aggregate time limits put on it, based on the model, I mean,

8   about a month trial, then I think we can accomplish that.

9          You know, part of this too Your Honor is we don't —

10          THE COURT:  Let me stop up here, just to make sure I

11   understand what you are saying.  So then what you are

12   proposing is continuing the consolidated matter but do you

13   envision an ordering of plaintiffs, and if so what would be

14   that order?

15          MR. ALSAFFAR:  So, yes, Your Honor, of course, we're

16   envisioning a consolidated matter.  This case has been

17   consolidated and we've been able to work within those

18   constraints and we think so we can do so here.

19          Secondarily, in terms of the order of the plaintiffs,

20   you know, our view of how those cases should be presented is

21   that we should start with the people that, you know, the

22   people that were in the church.

23          It's going to be very important for you as the finder

24   of fact, Your Honor, to understand for determining damages and

25   certain elements certainly of the damages what was happening

1  and what the people were going through.

2         So it makes sense to start with the folks in the

3  church.  And obviously, Your Honor, there are a lot of

4  different families from different cases that were there at the

5  time.

6         And then transition to making sure we present the

7  evidence of the estate claims, the folks that died, so that

8  you can hear that testimony.

9         And then moving on to the serious injured and the

10  others that were injured in the trial.

11         So it's a very orderly way of presenting the evidence

12  so that you get the story as it happened and it makes more

13  sense from the damages perspective in terms of understanding

14  the elements, but with that, you know, obviously we have a lot

15  of families who are going to be mixed into those groups,

16  right?

17         So you're going to have some of the Holcombe family.

18  You're going to have some of the Workmans, and the Wards, and

19  the Vidals that would be the folks in the church that could

20  tell you what happened.  And the same with the other elements

21  as well.

22         So in terms of going through the trial, it makes more

23  sense to do it that way.  And then, you know, it will be

24  incumbent on us to make sure that we organize and have all

25  those witnesses ready, which I don't think will be an issue

1  for us.

2         And then the second point, Your Honor, and I want to

3  make sure it's clear because I know it can seem a little

4  confusing.  Along those sames lines, if we did, just so you

5  understand what I was talking about in terms of the experts,

6  so for, you know, the life care plan experts, the economists,

7  and the neurologists, et cetera, that are talking about

8  damages for those that survived and suffered injuries, you

9  know, a life care planner for the plaintiff who saw someone in

10  the Holcombe family and someone in the Workman family and

11  someone in the Vidal family and the Brown family, et cetera,

12  that one witness would then have to be called on four or five,

13  six different times as an expert witness.

14         That doesn't seem to make as much sense as working

15  towards a plan, which Mr. Dingivan and I are getting closer

16  and closer to, where we can just make a select — a selection

17  of which plaintiffs for those experts make the most sense for

18  you to hear live and get through those.

19         But it makes it a little harder if we have to say,

20  okay, Mrs. Expert, you have to be available both on this week,

21  and then you have to be available the second or third day of

22  that week, and then two weeks from then as well, et cetera, if

23  we are doing the minitrial multiple—trial approach.

24         THE COURT:  Mr. Dingivan, your thoughts?

25         MR. DINGIVAN:  Yes, Your Honor.

1      The reason I originally proposed a minitrial was
2  along the lines I think of what you thought was that in
3  reality when you look at these plaintiffs as a whole, they
4  sort of break down neatly into family groups that are
5  generally represented by a single sort of attorney.

6      I can supplement to the Court the breakdown I had.  I
7  had it down to five sort of minitrials, each with, you know,
8  the Holcombe family as represented generally speaking by Miss
9  Strahan as their primary attorney; the Workman family with
10 Mr. Reynolds; the Braden family with Mr. Demerath.

11      So it does break down nicely.  And moreover, though,
12 Mr. Alsaffar raises a good point, that these experts would
13 have to come multiple weeks.  Each sort of family group,
14 generally speaking, is represented by a single lead counsel,
15 and therefore has the same expert.  You know, the same life
16 care planner saw basically all the Holcombes.  The same
17 psychologist saw basically all the Holcombes.

18      So while we can definitely come to agreement in the
19 future, Mr. Alsaffar and I, about where the targeted points of
20 disagreement are for each minitrial, I don't think that
21 conducting this in a minitrial would substantially increase
22 the time involved.

