```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
 2                       SAN ANTONIO DIVISION

 3
     JOE HOLCOMBE, ET AL,                .
 4                                       .
                     PLAINTIFFS,         .
 5          vs.                          . DOCKET NO. 5:18-CV-555-XR
                                         .
 6   UNITED STATES OF AMERICA,           .
                                         .
 7                   DEFENDANT.          .
                                         .
 8

 9
                     TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
10               BEFORE THE HONORABLE XAVIER RODRIGUEZ
                     UNITED STATES DISTRICT JUDGE
11                         APRIL 7, 2021

12

13

14

15

16   APPEARANCES:
     FOR THE PLAINTIFFS:     JAMAL K. ALSAFFAR, ESQUIRE
17                           TOM JACOB, ESQUIRE
                             KOBY J. KIRKLAND, ESQUIRE
18                           LAURIE M. HIGGINBOTHAM, ESQUIRE
                             STEVEN R. HASPEL, ESQUIRE
19                           WHITEHURST HARKNESS BREES CHENG
                              ALSAFFAR HIGGINBOTHAM AND JACOB
20                           7500 RIALTO BOULEVARD, BUILDING TWO
                             SUITE 250
21                           AUSTIN TX 78735

22

23                           ROBERT E. AMMONS, ESQUIRE
                             APRIL A. STRAHAN, ESQUIRE
24                           THE AMMONS LAW FIRM
                             3700 MONTROSE BOULEVARD
25                           HOUSTON TX 77006
```

```
 1

 2                    DANIEL D. BARKS, ESQUIRE
                      SPEISER KRAUSE, PC
 3                    5555 GLENRIDGE CONNECTOR
                      SUITE 550
 4                    ATLANTA GA 30342

 5

 6                    MARK W. COLLMER, ESQUIRE
                      COLLMER LAW FIRM
 7                    3700 MONTROSE
                      HOUSTON TX 77006
 8

 9                    JASON P. STEED, ESQUIRE
                      KILPATRICK TOWNSEND & STOCKTON LLP
10                    2001 ROSS AVENUE, SUITE 4400
                      DALLAS TX 75201
11

12                    DENNIS CHARLES PEERY, ESQUIRE
                      R. CRAIG BETTIS, ESQUIRE
13                    TYLER & PEERY
                      5822 WEST IH 10
14                    SAN ANTONIO TX 78201

15

16                    PAUL E. CAMPOLO, ESQUIRE
                      TIM MALONEY, ESQUIRE
17                    LAW OFFICES OF MALONEY & CAMPOLO, LLP
                      926 S. ALAMO
18                    SAN ANTONIO TX 78205

19

20                    GEORGE LOUIS LeGRAND, ESQUIRE
                      LeGRAND AND BERNSTEIN
21                    2511 N. ST. MARY'S STREET
                      SAN ANTONIO TX 78212-3739
22

23

24

25
```

```
 1
 2                    DANIEL J. T. SCIANO, ESQUIRE
                      RICHARD E. TINSMAN, ESQUIRE
 3                    TINSMAN & SCIANO
                      10107 McALLISTER FREEWAY
 4                    SAN ANTONIO TX 78216

 5

 6                    KELLY W. KELLY, ESQUIRE
                      ANDERSON & ASSOCIATES LAW FIRM
 7                    2600 SW MILITARY DRIVE, SUITE 118
                      SAN ANTONIO TX 78224
 8

 9                    ERIK A. KNOCKAERT, ESQUIRE
                      JOSEPH MICHAEL SCHREIBER, ESQUIRE
10                    SCHREIBER KNOCKAERT, PLLC
                      701 NORTH POST OAK, SUITE 325
11                    HOUSTON TX 77024

12

13                    BRETT T. REYNOLDS, ESQUIRE
                      BRETT REYNOLDS & ASSOCIATES PC
14                    1250 NE LOOP 410, SUITE 310
                      SAN ANTONIO TX 78209
15

16                    DAVID J. CAMPBELL, ESQUIRE
                      JUSTIN B. DEMERATH, ESQUIRE
17                    O'HANLON McCOLLOM & DEMERATH
                      808 WEST AVENUE
18                    AUSTIN TX 78701

19

20                    JORGE A. HERRERA, ESQUIRE
                      FRANK HERRERA, JR., ESQUIRE
21                    THE HERRERA LAW FIRM, INC.
                      1800 W COMMERCE STREET
22                    SAN ANTONIO TX 78207

23

24

25
```

```
 1

 2                    JASON C. WEBSTER, ESQUIRE
                      THE WEBSTER LAW FIRM
 3                    6200 SAVOY, SUITE 640
                      HOUSTON TX 77036
 4

 5                    CATHERINE TOBIN, ESQUIRE
                      HILLIARD MUNOZ GONZALES, LLP
 6                    719 S. SHORELINE BOULEVARD, SUITE 500
                      CORPUS CHRISTI TX 78401
 7

 8

 9                    HUGH JONES PLUMMER, JR., ESQUIRE
                      THOMAS J. HENRY
10                    PO BOX 696025
                      SAN ANTONIO TX 78269
11

12                    DENNIS BENTLEY, ESQUIRE
                      THOMAS J. HENRY, ESQUIRE
13                    THOMAS J. HENRY INJURY ATTORNEYS
                      521 STARR STREET
14                    CORPUS CHRISTI TX 78401

15

16                    MARCO CRAWFORD, ESQUIRE
                      LAW OFFICE OF THOMAS J. HENRY
17                    4715 FREDRICKSBURG
                      SAN ANTONIO TX 78229
18

19                    MARION M. REILLY, ESQUIRE
                      ROBERT C. HILLIARD, ESQUIRE
20                    HILLIARD MARTINEZ GONZALES LLP
                      719 S. SHORELINE, SUITE 500
21                    CORPUS CHRISTI TX 78401

22

23

24

25
```

```
 1
 2   FOR THE DEFENDANT:      AUSTIN L. FURMAN, ESQUIRE
                            PAUL D. STERN, ESQUIRE
 3                          UNITED STATES DEPARTMENT OF JUSTICE
                            THREE CONSTITUTION SQUARE
 4                          175 N STREET, NE
                            WASHINGTON DC 20002
 5
 6                          CLAYTON R. DIEDRICHS, ESQUIRE
                            JAMES F. GILLIGAN, ESQUIRE
 7                          JACQUELYN MICHELLE CHRISTILLES, ESQUIRE
                            JAMES EDWARD DINGIVAN, ESQUIRE
 8                          KRISTIN K. BLOODWORTH, ESQUIRE
                            KRISTY KAREN CALLAHAN, ESQUIRE
 9                          JOHN F. PANISZCZYN, ESQUIRE
                            UNITED STATES ATTORNEY'S OFFICE
10                          601 NW LOOP 410, SUITE 600
                            SAN ANTONIO TX 78216
11
12                          AUSTIN L. FURMAN
                            JOCELYN KRIEGER, ESQUIRE
13                          DANIEL P. CHUNG, ESQUIRE
                            JAMES G. TOUHEY, JR., ESQUIRE
14                          STEPHEN E. HANDLER, ESQUIRE
                            UNITED STATES DEPARTMENT OF JUSTICE
15                          PO BOX 888, BEN FRANKLIN STATION
                            WASHINGTON DC 20044
16
17   ON BEHALF OF RUBEN      PHILIP KOELSCH, ESQUIRE
     D. RIOS, JR.           CRAIG WILLIAM, ESQUIRE
18                          CARLSON LAW FIRM, PC
                            100 EAST CENTRAL EXPRESSWAY
19                          KILLEEN TX 76542
20
21   ON BEHALF OF           ELIZABETH G. BLOCH, ESQUIRE
     ACADEMY, LTD           DALE WAINWRIGHT, ESQUIRE
22                          GREENBERG TRAURIG LLP
                            300 WEST 6TH STREET, SUITE 2050
23                          AUSTIN TX 78701
24
25
```

```
 1                              JANET E. MILITELLO, ESQUIRE
                                LOCKE LORD LLP
 2                              600 TRAVIS STREET TOWER, SUITE 2800
                                HOUSTON TX 77002
 3

 4                              DAVID McDONALD PRICHARD, ESQUIRE
                                KEVIN MICHAEL YOUNG, ESQUIRE
 5                              PRICHARD YOUNG, LLP
                                10101 REUNION PLACE, SUITE 600
 6                              SAN ANTONIO TX 78216

 7

 8   ON BEHALF OF MOVANTS       J. DEAN JACKSON, ESQUIRE
     MICHAEL AND REBECCA        CURNEY FARMER HOUSE OSUNA & JACKSON
 9   KELLEY:                    411 HEIMER ROAD
                                SAN ANTONIO TX 78232
10

11

12   ON BEHALF OF MOVEANT       ADRIAAN TIELEMAN JANSSE, ESQUIRE
     DR. SHRIDHAR VASIREDDY     JANSSE LAW
13                              P.O. BOX 791215
                                SAN ANTONIO TX 78279
14

15   REPORTED BY:              GIGI SIMCOX, RMR, CRR
                               CHRIS POAGE, RMR, CRR
16                             OFFICIAL COURT REPORTERS
                               UNITED STATES DISTRICT COURT
17                             SAN ANTONIO, TEXAS

18

19

20

21

22

23

24

25
```

1    *(San Antonio, Texas; April 7, 2021, at 9:00 a.m., in open*
2    *court.)*

3            THE COURT:  The Court calls 18 civil 555, and all
4    related cause numbers in the consolidated action, Holcombe and
5    others versus the United States.

6            Before I announce for appearances, this is a first
7    for us, that we'll be broadcasting by Zoom to certain parties
8    because of the COVID pandemic.  All counsel, parties,
9    witnesses, participants, and members of the public are
10   reminded that this is a formal proceeding, and that they
11   should behave at all times, as if they were present in the
12   courtroom.  The standing order of the San Antonio Division of
13   the Western District of Texas on remote access to court
14   proceedings remains in effect.

15           Photography, recording, or streaming of this
16   proceeding, by any means, is strictly prohibited.  Though this
17   proceeding is open to the public, technological restraints
18   require that members of the general public request access from
19   the courtroom deputy to participate remotely.  Those granted
20   approval to participate remotely, must not forward the
21   electronic link to nonparticipating colleagues or persons, and
22   must not post the link on any public forum.

23           As with all proceedings, violations of these
24   instructions are subject to contempt proceedings.
25   Accordingly, please exercise proper decorum at all times.

```
1   With that, let me get appearances, please.
2           On behalf of the plaintiffs' group, who is lead
3   counsel?
4           MR. ALSAFFAR:  Good morning, Your Honor.  Jamal
5   Alsaffar for the plaintiffs.
6           THE COURT:  Thank you.  Would you like to introduce
7   who is at table?
8           MR. ALSAFFAR:  I would, Your Honor.  Jason Webster.
9           THE COURT:  Thank you.
10          And for the government?
11          MR. STERN:  Good morning, Your Honor.  Paul Stern on
12   behalf of the United States.
13          THE COURT:  And who do you have at table?
14          MR. STERN:  With me, Jacquelyn Christilles, Jocelyn
15   Krieger, and Clayton Diedrichs.
16          THE COURT:  Let's take care of some housekeeping
17   matters first.  Thank you to all the parties for working
18   collaboratively on trying to organization the exhibits in this
19   very complex case.  I received this morning, I think it was
20   filed late last night, the third amended trial exhibit list,
21   and that's the document I'm working from; is that correct?
22          MR. ALSAFFAR:  I believe — I believe that's correct,
23   Your Honor.  Yes, we were going through — it's the third
24   amended trial exhibit list.
25          THE COURT:  Thank you.  And the government agrees.
```

1          So with that, there are no objections to the joint

2  exhibits.  Joint Exhibits Nos. 1 through 803 listed on that

3  third amended exhibit list are admitted.

4      (Joint Exhibits 1 through 803 received into evidence.)

5          THE COURT:  There is a slight confusion, and it's the

6  Court's fault, with the plaintiff's exhibit list and the

7  government exhibit list.  The copy I've been printed out with

8  has no objections whatsoever.  If I go to the CM/ECF, though,

9  there is, and so I'm not sure how they've got script.  I'm

10 going to have to reprint from the third amended that you-all

11 just filed and figure out what is unobjected to.  And so I'll

12 make those rulings at the next break.

13         All parties have agreed to waive opening statements,

14 and we will have closing arguments at the end of this

15 liability phase, and so with that, I recognize the plaintiff's

16 first witness.

17         MR. ALSAFFAR:  Your Honor, before we begin, I have

18 a -- I do have a list of unobjected to plaintiff's exhibits

19 that I would -- I would like to offer and I can give you that

20 right now, and then we can see if we can go through and manage

21 the rest of them, if that's okay, Your Honor.

22         THE COURT:  That's fine.  Are what do you believe is

23 unobjected to?

24         MR. ALSAFFAR:  We would like to offer at this time

25 Plaintiffs' Exhibits 751.

1          THE COURT:  Go slow.  Hold on.

2          MR. ALSAFFAR:  Yes, Your Honor.

3          THE COURT:  751, okay.

4          MR. ALSAFFAR:  Plaintiffs' Exhibit 752.

5          THE COURT:  Go ahead.

6          MR. ALSAFFAR:  Plaintiffs' Exhibit 793.

7          THE COURT:  Go ahead.

8          MR. ALSAFFAR:  Plaintiffs' Exhibit 796A.  And

9   Plaintiffs' Exhibit 800, which is the summary of key

10  documents, all of which are joint exhibits.

11         THE COURT:  Any objections to 751, 752, 793, 796A?

12         MR. ALSAFFAR:  Your Honor, on 796, that's A through

13  AA.

14         THE COURT:  Oh.  The whole series?

15         MR. ALSAFFAR:  Yes, Your Honor.  Those are the Form

16  95s.

17         THE COURT:  The 796 series and then 800.

18         Any objections from the government?

19         MR. STERN:  Your Honor, with regards to 751, there's

20  no objection.

21         THE COURT:  That's admitted.

22         (Plaintiffs' Exhibit 751 received into evidence.)

23         MR. STERN:  With regards to 752, there is no

24  objection.

25         THE COURT:  That's admitted.

1            (Plaintiffs' 752 received into evidence.)

2            THE COURT:  793 is the next.

3            MR. STERN:  With regards to 793, we do object because

4    these were given to us at a late date, well after discovery

5    had closed.  We're not -- we're not familiar with how the

6    plaintiffs got -- obtained these and why they produced them so

7    late in discovery.  We're willing to have that conversation,

8    but given the late date that these were produced, we couldn't

9    just simply acquiesce to their request.

10           With regards to 796, these are the SF95 Forms, and at

11   this stage of the trial we don't believe that they are

12   appropriate for -- as exhibits in this liability phase.  While

13   we don't contest certain SF95s were submitted by certain

14   plaintiffs, we haven't gone through and checked the bona fides

15   of the substance of each of these SF95s.

16           So to the extent that they are trying to identify

17   each plaintiff having standing in this case, that's not an

18   issue for liability phase.  That would be an issue for if we

19   get to a damages portion in this trial.  With regards to 800,

20   we don't object to their key documents, insofar as they are

21   joint exhibits.  Now, United States also has its binder of key

22   documents ready for Your Honor as well.

23           THE COURT:  800 is admitted.

24           (Plaintiffs' Exhibit 800 received into evidence.)

25           THE COURT:  Your response to 793?

1          MR. ALSAFFAR:  Your Honor, just so you know what

2    these are.  This is actually the Texas Rangers Attorney

3    General file from that file that the government produced, and

4    it contains pictures of the home of Devin Kelley and Danielle

5    Kelley.  And we were — when we were scrubbing the file, it's

6    a 70,000-document file, the Texas Rangers references those

7    photos but; did not produce them.

8          We asked the government, do y'all have them.  Y'all

9    are supposed to produce them as part of the file.  They didn't

10   have them.  So the Attorney General and Texas Rangers produced

11   them to us a couple weeks ago.  The same day, we produced them

12   to the government.

13         THE COURT:  So the government has seen them prior to

14   today?

15         MR. ALSAFFAR:  Oh, yes, Your Honor.  We pointed them

16   out and we have shown it to them.

17         THE COURT:  793 is admitted.

18         (Plaintiffs' Exhibit 793 received into evidence.)

19         THE COURT:  The 796 series?

20         MR. ALSAFFAR:  Your Honor, as far as the — as far as

21   the 796 series, the Form 95s are in part — there are two

22   parts to them.  Of course, there is the jurisdictional part

23   and then the damages part, in terms of plaintiffs' addendum

24   clause, so it is related to the liability phase because it

25   deals with jurisdictional issues and standing.  And the

1    government concedes that they don't object to that, so it

2    makes sense to admit them in the liability phase as well.

3              THE COURT:  So this is a bench trial and not to a

4    jury, so I know how to make the distinction between the two

5    phases.  The 796 series, 796A through AA are admitted.

6              (Plaintiffs' Exhibits 796A through AA received into

7    evidence.)

8              THE COURT:  Anything else by housekeeping?

9              MR. STERN:  Your Honor?

10             THE COURT:  Yes.

11             MR. STERN:  Obviously, we don't object to that

12   ruling.  We just want to make sure for the record that we

13   reserve any right to contest anything contained within the SF

14   95s in the damages phase, if necessary.

15             THE COURT:  You have that right.

16             MR. STERN:  Thank you, sir.

17             THE COURT:  Anything else by way of housekeeping?

18             MR. ALSAFFAR:  One more thing, Your Honor, we wanted

19   to — to move for the admission of the deposition transcripts

20   that have already been filed and that were reviewed by the —

21   by the Court.  Those transcripts are Plaintiffs' Exhibit 87

22   through Plaintiffs' Exhibit 109 and 109A, the plaintiffs'

23   side.  We would like to offer those now, Your Honor.

24             THE COURT:  Any objections to 87 through 109A?

25             MR. STERN:  No objection, insofar as the government

1  also offers its deposition designations, those participating

2  in trial through deposition, as well as its objections and

3  counter-designations to plaintiffs' designations.

4          THE COURT:  With that, 87 and going forward through

5  109A are admitted.

6          (Plaintiffs' Exhibits 87 through 109A received into

7  evidence.)

8          THE COURT:  We can either do it at another break or

9  we can do it before the government's case in chief, I'll admit

10  your numbers when we get to them.

11          MR. STERN:  Your Honor --

12          THE COURT:  Anything else by housekeeping?

13          MR. ALSAFFAR:  No, Your Honor.  We do have the -- you

14  requested the key document binder.  We do have one for the

15  Court.

16          THE COURT:  Thank you.  I'll take that.

17          MR. ALSAFFAR:  Your Honor, we also have the witness

18  exhibit binder.  Can I offer that to you as well?

19          THE COURT:  So the witness binder will just go there

20  at the witness stand.

21          MR. STERN:  Government's as well, Your Honor?

22          THE COURT:  Yes.  Thank you.

23          Anything else by way of housekeeping?

24          MR. ALSAFFAR:  No, Your Honor.

25          THE COURT:  Mr. Stern?

1          MR. STERN:  Just a very minor point and that is a lot

2    of documents and material were produced subject to protective

3    orders and confidentiality agreements in this case, and as a

4    result they were not redacted before being produced.  I think

5    it's fair to say that both parties have worked very diligently

6    this week in trying to redact as much PII as possible.  I

7    think we came to a meeting of the minds regarding the vast

8    majority of it.  However, I just ask for the Court's patience.

9    Heaven forbid, we actually publish an exhibit that shows some

10   PII, we will try to take it down immediately, redact on the

11   fly.  We just want to make sure you are aware of that, Your

12   Honor.

13         THE COURT:  Thank you.  So, yeah.  If any exhibits

14   get shown that have PII, we will just go ahead and do it now,

15   and we will allow the exhibit to be shown.  But when it comes

16   time to actually entering it into the court record, then I'll

17   allow redactions to be made even post-trial.

18         MR. STERN:  Thank you, sir.

19         THE COURT:  Anything else?

20         MR. ALSAFFAR:  There is one more matter and it

21   relates to the government's summary exhibit that they just

22   handed the Court.  There are documents in there that are

23   objectionable.  Most of them are joint exhibits, and we do not

24   object to those.  There are about 13 or 14 that are

25   objectionable, and I don't know since the Court — since the

DANIELLE SMITH – DIRECT

1  government handed them to you now whether we should deal with

2  those now or...

3          THE COURT:  So yeah, those are just –– the binders

4  are just assistance to the Court.  I'm only going to review

5  what's actually been admitted into –– into this proceeding.

6          MR. ALSAFFAR:  We have no more matters, Your Honor.

7          THE COURT:  And with that, then your first witness.

8          MR. WEBSTER:  Your Honor, plaintiff calls as our

9  first witness Danielle Smith.

10     (DANIELLE SMITH, having been duly sworn, testified as

11  follows:)

12          MR. WEBSTER:  May I proceed, Your Honor?

13          THE COURT:  Yes.

14                       DIRECT EXAMINATION

15  BY MR. WEBSTER:

16  Q.  Good morning, Ms. Smith.

17      Could you please introduce yourself to the judge?

18  A.  Hi.  My name is Danielle Smith.

19  Q.  Ms. Smith my name is Jason Webster and we have met on a

20  couple of different occasions prior to your testimony here

21  today; is that correct?

22  A.  Correct.

23  Q.  And those two times were the times that we met in the

24  public library to discuss –– kind of informally –– to discuss

25  what you knew about this case and various issues, but then

DANIELLE SMITH – DIRECT

1  there was also the time we met during your deposition; is that

2  correct?

3  A.  Correct.

4  Q.  And you kind of understand how this –– I have not talked

5  to you since your deposition; is that true?

6  A.  True.

7  Q.  And would you agree with me today that I'm going to be

8  asking you some tough questions, that if you need to take a

9  break at any time, will you let me know, and I'll be happy to

10 do so?

11 A.  Yes.

12 Q.  Now, I want to start, Danielle –– is it okay if I call you

13 Danielle?

14 A.  Yes.

15 Q.  I want to start, Danielle, with –– to talk about, kind of,

16 your childhood, so that the Court gets a sense, the judge gets

17 a sense of kind of the person –– who you are, and what you've

18 been through; is that okay?

19 A.  Okay.

20 Q.  And it's going to be very general; okay.  First off,

21 Danielle, when is your birthday and how old are you as you sit

22 here today?

23 A.  My birthday is February 12 of '95, and I am 26 years old.

24 Q.  And where –– Danielle, where were you born?

25 A.  San Antonio.

18

DANIELLE SMITH – DIRECT

1  Q.  And can you tell —— you know, can you tell the judge a

2  little bit about your childhood when you were with your birth

3  parents what happened?

4  A.  They physically abused me and burned me.

5  Q.  I've seen notes that you were burned about 80 percent of

6  your body; is that true?

7  A.  Correct.

8  Q.  And as a result of that abuse, what happened?

9  A.  I got taken away from them, and I ended up getting a

10  settlement when I was 18.

11  Q.  Okay.  And when you were taken away from them, I would

12  assume that was through Child Protective Services?

13  A.  Correct.

14  Q.  And where were you placed after that?

15  A.  I was placed into CPS.

16  Q.  And about approximately how old were you when you were

17  placed in Child Protective Services?

18  A.  Three.

19  Q.  So when you were three —— when were you three, were you

20  placed in some foster homes?

21  A.  Yes.

22  Q.  About how many foster homes did you go to prior to being

23  adopted?

24  A.  I think it was one, but it could have been more.  I just

25  don't remember how many.

DANIELLE SMITH — DIRECT

1   Q.   You were pretty young at that point in time; right?

2   A.   Yes.

3   Q.   Now, when you were — you were eventually adopted; is that

4   true?

5   A.   Correct.

6   Q.   Who — can you tell the judge, who adopted you?

7   A.   Michelle Shields, and at the time she was married to Kurt

8   Brassfield.

9   Q.   About what approximate age were you adopted by them,

10  Danielle?

11  A.   I would have been four.

12  Q.   Four years old?

13  A.   Yes.

14  Q.   And how long did you live with Michelle Brassfield at the

15  time and Kurt Brassfield?

16  A.   Before they got divorced?

17  Q.   Yes, ma'am.

18  A.   I guess it would have been around when I was 9 or 10 years

19  old.

20  Q.   And during that time, you had another bad experience with

21  Kurt Brassfield; is that true?

22  A.   Yes.

23  Q.   And just real — just briefly, Mr. Brassfield sexually

24  abused you; correct?

25  A.   Yes.

DANIELLE SMITH – DIRECT

1   Q.  And this went on for a period of years; true?

2   A.  Yes.

3   Q.  And, in fact, Mr. Brassfield is — because of — partly

4   because of your testimony is actually in prison for that; is

5   that true?

6   A.  Yes, he got 50 years.

7   Q.  Now, during that time, I think you testified also that —

8   or during that time, was Mr. Brassfield and Michelle divorced;

9   is that true?

10  A.  Yes, they got divorced around nine or ten.

11  Q.  And did you — and he married someone else later?

12  A.  Yes.

13  Q.  And who did he marry?

14  A.  Erin Higgins.

15  Q.  And do you consider both Erin Higgins and Michelle to be

16  your mothers?

17  A.  Yes.

18  Q.  Did you become very close to Erin during those years?

19  A.  Yes.

20  Q.  Are you still close to her today?

21  A.  Yes.

22  Q.  Are you still close to your adopted mother, Ms. Shields?

23  A.  Yes.

24  Q.  Now, you — during the time that you were living with

25  Mr. Brassfield, did you ever tell anyone about the abuse you

DANIELLE SMITH - DIRECT

1  were suffering?

2  A.  It wasn't until I was older when they were getting a

3  divorce.

4  Q.  And you came out and told them — who all did you come out

5  to at that point in time and tell about the abuse?

6  A.  I told Michelle and I told the school.

7  Q.  And what was their reaction to when you told them that.

8  First off, let's split it up.  What was Michelle's reaction

9  when she told you that — when you told her that?

10 A.  She took me down to talk with the police.

11 Q.  And how did the police treat you while you were there?

12 A.  They said I was lying.

13 Q.  And so they did not take your statements or what you had

14 accused him of as seriously; true?

15 A.  True.  She took me to two different police departments:

16 one in Cibolo and one in Wilson County.

17 Q.  Was that pretty — was that pretty upsetting to you that

18 they did not believe you?

19 A.  Yes, they said I was just promiscuous.

20 Q.  During the times — so after that, what happened with your

21 relationship as it related to Kurt Brassfield, was he still

22 around?

23 A.  Yes.

24 Q.  And did — even after you cried out, did the abuse

25 continue?

DANIELLE SMITH — DIRECT

1   A.   Yes.

2   Q.   And how much longer did the abuse continue?

3   A.   It continued a lot longer.

4   Q.   And you had to testify in trial against Mr. Brassfield

5   about that abuse; correct?

6   A.   Yes.

7   Q.   And I think you stated earlier he was convicted as a

8   result of that; is that true?

9   A.   Correct.

10  Q.   Now, let's —— moving on for just a minute.

11       Let's talk about Devin Kelley.  All right?

12  A.   Okay.

13  Q.   Where did you first meet Devin Kelley?

14  A.   I met him when I was 13.

15  Q.   And can you tell the Court a little bit about maybe where

16  y'all were at and what you were doing when you met him?

17  A.   We were with mutual friends.

18  Q.   And can you tell us about what happened during that

19  exchange?

20  A.   He was 17 and I was 13, and he was just very —— I don't

21  know.  Just pushed himself onto me.

22  Q.   And when you say, "pushed himself onto you," he was —— he

23  tried to —— he called you a lot, texted you a lot?

24       What types of things did he do?

25  A.   He'd call me constantly.  Messaged constantly.  Every time

DANIELLE SMITH – DIRECT

1   I was visiting my mother Erin, he would try and hang out with
2   me.
3   Q.   Okay.  And how often would you see him?  I think you said
4   you were approximately 13.
5        How often would you see him personally?
6   A.   Every —— almost every weekend I was with Erin.
7   Q.   And so did he live close to there?
8   A.   He lived in New Braunfels.
9   Q.   All right.  Did he live in the same house that we're going
10  to talk about later that you lived in —— that they lived in
11  out of town, out in the country?
12  A.   Yes.
13  Q.   Okay.  And so how would —— how would you —— when you
14  were —— when you would be Erin's house on the weekends, how
15  would you actually see —— would he come over?  How would you
16  see him?
17  A.   He would drive over, and I would have to go out and meet
18  him.
19  Q.   How long did you —— did you talk to Devin or have a
20  relationship with Devin during that period of time?
21  A.   Until he joined the military, and then it was a little bit
22  after the military.  When he was in there, he would call and
23  tell me some stuff from when he was in the military.
24  Q.   So he went off at some point, and joined the military, and
25  y'all kind of parted ways, although you did talk a little bit

DANIELLE SMITH - DIRECT

1  while he was in the Air Force; is that true?

2  A.  Yes.

3  Q.  Now, you did have a sexual relationship with him at this

4  time; is that true?

5  A.  Yes.

6  Q.  And I think that you talked about you had gotten pretty

7  close to Devin during that period of time; is that correct?

8  A.  Yes.

9  Q.  And was Devin an outlet for you at that point?

10  A.  Yes.

11  Q.  Can you tell the Court why he was an outlet?  What was

12  going on in the relationship?

13  A.  I could just talk to him about stuff and tell him about

14  things in the home.

15  Q.  And even at that point in time, did he know what was going

16  on with Kurt Brassfield?

17  A.  He knew some of it.

18  Q.  Did he know that Mr. Brassfield was inappropriate with

19  you?

20  A.  Sometimes, yes.

21  Q.  And while you may not have told him everything that had

22  gone on, but you did tell him some things, so he knew this as

23  early as when you were 13 years old; correct?

24  A.  Yes.

25  Q.  Now, Devin went off to the Air Force, and I believe -- did

25

DANIELLE SMITH — DIRECT

1  he — he tried to contact you a couple times while he was in

2  the Air Force; is that true?

3  A.  Yes.

4  Q.  And what types of things would Devin tell you while he was

5  in the Air Force?

6  A.  That he was married and then that's when I told him I

7  didn't want to talk to him anymore and he kept calling and

8  calling and he was just saying how he thought his wife was

9  cheating on him.

10  Q.  Did he ever — did you ever know anything about — about

11  his — can you tell the Court what you knew about Devin's time

12  in the Air Force at any time?

13  A.  That he said he just had a hard time.

14  Q.  Okay.  Did he ever tell you at any point in time while he

15  was in the Air Force and in jail that — what he had been

16  convicted of?

17  A.  No.

18  Q.  Did he ever tell you that he had — that he had been

19  convicted of any type of felony which would prohibit him from

20  owning a weapon?

21  A.  No.

22  Q.  When you were talking to Devin, did he tell you why he

23  would — let me rephrase the question, I apologize.

24      When Devin would call you, he called you while he was

25  still working in the Air Force; is that true?

26

DANIELLE SMITH – DIRECT

1  A.  Yes, and when he was locked up in the brig.

2  Q.  And so how often would he call you on a regular basis

3  during the week?

4  A.  Whenever he got phone privileges when he was locked up.

5  Q.  Was that a certain day of the week, or...

6  A.  It ranged, but most of the time, I think it was on a

7  weekend.

8  Q.  Okay.  And so the — so while he was in the brig on

9  weekends, he would give you a call?

10  A.  Yes.

11  Q.  And what are the types of things y'all would talk about

12  during those conversations?

13  A.  Oh, he would just ask how I was doing, and ask how he was

14  doing.  There was nothing, you know, inappropriate.

15  Q.  Okay.  And you had told him that as long as he was

16  married, you did not want to see him; correct?

17  A.  Correct.

18  Q.  At some point in time, did he ever tell you during those

19  conversations why he was in the brig?

20  A.  No.  He said —

21      (Reporter Clarification.)

22  Q.  Can you repeat the last answer, please?

23  A.  He said he would tell me why he got locked up when he got

24  out.

25  Q.  So that was a discussion y'all did not have during those

DANIELLE SMITH - DIRECT

1    times?

2    A.   Yes.

3    Q.   Now, at some point in time, Mr. Kelley got out of the —

4    got out of the Air Force, along with the brig, and then he was

5    subsequently discharged from the Air Force; correct?

6    A.   Yes.

7    Q.   And how long was it before when he was discharged from the

8    Air Force to the time that you had heard from him?

9    A.   I guess a couple months is when he came and saw me.

10   Q.   And so when you say, "a couple months," did he call you

11   when he got out of jail?

12   A.   When he wanted to come and see me.

13   Q.   Okay.  Was that the first time you had heard from him in a

14   while?

15   A.   Yes.

16   Q.   Okay.  And when he — and when came — came — tell the

17   Court about that.

18       What happened when he got out of — when he got out of

19   jail and he came to see you?  What happened next?

20           THE COURT:  Let me stop you here.  Can you give me a

21   date?  About — what time are we in now?

22           THE WITNESS:  It would have been back when I was 18,

23   so I think 2013.

24           THE COURT:  Thank you.

25

DANIELLE SMITH - DIRECT

1  BY MR. WEBSTER:

2  Q.  So around 2013, would have been the time that he would

3  have -- did he drive down to Colorado to see you?

4  A.  No, I wasn't in Colorado.

5  Q.  Oh, I'm sorry.  Did he drive down from Colorado to see

6  you?

7  A.  I don't think he was in Colorado when I was 18.

8  Q.  Where was he living or residing at that time?

9  A.  With his parents.

10 Q.  So he -- at that point in time, Devin had moved back --

11 Devin Kelley had moved back home with his parents?

12 A.  Yes.

13 Q.  And tell us about the first time that you -- that you saw

14 him?

15 A.  I said he looked old.

16 Q.  And why did you tell him he looked old?

17 A.  Because I remember him at 17, and he had a beard, so I

18 thought he looked old.

19 Q.  Did he ask you out on a date at that point?

20 A.  He did, but I didn't want to see him like that until a

21 couple months after.

22 Q.  So when you say he came to see you, where was this at?

23 A.  I was at Michelle's house.

24 Q.  All right.  And when you say, "Michelle," Michelle

25 Shields; correct?

DANIELLE SMITH — DIRECT

1   A.   Yes.

2   Q.   All right.  And so he came over to the house, and y'all

3   talked for — how long do you think you talked for?

4   A.   Oh, like 30 minutes.

5   Q.   And then you told him he looked old?

6   A.   Yeah.

7   Q.   And he left at that point?

8   A.   Yes.

9   Q.   Did he continue to talk to you or call you during that

10  period of time?

11  A.   Yes.

12  Q.   And tell us what happened next.

13      Kind of give us a progression of what happened with your

14  relationship in 2013 with Mr. Kelley?

15  A.   He wouldn't leave me alone, and, finally, I said yes, so

16  he can just stop calling me all the time.

17  Q.   Was it almost impulsive calling what he was doing?

18  A.   Yes.  He would call and call and call.

19          MS. CHRISTILLES:  Objection.  Leading.

20          MR. STERN:  I'll reask the question.

21  BY MR. WEBSTER:

22  Q.   How would you characterize his calls during that period of

23  time?

24  A.   Um, like stalkers.

25  Q.   Did that give you some concerns?

DANIELLE SMITH – DIRECT

1  A.  I was 17, 18, I wasn't thinking.

2  Q.  Okay.  Were you flattered by his advances?

3  A.  It was annoying.

4  Q.  And so finally you agreed, and did y'all have a period of

5  time when you and Devin Kelley were dating?

6  A.  Yes.

7  Q.  And during that time that you were dating, kind of tell —

8  can you tell the Court how long you dated prior to when you

9  got married and the types of things and things that went on?

10  A.  When him and I got together — I guess we got married

11  April 4th of 2014.  Before then, I was — I don't know if we

12  got pregnant, and then I ended up losing my baby.  So not

13  really much.

14  Q.  Okay.  Let's talk about that for a moment.  So y'all were

15  married on April 4th of 2014; is that correct?

16  A.  Correct.

17  Q.  And you did not have a very good home life still at that

18  point in time; would you agree?

19  A.  Yes.

20  Q.  And so did Mr. Kelley kind of offer a solution to get out

21  of that home life at that point?

22  A.  He just said, you know, he would take care of me and so...

23  Q.  Okay.  Now, when he — during that period of time, when he

24  came to see you in 2013 and his marriage to you on April 4th,

25  2014, I think you stated that you became pregnant; is that

DANIELLE SMITH – DIRECT

1  true?

2  A.  Yes.

3  Q.  Can you tell the Court what happened with regards to the

4  circumstances surrounding your pregnancy?

5  A.  I lost my baby.

6  Q.  And, Danielle, can you tell –– I know it's hard, but could

7  you please tell the judge why you lost your baby?

8  A.  He kicked me in my stomach.

9  Q.  Where did this happen at, Danielle?

10  A.  At the Kelley's barndominium.

11  Q.  Were you living there are at the barndominium at the time

12  prior to your marriage?

13  A.  Yes.

14  Q.  When was the first time you suffered physical abuse at the

15  hands of Devin Kelley?

16  A.  When he kicked me in my stomach and I lost my first baby

17  because he got mad at me.

18  Q.  Now, I'd like to show you a picture from JEX0799–0012

19  that's already admitted into evidence.  It's going to pop up

20  on your screen so you can see it.

21  A.  Okay.

22  Q.  Danielle, backing up for just a minute, when after you

23  started dating Devin Kelley, did you move into the

24  barndominium?

25  A.  Around, I guess, Christmastime of 2013.

32

DANIELLE SMITH – DIRECT

1  Q.  And prior to moving into with him, you had not suffered

2  any type of abuse?  He was still kind of courting you at that

3  point; would you agree?

4  A.  Yes.

5  Q.  And so when you moved into the barndominium, is this a

6  true and correct —— I mean, is this the barndominium y'all

7  were living in?

8  A.  Yes, it was.

9  Q.  And immediately upon when you began dating Devin Kelley,

10  did he seem very —— how would you characterize how he treated

11  you?  Was he possessive?  Did he —— what types of traits did

12  he exhibit?

13  A.  At first, he wasn't —— he seemed normal until he got mad

14  and kicked me in my stomach and, you know, promised to never

15  do it again.

16  Q.  And the Kelley property, so that the Court understands ——

17  let's go to JEX793 that's been previously admitted, Your

18  Honor.

19      Can you see here on the map —— and you can go to the

20  second page.  This is, like, the Kelley residence at 2825 FM

21  2722 in New Braunfels, Texas; is that correct?

22  A.  Yes.

23  Q.  And would you agree with me that it's a very isolated

24  area?

25  A.  Yes, it is.

DANIELLE SMITH – DIRECT

1   Q.  And when I say that, meaning, there is not a lot —

2   there's not a lot of neighbors and there is not very many

3   houses around that area; is that true?

4   A.  Correct.

5   Q.  And who all lived out on the property in 2013, at

6   Christmas in 2013, when you moved in there?

7   A.  His mom and dad and I think his sister because I think she

8   had like one more year of school.

9   Q.  And so for a while, the sister lived there and then she

10  moved out and went off to college or school or something;

11  right?

12  A.  Yes.

13  Q.  And so if we go to the second page of this same exhibit

14  which is — yeah, here we go.  That's it.  Can you tell us

15  here if we look at this, where was the barndominium that we

16  saw in the picture earlier?

17  A.  It would be the top little square over — that one.  No.

18  Go down.  Yes, that one.

19  Q.  So this is where the barndominium would be?

20  A.  Yes.

21  Q.  And that's where you and Devin lived; correct?

22  A.  Yes.

23  Q.  If you screamed from the barndominium, going back to the

24  map, could the Kelley's hear you over at their house?

25  A.  No.

DANIELLE SMITH - DIRECT

1   Q.  And the other building that you see to the right, the

2   larger building at the top, what is that?

3   A.  That's the stables.

4   Q.  And at any time, how often would you actually go into the

5   Kelley's residence, the main house there?

6   A.  During that time, not often, unless it was for a family

7   dinner.

8   Q.  So you were basically — you were quartered off from the

9   area and not able — you didn't frequently go to the Kelley's

10  house at any time during the time you were married to Devin

11  Kelley; is that true?

12          MS. CHRISTILLES:  Objection.  Mischaracterization.

13  She said she would go —

14          THE COURT:  We have to wait for her answer.  That's

15  overruled.  Go ahead.

16          THE WITNESS:  Yeah.  I'd go for family dinners, and I

17  wasn't allowed to go without him.

18  BY MR. WEBSTER:

19  Q.  Meaning, you didn't go over — you weren't allowed to go

20  over and talk to Mr. and Mrs. Kelley unless you had his

21  permission?

22  A.  Yes, he had to be present.

23  Q.  And so what other types of things when you moved in — did

24  Devin become very controlling?

25  A.  Yes.

DANIELLE SMITH — DIRECT

1   Q.  Can you tell the Court in what ways Mr. Kelley became

2   controlling of you during that time?

3   A.  After the marriage, he started getting to where I wasn't

4   allowed to have friends.  He told me what to wear.  How I

5   should wear it.  I should wear makeup.  I wasn't allowed to

6   look at people.

7   Q.  Did he allow you to have social friends or go out on a

8   girls night?

9   A.  No, I was forbidden.

10  Q.  And did — and would you agree with me, you really had no

11  social network of support; is that true?

12  A.  Correct.  He cut everybody off from me.

13  Q.  And Devin as of the same — Devin Kelley, the times that

14  you knew him from 2013 until — until November 5th, he had no

15  close — would you — how would you characterize his social

16  network of friends?

17  A.  They were very, very small.

18  Q.  Okay.

19  A.  To like maybe less than three.

20  Q.  And did he talk to those friends very often?

21  A.  Closer to the shooting, he had a friend named David that

22  we would go and see.

23  Q.  Okay.  But as in having — he was not a very — how would

24  you characterize his social characteristics?  He was not a

25  very social person; was he?

DANIELLE SMITH – DIRECT

 1  A.  No.

 2  Q.  And, in fact, he did not get along with others very well;

 3  did he?

 4  A.  No, he didn't.

 5  Q.  Did he tell you –– can you tell the Court, how did

 6  Devin –– how did Devin look, did he have any –– did he like to

 7  deal with law enforcement?

 8  A.  No.

 9  Q.  Why?

10  A.  He said that he was never going back to jail, that he

11  would die before he went to jail.

12          THE COURT:  Counsel, let me interrupt here.

13          So I see that Colonel Younger is present, watching

14  these proceedings.  The rule has been invoked.

15          Is Colonel Younger...

16          MR. ALSAFFAR:  He's a retained plaintiffs' expert.

17          THE COURT:  So he's been excused from the rule?

18          MR. ALSAFFAR:  Yes, Your Honor.

19          THE COURT:  Thank you.  You may continue.

20          MR. WEBSTER:  Thank you, Your Honor.

21  BY MR. WEBSTER:

22  Q.  I need to go back for a minute.  You said earlier, he

23  actually kicked you in the stomach, correct, and you lost your

24  baby?

25  A.  Yes.

DANIELLE SMITH - DIRECT

1  Q.  And -- and tell the Court why you decided to stay at that

2  point?

3  A.  I had nowhere to go and I was stuck.

4          MR. WEBSTER:  Sorry, Your Honor.  I had the page

5  marked and it must have fell off.  One second.

6  BY MR. WEBSTER:

7  Q.  Can you please go to JEX00799-0058.  It's been previously

8  admitted, Your Honor.

9      Now, Miss -- this is a picture from inside -- from inside

10 the barndominium apartment.  Do you recall that, ma'am?

11 A.  Yes.

12 Q.  I think you were talking about how he kicked you in the

13 stomach at that point in time.

14     Is this the area where that would have happened?

15 A.  Yes.

16 Q.  Can you tell the Court -- do you see here where you have

17 the Coca-Cola -- the Coca-Cola cardboard box here taped up

18 against the wall.  Why is that there?

19 A.  That was just -- there was a hole that nobody could fix.

20 Q.  How did that hole get there?

21 A.  This hole was always there, but he kicked another hole in

22 the kitchen.  It was underneath the sink.  There is -- after

23 we were married.  He got mad at me because I was looking at

24 people and he said that I was a whore and he threw me down and

25 started kicked me and I moved.

DANIELLE SMITH - DIRECT

1  Q.  What types of abuse did you suffer at the hands of Devin

2  Kelley?  Can you tell the Court what types of things he did to

3  you?

4  A.  He would choke me and make me beg for my life.  He would

5  pull me around by my hair.  He would punch me; kick me in my

6  back.  He would grab my face and throw me down.  He would take

7  the butts of his guns and hit me and say that I was nothing to

8  him, and then he would force me to do things that I didn't

9  want to do.

10 Q.  Did he threaten to kill you?

11 A.  Yes, repeatedly.

12 Q.  Did he threaten -- did he ever threaten to kill your

13 family?

14 A.  Yes.  He said if I ever left him, I would have to pay for

15 it.  That the only way of leaving this marriage was one of us

16 was going to end up in a body bag.

17 Q.  And this barndominium that you lived in, it was very, very

18 close quarters; correct?

19 A.  Yes.

20 Q.  And when we say that -- if we go to -- we'll start at

21 JEX0019 -- 799-0019, please.

22     Danielle, I know you haven't seen these, but these are

23 photos from the Texas Rangers right after this happened; okay?

24 A.  Yeah.

25 Q.  So this would have been your -- that would have been

DANIELLE SMITH — DIRECT

1   y'all's bed here on the right; is that right?

2   A.   Yes.

3   Q.   And this is — the carriage that you have here, that would

4   have been where you would have — where your baby daughter was

5   staying at during the night; right?

6   A.   Yes.

7   Q.   And then you have the couch and you have the table there;

8   true?

9   A.   Yes.

10  Q.   And we can go to the next page, 0020.  And here you can

11  see — well, you can point out to us.  This would have been

12  the baby bed on the left where your son Michael would have

13  slept; true?

14  A.   Yes.

15  Q.   And then you have a kitchen and a bathroom; is that

16  correct?

17  A.   Yes.

18  Q.   And kind of — it looks like there was a little bit of

19  closet space.  Was there a closet in here?

20  A.   Yes.  It was over by the bed.  Like, up when you first

21  entered the doors, on that wall.

22  Q.   Okay.  So when you were — when y'all moved into this

23  barndominium in 2013, y'all would — this was the close

24  quarters that you were in.  And so anytime that he was

25  slapping or kicking you or hitting you, were your kids able to

DANIELLE SMITH – DIRECT

1  see that?

2  A.  Yes.

3  Q.  Now, going back for just a minute, y'all moved in there in

4  2013, but at times, you moved around, across –– back and forth

5  from Colorado; correct?

6  A.  Yes.

7  Q.  And can you tell the judge when –– in 2013, how long did

8  you live in this barndominium before you went off to Colorado?

9  A.  We were in the barndominium until June when we went down

10  to Kingsville.  I was in Kingsville for two months, and then

11  he took me from Kingsville to Colorado.

12  Q.  During those times that you were in Kingsville and then

13  when you went to Colorado, were you still suffering abuse?

14  A.  Yes.

15  Q.  And it was still the same types of abuse that you have

16  described to the Court today?

17  A.  Yes.

18  Q.  All right.  Now, during the time that you were married to

19  Devin, was he ever able to hold down a job?

20  A.  No.

21  Q.  And why could he not hold down a job?

22  A.  Because he didn't want to and he forced me to go out and

23  do it.

24  Q.  And he would force you to go to work?

25  A.  Yes.

DANIELLE SMITH - DIRECT

1  Q.  I think you testified earlier that you — you know, you

2  were abused by CPS, you actually got a settlement from CPS; is

3  that true?

4  A.  Yes.

5  Q.  And did you — what did Devin do with your CPS money or

6  what we'll call the CPS settlement money?

7  A.  He took ahold of it.

8  Q.  And he refused to work during that time; is that correct?

9  A.  Correct.

10  Q.  How would you characterize your marriage, from the time

11  you got married in 2014 until the time of, say — the time

12  that you moved, that you were in — went to Kingsville and

13  then Colorado?

14  A.  It was getting progressively worse with his abuse because

15  he would just slap you around.  Then it got worse when he

16  isolated me a thousand miles away from everybody.

17  Q.  Looking back, do you believe that he did that on purpose?

18  A.  Yes.  Because he knew I couldn't get away.  I couldn't

19  drive because he forbid me to drive.

20  Q.  And how many cars did y'all have?

21  A.  We only had the Jeep.

22  Q.  And tell us about your time — what happened while you

23  were in Colorado?  Tell us about your time there.

24      Where did you live and what went on while you were there?

25  A.  We lived in an RV park.  He was abusive.  I wasn't allowed

DANIELLE SMITH — DIRECT

1  to do anything.  He got in trouble for hitting the dog.

2  Q.  And what did he do to the dog?

3  A.  I wasn't physically there.  I was in the trailer, but from

4  the Court, they said that he beat the dog.

5  Q.  So you had seen — you had seen Devin being abusive to

6  animals; is that true?

7  A.  Yes.

8  Q.  Is that the first time you had ever seen him being abusive

9  to animals?

10  A.  From that one dog, yes, until we got my wieney dog.

11  Q.  Was he abusive to your wieney dog?

12  A.  Yes.

13  Q.  What did he — what would he do to the wieney dog?

14  A.  He would throw her and kick her and say it was my fault,

15  and he would use her as a punishment against me.

16  Q.  All right.  So if you did something or said something he

17  didn't like, he would abuse your dog?

18  A.  Yes.

19  Q.  Now, when you went off — when married him in 2014 or when

20  you moved in him with in 2013 into the barndominium, did Devin

21  have any guns at that point in time?

22  A.  Yes.

23  Q.  What did he have when you first got married?

24  A.  A hand-held gun.

25  Q.  Okay.  And I would assume — you are no firearms

DANIELLE SMITH – DIRECT

1  specialist; correct?

2  A.  No.

3  Q.  And in fact, if I show you pictures of guns, you probably

4  wouldn't — you don't know the difference in them between

5  maybe a handgun and rifle and those types; is that correct?

6  A.  Well, I mean, I know a handgun is short, and you have it

7  in your hand, but other than that, I can't tell you make and

8  model.  I can tell you the color.

9  Q.  Okay.  And when you say when y'all first got married, he

10  had one handgun, do you know what kind of gun or anything?

11  A.  It was shiny on the top and black on the bottom.

12  Q.  And what happened with that gun?

13  A.  He didn't like it because he said it kept jamming.

14  Q.  Was it a used gun?

15  A.  Yes.

16  Q.  Do you know where — as you sit here today, do you know

17  where Devin got that gun?

18  A.  He said he got it from a friend.

19  Q.  And you said he didn't like it.  Is it because it didn't

20  work well?

21  A.  Yes.

22  Q.  And since that gun didn't work well, he got rid of it?

23  A.  Yes.

24  Q.  What did he do with that gun?

25  A.  I don't really remember.  I think he threw it away.

DANIELLE SMITH – DIRECT

1  Q.  Okay.  And so during that period of time while you were

2  there from —— moving in from 2013, up until you went to

3  Colorado, that was the only time he had that gun; is that

4  true?

5  A.  Yes.

6  Q.  Now, did he —— during this period of time, was he looking

7  at guns?

8  A.  When we got in Colorado is when he started looking into

9  guns.

10  Q.  And you say —— when you say, "looking at the guns," what

11  type of guns —— when you moved to Colorado in 2014; is that

12  correct?

13  A.  Yes.

14  Q.  What type of guns did y'all look at while you were there?

15  A.  He looked at handguns.

16  Q.  And did he eventually purchase a handgun?

17  A.  Yes.

18  Q.  And how did —— excuse me.  Let me reask the question.

19     How did he purchase —— how did Devin Kelley purchase that

20  gun?

21  A.  He went to a shop there and bought it brand new.

22  Q.  And were you real happy with that at the time?

23  A.  I didn't have a say in it.

24  Q.  You didn't have a say in anything that he ever purchased

25  or anything that he ever did?

DANIELLE SMITH – DIRECT

1  A.  Correct.  He had control of the money.

2  Q.  When you –– if you wanted to call your parents during this

3  time or you wanted to call a friend, can you tell the Court

4  what he would require you to do?

5  A.  I had to ask permission, and when he granted it, I had to

6  have it on speakerphone, and I was only allowed five minutes.

7  Q.  And would he sit and listen to your conversations during

8  that time?

9  A.  Yes.  If I said something he didn't like, he would hang up

10  the phone.

11  Q.  Was that true for the entire marriage?

12  A.  Yes.

13  Q.  Even up until the day of the shooting?

14  A.  Yes.

15  Q.  Now, during the time that –– when you knew Devin prior to

16  his time in the Air Force, do you recall him having any

17  interest in guns before joining the Air Force?

18  A.  No.

19  Q.  And when you –– when he got out of the Air Force, is

20  that –– and you moved to Colorado is when he first started

21  getting really into guns from what you recall; is that true?

22  A.  Yes.

23  Q.  Once he got the new gun that he purchased from the store

24  in Colorado, what type of things did he use the gun for and

25  what did he do to you with the gun?

DANIELLE SMITH - DIRECT

1    A.   He — up there, I think he can, like, "open carry," is
2    what it's called.  He carried it on him all the time.
3    Q.   So when he would go out in the public and the rest, he
4    would carry a gun on his hip in a holster?
5    A.   Yeah.  I don't know what it's called, but, yeah, he had it
6    on him.
7    Q.   And when he would — and would he wear it on his hip?
8    A.   Yes.
9    Q.   And did he do that when he was at what I'll call the
10   Kelley compound?
11   A.   Yes, he never left without the gun.
12   Q.   So anywhere he went, he carried this gun, even when he was
13   in — whether he was in Colorado or Texas, he had this gun on
14   him?
15   A.   Yes.
16   Q.   And I think that we talked about historically that Devin
17   Kelley owned a shotgun at one point in time.
18        Do you recall that?
19   A.   Yes.
20   Q.   Can you tell the Court what happened with the shotgun?
21   A.   He bartered for it.
22   Q.   When you say, "bartered for it," what did he do?
23   A.   He got it from, you know, bartering and then he got rid of
24   it bartering.
25   Q.   And so was that a used gun?

DANIELLE SMITH - DIRECT

1  A.  Yes.

2  Q.  And did he like used guns?

3  A.  No.

4  Q.  Can you tell the Court why he did not like used guns?

5  A.  He told me that the only reason why he likes brand new

6  ones is because they won't break.

7  Q.  Did you ever see Devin Kelley during the time -- up until

8  the time -- up until the time of the shooting, did you ever

9  see him attempt to purchase, at any time, a gun from a private

10  individual?

11  A.  No.

12  Q.  He did not -- did he like to deal with private

13  individuals?

14  A.  No.  He only wanted to go to, like, the big stores because

15  he knows that those guns are brand new.

16  Q.  Did he ever -- I think that he also during this time of

17  your marriage, would also go to gun shows; is that true?

18  A.  Yes.

19  Q.  And during the times that he went to those gun shows, how

20  many times do you think he went to the gun shows between the

21  time in Colorado, up until the time of the shooting?

22  A.  It was only in Colorado --

23  Q.  Okay.

24  A.  -- he would go.

25  Q.  You just went to the gun shows in Colorado?

48

DANIELLE SMITH - DIRECT

1   A.   Yeah.

2   Q.   When you were there at those gun shows, did he ever

3   purchase a gun?

4   A.   No.  He just looked at everything.

5   Q.   And you never knew that, did you, that Devin wasn't

6   allowed to legally possess guns; correct?

7   A.   Correct.  I never knew.  He never told me.

8   Q.   If you had known that Devin was not allowed -- able to

9   possess or purchase guns, what difference would that have made

10  in your life?

11  A.   If his full background was disclosed, I never would have

12  gotten with him, and if he wasn't allowed to have guns, I

13  would have never -- I would have done everything I could to

14  make it to where he couldn't get them.

15  Q.   If you had known that and he had guns, would you have

16  called the police on him?

17  A.   Yes.  I would figure out a way.

18  Q.   Did he beat you with these guns?

19  A.   Yes.

20  Q.   Did he beat you with the pistol he bought in Colorado?

21  A.   Yes.

22  Q.   How often would he beat you with this pistol?

23  A.   It depended on the punishment.  The punishments ranged

24  from levels.  He would give me hand signs or he would just tap

25  his arm, which meant it's a warning.  One finger meant I get

DANIELLE SMITH - DIRECT

1  something taken.  Two fingers meant I'm getting hit.  When he
2  put all his finger on there, it meant that I was going to get
3  beaten until he made me pass out.
4  Q.  Would he do this while y'all were in public?
5  A.  The hand signals, yes.
6  Q.  And he explained those hand signals to you in order to
7  control you?
8  A.  Yes.
9  Q.  So if you were doing something in public that he didn't
10  like, he would place his --
11  A.  He would go like this.
12  Q.  Can you show the Court what exactly he would do?
13  A.  He'd do one hand -- (indicating).  This is a warning.
14  This is I get a punishment.  This is I'm getting hit.  This
15  means I was getting beaten.
16  Q.  And when you say "this," you mean when he would pat on
17  your arm, it meant that he was going to --
18  A.  It was on his arm.  Because all he had to do was go across
19  the room.  If I looked at somebody, that was automatically to
20  the first one.  If I talked out of turn, that was level two.
21  If I said something that made him look bad, all the fingers
22  would go up.
23  Q.  And so -- and how often -- would this go on every time you
24  went out in public?
25  A.  Yes.

DANIELLE SMITH – DIRECT

1    Q.   Now, when you were back home, in either Colorado or in the

2    barndominium at the Kelley compound, how was the violence

3    different than when you were in public?

4    A.   In public, he made it seem like he was a good person.  All

5    he had to do was do the signaling.

6    Q.   And so if you looked at a man that walked by, and he saw

7    you doing that, what would he do at that point?

8    A.   He would put his fingers up to where I knew I was getting

9    in trouble.  If I looked at a man talking, it was considered

10   cheating.  If I talked to somebody, it was considered

11   cheating.  If I didn't answer him in a timely manner, I would

12   get punished.

13   Q.   How long did y'all stay in Colorado during this time?

14   A.   In Colorado, it was until my son was born and then we came

15   back to Texas, and then we went to Colorado again for a little

16   bit and then we came back, and then we moved up there for like

17   a month and came back.

18   Q.   I want to break it down for just a minute for the Court so

19   we can understand, kind of, the history of your marriage and

20   where you lived.

21        So why did he decide to move –– first off, why did y'all

22   move to Kingsville, Texas?

23   A.   I was going to college.

24   Q.   Did you have a job during that time?

25   A.   No.

DANIELLE SMITH – DIRECT

1  Q.  What classes were you taking there?

2  A.  I was going in to be a biomedical person and studying

3  genetics.

4  Q.  Did — did Devin like that?

5  A.  No.

6  Q.  Can you tell the Court, why didn't Devin like the fact

7  that you were going to — that you were going to college in

8  Corpus Christi?

9  A.  Because he couldn't control it.

10  Q.  He didn't — he didn't like you being away from him; true?

11  A.  True.

12  Q.  So if you had to go off to class, he couldn't — how would

13  he react?

14  A.  He would be upset.

15  Q.  And would you take beatings when you got home?

16  A.  He would slap me around and tell me that if I looked at

17  somebody, you know...

18  Q.  When did you become pregnant with Michael, your first son?

19  A.  When we were in Colorado, 2014.

20  Q.  And during the time that you were pregnant, did he

21  continue to physically abuse you?

22  A.  Yes.

23  Q.  And when was — when was Michael born?

24  A.  He was born in March.

25  Q.  And what was his — what was his date of birth?

DANIELLE SMITH - DIRECT

1  A.  March 25th of 2015.

2  Q.  Was he born in Colorado, or was he born back here in

3  Texas?

4  A.  No.  He's my Colorado baby.

5  Q.  He's your Colorado baby.  And so were you still living

6  there in Colorado when he was born?

7  A.  Yes.

8  Q.  And where were y'all actually living at that point in

9  time?

10  A.  In the trailer.

11  Q.  Had y'all purchased a trailer, or did you bring it up from

12  Texas, or how did that work?

13  A.  We purchased a trailer in Texas and then we moved it up to

14  Colorado.

15  Q.  When y'all moved into Colorado, what area of Colorado did

16  you live in?

17  A.  In Colorado Springs.

18  Q.  So after the baby was born in March of 2015, how long was

19  it before you decided to move back to Texas?

20  A.  It was when he was six weeks old.

21  Q.  So that would probably be about May of 2015; is that fair?

22  A.  Yes.

23  Q.  And y'all would have moved back to the barndominium on

24  their property?

25  A.  Yes.

DANIELLE SMITH – DIRECT

1  Q.  What did they do with —— what did Devin do with the RV at

2  that point?

3  A.  It was left at the stables.

4  Q.  Y'all just picked up and left it and drove back?

5  A.  What?

6  Q.  I'm sorry.  Y'all just picked up and —— y'all picked up ——

7  y'all left it at the stables?  Did y'all still own it, or did

8  y'all just leave it there?

9  A.  No.  We owned the trailer.  Like, every time we moved

10 back, we would bring the trailer, and then we left the trailer

11 in the stables on the Kelley property.  I'm sorry.

12 Q.  Oh, okay.  I didn't mean to misunderstand you —— so y'all

13 brought the trailer back with you, and they would put it in

14 the stables.  You would put it there, and that's where it was

15 stored; is that true?

16 A.  Yes.

17 Q.  So when you moved back in May of 2015, you moved back into

18 the residence that we talked about earlier into the

19 barndominium; correct?

20 A.  Yes.

21 Q.  Were you still —— were there still rules that you talked

22 about earlier, and the rules, as it dealt with Devin Kelley's

23 family, were those still in existence at that time?

24 A.  Yes.

25 Q.  Now, when —— excuse me.

DANIELLE SMITH – DIRECT

1    Why did y'all make the decision to move back from Texas in

2 May of 2015?

3 A.  He wanted to move back for his parents so they could help

4 with Michael.

5 Q.  Was he patient with Mike at that point?

6 A.  At the beginning, he was, because Michael was just a baby.

7 Q.  Yeah.  And so y'all — when you moved back, did you have a

8 job?

9 A.  Yes.  I ended up getting a job at Target.

10 Q.  And tell us about the job at Target.

11    What did you do there?

12 A.  I was a cashier and I had to close the store down.

13 Q.  And that would put you working late a night?

14 A.  Yes.  I had gone there to, say, you know, work until

15 11:00, which is when the store closed, but that doesn't mean I

16 can go home, because I have to clean — you know, close the

17 store.

18 Q.  During that period of time, was Devin Kelley able to work

19 at that point in time?

20 A.  No.  He wasn't working.

21 Q.  Why?

22 A.  He didn't want to work.  I had to work.

23 Q.  So he would force you to work?

24 A.  Yes.

25 Q.  How would you get to work?

55

DANIELLE SMITH – DIRECT

1   A.   He would take me.

2   Q.   And would he pick you up from work also?

3   A.   Yes.

4   Q.   Were you able to keep your job at Target?

5   A.   No.  He got me fired.

6   Q.   Can you explain to the Court why Devin Kelley got you

7   fired during that period of time?

8   A.   He kept calling in and saying that I needed to get out,

9   and that he was there and he had been waiting and they had to

10  let me go because it was going to turn into a domestic issue.

11  Q.   So you were fired from your job at Target?

12  A.   Yes.

13  Q.   So after your job at Target, what happened next?

14       What was going on in your lives at that point in time?

15  A.   After Target, we went back and then he was using the money

16  that I had from the settlement, and then, you know, things got

17  worse.

18  Q.   Let's talk about that for a second.

19       You say you "went back."  Did you go back to Colorado?

20  A.   No.  Like.  Went back to just normal seclusion and...

21  Q.   Can you tell the judge –– can you tell the judge what a

22  day in 2015 was like, what your days were like with Devin

23  Kelley?

24  A.   I had to cater to him hand and foot.

25  Q.   Did you feel like you were walking on egg shells?

56

DANIELLE SMITH – DIRECT

1    A.   It was prison with him.   It was like he kept me hostage.

2    Q.   During the weeks of — was he — during 2015, and the

3    times that you were here at the barndominium, was Devin still

4    interested — becoming more interested in guns?

5    A.   Yes.

6    Q.   And when I say, "more interested in guns," what type of

7    things was he doing at this point in time in May of 2015 when

8    you came back from Colorado?

9    A.   He just came down and we were taking care of Michael.

10        He didn't get like really, really interested in it until

11   2016.

12   Q.   But during 2015, were you having problems in your

13   marriage?

14   A.   Yes.

15   Q.   Obviously so, if you are being abused, it's a problem in

16   your marriage, but did you ever express during those times

17   that you wanted to divorce Devin Kelley?

18   A.   Yes.   Repeatedly.

19   Q.   And when you said that, what would happen when you would

20   tell him in, say, 2015 that you wanted to get a divorce?

21   A.   He would hit me.

22   Q.   I'm going to show you what's been previously admitted

23   JEX487–B.

24        Can you see those text messages okay?

25   A.   Yes.

57

DANIELLE SMITH – DIRECT

1  Q.  And do you see — do you see where in the middle of the

2  page it says October 2nd, 2015?

3  A.  Yes.

4  Q.  Okay.  Now, this would have been during the time while you

5  were still living in Texas; correct?

6  A.  Yes.

7  Q.  Because you went back to Colorado one more time that we'll

8  talk about in a minute; correct?

9  A.  Yes.

10  Q.  And so whose number is this at the top or whose phone was

11  this?  Who would you have been talking to in this text

12  message?

13  A.  Oh, I don't even — I don't know.  I don't know the number

14  because it's blocked out.

15  Q.  But when you see where it says, "Devin sent this to me,

16  Hey, Danielle and I are going to part ways with you.  It's

17  obvious you don't want to talk to her, so good luck to you.

18  We really enjoyed seeing you last time, especially me.  It was

19  way much better than I expected.  LOL.  Anyway, we love you."

20  And they wrote, "He's cutie."  And then you — and then

21  there's a writing.  It says, "I don't know.  I didn't even

22  know he was texting you."

23      Do you see that?

24  A.  Yes.

25  Q.  Did somebody send this to you; do you recall?

58

DANIELLE SMITH – DIRECT

1  A.  I don't know.

2  Q.  If we go to the next page, it says — it says:  "I didn't

3  know he was texting you.  I figured.  Message him and tell him

4  to leave you alone."  Do you see that?

5  A.  Yes.

6  Q.  And then below that, it says:  "What's his deal?  I really

7  don't know to be honest.  I feel like I chose the wrong mating

8  partner for life."

9       Danielle, does that refresh your recollection that these

10  may have been text messages with someone that you were — you

11  were talking with?

12  A.  I guess.

13  Q.  Okay.  During those periods of time, did you feel like you

14  had chosen the wrong mating partner for life?

15  A.  Yeah.  I made a mistake marrying him.

16  Q.  Were you depressed during that time?

17  A.  Yeah.  I wanted to kill myself.

18  Q.  Did you ever try?

19  A.  Sometimes.

20  Q.  Did you cry every day?

21  A.  Yes.

22  Q.  And if you scroll down where it lists — it says:  "All he

23  does is yell at me and belittle me every day in public, even

24  then..."  Are those the kind of things that he would do?

25  A.  Yes.

59

DANIELLE SMITH - DIRECT

1  Q.  If we look on the next page, it says, "I'm taped in a

2  marriage that makes me suffer every day."  It should have

3  probably said "trapped"?

4  A.  Yes.

5  Q.  But do you recall writing that?

6  A.  Yeah, I was trapped.  I couldn't get out and if I tried,

7  he would make me pay for it.  He would block the doors.

8  Q.  If you scroll back up just a minute, and we go to the part

9  that says, "When I have to do everything, I spent all of my --

10  all of my settlement money on him.  Now I have nothing."

11      Do you see that?

12 A.  Yes.

13 Q.  That would have been you probably texting these text

14 messages; correct?

15 A.  Yes.

16 Q.  Because, in fact, by October of 2015, he had spent all of

17 your settlement money; correct?

18 A.  Yes.

19 Q.  And so how did his behavior change once he had spent

20 through the settlement money?

21 A.  He was aggressive.

22 Q.  Was he pretty pissed off all the time?

23 A.  Yes.

24 Q.  Go to page 3572.  Keep going, scroll over.  Just go to the

25 next page.  That's fine.  We'll start there.

DANIELLE SMITH - DIRECT

1      Do you see where he says, "He doesn't even take care of

2  Michael"?  Do you see that?

3  A.  Yes.

4  Q.  During those times when Michael was an infant, did he —

5  did he kind of neglect him?

6  A.  He forced me to take care of him, but I didn't mind taking

7  care of Michael because he's my baby.

8  Q.  Sure.  And that's being a good mom, but what you are

9  saying is you absolutely had no — he didn't work.  He was

10  abusive, and he would not take care of your child, help take

11  care of your child?

12  A.  Correct.  If I was making dinner and Michael would be

13  crying, I would ask him if he could go and see why he was

14  crying, and he said it's not his job.

15  Q.  Okay.  What types of things did he do every day?

16  A.  Sit there and boss me around.

17  Q.  Did he smoke weed?

18  A.  Yes.  And he did whippets.

19  Q.  Can you explain to the Court what a whippet is?

20  A.  It's the nitrous cartridges, and when they — like, when

21  you make with homemade whip cream.

22  Q.  Would that be something he would use to get high?

23  A.  Yes.

24  Q.  During this time in October of 2015, these text messages,

25  was he abusing — was he also abusing prescription pills?

DANIELLE SMITH - DIRECT

1  A.  Yes.

2  Q.  What types of prescription pills would he take?

3  A.  When I got pregnant with Rayleigh (phonetic), I was on

4  migraine medicines, because it would make it to where I would

5  throw up and was really, really sick so they had me on

6  Fioricet.  He wouldn't allow me to take my Fioricet because he

7  wanted to use it to get high.

8  Q.  And so he would take -- he would take your drugs also?

9  A.  Yes.

10  Q.  Now, if we go to the next page, we can see you sent a

11  picture to -- whomever this person you were talking to, you

12  sent a picture.

13      Do you recall sending this picture?

14  A.  Yes.  This would be to my mom, Erin.

15  Q.  This would have been to Erin Brassfield?

16  A.  Yes.

17  Q.  Now that you have had a chance to review the exhibit, you

18  can recall these pictures?

19  A.  Yes.

20  Q.  All right.  And it says -- this is on November 11, 2015,

21  roughly a month later to where we started.  It says, "Do you

22  still have a picture of when I sent you of me having a black

23  eye?"

24      Do you see that?

25  A.  Yes.

DANIELLE SMITH – DIRECT

1  Q.  Can you explain to the Court, have you previously sent

2  pictures to Erin Brassfield showing your abuse, and if you

3  did, how many times?

4  A.  Whenever I was able to.  I was only allowed to have

5  technology when I earned it.  And when he would beat me, he

6  would take it away, so I had to earn it back.

7  Q.  What types of things would you have to do to earn it?

8  A.  Whatever he told me to do.

9  Q.  During this time, from the time you were married in 2014

10 up until November 5th, when was the first time you found out

11 that he had been cheating on you?

12 A.  Oh, it was back when we were in Kingsville.

13 Q.  So that would have been approximately 2014 — no, wait.

14 I'm off on my dates.  Around May of 2015?

15 A.  Yes.

16 Q.  And how long did y'all actually stay in Kingsville?

17 A.  Like, a month or two.

18 Q.  And when you say, "he would take away, you would have to

19 earn it," you said you would have to work for him and do

20 different types of things?

21 A.  Yes.

22 Q.  But it would also be sexual in nature; correct?

23 A.  Yes.

24 Q.  So he would force you to do those things, basically, force

25 you to do those things in order for you to earn your

DANIELLE SMITH - DIRECT

1  privileges in order -- in order to even have contact with the
2  outside world; is that affair assessment?
3  A.  Yes.  He looked at me as his property.
4  Q.  And it says here — in November of 2015, it says, "It's
5  not.  It's fine.  I'm trying to get everything together for
6  when I talk to a lawyer.  Devin won't ever get to see Michael.
7  He's a predator and abusive."
8      Did I read that correct?
9  A.  Yes.
10  Q.  So you were reaching out to her when you did have the
11  privileges of technology to try to get some help so that you
12  can get out of this relationship; is that true?
13  A.  Yes.
14  Q.  And did you believe he was a predator at that point?
15  A.  Yes.
16  Q.  And you knew at this point in time also that he had --
17  that he had been cheating on you in November of 2015?
18  A.  Yes.
19  Q.  Now, at what point in time, Danielle, did you and Devin
20  move back to Colorado?
21  A.  Which time?
22  Q.  How many times did you move back to Colorado?  That's a
23  better question.
24  A.  I would say at least three times, maybe four if you count
25  the month, when we were down there for like a month.

DANIELLE SMITH - DIRECT

1   Q.  At one point in time, you moved to Colorado and y'all —

2   y'all rented an apartment; do you recall that?

3   A.  Yes.

4   Q.  Do you recall about what time of year that was when that

5   happened?

6   A.  I think it was during the summer.

7   Q.  And what year would that have been, 2016?

8   A.  Maybe.  I mean, Michael was just a little baby, like a

9   couple months old.  Maybe four months old.

10  Q.  And when you were there in Colorado at that time, what was

11  the reason he continued to move back to Colorado all the time?

12  A.  Because he wanted to go back because they had weed.

13  Q.  So he would — he would go back so that he could legally

14  buy marijuana?

15  A.  Yes.

16  Q.  And y'all would stay there for a while, and then he

17  would — he would pack up and decide that you were going to

18  leave?

19  A.  Yes.  That was the first and third time.  The second time

20  we left is because I reached out to a roommate at that time

21  with a handprint on Michael, and then when he found out that I

22  did that, he made us up and leave in the middle of the night.

23  Q.  And so I think y'all had leased an apartment and lived

24  there maybe two weeks or so.

25      Does that sound familiar?

DANIELLE SMITH — DIRECT

1    A.   Yes.

2    Q.   And you saw that your baby, Michael, had a handprint on

3    his leg?

4    A.   Yes.

5    Q.   And did you talk to Devin about that?

6    A.   Yeah.  I asked him.   And he said it was because he held

7    his leg too tight and his leg got bruised and he said he

8    wasn't going to do it again.

9    Q.   Were you pregnant with your daughter at this point in

10   time?

11   A.   No.  I didn't get pregnant with my daughter until 2016

12   because I had her in 2017.

13   Q.   Okay.  We're going to get to that.

14        During this time, though, y'all had just rented this,

15   leased this apartment, and you cried out to your roommate at

16   that point in time?

17   A.   Yes.

18   Q.   And what did she do — oh, first off, what was her name?

19   A.   Her name was Emily.

20   Q.   And what did Emily do when she found out, or when you

21   cried out to her and showed her the picture of the abuse to

22   Michael's leg?

23   A.   She said that, you know, she would get me help.

24            MS. CHRISTILLES:  Objection.  Hearsay.

25            THE COURT:  That's — any response to that?

DANIELLE SMITH - DIRECT

1        MR. WEBSTER:  I didn't hear her answer yet.

2        THE COURT:  Well, she's calling for hearsay.

3        MR. WEBSTER:  Okay.  I'm asking what her

4   understanding of -- I asked her what happened when she told --

5   let me reask --

6        THE COURT:  No.  What you asked was, "What did she

7   say?"

8        MR. WEBSTER:  I'm sorry.  Let me reask the question.

9        THE COURT:  That's sustained.

10       MR. WEBSTER:  Thank you, Your Honor.

11  BY MR. WEBSTER:

12  Q.  What -- what was your understanding -- what happened after

13  you disclosed to Emily that Michael's leg had been bruised by

14  Devin Kelley?

15  A.  That she would help me get out of the marriage.

16  Q.  And did --

17       MS. CHRISTILLES:  Objection.  Hearsay, Your Honor.

18       THE COURT:  Yeah.  No, that was not hearsay.  That's

19  overruled.

20  BY MR. WEBSTER:

21  Q.  Now, when you -- when Devin -- how did Devin find out that

22  you had shown her Michael's leg or provided her with a picture

23  of Michael's leg?

24  A.  He went through my tablet because I didn't have time to

25  delete the messages.

Gigi Simcox, RMR, CRR

DANIELLE SMITH – DIRECT

1  Q.  Did he beat you for this?

2  A.  He hit me.

3  Q.  Where did he hit you?

4  A.  On my ribs.

5  Q.  And during the time that –– during the time of your

6  marriage, did Devin get better at what I call "better at

7  abusing you" where you can't see it?

8  A.  Yes.

9  Q.  How did he change the way that he would abuse you during

10  this time?

11  A.  He didn't do my face as often unless he knew we were going

12  to not have to be in public.  He would hit my ribs to where it

13  would be his whole fist print or kick me in the back or choke

14  me and then I would have to wear shirts to cover it up or put

15  handprints on my legs.

16  Q.  Did he ever choke you to where you would lose

17  consciousness?

18  A.  Yes.

19  Q.  How many times would he do that, that you recall him doing

20  that?

21  A.  More times than any of us can count.

22  Q.  When he –– during the time in 2015, when you –– when you

23  came back from Colorado –– I think we talked about that ––

24  y'all –– I think y'all –– let me rephrase the question.

25      I'm sorry.  I got off topic.

DANIELLE SMITH - DIRECT

1    When you were in Colorado and y'all rented this apartment,
2 y'all had only been there about six weeks — or two weeks or
3 so; correct?
4 A.  Correct.
5 Q.  And y'all left?  Y'all packed everything and left in the
6 middle of the night?
7 A.  Yes.
8 Q.  And where did y'all go back to?
9 A.  To Michelle's house.
10 Q.  And did he, did Devin Kelley know whether or not Emily had
11 ever filed a police report?
12 A.  No.
13 Q.  Now I want to talk to you about — I want to talk to you
14 about when you moved back into — when did you come to
15 permanently live where you weren't coming back and forth to
16 Colorado?  About what time?
17 A.  I guess the end of '15, early '16.
18 Q.  So you moved — when I say "permanently," between the time
19 of the shooting, up until — going back —
20 A.  Um-hum.
21 Q.  — when was the last time that you actually lived in
22 Colorado?  Was it that night y'all moved out in the middle of
23 the night?
24 A.  It was the one time we went to Pueblo for a month and then
25 that's when we permanently moved back, and I guess that was

DANIELLE SMITH - DIRECT

1  2015-ish, 2016.  It was before I got pregnant with my

2  daughter.

3  Q.  Okay.  And when you came back and you got -- and you --

4  when you came back, did you get a job at H-E-B?

5  A.  Yes.  That was after I was pregnant with my daughter.

6  Q.  Was the pregnancy with your daughter planned, Danielle?

7  A.  No.

8  Q.  Was that pregnancy forced upon you?

9  A.  Yes.  He would take my birth control away from me as a

10 form of punishment.

11 Q.  Okay.  And I would assume you did not want to have another

12 baby at this point in time; is that true?

13 A.  That's correct.  I couldn't have another baby to try and

14 protect from him.

15 Q.  During this time, was he forcing you to watch pornography?

16 A.  Yes.

17 Q.  And he was still being -- still doing the same exact

18 things, punching, slapping, choking, dragging you by the hair?

19 A.  Yes.

20 Q.  Did he ever -- did y'all ever talk at all about his

21 previous relationships where he was married to Tessa?

22 A.  No.

23 Q.  Were you not allowed to bring that up or talk about it?

24 A.  I wasn't.

25 Q.  Now I want to move for a minute and talk to you now about

DANIELLE SMITH – DIRECT

1   after you came back from Colorado.  I want to talk to you

2   about Devin and guns.  Okay?

3   A.  Okay.

4   Q.  Now, at the time of the shooting, Devin owned, from what I

5   remember, three guns that you know of; is that correct?

6   A.  From the time of the shooting?

7   Q.  Yes, ma'am.

8   A.  Yes.

9   Q.  He had an AR-15; correct?

10  A.  Yes.

11  Q.  He had a .22 pistol; is that correct?

12  A.  I just know he had two pistols.

13  Q.  Fair enough.  Two pistols.  Okay.  Now, I want to go back

14  for a little bit.  You stated earlier he didn't have any

15  interest in guns prior to the Air Force that you can recall;

16  correct?

17  A.  Correct.

18  Q.  I think you told the Court earlier that he started having

19  an interest in guns in 2016; is that true?

20  A.  Yes.

21  Q.  And so how did it change in 2016 that he started

22  expressing more of an interest in guns?

23  A.  He just would research a lot, and then he said he wanted

24  to do a gun school to teach people about guns.

25  Q.  When he —— you issued an affidavit in this case with

DANIELLE SMITH – DIRECT

1  regards to —— would he tell you the types —— would Devin

2  Kelley tell you the types of —— the types of guns that he

3  would want to look at?

4  A.  He said he wanted the AR for home protection, is what he

5  would tell me.

6  Q.  And when y'all lived there in the barndominium that we

7  talked about earlier, did he have any type of —— he didn't

8  have any type of machining tools or any specialized knowledge

9  in building guns; did he?

10          MS. CHRISTILLES:  Objection.  Speculation.

11          THE COURT:  You can testify from your personal

12  knowledge.

13          THE WITNESS:  From my personal knowledge, no.  I

14  don't think he knew how to, like, build guns.

15  BY MR. WEBSTER:

16  Q.  If we go back and look at the photos of the —— of the

17  barndominium and we look at page JEX799-0015, one of the

18  entrances into the barndominium, the barndominium apartment

19  that you were staying in was just to the right of here; is

20  that correct?

21  A.  Yes.

22  Q.  And so this would have been the outdoor area where you can

23  see —— is that your stroller and some toys for the kids and

24  stuff over on the right?

25  A.  Yes.

DANIELLE SMITH - DIRECT

1  Q.  And so there was not any equipment or any type of machines

2  or any of the rest that you recall, that he could build or

3  assemble or disassemble guns that you recall; correct?

4  A.  Correct.

5  Q.  He didn't have any -- number one, y'all didn't have the

6  money for that type of stuff, and number two, Devin Kelley

7  didn't have the gun knowledge to even be able to do that; did

8  he?

9  A.  To my knowledge, he didn't, no.

10 Q.  And so the knowledge that he had acquired from -- at least

11 from what -- from your perspective based upon your own

12 personal knowledge, any gun -- would he have acquired that

13 knowledge from the Air Force?

14 A.  Um...

15         MS. CHRISTILLES:  Objection.  Speculation.

16         THE COURT:  That's speculation.  That's sustained.

17         MR. WEBSTER:  No problem.

18 BY MR. WEBSTER:

19 Q.  Do you know whether or not the Air Force ever trained

20 Devin Kelley in how to assemble or disassemble an AR-15?

21 A.  I don't -- I don't know.  I don't know anything about,

22 like, what they do.

23 Q.  Okay.  Now, you went to -- on several occasions, y'all

24 would go to different stores and look at guns; is that true?

25 A.  Yes.

73
DANIELLE SMITH - DIRECT

1   Q.  How often would that occur from, say, 2016, when you moved

2   back and you said he got more interested, how often would

3   y'all go to the store and look at those types of things?

4   A.  Frequently.  When he found a gun that he liked, and then

5   after he got the AR, I know we went back several times because

6   he wanted to buy stuff.  And most of the times when he was

7   going back, I would just take Michael and walk around with him

8   so he could see stuff.

9   Q.  Now, during that time, somewhere around November/December

10  of 2015, did you go shopping with Devin Kelley at Dick's

11  Sporting Goods?

12  A.  Yes.

13  Q.  Can you explain to the Court what happened while you were

14  there?  Why were y'all — why did you go to Dick's Sporting

15  Goods in November/December of 2015?

16  A.  He wanted to buy a gun, and they said that since he had a

17  Colorado ID and that Dicks wouldn't do it because it's

18  something about their policy or something.  They wouldn't sell

19  him it.

20  Q.  Were you personally there?  Did you see the actual gun he

21  was trying to buy?

22  A.  Yes.

23  Q.  What did you see at that point in time?

24  A.  I mean, guns look the same.

25  Q.  It's safe to say you are not real sure on the make or

DANIELLE SMITH – DIRECT

1  model or type of gun that it was; is that fair?

2  A.  Yes.

3  Q.  And what were you doing during that time?  You had your

4  son; correct?

5  A.  Yes.

6  Q.  Was he able to walk at that point in time?

7  A.  No.  He was just a baby.

8  Q.  What were you doing while he was trying to purchase this

9  gun?

10  A.  I was moving around, keeping him happy.

11  Q.  And you were just kind of basically what I would call

12  "hovering around the situation," but not really paying

13  attention to what's going on; is that a fair assessment?

14  A.  Yes.  When I came back around is when I came up upon them

15  when he was saying like towards the end Dick's wouldn't do it

16  because he had a Colorado ID.

17  Q.  Was he upset?

18  A.  I mean, we left the store and his face changed.

19  Q.  Did he try to force you to go back in and buy the gun?

20  A.  No.

21  Q.  Would you ever buy a gun for Devin Kelley if he asked you

22  to?

23  A.  No.

24  Q.  What would happen —— if he asked you to, what would

25  happen?

DANIELLE SMITH - DIRECT

1   A.  I would get -- you know, if I said, "no," he would beat

2   me, but I would take the beating.

3   Q.  Did you ever ask you to buy a gun for him?

4   A.  No.

5   Q.  Did you ever see him ask one of his parents or any other

6   friend or someone else try to purchase a gun for him?

7   A.  From my knowledge, no.

8   Q.  And that's what I'm asking.  Your personal knowledge, you

9   never saw that; correct?

10  A.  Correct.

11  Q.  And he was pretty much -- during this period of time in

12  2016, y'all were pretty much -- would you say that you were

13  pretty much quartered off from the rest of the world?

14  A.  Yes.

15  Q.  And during the days of the week, during the normal days of

16  the week, if neither one of you were working, y'all were just

17  there at the house during the entire time; right?

18  A.  Yeah.  I wasn't allowed to do nothing.

19  Q.  So were you allowed to take the kids outside and play?

20  A.  He had to watch me and I had to ask permission.  The only

21  time I was allowed to do everything is if I got everything

22  finished off the list of stuff that he had for me, and if I

23  didn't finish it on a time stamp that he had, I would get a

24  punishment.

25  Q.  When after -- between December 2015 and April of 2016, do

DANIELLE SMITH – DIRECT

1  you recall ever going to any stores after the Dick's event
2  where Devin Kelley tried to purchase any firearms?  Did he go
3  to any private individuals?  Did try to do it any other way
4  that you're aware of?
5  A.  Besides going to Academy?
6  Q.  Yes, ma'am.
7  A.  He went to Academy and bought the AR.
8  Q.  Right.  But I am saying between the time that he went and
9  bought the AR in April of 2016, do you recall — do you recall
10  at any time, did he try — did he try to purchase the gun in
11  any way that you're aware of?
12  A.  Oh, no.  He only wanted it from stores because he didn't
13  want them to break.
14  Q.  Now, when you — once he — in April of 2016, you went
15  to — you went to Academy with him; correct?
16  A.  Yes.
17  Q.  Did y'all go to different Academies from time to time?
18  A.  No.  We only went to the one Academy that was closest to
19  New Braunfels.
20  Q.  But you were there — you were there the day that the
21  rifle was purchased; correct?
22  A.  Yes.
23  Q.  If in your statement it says Selma, but the paperwork
24  shows it was purchased at an Academy in San Antonio.
25      Do you recall ever going to an Academy in San Antonio?

DANIELLE SMITH – DIRECT

1  A.  No.  I thought it was the Selma one because that's the

2  closest one to New Braunfels.

3  Q.  But if it shows it was bought there, are you telling the

4  Court — where you there when it was bought?

5  A.  No.  It was bought there.  I'm sorry.  I didn't know the

6  location.

7  Q.  How many times do you think that you went to Academy,

8  Danielle, during the time that you were married to Devin

9  Kelley?

10  A.  All of them except for the last one.

11  Q.  Meaning, y'all went all the time?

12  A.  Yeah.  He would drag me along, and I didn't have a say in

13  it, so when he would go in and buy it, I would take Michael

14  around.

15  Q.  And so you would go walk around the store and that kind of

16  thing?

17  A.  Yes.

18  Q.  So regardless of what — of what Academy it was in that

19  day where the gun was purchased, you are telling the Court as

20  you sit here today under oath that you were there?

21  A.  Yes.  I was there.

22  Q.  Can you describe to the judge what happened when you went

23  into the Academy and purchased the gun that day, what you can

24  recall?

25  A.  When we went in, they did a background check.  His

DANIELLE SMITH — DIRECT

1  background check came back pretty quickly.  I was driving
2  Michael today around.  I came back, and that's when manager
3  was there, and they were talking and the manager, I guess, had
4  to like override or approve, however you want to put it, for
5  him to get the gun.
6  Q.  And so once he purchased the weapon, y'all didn't have any
7  problems purchasing it?
8  A.  No once the manager came, it was quick.
9  Q.  And did you — were you upset that he was buying a gun?
10  A.  I didn't have a say, so I didn't get to show emotions
11  to —
12  Q.  Did y'all have the money to buy a gun?
13  A.  Oh, I didn't know what money we had because he would take
14  it.  He kept all finances away from me.
15  Q.  And so once he purchased the gun, did he use the gun?
16  A.  Yeah.
17  Q.  Would he shoot it?
18  A.  Yeah.  He would shoot it.  I know when we were there, he
19  bought the little things that you put in it.
20  Q.  The magazines?
21  A.  Yeah.  Those.  And he bought the really big ones and he
22  would go and shoot the gun.  He would force me to pick them
23  up, the shells, and if I didn't do it hard enough, he would
24  take his pistol and hit me.
25  Q.  So you would actually be out on their family property

DANIELLE SMITH - DIRECT

1  shooting the gun?

2  A.  No.  He would be shooting.  I didn't touch it.

3  Q.  I understand.  Let me rephrase the question.

4     Devin would be out on the family property actually

5  shooting the -- shooting the weapon and you would be standing

6  besides him?

7  A.  Yes.

8  Q.  And he would force you to watch this?

9  A.  Yes.

10 Q.  Where would your kids be or Michael at the time?

11 A.  I would have to have Michael with me and I put little,

12 like, stuff on his ears, so it wouldn't hurt his ears.

13 Q.  So when he would be out there practicing shooting, what

14 types of things would he force you to do?

15 A.  I would have to pick up the shells.

16 Q.  Now, how often would that go -- would that on, Danielle?

17 A.  A lot.

18 Q.  Once or twice a week or...

19 A.  However many times he went.  Sometimes it would be more,

20 or sometimes multiple times a day, like after a while, I

21 just -- I stopped counting because I was forced to do so much

22 stuff, I can't keep track.

23 Q.  Would he -- he would never -- would he ever leave you

24 alone in the barndominium?

25 A.  No.  Oh, I take that back.  No, unless he had to work

DANIELLE SMITH – DIRECT

1   because he had a job towards the end and that's when I had an

2   iPod, and when he left me alone, I had to check in, and if I

3   didn't check in on time, he would come home.

4   Q.  Okay.  And did he give you any way to communicate with the

5   outside world at that point?

6   A.  No.  The iPad you can't do nothing.  You can only talk to,

7   like, iPhones, but even then he monitored everything.

8   Q.  Would he lock you in that barndominium?

9   A.  Yes.  The doors that you showed, I don't know if you

10  wanted to put it back on so everybody can see so I can show

11  y'all.

12  Q.  Sure.  Go to 0799-0016.  Well, 17 would be better.

13  A.  So can you scoot it back to the door, to the main door?

14  Q.  Oh, okay.  Yes, we'll go back two.

15  A.  I'm sorry.  On this one, do you see where it's in front,

16  that was like cinder blocks, I think is what you call those

17  concrete blocks.  They had it there to block the door — I say

18  "they," Devin — to where I couldn't lift it up because he

19  would hear me and it was, yeah, those.

20  Q.  Okay.  So he would use cinder blocks to hold the door down

21  and you couldn't lift it up?

22  A.  Yeah.  And then on the side, there is like a little —

23  like a metal thingy.  You know, it's like a hook that you are

24  supposed to lock it.  He would lock those down to where if

25  you — if you lifted it, you could hear it, and it was the

DANIELLE SMITH - DIRECT

1  same on the other side by the front door.  Not the barn —

2  not, like, the apartment door, but like the front door to the

3  barn, like, thing that — like if you go back to your other

4  photo — yeah, that one.

5       Like he would close it and put stuff there to where I

6  couldn't get out, and then the front door next to it, it would

7  stick to where it would — you know, you got to pull it really

8  hard and he would hear it.

9  Q.  Okay.  And when he would leave, though, when he would go

10  to his job later on in time, did he lock you in the house at

11  that point, too?

12  A.  Yeah.  And the windows — you know, the first window up

13  there that has the foil, you can't get to it because it's

14  permanently closed.  The bathroom window, which is a tiny

15  little square past the big windows.

16       Yeah, that one.

17       There was no way to get to it.  And if these, the big ones

18  right there, it can open, but he put the heavy couch in front

19  of it.

20  Q.  Okay.  So it was a way to keep you inside the house at all

21  times?

22  A.  Yes.

23  Q.  Okay.

24  A.  And if you left, it would be in front of his parent's

25  house.

DANIELLE SMITH – DIRECT

1            MR. WEBSTER:  Your Honor, at this time, could we take

2     a short break?

3            THE COURT:  Let's go ahead and take a 10- to

4     15-minute break.

5            MR. WEBSTER:  Thank you, Your Honor.

6            (Recess.)

7            THE COURT:  You may continue.

8            MR. WEBSTER:  Thank you, Your Honor.

9     BY MR. WEBSTER:

10    Q.  Danielle, I'd like to transition now to a different area,

11    and I'd like to talk to you about the Sutherland Springs

12    Baptist Church; okay?

13    A.  Okay.

14    Q.  Can you tell the Court when did you first start going to

15    the Sutherland Springs Baptist Church?

16    A.  When I was a child.

17    Q.  Okay.  And you say, "when you were a child," would you go

18    there with Michelle Shields?

19    A.  Yes.

20    Q.  Your adopted mother?

21    A.  Yes.

22    Q.  And was she a member of that church?

23    A.  Yes.

24    Q.  Is she still a member today?

25    A.  Yes.

DANIELLE SMITH - DIRECT

1   Q.  And can you tell us over the years what did that church

2   mean to you?

3   A.  I grew up at the church, so it's like another home.

4   Q.  Were you close to many of the families there?

5   A.  I was close to the Holcombes and the Hills.

6   Q.  And did — when you — and you say you grew up in the

7   church, did you consistently go there up until when?

8   A.  Until I left home.

9   Q.  And when you say you "left home," that would have been in

10  April of 2014; correct?

11  A.  Yes.

12  Q.  And that would have been when you married Devin Kelley?

13  A.  No.  I left before then, because I moved out from

14  Michelle's when — I think, around 18 — then I went to Erin's

15  house.  And then after Erin's house, that's when I moved in

16  with him.

17  Q.  During the times that you — when you were growing up, did

18  you go to vacation Bible school?

19  A.  Yes.

20  Q.  What types of things did y'all do there?

21  A.  I helped with the toddlers.

22  Q.  How old were you when you were doing that?

23  A.  I was a teenager.

24  Q.  And you also — did you work in the nursery during

25  services and stuff?

DANIELLE SMITH – DIRECT

1   A.  I did.

2   Q.  And did you have difficulties with the family at the

3   church?

4   A.  Yes.

5   Q.  And why did you have difficulty with the family at the

6   church?

7   A.  I had a family that hasn't been at that church for a very

8   long time.  Her daughter and I just had a falling out and the

9   family was just really ugly towards me.

10  Q.  So did you stop going for a while — or once you got

11  married to Devin, did you stop going to church?

12  A.  Yeah, because he didn't like church.

13  Q.  Would he allow you to go to church?

14  A.  Only when you earned the right to go see my mother.

15  Q.  Would he attend church with you?

16  A.  Yes.

17  Q.  What was your mother's role at the church?

18  A.  Like when?  Like before the shooting?  After the shooting?

19  Q.  Yes, ma'am.  Before the shooting.

20  A.  Before the shooting, I think she was just a member.  After

21  the shooting, I think she was just a treasurer, kind of the

22  person that deals with like finances.

23  Q.  So she's still a member of the church today?

24  A.  Yes.

25  Q.  What other family members did you have, Danielle, that

DANIELLE SMITH – DIRECT

1   went to the church there?

2   A.  My grandma.

3   Q.  And any other family members?

4   A.  I mean, just Naw Naw, my — Lula White.

5   Q.  Okay.

6   A.  And then Michelle.

7   Q.  Can you explain how was Lula White — I apologize.

8      Can you tell us how Lula White — I apologize.  You were

9   going to finish.  I didn't mean to interrupt you.

10  A.  Oh, it would be my brother that went to church and then

11  Dan, who is my dad, went to church and then my grandmother and

12  my grandfather before he passed away.

13  Q.  Did Erin Brassfield ever go to church there?

14  A.  No.

15  Q.  Did Kurt Brassfield ever go to church there?

16  A.  No.

17  Q.  During the times that — when you were married to Devin

18  Kelley, did he know that that was a — that you enjoyed being

19  at that church?

20  A.  Yes.

21  Q.  Tell us how did that interaction work?  How did he know

22  that you enjoyed being at the Sutherland Springs Baptist

23  Church?

24  A.  He knew I took care of the babies.

25  Q.  Was the church — would you consider the Sutherland

DANIELLE SMITH — DIRECT

1  Springs Baptist Church a safe place for you?

2          MS. CHRISTILLES:  Objection.  Leading.

3          THE COURT:  That's overruled.

4          THE WITNESS:  Yes, it was home.

5  BY MR. WEBSTER:

6  Q.  Why would you call it home?

7  A.  Because it was just a place you can go in, and I loved the

8  children there.  I just wanted to work in the children's

9  ministry.

10  Q.  Did you often have conversations with Devin about this?

11  A.  No.  He knew beforehand that I loved it.  I love children.

12  Q.  And he knew that that was one of the places that was very

13  sacred in your heart; is that fair?

14  A.  Yes, because he knew that.  When you teach a child, right,

15  and when they get something, their little eyes sparkle.

16  Q.  Right.  Did Devin know during the time prior to the

17  shooting that you often looked to the church members for

18  support?

19  A.  Yes.

20  Q.  How did he know that?

21  A.  He knew Karla Holcombe, that I adored her, and she was my

22  youth pastor.

23  Q.  She was your youth pastor?

24  A.  Yes.

25  Q.  Did you often confide in her?

DANIELLE SMITH – DIRECT

1  A.  Yes.

2  Q.  Back when I was a teenager — you know, once I got married

3  to him, I couldn't talk to anybody.

4       Even when you went to church, would he control what you

5  had to say?

6  A.  Yes.

7  Q.  Now, when — and how often during the time that you were

8  married to Devin did you attend church there?

9  A.  Just a handful of times, just so I could see my mother.

10  Q.  Would he ever allow just her to come out to the house?

11  A.  No.  We had to go to her.

12  Q.  The barndominium, he was — she was never allowed on the

13  property; correct?

14  A.  Nobody was allowed there.

15  Q.  And when you say that, he would use church as a way for

16  you to be able to see her?

17  A.  Yes.

18  Q.  And can you explain to the Court when you would have an

19  interaction with your mom, and the other patrons of the

20  church, how was that, how did it work when Devin was with you?

21  A.  When we were there, I had to be careful with what I said

22  and how I said it, and I couldn't do eye contact.  And I was

23  only allowed short conversations.

24  Q.  He didn't want any — would you agree with me that he

25  didn't want anyone talking to you?

DANIELLE SMITH – DIRECT

1  A.  Yes.  If he wasn't present, he would take me away from the

2  conversation and ask what I said.

3  Q.  And was that because he was trying — was he — at this

4  point, do you believe he was scared that maybe you might tell

5  somebody about the abuse you'd suffered?

6         MS. CHRISTILLES:  Objection.  Speculation.

7         THE COURT:  That's sustained.

8         MR. WEBSTER:  Okay.

9  BY MR. WEBSTER:

10  Q.  Do you have any personal knowledge?  Did Devin ever tell

11  you why you were not allowed to talk to anyone?

12  A.  Because I was his property.

13  Q.  Did Devin ever express whether or not he actually liked

14  the church to you?

15  A.  He didn't say that he felt — he didn't like churches,

16  like it didn't matter what church it was, because he said he

17  was an atheist.  He didn't believe in any type of, like, a

18  deity.

19  Q.  So the only time you would get to church is if you earned

20  the right to go and to see your mother?

21  A.  Yes.

22  Q.  Did Devin ever express that he felt slighted by the church

23  members or that he felt unwelcome?

24  A.  I don't really know what "slighted" means.

25  Q.  That he felt like they had treated him badly?

DANIELLE SMITH - DIRECT

1   A.   Oh, he thought everybody did.   Like he thought everybody

2   was always out to get him.

3   Q.   He didn't like people; correct?

4   A.   Correct.

5   Q.   Now, he also — during that time, did he have a run-in

6   with your preacher?   What I call a run-in or an argument?

7   A.   Oh, I have no idea.

8   Q.   Do you know whether or not the preacher ever approached

9   Devin about a possible abuse towards you?

10  A.   Oh, I wouldn't know.

11  Q.   That's not something he would have told you; right?

12  A.   No.   He told me what he thought I needed to know at what

13  time I needed to know it.   Like, he kept a lot of things from

14  me, even though at the time I thought he was being truthful,

15  but he wasn't.

16  Q.   And on November 5 of 2017, did Devin Kelley know what this

17  church meant to you?

18  A.   Yes.

19  Q.   Now, I want to move to the next part, which is — we're

20  going to talk about — I'd like to talk about just prior to

21  November 5, 2017; okay?

22  A.   Okay.

23  Q.   Had y'all — let me go back for a minute.

24       During that point in time, there was a run in, what I

25  would call a run in or a law enforcement, that came out to the

DANIELLE SMITH – DIRECT

1   Kelley's property.

2       Do you recall that?

3   A.   Yes.

4   Q.   And you were not out there at the scene when that

5   happened; correct?

6   A.   Correct.   I wasn't allowed to be.

7   Q.   Where were you when the police came?

8   A.   I was in the barn with my baby.

9   Q.   How did you find out that the police had come to the

10  Kelley property?

11  A.   They left cards everywhere, and it was upsetting them, and

12  then he went down to the gate, and when him and Mr. Kelley

13  came back, they just looked very upset.

14  Q.   Was he armed when he went down to the gate?

15  A.   I believe so because he never took that off.

16  Q.   And then I'll show you what's — I'll show you JEX799–116.

17      And do you see where it says the number 5 over here?

18  A.   Yes.

19  Q.   Is that the holster that he would wear on a regular

20  occasion?

21  A.   I believe so.   I mean, I don't know much about gun stuff,

22  so if it fits, then it's what he used.

23  Q.   But he wore that — I think we talked about that earlier,

24  but he wore that on the property at all times; right?

25  A.   Yeah, he wore it everywhere.

DANIELLE SMITH - DIRECT

1  Q.  Now, what was your understanding as to why Devin Kelley

2  didn't want you testifying at the Brassfield trial?

3  A.  Because he couldn't control the situation.  If he can't

4  control what I say or what I do, he didn't like it.

5  Q.  Okay.  It wasn't any -- he wasn't looking out for your

6  best interest; was he?

7  A.  No.

8           MS. CHRISTILLES:  Objection.  Speculation.

9           THE COURT:  That's sustained.

10          MR. WEBSTER:  Here.  I'll rephrase the question.

11  BY MR. WEBSTER:

12  Q.  Do you feel like, based upon your own personal knowledge,

13  that Devin Kelley was, was interfering in the Donald

14  Brassfield trial in order to protect you?

15  A.  He didn't care about me.  He cared about himself he didn't

16  care that I would have to -- you know, if he -- if I wanted to

17  testify, right, and if he was there, he would have been fine

18  with it, because all you've got to do is just give a look or

19  do something.  If he wasn't allowed there.  He didn't want me

20  doing it.

21  Q.  Did he ever -- did Devin Kelley ever tell you that he

22  didn't want you testifying because he was scared of what you

23  might tell the police or tell prosecutors?

24  A.  He said I was forbidden from talking to anybody.

25  Q.  And it -- and it wasn't because -- I mean, do you believe,

DANIELLE SMITH — DIRECT

1  as you sit there today, based upon your own personal

2  knowledge, that that was because of any type of protection of

3  you in any way?

4          MS. CHRISTILLES:  Objection.  Leading.

5          THE COURT:  That's sustained.

6  BY MR. WEBSTER:

7  Q.  Why do you feel like he didn't want you to testify in the

8  Donald Brassfield trial?

9  A.  I guess because he thought I would try to get away from

10  him.

11  Q.  And would you have?

12  A.  If I knew I could get out safely without my babies dying,

13  yes.

14  Q.  Now, the abuse and the beatings had continued after he

15  bought the gun in 2016, right up until November 5th of 2017;

16  correct?

17  A.  Yes.

18  Q.  But the way you felt about things had changed, would you

19  agree?

20  A.  Changed like?

21  Q.  Meaning how did your reactions to the abuse you suffered

22  under Devin Kelley's hand change over time?

23  A.  I didn't want my son growing up to be like him.  When I

24  had my daughter, I didn't want her to think that she's some

25  man's trash, some man's property, because she's not.

DANIELLE SMITH – DIRECT

1  Q.  And when your daughter was born — when was your daughter

2  born?

3  A.  May 24th of 2017.

4  Q.  So she was just a baby on November 5th, 2017; right?

5  A.  Yes, she was only five months old.

6  Q.  So we talked about the November 1st, 2017 incident when

7  the police came; okay.  Leading up to that time, can you

8  explain to the judge or tell him what happened in your

9  relationship with Devin Kelley before November 5th of 2017?

10  A.  He was cheating on me constantly all the time.  I found

11  out he was cheating again and I had had enough.  I was tired.

12  I was tired of being his punching bag.

13  Q.  And did you know — it was different this time, you had

14  known about the cheating before but did you actually see

15  evidence of it?

16  A.  Yes.

17  Q.  Can you tell the judge what you saw?

18  A.  He had video of somebody giving him oral.

19  Q.  And he showed that to you?

20  A.  Yes.

21  Q.  And what did you tell him, when you saw it?

22  A.  I was done.  I'm tired.  I was done.

23  Q.  And you testified earlier — let's go to — I want to

24  show —

25      Go to 799-0043.

DANIELLE SMITH – DIRECT

1     This would have been standing, looking in the

2   barndominium.  The bed would have been behind you to the right

3   and the closet would have been over your left shoulder;

4   correct?

5   A.  Yes.

6   Q.  So this was the small area that many of the beatings that

7   you took occurred; is that true?

8   A.  Yes.

9   Q.  And so when you would be — as your daughter was born, she

10  would be laying in the crib that you can see in 0041 there to

11  the right; correct?

12  A.  Yes.  Oh, no.  No.  That white one, Michael was in the big

13  one.  The little rocker was where my daughter was at.

14  Q.  And so they would see and witness this, witness his abuse

15  of you on a daily basis?

16  A.  Michael would.  I would just tell him to close his eyes,

17  that it didn't hurt.

18  Q.  Would he start to cry, when he would see this?

19  A.  He would cry and I would tell him:  "It's okay.  It

20  doesn't hurt mommy.  Just close your eyes."

21  Q.  When did you tell Devin Kelley that you had had enough and

22  you wanted a divorce?

23  A.  It would have been that Friday and Saturday.  Friday, he

24  was cheating.  I told him I was done.  I was tired of him.  He

25  was punching me in my ribs.  And Saturday I told him I wanted

DANIELLE SMITH – DIRECT

1  a divorce, I was done.  I didn't want to be his punching bag

2  anymore.

3  Q.  If we go back to 0041, sir.

4      Danielle, where were y'all, when y'all were having this

5  conversation or this fight?

6  A.  It would have been on the couch.

7  Q.  And so he would actually hold you down and punch you on

8  the couch?

9  A.  He would pull me by my hair and throw me to the table.

10  And I would hit the table and he would hold me down and punch

11  me.

12  Q.  Did this happen on that Friday before?

13  A.  Yes.

14  Q.  Okay.  And that's when you told him –– he had shown you

15  the video?  At that point in time, he had shown you the video

16  of the cheating, and that's when you said you had had enough?

17  A.  Yes, because he got off on it.

18  Q.  Did he –– did you –– how did –– were you crying, when this

19  happened?

20  A.  Crying, as in to what?  That he was cheating on me?

21  Q.  Yes, ma'am.

22  A.  No, because I was used to being felt like I was trash.

23  Q.  Do you think that based upon the way that you told Devin

24  Kelley that you wanted a divorce, that he understood that it

25  was real this time?

DANIELLE SMITH — DIRECT

1          MS. CHRISTILLES:  Objection.  Speculation.

2          THE COURT:  You can testify from your personal

3  knowledge.

4          THE WITNESS:  From my personal knowledge, I think

5  from that moment he knew I would have done everything to get

6  away from him.

7  BY MR. WEBSTER:

8  Q.  Why?

9  A.  Because I tried fighting back but I lost.

10 Q.  And when you say you tried fighting back, what did you do?

11 A.  I tried hitting him.  I tried doing everything, but it got

12 to the point that I told him "I'm not afraid of you anymore,"

13 but I was.

14 Q.  And so what was his reaction at that point on Friday?

15 A.  He was beating me and then it stopped.  And then on

16 Saturday when I told him I wanted a divorce, he was just calm

17 about it, because I was expecting him to beat me again.

18 Q.  But this time he didn't?

19 A.  Not on Saturday, no.

20 Q.  When you had the conversation — going back to 0041.

21     When you had the conversation with Devin that day, were

22 y'all sitting on the couch again on Saturday?

23 A.  On Saturday, he was standing over me.

24 Q.  Okay.  Where were you at?

25 A.  On the couch.

DANIELLE SMITH - DIRECT

1  Q.  And when you say "standing over," were you sitting?  Were
2  you laying?  How were you on the couch?
3  A.  I was sitting there.
4  Q.  And you were just looking up at him and he was standing
5  over you?
6  A.  No.  I don't look him in the face.
7  Q.  You weren't allowed to look him in the face?
8  A.  No.
9  Q.  So you had your head down and you were sitting there?
10 A.  Yes.  I had to look down when I talked to him because I
11 wasn't allowed to look up at him.
12 Q.  And you just — can you tell the Judge exactly what you
13 told Devin Kelley on that Saturday?
14 A.  I wanted a divorce.  I was done.
15 Q.  And what did he say to you, if anything, at that point?
16 A.  He was calm.  And him and I talked and said that Monday we
17 were going to go down to the courthouse to file for a divorce.
18 And he agreed to meet my mother, Michelle, halfway.
19 Q.  Okay.  Had you reached out to your mom at this time to
20 tell her that you had planned to leave?
21 A.  No.  All I had to do was call her and she would be there.
22 It didn't matter where.  She would drive to Colorado, if I
23 needed her.
24 Q.  So the plan at that point in time was that you had planned
25 to leave on Monday?

DANIELLE SMITH — DIRECT

1   A.   Yes.

2   Q.   How come you just didn't stand up and leave right then?

3   A.   How could I leave?  I had two babies I have to worry

4   about.  I didn't care if he killed me.  I cared if he killed

5   my babies.

6   Q.   And was he okay with the plan that you were going to go

7   down there and meet Michelle?

8   A.   He seemed like it.

9   Q.   And did he get angry at that point, or anything like that?

10  A.   He was just calm.  Like no emotion.  Calm.

11  Q.   Did you believe, based upon your own personal knowledge in

12  seeing what was going on, that Devin was okay with you getting

13  a divorce?

14  A.   I thought he was going to let me go.  But, you know, he

15  will never let you go.

16  Q.   When the —

17         THE COURT:  Counsel, let me stop you.  The record is

18  unclear about what date this Friday and Saturday is.

19         MR. WEBSTER:  This would have been —

20  BY MR. WEBSTER:

21  Q.   I would believe all of these events, Danielle, what you

22  are talking about would have been on November 3rd and

23  November 4th, two and one days prior to the shooting on

24  November 5th, 2017; correct?

25  A.   Correct.

DANIELLE SMITH – DIRECT

1  Q.  And so what happened the rest of the day on Saturday?  Do

2  you recall what time approximately this conversation where he

3  became extremely calm occurred, what time of day it was?

4  A.  It was nighttime because he had to go to work and he came

5  home early.

6  Q.  Okay.  So he had gone to his security job at that point in

7  time during the day, and then when he came back is when y'all

8  had the conversation?

9  A.  Yes.

10  Q.  And that night did y'all sleep in the same bed?

11  A.  Yes, because there is nowhere else for us to go.

12  Q.  So did he force you to have sex with him that night?

13  A.  Yes.

14  Q.  Did you want to have sex with him?

15  A.  No, I never did.

16  Q.  How long had he been forcing or raping you over the

17  past —— since you had been married to him?

18  A.  Four years.

19  Q.  Would you try to fight him off at times?

20  A.  At times I did.  No matter how much I screamed, he just

21  pushed my face farther into the bed and said:  "This is what

22  whores deserve."

23  Q.  Did he — at any time — on that night, did you fight him

24  on that night before the shooting?

25  A.  I know if I just laid there and did nothing, he would

DANIELLE SMITH - DIRECT

1  stop.

2  Q.  So that's what you did?

3  A.  After a while you learn that if you don't fight back and

4  you just let it happen, it will be done quicker and you don't

5  have to die.

6  Q.  Was that a constant fear in your life?

7  A.  Him killing me?  Yes, because I knew he was going to one

8  day.

9  Q.  Now, I guess after this occurred you went to sleep; right?

10 A.  Yes.

11 Q.  Tell me what happened.  Take us through — first off, I

12 want to go back and talk about the scene for a second.

13     Can we go back to Figure 0041 to start.

14     Danielle, you see here — do you see in the corner the

15 black bucket?

16 A.  Yes.

17 Q.  See that right there?

18     Let's go to 0116.

19     Talked about that a minute ago.  Now, this is what — I

20 think this is what you referred to in your past testimony as

21 "Devin's black tub;" is that correct?

22 A.  Yes.

23 Q.  And were you allowed to touch that tub?

24 A.  No.

25 Q.  Why were you not allowed to touch that tub?

DANIELLE SMITH - DIRECT

1  A.  He made it clear.  It was one of his rules.  I can't touch

2  it.  I can't move it.  I can't get near it.

3  Q.  Were you allowed to look in it?

4  A.  No.

5  Q.  Did you, as you sit here today, on November 4th or the

6  morning of November 5th, 2017, did you have any idea what was

7  in that black tub?

8  A.  I didn't know what was in it until he forced me to watch

9  him put everything on.

10  Q.  Okay.  We're going to get to that in a second.  But this

11  black tub, is that the place that he always kept it, right

12  there by the door?

13  A.  Yes.

14  Q.  Where did he keep his AR-15?

15  A.  It was in the closet.  It had a little rack that he put it

16  on because he didn't want it to get messed up.

17  Q.  So he hung the gun in the closet and he kept things in

18  this bucket, but you didn't know what was in there; is that

19  true?

20  A.  Correct.

21  Q.  You never saw him open it and put it in and you stood over

22  his shoulder and got a chance to look at it?

23  A.  No.  I wasn't allowed to be there.

24  Q.  When he would get in that box?

25  A.  Yes.

DANIELLE SMITH – DIRECT

1  Q.  Did he put any type of devices or things on it there that

2  would keep you from being able to get into it?

3  A.  He put stuff on there to where he knew I touched it.  He

4  would beat me.  Or if he felt like I touched it, he would beat

5  me.

6  Q.  So you got accused of touching it at certain times but you

7  never touched it?

8  A.  Yes.

9  Q.  Now, going back to 0041, about what time did y'all get up?

10  About what time did y'all get up that morning on

11  November 5th of 2017?

12  A.  Early.  I don't know the time because I didn't have

13  anything to tell me time, so it was early in the morning.

14  Q.  You didn't have a clock or anything like that, so you

15  wouldn't know what time it was?

16  A.  Yes.  We didn't have a clock hanging up.

17  Q.  Tell me about his demeanor this morning.  What did you

18  perceive his demeanor to be that morning, when he woke up?

19  A.  He was just different.  Like the whole thing was just

20  different.

21  Q.  Was he talkative?

22  A.  No, not really.  He told me to fix him a light breakfast.

23  I fixed him a light breakfast.  He threw up that breakfast.

24  And then after that I got my babies taken care of, and that's

25  when he put the gun to my head and told me to get on the bed.

DANIELLE SMITH - DIRECT

1  Q.  Okay.  Let's talk about that for a second.  So was he

2  sitting on the couch, when he told you to make him some

3  breakfast?

4  A.  Yes.

5  Q.  And do you recall what you made him?

6  A.  I think it was tacos.

7  Q.  If there's some pictures here inside to show that you made

8  him some -- that there were pigs in a blanket on the bar?

9  A.  Oh, then yeah.  It was probably pigs in a blanket.

10  Something breakfast-y and quick.

11  Q.  So that was something you warmed up in the microwave?

12  A.  Yes.

13  Q.  What did you do next?  You carried the plate over to him?

14  A.  Yes.  I had to feed him, like I had to prepare his plates

15  for him.

16  Q.  And so once you set the plates down, what happened next?

17  Did he eat the food?

18  A.  He ate it and then he threw it up.

19  Q.  How long was it between the time he ate it and then he

20  threw it up?

21  A.  Not very long.

22  Q.  Did he get up from the couch and run into the bathroom?

23  A.  Yes.  And he threw up.

24  Q.  So where were you standing?  Did you watch this happen?

25  A.  I mean, I knew he was throwing up, but I was taking care

DANIELLE SMITH — DIRECT

1   of my kids.

2   Q.   Where were you in the house and here in the apartment at

3   that point?

4   A.   I was taking care of my daughter.

5   Q.   So were you over by the little baby, the smaller baby crib

6   that's next to the bed?

7   A.   Yes.

8   Q.   And so when he came out of the bathroom, what happened

9   next?

10  A.   I got my daughter dressed and changed.  Michael was in his

11  crib, already changed, and he came over and put the gun to my

12  head.

13  Q.   Where did he get the gun from?

14  A.   It was the gun that he carried with him all the time.

15  Q.   He already it had on that morning?

16  A.   Yes.

17  Q.   So when he got up and got dressed that morning from bed,

18  he put his gun on?

19  A.   Yes.  It was by the little table by the bed, like he slept

20  with it and —

21  Q.   He had it with him at all times; it was next to the bed?

22  A.   Yes.

23  Q.   So then he got up and then he came over.  And explain to

24  the Court exactly what he did, if you could, please.

25  A.   He put the gun to my head and forced me to get on the bed

DANIELLE SMITH - DIRECT

1  and hog tied me and handcuffed my hands and duct taped them

2  together.

3  Q.  When you say he put a gun to your head, did he grab you by

4  your hair?

5  A.  Yeah.  He ——

6  Q.  I know this is hard.

7  A.  He put the gun to my head and he bunched it up in the back

8  and threw me on the bed and positioned me to where he could

9  hog tie me.

10  Q.  So when he would doing this, was he saying anything to

11  you, Danielle?

12  A.  He was just quiet.

13  Q.  I'm sorry.  I can't hear you.

14  A.  He was quiet.  I knew I didn't fight back.  After getting

15  guns to your head so many times, you learn to be compliant.

16  Q.  And so he drug you by your hair and then put you on the

17  bed.  In what position did he put you, on your stomach?

18  A.  On my stomach, because he took my wrists and my ankles and

19  bound them together with rope.

20  Q.  Go to 0036, please.

21      And so I know this is hard, and this is not something you

22  want to relive, but we appreciate this.  But let me ask you

23  some more questions here.  When he threw you on the bed, which

24  way was your head pointed on the bed?

25  A.  At first it was pointed towards like the pillow by the

DANIELLE SMITH – DIRECT

1  corner so he could tie me up.

2  Q.  Okay.  So your head was forced into the corner here?

3  A.  So my head would have been pointing that way but I was

4  more towards the edge so he could tie me up.

5  Q.  Okay.  And when you say "hog tie", did he tie your hands

6  behind your back?

7  A.  Yes.  I was on my stomach.  He pulled my arms back, both

8  my ankles back, and tied them together.

9  Q.  Okay.  So in the sense of hog tie, you mean you are laying

10  on your stomach, your feet and your hands are up behind you,

11  and you are handcuffed, duct taped, and rope tied; is that

12  true?

13  A.  Yes.

14  Q.  Did he say why he was doing this?

15  A.  No.  After that he just flipped me around to where I had

16  to watch him.

17  Q.  Okay.  When you say flipped you around, he turned you back

18  towards where we would be looking at the tub that we saw in

19  Exhibit 0041?

20  A.  Yes.

21  Q.  All right.  And so did you ask him, hey — were you

22  screaming at that point in time?

23  A.  I was crying but my son was there, so I didn't want him

24  getting upset.

25  Q.  Okay.  So you weren't screaming, you were just quiet, just

DANIELLE SMITH - DIRECT

1  kind of watching; huh?

2  A.  Yeah.  Because what can you do, if your hog tied and your

3  children are there?  Because all he had to do was take them

4  and I couldn't do anything.

5  Q.  Was Michael standing up in the crib watching what was

6  going on?

7  A.  He was.

8  Q.  And what was your baby girl doing?

9  A.  She was laying there next to me on her little rocker crib.

10  Q.  Were either one of them crying at that point?

11  A.  Michael was.  I told him it would be okay, he had to just

12  close his eyes.

13  Q.  Did he do that?

14  A.  He was crying and screaming and closing them.

15  Q.  Now, and you -- did you ask him what he was going to do?

16  A.  No.  I stayed quiet.

17  Q.  Did he give you any instructions?

18  A.  No.  He just -- no.  We just laid there.  I laid there.  I

19  knew this is a time that something was going to happen.

20  Q.  How did you know that Danielle?

21  A.  Because he hog tied me and he got the guns and he put his

22  face mask on and told my son he would be right back.

23  Q.  So he then -- Devin then walked over to the crate that we

24  saw in Exhibit 116; right?

25  A.  Yes, the black box.

DANIELLE SMITH — DIRECT

1   Q.  The black box; right?

2   A.  Yes.

3   Q.  And tell the Court, what did Devin do and how did he do

4   it?

5   A.  He was already dressed in all black.  He put on the vest

6   that had everything attached to it.  He had both the little

7   guns on him and he took his AR-15 and put it on his back.

8   Q.  Did he do this slowly and methodically, while you watched

9   him?

10  A.  Yes.

11  Q.  What was your understanding as to why Devin Kelley was

12  doing that to you?

13  A.  Because I wanted to leave him.

14  Q.  Do you believe that this was a form of punishment, based

15  upon your personal knowledge of what happened in that room?

16          MS. CHRISTILLES:  Objection.  Speculation.

17          THE COURT:  That's overruled.

18          THE WITNESS:  Yes.  He punished me because he told me

19  repeatedly the only way one of us got out was a body bag.

20  BY MR. WEBSTER:

21  Q.  And so you did not know where he was headed or where he

22  was going to go that day; correct?

23  A.  Correct.  I didn't know.

24  Q.  And so he slowly and methodically put on his body gear,

25  his body armor?

DANIELLE SMITH – DIRECT

1    A.   Yes.

2    Q.   Did you even know he owned body armor?

3    A.   No.  I didn't know half the stuff that was in the box.  I

4    say half.  Like I didn't know anything.

5    Q.   Okay.  And so he slowly — and then the very last thing

6    that he put on was the mask?

7    A.   Yes.

8    Q.   And the only thing that he said was what?

9    A.   That he told my son he would be right back.

10   Q.   He looked at Michael and said he would be right back?

11   A.   Yes.

12   Q.   And then he walked out the door?

13   A.   Yes.

14   Q.   Okay.  Danielle, how long do you think you were there on

15   the bed?

16   A.   Oh, I have no idea.  It felt like forever.

17   Q.   Did you try to escape?

18   A.   Yes, but how can you do — when you move, the handcuffs

19   got tighter.  And then kept struggling, and then the rope

20   around my wrists and ankles were getting tighter.

21   Q.   Okay.  And so you don't know how long you were there.

22   Obviously, there was no clock for you to even tell what time

23   of day it was; right?

24   A.   Yes.

25   Q.   Did you know it was a Sunday?

DANIELLE SMITH – DIRECT

1   A.  No, I had no idea.

2   Q.  Now, when — tell me what happened next.  While you were

3   tied up in there, were your kids screaming?

4   A.  Michael was.  Rayleigh was just sleeping.

5   Q.  Michael watched what was going on?

6   A.  Yes.

7   Q.  Did he try to get out of the crib at all?

8   A.  No.  He's only two.  He's just a baby.  He didn't

9   understand.  I told him it didn't hurt and he didn't need to

10  be scared.

11  Q.  Okay.  Now, when was the first time you knew — at some

12  point in time the Kelley family came to your aid; right?

13  A.  Yes.

14  Q.  When I say the Kelley family, I mean his parents.

15  A.  Yes, Mr. and Mrs. Kelley.

16  Q.  Can you tell the Court what happened next, when the

17  Kelleys showed up to your house, or the barndominium?

18  A.  They couldn't — the door was locked, so they had to like

19  bust down the door.  They asked what did I do.

20  Q.  They asked what you did?

21  A.  Yes.

22  Q.  Did you find that odd?

23  A.  I mean, at the time I was just like nothing, because I

24  wanted to get out of the restraint.

25  Q.  Right.  And they untied you?

DANIELLE SMITH – DIRECT

1   A.   Yep.  They untied me.  That's when he called them and they
2   asked where the keys to the handcuffs were, and then that's
3   when he told them and they undid my handcuffs.
4   Q.   And so when he called them on the phone, was it on
5   speaker, or was he just talking to his dad?  Who was he
6   talking to then?
7   A.   When he called, he put it on — they put it on speaker for
8   a while, and so he told me to take him off of speaker.
9   Q.   Okay.  Before he told you to take him off the speaker,
10  what was said by Devin Kelley over the phone at that point in
11  time?
12  A.   That he shot a lot of people and that he was shot.  And
13  they asked where.  He said the church, and that he was trying
14  to come back home.
15  Q.   And when you heard that it was the church, when he said
16  the church, did you know what church he meant?
17  A.   Not until after, like after more of the conversation.
18  Q.   Can you tell us to the best of your recollection how you
19  figured out it was the Sutherland Springs Baptist Church?
20  A.   Because they were saying Sulfur Springs, and then he said
21  at her mother's church.
22  Q.   Okay.
23  A.   And that's when I knew.
24  Q.   What else did Devin tell you during that phone call or
25  prior to him going off speaker, what else do you recall that

DANIELLE SMITH — DIRECT

1  he said to you and the Kelleys?

2  A.  He had me take him off speaker and he said he loved me,

3  even though it was just to get me on the phone.  And then he

4  blamed me and said it was my fault and he shot himself.

5  Q.  Did you hear him shoot himself in the head?

6  A.  Yes.  That's when I hung up the phone.

7  Q.  And you hung up the phone?

8  A.  Yes.

9  Q.  Now, I think you said he blamed you for this?

10  A.  He did.  He said:  "It was your fault."

11  Q.  Michelle — I'm sorry.  Danielle, did y'all call law

12  enforcement after that?

13  A.  His parents did.

14  Q.  Were you there when that — what happened after you hung

15  up the phone?  What happened next?

16  A.  His dad called them and I was getting my babies.

17  Q.  And you were trying to take care of the children?

18  A.  Yes, because they were my concern.

19  Q.  And what happened next in the scheme of things?  Did y'all

20  go anywhere?  Did you stay at the house?  What happened next?

21  A.  We went down to their house.  They helped me get all my

22  babies and all their stuff.  And then we later on that night

23  we had to talk to the Texas Rangers.

24  Q.  Okay.  And so just after this the Texas Rangers came and

25  they wanted to speak to you about what had happened there; is

DANIELLE SMITH – DIRECT

1  that correct?

2  A.  Yes.

3  Q.  And Mr. Kelley went with you there; is that true?

4  A.  Well, all of us were there.  They had us all go.

5  Q.  Everybody was there, including Mr. and Mrs. Kelley and

6  you; right?

7  A.  Yes.

8  Q.  And your children?

9  A.  Yes.  But when the time to like talk to them, Mr. and

10  Mrs. Kelley went together.  Mrs. Kelley came back.  And then I

11  went in there, because Mr. Kelley was in there when I gave my

12  statements.

13  Q.  Can you please pull up Exhibit 7 –– 694, please.

14       MR. WEBSTER:  Your Honor, these are videos that have

15  been previously admitted under the Texas Ranger file.  The

16  first clip we are going to listen to is 5411 to 5522.

17       I'd like for you just to pull it to that point and

18  stop.  I have some questions but I have to set it up.

19       THE COURT:  So just to be clear, this is Joint

20  Exhibit 694?

21       MR. WEBSTER:  That is correct, Your Honor.  The

22  clips, for the court reporter, are 5411 to 5522 and 10159 to

23  10230.

24  BY MR. WEBER:

25  Q.  Okay.  Now, Danielle, that's you over in the right–hand

DANIELLE SMITH – DIRECT

1  corner; is that correct?

2  A.  Yes.

3  Q.  And that would be your then father-in-law, Mr. Kelley,

4  sitting next to you; is that right?

5  A.  Yes.

6  Q.  Did anybody advise you that you needed a lawyer at that

7  point in time?

8  A.  No.

9  Q.  Were you scared in that room?

10  A.  Yes.  I can't say anything because I don't like conflict.

11  Q.  Do you think that that is a reason — do you think that

12  that is because of the abuse that you suffered over the years?

13  A.  Yes.

14  Q.  And so when you were there, Mr. Kelley was sitting right

15  next to you listening to everything you had to say; correct?

16  A.  Yes.

17  Q.  Did you feel open that you could talk about what had

18  actually happened with the Rangers in front of Mr. Kelley?

19  A.  Like what do you mean, what happens?

20  Q.  Like the fact that you had told Devin Kelley that you

21  wanted a divorce, that you wanted a divorce and that you

22  planned to leave him, and those type of things?

23  A.  I thought his parents knew that we were going to get a

24  divorce —

25  Q.  Okay.

DANIELLE SMITH - DIRECT

1   A.  —— from my understanding.

2   Q.  How did you find that out?

3   A.  He said that he was going to have his parents watch one of

4   the days so that we could talk.  But on that Monday, we were

5   going to go and get a divorce.

6   Q.  And so if we look at —— let's move around real quick.  I'm

7   sorry to do this to you.

8        Joint Exhibit 799-00044.  If you blow up the portion that

9   says this is 8:14 a.m., this is the same day on November 5th,

10  2017, it says:  "If we get Medicaid back, maybe we will just

11  go to counseling.  I don't know.  Me and her need time to

12  talk."  Do you see that?

13  A.  Yes.

14  Q.  That is a text message from Devin Kelley to his mother.

15  Is that consistent with what you believed that his mother knew

16  at that time, as it relates to you wanting a divorce?

17  A.  Yes.

18  Q.  And that is November 5th, that was the actual day of the

19  shooting; correct?

20  A.  Yeah.

21  Q.  If you go back one page to 003, and it says:  Okay ——

22  this is where he had requested that his parents —— did you

23  know he had requested his parents to watch the kids?

24  A.  He told me that he wanted them to watch them before we

25  went to the courthouse so we could talk about the divorce.

DANIELLE SMITH – DIRECT

1   Q.  Okay.  And so where he says:  "We just need alone time to
2   talk, so maybe tomorrow."  That's consistent with what you had
3   told him about wanting a divorce that day; right?
4   A.  Yes.
5   Q.  If we go back to the video, and this is Joint Exhibit 694,
6   and that's you in the corner at that point; correct?
7   A.  Yes.
8   Q.  Had you even changed clothes that day from when you got up
9   that morning?
10  A.  No.
11  Q.  How did you find out that the Texas Rangers wanted to talk
12  to you?
13  A.  They called, I think Mr. Kelley, and said they needed all
14  of us to go and talk to them.
15  Q.  So you went down and this is where they put you in the
16  room?
17  A.  Yes.
18  Q.  And who was watching your kids at this point?
19  A.  They were out in like I guess a waiting area with
20  Mrs. Kelley.
21  Q.  And so Mr. Kelley was there with you during your
22  statement; right?
23  A.  Yes.
24  Q.  All right.  Could you please play this.
25      (Clip was played.)

DANIELLE SMITH – DIRECT

1   During that time, during that time in that interview, were
2   you shaking?
3   A.  Yeah.
4   Q.  I could see that — it looks like, were you crying?
5   A.  Yes.
6   Q.  Did you feel like you could tell them everything that
7   happened in front of Mr. Kelley?
8   A.  No.
9   Q.  Can you tell the Judge why?
10  A.  I don't like conflict and I didn't know what they would do
11  or say, since I lived with him.
12  Q.  There were times in the Texas Rangers' report,
13  specifically on Joint Exhibit 0600-003 —
14      And if you drop down to 2.20.
15      And do you see where it says:  "Michael stated earlier
16  that morning he had asked Danielle if she and Devin had a
17  fight.  Michael stated Danielle said no, they had not, and
18  everything was great and Devin was happy."  Was that truthful?
19  A.  No.
20  Q.  Why didn't you tell the truth there, Danielle?
21  A.  Because I can't tell them because Mr. Kelley was always
22  there every single time I was talking.  How can you tell
23  somebody that you were being in an abusive relationship when
24  their parents are sitting in the same room?
25  Q.  If you go to the next page, 004.  And it says, 2.33, at

DANIELLE SMITH - DIRECT

1  the very top.

2      It says:  "During the interview Danielle stated it was a

3  normal day.  She and Devin woke up and Danielle took the dog

4  outside while Devin was in the shower.  Danielle described

5  Devin as being normal and very loving that morning."  That's

6  not correct either; correct?

7  A.  Correct.  He wasn't loving.

8  Q.  Did he take a shower that morning?

9  A.  I don't remember him taking a shower.

10  Q.  And then if you drop down to 2.46, it says:  "Danielle

11  stated Devin had cheated on her but they had worked through it

12  and everything was fine."  Is that true?

13  A.  When you say "worked through it," as in beating me and I

14  never brought it up again.

15  Q.  Okay.  Did you feel like at that point in time -- why

16  would you say that everything was fine?

17  A.  Because I don't like talking about it.  Like, why -- how

18  do you tell people when you confront somebody, your spouse,

19  and they blame you for every single thing that they did.  And

20  then his parents are just sitting there, like his dad would be

21  like, oh, well, I never knew that.

22  Q.  Can you show the second clip, please, from the 694 video.

23      (Clip was played.)

24      Did you feel like Mr. Kelley was being in control of you,

25  when you had a hand on your shoulder and rubbed it during the

DANIELLE SMITH — DIRECT

1   interview?

2           MS. CHRISTILLES:  Objection.  Leading.

3           THE COURT:  You can testify as to how you felt.

4           THE WITNESS:  I felt like when he put his hand on me

5   I couldn't say nothing.

6   BY MR. WEBSTER:

7   Q.  At this point in time, did you have a car?

8   A.  Like of my own, or that we shared?

9   Q.  Even the one that you shared.  After the shooting here,

10  when you are sitting in that room, did you have any means of

11  transportation at that point?

12  A.  No, because the only vehicle we had was the one that he

13  took with him to the shooting.

14  Q.  And at that point in time did you have anyplace to really

15  go live at that point?

16  A.  I mean, besides Michelle's house, but I didn't want to go

17  there because it's so close to the church.

18  Q.  But you were living on the Kelley property and were

19  depending on Mr. Kelley; correct?

20  A.  Yeah.  I was depending on them, yes, because I had

21  nothing.

22  Q.  Was Mr. Kelley with you the entire time that you spoke to

23  any law enforcement officer, including the IG?

24  A.  Like the IG?

25  Q.  I am terrible with acronyms.

DANIELLE SMITH — DIRECT

1      The Inspector General's Office.
2  A.  Yes.  He was there for all of them.  The only time
3  Mr. Kelley was never there was when I talked to you.
4  Q.  And that was both the time that we met and discussed this
5  case, and then also when you gave your deposition; correct?
6  A.  Correct.
7  Q.  Is that the first time you felt like you could really tell
8  the truth about what happened?
9  A.  Yes, because they weren't there.
10  Q.  As you sit here today, Danielle, do you believe that Devin
11  Kelley shot up the Sutherland Springs church to punish you
12  because you wanted a divorce?
13  A.  Yes.
14  Q.  Your family members died in this; correct?
15  A.  Yes.
16  Q.  And who was it that passed away, your grandmother?
17  A.  My grandma.
18  Q.  What was her name?
19  A.  Her name was Lula White.
20  Q.  Do you believe that Devin Kelley believed that your mother
21  Michelle Shields would have been at the church that day?
22          MS. CHRISTILLES:  Objection.  Speculation.
23          THE COURT:  Only if you know.
24          THE WITNESS:  I believe he thought she was, since she
25  went almost every single Sunday and hardly missed.

DANIELLE SMITH – DIRECT

1  BY MR. WEBSTER:

2  Q.  Okay.  And the Brassfields, we talked about this earlier,

3  Erin or Kurt Brassfield would not have been in that church;

4  correct?

5  A.  Correct.

6  Q.  And, in fact, Erin Brassfield and Kurt Brassfield were —

7  he was out free on bond at that point; correct?

8  A.  I believe so.

9  Q.  So if he — if this was some type of avenged killing, as

10  the government says it was, as it relates to Mr. Brassfield —

11            MS. CHRISTILLES:  Objection.  Leading.

12            THE COURT:  That's sustained.

13            MR. WEBSTER:  Okay.

14  BY MR. WEBSTER:

15  Q.  Was there anything stopping Devin Kelley that morning from

16  driving over to Kurt Brassfield's house and killing him?

17            MS. CHRISTILLES:  Objection.  Speculation.

18            THE COURT:  That's sustained.

19  BY MR. WEBSTER:

20  Q.  Did Devin Kelley ever express to you, in any way, that he

21  planned to kill Kurt Brassfield?

22  A.  No.

23  Q.  And, as you sit here today, you believe this was

24  punishment for your divorce?

25            MS. CHRISTILLES:  Objection.  Asked and answered.

DANIELLE SMITH − DIRECT

```
 1              THE COURT:  That's overruled.

 2              THE WITNESS:  Yes.

 3              MR. WEBSTER:  Your Honor, plaintiffs pass the

 4   witness.

 5              THE COURT:  Any questions of this witness, from the

 6   government?

 7              MS. CHRISTILLES:  Your Honor, may we take a brief

 8   break?

 9              THE COURT:  So it's 11:42.  Should we break for

10   lunch?

11              MS. CHRISTILLES:  I think that would be a good

12   stopping point, Your Honor.

13              THE COURT:  Just for time purposes, any estimation

14   how long cross may take?

15              MS. CHRISTILLES:  I estimate two hours, Your Honor.

16   I submitted two hours.

17              THE COURT:  Are we going to get to Mr. Snyder today?

18              MR. ALSAFFAR:  Yes.

19              THE COURT:  So, as I mentioned earlier, places to eat

20   around here are very limited.  How much time do you want to

21   break, 30 minutes, 45 minutes, an hour?

22              MR. ALSAFFAR:  For the plaintiffs, Your Honor, 30

23   minutes is fine.

24              THE COURT:  How much time does the government want?

25              MS. CHRISTILLES:  Thirty minutes is fine, Your Honor.
```

DANIELLE SMITH – DIRECT

1          THE COURT:  So let's break for lunch.  We'll resume

2   about 12:15, 12:20.

3          MS. CHRISTILLES:  I'm sure counsel has prepared for

4   lunch, but I want to make sure the witness has adequate time

5   to eat.

6          MR. ALSAFFAR:  We'll take care of it, Your Honor.

7          THE COURT:  Thank you.

8          We're in recess.

9      (Recess.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (Change in reporter)
 2        (Open court)
 3              THE COURT:  Thank you.  Please be seated.
 4        Your cross.
 5              MS. CHRISTILLES:  Yes, Your Honor.
 6                         CROSS-EXAMINATION
 7   BY MS. CHRISTILLES:
 8   Q.  Good afternoon, Ms. Smith.  My name's Jacquie Christilles,
 9   and I'm a U.S. Attorney here in San Antonio, Texas.  And I
10   represent the United States in this matter.  Okay?
11   A.  Okay.
12   Q.  We've never met before, have we?
13   A.  No.
14   Q.  All right.  I want to start by talking to you about the
15   changes you noticed in Devin in the year or so before the
16   shooting.  Okay?
17   A.  Okay.
18   Q.  His mental health started to deteriorate in the last year
19   of his life, didn't it?
20   A.  Yes.
21   Q.  In fact, in the last six months of his life, he grew more
22   depressed?
23   A.  Yes.
24   Q.  His temper grew shorter?
25   A.  Yes.
```

DANIELLE SMITH – CROSS                                    125

1   Q.  He grew less tolerant?

2   A.  Yes.

3   Q.  He was slowly becoming not the person that he used to be?

4   A.  Correct.

5   Q.  He was shutting down?

6   A.  What do you mean by "shutting down"?

7   Q.  Ms. Smith, do you remember giving an interview to the

8   San Antonio Express-News?

9   A.  Okay.

10  Q.  Do you remember telling the San Antonio Express-News that

11  he was, quote, unquote, "shutting down"?

12  A.  Oh, he's just wasn't, like, open about things.

13  Q.  And that was in the last six months of his life?

14  A.  Yes.

15  Q.  You were actively trying to get Devin into some mental

16  health treatment, weren't you?

17  A.  Yes.

18  Q.  Everybody believed he needed it?

19  A.  Yes.

20  Q.  Even Devin wanted some mental health treatment?

21  A.  Yes.

22  Q.  He thought he might have some form of split personality

23  disorder or something?

24  A.  Yes.

25  Q.  Because he could be violent?

DANIELLE SMITH – CROSS                    126

1   A.  Yes.

2   Q.  But he could also be loving and compassionate?

3   A.  When he wanted to.

4   Q.  Devin actually did start seeing a counselor, correct?

5   A.  Yes.

6   Q.  Now, he didn't disclose to you why he was going to that

7   counselor, did he?

8   A.  No.

9   Q.  But he told you that he wanted to go talk to a counselor?

10  A.  Yes.

11  Q.  In the last two weeks of his life, he got some medicine

12  for his mental health issues, correct?

13  A.  Yes.

14  Q.  He was prescribed clonazepam?

15  A.  Yes.

16  Q.  The clonazepam was to treat anxiety, correct?

17  A.  Correct.

18  Q.  In the last week of his life, he began abusing that

19  clonazepam, didn't he?

20  A.  Yes.

21  Q.  Even though his mental health deteriorated, you had no

22  idea he intended to commit this act, did you?

23  A.  Correct.  I didn't know.

24  Q.  You never heard him say he wanted to kill anyone?

25  A.  No.

DANIELLE SMITH – CROSS                    127

1    Q.  Sometimes he would write lists of people he didn't like,

2    right?

3    A.  That was only one time, way before, like years before the

4    shooting happened.

5    Q.  And it was really something the two of you did together,

6    right?

7    A.  Yes.

8    Q.  And then you'd burn the list?

9    A.  Yes.  We put everything down.  Because, in therapy, they

10   teach you put everything -- anybody that ever wronged you or

11   you felt like they wronged you, and you burn it to let it go.

12   Q.  And so the two of you would write down people you maybe

13   didn't like, and you would burn it as an act of therapy?

14   A.  Yes.

15   Q.  I want to talk to you a little bit more about what was

16   going on in your lives in the year or so before the shooting.

17       In June of 2016, your stepsister reported that she had

18   been sexually abused by -- I think you call him Curt

19   Brassfield?

20   A.  Yes.

21   Q.  His real name is actually Donald Curt Brassfield, right?

22   A.  Yes.

23   Q.  And so in 2016, your stepsister reported that he had

24   actually sexually abused her?

25   A.  Yes.

DANIELLE SMITH - CROSS                    128

1    Q.  And I think we've talked about this.

2        Curt Brassfield was your adoptive father, correct?

3    A.  Yes.

4    Q.  And he also had adopted your stepsister, correct?

5    A.  No.  My sisters that are from Erin's side, they were not

6    adopted.  No, okay.  I -- let me, rephrase.

7        So when they got placed in their care, it was not adoption

8    at all.  It was just placement.  Erin, my mother, didn't adopt

9    my sisters, Marissa and Hayley, until well after everything

10   happened and Curt was no longer in the picture and he was

11   placed in prison.

12   Q.  Okay.  And thank you for that clarification.

13       But your stepsisters were living with Erin and Curt

14   Brassfield at some point?

15   A.  Yes.

16   Q.  Now, in addition -- we've talked about the fact that Curt

17   Brassfield sexually abused you, and then you found out he

18   abused your stepsister.

19       He had also sexually assaulted another girl in 2014,

20   correct?

21   A.  Yes.

22   Q.  He was arrested for your stepsister's assault, correct?

23   A.  Yes.

24   Q.  And I think that you said he was out on probation at the

25   time of the shooting?

1    A.  So he got out of, I guess, probation or bail.  So he was

2    out.  That's all I know.

3    Q.  He was being prosecuted by the Guadalupe County DA's

4    office for the sexual assault of your stepsister?

5    A.  Yes.

6    Q.  You were also a named victim in that prosecution, correct?

7    A.  Yes.

8    Q.  And you were set to testify at a trial about the abuse you

9    endured at his hands?

10   A.  Yes.

11   Q.  You were subpoenaed to testify in that trial?

12   A.  Yes.

13   Q.  You were subpoenaed in about October of 2017?

14   A.  I don't remember, like, exactly.  Because I know they came

15   out and talked.  And then that's when I talked to the DA on

16   the phone, but I had to have it on speaker.

17   Q.  Okay.  The trial was originally set for November 27th,

18   2017, correct?

19   A.  I guess.  I don't really know.  I just know, like, after

20   the whole shooting happened, I know then, like, I was

21   subpoenaed and went to court.

22   Q.  But the trial was originally set for less than two weeks

23   after the shooting, correct?

24   A.  I guess so.

25   Q.  Do you not recall, sitting here today, when that trial was

DANIELLE SMITH - CROSS                    130

1  originally scheduled for?

2  A.  I don't know when it was originally scheduled.  Like, I

3  don't know dates for the very first time or when Devin was in

4  the picture.

5  Q.  Ms. Smith, we've talked a little bit about the interview

6  you had with the rangers, correct?

7  A.  Yes.

8  Q.  Do you recall telling the rangers the date that you were

9  originally set to testify?

10 A.  If I did, then that means it was fresh on my mind at that

11 time.

12 Q.  So looking at the testimony or the interview that you gave

13 with the rangers would help you remember that date because it

14 was closer in time, correct?

15 A.  Yes.

16 Q.  Okay.  I'm going to show you JEX 477 at 092 -- 0092.

17    (Discussion off the record)

18        THE COURT:  Go ahead.

19 BY MS. CHRISTILLES:

20 Q.  Ms. Smith, I'm showing you a transcript of the interview

21 you had with the rangers.  Can you read through that to

22 yourself and let me know when you're finished.

23 A.  Okay.

24 Q.  That refreshes your recollection about what date you were

25 originally supposed to testify against Donald Brassfield,

1    correct?

2    A.   Correct.

3    Q.   And this was November 27th, less than two weeks after the

4    shooting, correct?

5    A.   Correct.

6    Q.   Devin was not happy about you testifying, was he?

7    A.   No.

8    Q.   He forbid you to testify?

9    A.   Yes.

10   Q.   Now, it's fair to say that testifying about this abuse was

11   going to be pretty traumatic for you, wasn't it?

12   A.   Yes.

13   Q.   You were going to have to relive all the pain during that

14   prosecution, weren't you?

15   A.   Yes.

16   Q.   Now, the first time that you had reported that Donald

17   Brassfield sexually assaulted you, you tried to kill yourself,

18   didn't you?

19   A.   Yes.

20   Q.   And Devin knew about the abuse at the hands of Curt

21   Brassfield?

22   A.   Yes.

23   Q.   He knew you'd tried to kill yourself?

24   A.   Yes.

25   Q.   He made you a promise that after you tried to take your

DANIELLE SMITH – CROSS                    132

1   own life, he was always going to be there for you?

2   A.  Yes.

3   Q.  You tried to kill yourself in part because nobody believed

4   you when you reported it; is that right?

5   A.  Yes.

6   Q.  In fact, some people treated you badly after you reported

7   it?

8   A.  Yes.

9   Q.  Nobody listened, and you were the black sheep of the

10  family?

11  A.  Yes.

12  Q.  Some of the people that didn't believe you and that

13  treated you badly were members of the First Baptist Church of

14  Sutherland Springs when the abuse occurred, correct?

15  A.  That would only be that one family that I stated about.

16  Everybody else, they were –– they were like family.

17  Q.  But there were people that made fun of you for the abuse,

18  correct?

19  A.  It was one family, in particular, yes.

20  Q.  Your testimony today is it was just one family, correct?

21  A.  Yes.  They no longer go to the church.

22  Q.  You've been interviewed a lot for this case, haven't you,

23  Ms. Smith?

24  A.  Yes.

25  Q.  Interviewed by the rangers?

DANIELLE SMITH – CROSS                                133

1    A.  Yes.

2    Q.  You were interviewed by the Department of Defense Office

3    of the Inspector General, correct?

4    A.  Yes.

5    Q.  Okay.  And you gave a deposition in this case?

6    A.  Yes.

7    Q.  And you've also been interviewed by news media, right?

8    A.  Yes.

9    Q.  Now, when you gave that -- and do you mind if I call it

10   "OIG" when I'm talking about the Department of Defense agents?

11   A.  Okay.

12   Q.  Okay.  Can we agree that that's what I'm talking about?

13   A.  Yes.

14   Q.  Appreciate you not making me say that whole thing.

15       When you were interviewed by OIG, you were under oath,

16   correct?

17   A.  Yes.

18   Q.  You told the OIG, quote, unquote, they mocked you and said

19   I deserved it.

20       Do you remember telling them that?

21   A.  Yes.

22   Q.  They told you that you should have died when you tried to

23   commit suicide.

24       Do you remember that?

25   A.  Yes.

DANIELLE SMITH – CROSS                    134

1   Q.  Do you remember telling OIG some of the adults said you

2   were a plague?

3   A.  Yes.

4   Q.  They didn't want their children hanging out with you?

5   A.  Yes.

6   Q.  They told you that you deserved to be raped and molested?

7   A.  Yes.

8   Q.  Someone's parents even said their daughter couldn't hang

9   out with you because you were promiscuous?

10  A.  Yes.

11  Q.  Now, Devin knew that members of the church knew about the

12  abuse, didn't he?

13  A.  He knew about that one family, yes.

14  Q.  He knew that some members had been awful to you when you

15  reported the abuse?

16  A.  Yes.

17  Q.  Devin was angry about the way you had been treated, wasn't

18  he?

19  A.  He was just an angry individual.

20  Q.  Ms. Smith, Curt Brassfield took pictures of the abuse of

21  you, didn't he?

22  A.  Yes.

23  Q.  He took videos?

24  A.  Yes.

25  Q.  You found those photos and videos in Michelle Shields'

DANIELLE SMITH - CROSS                    135

1  house, correct?

2  A.  Yes.

3  Q.  Devin was with you when you found them?

4  A.  Yes.

5  Q.  He was upset when he -- when you found those photos and

6  videos?

7  A.  Yes.

8  Q.  Now, you claim that you found the photos and videos years

9  before the shooting; is that right?

10  A.  Yes.

11  Q.  You claim you destroyed the photos and videos years before

12  the shooting?

13  A.  I did.

14  Q.  And you destroyed them because no one had believed you

15  about the abuse when you first told someone that it occurred,

16  correct?

17  A.  Correct.

18  Q.  At some point the district attorney's office, the

19  Guadalupe County DA's office that we talked about, learned

20  about the photos and video, didn't they?

21  A.  Yes.

22  Q.  And you're aware that they learned about them from Erin

23  Higgins, correct?

24  A.  Yes.

25  Q.  And Erin Higgins, I think we've already discussed, was

1  formerly Erin Brassfield?

2  A.  Yes.

3  Q.  And at one time she was married to Curt Brassfield?

4  A.  Yes.

5  Q.  And you've indicated that you were very close to Erin when

6  she was married to Curt Brassfield, correct?

7  A.  Yes.

8  Q.  And you've remained close to her?

9  A.  Yes.

10 Q.  In fact, when Michelle Shields and Curt Brassfield got

11 divorced, you actually wanted to live with Erin?

12 A.  Yes.

13 Q.  You wanted to live with Erin even though she was still

14 married to Curt Brassfield?

15 A.  Yes.

16 Q.  At some point, you even ran away from Michelle Shields to

17 live with Erin; is that correct?

18 A.  Yes.

19 Q.  Now, I think you indicated on direct that Devin would go

20 over to Erin's house after he got out of the Air Force to see

21 you; is that right?

22 A.  Yeah.  The one time when he came over and, like, he picked

23 me up.  And then that's when I moved out from her house.

24 Q.  Okay.  And he also came over to Erin's house to see you

25 when he was 17 and you were 13; is that correct?

DANIELLE SMITH – CROSS                              137

1  A.  Yes.

2  Q.  So it's fair to say Erin had known Devin Kelley for some

3  time as well?

4  A.  Not when I was seeing him when I was 13.  She only, like,

5  saw him and did a background check when I was 18, and I was

6  living with her.

7  Q.  Okay.  Are you aware that Erin Higgins claims that Devin

8  told her that he found the photos and videos at Michelle

9  Shields' house on October 31st, 2017?

10  A.  At the time I didn't know, until now.

11  Q.  But you've since learned that Erin Higgins claims that

12  Devin Kelley told her he found those photos and videos on

13  October 31st, 2017?

14  A.  Yes.

15  Q.  Now, four days before the shooting, a detective came to

16  your house, correct?

17  A.  Correct.

18  Q.  He came to your house to collect the photos and videos of

19  the abuse, correct?

20  A.  Yes.

21  Q.  He came to your house because the Guadalupe County DA's

22  office wanted those photos and videos for their prosecution?

23  A.  Yes.

24  Q.  So it's fair to say that that detective was coming to your

25  home to get evidence, correct?

1   A.  Yes.

2   Q.  Devin was angry about the detective coming to the house,

3   right?

4   A.  Yes.

5   Q.  He was angry because you'd already told the prosecutor

6   that those things had been destroyed?

7   A.  Yes.

8   Q.  But he wasn't angry at you?

9   A.  No.  He was angry at the situation.

10  Q.  Now, Devin was also angry about the situation because if

11  people had believed you, two other girls wouldn't have gotten

12  hurt; isn't that true?

13  A.  Yes.

14  Q.  Devin blamed a lot of people for what happened to you as a

15  child?

16  A.  I think he blamed everybody for everything.

17  Q.  But he blamed a lot of people for what had happened to you

18  as a child?

19  A.  Yes.

20  Q.  Devin had issues with the people at the church because of

21  the abuse and treatment that you experienced as a kid?

22  A.  No.  He had an issue with my mom because he thought, in

23  his eyes, that she was trying to break us up.  Because he

24  thought everybody was out against him.

25  Q.  Now, Ms. Smith, you, again, recall that interview with the

1  rangers, correct?

2  A.  Yes.

3  Q.  Okay.  So is it your testimony that -- today that Devin

4  didn't have issues with the people at the church because of

5  the abuse and treatment you experienced as a kid?

6  A.  After that family, no.  Like, there was only that one

7  family that was an issue that he knew about.  So everyone else

8  in the church congregation, they weren't ones to make him

9  upset.

10  Q.  Ms. Smith, I'm going to play JEX 694, which has been

11  previously admitted at 9709 through 9718.

12      Oh, wait.  Hold on.  Oh, no 8917 through 9312.  Sorry.

13          MR. WEBSTER:  Did you change the numbers?

14          MS. CHRISTILLES:  Yes.  I apologize.  It's JEX 94.

15  And we're going to do 8917 through 9312.

16      Was looking at the wrong line, Your Honor.

17          MR. WEBSTER:  Thank you, ma'am.

18          MS. CHRISTILLES:  Sorry about that.

19      *(Pause)*

20      *(Playing video)*

21  BY MS. CHRISTILLES:

22  Q.  Ms. Smith, do you recall telling the rangers, in response

23  to why you thought Devin might have gone to the church, that

24  it had something to do with what had happened to you as a kid?

25  A.  Yes.

1  Q.  Now, besides being angry with the people at the church,

2  Devin also resented God, didn't he?

3  A.  Yes.

4  Q.  He resented God for not protecting you?

5  A.  He resented God because he was an atheist.

6  Q.  He also resented God for not protecting you, correct?

7  A.  I guess, using his terms.

8  Q.  Isn't that what you told the San Antonio Express-News,

9  Ms. Smith?

10  A.  Yes.

11  Q.  You also told the San Antonio Express-News that Devin

12  resented God for not protecting him from the world's

13  cruelties?

14  A.  Yes.

15  Q.  And you said Devin was a staunch atheist?

16  A.  Yes.

17  Q.  He thought religion was unfair?

18  A.  Yes.

19  Q.  He thought partially that religion was unfair because if

20  babies weren't baptized, they would go to hell?

21  A.  Yes.

22  Q.  You ultimately testified at Donald Brassfield's trial,

23  correct?

24  A.  Yes.

25  Q.  And it was a pretty horrible experience?

1   A.  Yes.

2   Q.  Donald Brassfield was ultimately convicted of sexual

3   assault, correct?

4   A.  Correct.

5   Q.  I want to shift gears and talk to you a little bit more

6   about Devin Kelley's character.

7       I think you indicated that you'd known him since you were

8   13 years old?

9   A.  Yes.

10  Q.  Even after he joined the military, you still kept in touch

11  with him?

12  A.  Yes.

13  Q.  You even kept in touch with him while he was in

14  confinement in the Air Force, correct?

15  A.  Yes.

16  Q.  Now, it was your understanding that Devin was in

17  confinement for abusing his stepson, correct?

18  A.  No.  That's -- he was -- he told me he was in confinement

19  because he put a gun to his CO's head.

20  Q.  But you later found -- or, at least, Devin told you later

21  that he was in confinement for abusing his stepson, but he

22  didn't do it; he did it to protect Tessa -- or he confessed to

23  it to protect Tessa?

24  A.  So him and his parents stated that it wasn't his handprint

25  on Jack, that it was Tessa.  And all of them told me that it

DANIELLE SMITH - CROSS                           142

1   wasn't him.  The reason why he got put in the brig was because

2   he put a gun to his CO's head when he found Tessa and that CO

3   in intercourse.

4   Q.  But you also knew that there was some conversations about

5   a handprint on Jack?

6   A.  That's what they were just saying.

7   Q.  Devin was a pretty determined guy, wasn't he?

8   A.  Yes.

9   Q.  I think on direct, you said he would call you constantly,

10  he would message you constantly, he would stop by Erin's

11  house, he wouldn't leave you alone?

12  A.  Yes.

13  Q.  When he set his mind to something, he followed through

14  with it?

15  A.  Yes.

16  Q.  He had a determined side.

17      He also had a protective side, correct?

18  A.  Yes.

19  Q.  In fact, he bartered a shotgun for a dog that had been

20  severely abused, right?

21  A.  Yes.

22  Q.  Now, he liked that shotgun, didn't he?

23  A.  He liked it because I guess it was, like, kind of like a

24  free gun.

25  Q.  He used it to shoot bats?

DANIELLE SMITH – CROSS                              143

1    A.  Yes.

2    Q.  He used it to shoot birds?

3    A.  Yes.

4    Q.  So he used that shotgun quite a bit?

5    A.  Yes.

6    Q.  When you got that dog, the two of you took care of it,

7    didn't you?

8    A.  I took care of the dog.

9    Q.  You made sure the dog's ear and tail grew back?

10   A.  Yes.

11   Q.  Nursed that dog back to health?

12   A.  Yes.

13   Q.  And I think we just discussed this.

14       It was your belief, or what you had been told, that Devin

15   had confessed to abusing Tessa's son to protect Tessa,

16   correct?

17   A.  Yes.

18   Q.  You later found out that Devin had actually confessed to

19   abusing Tessa's son, correct?

20   A.  Yes.

21   Q.  And that that's why he was in confinement?

22   A.  Yes.

23   Q.  Now, your friend Emily from Colorado, you told her about

24   the abuse allegation, correct?

25   A.  I didn't tell her.

DANIELLE SMITH – CROSS                          144

1   Q.  How else would Emily have found out about it?

2   A.  It would have been a conversation between her and Devin.

3   Q.  Okay.  I think we've talked about this a lot, but Devin

4   also had an abusive side?

5   A.  Yes.

6   Q.  You later found out that he had been physically abusive

7   with Tessa?

8   A.  Yes.

9   Q.  Much like how he had physically abused you?

10  A.  Yes.

11  Q.  You actually knew that Devin was abusive before you

12  married him, didn't you?

13  A.  Yes.

14  Q.  In fact, two months before you were married, you called

15  the police because he was abusing you?

16  A.  No.  That's not correct.  I did not call the police.

17  Q.  Somebody found out that he was abusing you two months

18  before your marriage, correct?

19  A.  Yes.

20  Q.  Someone called the police?

21  A.  Yes.

22  Q.  And the police showed up?

23  A.  Yes.

24  Q.  But you still married Devin two months later?

25  A.  Yes.

 1    Q.  Devin was also controlling?

 2    A.  Yes.

 3    Q.  The only time you were allowed to use the phone was when

 4    he allowed you to use it?

 5    A.  Correct.

 6    Q.  You weren't allowed to make calls to anyone unless he told

 7    you it was okay?

 8    A.  Yes.

 9    Q.  When you made calls, the other person had to be on

10    speakerphone?

11    A.  Yes.

12    Q.  So it's fair to say if you messaged anyone via cellphone,

13    there was a good chance Devin was going to find out?

14    A.  Yes.

15    Q.  He'd see those messages?

16    A.  If he found out, yes, he would find them.

17    Q.  And that actually happened a couple of times, right?

18    A.  Yes.

19    Q.  Devin also had problems with obeying the law, didn't he?

20    A.  Yes.

21    Q.  You were aware of several occasions where he got in

22    trouble for violating the law?

23    A.  Yes.  The one with the dog.

24    Q.  He also got in trouble for using marijuana in 2006,

25    correct?

DANIELLE SMITH - CROSS                              146

1    A.  Yes.

2    Q.  You knew that he used K2 -- or it's also called Spice --

3    when he was in the Air Force?

4    A.  Yes.

5    Q.  And he knew it was illegal to use Spice in the Air Force?

6    A.  Yes.

7    Q.  But he did it anyway?

8    A.  Yes.

9    Q.  He only stopped, not because he thought he'd get caught,

10   but because he got too high?

11   A.  Yeah.

12   Q.  He also did whippits in the Air Force?

13   A.  No.  The whippits were when him and I were married.

14   Q.  Okay.  After the Air Force, he obtained Xanax illegally?

15   A.  Yes.

16   Q.  Once he received -- we've talked about his clonazepam

17   prescription.

18       Once he got that prescription, he still kept using the

19   Xanax, correct?

20   A.  Yes.

21   Q.  He would double dose on the clonazepam and Xanax?

22   A.  Yes.

23   Q.  He would also abuse your medication?

24   A.  Yes.

25   Q.  We've talked about the Fioricet for your migraines that he

DANIELLE SMITH – CROSS                                          147

 1    would abuse.

 2        But he also abused some muscle relaxers you had, correct?

 3    A.   Yes.

 4    Q.   He would take six of those muscle relaxers at a time?

 5    A.   Yes.

 6    Q.   We talked about the time he got in trouble for abusing the

 7    dog in Colorado, correct?

 8    A.   Yes.

 9    Q.   In 2010, he was also accused of sexual assaulting a girl,

10    correct?

11    A.   I didn't know about that until this whole court stuff's

12    going on.

13    Q.   After his time in the Air Force, Devin Kelley started

14    associating with the Bandidos, correct?

15    A.   Yes.

16    Q.   He wanted to be a member of the Bandidos?

17    A.   Yes.

18    Q.   The Bandidos is a motorcycle club known to be violent?

19    A.   Yes.

20    Q.   The Bandidos are known for their criminal activity?

21    A.   Yes.  They're considered an outlaw group.

22    Q.   And Devin wanted to be a member of that outlaw group?

23    A.   Yes.

24    Q.   After his time in the military, Devin developed an

25    interest in firearms while you were in Colorado, correct?

1  A.  Yes.

2  Q.  He also wanted to have his own shooting school?

3  A.  Yes.

4  Q.  When he was looking at having a shooting school, it was

5  your understanding that he wanted to teach people that guns

6  aren't all bad?

7  A.  Yes.

8  Q.  He wanted to show people that guns aren't the cause of bad

9  things?

10  A.  Yes.

11  Q.  That the person who carries out the act is the one at

12  fault?

13  A.  Yes.

14  Q.  He also took an interest in parts for guns?

15  A.  If you're talking about, like, he wanted to do designs on,

16  like, the plastic part where you hold, then, yes.

17  Q.  He started ordering things for guns online?

18  A.  No.  He –– oh, okay.  He ordered the thingy you put on you

19  and you, like, stick your gun in.  You know what I'm talking

20  about?

21  Q.  The holster or the sling?

22  A.  Sure.  Yeah.  That stuff.

23  Q.  Okay.

24  A.  He ordered that stuff.

25  Q.  So he didn't start ordering things for guns online?

DANIELLE SMITH - CROSS                    149

1    A.  The only thing he ordered was he -- I think it's like a

2    sleeve.  I don't know.  You, like, pull it up, like, the

3    handle and you can, like -- I think you get a thing and you

4    can, like, burn on it to design it.  You know?

5    Q.  No, I don't.  But that's okay.  Thank you for trying to

6    describe it to me.

7        What I'm asking about is, during your deposition, you

8    talked about him ordering things for guns online.

9        Do you remember talking about that?

10   A.  Okay.

11   Q.  Okay.  And during your interview with OIG, you told the

12   OIG that Devin took an interest in parts for guns.

13       Do you recall that?

14   A.  Okay.  Then, if that's it, then it'd be like the little

15   thing on the top that you can look through.  It's -- it's like

16   a magnifying glass.

17   Q.  Maybe like the scope?

18   A.  Yeah, that.

19   Q.  Okay.

20   A.  And then I guess the thing that you attach at the end to,

21   like, put it around your body, like that stuff, partwise.

22   Q.  Okay.  So it's fair to say he was ordering parts for guns

23   online?

24   A.  Yes.

25   Q.  He would spend what little money you had on guns and

```
 1    ammunition, wouldn't he?
 2    A.  Yes.
 3    Q.  Even if that meant you would do without?
 4    A.  Yes.  I was used to it.
 5    Q.  Devin loved guns?
 6    A.  Yes.
 7    Q.  He babied his guns?
 8    A.  Yes.
 9    Q.  He loved taking them apart?
10    A.  He would clean them.
11    Q.  He also loved taking them apart and comparing the
12    specifications to newer models, correct?
13    A.  Yeah.  He wanted to make sure his gun was top of the line.
14    Q.  He weighed the parts for his guns?
15    A.  Oh, I don't know if he weighed them.  I just know he
16    wanted to make sure nothing would break.
17    Q.  He was always cleaning them, I think you just said?
18    A.  Yes.
19    Q.  He also cleaned his parents' guns, didn't he?
20    A.  I know one time he cleaned them because he said if they
21    get like -- I don't want to say jammed.  But, like, if you
22    don't -- he said if you don't clean them properly, they won't
23    work.
24    Q.  So you know he cleaned his parents' guns?
25    A.  Yeah.  Like, one time he did, I guess, like trying to
```

```
 1    teach them how to do it.

 2    Q.   Now, Devin's dad had tools, correct?

 3    A.   Yeah.  He had a garage for tools.

 4    Q.   Because he was --

 5    A.   Normal tools.

 6    Q.   What's that?

 7    A.   Normal tools.

 8    Q.   He was always remodeling his house, wasn't he?

 9    A.   Yes.

10    Q.   So it's fair to say he had a lot of tools?

11    A.   Yes.

12    Q.   Now, Devin did nonstop research on guns, didn't he?

13    A.   Yes.

14    Q.   He looked up the AR-15 online?

15    A.   Yes.

16    Q.   He looked up the AR-15 at gun shows?

17    A.   Yes.

18    Q.   And then when he got the AR-15, he shot it almost daily?

19    A.   Yes.

20    Q.   Devin liked going to gun shows, didn't he?

21    A.   Yes.

22    Q.   He went to gun shows a lot?

23    A.   Yes, when we were in Colorado.

24    Q.   And that's right.

25         Ms. Smith, on direct, you testified that he only went to
```

1  gun shows in Colorado.  Is that your testimony?

2  A.  Yes.

3  Q.  Do you recall giving a deposition in this case, Ms. Smith?

4  A.  Yes.

5  Q.  And you wanted to be honest during that deposition,

6  correct?

7  A.  Yes.

8  Q.  I think in direct, you said, "It was the first time I

9  really told the truth."

10 A.  Yes.

11 Q.  I'm going to show you -- so it's your testimony today that

12 Devin only went to gun shows in Colorado, correct?

13 A.  As far as I believe, yes.

14 Q.  You never would have said that he also went to gun shows

15 in Texas?

16 A.  I mean, if he did, then he did.  I just know -- most of

17 what I remember is they were up in Colorado because they were

18 easy to get to because they're, like, close by to where we

19 lived.

20 Q.  Ms. Smith, did Devin Kelley go to gun shows in Texas?

21 A.  If he did, then he did.  I don't really remember.

22 Q.  I'm going to show you Government Exhibit 53, page 121,

23 lines 14 through 15.

24        THE COURT:  It's not been admitted yet.

25        MS. CHRISTILLES:  Correct, Your Honor.

DANIELLE SMITH – CROSS                    153

```
1              THE COURT:  So you can take it down.

2              MS. CHRISTILLES:  Okay.

3              THE COURT:  If you want to move for the admission,

4    then you can display it.

5              MS. CHRISTILLES:  Your Honor, I'm using it for

6    purposes of impeachment.

7         Is there a different way you would like me to do that?

8              THE COURT:  So it's not going to be admitted; it's

9    just for impeachment purposes only?

10             MS. CHRISTILLES:  That's correct.  I did not intend

11   to offer it.

12             THE COURT:  Go ahead.

13             MS. CHRISTILLES:  May I put it back up on the screen,

14   Your Honor?

15             THE COURT:  Yes.

16             MS. CHRISTILLES:  I apologize for not being clear

17   about that.

18        (Discussion off the record)

19   BY MS. CHRISTILLES:

20   Q.  Ms. Smith, do you remember being asked a question by

21   Mr. Stern about gun shows?  This was in Colorado and in Texas.

22   A.  Yes.

23   Q.  And do you recall answering yes?

24   A.  Yes.

25   Q.  Thank you.
```

1      So, Ms. Smith, Devin Kelley went to gun shows in Texas,

2   too, didn't he?

3   A.  During that time, in the question, all I heard was "this

4   was in Colorado."  And I said yes.

5   Q.  You weren't always paying attention to what Devin Kelley

6   did at gun shows, were you?

7   A.  No.

8   Q.  Because you were caring for your children?

9   A.  Yes.

10  Q.  To your knowledge, Devin didn't purchase a firearm at a

11  gun show?

12  A.  Correct.

13  Q.  But he did buy a gun from a friend in Colorado?

14  A.  No.  He bought a gun from a Colorado shop.

15  Q.  Is it your testimony today that he did not buy a gun from

16  a friend in Colorado?

17  A.  He never once bought a gun in Colorado from a friend.  The

18  only time he bought a gun from a friend was when he got out of

19  the military, and that would have been in Texas.

20  Q.  So you never would have testified that he bought a gun

21  from a friend in Colorado?

22  A.  No.  Because it was not in Colorado.  The only time he

23  bought a gun in Colorado was from a gun store.

24  Q.  Ms. Smith, again, do you recall giving a deposition in

25  this case?

1    A.  Yes.

2    Q.  And you recall being under oath?

3    A.  Yes.

4    Q.  And you wanted to tell the truth during that deposition,

5    correct?

6    A.  Yes.

7    Q.  Okay.  I'm going to show you Government Exhibit 53,

8    line 122 -- or page 122.  Start at 7 through 25.

9        So here in this deposition, Mr. Stern is asking you about

10   your testimony to the OIG.  And he confirms with you, "Is that

11   accurate?  He bought a gun from a friend?"  And your answer is

12   yes.

13           MR. WEBSTER:  I'll object, Your Honor, under optional

14   completeness, and also that it mischaracterizes the testimony

15   and question that was actually posed to the witness.

16           THE COURT:  You can clean it up on redirect.

17           MR. WEBSTER:  Thank you, Your Honor.

18           MS. CHRISTILLES:  And we can go to JEX 157.

19   BY MS. CHRISTILLES:

20   Q.  Ms. Smith, this was your testimony to the OIG, which was

21   also referenced in your deposition where Mr. Stern was talking

22   to you about that gun.

23       And you said to the OIG, "It started when we were in

24   Colorado, really majorly in Colorado.  So he bought -- so

25   after he got out of the military, he bought a gun from his

1   friend."
2       Do you recall telling the OIG that?
3   A.  Yes.
4   Q.  And then confirming that in your deposition?
5   A.  Yes, that his major gun interest was in Colorado.  But he
6   did not buy a gun from a friend in Colorado.  That was
7   strictly a Texas thing.
8   Q.  That he bought a gun from a friend?
9   A.  Yes.  That was in Texas.  After he got out of the
10  military, he was in Texas.  He was never in Colorado after he
11  got out of the military, straight after.
12  Q.  Okay.  Ms. Smith, but he bought a gun from a friend?
13  A.  Yes.
14  Q.  Okay.  He also bartered for a shotgun –– he also bartered
15  for a shotgun, correct?
16  A.  Yes.
17  Q.  A 12-gauge shotgun?
18  A.  Yes.
19  Q.  He bartered for the shotgun online?
20  A.  Yes.
21  Q.  I'm showing you what has been admitted as JEX 687.  Wait.
22      Do you recognize what's depicted in this picture?
23  A.  Yes.
24  Q.  That's the shotgun that Devin Kelley bartered for online,
25  correct?

1    A.   Yes.

2    Q.   Showing you JEX 500 at 0036.

3         This is a picture of Devin with that shotgun, isn't it?

4    A.   It's not on my screen.

5    Q.   Oh.  That's not good.  Is anything showing on your screen,

6    Ms. Smith?

7    A.   Yes.

8    Q.   What's up on your screen right now?

9    A.   It's of him and the shotgun.

10   Q.   Okay.  Do you see the picture of Devin Kelley with a

11   shotgun over his shoulder on your screen?

12   A.   Yes.

13   Q.   Is that the same shotgun he bartered for online?

14   A.   Yes.

15   Q.   It's the shotgun he used to shoot bats?

16   A.   Yes.

17   Q.   Used to shoot birds?

18   A.   Yes.

19   Q.   At some point, he exchanged that gun on Craigslist for a

20   dog, correct?

21   A.   Yes.

22   Q.   I'm going to talk about some of Devin Kelley's other

23   purchases related to guns.

24        On October 28th, 2017, just a week before the shooting,

25   Devin purchased two 100-round drum magazines, correct?

1   A.  Yes.

2   Q.  He'd seen and advertisement on Facebook for these

3   magazines?

4   A.  I guess.  I don't know.  I just know he took us there and

5   said he was buying it.  I didn't have a say in it.

6   Q.  He took you to the Hill Country Truck and Gun Store,

7   correct?

8   A.  Yes.

9   Q.  To purchase those magazines?

10  A.  Yes.

11  Q.  Devin told you he was buying them to resell them, correct?

12  A.  Yes.

13  Q.  Are you aware that he actually returned those drums

14  because they didn't fit his AR-15?

15  A.  I know he said he was having problems with them, but

16  that's as far as I know.

17  Q.  And he ordered new ones?

18  A.  Oh, I don't know.

19  Q.  Okay.  He actually -- are you aware he actually called the

20  Hill Country Truck and Gun Store every single day leading up

21  to the shooting to see if those drums were in?

22  A.  Oh, I didn't know.

23  Q.  He also purchased body armor online?

24  A.  I mean, I guess.  I don't know.  He bought a lot of stuff.

25  I wasn't allowed to look at the bank statements or what he

1    bought or anything.

2    Q.   He tried to conceal those purchases from you, didn't he?

3    A.   Yes.

4    Q.   He made a purchase from LA Police Gear?

5    A.   Oh, I have no idea.

6    Q.   That's right.  Because he concealed those purchases from

7    you, correct?

8    A.   Yes.

9    Q.   It's fair to say that he kept purchases -- a lot of

10   purchases from you?

11   A.   Yes.

12   Q.   But you were with Devin when he purchased the AR-15 at

13   Academy, correct?

14   A.   Yes.

15   Q.   He made that purchase after he was turned down at Dick's

16   Sporting Goods?

17   A.   Yes.

18   Q.   He was turned down at Dick's Sporting Goods because he had

19   a Colorado driver's license, correct?

20   A.   Yes.

21   Q.   He purchased the gun at Academy after the manager overrode

22   the Colorado ID issue, correct?

23   A.   Yes.

24   Q.   The store clerk needed to call a manager over before Devin

25   was able to purchase the AR-15, correct?

1   A.  Yes.

2   Q.  You weren't concerned about all his purchases, were you?

3   A.  How could I keep track if he didn't tell me anything?

4   Q.  And because you had no idea that he was prohibited from

5   buying guns?

6   A.  Correct.  I didn't know he wasn't allowed to have guns --

7   Q.  You also --

8   A.  -- until now, for court.

9   Q.  Right.

10      You also weren't concerned because, quote, unquote, "guns

11  are everywhere in Texas"?

12  A.  They are.

13  Q.  Devin Kelley also urged his father to buy an AR-556,

14  correct?

15  A.  Yes.

16  Q.  And when I say "AR-556," it's just a brand of AR-15,

17  correct?

18  A.  Oh, I don't know anything about guns.  I just know it

19  looks like his.

20  Q.  He urged his father to buy a gun that looked just like

21  his?

22  A.  Yes.

23  Q.  His father actually bought that gun at Cabela's, correct?

24  A.  Yes.

25  Q.  Devin was with him?

```
 1   A.  All of us were together.
 2   Q.  That's right.  The whole family went to Cabela's to buy
 3   this gun?
 4   A.  Yes.
 5   Q.  Ms. Smith, I want to shift gears and move towards the
 6   weeks leading up to the shooting.  Okay?
 7   A.  Okay.
 8   Q.  On October 31st, 2017, you, Devin, and your daughter went
 9   to the fall festival at Sutherland Springs Baptist Church,
10   didn't you?
11   A.  Yes.
12   Q.  It was Devin's idea to go to the church that day?
13   A.  No.  He let me go.  It'd be the first time my family would
14   get to meet my daughter at five months old.
15   Q.  But it was his idea to go?
16   A.  No.  I had to beg him.  Like, he said, you know, I could
17   go and see her.
18   Q.  Ms. Smith, is it your testimony here today that it was not
19   Devin's idea to go to the church that day?
20   A.  No.  I had to beg him, and he allowed me to go.  Like, he
21   said okay.  Like, it wasn't like a fight or anything.
22   Q.  So you never would have said it was Devin's idea to go to
23   the church that day?
24   A.  No.  I wanted to go to see my mom.  Like, I got to earn
25   that privilege from him.
```

1    Q.  Ms. Smith, we've talked a lot about that ranger interview,

2    and I want to set the stage a little bit for that ranger

3    interview.

4        That happened just hours after the shooting, didn't it?

5    A.  Yes.

6    Q.  You didn't know all the details of what had happened that

7    day, did you?

8    A.  No.

9    Q.  You didn't know that so many people had been killed?

10   A.  No.

11   Q.  You really didn't even know Devin's involvement in all of

12   it?

13   A.  No.  I'll take -- no.  So when he called, that's when he

14   told us that he killed everybody.  But as far as everything

15   else, I didn't know anything besides him going and saying that

16   he shot up the church and killed people.

17   Q.  And that interview was on the day of the shooting?

18   A.  Yes.

19   Q.  It was on November 5th, 2017?

20   A.  Yes.

21   Q.  So if you were talking about events that happened on

22   October 31st, 2017, it's fair to say that your memory on

23   November 5th was probably better than it is today, correct?

24   A.  Yes.

25   Q.  But today you're telling us you never would have said it

1    was Devin's idea to go to the church that day?

2    A.  On the 31st?  No.  Because I wanted to go.

3    Q.  Okay.  I'm going to show you JEX 477 at -- let's go to

4    102.  And we're going to go through a little bit of this to

5    give you context.  Okay?  So we'll start at -- marked as

6    page 102 and start at line 20.  We're talking about Halloween.

7        October 31st, 2017, is also Halloween; is that right,

8    Ms. Smith?

9    A.  Yes.

10   Q.  Okay.  So when you're -- if you're talking about

11   Halloween, you would be talking about the fall festival on

12   October 31st, 2017?

13   A.  Yes.

14   Q.  Okay.  So we're talking about Halloween.  Let's go to the

15   next page.

16       All right.  And so do you see where you tell the rangers

17   it was his idea to go over?

18   A.  Okay.

19   Q.  So, Ms. Smith, you actually did tell the rangers that it

20   was Devin's idea to go to the fall festival, correct?

21   A.  Yes.

22   Q.  Now, you'd stopped being a member of the church when you

23   were 18, correct?

24   A.  Yes.

25   Q.  Even when you were a member, you were in and out?

DANIELLE SMITH - CROSS                    164

1   A.  Yes.

2   Q.  The only time you were really active was during Vacation

3   Bible School?

4   A.  Vacation Bible School and Sunday school.

5   Q.  When you went for the fall festival, it was the first time

6   you'd been back to the church in several years, correct?

7   A.  For a while, yes.

8   Q.  Because you'd only gone a handful of times during your

9   marriage to Devin?

10  A.  Correct.

11  Q.  You called your mom the day before to ask her if you could

12  come out for the fall festival?

13  A.  Yes.

14  Q.  And when we say your mother, I'm talking about Michelle

15  Shields?

16  A.  Yes.

17  Q.  Okay.  You hadn't seen Michelle Shields, your mother,

18  since before the birth of your daughter in May of 2017,

19  correct?

20  A.  Correct.

21  Q.  You were going to cut off the relationship with your

22  mother that day?

23  A.  That's what he wanted.

24  Q.  Devin wanted you to cut off the relationship with your

25  mother that day?

DANIELLE SMITH – CROSS                                    165

1   A.  Yes.

2   Q.  And that was the plan?

3   A.  He said I had to go and, you know, try and make things

4   right between her.  And then we talked for a little bit, and

5   then we left.  Like, it was a very short visit.

6   Q.  Your mom got to see your daughter?

7   A.  Yes.

8   Q.  And Devin actually left you alone with your mother for a

9   little bit, didn't he?

10  A.  Yes.

11  Q.  That was really unusual?

12  A.  Yeah.

13  Q.  Fair to say that that was the first time you'd been left

14  alone with your mother since you'd been married to Devin

15  Kelley?

16  A.  Correct.

17  Q.  As you were getting ready to leave, your mother told Devin

18  she loved him?

19  A.  Yes.

20  Q.  He told her he loved her, too?

21  A.  Yes.

22  Q.  During the fall festival, Devin was acting like something

23  was on his mind, correct?

24  A.  Yes.

25  Q.  He was really quiet?

1    A.   Yes.

2    Q.   Now, Ms. Smith, you indicated that you asked Devin for a

3    divorce the night before the shooting?

4    A.   Yes.

5    Q.   You indicated that the reason that you asked him for a

6    divorce, on direct examination, was you'd found a video of him

7    cheating on you?

8    A.   Yes.

9    Q.   Ms. Smith, we've talked about all the times you've been

10   interviewed for this case, correct?

11   A.   Yes.

12   Q.   Interviewed by the rangers on the day of the shooting?

13   A.   Yes.

14   Q.   Interviewed by OIG?

15   A.   Yes.

16   Q.   Gave a deposition in this case?

17   A.   Yes.

18   Q.   And, again, during that deposition, on direct, you said it

19   was the first time that you really could tell the truth,

20   correct?

21   A.   Yes.

22   Q.   Interviewed by the news media?

23   A.   Yes.

24   Q.   Ms. Smith, not in a single statement did you ever say that

25   the reason that you were leaving Devin Kelley or that you had

 1   asked him for a divorce was because of this video, did you?

 2   A.  No.

 3   Q.  First time that ever came up was today during direct

 4   examination?

 5   A.  No.  That would have been -- I told him I wanted to leave

 6   because he was cheating on me, and I was tired of being a

 7   punching bag.

 8   Q.  That's what you're testifying that you told Devin Kelley?

 9   A.  Yeah.  That would have been when I talked to Webster to

10   come in and give my statement that one time, that I told him I

11   wanted a divorce.

12   Q.  Okay.  And, Ms. Smith, if I'm confusing you, I apologize.

13       The first time that you have ever told anybody about a

14   video of Devin Kelley cheating on you was today on direct

15   examination?

16   A.  Okay.

17   Q.  In fact, when you were talking about asking him for a

18   divorce the night before the shooting -- and I do want to get

19   back to that -- in your deposition, you said the reason was

20   you didn't want your daughter to think it was okay to be

21   abused by a man?

22   A.  Correct.

23   Q.  Nothing about a video?

24   A.  Nope.

25   Q.  In fact, your deposition was actually the first time you

1    ever told anybody that you told Devin the night before the

2    shooting that you wanted a divorce, wasn't it?

3    A.   No.  That would have been when I went and talked to

4    Webster, that I wanted a divorce around the time of him, like,

5    taking my -- I guess, an affidavit for everything.

6    Q.   Ms. Smith, is it your testimony that you told Mr. Webster

7    that you had asked Devin Kelley for a divorce the night before

8    the shooting?

9    A.   Yes.

10   Q.   But you never told the rangers?

11   A.   No.

12   Q.   Never told OIG?

13   A.   Nope.  How can you tell somebody that when his parents are

14   in the room with you?

15   Q.   But I'm confused, Ms. Smith, because, on direct, you told

16   us that they already knew about the divorce.

17   A.   Yeah.  There was a conversation about it.  But when you

18   lead up to that, how can you bring up the conversation of

19   their son being abusive when they wouldn't tell me the truth

20   about why he went to the brig?

21       Then there's the fact that even then, when you told --

22   when I told them that his -- when I talked to the rangers the

23   one time and said I found him cheating multiple times, and his

24   father will be like, "Oh, that's news to me."

25   Q.   All right.  Ms. Smith, let's break this down a little bit.

1    Okay?

2        On direct, you told us that Mr. and Mrs. Kelley knew

3    before the shooting that the two of you were looking to get

4    divorced, correct?

5    A.  Yes.

6    Q.  So they knew before you went into that rangers' interview

7    that you and Devin were looking at getting a divorce?

8    A.  Yes.  It's the reason why he was asking them to watch the

9    kids.

10   Q.  Okay.  But when the rangers were talking to you and they

11   specifically asked you if you had any problems in your

12   marriage, your testimony today is that you didn't feel like

13   you could tell the rangers that you had asked for a divorce

14   because Michael Kelley was in the room?

15   A.  Yeah.  I don't like conflict, and I was still living with

16   them.  You know how uncomfortable that would have been?

17   Q.  So when the rangers specifically asked you if you had any

18   problems in your marriage, you told them Devin was not a bad

19   guy?

20   A.  Yep.

21   Q.  You did tell them that Devin had cheated on you?

22   A.  Yes.

23   Q.  But you'd worked it out?

24   A.  Yep.

25   Q.  And everything was fine?

1   A.  Yes.

2   Q.  And then you were interviewed by the Department of Defense

3   Office of Inspector General, the OIG, on May 15th, 2018?

4   A.  Yes.

5   Q.  And you didn't tell them that you had asked Devin for a

6   divorce the night before the shooting, did you?

7   A.  No, because Mr. Kelley was there.

8   Q.  But you said a lot of things during that interview that

9   Mr. Kelley didn't know about, didn't you?

10  A.  Yep.

11  Q.  You told the agents that Devin attempted to kill himself

12  at one point?

13  A.  Yes.

14  Q.  Mr. Kelley didn't know about that?

15  A.  Nope.

16  Q.  You told the OIG that Devin was doing whippits?

17  A.  Yes.

18  Q.  And Mr. Kelley didn't know about that?

19  A.  Nope.

20  Q.  Now, on direct examination, you said that when you

21  allegedly told Devin the night before the shooting that you

22  wanted a divorce, that he knew it was for real this time

23  because you tried fighting back, correct?

24  A.  Yes.

25  Q.  But you also testified on direct that there were times

DANIELLE SMITH – CROSS                    171

1   that you had tried to fight him off, right?

2   A.   Yep.

3   Q.   So this wouldn't have been the first time you fought back?

4   A.   No.

5   Q.   Ms. Smith, you testified on direct examination that you

6   think that you asking for a divorce was what caused this

7   shooting, right?

8   A.   Yes.

9   Q.   But that's not what you told the rangers, is it?

10  A.   Nope.

11  Q.   In fact, we saw a video where you told the rangers it was

12  because of what had happened to you as a child?

13  A.   Yep.

14  Q.   That's also what you told OIG, isn't it?

15  A.   Yes.

16  Q.   You told the OIG, "Devin knew that, during the process of

17  the abuse I went through, that the church and her knew and

18  they made fun of me for it"?

19  A.   Yep.  That would be in reference to that one family.

20  Q.   But you didn't tell the OIG it was just one family, did

21  you?

22  A.   They never asked.  If y'all would ask, I would answer the

23  question.

24  Q.   You didn't tell the rangers it was just one family, did

25  you?

DANIELLE SMITH – CROSS                                    172

```
 1   A.  They didn't ask.

 2   Q.  You used the term "they" with the rangers?

 3   A.  As in the family.

 4   Q.  And you used "parents," plural, with the rangers, correct?

 5   A.  As in that person's mother and father.

 6   Q.  Now, we've also discussed that you were interviewed by

 7   several media outlets, correct?

 8   A.  One news media outlet.

 9   Q.  Sure.  The San Antonio Express-News?

10   A.  Yes.

11   Q.  You didn't tell the Express News that you had asked for a

12   divorce the night before the shooting, did you?

13   A.  Because they didn't ask, and they have their own

14   narrative.

15   Q.  You also had some Facebook conversations with one of the

16   plaintiffs in this case, correct?

17   A.  I guess.

18   Q.  Charlene Uhl?

19   A.  Yes.

20   Q.  You told Charlene Uhl you had no idea why Devin committed

21   this shooting?

22   A.  I mean, what do you tell the families?  A lot of the

23   families really do not care what I have to say, the ones --

24   besides the ones who are really nice.  There are some that

25   blame me for the reason why their family died.  I carry that.
```

1        What's the point in trying to explain to people my side

2   when nobody listens?

3   Q.  Charlene doesn't blame you, does she?

4   A.  No.  She's really sweet.  But it's not something to tell

5   her.  She doesn't need to understand or know.  I just tell her

6   I'm sorry because I will always, always carry that burden.

7   Q.  Now, I think on direct examination that -- you had asked

8   for a divorce from Devin lots of times, correct?

9   A.  Yep.

10  Q.  The first time was when he hit you and he caused you to

11  lose your first pregnancy?

12  A.  We weren't married during -- when I lost my first

13  pregnancy.

14  Q.  One time you told him that you wanted a divorce was around

15  the time when your son was about a year old?

16  A.  Yes.

17  Q.  And in response to that, he became abusive and took your

18  tablet away?

19  A.  Yes.

20  Q.  And I think we saw some text messages that you were able

21  to identify as text messages with Erin, correct?

22  A.  Yes.

23  Q.  And in those text messages, you're also talking about

24  divorce, correct?

25  A.  Yes.

```
 1   Q.  I want to take a look at those text messages, which have
 2   been previously admitted as JEX 478B, page 4.
 3       And we've established that these messages are with Erin
 4   Higgins, correct?
 5   A.  Yes.
 6   Q.  And Erin is telling you, "And either go live with Michelle
 7   or find a shelter to start your life," correct?
 8   A.  Yes.
 9   Q.  And these messages occurred in 2015?
10   A.  Oh, I don't know.  There's not a timestamp.  I have no
11   idea.
12   Q.  Sure.  Let's go back to page 1.
13       Do you see the date on those text messages?
14   A.  Yes.
15   Q.  So these messages would have occurred in 2015?
16   A.  Yes.
17   Q.  You were having conversations with Erin via text message
18   about divorcing Devin?
19   A.  Yes.
20   Q.  And she suggested you go live with Michelle?
21   A.  Or a woman's shelter.  But how can you leave when they
22   block everything?  And I barely had time to message her.
23   Q.  Ms. Smith, it's fair to say that you want to help the
24   plaintiffs in this case, don't you?
25   A.  Yes.
```

1  Q.  Even though you stopped going to the church when you were

2  18, you knew many of the victims of the shooting?

3  A.  Yes, I did.

4  Q.  You'd volunteer at the church?

5  A.  Yes.  Many of the babies that died, I babysat them.

6  Q.  You lost your grandmother?

7  A.  Yes.

8  Q.  And your mother, Michelle Shields, is actually employed by

9  the First Baptist Church of Sutherland Springs currently,

10  isn't she?

11  A.  Yes.

12  Q.  Been employed there since 2018?

13  A.  I don't know when she got employed.  I just know she works

14  for them.

15  Q.  You've attended services at the church since the shooting?

16  A.  I've gone, I think, twice.  Once was on the year

17  anniversary to go, and then I think maybe one time before

18  that.  Other than that, I don't go.

19  Q.  And I think you were talking about this when we were

20  talking about those messages with Charlene.

21      You carry a lot of sorrow for those victims?

22  A.  Yes.

23  Q.  You carry the shame from Devin?

24  A.  Yes.  Because everybody died so I could be free of him.

25  And that's sad.

1    Q.  Prior to this trial, you discussed the purchase of guns

2    with the attorneys for the families because you wanted to help

3    them, correct?

4    A.  Yes.

5    Q.  Mr. Webster was one of those attorneys?

6    A.  Yes.

7    Q.  You signed an affidavit regarding the purchase of the

8    firearms?

9    A.  Yes.

10   Q.  Someone associated with Mr. Webster drafted your

11   statement?

12   A.  Yes.

13   Q.  They drafted it the day you met with them?

14   A.  Yes.

15   Q.  And besides Mr. Webster, several other attorneys for the

16   families were there, correct?

17   A.  Yes.

18   Q.  Ms. Smith, I want to shift to the morning of the shooting.

19   Okay?

20   A.  Okay.

21   Q.  That morning, Devin Kelley asked you to make him a light

22   breakfast, correct?

23   A.  Yes.

24   Q.  That was kind of unusual, right?

25   A.  Yeah.

DANIELLE SMITH – CROSS                                177

1    Q.  He likes to eat a little more than a light breakfast?

2    A.  Yeah.  He eats a lot.

3    Q.  He then either went to his parents' house or texted his

4    parents about watching the children, correct?

5    A.  Yes.

6    Q.  At some point, he restrained you?

7    A.  Yes.

8    Q.  He made it so you couldn't leave the room?

9    A.  Yes.

10   Q.  He put a gun to your head?

11   A.  Yes.

12   Q.  But he didn't hit you?

13   A.  That would have been before Sunday.  He didn't hit me on

14   Sunday.  He drug me by my hair.

15   Q.  He didn't tell you he was going to kill you?

16   A.  No.

17   Q.  He didn't tell you he was going to make you pay for

18   leaving him?

19   A.  Not when he was tying me up.

20   Q.  Instead, he pulled out a black box?

21   A.  Yes.

22   Q.  And you'd seen that black box before?

23   A.  Yes.

24   Q.  The black box had been in your home for a while?

25   A.  Yes.

DANIELLE SMITH – CROSS                               178

1   Q.  But he strictly forbid you from touching that black box,

2   correct?

3   A.  Correct.

4   Q.  You weren't allowed to even touch it?

5   A.  Nope.

6   Q.  He took everything out of that black box?

7   A.  Yes.

8   Q.  And you'd never seen a lot of the things in there?

9   A.  Correct.

10  Q.  You'd never seen the ballistic vest?

11  A.  No.

12  Q.  That vest already had a lot of things on it?

13  A.  Yes.

14  Q.  He took a mask out from the box?

15  A.  Yes.

16  Q.  A mask resembling the Marvel anti-hero, The Punisher?

17  A.  Yes.

18  Q.  He put that mask on?

19  A.  Yes.

20  Q.  While he was doing this, he kept saying he was sorry?

21  A.  If I said that, I don't remember today if he did.

22  Q.  He didn't tell you he was going to prevent you from

23  divorcing him, did he?

24  A.  No.

25  Q.  He didn't tell you he was going after Michelle?

DANIELLE SMITH – CROSS                            179

1   A.  No.

2   Q.  He said he was sorry, and then he told your son, "I'll be

3   right back"?

4   A.  He told my son he'd be right back, after he had everything

5   on him.

6   Q.  The next thing that happened was your in-laws came into

7   the house and untied you?

8   A.  Yes.

9   Q.  You later found out that Devin had actually told them you

10  were tied up and that they should come untie you?

11  A.  Correct.

12  Q.  After Devin committed the shooting, he called you and left

13  you a voicemail?

14  A.  Correct.

15  Q.  On that voicemail, he told you he was sorry?

16  A.  Yes.

17  Q.  That he loved you?

18  A.  Yes.

19  Q.  That he was a fucking wreck and didn't know what had gone

20  on in his head?

21  A.  Yes.

22  Q.  Devin was also able to get ahold of your father-in-law's

23  phone after the shooting?

24  A.  Yes.

25  Q.  Y'all listened on speaker?

```
 1   A.   Yes.
 2   Q.   Told you he loved you?
 3   A.   Yes.
 4   Q.   Told you he was sorry?
 5   A.   Yes.
 6   Q.   Told you he was trying to get home?
 7   A.   Yes.
 8   Q.   Now, on direct you stated that you then got on the phone
 9   with him, and he said he blamed you and it was all your fault?
10   A.   He had me take him off of speakerphone.  And then he told
11   me that it was my fault, and killed himself.
12   Q.   Ms. Smith, that's the first time you have ever told
13   anybody that, isn't it?
14   A.   Yeah.
15   Q.   In fact, in your deposition, Mr. Webster asked you -- I'm
16   going to go to Government Exhibit 53 at page 240.
17            MR. WEBSTER:  I object, Your Honor, as improper
18   impeachment.  I never asked her that question.  In fact, I
19   stopped asking questions at that point.
20            THE COURT:  Well, I'll wait to see if she points out
21   a question.
22            MR. WEBSTER:  Okay.
23   BY MS. CHRISTILLES:
24   Q.   Mr. Webster asked you, "Anything else that Devin told you
25   during this phonecall?
```

1          "That he loved me and that he was just sorry.

2          "Did you hear anything else or anything else that happened

3     then?

4          "No."

5          Didn't tell Mr. Webster about Devin telling you he blamed

6     you, did you?

7     A.   No.  Because I don't like talking about it.

8     Q.   But you wanted to be truthful in that deposition, correct?

9     A.   Yes.

10    Q.   In fact, you told us on direct it's the first time you

11    ever were really truthful?

12    A.   Yes.

13              MR. WEBSTER:  Could you please give me that page

14    number, please.

15              MS. CHRISTILLES:  Sure.  That's 240.  Yeah, 240.

16              MR. WEBSTER:  Page 240?  Thank you.

17              MS. CHRISTILLES:  Yes.

18         Your Honor, may I have one moment?

19              THE COURT:  Yes.

20              MS. CHRISTILLES:  Pass the witness, Your Honor.

21              THE COURT:  Any redirect?

22              MR. WEBSTER:  Yes, Your Honor.  Briefly.

23                        REDIRECT EXAMINATION

24    BY MR. WEBSTER:

25    Q.   Let's begin with what he just talked about on page 240 of

1    Exhibit Number 53.  First off, while he's pulling that up, in

2    order to move things along, Danielle, you told both me and

3    Justin Demerath, another lawyer for the plaintiffs, this exact

4    story when we were at the library that day, didn't you?

5    A.  Yes.

6    Q.  And you told me what happened with the phone, correct?

7    A.  Yes.  But I didn't tell, like, the rangers or anybody

8    because nobody asked.

9    Q.  But you did tell -- you did tell me that story, didn't

10   you?

11   A.  Yes.

12   Q.  And, in fact, when we were at your deposition that day,

13   and I was asking you questions about what went on that day,

14   you started getting really upset, didn't you, when we started

15   getting to that point to talk about what happened in the end,

16   didn't you?

17   A.  Yes.

18   Q.  And, in fact, if you look at the deposition testimony that

19   we're talking about, Defense Exhibit -- or G-53.

20       (Pause)

21           THE COURT:  If you just want to approach the witness

22   with a -- it looks like you have the page ready.

23           MR. WEBSTER:  Sure.  Your Honor, you know it.

24   Basically -- is it okay to approach her?

25           THE COURT:  Yes.

```
1              MR. WEBSTER:  Thank you.
2              THE COURT:  Oh, here it comes up.
3              MR. WEBSTER:  Okay.  Here we go.  Pull up the entire
4    front lines, from lines 9 through -- oh, you can't pull it up?
5    There we go.
6    BY MR. WEBSTER:
7    Q.  Do you see where it says -- after what the government read
8    to you there, it says, "Did you hear anything else or anything
9    else that happened then?
10       "No."
11       And I said, "Okay.  You don't want to talk about it?"
12       And she says, "(Witness indicating by shaking her head
13   negatively)."  Do you recall that?
14   A.  Yeah.
15   Q.  Why did you -- why did you -- why did I say that, you
16   don't want to talk about it?
17   A.  Because I don't like having to keep going back.
18   Q.  And that's because you had told me, hadn't you, about what
19   happened on the phone after they -- after Devin asked you to
20   take him off speaker, didn't you?
21             MS. CHRISTILLES:  Objection.  Leading.
22             THE COURT:  That's sustained.
23   BY MR. WEBSTER:
24   Q.  Okay.  Why did you -- why did you not want to talk about
25   it?
```

1  A.  Because I don't like having to keep going back into that

2  memory.

3  Q.  And what had you told me -- what had you told me in that

4  library that day when you signed that statement?

5  A.  At the library, when y'all asked about it, I told y'all

6  about it.  But as far as everything else, I never told anybody

7  about that time.

8  Q.  And no one from the government followed up in your

9  deposition, that you can recall, and asked you about what

10  specifically happened, did they?

11          MS. CHRISTILLES:  Objection.  Leading.

12          THE COURT:  Sustained.

13  BY MR. WEBSTER:

14  Q.  Can you tell us, did anyone else ask you any questions

15  with regard to that moment, until today?

16  A.  No.

17  Q.  Also --

18      *(Discussion off the record)*

19  BY MR. WEBSTER:

20  Q.  I'll show you JEX 478A-0002.

21      It's already in evidence, Your Honor.

22      And this was Erin Higgins, who's your other mother, right?

23  A.  Yes.

24  Q.  And it says -- if you go down to the section -- I need to

25  see it.  Okay.  That's not the point I want.

DANIELLE SMITH – REDIRECT                    185

 1        *(Pause)*

 2             MS. CHRISTILLES:  Your Honor.

 3             THE COURT:  One second.  We're changing court

 4   reporters, I believe.

 5        Let us know when we're ready.

 6             COURT REPORTER:  I'm ready, Your Honor.

 7             THE COURT:  Okay.  Go ahead.

 8             MS. CHRISTILLES:  Your Honor, counsel would ask if we

 9   could approach the bench.

10             THE COURT:  Come on up.

11        *(At the bench)*

12             MS. CHRISTILLES:  Your Honor, where would you like

13   us?  I don't want to invade your space.

14             THE COURT:  So I'm okay.  But I'm not sure how I'm

15   supposed to mute and get to that side at the same time,

16   though.  I have to hold this button down.  Why don't you guys

17   come up here.

18             MS. CHRISTILLES:  Your Honor, I think Mr. Webster's

19   made himself a witness in this case.  He has indicated that

20   she's indicating the only person she told this statement to is

21   Mr. Webster.  So, I mean, do I call Mr. Webster?

22             THE COURT:  So I think the point's already been made

23   that she was asked a question in deposition, and then the

24   followup question is -- or following statement -- I guess, it

25   wasn't a question -- is, "You don't want to talk about it."

DANIELLE SMITH - REDIRECT                    186

1    And the witness answers by shaking her head negative.  So I

2    don't think I need to hear anything more on this point.

3              MR. WEBSTER:  No problem -- yes, sir.

4              THE COURT:  So are you making a motion to recuse

5    counsel?

6              MS. CHRISTILLES:  Your Honor, I'm just concerned that

7    I have impeached the witness on the statement, and now she's

8    indicating that there's a witness to her ever saying this

9    statement, and that witness appears to be Mr. Webster.

10             THE COURT:  -- point is going to be just to whether

11   or not she really made the statement before.  I mean, given

12   everything that's happened to this lady, and the statement was

13   clear in deposition she didn't want to have any more followup

14   on this.  And so I'm crediting that.

15             MR. WEBSTER:  Thank you, Your Honor.

16      (Open court)

17             THE COURT:  Do you have any further questions for

18   this witness?

19             MR. WEBSTER:  Yes, sir.  Just a few more.

20   BY MR. WEBSTER:

21   Q.  Danielle, this -- I'll show you what's been marked as JEX

22   478A-002.  And this was -- this is Erin Higgins' statement or

23   affidavit that she was given that's been marked as an exhibit

24   here.  It says, "Danielle was aware that Devin was cheating on

25   her in the time leading up to the church shooting.  Danielle

1    shared with me that on one occasion, one to three months

2    before the church shooting, he had left his computer open and

3    she'd seen a video of Devin Kelley in a sexual act with

4    another woman."

5         Does that refresh your recollection as to whether or

6    not --

7              THE COURT:  So one second.

8         Is there an objection?

9              MR. WEBSTER:  I'm sorry.

10             MS. CHRISTILLES:  Yes.  Objection.  Leading.

11   Personal knowledge.  I mean, this is Erin Higgins' statement.

12             THE COURT:  Yeah.  So what is the purpose of this

13   question?

14             MR. WEBSTER:  I was just going to ask her if -- as a

15   matter of her impeachment, I was asking if this refreshes her

16   recollection as to whether or not she actually told someone

17   about this prior to that.

18             THE COURT:  So these are two separate matters that

19   we're now talking about.  And so this is not used for

20   impeachment purposes.  So your next question.

21             MR. WEBSTER:  No problem, Your Honor.

22             THE COURT:  That's sustained.

23   BY MR. WEBSTER:

24   Q.  Did Devin --

25        You can take it down.  Thank you.

1      Did Devin embark on any particularly complex tasks such as

2  writing a novel or seeking publicity for some impractical

3  invention?

4  A.  I don't −− I don't know.

5  Q.  Did you ever see anything like that?

6  A.  No.  I didn't see nothing.

7  Q.  Did he ever tell people he had a special or secret

8  relationship with a famous person?

9  A.  No, not that I know of.

10 Q.  Okay.  Was his speech characterized by jokes, puns,

11 theatricality or with dramatic mannerisms such as singing or

12 excessive gesturing?

13          THE COURT:  One second.

14     Is there an objection?

15          MS. CHRISTILLES:  Objection.  Leading.

16          THE COURT:  That's sustained.  And this is going

17 beyond the testimony previously on cross.

18          MR. WEBSTER:  Your Honor, she actually −− they

19 actually brought up his severe mental decline, in the

20 questioning at the start of her cross−examination.  And this

21 goes −− and this goes to exactly what she's talking about in a

22 medical manner.  I'm asking −−

23          THE COURT:  I'll let that in.  But you're still

24 leading.

25          MR. WEBSTER:  Okay.  No problem.

1   BY MR. WEBSTER:

2   Q.  Let me ask you this.  Did you –– did you ever observe him

3   making any jokes?

4   A.  No.

5   Q.  Did you ever observe him making any puns or theatricality

6   or with dramatic mannerisms?

7   A.  No.

8   Q.  Did you ever see him singing or excessive gesturing?

9   A.  No.

10  Q.  Did you ever see him talk really fast or have any type of

11  accelerated speech or disorganized or incoherent speech?

12  A.  When he was high off the clonazepam, he would.  But it was

13  hard to make out what he would say.  And sometimes he would

14  speed up everything he would say.

15  Q.  When you would have conversations with Devin, did he ever

16  get distracted easily by your clothing, by background noises

17  or furnishings in the room so that he couldn't hold a rational

18  conversation?  Like, would he divert when he would see those

19  things?

20          THE COURT:  One second.

21          MS. CHRISTILLES:  Objection.  Leading.

22          THE COURT:  That's overruled.  He's asking for her

23  observations.

24          THE WITNESS:  If I wore something that he didn't

25  like, he would stop his conversation and address –– you know,

DANIELLE SMITH – REDIRECT                190

1  I would have to go and change, or if something else was out of
2  place in the house, he'd tell me to go and fix it.
3  BY MR. WEBSTER:
4  Q.  Did you ever -- did you ever see him take or plan multiple
5  activities at once, such as occupational, political or
6  religious activities?
7  A.  No.  He stayed on one task at one time.
8  Q.  Let me show you what's been previously marked as -- for
9  the final questions that I have, what's been previously marked
10 as JEX 0799-0079.  79.  0079.
11       MR. WEBSTER:  Apologize, Your Honor.  This is the
12 last set of questions I have.
13 BY MR. WEBSTER:
14 Q.  The government asked you about the masks that he wore, and
15 they talk about that he -- the one that he put on that
16 morning, that he slowly put on from the box, that was the
17 Punisher mask; is that correct?  That's what you saw?
18 A.  Yes.
19 Q.  He also had this other mask in the box that -- did you
20 know about that?
21 A.  No.
22 Q.  But on the day in question, even though he has this other
23 mask that was found in the house by the Texas Rangers, he
24 chose the Punisher mask, didn't he?
25 A.  Yes.

1    Q.  And he chose that Punisher mask because he wanted to

2    punish you, didn't he?

3             MS. CHRISTILLES:  Objection.  Leading.

4             THE COURT:  That's sustained.

5    BY MR. WEBSTER:

6    Q.  Okay.  Can you tell me why you think he put the Punisher

7    mask on, ma'am?

8    A.  To what I feel like today, it was to get back at me for

9    not wanting to be with him.

10            MR. WEBSTER:  Pass the witness.

11            THE COURT:  Anything based on those questions?

12            MS. CHRISTILLES:  Just one question, Your Honor.

13                      RECROSS-EXAMINATION

14   BY MS. CHRISTILLES:

15   Q.  Ms. Smith, I just want to be clear about what you're

16   testifying to today about Devin telling you on that phonecall

17   that he blamed you and it was all your fault.  Okay?

18   A.  Okay.

19   Q.  Just to be clear, the only person you have ever told that

20   to is plaintiffs' counsel, correct?

21   A.  Correct.

22            MS. CHRISTILLES:  Nothing further, Your Honor.

23            THE COURT:  You may step down.

24       Is there any further need for this witness, or is she

25   going to be excused?

1          MR. ALSAFFAR:  She may be excused, Your Honor.

2          THE COURT:  Any necessity for her further?

3          MS. CHRISTILLES:  No, Your Honor.

4          THE COURT:  Thank you, ma'am.  You're excused.

5          THE WITNESS:  Okay.

6          MR. WEBSTER:  Your Honor, we need to switch players

7    for a minute, if that's all right.

8          THE COURT:  Let's go ahead and just take a ten-minute

9    break.  And that'll give time to sanitize the area.

10          MR. WEBSTER:  Thank you, Your Honor.

11     (Recess)

12     (Change in reporter)

13

14

15

16

17

18

19

20

21

22

23

24

25

TERRY SNYDER - DIRECT

1              (Change in reporter.)

2              MR. LeGRAND:  Your Honor, we would call Texas Ranger
3    Terry Snyder to the stand.

4              THE COURT:  Someone will need to get him.

5              MR. LeGRAND:  Good afternoon, Your Honor.

6              THE COURT:  Good afternoon.

7              MR. LeGRAND:  I have placed a copy of my binder and a
8    copy of Ranger Snyder's deposition in front of him.  And I've
9    given you a copy of Ranger Snyder's deposition because I'm
10   going to make reference to a couple of areas of
11   question-and-answer with him to save time.

12             THE COURT:  Thank you.

13             MR. LeGRAND:  And I did not give you a binder, unless
14   you want one, because everything in there is going to be up on
15   the screens.

16             THE COURT:  That's fine.  Thank you.

17           (TERRY SNYDER, having been duly sworn, testified as
18   follows:)

19             THE COURT:  Mr. LeGrand.

20                     DIRECT EXAMINATION

21   BY MR. LeGRAND:

22   Q.  Good afternoon.  Would you please state your name, sir.

23   A.  Terry Snyder.

24   Q.  And what is your occupation?

25   A.  Texas Department of Public Safety, Texas Ranger.

194

TERRY SNYDER - DIRECT

1  Q.  Is it okay if I refer to you as Ranger Snyder during the

2  examination?

3  A.  Yes, sir.

4  Q.  Ranger Snyder, I've placed in front of you a binder — a

5  white binder there.  And I'm not sure if you're going to have

6  to refer to it.  If you need a hard copy of any of the things

7  we put on your screen there, you may refer to it, and I'll

8  give you a tab number.

9       In the black folder is your deposition, and I am going to

10  refer to a few sections of it where I want to ask the question

11  and then you state what your answer was back at that time.

12  And it will be fairly quick.

13  A.  Yes, sir.

14  Q.  Okay.  Do you understand you are under oath?

15  A.  Yes, sir.

16  Q.  And as a Texas ranger, do you know what that means?

17  A.  Yes, sir.

18  Q.  Okay.  Would you tell the truth anyway?

19  A.  Yes, sir.

20  Q.  Were you involved at all in the Sutherland Springs church

21  massacre that occurred November 5th of 2017?

22  A.  Yes, I was.

23  Q.  Was the FBI involved?

24  A.  Yes, they were.

25  Q.  Was the ATF involved?

TERRY SNYDER - DIRECT

1   A.  Yes, they were.

2   Q.  Was Homeland Security involved?

3   A.  Yes, I believe so.

4   Q.  Were various branches of local law enforcement involved?

5          MR. STERN:  Your Honor, objection.  Vague.

6          THE WITNESS:  Yes.

7          THE COURT:  Are you objecting to the word "involved"?

8          MR. STERN:  I believe he asked if they were involved

9   in the shooting.

10         THE COURT:  No.  He left off the word "shooting"

11  because I was expecting that.

12         MR. LeGRAND:  I meant "investigation."

13  BY MR. LeGRAND:

14  Q.  Ranger Snyder, were you involved in an investigation after

15  the shooting?

16  A.  Yes, I was.

17  Q.  Were you, in any way, at the church -- the baptist church

18  in Sutherland Springs before a shooting took place?

19  A.  No, I wasn't.

20  Q.  So when I ask you these questions, I'm assuming that you

21  didn't arrive on the scene until after the shooting had

22  occurred.  Fair enough?

23  A.  That's correct.

24  Q.  Would that be accurate?

25  A.  Yes, sir.

TERRY SNYDER — DIRECT

1  Q.  And all the various law enforcement organizations I asked

2  you about a few moments ago, would that be accurate for them

3  as well?

4  A.  That's correct.

5  Q.  And the local law enforcement organizations that were

6  involved, can you name some of them?

7  A.  Wilson County Sheriff's Office, LaVernia Police

8  Department, Bexar County Sheriff's Office, I think the city

9  marshal's office out of Stockdale, and Guadalupe County and

10  Texas DPS.

11  Q.  Was the DPS involved, Department of Public Safety, from

12  Texas?

13  A.  Yes.

14  Q.  And were the Texas Rangers involved?

15  A.  Yes.

16  Q.  Did — the FBI, did they take charge of the investigation?

17  A.  No, sir.  We worked jointly.

18  Q.  Okay.  Who worked jointly?

19  A.  We worked side by side, or along — we worked with each

20  other during the investigative part — or during the

21  investigation.

22  Q.  Did the ATF work alongside you-all?

23  A.  Yes, sir.

24  Q.  Let's back up just a minute, then.

25     How did you find out that something had happened?

1  A.   I received a call that morning from Investigator Stephen
2  Moore with the Wilson County Sheriff's Office informing me
3  they had an active shooter at the church in Stockdale, the
4  Sutherland Springs Baptist Church.
5  Q.   And what did you do next?
6  A.   I inquired and got some information from him.  He said
7  that the number of count that was deceased at the time was
8  very low that he had received.  So we hung up.  I called my
9  supervisor and immediately reported it to him, Lieutenant
10  Michael Parker at the time, who has since transferred.
11      And once I made that call to my lieutenant, of course, the
12  additional resources were called in at that time because we —
13  or I felt it was something bad.
14  Q.   And I'm going to back up with you again.  I want you to
15  tell the Court something about yourself.
16      Where did you grow up?
17  A.   Snyder, Texas.
18  Q.   And how did you get involved — or can you give us a
19  rendition of how you became a Texas ranger?  What did you go
20  through?  Did you go to high school in Snyder?
21  A.   I went to high school in Snyder and graduated.
22  Q.   Take us from there to the Texas Rangers.
23  A.   So after graduating high school, I did some side work and
24  put myself through junior college.  And then I — at the same
25  time, I got on with the local police department there as a

TERRY SNYDER - DIRECT

1  dispatcher and then later joined the academy out of Odessa,

2  where I received my basic peace officer training and then

3  later became a patrolman with the Snyder Police Department.

4      After four years with the police department, I tested and

5  was accepted with Texas DPS in 1998.  I graduated the

6  '98 school.  And upon graduation, I returned back to Snyder

7  where I did four years as a highway patrolman, and then I

8  tested for motor vehicle theft service.  At the time, it was

9  part of the criminal investigations division with DPS.

10      I made motor vehicle theft.  I transferred to McAllen,

11  Texas, for five years.  And then I voluntarily transferred to

12  Lubbock, Texas, and was there for about a year.  I promoted to

13  lieutenant.  Came to San Antonio.

14      In January of 2011, I tested for the Texas Rangers, was

15  accepted and was assigned to Brownsville for eight months. And

16  then after my time in Brownsville, I came back to the

17  San Antonio area, stationed in Devine.  And then I transferred

18  over to Floresville -- the Kerrville station.

19  Q.  Where were you stationed on November the 5th of 2017?

20  A.  In Floresville, Texas.

21  Q.  And did that have anything to do with you receiving a call

22  about the shooting in Sutherland Springs?

23  A.  Being that the Sutherland Springs Baptist Church lies

24  within Wilson County, Wilson County is a county that I'm

25  assigned to cover.  And I assist the local sheriff's office

199
TERRY SNYDER – DIRECT

1  and the local police departments there with investigations.

2  Q.  Okay.  After you received the call —— or what kind of call

3  did you receive?

4  A.  It was a personal call.  I say "personal call."  It was on

5  my cell phone —— my work cell phone from an investigator in

6  Wilson County of an active shooter.

7  Q.  What does "active shooter" mean to you, if you receive a

8  call?

9  A.  That an individual has been seen or observed at the First

10  Baptist Church in Sutherland Springs actively shooting and

11  harming people.

12  Q.  Did you head that way?

13  A.  Yes.  It took me a little while to get there.  But, yes, I

14  prepared myself, and then I traveled —— I live in Pleasanton,

15  Texas.  So it's about an hour—and—a—half drive,

16  hour—and—15—minute drive for me.

17  Q.  What did you do when you arrived at the church in

18  Sutherland Springs?

19  A.  Upon arrival, I met with the chief deputy of Wilson

20  County.  At the time —— they've had an administration change.

21  But at that time, it was Johnie Deagan is who I met with and

22  began gathering information as far as what all information

23  they had gathered prior to my arrival.

24  Q.  Were you the first Texas ranger to arrive on the scene?

25  A.  Yes.

TERRY SNYDER - DIRECT

1  Q.  How long were the Texas Rangers present at the Sutherland

2  Springs Baptist Church --

3  A.  From that Sunday --

4  Q.  -- doing their investigation?  I'm sorry.

5  A.  From that Sunday to about Thursday or Friday into the next

6  week.

7  Q.  Were you there the whole time?

8  A.  Yes.

9  Q.  Why?

10  A.  Basically I was assigned as the lead investigator of this

11  investigation, and after coordinating with Wilson County

12  Sheriff's Department, they are initially the lead agency but

13  due to the scope of the incident, they did not have the

14  resources or the manpower to handle such investigation, so

15  they asked us to take over the investigation.  And then I'm

16  assigned to that county.  I'm considered the lead ranger

17  responsible for the investigation part of it.

18  Q.  How many Rangers were involved, in total, in the entire

19  investigation?

20  A.  To give you an exact number, approximately 15 to 20

21  Rangers from across the state came in, maybe 30.

22  Q.  Did you have superiors that you reported to?

23  A.  Yes, I did.

24  Q.  And we've seen the acronym ROI, like Reports of

25  Investigation.  You Rangers on the scene, were you involved in

TERRY SNYDER - DIRECT

1  those from time to time?

2  A.  Yes, I was.

3  Q.  And are those reports to your superiors?

4  A.  That's correct.

5  Q.  And who are your superiors, or who were they back at that

6  time?

7  A.  My office lieutenant here was Lieutenant Jessie Valdez.  I

8  think he was out of town at the time, so I called Lieutenant

9  Parker, who was out of Waco, and Major Lane (phonetic), who is

10  also stationed in Waco.

11  Q.  That deposition that's laying in front of you, am I

12  correct it's dated July 7th of 2020?

13  A.  That's correct.

14  Q.  Do you recall giving that deposition?

15  A.  Yes, sir, I do.

16  Q.  Do you recall the government of the United States taking

17  your deposition?

18  A.  Yes, sir.

19  Q.  Do you know why -- was the Attorney General, were they

20  your lawyer during that deposition?

21  A.  Yes, sir.

22  Q.  Do you know why you were selected to give the deposition?

23  A.  No, sir.

24  Q.  Okay.  Did you know that the federal government noticed

25  the Texas Rangers for a deposition?

TERRY SNYDER - DIRECT

1   A.   I'm sorry.  Ask again.

2   Q.   In other words, did you understand at the time your

3   deposition was taken, did you understand that the government

4   didn't notice Terry Snyder's deposition, they noticed the

5   Texas Rangers' deposition; did you know that?

6   A.   No, sir.

7   Q.   Okay.  You were just told to show up and give a

8   deposition?

9   A.   Answer to a subpoena.

10  Q.   Okay.  Okay.  Pretty much like you did today?

11  A.   Yes, sir.

12  Q.   Okay.  Can you describe in a little more detail the time

13  you came in?

14  A.   The Texas ranger division has their own chain of command.

15  We fall under the Texas Department of Public Safety.  And the

16  Texas Department of Public Safety is led by a director.

17       And the ranger division has a chief that is under that

18  director.  So we have a ranger chief, an assistant chief, and

19  then we have four or five captains stationed in Austin.  And

20  then the field commanders of the six companies, A through F

21  that we have, are led by a major.  And each under each major

22  are two to three lieutenants.

23  Q.   Where do you fall in that hierarchy, or that pyramid?

24  A.   I'm field ranger, supervised by the first lieutenant.

25  Q.   Do you know why you were selected to lead this

TERRY SNYDER - DIRECT

1   investigation?

2   A.  Being that it was -- it occurred in Wilson County, which

3   Wilson County is a county I'm assigned to.

4   Q.  Does a Texas ranger -- am I using the term correct when I

5   say "investigation?"

6   A.  Yes, sir.

7   Q.  Does that have anything to do with the fact that the event

8   has already occurred?  And what I mean by that, in other

9   words, the shooting had already taken place when you arrived;

10  correct?

11  A.  Yes, sir.

12  Q.  So was your role as a Texas ranger and all the other

13  agencies that arrived -- one, I guess, was to take care of the

14  massive amount of victims; correct?

15  A.  That was one of the roles, yes.

16  Q.  Okay.  And so what I'm leading up to is that the other

17  part of your presence is to investigate what happened?

18  A.  That's correct.

19  Q.  When you arrived, did you know whether there were multiple

20  shooters?

21  A.  No, sir, not at the time.

22  Q.  When you arrived, did you know whether this was some kind

23  of foreign attack?

24  A.  No, sir, I didn't.

25  Q.  When you arrived, did you know anything about what had

Gigi Simcox, RMR, CRR

1  happened?

2  A.  No, sir, other than there was an active shooter and that

3  by the time I arrived that individual had fled the scene and

4  the officers or the different agencies were in pursuit.

5  Q.  So were you at the church?

6  A.  Yes, sir.

7  Q.  Tell me what you did there, when you arrived.

8  A.  I met with Johnie Deagan and we conducted a walk-through

9  of the church.  And shortly after my arrival our crime scene

10 team working group coordinator ranger Troy Wilson arrived and

11 I pretty much partnered up with him and Johnie afterwards and

12 we started kind of organizing and triaging a plan, as far as

13 the resources that we would need on the scene, and trying to

14 gain control, basically, of the scene at that time for

15 integrity purposes.

16 Q.  So upon your arrival, does that start the clock on

17 collecting facts?

18 A.  Yes.

19 Q.  And as a result of the Texas ranger investigation in its

20 entirety, do you know how many documents resulted from that,

21 roughly?  I don't need an exact number.

22 A.  I currently have approximately seven to eight binders

23 full.

24 Q.  Did we make you read all of those last night, or -- I'm

25 sorry.  I don't mean to make any humor out of this.

1  A.  I've studied some of them, yes.  I've gone through this

2  stuff a number of times, so...

3  Q.  Who compiled the Texas ranger file that exists right now

4  on Sutherland Springs?

5  A.  Basically the other Rangers that are called in, they are

6  assigned a task and they eventually write a report on

7  everything they did.  And that report, their reports are

8  written in our system under a file number which I create.

9  When I create that file number, all those other reports come

10 in and I eventually print them off, or my office prints them

11 off and I put them together.

12 Q.  So would I be correct that because you were made the lead

13 ranger there, you're at the top of the pyramid, as far as the

14 end result report is concerned?

15 A.  That's correct.

16 Q.  I want to go to JEX597-002.  Can you put that up.

17     Have you seen this document before, Ranger Snyder?

18 A.  Yes, sir.

19 Q.  Okay.  Is that — I will represent to you that all the

20 exhibits I plan to use today are from the Texas ranger file;

21 okay?

22 A.  Yes, sir.

23 Q.  And what is JEX597-0002?

24     Is it on the screen in front of you?

25 A.  No, sir, not in front of me.

206

TERRY SNYDER – DIRECT

1   Q.  Can we take a second to see what the technology is doing

2   there, because I don't want him to have to stare up.

3       Ranger Snyder, we're going to do this the old-fashioned

4   way.  Would you grab that white binder and go to Tab 2.  I

5   think if you look at Tab 2, you will find that JEX597-002.

6   A.  Yes, sir.  I've got it.

7   Q.  What is that?

8   A.  It looks like a time line of events that was compiled and

9   put together.

10  Q.  Would I be correct that if one goes through the entirety

11  of the Texas ranger file, there will be several time lines;

12  correct?

13  A.  Yes, sir.

14  Q.  For example, if we look at JEX597-001, that's the page

15  before this one; correct?

16  A.  Yes, sir.

17  Q.  And is that also a time line?

18  A.  That's correct.

19  Q.  Okay.  I want you to understand, I'm going to spend quite

20  a bit of time on 597-001 and 597-002; okay?

21  A.  Yes, sir.

22  Q.  And, to your knowledge, these time lines, were they

23  compiled by the Texas Rangers?

24  A.  The information was provided to our analysts who worked

25  along with us and she compiled the information into this

TERRY SNYDER - DIRECT

1  format.

2  Q.  What I'm really driving at, is all the information on

3  597-001 and JEX597-002, all of that information was compiled

4  and gathered from the investigation of the Texas Rangers;

5  would that be correct?

6  A.  That's correct.

7  Q.  So this time line wasn't generated the day of the

8  shooting; was it?

9  A.  No, sir.

10  Q.  Okay.  Let's start with JEX597-002.  Is that a time line

11  of the morning of the shooting?

12  A.  Yes, sir.

13  Q.  And then JEX597-001, the other companion under Tab 2 in

14  your notebook, that's an annual time line?

15  A.  Yes, sir.

16  Q.  Okay.  Let's first go to the morning of the shooting.  So

17  this apparently runs from roughly early in the morning to

18  11:32 a.m.; correct?

19  A.  That's correct.

20  Q.  The first thing, the first thing we have on the line, the

21  time line is in the middle of the page; correct?

22  A.  Yes, sir.

23  Q.  So under morning, it's got:  "Kelley contacts his parents

24  to watch the kids."  Underneath that, it's got:  "Kelley

25  enters the bedroom with a handgun and held his wife at

TERRY SNYDER - DIRECT

1  gunpoint.  Then he handcuffed her to the bed."  Correct?

2  A.  Correct.

3  Q.  Then it says:  "Kelley retrieves a black, quote, rifle,

4  close quote, bag and departs the apartment located on his

5  parents' property."  Have I read all of those correctly?

6  A.  Yes.

7  Q.  Those were all based on statements that were taken by

8  various Rangers to accumulate these facts; correct?

9  A.  Correct.

10 Q.  So instead of going through hundreds of pages of Texas

11 Rangers interviews, I'm okay to rely on these facts on this

12 time line; correct?

13 A.  Correct.

14 Q.  The second dot in the middle of the page would be from

15 11:14.  It goes up and around to the top of the document and

16 says it's from 11:14 a.m. to 11:22 a.m.; correct?

17 A.  Correct.

18 Q.  And you told us you were the head ranger, you would have

19 been in charge of all the compilation of all these facts;

20 correct?

21 A.  Yes, sir.

22        THE COURT:  One second here.  Ranger, do you mind if

23 this IT specialist works around you?

24        THE WITNESS:  Not at all.

25        THE COURT:  Go ahead, Daniel.

TERRY SNYDER - DIRECT

1          You can continue.

2          MR. LeGRAND:  Thank you, Your Honor.

3  BY MR. LeGRAND:

4  Q.  Do you know, Ranger Snyder, how long it took, for example,

5  to compile all the facts that make up JEX597-002?  A long

6  period of time?

7  A.  We were there from like Sunday to Thursday, so during

8  those days all this information was compiled and documented.

9  Q.  Now, was the attempt of JEX597-2 to demonstrate what

10 happened that morning, up until the point, I think over here

11 at the end it's got:  "Kelley is found deceased in the

12 interior of the vehicle with gunshot wounds, including a

13 self-inflicted gunshot wound to the head.  Additional firearms

14 and ammunition were removed from the vehicle."  Have I read

15 that correctly?

16 A.  That's correct.

17 Q.  So the start of the time line is Mr. Kelley contacting his

18 parents and the various things we just went through.  The end

19 of the time line is he's dead in his vehicle from a

20 self-inflicted wound; correct?

21 A.  Correct.

22 Q.  And in between, there is a number of things on this time

23 line.  I'd like to walk through them a little bit with you;

24 fair enough?

25 A.  Yes, sir.

TERRY SNYDER - DIRECT

1  Q.  Okay.  Going to the box that's up here, 11:14 a.m. to
2  11:22 a.m., it's got:  "Kelley parks the Ford Expedition
3  directly in front of the front door of the Sutherland Springs
4  church and exits the vehicle, dressed in all black military
5  style tactical gear and face mask, armed with a Ruger AR-556
6  semiautomatic rifle."  Have I read that accurately?
7  A.  Correct.
8  Q.  All of this was determined by your Texas ranger
9  investigation; correct?
10  A.  Yes, sir.
11  Q.  For example, as far as you know, would anything be on
12  these two time lines 597-1 and 597-2, if the FBI or the ATF
13  disagreed with it?
14        MR. STERN:  Objection.  Calls for speculation.
15        THE COURT:  That's overruled.
16  BY MR. LeGRAND:
17  Q.  You worked directly with them; didn't you?
18  A.  At the scene we worked side by side, yes.
19  Q.  So, as far as you know, anything on these two time
20  lines -- do you know of anything --
21      Do you know of anything, Ranger Snyder, on these two time
22  lines that the FBI, or the ATF, or Homeland Security
23  specifically disagree with?
24  A.  I would think not.
25  Q.  Now, when you got to the church, Ranger Snyder, did you go

1  into the church?

2  A.  Yes, I did.

3  Q.  What did you see?

4  A.  Um —

5  Q.  Are you okay?

6  A.  I first saw a small child, two years old, surrounded with

7  colors — coloring pages, that you would think that she had

8  been there with her grandparents, you know, at the church

9  service and just coloring.

10     And then throughout the church was just — I mean, there

11  was property damage, bullet defects, a lot of just deceased

12  individuals.  And the pews had been moved.  There had been —

13  some had been repositioned prior to our arrival.  And that was

14  due to medical intervention, trying to triage and assist the

15  wounded.

16  Q.  Ranger Snyder, we were on the part of 597-2, when the last

17  thing I read was "armed with a Ruger AR-556 semiautomatic

18  rifle."  Had it already been moved before you got there?

19  A.  Yes.  I was later contacted by a Wilson County deputy who

20  had entered the church prior to us.  He, along with LaVernia

21  Police Department officers, they entered the church to clear

22  the church and make sure there was no other threat.

23     And prior to them exiting the church, that Wilson County

24  deputy picked a rifle up from the center walkway between the

25  pews, the center walkway there, and he took the rifle and

212
TERRY SNYDER - DIRECT

1  secured it in his patrol car.

2  Q.  Was that before you arrived?

3  A.  Yes, sir.

4  Q.  So when you walked into the church, had any ambulance

5  arrived yet?

6  A.  Yes.

7  Q.  So was the process of treating injured people and dealing

8  with the scene still going on, when you arrived?

9  A.  Yes.  Upon my arrival, there was — I don't want to

10  describe it as chaos, but the scene was very busy with a large

11  number of people.  People coming from everywhere, the

12  community, the outskirts of the community, off-duty officers,

13  law enforcement, EMS personnel.

14      And, as I explained, we were trying to gain control of the

15  scene to conserve the integrity of any evidence that we would

16  gather, and also be able to treat and continue to treat the

17  wounded and get them to the hospital.

18  Q.  If you notice at the top of the exhibit we're referring

19  to, 597-002, it's got 11:14 to 11:22, but if we look down on

20  the line there are actually some events that occurred during

21  that; correct?

22  A.  That's correct.

23  Q.  For example, 11:17, it says — down under here, it says:

24  "Wilson County Sheriff's Office receives first 9-11 call."

25  Was that before you arrived?

TERRY SNYDER - DIRECT

1  A.  Yes.

2  Q.  Do you know what time you arrived?  Did you document that?

3  A.  I'm sure I did.  I would have to go back and research it,

4  but I probably didn't get the call until 11:30 maybe, or prior

5  to just a few minutes before.  And it takes me roughly an

6  hour-and-15, 20 minutes to get over there.

7  Q.  So the first Texas ranger on the scene was you; correct?

8  A.  That's correct.

9  Q.  So you would have arrived after the end of this time line

10 that is 597-002, JEX; correct?

11 A.  Yes.  Upon my arrival I learned that the pursuit — they

12 were in pursuit, and that they were — the car had fled.  The

13 suspect had fled and they were pursuing him and that he had

14 driven off the road, off the FM road, going back towards

15 Lubbock County, and he drove off the road and into a field.

16 Q.  Was that a considered a crime scene?

17 A.  Yes.

18 Q.  Was the church considered a crime scene?

19 A.  Yes.

20 Q.  Were there any other crime scenes?

21 A.  Two additional crime scenes, being the scene where the

22 civilian in the community that encountered — his name was

23 Stephen Willeford, who encountered the gunman inside the

24 church at the time.  His crime scene was across the street at

25 a corner residence that's right across from the church.

214 of 319

1    And then the other additional scene is the scene in

2  Comal County where Devin left that morning, and where he had

3  handcuffed and hog tied his wife and left his children.

4  Q.  So what's the total number of crime scenes that developed,

5  roughly?

6  A.  A total of four.

7  Q.  And one of those would have been where Danielle Kelly was

8  hog tied on the bed; correct?

9  A.  That's correct.

10 Q.  And then Mr. Willeford, who was he?  Is that his picture

11 here on JEX597-2?

12 A.  Yes, it is.

13 Q.  And next to him it says:  "Kelley exits the sanctuary and

14 is engaged by Stephen Willeford?"

15 A.  That's correct.

16 Q.  And, as you sit here today, do you know whether or not

17 Mr. Willeford fired on Mr. Kelley with a firearm?

18 A.  He did.

19 Q.  Do you know, as you sit here today, whether he wounded

20 Mr. Kelley?

21 A.  Yeah, I believe he did.  Yes.

22 Q.  And do you know whether or not Mr. Kelley succumbed from

23 those wounds, or as we see over here, a self-inflicted wound?

24 A.   It was determined that he succumbed to a self-inflicted

25 wound.

1  Q.  And Mr. Willeford, is this accurate, that on the
2  right-hand side of this exhibit that Mr. Willeford is picked
3  up by Johnnie Langendorff, and then the two of them then
4  pursued Kelley?
5  A.  That's correct.
6  Q.  And they ended up at the second crime scene where
7  Mr. Kelley went off into the field and committed suicide;
8  correct?
9  A.  That's correct.
10         THE COURT:  Let's pause for just a second.
11         Daniel.
12         (Off the record discussion.)
13  BY MR. LeGRAND:
14  Q.  Ranger Snyder, would you pick up your —
15         THE COURT:  One second here.
16         MR. LeGRAND:  I'm sorry.  I apologize, Your Honor.
17         THE COURT:  He's going to be off the Zoom in just a
18  moment and we'll wait for him to come back in.
19         Okay.  We're back in business.
20         Mr. LeGrand.
21  BY MR. LeGRAND:
22  Q.  Ranger Snyder, I may from time to time come back to
23  Exhibit JEX597-2, which is the morning of the event — okay?
24  — I may come back to that from time to time, but I want to
25  move now to the other page of that.  Do you know how — it's

TERRY SNYDER - DIRECT

1  in front of you.

2      I want to go to 597-1.

3      Do you see that in front of you?

4  A.  Yes, sir.

5  Q.  And we're going to spend quite a bit of time on this

6  today, but do you see that it begins in 2009, when it says:

7  "Suspect Devin Kelley enlists in the Air Force?"

8  A.  Yes.

9  Q.  And then it ends on November 5th of 2017, the morning you

10 drove up to the Sutherland Springs Baptist Church and

11 witnessed what you told us you witnessed, when you walked in;

12 correct?

13 A.  Yes, sir.

14 Q.  Okay.  And throughout this testimony I'm going to take you

15 through these various years and what the -- the Texas Rangers

16 were unable -- or were able.  The Texas Rangers were able to

17 uncover and investigate all this information that's on

18 JEX0597-1; correct?

19 A.  That's correct.

20 Q.  And when you gave your deposition back in July of last

21 year, you knew that; correct?

22 A.  Yes, sir.

23 Q.  And you knew all this various information, when you gave

24 your deposition?

25 A.  Yes, sir.

217
TERRY SNYDER - DIRECT

1  Q.  And you knew Mr. Kelley's history?

2  A.  Yes.

3  Q.  With that in mind, I'd like you to take your deposition

4  and I'm going to go through certain passages of it with you,

5  pretty much as if I were asking you the questions today, but

6  I'm going to give you page and line; okay?  I'm going to give

7  you the page and the line to go to.  I'm going to read the

8  question, and then I'd like you to read the answer, as if it

9  was your testimony today; fair enough?

10 A.  Yes, sir.

11        THE COURT:  One second.

12 BY MR. LeGRAND:

13 Q.  If you disagree with any of the answers that you gave back

14 in July, would you interrupt and tell us:  "I don't agree with

15 that anymore"?

16 A.  Yes, sir.

17        THE COURT:  Is there an objection?

18        MR. STERN:  There is, Your Honor.  I know there is

19 not a question pending, but this is a government exhibit of a

20 deposition, which, as I understand Mr. LeGrand plans to use to

21 ask the questions, almost to supplement his own.  If it was a

22 matter of impeaching, that would be one thing.  But,

23 otherwise, if they are willing to put in the government

24 exhibits of the depositions, we certainly don't object to

25 that.

1        THE COURT:  Yeah.  You need to ask him a question.

2    He needs to answer to the best of his ability without

3    referring to his deposition.  Then if you need to get him to

4    refresh his memory, then you can perhaps go to that, but this

5    is an improper questioning technique.

6        MR. LeGRAND:  Your Honor, my attempt was to save

7    time.  And that's always my attempt, is to save time.

8        THE COURT:  Yeah.  Thank you for that, but let's just

9    ask questions and get his best answer.

10        MR. LeGRAND:  Okay.

11   BY MR. LeGRAND:

12   Q.  I'm going to ask you questions, Ranger Snyder, based; on

13   your deposition, and if your answers disagree with what you

14   gave back then, we'll talk about it; fair enough?

15   A.  Yes, sir.

16   Q.  So I was asking you about Devin Kelley, and I said:  "Did

17   you determine that he's a convicted felon?"

18   A.  Yes.  We learned that he was, yes.

19   Q.  Okay.  And you didn't know that at the time you arrived at

20   the scene; did you?

21   A.  No, sir, we did not.

22   Q.  And you didn't learn that for the first time — you didn't

23   learn all of that — then I said:  "When is the first time you

24   learned that he was a convicted felon?"

25   A.  It was later that first day or the next day.  I know we

TERRY SNYDER - DIRECT

1    requested the analytical assistance.  The resources that we
2    were utilizing, we asked them to run background checks and run
3    any information that we could get on this guy's name and date
4    of birth, because at the time we didn't know what kind of
5    event that we had or what we were looking at to investigate,
6    if there were multiple shooters, if it was a terrorist act,
7    what we were dealing with at the time.  So we wanted to learn
8    as much information as we could about by his name and date of
9    birth.
10   Q.  Ranger Snyder, do you recall when your deposition was
11   taken that the United States attorney that asked you
12   questions, I think it was for roughly seven hours; do you
13   recall that?
14   A.  Yes, sir.
15   Q.  Okay.  Do you remember that his name was Mr. Furman?
16   A.  Yes, sir.
17   Q.  And Mr. Furman asked you, I think — do you recall that
18   Mr. Furman asked you a lot of questions about how criminals
19   got firearms, like stealing, borrowing, straw purchases, gun
20   shows; do you remember that line of questioning?
21   A.  Yes, sir.
22   Q.  And would you agree, Ranger Snyder, that every single gun
23   that was in Devin Kelley's possession on the day of the
24   shooting, he bought through a federal firearms licensee, and
25   that the sale was approved by the federal government?

TERRY SNYDER - DIRECT

1          MR. STERN:  Objection.  Is he being asked if he
2   recalls from his deposition?
3          MR. LeGRAND:  No.  I asked a question.
4          THE COURT:  That was all predicate.  Now the question
5   is:  "Do you know whether the guns used were all purchased
6   through a federally licensed arms dealer?"
7          THE WITNESS:  The investigative facts that we
8   gathered from Kelley being in possession of these firearms,
9   all these firearms collected and background checks, revealed
10  that he did purchase those firearms.
11  BY MR. LeGRAND:
12  Q.  So he didn't have a weapon that he got by a straw
13  purchase?
14  A.  No, sir.  Nothing indicated such.
15  Q.  And he didn't have a weapon that he stole?
16  A.  No, sir.
17  Q.  And he didn't have any weapons that he borrowed?
18  A.  No, sir.
19  Q.  And he didn't have any weapons that he bought at a gun
20  show?
21  A.  No, sir.
22  Q.  And did you determine that all of the weapons -- in fact,
23  did he have three weapons there that day?
24  A.  I believe there was three that was collected from him,
25  yes.

TERRY SNYDER - DIRECT

1  Q.  So one was a Ruger AR-556 assault rifle?

2  A.  That's correct.

3  Q.  And that was left laying on the floor of the church;

4  correct?

5  A.  Yes, sir.

6  Q.  And it was picked up by law a enforcement individual and

7  placed in a car?

8  A.  That's correct.

9  Q.  And was it bought at an FFL, or a federal firearms

10  licensed store?

11  A.  Yes.

12  Q.  And did your investigation turn up that that store was an

13  Academy store?

14  A.  That's correct.

15  Q.  And did your investigation turn up that Mr. Kelley filled

16  out a Form 4473 from the ATF in order to purchase that weapon?

17  A.  That's correct.

18  Q.  And that he purchased this new in the box; correct?

19  A.  Yes, sir.

20  Q.  And that was true with all three weapons that he had there

21  that day; correct?

22  A.  True, that they were legally -- or that they were

23  purchased -- I don't know, I can't remember if they were all

24  purchased from the Academy store, but, yes, they were all

25  purchased.

TERRY SNYDER – DIRECT

1  Q.  No, sir.  In fact, I think one, if we go to JEX0597–001,
2  the annual time line ––
3  A.  Yes, sir.
4  Q.  I think if you look on 2016, it says:  "Kelley purchases
5  Ruger AR–556 rifle, not eligible to purchase, due to his
6  conviction."  Have I read that correctly?
7  A.  I'm sorry, sir.  Will you direct me?
8  Q.  Go to 2016.
9  A.  Yes, sir.
10  Q.  Okay.  And it says:  "Kelley purchases Ruger AR–556
11  rifle."  And then it says:  "Not eligible to purchase, due to
12  conviction."  Correct?
13  A.  Correct.
14  Q.  So you had determined he was a felon by the time this
15  document was generated?
16  A.  That's correct.
17  Q.  So it would have been illegal for him to purchase that gun
18  as a felon; correct?
19  A.  Yes, sir.
20  Q.  But he did purchase it.  He purchased it new and it was
21  laying in the floor of the church; correct?
22  A.  That's correct.
23  Q.  And he used it to reek the havoc that he did on
24  November 5th, 2017; correct?
25  A.  Yes, sir.

TERRY SNYDER - DIRECT

1  Q.  Now, if you look over on 2014, do you see down on the
2  bottom right-hand side of 2014, it says:  "Kelley purchases
3  Glock, model 19, .9mm pistol."  Do you see that?
4  A.  Yes, sir.
5  Q.  And it also says:  "Not eligible to purchase, due to
6  conviction?"
7  A.  Yes, sir.
8  Q.  He had a Glock in his possession the day of the shooting;
9  correct?
10  A.  Yes, sir.
11  Q.  Did you determine that it was that Glock that's referred
12  to here that was purchased December 22nd of 2014?
13  A.  Yes, sir.
14  Q.  And then also, if you come up to 2017, October 18th -- you
15  with me?
16  A.  Yes, sir.
17  Q.  "Kelley purchases Ruger SR-22 pistol.  Not eligible to
18  purchase, due to conviction."  Have I read that correctly?
19  A.  That's correct.
20  Q.  The three guns I just went through, the AR-556, the Glock,
21  and the Ruger SR-22, I think the AR-556 and the SR-22 both
22  came from Academy; is that your recollection?
23  A.  I would agree.
24  Q.  Okay.  And that the SR-22 was in Mr. Kelley's backpack in
25  his car?

TERRY SNYDER – DIRECT

1   A.  That's correct.

2   Q.  It was never fired the day of the event; was it?

3   A.  No, sir.  There is no evidence indicating so.

4   Q.  And then he committed suicide with the Glock?

5   A.  That's correct.

6   Q.  Any evidence that he fired the Glock inside the church?  I

7   think you were asked that in your deposition.

8   A.  No evidence that he fired it inside the church.  I think

9   he discharged that weapon exiting the church in the gun fight

10  with the civilian.

11  Q.  So the investigation from the Texas Rangers — am I

12  correct? — it determined that Mr. Kelley used the Glock to

13  shoot at Mr. Willeford?

14  A.  That's correct.

15  Q.  But all the shooting he did to kill and maim and harm all

16  the people inside the church was done with this AR-556 assault

17  rifle; correct?

18  A.  That's correct.

19  Q.  That he bought with the clearance of the FBI.  Did your

20  investigation determine that?  That he filled out a 4473, and

21  that the FBI green lighted that because the Air Force never

22  told them he was a felon.  We reached that conclusion in your

23  deposition; correct?

24  A.  So the application was cleared for him to purchase that

25  from the Academy store, yes.

225

TERRY SNYDER — DIRECT

1   Q.  Right.  And your investigation determined that the Air
2   Force never told the FBI that Mr. Kelley had been convicted of
3   a child abuse felony; correct?
4   A.  The investigation —— I guess to answer that, it's revealed
5   that Kelley had been charged with a child abuse charge for a
6   domestic charge.
7   Q.  And would you go to 2012 on the exhibit?
8       I'm sorry.  Did I interrupt you?
9   A.  No, sir.  Go ahead.
10  Q.  Go to the bottom right-hand corner of 2012 under JEX597-1.
11  Do you see where it says:  "Kelley found guilty of domestic
12  abuse by Air Force.  Due to conviction, Kelley was not
13  eligible to purchase firearms."  Have I read the Texas ranger
14  time line correctly?
15  A.  Yes, sir.
16  Q.  So the result of your investigation was the Air Force
17  didn't report that to the FBI; did they?
18  A.  Well, according to this time line and according to the
19  investigation, it was found that he was convicted of this
20  domestic abuse and it was discovered we learned that
21  information.  How that information was communicated amongst
22  the agencies or the different entities, we didn't find
23  anything on that.  I mean ——
24  Q.  I'm not asking you that.  What I'm asking you is that the
25  end result of your investigation, do you recall in your

TERRY SNYDER - DIRECT

1  deposition you were asked "Do you agree that you-all
2  determined that Mr. -- that the Air Force did not report
3  Mr. Kelley's felony conviction to the FBI?"
4          MR. STERN:  Objection.  Asked and answered.
5          THE COURT:  That's overruled.
6          THE WITNESS:  That's correct.
7  BY MR. LeGRAND:
8  Q.  Okay.  Would you agree, Ranger Snyder, that your
9  investigation brought you to the conclusion that every single
10 one of the guns that Mr. Kelley had at the church, that he
11 bought from a licensed gun dealer with a form that he filled
12 out and sent in to the U.S. Government?
13 A.  That's correct.
14 Q.  Now, do you recall telling me in your deposition that it
15 was somewhere in the neighborhood of three days before you,
16 the Texas Rangers, the FBI, and the ATF determined that
17 Mr. Kelley was a convicted felon?
18 A.  It was two to three days.  We didn't learn that
19 immediately upon the onset of the investigation.
20 Q.  And do you recall telling me that you and the FBI and the
21 ATF all learned that about the same time?
22 A.  That's correct.
23 Q.  And do you recall telling me that the FBI told you that
24 the reason for that is that the Air Force never reported it to
25 them; do you recall telling me that in your deposition?

1   A.   Yes.

2   Q.   Do you recall telling me that the reason Mr. Kelley had

3   those three guns is because the Air Force didn't tell the FBI

4   that he was a convicted felon?

5         MR. STERN:   Objection.   Form.

6         THE COURT:   So this is improper impeachment.   You

7   need to ask him the question, rather than referencing the

8   deposition.

9         That's sustained.

10  BY MR. LeGRAND:

11  Q.   Is it correct, Ranger Snyder, that you-all at the Texas

12  Rangers learned through the FBI that the reason they didn't

13  know Mr. Kelley was a convicted felon is because the Air Force

14  didn't tell them that?

15  A.   Yes, sir.

16  Q.   Now, —

17      (Off the record discussion.)

18        THE COURT:   Let's just ask a question.

19        MR. LeGRAND:   That's what I'm trying to do, Your

20  Honor.   I apologize.

21  BY MR. LeGRAND:

22  Q.   Ranger Snyder, would you agree that in your job with the

23  Texas Rangers there is times when you report to the next NICS

24  database?

25  A.   Yes.

TERRY SNYDER - DIRECT

1   Q.  And do you report — as a Texas ranger, do you report
2   felony convictions to the NICS database?
3   A.  Yes.
4   Q.  And do you agree that if — what is your understanding of
5   what the NICS database is?
6   A.  We operate, or we run our checks on the individual's name,
7   date of birth, their driver's license number, social security
8   number through two different databases.  One is the —
9       (Reporter clarification.)
10      So we run our information through two databases, one being
11  the TCIC, being the Texas Crime Information Center, and then
12  the other one in NCIC, which is the National Crime Information
13  Center.
14  BY MR. LeGRAND:
15  Q.  And when Mr. Kelley or anybody else fills out a 4473 ATF
16  form that goes into the FBI, do you know, or is it your
17  understanding that that search through the NICS database to
18  see if they are eligible to buy a firearm?
19  A.  The search through the NICS system would return anybody
20  with a convicted felony or it would show their convictions and
21  their charges.
22  Q.  So as a Texas ranger do you report felons to the NICS
23  database, so they won't be able to buy firearms?
24      Is that one of the reasons you report them?
25  A.  That's correct.

1  Q.  Okay.  And do you recall ever having not reported a felon
2  to the NICS database, when you were required to do so?
3  A.  No, sir.
4  Q.  Are you required to report felons to the NICS database, if
5  it's your area or responsibility?
6  A.  Yes, sir.
7  Q.  Do you have supervisors that make sure you do that?
8  A.  That's correct.
9  Q.  And if you didn't do it, would your supervisor be very
10  upset with you?
11  A.  That's correct.
12  Q.  Would you, in fact, probably be fired from the Texas
13  Rangers, if you didn't report a felon to the NICS database?
14  A.  Yes.
15  Q.  And, in addition to not being allowed to buy a firearm, is
16  it your understanding from your work as a Texas ranger that
17  Mr. Kelley should not have been allowed to carry a firearm as
18  a convicted felon?
19  A.  There is other parameters that would determine that, just
20  not being based as a convicted felon, I guess you could say.
21  Q.  Okay.  Let me be more specific.  If he was a convicted
22  domestic abuse felon, would he be allowed to carry a firearm
23  in Texas?
24  A.  No, sir.
25  Q.  Okay.  And if you look back at JEX0597-1, 2012, you and I

1  read earlier -- correct? -- that he was:  "Found guilty for
2  domestic abuse by the USAF, and Kelley was therefore not
3  eligible to purchase firearms."  Correct?
4  A.  Correct.
5  Q.  He couldn't possess them, or wear them, or carry them
6  either; correct?
7  A.  That's correct.
8  Q.  So if he was wearing a firearm in 2017 everywhere he went,
9  would he be breaking the law everywhere he went?
10 A.  That's correct.
11 Q.  Do you recall in your deposition I went through a
12 hypothetical with you about if you had pulled Devin Kelley
13 over on Highway 87 on his way to Sutherland Springs the
14 morning of the shooting; do you recall that?
15 A.  Yes.
16 Q.  Okay.  And I think I took you back to your DPS days, when
17 you were driving a patrol car.  If you had pulled Devin Kelley
18 over for speeding -- do you recall me asking you about that?
19 A.  Yes, sir.
20 Q.  And you had seen a long gun, this AR-556 laying on his
21 back seat, would you have gone back to your patrol car and run
22 him up on your NICS database?
23         MR. STERN:  Objection.  Called for facts not in
24 evidence.
25         THE COURT:  That's overruled.

TERRY SNYDER - DIRECT

1          THE WITNESS:  I would have.

2  BY MR. LeGRAND:

3  Q.  And in hindsight, you wouldn't have found a thing, because

4  the Air Force never reported his felony; correct?

5  A.  His background I looked at during my investigation doesn't

6  report anything on there that would cause me any concern of

7  him being in possession of a firearm at the time that I would

8  have conducted a traffic stop.

9  Q.  And so, if he's convicted as a domestic abuse felon, he

10 can't wear body armor either; can he?

11 A.  No, sir.

12 Q.  He can't even possess body armor; can he?

13 A.  No, sir.

14 Q.  But that morning, if you had pulled him over and he had

15 body armor on, you couldn't have done anything to him — could

16 you? — because he was clean in the NICS system?

17          MR. STERN:  Objection.  Calls for speculation.

18          THE COURT:  That's overruled.

19          THE WITNESS:  Same as the firearm.  I mean, if I

20 would have noticed the body armor and I run a check on him, it

21 wouldn't have raised any concern because there was nothing

22 indicating on his criminal history.

23 BY MR. LeGRAND:

24 Q.  So if that morning if you had pulled him over for speeding

25 and you had run him in your NICS database in your DPS patrol

1  car, and that Ruger AR-556 assault rifle had been laying on

2  the back seat of the car, you wouldn't have done anything, you

3  would have let him go -- correct? -- after you gave him a

4  speeding ticket?

5          MR. STERN:  Objection.

6          THE WITNESS:  That's correct.

7          THE COURT:  That's been asked and answered, but we

8  got the answer.

9  BY MR. LeGRAND:

10 Q.  Now, you, and the FBI, and the ATF all found out about

11 Devin Kelley being a child abuse felon, along about the same

12 time?

13 A.  Yes.  Within a couple of days, yes.

14 Q.  Do you recall that the ATF boots on the ground and the FBI

15 boots on the ground there with you in Sutherland Springs were

16 shocked by that?

17 A.  I never -- I can't testify and say I ever heard a

18 statement made of such or any comment.

19 Q.  Do you recall telling me in your deposition that they were

20 shocked by it?

21 A.  I would have to refresh my memory or go back to it.

22 Q.  Okay.  Would you grab it there in front of you, page 248,

23 line 8.  Tell me when you're there with me; okay?

24 A.  Yes, sir.

25 Q.  Question on Line 8:  "But, okay, but you remember working

TERRY SNYDER - DIRECT

1  with the FBI and the ATF.  Were they shocked when they found

2  out that the Air Force had not turned this data in to them?"

3  And what was your answer?

4  A.  I answered:  "Yes, sir."

5  Q.  And do you agree with that answer today, or does that

6  refresh your recollection?

7  A.  I would agree.  I guess I'm implying and answering a

8  question to them being shocked because I was surprised because

9  the criminal history did not indicate anything as such.

10 Q.  Were you surprised and shocked that his criminal history

11 had not been turned into the FBI?

12 A.  I can't say that his criminal history hadn't been turned

13 over to the FBI, because there was some reports on there for

14 some juvenile records, so he did have a criminal history.

15 However, charges that would prevent him from purchasing a

16 firearm, being in possession of a firearm, or a body armor was

17 not indicated on that criminal history.

18 Q.  And did that shock you?

19 A.  Yes.

20 Q.  It wouldn't happen in the Texas Rangers; would it?

21 A.  No.

22 Q.  At least somebody would be in a whole lot of trouble?

23 A.  Yes.

24 Q.  Now, at the very end of your deposition — well, I'll ask

25 you the question.  Do you agree, Ranger Snyder, that if we

TERRY SNYDER - DIRECT

1  look at JEX0597-1, this is the annual time line?

2  A.  That's correct.

3  Q.  Do you agree that it shows, in 2012 it shows two purchases

4  at Holloman Air Force Base of firearms from a date standpoint

5  actually before Mr. Kelley was convicted; correct?

6  A.  Correct.

7  Q.  But do you agree that the Texas Ranger time line shows at

8  least four firearms on here -- and I can walk you through

9  them -- 2015.  Do you see on October 20th he purchased a .9mm

10  semiautomatic pistol?

11  A.  Yes.

12  Q.  And 2014, before that's when he purchased the Glock down

13  here in 2014; correct?

14  A.  Correct.

15  Q.  And 2016 he purchased the Ruger automatic rifle; correct?

16  A.  Correct.

17  Q.  And 2017 he purchased the 22?

18  A.  Correct.

19  Q.  Okay.  And do you recall ever having talked to me in your

20  deposition about how buying that many guns and passing that

21  many FBI background checks might eventually tell somebody that

22  they are not in the system?

23          MR. STERN:  Objection.  Calls for speculation.

24          THE COURT:  That's overruled.

25          THE WITNESS:  So part of our job as investigators is

TERRY SNYDER – DIRECT

1  to compile this information.  This information is put together
2  as a puzzle, so I see this as putting the border of this
3  puzzle together, and the remaining pieces we're trying to
4  compile as much information as we can to complete our
5  investigation.
6          What this information was able to tell him — I know
7  what it tells me is that he purchased four firearms.  What he
8  was thinking, or how it made him feel, obviously we didn't get
9  to interview him to get that answer or get the why from him or
10 what he was feeling.  I can just indicate he was able to
11 purchase four firearms.
12 BY MR. LeGRAND:
13 Q.  Okay.  I'm just asking you hypothetically.  In your
14 experience as a Texas Ranger, if somebody is able to walk in
15 to a retail store, that's a gun store, that's a federal
16 firearm licensee gun store on four separate occasions after
17 they are convicted as a domestic violence felon and buy
18 firearms, hypothetically, do you believe that at some point in
19 time that would start to tell them they are not in the system?
20         MR. STERN:  Same objection, Your Honor.  Calls for
21 speculation.  Lack of personal knowledge.
22         THE COURT:  Yeah.  That is sustained.
23 BY MR. LeGRAND:
24 Q.  So, Ranger Snyder, we have established, have we not, that
25 you learned during your investigation about the three firearms

TERRY SNYDER - DIRECT

1  that were located at the scene and used in Devin Kelley's

2  possession on the day that he went to the Baptist church in

3  Sutherland Springs and committed this massacre?

4  A.  That's correct.

5  Q.  And we know that those three firearms were traced through

6  the ATF tracing system?

7  A.  That's correct.

8  Q.  Let's go to JEX552.  Have you seen that document before,

9  Ranger Snyder?  It's from the Texas ranger file.

10  A.  Yes.  That's the firearms trace summary provided by ATF.

11  Q.  So ATF provided that to the Texas Rangers?

12  A.  That's correct.

13  Q.  And do you see that it's dated November 5th, 2017?

14  A.  Yes.

15  Q.  So that's the date of the shooting; correct?

16  A.  That's correct.

17  Q.  Did it say anything on that exhibit, JEX552, does it say

18  anything whatsoever on it about a previous felon or previous

19  felony?

20  A.  No, sir.

21  Q.  So does that trace on that firearm, the Ruger AR-556, does

22  it display any history whatsoever that this man is a convicted

23  domestic violence or child abuse felon?

24  A.  No, sir.

25  Q.  And then let's go to JEX553.  Do you see that in front of

TERRY SNYDER - DIRECT

1  you?

2  A.  Yes, sir.  It's a firearms trace summary for a Glock.

3  Q.  Is that the firearms trace summary for the Glock that was

4  in his possession?

5  A.  That's correct.

6  Q.  And so do you see the date on that?

7  A.  Completion date November 5th, 2017.

8  Q.  Is that the same day as the shooting?

9  A.  That's correct.

10  Q.  And so do you see anything on that document that shows

11  other than that Mr. Kelley bought that gun from a licensed

12  federal firearms dealer with the approval or go ahead from the

13  FBI?

14  A.  No, sir.

15  Q.  And then let's look at JEX554.  Would you look at the date

16  on that?  Is that another ATF trace summary?

17  A.  It's a firearms trace summary provided by ATF completed on

18  November 7th, 2017.

19  Q.  That's on the SR-22; correct?

20  A.  That's correct.

21  Q.  So that's two days after the shooting; correct?

22  A.  That's correct.

23  Q.  Do you see anything on this document, the ATF trace

24  document that's two days after the shooting, that says

25  anything about Devin Kelley being a convicted child abuse

1  felon?

2  A.  No, sir.

3  Q.  Ranger Snyder, did you know, did you know about

4  Mr. Kelley's application to attain a Texas handgun carry

5  permit?

6  A.  We learned of it during the investigation, yes, sir.

7  Q.  Okay.  If you look at JEX597-1 again, do you see under

8  2015 that it says:  "Kelley applies for Texas DPS concealed

9  handgun permit and it was denied."  Correct?

10  A.  That's correct.

11  Q.  Okay.  Would you look at JEX578 for me.  Have you seen

12  that document before?

13  A.  It's the letter of denial I believe from Texas Department

14  of Public Safety Regulatory Service Division.

15  Q.  Now, Ranger Snyder, when somebody applies for -- I think

16  they call them a CHL back in the day, a concealed handgun

17  license, but now I think they are called LTCs -- correct? --

18  license to carry?

19  A.  Yes, sir.

20  Q.  When someone applies for one of those, would I be correct

21  they supply their fingerprints?

22  A.  Yes, sir.  I believe they do.

23  Q.  Okay.  And so if Mr. Kelley applied for this Texas DPS

24  concealed handgun permit in 2015, he would have supplied his

25  fingerprints; correct?

1    A.   Yes.

2    Q.   And those get sent to the FBI by Texas; correct?

3    A.   Yes.

4    Q.   And so the reason Mr. Kelley was turned down, if we go

5    back to JEX578, is that the letter that tells Mr. Kelley he's

6    turned down?

7    A.   Yes.   That's the denial letter.

8    Q.   Does it tell Mr. Kelley he's turned down because his

9    fingerprints said he was a felon?

10   A.   The letter indicates the reason for denial is an animal

11   neglect charge in El Paso County, Colorado in 2014.

12   Q.   So, in effect, would you agree it tells Mr. Kelley he was

13   not turned down because of his fingerprints?   It doesn't

14   mention that; does it?

15   A.   No, sir.

16   Q.   In fact, it tells Mr. Kelley, the only reason you were

17   turned down by Texas for your handgun carry license is because

18   you neglected a dog or an animal; correct?

19   A.   Animal neglect, correct.

20   Q.   In fact, it even tells him if he can clean that up, he can

21   get a Texas handgun carry permit; correct?

22   A.   I believe he was asked to respond and he never responded.

23   Q.   Right.   But wouldn't this letter tell you as a Texas

24   Ranger that the FBI said his fingerprints were clear?

25   A.   This letter alone, I don't believe so.   The only way I

1  believe that he would be able to know that he's clear is

2  unless he ordered his own criminal history and he reviewed

3  that himself, what you are allowed to do through the Texas

4  DPS.

5  Q.  Would you agree this letter does not tell Mr. Kelley he's

6  being rejected because his fingerprints indicate he's a felon?

7  A.  Correct.

8  Q.  If his fingerprints had indicated that he was a felon, do

9  you believe Texas would have told him that?

10 A.  Correct.

11 Q.  What would Texas do if somebody that was a child abuse

12 felon and that their fingerprints at the FBI said they were a

13 child abuse felon –– okay? –– do you think Texas would notify

14 the person, if they applied for a handgun carry permit that

15 the FBI says you're a felon?

16        MR. STERN:  Objection.  Calls for speculation.

17 BY MR. LeGRAND:

18 Q.  I'm just asking you what you know as a Texas Ranger.  I'm

19 not asking you to guess or speculate.  Would Texas tell you

20 that?

21        MR. STERN:  Objection.

22        THE COURT:  Do you know the answer to that?

23        THE WITNESS:  No, sir.

24        THE COURT:  Next question.

25        MR. LeGRAND:  That's fair.

TERRY SNYDER – DIRECT

1  BY MR. LeGRAND:

2  Q.  But in 2015 he was rejected for his handgun carry permit

3  because of animal neglect, not because of his fingerprints;

4  correct?

5            THE COURT:  That's asked and answered.  Next

6  question.

7  BY MR. LeGRAND:

8  Q.  Ranger Snyder, was Mr. Kelley ever forced to behave as a

9  criminal in society?

10           MR. STERN:  Objection.

11           THE COURT:  So you need to be more specific in the

12  objection.

13           But that's awfully vague.  You need to clarify your

14  question.

15  BY MR. LeGRAND:

16  Q.  Well, Ranger Snyder, I want you — was Mr. Kelley, as far

17  as you know, ever denied the purchase of a firearm at a

18  licensed federal firearm dealer, based on your investigation?

19  A.  Based on my investigation, there is no evidence to support

20  that.

21  Q.  Was he ever forced to go to a market where criminals go to

22  buy firearms?

23  A.  There is no evidence to support that.

24  Q.  So as far as gun purchasing, was Mr. Kelley ever forced

25  because of his felony to go to the criminal market for guns?

1      MR. STERN:  Objection.  Vague.

2      THE COURT:  So he can answer that the same way he's

3 been answering.

4      THE WITNESS:  The investigation revealed he purchased

5 each weapon that he possessed and owned legally through a

6 licensed dealer.

7 BY MR. LeGRAND:

8 Q.  Now, Ranger Snyder, did your investigation determine

9 whether when he left Holloman Air Force Base he was a

10 convicted felon?  That's, in fact, on JEX597-1; correct?

11 A.  That's correct.

12 Q.  Did the Texas Rangers determine that he had escaped from a

13 mental hospital?

14 A.  We learned of that information, yes.

15 Q.  In fact, if you look at 2012, again on JEX597-1, under

16 2012, in the middle, do you see April 30th to June 7th, it

17 says:  "Admitted to Peak psychiatric hospital, and that he

18 eloped from the facility."  What does that mean?

19 A.  That he walked out, that he escaped from the facility.

20 Q.  And then does "eloped" also mean escaped?

21 A.  Sure.

22 Q.  If you come over to June 13th, does it say:  "Kelley

23 located a Greyhound Station in El Paso County —— I think it

24 should be Texas —— was allegedly attempting to carry out death

25 threats to the military chain of command."  Is that part of

TERRY SNYDER - DIRECT

1  the Texas Ranger, results of their investigation?

2  A.  That's information we learned, yes.

3  Q.  So the Air Force, according to your time line, knew he was

4  guilty of domestic abuse and was a felon; correct?

5  A.  Yes.

6  Q.  Did you determine any evidence in your investigation

7  whereby the Air Force told the rest of the world that?

8        MR. STERN:  Objection.  Vague.

9        THE COURT:  That's overruled.

10       THE WITNESS:  Through our investigation and through

11  our checks of background on him through the Texas system, the

12  national system, there was no indications of any of this

13  information that we learned outside running the database.

14  BY MR. LeGRAND:

15  Q.  Ranger Snyder, I want to change subjects for just a moment

16  and I'm going to go to — well, before I do that, let me ask

17  you.  Up to this point, you and I have talked about six times

18  that the FBI would have checked Mr. Kelley's fingerprints;

19  correct?

20  A.  Correct.

21  Q.  And all of those six times that they would have checked

22  his fingerprints, they would have said their records don't

23  show any felony conviction; correct?

24  A.  That's correct.

25  Q.  I want to go to the seventh time now for a second.  Do you

TERRY SNYDER - DIRECT

1  see on 2017 over here on JEX597-1?

2  A.  Yes, sir.

3  Q.  Do you see the first thing there, June 8th under 2017, it

4  says:  "Kelley issued nine commissioned security guard

5  license."  Do you know what one of those is?

6  A.  It's a license to participate or practice as a security

7  guard for a business or whoever hires you out here in the

8  private sector, as far as needing security.

9  Q.  Okay.  Would you look at JEX564.  Do you see on the top

10  there, is that a Texas private security registration?

11  A.  That's correct.

12  Q.  And it looks like a driver's license; correct?

13  A.  Yes, sir.

14  Q.  Was that issued to Mr. Kelley in June of 2017?

15  A.  That's correct.

16  Q.  And did Texas issue Mr. Kelley a noncommissioned security

17  guard license in 2017?

18          MR. STERN:  Objection, Your Honor.  Relevance.

19          THE COURT:  What is the relevance to this?

20          MR. LeGRAND:  I'll get to it, Your Honor, real quick.

21          THE WITNESS:  That's correct.

22  BY MR. LeGRAND:

23  Q.  Okay.  Did that require an FBI fingerprint background

24  check?

25  A.  That's correct.

TERRY SNYDER - DIRECT

1  Q.  So did the FBI check out Mr. Kelley and tell the state of

2  Texas whether or not it was okay to issue him a

3  noncommissioned security guard license?

4        MR. STERN:  Objection.  Relevance.

5        THE COURT:  That's overruled.

6        THE WITNESS:  Through the background check that's

7  conducted through the Texas DPS, who issues the license, it is

8  determined that he met the qualifications to receive the

9  license.  There was nothing to disqualify him.

10  BY MR. LeGRAND:

11  Q.  All right.  And would you -- but if he had on his record

12  at the FBI that he was a convicted domestic violence felon,

13  hopefully Texas would not have given him a security guard

14  license; would you agree?

15  A.  A felony wouldn't have met the qualifications.  They would

16  have disqualified him.

17  Q.  Do you know where he was applying to work, when he got

18  this security guard license?

19  A.  I'm not sure where he applied to work, but I think he was

20  working for, if I'm not mistaken, there was Schlitterbahn.  It

21  was either Schlitterbahn or an RV park.

22  Q.  Would you go to JEX563-001.

23        Is that a Texas Ranger document?

24  A.  Yes.  It's an email correspondence, December 12, 2017,

25  from, looks like security at Schlitterbahn.com to our analyst

TERRY SNYDER - DIRECT

1  and one of the majors that's in Company B.

2  Q.  So it's from Schlitterbahn to the Texas Rangers during

3  this investigation?

4  A.  Yes.  It's to Ranger Analyst Susan Burroughs, and a major

5  who commands Company B, William Kasper.

6  Q.  Did Mr. Kelley work at Schlitterbahn, according to the

7  Texas Ranger investigation?

8  A.  From June 6, 2017 until July 15, 2017, it indicated that

9  he was employed at the Water Park Management, Inc.

10  Schlitterbahn Waterpark Resort.

11  Q.  Was he a security guard there?

12          MR. STERN:  Objection, Your Honor.  Again, government

13  doesn't see the relevance of this line of questioning.

14          THE COURT:  Yeah.  What is the relevance of this?

15          MR. LeGRAND:  I'll show, Your Honor.

16          THE COURT:  Let's tie it up.

17          THE WITNESS:  That's correct.

18  BY MR. LeGRAND:

19  Q.  Well, let's get to the relevance.  Ranger Snyder, you are

20  a Texas Ranger.  Do you know what Schlitterbahn is?

21  A.  It's a public water park, slides, rides, entertainment.

22  Q.  Would you consider it a child's water park?

23  A.  Yes.

24  Q.  Is it your understanding from your investigation that

25  Devin Kelley had a history of having a felony and that one of

TERRY SNYDER - DIRECT

1  the reasons he was convicted is because he cracked his son's

2  skull, fractured his son's skull?

3          MR. STERN:  Objection, Your Honor.

4          THE COURT:  Yeah.  This is not relevant.

5          Next question.

6  BY MR. LeGRAND:

7  Q.  Let me ask it this way, Ranger Snyder.  Should Devin

8  Kelley had gotten a security license from the state of Texas,

9  based on his background?

10         MR. STERN:  Objection, Your Honor.  Relevance.

11         THE COURT:  That question I'll allow.

12         THE WITNESS:  Through the background investigation

13  which was conducted, there was nothing to disqualify him to

14  receive his security license.

15  BY MR. LeGRAND:

16  Q.  If the FBI's database check had been properly populated

17  with his felony conviction, should he have been allowed to

18  work at a child's water park as a security guard?

19         MR. STERN:  Your Honor, our objection is not just the

20  relevance of where he worked, but even the fact that he was

21  able to obtain this permit.  It's just simply not relevant to

22  the issues at hand.

23         THE COURT:  Yeah.  I'm allowing some in by

24  background, so I'll allow this.  That's overruled.

25

TERRY SNYDER – DIRECT

1   BY MR. LeGRAND:

2   Q.  You may answer, Ranger.

3   A.  If there had been a felony conviction indicated on his

4   criminal history during the background —

5   Q.  He would not have —

6   A.  — as we talked about, I guess, his domestic violence, he

7   would not have been allowed to obtain a security license.

8   Q.  Let me ask it this way.  As a Texas Ranger, Ranger Snyder,

9   with Devin Kelley's background as you know it, from your

10   investigation, the Texas Ranger investigation, should Devin

11   Kelley have been allowed to work around children with a

12   security guard license?

13          THE COURT:  That's not relevant.  Next question.

14   BY MR. LeGRAND:

15   Q.  Ranger Snyder, as a Texas Ranger, do you believe somebody

16   with a domestic violence felony should have a security license

17   from the state of Texas, period?

18          MR. STERN:  Again, Your Honor, Mr. Kelley's security

19   license has no relevance to this case.

20          THE COURT:  Yeah.  So, I mean, there's some minimal

21   relevance to foreseeability and those kind of issues, but I've

22   already got the answers to this, so you can move on to

23   something else.

24   BY MR. LeGRAND:

25   Q.  Let me ask it this way.

TERRY SNYDER – DIRECT

1          THE COURT:  Well, no.  Let's ask something completely
2  different.
3  BY MR. LeGRAND:
4  Q.  Ranger Snyder, I want to go back to JEX597-1.  In 2014 he
5  was arrested for animal cruelty in Colorado; do you see that?
6  A.  Yes, sir.
7  Q.  Based on your background and your investigation, if El
8  Paso, if the El Paso County Police Department checked with the
9  FBI, would they have found out about his felony?
10  A.  No, sir.
11  Q.  And then right below that when Mr. Kelley purchased the
12  Glock that we've talked about, the FFL that sold that Glock
13  didn't find out about Mr. Kelley's felony either; did he?
14  A.  No, sir.
15  Q.  Now, when Mr. Kelley was able to buy that Glock, after —
16  he had to lie on his 4473; didn't he?  The form that's sent
17  into the federal government, Mr. Kelley had to lie on that;
18  didn't he?
19  A.  I believe he did, if I remember reviewing it correctly,
20  yes.
21
22
23
24
25

1        *(Change in reporter)*

2    BY MR. LEGRAND:

3    Q.  Now, when Mr. Kelley was able to buy that Glock, after --

4    he had to lie on his 4473, didn't he?  The form that's sent

5    into the federal government, Mr. Kelley had to lie on that,

6    didn't he?

7    A.  I believe he did, if I remember reviewing it correctly,

8    yes.

9    Q.  Because isn't one of the questions on the 4473 whether or

10   not you're a felon?

11   A.  That's correct.

12   Q.  And Mr. Kelley would have had to say no for that to get

13   past the FFL store, correct?

14   A.  That's correct.

15   Q.  Okay.  So does that -- the purchase of that Glock, does

16   that tell Mr. Kelley that he's in the FBI system as a felon?

17       In other words, the fact that they allowed him to buy that

18   Glock, does that tell Mr. Kelley that he's in the FBI system

19   as a felon?

20           MR. STERN:  Objection.  Lacks personal knowledge.

21   Outside the scope of this witness's testimony.

22           THE COURT:  I'm not sure I am understanding the

23   question.

24       Do you understand the question?

25           THE WITNESS:  Vaguely.

```
 1              THE COURT:  Rephrase your question.

 2              MR. LEGRAND:  I'll rephrase it.

 3    BY MR. LEGRAND:

 4    Q.  When Mr. Kelley —— okay.

 5         First of all, Mr. Kelley had go through a background check

 6    with the FBI to buy that Glock, correct?

 7    A.  That's correct.

 8    Q.  Do you agree that when the FFL and the FBI allow

 9    Mr. Kelley to buy that Glock, that that indicates to

10    Mr. Kelley that his fingerprints are not in the system?

11              MR. STERN:  Again ——

12              THE COURT:  That's overruled.  You can answer the

13    question, if you can.

14              THE WITNESS:  I think —— would it indicate that?  I

15    can't say what he felt it indicated to him.  What it indicates

16    to him is that he's cleared the system and been allowed to

17    purchase this firearm and he was able to purchase it and gain

18    possession of it.

19    BY MR. LEGRAND:

20    Q.  And, really, what I'm asking you is does it tell you ——

21    does it tell Ranger Snyder that, apparently, Mr. Kelley's

22    fingerprints were not in the system?

23    A.  Him being allowed to purchase tells me he was cleared ——

24    the system cleared him and did not find any disqualifications

25    for him not to purchase this weapon.
```

TERRY SNYDER – DIRECT                              252

1   Q.  Would the same thing be true for the purchase of the

2   9-millimeter on October 20th of 2015?

3   A.  That's correct.

4   Q.  Would the same thing be true for the purchase of the

5   Ruger AR-556 on April the 7th of 2016?

6   A.  That's correct.

7   Q.  Would the same thing be true for the issuance of the

8   noncommissioned security license by the State of Texas on

9   June 8th, 2017?

10  A.  That's correct.

11  Q.  Okay.  So if you add all these up, there are seven or

12  eight occasions where Mr. Kelley submitted his fingerprints to

13  the FBI, and he was not told that he was a felon, correct?

14  A.  That's correct.

15  Q.  Okay.  Do you think that that had a chilling effect on

16  Mr. Kelley or a boldening effect?

17          MR. STERN:  Objection, Your Honor.

18          THE COURT:  So you got to make your objections more

19  specific than just saying "objection."

20      What is your objection?

21          MR. STERN:  Objection.  Misleading, vague, lacks

22  personal knowledge of what Mr. Kelley understood or the impact

23  that a denial or proceed at an FFL would have on him.

24          THE COURT:  Okay.  Yeah.  So it's calling for

25  speculation, and that's sustained.

1   BY MR. LEGRAND:

2   Q.  Do you recall, Ranger Snyder, that you were asked by the

3   government in your deposition as to whether or not you had

4   reviewed the body cam videos at Devin Kelley's gate on

5   November the 1st of 2017?

6   A.  Yes, sir.

7            MR. LEGRAND:  I'd like to take just a second, Your

8   Honor, and show a clip from JEX 606.

9   BY MR. LEGRAND:

10  Q.  Ranger, do you know for a fact that this video reflects an

11  event that took place November 1st of 2017?

12  A.  That's correct.

13  Q.  And that's four days before the shooting at Sutherland

14  Springs, correct?

15  A.  That's correct.  Yes.

16  Q.  Okay.

17      *(Playing video)*

18  BY MR. LEGRAND:

19  Q.  Ranger Snyder, have you seen that video before?

20  A.  Yes.

21  Q.  Did looking at that clip today refresh your memory?

22  A.  Yes.

23  Q.  Did you hear in there that Devin Kelley told -- well,

24  first of all, let me ask it this way:  Is there any doubt that

25  Devin Kelley knew that he was talking to law enforcement

TERRY SNYDER – DIRECT                              254

1  officers?

2  A.  No.  He indicated and referenced them as such.

3  Q.  Did you hear Devin Kelley tell those officers that he

4  didn't like talking to police officers?

5  A.  That's correct.

6  Q.  Did you hear Devin Kelley tell those officers that he was

7  carrying a gun?

8  A.  If I remember correctly, he motioned to his side and he

9  said that he had a gun.

10 Q.  As a convicted domestic violence felon, was he allowed to

11 carry a gun?

12 A.  On his property?

13 Q.  No.  On his person.

14 A.  On his person?  As I answered earlier, there's some

15 parameters behind being a convicted felon, and I can explain

16 that.  I mean, briefly, is the fact that if he's a convicted

17 felon and he's put on probation or whatever the service may

18 be —— which I didn't have that information because his

19 criminal history didn't indicate that —— but, however,

20 anything after five years, you're allowed to possess it on

21 your property.

22 Q.  Are you sure it's not in your house?

23 A.  Without referencing the material, I want to say property

24 or maybe residence.

25 Q.  And are you sure it's not ten years in Texas?

TERRY SNYDER - DIRECT                                         255

1    A.  I'm thinking it's five.

2    Q.  Okay.  So do you believe Devin Kelley was within his

3    rights to carry that gun at the gate in front of those

4    officers?

5    A.  If, in fact, he had a gun.  He just motioned to his side,

6    but his shirt was concealing.  I didn't -- if you can -- I

7    didn't see a gun that he actually displayed.  I just saw him

8    motion to his side indicating he had a gun.  I don't know if

9    it was on his person at that moment.

10   Q.  Did you hear him say "I have a gun too" and pat his side?

11   A.  I saw him motion to his side and said, "I have a gun."

12   Q.  Did you hear him say, "I have a gun too"?

13   A.  Uh-huh.

14   Q.  Did you hear the word "too"?

15   A.  Yes.

16   Q.  Okay.  Do you know if a federal law bars possession by a

17   domestic abuse felon of a firearm?

18   A.  Ask again, please.

19   Q.  Does federal law bar felons -- domestic abuse felons from

20   possessing or carrying firearms?

21   A.  I believe so, yes.

22   Q.  Okay.  So would Devin Kelley -- on the day at that gate

23   that you just saw in that clip, would he have been violating

24   federal law?

25   A.  Yes.

1    Q.   Is –– the situation in the clip that you just saw at the

2    gate, you just agreed with me that it violates federal law,

3    correct, if he was, in fact, carrying a firearm?

4    A.   Correct.

5    Q.   Okay.  And you know from the shooting at Sutherland

6    Springs that he possessed firearms, correct?

7    A.   Correct.

8    Q.   That, again, was a violation of the law, correct?

9    A.   Yes.

10   Q.   When he was at the church and did the shooting, he

11   violated the law with those firearms ––

12   A.   Correct.

13   Q.   –– in commission of the crime that he committed at the

14   church, correct?

15   A.   That's correct.

16   Q.   But just having the firearms also was a violation of the

17   law, correct?

18   A.   Yes, sir.

19   Q.   And did you find any evidence whatsoever in your Texas

20   Ranger investigation that any of the guns that Mr. Kelley used

21   to commit this crime, this terrible massacre at this church,

22   were bought other than through federal firearms licensees?

23   A.   No evidence indicated such.

24   Q.   Were any of them purchased at any kind of market that

25   criminals are forced to go to because they can't go into a

1    regular store?

2    A.  No, sir.

3    Q.  Did you see any evidence whatsoever, including the gate --

4    in other words, I'd already asked you the seven or eight times

5    that Mr. Kelley was able to pass, apparently, an FBI

6    fingerprint check -- seven or eight of them, correct?

7    A.  Yes, sir.

8         MR. STERN:  Objection.  "Fingerprint check," Your

9    Honor?

10        MR. LEGRAND:  Yes, fingerprints.

11        MR. STERN:  Misleading.

12   BY MR. LEGRAND:

13   Q.  Not a fingerprint check.  Okay.

14       Four 4473s to purchase guns, correct?

15   A.  That's correct.

16   Q.  And the others were fingerprint checks, correct?

17   A.  Background checks to include, I guess, the fingerprints,

18   yes.

19   Q.  Including the Texas handgun carry permit application?

20   A.  That's correct.

21   Q.  The security guard application?

22   A.  That's correct.

23   Q.  And then if we go to the gate incident, does anything

24   about the gate incident indicate to you that Mr. Kelley

25   thought he was in the federal FBI database when he confronted

1    those officers and told them that he had a gun?

2         MR. STERN:  Objection.  Speculation.

3         THE COURT:  That's sustained.

4    BY MR. LEGRAND:

5    Q.  Ranger Snyder, when —— in the clip that I played for you,

6    did Devin Kelley look at those officers and indicate to them

7    that he was carrying a gun?

8    A.  He did.

9    Q.  And Devin Kelley knew that he was a convicted domestic

10   violence felon, correct?

11        MR. STERN:  Actually, objection.  Assumes facts not

12   in evidence, speculation.

13        THE COURT:  Yeah.  I get it.  You know, so this is

14   not a jury trial where you have to say it two or three times.

15   I generally get it the first time.

16   BY MR. LEGRAND:

17   Q.  Ranger Snyder, I'm not asking you to guess or speculate as

18   to what was in Devin Kelley's head.

19       I'm asking you, based on your examination, should —— was

20   Devin Kelley present at Holloman Air Force Base when he was

21   convicted of a felony?

22   A.  Yes.

23   Q.  Did he serve time in jail?

24   A.  Yes.

25   Q.  Did he serve time in jail for that felony?

1  A.  Yes.

2  Q.  Based on your background and experience as a –– as a Texas

3  Ranger, should he have known that he was convicted –– a

4  convicted felon?

5  A.  An individual put through the system, I would –– that

6  would lead me to believe through –– that he would know, yes.

7  Q.  But we have at least seven occasions where Devin Kelley

8  became aware that the FBI didn't have a record of his felony

9  conviction, correct?

10  A.  His criminal history didn't indicate a felony conviction,

11  no, sir.

12  Q.  And do you agree, based on looking at the video clip that

13  we looked at, that Mr. Kelley, on November 1st of 2017, four

14  days before the shooting at Sutherland Springs, was bold

15  enough to look at two law enforcement officers and tell them,

16  "I don't talk to police" and "I'm carrying a gun"?

17  A.  The video reflected as such.

18  Q.  If they had arrested him for carrying that gun, would the

19  Sutherland Springs shooting have taken place?

20         MR. STERN:  Objection.  Calls for speculation.

21         THE COURT:  Sustained.

22  BY MR. LEGRAND:

23  Q.  Let me ask this:  If they had arrested him on November 1st

24  of 2017, would that have resulted, more likely than not, in a

25  search warrant?

1          MR. STERN:  Objection.  Calls for speculation.

2          THE COURT:  That's sustained.

3          MR. LEGRAND:  Can we take a break, Your Honor?

4          THE COURT:  Yes.

5     How much more do you have with this witness?

6          MR. LEGRAND:  I'm sorry, Your Honor?

7          THE COURT:  How much more do you have with this

8  witness?

9          MR. LEGRAND:  Just a few more minutes, Your Honor.

10         THE COURT:  Let's take about ten minutes.

11     *(Recess)*

12     *(Open court)*

13         THE COURT:  Thank you.  Please be seated.

14     Anything further?

15         MR. LEGRAND:  Yes, Your Honor.  Just a few questions.

16  May I proceed?

17         THE COURT:  Yes.

18         MR. LEGRAND:  Thank you.

19  BY MR. LEGRAND:

20  Q.  Ranger Snyder, going back to the gate incident,

21  November 1st -- first of all, according to JEX 597-1 -- can we

22  look at that again.

23     You see in 2013 there, Ranger Snyder, when Mr. Kelley was

24  released from jail?

25  A.  Yes.  2013, March 31st.

1    Q.  Okay.  And if you add five years to that, would that be

2    March 31st, 2018?

3    A.  That's correct.

4    Q.  So the gate incident would have been well within that,

5    correct?

6    A.  Yes.

7    Q.  So he's not allowed to carry a firearm at the time of the

8    gate incident, correct?

9    A.  That's correct.

10   Q.  And you have certain protocols you follow as a Texas

11   Ranger?

12   A.  Yes, sir.

13          MR. LEGRAND:  Okay.  I'd like to go to Exhibit 507,

14   please, JEX 507.  Can you blow up the box on the bottom right.

15          TECHNOLOGY SPECIALIST:  Here?

16          MR. LEGRAND:  Yes.  Just the bottom half of it, if

17   you can blow that up.

18          TECHNOLOGY SPECIALIST:  Here?

19          MR. LEGRAND:  Yeah.

20   BY MR. LEGRAND:

21   Q.  This document's from a timeline from the Texas Rangers'

22   file.

23       Do you understand that, Ranger Snyder?

24   A.  Yes.

25   Q.  And is it often that Texas Rangers work for local law

1    enforcement, such as district attorneys?

2    A.  We assist the local agencies, and sometimes the district

3    attorney will ask us to perform an investigative lead on

4    something or to go follow up on something, yes.

5    Q.  Okay.  I just want to look at the last five bullet points

6    on this document.

7        It says, "Erin Brassfield contacted Guadalupe County

8    District Attorney Courtney Hansen and informed her about the

9    situation and the photos."

10       Do you know what that's about?

11   A.  Apparently, there was a sexual assault allegation

12   investigation being conducted.  And apparently, it was

13   information to Brassfield that Devin Kelley was in possession

14   of some photos.

15   Q.  Could you look at the bullet point right above that.

16       And this also is a result of your Texas Ranger

17   investigation, correct?

18   A.  That's correct.

19   Q.  This came from an interview of some kind?

20   A.  Yes.

21   Q.  And would you read that bullet point?

22   A.  "D. Kelley called Erin Brassfield, the second ex-wife of

23   Donald Brassfield, and informed her he, Devin Kelley, had

24   found these photos and was unaware of what to do with them."

25   Q.  And as a domestic abuse felon, should Devin Kelley have

1    had explicit photos of a minor?

2    A.  No, sir, not that I'm aware of.

3    Q.  Okay.

4    A.  I don't know why he would.  I don't know.

5    Q.  No.  I mean, is he allowed to?

6    A.  I don't know.  Honestly, I think there's a bunch of felons

7    out there that's in possession of --

8    Q.  I understand.

9        Let's go to the next -- we've already done the bullet

10   point right after that.  Now, the next one down.

11       "When Hansen contacted" -- in other words, Hansen's the

12   district attorney, correct?

13       "When Hansen contacted Devin Kelley, he was uncooperative

14   and stated that he was not in possession of any photos and was

15   unaware of any photos."

16       Have I read that correctly?

17   A.  That's correct.

18   Q.  And then it says that Hansen contacted the Cibolo police

19   officers to make contact with Kelley.

20       That's what takes us to the gate scene, correct?

21   A.  That's correct.

22   Q.  Have you ever been in that situation where a district

23   attorney asked you to go do something like that?

24   A.  I've been in situations where the DA's asked me to conduct

25   an investigation on an incident, yes.

1  Q.  On an individual that might be in possession of some

2  photos like this?  Not specifically --

3  A.  Not specifically, but other criminal matters, yes.

4  Q.  Okay.  What is your protocol as far as checking out the

5  individual that you're going to go talk to before you go out

6  there?  Do you check them out at all?

7  A.  It all depends on the circumstances.  If it's an

8  individual I'm working a case on and the individual's a

9  suspect, I want to know the background -- as much background

10  on that individual as I can.  And if it's an individual that

11  I'm going to contact that's going to be a potential witness in

12  my case, I approach them accordingly and treat them as such.

13  Q.  What's that mean?  What's your protocol for --

14  A.  My protocol's different on both.  Meaning, if he's a

15  suspect target, I want to be more stringent on what I know

16  about him.  I want to know as much as I can about him.

17      If it's a potential witness and I'm going out just to

18  contact the individual who's going to be a witness for our

19  case, it's going to be somewhat more lenient.  I'm not going

20  to do a full background check.  I'm not going to do -- and

21  hopefully, by that time, if the DA has asked me to do

22  something for them on one of their cases to follow up on, they

23  have that information provided for me already.

24  Q.  Well, let's assume these facts that are on this board

25  here, that Kelley has told somebody he has some certain

1    photographs and that the district attorney contacts him, and

2    he's being uncooperative and that the district attorney sends

3    you out there to talk to this uncooperative person.

4        What's the protocol for whether or not you would have

5    checked them out at all?

6            MR. STERN:  Objection.  Assumes facts not in

7    evidence.  Calls for speculation.

8            THE COURT:  Yeah.  That's –– those objections are ––

9    I've got your point.  So we're rehashing old stuff.

10           MR. LEGRAND:  May I proceed, Your Honor?

11           THE COURT:  Yes.

12   BY MR. LEGRAND:

13   Q.  Ranger Snyder, what's your protocol for checking out a

14   person that made ––

15           THE COURT:  –– go back, Mr. LeGrand, to just –– the

16   point I just tried to get you to move off of.  I got it.

17   BY MR. LEGRAND:

18   Q.  So going back to the date of release that's on JEX 597–1,

19   based on the five years, Ranger Snyder, Mr. Kelley, if he was

20   in possession of a firearm, could have been prosecuted under

21   federal or state law?

22           MR. STERN:  Objection.

23           THE COURT:  So, again –– so an objection's not an

24   objection unless you give a specific objection.  Global

25   objections are not recognized by the Federal Rules of

1    Evidence.

2        With that said, I know where you're headed.  And so this

3    is asked and answered.  And let's move on.

4              MR. LEGRAND:  I'll pass the witness, Your Honor.

5              THE COURT:  Any cross from the government?

6              MR. STERN:  There is, Your Honor.  Actually, there's

7    some lengthy cross.  I know it's coming up on 4:30.  I don't

8    know if you want us to proceed now or how you want to handle

9    your schedule.

10             THE COURT:  So I've got an hour and 15 minutes.  So

11   let's just start with what we can do.

12             MR. STERN:  Happily, Your Honor.

13             THE COURT:  Hopefully, you can finish within that

14   time.

15                      CROSS—EXAMINATION

16   BY MR. STERN:

17   Q.  Ranger Snyder, good afternoon.

18   A.  Good afternoon.

19   Q.  As you recall, my name is Paul Stern.  I'm an attorney

20   with the United States Department of Justice.  I want to thank

21   you for your time here today.

22   A.  Yes, sir.

23   Q.  I'm actually going to start where opposing counsel left

24   off, but very quickly because I don't want to belabor the

25   point.

1        But, Ranger Snyder, you are here as a representative of

2    the Texas Rangers, correct?

3    A.  That's correct.

4    Q.  You're not here to represent any other law enforcement

5    department or agency?

6    A.  No, sir.

7    Q.  You're not here to represent any other departments or

8    speak about their policies, protocols, or procedures?

9    A.  No, sir.

10   Q.  You're not here to testify about the National Instant

11   Criminal Background Check System, otherwise known as NICS?

12   A.  No, sir.

13   Q.  You're not here to testify about the Uniform Code of

14   Military Justice, also known as UCMJ?

15   A.  No, sir.

16   Q.  You're not here to testify about the Air Force or on

17   behalf of the Air Force?

18   A.  No, sir.

19   Q.  Or about the information that the Air Force submits to

20   NICS when there's a violation of the UCMJ; is that correct?

21   A.  That's correct.

22   Q.  In fact, you're not here to testify about what a law

23   enforcement –– a local law enforcement would find if they did

24   a search regarding a violation of the UCMJ that was submitted

25   by the Air Force; is that correct?

1    A.   That's correct.

2    Q.   Now, I know opposing counsel talked to you at some length

3    about some interactions Devin Kelley had with a few law

4    enforcement entities.   And I'd like to briefly talk about

5    them.

6         Mr. LeGrand talked about the time the Cibolo police

7    detectives went to the Kelley property on November 1st.

8         We just spoke about that, correct?

9    A.   Yes, sir.

10   Q.   But, again, you're not here to testify on behalf of the

11   Cibolo Police Department, correct?

12   A.   No, I'm not.

13   Q.   Or their policies or procedures?

14   A.   No, sir.

15   Q.   In fact, when the detectives went to their property, Devin

16   Kelley wasn't a suspect, was he?

17   A.   Not that I'm aware of.

18            MR. LEGRAND:   Object.   That calls for speculation.

19            THE COURT:   He answered.

20   BY MR. STERN:

21   Q.   What was the purpose --

22            MR. STERN:   Sorry.   May he answer?

23            THE COURT:   He answered.

24   BY MR. STERN:

25   Q.   Okay.   What was the purpose of the Cibolo police

1  detectives going to the property on that day?

2  A.  An attempt to obtain some photographs that he alleged or

3  made a statement that he had regarding a sexual assault

4  investigation that was being conducted.

5  Q.  So, in fact, the detectives thought Mr. Kelley would

6  provide them evidence, correct?

7  A.  That's correct.

8  Q.  In fact, Mr. Kelley was a family member of a potential

9  victim?

10  A.  That's correct.

11  Q.  And so as you suggested, there may -- would be different

12  protocols for approaching someone who is a family member of a

13  victim as opposed to a suspect?

14  A.  Yes.

15  Q.  And so you can't testify about what the -- whether the

16  Cibolo police detective would have checked any databases

17  before approaching the property?

18  A.  That's correct.

19  Q.  If you recall, Mr. LeGrand asked you some questions about

20  Mr. Kelley's misdemeanor for animal cruelty.

21      Do you recall that?

22  A.  Yes, sir.

23  Q.  In fact, in August 2014, Mr. Kelley was arrested for

24  animal cruelty, correct?

25  A.  Yes, sir.

1    Q.  And that arrest resulted in a misdemeanor?

2    A.  That's correct.

3    Q.  You don't know if that punishment or that -- or that

4    misdemeanor would have changed had information been in the

5    NICS system, correct?

6    A.  If I remember correctly, I believe that charge may have

7    been a Class C misdemeanor.

8    Q.  Uh-huh.

9    A.  And Class Cs are up to fine only -- fine only.  They're

10   not reported -- that's not an offense -- or a Class C is not

11   an offense to be reported to the NICS system to be part of

12   criminal history.  It wouldn't have showed up.

13   Q.  And, in fact, that punishment, that Class C misdemeanor

14   you're referring to, that wouldn't have changed classes simply

15   because Devin Kelley's information from the Air Force may have

16   been in the system, correct?

17   A.  That's correct.

18   Q.  And, finally, Mr. LeGrand talked about Devin Kelley maybe

19   being pulled over for speeding.

20        Do you recall that testimony?

21   A.  Yes, sir.

22   Q.  But there's no evidence that he was ever pulled over with

23   a firearm in his back seat?

24   A.  Not that I -- not that we found.

25   Q.  Okay.  And I want to shift focus and talk about the things

 1  you are here to testify about.

 2      And, Ranger Snyder, you have to forgive me.  I'm going to

 3  be pretty direct right upfront.  And so it's not to upset

 4  anyone, but we need to get this testimony out.  So bear with

 5  me, please.

 6  A.  Sure.

 7  Q.  Ranger Snyder, when Devin Kelley approached the church on

 8  November 5th, 2017, what was he wearing?

 9  A.  I believe it was described as a mask covering or a

10  covering -- face covering described as a mask of some sort,

11  black, I believe.  Black -- all black, black tactical vest and

12  military -- described as military style.

13  Q.  You talked about the mask he was wearing.

14      Did that mask depict a white skull similar to the one used

15  by Marvel Comics character the "Punisher"?

16  A.  Yes.

17  Q.  And was Devin Kelley wearing black tactical gear?

18  A.  That's correct.

19  Q.  Was he wearing body armor?

20  A.  Yes.

21  Q.  Is it illegal for convicted felons to possess body armor

22  in Texas?

23  A.  Yes.

24  Q.  Can you please tell the Court what happened when Devin

25  Kelley arrived at the church.

1   A.   Through the investigation, it revealed that, through the

2   witnesses and the interviews, he pulls up front and he exits

3   his vehicle.  And he starts –– or he stands in front of the

4   church or the entryway, and he begins discharging his rifle.

5   And he works in a L–shaped pattern.

6       The church faces –– the way the church faces, off the back

7   side of the church, it Ls off the children's Bible study

8   rooms.  And he makes that L within there, firing from the

9   outside into the wall, into the inside of the church.

10  Q.   So he starts firing from outside the church?

11  A.   That's correct.

12  Q.   Does he spray the side of the church?

13  A.   Yes.

14  Q.   He shoots through the walls?

15  A.   Yes.  I think it was a total of 250–plus times.

16          MR. LEGRAND:  In fact, if we pull up Joint

17  Exhibit 669.  Go to the first highlighted portion.  Blow up

18  that section, please.

19  BY MR. LEGRAND:

20  Q.   Ranger Snyder, will you read that section, please.

21  A.   "11:15 a.m" –– I'm sorry.  "11:15 a.m., suspect exited the

22  SUV wearing all black tactical gear, protective vest,

23  white–print skull mask, and armed with a Ruger semiautomatic

24  rifle and a Glock 9–millimeter handgun.  Suspect opened fire

25  on the church from outside (254 shots outside).  The skull

1   print on the mask is indicative of the Marvel Comics character

2   the 'Punisher.'"

3   Q.  Devin Kelley shot 254 shots outside the church; is that

4   correct?

5   A.  Yes, sir.

6   Q.  And as you indicated before, he sprayed the church,

7   correct?

8   A.  That's correct.

9   Q.  He didn't target one specific location of the church?

10  A.  What we found in common is that they were all within a

11  line or some sort of line.  We discussed and determined that

12  it was —— it would be about head-high of individuals sitting

13  in a pew from the outside.

14  Q.  Multiple pews?

15  A.  Correct.

16  Q.  Sorry to be graphic, but just to make sure that we're

17  clear, you're suggesting that at the level that he was

18  shooting, they were essentially headshots along the side of

19  the church; is that correct?

20  A.  Yes.

21  Q.  Did he retrieve more ammunition from his vehicle after he

22  started shooting?

23  A.  He did afterwards and before he entered the church.

24  Q.  And then he eventually made his way into the church,

25  correct?

1    A.   That's correct.

2    Q.   How many shots did Kelley fire inside the church?

3    A.   Inside the church was another 250-plus.

4    Q.   Let me make sure we're clear.  If we could pull up the

5    next highlighted portion of this document.

6    A.   196.

7    Q.   It reads, "11:20 a.m., suspect entered the church building

8    through the main entrance.  Suspect began shooting church

9    attendees within the sanctuary room (196 shots inside)."

10        Is that consistent with your investigation?

11   A.   Yes, sir.

12   Q.   So if we look further down, 450 total shots fired by

13   suspect; is that correct?

14   A.   That's correct.

15   Q.   And how long did the shooting last?

16   A.   Approximately seven and a half minutes, 7 minutes and

17   24 seconds.

18   Q.   And how do we know -- or how do the rangers know how long

19   the shooting lasted?

20   A.   We monitored the time, the counter -- or the time count on

21   the video.

22   Q.   When you talk about a video, was there a video camera in

23   the church that recorded the events in real time?

24   A.   Yes.  Upon arrival, we learned that there was an

25   individual in the sound booth and that the church would video

1    their services on Sunday morning to put them up on YouTube.

2    Q.   And having looked at -- have you looked at the video?

3    A.   Yes, sir, I have.

4    Q.   Having looked at the video, did Devin Kelley kill men?

5    A.   Say that again.  I didn't get the last word.

6    Q.   Did Devin Kelley kill men?

7    A.   Yes.

8    Q.   Did he kill women?

9    A.   Yes.

10   Q.   Did he kill a pregnant woman?

11   A.   Yes.

12   Q.   Did he kill children?

13   A.   Yes.

14   Q.   Did he walk up and down through the aisles looking for

15   targets?

16   A.   Yes, he did.

17   Q.   Did he shoot people at close range?

18   A.   Yes.

19   Q.   Did he shoot people who were already shot or injured?

20   A.   Yes.

21   Q.   Did the church fill with smoke?

22   A.   Yes.

23   Q.   How many people did Devin Kelley kill on November 5th,

24   2017?

25   A.   Twenty-six.

1   Q.   How many people did he injure?

2   A.   Somewhere like 14, 16, maybe.

3   Q.   Okay.

4   A.   I'd like to look back at that if I could.

5   Q.   Could it be that he injured more than 20?

6   A.   Yes.

7   Q.   Thank you.

8        MR. STERN:  Your Honor, at this time, the government

9   requests that Your Honor watch in chambers, and at a time

10  convenient for Your Honor, so long as it is before the close

11  of this trial, that it watches Government Exhibit 141.

12       MR. ALSAFFAR:  Can we approach, Your Honor?

13       THE COURT:  Come up.

14     (At the bench)

15       THE COURT:  So it's offered.  It's objected to.

16  What's the objection?

17       MR. ALSAFFAR:  First, I just want to clarify, this is

18  the church video.

19       THE COURT:  Right.

20       MR. ALSAFFAR:  Okay.  Your Honor, our objection,

21  first of all, is primarily relevance --

22       COURT REPORTER:  I'm sorry.  "Primarily"?

23       MR. ALSAFFAR:  Oh, can you not hear me?

24       COURT REPORTER:  There's a mic right there.

25       THE COURT:  This is the mic.

1          MR. ALSAFFAR:  Relevance, Your Honor.  To put this
2    video into evidence -- no one's contesting these people were
3    brutally murdered.  No one's contesting that what's going
4    through --
5          COURT REPORTER:  I'm sorry.  I'm having a hard time
6    hearing.
7          MR. ALSAFFAR:  Okay.  I'm sorry.  I just don't want
8    this -- no one's contesting that this is a horrific shooting.
9    No one's contesting on the liability phase that he was -- he
10   was determined to kill these poor people.
11       This may be relevant in the damages phase, when we're
12   talking about the time and amount of suffering that the
13   plaintiffs went through, conceiving -- being aware of their
14   impending death.  But in a liability phase, it makes no sense,
15   under relevance grounds, Your Honor.  It doesn't make one fact
16   more -- necessary.
17         MR. STERN:  Your Honor, the United States disagrees
18   for many reasons.  First, the motive has been put on the table
19   squarely by the Court.
20       (Static noise)
21         COURT REPORTER:  I'm sorry.
22         MR. STERN:  Your Honor, it's directly relevant on
23   three grounds.  One motivation.  The Court squarely put
24   forward and asked that the matter of fact needs to be
25   addressed in this trial.  To the extent plaintiffs are

1    suggesting that Michelle Shields was the target, it is clear

2    from this video that the entire congregation is the target.

3    And that is a crucial piece of evidence.

4        Second, with regard to preventability, the notion that

5    where he got the gun is a substantial factor -- is I think

6    belied by watching the video and recognizing that he would

7    have done this regardless of where he got the firearms.

8        And, third, to the extent that we would ever need to get

9    to -- which the United States strongly states that we will

10   never have to get to, the idea of apportioning fault of the

11   Air Force compared to Devin Kelley and what he did that day is

12   directly relevant to the defense.

13            MR. ALSAFFAR:  If I may, Your Honor, I need to --

14   because now we need to add speculation to this whole thing,

15   because now the government's trying to say we can now divine

16   what Devin was -- Devin was thinking just by watching the

17   video.

18       But let me go back to the primary point on that, because

19   the government's completely wrong on this.  We don't need to

20   prove Michelle Shields was the only target.  We absolutely

21   believe the church was the target.  It was the family church.

22   We have no question about that.  And that was a

23   domestic-related issue.  It was the family church.  That's not

24   even relevant.  We -- that.

25       So why offering this video now -- it's just for prejudice.

1    It's serving no purpose to advance the ultimate issue.

2              THE COURT:  So --

3              MR. STERN:  Your Honor --

4              THE COURT:  One second.  One second.  So they have

5    raised proportionate liability.  So at some point, the Court's

6    got to determine how much, if any, culpability needs to be

7    assigned to Devin Kelley, to perhaps Academy when we get

8    there.  And so, I mean, this liability standpoint, I mean, am

9    I not -- after we make some assessments on liability, am I not

10   making assessments on proportionate liability at this point,

11   and then we move to damages?

12             MR. ALSAFFAR:  Of course, Your Honor.

13             THE COURT:  So how can you say it's not relevant?

14             MR. ALSAFFAR:  Well, the question is what -- what

15   would watching a video of something we all agree happened and

16   stipulated to -- would actually make anyone decide

17   proportionate responsibility in one way or another?  We're not

18   -- it's not in dispute.

19             MR. STERN:  Your Honor --

20             MR. ALSAFFAR:  It is not in dispute that he did this.

21             MR. STERN:  Your Honor --

22             THE COURT:  Okay.

23             MR. ALSAFFAR:  And so --

24             THE COURT:  Okay.  So objection's noted.  Overruled.

25   141's admitted.

1          MR. STERN:  Can I say one more point, Your Honor?

2          THE COURT:  Yeah.  Uh-huh.

3          MR. STERN:  If the plaintiffs are stipulating that

4   Michelle Shields was not the target, and you have a footnote

5   in your order --

6          MR. ALSAFFAR:  We're not stipulating that.  We're not

7   stipulating that.

8          MR. STERN:  That's exactly what you just said.

9          MR. ALSAFFAR:  -- both claims at the same time.

10         MR. STERN:  -- the church.  That is directly relevant

11  for motivation as well.

12         MR. ALSAFFAR:  Other things the same -- no, we do

13  not, Your Honor.

14         THE COURT:  So now I know their point.  And so the

15  objection's are noted.  Overruled.

16      And one -- watch it sometime this week after court

17  proceedings are adjourned.

18         MR. STERN:  Thank you.

19      (Discussion off the record)

20      (At the bench)

21         THE COURT:  You want the video sealed?

22         MR. STERN:  Yes, Your Honor.  I think the FBI --

23  Jamal, you want to come back up?

24         COURT REPORTER:  Hold on a second.

25      (Discussion off the record)

```
 1        (At the bench)

 2             THE COURT:  So why is the video sealed?

 3             MR. STERN:  Well, the Texas Rangers and the FBI have

 4    requested that this video not be released -- that it stays

 5    under seal.  In fact, I've just been handed a motion from DPS

 6    that either -- has either been filed or will be filed, asking

 7    that this video be under seal.  They're concerned about

 8    copycats.  They're concerned about giving it out.

 9        So we support their request.  It's not the government's

10    request; although, the FBI has indicated to me that there's

11    strong preference to keep this under seal.

12        Mr. Alsaffar, insofar as -- plaintiffs, they don't need to

13    watch this video.  I just ask Your Honor to watch it in

14    chambers before the close of the hearing.

15             THE COURT:  So what's the plaintiff say about sealed?

16             MR. ALSAFFAR:  I do not oppose that, Your Honor.

17             THE COURT:  You don't oppose.

18        Okay.  So at this point, I'm going to grant the sealing

19    request.  And then let me tell you, as soon as the media come

20    down on me, we'll have a hearing on that with the media

21    present.  If I get an objection from the media, then we'll

22    figure out at that point what to do.

23             MR. STERN:  Thanks, Judge.

24             MR. ALSAFFAR:  Thank you, Your Honor.

25        (Open court)
```

```
 1              THE COURT:  You may continue.
 2   BY MR. STERN:
 3   Q.  Ranger Snyder, as you already alluded to, you were one of
 4   the lead investigators on this case, correct?
 5   A.  That's correct.
 6   Q.  And you helped investigate Devin Kelley's background?
 7   A.  Yes.
 8   Q.  Can you walk me through some of the steps of that
 9   investigation?
10   A.  So through the -- through the investigation -- I mean,
11   once we identified who the suspect was that was at the church,
12   who fled from the church -- of course, after getting our
13   command post set up and our command structure in line and in
14   place, we get an analyst on board and we provide that
15   information to our analyst who is going to be working along
16   with us.
17       And once we provide her with that information, we request
18   a complete workup, is what we refer to it as, on this
19   individual to gain his background.  That includes criminal
20   history, his driver's license.  The whole workup is his whole
21   history.
22   Q.  And the Texas Rangers conducted interviews --
23   A.  Yes.
24   Q.  -- of those people associated or who knew Devin Kelley.
25   Fair?
```

1    A.   That's correct.

2    Q.   They also obtained evidence from Devin Kelley's iCloud

3    account?

4    A.   Yes.

5    Q.   And obtained material from his social media?

6    A.   That's correct.

7    Q.   I think, as you stated before, the FBI supported the Texas

8    Rangers in this investigation?

9    A.   That's correct.

10   Q.   As did the ATF?

11   A.   Yes, sir.   That's correct.

12   Q.   The Texas Rangers created timelines for events based on

13   the information that was obtained?

14   A.   That's correct.

15   Q.   Also created summaries of the collected evidence?

16   A.   Yes, sir.

17   Q.   And those summaries were based on the best available

18   evidence at the time?

19   A.   Yes, sir.

20   Q.   I'd like to discuss some of that evidence with you today.

21        If we could pull up Joint Exhibit 700, please.   700.

22             TECHNOLOGY SPECIALIST:   Yes.

23             MR. STERN:   Thank you.

24   BY MR. STERN:

25   Q.   Ranger Snyder, are you familiar with this document?

TERRY SNYDER – CROSS                284

```
1    A.  Yes, sir.

2    Q.  What is it?

3    A.  It's a summary of Devin Kelley's iCloud account.

4    Q.  Will you please read the first highlighted paragraph.

5    A.  The bullet point, "Notes – Kelley had numerous notes

6    within the account.  The notes included reminders of getting

7    ammo, deleting old iPhones, clearing his social media

8    accounts, et cetera.  The dates these relevant notes were

9    created indicate he had planned this shooting for quite some

10   time, as early as July 2017."

11   Q.  Okay.  So we'll discuss these notes in greater detail

12   later.

13        But according to this summary created by the Texas

14   Rangers, there was evidence indicating that Kelley had planned

15   the shooting for quite some time, as early as July 2017; is

16   that correct?

17   A.  That's indicated in this document, yes.

18   Q.  Correct.

19        Can you read the second paragraph, please.

20   A.  The bullet point "screenshots" -- the screenshots --

21   "Kelley saved screenshots to his device or the cloud.  Some of

22   these screenshots include his correspondence on YouTube on how

23   to make silencers, research on mass shootings (Columbine), and

24   research on characteristics of mass shooters."

25   Q.  And then if we look at the bottom half of this page, we
```

1    see three columns.  Let's take a look at the left-hand side of

2    the exhibit.

3        What does that depict?

4    A.  There's some sort of video and context below it.  I

5    believe it looks like it's discussing silencers.

6    Q.  So would this be the YouTube clip that Devin Kelley

7    commented on regarding how to make silencers?

8    A.  Yes, sir.

9    Q.  And would you read -- can you read his comment starting

10   with "the freeze plugs."

11   A.  Let's see, "the freeze plugs."

12       "So they obviously need a hole for the bullet to pass

13   through.  But my question is, really, if the holes are drilled

14   but the plugs are" -- and it ended -- it ends there.

15   Q.  So does this indicate to the Texas Rangers that he was

16   learning how to make his own silencer?

17   A.  The context in the video, yes.

18   Q.  Taking a look at the middle screenshot that -- Kelley's

19   research from SchoolShooters.info?

20   A.  That's correct.

21   Q.  Take a look at the highlighted portion.  I know it's

22   difficult to read.  If we can sort of blow it up.

23       Does that say, "Eric and Dylan on Trial"?

24   A.  That's correct, yes.

25   Q.  This is post -- I'm sorry.  This shows an article entitled

1    "Eric and Dylan on Trial" and discusses why the Columbine

2    massacre is still so popular many years later.

3        Is that fair?

4    A.  Yes, sir.

5    Q.  Do you know how the shooters who committed the Columbine

6    massacre got their weapons to commit the mass killing?

7    A.  No, sir.

8    Q.  Would it surprise you to learn that they purchased their

9    firearms through a straw purchaser?

10           MR. LEGRAND:  Your Honor, object.  That's leading,

11   suggestive, and it calls for speculation.  He's already

12   answered.

13           THE COURT:  He's already answered he doesn't know.

14   BY MR. STERN:

15   Q.  Taking a look at the third screenshot, is this an article

16   that discusses characteristics of mass shooters?

17   A.  Yes, sir.

18   Q.  Okay.  Let's move to the next page.  Will you read the

19   highlighted portion, please, sir.

20   A.  "Photographs – there were numerous images within

21   Kelley's –– within Kelley iCloud account that depict him

22   wearing the same type of tactical gear as when he committed

23   the mass murders in Sutherland Springs."

24   Q.  Okay.  And, in fact, some of those photos are the

25   photographs that were found on Devin Kelley's iCloud account?

1  A.  That's correct.

2  Q.  And in at least two of those pictures, he's wearing the

3  "Punisher" mask?

4  A.  That's correct.

5  Q.  In at least two of those, if not three of those, pictures,

6  he is wearing his tactical armor that he used to commit the

7  shooting, correct?

8  A.  Yes, sir.

9  Q.  In fact, Devin Kelley had many more pictures of him

10  holding firearms in menacing poses on his social media?

11  A.  Correct.

12  Q.  Let's take a look at some of those pictures.

13      Joint Exhibit 684, Devin Kelley had this photograph on his

14  iCloud account, correct?

15  A.  That's correct.

16  Q.  And this picture is believed to be Devin Kelley?

17  A.  I can't reference it to -- believe to be Devin Kelley.

18  All I can say is it's a subject standing there in green

19  tactical gear with the same kind of mask, some eye protection

20  and a rifle.

21  Q.  Do you recall in your -- do you recall providing a

22  deposition here in this case?

23  A.  I do.

24  Q.  And do you recall in your deposition saying that you

25  believed this was Devin Kelley?

1    A.  I don't believe it was -- if it was this photo, I don't

2    recall that, no.

3    Q.  It's okay.

4        Nonetheless, this was in Devin Kelley's iCloud account,

5    correct?

6    A.  That's correct.

7    Q.  Okay.  Let's take a look at Joint Exhibit 682.

8        This is another photograph of Devin Kelley taken from his

9    social media account?

10   A.  That's correct.

11   Q.  And 681, this is yet another picture of Devin Kelley that

12   was taken from his social media account?

13   A.  That is correct.

14   Q.  Pull up Joint Exhibit 686.

15       I believe this is one of the photographs that were on the

16   summary of the iCloud account?

17   A.  That's correct.

18   Q.  Is that believed to be the same Glock that was recovered

19   at the church?

20   A.  Yes, sir.

21   Q.  If you look underneath his pinky, is that an extended

22   magazine?

23   A.  Yes, sir.

24   Q.  Does that magazine hold more than the standard rounds for

25   a Glock clip?

1   A.   That's correct.

2   Q.   Taking a look at Joint Exhibit 691, is that the mask Devin

3   Kelley wore when he committed the mass shooting?

4   A.   Yes, sir.

5   Q.   Is that the firearm he used?

6   A.   Yes, sir.

7   Q.   Taking a look at Joint Exhibit 687, this is a photo of a

8   shotgun taken from Devin Kelley's social media account; is

9   that correct?

10  A.   That's correct.

11  Q.   Are you aware that Danielle Smith, Devin Kelley's widow,

12  testified that he bartered for this shotgun?

13  A.   No, I'm not.

14  Q.   Okay.  But you've never seen any ATF 4473 form associated

15  with this shotgun, correct?

16  A.   That's correct.

17  Q.   So according to Texas Rangers, he obtained this firearm

18  from a non-FFL?

19        MR. LEGRAND:  Your Honor, we object.  I mean, that

20  asks this witness to assume that -- first of all, it asks this

21  witness to assume that that picture's a gun belonging to Devin

22  Kelley.  That calls for speculation.

23        THE COURT:  State your question one more time.

24  BY MR. STERN:

25  Q.   This photograph was taken from Devin Kelley's social media

1   account, correct?

2   A.  That's correct.

3   Q.  And are you aware that his widow, Danielle Smith, already

4   testified that Devin Kelley bartered for a shotgun online?

5   A.  No, sir, I'm not.

6   Q.  But you have never seen any ATF 4473 form associated with

7   Devin Kelley purchasing a shotgun?

8          MR. LEGRAND:  Asked and answered, Your Honor.

9          THE COURT:  He hasn't answered that.  That's

10  overruled.

11  BY MR. STERN:

12  Q.  You can answer.

13  A.  I haven't seen that.

14  Q.  So according to the Texas Rangers -- or as far as the

15  Texas Rangers are aware, Devin Kelley obtained this shotgun

16  through a non-FFL; is that correct?

17         MR. LEGRAND:  Your Honor, we object.  There is still

18  no showing that that's -- it was -- showing that it's on Devin

19  Kelley's Facebook account doesn't prove that it's Devin

20  Kelley's gun.  We object on that --

21         THE COURT:  That testimony came through Danielle.

22  That's overruled.

23  BY MR. STERN:

24  Q.  You can answer it.

25  A.  We have no evidence supporting that the Federal Firearms

1    License application was completed for this particular firearm,

2    and there was nothing that came back for us to even run a

3    check on this firearm.

4    Q.  Thank you.  Thank you.

5        Take a look at Joint Exhibit 502-128.  This is another

6    picture that was retrieved from Devin Kelley's social media

7    account, correct?

8    A.  That's correct.

9    Q.  Okay.  If we look at the title, it's "Rifle Mod Pew Pew."

10       Do you see that?

11   A.  Yes, sir.

12   Q.  Do you take "mods" to mean "modification"?

13   A.  Yes, sir.

14   Q.  This is a picture of Devin Kelley showing all the various

15   modifications he made to his AR-556, correct?

16   A.  That is correct.

17   Q.  Did the Texas Rangers write those descriptors on when they

18   received the photograph?

19   A.  We took note of those -- or of this photograph, yes.

20   Q.  You took note, but you didn't write the descriptors,

21   correct?

22   A.  That's correct.  We just identified the rifle as it -- as

23   it -- as it is.

24   Q.  But you obtained this from Facebook as it -- as it was?

25   A.  That's correct.

1    Q.   Okay.  So the descriptors were already on the picture?

2    A.   Yes, I believe so.

3    Q.   Take a look at Joint Exhibit 502-39.

4         This is another photograph from Devin Kelley's Facebook

5    account, correct?

6    A.   That's correct.

7    Q.   He made this post on October 29th, 2017, seven days before

8    the shooting.  Is that accurate?

9    A.   Yes, sir.

10   Q.   It's a picture of his AR, and it's titled "She's a bad

11   bitch"?

12   A.   That's correct.

13   Q.   Ranger Snyder, I'd like to now discuss some of Devin

14   Kelley's iCloud notes obtained by the Texas Rangers.

15   A.   Yes, sir.

16   Q.   Okay.  And, again, according to the summary written by the

17   Texas Rangers, his iCloud notes indicated that he had planned

18   this shooting for quite some time, as early as July 2017,

19   correct?

20   A.   Indicated in that summary, yes.  I'm not -- I'm not

21   sure -- I can't put a name on that summary, but yes.

22   Q.   According to that summary, correct.

23        Taking a look at Joint Exhibit 583-5 -- pull that up -- "I

24   am the angel of death.  No one can stop me."

25        Did I read that correctly?

1  A.  That's correct.

2  Q.  This was one of Devin Kelley's iCloud account notes,

3  correct?

4  A.  Yes, sir.

5  Q.  And it was created in July 2017?

6  A.  That's correct.

7  Q.  It's the same month the Texas Rangers summary noted that

8  he started planning the shooting?

9  A.  That's correct.

10  Q.  Taking a look at Joint Exhibit 583-2.  Blow that one up.

11      "Surprise speed violence of action."

12      Did I read that correctly?

13  A.  Yes, sir.

14  Q.  Do you know what that means?

15  A.  Surprise speed violence of action.

16  Q.  Would it indicate to you that someone is preparing --

17  preparing to act violently?

18  A.  I would -- I would consider that, yes.  It would be

19  concerning, I guess you could say.

20  Q.  Thank you.

21      And this note was created May 26, 2017; is that correct?

22  A.  That's correct.

23  Q.  Taking a look at Joint Exhibit 583-11, a set of these

24  notes relate to firearms.  Is that fair?

25  A.  Yes, that's fair.

1    Q.   What is a "ProMag vert"?

2    A.   You're asking me what ——

3    Q.   I'm sorry.  Yes.

4         Do you know what a "ProMag vert 5.3 ounce" is?

5    A.   It's a —— I guess it's a brand of a magazine and the

6    weight of it.

7    Q.   What about "Magpul"?  Do you know what a "Magpul" is?

8    A.   This is the little handgrip that you mount underneath the

9    barrel at the foot of the rifle.

10   Q.   Taking a look at all of these notes, would it be fair to

11   conclude that these are weights that Kelley was preparing his

12   firearm to —— in order to be —— in order for his firearm to be

13   a certain weight?

14   A.   According to the notes, I would gather —— I would conclude

15   that, yes.

16   Q.   Thank you.

17        And this was created August 7th, 2017?

18   A.   That's correct.

19   Q.   Taking a look at Joint Exhibit 583-13.

20        And same with this note.  Would it be fair to assume that

21   Kelley was weighing his equipment?

22   A.   Yes, sir.

23   Q.   And that he was calculating the weight of his rifle with

24   everything on it?

25   A.   Yes, sir.

1  Q.  Was he comparing weights when the items were wet versus

2  dry?

3  A.  That's correct.

4  Q.  And this was created August 15th, 2017?

5  A.  Yes, sir.

6  Q.  Taking a look at Joint Exhibit 583-17.

7      Now, this one was created October 26th, 2017, correct?

8  A.  That's correct.

9  Q.  And that's ten days before the shooting?

10 A.  Yes, sir.

11 Q.  A note to himself to trash trailer.  You see that, where

12 it reads "trash trailer"?

13 A.  Yes, sir.

14 Q.  "Oil change"?

15 A.  Yes, sir.

16 Q.  "Turn off card"?

17 A.  Yes, sir.

18 Q.  "Get a pack pack for more ammo"?

19 A.  Yes, sir.

20 Q.  "Get more PMAGs"?

21 A.  Yes, sir.

22 Q.  Again, what are PMAGs?

23 A.  It's a type of magazine.  It holds ammo that inserts in

24 the bottom of the rifle.

25 Q.  So on October 26th, he was making a note to himself to get

 1    more magazines?

 2    A.  That's correct.

 3    Q.  And then it says, "Try on and reorganize gear."

 4        Did I read that correctly?

 5    A.  Yes, sir.

 6    Q.  Let's move to the next one, Joint Exhibit 583-18.

 7        And this note was created October 28th, 2017, correct?

 8    A.  Correct.

 9    Q.  Eight days before the shooting?

10    A.  Correct.

11    Q.  Do you see where it's a note that appears to be to himself

12    to delete his social media?

13        It says, "Delete Instagram and FB"?

14    A.  Yes, sir.

15    Q.  Would it be fair to assume that that's Facebook?

16    A.  Correct.

17    Q.  You see where it says, "Clear YouTube and Safari"?

18    A.  Yes, sir.

19    Q.  And it says above that, "Stuff in car"?

20    A.  Correct.

21    Q.  And, finally, the last one -- oh, I'm sorry.  The one

22    before that, "Block Sarah and David on all social media and

23    GoPhone"?

24    A.  Yes, sir.

25    Q.  Do you know what a GoPhone is?

1   A.   It's a pay-as-you-go-type phone, pay for your minutes.

2   Q.   Okay.  And finally the last one, "Destroy old iPhone."

3        Did I read that correctly?

4   A.   Correct.

5   Q.   So eight days before the shooting, Devin Kelley gave --

6   sent a note to himself or created a note to himself to destroy

7   an old iPhone?

8   A.   That's correct.

9   Q.   Taking a look at Joint Exhibit 583-19.

10       This note was also created October 28th, 2017, correct?

11  A.   Yes, sir.

12  Q.   Eight days before the shooting?

13  A.   Yes, sir.

14  Q.   Look at the first one, "Put together .22 kit."

15       Did I read that correctly?

16  A.   Yes, sir.

17  Q.   Do you know what a .22 kit is?

18  A.   I'm guessing it would be his -- the handgun that --

19  the .22-caliber handgun and its accessories.

20  Q.   That's okay.  And I don't want you to speculate.  If you

21  don't know, that's fine.  I just want to make sure --

22  A.   Don't know what he's referencing here.  I don't know.

23  Q.   Fair enough.  Thank you.

24       It also reads "Then put it in a backpack," correct?

25  A.   Correct.

TERRY SNYDER – CROSS                                298

1   Q.  "Roll a joint"?

2   A.  Yes, sir.

3   Q.  "Change out all batteries"?

4   A.  Yes, sir.

5   Q.  "Antidiarrhea"?

6   A.  Yes, sir.

7   Q.  Did you come to learn that Devin Kelley was taking

8   antidiarrhea mediation?

9   A.  I was not aware.

10  Q.  Okay.  "Remove all weed stuff from house"?

11  A.  Yes, sir.

12  Q.  And "put mag funnel back on"?

13  A.  Yes, sir.

14  Q.  Again, you take "mag" to mean "magazine"?

15  A.  Yes, sir.

16  Q.  One more, please.  If we can go to Joint Exhibit 583-20.

17      This note was created October 30th, 2017, correct?

18  A.  Yes, sir.

19  Q.  Six days before the shooting?

20  A.  Yes, sir.

21  Q.  Reminder to "check the tire pressure"?

22  A.  Correct.

23  Q.  "Charge her GoPhone"?

24  A.  Correct.

25  Q.  "Add cash to card"?

1    A.   Yes, sir.

2    Q.   "Make sure her card is in her pocket"?

3    A.   Yes, sir.

4    Q.   "Find location for push knife"?

5    A.   Correct.

6    Q.   "Put gun stuff in car when Danielle doesn't notice"?

7    A.   Yes, sir.

8    Q.   "Rifle into guitar case"?

9    A.   Yes, sir.

10   Q.   "Put dog tags for Michael in buried location"?

11   A.   Yes, sir.

12   Q.   Is it fair to suggest that, by putting the rifle into his

13   guitar –– or into a guitar case, he was concealing the rifle?

14   A.   It's fair.

15   Q.   Is it fair to suggest that when he was putting the gun

16   stuff in the car when Danielle doesn't notice, that he was

17   concealing his intent to at least put the gun stuff in the

18   car?

19   A.   Correct.

20   Q.   And it says, "Put dog tags for Michael in buried

21   location."

22        Did I read that correctly?

23   A.   Yes, sir.

24   Q.   Fair to assume that Devin Kelley was hiding dog tags for

25   his son in a buried location?

```
 1    A.  Yes, sir.
 2    Q.  And this note was created five days before the shooting,
 3    correct?
 4    A.  Yes, sir.
 5    Q.  Thank you.
 6         I'm going to transition and talk about some of Devin
 7    Kelley's purchases.  If we can go to Joint Exhibit 544.
 8         I'm not going to be able to read that.
 9         Ranger Snyder, are you familiar with this document?
10    A.  Yes, sir.
11    Q.  What is it?
12    A.  It's a Financial Crimes Enforcement Network -- it's, I
13    guess, their purchases or assets, their credit-type report.
14    Q.  So is it fair to say that after an event such as a mass
15    shooting, the Treasury Department will be contacted and run
16    one of these reports for suspicious activity?
17    A.  Yes, sir.
18    Q.  And "BSA," that refers to Bank Secrecy Act, correct?
19    A.  Yes, sir.
20    Q.  Okay.  Any reason --
21    A.  I'll agree with you.
22    Q.  Fair enough.
23         Do you have any reason to dispute --
24    A.  No, sir.
25    Q.  -- that BSA would stand for Bank Secrecy Act?
```

1    A.  No, sir.

2    Q.  Thank you, Ranger.

3        Let's go to the bottom half of page 2.  If we could ask

4    the ranger to –– Ranger Snyder, can you read the highlighted

5    portion.

6    A.  "On 8/6/2017, the subject, using PayPal account" ending

7    with "035, purchased AR500 body armor, bulletproof vest, BAM

8    low-profile base frag coating black via eBay (eBay ID

9    DEVIKELLE_23).  This purchase of body armor, bulletproof vest,

10   is noteworthy due to media reports that the subject was

11   wearing all black tactical gear and ballistic vest."

12   Q.  As you already testified, Devin Kelley was, in fact,

13   wearing body armor during the shooting, correct?

14   A.  That's correct.

15   Q.  And it was illegal for him to possess body armor in Texas?

16   A.  That's correct.

17   Q.  Nonetheless, according to this record, he was able to buy

18   it and bought it online?

19   A.  Correct.

20   Q.  Taking a look at page 4.  Sir, if you can read the

21   highlighted portion.

22   A.  "Purchases of note:  06/06/2016, $38.61 at LA Police

23   Gear, Inc., an online police and tactical gear retailer;

24   5/8/2017, $20.94 at KnifeCenter.com, an online knife retailer;

25   12/7/2015 to 11/3/2017 at Academy Sports, locations in Selma,

1   San Antonio, and San Marcos, Texas, a seller of firearms,

2   ammunition, and sporting goods.  There were nine transactions

3   totaling $356.64, ranging from $9.65 to $107.12, with the

4   transaction for $107.12 occurring on 11/3/2017."

5   Q.  I appreciate you reading that.  Thank you, Ranger Snyder.

6       According to this suspicious activities report, Kelley

7   purchased items from LA Police Gear, correct?

8   A.  Yes, sir.

9   Q.  He also purchased -- made purchases from KnifeCenter.com?

10  A.  Correct.

11  Q.  These are both online retailers?

12  A.  Yes, sir.

13  Q.  It also notes that Kelley made nine different purchases at

14  Academy Sports between December 7th of 2015 and November 3rd,

15  2017; is that correct?

16  A.  Yes, sir.

17  Q.  And these purchases range between $9.65 and $107.12?

18  A.  Correct.

19  Q.  One of those purchases occurred two days before the

20  shooting, correct?

21  A.  Yes, sir.

22  Q.  That last transaction was for $107.12?

23  A.  That's correct.

24  Q.  And, of course, a BSA report like this wouldn't factor in

25  all of the transactions that occurred where the individual

1  used cash, correct?

2  A.  Yes.

3  Q.  Take a look at Joint Exhibit 550.

4      Are you familiar with this document, Ranger Snyder?

5  A.  Yes, sir.  It's a LeadsOnline database search.

6  Q.  And why would Texas Rangers have occasion to run such a

7  search?

8  A.  We do in case -- to follow things that have been pawned or

9  bought from the pawnshop, and if anything's been -- any stolen

10 items or anything of that nature's been pawned in a local

11 pawnshop.

12 Q.  Okay.  And taking a look at the highlighted section, we

13 see a pistol, 9-millimeter semiautomatic single CPX-2,

14 correct?

15 A.  Yes, sir.

16 Q.  And in your investigation, you never found a ATF 4473 form

17 for a 9-millimeter semiautomatic pistol CPX-2, correct?

18 A.  No, sir.

19 Q.  And according to this document, Devin Kelley sold this to

20 EZ Pawn in New Braunfels, Texas?

21 A.  That's correct.

22 Q.  Thank you.

23     If we can go to the next document, Joint Exhibit 744.

24 Now, let's go to the second page and take a look at the

25 synopsis.

1          Ranger Snyder, what is this document reflecting?

2   A.   This is a front page or page 1 of 2 of a supplemental

3   report created by a ranger out of our reporting system.

4   Q.   Okay.  And the rangers interviewed Brandon Beaty, the

5   manager of Hill Country Truck Store; is that correct?

6   A.   Yes, sir.  That's correct.

7   Q.   Do you recall why they interviewed Mr. Beaty?  It's okay

8   if you don't.  We'll scroll down through the --

9   A.   Right off the top of my head, no, sir.

10  Q.   Fair enough.  Then let's go to the paragraph,

11  paragraph 8.2.  Sorry.  I'm going to have to ask you to read

12  aloud again, if you don't mind, sir.

13  A.   8.2 -- the 8.2 reference is detailed in Supplement 8.

14       "During the interview, Beaty confirmed that on

15  October 28th, 2017, Devin Kelley came into the store and

16  purchased two 100-round drum magazines and .223/5.56 ammo.

17  Beaty stated he had posted pictures of the magazines marketing

18  them on Facebook, and Devin had contacted him via Facebook and

19  inquired about the purchasing the magazines."

20  Q.   Okay.  So let's break that paragraph down a little bit.

21       According to Mr. Beaty, Devin Kelley bought two 100-round

22  drum magazines on October 28th, 2017, correct?

23  A.   Yes.

24  Q.   That's eight days before the shooting?

25  A.   Correct.

1   Q.  If you recall, this is also the same day Kelley wrote two

2   of his iCloud notes to delete all social media and destroy his

3   old iPhone?

4   A.  Correct.

5   Q.  Mr. Beaty stated that he posted pictures on Facebook and

6   that Kelley contacted him online via Facebook?

7   A.  Correct.

8   Q.  If we move to paragraph 8.3.  Can we take a look at the

9   highlighted portion.

10      Can you read that aloud, please, sir.

11  A.  "Beaty confirmed later that same afternoon Devin called

12  stating the magazines didn't fit and requested to return them.

13  Devin returned the magazines and requested to order two more

14  magazines to fit the rifle.  Beaty provided me with a Post-it

15  note that he had written himself that had cellphone number"

16  ending in "134 and a note to call upon arrival of the

17  magazines.  I noted this telephone number was Devin Kelley's."

18  Q.  So according to this paragraph, Devin Kelley returned the

19  magazines the same day he bought them because they didn't fit

20  his rifle?

21  A.  That's correct.

22  Q.  He then gave Mr. Beaty his telephone number so that he

23  could call Kelley whenever the new magazines arrived?

24  A.  Correct.

25  Q.  Taking a look at the next paragraph, if we could finish

TERRY SNYDER – CROSS                                    306

1    off this.

2    A.  "Beaty stated from the time of the return on October 28,

3    2017, until Saturday, 11/4/2017, Devin called him every day,

4    multiple times a day checking to see if the magazine had

5    arrived.  Beaty stated Devin came into the store on Saturday,

6    11/4/2017, to check on the magazines."

7    Q.  So between October 28th and the day before the shooting,

8    Devin Kelley called Mr. Beaty every day, multiple times a day,

9    checking to see if the magazines had arrived; is that correct?

10   A.  That's correct.

11   Q.  In fact, Devin Kelley went into the store on the day

12   before the shooting to check to see if the magazines had

13   arrived?

14   A.  That's correct.

15   Q.  Would this suggest that Mr. Kelley was anxious to obtain

16   the magazines?

17        MR. LEGRAND:  Your Honor, I'm going to object.  That

18   calls for speculation.

19        THE COURT:  That's overruled.

20        THE WITNESS:  That's correct.

21   BY MR. STERN:

22   Q.  Thank you.

23        Taking a look at Joint Exhibit 608.

24        I know I'm having you read a lot, Ranger Snyder.  How are

25   you holding up?

1    A.  I'm good.

2    Q.  Thank you.

3        Take a look at the synopsis, please.  Can you tell me what

4    this document -- what this document -- let's pull this down.

5            MR. STERN:  Your Honor, if I can have a moment,

6    please.

7        *(Discussion off the record)*

8            MR. STERN:  So, Your Honor, there's some PII I think

9    that's -- unredacted.  If we can just take five minutes?

10           THE COURT:  Why don't you push forward.  Like I said,

11   we'll redact, and I'll allow later redactions before this gets

12   released.

13   BY MR. STERN:

14   Q.  Certainly.  Why don't we go right to the highlighted

15   portion.  And if you can read this to yourself.

16       Is it fair to state that this is a document that recorded

17   all the evidence found in Devin Kelley's vehicle after he

18   committed -- after he shot himself?

19   A.  That's correct.

20   Q.  Okay.  Taking a look at the highlighted portion, can you

21   read that aloud.

22   A.  "Green backpack, back seat behind driver seat.  Ziploc

23   with 18 NFCR 9-millimeter Luger cartridges and oil can-type

24   suppressor."

25   Q.  Thank you.

1      With regards to the Ziploc with 18 NFCR 9-millimeter Luger

2  cartridges, do you know what that is?

3  A.  That would be -- I believe it would be like a Ziploc bag,

4  or some kind of bag, with 18 cartridges of 9-millimeter

5  caliber ammunition.

6  Q.  Thank you.

7      And it also reads, "oil can-type suppressor," correct?

8  A.  Correct.

9  Q.  And, again, we previously looked at a document where Devin

10  Kelley was commenting on a YouTube clip about how to make

11  homemade silencers, correct?

12  A.  That's correct.

13  Q.  Would it be fair to suggest that this oil can-type

14  suppressor is his attempt to make a homemade silencer?

15  A.  Correct.

16  Q.  Going further down, next page.

17      The next highlighted portion, "Glock magazine, 15-round

18  capacity."

19      Did I read that correctly?

20  A.  Yes, sir.

21  Q.  Again, would this indicate that he had a 15-round magazine

22  for his Glock pistol?

23  A.  Correct.

24  Q.  Okay.  It also reads, "containing six Hornady Luger

25  9-millimeter cartridges," one with -- "one Win 9-millimeter

1    cartridge."

2        Did I read that correctly?

3    A.  Yes, sir.

4    Q.  Do you know what that's in reference to?

5    A.  I'm guessing six Hornady Luger 9-millimeter cartridges.

6    So there's a 15-round capacity magazine at the time that they

7    inventoried or collected the live or unfired cartridges from

8    it, and six Hornady Luger 9-millimeter and one Winchester

9    9-millimeter cartridge.

10   Q.  Thank you.

11       Looking further down, it reads, "Prescription pill

12   container containing 24 pills, fill date: 10/25/2017 at two

13   pills per day."

14       Did I read that correctly?

15   A.  That's correct.

16   Q.  So Devin Kelley had a prescription pill container in the

17   car?

18   A.  That is correct.

19   Q.  Did the Texas Rangers come to learn, through the course of

20   its investigation, that Devin Kelley had recently been

21   prescribed clonazepam?

22   A.  I believe it was documented.  Yes, sir.

23   Q.  Thank you.

24       The next highlighted portion, "Letter from New Braunfels

25   counseling center - LPC Candace Marlowe" --

1        Did I read that correctly?

2   A.  That's correct.

3   Q.  -- "dated 7/20/2017, two pages of client schedule."

4   A.  Correct.

5   Q.  So in his car at the time of the shooting, Devin Kelley

6   had a prescription pill container and a letter from a

7   counseling center; is that correct?

8   A.  Yes, sir.

9   Q.  I'd like to shift focus and talk about some of the

10  interviews conducted by the FBI, if that's okay with you,

11  Ranger Snyder.

12  A.  Yes, sir.

13  Q.  Okay.  The FBI helped with this investigation, correct?

14  A.  Yes, sir.

15  Q.  They conducted several interviews of associates of Devin

16  Kelley?

17  A.  That's correct.

18  Q.  I'd like to discuss three of those interviews with you, if

19  that's okay.

20  A.  Sure.

21  Q.  Thank you.

22       Taking a look at Joint Exhibit 510, this is a report of an

23  interview that the FBI conducted of Jessica Lee Edwards,

24  correct?

25  A.  Correct.

1   Q.  It reads in part, "Edwards was Devin Patrick Kelley's

2   staff sergeant in the United States Air Force around 2010-2011

3   at Holloman Air Force Base in New Mexico."

4       Did I read that correctly?

5   A.  Yes, sir.

6   Q.  And I will represent to you that the parties have

7   stipulated that Ms. Edwards was no longer an Air Force

8   employee by December of 2012.  Okay?

9   A.  Okay.

10  Q.  Okay.  So at the end of this paragraph -- I want to

11  continue the next highlighted portion -- it reads, "A couple

12  of years later, Kelley contacted Edwards via Facebook."

13      Did I read that correctly?

14  A.  Yes, sir.

15  Q.  So if it's a couple years after 2010-2011, is it fair to

16  state that she was no longer an Air Force employee?

17  A.  Correct.

18  Q.  I want you to read the next highlighted portion, please.

19  Can you read it aloud, sir.

20  A.  "Kelley also obsessed with church shootings and guns.

21  Regarding the church shooting in South Carolina, Kelley told

22  Edwards, 'I wish I had the nerve to do it.'  Kelley also sent

23  Edwards pictures of multiple guns he was building,

24  specifically an AR-15-style rifle."

25  Q.  So according to this interview, a couple years after

1  Ms. Edwards leaves the Air Force, a couple years after Devin

2  Kelley leaves the Air Force, he contacts Ms. Edwards and says

3  he's obsessed with church shootings and guns, correct?

4  A.  Yes, sir.

5  Q.  In fact, "Regarding the church shooting in South Carolina,

6  Kelley told Edwards, 'I wish I had the nerve to do it.'"

7  A.  Correct.

8  Q.  Do you know when the church shooting in South Carolina

9  occurred?

10 A.  I can't tell you the day right now, sir.

11 Q.  Okay.  And, finally, it also says "Kelley" –– if we can

12 keep that up, please.  Thank you.  I just want to read the

13 last sentence again.

14     "Kelley also sent Edwards pictures of multiple guns he was

15 building, specifically an AR–15–style rifle."

16     Did I read that correctly?

17 A.  Yes, sir.

18 Q.  So according to Ms. Edwards, Devin Kelley contacted her

19 and showed her pictures of multiple guns he was building?

20 A.  Correct.

21 Q.  Thank you.

22     Next paragraph ––

23          THE COURT:  Do we have a year for this discussion?

24          MR. STERN:  It says, "A couple years later, after

25 Mr. Kelley was released from the Air Force."

1      The parties have already stipulated that Ms. Edwards was
2  no longer an employee after December of 2012, and, certainly,
3  by the fact that they're talking about the church shooting in
4  South Carolina, which I'll represent occurred in 2015, it
5  would be sometime thereafter.
6          THE COURT:  Thank you.
7          MR. STERN:  Thank you.
8  BY MR. STERN:
9  Q.  The next paragraph.  You can read that portion, sir.
10 A.  "Edwards told Kelley to get help, once she realized he was
11 completely obsessed with mass shootings.  Edwards then deleted
12 Kelley as a friend on Facebook.  Edwards said it was possible
13 that Kelley made a new Facebook account and attempted to add
14 her back as a friend."
15 Q.  So, again, according to Ms. Edwards, Kelley was completely
16 obsessed with mass shootings, correct?
17 A.  Yes.
18 Q.  In fact, she tried to block him on Facebook, correct?
19 A.  Correct.
20 Q.  And she was concerned that he might have made a new
21 Facebook account to continue their relationship?
22 A.  Correct.
23 Q.  So she tried to block him.  Yet, she thinks he still tried
24 to pursue their relationship?
25 A.  Yes, sir.

1    Q.  Thank you.

2        Let's go to the next interview, Joint Exhibit 513.  Take a

3    look -- this is an FBI interview of Joey Mizell; is that

4    correct?  Sorry?

5    A.  There's a delay here.  But, yes, that's correct.

6    Q.  I know we're all -- it's getting late in the day, so I'm

7    trying to rush through.  But please take your time, of course.

8    A.  Yes, sir.

9    Q.  Thank you.

10       This interview occurred November 6th, 2017, one day after

11   the shooting?

12   A.  Correct.

13   Q.  Okay.  Let's take a look at the second paragraph.  It

14   says, "Mr. Mizell told the FBI..."

15       Ranger Snyder, can I ask you to read this -- the second --

16   the first page of this interview.  And I'd like to just ask

17   you a few questions about it, please.

18   A.  Starting from the top or --

19   Q.  Just to yourself, the first page, please.

20   A.  Okay.

21       *(Witness reading)*

22           THE COURT:  Go ahead and scroll up and get rid of the

23   phone numbers.

24       Are you ready for a question, Ranger?

25           THE WITNESS:  Yes, sir.

```
 1              MR. STERN:  Thank you, sir.
 2   BY MR. STERN:
 3   Q.  So according to Mr. Mizell, he told the FBI that he had
 4   known Kelley since middle school or the eighth grade, correct?
 5   A.  That's correct.
 6   Q.  And that he thought Kelley was an ADHD-type of guy?
 7   A.  Yes, sir.
 8   Q.  He always wanted to be the center of attention, but he was
 9   very unlikable?
10   A.  Yes, sir.
11   Q.  And that people had issues with Kelley's personality, and
12   he was the arrogant type?
13   A.  Correct.
14   Q.  It also reads that Mr. Mizell stated Kelley had called him
15   after Kelley got out of the -- got out of the military, that
16   the last several weeks was when they were in touch the most,
17   either by text or phonecall?
18   A.  Correct.
19   Q.  "Mr. Mizell stated that Kelley never had any guns growing
20   up, but maybe after the military, he got involved with guns
21   more and hunted"?
22   A.  Correct.
23              MR. STERN:  Can you highlight the portion that talks
24   about his secret.
25
```

1    BY MR. STERN:

2    Q.  Mr. Mizell –– I'm sorry.  The interview notes read in

3    part, "Mizell felt Kelley had dark secrets but never really

4    expressed them to Mizell," correct?

5    A.  Correct.

6    Q.  All right.  The next highlighted portion.

7        We already talked about Mr. Mizell's belief that Devin

8    Kelley got more interested in firearms after he left the

9    military?

10   A.  Yes, sir.

11   Q.  Okay.  Again, it reads, "Mizell told Kelley" –– I'm sorry.

12   "Mizell stated Kelley was trying to get Mizell mad for telling

13   him about animals because Kelley knew Mizell was very

14   religious."

15   A.  Correct.

16   Q.  Did I read that correctly?

17       So he was concerned that Devin Kelley was trying to get

18   him angry or get him mad because he was very religious?

19   A.  Correct.

20   Q.  Okay.  Take a look at the next highlighted portion.  Can

21   you read that aloud, please, sir.

22   A.  "Mizell stated he warned another friend, Tony Last Name

23   Unknown about Kelley's behavior recently after Mizell had a

24   religious conversation with Kelley.  Kelley told Mizell that

25   the world was horrible, and Kelley was upset about bringing

1    his kid into the world."

2    Q.  So during this religious conversation Mizell and Kelley

3    had, Kelley told him that the world was horrible, and he was

4    upset about bringing his kids into the world, correct?

5    A.  Yes, sir.

6    Q.  Is that a yes?  Sorry.

7    A.  Yes, sir.

8    Q.  Thank you.

9        And then, finally, the last highlighted portion.

10       Again, based on this interview, there was a YouTube clip

11   of Kelley doing a canister of drugs called whippits?

12   A.  Correct.

13   Q.  And Mizell told –– stated that Kelley knew that he was

14   going to go to hell?

15   A.  Correct.

16   Q.  I want to turn your attention to one more FBI interview.

17           THE COURT:  So if you finished up with that person,

18   this is probably a good breaking point.

19       It appears to me you have much more to go with this

20   witness.

21           MR. STERN:  Much more to go, Your Honor.

22           THE COURT:  Yeah.  And will there be redirect?

23           MR. LEGRAND:  Yes, sir.  Yes, Your Honor.

24           THE COURT:  Yeah.  So it's past 5:30 now.  Let's go

25   ahead and take a stop.  We'll resume tomorrow morning at 9:00

1  with this witness.

2      I know it's late.  But if the two of y'all could confer

3  about what remaining exhibits we need to admit, I'd like to be

4  able to admit any unobjected-to plaintiffs' and government

5  witness exhibits first thing in the morning, if possible.  So

6  let's try to show up just slightly before 9:00.

7      Anything else we need to take up before I leave?

8          MR. ALSAFFAR:  None from plaintiffs, Your Honor.

9          MR. STERN:  None for defendants.

10         THE COURT:  We're adjourned until tomorrow morning.

11 * * *

12     *(Overnight recess)*

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              –oOo–

2        I certify that the foregoing is a correct transcript from

3   the record of proceedings in the above-entitled matter.

4

5   Date:  4/7/2021          /s/ Gigi Simcox
                             United States Court Reporter
6                            655 East Cesar E. Chavez Blvd., Rm. G-65
                             San Antonio, TX  78206
7                            Telephone:  (210) 244-5037

8   Date:  4/7/2021          /s/ Chris Poage
                             United States Court Reporter
9                            655 East Cesar E. Chavez Blvd., Rm. G-65
                             San Antonio, TX  78206
10                           Telephone:  (210) 244-5036

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25