```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
2                    SAN ANTONIO DIVISION

3
   JOE HOLCOMBE, ET AL,              .
4                                    .
                   PLAINTIFFS,       .
5          vs.                       . DOCKET NO. 5:18-CV-555-XR
                                     .
6  UNITED STATES OF AMERICA,         .
                                     .
7                  DEFENDANT.        .
                                     .
8

9
                   TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
10             BEFORE THE HONORABLE XAVIER RODRIGUEZ
                   UNITED STATES DISTRICT JUDGE
11                      APRIL 8, 2021

12

13

14

15

16 APPEARANCES:
   FOR THE PLAINTIFFS:    JAMAL K. ALSAFFAR, ESQUIRE
17                        TOM JACOB, ESQUIRE
                          KOBY J. KIRKLAND, ESQUIRE
18                        LAURIE M. HIGGINBOTHAM, ESQUIRE
                          STEVEN R. HASPEL, ESQUIRE
19                        WHITEHURST HARKNESS BREES CHENG
                           ALSAFFAR HIGGINBOTHAM AND JACOB
20                        7500 RIALTO BOULEVARD, BUILDING TWO
                          SUITE 250
21                        AUSTIN TX 78735

22

23                        ROBERT E. AMMONS, ESQUIRE
                          APRIL A. STRAHAN, ESQUIRE
24                        THE AMMONS LAW FIRM
                          3700 MONTROSE BOULEVARD
25                        HOUSTON TX 77006
```

```
 1

 2                    DANIEL D. BARKS, ESQUIRE
                      SPEISER KRAUSE, PC
 3                    5555 GLENRIDGE CONNECTOR
                      SUITE 550
 4                    ATLANTA GA 30342

 5

 6                    MARK W. COLLMER, ESQUIRE
                      COLLMER LAW FIRM
 7                    3700 MONTROSE
                      HOUSTON TX 77006
 8

 9                    JASON P. STEED, ESQUIRE
                      KILPATRICK TOWNSEND & STOCKTON LLP
10                    2001 ROSS AVENUE, SUITE 4400
                      DALLAS TX 75201
11

12                    DENNIS CHARLES PEERY, ESQUIRE
                      R. CRAIG BETTIS, ESQUIRE
13                    TYLER & PEERY
                      5822 WEST IH 10
14                    SAN ANTONIO TX 78201

15

16                    PAUL E. CAMPOLO, ESQUIRE
                      TIM MALONEY, ESQUIRE
17                    LAW OFFICES OF MALONEY & CAMPOLO, LLP
                      926 S. ALAMO
18                    SAN ANTONIO TX 78205

19

20                    GEORGE LOUIS LeGRAND, ESQUIRE
                      LeGRAND AND BERNSTEIN
21                    2511 N. ST. MARY'S STREET
                      SAN ANTONIO TX 78212-3739
22

23

24

25
```

```
 1

 2                    DANIEL J. T. SCIANO, ESQUIRE
                      RICHARD E. TINSMAN, ESQUIRE
 3                    TINSMAN & SCIANO
                      10107 McALLISTER FREEWAY
 4                    SAN ANTONIO TX 78216
                      KELLY W. KELLY, ESQUIRE
 5                    ANDERSON & ASSOCIATES LAW FIRM
                      2600 SW MILITARY DRIVE, SUITE 118
 6                    SAN ANTONIO TX 78224

 7

 8                    ERIK A. KNOCKAERT, ESQUIRE
                      JOSEPH MICHAEL SCHREIBER, ESQUIRE
 9                    SCHREIBER KNOCKAERT, PLLC
                      701 NORTH POST OAK, SUITE 325
10                    HOUSTON TX 77024

11

12                    BRETT T. REYNOLDS, ESQUIRE
                      BRETT REYNOLDS & ASSOCIATES PC
13                    1250 NE LOOP 410, SUITE 310
                      SAN ANTONIO TX 78209
14

15                    DAVID J. CAMPBELL, ESQUIRE
                      JUSTIN B. DEMERATH, ESQUIRE
16                    O'HANLON McCOLLOM & DEMERATH
                      808 WEST AVENUE
17                    AUSTIN TX 78701

18

19                    JORGE A. HERRERA, ESQUIRE
                      FRANK HERRERA, JR., ESQUIRE
20                    THE HERRERA LAW FIRM, INC.
                      1800 W COMMERCE STREET
21                    SAN ANTONIO TX 78207

22

23                    JASON C. WEBSTER, ESQUIRE
                      THE WEBSTER LAW FIRM
24                    6200 SAVOY, SUITE 640
                      HOUSTON TX 77036
25
```

```
 1

 2                         CATHERINE TOBIN, ESQUIRE
                          HILLIARD MUNOZ GONZALES, LLP
 3                         719 S. SHORELINE BOULEVARD, SUITE 500
                          CORPUS CHRISTI TX 78401
 4

 5                         HUGH JONES PLUMMER, JR., ESQUIRE
                          THOMAS J. HENRY
 6                         PO BOX 696025
                          SAN ANTONIO TX 78269
 7

 8                         DENNIS BENTLEY, ESQUIRE
                          THOMAS J. HENRY, ESQUIRE
 9                         THOMAS J. HENRY INJURY ATTORNEYS
                          521 STARR STREET
10                         CORPUS CHRISTI TX 78401

11

12                         MARCO CRAWFORD, ESQUIRE
                          LAW OFFICE OF THOMAS J. HENRY
13                         4715 FREDRICKSBURG
                          SAN ANTONIO TX 78229
14

15                         MARION M. REILLY, ESQUIRE
                          ROBERT C. HILLIARD, ESQUIRE
16                         HILLIARD MARTINEZ GONZALES LLP
                          719 S. SHORELINE, SUITE 500
17                         CORPUS CHRISTI TX 78401

18

19  FOR THE DEFENDANT:     AUSTIN L. FURMAN, ESQUIRE
                          PAUL D. STERN, ESQUIRE
20                         UNITED STATES DEPARTMENT OF JUSTICE
                          THREE CONSTITUTION SQUARE
21                         175 N STREET, NE
                          WASHINGTON DC 20002
22

23

24

25
```

```
 1

 2                              CLAYTON R. DIEDRICHS, ESQUIRE
                                JAMES F. GILLIGAN, ESQUIRE
 3                              JACQUELYN MICHELLE CHRISTILLES, ESQUIRE
                                JAMES EDWARD DINGIVAN, ESQUIRE
 4                              KRISTIN K. BLOODWORTH, ESQUIRE
                                KRISTY KAREN CALLAHAN, ESQUIRE
 5                              JOHN F. PANISZCZYN, ESQUIRE
                                UNITED STATES ATTORNEY'S OFFICE
 6                              601 NW LOOP 410, SUITE 600
                                SAN ANTONIO TX 78216
 7

 8                              AUSTIN L. FURMAN
                                JOCELYN KRIEGER, ESQUIRE
 9                              DANIEL P. CHUNG, ESQUIRE
                                JAMES G. TOUHEY, JR., ESQUIRE
10                              STEPHEN E. HANDLER, ESQUIRE
                                UNITED STATES DEPARTMENT OF JUSTICE
11                              PO BOX 888, BEN FRANKLIN STATION
                                WASHINGTON DC 20044
12

13   ON BEHALF OF RUBEN         PHILIP KOELSCH, ESQUIRE
     D. RIOS, JR.               CRAIG WILLIAM, ESQUIRE
14                              CARLSON LAW FIRM, PC
                                100 EAST CENTRAL EXPRESSWAY
15                              KILLEEN TX 76542

16

17   ON BEHALF OF              ELIZABETH G. BLOCH, ESQUIRE
     ACADEMY, LTD              DALE WAINWRIGHT, ESQUIRE
18                             GREENBERG TRAURIG LLP
                               300 WEST 6TH STREET, SUITE 2050
19                             AUSTIN TX 78701

20

21                             JANET E. MILITELLO, ESQUIRE
                               LOCKE LORD LLP
22                             600 TRAVIS STREET TOWER, SUITE 2800
                               HOUSTON TX 77002
23

24

25
```

```
 1

 2                              DAVID McDONALD PRICHARD, ESQUIRE
                                KEVIN MICHAEL YOUNG, ESQUIRE
 3                              PRICHARD YOUNG, LLP
                                10101 REUNION PLACE, SUITE 600
 4                              SAN ANTONIO TX 78216

 5

 6   ON BEHALF OF MOVANTS      J. DEAN JACKSON, ESQUIRE
     MICHAEL AND REBECCA       CURNEY FARMER HOUSE OSUNA & JACKSON
 7   KELLEY:                   411 HEIMER ROAD
                               SAN ANTONIO TX 78232
 8

 9

10   ON BEHALF OF MOVANT   ADRIAAN TIELEMAN JANSSE, ESQUIRE
     DR. SHRIDHAR VASIREDDY JANSSE LAW
11                             P.O. BOX 791215
                               SAN ANTONIO TX 78279
12

13   REPORTED BY:              GIGI SIMCOX, RMR, CRR
                               CHRIS POAGE, RMR, CRR
14                             OFFICIAL COURT REPORTERS
                               UNITED STATES DISTRICT COURT
15                             SAN ANTONIO, TEXAS

16

17

18

19

20

21

22

23

24

25
```

1    *(San Antonio, Texas; April 8, 2021, at 8:45 a.m., in open*
2    *court.)*

3         THE COURT:  Let's start with plaintiffs' exhibits
4    first.  What plaintiffs exhibits may be unobjected to that we
5    can admit at this time?

6         So we have already admitted 87 through 94, 94A
7    through 105, 105A through 109A.  And that's where we basically
8    sort of left off.  We've admitted 751 and 752.

9         Are there any remaining plaintiffs' that there is an
10   agreement to?

11        MR. JACOB:  Yes, Your Honor.  Plaintiffs agreed to
12   PEX 797 and PEX 798.

13        THE COURT:  Is that correct, Mr. Stern?

14        MR. STERN:  That is, Your Honor.

15        THE COURT:  797 is admitted, 798 is admitted.

16   (Plaintiffs Exhibits 797 and 798 received into evidence.)

17        THE COURT:  Are there any government exhibits that
18   are unobjected to that we can admit?

19        MR. STERN:  Yes, your Honor.  Government Exhibit 1
20   through 24.

21        THE COURT:  Is that correct from the plaintiffs'
22   side?

23        MR. JACOB:  Yes, your Honor.

24        THE COURT:  1 through 24 are admitted.

25        MR. STERN:  Next we have Government Exhibit 124

1  through 130.

2         THE COURT:  One second here.  I'm sorry.

3         MR. STERN:  124 —

4         THE COURT:  124.

5         MR. STERN:  — through 130.

6         THE COURT:  Is that correct?

7         MR. JACOB:  Yes, your Honor.

8         If I can go back to 1 through 24.  I thought the

9  agreement was 1 through 23, GEX 1 through 23.  We do have an

10  objection to GEX 24.

11        THE COURT:  Okay.  So I'll withdraw that for now.  24

12  is not admitted at this time.  We'll take that up later.

13        What about 124 through —

14        I'm sorry.  What was the number again?

15        MR. STERN:  130.

16        THE COURT:  — 130.  Any objections to that?

17        MR. JACOB:  No, Your Honor.

18        THE COURT:  124 is admitted, 125, 126, 127, 128, 129,

19  and 130.

20        (Government's Exhibits 124 through 130 received into

21  evidence.)

22        THE COURT:  Anything else?

23        MR. STERN:  Yes, Your Honor.  132 through 140.

24        THE COURT:  Is that correct?

25        MR. JACOB:  Yes, Your Honor.

```
1              THE COURT:  132, 133, 134, 135, 136, 137, 138, 139,
2    and 140 are admitted.
3              (Government's Exhibits 132 through 140 received into
4    evidence.)
5              THE COURT:  Anything else?
6              MR. STERN:  Just 131 sort of sticks out like a sore
7    thumb.  I don't know if Your Honor wants to take up that issue
8    now.
9              THE COURT:  So what's the objection to 131?
10             MR. JACOB:  It is an email, Your Honor.  It's
11   hearsay.
12             THE COURT:  So from Hardy, Kathleen, to who?
13             And what's the response to the hearsay objection?
14             MR. STERN:  Your Honor, the parties have agreed to
15   produce basically wholesale the Air Force investigative file
16   as well as the Texas Ranger investigative file.
17             This is just one of many documents that have been
18   produced, hearsay or otherwise, that would help the Court come
19   to a finding of fact regarding this case.
20             MR. JACOB:  May I respond, Your Honor?
21             THE COURT:  Yes.
22             MR. JACOB:  Your Honor, the parties have agreed to
23   produce it, but that does not mean they are admissible.  They
24   are still hearsay, and that's not an exception to the hearsay
25   rule.
```

 1          MR. STERN:  Your Honor, this is an email concerning

 2   CPS documents.

 3          THE COURT:  Yeah, it's part of the hot documents here

 4   at the bench.

 5          So what are we dealing with?

 6          MR. STERN:  We're dealing with the Child Protective

 7   Services from New Mexico, so it really deals with potential

 8   probable cause regarding June 2011, if I'm not mistaken.

 9          MR. JACOB:  Your Honor, it's a 2017 email.

10          THE COURT:  Yeah.  131, at least my exhibit list, is

11   indicating it was a 12/4/2017 email.

12          MR. STERN:  Yes, your Honor.  But the underlying

13   information concerns a previous investigation.

14          So as part of the Texas Rangers' investigative file,

15   they contacted CPS from New Mexico to obtain all the requisite

16   information.  So that's why the underlying information is

17   necessary for the Texas Rangers' investigation.

18          MR. JACOB:  And to be clear, Your Honor, we're not

19   objecting.  We have admitted the documents produced via this

20   email.  It's the email itself that's not -- that's hearsay and

21   irrelevant.

22          THE COURT:  Right.  So besides that, then, let's get

23   to the nitty.  What's your prejudice by this being admitted?

24          I've been letting a lot of background in that the

25   government is objecting to.  Why isn't this just background

1  for me to consider it and at least flesh out the chronology of

2  events?

3          MR. JACOB:  Well, Your Honor, I don't think it

4  contributes in any way to the chronology of the events.

5          THE COURT:  But that's not answering my question.

6  I'm asking what's the harm to you by admitting it.

7          MR. JACOB:  Other than it being hearsay, Your Honor,

8  no harm.

9          THE COURT:  131 is admitted.

10     (Government's Exhibit 131 received into evidence.)

11         THE COURT:  Anything else?

12         MR. STERN:  Yes, Your Honor.  142.

13         Is that correct, Mr. Jacob?

14         MR. JACOB:  The next document I have is 147.

15         MR. STERN:  We'll move 147 without objection.

16         THE COURT:  Any objection to 147?

17         MR. JACOB:  No, Your Honor.

18         THE COURT:  147 is admitted.

19     (Government's Exhibit 147 received into evidence.)

20         THE COURT:  Anything else?

21         MR. JACOB:  Mr. Stern is right.  We do not have an

22  objection to 142 as well.

23         THE COURT:  142 is admitted.

24         (Government's Exhibit 142 received into evidence.)

25         THE COURT:  Anything else?

1           MR. STERN:  Next is Government Exhibit 163 through

2    187.

3           THE COURT:  Is that correct?

4           MR. JACOB:  Yes, Your Honor.  We have no objection to

5    those as well.

6           THE COURT:  I'm sorry.  It's 163 through?

7           MR. JACOB:  187.

8           THE COURT:  187.

9           163, −64, −65, −66, −67, −68, −69, −70, −71, −72,

10   −73, −74, −75, −76, −77, −78, −79, −80, −81, −82, −83, −84,

11   −85, −86, and −87 are all admitted.

12           (Government's Exhibit 163 through 187 received into

13   evidence.)

14           THE COURT:  Anything else?

15           MR. STERN:  Next, Government Exhibit 112, 113, and

16   114.

17           MR. JACOB:  No objection.

18           THE COURT:  112, 113, and 114 are all admitted.

19           (Government's Exhibits 112 through 114 received into

20   evidence.)

21           THE COURT:  Anything else?

22           MR. STERN:  Did we agree to 144 and 145?

23           MR. JACOB:  Yes, Your Honor.  144 and 145 are agreed

24   to.

25           THE COURT:  144 and 145 are admitted.

1          (Government's Exhibits 144 and 145 received into
2   evidence.)
3          THE COURT:  Anything else, Mr. Stern?
4          MR. STERN:  I don't know if you want to take up the
5   issue of the one outstanding Academy deposition designation,
6   as we've moved to have all the rest of them admitted.
7          THE COURT:  What number is that?
8          MR. STERN:  Oh, I'm sorry.  Before that, Your Honor,
9   government exhibit — we move to have Government Exhibits 223
10  to 239 admitted.
11         THE COURT:  Mr. Stern, the court reporter didn't hear
12  you.
13         MR. STERN:  Excuse me.  Government Exhibit 223
14  through 239.
15         THE COURT:  Any objection to those?
16         MR. JACOB:  No, Your Honor.
17         THE COURT:  223, 224, 225, 226, 227, 228, 229, 230,
18  231, 232, 233, 234, 235, 236, 237, 238, and 239 are admitted.
19         (Government's Exhibits 223 through 239 received into
20  evidence.)
21         THE COURT:  Anything else?
22         MR. STERN:  Yes, Your Honor.  We can delay this
23  conversation.  However, as we just admitted Government
24  Exhibit 1 through 23, again, 24 sort of sticks out as a sore
25  thumb.  It's the answer to the deposition by written questions

1   from Academy witness.

2        If you recall, the United States sought to take a

3   deposition of an Academy 30(b)(6) witness.  By way of

4   compromise, we did a deposition through written questions.  We

5   received those answers.  We timely produced them to

6   plaintiffs.  They now have them.  We seek to move them into

7   evidence at this time.

8        MR. JACOB:  Our objection is under the rule of

9   optional completeness, Your Honor.  We sent cross questions to

10  Academy, which they did not respond to.  They lodged

11  objections; and, therefore, we would posit that the entire

12  exhibit should not be admitted, given Academy's conduct.

13       THE COURT:  I don't recall you bringing that to my

14  attention and asking for a motion to compel them to answer

15  those questions.  Did you?

16       MR. JACOB:  No, Your Honor, we did not.

17       THE COURT:  Yeah.  24 is admitted.

18       (Government's Exhibit 24 received into evidence.)

19       THE COURT:  Anything else?

20       MR. STERN:  Not at this time, Your Honor.

21       THE COURT:  Let's go ahead and bring back the ranger.

22       THE DEPUTY CLERK:  Is he still under oath?

23       THE COURT:  Yeah.  He's under oath.  I'll remind him

24  of that.

25       MR. STERN:  Your Honor, I don't know if you want to

1  read the admonition to those watching virtually right now.

2          THE COURT:  Thank you.

3          MR. STERN:  Thank you.

4          THE COURT:  One moment.  I have to log in.

5          MR. STERN:  Of course.

6     (Pause in proceedings.)

7          THE COURT:  Good morning, ladies and gentlemen.  To

8  those joining, I would like to remind you that all counsel,

9  parties, witnesses, participants, and members of the public

10 are reminded that this is a formal proceeding and that they

11 should behave at all times as though they were present in the

12 courtroom.  The standing order of the San Antonio Division of

13 the Western District of Texas on remote access to court

14 proceedings remains in effect.

15         Photography, recording, or streaming of this

16 proceeding is strictly prohibited.

17         Though this proceeding is open to the public.

18 Technological restraints require that members of the general

19 public request access from the courtroom deputy to participate

20 remotely.  Those granted approval to participate remotely must

21 not forward the electronic link to any nonparticipating

22 colleagues or persons and must not post a link on any public

23 forum.

24         As with all proceedings, violations of these

25 instructions are subject to contempt proceedings accordingly.

TERRY SNYDER – CROSS

1    Please exercise proper courtroom decorum at all times.

2            And with that, we will resume with the trial and the

3    examination of the witness.

4            Mr. Stern?

5            MR. STERN:  Thank you, sir.

6                    CROSS-EXAMINATION (Continued)

7    BY MR. STERN:

8    Q.  Ranger Snyder, good morning.

9    A.  Good morning.

10   Q.  Do you understand you're still under oath?

11   A.  Yes, sir.

12   Q.  Thank you.

13       Ranger Snyder, if you recall, we left off yesterday

14   talking about a few of the interviews that the FBI conducted

15   in support of the rangers' investigation of Devin Kelley.

16       Do you recall that?

17   A.  Yes, sir.

18   Q.  I'd like to go back and briefly discuss one of those

19   interviews taken by the FBI of Jessika Lee Edwards.

20       If we can pull up Joint Exhibit 510 again.

21       If we look at the bottom half of that interview report, if

22   you recall, Ms. Edwards told the FBI that Kelley was obsessed

23   with church shootings and guns, and that with regard to the

24   church shooting in South Carolina, Kelley told Edwards, quote,

25   "I wish I had the nerve to do it."

1      Do you recall that?

2  A.  Yes, sir.

3  Q.  She also told the FBI that Kelley sent her pictures of

4  multiple guns he was building.

5      Do you recall that?

6  A.  Yes, sir.

7  Q.  Now, the Court asked if we can sort of create a time line

8  for when this occurred, and I represented that the church

9  shooting in South Carolina occurred 2015.

10      Do you recall that?

11  A.  That's correct.

12  Q.  I want to see if we can try to drill down the dates for

13  this a little bit more.  So let's look at the second page of

14  this exhibit, the very last line, if you can highlight that.

15      It reads, "Edwards last communicated with Kelley about

16  four months ago."

17      Do you see that?

18  A.  Yes, sir.

19  Q.  And so you would take it that she stopped the Facebook

20  communication about four months prior to the shooting?

21  A.  Yes.

22  Q.  Okay.  And if we look at the previous page, the last

23  paragraph that's highlighted.

24      "Edwards told Kelley to get help once she realized he was

25  completely obsessed with mass shootings.  Edwards then deleted

1  Kelley as a friend on Facebook."

2      Did I read that correctly?

3  A.  That's correct.

4  Q.  So it's fair to surmise, based on this document, that four

5  months prior to the shooting, Ms. Edwards thought Kelley was

6  so obsessed with mass shootings that she blocked him on

7  Facebook; correct?

8  A.  Edwards indicated that in this statement, yes.

9  Q.  Thank you.

10      Let's move on to the FBI interview of Valerie Rowe, Joint

11  Exhibit 511.

12      Ranger Snyder, will you read the first highlighted

13  portion?

14  A.  "The last time Rowe saw Kelley was in February 2012 when

15  she" last –– or "when she left the Holloman Air Force Base and

16  relocated to Florida, where her recently retired husband

17  obtained a new job."

18  Q.  I'll represent to you the parties have already stipulated

19  that Valerie Rowe was Edwards' supervisor in 2011.

20      And according to this document, she left Holloman Air

21  Force Base February 2012; is that correct?

22  A.  Correct.

23  Q.  Take a look at the next highlighted portion.

24      Can you read that portion, sir.

25  A.  "Approximately a year after Rowe left Holloman Air Force

TERRY SNYDER - CROSS

1  Base, she received a threatening Facebook message from Kelley
2  that stated, 'Hey, you stupid bitch.  You should have been put
3  in the ground a long time ago.  Better hope I don't ever see
4  you.  Can't face that piece of shit.'"
5  Q.  So according to Ms. Rowe, Devin Kelley sent her this
6  message after she had left the Air Force; correct?
7  A.  Correct.
8  Q.  And it doesn't say that she reported this to anyone at the
9  Air Force; correct?
10  A.  She did not indicate that, no, sir.
11  Q.  Can we look at the next highlighted portion.
12     This is from May 2017; correct?
13  A.  Yes, sir.
14  Q.  Will you read this portion aloud.
15  A.  "In May 2017, Rowe received a second Facebook message from
16  Kelley.  Rowe did not capture or save this message but
17  recalled it was longer than the first message and essentially
18  stated, 'You know you're lucky.  The only thing I regret is
19  not ending you when I had the chance.  I wish you'd take a
20  nice long dirt nap.'  Rowe stated Kelley would block her on
21  Facebook after sending her a message, which would not allow
22  her to block him."
23  Q.  Then the last highlighted portion.
24  A.  "Rowe did not pursue any restraining order against Kelley
25  because she did not want him to become aware of her address."

TERRY SNYDER - CROSS

1  Q.  So according to Ms. Rowe, Devin Kelley sent her

2  threatening Facebook messages, May 2017; correct?

3  A.  That's correct.

4  Q.  Ms. Edwards told the FBI that Mr. Kelley sent her

5  threatening messages on Facebook four months before the

6  shooting?

7  A.  Correct.

8  Q.  And that would put it around July 2017?

9  A.  That's correct.

10  Q.  And if you recall from the summary of the iCloud account

11  that was created by the Texas Rangers, it indicated that there

12  was evidence that Devin Kelley started planning the shooting

13  as early as July 2017; correct?

14  A.  According to that document, yes.

15  Q.  According to that document.

16      And that would be right around the same time Ms. Edwards

17  was contacted by Devin Kelley with those threatening messages?

18  A.  Yes.

19  Q.  And around the same time, Valerie Rowe was contacted

20  regarding those threatening messages?

21  A.  Correct.

22  Q.  Thank you.

23      Ranger Snyder, I'd like to transition a little bit and

24  talk about Devin Kelley's motivation to commit the mass

25  shooting.  Is that okay?

1   A.   Yes, sir.

2   Q.   Thank you.

3        If we can take a look at Joint Exhibit 593.  Thank you.

4        Ranger Snyder, this is the situation report?

5   A.   Correct.

6   Q.   What is that?

7   A.   It's an update report, basically summarizing our events,

8   to keep our chain of command informed of our investigative

9   findings as the day continues and moves forward.

10  Q.   So this document would be sent up to your supervisors?

11  A.   It's created by the on-scene supervisor by the information

12  provided to him up through the chain of command, yes.

13  Q.   So who would receive this report?

14  A.   The field-level supervisor would create it, and it would

15  go up the chain of command up to the chief and then director.

16  Q.   And it's fair to say that it would be based on the best

17  available evidence at the time?

18  A.   That's correct.

19  Q.   Thank you.

20       Let's take a look at the second page, the highlighted

21  portion.

22       Will you read the highlighted portion, sir.

23  A.   "Danielle Kelley stated she grew up in Sutherland Springs

24  area and has always attended the First Baptist Church in

25  Sutherland Springs.  Danielle was reportedly sexually

1  assaulted by her foster dad, Donald Brassfield, a white male,

2  date of birth, who is currently incarcerated in the Guadalupe

3  County Jail awaiting trial on aggravated sex assault of a

4  child on 11/27/2017.  It is suspected that Devin was resentful

5  of Danielle's mother, Michelle Shields, for her husband's

6  assault of Danielle."

7  Q.  So according to this document that was sent up through

8  your chain of command, it was suspected that Devin was

9  resentful of Danielle's mother, Michelle Shields, for her

10  husband's sexual abuse of Danielle; is that correct?

11  A.  According to this statement, yes.

12  Q.  Okay.  It also reads that Donald Brassfield, at the time,

13  was currently incarcerated?

14  A.  That's correct.

15  Q.  There's nothing in your investigative file that suggests

16  he was out on bail?

17  A.  No, sir.

18  Q.  In fact, Donald Brassfield was awaiting trial for

19  aggravated sexual assault?

20  A.  Correct.

21  Q.  The trial was scheduled for November 27th; is that

22  correct?

23  A.  Correct.

24  Q.  The same month as the shooting?

25  A.  Correct.

1  Q.  If we take a look at Joint Exhibit 599.

2      Ranger, what is this document?

3  A.  It's a supplemental report, Number 22, a supplemental

4  report created by Christopher -- Ranger Christopher Kindell,

5  Supplement 22 to the Ranger file that's there.  It's hard to

6  read the small print.

7  Q.  Is this an interview of Erin Brassfield?

8  A.  Let's see.  The supplement is -- conducted a telephone

9  interview of Erin Brassfield, yes, sir.

10  Q.  Thank you.

11      And do you know who Erin Brassfield is?

12  A.  I believe he's, like, the stepfather or --

13  Q.  That's okay.  We can pull up a highlighted portion.  I

14  don't want you to have to speculate.  I think we have it right

15  here.

16      Take a look at paragraph 22.2.  "Erin is the ex-wife of

17  Donald Curtis (Curt) Brassfield.  Curt is the biological

18  father of Danielle Lee Kelley, previously identified."

19      Did I read that correctly?

20  A.  That's correct, yes.

21  Q.  So we know Danielle was actually adopted by Michelle

22  Shields; correct?

23  A.  That's correct.

24  Q.  And Michelle Shields was married to Donald Curt

25  Brassfield?

TERRY SNYDER – CROSS

1  A.  Yes.

2  Q.  And then Erin Brassfield would be the ex-wife of Donald

3  Curt Brassfield.  Is that fair?

4  A.  According to the findings, yes, sir.

5  Q.  Thank you.

6      Take a look at the next highlighted portion.  I'm going to

7  ask you to read 22.4.  I know it's long.

8  A.  "Kelley contacted Erin via text message on October 31st,

9  2017, and requested that Erin call as soon as she could.  Erin

10  called Kelley on October 31st, 2017.

11      "Kelley stated he was at Michelle Lorene Brassfield

12  Shields' previously identified residence and discovered

13  photographs and videos of Curt engaged in sexual acts with

14  Danielle.  Kelley stated he discovered the items in a drawer.

15      "Kelley wanted Erin to meet with him on Sunday,

16  November 5th, 2017, between 9:00 a.m. and 9:30 a.m.  Kelley

17  requested that Erin not tell anyone about the images and

18  further asked Erin if she was recording the phone conversation

19  between the two.  Kelley informed Erin the images and videos

20  were at Kelley's residence."

21  Q.  Okay.  It's a pretty long paragraph, so let's try to break

22  that down a little bit.

23      October 31st, that's Halloween; correct?

24  A.  That's correct.

25  Q.  During the course of your investigation, did you come to

1  realize that the First Baptist Church conducts a festival on

2  the day of Halloween?

3  A.  Yes.

4  Q.  Is it fair if I call it "fall festival," you'll know what

5  I'm referring to?

6  A.  Yes, sir.

7  Q.  Okay.  And that was six days before the shooting?

8  A.  That's correct.

9  Q.  Did you come to learn that Devin and Danielle had attended

10 the fall festival?

11 A.  Yes.

12 Q.  And so on the same day of the fall festival, Devin Kelley

13 contacts Erin Brassfield and says that he found videos —

14 video and photographs depicting the sexual assault of his wife

15 at Michelle Shields' house; is that correct?

16 A.  That's correct.

17 Q.  Devin doesn't tell Erin Brassfield that he found the

18 photographs and videos years earlier; does he?

19 A.  No, sir.

20 Q.  He doesn't tell Ms. Brassfield that he burned the

21 photographs and videos years earlier?

22 A.  No, sir.

23 Q.  According to Ms. Brassfield, Devin asked if she was

24 recording the conversation?

25 A.  Correct.

TERRY SNYDER - CROSS

1  Q.  In your experience as a law enforcement officer, does that

2  sound like a question from a paranoid person?

3  A.  In today's time, I take everything as being recorded.  But

4  the document just states that Kelley asked if the conversation

5  had been recorded.  I don't know how he was feeling, really.

6  Q.  Fair enough.

7      But he did also say that he wanted to meet Ms. Brassfield

8  on Sunday, November 5th, 2017; correct?

9  A.  That's correct.

10 Q.  And that's the day of the shooting?

11 A.  Correct.

12 Q.  Let's turn to the next paragraph, 22.5 and 22.6.  Sir, if

13 you can read aloud paragraph 22.5.

14 A.  "Erin contacted Guadalupe County district attorney's

15 office and informed them regarding Kelley's discovery.  The

16 DA's office requested Erin inform Kelley that possessing or

17 copying the items was against the law and that Kelley needed

18 to turn the items in to the police or DA's office."

19 Q.  Okay.  So according to Ms. Brassfield, she contact Devin

20 and encouraged him to turn in the items?

21 A.  That's correct.

22 Q.  Kelley told Ms. Brassfield that he had removed the items

23 and wasn't going to release them to authorities?

24 A.  That's correct.

25 Q.  Can you read 22.6, please.

1   A.   "Erin again spoke with Kelley and encouraged him to turn

2   in the items.  Kelley stated he removed the items from his

3   residence and he did not plan to release the images or videos

4   to authorities.  Kelley stated he did not want his wife,

5   Danielle, to testify or speak with authorities."

6   Q.   So, again, that's where we learn that Mr. Kelley told Erin

7   Brassfield that he already removed the items?

8   A.   Correct.

9   Q.   And that he wasn't going to release them to authorities?

10  A.   Yes, sir.

11  Q.   And that he didn't want his wife to speak to the

12  authorities?

13  A.   Correct.

14  Q.   And that he didn't want her to testify; correct?

15  A.   Correct.

16  Q.   Take a look at paragraph 22.7.  Are you there, sir?

17  A.   Yes, sir.

18     "Kelley stated he was upset with Michelle due to Michelle

19  having the images and videos for many years and never saying

20  anything about possessing the items.  Kelley further stated

21  that Michelle informed him the investigation into the sexual

22  assault of his wife would not 'go anywhere.'"

23  Q.   So, again, according to Ms. Brassfield, Devin Kelley was

24  told by Michelle Shields that she didn't think the actual

25  investigation into the sexual assault of his wife would not go

1  anywhere?

2  A.  Correct.

3  Q.  Does this evidence support the situation report's finding

4  that it was suspected that Devin was resentful of Danielle's

5  mother, Michelle Shields, for her husband's — for the sexual

6  assault of his wife?

7  A.  It's supporting information related to what we were

8  informed, yes.

9  Q.  Paragraph 22.8, if you would, sir.

10  A.  "Kelley later denied finding the photographs and videos

11  when the authorities questioned him.  Erin described Kelley as

12  controlling.  Kelley's wife, Danielle, was subpoenaed to

13  testify against Curt later in the month of November 2017.

14      "Kelley stated he did not want Danielle to testify and

15  they would just pay the fine for not appearing in court.  Erin

16  stated Kelley began to act 'strange'" — in quotes, "strange,"

17  the word "strange" — "last week but did not describe his

18  actions."

19  Q.  Thank you, sir.

20      So, again, according to Ms. Brassfield, Devin Kelley

21  denied to the authorities that he found the photographs and

22  videos; correct?

23  A.  Correct.

24  Q.  And we'll talk about when the Cibolo police detectives

25  went to their property later.

TERRY SNYDER – CROSS

1    But looking at 22.9, we see that Ms. Brassfield describes

2  Devin Kelley as controlling; correct?

3  A.   Correct.

4  Q.   That he knew that Danielle was subpoenaed to testify

5  against Curt later that month?

6  A.   Correct.

7  Q.   And that Mr. Kelley stated that he did not want his wife

8  to testify; correct?

9  A.   Correct.

10  Q.   And that they would just take the fine for not appearing

11  in court?

12  A.   Yes, sir.

13  Q.   In fact, Ms. Brassfield stated that Devin Kelley began to

14  act strange the week prior to this interview; correct?

15  A.   Correct.

16  Q.   And this interview was conducted the day after the

17  shooting?

18  A.   Correct.

19  Q.   Thank you, sir.

20    Then, if we move to Joint Exhibit 603.

21    You know, before we do, Ranger Snyder, we've already

22  talked about — I'm sorry.  You've already spoken with

23  plaintiffs' counsel a little bit about when the Cibolo police

24  detectives went to the property of the Kelleys' on

25  November 1st, 2017?

TERRY SNYDER - CROSS

1   A.  Yes, sir.

2   Q.  And, again, this was -- the purpose of them going to the

3   property was to retrieve the photographs and video that

4   Mr. Kelley, or Devin Kelley, told Erin Brassfield he found on

5   October 31st?

6   A.  Yes.

7   Q.  Six days before the shooting?

8   A.  Yes, sir.

9   Q.  Again, he wasn't a suspect at the time?

10  A.  Correct.

11  Q.  And they were going because they felt they had evidence

12  that might help their investigation?

13  A.  Correct.

14  Q.  That he was a family member of one of the potential

15  victims, that being his wife?

16  A.  Yes, sir.

17          MR. STERN:  Will you play the video, Joint

18  Exhibit 603.

19      (Clip was played.)

20          MR. STERN:  Your Honor, I believe we might be able to

21  play it through a different source and be able to hear it

22  better.

23          THE COURT:  That's fine.

24          MR. STERN:  If we could take five minutes?

25          THE COURT:  Let's see if she can --

TERRY SNYDER - CROSS

```
1          MR. STERN:  If we can take a recess in place?
2          THE COURT:  Yeah, that's fine.
3     (Recess.)
4     (Clip was played.)
5          MR. STERN:  Thank you.
6  BY MR. STERN:
7  Q.  Ranger Snyder, this interaction occurred four days before
8  the shooting; correct?
9  A.  Correct.
10 Q.  And Devin Kelley talks about being pissed off numerous
11 times?
12 A.  He mentions it, yes.
13 Q.  He used the word "pissed" several times; correct?
14 A.  Yes, sir.
15 Q.  He talks about the prospect of his wife being a hostile
16 witness?
17 A.  He referred to her several times as that, yes.
18 Q.  And that, in fact, she wouldn't testify but rather would
19 take the fine?
20 A.  Correct.
21 Q.  The officer told Devin that he wasn't in trouble; correct?
22 A.  He did.
23 Q.  And, of course, Devin responded that he doesn't do
24 anything illegal?
25 A.  He did.
```

1   Q.   He also said, "We don't have no more photos;" correct?

2   A.   Yes.

3   Q.   He also told the detectives to go digging around Michelle

4   Shields' home?

5   A.   He did.

6   Q.   That if they wanted to go find potentially more videos and

7   photographs, to go dig around her home?

8   A.   He did.

9   Q.   Would you describe Devin as being angry during that

10  interaction?

11  A.   I wouldn't say angry.  I'd say agitated.  He mentions

12  several times that they're just tired of people showing up at

13  their gate.  I would say agitated, possibly.

14  Q.   He was certainly upset at their presence?

15  A.   Yes.

16  Q.   And the Cibolo Police Department thought the same thing;

17  correct?

18  A.   He did say he wasn't upset with them.  He wasn't bitching

19  at them, that he was just upset with the whole situation and

20  that Erin Brassfield needed to get her story straight.

21  Q.   Okay.  In fact, if we look at Joint Exhibit 571, this is a

22  note that the Cibolo Police Department made reflecting that

23  interaction; is that correct?

