```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF TEXAS
 2                       SAN ANTONIO DIVISION

 3
      JOE HOLCOMBE, ET AL,                    .
 4                                            .
                     PLAINTIFFS,              .
 5          vs.                               . DOCKET NO. 5:18-CV-555-XR
                                              .
 6    UNITED STATES OF AMERICA,               .
                                              .
 7                   DEFENDANT.               .
                                              .
 8
                     TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
 9               BEFORE THE HONORABLE XAVIER RODRIGUEZ
                      UNITED STATES DISTRICT JUDGE
10                         APRIL 9, 2021

11

12

13

14    APPEARANCES:
      FOR THE PLAINTIFFS:      JAMAL K. ALSAFFAR, ESQUIRE
15                             TOM JACOB, ESQUIRE
                               KOBY J. KIRKLAND, ESQUIRE
16                             LAURIE M. HIGGINBOTHAM, ESQUIRE
                               STEVEN R. HASPEL, ESQUIRE
17                             WHITEHURST HARKNESS BREES CHENG
                                ALSAFFAR HIGGINBOTHAM AND JACOB
18                             7500 RIALTO BOULEVARD, BUILDING TWO
                               SUITE 250
19                             AUSTIN TX 78735

20                             ROBERT E. AMMONS, ESQUIRE
                               APRIL A. STRAHAN, ESQUIRE
21                             THE AMMONS LAW FIRM
                               3700 MONTROSE BOULEVARD
22                             HOUSTON TX 77006

23

24

25
```

```
 1                        DANIEL D. BARKS, ESQUIRE
                          SPEISER KRAUSE, PC
 2                        5555 GLENRIDGE CONNECTOR
                          SUITE 550
 3                        ATLANTA GA 30342

 4

 5                        MARK W. COLLMER, ESQUIRE
                          COLLMER LAW FIRM
 6                        3700 MONTROSE
                          HOUSTON TX 77006
 7

 8                        JASON P. STEED, ESQUIRE
                          KILPATRICK TOWNSEND & STOCKTON LLP
 9                        2001 ROSS AVENUE, SUITE 4400
                          DALLAS TX 75201
10

11                        DENNIS CHARLES PEERY, ESQUIRE
                          R. CRAIG BETTIS, ESQUIRE
12                        TYLER & PEERY
                          5822 WEST IH 10
13                        SAN ANTONIO TX 78201

14

15                        PAUL E. CAMPOLO, ESQUIRE
                          TIM MALONEY, ESQUIRE
16                        LAW OFFICES OF MALONEY & CAMPOLO, LLP
                          926 S. ALAMO
17                        SAN ANTONIO TX 78205

18

19                        GEORGE LOUIS LeGRAND, ESQUIRE
                          LeGRAND AND BERNSTEIN
20                        2511 N. ST. MARY'S STREET
                          SAN ANTONIO TX 78212-3739
21

22

23

24

25
```

```
 1              DANIEL J. T. SCIANO, ESQUIRE
                RICHARD E. TINSMAN, ESQUIRE
 2              TINSMAN & SCIANO
                10107 McALLISTER FREEWAY
 3              SAN ANTONIO TX 78216
                KELLY W. KELLY, ESQUIRE
 4              ANDERSON & ASSOCIATES LAW FIRM
                2600 SW MILITARY DRIVE, SUITE 118
 5              SAN ANTONIO TX 78224

 6

 7              ERIK A. KNOCKAERT, ESQUIRE
                JOSEPH MICHAEL SCHREIBER, ESQUIRE
 8              SCHREIBER KNOCKAERT, PLLC
                701 NORTH POST OAK, SUITE 325
 9              HOUSTON TX 77024

10

11              BRETT T. REYNOLDS, ESQUIRE
                BRETT REYNOLDS & ASSOCIATES PC
12              1250 NE LOOP 410, SUITE 310
                SAN ANTONIO TX 78209
13

14              DAVID J. CAMPBELL, ESQUIRE
                JUSTIN B. DEMERATH, ESQUIRE
15              O'HANLON McCOLLOM & DEMERATH
                808 WEST AVENUE
16              AUSTIN TX 78701

17

18              JORGE A. HERRERA, ESQUIRE
                FRANK HERRERA, JR., ESQUIRE
19              THE HERRERA LAW FIRM, INC.
                1800 W COMMERCE STREET
20              SAN ANTONIO TX 78207

21

22              JASON C. WEBSTER, ESQUIRE
                THE WEBSTER LAW FIRM
23              6200 SAVOY, SUITE 640
                HOUSTON TX 77036
24

25
```

```
 1              CATHERINE TOBIN, ESQUIRE
                HILLIARD MUNOZ GONZALES, LLP
 2              719 S. SHORELINE BOULEVARD, SUITE 500
                CORPUS CHRISTI TX 78401
 3

 4

 5              HUGH JONES PLUMMER, JR., ESQUIRE
                THOMAS J. HENRY
 6              PO BOX 696025
                SAN ANTONIO TX 78269
 7

 8              DENNIS BENTLEY, ESQUIRE
                THOMAS J. HENRY, ESQUIRE
 9              THOMAS J. HENRY INJURY ATTORNEYS
                521 STARR STREET
10              CORPUS CHRISTI TX 78401

11

12              MARCO CRAWFORD, ESQUIRE
                LAW OFFICE OF THOMAS J. HENRY
13              4715 FREDRICKSBURG
                SAN ANTONIO TX 78229
14

15              MARION M. REILLY, ESQUIRE
                ROBERT C. HILLIARD, ESQUIRE
16              HILLIARD MARTINEZ GONZALES LLP
                719 S. SHORELINE, SUITE 500
17              CORPUS CHRISTI TX 78401

18

19

20

21

22

23

24

25
```

```
 1   FOR THE DEFENDANT:        AUSTIN L. FURMAN, ESQUIRE
                               PAUL D. STERN, ESQUIRE
 2                             UNITED STATES DEPARTMENT OF JUSTICE
                               THREE CONSTITUTION SQUARE
 3                             175 N STREET, NE
                               WASHINGTON DC 20002
 4

 5                             CLAYTON R. DIEDRICHS, ESQUIRE
                               JAMES F. GILLIGAN, ESQUIRE
 6                             JACQUELYN MICHELLE CHRISTILLES, ESQUIRE
                               JAMES EDWARD DINGIVAN, ESQUIRE
 7                             KRISTIN K. BLOODWORTH, ESQUIRE
                               KRISTY KAREN CALLAHAN, ESQUIRE
 8                             JOHN F. PANISZCZYN, ESQUIRE
                               UNITED STATES ATTORNEY'S OFFICE
 9                             601 NW LOOP 410, SUITE 600
                               SAN ANTONIO TX 78216
10

11

12

13                             AUSTIN L. FURMAN
                               JOCELYN KRIEGER, ESQUIRE
14                             DANIEL P. CHUNG, ESQUIRE
                               JAMES G. TOUHEY, JR., ESQUIRE
15                             STEPHEN E. HANDLER, ESQUIRE
                               UNITED STATES DEPARTMENT OF JUSTICE
16                             PO BOX 888, BEN FRANKLIN STATION
                               WASHINGTON DC 20044
17

18   ON BEHALF OF RUBEN        PHILIP KOELSCH, ESQUIRE
     D. RIOS, JR.              CRAIG WILLIAM, ESQUIRE
19                             CARLSON LAW FIRM, PC
                               100 EAST CENTRAL EXPRESSWAY
20                             KILLEEN TX 76542

21

22

23

24

25
```

```
 1   ON BEHALF OF            ELIZABETH G. BLOCH, ESQUIRE
     ACADEMY, LTD            DALE WAINWRIGHT, ESQUIRE
 2                           GREENBERG TRAURIG LLP
                             300 WEST 6TH STREET, SUITE 2050
 3                           AUSTIN TX 78701

 4                           JANET E. MILITELLO, ESQUIRE
                             LOCKE LORD LLP
 5                           600 TRAVIS STREET TOWER, SUITE 2800
                             HOUSTON TX 77002
 6
                             DAVID McDONALD PRICHARD, ESQUIRE
 7                           KEVIN MICHAEL YOUNG, ESQUIRE
                             PRICHARD YOUNG, LLP
 8                           10101 REUNION PLACE, SUITE 600
                             SAN ANTONIO TX 78216
 9
     ON BEHALF OF MOVANTS    J. DEAN JACKSON, ESQUIRE
10   MICHAEL AND REBECCA     CURNEY FARMER HOUSE OSUNA & JACKSON
     KELLEY                  411 HEIMER ROAD
11                           SAN ANTONIO TX 78232

12   ON BEHALF OF MOVEANT    ADRIAAN TIELEMAN JANSSE, ESQUIRE
     DR. SHRIDHAR VASIREDDY  JANSSE LAW
13                           P.O. BOX 791215
                             SAN ANTONIO TX 78279
14
     REPORTED BY:            GIGI SIMCOX, RMR, CRR
15                           CHRIS POAGE, RMR, CRR
                             OFFICIAL COURT REPORTERS
16                           UNITED STATES DISTRICT COURT
                             SAN ANTONIO, TEXAS
17

18

19

20

21

22

23

24

25
```

1    *(San Antonio, Texas; April 9, 2021, at 9:58 a.m., in open*
2    *court.)*

3          THE COURT:  Thank you.  Please be seated.

4    Good morning, everyone.  Let's continue with our trial.

5    I remind all counsel, parties, witnesses, participants,

6    and members of the public that this is a formal proceeding,

7    and that they should behave at all times as if they were

8    present in the courtroom.

9    The standing order of the San Antonio Division of the

10   Western District of Texas on remote access to court

11   proceedings remains in effect.  Photography, recording, or

12   streaming of this proceeding by any means is strictly

13   prohibited.  Though this proceeding is open to the public,

14   technological restraints require that members of the general

15   public request access from the courtroom deputy to participate

16   remotely.

17   Those granted approval to participate remotely must not

18   forward the electronic link to nonparticipating colleagues or

19   persons and must not post the link on any public forum.  As

20   with all proceedings, violation of these instructions are

21   subject to contempt proceedings.  Accordingly, please exercise

22   proper courtroom decorum at all times.

23   And with that, your next witness?

24          MR. JACOB:  Yes, Your Honor.  Plaintiffs call

25   Kimberly Del Greco.

```
 1        (Witness enters courtroom)
 2             THE CLERK:  Please raise your right hand before you
 3    sit down.
 4        (The oath was administered)
 5             THE CLERK:  You can have a seat.
 6             MR. JACOB:  May I proceed, Your Honor?
 7             THE COURT:  Yes.
 8                  KIMBERLY DEL GRECO, WITNESS, SWORN
 9                       DIRECT EXAMINATION
10    BY MR. JACOB:
11    Q.  Good morning, Ms. Del Greco.
12    A.  Good morning.
13    Q.  My name is Tom Jacob.
14        Would you mind introducing yourself to the Court, please.
15    A.  Yes.  My name is Kimberly Del Greco.  I'm the deputy
16    assistant director for the FBI in Clarksburg, West Virginia,
17    for division -- it's the Criminal Justice Information Services
18    Division.
19    Q.  And does that stand for CJIS?
20    A.  Yes, CJIS.
21    Q.  CJIS.  Okay.
22        Ms. Del Greco, you're a representative of the FBI;
23    correct?
24    A.  Yes.
25    Q.  And you were actually hand-selected in this case to be the
```

1  representative of the FBI in this case; fair?

2  A.  Yes.

3  Q.  Did you know you've also been identified as a person with

4  knowledge about the facts of this case, surrounding this case?

5  A.  Yes.

6  Q.  And to be fair, you have the authority to speak on behalf

7  of the FBI today?

8  A.  I do.

9  Q.  Okay.  And, Ms. Del Greco, would you mind just speaking up

10  just a little bit louder?  I'm having a little bit of

11  difficulty hearing you.

12  A.  Absolutely.

13  Q.  Thank you.

14    Beyond being a representative of the FBI, you've been

15  working with the FBI for nearly all your career; is that fair?

16  A.  Yes.

17  Q.  Could you give us a little background into that, please?

18  A.  Sure.  I began in the government in 1990 with the

19  Department of Education, but only for five years, and then I

20  started with the FBI in 1995.

21  Q.  Okay.

22  A.  And I've been with them ever since.

23  Q.  Are you familiar with the NICS section?

24  A.  Yes.  I -- when I started my position with the FBI, it was

25  to develop the NICS program.

1   Q.  Okay.  And how long have you worked in the NICS section?

2   A.  The first time, eight years.  And then I went back for a

3   couple more years.

4   Q.  Have you had any leadership roles in the NICS section?

5   A.  I did.

6   Q.  Could you tell us a little bit about that, please?

7   A.  Sure.  I was a unit chief for NICS over their appeals and

8   their analytical staff.  I became the assistant section chief,

9   and then I acted as the section chief for a year and a half

10  before I took a position as a section chief in the biometrics

11  section with CJIS.

12  Q.  Okay.  And before we get too far, could you tell us --

13  NICS is an interesting acronym.

14      Could you tell us what NICS stands for, please?

15  A.  Absolutely.  The National Instant Criminal Background

16  Check System -- Section.

17  Q.  Okay.  How many employees does NICS have?

18  A.  Right now, about 700 employees and 130 contract staff.

19  Q.  2016, I think you told me they had roughly 450 to 500

20  employees; right?

21  A.  They had 600.  400 were in the -- that's the staff that

22  processes the background checks.  Yes.  You're right.

23  Q.  Okay.  So you had 400 to 500 employees just processing

24  background checks at the NICS?

25  A.  That's correct.

1  Q.  Okay.  Could you also tell the Court what an FFL is,

2  please?

3  A.  Yes.  That's a Federal Firearms Licensee.  They are a gun

4  store owner that processes the firearm background check.

5  Q.  Right.  They actually contact the NICS section to do a

6  background check before selling a gun to a potential buyer;

7  right?

8  A.  Yes, they do.

9  Q.  Okay.  And what I'd like to do is just give a little bit

10  more background.  And I'd like to do that using Joint Exhibit

11  496.  This has been admitted into evidence, and I'm going to

12  show you page 1 on your screen.

13      Do you see page 1?

14  A.  I do.

15  Q.  You've seen this document before; right?

16  A.  Yes, I have.

17  Q.  We went through it together in your deposition.

18      You remember that?

19  A.  Yes.

20  Q.  It just gives an overview of the NICS section; right?

21  A.  It does, yes.

22  Q.  Okay.  Let me take you to page 5 of Joint Exhibit 496.

23      Do you see the map on your screen?

24  A.  Yes.

25  Q.  Could you tell the Court what this map shows?

1    A.  It shows the state participation levels.  The red

2    indicates a full point of contact state.  Those states process

3    all of the firearm checks in their state.

4        The blue and yellow states are -- we call them partial

5    POCs.  The state processes handgun checks, and we process the

6    long gun background checks.

7        And the green -- the green states are nonpoint of contact

8    states.  And all of the FFLs in those states process their

9    checks directly to the FBI.

10   Q.  Okay.  And just to flesh that out a little bit, the red

11   states that are on this map on page 5 of 496 do still access

12   NICS data in order to process background checks; right?

13   A.  Yes.  That's correct.  They run their background checks

14   through our system.

15   Q.  Yes.

16   A.  Yes.

17   Q.  And for a state like Texas, they go directly to the FBI

18   when they need to run a background check; right?

19   A.  Correct.

20   Q.  Okay.  Let me show you, then, page 7 of Joint Exhibit 496.

21   And do you see on your screen page 7?

22   A.  I do, yes.

23   Q.  And it says the types of records searched by the NICS

24   system; right?

25   A.  Yes.

1  Q.  And so we have a little background, we know that the NICS

2  searches, specifically, three databases; right?

3  A.  That's correct.

4  Q.  You have the Interstate Identification Index; yes?

5  A.  Yes.

6  Q.  And you call the III; right?

7  A.  Correct.

8  Q.  And then you have the National Crime Information Center;

9  right?

10  A.  Correct.

11  Q.  And that's known as the NCIC?

12  A.  Correct.

13  Q.  And then you have the NICS indices; correct?

14  A.  That's correct.

15  Q.  And on page 7 of this Joint 496, you kind of see some of

16  the records that are within each of these databases; right?

17  A.  Yes.

18  Q.  And I'd like to look at the NICS indices.  NICS –– it

19  notes that the NICS indices contains convictions punishable by

20  an imprisonment for a term exceeding one year.

21     Do you see that?

22  A.  Yes.

23  Q.  Indictments for those same convictions?

24  A.  Yes.

25  Q.  You see it has mental health adjudications and

1    dishonorable discharges; right?

2    A.   Yes.

3    Q.   It also has convictions of misdemeanor crimes and domestic

4    violence; right?

5    A.   That's correct.

6    Q.   And these are Brady prohibiters?

7    A.   They are.

8    Q.   Right?

9         And tell us what a "Brady prohibiter" is, please.

10   A.   There are ten Brady prohibiters identified under the Brady

11   law that, if held, prohibits someone from purchasing and

12   owning a firearm.

13   Q.   Okay.  So the NICS -- so a person goes into an FFL.  They

14   want to buy a gun, and the FFL does a search with NICS in a --

15   in a point of contact state like Texas; right?

16   A.   A nonpoint of contact state; correct.

17   Q.   Yes.

18   A.   They issue a search of our system.

19   Q.   And the NICS automatically searches these three databases:

20   The III -- the III, the NCIC and the NICS indices; right?

21   A.   That's correct.

22   Q.   If there's information in the NICS indices of a Brady

23   prohibiter, that's an automatic denial, isn't it?

24            MR. STERN:  Objection.  Leading.

25            THE COURT:  Sustained.

1          MR. JACOB:  Your Honor, this is an adverse party

2    witness.

3          MR. STERN:  They called her as a witness, Your Honor.

4          THE COURT:  Let's just avoid the leading.

5    BY MR. JACOB:

6    Q.  Ma'am, if the NICS -- if there is a Brady prohibiter on

7    the -- in the NICS indices, would that be an automatic denial?

8    A.  Yes.

9    Q.  Let me show you -- well, let's talk a little bit about the

10   FFLs going to -- through the NICS background search system

11   real quick.

12       When an FFL needs to do a search and they do a search

13   through the NICS system, the NICS provides three responses;

14   correct?

15   A.  Can you repeat that question again?

16   Q.  Yeah.

17       When an FFL does a background gun check through NICS, what

18   are the responses that NICS can provide?

19   A.  So we only provide one response to the FFL.  It could

20   either be a proceed, and that means the sale may proceed -- or

21   the transaction may proceed.  The dealer makes the decision

22   whether to actually sell the gun.  It may be a denial.  That

23   means NICS found something prohibiting in the record and

24   denied the transaction to the dealer.  Or it could be a delay,

25   and that indicates that there's additional research that is

1    needed and a NICS transaction number, or NTN, is also provided
2    to the FFL.
3    Q.  Okay.  If NICS has a record of a felony conviction, that's
4    a conviction punishable by more than a year in prison, would
5    that be an instant denial?
6    A.  It depends.  If there's additional research that is needed
7    on that felony -- it's up to the individual examiner when
8    they're looking at it, and their training, to make that
9    decision.  Potentially, if it's a clean record and the final
10   disposition indicates a felony, yes, they could deny.
11   Q.  Ms. Del Greco, has that always been your testimony?
12   A.  Has that -- say that again.  State that again, please.
13   Q.  Sure.
14       Has that response to my question:  If a NICS -- if a
15   record of a felony conviction punishable by more than a year
16   in prison is provided, that's an instant denial?
17       Do you remember that question?
18   A.  It can be.  Yes, sir.
19   Q.  Okay.  And NICS also has a previously denied persons file;
20   right?
21   A.  Yes.  It's in the NCIC, yes.
22   Q.  Right.
23       So if you're a FFL that does a search and it comes back as
24   denied, NICS puts that person in the previously denied persons
25   file; right?

1    A.  That is a file –– yes.  It's a file accessible ––

2    accessible by state and local law enforcement.

3    Q.  And a previously denied persons file is also an instant

4    denial for future –– for future purchases; right?

5    A.  It would be a record that would be accessible to NICS;

6    correct.

7    Q.  And it would be an instant denial; isn't that fair?

8            MR. STERN:  Objection.  Leading.

9            THE COURT:  That's overruled.

10           THE WITNESS:  It can be.  You know, it depends on the

11   specific record and the examiner that's making that

12   determination.  But, yes, it can be.

13   BY MR. JACOB:

14   Q.  Okay.  Ms. Del Greco, I want to show you a document that

15   has been preadmitted, Plaintiffs' Exhibit PEX 797.  And you

16   should see that on your screen pretty soon here.  And I'll

17   show you the first page of 797.

18       You recognize –– do you recognize Plaintiffs' Exhibit 797?

19   A.  Yes, I do.

20   Q.  Can you identify Plaintiffs' Exhibit 797, please?

21   A.  This is a document that's given out to agencies.  It

22   highlights the various disqualifiers under the Brady law, and

23   it also highlights in the document how agencies can submit

24   records to the NICS.

25   Q.  It provides another overview of the NICS operations in

1    2016; right?

2    A.  Yes.

3    Q.  And this is a document that the FBI publishes on a yearly

4    basis; right?

5    A.  We do.

6    Q.  And so you can actually go to the CJIS website and pull

7    every single year up to 2019?  I believe that's the most

8    recent year.

9    A.  Yes.  That's correct.

10   Q.  Okay.  Let me show you page 2 of Exhibit 797.

11       Do you see that on your screen?

12   A.  I do.

13   Q.  And I know it's a little small font, so I want to bring --

14   call out the message from the NICS section chief.

15       Do you see that?

16   A.  Yes.

17   Q.  And if you scroll down to the bottom of that document, can

18   you tell me who the author of this message from the NICS

19   section chief is?

20   A.  Yes.  It's Kimberly J. Del Greco.

21   Q.  Okay.  And I want to call out the third full paragraph of

22   PEX 797, page 2.

23       And do you see the last sentence of this paragraph?

24   A.  Yes.

25   Q.  And I'll just highlight it for you.  And when you get --

1    when you see the highlight, would you read that sentence to

2    the Court, please?

3    A.   Sure.  "Being able to view valuable information in a

4    timely manner aided the NICS section to ensure public safety

5    by denying 120,497 firearm background checks in 2016."

6    Q.   Isn't it fair to say that denying firearm checks to felons

7    and child abusers aids the NICS sections in ensuring public

8    safety?

9    A.   It does.

10   Q.   And this is actually the mission of the NICS; isn't it?

11   A.   It is.

12   Q.   Let me show you page 4 of PEX 797.  And I want to call out

13   the -- specifically, the NICS section mission.  This is the

14   FBI's NICS section mission that you're seeing on your screen;

15   right?

16   A.   Yes.

17   Q.   It's a lot of words there.

18       Would you mind reading the mission of the -- of the NICS

19   section to the Court, please?

20   A.   Sure.  "The mission of the NICS section is to enhance

21   national security and public safety by providing timely and

22   accurate determination of a person's eligibility to both

23   possess firearms and/or explosives in accordance with federal

24   law."

25   Q.   Okay.  So for the rest of the conversation, what I'd like

1   to do with you is talk to you a little bit about how the NICS

2   provides both timely and accurate information.  Okay?

3   A.  Okay.

4   Q.  So one at a time.  Let's start with the timeliness aspect.

5       Okay.

6   A.  Yes.

7   Q.  And you know that the NICS –– well, actually, let me ––

8   let me ask it this way.

9       There –– what are the two ways that –– that in 2016 an FFL

10  could run a NICS background search?

11  A.  Yes.  So a NICS –– an FFL can either call our contracted

12  call center in Barbourville, Kentucky, and provide the

13  biographics from the 4473 to a call center employee, which

14  runs the transaction against our system, or an FFL can process

15  a background check through E-Check, and it's an electric

16  mechanism.

17  Q.  And I believe a call gets a response within less than 20

18  seconds; right?

19  A.  It does.

20  Q.  And electronic checks are even faster than that; right?

21  A.  They are, sir.

22  Q.  By an order of three to one?

23  A.  Correct.

24  Q.  So for every call that the NICS gets, you can process an

25  electronic check in –– you can process three electronic

1  checks; right?

2  A.  That's correct.

3  Q.  Okay.  Let me show you page 19 of PEX 797.

4      And could you tell the Court what an "immediate

5  determination rate" is?

6  A.  It's an immediate proceed or denial to an FFL from a NICS

7  search.

8  Q.  Is it fair to say that, throughout the history of the NICS

9  section, the NICS section has strove to meet this 90-percent

10  immediate determination rate?

11  A.  We have, yes.

12  Q.  And what does it mean have a 90-percent immediate

13  determination rate?

14  A.  For the NICS section, it's important to provide service to

15  the FFL.  We know that's their business.  And we also want

16  people that do not have a prohibiting record, or ones that do,

17  have an immediate response within the three days.

18  Q.  Right.

19      So an immediate response is either proceed or deny; right?

20  A.  That's correct.

21  Q.  And in 90 percent of the cases, the NICS provides either a

22  proceed or deny?

23  A.  That's correct.

24  Q.  Okay.  So we talked a little bit about the timeliness

25  aspect, how fast the NICS system is.  I want to talk about how

1    y'all get an accurate proceed or deny.  Okay?

2    A.  Yes.

3    Q.  And to do that, I need to show you –– and I want to talk

4    to you in particular about the Devin Kelley case.  And so I

5    need to show you some documents from the Devin Kelley case.

6    And these are all documents that you should have seen before.

7        Let me pull out Joint Exhibit 658, page 199.  And I want

8    to compare it to Joint Exhibit 658, page 369.

9        Do you see those two documents on your screens?

10   A.  I do, sir.

11   Q.  Could you tell the Court first what page 199, the document

12   on your left, is?

13   A.  That's a fingerprint card, a manual fingerprint card.

14   Q.  And it's a fingerprint card for Devin Kelley; do you see

15   that?

16   A.  Yes.

17   Q.  Okay.  And could you tell us what the document on the

18   right, page 369, is?

19   A.  It's a ATF Form 4473 that Devin Kelley filled out.

20   Q.  Okay.  And I want to look at the identifying biographical

21   features that are provided in each of these cards.

22       Do you see that, between the fingerprint card and the FFL,

23   Devin Kelley –– his name matches; right?

24   A.  Yes.

25   Q.  Does his height –– or does his gender match?

1    A.   Yes.

2    Q.   Does his date of birth match?

3    A.   Yes, it does.

4    Q.   And does his Social Security match?

5    A.   Yes, it does.

6    Q.   All right.  At least on this portion of the ATF form,

7    Devin Kelley told the truth about his identifying

8    characteristics; is that a fair assessment?

9    A.   He did.

10   Q.   Okay.  I want to show you the next page of the ATF form.

11   And that is Page 370 —— 371, actually.  Let me show you that.

12   And I'm going to call out the first half of this form for you

13   so you can see it.  It's a little blurry.

14       And you can see page 371 of Exhibit 658 is the ATF form

15   that Devin Kelley filled out to get his Ruger AR.  Do you see

16   that?

17   A.   I do.

18   Q.   And do you see the date on this form, 4/7/2016?

19   A.   Yes.

20   Q.   Ms. Del Greco, isn't it true that if before April 7, 2016,

21   a final disposition had been submitted to the FBI CJIS with

22   Devin Kelley's conviction of a felony, the FBI would have

23   denied that transaction?

24           MR. STERN:  Objection.  Leading.

25           THE COURT:  Overruled.

1          THE WITNESS:  Yes.

2   BY MR. JACOB:

3   Q.  But the FBI didn't have the information it needed in order

4   to run the background search on Devin Kelley; did it?

5   A.  We did not.

6   Q.  And at no point did either the DoD or the Air Force

7   correct that missing information; did it?

8   A.  No.

9   Q.  Ms. Del Greco, I want to show you JEX 658, page 202 and

10  203.  Can you tell the Court what pages 202 and 203 are?

11  A.  This is the -- what we term as the R-84 form.  And it's a

12  request for final disposition.

13  Q.  All right.  It is a green form that should have the final

14  disposition information of a convicted offender; right?

15  A.  It should, yes.

16  Q.  And I'll represent to you this, pages 202 and 203, are

17  copies of the final disposition form that was found in Devin

18  Kelley's Air Force file.

19      You know that these final disposition forms come with a

20  self-addressed envelope; right?

21  A.  Yes, I do.

22  Q.  All right.  And were you aware that the Air Force had not

23  even filled out Devin Kelley's final disposition form?

24  A.  I am.

25  Q.  Okay.  Let me talk to you about the consequences of the

1   Air Force's failure to fill out this form and submit it to the
2   FBI.  And I'll do that by showing you JEX 658, page 375.  And
3   I want to call out that first section so you can see it a
4   little bit better.
5       Can you tell us what we're looking at on page 375?
6   A.  This is a response to a NICS E-Check transaction providing
7   the NTN number, NICS transaction number, the date and the time
8   of the transaction, and the proceed response.
9   Q.  Okay.  Specifically, it's a response to Devin Kelley's
10  E-Check or a NICS check on 4/7/2016; right?
11  A.  Yes.
12  Q.  And the response at that time was "proceed"; right?
13  A.  That's correct.
14  Q.  And it was based on the information you had; right?
15  A.  Correct.
16  Q.  But it -- but you didn't have the information of his
17  felony conviction; right?
18  A.  Correct.
19  Q.  Ms. Del Greco, I want to talk to you -- keeping along the
20  theme of this -- the consequence of this failure, I'm going to
21  show you what we have premarked as Plaintiffs' Demonstrative
22  Exhibit B.
23      Can you see Plaintiffs' Demonstrative Exhibit B okay?
24  A.  Yeah.
25  Q.  I can try to reposition it.

1  A.  No, I can.  Farther to the left, I cannot.

2  Q.  And I'm just going to be talking about this section, so it

3  may be a little bit easier for us.

4      Ms. Del Greco, you're aware that on December 12th, 2014,

5  Devin Kelley purchased a Glock; right?

6  A.  Correct.

7  Q.  And you know now that should have been a denial; right?

8  A.  Correct.

9  Q.  And if this was a denial, so should his June 26, 2015

10  purchase; right?

11  A.  Yes.

12  Q.  And if that was a denial, so should the April 7th, 2016

13  purchase; fair?

14  A.  Yes.

15  Q.  And if his April 7, 2016 purchase of an AR was a denial,

16  so should his October 18th, 2017 purchase of the Ruger?

17  A.  Correct.

18  Q.  Okay.  But it's not just guns that -- preventing felons

19  from acquiring guns that protects public safety; is it?

20  A.  Correct.

21  Q.  The NICS section is actually used by the law enforcement

22  agencies to help protect public safety; isn't it?

23          MR. STERN:  Objection.  Leading and mischaracterizes

24  prior testimony.

25          THE COURT:  That's overruled.

1            THE WITNESS:  I'm not sure –– the question, when you

2    say "use" ––

3    BY MR. JACOB:

4    Q.  Well, the information in some of the NICS databases, the

5    III and the NCIC, are used by law enforcement agencies across

6    the country to help them close their cases; right?

7    A.  So I wouldn't categorize that as a NICS database.  III and

8    NCIC, National Crime Information Center, are separate

9    repositories at the FBI.

10   Q.  Sure.

11        But, nevertheless, those databases are used by law

12   enforcement agents across the country to help protect the

13   public, right?

14   A.  Correct.  Separate from NICS.  They do not have access to

15   NICS.

16   Q.  Okay.  Well, if Devin Kelley's information had been

17   submitted, I want to talk –– we've talked with Ranger Snyder,

18   a Texas Ranger, about some of the background checks that were

19   done on Devin Kelley through his employment and through other

20   law enforcement agents that came back clean.  And you may not

21   be aware of that.  But there's one particular background check

22   I want to talk to you about.

23        And it is this background check on July 14th, 2014 [sic].

24   Were you aware that a roommate of Devin Kelley's had reported

25   Kelley as a child abuser?

1    A.   No.

2    Q.   And they reported Kelley to the Colorado Springs Police

3    Department.

4         Were you aware of that?

5    A.   I don't believe I am.

6              THE COURT:  One second.

7              MR. STERN:  She just answered.

8              THE WITNESS:  I'm sorry.

9              MR. STERN:  No.  Please.

10             THE COURT:  You may continue.

11             MR. JACOB:  Okay.

12   BY MR. JACOB:

13   Q.   Well, I'll represent to you that the -- this is based on

14   evidence that's already in the record that the police did a

15   background check, and it revealed nothing.

16             THE COURT:  One second.

17        Is there a question?

18             MR. JACOB:  Yes, Your Honor.

19             THE COURT:  What's the question?

20             MR. JACOB:  The question is, I'm going to ask her

21   about another consequence of the failure to have that

22   information in the system.

23             THE COURT:  But what's the question?

24             MR. JACOB:  The specific question is whether she's

25   aware that it hurt a witness' credibility when that

1    information wasn't in the system.

2              THE COURT:  What's the objection?

3              MR. STERN:  Objection.  Speculation.

4              THE COURT:  That's sustained.

5    BY MR. JACOB:

6    Q.  Okay.  Ms. Del Greco, let me actually show you -- and I'm

7    going to cue up -- this has been preadmitted.  Willis -- the

8    testimony of Ms. Willis, page 105, lines 18 through 25.  And

9    I'll represent to you Ms. Willis is an individual and a

10   roommate of the Kelleys' that reported Kelley as a child

11   abuser.

12             MR. STERN:  Objection.  This is now a narrative.

13             THE COURT:  Yeah.  So what's the question?

14             MR. JACOB:  The question -- let me -- I was going to

15   play it for her and then ask the question.

16             MR. STERN:  But, Your Honor --

17             THE COURT:  But she didn't have knowledge.  So

18   where's this going?

19             MR. JACOB:  My point, Your Honor, is that the

20   information that the Air Force failed to submit into the NICS

21   database hurt a eyewitness' credibility in front of the police

22   when the eyewitness reported a child abuse crime that would

23   have put Devin Kelley in prison and prevented this massacre.

24             MR. STERN:  Objection.  Speculation.  It calls --

25   it's a legal conclusion and a narrative, which should be

 1   stricken from the record.

 2              THE COURT:  Yeah.  I'll take this one question at a

 3   time.  Continue.

 4   BY MR. JACOB:

 5   Q.  Okay.  Mr. Hanko, please play for Ms. Del Greco page 105,

 6   lines 18 through 25 of Ms. Willis' testimony.

 7        *(Playing video)*

 8   BY MR. JACOB:

 9   Q.  Ms. Del Greco, one of the ways the FBI CJIS division helps

10   protect public safety is providing information like the

11   background check information of Devin Kelley, so they can

12   assess the credibility of eyewitnesses; right?

13              MR. STERN:  Objection.  Leading.

14              THE COURT:  That's overruled.

15              THE WITNESS:  That would be provided to III, not to

16   NICS.  Law enforcement would not have access to the NICS

17   database.  They would have access to anything that's submitted

18   to III.  And that is your fingerprints, your arrest

19   information, and the criminal history that is associated with

20   that arrest.

21   BY MR. JACOB:

22   Q.  Right.  Fingerprints like the FD-249 fingerprint card?

23   A.  Fingerprints and arrest information and the criminal

24   history that is associated with that arrest.

25   Q.  Right.

1    And my question was actually a little different.  My

2 question was whether the CJIS division helps –– and CJIS is

3 the division that you used to work for; right?

