```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
 2                       SAN ANTONIO DIVISION

 3
     JOE HOLCOMBE, ET AL,                    .
 4                                           .
                      PLAINTIFFS,            .
 5         vs.                               . DOCKET NO. 5:18-CV-555-XR
                                             .
 6   UNITED STATES OF AMERICA,               .
                                             .
 7                    DEFENDANT.             .
                                             .
 8
                     TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
 9                  BEFORE THE HONORABLE XAVIER RODRIGUEZ
                        UNITED STATES DISTRICT JUDGE
10                          APRIL 12, 2021

11

12

13

14   APPEARANCES:
     FOR THE PLAINTIFFS:     JAMAL K. ALSAFFAR, ESQUIRE
15                           TOM JACOB, ESQUIRE
                             KOBY J. KIRKLAND, ESQUIRE
16                           LAURIE M. HIGGINBOTHAM, ESQUIRE
                             STEVEN R. HASPEL, ESQUIRE
17                           WHITEHURST HARKNESS BREES CHENG
                              ALSAFFAR HIGGINBOTHAM AND JACOB
18                           7500 RIALTO BOULEVARD, BUILDING TWO
                             SUITE 250
19                           AUSTIN TX 78735

20                           ROBERT E. AMMONS, ESQUIRE
                             APRIL A. STRAHAN, ESQUIRE
21                           THE AMMONS LAW FIRM
                             3700 MONTROSE BOULEVARD
22                           HOUSTON TX 77006

23

24

25
```

```
 1                    DANIEL D. BARKS, ESQUIRE
                     SPEISER KRAUSE, PC
 2                   5555 GLENRIDGE CONNECTOR
                     SUITE 550
 3                   ATLANTA GA 30342

 4

 5                   MARK W. COLLMER, ESQUIRE
                     COLLMER LAW FIRM
 6                   3700 MONTROSE
                     HOUSTON TX 77006
 7

 8                   JASON P. STEED, ESQUIRE
                     KILPATRICK TOWNSEND & STOCKTON LLP
 9                   2001 ROSS AVENUE, SUITE 4400
                     DALLAS TX 75201
10

11                   DENNIS CHARLES PEERY, ESQUIRE
                     R. CRAIG BETTIS, ESQUIRE
12                   TYLER & PEERY
                     5822 WEST IH 10
13                   SAN ANTONIO TX 78201

14

15                   PAUL E. CAMPOLO, ESQUIRE
                     TIM MALONEY, ESQUIRE
16                   LAW OFFICES OF MALONEY & CAMPOLO, LLP
                     926 S. ALAMO
17                   SAN ANTONIO TX 78205

18

19                   GEORGE LOUIS LeGRAND, ESQUIRE
                     LeGRAND AND BERNSTEIN
20                   2511 N. ST. MARY'S STREET
                     SAN ANTONIO TX 78212-3739
21

22

23

24

25
```

```
 1                    DANIEL J. T. SCIANO, ESQUIRE
                      RICHARD E. TINSMAN, ESQUIRE
 2                    TINSMAN & SCIANO
                      10107 McALLISTER FREEWAY
 3                    SAN ANTONIO TX 78216
                      KELLY W. KELLY, ESQUIRE
 4                    ANDERSON & ASSOCIATES LAW FIRM
                      2600 SW MILITARY DRIVE, SUITE 118
 5                    SAN ANTONIO TX 78224

 6

 7                    ERIK A. KNOCKAERT, ESQUIRE
                      JOSEPH MICHAEL SCHREIBER, ESQUIRE
 8                    SCHREIBER KNOCKAERT, PLLC
                      701 NORTH POST OAK, SUITE 325
 9                    HOUSTON TX 77024

10

11                    BRETT T. REYNOLDS, ESQUIRE
                      BRETT REYNOLDS & ASSOCIATES PC
12                    1250 NE LOOP 410, SUITE 310
                      SAN ANTONIO TX 78209

13

14                    DAVID J. CAMPBELL, ESQUIRE
                      JUSTIN B. DEMERATH, ESQUIRE
15                    O'HANLON McCOLLOM & DEMERATH
                      808 WEST AVENUE
16                    AUSTIN TX 78701

17

18                    JORGE A. HERRERA, ESQUIRE
                      FRANK HERRERA, JR., ESQUIRE
19                    THE HERRERA LAW FIRM, INC.
                      1800 W COMMERCE STREET
20                    SAN ANTONIO TX 78207

21

22                    JASON C. WEBSTER, ESQUIRE
                      THE WEBSTER LAW FIRM
23                    6200 SAVOY, SUITE 640
                      HOUSTON TX 77036
24

25
```

```
1              CATHERINE TOBIN, ESQUIRE
               HILLIARD MUNOZ GONZALES, LLP
2              719 S. SHORELINE BOULEVARD, SUITE 500
               CORPUS CHRISTI TX 78401
3

4

5              HUGH JONES PLUMMER, JR., ESQUIRE
               THOMAS J. HENRY
6              PO BOX 696025
               SAN ANTONIO TX 78269
7

8              DENNIS BENTLEY, ESQUIRE
               THOMAS J. HENRY, ESQUIRE
9              THOMAS J. HENRY INJURY ATTORNEYS
               521 STARR STREET
10             CORPUS CHRISTI TX 78401

11

12             MARCO CRAWFORD, ESQUIRE
               LAW OFFICE OF THOMAS J. HENRY
13             4715 FREDRICKSBURG
               SAN ANTONIO TX 78229
14

15             MARION M. REILLY, ESQUIRE
               ROBERT C. HILLIARD, ESQUIRE
16             HILLIARD MARTINEZ GONZALES LLP
               719 S. SHORELINE, SUITE 500
17             CORPUS CHRISTI TX 78401

18

19

20

21

22

23

24

25
```

```
 1    FOR THE DEFENDANT:       AUSTIN L. FURMAN, ESQUIRE
                               PAUL D. STERN, ESQUIRE
 2                             UNITED STATES DEPARTMENT OF JUSTICE
                               THREE CONSTITUTION SQUARE
 3                             175 N STREET, NE
                               WASHINGTON DC 20002
 4

 5                             CLAYTON R. DIEDRICHS, ESQUIRE
                               JAMES F. GILLIGAN, ESQUIRE
 6                             JACQUELYN MICHELLE CHRISTILLES, ESQUIRE
                               JAMES EDWARD DINGIVAN, ESQUIRE
 7                             KRISTIN K. BLOODWORTH, ESQUIRE
                               KRISTY KAREN CALLAHAN, ESQUIRE
 8                             JOHN F. PANISZCZYN, ESQUIRE
                               UNITED STATES ATTORNEY'S OFFICE
 9                             601 NW LOOP 410, SUITE 600
                               SAN ANTONIO TX 78216
10

11

12

13                            AUSTIN L. FURMAN
                               JOCELYN KRIEGER, ESQUIRE
14                            DANIEL P. CHUNG, ESQUIRE
                               JAMES G. TOUHEY, JR., ESQUIRE
15                            STEPHEN E. HANDLER, ESQUIRE
                               UNITED STATES DEPARTMENT OF JUSTICE
16                            PO BOX 888, BEN FRANKLIN STATION
                               WASHINGTON DC 20044
17

18    ON BEHALF OF RUBEN       PHILIP KOELSCH, ESQUIRE
      D. RIOS, JR.             CRAIG WILLIAM, ESQUIRE
19                            CARLSON LAW FIRM, PC
                               100 EAST CENTRAL EXPRESSWAY
20                            KILLEEN TX 76542

21

22

23

24

25
```

```
 1   ON BEHALF OF            ELIZABETH G. BLOCH, ESQUIRE
     ACADEMY, LTD            DALE WAINWRIGHT, ESQUIRE
 2                           GREENBERG TRAURIG LLP
                             300 WEST 6TH STREET, SUITE 2050
 3                           AUSTIN TX 78701

 4                           JANET E. MILITELLO, ESQUIRE
                             LOCKE LORD LLP
 5                           600 TRAVIS STREET TOWER, SUITE 2800
                             HOUSTON TX 77002
 6
                             DAVID McDONALD PRICHARD, ESQUIRE
 7                           KEVIN MICHAEL YOUNG, ESQUIRE
                             PRICHARD YOUNG, LLP
 8                           10101 REUNION PLACE, SUITE 600
                             SAN ANTONIO TX 78216
 9
     ON BEHALF OF MOVANTS    J. DEAN JACKSON, ESQUIRE
10   MICHAEL AND REBECCA     CURNEY FARMER HOUSE OSUNA & JACKSON
     KELLEY                  411 HEIMER ROAD
11                           SAN ANTONIO TX 78232

12   ON BEHALF OF MOVANT     ADRIAAN TIELEMAN JANSSE, ESQUIRE
     DR. SHRIDHAR VASIREDDY  JANSSE LAW
13                           P.O. BOX 791215
                             SAN ANTONIO TX 78279
14
     REPORTED BY:            GIGI SIMCOX, RMR, CRR
15                           CHRIS POAGE, RMR, CRR
                             OFFICIAL COURT REPORTERS
16                           UNITED STATES DISTRICT COURT
                             SAN ANTONIO, TEXAS
17

18

19

20

21

22

23

24

25
```

1    *(San Antonio, Texas; April 12, 2021, at 8:59 a.m., in open*
2    *court.)*

3         THE COURT:  Thank you.  Please be seated.

4    Good morning.  Well, I'm on -- I'm on mute.  Let's try

5    again.  Here we go.

6    Good morning.  We'll resume with 18-civil-555.  I remind

7    all counsel, parties, witnesses, participants, and members of

8    the public that this is a formal proceeding and that they

9    should behave at all times as if they were present in the

10   courtroom.

11   The standing order of the San Antonio Division of the

12   Western District of Texas on remote access to court

13   proceedings remains in effect.

14   Photography, recording, or streaming of this proceeding,

15   by any means, is strictly prohibited.  Though this proceeding

16   is open to the public, technological restraints require that

17   members of the general public request access the courtroom

18   deputy to participate remotely.  Those granted approval to

19   participate remotely must not forward the electronic link to

20   nonparticipating colleagues or persons and must not post the

21   link on any public forum.

22   As with all proceedings, violation of these instructions

23   are subject to contempt proceedings.  Accordingly, please

24   exercise proper decorum at all times.

25   Good morning.  And with that, we'll begin your next

1    witness, please.

2         MR. STERN:  Your Honor, I think there's a few

3    housekeeping matters to take care of --

4         THE COURT:  Okay.

5         MR. STERN:  -- first.

6        The government is going to withdraw Daniel Breyer from its

7    witness list.  The government can move up Stephen Barborini to

8    Tuesday or leave him on Wednesday.  However, it leaves

9    somewhat of a gap either Tuesday afternoon or Wednesday

10   afternoon.

11       And so we'll defer to the Court on how to handle its own

12   schedule.

13        THE COURT:  Let's get through today, and we'll see

14   where we land.

15        MR. STERN:  Fair enough.

16        THE COURT:  Yes, sir?

17        MR. ALSAFFAR:  That's it, Your Honor.

18        THE COURT:  Good enough.

19      Your next witness.

20        MR. STERN:  One other minor issue, and that is

21   Dr. Fox is going to be appearing in person, if that's okay

22   with Your Honor.

23        THE COURT:  Yes.

24        MR. STERN:  And that would be Friday.

25        THE COURT:  Thank you.

 1           MR. STERN:  Thank you.

 2           MR. ALSAFFAR:  Nothing from us, Your Honor.

 3           THE COURT:  Your next witness.

 4           MR. JACOB:  Your Honor, plaintiff calls Jon Rymer to

 5    the stand via remote.

 6           THE CLERK:  Mr. Rymer, if you'll raise your right

 7    hand, please.

 8       *(The oath was administered)*

 9           THE CLERK:  Thank you.

10               JON RYMER, PLAINTIFFS' WITNESS, SWORN

11                        DIRECT EXAMINATION

12    BY MR. JACOB:

13    Q.  Mr. Rymer, thank you for appearing.

14        Can you -- first, can you hear me okay?

15    A.  Yes, sir, I can.

16    Q.  Okay.  Would you mind, then, introducing yourself to the

17    Court, please.

18    A.  Yes.  My name is Jon Rymer.  I am -- was formerly the

19    inspector general at the Department of Defense from 2013 to

20    2016.  Prior to that, I was the inspector general at the

21    Federal Deposit Insurance Corporation from 2006 to 2013.  And

22    I spent almost a year as the interim inspector general at the

23    Securities and Exchange Commission.

24    Q.  And what is your current occupation, sir?

25    A.  Currently, I am working as an independent consultant to

 1    two firms that do auditing and financial assurance work for

 2    the federal government.

 3    Q.   Okay.  Let me show you Joint Exhibit 615, which has been

 4    entered in as your CV.

 5         First –– I know it may appear a little blurry, but can you

 6    see the document, Joint Exhibit 615, on your screen, sir?

 7    A.   Yes, sir, I can.

 8    Q.   And are you able to read it?

 9    A.   Yes, I can.

10    Q.   And is Joint Exhibit 615, your CV, accurately fleshing out

11    your experience and credentials in this case?

12    A.   Yes, it is.  It does.

13    Q.   Let me go through a couple of areas in your CV.  And I

14    want to show you page 3 of Joint Exhibit 615.

15         And can you first describe for the Court your educational

16    background, please.

17    A.   Yes, sir.  I have a bachelor's of arts from the University

18    of Tennessee.  My major was economics with a minor in Asian

19    studies.  And a few years later, I completed a master of

20    business administration at the University of Arkansas at

21    Little Rock.

22         In terms of –– shall I proceed?

23    Q.   Well, yes.  And the next area I wanted to ask you about is

24    any notable awards or recognition that you've received in

25    your –– your career.

1  A.  Yes, sir.  I would say the most significant are listed

2  here.  I was named distinguished alumnus at the University of

3  Arkansas at Little Rock.  I received Distinguished Leadership

4  Award from the Association of Government Accountants.  The

5  Institute of Internal Auditors recognized me as an –– one of

6  the top 15 most influential auditors in the federal

7  government.

8  Q.  And what –– I'm sorry, sir.

9      What about your medal for distinguished service?  Could

10 you describe that, please.

11 A.  Yes, sir.  The two medals that I think I cited on here

12 and –– one was the Army Legion of Merit, and that was really a

13 capstone of work for my 33 years as an active and reserve

14 soldier in the United States Army.  And the other is the

15 Distinguished Public Service Medal awarded by the Secretary of

16 Defense for my service when I was the IG at DoD.

17 Q.  Okay.  Let me take you to page 2 of your CV, and I want

18 to –– you mentioned your service in the Army.

19      First, thank you for your service.

20      And –– but, second, could you describe for the Court your

21 experience in the Army, briefly?

22 A.  Yes, sir.  I initially enlisted as a cryptologic linguist

23 and was –– spent a year at the national –– at the Defense

24 Language Institute learning Vietnamese, later spent time at

25 Goodfellow Air Force Base at the Air Force's School of

1  Cryptology and then later served in a military intelligence

2  battalion in the 2nd Armored Division at Fort Hood for the

3  remainder of my active duty service.

4      After that, I returned to Tennessee, to Knoxville,

5  finishing my degree and also continuing to serve in the Army

6  Reserve as an instructor.  And then had stints both in the

7  National Guard as a senior intelligence analyst and first

8  sergeant in a company and as a sergeant -- operations sergeant

9  major in an armored battalion.  And then two stints -- three

10  stints -- excuse me -- as a command sergeant major in National

11  Guard units and later in Army Reserve units.

12  Q.  Okay.

13  A.  And I was mobilized on two occasions; one in support of

14  Operation Desert Storm in 1990, and the second in 2004.

15  Q.  And I notice here that you attended the U.S. Army

16  Inspector General School.  Could you tell us a little bit

17  about that, please.

18  A.  Yes, sir.  Not long after I was appointed inspector

19  general of the -- of the FDIC, I requested to attend, and the

20  Army granted the Inspector General -- the Army's Inspector

21  General course at Fort Belvoir.  And I completed that course

22  in late 2006.

23  Q.  Okay.  And I understand that -- you told us that you

24  served as inspector general for various capacities in the

25  federal government.

1       Do you remember that testimony, sir?

2   A.  Yes, sir, I do.

3   Q.  And to be clear, is that a position or positions that

4   were -- required you to be appointed by the President of the

5   United States and confirmed by the Congress?

6   A.  More specifically, appointed by the President and

7   confirmed by the Senate.

8   Q.  Senate.  Yes, sir.

9       And I want to -- you said that there were two inspector

10  general roles -- two roles that you were particularly involved

11  in?

12  A.  Well, let me -- let me go back and clarify the one

13  statement I made.  I was appointed by President Bush as the

14  inspector general of the FDIC and then later by

15  President Obama as the inspector general of the DoD.

16      My interim appointment at the -- the work that I did at

17  Securities and Exchange Commission, that was just -- I was not

18  confirmed -- was not nominated or confirmed.  That's a

19  nominated -- or a position that does not require a nomination.

20  It was only a temporary position.

21  Q.  Okay.

22  A.  And I'm sorry.  Could you state your question again.

23  Q.  Yeah.  And I guess that leads me to my very next question,

24  is what -- could you briefly describe the role of an inspector

25  general.

1    A.   The inspector general —– the way I describe it to folks

2    that are not familiar at all, many people would be first

3    familiar with perhaps what an internal audit function is in a

4    corporate enterprise.

5         So the inspector general has that responsibility, to

6    ensure that the operations of a particular organization are in

7    compliance with laws, rules, regulations, and its own

8    policies, as well as the organization should —– the inspector

9    general would attempt to determine or would determine whether

10   or not the organization was operating efficiently and

11   effectively.

12        Now, that's a general description of internal auditing.

13        More broadly than that, the inspector general has that

14   responsibility in a federal agency, plus the responsibility of

15   essentially being a senior internal investigator over any

16   criminal matters or administrative matters in the

17   organization.

18        The inspector general also has responsibility to review

19   instructions or regulations that the organization is

20   influencing that may have an impact on investigations or audit

21   activities.

22   Q.   And —–

23   A.   So, in short, the —– the broader term that many people in

24   the federal government are familiar with for IG

25   responsibilities is to detect waste, fraud, and abuse in the

1    operations of a particular agency.

2    Q.  Does the inspector general have oversight roles?

3    A.  The inspector general's only direct oversight is to those

4    folks of that organization that is organic to the –– to the

5    office of inspector general.

6        In other words, the folks that –– in the case of the

7    DoD IG, I was the inspector general there.  That was an

8    organization of about 1,600 employees and a $300 million

9    budget.  My –– or my supervisory responsibility or directed

10   responsibility, if you will, were only –– it only concerned

11   those people that were organic, those 1,600 folks that were in

12   the organization.

13   Q.  Okay.

14   A.  The IG's role relative to the rest of the Department of

15   Defense, using that example, would be to find instances of

16   waste, fraud, or abuse in the operations or criminal activity

17   within the operations of the –– of the Department of Defense,

18   make the appropriate leader –– make the appropriate leaders in

19   the organization aware of it and recommend particular

20   remediation, plans, or programs to fix whatever was found, and

21   then monitor those –– monitor whatever those remediation plans

22   were to see that they become –– that they're –– that they're

23   enforced or put into place.

24   Q.  Okay.  Well, let me take you to Joint Exhibit 615 and

25   page 1 of your CV, and focus on what you mentioned –– your

 1    role as inspector general of the United States Department of

 2    Defense.

 3        You should see that on your screen shortly.

 4    A.  Yes, sir, I do.

 5    Q.  How many investigations did you conduct or were you

 6    involved in in your roles as inspector general, both in the

 7    Department of Defense and in the FDIC?

 8    A.  Well, in terms of the number of -- you know, the rough

 9    number I remember looking at recently, one of the semiannual

10    reports that I sent to Congress in 2015, I think, listed the

11    number as -- if I could just look at a piece of paper from

12    that report.  It was --

13            MR. STERN:  Objection.  Can we at least get an

14    understanding of what --

15            THE WITNESS:  About 150 investigations.

16            THE COURT:  One second, sir.

17            THE WITNESS:  I'm sorry.

18            THE COURT:  One second.

19            MR. STERN:  It's unclear to the United States what

20    Mr. Rymer's even looking at right now.

21            THE COURT:  Mr. Rymer, what are you looking right

22    now?

23            THE WITNESS:  I looked at, sir, a piece of paper --

24    an excerpt from the Department of Defense semiannual report,

25    dated October 1st through March 31st, 2015.

1          MR. STERN:  Yeah.  I don't believe this is an exhibit

2    in this --

3          THE WITNESS:  I'm sorry.  If I shouldn't be looking

4    at it, I won't look at it any further.  I apologize.

5          THE COURT:  So I think we're still trying to prove

6    him up as an expert, and so there's no need for him to be

7    looking at extrinsic reports at this stage.

8          MR. JACOB:  You're right, Your Honor.  I was just

9    asking his background.

10          THE COURT:  Oh.

11       So, Mr. Rymer, if you will avoid looking at that report

12    for now.  Let's just continue with your background.

13       That's sustained.

14          THE WITNESS:  Yes, sir.  My apologies.

15    BY MR. JACOB:

16    Q.  Mr. Rymer, could you tell the Court how many

17    investigations that you've been involved in over the course of

18    your career as an inspector general, both in the Department of

19    Defense and FDIC.

20    A.  I would say several hundred, sir, just to be --

21    Q.  And specifically -- and specific to your role as inspector

22    general of the Department of Defense, have you conducted

23    investigations into the military branches?

24    A.  Well, the organization that I supervise conducted --

25    Q.  Yes.

1    A.   -- investigations into the military branches, yes, sir.

2    Q.   And can you give the Court some examples of the types of

3    investigations that the inspector general conducted into the

4    military branches while you were inspector general of the

5    Department of Defense?

6    A.   Well, most typically, the Department of Defense inspector

7    general -- within the Office of Inspector General, there is a

8    group called the Defense Criminal Investigative -- the Defense

9    Criminal Investigations.

10       And that organization of about 500 or so employees, mostly

11   criminal investigators, the general focus was on -- much of

12   that focus was on procurement fraud and essentially

13   white-collar investigations about how either procurement -- or

14   how money is spent or, perhaps, improperly spent -- excuse

15   me -- within the Department of Defense.

16   Q.   Okay.  Let me take down your CV for a second and talk to

17   you about your role as inspector general.

18       In that role, did you familiarize yourself with the

19   various instructions and processes that apply to the inspector

20   general and his office?

21   A.   Yes, sir, I did.

22   Q.   And did you familiar -- do you have a familiarity and

23   expertise in that process of investigating and oversight that

24   the inspector general's office provides the U.S. government

25   and DoD, in particular?

1    A.  Yes, sir.  And I would say more broadly –– within the

2    inspector general community or profession, I would say more

3    broadly than just investigations.  I had to be familiar with

4    how investigations are conducted, evaluations, audits.

5    They're all –– they're all processes supporting each of those.

6        So investigation is a particular discipline within the

7    IG –– within an IG's operation.  But I was familiar with

8    investigations and familiar with valuations, and particularly

9    familiar with the structure and requirements of federal

10   audits.

11           MR. JACOB:  Okay.  Your Honor, at this time,

12   plaintiffs offer Mr. Rymer as an expert in the inspector

13   general process as well as the government oversight

14   procedures.

15           MR. STERN:  We do object and look forward to the

16   opportunity voir dire this witness, Your Honor.

17           THE COURT:  You can attempt to do it now.

18           MR. STERN:  Thank you.

19                    **VOIR DIRE EXAMINATION**

20   BY MR. STERN:

21   Q.  Mr. Rymer, good morning, sir.

22   A.  Good morning.

23   Q.  Can you hear me okay?

24   A.  You're a little bit soft, but I think I can make it out.

25   Yes, sir.

1   Q.  I'll try to speak up.  How about this?  Can you hear me

2   better?

3   A.  That's better.  Thank you.

4   Q.  Thank you.

5       Mr. Rymer, you are an accountant; correct?

6   A.  Yes, sir.  I would prefer the title "auditor."  But yes,

7   sir.

8   Q.  I'll give you "auditor."  Sure.

9       You're an auditor?

10  A.  That's one of the things I've done in my career, yes, sir.

11  Q.  Okay.  Well, if we take a look at Joint Exhibit 615, the

12  summary, it starts out "Financial services and auditing

13  professional with over nine years of experience as an

14  inspector general in the federal government, over seven years

15  as a director at a Big Four accounting firm, and over 15 years

16  of experience in the banking industry."

17      Did I read that correctly?

18  A.  Yes, sir.  That's correct.

19  Q.  So your experience is in banking and financial services?

20  A.  My civilian experience, yes, sir.

21  Q.  Okay.  It continues, "Served on a number of federal boards

22  and committees, principally concerned with financial oversight

23  and accounting and auditing guidance and standards."

24      Did I read that correctly?

25  A.  Yes, sir.

JON RYMER – VOIR DIRE                                        860

1    Q.  So, again, the primary concern on the boards that you

2    served on were financial oversight and accounting and

3    auditing?

4    A.  Yes, sir.  That's correct.

5    Q.  Again, it continues, "Testified on multiple occasions

6    before the United States Congress on auditing and inspector

7    general issues"?

8    A.  Yes, sir.  That's correct.

9    Q.  So your principle concern is with financial oversight,

10   accounting, auditing, guidance, and standards; is that

11   correct?

12   A.  That's my principal experience, yes, sir.

13   Q.  Okay.  And your current position is with Lynch

14   Consultants?

15   A.  I'm a –– I'm now a contractor for Lynch Consultants, yes,

16   sir.

17   Q.  And if we look down at the bottom half of 615, under

18   principle of Lynch Consultants, "Responsible for leading

19   multiple audit and accounting support engagements at federal

20   agency clients."

21       Did I read that correctly?

22   A.  Yes, sir, you did.

23   Q.  Sir, you are not a criminologist?

24   A.  No, sir, I'm not.

25   Q.  You're not a forensic neuropsychiatrist?

1    A.  No, sir.

2    Q.  You're not an epidemiologist?

3    A.  No, sir.

4    Q.  You have no expertise in federal or state regulation of

5    firearms?

6            MR. JACOB:  We're not offering him for an expert in

7    any of these areas.

8            THE COURT:  Yeah.  I don't understand the

9    epidemiology one, in particular.

10           MR. STERN:  Well, I don't understand what exactly

11   expertise they are offering him for, then.  There's no

12   question about the procedures for creating an IG report at

13   issue in this case.

14           MR. JACOB:  Absolutely.

15           MR. STERN:  They're simply trying to use his title as

16   the former Department of Defense inspector general to bolster

17   the underlying findings of an IG report.

18       But as I was about to go into, he has no direct experience

19   actually investigating DCIOs, MCIOs.  He has no personal

20   experience actually reviewing any of the material that

21   undergirds any of the IG reports.

22       He simply was the head of an oversight entity without

23   really knowing the nuts and bolts of these investigations

24   themselves.  And that's what I was going to get into.

25           MR. JACOB:  Your Honor, that goes to the weight that

1    Your Honor places on his testimony, not its admissibility.

2    And we do dispute the characterizations that the government

3    has asserted.

4        The government is disputing what their own inspector

5    general has found in various reports.  And so we are allowed

6    to explore the reliability of those opinions and those

7    findings with a person like Mr. Rymer, who has over -- or

8    nearly ten years of experience as an inspector general.

9            MR. STERN:  But that's just it, Your Honor.  He's

10   actually not here to testify about the substance of the IG

11   reports.  They offered him as an expert on the IG's policies

12   and protocols for creating these reports.

13       We don't dispute that the IG has set guidance for how they

14   create these reports.  But if he can't testify regarding the

15   substance of them, then his testimony is meaningless and is

16   only trying to serve to bolster the IG reports, in and of

17   themselves.

18           THE COURT:  So give me just a handful of exemplar

19   questions you intend to ask him.

20           MR. JACOB:  Sure.  A prime example, Your Honor, is

21   the government has disputed when and where the probable cause

22   arose, the types of investigations that the IG conducted into

23   probable cause.

24       And the areas that I intend to explore with Mr. Rymer is

25   the processes in place with the inspector general and whether

 1   those processes result in reliable conclusions by an inspector

 2   general in the various reports that are at issue in this case

 3   and that the government disputes.

 4          MR. STERN:  That's like saying a police department

 5   has policies and procedures for making probable cause

 6   determinations which wouldn't necessarily go to the nuts and

 7   bolts of whether probable cause actually exists at any given

 8   time.

 9      I mean, again, they're just trying to use the stature of

10   this witness to bolster the underlying substance of a DoD IG

11   report.

12          THE COURT:  But doesn't that happen all the time in

13   1983 cases, for example?  The policeman who's charged with

14   excessive force will bring some kind of chief of police,

15   retired, to testify that "Oh, no, this place had policies,

16   procedures.  This is" –– so why isn't it similar to that?

17          MR. STERN:  Because they've already done that with

18   Colonel Youngner.  And to the extent Colonel Youngner can

19   actually speak about the Air Force's instructions, manuals,

20   and so on and so forth, we didn't dispute that he had

21   expertise in that narrow field.

22      But here, with regards to the DoD IG, they produced 500

23   reports on various topics throughout the years.  He couldn't

24   possibly know the underlying –– not just the underlying

25   substance of when there was probable cause in any given

1   moment, but even the underlying policies and procedures that

2   the –– that the Air Force –– either the Office of Inspector

3   General –– I'm sorry –– the Office of Special Investigations

4   or the Security Forces Squadron relied on to make those

5   determinations.

6       It's simply too –– it's too wide of a scope, that the

7   DoD IG has, to be able to make any type of expertise –– to

8   provide any expertise on these issues.

9           MR. JACOB:  But he's very familiar with the methods

10  that the DoD IG uses, and can tell us whether those methods,

11  as applied to the particular reports in this case, did result

12  in reliable conclusions.

13          MR. STERN:  No more so than Your Honor can read the

14  instruction manuals himself and make those determinations.

15          THE COURT:  Yeah.  So this all goes to the weight.

16  Mr. Rymer led and was the inspector general for the Department

17  of Defense.  He was awarded high honors for that.  So we now

18  can't claim, as the government, "Well, he knows nothing."

19  That's kind of inconsistent.

20      But to the extent that, you know, this does go to the

21  weight, I'll see what weight, if any, I attribute to any of

22  the opinions he may render.

23      Do you want to continue to challenge him or ––

24          MR. STERN:  We'll do it on cross, then, Your Honor.

25          THE COURT:  Thank you.

 1          MR. STERN:  Thank you.

 2          THE COURT:  So he's recognized as an expert on IG

 3   practices and protocols.

 4      Your questions now?

 5                    DIRECT EXAMINATION (CONTINUED)

 6   BY MR. JACOB:

 7   Q.  Mr. Rymer, can you hear me again?

 8   A.  Yes, I can.

 9   Q.  Okay.  Mr. Rymer, I want to start out by talking to you a

10   little bit about the background of the inspector general and

11   specifically ask you what the mission of the DoD IG -- or DoD

12   inspector general is.

13   A.  Well, the mission, in a thumbnail, would be to find waste,

14   fraud, and abuse in the programs and operations of the

15   Department of Defense.

16   Q.  Okay.  And can you briefly describe the powers the IG has

17   in accomplishing that mission?

18   A.  Well, the IG has unlimited access to all books and records

19   of the Department of Defense and has subpoena authority, has

20   testimonial subpoena authority as well, to reach, say, retired

21   members of the department.  So the IG has broad authority to

22   seek out facts and information within the Department of

23   Defense.

24   Q.  Okay.  And let me take you now to this case, in

25   particular.  And can you briefly describe what you were asked

1   to do in this case.

2   A.  Well, what the Office of Inspector General was asked to do

3   after the tragedy and –– the shootings at Sutherland Springs,

4   the secretary of defense asked the IG to determine whether or

5   not there was –– there was immediate concern, I think, during

6   the –– once the investigation began, the day of the shooting,

7   that the Air Force had not forwarded criminal history

8   information, specifically disposition of Kelley's –– of

9   Kelley's court-martial, nor several occurrences where the

10  Air Force had collected Kelley's fingerprints.

11      It was the belief and summary of the IG that those should

12  have been forwarded to the FBI, and they were not.  That was a

13  concern that the secretary of defense had.  And the secretary

14  of defense directed that the Office of Inspector General

15  conduct an investigation or an evaluation of the circumstances

16  around whether or not those fingerprints and final disposition

17  information was given to the FBI.

18  Q.  Okay.  And can you describe the types of documents you

19  reviewed in your review of this case.

