```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF TEXAS
 2                        SAN ANTONIO DIVISION

 3
     JOE HOLCOMBE, ET AL,               .
 4                                      .
                   PLAINTIFFS,          .
 5          vs.                         . DOCKET NO. 5:18-CV-555-XR
                                        .
 6   UNITED STATES OF AMERICA,          .
                                        .
 7                 DEFENDANT.           .
                                        .
 8

 9
                    TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
10              BEFORE THE HONORABLE XAVIER RODRIGUEZ
                    UNITED STATES DISTRICT JUDGE
11                        APRIL 13, 2021

12

13

14

15   APPEARANCES:
     FOR THE PLAINTIFFS:    JAMAL K. ALSAFFAR, ESQUIRE
16                          TOM JACOB, ESQUIRE
                            KOBY J. KIRKLAND, ESQUIRE
17                          LAURIE M. HIGGINBOTHAM, ESQUIRE
                            STEVEN R. HASPEL, ESQUIRE
18                          WHITEHURST HARKNESS BREES CHENG
                             ALSAFFAR HIGGINBOTHAM AND JACOB
19                          7500 RIALTO BOULEVARD, BUILDING TWO
                            SUITE 250
20                          AUSTIN TX 78735

21

22                          ROBERT E. AMMONS, ESQUIRE
                            APRIL A. STRAHAN, ESQUIRE
23                          THE AMMONS LAW FIRM
                            3700 MONTROSE BOULEVARD
24                          HOUSTON TX 77006

25
```

```
 1                    DANIEL D. BARKS, ESQUIRE
 2                    SPEISER KRAUSE, PC
                      5555 GLENRIDGE CONNECTOR
 3                    SUITE 550
                      ATLANTA GA 30342
 4

 5                    MARK W. COLLMER, ESQUIRE
                      COLLMER LAW FIRM
 6                    3700 MONTROSE
                      HOUSTON TX 77006
 7

 8                    JASON P. STEED, ESQUIRE
                      KILPATRICK TOWNSEND & STOCKTON LLP
 9                    2001 ROSS AVENUE, SUITE 4400
                      DALLAS TX 75201
10

11                    DENNIS CHARLES PEERY, ESQUIRE
                      R. CRAIG BETTIS, ESQUIRE
12                    TYLER & PEERY
                      5822 WEST IH 10
13                    SAN ANTONIO TX 78201

14

15                    PAUL E. CAMPOLO, ESQUIRE
                      TIM MALONEY, ESQUIRE
16                    LAW OFFICES OF MALONEY & CAMPOLO, LLP
                      926 S. ALAMO
17                    SAN ANTONIO TX 78205

18

19                    GEORGE LOUIS LeGRAND, ESQUIRE
                      LeGRAND AND BERNSTEIN
20                    2511 N. ST. MARY'S STREET
                      SAN ANTONIO TX 78212-3739
21

22

23

24

25
```

```
 1

 2              DANIEL J. T. SCIANO, ESQUIRE
                RICHARD E. TINSMAN, ESQUIRE
 3              TINSMAN & SCIANO
                10107 McALLISTER FREEWAY
 4              SAN ANTONIO TX 78216
                KELLY W. KELLY, ESQUIRE
 5              ANDERSON & ASSOCIATES LAW FIRM
                2600 SW MILITARY DRIVE, SUITE 118
 6              SAN ANTONIO TX 78224

 7

 8              ERIK A. KNOCKAERT, ESQUIRE
                JOSEPH MICHAEL SCHREIBER, ESQUIRE
 9              SCHREIBER KNOCKAERT, PLLC
                701 NORTH POST OAK, SUITE 325
10              HOUSTON TX 77024

11

12              BRETT T. REYNOLDS, ESQUIRE
                BRETT REYNOLDS & ASSOCIATES PC
13              1250 NE LOOP 410, SUITE 310
                SAN ANTONIO TX 78209
14

15              DAVID J. CAMPBELL, ESQUIRE
                JUSTIN B. DEMERATH, ESQUIRE
16              O'HANLON McCOLLOM & DEMERATH
                808 WEST AVENUE
17              AUSTIN TX 78701

18

19              JORGE A. HERRERA, ESQUIRE
                FRANK HERRERA, JR., ESQUIRE
20              THE HERRERA LAW FIRM, INC.
                1800 W COMMERCE STREET
21              SAN ANTONIO TX 78207

22

23              JASON C. WEBSTER, ESQUIRE
                THE WEBSTER LAW FIRM
24              6200 SAVOY, SUITE 640
                HOUSTON TX 77036
25
```

```
 1                        CATHERINE TOBIN, ESQUIRE
                         HILLIARD MUNOZ GONZALES, LLP
 2                        719 S. SHORELINE BOULEVARD, SUITE 500
                         CORPUS CHRISTI TX 78401
 3

 4

 5                        HUGH JONES PLUMMER, JR., ESQUIRE
                         THOMAS J. HENRY
 6                        PO BOX 696025
                         SAN ANTONIO TX 78269
 7

 8                        DENNIS BENTLEY, ESQUIRE
                         THOMAS J. HENRY, ESQUIRE
 9                        THOMAS J. HENRY INJURY ATTORNEYS
                         521 STARR STREET
10                        CORPUS CHRISTI TX 78401

11

12                        MARCO CRAWFORD, ESQUIRE
                         LAW OFFICE OF THOMAS J. HENRY
13                        4715 FREDRICKSBURG
                         SAN ANTONIO TX 78229
14

15                        MARION M. REILLY, ESQUIRE
                         ROBERT C. HILLIARD, ESQUIRE
16                        HILLIARD MARTINEZ GONZALES LLP
                         719 S. SHORELINE, SUITE 500
17                        CORPUS CHRISTI TX 78401

18

19   FOR THE DEFENDANT:   AUSTIN L. FURMAN, ESQUIRE
                         PAUL D. STERN, ESQUIRE
20                        UNITED STATES DEPARTMENT OF JUSTICE
                         THREE CONSTITUTION SQUARE
21                        175 N STREET, NE
                         WASHINGTON DC 20002
22

23

24

25
```

CLAYTON R. DIEDRICHS, ESQUIRE
JAMES F. GILLIGAN, ESQUIRE
JACQUELYN MICHELLE CHRISTILLES, ESQUIRE
JAMES EDWARD DINGIVAN, ESQUIRE
KRISTIN K. BLOODWORTH, ESQUIRE
KRISTY KAREN CALLAHAN, ESQUIRE
JOHN F. PANISZCZYN, ESQUIRE
UNITED STATES ATTORNEY'S OFFICE
601 NW LOOP 410, SUITE 600
SAN ANTONIO TX 78216

AUSTIN L. FURMAN
JOCELYN KRIEGER, ESQUIRE
DANIEL P. CHUNG, ESQUIRE
JAMES G. TOUHEY, JR., ESQUIRE
STEPHEN E. HANDLER, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
PO BOX 888, BEN FRANKLIN STATION
WASHINGTON DC 20044

ON BEHALF OF RUBEN D. RIOS, JR.

PHILIP KOELSCH, ESQUIRE
CRAIG WILLIAM, ESQUIRE
CARLSON LAW FIRM, PC
100 EAST CENTRAL EXPRESSWAY
KILLEEN TX 76542

ON BEHALF OF ACADEMY, LTD

ELIZABETH G. BLOCH, ESQUIRE
DALE WAINWRIGHT, ESQUIRE
GREENBERG TRAURIG LLP
300 WEST 6TH STREET, SUITE 2050
AUSTIN TX 78701

JANET E. MILITELLO, ESQUIRE
LOCKE LORD LLP
600 TRAVIS STREET TOWER, SUITE 2800
HOUSTON TX 77002

```
 1                               DAVID McDONALD PRICHARD, ESQUIRE
 2                               KEVIN MICHAEL YOUNG, ESQUIRE
                                 PRICHARD YOUNG, LLP
 3                               10101 REUNION PLACE, SUITE 600
                                 SAN ANTONIO TX 78216
 4

 5

 6  ON BEHALF OF MOVANTS    J. DEAN JACKSON, ESQUIRE
    MICHAEL AND REBECCA     CURNEY FARMER HOUSE OSUNA & JACKSON
 7  KELLEY                  411 HEIMER ROAD
                            SAN ANTONIO TX 78232
 8

 9

10  ON BEHALF OF MOVEANT    ADRIAAN TIELEMAN JANSSE, ESQUIRE
    DR. SHRIDHAR VASIREDDY  JANSSE LAW
11                          P.O. BOX 791215
                            SAN ANTONIO TX 78279
12

13  REPORTED BY:           GIGI SIMCOX, RMR, CRR
                           CHRIS POAGE, RMR, CRR
14                         OFFICIAL COURT REPORTERS
                           UNITED STATES DISTRICT COURT
15                         SAN ANTONIO, TEXAS

16

17

18

19

20

21

22

23

24

25
```

1    *(San Antonio, Texas; April 13, 2021, at 9:00 a.m., in open*
2    *court.)*
3         THE COURT:  Good morning, ladies and gentlemen.
4    We'll resume with the trial today.  All counsel, parties,
5    witnesses, participants, and members of the public are
6    reminded that this is a formal proceeding, and that they
7    should behave at all times as if they were present in the
8    courtroom.
9         The standing order of the San Antonio Division of the
10   Western District of Texas on remote access to court
11   proceedings remains in effect.  Photography, recording, or
12   streaming of this proceeding by any means is strictly
13   prohibited.  Though this proceeding is open to the public,
14   technological restraints require that members of the general
15   public request access from the courtroom deputy to participate
16   remotely.  Those granted approval to participate remotely must
17   not forward the electronic link to nonparticipating colleagues
18   or persons and must not post a link on any public forum.
19        As with all proceedings, violations of these
20   instructions are subject to contempt proceedings.
21   Accordingly, please exercise proper decorum at all times, and,
22   with that, we'll begin with the government's case.
23        Your witness.
24        MR. STERN:  Thank you, Your Honor.  The United States
25   calls Mr. William Ryan.

WILLIAM RYAN - DIRECT

1    (WILLIAM RYAN, having been duly sworn, testified as
2  follows:)
3            THE COURT:  Is it warm in here?
4            THE DEPUTY CLERK:  Yes, I went ahead and let Michael
5  know.
6            THE COURT:  Thank you.
7                    DIRECT EXAMINATION
8  BY MR. STERN:
9  Q.  Mr. Ryan, good morning.
10 A.  Good morning.
11 Q.  Would you please introduce yourself to the Court.
12 A.  My name is William Ryan.  I'm an assistant chief counsel
13 for the Bureau of Alcohol, Tobacco, Firearms, and Explosives.
14 I'm stationed in Martinsburg, West Virginia.
15 Q.  When we talk about alcohol, tobacco, firearms and
16 explosives, can I use the acronym "ATF"?
17 A.  Yes.
18 Q.  How long have you worked for ATF?
19 A.  I've worked for approximately since 2009.  I've been in
20 five positions since that time.  Prior to that time, I was a
21 Marine Corps officer and judge advocate in Camp Pendleton,
22 California.
23            THE COURT:  Mr. Ryan, can you move that mic closer to
24 you?
25            (Reporter clarification.)

1    THE WITNESS:  Camp Pendleton, California.

2 BY MR. STERN:

3 Q.  And can you tell the Court some of the various roles that

4 you've held within the ATF?

5 A.  Yes, sir.  At ATF, I started as a staff attorney in 2009.

6 Through various reorganizations of the Office of Chief

7 Counsel, I was a senior attorney, and then finally assistant

8 chief counsel in the firearms and explosives law division.

9 I've been in that position for approximately three and a half

10 years.

11 Q.  In those positions with the ATF, do you have any

12 familiarity with the Gun Control Act of 1968?

13 A.  Yes, sir, I do.  Gun Control Act of 1968 is one of the

14 four laws that the ATF is — that the Attorney General has

15 allowed ATF to enforce through delegation orders.

16 Q.  Is that the same with the Brady Act?

17 A.  The Brady Act is part of the Gun Control Act, sir, yes.

18 Q.  And then the NICS Improvement Amendments Act of 2007?

19 A.  Also the Gun Control Act.  Yes, sir.

20 Q.  Thank you.  And, again, can I use an acronym NIAA for NICS

21 Improvement Amendments Act?

22 A.  Yes, sir.  That is the accepted acronym.

23 Q.  Thank you.  And do you have familiarity with firearms and

24 modifications of firearms?

25 A.  Yes.  One of my roles at ATF in the Martinsburg facility

WILLIAM RYAN – DIRECT

1  is counsel to the Firearms and Ammunition Technology Division
2  or FATD.  FATD houses the ATF's experts on firearm
3  classifications, technical modifications, things like that.
4  And so I have a regular — regular role of advising them in
5  the legal aspects of their job.
6  Q.  And you have already talked about your service with the
7  armed forces.  Do you have experience with tactical weaponry
8  as a result of that experience?
9  A.  I do.  I did serve on one tour in Al-Fallujah, Iraq with
10 the infantry battalion.  I was a legal adviser there.
11     Also, all Marine Corps officers are sent through what's
12 known as the basic school in Quantico, Virginia six-month
13 infantry training, so every Marine Corps officer is a rifle
14 platoon commander first.  So I've experienced and had
15 experience with many weapon systems there.
16     And then as part of my training for ATF, I've also gone to
17 gunsmithing courses, including one for LWRCI, which is a
18 manufacturer in Maryland.
19 Q.  Any other certifications or schooling relating to
20 firearms?
21 A.  Just mostly on-the-job training and what's involved in my
22 daily work at ATF, sir.
23 Q.  Okay.  I'd like to talk to you a little bit about
24 Devin Kelley specifically and his being prohibited under the
25 Gun Control Act, if that's okay.

WILLIAM RYAN — DIRECT

1   A.  Yes, sir.

2   Q.  Did there come a time when the Department of Defense

3   Office of Inspector General's office contacted your office and

4   request an official determination and analysis from the ATF

5   regarding Devin Patrick Kelley?

6   A.  There was.  I was at a meeting with the Office of

7   Inspector General for DOD and met with an inspector there who

8   was also working on the Devin Kelley case.  And we made

9   contact and I agreed that I would be — and I was appointed to

10  be the ATF liaison to the DOD Office of Inspector General on

11  that case.

12  Q.  And did you make determinations regarding whether Devin

13  Patrick Kelley was disqualified from legally owning or

14  possessing a firearm under the Gun Control Act?

15  A.  Yes, sir.  The Office of Inspector General provided us

16  documentation that they had accrued during their

17  investigation, and we determined that Mr. Kelley was a

18  prohibited person under 922(g)(1) and (g)(9) of the Gun

19  Control Act, the felon and the misdemeanor crime of domestic

20  violence prohibitors.

21  Q.  I want to pull up Joint Exhibit 9, please.

22       Is this the memorandum your office sent to the Department

23  of Defense Office of Inspector General in response to their

24  request?

25  A.  That is.  Yes, sir.

1   Q.   If we look at the bottom there, is that your signature?

2   A.   That is my signature, yes.

3   Q.   Now, it says "Barry Barlow," [phonetic], but that is your

4   signature?

5   A.   That is.  I have — as assistant chief counsel, I had

6   signature authority, so I was allowed to sign it, but

7   Mr. Barlow was the associate chief counsel who was in charge

8   of the section.

9   Q.   No forgery.  We're okay on that?

10   A.   We're good, sir.  Yes.

11   Q.   Then again, your conclusion, was Devin Kelley prohibited

12   from owning or possessing a firearm under 18 U.S.C. 922(g)(1)?

13   A.   That's correct, yes.

14   Q.   And (g)(9)?

15   A.   That's right.

16   Q.   What about (g)(4)?  Was Devin Kelley prohibited from

17   owning or possessing a firearm under 18 U.S.C. 922(g)(4)?

18   A.   No, sir.  Based on the documentation that we received from

19   the Office of Inspector General, we determined that Mr. Kelley

20   was either adjudicated a mental defective or committed to a

21   mental institution.

22   Q.   That he was not either of those?

23   A.   Right.

24   Q.   And then with regards to 922(g)(6), regarding dishonorable

25   discharges, was Devin Kelley prohibited from owning or

WILLIAM RYAN - DIRECT

1  possessing a firearm under 18 U.S.C. 922(g)(6)?

2  A.  No, sir, he was not.  He had received a bad conduct

3  discharge as a characterization of service and the prohibitor

4  under the Gun Control Act, (g)(6), very specifically states

5  dishonorable discharge.  A bad conduct discharge and a

6  dishonorable discharge are two very different

7  characterizations of service under the law.

8  Q.  And I'll actually represent to you that the parties have

9  stipulated that your analysis, this is correct, insofar as

10 Devin Kelley was not prohibited under 922(g)(4) or (g)(6)?

11 A.  Yes, sir.

12 Q.  Now, is each prohibitor under the Gun Control Act

13 independent of one another?

14 A.  Yes.  Each of the prohibitors stands alone, and so when

15 ATF or FBI is determining whether someone is prohibited, each

16 of the individual prohibitors would be looked at in — in —

17 by themselves to determine whether a person is prohibited.

18 Q.  Can the submitting department or agency evaluate any other

19 conduct regarding an individual when deciding whether they are

20 prohibited under the Gun Control Act?

21 A.  The submitting agency can submit information, whether —

22 whether that — it results in a prohibition — or that would

23 not result in a prohibition, I should say.  Unless it meets

24 one of those specific statutory factors.

25 Q.  So you said the agency may submit other information, but

WILLIAM RYAN - DIRECT

1  can that other information, in and of itself, create an

2  obligation to report under the Gun Control Act?

3  A.  No, sir.

4  Q.  What can the submitting department or agency consider when

5  determining whether an individual is prohibited under the Gun

6  Control Act?

7  A.  Any information that would — that would lead to a

8  conclusion that one of those prohibitors is met: a conviction

9  for a felony; a conviction for a misdemeanor crime of domestic

10  violence; or in this case, you know, if a discharge from the

11  military was a dishonorable discharge.  A bad conduct

12  discharge is indicative of something, but it is not indicative

13  that a person is prohibited under the Gun Control Act from

14  owning a firearm.

15  Q.  So, again, a bad conduct discharge in and of itself does

16  not create an obligation to submit under the Gun Control Act;

17  is that fair?

18  A.  It would not make it prohibited.  That's right, sir.

19  Q.  Let's take a look at Joint Exhibit 20.

20      Are you familiar with this document?

21  A.  I am.  Yes, sir.

22  Q.  What is it?

23  A.  This is the results of trial from the Air Force

24  court-martial of Devin Kelley.

25  Q.  And did Devin Kelley plead guilty to two specifications

1  under Article 128(g) of the Uniform Code of Military Justice?

2  A.  Yes.  The document shows two guilty pleas, one for each

3  specification.

4  Q.  Let's pull up Specification 1 and I'm going to have you

5  read the specifics of Specification 1.

6  A.  Sure.  "The nature of the offense is that Mr. Kelley did,

7  within the Continental United States, on diverse occasions

8  between on or about 24, June 2011, and on or about 27,

9  April 2012, unlawfully strike Tessa K. Kelley on her body with

10 his hands, unlawfully choked the said Tessa K. Kelley on the

11 neck with his hands, unlawfully pull the hair of said Tessa K.

12 Kelley with his hands, and unlawfully kick the said Tessa K.

13 Kelley on her body with his foot."

14 Q.  Was this the specification that made Devin Kelley

15 prohibited under 18 U.S.C. 922(g)(9)?

16 A.  Yes, sir.

17 Q.  Why is it that this specification is under (g)(9) as

18 opposed to (g)(1)?

19 A.  The –– the possible sentence, term of imprisonment that

20 Mr. Kelley could have received was limited to less than a

21 year, it would have been six months, and so it would not have

22 qualified as a (g)(1) confinement and greater than one year ––

23 one year or greater.

24 Q.  So is it fair to say that in order to be a (g)(1) felony,

25 the maximum allowable punishment would have to be over one

1   year?

2   A.   That's right.

3   Q.   And then for this specification, the maximum allowable

4   punishment was under one year?

5   A.   That's right.

6   Q.   Take a look at Specification 2, please.

7        Could you read aloud?

8   A.   "That Mr. Kelley did within the Continental United States,

9   on diverse occasions between on or about 27, April 2011, and

10  on or about 16, June 2011, commit an assault upon JML, a child

11  under the age of 16 years by striking him on the head and body

12  with a force likely to produce death or grievous bodily harm,

13  to wit: his hands."

14  Q.   Was this a specification that made Devin Kelley prohibited

15  under 18 U.S.C. 922(g)(1)?

16  A.   Yes, it was.

17  Q.   And why was this a felony rather than a misdemeanor of

18  domestic violence?

19  A.   The possible sentence or term of confinement that

20  Mr. Kelley could have received for this was over one year.  I

21  believe it was up to five years because of the age of the

22  child and the grievous bodily harm that was charged.

23  Q.   Did either of these specifications include the use of a

24  firearm?

25  A.   They did not.

WILLIAM RYAN - DIRECT

1  Q.  In fact, if we look at the second page of the result of

2  trial, do we see several specifications where Devin Kelley is

3  alleged to have used a firearm, either loaded or unloaded?

4  A.  Yes.  Specifications include both using pointing a loaded

5  and unloaded firearm.

6  Q.  What were the results of these specifications?

7  A.  These specifications resulted in not guilty pleas and then

8  ultimately withdrawal and dismissal after the arraignment.

9  Q.  Because these specifications were withdrawn, could they be

10  considered in determining whether Kelley was prohibited under

11  the Gun Control Act?

12  A.  No.  They would not have been relevant under the statutory

13  prohibitors.

14  Q.  Could they have created an obligation by the Air Force to

15  submit information regarding those specifications?

16  A.  Not as it pertains to the Gun Control Act, sir.

17  Q.  Thank you.

18      Going back to the first page, are these two specifications

19  the only grounds upon which the Air Force had an obligation to

20  submit Kelley's disqualifying information?

21  A.  Based on the information we've received there, sir, that's

22  correct, these were the two grounds.

23  Q.  Did any conduct other than these two specifications create

24  an obligation by the Air Force to submit Devin Kelley's

25  information to NICS?

WILLIAM RYAN – DIRECT

1  A.  No, sir.  Not under the Gun Control Act.

2  Q.  If Devin Kelley was not adjudicated a mental defect or

3  involuntarily committed, could his mental health issues create

4  an obligation by the Air Force to submit information to NICS?

5        MR. ALSAFFAR:  Objection, Your Honor.  This goes well

6  beyond his expertise.  Now he's trying to get him to testify

7  on specific elements of causes of action that he's clearly not

8  demonstrated as an expert in.  They have not actually

9  designated him in that area as well, Your Honor.

10        THE COURT:  I don't think he's been designated as an

11  expert at all.  That's overruled.

12  BY MR. STERN:

13  Q.  Again, based on your memo and your understanding of 18

14  U.S.C. 922(g)(4), if Devin Kelley was not adjudicated a mental

15  defect or was not involuntarily committed, could his mental

16  health issues create an obligation by the Air Force to submit

17  anything regarding Devin Kelley?

18  A.  Not as it pertains to prohibitors under the Gun Control

19  Act, sir.

20  Q.  Now, we've heard some testimony about general threats

21  Devin Kelley made to kill leadership and other people.  Could

22  such threats create an obligation by the Air Force to submit

23  Kelley's information into NICS?

24  A.  The statutory prohibitors are clear, sir, and — and so

25  the answer is no, because the statutory prohibitors are clear

WILLIAM RYAN - DIRECT

1  that only those categories of items are relevant.  Those

2  categories of prohibitors are relevant in determining whether

3  somebody can lawfully possess a firearm.

4  Q.  So could those threats even be considered when determining

5  whether someone was prohibited from owning or possessing a

6  firearm?

7  A.  They would be irrelevant, sir.

8  Q.  We've also heard about some really horrendous acts by

9  Devin Kelley that may have been known to the Air Force at the

10 time.  Could those other bad acts be considered in determining

11 whether Kelley was prohibited under the Gun Control Act?

12 A.  Yes, sir.  The prohibitors are for things such as

13 convictions.  None of those things were convictions.  Those

14 bad acts would not have led to a prohibition on the possession

15 of firearms, the lawful possession of firearms.

16 Q.  Those other bad acts wouldn't create a duty by the Air

17 Force, or an obligation by the Air Force to submit anything;

18 correct?

19 A.  Not under the Gun Control Act, sir, no.

20 Q.  And they couldn't be considered in terms of whether or not

21 Kelley was prohibited under the Gun Control Act?

22 A.  That's right.

23 Q.  Are you familiar with the facts of this case?

24 A.  I am, sir, yes.

25 Q.  Are you familiar with Kelley's interest in firearms?

WILLIAM RYAN - DIRECT

1  A.  I am, yes, sir.

2  Q.  Based on your knowledge and experience, was Devin Kelley

3  the type of person who would seek firearms through any means

4  possible?

5          MR. ALSAFFAR:  Objection, Your Honor.  That goes well

6  beyond his designation.

7          THE COURT:  That does.  That's sustained.

8  BY MR. STERN:

9  Q.  Okay.  So let's talk about the firearm that Devin Kelley

10  purchased at Academy in April 2016.  Are you familiar with

11  that transaction?

12  A.  I am, yes, sir.

13  Q.  Let's first talk about the firearm as it was found by the

14  Texas Rangers following the shooting.

15  A.  Okay, sir.

16  Q.  Following the shooting, did the ATF conduct an examination

17  of Kelley's firearm as it was recovered by the Texas Rangers?

18  A.  They did.  Yes, sir.

19  Q.  Can we take a look at Joint Exhibit 423.

20      Are you familiar with this document?

21  A.  I am.  Yes, sir.

22  Q.  What is it?

23  A.  This is the report of investigation from the San Antonio

24  Field Office, the field office from —— for ATF, and this first

25  portion is a summary of events of the —— of the ——

WILLIAM RYAN - DIRECT

1  observations and the investigation of the scene.

2  Q.  Turn to page 5.  A little further down.  Page 5 of this

3  memo.  One up above that.

4      If you look at the portion of this memo that talks about

5  the Ruger 556, can you read the first three lines?

6  A.  "The above rifle was manufactured by Ruger in Mayodan,

7  North Carolina as a semiautomatic firearm.  Manual field

8  testing of the firearm indicated semiautomatic function.  The

9  firearm was not test-fired by ATF personnel during the

10  inspection.  Additionally, the rifle was found to incorporate

11  an aftermarket drop in trigger assembly."

12  Q.  What is an aftermarket drop in trigger assembly?

13  A.  Aftermarket drop in trigger assemblies are often highly

14  engineered quality triggers that differ from the factory

15  triggers in the smoothness of operation, things like that, and

16  so target shooters, hunters, people who often use aftermarket

17  drop in triggers to increase the quality, the smoothness of

18  functioning of the weapon when they're -- when they're firing

19  rounds.

20  Q.  So is it fair to say this trigger did not come with the

21  rifle as it was purchased?

22  A.  That's right.  It does not appear to have come with the

23  rifle as a factory.

24  Q.  If we look at the next page, it talks about several other

25  modifications; is that correct?

WILLIAM RYAN – DIRECT

1  A.  Yes.  Those are –– those are the other features of that

2  firearm, yes.

3  Q.  Let's go –– was it features of the firearm, or is it

4  modifications to the firearm?

