```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3
   JOE HOLCOMBE, ET AL,                    .
 4                                         .
                   PLAINTIFFS,             .
 5         vs.                             . DOCKET NO. 5:18-CV-555-XR
                                           .
 6   UNITED STATES OF AMERICA,             .
                                           .
 7                   DEFENDANT.            .
                                           .
 8
                 TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
 9             BEFORE THE HONORABLE XAVIER RODRIGUEZ
                   UNITED STATES DISTRICT JUDGE
10                       APRIL 14, 2021

11

12

13

14   APPEARANCES:
     FOR THE PLAINTIFFS:    JAMAL K. ALSAFFAR, ESQUIRE
15                          TOM JACOB, ESQUIRE
                            KOBY J. KIRKLAND, ESQUIRE
16                          LAURIE M. HIGGINBOTHAM, ESQUIRE
                            STEVEN R. HASPEL, ESQUIRE
17                          WHITEHURST HARKNESS BREES CHENG
                             ALSAFFAR HIGGINBOTHAM AND JACOB
18                          7500 RIALTO BOULEVARD, BUILDING TWO
                            SUITE 250
19                          AUSTIN TX 78735

20                          ROBERT E. AMMONS, ESQUIRE
                            APRIL A. STRAHAN, ESQUIRE
21                          THE AMMONS LAW FIRM
                            3700 MONTROSE BOULEVARD
22                          HOUSTON TX 77006

23

24

25
```

```
 1                    DANIEL D. BARKS, ESQUIRE
                      SPEISER KRAUSE, PC
 2                    5555 GLENRIDGE CONNECTOR
                      SUITE 550
 3                    ATLANTA GA 30342

 4

 5                    MARK W. COLLMER, ESQUIRE
                      COLLMER LAW FIRM
 6                    3700 MONTROSE
                      HOUSTON TX 77006
 7

 8                    JASON P. STEED, ESQUIRE
                      KILPATRICK TOWNSEND & STOCKTON LLP
 9                    2001 ROSS AVENUE, SUITE 4400
                      DALLAS TX 75201
10

11                    DENNIS CHARLES PEERY, ESQUIRE
                      R. CRAIG BETTIS, ESQUIRE
12                    TYLER & PEERY
                      5822 WEST IH 10
13                    SAN ANTONIO TX 78201

14

15                    PAUL E. CAMPOLO, ESQUIRE
                      TIM MALONEY, ESQUIRE
16                    LAW OFFICES OF MALONEY & CAMPOLO, LLP
                      926 S. ALAMO
17                    SAN ANTONIO TX 78205

18

19                    GEORGE LOUIS LeGRAND, ESQUIRE
                      LeGRAND AND BERNSTEIN
20                    2511 N. ST. MARY'S STREET
                      SAN ANTONIO TX 78212-3739
21

22

23

24

25
```

```
 1                    DANIEL J. T. SCIANO, ESQUIRE
                     RICHARD E. TINSMAN, ESQUIRE
 2                   TINSMAN & SCIANO
                     10107 McALLISTER FREEWAY
 3                   SAN ANTONIO TX 78216
                     KELLY W. KELLY, ESQUIRE
 4                   ANDERSON & ASSOCIATES LAW FIRM
                     2600 SW MILITARY DRIVE, SUITE 118
 5                   SAN ANTONIO TX 78224

 6

 7                   ERIK A. KNOCKAERT, ESQUIRE
                     JOSEPH MICHAEL SCHREIBER, ESQUIRE
 8                   SCHREIBER KNOCKAERT, PLLC
                     701 NORTH POST OAK, SUITE 325
 9                   HOUSTON TX 77024

10

11                   BRETT T. REYNOLDS, ESQUIRE
                     BRETT REYNOLDS & ASSOCIATES PC
12                   1250 NE LOOP 410, SUITE 310
                     SAN ANTONIO TX 78209
13

14                   DAVID J. CAMPBELL, ESQUIRE
                     JUSTIN B. DEMERATH, ESQUIRE
15                   O'HANLON McCOLLOM & DEMERATH
                     808 WEST AVENUE
16                   AUSTIN TX 78701

17

18                   JORGE A. HERRERA, ESQUIRE
                     FRANK HERRERA, JR., ESQUIRE
19                   THE HERRERA LAW FIRM, INC.
                     1800 W COMMERCE STREET
20                   SAN ANTONIO TX 78207

21

22                   JASON C. WEBSTER, ESQUIRE
                     THE WEBSTER LAW FIRM
23                   6200 SAVOY, SUITE 640
                     HOUSTON TX 77036
24

25
```

```
 1                    CATHERINE TOBIN, ESQUIRE
                      HILLIARD MUNOZ GONZALES, LLP
 2                    719 S. SHORELINE BOULEVARD, SUITE 500
                      CORPUS CHRISTI TX 78401
 3

 4

 5                    HUGH JONES PLUMMER, JR., ESQUIRE
                      THOMAS J. HENRY
 6                    PO BOX 696025
                      SAN ANTONIO TX 78269
 7

 8                    DENNIS BENTLEY, ESQUIRE
                      THOMAS J. HENRY, ESQUIRE
 9                    THOMAS J. HENRY INJURY ATTORNEYS
                      521 STARR STREET
10                    CORPUS CHRISTI TX 78401

11

12                    MARCO CRAWFORD, ESQUIRE
                      LAW OFFICE OF THOMAS J. HENRY
13                    4715 FREDRICKSBURG
                      SAN ANTONIO TX 78229
14

15                    MARION M. REILLY, ESQUIRE
                      ROBERT C. HILLIARD, ESQUIRE
16                    HILLIARD MARTINEZ GONZALES LLP
                      719 S. SHORELINE, SUITE 500
17                    CORPUS CHRISTI TX 78401

18

19

20

21

22

23

24

25
```

```
 1   FOR THE DEFENDANT:        AUSTIN L. FURMAN, ESQUIRE
                               PAUL D. STERN, ESQUIRE
 2                             UNITED STATES DEPARTMENT OF JUSTICE
                               THREE CONSTITUTION SQUARE
 3                             175 N STREET, NE
                               WASHINGTON DC 20002
 4

 5                             CLAYTON R. DIEDRICHS, ESQUIRE
                               JAMES F. GILLIGAN, ESQUIRE
 6                             JACQUELYN MICHELLE CHRISTILLES, ESQUIRE
                               JAMES EDWARD DINGIVAN, ESQUIRE
 7                             KRISTIN K. BLOODWORTH, ESQUIRE
                               KRISTY KAREN CALLAHAN, ESQUIRE
 8                             UNITED STATES ATTORNEY'S OFFICE
                               601 NW LOOP 410, SUITE 600
 9                             SAN ANTONIO TX 78216

10

11

12

13                            AUSTIN L. FURMAN
                              JOCELYN KRIEGER, ESQUIRE
14                            DANIEL P. CHUNG, ESQUIRE
                              JAMES G. TOUHEY, JR., ESQUIRE
15                            STEPHEN E. HANDLER, ESQUIRE
                              UNITED STATES DEPARTMENT OF JUSTICE
16                            PO BOX 888, BEN FRANKLIN STATION
                              WASHINGTON DC 20044
17

18   ON BEHALF OF RUBEN       PHILIP KOELSCH, ESQUIRE
     D. RIOS, JR.             CRAIG WILLIAM, ESQUIRE
19                            CARLSON LAW FIRM, PC
                              100 EAST CENTRAL EXPRESSWAY
20                            KILLEEN TX 76542

21

22

23

24

25
```

```
 1   ON BEHALF OF            ELIZABETH G. BLOCH, ESQUIRE
     ACADEMY, LTD            DALE WAINWRIGHT, ESQUIRE
 2                           GREENBERG TRAURIG LLP
                             300 WEST 6TH STREET, SUITE 2050
 3                           AUSTIN TX 78701

 4                           JANET E. MILITELLO, ESQUIRE
                             LOCKE LORD LLP
 5                           600 TRAVIS STREET TOWER, SUITE 2800
                             HOUSTON TX 77002
 6
                             DAVID McDONALD PRICHARD, ESQUIRE
 7                           KEVIN MICHAEL YOUNG, ESQUIRE
                             PRICHARD YOUNG, LLP
 8                           10101 REUNION PLACE, SUITE 600
                             SAN ANTONIO TX 78216
 9
     ON BEHALF OF MOVANTS    J. DEAN JACKSON, ESQUIRE
10   MICHAEL AND REBECCA     CURNEY FARMER HOUSE OSUNA & JACKSON
     KELLEY                  411 HEIMER ROAD
11                           SAN ANTONIO TX 78232

12   ON BEHALF OF MOVANT     ADRIAAN TIELEMAN JANSSE, ESQUIRE
     DR. SHRIDHAR VASIREDDY  JANSSE LAW
13                           P.O. BOX 791215
                             SAN ANTONIO TX 78279
14
     REPORTED BY:            CHRIS POAGE, RMR, CRR
15                           OFFICIAL COURT REPORTER
                             UNITED STATES DISTRICT COURT
16                           SAN ANTONIO, TEXAS

17

18

19

20

21

22

23

24

25
```

1          *(San Antonio, Texas; April 14, 2021, at 10:28 a.m.)*

2              THE COURT:  Thank you.  Please be seated.

3          Good morning.  We'll resume with trial today.

4          All counsel, parties, witnesses, participants, and members

5     of the public are reminded that this is a formal proceeding,

6     and that they should behave at all times as if they were

7     present in the courtroom.  The standing order of the

8     San Antonio Division of the Western District of Texas on

9     remote access to court proceedings remains in effect.

10         Photography, recording, or streaming of these proceedings

11    by any means is strictly prohibited.  Though this proceeding

12    is open to the public, technological restraints require that

13    members of the general public request access from the

14    courtroom deputy to participate remotely.  Those granted

15    approval to participate remotely must not forward the

16    electronic link to nonparticipating colleagues or persons and

17    must not post the link on any public forum.

18         As with all courtroom proceedings, violations of these

19    instructions are subject to contempt proceedings.

20    Accordingly, please exercise proper courtroom decorum at all

21    times.

22         With that, do we need to take up anything before the

23    witness?

24              MR. STERN:  Just a minor housekeeping matter, Your

25    Honor.  With regards to outstanding documents on the

1  government's exhibit list, the government seeks to move in

2  Government's Exhibit 123.

3          THE COURT:  One second.  Thank you.

4     123?

5          MR. STERN:  115 and 116.

6          THE COURT:  Anything else?

7          MR. STERN:  143A through R.  Those are not objected

8  to?

9          MR. JACOB:  No objections, Your Honor.

10          THE COURT:  123's admitted, 115's admitted, 116 is

11  admitted, 143A through R admitted.

12          MR. STERN:  We also seek to admit 157 through 162.

13          THE COURT:  Any objection?

14          MR. JACOB:  157 through 162 are settlement documents

15  in a -- one of the plaintiff's cases.  While we can address

16  that in the damages stage, they have no relevance to this

17  stage of the proceeding.

18          THE COURT:  157 through 162 are not admitted at this

19  time.

20     Any other government exhibits that are agreed to?

21          MR. STERN:  Agreed to?  No.  Your Honor, there is the

22  Government's Exhibit 240 which is the government's key

23  documents.  As I understand plaintiffs' position, obviously

24  I'll let them speak for themselves, the issue would be whether

25  there's any documents contained within the key documents that

1  have been either not admitted at this time or wouldn't be

2  agreed to at a future date.  The government recognizes that,

3  and so with regards to one or two documents that may be

4  contained within the larger universe, those can be excluded

5  and then we would seek to admit the full Government's Exhibit

6  240.

7          MR. JACOB:  And, Your Honor, we were just told about

8  this, so we haven't had an opportunity to cross-reference the

9  specific documents that are in that batch with what has been

10  admitted up to this point.

11          THE COURT:  Right.

12          MR. STERN:  And that's fair.  So we can take up 240

13  at another time, and that's the only document that's still

14  outstanding with regards to the government's exhibit list.

15          THE COURT:  Anything else from the government?

16          MR. STERN:  No, Your Honor.

17          THE COURT:  Thank you.

18     Is your witness here?  Yes.  Your witness?

19          MS. KRIEGER:  Your Honor, the United States calls

20  John Donohue.  May I proceed?

21          THE CLERK:  Mr. Donohue, if you will raise your right

22  hand.

23     *(The oath was administered)*

24          THE COURT:  You may.

25          MS. KRIEGER:  Thank you.

```
 1              JOHN DONOHUE, III, DEFENDANT'S WITNESS, SWORN

 2                          DIRECT EXAMINATION

 3   BY MS. KRIEGER:

 4   Q.  Professor Donohue, can you see us okay?

 5   A.  I can.

 6   Q.  And you can hear us okay?

 7   A.  Yeah.

 8   Q.  And I see -- I just -- I can see you're in your office and

 9   that you have assorted papers around you.  I just want to ask

10   that you not look at any papers or documents unless we put

11   something on the screen.  If there's something that you cannot

12   read on the screen and you happen to have a paper version of

13   it, please let us know and you'll be able to look at that

14   paper copy.  Is that okay?

15   A.  That's fine.

16   Q.  Okay.  Great.

17       Professor Donohue, can you please introduce yourself to

18   the Court.

19   A.  Yes.  My name is John J. Donohue.

20   Q.  And what is your profession?

21   A.  I am a lawyer and an economist, and I teach at Stanford

22   Law School.

23   Q.  What is your title?

24   A.  Well, it's a long and involved one.  I'm the C. Wendell

25   and Edith M. Carlsmith Professor of Law.
```

1  Q.  What does it mean to be the C. Wendell and Edith M.

2  Carlsmith Professor of Law at Stanford Law School?

3  A.  That is just a designation that I'm -- I'm what's called a

4  chaired professor, so a professor with tenure, and a little --

5          THE COURT:  I was going to say, can you bring the mic

6  closer?  Professor Donohue, can you get either closer to the

7  mic or bring the mic closer to you?

8          THE WITNESS:  Yes.  Is that better?

9          THE COURT:  That's better.  Thank you.

10          THE WITNESS:  Okay.  I'll try to speak up.

11          MS. KRIEGER:  Does the court reporter need him to

12  repeat that answer?

13          COURT REPORTER:  Yes.

14  BY MS. KRIEGER:

15  Q.  So I'm just going to ask the question again.

16      What does it mean to be the C. Wendell and Edith M.

17  Carlsmith Professor of Law at Stanford Law School?

18  A.  Well, tenured professors are sometimes recognized with

19  what's called the chaired professorship, and this is what the

20  C. Wendell and Edith M. Carlsmith professorship is.  So it's

21  an honorific for those who survive long enough to get it, I

22  guess.

23  Q.  Professor Donohue, we're going to put JEX 619 up on the

24  screen.  Do you recognize this document?

25  A.  Yes, I do.  This is my CV.

1    Q.  Is this –– is this a current version of your CV, as far as

2    it's –– it's a long document.  But as far as you can tell, is

3    this the most current version?

4    A.  Yes.

5    Q.  Let's talk for a minute about your educational background.

6    Can you tell the Court what degrees you hold?

7    A.  Yes.  I went to Hamilton College and got a BA majoring in

8    math and economics.  Then I went to Harvard Law School, where

9    I got my law degree.  Then, after clerking and working for a

10   while, I went back to Yale and got a Ph.D. in economics.  And

11   then I've been teaching ever since I left Yale.

12   Q.  Your degrees in mathematics and economics helped you in

13   your research?

14   A.  Yes.  I think of myself with –– a lot of my work as ––

15   involved in empirical evaluation of law and policy, and it's

16   very heavily econometric and statistically focused.  So math

17   and economics has been critical to that.

18   Q.  Have you been awarded any fellowships?

19   A.  Yes.  I mean, I was a fellow at the Center for Advanced

20   Studies and Behavioral Sciences and have had other research

21   awards for funding of research.

22   Q.  You mentioned some research awards.  Can you give any

23   examples of awards that you have been, you know ––

24   A.  You know, the National Science Foundation has funded my

25   research at various times.

1  Q.  Can you provide the Court with a summary of your teaching

2  background?

3  A.  Yes.  I mean, I -- I taught economics at Yale initially.

4  But since I've been teaching in law schools, I've taught quite

5  an array of different classes.  But in recent years, I've

6  focused mainly on torts and criminal law.  I teach a course in

7  advanced criminal law, a seminar on the death penalty, a

8  course on statistical inference in law, but I've also

9  taught -- corporations and corporate finance.

10 Q.  Do you teach a course on empirical law and economics?

11 A.  Yes.  Empirical law and economics and empirical evaluation

12 of law have been constant courses that I've taught over the

13 years in the U.S. and around the country and even in other

14 countries.

15 Q.  In addition to your position at Stanford, where else have

16 you been a chaired professor?

17 A.  You know, first at Northwestern Law School before I came

18 to Stanford.  And then after I was at Stanford for nine years,

19 I went back to teach at Yale Law School, where I was also a

20 chaired professor.  And then now, eleven years ago, I returned

21 to Stanford after six years as a chaired professor at Yale.