23      You know, I recognize his concern about bringing
24 people back and forth and back and forth, even though it's not
25 even clear at this point, given the pandemic situation, that

1 | people are going to be traveling.  Most of their experts are
2 | local.  Ours are the ones, generally speaking, who are not
3 | local and, you know, we're willing to travel back and forth as
4 | need be.
5 |         And also, since it's all one trial, though, it would
6 | be broken up into different phases.  I think, you know, there
7 | is a reasonable possibility that we could have each expert
8 | sort of discuss general methodology once, and then have them
9 | come back and talk about individual plaintiffs as necessary,
10 | you know, over the course of various other sort of subsequent
11 | minitrials.
12 |         So I thought logistically, you know, this was
13 | honestly before, Your Honor, that I was aware that Mr.
14 | Alsaffar even had one month in mind.  I, frankly, was
15 | surprised that was — his estimate was that low.  I was
16 | expecting six to eight weeks total, so I thought the
17 | minitrials, breaking them out, sort of could keep all of our
18 | sanity over, you know, five two-week minitrials, as opposed to
19 | one ten-week megatrial.
20 |         That was the thought process behind my original
21 | proposal and I do think it works out well.  I think we can
22 | still make this as economic and judicious as possible, even if
23 | we were to go through the minitrial model.
24 |         THE COURT:  So thank you.  So it appeared that
25 | Mr. Alsaffar was leading me to believe you-all had reached

1  some kind of an agreement actually, but, no, that's not the

2  case.

3           MR. DINGIVAN:  No, Your Honor, not to the specific

4  framework of the deal.  We are — or the specific framework of

5  the trial.

6           We are reaching agreements, though, within that

7  framework.  So whatever framework the Court decides, we will

8  ultimately be able to, I think, reach a series of agreements

9  about what evidence is going to be admitted without objection,

10  what stipulations are available to damages for certain

11  plaintiffs.

12           You know, we obviously had our own life care planners

13  and our own economists examining these files.  And I can tell

14  you, Your Honor, their answers obviously aren't zero.  So

15  we'll be able to stipulate in many instances to certain

16  damages categories.

17           You know, and in alternatives to live testimony as

18  well.  I think we'll be getting there as well so we can

19  present testimony by a deposition in place of live testimony.

20           I think, regardless of what format the Court ends up

21  deciding, there are still going to be stipulations that we can

22  agree to, to streamline this case.

23           THE COURT:  So Mr. Alsaffar, the difficulty I'm

24  having with your proposal, and why I'm sort of leaning with

25  the government proposal, is, one, in light of the continuing

1   COVID issue, I can't very well infringe on my colleague's

2   cases by taking up one of the courtrooms that will be

3   necessary for the courtroom sharing plan that we've developed

4   and put it out of operation for four to six weeks and just

5   keep holding up my colleagues.

6           So that would be unfair to the other litigants, you

7   know, that have cases here that want a trial.  So that's one

8   difficulty I'm having.

9           The second difficulty is, as I think about what the

10  appropriate amount of damages should be, it just — trying

11  everybody rather than family units, at least in family units I

12  can get a better understanding especially when it comes to the

13  mental anguish claims of just what might be appropriate under

14  certain circumstances.

15          Lumping everybody in one huge megatrial, I think is

16  going to make that job a whole lot harder on me about what is

17  the appropriate amount of mental anguish rather than leaning

18  towards just kind of a formal application of, okay, you're a

19  bystander, you get this.

20          Your response.

21          MR. ALSAFFAR:  And Your Honor, we certainly share

22  your concerns with this unique situation.  Part of this is

23  trying to figure out how much time we'll actually have to do

24  it.

25          But let me address your main concern about sort of

1  understanding each family's damages.  And I think that that's
2  just incumbent on us with understanding what your concerns are
3  to then present the trial in that way.
4        We can do that without having to — what my
5  understanding of the government's proposition is, having
6  minitrials that are essentially we're going to be spreading
7  these out over many months and well into the next maybe sounds
8  like well into the next year, versus if we have this set on a
9  consecutive format, I think it will, based on our
10  conversations that we've had so far, as of today, or
11  yesterday, you know, we were able to knock off 14 experts that
12  don't need to be called, and so that's progress because the
13  reports are going to be admitted and there's a lot of
14  agreement on those.
15        And so we're getting now to a point where we're also
16  getting agreements on what plaintiffs can be presented by
17  deposition and which ones are live.  So we're starting to
18  really crunch those numbers.
19        And with that happening and knowing that listening,
20  it would be beneficial for you to hear the evidence in a
21  certain way, meaning more family groups, then we can present
22  it that way without having large gaps going well into the next
23  year and then having to call the same expert multiple times,
24  which, to me, seems contrary to the point of having all the
25  reports entered, if, you know, the whole point of that is to

1    make that more efficient.