24  A.   That's correct.

25  Q.   Look at the highlighted portion.

1    "Both Michael and Devin appeared upset at our presence and

2  request to speak with Devin regarding this case."

3    Did I read that accurately?

4  A.  That's correct.

5  Q.  Thank you, sir.

6    After the shooting, the Texas Rangers interviewed Michael

7  Kelley, Rebecca Kelley, and Danielle Kelley, now Danielle

8  Smith?

9  A.  That's correct.

10  Q.  And that occurred the day of the shooting; correct?

11  A.  Yes, sir.

12  Q.  What was the importance of those interviews?

13  A.  It was to — I mean, there was a crime scene there that we

14  identified, that we learned through our investigation.  And it

15  was to go obtain as much information of what they knew about

16  Kelley's actions.

17  Q.  And you would expect them at that time to provide honest,

18  truthful statements; correct?

19  A.  Absolutely.

20  Q.  That they would try to help the law enforcement in any way

21  they could?

22  A.  Yes, sir.

23  Q.  Did you have any reason to suspect Devin Kelley's parents

24  or wife were not telling the truth through those interviews?

25  A.  We would expect the truth to come out then at that moment.

TERRY SNYDER – CROSS

1    But I would say this:  I mean, as a parent and as what

2  their son had just done unto their knowledge, previously

3  learned by the father, they would be in, somewhat, shock.

4  And, you know, I'm not going to say that I wouldn't be

5  surprised.

6  Q.  Sure.  They were excited in the moment?

7  A.  Sure.

8  Q.  And they uttered things in that moment; correct?

9  A.  Correct.

10  Q.  If we could take a look at a few portions of that

11  interview.

12    That interview was recorded; correct?

13  A.  Yes, sir.

14  Q.  If we could take a look at a few portions of that.  This

15  is Joint Exhibit 694, which has been synced with Joint

16  Exhibit 477, which is a transcript of the recorded interviews.

17    Start with A, please.

18    (Clip was played.)

19  BY MR. STERN:

20  Q.  Okay.  So according to this interview, when the Texas

21  Rangers asked Michael Kelley why his son might have committed

22  this heinous act, he immediately talked about the sexual abuse

23  of Danielle Kelley; correct?

24  A.  He provided a history of Danielle Kelley, yes.

25  Q.  Well, when he was asked why his son might have done it, he

TERRY SNYDER - CROSS

1   immediately talked about the history of Danielle Kelley's

2   sexual abuse?

3   A.  He did mention that.

4   Q.  He also talked about how the case was pending?

5   A.  That's correct.

6   Q.  He talked about how Devin Kelley was, quote, "very upset

7   about all of it"?

8   A.  Correct.

9   Q.  He talked about how Devin Kelley was, quote, "very

10  protective of his wife and family"?

11  A.  Correct.

12  Q.  And he talked about how Devin, of course, was aware of

13  what transpired between his wife Danielle and her mother?

14  A.  Correct.

15          MR. STERN:  Can we watch the second portion.

16          THE COURT:  One second, before you do that.

17  Ranger -- just that note -- put that back up.

18          I'm just kind of curious, Ranger --

19          You can stop the audio.

20          I'm just kind of curious.  This is the second time

21  now that DPS has done interviews with a woman cowering in the

22  corner and a man hovering next to the woman.

23          Is this normal investigation techniques?

24          THE WITNESS:  I'm not aware of the instances.  I

25  guess you're referencing this case itself, or --

TERRY SNYDER – CROSS

1          THE COURT:  So you saw when Danielle was being
2  interviewed yesterday, and now we see the mother here with the
3  father.  And it just seems, to me, odd that DPS would be
4  trying to do interviews of potential witnesses with a man
5  hovering over a woman who is cowering in the corner.
6          Doesn't that tell you, as a law enforcement officer,
7  that perhaps something strange is here?
8          THE WITNESS:  You know, Judge, according to –– these
9  interview rooms, I'm not sure how they're set up or how they
10 positioned them in these rooms at the time of ––
11         THE COURT:  You wouldn't do it one at a time?
12         THE WITNESS:  That's a discretion made by the ones
13 doing the interview.  So I know each time I participated in an
14 interview with them at the residence, we were all together
15 there.
16         You know, common practice is individual, one at a
17 time.  Due to the circumstances of this being both parents, I
18 guess those rangers made the decision to conduct the interview
19 with both of them being present.
20         THE COURT:  It just strikes me as body language of
21 the women cowering in the corner would tell law enforcement
22 officers that something odd is here.
23         THE WITNESS:  Sure.
24         THE COURT:  You can continue.
25         MR. STERN:  Let's go to the second clip, please.

TERRY SNYDER – CROSS

1      (Clip was played.)

2  BY MR. STERN:

3  Q.  We've already seen the video of the detectives going to

4  the Kelley property on November 1st; correct?

5  A.  Yes, sir.

6  Q.  So in response to that, Mrs. Kelley tells the rangers that

7  Devin was –– quote, "was so upset he was crying" as a result

8  of that interaction?

9  A.  She stated that in her interview, yes.

10 Q.  Correct.  So she provided that testimony herself; correct?

11 A.  Yes.

12 Q.  So she spoke up during the interview when she felt that

13 she had something to share?

14 A.  That's correct.

15 Q.  And you felt Mr. Kelley was in the room to comfort her?

16 A.  I just see that they're both together.  What the reason

17 being, I don't know.  I can't for –– say that, I mean.

18 Q.  Sure.  But they both provided testimony during the course

19 of that interview; correct?

20 A.  Correct.

21 Q.  You found her to be truthful and honest during that

22 interview?

23 A.  I feel they exaggerated a little, yes.

24 Q.  But they just learned their son died; correct?

25 A.  Correct.

1  Q.  They're obviously very distraught?

2  A.  Correct.  They then make a note that she indicated that he

3  was upset to the point he was crying.  But the video we

4  watched, obviously, he wasn't crying.  So that's why I say the

5  exaggeration to some point.

6  Q.  Right.  But could it be that he was crying afterwards and

7  he was very upset, emotional —

8          THE COURT:  That's asking for speculation.

9          MR. LeGRAND:  That calls for speculation.

10  BY MR. STERN:

11  Q.  But according to her — according to his mother, he was

12  upset and he was crying?

13  A.  She did state that, yes.

14  Q.  Thank you.

15      Can we watch the next clip, please.

16      (Clip was played.)

17      So, again, Mrs. Kelley provided testimony during that

18  interview; correct?

19  A.  Correct.

20  Q.  She told the rangers that Devin had been having a lot of

21  anxiety?

22  A.  Correct.

23  Q.  That according to her, he had been recently — that she

24  had taken Devin to a psychiatrist a couple of weeks earlier?

25  A.  Correct.

TERRY SNYDER – CROSS

1  Q.  And that he was taking medication as a result?

2  A.  Correct.

3  Q.  Michael Kelley also talked about how it would be very

4  traumatic for both Devin and Danielle if she was made to

5  testify during the trial of Curt Brassfield?

6  A.  He stated that, yes.

7  Q.  And that Michael Kelley, in fact, told Devin that he

8  didn't really need to be there?

9  A.  Yes.

10  Q.  That it would be so emotional for him?

11  A.  Correct.

12          MR. STERN:  Let's watch the next clip, please.

13      (Clip was played.)

14  BY MR. STERN:

15  Q.  So, again, according to Mr. Kelley, he asked Danielle

16  Kelley whether or not they — "they" being Danielle and Devin

17  Kelley — got into a fight the night before, and she said no?

18  A.  Correct.

19  Q.  She said, in fact, everything was great?

20  A.  Correct.

21  Q.  She never told the Texas Rangers that she had asked for a

22  divorce the night before?

23          MR. LeGRAND:  Your Honor, we object.  The clip speaks

24  for itself.

25          THE COURT:  Yeah.  I remember all this.

TERRY SNYDER - CROSS

1  BY MR. STERN:

2  Q.  Throughout the course of your investigation, had you ever

3  come to learn that Danielle Kelley had asked for a divorce the

4  night before the shooting?

5  A.  No, sir.

6  Q.  Thank you.

7     Watch the next clip, please.

8     (Clip was played.)

9     So, again, during this interview, Mr. Kelley is

10  specifically asked whether Devin Kelley could access his

11  firearms; correct?

12  A.  Correct.

13  Q.  In fact, he's asked could he access them, or are they

14  locked up?

15  A.  Correct.

16  Q.  And Michael Kelley responds that Devin could access his

17  firearms?

18  A.  Correct.

19  Q.  In fact, that he checked to make sure that they were still

20  accounted for?

21  A.  Correct.

22  Q.  Did he ever later change or modify that answer?

23  A.  Not that I'm aware.

24  Q.  So to your knowledge, did he ever respond by saying, "Oh,

25  when I said that my son could access the firearms, I meant if

TERRY SNYDER - CROSS

1   he could find the key that I kept hidden"?

2   A.  No, sir.

3   Q.  He never said, "If he could break into the wardrobe or any

4   cabinet that I kept my firearms in"?

5   A.  No, sir.

6        MR. STERN:  Let's go to the next clip, please.

7     (Clip was played.)

8   BY MR. STERN:

9   Q.  So, again, this is Mrs. Kelley speaking up during the

10  interview?

11  A.  Correct.

12  Q.  Telling the rangers that Devin Kelley put them through

13  hell?

14  A.  Correct.

15  Q.  Thank you.

16    Next clip.

17    (Clip was played.)

18    Okay.  So this is Michael Kelley talking about Devin

19  Kelley's run-ins with the law while he was in the Air Force;

20  correct?

21  A.  Correct.

22  Q.  And that he suggests that Devin Kelley's punishment in the

23  Air Force was the same thing as if he got caught smoking pot?

24  A.  He compared that, yes.  He stated that.

25  Q.  In fact, he talked about how Devin's first wife was,

1  quote, "Just playing him"?

2  A.  Correct.

3  Q.  That he believed his son took the fall for the baby

4  getting a broken clavicle?

5  A.  Correct.

6          MR. STERN:  Let's watch the next clip, please.

7      (Clip was played.)

8  BY MR. STERN:

9  Q.  Ranger Snyder, was Danielle Kelley very distraught during

10  the start of this interview?

11  A.  Seemed upset, yes.

12  Q.  She'd just learned that her husband was dead?

13  A.  Correct.

14  Q.  And that he'd committed a heinous act?

15  A.  Correct.

16  Q.  Michael Kelley put his arm around her to try to comfort

17  her?

18  A.  Yes, sir.

19  Q.  In fact, she told the rangers that it was a normal day

20  when they first woke up; correct?

21  A.  She described Kelley as being happy, going on about

22  himself and...

23  Q.  That's correct.  She actually described Devin as happy and

24  was very loving?

25  A.  Correct.

TERRY SNYDER — CROSS

1  Q.  She also talked about Devin being very adamant that she

2  was not allowed to touch the black box where he kept his

3  firearm, ammunition, and other gear?

4  A.  Correct.

5  Q.  According to Danielle, Devin left a voice mail for her

6  telling her that he loved her; correct?

7  A.  She stated that, yes.

8  Q.  And that he wasn't right in the head?

9  A.  Yes.

10  Q.  She didn't say anything else?

11  A.  No, sir.

12  Q.  Devin left a message saying he loved her, he wasn't right

13  in the head?

14  A.  That's correct.

15  Q.  Again, no mention of a divorce?

16  A.  No, sir.

17  Q.  No mention of it being Danielle's fault?

18  A.  No, sir.

19          MR. STERN:  The next clip, please.

20      (Clip was played.)

21  BY MR. STERN:

22  Q.  Okay.  So here, when Danielle Kelley is asked why she

23  thinks Devin may have committed this heinous act, she

24  immediately says, quote, "What I went through as a kid."

25  Correct?

1   A.  Correct.

2   Q.  She talks about the abuse she suffered?

3   A.  She expressed that –– or she explained she was abused,

4   yes, as a child.

5   Q.  And when she's asked "So you think that's why Devin may

6   have gone down there was due to your childhood history,"

7   Danielle responds, quote, "I'm sure."

8   A.  Correct.

9   Q.  She followed up with, quote, "Devin was very upset"?

10  A.  Correct.

11  Q.  She talked about the pending court case?

12  A.  Yes.

13  Q.  And she knew she had to testify on November 27th against

14  her adoptive father?

15  A.  Yes.

16  Q.  She mentioned the photographs and how Devin was upset

17  about the sheriffs coming over to the house?

18  A.  Yes.

19  Q.  In talking about Curt Brassfield, she said, "He's in jail

20  right now"?

21  A.  Yes.

22  Q.  So at least based on her belief, Curtis Brassfield was

23  still in prison?

24  A.  She stated that she believed he was.

25          MR. STERN:  The next video.

1        (Clip was played.)

2   BY MR. STERN:

3   Q.  So, again, Danielle Kelley told the rangers that Devin

4   said, quote, "It's a fucked-up situation"?

5   A.  Correct.

6   Q.  He also said that, quote, "People don't care"?

7   A.  Correct.

8   Q.  And that people are heartless?

9   A.  Correct.

10  Q.  Did the rangers come to learn what Danielle meant by, "If

11  people believed me when I said something, two girls wouldn't

12  have gotten hurt"?

13  A.  No, sir.

14  Q.  Did you come to learn that Curt Brassfield had sexually

15  assaulted other young girls?

16  A.  It was mentioned in the video of the officers that

17  approached him from the DA's office.

18  Q.  Did the rangers learn that Danielle thought that if people

19  had believed her when she was younger, those two girls

20  wouldn't have been victims?

21  A.  I lost track on the first part of that question.

22  Q.  Certainly.  Danielle is mentioning if people believed her

23  when I said something, two girls wouldn't have gotten hurt.

24       Is it -- during the course of the Texas Rangers'

25  investigation, they had come to learn that Curtis Brassfield

1   had sexually assaulted other young girls; correct?

2   A.  We learned that by the Cibolo Police Department or the DA

3   investigator's investigation, yes.  We did not investigate

4   that case or were active in that case.  We just obtained

5   information that was already documented.

6   Q.  But according to that, there were additional victims of

7   Curtis Brassfield?

8   A.  Correct.

9   Q.  Danielle also told the Texas Rangers that Devin, quote,

10  "had a justification to be angry at the situation"?

11  A.  She stated that, yes.

12  Q.  Thank you.

13      Watch the next clip.

14      (Clip was played.)

15      So, again, Danielle Kelley was specifically asked whether

16  there were any marital problems; correct?

17  A.  That's correct.

18  Q.  And she mentioned Devin Kelley cheating on her?

19  A.  She did.

20  Q.  That they had worked it out?

21  A.  She indicated that, yes.

22  Q.  And that it was her belief that Devin and was a really

23  good dad and a very good husband?

24  A.  She stated that, yes.

25  Q.  During this time, Michael Kelley is just scrolling through

TERRY SNYDER - CROSS

1  his phone; correct?

2  A.  Correct.

3         MR. STERN:  Go to the next video.

4     (Clip was played.)

5  BY MR. STERN:

6  Q.  So, again, when Danielle Kelley is asked whether Devin

7  blamed Danielle's mother, Michelle Shields, Danielle responds,

8  "He blamed a lot of people for it."

9  A.  She stated that, yes.

10        MR. STERN:  Please.

11    (Clip was played.)

12 BY MR. STERN:

13 Q.  So according to Danielle, it was Devin's idea to go to the

14 fall festival; correct?

15 A.  According to Danielle, yes.

16 Q.  And the fall festival, if you recall, was on Halloween?

17 A.  That's correct.

18 Q.  That's the same day Devin contacts Erin Brassfield and

19 says that he found photographs and videos depicting the sexual

20 abuse of his wife at Michelle Shields' home?

21 A.  That's correct.

22 Q.  Danielle also says that during the fall festival, Devin

23 was real quiet?

24 A.  Correct.

25 Q.  Like something was on his mind?

1    A.   That's how she described it, yes.

2    Q.   During the course of your investigation, you interviewed

3    Pastor Frank Pomeroy; correct?

4    A.   That's correct.

5    Q.   This interview occurred about one month after the

6    shooting?

7    A.   Yes, sir.

8    Q.   What was the purpose of that interview?

9    A.   Just to gain any history that he knew about Devin and

10   Danielle.

11   Q.   Did you find the pastor to be truthful and honest?

12   A.   I felt he was, yes.

13          MR. STERN:  I would like to play just a few clips of

14   that interview, please, if you could start it.

15       I'm sorry.  That's Joint Exhibit 582.

16       (Clip was played.)

17   BY MR. STERN:

18   Q.   So Pastor Pomeroy told you that upon first meeting Devin,

19   he knew that Devin had, quote, "issues"?

20   A.   Yes.  He could feel that, or he had that kind of feeling,

21   yes.

22   Q.   In fact, he called it "little man's disease"?

23   A.   That's how he described it, yes, sir.

24   Q.   And that when Devin would come to the church on rare

25   occasions, he would make snide remarks about how he was an

TERRY SNYDER - CROSS

1  atheist?

2  A.  Correct.

3  Q.  About how God was not real?

4  A.  Correct.

5  Q.  He found Kelley to be abrasive?

6  A.  Yes.

7  Q.  And how he thought Devin acted as if the world revolved

8  around him?

9  A.  Correct.

10         MR. STERN:  Play the next one.

11     (Clip was played.)

12  BY MR. STERN:

13  Q.  So, again, according to Pastor Pomeroy, on the rare

14  occasions when Danielle and Devin attended the church, they

15  would sit -- at least Devin would sit in the back and not

16  participate?

17  A.  Correct.

18  Q.  And how Kelley had animosity towards the church?

19  A.  Correct.

20         MR. STERN:  Next clip, please.

21     (Clip was played.)

22  BY MR. STERN:

23  Q.  So, again, according to Pastor Pomeroy, Danielle Kelley

24  had a, quote, "incredible propensity to lie," correct?

25  A.  He stated that, yes.

TERRY SNYDER – CROSS

1  Q.  In fact, he also stated that she had an incredible

2  propensity to tell stories?

3  A.  Correct.

4  Q.  He also told you that Danielle didn't come to him for

5  guidance?

6  A.  He did.

7  Q.  That was — one of the reasons may have been that she was

8  concerned that the pastor may not believe her?

9  A.  Correct.

10  Q.  Is that consistent with her statement to the Texas Rangers

11  when she said, "If people believed me when I said something,

12  two girls would not have gotten hurt"?

13  A.  She stated that, yes.

14  Q.  She was concerned that people would not believe her?

15  A.  Correct.

16         MR. STERN:  Next clip.

17     (Clip was played.)

18  BY MR. STERN:

19  Q.  Okay.  So according to Pastor Pomeroy, Bryan Holcombe was

20  leading the sermon on that day rather than him?

21  A.  Correct.

22  Q.  He thought Devin Kelley may have taken out the pulpit

23  first?

24  A.  That was his thought or his assumption, yes.

25  Q.  So he didn't suggest that Devin Kelley had tried to take

1  out Michelle Shields first?

2  A.  He did not mention that, no.

3       MR. STERN:  Can we go to the last clip, please.

4     (Clip was played.)

5  BY MR. STERN:

6  Q.  Pastor Pomeroy told you that they had active shooter

7  training?

8  A.  He indicated that, yes.

9  Q.  That they would never dream of someone shooting through

10  the walls?

11  A.  He stated that.

12  Q.  That — he told you that it was cowardly to shoot women

13  and children?

14  A.  Correct.

15  Q.  But particularly cowardly to shoot through the walls?

16  A.  He stated that, yes.

17  Q.  And, in fact, it would never cross his mind that someone

18  would shoot through the walls?

19  A.  Correct.

20  Q.  He said, as a result, he thought Devin Kelley was, quote,

21  "ate up with darkness"?

22  A.  He did state that, yes.

23  Q.  I'd like to continue with that theme of Devin Kelley being

24  ate up with darkness by showing you a few more exhibits, if

25  that's okay.

TERRY SNYDER – CROSS

1    A.  Sure.

2          THE COURT:  Before you move to that, does the record

3    have any indication of when the pastor and Devin Kelley first

4    met?

5          MR. STERN:  I'll have to get back to you with an

6    exact time.  I know —

7          THE COURT:  I'm not looking for an exact time, just

8    the general year would be fine.

9          MR. STERN:  I'd prefer to get back to you with an

10   answer on that.

11         THE COURT:  Thank you.

12         MR. STERN:  Thank you, your Honor.

13   BY MR. STERN:

14   Q.  If we could turn to Joint Exhibit 742.

15       Take a look at the synopsis.  What is this document

16   reflecting?

17   A.  This is Supplemental Report Number 10 created by Ranger

18   Billy Mims.

19       Read the synopsis?

20   Q.  If you could read it to yourself.

21       Who are the Texas Rangers interviewing?

22   A.  Ranger Billy Mims interviews with Manuel — I'll spell the

23   last name; I don't know the pronunciation — it's

24   P-A-N-I-A-G-U-A, and Michael Swanson.  And this occurred on

25   November the 9th, 2017.

1  Q.  Okay if I try to pronounce it?  Paniagua?

2  A.  Paniagua.  I'll agree with that.

3  Q.  Paniagua?  Paniagua, I'll try.

4  A.  Sure.

5  Q.  Thank you.  Let's take a look at paragraph 10.14.  If

6  you'll read that aloud, please, sir.

7  A.  "Swanson stated in hindsight he could see 'little things'

8  in Devin's personality that made him not surprised Devin

9  committed the shooting.  Swanson stated he was aware of Devin

10  having 'issues' with his wife (Danielle Kelley) side of the

11  family as related to her pending criminal court case with her

12  father in Guadalupe County."

13  Q.  Again, based on this interview, Devin Kelley was even

14  talking to his own colleagues about the upcoming criminal

15  case; correct?

16  A.  Correct.

17  Q.  And that he had issues with his wife's family as it

18  related to that criminal court case?

19  A.  Correct.

20  Q.  He also talks about how he could see little things in

21  Devin's personality that made him not surprised that Devin

22  would commit the shooting?

23  A.  Swanson indicated that, yes.

24  Q.  Thank you.

25     If we could turn to the next highlighted paragraph.

1      Read aloud, sir.

2  A.  "Swanson stated he suffers from PTSD and that he takes

3  medications prescribed to him.  Swanson also stated Devin had

4  recently begun taking the same medication that Swanson takes,

5  clonazepam, and further added that he was aware of Devin

6  taking more of the meds than prescribed, stating Devin

7  admitted to him on 11/4/2017 that he had taken three times

8  what was prescribed to him due to a headache Devin had on that

9  date."

10 Q.  So, again, according to Kelley's coworker, he knew that

11 Devin had recently started taking clonazepam?

12 A.  Correct.

13 Q.  And had that the coworker knew that Kelley was taking more

14 than what was prescribed?

15 A.  Correct.

16 Q.  In fact, November 4th — which is the day before the

17 shooting; correct?

18 A.  Yes, sir.

19 Q.  So the day before the shooting, Kelley had taken three

20 times what was prescribed to him?

21 A.  Correct.

22 Q.  Let's take a look at 10.21.

23      Read aloud, sir.

24 A.  "Swanson stated that after the Las Vegas mass shooting,

25 Devin stated something to the effect of 'if you're going to do

1  it, do it big.'  Swanson further stated that Devin described

2  himself as 'homicidal' and 'suicidal.'"

3  Q.  So according to Devin's colleagues, Devin described

4  himself as homicidal and suicidal?

5  A.  Correct.

6  Q.  And that after the Las Vegas massacre, he stated, "If

7  you're going to do it, do it big"?

8  A.  Correct.

9  Q.  Are you aware that the Las Vegas shooting occurred in

10  October 2017?

11  A.  I couldn't recall the date, but I'll agree with you.

12  Q.  If we can we take a look at Joint Exhibit 543.

13      Ranger, do you know what this document is?

14  A.  It's a sitrep report created by, it appears, the criminal

15  investigation division from the FBI.

16  Q.  Yes.  So this is the FBI in further assistance of your

17  investigation?

18  A.  Correct.

19  Q.  And "sitrep," would that mean situation report?

20  A.  That's correct.

21  Q.  Take a look at the top of page 2 of this document.  Can

22  you read the highlighted portion, the first bullet point.

23  A.  "Numerous Facebook posts by Kelley provided relevant

24  information, including an indication he owned numerous guns, a

25  history of drug use, an interest in mass shootings, and a

1  reference to Guy Fawkes Day, November 5th, and suicidal

2  tendencies."

3  Q.  Is this bullet point consistent with the Rangers'

4  investigation of Kelley?

5  A.  Correct.

6  Q.  The next bullet point, please.

7  A.  "Around 2012, Facebook posts indicate a shift in Kelley's

8  ideology from devout Christianity to atheism."

9  Q.  Is that consistent with Pastor Pomeroy's statement about

10  Kelley making snide remarks about his atheism?

11  A.  Correct.

12  Q.  And about how God was not real?

13  A.  Correct.

14  Q.  Let's turn to the section that reads "Social Media

15  Exploitation."

16      I'm sorry, sir.  I'm going to have to ask you to keep

17  reading aloud please.  The highlighted portion.

18  A.  "A preliminary review of Kelley's Facebook account

19  revealed direct messages dated over a period of time between

20  November 4, 2017, and November 5th, 2017, with a Facebook

21  account identified as —— who was identified as Kelley's

22  sister.

23      "The messages include claims from the user of Kelley's

24  account indicating possible mental health issues.  Of

25  noteworthy interest was a message from —— asking Kelley if he

1   'was able to see a therapist.'  Prior to this message, the

2   user of Kelley's account characterized his way of thinking as

3   being 'unusual' and 'irrational.'

4        "The user of Kelley's account also claimed that he must

5   'hide among the sheep' and was worried about being 'hunted and

6   chained down.'"

7   Q.  The Texas Rangers obtained the Facebook messages that led

8   to this paragraph; correct?

9   A.  That's correct.

10             MR. STERN:  I'd like to take a look at those

11  documents.  If we could actually pull up Joint Exhibit 501-46,

12  please.

13  BY MR. STERN:

14  Q.  Again, if you look at the highlighted portion, this is

15  where L.R., which is Devin Kelley's sister, writes, "Were you

16  ever able to see a therapist?  I'm sorry you're struggling so

17  much.  I wish there was a way you could let in your feelings

18  and process them slowly and then slowly start to wear less of

19  a mask."

20       Did I read that correctly?

21  A.  That's correct.

22  Q.  There are two messages from Devin Kelley to his sister

23  right before that that leads to her response; correct?

24  A.  That's correct.

25  Q.  And this is 2017-11-05; is that correct?

1  A.  Yes, sir.

2  Q.  November 5th, 2017?

3  A.  Yes, sir.

4  Q.  I'm not great as converting UTC to central time, but is it

5  fair to suggest these would have been sent the night before

6  the shooting?

7  A.  Correct.

8  Q.  If I could have you read the first of Devin Kelley's

9  messages to his sister, I guess the first being the bottom

10  one.

11  A.  The very bottom?

12  Q.  Yeah.  If we could do it timewise, so I think the first

13  one is at 12:5:22 UTC.

14  A.  "Doing well.  LOL.  I fake everything because I am far

15  from doing well.  The more I fake, the more isolated I become.

16  It's become my way to survive.  I've learned the more I blend

17  in by pretending I have emotions or even a personality, that

18  people don't catch on that I am simply — I simply am not

19  there, a shell of a person.  I think some people are catching

20  on, though, which isn't good.  I'm more comfortable around

21  people with my mask on."

22  Q.  Devin Kelley told his sister the night before the shooting

23  that he's more comfortable around people with his mask on?

24  A.  Right.

25  Q.  How he's becoming more isolated?

TERRY SNYDER – CROSS

1  A.  Correct.

2  Q.  That he's blending into his surroundings?

3  A.  Correct.

4  Q.  And that he was worried that people were catching on?

5  A.  Correct.

6  Q.  That he was a shell of a person?

7  A.  Correct.

8  Q.  Read the next one, please.

9  A.  "My unusual and irrational thinking, I'm afraid, has

10 plagued my mind constantly.  I don't know if a fake life is

11 worth living.  If I was truly free to be myself, they would

12 hunt me down and chain me.  So the only way is to hide among

13 the sheep, but it only" —

14 Q.  "Propitiates the problem"?

15 A.  — "propitiates the problem."

16 Q.  Thank you.

17     So, again, the night before the shooting, Devin Kelley

18 messages his sister and talks about his unusual and irrational

19 thinking?

20 A.  That's correct.

21 Q.  How it plagues his mind constantly?

22 A.  Correct.

23 Q.  How he doesn't know if a fake life is worth living?

24 A.  Correct.

25 Q.  And that if he was truly free to be himself, he would be

1  hunted down and chained?

2  A.  Correct.

3  Q.  And that the only way is to hide among the "sheeple"?

4  A.  Correct.

5  Q.  But it only "propitiates the problem"?

6  A.  Correct.

7  Q.  I would like to return to the FBI report, please.  Let's

8  go to the paragraph where we left off.

9      October 28th, this is the first message — I'm sorry.  The

10  first paragraph is from October 28th, 2017; is that correct?

11  A.  Correct.

12  Q.  The same date that Devin Kelley goes to Hill Country to

13  try to obtain two 100-round ammunition magazines?

14  A.  Yes, sir.

15  Q.  He writes iCloud notes to himself in preparation for the

16  shooting, if you recall from yesterday's testimony?

17  A.  I remember the notes that we looked over and discussed.

18  They were notes preparing ammunition, different things with

19  vehicle, and concealing that stuff, yes.

20  Q.  Fair enough, sir.

21      "On October 28th, 2017, Kelley's associated Facebook

22  account posted a message stating, 'Remember, remember the

23  5th of November,' a likely reference to Guy Fawkes Day."

24      Did I read that correctly?

25  A.  That's correct, sir.

1  Q.  In fact, the mass shooting did occur happen on the 5th of

2  November?

3  A.  It did.

4  Q.  Can I ask you to read the second paragraph, please.

5  A.  "Kelley posted malicious and potentially violent messages

6  regarding towards his wife's family.  On May 2nd, 2017, one of

7  his associated Facebook accounts posted, 'All I know is if any

8  of my wife's family are going to heaven, I def don't want to

9  spend eternity with them.'  And 'I am an atheist, and they are

10  ignorant, self-righteous Christians, or so they claim in

11  public.  But behind closed doors, it's drug addiction and

12  domestic violence.  My wife was the right person to marry, but

13  the rest of them could get shot in the face and I'd laugh.'"

14  Q.  So again in this message, he talks about being an atheist?

15  A.  He does.

16  Q.  He talks about Danielle's family being "ignorant,

17  self-righteous Christians, or so they claim in public"?

18  A.  Correct.

19  Q.  But how when they're "behind closed doors, it's drug

20  addiction and domestic violence"?

21  A.  Correct.

22  Q.  How Danielle was the "right person to marry, but the rest

23  of them could get shot in the face and I'd laugh"?

24  A.  Correct.

25  Q.  If we could read the next paragraph.  Read it aloud, sir.

1  A.  "Kelley made numerous Facebook posts displaying opinions

2  on mass shooters and serial killers.  On March 21st, 2017, at

3  1807 UTC, associated Facebook account posted, 'You learn to

4  shoot by doing it.  A lot of the mass shooters are impossible

5  to detect.  I'm pretty sure they don't go around acting crazy,

6  screaming to the world, but are very careful, just like serial

7  killers.  So they pass psych evals anyway.'"

8  Q.  We can stop there.  That's one of the posts.  Thank you.

9       So Mr. Kelley, in this post, talks about "mass shooters

10 being impossible to detect"?

11 A.  Correct.

12 Q.  How "they don't go around acting crazy"?

13 A.  Correct.

14 Q.  Don't go around "screaming to the world but are very

15 careful"?

16 A.  Correct.

17 Q.  "Just like serial killers"?

18 A.  Correct.

19 Q.  In fact, he talked about them passing psych evals?

20 A.  Correct.

21 Q.  Next post, if you would continue.  One last one, sir,

22 starting on 11/19.

23 A.  Continue with this one?

24 Q.  Please.

25 A.  "On 11/19/2016 at 3:10 UTC, one of his associated Facebook

1  accounts posted, 'Mass murderers don't do it because of video

2  games.  They do it because they are tired of the fucking

3  bullshit in the rigged system and the hate that breeds in all

4  90 percent of humans.  And it's time for payback.  Most of

5  them anyway.  Serial killers do it because they are addicted

6  to the rush of killing and" getting — "and get bored with

7  killing animals.'"

8  Q.  So, again, in this post, Devin Kelley talks about mass

9  murderers doing it because of the "fucking bullshit in the

10 rigged system"?

11 A.  Correct.

12 Q.  And the "hate that breeds in 90 percent of humans"?

13 A.  Correct.

14 Q.  He says "time for payback"?

15 A.  Correct.

16 Q.  And that "serial killers do it because they are addicted

17 to the rush of killing"?

18 A.  Correct.

19 Q.  Because they "get bored killing animals"?

20 A.  Correct.

21 Q.  In fact, Devin Kelley did become a mass murderer; correct?

22 A.  Correct.

23 Q.  In your experience, are criminals who are willing to die

24 difficult to deter?

25 A.  In my experience, are they?

1   Q.  Difficult to deter?

2   A.  Correct.

3   Q.  And has it been your experience as a Texas Ranger and a

4   law enforcement officer that convicted felons are able to

5   obtain firearms in Texas?

6   A.  That's correct.

7   Q.  Thank you.

8          MR. STERN:  Pass the witness.

9          THE COURT:  Anything else?

10         MR. LeGRAND:  Yes, Your Honor.

11                   REDIRECT EXAMINATION

12  BY MR. LeGRAND:

13  Q.  Did your Texas — the question Mr. Stern just asked you,

14  did your Texas Ranger investigation, in its entirety, ever

15  find any weapons that Devin Kelley possessed or owned at the

16  time of this shooting that came from any illegitimate place or

17  any place that criminals go to buy guns?

18  A.  No, sir.

19  Q.  Thank you, sir.

20     And referring back, Mr. Stern just referred to JEX 543,

21  the FBI sitrep.

22     Do you recall that?

23  A.  Yes, sir.

24  Q.  And you went through pretty much the whole sitrep with

25  Mr. Stern; correct?

TERRY SNYDER - REDIRECT

1  A.  Yes, sir.

2  Q.  In that situation report, did you find or see anything

3  from the FBI that they determined that at the time of this

4  shooting that Mr. Kelley owned or possessed any firearms that

5  had not gone through an FBI background check before Mr. Kelley

6  received them?

7  A.  No, sir.

8  Q.  Now, Mr. Stern played for you the clip at the gate.

9     Do you recall that, the video at the gate?

10 A.  Yes, sir.

11 Q.  And he pointed out that Mr. Kelley appeared angry?

12 A.  Yes, sir.

13 Q.  But Mr. Kelley also padded his side, as we showed

14 yesterday, and claimed that he had a gun too, T-O-O; correct?

15 A.  Correct.

16 Q.  So this angry individual that was talking to these

17 sheriff's deputies from Cibolo, he also pointed out that he

18 had a gun and that he didn't like police; correct?

19     MR. STERN:  Objection.  Asked and answered.  This

20 line of questioning has already been exhausted.

21     THE COURT:  That's overruled.

22     Go ahead.

23     THE WITNESS:  Correct.

24 BY MR. LeGRAND:

25 Q.  Now, when those officers went out there, Mr. Stern pointed

1  out that they were going out there to talk to a witness;

2  correct?

3  A.  Yes, sir.

4  Q.  But they also knew from the district attorney that they

5  were going out there to talk to a witness that might be in

6  possession of material evidence to a crime; correct?

7  A.  That's correct.

8  Q.  Okay.  Now, with reference to Devin Kelley and those

9  pictures and this whole situation that Mr. Stern — and with

10  all due respect to Mr. Stern, spent quite a bit of time on

11  this Brassfield situation; correct?

12  A.  Yes, sir.

13  Q.  Okay.  Is it your experience — well, have you had

14  experience as a Texas Ranger with domestic abuse crimes?

15  A.  Yes.

16  Q.  Is it your — and we know from your investigation of the

17  history of Devin Kelley is that he was convicted back in the

18  Air Force of a domestic abuse crime; correct?

19  A.  Correct.

20  Q.  Is it your experience as a Texas Ranger that domestic

21  abusers like Mr. Kelley want to keep witnesses that they're

22  aware of to their situation under their control?

23  A.  The majority of the time, yes.

24  Q.  And did Mr. Stern point out to you on several occasions as

25  to how controlling Mr. Kelley was?

1  A.  Correct.

2  Q.  And one of the things that —— the Danielle Kelley

3  interview that Mr. Stern played for you —— do you recall that?

4  —— the video of it?

5  A.  The interview?

6  Q.  Of Danielle Kelley ——

7  A.  Yes.

8  Q.  —— by the Texas Rangers.

9     He played that for you; correct?

10 A.  Yes, sir.

11 Q.  And he also played for you the video of Mr. Kelley in the

12 room with his wife in an interview; correct?

13 A.  Yes, sir.

14 Q.  Do you recall when the judge asked you why Mr. Kelley was

15 in there with his wife?

16 A.  Yes.

17 Q.  Okay.  Well, I want to ask the same question about

18 Danielle Kelley.

19    Do you know why Mr. Kelley was in there with Danielle

20 Kelley?

21 A.  I was not privy to that.  It's an interview, and it was

22 the way those two rangers that conducted the interview did the

23 interview at the time.

24 Q.  And I just want to make sure the record is clear.

25    In both of those interviews, both Devin Kelley's mother

TERRY SNYDER — REDIRECT

1  and Devin Kelley's wife, Mr. Kelley was included in the room

2  in both of those interviews?

3  A.  That's correct.

4  Q.  Now, Mr. Stern took you through part of JEX 511.

5      Can we look at JEX 511.

6      It's Valerie Rowe.  Do you remember that name?

7  A.  Yes, sir.

8  Q.  Can we focus on the —— there we go.

9      Ranger, would you read the highlighted portions?

10  A.  "Valerie Lynn Rowe.  Rowe first met Devin Kelley in 2010

11  when she began working at the Holloman Air Force Base in

12  New Mexico and supervised him.  Upon meeting Kelley, Rowe

13  immediately thought he was odd and even told co-workers they

14  needed to 'keep an eye on him because he's the type of guy who

15  will come shoot us.'  Rowe believes all her co-workers felt

16  similarly about Kelley."

17  Q.  So does that state all of her co-workers at Holloman Air

18  Force Base felt the same way about Kelley?

19  A.  She stated that.  Rowe stated that, yes.

20  Q.  And this is a different paragraph than you read earlier;

21  correct?