4 A.  I currently work there, yes.

5 Q.  Okay.

6 A.  Yeah.

7 Q.  And the CJIS division is a –– has ownership of the NICS

8 database; right?

9 A.  We have ownership of all three databases, but NICS is

10 separate from III.

11 Q.  And NICS searches III, NCIC, and the NICS indices; right?

12 A.  That's correct.

13 Q.  Right.

14    My question is:  One of the ways that CJIS, the FBI, helps

15 protect public safety is by providing information in the III

16 and the NCIC to law enforcement agents so they can make

17 credibility determinations about eyewitnesses?

18 A.  Yes.

19 Q.  And if an eyewitness tells a law enforcement agent that,

20 you know, I think this person has a criminal history of a

21 felony and a domestic abuse, this person's a bad person, and

22 that check of the NCIC comes back as having none of that

23 history, that could hurt that witness' credibility; isn't that

24 true?

25             THE COURT:  One second.

1              MR. STERN:  Objection.  Speculation.  Leading.

2              THE COURT:  Okay.  You can answer, if you know.

3              THE WITNESS:  I can't surmise what a law enforcement

4    agency would do if they had access to information.  That is up

5    to them.

6    BY MR. JACOB:

7    Q.  Okay.  Ms. Del Greco, I want to talk to you a little bit

8    about the time from 2012 -- or from December 12th, 2014, to

9    the Sutherland Springs shooting, November 5th, 2017.  That's

10   three -- about three years; right?

11   A.  Yes.

12   Q.  And, you know, one of the issues that -- in this case is

13   about what would happen if Devin Kelley were able to get

14   firearms through a delay in the NICS system.

15         You're aware of that?

16   A.  Restate the question again.  I want to make sure I

17   understand you correctly.

18   Q.  Yeah.  Let me actually just talk to you about the

19   documents themselves.

20         Let's look at PEX 797.  Okay?

21   A.  Okay.

22   Q.  And I want to show you page 27 of PEX 797.  And this is

23   the NICS report from 2016 that we discussed earlier; right?

24   And I'm going to call out the first paragraph of PEX 797, page

25   27.

1      Can you tell the Court what "firearm retrieval referrals"

2  are?

3  A.  Yes.  If we have delayed a transaction because additional

4  research is needed before a final decision could be made on a

5  potential firearm transaction and information comes in after

6  the third business day and it denies the transaction, we

7  notify ATF that day that we have a denial and a potential

8  referral for retrieval to ATF.

9  Q.  And in 2016, the NICS section referred 4,170 firearm

10 retrieval actions to the ATF; is that right?

11 A.  That's correct.

12 Q.  And you expect --

13      THE COURT:  Just so I'm clear on this, so after three

14 business days, the FFL can still sell the weapon --

15      THE WITNESS:  Yeah.

16      THE COURT:  -- and so this retrieval is you telling

17 the ATF, "Go get that weapon from this person who shouldn't

18 have gotten it in the first place"?

19      THE WITNESS:  We recommend to ATF that there is

20 someone that's prohibited that had received one, yes.  We

21 know -- we -- clarifying, we call the FFL, notify him of the

22 denial, and he tells us if the firearm has been sold.

23 BY MR. JACOB:

24 Q.  Right.  And that only happens if there's a delay; right?

25 A.  It does, yes.

1    Q.  But in the vast majority of cases, 90 percent of the times

2    it's an instant denial; right?

3    A.  Proceed or denial, correct.

4    Q.  Proceed or deny.

5        Ms. Del Greco, I want to show you another document.

6    Actually, Plaintiffs' Exhibit Demonstrative Exhibit A.

7        Can you tell me if you can read this.  All right?

8            MR. STERN:  Your Honor, we do object to this

9    demonstrative.

10           THE COURT:  So what is this?

11           MR. JACOB:  Your Honor, this is a demonstrative of

12   admissions that we've gotten from various Air Force employees.

13   I'm actually not going to be asking her about this side of the

14   document.  I'm just going to be asking her about this side of

15   the document.  It's --

16           MR. STERN:  Your Honor --

17           THE COURT:  One second.  Let me read it.

18       So what's the objection?

19           MR. STERN:  Your Honor, as if the name of the

20   demonstrative isn't telling enough, all of these questions

21   that were asked are calls for legal conclusions.  We objected

22   during the deposition designations.  We have renewed those

23   objections during the deposition designations for purposes of

24   this trial.

25       To ask witnesses whether there is an increased risk of

 1   harm is an element of the duty at issue, and that is the pure

 2   province of the Court to decide.  It's inappropriate to ask

 3   Ms. Del Greco about an increased risk of harm, much less these

 4   lay witnesses who were asked during their depositions.  Now

 5   they want to blow this up and show it as a demonstrative.  And

 6   that's inappropriate.

 7            MR. JACOB:  First of all, Your Honor, this is already

 8   evidence that's -- this side of the board, the witness

 9   admissions are already in evidence, with the deposition

10   transcripts that we filed with the Court previously.

11            MR. STERN:  They're in evidence with our objections

12   and with our renewed objections.

13            THE COURT:  Right.  So he's going to ask her

14   questions about the left-hand side of that demonstrative.  I'm

15   disregarding the title of it.  With the exception of the

16   fourth bullet point, though, the other ones aren't asking for

17   any kind of legal conclusion.  They're asking about what the

18   NICS does.

19            MR. STERN:  And to the extent that she can answer

20   those from her personal knowledge, there's no need to have

21   this demonstrative up for --

22            THE COURT:  It's just demonstrative.  We're not here

23   in front of a jury.

24         Go ahead.

25            MR. STERN:  Thank you, Your Honor.

1   BY MR. STERN:

2   Q.   Ms. Del Greco, isn't it fair to say that government

3   agencies should collect fingerprints and submit them to the

4   FBI upon criminal arrests?

5   A.   Correct.

6   Q.   Government agencies should collect and submit deniable

7   offenses of felons and child abusers to the FBI?

8   A.   Upon arrest.

9   Q.   And government agencies should collect incomplete

10  information?

11  A.   Yes.

12  Q.   And isn't it also fair to say that time is of the essence

13  when it comes to reporting this type of disposition

14  information to the FBI?

15  A.   We would like to have the information timely and accurate

16  so it's available to all law enforcement across the nation.

17  Q.   Right.  For the NICS to work, federal agencies must

18  collect -- accurately collect and submit criminal history data

19  upon arrest?

20  A.   That's correct.

21  Q.   Isn't it also fair to say that the more information the

22  FBI has on dangerous felons, the better decisions that they

23  can make in preventing individuals who shouldn't have firearms

24  from getting those firearms?

25  A.   That's correct.

1   Q.  Ms. Del Greco, isn't it fair to say that the NICS

2   decreases the risk of shooting deaths by keeping guns out of

3   the hands of felons?

4           MR. STERN:  Objection.  Calls for a legal conclusion.

5           THE COURT:  Can you answer that question?

6       Has your agency done any kind of analysis to make that

7   kind of determination?

8           THE WITNESS:  The FBI does not study increase or

9   decrease risks to the American -- the American people.  We

10  process the transaction as the system was designed.

11      We do know, from historical cases, people have obtained a

12  firearm in many different ways to commit a crime.  But we

13  don't study that at the FBI.

14  BY MR. JACOB:

15  Q.  Isn't it true that the reason that the FBI doesn't study

16  that is Congress passed a bill preventing the research on gun

17  violence, by government agencies?

18  A.  I'm unaware, in all of my years at CJIS, about that law.

19  We are -- we don't consider our job the job to study the

20  impact to the community.

21          THE COURT:  Next question.

22  BY MR. JACOB:

23  Q.  Well, let's be very clear, then.  We do know that if

24  Kelley's fingerprints had been submitted (loud microphone

25  noise) final disposition -- let me restate the question,

1    Ms. Del Greco.

2        If Devin Kelley's fingerprints and final disposition had

3    been submitted to the FBI, he would have been prohibited from

4    purchasing the firearm, the very firearm that he used to kill

5    26 people; isn't that true?

6    A.   That is correct.

7             MR. JACOB:  Your Honor, we pass the witness.

8             THE COURT:  Any cross?

9             MR. STERN:  There is.  Can we have five minutes, Your

10   Honor?

11            THE COURT:  Yes.  We'll break for five.

12       *(Recess)*

13       *(Open court)*

14            THE COURT:  Thank you.  Please be seated.

15       Any cross?

16            MR. STERN:  Please, Your Honor.

17                       CROSS-EXAMINATION

18   BY MR. STERN:

19   Q.   Deputy Assistant Director Del Greco, good morning.

20   A.   Good morning.

21   Q.   As you may recall, my name is Paul Stern.  I'm an attorney

22   with the Department of Justice.  Thank you for being here

23   today.

24   A.   You're welcome.

25   Q.   I believe you've previously testified that the mission of

1    NICS is to enhance national security and public safety; is

2    that correct?

3    A.   That is correct.

4    Q.   And do you believe you're successful in your mission?

5    A.   I do.

6    Q.   Okay.  You had -- you successfully ensure that prohibited

7    individuals are prevented from obtaining firearms?

8    A.   With the information that we have available to us, yes.

9    Q.   Okay.  But you also said that the system was limited in

10   its design?

11   A.   That is correct.

12   Q.   How so?

13   A.   I mean, we -- it's a shared management database, and we

14   get information from all federal, state, local, and tribal law

15   enforcement agencies to allow us to access their records on a

16   national level.  The examiners are trained extensively, but

17   they all make their own decision based on the information they

18   have in front of them.

19   Q.   Is it also limited in its design, based on whether FFLs

20   versus non-FFLs have to participate?

21   A.   Yes.

22   Q.   How so?

23   A.   Well, an FFL has to be registered with the NICS in order

24   to process a firearm transaction with us.

25   Q.   Again, could you remind the Court what "FFL" stands for?

1  A.  Absolutely.  It's a Federal Firearms Licensee.

2  Q.  Okay.  And is –– are the entities that have to register

3  with NICS, is that defined by federal law?

4  A.  It is.

5  Q.  Okay.  So is it –– is it a business that is engaged in the

6  business of selling firearms?

7  A.  We process the transaction.  It is –– it is the FFL that

8  makes the determination whether to actually sell the firearm.

9  Q.  Correct.

10     But you –– as you suggested, it's limited to only FFLs;

11  correct?

12  A.  That is correct.  Yes, sir.

13  Q.  So is there a legal definition for –– for an FFL in order

14  to have to participate in the NICS system?

15  A.  I'm not aware of a legal definition.

16  Q.  Okay.  Let's pull up Joint Exhibit 32 –– I'm sorry ––

17  Government's Exhibit 32.  And that is 18 USC 921.  Can we look

18  at (a)(21)(D)?

19     So if you look at ––

20         MR. JACOB:  Your Honor, this –– I object.  This

21  witness testified she's not aware of this information.

22         MR. STERN:  Your Honor, this ––

23         MR. JACOB:  She would be speculating, Your Honor.

24         MR. STERN:  Showing her the law, which, obviously,

25  the Court can take judicial notice of.

1          THE COURT:  Yeah.  So, I mean, you're not asking her

2     to opine on the law.  So what's the question going to be?

3          MR. STERN:  The question is whether or not those who

4     are engaged in the business of selling firearms are those that

5     have to register as FFLs.

6          THE COURT:  Why don't you just ask her the other way?

7       What's your -- what's your understanding of non-FFLs?

8          THE WITNESS:  A non-FFL is a private sale, family

9     members selling firearms.  I'm -- I'm not sure what --

10         THE COURT:  And you-all don't regulate those?  You

11    don't --

12         THE WITNESS:  No, we do not.

13         THE COURT:  So point made.  Move on.

14         THE WITNESS:  And it happens regularly.

15         MR. STERN:  Thank you, Your Honor.

16    BY MR. STERN:

17    Q.  Just to clarify, non-FFLs don't have to participate in

18    NICS background checks before they sell the firearms.  Is that

19    fair?

20    A.  That is correct.

21    Q.  And are you aware of some of the ways that non-FFLs are

22    able to sell firearms?

23    A.  We do.  I mean, we know that there are stolen firearms.

24    There are gun shows.  There are ghost guns.  There are family

25    members that share guns.  There are many different ways to

1  obtain a firearm.

2  Q.  What about through online sources?

3  A.  Yes, and online, correct.

4  Q.  So is it fair to say that NICS performs background checks

5  within the legal parameters set forth in the Brady Act?

6  A.  Correct.

7  Q.  And in your experience, are prohibited individuals able to

8  circumvent the background check to obtain firearms?

9         MR. JACOB:  Objection.  Speculation.

10        MR. STERN:  If she knows.

11        THE COURT:  If you know.

12        THE WITNESS:  We do know that people get guns outside

13 of a NICS check.

14 BY MR. STERN:

15 Q.  And plaintiffs showed you statistics regarding the number

16 of felons who were denied sales at FFLs in 2016.

17     Do you recall that?

18 A.  Yes.

19 Q.  Do you know how many of them were able to circumvent NICS

20 to obtain firearms?

21 A.  I don't know how many.  But we do see on a weekly basis

22 crimes committed without --

23        MR. JACOB:  Objection, Your Honor.  Speculation.  She

24 testified --

25        THE COURT:  She's answering to her knowledge.

1        Go ahead.

2            THE WITNESS:  We –– we see on a weekly basis, crimes

3    that are committed.  We research that in our database and see

4    that a NICS check has not been initiated.

5    BY MR. STERN:

6    Q.  Did Devin Kelley have alternative means through which to

7    obtain firearms through non-FFL sources?

8    A.  He showed intent.

9    Q.  You suggested he showed intent.  If we could talk a little

10   bit more about that.  If we could pull up Joint Exhibit 345.

11   Start with number 4, please.  Page 4, please.

12            TECHNOLOGY SPECIALIST:  4?

13            MR. STERN:  Yes.

14   BY MR. STERN:

15   Q.  Again, I believe plaintiffs' counsel showed you this

16   ATF 4473 form; do you recall?

17   A.  Yes.

18   Q.  Okay.  And can you tell the Court what is an ATF 4473

19   form?

20   A.  It's a required form that the FFL gives a potential

21   purchaser to fill out.  They have to put their biographics and

22   answer all of the questions honestly on the form.

23   Q.  Okay.  And can you read the warning label on the top of

24   the form?

25   A.  "You may not receive a firearm if prohibited by federal or

1    state law.  The information you will provide will be used to

2    determine whether you are prohibited under law from receiving

3    a firearm.  Certain violations of the Gun Control Act, 18 USC

4    921, are prohibitive by up to ten years imprisonment and/or up

5    to a $250,000 fine."

6    Q.  So is this warning the individual who's filling out the

7    form that a violation of the Gun Control Act may be subject to

8    ten years imprisonment and up to $250,000 --

9    A.  Yes.

10   Q.  -- fine?  Thank you.

11        Then if we look at the second page, can you read the

12   certification block.  Why don't we have you read where it

13   says, "I also understand that making any false..."  In the

14   middle of the paragraph, please.

15   A.  Would you like me to read that?

16   Q.  Please.

17   A.  "I also understand that making any false oral or written

18   statement or exhibiting any false or misrepresented

19   identification with respect to this transaction is a crime

20   punishable as a felony under federal law, and may also violate

21   state and/or local law."

22   Q.  So when Devin Kelley was filling out this form, he knew

23   that any lies that he told in filling out that form would

24   subject him to that same -- fines of $250,000 and up to ten

25   years imprisonment?

1   A.   Yes.

2   Q.   Let's take a look at the first page of the form again,

3   then.  Can you read to the Court Question 11?

4        So this requires -- does this require that Devin Kelley

5   answered various questions about whether or not he was

6   prohibited from owning or possessing firearms under the Gun

7   Control Act?

8   A.   Yes.  That's correct.

9   Q.   And based on your knowledge, was Devin Kelley truthful in

10  providing those answers to Question 11?

11  A.   No.

12  Q.   Why not?

13  A.   He answered "no" to all of the questions that were

14  relevant to his criminal act.

15  Q.   You say "his criminal act."  Let's take a look at 11(c).

16  If you can read that one.

17  A.   You would like me to read it?

18  Q.   Please.

19  A.   Okay.  "Have you ever been convicted in any court of a

20  felony, or any other crime, for which the judge could have

21  imprisoned you for more than one year, even if you received a

22  shorter sentence, including probation."

23  Q.   Thank you.

24       And he answered "no" to that; correct?

25  A.   That is correct.

1  Q.  Take a look at 11(j).  I'm sorry.  11(i), please, if you

2  don't mind.

3  A.  "Have you ever been convicted in any court of a

4  misdemeanor crime of domestic violence?"

5  Q.  Did Devin Kelley answer that question truthfully?

6  A.  No.

7  Q.  So, in other words, was Devin Kelley willing to lie and

8  subject himself to a felony charge, with a punishment of up to

9  ten years imprisonment and $250,000, in order to obtain

10  firearms?

11  A.  Yes, he was.

12  Q.  As the deputy assistant director of NICS, what does

13  someone's willingness to lie on their ATF 4473 form indicate

14  to you?

15          MR. JACOB:  Objection.  Speculation.

16          THE COURT:  That's overruled.

17          THE WITNESS:  They have intent to obtain a gun in any

18  means capable to them.

19  BY MR. STERN:

20  Q.  Including a willingness to break the law in order to

21  obtain firearms?

22  A.  That's correct.

23  Q.  Including a willingness to conceal their past convictions

24  to obtain firearms?

25  A.  Yes.

1    Q.   Does it indicate their determination to obtain firearms?

2    A.   Absolutely.

3    Q.   Taking a look at Joint Exhibit 65, please.

4         Have you seen this document before?

5    A.   Yes.

6    Q.   What is it?

7    A.   It's a statement by Danielle Kelley.

8    Q.   Does she indicate in that statement that she went with

9    Devin Kelley to a Dick's Sporting Goods?

10   A.   Yes.

11   Q.   And what was the result of that attempted transaction at

12   Dick's?

13   A.   It was denied.

14   Q.   And does she state a reason why she thinks it was denied?

15   A.   I believe it was the Colorado law that required Dick's to

16   deny that transaction.

17   Q.   Okay.  Then if we look down at paragraph 5, can you read

18   that paragraph, please?

19   A.   Sure.  "In or around April 2016, Devin and I went to

20   Academy in Selma, Texas.  There, he purchased a Ruger AR-556.

21   That day, he also purchased a magazine and ammunition.  It was

22   a quick and easy transaction.  It is my understanding that the

23   firearm Devin used in the Sutherland Springs shootings was an

24   AR-556 that Devin bought at Academy, located in Selma, Texas."

25   Q.   So according to Devin Kelley's wife, Devin Kelley actually

1    went to an FFL and was denied?

2    A.   Correct.

3    Q.   And then he continued to try to obtain firearms?

4    A.   Correct.

5    Q.   In fact, he didn't even bother to change his driver's

6    license from Colorado to Texas before he went to continue to

7    obtain -- attempt to obtain firearms?

8    A.   That's correct.

9    Q.   As the deputy assistant director of NICS, does his attempt

10   to obtain firearms after he was denied at an FFL tell you

11   anything about his intent?

12   A.   To me, it tells me that he will obtain a firearm in any

13   means capable to him -- available to him.

14   Q.   Including violating the law?

15   A.   Including violating the law.

16   Q.   Was Devin Kelley deterred from trying to obtain firearms?

17   A.   No, he was not.

18   Q.   Did he see the error of his ways in trying to obtain

19   firearms through FFLs?

20   A.   I don't believe so, no.

21   Q.   Did he see the error of his ways in any attempts of his to

22   obtain firearms?

23   A.   No.

24   Q.   I'd like to pull up an exhibit that plaintiffs' counsel

25   showed you regarding the NICS overview.  I believe it's Joint

1  Exhibit 496, please.  You've already briefly discussed this

2  document.  But what is it?

3  A.  It is a PowerPoint presentation, giving the general

4  overview of NICS.

5  Q.  Thank you.

6     And I believe you already spoke briefly about page 5, but

7  let's pull that one up.  Could you clarify for the Court what

8  is the difference between a POC and a non-POC state?

9  A.  Sure.  A POC state is full point of contact state.  And

10  the FFLs in the POC states go to the state police agencies,

11  state criminal justice agency to process their firearms.  They

12  do use the NICS system, but they also use other state

13  databases to make a determination.

14     In the non-POC states, nonpoint of contact states, the

15  FFLs come directly to the NICS, and we search our system.

16  Q.  So why would a state want to be a POC state?

17  A.  Some states have a revenue that they get from a gun sale,

18  and they have other state databases that they can access.

19  Q.  So, in other words, for a non-POC state, they go to --

20  through NICS to perform the database search based on the three

21  databases that CJIS operates; is that fair?

22  A.  Yes.

23  Q.  Is it fair to say that POC states want to do it themselves

24  because they can check those three databases as well as other

25  state databases?

1   A.   That's correct.

2   Q.   So it might be a more comprehensive search?

3   A.   Yes.

4   Q.   And we look at Texas, that's green; right?  That means

5   it's a non-POC state?

6   A.   That's correct.

7   Q.   I'd like to turn to page 20, please.

8        Can you read the portion in red?

9   A.   "UCMJ offenses are not classified as felonies or

10  misdemeanors.  Punishment for an offense may not exceed such

11  limits" as President -- "as the President may prescribe for

12  that offense."

13  Q.   And what does "UCMJ" stand for?

14  A.   Uniform Code of Military Justice.

15          THE COURT:  Where is this coming from?

16          MR. STERN:  I'm sorry?

17          THE COURT:  Where is this coming from?  Is this some

18  law you're citing to me, or what -- what is this?

19          MR. STERN:  Your Honor, this is the overview that

20  plaintiffs' counsel used regarding NICS?

21          THE COURT:  No, I know that.  But if you're asking me

22  to make decisions, I want to know -- here, there's some

23  confusion about which UCMJ offense he was convicted of.

24       Is that the purpose of showing this me or...

25          MR. STERN:  The purpose is when you actually look at

1    a database such as III, it's not self-evident that there would

2    be an automatic denial or that a local law enforcement officer

3    would know that's the equivalent of a felony because you need

4    to convert an article violation under the UCMJ into a state

5    felony or a misdemeanor of domestic violence.

6              THE COURT:  So just so I'm clear, then, based upon

7    what Devin Kelley was court-martialled for and convicted by

8    court-martial, should that information have been sent by the

9    Air Force to the NICS?

10             THE WITNESS:  To III.

11             THE COURT:  To III.

12             THE WITNESS:  Yes.

13             THE COURT:  And so that information in III would have

14   eventually shown up in any NICS check?

15             THE WITNESS:  It would.  However, the NICS examiner

16   would not immediately make a determination on a UCMJ without

17   doing research.  It doesn't give us an immediate response.

18             THE COURT:  So, I mean, you're the chief of that

19   section.  Devin Kelley's conviction, does that show -- what

20   you -- is that a gray area, or was it a clearcut area for you

21   to be able to say yes or no to?

22             THE WITNESS:  Depending on -- for this particular

23   case, an Article 128 would need do research.  There are

24   different various levels of assault.  So the NICS examiner has

25   military pages that they refer to.  We have internal websites

 1    that we access of DoD.  So we would actually have to do some

 2    research first.  And if it's not clear, completely, we would

 3    have to reach out to the Air Force for a final disposition on

 4    what the maximum conviction would be for that assault.

 5            THE COURT:  So we know none of that was done because

 6    the Air Force never gave you the information in the first

 7    instance; right?

 8            THE WITNESS:  That's correct.

 9            THE COURT:  Now, let's just assume hypothetically

10    that they had.  Have you-all done an analysis now as to

11    whether or not that would have shown up as a yes, you can buy,

12    or a denial?

13        Yeah.  You answer my questions.  You don't look to him.

14            THE WITNESS:  I just want to make -- so the first

15    sentence, for Tessa Kelley, the NICS examiner would have to

16    determine who Tessa Kelley was.  The element of force is

17    there.  And so once they determine that she is his wife -- at

18    the onset of the record, we would not know who Tessa Kelley

19    is.

20        But the second sentence that he received for the juvenile,

21    we would have been able to deny, referring to that record.  It

22    said "guilty" on the charge.  The NICS examiner only needs

23    one -- one denial to deny the firearm.

24            THE COURT:  Thank you.

25            THE WITNESS:  You're welcome.

1          MR. STERN:  Your Honor, I'd like to continue with

2    that line of questioning.  Just --

3          THE COURT:  Go ahead.

4    BY MR. STERN:

5    Q.  Based on the -- the way that you just outlined how a NICS

6    examiner would have to interpret an Article 128(g) violation

7    under the UCMJ, would it be fair to assume that if a local law

8    enforcement officer checked III and saw a UCMJ violation,

9    they, likewise, wouldn't know it's an automatic felony?

10   A.  They would not know.

11   Q.  And so if they had to invoke any state obligation to

12   obtain -- to arrest someone based on a felony possession of a

13   firearm, would they know automatically, based on that UCMJ

14   violation, that that individual had been prohibited from

15   owning or possessing a firearm?

16   A.  I think they would have to refer to the same military

17   pages that our examiners refer to.

18   Q.  Thank you.

19        I believe plaintiffs' counsel briefly spoke about -- a

20   question about credibility of one of the Kelleys' former

21   roommates, Emily Willis.

22        Do you recall that --

23   A.  Yes.

24   Q.  -- testimony?

25        I'd like to show you a few pages concerning her report to

1    the police.  Let's take a look at Joint Exhibit 521, please.
2    We see here the first line under the comments is "complainant
3    Emily Wollis."  I believe that's Willis?
4    A.  Yes.
5    Q.  And then the third line, "RP believes roommate's child is
6    being abused."
7    A.  Yes.
8    Q.  The fourth line reads, "No BOLO."
9         Do you know what "no BOLO" means?
10   A.  I do.  And I can't recollect it right now.
11              THE COURT:  Be on the lookout.
12              THE WITNESS:  Yes.  Thank you.
13              MR. STERN:  It's fair.
14   BY MR. STERN:
15   Q.  So according to this document, there was no be on the
16   lookout for the Kelleys; correct?
17   A.  That's right.
18   Q.  And then if we look another two lines down, "UNK location
19   of child or mother."  It's fair to say, the location of the
20   child or mother were unknown?
21   A.  That's correct.
22   Q.  And then a little further down it says, "RP woke up this
23   morning and roommate, child, and belongings are gone."
24        Did I read that correctly?
25   A.  Yes.

1   Q.  And a little further down it says, once again, "No BOLO"?

2   A.  Yeah.

3   Q.  Okay.  Are you aware that Emily Willis testified that the

4   night before she contacted the police, Devin Kelley took

5   Danielle and the child and moved back to Texas?

6   A.  Yes.

7   Q.  And so as a result, that's why she's telling the law

8   enforcement officers that she woke up this morning and the

9   roommate and child and belongings were gone?

10  A.  Yes.

11  Q.  Is it fair to say that it's difficult to prosecute a

12  domestic violence case when the victim is no longer present in

13  the state?

14  A.  Yes.

15  Q.  Are you here to speculate as to whether the El Paso County

16  Sheriff's office would have handled this case any differently

17  had Devin Kelley's information been in III?

18  A.  I mean, it's case by case, officer by officer on how they

19  would handle a situation.

20  Q.  Okay.  I want to transition and discuss the point in time

21  in which someone is prohibited under the Gun Control Act.  Is

22  that okay?

23  A.  That's fine.

24  Q.  When does an individual become prohibited from possessing

25  or owning a firearm under a 922(g)(1)?

1   A.   When we have a complete, final disposition.

2   Q.   The disposition of the conviction?

3   A.   Yes.

4   Q.   So before that time, they're not prohibited under the Gun

5   Control Act; correct?

6   A.   Unless they're under indictment.

7   Q.   Okay.  So we'll get to that one.

8   A.   Okay.

9   Q.   But let's talk about 922(g)(9).

10  A.   Yes.

11  Q.   Would that also require a conviction?

12  A.   Yes.

13  Q.   Okay.  And then you alluded to a 922(n).

14       What is that in reference to?

15  A.   That means a person's under indictment.  And the NICS

16  examiner then can deny a firearm as well.

17  Q.   Okay.  So the first time the individual would actually be

18  prohibited from owning or possessing a firearm under the Gun

19  Control Act is at the time of indictment?

20  A.   That's correct.

21  Q.   Do you know what the equivalent of an indictment is under

22  the Uniform Code of Military Justice?

23  A.   I believe it's when it's referred to general

24  court-martial.

25  Q.   And I'll stipulate -- I'll represent to you that the

1  parties have already stipulated that Devin Kelley's referral

2  of charges occurred on August 27th, 2012.

3  A.  That's correct.

4  Q.  Thank you.

5        MR. STERN:  In fact, I can pull up that exhibit for

6  Your Honor, although it has been stipulated.  I can move on.

7        THE COURT:  That's fine.  I got it down.

8        MR. STERN:  Okay.  Thank you.

9  BY MR. STERN:

10  Q.  Then I'll move on.  Take a look at Joint Exhibit 18,

11  please.  Take a look at the third page.

12      This shows Devin Kelley purchased a revolver at Holloman

13  Air Force Base Exchange on February 12th, 2012; is that

14  correct?

15  A.  Yes.

16  Q.  Would there have been any basis for the FBI to issue a

17  denial at that time?

18  A.  No.

19  Q.  Even if his fingerprints were in the system at that time,

20  would there have been any basis to prohibit Devin Kelley from

21  owning or possessing a firearm?

22  A.  No.  Having a fingerprint does not equate to a denial.

23  Q.  Thank you.

24      Moving on to Joint Exhibit 16, same question with regards

25  to this 4437 Form.  If we look at the third page, again, this

1   is another purchase by Devin Kelley of a firearm at the

2   Air Force -- the Holloman Air Force Base Exchange.  This one

3   occurred on, I believe, April 12th, 2012; is that correct?

4   A.  Yes.

5   Q.  Again, same question.  Was there any basis to deny Devin

6   Kelley at this point in time?

7   A.  No.

8   Q.  Even if his fingerprints were in the system at that time,

9   would there have been any basis to prohibit him for owning or

10  possessing a firearm?

11  A.  It would not, no.

12  Q.  In all of your years of experience as not just the deputy

13  assistant director of NICS, but all your time at CJIS, have

14  you ever heard of an individual being conditioned to purchase

15  guns at an FFL because they received a delay or proceed as

16  opposed to a denial?

17  A.  I think it's up to the individual on how their mental

18  state is, and, you know, their desire to have a firearm.

19  Q.  I want to transition and talk about one of the two

20  investigations into Devin Kelley during his time at the

21  Air Force.

22      Are you aware that there were two separate investigations

23  of Devin Kelley?

24  A.  Yes.

25  Q.  One of those were conducted by the 49th Squadron Security

1   Forces.  Do you -- is that correct?

2   A.  That is correct.

3   Q.  And the other one is by the Air Force Office of Special

4   Investigations?

5   A.  That's correct.

6   Q.  Okay.  There's been testimony that's been admitted into

7   evidence already from a Colonel Ford who was a 30(b)(6)

8   witness on behalf of the Security Forces.  He testified that

9   Devin Kelley's -- the result of the investigation by Security

10  Forces Squadron of Devin Kelley ended in a letter of

11  reprimand.

12      Would a letter of reprimand be a basis to prohibit an

13  individual from owning or possessing firearms?

14  A.  It would not.

15  Q.  Why not?

16  A.  That's an administrative action.  And it doesn't -- I

17  believe there are no arrest charges against anyone with a

18  letter of reprimand.

19  Q.  Let's pull that up, if you can.  Joint Exhibit 21, page 73

20  and 74.

21      So this is the letter of reprimand Devin Kelley received

22  as a result of the investigation by Security Forces personnel;

23  correct?

24  A.  That is correct.

25  Q.  If you can read the first sentence on paragraph 1.

1    A.   "Investigation has revealed that you physically assaulted

2    Mrs. Tessa K. Kelley on or about February 17, 2012, at 2629B

3    McKinley Loop, Holloman Air Force Base, New Mexico."

4    Q.   So this is investigating the abuse engaged in by Devin

5    Kelley on February 17th, 2012; correct?

6    A.   That's correct.

7    Q.   And if we read the first sentence in paragraph -- or first

8    two sentences in paragraph 2.

9    A.   "You are hereby reprimanded!  Your actions violated

10   Article 128 of the UCMJ-Assault.  I need you to understand

11   that your conduct was criminal and cannot continue."

12   Q.   Thank you.

13        So this was his -- equivalent of his punishment; correct?

14   A.   That's correct.

15   Q.   It was not a conviction?

16   A.   No.

17   Q.   He would not have been prohibited under the Gun Control

18   Act --

19   A.   He is not.

20   Q.   -- as a result of this conviction?

21   A.   Yes.

22   Q.   I'm sorry?

23   A.   I'm sorry.  He is not.

24   Q.   Thank you.

25        In fact, if you look at the second page of this document,

1   Devin Kelley signed it; correct?

2   A.  That's correct.

3   Q.  So, again, if Devin Kelley's letter of reprimand was the

4   result of the investigation by Security Forces, and that

5   entire investigation ended in a letter of reprimand, then

6   could the investigation by the Security Forces have caused

7   Devin Kelley to be prohibited from owning or possessing a

8   firearm?

9   A.  No, they could not.

10  Q.  Again, even if his fingerprints would have been submitted?

11  A.  Even if his fingerprints are submitted.

12          MR. STERN:  Pass the witness.

13          THE COURT:  Any questions?

14          MR. JACOB:  Yes, Your Honor.

15                    REDIRECT EXAMINATION

16  BY MR. JACOB:

17  Q.  Ms. Del Greco, I want to pick up with the discussion of

18  these guns that Kelley got prior to his conviction.  Okay?

19  You remember that conversation?

20  A.  Yes.

21  Q.  Mr. Stern talked to you about a couple of guns that he

22  bought on February 12th and April 12th of 2012; right?

23  A.  Correct.

24  Q.  Were you aware that the first gun that Mr. Kelley got was

25  actually confiscated by the Air Force before his conviction?

1          MR. STERN:  Objection.  Relevance?

2          THE COURT:  What is the relevance of that?

3          MR. JACOB:  Well, Your Honor, they're arguing that

4   Kelley would have gotten these guns because his conviction

5   wouldn't have denied it, and maybe he would have used these

6   guns.  But I'm about to show that all of these guns, prior to

7   his conviction, were either confiscated by the Air Force or

8   his dad.

9          MR. STERN:  I don't understand what the scope -- what

10  the alleged duty is with regards to confiscation, or we were

11  -- and, furthermore, we're only simply arguing that he was not

12  prohibited from owning or possessing firearms prior to these

13  referral of charges.

14         THE COURT:  That's sustained.

15     Move on.

16         MR. JACOB:  Yes, Your Honor.

17  BY MR. JACOB:

18  Q.  Ms. Del Greco, I do want to talk, though, about JEX 20.

19  Mr. Stern talked to you about how a letter of reprimand was

20  not a -- not a reason for denial of a firearm.

21     Do you remember that conversation?

22  A.  Yes.

23  Q.  I want to show you JEX 20.  You see that on your screen?

24  A.  Yes.

25  Q.  And you should see at the top it says, "Report of Trial."

1    We can make that a little bigger.  You see "Report of Trial"?

2    A.  Yes.

3    Q.  And this is a report of trial -- results of trial for

4    Devin Kelley; right?

5        And you can see that the organization is the 49th

6    Logistics Squadron; right?

7    A.  Yes.

8    Q.  It's a general court-martial?

9    A.  Correct.

10   Q.  And you can -- and if we scroll down, you'll see the two

11   charges that you were discussing with the Court; right?