20  A.  Well, the documents that I reviewed were several IG

21  reports, several –– to get a sense of the accuracy of those

22  reports, several depositions of informations –– of individuals

23  that were interviewed by the IG.  And then refamiliarized

24  myself with a number of standards regarding the requirements

25  around a –– the requirements around the production of an

1    evaluation report, which this one is –– meets those standards.

2    The –– and I refamiliarized myself with the –– and certainly

3    spent time reviewing the IG Act.

4         But, in summary, that's what I –– what I looked at.

5    Q.  Okay.  And particularly concerning the 2018 DoD IG report

6    that you mentioned into the Air Force's failure to submit

7    Devin Kelley's criminal history to the FBI, did you also

8    review the underlying documents that were reviewed by the

9    DoD IG in that report?

10   A.  Well, I don't –– I don't recall documents.  I do –– well,

11   in a sense, the documents, being depositions, sworn testimony

12   by many of the agents involved, yes, sir, I did.

13   Q.  Okay.  And we'll go through the –– each –– the report and

14   some of the documents to identify them, in particular.

15        But in your review and reaching your report in this case,

16   do you believe you had sufficient information and evidence to

17   reach reliable opinions on the inspector general process that

18   resulted in the reports that you mentioned to the Court just

19   now?

20   A.  Yes, sir.

21   Q.  Okay.  And what I want to do, just to signpost for you, is

22   I want to get to the Devin Kelley report, but I want to give

23   just a brief background of a couple of the DoD IG inspector

24   general reports that were issued prior to the Devin Kelley

25   report.

1      And let me do that by showing you, first, Joint

2  Exhibit 14, page 1.

3      And, Mr. Rymer, have you seen Joint Exhibit 14 before?

4  A.  Yes, sir, I have.

5  Q.  And can you tell the Court what Joint Exhibit 14 is.

6  A.  Well, I believe what you have on the screen is a cover

7  page from a DoD IG report that was issued, I believe, in 1997.

8  And it concerns criminal history data reporting and the

9  submission of criminal history from the defense criminal

10  investigative organizations to the FBI.

11  Q.  Okay.  Let me show you page 3 of Joint Exhibit 14.

12      And I'll zoom in to it -- if you can zoom back out

13  please -- and zoom in to the entire executive summary portion

14  for us.

15  A.  Yes, sir, I see that.

16  Q.  And I'm going to provide you the executive summary here.

17      First, could you tell us why the DoD IG is investigating

18  and reporting in 1997 on DoD's criminal history submissions to

19  the FBI?

20  A.  Yes, sir, I can.  I would go back -- would go back to the

21  Inspector General Act in terms of -- to give you an

22  explanation why I believe this report was done originally.

23      The Inspector General Act says that the DoD IG is one of

24  the few policy responsibilities that the IG has, and that is

25  to set Department of Defense policy regarding criminal

1    investigations.  And so that authority, I believe, resulted in

2    a -- in a memo in -- I believe it was 1987 to determine

3    whether -- how often the DCIOs were actually submitting

4    information to the FBI.  And I don't have the numbers in front

5    of me, but the compliance rate was very low.

6        The IG believed it was in the best interest of both the

7    Department of Defense and for -- and for public safety that it

8    was important to forward to the FBI, for inclusion in the

9    national criminal database, information about crimes that had

10   been committed by service members.

11   Q.  Okay.

12   A.  Okay.  So that was the foundation of the 1987 memo.

13       And the IG followed up in 1997 with this -- with this

14   report, again, finding that there were -- there was

15   significant noncompliance with criminal history data reporting

16   to the FBI.

17       I think, in sum, this report also -- this -- it

18   recommended that the -- in addition to the criminal

19   investigative organizations, that, essentially, the military

20   police functions within each of the services also began

21   criminal history data reporting.

22   Q.  Okay.  Mr. Rymer --

23   A.  And the foundation of -- I'm sorry.

24   Q.  Let me just break that up.  And you gave us a lot, so I

25   need to kind of focus you a little bit and ask you some more

1   specific questions.

2        First of all, you used phrases like the "DCIOs."  And I

3   see on the screen "MCIOs" is another acronym that the

4   government is using.

5        First, can you just tell us what a DCIO and an MCIO is.

6   A.  Well, DCIO is defense criminal investigative -- defense

7   criminal investigation organization.

8        And what was your second question?

9   Q.  And what is an MCIO?

10  A.  Military criminal -- I use the term MP.  But essentially,

11  that's the police function within each of the departments.

12       And I'm sorry.  I'm a -- I was a career soldier.  So I use

13  the term M -- "military police," and they're called different

14  things in the other services.  But essentially to take that

15  military police -- military -- that responsibility to report,

16  to that police function within the -- within the services as

17  well.

18  Q.  So with regard to the -- we're here about the Air Force.

19       With regard to the Air Force, the military police would be

20  currently known as the security forces?

21  A.  Yes, the security forces, yes, sir.

22  Q.  And would the Air Force Office of -- Office of Special

23  Investigations be covered by this report, Joint Exhibit 14, as

24  well?

25  A.  Yes.  The Air Force Office of Special Investigation was

1    a -- is a defense criminal investigative organization.

2    Q.   Okay.  So the next question I want to direct you to is,

3    are you familiar with NICS, the National Instant Criminal

4    Background Search system?

5    A.   Yes, sir.

6    Q.   Okay.  And do you know when NICS was established?

7    A.   It was sometime, I believe -- I believe, in the 1990s,

8    and -- I believe in 1993 timeframe, something like that.

9    Q.   And do you know when NICS reporting began with the

10   criminal investigative organizations in DoD?

11   A.   I believe that would have been, sir, after the Brady Act

12   or the Brady Act amendments.  And so that would have been

13   sometime during -- in the 1990s.

14   Q.   Would it have been after this report?

15   A.   No.  It would have been, I believe, before this report --

16   I believe, the dates.

17   Q.   Well, let me ask you this:  With regard to -- you told the

18   Court earlier that in 1987, the Air Force issued an

19   instruction to start reporting criminal history to the FBI.

20       Do you remember that testimony, sir?

21   A.   Yes.

22   Q.   And then you said in 1997, so ten years after the issuance

23   of that report, the DoD IG came out with this inspector

24   general's report concerning the reporting of criminal history

25   to the FBI.

1      Do you remember that testimony, sir?

2   A.  Yes.  Yes.

3   Q.  Could you tell us, beyond reporting to NICS, is there any

4   reasons why the DoD IG is concerned with criminal –– the

5   military organization's criminal history reporting to the FBI?

6   A.  Well, I think the view –– and I certainly support this

7   view –– that criminal history reporting to the FBI essentially

8   expands the effectiveness of law enforcement and gives –– by

9   supporting the national criminal database, in my view, makes

10  law enforcement more effective.

11      So I think it's certainly in the interest of the

12  Department of Defense and ultimately in the national interest

13  to have a law enforcement function that is as –– that is as

14  effective as possible.  And by not reporting criminal history

15  data consistently to the FBI, I believe that a significant

16  portion of criminal activity would not have been included in

17  the national crime data.

18  Q.  In 1997, was the Air Force aware of these problems, as

19  reported by the Department of Defense inspector general?

20  A.  They would have been aware –– they certainly would have

21  been aware in the sense that the inspector general –– the

22  Department of Defense inspector general, certainly from the

23  work beginning back in the late '80s to 1987 work,

24  continuing through this report, for a couple of reasons.

25      One, let me say that this particular report was –– this

1    particular 1997 report was –– was completed due to a –– due

2    to –– or due to a requirement in the National Defense

3    Authorization Act in 1996 that the secretary of defense review

4    compliance with criminal history data reporting.  So the

5    secretary of defense directed the DoD IG to complete this

6    report.

7        So this report –– although the earlier instances may have

8    been at the discretion and direction of the DoD IG and their

9    authority under the IG Act for the 1987 work, the 1997 work

10   was a result of a –– was the result of the defense criminal ––

11   or I'm sorry –– was the result of the NDAA, the National

12   Defense Authorization Act.

13   Q.  Did the Air Force review these findings in Joint

14   Exhibit 14 and notify the IG that they were going to fix

15   these –– the issues?

16   A.  Yes, sir.  As I recall, the Air Force –– the Air Force did

17   not object to –– did not –– the Air Force concurred with the

18   findings and indicated that they would begin a process to

19   improve compliance.  Yes, sir.

20   Q.  Okay.  And following this 1997 report, are you aware of

21   any other reports the DoD IG has issued concerning

22   fingerprints and final disposition submissions to the FBI?

23   A.  Yes, sir.  There was a –– I think the next report was ––

24   specifically about fingerprints and final disposition reports

25   was the 2015 report that followed up on this 1997 report.  And

JON RYMER – DIRECT                                            874

1   I think –– although there was some improvement, I think there

2   was still significant noncompliance with the criminal history

3   data reporting.

4        And in a –– not referring to the –– any paperwork, I would

5   say that the number was still then in the 30, 32 percent

6   range, as I recall.

7   Q.  Well, Mr. Rymer, let me show you that report.  We can look

8   at it briefly.  I want to show you Joint Exhibit 1, which has

9   been previously admitted into evidence.

10       Can you identify Joint Exhibit 1, sir?

11  A.  Yes, sir.  That's the report I was referring to.

12  Q.  Okay.  Let me show you page 3 of Joint Exhibit 1.  And,

13  first, I want to sort of zoom in on the "Objective" section.

14       Do you see the column labeled "Objective"?

15  A.  Yes, sir.

16  Q.  Could you tell the Court what the objective of the DoD IG

17  in Joint Exhibit 1 is, briefly?

18  A.  Well, as I said a moment ago, the objective would be to

19  determine compliance with criminal history data reporting to

20  the FBI and to see where that compliance stands.  And the

21  method used here was a sampling process.

22       But as you can see, I think this goes through in some

23  detail how each of the –– each of the services were complying

24  or not complying with criminal history data reporting

25  requirements.

1  Q.  And you said the method that the IG uses in Joint

2  Exhibit 1 is a sampling process.

3      What time frame are they sampling?

4  A.  –– the interview.  But I think in this case and –– or in

5  this particular report, there were, in this case, I think, a

6  sample of 1,102 case files from Army, Navy, Air Force, Marine

7  Corps.  And you can see there the numbers.  I'm not sure it's

8  necessary that I read them.  But you can see that a

9  significant sample was taken, and the results of the sample

10 were, there was noncompliance.

11     Again, I don't think this excerpt shows it, but I think ––

12 Q.  Yeah.

13 A.  –– in the 30 percent range, as I recall, for the

14 Department of the Air Force of noncompliance.

15 Q.  Well, sir, let me ask you this –– and we'll get to those

16 specific findings in one second –– but it says that the sample

17 was taken of qualifying offenses between June 1, 2010, and

18 October 31st, 2012.

19     Do you see that, sir?

20 A.  Yes, sir, I do.

21 Q.  And if Devin Kelley's conviction was in November 7th of

22 2012, does that sample cover Devin Kelley's conviction?

23 A.  No, sir.  It does not.

24 Q.  Okay.  So let's look at the findings and talk about that

25 in more particular, then.  And I want to show you actually

1    Joint Exhibit 1, page 13 and 16.

2        And there are a couple of graphs on pages 13 and 16

3    concerning the Air Force fingerprint submission data and

4    criminal history data that I want to look at in particular.

5        So let me display both of those pages, Joint Exhibit --

6    Joint Exhibit 1, pages 13 and 16 together.

7        First, Mr. Rymer, are you able to see the graph concerning

8    the Air Force's fingerprint submissions?

9    A.  Yes, sir, I am.

10   Q.  And if we could just make that portion a little bit bigger

11   for Mr. Rymer, please.

12          TECHNOLOGY SPECIALIST:  Bottom left?

13          MR. JACOB:  Yes.

14       And then if we could also pull out the Air Force's final

15   disposition graph.

16   BY MR. JACOB:

17   Q.  And, Mr. Rymer, if you could explain to the Court what

18   we're looking at from pages 13 and 16 of Joint Exhibit 1.

19   A.  Well, this -- of the total sample, I think, that we read a

20   moment ago, of 1,100 or so cases that were reviewed, this

21   would be -- the sample pertaining to the Air Force would have

22   been about 358 cases, and the -- you can see the totals there

23   of fingerprint -- 248 of the cases, fingerprints were found.

24   And in -- and in 110, they were not.

25   Q.  Okay.  So if I'm understanding you correctly, the DoD IG

1    is looking at 358 qualifying cases in that sampling period

2    from the Air Force.  Is that fair?

3    A.  Yes.

4    Q.  And of those cases, 113 final dispositions were not

5    submitted and 111 -- or sorry, 110 fingerprints were not

6    submitted to the FBI?

7    A.  Yes.

8    Q.  Okay.  Before an IG reaches a finding or reviews documents

9    and concludes there's missing submissions, does the Air Force

10   have an opportunity to review drafts of reports and

11   conclusions such as this?

12   A.  Yes, sir, they do.  Number one, to explain a little

13   broader, the Air Force would have been involved in this data

14   collection initially.  This is not done -- well, the Air Force

15   would have been involved in the data collection.

16       And then once the -- a draft report is prepared, the

17   Air Force, as a subject of the report, would have had an

18   opportunity to comment on the report or correct any mistakes

19   that they saw in the report before the report is issued and

20   final.

21   Q.  Okay.  So as a part of the IG report-issuing process, the

22   agency itself has input into the report?

23   A.  Well, in this case, the agency -- well, the data belongs

24   to the Air Force.  So in the sense that the inspector general

25   requested data from the Air Force, the Air Force would assist

1   in collecting that data for the -- for the inspector general.

2   And then once the inspector general -- the Department of

3   Defense inspector general reviewed the data, the Air Force

4   would have the opportunity to point out any errors or missing

5   data or any significant problems with the report.

6   Q.  Okay.  And you said that the Air Force would then also

7   have an opportunity to comment on the recommendations?

8   A.  Yes, they would.

9   Q.  Okay.  Let me take you --

10  A.  Uh-huh.

11  Q.  Let me take you to page 18 of Joint Exhibit 1 and show you

12  some of these comments.  And I want to blow up both the

13  recommendation and the Air Force comments and the IG response

14  to the Air Force comments.

15      Okay.  And can you tell the Court what we're seeing on

16  page 18 of Joint Exhibit 1.

17  A.  Well, you would be seeing, number one, one of the

18  recommendations -- and I don't remember in this particular

19  report how many there were.  But an evaluation such as this

20  would result in a number of recommendations for process

21  improvement directed to the service secretaries.

22      In this recommendation, that -- this recommendation was

23  that the Air Force take prompt corrective action to ensure

24  that all future arrestees and convicted offenders conform with

25  the applicable DoD instruction, which is DoD 5505.11.

1      And I think the phrase below or the next section

2   "Air Force comments:  The Air Force agreed with our

3   recommendation and our response," meaning the DoD's response.

4   "Comments from the Air Force addressed all specifics of the

5   recommendation.  No further comments are required."

6      So what that says to me is the Air Force agreed with the

7   recommendations; set forth specific remedies, if you will, to

8   cure the problems that were identified by the DoD inspector

9   general.  And the DoD inspector general accepted that

10  remediation -- or those -- accepted the steps that the

11  Air Force planned to take to fix the problem.

12  Q.  And this report, Joint Exhibit 1, was issued in 2015.

13      Who was the DoD inspector general in 2015?

14  A.  I was, sir.

15  Q.  Okay.  And earlier we talked about how the specific sample

16  set that this inspector general's report reviewed did not --

17  was not -- or Devin Kelley's conviction fell out of that

18  specific sample set.

19      But does this recommendation make it clear to the

20  Air Force that there was an ongoing problem with the failure

21  to submit criminal history to the FBI?

22          MR. STERN:  Objection, Your Honor.  The Court's

23  already ruled on this issue.  We've both briefed it -- both

24  parties briefed it at summary judgment.  The Court has already

25  ruled that the Air Force adoption of the IG recommendations

1    did not –– did not include the requirement to submit Devin

2    Kelley's criminal history information.  This has already been

3    adjudicated and now is outside the scope of the –– what's left

4    for this trial.

5             MR. JACOB:  My question was about the Air Force's

6    awareness of the ongoing obligation, and that goes directly to

7    the knowledge and foreseeability the Air Force had.

8        The United States is disputing that this document made the

9    Air Force aware and reinforced the notion that they need to

10   submit criminal history to the FBI, and this is the IG

11   testifying about that very point.

12            THE COURT:  Yeah.  That's overruled.

13   BY MR. JACOB:

14   Q.  Mr. Rymer, let me ask my question to you one more time.

15       Earlier we discussed how the –– Devin Kelley's conviction

16   fell outside of the specific sample set that JEX 1 examined.

17       But my question to you is, does Recommendation 2, not

18   concerning the specific sample set but the more broader

19   recommendation, make the Air Force aware of its ongoing

20   obligation to report and fix criminal history reporting to the

21   FBI?

22   A.  Yes, sir.  I believe it clearly makes the Air Force aware.

23   Q.  Okay.  And I want to –– I want to play for you a clip

24   that –– of evidence that's already been entered, and then come

25   back to this report.

1      I want to play for you Joint Exhibit 628 from 1 hour

2  54 minutes and 47 seconds to 1 hour 55 minutes and 7 seconds,

3  and then ask you a question about that.  Okay?

4  A.  Yes, sir.

5      *(Playing video)*

6          MR. JACOB:  Okay.  We can play that one more time.

7      *(Playing video)*.

8  BY MR. JACOB:

9  Q.  Can you tell us who that is on the video, Mr. Rymer?

10  A.  Yes, sir.  That's Glenn Fine.  I believe he was the acting

11  inspector general of the Department of Defense.  That probably

12  would have been a hearing in 2017, I believe.

13      Mr. Fine was originally -- I brought Mr. Fine to DoD as

14  my -- as the deputy inspector general in 2015.  So when I left

15  the department in 2006, he became the acting inspector

16  general.

17  Q.  Okay.  Let me take down the video now and then ask you

18  this question.

19      If the Air Force, in this litigation, disagrees with you

20  and Mr. Fine on this -- these recommendations and whether they

21  made the Air Force aware of their ongoing problem to report

22  and fix criminal history, how would you respond to that?

23          MR. STERN:  Objection.  Speculation.  Outside the

24  scope of his expertise.

25          MR. JACOB:  I'm asking him how he would respond to

```
 1    this issue.
 2            THE COURT:  Yeah.  That's overruled.
 3    BY MR. JACOB:
 4    Q.  Sir, Mr. Rymer, how would you respond to the Air Force in
 5    this litigation taking a different position than it did when
 6    this report was issued?
 7    A.  Well, I would be, frankly, disappointed if that's what had
 8    happened.  The -- if that's what happened.  My view, it was
 9    very clear the Air Force agreed with the findings and
10    recommendations of the report and the -- and I want to go back
11    to this notion of how aware the Air Force would have been
12    about this.
13        I mean, the information contained in that report would
14    have been part of what would have been gathered with the
15    assistance of the inspector general function within the
16    Department of the Air Force.  That's routine for the DoD
17    inspector general.  When they're reaching out for information
18    from the services, it is done through the IG mechanism, if you
19    will, in each of -- in each of the services.
20        In this case, I would also like to point out that this
21    level of awareness for the Air Force would be, I think,
22    particularly high because of the organization structure of the
23    Department of the Air Force relative to its defense criminal
24    investigative function.
25        The defense criminal investigative function in the Army
```

 1   and the Navy, for example, are independent of the inspector

 2   general function -- or the inspector general within each of

 3   those services.  That's not the case in the Air Force.  The

 4   Air Force Office of Special Investigations is an

 5   organizational entity under the command and control of the

 6   inspector general of the Air Force.

 7   Q.  Okay.

 8   A.  And that's unique for the three services.

 9   Q.  If I can try to understand and break down that testimony

10   briefly.

11        With regard to the Air Force, who is the inspector general

12   of the Air Force?

13   A.  The inspector general of the Air Force would be a

14   three-star officer.  And at the time, I think it was General

15   Biscone.  I'm not certain who the inspector general is today.

16        But it's a -- it's a three-star position that would report

17   to the chief of staff of the Air Force.  In other words,

18   essentially the military commander of the Air Force --

19   Q.  Okay.

20   A.  -- would be the inspector general's boss, if you will.

21   Q.  Does the inspector general of the Air Force hold any

22   positions or any hats -- wear any hats other than just the

23   inspector general of the Air Force?

24   A.  Well, in addition to being the inspector general, the

25   inspector general of the Air Force is also the commanding

 1  general responsible for the Air Force Office of Special

 2  Investigations.

 3  Q.  Okay.  And this goes back to the question of the

 4  Air Force's knowledge of the problems.

 5      If the DoD IG is telling the Air Force inspector general

 6  that there is a significant problem with reporting criminal

 7  history to the FBI in the Office of Special Investigations,

 8  are they directly telling the commander -- the chain of

 9  command of the office of inspector -- of Special

10  Investigations of that problem?

11  A.  Yes.  Yes, sir.  I believe they would be.

12  Q.  And so the command structure -- the supervisory command

13  structure of the Office of Special Investigations would have

14  specific knowledge and direct knowledge of what the DoD IG is

15  reporting in the 1997 and the 2015 IG reports?

16  A.  Yes, sir.  I believe so.

17  Q.  Okay.  So with that background, let's look now at Joint

18  Exhibit 3.  And I want you to identify -- I'm going to show

19  you the first page of Joint Exhibit 3, and I want you to

20  identify it for us.  Okay?

21      Are you seeing Joint Exhibit 3 on your screen, sir?

22  A.  Yes, sir, I do.

23  Q.  Could you identify for the Court what Joint Exhibit 3 is.

24  A.  Yes, sir.  This would have been the report prepared by the

25  Office of Inspector General of the Department of Defense at

1   the request or direction of the secretary of defense to

2   determine if and how there was a failure by the Air Force to

3   submit Devin Kelley's criminal history to the FBI.

4   Q.  Okay.  And what I want to do for the Court, just so you're

5   aware of where I want to go, is I want to show the processes

6   the inspector general uses to lead to the findings that it

7   does in a report such as Joint Exhibit 3.

8        But I don't want to belabor the point and go through every

9   single finding and talk about each one.  So if you think it

10  would be helpful, what I would like to do, sir, is look at one

11  or two findings and talk to you about how an inspector general

12  reaches those findings and whether those findings can be

13  reliable, in your opinion.

14       Do you think that would be helpful, sir?

15  A.  Yes, sir.

16  Q.  Okay.  Let me show you page 66 of Joint Exhibit 3.  And

17  we'll zoom in to that first part.  And I'll represent to you

18  this is a finding concerning the first missed opportunity to

19  submit fingerprints.  And if we could just zoom in to the

20  entire first section.  Yes.

21       This is the –– Joint Exhibit 3, page 66, is the beginning

22  of the IG's section on the first missed opportunity to submit

23  Devin Kelley's fingerprints, from June 9th, 2011.

24       Do you see that on your screen?

25  A.  Yes, sir.

JON RYMER - DIRECT                                        886

1   Q.  Now, in talking about a finding like this, could you

2   briefly describe to the Court the types of information the

3   inspector general's office relies upon in reaching a finding

4   such as this.

5   A.  Well, certainly, they would rely on documentary

6   information.  That would be any files or written information

7   about the Kelley investigation that the U.S. -- that the

8   Air Force had, the inspector general would have reviewed.

9        And then they would have conducted -- and I believe this

10  particular section goes through some detail about the

11  particular interviews with the case agents and the supervisors

12  involved in this case.

13       So the DoD IG would have reviewed documentary evidence and

14  testimonial evidence -- or actually conducted interviews in

15  this regard to make this determination.

16  Q.  Okay.  And let's look -- well, let me ask you this:  You

17  know, the office of DoD IG, I assume, is not an expert on the

18  specific subject matters that they investigate, necessarily?

19  A.  Well, I would -- I would -- I would back up just a moment.

20       The team that conducted or produced this particular report

21  would have been a multidisciplinary team.  And it would have

22  contained evaluators, most likely auditors, administrative

23  investigators, and certainly criminal investigators, would

24  have all been part of the team developing this report.

25       So your question is -- if your statement was that the IG

1   would -- the IG's expertise would not necessarily include

2   criminal investigation or criminal investigation techniques, I

3   would -- I would disagree with that.

4       I'm certain, if -- I'm certain that the -- well, let me --

5   let me back up and say reports of -- like this that were

6   prepared during my tenure would have included a team that

7   included criminal investigators that were experienced --

8   experienced in conducting criminal investigations.

9   Q.  And that's exactly what I was getting at, sir.

10      Does the IG's office, when they conduct an investigation

11  like this, have access to the lawyers, legal staff, criminal

12  investigators -- really, the subject matter experts -- that

13  allows them to reach conclusions such as the one that it

14  reached in Joint Exhibit 3, page 66?

15  A.  Yes, sir, they do.

16  Q.  Okay.  Let me show you, then, another example finding.

17  And I will show you page 98 of Joint Exhibit 3.  98.  And

18  we'll zoom in to the -- really, the first and a half of the

19  second paragraph under "3.  AFOSI operations tempo."  Yes.

20      And, sir, I'll just represent to you here that the IG here

21  is looking at various investigations at -- specifically at

22  Detachment 225.  And the question the IG is posing is whether

23  the failure to submit Devin Kelley's fingerprints is an

24  isolated incident or a systemic problem at this time.

25      My question to you, sir, is when -- is the DoD IG's

1    examination into systemic problems something that the DoD IG
2    regularly conducts?
3    A.  Well, the systemic problem in terms of -- had certainly
4    been pointed out in the 2015 report.  So "regularly conducts,"
5    the IG would have been -- and did, I think, in 2017 conduct a
6    followup to the 2015 report.
7         So in terms of identifying a systemic problem like the
8    failure to report criminal history data, the IG identified it,
9    and the IG did follow up on it.
10   Q.  Okay.  And similar to how we talked about the 2015 report,
11   when they're looking at 84 investigations and -- open
12   investigations and 70 closed investigations during the Devin
13   Kelley -- at Detachment 225, where are they getting that data
14   from?
15   A.  Well, they would -- they would probably be getting that
16   data from the Defense Information -- DIBRS, Defense
17   Information -- and I don't remember -- DIBRS.  And I never can
18   remember that without looking at my notes.
19        But there's -- and also by "we examined 70 closed
20   investigations for fingerprint cards," I would say here, that
21   to me would read, they examined the case files of 70 closed
22   investigations.
23   Q.  So would that be something that the Air Force would be
24   cooperating with the IG, to provide them that data?
25   A.  Yes.

JON RYMER – DIRECT                                     889

1   Q.  Okay.  Let me show you Joint Exhibit 27, page 1.  And I'm

2   going to zoom in to the highlighted portion of Joint

3   Exhibit 27.

4       And can you identify for us what you're seeing in terms of

5   Joint Exhibit 27, page 1.

6   A.  Yes.  This is the -- this is the response by the Air Force

7   to the Office of Inspector General's data call, if you will,

8   the information that the Department of Defense inspector

9   general requested from the Department of the Air Force.

10  Q.  Okay.  And so we have some background and we're aware of

11  what we're looking at, the DoD IG is asking the Air Force to

12  provide information concerning the Devin Kelley

13  failure-to-submit report; is that correct?

14  A.  Yes, sir.

15  Q.  Okay.  And is this the type of information DoD IG -- or

16  inspector generals rely upon in their investigations?

17  A.  Yes, sir.

18  Q.  Okay.

19  A.  One type, yes, sir.

20  Q.  Yes.  Absolutely.

21      Let me show you page 2 of Joint Exhibit 27 -- sorry,

22  page 2.  And I'll zoom in on page 2.

23      And you can see the date of this report and that it

24  concerns Mr. Kelley; right?

25  A.  Yes, sir.

1   Q.   And, here, I want to point out, who is the IG –– the

2   Air Force IG that is providing and signing off on this report?

3   A.   Well, this –– I believe –– this is Colonel Zoerlein,

4   AFOSI IG investigating officer.  So he was part of the –– from

5   this signature block, I would surmise that he is the IG –– the

6   Air Force IG's investigating officer within the Air Force

7   Office of Security Investigations.

8   Q.   Okay.  So does this go back to how you were discussing

9   earlier that the Air Force IG wears the AFOSI command hat as

10  well, that the Air Force IG is in the chain of command for the

11  Air Force Office of Special Investigations?

12  A.   Yes, it does.

13  Q.   Okay.  Let me go to page 62 of this document.  And I'm

14  just going to zoom in on the first part, which says

15  "Findings."

16       First of all, you've reviewed this document.  Is that

17  fair?

18  A.   Yes.  Uh-huh.

19  Q.   Is it fair to say that this –– in Joint Exhibit 27, the

20  Air Force IG reaches conclusions similar to the conclusions

21  that the DoD IG reached in the Devin Kelley matter?

22  A.   As I recall, yes, sir.

23           MR. JACOB:  Okay.  And if we can zoom back out,

24  please, to page –– and this is page 62.

25

1    BY MR. JACOB:

2    Q.  And I'll represent to you, pages 62 to 69 of Joint

3    Exhibit 27 are redacted in this litigation.

4        When the DoD IG receives documents and findings such as

5    this, do they receive a redacted version or an unredacted

6    version?

7    A.  I never recall a data request from the services that

8    included redacted information like this.

9    Q.  Okay.  So if the Air Force provides the DoD IG redacted

10   information, say, on probable cause, does the DoD IG have the

11   power or authority to request the underlying information from

12   the service branches?

13   A.  Yes, sir.

14   Q.  And could you describe that power of authority.

15   A.  Well, that is described -- or is in the Inspector General

16   Act, that the inspector general of any agency has access to

17   all the records of the agency; in this case, all the records

18   of the Department of Defense.

19   Q.  Okay.

20   A.  There is a caveat -- there is a caveat in the IG Act

21   regarding national security items, that at the discretion of

22   the secretary of defense, some of that information can be

23   withheld.  But information like this regarding an

24   investigation, I find it would -- all I can say is, I've never

25   seen a report from one of the services to the IG that

1    contained redactions like this.

2    Q.  So if the Air Force disagreed with any findings or

3    conclusions that the DoD IG reaches in a draft report, would

4    that be noted by the DoD IG?

5    A.  Yes.  If there were –– if there were –– I think in some of

6    these reports, there were a couple of instances –– the

7    Air Force, first of all, in the reports that I reviewed,

8    agreed with the findings and recommendations or, in one case,

9    used the word "concurred" with the findings and

10   recommendations.

11   Q.  Yeah.

12   A.  There were examples –– I'm sure that everyone has read

13   these reports.  And you all see a couple of examples where

14   the –– one example, in particular, where the Navy disagreed

15   and explained why they disagreed.

16       So that's typically how it would occur.  If there is

17   disagreement, the report is submitted in draft form to the

18   subject organization.  And they have the opportunity to review

19   it and come to their own conclusions about whether or not they

20   agree with the findings, whether there's problems with the

21   information in the report, or whether they disagree with the

22   recommendations or the path that the IG is suggesting for

23   remediation.

24   Q.  Okay.

25   A.  So, yes, there is an avenue set forth in the –– in the

 1   policies and procedures regarding how these reports are

 2   developed for the subject of the report to respond to either

 3   inaccurate information or to disagree with recommendations

 4   made by the agency IG, which, in this case, would be the

 5   DoD IG.

 6   Q.   Are you aware whether the DoD IG in the Devin Kelley

 7   report that we were discussing previously noted in any fashion

 8   that the Air Force disagreed with any findings, including the

 9   probable cause findings that the DoD IG reached?

10   A.   No.  As I recall, the Air Force concurred with all the

11   findings that the IG reached.

12   Q.   Okay.  Let me show you page 70 of Joint Exhibit 27.  And I

13   want to show you, first, that first finding.

14        It says, "Improper indexing was a widespread problem in

15   AFOSI at the time of the Devin Kelley investigation."

16        Do you see that?

17   A.   Yes, sir.

18   Q.   So is it fair to say that the Air Force IG is agreeing

19   with the DoD IG's conclusion regarding the systemic nature of

20   this problem?

21   A.   Yes, sir.  I think the word "widespread" would imply it's

22   a systemic problem, yes, sir.

23   Q.   Okay.  Let me zoom out and show you the third finding of

24   the Air Force IG.

25        Here, the Air Force IG is saying, "Command policy and

1    training appeared adequate, but key Detachment 225 personnel

2    did not know/understand AFOSI policy with regard to indexing."

3        Is that a similar finding that the -- the DoD IG had?

4    A.  Yes, sir, it is.

5    Q.  Okay.  Let me -- let me take down Joint Exhibit 27 and ask

6    you a few follow-up questions.