5  A.  I don't know.  Like, for example, the electronic red dot

6  sight, likely aftermarket.  Whether or not Ruger had these in

7  the factory, these are –– these are generally aftermarket.

8  They may have been put on in the factory, but they are

9  typically what we see in the aftermarket realm.

10 Q.  Let's take these one at a time here.

11     First, the Bushnell electronic red dot sight with

12 high-rise mount.  What is that?

13 A.  The red dot sight is a sight that differs from a

14 traditional rifle sight, whereas a traditional rifle sight one

15 would close –– the shooter would close his eye, look through

16 the circle and align the post to fire.  The red dot sight

17 allows both eyes to remain open, increases target acquisition

18 and ––

19          MR. ALSAFFAR:  Objection.  May I interpose an

20 objection?

21          If I could, Your Honor, this is outside the scope of

22 his designation.  I would like to show you his designation ––

23 fact witness designation.  That's what it was.  It's the

24 defendant's latest disclosures on that.

25          His designation was simply to talk about the Gun

WILLIAM RYAN – DIRECT

1  Control Act prohibitors, which he's done, so we can check that
2  off and the section under the U.S.C. –– 18 U.S.C. Code
3  relating to Academy sale.
4          That's it.  He was not designated to talk about
5  firearms.  He was not designated to talk about how they work
6  and how you modify them and how you put them on and how you
7  change them.  This is well outside their designation.
8          And if we could show you ––
9          Could you pop up ––
10         THE COURT:  Well, why isn't this relevant to whether
11 or not at the time they were purchased from Academy, they had
12 this stuff on there or not?
13         MR. ALSAFFAR:  It's not relevant, Your Honor.  The
14 only question on that is whether it should have been sold.
15         THE COURT:  Your response?
16         MR. STERN:  To Your Honor's point, it does go to the
17 extent to which these modifications were made after the sale,
18 so we will get to the actual sale itself.  But to the extent
19 that Devin Kelley modified this firearm, it is directly
20 relevant to that purchase.
21         THE COURT:  Well, so the problem with your question
22 is about who modified them or not.  He doesn't know that.  But
23 you can ask him questions about at the time of the sale at
24 Academy, does he believe these were part of the sale or
25 whether they were done after the fact.

1       MR. STERN:  Okay.

2   BY MR. STERN:

3   Q.  Then let's take the Court's lead and ask just those

4   questions with regard to each of these.

5       Do you have an understanding as to whether the Bushnell

6   electronic red dot sight with high-rise mount was part of the

7   sale of the AR-556 in April of 2016?

8   A.  My understanding is that that was an aftermarket addition

9   to the firearm.

10      MR. STERN:  Your Honor, may I ask him what these

11  items are?

12      THE COURT:  Yeah, that's fine.

13      MR. STERN:  Thank you.

14  BY MR. STERN:

15  Q.  I think we've already talked about the high-rise mount

16  sight.  Let's talk about the Magpul forend having vertical

17  foregrip installed.  Do you believe that that was part of the

18  rifle as purchased in April 2016?

19  A.  I do believe that is an aftermarket addition as well.

20  Q.  And what is that?

21  A.  The foregrip is a place for the forward hand to grip the

22  firearm.  Rather than with palm upward, gripping the plastic

23  piece around the barrel, this allows the shooter to grip the

24  firearm in a more natural way, so the palm outward.  Just a

25  more ergonomic way of handling the firearm, especially over

1  long time periods or through much shooting.

2  Q.  Next, Magpul adjustable shoulder stock.  Do you believe

3  that was part of the firearm as purchased in April 2016?

4  A.  I don't — I don't know if it was or not.  The — the

5  adjustable shoulder stocks are specifically sometimes

6  included.  Whether the Magpul was, I just don't know if it

7  was.

8  Q.  That's fair.

9      The Magpul battery assist device.  Is it also known as

10  BAD?

11  A.  That's the Magpul acronym for it, yes.

12  Q.  What is a battery assist device?

13  A.  A battery assist device is — specifically as it's used by

14  Magpul, when one needs to release the bolt to load a round

15  after loading another magazine, one would normally have to

16  release the bolt by taking the finger off the trigger, or

17  otherwise moving the hands from the shooting position.

18      This allows a shooter to send a bolt home, load a new

19  round from the bolt, new magazine, without removing hands from

20  the trigger or other shooter positions — shooting positions.

21  Q.  And do you have an understanding as to whether or not this

22  was part of the rifle as purchased in April of 2016?

23  A.  I do not believe that it was.

24  Q.  Now, we've already talked about the aftermarket trigger

25  assembly, and you testified that you believed that that was

WILLIAM RYAN — DIRECT

1  not part of the rifle as purchased in April 2016?

2  A.  That's correct, based on the FAID report.  That's right.

3  Q.  The enlarged charging handle latch.  What is that?

4  A.  The enlarged charging handle latch is a mechanism for

5  pulling back and releasing the bolt to charge the weapon the

6  first time to load the first round.  Oftentimes, with gloves

7  or simply because of manual dexterity issues, it's a very

8  small factory handle.  Sometimes larger handles are added to

9  make it easier to charge the weapon the first time.

10  Q.  Do you have an understanding as to whether or not that

11  would have been part of the rifle at the time of purchase in

12  April 2016?

13  A.  That I don't know.  I don't know if that was part of the

14  Ruger package or not.

15  Q.  And, finally, two-point sling assembly.

16  A.  The two-point sling assembly is two loops on either —

17  metal loops, plastic loops, on either end of the firearm the

18  sling attached to, makes it possible to carry the firearm

19  either over the shoulder or cross-body.

20  Q.  Let's talk about the modifications as you've identified

21  them post — post-purchase.

22      Do those modifications — were they designed for a

23  military and law enforcement purpose?

24  A.  These, the Magpuls, the red dot sight, those are typically

25  used in a tactical setting.  And that's, I believe, what they

WILLIAM RYAN - DIRECT

1  were designed for, based on my experience, rapid target

2  acquisition, rapid loading, things like that.

3  Q.  Do they enhance the lethality of the firearm?

4  A.  They arguably enhance the accuracy and the number of

5  rounds that we say can get down range in a matter of time, and

6  so certainly they increase fire rate and perhaps accuracy as

7  well.

8  Q.  When we talk about accuracy and the number of bullets,

9  doesn't that equal lethality?

10  A.  Arguably, yes.

11  Q.  Does the fact that Devin Kelley made many modifications to

12  his firearms tell you anything about his level of gun

13  enthusiasm?

14          MR. ALSAFFAR:  Objection, Your Honor.  Speculation.

15          THE COURT:  Sustained.

16  BY MR. STERN:

17  Q.  Take a look at Joint Exhibit 502-128.

18      Is this a picture of Devin Kelley's firearm with the

19  various modifications?

20  A.  I can't see the serial number but that does appear to be

21  the firearm, or one very similar to it.  This one has the

22  addition of the Taclight, which is a tactical light, a

23  flashlight that was added on to the rail system on the front

24  of the firearm.

25  Q.  Thank you.  You can take that down.

WILLIAM RYAN – DIRECT

1      Now, let's talk about the actual purchase by Devin Kelley

2  at Academy Sports and Outdoors in April 2016; is that okay?

3  A.  Yes, sir.

4  Q.  Are you familiar with that transaction?

5  A.  I am, yes, sir.

6  Q.  Did — and I'm going to use shorthand "Academy" for

7  Academy Sports and Outdoors; is that okay?

8  A.  Yes, sir.

9  Q.  Did Academy violate federal law by selling the AR–556 to

10 Devin Patrick Kelley?

11     MR. ALSAFFAR:  Objection, Your Honor.  We do have an

12 objection to this because now the government is — the

13 objection, Your Honor, is that it's irrelevant because this is

14 testimony that goes directly to the province of the Court.  He

15 is now going to come in and testify as a lawyer for the same

16 Department of Justice that the attorneys work for to tell you

17 what the law is and in apportioning responsibility in this

18 case.

19     Just as Colonel Youngner had to stay within his

20 contours and not comment on the ultimate issues of law before

21 the Court, they have now brought one of their very own

22 Department of Justice lawyers, just as if I'd brought

23 Mr. Jacob and put him on the stand to tell you about

24 proportionate responsibility to tell you what the law is and

25 how to apply that law to these facts in the case.

WILLIAM RYAN – DIRECT

1       That is beyond the scope of any witness, much less

2  one of the very attorneys hired by the Department of Justice.

3       THE COURT:  So I'll let it in.  That's overruled.

4       I'm allowing in facts that this witness can tell me

5  to place with Academy's purchase, and that it is continuing

6  the relevant — there is relevance here for the proportionate

7  liability claim that the government's asserted against

8  Academy.  So with that, yeah, I don't want to hear —

9       I don't want you to tell me what the law is, just

10  tell me what the facts were.

11  BY MR. STERN:

12  Q.  As a matter of fact, April 7, 2016, when Academy sold the

13  AR-556 to Devin Kelley, was it violating federal law?

14       THE COURT:  Well, let's backtrack.  Tell me how it

15  violated.  What took place at Academy?  Give me facts.  Don't

16  give me a conclusion.

17       THE WITNESS:  Yes, sir.  Yes, sir.

18       The facts of this case were that the Ruger model that

19  was sold, the — I believe it was the 8500 — included with

20  it, and in the package, in the wrapped package, a 30-round

21  magazine.  That 30-round magazine is lawful to possess in

22  Texas.  It is unlawful to possess in Colorado.

23  BY MR. STERN:

24  Q.  If we pull up Joint Exhibit 345, page 4.

25       We're trying to deal with just the facts of the case —

1  right? -- we will break it down piece by piece.  If we look on
2  the first page, what address did Devin Kelley write down on
3  his ATF 4473 Form?
4  A.  On the 4473, his current residence address is listed as
5  Colorado Springs, Colorado.
6  Q.  If we look at the next page, what government-issued ID did
7  he use to make the purchase?
8  A.  The Box 20A for identification says, "CODL," which
9  indicates a Colorado driver's license was used as government
10 identification.
11 Q.  Is Academy required to rely on that address when
12 determining where Devin Kelley resided for purposes of
13 complying with federal law?
14 A.  So under federal law, one of the requirements is that an
15 individual provide government identification with an address.
16 That's what was provided.  That's the document that Mr. Kelley
17 provided, and that's the information he provided on his form.
18 And so the Colorado address, for Academy's purposes, would
19 have been the address they would have relied on.
20 Q.  Now, when we take a look at page 6 of this transaction, we
21 see in the top portion that the manufacturer is Ruger;
22 correct?
23 A.  That is correct.
24 Q.  What is the model?
25 A.  An AR-556.

WILLIAM RYAN – DIRECT

1   Q.  Do you see the serial number?

2   A.  Serial number's included as well in Box 28.

3   Q.  And the type?

4   A.  Type, generally is a rifle listed in 29.

5   Q.  And the caliber or gauge?

6   A.  The caliber is in Box 30 as 5.56 NATO.

7   Q.  If we look a little bit further down, we see a signature

8   by an employee of the FFL; is that correct?

9   A.  Yes, that appears to be the sales associate.

10  Q.  What is the purpose of having someone on behalf of the FFL

11  sign this form?

12  A.  One of the requirements is that the FFL must certify that

13  it's not unlawful to sell, deliver, transport, or dispose of

14  the firearm to the person listed on the 4473.  This is that

15  certification.

16  Q.  So is this, then, essentially saying that they are

17  complying with federal law?

18  A.  That's right.

19  Q.  If you look at page 12 — look at the bottom portion

20  there.  Do you know what this document is?

21  A.  Yes.  I understand.  This document is an internal

22  document, a document to Academy that ensures or is meant to

23  ensure compliance with federal law in firearms transactions.

24  Q.  If we look at the last portion, do you see where it says,

25  "SKU number"?

WILLIAM RYAN — DIRECT

1   A.  Yes, sir.

2   Q.  What is a SKU?

3   A.  A SKU is a general term used for production or a general

4   concept used for inventory purposes.  A SKU represents a

5   particular packaging or a particular item in an inventory, and

6   so the SKU in this case represented the AR-556 package that

7   was sold at the Academy sports store.

8   Q.  We'll come back to this document, but for right now, I

9   want to go to Joint Exhibit 76.  And let's remember that SKU.

10  I think if we highlight it one more time.

11      Can you read the SKU, please?

12  A.  The SKU is 103530047.

13  Q.  Thank you.  We'll return to this document, but let's go to

14  Joint Exhibit 76.  Are you familiar with this document?

15  A.  I am.  This is a printout of the Academy Sports and

16  Outdoor Web page advertisement for the Ruger AR-556.

17  Q.  If we pull up the portion that reads "SKU."

18      I know it's pretty difficult to read, but can you see it?

19  A.  I can.  On that Web page, the advertisement includes the

20  SKU 103530047.

21  Q.  Is that the same SKU that was on the transaction checklist

22  filled out by Academy when they sold the AR-556 to

23  Devin Kelley in April of 2016?

24  A.  Yes, sir.

25  Q.  So is it fair to surmise that this is the model and SKU of

WILLIAM RYAN – DIRECT

1 the AR–556 as it was sold to Devin Kelley?

2 A.  Yes, sir.

3 Q.  Can we look at page 2 of this document.

4     Can you read the paragraph that says, "details and specs"?

5 A.  I can.

6 Q.  Thank you.

7 A.  "The Ruger AR–556, 5.56 semiautomatic rifle, is a

8 semiautomatic rifle with a 30–round capacity that features a

9 cooled hammerforged medium contour, 1 1/2 by 28 threaded

10 barrel with a matte, corrosion resistant Type III hardcoat

11 anodized finish, a six-position telescoping M4 style buttstock

12 with a Milspec buffer tube, and an ergonomic pistol grip with

13 heat resistant glass-filled nylon handguards, includes a

14 30–round Magpul PMAG magazine."

15 Q.  By reading the details of the specs, do you know whether

16 the 30–round capacity magazine was sold in the box with the

17 AR–556?

18 A.  Yes, sir.  It came included with the rifle.

19 Q.  And if the 30–round capacity magazine is sold in the box

20 with the rest of the AR–556, is it a component part of the

21 rifle?

22 A.  Yes, sir.

23      MR. ALSAFFAR:  Objection, Your Honor.  He's now

24 testifying on what the definition of component part in the law

25 is.  The answer should be stricken.

WILLIAM RYAN – DIRECT

1          THE COURT:  That's overruled.

2   BY MR. STERN:

3   Q.  Continue.

4   A.  Yes, sir.  It was included in the box.  That was a

5   component that Ruger specifically sold as a component of that

6   firearm.

7   Q.  Is the 30-round capacity magazine lawful to purchase in

8   Colorado at the time?

9          MR. ALSAFFAR:  Objection, Your Honor.  He's now

10  talking about the law and how it applies to the case.

11         THE COURT:  Yeah.  That's overruled.

12         THE WITNESS:  The — at the time that this firearm

13  purchase occurred, and currently, 30-round magazines are not

14  lawfully possessed in Colorado.

15  BY MR. STERN:

16  Q.  When did Colorado ban large-capacity magazines?

17  A.  Following the — the theater shooting up in Colorado,

18  Aurora, the Colorado legislature passed a law banning

19  large-capacity magazines, I think after the date July 1st,

20  2013.  So possession of large-capacity magazines, including

21  30-round magazines after that date was unlawful within that

22  state.

23  Q.  And, again, Devin Kelley purchased the AR-556 with the

24  30-round magazine in the box; correct?

25  A.  That's correct.

WILLIAM RYAN − DIRECT

1  Q.  And as a result, would that have been a violation of

2  Colorado state law?

3  A.  Yes, sir.  That −−

4        MR. ALSAFFAR:  Objection, Your Honor.

5        Again −− and I apologize, but this is a clever way of

6  trying to sneak now this witness' opinion into what Texas law

7  is, and that's, I believe, the boundaries we've established

8  here.

9        THE COURT:  He's already answered that.  It wasn't a

10  violation of Texas law.  It was a violation of Colorado law.

11  So your objection is noted, but overruled.

12  BY MR. STERN:

13  Q.  Was it a violation of federal law?  When Academy sold the

14  AR−556 with the 30−round magazine in the box, was it a

15  violation of 18 U.S.C. 922(b)(3)?

16  A.  Yes, sir, it was.

17  Q.  Why?

18  A.  The Gun Control Act is meant to assist states in the

19  regulation within their borders of their firearms laws.  One

20  of the problems that Congress recognized in 1968 was that

21  someone could merely go over state lines, buy a firearm, and

22  bring it back to another state.

23        As part of that, what Congress did in the Gun Control Act

24  was made it unlawful for federal firearms licensees to assist

25  in that circumvention.  And so 922(b)(3) prohibits an FFL

1  within one state from violating another state's laws when they
2  know that buyer resides in that other state.
3  Q.  In other words, Colorado banned large-capacity magazines
4  after a mass shooting; correct?
5  A.  That is correct.
6  Q.  And Congress was concerned about prohibited individuals or
7  any individuals circumventing that law by going to other
8  states and purchasing the firearms; correct?
9  A.  That's correct.
10  Q.  And so as a result, Texas has to comport with the state
11  laws of Colorado?
12  A.  When selling to Colorado residents, yes, sir.
13  Q.  Again, we've already established that Academy had to rely
14  on Devin Kelley's Colorado driver's license when making the
15  sale?
16  A.  That's correct.
17  Q.  Take a look at Joint Exhibit 82.
18     Are you familiar with this document?
19  A.  I am, yes, sir.
20  Q.  What is it?
21  A.  This is the ATF guidebook for Importation & Verification
22  of Firearms, Ammunition, and Implements of the War.  This is a
23  document that ATF puts out and is available online.
24  Q.  If we look at page 8, this talks about a self-loading
25  action or a semiautomatic, correct?

1102

WILLIAM RYAN - DIRECT

1   A.  That is correct.  Yes, sir.

2   Q.  And under this nomenclator guidebook, would the magazine

3   be a component part, just like any other component team here?

4   A.  That is correct, sir.  The magazine is a component, same

5   as a trigger or a bolt, and it lists a couple different -- or

6   three different types, generally, of magazines that may be

7   used in semiautomatic firearms.

8   Q.  And if we take a look at Joint Exhibit 79.  Flip that

9   over.

10      Does this comparison chart show the distinction between an

11  AR-556 and a state-compliant AR-556?

12  A.  Yes, sir.  That's what it looks to show.

13  Q.  What would be the purpose of Ruger creating a

14  state-compliant AR-556?

15  A.  The reason is because of those state laws we talked about

16  before, sir.  Ruger is a national company.  They sell in more

17  than one state, and so what they've done is, in order to

18  comply with federal law, they've created a firearm -- the

19  "state compliant" refers generally to a firearm that would be

20  compliant in those states that have lower magazine

21  capacities -- allowances, and so the state compliant would not

22  typically have a 30-round magazine, it would have, say, a

23  10-round magazine, in a state such as Colorado, New York,

24  California, Connecticut, states like that where this firearm

25  could be sold.

WILLIAM RYAN – DIRECT

1   Q.   In fact, when we take a look at the row that talks about

2   magazines, we see the distinction that you are referring to;

3   correct?

4   A.   That's correct.  Yes, sir.

5   Q.   And how many rounds does the standard AR-556 have?

6   A.   The 556 in the first column has a 30-round Magpul

7   magazine.

8   Q.   And the state compliant?

9   A.   The state compliant, sir, has a 10-round metal magazine.

10  Q.   So in order to comply with Colorado law, does Ruger sell

11  this even in Colorado?

12  A.   The SKU for the AR-556 with the 30-round magazine would

13  not be lawful to sell to non-law enforcement or government

14  entities in Colorado, sir.

15  Q.   Do they sell the state-compliant version of the AR-556?

16  A.   I do believe that they do.  Yes, sir.

17  Q.   Is that –– to the extent that you know, is that in order

18  to be compliant with Colorado law?

19  A.   That's right, sir.  It would be unlawful to sell the rifle

20  with the 30-round magazine to citizens, just regular citizens,

21  in Colorado.

22  Q.   Thank you.

23       And let's take a look at Government Exhibit 223.

24       Are you familiar with this document?

25  A.   I am, yes, sir.

WILLIAM RYAN - DIRECT

1  Q.  What is it?

2  A.  This is an acknowledgment of federal firearms regulation.

3  This is a document that ATF utilizes in inspections and in

4  reviewing the laws with federal firearms licensees.

5  Q.  So can you walk the Court through that process of how you

6  sort of explain to FFLs their compliance requirements?

7  A.  Yes, sir.

8      One of the requirements, Your Honor, when an FFL

9  determines, or an individual company decides it's going to get

10  a federal firearms license, it has to go through numerous

11  inspections to make sure the facility is appropriate, there

12  is — the zoning is correct, all sorts of things.

13      One of the requirements is that ATF sit down with whoever

14  that responsible party is and go through all of the laws that

15  apply to federal firearms licensees, specifically when they

16  make sales or when they are engaged in the business.

17      This document is meant to guide that discussion and ensure

18  that all of the aspects of legal compliance are covered in

19  both the initial inspection when the license is issued, as

20  well as the annual inspections as they occur.

21  BY MR. STERN:

22  Q.  If we look down at the bottom of this document, page 2, we

23  see the signature.  Is that a signature from the — an

24  employee of the FFL?

25  A.  That's what it would be.  Yes, sir.

WILLIAM RYAN - DIRECT

1  Q.  And what — what would the first name — the first name,
2  would that be from the ATF inspector?
3  A.  The investigator's name is Mark Sadler who conducted this
4  review with the FFL or the responsible party of the FFL.  His
5  name is typed, and I believe his ATF investigator signature, I
6  believe that's also his signature on the second line.
7  Q.  So both the FFL and the ATF inspector have signed this
8  document?
9  A.  That's correct.
10  Q.  This is the way — is this — what's the purpose of having
11  the FFL sign this document?
12  A.  To ensure that that was the individual who was there, that
13  that individual is a responsible party who — who would be
14  someone with authority in these areas, and just to make sure
15  that, you know, that this meeting actually occurred.
16  Q.  And if we look at the date, November 24th, 2015?
17  A.  That's correct.
18  Q.  That would be approximately six months before the sale?
19  A.  Sometime before the sale, yes, sir.
20  Q.  Thank you.
21      Let's go back to —
22          THE COURT:  Before we get off that, I'm just curious,
23  so is this for Academy nationwide, or is this — or does each
24  Academy store and independent FFL that has to go through this
25  process?

WILLIAM RYAN - DIRECT

1    THE WITNESS:  Oh, yes, sir.

2    The actual business address.  So if Academy has 100

3 sites, they would have to have 100 licenses at the different

4 addresses, and each of those would require a responsible

5 person.  And so this would be at each of the addresses, not

6 corporate overall.

7    THE COURT:  So no one has shown this to me, but I'm

8 assuming this is for the location which the gun was sold?

9    MR. STERN:  That's correct.

10 BY MR. STERN:

11 Q.  Did you have an understanding as to whether or not this

12 was from the address where the firearm was sold?

13 A.  Yes, sir.  Mr. Sadler is an inspector in the San Antonio

14 office.

15 Q.  Thank you.

16    Let's go back to Joint Exhibit 67.  Again, I believe you

17 informed the Court what this document is, but can you please

18 state again briefly, what is the purpose of this firearm

19 checklist?

20 A.  This is a compliance document that the company made

21 through legal counsel or through their compliance people, I

22 would imagine, to make sure that the individual sales

23 associate goes through and hits all of these requirements to

24 make sure that every sale complies with the law.

25 Q.  I believe that there's about six steps on this checklist?

WILLIAM RYAN - DIRECT

1  A.  That's correct.

2  Q.  Can you walk the Court through these various steps?

3  A.  Sure.  In each of these steps, Step 1 starts with follow

4  all safety instructions for handling firearms.  Obviously,

5  don't point the weapon at anyone.  Make sure it's unloaded

6  before you hand it to customer, things like that.  And then in

7  concluding there, you'll see in line one, that the customer

8  has been instructed to follow all of these safety

9  instructions.

10      Step 2, verify the customer meets age and residency

11  requirements for a firearms transfer.  This includes the —

12  you know, the age of 18 for a long gun; 21 for other firearms,

13  and then that — there is a government-issued photo

14  identification as is required by the statute.

15      Step 3, is that they provide that identification.

16      Step 4, is to complete the 4473, which is the ATF Firearms

17  Transaction Record.  This is the document in which the

18  prohibited person questions are asked and the background check

19  information is completed or — or noted.

20      And then, finally, Step 5, pass the NICS or point of

21  contact background check, so that the firearm can finally be

22  transferred.

23  Q.  Is there a Step 6 in the last portion of this?

24  A.  I'm sorry.  Yes.

25      Step 6, and then review the paperwork and firearm, and

1  complete the firearm transfer, actually turning over that
2  firearm to the customer.
3  Q.  So when should have Academy stopped this transaction?
4  A.  Based on this form, one of the questions is, does the
5  customer meet the minimum age and residency requirements for a
6  handgun, pistol grip firearm, or receiver transfer.
7      That question, when I look at this form, is a bit odd that
8  it's not applicable, because the question is, "Does the
9  customer meet requirements and residency" —— I'm sorry —— "the
10  minimum age and residency requirements."  It's applicable.
11  And, unfortunately, the answer is no, they didn't.
12      Now, the question may be, well, this wasn't that kind of
13  firearm.
14  Q.  Um-hum.
15  A.  But that —— that answer, "not applicable," at that point
16  is simply inaccurate.  No, the customer would not have met the
17  requirements for those firearms.
18  Q.  So you are saying this checklist is not complete or
19  comprehensive enough?
20  A.  It's filled out —— it is filled out in a strange way such
21  that it asks a question that probably maybe isn't the question
22  they wanted to ask, but the way that question is termed,
23  "Does the customer meet the residency requirements for these
24  things," the answer is, no, he doesn't.  It's not that it's
25  not applicable.  It's that he doesn't meet those requirements.

WILLIAM RYAN - DIRECT

1  Q.  So let's step back from this document, then.  In the

2  normal transaction, if a Colorado resident, or someone showing

3  a Colorado ID, goes to a Texas FFL, tries to purchase this

4  AR-556 with the 30-round magazine in the box, when should the

5  FFL stop that transaction?

6  A.  The FFL, knowing that the individual is a Colorado

7  resident, has information at that point.  That information

8  includes that this person is not from a state where this —

9  this box could be sold, this magazine with this firearm could

10  be sold.  At that point, one would hope the red flags would go

11  up, and the Academy sales associate, or manager, or somebody

12  would have recognized that there may be an issue here.

13  Q.  In that circumstance when the FFL recognizes that there is

14  an issue, would they even initiate a NICS background check?

15  A.  If there's a concern about violating the law such that

16  this can't — this transaction can't go through because it

17  would violate the law, there is no need to perform a

18  background check at that point, because there's no point.

19  Even if the person is — comes back as not prohibited, the

20  firearm transaction can't go forward.

21  Q.  So is it fair to say that this sale should have stopped

22  before Step 4 on this checklist?

23  A.  Arguably that's when the — that is when the store, the

24  FFL was on notice that something was — that there may be a

25  problem with this.  That Colorado documentation that

1  Mr. Kelley provided should have been that point.  Even if the

2  4473 was completed or being done at the same time, that's at

3  the point that one would hope Academy, the sales associate

4  would have recognized an issue.