22 Q.  The weather in California's better than in Connecticut?

23 A.  It is, indeed.

24 Q.  Have you had any temporary appointments as a professor?

25 A.  Yeah.  I've been a visiting professor at an array of

JOHN DONOHUE − DIRECT                    1262

1    schools.

2    Q.  Can you give some examples?

3    A.  You know, I was a visiting professor at Harvard,

4    University of Virginia, University of Chicago, Cornell.  I was

5    a visiting professor at some foreign universities, St.

6    Gallen's in Switzerland, Oxford in England.  I just taught a

7    course this summer through a university in Bogota, Colombia.

8    I was also a visiting professor in Japan, at a university

9    called Toin University.  So I've done a fair amount of

10   visiting professors positions, also at Bocconi in Milan,

11   Italy.

12   Q.  You mentioned, before, the subjects that you teach.  But

13   have you developed any specializations in your research?

14   A.  I do think of myself as broadly involved in the empirical

15   evaluation of law and policy.  Within that broad category,

16   I −− I have spent quite a bit of time over the last 20 years

17   focusing on issues relating to crime and criminal justice.

18   And within that category, I've had quite a lot of work on

19   issues relating to guns and gun policy.

20   Q.  Have you published on the topics of guns and gun policies?

21   A.  Yes.  I've published extensively on all aspects of crime

22   and criminal justice, including guns and gun policy.

23   Q.  All right.  Have you published on empirical research into

24   the impact of gun regulations and gun policies?

25   A.  Yes, I have.

1   Q.  Can you give some examples of your publications on that

2   topic?

3   A.  Sure.  So, for example, I published a major paper on

4   impact of right-to-carry laws on violent crime in the Journal

5   of Empirical Legal Studies.  I had another publication on a

6   similar topic earlier in the American Law and Economics

7   Review.  I published in Science on the issue of guns and gun

8   regulation.  Also, in the American Journal of Public Health on

9   the same broad issue of guns and gun policy.  Published in the

10  American Economic Review as well.  So an array of publications

11  in peer-reviewed journals.

12  Q.  I was just going to ask, are those journals peer reviewed?

13  A.  Every one that I've just mentioned was peer reviewed.

14  I've also published quite a lot in non-peer-reviewed journals

15  as well.

16  Q.  In addition to having your work peer reviewed, you were

17  also the -- were you also the coeditor of the American Law and

18  Economics Review?

19  A.  Yes.  The American Law and Economics Review had two

20  editors for the journal, Steve Shavell at Harvard was the

21  editor focusing on theoretical articles, and I was the editor

22  focusing on empirical articles.

23  Q.  Are you a member of any boards or associations related to

24  gun regulations and gun policy?

25  A.  You know, I wouldn't frame it exactly in that way.  I was,

1   for eight years, a member of the committee on law and justice,

2   which I was probably invited to be a member of because of my

3   work in crime and gun policy, in particular.  And that's a

4   particularly august group of scholars and some practitioners

5   who work in the area of crime and criminal justice,

6   and provide information and synthesis of the research to

7   federal agencies and also private groups.  And it's part of

8   the National Science Foundation.

9   Q.  Have you previously served as an expert witness on the

10  topic of gun regulations and gun laws?

11  A.  Yes.  I've done quite a bit of that in the last few years.

12  Q.  Have you previously provided expert declarations as a

13  witness on those topics?

14  A.  Yes.  In –– in almost all of the cases where I served as

15  an expert witness, I provided a declaration or testified at

16  trial.  There were a couple of times when ––

17  Q.  About how –– oh, I'm sorry.

18      About how many times have you provided expert declarations

19  or reports on the topic of gun regulation and gun laws?

20  A.  You know, I probably should have kept it up on my CV.  But

21  I would guess in the neighborhood of about 10 or 12 times.

22  Q.  And then have you testified on subjects related to gun

23  regulations and gun policies?

24  A.  I have.

25  Q.  Have you testified in criminal or civil trials?

1    A.  I think all of the cases I was testifying in were civil

2    cases.

3    Q.  And were you testifying on behalf of plaintiffs or

4    defendants?

5    A.  Typically, I was testifying on behalf of a governmental

6    entity who was a defendant, and so most of the time, and

7    perhaps all of the time, for defendants.

8    Q.  And you say that you were testifying on behalf of

9    governmental entities.

10       What were those governmental entities defending?

11   A.  Well, much of it involved cases where certain gun lobbies

12   were trying to overturn gun regulations and a governmental

13   agency, either a city, state, or in one case a university,

14   contacted me and asked me if I would provide testimony to

15   support their regulation against the attack from the gun

16   lobby.

17   Q.  So is it —— is it fair to say that most of your testimony

18   has been in defense of gun regulations?

19   A.  Yes.

20   Q.  To your knowledge, have you ever been excluded as an

21   expert?

22   A.  No.  And I would know if I had been.

23   Q.  Have you been accepted in federal and state court as a

24   qualified expert witness?

25   A.  I have.

1   Q.  And you were retained in this case; correct?

2   A.  Yes, I was.

3   Q.  What, generally, were you requested to do?

4   A.  Well, I was originally contacted by your –– your team to

5   give some background information on the nature of the ways in

6   which people have access to guns in Texas.  And then after

7   some back and forth in those discussions, I was asked to write

8   an expert report sort of outlining my thoughts relevant to

9   this case on issues like causation and effectiveness of gun

10  regulation in this context.

11  Q.  What –– generally speaking, what information was given to

12  you?

13  A.  So I was given, you know, basic information about the

14  nature of the events.  Of course, I knew quite a bit about it

15  because I'd spent a number of years studying mass shootings.

16  But, you know, the government gave me an array of information

17  that I had not seen before.

18  Q.  Did you review the Department of Defense inspector general

19  report on the Devin Kelley incident?

20  A.  I did.

21  Q.  Did you review federal laws and regulations on gun

22  policies?

23  A.  I did.

24  Q.  Did you review the reports of other experts?

25  A.  Yes, I did.

1   Q.  Did you review Kelley's ATF Forms 4473?

2   A.  Yes.  Those were given to me, and I examined them.

3   Q.  Did you review the Air Force OSI file on Kelley?

4   A.  No, I did not.

5   Q.  Did you review any documents from the Texas Rangers

6   investigation?

7   A.  Not specifically, no.

8   Q.  The documents that were provided you -- to you, were they

9   of the type of information that you would ordinarily use to

10  conduct your research?

11  A.  Yes.  And, of course, I was delighted to have the

12  information that went beyond what I already knew.

13  Q.  Did you feel you had sufficient information to come to

14  opinions in this case?

15  A.  Yes.  Sufficient information to come to the opinions that

16  I set forth in my report.

17  Q.  I was just going to ask, did you prepare a report

18  concerning -- first, did you prepare a report concerning the

19  relevant gun regulations and laws at issue in this case?

20  A.  I did.

21  Q.  And did your report also contain the opinions that you

22  arrived at in this case?

23  A.  Yes, it did.

24  Q.  Did you use your -- your knowledge, training, and

25  expertise in coming to those opinions?

1    A.  Yes, I did.

2    Q.  Did you come to those –– did you develop those opinions to

3    a reasonable degree of certainty?

4    A.  Yes, I did.

5    Q.  After your report was issued, did you review the

6    depositions of Michael Kelley, Rebecca Kelley, Danielle Smith,

7    and Michelle Shields?

8    A.  Yes, I did.

9    Q.  Did those depositions change your opinions?

10   A.  They didn't change the opinions that I articulated in my

11   expert report.

12   Q.  And you've –– have you listened to the testimony that has

13   been given at trial so far?

14   A.  I've listened to as much of it as I could.  I was teaching

15   at some point, so I couldn't listen, but I tried to listen to

16   everything.

17   Q.  And that which you couldn't listen, did you review in the

18   form of transcripts?

19   A.  Yes.

20   Q.  Has any of that testimony changed your opinions?

21   A.  No.  It hasn't changed any of the opinions I set forth in

22   my report.

23        MS. KRIEGER:  Your Honor, at this time, we offer

24   Professor Donohue as an expert in the topics of federal and

25   state regulation of firearms in the United States, firearm

```
 1   policies, and empirical research on firearm regulations and
 2   policies.
 3              MR. ALSAFFAR:  No objections.
 4              THE COURT:  He's recognized as such.
 5              MS. KRIEGER:  Okay.
 6   BY MS. KRIEGER:
 7   Q.  Dr. Donohue, before we get into your opinions ––
 8              THE COURT:  Before we get going, Sylvia, is there a
 9   way we can increase the volume on our end?
10       (At the bench off the record)
11   BY MS. KRIEGER:
12   Q.  Professor, do you mind trying to speak loudly, perhaps as
13   if you are talking to a large classroom.
14   A.  Yeah.  My apologies.  Most of the time the Zoom seems to
15   work well.  But, today, it seems like I need to speak louder.
16   So is this better, if I speak at this level?
17   Q.  Yes.  Thank you.
18   A.  Okay.
19   Q.  Now, Professor, before we get into your opinions, just as
20   a background, can you discuss the regulatory framework set
21   forth in the Gun Control Act of 1968?
22   A.  Yeah.  The federal Gun Control Act of 1968 was the first
23   real effort to identify who should be prohibited by federal
24   law from having access to firearms.  And the law was passed in
25   1968 and set forth ten categories of individuals who were
```

1  prohibited purchasers.

2  Q.  I'm not going to ask you to recite all ten, but is one of

3  those categories a person "who has been convicted in any court

4  of a crime punishable by imprisonment for a term exceeding one

5  year"?

6  A.  Yes.  And that's often referred to as the prohibition on

7  felons in possession.

8  Q.  And then another category is a person who has been

9  convicted of a misdemeanor crime of domestic violence?

10  A.  That's correct.

11  Q.  Now, before the Brady Act was passed, these ten classes of

12  individuals, with one exception, were already prohibited from

13  possessing firearms; is that right?

14  A.  Yes.  That's correct.

15  Q.  Was there a mechanism to —— prior to the Brady Act, was

16  there a mechanism to enforce the prohibitors within the Gun

17  Control Act?

18  A.  No.  There was no effective mechanism.  I mean, if a

19  police officer happened to recognize that someone was

20  possessing a weapon and happened to know that they were a

21  prohibited purchaser, they could arrest them for that.  And,

22  of course, if they were caught in possession for another

23  crime, it would add on a penalty, but that was a very weak

24  form of enforcement.

25  Q.  So prior to the Brady Act, what would happen if a

 1    prohibited individual went to a gun store to purchase a

 2    firearm?

 3    A.  Well, since there would be no screening of that

 4    individual, the transaction would go through without any

 5    inhibiting supervision.

 6    Q.  So, in other words, if the government did not operate the

 7    NICS system, would Kelley have been able to walk into a gun

 8    store and purchase a firearm even though he was a prohibited

 9    individual?

10    A.  Yes.  Absolutely.

11         MR. ALSAFFAR:  Objection, Your Honor.  This is

12    irrelevant.  I think they're about to get -- we might save

13    some time here.  They're about to get into issues on negligent

14    undertaking, which obviously the Court's already ruled on.

15         THE COURT:  Yeah.  So at this point, this is history.

16    And so I'll let it in.  I'll take this one step at a time.

17         MS. KRIEGER:  Thank you.

18    BY MS. KRIEGER:

19    Q.  Professor Donohue, would the risk to these plaintiffs have

20    been lower if the government had not operated a background

21    check system at all?

22         MR. ALSAFFAR:  I think I should have waited one

23    question.  That was the question, Your Honor.

24      Objection.  Irrelevant.

25         MS. KRIEGER:  Your Honor, we're -- we understand that

1  you have already ruled on this issue, but we're trying to

2  build a record if the –– for if this case goes up on appeal.

3          THE COURT:  Yeah.  Well, one side or the other's

4  going to take this up.  So it's going on appeal.

5      But what's the relevance to this question, because I

6  thought you were in 1968 still.

7          MS. KRIEGER:  I'm sorry, Your Honor.  On the question

8  of increased risk of harm, we are just trying to demonstrate

9  that if the United States had not undertaken to have a

10  background check system at all, there would not have been ––

11  the situation that the plaintiffs, then, would have been no

12  different, so that there was no increased risk of harm.

13         THE COURT:  So you're at 1968, though.  But at some

14  point, historically, NICS came into existence, and at some

15  point the Air Force was required to report to NICS.  So what's

16  the relevance of this question at this point in time in this

17  narrative?

18         MS. KRIEGER:  The question –– Your Honor has stated

19  that the voluntary undertaking in this case is the operation

20  of the background check system.  We're just trying to

21  establish that, had that never been done, the risk of harm to

22  the plaintiffs would not have changed.

23         THE COURT:  Yeah.  Well, I'm still stuck in a very

24  chronological time frame.  You haven't walked him to that

25  point yet.  The objection's noted.  Sustained.

```
 1              MS. KRIEGER:  Fair enough.  I will walk him through
 2    the time frame first, then.
 3    BY MS. KRIEGER:
 4    Q.  Professor, do you know when the Brady Act was passed?
 5    A.  Yes.  1993.
 6    Q.  Okay.  And did the Brady Act establish the National
 7    Instant Criminal Background Check System?
 8    A.  It called for the creation of the National Background
 9    Check System.
10    Q.  Just for everyone's ease of speaking, is it okay if I call
11    the National Instant Criminal Background Check System the NICS
12    system?
13    A.  Yeah.  That's the typical reference.
14    Q.  What is the NICS system?
15    A.  Well, the NICS system, that was called for adoption in the
16    1993 Brady bill, said that the government had 60 months to
17    come up with a system that would allow Federal Firearms
18    Licensees, so gun dealers, to be able to contact the NICS
19    system and get an immediate decision as to whether the
20    purchase that was being contemplated was consistent with
21    federal law.
22    Q.  And when did the NICS system become operational?
23    A.  It was almost 60 months later, in 1998.
24    Q.  And I think you answered this question, but:  Was there a
25    federal statute that mandated this creation?
```

1    A.   Yes.  The Brady Act of 1993 instructed the Attorney

2    General to come up with the NICS system within 60 months.

3    Q.   And do federal agencies submit records to the NICS system?

4    A.   They do, and they are required by law to do so.

5    Q.   Is that a statutory obligation?

6    A.   Yes, it is, federal statutory obligation.

7    Q.   So to be clear, was the Air Force required by federal law

8    to report Kelley's information to NICS?

9    A.   It was required to provide information about convictions

10   for offenses that were within the prohibited categories set

11   out by the federal Gun Control Act of 1968.

12   Q.   And in your opinion should the Air Force have reported

13   Kelley's information to NICS?

14   A.   Yes.  They should have, yes.

15   Q.   I think that we've now gotten to the right point in time.

16   So I'm just going to ask, had the NICS system not been

17   implemented, would the risk to these plaintiffs have been

18   lower than it was, in fact?

19        MR. ALSAFFAR:  Your Honor, we now object to this on

20   several grounds.  Relevance.  And this is outside his -- I

21   believe it's outside his level of expertise.  The government

22   is now asking him to comment on tort law.

23        THE COURT:  Your response?

24        MS. KRIEGER:  We're not asking him to comment on tort

25   law.  We're asking him to comment on empirical -- you know,

 1  empirically, whether it would have made a difference in his

 2  opinion, as an expert in gun regulations and gun policies.

 3          THE COURT:  I still don't understand, though, the

 4  relevance.  What would it have mattered if the system had not

 5  been created?  The fact of the matter is, the system was

 6  created and he was required to report.

 7          MS. KRIEGER:  Your Honor, may Mr. Stern be heard on

 8  this?

 9          MR. STERN:  May I be heard?

10          THE COURT:  Yes.

11          MR. STERN:  Thank you, Your Honor.

12      One of the elements for negligent undertaking under a −−

13  Second Restatement of Torts 323 or 324(a) is an increased risk

14  of harm.  Now, the plaintiffs and the United States have a

15  difference of opinion, legally speaking, as to what are the

16  comparison points for that increased risk of harm.

17      Plaintiff suggests that because the government operates

18  NICS, it must do so in a non−negligent way, and that failing

19  to do so increased the risk of harm.

20      Now, the government's position is that basically renders

21  the increased risk of harm element a nullity, because it folds

22  it into the causation analysis.  The government's position,

23  instead, is that if the government never operated NICS, would

24  there have been an increased risk of harm?  And our position

25  is no.

1       Because while he might have been prohibited under the Gun

2  Control Act of 1968, there would not have been any mechanism

3  for which to prohibit him when he went to an FFL.  So if Your

4  Honor is finding the undertaking to be the operation of NICS,

5  there was no increased risk of harm, because had that

6  operation not occurred, then there would have been nothing to

7  prevent Devin Kelley from purchasing a firearm through an FFL.