2            So Your Honor, if it would be beneficial to you,

3    which is important for us to know, to have certain family

4    groups presented together to make it easier for you to do your

5    allocation, we can do that without the need to then take weeks

6    or however breaks, if we have a time that both parties agree

7    should be imposed on it, then we can figure out, okay, for

8    this family, this is how much time we need, and we'll present

9    those.

10           And then we'll move to the next one and then present

11   it that way.  So it will be easier for you to allocate.

12           And we can do that without needing to break up trial

13   dates or move to different courtrooms or any of that, as long

14   as we know that's the preference that the Court prefers and we

15   can do that without having to take, say, six months or so, or

16   however long it will take to do these broken up trials.

17           THE COURT:  So let me ask the question this way.  Are

18   the plaintiffs' groups all now ready for damage trials, or is

19   there still remaining discovery that needs to be completed?

20           MR. ALSAFFAR:  We're ready, Your Honor.

21           THE COURT:  And what about the government?

22           MR. DINGIVAN:  Your Honor, there's still one more

23   deposition that I'm aware of scheduled for August 27.  It is

24   an expert deposition.

25           So that's sort of a big, one big — within the scope

1  of this trial, everything is, you know, relative, but it is

2  one big issue that still remains out there.  That is one issue

3  related to one discrete family group.

4          And so that's, you know, again, that goes back to why

5  I think the minitrials would be successful is because you

6  could take care of these issues sort of, you know, in order of

7  their readiness.

8          But to answer Your Honor's direct question, is

9  there's a little bit of discovery left with that deposition

10  scheduled for August 27th, but I don't believe we have

11  anything else on the books at this moment.

12          MR. ALSAFFAR:  That's it, Your Honor.

13          And Mr. Dingivan is right.  It's just one.  And it

14  was long ago planned.  But there's no other.  I mean,

15  discovery is closed and we've gotten what we need to do, save

16  for that one that's already been set to get completed for one

17  individual, relates to one plaintiff I believe.

18          THE COURT:  So I mean, I can make arbitrary rulings,

19  or you-all can continue to try to work together.  You and

20  Mr. Dingivan seem to be cooperating here.

21          MR. ALSAFFAR:  We are.

22          THE COURT:  So in terms of just —— this is not an

23  order, but in terms of just broad guidance, I could try to do

24  this, all the damages plaintiffs in October, November, and the

25  first two weeks of December.

1          Within that time frame, I would like to group this as
2  much by families as possible so I can have a good sense of
3  what appropriate mental anguish has been suffered by family
4  groups, as opposed to me defaulting to some arbitrary
5  application of a formula.  So that would be my preference.
6          Within that October, November, first two weeks of
7  December framework, there would be breaks.  One, I need from
8  you-all sort of a proposal of dates of when you see logical
9  stopping and starting points, but I'm going to have to consult
10 with my colleagues' calendars to figure out how this might
11 impact that master calendar that we have going on here.
12          And so that's the broad guidance that I'm giving you
13 right now.  Do you need more guidance?
14          Mr. Alsaffar.
15          MR. ALSAFFAR:  Your Honor, if I could, and I think
16 what we're trying to get a sense of is, honestly, your
17 calendar.  That will be very helpful.
18          So when you say that you have October, November, and
19 the first two weeks of December, if we understood a little
20 more, and I know this may not be our right to ask, but if we
21 could understand a little more about what that time — is it
22 one week in October?  Is it the whole month of October?  Is it
23 three weeks, et cetera?  And then November, for the same.
24          And if we were given broad, okay, here's the time
25 you're going to have available to get this done, guys, figure

1  it out, figure out how you're going to do that, I think

2  actually that would be very, very helpful.

3       We're a little bit in working in a vacuum because we

4  just don't know how much time Your Honor has and I know you

5  don't have a lot.