22  A.  Yes, sir.

23  Q.  Okay.  And in this paragraph, it goes back to 2010;

24  correct?

25  A.  That's correct.

1  Q.  And it talks about when Mr. Kelley was in the Air Force at

2  Holloman Air Force Base; correct?

3  A.  Yes, sir.

4  Q.  And it points out that they need to "keep an eye on him

5  because he's the type of guy that will come shoot us."

6  Correct?

7  A.  That's correct.

8  Q.  And that's back at Holloman Air Force Base; correct?

9  A.  Yes, sir.

10  Q.  In 2010 before he was convicted?

11  A.  Yes, sir.

12  Q.  Okay.  Now, I'd like to go to JEX 584.

13     Now, Ranger Snyder, during the Texas Rangers'

14  investigation, is it correct, part of what your investigation

15  turned up –– and I think, as Mr. Stern pointed out, a lot of

16  stones were turned over –– correct? –– to find information

17  about Devin Kelley?

18  A.  That's correct.

19  Q.  And is –– one of the stones that were turned over were the

20  text messages in Michelle's cell phone?

21  A.  Yes, sir.

22  Q.  Okay.  And is that what this exhibit is?

23        MR. STERN:  Objection, Your Honor.  That's beyond the

24  scope.

25        THE COURT:  That's overruled.

TERRY SNYDER - REDIRECT

1   BY MR. LeGRAND:

2   Q.  Did Michelle Brassfield make reference in her cell phone

3   text messages to the extent that she felt that she and her

4   family were a target of Devin Kelley?  Michelle Shields, I'm

5   sorry.

6   A.  Correct.

7   Q.  And, Ranger Snyder, this text message that we're looking

8   at, do you see where it's dated Friday, May 26th, 2011 -- I

9   mean 2017?

10  A.  Yes, sir.

11  Q.  Okay.  And Mr. Stern referred that -- or went through with

12  you evidence where he was -- I believe he was pointing out

13  that Mr. Kelley was thinking about this crime several months

14  before November of 2017.

15      Do you recall that line of questioning?

16  A.  Yes, sir.

17  Q.  Now, this cell phone text that we just looked at from

18  Michelle Shields, that's several months before the incident;

19  correct?

20  A.  That's correct.

21  Q.  And it refers to Michelle Shields; Ben Shields; Nana,

22  which was Lula White?

23  A.  That's correct.

24  Q.  Okay.  And Lula White, for example, was killed at the

25  church in this event; correct?

TERRY SNYDER - REDIRECT

1  A.  Yes, sir.

2  Q.  In your investigation, did you determine that the --

3  whether or not there were any other people that Devin Kelley

4  had threatened within several months of this incident, other

5  than these folks in this text message?

6  A.  Nothing uncovered indicated such.

7  Q.  And would you agree that the folks that are mentioned in

8  Ms. Shields -- and before we do that, just so -- for clarity,

9  this cuts off at one point.  It doesn't have all the words --

10 correct? -- in JEX 584?

11 A.  That's correct.

12       MR. LeGRAND:  I'd like to play the audio of this just

13 so the record is complete.  It's JEX 598, and it's at

14 11:00 minutes 24 seconds through 13 minutes 7 seconds, Your

15 Honor.

16       Could you play that for me, please.

17       And just for the record, so whoever is watching this

18 is clear, there won't be any person on the screen, Your Honor.

19 It's just audio.

20    (Clip was played.)

21 BY MR. LeGRAND:

22 Q.  Ranger Snyder, Mr. Stern took you back through his

23 questioning to show that Mr. Kelley was thinking about that --

24 or this event several months before; correct?

25       MR. STERN:  Objection.  Mischaracterizes.

1           THE COURT:  Let me go ahead and hear the question.
2   BY MR. LeGRAND:
3   Q.  Well, does -- this text message and the audio that you
4   just heard from Michelle Shields, does it go back to May of
5   2017?
6   A.  Correct.
7   Q.  Okay.  And the folks that are mentioned in this text
8   message of Michelle Shields, did they all have something in
9   common, based on your investigation?  In other words, were
10  they all members of the Sutherland Springs Baptist Church?
11  A.  They all -- I can't say they were members.  They attended
12  or went to the church, and I'm not sure -- I know the mother
13  or mother-in-law was mentioned, but I don't think she,
14  obviously, went there.  I don't think.
15  Q.  Well, if that's Nana, she was killed the morning of the
16  shooting; correct?
17  A.  You're correct.
18  Q.  Lula White?
19  A.  That's correct.
20  Q.  Okay.  So she was there?  She attended that church;
21  correct?
22  A.  Correct.
23  Q.  Okay.  I want to go now, Ranger Snyder, to -- Mr. Stern
24  referred to the 100-round drum magazines a couple of times.
25          Do you recall that?

TERRY SNYDER – REDIRECT

1  A.  Yes, sir.

2  Q.  Do you recall when Mr. Stern asked you — or pointed out

3  that Devin Kelley called this store?  Do you remember the name

4  of the store?

5      It's okay.  It's not that important, if you don't.

6  A.  I don't remember the name right off the top of my head.

7  Q.  That's all right.

8      In any event, was there a store where Mr. Kelley had

9  purchased two 100-round drum magazines?

10  A.  Yes.

11  Q.  And did your investigation determine that those magazines

12  apparently didn't work right on his gun?

13  A.  That's correct.

14  Q.  And he brought them back?

15  A.  Yes, sir.

16  Q.  And did he order some more?

17  A.  He did.

18  Q.  Okay.  Now, Mr. Stern pointed out that Mr. Kelley then

19  kept calling every day to find out about those magazines;

20  correct?

21  A.  Correct.

22  Q.  Do you know — Ranger Snyder, do you know if something

23  happened on Saturday night, November 4th, to cause Devin

24  Kelley to forgo or give up on those magazines?

25           MR. STERN:  Objection.  Speculation.

TERRY SNYDER - REDIRECT

1        THE COURT:  Only if you know.

2        MR. LeGRAND:  All I asked is if he knows.

3        THE WITNESS:  No, sir.

4    BY MR. LeGRAND:

5    Q.  So your investigation didn't turn up what happened, if

6    anything, on Saturday night that would have caused Devin

7    Kelley to give up on those hundred-round magazines?

8    A.  No, sir.

9    Q.  Let's go to JEX 544.  I believe it's a document Mr. Stern

10   referred you to.

11        Do you recall this document?

12   A.  Yes, sir.

13   Q.  Can we come down to — there's a line that begins with the

14   word "purchases" about two-thirds of the way down the page.

15   It's on JEX 544-4.  I'm sorry.  Right.  Could you highlight

16   that line and the line right below it.

17        Would you read that, Ranger Snyder.

18   A.  "Purchases of note:  June 6, 2016, $38.61 at LA Police

19   Gear Inc., an online police and tactical gear retailer.

20   May 8th, 2017, $20.94 at KnifeCenter.com, an online knife

21   retailer.  December 7, 2017 to November 3rd, 2017 at Academy

22   Sports locations in Selma, San Antonio, and San Marcos, Texas,

23   a seller of firearms, ammunition, and sporting goods."

24   Q.  And you had looked at other sections of this suspicious

25   activity from FinCEN; correct?

TERRY SNYDER – REDIRECT

1   A.  Correct.

2   Q.  What is "FinCEN" in your vernacular?

3   A.  It's a financial document, to see their financial — their

4   spending, their income, their earnings, their assets.

5   Q.  Did you find anything in your investigation,

6   Ranger Snyder — with the support and help of FinCEN, the FBI,

7   ATF, did you find anything — in fact, including

8   JEX 544-004 — that Mr. Kelley purchased or possessed at the

9   time of the incident — the shooting at Sutherland Springs,

10  any firearms that he purchased without a background check from

11  the FBI?

12  A.  No, sir.

13  Q.  And then Mr. Stern showed you a pawn ticket and a picture

14  of a shotgun.

15      Do you recall that?

16  A.  Yes, sir.

17  Q.  Did your investigation turn up any evidence whatsoever

18  that he possessed those firearms at the time that the shooting

19  occurred in November of 2017?

20  A.  No, sir.

21  Q.  And did your investigation — in other words, you went to

22  Mr. Kelley's house; correct?

23      The rangers — when I say "you," I'm referring to the

24  rangers.

25  A.  Yes, sir.

TERRY SNYDER - REDIRECT

1   Q.  And did you do a complete search of the house?

2   A.  Yes, sir, we did.

3   Q.  And did -- you had the three weapons that were recovered

4   at the two or three crime scenes over near Sutherland Springs;

5   correct?

6   A.  That's correct.

7   Q.  Okay.  Did you find, in the course of all your work in

8   this case, any weapons that Mr. Kelley possessed or owned that

9   had not gone through an FBI background check in order to be in

10   Mr. Kelley's possession?

11   A.  No, sir.

12   Q.  Okay.  Did you find any weapons purchased -- or did you

13   find any weapons that were stolen?

14   A.  No, sir.

15   Q.  Did you find any weapons that were from straw sales?

16   A.  No, sir.

17   Q.  And if you recall, I think Mr. Stern mentioned

18   Mr. Kelley's interview, and there was some conversation or

19   questions about Mr. Kelley's firearms.

20      Do you recall that?

21   A.  Yes, sir.

22   Q.  Did you ever find that Mr. -- any evidence whatsoever that

23   Mr. Kelley ever straw purchased a firearm for Devin Kelley?

24   A.  No, sir.

25   Q.  All of the firearms that Mr. Kelley purchased, were they

1  all purchased with his signature on a Form 4473 that the FBI

2  checked out and gave a proceed?

3  A.  Yes, sir.

4  Q.  Did you ever find any evidence whatsoever that Mr. Kelley

5  ever used any of his father's firearms for anything?

6  A.  No, sir.

7  Q.  And that's through your complete investigation, thousands

8  of pages; correct?

9  A.  Correct.

10  Q.  And then Mr. Stern asked you questions, do you recall,

11  about the 254 shots outside the church and, I think,

12  250-some-odd shots inside the church.

13      Do you recall that?

14  A.  Yes.

15  Q.  Okay.  And did you — did your investigation determine

16  that all of those shots — somewhere near 500 shots; correct?

17  A.  That's correct.

18  Q.  Did you find that all of them came from the AR-556

19  purchased at Academy after the FBI background check?

20  A.  That's correct.

21  Q.  And that weapon was in the automobile of a law enforcement

22  officer when you arrived?

23  A.  Yes, sir.

24  Q.  Okay.  That was a real gun; correct?

25  A.  Correct.

TERRY SNYDER - REDIRECT

1  Q.  Purchased at a real store?

2        MR. STERN:  Objection.  Objection.  Vague.

3        THE COURT:  That's overruled.

4  BY MR. LeGRAND:

5  Q.  Was it a real gun purchased at a real store with a real

6  background check?

7  A.  Correct.

8  Q.  That said proceed; you can sell this gun to Devin Kelley?

9  A.  Yes, sir.

10  Q.  It wasn't a fictional gun that was bought or stolen or any

11  of those things; correct?

12        MR. STERN:  Objection.

13        THE COURT:  So I'm guessing the objection is asked

14  and answered, and that's sustained.

15  BY MR. LeGRAND:

16  Q.  Well, Ranger Snyder, the only reason I ask is, as a Texas

17  Ranger, don't the Texas Rangers have to deal in facts?

18        MR. STERN:  Objection.  Argumentative.

19        THE COURT:  That's overruled.

20        THE WITNESS:  Correct.

21  BY MR. LeGRAND:

22  Q.  When you do your investigation, you're not allowed to deal

23  in fiction; correct?

24  A.  Correct.

25  Q.  And so did your investigation deal with the facts of what

1   guns you found?

2   A.  Yes, sir.

3   Q.  Not the fiction of what guns might have been if certain

4   facts were; correct?

5   A.  Yes, sir.

6   Q.  That didn't happen; did it?

7   A.  No, sir.

8   Q.  Now I want to go to JEX 510 again.  It's the Jessika

9   Edwards — it's 510-001.

10      Do you recall this document?

11  A.  Yes, sir.

12  Q.  I want to come down to the last — next to the last

13  paragraph that Mr. Stern discussed with you.

14      It makes reference to being obsessed with church

15  shootings?

16  A.  Correct.

17  Q.  And guns; correct?

18  A.  Yes, sir.

19  Q.  And then it says Kelley also sent Ms. Edwards pictures of

20  multiple guns that he was building, specifically an

21  AR-15-style rifle.

22      Do you see that?

23  A.  Yes, sir.

24  Q.  Did your investigation and your search warrants and

25  everything the rangers did in conjunction with the FBI and the

1   ATF, did you find any firearms whatsoever that Mr. Kelley

2   constructed?

3   A.  No, sir.

4   Q.  Did you find any evidence that Mr. Kelley had the

5   capability to construct a firearm?

6   A.  No, sir.

7   Q.  Now I want to go to JEX 545.

8       And what is JEX 545, Ranger Snyder?

9   A.  This is a Google Map photo — a screenshot of three

10  different locations, three different crime scenes that are

11  documented.

12  Q.  The three red circles, are those the three different crime

13  scenes?

14  A.  Yes, sir.

15  Q.  The top one, what is that?

16  A.  Number 1, the gunman's residence.

17  Q.  The middle one, what is that?

18  A.  Number 3, Devin Kelley found dead.

19  Q.  And what's the bottom red circle?

20  A.  Number 2, the site of the massacre.

21  Q.  Would you agree, from a Google Earth standpoint,

22  Ranger Snyder, that JEX 545 actually depicts that the site of

23  the massacre is closer to New Braunfels, the gunman's

24  residence, than San Antonio is?

25      In other words, San Antonio is closer to his residence

1  than the massacre?

2  A.   Correct.

3           MR. STERN:  Objection.  Leading.

4           THE COURT:  That's overruled.

5           MR. LeGRAND:  Well, physically, is all I'm asking.

6           THE COURT:  Right.  It's overruled.  Go ahead.

7  BY MR. LeGRAND:

8  Q.   So, Ranger Snyder, would it be your –– and you worked this

9  area; correct?

10  A.   Yes, sir.

11  Q.   Between New Braunfels and the site of the massacre, are

12  there lots of churches and movie theaters and malls and

13  schools and targets for a shooting?

14  A.   Yes.

15  Q.   Okay.  But Mr. Kelley on the day –– on November the 5th of

16  2017, am I correct your investigation determined that he chose

17  the church at Sutherland Springs to drive to; correct?

18  A.   The investigation revealed that, yes.

19  Q.   And that's where this crime occurred; correct?

20  A.   That's correct.

21  Q.   Okay.  Would you agree that that church, as Mr. Stern

22  pointed out, is the church where Danielle Kelley had attended

23  in her lifetime?

24  A.   That's correct.

25  Q.   And that her mother attended?

TERRY SNYDER — REDIRECT

1  A.  That's correct.

2  Q.  And her grandmother attended?

3  A.  That's correct.

4  Q.  That her stepfather attended?

5  A.  Correct.

6  Q.  That her brother attended?

7  A.  Yes.

8  Q.  So did your investigation, in any place whatsoever in

9  conjunction with the FBI and the ATF, determine anywhere —

10  did any of those reports ever say that this church was a

11  random location?

12  A.  No, sir.

13  Q.  In fact, a few moments ago with Mr. Stern, do you recall

14  that you discussed Pastor Pomeroy?

15  A.  Yes, sir.

16  Q.  And when you were talking to Mr. Stern a few minutes

17  ago — I think it may have been Mr. Stern that pointed out

18  that according to Pastor Pomeroy, Mr. Kelley felt an animosity

19  towards that church?

20  A.  He did state that, yes.

21       MR. LeGRAND:  I don't have any further questions,

22  sir.  Thank you very much.

23       THE COURT:  Anything else?

24       MR. STERN:  Very briefly, Your Honor.

25

1                    RECROSS–EXAMINATION

2  BY MR. STERN:

3  Q.  Ranger Kelley, Devin Kelley did obtain the CPX–2 handgun

4  from a non–FFL; correct?

5  A.  Through our investigation, I don't recall discovering that

6  information.  Everything was legally purchased, the ones that

7  we recovered.

8  Q.  Sure.  I'm referring to the one that was sold to EZPAWN

9  shop, the CPX–2 model.

10  A.  Yes.  Okay.  I do recall that, yes.

11  Q.  Okay.  Thank you.

12      That was obtained by through a non–FFL source?

13  A.  Correct, yes.

14  Q.  Devin Kelley also obtained a shotgun through a non–FFL

15  source?

16  A.  Our investigation didn't find that out.  I'm learning that

17  through the information you're presenting, yes.

18  Q.  But there's no indication that he filled out an ATF 4473

19  form to obtain ––

20  A.  There's no evidence to support that, no, sir.

21  Q.  You're not here to talk about or to testify on behalf of

22  Academy; correct?

23  A.  Correct.

24  Q.  Do you know if Academy violated federal law by selling the

25  AR–556 to Devin Kelley in April 2016?

1  A.  No.  I'm not aware of the federal law, their standards, or

2  practices, no, sir.

3  Q.  And due to the fact that if they actually comported with

4  federal law, they would have — wouldn't have sold Devin

5  Kelley the firearm in April of 2016?

6          MR. LeGRAND:  Your Honor, we object.  He just

7  testified that he didn't know about federal law in that

8  regard.

9          THE COURT:  Can you answer the question or not?

10          THE WITNESS:  I'm not aware of the federal law to

11  stand here and testify to it, no, sir.

12          THE COURT:  Next question.

13          MR. STERN:  I'll move on.

14  BY MR. STERN:

15  Q.  Let's briefly discuss the text messages that Mr. LeGrand

16  just showed you back and forth between Devin Kelley and

17  Michelle Shields.

18      That was in May, 2017; correct?

19  A.  That's correct.

20  Q.  And, in fact, if we could pull up the interview of Valerie

21  Rowe one more time.  It's Joint Exhibit 511.  Go to the last

22  paragraph.

23      It talks about Devin Kelley threatening Ms. Rowe in

24  May 2017; correct?

25  A.  That's correct.

1  Q.  At the same time he was threatening Michelle Shields?

2  A.  Correct.

3  Q.  We talked about the FBI interview of Jessika Edwards.

4      Do you recall that?

5      You know, before we go to Ms. Edwards' interview, let's

6  take a look again at that paragraph, the second paragraph

7  where it talks about Rowe being concerned about Devin Kelley

8  while she was in the Air Force.

9      Do you recall that testimony?

10 A.  Correct.

11 Q.  She doesn't state that she told anyone from Security

12 Forces Squadron about her concerns; does it?

13 A.  No, sir.

14 Q.  Doesn't state that she told anyone from Air Force Office

15 of Special Investigations about her concerns?

16 A.  No, sir.

17 Q.  And you know of no duty that she had to submit Devin

18 Kelley's information into the NICS system?

19 A.  I'm not aware, no, sir.

20 Q.  Thank you.

21     Looking also at the Jessika Edwards' interview again very

22 quickly.  That's Joint Exhibit 510.

23     Again, if we look at the very last sentence — we've

24 already talked about this, so I don't want to belabor the

25 point.  But she severed ties with Devin four months before the

1  shooting; correct?

2  A.  Yes, sir.

3  Q.  And that was because he was completely obsessed with mass

4  shootings?

5  A.  That had been stated several times, yes.

6  Q.  And that was around the same time that he was threatening

7  Michelle Shields?

8  A.  Correct.

9  Q.  That was around the same time he was threatening Valerie

10  Rowe?

11  A.  Correct.

12  Q.  It was around the same time that the summary iCloud

13  account suggests that his notes indicated that he started

14  planning as early as July 2017?

15  A.  His notes compiled information that -- I wouldn't

16  necessarily say they were indicating a plan, but he's making

17  notes to himself for reminders.

18        MR. STERN:  Ranger Snyder, I want to thank you for

19  your time here today.

20        THE WITNESS:  Yes, sir.

21        MR. LeGRAND:  Nothing further, Your Honor.

22        THE COURT:  Any further need for this witness, or can

23  he be excused?

24        MR. LeGRAND:  No, Your Honor.

25        THE COURT:  You're excused.  Thank you, Ranger.

1          THE WITNESS:  Thank you.

2          THE COURT:  Why don't we take a short little break,

3  and then you can have your next witness ready.  Let's take

4  about ten minutes.

5     (Recess.)

6          THE COURT:  Your next witness?

7          MR. ALSAFFAR:  Your Honor, plaintiffs call Michelle

8  Shields.

9     (MICHELLE SHIELDS, having been duly sworn, testified as

10 follows:)

11         MR. ALSAFFAR:  May I proceed, Your Honor?

12         THE COURT:  Yes.

13         MR. ALSAFFAR:  Thank you.

14                   DIRECT EXAMINATION

15 BY MR. ALSAFFAR:

16 Q.  Good morning, ma'am.  Could you introduce yourself to the

17 Court.

18 A.  Yes.  My name is Michelle Shields.

19 Q.  Ms. Shields, I want to thank you for being here.  I know

20 this is difficult.  So I'd like, if you don't mind, just to

21 start with you telling the judge just a little bit about

22 yourself, where you're from, if you don't mind.

23 A.  Okay.  I'm from Sutherland Springs.  I've been there about

24 30 years.  I was — practically brought my children up in that

25 town and everything.  They attended Floresville School, and we

MICHELLE SHIELDS — DIRECT

1  went to the church there in Sutherland Springs since about

2  2004.

3  Q.  Ms. Shields, are you married?

4  A.  Yes.

5  Q.  Who is your husband?

6  A.  Benjamin Shields.

7  Q.  How many children do you have?

8  A.  I have four; two that I adopted, and two stepchildren.

9  Q.  And how are you related to Danielle Smith?

10  A.  She's my stepdaughter.  I don't like to use the "step."

11  Actually, not stepdaughter.  I'm sorry.  She's my adopted

12  daughter.  I don't like to use "adoption."

13  Q.  Now, you and I have never met before yesterday when I

14  introduced myself to you outside the courtroom; is that right?

15  A.  Not in person, correct.

16  Q.  And I was on a video of your deposition, but you and I

17  never talked; right?

18  A.  Right.

19  Q.  And I know you're represented by an independent lawyer.

20     You have an independent counsel — right? —— who's here

21  with you today?

22  A.  Yes.

23  Q.  Okay.  I want to talk to you briefly about what happened,

24  and I know it's hard.

25     Can you tell us who you lost in the shooting at Sutherland

MICHELLE SHIELDS - DIRECT

1 | Springs First Baptist Church on November 5th, 2017?
2 | A.  I lost my mother and my church family.
3 | Q.  Just so the Court knows, can you tell us who your mother
4 | was.
5 | A.  My mother was Lula White.  She was 71 years old.
6 | Q.  You also said that you lost your church family.
7 |     What do you mean by that?
8 | A.  Everybody there was family.  We got together at family
9 | get-togethers, went camping together.  We spent a lot of time
10 | together, so...
11 | Q.  How long has Sutherland Springs been your home?
12 | A.  Since '93.
13 | Q.  What kind of town is it?
14 | A.  It's a small country town, very tight community.
15 | Everybody knows everybody.
16 | Q.  And what was the importance of the church there?
17 |     And let me just back up a little.  When I say "church,"
18 | from here on out, I just want make sure you know I am talking
19 | about your church, the Sutherland Springs First Baptist
20 | Church.  Okay?
21 | A.  Okay.
22 | Q.  Okay.  So let me ask that again.
23 |     Can you tell the Court a little bit about the importance
24 | of the church itself to that community and everybody who went
25 | to it.

MICHELLE SHIELDS – DIRECT

1  A.  The church offered a lot of help to people at the

2  community, which we still do.  We have a food pantry that we

3  provide to people who are in need of food.  We have

4  counseling.  We talk to a lot of the people in the community

5  that just need help or want to come and know about the Lord.

6  Q.  Ms. Shields, did you regularly go to church — to the

7  church on Sundays?

8  A.  Yes.

9  Q.  Did everyone in that community know you as a regular

10  church-going, every-Sunday member of the church?

11  A.  Yes, sir.

12  Q.  Have you ever taken any leadership positions at the

13  church?

14  A.  Yes, sir.

15  Q.  Can you tell us about that.

16  A.  Before, I volunteered as a treasury — assistant treasurer

17  to my mother, and I helped out in the food pantry.  And now

18  they appointed me as the treasurer, as financial

19  administrator.  And I'm also head of the stewardship.

20  Q.  Did I hear you correctly?  Did you say that this

21  treasury — new treasury position that you're now in for the

22  church, that you took that over from your mother, Lula White?

23  A.  Yes.

24  Q.  Was that what she — a board position she was serving in

25  when she was —

MICHELLE SHIELDS – DIRECT

1    A.  No, sir.  She did it as a volunteer treasurer, and she

2    volunteered to be a director at the food pantry that's owned

3    by the church.

4    Q.  Did — your husband, Ben Shields, did he also regularly

5    attend the church with you?

6    A.  Yes.

7    Q.  And did he — usually, was it when you went, he went?

8    A.  Yes, sir.  He also went to the Bible study groups without

9    me.

10   Q.  Okay.  So he would always go to church with you on Sunday,

11   but he'd also do other things in the church with the church

12   family there?

13   A.  Yes.

14   Q.  Okay.  How about your mother, Lula?  Can I ask you, we've

15   seen a lot of referrals to "Nana."

16   A.  Nana.

17   Q.  Nana.  Sorry.  Nana.  I call mine "Nana."  I have a Nana,

18   so I apologize.  Nana.

19       Is that what Lula White was affectionately referred to by

20   the members of the church family?

21   A.  Yes.

22   Q.  So if we see "Nana" anywhere in the phone, text, that's

23   referring to your mother, Lula?

24   A.  Yes.

25   Q.  All right.  Thank you.  I asked you about Ms. White, your

MICHELLE SHIELDS - DIRECT

1   mom.
2       How about your son David?  I believe you said David is his
3   name; correct?
4   A.  Yes.
5   Q.  How old is David, by the way?
6   A.  He's 24 now.
7   Q.  And would David also be one of the family members — your
8   family members that would attend the church as well?
9   A.  Yes, sir.
10  Q.  Okay.  Do you mind if I talk to you a little bit about
11  Danielle and her growing up in the church, if that's okay.
12      Was she a regular member, growing up as a child, going to
13  the church?
14  A.  Yes, sir.
15  Q.  Did she love that church?
16  A.  Yes.
17  Q.  Would you mind telling the Court just a little bit about
18  what Danielle loved doing at the church when she was growing
19  up in the years just prior to her marriage to Devin Kelley?
20  A.  She loved children.  And growing up, she worked in the
21  nursery, assisting with the children.  And she did volunteer
22  work whenever it was needed to do, like a float or something.
23  She was always there to be helpful for the church.
24  Q.  How was the church with Danielle?  Was it part of her
25  family as well?

MICHELLE SHIELDS - DIRECT

1   A.   Yes.  Everybody loves her.

2   Q.   Still do?

3   A.   Yes.

4   Q.   And when you say that everybody loves Danielle, was the

5   church always a place -- for either Danielle or yourself, a

6   place where she could always count on and rely on if she ever

7   needed anything or needed any help?

8   A.   Yes.

9   Q.   Was the church always welcoming to Danielle?

10  A.   Yes, sir.

11  Q.   There's been some discussion from the government lawyers

12  in this case about there being one -- some members of the

13  church that maybe Danielle didn't get along with.

14       Do you know what that's about, one family that she had

15  trouble with?

16  A.   When she was a teenager, it was --

17  Q.   Just one family?

18  A.   It was a kid from a family, and so they just would pick on

19  her.

20  Q.   It was one kid from one family?

21  A.   Right.  As far as I remember.

22  Q.   But other than that one kid from one family, generally,

23  that church was one big family for Danielle as well?

24  A.   Yes.

25  Q.   And for you too?

MICHELLE SHIELDS – DIRECT

1  A.  Yes, sir.

2  Q.  For your whole family; is that right?

3  A.  Um-hum.

4  Q.  I didn't hear you.

5  A.  Yes, sir.

6  Q.  Okay.  Thank you.

7  A.  Sorry.

8  Q.  That's okay.  No.  That's my fault.  I couldn't hear you.

9      I wanted to talk about after — if you don't mind, after

10 Danielle — well, actually, before we get to after Danielle

11 got married to Devin in the church.

12     You had mentioned — I think you just said that one of the

13 things that Danielle loved to do when she was at the church

14 was help with the children at the church.

15     Can you describe that a little more for the Court?

16 A.  We have a daycare where we have different age groups in

17 different classrooms, and she helped with all the different

18 age groups, according to when she was needed.  And she was

19 really good with all the children.  They all adored her.

20 Q.  They all adored her?

21 A.  Um-hum.

22 Q.  Did —

23 A.  And she —

24 Q.  Oh, I'm sorry.  Please go ahead.

25 A.  I was just going to say that she still knows a lot of

1  those kids now growing up, and they come to her when she is

2  there.

3  Q.  So those children that she helped raise at the church,

4  they still know her, love her, and come to her from time to

5  time?

6  A.  Yes, sir, the ones that are still alive.

7  Q.  And I know this is difficult, because I was going to ask a

8  little bit about that.  And I won't spend — I apologize.  I'm

9  not going to spend too much time, but it's important.

10      Danielle mentioned — has talked about or testified as

11  well that a lot of the children that died in that shooting

12  were her babies.

13      Based on your own experience with Danielle at the church,

14  was she talking about those children that she helped raise her

15  whole life at that church?

16  A.  Yes, sir.  The Hill family and the Holcombe family, their

17  biological father died of heart failure.  We were there for

18  the family, and we had been there for them the whole time

19  growing up and trying to take care of them, be there for them

20  when they needed help.

21  Q.  And that was before the shooting when Mr. Holcombe, you're

22  talking about, passed away?

23  A.  No.  That was Mr. Hill, Peter Hill.

24  Q.  I'm sorry.  Mr. Hill, right.

25      And she helped comfort and take care of those kids after

MICHELLE SHIELDS – DIRECT

1  their loss?

2  A.  Yes, sir.

3  Q.  Did everyone in the community know that Danielle –– in

4  your church community, the people that you spent time with,

5  the people that you had at your home from the church and the

6  people you went to congregation with, did they all know that

7  Danielle considered the children of that church really like

8  her children?

9  A.  I would think so.  I'm not –– I haven't talked to people.

10  I just know that the parents knew that.  That's why they came

11  to her.

12  Q.  And is that how Danielle felt about them?

13  A.  Um-hum.  Yes, sir.

14  Q.  Did Devin Kelley know that too, as far as you know?

15  A.  I don't know.  I would assume so, but I don't know.

16  Q.  Well, let me talk a little bit about that, about what

17  started happening after Danielle married Devin Kelley.

18      Now, before she married Devin Kelley, was the church a

19  regular part of her daily and weekly life?

20  A.  Yes.

21  Q.  After she married Devin Kelley, was the church a regular

22  part of her daily and weekly life?

23  A.  She wasn't around as much.  But when she was around, she

24  did go to church a few times with us.  They've always asked

25  about her, and she just always asked about the people there

MICHELLE SHIELDS - DIRECT

1  too.

2  Q.  Right.  So after she married Devin Kelley, was she going

3  to the church less and less over time?

4  A.  Yes, sir.

5  Q.  And I think you said she would go — she went a handful or

6  a few times in the years after she met — married Devin

7  Kelley; is that right?

8  A.  Yes, sir.

9  Q.  Okay.  And in those few times that she went, though, I

10  think you've just said — did you just say that, well, when

11  she was there those few times, the members of the church were

12  so happy to see her and welcoming to her and really conveyed

13  that they missed her; is that accurate?

14  A.  Yes, sir.

15  Q.  And those few times when she was allowed to go to the

16  church after she married Devin Kelley and the church members

17  were so happy to see her and welcoming to her, Devin Kelley

18  was there with her every time watching that; wasn't he?

19  A.  Yes, sir.

20  Q.  And he saw, those few times that he allowed Danielle to go

21  to your church, your family church, that they were welcoming

22  and open arms to Danielle?

23  A.  Yes, sir.

24  Q.  Did he see that?  Okay.

25      Even when Danielle, your daughter, was not able to go to

1  the church as often, would you still try to make it very clear
2  to her that she was always welcome whenever she wanted to come
3  to you or the church?
4  A.  Yes, sir.
5  Q.  You also told — made sure Devin Kelley knew that too,
6  that he — you would welcome him and have him at the church
7  and your home, if he needed, as well; right?
8          MS. KRIEGER:  Objection.  Leading.
9          THE COURT:  Sustained.
10 BY MR. ALSAFFAR:
11 Q.  Would you also let Devin Kelley know that he was welcome
12 at the church?
13 A.  Yes.
14 Q.  And can you let the Court know why you did that.
15 A.  Try to get him closer to God.
16 Q.  Was one of the reasons also that you wanted Danielle to
17 feel that family, that church family as well?
18          MS. KRIEGER:  Objection.  Leading.
19          THE COURT:  Sustained.
20          MR. ALSAFFAR:  Let me ask it a different way.
21 BY MR. ALSAFFAR:
22 Q.  You said you wanted Devin to feel closer to God.
23     What about your daughter after she was married?
24 A.  I don't think she ever strayed away from God.  She just
25 didn't have the opportunity.

MICHELLE SHIELDS – DIRECT

1  Q.  What do you mean by that?

2  A.  By him controlling her.

3  Q.  Are you talking about ——

4  A.  Devin.

5  Q.  —— Devin?  Okay.

6      And when you said "by controlling her," can you tell us

7  what your understanding of that was?

8  A.  He always controlled every situation.  We weren't allowed

9  to talk together unless it was speakerphone.  And if he didn't

10 like what we were saying, he would hang up the phone.  And he

11 would take away her phone or her iPod and stuff if he didn't

12 want her calling me, thinking that she was going to call me

13 when he was away.

14 Q.  Did that ever happen to Danielle before, in your

15 experience?

16 A.  No, sir.

17 Q.  Was she ever surveilled by whoever she was with whenever

18 you talked to her?

19 A.  No, sir —— well, can you explain that one more time?

20 Q.  Oh, sure.  When I said "surveilled," I mean monitored.

21     I think you said that when you would call when —— the few

22 times you could call Danielle, he would be there listening on

23 the speakerphone?

24 A.  There was another incident that happened, and it wasn't

25 Devin that was there.  So it was the day of the shooting.

MICHELLE SHIELDS – DIRECT

1  Q.  I'll get to that.  I'm sorry.  I apologize.  That's my

2  fault.

3  A.  Okay.

4  Q.  I was not clear.  I'm really sorry about that.

5      I'm just talking about before —

6  A.  I didn't want to say "no" when it did happen.

7  Q.  No.  Of course.  Of course.  And I appreciate that.  Any

8  time you're not sure about what I'm asking, that's my fault,

9  you just tell me and I'll fix it.

10  A.  Okay.

11  Q.  So I'm asking about sort of the years leading up — after

12  they were married and not the time — not exactly the time of

13  the shooting.  We'll talk about that in just a second.  I'm

14  just talking about sort of generally leading up.

15      You said that when you tried to communicate or talk with

16  Danielle that he would always be listening on the

17  speakerphone?

18  A.  Yes.

19  Q.  And that's what I meant, that he was surveilling or

20  listening and —

21  A.  Yes.

22  Q.  Okay.  All right.  And I'll get to that in a little more

23  detail.  But I want to ask you actually about your church

24  pastor, Pastor Pomeroy.

25      When she was an adult and then married to Devin Kelley,

MICHELLE SHIELDS - DIRECT

1  would the church and its pastor — Pastor Pomeroy,

2  specifically — would they be there for her if she ever needed

3  anything, Danielle?

4  A.  Yes, sir.

5  Q.  Okay.  What was the relationship — in your understanding,

6  based on your experience with Danielle and Pastor Pomeroy,

7  what was that relationship like when she was an adult and

8  about the time she was married to Devin?

9  A.  They really didn't have a close relationship after she got

10 married because she wasn't around, but he always treated her

11 like a daughter.

12 Q.  And I understand you didn't have much of a relationship

13 with Danielle after she married Devin because he wouldn't

14 allow it; is that right?

15 A.  Yes.

16 Q.  Okay.  He did the same thing with the pastor; correct?

17 A.  Yes, with everyone.

18 Q.  And you said Pastor Pomeroy treated Danielle like a

19 daughter.

20     Is that what you said?

21 A.  Yes.

22 Q.  Okay.  And that was how he treated her before she married,

23 Danielle, and after, if he could?

24 A.  Right.

25          MS. KRIEGER:  Objection.  Leading.

MICHELLE SHIELDS – DIRECT

1          THE COURT:  That's sustained.

2     BY MR. ALSAFFAR:

3     Q.  Did Pastor Pomeroy treat Danielle like a daughter before

4     and after she got married to Devin Kelley?

5     A.  Yes.

6     Q.  Can you tell the Court whether or not you ever confided in

7     Pastor Pomeroy about any concerns and that you had that

8     Danielle was going through with Devin Kelley?

9     A.  I may have gone to him and talked about concerns with him,

10    so...

11    Q.  And that's what I'm — do you remember whether or not

12    after — and I want to be clear of the time period.

13         After Danielle married Devin Kelley, do you recall from

14    time to time whether or not you would seek counsel from Pastor

15    Pomeroy and talk to him about those troubles you saw and were

16    worried about in Danielle's marriage to Devin?

17    A.  Yes, sir.

18    Q.  You do?

19    A.  I would think so, yes.

20    Q.  Okay.

21    A.  I don't remember a whole lot, but I would think so because

22    he was like a brother to me.

23    Q.  Okay.  That's all I'm asking.

24         So would Pastor Pomeroy have been aware of some of the

25    mistreatment that Devin was visiting on your daughter during

MICHELLE SHIELDS – DIRECT

1  their marriage, based on your counseling with him?

2  A.  I'm sure, yes.

3  Q.  Okay.  Ms. Shields, did you know that your pastor, the

4  head of the church, the Sutherland Springs church, confronted

5  Devin Kelley about what he had learned regarding Devin

6  Kelley's treatment of your daughter?

7  A.  No, I wasn't aware of that.

8  Q.  I'm going to play you an interview clip just of Pastor

9  Pomeroy, an interview he gave to the Texas Rangers after

10  the — this horrible event about this issue.