12   A.  That's correct.

13   Q.  The second charge is the charge for the assault on the

14   child.

15   A.  That's correct.

16   Q.  Do you remember that?

17       Now, let's keep scrolling down, if you wouldn't mind, to

18   the bottom of that page.

19       Do you see the "distribution" section?

20   A.  I do.

21   Q.  And do you see the 49th Security Forces Commander SFOI?

22   A.  Yes.

23   Q.  So this document was actually distributed to the Security

24   Forces Squadron; right?

25   A.  I don't know that.

1   Q.  Well, I'll represent to you, we already have in evidence

2   that this document was distributed to the Security Forces

3   commander, and that they had the information of the Report of

4   Trial to report to the -- to the FBI.  Okay?

5   A.  Okay.

6   Q.  And so based on this information, the Security Forces

7   should report his conviction to the -- to the FBI; isn't that

8   true?

9           MR. STERN:  Objection.  Leading.  Speculation.

10          THE COURT:  That's overruled.

11  BY MR. JACOB:

12  Q.  Based on the Report of Trial that was reported to the

13  Security Forces, they had enough information to report his

14  conviction for a felony and domestic abuse to the FBI; isn't

15  that true, Ms. Del Greco?

16  A.  Yes.

17  Q.  Ms. Del Greco, I also want to talk to you about the ten

18  years in prison.  You remember how Mr. Stern talked to you

19  about Devin Kelley lied on his ATF forms in December of 2014?

20  A.  Yes.

21  Q.  That would have subjected him to ten years in prison?

22  A.  Yes.

23  Q.  He lied on his ATF form in June 26, 2015?

24  A.  Yes.

25  Q.  That would have subjected him to ten years in prison?

1   A.   Yes.

2   Q.   So we're at 20 years now?

3   A.   I don't know how they would adjudicate that.

4   Q.   He lied on his April 7, 2016 ATF form?

5   A.   Yes.

6   Q.   That's another ten years in prison?

7           MR. STERN:  Objection.  Speculation.

8           THE COURT:  -- doesn't know that already.

9           MR. JACOB:  I'm asking whether that violation is a

10  ten-year prison sentence.

11          THE COURT:  Are you asking cumulatively, or you're

12  saying that's the maximums he could have been receiving?

13          MR. JACOB:  Yes.  That's the maximum he could have

14  been receiving.

15          THE COURT:  Go ahead.

16  BY MR. JACOB:

17  Q.   For this lie on April 7, 2016, the maximum punishment for

18  his lie was ten years in prison; isn't that true?

19  A.   That's correct.

20  Q.   For this lie on April -- or August -- October 18th, 2017,

21  the maximum sentence is ten years in prison; right?

22  A.   That's correct.

23  Q.   Now, Ms. Del Greco, I want to show you Plaintiffs' Exhibit

24  798, which has been admitted into evidence already.  And it

25  should pop up on your screen in a second.  You should see that

1   this is a -- you've seen 798 before; haven't you?

2   A.   Yes, I have.

3   Q.   This is a document that the FBI publishes on its web page,

4   right?

5   A.   Yes.

6   Q.   And the FBI actually -- the CJIS division actually

7   updated -- this isn't even the most recent document; is it?

8   A.   I believe it's not.  It's a monthly --

9   Q.   Yeah.

10  A.   Yes.

11  Q.   And so the most recent edition is from March of 2021;

12  right?

13  A.   That's correct.

14  Q.   And what this document, PEX 798, shows is the reasons why

15  the NICS section denies a firearm purchase in a background

16  search; right?

17  A.   Correct.

18  Q.   You can see, from 1998 to 2021, the NICS section has

19  denied nearly a million felony convictions; right?

20  A.   Some of them are not felonies.

21  Q.   I'm sorry.  That's not the one that I wanted to show.

22  It's paragraph 1.

23  A.   Yeah.  Yeah.

24  Q.   You see paragraph 1.  And you can see --

25  A.   Yeah.

1  Q.  —— the NICS section has denied nearly a million felony

2  convictions; right?

3  A.  Yes.

4  Q.  And I also want to show you paragraph 4.

5      You see paragraph 4, the NICS section has denied nearly

6  200,000 misdemeanor crimes of violence; right?

7  A.  Correct.

8  Q.  Isn't it fair to say that all of those million-plus

9  people, just like Devin Kelley, lied on their ATF forms?

10 A.  That's correct.

11 Q.  And all of those million-plus people were prevented from

12 getting a gun, by the NICS section, by denying them to the

13 FFL; right?

14 A.  I can't say "prevented."  We provide a denial to the FFL.

15 It is up to the FFL to make that final determination.

16 Q.  And you expect the FFLs to follow the law; don't you?

17 A.  We do —— we do expect that.

18 Q.  And if ——

19 A.  And in some cases, it doesn't.  But in the majority, yes.

20 Q.  And if they're following the law, they are denying over a

21 million guns to felons and child abusers; right?

22 A.  Yes.

23          MR. JACOB:  Pass the witness, Your Honor.

24          THE COURT:  Anything else?

25

```
 1                      RECROSS−EXAMINATION
 2    BY MR. STERN:
 3    Q.  Taking a look at Joint Exhibit 798 again.
 4           MR. STERN:  I'm sorry.  It might be Plaintiffs'
 5    Exhibit 798.  It was renamed; right?
 6        (Discussion off the record)
 7    BY MR. STERN:
 8    Q.  This was the federal denials form that plaintiffs' counsel
 9    just showed you; is that correct?
10    A.  That's correct.
11    Q.  NICS is successful in its mission; correct?
12    A.  Yes.
13    Q.  But within the limitations of the law as set forth by
14    Congress?
15    A.  Correct.
16    Q.  And you don't know how many of these individuals were able
17    to obtain firearms through non−FFLs; do you?
18    A.  We do not.
19    Q.  And as you've said before, it's basically individual by
20    individual?
21    A.  That's correct.
22    Q.  Whether or not someone had the requisite intent to obtain
23    firearms through any means possible?
24    A.  That's correct.
25    Q.  Take a look at Joint Exhibit 20.  Take a look at this
```

1    distribution list that plaintiffs' counsel was referring to.

2        In fact, there were ten entities that were informed about

3    the result of trial; correct?

4    A.  Yes.

5    Q.  Not all ten of these are required to submit a final

6    disposition to -- to NICS; are they?

7    A.  At the time of arrest and at the time of a disposition.

8    Q.  Well, he was suggesting that the Security Forces had the

9    obligation.  But are you aware of testimony by Colonel Ford

10   that said it was the -- it was the investigative agency that

11   actually leads to the conviction that had the obligation to

12   submit to NICS?

13   A.  Yes.

14   Q.  So, again, even if Security Forces Squadron was one of ten

15   entities that got the result of the trial, that doesn't

16   necessarily obligate them to submit to NICS; does it?

17   A.  No.

18           THE COURT:  But just so I'm -- just so I know the

19   government's position:  Who was required to submit to NICS?

20           THE WITNESS:  It's actually the entity that made the

21   arrest and took the fingerprints.

22           THE COURT:  And so who is that in this case?

23           THE WITNESS:  I'm not -- I'd have to look back at the

24   document to see the specific, but I believe it's the

25   investigating agency.

1          MR. STERN:  Correct.  The investigating agency that
2     led to the actual conviction?
3          THE WITNESS:  Yeah.
4          MR. STERN:  Which would not be Security Forces.
5          THE COURT:  So in nebulous government world, there's
6     a whole bunch of agencies.
7          MR. STERN:  Not --
8          THE COURT:  Who is the agency in this case?
9          MR. STERN:  Air Force Office of Special
10    Investigations, OSI, which is a different component than SFS,
11    which is Security Forces Squadron.
12       So the only purpose with regards to showing the letter of
13    referral -- I'm sorry -- the letter of reprimand was that
14    Security Forces' investigation ended with a letter of
15    reprimand, thereby, not prohibiting Devin Kelley from owning
16    or possessing firearms under the Gun Control Act.
17          THE COURT:  So then, to be clear, in Joint Exhibit
18    20, Air Force Office of Special Investigations Detachment 225
19    was the investigating authority, and they received a copy of
20    this report of conviction; correct?
21          MR. STERN:  Correct.
22          THE COURT:  Okay.
23          THE WITNESS:  Yeah.
24          MR. STERN:  Correct.
25       But, again, not all ten entities --

1          THE COURT:  No.  I got that.

2          MR. STERN:  Then I'll move on.  Then I'll move on.

3  Okay.

4  BY MR. STERN:

5  Q.  Devin Kelley was not prohibited from owning or possessing

6  a firearm at this time (indicating)?

7  A.  That's correct.

8  Q.  He was not prohibited from owning or possessing a firearm

9  at this time (indicating)?

10 A.  Correct.

11 Q.  He was not prohibited from owning or possessing a firearm

12 at this time (indicating)?

13 A.  Correct.

14 Q.  He was willingness -- he was willing to subject himself to

15 up to ten years imprisonment to obtain a firearm at this time

16 (indicating)?

17 A.  He was.

18 Q.  He was willing to subject himself to ten years

19 imprisonment at this time, to obtain firearms (indicating)?

20 A.  Yes.

21 Q.  He was denied at an FFL; correct?

22 A.  That's correct.

23 Q.  And continued to try to obtain firearms?

24 A.  Yes.

25 Q.  He subjected himself to ten years imprisonment to obtain

1    firearms at this time (indicating)?

2    A.  Yes.

3    Q.  He subjected himself to ten years imprisonment to obtain

4    firearms at this time (indicating)?

5    A.  Correct.

6            MR. STERN:  No further questions, Your Honor.

7            MR. JACOB:  May I, Your Honor?

8            THE COURT:  Yes.

9            MR. JACOB:  Briefly.

10                  FURTHER REDIRECT EXAMINATION

11   BY MR. JACOB:

12   Q.  Ms. Del Greco, Mr. Stern talked about how he was denied at

13   Dick's.  Do you remember that conversation?

14   A.  I do.

15   Q.  Between the attempted purchase at Dick's –– or after the

16   attempted purchase at Dick's, you know that Devin Kelley went

17   to an FFL to purchase his gun; right?

18   A.  Correct.

19   Q.  Do you have any evidence to suggest, between November 2015

20   and his purchase of this AR in April of 2016, that Devin

21   Kelley went to a gun show and bought a gun?

22   A.  I have no knowledge of that.

23   Q.  Do you have any evidence to suggest, between the Dick's

24   denial and his AR purchase, Devin Kelley built a ghost gun?

25           MR. STERN:  Objection.  Speculation.  Asked and

1   answered.

2           THE COURT:  She's representing the FBI here.  So she

3   can ask -- she's answering, I believe, as the representative

4   of the FBI; right?

5           MR. JACOB:  Yes, Your Honor.

6           THE COURT:  And so your answers are, does the FBI or

7   you know whether any evidence exists that you-all are aware

8   of?

9           THE WITNESS:  No.

10          MR. STERN:  Your Honor, I do want to be clear,

11  because she is a representative of the FBI as a 30(b)(6)

12  witness as it relates to NICS, not with regards to the

13  investigative file of the Texas Rangers that was supported by

14  the FBI.  So she's not here to testify on behalf of the FBI

15  at-large.

16          THE COURT:  I understand that now.

17          MR. STERN:  Thank you.

18          THE COURT:  Go ahead with your questions.

19  BY MR. JACOB:

20  Q.  Ms. Del Greco, do you have any evidence to suggest that

21  between his denial at Dick's and his purchase of this AR in

22  2016, Devin Kelley built ghost guns or borrowed a gun or got

23  any guns through a non-FFL source?

24  A.  I'm not aware.

25          MR. JACOB:  Pass the witness, Your Honor.

1           THE COURT:  Anything else?

2           MR. STERN:  Nothing, Your Honor.

3           THE COURT:  Any further need for this witness, or can

4    she be excused?

5           MR. JACOB:  One moment, Your Honor.

6           MR. ALSAFFAR:  One moment, Your Honor.

7        *(Discussion off the record)*

8           MR. JACOB:  Your Honor, we do have one more question

9    for Ms. Del Greco.  I apologize.

10          THE COURT:  Go ahead.

11          MR. JACOB:  We're just cueing up a clip.

12   BY MR. JACOB:

13   Q.  Ms. Del Greco, you talked to Mr. Stern about the --

14   Colonel Ford's testimony; right?

15   A.  Yes.

16   Q.  I'd like to show you, actually, what Colonel Ford

17   testified to on that matter.  And I'm going to be playing --

18   okay.  We're showing the transcript, page 171 through 172.

19       Do you see line 21 on page 171?

20   A.  Yes.

21   Q.  He's asked the question:  "So this is a mandatory

22   instruction, that once law enforcement agency and DoD Security

23   Forces receives the notification from the SJA on the final

24   disposition of military judicial action, they must send the

25   R-84 to the FBI within 15 days."

1    And on the next page the question is, "Correct?"

2    Do you see that?

3  A.  I do.

4         MR. STERN:  Objection.

5  Q.  How did --

6         THE COURT:  What's the objection?

7         MR. STERN:  Vague.  "They are."  The distribution

8  list, she already testified that not all ten -- or at least

9  she doesn't know whether all ten who receive this result of

10 trial need to submit to NICS.

11        THE COURT:  So that's not the question pending.

12    So ask your question.

13 BY MR. JACOB:

14 Q.  The question is:  He answers, "Yes, that's correct"; isn't

15 that true, Ms. Del Greco?

16 A.  I see that on the slide, yes.

17 Q.  He answers that the Security -- when the Security Forces

18 receives the notification of the results of trial, as you

19 discussed with Mr. Stern, from the SJA on final disposition,

20 they must send the R-84 to the FBI.  Is that true?

21        THE COURT:  Now, are you asking for her personal

22 knowledge, or are you asking for what -- is that on the

23 screen?

24        MR. JACOB:  This is impeachment, Your Honor.  They

25 used this witness to try to --

1          THE COURT:  My question to you is:  Are you asking
2   her whether that's correct, or are you just asking her if
3   that's a correct recitation from the page?
4          MR. JACOB:  I'm asking her if it's correct, Your
5   Honor, from her knowledge.
6          THE COURT:  So can you answer that question?
7          THE WITNESS:  I know that the Department of Defense
8   has an MOU with the FBI to submit timely final dispositions to
9   the NICS.  Beyond that, within their own department, I do not
10  know what their specific rules are.
11         THE COURT:  So as to the memorandum of understanding,
12  it's your understanding of that MOU that they're supposed to
13  send these notice of finals within 15 days?
14         THE WITNESS:  Yes.
15         THE COURT:  Your next question.
16         MR. JACOB:  Your Honor, that was the point that I was
17  making.  I'll pass the witness.
18         THE COURT:  Anything else?
19                    FURTHER RECROSS-EXAMINATION
20  BY MR. STERN:
21  Q.  Is it clear from this transcript who "they" are in terms
22  of the obligation to submit to NICS?
23  A.  No.
24         MR. STERN:  Thank you.
25         THE COURT:  Well, just to make sure I'm understanding

1   things, then -- I mean, I thought we'd already cleared this

2   up.  I thought it was the Air Force OSI Detachment 225 who

3   received that final notice.  It was their obligation, pursuant

4   to the MOU, to send to NICS within 15 days that final

5   disposition.

6          THE WITNESS:  Yes.  It would be unusual for us to get

7   it ten times.

8          THE COURT:  Right.  I'm just worried about AFOSI

9   Detachment 225.

10         THE WITNESS:  Yes.

11         MR. JACOB:  And, Your Honor, my point was that that's

12  the government's position, and it's an incorrect position

13  based on the testimony and the instructions.

14         MR. STERN:  We can clean this up in post-trial

15  briefing as well because we have the depositions already

16  designated and in the record.  I don't think it's necessary to

17  belabor the point with this witness.

18         THE COURT:  Right.  Yeah.  So we're here just with

19  this witness.  I've asked the questions I think I need out of

20  her.  Do you have any further questions for this witness?

21         MR. JACOB:  No, Your Honor.

22         THE COURT:  Does the government have any further

23  questions from this witness?

24         MR. STERN:  No, Your Honor.

25         THE COURT:  May she be excused?

 1          MR. JACOB:  Yes, Your Honor.

 2          MR. STERN:  Yes, Your Honor.

 3          THE COURT:  Thank you, ma'am.  You're excused.

 4          THE WITNESS:  Thank you.  Thank you.

 5          THE COURT:  So 11:37.  What do you-all want to do?

 6  Do you want to start your next witness?  You want to break for

 7  lunch?

 8          MR. ALSAFFAR:  I think it would make sense to break

 9  for lunch.  This is the start of the remote witnesses, Your

10  Honor.  And it probably -- I believe the tech staff would like

11  to make sure that we've got everything going.  And we can use

12  that time.

13          THE COURT:  Okay.

14          MR. ALSAFFAR:  If that's okay, Your Honor.

15          THE COURT:  Yeah.  That's fine with me.  So he is by

16  Zoom.

17     How long do you think this witness is going to be taking?

18          MR. ALSAFFAR:  This is going to be the last witness

19  of the day by agreement with the government.

20          THE COURT:  Right.

21          MR. ALSAFFAR:  And it's an expert witness.  So I

22  think it'll be a few hours.  But we will be done with this

23  witness today, I believe.