7        Like I said at the beginning of this conversation, instead

8    of going through each of the findings of the DoD IG, I want to

9    talk to you about the specific findings and ask you, to a

10   reasonable degree of certainty, have you reached conclusions

11   on the reliability of the reports issued by the various IG's

12   in this case?

13   A.  Yes, I have.

14   Q.  Were their evidence-collection methods reasonable?

15   A.  Yes, sir.  They -- everything that I've -- that I

16   reviewed -- and I principally relied on both reports and then

17   the depositions that I read and then my understanding of the

18   standards that were in place for production of such reports.

19   The Council of the Inspectors General on Integrity and

20   Efficiency promulgates standards on how these reports are to

21   be constructed.

22       The CIGIE, if you will, or Council of Inspectors General,

23   also -- in addition to publishing standards on how the reports

24   are to be put together, they also have a peer-review process

25   where the control environment under which the reports were

1    produced is examined and tested.  I reviewed the peer-review

2    report for the Office of Inspector General for the period in

3    question when these reports were -- the period in which these

4    reports were prepared.

5        That peer-review report was prepared by the inspector

6    general of the Department of Health and Human Services, and

7    the Department of Health and Human Services IG determined that

8    the DoD IG evaluation process was sufficient, and essentially

9    passed them.  The -- the Health and Human Services IG wrote a

10   report that indicated that the DoD IG had passed the -- trying

11   the peer review for that period -- covering that particular

12   period.

13   Q.  Mr. Rymer, did you find, to a reasonable degree of

14   certainty, that the inspector general, in issuing these

15   reports that we discussed, had sufficient information to reach

16   reliable conclusions?

17   A.  Yes, sir, I did.

18   Q.  To a reasonable degree of certainty, were the conclusions

19   and the findings in the IG reports, that you reviewed, the

20   product of reliable methods and principles?

21   A.  Yes, sir.  Again, based on the -- based on my reading of

22   the report and my reading of the peer review and my

23   understanding of the standards, there -- the report complied

24   with the standards.  The standards complied with the -- or the

25   report complied with the DoD standards, and those DoD

1   standards complied with the CIGIE standards or the

2   government-wide standards regarding the production of

3   evaluation reports.

4   Q.  And does compliance with the standards mean a reliable end

5   product?

6   A.  Yes, sir.  That's the intent.  The standards are to -- are

7   in place to produce a product that can be relied upon, both by

8   the public and the Congress.

9         MR. JACOB:  Your Honor, we pass the witness.

10         THE COURT:  Let's go ahead and take a ten-minute

11   break.

12      *(Recess)*

13      *(Open court)*

14         THE COURT:  Thank you.  Please be seated.

15      Your cross.

16                   CROSS-EXAMINATION

17   BY MR. STERN:

18   Q.  Mr. Rymer, good morning again, sir.

19         THE CLERK:  Excuse me.

20   BY MR. STERN:

21   Q.  Mr. Rymer, good morning, sir.

22   A.  Yes, sir.  Thank you.

23   Q.  Can you hear me okay?

24   A.  Yes, sir, I can.

25   Q.  Thank you.

1          As you may recall, my name is Paul Stern.  I'm an attorney

2    with the United States Department of Justice.

3          Thank you for your time today.

4    A.  Yes, Mr. Stern.

5    Q.  Just a few questions, sir.

6          The DoD Office of Inspector General produces somewhere

7    around 500 reports, investigations, evaluations, audits in any

8    given year.  Is that fair?

9    A.  Somewhere around, yes, sir.  That's correct.

10   Q.  I believe you spoke with Mr. Jacob about a few of those

11   reports, and so I'd like to discuss them.

12         If we could start at Joint Exhibit 14.  I believe this was

13   the IG report from 1997 that was referred to?

14   A.  Yes, sir.

15   Q.  Are you aware that the NICS did not start in operation

16   until November 1998?

17   A.  I was a little foggy on the date.  But, yes, sir, I agree

18   with you.  Yes, sir.

19   Q.  Okay.  So this report predates the operation of NICS?

20   A.  Yes, sir, it does.

21   Q.  In fact, if we look at page 3, when we look at "Evaluation

22   Objectives," as Mr. Jacob noted, "The primary objective was to

23   evaluate whether DCIOs are reporting criminal history data to

24   the FBI in compliance with DoD Criminal Investigations Policy

25   Memorandum Number 10" or CPM Number 10.

1      Did I read that correctly?

2  A.  Yes, sir.  And it goes on to say that those requirements,

3  I think, became effective in March 1987.  Yes, sir.

4  Q.  That's correct.

5      In fact, if we take a look at page 8 of this report.  Take

6  a look at the bottom portion -- little bit lower.

7      It reads, "United States Code, Title 28, Section 534,

8  states, the Attorney General shall acquire, collect, classify

9  and preserve criminal history information, and shall exchange

10 such records and information with other law enforcement

11 officials."

12     Did I read that correctly?

13 A.  Yes, sir.

14 Q.  And then, "The Criminal Information Services Division,

15 Federal Bureau of Investigation, is designed for complying and

16 disseminating criminal history record information."

17     Is that correct?

18 A.  "Is designated for complying and disseminating," yes, sir.

19 Q.  I'm sorry.  Thank you.  "Designated for complying and

20 disseminating criminal history record information."

21     So this is saying the obligations stemmed from

22 28 U.S.C. 534; is that correct?

23 A.  Yes, sir.

24 Q.  Is that Uniform Code of -- I'm sorry.  The Uniform Crime

25 Reporting Act?

1    A.  Yes.

2    Q.  And then if we look at the next page, the first part talks

3    about the CFR as it relates to the Uniform Crime Reporting

4    Act?

5    A.  Yes.

6    Q.  And that the agencies are now to submit fingerprints and

7    final dispositions as a result of the Uniform Crime Reporting

8    Act; correct?

9    A.  Yes.

10   Q.  And then to start the next paragraph, "On March 25th,

11   1987, the deputy inspector general, Department of Defense,

12   issued Criminal Investigation Policy Memorandum Number 10" or

13   CPM Number 10, "criminal history data reporting requirements."

14       Did I read that correctly?

15   A.  Yes, sir.  Yes, sir.

16   Q.  So essentially, the requirement to submit fingerprints and

17   final dispositions derived from the Uniform Crime Reporting

18   Act; correct?

19   A.  Yes.

20   Q.  And in order to give guidance to DCIOs, the deputy

21   inspector general issued CPM Number 10?

22   A.  Yes, sir.

23   Q.  Let's take a look at page 53.  And this is the Air Force's

24   response to this IG report.

25       It's pretty blurry, so if we can blow up the portion that

1   says, "We concur with your findings on noncompliance."  Thank

2   you.

3        It reads, in part, "We concur with your findings of

4   noncompliance.  The Air Force Office of Special Investigations

5   (AFOSI) has been working on this issue since its March 1993

6   evaluation of required documentation in AFOSI investigative

7   files."

8        Did I read that correctly?

9   A.  Yes, sir.

10  Q.  So –– so essentially, the Air Force Office of Special ––

11  of Special Investigations was aware of CPM Number 10 and had

12  actually evaluated itself as early as March 1993?

13  A.  Yes, sir.

14  Q.  It goes on to read, a little bit lower down, "DoD IG's

15  recent evaluation report found that high noncompliance levels

16  occurred –– between CPM 10 lacks adequate procedural guidance.

17  AFOSI found a similar problem with its implementing regulation

18  (AFOSI Regulation 124-102).  To remedy that problem, HQ AFOSI

19  issued clarifying guidance on 13 Nov" –– or November –– "1995

20  requiring AFOSI special agents to coordinate with installation

21  staff judge advocates" –– or SJA –– "to determine the best

22  time to fingerprint subjects of a criminal investigation."

23       Did I read that correctly?

24  A.  Yes, sir, you did.

25  Q.  Okay.  So essentially, this is saying AFOSI recognized the

1  problem within CPM Number 10 and took its own steps to remedy

2  the issue by establishing its own policies.  Is that fair?

3  A.  Yes, sir.

4  Q.  Looking at the next page, it reads, "We concur with the

5  recommendation that procedure guidance found in DoD IG's

6  14 November '96 memorandum to the military departments will be

7  used until a new DoD instruction is developed.

8      "Please note that AFOSI already has a more restrictive

9  policy implemented" that suggests -- "than that suggested in

10  the 14 November 1996 memorandum.  We do not believe it prudent

11  at this time to relax or change our requirements, which

12  presently appear to be working well."

13      Did I read that correctly?

14  A.  Yes, sir, you did.

15  Q.  So this is saying that AFOSI already recognized the

16  problem and had devised more restrictive obligations than the

17  DoD Office of Inspector General had devised; correct?

18  A.  Yes, sir.  That's what it said.  Yes, sir.

19  Q.  And they themselves thought it prudent not to relax or

20  change those more restrictive requirements at the time?

21  A.  Yes, sir.

22  Q.  In fact, their own policies at the time became the genesis

23  for DoD Instruction 5505.11, did it not?

24  A.  I don't know that, sir.

25  Q.  Okay.  If we look at page 19.

1      Let me ask you this:  Are you aware that the Department of

2  Defense Office of -- it's fine.

3      Sir, let me ask it this way:  Are you aware that the DoD

4  Office of Inspector General concurred with the fully

5  responsive comments by the Air Force office of inspector --

6  Office of Special Investigations?

7  A.  Could you show that in the report, sir?  It should --

8  Q.  I am trying.

9  A.  I'm sorry.  I understand we're having maybe a technical

10  issue.  But I would -- I would say, I would find it unusual

11  that the DoD IG would say they concur.  And that may be the

12  word they use, but I think most typically it would be the IG

13  accepts the response of the Air Force, and no further action

14  is required.

15      Now, that's typical.  I don't remember how it's worded

16  specifically in this report.

17  Q.  Fair enough, sir.  And I think you're right.

18      If we look at the first line of the evaluation response,

19  "We consider the Army and the Air Force comments fully

20  responsive."

21  A.  Yes, sir.

22  Q.  So it's fair to say that AFOSI's comments to the DoD OIG

23  were deemed fully responsive?

24  A.  Yes, sir.

25  Q.  Fair enough.

1          Let's look at the next report that was referenced, and
2     that's Joint Exhibit 1.
3          This is the evaluation of Department of Defense compliance
4     with criminal history data reporting requirements; correct?
5     A.  Yes, sir.
6     Q.  You already spoke to plaintiffs' counsel about this
7     report, so we don't have to go to great length.
8          But you were the IG at the time of this report?
9     A.  Yes, sir, I was.
10    Q.  You weren't directly involved with any of the underlying
11    investigation that led to this report; correct?
12    A.  I'm sorry.  I didn't hear the first part of your question.
13    Q.  You were not directly involved with any of the
14    investigation that led to this report; correct?
15    A.  That's correct, sir.  Yes.
16    Q.  You didn't -- you didn't conduct any of the interviews
17    that led to this report?
18    A.  No, sir.
19    Q.  You didn't obtain any of the material yourself?
20    A.  No, sir.
21    Q.  Okay.  In fact, if we look at the signature page on this
22    report.  Right there.
23    A.  Yes, sir.
24    Q.  That is not your signature on this report; correct?
25    A.  No, sir.  That's Randy Stone.  Randolph Stone was a direct

1    subordinate of mine, the deputy inspector general of policy

2    and oversight.

3    Q.  So you might have reviewed a summary of this report, but

4    not the report itself.  Is that fair?

5    A.  That's correct, sir.

6    Q.  Okay.  If we take a look at page 3 of this report.  Take a

7    look at the "Objective."  And I believe you already addressed

8    this with plaintiffs' counsel, but I want to make sure we're

9    very clear about the issue here.

10       The range of the -- of the sample size, as you suggested

11   previously, was between June 1, 2010, and October 31st, 2012;

12   correct?

13   A.  Yes, sir.  That's correct.

14   Q.  And as you already testified, Devin Kelley was not

15   convicted within that time period?

16   A.  He was convicted, I believe, in November 2012, sir.

17   Q.  That's correct.

18       So not in this time period; correct?

19   A.  That's correct, sir, yes.

20   Q.  So as a result, you acknowledge that Kelley's file would

21   not have been part of the sample study by the IG in this

22   report?

23   A.  Yes, sir.  That's correct.

24   Q.  Thank you.

25       And looking at the "Findings" section, the first part, it

1   shows an aggregate of noncompliance for Navy, Air Force, and

2   Marines; correct?

3   A.  Yes, sir.  That's correct.

4   Q.  That's –– the first part being aggregate for fingerprints,

5   and the second part being an aggregate for a final

6   disposition?

7   A.  Yes.

8   Q.  And in their "Recommendations" section, the first part,

9   "We recommend the secretaries of the Navy and Air Force take

10  prompt action to submit the missing 304 fingerprints and 334

11  final disposition reports to the FBI for inclusion into

12  IAFIS."

13      Do you know what IAFIS is?

14  A.  Sir, there would be an abbreviation index at the back of

15  the report.  I would just have to refer to that.

16  Q.  But you don't know offhand?

17  A.  Not offhand.  I don't remember.  It's been five years

18  since I was the IG.

19  Q.  Sure.

20      So this report is saying, within the sample size, certain

21  fingerprints and final dispositions were deemed to be missing;

22  correct?

23  A.  Yes, sir.

24  Q.  And as a result, these missing fingerprints and final

25  dispositions within that sample size –– or the sample period

1    should be submitted?

2    A.   That's correct.

3    Q.   Correct.

4         And, again, that didn't include Devin Kelley's?

5    A.   That's correct.

6    Q.   Right.

7         Then the second recommendation, "In addition, we recommend

8    the secretaries of the Navy and Air Force take prompt action

9    to ensure fingerprints and final disposition reports for

10   future arrestees and convicted offenders conform to Department

11   of Defense Instruction 5505.11, Fingerprint Card and Final

12   Disposition Report Submission Requirements."

13        Did I read that correctly?

14   A.   Yes, sir, you did.

15   Q.   And this report was issued February of 2015; correct?

16   A.   Yes, sir.  That's right.

17   Q.   So this recommendation here would have been

18   forward-looking; isn't that correct?

19   A.   Yes, sir, it was.

20   Q.   And, again, Devin Kelley was convicted before

21   February 2015?

22   A.   Yes, sir.  That's correct.

23   Q.   Okay.  Now, I want to take a look at AFOSI's -- and by

24   "AFOSI," do you appreciate that I'm referring to the Air Force

25   Office of Special Investigations?

1    A.  Yes, sir.  I understand that.

2    Q.  Do you mind if I use "AFOSI" for short?

3    A.  No, sir.  That'd be fine.

4    Q.  I appreciate that.

5        Let's take a look at the recommendation -- I'm sorry --

6    the response by AFOSI to these recommendations.  Let's take a

7    look at page 31, please.  If we could blow up the portion that

8    says, "AFOSI was tasked with validating 271 service members."

9    Thank you.

10       If we cut to the bottom portion of this paragraph, it

11   reads, "However, AFOSI correctly submitted 245 out of 261

12   fingerprints and 244 out of 261 final dispositions to

13   IAFIS" -- or IAFIS, IAFIS -- "which reflected a 93.86 percent

14   success rate for fingerprints and a 93.48 percent success rate

15   for final dispositions."

16       Did I read that correctly?

17   A.  Yes, sir.

18   Q.  So, in other words, AFOSI told the inspector general in

19   2015 that it was complying at rate of 94 percent, roughly, for

20   compliance with fingerprint cards and final dispositions;

21   correct?

22   A.  No, sir.  I don't think that's what that's saying.

23   Q.  That is --

24   A.  Well, if I could maybe explain.  And maybe I'm wrong.  But

25   the -- AFOSI was tasked with validating 271 member service

1  criminal histories.  My assumption would be, reading that,
2  that those 271 were in the -- were part of the 1,100 sample
3  that was the foundation for this report.
4      So to say that they're in compliance with 93 percent
5  success rate for final disposition reports, I think that
6  93 percent success rate would be 93 percent of the 271 service
7  member criminal histories that were in the original sample.
8  Q.  Well, that's exactly right --
9  A.  Not overall -- not overall 93 percent success rate.
10  Q.  But we're looking at the point in time; correct?
11      In 2015, the Department of Defense Office of Inspector
12  General conducts an evaluation based on a sample size;
13  correct?
14  A.  Yes, sir.  Yes, sir.
15  Q.  And based on that sample size, AFOSI determined that they
16  had a 94 percent compliance rate; correct?
17  A.  Could you give me a second, sir, to look at it in just a
18  little bit more detail.
19      Yes, sir, I believe that's correct.
20  Q.  Okay.  And the recommendation from this report, being
21  forward-looking, asks for better compliance with future --
22  concerning future arrestees; correct?
23  A.  Yes, sir.
24  Q.  Okay.  So to be clear, it did not require a comprehensive
25  review of all criminal history data being reported, going back

1  to 1997, did it?

2  A.  No, sir.  It did not.

3  Q.  Now, I want to discuss one last report with you, and that

4  is Joint Exhibit 2, DoD IG 2018-035.

5      If we look at the date on this report, it's December 4,

6  2017.  That's approximately one month after the shooting;

7  correct?

8  A.  Yes, sir.  I believe that's correct.

9  Q.  If we look at the "Objective" section on page 3, the

10 objective -- "The objective of our evaluation was to determine

11 whether all military services law enforcement organizations

12 (LEOs) had submitted fingerprint cards and final disposition

13 reports for military service members convicted by

14 court-martial of qualifying offenses, as required by DoD

15 instruction."

16     Did I read that correctly?

17 A.  Yes, sir.

18 Q.  If we look down to the chart on the first page here, the

19 DoD Office of Inspector General found that AFOSI had a

20 98 percent compliance rate for fingerprint card submission;

21 correct?

22 A.  Yes, sir.  Yes, sir.

23 Q.  For fingerprint card.  Okay.  We'll get to the final

24 disposition as well, because final disposition, the DoD Office

25 of Inspector General found that AFOSI, again, had a 98 percent

1   compliance rate?

2   A.  Yes, sir.

3   Q.  And if we look at the recommendation by the IG in this

4   report -- and that's on page 4 -- this recommendation reads,

5   in part, "Immediately perform a comprehensive review of their

6   criminal investigative databases and files to ensure that all

7   required fingerprint cards and final disposition reports for

8   disqualifying offenses at least to 1998 have been submitted to

9   FBI CJIS in compliance with DoD and FBI requirements."

10      Did I read that correctly?

11  A.  Yes, sir.

12  Q.  So here, despite AFOSI's 98 percent compliance rate, the

13  IG, one month after the shooting, recommends that the

14  secretaries of Army, Navy, and Air Force, as well as the

15  undersecretary of defense for intelligence and the deputy

16  chief management officer, that they perform comprehensive

17  reviews going all the way back to 1998; correct?

18  A.  Yes, sir.

19  Q.  Okay.  But prior to the shooting, such a comprehensive

20  audit or review was not required or even recommended in either

21  of the two IG reports already reviewed; isn't that correct?

22  A.  Yes, sir.

23  Q.  I believe Mr. -- plaintiffs' counsel used the word "aware"

24  when it comes to the 2015 IG report.

25      Is it your expert opinion that the 1997 IG report and the

1  2015 report made the Air Force aware of its requirements to

2  submit disqualifying information to CJIS?

3  A.  Yes, sir.

4  Q.  And that they didn't prioritize that obligation?

5  A.  Well, I think if we had a noncompliance rate at that time

6  in the 30 percent range, there were certainly -- it should

7  have -- in my view, should have been higher, yes, sir.

8      So whether or not they didn't put the right -- the

9  emphasis that I would recommend on it, that seemed obvious to

10  me, sir, yes.

11  Q.  So, again, AFOSI had approximately a 94 percent compliance

12  rate; correct?

13  A.  A 94 percent compliance rate?  I think that was in the

14  2017 report.

15  Q.  The 2015 report that we already looked at?

16  A.  2015 report, yes.

17  Q.  Okay.  But in your estimation, it should have been higher;

18  correct?  Is that your testimony today?

19  A.  Well, I'm sorry.  You've lost me, sir.  I'm not -- I'm not

20  following you.  If you could -- if you could restate that.

21  I'm sorry.  I lost track there.

22  Q.  AFOSI was found to have a 94 percent compliance rate in

23  the 2015 report; correct?

24  A.  Yes.

25  Q.  And it's your testimony -- is it your testimony that AFOSI

1   didn't prioritize the submission of fingerprints and final

2   dispositions sufficiently?

3   A.  Well, I think the evidence shows, sir, that there -- when

4   you say "didn't," you don't specify period of time.  But

5   certainly in the '97 report, the 2015 report, there were

6   opportunities for improvement, yes, sir.

7   Q.  Opportunities for improvement.  Is that fair?

8   A.  Yes, sir.

9   Q.  Thank you.

10          MR. STERN:  No further questions, Your Honor.

11          THE COURT:  Any redirect?

12          MR. JACOB:  Yes, Your Honor.

13                      REDIRECT EXAMINATION

14  BY MR. JACOB:

15  Q.  Mr. Rymer, let me -- can you hear me?

16  A.  No, sir, I can't.

17  Q.  Can you hear me better now?

18  A.  Yes, sir.

19  Q.  Okay.  Mr. Stern discussed with you how the IG

20  investigations, in your opinion, didn't recommend fixing or

21  submitting Devin Kelley's criminal history.

22          Do you remember that conversation?

23  A.  Yes, sir.  I think Mr. Stern -- or I think I answered

24  Mr. Stern by saying that the -- that the Devin Kelley

25  conviction was outside of the sample period.  Yes, sir.

1   Q.  Right.

2       But did the Air Force have an ongoing obligation to submit

3   the missing criminal history of Mr. Kelley?

4   A.  I think, in order to be in compliance with its own

5   regulation and the DoD regulation, yes, it did.

6   Q.  And Mr. Stern showed you numbers on the percentage of the

7   AFOSI reporting.

8       Did he show you numbers on the percentage of security

9   forces reporting?

10  A.  I think it was on the chart, but I don't think he

11  mentioned it, no, sir.

12  Q.  Okay.  And specifically, I want to look at the raw

13  numbers.  If I can show you Joint Exhibit 433, page 5.

14      And I'll represent to you, this is an exhibit that has

15  been entered into evidence, and I want to show you the results

16  of the task force on correcting the problems following the

17  Sutherland Springs shooting.

18          MR. STERN:  Objection, Your Honor.  This is beyond

19  the scope of Mr. Rymer's report.  He did not actually

20  reference the NCIC indexing task force in his report, nor has

21  plaintiffs' counsel alluded to it during their direct.

22          MR. JACOB:  Mr. Stern, however, did show the

23  percentage numbers, trying to minimize the size of the

24  problem, when this document shows that they had 73 -- over

25  7,300 missing fingerprints and final dispositions from the

 1  Air Force itself.

 2          MR. STERN:  To be quite clear, the United States is

 3  not making that argument.

 4      What we are saying is, at the time that the IG reports

 5  were produced, the AFOSI -- the Air Force, in general, was

 6  only aware of that which they're being told at the time.

 7  These type of subsequent remedial measures are not only

 8  inappropriate under tort law to consider, but they skew the

 9  entirety of what was being known -- what was being told to the

10  Air Force at the time those previous IG reports were created.

11          MR. JACOB:  Your Honor, this is admitted evidence.

12          MR. STERN:  -- bias here.

13          MR. JACOB:  This is admitted evidence.  Their

14  objection to subsequent remedial measures is long past.

15          THE COURT:  Yeah.  So --

16          MR. STERN:  That's a legal argument that has never

17  been waived.  Just because --

18          THE COURT:  That doesn't go back to the underlying

19  objection of whether or not he was designated to talk about

20  the indexing task force.  So that is sustained.

21      Next question.

22          MR. JACOB:  Yes, Your Honor.

23  BY MR. JACOB:

24  Q.  Mr. Rymer, Mr. Stern discussed with you that, in response

25  to these IG reports, the Air Force provided a response.

1      Do you recall that conversation?

2   A.  Yes, sir.

3   Q.  And he pointed out, the DoD considers the Air Force

4   response or the Air Force comments as being responsive; right?

5   A.  Yes, sir.

6   Q.  And to be clear, the DoD IG did not concur with the

7   Air Force response.

8      That's not what those documents said; right?

9   A.  Well, I think –– I think the word was "accepted."  I don't

10  think they used the word "concur," no, sir.

11  Q.  Okay.  Is there –– is there a difference between

12  responding to the recommendation –– being responsive to the

13  recommendation and actually implementing and responding and

14  fixing the problems the recommendation highlights?

15  A.  Well, most typically, in an evaluation report or an audit

16  report like this, the IG would accept the concurrence or

17  acceptance of the –– of the subject of the audit or

18  evaluation, and then that would also include a remediation

19  plan that the IG would have the opportunity to review.

20     And then as the remediation plan is executed, the IG

21  might –– would be taking steps to ensure that the plan is

22  executed as it was originally presented.

23     But, yes, sir, there is a fair amount of follow-up ––

24  excuse me –– to –– once the report –– once the recommendation

25  is accepted by the subject of the evaluation, the remediation

1   process begins.  That remediation plan is submitted to the IG

2   and then monitored by the IG.  Yes, sir.

3            MR. JACOB:  Okay.  Pass the witness, Your Honor.

4            THE COURT:  Anything else?

5            MR. STERN:  Very briefly, Your Honor.

6                         RECROSS-EXAMINATION

7   BY MR. STERN:

8   Q.  Plaintiffs' counsel just referred to security forces

9   investigation.

10      In your report, you noted that Devin Kelley was subject to

11  two law enforcement investigations; one led by 49th Security

12  Forces at Holloman Air Force Base, the other led by the

13  Air Force Office of Special Investigations Detachment 225;

14  correct?

15  A.  Yes, sir.  That's right.

16  Q.  So you recognize that those were two separate, independent

17  investigations?

18  A.  Yes, sir, I would.

19  Q.  Are you aware that the security forces investigations

20  resulted in a letter of reprimand?

21  A.  A letter of reprimand to whom, sir?  One of the

22  investigating officials?

23  Q.  To Devin Kelley.

24  A.  Well, yes, sir.  I believe there were a number of

25  disciplinary actions, but I believe that was one, yes, sir.

1    Q.  But I'm referring to the investigation starting

2    November 17th, 2012, that led to a letter of reprimand that

3    concluded the security forces investigation of Devin Kelley?

4    A.  Yes, sir.  I believe that's correct.  Yes, sir.

5    Q.  Okay.  And as a result of that letter of reprimand, the

6    final disposition of that investigation would have needed to

7    be submitted to the FBI; correct?

8    A.  Would you -- I didn't understand.  Did you say "would" or

9    "would not" have been submitted?

10   Q.  "Would have."

11       Let me try this another way.  Let's take a look at Joint

12   Exhibit 8.  This is Department of Defense Instruction --

13           MR. JACOB:  Your Honor, I apologize.  This is beyond

14   the scope.

15           MR. STERN:  Look, to the -- to the extent that

16   plaintiffs are arguing that the security forces' failures to

17   submit fingerprints and final dispositions is relevant, as

18   it's articulated in the IG reports, our argument has always

19   been that the security force investigation could not be the

20   proximate cause of plaintiffs' injuries because the security

21   forces investigation ended in a letter of reprimand.

22       As a result, even if the fingerprints needed to be

23   submitted at the time -- probable cause, the final

24   disposition, i.e., the letter of reprimand, would also have

25   needed to be submitted to close the loop on that

1   investigation.

2       Because the letter of reprimand was not a prohibiter under

3   the Gun Control Act, Kelley would not have been prohibited,

4   based on that investigation.  And as a result, it could not be

5   the proximate cause of plaintiffs' injuries.

6           MR. JACOB:  Your Honor -- and they may have another

7   witness to talk about that.  But this testimony with this

8   witness is beyond the scope of redirect examination.

9           MR. STERN:  Then, I would ask to strike the comments

10  regarding the security forces' failure to submit fingerprints

11  and final disposition, as articulated in the DoD IG reports.

12          THE COURT:  The objection's overruled.

13      You can continue.

14          MR. STERN:  Thank you.

15  BY MR. STERN:

16  Q.  If we look at Enclosure 3 in this instruction.

17      Sir, looking at this instruction, it reads, in part,

18  "Within 15 calendar days after final disposition of military

19  judicial or nonjudicial proceedings or the approval of a

20  request for discharge, retirement, or resignation in lieu of

21  court-martial, disposition information shall be reported by

22  the DCIO or other DoD law enforcement organizations under the

23  R-84 or an electronic data transfer equivalent if it has not

24  already been reported on an FD-249."

25      Page 10.  Mr. Rymer, I apologize.  I believe it's

 1  Enclosure 4.  So we're taking a look at this.

 2      It states that, "Within 15 calendar days after final

 3  disposition of military judicial or nonjudicial proceedings or

 4  the approval of a request for discharge, retirement, or

 5  resignation in lieu of court-martial, disposition information

 6  shall be reported by the DCIO or other DoD law enforcement

 7  organization on the R-84 or an electronic data transfer

 8  equivalent, if it has not already been reported on an FD-249."

 9      Did I read that correctly?

10  A.  Yes, sir.

11  Q.  So if a security forces investigation ended in a letter of

12  reprimand -- and you acknowledge that a letter of reprimand is

13  a nonjudicial proceeding; correct?

14  A.  Yes, sir.

15  Q.  Then they -- then security forces would have needed to

16  submit an R-84 to CJIS within 15 days after that letter of

17  reprimand; correct?

18  A.  According to this, yes, sir.

19  Q.  Thank you.

20          MR. STERN:  No further questions, Your Honor.

21          THE COURT:  Anything else?

22          MR. JACOB:  No, Your Honor.

23      May this witness be excused?

24          THE COURT:  Any further need for this witness?

25          MR. STERN:  No need, Your Honor.

```
 1              THE COURT:  Thank you, Mr. Rymer.  You're excused.

 2              THE WITNESS:  Thank you, sir.

 3              THE COURT:  And your next witness.

 4              MR. JACOB:  Yes, Your Honor.  If we may have five

 5    minutes to get him connected and test.

 6              THE COURT:  And that'll be Daniel Webster?

 7              MR. JACOB:  Yes, sir.

 8              THE COURT:  Let's go ahead and take a five-minute

 9    break.

10         (Recess)

11         (Open court)

12              THE COURT:  Thank you.  Please be seated.

13              MR. JACOB:  Your Honor, plaintiffs call Daniel

14    Webster.

15              THE CLERK:  Mr. Webster, if you'll raise your right

16    hand, please.

17         Mr. Webster, if you'll raise your right hand.

18              MR. JACOB:  Mr. Webster, can you hear us?

19              THE WITNESS:  Yeah, I can hear you.

20              THE CLERK:  Mr. Webster, will you raise your right

21    hand, please, so I can swear you in.

22         (The oath was administered)

23

24

25
```

```
 1              DANIEL WEBSTER, PLAINTIFFS' WITNESS, SWORN

 2                         DIRECT EXAMINATION

 3   BY MR. JACOB:

 4   Q.  Sir, would you introduce yourself to the Court, please.

 5   A.  Sure.  My name's Daniel Webster.

 6   Q.  And who is your employer?

 7   A.  Johns Hopkins University.

 8   Q.  And what do you do for a living?

 9   A.  I'm a professor in the Department of Health Policy in the

10   School of Public Health.  I teach graduate courses on violence

11   prevention, research methods.  And I conduct research.  Most

12   of that research is focused on the problem of gun violence and

13   what to do about it.

14   Q.  Okay.  And I want to go into that background in a little

15   bit of detail.

16       But, first, could you tell us, do you have an official

17   title at Johns Hopkins?

18   A.  Sure.  My official title is Bloomberg professor of

19   American health in violence prevention, and I'm a tenured

20   professor.

21   Q.  And is Johns Hopkins School of Public Health a ranked

22   school of public health?

23   A.  Yes, it is.  We're ranked number one.

24   Q.  And let me show you your CV, Joint Exhibit 316 [sic], and

25   talk -- take you through that, if you wouldn't mind.
```

1    A.   Okay.  Sure.

2    Q.   First of all, do you see Joint Exhibit 316 on your screen?

3    A.   Yes.

4    Q.   And is Joint Exhibit 316 a copy of your CV?

5    A.   Yes, it is.

6    Q.   You've reviewed this CD.  Is that –– CV.  Is that fair?

7    A.   Sure.  Yes.

8    Q.   And is Joint Exhibit 613 accurately fleshing out your

9    experience, your credentials, education, training?

10   A.   Yes, it is.

11   Q.   Okay.  First, could you describe for us briefly –– and

12   I'll zoom in on your education and training –– your

13   educational background.

14   A.   Sure.  I have a bachelor's degree in psychology from

15   University of Northern Colorado.  I have a master's in public

16   health degree from University of Michigan, completed in 1985.