5  Q.  Let me ask you this way:  You don't need to run a NICS

6  background check in order to realize, or at least -- or at

7  least for an FFL that they should have realized that they were

8  not complying with federal law; correct?

9  A.  That's right.  That's why that information is on the top

10  of the 4473 before the background check information, to cut

11  out those issues before the background check is completed.

12  Q.  So if Academy complied with federal law, would it have

13  conducted a NICS background check?

14         MR. ALSAFFAR:  Objection.  That calls for complete

15  speculation.  They have not established a foundation at all

16  that he has any factual knowledge or understanding of the

17  process and the order in which anyone at this Academy store

18  went through.  He's guessing at this point.

19         THE COURT:  Say your question again.

20         MR. STERN:  If Academy complied with federal law,

21  would it have conducted a NICS background check?

22         THE COURT:  You can answer.  That's overruled.

23         THE WITNESS:  There would not have been a need to

24  conduct a background check, sir.

25

WILLIAM RYAN - DIRECT

1 BY MR. STERN:

2 Q.   They would have all the requisite information to make the

3 determination that the sale was not compliant with federal

4 law?

5 A.   Regardless of whether that individual was specifically

6 prohibited, the transfer could not have gone forward.

7 Q.   Are FFLs presumed to know and comply with federal law?

8 A.   Yes, sir.

9 Q.   The acknowledgment form that we already looked at verified

10 that FFLs are presumed to know and comply with federal law?

11 A.   And then — yes, sir.  And then go over specifics that are

12 included.

13 Q.   Why is it important for FFLs to comply with the laws of

14 both where the state — where the sale occurs and where the

15 buyer resides?

16 A.   Again, sir, the point of the Gun Control Act, and one of

17 Congress' concern, was helping states enforce their law and

18 allowing the unfettered interstate transfer or transport of

19 these items in violation of that would undermine that purpose.

20 And so the requirements that FFLs abide with other state's

21 laws is one of the bases of the Gun Control Act.

22 Q.   Following the events of November 5th, 2017, did anyone

23 from ATF tell Academy that its sale to Devin Kelley in April

24 2016 was legal?

25 A.   Not based on these facts.  No, sir.

WILLIAM RYAN – DIRECT

1  Q.  Did anyone from ATF tell Academy that the sale was, quote,

2  unquote "a good sale"?

3  A.  Not based on the facts that we have here, sir, no.

4  Q.  Are you aware that there was testimony from Academy's

5  compliance officer, testifying that after the shooting,

6  Academy received confirmation from ATF Assistant Director Andy

7  Graham, and that he told Academy the sale was, quote,

8  "completely legal"?

9  A.  I understand that testimony exists, yes, sir.

10 Q.  Can you confirm whether anyone, including Assistant

11 Director Graham told Academy that the sale was completely

12 legal?

13 A.  Based on these facts, sir, of what it was that was sold,

14 not just a quote, unquote "long gun" —

15         MR. ALSAFFAR:  Objection, Your Honor.

16         Two objections.  First, speculation.  Second, this

17 goes well beyond his designation.  He is now guessing over

18 what an assistant director may or may not have told at the

19 ATF — or may not have — told or communicated to the Academy

20 store.  The question was:  What do you think he would have

21 done in this situation?

22         THE COURT:  That's not the question yet.  So that's

23 overruled.

24         Let's take this one question at a time.  Supposedly,

25 this gentleman said that this sale was legal.  From your

WILLIAM RYAN – DIRECT

1  personal knowledge, is the question is that correct or not?

2       MR. STERN:  Well, I can ask him if he has spoken —

3  if he has spoken to ATF Assistant Andy Graham.

4       MR. ALSAFFAR:  That's hearsay.

5       THE COURT:  Well, that's hearsay, so ask him

6  something that's going to avoid a hearsay problem.

7  BY MR. STERN:

8  Q.  Are you aware of any communications by ATF to Academy

9  telling Academy that that sale was legal?

10 A.  Not based on the facts, and what was in the box, sir.

11      THE COURT:  Well, but you know that now.  But, I

12 mean, the question is:  Do you know something that

13 contradicts — other than your testimony today, are you aware

14 of something else that contradicts this gentleman's testimony?

15      THE WITNESS:  Well, sir.  Yes, sir.

16      The question that — that concerned me is what was

17 said on the phone.  And if the question was, we sold a long

18 gun to a resident of Colorado, that's a very different

19 question than, we sold a long gun that Ruger sells with a

20 30-round magazine to a resident of Colorado.

21      And so I guess my problem is no one at ATF has

22 advised that the sale of a Ruger 556 with a 30-round magazine

23 under that SKU is permissible or lawful.  Whether someone said

24 sale of a long gun to a Colorado resident is lawful is an

25 entirely different question.

WILLIAM RYAN - CROSS

1       THE COURT:  Well, just for my sake, is there

2  testimony from this gentleman that he said this?

3       MR. STERN:  There is no testimony, Your Honor.

4       MR. ALSAFFAR:  That's right.

5       THE COURT:  Okay.  Go ahead.

6       MR. STERN:  Pass the witness.

7       THE COURT:  Any questions?

8       MR. ALSAFFAR:  Yes, Your Honor.  Thank you.

9                  CROSS-EXAMINATION

10  BY MR. ALSAFFAR:

11  Q.  I had to check my watch to make sure it was still morning.

12      Good morning, sir.

13  A.  Good morning, sir.

14  Q.  You and I have never met before; right?

15  A.  I don't believe so.

16  Q.  My name is Mr. Alsaffar.  I represent the Sutherland

17  Springs victims of this mass shooting.  I have a few questions

18  for you, if that's okay?

19  A.  Yes, sir.

20  Q.  Can you hear me okay?

21  A.  I can.  Yes, sir.  Thank you.

22  Q.  Let me — let me ask you just to start off with about what

23  you were asked about in regards to the prohibitors early on in

24  Mr. Stern's examination.  The bottom line is that — that

25  Devin Kelley should never have been able to be — have a gun,

WILLIAM RYAN - CROSS

1  like the one he used in this shooting; right?

2  A.  He was a prohibited person at the time he bought it.  Yes,

3  sir.

4  Q.  And that means that an FFL can't sell it to him if it's

5  reported to the FBI, those convictions were reported to the

6  FBI?

7  A.  It means that the background check would catch it, so the

8  FFL would not be able to sell it.  Yes, sir.

9  Q.  The thing that Mr. Stern, I don't think, asked you about

10  very quickly is that you went over the conviction and the

11  report of result of trial; do you remember that?

12  A.  Yes, sir.

13  Q.  And those were — those would have resulted in automatic

14  denials from the FBI background check; right?

15          MR. STERN:  Objection.  Calls for speculation.

16          THE COURT:  That's overruled.

17          THE WITNESS:  It would have resulted in an automatic

18  denial.  The term "automatic denial" is throwing me, sir.

19          Could you clarify?

20  BY MR. ALSAFFAR:

21  Q.  Are you familiar — you've talked a lot about the

22  background check system, and whether or not — and the timing

23  of it and how it goes along.  Are you familiar with how it

24  interacts with these prohibitors that you testified about?

25  A.  Yes, sir.

WILLIAM RYAN - CROSS

1   Q.  What I'm saying is that when you beat a child --
2           THE COURT:  Mr. Alsaffar, slow down.
3           MR. ALSAFFAR:  Oh.  Thank you.
4           I'm sorry, Gigi.  I apologize.
5   BY MR. ALSAFFAR:
6   Q.  When you are convicted of beating a child almost to
7   death -- which is what Devin Kelley was convicted of by the
8   Air Force; correct?
9   A.  Yes, sir.
10  Q.  And the way in which that was communicated on the report
11  of result of trial, it was clear that that was a prohibitor
12  that should result in an automatic denial if it's reported to
13  the FBI?
14  A.  That's right, sir.  It would be a felony conviction.  And
15  that, the FBI would deny on.  Yes, sir.
16  Q.  And I'm sorry if I wasn't clear.  What I meant by
17  automatic was just fast, quick to know.
18          MR. STERN:  Objection.  Calls for speculation.
19          MR. ALSAFFAR:  I'm asking him, Your Honor.
20          THE COURT:  That's overruled.
21          THE WITNESS:  Based on the results of trial, that
22  would be a clear felony conviction, sir.  Yes, sir, for the
23  child.
24  BY MR. ALSAFFAR:
25  Q.  Thank you.  I appreciate that.

WILLIAM RYAN – CROSS

1    You also — I didn't know this until today, you said that
2  the actual DODIG Inspector General, I believe Mr. Fine, who
3  conducted the investigation into the Devin Kelley shooting,
4  that you were asked by that office to provide them with legal
5  opinions?
6  A.  No, sir.  It wasn't Mr. Fine.  One of the investigators,
7  Laura Hummage [phonetic] was her name.  She was working on
8  that case.  I met with her and she asked if — if ATF could
9  assist Mr. Siminton [phonetic], who was the recipient of that
10  letter, is the one who corresponded with us.
11  Q.  And all I meant was — and I apologize, because that's
12  exactly what I said.  What I really meant was the Office of
13  the IG that did the ultimate report, that office asked you to
14  provide them with legal opinions; correct?
15  A.  As the agency authorized to enforce the Gun Control Act,
16  and delegated, they wanted the Attorney General and the ATF to
17  opine, sir.  Yes.
18  Q.  You did that?
19  A.  Yes, sir.
20  Q.  And you've seen the report?
21  A.  The report, sir?
22  Q.  I apologize.  You — any time I ask you a question and you
23  don't know what I'm asking, please, please tell me.
24  A.  Yes, sir.
25  Q.  That's always my fault, not your fault.

WILLIAM RYAN - CROSS

1   A.  Yes, sir.

2   Q.  When I say "report," I mean the DOD Inspector General

3   final report on the Devin Kelley shooting.

4   A.  I did review that, sir, some time ago, yes.

5   Q.  I would imagine you would have — you would have reviewed

6   it to ensure that whatever opinions you gave about this

7   transaction were actually accurately represented in the

8   report; is that fair?

9   A.  I think so, sir.  I think that I was more concerned with

10  the Air Force opinion and — but, yes, sir, I get your point.

11  Yes, I wanted to make sure that they didn't disagree, or that

12  my opinions were not in error in some way, yes.

13  Q.  Or that they misrepresented your opinions regarding this

14  transaction?

15  A.  Fair enough.

16  Q.  And nowhere in the inspector general report, do we find

17  any kind of conclusions, like the ones you just gave,

18  regarding Academy; is that fair to say?

19          MR. STERN:  Objection.  Relevance, whether the DODIG

20  report talked about Academy in its reporting.

21          THE COURT:  That's overruled.

22  BY MR. ALSAFFAR:

23  Q.  Let me re-ask the question.

24  A.  Please.

25  Q.  Nowhere in the DODIG report or the — that you've seen,

1   does –– did the DODIG make any kind of conclusions or

2   commentary about Academy's role in this –– in this shooting;

3   correct?

4   A.  I think that's right, sir.  As I recall, they were

5   concerned with internal processes of reporting.  I don't think

6   they were concerned with how he got the weapon afterwards.

7   That was what DOJ was more concerned with, not DOD.

8   Q.  And I appreciate that.  So what I said was correct?

9   A.  I don't think they talked about Academy.  That's right,

10  sir.

11  Q.  Now, let me transition to something that you and Mr. Stern

12  talked about and I'd like to actually relate it to the ––

13  relate it to the sale transactions at Academy, and I'd like to

14  show you some documents that the government decided not to

15  show you that relate to that transaction, if you don't mind.

16  A.  Okay, sir.

17  Q.  Is that okay?

18  A.  Yes, sir.

19          THE COURT:  Let's avoid those kind of snide remarks.

20          MR. ALSAFFAR:  Thank you, Your Honor.

21  BY MR. ALSAFFAR:

22  Q.  Devin Kelley was convicted of a felony in a crime of

23  domestic violence; right?

24  A.  Yes, sir.

25  Q.  Both of which required the Air Force to submit his

1   fingerprints and conviction to the NICS background system?

2   A.   That's correct.

3   Q.   Which means he would be, like we said, he would be

4   prohibited from purchasing weapons at Academy or any other FFL

5   for that matter?

6   A.   That's right.

7   Q.   Did you know that Devin Kelley obtained a Texas driver's

8   license before the shooting occurred?

9   A.   I don't believe I knew that, sir, or if I knew it, I

10  didn't recall that.

11  Q.   Did anybody from the government Department of Justice

12  office provide you with any evidence that Devin Kelley had

13  obtained a Texas driver's license well before this shooting

14  had occurred?

15  A.   I don't recall a Texas driver's license, sir.  I just

16  recall the 4473 with the Colorado.  So to answer your

17  question, sir, I don't remember hearing about a Texas driver's

18  license.

19  Q.   That's okay.  Is it okay if I show it to you?

20  A.   Yes, sir.

21  Q.   Okay.  I'd like to show Mr. Ryan Joint Exhibit 380, if we

22  could.

23       Mr. Ryan, just so you are oriented a little bit, it should

24  pop up on your screen.

25       Do you have something that's showing up on your screen

WILLIAM RYAN – CROSS

1 | that says JEX 380?
2 | A.  I do, sir, yes.
3 | Q.  Okay.  And what I'd like to do is just highlight for you
4 | the part that talks about Devin Kelley's driver's license
5 | number, if we could highlight that paragraph, "driver's
6 | license" and "commercial," and it will — it will magnify for
7 | you.  Do you see that?
8 | A.  Yes, sir.
9 | Q.  So this shows that Devin Kelley, prior to the shooting,
10 | you see that May 2017, had obtained a Texas driver's license,
11 | license number 25628192; correct?
12 | A.  Yes, sir.
13 | Q.  All right.  Did the government attorneys also let you know
14 | that not only did Devin Kelley obtain a Texas driver's
15 | license, but that he also used that Texas driver's license at
16 | an Academy in Texas to purchase a firearm?
17 | A.  Yes, sir.  I was aware that — that there was some debate
18 | at the Academy store about whether Mr. Kelley was actually
19 | Colorado or Texas, but that he put Colorado on the 4473, sir.
20 | So I was aware that there was a question about that at the
21 | location.
22 | Q.  You are in the ATF; correct?
23 | A.  That's right.  Yes, sir.
24 | Q.  Where is the ATF building in Washington, D.C.?
25 | A.  It is at 99 New York Avenue, north of the Capitol

1  building.

2  Q.  That's right across the street from Mr. Stern's office;

3  isn't it?

4  A.  That could be.  I don't know.

5  Q.  The ATF actually does what's called "trace summary

6  sheets;" correct?

7  A.  That's right.

8  Q.  And what that means is that whenever a gun is purchased at

9  an FFL, like you've been talking about, the ATF does a trace

10 summary, tells you where it was purchased, tells you what time

11 it was purchased, tells you the license that was used to

12 purchase that firearm; correct?

13 A.  I think it's when a firearm is traced, yes, sir, it

14 creates that summary.

15 Q.  Fair enough.

16     And this firearm from Devin Kelley was traced, all of his

17 firearms were traced by the ATF?

18 A.  Yes, sir.

19 Q.  And can I show you –– I want to show you that trace

20 summary.  It's ––

21     Your Honor, it's Joint Exhibit 554.

22     And before I ––

23     Does this look familiar, the standard ATF Trace Summary

24 Report?

25 A.  It does, sir.  That's the general format, yes.

WILLIAM RYAN - CROSS

1  Q.  And what I'm going to do is just highlight a couple of

2  parts for you so you can see them clearly.  If we could go

3  there, Sean, thank you very much.  That middle part.  I'm just

4  going to make it easier for you to see.

5       Can you see that?

6  A.  I can.  Yes, sir.

7  Q.  Okay.  Now, this trace summary report shows that

8  Devin Kelley used his Texas driver's license.  Do you see that

9  driver's license number at the bottom there that's

10 highlighted?

11 A.  I do.  Yes, sir.

12 Q.  And if you will recall, that's the same driver's license

13 that matches up with the abstract that I showed you from the

14 Texas DPS; correct?

15 A.  I believe it is, sir, yes.

16 Q.  And if you look just a little bit up there, it's not

17 highlighted, right above Devin Kelley — I'm sorry —

18 Devin Kelley's name, it says, "purchase date, 10/18/2017"; do

19 you see that?

20 A.  Yes, sir.

21 Q.  That is less than a month before this shooting; isn't it?

22 A.  Yes, sir.

23 Q.  All right.  And then you see the address where this weapon

24 was sold to Devin Kelley using a Texas driver's license at an

25 Academy store in Selma; is that right?

1   A.  That is correct.

2   Q.  So if Devin Kelley was denied the first time at the

3   Academy due to a Colorado license, let's just say that

4   happened, okay, he could have come back with his Texas license

5   and purchased a gun?

6           MR. STERN:  Objection.  Calls for speculation.

7           THE COURT:  That's overruled.

8   BY MR. ALSAFFAR:

9   Q.  If Devin Kelley, as you said, should have been denied

10  purchasing an AR-15 with his Colorado license, he could have

11  just come back with his Texas license and bought it; correct?

12  A.  If he had a Texas license, sir, he could have used that

13  showing he was a resident of Texas and that problem would not

14  have occurred for him.

15  Q.  That's right.  In fact, that's exactly what happened in

16  this case.  He bought a gun before the shooting at an Academy

17  with a Texas driver's license; correct?

18  A.  The Ruger SR22, yes, sir.

19  Q.  He didn't have the AR-15 on October 18, 2017.  He could

20  have showed his license with the Texas driver's license,

21  bought the AR-15, and there would have been no problems with

22  that sale, you would have no criticisms of Academy then; would

23  you?

24  A.  That's right, sir.  And the reason is because the Texas

25  driver's license would show him to be a Texas resident, not a

1  Colorado resident, so (b)(3) wouldn't be the issue.

2  Q.  Okay.  So what I said was correct?

3  A.  Just further explaining, yes, sir.

4  Q.  That's okay.  I don't mind.

5      Now, regardless of whether he had a Texas driver's

6  license, if the Air Force had done its job, all those sales at

7  the FFLs following his conviction would have been denied;

8  correct?

9  A.  Regardless of the license, sir, if he was a prohibited

10  person and the NICS check was conducted, that would have

11  stopped the sale.

12  Q.  And he was a prohibited person; correct?

13  A.  That's right.

14  Q.  And you've seen it, that Academy ran the NICS background

15  check on those purchases?

16  A.  They do have a NICS number on the 4473, yes.

17  Q.  What did they say on them?

18  A.  They proceeded, sir.

19  Q.  Including the AR-15; correct?

20  A.  That's right.

21  Q.  If the federal government would have done its job and

22  reported his convictions, all those guns would not have been

23  sold to Devin Kelley at Academy; correct?

24  A.  If the Air Force had reported the record of trial, the FBI

25  would have denied the transaction, yes, sir.

WILLIAM RYAN — CROSS

1  Q.  And it doesn't matter what language a salesperson used.

2  It doesn't matter what order a salesperson at Academy decided

3  to do their application process.  Had that happened, the

4  Air Force had done its job, those guns wouldn't have been sold

5  to him?

6          THE COURT:  One second.

7          MR. STERN:  Objection.  Speculation.

8          THE COURT:  That's overruled.

9          THE WITNESS:  The background check would have denied

10  the transactions.

11  BY MR. ALSAFFAR:

12  Q.  And the Air Force, Mr. Ryan, you would agree with me, is

13  the only party 100 percent responsible for reporting

14  Devin Kelley's fingerprints and conviction information to the

15  FBI; is that fair?

16  A.  Because it was an Air Force court-martial, sir, I would

17  agree with you.

18  Q.  Are you saying that the Academy sale caused the shooting

19  in this case?

20          MR. STERN:  Objection.  Argumentative.  Calls for a

21  legal conclusion.

22          THE COURT:  This is strange.  I'm not sure which part

23  of the government is speaking here.  This is the ATF.  That's

24  the Department of Air Force's position.  I'm not sure whether

25  that's the ATF's position.

1     MR. ALSAFFAR:  I'm not sure either, Your Honor.

2     THE COURT:  So make it clear which part of the

3 government you think you are asking this question to.

4     MR. ALSAFFAR:  I'll try to clear it up, Your Honor.

5     MR. STERN:  Your Honor, it still calls for a legal

6 conclusion.

7     THE COURT:  That's overruled.

8 BY MR. ALSAFFAR:

9 Q.  All I'm asking you is:  Do you —— is it your stance, on

10 behalf of the ATF, that had Academy not sold this AR—15 to

11 Devin Kelley, this shooting wouldn't have happened?

12 A.  I don't think that anybody at ATF or the government can

13 say that that single factor, that an FFL selling a firearm or

14 not selling a firearm caused or did not cause the shooting to

15 happen, sir.  I just cannot say that.

16 Q.  That's okay.  So you have no opinion on that, then?

17 A.  No opinion on it is different than "I can't agree with

18 your conclusion."  So I think that as much as a single factor

19 can cause anything, I understand your point, but the fact that

20 Academy didn't sell the firearm, doesn't mean he couldn't have

21 gotten it elsewhere, doesn't mean he couldn't have bought it

22 from a private sale.  Whatever the situation is, I just can't

23 speculate on the fact, whether that one transaction was the

24 cause.  I just can't do that.

25 Q.  That's fair.  Then we won't ask you any more about that.

1    All right.  Let me ask you something that Mr. Stern
2  brought up that I'd like to talk to you about, and that was —
3  do you remember the discussion he had with you about — about
4  whether — whether ATF had communicated to Academy at all that
5  this sale was — I think the term used was good sale or legal
6  sale.  Do you remember that conversation?
7  A.  Yes, sir.
8  Q.  And I think what you were talking about is, "Hey" — you
9  were being asked is, "Well, did the ATF tell Academy, no, this
10  is a good sale?"  Is that what you were referring to?
11  A.  After the fact, was it a good sale.  That's right, sir.
12  Q.  And I think you said, no, they didn't — they didn't ever
13  bless this as a good sale or a legal sale; correct?
14    Is that right?
15  A.  I think my testimony, and still is, that they never
16  blessed it as a good sale based on the facts here.
17  Q.  Okay.
18  A.  So given all the facts, no one at ATF said, "Yes, that
19  sale was a good sale," as that term is used.
20  Q.  I have a similar but different question for you.
21  A.  Okay.
22  Q.  Because it's been over three years since this horrific
23  shooting.  My question to you is:  As senior legal counsel for
24  the ATF, has anyone from the ATF communicated to Academy that
25  this sale was illegal that you are aware of?

WILLIAM RYAN – CROSS

1   A.  I just don't know.  I have not.

2   Q.  Okay.  It's a pretty big deal what you are saying Academy

3   did; right?  It's a pretty big deal what they did?

4           MR. STERN:  Objection.  Argumentative.

5           THE COURT:  That's sustained.

6   BY MR. ALSAFFAR:

7   Q.  Let me rephrase it for you.  The laws that you are talking

8   about that you say Academy broke are important laws; right?

9   A.  Yes, sir.

10  Q.  Those laws about selling guns are designed to keep every

11  single one of us safe; correct?

12  A.  Yes, sir.

13  Q.  Safe — they are designed to keep all of us safe from gun

14  violence; aren't they?

15  A.  Yes.  Yes, sir.

16  Q.  And when a gun seller breaks the law, do you think they

17  ought to be held accountable for breaking the law?

18  A.  Yes, sir.

19  Q.  What have you done, then, to hold Academy accountable for

20  allegedly breaking the law?

21          MR. STERN:  Objection.  This is beyond the scope of

22  direct examination.

23          MR. ALSAFFAR:  It goes to credibility, Your Honor.

24          THE COURT:  Well, I'm questioning relevance.  What is

25  the relevance of this question?

WILLIAM RYAN — CROSS

1    MR. ALSAFFAR:  Your Honor, the United States has

2    brought in a DOJ lawyer to say that the –– this Academy sale

3    was wrong, and that the ATF specifically never told Academy

4    that it was a good legal sale.  And I think if this is –– if

5    that's what their position is, then we ought to know, for

6    credibility reasons, if they have done one thing to tell

7    Academy or enforce the law against Academy for this alleged

8    breaking of the law.

9         THE COURT:  So my job, though, is to determine what

10   liability, if any, and what proportionate liability ought to

11   be assigned to either the United States Air Force or to

12   Academy.  And so whatever deficiencies the ATF might have done

13   in not chastising or reprimanding or disciplining the FFL is

14   not relevant to what I have to do.  That's sustained.

15        Well, my objection is sustained.

16        MR. ALSAFFAR:  Well, I understood what your objection

17   was.  Thank you, Your Honor.

18   BY MR. ALSAFFAR:

19   Q.  All right.  Well, let me ask you something about the

20   document that Mr. Stern showed you in your direct examination.

21   I believe it was JEX 423, and we'll look at the first page,

22   page 1.  This document, JEX 423, I think is an ATF document;

23   correct?

24   A.  That is correct, yes, sir.

25   Q.  Summary of what happened at the scene of the shooting;

1  right?

2  A.  That's right.

3  Q.  And this was actually done by ATF agents on the scene; is

4  that right?

5  A.  That is correct, yes, sir.

6  Q.  All right.  And what — if we can look at paragraph —

7  sorry — paragraph 5.  What that's telling us and telling the

8  Court is that every single gun that was found at the scene of

9  this crime was an FFL-purchased gun; correct?

10  A.  It looks that way, sir.  Academy, Academy and Specialty

11  Sports and Supply, I would assume, is an FFL.

12  Q.  Right.  If it was any kind of an illegal purchase,

13  certainly the ATF would have noted that on the report of

14  investigation; correct?

15  A.  If it was an illegal purchase, I would assume so, yes,

16  sir.

17  Q.  Okay.  And if we go to paragraph numbers 9 and 10, I'll

18  ask you about that, and one of the things that ATF special

19  agents do when they arrive at a scene like this, is they

20  gather every single piece of firearm evidence that they can at

21  the scene; correct?

22  A.  That's right, sir.  If it's — if it's FBI, if it's ATF,

23  whoever is in charge, they will collect all of them, yes, sir.

24  Q.  And at this particular scene, if we look at the paragraph

25  number 10, "no additional," that sentence.

WILLIAM RYAN - CROSS

1    Is it on your screen, sir?  I'm sorry?

2  A.  I'm sorry.  My little —— the picture of myself is covering

3  half the words on the —— on the screen, so I can't.

4        SEAN:  Can I do it?

5        MR. ALSAFFAR:  Yeah, please do, because that might be

6  a problem later.

7        Is that okay, Your Honor?

8        THE COURT:  Yes.

9        THE WITNESS:  Thank you, sir.

10  BY MR. ALSAFFAR:

11  Q.  Are you ready?

12  A.  I am.  Yes, sir.  Thank you.

13  Q.  No, you're welcome.  You're welcome.

14    So looking at paragraphs 9 and 10, what we know also in

15  addition to all the guns at the scene were FFL purchased guns,

16  we also know that all the casings, the ammunition that were

17  recovered at the scene, the magazines were all from the AR-15

18  that was purchased at the FFL by Devin Kelley after clearing a

19  background check; correct?

20  A.  I believe that's correct, sir, what they collected was

21  from the —— were 5.56 caliber.  Yes, sir.