8  That's why our comparison point has to be pre-NICS, i.e.

9  pre-November 1998 to post-operation in 1998.  That's the point

10  I think the professor's trying to make.

11          MR. ALSAFFAR:  May I respond, Your Honor?

12          THE COURT:  Yeah.

13          MR. ALSAFFAR:  I think the government has just

14  conceded that they're asking him to comment on tort law, and

15  that's outside his expertise.  And -- but to the second point,

16  they can easily ask him about factual data pre-'68, post-'68.

17  That's a different inquiry.  That's factual.  That's research

18  based.  He can certainly go into that, and we don't object.

19      What they're trying to do is bootstrap that in and then

20  have him make a tort opinion.  If I can ask -- if I can take

21  him on voir dire for a couple of questions, I think I can

22  demonstrate that.

23          MR. STERN:  Your Honor, not at all.  We're going to

24  make that argument in closing, as I just did.  But the point

25  is only that there's no mechanism pre-1998 for which a

1    prohibited individual goes into an FFL and gets a denial.  He

2    would have been allowed to obtain that firearm even if he was

3    prohibited pre the operation of NICS.

4        So as a result, the United States, under Good Samaritan

5    Law, trying to create this mechanism, by doing so didn't

6    increase the risk of harm, because in the absence of that

7    operation, the net result would have been Kelley being allowed

8    to go and purchase the firearm at an FFL.  And that's just the

9    factual underpinnings that we're trying to ascertain from

10   the -- from the professor.

11            THE COURT:  So I'm not sure how Good Samaritan fits

12   into this.  Good Samaritan's a voluntary act done by a person.

13   This is a statutory obligation imposed by Congress on the

14   federal agencies to report.

15       Your voir dire.  Go ahead.

16            MR. ALSAFFAR:  Thank you.

17                    VOIR DIRE EXAMINATION

18   BY MR. ALSAFFAR:

19   Q.  Mr. Donohue, hello.  Can you hear me okay?

20   A.  Yes, I can.

21   Q.  Hi.  We've never met before.  Your deposition was not

22   taken in this case; correct?

23   A.  It was not taken.

24   Q.  And my name is Jamal Alsaffar.  I represent the victims of

25   this shooting.  It's nice to meet you, sir.  I have a couple

1    of questions very quickly.

2        I've looked over your –– your CV.  And please correct me

3    if I'm wrong.  Have you ever been a professor or tenured

4    professor in any –– in torts?

5    A.  Yeah.  I taught torts for six years at Yale Law School and

6    also at Stanford Law School.

7    Q.  And when did –– when was that?

8    A.  So I was at Yale for 2004 to 2010, and then I came back to

9    Stanford, where I had been for nine years prior to Yale, in

10   2010.  And I've been here ever since.

11   Q.  Okay.  And have you ever taught any courses on Texas tort

12   law?

13   A.  No, I have not.

14   Q.  Have you ever taught any courses on the Federal Tort

15   Claims Act and its intersection and application of state law

16   through the vehicle of the Federal Tort Claims Act?

17   A.  No, I have not.

18   Q.  Okay.

19         MR. ALSAFFAR:  Your Honor, we raise our objection

20   again.  We do not object to any factual data he's testifying

21   about pre and post, but any –– any conclusions he makes as to

22   duty and tort law should be excluded.

23         THE COURT:  Yeah.  So I'm personally going to exclude

24   it because this is an attempt to circumvent my prior ruling.

25   But I'm going to allow the questions just so everything's teed

1    up at the Court of Appeals, if it's necessary at that stage.

2            MR. ALSAFFAR:  Thank you, Your Honor.

3            MS. KRIEGER:  So may the witness answer that

4    question, then?

5            THE COURT:  Yeah.  If he remembers what the question

6    was.

7            MS. KRIEGER:  Let me ask it one more time.

8                    DIRECT EXAMINATION (CONTINUED)

9    BY MS. KRIEGER:

10   Q.  Professor Donohue, would the risk to these plaintiffs have

11   been lower with regard to Devin Kelley if the government

12   didn't operate the NICS system at all?

13   A.  No, it would not.

14   Q.  Just to go back to the reporting –– the reporting

15   obligation, statutory reporting obligation of the Air Force,

16   would any information not directly tied to a prohibitor impact

17   the requirement for submission to NICS?

18   A.  No, it would not impact that requirement.

19   Q.  So if someone is convicted of a felony, but that person

20   has also been accused of other bad acts, such as sexual

21   assault or making threats, would that impact –– would that

22   information impact, in any way, the requirement for the

23   Air Force to submit his information to the NICS system under

24   federal law?

25   A.  No.  The federal requirements existed and is not

1    influenced by any other information.

2    Q.   Let's turn to the sales side of the NICS system.

3         Are all gun sales in the United States subject to a NICS

4    background check?

5    A.   No, they are not.

6    Q.   Which gun sales are subject to the background check?

7    A.   Well, sales that proceed through the Federal Firearm

8    Licensee, or gun dealer, must go through the federal

9    background check system.  But other than that, there's no

10   federal obligation to have other gun transactions go through

11   the NICS background check system.

12   Q.   Do you know what the definition is for a "Federal Firearms

13   Licensee"?

14   A.   It's a little bit opaque, but it essentially refers to the

15   fact that someone's a federal firearm -- or must be a Federal

16   Firearm Licensee if they are engaged in the business of

17   selling firearms.

18   Q.   So to be clear, if an individual is not regularly buying

19   and selling firearms for profit, is that person required to be

20   a Federal Firearms Licensee?

21   A.   No, he's not.

22   Q.   And under federal law, does the NICS system apply to sales

23   between private individuals who are residents of the same

24   state?

25   A.   The NICS system does not apply to such private

1   individuals.

2   Q.  Under federal law or non-FFLs, and using that as a

3   shorthand for "Federal Firearms Licensee," are non-FFLs

4   permitted to sell firearms without conducting background

5   checks?

6   A.  Yes, they are.

7   Q.  Now, without conducting a background check, do private

8   sellers have any way of knowing whether they are selling to a

9   prohibited purchaser?

10  A.  In general, they would have no knowledge unless they

11  happened to know the individual or had some independent

12  information about them.

13  Q.  Is that -- is that referred to as the "private sale

14  loophole"?

15  A.  Yes.  Sometimes it is referred to as the "private sale

16  loophole."

17  Q.  Do prohibited individuals take advantage of the private

18  sale loophole?

19  A.  Yes, they do.

20  Q.  What are some of the ways these kinds of private sales

21  occur?

22  A.  Well, it can occur in many different ways.  You know, if

23  you think about the Columbine mass shooting, there were two

24  individuals who were not able to procure weapons on their own

25  because of their age and they got some weapons through a straw

1   purchase, and then they got other weapons through an employee

2   at a pizza shop that they happened to know.

3       So private sales and straw purchases are two mechanisms by

4   which individuals circumvent the NICS background check

5   requirement.

6   Q.  Do private sales also occur at gun shows?

7   A.  Yes, they do.

8   Q.  Do private sales also occur online?

9   A.  Yes.  That's very common.

10  Q.  I was going to mention -- so you kind of -- we kind of

11  said straw purchasers, private sales between individuals,

12  sales at gun shows, and sales online.  Let's kind of talk

13  through those.

14      How is it that individuals are able to buy firearms at gun

15  shows without being subject to a background check?

16  A.  Gun shows typically have two types of sellers.  There'll

17  be federally licensed sellers.  So FFLs show up at gun shows,

18  and they must go through the background check.  But private

19  sellers also are abundant at gun shows, and they will

20  typically put up a card highlighting the fact that they are

21  private sellers, which is a way of signaling to prohibited

22  purchasers that they can buy guns from them without going

23  through a background check.

24  Q.  Have any studies assessed whether private sellers at gun

25  shows are willing to sell even if they have reason to believe

1   the purchasers are prohibited?

2   A.   Yeah.   There have been investigations that have looked

3   into exactly that question by sending in investigators to see

4   whether the gun sellers at gun shows will go through with the

5   transaction.

6   Q.   Okay.   Can we put up GEX 104; what has been previously

7   marked as GEX 104.

8       Do you know what this document is?

9   A.   Yeah.   This is the study that I was referencing, and it

10  involved these undercover examinations to test whether illegal

11  sales were being conducted through private sellers at gun

12  shows.

13  Q.   And the author of this study is the City of New York; is

14  that correct?

15  A.   Yes.  Mayor Bloomberg was very concerned about gun

16  violence, and, of course, New York has some strict laws, but

17  people were able to circumvent the laws by virtue of this

18  illegal conduct at –– at gun shows.

19  Q.   Do you consider this study to be a reliable authority on

20  this topic?

21  A.   Yes.  It was –– it was an important examination, and I

22  thought it was well–done.

23  Q.   Okay.  Let's turn to page 6.  And can we pull out that

24  last paragraph, the bullet point there.  Yes.  Under

25  "Results."

1     (Discussion off the record)

2   BY MS. KRIEGER:

3   Q.  Professor, can you read that paragraph out loud?

4   A.  Yes.  It says, "63 percent of private sellers approached

5   by investigators failed the integrity test by selling to a

6   purchaser who said he probably could not pass a background

7   check.  Some private sellers failed this test multiple times

8   at multiple shows."

9   Q.  So these sellers had no independent way of knowing whether

10  someone is a prohibited individual; correct?

11  A.  They wouldn't have known.  In this particular case, the

12  investigator signaled to them -- the undercover investigator

13  signaled to them that they were, you know, a prohibited

14  purchaser, to see whether they would go ahead with the sale

15  once they were given that information.

16  Q.  Right.

17      So even once they were told that this person was

18  prohibited, did they still, in many cases, sell the gun to the

19  individual?

20  A.  Yeah.  It was an alarmingly high percentage who were

21  willing to go ahead.

22  Q.  Are gun shows common in Texas?

23  A.  Yeah.  Gun shows are more common in Texas than any other

24  state.

25  Q.  Do you know if San Antonio has gun shows?

1   A.  San Antonio does indeed have gun shows.

2   Q.  Do you know if San Antonio had gun shows in the months

3   leading up to the shooting in November 2017?

4   A.  Yes.  There was a gun show in the summer of 2017, a few

5   months prior to the shooting in this case.

6   Q.  I'm sorry.  I'm just going to remind you to try and speak

7   up.

8       Are new guns available to purchase at gun shows?

9   A.  Yes, they are.

10  Q.  Are they available to purchase from private sellers at gun

11  shows?

12  A.  Yes, they are.

13  Q.  Let's talk about private sales that occur online.  How is

14  it that individuals can buy firearms online without being

15  subject to a background check?

16  A.  Well, again, if the online transaction is being conducted

17  through a private seller, private seller would have no

18  obligation to go through a NICS background check.  If it is a

19  Federal Firearms Licensee selling guns on an online forum,

20  then they must go through the background check system.  And so

21  you can go online and see both of them.  You can find on

22  Armslist, for example, you know, lots of private sellers who

23  are selling guns.  But if you, you know, go to Cabela's web

24  page, which is a major Federal Firearms Licensee, you can see

25  what guns are available through that licensed dealer.

1    Q.   Are there -- are there websites that facilitate private

2    sales online?

3    A.   Yeah.  So Armslist would probably be one of the most, you

4    know, recognized ones, but there are many others.  And if you

5    simply type in, you know, "private gun sales," it will bring

6    up a number of different online fora, you know, Pew-Pew or Gun

7    Buyers or other online mechanisms to seek out private sales.

8    Q.   Let's pull up what has been marked as GEX 93.

9         And do you recognize this document?

10   A.   Yes, I do.

11   Q.   It's titled, "Felon Seeks Firearm, No Strings Attached."

12   This might be kind of hard to see, but I think the author is

13   "Mayors Against Illegal Guns."  There it is.

14   A.   Yes.  And this is a group that Mayor Bloomberg initiated.

15   Q.   Do you consider Mayors Against Illegal Guns to be a

16   reliable source?

17   A.   Certainly for this study, I do.  Yes.

18   Q.   Do you consider this study to be a reliable authority in

19   this topic?

20   A.   Yes, indeed.

21   Q.   Let's turn to page 8.  Starting with "the investigation."

22   I think it's the -- there we go.

23        Can you read this paragraph out loud?

24   A.   Yes.  "The investigation found that prohibited gun buyers

25   are clearly turning to the online marketplace.  Individuals

1  looking for guns on Armslist are nearly four times more likely

2  to have prohibiting criminal records than buyers at licensed

3  dealers.  Where fewer than 1 in 100 prospective buyers at a

4  dealer fails a federal background check due to a criminal

5  history, 1 in 30 prospective buyers on Armslist is prohibited

6  for that reason, and no background check prevents them from

7  completing the sale."

8  Q.  Let's now turn to page 11.  And highlight the paragraph

9  that starts with "the city's investigators," if we can pull

10  that out.  It's at the top of the -- yeah, there it is.

11       Professor, can you read that paragraph out loud?

12  A.  "The city's investigators called 125 private sellers in 14

13  states advertising guns on ten websites, including Armslist.

14  During each conversation, the investigators told the sellers

15  that they probably could not pass a background check.  Fully,

16  62 percent of these sellers agreed to sell the gun anyway,

17  though, it is a felony to sell a firearm to a person the

18  seller has reason to believe is a prohibited purchaser.  54

19  percent of the private sellers who posted ads on Armslist were

20  willing to sell guns to people who admitted they were

21  prohibited purchasers."

22  Q.  So was this investigation pretty similar to the -- the

23  previous one that we looked at for gun shows?

24  A.  Yeah.  What -- what the investigation was trying to do was

25  mimic the approach that had been used in gun shows, to show

1    that the same capacious mechanism for evading the federal

2    background check system was available for online purchases.

3    Q.  And we looked at the results of both those studies.

4        How do the percentages of sellers willing to sell to

5    prohibited persons online compare to the percentages of

6    sellers willing to sell to a prohibited person at a gun show?

7    A.  They are quite similar, and, indeed, these are often the

8    same people.  So in that sense, it's not surprising that it

9    would be a similar percentage.

10   Q.  Are new guns available to purchase in private sales

11   online?

12   A.  Yes, they are.

13   Q.  You mentioned the term "straw purchase."

14       What -- what is a straw purchase?

15   A.  So in cases where an individual wants to procure a weapon

16   through a licensed dealer, if they are a prohibited purchaser,

17   they can ask a friend or acquaintance or relative to go in and

18   purchase a gun for them if that individual who is conducting

19   the sale can pass the background check system.

20   Q.  Are straw purchases always friends or family members or

21   relatives?

22   A.  No.  You can actually pay someone to do it for you if you

23   don't have a friend or relative who's willing to do it.

24   Q.  You mentioned the Columbine shooting, that the shooters

25   acquired their weapons through a straw purchase.  Are you

JOHN DONOHUE – DIRECT                    1289

1   aware of any other mass shootings where the individual used a

2   straw purchaser to obtain their weapons?

3   A.   Yeah.   The San Bernadino mass shooting, in which I believe

4   14 people were killed, was effectuated through a straw

5   purchase.

6   Q.   Now, we talked about a number of alternative avenues to

7   get guns, to get -- guns.

8        Can you explain to the Court what a ghost gun is?

9   A.   Yeah.   A ghost gun is essentially a mechanism for evading

10  federal background checks by buying a kit usually that is --

11  involves a lower receiver that is not fully functional yet.

12  And because of the definition of a firearm under the federal

13  Gun Control Act, the incomplete lower receiver is not deemed

14  to be a firearm, and, therefore, it can be purchased in this

15  incomplete state, sometimes referred to as an "80 percent

16  receiver."

17       And the individual who purchases the kit then assembles it

18  into an effective and working, operable firearm but, in doing

19  so, they have evaded the NICS background check system, even if

20  they were a prohibited purchaser.

21  Q.   You know how easy it is to build a ghost gun?

22  A.   Yes.   It's a relatively easy endeavor, and there are

23  instructions on YouTube to do it.   And sometimes individuals

24  have parties to get together and assemble guns, you know, in a

25  group.

1  Q.  Do you know what kind of equipment you need to build a

2  ghost gun?

3  A.  It would be ordinary hand tools.  And some of the kits

4  provide all of the material that you would need to complete

5  the assembly of the gun.

6  Q.  Are these kits widely available?

7  A.  Oh, yes.

8  Q.  Do you recall in your report you discussed a 60 Minutes

9  episode on ghost guns.

10      Do you know what that episode stated about ghost guns?

11          MR. ALSAFFAR:  Objection.  Hearsay.  Talking about 60

12  Minutes now?

13          MS. KRIEGER:  Your Honor, I can reestablish that as a

14  learned treatise or a reliable authority.

15          MR. ALSAFFAR:  Ooh.  Boy.

16          THE COURT:  60 Minutes is a reliable treatise?

17          MS. KRIEGER:  This goes to his -- the basis for his

18  opinion.

19          MR. ALSAFFAR:  That doesn't make it admissible.

20          THE COURT:  I'm sure the professor's able to answer

21  that question someway else.  That's sustained.

22  BY MS. KRIEGER:

23  Q.  Professor, are you aware of any mass shootings in which

24  the perpetrator used a ghost gun?