6       THE COURT:  Right.

7       MR. ALSAFFAR:  So we're trying to be cognizant of

8  that.

9       So if we knew, listen, October is going to be two

10  weeks, and then we have to have a break, and then there would

11  be two or three, or however long in November, then I think we

12  could say, okay, we know how many hours in a day, how many

13  real trial hours.

14       You know, we've already been with Your Honor and I

15  felt like the liability phase was handled very efficiently and

16  hit targets much shorter than some expected, and that we do

17  the same on the damages phase, if we knew what the parameters

18  were, because we know how many hours a day we're probably

19  likely going to get of real trial time, if it mirrors what

20  happened with the liability phase, and we can actually sit

21  down with pen and paper and say, okay, well, if we have X

22  number of witnesses, and five to six hours a day, and five

23  days a week, okay, Mr. Dingivan and I have to sit down and go,

24  all right, here's what we are going to do, we cannot put a

25  witness on for three or four hours, right?

1       We are going to have to actually allocate time
2  accordingly if we know what that time is.  That would be very
3  helpful, Your Honor.  I don't want to speak for the
4  government, but I think for our side I think that would be
5  helpful.
6       THE COURT:  So in terms of broad guidance right now,
7  I can tell you there is a whole bunch of stuff on the calendar
8  I will have to move around, but I will.  October 4th is
9  available, the week of.  The week of October 11 is available.
10      THE DEPUTY CLERK:  Judge, I'm sorry to interrupt, but
11 there's a one-day bench trial scheduled for October 12th.
12      THE COURT:  Yeah, I know, I saw that.  I might have
13 to get some other judge to try to do that or something, but
14 I'm trying to make this work.  But thank you for that.
15      Do let me know if I'm messing up again though here.
16      Then again, a whole bunch of stuff would need to be
17 moved around but I could make my calendar work for November,
18 the week of November 1, as well as the week of November 8th,
19 but that Thursday is a federal holiday and so the building
20 will be closed but that week is good.
21      And then it would have to be partial weeks in
22 November, the 15th and 16th are good dates, and the 22nd and
23 23rd would be good dates.  The week of the 29th is very good
24 right now.
25      The week of December 6th is good.  I could do the

1  first three days of December 13th, 14th, and 15, but after
2  that we are moving the courthouse to the new courthouse
3  facility, and so this place and the other place will be a
4  shambles for the rest of December.
5           So that's what that's looking like.  And then the
6  week of January 3rd in the new courthouse facility is good as
7  well.  Frankly, all of January 2022 is good for the exception
8  of January 13th and 14th.
9           MR. ALSAFFAR:  Your Honor, I think with the
10  guidance — Thank you, Your Honor, that's helpful, and I think
11  with that guidance we ought to be able to get this done before
12  you move to the new — I guess it would be a temporary
13  facility in the new facility.  What I'm saying is before
14  December is over.
15           THE COURT:  Yeah.  Literally there will be movers
16  that 14th, 15th, and so...
17           MR. ALSAFFAR:  Well, I think our goal should be to
18  try to get it done before then and I think with that guidance
19  we ought to be able to.
20           THE COURT:  Now, so as you start planning for that,
21  though, recall that I still have to visit with my other
22  colleagues to see what kind of impact me using a courtroom
23  will be having on the rest of the operations that they may
24  have.
25           We were sincerely hoping for September 1 to resume

1 | normal operations.  That doesn't look like it's going to
2 | happen and I have no idea what's going to happen for October
3 | and November, and so that's beyond all of us.
4 |       Now, some miscellaneous questions that's coming up
5 | here.
6 |       19-1291, Donna White.  Are there any claims or cases
7 | that can be severed or dismissed on that case?  And if you
8 | can't answer now, you can just give me an advisory.
9 |       But I'm not sure about the claims of Patsy McCain,
10 | Guadalupe Rodriguez, and Jose Rodriguez.  Do they need to be
11 | severed and dismissed, or what's going on there?
12 |       MR. ALSAFFAR:  Yes, Your Honor.  I believe those are
13 | the cases that we identified that were subject to dismissal
14 | because of their passings.  If you don't mind, let me consult
15 | with the individual lawyers who represent those families on
16 | that, but I think it's right to point those out and to have
17 | those dealt with.  I can provide an advisory to you within two
18 | days, if that's okay, Your Honor.
19 |       THE COURT:  That's fine.
20 |       Okay.  Before we conclude here, anything else that
21 | you think we need to take up at this time, Mr. Alsaffar?
22 |       MR. ALSAFFAR:  Just checking my notes, Your Honor, on
23 | the joint status.  No, Your Honor.  I think we're okay for the
24 | plaintiffs.  Thank you, again.
25 |       THE COURT:  Mr. Dingivan.