11      If we could play JEX 5282.

12      MS. KRIEGER:  Objection.  Your Honor, the witness

13  just stated she wasn't aware of the conversation that Pastor

14  Pomeroy had with Mr. Kelley.

15      THE COURT:  Yeah.  So what's the purpose of this?

16      MR. ALSAFFAR:  Your Honor, she said that she had

17  expressed in counsel with Pastor Pomeroy about concerns she

18  had.  And this is just Pastor Pomeroy confirming that that

19  did, in fact, happen and that he did, in fact, confront Devin

20  Kelley before the shooting about his domestic abuse of his

21  daughter.

22      THE COURT:  I understood the question that you were

23  asking Ms. Shields here, whether she confided with the pastor

24  about Danielle.

25      MR. ALSAFFAR:  She did, and she said she did.

1          THE COURT:  Right.

2          MR. ALSAFFAR:  And this is — I wanted to ask her

3   about some of the comments he had made about confronting Devin

4   Kelley.

5          MS. KRIEGER:  But, Your Honor, she just stated she

6   didn't know that the pastor had confronted Devin Kelley.

7          MR. ALSAFFAR:  Well, that's right.  That's exactly

8   why we're playing it.  It's an interview he gave with the

9   rangers, not with her.

10          THE COURT:  I'll take this one step at a time.

11          Go ahead.

12          MR. ALSAFFAR:  If you could play Clip 213 to 231.

13     (Clip was played.)

14          MS. KRIEGER:  Your Honor —

15   BY MR. ALSAFFAR:

16   Q.  Ms. Shields, I have a couple questions about —

17          THE COURT:  One second.  You have to wait for a

18   question.

19   BY MR. ALSAFFAR:

20   Q.  I just have a couple questions about that.

21          First of all, Pastor Pomeroy — so this was another person

22   at your family church who knew about Devin's treatment of

23   Danielle and confronted him about it; is that right?

24   A.  I guess.  I didn't know that he had confronted Devin about

25   it.

MICHELLE SHIELDS – DIRECT

1  Q.  And when you heard Pastor Pomeroy, did you hear that part

2  where he was talking about how Devin Kelley reacted to him

3  after that, and he would make snide remarks?

4      Do you remember that?  We just played that part.

5  A.  Yes.

6  Q.  Okay.  Do you ever see –– I just don't know, but did you

7  ever happen to see in the, you know, year or so prior to the

8  shooting, Pastor Pomeroy have any interaction with Devin

9  Kelley just in the church whenever he –– the few times he

10 would come?

11 A.  I don't recall.  I don't remember.

12 Q.  Okay.  Now, as far as Pastor Pomeroy –– I know this might

13 seem like an obvious question, but I just don't know –– was he

14 usually there on Sundays at the head of the pulpit?

15 A.  Yes, sir.

16 Q.  Okay.  Some ministers sort of travel around.  They're not

17 always there.

18     But was he regularly there at the head of the pulpit

19 almost every Sunday at the church?

20 A.  Except for if he had an event to go to or he had another

21 speech or something to go to.

22 Q.  And did you expect him to be at the church –– at the

23 pulpit on November 5th, 2017?

24 A.  No.  We knew that he was going to be gone.

25 Q.  All right.  So he told the church before that Sunday

MICHELLE SHIELDS – DIRECT

1  that –– the members of the church that he had another event he

2  had to be at?

3  A.  Yes, sir.

4  Q.  Okay.  How did he tell the church members that?  Was it at

5  the previous sermon, or was it just in the days leading up; if

6  you remember?

7  A.  I don't recall.  But we always had meetings and Bible

8  studies during the week, and he could have said it during each

9  one of those.  I don't recall how.  But I talked to him on a

10 daily basis when I could.

11 Q.  Okay.  And you didn't relay that information to Danielle

12 or Devin that week, that he may not be there that week at the

13 head of the pulpit?

14 A.  No, sir.

15 Q.  Okay.  How are you doing?  You okay?

16     All right.  I want to talk a little bit about your mother,

17 and I know it's difficult.  But would you mind just describing

18 your mother a little bit for us.

19 A.  She was a fun-loving mom.

20 Q.  So ––

21 A.  She just enjoyed life and was always there for everybody.

22 If you needed her, she was right there for you.  Everybody

23 loved her, liked her.  She was a grandma to most everybody

24 there at the church.  She was a mom to the pastor and his

25 wife.  She treated them like her kids, and they were like my

1   brother and sister.

2       And it was just -- she's just a great person.  She always

3   volunteered for different things.  She didn't put herself

4   first.  She put everybody else first.

5           THE COURT:  Why don't we have counsel come up.

6           MR. ALSAFFAR:  Yes.

7           Sidebar, Your Honor?

8           THE COURT:  Yes.  Over here.

9           (At the bench.)

10          I don't want to be insensitive here, but what's the

11  relevance of these questions?

12          MR. ALSAFFAR:  Oh, no, we're not going to take long.

13  It's just to establish the predicate that she was well known

14  in the community, in the church, and not digging into any deep

15  background.

16          THE COURT:  I'm not going to allow any more questions

17  on this.  You need to move on.

18          MR. ALSAFFAR:  Okay.  No problem, Your Honor.  Thank

19  you.

20      (Open court.)

21  BY MR. ALSAFFAR:

22  Q.  Ms. Shields, are you ready?

23  A.  Um-hum.

24  Q.  Okay.  I want to ask you about Lula and Danielle's

25  relationship.

1    Did they have a close relationship?

2  A.  Yes.

3  Q.  Okay.  Can you tell us a little bit about that.

4  A.  They were always together, spending time together.  They

5  had the same interest in arts and poetry, and they just always

6  spent a lot of time together.  They had a loving relationship.

7  Q.  And did Devin Kelley know that Lula, your mother, and

8  Danielle had a very loving and close relationship?

9  A.  Yes, sir.

10  Q.  Okay.  Would he have known that — well, let me ask you

11  the question.

12    If Danielle needed anything from her grandmother, your

13  mother, from Lula, would she have dropped everything and been

14  there for her if she needed something?

15  A.  Yes, sir.

16  Q.  Did Devin Kelley know that about your mother?

17  A.  I would think so.

18  Q.  That's based on your own observation and interaction with

19  Lula, Devin, and Danielle.  Is that fair to say?

20  A.  Yes, sir.

21  Q.  Okay.  In fact, do you remember when Danielle had her

22  first two children, your grandkids?

23  A.  Yes, sir.

24  Q.  Where was Danielle when that happened?

25  A.  For the first child, in Colorado.

1  Q.  And the second.

2  A.  And the second one, in San Antonio.

3  Q.  And I'll talk about it a little bit later, but the first

4  child in Colorado, where were you and Lula living at that

5  time?

6  A.  In her house, at the same property in Sutherland Springs.

7  Q.  And where was Danielle in Colorado?

8  A.  She was in Colorado Springs.

9  Q.  So when she had her first baby, you and your mother Lula

10  went to Colorado Springs to be there?

11  A.  She wanted me to be there and my mom with her.

12  Q.  She wanted your mom to be there too?

13  A.  Yes, sir.

14  Q.  And when you say "she," you mean Danielle wanted both you

15  and Lula to be in Colorado with her when her first child was

16  born?

17  A.  Yes, sir.

18  Q.  Did you both go?

19  A.  Correct.

20  Q.  Did you drive?  Did you fly?

21  A.  No.  We drove.

22  Q.  Okay.  So when Danielle asked you to be there and — you

23  and Lula to be there for her, you guys were willing to get in

24  the car and drive multiple states to get there to be with her;

25  is that fair?

MICHELLE SHIELDS - DIRECT

 1  A.  Yes.

 2  Q.  Is that just the kind of relationship that you, Danielle,

 3  and Lula White had?

 4  A.  Yes, sir.

 5  Q.  Devin knew that?  Did he know that?

 6  A.  Yes, sir.

 7  Q.  I want to ask you just a very little bit about a prior

 8  marriage you had, and I know it's difficult.  It's about

 9  Donald Brassfield.  And I won't spend a lot of time on it.

10  But it's been brought up, and I would like to ask you a few

11  questions, if that's okay.

12      You were married — Donald Brassfield is your ex-husband;

13  right?

14  A.  Yes, sir.

15  Q.  Can you tell us when you were married to him.

16  A.  From '86 to 2007.

17  Q.  Okay.  Can you just tell us your understanding of what

18  happened between him and Danielle.

19  A.  I wasn't aware of it until after the divorce, but he had

20  sexually assaulted her as a child.

21  Q.  Okay.  Can you tell the Court what you did to protect

22  Danielle when you found that out?

23  A.  Yes.  The school had called me.  And when I found out the

24  news, I immediately took her to the police department.  And we

25  proceeded with two different police departments because he

MICHELLE SHIELDS - DIRECT

1  lived in Guadalupe County and I lived in Wilson.  Neither one
2  of them wanted to take the case.
3      And so I kept insisting that we go between both, you know,
4  to try to get something done between both counties.
5  Q.  You took — you went to both police departments.  You
6  said, "I kept insisting."
7      Can you tell us a little more detail about that.
8  A.  Yes.  Because I didn't have any evidence to show, and so
9  Guadalupe County actually did a videotape where they sent
10 Mr. Brassfield — where Danielle called him, and he apologized
11 to her for ever hurting her and admitted to what he had done
12 to her.
13     But then the judge said it wasn't enough evidence, and so
14 they dismissed it and no-billed.  And it was very
15 heartbreaking because I couldn't keep her away from him with
16 that being no-billed.
17 Q.  And that — both prosecutions, they didn't go forward with
18 it?
19 A.  No.  So I then hired an attorney.
20 Q.  So that didn't stop you from protecting Danielle; is that
21 right?  You didn't stop?
22 A.  Right.
23 Q.  Can you tell us what you did then when the prosecutors
24 wouldn't go after him?
25 A.  I hired an attorney, and I was — I put up a — oh, I

MICHELLE SHIELDS – DIRECT

1  can't even think right now –– to where he couldn't have any

2  rights around her.  I can't think right now.  Sorry.

3  Q.  That's okay.

4  A.  Just nervous.

5      But when we put up the –– to where he couldn't come around

6  or anything or see her, then he got mad.  And I was talking to

7  him and convinced him to turn over his parental rights, and so

8  he signed over his parental rights so that –– I guess he –– I

9  don't know.  He was just convinced to do it.

10 Q.  Was it hard to get that done even though the prosecutors

11 wouldn't go after him?

12 A.  Yes, it was.

13 Q.  How did you find out about that?  What was going on with

14 Danielle and your ex–husband?

15 A.  She had gone to a counselor at school and –– after we were

16 divorced.  And they called me, and I went up there immediately

17 and was talking to him.  And I was, of course, in shock that

18 it ever happened, so...

19 Q.  Did you hesitate to protect her the moment you found out?

20         MS. KRIEGER:  Objection.  Leading.

21         MR. ALSAFFAR:  I'll rephrase.

22 BY MR. ALSAFFAR:

23 Q.  How long did you take to help protect your daughter when

24 you found out?

25 A.  I went from the school to the police department

MICHELLE SHIELDS - DIRECT

1  immediately.

2  Q.  What were you trying to demonstrate to Danielle, as her

3  mother, when you found out that -- what had happened to her

4  even though, you know, you failed at first to get the

5  prosecutors to move forward, were you trying to demonstrate or

6  model something for her?

7  A.  Yeah.  She shouldn't put up with any of that and that --

8  that it's not right and that you have to go forward and try to

9  do something about it or they're going to keep doing it.

10  Q.  Did Danielle -- based on your knowledge, did she learn in

11  that time that you would do anything to protect her or fight

12  for her if she needed it?

13  A.  Yes, sir.

14  Q.  I'm going to go back a little bit to what we started

15  talking about in terms of the marriage, what the marriage

16  between Devin Kelley and Danielle was like based on what you

17  saw.

18      Was he controlling of her?

19  A.  Yes, sir.

20  Q.  Can you give the Court some examples, to the best of your

21  memory, of what types of things -- you'd mentioned the phone

22  thing, but can you talk about what types of things that Devin

23  Kelley would do to control her?

24  A.  When they lived with us when they came back from Colorado,

25  I'd asked her to go to the grocery store with me.  And he said

MICHELLE SHIELDS - DIRECT

1  that he had to go also.  He wouldn't let us go together.  He
2  had to be present at all times.
3      And he just was always telling her what to do, how to do
4  it.  And he was always — and he was even telling us at some
5  points.  And if he didn't agree with what we were having for
6  dinner, he had a hissy fit.  And so I told him I would fix him
7  what he wanted to eat; he didn't have to eat what we were
8  eating.
9  Q.  There was a few weeks of — in time where, actually,
10  Mr. Kelley — Devin Kelley and Danielle lived with you and
11  Mr. Shields; is that right?
12  A.  Yes, sir.
13  Q.  When was that?
14  A.  When they moved back from Colorado.
15  Q.  And how long did they live there?
16  A.  I would say no more than five weeks or so.
17  Q.  Did Devin Kelley, when he was living in your house —
18  well, let me back up a little bit.
19      So was that an occasion where — you know, why were they
20  living with y'all?  Were y'all trying to help them out?
21  A.  They asked if they could come stay with us until they got
22  a place.  And, of course, I opened — you know, open arms,
23  so...
24  Q.  How was Devin when he was living with you?  How were his
25  interactions with you and then your husband, Mr. Shields?

1  A.  He was very standoff-ish.  He was always picking on my

2  son.

3  Q.  Your son — can you tell us about your son's condition?

4  A.  My son is autistic and ADHD and bipolar, and he has

5  control of it with his medicine and stuff.  But Devin was

6  always picking on him and making fun of him.

7  Q.  Is this David Shields?

8  A.  Yes.

9  Q.  David also regularly attended the Sutherland Springs

10 church; right?

11 A.  Yes, sir.

12 Q.  Okay.  And you said he would bully and pick on your son?

13 A.  Yes, sir.

14 Q.  How did your husband feel about that?

15 A.  He was upset, I think.

16 Q.  Did he —

17 A.  I think he would confront Devin about picking on David,

18 and he would always point the finger at David.

19 Q.  Okay.  So your husband, Ben Shields, had confrontations

20 with Devin about the way Devin treated the family?

21 A.  I wouldn't say "confrontation."  He did talk to him about

22 it.

23 Q.  All right.  Did he try to — when you say he talked to him

24 about it, would he try to get Devin to treat the family

25 better?

435

MICHELLE SHIELDS - DIRECT

1   A.   Yes, sir.

2   Q.   Okay.  What was the reason he — Devin and Danielle left

3   the house five weeks later?

4   A.   Because we told him he had a certain amount of time to get

5   a job, and he wasn't looking for a job.  So — and then he got

6   mad because we told him to look for a job.

7   Q.   Um-hum.  When he was staying with you and Mr. Shields —

8   when he and Danielle were staying with you, did he have a gun?

9   A.   He had a handgun, and we asked him not to have it on the

10  property.  So he had told me he had taken it to his dad's

11  house.

12  Q.   So he would bring the gun onto your — into your house?

13  A.   He did, yes.

14  Q.   Where did he wear it?  Was it — you said it was a

15  handgun.  Did he wear it on his person?

16  A.   Yeah.  His back.

17  Q.   His backside, like here?

18  A.   Yes, sir.

19  Q.   Okay.  Did he do that regularly?

20  A.   As far as I know.

21  Q.   Devin — was Devin very subtle about having a gun and

22  carrying it around, in your experience?

23  A.   I just knew that he had it, and he talked about guns and

24  stuff.  But I only knew of the one gun that he had, and we

25  told him just not to bring it on the property.

MICHELLE SHIELDS - DIRECT

1  Q.  Okay.  And the reason I'm asking, you said you always knew
2  that he had it.
3      How did you always know that he had, you know, that gun on
4  his side?
5  A.  He always talked about it.
6  Q.  Okay.  He wouldn't try to conceal the fact that he was
7  wearing a gun on him?
8  A.  He didn't conceal it, but it was never showing, really.
9  Q.  And that's a good point.  I meant not physically.
10     He wouldn't hide — he would tell people openly, "I've got
11  a gun"?
12  A.  Yes, sir.
13  Q.  Okay.  And at that time, you didn't know that he was a
14  felon who — it was a felon — a felony for him to have that
15  gun?  You didn't know that?
16  A.  No.  Correct.
17  Q.  And you had mentioned that after he left — he and
18  Danielle left, do you know where they went to, where they
19  moved?
20  A.  I'm not sure exactly where they went at first, but I know
21  that they ended up at his parents' house.
22  Q.  Okay.  Michael and Rebecca Kelley?  Is that who you're
23  referring to?
24  A.  Yes.
25  Q.  Okay.  Thank you.

1      And this is the 2015 time frame?

2  A.  I think so, yes.

3  Q.  Okay.  Is that when — you mentioned earlier that Devin

4  would isolate Danielle from your family.

5      Am I characterizing that correctly?

6  A.  Yes, sir.

7  Q.  Okay.  Is that — from that time toward when they left,

8  did that — Devin Kelley trying to isolate her from your

9  family, did that sort of increase over the time leading up to

10  the shooting?

11  A.  It was back and forth during our relationship.  But at the

12  very end, it had decreased when the other child was born.

13  Q.  Do you remember in 2015, a time when Danielle texted you

14  or reported to you that she was being abused by Devin?

15  A.  She sent me some pictures showing that — where he had

16  made bruises on her, and said that he was hurting her.

17  Q.  She sent you text pictures of Devin —

18  A.  She emailed them to me.

19  Q.  Okay.  That was risky for her to do that; wasn't it?

20  A.  Yes, it was.

21  Q.  Can you tell us why.

22  A.  So she just wanted me to have them in case something ever

23  happened to her.  And I told her that we would always be

24  there, just say when and we'd be there to pick her up, her and

25  Michael at that time.

MICHELLE SHIELDS – DIRECT

1  Q.  You told her, as far back as 2015, that all you have to do

2  is say when and you'd be there for her right away?

3  A.  Yes, sir.

4  Q.  But she wasn't allowed to talk to you very much, was she?

5  A.  No, sir.

6  Q.  And every time you did — you were allowed to talk to her,

7  at least on the phone, like, talk on the phone, Devin was

8  there?

9  A.  Yes, sir.

10  Q.  When you told her that — when you let her know that, when

11  she was being hurt by Devin, when you let her know that you

12  would be there for her anytime in a moment's notice, did you

13  mean that?

14  A.  Of course, I meant it.

15  Q.  Was Devin Kelley aware of how close you were to Danielle

16  when he was married to her?

17  A.  I would think so.

18  Q.  Why would you think so?

19  A.  Because he knew that I loved her.

20  Q.  Did Devin Kelley ever just make — sort of make up excuses

21  about conflicts with you that didn't really exist just to keep

22  Danielle away from y'all?

23  A.  Yes, sir.

24  Q.  Can you give me your explanation of what that means.

25  A.  For instance, on — when the second baby was born, he

MICHELLE SHIELDS – DIRECT

1  would say that there was conflict, that — not to insert
2  ourselves between their family.  And we never did.
3      And I just showed up at the hospital because she'd asked
4  me to, my mom and I, when the second child was born.  And then
5  he got all mad because we were at the hospital.  Then he said
6  I was inserting myself between him and the family.
7  Q.  Do you mind if — I actually want to back up just a little
8  bit because I want to talk about that because I think the
9  second baby — do you remember when your — is this your —
10 the year, do you remember when Danielle's second baby was
11 born?
12 A.  2016, I believe.  Yes.  Or 2017.  I'm sorry.
13 Q.  That's okay.  That's okay.
14 A.  2017 in May.
15 Q.  May 2017.  All right.
16     I want to talk about that in just a second, but I want to
17 back up, actually, same year, 2017, about another event, if
18 you don't mind.
19     Do you remember your son's birthday party the same year
20 but a few months before that in March of 2017?
21 A.  Yes, sir.
22 Q.  Okay.  If you don't mind, I'm just going to walk right
23 here to this board.
24 A.  Okay.
25 Q.  When is your son's birthday?

1   A.  March 2nd.

2          THE COURT:  You can relocate if you want.

3   BY MR. ALSAFFAR:

4   Q.  Okay.  If you don't mind, can you tell us, did you have a

5   birthday party for your son?

6   A.  Yes.  It was just family at the time.  So — and it was my

7   mom, my mother-in-law, my husband, myself, my son, and Devin

8   and Danielle and Michael.

9   Q.  I'm sorry.  I didn't hear everybody who was there at the

10  time.  You said —

11  A.  It was Devin, Danielle, Michael, my grandson, and then my

12  mom, my mother-in-law, my husband and I, and David.

13  Q.  Okay.  And David?

14  A.  Yes.  It was his birthday.

15  Q.  Okay.  Right.  That was David's birthday.  Okay.

16      Was this the son who Devin would pick on and bully?

17  A.  Yes, sir.

18  Q.  Okay.  And did you — did I hear you correctly?  You said

19  your mother-in-law was there as well?

20  A.  Yes, sir.

21  Q.  Okay.  Can you tell me what happened at that event,

22  March 2nd, 2017?

23  A.  We had gotten my son a hoverboard, and everybody was

24  taking turns on it, just playing around.  And we told Devin to

25  get on it and try to see, you know, how he did on it.  And my

1   mother-in-law had made a comment, just playing around, like

2   you know, you're being a show-off, you know, because he was

3   doing really good on it.

4       And he didn't like that.  He thought that she meant it in

5   another way, I guess, and turned it all around.  And he said

6   it was time for them to go.  And he asked me to go out on the

7   front porch to talk to them, and I went out there.

8       And he goes, "We're leaving now because I don't like how

9   she talked to me."

10      And I said, "Well, she didn't mean anything by it.  She

11  was just saying that you were good at it, showing off because

12  you were better than everybody else."

13      And she came out there and — she wasn't living with us at

14  the time, and she came out there and said, "Well, I'm going to

15  go ahead and go."  And she went up to give him a hug, and she

16  didn't know that he had really taken it that way.  And he just

17  pushed her away.

18  Q.  What did your husband do when he saw that?

19  A.  My husband was very upset that he treated her that way.

20  And he told him not to treat his mother that way and not to

21  come back if he was going to be treating people that way.

22  Q.  So this was another family member of yours that — and

23  Danielle's that Devin Kelley would mistreat, your

24  mother-in-law?

25  A.  Yes, sir.

1  Q.  And do you remember you gave an interview —— and I know

2  this is hard —— the day of the shooting to the Texas Rangers

3  and you talked about this.

4     Do you remember that?

5     It's okay if you don't.  I can play it for you if you

6  don't.

7  A.  I don't remember having the interview.  But I remember

8  that I was talking to somebody, but I don't remember

9  everything that I said in the interview.

10 Q.  That's okay.  Would it help you remember if I played it

11 for you?

12 A.  Yes, sir.

13 Q.  Okay.  And then I can ask you about it.

14    If we could, what I'm going to do is we're going to

15 play —— it's an audio clip, JEX 598, just real short.  It's

16 12:20 to 12:37.  It's going to play over the audio system.

17 And when it's done, I'll just ask you a couple quick

18 questions.

19    Go ahead.

20    (Clip was played.)

21 BY MR. ALSAFFAR:

22 Q.  Ms. Shields, the Ben that you were talking about in that

23 audio clip — did you hear that — could you hear that okay?

24 A.  Yes, sir.

25 Q.  Okay.  The Ben that you were talking about, that's your

MICHELLE SHIELDS – DIRECT

1  husband?

2  A.  Yes, sir.

3  Q.  Okay.  And you told the Texas Rangers that Ben stepped in

4  when Devin Kelley attacked your mother-in-law.

5      That's the phrase you used?

6  A.  Well, I don't remember saying "attacked," but he did shove

7  her.

8  Q.  Okay.  I'm asking, in that clip, when you were describing

9  that, you used the word "attacked."

10     Did you hear that?

11  A.  I did, but I don't recall saying that.

12  Q.  Oh, that's okay.

13  A.  Okay.

14  Q.  That's okay.  I just wanted to make sure that I heard it

15  correctly, that we accurately heard you telling the Texas

16  Rangers that at the time you were describing it as him

17  attacking your mother-in-law.

18     Is that accurate?

19  A.  Yeah, according to the audio.

20  Q.  And that's what you were describing a few minutes ago when

21  you said your husband stepped in to protect your

22  mother-in-law —

23  A.  Yes, sir.

24  Q.  — from Devin Kelley?

25  A.  Yes, sir.

MICHELLE SHIELDS - DIRECT

1  Q.  All right.  And that was at your house; right?

2  A.  Yes, sir.

3  Q.  Did you do a fair amount of events at your house that

4  included the church family members?

5  A.  Yes, sir.

6  Q.  Was it kind of one big church family at Sutherland Springs

7  church?

8  A.  Yes, sir.

9  Q.  Can you tell us a little about some of those gatherings

10  you would regularly have for the church at your house?

11  A.  We always had Thanksgiving and Christmas at our house, and

12  everybody was welcome to come.  And the family members at the

13  church who didn't have a place to go would always come over.

14  And we would welcome everybody with open arms, and we were

15  just one big family.

16      And then on my husband's birthday, which is New Year's

17  Eve, we always had a big get-together at the house.  And

18  everybody would come over from the church that could make it.

19  A lot of them were close friends from the church.

20  Q.  A lot of those people that were at those gatherings, were

21  they killed by Devin Kelley?

22  A.  Yes, sir.

23  Q.  I want to ask you about — are you okay?  Do you need a

24  break?

25  A.  I'm okay.

MICHELLE SHIELDS - DIRECT

1  Q.  Are you okay?

2  A.  Yeah.

3  Q.  I'm going to ask you -- do you remember the second event

4  you talked about -- I want to get this right -- May 26th,

5  around that time, 2017.  I want to ask you about that.

6  That's --

7  A.  May 26th?

8  Q.  Yeah, when your second grandbaby was born.

9  A.  Okay.

10 Q.  Okay.  What happened in this time frame, May 25th and 26th

11 of 2017?

12 A.  Danielle had wanted my mother and I to be there when the

13 second child was born.  And they had said that when she had

14 her epidural, that they would call us and that we could go up

15 there and be with her.

16     And so we were going out and doing errands and stuff that

17 day, and Devin had texted saying that she had an epidural.  So

18 we said, "We're on our way."

19     And when -- he said, "No, not now."

20     And we were like, "We're just going to be in the waiting

21 room until we're ready."  My mom was texting for me, because I

22 was driving.  And she had offered to get him some food also.

23 And then he said he wasn't playing around, that -- you know,

24 we'd like to show up, but we went to the waiting room waiting

25 to see.  And he said that since we -- he never talked to us;

MICHELLE SHIELDS - DIRECT

1  he just did texts.  He said that since we disrespected his

2  wishes, that we were not going to see my daughter, so — or

3  the baby.

4  Q.  Do you remember when we were talking about, gosh, a few

5  minutes ago the first time in Colorado when Danielle had the

6  first grandbaby?  Do you remember that?

7  A.  Yes, sir.

8  Q.  And I believe you said you and your mom Lula drove up to

9  Colorado?

10 A.  Yes, sir.

11 Q.  That hospital event with Danielle's first baby, was there

12 a confrontation that first time you went to help with the

13 baby?

14 A.  Yes.  It was with Danielle during the pregnancy.  We were

15 in a trailer, and she started running a fever.  And I told her

16 that, you know, we needed to bundle her up because it was cold

17 outside.  We didn't want to put her in ice or nothing, that we

18 would try to sweat it out of her so that way it wouldn't harm

19 the baby or anything.  He got mad and said that he was calling

20 his mom, which is in a different state, and asked us to leave

21 because he didn't want me interfering and trying to take care

22 of Danielle.

23 Q.  Your mom as well, Lula White, was there?

24 A.  Yes.

25 Q.  So he — even though you drove all the way up from Texas,

1  he abruptly told you to leave?

2  A.  Yes.

3  Q.  Let me ask you now about this event in 2017 — in May of

4  2017.

5      I think you told us this was when Danielle was giving

6  birth, I believe you said, in San Antonio?

7  A.  Yes, sir.

8  Q.  And y'all knew — and, again, you and your mom Lula White

9  went to the hospital because she asked you to come be with her

10  when she had her second child?

11  A.  Yes.

12  Q.  That's all that was.  Nothing big.  It's what moms and

13  grandmas do all the time.

14  A.  Yes, sir.

15  Q.  And y'all wanted to be there with her and for her again?

16  A.  Yes.

17  Q.  What happened?

18  A.  Well, he wouldn't let us see her or the child.  And then

19  he started sending threatening messages to me and said that if

20  I didn't obey him, that he would resolve my family, and

21  just —

22  Q.  You said he sent you threatening messages?

23  A.  Yes.

24  Q.  And you said — what do you mean, "threatening messages"?

25  A.  That he would resolve my family, like, take care of us.

MICHELLE SHIELDS - DIRECT

1  And he was always that way.  Like, in Colorado, he got mad and
2  kicked us out.  We went to a hotel room.  And the next day, he
3  showed up and jumped on the bed like nothing was happening and
4  wanted to go sightseeing.
5      So I just thought, well, he'll get over it again tomorrow
6  and, you know, it will be a different day.
7  Q.  He didn't, though; did he?
8  A.  No.
9  Q.  Okay.  I'm going to ask you about those threats in May of
10  2017, specifically, because it's important.  I just played you
11  an audio clip with the officer — law enforcement ranger that
12  interviewed you on the day of the shooting.
13      Do you remember that you also talked to him about these
14  threats and read your phone texts — the specific texts that
15  were on your phone referring to this day?
16  A.  I didn't quite remember that until I was showed it.
17  Q.  Well, would it help you if I showed it to you again?
18  A.  That's fine.
19  Q.  Okay.  If we could, what I'd like to do is, just like with
20  the other audiotapes, you're going to hear yourself — it's
21  kind of weird, I know.  You're going to hear yourself come
22  through.
23      If we could play Joint Exhibit 598 and Clip 11:24 to
24  12:32.
25      (Clip was played.)

MICHELLE SHIELDS - DIRECT

1   BY MR. ALSAFFAR:

2   Q.  So the text that Devin Kelley sent you is May 2017.  I'm

3   just going to put "MS" for Michelle, for you, Michelle

4   Shields.

5       He said he would destroy your entire family; is that

6   right?

7   A.  Yes, sir.

8           MR. ALSAFFAR:  Your Honor, we'd like to mark this as

9   just a demonstrative for –– preserve it for demonstrative

10  purposes in closing.  It's Plaintiffs' Exhibit C.

11          THE COURT:  I've already taken the notes, so don't

12  worry about it.

13          MR. ALSAFFAR:  Okay.  Could you put up the text

14  messages again, please.  Thank you.

15  BY MR. ALSAFFAR:

16  Q.  Ms. Shields, can you see that on your screen okay?

17  A.  Yes, sir.

18  Q.  Okay.  In those messages he was sending to you, do you

19  note there on the –– we're looking at the one on the right,

20  May 26th, 2017, he mentions you, Ben, or Nana.

21      Do you see that part?

22  A.  Okay.

23  Q.  We're going to highlight it for you.

24      Okay.  And I'm just going to –– just because I want to

25  make this very clear on the record, when Devin Kelley sent

MICHELLE SHIELDS - DIRECT

1  this text to you that he would destroy your entire family, and
2  he's referencing you, Ben, or Nana, Ben is Ben Shields; is
3  that right?
4  A.  Yes, sir.
5  Q.  And "Nana" is your mother, Lula White?
6  A.  Yes, sir.
7  Q.  And all three of you, along with your son that he picked
8  on and bullied, were regular attendees at Sutherland Springs
9  Baptist Church; is that right?
10 A.  Yes, sir.
11 Q.  And he knew that?  Devin Kelley knew that; didn't he?
12 A.  Yes, sir.
13 Q.  And you told — do you remember telling the Texas Rangers
14 that you felt like you were the target or your family was the
15 target of Devin Kelley in the shooting?
16     Do you remember saying that?
17 A.  Yes, sir.
18 Q.  Can you tell the Court why you said that.
19 A.  Well, just after learning about — I didn't really think
20 it was domestic violence that he was doing before.  But after
21 the shooting and looking back at all of his behavior and
22 everything, I just assumed that that's what he was doing was
23 coming after us.  And my — I found out later that my daughter
24 had asked for a divorce, and I would think he was coming to
25 get rid of us so that we — she couldn't have a place to go.

MICHELLE SHIELDS - DIRECT

1  That's the only thing I could think of as the reason why he

2  would do that.

3  Q.  And you mentioned the divorce.

4      In the months — the weeks and the months right after the

5  shooting, did Danielle tell you that I — that she had told

6  Devin Kelley that she wanted a divorce?

7  A.  She told me after the shooting.

8  Q.  And that was in the weeks or months after the shooting?

9  A.  Yes, sir.

10  Q.  Okay.  And, Ms. Shields, if Danielle — if Danielle needed

11  you at a moment's notice to watch her kids and help her get a

12  divorce from Devin Kelley, even if it was on a moment's

13  notice, would you have done that without asking any questions?

14  A.  Yes, sir.

15          MR. ALSAFFAR:  Your Honor, we pass the witness.

16          THE COURT:  Any questions for this witness?

17          MS. KRIEGER:  I would ask Mr. Alsaffar to take down

18  his demonstrative.

19          MR. ALSAFFAR:  Where would you like me to move it?

20          MS. KRIEGER:  Somewhere ——

21          THE COURT:  Just remove the sheet.

22          MR. ALSAFFAR:  Can I just flip it over?

23          THE COURT:  Just remove it.

24

25

1                   CROSS-EXAMINATION

2    BY MS. KRIEGER:

3    Q.  Good morning, Ms. Shields.  My name is Jocelyn Krieger.

4    I'm representing the United States in this action.

5        You and I met before.  You may recall I took your

6    deposition.

7    A.  Yes, sir — I mean, yes, ma'am.  I'm sorry.

8    Q.  And I haven't spoken to you other than at that deposition

9    that day; correct?

10   A.  Correct.

11   Q.  Did you review any of the media coverage of yesterday's

12   testimony?

13   A.  No, ma'am.

14   Q.  You didn't read or watch anything?

15   A.  No, ma'am.

16   Q.  Now, Danielle gave you a call on October 30th, 2017; is

17   that right?

18   A.  October 30th.

19   Q.  The 30th, the day before Halloween.

20   A.  Oh, yes.  Um-hum.

21   Q.  And she asked if she and Devin could come to the fall fest

22   at the church the next day?

23   A.  Yes, ma'am.

24   Q.  Now, that was a surprise to you; right?

25   A.  Very.

MICHELLE SHIELDS — CROSS

1  Q.  And that's because you hadn't actually had any

2  conversation with Danielle or Devin for several months?

3  A.  Yes, ma'am.

4  Q.  And back when you did speak with them, Devin controlled

5  all of the conversations; right?

6  A.  Yes.

7  Q.  You told Mr. Alsaffar he was always on speakerphone when

8  you talked to Danielle?

9  A.  Yes, ma'am.

10  Q.  In fact, in all the years that Danielle was married, you

11  never spoke to Danielle without him listening?

12  A.  She did try to, with her laptop, send messages and stuff

13  without him being there.

14  Q.  But if Devin found out about those conversations —

15  A.  Then he would get upset.

16  Q.  — would he take away the laptop?

17  A.  Yes.

18  Q.  And at other times, he would just prevent her from talking

19  to you for months at a time?

20  A.  Yes, ma'am.

21  Q.  And when you were talking to them, if he didn't like what

22  you were talking about, he would hang up the phone?

23  A.  Yes, ma'am.

24  Q.  In fact, you tried to avoid a lot of subjects because he'd

25  get upset?

MICHELLE SHIELDS — CROSS

1   A.   Yes.

2   Q.   And sometimes even in the middle of the conversation, he'd

3   take the phone away from her?

4   A.   Yes, ma'am.

5   Q.   And in all the years that they were married, you were

6   never alone with Danielle?

7   A.   Correct.

8   Q.   Even when they lived with you?

9   A.   Correct.

10  Q.   There was only one time you thought that Devin was

11  physically abusing Danielle; right?

12  A.   Well, the pictures that she sent me.

13  Q.   Right.  That was what we — you just talked about with

14  Mr. Alsaffar, in around 2015 when Danielle sent you the

15  pictures of the bruising?

16  A.   Yes, ma'am.

17  Q.   And when she did that, you asked her if she was hurt;

18  right?

19  A.   Yes, ma'am.

20  Q.   You asked her if you needed to come get her?

21  A.   Yes, ma'am.

22  Q.   You asked her if you needed to call the police?

23  A.   Yes, ma'am.

24  Q.   And she said, "No.  Everything is okay now"?

25  A.   Yes, I believe so.

MICHELLE SHIELDS – CROSS

1  Q.  And other than that one time, you never had any other

2  indications that Devin was physically abusing Danielle;

3  correct?

4  A.  I didn't have the evidence of it, no.  But I just assumed.

5  Q.  You just assumed because he was so controlling?

6  A.  Yes.  Yes, ma'am.

7  Q.  But Danielle never asked you for help leaving Devin?

8  A.  Not to leave him, no.

9  Q.  In fact, until after the shooting, she never said anything

10  to you at all about trying to leave him?

11  A.  Correct.

12  Q.  Now, when Devin wanted something, he was very determined

13  to get it; right?

14  A.  Yes, ma'am.

15  Q.  And Devin lied to you about his criminal record?

16  A.  Yes, ma'am.

17      (Cell phone interruption.)

18          THE COURT:  Can you turn that off.

19  BY MS. KRIEGER:

20  Q.  I'm sorry.  You just said "yes"?  You just said, yes,

21  Devin lied to you about his criminal record?

22  A.  Yes, ma'am.

23  Q.  He actually told you he'd gone to prison for assaulting an

24  officer?

25  A.  Yes, ma'am.

MICHELLE SHIELDS – CROSS

1  Q.  Danielle stopped being a member of the First Baptist

2  Church before she married Devin; correct?

3  A.  She never stopped being a member, but she stopped going

4  because she was going to college too.

5  Q.  And then after she did marry Devin, she only went to

6  services with him maybe two or three times?

7  A.  Yes.

8  Q.  And Devin was with her on all of those occasions?

9  A.  Yes.

10  Q.  Devin never went to the First Baptist Church before his

11  marriage to Danielle?

12  A.  No.

13  Q.  You would have known if he had done that; right?

14  A.  Correct.

15  Q.  Do you remember plaintiffs' counsel talked to you a bit

16  about having events at your house?

17  A.  Yes.

18  Q.  And you talked about having events with your church

19  family?

20  A.  Yes, ma'am.

21  Q.  Danielle and Devin only ever came to your house for those

22  events two or three times, at most; correct?