24          THE COURT:  Okay.  So...

25          MR. ALSAFFAR:  Don't want to commit --

```
 1              THE COURT:  11:00, basically --
 2              MR. JACOB:  Come on, Paul.  You can commit.
 3              THE COURT:  It's 11:40.  Is 12:30 enough time for
 4    everyone?  12:30.
 5              MR. ALSAFFAR:  Oh, yes, Your Honor.  Thank you.
 6              THE COURT:  So let's resume by Zoom at 12:30.
 7         (Recess)
 8         (Change in reporter)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

LARRY YOUNGNER — DIRECT

1          (Change in reporter.)

2               THE COURT:  Your next witness.

3               MR. ALSAFFAR:  Thank you, your Honor.  Plaintiffs

4     call, via remote, Colonel Larry Youngner.

5          (LARRY YOUNGNER, having been duly sworn, testified as

6     follows:)

7               THE COURT:  You may continue.

8               MR. ALSAFFAR:  Thank you, your Honor.

9                         DIRECT EXAMINATION

10    BY MR. ALSAFFAR:

11    Q.  Colonel, first of all, if you don't mind, I'm just going

12    to do a little technology check, because you do have the honor

13    of being our first remote witness in this trial.

14         So can you — first of all, can you hear me okay?

15    A.  Yes, I can.

16    Q.  Okay.  Can you see us okay?

17    A.  Yes, sir.  I have four — actually, let me check this

18    again, if I've got this maximized.

19         Yes, I have a view of the courthouse, of the government

20    table, the plaintiffs' table, and then myself.

21    Q.  Okay.  Well, that should do it.  That should do it.

22         Colonel, would you mind stating your name for the record.

23    A.  Sure.  Larry Douglas Youngner Jr., Colonel, United States

24    Air Force, retired.

25    Q.  Colonel, I'd like to take the judge through a little bit

LARRY YOUNGNER - DIRECT

 1 about your background.  I won't go through all of it, because
 2 I know it's extensive, but I would like to highlight some key
 3 points.
 4          MR. ALSAFFAR:  And, Your Honor, Colonel Youngner's CV
 5 has been admitted into evidence as JEX 614.
 6          THE COURT:  Thank you.
 7          MR. ALSAFFAR:  And I've also provided you with his
 8 witness notebook on the bench, Your Honor.
 9 BY MR. ALSAFFAR:
10 Q.  Colonel, tell us a little bit about your educational
11 background.
12 A.  Yes.  I attended the University of Georgia for
13 undergraduate in 1983.  That same year, I was commissioned as
14 an infantry officer in the Army Reserve, and I drilled with a
15 reserve unit while on educational delay to attend law school
16 at the University of Georgia.
17      My next degree was earned in 1986 with a jurist doctorate
18 from the University of Georgia.  Related to that, I was able
19 to take the bar as a third-year student in February, under
20 Georgia rules at the time.  And I passed the bar prior to
21 graduation from law school that May of 1986, and then I
22 entered active duty.
23      Back to education, I obtained a LLM degree from the
24 Army -- we call it the Army JAG.  So it's now the Judge
25 Advocate General's Legal Center and School.  It's an

LARRY YOUNGNER – DIRECT

1  ABA-accredited law school co-located with the University of
2  Virginia.  That was 1998.  My LLM was in military law with a
3  specialty in international operations law.
4      The last educational experience I had was at National
5  Defense University where I obtained a master's degree in
6  national resource strategy.  It's now called the Eisenhower
7  School.  It used to be called the Industrial College of the
8  Armed Forces.  And that was in 2006.
9  Q.  And, Colonel, since we're remote and you're the first
10  witness, I'm just going to test your screen to make sure that
11  you can see the documents okay.
12      And while you were talking about your background, I put up
13  a part of your CV, which is JEX 614.
14      Can you see that okay?  Is that clear to you?
15  A.  Yes, sir.  I saw a page pop-up, and then I saw a block
16  expand while I was answering your question, sir.
17  Q.  Okay.  Thank you.
18      And we can take that -- we can take that down.  Thank you
19  very much.
20      How many years did you serve in the military again?
21  A.  Just at 31 years, from June of 1983 until I retired in
22  July of 2014.  Six of those years were in the Army, just over
23  six.  And just under 25, about 24 1/2, were in the Air Force.
24      The last 24 1/2 was as an Air Force judge advocate.  I was
25  an active member of the State Bar of Georgia since 1986, but I

LARRY YOUNGNER – DIRECT

1  was not practicing as an attorney from 1986 through 1989.  I

2  did not begin my legal practice in earnest until 1989 as an

3  Air Force judge advocate.

4  Q.  Thank you, Colonel.  And just to make things, hopefully, a

5  little smoother, every once in a while, I might put my hand up

6  like that.  And if I do that, I may just be cueing you real

7  quick, if you could stop and let me ask a question or try to

8  break it up a little bit.

9      With this remote system, it's really hard for us to read

10 each other's cues.  So I'm not trying to be rude when I do

11 that, but I thought that might be helpful for you.

12     Is that okay?

13 A.  Yes, sir.

14 Q.  All right.

15 A.  Yes, sir.

16 Q.  In your 24 1/2 years of service — thank you for your

17 service, by the way.

18     In your 24 1/2 years of service for the Air Force as a JAG

19 officer, about how many court-martials did you personally, as

20 legal counsel, complete?

21 A.  All total, 40 courts-martial.  As lead counsel, I want to

22 say 36.  The first four cases, I was, if you will, second

23 chair to a more senior attorney while I — we had to get

24 qualified.

25     So I participated in 40.  To answer your question

LARRY YOUNGNER — DIRECT

1  precisely, as lead counsel, 36 of those 40.

2  Q.  And how many courts-martial — well, let me ask you this.

3  I didn't ask you this about command.

4      Did you ever serve in the command structure, at the

5  command level with the SJA, which is the judge advocate's

6  office for the Air Force?

7  A.  Yes.  I was the staff judge advocate several times in my

8  career from insulation level up to the major command level.

9  Q.  How many —

10 A.  So I'd have to — yes, sir.

11 Q.  Oh, I'm sorry.  I was just going to ask you just

12 approximately, if you know, how many courts-martials as a

13 command SJA did you oversee and supervise and — supervise

14 while you were in the Air Force?

15 A.  In the supervisory capacity, well over 300.  I believe it

16 was around 390, 396.  It's in my CV and report.

17 Q.  Okay.  As part of your job as both a JAG officer in the

18 Air Force as well as your 300 to 400 supervisory

19 courts-martials, was it part of your job to regularly review

20 security forces instructions and Air Force OSI instructions

21 during your career?

22 A.  We would review those instructions for compliance, mainly

23 as issues developed in a case.  If we spotted an issue, what

24 we really dug into — so the short answer is yes, we would

25 review those.

LARRY YOUNGNER - DIRECT

1     We would dig deeper if we saw we had a problem on a case

2  or a potential problem being able -- as a prosecutor, we want

3  to make sure we could handle all the elements of the offense,

4  that we had investigative sufficiency from either OSI or a

5  security forces office of investigations, depending upon which

6  one of the two agencies were doing the investigation.

7     But, yes, we would absolutely review OSI Manual 71-121.

8  The security forces had what they call a 31 series of AFIs

9  that governed security force matters.

10     And where we really got into the heart of it was on

11  actually digging into the case files as a prosecutor or as a

12  defense counsel.

13  Q.  This case, as you know, involves security forces

14  instructions in the 31 table and the AFOSI security

15  instructions as well as the DODI.

16     Are those the types of instructions -- those specifically

17  as well -- that you would regularly review for investigative

18  case file sufficiency in your 30 -- almost 25 years in the

19  Air Force?

20  A.  Yes, sir.  We would review those.  The DODIG instructions

21  would depend upon what type of investigation they were

22  conducting.  There was a unit compliance inspection.  I

23  believe it was 9201, and then 301 was the series for actual IG

24  investigations for fraud, waste, and abuse into a particular

25  matter.

LARRY YOUNGNER – DIRECT

1     That would have been –– so, anyway, yes, sir.

2     And there were DOD equivalents, but I focused mainly on

3 the Air Force instructions.

4 Q.  Okay.  Did you also have occasion –– did the Air Force ask

5 you also to serve as a teacher to the AFOSI Academy at any

6 time?

7 A.  Yes.  When I was an area defense counsel and then later as

8 a circuit defense counsel –– the OSI Academy used to be at

9 Bolling Air Force Base before they ultimately went to the

10 Federal Law Enforcement Training Center down in Brunswick,

11 Georgia.

12     So I would conduct a class and then follow it up with a

13 mock trial.  Where, as a defense counsel, I would

14 cross–examine OSI agent trainees.  And then we'd do a debrief

15 afterwards to talk about what they could expect when they

16 testify for the first time.

17     It was to give them comfortable with having to come into

18 court, be sworn in, and answer questions on both direct exam

19 and cross–exam.

20     So, yes, sir, I did that several times while I was an area

21 defense counsel out at Andrews Air Force Base.  And then it

22 continued when I was at Bolling as a next–level–up circuit

23 defense counsel, we called it at that time.

24 Q.  Would you mind just providing the Court just a very quick

25 summary of the various command posts where you would advise

LARRY YOUNGNER — DIRECT

1  AFOSI and security forces personnel on investigative
2  sufficiency in criminal investigations, the various posts
3  around the world that you've done that?
4  A.   Sure.  So working on the prosecution side at Bolling Air
5  Force Base as a lead counsel, trial counsel; then at
6  Rhein—Main Air Base in Germany as the deputy staff judge
7  advocate for a few months, then as the staff judge advocate;
8  at Seymour Johnson Air Force Base in Goldsboro, North
9  Carolina; while on deployment in Sarajevo; prior to that, in
10  Bosnia; and while deployed to Iraq in 2003, where I was a
11  staff judge advocate.
12      And then moving up at the next level was what we call a
13  numbered Air Force, at Ninth Air Force.  So there I was
14  reviewing —— there, I was working more with the management
15  level.  So we would talk to the field investigative region a
16  good bit.
17      So let me stop at that point.
18      I continued to work with OSI at Hurlburt Field as the
19  Air Force Special Operations Command staff judge advocate.
20  But, again, that was at a higher level or a more serious type
21  of investigation.
22      I really worked very closely with the DetCo or the
23  detachment commander of an Air Force Office of Special
24  Investigations detachment for their superintendent, which was
25  their senior enlisted supervisor.  I worked with them most

LARRY YOUNGNER — DIRECT

1  closely at Rhein-Main Air Base, at the 4th Fighter Wing at
2  Seymour Johnson Air Force Base in North Carolina, and then as
3  an initial trial counsel at Bolling Air Force Base.
4  Q.  When you say you worked with DetCo and superintendents,
5  just so that we understand — and I apologize if I don't, but
6  I want to sure we understand the terminology.
7      DetCo would be a detachment commander for a particular
8  detachment at an installation like Holloman Air Force Base?
9  A.  Yes.  The distinction — and there is a difference.  But
10 the DetCo is a commissioned officer; whereas, the
11 superintendent is a — is usually a senior NCO, though there
12 could also be a GS, a senior civilian — GS, say, 13 or 14.
13     In fact, for a while at Seymour Johnson, we had a GS-14,
14 who was a retired senior NCO who then got hired back by OSI
15 and worked as a very competent superintendent.
16 Q.  Can I ask you now about a different area of experience
17 that you had in the Air Force?
18 A.  Sure.  Of course.
19 Q.  Did you have any experience with advising or working with
20 inspector general investigations while in the Air Force?
21 A.  Yes.  And it falls parallel track, if you will.  We try
22 not to cross the streams between IG investigations and
23 criminal investigations; though, it is quite often that an IG
24 investigation — because they typically will get into fraud,
25 waste, or abuse of authority.  And it is not unusual for an IG

LARRY YOUNGNER – DIRECT

1  investigation to result when it's completed if substantiated

2  findings exist in a criminal case.

3      So back to your question.  The IG work at base level at

4  Bolling was to mainly to review for legal sufficiency the

5  reported investigation that the IG was conducting.  And I

6  accomplished that or I supervised as a staff judge advocate a

7  subordinate –– you know, a major or a captain –– who was

8  conducting that.

9      I reviewed their legal sufficiency.  And at the higher

10 level, I had a major or lieutenant colonel draft that, say,

11 for example, at Air Force Special Operations Command at

12 Hurlburt Field, Florida.

13     But before it went into our commanding general, I read

14 through it and made sure it was legally sufficient.  And if it

15 wasn't –– and on one occasion, we sent something back for

16 reinvestigation.

17     And I don't want to get into the nuts and bolts of it, but

18 I did do that every time I served as a staff judge advocate.

19 It's just the scope of the investigation was often larger.

20     I'll give you one example.  At Hurlburt Field, there was

21 an allegation that the 1st Special Operations Wing had some

22 senior personnel that were taking extended brass ––

23 105-millimeter Howitzer shells from our AC-130 gunships.  And

24 they were basically selling the brass for profit instead of

25 turning it into the Defense Reutilization and Marketing

LARRY YOUNGNER – DIRECT

1  Office.

2      So if we were going to look at such a serious accusation

3  against both military and contractors, we needed to make sure

4  that the i's were dotted, t's were crossed, so to speak.

5      So was there investigative sufficiency?  Did it meet the

6  burden of proof in the case?  Was there credible evidence to a

7  preponderance, in that standard?  It wasn't a criminal case at

8  that point.

9  Q.  And did you advise IG -- or sorry -- inspector generals

10  investigations at a variety of level of commands in the

11  Air Force?

12  A.  Yes.  I also -- at the Headquarters U.S. Air Force, my

13  final assignment, I was the chief of staff of the Air Force

14  JAG corps.  And in that capacity, there were opportunities to

15  advise the IG either on -- we would review AFI regulatory

16  changes.  So that was more of an administrative review.

17      And then occasionally there would be a case that we would

18  coordinate on.  One example at the Headquarters Air Force

19  level was how to approach an alleged cheating scandal at the

20  OSI -- excuse me, at the U.S. Air Force Academy.  And the

21  second one also involved an alleged cheating scandal among

22  nuclear surety officers.

23      Anyway, so those are cases that we worked with staff.  So

24  the IG -- staff IG, the Secretary of the Air Force Inspector

25  General is a three-star position at the Headquarters

LARRY YOUNGNER – DIRECT

1  Air Force.  Underneath staff IG is both the inspection piece
2  of this and OSI.
3      So Headquarters Air Force OSI is a subordinate unit to
4  that three-star general.  So at that level, we would advise
5  SAF IG where we — what's the choice of forum for
6  investigation; should you keep this in IG channels, or should
7  you send it to OSI?
8      And that's the kind of advice I would give at the
9  air staff level in 2013 and 2014.
10 Q.  Thank you, Colonel.
11     And your current practice — your current private
12 practice, what does that focus on?
13 A.  Currently, I am focused on military courts-martial
14 defense, national security clearance matters, and boards for
15 correction of records for either an inequity or an injustice
16 in — identified in mainly officers' records, so officer grade
17 determinations and so forth.  That's what I'm currently doing.
18     When I retired in 2014, I did join a firm.  And with that
19 firm, I became a managing partner.  So I had both supervisory
20 duties — much like being an SJA again — as well as consults
21 for the clients.  And then I defended — I then did three
22 court-martial defense cases as a civilian private practice
23 attorney between 2014 and 2020.
24 Q.  Colonel, as part of your education and your Air Force
25 training, your Air Force service as well as your Air Force

LARRY YOUNGNER - DIRECT

1  experience, did you regularly encounter, evaluate, and analyze
2  DOD instructions, Air Force instructions, security forces
3  instructions, IG investigations, IG reports relating to
4  criminal investigations?
5  A.  Yes, sir.
6  Q.  As part of your education, Air Force training, Air Force
7  service, and experience, did you encounter and analyze
8  instructions that are -- that are forming the basis of this
9  case, DODI 5505.11, Air Force Instruction 71-121, and
10 Air Force Security Forces Instruction 31-205 and 206?
11 A.  Yes, sir.  I actually think it's OSI Manual 71-121.  But,
12 yes, sir, I did.  And related handbooks and instructions
13 within OSI.
14 Q.  Thank you.  Thank you.
15     As part of your education, Air Force training, Air Force
16 service, and experience, did you evaluate and analyze the
17 compliance requirements for Air Force criminal investigations,
18 inspector general investigations, and the consequences of
19 those compliance failures?
20 A.  Yes, sir.  Primarily on cases that we were reviewing for
21 investigative sufficiency or legal sufficiency.  But then
22 also, just from a broader perspective, you had to make sure
23 that if, say, there was an IG investigation that you followed
24 up and complied with the findings and recommendations that you
25 agreed to.

1  Q.  And turning to this case and the opinions that you formed

2  in this case, did you apply the same methodology, the same

3  rigor, the same process that you applied in your 24 1/2 years

4  of Air Force experience investigating and working and

5  prosecuting and defending and supervising Air Force criminal

6  investigations?

7  A.  Yes, sir, the same rigor and the same methodology.

8  Q.  And in forming those conclusions, did you arrive at your

9  conclusion within a reasonable degree of certainty within your

10  field of expertise?

11  A.  Yes.  Yes, I did.

12  Q.  Can you — and I — I know that we have asked you to

13  review tens and tens of thousands of documents in this case.

14      But if you don't mind, can you provide just a sort of

15  bullet-point list of the types of documents and information

16  that you reviewed in forming your conclusions in this case?

17  A.  Yes, sir.  So to begin with, I reviewed all the DODIG

18  reports that had been provided to me.  I reviewed depositions

19  of all the Air Force personnel, to include — well, let's see.

20  There were case agents, supervisors, commanders.  There were

21  designated representatives from agencies like at NICS or for

22  the Air Force.  I think Colonel Ford represented security

23  forces, for example.

24      But basically every witness deposition and all of the

25  associated exhibits that were related to that deposition.  So

LARRY YOUNGNER — DIRECT

1    if Special Agent Holz, for example, is called as a witness, I
2    looked at every exhibit that was produced as part of that.
3        As far as files, that included the Det 22 — the OSI
4    Detachment 225 at Holloman had an investigative file.  The
5    security forces — the 49th Security Forces Squadron had their
6    files.  The Logistics Readiness Squadron, the 49th LRS, had
7    a — what we call a PIF, a personnel information file.
8    Basically, it's a list of issues typically that concerned
9    Devin Kelley.
10        Let's see.  I looked at the Texas Ranger Snyder
11    deposition, all of his files, which were extensive.
12        There were DOD — I mentioned the reports, but there were
13    instructions from DOD, Air Force, Air Force OSI.  And then I
14    think the last area would be the defense expert reports.
15    Typically, there was a report and a supplemental report for
16    each of their experts, I believe.  I think there were five in
17    total.
18    Q.  Colonel, the type of information that you just went
19    through — and including the full breadth of the information
20    you actually did review that I know is detailed in your
21    report — is this the type of information and data an expert
22    in your field would reasonably rely upon in forming their
23    conclusions in cases?
24    A.  Yes, sir, it is.  You want to look at the collective
25    facts.  You want to look at the evidence.  You want to look at

LARRY YOUNGNER - DIRECT

1  the rules and regulations that were applied.

2        MR. ALSAFFAR:  Your Honor, we'd like to offer

3  Colonel Youngner as an expert in Air Force criminal

4  investigations, IG investigations, and oversight within the

5  Air Force, Air Force protocols in criminal investigations and

6  SJA responsibilities.

7        THE COURT:  Any objection?

8        MS. CHRISTILLES:  Your Honor, we don't object to

9  Colonel Youngner testifying on matters concerning Air Force

10  protocols and staff judge advocate responsibilities.  To the

11  extent that Colonel Youngner will provide testimony outside of

12  those areas of expertise, we would object, as fully briefed in

13  the government's motion to exclude, which is at Docket 352.

14  And we're basing that on the report and supplemental report of

15  Colonel Youngner.

16        So at this point, Your Honor, I think that the best

17  way to proceed is to not voir dire the witness but to let

18  counsel proceed and then allow us to cross-examine the witness

19  on his qualifications, unless Your Honor would prefer voir

20  dire at this point.

21        THE COURT:  No.  So I'm ready to rule on that.  The

22  motion — the government's motion is denied.  Colonel Youngner

23  is recognized as an expert in those three fields.

24        However, on the government's many motions — or many

25  objections as to ultimate conclusions of law that

LARRY YOUNGNER – DIRECT

1   Colonel Youngner has expressed, I'll exclude those ultimate
2   conclusions as I review his reports.  And I'll entertain any
3   objections he makes during his testimony today if it arises in
4   that area.
5          MR. ALSAFFAR:  We will follow that closely.  Thank
6   you, your Honor.
7   BY MR. ALSAFFAR:
8   Q.  Okay.  Colonel, I'd like to now start digging into –– into
9   the Devin Kelley case and your opinions in the case.
10      And if you don't mind just briefly providing us a little
11  lit of background in sort of how this all started in terms of
12  the DOD and Air Force recording –– sorry –– reporting
13  requirements related to fingerprint submission and criminal
14  history or also referred to as final disposition reporting.
15  A.  Yes, sir.  So I –– well, sir, I hate to tell you what time
16  it is by how to build a clock, and so I apologize to the
17  Court.  And please stop me if I go too far on this.
18      It starts with the Gun Control Act of 1968.  Congress
19  recognized that we needed a comprehensive scheme to ban
20  prohibited persons from obtaining, possessing, transferring,
21  selling firearms.
22      The next major muscle movement was what I'll call
23  colloquially the Brady Act.  I believe it's the Handgun
24  Violence Protection Act.  And basically that required use of
25  NICS.  And government agencies, to include the DOD and the

LARRY YOUNGNER – DIRECT

1  U.S. Air Force, were required to submit data to the FBI

2  National Instant Criminal Background Check System.

3      And then the third major muscle movement was the

4  Lautenberg Amendment, which focused on domestic violence and

5  adding them under 18 U.S. Code 922, I believe (g), there's a

6  category for as low as a misdemeanor-level domestic violence

7  offense.

8      My understanding is that the intent of Congress was to

9  further protect those, you know, victims of domestic violence

10 and to prevent future offenders from obtaining a weapon.

11          MR. ALSAFFAR:  Okay.

12          THE WITNESS:  I see counsel stood up.

13          MS. CHRISTILLES:  Your Honor, I would just object to

14 Colonel Youngner testifying about any of the federal laws.

15 Again, he's been qualified in Air Force protocols and

16 responsibilities.

17          THE COURT:  So the two go in tandem.  But at this

18 point, he's just reciting what laws have already passed.  I

19 can read the congressional intent by reading the 922 language

20 myself.

21          MS. CHRISTILLES:  Yes, Your Honor.

22          THE COURT:  So let's move him along.

23          MR. ALSAFFAR:  We are.  A brief summary, Your Honor.

24 BY MR. ALSAFFAR:

25 Q.  I'd like, Colonel, to sort of in that context relating to

LARRY YOUNGNER — DIRECT

1  the DOD IG history as it relates to this case — and what I'm

2  talking about is the — and I don't want to go — we've

3  already gone — established, and it's not in dispute, about

4  what those reports say and what they do.

5      But just by way of background in terms of framing the

6  issue that I want to talk to you about today, which is the

7  supervisory issues and responsibilities, if we could just

8  briefly — if I could just show you — well, before I show you

9  this.

10     Just generally — just generally, what was the — in your

11  opinion, what was the purpose of the various DODIG, inspector

12  general, reports regarding the Air Force's failures over the

13  decades to report fingerprint submissions and criminal history

14  data like they did in this case?

15  A.  So the purpose was to look at compliance with the

16  duty-to-report criminal history data.  Those three legislative

17  acts that I talked about required fingerprint data on an

18  FD-249 and a final disposition report on a Form R-84.

19     And the question was:  Was the OSI and the security

20  forces, where required under the law and under the

21  implementing DOD Instruction 5505.11 and the Air Force

22  instructions, were they compliant?

23     And the gist of those reports were they were not complying

24  or there were misses.  In fact, at one point — and that

25  started in 1997.  There was a major —

LARRY YOUNGNER – DIRECT

1  Q.  Let me stop you since we're talking about — and I'm going
2  to show JEX 14.
3      And, Colonel, whenever I say — and I apologize.  I should
4  have told you this.  Whenever I say "JEX," that is an exhibit
5  number.  That means that the exhibit is already part of
6  evidence.  It's been admitted into evidence, just so you
7  understand the terminology.
8      I think you've been working with Bates numbers for a long
9  time —
10 A.  Right.
11 Q.  — but we're now transitioning to trial exhibit numbers.
12     I'm showing you JEX, since you mentioned it, 14.
13     And is that the 1997 IG report you just referenced?
14 A.  It is.  I believe it's the one that Ms. Eleanor Hill, as
15 the DODIG, complied with the requirement — the congressional
16 requirement to do this report.
17 Q.  Okay.  And what was the — just a quick summary.  We'll
18 just say what was the ultimate conclusion in terms of the
19 Air Force's failure rate dating back to 1997 in reporting
20 criminal fingerprint history and criminal conviction history?
21 A.  Around — well, first of all, the discovery was made that
22 defense criminal investigating office agencies, organizations
23 such as OSI, CID for the Army, and NCIS were reporting.  But
24 they were missing, in the Air Force, around 35 to 40 percent,
25 around 38 percent, of their fingerprints, and I believe about

LARRY YOUNGNER - DIRECT

1  50 percent of the final disposition reports.  And those

2  findings were published in there.

3      The other major, you know, lightbulb that went off here

4  was that, you know, law enforcement organizations that would

5  also take fingerprints weren't submitting anything or found

6  disposition reports.  By that, I mean the military police, the

7  security forces, and the Navy shore patrols.

8  Q.  I want to ask you a quick question, because it was brought

9  up with one of the witnesses this morning for the FBI.  And I

10  don't know, Colonel, when you were preparing for this, if you

11  were able to see.

12      But were you able to see the FBI deputy director testimony

13  this morning?

14  A.  I probably caught about ten minutes of, I believe,

15  Ms. Del Greco's testimony.

16  Q.  That's right.

17  A.  But that's all that I —

18  Q.  And you reviewed her deposition testimony; correct?

19  A.  Oh yes, I did.

20  Q.  The reason I asked you is because I wanted to ask you

21  about something that came up, and that was regarding the

22  security forces.

23      Because you mentioned in 1997, the inspector general

24  pointed out that the military law enforcement organizations,

25  which include the security forces, not just OSI — but the

698

LARRY YOUNGNER – DIRECT

1  security forces were also failing at a high rate to report

2  this criminal data.

3      Is that a fair summary?

4  A.  Yes, sir.  That's a fair summary.

5  Q.  All right.  And then after that, after 1997, at that point

6  were the security forces specifically — or tell us — tell me

7  what the security forces specifically did to get roped into

8  the mandatory instruction and compliance requirements to

9  report this data to the FBI?

10 A.  Well, the short answer is Ms. Hill, the DODIG at the time,

11 in coordination with the secretary of defense and the service

12 secretaries, agreed to promulgate a new instruction that would

13 require all the law enforcement organizations to submit when

14 the trigger events occur, if you will, when the criteria is

15 met, submit fingerprints and final disposition reports.

16 Q.  Okay.  I want to fast-forward — so that — and that

17 applied to both — did I hear you correctly? — both OSI

18 detachments in the Air Force and security forces as well?

19 A.  At that point, yes, sir.

20 Q.  Okay.  So I want to fast-forward to about — I was told

21 there would be no math — about 17 years, 2014, and show you

22 Joint Exhibit 111.

23      And if we go to — while I'm finding the page — I

24 apologize.

25      Colonel, can you tell us what the conclusions were related

LARRY YOUNGNER - DIRECT

1   to the Air Force reporting criminal data for the last 10 years
2   to the FBI and the 10 years prior to this report?
3   A.  The gist of that, as I recall, is about 10 years' worth of
4   data had not made its way to NICS.  The discovery here -- the
5   next lightbulb to go off was just because you submitted
6   something to DIBRS, the Defense Incident-Based Reporting
7   System -- I apologize for the acronyms -- that -- that data
8   didn't make it to the FBI.
9       And I believe the OSI commander at the time -- and the
10  bottom line is the Air Force agreed with the findings and
11  recommendations to fix this.  One of the fixes the Air Force
12  put in was a checklist that would become mandatory for use, at
13  least within OSI.  And my understanding is security forces
14  would be implementing an instruction change in the 31 series
15  for investigative processes as well.
16      Your question about --
17  Q.  Well, let me -- I think you answered it.  And we're
18  showing the conclusion up on the screen.
19      Can you see it there, Colonel?
20  A.  Yes, sir.
21  Q.  Okay.  So we talked about 1997, Air Force is being told
22  they're failing at a 38 to 50 percent rate for this data.
23      Fast-forward 17 years, they're being told, for the last
24  10 years, we're still not getting this stuff to the FBI.
25      I'd like to now go to the following year, 2015, which is

1  JEX 1.

2      Can you see that?  Can you tell us what that is?

3  A.  Yes.  So it's another DODIG investigation, specifically on

4  compliance with criminal history data reporting requirements.

5  That would be the fingerprint cards and the final disposition

6  reports and look at all the services, both their OSI, if you

7  will, for the Air Force and security forces office of

8  investigation.

9  Q.  So in 2015 –– let's talk about just the Air Force ––

10  A.  Yes, sir.

11  Q.  –– the failure rate on submission of fingerprint data to

12  the FBI.  I'm going to show you page 13 of JEX 1.

13  A.  Okay.

14  Q.  And what was the conclusion on the failure rate for

15  Air Force fingerprint analysis in 2015?

16  A.  Sure.  What you're looking at there, you know, shows

17  approximately a 30 percent failure rate on the fingerprint

18  submission data.

19  Q.  Okay.  And let's go to page, JEX, 16.  This is regarding

20  final disposition report failures, which would be –– that's

21  criminal conviction information; is that right, Colonel?

22  A.  Right.  Well, yeah.  That was final disposition of a case.

23  So whatever that –– I mean, it could have been an acquittal.

24  But in most instances, there's a high rate of conviction.

25      So –– and it was about the same –– oh, there it is.  So

1  you're looking at, again, about 30 percent, maybe slightly

2  higher.

3  Q.  All right.  So at the point of the — of the Devin Kelley

4  investigation in the mid-2000s, going forward, how would you

5  describe the Air Force's compliance with the mandatory

6  requirements to submit fingerprint data to the FBI as well as

7  criminal history data?

8      And what I mean by "how would you describe it," was it

9  tracking closely?  Was it way off?  Was it systemic?  How

10  would you describe it?

11  A.  Well, I've described it in my report as a systemic

12  failure.  It varies.  And it varies between OSI and security

13  forces.  There were times when OSI would improve, and then

14  there are times when they would not improve.  And that was

15  born out, frankly, all the way through the 2018 report, which

16  we haven't talked about, and the task force that OSI created

17  on criminal history data.

18  Q.  Well, I want to —

19          THE COURT:  One second.

20          MR. ALSAFFAR:  Oh, I'm sorry.  I didn't hear

21  anything.

22          MS. CHRISTILLES:  Your Honor, it sounds like

23  plaintiffs' counsel is going through the issue of duty.  I

24  think the Court has already ruled on that.

25          MR. ALSAFFAR:  If I may respond, Your Honor.

LARRY YOUNGNER – DIRECT

1          We're not going to address this in terms of duty
2     because, obviously, the Court has already ruled on this.  This
3     is actually just going directly into the scope of supervisory
4     awareness and how that failure to grapple with the facts that
5     were going on fed down to the supervisory level.
6               THE COURT:  That's the only way I'm receiving this.
7               MR. ALSAFFAR:  Okay.  Thank you, your Honor.
8     BY MR. ALSAFFAR:
9     Q.  Because of what was mentioned this morning from the FBI
10    deputy director, Del Greco, I wanted to just show you the IG
11    report of 2017, which has been admitted as Joint Exhibit
12    Number 2.  And what I'm talking about, Colonel, is the
13    security forces.
14          The security forces were not — were they ever exempt
15    after 1997 from reporting final disposition reports when they
16    were informed in writing of a final disposition report
17    relating to military personnel that they were part of the
18    investigation on?
19    A.  Short answer is no, they were not exempt.  The longer
20    answer is you may have investigative responsibility that's
21    shared, or you may even have two separate offenses.
22          In my experience, I've had a military criminal accused who
23    was being investigated by OSI for certain offenses, because
24    there is a regulatory split between types of cases that OSI
25    will take -- regulatory within the Air Force and security

1  forces.

2      We preferred, as staff judge advocates, to have one agency

3  handle everything.  But it is — it has happened that at times

4  both will investigate the same person for different offenses,

5  and both will continue to have an obligation to submit

6  fingerprint data if the trigger requirements criteria for

7  submission are met.  And both could have a requirement to

8  submit a final disposition report again if those requirements

9  are met.

10     And I would — well, no, I'll stop there.  So that answers

11  your question.

12  Q.  In this 2017 report — first of all, what data years were

13  they actually evaluating, if you know?

14  A.  Yeah, I do know.  I'd have to check my notes again for the

15  specific dates, but it was sometime in 2015 — I want to say

16  October — to approximately December of 2016.

17  Q.  What — just to wrap this up.

18     What was the security force -- the DODIG conclusion about

19  the security forces', specifically, failure rate in this

20  report to submit criminal history data and final disposition

21  reports that they're aware of?

22  A.  I think they were hitting about 60 percent noncompliance.

23  Q.  All right.  Now — and let's — just to be clear, let's

24  show you page — this is Joint Exhibit 2 that's in front of

25  you, but let's go to page 39.  I think you actually remembered

LARRY YOUNGNER – DIRECT

1  correctly, but let's just show you page 39 from the IG report
2  relating specifically to the security forces, that finding.
3      Do you see it there?
4  A.  Yes, sir, that's it.  Yeah, 93.  Okay.
5  Q.  So the IG was telling the security forces that not only
6  were you failing at a 60 percent clip to submit criminal
7  history data but you were failing at a 60 percent clip to
8  submit fingerprint cards too?
9  A.  As I recall, that year, it was the identical number of
10  both fingerprints and FDRs.
11          MR. ALSAFFAR:  Okay.  You can take it down.  Thank
12  you.
13  BY MR. ALSAFFAR:
14  Q.  Now, going back now to this case.  You know, these –– all
15  of these various IG investigations reports over the prior
16  25–plus years –– when I say "prior," I mean to the years prior
17  to this shooting.
18      In terms of supervising agents on the ground, can you
19  explain, based on your review of this case and your experience
20  working with IG investigators yourself –– investigations
21  yourself, why is it that these IG reports never got pushed
22  down to the Detachment 225 and the 49th Security Forces Wing
23  at Holloman Air Force Base where Devin Kelley was?
24  A.  Assuming that they weren't pushed down –– I don't know
25  that they weren't.  One answer immediately is they were

LARRY YOUNGNER – DIRECT

1  ignored; they were pushed, and it's just there was a bigger

2  concern.

3      The more direct answer, I believe, is a human factor.  And

4  that's the — I'm sorry.  I see the counsel stood up.

5          MS. CHRISTILLES:  Objection.  Speculation, Your

6  Honor.

7          THE COURT:  Yeah.  Has he done any independent

8  investigation on any of this?

9          MR. ALSAFFAR:  Not independent.  Just the records of

10  the case and the outside —— and, of course, the IG

11  investigations, Your Honor.

12          THE COURT:  So he's just repeating the IG's reports

13  that are already in evidence?

14          MR. ALSAFFAR:  No, I don't think he's repeating.  No,

15  no.  We're actually going to get into specifically why it went

16  down to the detachment level.

17          THE COURT:  What I'm trying to get at is how does he

18  know any of this?  So he doesn't have personal knowledge.

19          MR. ALSAFFAR:  Of course not.  Yes, he was not there.

20  He's an expert reviewing the records, yes.

21          THE COURT:  That's what I'm trying to get at.  There

22  is underlying evidence that's supporting his statements?

23          MR. ALSAFFAR:  Yes.  Yes.

24          THE COURT:  Go ahead.

25          MR. ALSAFFAR:  I'm sorry.  I misunderstood.

LARRY YOUNGNER – DIRECT

1  BY MR. ALSAFFAR:

2  Q.  All right.  Now, when we're talking about this supervisory

3  chain to get down to the supervisors at the detachment

4  level — and I want to ask you about the Region 2 level just

5  as it relates to the supervisory failures in this case.  I

6  don't want to ask you about what responsibilities Region 2

7  had, anything like that, just — or duties.  I'm asking about

8  how this supervisory chain may not or may have failed.

9      First of all, are you familiar with Region 2 level, and

10  what — can you tell us what that is?

11  A.  Yes.  There was a Field Investigative Region 2, which was

12  responsible for multiple installations, to include Holloman

13  Air Force Base —

14  Q.  And who was —

15  A.  — at Detachment 225.

16  Q.  I'm sorry.  I didn't mean to interrupt.

17      Who was the Region 2 commander responsible — the

18  supervisory commander at the time of the Devin Kelley

19  investigations?

20  A.  I'm trying to remember if it was Colonel Hudson or —

21  there was also another deposition by another colonel who I

22  believe is his deputy, a female colonel.  But they expressed

23  opinions about this, and so did others that I read.  So I —

24  Q.  Well, let me ask you about Colonel Hudson, who was — you

25  got that correctly.

LARRY YOUNGNER – DIRECT

1      Did you review Colonel Hudson's deposition?

2  A.  I did.

3  Q.  And in terms of what we're discussing about, about these

4  sort of 25-year failures in the Air Force to correct these the

5  issues that are — had happened in the Devin Kelley

6  investigation, what did Colonel Hudson say about his awareness

7  to provide the IG information to supervisors at Detachment 225

8  and security — Detachment 225?

9  A.  Just that he wasn't aware of that requirement until after

10  the Devin Kelley shooting.

11  Q.  Okay.

12  A.  And that they can read, you know, as far as the

13  requirement to follow a checklist.  Another agent said that.

14      So back to your threshold question before the objection,

15  there was a — the Court can assess what the attitude was of

16  the supervisory agents to explain why this wasn't either taken

17  seriously or wasn't pushed down, but there was ignorance at

18  FIR 2 of the —

19  Q.  Let me stop you.  You said — and anytime I hear

20  terminology that I want to be clear, I'll interrupt you.  And

21  I don't mean to be rude.

22  A.  Yes, sir.

23  Q.  I just want to make sure — you said there were ignorance

24  at FIR 2.

25      Are you referring, when you say "FIR," to Region 2

LARRY YOUNGNER – DIRECT

1  command?

2  A.  Yes, Field Investigative Region Number 2 of the OSI, yes,

3  sir.

4  Q.  Okay.  So you said you reviewed Colonel Hudson's

5  deposition, who was the AFOSI Region 2 commander.

6      You did review that particular deposition.  You said that

7  he was unaware of these IG investigations until after

8  Devin Kelley committed the shooting?

9  A.  As I recall.

10 Q.  How would that affect the supervisory —

11         THE COURT:  One second.

12         MS. CHRISTILLES:  Your Honor, I thought that

13 Mr. Alsaffar was trying to get some background on supervision.

14 Your Honor has already ruled on the supervisory duties with

15 respect to the region, and the — I believe the only issue

16 before this Court is supervision at Det 225.

17         So I let Mr. Alsaffar go, as I thought we were

18 getting background, but I believe we're going into the issue

19 of supervision at the region level, which has already been

20 ruled on by this Court.

21         MR. ALSAFFAR:  We are not, Your Honor.  I am

22 explicitly not addressing whether or not they had a legal

23 failure or a duty failure.

24         The question is a factual one.  How did this happen?

25 It's not only Detachment 225.  They keep trying to limit it.

LARRY YOUNGNER - DIRECT

1  It's — now we've learned it's actually security forces as
2  well involved in this case, all at Holloman Air Force Base.
3       But the question is — this isn't about legal duty of
4  supervisors for Region 2.  This is about how — how did
5  Holloman Air Force Base supervisors have no idea about these
6  rules and regulations that they had to have?
7       And it is relevant to understand that this happened
8  at more than just one level.  So it wasn't just the local
9  level.  Supervisors at local can't do their job if supervisors
10 above them don't even know if there's a problem that exists.
11      THE COURT:  That's overruled.  You can continue.
12 BY MR. ALSAFFAR:
13 Q.  I won't belabor this point because I think you just
14 pointed out the major problem, Colonel, which was the Region 2
15 commander didn't even know this was a problem.
16      Is that a fair summary of Colonel Hudson?
17 A.  Yes, sir.
18 Q.  Okay.
19 A.  Yes, sir.
20 Q.  So let's go down to — I'm going to move down into command