17   And then I got my doctorate of science degree from the same

18   department I now teach in, at the Johns Hopkins School of

19   Public Health in 1991.

20   Q.   Okay.  And I apologize if this question sounds very basic.

21      But could you tell us what public health is, the study of

22   public health?

23   A.   Okay.  That's actually sort of challenging because public

24   health is pretty massive.

25      But, generally, the field of public health, of course, is

 1    interested in not only the health and safety of individuals,

 2    but of populations.  So the field is very vast.  It's a very

 3    multi-disciplined field.

 4        The way I characterize public health is, it's a field

 5    focused on solving problems relevant to our health and safety.

 6    And, of course, that's very broad, but that's truly what

 7    public health is.  And my focus has been on policies -- health

 8    policies that impact the health of populations.

 9    Q.  Okay.  And today, in your career, do you have a specific

10    focus inside of public health, an area that you specialize in?

11    A.  Yes.  For the past thirty years, my focus has been on the

12    prevention of gun violence, including suicide, unintentional

13    shootings as well.  I also have subarea of focus in issues

14    relevant to drug and alcohol policy as well.

15    Q.  Okay.  And is public health a field of epidemiology?

16    A.  Epidemiology is a foundation upon which most of public

17    health is based.  It is -- it is where we begin to understand

18    the nature of the problem, who's affected by it, the scope of

19    it, and understand causal factors related to the health

20    conditions that we're studying and trying to impact.

21    Q.  Okay.  And so what I'd like to do for the Court is show

22    the Court how you got from your various degrees, your

23    master's, doctor's, and bachelor's, to your current role.

24        Could you tell the Court where you started your career.

25    A.  Sure.  After I got my bachelor's degree, shortly

1    thereafter, I became a social worker for the Department of

2    Social Services in the Commonwealth of Kentucky where my role

3    was to mostly investigate child abuse and neglect.

4        I also was involved in supervision of some juveniles who

5    had gotten into trouble.  And occasionally, I also dealt with

6    broader family violence issues in my role.

7    Q.  And was that a fairly hands-on role?

8    A.  Very directly hands-on, yes.

9    Q.  Okay.

10   A.  I went into homes in the county that I worked in, worked

11   directly with the -- with the families and other agencies that

12   were relevant to the situation going on, whether it was

13   schools or hospitals or the court systems.

14   Q.  Okay.  And after your role as a social worker, following

15   your degree in -- where did you go?

16   A.  I went to University of Michigan to get my master's of

17   public health.  It was there that I began to focus more on

18   injury and violence prevention and -- yeah.

19   Q.  Do you -- let me show you page 22 of your CV, Joint

20   Exhibit 316 -- or 613.  I apologize.

21   A.  Okay.

22   Q.  Since your educational -- since you received your master's

23   and then your doctorate of science in these fields, have you

24   taught these areas?

25   A.  Yeah.  I actually developed the first course in an

1   accredited school of public health on violence prevention.  So

2   I was very much involved in the foundation of understanding

3   violence through a public health lens as a public health

4   problem.  I've also taught courses in research methodology.

5       What's not on this is a brand-new course I'm teaching now,

6   a problem-solving course focused on gun violence.

7   Q.  And could you describe what you mean by "a problem-solving

8   course" on gun violence?

9   A.  Sure.  So this is a course that takes graduate students

10  through the entire process, from gathering data, to understand

11  the nature and scope of the problem, who is impacted,

12  developing conceptual models of that problem and logic models

13  for various strategies to address it, to formally reviewing

14  and synthesizing evidence on intervention models that --

15  excuse me -- that impact the nature of gun violence that

16  you're focused on and even carries through into understanding

17  key issues relevant to implementation.

18      This covers not only the passage and enforcement of laws,

19  but it also covers programmatic interventions in communities.

20  Q.  Okay.  And you said over the course of your 30 years that

21  you've been working on this particular area, the touching on

22  gun violence prevention and policy.  Over that time has

23  your -- how do you divide your time between teaching versus

24  research or other activities?

25  A.  Yeah.  I would say that roughly 75 percent of my time is

1   focused on research, and the other 25 percent is focused on

2   teaching, advising, mentoring graduate students.

3   Q.  Over the course of your career, how many students have you

4   taught, advised, mentored in these areas?

5   A.  Yeah, that's hard.  So as far as doctoral students, I've

6   probably advised and have close working relationships with

7   about a dozen such students.  I've trained many of the top --

8   or leading researchers in this field.

9       I also have mentored roughly 50 master's students, many of

10  whom focused in some, shape, or form on violence prevention

11  and often very specifically on gun violence.  Then, of course,

12  I taught, I don't know how many people over those years.  A

13  lot.

14  Q.  Do you testify before legislatures on these issues?

15  A.  Yes.  Occasionally, I do testify at state legislatures and

16  in Congress.

17  Q.  Are you invited to testify?

18  A.  Sometimes, yes.  That's more commonly the scenario.

19      I'm pretty busy.  So the nature of my research -- there is

20  often legislative things going on all the time.  And I, of

21  course, don't have time to testify on all of those cases.  But

22  occasionally, I'm asked, based upon the nature of the bill and

23  the research that I've done on the topic.

24  Q.  Are you invited to provide presentations or educational

25  materials outside of your work with Johns Hopkins concerning

1    the topics of gun violence prevention and all of the issues in

2    that area?

3    A.  Yes, quite frequently.  I've given many invited talks and

4    lectures at universities across the country.  More than I

5    could count.

6    Q.  Are we talking, you know, dozens or hundreds?  What's ––

7    A.  Oh, so in a typical year, I'm probably giving four,

8    five –– about four lectures at other universities or –– and

9    then in addition to that, there are other meetings and

10   convenings of other professional organizations; like the

11   National Academy of Sciences, for example.  So ––

12   Q.  Yeah.  Can you give me an example of a few universities

13   that you have lectured at or have invited you to lecture?

14   A.  Oh, sure.  So I've given lectures at Harvard, Penn,

15   Columbia –– let's see –– Oregon Health Sciences, Ohio State,

16   Michigan.

17   Q.  How about the University of Texas?

18   A.  University of Texas?  I'm trying to think if I've done

19   them.  I'm not sure if I have or not.

20   Q.  Okay.  Let me turn your attention to your –– the

21   "Publications" area of your CV.  And I want to show you

22   page 8 ––

23   A.  Sure.

24   Q.  –– of Joint Exhibit 613.

25   A.  Uh–huh.

1   Q.  And, first of all, that's just the beginning portion of

2   your publications.  Is that fair to say?

3   A.  Yeah.  That's the most recent ones.  And this is what I

4   believe I submitted in March or something of --

5   Q.  Is --

6   A.  -- the prior year.

7   Q.  Sure.

8       Can you tell the Court how many peer-reviewed publications

9   you have to your name?

10  A.  I think I have approximately 140.

11  Q.  Do you have publications in other journals beyond just

12  peer-reviewed publications?

13  A.  Yeah, occasionally.  Most of my work is peer-reviewed

14  publications.  Occasionally, I will write op-eds in, you know,

15  *Washington Post* and other news outlets of that type.

16      And, occasionally, I'm also invited by journals to write

17  special commentaries on the issue of gun violence and its

18  prevention.

19  Q.  Have you published -- and if we can zoom back out to your

20  full CV.

21      Have you published in the areas of gun violence and gun

22  violence prevention?

23  A.  Yes.  I would estimate -- I haven't broken this down, but

24  I would estimate probably three-quarters, if not more, of my

25  publications are on the topic of gun violence and its

1    prevention.

2    Q.  What about domestic violence?  Have you published or

3    studied that area?

4    A.  Yes, I have.  I actually designed and was the second

5    author of a very important study on risk and protective

6    factors for intimate partner homicide.  I believe it actually

7    might be the most commonly cited study in the field of

8    domestic violence research, as important ramifications for

9    understanding how we address this important problem of

10   domestic homicide.

11   Q.  And when you say "most commonly cited study," how many

12   citations are we talking about?

13   A.  I don't know off the top of my head.  There was an article

14   that came out within the past year that sort of summarized

15   some of these things.

16       Some researchers track these things almost obsessively.  I

17   don't.  I know it's a commonly cited thing.  But in a

18   publication that came out recently, I saw that it was -- it

19   was the number one.

20   Q.  Can you tell the Court why you study domestic violence in

21   the context of gun violence prevention?

22   A.  Yeah.  I guess the answer to that question is twofold.

23       One is it's just an important form of gun violence.  It

24   also is a type of gun violence that I think perhaps we have

25   more opportunities to intervene with policy and other

1    interventions.

2        The other thing I would say, the important reason to

3    understand and study connections between domestic violence and

4    firearms, in particular, is that many people who –– the people

5    who commit the most severe forms of domestic violence in

6    intimate partner violence, including those involving firearms,

7    are rarely only violent within that context.  They more

8    commonly are violent outside of that intimate partner or

9    family context.

10       And so understanding and zeroing in on such individuals,

11   you have a potential to address not only the problem of

12   domestic homicide but also other acts of violence that

13   individuals with histories of domestic violence might commit.

14   Q.  Okay.  And we'll definitely get into that later in our

15   conversation.

16       But first, with regard to the research that you've

17   published over the course of your 30 years, how is that

18   research typically funded?

19   A.  Most of my research has been funded by private

20   foundations.  I've also received grants from the Centers for

21   Disease Control and Prevention to study strategies to

22   prevent –– to prevent youth homicide and youth violence.  I've

23   had three different CDC grants covering five years ––

24   five-year grants, for example.

25       I've had some NIJ grant funding; although, not

1   particularly recently.  And some of my research has been

2   funded sort of in partnerships with law enforcement agencies

3   through U.S. DOJ grant funding from the Bureau of Justice

4   Assistance.

5   Q.  Okay.  Let me take down Joint Exhibit 613, so we can talk

6   more directly with you.

7       Are you familiar with the concept of research as applied

8   to individuals versus theoretical research?

9   A.  Sure.  Well, I'm not sure what you mean by "theoretical

10  research."  So you're going to have to be more specific about

11  that.

12  Q.  Yeah.  What I want to talk about is the applied aspect of

13  your -- of research.

14      Is the research studies that you perform applied to

15  specific individuals or more broad -- broader than that?

16  A.  Well, I've conducted two kinds of research.  Some of the

17  research that I've done of the nature that I was describing

18  earlier where we're understanding risk and protective factors

19  for lethal outcomes in the context of domestic violence, those

20  are individual-level studies that were interested in all the

21  individual factors going on so that we can predict outcomes

22  and ideally try to intervene before the bad outcomes occur.

23      But a lot of my research focuses at the population level.

24  So the units of analysis that we're studying could be

25  counties, cities, or states and what policies they've applied

1   to address problems relevant to violence and, particularly,

2   gun violence.

3   Q.  Have you studied the concept of risk among individuals in

4   that type of population and specifically domestic violence and

5   gun violence individuals?

6   A.  Yes, absolutely.  The foundational study that I was

7   referring to earlier with the -- it was 11 major cities,

8   geographically diverse across the United States, focused --

9   looking at -- actually, there were three categories.

10      There were intimate partner homicides, another category

11  that were either near -- sometimes we call them near homicides

12  or attempted homicides.  These were very serious assaults that

13  people were lucky to survive.  And then the other category

14  were the nonfatal cases where we identified those individuals

15  through random-digit-dial surveys in communities to identify

16  women who were either in physically abusive relationships or

17  recently out of them.

18      That study was designed very specifically to understand

19  these individual risks, and it was the foundation upon which

20  two different tools that are commonly used across the

21  United States, and I think actually beyond, one called the

22  danger assessment tool.  I believe it's 22 items designed to

23  predict how dangerous someone is, particularly with lethal

24  outcomes.  And then a somewhat shorter tool used in the field

25  by -- often by law enforcement and -- or occasionally in

 1   clinical contexts, shorter survey designed to do the same kind

 2   of thing of sort of sort and identify those at the highest

 3   risk for committing lethal acts of violence.

 4   Q.  And could you explain to the Court your role in creating

 5   these tools, such as the danger assessment tool and the second

 6   high-risk individual tool?

 7   A.  Sure.  So the -- it was based upon, you know, a design of

 8   an initial study, a design that in epidemiology we refer to as

 9   a case control study.

10       The cases are the outcome of interest in this case,

11   intimate partner homicides.  And the controls were people in

12   very similar circumstances who had, you know, not been killed

13   in their relationship, that also had physical violence.

14       So part of it is the design, just -- by the way, I mean,

15   in an ideal world, if you had unlimited time and money --

16   which we never do, of course -- you would just study entire

17   populations and sort these risk factors out.  But, of course,

18   you need to be more efficient.  And a common way that

19   epidemiologists do that is through a case control design.

20       We then -- in terms of assessing risk for something like

21   the danger assessment or lethality assessment tool, it's based

22   upon a set of weights, which set of factors are most

23   predictive of elevated risk, in this case, for the outcome of

24   domestic homicides.

25       So the factors, such as the abuser's possession of a

1    weapon, which we found to elevate risk more than any other

2    independent risk factor –– so those –– the weights of how much

3    these conditions, in a sense, either increase or decrease risk

4    are factored in the overall danger score or lethality score.

5    Q.  And what kind of organizations or institutions use your ––

6    the tools that you design –– the danger assessment tool, the

7    high-risk individual assessment tool –– in their day-to-day

8    lives?

9    A.  So I want to give credit where credit is due.  My

10   colleague, Jacquelyn Campbell, is the primary author of the

11   danger assessment and developed a lot of the underlying

12   theory.  And then we worked together on some of the research.

13   So I just want to make sure I'm giving the appropriate credit.

14       But in terms –– to answer your question, these are tools

15   that are used in law enforcement agencies, probably in every

16   single state by now.  I know, not that long ago, it was

17   40-some states were using the tool.

18       It's a tool that's used in programs that serve victims of

19   domestic violence for emergency shelter and other types of

20   services.  It's used by legal clinics that serve that same

21   population, and it's also used by health professionals who

22   encounter and treat and try to provide assistance to patients

23   who come in with that type of history of domestic violence.

24   Q.  And is the tools that you and your colleague, Ms. –– or

25   Dr. Campbell, developed used on an individual-by-individual

1   basis, or is it a broader tool?

2   A.   Individual basis, yeah.  I mean, you cannot calculate with

3   great precision, of course, it across whole populations.

4        So the tool is designed, based upon the underlying study,

5   to look at the individual set of factors going on for that --

6   in that individual's case.

7   Q.  And have subsequent studies borne out the reliability of

8   these danger assessment tools that you and Dr. Campbell

9   designed?

10  A.  Well, there are other studies that look at risk factors

11  for lethal outcomes.  They don't always cover every single

12  thing that's in the danger assessment.  But there's

13  independent research support for the key factors that are

14  included there, such as history of strangulation -- or

15  sometimes the victims use the word "choking"; "he choked

16  me" -- threats with a weapon and the presence -- the abuser's

17  ownership of a weapon.

18       A lot of those factors have also been studied and

19  corroborated, I guess, in prior -- in other studies.

20  Q.  Okay.

21            MR. JACOB:  Your Honor, at this time, we offer

22  Dr. Webster in epidemiology, gun violence policy and

23  prevention and public health policy.

24            MS. KRIEGER:  No objection.

25            THE COURT:  Y'all need to be more specific in

 1   objections.  Is there --

 2           MS. KRIEGER:  I said, "No objection."

 3           THE COURT:  No objection.  Okay.  Thank you.  All I

 4   heard was "objection."

 5           MS. KRIEGER:  I apologize.  I apologize, sir.

 6      No objection.

 7           THE COURT:  The doctor's recognized as an expert as

 8   such.

 9   BY MR. JACOB:

10   Q.  Dr. Webster, I want to shift gears a little bit and talk

11   about this particular case.  Could you tell the Court what you

12   were asked to do in this case.

13   A.  Yeah.  So I was asked to look at the set of facts and

14   provide my assessment of whether it was foreseeable that

15   Mr. Kelley, Devin Kelley, could commit serious acts of

16   violence, to examine what happened or didn't happen with

17   respect to his prior history, criminal history, and the

18   records involved, and draw upon both my own research but other

19   research to provide an assessment whether this is -- this was

20   basically something that could have been prevented.

21   Q.  And we'll get to that in detail, but I know -- I

22   understand that you've reviewed thousands, probably, pages of

23   documents in this case.

24      Would you mind giving the Court a brief overview of the

25   types of information that you reviewed in this case.

 1   A.   Sure.  So I reviewed files from the investigations of

 2   domestic violence, the interviews of Air Force personnel who

 3   were Devin Patrick's supervisors.  I reviewed interview

 4   documentation from interviews with Devin Kelley's father and

 5   family members connected to Tessa and Danielle, his first and

 6   second wife.

 7        I'm trying to remember what else I reviewed now.

 8   Q.   Well, if I can ask you about some categories.

 9   A.   Yeah.

10   Q.   First of all, I assume in your day-to-day practice, you

11   review studies that are directly applicable to these types of

12   issues that we're about to discuss?

13   A.   Oh, yes.

14   Q.   Did you review mental health records of Devin Kelley?

15   A.   Yes, I did.

16   Q.   What about post-shooting investigations in this case?

17        And when I refer to "shooting," I mean the Sutherland

18   Springs shooting in November of 2017.

19   A.   Yeah.  So what I particularly remember and keyed in on was

20   the assessment when he was involuntarily hospitalized due to

21   some mental breakdowns and an assessment of depression,

22   suicidality, antisocial behavior disorder.  That -- those

23   were, I think, particularly key and important, as well as a

24   very direct assessment of his danger to others at that time.

25   Q.   And what about depositions in this case?

1          Did you review depositions of the various witnesses

2     involved in this case that were taken?

3     A.   Yes.

4     Q.   And trial testimony?

5          We've had the testimony of Danielle Smith; Michelle

6     Shields; and Mr. and Mrs. Kelley, the parents of Devin Kelley.

7          Did you review that testimony?

8     A.   Yes.

9     Q.   And more broadly speaking, was this case –– your

10    involvement in this case, the first time you had heard about

11    the Sutherland Springs shooting?

12    A.   Oh, no.  Of course, you know, I study gun violence.  This

13    was a major event.  So I was –– I definitely followed what was

14    in the news as information came out about it.

15    Q.   Okay.  And could you briefly describe to the Court when

16    the first time –– and the circumstances surrounding the first

17    time you heard about this particular case?

18    A.   Yeah.  So, you know, I remember, as more information came

19    out about, you know, why –– you know, why would someone come

20    to a church and commit this act of violence?

21         Most commonly, in any shooting, but particularly in mass

22    shootings, this is not random.  Targets are not random.  There

23    are, of course, exceptions, but usually they're motivated.

24    They're motivated by a sense of grievance and anger towards

25    someone or some set of individuals.

1      So as it became, you know, more known about his spouse's

2   family's connections to that church and Danielle Kelley's own

3   connections to that church as being a very important place for

4   her, in my mind, I understood this as, again, something that

5   was very much a family domestic violence-oriented and

6   motivated attack.

7      It is something -- again, there's too many cases to count

8   in which very deadly shootings are motivated by these -- you

9   know, intense emotions and grievance -- feelings of grievance,

10  to intimate partners, in particular.  So that is what struck

11  me about this case in particular, and just also discussing

12  this among my colleagues, who, you know, share a similar

13  interest in understanding gun violence, what motivates it.

14  Q.  So when you learned about this case, did you learn about

15  it through your job as a gun violence prevention researcher

16  and professor at Johns Hopkins?

17  A.  Well, I didn't undertake a separate study of this

18  particular incident.  I just -- frankly, I'm often asked to

19  comment on such tragedies in the news media.  So I want to

20  become as knowledgeable as I can about the set of facts at

21  play.  So --

22  Q.  And since that time, have you found out much more

23  particular details about this case than what you learned

24  initially?

25  A.  Oh, yeah.  Yeah, a lot more.  I did not really know

1  Mr. Kelley's -- Devin Kelley's full history.  Of course, I did

2  know, because it was a major item -- newsworthy item and also

3  relevant to gun policy, that in his history were these

4  convictions for felony domestic violence that should have

5  prohibited him from purchasing the rifle that he used in this

6  shooting.

7  Q.  Okay.  And we'll get to that.

8      But before we do, I want to ask you, is your approach to

9  this case and the conclusions that you reached in this case

10  the same approach you take in your day-to-day professional

11  career as a gun violence prevention professor and researcher

12  and scientist?

13  A.  So yes and no.  Yes, in that I am looking at data and

14  research and trying to draw what I think are the best

15  inferences, most solid inferences from that available

16  research.  Usually, my job as a policy researcher, I am not

17  looking at every individual case in the same sort of detailed

18  way as I am now, because usually the level of detail is not,

19  frankly, there to do that.

20      So, you know, more commonly, my research that I do, I am

21  not as in the weeds of all the set of factors at play in going

22  about my research.  But, again, this was a different case

23  and --

24  Q.  So in this case, would it be fair to say you have more

25  information than you typically have access to in reaching your

1    conclusions?

2    A.   Far more, yes.

3    Q.   And did you reach your conclusions with the same rigor

4    that you would use in your professional career?

5    A.   Yes.

6    Q.   Are all of the opinions that you're going to be providing

7    this Court reached to a reasonable degree of certainty?

8    A.   What do you mean by "reasonable degree of certainty"?

9    Q.   Sure.  You know, this is a civil suit, and the opinions

10   you offer have to be to a –– the preponderance of the evidence

11   standard, more likely than not.

12       Are you reaching those –– the opinions that you've reached

13   in this case using that standard?

14   A.   Yes.

15   Q.   Okay.  So the first topic that I'd like to discuss with

16   you is acquisition of firearms by people like Devin Kelley.

17       Is that –– is that a subject that you've studied

18   extensively?

19   A.   Yes.

20   Q.   And have you published in that area?

21   A.   Yes.

22   Q.   And can you describe some of the publications.

23   A.   Yeah.  Maybe the most important and direct one is, again,

24   the study I've referenced a few times now, the risk factors

25   for intimate partner femicide study that I was the second

1   author on, with Dr. Jacquelyn Campbell as the lead, published

2   in *American Journal of Public Health*.

3       There, we studied hundreds of women who were murdered by

4   their either current or former intimate partners, and went and

5   collected data on nonfatal cases in the same cities where

6   these deaths occurred, where these homicides occurred.  And

7   the study was a federally-funded study, incredibly

8   comprehensive.

9       It's hard to imagine what risk factor we didn't examine in

10  our study.  So it was an incredibly comprehensive set of

11  studies -- or, well, principal study there.

12      As I mentioned, there were two key outcomes we were

13  looking at.  We were looking at lethal cases and near-lethal

14  cases.  So we also published on the near-lethal cases as well.

15  Q.  Okay.  And I promise we will get to that study.

16          MR. JACOB:  But before we do, Your Honor, it's about

17  noon.  I don't know if this is an appropriate time, since

18  we've just finished, sort of, the methodology and we're about

19  to go into the substance, to take a lunch break.

20      I'll defer to the Court and counsel on that.

21          THE COURT:  This looks like a good break.

22      I'm just kind of curious, are we going to have available

23  time at the end of the day, or is this witness going to take

24  the whole day?

25          MR. JACOB:  In terms -- this is the only witness left

1    for today.

2              THE COURT:  Right.  Yeah.  That's why I'm asking.

3    I'm trying to figure out -- can I do something at 4:00 or not,

4    is what I'm trying to figure out.  So what's your estimation?

5              MR. JACOB:  If we can take a short lunch --

6              THE COURT:  Yeah.  If I can squeeze another meeting

7    in, that would be great.  But if not, I understand.  And so

8    I'm just trying to figure out schedule.

9         Let's take 30 minutes.  We'll be back about 12:30,

10   12:35-ish.

11        *(Recess)*

12        *(Change in reporter)*

13

14

15

16

17

18

19

20

21

22

23

24

25

DANIEL WEBSTER – DIRECT

1   (Change in reporter.)

2           MR. JACOB:  Proceed, Your Honor?

3           THE COURT:  Yes.

4                   DIRECT EXAMINATION CONT'D.

5   BY MR. JACOB:

6   Q.  All right.  Dr. Webster, can you hear us?

7   A.  Yes.

8   Q.  Okay.  Now I want to talk to you a little bit about the

9   acquisition of firearms by people like Devin Kelley.  And one

10  of the issues that we're dealing with in this case is if the

11  Air Force had exercised reasonable care in collecting and

12  submitting Mr. Kelley's criminal history to the FBI.

13      What I want to know about that particular subject is, is

14  there evidence in your field that individuals like Kelley

15  would be discouraged or deterred from acquiring firearms,

16  altogether, if they had been denied firearms by a FFL, a

17  federal firearms licensee?

18  A.  Yes.  There are -- there is research evidence to support

19  that.  There are at least three that come to mind that are --

20  what I would say are individual-focused as opposed to broad

21  policy-focused, population level.

22      So there's one study.  The lead author is Mona Wright

23  along with Drs. Garen Wintemute and Frederick Rivara, that

24  they studied individuals with a history of prior felony

25  arrests; some of whom were convicted and denied when they

DANIEL WEBSTER — DIRECT

1  attempted to purchase firearms, and another group who did not

2  have a disqualifying conviction and, therefore, were allowed

3  to go forward and purchase.

4  Q.  Okay.

5  A.  In that study, they did find that those — those who were

6  allowed to purchase after controlling for history — prior

7  criminal history had an elevated risk for committing both gun

8  and violent offenses.

9  Q.  Okay.  And I want to —

10  A.  And I talked about —

11  Q.  Yeah, go ahead.

12  A.  Sorry.

13  Q.  Yeah, I want to go through those studies.  You said the

14  first study was Wright.

15      What were the other two studies that you mentioned?

16  A.  Sure.  The other two; one, the first author is, again,

17  Dr. Garen Wintemute.  This focuses on disqualifying violent

18  misdemeanants.  The policy changed in 1990 or '91 — I can't

19  remember exactly — in California.

20      Anyway Dr. Wintemute had access to data for people — from

21  people who were applying to purchase handguns but, before and

22  after that policy change, provided an opportunity to contrast

23  people with, basically, similar prior histories in one portion

24  of time that were allowed to — they were not denied because

25  they're not disqualified yet and, subsequently, those who were

946
DANIEL WEBSTER — DIRECT

1  denied.

2      And then finally, there is a study by — led by

3  Dr. Jeffrey Swanson from Duke University.  Here, the study

4  looked at what happened when the State of Connecticut had a

5  policy change and started to submit its records for

6  disqualifying mental health-related events in the State of

7  Connecticut.

8      And what Dr. Swanson and his colleagues found was that

9  when that policy change occurred, by providing those criminal

10 history records made available for background check for

11 firearm purchases, the rate of violent crime among those for

12 whom this was relevant, meaning those who had mental health

13 disqualifiers, their rate of violent offending was basically

14 cut in half as a result of that policy change.

15     So those are the three that I think are probably most on

16 point.

17 Q.  Dr. Webster, what I'd like to do with you, then, is first

18 I want to give the Court a preview of that opinion that you

19 hold concerning whether Devin Kelley would have been deterred

20 or discouraged from acquiring firearms altogether.

21 A.  Um-hum.

22 Q.  And then, second, go into the studies and any other

23 information you used to reach that conclusion.

24 A.  Sure.

25 Q.  Do you think that would be helpful in understanding your

1  opinions and the underlying science?

2  A.  Yes.

3  Q.  Okay.  So, first, have you reached a conclusion as to

4  whether Devin Kelley would be discouraged or deterred from

5  acquiring firearms altogether if he had been denied at a FFL?

6  A.  Yes.  I think he would have been discouraged.  You never

7  know with 100 percent certainty whether he would have gone on.

8      But the available facts, both from those studies that I

9  mentioned and very specific facts relevant to Devin Kelley,

10  both lead me to believe that he would have been discouraged

11  from accessing the firearms that he used to commit mass murder

12  in Sutherland Springs.

13  Q.  Right.  And that actually goes to — my next question is

14  did you reach that opinion to a reasonable degree of

15  certainty, that more-likely-than-not standard that we

16  discussed?

17  A.  Yes.  Again, I want to stress that when you're trying to

18  predict who is going to commit mass murder, which is a — not

19  a frequent event, that's hard to do.  But what I'm basing my

20  opinion on is that he would have been deterred from serious

21  acts of violence with a gun.

22      The facts available, obviously, are what they are, as they

23  played out, because he did follow through with this particular

24  act.

25      I simply wanted to note that, just because predicting any

DANIEL WEBSTER - DIRECT

1  one single event, particularly an event of this magnitude,
2  would be very difficult.  But it was very foreseeable and
3  predictable that Devin Kelley would commit serious acts of
4  violence, and that those acts would be almost certainly lethal
5  if he had access to a firearm.
6      I also base that opinion based upon Mr. Kelley's history
7  with firearms.  He clearly had a preference for going to -- to
8  purchase his weapons -- his firearms from federally licensed
9  dealers.  That's actually a very logical conclusion or
10 preference.
11 Q.  Um-hum.
12 A.  When you -- I have studied two direct studies of
13 underground gun market behavior, both of those in Baltimore;
14 one with a youthful sample, mostly ages 15 to 20, and then
15 another adult sample.
16     But in each case, we find that there's great hesitancy to
17 engage in a transaction with a firearm with someone you don't
18 know or trust.  And so there's a number of things that come in
19 to play in people's decisions and preferences about if or
20 where they will try to purchase a gun.
21     We know the things that they care about is the reliability
22 of the gun.  If you are purchasing from someone who has a
23 licensed business, you know, there are far more safeguards
24 from a quality standpoint than if you just meet some stranger
25 and said, "Hey, do you want to buy this gun?"

DANIEL WEBSTER – DIRECT

1    There's also great risk to a purchaser in the underground
2    gun market because you could show up with money to buy a gun.
3    And, of course, that person has a gun and could simply take
4    your money, could rob you.  They could be an informant.
5        There's a variety of reasons why people are reluctant to
6    engage in an underground exchange with someone they don't
7    know.
8    Q.  Okay.
9    A.  So there may be a lot of guns in a given place.  But,
10   really, what is relevant is are they guns and suppliers that
11   that potential purchaser trusts, trusts enough to spend money
12   and potentially risk something if they're going to use a
13   firearm and it's not going to work.
14   Q.  Okay.  Well, I do want to get to all of that, but if I can
15   just go one step at a time.  And what I want to do --
16   A.  Sure.
17   Q.  -- is start with the studies that you mentioned earlier,
18   the Wright and Wintemute study.  So let me do that.
19       Let me show you Plaintiffs' Exhibit 757.  And I want to
20   ask you some foundational questions about this study first.
21       First of all, can you identify Plaintiffs' Exhibit 757 for
22   us, please.
23   A.  Yes, it's a study by Garen Wintemute and his colleagues on
24   subsequent criminal activity among violent misdemeanants who
25   seek to purchase handguns.

DANIEL WEBSTER — DIRECT

1  Q.  What journal is this study published in?

2  A.  Journal of American Medical Association, I believe.

3  Q.  Is that a reputable journal?

4  A.  It's one of — the most reputable journal in the field of

5  public health and medicine.

6  Q.  Okay.  Is this article, Plaintiffs' Exhibit 757, a

7  reliable authority in your field?

8  A.  Most definitely.

9  Q.  Okay.

10  A.  It is really hard to get articles published in JAMA.

11  Q.  Okay.

12  A.  Very, very high bar.

13  Q.  Okay.  Well, let's look at the abstract and just cover

14  this study briefly.  If you could —

15  A.  Sure.

16  Q.  I'm going to show you the abstract on Plaintiffs'

17  Exhibit 757, and tell us what the objective of this study is.

18  A.  Yeah.  This study was to determine risk factors for new

19  criminal activity among violent misdemeanants who are seeking

20  to purchase handguns.  Again, these are handguns from licensed

21  dealers — it's not stated there, but that's the nature of

22  this study — and whether denial of such purchase applications

23  by violent misdemeanants affects their risk for arrest for new

24  crimes they commit, particularly those involving guns or

25  violence.

DANIEL WEBSTER - DIRECT

1  Q.  And what did Dr. Wintemute and Dr. Wright discover after

2  studying that issue of whether violent misdemeanants were

3  denied firearms?

4  A.  Yeah.  What they found was that — well, actually, when

5  you compare those who were denied their — when they went to

6  purchase a handgun with those who were allowed to purchase,

7  the purchasers' rate for risk for committing new crimes of

8  violence involving guns were 29 percent higher, with a

9  confidence interval ranging from 4 percent higher to

10 60 percent higher.  This relationship — and I think this is

11 important — did not hold for commissions of crimes that

12 didn't involve guns or violence.