22  Q.  Okay.  Thank you.

23    If you don't mind, I'd like to transition a little bit

24  into some of the —— some of the roles you were discussing on

25  direct examination, in terms of sort of the ATF roles in these

1   gun sales, these gun purchases, and how they happen?

2   A.  Yes, sir.

3   Q.  Now, the NICS system, the FBI NICS system, you are

4   familiar with it; right?

5   A.  I am.  Yes, sir.

6   Q.  It does a really good job of keeping firearms out of the

7   hands of felons; doesn't it?

8   A.  They do an amazing job, yes, sir.

9   Q.  And just to show you the amazing job that they do, if we

10  can show Plaintiffs' Exhibit 798.  This has been admitted into

11  evidence, Your Honor, even though it's PEX 798.

12      This is the most recent FBI data, if we can highlight

13  paragraph — let's highlight paragraph 1 and 3.  This is the

14  most recent NICS FBI data on how many — how many felons they

15  have prevented from having access to firearms through the

16  background check system; correct?

17          MR. STERN:  Your Honor, I'm going to argue that this

18  is cumulative testimony.  Deputy Assistant Director Kim Del

19  Greco already testified to this line of questioning.

20          THE COURT:  So this is cumulative.  What is the

21  purpose of asking him?

22          MR. ALSAFFAR:  Well, Your Honor, if they are going to

23  designate an ATF person to talk about background checks, I

24  think it's important that we have as many federal government

25  representatives saying that these things work, because part of

1  their position, Your Honor, is that they don't work.

2          THE COURT:  Yeah.  So —

3          MR. STERN:  He didn't testify about background

4  checks.  He only testified about prohibitors and the sale by

5  Academy.

6          THE COURT:  No, I think what Mr. Alsaffar's comment

7  is, yesterday the government seemed to suggest that we

8  shouldn't bother with background checks because they don't

9  work.  And so we heard contradictory testimony from the

10  director of NICS and the other groups, so I'll hear from ATF

11  on that.

12          MR. STERN:  Your Honor, can I just clarify one point,

13  because the United States' position has never been that we

14  shouldn't bother with background checks.  That needs to be

15  clear as a representative of the Department of Justice,

16  because we have never taken the position in this case or

17  anyone else that NICS is ineffective or that we shouldn't

18  bother.

19          We recognize that NICS can be efficient and

20  effective; however, it is limited in scope by the law as

21  written by Congress.  And as a result, in Texas, the access to

22  firearms through non-FFLs renders the United States not a

23  proximate cause in this case, because it was not —

24  Devin Kelley's ability to purchase a firearm through an FFL

25  was not a substantial factor.

WILLIAM RYAN - CROSS

1      That needs to be clear.  The United States' position
2  has never been that NICS is not efficient, effective, or that
3  we shouldn't bother conducting background checks.  I can't —
4      THE COURT:  No, I appreciate that stipulation, and I
5  thank you for that because it was sort of coming across
6  yesterday that you were attempting to argue that it wasn't
7  efficient.  And so I was questioning, well, then why do we
8  have a NICS chief and the NICS staff and so —
9      MR. STERN:  Then, Your Honor —
10     THE COURT:  — thank you for the stipulation and the
11  concession because, you know, it did appear to me that you
12  were arguing otherwise.
13     MR. STERN:  If my passion got the best of me, then I
14  do apologize.  I am making a tort argument, not a policy
15  argument, and so I just need to be crystal clear that the
16  DOJ's position has never been to impugn the efficiency of
17  NICS.  I can't make that position.
18     My position is simply is as a matter of Texas tort
19  law because of the alternative avenues for Devin Kelley to
20  purchase, obtain, or purchase firearms through non-FFLs, that
21  his ability to get guns at FFLs was not a substantial factor
22  in causing this mass shooting.
23     THE COURT:  Thank you.  So that helps me better
24  understand the government's position here, and so thank you
25  for that.

1        With that said, you can still ask him questions.

2        MR. ALSAFFAR:  Thank you, Your Honor.  I'll be brief

3   on this.

4   BY MR. ALSAFFAR:

5   Q.  When we look at these two categories, the reason I

6   highlighted these two for you, Mr. Ryan -- and you probably

7   know this better than I do, but those are the two categories

8   that Devin Kelley was convicted on.  Is that a fair statement

9   by me?

10  A.  Yes, sir.  The (g)(1) and the (g)(9), the felony and the

11  MCDV.  Yes, sir.

12  Q.  So if we look at just those two categories that

13  Devin Kelley was convicted of, that's, doing simple math,

14  that's over 1.1 million denials for people like Devin Kelley

15  that the FBI NICS system has provided for us in this country;

16  right?

17  A.  That's correct.  Yes, sir.

18  Q.  And if you look -- if we pan out just a little bit so we

19  can see the total number.  If you don't mind showing the total

20  number of denials.

21      Fair to say that the categories of convictions that

22  Devin Kelley was convicted of consists of a majority of the

23  FBI NICS denials in this country.  Is that fair to say?

24  A.  Yes, sir.  A large percentage, yes, sir.

25  Q.  Thank you.  You can put it down whenever you are ready.

WILLIAM RYAN - CROSS

1    Now, the reason Devin Kelley was not denied by NICS was

2  because the Air Force didn't do its job; right?

3  A.  The records are not in NICS, yes, sir.

4  Q.  And but the NICS system is not just about what I was

5  showing you there, it's not just about denying felons access

6  to dangerous weapons; right?  It plays many roles, including

7  roles that you at the ATF work with as well.  Is that fair to

8  say, sir?

9  A.  Yes.

10 Q.  The more information that the FBI has on dangerous felons,

11 would you agree that they are the better decisions they can

12 make in preventing individuals who shouldn't have firearms

13 from getting those firearms?

14 A.  The better of — I would agree with that with the caveat,

15 sir, the better information on convictions that they have.

16 Q.  Fair enough.

17    When the government agencies don't share data on dangerous

18 and violent felons, they unnecessarily expose the public to a

19 risk of gun violence; is that fair to say?

20 A.  Yes, sir.  I mean, I wouldn't — again, the phrasing is

21 not quite the way I would put it.  When the information is not

22 put into NICS, NICS can't rely on that to deny.  And so if

23 someone is prohibited and the information is not in the

24 system, NICS can't deny that person based on that information.

25 Q.  Fair enough.

1     Would you agree that the more — that the dangerous

2  felons — let me take that back.

3     Do you agree Devin Kelley was a dangerous felon?

4  A.  Yes, sir.

5  Q.  Do you agree that dangerous felons become more dangerous

6  to the public the more weapons they are allowed to accumulate

7  illegally?

8  A.  I think as a general statement, I would agree with that,

9  yes, sir, there is a greater public safety risk.

10  Q.  So, remember, we're talking about how the NICS system also

11  does other things to keep us safe, not just denying guns to

12  felons, but also working with federal agencies like the ATF;

13  is that correct?

14  A.  That's right.  Yes, sir.

15  Q.  You are familiar with "lie and buy"?

16  A.  Yes, sir.

17  Q.  And if a criminal — as an example, and if it's not a good

18  one, tell me, but, for example, if criminal history data is

19  accurately reported to NICS, the ATF actually can help catch

20  people who lie on their Form 4473s; correct?

21  A.  That's right, sir.  So the information would come in and

22  then a determination could be made whether that person — a

23  further investigation could occur, yes, sir.

24  Q.  And I believe that's no small penalty; is it?  It's up to

25  10 years and $250,000 fine, right?

WILLIAM RYAN - CROSS

1   A.  Potentially, sir.

2          MR. STERN:  Your Honor, this is now going beyond the

3   scope of direct examination.

4          THE COURT:  Sustained.

5          MR. ALSAFFAR:  Your Honor, if I may, just for the

6   record -- just before -- just so I can get it on the record,

7   actually, Mr. Stern showed this witness several Form 4473s.

8   This is information that appeared on those forms.  He just

9   didn't ask him about it.

10          THE COURT:  That's a bit of a stretch.  Let's move

11   on.  I don't need to know the penalties.

12          MR. ALSAFFAR:  Okay.  Yes, Your Honor.

13   BY MR. ALSAFFAR:

14   Q.  Do you know how much time the -- oh, let me -- before I

15   ask you that question.  What I wanted to ask you about this,

16   sort of this part of the interaction with the ATF and the NICS

17   system is that, when a felon lies on those forms, they can be

18   subject to prosecution; right?

19   A.  That's correct.

20   Q.  Do you know how many times Devin Kelley lied on these

21   forms that would have made him subject to prosecution and a

22   referral to the ATF?

23   A.  On these forms, I think there have been -- what? -- three

24   different transactions.  For example, the firearms that we

25   talked about here, where he said he was not a felon or not

1  convicted of an MCDV, a misdemeanor crime of domestic
2  violence.  And so I think three in this case is what the
3  answer would be.
4  Q.  Well, let me show you Plaintiffs' Exhibit B very quickly.
5  It's just a -- shows a timeline of those purchases.  And
6  you'll see the number and then we can get that clear for you
7  on the record.
8  A.  Okay.
9  Q.  This is Demonstrative Exhibit B.
10      MR. STERN:  Objection, Your Honor.  I thought my
11  objection was sustained.
12      THE COURT:  It was.
13      What's your question now that you are asking him?
14      MR. ALSAFFAR:  Your Honor, I'm asking him how many
15  legal purchases he was allowed to make, and that the ATF could
16  have followed up on.
17      THE COURT:  Yeah.  This is repetitive.  I know.  I
18  know the answers to this.
19      MR. ALSAFFAR:  Okay.  You can take that down.  Thank
20  you.
21  BY MR. ALSAFFAR:
22  Q.  All right.  Now, second thing, different than -- that what
23  we were talking about, lying on the form, is, felons -- it's a
24  felony for felons to be in possession; correct?
25  A.  That's correct, yes, sir.

 1  Q.  And the ATF actually works with United States attorneys in
 2  prosecuting felons who are in possession; correct?
 3  A.  That's correct, sir.
 4  Q.  And Devin Kelley was a felon, illegally in possession;
 5  right?
 6          MR. STERN:  Again, Your Honor, this is beyond the
 7  scope of direct examination.
 8          THE COURT:  Yeah.  This is also not relevant.
 9          MR. ALSAFFAR:  Okay.
10  BY MR. ALSAFFAR:
11  Q.  Well, let me ask you about firearm retrievals.
12      Are you familiar with firearm retrievals?
13  A.  Yes, sir.
14  Q.  So what we are talking about here is that the ATF, when
15  they learned that a prohibitor, a prohibited individual like
16  Devin Kelly, is in possession of an illegal firearm, they can
17  actually go and get those illegally possessed guns; correct?
18          MR. STERN:  Same objection.
19          THE COURT:  Yeah.  That's not relevant.
20          MR. ALSAFFAR:  Okay.
21  BY MR. ALSAFFAR:
22  Q.  Do you remember during direct examination you were asked
23  about all the records you reviewed to the Department of
24  Defense Inspector General relating to your conclusions that
25  you were providing — both here and at the time — to the

1142

WILLIAM RYAN - CROSS

1 | Department of Defense Inspector General?
2 | A.  Yes, sir.
3 | Q.  And he showed you the memo that you did.  And I can show
4 | it to you again.  It's Joint Exhibit 9.
5 | A.  Yes, sir.  I remember the memo, yes.
6 | Q.  I want to show that to you, if you don't mind, and just
7 | ask you a couple of quick questions that you weren't asked
8 | about on direct on this memo, on this memo.
9 |    This was the memo you were talking about on direct
10 | examination; correct?
11 | A.  Yes, sir.
12 | Q.  And, again, that's your signature, even though it's -- you
13 | were writing signed for your boss there?
14 | A.  That's correct.  That is my signature.
15 | Q.  Don't worry.  That's okay.  I can give you that legal
16 | opinion.  Nothing wrong with that?
17 | A.  I appreciate that, sir.  Thank you.
18 | Q.  I want to show you on page 3 of your memo.  You had access
19 | to Devin Kelley's -- I believe you said to a lot of records in
20 | this case file -- that included his mental health history; is
21 | that right?
22 | A.  That's right.  Yes, sir.
23 | Q.  And you put in this, you included in this memo a timeline
24 | of that mental health history; is that right?
25 | A.  That's right.  That was based on the documents I was

1  given.  Yes, sir.

2  Q.  That was actually based on the Air Force mental health

3  medical records that were provided to you in order for you to

4  make that opinion; right?

5  A.  In whatever it was.  Peak –– I believe it was Peak –– Peak

6  Behavioral Service as well.  I don't know if that was

7  Air Force or civilian, but this is what I received from DOD.

8  Yes, sir.

9  Q.  If we look at that section, if we can highlight that

10 paragraph with the dates on it.  First, the first one,

11 June 2010 through June 2012.  You were stating here that based

12 on your review of the Air Force mental health records, that

13 Devin Kelley essentially was receiving out-patient mental

14 health care almost the entire time he was in the Air Force;

15 correct?

16       MR. STERN:  I'm sorry, Your Honor.  I'm going to

17 object to relevance.  Mr. Ryan has already testified that

18 Kelley wasn't prohibited under (g)(4) and the parties have

19 already stipulated that Mr. Kelley was not prohibited under

20 922(g)(4).

21       MR. ALSAFFAR:  May I respond, Your Honor?

22       You made a point in your order, your most recent

23 order, that even though he was not a prohibitor, that this

24 type of evidence actually was directly relevant, and it goes

25 to the foreseeability and causation analysis.  And if they are

WILLIAM RYAN - CROSS

1  allowed to talk about his mental health on direct, we

2  certainly can go into what he discovered about the Air Force's

3  knowledge, too.

4        THE COURT:  That's overruled.

5  BY MR. ALSAFFAR:

6  Q.  If we could — I'm sorry.  I couldn't remember the answer.

7  Did you say that's correct, that almost his — Devin Kelley's,

8  entire time at the Air Force was marked by mental health

9  treatment of some kind?

10  A.  I'm sorry.  Sir, I don't know off the top of my head what

11  his entire career with the Air Force was, but from June 2010

12  to June 2012, that is correct, he was receiving out-patient

13  treatment.

14  Q.  Fair.  Fair.

15     He was admitted two different times, voluntarily admitted

16  two different times to mental health facilities while in the

17  Air Force; correct?

18  A.  That appears to be the case, yes, sir.

19  Q.  And then you note here that on May 14th to 15th, that

20  Holloman Air Force Base put together a high risk for violence

21  responsible team; correct?

22  A.  That's right.

23  Q.  And you note here that Kelley's — sorry.  Go back to

24  that.  We're almost done.

25     You note here in the May 14th and 15th entry that Kelley's

WILLIAM RYAN – CROSS

1   squadron leadership and his mental health providers feel that

2   he's a major threat to commit an act of violence; correct?

3   A.   That's right, yes, sir.

4   Q.   And that was your ATF conclusion after reviewing all the

5   mental health records; correct?

6   A.   That's correct, yes, sir.

7   Q.   And you also looked — this is the Peak medical records

8   you were looking at, if I can show you Joint Exhibit 365.  I'm

9   going to show you one page, page 52.  This is Joint Exhibit

10  365, page 52.

11  A.   Yes, sir.

12  Q.   All right.  And you see this is from the mental health

13  family advocacy at the Air Force?

14  A.   I do, yes, sir.

15  Q.   And you see here that it's the May — it states May — the

16  date on this is May —

17       If we could show the date, please, Sean.

18       The date on this is May 2, 2012 from the Department of the

19  Air Force; correct?

20  A.   That's correct.

21  Q.   And if you look at the paragraph now.  I'll show that to

22  you.

23       Thank you.

24       It states in the middle there — do you see "Airman

25  Kelley's condition"?  Do you see that?

WILLIAM RYAN – CROSS

1  A.  I do, yes, sir.  Thank you.

2  Q.  In May 2012, the Air Force was stating in his mental

3  health records that Airman Kelley's condition took a rapid

4  decline in February, whereupon he was hospitalized

5  February 23rd, 2012, for depression and possible suicidal

6  ideations.  Do you see that?

7  A.  Yes, sir.

8  Q.  All right.  And you remember how in your ATF note, JX 9,

9  you stated that this high risk for violence response team was

10  formed by Kelley's leadership?

11  A.  Yes, in the family advocacy program.  Yes, sir.

12  Q.  Still sticking with these records you reviewed, I want to

13  show you same Joint Exhibit 365.  This is page 156.  So this

14  relates — sorry.  Page 1.  Yeah, you got it.

15     Page 156 of Joint Exhibit 365.  This is one of — this is

16  in May.  I believe that's 14th, 2012; correct?

17  A.  That's right.  Yes, sir.  That's the date.

18  Q.  And you if you look at the last sentence, "It was agreed

19  that the service member is to be considered high risk for SI

20  and HI, should be he released from the hospital."  Do you see

21  that?

22  A.  Yes, sir.

23  Q.  And that's, SI and HI stands for suicidal and homicidal

24  ideation; is that your understanding?

25  A.  That's my understanding.  Yes, sir.

WILLIAM RYAN - CROSS

1  Q.  Show you one last page from the record you reviewed in

2  forming your memo, 365 -- still Joint Exhibit 365.  And this

3  is page 150, and I believe this is dated May 30th, a few weeks

4  later, 2012.

5  A.  That's correct.

6  Q.  All right.  You see that the meeting here, "The high risk

7  for violence response team included Devin Kelley's commander,

8  First Sergeant Security Forces OSI."

9      Do you know what OSI and Security Forces are?

10 A.  Yes, sir.  The law enforcement arms of the Air Force.

11 Q.  And the next sentence states, "In May 30th, 2012, that it

12 was determined by Security Forces and OSI that ADM," that's

13 Devin Kelley, "is a danger to the community."  Correct?

14 A.  That's right.  Yes, sir.

15 Q.  All right, and you reviewed his records at the time.  You

16 would agree with that, right?

17 A.  I agree that's what the records state, yes, sir.

18 Q.  And you didn't offer any opinions in your memos or to

19 DODIG that any of this was inaccurate?

20 A.  No, sir.  I had no reason to believe it was inaccurate.

21          MR. ALSAFFAR:  Pass the witness, Your Honor.

22          THE COURT:  Anything further, or do you want to

23 break?

24          MR. STERN:  Very briefly, but I just have a few

25 questions.  So we'll go ahead and then break after, I guess.

1    THE COURT:  That's fine.

2    MR. STERN:  Thank you, Your Honor.

3              REDIRECT EXAMINATION

4 BY MR. STERN:

5 Q.  Just briefly, you spoke about a few of the medical records

6 you reviewed when rendering your — or offering your opinion

7 to DOD Office of the Inspector General; correct?

8 A.  Yes, sir.

9 Q.  And despite all of those medical records, did you conclude

10 that Devin Kelley was not prohibited under 18 U.S.C.

11 922(g)(4)?

12 A.  In spite all of those medical records and the things in

13 them, we concluded that he was not prohibited under (g)(4).

14 Q.  As a result, did any of those medical records create an

15 obligation by the Air Force to do anything with regards to

16 preventing Devin Kelley from owning or possessing a firearm?

17 A.  Not under the GCA — or not in regard to the GCA, sir.

18 Q.  And we previously talked about how each prohibition is

19 sort of assessed unto itself.  Is that fair?

20 A.  That's right, sir.

21 Q.  There's never a heightened obligation or a lesser

22 obligation to that; correct?

23 A.  That's right, sir.  If there was a general public safety

24 threat prohibitor, perhaps.  That doesn't exist in the

25 statute.

WILLIAM RYAN - REDIRECT

1  Q.  And so as a result —— is it fair to say that as a result
2  of Devin Kelley's mental health —— Devin Kelley's mental
3  health records had no bearing on any obligations by the
4  Air Force?
5  A.  That's right, sir, under the GCA.  That is correct.
6  Q.  Thank you.
7       Very briefly, the ATF issued a report of investigation
8  regarding the firearm that was actually used in the mass
9  shooting; correct?
10 A.  Yes, sir.
11 Q.  And was that firearm that was used the Ruger AR-556, that
12 we previously discussed?
13 A.  Yes, it was, sir.
14 Q.  And according to your previous testimony, was Academy
15 prohibited from selling that firearm to Devin Kelley?
16 A.  It was, sir, yes.
17 Q.  So under any —— under that scenario, would Devin Kelley
18 had to have obtained a different firearm, whether through an
19 FFL or a non-FFL, in order to commit that mass shooting?
20 A.  I'm sorry, sir.  I don't understand the question.
21 Q.  In order to obtain an AR-556 to commit this mass shooting,
22 would Devin Kelley had to have obtained the firearm in a
23 transaction other than what actually occurred in April 2016?
24      That was a terrible question.
25 A.  I'm sorry, sir.

WILLIAM RYAN - REDIRECT

1   Q.  Yeah.  Okay.
2       Did Devin Kelley use the firearm that he purchased from
3   Academy to commit the mass shooting?
4   A.  Yes, sir.
5   Q.  And was that sale a legal sale under federal law?
6   A.  It was not.
7   Q.  So if Devin Kelley was going to obtain an AR in order to
8   commit this heinous act, would he have had to obtain a gun
9   elsewhere?
10  A.  If he had been denied at Academy, he could have obtained
11  -- or would have had to obtain a gun elsewhere, sir.
12  Q.  Whether that be through an FFL or a non-FFL?
13  A.  It could have been an FFL, a non-FFL, or however.  It
14  would have had to have been another means.
15  Q.  A different sale?
16  A.  Yes, sir.
17          MR. ALSAFFAR:  Thank you.  No further questions.
18          MR. STERN:  Nothing further, Your Honor.
19          THE COURT:  Any further need for this witness?
20          MR. ALSAFFAR:  No, Your Honor.
21          MR. STERN:  No, Your Honor.
22          THE COURT:  Thank you, sir.  You are excused.
23          Let's go ahead and take a 15-minute break.
24          (Recess.)
25          THE COURT:  Your next witness.

STEPHEN BARBORINI - DIRECT

1      MS. CHRISTILLES:  The United States calls Stephen
2  Barborini.
3      THE COURT:  Swear him in.
4    (STEPHEN BARBORINI, having been duly sworn, testified as
5  follows:)
6                     DIRECT EXAMINATION
7  BY MS. CHRISTILLES:
8  Q.  Good morning, Mr. Barborini.  I'm Jacquelyn Christilles.
9  We've talked on the phone a couple of times.
10     Can you please introduce yourself to Judge Rodriguez?
11 A.  Stephen Barborini, B-A-R-B-O-R-I-N-I.
12 Q.  Mr. Barborini, are you having some audio issues?
13 A.  I don't believe so.  I hear myself on sort of an echo.
14     Can you hear me?
15 Q.  I can hear you.  I'm just making sure that you can -- I
16 heard a pause when you were introducing yourself, so I was
17 making sure that your audio was working okay.
18 A.  I'm good.
19 Q.  All right.  Mr. Barborini, what is your present
20 employment, including your position and title?
21 A.  I'm currently a detective on a part-time basis, 28 hours a
22 week for the Palm Beach County Sheriff's Office located in
23 West Palm Beach, Florida.  I'm assigned to the violent crime
24 division to a subunit called the firearms investigative unit.
25 Q.  So you indicated that on a part-time basis you work for

STEPHEN BARBORINI – DIRECT

1 the Palm Beach County Sheriff's Office in a specialized unit.

2     What do you do in that specialized unit?

3 A.  Our unit, which basically consists of myself, a NIBIN

4 tech, an analyst from — a crime analyst — that deals with

5 firearms investigations, and now we actually have a detective

6 assigned — another detective, part-time assigned, a gang unit

7 detective.

8     My job is multifaceted.  In the morning, the guns that

9 come in, myself and the NIBIN tech look at the guns that come

10 in.  We compare what's on the box to what is really in the box

11 because there's many mistakes.  We take that information and

12 correct any mistakes.  We then use that information to trace

13 the guns, myself and the analyst, trace these firearms through

14 the ATF Tracing Center.

15     We also — we have a crimes lab that shoots more of the

16 high-priority guns.  I and the NIBIN tech, shoot the lower

17 priority guns.  We did get over 1500 guns last year, so it's a

18 bunch of guns.

19     Besides that, I also create training for PDSO and firearms

20 identification and investigations, as well as I also am a,

21 sort of a person here that goes to review social media,

22 cellphone downloads, and computers, photographs of firearms to

23 attempt to make criminal cases where felons are displaying

24 firearms so we can get either a search warrant or to assist in

25 a sentencing or actually to get arrest warrants.

STEPHEN BARBORINI - DIRECT

1  Q.  How long have you been a part-time detective for the Palm

2  Beach County Sheriff's Office?

3  A.  Since March of 2012.

4  Q.  Do you currently have any other employment besides your

5  part-time employment with the Palm Beach County Sheriff's

6  Office?

7  A.  Yes.  I'm contracted with the Bureau of Alcohol, Tobacco

8  and Firearms, the ATF, to instruct both at the National

9  Academy in Glynco, Georgia, as well as on the road.  And the

10  subject matter is basically firearms identification, firearms

11  technology, and firearms trafficking.

12  Q.  Were you employed prior to the Palm Beach County Sheriff's

13  Office and your part-time instructing with ATF?

14  A.  Yes.  For 25 years, I was a special agent with the Bureau

15  of Alcohol, Tobacco, and Firearms.  The last four and a half

16  years, I was the resident agent in charge of the local area

17  that the West Palm Beach field office served.

18  Q.  So how long were you employed by ATF in total?

19  A.  Just about 25 years.

20  Q.  What is the mission of ATF?

21  A.  Investigate violations of the firearms and explosives and

22  arson laws.

23  Q.  As a special agent, what were your duties?

24  A.  I investigated mostly firearms violations.  That was about

25  85 to 95 percent of our work.  Felons in possession, firearms

STEPHEN BARBORINI — DIRECT

1  trafficking, people — dirty gun dealers, importers, as well

2  as street crimes.  Occasional, I worked pipe bomb cases and as

3  well as commercial arson cases.

4  Q.  Did you have any other law enforcement employment prior to

5  your time at ATF?

6  A.  Before that, I was just over a year with the U.S. Marshal

7  Service.  And before that, I was approximately seven years as

8  a police officer.  I worked patrol.  I worked as a crime

9  scene.  I worked as a detective.  And then last was a road

10  patrol sergeant.

11  Q.  Have I covered all the employment history relevant to your

12  testimony today?

13  A.  Yes.

14  Q.  I want to talk to you a little bit about your education.

15      Do you hold any degrees?

16  A.  A bachelor's degree in criminal justice.

17  Q.  Besides your bachelor's degree, do you have any

18  specialized training specifically as it relates to firearms?

19  A.  Yes.  The training — actually, the training started — a

20  lot of personal training, because I did collect firearms at a

21  young age as well as personal interest as well as research.

22      Professional training was at various police academies to

23  include the ATF Academy, which is now in Glynco, Georgia at

24  F-L-E-T-C, and that training is — we have, obviously, this

25  four or five days with nothing but firearms identification and

STEPHEN BARBORINI - DIRECT

1   trafficking training as well as firearms law training.

2       After that, I went to a couple of advanced schools at

3   FLETC.  I also went to armored schools, both Glock, Remington,

4   and six-hour armored schools.