25  A.  Yes.  For example, a guy named John Zawahri committed a

 1   mass shooting in Southern California, where he had been a

 2   denied purchaser in 2011 by virtue of a mental health issue.

 3   And in 2013, he went to Santa Monica College and ended up

 4   killing five people with an AR-15 ghost gun that he had

 5   assembled himself.

 6   Q.  Are ghost guns prominent in Texas?

 7   A.  You know, interestingly, while there have been mass

 8   shootings in Texas involving ghost guns, it's usually so easy

 9   to get guns in Texas that you don't need to take that extra

10   step of putting it together yourself.  So ghost guns would be

11   more prevalent in California than they are in Texas because

12   California is much more concerned about keeping guns away from

13   dangerous individuals.

14   Q.  You talked about straw purchasers, online purchasers, gun

15   shows, and ghost guns.  Do any of these methods for acquiring

16   guns without a background check require any kind of

17   specialized knowledge?

18   A.  No.  So, for example, in the Odessa killing in Texas, that

19   was by a prohibited purchaser who procured his weapon through

20   a private sale where the seller had manufactured or put

21   together the ghost gun himself.  So you don't -- you can

22   either do it yourself or you can buy in a private sale,

23   someone who has put it together for you.

24   Q.  And all of these methods, ghost guns, gun shows, online

25   sales, straw purchasers, do you need some kind of special

1  connection or relationship with anyone in order to acquire

2  guns in those ways?

3  A.  No, you don't.

4  Q.  We talked about the federal regulations on gun sales.

5  Have some -- have some states enacted regulations that go

6  beyond federal law?

7  A.  Yes.  There's quite a range, with Texas being on the low

8  end of efforts to restrict mass shootings and other criminal

9  acts, and states like California typically thought to be at

10 the high end of gun safety regulation.

11 Q.  What are -- what are some of the additional state

12 regulations that have been passed?

13 A.  Well, you know, probably the one that comes immediately to

14 mind is the fact that a number of states have adopted

15 universal background checks in an effort to address what we

16 previously alluded to as the "private sale loophole."

17     So while federal law only requires Federal Firearms

18 Licensees to conduct a background check when they initiate a

19 gun sale, in a state like California and New York, all

20 transactions, whether private or through a gun dealer, are

21 required by law to be processed pursuant to a background

22 check.

23 Q.  I'm sorry, sir.  I think you just explained what a

24 universal background check system is, is that correct, that

25 all sales have to go through the background check?

1   A.   That's right.   That's the universal background check

2   system.

3   Q.   What's a comprehensive background check system?

4   A.   Well, these are –– are terms of art.   Some people, when

5   they refer to comprehensive background check systems, are

6   referring to the universal background checks.   I distinguish

7   them in the following way:   A universal background check

8   system, as I use the term, refers to requirements that all gun

9   transactions must go through some form of background check.

10  And when I refer to comprehensive background check systems,

11  although not everyone follows this definition, I'm talking

12  about more comprehensive searches of databases beyond what's

13  available through the federal NICS system.

14  Q.   And I think you were saying there's some confusion between

15  the two terms.   Did you listen to or review Dr. Webster's

16  testimony?

17  A.   Yes, I did.

18  Q.   When he –– he discussed comprehensive background checks.

19  Do you recall that?

20  A.   Yes.   And he has written, you know, articles in which he

21  refers to comprehensive background check systems.

22  Q.   And is it your understanding that when he talked about

23  comprehensive background checks, he was referring to what you

24  called universal background checks?

25  A.   That's correct.   That's correct.

1    Q.   Have universal background checks been proven effective at

2    reducing gun violence?

3    A.   Universal background checks, there is certainly empirical

4    evidence to indicate that you do get benefits from having

5    universal background check systems in place.

6    Q.   Even in states with universal background checks, do a

7    large percentage of private party firearm transfers still

8    occur without a background check?

9    A.   Yes.   Even in states such as California and New York, that

10   have mandated requirements that private sales must go through

11   a background check system, a fairly substantial percentage of

12   firearm transactions still go through without conducting the

13   mandated background check.

14   Q.   Professor, what are red flag laws?

15   A.   So red flag laws are another effort to identify

16   individuals who are at risk for engaging in violent behavior,

17   that poses a threat to either themselves or to others, and it

18   allows family members, law enforcement, and others to petition

19   for an order to remove guns from those individuals as an

20   effort to stop them from engaging in dangerous conduct to

21   themselves or to others.

22   Q.   Do some states limit the lethality of weapons sold in the

23   state?

24   A.   Yes.   We have a number of states in the country that have

25   persisted in the effort to do what the Federal Assault Weapon

1   Ban did, which was to restrict certain weapons because they

2   were considered to be more lethal and also would facilitate

3   more killing in these mass shooting events.  So states will

4   pass laws banning certain assault weapons as well as

5   restricting the size of the magazines that are used in these

6   weapons.

7   Q.  Has Texas adopted any of the state regulations that we've

8   just talked about?

9   A.  No.  Texas, in a sense, goes naked.  They rely on the

10  federal system, but have not tried to augment any of the gun

11  safety measures that other states have adopted.

12  Q.  So does Texas have universal background check laws?

13  A.  No.  And, in fact, has been highly -- at least the

14  politicians have been highly opposed to such efforts.

15  Q.  What are Second Amendment sanctuaries?

16  A.  So Second Amendment sanctuaries are proclamations, usually

17  by a city or county, in which the particular jurisdiction is

18  trying to make a pronouncement in which they show their

19  hostility to gun safety regulations.

20  Q.  How do they show their hostility?

21  A.  Well, they will pass statements saying that -- you know,

22  there are different pronouncements.  They will typically say,

23  you know, this county or jurisdiction is a Second Amendment

24  sanctuary.  Edwards County in Texas, for example, states that

25  universal background check systems are a violation of the

1    Second Amendment, which is an odd and unusual claim.  But

2    those are the types of proclamations that they make.

3        Some -- some will say, we will not enforce any federal gun

4    safety measures.  So it's an overall hostility.  And, of

5    course, even the Brady bill, when it passed in 1993, was

6    overwhelmingly opposed by the Texas congressional delegation.

7    So there's been a long history of opposition by the

8    politicians in Texas to any measure of either federal or state

9    gun control.

10   Q.  You mentioned one Texas county.  Do you know how many

11   counties in Texas have adopted Second Amendment sanctuary

12   resolutions?

13   A.  Yes.  Well, there are 254 counties in Texas, and 78 of

14   them have specifically endorsed one of these so-called Second

15   Amendment sanctuary proclamations.

16   Q.  In general, how easy is it to obtain a firearm in Texas

17   without undergoing a background check?

18   A.  I mean, it's quite easy.  It's sort of like about as easy

19   as buying a used car, and a lot cheaper.

20   Q.  Now, what is a -- what is the GVPedia report?

21   A.  GVPedia, which is sort of a shorthand for -- or an amalgam

22   of gun violence encyclopedia, is an online forum that tries to

23   collect, you know, the best data and research on gun violence

24   prevention.

25   Q.  Does GVPedia provide grades as for -- on this -- on its

1    reports?

2    A.  Well, they rely on the grading of the different states in

3    terms of the, you know, level of gun safety regulation that a

4    state will have, and they've conducted research and published

5    research using these gradings to see whether they are

6    effective in stopping mass shootings.

7    Q.  You know what grade Texas received from the GVPedia

8    report?

9    A.  Yes.  The GVPedia used the Giffords rating of states, in

10   terms of gun safety regulation, and Texas always received an F

11   grade on that rating of gun safety regulation.

12   Q.  Does the GVPedia report identify a correlation between the

13   number of mass shootings and states' ratings on gun laws?

14   A.  Yes.  The GVPedia report concluded, based on their

15   examination of mass shootings around the country, that those

16   states that had the lowest grades on gun safety regulation had

17   both higher numbers of mass shootings and also considerably

18   higher death counts when those mass shootings occurred.

19   Q.  What are the consequences of Texas' limited firearms

20   regulations, in terms of mass shootings?

21   A.  Well, Texas has become, you know, a leader in the

22   United States, and, indeed, the world in both the frequency

23   and deadliness of mass shootings.  And the GVP -- Pedia report

24   highlighted that there were 20 mass shootings over the period

25   that they looked at, or the 20 mass shootings that had the

1   highest death tolls.  And, essentially, 30 percent of those,

2   or six cases, occurred in Texas.  So a number vastly higher

3   than the proportion of the population in the United States.

4   Q.  Are you aware of mass shootings or would-be mass shootings

5   in Texas where the perpetrator was denied a firearm through a

6   NICS background check but, nonetheless, obtained the firearm?

7   A.  Yes.  I alluded to the Odessa mass shooting case a while

8   ago, and that was a case where the individual had been denied

9   access through a background check and then sought an AR-15

10  through a private sale.

11  Q.  Do you know how many people were killed or injured in the

12  Odessa mass shooting?

13  A.  If I'm not mistaken, I think seven were killed and 15 were

14  injured.

15  Q.  Are you familiar with the White Settlement shooting?

16  A.  Yes, I am.

17  Q.  Do you know if the shooter in the White Settlement

18  shooting had previously been denied a firearm through a NICS

19  background check?

20  A.  Yeah.  That particular killer had been denied repeatedly

21  and was still able to acquire a weapon in Texas, and go into a

22  church and started killing people at random.

23  Q.  You already mentioned John Zawahri who was also a mass

24  shooter who was denied a firearm, but obtained -- through

25  NICS -- but obtained one anyway?

1    A.   Yes.

2    Q.   Are you aware of any other mass shootings in general

3    perpetrated by people who obtained their firearms through

4    means other than at FFLs?

5    A.   Yeah.   There are quite a large number.   I mean, everyone

6    from, you know, the Columbine shooters to Adam Lanza, who went

7    into Newtown.   And, you know, in Texas, you have the Santa Fe

8    High School shooting, where an individual, you know, took his

9    father's gun and went into a high school and killed quite a

10   number of students.   So, you know, the vehicle –– the pathways

11   to procure guns are fairly abundant, and mass shooters have

12   taken an advantage of all of the different opportunities.

13   Q.   Let's talk about some of your opinions.

14       What is your opinion on whether the shooting at the First

15   Baptist Church of Sutherland Springs would have occurred if

16   Kelley's information –– if Kelley's information had been

17   submitted to NICS?

18   A.   Yes.   So obviously, the federal government had an

19   obligation to submit the background check information.   And,

20   you know, thinking in terms of what would have happened had

21   they submitted it, I was focused on, is it more likely than

22   not that this mass shooting could have been avoided had they

23   submitted the information?   And I concluded it was not more

24   likely than not that this mass shooting would have been

25   avoided had the Air Force complied with its obligation to

1   supply the information to the NICS background check system.

2   Q.   Is that opinion made to a reasonable degree of certainty?

3   A.   Yes, it was.

4   Q.   What's the basis for that opinion?

5   A.   Well, it's based both on my examination of mass shootings

6   over a number of years of research as well as the empirical

7   literature that tries to identify how effective background

8   check systems are in reducing crime in general and mass

9   shootings in particular.

10  Q.   And we'll get more into that research in a minute.

11       Did all the alternative means to obtain firearms that we

12  just discussed have any effect on your opinion regarding

13  whether the shooting would have occurred had Kelley's

14  information been in NICS?

15  A.   Yes.   That was critical to the discussion –– both for

16  Kelley himself as well as the existing regulatory environment

17  in Texas, where, you know, both the lack of gun safety

18  regulation, hostility towards gun safety regulation, and gun

19  safety enforcement by the relevant authorities in Texas, you

20  know, very strongly informs my opinion in this case.

21  Q.   Does research show that prohibited persons regularly

22  obtain firearms through means other than FFLs?

23  A.   Yes, it does.

24  Q.   I'm going to pull up a document we've already seen, GEX

25  93.   And let's turn to page 10.   And can you pull up the

1  second paragraph.

2      Can you please read just that first sentence of the -- of

3  the second paragraph.

4  A.  "This system is efficient and effective."

5  Q.  Is this referring to the NICS system?

6  A.  Yes, it is.

7  Q.  And then can we scroll down to the next paragraph.  Can

8  you read that top paragraph here, "Since its creation in

9  1998."

10  A.  "Since its creation in 1998, NICS has blocked more than

11  two million gun sales to criminals and other prohibited

12  purchasers."

13  Q.  Can you read the next paragraph there as well?

14  A.  "But not all gun sellers are required to conduct

15  background checks.  Under federal law, licensed firearm

16  dealers must do so, but unlicensed sellers who are not 'in the

17  business' of selling firearms, are exempt."

18  Q.  And let's go down to the last paragraph in this column.

19  Can you just read the first two sentences of this paragraph?

20  A.  Yes.  "This two-tiered system has created a vast secondary

21  market, leaving a large share of firearms sales completely

22  unregulated.  National telephone surveys and law enforcement

23  data suggest that some 40 percent of gun transfers do not

24  involve a licensed dealer, meaning an estimated 6.6 million

25  guns were transferred without background checks in 2012."

1  Q.  Thank you.  You can take that down.  Let's turn to your

2  second opinion.

3      What is your opinion on the effectiveness of background

4  checks to deter individuals from acquiring weapons?

5  A.  So I think the empirical evidence shows that background

6  check systems are effective in reducing both suicides and

7  violence.  And -- but with obviously much less than 100

8  percent effectiveness.  The effectiveness obviously depends on

9  how comprehensive or universal the background check system is,

10 and also depends on the nature of the individual, with some

11 individuals being much more likely to be dissuaded by virtue

12 of a background check system, and others much less likely to

13 be dissuaded.

14 Q.  So is it your opinion that background checks are not

15 universally effective and are less effective in stopping

16 individuals who are more extreme cases of dysfunction and

17 criminality, such as determined mass shooters?

18 A.  Yes.  That would be my opinion.

19 Q.  Is this opinion made to a reasonable degree of certainty?

20 A.  Yes, it is.

21 Q.  Is there -- we've already talked about this a little bit,

22 but there is evidence that background checks and similar

23 measures have some deterrent effect; is that -- is that right?

24 A.  Yes, there is.

25 Q.  Are there categories of people for whom background checks

1  and other measures are more likely to be an effective

2  deterrent?

3  A.  Yes.  And you can see this in many different ways.  One

4  thing that I often point out is, you know, for suicides, for

5  example, you know, sort of modest measures have been proven to

6  reduce some suicides because some people are on the margins of

7  suicide, and impediments for them are effective.  Obviously,

8  if you're on the other side of intense suicidal urge, you're

9  going to be much less likely to be dissuaded.

10      And the same thing applies for gun violence.  There are

11  some people who are on the margins of gun violence, and,

12  therefore, are more likely to be dissuaded.  And, conversely,

13  others who are more, sort of, intensely focused on committing

14  gun violence and perhaps have greater interest and access to

15  guns are going to be less effectively dissuaded by background

16  check systems.

17  Q.  Let's look at Plaintiffs' Exhibit 757.  Now, we've --

18  Dr. Webster testified extensively on this study.  So we don't

19  need to belabor the point.

20      But what did this study evaluate?

21  A.  So this was a very interesting study done, looking at

22  effectiveness of two aspects of California state law that were

23  adopted in 1991.  One was the universal background check

24  system, and two was the fact that California had made any form

25  of misdemeanor violence a prohibiting category.  So it went

1    beyond what the federal Gun Control Act stated, in terms of

2    who is prohibited by virtue of a misdemeanor conviction.

3    Q.  And how did the study make -- conduct its evaluation?

4    A.  Yeah.  So the author, Garen Wintemute, who is quite an

5    impressive researcher, got very detailed information on

6    individuals who had been convicted of misdemeanor violence

7    prior to the 1991 prohibition, and compared that with

8    individuals who were prohibited from purchasing after 1991 by

9    virtue of a conviction.  And he sought to examine whether

10   the -- these two categories of individuals, who were the same

11   in terms of the underlying misconduct, had different rates of

12   gun violence in the future.

        And what he concluded was that the California universal

14   background check system reduced the prevalence of gun violence

15   by these miscreants you can refer to them as.

16   Q.  Let's turn to Table 3.  It's at page 6.  And can we just

17   highlight under where "purchase status approved," that middle

18   column there.  We've already heard testimony on this, so I'll

19   just say:  Does this show that purchasers who were approved

20   had a 29 percent higher rate of later arrests for gun or

21   violent crime?

22   A.  Yes.  29 percent higher rate for gun or violent crime, and

23   no higher rate for non-gun or nonviolent crime.

24   Q.  Can we just kind of flip that.  What does that mean as far

25   as reducing violent crime for people who were denied?

1    A.   Yeah.  So the -- the 29 percent increase relative to those

2    who denied essentially tells us that the prohibition and

3    universal background check system in place in California

4    reduced violence within this group by roughly 22 percent.