1          MR. DINGIVAN:  Yes, Your Honor, just one quick

2    question.

3          I'm hoping, do you have any envision or any idea of

4    sort of how long you envision these familial trials so that we

5    know sort of how to break them up most appropriately?  You

6    know, is it your idea that we come up with this on our own, or

7    if, you know, do you have in your mind, well, October 4th and

8    11, let's get one whole one done then, or two, or do you have

9    any idea at this point, Your Honor?

10          THE COURT:  Well, I was hoping the two of you would

11    come to some kind of an agreement.  I mean, I have

12    arbitrarily, and my staff has arbitrarily designed a family

13    tree chart.  I can impose that on you-all.  I don't think

14    that's the best way to handle this.

15          MR. DINGIVAN:  I think Mr. Alsaffar and I can come to

16    that agreement.  We'll make it work.

17          MR. ALSAFFAR:  Yeah, Your Honor.  And I will tell

18    you — I'm sorry, Your Honor, if I may.  I didn't mean to

19    interrupt you.

20          THE COURT:  Go ahead.

21          MR. ALSAFFAR:  I will tell you that Mr. Dingivan and

22    I are working very well together.  We've known each other for

23    some time and we have worked on this case a lot, and we are

24    almost every other day in contact trying to streamline things

25    and do what's making sense.

1            I think we can do that for you, especially with the

2    guidance that Your Honor provided us today.  It's very helpful

3    for us actually so that we can say, okay, we have a little bit

4    better idea, we have a calendar now.  That's going to help us

5    immensely, Your Honor.

6            And if you would like for us within a certain time to

7    follow-up with another update, I think that would be help —

8    we can do that and provide some clarity on what it's going to

9    actually look like.

10            THE COURT:  Yeah.  Now, to the extent you can

11   accommodate me, my daughter has a White Coat Ceremony at

12   Massachusetts General Hospital on October 28th.  I would sure

13   like to be there, which would take me out the 27th, 28th, and

14   29th.

15            MR. ALSAFFAR:  Congratulations.

16            MR. DINGIVAN:  We can make that work.

17            MR. ALSAFFAR:  We can make that work absolutely.

18            THE COURT:  Appreciate that.

19            So now, if for some reason your cooperation breaks

20   down, give me an advisory, let's say, in ten days about how

21   you intend to go forward.  If there's discrete issues that you

22   can't agree with and what resolution, point out to me each

23   party's perspective on the disagreement and then I'll

24   intervene at that point.

25            Now, just to give everybody a heads-up on what I'm

1  going to be doing, just for admin purposes, the Civil Justice

2  Reform Act, I call it the "bad boy list," that shows cases

3  more than three years old will hit me in September.

4         I'm going to administratively close all these cases,

5  and then when I get your advisory in ten days, I will reopen

6  and that will clear my list.  No one freak out that your case

7  is going to be dismissed.  This is just an admin procedure for

8  me to clear that list.

9         MR. ALSAFFAR:  Thank you for giving us — I think the

10  plaintiffs probably needed that notice more than anything, so

11  I appreciate the heads-up.

12         THE COURT:  Okay.  Last call, Mr. Alsaffar, anything?

13         MR. ALSAFFAR:  No, Your Honor.

14         THE COURT:  Mr. Dingivan?

15         MR. DINGIVAN:  No, Your Honor.

16         THE COURT:  Okay.  I'll look forward to your advisory

17  in ten days.

18         I want a staff meeting with my own staff, so if

19  everybody else can drop.

20         MR. ALSAFFAR:  Thank you, Your Honor.

21         MR. DINGIVAN:  Thank you, Your Honor.

22    *(Concludes proceedings)*

23

24

25

–o0o–

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.   I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.


Date:   07/18/22              /s/  *Gigi Simcox*
                             United States Court Reporter
                             262 West Nueve Street
                             San Antonio TX 78207
                             Telephone:   (210)244-5037