23  A.  I would say so.  I don't — haven't counted them.

24  Q.  It wasn't very often?

25  A.  No.

MICHELLE SHIELDS – CROSS

1   Q.  So going back to that phone call from Danielle on

2   October 30th, 2017, it was totally out of the blue?

3   A.  Yes.

4   Q.  And you said she asked about coming to the fall fest?

5   A.  Yes.

6   Q.  That's an alternative event to Halloween; right?

7   A.  Yes, ma'am.

8   Q.  It takes place on October 31st?

9   A.  Yes, ma'am.

10  Q.  Same date every year?

11  A.  Yes, ma'am.

12  Q.  And that takes place at the church; correct?

13  A.  Yes.

14  Q.  And Danielle and Devin did actually come to the fall fest

15  in 2017; right?

16  A.  Yes.

17  Q.  They brought the baby?

18  A.  Yes.

19  Q.  They didn't bring your grandson; correct?

20  A.  No.

21  Q.  But you were excited to meet the baby?

22  A.  Yes.

23  Q.  And now while they were there, Devin mentioned to you that

24  he was taking medication?

25  A.  He had said that to my mom and my husband while we were at

1  the registration counter.

2  Q.  You heard him say that he was taking medication?  He said

3  that the medication was for his moods?

4  A.  Yes, ma'am.

5  Q.  He said he'd been having mood swings?

6  A.  Yes, ma'am.

7  Q.  So you said you had been at the registration table.

8      Did you leave the registration table to talk with Danielle

9  and Devin?

10  A.  Yes.  We all walked into the fellowship hall, and they

11  were showing me the baby.  And then he actually left us alone

12  there for a few minutes, which I thought was different for him

13  to do that because he's never done that.

14  Q.  So that's right.  So at some point, Devin left you all

15  alone?

16  A.  Yes.  At one point, yes.

17  Q.  And that was the first time you'd actually been alone with

18  Danielle since she got married?

19  A.  Yes.

20  Q.  It was the first time you had a private conversation with

21  Danielle since she had got married?

22  A.  Yes, ma'am.

23  Q.  And you spent about maybe ten minutes alone with Danielle?

24  A.  I would say closer to five minutes.

25  Q.  You know what Devin was doing while you were alone with

1  Danielle?

2  A.  No.  I didn't find out until later by another member that

3  he was — they saw him casing the place, walking around.  That

4  was after the shooting.

5  Q.  Now, at the fall festival, did you talk to either Devin or

6  Danielle about Danielle's upcoming testimony against Donald

7  Brassfield?

8  A.  Rephrase that.  How did you —

9  Q.  I'm sorry.  Did you know at the time of the fall festival

10  that Danielle was going to testify that Donald — Curt

11  Brassfield — your ex-husband; correct?

12  A.  Yes.

13  Q.  Did you know at the time of the fall festival that

14  Danielle was going to testify against Curt Brassfield at his

15  trial for sexual assault?

16  A.  It had been brought up before in a conversation when Devin

17  was on the phone with us and that he was — she was going to

18  be called to testify against him.

19  Q.  When was that conversation?

20  A.  I don't remember.

21  Q.  Would it have been before the birth of your granddaughter?

22  A.  I'm sure it was probably at that time, because the case

23  was being reopened by his ex-wife, other than me.

24  Q.  And then you didn't actually talk with Devin or Danielle

25  between the birth of your granddaughter and the end of

1  October 2017; right?

2  A.  Correct.

3  Q.  Did you bring up that case — that upcoming testimony at

4  the fall festival at all?

5  A.  No, ma'am.

6  Q.  Now, you are aware that some of the kids at the church

7  used to bully Danielle; right?

8  A.  There was a girl that used to bully her that I know of.

9  Q.  In fact, at your — did you say that all the kids — I'm

10  sorry.

11      Would all of the kids at the church bully each other?

12  A.  No.

13  Q.  Do you recall giving your deposition in this case?

14  A.  Yes, ma'am.

15  Q.  Do you recall — it's your testimony now that there is

16  only one child at the church who ever used to bully Danielle?

17  A.  Well, it was one girl that was supposedly friends with

18  her.  But kids are kids when they're around other kids.  But

19  with her, she did give Danielle a hard time.

20  Q.  So it's your testimony that it was just this one girl who

21  bullied Danielle?

22  A.  That I'm aware of, yes.

23  Q.  Okay.  Do you remember being deposed in this case?

24  A.  Pardon me?

25  Q.  Do you remember giving your deposition?  It was the end of

1  November.

2  A.  I remember giving my deposition.

3      MS. KRIEGER:  Bring up her deposition.  It's GEX 54,

4  page 24 — 124, excuse me, line 15.

5  BY MS. KRIEGER:

6  Q.  Now, at your deposition, you may recall I asked you — you

7  said that some — I'm sorry.  You can read that to yourself.

8  A.  I've read it.

9  Q.  Okay.  Do you now remember saying that all the kids would

10 bully each other at the church?

11 A.  I didn't say "at the church."

12 Q.  You said, "All kids bully each other"?

13 A.  Yes.  Kids will be kids.

14 Q.  Let's look at page 123, lines 10 — I'm sorry.  Top of the

15 page, line — yes, there we go.  Can you read that to

16 yourself.

17 A.  Okay.

18 Q.  Now, I asked you at the time if you were aware of anyone

19 from the church teasing or making fun of Danielle about the

20 abuse.

21     And you said, "Not of the abuse.  They made fun of her on

22 other issues"?

23 A.  Right.  And it was one particular girl, because of her

24 adoption.

25 Q.  So it's your testimony today that when you said "they"

1  made fun of her, you were just talking about one girl?

2  A.  Yes.  Because I don't remember saying "they."

3          MS. KRIEGER:  Take that down.

4  BY MS. KRIEGER:

5  Q.  Now, you said that person made fun of her for being a

6  foster child and being adopted; is that right?

7  A.  Yes, ma'am.

8  Q.  Some people at the church did mock her for sexual abuse,

9  though?

10 A.  As far as I know, nobody else knew except for the pastor.

11 Q.  Did they mock her for being promiscuous?

12 A.  Not that I'm aware of.

13 Q.  Are you aware that Danielle testified yesterday that they

14 mocked her for being promiscuous?

15 A.  No.

16 Q.  You weren't aware of any of this kind of mocking; correct?

17 A.  Correct.

18 Q.  Danielle moved out of your house at age 18; is that right?

19 A.  Yes.

20 Q.  She actually moved in with Erin Brassfield?

21 A.  That was when — her younger year of 18.

22 Q.  Before she was 18, she moved out and moved in with Erin

23 Brassfield?

24 A.  She moved over there and came back.

25 Q.  She lived with Erin Brassfield for some time, even though

1  Erin was still married to Curt Brassfield at the time?

2  A.  I don't know if they were still married.  I don't recall.

3  Q.  Do you know when Erin and Curt got divorced?

4  A.  I don't recall.

5  Q.  Let's go back to the fall festival, to October 31st.

6       To your knowledge, did Devin or Danielle go to your house

7  that day?

8  A.  No, they did not come to my house.

9  Q.  Your house is about half a mile from the church; is that

10  right?

11  A.  Yes.

12  Q.  We were talking about how Devin left you and Danielle

13  alone for a few minutes.

14       But at some point, he came back?

15  A.  Yes.

16  Q.  And then you had to go back to working the registration

17  table?

18  A.  Yes, ma'am.

19  Q.  But you told Devin that you loved him?

20  A.  Yes.

21  Q.  And he said he loved you too?

22  A.  Yes.

23  Q.  And then while you were at the registration table, they

24  left?

25  A.  Yes.

MICHELLE SHIELDS - CROSS

1  Q.  Now, after the fall festival, you didn't speak to Danielle
2  again until the day of the shooting; is that right?
3  A.  Correct.
4  Q.  It wasn't until weeks after the shooting that Danielle
5  told you she had planned to divorce Devin?
6  A.  Yes, ma'am.
7  Q.  You don't have any knowledge of why Devin decided to
8  commit a shooting at the church on November 5th, 2017?
9  A.  Who would?
10 Q.  But you said it feels like you were the target of the
11 shooting?
12 A.  Right.
13 Q.  That's just a feeling that you have?
14 A.  Just a feeling.
15 Q.  You feel responsible, even though you didn't do anything
16 wrong?
17 A.  I don't feel responsible.  I feel like he was targeting us
18 because of my relationship with my daughter, that I wanted to
19 have, you know, a stronger relationship.
20 Q.  That's just your feeling; correct?
21 A.  Correct.
22 Q.  You and Ben and David all lived together; correct?
23 A.  Yeah.  We were together four years and then married ten.
24 Q.  And you lived -- so you lived with your husband Ben
25 Shields?

MICHELLE SHIELDS - REDIRECT

1  A.  Yes.

2  Q.  And you lived with your son David?

3  A.  Yes.

4  Q.  You also lived with your mother-in-law?

5  A.  My mother-in-law didn't move in until after the shooting.

6  Q.  Before the shooting, did Nana live with you?

7  A.  No, she lived next door.

8  Q.  You don't know if Devin committed the shooting because he

9  was angry at you; right?

10  A.  No, ma'am.

11  Q.  He didn't show any anger the last time you saw him?

12  A.  No, ma'am.

13  Q.  No one ever told you that Devin committed the shooting

14  because he was angry at you?

15  A.  No, ma'am.

16  Q.  In fact, the last time you saw him, you said, "I love you"

17  and he said, "I love you too"?

18  A.  Yes, ma'am.

19          MS. KRIEGER:  No further questions.

20          THE COURT:  Anything else?

21          MR. ALSAFFAR:  Very brief, Your Honor, if that's

22  okay.

23                  REDIRECT EXAMINATION

24  BY MR. ALSAFFAR:

25  Q.  Ms. Shields, I want to ask you about that fall fest that

1    Ms. Krieger was just talking about the few days before the

2    shooting.

3        When Danielle came there with her baby, how did the

4    churchgoers at the church respond when they saw her?

5    A.  Everybody was excited to see her.  They were happy to see

6    her, the baby and, you know, welcomed them with open arms.

7    Q.  Did Devin Kelley witness that when Danielle went to this

8    church on that day, a few days before the shooting, that the

9    church family was welcoming her with open arms?

10   A.  Yes.  They also welcomed him.

11              MR. ALSAFFAR:  No further questions, Your Honor.

12              THE COURT:  Anything based on that?

13              MS. KRIEGER:  No, sir.

14              THE COURT:  Any further need for this witness?

15              MR. ALSAFFAR:  No, Your Honor.

16              MS. KRIEGER:  No.

17              THE COURT:  You're excused, ma'am.  Thank you.

18              THE WITNESS:  Thank you.

19              THE COURT:  With that, let's go ahead and take a

20   lunch break.  Let's resume about 1:15, 1:20.

21              (Recess.)

22

23

24

25

1      *(Open court)*

2           THE COURT:  Thank you.  Please be seated.

3      Your next witness.

4           MR. SCHREIBER:  Your Honor, the plaintiffs would call

5      Michael Kelley.  Mr. Kelley's here with his own personal

6      attorney.  She'll sit here behind me, if that's okay.

7           THE COURT:  Yes.

8      *(The oath was administered)*

9           MR. SCHREIBER:  Mr. Kelley, first, would you mind

10     taking off your mask since you're away from everybody and

11     behind the plexiglass.

12     Your Honor, I believe you'd like to see him testify

13     without the mask.  Is that true?  Or do you care?

14          THE COURT:  If he can be heard through the mask,

15     that's fine.  But we can --

16          MR. SCHREIBER:  Okay.  That's fine.  Whatever you're

17     most comfortable with, Mr. Kelley.

18          THE WITNESS:  I prefer the mask.

19          MICHAEL KELLEY, PLAINTIFFS' WITNESS, SWORN

20                    DIRECT EXAMINATION

21     BY MR. SCHREIBER:

22     Q.  Yes, sir.  My name is Joseph Schreiber.  You and I met at

23     your deposition, correct?

24     A.  Correct.

25     Q.  And aside from speaking outside in the hallway just to

1  tell you kind of the order of witnesses, we never talked

2  before or since, have we, sir?

3  A.  No, sir.

4  Q.  What I want to do today -- and I promise I won't keep you

5  very long -- is I want to talk about your background and your

6  family first.  Then I'm going to talk about what you knew

7  about Devin Kelley, your son's crimes in the Air Force.  And,

8  third, I want to talk -- talk about guns for a little bit.

9  Okay?

10 A.  Uh-huh.

11 Q.  And I will switch -- I'll try and let you know when I

12 switch topics.  And if you say "uh-huh" or "huh-uh," I'm going

13 to have to ask you if that's a "yes" or a "no" just so the

14 court reporter can get it.

15 A.  Okay.

16 Q.  If for some reason you don't understand any of my

17 questions, because I mumble or speak too fast, just let me

18 know.  And I'll do the same if we can't hear you as well.

19 Okay?

20 A.  Okay.

21 Q.  First off, what's your full name, sir?

22 A.  Michael Kelley.

23 Q.  Do you have a middle name?

24 A.  Shawn.

25 Q.  Tell me, are you married?

MICHAEL KELLEY – DIRECT                    469

1  A.  Yes.

2  Q.  What's your wife's name?

3  A.  Rebecca Anne Kelley.

4  Q.  Do you have any children?

5  A.  Yes.

6  Q.  Can you tell me your children's names.

7  A.  Lauren Kelley, Devin Kelley, and Lillian Kelley.

8  Q.  How old is Lauren?

9  A.  35.

10  Q.  And how old is Lillian?

11  A.  25.

12  Q.  How long have you been married to Rebecca?

13  A.  41 years.

14  Q.  Give me one moment.  Got to get my water in case I need

15  it.

16      In 2017, where did y'all live?

17      Don't give me an exact address.  Just tell me general area

18  y'all lived.

19  A.  In New Braunfels.

20  Q.  Did you live on some property?

21  A.  Yes.

22  Q.  How many acres did y'all have?

23  A.  Approximately 28.

24  Q.  How long had you lived on that 28 acres?

25  A.  As of 2017 –– right now, it's like 28 years.  So I guess

1    that'd be 25-ish.

2    Q.  Where did you graduate from college?

3    A.  Texas A&M.

4    Q.  What years did you go there?

5    A.  Graduated in '79.

6    Q.  What did you study?

7    A.  Economics.

8    Q.  And what's your career been?

9    A.  I was -- well, I did several things.  I started off in

10   sales with a computer company and then went into accounting

11   with an HMO and eventually went up in management.  And then I

12   went off onto my own software company.

13   Q.  How long did you have your own software company?

14   A.  Since 1985 or '86.

15   Q.  Do you have an office, or do you work out of your house?

16   A.  Work out of the house.

17   Q.  Has that been that way since 1985 or '6?

18   A.  Yes.

19   Q.  A direct question:  Have you ever been convicted of any

20   crimes?

21   A.  Not that I'm aware of.

22   Q.  Have you ever been charged with any crimes?

23   A.  Speeding tickets.  Does that count?  I don't know.

24   Q.  Anything other than a speeding ticket?

25   A.  Not that I'm aware of.

MICHAEL KELLEY – DIRECT                  471

```
 1   Q.  Aside from a speeding ticket, have you ever been in
 2   trouble with the law?
 3   A.  Not that I'm aware of.
 4   Q.  Your daughter, Lauren, what is -- what does she do?
 5   A.  She's on disability.
 6   Q.  Has she ever been in trouble with the law?
 7   A.  Not that I know of.
 8   Q.  And what about Lillian?  What does she do?
 9   A.  She is a buying assistant now.
10   Q.  For a store or for --
11   A.  Yeah, for a corporation.
12   Q.  Has she ever been in trouble with the law?
13   A.  Not to my knowledge.
14   Q.  And we'll talk to your wife in a moment when you're
15   finished.
16        But your wife, has she ever been in trouble with the law?
17   A.  Not that I know of.
18   Q.  I'm going to switch gears, and I'm going to do this pretty
19   frequently, sir.
20   A.  Is it okay if I hold the mic?  Because this is making my
21   back hurt, having to lean forward, and this chair won't move.
22   Is it okay if I hold the mic?
23            THE COURT:  That's fine.
24            MR. SCHREIBER:  Is that all right?
25            THE WITNESS:  Yes.
```

```
 1            THE COURT:  Okay.
 2   BY MR. SCHREIBER:
 3   Q.  When did Devin –– or sorry.
 4       Devin Kelley is your son, correct?
 5   A.  Correct.
 6   Q.  When did Devin go into the Air Force, approximately?
 7   A.  Six months after he got out of high school, so I guess
 8   that would be in '10.
 9   Q.  2010?
10   A.  Yes.  Or January –– it was January 2010, '11.  I don't
11   remember now.
12   Q.  We'll talk about Devin's court-martial in a little bit.
13       But preceding Devin's court-martial, did he have any
14   trouble in the Air Force before that court-martial, to your
15   knowledge?
16   A.  Not to my knowledge.
17   Q.  Did he ever go AWOL and come home without leave?
18   A.  Yes.  There was one time.  I don't know if it was
19   officially called AWOL or not.
20   Q.  Tell me about that.  What happened?
21   A.  Well, I just –– I got a call from someone –– I don't
22   remember who it was at the base –– that said Devin is not
23   there and wanted to know if he was there.  And I said, "Well,
24   I don't think so."
25       Shortly after, as I recall, he showed up.  And they said
```

1    "Well, we'd rather not list him as AWOL.  So, you know, can

2    you call" -- or they were going to call back.  I don't

3    remember.  But, in essence, I drove him back.

4    Q.  So Devin essentially came to your house in New Braunfels

5    without his superiors knowing, I assume?

6    A.  I don't know.  I would assume so, but I have no direct

7    knowledge.

8    Q.  And they wanted him to come back, correct?

9    A.  Correct.

10   Q.  And did you help get him back to the base?

11   A.  Yes.  I drove him back.

12   Q.  Do you know why Devin came home?  Did he tell you?

13   A.  I don't remember if he told me or not.  I don't really

14   remember the details.

15   Q.  I guess the only point I'm making is that when Devin came

16   home, you didn't hide him away or anything.  You took him

17   back, correct?

18   A.  No.  Of course.

19   Q.  Was there one point in the Air Force you got a call about

20   getting a gun that Devin had on base?

21   A.  Yes.  I got a call from his NCO, I believe it was, asking

22   me if I would mind coming down and getting his gun from him

23   and keeping it.

24   Q.  Getting Devin's gun from Devin?

25   A.  Yes.

1    Q.  What — do you know what the issue with Devin having a gun

2    on the base was?

3    A.  I have no idea what base rules are with a gun or not.

4    Nobody told me.  I happened to be up there relatively close,

5    distance—wise, at our cabin.

6    Q.  Where's your cabin?

7    A.  In New Mexico.  It was about an hour from Holloman.

8    Q.  You drove down to Holloman?

9    A.  And I drove down and met Devin and the NCO, and they went

10   into a building that I believe someone told me at some

11   point — or I came to know — was where you — you know,

12   soldiers could check in their own firearms or whatever.  I

13   don't know.  I didn't go inside.  But I assume there were

14   individual safes or something.  I have no idea.

15       Anyway, Devin and the NCO came out.  And Devin gave me his

16   gun, and I left.

17   Q.  What did you do with the gun?

18   A.  I kept it at our cabin for a period of time.

19   Q.  And what happened at the end of that period of time?

20   A.  Eventually, I sold it to the pawnshop or gun shop there in

21   Ruidoso.

22   Q.  Why did you sell the gun?

23   A.  I already had a pistol, and so I didn't need an extra one.

24   And I was never really given clear answers on anything from

25   the Air Force.

MICHAEL KELLEY – DIRECT                           475

1    Q.  Did Devin want you to sell the gun?

2    A.  I don't know that he and I ever talked about me doing that

3    in advance.

4    Q.  But you did it anyway.  You got rid of the gun when

5    somebody asked you to come get it, correct?

6    A.  Correct.  I took it up to the cabin, yeah.

7    Q.  There was no Second Amendment protest or anything like

8    that?

9    A.  Not that I recall.

10   Q.  I'm going to switch over now, jump ahead and talk about

11   Devin's court-martial.

12   A.  Uh-huh.

13   Q.  Were you present at any stage in that court-martial

14   proceeding?

15   A.  I don't know the technical terms of the various

16   proceedings.  But the end, I think, they called sentencing or

17   something, they called me to make a statement.

18   Q.  Were you there during the -- I guess they call it either

19   the plea or the punishment -- the plea phase or the trial

20   phase?

21   A.  Not that I recall.

22   Q.  Did you hear --

23   A.  Because I don't think there was, like, an initial stage.

24   Q.  Are you aware that Devin pled guilty to a couple of

25   charges?

1    A.  I'm aware that he pled guilty to a couple charges.

2    Q.  Did you know at the time what those charges were?

3    A.  At the time, I don't remember if I knew specifically or

4    not.  I assumed something related to Jack and the bruises on

5    his face.

6    Q.  Jack was Devin's wife Tessa's son, correct?

7    A.  Tessa's son, correct.

8    Q.  Did you know the specifics of what Devin was accused of as

9    far as Jack goes?

10   A.  No.

11   Q.  Did you know --

12   A.  Not that I recall.

13   Q.  Did you know whether or not Devin was charged with any

14   assault against Tessa, his then wife?

15   A.  I don't remember.  I don't think I did.  But, you know, I

16   was told on several occasions that, you know, "Mr. Kelley,

17   this doesn't involve you; you're just the dad."

18   Q.  Who was -- Okay.  Who would say that you're just the dad?

19   A.  As I recall, it was Mark Rosenow, the Air Force attorney

20   that was supposed to be representing Devin.

21   Q.  Do you know what he -- I guess I'm not asking you what he

22   meant, but what did you take that to mean that "you're just

23   the dad"?

24   A.  Mixed emotions.  Part of it was, okay, we're in a society

25   with HIPAA rules, and no one can talk to anybody after they're

1    18, and blah, blah, blah.  But also, as in a -- you know, just

2    be quiet, don't get involved, come by, see him, be moral

3    support, but basically, you know, you're not -- you're not

4    part of this.

5    Q.  Did you recall Devin being in a place called Peak Mental

6    Health?

7    A.  Yes.  I didn't know at the time it was mental health.  I

8    just heard it referred to as Peak, whatever that stands for.

9    Q.  I have no idea, frankly.

10       Did you visit him at Peak?

11   A.  Yes.

12   Q.  Were you aware that Peak, at least part of it, was a

13   mental hospital?

14   A.  I don't know at the time that I was aware it was a mental

15   hospital.  It was explained to me -- and I don't remember who

16   explained it, if it was Devin or somebody else -- that when

17   soldiers from the base there were having issues, they would

18   send them over there for a period of time.

19   Q.  Do you know how many times Devin was at Peak?

20   A.  At the time, no.  I now know from, you know, his

21   depositions and all that it was twice.

22   Q.  At the -- I want to know what you knew back then,

23   pre-2017, basically.

24   A.  I don't really remember if I knew.  We visited him there

25   several times, twice.  But, you know, it was a decade ago.  I

1  don't remember if it was all on the first trip, the second

2  trip, one each trip.  I don't really remember.

3  Q.  For a timeline, was Devin, in your recollection, in Peak

4  before or after the court-martial, if you recall?

5  A.  I don't really recall.  I would assume it would have been

6  before or during, because then they had him in solitary.

7  Q.  Do you recall Devin leaving Peak without permission and

8  getting picked up at a bus station?

9  A.  I remember hearing about it.

10  Q.  How did you hear about it?

11  A.  I don't remember.  I probably got a call from the first

12  sergeant again or somebody.  I don't know.

13  Q.  Do you recall what the first sergeant would have said?

14  A.  No.  I don't recall after this time.

15  Q.  Did you get involved in any way in helping get Devin back

16  to the base?

17  A.  No.  Because he wasn't there.  We were 600 miles away.

18  Q.  When Devin went back to Peak after eloping, did you go

19  visit him at Peak?

20  A.  Yeah.  I don't remember when we made visits.  I don't

21  remember which timeline they were.

22  Q.  When you went -- so let's go back to the court-martial,

23  then.

24       You were present at the sentencing phase, correct?

25  A.  I think that's what they called it, yes.

1   Q.  And you gave testimony, correct?

2   A.  Correct.

3   Q.  What was your -- the -- generally, what was your testimony

4   at the sentencing phase?

5   A.  I mean, I don't really remember a lot of the specifics.

6   But, generally, the presiding judge or colonel or major,

7   whatever he was, basically was asking me if Devin had a place

8   to go back to when he, you know, was released.

9   Q.  And what --

10  A.  And the answer was, you know, yes, he has a house.  You

11  know, we're not just going to turn him out on the street.

12  Q.  So you told the Air Force that Devin was going to come and

13  live with y'all, correct?

14  A.  Correct.

15  Q.  Back at the same place in New Braunfels?

16  A.  Correct.

17  Q.  Outside New Braunfels.

18      Did you talk to -- and you said the gentlemen's name was

19  Rosen, correct?

20  A.  Mark Rosenow.

21  Q.  Rosenow.

22      And that was Devin's Air Force attorney, correct?

23  A.  Yeah, the Air Force appointed attorney, yeah.

24  Q.  Did you talk to that attorney about any restrictions Devin

25  might have when he came out of confinement?

1  A.  Generally.  And –– excuse me –– this is very general

2  because it's a decade later.  I don't remember all the

3  specifics.  But the general gist of it was, is this going to

4  be considered a felony or a misdemeanor or what, so that we

5  would know if, you know, Devin can vote, can he, you know, get

6  a passport to travel or, you know, those kinds of things.

7      And he basically told me that, you know, no one knows.

8  And I said, "Well, what do you mean 'no one knows'?"

9      And he said, "Well, the Air Force is federal; therefore,

10  it's federal."  But because of the time or something, it's a

11  misdemeanor.  So he said, "You got to go talk to attorneys and

12  pay them and see what they say.  But I'm telling you right

13  now, you talk to ten attorneys, you're going to get ten

14  different answers."

15      And I said, "No one really knows?"

16      And he said, "No.  It's a gray area."

17      I said, "Okay."

18  Q.  Were you told by that attorney or anybody else in the

19  Air Force that Devin could not possess a gun when he got out

20  of military confinement?

21  A.  Not that I recall.

22  Q.  Is that something you would have wanted to know since he's

23  coming back to your property?

24  A.  I would think that I would want to know any restrictions

25  that may or may not be placed upon him.

MICHAEL KELLEY – DIRECT                    481

1  Q.  But nobody from the Air Force told you that Devin couldn't

2  possess a gun, correct?

3  A.  Not that I recall.

4  Q.  When Devin got out of the Air Force, did he come back to

5  your -- to your place?

6  A.  Yes.  I picked him up.  They dropped him off at a hotel in

7  the town outside the base, and I drove down and picked him up

8  at the hotel.

9  Q.  And then did y'all go straight back to the New Braunfels

10  area?

11  A.  No.  We went back to the cabin for -- I don't know what it

12  was -- day or two.  I don't remember.  And then we headed

13  home.

14  Q.  What was the point of going to the cabin?

15  A.  Well, for one thing, all of my stuff was there.  Okay.

16  And it's a very, very long drive.  So to, you know, stop by

17  and pick him up -- and I didn't know what to expect, timing or

18  anything else that -- you know, so I was just, "Okay.  I'll

19  pick you up and we'll go back to the cabin."

20  Q.  And then y'all went back to New Braunfels, correct?

21  A.  Correct.

22  Q.  And when you first got back to New Braunfels, where was --

23  where was Devin living on your home place?

24  A.  In the barn.

25  Q.  I want to talk about your property, in general.

```
 1        You said it's 28 acres, correct?
 2   A.  Correct.
 3   Q.  And we saw earlier in the trial a video at the front --
 4   the front gate where a police officer came up, right?
 5   A.  Right.
 6   Q.  Your area, is it relatively hilly?
 7   A.  It's upward-sloping from the highway up to our house.
 8   Q.  Is it wooded?
 9   A.  Pretty heavily, yes.
10   Q.  The house, does it -- where does the house sit, in
11   general?  Like in the middle?  On the edge?  The main house.
12   A.  In -- fairly close to the center, right to left.  And
13   probably, I don't know, two-thirds of the way back.  I'm just
14   guessing.
15   Q.  Where is the barn located relative to the house?
16   A.  Like I told you in the deposition, I'm not real good with
17   visual distances, so I got to relate it to like a football
18   field.  And if I were to guess, I don't know, it's 50 yards,
19   75 yards.  I'm just ballparking it.
20   Q.  Sure.
21        What's between the house and the barn in those 50 yards?
22   Is it bare, flat ground?  Is it pasture?  Is it woods?
23   A.  Mostly woods.  And there's some rocks in between, but it's
24   heavily wooded.
25   Q.  Is it on the same level, the barn and the house?
```

1   A.   No.  Because it seems like I'm going slightly uphill every

2   time I walk up there.

3   Q.   Up to the barn?

4   A.   Right.  But it's not like it's a huge difference.  I don't

5   know.  Two-feet-higher elevation, whatever.  I don't know.

6   Q.   Is there a clear sight line between the house and the

7   barn?

8   A.   Not really.

9   Q.   So if you're standing -- is there a porch on the house?

10  A.   Correct.

11  Q.   If you're standing on the porch, can you see what's going

12  on in the barn?

13  A.   You couldn't see what's going in.  I think maybe -- if

14  you're on the edge of the porch and you lean out, maybe you

15  can see the very corner metal part of the barn, maybe.  I

16  don't know.  I haven't really paid that close attention to it.

17  But you definitely can't see in the windows, the doors, you

18  know, the full front of it or anything like that.

19  Q.   Do y'all have animals on the property?

20  A.   At times, yes.

21  Q.   What kind of animals do y'all have?

22  A.   Dogs, cats, horses, cows.

23  Q.   If someone's talking down at the barn, can you hear it up

24  at the house?

25  A.   Probably not.  It'd have to be yelling, and then it might

1    be kind of muffled.  You can't hear anything from inside the

2    house because it's very well insulated.

3    Q.  On a day-to-day basis, say from 2015-2017 -- this is a

4    fairly general question -- what were your days like?

5        Did you -- did you get up and work in the house, in an

6    office in the house?  Or were you always out on the property,

7    like on an ATV or something?  What were your days like?

8    A.  No.  Well, I don't own an ATV.  But, no, I mean, I --

9    typically, we'd get up and we'd go run or walk or whatever our

10   exercise routine was in the morning.  And in town, I might

11   make trips to the bank or the post office or, you know,

12   whatever, and then usually in the house.

13   Q.  I want to talk about the barn for a minute.

14   A.  Okay.

15   Q.  When Devin got back from the Air Force, was it outfitted

16   for somebody to live in the barn at this point?

17   A.  It had been, yes.

18   Q.  And what portion of the barn was outfitted as living

19   quarters?

20   A.  Roughly a 10-foot side of it that used to be a raised deck

21   for putting hay and seed and all on.

22   Q.  And how big was the rest of the barn, approximately?

23   A.  It's 30 by -- 30 by 60, 30 by 90?

24   Q.  Did you have tools out at the -- at the barn?

25   A.  Yeah.  It's a barn.  It has, you know --

MICHAEL KELLEY – DIRECT                                    485

1    Q.  Did it have a full machine shop out there?

2    A.  No.

3    Q.  When we talk about tools, are we talking -- what kind of

4    tools are we talking about?

5    A.  Anything from storing T-posts, rolls of wire, the Bobcat,

6    you know, which is a tractor; implements for the Bobcat.  You

7    know, pieces of wood, you know, scrap pieces of wood.  You

8    know, just general storage.

9    Q.  You didn't have, like, an industrial lathe out there?

10   A.  No.  I wish.

11   Q.  You didn't have, you know, any essentially manufacturing

12   or forging equipment out there, did you?

13   A.  No.  I mean, at times, there's been a radial arm saw out

14   there.

15   Q.  But nothing where you could forge metal out there?

16   A.  No.  I'm not a metal person.

17   Q.  And to your knowledge, was Devin ever trained as a

18   millwright?

19   A.  A what?

20   Q.  Somebody who uses a lathe.

21   A.  Not that I'm aware of.

22   Q.  Did Devin have any technical training on how to

23   manufacture metal goods, to your knowledge?

24   A.  Not to my knowledge.

25   Q.  And there was, again, nothing out there in that barn that

MICHAEL KELLEY – DIRECT                    486

1  was a machine shop, correct?

2  A.  No, nothing at all.

3  Q.  And anywhere else in your property, there's no machine

4  shops in your property, were there?

5  A.  No.

6  Q.  And I guess, without saying, there's no lathe anywhere on

7  your property, is there?

8  A.  No.  A lathe is the thing that just spins round and round?

9  Q.  Yeah.  It's a giant piece of machinery that a millwright

10  could use to manufacture metal or --

11  A.  I have wood saws, and that's --

12  Q.  L-A-T-H-E is what I'm talking about.

13  A.  Right, right, right, right, right.

14  Q.  I want to talk now about your guns.

15  A.  Okay.

16  Q.  When Devin got out of the Air Force, when he got out of

17  confinement and he came back to the house, did you own any

18  guns?

19  A.  Yes.

20  Q.  What guns did you own?

21  A.  I have a pistol, 9-millimeter pistol.  And at that time, I

22  think I had the shotgun and the .22 rifle.

23  Q.  Did you later get any other weapons between when Devin got

24  out of court-martial and November 5, 2017, the church

25  shooting?

MICHAEL KELLEY – DIRECT                          487

1    A.  Well, at some point, we added another smaller,

2    lighter-weight pistol, but I don't remember exactly the

3    timeframe of it.  And then I bought an AR.

4    Q.  When did you buy the AR, approximately?

5    A.  I don't remember.

6    Q.  Ballpark?  2016?  2017?

7    A.  I'm going to guess '16, '17.  I really don't remember.

8    Q.  Where were your guns kept?  Where did you keep them on a

9    day-to-day basis?

10   A.  On the day in question?

11   Q.  No.  I mean from basically 2013-2017, where did you keep

12   your guns?

13   A.  Same place they are now.  It's -- we call it the gun

14   cabinet.  It's really an antique wardrobe.

15   Q.  Can you describe this thing for me.

16   A.  It's like maybe 7-foot tall and 4-foot wide.

17   Q.  What's it made out of?

18   A.  Wood.

19   Q.  Is it light wood?  Heavy wood?

20   A.  Oh, it's heavy.  It's mostly a walnut.

21   Q.  Is it -- does it have a lock?

22   A.  Yes.

23   Q.  What's -- is it just a standard, like, double-key lock?

24   A.  Like the old, you know, skeleton key kind of lock.  I

25   don't know that "skeleton key" is the right term.  But, you

MICHAEL KELLEY – DIRECT                                    488

1   know, it's not a padlock, if that's what you mean.

2   Q.  Did you consider it secure?

3   A.  Well, it's as secure as can be.  If someone wanted to come

4   in with a hammer and a crowbar, I'm sure they could do some

5   damage.  But it would be pretty obvious.

6   Q.  Would it be difficult to get in there?

7   A.  To get in there?

8   Q.  If the cabinet -- if that gun cabinet was locked, would it

9   be difficult to get in?

10  A.  It would -- I would think it would take some time and

11  effort and tools.

12  Q.  Did you use trigger locks on your weapons?

13  A.  Periodically, at times, yes.

14  Q.  Which weapons did you put trigger locks on?

15  A.  At various times, on all of them or each of them.  It, you

16  know, just depends.

17  Q.  And I don't want to -- because we're in open court here, I

18  don't want specifics when I ask this question.

19      Is the gun cabinet, or the gun -- is it in a secluded

20  place in the house or is it somewhere, like, near an entrance?

21  A.  No.  It's where -- what we call our dressing room, which

22  is off our bathroom.

23  Q.  Is that far back into the house?

24  A.  That's back on the far, far corner.

25  Q.  Did anybody have access to that gun cabinet except for you

MICHAEL KELLEY – DIRECT                    489

1    and your wife?

2    A.  Anybody who walked through the house would see it.  I

3    don't know how you define "access" to it because it's locked.

4    But, you know, I mean, if someone came in to use our shower or

5    our bathroom, you know, they could see it.

6    Q.  And I asked a poor question.

7         How many keys did you have for that?

8    A.  There's just one.

9    Q.  And who knew where that key was?

10   A.  As far as I know, just me and my wife.

11   Q.  To your knowledge, did Devin ever access your guns?

12   A.  Not to my knowledge.

13   Q.  Did Devin have his own guns?

14   A.  Yes.

15   Q.  What guns did Devin have?

16        And I'm talking now from the time he left the Air Force

17   until the church shooting.

18   A.  I don't remember which guns he had at what point.

19   Q.  Sure.

20   A.  I know the day of the shooting, he had his pistol and his

21   AR.  And he had just recently bought a .22 plinker, you know,

22   a little target-shooting pistol.

23        But at some point through the deposition, someone brought

24   up a shotgun, and I do remember him having a shotgun at one

25   point.  I don't remember when it was or where it came from or

1    where it went to or anything else.

2    Q.  Did Devin ever go into your gun cabinet and get any of

3    your guns?

4    A.  Not to my knowledge.

5    Q.  Did Devin ever ask to get any of your guns?

6    A.  Not to my knowledge.

7    Q.  I believe at some point, he helped clean one of the

8    pistols; is that correct?

9    A.  Correct.

10   Q.  Can you tell me about that.

11   A.  Well, it's a smaller pistol that's got a really weird way

12   of taking it apart.  It's a special tool and everything.  And

13   I still haven't figured out how to do it smoothly.  Okay?  But

14   it doesn't get used very often, so it doesn't need cleaning

15   very often.

16       But I remember on one occasion -- there may have been a

17   couple -- where, you know, we'd sit down at the kitchen table,

18   and I'd drag out all my cleaning stuff.  And we'd go through

19   and clean the shotgun, the rifle, you know, the pistols, or

20   whatever.  And, you know, he'd sit there and help and, you

21   know, probably did his.  But I don't really remember.

22   Q.  Did you then put the guns back up?

23   A.  Yes.

24   Q.  And was it your habit to keep the guns under lock and key

25   if they weren't being used?

1   A.  With the exception of I usually sleep with one on my

2   bedside stand at night.

3   Q.  A pistol?

4   A.  Yes, pistol.

5   Q.  Aside from that, it's your habit to keep the guns locked

6   up?

7   A.  Unless we're traveling or, you know, things like that.

8   But, yes, like right now, they're all locked up in there, you

9   know, because we're not at home.

10  Q.  You don't just leave them laying around?

11  A.  I'm not going to say it's never, ever happened.  But I

12  can't think of any time.  And as a practical matter, there --

13  you know, that's why we decided where to put them.