21 levels.  We talked about IG telling the various command
22 levels, the Region 2 supervisors getting that information down
23 to the local.  I'd like to talk about the local supervisory,
24 and this is in the AFOSI department first.
25      So I want to talk about OSI first, and then we'll talk

LARRY YOUNGNER - DIRECT

1  about the security forces on Holloman Air Force Base.

2      Are you tracking that?

3  A.  I'm tracking, yes, sir.

4  Q.  Okay.  Let's first talk about Detachment 225, the OSI

5  detachment.

6      First, what's the DODI instruction, the Department of

7  Defense instruction, that specifically relates to AFOSI

8  fingerprint submission and data?

9  A.  Well, there's two.  The DOD is 5505.11, and the OSI manual

10  is 71-121.

11  Q.  I don't want to go through all of this.  The Court has

12  been highly, highly educated about all these instructions.  I

13  just want to kind of get to the heart of those sections in

14  terms of the supervisory level —

15  A.  Sure.

16  Q.  — so that we can talk about that specific one.

17      But let's show JEX Number 8, which is the first one you

18  mentioned, DODI 5505.11, page — let's just show page 1 so we

19  know it's the instruction.

20      Do you see that?

21  A.  I do see it.

22  Q.  Okay.  And if we could just go ahead and skip to page 2.

23  And if we could highlight paragraph 4.

24      All right.  Now, just very quickly, just to orient

25  ourselves a little bit, when we say "Department of Defense

LARRY YOUNGNER - DIRECT

1  instruction," what does the Department of Defense include when

2  it's referring to law enforcement organizations?

3      Is it just OSI folks, or is it more than that?

4  A.  Well, the distinction is DCIOs are defense criminal

5  investigation organizations.  That would be OSI, NCIS.  And

6  DOD law enforcement organizations are their police arm, the

7  security forces, the military police, and the shore patrol.

8  Q.  And I don't mean to be basic, but does this mean that this

9  Department of Defense mandatory instruction also applies to

10  OSI and security forces?

11  A.  Yes, it does.

12  Q.  Okay.  And is there anything in the Department of Defense

13  instruction that says that security forces can ignore their

14  mandatory obligations if they independently determine, "Nah,

15  this isn't my case.  I only touched it for a little while.

16  It's not my case anymore"?

17      Anything like this in this mandatory instruction?

18  A.  I would say not if they independently determined that.

19  There is, I believe, either in this instruction or a related

20  one, the ability for one organization to take investigative

21  lead.

22      But, again, there's no get-out-of-the-responsibility

23  exception for either OSI or security forces when the criteria

24  applies for them to submit fingerprints or final disposition

25  reporting information.

LARRY YOUNGNER - DIRECT

1  Q.  Let's go to page 6, just to make sure that for the rest of
2  the time we're talking about this, we're oriented.  And I want
3  to highlight Article 128 for you, which is paragraph 33.  It
4  says "assault."
5  A.  Yes.
6  Q.  This part of the DODI instruction — and I believe we'll
7  show you the Air Force one too.
8      Can you tell us the significance of this qualifying
9  offense, what that means?
10 A.  Well, Article 128 is of the Uniform Code of Military
11 Justice.  That's Title 10 U.S. Code, Section 928.
12     There are a variety of offenses in the manual for
13 court-martial.  There is also an accompanying table of maximum
14 punishment for the variety of offenses, roughly 18.  Three of
15 them are punishable by less than a year.  The other 15 or more
16 are punishable by a year or more.
17     So Article 128 is a qualifying offense that requires
18 submission of fingerprints if you have probable cause to
19 believe that someone has committed that offense.  That's the
20 significance there.
21     Subsequent to that, if there is a final disposition that
22 requires a — that is a conviction — I'm sorry.  I'll stop.
23 Q.  No.  No.  Because I want to talk about — let's go to
24 page 10, because you were talking about that specifically,
25 just so that we can see the requirement in writing for

LARRY YOUNGNER - DIRECT

1  military subjects.

2      So if we go to page -- JEX 8, page 10 and paragraph 1 and

3  paragraph 3.

4      This is the instruction that applies to military subjects

5  like Devin Kelley; is that correct?

6  A.  That's correct.

7  Q.  All right.  And if you look at -- we're going to highlight

8  both of them for you so you can see both of them at the same

9  time.

10     If you look at paragraph 1, again, that relates to both

11 OSI and security forces; correct?

12 A.  That's correct.

13 Q.  And what is the mandatory instruction for reporting -- for

14 reporting final disposition or conviction?  Let's just say

15 it's conviction data for assault, like in this case.

16     What's the reporting requirements for both OSI and

17 security forces?

18 A.  On the final disposition piece?

19 Q.  Yes.

20 A.  Okay.  On the R-84 final disposition, they've got a 15-day

21 time line to submit the FDR report after that has been

22 communicated to the OSI or security forces.

23 Q.  Okay.  And when was Devin Kelley convicted of his

24 qualifying assault charges?

25 A.  It was November -- I believe November 7th of 2012.

LARRY YOUNGNER – DIRECT

1  Q.  All right.  So within 15 days after that or shortly after

2  that, upon receipt from both Air Force and security forces,

3  that data should have gone to the FBI; is that right?

4  A.  Approximately the 22nd of November 2012.

5  Q.  All right.  And we know that did not happen; right?

6  A.  That is correct.  Though, I believe —— and I know the

7  parties have stipulated to this, so the Court can look at

8  that.

9     But there was a —— part of the requirement to be

10  completely clear is, once this information is communicated to

11  the parties, I believe —— or, excuse me, the law enforcement

12  entities.  So security forces had that information on the

13  7th of November 2012.  I believe the trigger for —— or the

14  criteria for OSI was when they received the general

15  court-martial-convening authority's action on the sentence.

16     So —— and that did not happen until, I believe, a month ——

17  just over a month later, around the middle of December 2012.

18  And that, again, is —— both parties can look at the

19  stipulation there as to those details.

20  Q.  Okay.  Well, let's talk about the Air Force instruction

21  very quickly, and I want to focus on —— and what I'm talking

22  about —— when I say "Air Force instruction," is it okay if you

23  understand that I'm referring to 71-121?

24  A.  Yes, sir.  I can understand that.

25  Q.  Okay.  And I'd like to jump to that instruction that

LARRY YOUNGNER — DIRECT

1  specifically relates to supervisory monthly reviews and then
2  supervisory reviews for what you've termed "investigative
3  sufficiency."
4  A.  Yes, sir.
5  Q.  You mentioned earlier in your testimony about your
6  extensive experience in 25 years working with the Air Force
7  and the IG in the Air Force and the criminal law enforcement
8  organizations that you had — you regularly dealt with
9  investigative sufficiency.
10      Did I — in case files.  Did I hear that correctly?
11  A.  Yes, sir.
12  Q.  Okay.  Would investigative sufficiency include — and I'm
13  referring to the — these instructions, the AFI instructions.
14      Would they include the review of fingerprint data and
15  criminal history data to ensure those were sufficiently
16  complied with?
17  A.  Short answer is yes, it would, because the criteria for
18  submission of fingerprints, you know, is establishment of
19  probable cause.  And there's a checklist to make sure you have
20  investigative sufficiency.
21      Included on that checklist is the fingerprint requirement.
22  And for case closure, the final disposition report submission.
23      So it's not just administrative.  It's actually
24  substantive for having investigative sufficiency, that you had
25  probable cause, that you submitted the fingerprints.  I mean,

LARRY YOUNGNER — DIRECT

1  these are, you know, lightbulbs popping off in the brain of

2  the case agent and the supervisor saying, "Hey, have we done

3  everything?"

4  Q.  And if we can —

5          THE COURT:  One second.

6          MS. CHRISTILLES:  Objection.  Speculation.

7          THE COURT:  That's overruled.

8  BY MR. ALSAFFAR:

9  Q.  If we could look at page 51 of — I'm sorry, JEX 4,

10  page 51.  I believe this is Section 4.24.31.  I hope I got

11  that sequence right.  So this is page 30 — I'm sorry —

12  page 51, please.

13      And this is the section I want to talk to you about that I

14  just mentioned about supervisory.

15      Do you remember the monthly review requirements?

16      While we're showing this to you, Colonel, can you just

17  tell me what your understanding is of this mandatory

18  instruction as it relates to supervisory monthly reviews at

19  Holloman Air Force Base during the Devin Kelley investigation

20  and what that — what this required them to do?

21  A.  Well, it's a — to be pristine, you would check all

22  aspects of investigative sufficiency up to that point in the

23  case.  And, you know, if I am certain I've complied with

24  something, I don't have to review it, necessarily, but I want

25  to look at — I would want — I'm trying to be careful about

LARRY YOUNGNER – DIRECT

1   what I assess an ordinarily reasonably prudent OSI agent and

2   supervisor would do, not what I would do as a staff judge

3   advocate.

4       So as a staff judge advocate, we look at a case file.  And

5   we're looking for problems, for gaps, seams, issues if I'm

6   prosecuting a case.  Frankly, I do the same if I'm defending a

7   case.  What did they miss?  Setting that aside, that's the

8   context I bring to this.

9       Now, as a prudent OSI agent, as a supervisor, I really

10  want to make sure that all the elements of the offense are

11  met; that the — I've got evidence to establish; I've followed

12  my investigative leads; that if I've established probable

13  cause, I've either done it on my own or I've got the SJA's

14  advice.

15      That should immediately trigger in my mind the

16  probable-cause piece.  Get fingerprints.  You know, two sets;

17  one for the file, one for NICS.  And, you know, those are the

18  things you're doing.

19          THE COURT:  Yeah.  So let's stop here.  One, he's not

20  being responsive to your question.  I think he went off

21  completely differently.

22          THE WITNESS:  Sorry.

23          THE COURT:  And, two, we really need to go to Q and A

24  and avoid the long narratives.

25          MR. ALSAFFAR:  That's my fault.  I will correct that,

LARRY YOUNGNER – DIRECT

1  Your Honor.  I apologize.

2  BY MR. ALSAFFAR:

3  Q.  Colonel, that's my fault.  And I'll try to break these up

4  a little bit more to make it a little quicker.  And I know

5  you've never served as an expert before, and so that's my

6  responsibility.  So I apologize.

7      I'm showing you 4.24.1.3.

8      Is that the mandatory Air Force instruction that was in

9  place during Devin Kelley's investigation that required

10 monthly reviews by the supervisors at Detachment 225?

11 A.  Yes, sir.

12 Q.  Okay.  Have you had a chance to review the deposition

13 testimony of the supervisory agents, Bustillo and –– as well

14 as the case agent, Mills, that worked on this case, the

15 Devin Kelley case?

16 A.  Yes, sir.  Mills and, I believe, Holz too.

17 Q.  Right.  And just to make it quick, did both Bustillo and,

18 let's say, Mills as well, who worked on Devin Kelley's case,

19 agree that this instruction required them to have monthly

20 reviews and that as part of those monthly supervisory reviews,

21 they were supposed to go over the fingerprint submission

22 and –– I'm sorry.

23     The investigative sufficiency requirement would include

24 fingerprint and final disposition information?

25 A.  Yes.  It would include fingerprints and then, once ready,

LARRY YOUNGNER – DIRECT

1  final disposition report.

2  Q.  Okay.  I want to show you page 80 of Joint Exhibit 4.

3     Actually, let's skip that.  We've already talked about

4  this.

5     Let's go to page 33, which is the –– relates to the close

6  file checklist that you just mentioned.

7     Do you remember mentioning that?

8  A.  Yes, sir.

9  Q.  Okay.  And I want to show you Section 3.16.4.

10    Now, does this specifically address leadership

11  responsibility, supervisory responsibility?

12  A.  Yes.  Right at the beginning.

13  Q.  Okay.  And what does unit leadership mean?

14  A.  I take that as the superintendent or DetCo.

15  Q.  And you had mentioned that you had worked with

16  superintendents in DetCos as part of your career in the

17  Air Force.  You know, "superintendent" may mean something to

18  somebody else.

19    But in the Air Force parlance, in Detachment 225, was

20  superintendent a supervisory position reviewing criminal

21  investigations?

22  A.  Yes.

23  Q.  Okay.  And "det commander," does that stand for detachment

24  commander?

25  A.  Yes, it does.

LARRY YOUNGNER – DIRECT

1   Q.  All right.  And I want to show you, on this mandatory

2   instruction page —— Joint Exhibit 4, page 1, actually.  And if

3   we just go to the first page of Joint Exhibit Number 4.

4       And if you look down towards the middle, does this

5   instruction also define for us "unit leadership" and what that

6   means?  If we go down to the —— yeah, the bottom half there.

7       Do you see the term "unit leadership"?

8   A.  It does.

9   Q.  And you mentioned that —— you had mentioned commander

10  already.

11      What is the SAC?

12  A.  Typically, the SAC is the detachment commander, but it can

13  also be the superintendent on certain units.

14  Q.  Well, let's look at that close file checklist that the

15  instruction said that unit leadership must use in these

16  reviews and —— of their case files.

17      Let's go to —— we're still in Joint Exhibit Number 4, and

18  let's go to page 159 through –60.  Thank you.

19      Is this the close file checklist that you were referring

20  to?

21  A.  Yes, sir.

22  Q.  Okay.  And can you tell the Court what —— what are the

23  supervisor's responsibility, just specifically relating to

24  this checklist, relating to fingerprint submission and final

25  disposition or criminal history data?

LARRY YOUNGNER - DIRECT

1  A.  Going back to look through the tab where it required it.

2      But to answer your question, I believe at page 160,

3  blocks 17 and 18 require them to indicate whether that has

4  been submitted or not or is not applicable.

5  Q.  Can I ask you -- and if we could show 17 and 18.

6      So these specific issues that we're talking about in

7  Devin Kelley's case, the fingerprints and the FDR, is it --

8  why is that the Air Force -- these instructions are very long.

9  They always are.  Just -- you know, we're used to that.

10 They're long instructions.

11     Why is it, at the end of the day, for their supervisors,

12 does the Air Force give them a two-page checklist?  What's the

13 purpose of that?

14 A.  I mean culturally, the Air Force has had a mentality of

15 what gets put on a checklist gets checked, gets inspected, and

16 gets complied with.  So the purpose of putting it on the

17 checklist is to comply it.

18     And I don't mean to be flippant, but -- I don't want to

19 say "dumb it down," but that's what immediately comes to mind.

20 Keep it simple.  And these are the key things that you must do

21 to have investigative sufficiency, get all of this done.

22     So before you close it, make sure you physically put eyes

23 on each of these requirements and answer one of the three

24 blocks.

25 Q.  Is one of the purposes, as you said, keep-it-simple

LARRY YOUNGNER — DIRECT

1  checklist relating to these issues that we're talking about
2  here — is one of the purposes to ensure that somebody doesn't
3  come in the detachments at Holloman and say, "You know what?
4  These instructions are so complicated.  I can't possibly
5  follow this stuff.  It's hard to follow.  I don't know what to
6  do."
7       Is that one of the purposes of these checklists?
8            MS. CHRISTILLES:  Objection.  Leading.
9            THE COURT:  Sustained.
10 BY MR. ALSAFFAR:
11 Q.  What is one of the purposes of these checklists?
12 A.  So you have a fairly lengthy regulation, and this is a
13 control measure.  It's a check, if you will, on compliance.
14      It's a tool to be used by the case agent and supervisors.
15 The case agent, to make sure it's sufficient; the supervisor
16 to, again, make sure it's sufficient in a supervisory capacity
17 at that local level.  And then they have a — when they close
18 it and archive it, they have a separate checklist too.
19 Q.  So weren't there two checklists in this case for Holloman
20 Air Force Base to simply follow these rules?
21 A.  Yes.  There is the file closure, and then there is the —
22 well, there's the investigative sufficiency checklist, and
23 then there's a supervisory checklist to use as well.
24 Q.  Let's look at that one.  So just to be clear for the
25 Court, this one that we just showed you relates to — at the

LARRY YOUNGNER − DIRECT

1   end of the case file, when it's ready to be closed, a

2   supervisor is supposed to come in and use this one?

3   A.   That's my understanding, yes, sir.

4   Q.   Okay.  And then you mentioned that there's another one, an

5   investigative −− supervisory investigative sufficiency

6   checklist.

7        I would like to show that to the Court and to you as well,

8   which is page 174 of JEX −− I'm sorry, it's not page 174.  I

9   apologize.  It's page 307.

10       You're already ahead of me.  Thank you, Shawn (phonetic).

11       And this is the first page.

12       Is this the supervisory investigative sufficiency list

13   that you were talking about?

14   A.   Short answer, yes.

15   Q.   Okay.  And if we could go to the −− 309 through 310, I

16   believe is the −− that relates to the fingerprint submission

17   and the R−84 or −− when we say "R−84," what does that mean?

18   A.   That's the final disposition report.

19   Q.   All right.  So when we talk about criminal history data,

20   when we talk about final disposition reports, when we hear the

21   word "R−84" −− which we heard a lot this morning −− we are

22   talking about the information related to the criminal

23   conviction or the acquittal; correct?

24   A.   Right.  That's correct.

25   Q.   All right.  So what does this supervisory investigative

LARRY YOUNGNER - DIRECT

1  sufficiency checklist in mandatory instruction 71-121 say

2  about those two issues, fingerprints and final disposition

3  reports?

4  A.  Well, if you go to page 309 at block 22, along with the

5  ones you've already highlighted at 53 and 54, it wants to make

6  sure that you have — yes, you've done this; no, you haven't;

7  or it's not applicable.  And when it's not applicable, I

8  understand they often enter a note in an internal data page,

9  or IDP, explaining why it was not.

10 Q.  All right.  And we're about to talk about what you just

11 mentioned, the internal data page or reviewer notes.

12      Does that sound familiar?  Did you look at those in this

13 case?

14 A.  I did.

15 Q.  And I want to stick here with this investigative

16 sufficiency checklist.

17      You remember we talked about the instruction that said

18 you're supposed to — these supervisors are supposed to have

19 monthly meetings to go over the investigative sufficiency.

20      Do you recall that?

21 A.  Yes, sir.

22 Q.  And approximately how many months are we talking about

23 that the Devin Kelley file — the life of the Devin Kelley

24 file was?

25 A.  15 to 17 months.  I'd have to go back and do the math

1  here.  I know there were at least 15 —

2  Q.  You're right.  You're right.

3  A.  Let me rephrase that.  Yes, 15 to 17 months.

4  Q.  Okay.  And so at each of these monthly meetings, was the

5  supervisory agent at Detachment 225 supposed to have this

6  checklist with them and look at the three to four different

7  parts of the checklist that actually reference the fingerprint

8  and criminal history data?

9  A.  Yeah.  I assess a reasonably prudent agent, as a

10 supervisor, would do that.

11 Q.  And this may be an obvious statement, but was that ever

12 done in all these monthly reviews as it related to the

13 Devin Kelley case at Holloman Air Force Base, even with a

14 checklist?

15 A.  The short answer, no, it was not.  I'm trying to remember

16 which report indicated that it might have been pencil-whipped

17 to close it.  But, no, it was not.

18 Q.  And when you say it "might have been pencil-whipped,"

19 you're talking about the checklist "might have been

20 pencil-whipped," what does that mean, "pencil-whipped"?

21 A.  To me, that means they marked it without actually putting

22 eyes on the final disposition report or eyes on the

23 fingerprint and the submission to NICS of those required

24 documents.

25 Q.  All right.

LARRY YOUNGNER – DIRECT

1   A.  So before you would mark it onto the checklist, you would

2   and the want to confirm that it was done, not make an

3   assumption.

4   Q.  All right.  And does that mean that just because you check

5   it off, you actually have to do it?

6   A.  Yes.

7   Q.  Okay.  I'd like to talk about what the case agents the

8   opportunities –– the supervisory opportunities that the SAICs,

9   the superintendents, the commanders had at Holloman Air Force

10  Base to actually check the Devin Kelley file and ensure that

11  the information in there was properly submitted.

12      Is it okay if we transition to that?

13  A.  It is.

14      I'm older in years, and it would be –– if appropriate, is

15  it okay if we ask for just a very short comfort break?

16          MR. ALSAFFAR:  Your Honor, it has been a hour and

17  15 minutes.  Is that okay?

18          THE COURT:  Yes.  Let's take 15.

19          MR. ALSAFFAR:  Thank you, your Honor.

20      (Recess.)

21          THE COURT:  So before we resume with questions, let's

22  just do cleanup here.

23          So when I admitted exhibits on our first day of

24  trial, I was assuming Joint Exhibit 1 through 803 were just

25  chronologically in order, but apparently they're not.

LARRY YOUNGNER – DIRECT

1          And so I believe the correct ruling is Joint

2    Exhibit 1 to Joint Exhibit 86 are admitted.  There is no Joint

3    Exhibit 87 through 109.  Joint Exhibit 110 to Joint

4    Exhibit 749 are admitted.  There is no Joint Exhibit 750

5    through 798.  With regard to Joint Exhibit 799, I did not

6    indicate that as admitted.

7          What are your notes?

8          MR. ALSAFFAR:  My notes have ——

9          THE COURT:  Oh, that would have been part of the

10   global, right.  Yeah.  So 799, then, is admitted.  There is no

11   800.  And then 801 through 803 are admitted.

12         So with that cleanup, let's continue.

13         MR. ALSAFFAR:  Would you like me to proceed, Your

14   Honor?

15         THE COURT:  Yes.

16         MR. ALSAFFAR:  Thank you, your Honor.

17   BY MR. ALSAFFAR:

18   Q.  Colonel Youngner, can you hear me okay?

19   A.  Yes, sir, I can.

20   Q.  Can you see me okay?

21   A.  Yes, sir, I can.

22   Q.  All right.  And I just want to remind you again that if

23   you see me put the stop—sign hand on, I apologize.  I'm not

24   trying to be rude to you, Colonel, but I'm just trying to find

25   a better way to communicate on this connection.  Okay?

LARRY YOUNGNER – DIRECT

1   A.   Yes, sir.  And I also understand that I'm still under
2   oath.
3   Q.   Thank you.  Okay.  Colonel, can you please — we were
4   transitioning to talk specifically about the supervisory
5   reviews and the number of reviews that were done on
6   Devin Kelley's case file.
7        Do you recall Special Agent in Charge Vince Bustillo's
8   testimony on that matter?
9   A.   I do.
10  Q.   Okay.  And in addition to that, after reviewing the
11  requirements of the instruction that we just went over in
12  detail, along with the depositions of the various supervisory
13  case agents in this case, I'd like to break these numbers down
14  a little bit.
15       You've already told us 15 monthly reviews are required.
16  And did the case agents at Detachment 225 also agree with
17  that?
18  A.   Yes, they did.
19  Q.   All right.  And were there also weekly reviews by the
20  supervisors on the case files?
21  A.   Yes, sir, there were.
22  Q.   As part of those weekly reviews, would they have also been
23  required?
24       And I'm talking about the supervisory agents in charge,
25  the superintendents, the supervisory folks at Detachment 225.

1     Were they also required during those weekly case meetings
2 to review investigative sufficiency items in Devin Kelley's
3 file?
4 A.  Yes.  That's the whole purpose of the weekly review is
5 investigative sufficiency and progress.
6 Q.  So if we add the 15 that they said they had every month on
7 Devin Kelley's file and we add the weekly supervisory case
8 meetings reviewing his file for fingerprints and criminal
9 history data information, how many does that add up to?
10 A.  75.
11 Q.  All right.  And I want to make sure I heard you correctly.
12     Did you say 75?
13 A.  Yes, I did, 75.
14 Q.  All right.  Now, by the way, the head SJA –– or one of the
15 SJAs at the time of the Devin Kelley investigation, what was
16 his name again?
17 A.  It was Lieutenant Colonel Tullos and then later Owen.
18 Q.  Did he also agree with that assessment that 75 supervisory
19 reviews were done –– or should have been done on the
20 Devin Kelley case file?
21 A.  As I recall, yes.
22 Q.  Okay.  I want to now show you the –– another element
23 that –– of supervisory review that relates to these
24 investigative sufficiency requirements, and I want to turn
25 your attention to the instruction again, 71–121?

LARRY YOUNGNER – DIRECT

1   A.   Yes.

2   Q.   Again, that's Joint Exhibit Number 4, and I want to draw

3   your attention to page 51 of Joint Exhibit 4.  So it's 4-51.

4        And tell me when you can see it on your screen.

5   A.   All I see is —

6   Q.   Don't worry.  I'll maximize it.  I just want to make sure

7   that it's — I always check when I do these remote depositions

8   or testimony because I want to make sure that you're seeing

9   something.  I can make it better.  I just want to make sure

10  you're seeing it.

11  A.   Got it.

12  Q.   Okay.  And I want to draw your attention to

13  Section 4.24.1.3 again, the first paragraph.  If we could —

14  and I'll try to highlight it for you to make it easier.

15       If we can just look at the first sentence — highlight the

16  first sentence, from case file to retention.

17  A.   Yes.

18  Q.   I'm sorry.  The second sentence as well.  That's my fault.

19       So we've already talked about the case file needing a

20  monthly review, but what I want to ask you about is the second

21  sentence of this mandatory instruction.

22       "This review will occur from the date the allegation or

23  complaint was received" —

24       So what date would that be in Devin Kelley's file,

25  approximately?

LARRY YOUNGNER – DIRECT

1   A.   The 9th of June 2011, I believe, was when they first
2   interviewed Devin Kelley and Tessa Kelley.
3   Q.   And then it says "until closed and the AFOSI Form 2 is
4   forwarded to headquarters for retention."
5        What does that mean?
6   A.   They have a closure form and the case summary, I believe.
7   I'd have to go back and look up the index of the OSI forms.
8        But the bottom line is this is submitted, and that's
9   reflected in their Investigative Information Management
10  System, or I2MS, as well.
11  Q.   All right.  And I want to look at that specifically.  But
12  when this mandatory instruction says that you're supposed to
13  look at it not only monthly until — from the time you open it
14  to close it, but also until it is forwarded to headquarters
15  for retention, is that what's referred to as archiving the
16  file?
17  A.   Yes.  That's archiving the file.  And you would not
18  archive it until you completed that closure checklist as well.
19  Q.   And that closure checklist you're talking about is the
20  attachment — the close file checklist that we saw earlier;
21  correct?
22  A.   Yes, sir.
23  Q.   All right.  So you would do that checklist not only at
24  closing but at archive retention state as well.
25       Is that what you're saying?

LARRY YOUNGNER - DIRECT

1   A.  Yes.  You would include that, make sure it's there for the
2   archive record.
3   Q.  Okay.  So if I can show you that date in this case -- and
4   we have an audit trail record.  That's Joint Exhibit 19.
5   Okay.  And it's page 1.  And what I'd actually like to do is
6   focus on these two -- on two dates.
7       Let me start with the "submit for closure."
8       What date is that?
9   A.  That is the 14th of December 2012.
10  Q.  And I apologize --
11  A.  And that --
12  Q.  I apologize I didn't get this on the record, but are we
13  looking at the Devin Kelley case file right now in terms of
14  this document?
15  A.  Yes.
16  Q.  All right.  So remember the mandatory instruction said,
17  you know, you've got to do these monthly reviews from the time
18  you open the case file until you close it.
19      Is that this time?  The closure is 12/14/2012?
20  A.  That is correct.
21  Q.  All right.  I want you to turn your attention to the
22  bottom of this paragraph.
23      You see that bottom date -- and we can highlight it,
24  Shawn.  I apologize I didn't highlight it.
25      It says, "Send to archive."

1    Do you see that?

2  A.  I do see that.

3  Q.  Do you remember in the instruction — the mandatory

4  instruction we just showed you, there was — it said, you

5  know, do these monthly reviews all the way through archiving.

6    Do you remember that?

7  A.  Right until that point, and the Form 2 gets forwarded.

8  Q.  All right.  So what's the archival date of this file in

9  this case?

10  A.  It is the 10th of April 2013.

11  Q.  Was Lyle Bankhead a supervisory agent at Holloman Air

12  Force Base?

13  A.  Yes, he was.

14  Q.  All right.  Did the supervisory agent at Holloman Air

15  Force Base pencil-whip this investigative closure checklist

16  that you talked about at this moment in time, 4/10/2013?

17      MS. CHRISTILLES:  Objection.  Speculation.

18      MR. ALSAFFAR:  I don't think so, Your Honor.

19      THE COURT:  Well, I'm not sure he can say it was

20  "pencil-whipped."  He can say a different word, but...

21      MR. ALSAFFAR:  I'll do that.

22  BY MR. ALSAFFAR:

23  Q.  Colonel, did Lyle Bankhead actually — at the archival

24  stage, did he actually send the fingerprints of Devin Kelley

25  and conviction history to the FBI?

LARRY YOUNGNER – DIRECT

1  A.  As I reviewed the record and the case file for OSI and the

2  depositions, he did not, because the NICS did not receive it

3  and there –– they did not receive the fingerprints or the

4  final disposition report, which, if he had actually checked

5  the file and checked I2MS and confirmed that they had been

6  submitted before he checked off on the closure list, he would

7  have seen that they had not, and he would have to make sure

8  that was accomplished at that time.  So no.

9  Q.  And I want to show the Court the actual list and why I

10 mentioned that term that you used earlier.

11     I want to show Joint Exhibit 22.  This is the close

12 investigation file checklist for Devin Kelley.  This is Joint

13 Exhibit Number 22, if we could look at page 4.

14     And if you look at the very last item, 32, it is checked

15 that the close investigation file checklist was followed; is

16 that right?

17 A.  Yes, it is.

18 Q.  All right.  And even though it was checked, it was not

19 done.  It was just checked.

20     Is that fair to say?

21 A.  Yes.

22 Q.  And if you look at paragraph 17 and 18 of this close

23 investigation checklist for Devin Kelley, what does that say?

24 A.  Nothing.  It doesn't indicate compliance or noncompliance.

25 It's blank.

LARRY YOUNGNER — DIRECT

1  Q.  And despite not checking that they had actually done the

2  fingerprint and conviction report for Devin Kelley, they

3  checked at Detachment 225 that they completed the whole

4  checklist.

5      Is that what we're reading?

6  A.  That's correct.

7  Q.  Okay.  Now, I hate to state the obvious, but does that

8  comply with the mandatory instructions for supervisors at

9  Detachment 225?

10  A.  No, sir, it does not.

11  Q.  All right.  Now, let me go back, if we don't mind — I

12  don't mean to whiplash you too much, Colonel, but if we can go

13  back to Joint Exhibit Number 4, page 51, that we had that

14  talked about — I'm sorry, not Joint Exhibit 4, Joint

15  Exhibit 19 that showed the archival date.

16      Can you see that okay, Colonel?

17  A.  I can.  It was the April 10, 2013, date.

18  Q.  All right.  Now, you remember a few minutes ago, based on

19  the testimony of the actual case agents on the Devin Kelley

20  case, that we added up 75 monthly and weekly reviews in the

21  Devin Kelley case file should have included looking over this

22  mandatory requirement.

23      Do you remember that discussion?

24  A.  Yes, sir.

25  Q.  Now, there's more that they should have done; isn't that

LARRY YOUNGNER – DIRECT

1 right?

2     From the time of closure to the time of archive, there was

3 more time and opportunity for them to do their supervisory

4 monthly reviews.  Is that fair to say?

5 A.  As I understand —

6 Q.  Let me rephrase the question.

7 A.  To answer your question —

8 Q.  Sorry.  Did you understand my question?

9 A.  I'd rather you rephrase it to make sure I'm clear.

10 Q.  Okay.  The mandatory instruction, 71-121, required that

11 monthly reviews by supervisory — you know, investigative case

12 sufficiency reviews be conducted from — not just stopped at

13 closure but all the way of archival of the case file; is that

14 right?

15 A.  That's right, yes, sir.

16 Q.  Okay.  So how many more months or more monthly reviews,

17 between the date of closure of Devin Kelley's file and the

18 date of archival, should the Holloman Air Force Base

19 supervisory agents have conducted?

20 A.  Approximately four more monthly reviews —

21 Q.  All right.

22 A.  — if you look at, you know, December to April.

23 Q.  Okay.  So that would take the number to about 79 monthly

24 and weekly supervisory investigative case sufficiency reviews

25 that should have been done on Devin Kelley's file?

LARRY YOUNGNER - DIRECT

1  A.  Yes, sir.

2  Q.  Okay.  Now, I want to talk about something a little bit

3  different, not just monthly reviews that should have been done

4  and the number.

5      But I want to actually talk about how many times that the

6  Devin Kelley case file was contacted or looked at by various

7  agents, including supervisory agents, at Holloman Air Force

8  Base and Detachment 225.

9      Does that make sense, what I'm asking you?

10 A.  Yes, sir, it does.

11 Q.  Okay.  And were you able to review documents that were

12 produced by government in this case that allowed us to

13 actually analyze or allowed you to analyze and review how many

14 times the supervisory agents and case agents were accessing

15 and looking at and — Devin Kelley's case file for

16 investigative case sufficiency?

17 A.  Yes, sir, I was.  There were two files.  One very large;

18 the other, a little bit smaller.

19 Q.  Okay.  I'd like to talk about that.  Let's talk about that

20 first one.  I believe it's Joint Exhibit 348.

21     I'm not going to blow this up because there's a lot of

22 information.  This is an Excel native file that's had to be

23 converted.  So it's got a lot of information on it, and it's

24 not easy to see.

25     But can you just tell us what this document is?

LARRY YOUNGNER – DIRECT

1   A.   It's referred to as an internal data page summary.  The

2   acronym is IDP, india-delta-papa.  And it contains internal

3   data that agents would note on a case file.

4        And so when the agents — if you look at it from left to

5   right, it shows the date of a contact.  And it shows, you

6   know, the substance of that, the person on the — who touched

7   it on the right, and then whether they opened or locked the

8   case file when they were done.

9   Q.   Okay.  And we just — if we could go back to that

10  highlighted example that you just blew up.

11       Thank you, Shawn.

12       Just to orient the Court, this is a good — this is an

13  example of — those agents that you see on the right, Hoy,

14  Harper, Meusburger, those are all supervisory case agents

15  touching this file; right?

16  A.   Those are — there is one subordinate agent who touched it

17  in addition to them, yes, sir.

18  Q.   Okay.  And this is Devin Kelley's file; correct?

19  A.   Yes, it is.

20  Q.   All right.  So were you able to look at this file and just

21  simply conduct an account of how many times this IDP reviewer

22  note file showed supervisory agents as well as case agents

23  contacting — having contact and review for investigative

24  sufficiency of Devin Kelley's file?

25  A.   Yes, I did.

1    Q.  All right.  I'm going to ask you — can you tell me —

2    tell the Court how many times, based on JEX 348,

3    Detachment 225 supervisory agents, as well as the case agents

4    under, them contacted Devin Kelley's file?

5    A.  I counted 53 contacts during that time period.

6    Q.  Okay.  I want to now show you another document.  We were

7    able to — were you able to look at an audit trail document

8    that was produced by the government that showed every single

9    time, in addition to the IDP and reviewer notes we see here,

10   but also every single time a Detachment 225 supervisory agent

11   or case agent contacted Devin Kelley's file?

12   A.  Yes, sir.  I believe that was the 37-or-so-page document.

13   Q.  All right.  Well, let's put up that document.  That's

14   JEX 349.

15       And, first, can you just confirm that this is — yeah,

16   let's highlight a few lines just so we can see what this is.

17   A.  That appears to be the Devin Kelley summary that I

18   reviewed.  It is the Devin Kelley summary that I reviewed.

19       And from — just to orient the Court, from left to right,

20   it's got the agents' name abbreviation, a type of contact

21   done.  And then to the right, a date/time stamp of when they

22   posted an entry.

23       This would, I understand, be in, again, I2MS, the OSI's

24   Investigative Information Management System.

25   Q.  All right.  What I'd like you to do is — if you could,

LARRY YOUNGNER - DIRECT

1   for me, I'd like to go through each year.

2       Summarize for the Court how many opportunities -- missed

3   opportunities the Air Force had in Devin Kelley's file to fix

4   any data corrections or problems with investigative

5   sufficiency, starting with the 2011 time frame, obviously,

6   when the case was opened.

7       So what I'd like to do is -- if you could -- if you could,

8   count for us and -- can --

9           MS. CHRISTILLES:  Your Honor.

10          MR. ALSAFFAR:  Can you hear me okay?

11          THE WITNESS:  I can hear you okay, but I think you

12  have an objection, if I may be quiet until that's --

13          MR. ALSAFFAR:  Sure.  Sure.

14          MS. CHRISTILLES:  Your Honor, I apologize.  It took

15  me a minute to rereview Colonel Youngner's expert report, and

16  I did not find anywhere in his expert report where he analyzes

17  what he is now referring to as missed opportunities where case

18  agents touched the file.

19          And, therefore, I will object as this is outside of

20  Colonel Youngner's expert report and supplemental report.

21          MR. ALSAFFAR:  Your Honor, that's not correct.

22  His -- both his initial report and supplemental report, which

23  you have, extensively talk about the various supervisory

24  misses, the various opportunities, the dates, et cetera.

25          This is actually just counting, simple math.  That's

LARRY YOUNGNER - DIRECT

1  all this is.  He spent pages and pages talking about

2  supervisory negligence.  I think they're just really objecting

3  to our simple addition.

4          THE COURT:  But the addition is getting redundant

5  now.

6          So you've already talked about 79 missed monthly

7  contacts.  Joint exhibit 348 already has 53.  And then I'm not

8  sure what you're going to say now that 349 has.

9          But at some point, in all your math, you're going to

10 have to discount because, in some of those monthly contacts —

11 in 348, you're saying there was 53 missed contacts, but I'm

12 not going to go through a whole math exercise to see, well,

13 did that fall within the period of June 9, 2011, to

14 December 14, 2012?  And so did that monthly contact constitute

15 a contact on this graph?

16          I get your point, and let's move on.

17          MR. ALSAFFAR:  Okay.  We can do that, Your Honor.  No

18 problem.

19          Your Honor, is it okay if I just get on the record

20 the total?  One question on the total?

21          THE COURT:  Just ask him one question on what he

22 thinks the total is for 349.

23          MR. ALSAFFAR:  Thank you, your Honor.

24 BY MR. ALSAFFAR:

25 Q.  And, Colonel, what we're going to do is — if I can just

LARRY YOUNGNER – DIRECT

1  ask you one simple question, based on your review of both

2  these documents and your review of the record case file —— not

3  double-counting either, not counting the stuff that was also

4  included on 348 — how many opportunities and contacts did the

5  detachment —— just the Detachment 225 supervisory case agents

6  have with Devin Kelley's file?

7  A.   I counted 103, and that was just by the day.  Just to be

8  very brief on the methodology, I didn't double-, triple-, or

9  quadruple-count contacts.  So if Boyd touched it one day and

10  did ten things, I only counted that as one touch or one

11  contact.

12       But the answer, again, is 130 total.  And that divided

13  into approximately, I believe, 96 touches or contacts by

14  supervisors and 34, if I —— I'd have to go back and check my

15  math —— subordinate agent contacts.

16  Q.   So a vast majority of those contacts with Devin Kelley's

17  file over its lifetime were actually supervisory agents at

18  Detachment 225?

19  A.   Over the entire lifetime of both documents, it was just

20  under 70 percent.  And for that 349 JEX, it was 75 percent.

21  Q.   Okay.

22       MS. CHRISTILLES:  And, Your Honor, I'd just renew our

23  objection.  Again, I looked through that report.  None of that

24  analysis is in the report.

25       THE COURT:  Yeah.

LARRY YOUNGNER – DIRECT

1          MS. CHRISTILLES:  He talks about missed

2    opportunities, but this is not discussed in his report.

3          THE COURT:  All I'm going to take out of this is

4    there was numerous contacts and numerous opportunities for the

5    Air Force, through its supervisory agents, to see that

6    mistakes — that some things weren't done and weren't

7    corrected.

8          MR. ALSAFFAR:  Thank you, your Honor.

9          THE COURT:  Got it.

10   BY MR. ALSAFFAR:

11   Q.  Now, you remember earlier when we talked about the

12   inspector general reports that were just sort of related to

13   the entire Air Force issues with these submission of

14   fingerprints and criminal history data that covered the entire

15   Air Force.

16       Do you remember those reports?

17   A.  Yes, I do.

18   Q.  Did the Air Force inspector general also specifically look

19   at Detachment 225 — at Holloman Air Force Base's compliance

20   rate with fingerprint submission and criminal history data?

21   A.  Yes, after the Devin Kelley shooting.

22   Q.  I want to show you JEX 432.

23       And, Colonel, this is one of the documents you reviewed.

24   This is the — specifically the Air Force's inspector general,

25   not the DOD, but the Air Force inspector general.

LARRY YOUNGNER — DIRECT

1     Do you see that?

2  A.  Yes, I do.

3  Q.  And I'd like to show you page 18.  And if we could —

4  sorry.  If we could highlight — I believe it's in the first

5  paragraph.  Actually, the next one, where it starts with

6  "After the shooting tragedy."  Thank you.

7     What was the Detachment 225 failure rate?  So specifically

8  Detachment 225's failure rate for reporting qualified

9  fingerprint data and qualified criminal history data?

10 A.  It reflects a 43 percent noncompliance.

11 Q.  Was Holloman Air Force Base's 43 percent failure rate

12 higher than the overall national average failure rate for

13 these items?

14 A.  Yes.  That summary is in that same paragraph, and it