13 Q.  Okay.

14 A.  So this wasn't what we would refer to as a selection bias.

15 There's just more criminal offending in one group versus

16 another.

17     This effect of being denied was very specific to the type

18 of events one would hypothesize if denial makes a difference

19 in risk for future commission of acts of violence —

20 Q.  Okay.

21 A.  — and those involving guns.

22 Q.  And can you tell us how many people did this study

23 examine.

24 A.  Yeah.  So there were — let me see.  They had follow-up

25 information on 1,654 subjects.

DANIEL WEBSTER — DIRECT

1   Q.  Okay.

2   A.  Yeah.

3   Q.  And could you read for us the conclusion of this study.

4   A.  Yeah.  The results indicate that denial of handgun

5   purchase to violent misdemeanants is associated with a

6   specific decrease in risk of arrests for new gun and/or

7   violent crimes.

8   Q.  Okay.  And it uses the phrase "violent misdemeanants."

9       Could you tell us what a violent misdemeanant is, as used

10  in this study?

11  A.  Sure.  In this study, it means someone who was convicted

12  of a violent crime classified as a misdemeanor as opposed to a

13  felony crime.

14  Q.  Okay.

15  A.  So, again, based upon California's law in the early '90s,

16  those set of individuals, at least for a period of time, until

17  many years they've demonstrated they haven't committed any

18  other prohibitive offenses, that they're prohibited based upon

19  state law.

20  Q.  Are there studies that examine what happens when felons

21  are denied firearms?

22  A.  Yes.  That's a separate study that I examined.  Mona

23  Wright was the lead author of that.  Garen Wintemute and

24  Frederick Rivara were coauthors.

25  Q.  Okay.  Can I show you Plaintiffs' Exhibit 753, please.

DANIEL WEBSTER - DIRECT

1   And can you identify for the Court what Plaintiffs'
2   Exhibit 753 is.
3   A.  Yes.  It's an article in — I believe this was published
4   issued in American Journal of Public Health — yes.  Yeah —
5   in 1999.  Yeah.  Thank you.
6       So what these researchers were able to do is to examine,
7   again, a cohort of two different kinds of individuals, both of
8   whom were — you know, had —
9   Q.  Sure.  And, Dr. Webster, before we jump into that, let me
10  just ask you a couple more foundational questions.
11      Is Plaintiffs' Exhibit 753 is a reliable authority in your
12  field?
13  A.  Yes.
14  Q.  And is the American Journal of Public Health a reputable
15  publication?
16  A.  Yes.
17  Q.  Okay.  With that in mind, let's just take this one step at
18  a time.
19  A.  Sure.
20  Q.  And I'm going to show you that highlighted portion, and I
21  want you to read that highlighted portion to the Court and
22  then I'd like to discuss it.  Okay?
23  A.  Okay.  I have to adjust something on my screen so I can —
24  part of this is blocking it, so just bear with me just one
25  second.

DANIEL WEBSTER - DIRECT

1      Okay.  "We report the results of a cohort study as
2   criminal activity among two groups of persons attempting to
3   purchase handguns in California in 1977.  The first group's
4   handgun purchasers were denied as a result of a prior felony
5   conviction.  The second group's purchases were approved.
6   Members of this group had prior felony arrests but no felony
7   convictions."
8   Q.  Okay.
9   A.  "We hypothesized that the risk" --
10  Q.  Keep going, please.
11  A.  Okay.  "We hypothesized that the risk for subsequent
12  criminal activity would be lower for those whose handgun
13  purchases were denied than for those whose purchases were
14  approved."
15  Q.  Okay.  So in layman's speak, could you explain the
16  hypothesis of this article, Plaintiffs' 753?
17  A.  Yeah, I'll do my best.  I think what these researchers
18  were trying to do is say let's look at two groups, both with
19  criminal histories.  There's a variety of reasons why some
20  might lead to convictions or not.  And let's try to adjust for
21  the differences in their criminal histories and determine
22  whether their future offending is different, basically.
23  Q.  So if I understand you, does this study examine two groups
24  of individuals; both of which who have a violent gun arrest
25  history?

DANIEL WEBSTER — DIRECT

1  A.  They're a broad group.  A subset of them, their felony is

2  specific to guns and violence arrest.  Not all of them have

3  such an arrest.

4  Q.  Okay.  So talking about that —

5  A.  But they do have felony arrests.  Sorry.

6  Q.  Yes.  So talking about that subset of individuals, is the

7  article dividing that into individuals who subsequently go and

8  purchase a gun and are denied and individuals who subsequently

9  go and purchase a gun and have — are granted access to that

10  gun?

11  A.  That's exactly what this is, yes.

12  Q.  And so are Wright and Wintemute examining the reoffending

13  rate of the individuals that are denied versus the reoffending

14  rate — violent gun violence rate of those who actually are

15  granted access to firearms?

16  A.  Yes.

17  Q.  So what does that tell us?  What could the results of that

18  tell us about an individual like Devin Kelley?

19  A.  Well, it would tell us whether — at least on average in

20  this population, whether denial lowers risk.

21      We don't know for certain whether it would apply exactly

22  in his situation, but in my opinion, I think it would.  And I

23  can explain that.

24  Q.  Yes?

25  A.  That's — he clearly falls within — if his case would

1  have been thrown in to the records that Wright, Wintemute, and
2  Rivara were examining in this case, he would be included in
3  this — he would be included in this cite.
4  Q.  Okay.  Well, let's take a look at the records.  And to do
5  that, I want to show you the second page of Plaintiffs'
6  Exhibit 753.  And they have a table, Table 2, that shows us
7  the results.
8      And if you could, take the Court through what we're
9  looking at on Table 2 of Plaintiffs' Exhibit 753.
10  A.  Could I ask to start with Table 1?  Because I actually
11  think that's foundational.
12  Q.  Okay.  Well, let's start with Table 1, then.
13  A.  Thank you.
14  Q.  So what —
15  A.  Go ahead.  Sorry.
16  Q.  No, no.  What is Table 1 showing us?
17  A.  Yeah.  So it is showing the crude and adjusted relative
18  risks for committing criminal activity after an attempt to
19  purchase a handgun, relative to persons whose purchases were
20  denied.
21      Again, I have to adjust my screen a little bit because
22  part of this is blocking.  But that's fine.
23      So the top row shows, in essence, accrued relative risk,
24  not adjusting for anything.  And there you see — so the
25  relative risk, if it's 1, means that there's no difference

DANIEL WEBSTER – DIRECT

1  between being denied or purchasing a gun, for example.

2       So the crude relative risk for gun and violent offenses

3  points towards purchase elevating risk, but it is not

4  statistically significant without first adjusting for age or

5  prior weapon and violent arrest charges.

6       So as I look at these data, what I think is most important

7  here is adjusting for prior –– the number of prior weapon or

8  violent arrests.  So that –– excuse me –– that third row

9  there, that's focusing on –– the one up even above that too.

10 The last two are relevant.

11      So the first one adjusts for prior weapon or violent

12 arrests, the number of such cases in their history –– criminal

13 histories.  And there you see a statistically significant

14 elevated risk for gun offenses and violent offenses if you

15 were allowed to purchase as opposed to being denied.  Also

16 true, a very similar relationship based upon the number of

17 prior arrest charges that did not involve a weapon or violent

18 charges.

19      So there, I think, is the most straightforward and

20 fundamental way to look at these –– the difference between

21 these two cohorts; one of which was allowed to purchase, and

22 one of which was denied.  And those who were allowed to

23 purchase had a significantly higher rate of offending after

24 you adjust for these prior number of offenses.

25 Q.  Okay.  And in layman's speak, if we're going back to the

DANIEL WEBSTER — DIRECT

1  two groups, one — both subset of groups that have a violent

2  offense or gun offense in their past, one group is denied, and

3  the other group is allowed access to the firearm, who commits

4  more firearms-related offenses or violent offenses?

5  A.   Those who were allowed to purchase as opposed to those

6  denied.

7  Q.   Okay.  And I want to look at some of the other text in

8  this article and maybe jump to the — to some of the

9  conclusions that help us understand this data a little bit.

10     First, the highlight at the bottom, I want to pull that

11  out for you.

12  A.   Um-hum.  Okay.

13  Q.   And could you read that highlighted portion from

14  Plaintiffs' Exhibit 753?

15  A.   "Among those with only one prior weapon or violent arrest

16  charge, purchasers were two to four times as likely to be

17  charged with new offenses as those who were denied."

18  Q.   Okay.  And when they use "violent" or "arrest" — "violent

19  arrest charge," what do they mean by that?

20  A.   Number of arrests that were connected to violent offenses

21  or weapon offenses.

22  Q.   Okay.  So I guess my question is are we talking about

23  incidents, or what they subsequently go on to get charged

24  with?

25  A.   Oh, this elevated risk for what — are what they

DANIEL WEBSTER - DIRECT

1  ultimately go on to be charged with, after they went to apply

2  to purchase a handgun.

3  Q.  Oh.

4  A.  I don't know if I'm answering the right question.  Sorry.

5  Q.  Yeah.  I guess what I'm asking is are we talking about —

6  so, for example, among those with one prior weapon or violent

7  arrest charge, would that be — would that fit Devin Kelley,

8  as we knew him in 2012?

9  A.  I think it would.  But, honestly, I'm not 100 percent sure

10 based upon how these researchers would classify it.

11 Q.  And could you —

12 A.  Because — yeah, sorry.

13 Q.  Could you explain that.

14 A.  Well, he had one incidence in which he was arrested, but

15 he was subsequently charged with more than one violent crime.

16     So it's not 100 percent clear to me whether this would

17 be — he would be categorized in this group based upon his

18 arrest, or whether he would have been — this case would have

19 been classified as — as — based upon multiple charges of

20 violence.

21 Q.  When epidemiologists do studies like this, do they look at

22 the specifications that prosecutors end up charging an

23 individual, or do they look at individual's incidence of

24 arrest?

25 A.  Well, more commonly, we look at incidence of arrest.  You

DANIEL WEBSTER – DIRECT

1  know, criminologists or law professors, perhaps, might be more

2  inclined to look at arrest charges.

3      But I think more commonly within the field of

4  epidemiology, we're looking at instances of cases of —— in

5  this case, of arrest.  But, again, it's not 100 percent clear

6  from their writing, in my opinion.

7  Q.  And let's look back at the broader study.  And I want to

8  ask you two more questions about the broader study.

9  A.  Okay.

10  Q.  In terms of comparing the two groups, that one group of

11  violent felons that are denied weapons versus the group of

12  violent felons that have —— are gained access to weapons, you

13  know, more likely than not, what is your belief in terms of

14  the impact of this study concerning the facts we know about

15  Devin Kelley?

16  A.  Yeah.  So, to me, this —— what this study says is that

17  clearly there are some individuals with serious violence

18  charges in their history who are deterred from committing

19  future acts of violence when they are denied when they go to

20  purchase a handgun from a licensed dealer.

21      Mr. Kelley, you know, again, within this large cohort,

22  some who —— the group that were denied, some were able to get

23  a gun, and some were not.

24      What I understand about the facts in Mr. Kelley's case,

25  Devin Kelley's case, I'm skeptical about his capacity to

1  get — to find a trusted supplier and a trusted gun to commit
2  an act of the type that he committed.
3  Q.  Okay.  And, I guess, that's the next area I want to cover
4  is your scientific basis for those opinions.  But before we
5  do, let me cover this last conclusion paragraph that they
6  offer.  And that's the second highlight that we have in
7  Plaintiffs' Exhibit 753 on page 2.
8      Could you read the conclusion paragraph to the Court,
9  please.
10  A.  Sure.  "We do not know whether those denied legal handgun
11  purchase obtained a firearm by other means.  But while this
12  policy's immediate objective is to prevent acquisition of
13  handguns by high-risk individuals, its overall goal is to
14  reduce their rate of criminal activity.  Our evidence
15  indicates that this occurs."
16  Q.  Okay.  And —
17  A.  So, again, what these researchers are concluding, which is
18  similar — basically, the same as my own conclusion, which is
19  that this is — this policy of denying people ability to
20  purchase handguns based upon their criminal convictions does
21  reduce their rate of criminal activity, including offenses
22  with violence that involve violence and/or firearms.
23  Q.  Okay.  And —
24  A.  So — yeah.
25  Q.  And that leads me to the next question, which is did you

DANIEL WEBSTER - DIRECT

1  consider whether Kelley could have gotten firearms from

2  someone other than a federally licensed firearm -- federal

3  firearms licensee?

4  A.  Of course.  Yes, that's always a possibility.

5  Q.  Right.  And you previewed that information.

6     But could you tell us what are the factors that deter

7  people from buying guns outside of the an FFL?

8  A.  Yeah.  I was mentioning this earlier, but I'll go through

9  this.

10     So I think this applies to most products that we might

11  want to purchase, but I think it's particularly important when

12  it comes to firearms that you should be, and many are, quite

13  particular of the quality of the product that they're getting.

14  They want to make sure that it can fire and not jam or

15  whatever because sometimes, of course, their life could depend

16  upon whether the firearm works properly or not.

17     The other reasons include -- and this is something that we

18  found in a study we conducted with youthful offenders in

19  Maryland -- is that they were very reluctant to buy a gun from

20  a stranger because that gun might be used -- might have been

21  used in another crime.  And if you're arrested with such a

22  firearm, you could get a lot of unwanted attention from police

23  and prosecutors about your potential connection to serious

24  violent crimes.

25     So, generally, there is a preference for new so-called

DANIEL WEBSTER — DIRECT

1  out-of-the-box guns that you are much more, you know, trusting

2  that, A, they work; B, they haven't been used in violent

3  crimes.

4  Q.  Okay.

5  A.  The last part — let me — if you don't mind —

6  Q.  Yeah.

7  A.  — to complete the thought is that there's two things that

8  you're looking for here; you're looking for trust in the

9  product, and you're looking for trust in the supplier or

10  seller of that firearm.

11     And what we've learned in our studies — and this is

12  consistent with other studies as well — is that people are

13  very reluctant to purchase firearms from someone they don't

14  know and trust.

15     From what I understand of Mr. Kelley's case, he did not

16  really have an extensive network of friends or family who were

17  willing to buy him a gun or supply him with a gun.  And so

18  Mr. Kelley would have been forced to venture out into the

19  rather risky and unpredictable marketplace in which you could

20  get robbed, you could get a bad gun, you could get a gun

21  connected to a prior crime.  A whole range of other outcomes

22  that aren't particularly an attractive to you.

23  Q.  Okay.  So if I understand your testimony correctly,

24  there's sort of three factors that come into play when getting

25  guns outside of an FFL.

DANIEL WEBSTER – DIRECT

1      It's the risk involved, the reliability of the firearms,
2  and the social network of the individual -- the immediate
3  social network of the individual itself.
4      Did I understand you correctly?
5  A.  Exactly, yes.
6  Q.  So let's take those each at a time.
7      With regard to the risk involved, are there any studies
8  and research on point?
9  A.  Well, yes.  The one I referred to earlier in our own
10 studies.  You can see more broadly -- there's a study that is
11 U.S. Department of Justice study that -- based upon a
12 representative sample of people in state prisons that ask
13 fairly detailed questions about firearm use and acquisition.
14     What you'll find there is that the predominant way in
15 which people acquire guns outside of licensed dealers is from
16 family and friends.
17     There's this other category in the Department of Justice
18 surveys -- the most recent one was 2016 -- that says it's just
19 a rather broad and, as a researcher, a frustrating category of
20 the street.  But, again, what we found, at least from our
21 studies -- and there's another study in Chicago with very --
22 basically the same finding, which is, as I was saying, a
23 great, great reluctance to engage with business on buying
24 firearms unless you trust that underground source.
25 Q.  Sure.

DANIEL WEBSTER - DIRECT

1  A.  So —

2  Q.  And have you personally conducted any recently studies —

3  recent studies directly on this issue of acquisition of

4  firearms and underground markets?

5  A.  Yes.  We published a study recently of people on parole

6  and probation in Baltimore city.

7  Q.  And how many people did you survey?

8  A.  200 or — roughly 200, yeah.

9  Q.  And what were the results of your surveys of individuals

10  in Baltimore?

11  A.  Well, what we found is something very basic that, frankly,

12  a lot of people don't get and understand, that they believe

13  that, oh, anybody can get a gun anytime they want; it's a

14  piece of cake.

15      Well, we found many people — again, these were people on

16  parole or probation — who said they wanted a firearm, but

17  they did not get one.  And in many cases, they were not able

18  to get someone to buy a gun for them, again, because there's

19  risk all around here.

20      You need to the convergence of people who are accepting

21  risk on the acquisition and the supply side of this exchange.

22  Q.  So are you saying, so in order to get a firearm from an

23  individual outside of the FFL, you're bringing a certain

24  amount of cash to an individual that you know is heavily

25  armed?

1  A.  Well, you know —

2          MS. KRIEGER:  Objection.  Leading.

3          THE WITNESS:  — they at least have one gun.

4          THE COURT:  One second.  Doctor, one second.

5          MS. KRIEGER:  I said, "Objection.  Leading."

6          THE COURT:  That's sustained.

7  BY MR. JACOB:

8  Q.  What are the causes of an individual recognizing risk in

9  an underground gun transaction with a person they are

10 unfamiliar with or do not know?

11 A.  Well, as I — I was saying before that there are multiple

12 risks.  I think the most direct risk is that you could be

13 robbed, perhaps shot as well; you're bringing cash, again, to

14 this underground exchange.

15     I mean, that's why underground marketplaces, whether it's

16 drugs or guns or whatever, there's tons of risk there.  But

17 when you know the person you're going to engage with, with

18 cash, has a firearm, there is reluctance and there's a risk.

19 And there has to be some assurance that this person thinks

20 they can trust this person with this exchange.

21 Q.  Okay.  And then —

22 A.  And — go ahead.  Sorry.

23 Q.  Well, yeah, that leads me to the second factor, the

24 immediate social network.

25     Did you review Mr. Kelley's family testimony in trial

DANIEL WEBSTER — DIRECT

1  today?

2  A.  Yeah.

3  Q.  And previous last week as well?

4  A.  Previous.  Previous, yes.  Yeah.  So my understanding is

5  that his father did not trust Devin Kelley with firearms,

6  would not give him one, would store his guns in a manner —

7          MS. KRIEGER:  Objection.

8          THE WITNESS:  Sure.

9          MS. KRIEGER:  I think he's mischaracterizing

10  Mr. Kelley's testimony that he did not trust Devin Kelley with

11  firearms.

12          THE COURT:  You can try to straighten that up on your

13  own cross.

14  BY MR. JACOB:

15  Q.  I'm sorry.  Dr. Webster, what were you saying about

16  Kelley's parents and wife concerning his access to firearms?

17  A.  Well, they were both very concerned about it.  I'll leave

18  it at that.

19  Q.  Okay.  And the other aspect that you mentioned was the

20  reliability of firearms.

21      Is there evidence that Devin Kelley preferred reliable

22  firearms?

23  A.  Well, we know that he went to FFL for his purchases.  We

24  know that at least one gun that he acquired, he wasn't

25  satisfied with its quality, one that he did not acquire from a

DANIEL WEBSTER - DIRECT

1  FFL, a personal trade, and ended up trading away because it

2  wasn't a good quality gun.  So we know that.

3      There's also some references to some Facebook postings

4  that more generally talk about his desire to make sure that he

5  gets a good gun, basically.

6  Q.  Sure.  And let me show you an example of that, and I want

7  to see if you have an opinion on that.

8      I'm going to show you Joint Exhibit 502, pages 126 and 127

9  together.  And you should see that this is a Facebook post by

10 Devin Kelley concerning firearms.

11 A.  So can I ask for, like, a 30-second pause because my —

12 this is embarrassing.  My dog is scratching at my door, and I

13 don't want him to rip all the paint off here.  It will

14 literally only take me 30 seconds.  Is that okay?

15         THE COURT:  That's fine.

16         THE WITNESS:  Sorry.

17     (Pause in proceedings.)

18         THE WITNESS:  All right.  I'm back.

19 BY MR. JACOB:

20 Q.  And I just — so we're looking at a Joint Exhibit 502,

21 pages 126 and 127.  And I want to zoom in to the tile of this

22 Facebook post on Devin Kelley on page 127.

23 A.  Okay.

24 Q.  Do you see where he says, "I just put on a magwell funnel

25 on the rifle, and while it looks ugly, man, does it

1   dramatically increase the consistency and speed of reloads."

2       Did I read that correctly?

3   A.  Yes.

4   Q.  Is that evidence that Devin Kelley preferred a reliable

5   firearm?

6   A.  Well, I think it's saying two things.

7       One, it's saying that speed of reloads and ammo capacity

8   is important.  But, of course, that is, in part, a function of

9   reliability.  Because if you're switching magazines and things

10  jam and things like that, it's then — you know, so it's clear

11  that he is very intent on getting a firearm that he is going

12  to be able to fire a lot of rounds with confidence and speed.

13  Q.  And is there evidence that — well, let me back that up.

14      Do you believe based on the information that you reviewed

15  and the studies and literature that are published in your

16  field, that had he been denied a firearm, more likely than

17  not, he would have been prevented from acquiring a firearm

18  outside of the FFL market?

19  A.  I believe so, again, based upon my understanding of how

20  underground markets work, and Mr. Kelley's quite limited

21  options of places he could go to to get a gun.

22      Again, most of these come from friends and family.  And I

23  think, you know, just everything I've read about his

24  incredibly troubled history from adolescence to young

25  adulthood, I think people understood that he was troubled.

DANIEL WEBSTER - DIRECT

1  Q.  All right.  Let me switch gears a little bit and chat with
2  you about the importance of a reporting this criminal history
3  to the NICS system.
4      Can your particular areas of study and expertise in your
5  field help us understand whether the failure to report
6  criminal history to NICS may increase the risk of physical
7  harm to the public or not?
8  A.  I think it does, based upon the research that we were just
9  covering, based upon the impact of denial.
10 Q.  And have you reached an opinion, to a reasonable degree of
11 certainty, whether the failure to submit criminal history
12 increases the risk of harm to the public?
13 A.  Sorry.  My connection may have frozen.
14 Q.  Oh.  Let me reask the question, Dr. Webster.
15 A.  I'm sorry.
16 Q.  Have you reached an opinion, to a reasonable degree of
17 certainty, as to whether the failure to submit criminal
18 history to the NICS increases the risk of harm to the public?
19 A.  Yes.
20 Q.  And what is your opinion based on?
21 A.  My opinion is based upon the research that you just went
22 over, based upon studies looking at denial of purchase
23 applications with licensed dealers.
24      It's also based upon research, as I was alluding to, that
25 Dr. Jeffrey Swanson led that also demonstrated the importance

DANIEL WEBSTER – DIRECT

1  of availability of records to prevent people with violent

2  histories who — you know, from accessing firearms, that it

3  cut their rate of violent offending basically in half.

4      So I think there's a number of studies that indicate that,

5  of course, not everyone is deterred.  But a sizeable number of

6  people are deterred when they are denied when they go to

7  seek — to purchase firearms from licensed dealers.

8  Q.  And I just want to make sure our record is clear.

9      What is your opinion as to whether the failure to submit

10  Devin Kelley's criminal history to the NICS system increases

11  the risk of harm to the public?

12  A.  I think the evidence is quite clear that Mr. Kelley would

13  not have been able to purchase the gun that he used to commit

14  mass murder had the record been submitted.

15  Q.  And are there studies or articles published in your field

16  of science that show that missing records from the NICS system

17  actually hurts the, you know, public safety?

18  A.  Yes.  As I was mentioning a minute ago, from Dr. Swanson's

19  research, I believe I cited the one in Connecticut that

20  verified that finding.  I believe he actually has an

21  additional newer study from a Florida population that was

22  similar remarks — similar findings.  Excuse me.

23      So the availability of records is sort of foundational to

24  the whole system.  And we've seen that when the system works,

25  it can reduce risk for future offending.  But, of course, it's

DANIEL WEBSTER – DIRECT

1  all based upon having the available record.

2  Q.  Sure.  And I'll represent to you that in evidence today --

3  or evidence in this trial is evidence that the Air Force

4  Office of Special Investigations identified over 7,300 files

5  that should have been reported to the NICS system but was not.

6       MS. KRIEGER:  I'm sorry.  Objection.  I don't think

7  that actually came into evidence.  I believe that objection

8  was sustained this morning.

9       MR. JACOB:  Your Honor, it's Joint Exhibit 433.  It's

10  been admitted into evidence.

11       THE COURT:  Yeah.  So there's some discussion among

12  the experts about the time frame of those studies.  I think

13  those numbers — the earlier numbers of 294, or something

14  around those figures, was sampling of that overall number.

15       So you can try to clean that up on cross if you want.

16       Go ahead.

17  BY MR. JACOB:

18  Q.  Well, let me just be very clear and show you the record

19  itself, so we can be clear as to what we're talking about.

20  A.  Sure.

21  Q.  I want to show you Joint Exhibit 433.

22       And do you see Joint Exhibit 433, page 1, on your screen,

23  sir?

24  A.  Yes.

25  Q.  And it is from the headquarters of the Office of Special

1  Investigations.

2      Do you see that?

3  A.  Yes.

4  Q.  And I'll jump — I don't want to take too much time, but

5  I'll jump to the conclusion of this study on page 5, and zoom

6  into the summary.

7      So the NCIC indexing task force here, this is — actually,

8  let me step back.

9      Let me show you page 2 of this document so we have some

10 context and history.  Let me show you the overview here.

11     So I'll represent to you, in response to the Sutherland

12 Springs shooting, the Air Force tried to address the failure

13 to submit and find out which files were not submitted to the

14 NICS system following the Sutherland Springs shooting.  And we

15 have the overview here, but this page discusses that.

16     Have you reviewed this document, sir?

17 A.  Yes.

18 Q.  Okay.  Let's go to the conclusion then, the summary.

19     And you see here, "Over 21 months and 14 six-week

20 iterations, the task force reviewed 7,300 files and identified

21 over" — sorry — "the task force reviewed over 73,000 files

22 and identified over 7,300 files requiring correction."

23     My question to you, Dr. Webster, is the — you talk about

24 the increased risk to the public from the missing records.

25     This 7,300 missing fingerprints and final dispositions

1  that should have been sent to the FBI by the AFOSI, just

2  AFOSI, but weren't, is that the type of data that increases

3  the risk of harm to the public?

4  A.  Yes.

5  Q.  Okay.  Let me take that down.  I want to switch gears

6  again, and now talk to you about your conclusions on the

7  foreseeability of this act.

8       Can your work in gun violence research help us understand

9  whether the danger of future injury might be reasonably

10  anticipated based on the particular circumstances known to the

11  Air Force about Devin Kelley?

12  A.  Yes.  Devin Kelley –– I mentioned before the research we

13  did to look at risk factors for domestic homicides and the

14  danger assessment.

15       So Mr. Kelley, based upon information the Air Force had,

16  you know, he would check many of the boxes that showed the

17  greatest elevated risk for future lethal violence.

18       And they may or may not have known that research or the

19  danger assessment.  Excuse me.  But they –– they knew of a

20  very violent past.  They knew of specific threats of

21  committing mass shootings, including on the base themselves ––

22  itself.  They took measures on their end based upon their

23  perception of the riskiness of this individual.

24       So yeah.  And even in the pre –– the document relevant to

25  whether he could be released when he was on trial for domestic

DANIEL WEBSTER – DIRECT

1   violence charges, the determination was that was he was too
2   great of a risk, not only of fleeing but also of committing
3   violence.
4       So there was a variety of things that anyone, you know,
5   who is knowledgeable about risk for serious violence — but
6   particularly the Air Force also knew well before these — this
7   tragic incident in Sutherland Springs.
8   Q.  Well, could you give us examples of the type of risk
9   factors that put an individual at high risk for committing
10  serious acts of violence?
11  A.  Sure.  The things that stand out to me, in particular, are
12  pointing a loaded gun at the head of his spouse; hyper,
13  hyper-control of his intimate partners, and using violence and
14  intimidation as part of that control; prior strangulation;
15  sexual violence — a history of sexual violence; obviously,
16  use of — or excuse me, access to a firearm and — trying to
17  think.
18      Another, actually, factor that comes into play, but I
19  think this comes into play later, is his abuse of animals.
20  Q.  Um-hum.
21  A.  But that's — I think that may be after he was already out
22  of the Air Force where that came to light.
23      But there was a number of things that came to light —
24  child abuse as well, actually, and threatening — using
25  threats of violence against his partner's child as a way to

1  manipulate and control her.

2      So all of those are signs of great elevated risk.  And

3  even within situations in which there is domestic violence of

4  some sort, those behaviors are not normal even within domestic

5  violence.  They highlight and distinguish the most lethally

6  violent individuals from those who just sometimes get upset

7  and can't control their emotions or something.

8      His set of behavior, as well as his diagnoses when he was

9  involuntarily hospitalized of antisocial behavior disorder,

10  depression, suicidality, I mean, there are just a host of

11  factors that are quite consistent with future lethal violence.

12      And the new research that's really, I think, telling us a

13  lot more than we used to know specifically about mass

14  violence, he checks many of those boxes as well.  The research

15  coming from what's called The Violence Project, a federally

16  funded study of mass shooting events in the United States.

17  Q.  And what boxes does Devin Kelley particularly check

18  concerning mass violence?

19  A.  History of domestic violence, for one, most important, I

20  think; suicidality; early history of sort of getting into a

21  lot of trouble early in life, you know, as a teen; fascination

22  with firearms; threats of violence.

23      Many of the people who go on to commit such acts

24  previously were telling people they were going to do that,

25  basically.

DANIEL WEBSTER - DIRECT

1  Q.  In this case, is there evidence that the Air Force knew

2  that Devin Kelley had threatened a mass violence multiple

3  times?

4  A.  My understanding is that's what he told his supervisors,

5  from the documents that I reviewed.

6  Q.  And you said that there's a connection between domestic

7  violence and mass shooters.

8      Could you explain what you meant by that.

9  A.  Well, some are more direct than others.  Some of the mass

10  murder, in essence, is of an intimate partner and often

11  related family members.  Other times, it is connected to

12  anyone close to that individual, including that individual

13  that they have the intimate relationship with --

14  Q.  Are there studies --

15  A.  -- but -- sorry.  Just to complete that thought.

16      There are other instances in which people with histories

17  of violence against women commit acts of mass murder.

18  Sometimes they're motivated by, in essence, their

19  frustrations.  And it more broadly has to do with women.

20  Q.  Well, let me ask you this:  Are there studies that support

21  the conclusion that the danger of this type of gun violence

22  may be reasonably anticipated from the circumstances of a

23  domestic violence offender like Devin Kelley?

24  A.  Well, he -- he had the risk factors.  I'll say that.  And

25  he was saying very explicitly intentions of committing

DANIEL WEBSTER − DIRECT

1  violence, including mass violence.

2      So, again, he's checking all the boxes that are apparent,

3  in a lot of cases, of mass violence.  Of course, some people

4  blow smoke and whatever, and they don't carry it out.

5      But, again, this — all the signals in Mr. Kelley's case

6  are really quite strong and severe, in my opinion.  And they

7  were severe enough that the Air Force themselves thought

8  themselves to be at risk.

9      So, to me, that said a lot.  All the factors and

10  information available to the Air Force at that time were all

11  saying that this is a violent young man who is capable of

12  lethal violence, including mass violence.

13  Q.  Okay.  And is there a connection between domestic violence

14  and gun violence?

15  A.  Quite often, yes.  Some people overcompartmentalize

16  domestic violence from other, say, community violence.  But

17  when you look at the most violent individuals, they almost

18  never are only violent in one place.  They are violent in

19  multiple contexts, and that is what I believe is the case with

20  Mr. Kelley, Devin Kelley.

21  Q.  Okay.  Well, I want to go through some of these studies.

22  And I think the first study I'd like to look at is the study

23  that you started this discussion with from Campbell.

24  A.  Yes.

25  Q.  And I'll show you Plaintiffs' Exhibit 754, page 1.  And

DANIEL WEBSTER – DIRECT

1    zooming into the first part of that, could you identify

2    Plaintiffs' Exhibit 754, page 1.

3    A.   Yes.  This is a study published in American Journal of

4    Public Health, "Risk factors for femicide in abusive

5    relationships:  Results from a multisite case control study."

6    Q.   And let me ask you this:  Is this study, Plaintiffs'

7    Exhibit 754, a reliable authority in your field?

8    A.   Absolutely.

9    Q.   And can you tell us who the second named author in this

10   study is?

11   A.   Yes.  Myself, Daniel Webster.

12   Q.   And focusing on the objectives of this study, can you tell

13   us what the objective of this study is?