5       Because of my knowledge in firearms, I was asked to --

6   to -- it's called the firearms nexus training, where there's

7   really no schools we can go, so to learn more about firearm's

8   function and identification, we actually tour factories.  So

9   part of our training is to actually go to firearms factories

10  in the United States first, you know, normal factories, Colt,

11  Remington, and whatever.

12      And from there, we also go to museums, which continued

13  throughout my career.  For a very short time, ATF did have

14  some funds.  We -- they wanted 24 people that over a

15  three-year period was chosen to go to Europe, and we actually

16  toured factories, proof houses, and museums throughout Europe,

17  and continued to go to through these factories tours until

18  COVID hit.

19      ATF hired me, sort of, to set up factory tours in Florida,

20  places like Taurus, Rossi, Diamondback Firearms, Caltech, and

21  Knights Armament Corporation, and that stopped when COVID hit,

22  as well as sell -- going to, on my own, going to -- I go to

23  the shot show year every year, except for this year because of

24  COVID, which is the largest place where you can look at

25  firearms in the United States as well as personal tours of

STEPHEN BARBORINI - DIRECT

1  firearms and museums.

2  Q.  Now, I'm going to show you JEX 621, which has been

3  previously admitted.  Do you see that up on your screen there?

4  A.  Yes, it's my CV.

5  Q.  I think you broke up there a little bit, but I think that

6  you indicated that this is your CV; is that correct?

7  A.  That is correct.

8  Q.  So you recognize this document as your CV?

9  A.  Yes, I do.

10 Q.  Does your CV accurately reflect your employment, your

11 education, and your training?

12 A.  Yes.

13 Q.  Now, you talked a little bit about the training that you

14 received, some of the proof houses, and gun manufacturer

15 facilities that you have toured.

16      Have you also instructed courses on firearms?

17 A.  Yes.  Starting in approximately 1998, '99, I teach the

18 firearms technology Glock.  Now it's known as the GCA NFA

19 class, which basically starts with — if you know nothing

20 about firearms, or something, we start at the beginning, with

21 anti-condition systems, all the way through modern firearms,

22 how they function, as well as the laws that apply to those

23 firearms.  And also, of course, things change.  We also talk

24 about various conversions to machine guns, common conversions

25 for Glocks, and AR-15s, for instance.  Of course, now ghost

STEPHEN BARBORINI — DIRECT

1  guns and silencers.  So it's basically — that's the basic

2  firearms class ATF agents get.

3      I also teach — up until last year, I was teaching

4  firearms trafficking, so we teach how to investigate people

5  that traffic firearms, whether it's interstate, intrastate, or

6  internationally.

7  Q.  So I think that you have indicated that through your

8  professional employment and training, you've gained expertise

9  in firearms generally; is that fair to say?

10  A.  Yes.

11  Q.  You indicated that you've taught on conversions for

12  firearms.  Would it be fair to say that your professional

13  employment and training has helped you gain expertise on

14  firearms, accessories, and conversions?

15  A.  Yes.

16  Q.  When we are talking about conversions and accessories,

17  does that include aftermarket modifications for firearms?

18  A.  Yes.

19  Q.  You've talked a little bit about firearms trafficking.

20      Does that mean you have expertise in firearm sales?

21  A.  Yes.

22  Q.  Does that expertise include firearm sales by federally

23  licensed firearm dealers?

24  A.  Yes.

25  Q.  How about sales outside of federally licensed firearm

1  dealers, and if you wouldn't mind if I use the term "FFL," can
2  we agree that I'm talking about federally licensed firearm
3  dealers?
4  A.  Sure.
5  Q.  Okay.  So have you gained any experience, or do you have
6  expertise on sales of firearms by non-FFLs?
7  A.  Yes.
8  Q.  You also gained experience on illegal firearm sales?
9  A.  Yes.
10 Q.  Have you been accepted in both state and federal courts as
11 a qualified expert to testify on firearms, firearm
12 modifications, and sales of firearms?
13 A.  Yes.  Well, I taught the firearms trafficking, firearms
14 identifications, the — also the information needed for sale
15 of a firearm from an FFL.
16 Q.  Is your testimonial history reflected on your curriculum
17 vitae?
18 A.  Yes.
19 Q.  I want to turn to your review in this case.
20    What, generally, just generally, were you requested to do
21 in this case?
22 A.  Oh, the screen just changed — okay.
23    Basically, alternative ways to purchase firearms other
24 than a federal licensed firearms dealer.
25 Q.  With regard to Devin Kelley and the shooting that he

1   committed on November 5th, 2017 at the First Baptist Church of

2   Sutherland Springs, can we agree that when I refer to "the

3   shooting," that that's what I'm referring to?

4   A.   Yes.

5   Q.   Did you prepare a report concerning the alternative means

6   of obtaining a gun as it would have related to Devin Kelley?

7   A.   Yes.

8   Q.   Did you ever supplement that report?

9   A.   Yes.

10  Q.   What material did you review in creating your original

11  report?

12  A.   I reviewed the Texas Ranger report, ATF report,

13  photographs that was also in the Texas Ranger report,

14  Department of Defense report, and Danielle Kelley and I think

15  the father's deposition.

16  Q.   Now, you've indicated that you supplemented your report.

17  Why did you supplement your report?

18  A.   I was given a deposition from the father about -- mostly

19  about gun storage, so after I read that, I supplemented.

20  Q.   Do your reports include conclusions regarding the firearms

21  issues in this case?

22  A.   Yes.

23  Q.   Did you use your knowledge, skill, experience, training,

24  and education to analyze the firearms issues in this case?

25  A.   Yes, I did.

STEPHEN BARBORINI – DIRECT

1 Q.  Do you believe your testimony will be helpful in assisting

2 the judge to understand the facts of this case?

3 A.  Yes.

4        MS. CHRISTILLES:  Your Honor, at this time, we tender

5 Mr. Barborini as an expert in firearms, firearms accessories,

6 and aftermarket modification, and alternative sales of

7 firearms.

8        THE COURT:  Any objection?

9        MR. LeGRAND:  Your Honor, we have no objection on

10 those specific areas.

11        THE COURT:  He's recognized as such.

12 BY MS. CHRISTILLES:

13 Q.  Mr. Barborini, in general terms, what did you –– what did

14 you find with respect to whether or not Devin Kelley would

15 have obtained a firearm, even if his information had not been

16 entered into NICS?

17        MR. LeGRAND:  Your Honor, we object.

18        That's completely outside the areas that they just

19 designated him in.  He is not qualified in any way whatsoever

20 to testify as to what Devin Kelley would have done.

21        MS. CHRISTILLES:  Your Honor, I asked in general

22 terms.  He looked at the firearms issues in this case with

23 regard to Devin Kelley, that's what he indicated, and he

24 indicated that he looked into the issues of purchases outside

25 of an FFL.

STEPHEN BARBORINI - DIRECT

1    THE COURT:  Yeah.  So he's been recognized as an
2  expert in alternative sales, and so this broadly fits into
3  that category.
4    Restate your question for me.
5    MS. CHRISTILLES:  Yes, Your Honor.
6    In general terms, what did you find with respect to
7  whether or not Devin Kelley would have obtained a firearm,
8  even if his information had been entered into NICS?
9    MR. LeGRAND:  Your Honor, we object to the word
10  "would."  He is designated as an expert in "do these markets
11  exist," and "could he have attained a firearm from some other
12  source," but whether he would or not requires lots of
13  expertise concerning human behavioral psychology, various
14  other subjects.
15    THE COURT:  That's sustained.
16    So you can get there.  You're just using the wrong
17  verbiage.
18    MS. CHRISTILLES:  Yes, Your Honor.
19  BY MS. CHRISTILLES:
20  Q.  Mr. Barborini, in general terms, what did you find with
21  respect to whether or not Devin Kelley could have obtained a
22  firearm, even if his information had been entered into NICS?
23  A.  Yes.  Very easily he could have purchased firearms from
24  alternate methods, alternate places.
25  Q.  Are your opinions reflected in your report and your

1   supplemental report?

2   A.   Yes.

3          MS. CHRISTILLES:  Your Honor, at this time, the

4   government offers GEX 30 and GEX 154 into evidence.

5          MR. LeGRAND:  Your Honor, we object.  Those are his

6   reports.  They are repetitious.  They are hearsay.  And he's

7   here to testify.  And if they want to ask him a question about

8   his reports, they are free to do so.

9          And we further object to the reports because in some

10  areas there are certain sentences that suggest what

11  Devin Kelley would have done under certain circumstances.  And

12  we object to that because he's not qualified.  There is no

13  foundation for those opinions, and it's speculation on his

14  part.

15         THE COURT:  Yeah.  Generally, expert reports don't

16  come in.  Is there some exception?

17         MR. LeGRAND:  No, Your Honor.

18         THE COURT:  I'm talking to her.

19         MR. LeGRAND:  I'm sorry.  I apologize.

20         THE COURT:  I knew what your answer was.

21         MR. LeGRAND:  Yes, sir.  I accept that.

22         MS. CHRISTILLES:  Your Honor, as you have indicated

23  many times during this case, this is a bench trial.  There is

24  no jury.  Mr. Barborini is here testifying in court, is

25  subject to cross-examination by plaintiffs' counsels.  The

1163

STEPHEN BARBORINI – DIRECT

1    parties have already given this Court almost a thousand pages

2    of documents to review.  We believe that it will be helpful to

3    the Court to also have the expert reports available while you

4    are making your decision, and Your Honor has already reviewed

5    in totality two of plaintiffs' experts reports in motion

6    practice for this case.

7                THE COURT:  Yeah.  So here, though, if I let the

8    expert reports in, extraneous matter might come in that I'm

9    not supposed to be taking into account.  So 30 and 31 are not

10   admitted.

11               MS. CHRISTILLES:  And it would be 30 and 154, Your

12   Honor, just for the record, I believe.

13               THE COURT:  Oh, I'm sorry.  So it's GEX 30?  I

14   thought you said 31.  What's the other one?

15               MS. CHRISTILLES:  GEX 30 is the —

16               THE COURT:  That's the Barborini report.

17               MS. CHRISTILLES:  Yes.  And then 154 should be the

18   supplemental report, if I have my numbers here correctly, Your

19   Honor.  Yes.  154 would be his supplemental report.

20               THE COURT:  Yeah, that's not admitted.

21               Oh, and, by the way, while I'm doing clean up, so

22   I've taken a look at your — the objections to the learned

23   treatise doctrine.

24               The government's request to have all those exhibits

25   admitted into evidence is denied.  There's no exemption

1  applicable.  I'll clean up later.  Someone remind me about

2  which exhibit numbers are not admitted.

3        Go ahead.

4        MS. CHRISTILLES:  Yes, Your Honor.

5  BY MS. CHRISTILLES:

6  Q.  And I know I've already asked this question, but just

7  because we got off track there a little bit I want to make

8  sure that we're refocusing here.

9      I think you stated that you did come to an opinion on

10 whether or not Devin Kelley could have obtained a firearm even

11 if his information had been entered into NICS.  And in general

12 terms, what was that opinion?

13 A.  Yes, very easily from various methods.

14 Q.  Now, I use the word "NICS," are you familiar with what

15 NICS is?

16 A.  Yes, the National Instant Background Check, basically.

17 Q.  What is NICS used for?

18 A.  When you —

19       MR. LeGRAND:  Your Honor, we object.  This witness

20 has not been designated as an expert on NICS.

21       THE COURT:  So that's — that's overruled.

22 BY MS. CHRISTILLES:

23 Q.  In your experience, what is NICS used for?

24 A.  When you purchase a firearm from an FFL, after you've

25 filled out the ATF Form 4473 and give your biographical

1  information, then the gun dealer, federal or state, either by

2  phone or by computer, then runs your — runs your information

3  through CJIS, which is basically a criminal record background

4  check.

5  Q.  Is there any way to obtain a weapon besides purchasing one

6  from an FFL?

7  A.  Yes.

8  Q.  Would you refer to that as a secondary market?

9  A.  Yes.

10  Q.  What are the types of secondary markets that you are

11  familiar with?

12  A.  Gun shows, the internet, newspapers, friends, ghost guns,

13  and straw purchases, and a straw purchase from an FFL.

14  Q.  Are these secondary —

15  A.  It is a secondary market.  It would be a secondary person.

16  Q.  So just to make sure, we've got gun shows, flea markets,

17  online, newspaper, friends, ghost guns, and then a straw

18  purchase would kind of be lumped in there; would you agree?

19  A.  Yes.

20  Q.  Are these secondary markets considered underground

21  markets?

22  A.  No.  It's considered basically — for instance, a gun show

23  or even internet, it could be a private sale.  So, I mean, I

24  buy — I've bought guns at gun shows without background

25  checks, so it's not underground at all.  It's in the open.

STEPHEN BARBORINI – DIRECT

1  Q.  And you indicate that you buy guns at gun shows.  I'm

2  assuming you are not a prohibited purchaser.

3  A.  Assuming I'm not, yes.  I'm sure I'm not.

4  Q.  So is it fair to say that people who are legally allowed

5  to buy weapons utilize these secondary markets?

6  A.  Correct.

7  Q.  They utilize these markets without concern that something

8  nefarious might happen during the sale?

9  A.  Yes.  Yes.  It's legal, unless they are prohibited, and

10 then that would be a problem if we know about it, but we don't

11 know when people do private sales.

12 Q.  And I want to go into that a little more.  You indicated

13 that there's no laws prohibiting those sales, so is it fair to

14 say that there are no laws prohibiting sales between private

15 parties?

16 A.  I believe there's not a law about private sales.  And

17 Texas, like Florida, is an open state, where there is no

18 registration or permit requirement.

19 Q.  You used the term "open state," and you indicated that

20 Florida and Texas are open states; is that accurate?

21 A.  Yes.

22 Q.  Are there states that are not, quote, unquote "open

23 states"?

24 A.  Yes.  States — mostly, they are northeast, such as like

25 New York.  You have to have a permit to buy a — buy a

STEPHEN BARBORINI — DIRECT

1   firearm, so it would not be a state where I can just walk in
2   and buy a gun and take it that day or do any private sale
3   since guns have to be registered.
4   Q.  So do sales between private individuals require a
5   background check in Texas?
6   A.  No.
7   Q.  So is it fair to say that Texas is different from other
8   states with regard to non-FFL sales?
9   A.  It's an open state, so it's — actually, most states are
10  open states in my experience.  There's no requirement for
11  background checks on private sales.
12  Q.  I want to shift gears and talk about these secondary
13  markets that you've indicated.  Let's start with gun shows.
14  What exactly is a gun show?
15  A.  A gun show is a place where both FFLs and private
16  individuals or hobbyists can display their firearms for sale
17  where you can — where a private individual actually can have
18  a table at the gun show and they can sell guns to enhance
19  their collection, buy guns without background checks.
20      And FFLs are also at gun shows.  Of course, when they sell
21  at gun shows, they are allowed to sell, other than a licensed
22  premise, and they have to complete the ATF forms and the
23  background checks.
24  Q.  So at gun shows, there can be FFLs and non-FFLs selling
25  firearms; correct?

1   A.   Correct.

2   Q.   What types of firearms are sold at gun shows?

3   A.   Everything from antiques to collectible guns to brand new

4   guns.

5   Q.   You indicated that brand new guns are for sale at gun

6   shows; is that accurate?

7   A.   Yes.

8   Q.   So are new guns only available for sale from FFLs at gun

9   shows?

10  A.   Oh, not at all.  Many private individuals have brand new

11  guns or appear to be brand new guns.  You can't really tell if

12  they are brand new.  They're in the box with the original

13  paperwork and they are for sale from private individuals as

14  well as licensed dealers, FFLs.

15  Q.   So at a gun show, a private seller could be selling a

16  brand new in the box gun; is that accurate?

17  A.   Yes.

18  Q.   So you wouldn't say that only defective guns are for sale

19  at gun shows; correct?

20  A.   No, not at all.

21  Q.   Now, you said sometimes it's hard to tell whether or not

22  it's a brand new gun, but it's in the box.  Are brand new guns

23  never fired?

24  A.   No.  Manufacturers, when they make a firearm, they shoot

25  them.  So if you look at a brand new gun, it's actually ──

1  you'll see some residue in the barrel because they shoot them.

2  It's called proof test.  They usually shoot them with an

3  overload, and if they survive the overload, obviously, for

4  liability reasons they do it.  So if somebody shoots a gun and

5  said it blew up when they shot factory ammunition, they show

6  that we shot this with a proof load, so it must be something

7  you did.

8  Q.  In your experience, have you actually seen new guns for

9  sale at gun shows from non-FFLs?

10  A.  Oh, yes, many times.  Actually, both in criminal

11  investigations where the private seller oversteps private

12  sales, and we see these people all over the State of Florida

13  selling guns that are new where they will buy brand new guns,

14  a multiple purchase, and then take them right to the gun show

15  and sell them to people without background checks.

16  Q.  Now, you said they overstep.  What's the difference

17  between a private seller that's allowed to sell a brand new

18  gun at a gun show and somebody who oversteps?

19  A.  The law basically says anybody that devotes time and

20  attendance to the repetitive sale of firearms for profit needs

21  to get a federal firearms license, which is a very gray area,

22  so we've — if you see somebody with brand new guns, or even a

23  lot of used guns, let's say in Ft. Lauderdale, Florida, the

24  next day — next weekend he's in West Palm Beach.

25      We get complaints from licensed gun dealers who say, "Hey,

STEPHEN BARBORINI - DIRECT

1  this guy is all over the State of Florida.  I've actually seen
2  him in Texas and Oklahoma.  Why do I have a license, when this
3  guy is buying guns and flipping them without any paperwork"?
4  Q.  Have you actually attended gun shows as part of your
5  professional employment?
6  A.  Yes.  I actually ran the gun show task force throughout
7  the State of Florida in 1996 and '97.  And then here, I had a
8  gun show task force from 2008.  So December 2012.  I
9  occasionally still assist with it at the Palm Beach County
10  area.
11  Q.  I think you mentioned it earlier.  Have you also attended
12  gun shows in your personal capacity?
13  A.  Oh, yeah.
14  Q.  How many gun shows would you say that you have attended in
15  your lifetime?
16  A.  Just in 1996, I attended 50 in one year, so it's going to
17  be in the hundreds.
18  Q.  What percentage of those gun shows that you have attended
19  had new or like new firearms for sale from non-FFLs?
20          MR. LeGRAND:  Your Honor, we object.  That calls for
21  speculation.
22          THE COURT:  That's overruled.
23          THE WITNESS:  Other than the gun show that's local,
24  that's for antique guns, basically all of them.
25

STEPHEN BARBORINI – DIRECT

1  BY MS. CHRISTILLES:

2  Q.  So is it fair to say that new guns are available without a

3  background check from non-FFLs at a gun show?

4  A.  Yes.  Guns that are brand new or appear brand new, because

5  you really can't tell.

6  Q.  Are you aware of the firearms that were recovered from the

7  scene of the shooting?

8  A.  Yes.

9  Q.  Did the investigation determine if all of the firearms

10  were used by Kelley to perpetrate the shooting?

11  A.  Except for the Ruger 22 pistol, it was not used.

12  Q.  Okay.  So the Ruger 22 pistol was not used; is that

13  accurate?

14  A.  Yes.

15  Q.  So what weapons were used in the shooting?

16  A.  The AR-15 and the Glock 19.

17  Q.  Now, you've called it an AR-15.  I've also called it an

18  AR-556.  Help me clear up the difference there.

19  A.  Well, AR-15 is basically the most popular rifle in the

20  United States.  There are well over a hundred brands of

21  AR-15s.  They started back in the '50s, developed by Eugene

22  Stoner in the military, and that's now morphed into hundreds

23  and hundreds of brands of semiautomatic versions of the

24  military M16 rifle.

25      SR556, AR-556, they are both AR-15 type rifles.  They are

STEPHEN BARBORINI – DIRECT

1  just — there are names for them.

2      You remember AR-15 rifles, they have to be the same, as

3  far as the receivers, because the aftermarket parts have to

4  fit.  So the lower receiver and the upper receivers are all

5  the same, they just, as far as a Milspec, to accept the

6  trigger or whatever.

7      So it was just Smith & Wesson has an MD15.  I'm going to

8  say the Army has a PA-15, so...  And then Ruger has an AR-556

9  and an SR556, and there's hundreds and hundreds of companies,

10  but it's the same basic rifle.

11  Q.  So where in the spectrum is the AR-556?  Is it the

12  absolutely best AR-15 sold on the market?  Is it the worst?

13  Where does it fall on that spectrum?

14  A.  It's considered an average, so it's a middle-of-the-road

15  AR-15.

16  Q.  So I think what you are saying is there are brands of

17  cars, like Ford, Chevy, just like there are brands of AR-15,

18  and the AR-556 is the mid-range AR-15?

19  A.  Yes.  Yes.

20  Q.  Would the AR-556 be generally available at a gun show?

21  A.  It could be.  I mean, the gun shows that are — especially

22  the last 15 years, probably the most popular rifle are the

23  AR-15s.  You could find an AR-556, but I'm not saying every

24  show you have an AR-556.  There will be plenty of AR-15s.

25  Q.  So not every show might have the Ruger AR-556, but how

STEPHEN BARBORINI – DIRECT

1  many would have a different brand of AR-15?

2  A.  Oh, all except the antique shows will have AR-15s.

3  Q.  And you talk about the AR-556 kind of being in the middle

4  spectrum.  Are there other AR-15s that are kind of in that

5  middle spectrum with the AR-556?

6  A.  Yeah.  Such as, like the Smith & Wesson, the Bushmasters,

7  the Remingtons, the Armories, they are all — I just went to a

8  gun show a couple weeks ago, and it was plenty of those type

9  of guns.  Of course, the price is a lot higher now.

10  Q.  So I think you mentioned this.  The gun show you went to

11  last weekend, plenty of AR-15s available.  Did I hear that

12  correctly?

13  A.  Yes.

14  Q.  Would an AR-15 be available in a new condition from a

15  non-FFL at a gun show?

16  A.  Yes.

17  Q.  Have you personally seen a new AR-15 available from a

18  non-FFL at a gun show?

19  A.  Yes.

20  Q.  How about the Glock 9mm?  Have you seen a new Glock 9mm

21  available from a non-FFL at a gun show?

22  A.  Yes.  Or appears new, original box and papers.

23  Q.  How often do you see Glock 9mms at gun shows?

24  A.  Glock is the number one selling handgun, in Florida

25  anyway.  Very popular.  And I see them.  Just at the last show

 1  there were plenty of Glocks from both FFLs and non-FFLs.

 2  Q.  You indicated that the Glock is the number one selling

 3  handgun.  Did I get that correct?

 4  A.  From my research here, I'm looking both at what I see at

 5  the gun shows, and also what I see in evidence.  We took in

 6  1500 guns, and it's -- I don't know how many thousand brands

 7  of firearms.  Last year, 18 percent of the guns were Glocks.

 8  Not because they were used in crimes, but many are stolen from

 9  legitimate citizens.

10  Q.  You said many are stolen from legitimate citizens?

11  A.  Yes.

12  Q.  What makes the Glock so popular?

13  A.  Well, it's the first mass produced polymer striker fire

14  pistol that passed all the torture tests in the '80s, so the

15  police department started accepting them and using them.  They

16  are cheaper than the metal guns back then, including PBSO.

17  You have 3,000 here.

18      So and, of course, once police and military use them, then

19  you know, citizens also use them.  They are very reliable.

20  They are very easy to shoot.  You pull the trigger.  It goes

21  off.  There's no real manual safety to turn on and off.  And

22  so actually (audio transmission gap).

23  Q.  You indicated that it's a polymer weapon.  What is

24  polymer?

25  A.  Well, it's like a plastic.  The frame and receiver, the

STEPHEN BARBORINI – DIRECT

1  bottom part is polymer.

2  Q.  And we've talked about the AR-15 and the Glock being

3  available at a gun show from a non-FFL.  Is a background check

4  required to purchase a weapon from a non-FFL at a gun show in

5  Texas?

6  A.  No.

7  Q.  Do you have any experience with individuals buying

8  firearms at gun shows where those individuals would otherwise

9  be prohibited from buying a firearm from an FFL?

10  A.  Yes.

11  Q.  You also talked about online sales, so I want to shift to

12  online sales.  How would an individual purchase a firearm

13  online?

14  A.  Just people used to advertise in newspapers, which is sort

15  of rare.  When they sell guns now it's basically done online.

16  For instance, Armslist, Guntraders, and, plus, every website

17  actually that deals in collecting guns usually has a buy-sell

18  page, when it's something like Armslist.

19      We have Florida Gun Traders, because of Texas Gun Trader,

20  which I joined, I think back in June — and within 15 minutes,

21  I found people.  If I could meet them in Texas, I could have

22  bought an AR-15 rifle and a Glock, and they were non-FFLs.

23  Q.  So you indicated that you actually joined some of the

24  online forums for buying guns in Texas; is that accurate?

25  A.  Yes.

STEPHEN BARBORINI — DIRECT

1  Q.  And you indicated that within 15 minutes, you could have
2  purchased an AR-15 and a Glock; is that accurate?
3  A.  Correct.
4  Q.  Would a background check have been required for you to
5  purchase that AR-15 or the Glock that you found on Texas Gun
6  Traders?
7  A.  Well, the people that were advertising were not dealers,
8  so I would have to meet them in Texas, obviously, meet them in
9  a parking lot to consummate the deal, but I wouldn't — not
10 have to have a background check.
11 Q.  Are new guns available through these online forums?
12 A.  Oh, yes.
13 Q.  Now, I think you talked about the Texas Gun Traders, and
14 you actually going to that site.  In your professional
15 experience, besides that do you have other experience with
16 purchasing firearms online without a background check?
17 A.  Oh, yes.  As an agent with ATF I purchased everything from
18 normal guns to machine guns from people without background
19 checks.
20 Q.  Have you also done some work outside of the ATF concerning
21 online purchases of firearms without a background check?
22 A.  Yes.  In 2012 I was approached by the Today show about the
23 ease of buying guns, online sales with a background check, so
24 I agreed to do it.  And we went and met in Arizona, another
25 open state, and we went to an internet buy-sell site called

STEPHEN BARBORINI – DIRECT

1  Backpage, which is now no lodger, this is 2012, where

2  basically I just looked for ads for guns and I would use my

3  iPad and I set up buying the guns and setting up the meeting

4  places where instead of me being the person that met these

5  people for the final sale, I set up the deal and then they

6  would show up.

7      It was a male and female actor and they would buy the gun

8  without any background checks.  And also after they bought the

9  gun from these people, which they actually told the people,

10  "Thank you for selling me the gun.  I probably couldn't pass a

11  background check anyway," nobody asked for the gun back.

12      All those guns that we bought, a Glock and AR-15, after

13  our investigation was over it was on the Today show, and those

14  guns were turned over to Phoenix PD.

15  Q.  You indicated in that Today show work you purchased an

16  AR-15 and a Glock online.  Is that accurate?

17  A.  Correct.

18  Q.  Now, in addition to gun shows and online sales, you also

19  mentioned something called a straw purchase.  What is a straw

20  purchase?