5    Q.   Do you believe that this study is relevant to this case?

6    A.   I do think it is relevant to this case, yes.

7    Q.   And how -- why is it relevant?

8    A.   Well, I think it shows two things.  That universal -- a

9    universal background check system does reduce gun or violent

10   crime in a category that's at least close in some respects to

11   Devin Kelley, but that it's, you know, far less than 100

12   percent or even 50 percent effective in reducing gun or

13   violent crime.

14   Q.   Now, the rate that it reduced violent crime -- gun or

15   violent crime, this study was focused on misdemeanants; right?

16   A.   Yes, misdemeanants who had been convicted of a violent

17   misdemeanor.

18   Q.   In your opinion, would that reduction be higher or lower

19   for prohibited felons?

20   A.   Yeah.  So one would ordinarily think that the more violent

21   one's nature, the less effective the particular universal

22   background check system, in this case, would be in reducing

23   future criminality.  And, therefore, while this study was

24   focused on those who had only committed and been convicted of

25   violent misdemeanors, you would think it would be less

1    effective if you were referring to felons.

2    Q.  And now, this study was also done in California.

3         Do you think that effect would be higher or lower in a

4    state like Texas?

5    A.  One would assume that the effect would be lower in a state

6    like Texas.

7              MR. ALSAFFAR:  Objection, Your Honor.  This is

8    speculation.  This study has to do with California.  Now she's

9    asking him to speculate on how it would apply in Texas.

10             THE COURT:  Yeah.  Professor, have you done any

11   studies to be able to make that jump to Texas?

12             THE WITNESS:  Well, essentially, the way I make the

13   leap is by recognizing that Texas has a –– that California has

14   a universal background check system and Texas has a more

15   limited background check system, only relying on the NICS

16   system.  So it's almost a matter of logic that the impact will

17   be lower because the avenues for circumvention are greater in

18   Texas.

19             MR. ALSAFFAR:  Well, that's –– that's why it's apples

20   and oranges, Your Honor.

21             THE COURT:  Yeah.  It goes to the weight of his

22   testimony, not to striking.

23        Go ahead.

24   BY MS. KRIEGER:

25   Q.  I think you basically just said it.  But in your opinion,

JOHN DONOHUE – DIRECT                                    1307

1  based on your expertise, would that rate be higher or lower in

2  a state like Texas?

3  A.  You would expect it to be lower because Texas doesn't have

4  the universal background check systems that were in operation

5  at the time of this study in 1991 in California.

6  Q.  Do you know what the saturation of guns is in Texas?

7  A.  I mean, I don't have a precise number, but it's widely

8  recognized that it is a far more gun-saturated environment

9  than certainly California was in 1991.

10  Q.  Based on your experience, training, research, expertise,

11  would the saturation level of guns in Texas have an impact on

12  the deterrent effect of a denial?

13  A.  Yes.  And this goes to the point that we've made

14  previously, about Texas being a leader in mass shootings.  The

15  greater the access to weaponry, the more it facilitates these

16  types of mass shooting events.

17  Q.  Would that deterrent effect be higher or lower for

18  somebody who loves guns?

19  A.  Yeah.  If one looks across the universe of mass shooters,

20  one of the things that stands out is some mass shooters seem

21  to be more deterrable than others.  The ones who have a

22  fascination with mass shootings and with guns tend to be those

23  who are more committed to their deadly enterprise and,

24  therefore, harder to deter simply with a background check

25  system.

1  Q.  Based on this study, can plaintiffs say that it was more

2  likely than not that Kelley would have been deterred by a

3  background check?

4          MR. ALSAFFAR:  Your Honor, that now is speculation.

5  I think we can demonstrate that he has actually looked at no

6  records relating to Devin Kelley, so he has no personal

7  knowledge about Devin Kelley specifically.

8          THE COURT:  Professor, this is sounding like

9  psychology.  I mean, can you answer this question?

10         THE WITNESS:  Yeah.  Well, let me give you an

11 example.  You know, Dylann Roof committed a horrific mass

12 shooting in a church.

13         MR. ALSAFFAR:  Your Honor, I don't mean interrupt.

14 He's now pulling on another person we have nothing about.  It

15 doesn't apply.

16         THE COURT:  Yeah, s.o let me hear his answer before I

17 strike it.

18         THE WITNESS:  Okay.  So I was going to say that

19 Dylann Roof committed a horrendous mass shooting at a church

20 in South Carolina in Charleston.  And he actually waited to

21 purchase his firearm lawfully when he became 21.  So he was

22 someone who seemed to be restrained by the prohibitions that

23 NICS were —— and failed because he didn't buy the gun until he

24 reached his 21st birthday.

25     So he is someone who, you know, might have been deterred

1   by a more effective background check system.

2      Kelley, on the other hand, represents a very different

3   category of someone both with demonstrated mental illness, a

4   commitment to --

5              THE COURT:  But, Professor, how do you know that if

6   you didn't review any of those records?  That's what I'm

7   struck by.

8              THE WITNESS:  Yeah.  Well, this is actually sort of

9   well known in the literature on these individuals.  I mean,

10  I've studied mass shootings.  And so I was commenting on the

11  Charleston mass shooting by Dylann Roof, and then I've

12  reviewed, you know, all of the publicly available information

13  on this case, which was abundant, as well as all of the

14  information that's been presented in this trial and the

15  depositions that we alluded to earlier.  So I think I do have

16  a rich understanding of how this mass shooting fits into the

17  overall picture of cases, you know, based on my research over

18  the years examining mass shooting episodes.

19             THE COURT:  Yeah.  I'll note that he hasn't reviewed

20  many of the records in this case, but this goes to the weight,

21  not to exclusion.

22     You can continue.

23             MR. STERN:  Your Honor, we would have the last answer

24  stricken from the record as well, the entirety of the answer.

25             MR. ALSAFFAR:  Your Honor, can I tell you why they're

 1    asking you to do that?  They're now asking you to strike their

 2    witness' answer because he gave an inaccurate one, and they

 3    know that the answer he just gave is going to hurt them in the

 4    Dylann Roof litigation.

 5          Right now -- I was going to cross-examine him on -- now.

 6    Right now, the federal government is on -- is about to go to

 7    trial for their failure to operate the system properly in the

 8    South Carolina shooting case.  It was not because he was able

 9    to access guns because there weren't good laws.  It was

10    because the federal government was negligent in allowing him

11    to have guns he shouldn't have had.  It's very similar to this

12    case.  This is the Sanders case, Your Honor, the Fourth

13    Circuit case.  So that's why now they want this witness'

14    answer stricken.

15                THE COURT:  So --

16                MR. ALSAFFAR:  I would like to keep that one on the

17    record because I want to cross-examine on it now.

18                THE COURT:  Yeah.  His answer will not be stricken.

19          You know, I guess I'm going back to the comment I made

20    yesterday or day before.  I'm not sure I understand the

21    government's position.  You seem to be telling me that, no,

22    you-all -- the government's position is y'all still believe in

23    gun regulation.  But then you keep on bringing witnesses to

24    the -- to the witness stand who all keep saying that these

25    things are ineffective.  I'm just -- I'm not -- I don't

1    understand what's going on here.

2           MR. STERN:  The government's position is that the

3    NICS system is effective, but it is limited by law.  It is

4    only pertaining to purchases at FFLs.  And as Your Honor

5    stated in Docket Entry 318, the order in response to partial

6    motions for summary judgment, Devin Kelley's ability to access

7    firearms through non-FFLs is at the heart of this litigation.

8       We are trying to demonstrate that, given the limitations

9    of the NICS system, that Devin Kelley could easily have

10   accessed firearms through non-FFLs, thereby circumventing the

11   NICS background check.  And his individualized determination

12   as well as his obsession with firearms ensures that it is more

13   likely than not he would have obtained a firearm through a

14   non-FFL in order to commit this mass shooting.

15      Therefore, as a matter of tort law -- not as a matter of

16   policy, but as a matter of tort law, cause and effect cannot

17   be proven by plaintiffs because this shooting would have

18   occurred regardless of whether Devin Kelley's information had

19   been submitted by the Air Force.  And as a result, his ability

20   to obtain a firearm through an FFL was not a substantial

21   factor in bringing about this shooting.  And that is what's at

22   issue here, whether his ability to get a gun through a non-FFL

23   was a substantial factor, without which plaintiffs' injuries

24   would not have occurred.

25      And our argument has always been, his access, his

1    determination, and his obsession all ensure that he would have

2    obtained a firearm, particularly in Texas, through non-FFL

3    means and, thereby, still committed this heinous act.

4            THE COURT:  So I'm still hearing that you-all say,

5    though, despite all of that distinction, that -- and what I

6    thought I heard Professor Donohue say is, some background

7    checks have some minimal ability to deter -- it may have some

8    deterrent effect, but it's less than 50 percent efficiency

9    based upon that Table 3 that you-all relied upon.

10       So then, I mean, Congress required federal agencies to

11   report.  And so the effect of your position is, there should

12   be no consequences if federal agencies do not report.  That's

13   the natural leap; right?

14           MR. STERN:  The natural leap is that this case runs

15   headlong into *Johnson v. Sawyer*, Your Honor.  Your Honor just

16   said it a few minutes ago:  What does Good Samaritan Law have

17   to do with this case?

18       This is a statutorily-imposed obligation by Congress.

19   Your Honor, the government couldn't agree more.  That is

20   exactly why this case is barred by *Johnson v. Sawyer*.

21           THE COURT:  Well, but answer my question.  So the

22   natural -- the natural effect of the government's position

23   here is, no federal agency will ever have any liability for

24   any failure to report.

25           MR. STERN:  When it comes to these type of

 1   intra-governmental reporting obligations, there is no duty

 2   under Texas state substantive law.

 3            THE COURT:  So your answer to my question is, yes,

 4   there will never -- there will never, ever be liability on a

 5   federal agency?

 6            MR. STERN:  Your Honor, I hesitate to say "never,

 7   ever."  I mean, to the extent that you can make an argument

 8   that perhaps if Tessa Kelley was killed -- I wouldn't even go

 9   there.  But, perhaps, there'd be some argument with regards to

10   using these common law tort principles that Your Honor used

11   under -- I think it was *Greater Houston Transportation v.*

12   *Phillips*, to try to find a tort under Texas state law.

13       The problem with that, though, Your Honor, is when it

14   comes to issues like foreseeability, the foreseeability

15   analysis here is limited by statute.  That's why we're

16   still --

17            THE COURT:  -- foreseeability.  I'm sorry, Professor

18   Donohue, we're sort of going sidetrack here.

19       But for foreseeability, the government is arguing that

20   Academy ought to be brought in.  I mean, Academy here

21   doesn't -- they sell a 30-round magazine that they shouldn't

22   have sold.  But just because of that failure, you're arguing,

23   by bringing them in, that they should have foresaw that this

24   would have caused a mass shooting; right?

25            MR. STERN:  Well, Your Honor, there's several

1    arguments with regards to Academy.  But we're bringing them in

2    because plaintiffs have argued previously that all of these

3    types of counterfactuals are beside the point.  Devin Kelley

4    purchased this firearm to commit this shooting.  That was one

5    of their arguments.  And, of course, we disagree.  And I

6    believe Your Honor disagrees because, otherwise, we wouldn't

7    be having a trial here.  That has never really been in

8    dispute; right?  That statement is correct; right?

9        The Air Force has always -- I'm sorry.  The government's

10   position has always been -- in fact, we stipulated to it two

11   years ago -- the Air Force did fail to submit Devin Kelley's

12   disqualifying information in to NICS.  He purchased the AR-556

13   from Academy in April 2016.  Our position is, even if we're

14   looking only at that specific purchase on that day, then that

15   purchase should have been denied by Academy.

16       And then the question becomes, "Well, maybe he would have

17   changed his Texas driver's license."  Maybe, maybe not.  But

18   now we're back in this counterfactual world.  If Devin Kelley

19   was denied at all FFLs, would he simply have just stopped

20   trying to obtain firearms to commit this heinous act?  And the

21   government is saying, of course not.

22       He certainly had numerous means, because Texas -- and this

23   is the point we're trying to make here -- Texas has not

24   imposed these additional limitations to gun access.  They

25   haven't imposed or enacted a universal background check, a

 1    permit to purchase or any of these other types of gun policies

 2    that can limit access.  And by more limited -- by limiting the

 3    access, you actually impact the cause-and-fact analysis that

 4    we're trying to make here.  So I don't know that we can make

 5    this argument in all states, but here --

 6            THE COURT:  So let me circle back to, I think, the

 7    question that was pending before Professor Donohue.

 8        So he made the statement that some mass shootings -- or

 9    shooters are more deterrable than others.  And then we, I

10    think, got off on, well, how does he know that?  And --

11    because he didn't review a lot of the underlying records

12    regarding Mr. Kelley.

13            MR. STERN:  And our point was, I think we agree, Your

14    Honor.  We have future experts that will handle those issues.

15    So to the extent that he is here to talk about gun policies

16    and sort of the argument that I am making here, that is the

17    scope of his testimony, which is why we're asking to strike

18    his previous answers.

19            MR. ALSAFFAR:  I forgot my original objection.  But I

20    think I'm going to try to go back to sum it up very quickly.

21    I think what the government is saying, Your Honor -- we

22    shouldn't strike his answers, Your Honor.  It's too late for

23    that.  But secondarily -- because it's cross-examination

24    fodder.

25        The second thing, Your Honor, just very quickly.  I

 1   believe I just heard, and I think it would make this a little

 2   bit easier, the government is stipulating that this witness,

 3   just this witness, will not be offering any opinions on the

 4   foreseeability prong of proximate cause.  Is that correct?

 5           MR. STERN:  He could talk about mass shooters in

 6   general and the laws applicable to gun access through FFL and

 7   non-FFL means.  I would agree that with regards to the

 8   particulars of Devin Kelley, we will have future experts, most

 9   notably a criminologist and a forensic psychiatrist, who will

10   sort of do the deeper dive into Kelley.

11       That is why, with regards to the professor's comparison to

12   Dylann Roof versus Kelley or anyone else, we are not asking

13   him to opine on that limited portion.

14           THE COURT:  So that's where I thought he was headed

15   when he started talking about some mass shooters were more

16   deterrable than others.  I thought we were heading towards

17   causation and foreseeability.  But since you're saying he's

18   not being used for that purpose, let's pose a new question to

19   the professor.

20   BY MS. KRIEGER:

21   Q.  Let's pull up GEX 102.

22       Professor, are you familiar with this study?

23   A.  Yes, I am.

24   Q.  This is a study by Dr. Webster.  We've looked at this

25   before as well.  Do you consider this study to be a reliable

JOHN DONOHUE – DIRECT                    1317

1  authority?

2  A.  You know, it's –– it's by a very imminent group of

3  researchers and a significant publication.  And –– I may have

4  some disagreement with its conclusions, I do think it's a

5  reliable study to look at.

6  Q.  Let's look at page 4.  Can we bring out the first

7  paragraph under "Data."

8     Can you read the second sentence starting with, "We

9  limited our data"?

10  A.  Yes.  "We limited our dataset to incidents of homicide

11  that occurred between 1984 and 2017, involved four or more

12  victims (excluding any offender death), and involved a firearm

13  of any type."

14  Q.  So this study was only looking –– was this study only

15  looking at the effect of state laws on mass shootings?

16  A.  Yes.  And the particular definition of mass shootings that

17  they articulate here.

18  Q.  Do you –– do you recall –– we had testimony on this.

19     Do you recall what the study said about the effectiveness

20  of universal –– or I think they might call it comprehensive ––

21  background check systems on mass shootings?

22  A.  Yeah.  This study concluded that comprehensive background

23  check systems were not effective.

24  Q.  For reducing mass shootings; is that fair?

25  A.  Yeah.  For the mass shootings that they were looking at in

1  this case.

2  Q.  Is the finding of this study different from the research

3  on the effectiveness of universal background checks on gun

4  violence at-large?

5  A.  Yes.  It was different from what we were looking at

6  earlier with the study by Wintemute and his coauthors.

7  Q.  We've just talked about –– you can take that down.

8      We've talked about some of the research on whether

9  background checks are an effective deterrent.  Based on this

10  research and other research that you've seen, in your opinion

11  at a population level, does NICS reduce the number of

12  prohibited individuals who acquire firearms?

13  A.  Yes, it does.

14  Q.  And in your opinion do universal background check systems

15  at a population level reduce the number of prohibited

16  individuals who obtain firearms?

17  A.  Yes, they do.

18  Q.  Now, in your opinion does being denied from purchasing a

19  firearm, either via NICS or a universal background check

20  system, make it more likely than not that any given individual

21  would be prevented from obtaining a firearm in the future?

22  A.  It is a different inquiry for any specific individual than

23  at the population level.

24  Q.  Why is that?

25  A.  Well, as I said earlier, there is a range of durability

 1  based on the characteristics of the individual jurisdiction as

 2  well as the elements of the particular individual, both in

 3  terms of their focus on weaponry and also their, you know,

 4  mental health or predisposition to commit violent crime.

 5          MS. KRIEGER:  Pass the witness.

 6          THE COURT:  How much time do you think you're going

 7  to need?