14      We had grandkids running around.  Back in the day we had

15  kids running around.  And last thing I want to do is hear a

16  shot go off and, you know, have a problem, ruin my life.

17  Q.  To your knowledge, did Devin buy his guns from gun stores?

18  A.  I have no knowledge.

19  Q.  You don't know where they got them?

20  A.  I have no idea.  One of them, I know he bought -- maybe

21  more -- in Colorado.  But I was never with him when he bought

22  a gun.  I don't ever remember him saying where he bought them.

23  So I have no direct knowledge.

24  Q.  Have you ever -- you ever bought a gun for somebody else?

25  A.  No.

MICHAEL KELLEY – DIRECT                           492

1   Q.  Would you ever buy a gun for somebody else?

2   A.  I can't imagine me doing something like that in this day

3   and age.

4   Q.  But you're familiar -- you got a -- you bought your gun at

5   gun stores, correct?

6   A.  Correct.

7   Q.  And you're familiar, generally, when you buy a gun at a

8   gun store, you have to fill out a form for the federal

9   government, correct?

10  A.  Yeah.  You have to fill out forms, and they do the

11  background check, and then you can get your gun.

12  Q.  And one of the things it says is this is going to be your

13  gun, right?

14  A.  I don't remember.

15  Q.  But you would never -- you never in your life have bought

16  a gun for anybody else, correct?

17  A.  Not that I recall, no.

18  Q.  And let me back up a second.  And I think I asked you this

19  already.  I apologize for repeating myself.  I want to be real

20  specific.

21      When Devin got out of the Air Force, nobody from the

22  Air Force told you he couldn't have a gun, did they?

23  A.  Not that I recall.

24  Q.  And Devin did have guns at your property, correct?

25  A.  Correct.

1   Q.  If you had known that Devin couldn't possess a gun, would
2   you have let him have a gun on your property?
3   A.  Well, obviously not.  I mean, if I had known he was not
4   allowed to have a gun, I would have told him, "Son, I don't
5   know why you got a gun, but you can't have it on this
6   property.  You leave.  Go figure it out, whatever.  But we're
7   not going to go down that road here."
8   Q.  And if you had known Devin couldn't have a gun, you
9   certainly wouldn't have bought him a gun, would you?
10  A.  Obviously not.
11  Q.  And if somebody were to come in who had never met you and
12  claim they read something about you and said "Well, Mr. Kelley
13  would have bought Devin a gun illegally," you'd disagree with
14  that, wouldn't you?
15  A.  Oh, wholeheartedly, because I know I have never bought him
16  a gun.
17  Q.  And you never would if it were illegal?
18  A.  No.  I don't know that I would even buy someone a gun if
19  it were legal, because you got to go through the paperwork,
20  background checks or whatever.
21  Q.  I want to switch and talk to you briefly just about the
22  time -- your relationship with Devin and Danielle and the
23  kids.
24      Do you recall when Devin got married to Danielle?
25  A.  Yes.

1   Q.   Approximately when was that?

2   A.   I'm going to guess it was somewhere in that fall, maybe

3   early spring, after he was released from confinement.

4   Q.   Did you know her at all before they married?

5   A.   Never -- well, I mean, she lived with him in the barn for

6   a period of time, if that's -- prior to that, no, I didn't

7   know who she was.

8   Q.   Prior to Devin getting married to Danielle, did you talk

9   to him on a regular basis?  I'm talking from the end of

10  confinement when he came back home to when he got married to

11  Danielle -- and so we're splitting up time here -- did you

12  talk to Devin on a daily basis?

13  A.   I don't recall if it was daily.

14  Q.   Would it be --

15  A.   I mean, on a regular basis, yes.  I mean, it's just like

16  even afterwards, I might -- I might see him twice in one day.

17  You know, I may not see him for a week, ten days, you know,

18  because I didn't go up to the barn on any kind of regular

19  basis.  And we were out of town a lot and --

20  Q.   You say "we," you and your wife?

21  A.   Yes.

22  Q.   At some point when Devin got married, Danielle, I guess

23  she moved onto the property.  Was it shortly before or after

24  they got married, do you recall?

25  A.   That they what?

MICHAEL KELLEY – DIRECT                        495

1    Q.   That she moved onto the property?

2    A.   She moved on the property before they got married, as I

3    recall.

4    Q.   Did you talk to Devin and see him as much when he got

5    married -- when Danielle moved onto the place?

6    A.   I don't remember.

7    Q.   At some point, they moved and went down to Kingsville, I

8    believe?

9    A.   Correct.

10   Q.   Do you recall when that was, approximately?

11   A.   It was that spring after he was released in April.  It was

12   the following spring, if I recall.

13   Q.   So a year later?

14   A.   Well, a little less than a year.

15   Q.   Do you know how long they were down in Kingsville?

16   A.   I believe she dropped out of the school there within

17   couple months, three months.  I don't remember.

18   Q.   What was your -- how often would you talk to Devin when

19   they were down in Kingsville, approximately?

20   A.   No idea.

21   Q.   Was it like a weekly occurrence?  Two weeks?

22   A.   I really don't remember.

23   Q.   Did they move up to Colorado at some point?

24   A.   Yes.   They -- when they decided -- when she decided that

25   she didn't want to stay at Kingsville, the university there,

1    they decided at that point to, as I recall, move to Colorado
2    at that point.
3    Q.  And did they go back and forth a couple times?
4    A.  Well, they were in Colorado for a period of time, but I
5    don't remember how long it was.  It was a year, year and a
6    half, two.  I really don't remember.  But they moved to
7    Colorado.
8        And then when Michael was born, they moved back with us.
9    And then they moved back to Colorado -- to Pueblo, I think --
10   for -- I don't remember how long it was for.
11   Q.  Then about -- what? -- about 2015, they came back to Texas
12   for good?
13   A.  Well, I don't know that I'd say "for good" because, even
14   though they came back, then they went back to Pueblo for a
15   period of time and then came back.
16   Q.  When they were up in Colorado, did you talk to Devin on
17   any regular basis?
18   A.  I don't remember what regular is.
19   Q.  Once a week?
20   A.  I mean, we talked.  But I don't remember if it was once a
21   day, once a week, once a month.  I have no idea.
22   Q.  I'm sort of trudging through a predicate, and I apologize
23   for belaboring this.
24       I'm just trying to see if from the time -- I know you
25   obviously saw Devin all the time when he was a small boy until

1   he went off to the Air Force, correct?

2   A.  Correct.

3   Q.  And he lived in the house with you?

4   A.  Right.

5   Q.  Okay.  And then when he was in the Air Force, you went to

6   visit him a couple times, correct?

7   A.  Correct.

8   Q.  Including a couple times when he was at Peak, you still

9   went to visit him there?

10  A.  Correct.

11  Q.  Did you visit him when was he was in confinement?

12  A.  Yes.

13  Q.  And then when he came back to -- when he got out of

14  confinement, you still -- and he was on your property, he was

15  a little further away, though, right?

16  A.  Correct.

17  Q.  He moved in the barn?

18  A.  Correct.

19  Q.  And you didn't see him as often as you did up at the

20  house, correct?

21  A.  Well, not as often as, you know, when they're in high

22  school, "Get up, let's go get to school," whatever.

23  Q.  But you still talked to him on a fairly regular basis,

24  correct?

25  A.  Yeah.  I can't define how regular is regular because I

1    honestly don't know, but it wasn't like we never talked or

2    like we chitchatted all day long either.  Okay.  I mean, we

3    just -- whenever we talked, we talked.

4    Q.  Did you talk to Danielle by herself often?

5    A.  Yeah.  On a very regular basis, she'd come down to the

6    house with the kids or without.

7    Q.  What did y'all talk about?  Just children?

8    A.  I don't really remember what.

9    Q.  And I forgot -- let me back up a second because I forgot

10   to ask you something when I was talking about the cabinet, the

11   gun cabinet.  I asked you -- I'm repeating myself to get the

12   predicate to where I'm going.

13       I asked you about access to the gun cabinet, and you told

14   me that people could come and could see it, but somebody would

15   have to use a crowbar and whatnot to break into it, correct?

16   A.  Uh-huh.

17   Q.  Yes, sir?

18   A.  Yes, sir.

19   Q.  Do you recall talking to the Texas Rangers shortly after

20   the church massacre?

21   A.  I remember talking to them.  But, you know, a lot of that

22   is very fuzzy at this point.

23   Q.  Do you recall telling the rangers at any point that Devin

24   might have had, quote, "access to your guns"?

25   A.  I saw that on the transcript during the deposition.

1    Q.  Yes, sir.

2    A.  Okay.  I don't really remember saying that.  But, you

3    know, conceptually, it would have been -- anybody who goes

4    through the house conceptually could have access to it.  It

5    wasn't that he had access like, oh, they're sitting right

6    there on a shelf, you can just grab it and go.  Okay?

7        It was more of a conceptual thing, that my guns are in the

8    house.  But I went and checked.  All my guns are there.

9    Q.  And somebody would have had to -- hypothetically, somebody

10   would have had to break in that cabinet with a crowbar and a

11   hammer, you said, right?

12   A.  Correct.

13   Q.  And then at that point, even if they got in the cabinet,

14   there were still trigger locks on the guns, correct?

15   A.  Correct.

16   Q.  I'm going to --

17   A.  Most of the time.

18   Q.  Most of the time.

19       So I want to talk in sort of general terms about Devin's

20   social circle, his personality, things of that nature.  Okay?

21   A.  Uh-huh.

22   Q.  When Devin got out of confinement, did he have, to your

23   knowledge, a social -- like a large group of friends?  Did he

24   have a small group of friends?  Any group of friends?

25   A.  I don't know -- I have no idea what the size was.  I know

1   he was going out and hanging out with friends and kind of

2   reacclimating to world after confinement.

3   Q.  Did you have any knowledge if Devin was ever in a

4   motorcycle gang or a criminal gang?

5   A.  Not to my knowledge.

6   Q.  Devin never showed up wearing Bandidos gear?

7   A.  No.  I think there would have been a big issue if that had

8   happened.

9   Q.  You would have taken issue with Devin with that?

10  A.  I would have taken issue with all of it.  I don't want any

11  of that crap on my property.  If that's what you're going to

12  do, then you need to figure out your own life and don't ask me

13  for help.  That's not a road we go down.

14  Q.  Did Danielle's family come out to your property ever?

15  A.  I don't remember them ever coming out, but I honestly

16  don't remember.  I mean, they could have when we were not

17  there, out of town.

18      As I said, when you're in the house, you can't hear all

19  the road noise.  You step outside the front door, and you hear

20  tons of road noise.  So someone could easily have driven up

21  and us not even noticed it, believe it or not.

22  Q.  Did you -- you didn't have a problem with the -- say, the

23  Shields family coming over to your property, would you?

24  A.  No.

25  Q.  And if Erin Brassfield wanted to come over, you wouldn't

1    have a problem with that?

2    A.  The only time I recall -- and we were talking about this

3    going over the deposition.  I had only heard the name "Erin"

4    in casual conversation, or whatever, prior to.  After the

5    shooting, I remember Danielle saying, "There's somebody down

6    at the gate that wants to come up and see me, and I don't want

7    to see them."

8        I walked down, saw this lady -- that's when the deputies

9    were all outside -- saw this lady and said, "Danielle asked me

10   to come down and tell you she doesn't want to see you."

11   Q.  This is after the shooting?

12   A.  This is after -- within a day or two afterwards.  And I

13   later found out that that was Erin.  Okay.  And I have no idea

14   if they had ever invited her up to their -- you know, their

15   place up there in the barn or not.

16   Q.  But you wouldn't have forbidden Erin coming on your

17   property or anything like that, would you?

18   A.  Have no reason to.

19   Q.  On -- I'm going to switch gears now and talk to you about

20   the day of the shootings.  Okay?

21   A.  Okay.

22   Q.  Did Devin -- I guess, what was your interaction with Devin

23   the day of the shooting?

24   A.  Well, he came down that morning.  My youngest daughter was

25   down from college with some friends for the weekend.  And we

1    were, you know, having breakfast with them.  And then I was

2    going up to do some more painting and sanding, trying to get

3    our house finished.

4        And he came down at one point to, I assume, kind of

5    socialize or -- I don't know -- see Lily or say hello or what.

6    I don't know.  But he came down and at one point asked us --

7    and I don't remember now if it was via text or in person --

8    but asked us if we would watch the kids that morning and that

9    he and Danielle needed to go someplace.

10       And I says, "Well, no, we can't this morning.  You know,

11   Lilly's down with her friends and we're visiting.  But we can

12   this afternoon if you'd like.  I don't know, say, 1:00, 2:00,

13   whatever, we'd be more than glad to watch the kids."

14       And he said, "Well, okay."  And --

15   Q.  Was he acting bizarre to you?

16   A.  Not at all to me.

17   Q.  In the previous, say, six months, had you noticed any

18   changes in Devin -- mental health changes in Devin?

19   A.  Not that I noticed and said, "Oh, whoa, that's different"

20   or something like that.  It was just pretty much Devin the

21   way, you know, he was, you know.

22   Q.  How was Devin?

23   A.  Well, as a child, he was very, very happy, always smiling,

24   cutting up, telling jokes, that kind of thing.  When he came

25   back from the Air Force, that part of him seemed missing.  But

1    I didn't look at it like, "Oh, that's a problem; you got to

2    identify what this is" because it's like, okay, well, if I'd

3    just come back from spending that many months, effectively, in

4    solitary confinement and going through everything he did, you

5    know, there's going to be a period of adjusting, you know,

6    that one would think going through, as well as just growing up

7    in life from an 18-year-old kid to a 20-whatever-year-old man.

8        So there was nothing that I looked at that I felt was

9    strange or suspicious or concerning.

10   Q.  You didn't see him fall apart over the last couple of

11   weeks of his life, did you?

12   A.  Not that I recall.

13   Q.  Was Devin -- in your estimation, just personality-wise,

14   was he introverted?  Extroverted?

15   A.  When he was younger, I would say he was borderline

16   extrovert.  Like I say, always laughing, talking, everything

17   else.

18       When he came back from the Air Force, I would say he was

19   probably more introverted.  But when he would be around people

20   he knew, okay, he would kind of, you know, go back to, at

21   times, himself, laughing, kidding, telling jokes, things like

22   that.

23   Q.  Was he impulsive as a -- as a general personality trait?

24   Was he slow to do things and careful to consider?

25   A.  No.  Devin, pretty much, was always a very impulsive --

 1  part of his ADD stuff, we believe at least.

 2  Q.  And when was he diagnosed with ADD, approximately?

 3  A.  I don't remember.

 4  Q.  Was he a little kid?

 5  A.  Yeah.  He was a young kid.  I don't remember exactly.  The

 6  wife handles the medical in our family.

 7  Q.  I'll ask her about that in a minute, then.

 8  A.  Yeah.  It was when he was young.  I don't remember how old

 9  but --

10  Q.  Did you see him change from that impulsive personality

11  through, like, right before the church shooting?

12  A.  No.  I would say that part of it was typically about the

13  same.  I mean, it's not like I sat down and studied it and

14  said, "Okay.  You know, is there any change?  What is it?

15  Let's document it or let's study it" or -- it's like, you

16  know, he's out.  He's trying to get his life back together;

17  we've got our life we're doing.  And, you know, so it's not

18  anything that I noticed that, "Oh, wow.  This is really

19  different."

20  Q.  You were around -- you saw him every couple of days at

21  least, correct?

22  A.  Well, it depends.  Sometimes they may go -- come down to

23  the house twice, three times in one day.  I may be up in the

24  barn getting or doing something, you know.  I may not -- may

25  not have seen them for two, three days, a week.  If we were

 1  out of town, it could be two weeks, three weeks.

 2  Q.  I guess I was just being inartful in my question.

 3      I was just trying to establish that you saw –– when I

 4  asked the predicate question of if you saw any major changes,

 5  you were still actually seeing Devin during that time I'm

 6  talking about, right?  That there weren't changes?

 7  A.  Oh, yeah.  I mean, he and I went camping roughly a month

 8  before, you know, the shooting.  And he seemed perfectly

 9  normal, you know, camping buddy.

10  Q.  The morning –– getting back to now November 5th 2017.

11      Devin came to the house, asked you to watch the children.

12  You said you couldn't because your younger daughter was in

13  town, correct?

14  A.  Correct.

15  Q.  And you were doing work on the house, correct?

16  A.  Correct.

17  Q.  When's the next you heard –– I guess, was it like early

18  morning?  Breakfast time?  Shortly after?

19  A.  Yeah.  I would assume it was early morning, breakfast.

20  Because they were –– Lily and her friends were going to be

21  getting ready to head back to college sometime early that

22  morning.  I don't remember exactly what time.  But, you know,

23  he left, and that was the last time I saw him.

24  Q.  When's the next you heard from him?

25  A.  At some point, the, you know, rangers/FBI, whoever has my

1   phone with all the text messages that they could look at to

2   see the exact time or whatever.  But at some point, Lily and

3   her friends were getting ready to leave.  And I went back on

4   upstairs painting, sanding -- I don't remember what I was

5   doing.

6       And I heard my phone beep.  And it was like, okay, I'll

7   finish this up or whatever.  And after I finished it up, kind

8   of wiped my hands off, I went and picked up my phone and

9   looked at it.  It was a text message, a group message to me

10  and my wife from him.

11  Q.  From Devin?

12  A.  From Devin.

13  Q.  What did it say, to the best of your recollection?

14  A.  To the best of my recollection -- and, you know, the FBI,

15  rangers, whoever will have it -- you know, the exact.  But it

16  was something to the effect of, "I'm sorry.  I love you guys.

17  Please go untie Danielle in the barn."

18  Q.  Did you know what he meant by "untie Danielle"?

19  A.  I had no idea.  So I walked downstairs -- because I saw it

20  was a group message, so I walked downstairs to my wife.  And I

21  said, "Honey, did you see that message?"

22      And she says.  "No.  What message?"

23      So we found her phone, and she looked at it.  And I said,

24  "Do you know what the hell this means?"

25      She said no, and so we headed up to the barn.

1  Q.  What did you find in the barn?

2  A.  Well, the door was locked.  So it took us a while to

3  figure out how to kind of jimmy it to get in.  And we went in,

4  and the two babies were in their playpen.  And Danielle was,

5  you know, tied up on the bed.

6  Q.  Tied up how?

7  A.  Her hands were behind her and a rope between her legs and

8  the handcuffs.

9  Q.  Did you get her out of that?

10  A.  Yeah.  We untied her.  But the only thing I could find for

11  the handcuffs were, you know, a cheap, old, crappy piece of

12  wire cutters that I happened to have up there.  And they

13  weren't cutting through it or whatever.

14      So, you know, Danielle was sobbing and, you know, couldn't

15  understand what she was saying.  And so I left my phone there,

16  and I headed up to the house to get something better.  And in

17  the meantime –– and I wasn't there, but I saw the text because

18  my phone was up there with us at that point, not my wife's, as

19  I recall.

20      And apparently my wife had texted him, saying, "Where's

21  the key to these handcuffs?"  Now, I don't remember at some

22  point, because I wasn't there, to be able to say was that all

23  text or was that voice, or I don't really remember.  But when

24  I got back with a pair of cutters, Danielle's handcuffs were

25  off, and they were talking with Danielle –– I mean, with Devin

MICHAEL KELLEY – DIRECT                    508

1  on the speakerphone.

2  Q.  On your speakerphone?

3  A.  Yes.

4  Q.  And what was the gist of that conversation with Devin on

5  speakerphone?

6  A.  I don't know what was said exactly leading up to it.

7  Q.  Sure.  But when you got there?

8  A.  I –– you know, you can ask Becca what was said there.  I

9  don't want to put words in her mouth.  Okay.  I know she told

10  me what was said.

11  Q.  I'll ask her.

12  A.  But when I got there, it was like, "Wait.  You did what?

13  Where?  What is this place you're talking about?"

14     And he was saying –– I never heard of the term "Sutherland

15  Springs" before.  And he said –– he said something to the

16  effect that –– he said, "Dad, I fucked up.  I just killed a

17  bunch of people in church."

18     And I said, "What do you mean you killed" ––

19  Q.  Sir, if you need to take a moment, just take a moment.

20  Okay?  I believe there's tissue in front of you.

21  A.  I said, "Son, what do you mean you killed a bunch of

22  people in church?"

23     And he said, "I just killed a bunch of people in church."

24  And he said –– he said, "I've been shot and I'm bleeding out."

25  And he said, "I'm not ever going to get back to the house to

1    see you again."

2    Q.  I'll take a moment.  Just...

3        (Pause)

4    Q.  I'm not in a hurry, so you let me know when you're ready.

5    Okay?

6    A.  I think we just need to go on.

7    Q.  Yes, sir.

8        What happened next?

9    A.  I don't know.  It's all a blur.  At some point, he said

10   Sutherland Springs or whatever, and I asked Danielle, "What is

11   that?"

12       And she said, "That's the church that, you know, I grew up

13   in, my parent -- my mom goes to."

14       And there was a little bit of chitchat of, "I love you,

15   son."

16       And then at one point, he said, "Let me talk to Danielle."

17   And I remember hearing him say, "Danielle, I love you.  Please

18   don't ever forget me."

19       And she said, "I love you too.  I'll never, ever forget

20   you."

21       And then I took the phone, and we called 911 to report it.

22   Q.  Danielle was here yesterday and testified about being

23   abused by Devin.

24       Do you have any knowledge of what was going on in that

25   barn when they were together by themselves?

1   A.  Of being abused by Devin?

2   Q.  Yes, sir.

3   A.  I have no knowledge of any of that whatsoever.  Never saw

4   anything like that.  Never saw any evidence of anything like

5   that, you know.

6   Q.  You weren't in the barn with them alone, correct?

7   A.  Was or was not?

8   Q.  Were you ever in the barn alone with them -- I guess, when

9   they were in their living quarters, are you there with them?

10  A.  Well, I mean, at times, if I was up in the barn, I might,

11  you know, pop in and say hey and, you know, play with the kids

12  a little bit or whatever.  Or he'd call me up a couple of

13  times, "The air-conditioner is not working," and, you know, go

14  up and show him how to clean the filter and that kind of

15  stuff.

16  Q.  They had their own life down in barn, correct?

17  A.  Yes.

18  Q.  Up in the barn.

19      And Devin was a grown man with a wife, and you let him

20  have his life up there, correct?

21  A.  And two kids, yes.

22  Q.  When Devin was released -- I want to back up a minute.

23      We talked about, briefly, that no one from the Air Force

24  told you Devin couldn't have a gun, correct?

25  A.  Correct.

MICHAEL KELLEY - DIRECT                          511

1   Q.  And we talked briefly ——

2   A.  Not that I recall, anyway.

3   Q.  That you recall.

4       And we —— I apologize for speaking over you, sir.

5       You said what now?

6   A.  No.  I just said, not that I recall.

7   Q.  And you knew that Devin had been in Peak for a bit,

8   correct?

9   A.  Correct.

10  Q.  Did anybody from the Air Force ever tell you that Devin

11  had been suicidal when he was in Peak?

12  A.  No.

13  Q.  Is that information you would have wanted to know as his

14  father?

15  A.  Absolutely.  In fact, the first time I even heard about a

16  suicide or attempt was at the meeting with the inspector

17  general when it was brought up.

18  Q.  Would you have wanted —— and, obviously, Devin had guns on

19  your property.

20      Would you want to know if Devin had ever been suicidal, if

21  he was having a gun?

22  A.  Well, of course.

23  Q.  If you had known Devin had been suicidal, would that have

24  changed your opinion on him having a gun?

25  A.  Absolutely.

MICHAEL KELLEY – DIRECT                    512

1    Q.   In what way?

2    A.   Well, I mean, look, anybody, if they're suicidal –– I'm no

3    shrink or, whatever, expert.  But it's only common sense that

4    if someone is suicidal, that they don't need to have access to

5    something that is potentially, you know, life-ending or

6    whatever.

7    Q.   Shifting gears just a moment.

8         Did Devin ever ask you to buy him a gun?

9    A.   Not that I recall.

10   Q.   If Devin had asked you –– do you know what a "straw

11   purchase" is on a gun?

12   A.   A what?

13   Q.   It's called a "straw purchase."

14   A.   No idea.  Never heard that term.

15   Q.   A straw –– a straw purchase is basically when someone who

16   can't buy a gun wants you to buy it for them to hide the

17   identity of the eventual owner.

18   A.   Oh.  Never heard the term.

19   Q.   So Devin never asked you to do anything like that?

20   A.   No.

21   Q.   When Devin got out of the military, were you aware that he

22   had made threats toward his leadership in the military?

23   A.   Not that I recall.  Not at that time, no.

24   Q.   And when you say "at that time," I told you about that at

25   the deposition?

1    A.  Right.  Subsequently, through whatever this process, I've

2    learned that or been told that.

3    Q.  I want to show you an exhibit.  And I'm going to use the

4    ELMO, if it's okay with everybody.  I'm just more comfortable

5    with it, frankly.

6        This is JEX 21.  It's part of the barment file, Your

7    Honor, and it's pages 4 through 5, JEX.  It's part of the

8    barment file.

9            THE COURT:  Go ahead.  It's been admitted.

10           MR. SCHREIBER:  And let me make it a little bigger.

11           THE WITNESS:  I grabbed my contact case, but there's

12   no contacts in it, so --

13   BY MR. SCHREIBER:

14   Q.  Okay.  This is -- and I'll walk you through this.  This is

15   indicated March 27, 2013.  And the subject is "Request for

16   expulsion and order not to reenter Holloman Air Force Base for

17   AB Devin P. Kelley."

18       Do you see that, sir?

19   A.  Yes.

20   Q.  And if we go down in paragraph 2 under "Background," it

21   says, "Due to Kelley's extensive record of violence and

22   directing death threats toward his leadership and spouse" --

23           MR. DIEDRICHS:  Your Honor, I'm going to object this

24   line of questioning.  He said he had no personal knowledge of

25   this information.

1          THE COURT:  Yeah.  So you're doing this by

2    background.  What kind of question are you going to ask?

3          MR. SCHREIBER:  I'm going to ask him, if he had known

4    this, would that have changed his behavior toward letting

5    Devin have a gun on the property?

6          THE COURT:  Go ahead.

7    BY MR. SCHREIBER:

8    Q.  And this -- so it says, "Due to Kelley's extensive record

9    of violence and directing death threats toward his leadership

10   and spouse, his leadership has requested that you bar him from

11   Holloman AFB."

12       Did I read that correctly?

13   A.  Correct.

14   Q.  And then down in 3, "Facts:  He has repeatedly threatened

15   to kill his leadership," correct?

16   A.  Correct.  That's what it says.

17   Q.  If you had been told that by the Air Force, would you have

18   let Devin have a gun on your property?

19   A.  I can't imagine, no.

20   Q.  This is extremely serious to you, isn't it?

21   A.  Absolutely.

22   Q.  Were you made aware at any point from anybody at the

23   Air Force, before this litigation, that Devin had threatened

24   to kill his leadership?

25   A.  Not that I recall.

MICHAEL KELLEY – CROSS                    515

1   Q.  That is something you probably would recall, right?

2   A.  I would certainly think so.

3   Q.  If you had been aware of that, that Devin had threatened

4   to kill his leadership, would you have tried to get him mental

5   health counseling about that?

6   A.  I think I would have, definitely.

7   Q.  If you had known that he was suicidal while in the

8   Air Force, would you have tried to get him mental health

9   counseling when you got out?

10  A.  Absolutely.

11          MR. SCHREIBER:  Your Honor, I'll pass the witness.

12          THE COURT:  Any cross?

13          MR. DIEDRICHS:  Yes, Your Honor.  Thank you.

14                    CROSS-EXAMINATION

15  BY MR. DIEDRICHS:

16  Q.  Mr. Kelley, we were just talking about the mental status

17  of your son, Devin.

18          THE COURT:  Can you pull that closer to you?  Your

19  voice isn't carrying.  Thank you.

20  BY MR. DIEDRICHS:

21  Q.  Okay.  So let's kind of talk about a family history.

22      You mentioned in your deposition that one of your

23  daughters has bipolar condition?

24  A.  I don't know that I mentioned that.

25  Q.  Is it true, though?

MICHAEL KELLEY – CROSS                          516

1   A.  I have no idea.  I don't think so.

2   Q.  Okay.

3   A.  Can you show me in the deposition where I said she has

4   bipolar, and which one?

5   Q.  Well, you're not aware if she does or does not?

6   A.  I'm not aware of it.

7   Q.  Okay.  All right.  And you ––

8   A.  I reviewed the deposition.  I don't remember anything

9   about bipolar being brought up in mine.

10  Q.  But you've never heard that she's had bipolar ––

11  A.  Not that I recall, no.

12  Q.  Okay.  Or that she's been diagnosed with that?

13  A.  Not that I recall.

14  Q.  Okay.  How old was Devin when he went to the Air Force?

15  A.  It was right after he got out of high school.  So I think

16  18, fixing to turn 19, when he was in basic.

17  Q.  All right.  And how old was he when he left the Air Force?

18  A.  I'd have to do the math.  I don't remember.  Four years

19  later, whatever it was he was in.

20  Q.  So 22, 23?

21  A.  Yeah.  Somewhere in that range, I'm guessing, yeah.

22  Q.  You previously, in your testimony, testified that you knew

23  something about the HIPAA rules.

24  A.  Just vaguely.

25  Q.  Okay.  You know the HIPAA rules prevent the transfer of

1    medical information from one -- about a patient to any other

2    person without their permission?

3                MR. SCHREIBER:  Your Honor, objection.  I think it's

4    calling for a legal conclusion by a lay witness, and I don't

5    know that it's true.

6                THE COURT:  Yeah.  That's overruled.

7    BY MR. DIEDRICHS:

8    Q.  Are you familiar with that?

9    A.  Generally, I'm familiar with you're not supposed to tell

10   people about other people's medical.

11   Q.  Okay.  Are you aware that he was in Peak voluntarily?

12   A.  No, I'm not.

13   Q.  Devin never told you that?

14   A.  Not that I recall.

15   Q.  When you asked -- was it his defense attorney Rosenow --

16   is that how you pronounced it?

17   A.  I think it's pronounced Rosenow.

18   Q.  You asked him about what restrictions Devin might have

19   with respect to his conviction, correct?

20   A.  I don't remember the exact wording, but it's conceptually,

21   is this considered a felony or a misdemeanor?

22   Q.  Okay.  And he referred you to an attorney to figure that

23   out?

24   A.  Not immediately, no.

25   Q.  What do you mean, "not immediately"?

1   A.  Well, like I just said a few minutes ago to the other guy,

2   that he said it's Air Force; therefore, it's federal.  But

3   it's -- because it's under 12 months -- or I don't know

4   whatever the deal, the limiting issue is -- it's a

5   misdemeanor.

6       But he said this is, you know -- this is the Air Force

7   stuff.  So he says, "I can't give you a clear answer."  But he

8   said, "If you want, you can go ask, you know, ten different

9   attorneys, and you'll get ten different answers.  But the

10  reality is it's gray area.  No one knows.  Depends on where

11  you are," whatever that means.

12  Q.  Well, you were -- you were coming back to Texas?

13  A.  Correct.

14  Q.  When you got back here, did you go ask a lawyer what the

15  restrictions were?

16  A.  No.

17  Q.  You mentioned some tools that you had in the barn.

18      Do you own a drill?

19  A.  Yeah.

20  Q.  Screwdrivers?

21  A.  Yeah.

22  Q.  Allen wrenches?

23  A.  Not up in the barn.

24  Q.  Anywhere in the house?

25  A.  Down in my garage.

1   Q.  Oh, okay.  Did Devin have access to those tools?

2   A.  Anybody that walked through the garage could use the

3   tools.

4   Q.  Okay.  Devin knew where they were?

5   A.  Everybody in the household knows where they are.  It's

6   obvious.  They're hanging on a pegboard in the garage.

7   Q.  Okay.  Were you aware that Danielle testified in her

8   deposition that when he first got back from the Air Force,

9   he -- Devin was trying to become a member of the Bandidos?

10  A.  In the first place, I know nothing about Danielle's

11  testimony or her deposition.  I have not read it or seen it.

12  Q.  Okay.  But if she did testify to that, do you have any

13  reason to disbelieve her?

14  A.  I have no reason to believe or disbelieve.  I was not

15  aware of anything like that.

16  Q.  Okay.  In an average month, if you can estimate how many

17  times you would go over the barn and visit.

18  A.  There would be no way to estimate that.

19  Q.  Okay.

20  A.  As I said, sometimes, like earlier this week, I was up

21  there three or four times doing stuff.  Before that, I hadn't

22  been up there since probably Christmas.  I'm just guessing.

23  So it's a real hit-or-miss when I would be up there or not be

24  up there.

25  Q.  Did you ever go up there just to visit with Devin,

1   Danielle, and your grandchildren?

2   A.  Not just to visit.  It was — usually, they would come

3   down to the house to visit.  Or, you know, like I said,

4   earlier, Devin might call and say, "Hey, something's wrong

5   with the air-conditioner.  Can you come look at it?" or "The

6   hot water heater's not working.  Can you look at it?"

7   Q.  Or if you were up there doing something --

8   A.  Right.

9   Q.  -- you might stop in?

10  A.  Or he might poke his head out, or Danielle or the kids.

11  You know, I'd be up there doing something, and, you know, they

12  might come out and talk with me and, you know...

13  Q.  And I guess you just found out today that Danielle accused

14  Devin of physical abuse?

15  A.  I don't know.  Did I — did you just say something to that

16  earlier today?

17  Q.  You were asked a question earlier about if you were aware

18  that Danielle made accusations --

19  A.  Oh.

20  Q.  -- that --

21  A.  No, I'm not aware of any physical abuse.

22  Q.  Okay.

23  A.  I'm not aware of any accusations of it other than what may

24  have been said earlier.

25  Q.  Okay.  So if that was true that he was doing that, he was

MICHAEL KELLEY — CROSS                 521

 1  able to keep that from you?

 2  A.  Since I was not aware of it, yeah.  I mean ––

 3  Q.  Okay.  And, again, assuming that his participation in the

 4  Bandidos was accurate, he kept that from you?

 5          MR. SCHREIBER:  Objection, Your Honor.  That

 6  misstates testimony.

 7          THE COURT:  That's sustained.

 8  BY MR. DIEDRICHS:

 9  Q.  Okay.  Did you know that he used drugs?

10  A.  I was aware that he occasionally smoked pot.

11  Q.  Did you know that he abused prescription drugs?

12  A.  No, not to my knowledge.

13  Q.  So if that's true, he was able to keep that from your

14  knowledge?

15  A.  They were up there living their lives.  I wasn't watching

16  what was in there or ––

17  Q.  And if Danielle testified that over the last year of his

18  life, the abuse was becoming more and more violent, you don't

19  have any knowledge of that?

20  A.  Never saw evidence of any violence towards Danielle or

21  kids or anybody.

22  Q.  So if it was true that it was increasing over the last

23  year of his life, he was able to keep that from you?

24  A.  I guess that's true.  I never saw any evidence of physical

25  abuse to anybody.

1    Q.  You mentioned that you would go –– that you went camping

2    with Devin about a month before the shooting?

3    A.  Uh-huh.

4    Q.  How long were y'all out?

5    A.  A week, roughly.  Maybe ten days.  I don't remember.

6    Q.  Do you remember where you went?

7    A.  Uh-huh.  Colorado.

8    Q.  Do you know if Danielle stayed at your property, or did

9    she go to stay with someone else?

10   A.  I wasn't there, so I'd have no idea.

11   Q.  Okay.  Did she ever go camping with you?

12   A.  No.  I don't know that Danielle is the camping type, but

13   this was just kind of a guys-go-camping thing.

14   Q.  Okay.  How often did you guys go camping?

15   A.  Well, that's probably the first time since, you know,

16   before he went into the Air Force, if I recall.

17   Q.  Okay.  Did Danielle have her own cellphone?

18   A.  She had phones.  I don't know if they were hers or if they

19   were, you know, active or not.

20        Well, at one point, they were active because she was

21   talking about she got on one of those monthly plans or

22   whatever where you got to go do a card.  I don't remember

23   which one it was, but ––

24   Q.  Okay.  Did you have her phone number in your cellphone?

25   A.  I don't recall.  I would assume I did, but I don't

 1   remember.  Danielle has gone through a number of different

 2   phone numbers over the years.

 3   Q.  Okay.  Do you ever remember giving her a call from your

 4   cellphone to her cellphone?

 5   A.  I would have no way of remembering that.

 6   Q.  Okay.  All right.  You talked a little bit about when you

 7   were interviewed by the Texas Rangers on the day of the

 8   shooting about -- they asked you if Devin had access to your

 9   weapons.

10       Do you recall that testimony earlier?

11   A.  I remember the testimony.  I don't remember the accuracy

12   of who said what at this point but --

13   Q.  Sure.  No.  I understand that.

14       If we could bring up that clip of JEX 477.  Oh, I'm sorry.

15       Okay.  I'm sorry.  That's Joint Exhibit 694.

16   BY MR. DIEDRICHS:

17   Q.  Now, when you went up -- when you were in -- went to --

18       (Playing video)

19           MR. DIEDRICHS:  Can you pause that for a sec?

20   BY MR. DIEDRICHS:

21   Q.  When you went to the Texas Rangers on the day of the

22   shooting, you went there voluntarily, correct?

23   A.  I don't know how you describe or call it "voluntarily."

24   They had two police outside saying, "They want to see you down

25   there.  The rangers are waiting for you."

MICHAEL KELLEY - CROSS                    524

1   Q.  Oh, okay.  And you knew that they were there to discuss

2   circumstances surrounding the shooting, what you knew, what

3   you didn't know?

4   A.  I assume that was the reason, yeah.

5   Q.  Right.  Right.

6       And you knew it was important to answer those questions

7   truthfully, right?

8   A.  (Nods.)

9   Q.  And you did that, right?

10  A.  To the best of my abilities, as I recall.

11          MR. DIEDRICHS:  Okay.  All right.  If we can go ahead

12  and play the clip.

13      *(Playing video)*

14  BY MR. DIEDRICHS:

15  Q.  Okay.  So in that clip, the ranger specifically asked you

16  if Devin had access to it, and you said --

17  A.  Was the word -- was the word "could" in there?  I think I

18  heard the word "could."

19  Q.  Do you want -- do you want to hear that again?

20  A.  Please.  Please.

21  Q.  We can run it again.

22      *(Playing video)*

23          THE WITNESS:  Yeah.  He said, "Could he access

24  yours?"  Anybody walking through the house could, in theory,

25  access them.