15 reflected the whole rate being below the Air Force average in

16 the last sentence.

17 Q.  I want to switch gears now to the security forces issue.

18 And I won't take too much time on this one, but we need to

19 talk about the security forces department or the security

20 forces element of Holloman Air Force Base.

21    So we had OSI, we also had security forces that were

22 involved in the Devin Kelley case; is that correct?

23 A.  Yes, sir.

24 Q.  And I want to show you JEX 11, which is the mandatory

25 instruction for the security forces, specifically.

LARRY YOUNGNER – DIRECT

1    Did you have an opportunity to review this in forming your

2    opinions in this case?

3    A.  Yes, I did have an opportunity to review that instruction.

4    Q.  All right.  And I won't belabor the point, but let me ask

5    you to get right to the heart of the matter.

6    Remember how we showed you the overall Department of

7    Defense instruction.  We talked about 5505.11 had the

8    mandatory reporting requirements for both OSI and security

9    forces.

10   Do you remember that?

11   A.  Yes, sir.

12   Q.  Bottom line, did the Air Force create a security forces

13   instruction that contradicted the superior DODI instruction on

14   fingerprint and criminal history data reporting?

15   A.  They did, and that was later corrected.

16   Q.  And that contradiction actually existed in the security

17   forces at the time that Devin Kelley's case was being handled

18   by the security forces; is that correct?

19   A.  Yes.

20   Q.  All right.  And what did Colonel Ford, who was the

21   handpicked corporate representative to represent the Air Force

22   in the litigation, the security forces representative, what

23   did he have to say about this conflict and whose

24   responsibility it was to resolve it?

25   A.  He indicated that -- where he worked on the air staff.  I

LARRY YOUNGNER – DIRECT

1  believe it was Lieutenant General Reno who was responsible
2  ultimately for approving the regulation and that, once that
3  had been caught, it was correct.
4  Q.  And that wasn't corrected in time for the Devin Kelley
5  security forces investigation, was it?
6  A.  No, it was not.
7  Q.  And I believe you said it was Lieutenant General Reno in
8  the Air Force who was responsible for this failure to follow
9  the mandatory instruction?
10  A.  Yes, the deputy chief of staff.  A4/7 is the designation.
11  But, ultimately, that general officer was responsible for
12  security forces within the entire Air Force as far as policy
13  and regulations.
14  Q.  All right.  And just so it's clear, Lieutenant General
15  Reno, who was responsible for creating this conflict in the
16  mandatory instructions for the security forces, I mean, she's
17  not a person that's actually responsible for reporting any
18  data to NICS; right?  She's not a person who does that?
19  A.  Short answer, no, she's not.  She's responsible for
20  setting the rule set that the subordinates who are responsible
21  must follow.
22  Q.  Now to be clear, at some point in time, the —
23  Devin Kelley was in jail at the Air Force?  He was in
24  confinement; right?
25  A.  Right.

LARRY YOUNGNER - DIRECT

1  Q.  And which department was responsible for the confinement

2  facility at Holloman Air Force Base?  Was it OSI, or was it

3  security?

4  A.  At Holloman Air Force Base, it was the security force ——

5  it was the 49th Security Forces Squadron's correctional

6  division.  And the AFI that governed their rule set was AFI ——

7  Air Force Instruction 31-205, which I also reviewed.

8  Q.  And you remember the Air Force inspector general report we

9  just showed you that related to this case specifically.

10      What did they have to say about the security forces'

11  obligation to mandatorily report at Holloman Air Force Base

12  security forces the conviction and fingerprint information on

13  Devin Kelley?

14  A.  The DODIG concluded that the Security Forces Squadron did

15  have an obligation under the instructions to submit the final

16  disposition report data, and that obligation was independent

17  of the OSI obligation.

18      In fact, the security forces' obligation predated by about

19  a month the OSI obligation to submit the FDR, the final

20  disposition report.

21  Q.  All right.  So when we're looking at —— you know, we

22  talked about the OSI file having almost, like, 79 monthly

23  review requirements and weekly review requirements, the

24  hundred-plus contacts of Devin Kelley's file by the OSI.

25      There was also a security forces independent obligation to

748

LARRY YOUNGNER - DIRECT

1  add on to that, is that fair to say, at Holloman Air Force

2  Base?

3  A.  Yes, sir.

4  Q.  So that number goes up, doesn't it?

5  A.  As far as the -- there were four obligations found that

6  OSI had.  There were two obligations security forces had.  So

7  the number goes up to six, as far as the -- I mean, I don't --

8  as far as those obligations.  And then as far as the total

9  contacts, yes, there was a separate list of contacts and time

10 elapsed for security forces.

11 Q.  And who was the -- is there -- this -- this may seem

12 obvious again, and I apologize.

13     But is there a supervisory officer at the confinement

14 facility who was responsible for submitting this information

15 on Devin Kelley?

16 A.  Ultimately, it is the squadron commander -- I believe

17 Lieutenant Colonel Boyd's responsibility.  But at most

18 Air Force installations, there is a noncommissioned officer in

19 charge of the confinement facility.

20     It's typically a technical sergeant, sometimes a staff

21 sergeant, an enlisted noncommissioned officer who is trained

22 on confinement duties and responsibilities.  And that is the

23 person who would typically -- unless they have some local rule

24 that's different.  Under the AFI 31-205, that confinement

25 facility NCO would complete that paperwork, submission of the

1  FDR to NICS.

2  Q.  So I want to break this down a little bit.

3      On the security forces side of detachment –– I'm sorry,

4  Holloman Air Force Base security forces offices, Lieutenant

5  Commander Boyd was the security forces commander ultimately

6  responsible for submitting and ensuring that Devin Kelley ––

7  A.  And ––

8  Q.  Let me finish.

9  A.  Please?

10 Q.  –– for submitting and ensuring that Devin Kelley's

11 information was sent to the FBI?

12 A.  Lieutenant Colonel Boyd would be the commander responsible

13 of the 49th Security Forces Squadron, the person responsible

14 for supervising that submission.

15 Q.  And then you also mentioned that there was a

16 noncommissioned officer at the security forces confinement

17 facility as well that was a –– is that –– is the document ––

18 if the judge says "NCOIC" at the confinement facility, is that

19 the noncommissioned officer you're referring to?

20 A.  Yes, the noncommissioned officer in charge.  And I put

21 that acronym, I believe, in any acronym list.

22 Q.  Okay.  In your report?

23 A.  Yes, sir.

24 Q.  Okay.  And so that's –– the NCOIC at the security forces

25 confinement facility is another supervisory agent within the

LARRY YOUNGNER – DIRECT

1  security forces side that had a —— that had a responsibility
2  but did not ultimately submit Devin Kelley's conviction or
3  fingerprint information to the FBI?
4  A.  I would assess they are a supervisory law enforcement
5  official in charge of corrections.  They were not agents.
6  Q.  Thank you.
7  A.  A minor point.  Not to quibble.  But different role and
8  mission, sir.
9  Q.  No, no.  That's okay, and I appreciate it.  And if I say
10  something incorrect, please tell me.
11  A.  Yes, sir.
12  Q.  How many —— I just want to talk about the time for —— real
13  quickly.
14      How many days did the Air Force have from the first time
15  the inspector general told them that this was a major problem,
16  submitting fingerprints and criminal history data on these
17  convicts and these dangerous people —— how many days from the
18  1997 report passed for them to try to correct it?
19  A.  Well over 7,500 days.  I don't have the number at the top
20  of my brain, but it was over 7,500 days between.  I did a date
21  elapse between when that report got published and the 5th of
22  November of 2017.  Not counting the 5th of November, it was
23  over 7,500 days of awareness that this is an issue for
24  security forces and OSI.
25  Q.  About how many days did the Air Force have from the time

LARRY YOUNGNER – DIRECT

1  that Devin Kelley's case file was closed to correct this

2  problem before the — from the time it was closed to the day

3  of the shooting?

4  A.  Not archived but closed?

5  Q.  Yes, sir.

6  A.  Because this happened at different times.

7      The — I believe it was — I'm trying to go back to when

8  it was closed.  I believe they closed it — I know they

9  archived it in April of '13.  I'd have to go back to that

10 chart you were looking at.

11     It was about 1,600 days from archive.  And then from

12 closure, I believe that was four months earlier.

13 Q.  Yes.

14 A.  So 120 would be about 17 — 1,750 days to comply.

15 Q.  Devin Kelley purchased his AR-15 at a federally — a

16 firearm-licensed dealer after passing a NICS background check;

17 is that correct?

18 A.  That's correct, sir.

19 Q.  First of all, simple, simple question:

20     Would Devin Kelley have had the AR-15 that he used to kill

21 26 people and injure 22 more if the Air Force submitted his

22 fingerprint and criminal history data to the FBI?

23          THE COURT:  Your objection?

24          MS. CHRISTILLES:  Objection, your Honor.  It calls

25 for a legal conclusion.

LARRY YOUNGNER - DIRECT

1          MR. ALSAFFAR:  That's a factual question, Your Honor.

2          THE COURT:  So it's a factual question.  We've heard

3  it plenty of times.  And so it goes with the caveat, assuming

4  the FFL actually complied with the law, would he have had the

5  weapon.

6          MR. ALSAFFAR:  Okay.

7          THE COURT:  Go ahead.

8  BY MR. ALSAFFAR:

9  Q.  Colonel Youngner, I want you to assume for me, based on --

10  well, I don't think we have to assume.

11     The Academy store that sold the AR-15 did submit his

12  information to the FBI, did they not?

13  A.  Yes, they did.

14          THE COURT:  The assumption would have been that they

15  actually would have sold it no matter what the circumstances

16  were.  We really don't know; right?

17          MR. ALSAFFAR:  Of course.  Of course.

18          THE COURT:  But with all that, we've heard this

19  plenty of times.  Go ahead and ask the question.  Let's get

20  the answer.

21          MR. ALSAFFAR:  Thank you, Your Honor.

22          MS. CHRISTILLES:  Your Honor?

23          THE COURT:  Yeah.

24          MS. CHRISTILLES:  May I be heard?

25          THE COURT:  Yes.

1          MS. CHRISTILLES:  I will also object because

2     plaintiff has proffered Colonel Youngner as an expert in Air

3     Force protocols.  I think whether or not he would have been

4     able to buy a weapon at Academy is far outside of what the

5     plaintiffs have submitted him for as an expert.

6          THE COURT:  That's fair enough.

7          You know, so the other part about all this too, as to

8     many of the objections on his testimony as an expert, I mean,

9     this is not a trial to the jury.  It's a trial to the bench.

10          And, frankly, I know to discount testimony as I see

11     fit.  And so I can take in whatever and disregard whatever.

12     And so I take — I'm letting lots of this in.  It doesn't mean

13     I'm going to give it actually any credence whatsoever,

14     especially as it impinges on legal conclusions.

15          But that said, you know, this is outside now the

16     lines of the testimony that he was proffered for.

17          So any other questions?

18          MR. ALSAFFAR:  Yes, I do, Your Honor.

19          THE COURT:  Go ahead.

20     BY MR. ALSAFFAR:

21     Q.  Okay.  I want to now turn to the case file itself and what

22     the Air Force knew about Devin Kelley's character and what

23     they knew about his violent tendencies and his actual violent

24     acts prior to them failing to submit his fingerprints and his

25     conviction to the FBI.  Okay?

754

LARRY YOUNGNER – DIRECT

1  A.  Okay.

2  Q.  And I think you've already said that you had an ample

3  opportunity to have, in fact, as you stated in your report,

4  detailed the various instances in which the Air Force

5  documented a variety of violent acts and threats that

6  Devin Kelley made the Air Force aware of while he was there.

7      Do you recall that?

8  A.  Yes, I do.

9  Q.  Okay.  What I'd like to do is just to take the Court

10  through some of those, and I'd like to start with one of

11  Devin Kelley's Air Force files, if we could.

12      So I'd like to look first at Joint Exhibit 21, page 4.

13      Have you had a chance —— this was one of the reports that

14  you reviewed in forming your opinions on what the Air Force

15  knew about Devin Kelley's violence; correct?

16  A.  Yes.  I recall that is the expulsion or barment order.

17  Q.  Okay.  We're looking at a document dated March 27th, 2013.

18  And I want to highlight in the first paragraph the statement

19  that says, "Due to Kelley" —— if we look down in paragraph 2,

20  it starts with "Due to Kelley's."

21      Thank you.  That's all right.

22  A.  Yes.

23  Q.  And if you look toward the bottom of that paragraph.

24  A.  Yes.

25  Q.  All right.  Now, in March 2013, the Air Force was aware

LARRY YOUNGNER – DIRECT

1  that Devin Kelley had an extensive record of violence;

2  correct?

3  A.  This summarizes it, yes.

4  Q.  He was directing death threats towards not just his

5  domestic partner but his leadership in the Air Force; is that

6  right?

7  A.  That's correct.

8  Q.  And at this point in time, March 2013, what was the

9  Air Force saying in this letter about whether or not it was —

10  the Air Force was safe from Devin Kelley at Holloman Air Force

11  Base?

12  A.  This was — the Air Force was requesting — his leadership

13  was requesting he be barred from the base because he presented

14  a threat to the leadership and to public safety on the

15  installation of Holloman Air Force Base.

16  Q.  Now, the next paragraph, paragraph 3.  So we're talking

17  about in March 27th, 2003 — 2013, sorry.  Paragraph 3, the

18  very first paragraph there, "AB Kelley."

19      The Air Force — what is the Air Force reporting about

20  Devin Kelley's mental health situation?

21  A.  Well, they are describing conduct that also reflects

22  severe mental health problems, and then they're describing the

23  evidence to support that below.

24  Q.  Did you have a chance to review as well his multiple

25  mental health facility stays while he was at the Air Force?

LARRY YOUNGNER - DIRECT

1  A.  Yes.  Two at Peak, a civilian facility for behavioral
2  health counseling that was off the installation.
3  Q.  Okay.  And so this severe mental health decline was
4  apparent, in March of 2013, to the Air Force; is that right?
5  A.  It was summarized in '13.  It was apparent prior to that,
6  as described in the document itself when he was taken to Peak.
7  This was — this document was written prior to his release
8  from confinement to bar him from the installation.
9  Q.  And at this point in time, March 27th, 2013, we're talking
10 about after he's been convicted, after he's served his time,
11 and he's, essentially, a free person; is that correct?
12 A.  Well, he's about to be put on appellate leave and released
13 from confinement, which started his pretrial confinement and
14 continued until he served his sentence.
15 Q.  So even after he served his sentence and he was about to
16 be a free man, the Air Force had determined that his mental
17 health problems are so severe and his threats of violence are
18 so dangerous that he was too dangerous to the entire Air Force
19 base of Holloman Air Force Base ever to be allowed to enter
20 ever again.
21    Is that fair to say?
22 A.  That was the request.  And the decision was made a few
23 days later by the installation commander to bar him, based on
24 what's here as well as some additional threats that had been
25 communicated.

LARRY YOUNGNER – DIRECT

1  Q.  All right.

2  A.  I think they're described elsewhere in this letter.

3  Q.  Now, the next sentence says that he open —— in

4  paragraph 3, it says, "He openly carried a firearm on Holloman

5  Air Force Base and placed a weapon to his wife's head."

6      Do you know who that wife is?

7  A.  Tessa, his first wife.

8  Q.  Were you able to listen to Danielle Kelley's testimony in

9  trial?

10 A.  I was.

11 Q.  Okay.

12 A.  Yes, I did.

13 Q.  Was this similar domestic violence conduct to what he did

14 to Danielle?

15 A.  I assess it —— I'm sorry.  The counsel has raised an

16 objection.

17         THE COURT:  Yeah.

18         MS. CHRISTILLES:  Objection, Your Honor.  That's

19 outside his expertise.  Similar domestic violence conduct, I

20 don't see how that relates to Air Force protocol.

21         MR. ALSAFFAR:  I'll rephrase.

22 BY MR. ALSAFFAR:

23 Q.  Let me ask it this way, Colonel.

24     Based on your review of the entire file, did Tessa Kelley

25 get a gun pointed to her head by Devin Kelley in 2012–2013?

LARRY YOUNGNER - DIRECT

1   A.  Yes.

2   Q.  All right.  Based on your review of the testimony and

3   depositions, did Danielle Kelley get a gun pointed to her head

4   by Devin Kelley?

5           MS. CHRISTILLES:  Objection, Your Honor.  He's

6   leading the witness here.

7           THE COURT:  That's sustained.

8   BY MR. ALSAFFAR:

9   Q.  All right.  Can you tell us whether or not Danielle Kelley

10  had a gun pointed to her head by Devin Kelley?

11  A.  Yes.  I understand that from her depositions and from her

12  testimony earlier this week.

13  Q.  Now, if you look down in paragraph B -- oh, by the way,

14  before I do that, I didn't show you the next page, page 5.

15      If we could look at the signature page, the bottom blue

16  signature page.  The bottom blue signature page.  Thank you.

17      Who is this that's making this report from the Air Force?

18  A.  So that is a captain who works for the staff judge

19  advocate within the 49th Wing staff judge advocate's office.

20  And so it appears he reviewed the work of either a paralegal

21  or law clerk civilian and forwarded this to the installation

22  commander based upon his legal review.

23  Q.  It's an Air Force government lawyer; right?

24  A.  Yes, that's correct.

25  Q.  Let's look at what the government Air Force lawyer said in

LARRY YOUNGNER — DIRECT

1  paragraph B about Devin Kelley.  If you look under B, it's
2  March 2013, "Additional evidence," that sentence.
3  A.  Yes.
4  Q.  The Air Force attorney states, "Additional evidence of
5  Kelley's high-risk, unpredictable, and criminal behavior
6  includes his history of mental health issues, his
7  preoccupation with weapons, his verbal declaration that he's
8  contemplated offensive attack strategies on both Air Force
9  personnel and organizations, including leadership and security
10 forces."
11     I want to stop right there.
12     What — "offensive attack strategies," what does that mean
13 to you?
14 A.  He's looking for a way to harm someone offensively or
15 aggressively.
16 Q.  And is it — based on this review in 2013, is the
17 Air Force saying that his offensive attack strategies are not
18 limited to people in his family or domestic situations;
19 they're other people?
20 A.  There's also the unit, the leadership.  And so his unit
21 and his unit leadership.
22 Q.  We're talking about mass violence here; is that right?
23         MS. CHRISTILLES:  Objection, Your Honor.  Leading.
24         THE COURT:  That's sustained.
25

LARRY YOUNGNER – DIRECT

1   BY MR. ALSAFFAR:

2   Q.  Can you tell us whether or not this is, in your view, what

3   we're talking about, mass violence?

4   A.  To the extent he was focused on larger organizations and

5   units, yes, I would assess it was.  And that is also based on

6   my having read what Devin Kelley reportedly told supervisors

7   about how he would approach them if he had a shotgun, he'd go

8   in and shoot the place up, et cetera.

9   Q.  Okay.  We'll look at that, but let's finish with this

10  document, the next — 21, page 5.

11      Actually, let's get to the recommendation part from this

12  Air Force lawyer.  If we look down under paragraph 5,

13  "AB Kelley has."

14      The government attorney here states that "AB Kelley has a

15  well-documented history of making threats of physical

16  violence, researching methods of carrying out violence, and a

17  conviction for assaulting his wife and stepson."

18      What does that sound like to you?

19  A.  I assess that as a factual predicate for the decision to

20  bar them, that this person has demonstrated violence as

21  evidenced by these matters that are noted above.

22  Q.  And did your independent review of this file indicate that

23  Devin Kelley had and was researching methods of carrying out

24  violence?

25  A.  Yes.  He had, both at Peak and elsewhere.

LARRY YOUNGNER — DIRECT

1  Q.  And would that include thinking through and planning
2  through acts of mass violence while he was at the Air Force?
3  A.  As far as assessing how he would go about doing something,
4  I don't have the details other than the summaries,
5  particularly from Peak, and conversations he had with
6  supervisors at the 49th Logistics Readiness Squadron.
7  Q.  All right.  Well, let's actually look at that planning and
8  researching that he did related to that issue while he was in
9  the Air Force.
10     Let's look at document JEX 21, page 6.  It's a new
11  document.  This is a few days later from another commander.
12  And let's look at the second page — I'm sorry, page 7, so we
13  can orient the Court.
14     This is signed by Andrew Croft, Colonel, Air Force
15  Commander.
16     Do you see that?
17  A.  Yes, I do.
18  Q.  Okay.  And if we can look on the first page again, what is
19  this the Court's looking at?
20  A.  That is the order approving the request, which was the
21  document you showed me previously.  It's an order to not —
22  it's to basically bar Devin Kelley from entering or reentering
23  Holloman Air Force Base indefinitely.
24  Q.  Let's look at the first — keep that up — the first
25  sentence there and — starting with "You had repeatedly."

LARRY YOUNGNER – DIRECT

1   Now, this is addressed to Devin Kelley.

2       The "you" here is Devin Kelley; is that right?

3   A.  That's correct.

4   Q.  All right.  Devin Kelley "had repeatedly threatened the

5   lives of United States Air Force leadership."

6       Do you see that?

7   A.  Yes.

8   Q.  So at this point, was the Air Force aware that

9   Devin Kelley was threatening, not just one, but multiple lives

10  of United States Air Force personnel?

11  A.  That is correct.

12  Q.  And then you remember how you talked about you viewed

13  documents regarding Devin Kelley's planning about violence.

14  And I want to show you that in this document.

15      It's the same paragraph.  Sorry.  Same paragraph.

16  A.  Yep.

17  Q.  Bottom of the paragraph starting with "During."  Can you

18  read today out loud to the Court.

19  A.  "During your hospitalization at the Peak, you had searched

20  the internet" —

21      And I'm going to have to change my view.  I blocked — the

22  Court view on the right is blocking the entire thing for me.

23  So bear with me.

24  Q.  That's okay?

25  A.  Let's see if that does it.  Okay.

LARRY YOUNGNER - DIRECT

1    "During your hospitalization at the Peak, you had searched

2    the internet on a computer for body armor and purchasing of

3    weapons."

4        So that suggested to me that he was -- you know, a tactic,

5    technique, or procedure he wanted was use of body armor in

6    engaging in potential violence.

7            MS. CHRISTILLES:  Objection to that opinion, Your

8    Honor.

9            THE COURT:  So he's basically just restating what's

10   already in the record, so I can read documents for myself.

11           MR. ALSAFFAR:  Okay.

12   BY MR. ALSAFFAR:

13   Q.  How many times did Devin Kelley threaten mass violence

14   that the Air Force was aware of at various times during his

15   stay at Holloman Air Force Base?

16   A.  Immediately, three come to mind.  I'd have to go through

17   the record and count it.  You know, the instances where he

18   told a -- his wife, "If I had a shotgun, I'd go in and shoot

19   them all up" is what he told Tessa.

20       The threats made at Peak, I believe.  And then the third

21   was prior to release.

22       I guess a fourth was when he told a former supervisor --

23   he communicated to Master Sergeant Bizzack threats, but I

24   don't know if that was just one or a large group of leadership

25   or former leadership.

LARRY YOUNGNER – DIRECT

1    But there were several, three or more, that the Air Force
2  was aware of.
3  Q.  All right.  So the Air Force was aware of multiple
4  occasions that they could reasonably anticipate that that is
5  the kind of person that might engage in mass shootings because
6  he threatened it multiple times?
7       MS. CHRISTILLES:  Objection, your Honor.  Calls for a
8  legal conclusion.
9       THE COURT:  So it's actually asking him to speculate.
10  So he's not a psychiatrist or a psychologist, and so you're
11  asking him to speculate as to whether or not Colonel Youngner
12  thinks he would commit mass shootings.  That's beyond his
13  scope.
14       MR. ALSAFFAR:  All right.
15  BY MR. ALSAFFAR:
16  Q.  So at least on three occasions, Devin Kelley threatened to
17  commit mass shootings while he was in the Air Force, and the
18  Air Force was aware of it.
19       Is that a fair summary?
20  A.  Yes.
21  Q.  They also learned something else about Devin Kelley.
22       In addition to his abuse of Tessa Kelley and the kind of
23  abuse he had with Tessa Kelley, did they also discover –– and
24  then in addition to his mental health –– severe mental health
25  problems and his threats of mass shooting violence on multiple

LARRY YOUNGNER - DIRECT

1  occasions, did they also discover something else about his
2  past and violence as well?
3  A.  Well, I mean, they also had the assault upon his
4  stepson —
5  Q.  Oh, right.  Right.
6  A.  — in addition to Tessa Kelley and —
7  Q.  What I'm referring to is, as part of the OSI
8  investigation, did the Air Force learn about other acts of
9  violence that he had committed against other women?
10  A.  They did.  When they did their research, OSI, in their
11  investigation, found that there was some preservice drug use
12  that they discovered.  And there was also a — I believe —
13  I'm trying to remember how many.  There was at least one
14  instance of an alleged, I'll call it, sexual assault on a
15  dating interest prior to his enlisting.
16        THE COURT:  Let me make sure I've got the time line
17  on this right.
18        Is this stuff that the Air Force learned after the
19  shooting, or are you talking about —
20        MR. ALSAFFAR:  No.  This is what they learned before
21  he was convicted and had on their system every day prior to
22  his conviction all the way up to the shooting, and I'll make
23  that clear on the record.  I apologize.  That's my fault.
24        THE COURT:  I was getting lost on what you were
25  talking about.

1          MR. ALSAFFAR:  I'm going to show you the documents,
2   Your Honor, real quick.  Let's start with the first time.  And
3   this, Your Honor, is June 18th, 2012.
4   BY MR. ALSAFFAR:
5   Q.  The OSI -- Detachment 225 -- and this is JEX 22, page 63.
6       I apologize in advance, Colonel, for the nature of this,
7   what the Air Force learned about Devin Kelley in 2012 and the
8   nature of what they learned, but I think it's very important
9   for the Court to understand the degree and extent of it.  So
10  I'm just giving you fair warning, and I know you've reviewed
11  this.
12      Okay.  This is June 18th, 2012.  This is part of the
13  Air Force's investigation of Devin Kelley.  Fair?
14  A.  Yes.
15  Q.  And just to orient the Court as well, just for the record,
16  if you look on the very bottom, the special agent that's
17  investigating this is Yonaton Holz.
18      Do you see that?
19  A.  I do.
20  Q.  Let's go back to the main body of the paragraph.  And we
21  have redacted the name, so I'm just going to say "victim."
22      Okay, Colonel?
23  A.  Yes.
24  Q.  I'm going to highlight for you, because you were asking --
25  you said there were several events, but you were asking to

LARRY YOUNGNER — DIRECT

1  look at the document.

2      On June 18th, 2012, Mr. Holz spoke with the victim and

3  states, "Victim met subject Kelley in 2005 while she was in

4  the seventh grade in New Braunfels."

5      See that?

6  A.  Yes, I do.

7  Q.  Next sentence, "Victim dated subject D. Kelley for

8  approximately eight months but terminated the relationship due

9  to constant verbal and sexual abuse by subject Kelley."

10 A.  Yes, I read that.

11 Q.  "Victim tried to end the relationship numerous times, but

12 subject Kelley would state he would kill himself if she did."

13     Do you see that?

14 A.  Yes, sir.

15 Q.  "Subject Kelley told victim he would kill himself

16 approximately five to eight times throughout the relationship.

17 Subject Kelley made her do things no seventh grader should.

18 Subject Kelley would force victim to give him oral sex by

19 pushing her head down to his groin.  Subject Kelley would also

20 force victim to masturbate him."

21     So the Air Force was aware of this on June 8th, 2012,

22 about the nature, degree, and depth of Devin Kelley's

23 problems.

24     Is that fair to say?

25 A.  Yes.  About five months —

LARRY YOUNGNER – DIRECT

1           MS. CHRISTILLES:  Objection, Your Honor.

2           THE WITNESS:  —— before the prosecution and

3    conviction.

4           THE COURT:  What's your objection?

5           MS. CHRISTILLES:  Counsel is testifying and leading,

6    nature, depth.

7           Is there a question or ——

8           MR. ALSAFFAR:  There was a question.

9           THE COURT:  So I understood the question.  The

10   question was, was the Air Force aware of the fact that he

11   was —— he, in 2005, was engaged in a sexual relationship with

12   an underage girl and that Kelley said he would kill himself if

13   she attempted to end the relationship and that the government

14   knew that as of June of 2012.

15          So, yeah, I understood the question.

16          My question is how old was Kelley in 2005?

17          MR. ALSAFFAR:  He was 15.  He was born in 1991, Your

18   Honor —— 14.  14.

19          THE COURT:  So Kelley, at that age —— at that time,

20   is underage himself?

21          MR. ALSAFFAR:  Yes, Your Honor.

22          THE COURT:  Okay.  Thank you.

23          MS. CHRISTILLES:  Your Honor, to that point, I would

24   object to relevance of this.

25          THE COURT:  So that's overruled.

LARRY YOUNGNER - DIRECT

1  BY MR. ALSAFFAR:

2  Q.  Okay.  Let's go to the next one.

3      Was there another victim that the Air Force learned about

4  of Devin Kelley?

5  A.  I believe so, yes.

6          MR. ALSAFFAR:  Let's go to JEX 22, page 65.

7          And, Your Honor, just to orient you, this is the same

8  Detachment 225 agent, but it's two days later.  It's

9  June 20th, 2012.

10         And if we could, again, just blow up the main

11  paragraph, and we'll highlight it for you.

12 BY MR. ALSAFFAR:

13 Q.  On June 20th — sorry, June 20th, 2012, Special Agent Holz

14 interviewed victim.  Victim met subject Kelley approximately

15 five years ago at church.

16     So five years prior to 2012, what year would that be,

17 Colonel?

18 A.  2007.

19 Q.  So "Victim was 14 years old at the time, and they began

20 dating.  Victim stated subject Kelley was the one that pursued

21 the relationship."

22     Go down a couple more lines.

23     "Victim explained Devin Kelley made her do things no

24 seventh grader should be doing at their age.  Victim felt her

25 relationship with subject Kelley was sexually and emotionally

LARRY YOUNGNER – DIRECT

1  abusive.

2      "Subject Kelley sexually abused victim approximately four

3  to five times after they broke up.  Subject Kelley would force

4  victim to masturbate him by using verbal abuse to control her.

5      "Subject Kelley would often tell victim she was not good

6  at anything but 'sucking dick.'"

7      I apologize for the language.  That's in the record.

8      "Subject Kelley would begin to breathe heavy on the phone

9  and would ask victim to play along.  Victim found the act

10 disgusting and would hang up the phone.  Subject Kelley would

11 sometimes call victim and hide the fact that he was

12 masturbating from her."

13     Few more lines down.

14     Special Agent Holz notes that "Subject Kelley pulled his

15 penis out of his pants and began masturbating and asked victim

16 to lift her shirt so he could see her breasts.  Victim refused

17 to comply with subject Kelley's demands.  Subject Kelley

18 climaxed quickly on his hands and rubbed his semen on victim's

19 stomach after lifting her shirt up."

20     Do you see that?

21 A.  Yes, I do.

22 Q.  Okay.  So the Air Force was aware of this conduct of

23 Devin Kelley on June 20th, 2012, on another victim?

24 A.  Correct.  Yes, they were aware.

25 Q.  All right.  I want to show you a third victim that the

LARRY YOUNGNER — DIRECT

1  Air Force was aware of prior to the shooting and prior to his

2  release from Holloman Air Force Base.

3      I'm going to show you JEX 22, page 67.

4      And, Your Honor, to orient to you again, it's the same

5  case agent, Holz.  It's a few days later, June 26th, 2012.

6      I'm going to highlight the first paragraph.  Just the

7  first half of that paragraph.

8      Shawn, that should be enough.  Thank you.

9      Again, you reviewed this in forming your opinions in this

10 case, did you not, Colonel Youngner —

11 A.  I did.

12 Q.  — about what the Air Force was aware of about his

13 conduct; correct?

14 A.  Right.  The other investigative leads that the agents

15 followed up on in developing the case file prior to the

16 court-martial.

17 Q.  Okay.  On June — I'm reading from JEX 22.

18      "On June 26th, Special Agent Holz interviewed victim.

19 Victim met subject Kelley and began dating him during her

20 freshman year of high school in 2008.  Victim and subject

21 D. Kelley ended the relationship because they constantly

22 fought and subject Kelley moved to enlist in the Air Force.

23      "Victim described her relationship as violent and

24 aggressive.  Victim and subject Kelley would often strike each

25 other if one or the other said something to infuriate the

LARRY YOUNGNER – DIRECT

1  other."

2      A few lines down.

3      "Subject Kelley forcefully took victim's sexual virginity.

4  Victim was 16 years old at the time and did not know what to

5  do in regards to having sex with subject D. Kelley.  Victim

6  tried pushing subject Kelley away, but subject Kelley was

7  stronger than she was.  Subject Kelley inserted his penis into

8  victim's vagina and penetrated her hymen."

9      Is this excessively violent conduct by Devin Kelley that

10  the Air Force was aware of?

11  A.  This is conduct the Air Force was aware of, the sexual

12  violence.

13  Q.  Is it heinous violence?

14          MS. CHRISTILLES:  Objection, Your Honor.

15          THE COURT:  That's beyond his — next question.

16  Sustained.

17  BY MR. ALSAFFAR:

18  Q.  Let me show you a mental health record that was part of

19  the Devin Kelley file and what the — what you reviewed and

20  what the Air Force was aware of prior to releasing him and

21  prior to the shooting.

22      It's JEX 22, and it's page 591.

23      Now, you recall that — and the date on this is April 26,

24  2011, but I believe that it was just a typo by the mental

25  health facility.  It's 2012.

LARRY YOUNGNER — DIRECT

1    But you reviewed this document as part of your review of

2    the Devin Kelley case file; correct?

3    A.  I did.  And I also noted the date stamp at the bottom

4    indicated a 2012 date.

5    Q.  Yeah.  In fact, let's just be clear, because I want the

6    Court to understand exactly where this document is coming

7    from.

8         If we actually look at JEX 22, page 590.

9         This document I'm about to show you is from the AFOSI

10   April 26th, 2012, case file on Devin Kelley; is that right?

11   A.  That's correct.

12   Q.  Okay.  If we could skip to 22, 592.

13        You're aware that this facility and that the Air Force was

14   aware that he had actually had some pretty extensive mental

15   health testing and behavioral testing done while he was at

16   Holloman Air Force Base and that the Air Force was aware of;

17   is that true?

18   A.  That's true.

19   Q.  Okay.  And I —

20   A.  It's reflected here.

21   Q.  And I want to show you that that's what's reflected here.

22        After their testing of his mental health while he was in

23   the Air Force, what was the conclusion under "control scale"

24   for Devin Kelley?

25   A.  This reflects that maximum risk range that put him at the

LARRY YOUNGNER – DIRECT

1  98th percentile of being controlling, and it describes what

2  that definition means beyond that.

3  Q.  Let me highlight the middle down in that same paragraph,

4  "This person's."

5      Do you see that?

6  A.  Yes.

7  Q.  Can you read that sentence for the Court, please.

8  A.  "This person's significant other may be held in bondage

9  through intimidation and raw violence."

10 Q.  So the Air Force, in April 2012, was aware that

11 Devin Kelley and was maximum risk range of control and a

12 maximum risk range for raw violence; is that right?

13 A.  That's correct.  That's elsewhere.

14 Q.  In the same document, he had some more testing done, and

15 it has some conclusions from that behavioral testing under

16 "violence scale."

17     It's a test for violence scale that the Air Force was

18 aware of; is that correct?

19 A.  That's correct.  And, again, he was a high-risk assessment

20 at the maximum risk range.

21 Q.  Well, I want to be clear.  It wasn't high risk; it was

22 maximum risk range.

23     Is that what the record shows?

24 A.  Right.  I mean, it says both.  But, yes, maximum risk

25 range in bold, and risk percentile is 93.  And his pattern on

LARRY YOUNGNER − DIRECT

1  the scale is in the high risk, 90 to 100 percentile range, at
2  93.  And it goes on to describe that.
3  Q.  If we look under high−risk scores, which is what his score
4  is, what did the Air Force learn about his mental health risk
5  in April 2012 from his testing?
6  A.  It described that he can be hostile, he can be violent, he
7  can be dangerous and should be considered dangerous.
8  Q.  Let's look at another conclusion that this mental health
9  testing determined for Devin Kelley when he was in the
10  Air Force and that the Air Force learned about him the end of
11  April 2012.
12      And it's on page −− it's JEX 22, page 593.
13      If we look under the category of "stress coping scale,"
14  what did the Air Force learn about Devin Kelley's mental
15  health status in terms of coping with stress?  What range did
16  he score on?
17  A.  Again, in the maximum risk range, which indicated he had a
18  poor ability −− inability, if you will, to scope with stress.
19  And it describes how that contributes to his impaired
20  adjustment.
21  Q.  How did the mental health testing that the Air Force was
22  aware of in April 2012 categorize the level of this
23  adjustment, this impairment?
24  A.  Again, in the high−risk range.
25  Q.  And what did they conclude about −− it's highlighted

LARRY YOUNGNER – DIRECT

1   there.  Can you read that into the record.

2          MS. CHRISTILLES:  Your Honor.

3          THE WITNESS:  "Stress or this person's inability to

4   cope with" —

5          THE COURT:  One second.

6          THE WITNESS:  Please.  I'm sorry.

7          MR. ALSAFFAR:  That's okay.

8          MS. CHRISTILLES:  I'm going to object.

9   Colonel Youngner is simply reading from the record.  He has

10  not been qualified as a medical provider, a mental health

11  professional, or any such qualifications that would qualify

12  him to read through these mental health records.

13         THE COURT:  That's overruled.  But I'm not taking any

14  of his testimony as him giving any expert testimony on that

15  fact.  I'm limiting it solely to what Detachment 225 knew on

16  or about April 26th, 2012, about Devin Kelley's mental health.

17         MR. ALSAFFAR:  That's right, Your Honor.  In what we

18  do, we'll limit it to that.

19  BY MR. ALSAFFAR:

20  Q.  You were in the middle of finishing reading that into the

21  record, Colonel, starting with "Stress."

22  A.  I'll start over.

23      "Stress or this person's inability to cope with stress is

24  contributing to a seriously impaired adjustment."

25  Q.  So this — you remember the first page of this document we

LARRY YOUNGNER - DIRECT

1  showed you was the AFOSI Detachment 225 coversheet showing

2  that Agent Holz obtained this record.

3      Do you remember that?

4  A.  I do.

5  Q.  When we were talking earlier about the supervisory

6  contacts — you know, the 130, 180-plus contacts of this

7  file — at some point in time, from April 2012 all the way to

8  November 5th, 2017 — or let's — let me rephrase that.

9      At some point in time, from April 2012 to archival of this

10  file, this information that we just read about his mental

11  health impairment and testing was available to the supervisory

12  agents every single time they touched this file.

13      Is that fair to say, based on your review?

14  A.  Yes, because Holz put it in the file, and they had to

15  review it — well, it was available for their review, yes.

16  Q.  And I know it seems simple.  But when we were talking

17  about investigative case sufficiency and we were showing the

18  judge — the Court the audit trails that showed access to the

19  file, what we're looking at that is file.

20      Is that fair to say?

21  A.  That's correct.  It's the investigative file.  Then it

22  goes into the report of investigation.

23  Q.  And I'm sorry if this seems obvious, because you did this

24  a lot in the Air Force, but most of us did not.

25      When you — because I didn't ask this on those questions.

1      When we went through the rapes of these minor girls with
2  Devin Kelley that the Air Force was aware of, were those
3  violent acts in the file every single time from those dates of
4  June 2012 until case archival for all those supervisory agents
5  at Detachment 225 to review and look at?
6  A.  They should have been put in the file on the date of the
7  report that Agent Holz or the case agent developed the lead.
8  So I believe that's correct, yes.  It was available for their
9  review.
10  Q.  Okay.
11  A.  And — well, yes.  That's all.  I'm sorry.
12  Q.  That's okay.  I want to — I'm close to wrapping up here,
13  Colonel.
14      I want to talk about — a little bit earlier, we talked
15  about why this had happened in terms of the supervisory
16  misses, and we had spoken about Colonel Hudson and then
17  Commander Boyd.
18      I want to show you — did you review — I'm sorry.  I
19  think you said you did.
20      But did you review the — one of the supervisory agents in
21  charge, Vince Bustillo's, deposition; correct?
22  A.  I did, yes.
23  Q.  And he was one of the supervisory agents who was
24  responsible for reviewing Devin Kelley's case files as well;
25  correct?

1  A.  Yes, sir.

2  Q.  Okay.  And did he provide –– I want to show you a clip

3  from his testimony and ask you –– relating to this issue of

4  supervisory review.

5      If we could play Bustillo's deposition, page 120, line 14

6  through line 121.  It's a short clip, page 121, line 4.  So

7  page 120, line ––

8      (Clip was played.)

9          MS. CHRISTILLES:  Your Honor.

10          THE COURT:  Stop it.  Yes?

11          MS. CHRISTILLES:  I'm just trying to verify whether

12  or not this video has actually been admitted.

13          MR. ALSAFFAR:  It has.  Your Honor, everything we're

14  playing is only something that's already been preadmitted.

15          THE COURT:  So what is this number?

16          MR. ALSAFFAR:  Let me find the exhibit number, Your

17  Honor.  I believe it's 3 –– trying to make sure I don't give

18  you the ECF file number versus the joint exhibit number.  I'm

19  giving you the ECF file number.  It's Plaintiffs' 93.

20          THE COURT:  This is Plaintiffs' 93?

21          MR. ALSAFFAR:  Yes, Your Honor.  These were admitted,

22  I think, on day one.