14   A.   Sure.  The principal objective was to draw upon these data

15   from 11 cities to identify risk factors for femicide in

16   abusive relationships.  So the context is not all women and

17   what their risks are, but very specifically women who are in

18   or recently out of intimate relationships that involve

19   physical violence.

20   Q.   And I think at the beginning of our conversation, you told

21   us that this study was one of the most cited studies in this

22   area.

23       Do you remember that?

24   A.   Yes.

25   Q.   Can you explain to the Court why Plaintiffs' Exhibit 754

DANIEL WEBSTER — DIRECT

1  is one of the most cited studies in the field?

2  A.   You know, I can't get into the heads all the people who

3  are citing it.  But, basically, this study did one of the most

4  important things that people wanted to do is really — we know

5  that domestic violence is, sadly, a very common occurrence.

6      And all sorts of systems — law enforcement, service

7  providers, health systems — encounter people who are in these

8  kind of relationships.  And researchers and practitioners and

9  people at all levels, policymakers, keenly want to know, well,

10 how do you know the most dangerous situation so that we make

11 sure, from a policy perspective or a service provision

12 perspective or a law enforcement perspective, when it's most

13 important to intervene and with what kind of measures.

14     So that's why I think it's particularly important.

15 Because in all the different studies that are examining this

16 problem, we're answering a really fundamental question

17 relevant to — both to domestic violence but even more broadly

18 to understanding the connection between availability of

19 firearms and ownership of firearms among people with violent

20 histories.

21 Q.   Okay.  Could you tell — could you read the conclusion of

22 this study for us real quickly.

23 A.   Yeah.  Again, I have to do a little slight adjustment.

24     Yeah, there are identifiable risk factors for intimate

25 partner femicide, yes, basically.

DANIEL WEBSTER — DIRECT

1  Q.  And let me show you page 3 of this study real quick.

2  A.  Okay.

3  Q.  And I want to show you a conclusion or result that you

4  reached.

5  A.  Um-hum.

6       MR. JACOB:  I'm sorry.  I think you've gonna little

7  too far.  We're talking about page 3 of Plaintiffs'

8  Exhibit 57 — 754, yes.

9  BY MR. JACOB:

10  Q.  And it's the top column, starting with the paragraph

11  "Incident-level variables" and just that first paragraph.

12  Could you read that first paragraph to us, please.

13  A.  "Incident-level variable were added in Model 7.  Abuser's

14  use of a gun in the worst incident of abuse was associated

15  with a 41-fold increase in the risk of femicide after control

16  for other risk factors.  This effect is apparently mediating

17  the effects of abuser's access to a gun, which was no longer

18  significant.  However, previous threats with a weapon

19  continued to be associated with increased femicide risk."

20  Q.  Okay.  What does it mean when it says that there's a

21  41-fold increase in the risk of femicide when the abuser has

22  an access to guns?

23  A.  Well, very specifically, when they use the gun in that

24  most serious incident.  So — and this has been borne out by

25  other studies as well.

DANIEL WEBSTER - DIRECT

1     It just — it turns out that firearms are a particularly

2   lethal form of violence.  And so in the most serious act of

3   violence, which we ask — in the case of people who were

4   dying, we asked proxies, people who were close to those

5   individuals, information about background.  But in the

6   incident level, of course, we had information from police

7   reports as well.

8     So we gather information about the most serious incident

9   of abuse both for cases and controls.  And what was in a

10  situation where firearms were involved, those risks

11  elevated — were greatly different from the most serious of

12  incident of abuse for the controls —

13  Q.  So if —

14  A.  — and —

15  Q.  I apologize.  If I understand what you're saying, are you

16  saying that when a — there's a history of using a firearm in

17  that relationship, that increases the risk of femicide by

18  41-fold?

19  A.  No.  So this is actually at the incident level.  So if you

20  would back up to Model 7, we did a logical progression,

21  basically, of sets of risk factors that we were looking at.

22  And we looked at — first we looked at the role of having a

23  gun as a risk factor for lethal outcomes.  It was over a

24  fivefold increase of just having a gun.

25    You can have a gun but not use it in a serious act of

DANIEL WEBSTER – DIRECT

1  intimate partner violence.  So this 41-fold increase is at the
2  next level, is when you ask people about the most serious
3  incident of intimate partner violence, the ones that involve
4  firearms were the ones that elevated this risk of femicide
5  41 times above not using firearms.
6  Q.  Okay.  Well, Dr. Webster —
7  A.  So, again, it — again, it just sort of underscores that
8  it can be hard to kill someone with your hands or sometimes
9  even a knife.  That a firearm, when it is used, particularly
10  in an intimate partner femicide, is highly lethal.
11      Normally, the circumstances are such that that person
12  cannot escape.  They're not — they can't flee, and often it
13  ends up in a fatal outcome.
14  Q.  Well, Dr. Webster, you know, what about the risk to people
15  other than the intimate partner?
16      Are there studies on domestic violence and the risk to
17  people beyond just the intimate partner?
18  A.  Yes.  I mean, in many instances of intimate partner
19  femicide, others are killed as well.  Most commonly, it is
20  family members, but sometimes it is people who just happened
21  to be in the same place or have some connection.  It could be
22  co-workers.  It could be, you know, somebody, you know, close
23  to that individual in some shape or form.
24  Q.  Okay.  Well, I'd like to go through two studies that you
25  cited on this particular issue.  First, let me show you

DANIEL WEBSTER — DIRECT

1  Plaintiffs' Exhibit 762.

2      And can you identify —— and we'll make it a little bit

3  bigger for you.

4      Can you identify Plaintiffs' Exhibit 762 for us.

5  A.  Yes.  This is a journal article by Linda Saltzman and

6  colleagues.  It's a group from the Centers for Disease Control

7  and Prevention and their center that focuses on injury and

8  violence.

9      This examines "Weapon involvement and injury outcomes in

10  family and intimate assaults."

11  Q.  Is that the title of the article?

12  A.  Yes.

13  Q.  Okay.  Is the Saltzman article, which is Plaintiffs'

14  Exhibit 762, a reliability authority in your field?

15  A.  Yes, very commonly cited.

16  Q.  Do you know the journal that the Saltzman article is

17  published in?

18  A.  I think it was JAMA, yeah.

19  Q.  Okay.  So let's look at the —— yeah, the abstract.

20      Could you tell us the objective of this study, the

21  Saltzman article, Plaintiffs' Exhibit 762.

22  A.  Yeah.  It is to compare the risk of death and the risk of

23  nonfatal injury during firearm-associated family and intimate

24  partner —— intimate assaults ——

25  Q.  So ——

985

DANIEL WEBSTER — DIRECT

1  A.  — with the risks compared to when a firearm is not

2  involved, non-firearm-associated events.

3  Q.  So is Plaintiffs' 762 looking at more than just the risk

4  to the intimate partner?

5  A.  No.  It extends out beyond that to family members as well.

6  Q.  Okay.  And could you briefly describe how they conducted

7  this study and what the results of this study were.

8  A.  Yeah.  They were looking at police reports in Atlanta,

9  Georgia, looking at reports that police responded to these

10  incidents; wrote up reports of the set of facts involved in

11  both fatal and nonfatal outcomes from these cases.

12  Q.  And could you read to us the results of the study first,

13  and then we'll talk about them.  Okay?

14  A.  Sure.  "Firearm associated FIAs" — again, that's family

15  and intimate assaults — "were three times more likely to

16  result in death than FIAs involving knives or other cutting

17  instruments, and 23.4 times more likely to result in death

18  than FIAs involving other weapons or bodily force.  Overall,

19  firearm-associated FIAs were 12 times more likely to result in

20  death than non-firearm-associated FIAs."

21  Q.  So what is the point of this study in terms of its

22  relevance to your conclusions?

23  A.  The point of this study really — it shows that access to

24  a firearm and use of a firearm greatly determines the outcomes

25  of an act of violence, particularly in the context of family

DANIEL WEBSTER — DIRECT

1  and intimate violence.

2  Q.  Okay.  I want to keep along this — the theme of not just

3  intimate partners but going beyond that scale and see if

4  domestic violence is connected to deaths beyond the intimate

5  partner.  And I want to show you Plaintiffs' Exhibit 758.

6  A.  Okay.

7  Q.  I'm sorry.  Sorry, 785.  I apologize.

8    So let me show you page 2 of Plaintiffs' Exhibit 785.

9  A.  Um-hum.

10 Q.  And I'll just zoom in to the first part, and could you

11 identify the article that you're seeing as Plaintiffs' 785.

12    MS. KRIEGER:  Objection.  Your Honor, I believe that

13 this study along with several others were part of the opinions

14 that Dr. Webster issued in his supplemental declaration and

15 which Your Honor excluded during our — in your order

16 following our motion to exclude Dr. Webster.

17    THE COURT:  So 785 has not been admitted yet.

18    Your response?

19    MR. JACOB:  Well, Your Honor, I was laying foundation

20 for the reliable — learned treatise exemption to the hearsay

21 rule.  But addressing the objection in particular, Your Honor

22 didn't carte blanche exclude all of the studies that the

23 government — in the supplemental report.  Instead, Your Honor

24 delineated it into two specific categories that were

25 admissible that were directly responsive to the issues that

DANIEL WEBSTER — DIRECT

1   the government raised in Dr. Webster's deposition.
2        And this study is directly responsible — responsive
3   to the issues raised in the depositions.
4        THE COURT:  Let me take this one question at a time.
5   Go ahead.
6        MR. JACOB:  Yes, Your Honor.
7   BY MR. JACOB:
8   Q.  So, Professor — Dr. Webster, could you identify
9   Plaintiffs' 785 for the Court, please.
10  A.  Yes.  This is an article from the journal Homicide
11  Studies, 2014, "Patterns of multiple family homicide."
12  Q.  And is the article that we are showing you as
13  Plaintiffs' 785 a reliable authority in your field?
14  A.  Yes.
15  Q.  And can you tell us where this article is published?
16  A.  A journal called Homicide Studies.  It's a
17  multidisciplinary journal focused, as the name implies, on
18  understanding homicides and lethal violence.
19  Q.  Is that an authoritative publication in your field?
20  A.  It gets cited it all the time.
21  Q.  Okay.  I want to talk to you about the specific goals of
22  this study and how you used this study.  Okay?
23  A.  Sure.
24  Q.  First, looking at the abstract, can you tell us what the
25  goal of the study, Plaintiffs' 785, was?

DANIEL WEBSTER - DIRECT

1  A.  Yeah.  So as this lays out here, the prior research

2  treated multiple family homicide, something called

3  "familicide," as a uniform event, but they want to explore

4  whether there are subtypes of this type of event that could be

5  discerned.

6      Looking at data from supplemental homicidal reports, which

7  is the detailed data collected as part of the FBI's Uniform

8  Crime Reporting system, they coupled that information with

9  data from newspaper -- published in newspaper articles to look

10 at 238 cases in this -- what they refer to as a two-step

11 cluster analysis, showing that there are important

12 subgroups -- in this case, four categories -- based upon age,

13 relationship between the perpetrator and victims, and

14 perpetrator suicide.

15 Q.  And what are the four categories of domestic violence

16 offenders that Plaintiffs' 785 discovered?

17 A.  One was despondent husbands, spousal revenge, extended

18 parricide, and diffuse conflict.

19 Q.  Okay.  I want to take a look at the "diffuse conflict"

20 section of this article, and I want to show you Plaintiffs'

21 Exhibit 785, page 12.

22 A.  Okay.

23 Q.  And we'll zoom in on the "diffuse conflict" section.  And,

24 first, could you read the description -- the first sentence,

25 the description of diffuse conflict familicides that were

DANIEL WEBSTER - DIRECT

1   found as a cluster of domestic violence offenses in this

2   study.

3   A.   You just want me to read this part?

4   Q.   The first sentence, please.

5   A.   Okay.  "Diffuse conflict familicides represent the

6   second-largest familicide cluster and could be distinguished

7   from the above-mentioned clusters by the diverse constellation

8   of victims ranging from in-laws, uncles, aunts, cousins, and

9   secondary family relations."

10  Q.   Okay.  And I want to show you one more paragraph from this

11  section, going back out to this page, the very next paragraph.

12  A.   Um-hum.

13  Q.   And could you read the first two sentences for us, please.

14  A.   Sure.  "In contrast to earlier research merely focusing on

15  just one type of multiple family homicides, we revealed the

16  existence of four separate groups.  What all four familicide

17  categories had in common, other than the defining fact that

18  the victims consist of multiple family members, was the

19  presence of primary and secondary victims."

20  Q.   Okay.  And I want to stay on this.

21      What is a primary versus secondary victim in domestic

22  violence?

23  A.   Well, primary victim is the person you are kind of

24  directing your aggression at.  Secondary are those because

25  they have some connection to that primary person, again,

DANIEL WEBSTER — DIRECT

1  someone important to them.  Could be a sibling, a parent, you
2  know, any number of relationships, just that they're very
3  close to the primary victim.
4  Q.  Okay.  And could you read the rest of that paragraph,
5  starting with "secondary victims," into the record, please?
6  A.  Sure.  Yeah.  "Secondary victims were either killed
7  because they were seen as extensions of the primary victim or
8  because of their physical closeness to the primary victims.
9  Arguably, this even accounts for the despondent father who
10  perceives his victims not as extensions of each other but
11  rather as extensions of himself.  Such men consider themselves
12  to be the central figure in the lives of their family members
13  and, as such, aim to protect his loved ones by taking them
14  along with his suicide."
15  Q.  Okay.  Is the data that this study, Plaintiffs' 785, is
16  looking at a small sample set of data?
17  A.  I believe there's 238 cases overall that they were
18  analyzing.
19  Q.  And was it a very detailed examination?
20  A.  Yes, quite detailed.
21  Q.  Okay.  Let me take that down, and I want to finish off our
22  discussion on this point with how your field defines domestic
23  violence.
24      Does your field limit the definition of domestic violence
25  or a crime of domestic violence to abuse or injury towards

1   only an intimate partner?

2   A.   No.

3   Q.   How does —

4   A.   No.

5   Q.   How does your field define a crime of domestic violence?

6   A.   Well, most studies that are studying domestic violence,

7   honestly, they're based upon databases like this supplemental

8   homicide report where individuals are categorized.

9        And so "domestic violence" typically means family members

10  broadly or, in some cases, those who are cohabitants, in

11  essence, part of a family unit whether they're actually,

12  technically, family or not.

13  Q.   You know, in the studies that we just looked at, we saw

14  that some domestic violence crimes extend beyond the family to

15  people that are in the perpetrator's way or in close proximity

16  to the perpetrator's intended crime.

17       Do you remember that discussion?

18  A.   Yes.

19  Q.   The fact that people other than family members are injured

20  in the process of a crime of domestic violence, does that make

21  it no longer a crime of domestic violence?

22  A.   It depends upon how you're defining it.  Again, if you're

23  going to be rigid about categorizations, it depends on the

24  study and how people are defining it.

25       But I think conceptually what's important is the

1   connection to the intimate partner and/or family member.  It's

2   all about relationships.  And sometimes they're easy to very

3   directly categorize, and sometimes less so.

4       But generally speaking, the phenomenon of interest here is

5   familial and intimate relationships.  And, again, there are a

6   subset of individuals of abusers who are hypercontrolling.

7   And, of course, if you are trying to control someone, often

8   that means there are connections to the people who are close

9   to them.  Often, they're family members.

10  Q.  And I guess getting directly to the point, in your opinion

11  and based on your background, education, training, and

12  experience in this field, was the Sutherland Springs shooting

13  on November 7th, 2017, [verbatim], a crime of domestic

14  violence?

15  A.  I think it was motivated by domestic violence, most

16  certainly.  And that's, I think, a proper lens to view it.

17  Q.  And have you reached a conclusion, to a reasonable degree

18  of probability, as to whether the Sutherland Springs mass

19  shooting on November 7th, 2017, was foreseeable based on what

20  the Air Force knew of Devin Kelley at the time he was in the

21  Air Force?

22  A.  Well, again, I guess I'm hesitant to say they would know

23  exactly what was going to happen.  That's, frankly,

24  impossible.

25      But I think it is certainly foreseeable, highly

DANIEL WEBSTER - DIRECT

1  foreseeable, that Mr. Kelley could carry out a very serious

2  act of violence, including mass violence.  So, again, I don't

3  want to say that they knew that on a particular date and a

4  particular place and so on and so on.  I mean, that's

5  impossible.

6      But, again, it's evident to me that his history of severe

7  violence, his history of mental illness connected to

8  violence — of course, a lot of times, mental illness has

9  nothing to do with violence.  But in this case, it clearly,

10 apparently, did.  And also his prior threats relevant to mass

11 violence involving firearms.

12     I think all of those are quite, you know, foreseeable that

13 this was an individual who could really carry out really

14 serious acts of violence.

15 Q.  And what opinion do you hold, if any, to a reasonable

16 degree of probability, that reporting Devin Kelley's criminal

17 history to the FBI by the Air Force would have prevented the

18 shooting?

19 A.  Am I — I'm sorry.  Can you rephrase.  I want to make sure

20 I'm just responsive very specifically to what you're asking.

21 Q.  Sure.  Do you have an opinion as to whether — to a

22 reasonable degree of probability, whether if the Air Force had

23 reported Devin Kelley criminal history to the NICS, that would

24 have presented Devin Kelley's ability to acquire these

25 firearms that — and commit the mass shooting on November 7th,

1  2017 — November 5th?  I apologize.

2  A.  Yeah, I do.

3  Q.  And what is your opinion?

4  A.  Yeah.  My opinion is that the failure to report those

5  records did allow this to happen, facilitated this outcome.

6          MR. JACOB:  Your Honor, at this time, we pass the

7  witness.

8          THE COURT:  Thank you.

9          MS. KRIEGER:  Your Honor —

10          THE COURT:  Let's go ahead and take a ten-minute

11  break.

12          There are two members of the attendees who are

13  raising their hands.  To those two people, Mr. Ramsey and

14  Ms. Workman, and Mr. Herrera — who is a lawyer, I believe —

15  so you can't — this is a courtroom proceeding.  And so like

16  in any courtroom proceeding, the individuals in the gallery

17  would not be allowed to pose questions or ask questions.  And

18  so that's the case here as well.  So I'll be removing the hand

19  gesture, and that's why.

20          Anything we need to take up at this time before we

21  take a break?

22          MR. STERN:  Your Honor, just very briefly, I think

23  it's about 2:00 now.  Your Honor suggested you have a meeting

24  at 4:00.  As of right now, I believe we only have one witness

25  tomorrow, and I can't promise that we're going to finish up

DANIEL WEBSTER – DIRECT

1   our cross by 4:00.  So we ask for the opportunity to maybe

2   call this witness back in, if necessary, tomorrow.

3        THE COURT:  So I already told my 4:00 I can't do.  So

4   we'll just truck on today.  And if this continues to tomorrow

5   morning with Mr. Webster, we'll see.  We'll see what headway

6   we make today.

7        MR. STERN:  Fair enough.

8        MR. ALSAFFAR:  I just want to clarify, because this

9   morning, we were told there were two witnesses tomorrow from

10  the government.

11       MR. STERN:  So remember, we removed Mr. Breyer.  And

12  then we suggested we can move up Mr. Barborini to Tuesday or

13  leave him on Wednesday.  But either way, it will leave one day

14  where we only have one witness.

15       MR. ALSAFFAR:  No problem.

16       MR. STERN:  That's why I want to know in advance of

17  tomorrow, obviously, whether or not we call to call

18  Mr. Barborini tomorrow.  That's why I was suggesting, if we're

19  going to carry Dr. Webster over to tomorrow morning and then

20  we maybe can start our case in chief tomorrow afternoon.

21       But, obviously, I defer to the Court.

22       THE COURT:  Well, let's see how we do.  We've got

23  three hours here yet, and maybe we can finish off Mr. Webster.

24       Let's take a — let's be back at 2:15.

25   (Recess.)

1          THE COURT:  Cross?

2          MS. KRIEGER:  Thank you.

3                    CROSS-EXAMINATION

4    BY MS. KRIEGER:

5    Q.  Dr. Webster, can you hear me?

6          THE COURT:  Dr. Webster, you're on mute.  There you

7    go.

8          THE WITNESS:  Yes.  I can hear you.  Sorry.

9    BY MS. KRIEGER:

10   Q.  My name is Jocelyn Krieger.  I'm an attorney with the

11   United States Department of Justice.  I'm representing the

12   government in this case.

13       Now, Dr. Webster, you are, among other things, an expert

14   among gun violence and gun violence prevention; is that right?

15   A.  Yes.

16   Q.  And epidemiology is your method of studying gun violence

17   and prevention?

18   A.  Yes.

19   Q.  You're not an expert in psychology; correct?

20   A.  No.

21   Q.  And you don't — you said — you testified earlier that

22   you do not usually look at individual cases as part of your

23   work; correct?

24   A.  Actually, I think what I said is that my research involves

25   both some studies that are individual-focused, but many are

DANIEL WEBSTER — CROSS

1   population-focused.

2   Q.  I understand that some of your studies look at risk

3   factors that are associated with individuals, but you

4   generally don't look at specific individual cases as part of

5   your work?

6   A.  Well, the individual cases would be part of those

7   individual-level studies —

8   Q.  It's not —

9   A.  — of the type that I was talking about earlier with the

10  case control study for intimate partner femicide.

11  Q.  Let me put this a different way.

12      It's not the nature of your job to predict individual

13  behavior; correct?

14  A.  Well, some of my research is designed with that intent.

15  Q.  But you, in your job, do not generally try to predict

16  individual behavior in the future?

17  A.  Well, as I said, the reason we do studies of the nature of

18  the risk factors for intimate partner femicide is to predict

19  future risk.

20  Q.  Do you recall being deposed in this case?

21  A.  Yes.

22  Q.  It is your testimony today that part of the nature of your

23  job is to predict individual behavior; is that correct?

24  A.  I study a lot of different things, and I use different

25  research designs.  Some of my studies are focused on

998

DANIEL WEBSTER — CROSS

1  individuals, and those studies are looking at risk factors for

2  future violence.

3      I'm not sure what else to say about that.  I'm sorry.

4  Q.  I'm just going to show you — do you recall being deposed

5  in this case?

6  A.  Of course.

7  Q.  And do you recall being under oath in your deposition?

8  A.  Of course.

9  Q.  I'm going to show you a page from that deposition.  It's

10  Government Exhibit 62, page 59.  And let's look at lines 4

11  through 7.

12      Mr. Furman asked you, "I mean, before this case, have you

13  had instances where you had to predict individual behavior."

14      And you responded, "That's not the nature of my job, no."

15      Did I read that correctly?

16  A.  Yes.

17          MS. KRIEGER:  You can take that down.

18  BY MS. KRIEGER:

19  Q.  In your —

20  A.  I'm sorry?

21  Q.  I'm sorry.  I was telling our tech person to take down the

22  exhibit.

23      In your epidemiology work, as you said, you attempt to

24  determine risk factors for people that engage in gun violence

25  or domestic violence?

DANIEL WEBSTER — CROSS

1   A.   Yes.

2   Q.   Now, when you're doing these studies, such as the 11-city

3   study that, I think, you've mentioned a couple times, you're

4   looking at cases where someone has already committed violence

5   to determine what factors are associated with that violence;

6   is that right?

7   A.   We examine factors that were present before the outcomes,

8   in this case, for intimate partner homicides.  The nature of

9   the — the design of the study is a case control study

10  because, as I was alluding to earlier in my testimony, that it

11  is simply too expensive and too impractical to gather the kind

12  of detailed information relevant to this problem to study —

13  to follow thousands and thousands of people.

14      So what we do is we gather information on cases, in this

15  case, women who were killed by an intimate partner.  And then

16  we gather information about the history prior to those events.

17  Q.   Right.  So you were looking at women who had already been

18  killed and then, going back, looking at the history that

19  occurred prior to that to determine risk factors; correct?

20  A.   That's correct.

21  Q.   You mentioned briefly when you were talking about your CV

22  that at one point, you were a social worker in Kentucky?

23  A.   Yes.

24  Q.   And that was from 1982 to 1983; correct?

25  A.   Yes.

DANIEL WEBSTER — CROSS

1  Q.  One year?

2  A.  I was there for, I think, 20 months.  I'm not sure.

3  Q.  So a little less than two years?

4  A.  Yeah.

5  Q.  It was about 38 years ago?

6  A.  Um-hum.

7  Q.  I just want to ask you for a minute —— can we pull up

8  Docket 206, page 9.

9      And I'll represent to you that this is a pleading that was

10  filed by plaintiffs' counsel in this case.

11      Now, that's you, listed as Number 3; correct?

12  A.  That's me.

13  Q.  Okay.  Can we go to — I think it's the next page or maybe

14  the page after.  Yes.

15      So looking at page —— this page as well as the page

16  afterwards —— Megan, can you just go to the next page too.

17      This is a list of documents that you reviewed prior to

18  writing your report; correct?

19  A.  Yes.

20  Q.  And then after your reported was issued, you reviewed

21  additional documents; correct?

22  A.  Yes.

23  Q.  You reviewed documents from the Texas Rangers

24  investigation that occurred after the shooting?

25  A.  Yes.

DANIEL WEBSTER — CROSS

1  Q.  You reviewed those after you submitted your report?

2  A.  I believe so, yes.

3  Q.  And then you also later reviewed the deposition of

4  Danielle Kelley; correct?

5  A.  That's correct.

6  Q.  And at some later point, you also reviewed the

7  depositions, I'm guessing, of Michelle Shields, Michael

8  Kelley, and Rebecca Kelley?

9  A.  Yes.

10  Q.  And none of those documents or depositions changed any of

11  your opinions from your original report?

12  A.  No.

13  Q.  You just spoke with plaintiffs' counsel about some of

14  those opinions.  I just want to take a look at a few of them.

15      Pull up the report on page 14.

16      And it is your opinion — sorry.  I'm trying to — it's

17  hard to see.

18      Starting with, "It is more likely than not."

19      Do you see that?

20  A.  I'm trying to find where you're at on the page.  Sorry.

21  Q.  Yeah, I'm trying to make it bigger for you.  There we go.

22  A.  Oh, okay.

23  Q.  Your opinion in your report was stated as "It is more

24  likely than not, based on the above research and my

25  background, had the United States Air Force or Department of

DANIEL WEBSTER – CROSS

1  Defense reported the relevant disqualifying information

2  concerning Devin Kelley to the FBI, that would have prevented

3  Kelley's ability to purchase firearms and his ability to kill

4  26 people at the First Baptist Church of Sutherland Springs."

5      Did I read that correctly?

6  A.  Yes.

7          MS. KRIEGER:  You can take that down.

8  BY MS. KRIEGER:

9  Q.  After you provided this report, you were deposed; correct?

10  A.  Yes.

11  Q.  And after your deposition, the United States filed a

12  motion to exclude your testimony?

13  A.  Yes.

14  Q.  And in response to that motion, you submitted a

15  supplemental declaration; correct?

16  A.  Correct.

17          MS. KRIEGER:  Let's pull up the supplemental

18  declaration, page 2, paragraph –– I believe it's paragraph 4.

19  BY MS. KRIEGER:

20  Q.  Now, here, you stated –– in your second question, you

21  stated that your "report and testimony answer the specific

22  causation question in this case, if the United States had

23  followed the law, whether that would have prevented

24  Devin Kelley from acquiring the firearms he used in the

25  Sutherland Springs shooting."

DANIEL WEBSTER – CROSS

1       Did I read that correctly?

2   A.   Yes.

3   Q.   It's a little bit different; right?

4   A.   I'm not sure what you mean.

5   Q.   Initially, your opinion was that if the — Kelley's

6   information had been submitted to NICS, it would have

7   prevented Kelley's ability to purchase firearms.  And your

8   later opinion is that it would have prevented Kelley from

9   getting the firearms that he used; is that correct?

10  A.   Yeah.  That would include the firearms that he used in

11  this Sutherland Springs shooting.

12          MS. KRIEGER:  Pull that down.

13  BY MS. KRIEGER:

14  Q.   Now, you relied on quite a few studies in both your report

15  and supplemental declaration; correct?

16  A.   Correct.

17  Q.   And we've already seen a number of them today, and you

18  agreed that those were all reliable authorities; right?

19  A.   Yes.

20  Q.   Do you agree that all of the studies you cite in your

21  report are reliable authorities?

22  A.   Yes.

23  Q.   We can look at a couple of them.

24      Several of these studies actually state that people who

25  are prohibited from owning firearms commonly acquire firearms

DANIEL WEBSTER — CROSS

1  without background checks; isn't that correct?

2  A.  Yes.

3  Q.  Okay.  Let's look at the study — you mentioned this a

4  couple times — the study by Jeffrey Swanson, "Preventing gun

5  violence involving people with serious mental illness."  It's

6  PEX 782.

7  A.  Um-hum.

8      MS. KRIEGER:  And let's turn to page 13, and it's

9  going to actually be going on to page 14.  Pull out the

10  bottom — that bottom paragraph there.

11  BY MS. KRIEGER:

12  Q.  I assume it's Dr. Swanson states, "Considering our study

13  population as a whole, we find little evidence that the Brady

14  Act prohibitions serve to reduce the risk of violent crime.

15  Indeed, having a gun disqualifying criminal record serves as a

16  marker for significantly" — pull up the top of the

17  paragraph — "significantly increased risk of committing a

18  future violent crime.

19      "To the extent that guns were involved in the commission

20  of these crimes by people who could not legally buy a gun, it

21  is clear that perpetrators did not need to patronize a

22  federally licensed gun dealer and undergo a background check.

23  Other ways, means, and suppliers abound for those willing to

24  exploit them."

25      Did I read that correctly?

1   A.  Yes.

2          MS. KRIEGER:  And then turning to page 18.  Should be

3   on line —— yes, top, first full paragraph.

4   BY MS. KRIEGER:

5   Q.  It says, "Our study results suggest that among people with

6   mental illness who have a history of criminal offending and

7   involvement with the justice system, existing law and policy

8   designed to prevent access to firearms through federally

9   licensed gun dealers is likely to be of limited

10  effectiveness."

11         Did I read that correctly?

12  A.  Yes.

13  Q.  In your report, you also referred to several studies by

14  Garen Wintemute.  But I'm just, right now, going to talk about

15  the one titled "Background checks for firearm purchases:

16  Problems and recommendations to improve effectiveness."

17         It's PEX 765.

18         Let's go to page —— do you recognize this document?

19  A.  Yes.

20  Q.  This is a document that you cite in your report?

21  A.  Yes.

22  Q.  And you consider Garen Wintemute to be a reliable

23  authority?

24  A.  Most definitely.

25         MS. KRIEGER:  Let's look at page 2, at the top of

DANIEL WEBSTER - CROSS

1  column 2, the second column there.

2  BY MS. KRIEGER:

3  Q.  It says, "About 22 percent of all firearm transfers in the

4  United States proceed without background checks."

5     Did I read that correctly?

6  A.  Yes.

7  Q.  And then the next paragraph, "For a prohibited person or a

8  purchaser with criminal intent, a private-party transaction is

9  essential.  Not surprisingly, the vast majority, about

10  90 percent, of firearms used in crime are obtained through

11  transactions that do not involve background checks."

12     Did I read that correctly?

13  A.  Yes.

14  Q.  You also cite to a study by April Zeoli and Jennifer

15  Paruk.  It's entitled "Potential to prevent mass shootings

16  through domestic firearms restrictions."

17     And that's from Criminology & Public Policy; correct?

18  A.  That's correct.

19        MS. KRIEGER:  It's PEX 750.

20  BY MS. KRIEGER:

21  Q.  You were actually an advisory to Dr. Zeoli, weren't you?

22  A.  Yes, I was.

23  Q.  You would agree that she's a reliable authority?

24  A.  Yes.

25        MS. KRIEGER:  Let's turn to page 14.

DANIEL WEBSTER – CROSS

1    BY MS. KRIEGER:

2    Q.   It starts with "it may be possible."  Do you see where

3    that is?

4        Sorry.  I'm going to call out the section.

5        "It may be possible, however, for the disqualified

6    individual to purchase a firearm without a background check.

7    Private sellers in many states are not legally required to

8    perform background checks to sell their firearms."

9        Did I read that correctly?

10   A.   Yes.

11   Q.   You yourself have also stated that 80 percent of firearms

12   acquired for criminal purposes are acquired through

13   private-party transfers; is that correct?

14   A.   Yes.

15   Q.   In some states — you can take that down.

16       In some states, private sales do actually require

17   background checks; right?

18   A.   Yes.

19   Q.   That's not the case in Texas, is it?

20   A.   No.

21   Q.   Now, many of the studies that you cite in your original

22   report and in your declaration are about intimate partner

23   homicide; is that right?