21  A.  A straw purchase is where somebody, usually a prohibited

22  person, or maybe it's somebody that doesn't want their name on

23  the ATF Form 4473 because they want to commit a crime or ship

24  the guns either out-of-state or to a gang or internationally,

25  they will send a straw purchaser in, which means the straw

1  purchaser goes to the FFL, fills out the form, but the true

2  buyer is the person that doesn't want their name on the form

3  so they will provide the money and buy the gun.

4      So if the gun is ever traced, it comes back to the straw

5  purchaser, not total actual possessor or the actual purchaser.

6  It goes back to the straw purchaser which has no interest in

7  the gun.  We see many of those and work them both from FFLs at

8  gun shows.

9  Q.  So how would an FFL know if the weapon is being purchased

10 for someone else in a straw purchase type of scenario?

11 A.  If the FFL is — they are actually training the other guy

12 to FFLs, or if they suspect the straw purchase they should

13 stop the sale.  But in our experience, my experience actually,

14 we actually — actually during gun shows because gun shows are

15 so crowded we see people — we have people outside the gun

16 show, usually local police that could identify that the gang

17 members, the felons, people that shouldn't be there, and if

18 they are at a gun show they are going to buy a gun or ammo.

19     We follow these people around.  Or a gun dealer will call

20 us.  And they may approach a table many times with a

21 girlfriend or a wife.  We will see that person that we know is

22 prohibited, pick up a gun, look at a gun.  And they will walk

23 away.  And then the female that is with them — usually it's a

24 female, will fill out the paperwork, get the gun.  And later

25 on we do a traffic stop and find out who the true purchaser

1  is.

2  Q.   You talked a little bit about — I know we've talked about

3  gun shows, but you just brought something up.  You talked

4  about having your agents at a gun show and it's very crowded

5  and you used the word "gang members and felons."  When you are

6  working a gun show, are you just randomly targeting people to

7  determine if there is some type of sale where a background

8  check might be required?

9  A.   No.  Information usually comes from either a gun dealer

10 that suspects it, or from one of the local either ATF.  Local

11 cops usually that know these people that say so-and-so is in

12 the show, he shouldn't be here, he's a felon.  And that's how

13 we spot them.  Either somebody buys from a collector or a

14 private sale, or they will buy it using a straw purchaser from

15 an FFL.

16 Q.   Now, what if a parent buys a firearm for a child.  Is that

17 considered a straw purchase?

18 A.   No.  That's a gift exception.  You can buy your — you

19 know, obviously a child, a gun, if your child is a convicted

20 felon — if your child is a convicted felon and you know it,

21 then that would be a straw purchase.  But, no, you can buy

22 your child a gift.

23 Q.   How about a wife buying a firearm for her husband.  Is

24 that considered a straw purchase?

25 A.   No.  Only if she knows he's a prohibited person and can't

STEPHEN BARBORINI - DIRECT

1  buy the gun, then it would be.  Otherwise, it would just be a
2  gift.
3  Q.  Now, you also used the term "ghost gun."  What is a ghost
4  gun?
5  A.  A ghost gun, I guess, is a term used by the news for a gun
6  that's untraceable.  It's been a problem lately.  The last
7  five or six years it's gotten a lot worst because of the
8  polymer kits.  Polymer kits are so easy.
9       For instance, a Polymer80 is probably one of the
10 highest-selling kits in the United States.  Some states are
11 making it illegal right now.
12      So the Polymer80 kit, they basically sell mostly Glock
13 kits and AR-15 kits.  So you get this piece of plastic that
14 looks like the lower receiver or a frame of a Glock.  But it
15 comes in a jig.  It comes with little pieces you have to put
16 in it, as well as drill bits.
17      So when you get the gun, it's also there is an 80 percent
18 gun.  ATF advises in that form, it's not yet a firearm.  So
19 once you go to YouTube -- usually that's the best way to learn
20 how to do it, and use hand tools, and they provide everything.
21 You need maybe a pair of snips and a little file and a drill.
22      It's all there.  The kit tells you where to drill.  You
23 put in a couple parts.  And at that point, you've made a
24 firearm, because that's the control item.  And it's legal,
25 because federally it's legal to make your own firearm.

STEPHEN BARBORINI – DIRECT

1    So everything else — that's the only controlled item.  So
2  a convicted felon cannot have that piece.
3    Now, everything else, let's say an AR-15, Glock, the
4  barrel, the triggers, some of these are all — they are not
5  regulated, so everything else you can either buy at a gun show
6  or online or buy at the gun store.
7  Q.  So that was a lot of information so I'm going to break
8  that down a little bit.  So a ghost a gun is an untraceable
9  gun.  That's really what that term means; is that correct?
10  A.  Correct.
11  Q.  Okay.  And then you talked about Polymer80 kits.  Are
12  those often referred to as 80 percent kits?
13  A.  It's one of the brands of 80 percent kits, yes.
14  Q.  So there is 80 percent kits.  There's different brands.
15  Polymer80 is the most popular?
16  A.  Correct.
17  Q.  Okay.  And with one of these 80 percent kits, you can
18  assemble a firearm; is that correct?
19  A.  Correct.
20  Q.  Okay.  Are there 80 percent kits available for an AR-15?
21  A.  Yes.
22  Q.  Are there 80 percent kits available for a Glock .9mm?
23  A.  Yes.
24  Q.  Can a felon purchase an 80 percent kit?
25  A.  Yes.

1  Q.  Is a background check required to purchase an 80 percent

2  kit?

3  A.  No, not at all.  He can buy them in the mail.

4  Q.  Okay.  So tell me where you can buy a 80 percent kit from.

5  A.  You go to the website and have it mailed to your home.

6  You can go to a gun show and buy it from anyone.  And actually

7  some gun stores sell it.  But when you buy it from an FFL, you

8  don't need a background check.  You just buy it like you would

9  buy a (audio transmission gap).  It's not regulated at all.

10  Q.  Are you telling me you can buy an 80 percent kit from an

11  FFL?

12  A.  Yes.

13  Q.  Without a background check?

14  A.  Yes.

15  Q.  Once you get that 80 percent kit, let's say in the mail,

16  you get your 80 percent kit, you get it home.  How do you make

17  a gun out of it?

18  A.  Well, it has instructions.  And the best thing is to go to

19  YouTube.  There is hundreds of YouTube sites that show you how

20  to do it step by step, because it actually comes in a jig,

21  which is like something — it's plastic, looks like a gun

22  frame.  It's not yet a gun yet.  And it comes in this jig.

23  And it tells you exactly where to drill, to put in your pins.

24  And actually it supplies a drill bit.

25      So watch YouTube, drill the holes.  You might have to snip

STEPHEN BARBORINI – DIRECT

1  out a little bit of plastic, grind a little of the file.  And

2  at that point ATF is going to say, okay, you just made a gun.

3      So when you start, it's not a gun.  When you finish, let's

4  say if it's a Polymer80 Glock, once you make that bottom, the

5  frame, you have made a firearm.  And then any Glock parts kits

6  or aftermarket Glock kits will fit right in and function as a

7  Glock pistol would.

8  Q.  What kind of tools do you need to put the 80 percent kit

9  together?

10 A.  Probably snips, the file, and an electric drill.

11 Q.  Do you need a metal lathe?

12 A.  No.

13 Q.  So to put one of these —— to make a gun out of an

14 80 percent kit, you need a hand drill, a pair of snips, and

15 maybe a file; is that correct?

16 A.  Yes.  Especially for the polymer plastic, which is the

17 Polymer80S.

18 Q.  And I think we talked earlier, the Glock .9mm that you

19 would purchase from a store, it's made out of polymer; is that

20 right?

21 A.  Correct.

22 Q.  So once somebody has assembled this 80 percent kit with

23 their hand drill, their pair of snips and their file, will it

24 operate as a firearm?  Will it shoot bullets?

25 A.  Yes.  Shoots them automatically, just as it was —— the

1  same as a Glock pistol would.

2  Q.  Okay.  And just to be clear, are there any laws

3  prohibiting the sale of one of these kits to a felon?

4  A.  Not federally and not in Texas or Florida.

5  Q.  Are you aware of any shootings that have involved a

6  shooter using a ghost gun to carry out the shooting?

7  A.  I think there was a Saugus High School shooting in 2019

8  and five kids were shot with an 80 percent kit.  One dead.

9  One wounded.  A couple wounded.  I remember that because I saw

10  a picture.

11  Q.  We've talked about gun shows.  We've talked about online

12  purchases, straw purchases, and ghost guns.  You also

13  mentioned family and friends.  Would you consider that another

14  way to obtain a firearm without a background check?

15  A.  Yes.

16  Q.  In your review of this case did it appear that

17  Devin Kelley could have had access to firearms through a

18  friend or family member?

19         MR. LeGRAND:  Your Honor, we object.  That's outside

20  the evidence in the case.

21         THE COURT:  That's overruled.

22  BY MS. CHRISTILLES:

23  Q.  Mr. Barborini, I'll ask you again.  In your review of this

24  case, did it appear that Devin Kelley could have accessed

25  firearms through a friend or family member?

STEPHEN BARBORINI - DIRECT

1  A.  Yes.

2  Q.  And what was that access?

3  A.  His father had guns that he shot.  Also a friend.  He got

4  a Maverick shotgun, which he bartered off later from someone.

5  It's not clear how he got that one, so it was from somebody.

6  Q.  And you indicated that his father had firearms; is that

7  accurate?

8  A.  Yes.

9  Q.  How did you determine that Devin Kelley could have

10  accessed those firearms?

11  A.  There was a — the father, in a deposition, said he kept

12  his guns in a wardrobe cabinet that was made out of wood,

13  which where Devin Kelley stayed, so obviously, a wardrobe

14  cabinet, you can get in with a screwdriver.  So even without

15  permission from his dad, most people would be able to get in

16  that wooden wardrobe cabinet.  It's not gun safe.

17  Q.  You mentioned that it's not a gun safe.  Is there a

18  difference between a wardrobe cabinet and a gun safe?

19  A.  Yes.

20  Q.  What is that difference?

21  A.  A gun safe, you'll have a metal gun cabinet.  If you can't

22  afford a real gun safe, it's going to be steel.  It's going to

23  have some locks that you bolt to the wall.  You need a crowbar

24  (audio transmission gap) grow up to bigger gun safes, which

25  are pretty hard to get in.  They have thicker metal.

1     A wooden cabinet for wardrobe is made with clothes.  I

2 know I have one at home, so you could take a screwdriver and

3 get in in a second, or one shot with a hammer.

4 Q.  Now, we've talked about the possible avenues that

5 Devin Kelley could have accessed weapons from a non-FFL.  I

6 want to turn and talk to you about the firearms that

7 Devin Kelley actually used in the shooting; okay?

8 A.  Yes.  Okay.

9 Q.  And we've talked a little bit about them, but let's go

10 back to the Glock .9mm semiautomatic pistol.  Is there

11 anything about this particular firearm that would have made it

12 easier or more difficult for Devin Kelley to obtain it through

13 the methods that we've discussed?

14 A.  No.  It could get that gun private sale, gun show, online,

15 whatever, without a background.

16 Q.  And is there any characteristics or anything about this

17 weapon that would make it available through these non-FFL

18 sources that we've discussed?

19 A.  It's just a Glock 19.  It's available anywhere, FFLs or

20 non-FFLs.

21 Q.  How about the Ruger AR-556, or an AR-15, would it have

22 been easy for Devin Kelley to obtain this weapon from a

23 non-FFL?

24 A.  AR-15, not a problem at all.  If he wanted that exact

25 brand, he might have had to search for a while.  It just

STEPHEN BARBORINI - DIRECT

1  depends on how many are out there, but AR-15s are the most
2  popular guns out there.
3  Q.  And I think you mentioned it a little earlier.  We talked
4  about a Ruger model SR22.  What is that gun generally used
5  for?
6  A.  Used for plinking, because it shoots -- it's a long rifle,
7  so if you shoot, especially nowadays, even then the ammunition
8  cost of shooting a 9-millimeter Glock compared to a little 22.
9  So it's a semiautomatic, works similar to a Glock.
10  Semiautomatic.  You pull the trigger.  It will shoot.  Except
11  the cost of shooting is probably about 89 percent less.  So I
12  have the same thing.  I have a 22.  I shoot it more often
13  because it's cheaper to shoot so you get more trigger time for
14  training.
15  Q.  And I think you used the word "plinking?"  Did I hear that
16  correctly?
17  A.  Plinking.  So if you don't have a Glock, people use like
18  22S to shoot at cans, target shooting.  It's a cheap way to
19  shoot.
20  Q.  So SR22S are generally used for target practice and
21  training because the ammunition is cheaper.  Is that fair to
22  say?
23  A.  Yes.
24  Q.  Was there any evidence that Devin Kelley used this firearm
25  during the shooting --

STEPHEN BARBORINI - DIRECT

1    A.  Not that I recall.

2    Q.  -- in your review?

3    A.  No.

4    Q.  Now let's talk a little bit about Devin Kelley's actual

5    purchases of firearms.  And I think you alluded to it a little

6    bit.  Did you have an opportunity to review information about

7    Devin Kelley's firearm purchasing history?

8    A.  Yes.

9    Q.  In your expert opinion did Devin Kelley demonstrate any

10   knowledge of the types of non-FFL purchases that we have

11   discussed today?

12   A.  Yes.  He mentioned particular gun shows, and he was

13   searching the internet for accessories.  So he would

14   definitely have knowledge.

15   Q.  In your review of the information, did you find any

16   evidence that Devin Kelley ever utilized any type of non-FFL

17   purchase avenues that we have discussed today?

18   A.  I believe the shotgun he got from a friend.  And there's

19   another firearm that he didn't like and got rid of.  And I

20   think it was the SCCY, S-C-C-Y.  I don't know how he got that

21   one.  I think that was also from a friend, but I couldn't be

22   sure.

23   Q.  You talked about buying firearm accessories online.  I

24   want to talk about some of Devin Kelley's non-firearm

25   purchases.  Are you familiar with accessories that can be

1  purchased for firearms?

2  A.  Yes.

3  Q.  In your review of the case, was there any evidence that

4  Devin Kelley added any accessories to the firearms used in the

5  shooting?

6  A.  Yes.

7  Q.  In your experience, are these accessories generally sold

8  stock on the weapon, if it's purchased at a sporting goods

9  store?

10 A.  No.  It would have been added.

11 Q.  How difficult is it to add these accessories to a firearm?

12 A.  Oh, very easy.

13 Q.  Now, we talked about assembling an 80 percent kit earlier.

14 If someone has the ability to add the types of accessories

15 that Devin Kelley added to his weapon —

16      MR. LeGRAND:  Your Honor, we object.  That calls for

17 speculation.  There's no evidence that Devin Kelley had the

18 ability.  That evidence has come in before the Court that

19 there's no evidence that he had the ability to manufacture

20 guns.  And it's also irrelevant to the facts of this case,

21 Your Honor.

22      MS. CHRISTILLES:  Your Honor, we are not asking

23 Mr. Barborini to speculate on whether Devin Kelley could have

24 assembled an 80 percent kit, or did assemble an 80 percent

25 kit, all we are asking is in his expert opinion if he could

1   put accessories on the gun —

2          THE COURT:  But that's where the assumption is.

3   There is no evidence that he actually put the accessories on.

4   I mean, some third party could have put the accessories on.

5   I'm not aware of any evidence, one way or the other.  Am I

6   missing something?  Did I miss part of the evidence?

7          MS. CHRISTILLES:  Your Honor, I will get there then

8   and I will save this question.

9          THE COURT:  So, if you will bear with me, another

10  civil case has flared up.  Let me attend to that.  It will

11  take all of five minutes.  Why don't y'all stick around.  You

12  can hear the fight, and let me just put this case to bed.

13     (Off the record discussion.)

14     (Other proceedings were held.)

15     (Off the record discussion.)

16          THE COURT:  Mr. Barborini, can you hear me now?

17          THE WITNESS:  Yes, I can, Your Honor.

18          THE COURT:  And the feedback solution has been taken

19  care of.  Okay.  I apologize for that.

20          Where were we?  There we are.

21          MS. CHRISTILLES:  Yes, Your Honor.

22  BY MS. CHRISTILLES:

23  Q.  Mr. Barborini, when we took a little break there, we were

24  talking about the accessories for firearms.  Do you remember

25  that conversation?

STEPHEN BARBORINI – DIRECT

1   A.   Yes.

2   Q.   And during your review of the case were you able to look

3   at the accessories that had been added to the firearms used in

4   the shooting?

5   A.   Yes.

6   Q.   And I want to talk specifically about those accessories,

7   but I also want, before we get there, to talk a little bit

8   kind of about accessories in general.  Are you familiar with

9   silencers?

10  A.   Yes.

11  Q.   Are they also called suppressors?

12  A.   Yes.

13  Q.   Are those regulated?

14  A.   Yes.  They have to be registered with ATF before you can

15  even buy one.

16  Q.   So before you can even buy one, you have to go through a

17  process with ATF.  Tell me about that process.

18  A.   For instance, if you have a Class 3 dealer that deals in

19  national firearms act firearms, which is an FFL that has,

20  actually has special occupational taxpayer license, so if he

21  gets a silencer from, let's say, SilencerCo, which is a

22  manufacturer, it may be in the store but he can't just sell

23  you the silencers like he would a normal firearm.

24       You would fill out an ATF Form 4, which basically your

25  biographical data, photograph, fingerprints, and then $200 as

1  a tax for that silencer.  Then it all goes up to ATF.  And it

2  takes approximately six months for approval.

3      Once that's approved and the check clears, then you can go

4  back and pay for your silencer.

5  Q.  Is it fair to say that the process for getting a silencer

6  or a suppressor is more difficult than getting a firearm?

7  A.  Yes.  And it's also registered to you.  You can't just

8  sell it after that either.  It's got to go through the same

9  process again, if you wanted to sell it.

10  Q.  I want to show you JEX 608 which has been previously

11  admitted.  So you're going to have a document pop up on the

12  screen there for you.

13      In the middle of that document.

14      This is from the Texas Rangers report.  You indicated that

15  you reviewed the Texas Rangers file; correct?

16  A.  Right.

17  Q.  Right in the middle of the page there, it says "oil can

18  type suppressor."  Do you have any clue what that is?

19          MR. LeGRAND:  Your Honor, we object.  There's no

20  showing that this witness reviewed this document in

21  preparation of either of his reports.  In fact, the first

22  paragraph of Government 30, which is his first report, the

23  whole first paragraph is what he did review.  And this

24  document is not on there.

25          MS. CHRISTILLES:  Your Honor, he indicated that he

1  reviewed the entire Texas Rangers file.  This is clearly part

2  of the Texas Rangers file.

3          THE COURT:  That's what I heard.  That's overruled.

4          MR. LeGRAND:  Your Honor, this paragraph says that he

5  reviewed certain, and he lists them from the Texas Rangers

6  file.  And it's about 12 to 15 pages.

7          THE COURT:  I'll let it in.  That's overruled.

8  BY MS. CHRISTILLES:

9  Q.  Mr. Barborini, do you know what an oil can type suppressor

10  is?

11  A.  It's a vernacular of the, I guess, the back of the gun and

12  ways to get around licensed silencers.  Oil can type

13  suppressor.  So basically, also — they are also called

14  solvent traps.  So basically say you have a — it could be a

15  couple different things.

16       The most common one is an oil filter like for your car,

17  like a canister spinner oil filter.  That actually makes a

18  pretty good silencer for a couple shots.  So what they do,

19  they sell an adapter for a thread.  So you can thread this —

20  your oil filter to your firearm.  Right?

21       So when you put on your firearm, these people that sell

22  the adaptors say this is for a solid trap, so when you clean

23  your gun you don't get solid on your carpet.  So ATF has

24  basically said, well, it can catch solvent, which, of course,

25  is, you know, BS, because nobody screws an oil can filter on a

1    gun.

2        But anyway, so but once you shoot it, it acts as a

3    suppresser.  So once you start shooting it, then your intent

4    is you actually made a silencer, which would be illegal to

5    possess.

6    Q.  That was going to be my question.  Is it legal to possess

7    an oil can type suppressor?  Is it legal to possess one?

8    A.  The only way you can possess that legally, it's called a

9    Form 1.  You would have to take that oil can and the adapter,

10   or the adapter, and you would have to apply to make your own

11   silencer.

12       So you would have to put down you as a manufacturer, the

13   same state of manufacture, the serial number.  You send all

14   the information, all your biographical information, to ATF,

15   fingerprints, photographs, all of that, with a $200 check.

16       After six months goes buy, they will say, okay, you made

17   that oil can suppressor.  Now you can have it.  Before you

18   make it.  Otherwise, no, you can't just screw it on your gun

19   and shoot it.

20   Q.  Okay.  Now, I want to talk about — I do want to turn to

21   the accessories that were added to the firearms recovered from

22   the scene of the shooting.  Do you know what accessories were

23   added to the Glock .9mm?

24   A.  Yes.  Basically a Glock 19 has a 15-shot magazine.  So

25   this one had a 31-shot — well, a high-capacity magazine that

STEPHEN BARBORINI – DIRECT

1    could hold 31 rounds.  But he also bought the floor plate.

2    It's called a plus-two extender.  So now that magazine

3    actually holds 33 rounds.

4        And I also saw he added some grip decals.  Commonly known

5    as grip tape.  So it's a decal sold by the manufacturers that

6    you could stick on your Glock grip to make it, you know,

7    stickier or rougher so it doesn't slip in your hand.

8    Q.  Were there accessories or aftermarket modifications to the

9    AR-556?

10   A.  Yes.

11   Q.  And I want to show you JEX 502-128.  Oh, actually, before

12   I do that.  Can I show you JEX 686?

13   A.  Okay.  Got it.

14   Q.  All right.  You talked about this extended magazine for

15   the Glock .9mm.  Does this appear to be what you were

16   discussing with that extended magazine?

17   A.  Yes.

18   Q.  And which gun are we talking about, when we are talking

19   about the Glock .9mm, just to be clear?

20   A.  The pistol pointing right at the camera.

21   Q.  Okay.  And what would be the part of that firearm that is

22   the extended magazine?  How can you tell this has the extended

23   magazine?

24   A.  Normally the stock log mags would stop at the grip, so it

25   would just be just below his pinkie finger.  We can see it's

1  an extended magazine.  And plus it has a little thicker floor

2  plate.  That's a plus-two extender, so it makes it, you know,

3  a 33-round magazine.

4  Q.  So it's fair to say that gun pointing forward in the

5  picture in JEX 686, the metal piece extending below

6  Devin Kelley's pinkie finger is the extended magazine that you

7  are referring to?

8  A.  It's actually plastic, but yes.

9  Q.  Okay.  I apologize.

10      All right.  Now I do want to turn to the accessories added

11  to the AR-556 and I want to pull up JEX 502 at page 128.

12  A.  Yes.

13  Q.  And we're going to bring up that picture.

14  A.  Okay.

15  Q.  You indicated that you reviewed the accessories that were

16  added to the AR-556 as part of your expert opinion in this

17  case?

18  A.  Yes.

19  Q.  I want to walk through some of those accessories.  Does

20  this picture accurately reflect some of the accessories that

21  were added to the AR-556 used in the shooting?

22  A.  Yes.  Yes.

23  Q.  Let's start in the front.  It says Taclight.  What is a

24  Taclight?

25  A.  It's short for tactical lights.  So he's got a

1  rail-mounted light, so he's got a little adapter to fit on

2  that rail system so he has a light so therefore he can shoot

3  when it's dark without holding a flashlight.

4  Q.  Okay.  How about the XTS quad rail.  What is that?

5  A.  That's the hand guard.  That's a Picatinny rail.

6  Picatinny is — you can see the little squares, so a Picatinny

7  rail is where you attach various accessories to include the

8  Taclight as a hook with a piece of metal, so you can hook to

9  the Picatinny rail.

10 Q.  While we are looking at that rail, I'm going to do a

11 little shifting of pictures, and I'm apologize, but I want to

12 pull up — we'll come back to this one, but I want to pull up

13 502-0039.

14     Highlight that picture.

15 A.  Yes.

16 Q.  We were talking about that rail.  Does the rail appear to

17 be different in this picture?

18 A.  Yes.

19 Q.  And when we are talking about the rail, are we talking

20 about that front-most part of the firearm?

21 A.  Not what's circled there, that's the vertical grip.  So it

22 would be above that, so...

23 Q.  Okay.

24 A.  Yes.  That's the hand guard, is the general term.

25 Q.  And you indicated — so this is different from the

1  previous picture; is that correct?

2  A.  Yes.  The other one is a quad rail, Picatinny rail.  This

3  is a polymer Magpul rail.

4  Q.  What's the difference in the two?

5  A.  This is polymer and it's much lighter.  And instead of

6  using a Picatinny saw tooth to attach — it's called an M—LOK

7  system.  So you can attach things.  It's called an M—LOK

8  system.  So it's smaller and lighter than the other rail.

9  Q.  I want to zoom out of that and I want to look at the date

10 on this picture.

11    Mr. Barborini, what was the date that this picture was

12 posted?

13 A.  So it says October 29, 2017.

14 Q.  And just to be clear, the rail in this picture was a

15 different rail than the picture that we looked at previously;

16 correct?

17 A.  Definitely.

18 Q.  And this rail is lighter?

19 A.  Yes.

20 Q.  Okay.  I want to go back to JEX 502—128.  All right.

21 Let's highlight that picture again.

22    All right.  We've talked about the Taclight.  We've talked

23 about the quad rail.  What is this TRS25 red dot?

24 A.  It's a Bushnell, that's the brand, red dot.  So instead of

25 having — like a normal firearm, you have a rear site and a

1  front site, so you have to line up two things like this.

2      Well, I'm an AR-15 instructor and we were also issued this

3  ATF (audio transmission gap) a red dot type site.  So instead

4  of lining up two things for faster target acquisition, you use

5  the red dot site.  So once you site it in, wherever you shoot

6  at, you just point the dots.  So wherever the dot it, it will

7  hit.  I don't have to waste time lining up the rear and front

8  site.

9  Q.  And you said this is a Bushnell brand red dot; is that

10 right?

11 A.  Yes.  You can sort of see the blurry brand on top of it.

12 Q.  So it's not a Ruger red dot brand site?

13 A.  No.

14 Q.  And I think you mentioned this, but what is the purpose

15 for adding a red dot?

16 A.  To make target acquisition much faster, especially it's —

17 so you see a target, whether it's moving or not, I put that

18 dot, I pull the trigger, I can go to the next target.  So we

19 actually, through tactical training, we can address multiple

20 targets much faster.

21 Q.  You then have the extended charging handle latch; what is

22 that?

23 A.  AR-15s have charging handles and some people like to put

24 larger ones.  Because if an AR-15 jams, you have to use the

25 charging handle to withdraw the (audio transmission gap) back

STEPHEN BARBORINI – DIRECT

1  to clear the jam.  Well, sometimes you have problems because

2  it's so small you slip.  So people put on large charging

3  handles so you can clear jams easier.

4  Q.  So the purpose of this modification is to clear jams

5  easier?

6  A.  Yes.  Get the gun up and running faster.

7  Q.  Okay.  What is an MOE stock?

8  A.  It's another Magpul.  A Magpul original equipment.  So

9  that's just a polymer stock made by Magpul.  It's an

10  adjustable AR-15 stock.  It fits AR-15 variance rifles.