 8          MR. ALSAFFAR:  No more than 30 to 40 minutes, Your

 9  Honor.

10          THE COURT:  You want to plow through?

11          MR. ALSAFFAR:  I'm more than happy to.

12          THE COURT:  Go ahead.

13          MR. ALSAFFAR:  Thank you, Your Honor.

14                      CROSS-EXAMINATION

15  BY MR. ALSAFFAR:

16  Q.  Good afternoon, Doctor.

17  A.  Good afternoon.

18  Q.  Can you hear me okay?

19  A.  Yes, I can hear you.

20  Q.  All right.  Can you see me okay?

21  A.  I can.  You look good.

22  Q.  It's coming.  My camera just moved off me right when I

23  asked that question.

24      Can you see me now?

25  A.  I can.

1   Q.  Okay.  Doctor, to be fair, everything you just said about

2   the alternate gun market has nothing to do with the facts of

3   this case; correct?

4   A.  Are you being fair?

5   Q.  I'm asking you if that's a fair statement, sir.

6   A.  Oh, no.  I don't think that's fair.

7   Q.  Okay.  Well, then let's talk about it a little bit.  First

8   of all, do you agree that an opinion -- any opinion, including

9   one in a court of law -- is only as good as the information

10  that it's based upon?

11  A.  Yeah.  Presumably, that is true.

12  Q.  Okay.  Do you agree that the more relevant information

13  that you can review related to a case you're providing

14  opinions on, the more reliable your opinion will be?

15  A.  Certainly, more information as a general matter is better

16  than less information.

17  Q.  "More relevant information" was my question.  That's

18  important.  The more relevant information that you can review

19  regarding your opinion, the more reliable your opinion will

20  be.  Is that a fair statement?

21  A.  Yeah.  As a general matter, that is true.

22  Q.  And my understanding, Mr. -- is it Mister or Doctor

23  Donahue?  I did not ask you how you prefer to be referenced,

24  and I apologize.

25  A.  It is -- I am a doctor, but my mother would never allow me

1    to refer to myself in this way.

2    Q.  Okay.  Okay.  I just -- I wanted -- I didn't want to be

3    disrespectful.  Mr. Donohue is okay, then?

4    A.  Yeah.  That's fine.

5    Q.  Okay.  Mother approved?

6    A.  That would be mother approved.

7    Q.  All right.  In this case -- in this case, you are -- my

8    understanding is you are offering opinions about other gun

9    markets and other gun options that Devin Kelley specifically

10   could have accessed; is that right?

11   A.  That's correct.

12   Q.  And in order to reach those opinions, would it be helpful

13   for you to look at the facts and the circumstances available

14   to you that relate to Devin Kelley's actual life?

15   A.  Yes.  And I think I did.

16   Q.  Okay.  Well, let's talk about that.  Specifically, when

17   I'm asking you about facts and circumstances related to Devin

18   Kelley's life specifically, those would aid you in reliably

19   forming your conclusions about what other options he actually

20   did have and what his feelings and -- were about those

21   options; right?

22   A.  Yes.

23   Q.  Now, did the government tell you, before you formed your

24   opinions in this case, when you provided your report, that

25   there were over 30,000 documents that were produced relating

1    to Devin Kelley's time in the Air Force specifically?

2            MS. KRIEGER:  Objection.  He's asking for

3    communications between government --

4            THE COURT:  He's asking a sheer number, nothing

5    detailed.  That's overruled.

6            THE WITNESS:  They did not mention any specific

7    number, no.

8    BY MR. ALSAFFAR:

9    Q.  Let me ask a more specific question.  And did they provide

10   you with the over 30,000 documents related specifically to

11   Devin Kelley's time in the Air Force?

12   A.  Not the 30,000 documents, no.

13   Q.  Okay.  Did the government provide you with the over 70,000

14   documents that were produced by the Texas Rangers, the ATF,

15   the FBI, local Texas law enforcement that specifically related

16   to Devin Kelley's life and this shooting in particular?

17   A.  Not 70,000 documents, no.

18   Q.  I think I heard you on the direct examination, that you

19   didn't look at one Texas Ranger document file.  Is that fair

20   to say?

21   A.  I mean, I think there were Texas Ranger documents that

22   were presented in court, and I did examine those documents.

23   Q.  Okay.  And that's not my -- thank you for clarifying that,

24   but that's not what I asked you.  So let's be specific about

25   this.

1        In forming your conclusions that you just gave in this

2    case, and the ones that you placed in your report, you did not

3    review one document from the Texas Rangers file that related

4    to Devin Kelley's life and this shooting specifically; is that

5    fair?

6    A.  Well, in forming the opinions that I just testified to, I

7    did consult the documents that were presented here in court

8    today.

9    Q.  Only those that were presented during the trial this week;

10   correct?

11   A.  And last week, yes.

12   Q.  And when you provided your report in this case, you didn't

13   look at any Texas Ranger documents; correct?

14   A.  You know, I don't believe I looked at a Texas Ranger

15   document at that time.

16   Q.  Okay.  Well, let's actually look at what you reviewed

17   before forming your opinions, in your report at least, in this

18   case.  If we could show GEX 29.

19       And this has been admitted into evidence, Your Honor, I

20   believe.

21            MR. STERN:  What document?

22            MR. ALSAFFAR:  List of documents he reviewed.

23       Oh, it hasn't?  Okay.  I apologize.

24       So we're just going to show you this for cross-examination

25   purposes.  This is GEX 29.

1    BY MR. ALSAFFAR:

2    Q.  Is this a true and correct copy of the list of documents

3    you reviewed prior to forming your opinions in this case?

4    A.  Oh, it's a list of documents that were specifically

5    provided in this case.  But, of course, I've spent years

6    looking at both this mass shooting and many others that inform

7    my thinking on these matters.

8    Q.  So this is a list of the entire universe of documents you

9    reviewed prior to forming your specific opinions in the Devin

10   Kelley case; correct?  Your report.

11   A.  With the qualification that I just gave, these were the

12   documents that were provided to me anew, beyond what I already

13   had from my prior research.

14   Q.  You didn't look at -- you didn't review any depositions in

15   this case, other than the FBI director's, prior to forming

16   your written report opinions in this case; correct?

17   A.  I think that's correct.

18   Q.  You didn't review -- you still haven't reviewed any of the

19   20-plus depositions of the Air Force employees, the Air Force

20   commanders, the Air Force supervisors and colonels and

21   commanders that were taken in this case prior to today.  Is

22   that fair to say?

23        MS. KRIEGER:  Objection, Your Honor.  This witness is

24   not being offered for the question of foreseeability by the

25   Air Force.

1          MR. ALSAFFAR:  Your Honor, may I respond?  This

2    actually gets into that part of his testimony in direct where

3    he was talking about increased risk of harm, and that does

4    dovetail with how much information.  And it's a credibility

5    assessment, too.

6          THE COURT:  It's overruled.

7    BY MR. ALSAFFAR:

8    Q.  Mr. Donohue, I'm sorry.  If you answered, I didn't hear

9    you, so I'm going to reask the question for the record, if

10   that's okay?

11   A.  Sure.

12   Q.  Prior to today's testimony, you did not review any of the

13   depositions of the Air Force members, commanders, employees,

14   or experts that provided testimony in this case; correct?

15   A.  Not beyond what was made available during the trial.

16   Q.  Okay.  And I think you mentioned that the only thing you

17   finally did review prior to your trial testimony was the

18   Michael Kelley, Rebecca Kelley, Danielle Smith, and

19   Ms. Shields depositions.  Did I get that correct?

20   A.  Yeah.  I did review all of those depositions.

21   Q.  Okay.  And four of those documents listed on your list

22   here that's still in front of you relate to a shooter that has

23   nothing to do with this case; right?

24   A.  Yeah.  Some of them are documents not related to this.

25   Q.  And more specifically related to the causation opinion

1   that you provided earlier, are you aware of how many mental

2   health records related to Devin Kelley's mental health history

3   were in the file that the Air Force had while he was in the

4   Air Force?

5           MS. KRIEGER:  Objection.  Speculation.

6           THE COURT:  That's overruled.

7           MR. ALSAFFAR:  I'm asking --

8   BY MR. ALSAFFAR:

9   Q.  Let me reask the question.

10  A.  Sure.

11  Q.  Are you aware of how many mental health records the

12  Air Force was aware of and had in their possession related to

13  the Devin Kelley mental health treatment that he received

14  while he was in the Air Force?

15  A.  I assume, by virtue of two episodes in a psychiatric ward,

16  there were lots of records.

17  Q.  Would it surprise you to learn that there are over 2500

18  mental health records related to his mental health treatment

19  while in the Air Force?

20  A.  2500 documents?

21  Q.  Pages.

22  A.  Pages.  I might be surprised at the number.

23  Q.  That's a lot; isn't it?

24  A.  It is a lot.

25  Q.  Okay.  Did you -- my understanding, too, and I want to be

1    clear for the record, but I think this is correct, but you

2    tell me if I'm wrong, is that you also did not review any of

3    the approximately 1400 pages of investigations, of reviews, of

4    barment requests records that all related to Devin Kelley's

5    conduct while he was in the Air Force, prior to forming your

6    conclusions in this case?

7    A.   Yeah.   I didn't go look at those, beyond what was

8    available in this trial.

9    Q.   Okay.   So is my statement correct?

10   A.   To the extent it doesn't disagree with my statement.

11   Q.   Okay.   I think what you're saying is that for the first

12   time in your history of this –– sort of your life –– your

13   history –– when I say "history," your time involved as an

14   expert in this case.   The first time you ever laid eyes on a

15   few of these records from the investigative file was when you

16   were sitting down and watching other witnesses provide

17   testimony in trial.   Is that fair to say?

18   A.   Well, I mean, I did testify that I reviewed depositions,

19   and, obviously, much of this information was available.   The

20   amount of surprising information that came to me today in the

21   course of the trial is a very limited set of things.   One of

22   them was your statement that there were 2500 pages.   I might

23   have thought it was a smaller number than that.   But almost

24   everything else that I've heard is sort of consistent with the

25   evidence that I had prior, and generally reaffirmed the views

1   that I had.

2   Q.  Okay.  So it's not –– we understand, you're not changing

3   your opinions despite not looking at any of those records

4   about Devin Kelley; is that right?  You're keeping to your ––

5   sticking to your guns on that so to speak?

6            MS. KRIEGER:  Objection.  Argumentative.

7            THE COURT:  That's overruled.

8   BY MR. ALSAFFAR:

9   Q.  Is that correct?

10  A.  I have not changed my opinion as articulated in the

11  testimony today.

12  Q.  Thank you, Doctor.

13       Now, I want to turn now to something that –– I believe it

14  was –– Ms. Krieger was asking you on direct examinations.  And

15  it kind of related now to sort of the general research or

16  general opinions you've provided sort of in the body of work

17  on –– on gun violence.

18       And you've written –– sir, you've written a lot of op-eds

19  and newspaper articles about this area of gun violence; is

20  that right?

21  A.  I have.

22  Q.  And I'd like to talk to you just about a few of those, if

23  you don't mind, for a minute.  If you can please put up the

24  article, "It's Going to Take More."  And if we can go to

25  page 2.  This is one of your publications, or one of your

1   op-eds; correct?

2   A.  It is.

3   Q.  Okay.  And if we look at the second paragraph, beginning

4   with "in this realm."  And tell me if you can see that okay,

5   Mr. Donohue.

6   A.  "In this realm."

7   Q.  Oh, no.  No.  I'm just -- I'll ask you what -- yeah.  No,

8   absolutely, you can read as much to yourself as possible.  But

9   I won't ask -- I won't ask you to be reading stuff into the

10  record like you did on direct, if that's all right.  But I

11  certainly want you to read it to yourself, absolutely.

12  A.  Okay.  Sure.

13  Q.  So my question is about this statement that you said,

14  "Although the vast majority," that part, "of mass shooters

15  have left a record that would clearly reflect unsuitability

16  for gun possession."  You see that line?  We can highlight

17  that all the way down to "databases."

18  A.  Yes.  Yes.

19  Q.  Okay.  Now, is it fair to say that what you're talking

20  about here is that one of the problems, when we're talking

21  about the effectiveness of these background -- universal or

22  NICS, background check systems is one of the problems that's

23  been plaguing the country in the -- in making these more

24  effective is the failure to submit the proper criminal records

25  into the databases?

1            MS. KRIEGER:  Objection.  Misstates the evidence.

2            THE COURT:  Well, he can answer his own −−

3            MR. ALSAFFAR:  Yeah.

4            THE COURT:  −− statement.

5    BY MR. ALSAFFAR:

6    Q.  Do you agree to that?

7    A.  Well, this statement was referring to my basic notion

8    that, you know, if we went to, you know, systems that are

9    prevalent in other major affluent democracies, you would have

10   a more effective system in place, beyond NICS or even the

11   universal background check system.  And, you know, as it

12   states, in almost every mass shooting −− I won't say in every

13   one −− but in almost every one that I've looked at, the

14   evidence was so abundant that this person should not have a

15   gun in my view and the view of most, you know, western

16   democracies.  I would like to see a system that would allow

17   that to be, you know, effectuated much better than we have in

18   the United States.

19   Q.  In fact −− and so let's go back to my statement, actually.

20       Is it −− is it correct or incorrect that one of the −− one

21   of the issues plaguing the background check system efficiency

22   is a failure of law enforcement agencies to submit those

23   criminal records into the system?  Is that one of the

24   problems?

25   A.  You know, there are multiple problems, and one problem is

1  when the records don't get into the system.

2  Q.  And if we just talk about the facts of this case and not

3  others, we know that that particular problem is why Devin

4  Kelley was able to get the gun he used to kill everybody in

5  this case and to injure everybody in this case; right?

6  A.  If you're talking about the specific gun, certainly, that

7  made it a lot more likely that he would get that particular

8  gun.

9  Q.  A lot more likely to get that gun?

10 A.  Yes.

11 Q.  Okay.  Was your answer, "yes"?  I'm sorry.

12 A.  Yes.  A lot more likely that he would get that specific

13 gun.

14 Q.  Okay.  And then you make the point here that -- at the

15 bottom there, that without the proper reporting of these

16 criminal records by these law enforcement agencies, these

17 folks buying really deadly weapons just appear to be

18 law-abiding citizens until they kill somebody; right?

19 A.  Yes.

20 Q.  Okay.  I want to talk about another -- another piece --

21 actually, let's stick on this one, if we can, really quickly.

22 On the next page, 4, in this article, Mr. Donohue, do you

23 still agree -- the second paragraph "while the best."

24      Do you still agree with this opinion that you've put in

25 this 2018 article, that "the best way to stop shooters is to

1   prevent them from having a gun from the first place"?

2   A.  Yeah.  I mean, I think that it is much better if you can

3   stop them from having a gun the first place.

4   Q.  All right.  And let's take that down.

5       If we could put up for Mr. Donohue the piece he

6   contributed to in -- that's titled "How to Stop Shootings in

7   America."  And if we could show him the first page first.  I

8   want to make sure he looks at the first page or two.

9       You contributed to this piece in the Business Insider; is

10  that correct?

11  A.  (Inaudible.)

12  Q.  That's okay.

13  A.  Is my name somewhere on this?

14  Q.  Yeah.  Yeah.  Oh, here.  Actually, why don't we go to page

15  3.  I'll just show you some exemplars.  Just, if we could

16  highlight his name that appears quoted in here a few times.  I

17  think there are three or four times on this page.

18      Do you -- do you -- first of all, do you remember

19  participating in this piece?

20  A.  Yeah.  It looks like I was interviewed for this

21  publication.

22  Q.  And if we could go to page 6 of this piece.

23  A.  Yes.

24  Q.  And I actually believe this is an opinion you just

25  testified on direct examination, that I'm going to like to ask

1    you just little bit about.  And that is this.  They're asking

2    the question, "Do gun violence restraining orders or red

3    flags" -- sorry -- "red flag laws work?"  And you believe they

4    do.  You are a big advocate of red flag laws; correct?

5    A.   Yeah.  I think red flag laws would be helpful, certainly.

6    Q.   And you've -- you've done work with the Every Town for Gun

7    Safety, the Bloomberg group; correct?  You've worked with them

8    before?

9    A.   You know, I've probably spoken at some of their events.  I

10   haven't specifically worked with them.

11   Q.   And I didn't mean to -- like you're an employee or

12   anything.  What I meant is that you review their publications.

13   They're reliable publications regarding mass shootings;

14   correct?

15   A.   Yes.

16   Q.   Okay.  And if you look down on the paragraph here, this

17   article you appeared in, under "according to" -- can we

18   highlight that for Mr. Donohue so he can see it.

19       And do you agree with this analysis, that according to

20   analysis from Every Town for Gun Safety, "Of the 156 mass

21   shootings that occur between 2009 and 2016, 54 percent were

22   related to domestic or family violence.  This strong

23   connection suggests that domestic violence is a likely

24   predictor of violent behavior."