MICHAEL KELLEY – CROSS                     525

```
 1   BY MR. DIEDRICHS:
 2   Q.  I believe what he said was "Would he be able to access
 3   your weapons?"
 4           THE COURT:  That's misstates the --
 5           THE WITNESS:  That's not what he said.
 6   BY MR. DIEDRICHS:
 7   Q.  Is that right?
 8           THE COURT:  No.  Move on.
 9           MR. DIEDRICHS:  I'm sorry.
10           THE CLERK:  He said "could."
11           MR. DIEDRICHS:  Okay.  I apologize, Your Honor.
12   BY MR. DIEDRICHS:
13   Q.  And you said, "He could.  But I've checked, and mine are
14   all there"?
15   A.  You'd have to show me.  I don't remember now, did I say he
16   could?  But I know I said I checked mine.
17   Q.  That was my error.  We can go ahead.
18           MR. DIEDRICHS:  Can you run that again.
19       (Playing video)
20   BY MR. DIEDRICHS:
21   Q.  Okay.  And you said he could access them, correct?
22   A.  Conceptually, anybody could access them.
23   Q.  Further, he asked, "Are they locked up?"
24   A.  Did he ask that, or I just volunteered it?  Whichever.
25   But, yeah, they're locked up.
```

1    Q.  But you didn't say that.  What you said is, "Well, he
2    could" --
3    A.  Can we go back?
4    Q.  -- "but I've checked.  Mine are all there."
5    A.  Could you scroll it down?
6    Q.  Can you --
7    A.  You don't need to play the video, just the wording.
8    Q.  Okay.  Do you see it there?
9    A.  No.  No.
10   Q.  I'm sorry.  How far back did you want to go?
11   A.  Okay.  Just a little bit further down, then.
12        *(Playing video)*
13            THE WITNESS:  Yeah.  I mean, he kind of asked are
14   they locked up.  And I said, "Well, I checked.  Mine are
15   there."
16   BY MR. DIEDRICHS:
17   Q.  Right.  But you didn't say, "Yeah, they're locked up"?
18   A.  I don't think it was really necessary because he had
19   brought up, "Are they locked up?"  And I said, "I've already
20   checked.  They're there."
21   Q.  Well, you could have checked them and found them there
22   even if they weren't locked up?
23   A.  I mean, anything's possible.  But I'm telling you,
24   historically, our guns are locked in the cabinet.  I don't
25   remember that morning.  There was a lot going on.  A lot of

1   emotions.

2       I don't remember if I walked in there and they were locked

3   or unlocked.  But I would be willing to bet that they were

4   locked up, and I had to grab the key and open it and look and

5   see, "Okay.  Yes, they're there."  That would have been my

6   natural inclination.

7   Q.  Okay.  And you checked because you wanted to make sure

8   Devin didn't take them?

9   A.  Well, I wanted to make sure that -- if something heinous

10  like this happens, as a gun owner, you want to be prudent.  To

11  me, that's just normal.

12  Q.  And the -- and the heinous thing that happened was your

13  son went and shot, as he said, a bunch of people?

14  A.  Yes.

15  Q.  And you wanted to make sure that he didn't shoot them with

16  your gun?

17  A.  I don't know that that's what was going on in my mind,

18  that it's "Oh, did he shoot them with my gun?" or not.  It was

19  just, "Check.  Are my guns there?  Yes.  They're there."

20  Q.  Okay.

21  A.  There was no thought process to that, as I recall.  I

22  mean, as I said, that morning there was a lot of emotion, a

23  lot of hectic.  It's been three and a half-plus years or

24  whatever and --

25  Q.  But the video isn't from three and a half years ago or

MICHAEL KELLEY – CROSS                    528

1   it --
2   A.  It is from three and a half years ago.
3          THE COURT:  Let's move on to a new question.
4          MR. DIEDRICHS:  Yes, Your Honor.
5   BY MR. DIEDRICHS:
6   Q.  If we could, let's go to your deposition, Government
7   Exhibit 57, page 31, of that exhibit, which is page 240 of
8   your transcript.
9          MR. SCHREIBER:  Your Honor, objection.  Improper
10  impeachment.  Has he asked a question he's impeaching him on
11  now, or is he just talking about the testimony in general?
12         THE COURT:  I'll wait for -- I'll take this one at a
13  time.
14     This is not impeachment, right?  You're moving on to a new
15  area, correct?
16         MR. DIEDRICHS:  No.  This is impeachment.  This is --
17  I'm continuing on to this.
18         THE COURT:  We've already covered this subject, and
19  I've already understood it.  So let's move on.
20         MR. DIEDRICHS:  But --
21         THE COURT:  Move on.
22         MR. DIEDRICHS:  Yes, Your Honor.
23  BY MR. DIEDRICHS:
24  Q.  And you indicated you had an AR-15 yourself?
25  A.  Correct.

1  Q.  It was similar to the one Devin had?

2  A.  There's a couple different brands.  Sorry.  I don't know

3  if it was the same brand as his or not, you know.

4  Q.  Okay.  Did it look similar?

5  A.  Generically, I would say, yeah.  I'm not a real gun

6  enthusiast, so...

7  Q.  If you're not a real gun enthusiast, why did you get that

8  weapon?

9  A.  I don't remember.

10  Q.  Danielle testified yesterday that you purchased the AR-15

11  because Devin suggested that.

12     Are you aware of that?

13  A.  I'm not aware of that.  I don't recall that at all.

14  Q.  Okay.  And if you can't recall it or why you purchased it,

15  you're not trying to tell the Court that Danielle's testimony

16  yesterday was untruthful, are you?

17  A.  I have no idea what her testimony was, if it's truthful or

18  not.  I can't get into her head.  But I would not go and make

19  that expensive of one based on, you know, my son making --

20  saying, "Oh, you need to go buy one."

21     I don't know if that's what you're trying to imply, but

22  that's not -- you know, that's not why I went and bought one.

23  I don't really remember why, but I don't remember it being

24  Devin pressuring me or telling me to.

25  Q.  But you can't remember why you bought it?

MICHAEL KELLEY - CROSS                                        530

1    A.  Not really.

2    Q.  Okay.  Do you recall the whole family going up to Cabela's

3    south of Austin to purchase that AR-15?

4    A.  I remember we've gone to Cabela's a number of times to do

5    various things as a family.  I don't remember if I purchased

6    it at Cabela's on that occasion or Cabela's -- I really don't

7    remember at this point.

8    Q.  All right.  But if that's Danielle's recollection, again,

9    and she testified to that, your memory wouldn't be able to

10   impeach her on that, would it?

11   A.  I'm not sure what you mean, "impeach her on that."

12   Q.  Well, you couldn't say, from the memory that you do have,

13   that her testimony was not truthful?

14          MR. SCHREIBER:  Your Honor, objection.  Repetitive.

15   I think he's been over this a couple of times.

16          THE COURT:  That's overruled.  Let's just finish this

17   off.

18          THE WITNESS:  I mean, I can't get in Danielle's mind.

19   So I have no idea if that's what she saw or perceived or said

20   or -- I have no way of knowing.

21   BY MR. DIEDRICHS:

22   Q.  And at least today, because you can't remember it, you

23   can't tell -- you can't tell the Court that it's not accurate?

24   A.  I would find it hard to believe that that was -- not that

25   she said that.  I can believe she said it, if you said so.

```
 1  But I would find it very hard to believe that I would, you
 2  know, go buy something like that at that kind of cost based on
 3  my son saying, "Hey, you need to go buy this."  That would not
 4  be a reason for me for buying a pistol or a rifle or anything
 5  else.
 6  Q.  Do you still own the weapon, sir?
 7  A.  Yes.
 8  Q.  And you keep it in that cabinet?
 9  A.  Yes.
10  Q.  In the last year of Devin's life, did you ever see his
11  AR-15?
12  A.  Probably.  But I have no way of remembering that.
13  Q.  Well, let me ask it a different way.
14      Did you ever see some of the modifications he made to that
15  weapon?
16  A.  I don't know that I know he made modifications.
17  Q.  You never saw the tactical light on the front of it?
18  A.  I don't remember.
19  Q.  Okay.  What about the pistol grip on the barrel?
20  A.  I don't remember.
21  Q.  Okay.  Do you remember if you saw it with a sling on it?
22  A.  I'm assuming he probably had a sling, but I don't know.  I
23  didn't pay attention.
24  Q.  Okay.  That's fine.  Thank you.
25      Were you aware that he was purchasing high-capacity
```

1   magazines for his AR-15?

2   A.  Not that I remember.

3   Q.  He never showed you any of those?

4   A.  What do you call "high-capacity"?

5   Q.  30 rounds.

6   A.  I think 30-round is pretty standard for most people who

7   have ARs.

8   Q.  What about 100 rounds?

9   A.  I don't know that you can get 100-round.

10  Q.  And if he tried to get one, he at least didn't let you

11  know that?

12  A.  I was not aware of it.

13  Q.  Okay.  Do you have an opinion as to why Devin chose that

14  church as a target?

15  A.  You know, I want to be very careful of speculating.  I

16  can't get in his mind.

17  Q.  Do you remember being interviewed by the Department of

18  Defense OIG, Office of Inspector General?

19  A.  Yes.

20  Q.  Do you remember telling them what you thought the reason

21  was?

22  A.  I remember seeing the transcript, I think, in the

23  depositions or whatever, that I probably said something about,

24  you know, based on what Danielle had told us about her history

25  with that church and everything else.  You know, I mean, that

1    would be, to me, kind of a logical conclusion.

2    Q.  And the history that you're talking about is Danielle's

3    history of being sexually abused and that she was mocked by

4    people at the church?

5    A.  First, I want to clarify that I do not have any direct

6    knowledge of any of that abuse or anything else.

7    Q.  I understand.

8    A.  All I know is what Danielle told us, meaning me and my

9    wife, and presumably told Devin -- I don't know if Devin was

10   there when she told us these things -- over a period of time.

11        But, you know, just generically, I was familiar with --

12   what she said is that when all of this stuff was happening at

13   home, the sexual abuse and everything, that she felt like the

14   church treated her like it was her fault, that she did it and

15   she deserved it.  As I recall, that's the basic sentiment of

16   what she expressed to us.

17   Q.  Okay.  But you don't -- you don't know if she shared that

18   with Devin also?

19   A.  I don't have any idea if -- I don't recall if Devin would

20   have been present when she was saying that to me or my wife.

21   Okay.  So all I could do is guess.  Just like I can't imagine

22   Danielle telling me that stuff by myself, with my wife not

23   being there, just kind of being a girl thing and all of that.

24        So -- but I don't know if Devin was there or not.  But I

25   would say I don't know how Devin would have known those kinds

1    of things if he, you know –– she hadn't told him because he

2    obviously wasn't there at the time either.

3    Q.  Certainly.

4        So if he knew them, she would have to have been the one

5    that told him?

6    A.  I would have assumed that, but I have no way of knowing

7    that for sure.

8    Q.  Okay.  But she did tell you and your wife?

9    A.  Yes, as I recall.

10   Q.  Okay.  And the whole situation –– a trial on those –– on

11   Danielle's abuser was approaching at the time of the shooting;

12   is that correct?

13   A.  As I recall, yes.

14   Q.  And a Cibolo County sheriff came out to your house on the

15   1st of November to talk to you and Devin; is that correct?

16   A.  I don't remember what the date was, but somewhere around

17   there.

18   Q.  Okay.  But you remember one coming out?

19   A.  Yes.

20   Q.  Do you remember what they wanted?

21   A.  Something about pictures of Danielle from when she was

22   younger or something.

23   Q.  Okay.  Pictures of sexual abuse?

24   A.  I don't know.

25   Q.  Okay.

1   A.  I don't remember if they said "sexual abuse" or not.  I

2   just remember, you know, pictures.  I didn't say much -- if

3   you go back and watch that whole conversation, I really didn't

4   say much throughout the whole thing, other than clarifying it

5   and saying we've covered this several times now.

6   Q.  But you were there when Devin and the sheriff were

7   speaking?

8   A.  Correct.

9   Q.  Okay.  Would you say Devin was upset about him being

10  there?

11  A.  He appeared to not be happy that they were coming by.  And

12  in the video, I think he expressed that he felt like he was

13  getting -- they were getting harassed and getting tired of it.

14  Q.  And even you complained about people leaving cards in your

15  mailbox?

16  A.  I don't know that I complained about that.  Can we look at

17  the actual quoting?

18  Q.  Yeah.  Sure.  If you want.

19  A.  I mean, at some point, a card was left that had Danielle's

20  name on it, and I gave it to her.  I don't know that I

21  complained about that.

22  Q.  Okay.  Well, let's watch the video.

23       MR. DIEDRICHS:  I'm sorry, Your Honor.  If you can

24  give us just one second.

25       *(Playing video)*

1    BY MR. DIEDRICHS:

2    Q.  Does that refresh your recollection, sir?

3    A.  Yes.  Do you want me to answer now?

4    Q.  Yes.

5    A.  Okay.  It's pretty clear, if you listen to it, that I was

6    not saying I was pissed about a card being left in the

7    mailbox.  I was pissed about getting calls all the time,

8    because I don't recognize a number, and I get a boatload of

9    junk calls.  And I was in the middle of trying to do some

10   painting and all.  And here I am getting calls again, which I

11   presumed was going to be, you know, a junk call.

12       And that's what I was pissed about, getting interrupted

13   once again by junk calls.  And it turns out it wasn't a junk

14   call.

15   Q.  Okay.  Fair enough.

16       Was Devin upset by the police –– or the sheriffs coming up

17   to the fence to talk to him about that?

18           MR. SCHREIBER:  Objection, Your Honor.  Calls for

19   speculation, to the extent he knows what Devin was –– in

20   Devin's mind.

21           THE COURT:  You can testify as to what you saw and

22   his demeanor.

23           THE WITNESS:  In the video, it appears to me that he

24   was a little irritated.

25

 1    BY MR. DIEDRICHS:

 2    Q.  Did y'all talk about that after the sheriffs left?

 3    A.  I don't remember.

 4    Q.  Okay.  Devin was very protective of his family?

 5    A.  I would say that's a fair assessment.

 6    Q.  Okay.  Did you know that Danielle told Devin she wanted a

 7    divorce the night before the shooting?

 8            MR. SCHREIBER:  Objection, Your Honor.  Calls for

 9    hearsay, what Danielle said.

10            THE COURT:  He asked if he knew.

11            MR. SCHREIBER:  Okay.

12            THE WITNESS:  I have no knowledge of that.

13            MR. DIEDRICHS:  Okay.  I have no further questions,

14    Your Honor.

15            THE COURT:  Anything else?

16            MR. SCHREIBER:  Very brief, Your Honor.

17                        REDIRECT EXAMINATION

18    BY MR. SCHREIBER:

19    Q.  Mr. Diedrichs, a few minutes ago --

20    A.  Who?

21    Q.  The attorney.

22    A.  Oh, I didn't catch the name in the beginning.

23    Q.  We're familiar with each other.

24        Mr. Diedrichs was talking to you a few minutes ago about

25    if you knew why Devin chose that church, and there was talk

1   about the stuff that Danielle −− happened to Danielle as a

2   kid.

3        Do you blame anybody at that church for getting shot?

4   A.  Those people were in church praying.  What my son did was

5   unexcusable, especially knowing that his mom and I are

6   religious people.  There was no freaking excuse for that crap.

7   Those people didn't do anything to him.  They didn't deserve

8   anything like that.  There's no way I would ever blame those

9   26 souls and those that are left behind to deal with his crap.

10  Q.  Yes, sir.  I just wanted to make it clear.

11       And this is the last thing I have a question about.

12       We talked about the Air Force attorney for Devin back when

13  he got out of −− sorry −− when he was convicted, and saying

14  that −− I believe you testified that he said it might be a

15  misdemeanor because of the time in jail.

16       Is that what you said?

17  A.  As I recall, something about 12 months or −− I mean, it's

18  a legal thing but −−

19  Q.  Sure.

20  A.  −− something about if you serve less than 12 months or

21  12 months and a day or if the sentence −− I don't know.

22  Whatever.  It's something along those lines.

23  Q.  Yes, sir.

24       I'm going to show you a document marked as Joint Exhibit

25  21, page 42.  This is the report of result at trial.

1        Can you throw this up on the screen for me, on the ELMO.
2   Maybe we can see that.  Okay.  Let me make it bigger.
3        You see here where it says, that I've highlighted, "crime
4   of domestic violence"?
5   A.  I see that.
6   Q.  "Reduction to grade E-1, confinement for 12 months and a
7   bad conduct discharge.  PTA-approved sentence to confinement
8   will not exceed three years."
9        You see that?
10  A.  I see that.
11  Q.  Did the lawyer tell you that?
12  A.  I don't recall ever seeing that.  I don't really recall
13  any wording to that effect.  It was just something about the
14  12-month mark.
15  Q.  If the lawyer should have known it was a felony, do you
16  think he should have told you that?
17  A.  At the time, I thought I was asking someone who should
18  know that kind of stuff.  I mean, he's the attorney, Devin's
19  defense guy.  I would assume they've gone through this.
20  They're supposed to be smart people.  You would think they'd
21  know that.
22        But it clearly left me with the impression that this is
23  one of those gray areas that civil, military justice system --
24  I don't know, federal, local, whatever, that -- as he says,
25  it's gray area.  So I just took it at what he said is, "Oh,

1    okay.  It's gray area."

2        And then later, when Devin was able to vote and able to,

3    you know, purchase a gun in Colorado, then I assume he went

4    through a similar process that I did, that, "Well, okay.  So

5    it must not have been federal," you know.

6              MR. SCHREIBER:  I'll pass the witness back, Your

7    Honor.

8              THE COURT:  Anything else based on those questions?

9              MR. DIEDRICHS:  Just very briefly, Your Honor.

10                      RECROSS-EXAMINATION

11   BY MR. DIEDRICHS:

12   Q.  You have no idea what the attorney told Devin, do you?

13   A.  I have no idea.  I was kept out of the equation by being

14   told I'm just the dad.

15   Q.  Well, have you ever heard of the concept of the

16   attorney-client privilege?

17   A.  Oh, yes.

18   Q.  Okay.  And you know that that attorney had that privilege

19   with your son, and you know -- do you know that he could not

20   break that privilege without your son's permission?

21             MR. SCHREIBER:  Objection, Your Honor.  I think it's

22   a mischaracterization.  That's legal advice, not whether or

23   not a sentence is there.

24             THE COURT:  That's sustained.

25        Rephrase your question.

1    BY MR. DIEDRICHS:

2    Q.  If he had told your son that this was a felony conviction,

3    he certainly couldn't share that with you without Devin's

4    permission?

5              MR. SCHREIBER:  Objection, Your Honor.  I think that

6    --

7              THE COURT:  No.  That's a fair question.  That's

8    overruled.

9              THE WITNESS:  I have no idea if he told Devin that or

10   not.

11             MR. DIEDRICHS:  That's all I have, Your Honor.

12             THE COURT:  Any further need for this witness?

13             MR. SCHREIBER:  No, Your Honor.

14             THE COURT:  Can he be excused?

15             MR. DIEDRICHS:  Yes, Your Honor.

16             THE COURT:  Thank you, sir.

17             THE WITNESS:  Thank you.

18             MR. SCHREIBER:  At this point, we would call Rebecca

19   Kelley.

20             THE COURT:  Let's go ahead and take an afternoon

21   break for about 15 minutes.

22             MR. SCHREIBER:  Yes, Your Honor.

23      *(Recess)*

24      *(Open court)*

25             THE COURT:  Thank you.  Please be seated.

1          If you will call your next witness.

2               MR. STERN:  Your Honor, if we may, very quickly

3     before we call the next witness?

4               THE COURT:  Yes.

5               MR. STERN:  The witness after Mrs. Kelley will be FBI

6     Director of NICS, Kim Del Greco.  Now, she has arrived in

7     San Antonio.  And she, obviously, will be available.  But I'd

8     rather not call her from her hotel now if we're not going to

9     get to her today.  I just want to get a sense of the schedule.

10              THE COURT:  So I think we're moving along fine.  So

11    we'll just get to Ms. Kelley today.

12              MR. STERN:  Okay.  Thank you, Your Honor.

13              THE COURT:  You're calling Rebecca Kelley?

14              MR. SCHREIBER:  Yes, Your Honor.

15              THE COURT:  If you will swear in the witness.

16              THE WITNESS:  Do I stand?

17              THE CLERK:  You can just sit.

18         (The oath was administered)

19              REBECCA KELLEY, PLAINTIFFS' WITNESS, SWORN

20                       DIRECT EXAMINATION

21    BY MR. SCHREIBER:

22    Q.  Hello, Ms. Kelley.

23    A.  Hi.

24    Q.  I'm Joe Schreiber.

25         You and I met at your deposition, correct?

```
 1    A.  Yes.
 2    Q.  And we talked briefly out in the hallway just to say hello
 3    before this testimony, correct?
 4    A.  Correct.
 5    Q.  And we have not talked otherwise, have we?
 6    A.  No.
 7    Q.  We're here for -- obviously, you know we're here about the
 8    Sutherland Springs church shooting, correct?
 9    A.  Yes.
10    Q.  And like I said at your deposition, I'm going to be going
11    into some areas that may be relatively difficult to get
12    through.  Okay?
13        If, for whatever reason, you need to stop or take a break,
14    that's totally fine.  We'll wait.  All right?
15    A.  Okay.
16    Q.  What I'm going to do today -- and I won't keep you long.
17    I promise.  I'm going to talk a little bit about Devin first
18    and his personality, after we introduce you just a bit.  I'm
19    going to go into talking about you and your husband's guns,
20    and then I'm going to talk about some changes you may have
21    seen in Devin.  Okay?
22    A.  Okay.
23    Q.  Very briefly, can you give us your full name.
24    A.  Rebecca Anne Kelley.
25    Q.  And when did you marry Michael Kelley?
```

1   A.   In 1979, August the 31st.

2   Q.   And you are –– just for the record, obviously, you're the

3   wife of Michael Kelley, correct?

4   A.   Yes.

5   Q.   And you're the mother of Devin Kelley, correct?

6   A.   Yes.

7   Q.   And you have two other daughters, correct?

8   A.   Correct.

9   Q.   And one is older and one was younger than Devin?

10  A.   Correct.

11  Q.   Tell me about your education.

12  A.   I've got a bachelor of science from Texas A&M.

13  Q.   When did you get that?

14  A.   1979.

15  Q.   And what was your career –– had been your career?

16  A.   For the last 30 years, I've been working with my husband

17  in the business.

18  Q.   And what do you do in that business?

19  A.   I'm officially the art director, but I do things like take

20  mail and –– and we bounce things off.  And if he needs any

21  wording on the website changed, I'll change that.

22  Q.   What kind of business is it?

23  A.   Computer software.

24  Q.   Do y'all work at your –– at your house?

25  A.   Yes.

REBECCA KELLEY – DIRECT                          545

1  Q.  And we talked to Michael about this, so I won't -- and I

2  apologize.  If I refer to your husband by his first name and

3  your son by his first name, it's only to distinguish between

4  the two Mr. Kelleys.  Okay?

5  A.  Uh-huh.

6  Q.  I don't mean any disrespect to either of those two.  Okay?

7  A.  Okay.

8  Q.  Your and Michael's place, Michael told us that it's on

9  about 28 acres and outside New Braunfels, correct?

10 A.  Correct.

11 Q.  Can you describe the property for us briefly.

12 A.  It is heavily wooded.  It has our house, our barn, our

13 stables, a pump house.

14 Q.  And your house is where on the property, about?

15 A.  I would guess it's about halfway up the 28 acres.

16 Q.  And where --

17 A.  About a quarter of a mile from the highway up.

18 Q.  Okay.  And where is the barn?

19 A.  The barn is -- if you drive up the driveway, it's to the

20 right of the house on its own little road that goes up and

21 then curves right -- curves left.

22 Q.  Is the barn outfitted with an apartment?

23 A.  It is like an efficiency with a bathroom and a little

24 kitchen, one bedroom and a closet.

25 Q.  When did y'all make it into -- I guess, when did y'all put

 1  living quarters in the barn, approximately?

 2  A.  Are you asking for the year?

 3  Q.  Yeah.  Or ten years ago, 20 years ago, something like

 4  that.  Just approximately.

 5      Is it something recent or is it --

 6  A.  Oh, no.  It's been there.

 7  Q.  And I need to back up.  I apologize for not asking this.

 8      And it's a formality with witnesses, but have you ever

 9  been convicted of any crimes?

10  A.  No.

11  Q.  You ever been arrested of any crimes?

12  A.  No.

13  Q.  You've always been a law-abiding citizen?

14  A.  Yes.

15  Q.  You loved all your children?

16  A.  All of them.

17  Q.  You love your grandchildren?

18  A.  I adore them.

19  Q.  You've done your best to raise your children and

20  grandchildren as best you can, correct?

21  A.  Yes.

22  Q.  And part of that is guiding them as a role model?

23  A.  Yes.

24  Q.  And part of that is keeping them out of trouble as best

25  you could?

1   A.   Yes.

2   Q.   And part of that is helping them if they're in trouble,

3   correct?

4   A.   What?

5   Q.   Helping them if they're in trouble.

6   A.   Yes.

7   Q.   When you help your kids if they're in trouble, part of

8   that is helping them obey the law, correct?

9   A.   Correct.

10  Q.   Would you ever help your child violate the law?

11  A.   Absolutely not.

12  Q.   I want to talk briefly about Devin, what he was like as a

13  child and then kind of get up to his time in the Air Force.

14  Okay?

15  A.   Uh-huh.

16  Q.   Describe Devin as a child for me.

17  A.   He was a very cute, very happy, very chubby, little blond

18  boy with big, long lashes and a belly laugh that would just

19  light up a room.

20  Q.   Did he -- did he go to school as a child -- go away to

21  school?

22  A.   No.   He was -- he was homeschooled.

23  Q.   Why he was homeschooled?

24  A.   He had some problems reading.

25  Q.   Was there anything -- did you come to -- I guess, did you

1    figure out why he had problems reading?  Was there a cause of

2    that?

3    A.  Well, we went to an ophthalmologist, and he said that he

4    had some monofixation syndrome, which one eye shuts down.  But

5    he overcame that, and we were able to -- I was able to teach

6    him to read.

7    Q.  Did he have attention issues as a child?

8    A.  Yes.

9    Q.  What kind of attention issues did he have?

10   A.  He was having a hard time focusing on any lessons.

11   Q.  Was that with you?

12   A.  Oh, yes.  Uh-huh.

13   Q.  Did you -- did you take him to get medical care for that?

14   A.  Yes.

15   Q.  What kind of medical care did you get Devin for the

16   attention?

17   A.  The doctor put him on one of the ADHD meds.

18   Q.  Do you know if he kept taking that throughout his

19   childhood?

20   A.  Until he got to high school and refused.

21   Q.  Do you know why he refused in high school?  Did he tell

22   you why he stopped wanting to take the medicine?

23   A.  He just didn't want to take it.

24   Q.  So when did he start going to school outside the home?

25   A.  There were -- there were some, like, Christian schools

1   that he had –– we went and –– like, I taught and he went to.

2   But that was –– that was like a homeschool thing.

3   Q.   Did he go to regular high school?

4   A.   He did.

5   Q.   How did he do in regular high school?

6   A.   When he turned in his homework, he did great.

7   Q.   Did he have a problem turning in his homework?

8   A.   Yes.

9   Q.   I believe at one point you used a phrase Devin gave you

10  hell as a child?

11  A.   Uh–huh.

12  Q.   You recall using that phrase?

13  A.   No, not as a child.

14  Q.   Oh.

15  A.   As a teenager.

16  Q.   As a teenager.  Okay.

17       What is that –– what do you mean by that?

18  A.   I had to keep track of all of his school stuff, and I had

19  to push him every day.  And then he'd have his homework, like,

20  in his hand, and I'd find out then from the teacher that he

21  had his homework and he just didn't put it in the box to turn

22  it in.  So I felt like I was riding him every single day.

23  Q.   Did Devin –– as a general proposition, if I can split it

24  in half.

25       If some –– on one side being impulsive, as an individual,

1    and another side being very planning and thoughtful and

2    caring, where did Devin fit in that spectrum?

3    A.   In the impulsive side.

4    Q.   Was he that way from as long as you could remember?

5    A.   From the very beginning.

6    Q.   Did that change at all in his life --

7    A.   Not that I --

8    Q.   -- that you saw?

9    A.   Not that I know of.

10   Q.   When did Devin join the Air Force?  About what age?

11   A.   I think he was 18 or 19.

12   Q.   Do you recall a time when he came home unexpectedly?

13   A.   Yes.

14   Q.   Tell me about that.

15   A.   He took his motorcycle home and -- he drove his motorcycle

16   from Holloman to the house.

17   Q.   And Holloman's where?

18   A.   In Alamogordo.

19   Q.   New Mexico?

20   A.   Uh-huh.

21   Q.   Is that "yes," ma'am?

22   A.   Yes.  Yes.

23   Q.   I don't mean to fuss at you.  It's just hard for the

24   written record if there are "uh-huhs" and "huh-uhs."

25   A.   Okay.

1  Q.  And so if I say "is that a yes," I'm just asking –– I'm
2  not trying to put words in your mouth.
3  A.  Okay.
4  Q.  Do you know about how far it is from Holloman to your
5  place in New Braunfels, like, to drive?
6  A.  To approximate?  I can't tell the exact miles, but I can
7  approximate for you.
8  Q.  Please.
9  A.  Probably 600.
10 Q.  600 miles?
11 A.  Uh–huh.
12 Q.  Have you driven back and forth from there?
13 A.  Oh, yes.
14 Q.  How long did it take you to drive that far?
15 A.  Well, I don't usually drive to Alamogordo, but probably
16 nine and a half hours, nine hours.
17 Q.  Did Devin ever tell you why he'd left and come to the
18 place in New Braunfels?
19 A.  No.  But he just –– no, he didn't.
20 Q.  What happened after he got home?  Did he have to get back?
21 A.  He seemed really scared.  And we were like, "What the heck
22 are you doing here?"  And so I suggested to my husband to call
23 the chaplain.
24 Q.  Chaplain of the Air Force?
25 A.  Uh–huh.

REBECCA KELLEY - DIRECT                                552

```
 1   Q.  Is that "yes"?
 2   A.  Yes, it is.  Yes.
 3   Q.  Do you know the outcome of that conversation with the
 4   chaplain?
 5   A.  I don't know the exact words.
 6   Q.  That's okay.
 7   A.  But he -- he said something to my husband like, "If you
 8   can get him here by -- get him to a place called Peak by a
 9   certain time, then he won't get into trouble."
10   Q.  Did that happen?  Did he go to Peak?
11   A.  They left within an hour.
12   Q.  Your husband and Devin?
13   A.  Yeah.  My husband drove Devin there.
14   Q.  Did you ever -- are you familiar with what Peak is, what
15   kind of institution it is?
16   A.  It is some kind of psychiatric place.
17   Q.  Did you visit Devin there ever?
18   A.  Yes.
19   Q.  Do you recall when?
20   A.  I don't remember when it was.
21   Q.  Was it when he was in the Air Force?
22   A.  Yes.
23   Q.  Devin was married at the time of the church shooting to a
24   lady named Danielle, correct?
25   A.  Correct.
```

REBECCA KELLEY – DIRECT                    553

```
 1   Q.  Did Devin have a prior wife?
 2   A.  Yes.
 3   Q.  What was her name?
 4   A.  Tessa.
 5   Q.  Did you meet Tessa before Devin married Tessa?
 6   A.  I met her, like, once before, for a very short period of
 7   time.
 8   Q.  Did they have a long courtship or a short courtship?
 9   A.  Very short.
10   Q.  How short are we talking?
11   A.  I would say -- ooh, it's hard to say because I don't know
12   the exact amount of time.  But it didn't seem very long.
13   Q.  You said it did not seem long?
14   A.  No.
15   Q.  Would you take that as an impulsive decision by Devin?
16   A.  Oh, yes.
17   Q.  Did Devin's impulsivity change after he got in the
18   Air Force?
19   A.  I didn't see a big change in his impulsivity.
20   Q.  When Devin got out of the Air Force, did he come back and
21   live with you and your husband?
22   A.  Yes.
23   Q.  Did he -- I guess before --
24   A.  For a period of time.
25   Q.  Thank you.
```

1       Before Devin went in the Air Force, did he live in the

2   house with y'all, I guess, when he was in high school?

3   A.   Oh, before he went to the Air Force?

4   Q.   Yes, ma'am.

5   A.   Yes, he lived in our house.

6   Q.   When he came back from the Air Force and he was living on

7   your place, where was he living?

8   A.   In the -- in the barn apartment.

9   Q.   The barn apartment?

10  A.   Uh-huh.

11  Q.   I'm just asking you to repeat because it's sometimes hard

12  to hear through the mask.  That's all.

13  A.   Okay.

14  Q.   I don't mean to fuss at you at all, ma'am.

15  A.   I'll just put my mouth closer.

16  Q.   Okay.  At some point, he married Danielle, correct?

17  A.   Correct.

18  Q.   Do you recall how long after he got out of the Air Force

19  he married Danielle?

20  A.   No.

21  Q.   You don't --

22  A.   I can't remember.

23  Q.   Did you see Devin -- I guess, when he was in the house in

24  high school, you saw him every day, correct?

25  A.   Yes.

```
 1   Q.  When he came back to live on the home place after he got
 2   out of the Air Force, before he got married, did you see him
 3   every day?
 4   A.  No.
 5   Q.  How often -- how long could it be between times you saw
 6   him, just ballpark?  Like, was it -- a couple days would go
 7   by?  Did he go away for like a month?
 8   A.  Oh, no.  He wasn't gone like a month, but he'd be -- but
 9   then I was also traveling, so I wasn't there all the time.  I
10   would say, when I was there, maybe once or twice a week.
11   Q.  When he married Danielle, did she come live on the home
12   place with y'all?
13   A.  Yes.
14   Q.  And did they live in the barn apartment together?
15   A.  Initially.
16   Q.  And then they moved to Kingsville for a little bit,
17   correct?
18   A.  Correct.
19   Q.  And then from Kingsville, they went to Colorado?
20   A.  Correct.
21   Q.  And then they came back down?
22   A.  Correct.
23   Q.  When they were in Kingsville, did you talk to Devin and
24   Danielle regularly?
25   A.  When they were in Kingsville?
```

1  Q.  Yes, ma'am.  I know that was only a couple of months.

2  A.  It was a short period.  I would not -- I don't know.

3  Q.  And if you don't recall, that's a perfectly good answer,

4  as long as it's true.

5  A.  Yeah.  I don't recall.

6  Q.  Do you recall how often you talked to Devin when he was in

7  Colorado the first time?  Was it a regular occurrence?

8  Irregular?

9  A.  I would not say it was regular, in that we had a set day.

10  Q.  You talked to him about once a week?  Once every two

11  weeks?

12  A.  I would say once a week to once every two weeks.

13  Q.  And then he came back down to New Braunfels, correct?

14  A.  Correct.

15  Q.  And then went back into the barn apartment, right?

16  A.  Initially, they were in the trailer.

17  Q.  The trailer they brought back from Colorado with them?

18  A.  Yes.

19  Q.  And where was that trailer located on the property?  Was

20  it near where the barn is?

21  A.  It was underneath the stables.

22  Q.  Where is that in relation to the house?

23  A.  Okay.  It's kind of like -- here's the house, and it was

24  like -- it's like kind of like catty-corner but far away.

25  Kind of like catty-corner like this but far away.

1    Q.  Like a football field?  Two football fields?

2    A.  I would say it's -- I'm bad with distances.  It's about as

3    far as the barn is but in a different direction.

4    Q.  And your husband testified that was about half a football

5    field or about 50 yards.

6        Is that your recollection as well?

7    A.  Yes.

8    Q.  Between the house and, I guess, the trailer, what was in

9    between those?

10   A.  The house and the trailer?

11   Q.  Yeah.  Were there trees?  Was there an empty field?

12   A.  It's a big pasture-like area, and their trailer was on the

13   far side of the stables.

14   Q.  Could -- if you were in the house, could you hear anything

15   going on in that trailer?

16   A.  Absolutely not.

17   Q.  If you were on the porch, could you hear what was going on

18   in the trailer?

19   A.  I don't think so, no.

20   Q.  What about the barn?  What was between the house and the

21   barn apartment?

22   A.  The barn apartment -- the barn, you can't see from the

23   house.  And between the barn and the house is a stand of --

24   thick stand of, like, cedars and oaks.

25   Q.  So you can't see what's going on at the barn from the

1   house?

2   A.  No.

3   Q.  And you can't hear what's going on in the barn from the

4   house?

5   A.  No.

6   Q.  When Devin and Danielle came back, they had a baby boy,

7   correct?

8   A.  Correct.

9   Q.  He was born in Colorado?

10  A.  Correct.

11  Q.  Did you -- did you take care of the baby?

12  A.  Occasionally, I would baby-sit, uh-huh.

13  Q.  Did you take care of him often?

14      I guess I should define "often."

15      Like a couple times a week?

16  A.  Yeah, probably.  Uh-huh.

17  Q.  Did he then -- did Danielle bring him up to the house for

18  that, or did you go down to the barn?

19  A.  No.  She always came to the house.

20  Q.  As a general proposition, did you know what was going on

21  between Danielle and Devin down in the barn apartment?

22          MR. STERN:  Objection.  Vague.

23          THE COURT:  That's overruled.

24  BY MR. SCHREIBER:

25  Q.  Do you know what I meant?

```
 1   A.  No.
 2   Q.  Okay.  You told me that you couldn't hear what was -- you
 3   couldn't hear the barn from the house, correct?
 4   A.  Correct.
 5   Q.  You couldn't see the barn from the house, correct?
 6   A.  Correct.
 7   Q.  For a couple of years, Devin and Danielle, off and on,
 8   lived in that barn, correct?
 9   A.  Correct.
10   Q.  Did you know what was going on between those two, between
11   Devin and Danielle, in the confines of the barn when they
12   lived in there?
13   A.  I was not there.
14   Q.  So you don't know?
15   A.  I do not know.
16   Q.  Did you notice a change in Devin's personality?  At any
17   point in his life, did he kind of switch in his personality?
18       I don't mean like a split personality disorder.  I mean
19   like Devin just either grew up, got mature, went from being
20   happy to being sad, something like that?
21   A.  After he got out of the Air Force, he was more --
22   Q.  What was --
23   A.  It's like grown up -- like more grown up and a little
24   serious.
25   Q.  You say "serious."
```

1    Would you say jaded?

2  A.  No.  I didn't say "jaded."

3  Q.  Oh, I'm sorry.

4         MR. STERN:  Objection.  Mischaracterizes testimony.

5         THE COURT:  It's been cleared up.

6         MR. STERN:  Okay.

7  BY MR. SCHREIBER:

8  Q.  Could you repeat to me, then, what you saw was different

9  in him.