23          THE COURT:  Plaintiffs' 93, trial deposition

24  designations of Yonaton Holz?

25          MR. ALSAFFAR:  Oh, no.  This is Bustillo.  Sorry.

 1  It's Plaintiffs' 88, Your Honor.  I apologize.

 2          THE COURT:  88 has been admitted, plaintiffs' trial

 3  deposition testimony trial of Vince Bustillo.

 4          MS. CHRISTILLES:  By video, Your Honor?

 5          MR. ALSAFFAR:  Yes.  I believe this is one of our

 6  video — I don't think that matters, Your Honor.  It's

 7  testimony.

 8          THE COURT:  I mean, just — there's nothing in the

 9  video that's not in the deposition transcript; right?

10          MR. ALSAFFAR:  That's right.

11          THE COURT:  Go ahead.

12          MR. ALSAFFAR:  Thank you.

13     (Clip was played.)

14          MR. ALSAFFAR:  Start over.  Thank you.

15     (Clip was played.)

16  BY MR. ALSAFFAR:

17  Q.  Colonel, is it acceptable for a reasonably prudent

18  supervisory agent to supervise his agents with a "they know

19  how to read" mentality at Detachment 225?

20  A.  I assess that it is not.  The description just given by

21  former Special Agent Bustillo is not consistent with, frankly,

22  Air Force instructions or policy on leadership.  And an

23  ordinary, reasonably prudent supervisor would not expect your

24  agents to just do it for themselves and not be led.  They need

25  to be led.

781
LARRY YOUNGNER — DIRECT

1   That's the whole point of having a special agent in charge
2  or a superintendent or a detachment commander is to emphasize
3  the significant items both for investigative sufficiency but
4  also policies that are pushed down from DODIG or the secretary
5  of the Air Force or others.  At that time, sexual assault was
6  a very important policy matter.
7          THE COURT:  He's gone beyond the question.
8          MR. ALSAFFAR:  I agree with the judge.  I just put my
9  hand up.
10         Thank you, your Honor.
11         THE WITNESS:  I apologize.
12  BY MR. ALSAFFAR:
13  Q.  That's okay.
14     SAIC Bustillo also said, "I shouldn't have to lead."
15     Is that reasonably prudent for a supervising agent at
16  Detachment 225 regarding these instructions for fingerprint
17  and conviction data to supervise by saying, "I shouldn't have
18  to lead"?
19     Is that — you can answer.
20         MS. CHRISTILLES:  Your Honor, objection.  That wasn't
21  in the video.  He's talking about supervisory duties in
22  general.
23         THE COURT:  So he said, "I shouldn't have to lead."
24  And then he talked about minute details.
25         So I don't think he said he shouldn't lead at all,

LARRY YOUNGNER – DIRECT

1  but he qualified it as to minute details.

2          So do you want to rephrase your question?

3          MR. ALSAFFAR:  You bet.  You bet.

4          Thank you, Your Honor.

5  BY MR. ALSAFFAR:

6  Q.  Well, first of all, are — fingerprint submissions and

7  criminal history data, should that be considered a minute

8  detail by a supervisory agent?

9  A.  I assess that it's — because it is on the checklist for

10  supervisors, it's not a minor point.  And so, no, it's not a

11  minute detail, or else the OSI wouldn't have put it on that

12  very important checklist — both checklists.

13     So I disagree with that characterization.  It is an

14  important detail, not a minor detail.

15          MR. ALSAFFAR:  Your Honor, is it okay if I have a

16  five-minute break just to go over — I think we're concluding

17  here, but I just want to make sure and confer with my counsel.

18          THE COURT:  Can we get through cross by today?

19          MS. CHRISTILLES:  Your Honor, I don't even know what

20  time it is.

21          THE COURT:  It's 3:20.

22          MS. CHRISTILLES:  I'm not going to promise, Your

23  Honor, I will get through my entire cross today.  I can

24  certainly start, but I think it might take a couple of hours.

25          THE COURT:  Okay.  Let's take a ten-minute break.

LARRY YOUNGNER – DIRECT

1     (Recess.)

2          MR. ALSAFFAR:  Just a couple more questions, and I'll

3    be done.  May I proceed?

4          THE COURT:  Yes.

5    BY MR. ALSAFFAR:

6    Q.  Colonel, can you see me?  Can you hear me?

7    A.  I can hear you and see you, yes, sir.

8    Q.  Thank you, sir.

9         Okay.  We were talking about April 2012 and some of those

10   records in the case file.  I want to show you Joint Exhibit

11   Number 9.

12   A.  Okay.

13          MR. ALSAFFAR:  And just show the first — let's just

14   jump straight to it, Joint Exhibit 9, page 3.  We'll put that

15   up on the screen for you.

16          THE WITNESS:  Yes, sir.

17          MR. ALSAFFAR:  Joint Exhibit 9.  Thank you.

18   BY MR. ALSAFFAR:

19   Q.  If you look at the bottom paragraph there, can you read

20   that.

21        This states that May 14th–15th, 2012, so about two weeks

22   after that last mental health record, Holloman Air Force Base

23   High Risk for Violence Response Team convened to discuss

24   Kelley's mental health concerns.

25        Do you know what a High Risk for Violence Response Team

LARRY YOUNGNER – DIRECT

1   is?

2   A.   Yes.  It's a multidiscipline team on an Air Force

3   installation involving typically mental health, unit

4   commander, legal, and other services or helping organizations

5   that are involved with care for airmen on an installation.

6   Q.   Okay.  And the high risk for violence team — let me

7   reread this.

8       "Kelley's squadron leadership" — what does "squadron

9   leadership" mean?

10  A.   It typically means the commander and the first sergeant,

11  maybe their section supervisor as well.  So the lieutenant

12  colonel or major, as a commander, and then a first sergeant or

13  senior noncommissioned officer.

14  Q.   "Kelley's squadron leadership and his mental health

15  providers feel that he is a major threat to commit an act of

16  violence, and is currently institutionalized for mental and

17  emotional instability."

18      So that was a couple of weeks after the last document I

19  show you regarding his mental health test; correct?

20  A.   I'd have to compare them.  But, yes, I recall that it was

21  around that same time.

22  Q.   I want to show you one of the actual records for this High

23  Risk for Violence Response Team.

24      This is JEX Number 365, and it's page 150.  If we could

25  highlight that whole top section and just pull that up for the

LARRY YOUNGNER – DIRECT

1  colonel.

2      What's the date of this letter –– I'm sorry, this record?

3      First of all, can you tell us what the date is and what

4  record it's from?

5  A.  Yes.  It's dated 30 May 2012, and family advocacy

6  office –– typically, family advocacy convenes the High Risk

7  for Violence, you know, Response Team.  So it's under their

8  auspices.  They often fall under the medical group.

9  Q.  This record from Devin Kelley's Holloman Air Force Base

10 records states that HRVRT held –– is that –– what is HRVRT?

11 A.  High Risk for Violence Response Team.

12 Q.  Okay.  "High Risk for Violence Response Team held at the

13 request of the FAO."

14     What is FAO?

15 A.  Family advocacy office.

16 Q.  Okay.  I'm going to skip to the next sentence.  It says,

17 "The meeting included ADMs CC" ––

18     What does that mean?

19 A.  The active duty member's commander.  So ADM, active duty

20 member.  CC is an Air Force abbreviation for commander.

21 Q.  –– "first sergeant, SF" ––

22     What does SF stand for?

23 A.  Security forces representative, someone from the

24 49th Security Forces Squadron.

25 Q.  –– "OSI" ––

1      What does that stand for?

2  A.  Office of Special Investigations would have been Det 225

3  at Holloman.

4  Q.  —— "JAG" ——

5      What does that stand for?

6  A.  The judge advocate general office at Holloman.

7  Q.  —— "TM" ——

8      Do you know what that stand for?

9  A.  I believe it stands for transportation management, but I'm

10 not clear on that.  So I would have to ——

11 Q.  Was Devin Kelley in the Logistics Readiness Squadron or

12 traffic ——

13 A.  He was in the Logistics Readiness Squadron, and traffic

14 management was a subordinate section.  So that's what I recall

15 from my military experience.  That's what I would assume "TM"

16 means, without asking anybody about this particular meeting.

17 Q.  So this meeting —— this High Risk for Violence Response

18 Team included several supervisory members of the Air Force,

19 including his direct command and security forces and OSI;

20 correct?

21 A.  That's correct.

22 Q.  All right.  Next sentence, "It was determined by security

23 forces and OSI that ADM" ——

24      And "ADM" is Devin Kelley; right?

25 A.  Right, the active duty member, in this case, is referring

LARRY YOUNGNER - DIRECT

1  to Devin Kelley.

2  Q.  "It was determined by security forces and OSI that ADM is

3  a danger to the community given his past statements and

4  possibly a danger to FM/W."

5      What does "FM/W" means, if you know?

6  A.  So to family members.  And I assume "W" was wife.

7  Q.  So May 30th of 2012, the Air Force held in a High Risk for

8  Violence Response Team on Devin Kelley and determined that he

9  was a danger to the community -- security forces and OSI

10 determined he was a danger both to the community generally and

11 to his specific domestic partner.

12     Is that fair to say?

13 A.  Yes.

14 Q.  And it also concluded that Devin Kelley -- the Air Force

15 concluded that Devin Kelley, in May of 2012, was also a danger

16 to family as well; correct?

17 A.  Yes, that's --

18         MS. CHRISTILLES:  Objection, Your Honor.  Leading the

19 witness, but...

20         THE COURT:  That's sustained.

21 BY MR. ALSAFFAR:

22 Q.  Did the Air Force High Risk for Violence Response Team

23 determine that Devin Kelley, on May 13th, 2012, was also a

24 danger to his family?

25 A.  That's the plain meaning, yes, of that sentence.

LARRY YOUNGNER – CROSS

1    It was determined by security forces and OSI that

2  Devin Kelley was a danger to the community given his past

3  statements and possibly a danger –– so the qualifier was

4  possibly a danger to family.

5         MR. ALSAFFAR:  Your Honor, pass the witness.

6         THE COURT:  Any cross?

7         MS. CHRISTILLES:  Yes, Your Honor.

8                    CROSS-EXAMINATION

9  BY MS. CHRISTILLES:

10  Q.  Good afternoon, Colonel Youngner.  Can you hear me okay?

11  A.  Yes, ma'am.  I can.  Good afternoon.

12         MS. CHRISTILLES:  I'm just looking at the court

13  reporter.

14         Can she hear me okay?

15         THE REPORTER:  Yes, ma'am.  Thank you.

16  BY MS. CHRISTILLES:

17  Q.  Colonel Youngner, I just want to go through a little bit

18  your CV.  I know you talked to plaintiffs' counsel about that

19  already.  Okay?

20  A.  Yes, ma'am.

21  Q.  So it's fair to say that from 1989 to 1991, according to

22  your CV, you list yourself as trial counsel; correct?

23  A.  Yes, ma'am.  I believe so.  I have not opened my file.  I

24  do have my report.  But just from memory, yes, ma'am, that

25  would be correct.

LARRY YOUNGNER – CROSS

1  Q.  As trial counsel, you are the judge advocate meeting with

2  the case agent to go over the case file; correct?

3  A.  Yes, ma'am, that's correct.

4  Q.  But your job title at that time was not actually trial

5  counsel, was it?

6  A.  It wasn't because the — again, no, it wasn't, to answer

7  your question.

8  Q.  In fact, you were the chief of claims?

9  A.  I was the chief of claims, initially.  And then I went

10  through other assignments while I was also serving as a trial

11  counsel.

12      The Air Force approaches this practice different than the

13  other services, but I don't want to — I'm sorry.  I'll stop

14  right there.  I answered your question.

15  Q.  That's right.  You worked on environmental law, labor law,

16  and claims.

17      Those were your prime duties; correct?

18  A.  When I wasn't doing a court-martial.  When we were doing a

19  court-martial, that case took priority over the — if you

20  will, the assigned duty you had.

21      But, yes, ma'am, my primary duty on my officer evaluation

22  reports was as initially chief of claims and then, I believe,

23  chief of labor and environmental law during that two-year

24  period.

25  Q.  And during that two-year period, you only tried about four

LARRY YOUNGNER - CROSS

1  court-martials as second chair; correct?

2  A.  I'd have to go back and look at the count, but it was

3  somewhere in that range of four to six.  There were also some

4  discharge board proceedings.

5      So, yes, ma'am, that's a fair, you know, summary.  It's in

6  the ballpark.

7  Q.  So three or four cases where you were working with OSI

8  agents going over their case file?

9  A.  Yes, ma'am.  But also there were cases that were disposed

10 of alternately where I worked pretty closely with OSI in where

11 a decision was made not to take it to a court-martial but an

12 alternate disposition.

13     So there were probably another -- about twice that --

14 about, I'd say, eight cases that I worked with them pretty

15 closely, four of them went to court-martial.

16 Q.  Fair to say, though, you weren't worked with OSI case

17 agents on a daily basis?

18 A.  At that time in my career, not on a daily basis.  I was

19 when I was on a court -- even that, no, I can't say daily.  It

20 peaked -- it ebbed and flowed depending upon where we were on

21 preparing for trial.

22 Q.  Okay.  In 1991, you transitioned over to the role of area

23 defense counsel?

24 A.  Yes, ma'am.

25 Q.  In your position as a defense counsel, you're defending

LARRY YOUNGNER – CROSS

1  airmen excused of either misconduct or a crime; correct?

2  A.  Yes.

3  Q.  As a defense attorney, you certainly weren't meeting with

4  OSI agents to help them develop the legal sufficiency of their

5  case; correct?

6  A.  That's correct.  I was doing just the opposite.  I was

7  challenging their investigative sufficiency.

8  Q.  In 1992, you became a circuit defense counsel?

9  A.  Yes, ma'am.

10  Q.  Held that position for two years?

11  A.  Yes, ma'am.

12  Q.  As a circuit defense counsel, you certainly weren't

13  working with OSI agents to develop the legal sufficiency of

14  their case; correct?

15  A.  Again, that's correct.  I was just questioning their

16  challenging the legal sufficiency as I reviewed a case for

17  defense.

18  Q.  So you wouldn't have been looking through their case file

19  for fingerprints; correct?

20  A.  Actually, I — in general, that's correct.  I looked

21  through their case file as a defense counsel for gaps in the

22  elements-of-proof worksheet.  If, however, I see that they

23  didn't have probable cause — and this occurred on a couple of

24  instances — or they made mistakes with the constitutional

25  rights of an accused, then we'd use that at trial to either

LARRY YOUNGNER - CROSS

1  suppress evidence or take other actions or to pursue alternate
2  dispositions.
3       So we did review the entire case file.  And if I saw an
4  error — I will tell you I never saw missing fingerprints in
5  those cases that I reviewed.
6  Q.  Okay.  And I think that was my question, whether or not
7  you were looking for fingerprints in the OSI case file.
8  A.  It would be — I was looking at it overall.  I was not
9  going into it just to look for fingerprints.  I was going into
10 it to look for overall investigative sufficiency, but that
11 would include fingerprints, on occasion.
12 Q.  Okay.  And we'll talk a little bit more about that in a
13 moment.
14 A.  Yes, ma'am.
15 Q.  In 1994, you became a deputy SJA; correct?
16 A.  Yes, ma'am.
17 Q.  Held that position for six months?
18 A.  Yes, ma'am.
19 Q.  As a deputy SJA, you're second in the supervisory chain of
20 the judge advocates assigned to the office; correct?
21 A.  That's correct.
22 Q.  You have a whole host of duties as a deputy SJA; correct?
23 A.  To some extent; though, my case was unique.  But overall,
24 that's correct, in general, for the Air Force.
25      But that was not the case for me.  And I can explain why,

LARRY YOUNGNER – CROSS

1  if you want to know.

2  Q.  Well, I think you tried a couple of cases as deputy SJA,

3  primarily because you had a leftover defense case; correct?

4  A.  As a deputy SJA, I tried — I prosecuted three general

5  courts-martial at Rein-Main Air Base where I was extensively

6  working with the OSI agents, as described before.

7      I also had a major negligent homicide case with the

8  Blackhawk shoot-down that I was defending.  So that's why I

9  didn't start out as the staff judge advocate for six months

10 because I was toggling between one case as a defense counsel.

11     And the other three cases at Rein-Main were as a

12 prosecutor.  So I was traveling back to the States for the

13 defense counsel role.

14 Q.  Okay.  And then after six months, you transitioned into

15 the staff judge advocate role?

16 A.  Yes, ma'am, that's correct.

17 Q.  As a staff judge advocate, you are no longer trying the

18 cases; correct?

19 A.  That's correct, yes, ma'am.

20 Q.  In fact, you no longer sit down with the case agents to

21 discuss the legal sufficiency of their case file?

22 A.  No, ma'am, that's not true, especially at a small

23 installation line Rein-Main.  At one point, we were down to

24 three judge advocates there.  They were looking to downsize

25 and then close the base.

LARRY YOUNGNER – CROSS

1    So long story made short is we would sit down and do a
2  cops-and-robbers meeting with the OSI, and usually the --
3  well, and we would do a status and discipline meeting
4  involving OSI and security forces.
5    So those two meetings were opportunities for us to work,
6  though, the status and discipline wasn't the detail that you
7  were just asking about.  But the cops-and-robbers meeting, we
8  called it, we would get into investigative sufficiency.  And
9  it would be myself and the security forces squadron commander
10 and the OSI det commander or superintendent along with
11 supporting staff.
12   And that was an important meeting for us.  It varied from
13 installation to once a week to once a month.  I'd say, on
14 average, it was more like once a month.
15 Q.  Okay.  At the cops-and-robbers meeting, though, OSI
16 doesn't bring their entire case file, do they?
17 A.  Unless there was one that was a command emphasis item,
18 they do not.  That's correct.
19 Q.  Now, when we're talking about an OSI file, they might have
20 the report of investigation; correct?
21 A.  It depends on what they want to bring.  They would have
22 the report of investigation, if it's completed.  They would
23 have agents' notes.  There's typically a six-part folder on
24 the hard -- I'm dating myself now, but -- so it really
25 depended upon what the command was interested in talking about

1  or the — for cops-and-robbers, what they wanted to compare

2  and get into.

3      If we had a court-martial coming up, we might spend more

4  time on that.  And what I would do then is I had the trial

5  counsel with me.  And, frankly, we had this management

6  meeting, and then I would back off and let the trial —

7  literally sometimes leave so the trial counsel could stay

8  there and work with the OSI agent.

9      Anyway, I don't want to go explaining too much.  I just

10 want to make sure I'm responsive to your questions.

11 Q.  So it's your testimony that during a cops-and-robbers

12 meeting, OSI would bring their entire case file, to include

13 their agent notes and the file with the fingerprints in it?

14 A.  It is — so every time, no.  On occasion, possibly.  I

15 would say it is more likely than not they would not bring the

16 entire case file.

17     But if we were — I don't want to get off on war stories

18 or anecdotes to save the Court's time.  But I can think of

19 specific examples where we would bring the entire case file

20 because we had an issue.  And so to pursue that issue, it was

21 a good use of our time to work out the concerns between the

22 prosecution team and the investigative team.

23     There might be a confidential source that they don't want

24 to reveal to us who we want to interview.  And if we're going

25 to get the successful drug prosecution done, I need my trial

LARRY YOUNGNER — CROSS

1   counsel to be able to talk to the confidential source.

2       And so those were the kind of issues we'd hammer out at

3   some of these meetings, and they would bring the whole file.

4   Q.  Do you recall telling us during your depositions that it

5   was like pulling teeth to get the entire OSI case file?

6   A.  It often was, especially as you're a junior trial counsel.

7   You might be able to sit down with an agent, but that was —

8   there was a love-hate relationship at times between the SJA's

9   office and the OSI office, even though we're all on the same

10  team.

11  Q.  In fact, there's also a healthy tension between the

12  prosecutors, or the trial counsel, and the staff judge

13  advocate at the case; correct?

14  A.  Hmm.  I don't know that I would describe it that way.

15  There can be.

16      I mean, clearly, the staff judge advocate is their rater,

17  their supervisor.  So in that regard, there might be some

18  discomfort when you ask tough questions of a subordinate about

19  have you — you know, why don't you — I use an

20  elements-of-proof checklist with my attorneys.  And if they

21  haven't completed that trial brief, that checklist, they're

22  going to get some hard questions.

23      So that, I think, would be fair to characterize as,

24  perhaps, tense.

25  Q.  Colonel Youngner, didn't you actually say in your

1  deposition, "In fact, because you are advising command, there
2  is often a healthy tension between the prosecutor and the
3  staff judge advocate looking at a case and the case agents"?
4  A.  Yes.  Describing the tension between the JA side, on one
5  hand, and the case agents, on the other.
6       So I think it depends on where you put the comma in that
7  clause, but I was putting the SJA and the prosecutor together
8  on one side, the OSI agents on the other.
9  Q.  So there's a healthy tension with the case agents?
10  A.  Yeah, I think there can be.  And then with the DetCo or
11  superintendent who wants to — you know, we're each kind of
12  protecting our rice bowl of our subordinates.  And where we
13  break down those barriers and have good working relationships,
14  we get a lot more done.  And we were able to do that
15  effectively, for example, at Rein — well, at other
16  installations.  I'll just stop there.
17  Q.  But you couldn't be thoroughly involved in the case, as
18  the SJA, because you would eventually have to write the staff
19  judge advocate's recommendation for the commander; correct?
20  A.  Yes, ma'am, that's — I could not try the case.  In fact,
21  it got to the point where I realized my limitations, so I
22  would not sit in and observe the court-martial because I found
23  myself wanting to get up and object.  And, you know, I can't
24  run it for them.
25       So I left them alone to do their job and trusted they were

LARRY YOUNGNER - CROSS

1  prepared, and it was just more appropriate that way.

2  Q.  Because you had to write that staff judge advocate

3  recommendation; correct?

4  A.  Well, you have to objectively assess everything in there

5  when you write that recommendation, yes, ma'am.

6      And so the military justice system does have a unique role

7  where the staff judge advocate recommends to the convening

8  authority, initially, whether to prefer or refer the charges

9  to begin with.  Then when the whole case is done, makes a

10  recommendation as to disposition, which is the staff judge

11  advocate recommendation that you're referring to.

12      And, you know, there are instances where you may recommend

13  a disposition that is, perhaps, more lenient than what was

14  decided at the trial.

15  Q.  So it's safe to say that after 1994, you never held a

16  position as a trial counsel again in the military; correct?

17  A.  I believe that's correct, yes, ma'am.  And —

18  Q.  And the —

19  A.  I'm sorry.

20  Q.  And the NICS system became operational in 1998; correct?

21  A.  As I understand the Brady Act, it was implemented after

22  that was passed, yes, ma'am.

23  Q.  During your career, you have never been involved in a case

24  where someone who was prohibited from purchasing firearms was,

25  nonetheless, able to purchase firearms; correct?

1  A.  I believe that's correct.  One caveat to that.  I did
2  represent, in my civilian practice, someone who was registered
3  as a firearms offender.  It was the Williams trial, if you
4  look at that in my CV.  That's since I retired in 2014.
5       He was convicted of rape, and we were able to secure an
6  acquittal on appeal and then at retrial.  And I did advise him
7  on how to proceed with basically getting -- actually getting
8  untitled and removed from the database.  So that's the only
9  instance I've had prior to -- in this area prior to being an
10  expert for the plaintiffs in this case.
11  Q.  And I think that's a good point, Colonel Youngner.
12       That instance where you were trying to get your client
13  removed from the NICS database, that was the first experience
14  you'd ever had reviewing any of the regulations dealing with
15  the Air Force or the DOD's responsibility to submit criminal
16  history data before this case; correct?
17  A.  Not exactly.  Just from a broad-brush perspective, as we
18  had -- so we would do annual continuing legal education for
19  staff judge advocates.  I also attended a staff judge advocate
20  course and then taught at it later.
21       So these requirements -- for example, you'll see on the
22  charge sheet -- well, excuse me -- on the report or result of
23  trial for Devin Kelley DNA processing required, domestic
24  violence offense.
25       So there were -- under Air Force Instruction 51-201, which

1 is the Administration of Military Justice, there would have
2 been changes in effect requiring compliance with these
3 reporting requirements.  There was, again, in this case
4 some –– so let me stop and answer your question.
5     I did have exposure to these regulations and requirements
6 in my capacity as a supervisory staff judge advocate.  Though,
7 as I –– I don't want to overstate my credentials.  I just want
8 to make it clear that as a supervisory SJA, I made sure my
9 NCOs were following checklists at the general court-martial
10 convening authority level.
11     So at 9th Air Force, for example, or at the Air Force
12 Special Operations Command, I would review all general
13 court-martials and do the SJA recommendation.  I would have to
14 check our checklist and do those –– kind of make sure we
15 complied with these requirements.
16     The JAG corps didn't have that requirement to submit the
17 data, but it was –– it was something I was aware of, at least
18 in my role as a staff judge advocate, of these requirements.
19 But I was not responsible for submitting that data.  And so I
20 was not into the details of who had to submit it when, but I
21 was familiar with the regulations.
22 Q.  Nor were you extremely –– I'm going to quote you ––
23 extremely familiar with DODI 5505.11 before this case;
24 correct?
25 A.  That's correct, yes, ma'am.

LARRY YOUNGNER – CROSS

1  Q.  In fact, the first time you actually familiarized yourself
2  with that publication was in preparation for this case?
3  A.  I don't agree with that.  I'm pretty certain — and check
4  what I've said in the deposition before.
5      But I recall having been familiar with the DOD — just
6  generally about DIBRS, in particular, as a requirement and a
7  program.  And, frankly, when I was at AFCENT, we began to do
8  biometric data on overseas installations.
9      And so there was some question about what we could collect
10  on civilian employees, particularly third-country nationals
11  overseas.  And so I was aware, but for different reasons,
12  of — generally of the DOD instruction.
13  Q.  Okay.
14  A.  But I don't want to — I wasn't intimately familiar with
15  it.  No, ma'am, not like I am now with having prepared for
16  this.
17  Q.  All right.  You also talked about AFOSI Manual 71-121;
18  correct?
19  A.  Yes, ma'am.
20  Q.  During your time in the Air Force, you were not familiar
21  with any of the written OSI policies and procedures; correct?
22  A.  I was not given — I can't — no, that's too broad of a —
23  you know, not familiar with any?  I was rarely able to obtain
24  a complete copy — I don't know that I ever obtained a
25  complete copy of those instructions or handbooks, ma'am.

LARRY YOUNGNER – CROSS

1    However, as issues came up on cases, we would be given

2  access to certain matters.  And we would also have to

3  coordinate, as staff judge advocates, with the OSI staff judge

4  advocate.  So there was actually a JAG at Headquarters OSI in

5  Quantico who we would talk to.

6    Again, if we had any problem with getting a confidential

7  informant disclosed or if we had some discovery concerns

8  working with the OSI agents.  Then we would get into a

9  back-and-forth about what we were allowed to see and know.

10    But to be clear, I wasn't fully aware of those

11  instructions on the OSI side.  I knew they existed.  I didn't

12  have the full contents of those.

13  Q.  Because those publications are restricted-access items?

14  A.  Yes, ma'am, that is correct.

15  Q.  In fact, when you were in the Air Force, it took a court

16  order to obtain part of those AFOSI manuals or instructions?

17  A.  Almost always, yes, ma'am.

18  Q.  And you mentioned OSI JA.

19    You never worked for OSI JA, did you?

20  A.  No, ma'am, I did not.

21  Q.  So it's fair to say you did not review all of AFOSI

22  Manual 71-121 during your time in the Air Force?

23  A.  That's true, yes, ma'am.

24  Q.  The first time you've ever read through that whole manual

25  was for this case?

LARRY YOUNGNER – CROSS

1  A.  Yes, ma'am.  In the last two years, since late December, I

2  believe, 2019, January 2020.

3  Q.  You've never been an OSI agent?

4  A.  That's correct, I have not.

5  Q.  You've never attended the OSI training school; correct?

6  A.  Only as adjunct faculty.

7  Q.  Okay.  And let's talk a little bit about your role.

8      You weren't part of the permanent faculty at FLETC, were

9  you?

10 A.  No, ma'am.  And this was actually at Bolling, before the

11 OSI Academy moved to the Federal Law Enforcement Training

12 Center in Brunswick.

13 Q.  Okay.  You'd go down there and teach a course on trial

14 skills; correct?

15 A.  Yes, ma'am.  I was adjunct faculty at Bolling Air Force

16 Base before they relocated for those years that I was as an

17 area defense counsel that you talked about before and as a

18 circuit defense counsel.

19 Q.  So when you were teaching at — the OSI agents, you were

20 there in your capacity as a defense counsel?

21 A.  Yes, ma'am.

22 Q.  So you weren't teaching them about their requirements for

23 submission of fingerprints?

24 A.  That's right.  I was not.

25 Q.  In your OSI — or in your military career, you never

1  supervised OSI personnel?

2  A.  No, ma'am, I did not supervise OSI personnel.  I worked

3  with their DetCo and superintendent, but I did not directly

4  supervise them.  We did provide guidance on case

5  investigations, but I did not supervise them.

6  Q.  You were never part of a security forces squadron?

7  A.  I was when I deployed to Iraq.  I was part of the

8  820th Security Forces Group and the 822nd Security Forces

9  Squadron in 2013 when we went to Talil Air Base.  So I

10  actually deployed as security forces.

11      Again, I was attached to them for the deployment, but my

12  role there was —— to be clear, was not as a law enforcement

13  person.  I was the legal adviser to the staff judge advocate

14  for that deployment embedded with the 822nd Security Forces

15  Squadron and the 820th Security Forces Group.  They were out

16  of Moody Air Force Base, Georgia.  And we went to Talil in

17  Al Nasiriyah, Iraq, in 2003.

18  Q.  But you were not a security forces ——

19  A.  I was not credentialed as a security forces law

20  enforcement officer, no, ma'am.

21  Q.  Never attended any of the security forces training;

22  correct?

23  A.  That's correct, yes, ma'am.

24  Q.  Colonel Youngner, I want to go through some of what

25  plaintiffs' counsel went through with you on AFOSI

LARRY YOUNGNER — CROSS

1  Manual 71-121.  Okay?

2  A.  Yes, ma'am.

3  Q.  Plaintiffs showed you — and that's JEX 4.

4  A.  Yes, ma'am.

5  Q.  Go down to paragraph 4.24.1.3, page 51.

6      Okay.  And so this is the paragraph that — 424.1.3, the

7  case file.

8      This is the paragraph that plaintiffs' counsel is talking

9  to you about; correct?

10 A.  Yes, ma'am.  It was one of them.

11 Q.  Okay.  And this is talking about the monthly reviews;

12 correct?

13 A.  Yes, ma'am.

14 Q.  And at the bottom of that, it says, "The case agent and

15 supervisory or senior agent will ensure every case file is

16 reviewed monthly to ensure investigative sufficiency progress

17 and data integrity between the ROI and activity narrative and

18 note fields."  Correct?

19 A.  Yes, ma'am.

20 Q.  I want to skip down to paragraph 4.24.4.  It's on the same

21 page.

22     And it says, "Use the AFOSI investigative sufficiency

23 checklist at Attachment 7" —

24     Do you remember looking at Attachment 7 with plaintiffs'

25 counsel?

LARRY YOUNGNER — CROSS

1   A.  Yes, ma'am, I do.

2   Q.  — "or a more comprehensive checklist, such as a region

3   case review checklist as a guide for reviews."

4       Do you see that language there, Colonel?

5   A.  Yes, ma'am.

6   Q.  Then it says in that highlighted portion, "Merely use it

7   as a guide for discussion during the review."

8       Do you see that, Colonel?

9   A.  Yes, ma'am, I absolutely do.

10  Q.  In your experience reviewing Air Force policies, is that

11  language mandatory to use Attachment 7?

12  A.  Ma'am, it is not mandatory.  It is telling the reader that

13  this is a guide.  And the fact that they offer that or a more

14  comprehensive checklist — you know, my understanding is the

15  Air Force offers a checklist because they really want you to

16  use it.  Usually, we come up with a checklist when we've

17  identified a problem in the Air Force.

18      So to fix that problem, we now have a checklist for you to

19  follow.  So a prudent person would use that checklist to make

20  sure they get it right.  But it is not mandatory, to be more

21  precise to your question.

22  Q.  So it would be within the discretion of the supervisor

23  whether or not to use Attachment 7; correct?

24  A.  Per this section, yes, ma'am.

25  Q.  Now, you talked about, with plaintiffs' counsel, weekly

1  reviews; correct?

2  A.  Monthly and weekly reviews, yes, ma'am.

3  Q.  Can you point me to the portion of this manual or any

4  AFOSI regulation that requires a mandatory weekly review of

5  the file?

6  A.  No, ma'am.  I believe the only thing I could point to

7  would be monthly reviews.  I do recall witnesses testifying

8  about weekly reviews, but I don't recall a point in this

9  manual that says anything other than monthly reviews once it's

10  been opened.

11  Q.  So doing a weekly review would be at the discretion of the

12  supervisor?

13  A.  Yes, ma'am.  Or the case agent themself, if they wanted to

14  be, you know, diligent.

15  Q.  Now, I want to talk about -- I think you mentioned this

16  earlier when we were talking about you reviewing the

17  investigative sufficiency of the file.  Can we move to that.

18  A.  Yes, ma'am.

19  Q.  As a judge advocate.

20  A.  Now, you are talking about the Kelley file in particular?

21  Q.  No, Colonel Youngner.  I'm just talking about your

22  experience as a judge advocate reviewing with case agents the

23  legal sufficiency of the file.

24  A.  Yes, ma'am.

25  Q.  Okay.  Now, when you're reviewing -- in your Air Force

LARRY YOUNGNER — CROSS

1  career, when you were reviewing the legal sufficiency of the

2  file, you can't ever remember asking agents if they had

3  submitted fingerprints, can you?

4  A.  I cannot remember that, ma'am.

5  Q.  You were just discussing with the agents what information

6  they would need to prove their case?

7  A.  The focus was on the elements-of-proof worksheet, you

8  know, witnesses and evidence needed to prove that case.  And

9  then if there were questions over rights advisements or

10 probable cause, we would discuss those.

11 Q.  Sure.  But nothing about fingerprints?

12 A.  As I recall — frankly, I remember the very first time I

13 went down to the det at Bolling and we had the folder.  I

14 didn't know there was a thing called case notes, and they

15 explained that to me.  And that very first time, I actually

16 saw a fingerprint card.

17     And that predates the NICS requirement, but — so it was

18 kind of cool to me, as a young captain JAG, to see just what

19 all went into, frankly, the really hard work that a good OSI

20 agent does to put that file together.  So I have seen them

21 before, coincidentally.  But that didn't cause me, at that

22 stage of my career, as a captain, to say, "Oh, don't forget

23 about these fingerprints."  And, frankly, timing-wise, that

24 was in the early 90's.

25 Q.  Nor did you discuss fingerprint submission with security

LARRY YOUNGNER — CROSS

1  forces personnel; correct?

2  A.  No, ma'am.  That's correct.

3  Q.  It's not something you would do with security forces?

4  A.  As a staff judge advocate, no, unless there was some —

5  you know, if we had any — so short answer is no.  Unless

6  there was some reason to, no, there would not.

7  Q.  Now, I want to talk a little bit about security forces'

8  responsibilities to submit final disposition reports.  Okay?

9  A.  Yes, ma'am.

10  Q.  And you said this a couple of times when you were talking

11  to plaintiffs, and so I just want to clear this up.

12  A.  Certainly.

13  Q.  You were talking about investigative responsibility.

14      Do you remember that topic?

15  A.  Generally, yes.

16  Q.  Okay.  And you said that, generally, one agency had

17  investigative responsibility for the case; correct?

18  A.  Yes, I did.

19  Q.  You've reviewed the Kelley case; correct?

20  A.  Yes, I have.

21  Q.  And you know that SF, security forces, did some

22  investigation on an alleged assault of Tessa Kelley; correct?

23  A.  That's correct.

24  Q.  And that investigation resulted in a letter of reprimand;

25  correct?

LARRY YOUNGNER – CROSS

1   A.  I'm aware of that.  That was from February 2012, if I'm

2   not mistaken.

3   Q.  And a letter of reprimand is not a criminal action;

4   correct?

5   A.  It's an administrative sanction.  It's an unfavorable

6   information file matter.

7   Q.  Not a criminal action?

8   A.  No.  It's to reflect the conduct.  The conduct that

9   it's –– it's basically a censure, a reprimand.  And it's based

10  on typically some type of either poor performance or

11  misconduct.  So there was misconduct.  There was a criminal

12  act.  It's just it wasn't a sentence or a conviction.  It was

13  simply an administrative sanction for the criminal act cited

14  in that –– and a very low-level slap on the wrist, if you

15  will, as how I would describe that.  It's certainly not a

16  conviction.

17  Q.  And then OSI did what you would characterize as a separate

18  investigation on domestic abuse concerning Tessa Kelley;

19  correct?

20  A.  That predated it in June of 2011, prior to the security

21  forces doing their separate incident.  So OSI took the

22  fingerprints in '11.  The security forces did not take

23  fingerprints in February of '12 –– 2012.

24  Q.  And I'm not talking about fingerprints.

25      I'm asking did OSI conduct its own separate investigation

LARRY YOUNGNER - CROSS

1  on domestic violence regarding Tessa Kelley?

2  A.  Yes, ma'am.

3  Q.  Okay.  And that also included the allegation of the

4  assault on the stepson; correct?

5  A.  Ultimately, it did.  Yes, ma'am.

6  Q.  And that investigation resulted in a court-martial;

7  correct?

8  A.  That's correct.

9  Q.  And that court-martial — after that court-martial, there

10  was a final disposition report; correct?

11  A.  Yes.  There were two opportunities for final disposition

12  reports.

13  Q.  Colonel Youngner, I'm not asking about opportunities.

14     All I'm asking is, at the end of that court-martial, there

15  is a result of trial that's a final disposition report;

16  correct?

17  A.  There are — is a report, a result of trial.  And there

18  are two final disposition reports in the Kelley case.

19  Q.  Okay.  And on that report of result of trial, there's a

20  distribution list; correct?

21  A.  That's correct.

22  Q.  Ten entities on there, isn't there?

23  A.  I'd have to count the number, but it sounds right.

24  Q.  Not all of those entities have a requirement to submit

25  that report; correct?

1  A.  Yeah.  The only two that have a requirement are the

2  security forces confinement facility supervisors and the OSI.

3  The rest of them do not have a requirement.

4  Q.  And the only reason that security forces has the

5  responsibility is because there was confinement; correct?

6  A.  That's correct.  For AFI 31-, I believe it's 205.

7  Q.  Okay.  So they don't have an independent responsibility

8  just because the investigation of the assault of Tessa Kelley

9  resulted in a court-martial conviction; correct?

10  A.  I disagree.  They have an independent responsibility

11  through their own instruction, AFI 31-205, that requires them

12  to because of the confinement and the nature of the offenses

13  that led to that confinement being subject to punishment

14  beyond a year and domestic violence.

15  Q.  But because of the confinement, security forces has —

16  A.  Yes.  Absolutely.

17  Q.  Okay.

18  A.  Absolutely.

19  Q.  OSI has the responsibility because they were the lead

20  investigative agency; correct?

21  A.  That's correct, yes, ma'am.

22  Q.  Okay.  So the reason that there's the responsibility to

23  submit that final disposition report — it's two different

24  reasons; correct?

25  A.  That's correct.  Absolutely.  Yes, ma'am.

1   Q.  Okay.  So if security forces -- if Devin Kelley had not

2   been sentenced to confinement, hypothetically, after this

3   court-martial, he just got a bad conduct discharge, he had not

4   been sentenced to confinement, security forces wouldn't have

5   had a responsibility to submit the report; correct?

6   A.  I believe you are correct there.  The only question I have

7   on this case is, because he was in pretrial confinement, you

8   know, would there have -- I would have to go back and check

9   31-205 to see what is the criteria requiring submission when

10  someone is convicted but not sentenced to any more

11  confinement.

12      Because there could be a judge -- I've seen cases where

13  the pretrial confinement period was long enough to satisfy the

14  sentence to confinement, so to get a bad conduct discharge and

15  no additional time.

16      But back to your hypothetical, I could imagine -- and I

17  believe there could be a scenario where there wouldn't have

18  been an independent security forces requirement, but those

19  aren't the facts of this case.  The facts of this case are

20  there was an independent requirement.

21  Q.  Because of the confinement?

22  A.  Yes, ma'am.

23  Q.  Okay.  Not because security forces had investigated some

24  abuse of Tessa Kelley that resulted in an LOR?

25  A.  No.  The issue with security forces had to deal with

LARRY YOUNGNER — CROSS

1  fingerprints as the second prong.  And I'll leave that to

2  y'all to — let me stop there.  Yes, ma'am.

3  Q.  Okay.  Now, you talked a little bit about — while we're

4  on the subject of security forces — the DODIG report that

5  indicated that security forces only had a 64 percent

6  completion rate or submission of final disposition reports;

7  correct?

8      Do you remember talking about the DODIG report, JEX 1,

9  with plaintiffs' counsel?

10         MR. ALSAFFAR:  Objection, Your Honor.  It's just —

11  counsel is misstating the evidence.  It's 60 percent failure

12  rate, not compliance rate in that report.

13         THE COURT:  You can clean that up.

14         Go ahead.

15  BY MS. CHRISTILLES:

16  Q.  Colonel Youngner, do you remember talking about the

17  compliance rate of security forces, as referenced in that

18  DODIG report?

19  A.  Yes, ma'am, I do remember that.  I think it was the 2017

20  report.

21  Q.  Sure.  Do you remember what OSI's compliance rate was in

22  that report?

23  A.  It was much higher.  They had about a 88, an 87-or-so

24  percent compliance.  They were missing 12 or 13 percent.

25      So the aggregate for the Air Force was what you had, the