24   A.   Yes.

25   Q.   Actually, one of those studies defines "intimate partner

1  homicide" as those homicides in which the primary suspect was
2  the current or former romantic partner, including spouse or
3  nonmarried partner.
4      Do you agree with that definition?
5  A.  Yes.
6  Q.  That's actually -- the study is actually "Suicide and
7  additional homicides associated with intimate partner
8  homicide," which is -- we don't have to pull it up.  It's
9  PEX 763.
10     That study focuses specifically on intimate partner
11 homicide and related suicides and additional homicide victims;
12 correct?
13 A.  That's correct.
14 Q.  And you've mentioned a few times the study led by
15 Campbell, of which you're the second author.  I think we
16 looked at it in some great detail.
17     That study, "Risk factors for femicide and abusive
18 relationships," PEX 754.  Yeah?
19 A.  Yes.
20 Q.  And actually, in your report, you describe that study as
21 an 11-city case control study of risk factors for intimate
22 partner femicide among those who were in intimate
23 relationships with history of physical violence; is that
24 correct?
25 A.  Yes.

DANIEL WEBSTER - CROSS

1  Q.  This is looking at women who are killed by their intimate

2  partners; right?

3  A.  Yes.

4  Q.  There's another study that you cite.  It's — the lead

5  author is Jane Koziol-McLain, titled "Risk factors for

6  femicide—suicide and abuse relationships."

7      You're a coauthor on that study as well; right?

8  A.  Yes.

9  Q.  In your report, you describe that study as one where you,

10 "looked at factors associated with intimate partner

11 femicides."  Correct?

12 A.  Correct.

13 Q.  Just one more study.  Again, the lead author is April

14 Zeoli.  The second author is McCourt, "Analysis of the

15 strength of legal firearms restrictions for perpetrators of

16 domestic violence and their associations with intimate partner

17 homicide."

18     And you're a coauthor on that study as well; right?

19 A.  Yes, I am.

20 Q.  And you cited that study in your report?

21 A.  Yes.

22 Q.  And you described that study as one "designed to

23 understand the impact of firearm restrictions on population

24 level rates of intimate partner homicide."  Correct?

25 A.  Correct.

DANIEL WEBSTER — CROSS

1   Q.   These are some of the studies on which you base your

2   conclusions in your report; correct?

3   A.   Correct.

4   Q.   None of these studies assessed mass shooters?

5   A.   None of those studies you cite address mass shooters

6   directly.

7   Q.   Devin Kelley did not commit intimate partner homicide;

8   right?

9   A.   That's correct.

10  Q.   Danielle Kelley is still alive?

11  A.   She is, thankfully.

12  Q.   Now, in your original report, you state — and I think you

13  state it again in your direct testimony — that many of the

14  risk factors for intimate partner homicide are common among

15  those who commit mass shooting; is that right?

16  A.   Yes.

17  Q.   And one of the studies you cite to support that statement

18  is that study by April Zeoli that we've already mentioned,

19  "Potential to prevent mass shootings through domestic firearm

20  restrictions," PEX 750.

21       Let's pull that back up.

22  A.   Yes.

23       MS. KRIEGER:  Now, looking at page 15 of that study,

24  I think it is the — yeah, the first full paragraph.  Can you

25  make that larger.

DANIEL WEBSTER — CROSS

1   BY MS. KRIEGER:

2   Q.  They state in that study, "We do not suggest that domestic

3   violence perpetration be viewed as a predictor of mass

4   shootings.  Certainly, only a small fraction of individuals

5   who commit domestic violence will conceive of, plan, or commit

6   a mass shooting."

7       Did I read that correctly?

8   A.  Yes.

9   Q.  In fact, in your own research, you found no evidence that

10  laws designed to keep firearms from perpetrators of domestic

11  violence have affected mass shootings connected to domestic

12  violence; is that correct?

13  A.  Yes.

14          MS. KRIEGER:  Just pull up that article.  It's

15  Government Exhibit 102.

16  BY MS. KRIEGER:

17  Q.  You're the –– this article is titled "Evidence concerning

18  the regulation of firearms design sale, and carrying on fatal

19  mass shootings in the United States."  Correct?

20  A.  Correct.

21  Q.  And you're the lead author of this article; correct?

22  A.  Correct.

23  Q.  You'd agree that your own study is a reliable authority;

24  correct?

25  A.  Yes.

1     MS. KRIEGER:  Let's look at page 17.  I think it's in

2  the middle of a paragraph, so I may have to search a little

3  bit.

4  BY MS. KRIEGER:

5  Q.  It starts "28 percent of the shootings."  I believe

6  it's — got it.

7     Yeah.  So middle of that paragraph there, "28 percent of

8  the shootings in this study" — sorry — just to back up a

9  second.

10     Here, you were studying specifically mass shootings;

11  correct?

12  A.  Yes.

13  Q.  "28" —

14  A.  Fatal — just to be clear, "fatal mass shootings,"

15  principally defined, four or more victims killed.

16  Q.  Thank you.  Thank you for clarifying that.

17     It says, "28 percent of the shootings in this study had

18  some connection to domestic violence, yet we found no evidence

19  that laws designed to keep firearms from perpetrators of

20  domestic violence have affected mass shootings connected to

21  domestic violence."

22     Did I read that correctly?

23  A.  Yes.

24     MS. KRIEGER:  Okay.  Take that down.

25

DANIEL WEBSTER – CROSS

1  BY MS. KRIEGER:

2  Q.  You cite to a few studies regarding –– you talked about a

3  few studies about whether denials of handgun purchases have a

4  deterrent effect; correct?

5  A.  Yes.

6  Q.  Specifically, you talked about a study led by Garen

7  Wintemute, "Subsequent criminal activity among violent

8  misdemeanants who seek to purchase handguns."

9  A.  Yes.

10        MS. KRIEGER:  That was PEX 757.  Let's pull that one

11  up.

12  BY MS. KRIEGER:

13  Q.  You talked quite a bit with Mr. Jacob, so I don't need to

14  belabor it.

15     This study compared people with violent misdemeanors who

16  attempted to buy guns before and after California outlawed

17  sales to those people; right?

18  A.  Correct.

19  Q.  And it looked at whether those individuals were arrested

20  during the three-year follow-up period?

21  A.  Yes.

22  Q.  So if those individuals committed violence either with or

23  without a gun but were not arrested, that data would not be

24  included in this study; correct?

25  A.  That's correct.

DANIEL WEBSTER — CROSS

1  Q.  In fact, most violent behavior is not reported, and it's

2  difficult to measure; right?

3  A.  Yes.

4          MS. KRIEGER:  Let's look at page 7, bottom of the

5  second column.

6  BY MS. KRIEGER:

7  Q.  It says, "The records" —— I think it's the last paragraph

8  in the second column.  Here we go.

9      It says, "Because the criminal records data were not

10  sufficiently specific, we were unable to categorize crimes

11  systematically as involving guns, violence, both, or neither."

12  Correct?

13  A.  Yes.

14  Q.  And when they're talking in this study about guns or

15  violent crime, we can't actually be sure whether these

16  individuals committed a gun crime or a violent crime or both;

17  is that right?

18  A.  Yeah.  They were in these broad categories.

19  Q.  Let's go back to ——

20  A.  Because ——

21  Q.  Sorry.  Go ahead.

22  A.  I'm just saying that they could only provide the broad

23  categories.

24  Q.  Of course.

25      Let's look at Table 2, which is on page 4.

1   A.   Okay.

2   Q.   Looking at the line where it says "purchase status."  And

3   it says "denied" and "approved" there.

4        Do you see that?

5        Can you highlight that all the way across the line.

6   A.   Um-hum.

7   Q.   Of the people who were denied, 20.1 percent were later

8   arrested for gun or violent crimes; is that correct?

9        Gun and/or violent crimes?

10  A.   Yeah.  I just want to make sure I'm reading this

11  correctly.

12       Yes.

13  Q.   And among the people who purchased guns, 23.9 percent were

14  later arrested for gun or violent crimes; correct?

15  A.   Correct.

16  Q.   And I think you actually mentioned in your supplemental

17  declaration that, among the denied group, there were only

18  eight people charged with gun or violent crimes for every

19  100 years of person follow-up.

20       Do you see that there?

21  A.   Yes.

22  Q.   And among the approved group for the same statistics, it's

23  only 9.9 people charged with gun or violent crimes per

24  100 years of follow-up; correct?

25  A.   Yes.

DANIEL WEBSTER – CROSS

1    MS. KRIEGER:  Let's look at Table 2 –– I'm sorry,
2    Table 3, which is on page 6.
3    BY MS. KRIEGER:
4    Q.  You talked about this a little bit with Mr. Jacob.
5        Now, what we're looking at under "purchase status,"
6    "denied" or "approved," the column "gun and/or violent crime
7    adjusted relative hazard."
8        Now, you noted that based on this –– this is a multivaried
9    regression analysis; right?
10   A.  Yes.
11   Q.  So based on that regression analysis, violent offenders
12   who were allowed to purchase handguns subsequently had a rate
13   of offending for violent and/or gun crimes that was 29 percent
14   higher than those with similar histories who were denied
15   handgun purchases.
16       And I apologize for the math here, but a 29 percent higher
17   rate for those with similar histories is essentially the same
18   thing as a 22.5 percent reduction in future violence for those
19   who were denied; is that right?
20   A.  I haven't done the math, but it's probably pretty close.
21   Q.  Dividing 1.29 by 1?
22   A.  Um-hum.
23   Q.  Okay.  So that means that three out of four people who
24   were denied are still going to commit –– or were still going
25   to commit a gun or violent crime even though they're denied;

1    correct?

2    A.   Approximate, yep.

3    Q.   You also talked —— you can pull this study down —— talked

4    about the study headed by Mona Wright, "Effectiveness of

5    denial of handgun purchase to persons believed to be at high

6    risk for firearm violence."  That's PEX 753.

7         Now, again, this study looked at —— the follow-up was

8    looking at charges that were made for new offenses; is that

9    correct?

10        Do you want me to pull it out?  I think it's the top

11   paragraph of the second column there.  It says, "Arrest

12   charges for new offenses occurring in the three years

13   following handgun purchase were the outcomes of interest."

14   A.   Yes.

15   Q.   Okay.  So, again, to the extent that any of these persons

16   were committing violent acts but were never arrested, that

17   wouldn't have been caught by this study; right?

18   A.   That's correct.  Of course, it's simply impossible to

19   follow people and all of their violent things they do.  So

20   almost all studies that are going to be published are going to

21   be based upon —— you know, at least that are looking at gun

22   violence in these sort of studies are going to rely upon the

23   available records.

24   Q.   Of course.

25        And let's go to the next page.  I'm sorry.  Let's pull out

DANIEL WEBSTER – CROSS

1 the paragraph just above where it says "Discussion."

2     It says here, "We estimate that 12 percent of gun offense

3 and 14 percent of violence offense arrests among handgun

4 purchasers were attributable to the handgun purchase."

5     Did I read that correctly?

6 A. Yes.

7 Q. So, again, the math, not my strongest suit.

8     86 percent of violent offense arrests would not have been

9 attributable to the handgun purchase?

10 A. Um, that's correct.

11 Q. And 88 percent of gun offenses are also not attributable

12 to the handgun purchase?

13 A. Correct.

14 Q. And let's just look — you looked at this already, but

15 very briefly, that last paragraph in the — very last

16 paragraph on the page. I'm sorry.

17     Ms. Wright — Dr. Wright and her coauthors state here, "We

18 do not know whether those denied legal handgun purchase

19 obtained a firearm by other means."

20     Did I read that correctly?

21 A. That's correct.

22 Q. A certain percentage of them did commit future gun crimes,

23 though; correct? A certain percentage of those denied legal

24 handgun purchases, nonetheless, committed future gun offenses?

25 A. That's correct.

DANIEL WEBSTER - CROSS

1    Q.  Now, based on those two studies, it's your view that those

2    studies are an indication that the denial of background checks

3    lowers the population rates of violent crime; is that correct?

4    A.  It lowers the rate for those who are denied.

5    Q.  Yes.  And I apologize if I said that badly.

6        Looking at a population, the people being denied as a

7    result of background checks over the course of population will

8    lower their rates of violent crime, the overall rates?

9    A.  That's what these studies indicate.

10   Q.  You don't have data specifically as to how denials of

11   background checks impact mass shootings on a population level,

12   do you?

13   A.  No.

14   Q.  You talked a little bit in your direct examination about

15   the idea that persons might have a hesitancy to engage in

16   transaction with firearms without somebody that they know and

17   trust; correct?

18   A.  That's correct.

19   Q.  You mentioned some studies that you were involved in;

20   correct?

21   A.  Yes.

22   Q.  Both of those studies that you were involved in were

23   surveys done in Maryland?

24   A.  Correct.

25   Q.  One was a survey conducted in Baltimore; correct?

DANIEL WEBSTER – CROSS

1   A.   Yes.

2   Q.   And that was –– you mentioned on direct that that was a

3   survey conducted of people on parole or probation; is that

4   right?

5   A.   That's right, yes.

6   Q.   And the other was?

7   A.   These were anonymous, just for what that's worth.  So we

8   wanted to make sure people were giving us honest information.

9   Q.   The other survey was one conducted of youths in Maryland?

10  A.   Yes, incarcerated youth.

11  Q.   Incarcerated youths, that's right.

12       Now, Maryland has firearm regulations that go beyond

13  federal law; correct?

14  A.   Yes.

15  Q.   Maryland requires all handgun sales, including private

16  sales, to be contingent on the purchaser passing a background

17  check?

18  A.   Yes.

19  Q.   And, actually, one of the studies you mentioned was

20  actually looking at the effect of the 2013 Firearms Safety Act

21  in Maryland; is that right?

22  A.   That's right.

23  Q.   That law required a permit to purchase for anyone

24  purchasing a handgun, including in private sales.  Yes?

25  A.   Yes.

DANIEL WEBSTER — CROSS

1  Q.  That statute banned assault rifles?

2  A.  It did.

3  Q.  It also limited magazine sizes to ten rounds?

4  A.  That's correct.

5  Q.  And it expanded authority for state police to act against

6  gun dealers who were in violation of state gun laws; is that

7  right?

8  A.  That's right.

9  Q.  Also in your declaration, you mentioned some studies that

10 were done by Philip Cook; correct?

11 A.  Yes.

12 Q.  Those studies were done in Chicago?

13 A.  Yes.

14 Q.  Chicago has unusually restrictive firearm regulations;

15 doesn't it?

16 A.  Yes.

17 Q.  In fact, in Illinois, all gun owners are required to have

18 a Firearm Owner's ID Card; right?

19 A.  That's correct.

20 Q.  Private sales to persons without that card are illegal?

21 A.  Yes.

22 Q.  Chicago has actually essentially banned handguns; isn't

23 that right?

24 A.  In 2010, the Supreme Court said that they could not do

25 that anymore.  So, no, handguns are not banned in the city of

DANIEL WEBSTER — CROSS

1  Chicago, no.

2  Q.  At the time that these studies were done, were handguns

3  banned in Chicago?

4  A.  Yes.  The one in particular that I believe I cited.

5  There's been subsequent studies in Chicago, actually, led by

6  Philip Cook, a slightly different method.

7  Q.  The Chicago Police Department has made gun enforcement a

8  priority since the 1950s; correct?

9  A.  Yes.

10 Q.  So the studies that support your statement — your opinion

11 that prohibited persons prefer to use a trusted source, those

12 were done in areas with significant restrictive firearm

13 regulations and enforcement; is that right?

14 A.  Well, you could certainly say that about Chicago.

15    With respect to the Baltimore examples, actually, I have

16 studied the frequency with which people are charged for

17 violating the private background check requirement.  And what

18 we find is that it is extremely rare in the entire state of

19 Maryland, but particularly in Baltimore city, that anyone is

20 ever charged with that.

21    So there — yes, there are requirements.  But with respect

22 to enforcing the private background check requirement, I would

23 say that that is not something that is strictly enforced.  So

24 I felt that that's relevant to this conversation.

25 Q.  You'd agree that regulations on gun sales have an impact

DANIEL WEBSTER – CROSS

1 | on the illegal market; correct?
2 | A.  Yes, I do.
3 | Q.  Texas firearm regulations do not go beyond what is
4 | required by federal law; correct?
5 | A.  For the most part.  And I don't have the full spectrum of
6 | their laws in front of me right now.  But generally speaking,
7 | their laws are reasonably close to the federal laws.
8 | Q.  In Texas, private sales without a background check are
9 | legal?
10 | A.  Say that again, please.
11 | Q.  I'm sorry.  In Texas, private sales done without a
12 | background check between private –– to private individuals are
13 | legal; is that correct?
14 | A.  You can legally do that, yes.
15 | Q.  You're aware that private sales occur at gun shows;
16 | correct?
17 | A.  Yes.
18 | Q.  You're aware that private sales occur on the internet;
19 | correct?
20 | A.  Yes.
21 | Q.  You're aware –– are you aware of the website Armslist?
22 | A.  Yes.
23 | Q.  That's a place where people can conduct private sales of
24 | firearms; correct?
25 | A.  Yes.

DANIEL WEBSTER — CROSS

1  Q.  You don't know whether people who buy their firearms
2  through websites like Armslist have some kind of preexisting
3  trusted relationship with those sellers, do you?
4  A.  I don't.
5  Q.  And you actually — you talked a little bit about Kelley
6  being concerned about the risky, unpredictable, quote,
7  underground gun market; is that right?
8  A.  What I said is that it's quite likely that he did not want
9  to go into that unregulated marketplace —
10  Q.  Because it —
11  A.  — for the reasons I — for the reasons I stated; that
12  there's less control with respect to the quality of the
13  firearms, whether they have been used in a crime or not, and
14  personal safety reasons.
15  Q.  Risky and unpredictable to use the private market;
16  correct?
17  A.  Yes.
18  Q.  You don't — you didn't cite any research in either your
19  report or your declaration discussing the riskiness or
20  unpredictability of private sales in Texas, did you?
21  A.  No.
22  Q.  You talked about a study, on direct, "Patterns of multiple
23  family homicide."  That was PEX 785.
24  A.  Um-hum.
25  Q.  You — in discussing that study, you were talking about

DANIEL WEBSTER — CROSS

1 extended family members being killed; is that right?

2 A.  Yes.

3         MS. KRIEGER:  Let's look at page 10 of that study,

4 the paragraph that starts — second to the last paragraph, can

5 you bring that out.  Here we go.  Sorry.

6 BY MS. KRIEGER:

7 Q.  Looking in the middle of the paragraph, it says, "In cases

8 in which the spouse and in-laws were killed, the spouse

9 constituted the primary target.  Here, the perpetrator

10 perceived the in-laws as equally guilty of betrayal."

11     Did I read that correctly?

12 A.  Yes.

13 Q.  Again, these are cases in which both the spouse and the

14 in-laws are killed, is that right, what's describes in that

15 sentence?

16 A.  Yes.  Yes.

17         MS. KRIEGER:  Let's look at page 12.  And then

18 there's a paragraph that starts "diffuse conflict."  Here we

19 go.

20 BY MS. KRIEGER:

21 Q.  So this paragraph is talking about familicides involving

22 relatives who are much more distantly related; correct?

23 A.  Yes.

24         MS. KRIEGER:  Highlight the sentence starting "Based

25 on the available information."  Keep going.  There you go.

1  BY MS. KRIEGER:

2  Q.  I'm going to read the sentence.

3      "Based on the available information, it could be

4  hypothesized that the more distant the family relation between

5  victim and perpetrator, such as involving cousins, nephews,

6  uncles and grandparents, the more likely the homicide

7  resembles nonfamily homicides."

8      Did I read that correctly?

9  A.  Yes.

10          MS. KRIEGER:  Take that down.

11  BY MS. KRIEGER:

12  Q.  You testified that you believed that the shooting was

13  motivated by domestic violence; correct?

14  A.  It was connected to domestic violence, yes.

15  Q.  You actually were talking to Mr. Jacob about the —— when

16  you first heard about this case, prior to being retained.

17      Do you remember that conversation?

18  A.  Yes.

19  Q.  You actually testified that before you were retained, when

20  you first heard about this case, you had already determined

21  that the motivation was domestic violence; is that right?

22  A.  Based on the information that was available.

23  Q.  That was before you viewed any of the documents that were

24  provided to you specifically by plaintiffs' counsel in this

25  case; correct?

1   A.   It was based on information that was coming up from news

2   reports about the connections between Danielle Kelley's

3   family, his history of domestic violence, and the importance

4   of that church community to Danielle and her family.

5   Q.   Um-hum.  And we've spent some time already talking about

6   whether Kelley was likely to purchase a gun from a non-FFL

7   source.  And I think you already mentioned this.

8        You are aware that Kelley bought a handgun from a friend;

9   right?

10  A.   Yes.

11  Q.   And you're aware that he bartered for another shotgun —

12  for a shotgun?

13  A.   Yes.

14  Q.   And I don't know if you were observing the testimony of

15  Ranger Snyder.

16       Are you aware that Kelley sold a firearm to a pawn shop

17  for which there's no 4473 on record?

18  A.   Yes.  Yeah.  I mean, going into a pawn shop is not a

19  particularly risky thing to do.

20  Q.   Sure.  He was actually selling that firearm; correct?

21  A.   Right.  That's correct.

22  Q.   And the fact that there's no Form 4473 on record suggests

23  that was also acquired from a non-FFL source?

24            MR. JACOB:  Objection, Your Honor.  Counsel is

25  conflating the various firearms.  The firearm — the handgun

DANIEL WEBSTER - CROSS

1   that he got rid of was the handgun he sold.

2          THE COURT:  So let's let the witness testify to what

3   he knows.

4          THE WITNESS:  I'm sorry.  Could you please restate

5   the question.

6   BY MS. KRIEGER:

7   Q.  Were you aware that the firearm that was sold to the pawn

8   shop, there's no 4473 form on record for that firearm?

9   A.  No, I didn't know anything about that.

10  Q.  I'm just going to ask you a couple questions about some of

11  the things that you testified here.

12       You stated at one point that Kelley -- you were basing

13  some of your opinions on the records of Kelley's involuntary

14  hospitalization.

15       Are you aware that Kelley was actually voluntarily

16  hospitalized?

17  A.  Yeah.  I misspoke.  Sorry.

18  Q.  And you also said that Kelley's father didn't trust Devin

19  with firearms; is that correct?

20  A.  Yes.

21  Q.  Kelley's father allowed him to have firearms in his home;

22  is that right?

23  A.  Well, he didn't have -- allow him to access his own

24  firearms -- I mean, Mr. Kelley's firearms.

25  Q.  Sure.  But Mr. Kelley didn't have any problems with

1  Devin Kelley having — possessing firearms within Mr. Kelley's
2  house, having Devin's own firearms?
3  A.  I don't think he was crazy about that.  But, again, I
4  don't necessarily want to speak to that.  I mean —
5  Q.  What are you basing the testimony — what are you basing
6  that statement on, that he wasn't crazy about Devin having
7  firearms in the house?
8  A.  Well, I just read testimony that he was concerned about
9  firearms and his son.
10 Q.  Mr. Kelley had his own firearms; right?
11 A.  Yeah.
12 Q.  He testified, I think, he had four firearms at one point?
13 A.  Um-hum.  Yes.
14 Q.  And he also — and his wife, Mrs. Kelley, testified that
15 they had no idea that Kelley was prohibited from owning
16 firearms; correct?
17 A.  Yes.
18 Q.  They testified that on at least one occasion, Devin Kelley
19 cleaned one of his parents' guns.
20     Do you recall that testimony?
21 A.  Yes.
22 Q.  They also testified that Devin went shooting almost daily
23 on the family property; correct?
24 A.  Yes.
25 Q.  There was no testimony that they ever asked Devin not to

1  have firearms on the property; correct?

2  A.  As far as I know, no.

3  Q.  Let's go back to one of — your own study.  We looked at

4  this a few minutes ago, the article from March 2020 called

5  "Evidence concerning the regulation of firearms design, sale

6  and carrying on fatal mass shootings in the USA," GEX 102.

7  A.  Um-hum.

8          MS. KRIEGER:  Can you pull up that research summary,

9  just the whole gray box.

10  BY MS. KRIEGER:

11  Q.  So in the summary, when it's providing a summary of the

12  conclusions, it says, "Handgun purchaser licensing laws and

13  bans of large-capacity magazines were associated with

14  significant reduction in the incidence of fatal mass

15  shootings."  Correct?

16  A.  Correct.

17  Q.  And below that, it says, "Other laws commonly advocated as

18  solutions to mass shootings – comprehensive background checks,

19  assault weapons bans, and deregulation of civilian concealed

20  carry of firearms – were unrelated to fatal mass shootings."

21  Correct?

22  A.  That's correct.

23          MS. KRIEGER:  Let's turn to page 11.  It says

24  "Results."  I want to say the second paragraph, but I'm

25  actually not positive.  Pull out that whole section.

1    Yes, second paragraph.

2  BY MS. KRIEGER:

3  Q.  Are you able to read that?  Should we make it a little

4  bigger?

5  A.  No.  I can read it.

6  Q.  Okay.  You concluded -- so I'm starting kind of partway --

7  the first sentence of that second paragraph, you concluded,

8  "The estimates from the full negative binomial models indicate

9  that handgun purchaser licensing laws requiring in-person

10  application with law enforcement or fingerprinting were

11  associated with incidence of fatal mass shootings 56 percent

12  lower than that of other states."

13    Did I read that correctly?

14  A.  Yes.

15  Q.  Texas does not have handgun purchaser license laws

16  requiring in-person application with law enforcement or

17  fingerprinting; is that correct?

18  A.  That's correct.

19  Q.  And then, same paragraph, you state, "For LCM bans" -- and

20  just to be clear, "LCM bans," that's large-capacity magazine

21  bans?

22  A.  Correct.

23  Q.  "For LCM bans, the IRR estimate indicates a 48 percent

24  lower risk of fatal mass shootings associated with the

25  policy."

DANIEL WEBSTER — CROSS

1     Did I read that correctly?
2  A.  Yes.
3  Q.  Texas does not have a large-capacity magazine ban;
4  correct?
5  A.  Correct.
6  Q.  Colorado does have a large-capacity magazine ban; is that
7  right?
8  A.  That is correct.
9  Q.  And Colorado's large-capacity magazine ban was in effect
10  in 2016, was it not?
11  A.  Yes.
12  Q.  Next sentence, "We found no evidence that concealed carry
13  laws, assault weapons bans, prohibitions for domestic abusers
14  and violent misdemeanants or point of sale CBC laws were
15  associated with the incidence of fatal mass shootings."
16     Did I read that correctly?
17  A.  You did.
18  Q.  "CBC laws" are comprehensive background check laws?
19  A.  Yes.
20     MS. KRIEGER:  Let's look at page 12.  You can pull up
21  the paragraph there.  Just the whole thing.
22  BY MS. KRIEGER:
23  Q.  There it says, "Models for the incidence of mass shootings
24  with domestic or intimate partner violence links revealed no
25  significant associations with laws prohibiting firearms for

1  domestic violence abusers or violent misdemeanants or
2  purchaser licensing laws."
3      Did I read that correctly?
4  A.  Yes.
5  Q.  The next sentence there, "LCM bans, however, were
6  associated with a 61 percent lower rate of domestic mass
7  shootings."
8      Is that correct?  Did I read that correctly?
9  A.  That is.  You did.
10      MS. KRIEGER:  Let's turn to page 17.  It says, "The
11  findings of this study."  Second — yeah.
12  BY MS. KRIEGER:
13  Q.  You state, "The findings of this study suggest that the
14  most common policy prescriptions offered by advocates on each
15  side of the debate over gun control — comprehensive background
16  checks, and assault weapons bans on one side and so-called
17  'right to carry' laws reducing restrictions on civilian
18  concealed carry of firearms on the other side — do not seem to
19  be associated with the incidence of fatal mass shootings."
20      Is that correct?
21  A.  Yes.
22  Q.  Continuing on, you state, "28 percent of the shootings in
23  this study had some connection to domestic violence, yet we
24  found no evidence that laws designed to keep firearms from
25  perpetrators of domestic violence have affected mass shootings

DANIEL WEBSTER – REDIRECT

1  connected to domestic violence."

2      Did I read that correctly?

3  A.  Yes.

4  Q.  You would agree there are always some people who —— if

5  they have the resources, the determination, and the ability,

6  there are always some people who are going to get a firearm;

7  is that right?

8  A.  Yes.

9          MS. KRIEGER:  Pass the witness.

10          THE COURT:  Any redirect?

11          MR. JACOB:  Yes, Your Honor.

12          May I proceed Your Honor?

13          THE COURT:  Yes.

14                  REDIRECT EXAMINATION

15  BY MR. JACOB:

16  Q.  Dr. Webster, I want to start with that study, and I'll

17  give an opportunity for the tech —— can you hear me okay?

18  A.  Yeah.

19  Q.  Okay.  Let me start with GEX 102, and I'm going to display

20  GEX 102 for you.

21      And this is the study that you were just discussing with

22  Ms. Krieger; is that correct?

23  A.  That's right.

24  Q.  Dr. Webster, does GEX 102 answer any question that is at

25  issue in this case?

DANIEL WEBSTER – REDIRECT

1  A.  Well, what I think it does is it examines broad policies

2  and their impact across populations within the states.  The

3  nature of the data that we had to examine — pardon me.

4      We couldn't — we could not, in essence, assess which

5  individuals were prohibited or not.  These were broad —

6  again, broad correlational studies looking at the presence of

7  certain firearm laws and population rates.

8  Q.  The government — in this study, Government Exhibit 102

9  discusses comprehensive background checks.

10      Is a comprehensive background check different than the

11  status quo, the federal system that we're discussing here?

12  A.  Yeah.  It's different, principally, in the sense that

13  private transfers are required to proceed only if the

14  purchaser or transferee has passed a background check.

15      Now, I think it's important to understand what we were

16  examining here.  We were examining whether that policy change

17  of extending the background check requirement to private

18  transfers, in addition to transfers from licensed dealers,

19  impacts fatal mass shootings.  We found it did not.

20      Research that I have cited in — I believe, in my second

21  declaration, points out that in studies that I've coauthored,

22  we find actually no significant increase in the number of

23  background checks after these requirements are put into place,

24  which brings it in what I was describing earlier about the

25  case in Maryland where these — sadly, these are types of laws

DANIEL WEBSTER – REDIRECT

1 that for private individuals, law enforcement seems very

2 reluctant to investigate and bring charges against as opposed

3 to federally licensed firearm dealers.

4 Q.  Okay.  And just so I understand the specific data that

5 you're comparing when you reach conclusions in Government

6 Exhibit 102, such as the effectiveness of comprehensive

7 background searches –– search laws, are you comparing

8 basically two groups or two sets of data, one set of data

9 being the effectiveness of comprehensive –– extending the

10 background check to private sales in contrast to just –– in

11 contrast to data that does not extend the background check to

12 private sales?

13 A.  Yeah, exactly.  We're contrasting changes that occur in

14 response to this extension to background checks for private

15 sellers and whether the trends change differentially in those

16 states versus states that don't extend their background check

17 requirement to private transfers.

18 Q.  So is it ––

19 A.  So we find no clear correlation between extending –– the

20 law extending requirements to private sellers and the

21 incidence of fatal mass shootings.

22 Q.  And let's take a look at some of the reasons why that may

23 be.

24      If we can look at Plaintiffs' Exhibit 765, the Wintemute

25 article that was covered by Ms. Krieger as well.

DANIEL WEBSTER – REDIRECT

1    You recognize this article; right?

2  A.  Yes.

3  Q.  And I want to take you to page 4 of the Wintemute article,

4  Plaintiffs' Exhibit 765, and just zoom in on the first

5  paragraph that says, "Incomplete data due to failed

6  reporting."

7  A.  Yes.

8  Q.  Can you explain to us what this summary article is

9  describing about the literature in the field?

10  A.  Yeah.  What Dr. Wintemute was doing here is really

11  breaking down a far more detailed understanding of background

12  checks and research relevant to background checks —— so what

13  we can and cannot conclude —— and also identifying, in

14  essence, how one might get better outcomes from background

15  check requirements.

16    And one of the things Dr. Wintemute focuses on,

17  particularly, in this article, is completeness of the records.

18  Q.  And how does incomplete records affect the studies and the

19  research done on background check systems?

20  A.  Well, incompleteness of records would reduce the impact of

21  background check requirements by people applying to purchase

22  firearms who are prohibited but are given a green light to go

23  forward because those records aren't in there.  And many of

24  the studies that actually I've coauthored with Dr. Wintemute

25  are studies that were done examining law changes in the 1990s,

DANIEL WEBSTER – REDIRECT

1  principally, at a time when the records were far less complete

2  than they are now.