11  Q.  And I think you indicated, is this stock on a weapon that

12  you would buy at a sporting goods store, this accessory?

13  A.  That sometimes comes as factory on that brand, on some

14  AR-15s, or you can buy them after.  You can buy them

15  afterwards.  They just slip on and off.  It doesn't take

16  really any tools.

17  Q.  Why would you change the stock on your AR-15?

18  A.  A personal preference.

19  Q.  And then you've got a sling.  What's a — why would

20  somebody add a sling to their AR-15?

21  A.  Well, it's a more of a tactical sling.  You can see it's

22  attached at one side, the buttstock.  The other side it has

23  attached to it the Picatinny rail.

24       And as a firearms instructor, an AR-15 firearms

25  instructor, we are trained if you are engaged in any kind of a

1  firefight and your AR-15 goes down, that's a bungee sling, so

2  it sort of springs.  You basically brush your AR-15 to the

3  side.  So you sling it.  You don't want to get rid of it.  You

4  switch to your handgun and continue to firefight while you

5  look for cover and get your rifle up and running.

6  Q.  And then you've got the CMC3.5 trigger.  What's that?

7  A.  Usually a stock trigger on a Ruger 556 is going to be

8  stiff.  Most AR-15s are base models, so you put a drop-in

9  trigger so it has a lighter trigger pull.  It basically helps

10 you shoot faster and more accurately.

11 Q.  Is it easy to put in one of those new trigger pulls?

12 A.  Yeah.  It's not –– you have to –– basically you have to

13 knock out some pins, take out the original trigger, drop this

14 trigger in it and replace the pins.

15 Q.  How about this pro mag vert grip?  What is that?

16 A.  Instead of grabbing, when you fire right from the

17 shoulder, instead of holding around the hand guard some

18 people's personal preference, they like to hold a vertical

19 grip.  It's a personal preference for tactical shooting.  Some

20 people like it.  Some people don't.

21 Q.  I want to zoom out and look at the date on this picture.

22 A.  It says June 3rd, 2017.

23 Q.  Okay.  And what is the title of this post?

24 A.  Rifle mods pew pew.

25 Q.  So this is June 3rd, 2017.  I want to go to JEX 502-0127

1202

STEPHEN BARBORINI — DIRECT

1  next.

2      All right.  And I want to look at this post.  This says,

3  "I just put a magwell funnel on the rifle."  What's a magwell

4  funnel?

5  A.  A funnel is like you have, let's say, a funnel to a (audio

6  transmission gap) your car, or if you're cooking, so you don't

7  want to spill — try to spill something into a small hole, so

8  you put a magwell funnel.  So if you have to do a fast mag

9  change, sometimes you load the mag in fast and you hit the

10 side of the magwell.  So this funnels your magazine in for

11 faster mag reloads.

12 Q.  Okay.  And just help me understand.  What goes into the

13 magazine?

14 A.  Well, what goes into the magazine well is the magazine.

15 The magazine holds the ammunition.  In this case he had a

16 30-round, I believe a 30-round Magpul mags.  So your magwell

17 is the lower receiver of AR-15, and this magwell, as it says

18 in this thing, it talks about it, it helps with the speed of

19 reloading.

20     So once you shoot a mag, you drop the mag.  You want to

21 load again, you may screw up by hitting the side of the

22 magwell, but now you have a funnel.  It's a bigger area.  You

23 can jam that in without looking at it.

24 Q.  So would it be accurate that somebody would put a magwell

25 funnel in to dramatically increase the consistency and speed

1  of reloads?

2  A.  Yes, definitely.

3  Q.  I want to look at — let's look one more time at 502-0039.

4  Let's look at that picture again.

5  A.  Okay.

6  Q.  Besides that lighter rail, is there anything else

7  different about the accessories in this picture as opposed to

8  the ones we were looking at from the June 2017 picture?

9  A.  In this one there is no magwell on — what do you call it?

10  There is no mag funnel.  And now I can clearly see a BAD

11  lever, a B-A-D lever, on it, which is right in front of the

12  trigger inside the trigger guard.

13  Q.  What is a BAD lever?

14  A.  BAD lever is made by MagPole, a battery assist device

15  basically.  Our AR-15 type rifles, let's say you shoot your

16  AR-15s and a mag runs out.  Well, the bullet stays open, so

17  then you would dump your magazine by pressing the magazine

18  release on the right side of the gun.  The bolt is open, so

19  you put in your new mag, and now the bolt closes on the left

20  side.

21      So what the mag, the BAD lever does, you attach it just

22  with a screw, and now if you looked up at a trigger, instead

23  of taking my hand off the rifle and smacking the bolt closed,

24  I can just use my trigger finger and lift it up and it will do

25  the same thing.  So it increases.  You don't have to change

STEPHEN BARBORINI − DIRECT

1  hands.  Or you can hit it on the left or you can use the
2  right.
3  Q.  So what's the purpose of having a BAD lever?
4  A.  A couple of reasons.  Number one, you don't have to move
5  your hands so you have more speed.  You don't have to move
6  your hand to close that bolt.  You keep it on —— you keep it
7  in the trigger guard, which you want to start shooting again.
8      And now it's ambidextrous.  I can shoot — I can close
9  with either hand basically.  But now it allows my finger
10  trigger to also shut the bolt, get it up and running in faster
11  speed, and then I can start shooting again.
12  Q.  And you said you didn't see the magwell funnel in this
13  picture?
14  A.  No.
15  Q.  Would having the BAD lever help with increased speed of
16  reloads?
17  A.  Yes.  Yes, because you don't have to take your hand off
18  the gun.  You just use the —— especially if you practice.  You
19  become much faster because if you just push your finger up and
20  it shuts the bolt.
21  Q.  Mr. Barborini, I'm going to pose a hypothetical for you.
22  Based on your experience, if someone were to add accessories
23  to a weapon, like the accessories that we have seen here.  If
24  they had the ability to add those accessories, would they have
25  the ability to assemble an 80 percent kit?

STEPHEN BARBORINI – DIRECT

1           MR. LeGRAND:  Your Honor, we object.  That's an

2   attempt to circumvent this Court's ruling, first of all.  And

3   it's assumption not in evidence.

4           MS. CHRISTILLES:  Your Honor, I'm posing a

5   hypothetical to the expert witness, and Your Honor was

6   concerned that we didn't have any evidence that Devin Kelley

7   actually added these accessories, yet we just presented a

8   joint exhibit that at least circumstantially it could be

9   inferred that he added them when he talks about adding the

10  magwell funnel.

11          THE COURT:  That's overruled.  You can continue.

12  BY MS. CHRISTILLES:

13  Q.  Mr. Barborini, just to make sure you heard my question:

14  If somebody hypothetically had the requisite ability to add

15  the accessories that we've seen on this weapon to the AR-15,

16  would they have the ability to assemble an 80 percent kit?

17  A.  Yes.  And especially the Polymer80 type kits, which is the

18  most common polymer.

19  Q.  I want to show you JEX 583-0011.

20          MS. CHRISTILLES:  If I may have a moment, Your Honor.

21          No 11.  Not 111.

22          There we go.  If you could blow that up for me.

23  BY MS. CHRISTILLES:

24  Q.  Mr. Barborini, we've kind of talked about those

25  accessories.  You see some weights here.  Are those weights

 1  that seem consistent with the accessories that we've looked
 2  at?
 3  A.  Yes, except the grip.  I mean, I don't know if that's the
 4  brand grip, but you have the quick detach sling.  You have the
 5  light.  You have the vertical foregrip.  And then you have the
 6  MOE hand guard, which is the Magpul.  That's the, I guess the
 7  final one he had, the polymer handgun we discussed, which
 8  means Magpul original equipment hand guard.  So that's a light
 9  handgun.  He even has 6.8 ounces, which is lighter than the
10  original one, which is made out of an aluminum and has all its
11  teeth on it.
12  Q.  So that MOE hand guard would have been for the Glock .9mm?
13  A.  No, that's for the AR-15.
14  Q.  I apologize.  So this would have all been the AR-15
15  accessories that were added to the firearm?
16  A.  Yes.
17  Q.  What would, in your professional experience, what would be
18  the purpose of weighing the parts on your gun?
19  A.  Well, if you're going to move and shoot, you want the gun
20  to be lighter.  I mean, we actually make fun.  Some people
21  that don't know, they put so many heavy things on their AR-15
22  they can't even lift them.  So the lighter I can make it, the
23  faster I can get it up, get it on my shoulder, and, you know,
24  move and shoot.
25  Q.  Mr. Barborini, in your expert opinion what is the

1 significance of these accessories that were added to the
2 AR-556 used in this shooting?
3 A.   Tactically, you have everything from the start of the red
4 dot which makes much quicker target acquisition than having
5 sites.  And you see actually there is also back-up sites on
6 there, so that one actually has a pop-up back-up site.  It's
7 called the back-up iron sites.
8      And then you have the BAD lever.  So that helps get it up
9 and running, if you have a jam, or just to change mags.  You
10 have that for more speed.
11      You have the charging handles, the extended charging
12 handle.  Again, if you have a jab, or if you want to instead
13 of using your bolt close, you could actually sling shot that
14 charging handle and that could grip it.
15      You have the magwell, which makes it faster again.  When
16 I'm doing speed, I don't want to jam the side of my gun.  Now
17 I can funnel that magazine right away get this thing up and
18 running with a fresh mag.
19      And then you've got the magwell MOE hand guard.  So the
20 Picatinny hand guard is much lighter.  And then you have the
21 BAD lever, so now I can — never have to take my finger out of
22 the trigger guard when I need to close that bolt.  I just can
23 put my trigger finger up.  So I mean, basically faster
24 shooting, multiple targets, easier, lighter, and faster target
25 access.

STEPHEN BARBORINI – DIRECT

1       MS. CHRISTILLES:  Pass the witness, Your Honor.

2       THE COURT:  Will there be cross?

3       MR. LeGRAND:  Yes, Your Honor.

4       THE COURT:  Do you want to take a lunch break now or

5  come back, or —

6       MR. LeGRAND:  Your call.

7       THE COURT:  How much time do you think you need?

8       MR. LeGRAND:  Oh, roughly an hour.  I'm usually not

9  very long.

10      THE COURT:  Let's go ahead and take a break now then.

11      Mr. Barborini, we're going to take our lunch break

12  now.  If you will be back on no later than 1:20, central.  I'm

13  assuming you are in Florida.

14      THE WITNESS:  Yes, Your Honor.

15      THE COURT:  Yeah.  So 1:20 central.  2:20 your time.

16      THE WITNESS:  Thank you.

17  (Recess.)

18

19

20

21

22

23

24

25

1      *(Change in reporter)*

2      *(Open court)*

3           THE COURT:  Thank you.  Please be seated.

4      Your cross.

5           MR. LEGRAND:  May I proceed, Your Honor?

6           THE COURT:  Yes.

7           MR. LEGRAND:  Thank you.

8                         CROSS-EXAMINATION

9      BY MR. LEGRAND:

10     Q.  Mr. Barborini -- did I pronounce that correctly?

11     A.  Yes.

12     Q.  My name is George LeGrand, and I'm one of the plaintiffs'

13     lawyers in this case.  We've never met before.  I don't

14     remember.  Do you recall?

15     A.  I do not.

16     Q.  Okay.

17     A.  I don't think we have met.

18     Q.  I have a few questions for you today.  Hope you'll bear

19     with me.  I'll try not to take too long.

20          If I ask a question you don't understand, would you please

21     stop me and ask me to rephrase it or reask it?

22     A.  Yes, sir.

23     Q.  Okay.  If you don't stop me, I'm going to presume that you

24     at least thought you understood the question.  Okay?

25     A.  Okay.

STEPHEN BARBORINI – CROSS                    1210

1    Q.  How long -- if we add all the years up that you've been in

2    law enforcement, how would it -- how many would it be?

3    A.  19 -- I was sworn in -- I got hired '77, sworn in in '78,

4    to 2021.

5    Q.  And --

6    A.  You can do the math.

7    Q.  In your career, have you testified more than once?

8    A.  Yes.

9    Q.  Okay.  How many times have you testified?

10   A.  I really don't know.

11   Q.  Can you offer us a guess?

12   A.  I'd say, in federal court, it's well over 100 times I've

13   testified as far as firearms-related matters.

14   Q.  And that's just in federal court?

15   A.  Well, federal and state court.

16   Q.  Has that always been for a governmental entity?

17   A.  You were broken up.  Say that again.

18   Q.  That's always been -- has all of your testimony that

19   you've ever given been for the government?

20   A.  Other than civil cases.

21   Q.  How many civil cases?

22   A.  I worked on two civil cases.

23   Q.  Okay.  And when were they?

24   A.  One was probably five years ago or six years ago, and one

25   was about three years ago.

 1    Q.  When you worked on civil cases, did you ever testify

 2    against the government?

 3    A.  No.

 4    Q.  Would you?

 5    A.  Would I?  Yeah.  I testify to the truth.

 6    Q.  Would you testify against the government?

 7    A.  If the government was wrong, yes.

 8    Q.  Okay.  You know the facts of this case; correct?

 9    A.  Basic facts, yes.

10    Q.  Okay.  Was the Air Force wrong?

11    A.  The Air Force was --

12              MS. CHRISTILLES:  Objection, Your Honor.  Outside the

13    scope of direct examination.  Speculation.

14              MR. LEGRAND:  Your Honor, may I respond?

15              THE COURT:  Yeah.

16              MR. LEGRAND:  This witness has been directly

17    designated as an expert witness concerning these alternative

18    markets.  Well, his opinion and his report -- both of his

19    reports, both his primary report and his supplemental report,

20    deal with a two-prong test.

21        First is that Mr. Kelley gets rejected in a firearms sale.

22    And then after that happens, we go to this other alternative

23    market part of his opinion.

24        So this part of my questioning is about the first prong,

25    and that is the Air Force.

1           THE COURT:  That's overruled.

2      You can continue.

3           MR. LEGRAND:  Thank you, Your Honor.

4  BY MR. LEGRAND:

5  Q.  So did you understand my question, Mr. Barborini?

6  A.  Yes.

7  Q.  What's your answer?

8  A.  Somebody in an arm of the military failed to send in an

9  R-84, which would be transmitted to the criminal justice

10 records.  So that would -- that would be a mistake.

11 Q.  Okay.  Are you here to defend that conduct?

12 A.  No.  I'm here to testify about what I -- what I just

13 testified to; firearms and firearms-related matters.

14 Q.  So in the past some 30-odd years that you've worked in law

15 enforcement, have you worked on gun-related cases where you

16 were trying to -- for example, how many years did you spend

17 where you were trying to arrest people for violating gun laws?

18 A.  Well, I investigated gun laws for 25 years, and now I

19 assist in those investigations.

20 Q.  And your reports talk about a lot -- many pages of arrests

21 that you've made for felons; correct?  Committing felonies

22 related to guns; correct?

23 A.  I don't think it has a number of arrests.  But, yes, I

24 investigated felons who had firearms, correct.

25 Q.  Have you been responsible in your career for felons

1   populating or being put into the NICS database?

2   A.  Oh, when I make the arrest -- yes, I make the arrest, and

3   the fingerprints are sent in by my agency, whatever agency I

4   work for, yes.

5   Q.  Okay.  Are you aware of any instance where you were

6   involved in the prosecution of a felony where the fingerprints

7   of that -- well, where the person was convicted?  Let's start

8   there.

9   A.  Person was convicted, yes.

10  Q.  Okay.  Are you aware of any -- how many of those cases

11  have you worked on in 30 years where a felon was convicted?

12  A.  Probably hundreds of those cases.

13  Q.  Hundreds?

14        MS. CHRISTILLES:  Objection, Your Honor.  I think

15  that question's a little vague, "felons."  How many cases have

16  you worked on where felons were convicted?

17  BY MR. LEGRAND:

18  Q.  Okay.  How many cases have you worked on where felons were

19  convicted in gun crimes?

20  A.  Probably hundreds of cases, state and federal.

21  Q.  Okay.  And are you aware of any single case you've ever

22  worked for -- either in the police departments you worked for

23  or your 25 years at the ATF, or any of your Palm Beach County

24  work that you've done recently, are you aware of any felony

25  prosecution resulting in a conviction that was not put into

STEPHEN BARBORINI – CROSS                                    1214

1  the NICS database?

2  A.  I'm not aware of any of those.

3  Q.  Okay.  So they were all put into the NICS database;

4  correct?

5  A.  I would assume so.

6          MS. CHRISTILLES:  Objection.

7          MR. LEGRAND:  Would you be ––

8          MS. CHRISTILLES:  Speculation.

9          THE COURT:  He's already answered.

10 BY MR. LEGRAND:

11 Q.  Would you be critical if any of your felony prosecutions

12 that you were involved in that resulted in a conviction were

13 not populated into the NICS database?

14         MS. CHRISTILLES:  Objection, Your Honor.  Relevance.

15         THE COURT:  That's overruled.

16         THE WITNESS:  Yes.

17 BY MR. LEGRAND:

18 Q.  And why would you be critical of that?

19 A.  Because he's convicted by a court of law, and it is

20 supposed to go to his –– to CJIS.

21 Q.  Mr. Kelley was convicted of cracking his son's skull;

22 correct?

23 A.  I'm not sure.  He was convicted of –– in the military.

24 I'm not sure about cracking his son's skull.  But yes.

25 Q.  Was he convicted of a domestic violence felony ––

STEPHEN BARBORINI - CROSS                    1215

1    A.  Yes.

2    Q.  -- that resulted in the fact that he should have been

3    denied any purchase of a firearm after that; correct?

4    A.  Yes.

5    Q.  And the Air Force should have submitted that to the FBI;

6    correct?

7    A.  That is correct.

8    Q.  And you're critical of them not doing that; correct?

9    A.  Yes.

10   Q.  And if they had submitted Mr. Kelley's criminal background

11   history to the FBI, do you agree Mr. Kelley would not have

12   been allowed to buy the AR-556 that he committed all of the

13   horrendous acts that he committed at the Sutherland Springs

14   Baptist Church?

15   A.  Well --

16          MS. CHRISTILLES:  Objection, Your Honor.  That calls

17   for speculation.

18          THE COURT:  That's overruled.

19   BY MR. LEGRAND:

20   Q.  You can answer --

21   A.  Yes, sir.

22   Q.  -- Mr. Barborini.

23   A.  That gun from that gun dealer, correct.

24   Q.  Thank you.

25          So you agree he would not -- I'll go on to another

1    question.

2        You agree that your job for 30-some-odd years has been to

3    get criminals off the streets; correct?

4    A.  Correct.

5    Q.  And your job has been to make sure they get into the NICS

6    database; correct?

7    A.  Yes.

8    Q.  And do you agree that your job as a law enforcement

9    officer depends, in many respects, on felony convictions

10   getting into the FBI databases; correct?

11   A.  Correct.

12   Q.  Do you agree that you depend every day in your job on

13   the −− on the FBI databases having been properly populated

14   with felony convictions?

15   A.  Most −− well, not every case.  But yes.

16   Q.  Do you agree that if someone is not put into the FBI

17   database when they've committed a domestic violence felony,

18   that it hinders your job as a law enforcement officer?

19   A.  Yes.

20   Q.  Now, Mr. Barborini, I'm going to go just for a moment −−

21   if you'll bear with me, I need to go back through a few things

22   that the government went through with you, and then I'm going

23   to go back to some different subjects.  Okay?

24   A.  Okay.

25   Q.  But, first of all, you reviewed −− or counsel put up on

1    the screen a Texas Ranger document.

2        Do you recall that?

3    A.   Yes.

4    Q.   Did you review that document before today?

5    A.   Yes.

6    Q.   When?

7    A.   I don't know.  But I've seen it before about the (audio

8    transmission gap).

9    Q.   Okay.  I've got your report -- your first report.

10       In fact, your second report only makes reference to you

11   reviewing some deposition testimony; correct?

12   A.   Correct.

13   Q.   Okay.  And your first report talks about what documents

14   you've reviewed; correct?

15   A.   Correct.

16   Q.   And you recall -- and I think I've counted them -- it

17   mentions some 13 Texas Ranger documents?

18   A.   I guess, what the report says, correct.

19   Q.   Are you aware that the Texas Rangers file consists of some

20   70,000 documents?

21   A.   No.

22   Q.   So you -- did you review what the government sent you to

23   review?

24   A.   I reviewed those documents, and I recall seeing that

25   document before.  But there is a lot of documents.

 1   Q.  Did the government send you the 70,000 documents from the

 2   Texas Ranger file or just these specific 13?

 3   A.  I --

 4   Q.  I guess we can say 14 today.

 5   A.  I am not sure exactly.  I reviewed those documents.  I do

 6   not know if there were 70,000, sir.

 7   Q.  Okay.  Well, I guess what I'm asking you is, in your

 8   report, you only list 13.

 9   A.  Okay.

10   Q.  So did you know there were 70,000?

11       That's really what I'm trying to get to.

12   A.  I can't answer a question I don't know, sir.  That's all I

13   can tell you.

14   Q.  Wouldn't you remember if you reviewed 70,000 documents?

15   A.  No, I would not.

16       MS. CHRISTILLES:  Your Honor, this is asked and

17   answered.

18   BY MR. LEGRAND:

19   Q.  You wouldn't?

20   A.  No.

21       THE COURT:  One second.  So now it's been asked and

22   answered.  I am surprised that he wouldn't recall reviewing

23   70,000 pages of stuff, but he's given an answer.

24       MR. LEGRAND:  Thank you, sir.

25

STEPHEN BARBORINI - CROSS                    1219

1    BY MR. LEGRAND:

2    Q.  In your review of the various documents the government

3    gave you to review in this case, one of the documents you do

4    list on your report is ATF Firearm Report 12797, which is

5    JEX 423.

6         Do you recall reviewing that, the ATF report in this case?

7    A.  Yes.

8    Q.  Okay.  Did you find anywhere in the ATF report that they

9    discussed the existence of alternative markets that might have

10   been available to Devin Kelley for firearms?

11   A.  No.

12   Q.  Okay.  In reviewing the Texas Rangers file, the some

13   70,000 documents that you don't recall, or in reviewing the

14   FBI file -- did you review the FBI file?

15   A.  Yes.

16   Q.  Okay.  Did you see anything in the FBI file or the Texas

17   Ranger file that said anything about the availability of

18   alternative gun markets to Devin Kelley?

19   A.  Do not recall seeing that.

20   Q.  You didn't see it, did you?

21   A.  No.

22   Q.  As far as you know, it's not there, is it?

23   A.  I do not remember seeing that document referring to that

24   subject.

25   Q.  Okay.  You went through with counsel the secondary

1  markets.  Let me see if I wrote this down correctly.  We'll

2  start with gun shows.

3  A.  Yes.

4  Q.  Are you aware of any evidence in this case that Devin

5  Kelley ever purchased a firearm at a gun show?

6  A.  No.

7  Q.  Okay.  Are you aware of any evidence in this case that

8  Devin Kelley purchased a firearm from the internet?

9  A.  No.

10 Q.  Do you know whether or not -- in fact, do you believe that

11 the Texas Rangers turned over every stone trying to find

12 anything in this case about Devin Kelley?

13         MS. CHRISTILLES:  Objection.  Speculation.

14         THE COURT:  That's sustained.

15 BY MR. LEGRAND:

16 Q.  Do you know how extensive the Texas Ranger investigation

17 was?

18 A.  I assume they're pretty good.  I just don't -- I'm not

19 familiar with them.

20 Q.  Did you find anything whatsoever to suggest that Devin

21 Kelley had a log-in for Armslist or Texas Gun Trader?

22 A.  No.

23 Q.  Did you find any evidence whatsoever that Devin Kelley

24 ever went to any of those websites?

25 A.  No.

1    Q.  So all of your conversation with counsel about that was

2    zero evidence, just conversation?  You have no evidence of it?

3    A.  No.  The conversation was -- referenced how else to get a

4    gun -- that's what my testimony was about -- besides a dealer.

5    Q.  Well, let's talk about whether Devin Kelley ever went to

6    those places.

7        Do you have any evidence of that?

8    A.  No.

9    Q.  Okay.  That's what I meant by it being conversation.

10       In other words, the markets exist, is what you're saying?

11   A.  Yes.

12   Q.  Straw purchase?  Do you have any evidence that Mr. Kelley

13   ever was involved in a straw purchase?

14   A.  No.

15   Q.  Do you have any evidence that Mr. Kelley ever used any of

16   his father's firearms?

17   A.  He did shoot his father's firearms.

18   Q.  You have evidence that he shot his father's firearms?

19   A.  Depositions -- shooting at his father's place.

20         MR. LEGRAND:  Okay.  Could we pull up Michael

21   Kelley's deposition, Volume I, page 42.

22     (Playing video)

23   BY MR. LEGRAND:

24   Q.  Okay.  Does that refresh your recollection of that

25   testimony?

STEPHEN BARBORINI – CROSS                    1222

```
 1   A.  There's something about a .380 Walther, I sort of
 2   remember, that Devin had access to.
 3   Q.  And you mentioned Mr. Kelley's guns and where they were
 4   kept in a cabinet; correct?
 5   A.  Correct.
 6   Q.  You didn't mention the fact that Mr. Kelley used trigger
 7   locks.
 8       What are trigger locks?
 9   A.  A trigger lock is either a –– could be a –– looks like a
10   hasp lock with a cable on it, or a trigger lock that fills in
11   the trigger guard to prevent someone from pulling the trigger
12   or –– it depends on where you put the lock –– or accessing the
13   chamber to load it.
14   Q.  Are they reliable?
15   A.  Well, if it's the cable –– the trigger locks/cable locks
16   can be defeated with snips or a hacksaw.
17   Q.  Do you own any trigger locks?
18   A.  Yes.
19   Q.  So you make use of them yourself?
20   A.  No.  I keep my guns in a safe.
21   Q.  Have you ever used trigger locks?
22   A.  No.
23   Q.  Do you know whether or not Michael Kelley used trigger
24   locks?
25   A.  I do not know.
```

STEPHEN BARBORINI – CROSS                    1223

1   Q.  Okay.  You didn't mention it in your reports; correct?

2   A.  Correct.

3   Q.  You did read his deposition, though.

4       Are you aware that he said in his deposition that he used

5   trigger locks?

6   A.  He may have.

7   Q.  Okay.  Now, next, you talked about this 80 percent gun?

8   A.  Yes.

9   Q.  In this case, have you seen any evidence whatsoever that

10  Devin Kelley ever purchased or possessed an 80 percent gun?

11  A.  No.

12  Q.  Have you seen any evidence whatsoever that he ever built a

13  gun out of an 80 percent gun?

14  A.  No.

15  Q.  The newspaper?  Have you seen any evidence that Mr. Kelley

16  ever -- Devin Kelley ever purchased a firearm from a

17  newspaper?

18  A.  No.

19  Q.  How about from friends?

20  A.  Oh, Danielle, in her deposition, said that he got a gun

21  from a friend and he hated it.  So he got rid of it and got

22  the Glock.

23  Q.  And ghost guns?  Any evidence that Mr. Kelley ever had a

24  ghost gun?

25  A.  No.

STEPHEN BARBORINI – CROSS                                    1224

1   Q.  Do you know whether or not Devin Kelley ever attended any

2   gun shows?