25       Do you agree with that?

 1            MS. KRIEGER:  Objection, Your Honor.  I think this is

 2   improper impeachment.  This is not Professor Donohue's

 3   statement.

 4            MR. ALSAFFAR:  I just asked if he agreed with it.

 5   It's a publication he appeared in.

 6            THE COURT:  That's overruled.

 7   BY MR. ALSAFFAR:

 8   Q.  Do you agree with that statement, Doctor -- Mr. Donohue?

 9   Sorry.

10   A.  Well, the Gun Control Act specifically does single out

11   those who are convicted of a misdemeanor -- you know, violent

12   misdemeanor involving domestic violence.  And so that is a

13   presumption of federal law.

14   Q.  But it's not only a presumption of federal law.  The

15   statistics of "54 percent of mass shootings were related to

16   domestic or family violence," that's true; right?

17   A.  You know, I don't know the exact percentage.  And there

18   are, you know, differences in definitions of mass shootings.

19   But there certainly is quite a bit of evidence that the

20   shooters have some sort of history of family violence or

21   commit such violence.

22       You know, for example, in the Newtown shooting, the first

23   person that was killed was the -- was the mother of the mass

24   shooter.  So there was --

25   Q.  Yeah.

1  A.  –– a domestic violence element there.  And we mentioned

2  the Santa Monica shooting with John Zawahri.  And he first

3  killed his father and his brother and then went off to kill

4  others.  So in that sense, I don't know exactly what the

5  percentage is, but it does seem that there is often this

6  connection to violence within the family that then spills over

7  into the public arena, in these mass shooting cases.

8  Q.  And those two mass shootings you just mentioned, they ––

9  they had –– both things were true at the same time?  They were

10 domestic-violence-related shootings, but also other innocent

11 nonfamily members were killed and injured seriously; correct?

12 A.  That's correct.

13 Q.  And that's a lot like this case; right?

14 A.  Well, those are differing in the sense that the person

15 seemed to have broke in and then started the killing.  Here,

16 there was earlier violence in the domestic realm, and there ––

17 there wasn't the, you know, sort of immediate family killing

18 before launching the wider attack.

19 Q.  And in this case, I think you said you listened to –– I

20 know you didn't review this prior to the trial, but you did

21 listen to the trial testimony of family members; right?

22 A.  Yes.

23 Q.  The morning of the shooting, Devin Kelley committed an act

24 of domestic violence against his wife; right?  He put a gun to

25 her head and tied her up, hogtied her?

1    A.   Yes.

2    Q.   And then said he'd be back; right?  You heard that?

3    A.   Yes.

4    Q.   And then he went to the church where his –– to the church,

5    his wife's family church; right?

6    A.   Yes, he did.

7    Q.   He went to his wife's family church where his

8    mother-in-law, his grandmother, his step –– his wife's

9    stepfather, and his wife's brother went to church regularly;

10   correct?

11   A.   That's my understanding, yes.

12   Q.   And he killed his wife's grandmother; correct?

13   A.   He did.

14   Q.   He killed his grandmother who he had several conflicts

15   with in that year of the shooting; correct?  You heard that

16   testimony?

17   A.   Yeah.  His wife's grandmother, yes.

18   Q.   Uh-huh.  And he targeted that church within months after,

19   specifically threatening to wipe out Danielle's entire family,

20   his mother-in-law, his grandmother, his brother, and his ––

21   Danielle's stepfather; correct?

22           MS. KRIEGER:  Objection.  Misstates prior testimony.

23           THE COURT:  That's overruled.

24   BY MR. ALSAFFAR:

25   Q.   You can answer.

1    A.  I think you're asking about the nature of the threats.

2    And, certainly, I was aware of many threatening comments, but

3    the full extent of the threatening comments, I'm less certain

4    about.

5    Q.  Well, I'm just asking about what you -- I know you didn't

6    review everything in this case.  I'm asking about the trial

7    testimony.  Were you -- I don't know.  Were you teaching, or

8    did you read the Michelle Shields trial testimony?

9    A.  No.  I did listen.

10   Q.  Okay.  So you saw both the documentary evidence from the

11   Ranger file, that Devin Kelley had sent a specific threat to

12   wipe out Michelle Shields' entire family, which is Danielle

13   Shields' family, in the few months before the shooting;

14   correct?

15   A.  Yes.

16   Q.  And then you read the testimony that Michelle Shields felt

17   she was target of the shooting; correct?

18   A.  Yes.

19   Q.  And, in fact, her family, Danielle's family, was targeted

20   in the shooting; correct?

21          MS. KRIEGER:  Objection.  Calls for speculation.

22          MR. ALSAFFAR:  I'm asking about facts, Your Honor.

23          THE COURT:  That's overruled.

24   BY MR. ALSAFFAR:

25   Q.  Danielle Kelley's family was targeted, and, in fact, one

1   of them was murdered in the shooting; correct?

2   A.  Yeah.  Certainly, the evidence suggests that he went to

3   that church because the family connection was there.

4   Q.  Okay.  And just like in the Sandy Hook church shooting and

5   the other one you mentioned, you had one or two families

6   either shot or injured or targeted.  And yet, other family

7   members, who are either strangers or not strangers but not

8   family, were also killed and shot; correct?  In this one?

9   A.  Yes.

10  Q.  Okay.  Thank you, Doctor.

11      All right.  Now, I want to talk now about these –– these

12  other –– these other factors that you said were other gun

13  avenues that you said were available in Texas, I believe; is

14  that right?

15  A.  Yes.

16  Q.  Okay.  And first, let me ask this question.  It's about

17  the FBI, the Department of Justice.  You know –– and I bet ––

18  you obviously probably know a lot more than I do.  But you

19  know that the FBI has actually looked in –– extensively, has

20  looked into the very thing you're talking about today, the

21  availability or reality of other markets and comparing what

22  actually happens in theory with these other markets versus

23  facts.  You know the FBI has studied that; right?

24  A.  Yes.  The FBI is attentive to these issues.

25  Q.  And, Mr. Donohue, I would imagine that in your field of

1  gun violence research, that you would look at what the FBI

2  does, pretty extensively, when it comes to their research on

3  gun violence and mass shootings specifically; is that -- or am

4  I making an assumption I shouldn't?

5  A.  You know, I try to look at everything that I think is

6  relevant to my work.

7  Q.  Okay.  And would the FBI criminal statistics data on mass

8  shootings and what tools and methods mass shooters use, would

9  that be relevant to your area of gun violence research?

10 A.  Yes.

11 Q.  Okay.  I want to show you the U.S. Department of Justice

12 FBI study of pre-attack behaviors of active shooters in the

13 United States between 2000 and 2013.

14     Can you see that on your screen?

15 A.  Yes.

16 Q.  And let's actually skip to their study summaries on page

17 7, if we could.  And if we could look at -- let's highlight

18 conclusion 3 with you -- for you.  I'm sorry.

19          TECHNOLOGY SPECIALIST:  3?

20          MR. ALSAFFAR:  Yes, please.

21 BY MR. ALSAFFAR:

22 Q.  The FBI concluded that, "A majority of active shooters

23 obtained their firearms legally, with only very small

24 percentages obtaining a firearm illegally"; correct?

25 A.  That's what they say, yes.

1    Q.  Any reason to disagree with the FBI and Department of

2    Justice on that?

3    A.  Well, there are some sort of caveats to that statement,

4    but --

5    Q.  Well, let me ask you this -- let me ask you this:  You

6    brought up on --

7        *(Audio echoing)*

8            MR. ALSAFFAR:  Okay.  I heard myself twice.  I want

9    to make sure -- I think we got an audio problem here.

10           THE COURT:  It's probably your laptop.  Check your

11   volume.

12           MR. ALSAFFAR:  Mine's on mute.  But I'm going to

13   close it.  Now I think it got resolved.

14       Is that -- is it okay on your end, Your Honor?

15           THE COURT:  Yeah.

16   BY MR. ALSAFFAR:

17   Q.  Okay.  Mr. Donohue, am I okay on your end?

18   A.  Yes, very good.

19   Q.  I hate the sound of my voice.  And to hear it twice must

20   be horrible.  So are you okay?

21   A.  Yeah.  Great.

22   Q.  Okay.  Thank you.

23       On direct examination you brought up a couple of other

24   examples where illegal purchases were made; right?

25   A.  Yes.

 1   Q.  And the FBI is not disagreeing with you.  They're just

 2   saying, "Well, only a very small percentage of mass shootings

 3   are a result of being an illegal firearm"; fair?

 4   A.  Yeah.  Although, here is where I think I disagree with

 5   this statement, at least as relevant to this case, because

 6   they're considering like the Adam Lanza mass shooting as being

 7   a legally-obtained firearm.  And, of course, you know, those

 8   types of things, the gun purchase was legal, but then somebody

 9   used the gun of somebody else to go off and do the killing.

10   Q.  Yeah.

11   A.  And that pattern is actually fairly common.  And that's --

12   you know, somebody grabs the dad's gun and then goes off and

13   commits the mass shooting.  So even though it's a

14   legally-obtained firearm, it has relevance to this case where,

15   you know, other avenues of acquisition might apply.

16   Q.  Okay.  Well, let's break that down a little bit.  And

17   Mr. Lanza, actually, he stole his mother's guns; right?

18   A.  Yeah.  But the gun itself was a legally-obtained firearm

19   and --

20   Q.  By his mother?  By his mother?

21   A.  But that's what they're referring to here --

22   Q.  Okay.

23   A.  -- in this.

24   Q.  Sure.  No.  It's okay.  You don't have to agree with the

25   FBI.  No.  It's okay.  That's why I asked.

1      Let me ask you about another conclusion they came to and

2  ask you if you agree or disagree with the FBI again on this

3  one.

4  A.  Sure.

5  Q.  Let's go to Conclusion No. 6.

6  A.  Yeah.

7  Q.  The FBI concluded that, "The most frequently occurring

8  concerning behaviors were related to the active shooter's

9  mental health, problematic interpersonal interactions, and

10 leakage of violent intent."  You see that?

11 A.  I do.

12 Q.  Do you agree with that statement, conclusion from the FBI?

13 A.  Yeah.  I think that there were certainly -- it's a lot to

14 that.  I'm just trying to canvass in my own mind my

15 examination of the array of mass shooters.  And as I said, you

16 know, many of them manifest these particular problems I think

17 well in advance of the actual mass shooting.

18 Q.  Like Devin Kelley did; right?

19 A.  Yes.

20 Q.  In fact, he evidenced every single one of these factors

21 that are the most concerning factors related to active shooter

22 threats; correct?

23      MS. KRIEGER:  Objection.  Plaintiffs have established

24 very well that Professor Donohue is unaware of Mr. Kelley's

25 personal behavior.

1              MR. ALSAFFAR:  I'll rephrase.  I'll rephrase.

2    BY MR. ALSAFFAR:

3    Q.  Just based on -- just based alone on the trial testimony

4    that you viewed this last week and a half, Devin Kelley

5    exhibited every single one of these factors identified by the

6    FBI as the most concerning behaviors that were related to

7    active shooters; correct?

8    A.  Well, certainly, the mental health problem, problematic

9    interpersonal interactions.

10       "Leakage of violent intent," I'm not exactly sure what

11   they're referring to.  But I would -- I would have said

12   something like manifestations of violent intent.

13   Q.  Right.

14       Well, let's use your phrase.  Devin Kelley had a whole

15   assortment of manifestation of violent intent that the

16   Air Force was aware of before they released him to the public;

17   correct?

18              MS. KRIEGER:  Objection.  He's already testified that

19   he has not reviewed the Air Force records.

20              MR. ALSAFFAR:  Just limiting it to what he's reviewed

21   in the trial, Your Honor.

22              THE COURT:  Go ahead.

23   BY MR. ALSAFFAR:

24   Q.  Based on what you reviewed in this trial, you know that

25   the Air Force had a whole array of manifestations of violent

1  intent exhibited by Devin Kelley before they released him to

2  the public.  Is that a fair statement?

3  A.  That's correct.

4  Q.  Okay.  And one of those hosts and array of manifestations

5  of violent intent that the Air Force knew about prior to

6  releasing him to the public was specific and numerous threats

7  of mass shooting violence, correct, based on your review of

8  the trial testimony?

9  A.  I'm just not sure what -- what your time frame is in

10  referring to this.

11  Q.  Fair.  Fair.  Let me reask the question.

12      Based on your review of the trial testimony, the

13  Air Force, while Devin Kelley was in the Air Force, was aware

14  of numerous instances of specific threats Devin Kelley made to

15  commit mass shooting violence?

16          MS. KRIEGER:  Objection.  Once again, this witness is

17  not testifying as to the question of foreseeability by the

18  Air Force.  So I don't know what the relevance is of this

19  question.

20          MR. ALSAFFAR:  Your Honor, this relates direct --

21  sorry.  This relates directly to that causation prong again.

22  He testified on risk of harm.

23          THE COURT:  That's overruled.

24  BY MR. ALSAFFAR:

25  Q.  Let me ask the question again, Mr. Donohue.

1   A.   Sure.

2   Q.   While Devin Kelley was in the Air Force, the Air Force had

3   numerous examples of the manifestation of Devin Kelley's

4   violent intent, specifically to threats by him to commit mass

5   shooting violence; is that fair?

6   A.   There were certainly testimony and evidence that people in

7   the Air Force were concerned about the possibility that he

8   would come and shoot us all up and things of that nature.

9   Q.   "Blow everybody's head off" is one of the statements he

10  made; correct?

11  A.   Yeah.  I don't remember that specific one, but I do

12  remember expressions of concern that he's the sort of person

13  that could, you know, come and try to shoot us all up.

14  Q.   Okay.  Remember a few minutes ago when we were talking

15  about the FDI — FBI data — specifically about background

16  check systems and how reporting that criminal data is really

17  important to help increase the efficiency of background check

18  systems.  Do you remember that discussion?

19  A.   Yes.

20  Q.   And in addition to not reporting Devin Kelley's, you know

21  that — prior to the shooting, that the Air Force — just the

22  Air Force had failed to submit over 7,300 instances of

23  qualified prohibited cases of folks who were supposed to be

24  reported to the background check system; true?

25  A.   Yeah.  I can't remember the precise number, but it was in

1    that neighborhood.  So yes.

2    Q.  And you know, based on your gun research and your

3    examination of the validity of these background check systems,

4    that when a government agency fails to submit thousands of

5    data on violent criminals, that that -- by that information

6    not being in the system, the background check NICS system,

7    that increases the risk of harm to the public because those

8    folks can get guns when they shouldn't be able to; is that

9    fair?

10             MS. KRIEGER:  Objection.  Calls for a legal

11   conclusion.

12             MR. ALSAFFAR:  Your Honor, they asked him three times

13   to specifically comment on increase risk of harm.

14             MS. KRIEGER:  And Mr. Alsaffar objected.

15             MR. ALSAFFAR:  And I got overruled, Your Honor, so I

16   have to cross on it.

17             THE COURT:  And this objection's overruled.

18      Go ahead.

19             THE WITNESS:  So the, you know, failure to submit,

20   you know, thousands of background check systems would, you

21   know, be likely to lead to more adverse outcomes, whether it's

22   violence or suicide -- so yes.  I mean, that's what the

23   background check system is for.

24   BY MR. ALSAFFAR:

25   Q.  Okay.  Let's turn to the alternate markets you talked

1   about as they specifically apply to Devin Kelley's case.

2       Is that okay?  Can we talk about that?

3   A.   Sure.

4   Q.   Okay.  Now, I think you stated this, but I want to make

5   sure this is clear as day for the record; that the facts of

6   this case -- this case, no one else's, no one else in Texas,

7   no one else in California, no one else in Connecticut, this

8   case.  All the guns that Devin Kelley had with him the day of

9   this massacre, and that were used to kill 26 people and injure

10  and maim 22 others at the Sutherland Springs Baptist Church,

11  were all legally purchased from FFLs; correct?

12  A.   That's correct.

13  Q.   And the only reason, the hundred percent reason he was

14  able to legally purchase them was because he passed an FBI

15  background check at the FFLs; correct?

16  A.   Yeah.  I mean -- for him to purchase them himself, he

17  needed to either pass the background check system or have an

18  FFL who ignored the background check system.

19  Q.   Okay.  And that's what happened; right?

20  A.   Yeah.  He did -- he did purchase them himself.

21  Q.   And the only reason he was able to pass the FBI -- the

22  hundred percent reason that he was able to pass the FBI

23  background check was because the Air Force did not report the

24  mandatory criminal data they were required to report to the

25  FBI; true?

1   A.   Yes.   That's correct.

2   Q.   Okay.   Now, let's turn to your alternate theories.   First,

3   we only get to your theories, is it fair, Mr. Donohue -- and

4   I'm not being disrespectful here.   But we only get to your

5   theories if we assume away the facts that happened in this

6   case; correct?

7   A.   Well, that's the nature of tort litigation.   You have to

8   consider the counterfactual.