10  A.  He was way more serious, a little stoic.

11  Q.  Anything else?

12  A.  Nope.

13  Q.  In the -- in the last couple of months of his life, say

14  between about May and November of 2017, did you notice any big

15  changes in Devin?

16  A.  No.

17  Q.  Did you notice any big changes in Danielle during that

18  time?

19  A.  Not that I can think of.

20  Q.  I want to switch gears and talk to you relatively briefly

21  about the guns at your house.

22  A.  Okay.

23  Q.  When I say "your guns," I mean, any guns that you and your

24  husband had.  Okay?

25  A.  Okay.

1    Q.  Did you and your husband have guns -- I'm talking about

2    the time period from when Devin got out of the military until

3    the time of his death.  Okay?

4    A.  Okay.

5    Q.  Did you and your husband own guns?

6    A.  They are in his name, so he owns them.  And yes.

7    Q.  What were those guns?  What kind?  Do you know?

8    A.  From when to when?

9    Q.  If you can -- when Devin got out of the military, until

10   2017.

11   A.  Okay.  Well, we had the -- what's it called?  Beretta, the

12   Walther, a .22 rifle, the AR, and a shotgun.

13   Q.  The Beretta and the Walther, those are pistols?

14   A.  Correct.

15   Q.  Where were those stored?

16   A.  They are in a locked cabinet.  It's like a wardrobe, an

17   antique wardrobe.

18   Q.  What's it made of?

19   A.  It's made of wood.  The front -- it's got a huge front

20   door on it that has a mirror with a piece of wood behind it.

21   Q.  Is it thick wood?  Is it thin wood?

22   A.  It's pretty thick wood.  The door's so heavy we had to

23   anchor it to the wall behind, or it'll fall over.

24   Q.  Does that cabinet lock?

25   A.  Oh, it does.  It doesn't have a handle or anything to open

1   it.  You have to have the key.

2   Q.  How many keys did y'all have?

3   A.  One.

4   Q.  Aside from you and your husband, did anybody know where

5   those keys were?

6   A.  Nope.

7   Q.  To your knowledge, did ever -- did Devin ever go into that

8   gun cabinet?

9   A.  Not that I'm aware of.

10  Q.  Do you know if anybody but you and your husband went into

11  that gun cabinet?

12  A.  I don't think so.

13  Q.  You didn't leave -- did you leave the guns laying around,

14  or did you typically put them up when they weren't in use?

15  A.  Only at night would they be on the bedside table.

16  Generally, I didn't have one on mine, but sometimes I did.

17  Q.  Which gun -- which gun would be on the bedside table at

18  night?

19  A.  The handguns.

20  Q.  The rifles or the long guns or the .22, the AR and the

21  shotgun?

22  A.  They're all locked up.

23  Q.  To your knowledge, did Devin ever use your husband's AR?

24  A.  No, I don't think so.  I can't recall him doing that.

25  Q.  He had his own AR, correct?

```
 1    A.  Correct.

 2    Q.  He had no reason to borrow y'all's?

 3    A.  Correct.

 4    Q.  Did Devin ever ask you to buy him a gun?

 5    A.  No, not that I'm aware of.

 6    Q.  When Devin got out -- I'm going to switch gears now.

 7    Let's talk about when Devin got out of the Air Force.

 8    A.  Okay.

 9    Q.  Were you aware of what charges Devin had pled guilty to

10    specifically?

11    A.  I was not part of all of that, so I can't be specific on

12    what it was.

13    Q.  Were you aware of any restrictions placed on Devin when he

14    got out -- when he came out of Air Force confinement?

15    A.  No.

16    Q.  Did you know whether or not he could own a gun?

17    A.  No.  But I assumed he could when he -- when he passed a

18    background check and bought one.

19    Q.  I've got to ask you a hypothetical question.

20    A.  Okay.

21    Q.  If you had known it were illegal for Devin to own a gun,

22    would you have given Devin a gun?

23    A.  No.

24              MR. STERN:  Objection.

25              THE COURT:  That's late.
```

```
 1   BY MR. SCHREIBER:
 2   Q.  You're a law-abiding citizen, correct?
 3   A.  Correct.
 4   Q.  You have been your whole life?
 5   A.  Yes.
 6   Q.  You had no intention to start -- become -- doing illegal
 7   things late in life, did you?
 8   A.  Heck no.
 9           MR. SCHREIBER:  Just a moment.
10   BY MR. SCHREIBER:
11   Q.  I want to ask you some -- probably some pretty difficult
12   questions from here on.  Okay?
13   A.  Okay.
14   Q.  Were you aware that Devin had threatened to commit suicide
15   when he was in the Air Force?
16   A.  No.
17   Q.  Would you have wanted to know that?
18   A.  Yes.
19   Q.  If you had known that Devin had threatened to commit
20   suicide in the Air Force, would that have changed your opinion
21   on whether he should have a gun on your property?
22   A.  Absolutely.
23   Q.  How would that have changed your opinion?
24   A.  We would have told him not to.
25   Q.  And I think through this -- through this litigation, I
```

1   made you aware that Devin threatened to kill his supervisors

2   in the Air Force.

3       You remember me telling you that?

4   A.  Yes.

5   Q.  If you had been made aware of that, would you have let

6   Devin have a gun on your property?

7   A.  Absolutely not.

8   Q.  And you've already told me you loved your kids and your

9   grandkids, all of them?

10  A.  Yes.

11  Q.  And you loved Devin?

12  A.  Yes.

13  Q.  No matter what Devin did in the Air Force, you still loved

14  him with all your heart?

15  A.  Of course.

16  Q.  And as a mother, loving your son, if you had known that he

17  had threatened suicide, you would have tried to get him help,

18  wouldn't you?

19  A.  If he would go, yes.

20  Q.  You'd do what you could to try and get him to go?

21  A.  Correct.

22  Q.  And if you had known that he had threatened to kill his

23  supervisors, you would try and get him help for that as well,

24  correct?

25  A.  Correct.

1  Q.  And do whatever you could to help him, right?

2  A.  Correct.

3  Q.  Doing whatever you could doesn't mean you'd buy him a gun;

4  it means you'd get him to a doctor, right?

5  A.  Correct.

6  Q.  I want to switch gears again on you.  I want to talk about

7  the days leading up to the church shooting.

8      Did you notice any big changes in Devin in the days

9  leading up to the church shooting?

10 A.  He seemed like he had been.

11 Q.  I'm sorry, ma'am?

12 A.  He seemed like he had been, the way he was before.

13 Q.  Do you recall talking to Devin about going to see a

14 counselor with Danielle in the days before the church

15 shooting?

16 A.  I can't remember that specifically.

17 Q.  Do you recall trading text messages with Devin, just as a

18 matter of course?

19 A.  Yes.

20 Q.  If I showed you a text message between you and Devin,

21 would that refresh your recollection of some conversation?

22 A.  Sure.

23      MR. SCHREIBER:  Would you pull up 799 at page 4.

24 It's Joint Exhibit 799, page 4.

25

1   BY MR. SCHREIBER:

2   Q.  And it should show up on the screen in front of you.

3       Can you see that, Ms. Kelley?

4   A.  Uh-huh.  I can.

5   Q.  Okay.  Do we need to make it bigger or smaller for you?

6   A.  No.  It's fine.

7   Q.  And it appears -- do you recognize this as your phone from

8   the conversation?

9   A.  I guess it would be my phone.

10  Q.  Do you recall having a conversation with Devin where you

11  said -- or Devin asked you to watch the kids on the 3rd or 4th

12  when they go to Wurstfest?

13  A.  Correct.

14  Q.  You had that conversation with him?

15  A.  Yes.

16  Q.  Down below, where it says, "Today, 8:14 a.m., If we get

17  Medicaid back, maybe we will just go to counseling."  I

18  believe it's "IDK."

19  A.  I don't know.

20  Q.  I don't know.

21      "Me and her need time to talk."

22      Did I read that correctly?

23  A.  Yes.

24  Q.  And then the response back is "Dev, I think that's a good

25  idea."

1    A.   Correct.

2    Q.   That was you telling him that's a good idea?

3    A.   Right.

4    Q.   What was the context around this text message?

5    A.   The only thing that I can think of is they had both said

6    that they were squabbling.  And I didn't want to insert myself

7    in the middle of their marriage, and I felt like it would be

8    good for them to go outside the marriage and go talk to

9    people.

10   Q.   Were you aware of any problems between Devin and -- aside

11   from this text message, specifics of any problems between

12   Devin and Danielle?  We're talking November 2017.

13   A.   Not specific things.

14   Q.   I'm going to talk to you now about the day of the

15   shooting.

16   A.   Oh.

17   Q.   And, again, if you have to stop, just let me know when to

18   stop.  Okay?

19   A.   (Nods head.)

20   Q.   I won't belabor any points with you.  Okay?

21        What do you recall about that morning, November 5th?  Did

22   you talk to Devin in the morning?

23   A.   He came down.  We were sitting, having a cup of coffee,

24   because my daughter and her friends were down from Wurstfest.

25   And we were waiting to get up and feed them breakfast before

1    they left.  And he came down a couple of times, I think.  But

2    I can't recall for sure if it was twice or not, now.  Too much

3    has happened, gone on -- and asked if we could babysit.

4    Q.  Did you say whether or not you could babysit?

5    A.  We said we couldn't, because we had Lily and her friends

6    over to the house, but I could later that day.

7    Q.  Then what happened?

8    A.  It's big-time blurry.  I've gone over it a million times.

9        So what I remember is I was in the kitchen getting ready

10   to start breakfast when Mickey came up and said, "Did you read

11   this text?"

12   Q.  When you say "Mickey," you mean your husband Michael?

13   A.  (Nods.)

14   Q.  Is that "yes," ma'am?

15   A.  Yes, that's correct.

16   Q.  And you said he had a text.

17       Do you recall what the text said?

18   A.  The text said something about "Go untie Danielle."

19   Q.  Do you know what that meant?

20   A.  No.  But I knew it couldn't be good.

21   Q.  And what did you -- what did you do next?

22   A.  Lily was walking down the stairs at that point, and I had

23   put my phone on the counter.  And I told her next is -- to

24   leave, to get her friends and to leave.

25       And then I had a phone, but I think it was my husband's.

1    I don't know whose phone it was in my hand.  And I ran to the

2    barn.  And when I got there, it was locked.

3    Q.  What did y'all do next?

4    A.  I couldn't get in the barn.  She wasn't opening the door.

5    And so Mickey got something to open -- like a -- something he

6    used, like a screwdriver or something, to open the door.

7    Q.  What did y'all find inside?

8    A.  It's pretty surreal.  We -- I saw Michael in the crib

9    smiling at me.

10   Q.  The baby?

11   A.  The two-year-old.

12   Q.  I'm sorry.

13   A.  Oh, I'm sorry.  I shouldn't have said his name.

14   Q.  It's okay.  It's okay.

15   A.  I saw Ray-Ray in the little plastic crib thing, and I saw

16   Danielle tied up on the bed.

17   Q.  How was she tied up?

18   A.  She had handcuffs like this, and her feet were tied like

19   this to the handcuffs.

20   Q.  You're demonstrating your hands behind your back and your

21   feet behind the back?

22   A.  Uh-huh.  And all tied up.

23   Q.  And hands and feet tied together?

24   A.  Uh-huh.

25   Q.  Is that "yes"?

1   A.   Yes.

2   Q.   Was Danielle in distress?

3   A.   Oh, her eyes were swollen like she had been crying a long

4   time.

5   Q.   Do you know how long she'd been there?

6   A.   And she had snot running all over her face.

7   Q.   I guess -- I apologize.  I asked you if you knew how long

8   she had been there, and you shook your head no?

9   A.   I don't know.

10  Q.   I was trying to clear that up.  That's all.

11       Did Danielle say anything to you about what happened?

12  A.   No.  I was untying her.

13  Q.   What happened next?

14  A.   I was untying her, and then she still was like this with

15  the handcuffs.  And it was like, "Where's the key?"  And she's

16  like (shaking head).  So I called -- no, I didn't call.  I

17  texted, "Where's the key?  Where's the key?"

18  Q.   Texted to whom?

19  A.   Devin.  "Where's the key?"  And --

20  Q.   Did you get --

21  A.   He called.

22  Q.   Devin called your phone?

23  A.   I don't know whose -- if it was mine or my husband.  I

24  don't know.

25  Q.   The phone was in your hand?

1   A.  The phone was in my hand.

2   Q.  What was the contents of that conversation, to the best

3   you can recall?

4   A.  He said the key was in the shoe thing.  They have this

5   plastic shoe thing that hooks over the door and comes down,

6   and he said it was in there.  And he said, "But you need to

7   wait."

8       And I don't know if I handed the phone to Mickey at that

9   time.  I don't know what -- who had the phone at that moment

10  because I was scrambling for the key.

11  Q.  Do you know why he said you had to wait?

12  A.  I was trying to get Danielle -- I -- he didn't.

13  Q.  Oh.  Oh, okay.

14  A.  I said it.

15  Q.  I'm sorry.

16  A.  But I don't know at that point who had the phone, because

17  I was trying to unlock her and get her out of the handcuffs.

18      And he kept saying that he had done a terrible thing, and

19  he didn't know what he was thinking.  And I said, "Okay.  What

20  did you do?"

21      And he said, "Mom, I killed a bunch of people."

22      And I said, "Where?  Where are you?  Where?"

23      And he started, like, slurring his words.  And I couldn't

24  figure out what he was trying to say.

25      And I turn around and I looked at Danielle.  And she said,

1    "Sutherland Springs."

2    Q.  Do you know how she knew that?

3    A.  I'm just thinking she understood Devin—talk more than I

4    did.

5         And I said, "Where's that?"  Because at that point, I had

6    never heard of Sutherland Springs.

7         And she says, "That's where my mom lives."

8         And Devin said "Mom, you've got to listen to me.  I am

9    dying."

10        And it's like, "What?"

11        He said, "I've been shot."

12        And I might be getting all this out of order.  This

13   might -- it's hard for me to remember.  During that time,

14   there was so much emotion going on.  I don't know if this is

15   the exact order or not.  It's just little pieces that I'm

16   remembering here and there.

17   Q.  I understand, ma'am.

18   A.  Okay.  So he said, "I've been shot once in the side and

19   twice in the leg, and I'm bleeding out, and I'm dying."

20        And at that point, I thought in my mind, well, if he's

21   really done this, I can't forgive him.  But if it was me that

22   had done something terrible like that, I would at least want

23   to be told that I was still loved.  And so I said, "I love

24   you, Devin."

25        And he just fell apart and was wailing, wailing that he

1  was sorry, over and over and over again.  And he kept saying,

2  "I didn't know what I was thinking.  I wasn't thinking

3  straight."

4      And so then the phone gets passed to my husband and

5  Danielle, and everybody's trying to take a turn to talk to him

6  at the very end.  And at that point, I was dealing with the

7  babies.

8      So the only thing that I heard with their conversations

9  was Devin saying, "Dad, please take care of my wife and kids"

10 and Mickey saying, "You know I will, Son."

11 Q.  Is that the end of it, that you heard?

12 A.  And that was the –– that's all I heard, other than what he

13 said to me.

14 Q.  Do you know if Danielle talked to Devin in that process?

15 A.  Yes, she did.

16 Q.  Do you know what she said with him?

17 A.  No.

18 Q.  Do you know –– this is a yes or no, whether or not you

19 know this.

20     Do you know why Devin went to the Sutherland Springs

21 Baptist Church and shot it up?

22 A.  No.

23 Q.  Did you suspect in the last days of Devin's life that he

24 was going to do something like this?

25 A.  No.

1    Q.  Did Danielle continue to live on your property with you

2    and Michael?

3    A.  And Ray-Ray?

4    Q.  Yeah.  And with the children?

5    A.  Yeah.  Yes, for a while.

6    Q.  Do you know about how long, ballpark?  Couple months?

7    Year?

8    A.  I can't recall the amount of time, but it was short

9    because she went from our house, and she went to live with

10   friends at that point.  And then she went to live with Erin at

11   that point, and then she went to live with her current

12   husband.  So it was a lot of bouncing around.

13   Q.  Do you think the government should have told you if there

14   were restrictions on Devin owning guns?

15   A.  Yes.

16   Q.  You think the government should have told you that he had

17   threatened to kill his supervisors?

18   A.  Yes.

19           MR. STERN:  Objection.  Argumentative.

20           THE COURT:  It's been asked and answered as well.

21           MR. SCHREIBER:  We'll pass the witness, Your Honor.

22           THE COURT:  Any questions?

23           MR. STERN:  Yes, Your Honor, I do.

24

25

```
 1                       CROSS-EXAMINATION
 2   BY MR. STERN:
 3   Q.  Mrs. Kelley, good afternoon.
 4   A.  Hi.
 5   Q.  Hi.
 6           THE COURT:  Can you move your mic up a little closer?
 7           MR. STERN:  Of course.
 8           THE WITNESS:  You bet.
 9           MR. STERN:  I think the judge was talking to me.
10           THE WITNESS:  Okay.
11           MR. STERN:  Sorry.  Let me just get oriented here.
12   BY MR. STERN:
13   Q.  Ms. Kelley, good afternoon.
14   A.  Good afternoon.
15   Q.  As you may recall, my name is Paul Stern.  I took your
16   deposition January, this year.
17   A.  Yes.
18   Q.  I want to thank you for being here today.
19       I'm going to start where we left off.
20       You weren't aware of what your son was convicted of in the
21   Air Force, correct?
22   A.  I wasn't there, so I do not know what the charges were
23   exactly.
24   Q.  Okay.  And you were not aware of any restrictions of Devin
25   as a result of that conviction?
```

1   A.  Correct.

2   Q.  You weren't aware that he was prohibited from owning or

3   possessing firearms?

4   A.  Nobody told me.

5   Q.  And you weren't aware of his attempt at suicide?

6   A.  No.

7   Q.  Or any threats to kill his supervisors?

8   A.  No.

9   Q.  Your husband wasn't aware of his -- of your son's

10  conviction or the extent of his conviction equaling a felony,

11  correct?

12  A.  As far as I know, but you need to ask him.

13  Q.  Fair enough.

14      As far as you're aware, your husband wasn't aware of any

15  prohibitions of your son owning or possessing firearms?

16  A.  Correct.

17  Q.  As a result, you had no concern for Devin owning or

18  possessing firearms?

19  A.  Correct.

20  Q.  Danielle and Devin was living on your property at the time

21  of the shooting, correct?

22  A.  Correct.

23  Q.  In fact, Devin was living on your property on and off

24  between the time he left the Air Force and the shooting?

25  A.  Correct.

1   Q.  He and Danielle moved to Colorado a few times during that

2   period?

3   A.  I don't know how many times.

4   Q.  A few times?  Three or four?

5   A.  I don't --

6   Q.  Is that fair?

7   A.  I don't know.

8   Q.  Okay.  But, otherwise, when they were living in Texas,

9   they lived with you at the barn apartment?

10  A.  Or they were at Kingsville.

11  Q.  Okay.  And throughout that time, you only met Danielle's

12  mother, Michelle Shields, a handful of times?

13  A.  As far as I can recall.

14  Q.  And you knew Danielle was estranged from Michelle Shields

15  when she was living with you?

16  A.  Yes.

17  Q.  It was your understanding that Danielle chose not to

18  communicate with her mother?

19  A.  Correct.

20  Q.  Danielle told you that she was sexually abused as a child?

21  A.  Yes.

22  Q.  And that Devin was protective of Danielle?

23  A.  Yes.

24  Q.  He was protective -- protective of you?

25  A.  Yes.

1  Q.  In fact, he had the "I'm a male in the household, and I'm

2  going to protect the females in the household" kind of

3  attitude, didn't he?

4  A.  Correct.

5  Q.  How would you describe Danielle's disposition?

6         MR. SCHREIBER:  Objection, Your Honor.  Vague as to

7  time, place, what he means.

8         THE COURT:  That's overruled.

9         THE WITNESS:  Her disposition?

10 BY MR. STERN:

11 Q.  Yeah.  Can you describe her characteristics, her demeanor.

12 A.  I liked Danielle.  She was sweet.

13 Q.  And did her sweetness change between whether Devin was

14 around or when she was alone with you?

15 A.  Well, I wasn't with her all the time she was around Devin.

16 But when they were in our house, she was the same.

17 Q.  Sure.

18     Did you ever spend one-on-one time with Danielle?

19 A.  Yes.

20 Q.  Okay.  And, again, did her character change between when

21 she was alone with you or when Devin was around?

22 A.  No.

23 Q.  I believe plaintiffs' counsel just asked you to sort of

24 put your son on a spectrum of impulsive versus compulsive.  Do

25 you remember that testimony?

```
1            MR. SCHREIBER:  It wasn't impulsive or compulsive.
2    It was impulsive versus planning.
3            MR. STERN:  Oh, impulsive versus planning.
4            MR. SCHREIBER:  Objection.
5            MR. STERN:  Thank you.
6            THE WITNESS:  Oh, there you go.  Yes.
7            MR. STERN:  Fair enough.
8    BY MR. STERN:
9    Q.  And you described your son as impulsive?
10   A.  Yes.
11   Q.  You were Facebook friends with your son, correct?
12   A.  Yes and no.
13   Q.  What do you mean by that?
14   A.  I had him -- he was a friend, but I didn't have him on my
15   news feed.
16   Q.  Right.  So he wasn't part of your news feed.
17       You didn't see any of his posts?
18   A.  I saw maybe one or two every -- once a year, maybe twice a
19   year max.  I'd go in and look for something that I could say
20   something so he wouldn't get his feelings hurt.
21   Q.  Sure.
22   A.  But on -- but them coming through all the time, no.
23   Q.  You didn't see anything disturbing?
24   A.  No.
25   Q.  You didn't Facebook-message with him?
```

1   A.  Not that I remember.

2   Q.  And you would never have seen anything he put in his

3   iCloud account?

4   A.  No.

5   Q.  Did you ever know your son was doing illegal drugs?

6   A.  No.

7   Q.  Do you know about any other run-ins with the law your son

8   had?

9   A.  He got a ticket for an expired -- I think it was

10  inspection.

11  Q.  Other than that?

12  A.  I can't recall anything.

13  Q.  You didn't see a black box in your son's apartment?

14  A.  A black box?  No.

15  Q.  Okay.  You never heard about your son training his

16  cardiovascular system, creating a diversion to jump a fence at

17  some point to run several miles to a bus station?

18  A.  Not that I can remember.

19  Q.  Okay.  I'd like to talk a little bit about Devin's

20  upbringing.

21      I believe you previously testified that he was diagnosed

22  with attention deficit disorder around the age -- when he was

23  younger?

24  A.  Uh-huh, yes.

25  Q.  Around the age of seven?

```
 1   A.  Yes.  I think he was seven.  That's kind of the age that
 2   sticks in my brain, but it could be off by a year.
 3   Q.  I won't hold you to it.
 4   A.  Yeah.
 5   Q.  Around seven?
 6   A.  Yes.
 7   Q.  Thank you.
 8       And he was given medication as a result?
 9   A.  Correct.
10   Q.  You tried various medications?
11   A.  Yes.
12   Q.  Concerta?
13   A.  Yes.
14   Q.  Ritalin?
15   A.  Yes.
16   Q.  Adderall?
17   A.  Yep.
18   Q.  And Devin was homeschooled until the sixth grade?
19   A.  Yes.  With -- at the end of sixth grade, we put him in
20   public school.
21   Q.  And he was bullied while he was in school, correct?
22   A.  Correct.
23   Q.  And as you previously testified, when he was in high
24   school, he, quote, "put you through hell"?
25   A.  Yes.
```

REBECCA KELLEY - CROSS                                    583

1   Q.  He was sent to alternative school for some time?

2   A.  Correct.

3   Q.  And that was a punishment for getting in trouble?

4   A.  Yes.

5   Q.  He refused to take his medication when he was -- when he

6   was in high school?

7   A.  Yes.

8   Q.  And Devin went into the Air Force around 2010?

9   A.  I don't know the date.  I don't know what it was.

10  Q.  Sometime after high school?

11  A.  Sometime after high school.

12  Q.  Fair enough.

13      And you mentioned, at some point, he came home on his

14  motorcycle?

15  A.  Yes.

16  Q.  Okay.  And you said he was frightened upon his arrival?

17  A.  Correct.

18  Q.  And you weren't told why he left the air force base?

19  A.  I can't recall what he said.

20  Q.  Okay.

21  A.  I just worried that he was going to get in trouble.

22  Q.  And so you had your husband contact the chaplain?

23  A.  Correct.

24  Q.  And the chaplain told him to take him to Peak?

25  A.  Within, like, eight hours, he had to get him there.

1   Q.   And you visited Devin when he was at Peak, correct?

2   A.   Yes.

3   Q.   And he seemed like his normal self while he was there?

4   A.   Correct.

5   Q.   So you didn't see any difference in his mental health

6   between when he was in high school and when he was at Peak?

7   A.   He seemed pretty stable at Peak.

8   Q.   Let's talk about the time after the Air Force.

9   A.   Okay.

10  Q.   Again, he came to live with you and your husband?

11  A.   Correct.

12  Q.   You thought he was acting his normal self?

13  A.   His normal self, but he was more adult and he's a little

14  more stoic, I think, but he was acting normal.

15  Q.   Normal.

16       His happy-go-lucky self?

17  A.   At times, yeah.

18  Q.   So he's the same mental health when he was in Peak as when

19  he returned to your home?

20  A.   He seemed happier at Peak than he did when he came home.

21  Q.   All right.

22  A.   But he didn't seem happy at Peak.

23  Q.   But roughly the same, maybe even a little happier at Peak.

24  Is that fair?

25  A.   I would say -- yeah, he seemed -- I don't -- yeah, I

1    guess.  I'm not sure.

2    Q.  Okay.

3    A.  About the same.

4    Q.  About the same.

5        We already talked about Devin and Danielle eventually

6    marrying.

7        Do you recall that Danielle was set to go off to college

8    at some point?

9    A.  Oh, no.  That's not how it was.

10   Q.  Danielle wasn't going to go away to college?

11   A.  When she got to our place, she told us that she could go

12   off to college, but it wasn't set up.  I helped her set that

13   up.

14   Q.  Okay.  You helped her actually fill out her paperwork to

15   go to college?

16   A.  Correct.

17   Q.  And you wanted to see her go off to college?

18   A.  Absolutely.

19   Q.  She was set to live in the dorms by herself?

20   A.  She would have to as a freshman unless she was married.

21   Q.  All right.  But then she decided she would not go without

22   Devin?

23   A.  Correct.

24   Q.  And so, instead, they decided to get married?

25   A.  Correct.

```
1   Q.  They had their first child in Colorado?

2   A.  Correct.

3   Q.  And they seemed happy at the time?

4   A.  I thought very.

5   Q.  You didn't have any concerns about Devin's mental health

6   at that point?

7   A.  No.

8   Q.  So this is where -- when Devin and Danielle are in

9   Colorado, just had their firstborn, you weren't aware of Devin

10  being interested in guns before he moved to Colorado, correct?

11  A.  He was more interested -- he was interested in one of the

12  guns he had while he was at the Air Force, but I don't

13  remember which one it was.

14  Q.  Okay.  But other than that firearm, you didn't know him to

15  have a strong interest in firearms at the time?

16  A.  Not at -- not at that point, not that I can recall.

17  Q.  Fair enough.  Thank you.  And I'm only asking for your

18  recollection, of course.

19  A.  Okay.

20  Q.  Thank you.

21      But when he returned from Colorado, he talked about owning

22  a business to teach people to use firearms?

23  A.  Correct.

24  Q.  He owned a shotgun at one point?

25  A.  At one point.
```

1   Q.  In fact, when he was living with you, he would go out to

2   practice shooting fairly frequently?

3   A.  I don't know how often he did.

4   Q.  Do you recall using the phrase "fairly frequently"?

5   A.  I don't recall how often he went out.

6   Q.  Okay.  Is there anything maybe I can use to help refresh

7   your recollection of that phrase?  Maybe if I share your

8   deposition?

9   A.  He would more than I would.

10  Q.  Okay.  We'll look at page 73.  I'm going to show you

11  Government's Exhibit 58.

12      Do you recall -- I'm just refreshing your recollection.

13  Do you recall having your deposition taken in this case?

14  A.  Yes.

15  Q.  Remember it was through Zoom --

16  A.  Yes.

17  Q.  -- and I was asking you some questions?  I'm sorry?

18  A.  Yes.

19  Q.  Okay.

20  A.  Uh-huh.

21  Q.  Thank you.

22      I want to show you page 73 of that deposition, between 10

23  and 13.

24      Ms. Kelley, can you read that section.

25  A.  Uh-huh.

1   Q.  Does that refresh your recollection?

2   A.  Do you want me to -- hold on just a sec.

3       Yeah.

4   Q.  Okay.  So let me ask you again -- we'll take that down for

5   right now.

6       Ask, when Devin was living with you, did he use his

7   firearms often?

8   A.  When we were in town?

9   Q.  I'm sorry?

10  A.  When we were in town?  I don't know what he was doing when

11  we were out of town.

12          THE COURT:  I don't think she heard your question.

13          MR. STERN:  Oh, I'm sorry.

14  BY MR. STERN:

15  Q.  I was asking, when Devin lived with you on your property,

16  is it fair to say that Devin shot his firearms fairly

17  frequently?

18  A.  Probably once a week or so.

19  Q.  Devin taught you how to shoot?

20  A.  Not totally, but he gave me pointers.

21  Q.  Your husband's not a gun enthusiast, is he?

22  A.  No.

23  Q.  But he has a license to carry?

24  A.  Yes.

25  Q.  And you have a license to carry?

```
 1   A.  Yes.

 2   Q.  He owned an AK at the time of the shooting?

 3          MR. SCHREIBER:  Objection, Your Honor.  Misstatement.

 4   I believe he said AR, not AK.

 5          THE COURT:  He can ask the question, and she can

 6   answer.

 7          MR. SCHREIBER:  Oh, okay.

 8          THE WITNESS:  What was your question again?

 9   BY MR. STERN:

10   Q.  Your husband owned an AR at the time of the shooting?

11   A.  Yes.

12   Q.  Thank you.

13       He owned a shotgun?

14   A.  Yes.

15   Q.  A Beretta?

16   A.  Uh-huh.

17   Q.  And a Walther .22 rifle?

18   A.  Uh-huh.

19   Q.  He kept these guns in an antique cabinet?

20   A.  Yes.

21   Q.  It was a piece of furniture, correct?

22   A.  Correct.

23   Q.  It was not a safe?

24   A.  Oh, it would take a lot to get in there.

25   Q.  But you weren't intentionally keeping the key from Devin,
```

1  correct?

2  A.  I was not keeping -- I would not give that key to anybody

3  besides my husband and myself.

4  Q.  Your concerns were over the kids, the grandchildren

5  getting access?

6  A.  My concerns were anybody getting access but my husband and

7  I.

8  Q.  Yeah.  But you had no concerns about Devin owning or

9  possessing firearms, correct?

10  A.  Yes.  He had his own.

11  Q.  And you don't recall the Texas Rangers -- you don't have

12  any knowledge, one way or another, of whether Devin ever

13  borrowed your husband's firearms?

14  A.  Why would he, if he had his own?

15  Q.  Right.

16      But you have no knowledge one way or another?

17  A.  Absolutely not.

18  Q.  Devin made an appointment to see a physician assistant

19  shortly before the shooting, correct?

20  A.  Correct.

21  Q.  You drove him to that appointment?

22  A.  He asked me to drive him because his car was broken down.

23  Q.  At the time, he was having anxiety where he would lose

24  control of his bowels, correct?

25  A.  Correct.

REBECCA KELLEY – CROSS                               591

1    Q.  You don't remember him having that much anxiety in the
2    months or years leading up to that visit where he would lose
3    control of his bowels?
4    A.  He would –– he would occasionally.  He would tell me.
5    Q.  But you don't recall within the months or even years
6    leading up to that that he would have such anxiety where he
7    would lose control of his bowels, correct?
8    A.  Not that much anxiety.
9    Q.  Thank you.
10       So it got so bad in the weeks leading up to the shooting
11   that he went to visit Dr. Batenburg's physician assistant,
12   correct?
13   A.  Correct.
14   Q.  He was suffering from migraines around that time?
15   A.  He'd been suffering with headaches for a while.  I can't
16   tell you how long.
17   Q.  Okay.  But he didn't have those headaches when he was
18   younger?
19   A.  No.
20   Q.  Around the time of the shooting, he was obese by that
21   point?
22   A.  Correct.
23   Q.  He'd actually gained a lot of weight between the time he
24   left the Air Force and when he went to see the physician
25   assistant?

```
 1   A.  Correct.
 2   Q.  He was short when he talked to people?
 3       I'm sorry.  He was short?
 4   A.  I don't know about other people.  He seemed -- he --
 5   occasionally, he was short with me and short with everybody.
 6   Q.  Okay.
 7   A.  A little irritable.
 8   Q.  So it would be accurate to say that, by 2017, Devin did
 9   not seem like he was the same person?
10   A.  From what point?
11   Q.  From when he returned to your home after he left the
12   Air Force?
13   A.  He was himself.  I mean, he wasn't -- he wasn't, like,
14   hallucinating or delusional or anything like that.  He was
15   just more serious.
16   Q.  Okay.  Is it fair to say that, by 2017, he didn't seem
17   mentally totally off, but he didn't seem like the same person?
18   A.  He's not -- he didn't seem like he was the same person,
19   no.
20   Q.  Okay.  You already spoke with plaintiffs' counsel about
21   the day of the shooting, and I don't want to drudge that up
22   again.  I do want to ask you one or two questions about the
23   conversation that you had with your son right before he lost
24   his life.
25   A.  Okay.
```

1   Q.  During that conversation, he was on speakerphone, correct?

2   A.  Correct.

3   Q.  And the last thing that you heard him say was telling his

4   father to "Please take care of my wife and kids," correct?

5   A.  Correct.

6   Q.  He was wailing, saying he was sorry?

7   A.  Correct.

8   Q.  And that he loved his family?

9   A.  Yes.

10          MR. STERN:  Pass the witness.

11          THE COURT:  Anything else?

12          MR. SCHREIBER:  Very short follow-up, Your Honor.

13                    REDIRECT EXAMINATION

14  BY MR. SCHREIBER:

15  Q.  Ms. Kelley, I won't belabor this point.

16      Devin had had anxiety problems well before 2017, correct?

17  A.  I -- you mean before he did what he did?

18  Q.  Yes, ma'am.

19  A.  I think he did.

20  Q.  And Devin -- and Devin had other issues -- we talked about

21  his bowel problems.

22      Did he have -- from 2013 to 2017, were there other

23  occasions when he would, I guess, deal with stress digestively

24  and get upset stomach from stress?

25  A.  I'm sure.

1    Q.  That wasn't something that just started all of a sudden in

2    November 2017, was it?

3    A.  I don't -- I cannot tell you when that started because I

4    don't know.  I don't remember when it started.

5    Q.  Is that an issue that's common in your family?

6    A.  Very.

7    Q.  I want to make just something clear about change in

8    Devin -- in Devin's personality.

9    A.  Okay.

10   Q.  Was Devin's -- when the change came, was it between before

11   the Air Force and after the Air Force?

12   A.  It was after the Air Force.

13   Q.  Did you notice a change occur when he left the Air Force,

14   or did the change occur right before he shot everybody?

15   A.  I think he was different after he came out.

16   Q.  Right after he came out?

17   A.  Uh-huh.

18   Q.  Is that a "yes"?

19   A.  Yes.

20           MR. SCHREIBER:  Pass the witness back.

21           THE COURT:  Anything else from those last questions?

22                     RECROSS-EXAMINATION

23   BY MR. STERN:

24   Q.  Mrs. Kelley --

25   A.  Uh-huh.

1  Q.  -- it's fair to say that Devin's anxiety got so bad within

2  the weeks prior to the shooting that he went to

3  Dr. Batenburg's physician assistant to get medication,

4  correct?

5  A.  I guess, yeah.  They wouldn't let me in there.

6  Q.  Fair enough.

7  A.  So I wasn't in there.

8         MR. STERN:  Thank you.

9      No further questions.

10        MR. SCHREIBER:  Nothing further, Your Honor.

11        THE COURT:  Any further need for this witness, or can

12  she be excused?

13        MR. SCHREIBER:  Nothing from us.

14        MR. STERN:  Nothing from us.

15        THE COURT:  Thank you, ma'am.  You're excused.

16        THE WITNESS:  Okay.  Thank you.  Can I leave?

17        THE COURT:  Yes, ma'am.

18     So we've concluded all the witnesses that we were

19  expecting today.  We'll resume tomorrow.

20     I have to preside over a state bar meeting.  I have about

21  an hour's worth of work that I must attend to there, and then

22  I'll turn over the gavel to the vice chair.

23     So I'll start up us at 10:00 in the morning.  And so

24  that'll alleviate the need of any morning break.  So let's

25  plan on resuming at 10:00, and then we'll work through those

1    witnesses scheduled for tomorrow.

2        Anything else we need to take up today from the

3    plaintiffs?

4            MR. ALSAFFAR:  Nothing from the plaintiffs, Your

5    Honor.

6            THE COURT:  Anything for the government?

7            MR. STERN:  Nothing, Your Honor.

8            THE COURT:  We'll see you a couple minutes before

9    10:00.

10       With that, I'm going to adjourn for today.  We'll log

11   everyone off.

12   * * *

13       *(Overnight recess)*

14

15

16

17

18

19

20

21

22

23

24

25

1                              −oOo−

2        I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above-entitled matter.

4

5    Date:  4/8/2021        /s/ Gigi Simcox
                            United States Court Reporter
6                            655 East Cesar E. Chavez Blvd., Rm. G-65
                            San Antonio, TX  78206
7                            Telephone:  (210) 244-5037

8    Date:  4/8/2021        /s/ Chris Poage
                            United States Court Reporter
9                            655 East Cesar E. Chavez Blvd., Rm. G-65
                            San Antonio, TX  78206
10                           Telephone:  (210) 244-5036

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25