```
 1  high 60 percent number for too, but that was mainly because of
 2  security forces.
 3  Q.  So if we look at JEX 1 at page 31.
 4      I won't make you guess on what that compliance rate was.
 5  Just take a look.
 6  A.  Okay.
 7  Q.  So, Colonel Youngner, if you look at the bottom of that
 8  document, which is part of JEX 1 which plaintiffs' counsel
 9  showed you.
10  A.  Right.
11  Q.  It looks like a 93.86 percent success rate for
12  fingerprints and 93.48 percent success rate for final
13  dispositions; correct?
14  A.  Yes, that's correct.
15  Q.  Okay.  Let's talk a little bit about the evidence you did
16  review for this Kelley case — or for the Kelley case.
17      Okay, Colonel Youngner?
18  A.  Certainly.  Yes, ma'am.
19  Q.  Okay.  Sorry.  Plaintiffs' counsel was getting up, and I
20  thought he was going to object to me.
21          MR. ALSAFFAR:  Sorry.  I'm just grabbing a binder.
22  BY MS. CHRISTILLES:
23  Q.  All right.  I want to go back to what plaintiffs' counsel
24  talked to you about.
25      They talked to you about information that was in a barment
```

LARRY YOUNGNER - CROSS

1   letter; correct?

2   A.   Yes, ma'am.   The recommendation and then two days later --

3   I think it was the 29th of March '13, the barment letter, the

4   actual order.

5   Q.   And it talked about in there some alleged threats to

6   leadership; correct?

7   A.   Yes, ma'am.

8   Q.   And I think that you indicated that there were four

9   instances of threats to leadership?

10  A.   Well, there were -- I think the question, as I recall,

11  included threats known by leadership.   Some were to leadership

12  and some were to a former supervisor.   The last one I recall

13  was communicated Master Sergeant Bizzack, and it was after

14  Kelley had separated.

15       But on the barment letter, there were threats

16  communicated, I believe, to -- so, yes, to answer your

17  question, there were probably three, I think, while he was

18  still on active duty that were known at the time of that

19  barment letter, to the best of my recollection.

20  Q.   He told his wife, correct, that he -- if he had a shotgun,

21  he would shoot his leadership, allegedly?

22  A.   Yes.

23  Q.   And at the time, that was Tessa Kelley, correct?

24  A.   That's correct, yes, ma'am.

25  Q.   So that was a communication to his wife?

1  A.  Yes, ma'am, that's correct.

2  Q.  Okay.

3  A.  And I don't know if she then communicated that to — or

4  when she would have passed that on to the OSI agents, I

5  believe, in the case.

6  Q.  And then you referenced some alleged threats to Master

7  Sergeant Bizzack; is that correct?

8  A.  Well, it was passed on to Sergeant Master Bizzack.  I'm

9  trying to remember if it was Ms. Rowe.  But it was another —

10  it was a supervisor who then passed that on.  There was also,

11  I believe, a Sergeant Edwards who he may have discussed some

12  concerns with.

13     But, again, I'm trying to keep the date — I'd have to go

14  back and review my report or other matters to find those

15  specific instances.

16     And then I don't know what was communicated out of Peak to

17  the leadership, but the letter — the barment letter that you

18  oriented me to cited the nature of the threats, and I'm trying

19  to recall what I reviewed.

20     Those seem to sick out in my mind, those three.

21  Q.  Okay.  Well, let's take a look at the statement of

22  Ms. Rowe that she made after the shooting, and that's JEX 511.

23     I'm just trying to get up here so we can blow it up for

24  you.

25  A.  Yes, ma'am.

818

LARRY YOUNGNER – CROSS

1            MS. CHRISTILLES:  It's the second paragraph there.

2  BY MS. CHRISTILLES:

3  Q.  Ms. Rowe says she first meets Kelley in 2010.  Upon

4  meeting Kelley, she immediately thought he was odd and even

5  told co-workers they needed to keep an eye on him because he's

6  the type of guy who will come to shoot us.

7       Do you remember viewing that statement?

8  A.  I do, yes, ma'am.

9  Q.  Did you review any statements from Ms. Rowe in the OSI

10  investigative report?

11  A.  I'd have to — I'd have to go back and look at that.  I

12  just don't recall.  So I don't recall.  I may have, but this

13  may — I just — I'm not certain.  So since I'm not certain, I

14  can't confirm that I did.

15  Q.  So Ms. Rowe opines after the shooting — or states to

16  investigators after the shooting — and I can pull up the date

17  on this, if you'd like.

18       But she tells investigators after the shooting that she

19  told co-workers they needed to keep an eye on him because he's

20  the type of guy who will come shoot us; correct?

21  A.  That's correct.  So before the shooting, while he was on

22  active duty, she informed co-workers of this concern.  But

23  there was no evidence of her, that I'm aware of, filing a —

24  you know, she didn't go report it to OSI or to security forces

25  but, she did alert her co-workers.

LARRY YOUNGNER - CROSS

1  Q.  And it was because she had a feeling; correct?

2  A.  That's what she said, yes, ma'am.

3  Q.  No actual threat from Mr. Kelley — from Devin Kelley?

4  A.  At that point, no, ma'am.

5  Q.  Okay.  Any threatening messages to Ms. Rowe were well

6  after Devin Kelley had left the Air Force; correct?

7  A.  I believe so.  Yeah, she —

8  Q.  Well —

9  A.  I'm sorry.  Please.

10  Q.  No.  Go ahead.

11  A.  I don't want to speculate again or try to — I don't want

12  to confuse Rowe and Edwards and who deserves a dirt ending or

13  something like that, words to that effect.  So I think it's in

14  the record and —

15  Q.  Well, we can look down at Ms. Rowe's statement, those last

16  couple of paragraphs.

17  A.  Right.

18  Q.  It indicates, in May of 2017, Rowe received a second

19  Facebook message from Kelley.

20      That would have been after Devin Kelley had left the

21  Air Force; correct?

22  A.  Right.  And I guess there were — and above that is some

23  concerns communicated to Bizzack as well.  So yes, ma'am.

24  Q.  And you talk about Master Sergeant Bizzack as well.

25      Let's look at JEX 517.

1    And according to Master Sergeant Bizzack, he had a gut

2    feeling that if there were ever going to be someone who would

3    shoot up the shop, it would be him?

4    A.  Yes, ma'am.

5    Q.  Stating there was something that was off about him;

6    correct?

7    A.  That's — yes, ma'am, that's right.

8    Q.  And this was in a statement that he gave to investigators

9    after the shooting; correct?

10   A.  That's correct, ma'am.  Any actions he would have taken at

11   the time would have been in the PIF, the personnel information

12   file.  And that's a separate document that OSI did have as

13   part of their investigation.

14       And that covers, like you mentioned, that letter of

15   reprimand from before.  There are other lists of actions taken

16   to reflect the misconduct of Devin Kelley, at least prior to

17   the court-martial in that PIF.

18   Q.  That's right.  Actually, Ms. Rowe gave Devin Kelley

19   multiple letters of counseling and multiple letters of

20   reprimand; correct?

21   A.  There were unfavorable information letters throughout

22   that, along with letters from more senior leaders within the

23   squadron.

24   Q.  You wouldn't consider an administrative action as a

25   positive thing for an airman, would you?

LARRY YOUNGNER – CROSS

1  A.  Oh, those are not –– those are adverse administrative

2  actions.  There are positive ones.  But most everything –– I

3  don't recall seeing any positive administrative action on the

4  two pages of the PIF for Airman Basic Devin Kelley when I

5  reviewed it.  And there were multiple –– anyway, I hope that

6  answers your question.

7  Q.  So it's fair so say that Ms. Rowe took some unfavorable

8  actions against Kelley while he was in the Air Force; correct?

9  A.  Yes, she did.

10  Q.  And you did mention Jessika Edwards; right?

11  A.  I did.

12  Q.  Now, any statements made to Jessika Edwards were after she

13  had left the Air Force; correct?

14  A.  As I recall, yes, ma'am.

15  Q.  Okay.  So those wouldn't have been known to an Air Force

16  employee; correct?

17  A.  I don't believe so, unless she communicated it.  And so it

18  would not.

19  Q.  Okay.  You didn't see any evidence in your review of the

20  file that Jessika Edwards communicated those things to anyone

21  in the Air Force, did you?

22  A.  I did not, that I can recall.  I believe she did not.

23  Q.  When reviewing the file, do you recall any firsthand

24  statements from anyone where Devin Kelley threatened to shoot

25  them or shoot up the squadron?

822

LARRY YOUNGNER - CROSS

1  A.  The -- Tessa Kelley is the immediate one that comes to

2  mind.  And beyond that, I don't believe that his research at

3  Peak was communicating a threat.  So that would be the --

4  right now, the direct communication was to his wife, Tessa

5  Kelley.

6  Q.  Now, you talked a little bit with plaintiffs' counsel

7  about some of the things in the OSI file regarding sexual

8  assaults; correct?

9  A.  Yes, they were reviewed by counsel.

10  Q.  Colonel Youngner, you haven't done any independent

11  research on whether or not sexual assault would lead to a mass

12  shooting, have you?

13  A.  I have not done that type of research.

14        MS. CHRISTILLES:  Your Honor, may I have five

15  minutes?

16        THE COURT:  Yes.  So while we're on break -- and I'm

17  not sure if this is going to influence you asking more

18  questions -- but I'm now, frankly, confused.

19        You've asked a number of questions suggesting that

20  there was no evidence before the Air Force.  And I'm wondering

21  then if there was no evidence, pursuant to your argument, how

22  was it that the Air Force is writing on March 27th, 2013, that

23  he's got severe mental health problems, violent and dangerous

24  behavior, and well-documented history of making threats?

25        The commander issues that order on March 29th, giving

1    an order of expulsion and ordering him not to enter the base.

2    And then on April 26th, a year earlier, the Air Force's

3    assessment, which OSI is present for, gives him all those

4    ratings on his rage and violence score.

5           So I'm, frankly, confused about the argument of

6    there's no evidence before the Air Force.

7           And then the other question I'm wondering about is,

8    if I understand your argument right, you're saying that the

9    only entity that had an obligation to forward the final

10   determination report was the 49th Squadron because they were

11   in charge of the brig.

12          Is that your argument?

13          MS. CHRISTILLES:  No, Your Honor.  And I was trying

14   to clean that up a little bit, because I think it got

15   confused.

16          THE COURT:  So I am confused, just to let you know.

17          MS. CHRISTILLES:  Sure.

18          THE COURT:  So I need you to clean up for me — what

19   is your argument?  Who had the — from your perspective, I

20   think I'm hearing sole responsibility.  So I need that cleaned

21   up.

22          And then the last point I'm confused about was, so

23   somewhere in this — and I was looking for it, and I can't

24   find it now — I thought there was a requirement by either the

25   49th or the OSI that, upon probable cause, they should have

LARRY YOUNGNER – CROSS

1   issued the fingerprint — forwarded the fingerprints.

2           And so, I mean, based upon all these requests for

3   expulsion and the commander's order not to enter, I mean,

4   wasn't that probable cause?

5           MS. CHRISTILLES:  Your Honor, if I may.

6           THE COURT:  Yeah.

7           MS. CHRISTILLES:  I'm going to start with what I

8   think is the easiest one: the final disposition after

9   court-martial.

10           OSI did have a requirement to submit the final

11   disposition.  It was based on the fact that they were the

12   investigative agency handling that case.

13           Because Devin Kelley was also sentenced to

14   confinement, we have stipulated that security forces also had

15   a duty because of the confinement.  But security forces didn't

16   also have a duty because they had investigated him.  And I

17   think that — and it may be my confusion with what I hear

18   plaintiffs saying, but what I thought I heard plaintiffs

19   arguing was that OSI had a duty to send it in because they

20   were the investigative agency, but so did security forces.

21           And, Your Honor, I think Colonel Youngner has cleared

22   that up for us.  That's not true.

23           OSI had to submit it because they were the

24   investigative agency.  Security forces had to submit it simply

25   because they were the confinement facility.

LARRY YOUNGNER – CROSS

1          THE COURT:  And didn't security forces, though, also
2  have a requirement to submit the fingerprint card earlier?
3          MS. CHRISTILLES:  And, sir, I can — Your Honor, I
4  can cover that, if you would like.  It's separate from the
5  final disposition report.
6          THE COURT:  Right.  And I understand that.
7          MS. CHRISTILLES:  The final disposition report is
8  actually what results in the denial.  The probable cause
9  fingerprint submission will not result in a denial, which is
10  what I think —
11          THE COURT:  But won't it result in a delay?
12          MS. CHRISTILLES:  It may, Your Honor.  It may.
13          THE COURT:  Okay.  Thank you for putting me back on
14  track because I was losing sight of the argument.
15          Okay.  Let's — well, it's 4:34.  How much more do
16  you have with him?
17          MS. CHRISTILLES:  If we could take five minutes, I
18  can give you an accurate assessment, Your Honor.
19          THE COURT:  Okay.  Let's take five.
20     (Recess.)
21          THE COURT:  Do you have other questions?
22          MS. CHRISTILLES:  I just have a couple, Your Honor.
23          But before we proceed, I just — one more thing on
24  the security forces thing.  There's been testimony about these
25  missed opportunities, and one of those was security forces

LARRY YOUNGNER - CROSS

1   collecting the fingerprints in February, which is what Your
2   Honor was alluding to.
3          It's the government's position that for purposes of
4   proximate cause, that couldn't have been the proximate cause
5   because it would have never resulted in a denial.  And so
6   that's why the —
7          THE COURT:  I thought I'd just give you advance
8   warning of a question I have.  It could have potentially
9   resulted in a delay.  And so the delay could have potentially
10  put the FBI on notice that, hey, maybe we need to check
11  further.  And they could have found the conviction.
12         I mean, that's one potential route that this could
13  have led to; right?
14         MS. CHRISTILLES:  Except that, Your Honor —
15         THE COURT:  And so I don't mean to engage in argument
16  right now.
17         MS. CHRISTILLES:  Sure.
18         THE COURT:  I just want to give you fair warning
19  about what's popping into my head so you all can be prepared
20  to respond to it.
21         MS. CHRISTILLES:  Yes, Your Honor.  And we can more
22  fully brief on once it goes in as probable cause and then
23  there's no final disposition, what happens to it.
24         THE COURT:  And I generally — I would never do this
25  in front of a jury.  But since this is just a bench trial, as

LARRY YOUNGNER - CROSS

1  questions arise, I'm going to give both sides fair notice
2  about what questions are going through my mind.
3         MS. CHRISTILLES:  Yes, your Honor.
4         MR. ALSAFFAR:  Appreciate it.
5         MS. CHRISTILLES:  That may be more appropriately
6  briefed or handled with a different witness.  I don't think
7  that Colonel Youngner is qualified to answer that.
8         MR. JACOB:  And Your Honor, just to be clear, we
9  disagree with that assessment.
10         THE COURT:  I knew you would.
11         MR. JACOB:  Yeah.
12         THE COURT:  Anything further for Colonel Youngner?
13         MS. CHRISTILLES:  I do just have a couple more
14  questions, Your Honor.
15         THE COURT:  Go ahead.
16  BY MS. CHRISTILLES:
17  Q.  Colonel Youngner, we were talking about — or, actually,
18  you were talked about plaintiffs about the case agents
19  touching the file; correct?  Do you remember that?
20  A.  I do recall that, yes.
21  Q.  And they showed you an Excel spreadsheet with a bunch of
22  different lines on it, and it would say "locked" or "opened."
23  Correct?
24  A.  There were two of those, yes.  It was JEX 348 and JEX 349.
25  Yes, ma'am.

828

LARRY YOUNGNER - CROSS

1  Q.  That would have been the electronic file that they were

2  closing and opening; correct?

3  A.  That's correct, yes, ma'am.

4  Q.  And the fingerprints for Devin Kelley were hard copy;

5  correct?

6  A.  Those fingerprints were hard copy, and — but, you know —

7  yes, ma'am, to answer your question.

8  Q.  So they wouldn't have been in the electronic file;

9  correct?

10  A.  The fingerprints would not have been in the electronic

11  file.

12  Q.  Okay.  And you aren't aware of any regulation that

13  requires a case agent, every time they touch a file

14  electronically, to verify that hard-copy fingerprints have

15  been submitted; correct?

16  A.  Every time they do it, that would not be a requirement,

17  only when they are running the two checklists, which, you

18  know, you could do IDP — excuse me, an internal data page

19  note or — about what you've accomplished or you could do an

20  I2MS entry as well.

21      Anyway, I'll just leave it at that.

22  Q.  And there is no requirement that makes it mandatory for a

23  supervisor to, every time they electronically touch that file,

24  to determine that the fingerprints have been submitted?

25  A.  No.  It's just an opportunity.  It's not a requirement.

1  It's an opportunity.

2  Q.  It's an opportunity?  Nothing mandatory?

3  A.  The only —— again, it's —— there's nothing mandatory in

4  making an electronic note that requires checking for

5  fingerprints or FDR every time, that's correct.

6          MS. CHRISTILLES:  I'll pass the witness, Your Honor.

7          THE COURT:  Any redirect?

8          MR. ALSAFFAR:  Very brief, Your Honor.

9                    REDIRECT EXAMINATION

10 BY MR. ALSAFFAR:

11 Q.  On that last point, Colonel Youngner, that the

12 U.S. attorney was asking you about, there's —— the agents and

13 the supervisor is required to document electronically whether

14 they submitted the fingerprints or conviction when it's a

15 qualifying offense; is that correct?

16 A.  So I'm going to ask you, sir —— I'm sorry.  I'm having a

17 little trouble hearing you.

18 Q.  I didn't have my mic on.  That's my fault.

19 A.  Okay.

20 Q.  Responding to what the U.S. attorney just said, the

21 supervisory agents and the case agents are required to

22 electronically —— in the electronic file, document their

23 submission of fingerprints and convictions when it's a

24 qualifying offense.

25     That's required to be put into the electronic file, isn't

LARRY YOUNGNER - REDIRECT

1  it?

2  A.  Ultimately, there is a requirement to note that, and

3  that's a separate question than what defense counsel had

4  asked.

5      So, yes, sir, there is an electronic requirement, but —

6  to be clear on both.  So there's a requirement to note that.

7  And then whether there's a requirement to look at it each

8  time, no, there's an opportunity to correct your problems each

9  time.

10  Q.  And that mandatory instruction that talks about the

11  mandatory monthly reviews, that's Section 71-121 — and I

12  believe that's Section 4.24.1.3 — let me pull it up for you.

13      It's Joint Exhibit Number 4, page 51, real quickly.

14      When the U.S. attorney was asking you these questions, she

15  didn't show you this part of that mandatory section that dealt

16  with the monthly case reviews, so I want to show it to you.

17      Just give us a second.  It's Joint Exhibit 4 and page 51.

18  It's just not showing on the screen.  That's all.  That's

19  okay.  That's all right.

20      If we could just narrow it on 4.24.1.3, the case file

21  review, page 51.  That's JX 5.  You've just got the wrong

22  number up.  It's JX 4.  It's Joint Exhibit 4, page 51.  There

23  you go.  Thank you.  That's okay.

24      What is one of the — if you look at "for example," what

25  is one of the examples the mandatory instruction is showing

LARRY YOUNGNER - REDIRECT

1  relating to these mandatory monthly reviews?

2  A.   This references the final disposition report Form R-84.

3  Q.   Okay.  And you were asked about this -- the checklist.

4       The checklist isn't mandatory rule; the mandatory rule is

5  the actual rule.

6       Does that make sense?

7  A.   In other words, the mandatory rule is what's required to

8  be submitted.  The checklist is a tool to make sure you comply

9  with that.

10      In fact, OSI developed a checklist, in part, in response

11 to the DODIG reports.  That was in one of the reports.  It

12 made it clear that, "Hey, we're just getting ahead of this.

13 We're going to fix it."  And OSI demonstrated some success,

14 though -- anyway, I'll just leave it at that.

15 Q.   Right.  After the -- in the 2017 report.

16      But what I want to ask you about regarding that checklist

17 part that you were asked about on cross-examination is -- is

18 that -- well, first of all, just to be clear, the checklist

19 actually has the required submission fingerprints and

20 convictions; right?  It's on the checklist; right?

21 A.   Those are on the checklist; in fact, in a couple places on

22 one of them.

23 Q.   Well, let's just assume this.  Let's assume it wasn't on

24 the checklist.  And the checklist is just a guide anyway.  And

25 let's just assume they just forgot to put it on the checklist.

LARRY YOUNGNER - REDIRECT

1     Would that absolve the Air Force of the mandatory

2  instruction that says you still have to submit fingerprints

3  and convictions?

4  A.  No.  There was still the requirement.

5  Q.  Okay.  The U.S. attorney had asked you and showed you

6  about the Air Force, in 2017, sort of finally getting up to

7  speed and having a better success rate on this issue that had

8  plagued it for 30 years, the compliance rate — or at least on

9  the OSI side.  Not on the security forces side, but the OSI

10  side.

11     Do you remember that?

12  A.  That's correct.

13  Q.  All right.  And I want to show you plaintiffs' — I'm

14  sorry not plaintiffs' exhibit — Joint Exhibit 433.  Start

15  with page 1.

16     The Air Force actually conducted a review of what the

17  consequences were of their failures over that time period,

18  1998 through present; correct?

19          THE COURT:  One second.

20          THE WITNESS:  That's correct.

21          MS. CHRISTILLES:  Your Honor, objection.  That's

22  outside the scope of cross-examination.

23          THE COURT:  Sustained.

24          MR. ALSAFFAR:  Okay.

25          Can we show Joint Exhibit 173, page 1 and 2.  It's

1   just a two-page document.

2   BY MR. ALSAFFAR:

3   Q.  And do you remember when Ms. Christilles was asking you

4   about Ms. Rowe, and she was showing you another statement from

5   the FBI summary of her statement from the FBI?

6       Do you remember that?

7   A.  I do recall that, yes.

8   Q.  I'm showing you Joint Exhibit 173.

9       Can I see where the highlights are?  Thank you.

10      I'm showing you Joint Exhibit 173, which was — this was

11  the one you were referring to with the U.S. attorney when you

12  were talking about what you reviewed for your report; correct?

13  A.  Right.  This was one of the documents that was also

14  referenced in the personnel information file of Airman Kelley

15  when he was in the Air Force.

16  Q.  And this was actually the Department of Defense's

17  investigation interview with Ms. Rowe; right?

18  A.  Yes.  That's my understanding.

19  Q.  And I'm showing you — under the paragraph "interview," if

20  you can highlight that for the colonel.

21      This is where Ms. Rowe states that she was the supervisor

22  in 2010.

23      Do you see that?

24  A.  Yes.

25  Q.  And then little bit down, she says, "After that point" —

1 so when she was supervising Mr. Kelley, she began to observe

2 behavior issues with him or red flags.

3     Do you see that?

4 A.  I do.

5 Q.  And so she's reporting -- is she reporting these red flags

6 that she was noticing while she was supervising him prior to

7 his release from the Air Force?

8 A.  Right.  And those are the -- so this document wasn't in

9 the PIF, to be clear about what I said before.  But the

10 actions she took about it were reflected in that personnel

11 information file.

12 Q.  And a little further down, she states her uneasiness

13 regarding Devin Kelley resulted if her telling her supervisor,

14 Master Sergeant Troy Bizzack, "We need to watch this guy

15 because he's the kind of person who will come and shoot

16 everybody"?

17 A.  Yes.

18 Q.  Okay.  And so she was --

19 A.  That's what she said.

20 Q.  And then if you go a little bit down on page 2, just the

21 next page, the top paragraph starting with "Rowe said."  This

22 is Ms. Rowe reporting about her time in the Air Force when

23 Devin Kelley there was.

24     She stated -- Rowe said that "All of the supervisors in

25 her shop were concerned that Kelley had firearms.  This

LARRY YOUNGNER - RECROSS

1  included the unit secretary, Master Sergeant Bizzack, Sergeant
2  Lindemann, and Captain Elizabeth Nugent."
3       Do you see that?
4  A.  I do see that, yes.
5  Q.  Those are multiple service supervisors she was reporting
6  to while she was in the Air Force prior to the shooting;
7  correct?
8  A.  That's correct.
9            MR. ALSAFFAR:  Pass the witness, Your Honor.
10           THE COURT:  Anything else?
11                       RECROSS-EXAMINATION
12  BY MS. CHRISTILLES:
13  Q.  Just to clarify a couple of those with Ms. Rowe's
14  statements.
15      Plaintiffs' counsel asked you about actions in the PIFs
16  with regard to the red flags.
17      Do you remember that question?
18  A.  Yes, ma'am.  However, I'm having a little more trouble
19  hearing you as well.
20  Q.  That's because Mr. Alsaffar and I don't know how to turn
21  our microphones on.
22           THE COURT:  You're going to be speaking out of this
23  microphone, so if you'll just pull this one.
24           MS. CHRISTILLES:  Yes, Your Honor.  I didn't have it
25  on, which might be the problem.

LARRY YOUNGNER – RECROSS

1   BY MS. CHRISTILLES:

2   Q.   You hear me now, Colonel Youngner?

3   A.   I can, yes, ma'am.

4   Q.   Great.

5        Mr. Alsaffar had asked you about actions in the PIF with

6   regard to the red flags; correct?

7   A.   In general, yes, regarding Ms. Rowe.

8   Q.   You don't remember seeing anything in the PIF about

9   actions taken because Devin Kelley had threatened to shoot his

10  supervisors; correct?

11  A.   I don't recall direct threats to supervisors.  I can't

12  remember if there were — there may have been an entry after

13  the Peak incident where he was researching some matters there.

14       So — but, again, the researching body armor and tactics,

15  techniques, procedures that may have been one entry in the

16  PIF.  But the threat that he made — or communicated to his

17  wife and the concerns that Ms. Rowe had, I did not see those

18  reflected in a letter of reprimand or admonishment or

19  counseling or in the high-risk violence response teams.  And

20  then there were a couple other areas entered.

21       So, no, I don't recall that specifically.

22            MS. CHRISTILLES:  Nothing further, Your Honor.

23            THE COURT:  Anything else?

24            MR. ALSAFFAR:  No, Your Honor.

25            THE COURT:  Can this witness be excused?

1          MR. ALSAFFAR:  Yes, Your Honor.

2          MS. CHRISTILLES:  Yes, Your Honor.

3          THE COURT:  Thank you, Colonel Youngner.

4          THE WITNESS:  Yes, Your Honor.  Thank you, sir.

5          THE COURT:  So we will resume at 9:00.  Thank you for

6   keeping us to the schedule, and so we are on schedule.  We'll

7   resume at 9:00 with the next set of witnesses by Zoom.

8          I hope I don't jinx us by saying this, but I've been

9   asked to be part of a judge presentation to speak to federal

10  and state judges about what technology is working and not

11  working.  Knock on wood, this seems to be working.

12         MR. ALSAFFAR:  Except for the mic buttons.

13         THE COURT:  So the request is — and I guess it's of

14  your IT guy, along with Daniel — can you all provide me a

15  short summary of what equipment we have in here?

16         MR. ALSAFFAR:  Yeah.

17         THE COURT:  So I know what to pass on to my

18  colleagues, saying what equipment seems to be working.

19         I just need a couple of pages.  I don't need

20  paragraphs of that too.  What the make and model of your

21  camera is and all of that.  That's what I'm sort of looking

22  for.  I don't know if that's your equipment, or is this the

23  court equipment?  This is not my courtroom, usually.

24         MR. ALSAFFAR:  That's the court's.

25         THE COURT:  It's the court's?

1        So you might want to talk to Daniel about how does he

2   hook that up to Zoom.  I'd probably need an explanation of

3   that.

4            MR. ALSAFFAR:  Be glad to.

5            THE COURT:  And so thank you.

6            MR. ALSAFFAR:  Judge, when do you need it by?

7            THE COURT:  Oh, two weeks.  I mean, I'm just — so

8   it's a thought that hit me.  I've been invited to the program.

9   And so all of a sudden, I thought let me make the request as

10  I'm thinking about this.

11           MR. ALSAFFAR:  Will do.

12           THE COURT:  Anything else we need to take up before

13  we adjourn for today?

14           MR. ALSAFFAR:  I don't have anything.

15           Paul, are you good?

16           MR. STERN:  Good.

17           MR. ALSAFFAR:  Okay.

18           THE COURT:  You're welcome to leave your stuff here.

19  This courtroom will be locked up.  Or you can take what you

20  want to take.

21           We're adjourned.

22           MR. ALSAFFAR:  Thank you, Your Honor.

23           (Proceedings continued in progress.)

24

25

```
1                            –o0o–

2        I certify that the foregoing is a correct transcript from

3   the record of proceedings in the above–entitled matter.  I

4   further certify that the transcript fees and format comply

5   with those prescribed by the Court and the Judicial Conference

6   of the United States.

7

8   Date:  04/09/2021         /s/  Gigi Simcox
                               United States Court Reporter
9                              655 East Cesar E. Chavez Boulevard
                               San Antonio TX 78206
10                             Telephone:  (210)244–5037

11

12         04/09/2021          /s/  Chris Poage
                               United States Court Reporter
13                             655 East Cesar E. Chavez Boulevard
                               San Antonio TX 78206
14                             Telephone:  (210)244–5036

15

16

17

18

19

20

21

22

23

24

25
```