3      So that's one reason why we are continuing research to

4  look at more recent adoption of these laws because this is

5  getting better.  The completeness of records are improving

6  over time.

7  Q.  And from what you've learned in your research and in this

8  case, is the federal government responsible for some of the

9  incompleteness of the records that you're seeing in the

10  background check system?

11  A.  Yes, they are, including the Department of Defense.

12  Q.  And is AFOSI, in particular, responsible for at least

13  7,300 records not being reported to NICS?

14  A.  That's correct.

15  Q.  Let me show you Plaintiffs' –– or Exhibit 750.

16      And do you recognize PEX 750 as an article that you

17  discussed with Ms. Krieger?

18  A.  That's right, yes.

19  Q.  And I want to zoom in to the policy implication section

20  of –– well, first, tell us what PEX 750 is trying to do, the

21  article itself.

22  A.  Yeah.  It's trying to –– it's summarizing data relevant to

23  the degree to which domestic violence has –– is connected to

24  fatal mass shootings.

25      And as the title implies, might there be opportunities to

DANIEL WEBSTER — REDIRECT

1  prevent these types of acts that are — have this nexus
2  between domestic violence and fatal mass shootings.
3  Q.  And I want to zoom in on policy implications, and have you
4  read the policy implications into the record for us.
5  A.  Sure.  "Implementation of domestic violence firearm
6  restrictions may prevent access to firearms for some
7  potential" — "some potential mass shooters.  For this to
8  happen, domestic violence cases need to become known to and
9  move through the justice system to conviction or granting a
10  domestic violence restraining order, and the firearms
11  restrictions need to be effectively implemented."
12      And this is really important in studies, that actually
13  I've done with Dr. Zeoli, that show that how comprehensive the
14  restraining orders are, and whether there's actual
15  requirements to surrender the firearms actually matter in
16  terms of their impact on domestic homicides.
17  Q.  And when it says "firearms restrictions need to be
18  effectively implemented," does that include the need for
19  governmental agencies like AFOSI and security forces to submit
20  criminal history to the FBI?
21  A.  Yes, that's certainly part of it.
22  Q.  Okay.  Let me show you the last page of this article.  So
23  you should — you should be looking at page 15 — sorry,
24  page 15 of PEX 750.  And if we can highlight just the first
25  section of under "Conclusion" so we can see it, including the

DANIEL WEBSTER - REDIRECT

1  word "Conclusion" so you're able to read that.

2  A.  Okay.

3  Q.  Can you read into the record the first three sentences of

4  the conclusion?

5  A.  Yes.  "Domestic violence firearm restrictions are

6  considered promising tools to prevent mass shootings because

7  of the perception that mass shooters typically have histories

8  of committing domestic violence.  Through this analysis, we

9  found that more than 30 percent of mass shooters had these

10 histories.

11      "It is clear that domestic violence firearm restrictions

12 will only prevent mass shootings if high-risk individuals

13 obtain restrictions through criminal convictions or domestic

14 violence restraining orders and have those restrictions

15 enforced."

16 Q.  So I guess two points here.

17      First, is the figure that Zeoli -- in this article, PEX

18 750 -- that 30 percent of mass shooters have history of

19 domestic violence, is that an accurate figure based on your

20 survey of all the literature in the field?

21 A.  That's certainly consistent with it.  I mean, this

22 particular study that Dr. Zeoli led was, I think, the most

23 recent comprehensive study to pull this data together.

24 Q.  And when it says "it is clear that domestic violence

25 firearm restrictions will only prevent mass shootings if

DANIEL WEBSTER – REDIRECT

1  high-risk individuals obtain restrictions through criminal

2  convictions," does that include the conviction and submission

3  of that conviction information to the FBI's NICS system?

4  A.  Yes.

5  Q.  I want to go to one last article, PEX 785.  And I'll go to

6  page 2 of PEX 785.

7      Do you remember discussing patterns of multifamily

8  homicide with Ms. Krieger?

9  A.  Yes.

10  Q.  And I believe y'all discussed page 10 of PEX 785, and if I

11  can show you the paragraph, in particular, that y'all

12  discussed on page 10 of 785.

13      We'll zoom in to that paragraph that starts with

14  "Cluster 4."

15  A.  Okay.

16  Q.  Okay.  And I think the sentence that Ms. Krieger talked to

17  you about was "In cases in which the spouse and in-laws were

18  killed, the spouse constituted the primary target.  Here the

19  perpetrator perceived in-laws as equally guilty of betrayal."

20      Did I read that correctly?

21  A.  Yes.

22  Q.  Could you read the last sentence of this paragraph,

23  starting with "typically."

24  A.  Oh, yes.  "Typically, the victims and perpetrator did not

25  share a household.  The event was premeditated in about

1  two-thirds of the cases."

2  Q.  And with this in mind, I want to ask you a couple of

3  questions.

4      If this were not — if the Sutherland Springs shooting

5  were not in some way connected to domestic violence, do you

6  have any evidence or knowledge as to why Devin Kelley would

7  hogtie Danielle Shields before leaving to shoot up the church?

8          MS. KRIEGER:  Objection.  Calls for speculation.

9          THE COURT:  Yeah, I don't see how he can answer that

10  this question.  How is that within his realm of expertise?

11         MR. JACOB:  Well, the point is that there would be no

12  other explanation, Your Honor.

13         MS. KRIEGER:  Your Honor, I could think of plenty of

14  other explanations, but I'm not testifying.

15         THE COURT:  That's sustained.

16  BY MR. JACOB:

17  Q.  Now, this article talks about the spouse being a target.

18  I want to show you the part of the trial transcript from

19  Danielle Kelley's testimony, day one.

20      And if I can pull up page 107 of the transcript from the

21  first day of trial and show that to you.  And I want to just

22  highlight line 17 through 22 of Danielle Smith's testimony for

23  you.

24      This is where Ms. Smith is discussing how Devin Kelley

25  hogtied her before leaving for the Sutherland Springs

DANIEL WEBSTER - RECROSS

1  shooting.

2     Do you see that?

3  A.  I'm reading.

4     Okay.  Yes.

5  Q.  And based on Ms. Smith's testimony, is it your

6  understanding that Devin Kelley told their son that he would

7  be back after the Sutherland Springs shooting?

8  A.  Yes.

9  Q.  And do you know why he would be back?

10          MS. KRIEGER:  Objection.  Calls for speculation.

11          THE COURT:  That's sustained.

12          MR. JACOB:  I'll withdraw, Your Honor, and pass the

13  witness.

14          THE COURT:  Anything further?

15          MS. KRIEGER:  Just two things.

16                    RECROSS-EXAMINATION

17  BY MS. KRIEGER:

18  Q.  Sorry.  Turning back to GEX 102, page 17 again.

19     Mr. Jacob asked you — and I don't even need the page —

20  Mr. Jacob asked you whether this study answered any questions

21  that are relevant to this case.

22     Now, you found on — page 17, you stated, "28 percent of

23  the shootings in this study had some connection to domestic

24  violence, yet we found no evidence that laws designed to keep

25  firearms from perpetrators of domestic violence have affected

1  mass shootings connected to domestic violence."

2      I read that correctly; right?

3  A.  Yeah.

4      But the audio right now is not great, so I'm sorry.

5  Q.  I apologize.  That's my fault.  I muted my microphone.

6      Do you want me to read that again, or did you — you got

7  it?

8  A.  No, that's fine.  I think I got it, but I just wanted to

9  make sure I was hearing you.

10          MS. KRIEGER:  Did the court reporter get that?  I

11  think I was on the microphone.

12          THE REPORTER:  Yes.

13  BY MS. KRIEGER:

14  Q.  And then just very briefly, do you know what percentage of

15  people who commit domestic violence go on to commit mass

16  shootings?

17  A.  No, I don't.

18          MS. KRIEGER:  If we could pull up PEX 750, page 15

19  one more time, and that last paragraph above "Conclusions"

20  again.

21  BY MS. KRIEGER:

22  Q.  Dr. Zeoli states there, "Certainly only a small fraction

23  of individuals who commit domestic violence will conceive of,

24  plan, or commit a mass shooting."  Is that correct?

25  A.  Yeah, that's correct.  I mean, domestic violence is very

1  common; mass shootings aren't.

2         MS. KRIEGER:  No further questions.

3         THE COURT:  Anything else?

4         MR. JACOB:  Yes, Your Honor briefly.

5                  FURTHER REDIRECT EXAMINATION

6  BY MR. JACOB:

7  Q.  Back to GEX 102.

8     When the -- when the article, GEX 102, says, "Laws

9  designed to keep firearms away from perpetrators," is that

10 referring to, for example, the comprehensive background check

11 system that we discussed in your redirect examination

12 previously?

13 A.  It certainly includes it, yes.

14 Q.  So, again, is this referring to the difference between the

15 comprehensive background search system versus the status quo

16 federal system, which we are here discussing today?

17 A.  Yeah.  That's what this article examines as it relates to

18 comprehensive background checks.  We also look at other

19 firearm policies as well.

20 Q.  So would another way of stating that sentence be "Laws

21 extending background checks to private sales have" -- let me

22 read the exact language.

23    "Laws extending background checks to private sales have

24 demonstrate" -- one second.  Let me...

25    Okay.  So another way -- would another way of stating that

 1  be "Laws extending background checks to private sales have no

 2  effect on mass shootings"?

 3  A.  Yes.

 4        MR. JACOB:  Pass the witness, Your Honor.

 5        MS. KRIEGER:  I'm sorry.  I just have one or two

 6  questions.

 7              FURTHER RECROSS-EXAMINATION

 8  BY MS. KRIEGER:

 9  Q.  Looking at GEX 102, looking at page 12, just pull out that

10  first paragraph.

11     It says, "Models for the incidence of mass shootings with

12  domestic or intimate partner violence links revealed no

13  significant associations with laws prohibiting firearms for

14  domestic violence abusers or violent misdemeanants or

15  purchaser licensing laws.  Table 4."

16     Is that correct?

17  A.  Yes.

18        MS. KRIEGER:  Looking at table -- that's Table 2.  I

19  apologize.  Looking at Table 4, which is on page 15.

20        Never mind.  No further questions.

21        But, Your Honor, the United States would request that

22  the documents cited by Dr. Webster in his testimony be moved

23  into evidence.  He read from them, but none of them have

24  actually been moved in.

25        MR. JACOB:  Your Honor, the learned treatise rule

DANIEL WEBSTER – FURTHER RECROSS-EXAMINATION

1  expressly prohibits the entrance of learned treatises into

2  evidence.  They can only be read into the record, not entered

3  into evidence.

4       MS. KRIEGER:  Your Honor, this is a bench trial.  We

5  believe that these documents would be helpful to you.

6       THE COURT:  So give me specifics.  What numbers are

7  we talking about?

8       MS. KRIEGER:  Let's see.  PEX 782, PEX 765,

9  PEX 750 —— I have kind after long list —— PEX 754, 759,

10  PEX 763, PEX 761, certainly Government Exhibit 102, PEX 757,

11  PEX —— did I say 753?  No.  753.  PEX 788, PEX 786, and

12  PEX 787, as well as, I think, PEX 785.

13       THE COURT:  So...

14       MS. KRIEGER:  If there are others that plaintiffs'

15  counsel —— those are the ones on my list.  If there are others

16  that plaintiffs' counsel would like to move in, we would not

17  object to that.

18       THE COURT:  So these were all initially offered by

19  the plaintiffs, and now you don't want them admitted?

20       MR. JACOB:  Well, Your Honor, we were offering them

21  under the learned treatise rule, which expressly says that, if

22  admitted, the statement may be read into evidence but not

23  received as an exhibit.

24       If Your Honor is going to take this into evidence, I

25  ask that you allow us an opportunity to review specifically

1  what documents after we receive the transcript and then make

2  that offer tomorrow.

3         THE COURT:  Yeah, I'll take that under consideration.

4  I want to review again the learned evidence rule and find out

5  what the exceptions may be.

6         But, Dr. Webster, I do have a question for you.

7         Can you go back to where the government was on

8  page 12 just a moment ago.

9         MS. KRIEGER:  Of GEX 102?

10        THE COURT:  Yes.  So I think it was page 12 that you

11 were at earlier.

12        MS. KRIEGER:  Yes.

13        THE COURT:  If you can pull out that language there.

14 There we go.

15        So, Doctor, to sort of summarize your testimony, I

16 want to make sure I understand here.

17        So big picture, what I walked away from was that

18 you're opining that extending background checks to non—FFLs

19 doesn't have any kind of correlation between diminishing acts

20 of violence or mass violence; is that correct?

21        THE WITNESS:  That's correct.  In this case, we're

22 focused on fatal mass shootings.

23        THE COURT:  Okay.  However, on this page, with regard

24 to domestic violence, you seem to opine that these models for

25 incidence of mass shootings with domestic violence or intimate

1   partner violence links revealed no significant associations

2   with laws prohibiting firearms or purchaser licensing laws.

3          How do I reconcile that statement that's highlighted

4   right now with an earlier statement that you opined that

5   domestic violence firearm restrictions will only prevent mass

6   shootings if restrictions are enforced?

7          How are those two statements reconciled, or can they

8   be?

9          THE WITNESS:  Well, in the case of the domestic

10  violence prohibitors, the information needs to get into the

11  NICS system for them to work, basically.  And what we've found

12  and what Dr. Wintemute in his article goes into — but other

13  studies examined this more specifically; in particular, as it

14  relates to domestic violence.

15         Because a lot of the records, for example, might have

16  a conviction for aggravated assault, but it is not specific

17  enough to say whether or not it was domestic violence.

18  Restraining order records, sadly, over the years have not

19  always been submitted to the systems.

20         So I think the way I reconciled this is that for

21  these very specific domestic violence prohibitors to be

22  impactful, that they require the full reporting of the

23  records.

24         THE COURT:  So I just want to make sure what your

25  opinions are.

1           THE WITNESS:  Um-hum.

2           THE COURT:  Do I understand you correctly that you're

3   saying that if an act of domestic violence should put somebody

4   on the restriction list and the restriction list is reported,

5   there's a decrease in violence in the future, but just

6   domestic violence incidence, without any kind of triggering,

7   doesn't do anything?

8           Is that what I'm walking away with from your

9   testimony?

10          THE WITNESS:  Well, I want to be specific about

11  what's in this study.  And then, you know, there are separate

12  ways to think about this general question.

13          So in other studies, we've found -- that I've done

14  with April Zeoli, for example -- we found that domestic

15  violence restraining orders, and laws that restrict firearms

16  connected to those restraining orders, and firearm laws that

17  prohibit based upon violent misdemeanors result in significant

18  reductions in intimate partner homicide.

19          We did not see that in the case of mass shootings.

20  We're talking about a much smaller sample size to examine this

21  rather than for overall intimate partner homicides.

22          And so we also, in our prior work, didn't see as

23  strong a relationship to the domestic violence offenses as --

24  rather than the broader category of violent convictions for

25  violent crimes.  And, again, I think that has to do with a

1 combination of the incidence not being categorized as domestic

2 violence, as well as the fact that convictions don't happen as

3 frequently because victims don't want to press those charges

4 and so on.

5 So it's sort of a complicated set of factors involved

6 as they relate very specific to offenses that are in the

7 records as domestic violence prohibitors.

8 THE COURT:  Any questions based on my questions?

9 MR. JACOB:  No, Your Honor.

10 MS. KRIEGER:  Just one, Your Honor.

11 FURTHER RECROSS-EXAMINATION

12 BY MS. KRIEGER:

13 Q.  Dr. Webster, this study, GEX 102, it doesn't state that

14 the reason that laws designed to keep firearms from

15 perpetrators of domestic violence has — that no effect was

16 seen on mass shootings based on those laws, the study doesn't

17 state that the reason for that is because these incidents are

18 not reported; is that correct?

19 A.  Well, what we're looking at here is just the results.

20 You're presenting the results.

21 Q.  Right.  The study doesn't actually —

22 A.  So —

23 Q.  — give an explanation for that; is that right?

24 A.  Well, we don't have the access to all the records to say

25 precisely what is going on in each of these cases.

1  Q.  Um-hum.

2  A.  But as we have discussed, it's well documented that there

3  are problems in the records upon which the background check

4  systems are based and the firearm prohibitors are based.

5  Q.  Well, you actually — can we just pull up page 17 again.

6      I think this is actually something that you just testified

7  to.  You state -- sorry.  Pull up that second-to-last

8  paragraph.

9      You state that — the last sentence, it's actually

10 surprising that there's no evidence that this affects mass

11 shooters because there is evidence that laws prohibiting

12 persons under these types of — these types of laws are

13 associated with reduced intimate partner homicides; correct?

14 A.  That's correct.

15          MS. KRIEGER:  That's all.  Thank you.

16          THE COURT:  Any further need for this witness?

17          MR. JACOB:  No, Your Honor.

18          THE COURT:  May he be excused?

19          MS. KRIEGER:  Yes, Your Honor.

20          THE COURT:  Thank you, Dr. Webster.

21          THE WITNESS:  Thanks.

22          THE COURT:  So let's go over the schedule for the

23 rest of the week here before we adjourn for the day.

24          So the only conflict that I have is on Friday.  At

25 1:00, the judges of the Western District are meeting to

1  discuss a couple of those issues, and I would like to be

2  present.  One of the discussions is going to be a potential

3  relocation of one of our posts to another division.  So it's

4  going to be an interesting discussion, and I'd like to be

5  present for that.

6          So how do we keep us on track?  We've got two

7  witnesses for tomorrow, Ryan and Barborini?

8          MR. ALSAFFAR:  Yes, the defense witnesses, Your

9  Honor.  That's my understanding.

10         THE COURT:  Yeah.  And then Wednesday, we only have

11  one.  I mean, is there a possibility we can move everybody up

12  one, and that way we only have one witness for Friday morning?

13  Would that work?

14         MR. STERN:  The problem, Your Honor, is that we

15  already issued the witness subpoena for Erin Higgins for

16  Thursday, and we would like our experts, Drs. Fox and

17  Dr. Bursztajn, to watch that testimony before they give their

18  own testimony.

19         THE COURT:  Okay.

20         MR. ALSAFFAR:  Your Honor, they can still do that,

21  actually.  If they go Higgins on Wednesday, Bursztajn and Fox

22  would follow Higgins on Thursday.

23         MR. STERN:  We don't think we're going to get to both

24  of them on Thursday.

25         THE COURT:  Okay.  So what we'll do -- that's fine.

1    I'm just trying to do my planning.

2         So I, over an abundance of precaution, am thinking

3    that we may not finish by the 16th.  We can still do closing

4    arguments perhaps on Monday the 19th.  And if necessary, I've

5    got the 20th still free, so if, for some reason, we have to

6    push over.

7         Let's plan on this, then.  Let's plan that we're only

8    going to be working Friday morning, and we'll recess at about

9    12:55 for me to get to that meeting.  So you can plan

10   accordingly for that.

11        With that, does the plaintiffs rest?

12        MR. ALSAFFAR:  Your Honor, we have a rebuttal

13   witness, Dr. Metzner, who will be coming after their last

14   witness.

15        THE COURT:  Okay.

16        MR. ALSAFFAR:  And so I think what I'm hearing, Your

17   Honor, is that the government will not have a witness

18   Wednesday afternoon, so that we'll just do two on Thursday and

19   then their final witness on Friday morning, which would mean,

20   with your break, we would do Metzner, our rebuttal witness, on

21   Monday and then perhaps close Monday afternoon.

22        Does that sound —

23        MR. STERN:  Originally, you talked about Metzner

24   going Friday morning, but we are kicking him to Monday now?

25        MR. ALSAFFAR:  Because the judge cannot go past

1  12:55.

2          MR. STERN:  Exactly.  Fox, Friday morning; Metzner,

3  Monday morning?

4          MR. ALSAFFAR:  That's right, yes.

5          MR. STERN:  I think we're all right.

6          THE COURT:  Let's plan accordingly, then.

7          MR. STERN:  Your Honor, there's one other thing.

8          THE COURT:  Shall we -- well, the rest of those

9  watching these proceedings, we are finished with testimony for

10  today.  We are just merely doing housekeeping matters.  You're

11  welcome to remain online, or you can drop if you wish.

12          MR. STERN:  Your Honor, technically, it's not a

13  housekeeping matter, but that's up to you.  Sorry.

14          THE COURT:  Oh.  Well, we won't be hearing any

15  testimony.  You're welcome to remain on if you'd like.

16          So what we do have?

17          MR. STERN:  As the plaintiffs have just closed their

18  case in chief the United States would seek judgment on partial

19  findings pursuant to Federal Rule of Civil Procedure 52(c).

20          Now, admittedly, several of these grounds are issues

21  that the Court has already adjudicated, and so the United

22  States is happy to file a formal motion.  But, of course,

23  considering there's been about 400-plus entries in the docket

24  already, I don't want to clog the Court's dockets.

25          So I can either read the grounds into the record

1    right now or proceed however Your Honor wants.

2            THE COURT:  Why don't you read them into the record

3    right now.

4            MR. STERN:  Fair enough.

5            Your Honor, the United States seeks motion on partial

6    findings pursuant to Federal Rule of Civil Procedure 52(c) on

7    five grounds.

8            The first, the United States is immune from suit

9    under the Brady Act immunity provision, 18 USC 922(t)(6).

10           Second, the United States is immune from suit under

11   the FTCA misrepresentation exception, 28 USC 2680(h).

12           Three, the United States is immune from suit because

13   the Federal Tort Claims Act creates no causes of action for

14   violations of federal statutes or regulations pursuant to

15   *Johnson v. Sawyer*, 47 F.3d 716, from 1985 from the Fifth

16   Circuit.

17           Fourth, under Texas law, a private person would not

18   be held liable to these plaintiffs in similar circumstances,

19   and the United States, therefore, do not owe a duty of care in

20   this case.

21           And, five, plaintiffs have failed to prove the United

22   States was the proximate cause of their injuries.

23           THE COURT:  Any response?

24           MR. ALSAFFAR:  Well, Your Honor, I think we've

25   litigated every single one of those already extensively, so we

1 would refer to our filings.  And we'd also refer to the 20
2 depositions that have been preadmitted as part of the trial.
3 It's easy to forget those.  All of those establish the Brady
4 immunity doesn't apply and reinforces the Court's initial
5 decision.
6          And in terms of the FTCA state law, the motion and —
7 that — again, Your Honor, that's a matter of law.  I don't
8 think we need to discuss that right now.  That doesn't relate
9 to the trial facts.
10          And then the last one, proximate cause, Your Honor,
11 we've obviously put on extensive evidence that the government
12 was both aware causally and factually that this particular
13 plaintiff — I'm sorry, this particular shooter had a very
14 specific and particular preference for these kinds of weapons
15 that he specifically used in this shooting.  They really
16 presented no evidence to the contrary on that, other than
17 speculation.
18          And then on the second part, foreseeability, which I
19 assume is part of the proximate cause analysis, without going
20 into the extensive detailed records we've admitted into
21 evidence, it's safe to say that the Air Force knew more than
22 anybody else in Devin Kelley's life that this was a deeply
23 depraved, mentally unstable man who had extensive violence
24 that the Air Force knew more about than any other person in
25 his life.  And that included sexual violence, physical

1  violence, domestic violence.  And now we know more than we

2  knew before, extensive threats of mass shooting violence.

3          And that clears the foreseeability bar quite clearly.

4          MR. STERN:  Your Honor?

5          THE COURT:  Go ahead.

6          MR. STERN:  The plaintiffs got to make some argument.

7  Am I allowed to do the same briefly?

8          THE COURT:  Sure.

9          MR. STERN:  With regard to the Brady Act immunity

10  provision, I understand that this has been briefed

11  extensively.  However, Your Honor has still yet to rule as —

12  how *Maroney* [phonetic] applies in this case.  Because if you

13  recall, *Maroney* actually is a case whereby an employer, under

14  Texas law, was allowed to use the immunity provided by its

15  employee under federal statute.

16          And this is the same exact case we have here, that

17  under Texas law, an employer can get the benefit of a federal

18  immunity given to its employee.

19          Therefore, even if Your Honor reads 922(t)(6) as

20  allowing immunity to United States employees, then under

21  respondeat superior liability pursuant to the Federal Tort

22  Claims Act, the United States gets the benefit of immunities

23  given to its employees not only pursuant to state law under

24  *Alfonso* case, but those immunities provided by federal law

25  under the *Maroney* case.

1   And that has still not been adjudicated by the Court,

2   how it reconciles the *Maroney* decision.  When it comes to —

3   MR. ALSAFFAR:  Your Honor?

4   MR. STERN:  Hold on.

5   MR. ALSAFFAR:  I thought you were finished.

6   MR. STERN:  I'm going to keep going, if you don't

7   mind.

8   Let's start with Number 2, the misrepresentation

9   exception.  This has been briefed as well.  However, to the

10  extent that the plaintiffs are arguing that the Air Force

11  failed to provide information to NICS, then that was a

12  misrepresentation by the Air Force.  Or if they are arguing

13  that the NICS system provided a proceed to the FFL rather than

14  what should have been denial, that is a misrepresentation too.

15  So under either communication that's at issue in this

16  case, it is barred under the misrepresentation exception under

17  28 USC 2680(h).

18  Three, with regards to *Johnson v. Sawyer*, the United

19  States has to be clear and somewhat careful because I know

20  Your Honor has already ruled on this issue.

21  But the United States maintains that *Johnson v.*

22  *Sawyer* is very clear that, under FTCA law, the tort or the

23  duty cannot be based on federal statutory duties.

24  And, Your Honor, with due deference, the notion that

25  this case is not predicated on federal statutory duties but

1  the operation of a bureaucratic system pursuant to those

2  federal statutory duties is a distinction without a

3  difference.

4      Plaintiffs can always circumvent *Johnson v. Sawyer* by

5  saying "No, no, no, it's not the Brady Act, but it's the

6  operation of NICS.  It's not the Crime Reporting Act, but it's

7  the operation of interstate identification index.  It's not

8  the Patriot Act, but it's the implementation of a terrorist

9  watch list."

10      Under all of those circumstances, *Johnson v. Sawyer*

11  can always be circumvented by saying it's not federal law, but

12  it's the intergovernmental reporting obligations pursuant to

13  that federal law.

14      And that's why under even the restatement of torts

15  323 and 324A, you need a negligent undertaking that is a

16  service-rendered, quote/unquote, to another.  And here, this

17  is not a duty rendered to these plaintiffs; it is provided to

18  the general public.

19      And I remember when we were arguing the motion to

20  dismiss, and it was our deputy assistant attorney general who

21  argued this was arguably a responsibility to the general

22  public for all Americans.  And the next sentence should have

23  been "a duty to all is a duty to none."  That is black letter

24  law both in Texas tort law and throughout this country that

25  without some type of tethering to these plaintiffs, then this

1   is just simply a bureaucratic enterprise for which the United

2   States cannot be held liable.

3        With regards to four, no private person analogue,

4   simply because Texas recognizes the doctrine of negligent

5   undertaking, it does not mean that the plaintiffs have found a

6   private person analogue.

7        Here, the most analogous case is *Perry versus S.N.*

8   And Your Honor already recognized that there was no common law

9   duty under that case.  Frankly, Your Honor, that should have

10  ended this case two years ago.  *Perry v. SN* is the most

11  analogous case to the case at bar.

12       And as a result, plaintiffs cannot show a common law

13  duty for which a private party would be held liable.  And so

14  the United States, likewise, in similar circumstances, must be

15  dismissed from this case.

16       And, five, I want to be very clear because, yes, of

17  course, when we're talking about proximate cause, we're

18  talking about two factors; foreseeability and cause-in-fact.

19       Foreseeability, we only look at what which gave rise

20  to the alleged duty.  And I want to be clear with the word

21  "alleged."  Because when we're talking about proximate cause

22  we are talking about whether the breach of a duty proximately

23  caused the injuries.

24       So what was the alleged duty?  Here, it is only

25  predicated on 18 USC (g)(1) and (g)(9), the two specifications

1  that gave rise to any reporting obligation by the Air Force.

2  As a result, that is the only conduct of Devin Kelley's that

3  can even be considered by the Court as to whether or not there

4  was a duty, a breach, and whether the breach of that duty

5  caused plaintiffs' injuries.

6        And as a result, if you're looking at foreseeability,

7  which means whether the mass shooting was of the same general

8  character as that which occurred when Devin Kelley was in the

9  Air Force, the answer is categorically no.

10       The assault that he did, while it was brutal on Tessa

11 Kelley and his stepson, is so different in kind in both

12 severity and in character to one of the most deadly mass

13 shootings in the United States that, on its face, it cannot go

14 forward, and the case must be dismissed because it was not

15 foreseeable to the Air Force that five years later or any time

16 period later that Devin Kelley would commit this heinous act.

17       And when it comes to cause-in-fact, Your Honor has

18 heard testimony regarding the numerous instances where Kelley

19 obtained firearms from non-FFLs, his determination, his

20 motivation, the fact that this person was not deterred by

21 laws, was not deterred by physical barriers as he jumped a

22 fence to elope from Peak to obtain firearms he had researched

23 online, the fact that he broke the laws time and time again,

24 that he was planning days in advance, that he had a black box

25 where he was concealing his true intent, including putting on

1  that "Punisher" mask and doing what he did.

2         Your Honor, it is very clear that no laws, certainly

3  no background checks that are limited by law that Congress has

4  limited only to FFLs when everyone knows, that you can easily

5  obtain firearms in Texas through non-FFLs.  Ranger Snyder said

6  as much, that other individuals recognize Kelley researched

7  online extensively.  You can obtain firearms through non-FFLs

8  online.

9         He went to gun shows regularly.  That shows that he

10 knows how to obtain firearms knew non-FFLs.  His father, when

11 he was being interviewed by the Texas Rangers on the day of

12 the shooting, said his son could access his firearms.

13        There was the access.  There was determination.

14 There was the means.  And there was Kelley's depravity, which

15 shows that the background check system would not have

16 prevented him from committing this act.

17        And even if the Air Force failed to submit his

18 information to NICS, it was not a substantial factor, because

19 we all know Devin Kelley would have committed this heinous act

20 regardless of whether his information was in NICS.

21        THE COURT:  Finished?

22        MR. STERN:  I am, Your Honor.

23        THE COURT:  Your response.

24        MR. ALSAFFAR:  Do I need to respond, Your Honor?

25        THE COURT:  No.  But feel free if you want.

```
 1              MR. ALSAFFAR:  I think I'm good.

 2              THE COURT:  So with regard to misrepresentations,

 3    there was no misrepresentation.  There was a complete failure

 4    by the United States Air Force to transmit the necessary

 5    information to NICS.

 6              With regard to Johnson v. Sawyer, I've already ruled

 7    on that.  And so this is basically a motion for

 8    reconsideration, which I deny.

 9              With regard to the negligent undertaking to all

10    should be a duty to no one, that's an interesting theory from

11    the government.

12              You know, the Air Force foresaw that he was a danger.

13    The tech sergeant — I think that was her rank — was saying

14    that he was a danger to — "he's going to shoot us all" I

15    believe was her statement.  You know, so the Air Force

16    obviously knew that he could potentially be a mass shooter,

17    and so they foresaw this or could have foreseen this.  I'm not

18    making any final rulings.

19              And so there's fact issues still remaining that cause

20    this motion to be denied on the foreseeability issue.

21              The Air Force was concerned enough to get a

22    restraining order placed against him that would bar him from

23    reentering the facility.  So, apparently, the Air Force was

24    protecting themselves.  It's disappointing from the government

25    that the argument is they had no duty to protect the rest of
```

1  us.

2          Anything else we need to take up today?

3          MR. ALSAFFAR:  Not from plaintiffs, Your Honor.

4          THE COURT:  We'll resume at 9:00.

5          (Proceedings continued in progress.)

6                          -o0o-

7      I certify that the foregoing is a correct transcript from

8  the record of proceedings in the above-entitled matter.  I

9  further certify that the transcript fees and format comply

10  with those prescribed by the Court and the Judicial Conference

11  of the United States.

12

13  Date:  04/12/2021          /s/  Gigi Simcox
                              United States Court Reporter
14                              655 East Cesar E. Chavez Boulevard
                              San Antonio TX 78206
15                              Telephone:  (210)244-5037

16

17  Date:  04/12/2021          /s/  Chris Poage
                              United States Court Reporter
18                              655 East Cesar E. Chavez Boulevard
                              San Antonio TX 78206
19                              Telephone:  (210)244-5036

20

21

22

23

24

25