3   A.  No.

4   Q.  Did the government give you any evidence in that regard

5   concerning Devin Kelley going to gun shows?

6   A.  No.  I don't believe so.

7   Q.  Okay.  Now, you mentioned -- in your conversations with

8   counsel, you also mentioned that sometimes FFLs call you to

9   complain.

10      Do you recall that?

11  A.  Correct.

12  Q.  Okay.  Do you know if any FFLs in this case ever contacted

13  or were in touch with a law enforcement concerning Devin

14  Kelley?

15  A.  No.

16  Q.  Have you been provided any evidence that discusses whether

17  or not an FFL ever contacted law enforcement with reference to

18  Devin Kelley?

19  A.  No.

20          MR. LEGRAND:  Can we look at JEX 22-585.

21      Can you blow up paragraph 4 for me.

22  BY MR. LEGRAND:

23  Q.  Have you ever reviewed -- this is the top half of

24  paragraph 4.

25      Have you seen this document before?

1    A.  No, I --

2    Q.  You have?

3    A.  I don't know.

4    Q.  You understand it talks about Mr. Kelley and "If the cops

5    show up at my door, I'll shoot them," and "My work is so lucky

6    I do not have a shotgun because I would go in there and shoot

7    everyone"?

8             MS. CHRISTILLES:  Objection, Your Honor.

9             THE COURT:  One second.

10       Go ahead.

11            MS. CHRISTILLES:  Objection.  Relevance.

12       I think the question was if an FFL ever called the cops on

13   Mr. Kelley, and then we transitioned into this document.  And

14   I'm not sure how this document is at all relevant to

15   Mr. Barborini's expert testimony on firearms.

16            MR. LEGRAND:  Your Honor, I'm going to show that here

17   in the next question.

18            THE COURT:  Yeah.  Tie it in.

19            MR. LEGRAND:  Can we go to the next paragraph,

20   straight down, that begins with "on June" -- "on 7 June."

21       Can you highlight that paragraph for me, the first three

22   lines.  Thank you.

23   BY MR. LEGRAND:

24   Q.  Have you reviewed this paragraph of JEX 22 before,

25   Mr. Barborini?

 1   A.  I recall the DB9, yes.

 2   Q.  Okay.  Are you aware that the Holloman Air Force Base base

 3   exchange is also a firearm FFL?

 4   A.  Yes.

 5   Q.  And are you aware that at least two of the firearms that

 6   Mr. Kelley owned or purchased were purchased at the Holloman

 7   Air Force Base exchange?

 8   A.  Yes.

 9   Q.  Now, reading the first line of this paragraph, do you see

10   where it says "on 7 June --"

11   A.  "The BX," yes.

12   Q.  -- "of 2012"?

13   A.  Yes.

14   Q.  Do you know what was going on that day in Devin Kelley's

15   life?

16        MS. CHRISTILLES:  Objection, Your Honor.  Outside the

17   scope of direct.  Relevance.

18        THE COURT:  That's overruled.

19   BY MR. LEGRAND:

20   Q.  Okay.

21   A.  I don't recall --

22   Q.  If you look down -- if you look down further in the

23   paragraph, Mr. Barborini, do you see that that is the same day

24   he escaped from the Peak mental health facility?

25   A.  Yes.  I'm reading that now.  Yes, sir.

1    Q.  Okay.  And are you aware that on the very same day, the

2    Holloman Air Force Base, New Mexico, base exchange notified

3    the Air Force Office of Special Investigations, the Det 225

4    that "The subject" -- that would be referring to Devin Kelley;

5    correct?

6    A.  Yes.

7    Q.  "The subject called and placed an order around

8    1400 hours" -- that would be 2:00 in the afternoon; correct?

9    A.  Yes.

10   Q.  -- "on 7 June of 2012 for a Diamondback DB9, semiautomatic

11   9-millimeter handgun."

12       What is that, Mr. Barborini?

13   A.  A DB9 is a semiautomatic pistol made in Daytona Beach,

14   Florida -- actually in Daytona, Florida -- Cocoa, Florida.

15   Excuse me.  DB9 is a polymer semiautomatic handgun.

16   Q.  Are you aware, Mr. Barborini, that on February 12th of

17   2012, Mr. Kelley bought an EAA W .38-caliber revolver at the

18   Holloman BX?

19   A.  Yes.

20   Q.  Okay.

21            THE COURT:  What was that date again?

22            MR. LEGRAND:  February 12th of 2012.

23            THE COURT:  Thank you.

24   BY MR. LEGRAND:

25   Q.  And are you aware, Mr. Barborini, that on April the 12th

1  of 2012, Mr. Kelley bought a SIG Sauer P250 at the Holloman

2  Air Force Base base exchange?

3  A.  Yes.

4  Q.  Did anyone in this case tell you that the 49th Security

5  Forces at Holloman Air Force Base had caused -- somewhere in

6  this time period had caused Mr. Kelley to give up his

7  EAA W .38 revolver?

8  A.  No.

9  Q.  Did the government ever tell you that that gun was in the

10 armory because the 49th Security Forces had ordered Mr. Kelley

11 to turn it over?

12 A.  No.

13 Q.  And does it appear here, then, that then he returned -- in

14 other words, after he was told to turn over his gun and put it

15 in the armory, where did he go next to buy a firearm?  Another

16 FFL?

17        MS. CHRISTILLES:  Your Honor, I'm going to object to

18 relevance and outside the scope of direct.

19        THE COURT:  That's overruled.

20 BY MR. LEGRAND:

21 Q.  Did he return to Holloman Air Force Base to purchase the

22 SIG Sauer P250?

23 A.  The SIG Sauer, he already bought.

24      And then he went to the DB9; is that what you're saying?

25 Q.  No.  I'm saying they told him to turn in the

1   .38 revolver --

2   A.  Okay.

3   Q.  -- and then, after that, he bought the SIG Sauer P250 at

4   Holloman Air Force Base base exchange?

5   A.  Yes.  Yes.

6   Q.  Okay.  And so when confronted with giving his weapon up to

7   the -- to the Security Forces at the 49th, his -- what he

8   resorted to doing was returning to an FFL; correct?

9   A.  Correct.

10  Q.  In fact, the same one he had gone to before, on the BX?

11  A.  Yes.

12  Q.  Okay.  And then as you and I talked a few minutes ago, on

13  the document that's JEX 22, apparently, on June the 9th -- on

14  June the 7th, Holloman Air Force Base base exchange called the

15  Office of Special Investigations and told them that Mr. Kelley

16  had ordered a firearm?

17  A.  Yes.

18  Q.  Why would an FFL call the law enforcement officers and

19  tell them that this man has ordered a firearm?

20          MS. CHRISTILLES:  Objection.  Speculation.

21          THE COURT:  That's sustained.

22  BY MR. LEGRAND:

23  Q.  Well, is it a fact they did apparently call the Office of

24  Special Investigations and tell them that Mr. Kelley had

25  ordered a firearm?

1    A.  Yes.

2    Q.  Okay.  So does it appear from this document that, for some

3    reason, the BX called the Office of Special Investigations

4    about Mr. Kelley?

5    A.  Yes.

6    Q.  Do you know how the BX learned or came into the

7    understanding that they should call the Office of Special

8    Investigations if Mr. Kelley orders a firearm?

9           MS. CHRISTILLES:  Objection.  Personal knowledge.

10          THE COURT:  Yeah, he needs to -- that's what the

11   question's asking him, does he know?

12      That's overruled so far.  Let's wait for the response.

13   BY MR. LEGRAND:

14   Q.  Well, do you know how they came into that knowledge?

15   A.  No.

16   Q.  We do know, do we not, sir, that no other FFLs in the

17   country came into any knowledge about Devin Kelley; correct?

18   A.  That I know of, correct.

19   Q.  Okay.  So, apparently, the BX at Holloman somehow came

20   into some information about Mr. Kelley; correct?

21   A.  Yes.

22   Q.  But would it appear -- well, you know -- you know for a

23   fact that the security forces at Holloman Air Force Base

24   didn't share that information with the FBI, did they, that

25   there was a problem with Devin Kelley?

```
 1   A.   No.
 2   Q.   Okay.  They should have, shouldn't they?
 3        You and I have already discussed that.
 4   A.   The FBI -- when you say "FBI," you're talking about the
 5   records?
 6   Q.   The FBI should have known about Devin Kelley's conviction?
 7   A.   If you're talking about CJIS records, correct.
 8   Q.   Okay.  Now, next on my list, in December of 2014, am I
 9   correct that's when Mr. Kelley bought the Glock 19 from
10   Specialty Sports?
11   A.   Okay.
12   Q.   Is that correct?
13   A.   Yes.
14   Q.   Okay.  And is Specialty Sports an FFL?
15   A.   Yes.
16   Q.   Okay.  And then June 26th of 2015, did Mr. Kelley buy a
17   .357 pistol or handgun from Specialty Sports --
18   A.   Yes.
19   Q.   -- in Colorado?
20   A.   Yes.
21   Q.   Are they an FFL?
22   A.   Yes.
23   Q.   On April the 7th of 2016, did Mr. Kelley buy that
24   Ruger AR-556 that he sprayed the church at Sutherland Springs
25   with?
```

STEPHEN BARBORINI – CROSS                        1232

1   A.  Yes.

2   Q.  Did he buy it from an FFL?

3   A.  Yes.

4   Q.  Did the government make you aware that a few months before

5   that, he had gone to Dick's Sporting Goods in New Braunfels

6   and tried to buy a weapon like that?

7   A.  I don't believe so.

8   Q.  Okay.  Has the government made you aware that Dick's

9   Sporting Goods rejected Mr. Kelley?

10  A.  There's one dealer that rejected him due to a magazine

11  being with the gun, but that was the same one he got it from.

12  I don't recall the other one.

13  Q.  My question -- I'll repeat it for you.

14      My question is, did the government ever make you aware

15  that there's evidence that Dick's Sporting Goods rejected

16  Mr. Kelley in an attempt to purchase a firearm?

17  A.  I don't -- I don't believe so.

18  Q.  Okay.  Assuming that they did, would it appear that

19  Mr. Kelley then again returned to another FFL?

20  A.  Yes.

21  Q.  Okay.  He didn't go to any of these alternative markets

22  that you've talked about; correct?

23  A.  For that gun, you are correct.

24  Q.  In other words, when they took his gun away from him at

25  Holloman, he went back to an FFL, correct, to get another one?

1   A.  Correct.

2   Q.  Okay.  When he escaped from Peak mental hospital, he tried

3   to get a gun from where?  Another FFL; correct?

4   A.  Yes.

5   Q.  Okay.  And, in fact, that FFL called security forces;

6   correct?

7   A.  Yes.

8   Q.  And then when he tried to buy a firearm at Dick's Sporting

9   Goods and was rejected, he returned to an FFL; correct?

10  A.  Yes.

11  Q.  He never went to any of these alternative markets that

12  you've testified about today; correct?

13  A.  That I know of, correct.

14  Q.  Now, am I correct that because of the Air Force and their

15  failure to report Mr. Kelley to the FBI, that the entire gun

16  market was available to Mr. Kelley?

17  A.  From an FFL, correct.

18  Q.  Okay.  He could go anywhere he wanted to buy a firearm;

19  correct?

20  A.  Yes.  In certain -- in those states, correct.  In -- state

21  and Colorado for long guns, correct.

22  Q.  And do you have any evidence that other than this handgun

23  you mentioned and the shotgun that he didn't like, that he

24  ever went anywhere but an FFL?

25  A.  No.

1  Q.  That's the choice he made; correct?

2  A.  Correct.

3  Q.  Do you know why he made that choice?

4  A.  I have no idea.

5  Q.  Okay.  You've talked about the fact that new weapons are

6  available at gun shows; correct?

7  A.  You were broken up, sir.  Try one more time.

8  Q.  You testified today that new guns are available at gun

9  shows; correct?

10  A.  Yes.  Yes.

11  Q.  Okay.  Any evidence that Mr. Kelley ever took advantage of

12  that?

13  A.  No.

14  Q.  Any evidence that Mr. Kelley ever went anywhere to get

15  this Ruger AR-556 except a FFL?

16  A.  No.

17  Q.  He could have gone to his father?  His father had an --

18  had an AR; correct?

19  A.  Correct.

20  Q.  In fact, he went with his father to Cabela's to buy that

21  firearm.

22      Did you understand that?

23  A.  I don't recall that.  Could have happened, but I don't

24  recall.

25  Q.  So if one of these straw purchases you've talked about

STEPHEN BARBORINI – CROSS                    1235

1    were going to take place, that would have been an opportunity,

2    wouldn't it, when he and his father went to Cabela's and his

3    father bought an AR rifle?

4    A.   Yes, could have.

5    Q.   Okay.  Do you have any evidence that Mr. Kelley bought

6    that gun for Devin?

7    A.   No.

8    Q.   Okay.  So Devin didn't seize on that opportunity to go

9    through a straw sale, did he?

10   A.   Correct.

11   Q.   And the other choice he could have made, that you've

12   talked about, is Armslist or Texas Gun Traders.

13        We've gone through that, haven't we?

14   A.   Yes, we have.

15   Q.   Now, I want to go -- counsel talked about silencers and an

16   oil can silencer.

17        Do you know why she brought that up?

18   A.   No.

19   Q.   Okay.  Any evidence that Mr. Kelley ever used a silencer

20   at Sutherland Springs?

21   A.   No.

22   Q.   These oil can silencers, could you fire 500 shots through

23   one of them?

24   A.   Yes.

25   Q.   Could?

1    Do you have any evidence that he used one to shoot all

2 these folks?

3 A.  No.

4 Q.  Okay.  So you have no idea why she brought that up?

5 A.  It was —— it was in an email.

6 Q.  No, no.  I'm talking about counsel for the government.

7    Do you know why she brought up the oil can silencer?

8 A.  No.

9 Q.  Do you know why she brought up all these alternative

10 markets?

11 A.  Well, the oil can silencer, it's a way to get around the

12 law of —— a silencer law.  And he stated it in an email, so

13 that's probably why she brought it up.

14 Q.  The oil can silencer would have been illegal, correct, for

15 Devin Kelley?

16 A.  Well, again, once he shoots it, yes.  Once he intends to

17 use it as a silencer, correct.

18 Q.  But that —— even if he had an oil can silencer or even if

19 he intended to use one, that oil can silencer wasn't any more

20 illegal than the three firearms he had with him at Sutherland

21 Springs, were they?  They were just as illegal, weren't they?

22 A.  The oil can silencer, when you buy it, it's a solvent

23 trap.  So it's not illegal for anyone to have until you shoot

24 it.  And then, okay, it's a silencer.

25 Q.  So until he put it on a gun and used it as a silencer,

1    there's nothing wrong with having that?

2    A.  That's correct.

3    Q.  But the three firearms that he had with him at Sutherland

4    Springs, they were definitely –– definitely illegal; correct?

5    A.  For him to possess, correct.

6    Q.  Now, you and I have talked about –– and I don't want to

7    spend any length of time on this, really.

8        But you and I have talked about the fact you're critical

9    of the Air Force for not reporting Devin Kelley; correct?

10   A.  Well, someone that –– yes.

11   Q.  Do you agree that the Air Force failure to report was a

12   substantial factor in Devin Kelley being able to purchase the

13   AR-556 that he used at Sutherland Springs?

14             MS. CHRISTILLES:  Objection.

15             THE COURT:  One second.

16             MS. CHRISTILLES:  That calls for a legal conclusion.

17             THE COURT:  That's overruled.

18   BY MR. LEGRAND:

19   Q.  Go ahead.  You can answer, sir.

20   A.  Say that question one more time.

21   Q.  I'll say it a lot slower.

22       Do you agree, Mr. Barborini, that the Air Force's failure

23   to put Devin Kelley's felony conviction into the NICS database

24   was a substantial factor in Devin Kelley being able to acquire

25   the Ruger AR-556 that he used to shoot everybody at Sutherland

1  Springs?

2  A.  That rifle, correct.

3  Q.  Okay.  And your testimony -- sir, your testimony's a

4  two-prong test, correct --

5  A.  Tell me --

6  Q.  -- as I understand it?

7      In reading your report -- in reading your report, what I

8  find, sir, is that your report depends on two factors.

9      One, your report talks about all these alternative markets

10 that are out there; correct?

11 A.  Correct.

12 Q.  Okay.  But am I not correct that your report -- before

13 these alternative markets even come into play, Mr. Kelley had

14 to be rejected somewhere from buying a firearm; correct?

15 Doesn't your report assume that?

16 A.  Well, it's an alternative market.  If he was rejected, he

17 may have gone to that market, or maybe he just would have went

18 to that market anyway.  But I don't know what was in his mind,

19 why he would go to an FFL.

20 Q.  You don't know that, and I don't want to get into that.

21 My question is very simple.

22     Do you agree Mr. Kelley never had to go to an alternative

23 market?  He could go where he wanted; correct?

24 A.  He can go to a dealer, yes.

25 Q.  And you have no evidence whatsoever that he ever went to

1  an alternative market; correct?

2  A.  Correct.

3  Q.  And all I'm driving at is that in your report, don't you

4  make it clear that all of these alternative markets aren't

5  really in Devin Kelley's universe unless he gets rejected

6  somewhere trying to buy a gun?

7  A.  My report basically just outlines how to get the gun.

8  Yes, he was rejected, he could go there.  But he could have

9  gone there anyway.  And I don't know what was in Devin

10 Kelley's mind.

11 Q.  But if he wasn't rejected, he continued -- he did continue

12 to go to FFLs; correct?

13 A.  That is correct.

14         MR. LEGRAND:  I'll pass the witness.  Thank you.

15         THE COURT:  Anything else?

16         MS. CHRISTILLES:  Yes, Your Honor.

17                     REDIRECT EXAMINATION

18 BY MS. CHRISTILLES:

19 Q.  Mr. Barborini, I'm going to go back through and just talk

20 about, first, Devin Kelley's access to other weapons.  And

21 let's start with Michael Kelley and Rebecca Kelley.

22      Did you review certain depositions in this case from

23 Michael Kelley?

24 A.  Yes.

25 Q.  Okay.  Did -- I think you started to say it on

1    cross-examination.  You were talking about a weapon of Michael

2    Kelley's that you thought Devin Kelley had access to.

3        Why don't you go ahead and finish that statement now.

4            MR. LEGRAND:  Your Honor, we would object.  That's

5    not proper redirect.

6            THE COURT:  That's overruled.

7            THE WITNESS:  I remember he had access -- shoot a

8    Walther .380, a PPK.

9    BY MS. CHRISTILLES:

10   Q.  And do you recall Michael Kelley talking about Devin

11   Kelley cleaning his weapons?

12   A.  Yes.

13   Q.  Do you ever recall looking at any testimony that talked

14   about Devin teaching his mother how to shoot?

15   A.  You broke -- I'm sorry.  You're broken up.

16   Q.  Oh, because I can't remember to turn my microphone up.

17   A.  Okay.  That's better.

18   Q.  That's all right.

19       Do you recall anything about Devin Kelley teaching his

20   mother to shoot better?

21   A.  Yes.

22   Q.  Now, let's talk about Danielle Kelley's testimony.

23       You reviewed her testimony; correct?

24   A.  Yes.

25   Q.  Okay.  Does she talk about Devin Kelley ever going to any

1  gun shows?

2  A.  I'm not sure.  I think she makes mention of it, but I just

3  can't recall for -- but I just can't recall.  I think she

4  mentioned going to a gun show, but I just don't recall.

5  Q.  But I think you did talk about her mentioning a handgun

6  that --

7  A.  Oh, she definitely got a handgun from -- Devin Kelley got

8  a handgun from a friend.  He didn't like it, so he sold it.

9      And then I noticed further in a report that he said it was

10  a cheap gun and he didn't like it.  And then later I noticed

11  the SCCY semiautomatic 9-millimeter pistol that he sold to a

12  pawn shop.

13      So I surmise that may be the gun, because it is a cheap

14  gun compared with the Glock.

15  Q.  Do you recall any other weapons that Kelley might have

16  bartered for besides that handgun?

17  A.  The shotgun, the 12-gauge shotgun.  I believe it was a

18  Maverick shotgun.

19  Q.  Do you recall whether or not he got that from an FFL or a

20  non-FFL?

21  A.  I believe he got it from a source, a friend.

22  Q.  Now, you reviewed some of Michael Kelley's information.

23      Do you recall if Michael Kelley ever mentioned trigger

24  locks when he was interviewed by the Texas Rangers?

25  A.  I don't recall that.

1   Q.  Now, I want to -- I want to shift to this information

2   about guns purchased while Devin Kelley was in the Air Force.

3   Okay?

4   A.  Yes.

5   Q.  Counsel talked about some gun purchases at the BX.

6       Do you know what a BX is?

7   A.  Yes.

8   Q.  What is a BX?

9   A.  It's a place you go to get anything from food to clothing.

10  My father-in-law, who was in the military -- went to the BX

11  with him.

12  Q.  Okay.  So it's a store.

13      And plaintiffs' counsel talked to you about some gun

14  purchases in February of 2012.

15      Do you remember that?

16  A.  Yes.

17  Q.  Okay.  And I think in April of 2012.

18      Do you remember that?

19  A.  Yes.

20  Q.  Do you know when Devin Kelley would have been prohibited

21  from buying an -- from buying a firearm from an FFL?

22  A.  I don't recall -- the date that he was convicted, which I

23  don't recall the exact date.

24  Q.  Okay.  So you don't know whether or not -- when he

25  purchased those weapons from the BX, whether or not he was

1  prohibited from buying them?

2  A.  I can't —— don't know —— don't remember the exact day he

3  was convicted.  I think it was '15, maybe.

4  Q.  But there would have had to have been a conviction;

5  correct?

6  A.  Correct.

7  Q.  And you don't have any personal knowledge about why there

8  would have been a call from the BX to OSI, do you?

9  A.  No.

10  Q.  Now, you were asked about whether or not Devin Kelley

11  could have purchased that AR-556, correct, from the FFL?

12  A.  Yes.

13  Q.  You're not here to testify about whether Academy legally

14  sold the AR-556 on April 7th, 2016, are you?

15  A.  No.

16        MS. CHRISTILLES:  One moment, Your Honor.

17     *(Discussion off the record)*

18        MS. CHRISTILLES:  Pass the witness, Your Honor.

19        THE COURT:  Anything further?

20        MR. LEGRAND:  Nothing further.

21        THE COURT:  Any further need for this witness?

22        MR. LEGRAND:  No, Your Honor.

23        THE COURT:  Can he be excused?

24        MS. CHRISTILLES:  Yes, Your Honor.

25        MR. LEGRAND:  Yes, Your Honor.

```
 1              THE COURT:  Thank you, sir.  You're excused.

 2              THE WITNESS:  Thank you, Your Honor.

 3              THE COURT:  Have we gone through all the witnesses

 4    for today now or not?

 5              MR. STERN:  Yes, Your Honor.

 6              THE COURT:  So what's the schedule for tomorrow?  Is

 7    it still just John Donohue?

 8              MR. STERN:  Just John Donohue.

 9              THE COURT:  Okay.

10              MR. STERN:  And, Your Honor, he's actually on

11    California time.  I don't know if that means we could take a

12    little bit -- start a little bit later in the morning.

13              THE COURT:  Yeah.  Well, considering we're only doing

14    one witness.

15         And we can get through him tomorrow; right?

16              MR. STERN:  Oh, I believe so.  Absolutely.

17              MR. ALSAFFAR:  Definitely.  Definitely.

18              MR. STERN:  I would think he's actually relatively

19    short.

20              THE COURT:  Well, I don't want to give you -- I don't

21    want to give you too late a -- too late of a start time and

22    then all of the sudden we don't do -- finish him up.

23         Start at 10:00, 10:30?  Central or --

24              MR. STERN:  That works for us.

25              MR. ALSAFFAR:  It's your witness, so that's fine with
```

 1   me, but I don't want to —

 2          MR. STERN:  If we start at 10:30, we'll certainly

 3   finish by —

 4          MR. ALSAFFAR:  I think that's true.

 5          MR. STERN:  — I think around lunchtime, frankly.

 6   But I don't know.

 7          THE COURT:  Okay.  Then, we'll start 10:30 central

 8   for the witness.  That will be 8:30 his time.  And just

 9   Mr. Donohue tomorrow.

10      Then, just planning the rest of the week out, what are we

11   doing for Thursday?

12          MR. STERN:  Thursday, we have, in the morning, Erin

13   Higgins, followed by Dr. Bursztajn.

14      Friday morning, we have only Dr. Fox.

15      Monday morning, we have plaintiffs' rebuttal, Dr. Metzner,

16   followed by — I take it that we will do closing perhaps in

17   the afternoon.  We haven't gotten much direction from Your

18   Honor in terms of the length of closing arguments.

19          THE COURT:  So why don't I give you — if we finish

20   up — under the assumption we finish up Metzner Monday —

21          MR. ALSAFFAR:  Yes.

22          THE COURT:  — let's just plan on just Metzner on

23   Monday.  You all have time to prepare your closing remarks,

24   and we'll hear those on Tuesday.

25      How much time do you want for closing, Plaintiffs?

```
1            MR. ALSAFFAR:  Your Honor, I don't think we need more
2       than an hour each.
3            THE COURT:  What do you think?
4            MR. STERN:  Your Honor, can -- I think you heard a
5       lot of mine yesterday, so I think an hour will be sufficient.
6            THE COURT:  Okay.  So an hour each for closing, and
7       that'll be on Tuesday morning, assuming we remain on this
8       schedule.
9         Very well, then.  10:30 tomorrow morning.
10        (At the bench off the record)
11           MR. STERN:  Your Honor?
12           THE COURT:  Yes.
13           MR. STERN:  If I can propose?
14           THE COURT:  Yes.
15           MR. STERN:  I take it that your ruling with regards
16      to Mr. Barborini's report and supplemental report will hold as
17      it pertains to all the rest of the expert reports as well?
18           THE COURT:  Yes.
19           MR. STERN:  And the learned treatises as well.
20           THE COURT:  Yes.
21           MR. STERN:  So what I propose is just to have
22      plaintiffs' counsel and I go through the rest of the
23      outstanding exhibits tonight.  And I think we could probably,
24      you know, cut down the vast majority of what's left.
25           THE COURT:  That would be appreciated.
```

1         MR. STERN:  Of course.

2         MR. ALSAFFAR:  Yeah, I agree.

3         THE COURT:  Anything else we need to take up, then,

4    before I leave today?

5         MR. ALSAFFAR:  No, Your Honor, not from plaintiffs.

6         MR. STERN:  Not from the government.

7         THE COURT:  Thank you.  We'll see you all 10:30

8    tomorrow morning.

9    * * *

10        *(Overnight recess)*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              −oOo−

2        I certify that the foregoing is a correct transcript from

3   the record of proceedings in the above-entitled matter.

4

5   Date:  4/13/2021        /s/ Gigi Simcox
                            United States Court Reporter
6                            655 East Cesar E. Chavez Blvd., Rm. G-65
                            San Antonio, TX  78206
7                            Telephone:  (210) 244-5037

8   Date:  4/13/2021        /s/ Chris Poage
                            United States Court Reporter
9                            655 East Cesar E. Chavez Blvd., Rm. G-65
                            San Antonio, TX  78206
10                           Telephone:  (210) 244-5036

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25