9   Q.   And the definition, the William -- the Webster's

10  Dictionary definition of "counterfactual" is contrary to the

11  facts; fair?

12  A.   Yeah.   And every private tort litigation requires you to

13  consider what would have happened had the person complied with

14  the legal obligation.

15  Q.   So my definition of "counterfactual" is correct; right?

16  A.   Yeah.   And my statement, that every tort litigation

17  involves it, is also correct.

18  Q.   "Every tort litigation," that's your opinion, is contrary

19  to the facts?

20  A.   No.   I said every tort litigation in which causation is a

21  relevant factor requires you to answer the question, "What

22  would have happened had the person complied with the legal

23  obligation?"

24  Q.   And let me talk about, though -- that's not the only fact

25  we have to assume away to reach your conclusion.   We also have

1  to assume away that the Air Force negligently failed to report

2  his criminal conviction; correct?

3  A.  Yeah.  So the counterfactual is, what would have happened

4  had the Air Force complied with the requirement to turn over

5  the evidence to the NICS background check system.

6  Q.  Right.

7      There's a third set of facts that we have to assume away

8  to reach your conclusion as well.  And let me ask you, the

9  third set of the facts we have to assume away is that Devin

10  Kelley would have both preferred and followed through on any

11  one of these alternative reality methods that you've opined

12  about today; true?

13  A.  Yeah.  I mean, I think what I'm trying to say is if the

14  Air Force had complied with their obligation, Devin Kelley

15  would have been able to directly purchase from an FFL, and

16  what seems most likely would have been the outcome, based on

17  research and sort of understanding of his particular case.

18  Q.  Right.

19      So my question is correct.  You –– looking at Devin –– you

20  have to look at Devin Kelley specifically and assume that he

21  would have both preferred and followed through on all these

22  alternative methods that you've talked about today; correct?

23  A.  Yeah.  Make some judgment about what is more likely than

24  not.

25  Q.  Okay.  Well, let's talk about just those real quickly

 1  individually.

 2  A.  Yeah.

 3  Q.  The first one I think you mentioned was --

 4          MR. STERN:  Could we take five?

 5          MR. ALSAFFAR:  No.  I'm almost done.  If I can

 6  finish, and we'll be done.  Okay.

 7      Mr. Donohue, I'm sorry.  We're close to being done.  Are

 8  you okay?  Do you need a break?  Are you okay?

 9          THE WITNESS:  I'm having a good time.

10  BY MR. ALSAFFAR:

11  Q.  Okay.  All right.  So let's talk about the first one,

12  "stealing guns."  You remember -- and I asked you earlier

13  about the 70,000-page Texas Rangers investigation that was

14  done on Devin Kelley specifically.  You remember that?

15  A.  Uh-huh.

16  Q.  And I'm sorry.  I didn't hear your answer.

17  A.  Yes.  I remember that.

18  Q.  And you -- I'm assuming you reviewed and looked at the

19  testimony of Terry Snyder, the Texas Ranger that conducted

20  that investigation; correct?

21  A.  (Inaudible).

22  Q.  Correct?

23  A.  Yes, I did.

24  Q.  Sorry.  It just -- let me say something.  I do not mean to

25  be rude when I say that.  I'm just not sure -- if I'm not sure

1    about your answer for the court reporter, Chris here, I listen

2    to him, and I need to make sure he gets that record.  So I'll

3    just follow up every once in a while.  Is that okay?

4    A.  Oh, sure.

5    Q.  Okay.  So let's talk.  I want to show you Travis

6    Snyder's –– I'm sorry.  Terry Snyder's –– I was going to say

7    deposition.  His trial testimony.  He was ––

8         Do you see it on your screen?

9    A.  Yes.

10   Q.  So you now know, as of today, that there were no stolen

11   weapons found anywhere on Devin Kelley or his property;

12   correct?

13            MS. KRIEGER:  Objection.  Goes beyond the scope of

14   direct.  Professor Donohue didn't testify about stolen

15   weapons.

16            THE COURT:  Yeah.  I didn't hear any testimony about

17   stolen weapons.

18            MR. ALSAFFAR:  Oh, Your Honor, if I may, the reason I

19   brought this up is he spoke about the Sandy Hook and the

20   California gun –– ghost gun case.  Those are both where

21   someone took –– stole the guns of somebody else.

22            THE COURT:  Let's go quickly through that.

23            MR. ALSAFFAR:  That's the last question.

24   BY MR. ALSAFFAR:

25   Q.  Mr. Donohue, you now know –– you now know that there were

1  no stolen weapons found anywhere on his person or anywhere on

2  his property; correct?

3  A.  That's correct.

4  Q.  All right.  Let's talk about straw purchases.  You

5  remember discussing straw purchases; right?

6  A.  Yes, I do.

7  Q.  And I want to show you the testimony of Terry Snyder at

8  trial.  This is page 395, line 22 through 396, line 3.

9     Can you see that?

10 A.  Yes.

11 Q.  So Ranger Snyder testified there was no evidence

12 whatsoever that Mr. Kelley ever straw purchased a firearm;

13 correct?

14 A.  That's correct.

15 Q.  All right.  And you also –– unless you need me to, but ––

16 and I'll be happy to.  But you also read the testimony or saw

17 the testimony of Rebecca Kelley, his mother, Michael Kelley,

18 his father, and Danielle Smith, his wife, all of whom said

19 that neither did they conduct a straw purchase or were even

20 asked to buy a gun on behalf of Devin Kelley; is that correct?

21 A.  That's correct.

22 Q.  All right.  So those are the facts of this case on straw

23 purchasing; correct?

24 A.  That's what happened in this case, yes.

25 Q.  All right.  Let's look at gun shows.  You talked a lot

1    about gun shows.  And there are a lot of —— I'll agree with

2    you, Mr. Donohue.  There are a lot of guns in Texas and a lot

3    of gun shows in Texas; right?

4    A.  That's correct.

5    Q.  Okay.  And Devin Kelley went to a few gun shows.  You

6    learned that; didn't you?

7    A.  Yes.

8    Q.  Okay.  I want to show you —— do you remember Danielle, his

9    wife's testimony, that she went to gun shows with him, and

10   that he never —— despite going to them, he never purchased any

11   guns at gun shows; correct?

12   A.  When she was there.

13   Q.  All right.  Well, there's no evidence in this case ——

14   unless you can point me to it.  I'd love to hear it —— is

15   there is no evidence in this case that any of his guns were

16   purchased at gun shows; correct?

17   A.  I think that's right.  There are some guns where —— not

18   totally sure where they came from, but no specific evidence

19   that they came from gun shows.

20   Q.  Right.

21       Those guns you're talking about, they'd gotten rid of

22   years before this shooting; correct?

23   A.  Some time before the shooting, yes.

24   Q.  Years before.  Not "some time."  Years before the

25   shooting; correct?

1    A.   "Some time" includes years.

2    Q.   Okay.  And, of course, every single gun that was found on

3    his property, every single gun that was found at the scene,

4    every single gun that was used in the massacre, none from gun

5    shows; correct?

6    A.   That's correct.

7    Q.   Those are the facts of this case; aren't they?

8    A.   Correct.

9    Q.   You also spoke about ghost guns.  And I'll show you page

10   398 from the trial transcript.  Page 24 to 399.  This is ––

11   the lead Texas Ranger investigator also looked into this

12   alternative reality; didn't he?  The gun ghost theory;

13   correct?

14   A.   Yes.

15   Q.   And you know, don't you, that the Texas Rangers, the FBI,

16   the ATF, they turned over every stone in Devin Kelley's life,

17   including every piece, every inch of his property?

18        You know that now; don't you?

19   A.   They certainly examined extensively.

20   Q.   Yeah.  And after doing, as you put it, an extensive

21   examination of his life, the Texas Ranger testified that there

22   was no evidence whatsoever that Mr. Kelley constructed or was

23   even in the process of constructing a gun, a ghost gun;

24   correct?

25   A.   Yeah.  That's what they testified.

1   Q.   Okay.  And Terry Snyder, the head investigator of the

2   Texas Rangers investigation, also said there's no evidence

3   that Devin Kelley even had the capability of constructing a

4   firearm; correct?  They looked into that, and there's no

5   evidence that he even had the capability of constructing one;

6   correct?

7   A.   That's what it says here.  Although, I would –– I would be

8   in some disagreement that statement.

9   Q.   All right.  Do you have any evidence, specifically –– and

10  it's okay if you disagree with the lead investigator.  It's

11  fine.  So do you have any evidence specifically, that you can

12  show the Court, that Mr. Kelley –– not some other person ––

13  Mr. Kelley had the capability specifically to construct a

14  firearm?

15  A.   Well, my own sense of the gun kits that are readily

16  available are that almost anyone is capable of constructing a

17  firearm out of them.  And then we do have the evidence about

18  the modifications that Kelley was doing on his gun.  So I

19  would say he certainly had the capability to, you know, put

20  together a ghost gun.  Now, he might not have the capability

21  to manufacture a 3D gun or make a gun from scratch.  So I'm

22  just not clear what the investigator was alluding to when he

23  made this statement.

24  Q.   And if I –– to be fair, if I understand your conclusion,

25  really kind of what you're saying is, "Well, anyone can do it,

1  so Devin Kelley could have done it"?

2  A.  Yeah.  And also, people who are obsessed with guns and

3  tinker with their guns and add accouterments that make them

4  more lethal, you know, are showing an interest and a capacity

5  to work with firearms that not everyone else would have.

6  Q.  And every single one of those trinkets that Mr. Kelley put

7  on his gun that you referenced, all of those are off the

8  shelf.  You can buy them and just hook them onto your gun.

9  You don't need a drill.  You don't need a press.  You don't

10  need a lathe.  You don't need anything like that.  You can

11  just snap them on.  Yeah?  Is that correct?

12  A.  Right.  But you don't need a lathe to put together a ghost

13  gun either.

14  Q.  That's not my question.  Everything that he put on that

15  gun is something you could buy off the shelf at Walmart and

16  stick on your gun; correct?

17  A.  I don't know if Walmart sells them, but you can buy them

18  and add them to your weapon.

19  Q.  All right.  And more to the point, Devin Kelley didn't

20  have any ghost gun kits or ghost guns anywhere; right?

21  A.  That's right.

22          MR. ALSAFFAR:  Pass the witness, Your Honor.

23          THE COURT:  Anything further?

24          MS. KRIEGER:  I do have a little bit further, but

25  could we just take a five-minute break?

1          THE COURT:  Yes.

2      *(Recess)*

3      *(Open court)*

4          THE COURT:  Thank you.  Please be seated.

5          MS. KRIEGER:  May I proceed?

6          THE COURT:  Yes.

7                      REDIRECT EXAMINATION

8  BY MS. KRIEGER:

9  Q.  Oh, I was going to ask you to unmute, but I see that you

10 have done so.

11     Professor, plaintiffs put up a document from the FBI.

12 There was a statement along the lines of that the majority of

13 active shooters obtained firearms legally.  And you said there

14 were some caveats to that statement.  What are those caveats?

15 A.  Yes.  So in that particular active shooter, the

16 investigators looked at the source of the weapon that was used

17 in the mass shooting.  And so if the weapon itself was legally

18 acquired, they considered that to be a, quote, "legally

19 acquired weapon."  But many of those mass shootings

20 represented circumvention of, you know, criminal background

21 check scenarios.

22     So, for example, you know, if you think about the Santa Fe

23 shooting in Texas in 2018, that 17-year-old shooter took a

24 legally-acquired weapon of his father and then committed the

25 mass shooting.  And that was the case with Adam Lanza as well,

1    where he took a legally-acquired weapon of his mother to

2    commit the mass shooting.

3         So you just want to be focused about how you're

4    aggregating the data.  And in that case, I was just making

5    that caveat.

6    Q.  Are private sales legal?

7    A.  Yeah.  Private sales are legal.

8    Q.  Are ghost guns legal?

9    A.  Yeah.  Ghost guns are legal.

10   Q.  Do you need a lathe or a press to put together a ghost

11   gun?

12   A.  No.  You would not need a lathe or a press to put together

13   a ghost gun.

14   Q.  Plaintiffs asked you some questions about Devin Kelley's

15   history in the Air Force.  In your opinion, someone with that

16   history, such as the threats, his mental health history, would

17   that history make somebody more or less likely to be deterred

18   by a denial at a gun shop –– to be deterred from obtaining a

19   weapon in the future, in your opinion?

20   A.  Yeah.  In my opinion, those aspects of Devin Kelley's, you

21   know, specific traits made it more likely that he was sort of

22   dedicated to pursue his –– designs, and, therefore, would be

23   less deterrable than someone with less of the mental health

24   and other violent tendencies.

25   Q.  And plaintiffs' counsel also discussed increased risk of

 1  harm.  And I think they were talking about the increased risk

 2  of harm for the Air Force failing to submit some 7,000 records

 3  to the FBI.  Do you recall that conversation?

 4  A.  Yes.

 5  Q.  Now, that's an increased risk on a population level; is

 6  that correct?

 7  A.  That's correct.

 8  Q.  Can you say if the failure to submit any one person's

 9  information would increase the risk of harm to the public?

10  A.  You know, you -- what we've already seen is that the

11  likelihood that any given individual will be deterred is, you

12  know, quite a bit less than even 25 percent.

13          MS. KRIEGER:  No further questions.

14          THE COURT:  Anything else?

15          MR. ALSAFFAR:  No, Your Honor.

16          THE COURT:  Any further need for this witness?

17          MS. KRIEGER:  No, Your Honor.

18          THE COURT:  Mr. Alsaffar?

19          MR. ALSAFFAR:  No, Your Honor.

20          THE COURT:  Thank you, Professor.  You're excused.

21          THE WITNESS:  Thank you.

22          THE COURT:  So I believe this concludes the witnesses

23  we had scheduled for today.  Do we still have Ms. Higgins

24  and -- sorry, I'm going to pronounce -- mispronounce the

25  doctor's name -- Dr. Bursztajn?

1    MR. STERN:  I think --

2    MR. ALSAFFAR:  I think that's right.

3    MS. KRIEGER:  I believe -- is it Bursztajn?

4    MR. STERN:  We're still trying to figure that out.

5    MR. ALSAFFAR:  I wrote this down a year ago.  And I

6  put S-T-A-I-N to that last part.  And I think that's -- you

7  told me that was right.  So I think the judge -- I'm going to

8  say the judge got it right.  That's my opinion.

9    THE COURT:  So it's those two for tomorrow?  Okay.

10    MS. KRIEGER:  Just those two.

11    THE COURT:  So we'll be in adjournment till tomorrow.

12  Just while I'm thinking -- while Professor Donohue's

13  testimony is on my mind, as you-all are doing me that favor of

14  compiling the technology list, I'm just kind of curious.  Did

15  either side provide cameras or better microphones to the

16  witnesses who were Zoom, or did you just let them rely upon

17  their own equipment?

18    MR. JACOB:  Judge, I think -- I think we might have

19  provided a light to one of the witnesses.  But Sean can tell

20  you in more detail.

21    TECHNOLOGY SPECIALIST:  And then all we did is we

22  thoroughly checked it two or three times before the daily

23  testimony.

24    THE COURT:  So you relied on their own equipment?

25    MR. ALSAFFAR:  We did because we didn't need to.  But

1    I would -- in our paper, I think we're going to put the --

2    recommendation.

3              THE COURT:  Suggest otherwise?  Yeah.

4              MR. ALSAFFAR:  Yeah.  We just happened to be in a

5    good situation where ours had everything checked out.  But we

6    have not always been in that situation with other witnesses.

7    So we always -- these are alternate cameras we brought as

8    well.  So I would recommend it.

9              MS. KRIEGER:  We did have one -- Mr. Breyer, who was

10   withdrawn, did not have the adequate technology.  And we had

11   actually arranged for him to go to the local U.S. Attorney's

12   office to testify.

13             THE COURT:  Yeah.  Thank you.

14       So I couldn't tell what -- if the issue was at

15   Mr. Donohue's end.  I think it was.  And so I'm assuming he

16   just relied upon his -- the hardware in his laptop, which is

17   why we were having the problem.  If you had previously tested

18   him, the broadband would have been strong enough.  And so it

19   didn't seem to be that kind of an issue.

20             MR. ALSAFFAR:  Ours had microphones attached to their

21   computers, and that helps.  That helps a lot.

22             THE COURT:  But, nevertheless, I believe the court

23   reporter captured his testimony adequately, and I understood

24   him well enough.

25       Tomorrow morning at 9:00.

1   MR. ALSAFFAR:  Thank you, Your Honor.

2   MS. KRIEGER:  Thank you.

3  * * *

4      *(Overnight recess)*

1                              −oOo−

2        I certify that the foregoing is a correct transcript from

3   the record of proceedings in the above−entitled matter.

4

5   Date:  4/14/2021        /s/ Chris Poage
                            United States Court Reporter
6                           655 East Cesar E. Chavez Blvd., Rm. G−65
                            San Antonio, TX  78206
7                           Telephone:  (210) 244−5036

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25